

1  COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2  SPENCER A. BURKHOLZ (147029)
   THOMAS E. EGLER (189871)
3  DANIEL S. DROSMAN (200643)
   SCOTT H. SAHAM (188355)
4  LAUREN G. KERKHOFF (236902)
   JENNIFER Y. LAI (228117)
5  CHRISTINA A. ROYCE (254551)
   655 WEST BROADWAY, SUITE 1900
6  SAN DIEGO, CA  92101
   TELEPHONE:  619/231-1058
7  619/231-7423 (FAX)

8  BARROWAY TOPAZ KESSLER
   MELTZER & CHECK, LLP
9  ANDREW L. ZIVITZ (*pro hac vice* pending)
   SHARAN NIMUL (*pro hac vice* pending)
10 LAUREN WAGNER PEDERSON (*pro hac vice* pending)
   JENNIFER L. JOOST (*pro hac vice* pending)
11 280 King of Prussia Road
   Radnor, PA  19087
12 Telephone:  610/667-7706
   610/667-7056 (fax)

13

14 Attorneys for Plaintiffs

15              UNITED STATES DISTRICT COURT

16            CENTRAL DISTRICT OF CALIFORNIA

17
   MAINE STATE RETIREMENT              )  CV-10  0302
18 SYSTEM, Individually and On Behalf  )
   of All Others Similarly Situated,   )  COMPLAINT FOR VIOLATION OF
19                                      )  §§11, 12 AND 15 OF THE
                      Plaintiffs,       )  SECURITIES ACT OF 1933
20                                      )
             vs.                        )
21                                      )  DEMAND FOR JURY TRIAL
   COUNTRYWIDE FINANCIAL               )
22 CORPORATION, a Delaware              )
   corporation; COUNTRYWIDE HOME       )
23 LOANS, INC.; CWALT, INC., a          )
   Delaware corporation; CWMBS, INC., a )
24 Delaware corporation; CWABS, INC., a )
   Delaware corporation; CWHEQ, INC., a )
25 Delaware corporation;                )
   COUNTRYWIDE CAPITAL                 )
26 MARKETS; COUNTRYWIDE                )
   SECURITIES CORPORATION;             )
27 J.P. MORGAN SECURITIES INC.;         )
   DEUTSCHE BANK SECURITIES            )
28 INC.; BEAR, STEARNS & CO. INC.;     )

478757_1

1  BANC OF AMERICA SECURITIES     )
   LLC; UBS SECURITIES, LLC;      )
2  MORGAN STANLEY & CO.           )
   INCORPORATED; EDWARD D.        )
3  JONES & CO., L.P.; CITIGROUP   )
   GLOBAL MARKETS INC.;           )
4  GOLDMAN, SACHS & CO.;          )
   CREDIT SUISSE SECURITIES (USA) )
5  LLC; GREENWICH CAPITAL         )
   MARKETS, INC. A.K.A. RBS       )
6  GREENWICH CAPITAL;             )
   BARCLAYS CAPITAL INC.;         )
7  HSBC SECURITIES (USA);         )
   BNP PARIBAS SECURITIES CORP.;  )
8  MERRILL LYNCH, PIERCE,         )
   FENNER & SMITH,                )
9  INCORPORATED; STANFORD L.      )
   KURLAND; DAVID A. SPECTOR;     )
10 ERIC P. SIERACKI; N. JOSHUA    )
   ADLER; RANJIT KRIPALANI;       )
11 JENNIFER S. SANDEFUR; DAVID A. )
   SAMBOL,                        )
12                                )
                                  )
13                                )
                   Defendants.    )
14 _____)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

478757_1

## SUMMARY OF THE ACTION

This Complaint is brought pursuant to the Securities Act of 1933 (the "Securities Act") by plaintiff Maine Public Employees State Retirement System, individually, and as a class action on behalf of all persons or entities ("plaintiffs" or the "Class") who purchased or otherwise acquired (1) Alternative Loan Trust Certificates issued by, *inter alia*, Defendant CWALT, Inc. ("CWALT"); (2) CWABS Asset-Backed Trust Certificates issued by, *inter alia*, Defendant CWABS, Inc. ("CWABS"); (3) CHL Mortgage Pass-Through Trust Certificates issued by, *inter alia*, Defendant CWMBS, Inc. ("CWMBS"); and (4) CWHEQ Revolving Home Equity Loan Trusts and Home Equity Loan Trusts issued by, *inter alia*, Defendant CWHEQ, Inc. ("CWHEQ") (collectively referred to as the "Certificates").

1.      Defendants CWALT, CWABS, CWMBS and CWHEQ, among other defendants identified herein, issued the Certificates pursuant or traceable to 20 registration statements (the "Registration Statements") filed with the Securities and Exchange Commission ("SEC"), as set forth herein.  The Certificates were then sold to plaintiffs by the Underwriter Defendants, as defined herein, pursuant to certain prospectuses (the "Prospectus Supplements"), which also were filed with the SEC and incorporated by reference into the Registration Statements.

2.      As set forth below, the Registration Statements and Prospectus Supplements contained materially false and misleading statements and omitted material information in violation of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o.  As this Complaint is rooted exclusively in theories of innocent and/or negligent conduct to which the strict liability provisions of the foregoing statutes apply, it does not allege or intend to allege any claims or assertions of fraud.

3.      The claims in this case stem from the activities of Defendant Countrywide Financial Corporation ("CFC"), and its wholly owned subsidiary, Defendant Countrywide Home Loans, Inc. ("CHL") (collectively "Countrywide").

Countrywide is the nation's largest residential mortgage lender.  In 2005 and 2006 alone, Countrywide originated in excess of $850 billion in home loans throughout the United States.

4.       Many of the loans Countrywide originated in 2005, 2006 and 2007 were pooled together by Countrywide and deposited into qualifying special-purpose entities, referred to herein as the "Issuing Trusts," which were created by Defendants CWALT, CWABS, CWMBS and CWHEQ, wholly-owned subsidiaries of Countrywide.  These pools of mortgages were then securitized into mortgage-backed securities ("MBS") and sold by the Issuing Trusts (defined herein) and the Underwriter Defendants (defined herein) to plaintiffs in the form of the Certificates.  The Certificates entitled plaintiffs to receive monthly distributions of interest and principal on cash flows from the mortgages held by the Issuing Trusts.  As borrowers paid their mortgages, distributions were made to plaintiffs in accordance with the terms of the Certificates.

5.       The investment quality of the Certificates was necessarily linked to the quality of the mortgages pooled into each Issuing Trust.  Countrywide, as originator of the mortgages held by the Issuing Trusts, repeatedly touted the strength of its underwriting standards to assure plaintiffs that (i) the mortgages held by the Issuing Trusts were issued to borrowers who satisfied certain thresholds of credit-worthiness, including having the necessary income to repay the loans; and (ii) the real estate that collateralized the loans was subjected to objective and independent real estate appraisals that met the standards of the Uniform Standards of Professional Appraisal ("USPAP").

6.       In this regard, the Registration Statements and Prospectus Supplements included numerous representations about (i) the quality of the mortgage pools underlying the Issuing Trusts, such as the underwriting standards employed to originate the mortgages, the value of the collateral securing the mortgages, and the soundness of the appraisals used to arrive at this value; (ii) the mortgages' loan-to-

value ("LTV") ratios; and (iii) other criteria that was used to qualify borrowers for the mortgages. These representations and others were essential to plaintiffs' determination of the riskiness of the mortgage pool and the quality of their investment in the Certificates.

7. The Certificates issued by each Issuing Trust were divided into several classes (or "tranches") which had different priorities of seniority, priorities of payment, exposure to default, and interest payment provisions. Rating agencies, like Moody's Investors Service, Inc. ("Moody's"), Fitch, Inc. ("Fitch") and/or Standard & Poor's Corporation ("S&P"),[1] rated the investment quality of the Certificates based on information provided by the defendants about the quality of the mortgages in each mortgage pool, and the seniority of the Certificate among the various Certificates issued by each Issuing Trust. These ratings, in part, determined the price at which these Certificates were offered to the Class. As borrowers repaid their mortgage loans, these Certificates entitled plaintiffs to receive a pre-determined amount of the monthly interest and principal payments received by the Trust. If borrowers failed to pay back their mortgages, these losses would flow to plaintiffs based on the seniority of their Certificates.

8. Based on the representations concerning the purported quality of the underlying mortgages pooled in the Issuing Trusts set forth in the Registration Statements and Prospectus Supplements, the Rating Agencies assigned investment grade ratings on all tranches of the Certificates.

9. The highest investment rating used by the Rating Agencies is AAA, which signifies the highest investment grade and suggests that there is a very low risk of investment loss or credit risk associated with the security. Ratings of "AA," "A"

---

[1] Moody's, Fitch and S&P (collectively the "Rating Agencies") are approved by the SEC as "Nationally Recognized Statistical Rating Organizations" and provide credit ratings which are used to distinguish among grades of creditworthiness of various securities under the federal securities laws.

478757_1

1    and "BBB" represent very high credit quality, high credit quality, and good credit

2    quality, respectively.  There are various intermediate ratings between BBB and AAA.

3    Anything rated lower than BBB is considered speculative or "junk," *i.e.*, not

4    investment grade.

5          10.    As alleged more fully below, the Registration Statements and Prospectus

6    Supplements misstated and omitted material information regarding, *inter alia*, the

7    process used to originate and the quality of the mortgages that were pooled in the

8    Issuing Trusts and were used as the financial basis for the Certificates.  For example,

9    Countrywide did not follow the underwriting and appraisal standards described in

10   these Registration Statements and the Prospectus Supplements.  Indeed, Countrywide

11   issued mortgages to borrowers that did not satisfy the requisite eligibility criteria as

12   described in the Registration Statements and Prospectus Supplements.  Likewise, the

13   mortgages held by the Issuing Trusts and underlying the Certificates were based on

14   collateral appraisals that overstated the value of the underlying properties, thus

15   exposing the Issuing Trusts and plaintiffs to losses in the event of foreclosure.

16         11.    As a result of the material misrepresentations and omissions in the

17   Prospectuses, investors purchased securities that were far riskier than represented and

18   the values of the securities have collapsed as the truth about the quality of the

19   mortgages underlying the Issuing Trusts has emerged.

20         12.    For example, by mid-2007 the mortgages held by the Issuing Trusts and

21   underlying the Certificates began suffering accelerating delinquencies and defaults.

22   The defaults led to real estate foreclosures, which revealed that the properties

23   underlying the mortgages were worth materially less than the loans issued to the

24   borrowers, and the borrowers did not have sufficient financial wherewithal to cover

25   the outstanding mortgage balances.

26         13.    As a consequence of the foregoing, the Rating Agencies placed negative-

27   watch labels on many of the Certificates, and downgraded many of them, some to

28   below investment grade level.

14.    As a result of, *inter alia*, the mortgage defaults and Rating Agency downgrades that resulted from Countrywide's failure to comply with stated underwriting and appraisal guidelines, Countrywide faced massive losses beginning in mid-2007.  As these losses mounted from increasing delinquencies and foreclosures in the loans it originated and underwrote, Countrywide spiraled toward bankruptcy and was acquired by Bank of America for $4.1 billion in January 2008.

15.    Countrywide's lending practices, including the subjects of the misrepresentations and omissions in the Registration Statements and Prospectus Supplements, are currently the target of multiple state and federal investigations and proceedings.  Various state attorneys general, including those from California, Illinois, Connecticut, Florida, and Indiana, have brought lawsuits and/or initiated investigations against Countrywide based on its lending, underwriting and appraisal practices for mortgage loans.  The complaint filed by the Attorney General of the State of California is attached hereto as Exhibit A.  The Florida Attorney General is investigating Countrywide for "unfair and deceptive trade practices," including the Company's sales and marketing tactics and its subprime loan underwriting, including whether Countrywide put borrowers "into mortgages that in the first place they couldn't afford or loans with rates that were not what they were advertising or that were misleading."

16.    According to the March 2008 policy statement of the President's Working Group on Financial Markets (the "President's Working Group"), the underlying causes of the mortgage crisis include, *inter alia*: (i) "a breakdown in underwriting standards for subprime mortgages"; and (ii) "a significant erosion of market discipline by those involved in the securitization processes, including originators [and] underwriters . . . related in part to failures to provide or obtain adequate risk disclosures."

478757_1

17.     The Certificates continue to diminish in value as a result of increasing delinquencies and foreclosures related to the mortgages underlying the Certificates, and plaintiffs and other Class members have suffered significant losses and damages.

18.     On July 1, 2008, Defendant CFC completed a merger with a wholly-owned subsidiary of Bank of America Corporation ("Bank of America") pursuant to the terms of an Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank of America and CFC and other entities created to effectuate the merger.   The entity surviving the merger was renamed Countrywide Financial Corporation. On July 3, 2008, Defendant CHL completed the sale of some or substantially all of its assets to NB Holdings Corporation, also a wholly-owned subsidiary of Bank of America.

## JURISDICTION AND VENUE

19.     The claims alleged herein arise under §§11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by §22 of the Securities Act and venue is proper pursuant to §22 of the Securities Act.

20.     The violations of law complained of herein occurred in this District, including the preparation and dissemination of materially false and misleading statements in the Registration Statements and the Prospectus Supplements. Furthermore, CFC and CHL, and many of their affiliated entities, maintain their principal executive offices in this District, and each of the Underwriter Defendants, defined herein, conduct business and/or are headquartered in this District.

## PARTIES

21.     Plaintiff Maine Public Employees Retirement System, formerly known as Maine State Retirement System ("MSRS"), established in 1942, operates pursuant to the authority granted to it by the Maine State Legislature, and administers retirement programs that cover Maine public employees, Maine's public school teachers, judges, legislators, as well as employees of approximately 267 municipalities and other public entities in Maine.  MSRS services 93,221  members, including active

6

478757_1

employees and retirees. MSRS manages net assets of over $8.3 billion. MSRS and/or members of the Class acquired Certificates pursuant and/or traceable to the following Registration Statements and Prospectus Supplements, including those Prospectus Supplements issued in connection with the offerings for the securities referenced in the Certification of MSRS's purchases, which is attached hereto. Each of these Registration Statements and Prospectus Supplements, as described herein, contained substantially similar or identical representations as every Registration Statement and Prospectus Supplement used to issue the MBS acquired by Plaintiff MSRS and/or the members of the Class, and this language was rendered false and misleading as a consequence of the same course of conduct by defendants. MSRS purchased Certificates in the following Registration Statements:

> 333-131630 (CWALT)
> 333-125164 (CWABS)
> 333-131591 (CWABS)

22. Defendant CFC is a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California. CFC is a holding company which, through its subsidiaries, is engaged in mortgage lending and other real estate finance related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting. The Company operates through five business segments: Mortgage Banking, which originates, purchases, sells and services non-commercial mortgage loans nationwide; Banking, which takes deposits and invests in mortgage loans and home equity lines of credit; Capital Markets, which operates an institutional broker-dealer that primarily specializes in trading and underwriting MBS; Insurance, which offers property, casualty, life and disability insurance as an underwriter and as an insurance agency; and Global Operations, which licenses and supports technology to mortgage lenders in the United Kingdom.

23.     Defendant CFC structured Defendants CWALT, CWMBS, CWABS, and CWHEQ as limited purpose, wholly-owned, finance subsidiaries to facilitate its issuance and sale of the Certificates.  CWALT, CWMBS, CWABS and CWHEQ have no assets of their own and are controlled directly by CFC, through its appointment of CFC executives as directors and officers of these entities.  Revenues flowing from issuance and the sale of Certificates issued by CWALT, CWMBS, CWABS and CWHEQ and the Issuing Trusts (as defined herein) were passed through to CFC and consolidated into CFC's financial statements.  Defendant CFC, therefore, exercised actual day to day control over Defendants CWALT, CWMBS, CWABS and CWHEQ.

24.     According to Defendant CFC's Form 10-K for the year ended December 31, 2007, filed with the SEC on February 29, 2008 ("2007 Form 10-K"), Defendant CFC also "operate[s] an institutional broker-dealer that primarily specializes in trading and underwriting MBS" known as CSC.  The financial results of CSC are set forth in the Capital Markets Segment of Defendant CFC's financial statements.  Defendant CFC further stated in its 2007 Form 10-K that it was "ranked fourth among Non-Agency MBS Underwriters" for 2007, but that its underwriting activities had tapered off towards the latter half of 2007 due to issues in the market.

25.     Defendant CHL is a direct wholly-owned subsidiary of CFC.  CHL is engaged in the mortgage banking business, and originates, purchases, sells and services mortgage loans.  CHL's principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC.  CHL served as the "Sponsor" or "Seller" of the Certificates, meaning that it provided the pools of mortgage loans to the Issuing Trusts upon which the Certificates were based.

26.     Defendant Countrywide Capital Markets ("CCM") is a direct wholly-owned subsidiary of CFC.  CCM's principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC.  CCM operates through its two main wholly-owned subsidiaries, Defendant Countrywide Securities Corporation ("CSC") and Countrywide Servicing Exchange. According to Defendant CFC's Form

478757_1

10-K, "Capital Markets participates in both competitive bid and negotiated underwritings and performs underwriting services for CHL, Countrywide Bank and third parties." The financial results of CCM are set forth in the Capital Markets Segment of Defendant CFC's financial statements.

27.   Defendant CWALT is a Delaware corporation and a limited purpose financing subsidiary of CFC.  CWALT's principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC.  CWALT served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in ¶47 below, and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| Registration Number | Date Filed | Amount Registered |
| --- | --- | --- |
| 333-110343 | January 13, 2004 | $19,000,000,000 |
| 333-117949 | September 23, 2004 | $24,126,000,000 |
| 333-123167 | April 21, 2005 | $45,335,287,290 |
| 333-125902 | July 25, 2005 | $45,335,287,290 |
| 333-131630 | March 6, 2006 | $100,271,785,327 |
| 333-140962 | April 24, 2007 | $103,095,483,061 |

28.   Defendant CWMBS is a Delaware corporation and a limited purpose financing subsidiary of CFC.  CWMBS' principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC.  Defendant CWMBS served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in ¶47 below, and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| Registration Number | Date Filed | Amount Registered |
| --- | --- | --- |
| 333-100418 | October 28, 2002 | $14,978,548,884 |
| 333-121249 | February 8, 2005 | $20,863,464,518 |
| 333-125963 | July 25, 2005 | $40,742,304,251 |
| 333-131662 | March 6, 2006 | $60,846,662,430 |
| 333-140958 | April 24, 2007 | $144,647,113,029 |

9

29.     Defendant CWABS is a Delaware corporation and a limited purpose financing subsidiary of CFC. CWABS' principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC. Defendant CWABS served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in ¶47 below, and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| Registration Number | Date Filed | Amount Registered |
|---|---|---|
| 333-118926 | October 18, 2004 | $60,598,485,932 |
| 333-125164 | June 10, 2005 | $46,598,657,434 |
| 333-131591 | February 21, 2006 | $34,327,892,523 |
| 333-135846 | August 8, 2006 | $40,000,000,000 |
| 333-140960 | April 24, 2007 | $113,336,555,700 |

30.     Defendant CWHEQ is a Delaware corporation and a limited purpose financing subsidiary of CFC. CWHEQ's principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC. Defendant CWHEQ served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in ¶47 below and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| Registration Number | Date Filed | Amount Registered |
|---|---|---|
| 333-121378 | December 17, 2004 | $20,000,000,000 |
| 333-126790 | August 4, 2005 | $30,572,949,813 |
| 333-132375 | April 12, 2006 | $26,572,949,813 |
| 333-139891 | May 22, 2007 | $31,717,192,508 |

31.     Defendant CSC, an affiliate of CFC, acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

32.     Defendant J.P. Morgan Securities Inc. ("JP Morgan") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

33.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

34.     Defendant Bear, Stearns & Co. Inc. ("Bear Stearns"), a wholly-owned subsidiary of J.P. Morgan Chase & Co. pursuant to the Agreement and Plan of Merger by and between The Bear Stearns Companies, Inc. and J.P. Morgan Chase & Co. dated March 16, 2008, acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.  As of the date of the merger, J.P. Morgan Chase & Co. is a successor in interest of Bear Stearns.

35.     Defendant Banc of America Securities LLC ("BoA") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

36.     Defendant UBS Securities, LLC ("UBS") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

37.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

478757_1

38.    Defendant Edward D. Jones & Co., L.P. ("Edward Jones") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

39.    Defendant Citigroup Global Markets Inc. ("Citigroup") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

40.    Defendant Goldman, Sachs & Co. ("Goldman Sachs") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

41.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

42.    Defendant Greenwich Capital Markets, Inc. a.k.a. RBS Greenwich Capital ("RBS") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

43.    Defendant Barclays Capital Inc. ("Barclays") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

44.    Defendant HSBC Securities (USA) ("HSBC") acted as an underwriter for the Certificates identified in ¶47 below, within the meaning of the Securities Act, 15

1  U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements

2  pursuant to which the Certificates were sold to plaintiffs.

3       45.     Defendant BNP Paribas Securities Corp. ("BNP") acted as an underwriter

4  for the Certificates identified in ¶47 below, within the meaning of the Securities Act,

5  15 U.S.C. §77b(a)(11), and drafted and disseminated the Prospectus Supplements

6  pursuant to which the Certificates were sold to plaintiffs.

7       46.     Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill

8  Lynch") acted as an underwriter for the Certificates identified in ¶47 below, within the

9  meaning of the Securities Act, 15 U.S.C. §77b(a)(11), and drafted and disseminated

10  the Prospectus Supplements pursuant to which the Certificates were sold to plaintiffs.

11  On September 15, 2008, Bank of America announced that it had purchased Merrill

12  Lynch.  The transaction is currently pending.

13                  **RELEVANT NON-PARTIES**

14       47.     The Issuing Trusts were set up by CWALT, CWMBS, CWABS and

15  CWHEQ to issue hundreds of billions of dollars worth of Certificates pursuant to the

16  Registration Statements and Prospectus Supplements.  The following chart identifies

17  (1) each Issuing Trust, (2) the stated value of the Certificates it issued, (3) the

18  Registration Statements and Supplement Prospectuses pursuant to which the

19  Certificates were issued and sold, and (4) the identities of the Depositor/Issuer,

20  Underwriters, and Sponsor/Seller for each issuance:

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| 1/13/2004 | Alternative Loan Trust 2006-43CB | 12/28/2006 | $874,833,833 | CWALT | UBS/CSC/ Deutsche Bank | CHL |
| | | | | | | |
| 9/23/2004 | Alternative Loan Trust 2005-10CB | 3/28/2005 | $1,132,559,959 | CWALT | JP Morgan/ Deutsche Bank/ UBS | CHL |

13

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2005-13CB | 3/22/2005 | $729,629,938 | CWALT | Bear Stearns/CSC/ Edward Jones | CHL |
| | Alternative Loan Trust 2005-14 | 3/28/2005 | $1,223,957,100 | CWALT | BoA | CHL |
| | Alternative Loan Trust 2005-18CB | 3/29/2005 | $228,023,117 | CWALT | Deutsche Bank/JP Morgan | CHL |
| | Alternative Loan Trust 2005-1CB | 1/27/2005 | $1,068,597,926 | CWALT | Deutsche Bank/JP Morgan/Credit Suisse | CHL |
| | Alternative Loan Trust 2005-2 | 1/27/2005 | $259,145,100 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2005-3CB | 1/25/2005 | $1,377,382,958 | CWALT | RBS/ CSC/Citigroup | CHL |
| | Alternative Loan Trust 2005-4 | 2/24/2005 | $365,434,966 | CWALT | Bear Stearns | CHL |
| | Alternative Loan Trust 2005-6CB | 2/23/2005 | $1,145,261,068 | CWALT | RBS | CHL |
| | Alternative Loan Trust 2005-7CB | 2/23/2005 | $1,016,691,725 | CWALT | Deutsche Bank/CSC | CHL |
| | Alternative Loan Trust 2005-9CB | 3/28/2005 | $619,113,703 | CWALT | CSC/JP Morgan | CHL |
| | Alternative Loan Trust 2005-J1 | 1/26/2005 | $862,291,563 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J2 | 2/24/2005 | $633,547,212 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J3 | 3/28/2005 | $502,950,968 | CWALT | CSC | CHL |

14

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust Resecuritization 2005-5R | 1/27/2005 | $152,265,968 | CWALT | Deutsche Bank | CHL |
| 4/21/2005 | Alternative Loan Trust 2005-11CB | 4/27/2005 | $1,145,181,103 | CWALT | Deutsche Bank/CSC | CHL |
| | Alternative Loan Trust 2005-16 | 4/26/2005 | $641,647,100 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2005-17 | 5/26/2005 | $1,145,690,100 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2005-19CB | 4/25/2005 | $414,809,999 | CWALT | Bear Stearns/ Morgan Stanley/Edward Jones | CHL |
| | Alternative Loan Trust 2005-20CB | 5/25/2005 | $1,137,170,938 | CWALT | Deutsche Bank/CSC/ Lehman | CHL |
| | Alternative Loan Trust 2005-21CB | 4/26/2005 | $722,227,948 | CWALT | Morgan Stanley/CSC | CHL |
| | Alternative Loan Trust 2005-22T1 | 4/26/2005 | $262,349,932 | CWALT | Citigroup/ Goldman Sachs | CHL |
| | Alternative Loan Trust 2005-23CB | 4/26/2005 | $717,484,000 | CWALT | Credit Suisse/CSC | CHL |
| | Alternative Loan Trust 2005-24 | 5/26/2005 | $1,425,304,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-25T1 | 5/23/2005 | $292,299,470 | CWALT | Citigroup/CSC | CHL |
| | Alternative Loan Trust 2005-26CB | 5/24/2005 | $493,999,752 | CWALT | RBS/CSC | CHL |
| | Alternative Loan Trust 2005-27 | 6/28/2005 | $1,524,298,100 | CWALT | UBS | CHL |

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2005-28CB | 6/27/2005 | $831,895,756 | CWALT | Deutsche Bank/ JP Morgan | CHL |
| | Alternative Loan Trust 2005-29 | 5/24/2005 | $273,952,380 | CWALT | UBS/Bear Stearns | CHL |
| | Alternative Loan Trust 2005-30CB | 6/27/2005 | $521,202,999 | CWALT | Credit Suisse/CSC | CHL |
| | Alternative Loan Trust 2005-31 | 6/27/2005 | $971,317,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2005-32T1 | 6/24/2005 | $354,959,907 | CWALT | Bear Stearns/CSC | CHL |
| | Alternative Loan Trust 2005-33CB | 6/23/2005 | $539,993,529 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-36 | 6/23/2005 | $769,213,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-69 | 12/13/2005 | $500,429,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2005-J4 | 5/26/2005 | $671,259,700 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J5 | 4/22/2005 | $311,458,678 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J6 | 5/27/2005 | $195,470,622 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J7 | 6/29/2005 | $232,508,165 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J8 | 6/29/2005 | $194,930,382 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J9 | 7/25/2005 | $262,193,019 | CWALT | CSC | CHL |

16

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | | | | | | |
| 7/25/2005 | Alternative Loan Trust 2005-34CB | 7/25/2005 | $416,789,991 | CWALT | Deutsche Bank/ CSC/Edward Jones | CHL |
| | Alternative Loan Trust 2005-35CB | 7/27/2005 | $726,658,739 | CWALT | CSC/UBS | CHL |
| | Alternative Loan Trust 2005-37Tl | 7/26/2005 | $344,113,666 | CWALT | Morgan Stanley/CSC | CHL |
| | Alternative Loan Trust 2005-38 | 7/27/2005 | $1,817,402,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2005-40CB | 8/24/2005 | $363,951,745 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-41 | 7/28/2005 | $773,858,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-42CB | 8/26/2005 | $415,379,470 | CWALT | Citigroup/CSC | CHL |
| | Alternative Loan Trust 2005-43 | 8/24/2005 | $448,198,100 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2005-44 | 8/29/2005 | $776,592,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-45 | 8/29/2005 | $1,448,824,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-46CB | 8/29/2005 | $1,146,008,499 | CWALT | Bear Stearns/ JP Morgan | CHL |
| | Alternative Loan Trust 2005-47CB | 8/25/2005 | $414,809,863 | CWALT | Morgan Stanley/CSC | CHL |
| | Alternative Loan Trust 2005-48Tl | 9/26/2005 | $394,599,999 | CWALT | Deutsche Bank/Lehman | CHL |

17

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2005-49CB | 9/27/2005 | $520,739,090 | CWALT | RBS | CHL |
| | Alternative Loan Trust 2005-50CB | 9/27/2005 | $441,768,810 | CWALT | CSC/Morgan Stanley | CHL |
| | Alternative Loan Trust 2005-51 | 9/29/2005 | $1,771,320,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-52CB | 9/26/2005 | $519,749,910 | CWALT | Deutsche Bank/CSC/ Edward Jones | CHL |
| | Alternative Loan Trust 2005-53T2 | 9/28/2005 | $331,897,280 | CWALT | Bear Stearns | CHL |
| | Alternative Loan Trust 2005-54CB | 9/27/2005 | $959,309,669 | CWALT | Credit Suisse/CSC | CHL |
| | Alternative Loan Trust 2005-55CB | 9/28/2005 | $621,825,498 | CWALT | Bear Stearns/JP Morgan | CHL |
| | Alternative Loan Trust 2005-56 | 9/28/2005 | $2,494,019,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2005-57CB | 10/28/2005 | $818,209,269 | CWALT | CSC/JP Morgan | CHL |
| | Alternative Loan Trust 2005-58 | 10/27/2005 | $774,000,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-59 | 9/29/2005 | $2,178,000,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-60T1 | 10/25/2005 | $420,247,503 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2005-61 | 10/26/2005 | $765,519,100 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2005-62 | 10/28/2005 | $1,559,819,100 | CWALT | Deutsche Bank | CHL |

18

| | Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|---|
| | | Alternative Loan Trust 2005-63 | 10/25/2005 | $719,536,100 | CWALT | UBS | CHL |
| | | Alternative Loan Trust 2005-64CB | 10/27/2005 | $839,649,564 | CWALT | Bear Stearns/CSC | CHL |
| | | Alternative Loan Trust 2005-65CB | 11/28/2005 | $978,645,126 | CWALT | Deutsche Bank/ JP Morgan | CHL |
| | | Alternative Loan Trust 2005-67CB | 12/19/2005 | $209,232,483 | CWALT | CSC/Lehman | CHL |
| | | Alternative Loan Trust 2005-70CB | 11/23/2005 | $492,524,020 | CWALT | Citigroup/RBS | CHL |
| | | Alternative Loan Trust 2005-71 | 11/21/2005 | $170,139,100 | CWALT | Deutsche Bank | CHL |
| | | Alternative Loan Trust 2005-72 | 11/29/2005 | $737,628,100 | CWALT | UBS | CHL |
| | | Alternative Loan Trust 2005-73CB | 11/28/2005 | $359,722,468 | CWALT | Bear Stearns/RBS | CHL |
| | | Alternative Loan Trust 2005-74T1 | 11/22/2005 | $365,544,950 | CWALT | UBS/Morgan Stanley | CHL |
| | | Alternative Loan Trust 2005-75CB | 11/18/2005 | $414,233,182 | CWALT | CSC/Morgan Stanley | CHL |
| | | Alternative Loan Trust 2005-76 | 12/28/2005 | $1,776,305,100 | CWALT | Deutsche Bank | CHL |
| | | Alternative Loan Trust 2005-77T1 | 12/23/2005 | $1,050,079,829 | CWALT | Bear Stearns/ Lehman | CHL |
| | | Alternative Loan Trust 2005-79CB | 12/19/2005 | $321,387,756 | CWALT | Citigroup/ Morgan Stanley | CHL |
| | | Alternative Loan Trust 2005-80CB | 12/27/2005 | $1,256,585,157 | CWALT | RBS/CSC | CHL |

19

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2005-81 | 12/27/2005 | $926,958,100 | CWALT | Goldman Sachs | CHL |
| | Alternative Loan Trust 2005-82 | 12/23/2005 | $333,593,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-83CB | 12/28/2005 | $364,032,468 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-84 | 12/21/2005 | $941,530,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust-2005-85CB | 12/23/2005 | $1,257,944,756 | CWALT | Deutsche Bank/Lehman/ JP Morgan | CHL |
| | Alternative Loan Trust 2005-86CB | 12/27/2005 | $989,999,224 | CWALT | Morgan Stanley/CSC | CHL |
| | Alternative Loan Trust 2005-AR1 | 12/23/2005 | $768,170,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-IM1 | 12/8/2005 | $374,969,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J10 | 8/29/2005 | $507,732,857 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J11 | 9/29/2005 | $596,668,088 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J12 | 10/26/2005 | $604,102,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J13 | 10/26/2005 | $248,054,797 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2005-J14 | 11/28/2005 | $504,455,633 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-2CB | 1/27/2006 | $876,481,015 | CWALT | CSC | CHL |

20

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2006-4CB | 2/23/2006 | $683,680,636 | CWALT | UBS/RBS | CHL |
| | Alternative Loan Trust 2006-5T2 | 2/23/2006 | $370,765,076 | CWALT | CSC/BoA | CHL |
| | Alternative Loan Trust 2006-8T1 | 2/24/2006 | $355,528,517 | CWMBS | CSC/BoA | CHL |
| | Alternative Loan Trust 2006-HY3 | 1/22/2006 | $249,703,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2006-J1 | 1/27/2006 | $781,555,047 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OA1 | 1/24/2006 | $1,038,779,100 | CWMBS | CSC | CHL |
| | Alternative Loan Trust 2006-OA2 | 1/27/2006 | $1,697,910,100 | CWALT | CSC | CHL |
| 3/6/2006 | Alternative Loan Trust 2006-11CB | 1/24/2006 | $763,457,959 | CWALT | RBS/CSC | CHL |
| | Alternative Loan Trust 2006-12CB | 1/27/2006 | $624,731,141 | CWALT | UBS/JP Morgan | CHL |
| | Alternative Loan Trust 2006-13T1 | 3/29/2006 | $493,728,887 | CWALT | BoA/Deutsche Bank | CHL |
| | Alternative Loan Trust 2006-14CB | 4/25/2006 | $519,223,126 | CWALT | Deutsche Bank/ JP Morgan | CHL |
| | Alternative Loan Trust 2006-15CB | 4/24/2006 | $366,789,456 | CWALT | RBS/Lehman | CHL |
| | Alternative Loan Trust 2006-16CB | 4/26/2006 | $311,691,556 | CWALT | Bear Stearns/CSC | CHL |

21

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2006-17T1 | 4/25/2006 | $474,959,606 | CWALT | Credit Suisse/BoA | CHL |
| | Alternative Loan Trust 2006-18CB | 5/26/2006 | $1,040,024,215 | CWALT | Deutsche Bank/CSC | CHL |
| | Alternative Loan Trust 2006-19CB | 6/28/2006 | $1,558,637,921 | CWALT | Deutsche Bank/CSC | CHL |
| | Alternative Loan Trust 2006-20CB | 5/25/2006 | $551,732,773 | CWALT | Morgan Stanley/CSC | CHL |
| | Alternative Loan Trust 2006-21CB | 5/26/2006 | $520,536,856 | CWALT | Citigroup/BoA | CHL |
| | Alternative Loan Trust 2006-23CB | 6/27/2006 | $987,020,570 | CWALT | UBS/CSC | CHL |
| | Alternative Loan Trust 2006-24CB | 6/28/2006 | $880,451,378 | CWALT | Bear Stearns/Morgan Stanley | CHL |
| | Alternative Loan Trust 2006-25CB | 7/27/2006 | $518,814,998 | CWALT | Deutsche Bank/CSC | CHL |
| | Alternative Loan Trust 2006-26CB | 7/27/2006 | $395,599,061 | CWALT | BoA | CHL |
| | Alternative Loan Trust 2006-27CB | 8/29/2006 | $310,200,987 | CWALT | Morgan Stanley/CSC | CHL |
| | Alternative Loan Trust 2006-28CB | 8/29/2006 | $518,233,936 | CWALT | Citigroup/ Morgan Stanley | CHL |
| | Alternative Loan Trust 2006-29T1 | 8/29/2006 | $785,759,998 | CWALT | Barclays/BoA | CHL |
| | Alternative Loan Trust 2006-30T1 | 9/27/2006 | $469,299,928 | CWALT | RBS/CSC | CHL |
| | Alternative Loan Trust 2006-31CB | 9/27/2006 | $865,696,096 | CWALT | Deutsche Bank/ Merrill Lynch | CHL |

22

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2006-32CB | 9/26/2006 | $619,686,154 | CWALT | Morgan Stanley | CHL |
| | Alternative Loan Trust 2006-33CB | 9/28/2006 | $619,062,482 | CWALT | Citigroup/CSC | CHL |
| | Alternative Loan Trust 2006-34 | 9/27/2006 | $200,553,202 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-35CB | 10/26/2006 | $619,050,252 | CWALT | Citigroup/ Morgan Stanley | CHL |
| | Alternative Loan Trust 2006-36T2 | 10/27/2006 | $734,911,293 | CWALT | Bear Stearns/CSC | CHL |
| | Alternative Loan Trust 2006-37R | 10/27/2006 | $68,315,933 | CWALT | UBS | UBS |
| | Alternative Loan Trust 2006-39CB | 11/29/2006 | $808,983,132 | CWALT | Deutsche Bank/BoA | CHL |
| | Alternative Loan Trust 2006-40T1 | 11/28/2006 | $592,478,599 | CWALT | HSBC/CSC | CHL |
| | Alternative Loan Trust 2006-41CB | 11/29/2006 | $1,135,112,855 | CWALT | Credit Suisse/CSC | CHL |
| | Alternative Loan Trust 2006-42 | 11/27/2006 | $246,986,001 | CWALT | Barclays/CSC | CHL |
| | Alternative Loan Trust 2006-45T1 | 12/27/2006 | $1,113,036,850 | CWALT | Morgan Stanley/BoA | CHL |
| | Alternative Loan Trust 2006-46 | 12/27/2006 | $296,399,437 | CWALT | Barclays/ Lehman | CHL |
| | Alternative Loan Trust 2006-6CB | 3/29/2006 | $2,164,334,096 | CWALT | CSC/Deutsche Bank | CHL |
| | Alternative Loan Trust 2006-7CB | 3/29/2006 | $548,064,958 | CWALT | Credit Suisse/ JP Morgan | CHL |

23

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2006-9T1 | 3/29/2006 | $522,122,602 | CWALT | Bear Stearns/Credit Suisse | CHL |
| | Alternative Loan Trust 2006-HY10 | 3/28/2006 | $529,427,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2006-HY11 | 4/27/2006 | $445,727,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2006-HY12 | 6/27/2006 | $791,111,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2006-HY13 | 12/28/2006 | $883,972,100 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2006-J2 | 3/28/2006 | $245,087,019 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-J3 | 4/27/2006 | $253,461,322 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-J4 | 6/29/2006 | $428,134,055 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-J5 | 7/27/2006 | $421,364,240 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-J6 | 9/26/2006 | $185,251,552 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-J7 | 10/27/2006 | $347,393,561 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-J8 | 12/26/2006 | $462,029,521 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OA10 | 6/29/2006 | $2,768,599,100 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2006-OA11 | 6/29/2006 | $1,237,208,100 | CWALT | CSC | CHL |

24

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2006-OA12 | 7/27/2006 | $984,619,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OA14 | 9/29/2006 | $949,619,100 | CWALT | BoA | CHL |
| | Alternative Loan Trust 2006-OA16 | 8/29/2006 | $1,336,380,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OA17 | 9/28/2006 | $1,560,610,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OA18 | 11/14/2006 | $498,492,256 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OA19 | 11/29/2006 | $1,199,267,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OA21 | 3/28/2006 | $1,292,642,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OA22 | 12/28/2006 | $380,943,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OA3 | 12/8/2006 | $753,195,100 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2006-OA6 | 3/31/2006 | $1,034,375,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OA7 | 5/16/2006 | $1,177,528,100 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2006-OA8 | 4/28/2006 | $606,092,100 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2006-OA9 | 3/30/2006 | $928,908,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OC1 | 5/26/2006 | $1,196,264,100 | CWALT | CSC | CHL |

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2006-OC10 | 11/29/2006 | $805,404,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OC11 | 12/27/2006 | $1,089,000,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OC2 | 3/27/2006 | $833,712,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OC3 | 4/27/2006 | $671,248,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OC4 | 5/25/2006 | $569,225,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OC5 | 6/28/2006 | $789,079,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OC6 | 7/28/2006 | $625,543,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OC7 | 8/29/2006 | $582,249,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OC8 | 9/28/2006 | $1,693,916,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2006-OC9 | 11/14/2006 | $546,528,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-10CB | 3/28/2007 | $742,499,999 | CWALT | JP Morgan | CHL |
| | Alternative Loan Trust 2007-11T1 | 3/29/2007 | $587,626,182 | CWALT | HSBC/UBS | CHL |
| | Alternative Loan Trust 2007-1T1 | 1/29/2007 | $493,712,524 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-2CB | 1/29/2007 | $1,018,739,168 | CWALT | Deutsche Bank/CSC | CHL |

26

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2007-3T1 | 2/26/2007 | $792,149,705 | CWALT | UBS/CSC/ Morgan Stanley | CHL |
| | Alternative Loan Trust 2007-4CB | 4/10/2007 | $579,145,196 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-5CB | 2/26/2007 | $1,559,847,536 | CWALT | Citigroup/CSC | CHL |
| | Alternative Loan Trust 2007-6 | 2/26/2007 | $366,513,427 | CWALT | Citigroup/CSC | CHL |
| | Alternative Loan Trust 2007-7T2 | 2/26/2007 | $365,759,889 | CWALT | HSBC/Lehman | CHL |
| | Alternative Loan Trust 2007-8CB | 3/28/2007 | $744,971,687 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2007-9T1 | 3/29/2007 | $837,346,400 | CWALT | CSC/Deutsche Bank/BoA | CHL |
| | Alternative Loan Trust 2007-HY2 | 1/29/2007 | $508,705,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-HY3 | 2/27/2007 | $989,260,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2007-HY5R | 3/29/2007 | $553,116,614 | CWALT | Deutsche Bank | |
| | Alternative Loan Trust 2007-J1 | 2/27/2007 | $583,156,580 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-OA2 | 2/14/2007 | $666,176,100 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2007-OA3 | 2/28/2007 | $1,137,053,100 | CWALT | BoA | CHL |
| | Alternative Loan Trust 2007-OA4 | 3/28/2007 | $717,258,300 | CWALT | Goldman Sachs | CHL |

27

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2007-OA7 | 3/29/2007 | $771,733,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust Resecuritizati on 2006-22R | 5/26/2006 | $416,626,008 | CWALT | RBS | RBS |
| | Alternative Loan Trust Resecuritizati on 2007-26R | 12/17/2007 | $41,798,027 | CWALT | Deutsche Bank | |
| 4/27/2007 | Alternative Loan Trust 2007-12T1 | 4/27/2007 | $855,728,140 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-13 | 4/26/2007 | $207,556,676 | CWALT | Deutsche Bank/CSC | CHL |
| | Alternative Loan Trust 2007-14T2 | 5/29/2007 | $409,317,845 | CWALT | Credit Suisse/CSC | CHL |
| | Alternative Loan Trust 2007-15CB | 5/30/2007 | $669,615,650 | CWALT | Credit Suisse/CSC | CHL |
| | Alternative Loan Trust 2007-16CB | 6/28/2007 | $1,615,596,399 | CWALT | Deutsche Bank/BoA | CHL |
| | Alternative Loan Trust 2007-17CB | 6/28/2007 | $745,477,658 | CWALT | Morgan Stanley/Credit Suisse | CHL |
| | Alternative Loan Trust 2007-18CB | 6/28/2007 | $719,917,790 | CWALT | Credit Suisse/CSC | CHL |
| | Alternative Loan Trust 2007-19 | 6/28/2007 | $1,166,488,020 | CWALT | Credit Suisse/ Deutsche Bank | CHL |
| | Alternative Loan Trust 2007-20 | 6/27/2007 | $296,399,844 | CWALT | RBS/UBS | CHL |
| | Alternative Loan Trust 2007-21CB | 7/27/2007 | $769,186,604 | CWALT | Deutsche Bank | CHL |

28

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2007-22 | 7/27/2007 | $791,348,018 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2007-23CB | 7/30/2007 | $1,030,214,330 | CWALT | Bear Stearns | CHL |
| | Alternative Loan Trust 2007-24 | 8/29/2007 | $537,168,947 | CWALT | UBS | CHL |
| | Alternative Loan Trust 2007-25 | 9/27/2007 | $660,495,859 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-AL1 | 6/18/2007 | $228,622,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-HY4 | 5/30/2007 | $1,432,682,100 | CWALT | Bear Stearns | CHL |
| | Alternative Loan Trust 2007-HY6 | 6/29/2007 | $869,708,100 | CWALT | BoA | CHL |
| | Alternative Loan Trust 2007-HY7C | 6/28/2007 | $1,022,825,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2007-HY8C | 7/30/2007 | $453,460,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2007-HY9 | 9/27/2007 | $34,861,100 | CWALT | Deutsche Bank | CHL |
| | Alternative Loan Trust 2007-J2 | 5/29/2007 | $267,858,014 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-OA10 | 7/30/2007 | $549,502,100 | CWALT | BoA | CHL |
| | Alternative Loan Trust 2007-OA11 | 10/29/2007 | $495,597,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-OA6 | 4/27/2007 | $561,485,100 | CWALT | Credit Suisse | CHL |

29

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | Alternative Loan Trust 2007-OA8 | 6/28/2007 | $666,706,100 | CWALT | BoA | CHL |
| | Alternative Loan Trust 2007-OA9 | 7/27/2007 | $391,151,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-OH1 | 5/29/2007 | $495,113,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-OH2 | 6/28/2007 | $984,602,100 | CWALT | CSC | CHL |
| | Alternative Loan Trust 2007-OH3 | 7/27/2007 | $579,826,100 | CWALT | CSC | CHL |
| | | | | | | |
| 10/28/2002 | CHL Mortgage Pass-Through Trust 2005-HYB10 | 12/27/2005 | $1,010,798,100 | CWMBS | CSC | CHL |
| | | | | | | |
| 2/8/2005 | CHL Mortgage Pass-Through Trust 2005-15 | 6/20/2005 | $412,924,044 | CWMBS | Morgan Stanley/ CSC/ Edward Jones | CHL |
| | CHL Mortgage Pass-Through Trust 2005-HYB4 | 6/15/2005 | $791,873,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-J2 | 6/29/2005 | $806,148,679 | CWMBS | CSC | CHL |
| | | | | | | |
| 7/25/2005 | CHL Mortgage Pass-Through Trust 2005-16 | 7/26/2005 | $412,924,740 | CWMBS | Goldman Sachs/Lehman | CHL |

30

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CHL Mortgage Pass-Through Trust 2005-17 | 7/25/2005 | $629,201,708 | CWMBS | UBS/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-18 | 8/25/2005 | $413,919,844 | CWMBS | Goldman Sachs/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-19 | 8/1/2005 | $398,521,241 | CWMBS | Bear Stearns | CHL |
| | CHL Mortgage Pass-Through Trust 2005-20 | 8/25/2005 | $413,919,460 | CWMBS | UBS/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-21 | 8/25/2005 | $983,059,554 | CWMBS | RBS/UBS | CHL |
| | CHL Mortgage Pass-Through Trust 2005-22 | 9/27/2005 | $588,995,100 | CWMBS | UBS | CHL |
| | CHL Mortgage Pass-Through Trust 2005-23 | 9/26/2005 | $313,630,166 | CWMBS | Citigroup/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-24 | 9/27/2005 | $1,036,789,285 | CWMBS | Goldman Sachs/ CSC/ Edward Jones | CHL |
| | CHL Mortgage Pass-Through Trust 2005-25 | 9/27/2005 | $363,174,579 | CWMBS | UBS/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-26 | 9/27/2005 | $497,507,486 | CWMBS | Bear Stearns | CHL |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CHL Mortgage Pass-Through Trust 2005-27 | 8/29/2007 | $518,394,257 | CWMBS | Credit Suisse/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-28 | 8/29/2007 | $414,914,141 | CWMBS | UBS/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-29 | 8/29/2007 | $295,924,912 | CWMBS | CSC/BoA | CHL |
| | CHL Mortgage Pass-Through Trust 2005-30 | 11/22/2005 | $514,555,415 | CWMBS | UBS/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-31 | 12/22/2005 | $620,690,100 | CWMBS | Goldman Sachs | CHL |
| | CHL Mortgage Pass-Through Trust 2005-HYB5 | 7/27/2005 | $791,278,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-HYB6 | 8/26/2005 | $991,562,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-HYB7 | 9/27/2005 | $1,017,720,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-HYB8 | 10/27/2005 | $593,432,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2005-J3 | 7/27/2005 | $381,311,999 | CWMBS | CSC | CHL |

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CHL Mortgage Pass-Through Trust 2005-J4 | 10/26/2005 | $200,059,714 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-1 | 1/26/2006 | $373,367,486 | CWMBS | Lehman/RBS | CHL |
| | CHL Mortgage Pass-Through Trust 2006-3 | 1/30/2006 | $1,052,797,100 | CWMBS | UBS | CHL |
| | CHL Mortgage Pass-Through Trust 2006-6 | 2/23/2006 | $481,822,327 | CWMBS | RBS/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-HYB1 | 1/27/2006 | $1,154,098,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-HYB2 | 2/23/2006 | $653,891,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-HYB5 | 7/27/2006 | $526,000,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-J1 | 1/27/2006 | $406,869,042 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-J2 | 2/23/2006 | $174,124,645 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-OA4 | 2/24/2006 | $774,076,100 | CWMBS | Deutsche Bank | CHL |

33

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CHL Mortgage Pass-Through Trust 2006-OA5 | 2/28/2006 | $1,364,317,100 | CWMBS | UBS | CHL |
| 3/6/2006 | CHL Mortgage Pass-Through Trust 2006-10 | 3/29/2006 | $600,481,743 | CWMBS | Bear Stearns/BoA | CHL |
| | CHL Mortgage Pass-Through Trust 2006-11 | 4/24/2006 | $626,849,839 | CWMBS | Credit Suisse/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-12 | 5/22/2006 | $652,719,878 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-13 | 7/27/2006 | $519,389,436 | CWMBS | Credit Suisse/ Morgan Stanley | CHL |
| | CHL Mortgage Pass-Through Trust 2006-14 | 7/28/2006 | $366,159,454 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-15 | 8/28/2006 | $397,004,000 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-16 | 9/27/2006 | $994,995,037 | CWMBS | Goldman Sachs/BoA | CHL |
| | CHL Mortgage Pass-Through Trust 2006-17 | 10/27/2006 | $518,379,893 | CWMBS | HSBC/Lehman | CHL |
| | CHL Mortgage Pass-Through Trust 2006-18 | 10/27/2006 | $517,384,203 | CWMBS | Credit Suisse/CSC | CHL |

34

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CHL Mortgage Pass-Through Trust 2006-19 | 11/28/2006 | $1,241,757,925 | CWMBS | Credit Suisse/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-20 | 12/27/2006 | $1,035,793,979 | CWMBS | Credit Suisse | CHL |
| | CHL Mortgage Pass-Through Trust 2006-21 | 12/27/2006 | $1,016,881,735 | CWMBS | Bear Stearns/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-8 | 3/29/2006 | $778,089,936 | CWMBS | Credit Suisse/BoA | CHL |
| | CHL Mortgage Pass-Through Trust 2006-9 | 3/28/2006 | $415,909,999 | CWMBS | Barclays/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-HYB3 | 4/26/2006 | $966,897,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-HYB4 | 5/26/2006 | $443,360,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-J3 | 5/25/2006 | $216,167,679 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-J4 | 7/27/2006 | $371,980,842 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2006-TM1 | 3/16/2006 | $902,091,850 | CWMBS | CSC | CHL |

35

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CHL Mortgage Pass-Through Trust 2007-1 | 1/29/2007 | $746,249,967 | CWMBS | Goldman Sachs/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-2 | 8/29/2007 | $362,933,532 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-3 | 2/26/2007 | $1,141,241,764 | CWMBS | BNP/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-4 | 8/29/2007 | $1,058,011,000 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-5 | 3/30/2007 | $845,749,614 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-HY1 | 2/27/2007 | $394,190,100 | CWMBS | UBS | CHL |
| | CHL Mortgage Pass-Through Trust 2007-HYB1 | 1/29/2007 | $623,894,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-HYB2 | 3/29/2007 | $620,703,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-J1 | 1/29/2007 | $309,676,683 | CWMBS | CSC | CHL |

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| 4/26/2007 | CHL Mortgage Pass-Through Trust 2007-10 | 5/29/2007 | $646,730,067 | CWMBS | UBS/Lehman | CHL |
| | CHL Mortgage Pass-Through Trust 2007-11 | 6/27/2007 | $994,999,544 | CWMBS | BNP/CSC/ Lehman | CHL |
| | CHL Mortgage Pass-Through Trust 2007-12 | 6/27/2007 | $414,914,963 | CWMBS | UBS/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-13 | 6/27/2007 | $572,087,807 | CWMBS | Bear Stearns/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-14 | 7/27/2007 | $746,249,918 | CWMBS | BoA/Lehman | CHL |
| | CHL Mortgage Pass-Through Trust 2007-15 | 7/27/2007 | $1,031,170,625 | CWMBS | RBS/CSC/ Lehman | CHL |
| | CHL Mortgage Pass-Through Trust 2007-16 | 8/29/2007 | $770,783,999 | CWMBS | HBSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-17 | 8/29/2007 | $872,433,848 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-18 | 9/27/2007 | $410,362,919 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-19 | 10/29/2007 | $441,172,477 | CWMBS | CSC | CHL |

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CHL Mortgage Pass-Through Trust 2007-20 | 11/28/2007 | $297,592,472 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-21 | 12/27/2007 | $778,228,036 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-6 | 4/26/2007 | $746,250,000 | CWMBS | JP Morgan/ CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-7 | 4/26/2007 | $746,236,970 | CWMBS | RBS/CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-8 | 8/29/2007 | $855,000,000 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-9 | 5/29/2007 | $696,499,987 | CWMBS | Goldman Sachs/UBS | CHL |
| | CHL Mortgage Pass-Through Trust 2007-HY3 | 4/27/2007 | $579,898,100 | CWMBS | UBS | CHL |
| | CHL Mortgage Pass-Through Trust 2007-HY4 | 9/27/2007 | $613,573,100 | CWMBS | UBS | CHL |
| | CHL Mortgage Pass-Through Trust 2007-HY5 | 7/30/2007 | $360,740,100 | CWMBS | Deutsche Bank | CHL |
| | CHL Mortgage Pass-Through Trust 2007-HY6 | 9/27/2007 | $1,201,511,100 | CWMBS | CSC | CHL |

38

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CHL Mortgage Pass-Through Trust 2007-HY7 | 10/29/2007 | $551,019,100 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-J2 | 5/29/2007 | $411,278,672 | CWMBS | CSC | CHL |
| | CHL Mortgage Pass-Through Trust 2007-J3 | 6/28/2007 | $223,874,843 | CWMBS | CSC | CHL |
| 10/18/2004 | CWABS Asset-Backed Certificates Trust 2005-BC3 | 6/29/2005 | $800,000,100 | CWABS | CSC | CHL |
| 6/10/2005 | CWABS Asset-Backed Certificates Trust 2005-10 | 9/15/2005 | $695,001,100 | CWABS | CSC/Deutsche Bank/JP Morgan | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-11 | 9/23/2005 | $1,929,704,100 | CWABS | CSC/Morgan Stanley/ RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-12 | 9/28/2005 | $876,150,100 | CWABS | CSC/Deutsche Bank/ RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-13 | 11/16/2005 | $1,950,700,100 | CWABS | CSC/BoA/ Barclays | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-14 | 12/16/2005 | $2,032,800,100 | CWABS | CSC/Bear Stearns/RBS | CHL |

39

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWABS Asset-Backed Certificates Trust 2005-15 | 12/28/2005 | $362,200,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-16 | 12/23/2005 | $2,209,500,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-17 | 12/23/2005 | $2,520,700,100 | CWABS | CSC/BNP/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-4 | 6/14/2005 | $2,826,900,100 | CWABS | CSC/Bear Stearns/ Merrill Lynch | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-5 | 6/20/2005 | $788,400,100 | CWABS | CSC/BoA/ Bear Stearns | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-6 | 6/23/2005 | $1,694,050,100 | CWABS | CSC/Bear Stearns/JP Morgan | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-7 | 6/24/2005 | $2,138,899,100 | CWABS | CSC/Bear Stearns/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-8 | 8/25/2005 | $621,372,100 | CWABS | CSC/Lehman | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-9 | 9/22/2005 | $1,281,150,100 | CWABS | CSC/RBS/ Merrill Lynch | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-AB2 | 6/16/2005 | $1,000,000,100 | CWABS | CSC/Bear Stearns/Credit Suisse | CHL |

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWABS Asset-Backed Certificates Trust 2005-AB3 | 9/21/2005 | $631,475,100 | CWABS | CSC/Barclays/BoA | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-AB4 | 11/23/2005 | $1,592,000,100 | CWABS | CSC/Deutsche Bank/JP Morgan | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-AB5 | 12/23/2005 | $695,800,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-BC4 | 9/26/2005 | $755,338,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-BC5 | 12/23/2005 | $921,500,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-HYB9 | 11/29/2005 | $1,088,954,000 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-IM1 | 8/23/2005 | $897,285,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-IM2 | 10/26/2005 | $715,077,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-IM3 | 12/19/2005 | $1,094,500,100 | CWABS | CSC | CHL |

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWABS Asset-Backed Certificates Trust 2006-1 | 2/8/2006 | $756,643,100 | CWABS | CSC/Lehman | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-IM1 | 1/27/2006 | $697,200,100 | CWABS | CSC | CHL |
| 2/21/2006 | CWABS Asset-Backed Certificate Trust 2006-ABC1 | 6/27/2006 | $396,600,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-10 | 6/29/2006 | $585,515,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-11 | 6/28/2006 | $1,846,600,100 | CWABS | CSC/Barclays/UBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-12 | 6/29/2006 | $1,272,700,100 | CWABS | CSC/BNP/ Lehman | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-13 | 7/27/2006 | $1,602,525,100 | CWABS | CSC/Bear Stearns/ Lehman | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-2 | 2/23/2006 | $801,975,100 | CWABS | CSC/BoA/JP Morgan | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-3 | 2/23/2006 | $1,361,500,100 | CWABS | CSC/Barclays/Deutsche Bank | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-4 | 3/15/2006 | $606,775,100 | CWABS | CSC/JP Morgan/ Lehman | CHL |

42

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWABS Asset-Backed Certificates Trust 2006-5 | 3/24/2006 | $672,135,100 | CWABS | CSC/Bear Stearns/ Lehman | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-6 | 3/27/2006 | $1,762,200,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-7 | 6/26/2006 | $1,017,378,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-8 | 6/26/2006 | $1,946,000,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-9 | 6/29/2006 | $563,832,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-BC1 | 4/25/2006 | $506,885,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-BC2 | 5/26/2006 | $629,525,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-BC3 | 8/29/2006 | $579,300,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-SPS1 | 6/26/2006 | $230,875,100 | CWABS | Credit Suisse/ Deutsche Bank | CHL |

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| 8/8/2006 | CWABS Asset-Backed Certificates Trust 2006-14 | 9/7/2006 | $1,453,500,100 | CWABS | CSC/Deutsche Bank/ HSBC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-15 | 9/27/2006 | $937,000,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-16 | 9/27/2006 | $486,500,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-17 | 9/22/2006 | $972,000,100 | CWABS | CSC/Deutsche Bank/ Lehman | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-18 | 9/27/2006 | $1,653,250,100 | CWABS | CSC/Bear Stearns/ Deutsche Bank | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-19 | 9/28/2006 | $869,850,100 | CWABS | CSC/Bear Stearns | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-20 | 11/7/2006 | $976,000,100 | CWABS | CSC/Bear Stearns/ HSBC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-21 | 11/29/2006 | $1,069,750,100 | CWABS | CSC/JP Morgan/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-22 | 11/29/2006 | $1,556,000,100 | CWABS | CSC/Barclays/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-23 | 12/7/2006 | $1,553,600,100 | CWABS | CSC/JP Morgan/RBS | CHL |

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWABS Asset-Backed Certificates Trust 2006-24 | 12/28/2006 | $1,305,024,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-25 | 12/28/2006 | $1,507,375,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-26 | 12/28/2006 | $1,167,600,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-BC4 | 9/27/2006 | $579,000,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-BC5 | 12/28/2006 | $729,003,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2006-SPS2 | 8/28/2006 | $456,500,100 | CWABS | CSC/Credit Suisse/ Merrill Lynch | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-1 | 2/8/2007 | $1,942,000,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-2 | 2/27/2007 | $1,513,980,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-3 | 3/28/2007 | $735,711,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-4 | 3/28/2007 | $959,500,100 | CWABS | CSC/RBS | CHL |

45

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWABS Asset-Backed Certificates Trust 2007-5 | 3/29/2007 | $1,150,000,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-6 | 3/29/2007 | $966,000,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-BC1 | 2/27/2007 | $467,750,100 | CWABS | CSC | CHL |
| 4/26/2007 | CWABS Asset-Backed Certificates Trust 2007-10 | 6/28/2007 | $973,500,100 | CWABS | CSC/Barclays/Deutsche Bank | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-11 | 6/28/2007 | $780,400,100 | CWABS | CSC/HSBC/ Merrill Lynch | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-12 | 8/13/2007 | $2,800,000 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-13 | 10/29/2007 | $735,600,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-7 | 5/3/2007 | $1,070,850,100 | CWABS | CSC/RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-8 | 5/30/2007 | $1,264,900,100 | CWABS | CSC/Lehman/ RBS | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-9 | 6/7/2007 | $1,171,200,100 | CWABS | CSC/Lehman/ RBS | CHL |

46

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWABS Asset-Backed Certificates Trust 2007-BC2 | 4/26/2007 | $615,875,100 | CWABS | CSC | CHL |
| | CWABS Asset-Backed Certificates Trust 2007-BC3 | 6/28/2007 | $551,418,100 | CWABS | CSC | CHL |
| | | | | | | |
| 12/17/2004 | CWHEQ Revolving Home Equity Loan Asset-Backed Notes, Series 2005-C | 6/28/2005 | $1,015,000,000 | CWHEQ | CSC | CHL |
| | | | | | | |
| 8/4/2005 | CWHEQ Home Equity Loan Trust, Series 2006-S1 | 3/29/2006 | $860,000,100 | CWHEQ | CSC/Bear Stearns/ Lehman | CHL |
| | CWHEQ Home Equity Loan Trust, Series 2006-S2 | 3/29/2006 | $1,050,000,100 | CWHEQ | CSC/BNP/JP Morgan | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-G | 9/28/2005 | $1,771,875,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-D | 8/26/2005 | $2,000,000,000 | CWHEQ | CSC | CHL |

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-E | 8/26/2005 | $2,000,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-F | 9/27/2005 | $2,706,750,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-H | 9/28/2005 | $1,771,875,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-I | 12/22/2005 | $2,000,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-J | 12/23/2005 | $1,500,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-K | 12/27/2005 | $1,000,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-L | 12/23/2005 | $400,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2005-M | 12/27/2005 | $2,000,000,000 | CWHEQ | CSC/Lehman/HSBC | CHL |

48

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWHEQ Revolving Home Equity Loan Trust, Series 2006-A | 2/24/2006 | $800,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2006-B | 3/28/2006 | $1,150,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2006-C | 3/28/2006 | $1,850,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2006-D | 3/29/2006 | $1,850,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2006-E | 6/28/2006 | $1,500,000,000 | CWHEQ | CSC | CHL |
| 4/12/2006 | CWHEQ Home Equity Loan Trust, Series 2006-S10 | 12/28/2006 | $1,597,600,100 | CWHEQ | CSC/RBS | CHL |
| | CWHEQ Home Equity Loan Trust, Series 2006-S3 | 6/26/2006 | $1,000,000,100 | CWHEQ | CSC/Goldman Sachs/ HSBC | CHL |
| | CWHEQ Home Equity Loan Trust, Series 2006-S4 | 9/7/2006 | $1,000,000,100 | CWHEQ | CSC/Bear Stearns/Credit Suisse | CHL |

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWHEQ Home Equity Loan Trust, Series 2006-S5 | 9/26/2006 | $900,000,100 | CWHEQ | CSC/Bear Stearns/BNP | CHL |
| | CWHEQ Home Equity Loan Trust, Series 2006-S6 | 9/28/2006 | $1,100,000,100 | CWHEQ | CSC/Bear Stearns | CHL |
| | CWHEQ Home Equity Loan Trust, Series 2006-S7 | 11/29/2006 | $994,500,100 | CWHEQ | CSC/Merrill Lynch/RBS | CHL |
| | CWHEQ Home Equity Loan Trust, Series 2006-S8 | 12/27/2006 | $1,000,000,100 | CWHEQ | CSC/RBS | CHL |
| | CWHEQ Home Equity Loan Trust, Series 2006-S9 | 12/28/2006 | $1,000,000,100 | CWHEQ | CSC/RBS | CHL |
| | CWHEQ Home Equity Loan Trust, Series 2007-S1 | 2/27/2007 | $1,600,000,100 | CWHEQ | CSC/RBS | CHL |
| | CWHEQ Home Equity Loan Trust, Series 2007-S2 | 3/29/2007 | $999,000,100 | CWHEQ | CSC/RBS | CHL |
| | CWHEQ Home Equity Loan Trust, Series 2007-S3 | 3/29/2007 | $700,000,100 | CWHEQ | CSC/RBS | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2006-F | 6/29/2006 | $1,620,000,000 | CWHEQ | CSC | CHL |

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/ Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWHEQ Revolving Home Equity Loan Trust, Series 2006-G | 8/29/2006 | $1,000,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2006-H | 9/28/2006 | $1,000,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2006-I | 12/27/2006 | $2,100,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2007-A | 1/30/2007 | $1,200,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2007-B | 3/28/2007 | $950,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2007-C | 3/29/2007 | $950,000,000 | CWHEQ | CSC | CHL |
| | | | | | | |
| 5/22/2007 | CWHEQ Revolving Home Equity Loan Trust, Series 2007-D | 5/30/2007 | $900,000,000 | CWHEQ | CSC | CHL |
| | CWHEQ Revolving Home Equity Loan Trust, Series 2007-E | 5/30/2007 | $900,000,000 | CWHEQ | CSC | CHL |

478757_1

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date | Principal Amount | Depositor/Issuer | Underwriter(s) | Sponsor |
|---|---|---|---|---|---|---|
| | CWHEQ Revolving Home Equity Loan Trust, Series 2007-G | 8/14/2007 | $566,952,000 | CWHEQ | CSC | CHL |
| | | | | | | |

48.     CWALT, CWMBS, CWABS and CWHEQ, and CFC are collectively referred to herein as the "Issuing Defendants."

49.     Defendants CFC, CCM, CSC, JP Morgan, Deutsche Bank, Bear Stearns, BoA, UBS, Morgan Stanley, Edward Jones, Citigroup, Goldman Sachs, Credit Suisse, RBS, Barclays, HSBC, BNP, and Merrill Lynch are referred to herein as the "Underwriter Defendants."

50.     The Issuing Defendants and Underwriting Defendants are collectively referred to herein as the "Issuing and Underwriting Defendants."

51.     Defendant Stanford L. Kurland ("Kurland") was, at relevant times, the Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors for CWALT, CWMBS and CWABS.  Defendant Kurland signed: CWALT's January 13, 2004, June 17, 2005, July 25, 2005, February 7, 2006, and March 6, 2006 Registration Statements; CWMBS' October 28, 2002, June 20, 2005, July 25, 2005, February 8, 2006, and March 6, 2006 Registration Statements; CWABS' October 18, 2004, February 6, 2006, February 21, 2006, July 18, 2006, and August 8, 2006 Registration Statements; and CWHEQ's December 17, 2004, August 4, 2005, and April 12, 2006 Registration Statements.  Defendant Kurland was concurrently the Executive Vice President and Chief Operating Officer ("COO") of Defendant CFC.

52.     Defendant David A. Spector ("Spector") was, at relevant times, Vice President and a member of the Board of Directors for CWALT, CWMBS, CWABS

and CWHEQ.  Defendant Spector signed: CWALT's January 13, 2004, June 17, 2005, July 25, 2005, February 7, 2006, and March 6, 2006 Registration Statements; CWMBS' October 28, 2002, June 20, 2005, July 25, 2005, February 8, 2006, and March 6, 2006 Registration Statements; CWABS' October 18, 2004, February 6, 2006, February 21, 2006, July 18, 2006, and August 8, 2006 Registration Statements; and CWHEQ's December 17, 2004, August 4, 2005, and April 12, 2006 Registration Statements.  Defendant Spector was concurrently the Senior Managing Director of Secondary Marketing of Defendant CFC.

53.     Defendant Eric P. Sieracki ("Sieracki") was, at relevant times, the Executive Vice President, CFO, Treasurer and member of the Board of Directors for CWALT, CWMBS, and CWABS.  Defendant Sieracki signed: CWALT's June 17, 2005, July 25, 2005, February 7, 2006, March 6, 2006, February 28, 2007, and April 24, 2007 Registration Statements; CWMBS' June 20, 2005, July 25, 2005, February 8, 2006, March 6, 2006, February 28, 2007, and April 24, 2007 Registration Statements; CWABS' February 6, 2006, February 21, 2006, July 18, 2006, August 8, 2006, February 28, 2007, and April 24, 2007 Registration Statements; and CWHEQ's August 4, 2005, April 12, 2006 and May 22, 2007 Registration Statements.  Defendant Sieracki was concurrently the Executive Vice President and CFO of Defendant CFC.

54.     Defendant N. Joshua Adler ("Adler") was, at relevant times, President, CEO and a member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ.  Defendant Adler signed: CWALT's February 28, 2007 and April 24, 2007 Registration Statements; CWMBS' February 28, 2007 and April 24, 2007 Registration Statements; CWABS' February 28, 2007 and April 24, 2007 Registration Statements; and CWHEQ's May 22, 2007 Registration Statement.

55.     Defendant Ranjit Kripalani ("Kripalani") was, at relevant times, a member of CWALT's, CWMBS', CWABS' and CWHEQ's Board of Directors. Defendant Kripalani signed CWALT's February 28, 2007 and April 24, 2007 Registration Statements; CWMBS' February 28, 2007 and April 24, 2007 Registration

1   Statements; CWABS' February 28, 2007 and April 24, 2007 Registration Statements;

2   and CWHEQ's May 22, 2007 Registration Statement.  Defendant Kripalani was

3   concurrently the Senior Managing Director of Defendant CCM.

4        56.   Defendant Jennifer S. Sandefur ("Sandefur") was, at relevant times, a

5   member of CWALT's, CWMBS', CWABS' and CWHEQ's Board of Directors.

6   Defendant Sandefur signed CWALT's February 28, 2007 and April 24, 2007

7   Registration Statements; CWMBS' February 28, 2007 and April 24, 2007 Registration

8   Statements; CWABS' February 28, 2007 and April 24, 2007 Registration Statements;

9   and CWHEQ's May 22, 2007 Registration Statement.  Defendant Sandefur was

10   concurrently the Senior Managing Director and Treasurer of Defendant CHL.

11        57.   Defendant David A. Sambol ("Sambol") was, at relevant times,

12   President, CEO and a member of the Board of Directors for CWHEQ.  Sambol also

13   was the mastermind of Countrywide's mortgage-backed securities business.

14   Defendant Sambol signed CWHEQ's January 10, 2007, March 2, 2007 and April 17,

15   2007 Registration Statements.  Defendant Sambol was concurrently the President and

16   COO of Defendant CFC.

17        58.   Defendants Kurland, Spector, Sieracki, Adler, Kripalani, Sandefur and

18   Sambol are collectively referred to hereinafter as the "Individual Defendants."

19                       **SUBSTANTIVE ALLEGATIONS**

20   **Background**

21        59.   Traditionally, the model for a mortgage loan involved a lending

22   institution (*i.e.*, the loan originator) extending a loan to a prospective home buyer in

23   exchange for a promissory note from the home buyer to repay the principal and

24   interest on loan.  The loan originator also held a lien against the home as collateral in

25   the event the home buyer defaulted on the obligation.  Under this simple model, the

26   loan originator held the promissory note until it matured and was exposed to the

27   concomitant risk that the borrower may fail to repay the loan.  As such, under the

28   traditional model, the loan originator had a financial incentive to ensure that (1) the

1   borrower had the financial wherewithal and ability to repay the promissory note, and

2   (2) the underlying property had sufficient value to enable the originator to recovery

3   its principal and interest in the event that the borrower defaulted on the promissory

4   note.

5        60.    Beginning in the 1990s, persistent low interest rates and low inflation led

6   to a demand for mortgages.  As a result, banks and other mortgage lending institutions

7   took advantage of this opportunity, introducing financial innovations in the form of

8   asset securitization to finance an expanding mortgage market.  As discussed below,

9   these innovations altered (1) the foregoing traditional lending model, severing the

10  traditional direct link between borrower and lender, and (2) the risks normally

11  associated with mortgage loans.

12       61.    Unlike the traditional lending model, an asset securitization involves the

13  sale and securitization of mortgages.  Specifically, after a loan originator issues a

14  mortgage to a borrower, the loan originator sells the mortgage in the financial markets

15  to a third-party financial institution.  By selling the mortgage, the loan originator

16  obtains fees in connection with the issuance of the mortgage, receives upfront

17  proceeds when it sells the mortgage into the financial markets, and thereby has new

18  capital to issue more mortgages.  The mortgages sold into the financial markets are

19  typically pooled together and securitized into what are commonly referred to as

20  mortgage-backed securities or MBS.  In addition to receiving proceeds from the sale

21  of the mortgage, the loan originator is no longer subject to the risk that the borrower

22  may default; that risk is transferred with the mortgages to investors who purchase the

23  MBS.

24       62.    As illustrated below, in a mortgage securitization, mortgage loans are

25  acquired, pooled together or "securitized," and then sold to investors in the form of

26  MBS, whereby the investors acquire rights in the income flowing from the mortgage

27  pools.

28

55



(Source: *The Wall Street Journal*)

63.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash-flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage.  Of course, since the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

64.     In this MBS structure, the senior tranches received the highest investment rating by the Rating Agencies, usually AAA.  After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds. In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BB by the Rating Agencies.

65.     The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.  This process is repeated each month and all investors receive the payments owed to them so long as the mortgage-borrowers are current on their mortgages.  The following diagram illustrates the concept of tranches within a MBS comprised of residential mortgages (often referred to as a "residential mortgage-backed securities"):

478757_1



(Source: *The Wall Street Journal*)

66.   As illustrated below, in the typical securitization transaction, participants in the transaction are (1) the servicer of the loans to be securitized, often called the "sponsor," (2) the depositor of the loans in a trust or entity for securitization, (3) the underwriter of the MBS, (4) the entity or trust responsible for issuing the MBS, often called the "issuing trust," and (5) the investors in the MBS.

67.   Viewing the securitization process as a series of arms-length transactions, the process of securitization begins with the sale of mortgage loans by the sponsor – the original owner of the mortgages – to the depositor in return for cash.   The depositor then sells those mortgage loans and related assets to the trust, in exchange for the trust issuing certificates to the depositor.   The depositor then works with the underwriter of the trust to price and sell the certificates to investors.



478757_1

68.     Thereafter, the mortgage loans held by the trusts are serviced, *i.e*, principal and interest are collected from mortgagors, by the servicer, which earns monthly servicing fees for collecting such principal and interest from mortgagors. After subtracting a servicing fee, the servicer sends the remainder of the mortgage payments to a trustee for administration and distribution to the trust, and ultimately, to the purchasers of the MBS Certificates.

69.     In this case, however, the transactions among the sponsor, depositor and Issuing Trusts were not arms-length transactions as CFC controlled all three entities. CFC set up Defendants CWALT, CWMBS, CWABS, and CWHEQ, the depositors in this case, as "limited purpose finance entities" solely for the purpose for issuing the Certificates. CHL acted as the servicer of the mortgages and CSC, Countrywide's underwriting division, along with the other Underwriter Defendants, marketed and sold the securities. While Defendants CWALT, CWMBS, CWABS, and CWHEQ served as the Depositors for the Issuing Trusts and issued the Registration Statements, this process was directed by CFC.

70.     With respect to the MBS Certificates at issue here, the Registration Statements and each of the Prospectus Supplements contained material statements concerning, *inter alia*, (1) the underwriting process and standards by which mortgages held by the Issuing Trusts were originated, and (2) a representation of the value of the real-estate securing the mortgages pooled in the Issuing Trusts, expressed in part as the average LTV ratios of the underlying mortgages and the appraisal standards by which such real estate values were obtained.

71.     Each Certificate sold to plaintiffs was sold pursuant to a Registration Statement, which incorporated by reference, a Prospectus Supplement, filed at the time that the Certificates were sold to plaintiffs.

72.     Each Prospectus Supplement filed with the SEC in connection with the Registration Statements was incorporated by reference prospectively in the Registration Statements and contained the specific disclosures concerning the

58

1   particular Issuing Trust.  Nonetheless, in each Prospectus Supplement, as set forth
2   herein, the Issuing Defendants and the respective underwriters made the same
3   representations concerning CHL's standards in originating the mortgages and valuing
4   the properties underlying the Issuing Trusts.

5       73.   As set forth above, CWALT filed numerous Registration Statements with
6   the SEC for the sale of several class of Certificates backed primarily by:

7           (a)    first lien mortgage loans secured by one to four family residential
8   properties;

9           (b)    mortgage loans secured by first liens on small multi-family
10  residential properties, such as residential apartment buildings or projects containing
11  five to fifty residential units;

12          (c)    collections arising from one or more types of the loans described
13  above which are not used to make payments on securities issued by a trust fund,
14  including excess servicing fees and prepayment charges;

15          (d)    mortgage pass-through securities issued or guaranteed by Ginnie
16  Mae, Fannie Mae, or Freddie Mac; or

17          (e)    mortgage-backed securities evidencing an interest in, or secured
18  by, loans of the type that would otherwise be eligible to be loans included in a trust
19  fund and issued by entities other than Ginnie Mae, Fannie Mae or Freddie Mac.

20      74.   As set forth above, CWMBS filed numerous Registration Statements
21  with the SEC for the sale of several classes of Certificates backed primarily by:

22          (a)    first lien mortgage loans secured by one to four family residential
23  properties or participations in that type of loan;

24          (b)    mortgage pass-through securities issued or guaranteed by Ginnie
25  Mae, Fannie Mae, or Freddie Mac; or

26          (c)    private mortgage-backed securities backed by first lien mortgage
27  loans secured by one to four family residential properties or participations in that type
28  of loan.

478757_1

75.     As set forth above, CWABS filed numerous Registration Statements with the SEC for the sale of several classes of Certificates backed primarily by:

(a)     first lien mortgage loans secured by one to four family residential properties;

(b)     mortgage loans secured by first liens on small multi-family residential properties, such as residential apartment buildings or projects containing five to fifty residential units;

(c)     closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one to four family residential properties; or

(d)     home improvement loans, secured by first or subordinate liens on one to four family residential properties or by personal property security interests, and home improvement sales contracts, secured by personal property security interests.

76.     As set forth above, CWHEQ filed numerous Registration Statements with the SEC for the sale of several classes of Certificates backed primarily by:

(a)     first lien mortgage loans secured by first and/or subordinate liens on one to four family residential properties;

(b)     closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one to four family residential properties; or

(c)     home improvement loans, secured by first or subordinate liens on one to four family residential properties or by personal property security interests, and home improvement sales contracts, secured by personal property security interests.

**The Importance of Defendants' Representations Concerning Its Loan Underwriting Standards to Investors in the Trusts**

77.     Each of the Registration Statements and Prospectus Supplements contained representations concerning the standards purportedly used to underwrite the mortgages in the Issuing Trusts.  For example, each of the Registration Statements

60

1   issued by CWALT and CWMBS represented that: "All of the mortgage loans in the

2   trust fund will have been originated or acquired by Countrywide Home Loans in

3   accordance with its credit, appraisal and underwriting standards. Countrywide Home

4   Loans' underwriting standards are applied in accordance with applicable federal and

5   state laws and regulations." Each of the Registration Statements issued by CWABS

6   and CWHEQ similarly, indicated the importance of loan underwriting, expressing

7   their compliance with "applicable federal and state laws and regulations."

8        78.    Moreover, each of the Registration Statements issued by the Issuing

9   Defendants in connection with CWALT's and CWMBS' issuance of Certificates, set

10  forth the following representation regarding Countrywide's underwriting standards:

11       Countrywide Home Loans' underwriting standards are applied by
12  or on behalf of Countrywide Home Loans to evaluate the prospective
    borrower's credit standing and repayment ability and the value and
    adequacy of the mortgaged property as collateral. Under those standards,
13  a prospective borrower must generally demonstrate that the ratio of the
    borrower's monthly housing expenses (including principal and interest
14  on the proposed mortgage loan and, as applicable, the related monthly
    portion of property taxes, hazard insurance and mortgage insurance) to
15  the borrower's monthly gross income and the ratio of total monthly debt
    to the monthly gross income (the "debt-to-income" ratios) are within
16  acceptable limits. The maximum acceptable debt-to-income ratio, which
    is determined on a loan-by-loan basis varies depending on a number of
17  underwriting criteria, including the Loan-to-Value Ratio, loan purpose,
    loan amount and credit history of the borrower. In addition to meeting
18  the debt-to-income ratio guidelines, each prospective borrower is
    required to have sufficient cash resources to pay the down payment and
19  closing costs. Exceptions to Countrywide Home Loans' underwriting
    guidelines may be made if compensating factors are demonstrated by a
20  prospective borrower.

21       79.    The Registration Statements issued by the Issuing Defendants in

22  connection with CWABS' issuance of Certificates similarly described the criteria by

23  which loans in the Issuing Trusts were originated:

24       Countrywide Home Loans' underwriting standards are primarily
    intended to evaluate the value and adequacy of the mortgaged property
25  as collateral for the proposed mortgage loan and the borrower's credit
    standing and repayment ability. On a case by case basis, Countrywide
26  Home Loans may determine that, based upon compensating factors, a
    prospective borrower not strictly qualifying under the underwriting risk
27  category guidelines described below warrants an underwriting exception.
    Compensating factors may include low loan-to-value ratio, low debt-to-
28  income ratio, stable employment, time in the same residence or other

61

factors.  It is expected that a significant number of the Mortgage Loans will have been originated based on such underwriting exceptions.

80.     Likewise, the Registration Statements issued by CWHEQ, as modified by its Prospectus Supplements, made similar representations with respect to Countrywide's underwriting practices for fixed rate closed-end second lien mortgage loans and home equity loans:

> The underwriting process is intended to assess the applicant's credit standing and repayment ability, and the value and adequacy of the real property security as collateral for the proposed loan. Exceptions to the applicable originator's underwriting guidelines will be made when compensating factors are present. These factors include the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan.

81.     Sound underwriting is critically important to the investors acquiring the Certificates issued by the Issuing Trusts because the ability of Countrywide's borrowers to repay the principal and interest on the mortgages collaterizing the Issuing Trusts is the fundamental basis upon which the investment in the Certificate is valued. If, however, the mortgages pooled in the MBS suffered delinquencies in excess of the assumptions built into the mortgage pool, owners of the Certificates would suffer losses as the principal and income necessary to service the Certificates would, necessarily diminish.   This would reduce the yield on the Certificates and their corresponding value.

**Importance of Objective, Unbiased, and Accurate Property Appraisals**

82.     In addition to the representations concerning the underwriting standards used for the mortgages underlying the Issuing Trusts, the Registration Statements and Prospectus Supplements contained representations concerning the appraised value of the properties securing the loans.

83.     Independent and accurate real-estate appraisals are essential to the entire mortgage lending and securitization process, providing borrowers, lenders, and investors in MBS with supposedly independent and accurate assessments of the value of the mortgaged properties.  Accurate appraisals ensure that a mortgage or

478757_1

home equity loan is not under-collateralized, thereby protecting borrowers from financially over-extending themselves and protecting lenders and investors in MBS in the event a borrower defaults on a loan.   Accurate appraisals also provide investors with a basis for assessing the price and risk of MBS.

84.   As accurate appraisal is also critical in determining the LTV ratio, which is a financial metric that Wall Street analysts and investors commonly use when evaluating the price and risk of MBSs.  The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total appraised value of the property.  For example, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000, or 90%.   If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).

85.   From a lender's perspective, a high LTV ratio is riskier because a borrower with a small equity position in a property has less to lose if he/she defaults on the loan.  Worse, particularly in an era of falling housing prices, a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may exceed the value of the property.

86.   Real estate appraisals are governed by USPAP, which are the generally accepted standards for professional appraisal practice in North America, promulgated by the Appraisal Standards Board of the Appraisal Foundation, as authorized by Congress.  With respect to real estate appraisals, the USPAP requires:

> An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.
>
> In appraisal practice, an appraiser must not perform as an advocate for any party or issue.
>
> An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

*       *       *

63

478757_1

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

    1.    the reporting of a predetermined result (e.g., opinion of value);

    2.    a direction in assignment results that favors the cause of the client;

    3.    the amount of a value opinion;

    4.    the attainment of a stipulated result; or

    5.    the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

87.    The Registration Statements and Prospectus Supplements contained extensive disclosures concerning the value of the collateral underlying the mortgages pooled in the Issuing Trusts and the appraisals by which such values were obtained. For example, Prospectus Supplements stated that:

> ***Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and <u>require</u> an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. <u>Each</u> appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home*** and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan. ***<u>Every</u> independent appraisal is <u>reviewed</u> by a representative of Countrywide Home Loans before the loan is funded, and an additional review appraisal is generally performed in connection with appraisals not provided by Landsafe Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans***.

Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-1 (Form 424B5), at S-37 (Feb. 8, 2006).[2]

_____

[2]    The Prospectuses uniformly used the same, or substantially similar, language. *Accord, e.g.*, Prospectus Supplement for Alternative Loan Trust 2005-J7 (Form 424B5), at S-32 (June 29, 2005); Prospectus Supplement for Alternative Loan Trust 2005-63 (Form 424B5), at S-80 (Oct. 31, 2005); Prospectus Supplement for Alternative Loan Trust 2006-6CB (Form 424B5), at S-60 (Mar. 29, 2006); Prospectus Supplement for Alternative Loan Trust 2007-12T1 (Form 424B5), at S-37 (Apr. 27, 2007); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB3

88.     Each Prospectus Supplement also reported the average loan to value ratios of the collateral underlying the mortgages pooled in the Issuing Trusts.

89.     Investors bought the Certificates based on, *inter alia*, these representations concerning the value of the underlying properties in the pools of mortgages and the propriety of the appraisals used to determine the value of these properties.

**COUNTRYWIDE'S UNDERWRITING PRACTICES DIVERGED MATERIALLY FROM THE REPRESENTATIONS IN THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS**

90.     The mortgage pools underlying the Certificates have suffered serious delinquencies and foreclosures far above the rates that plaintiffs anticipated based on the defendants' representations concerning the underwriting standards and quality of mortgages pooled in the Issuing Trusts.  Foreclosures have revealed that the properties underlying the mortgages were valued far in excess of their true value.   As a consequence, the Certificates have lost value and plaintiffs have suffered damages.

91.     As discussed below, these elevated rates of delinquency and foreclosure are due to material deviations from the underwriting standards that were represented in Registration Statements and Prospectus Supplements.  In addition, it has been disclosed that the values assigned to the collateral underlying the mortgage loans were

---

(Form 424B5), at S-99 (May 1, 2006); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2005-30 (Form 424B5), at S-23 (Nov. 22, 2005); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-11 (Form 424B5), at S-34 (Apr. 24, 2006); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2007-1 (Form 424B5), at S-31 (Jan. 29, 2007); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2005-10 (Form 424B5), at S-29 (Sept. 15, 2005); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-1 (Form 424B5), at S-38 (Feb. 8, 2007); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2006-S2 (Form 424B5), at S-31 (Mar. 29, 2006); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2007-S3 (Form 424B5), at S-36 (Mar. 29, 2007); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-I (Form 424B5), at S-26 (Dec. 22, 2005); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2006-B (Form 424B5), at S-33 (Mar. 28, 2006); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2007-A (Form 424B5), at S-32 (Jan. 30, 2007).

478757_1

1    not determined in accordance with the appraisal standards represented in the

2    Registration Statements and Prospectus Supplements.   As a consequence, these

3    offering materials failed to disclose and misrepresented the true risks of investing in

4    the Certificates.

5    **Countrywide's Underwriting Standards Deviated Materially from the**
6    **Representations Contained in the Registration Statements and Prospectus**
       **Supplements**

7    92.   While the offering documents represented that Countrywide's

8    underwriting of mortgages was designed to ensure the borrower's ability to repay the

9    mortgage and the adequacy of the collateral supporting the mortgage, in reality,

10    however, Countrywide's underwriting standards were designed to originate as many

11    mortgage loans as possible without regard to the ability of its borrowers to afford such

12    mortgages. Indeed, contrary to the representations in the Registration Statements and

13    Prospectus Supplements, it has now been revealed that Countrywide's loan originators

14    systemically disregarded and/or manipulated the income, assets and employment

15    status of borrowers seeking mortgage loans in order to qualify these borrowers for

16    mortgages that were then pooled and sold to plaintiffs.  In many instances, this was

17    done by inflating borrowers' stated income, or facilitating income inflation by

18    encouraging ineligible borrowers to resort to "no documentation loans" and "stated

19    income loans."   In other cases, Countrywide customers were steered to more

20    expensive, higher interest loans, such as subprime and "alternative" mortgages, to

21    increase its supply of mortgages sold to the secondary mortgage markets.

22    93.   The falsity of the underwriting representations in the Registration

23    Statements and Prospectus Supplements is supported further by the allegations of

24    others against Countrywide for its role in the subprime mortgage crisis.  Senator

25    Charles Schumer from New York publicly stated, "'Countrywide did more to

26    contribute to the subprime mortgage crisis than anyone else.'"  Jonathan Stempel &

27    Dan Wilchins, "Countrywide's Sambol won't join Bank of America," *Reuters*, May

28    28, 2008 (quoting Senator Schumer).  Furthermore, in an action commenced against

Countrywide for wrongful termination, styled *Zachary v. Countrywide Financial Corporation*, No. 4:08-cv-00214, currently pending in the United States District Court for the Southern District of Texas, the plaintiff, Mark Zachary ("Zachary"), a Regional Vice President of Countrywide KB Homes Loans, Inc. ("CWKB"), alleged that CWKB, a 50-50 joint venture between Countrywide and KB Home Loans ("KB Home"), engaged in a host of mortgage origination and underwriting activities that did not comport with stated and standard practices.  Zachary described how loan officers would go so far as to help the loan applicant submit a loan application with *false income amounts*, so that the applicant would get the loan under false pretenses.

94.     According to Mr. Zachary, one of these practices involved CWKB's practice of *flipping* a loan application from a "full documentation" loan program to a "stated income" or "no income, no asset" loan program.  He learned that loans were being canceled at the prime regional operations center as full documentation loans and transferred to the sub-prime operations center in Plano, Texas, as stated asset, stated income ("SISA") loans, a "low-doc" loan, or no income, no assets ("NINA") loans, a "no-doc" loan.  Otherwise known as "liar loans," NINA loans allowed a borrower to simply state their income without providing any documentation or proof of this income.  Thus, rather than denying an applicant based on the information revealed in the original mortgage application, Countrywide pretended that it did not see the disqualifying information, such as insufficient income or assets, and instead, allowed applicants to apply for a no documentation loan, implicitly encouraging them to lie on these renewed applications.

95.     Furthermore, Mr. Zachary explained that while a material number of Countrywide's loan applicants were *not* eligible for *any* loan program requiring documentation based on the applicant's verified income level and/or job status, CWKB loan officers would (1) cancel the application for the loan program that required documentation, (2) re-do the application as a SISA or a NINA loan through the company's subprime originators in Plano, Texas, and (3) coach the loan applicant

67

1   as to what income level he or she would need to have in order to qualify for the low-
2   doc or no-doc loan.

3       96.     Investigations by others into Countrywide's business practices document
4   testimony by former Countrywide employees that corroborates Zachary's allegations
5   and portrays a systemic departure from Countrywide's underwriting standards.

6       97.     On February 15, 2008, Countrywide shareholders filed a consolidated
7   complaint alleging derivative claims against the officers and directors of Countrywide
8   in an action styled *In re Countrywide Financial Corp. Derivative Litigation*, No. 07-
9   CV-06293-MRP-(MANx), currently pending in the United States District Court for
10  the Central District of California (the "Derivative Complaint").   The Derivative
11  Complaint cited information obtained from several former Countrywide employees
12  who stated that the vast majority of Countrywide's loans were underwritten in
13  contravention of the company's stated underwriting standards.  For example, a former
14  "Underwriter II" – a Countrywide employment classification – based in a
15  Jacksonville, Florida, processing center between June 2006 and April 2007 stated that
16  in Countrywide's campaign to increase the volume of loan originations, as much as
17  80% of the loans originated by Countrywide in that office involved significant
18  variations from the underwriting standards.

19      98.     Purchasers of Countrywide common shares (the "Securities Plaintiffs")
20  filed a complaint in the United States District Court of the Central District of
21  California (*In re Countrywide Financial Corp. Securities Litigation*, No. CV 07-
22  05295 MRP (MANx)), which confirms the foregoing, and reveals further, systematic
23  transgressions in Countrywide's loan origination practices.

24      99.     For example, a supervising underwriter at Countrywide until mid-2005,
25  who oversaw the company's underwriting operations in several states (the
26  "Supervising Underwriter"), stated that the underwriting guidelines were "very loose
27  and lax" and designed to help Countrywide make more loans (as opposed to
28  protecting the entity that ended up taking on the credit risk that the borrower would

478757_1

1    default on the mortgage).  Another former employee confirmed that Countrywide's

2    "Sales Training Facilitator Guide" stated that "we always look for ways to make the

3    loan rather than turn it down."

4        100.   The Supervising Underwriter further stated that since late 2004,

5    Countrywide's Structured Loan Desks employed software called the Exception

6    Processing System or EPS in order to obtain approval for loans that were exceptions

7    to and should have been rejected by Countrywide's underwriting standards.  As many

8    as 15% to 20% of the loans generated each day at the Company's Structured Loan

9    Desks were run through EPS and very few were ever rejected.  This practice was

10   confirmed by documents publicly filed in an Alaskan criminal case against a former

11   Countrywide manager charged with extending improper loans, which reveal that the

12   objectives of EPS were to "[a]pprove virtually every borrower and loan profile" and

13   "[p]rocess and price exceptions on standard products for high risk borrowers."

14       101.   The Supervising Underwriter further stated that if a potential borrower

15   applying for a SISA loan provided a bank name, address and account number for asset

16   verification, it was the practice at Countrywide not to verify the bank balance.

17   According to another former employee identified during the Securities Plaintiffs'

18   investigation, as well as an April 6, 2008 article in the *New York Times,* even though

19   Countrywide had the right to verify stated income on an application through the

20   Internal Revenue Service ("IRS") (and this check took less than one day to complete),

21   income was verified with the IRS on only 3%-5% of all loans funded by Countrywide

22   in 2006.

23       102.   Another witness identified during the investigation by the Securities

24   Plaintiffs, a Senior Underwriter in Roseville, California, from September 2002 to

25   September 2006, said that Countrywide regularly would classify loans as "prime"

26   even if made to unqualified borrowers, including those who had recently gone through

27   a bankruptcy and were still having credit problems. According to this witness,

28   Countrywide's stated underwriting policies were not followed throughout 2006.

478757_1

103.   Attorneys General from various states have launched investigations into Countrywide's lending practices and also have alleged that Countrywide systematically departed from the underwriting standards it professed using for originating residential loans.

104.   For example, the Illinois Attorney General (the "Illinois AG") launched an investigation into Countrywide's loan practices that has culminated in the action styled *The People of the State of Illinois v. Countrywide Financial Corporation, et al.*, No. 08CH22994, originally filed on June 25, 2008 in the Chancery Division of the Circuit Court of Cook County, Illinois (the "Illinois AG Complaint"). In 2004, 2005 and 2006, Countrywide was Illinois' largest mortgage originator, originating and selling approximately 94,000 mortgage loans to Illinois consumers.

105.   According to Countrywide employees who the Illinois AG interviewed, Countrywide originated loans that did not meet its underwriting criteria because Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrower was able to repay the loan.

106.   With respect to stated income loans, Countrywide employees explained to the Illinois AG that while the company had a "reasonableness standard" in order to check fraudulent stated income, employees were only required to use their judgment in deciding whether or not a stated income loan seemed reasonable.  To supplement an employee's judgment as to whether or not a potential borrower's income was "reasonable," beginning in 2005, Countrywide required its employees to utilize a website, www.salary.com, in order to determine if the potential borrower's stated income was indeed reasonable.  The website only provides a range of salaries based on the zip code and stated job title of the potential borrower.  Even though Countrywide required the use of www.salary.com, if the stated salary was outside of the range provided by the website, Countrywide employees could still approve the loan.  The Illinois AG contends that the foregoing "reasonableness" test contravened proper underwriting practices.

107.   The Illinois AG Complaint also alleges that Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of Countrywide's stated income loans were based on inflated estimates of borrowers' income.   For example, (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.

108.   Likewise, the *Chicago Tribune* reported that a review of 100 stated income loans by the Mortgage Asset Research Institute revealed that 60% of the income amounts were inflated by more than 50% and that 90% of the loans had inflated income of at least 5%.

109.   Countrywide also originated and sold adjustable rate mortgages ("ARMs") to borrowers who could not afford the ARMs once the initial or "teaser" interest rate expired.   Indeed, the company admitted in a May 7, 2007 letter to the Office of Thrift Supervision that in the fourth quarter of 2006 alone "almost 60% of the borrowers who obtained subprime hybrid ARMs [from Countrywide] would not have qualified at the fully indexed rate" and that "25% of the borrowers would not have qualified for any other [Countrywide] product."

110.   The fully indexed rate is the amount of interest that is payable on an ARM once the teaser rate is removed.   The "teaser rate," typically 1%-1.25% is only applied to the loan for the first month.   Once the teaser rate is removed, the interest on the mortgage begins accruing according to the fully indexed rate.

111.   The fully indexed rate can change over time and is dependent on fluctuations in the current value of the chosen rate index, such as the 11th District Cost of Funds Index ("COFI"), the 12 Month Treasury Average Index or the London Interbank Offer Rate.   The fully indexed rate is calculated by adding the current value of the rate index (which fluctuates monthly) and adding the margin agreed to by the

71

borrower.   The margin remains static for the life of the loan.   The margin on Countrywide loans could be as high as 4%.  Thus, if the Countrywide ARM identifies the rate index as COFI (which was at 2.8% in July 2008) and the margin as 4%, then once the cap or "teaser rate" has expired, the borrower will be subject to an interest rate equal to the fully indexed rate ("FIR") or 6.8% for that month.

112.   Because the borrower has the option of making monthly payments as though the interest rate had not changed, most of those who had Countrywide ARMs paid only the "minimum" payment – a payment that is based on the teaser rate of 1% to 1.25% as opposed to the FIR of 6.8%, meaning that borrowers were making payments that were less than the amount of interest accruing on the loan after the teaser rate expired.  The unpaid interest that accrues while the borrower is making the payment based on the teaser rate is tacked on to the principal.  Once the principal is 115% of the original loan, then the borrower's monthly payment immediately is raised in order to a level that will pay off the new balance (original principal plus the unpaid interest) of the loan.  This is called "payment shock."

113.   Countrywide thus admitted to the Office of Thrift Supervision that even though 60% of its potential borrowers would not have qualified for a Countrywide loan with an interest rate of 6.8%, they were qualified for the same loan with a teaser rate of 1.25%, even though that borrower would likely experience "payment shock" and be unable to pay off the loan in the near future.

114.   Even when Countrywide employees received proper income documentation (*i.e.*, a W-2 form) demonstrating that the borrower did not qualify for a loan, the loan was submitted as a stated income loan so as to obtain approval of the loan.

115.   The California Attorney General ("California AG") also commenced an investigation into Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, styled *The People of the State of California v. Countrywide Financial Corporation, et al*, No. LC081846

1   (the "California AG Complaint").  The California AG's complaint also alleges that

2   Countrywide departed from its stated underwriting standards.  For example, the

3   Complaint alleges that employees were pressured to issue loans to unqualified

4   borrowers by permitting exceptions to underwriting standards, incentivizing

5   employees to extend more loans without regard to the underwriting standards for such

6   loans, and failing to verify documentation and information provided by borrowers that

7   allowed them to qualify for loans.

8       116.   According to the California AG, Countrywide used a system called

9   CLUES or Countrywide Loan Underwriting Expert System.  A Countrywide

10   underwriter would enter the borrower's financial and credit information and the terms

11   of the loan into CLUES, which would then provide a loan analysis report that

12   indicated whether the loan was within Countrywide's underwriting guidelines.

13   CLUES reports stating that a borrower was not within Countrywide's underwriting

14   guidelines often were ignored in order to effectuate the loan.

15       117.   Moreover, like the employees interviewed by the Illinois AG, California

16   Countrywide employees cited in the California AG Complaint claimed to have

17   utilized the website www.salary.com purportedly to confirm a borrower's stated

18   income.  According to the California AG Complaint, California employees would

19   know ahead of time the range of salaries that www.salary.com would provide for a

20   particular job and, therefore, know by how much they could overstate a borrower's

21   income.  A former California loan officer for Countrywide further explained that its

22   loan officers typically explained to potential borrowers that "with your credit score of

23   X, for this house, and to make X payment, X is the income that you need to make";

24   after which the borrower would state the he or she made X amount of income.

25       118.   The California AG Complaint alleged that Countrywide's practice of

26   approving loans based on the borrower's ability to pay the teaser rate (as opposed to

27   the fully indexed rate), as admitted to by the company in the May 7, 2007 letter to the

28   Office of Thrift Supervision, commenced in 2005.

73

119.   Likewise, a December 28, 2007 *Los Angeles Times* article reported that Countrywide tightened its lending standards in the summer of 2007 in order to ensure that borrowers could afford loans at the fully indexed rate (as opposed to just the teaser rate), and that the company admitted that had those guidelines been in effect during the relevant time period, "it would have rejected 89% of the option ARM loans it made in 2006, amounting to $64 billion, and $74 billion, or 83%, of those it made in 2005."

120.   The Connecticut Attorney General (the "Connecticut AG") filed a complaint in Superior Court, Judicial District of Hartford styled *State of Connecticut v. Countrywide Financial Corporation, et al.*, alleging that Countrywide's employees inflated borrowers' incomes in order to qualify them for loans they otherwise would not have received. The Connecticut AG's complaint further bolsters the allegations that Countrywide employees circumvented the company's underwriting procedures and guidelines to grow the number of Countrywide loan originations.

121.   Many of the allegations in the Illinois, California and Connecticut complaints were confirmed by investigations in other states such as Washington, West Virginia, Indiana and Florida, revealing the nationwide scope of Countrywide's departures from the underwriting standards set forth in each Registration Statement and Supplemental Prospectus.  Significantly, on October 6, 2008, Countrywide announced that it had settled the fraud claims brought by 11 states, including California and Illinois for an estimated $8.4 billion, which, according to the California AG, is likely the largest settlement of allegations of predatory lending.

122.   Press reports and articles further highlight the excess lending and lax underwriting that existed throughout Countrywide during the relevant time period, when the mortgages supporting the Issuing Trusts were originated.  For example, on August 26, 2007, in an article by Gretchen Morgenson entitled "Inside the Countrywide Lending Spree," the *New York Times* described how Countrywide's focus on underwriting was not the ability of a borrower to repay a loan, but on the

74

1    amount of fees that Countrywide could generate from the loan.  As such, Countrywide

2    steered borrowers to loans with the highest interest rates and the most fees, while

3    concealing less expensive loan products that those customers could afford.  The result:

4    greater delinquencies.

5          123.   Similarly, on February 23, 2008, *The Wall Street Journal* reported in an

6    article entitled "Mortgage Chief Picked by BofA Sparks Worries – Countrywide

7    Executive Spearheaded Pursuit of Subprime Business" that Countrywide's stated

8    underwriting standards were not followed and warnings from risk-control managers at

9    Countrywide were not heeded during the time the Registration Statements and

10   Prospectus Supplements were issued.

11         124.   *The Wall Street Journal* further reported that Countrywide strived to

12   close more loans in 2006 while third party risk analysts concluded that the computer

13   risk models used by Countrywide to project defaults on its subprime loans materially

14   underestimated the number of at risk loans.

15         125.   Countrywide's underwriting standards are also the subject of an

16   investigation by the Federal Bureau of Investigation ("FBI"), which was first reported

17   on March 8, 2008, by *The Wall Street Journal* in an article entitled "FBI Investigates

18   Countrywide – U.S. Scrutinizes Filings on Financial Strength, Loan Quality for

19   Fraud."   The FBI investigation is focused on "whether company officials made

20   misrepresentations about the company's financial position and the quality of its

21   mortgage loans in securities filings."

22         126.   On March 11, 2008, *The Wall Street Journal* published another article

23   further detailing the FBI's investigation of Countrywide's lending practices.

24   According to the sources interviewed by *The Wall Street Journal*, federal investigators

25   were finding that "Countrywide's loan documents often were marked by dubious or

26   erroneous information about its mortgage clients, according to people involved in the

27   matter.  ***The company packaged many of those mortgages into securities and sold***

28

1   *them to investors, raising the additional question of whether Countrywide*
2   *understated the risks such investments carried*."

3   127.   On September 30, 2008, MBIA Insurance Corp. ("MBIA") filed a
4   complaint against Countrywide in New York state court alleging that Countrywide
5   had fraudulently induced it to provide insurance for certain of the Certificates,
6   including those contained in the following trusts:  CWHEQ 2005-E; CWHEQ 2005-I;
7   CWHEQ 2005-M; CWHEQ 2006-E; CWHEQ 2006-G; CWHEQ 2006-S8; CWHEQ
8   2007-E; CWHEQ 2007-S1; CWHEQ 2007-S2; and CWHEQ 2007-S3.  The case is
9   styled *MBIA Insurance Corp. v. Countrywide, et al.*, No. 08/602825, currently
10  pending in the Supreme Court of the State of New York, County of New York.

11  128.   MBIA was able to obtain some 19,000 loan files for the Certificates it
12  insured as a result of its contractual agreements with Countrywide.  After reviewing
13  the portfolios and basically re-underwriting each loan provided by Countrywide,
14  MBIA discovered that there was an "extraordinarily high incidence of material
15  deviations from the underwriting guidelines Countrywide represented it would
16  follow."  Notably, the underwriting guidelines that Countrywide provided to MBIA
17  were the same ones that were detailed in the Registration Statements the Prospectus
18  Supplements.  MBIA discovered that many of the loan applications "lack[ed] key
19  documentation, such as a verification of borrower assets or income; include[d] an
20  invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of
21  the application; or reflect[ed] that any borrower income, FICO score, or debt, or DTI
22  or CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible
23  exception)."  Significantly, "MBIA's re-underwriting review . . . revealed that almost
24  90% of defaulted or delinquent loans in the Countrywide Securitizations show
25  material discrepancies."

26  129.   On June 4, 2009, the SEC filed a complaint against Angelo Mozilo,
27  David Sambol and Eric Sieracki.  The SEC Complaint alleges, among other things:

28

- Countrywide embarked on a strategy of underwriting a higher number of exception loans. The SEC alleges that "[t]he elevated number of exceptions resulted largely from Countrywide's use of exceptions as part of its matching strategy to introduce new guidelines and product changes." SEC Complaint, ¶29. By February 2007, internal risk management "noted that the production divisions continued to advocate for, and operated pursuant to, an approach based upon the matching strategy alone . . . . Additionally, [a senior risk management employee] warned [Sambol] that, *I doubt this approach would play well with regulators, investors, rating agencies etc*. To some, this approach might seem like *we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines*.'" SEC Complaint, ¶44.

- Countrywide's risk management reported to the credit risk committee on June 28, 2005, that there was "evidence of borrowers misrepresenting their income and occupation on reduced documentation loan applications." SEC Complaint, ¶37.

- By June 2006 "both Mozilo and Sambol were aware . . . that a significant percentage of borrowers who were taking out stated income loans were engaged in mortgage fraud." SEC Complaint, ¶40. For example, "[o]n June 2, 2006, Sambol received an email reporting on the results of a quality control audit at Countrywide Bank that showed that *50%* of the stated income loans audited by the bank showed a variance in income from the borrowers' IRS filings of greater than 10%. Of those, 69% had an income variance of greater than 50%." *Id*.

- Angelo Mozilo, Countrywide's CEO, noted in an April 13, 2006 email "that he had *personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated* versus the pricing of those loan [sic]." SEC Complaint, ¶49.

- A December 13, 2007 internal Countrywide memorandum reveals, "'Countrywide had reviewed limited samples of first- and second-trust-deed mortgages originated by Countrywide Bank during the fourth quarter of 2006 and the first quarter of 2007 in order to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures. The review resulted in . . . the finding that *borrower repayment capacity was not adequately assessed by the bank during the underwriting process* for home equity loans. More specifically, *debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or any increase in interest*.'" SEC Complaint, ¶56.

- A senior risk management employee warned defendant Sambol on May 22, 2005, "of the likelihood of significantly higher default rates in loans made on an exception basis: '[t]he main issue is to make sure everyone's aware that we will see higher default rates.'" SEC Complaint, ¶54. According to the SEC Complaint, the senior risk management employee explained to Sambol "that 'exceptions are generally done at terms more aggressive than our guidelines,' and continued that '*[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions*.' [The senior risk management employee

77

478757_1

further] warned [Sambol] *that increased defaults would cause repurchase and indemnification requests to rise and the performance of Countrywide-issued MBS to deteriorate*." *Id.*

**Countrywide's Appraisals Were Not in Accordance with Industry Accepted Appraisal Standards**

130.  During the period in which the defendants issued the Registration Statements and Prospectus Supplements and sold the Certificates, Countrywide's appraisals of properties underlying the pooled mortgages in the Issuing Trusts did not comport with the standards disclosed in the offering materials for the Certificates.

131.  According to Countrywide's "Subprime Appraisal Requirements," virtually every loan needed to be accompanied by at least one independent appraisal performed by (1) an appraiser working through Countrywide's subsidiary, Landsafe Appraisals, Inc. ("Landsafe"), or (2) a secondary appraisal from an "approved appraisal company," including eAppraiseIT.com, Lender Services Inc. and LandAmerica Lender Services.

132.  Notwithstanding Countrywide's "Subprime Appraisal Requirements," the appraisals obtained by Countrywide underwriters were not independent.  For example, the Securities Plaintiffs allege that since at least 2005, loan officers from all of Countrywide's origination divisions were permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that did not support loan transactions, and (iii) substitute more favorable appraisals by replacement appraisers when necessary to obtain a more favorable loan to value ratio so as to qualify the loan for approval.

78

478757_1

Countrywide loan officers were allowed to lobby appraisers to assign particular values to a property in order to support the closing of a loan.

133.   Furthermore, numerous appraisers have confirmed that the inflation of appraisals was commonplace.  For example, the owner of a small Midwest residential real estate appraisal firm in Illinois – who was approved and/or utilized by CHL and other originators in approximately 200 transactions – stated that mortgage brokers would call him and say "I need this number."  This appraiser also stated that he was frequently threatened with, "either give us this home value or you will never do business for us again."

134.   An independent appraiser from Florida, who was approved by CHL and other originators, stated that she was told by brokers and/or lenders that: "WE NEED THIS NUMBER, OR YOU WILL NEVER WORK FOR US AGAIN."  In order to stay in business, she gave the valuations the broker or lender demanded, even if it required driving 20 miles away for a comparable sale.  During the relevant period, this appraiser completed 100+ appraisals for CHL and other originators that were over-inflated.

135.   A real estate appraiser in Las Vegas stated that when the Vegas market had peaked, CHL was requiring appraisers to come up with real estate appraisals reflecting escalating values or they would black-ball them.  This appraiser conducted over 300 appraisals that in his opinion were inflated for CHL and other originators.

According to this appraiser, typically the appraisals demanded by CHL was 15% to 25% over the actual market.

136.   Another independent appraiser stated that CHL in-house or outside loan officers demanded inflated numbers from him in Compton and Watts, California.  The lenders told him to either give them the appraisal numbers they wanted or that he would be "done" and that he would be blackballed by every lender doing business in California.  According to this appraiser, he did over 100 over-inflated appraisals just for CHL and one other originator.  In some cases he was appraising houses that he described as "crack houses" that should have been bulldozed, for $100,000 more than they were worth.  The neighborhoods were so bad, sometimes he never even got out of his car.  He would simply drive by and take pictures of the house and give the broker or the lender the number they demanded.

137.   Additionally, several complaints have been filed against Countrywide and its appraisal subsidiary, Landsafe, as well as several of the "approved appraisal companies" alleging that the appraisals obtained were inflated.

138.   Three lawsuits have been filed against Countrywide and Landsafe regarding the use of inflated Landsafe appraisals to obtain loans for individuals through CWKB, the *Zachary* Complaint and two class actions brought by KB Home purchasers: (1) *Zaldana, et al. v. KB Home, et al.*, No. CV 08-3399 (EDL), currently pending in the United States District Court for the Northern District of California (the "*Zaldana* Complaint"); and (2) *Bolden, et al v. KB Home, et al.*, No. BC385040, currently pending in Los Angeles County Superior Court (the "*Bolden* Complaint").

139.   Mark Zachary stated that while he was employed at CWKB, Landsafe – the only appraiser employed by CWKB to appraise the homes on behalf of the joint venture – was encouraged to inflate the value of appraised homes by as much as 6% in order to allow the borrower to "roll up" the closing costs of the mortgage.  This practice resulted in the actual home value being less than the mortgaged amount,

1   putting the home buyer "upside down" on the home immediately after purchasing it.

2   It also put the lender and secondary market end investor at risk because they were

3   unaware of the true value of their asset.

4      140.   The *Zaldana* Complaint described a process whereby KB Home paid

5   Countrywide to make loans with subsidized initial payments to KB borrowers, thereby

6   allowing KB to prop up the ostensible sales price of KB homes and sell to buyers who

7   would not otherwise be able to afford or qualify for the monthly mortgage payments.

8   In turn, Countrywide would have its Landsafe appraisers ignore the subsidiaries in

9   order to appraise the home at the full stated sales price, thereby inflating the actual

10  value of the house (*i.e.*, the price that a buyer was willing to pay for it).

11     141.   Deborah and Lonnie Bolden describe in the *Bolden* Complaint how

12  CWKB inflated appraisals in a KB development in Live Oak, California.  According

13  to the Bolden Complaint, CWKB required the use of Landsafe.  When one of the

14  Bolden's neighbors refused to use CWKB as the lender, they sought an independent

15  appraisal of their property.  The independent appraiser concluded that the neighbor's

16  property was worth $408,000, or approximately 13% less than the $469,000 value

17  appraised by CWKB.  Upon further investigation, the Boldens discovered that the

18  appraisal performed by CWKB provided inflated values of purportedly "comparable"

19  properties to justify an inflated value for the Bolden's home.  Specifically, the

20  Boldens' appraisal report listed two properties as having sold for $461,000 and

21  $480,500, while the public records from the county recorder's office indicate that the

22  homes were actually sold for $408,500 and $410,000, respectively.

23     142.   Countrywide, Landsafe and eAppraiseIT.com have been sued by

24  investors of Fannie Mae and Freddie Mac on behalf of the companies for damages as

25  a result of generating artificially high and unjustified appraisals for property

26  underlying mortgage packages sold to both Fannie Mae and Freddie Mac.

27     143.   Additionally, former appraisers for Countrywide have stated that the

28  company applied as much or more pressure to appraisers who worked through

81

478757_1

1   Landsafe as well as the approved appraisal companies eAppraiseIT.com and Lender
2   Services Inc., to inflate appraisals as other mortgage lenders.  For example, Jennifer
3   Wertz, a licensed Real Estate Appraiser in California sued eAppraiseIT.com and
4   Lender Services Inc., among others, after she failed to replace a reference to
5   "'declining' market conditions" in an appraisal to "'stable' market conditions" in two
6   appraisals for Washington Mutual ("WaMu").  Thereafter, eAppraiseIT.com and
7   Lender Services Inc. failed to give Wertz any work (even non-WaMu work) because
8   she refused to alter her appraisals.

9        144.   Since the end of 2007, Countrywide has tightened its standards for
10   appraisals it will accept.  For example, in a fall 2007 letter to its "Valued Business
11   Partner[s]," Countrywide provided "additional appraisal due diligence controls" in
12   soft markets "in an effort to make decisions based on accurate current market values
13   and trends."

14        145.   Moreover, individuals who received Countrywide loans in 2005 and 2006
15   and are now seeking to refinance are discovering that the appraised value of their
16   homes has plummeted because the "value" of the homes were inflated to begin with.
17   For example, an individual living in Portland, Maine, was shocked to discover that his
18   1820's Cape Code style home, which was described in an earlier appraisal done by
19   Landsafe in December 2005 as having four bedrooms and two full bathrooms was
20   appraised by the same Landsafe appraiser in November 2007 for $100,000 less in part
21   because the house now only had three bedrooms, 1.75 bathrooms and was 200 square
22   feet smaller.  When asked for an explanation, the owner of the Landsafe-approved
23   appraiser stated that Countrywide had changed its rules after allowing their appraisers
24   to overvalue properties to substantiate large loans for the last two years.  The owner
25   stated that under the new rules a Landsafe-approved appraiser cannot appraise a home
26   higher than the two lowest price listings in the surrounding area, despite the subject
27   property's actual value.

28

478757_1

## MATERIAL MISSTATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS

146.   Each Registration Statement for the Issuing Trusts contained an illustrative form of a prospectus supplement for use in the offering of the Certificates. Each Registration Statement was prepared by the Issuing Defendants and signed by the Individual Defendants.  At the effective date of the offering of the Certificates, a final Prospectus Supplement was filed with the SEC containing a description of the mortgage pool underlying the Certificates and the underwriting standards by which the mortgages were originated.  The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements.

147.   Each Registration Statement and Prospectus Supplement issued by CWALT and CWMBS contained the following language concerning the underwriting standards by which the mortgages pooled into CWALT's and CWMBS' Issuing Trusts were originated:

> All of the Mortgage Loans have been originated or acquired by Countrywide Home Loans, Inc., in accordance with its credit, appraisal and underwriting standards. . . .   Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.
>
> *          *          *
>
> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.  The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower.  In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

83

478757_1

Registration Statements filed by CWALT on Form S-3 on Nov. 7, 2003 (at S-19-20) (as amended Jan. 13, 2004) and Form S-3/A on Sept. 23, 2004 (at S-18-19), Apr. 21, 2005 (at S-18-19), July 25, 2005 (at S-18-19), Mar. 6, 2006 (at S-52-53), Apr. 27, 2007 (at S-39-40); and Registration Statements filed by CWMBS on Form S-3/A on Oct. 28, 2002 (at S-18-19), Feb. 8, 2005 (at S-20-21), July 25, 2005 (at S-21), Mar. 6, 2006 (at S-52-53) and Apr. 24, 2007 (at S-40-41). These statements were repeated the Prospectus Supplements subsequently filed for each of these Registration Statements. *See, e.g.*, Prospectus Supplement for Alternative Loan Trust 2005-J7 (Form 424B5), at S-31 and S-35 (June 29, 2005).[3]

148. The above statements, concerning Countrywide's adherence to its underwriting standards and to federal and state underwriting standards, with respect to mortgages pooled into CWALT and CWMBS Issuing Trusts, were materially false and misleading when made because:

(a)     The defendants failed to disclose that Countrywide systematically ignored underwriting standards imposed by state and federal law in issuing the mortgages pooled into the Issuing Trusts.

(b)     Countywide did not, contrary to its statement above, properly "evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."   Rather, as alleged herein, Countrywide systematically ignored borrowers' repayment ability and the

---

[3]     The Prospectus Supplements for these Registration Statements uniformly used the same, or substantially similar, language. *Accord, e.g.*, Prospectus Supplement for Alternative Loan Trust 2006-6CB (Form 424B5), at S-59 (Mar. 29, 2006); Prospectus Supplement for Alternative Loan Trust 2005-63 (Form 424B5), at S-79 (Oct. 31, 2005); Prospectus Supplement for Alternative Loan Trust 2007-12T1 (Form 424B5), at S-37 (Apr. 27, 2007); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB3 (Form 424B5), at S-98 (May 1, 2006); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2005-30 (Form 424B5), at S-23 (Nov. 22, 2005); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-11 (Form 424B5), at S-34 (Apr. 24, 2006); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2007-1 (Form 424B5), at S-31 (Jan. 29, 2007).

478757_1

1    value and adequacy of mortgaged property used as collateral in issuing loans.  Rather,

2    Countrywide designed its underwriting standards to ensure that it received the highest

3    possible fees for originating loans without regard to the actual ability of its borrowers

4    to repay the loan, or whether the mortgaged property had sufficient value to collaterize

5    the loan.

6                (c)    Countrywide's underwriting standards did not require that a

7    borrower "generally demonstrate that the ratio of the borrower's monthly housing

8    expenses (including principal and interest on the proposed mortgage loan and, as

9    applicable, the related monthly portion of property taxes, hazard insurance and

10   mortgage insurance) to the borrower's monthly gross income and the ratio of total

11   monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within

12   acceptable limits."   Instead, Countrywide's underwriting included the following

13   practices that disregarded a borrowers' ability to pay:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs, *see, supra*, §V.A.

- Steering borrowers to more expensive loans that exceeded their borrowing capacity, *see, supra*, §V.A.

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes, *see, supra*, §V.A.

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted, *see, supra*, §V.A.

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies.

- Systematically overriding flags identified by the CLUES system that was meant to weed out non-qualifying loans and nonetheless approving such loans.

149. Each Registration Statement and Prospectus Supplement issued by CWABS and CWHEQ contained the following language concerning the underwriting standards by which the mortgages pooled into the Issuing Trusts were originated:

> Credit Blemished Mortgage Loans. The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit blemished mortgage loans. . . . Countrywide Home Loans produces its credit blemished mortgage loans through its Consumer Markets, Full Spectrum Lending, Correspondent Lending and Wholesale Lending Divisions. Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans. In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit blemished mortgage loan that it has not itself underwritten.

> Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors. It is expected that a significant number of the Mortgage Loans will have been originated based on such underwriting exceptions.

> Each prospective borrower completes an application which includes information with respect to the applicant's assets, liabilities, income and employment history, as well as certain other personal information. Countrywide Home Loans requires an independent credit bureau report on the credit history of each applicant in order to evaluate the applicant's prior willingness and/or ability to repay.  The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments, among other matters.

> After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income. The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 50%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

1                              *       *       *

2     While more flexible, Countrywide Home Loans' underwriting guidelines
      still place primary reliance on a borrower's ability to repay; however

3     Countrywide Home Loans may require lower loan-to-value ratios than
      for loans underwritten to more traditional standards. Borrowers who

4     qualify generally have payment histories and debt-to-income ratios
      which would not satisfy more traditional underwriting guidelines and

5     may have a record of major derogatory credit items such as outstanding
      judgments or prior bankruptcies. Countrywide Home Loans' credit

6     blemished mortgage loan underwriting guidelines establish the
      maximum permitted loan-to-value ratio for each loan type based upon

7     these and other risk factors with more risk factors resulting in lower
      loan-to-value ratios.

8

9     *See* Registration Statements filed by CWABS on Form S-3/A on Oct. 18, 2004 (at S-

10    47), June 10, 2006 (at S-47), Feb. 21, 2006 (at S-38-39), Aug. 8, 2006 (at S-38-39)

11    and Apr. 24, 2007 (at S-40-41); Registration Statements filed by CWHEQ on Form S-

12    3 on Dec. 17, 2004 (at S-25) and on Form S-3/A on Aug. 4, 2005 (at S-25), Apr. 14,

13    2006 (at S-38-39) and May 22, 2007 (at S-38-39).[4]

14          150.   In addition, the Prospectus Supplements for CWHEQ Registration

15    Statements also contained additional language describing the standards by which

16    CWHEQ's home equity loans and second lien mortgage loans were originated:

17    The underwriting process is intended to assess the applicant's credit
      standing and repayment ability, and the value and adequacy of the real

18    property security as collateral for the proposed loan. Exceptions to the
      applicable originator's underwriting guidelines will be made when

19    compensating factors are present. These factors include the borrower's
      employment stability, favorable credit history, equity in the related

20    property, and the nature of the underlying first mortgage loan.

21    _____

22    [4]     The Prospectus Supplements for these Registration Statements uniformly used
      the same, or substantially similar, language. *See, e.g.*, Prospectus Supplement for

23    CWABS Asset-Backed Certificates Trust 2006-15 (Form 424B5), at S-33-34 (Sept.
      27, 2006); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-

24    10 (Form 424B5), at S-40-41 (June 26, 2006); Prospectus Supplement for CWABS
      Asset-Backed Certificates Trust (Form 424B5) 2006-11, at S-42-43 (June 28, 2006);

25    Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-13 (Form
      424B5), at S-41-42 (July 27, 2006); Prospectus Supplement for CWABS Asset-

26    Backed Certificates Trust 2006-3 (Form 424B5), at S-37-38 (Feb. 23, 2006);
      Prospectus Supplement for CWABS Asset-Backed Certificates Trust (Form 424B5)

27    2006-4, at S-35-36 (Mar. 15, 2006).

28

1   *See, e.g.*, Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust

2   Series 2005-G (Form 424B5), at S-21 (Sept. 28, 2005); Prospectus Supplement for

3   CWHEQ Revolving Home Equity Loan Trust Series 2005-M (Form 424B5), at S-23

4   (Dec. 27, 2005); Prospectus Supplement for CWHEQ Revolving Home Equity Loan

5   Trust Series 2006-G (Form 424B5), at S-33 (Aug. 29, 2006); Prospectus Supplement

6   for CWHEQ Revolving Home Equity Loan Trust Series 2007-B (Form 424B5), at S-

7   31 (Mar. 28, 2007); *see also* Prospectus Supplement for CWHEQ Home Equity Loan

8   Trust, Series 2006-S6 (Form 424B5), at S-31 (Sept. 28, 2006); Prospectus Supplement

9   for CWHEQ Home Equity Loan Trust, Series 2007-S1(Form 424B5), at S-34 (Feb.

10  27, 2008); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series

11  2006-S9 (Form 424B5), at S-31 (Dec. 28, 2006); Prospectus Supplement for CWHEQ

12  Home Equity Loan Trust, Series 2006-S9 (Form 424B5), at S-31 (Dec. 28, 2006).

13         151.   The Prospectus Supplements for CWHEQ Registration Statements also

14  stated:

15         After obtaining all applicable income, liability, asset, employment,
       credit, and property information, the applicable originator generally uses
16     a debt-to-income ratio to assist in determining whether the prospective
       borrower has sufficient monthly income available to support the
17     payments on the home equity loan in addition to any senior mortgage
       loan payments (including any escrows for property taxes and hazard
18     insurance premiums) and other monthly credit obligations. The "debt-to-
       income ratio" is the ratio of the borrower's total monthly credit
19     obligations (assuming the mortgage loan interest rate is based on the
       applicable fully indexed interest rate) to the borrower's gross monthly
20     income. Based on this, the maximum monthly debt-to-income ratio is
       45%. Variations in the monthly debt-to-income ratios limits are
21     permitted based on compensating factors. The originators currently offer
       home equity loan products that allow maximum combined loan-to-value
22     ratios up to 100%.

23  *See, e.g.*, Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust

24  Series 2005-G (Form 424B5), at S-22-23 (Sept. 28, 2005); Prospectus Supplement for

25  CWHEQ Revolving Home Equity Loan Trust Series 2005-M (Form 424B5), at S-24

26  (Dec. 27, 2005); Prospectus Supplement for  CWHEQ Revolving Home Equity Loan

27  Trust Series 2006-G (Form 424B5), at S-34 (Aug. 29, 2006); Prospectus Supplement

28  for CWHEQ Revolving Home Equity Loan Trust Series 2007-B (Form 424B5), at S-

478757_1

32 (Mar. 28, 2007); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2006-S6 (Form 424B5), at S-32 (Sept. 28, 2006); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2007-S1 (Form 424B5), at S-36 (Feb. 27, 2008); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2006-S9 (Form 424B5), at S-32 (Dec. 28, 2006).

152.    The above statements were materially false and misleading when made because:

(a)    Contrary to the statements that Countrywide's underwriting standards were "primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan" and to evaluate "the borrower's credit standing and repayment ability," Countrywide  subordinated its underwriting standards to originating and securitizing as many mortgage loans as it could so that it could garner fees in the secondary mortgage market.  As alleged herein, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans.  Rather, Countrywide designed its underwriting standards to ensure that it received the highest possible fees for originating loans without regard to the actual ability of its borrowers to repay the loan, or whether the mortgaged property had sufficient value to collaterize the loan.

(b)    Contrary to the representation above that "After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations," Countrywide's underwriting included the following practices that disregarding a borrowers' ability to pay:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan

programs when their income was insufficient to qualify for full documentation loan programs, *see, supra,* §V.A.

- Steering borrowers to more expensive loans that exceeded their borrowing capacity, *see, supra,* §V.A.

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes, *see, supra,* §V.A.

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted, *see, supra,* §V.A.

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors, *see, supra,* §V.A.

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies, *see, supra,* §V.A.

- Systematically overriding flags identified by the CLUES system that were meant to weed out non-qualifying loans and, despite the flags, approving such loans, *see, supra,* §V.A.

(c)     Contrary to the statement that "Exceptions to the applicable originator's underwriting guidelines will be made when compensating factors are present" and that those factors included "the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan," Countrywide adopted procedures to incentivize its employees to approve exceptions to loans regardless of whether any compensating factors were present.

153.    Each Registration Statement issued by CWALT, CWABS, CWMBS and CWHEQ contained the following statement regarding Countrywide's assessment of a prospective borrower:

Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses

90

related to the mortgaged property such as property taxes and hazard insurance). The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist.

154. Each Registration Statement issued by CWALT, CWABS, CWMBS and CWHEQ contained the following statement regarding Countrywide's review of information provided by a prospective borrower:

> Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.

155. These statements were materially false and misleading when made because:

(a) Contrary to the statement that "a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan," Countrywide implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs, *see, supra*, §V.A.

- Steering borrowers to more expensive loans that exceeded their borrowing capacity, *see, supra*, §V.A.

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes, *see, supra*, §V.A.

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted, *see, supra*, §V.A.

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors, *see, supra*, §V.A.

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies, *see, supra*, §V.A.

- Systematically overriding flags identified by the CLUES system that were meant to weed out non-qualifying loans and, despite the flags, approving such loans, *see, supra*, §V.A.

- Failing to determine whether stated income or stated assets were reasonable, failing to inform investors that Countrywide employees used www.salary.com in order to verify income and, often times, failing to check the veracity of information that was provided and easily verified (such as bank account balances), *see, supra*, §V.A.

156. Each Registration Statement and Prospectus Supplement issued by CWALT and CWMBS contained the following language concerning the collateral supporting each mortgage pooled in the Issuing Trusts and the appraisals by which the collateral was valued:

> Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

*See* Registration Statements filed by CWALT on Form S-3 on Nov. 7, 2003 (at S-19-20) (as amended on Jan. 13, 2004) and on Form S-3/A on Sept. 23, 2004 (at S-20), Apr. 21, 2005 (at S-20), July 25, 2005 (at S-20), Mar. 6, 2006 (at S-54), Apr. 27, 2007 (at S-41); Registration Statements filed by CWMBS on Form S-3/A on Oct. 28, 2002

478757_1

1   (at S-20), Feb. 8, 2005 (at S-21), July 25, 2005 (at S-21), Mar. 6, 2006 (at S-54) and

2   Apr. 24, 2007 (at S-41-42). [5]

3      157.   Each Registration Statement and Prospectus Supplement issued by

4   CWABS and CWHEQ contained the following language concerning the collateral

5   supporting each mortgage pooled in the Issuing Trusts and the appraisals by which the

6   collateral was valued:

> ***Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and <u>require</u> an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. <u>Each</u> appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home*** and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan.

*See* Registration Statements filed by CWABS on Form S-3/A on June 10, 2005 (at S-47), Feb. 21, 2006 (at S-39), Aug. 8, 2006 (at S-38-39) and Apr. 24, 2007 (at S-41); Registrations Statements filed by CWHEQ on Form S-3 on Dec. 17, 2004 (at S-25) and on Form S-3/A on Aug. 4, 2005 (at S-25), Apr. 12, 2006 (at S-39), and May 22, 2007 (at S-39). [6]

---

[5]   The Prospectus Supplements for these Registration Statements uniformly used the same, or substantially similar, language. *Accord, e.g.*, Prospectus Supplement for Alternative Loan Trust 2005-J7 (Form 424B5), at S-32 (June 29, 2005); Prospectus Supplement for Alternative Loan Trust 2005-63 (Form 424B5), at S-80 (Oct. 31, 2005); Prospectus Supplement for Alternative Loan Trust 2006-6CB (Form 424B5), at S-60 (Mar. 29, 2006); Prospectus Supplement for Alternative Loan Trust 2007-12T1 (Form 424B5), at S-37 (Apr. 27, 2007); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB3 (Form 424B5), at S-99 (May 1, 2006); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2005-30 (Form 424B5), at S-23 (Nov. 22, 2005); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-11 (Form 424B5), at S-34 (Apr. 24, 2006); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2007-1 (Form 424B5), at S-31 (Jan. 29, 2007);

[6]   Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-1 (Form 424B5), at S-37 (Feb. 8, 2006); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2005-10 (Form 424B5), at S-29 (Sept. 15, 2005); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-1 (Form 424B5), at S-38 (Feb. 8, 2007).

478757_1

158.   The Prospectus Supplements issued by CWHEQ contained representations concerning the appraisals done with respect to home equity and second mortgage liens.  They stated with respect to home equity loans:

> Full appraisals are generally performed on all home equity loans. These appraisals are determined on the basis of an applicable originator-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac. For certain home equity loans that had at origination a credit limit between $100,000 and $250,000, determined by the FICO score of the borrower, a drive-by evaluation is generally completed by a state-licensed, independent third-party, professional appraiser on forms approved by either Fannie Mae or Freddie Mac. The drive-by evaluation is an exterior examination of the premises by the appraiser to determine that the property is in good condition. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements, and generally must have been made no earlier than 180 days before the date of origination of the mortgage loan. For certain home equity loans with credit limits between $100,000 and $250,000, determined by the FICO score of the borrower, the applicable originator may have the related mortgaged property appraised electronically. The minimum and maximum loan amounts for home equity loans are generally $7,500 (or, if smaller, the state-allowed maximum) and $1,000,000, respectively.

Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust Series 2005-G (Form 424B5), at S-22 (Sept. 28, 2005); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust Series 2005-M (Form 424B5), at S-23-24 (Dec. 27, 2005); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust Series 2006-G (Form 424B5), at S-34 (Aug. 29, 2006); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust Series 2007-B (Form 424B5), at S-32 (Mar. 28, 2007).

159.   With respect to closed-end second lien mortgage loans, the Prospectus Supplements for the CWHEQ Registration Statements said the following:

> Full appraisals are generally performed on all closed-end second lien mortgage loans that at origination had a loan amount greater than $100,000. These appraisals are determined on the basis of a sponsor-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac. For certain closed-end second lien mortgage loans that had at origination a loan amount between $100,000 and $250,000, determined by the FICO score of the borrower, a drive-by evaluation is generally completed by a state licensed, independent third-party, professional appraiser on forms approved by either Fannie Mae or Freddie Mac. The drive-by evaluation is an exterior examination of the premises by the appraiser to determine

that the property is in good condition. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements, and generally must have been made not earlier than 180 days before the date of origination of the mortgage loan. For certain closed-end second lien mortgage loans with loan amounts less than $250,000, determined by the FICO score of the borrower, Countrywide Home Loans may have the related mortgaged property appraised electronically. The minimum and maximum loan amounts for closed-end second lien mortgage loans are generally $7,500 (or, if smaller, the state-allowed maximum) and $1,000,000, respectively.

Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2006-S6 (Form 424B5), at S-29 (Sept. 28, 2006); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2007-S1 (Form 424B5), at S-36 (Feb. 27, 2008); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2006-S9 (Form 424B5), at S-32 (Dec. 28, 2006).

160.   These statements were false and misleading when made because they failed to disclose that the value and adequacy of the mortgaged property was not appraised, on a consistent basis, using "market data analysis based on recent sales of comparable homes in the area, where deemed appropriate, replacement cost analysis based on the current costs of constructing a similar home" or "on the basis of an applicable originator-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac."  Instead, as alleged herein, Countrywide systematically inflated appraisals for properties used as collateral for mortgage loans underlying the Issuing Trusts.  These inflated appraisals did not conform to the USPAP and were not market data analyses of comparable homes in the area or analyses of the cost of construction of a comparable home.

161.   Each Prospectus Supplement referenced and incorporated into each Registration Statement described the LTV ratio of the mortgages pooled into the Issuing Trusts.  The LTV ratio of mortgages in the trust was described as equal to: (1) the principal balance of the mortgage loan at the date of origination, divided by; (2) the collateral value of the related mortgaged property, where the "collateral value" was the lesser of either the appraised value based on an appraisal made for

95

Countrywide by an independent fee appraiser at the time of the origination of the related mortgage loan, or the sales price of the mortgaged property at the time of origination. Each Prospectus Supplement then provided an average LTV ratio of the mortgage loans included in the Issuing Trusts and a disclosure concerning the maximum LTV ratio of mortgage loans included in the Issuing Trusts.

162.   The statements concerning the average LTV ratio of mortgages included in the Issuing Trusts and the maximum LTV ratio of mortgages included in the Issuing Trusts were false and misleading when made because these ratios were rendered inaccurate because of incorrect and/or inflated appraisal values assigned to the collateral supporting the mortgage loans pooled into each Issuing Trust.

## THE UNDERWRITING DEFENDANTS DID NOT PERFORM ADEQUATE DUE DILIGENCE

163.   According to the March 2008 policy statement issued by the President's Working Group, "[a]though market participants had economic incentives to conduct due diligence . . . the steps they took were insufficient."

164.   Many, if not all, of the Underwriting Defendants received due diligence reports from external firms, including, specifically, Clayton Holdings, Inc. ("Clayton") and the Bohan Group ("Bohan"), when they underwrote offerings for the Issuing Defendants. The Underwriting Defendants hired Clayton or Bohan to review whether the loans to be included in a particular MBS complied with the law and met the lending standards that mortgage companies, such as Countrywide, said that they were using.

165.   Clayton provides "services to the leading buyers and sellers of, and investors in, residential and commercial loan portfolios and securities . . . includ[ing] major capital markets firms, banks and lending institutions, including the largest MBS issuers/dealers." Clayton's Form 10-K filed March 14, 2008. Indeed, "[d]uring 2007, 2006 and 2005, [Clayton] worked with each of the 10 largest non-agency MBS underwriters, as ranked by *Inside MBS & ABS*, which accounted for 70%, 73% and

1   73% of total underwriting volume during those respective periods." *Id.*  Additionally,

2   Clayton has specifically identified Bear Stearns, Morgan Stanley, Deutsche Bank and

3   Goldman Sachs as clients for its underwriting due diligence services.  Bohan is a

4   private company which also provides underwriting due diligences services, with

5   offices in New York, San Francisco and, importantly, in Orange County, California.

6   Bohan's clients include Bear Stearns and Merrill Lynch.

7       166.  In June 2007, the New York Attorney General, Andrew Cuomo

8   ("NYAG"), subpoenaed documents from both Clayton and Bohan related to their due

9   diligence efforts on behalf of the investment banks that underwrote substantial

10  amounts of MBS.  The NYAG, along with Massachusetts, Connecticut and the SEC

11  (all of which also subpoenaed documents) are investigating whether investment banks

12  held back information they should have provided in the disclosures that accompanied

13  the MBS that they offered for sale to investors.

14      167.  On January 27, 2008, Clayton revealed that it had entered into an

15  agreement with the NYAG for immunity from civil and criminal prosecution in the

16  State of New York in exchange for agreeing to provide additional documents and

17  testimony regarding its due diligence reports, including copies of the actual reports

18  provided to its clients.  Both the *New York Times* and *The Wall Street Journal* ran

19  articles describing the nature of the NYAG's investigation and Clayton's testimony.

20  *The Wall Street Journal* reported that the NYAG's investigation is focused on "the

21  broad language written in prospectuses about the risky nature of these securities

22  changed little in recent years, even as due-diligence reports noted that the number of

23  exception loans backing the securities was rising."  According to the *New York Times*

24  article, Clayton is "the nation's largest provider of mortgage due diligence services to

25  investment banks" and it "communicated daily with bankers putting together

26  mortgage securities."  The *New York Times* also reported that Clayton told the NYAG

27  "that starting in 2005, it saw a significant deterioration of lending standards and a

28

97

parallel jump in lending exceptions" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

168.   A March 17, 2008 *Los Angeles Times* article reported that Clayton and Bohan employees (including, specifically, eight former reviewers who were interviewed for the article) "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports."  Moreover, while underwriters, such as the Underwriting Defendants, would have sought to have Clayton review 25%-40% of loans in a pool that was going to be securitized earlier in the decade, by 2006 the typical percentage of loans reviewed for due diligence purposes was just 10%.

**The Models that Produced the Certificates' Ratings Were Based upon Outdated Assumptions Regarding Loan Performance**

169.   Moody's and S&P, two examples of the Rating Agencies that rated the Certificates, used models to produce the ratings for the Certificates.  These models were based upon loan performance ***prior*** to the year 2000.  However, an unprecedented decline and deterioration in mortgage lending standards occurred ***after*** 2000.  For instance, from 2001 through 2005, (i) the percentage of "sub-prime" mortgage loans tripled; (ii) the combined LTV ratio of loans in excess of 90% tripled; (iii) "limited documentation" loans (or "liar loans") nearly quadrupled; (iv) "interest only" and "option" ARMs quintupled; (v) "piggy back" or second-lien mortgages doubled; (vi) the amount of equity U.S. homeowners stripped out of their homes tripled; (vii) the volume of loans originated for "second homes" more than tripled; (viii) the percentage of loans including "silent seconds" – a nearly non-existent

98

phenomenon a few years prior to the issuance of the Certificates – experienced over a 16,000% increase; and (ix) the volume of non-traditional mortgages more than quintupled.

170.    This decline in lending standards and increase in riskier exotic mortgage products during the 2001 through 2005 time period rendered Moody's and S&P's pre-2000 loan performance data obsolete.  However, these agencies did not update their models to reflect these changes.  Thus, by the time the agencies provided "investment grade" certifications to the Certificates, their historical data no longer reflected the reality that mortgage credit quality was rapidly deteriorating.

171.    Moody's and S&P continued to use these outmoded models even though more current and accurate models were available.  According to Frank Raiter – the Managing Director and Head of RMBS Ratings at S&P from March 1995 to April 2005 – S&P had developed models that accounted for the new type of mortgage products available after 2000 (particularly Alt-A type loans).  These models better captured the changes in the post-2000 mortgage landscape and were therefore better at determining default risks posed by these new mortgages.  However, S&P did not implement these models due to their cost and because improving the model would not add to S&P's revenues (as S&P's RMBS group already enjoyed the largest ratings market share amongst the three major rating agencies).  As Raiter explained, the unfortunate consequences of continuing to use out-dated versions of the rating model included "the failure to capture changes in performance of the new non-prime

478757_1

products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."   The current President of S&P, Deven Sharma, agreed, noting: "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work. . . . [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

172.   Executives at Moody's also acknowledged a lack of investment in Moody's rating models and the failure of Moody's rating models to capture the deterioration in lending standards.   In an internal e-mail, Raymond McDaniel, the current Chairman and CEO of Moody's, noted that a lack of investment in updating the rating models can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment."   McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape.   Brian Clarkson – the former President and COO of Moody's – also recognized Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decline in underwriting standards]."

173.   Not only were Moody's and S&P's models based on outmoded data, but they were often constructed by people who were not familiar with the housing markets in the areas that they were rating.   And in some instances real estate investments were

100

graded by analysts who never actually reviewed the investment and who merely relied upon ratings assigned by a competitor rating agency.

**The Rating Agencies' Relaxing of Ratings Criteria Led to Artificially High Ratings for the Certificates**

174.   In addition to using flawed models to generate ratings, Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business.  This easing of ratings standards was due in large part to the fact that rating agencies like Moody's and S&P were compensated by the very entities that they provided ratings to, and the fact that those entities were free to shop around for the rating agency that would provide them with the highest ratings.  Former S&P Managing Director Richard Gugliada explained the easing of standards as a "***market-share war where criteria were relaxed***" and admitted "***I knew it was wrong at the time . . . [i]t was either that or skip the business***.  That wasn't my mandate.  My mandate was to find a way.  Find the way."  According to Gugliada, when the subject of tightening S&P's rating criteria came up, the co-director of CDO ratings, David Tesher, said: "Don't kill the golden goose."  This comment reflected Tesher's belief that if S&P implemented more stringent rating criteria than its competitors (and thereby began assigning lower ratings to investments that it rated), entities that needed their investments rated – such as the defendants herein – would avoid S&P.  Instead, these entities would seek ratings from S&P's competitors who, because they had weaker rating criteria, would assign a higher rating to the investment.

478757_1

175.   The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney") – two S&P analysts describing S&P's rating of an investment similar to the Trusts:

> Shah:  btw – that deal is ridiculous
>
> Mooney:  i know right . . . *model def does not capture half of the rish [sic]*
>
> Mooney:  *risk*
>
> Shah:  *we should not be rating it*
>
> Mooney:  *we rate every deal*
>
> Mooney:  *it could be structured by cows and we would rate it*
>
> Shah:  but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

176.   In another e-mail, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the "[r]ating agencies continue to create and [sic] *even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters*."

177.   The loosening of ratings criteria due to market share considerations was evident at Moody's also.  Jerome Fons, a former Managing Director for Credit Quality at Moody's, indicated that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

178.   Fons explained that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "***typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality***."  Fons noted that the rating agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  Fons said it was this business model that "***prevented analysts from putting investor interests first***."

179.   McDaniel of Moody's also acknowledged the degradation of ratings standards.  In a presentation to Moody's board of directors in October 2007, McDaniel told his board: "The real problem is not that the market . . . underweights ratings quality but rather that, in some sectors, it actually penalizes quality . . . . It turns out that ***ratings quality has surprisingly few friends*** . . . ."  He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'"  In fact, *The Wall Street Journal* found that in at least one instance, Moody's increased the amount of a mortgage deal that was rated triple-A after its client complained and said it might go with a different rating firm.

180.   As McDaniel noted, this degradation of ratings quality was not limited to Moody's: "[W]hat happened in '04 and '05 with respect to subordinated tranches is

103

that our competition, *Fitch and S&P, went nuts.  Everything was investment grade.  It didn't really matter*."

**Due to Defects in the Underwriting Process, Inaccurate Data Was Entered into the Ratings Models Thereby Yielding Inaccurate Ratings**

181.   In addition to the eroding rating standards and the flawed rating models alleged above, Moody's and S&P's ratings were also based on inaccurate information.  The rating agencies rated the Certificates based in large part on data about each of the mortgage loans that defendants provided to them – including appraisal values, LTV ratios, and borrower creditworthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels.  As alleged above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation and falsification, and the other facets of defective underwriting alleged herein.  Neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities).  Nor did they seek representations from sponsors that due diligence was performed.  During a "Town Hall Meeting" hosted by Moody's McDaniel, executives at Moody's acknowledged that the Rating Agencies used inaccurate data to form their ratings:

> We're on notice that a lot of things that we relied on before just weren't true. . . . [W]e relied on reps and warrantees that no loans were originated in violation of any state or federal law.  We know that's a lie.

\*       \*       \*

[W]e're being asked to figure out how much everybody lied. . . . [If] all of the information was truthful and comprehensive and complete, we wouldn't have an issue here. . . .

What we're really being asked to do is figure out how much lying is going on and bake that into a credit [rating] . . . which is a pretty challenging thing to do. I'm not sure how you tackle that from a modeling standpoint.

182.   In response to the "Town Hall Meeting," a Moody's employee noted:

[W]hat really went wrong with Moody's sub prime ratings leading to massive downgrades and potential more down grades to come? We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets. As for #1, it seems to me that **we had blinders on and never questioned the information we were given**. Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan? As for #2, **it is our job to think of the worst case scenarios and model for them** . . . . **Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both**.

183.   Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk. Certificates were given investment grade ratings when in reality they were not of investment grade quality. As such, the statements regarding the ratings of the Certificates were false and misleading.

184.   The problems identified above were not disclosed to the public and resulted in artificially high ratings for the Certificates. These artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

**DEFENDANTS' MISREPRESENTATIONS HARMED PLAINTIFFS**

185.   The defendants' misrepresentations and/or omissions in the Registration Statements and Prospectus Supplements were revealed through increasing default

105

rates on the Issuing Trusts' mortgage pools and mounting foreclosures on the properties collaterizing the mortgage loans, which have yielded insufficient value to recover the outstanding principal and interest due on the loans.  These defaults and foreclosures exceed the expected rates of default on the mortgage pools underlying each of the Issuing Trusts and, as a result, have resulted in a diminished value of each of the Certificates.

**CWALT Loans**

186.   As of August 2008, of the pool of mortgages underlying the Certificates issued by CWALT during fiscal year 2005, 11.66% of these mortgages are delinquent by more than 60 days and 9.77% are delinquent by more than 90 days.  This has risen from 7.43% and 5.69%, respectively, since January 2008.  4.27% of these loans are in foreclosure.

187.   As of August 2008, of the pool of mortgages underlying the Certificates issued by CWALT during fiscal year 2006, 18.24% of these mortgages are delinquent by more than 60 days and 15.50% are delinquent by more than 90 days.  This has risen from 10.53% and 8.16%, respectively, since January 2008.  6.78% of these loans are in foreclosure.

188.   As of August 2008, of the pool of mortgages underlying the Certificates issued by CWALT during fiscal year 2007, 11.31% of these mortgages are delinquent by more than 60 days and 9.30% are delinquent by more than 90 days.  This has risen from 4.57% and 3.17%, respectively, since January 2008.  4.01% of these loans are in foreclosure.

189.   The delinquencies, defaults and foreclosures on these mortgage loans have prompted rating agencies to downgrade Certificates issued by CWALT.  For example, S&P downgraded Certificates issued pursuant to CWALT's Registration Statements on November 16, 2007, May 28, 2008, August 25, 2008 and August 26, 2008.

**CWABS Loans**

190.   As of August 2008, of the pool of mortgages underlying the Certificates issued by CWABS during fiscal year 2005, 26.17% of these mortgages are delinquent by more than 60 days and 22.63% are delinquent by more than 90 days.  This has risen from 21.93% and 18.25%, respectively, since January 2008.  10.43% of these loans are in foreclosure.

191.   As of August 2008, of the pool of mortgages underlying the Certificates issued by CWABS during fiscal year 2006, 22.42% of these mortgages are delinquent by more than 60 days and 18.86% are delinquent by more than 90 days.  This has risen from 12.37% and 9.20%, respectively, since January 2008.  10.11% of these loans are in foreclosure.

192.   As of August 2008, of the pool of mortgages underlying the Certificates issued by CWABS during fiscal year 2007, 24.96% of these mortgages are delinquent by more than 60 days and 21.66% are delinquent by more than 90 days.  This has risen from 18.79% and 15.63%, respectively, since January 2008.  10.05% of these loans are in foreclosure.

193.   The delinquencies, defaults and foreclosures on these mortgage loans have prompted rating agencies to downgrade Certificates issued by CWABS.  For example, S&P downgraded Certificates issued by CWABS pursuant to the its Registration Statements on July 12, 2007, November 12, 2007, August 20, 2008, August 25, 2008 and August 26, 2008.

**CWMBS Loans**

194.   As of August 2008, of the pool of mortgages underlying the Certificates issued by CWMBS during fiscal year 2005, 6.62% of these mortgages are delinquent by more than 60 days and 5.41% are delinquent by more than 90 days.  This has risen from 3.97% and 3.11%, respectively, since January 2008.  2.28% of these loans are in foreclosure.

478757_1

195.   As of August 2008, of the pool of mortgages underlying the Certificates issued by CWMBS during fiscal year 2006, 9.70% of these mortgages are delinquent by more than 60 days and 8.07% are delinquent by more than 90 days.  This has risen from 6.59% and 5.22%, respectively, since January 2008.  3.63% of these loans are in foreclosure.

196.   As of August 2008, of the pool of mortgages underlying the Certificates issued by CWMBS during fiscal year 2007, 3.73% of these mortgages are delinquent by more than 60 days and 3.02% are delinquent by more than 90 days.  This has risen from 1.41% and 0.96%, respectively, since January 2008.  1.22% of these loans are in foreclosure.

197.   The delinquencies, defaults and foreclosures on these mortgage loans have prompted rating agencies to downgrade Certificates issued by CWMBS.  For example, S&P downgraded Certificates issued pursuant to CWMBS' Registration Statements on November 16, 2007, March 17, 2008, May 1, 2008 and May 28, 2008.

**D.    CWHEQ Loans**

198.   The mortgage loans issued by CWHEQ have also suffered deteriorating delinquency rates.  As such, CWHEQ's Issuing Trusts have also been downgraded by the Ratings Agencies.  For example, S&P downgraded Certificates issued pursuant to CWHEQ's Registration Statements, *inter alia*, on June 27, 2008, August 25, 2008 and August 26, 2008.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

199.   Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities who purchased or acquired the Certificates of the Issuing Trusts pursuant or traceable to the Registration Statements and Prospectus Supplements identified in ¶47 above. Excluded from the Class are defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs,

108

successors or assigns and any entity in which defendants have or had a controlling interest.

200.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Issuing Defendants, and/or their agents, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Billions of dollars worth of Certificates were issued pursuant to the false and misleading Prospectuses complained of herein.

201.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

202.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

203.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

whether defendants violated the Securities Act;

whether statements made by defendants to the investing public in the Registration Statements and Prospectus Supplements both omitted and misrepresented material facts about the mortgages underlying the Issuing Trusts; and

the extent – and proper measure – of the damages sustained by the members of the Class.

204.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

109

478757_1

impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violation of Section 11 of the Securities Act Against
the Individual Defendants and the Issuing and Underwriting Defendants**

205.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud plaintiffs or members of the Class.  This count is predicated upon defendants' ***strict liability*** for making false and materially misleading statements in the Registration Statements.  This Cause of Action is brought pursuant to Section 11 of the Securities Act, on behalf of the Class, against the Individual Defendants and the Issuing and Underwriting Defendants.

206.   The Registration Statements for the Certificate offerings were materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

207.   The Individual Defendants and the Issuing and Underwriting Defendants of the Certificates are strictly liable to plaintiffs and the Class for the misstatements and omissions.

208.   The Individual Defendants signed CWALT's, CWABS', CWMBS' and CWHEQ's Registration Statements as detailed herein at ¶¶51-58, *supra*.

209.   Defendant CSC, an affiliate of CFC, acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant CSC was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

210.   Defendant JP Morgan acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant JP Morgan was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

211.   Defendant Deutsche Bank acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant Deutsche Bank was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

212.   Defendant Bear Stearns acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant Bear Stearns was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

213.   Defendant BoA acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant BoA was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

214.   Defendant UBS acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant UBS was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

215.   Defendant Morgan Stanley acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant Morgan Stanley was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

216.   Defendant Edward Jones acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant Edward Jones was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

478757_1

217.   Defendant Citigroup acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant Citigroup was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

218.   Defendant Goldman Sachs acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant Goldman Sachs was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

219.   Defendant Credit Suisse acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant Credit Suisse was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

220.   Defendant RBS acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant RBS was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

221.   Defendant Barclays acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant Barclays was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

222.   Defendant HSBC acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant HSBC was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

223.   Defendant BNP acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant BNP was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

478757_1

224.   Defendant Merrill Lynch acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates.  Defendant Merrill Lynch was an underwriter for the Issuing Trusts as detailed at ¶47, *supra*.

225.   The Individual Defendants and the Issuing and Underwriting Defendants owed to the plaintiffs and other members of the Class the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  The Individual Defendants and the Issuing and Underwriting Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statements as set forth herein.  As such, the Individual Defendants and the Issuing and Underwriting Defendants are liable to the Class.

226.   None of the Individual Defendants or the Issuing and Underwriting Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

227.   The Individual Defendants and the Issuing and Underwriting Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of material misstatements to the investing public which were contained in the Prospectuses, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.

228.   By reason of the conduct herein alleged, each of the Individual Defendants and the Issuing and Underwriting Defendants violated Section 11 of the Securities Act.

478757_1

229.   Plaintiffs acquired the Certificates pursuant and/or traceable to the Registration Statements.

230.   At the time they obtained their Certificates, plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

231.   This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statements which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statements.

232.   Plaintiffs and the Class have sustained damages.   The value of the Certificates has declined substantially, subsequent to, and due to, the Individual Defendants' and the Issuing and Underwriting Defendants' violations.

233.   By virtue of the foregoing, plaintiffs and the other members of the Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), jointly and severally from each of the Individual Defendants and the Issuing and Underwriting Defendants.

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act Against the Issuing and Underwriting Defendants

234.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

235.   This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against the Issuing and Underwriting Defendants.

236.   The Issuing and Underwriting Defendants promoted and sold the Certificates pursuant to the defective Prospectuses.

237.   The Prospectuses contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

478757_1

238.   The Issuing and Underwriting Defendants owed to plaintiffs, and other members of the Class who purchased the Certificates pursuant to the Prospectuses, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Issuing and Underwriting Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses as set forth above.

239.   Plaintiffs and other members of the Class purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Prospectuses. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses.

240.   By reason of the conduct alleged herein, the Issuing and Underwriting Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, plaintiffs and members of the Class who purchased the Certificates pursuant to and/or traceable to the Prospectuses sustained material damages in connection with their purchases of the Certificates.  Plaintiffs and other members of the Class who hold the Certificates issued pursuant to the Prospectuses have the right to rescind and recover the consideration paid for their Certificates, and hereby elect to rescind and tender their securities to the Issuing and the Underwriter Defendants.  Class members who have sold their Certificates are entitled to rescissory damages.

241.   This action is brought within three years from the time that the Certificates upon which this Count is brought were sold to the public, and within one year from the time when plaintiffs discovered or reasonably could have discovered the facts upon which this action is based.

115

## COUNT III

### Violation of Section 15 of the Securities Act Against
### CFC, CSC, CCM, CHL and the Individual Defendants

242.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

243.   This count is asserted against CFC, CSC, CCM, CHL and the Individual Defendantsand is based upon Section 15 of the Securities Act.

244.   Each of CFC, CSC, CCM, CHL and the Individual Defendants by virtue of its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of the Issuing Defendants within the meaning of Section 15 of the Securities Act.  CFC, CSC, CCM and CHL had the power and influence and exercised the same to cause the Issuing Defendants to engage in the acts described herein.

245.   CFC's, CSC's, CCM's, CHL's and the Individual Defendants' control, ownership and position made them privy to and provided them with knowledge of the material facts concealed from plaintiffs and the Class.

246.   By virtue of the conduct alleged herein, CFC, CSC, CCM, CHL and the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to plaintiffs and the Class for damages suffered as a result.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action is a proper class action and certifying plaintiff MSRS as a Class representative;

B.   Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

116

478757_1

1       C.    Awarding plaintiffs and the Class their reasonable costs and expenses

2  incurred in this action, including counsel fees and expert fees;

3       D.    Awarding rescission or a rescissory measure of damages; and

4       E.    Awarding such additional equitable/injunctive or other relief as deemed

5  appropriate by the Court.

6                    **JURY TRIAL DEMANDED**

7      Plaintiffs hereby demand a trial by jury.

8  DATED: January 14, 2010          COUGHLIN STOIA GELLER
                                 RUDMAN & ROBBINS LLP

9                             SPENCER A. BURKHOLZ (147029)
                           THOMAS E. EGLER (189871)

10                             DANIEL S. DROSMAN (200643)
                           SCOTT H. SAHAM (188355)

11                             LAUREN G. KERKHOFF (236902)
                           JENNIFER Y. LAI (228117)

12                             CHRISTINA A. ROYCE (254551)

13

14                           _____
                           SPENCER A. BURKHOLZ

15

16                           655 West Broadway, Suite 1900
                         San Diego, CA 92101-3301

17                           Telephone: 619/231-1058
                         619/231-7423 (fax)

18                           BARROWAY TOPAZ KESSLER
                         MELTZER & CHECK, LLP

19                           ANDREW L. ZIVITZ (*pro hac vice*)
                         SHARAN NIMUL (*pro hac vice*)

20                           LAUREN WAGNER PEDERSON (*pro hac vice*)

21                           JENNIFER L. JOOST (*pro hac vice*)
                         280 King of Prussia Road

22                           Radnor, PA 19087
                         Telephone: 610/667-7706

23                           610/667-7056 (fax)

24                           Co- Counsel for Plaintiffs

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEUTSCH & LIPNER
SETH E. LIPNER
1325 Franklin Avenue, Suite 225
Garden City, NY  11530
Telephone: 516/294-8899
516/742-9416 (fax)

Additional Counsel for Plaintiff

**CERTIFICATION OF JOHN C. MILAZZO IN SUPPORT
OF THE MAINE PUBLIC EMPLOYEES RETIREMENT SYSTEM
PURSUANT TO FEDERAL SECURITIES LAWS**

I, John C. Milazzo, on behalf of the Maine Public Employees Retirement System

("MPERS" or "Plaintiff") declare as to the claims asserted under the federal securities laws, that:

1.      MPERS has reviewed the Complaint filed in connection with this matter and
authorizes its filing.

2.      MPERS did not purchase the security that is the subject of this action at the
direction of Plaintiff's counsel or in order to participate in any private action.

3.      MPERS is willing to serve as a representative party on behalf of the class,
including providing testimony at deposition and trial, if necessary.

4.      Attached in Schedule A (segregated by relevant CUSIP number) are Plaintiff's
transactions in the securities identified in the attached Complaint.

5.      I, John C. Milazzo, Chief Deputy Executive Director and General Counsel, am
authorized to make legal decisions on behalf of the Maine Public Employees Retirement System.

6.      MPERS intends to actively monitor and vigorously pursue this action for the
benefit of the class, and it has retained the law firm of Barroway Topaz Kessler Meltzer &
Check, LLP which has extensive experience in securities litigation and in the representation of
institutional investors, to represent Plaintiff in this action.

7.      MPERS has served as a representative party for a class action filed under the
federal securities laws during the three years prior to the date of this Certification in *In re Eli
Lilly & Co. Sec. Litig.*, No. 1:07-cv-01310-JBW (E.D.N.Y.).  Further, MPERS was a plaintiff in
a class action complaint captioned as *Maine Public Employees Retirement System v. American
International Group, Inc.*, No. 08-cv-5464 (S.D.N.Y.), which was consolidated with *In re*

1

*American International Group, Inc.* 2008 *Securities Litigation*, No. 08 Civ. 4772 (S.D.N.Y.). MPERS is a named plaintiff in *In re American International Group, Inc.* 2008 *Securities Litigation*, No. 08 Civ. 4772 (S.D.N.Y.).

8.     MPERS has sought to serve (but was not appointed) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *In re Wachovia Equity Securities Litigation*, No. 1:08-cv-6171 (S.D.N.Y.), *Kairalla v. Amgen Inc., et al.,* No. CV 07-2536 (C.D. Cal.) and *Gold v. Morrice, et al.*, No. CV 07-931 (C.D. Cal.).

9.     MPERS will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of January, 2010.

Maine Public Employees Retirement System

By: _____
John C. Milazzo
Chief Deputy Executive Director
and General Counsel
*Maine Public Employees Retirement System*

2

## SCHEDULE A

| Trust | CUSIP | Buy/Sell | Date | Units | Price | Cost Basis/ Proceeds |
|---|---|---|---|---|---|---|
| CWABS Inc. Series 2005-4 | 126673Q47 | Buy | 5/27/2005 | 6,800,000.00 | 100.000 | $6,800,000.00 |
| CWABS Inc Series 2005-5 | 126673U59 | Buy | 6/9/2005 | 3,600,000.00 | 100.000 | $3,600,000.00 |
| CWABS Inc Series 2005-6 | 126673X56 | Buy | 6/14/2005 | 4,000,000.00 | 100.000 | $4,000,000.00 |
| CWABS Inc. Series 2005-9 | 126673GB3 | Buy | 8/19/2005 | 2,000,000.00 | 100.000 | $2,000,000.00 |
| CWABS Inc. Series 2005-9 | 126673GC1 | Buy | 11/20/2006 | 600,000.00 | 99.977 | $599,859.38 |
| CWABS Inc. Series 2005-HYB9 | 126670JY5 | Buy | 11/28/2005 | 6,800,000.00 | 99.719 | $6,780,875.00 |
| CWALT Inc. Series 2005-81 | 12668BBN2 | Buy | 12/22/2005 | 10,045,000.00 | 100.000 | $10,045,000.00 |
| CWABS Inc. Series 2006-6 | 126670ZK7 | Buy | 11/20/2006 | 842,440.23 | 99.977 | $842,242.78 |
| CWABS Inc. Series 2006-6 | 126670ZK7 | Sell | 8/3/2007 | (137,401.04) | 99.875 | ($137,229.29) |
| CWABS Inc. Series 2006-4 | 126670WS3 | Buy | 11/20/06 | 1,600,158.27 | 100.004 | $1,600,220.78 |
| CWABS Inc. Series 2006-3 | 126670VX3 | Buy | 11/20/2006 | 1,328,149.21 | 99.977 | $1,327,837.92 |
| CWALT Inc. Series 2006-OA2 | 126694R83 | Buy | 11/20/2006 | 1,663,004.90 | 100.000 | $1,663,004.90 |
| CWALT Inc. Series 2006-OA2 | 126694R75 | Buy | 11/20/2006 | 2,020,025.35 | 99.984 | $2,019,709.72 |

Name & Address:
Spencer A. Burkholz, Esq. (Bar No. 147029)
Coughlin Stoia Geller Rudman & Robbins LLP
655 W. Broadway, Suite 1900
San Diego, CA 92101
Tel: 619-231-1058

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAINE STATE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, <br><br> v. <br><br> COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; [cont'd on Attachment] | CASE NUMBER <br><br> CV10-0302-SJO (PJWx) |
| PLAINTIFF(S) | |
| DEFENDANT(S). | SUMMONS |

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Spencer A. Burkholz_____, whose address is _Coughlin Stoia, et al., 655 W. Broadway, Ste. 1900, San Diego, CA 92101_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

SHEA BOURGEOIS

Dated:   1 5 JAN 2010 _____        By: _____
                                                    Deputy Clerk

                                                    (Seal of the Court)
                                                    SEAL

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## ATTACHMENT TO SUMMONS
### Case No. CV10-0302-SJO (PJWx)

COUNTRYWIDE HOME LOANS, INC.; CWALT, INC., a Delaware corporation; CWMBS, INC., a Delaware corporation; CWABS, INC., a Delaware corporation; CWHEQ, INC., a Delaware corporation; COUNTRYWIDE CAPITAL MARKETS; COUNTRYWIDE SECURITIES CORPORATION; J.P. MORGAN SECURITIES INC.; DEUTSCHE BANK SECURITIES INC.; BEAR, STEARNS & CO. INC.; BANC OF AMERICA SECURITIES LLC; UBS SECURITIES, LLC; MORGAN STANLEY & CO. INCORPORATED; EDWARD D. JONES & CO., L.P.; CITIGROUP GLOBAL MARKETS INC.; GOLDMAN, SACHS & CO.; CREDIT SUISSE SECURITIES (USA) LLC; GREENWICH CAPITAL MARKETS, INC. A.K.A. RBS GREENWICH CAPITAL; BARCLAYS CAPITAL INC.; HSBC SECURITIES (USA); BNP PARIBAS SECURITIES CORP.; MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED; STANFORD L. KURLAND; DAVID A. SPECTOR; ERIC P. SIERACKI; N. JOSHUA ADLER; RANJIT KRIPALANI; JENNIFER S. SANDEFUR; DAVID A. SAMBOL,

DEFENDANT(S).

216543_1

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| MAINE STATE RETIREMENT SYSTEM | Countrywide Financial Corporation; Countrywide Home Loans, Inc.; Countrywide Securities Corporation; Countrywide Capital Markets, Inc.; CWALT, Inc.; CWMBS, Inc.; CWABS, Inc.; [cont'd on Attachment] |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Spencer A. Burkholz, Esq.      Tel: 619-231-1058 | Lloyd Winawer, Esq.      Tel: 310-788-5177 |
| Coughlin Stoia Geller Rudman & Robbins LLP | Goodwin Procter LLP |
| 655 W. Broadway, Suite 1900, San Diego, CA 92101 | 10350 Constellation Blvd., 21st Floor, Los Angeles, CA 90067 |
| | [cont'd on Attachment] |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes   ☐ No      ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. §77k - false registration statements; 15 U.S.C. §77l(a)(2) - false prospectuses; 15 U.S.C. §77o - liability of control persons

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Fed. Employers' Liability | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 340 Marine | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 355 Motor Vehicle Product Liability | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**CV10  0302**

FOR OFFICE USE ONLY:   Case Number: **No. 2:07-cv-8165-MRP(MANx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

| CV-71 (05/08) | CIVIL COVER SHEET | Page 1 of 2 |
|---|---|---|

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑ Yes
If yes, list case number(s):  Please see Attachment hereto. _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☑ A.  Arise from the same or closely related transactions, happenings, or events; or
                          ☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                          ☑ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                          ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Maine State Retirement System - Maine |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | J.P. Morgan Securities Inc. - New York<br>Deutsche Bank Securities Inc. - New York<br>[cont'd on Attachment] |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date  January 14, 2010

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# ATTACHMENT TO CIVIL COVER SHEET

## I. PLAINTIFFS/DEFENDANTS

*(a) DEFENDANTS [continued]:*

CWHEQ, INC.; J.P. MORGAN SECURITIES INC.; DEUTSCHE BANK SECURITIES INC.; BEAR, STEARNS & CO. INC.; BANC OF AMERICA SECURITIES LLC; UBS SECURITIES, LLC; MORGAN STANLEY & CO. INCORPORATED; EDWARD D. JONES & CO., L.P.; CITIGROUP GLOBAL MARKETS INC.; GOLDMAN, SACHS & CO.; CREDIT SUISSE SECURITIES (USA) LLC; GREENWICH CAPITAL MARKETS, INC. A.K.A. RBS GREENWICH CAPITAL; BARCLAYS CAPITAL INC.; HSBC SECURITIES (USA); BNP PARIBAS SECURITIES CORP.; MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED; STANFORD L. KURLAND; DAVID A. SPECTOR; ERIC P. SIERACKI; N. JOSHUA ADLER; RANJIT KRIPALANI; JENNIFER S. SANDEFUR; and DAVID A. SAMBOL

*(b) DEFENDANTS' ATTORNEYS [continued]:*

William F. Sullivan, Esq.        Tel: 213-683-6000
Paul, Hastings, Janofsky & Walker LLP
515 S. Flower St., 25th Fl.
Los Angeles, CA 90071-2228

Christopher G. Caldwell, Esq.    Tel: 213-629-9040
Caldwell Leslie & Proctor, PC
1000 Wilshire Blvd., Ste. 600
Los Angeles, CA 90017-2463

Michael C. Tu, Esq.              Tel: 213-629-2020
Orrick, Herrington & Sutcliffe LLP
777 S. Figueroa St., Ste. 3200
Los Angeles, CA 90017

Nicholas Morgan, Esq.            Tel: 310-595-3000
DLA Piper LLP (US)
1999 Avenue of the Stars, Ste. 400
Los Angeles, CA 90067-6022

Dean J. Kitchens, Esq.           Tel: 213-229-7000
Gibson, Dunn & Crutcher LLP
333 S. Grand Ave.
Los Angeles, CA 90071-3197
Jennifer M. Sepic, Esq.          Tel: 213-680-6400
Bingham McCutchen LLP
355 S. Grand Ave., Ste. 4400
Los Angeles, CA 90071-3106

216487_1

**VIII(b). RELATED CASES:**

Case Numbers

2:07-cv-05432-MRP-MAN

2:07-cv-05567-MRP-MAN

2:07-cv-05727-MRP-MAN

2:07-cv-06083-MRP-MAN

2:07-cv-06444-MRP-MAN

2:07-cv-06635-MRP-MAN

2:07-cv-06923-MRP-MAN

2:07-cv-07058-MRP-MAN

2:07-cv-07097-MRP-MAN

2:07-cv-07259-MRP-MAN

2:07-cv-07548-MRP-MAN

2:08-cv-00236-MRP-MAN

2:08-cv-00287-MRP-MAN

2:08-cv-00285-MRP-MAN

2:08-cv-00392-MRP-MAN

2:08-cv-00492-MRP-MAN

2:08-cv-03262-MRP-MAN

2:08-cv-03364-MRP-MAN

2:09-cv-03994-JFW-MAN

2:08-cv-06029-MRP-MAN

2:07-cv-05295-MRP-MAN

2:07-cv-8165-MRP-MAN

# IX. VENUE

*(b) [continued]*

| County in this District | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| CWALT, Inc. – Los Angeles | Bear Stearns & Co Inc. – New Jersey |
| CWMBS, Inc. – Los Angeles | Bank of America Securities LLC – North Carolina |
| CWABS, Inc. – Los Angeles | UBS Securities, LLC – Connecticut |
| CWHEQ, Inc. – Los Angeles | Morgan Stanley & Co. Incorporated – New York |
| Countrywide Capital Markets, Inc. – Los Angeles | Edward D. Jones & Co., L.P. – Missouri |
| Countrywide Securities Corporation – Los Angeles | Citigroup Global Markets Inc. – New York |
| Stanford L. Kurland – Los Angeles | Goldman, Sachs & Co. – New York |
| Eric P. Sieracki - Ventura | Credit Suisse Securities (USA) LLC – New York |

| County in this District | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| N. Joshua Adler – Los Angeles | Greenwich Capital Markets, Inc. a.k.a. RBS Greenwich Capital – Connecticut |
| Ranjit Kripalani – Los Angeles | Barclays Capital Inc. – New York |
| Jennifer S. Sandefur – Los Angeles | HSBC Securities (USA) – New York |
| David A. Sambol – Los Angeles | BNP Paribas Securities Corp. – New York |
| | Merrill Lynch, Pierce, Fenner & Smith – New York |
| | David A. Spector – United Kingdom |

216487_1

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge S. James Otero and the assigned discovery Magistrate Judge is Patrick J. Walsh.

The case number on all documents filed with the Court should read as follows:

## CV10- 302 SJO (PJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

============================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[_] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[_] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.