1   LIONEL Z. GLANCY (#134180)
2   MICHAEL GOLDBERG (#188669)
    1801 Avenue of the Stars, Suite 311
3   Los Angeles, California  90067
    Telephone:  (310) 201-9150
4   Facsimile:   (310) 201-9160
    E-mail: info@glancylaw.com
5
6   *Liaison Counsel for Lead Plaintiff Iowa Public*
    *Employees' Retirement System*
7   *[Additional Counsel on Signature Page]*

8            UNITED STATES DISTRICT COURT
9            CENTRAL DISTRICT OF CALIFORNIA

10  MAINE STATE RETIREMENT SYSTEM,        No.  2:10-CV-00302 MRP
    Individually and On Behalf of All Others   (MAN)
11  Similarly Situated,

12                Plaintiff,                CLASS ACTION

13          v.

14  COUNTRYWIDE FINANCIAL
    CORPORATION;  COUNTRYWIDE            AMENDED CONSOLIDATED
15  SECURITIES CORPORATION;              CLASS ACTION COMPLAINT
    COUNTRYWIDE HOME LOANS, INC.;
16  COUNTRYWIDE CAPITAL MARKETS;
    BANK OF AMERICA CORP.; NB
17  HOLDINGS CORPORATION; CWALT,
    INC.; CWMBS, INC.; CWABS, INC.;
18  CWHEQ, INC.; J.P. MORGAN
    SECURITIES, INC.; DEUTSCHE BANK
19  SECURITIES INC.; BEAR, STEARNS &
    CO., INC.; JPMORGAN CHASE, INC.;
20  BANC OF AMERICA SECURITIES LLC;
    UBS SECURITIES LLC; MORGAN
21  STANLEY & CO., INC.; EDWARD D.
    JONES & CO., L.P.; CITIGROUP GLOBAL
22  MARKETS, INC.; GOLDMAN, SACHS &
    CO.; CREDIT SUISSE SECURITIES (USA)
23  LLC; RBS SECURITIES INC.; BARCLAY'S
    CAPITAL, INC.; HSBC SECURITIES (USA)
24  INC.; BNP PARIBAS SECURITIES CORP.;
    MERRILL LYNCH, PIERCE, FENNER &
25  SMITH, INC.; STANFORD L. KURLAND;
    DAVID A. SPECTOR; ERIC P. SIERACKI;
26  N. JOSHUA ADLER; RANJIT KRIPALANI;
    JENNIFER S. SANDEFUR; THOMAS
27  KEITH MCLAUGHLIN; THOMAS H.          **CHAMBER'S COPY**
    BOONE; JEFFREY P. GROGIN; DAVID A.
28  SAMBOL,
                Defendants.

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF THE ACTION ...................................................................1

II.     JURISDICTION AND VENUE ................................................................7

III.    PARTIES ..................................................................................................8

        A.      Plaintiffs ........................................................................................8

        B.      Defendants ...................................................................................13

                1.      Countrywide Defendants .......................................................13

                2.      The Issuing Defendants..........................................................15

                3.      The Underwriter Defendants..................................................18

                4.      The Individual Defendants.....................................................21

                5.      David A. Sambol ...................................................................24

        C.      The Issuing Trust Non-Parties.....................................................24

IV.     BACKGROUND .....................................................................................24

        A.      Countrywide Was a Leading Issuer and Underwriter of
                Mortgage-Backed Securities .......................................................24

        B.      Countrywide's Origination and Securitization Operations.................27

V.      EVIDENCE OF SYSTEMIC DISREGARD OF STATED LOAN
        ORIGINATION GUIDELINES CONTAINED IN OFFERING
        DOCUMENTS .........................................................................................31

        A.      Exponential Increase in Certificate Default Rates in Months
                After Issuance No Matter When Offering Occurred Evidences
                Disregard of Origination Guidelines.....................................................31

        B.      Rating Agencies Collapsed Certificate Ratings to "Junk Bond"
                Levels Due to Undisclosed "Aggressive Underwriting"
                Practices................................................................................................33

        C.      Numerous Government Investigations Reveal the Falsity of the
                Offering Documents..............................................................................35

        D.      Allegations in Numerous Other Civil Lawsuits Show the Falsity
                of the Offering Documents....................................................................44

        E.      Underwriter Defendants "Contracted Out" and Failed to
                Conduct Required Due Diligence of Loan Underwriting
                Guidelines Contained in Offering Documents......................................52

F.    Additional Government Investigations Further Confirm Systemic Disregard for Mortgage Loan Underwriting Guidelines ...................................................................................58

G.    Underwriter Defendants Employed Rating Shopping Practices to Ensure Inflated Investment Grade Rating for All the Certificates ................................................................................59

VI.    THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING AND APPRAISAL STANDARDS .............................60

VII.   CLASS ACTION ALLEGATIONS ...............................................81

VIII.  STANDING ......................................................................................82

IX.    CLAIMS ...........................................................................................83

       COUNT I ...........................................................................................83

              Violation of Section 11 of the Securities Act Against the Individual Defendants, the Issuing Defendants, and the Underwriter Defendants

       COUNT II ..........................................................................................87

              Violation of Section 12(a)(2) of the Securities Act Against the Issuing Defendants and the Underwriter Defendants

       COUNT III .........................................................................................89

              Violation of Section 15 of the Securities Act Against the Countrywide Defendants, the Individual Defendants, and Sambol

X.     RELIEF REQUESTED ....................................................................89

XI.    JURY DEMAND ..............................................................................90

Lead Plaintiff Iowa Public Employees' Retirement System and additional named plaintiffs the General Board of Pension and Health Benefits of the United Methodist Church, Orange County Employees' Retirement System, and Oregon Public Employees' Retirement System (collectively, "Plaintiffs"), allege the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their counsel. The investigation included, for example: (i) review and analysis of the offering materials for the Certificates as defined below, and the Certificates' rating histories; (ii) examination of the monthly service or remittance reports issued in connection with the Certificates; (iii) examination of the SEC filings, press releases and other public statements of Countrywide Financial Corporation ("CFC"); (iv) review and analysis of court filings cited herein; (v) review and analysis of media reports, congressional testimony and additional material; and (vi) analysis of the Securities and Exchange Commission's ("SEC") Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies ("SEC Report") and additional documents cited herein. Many of the facts related to Plaintiffs' allegations are known only by the Defendants named herein, or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## I.   SUMMARY OF THE ACTION

1.   This Complaint is brought by Plaintiffs pursuant to the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* (the "Securities Act"), on behalf of all persons or entities who purchased or otherwise acquired $351 billion of the following mortgage-backed securities ("MBS" or "Certificates") issued pursuant or traceable to Registration Statements, Prospectuses, and Prospectus Supplements filed with

the SEC: (1) Alternative Loan Trust Certificates issued by Defendant CWALT, Inc. ("CWALT"); (2) CWABS Asset-Backed Trust Certificates issued by Defendant CWABS, Inc. ("CWABS"); (3) CHL Mortgage Pass-Through Trust Certificates issued by Defendant CWMBS, Inc. ("CWMBS"); and (4) CWHEQ Revolving Home Equity Loan Trusts and Home Equity Loan Trusts issued by Defendant CWHEQ, Inc. ("CWHEQ") (CWALT, CWABS, CWMBS, and CWHEQ are collectively referred to herein as the "Depositors" or "Issuers").  All of the Certificates were collateralized by residential mortgage loans that Countrywide Home Loans, Inc. ("Countrywide") or its affiliates originated.  The Certificates were sold in 427 separate public offerings (the "Offerings") over thirty-four months between January 25, 2005 and November 29, 2007.  A complete list of each Offering that is the subject of this Complaint is set forth in Exhibit A of the accompanying Appendix.

2.     The Offerings were underwritten by Defendants Countrywide Securities Corporation ("CSC"), J.P. Morgan Securities, Inc. ("JPMSI"), Deutsche Bank Securities Inc. ("Deutsche Bank"),   Bear, Stearns & Co., Inc. ("Bear Stearns"), Banc of America Securities LLC ("BOFAS"), UBS Securities LLC ("UBS"), Morgan Stanley & Co., Inc. ("Morgan Stanley"), Edward D. Jones & Co., L.P. ("Edward Jones"), Citigroup Global Markets, Inc. ("Citigroup"), Goldman, Sachs & Co. ("Goldman Sachs"), Credit Suisse Securities (USA) LLC f/k/a Credit Suisse First Boston LLC ("Credit Suisse"), RBS Securities Inc. f/k/a RBS Greenwich Capital d/b/a Greenwich Capital Markets, Inc. ("RBS"), Barclay's Capital, Inc. ("Barclay's"), HSBC Securities (USA) Inc. ("HSBC"), BNP Paribas Securities Corp. ("BNP Paribas"), and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") (collectively the "Underwriters" or "Underwriter Defendants").

3.     Plaintiffs assert claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, arising from material misstatements and omissions in the Registration Statements, Prospectuses and

subsequently-filed Prospectus Supplements (collectively referred to herein as the "Offering Documents"). Accordingly, this action involves claims of negligence and strict liability under the Securities Act. The Complaint asserts no allegations of fraud on the part of any Defendant.

4.     From 2005 through 2007, Countrywide was the nation's largest residential mortgage lender. Countrywide originated in excess of $850 billion in home loans throughout the United States in 2005 and 2006 alone. Countrywide's ability to originate residential mortgages on such a massive scale was facilitated, in large part, by its ability to rapidly package or securitize those loans and then, through the activities of the Underwriter Defendants, sell them to investors as purportedly investment grade mortgage-backed securities.

5.     Each Offering operated in the same manner. A special-purpose trust (the "Issuing Trust") was created by the Depositor to hold the underlying mortgage loan collateral. Certificates entitled investors to receive monthly distributions of interest and principal from the Issuing Trusts derived from cash flows from borrower repayment of the mortgage loans. The cash flows from the principal and interest payments from those mortgage loans were then divided into multiple classes, or "tranches," of senior and subordinated Certificates. If borrowers failed to pay back their mortgages, these losses would flow to Plaintiffs based on the seniority of their Certificates. However, since all of the Certificates issued by an individual Issuing Trust were backed by the pool of mortgages associated with that Issuing Trust, a decline in the value of the mortgages in the pool arising from delinquencies, defaults, or other problems with the particular loans would cause a decline in the value of each and every class or tranche of Certificates in the Issuing Trust, regardless of the subordination of certain Certificates to more senior ones.

6.     The assembly line created by Countrywide and the Underwriter Defendants for the mass production and sale of the Certificates began with Countrywide and its affiliates originating the mortgage loans. These loans were all

purportedly underwritten pursuant to specific loan origination guidelines set forth in the Offering Documents. The guidelines provided, *inter alia*, that Countrywide and its affiliates would assess borrower creditworthiness and appraise the value of the mortgaged property pursuant to standard appraisal methodologies. As set forth below, these descriptions of the loan origination guidelines in the Offering Documents contained material misstatements and omissions since, in fact, the guidelines were systematically disregarded to include borrowers who did not meet the aforementioned criteria.

7. Once the loans were originated they were ultimately sold to the Depositors who were all limited purpose entities created by CFC. The Depositors would deposit the loans into Issuing Trusts and, along with the Underwriter Defendants and the Rating Agencies, including Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's ("S&P") and Fitch Ratings, Inc. ("Fitch") (collectively referred to herein as the "Rating Agencies"), design the structure of each Offering. The Offering structures determined how the cash flows from the mortgage loans would be distributed to different senior and subordinate classes of Certificate investors. Each Offering purported to provide various forms of investor protections and purported to justify the investment grade ratings assigned to the Certificates.

8. It was critically important to the Underwriter Defendants not only that all of the Certificates be assigned investment grade ratings by the Rating Agencies at the time of issuance, but that they be assigned the highest investment grade ratings. The highest investment rating used by the Rating Agencies is AAA (Aaa for Moody's), which signifies the highest investment grade and suggests that there is almost no risk of investment loss associated with the security – the safest investment next to U.S. Treasury bonds. Ratings of "AA," "A" and "BBB" represent very high credit quality, high credit quality, and good credit quality, respectively. There are various intermediate ratings between BBB and AAA.

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT   4

Anything rated lower than BBB is considered speculative or "junk," *i.e.,* not investment grade.

9. In fact, all of the Countrywide-issued Certificates were assigned investment grade ratings and over 92% received the highest investment grade ratings. These ratings assured the rapid sale of the Certificates to conservative investors such as public and private pension funds and insurance companies whose investment guidelines typically require them to purchase only investment grade securities. The Underwriter Defendants exercised their substantial economic power by soliciting the Rating Agencies to bid for the ratings engagements via the Rating Agencies' proposed ratings of the Certificates. The Underwriters' competitive selection process for securing ratings, known as "ratings shopping," ensured that the highest investment grade ratings were assigned to substantially all of the Certificates.

10. After the Certificates were issued, facts began to emerge reflecting that the mortgage collateral supporting the purported investment grade securities was fundamentally impaired and that the guidelines described in the Offering Documents had been systematically disregarded:[1]

11. No matter when the Offering occurred, the default and delinquency rates of the Sampled Certificates skyrocketed exponentially in the first year after the loans were originated, reflecting en mass early payment defaults. Such early defaults are a strong indicator that origination guidelines have not been applied, *infra* ¶ 89;

12. As a result of such poor loan performance the Rating Agencies were forced not merely to downgrade isolated Certificates, but rather to revise the entire

---

[1] For purposes of the Securities Act, the Depositor is considered the "Issuer" under Section 2(a)(4), 15 U.S.C. § 77b(a)(4). The "issuing entity" in each Offering was the specifically denominated Issuing Trust, *e.g.,* for the CWALT Series 2005-11CB $1,145,181,103 Offering on April 27, 2005, the Issuer was CWALT, Inc. and the issuing entity was the Issuing Trust denominated "Alternative Loan Trust 2005-11CB."

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT    5

methodology used to assign investment grade ratings to the Certificates. Further, in making these fundamental revisions, the Rating Agencies explained that the impetus for the change was previously undisclosed and systematic "aggressive underwriting" practices used to originate the mortgage loan collateral. When these revised methodologies were applied to the Certificates in 2008 and 2009, the result was an unprecedented collapse of the investment grade ratings. Indeed, the Certificates bearing the highest investment grade ratings collapsed largely in one fell swoop – not merely one or two rating levels, but *as much as 22 rating levels* to below investment grade or junk bond rating. Indeed, 87% of the Certificates have been downgraded to junk bond levels – including over 92% of the Certificates initially awarded AAA/maximum-safety ratings, *infra* ¶ 97;[2]

13.    Investigations into Countrywide's loan origination practices during the period from 2005 through 2007 and presented in actions filed by the SEC against Countrywide and its senior management, including Angelo Mozilo ("Mozilo"), David Sambol ("Sambol") and Eric Sieracki ("Sieracki"), as well as by the Illinois and California attorneys general have confirmed, as a result of those agencies' subpoena power, that Countrywide's underwriting guidelines were systematically disregarded. In addition, MBIA Insurance Corp. ("MBIA"), one of the largest providers of bond insurance, brought its own lawsuit against Countrywide alleging that Countrywide fraudulently induced it to insure certain Certificates at issue in this action based on its improper loan origination practices. Moreover, allegations set forth in complaints against Countrywide alleging derivative and securities claims have further detailed Countrywide's rampant disregard for its own loan origination guidelines.

---

[2]    With respect to the ratings downgrade and delinquency figures set forth in this Complaint, Plaintiffs calculated the figures based on a statistically significant random sample of 309 ($265 billion) of the total 427 ($351 billion) Offerings at issue in this action. The Offerings or Certificates which were part of the test group are referred to herein at times as the "Sampled Certificates" or "Sampled Offerings."

14.     Fourth, more general government investigations into the issuance of mortgage-backed securities during the period when the Certificates were issued have also confirmed a systemic disregard for loan origination guidelines.  Thus, for example, according to the March 2008 policy statement of the President's Working Group on Financial Markets (the "President's Working Group"), the underlying causes of the mortgage crisis include, *inter alia*:  (i) "a breakdown in underwriting standards for subprime mortgages"; and (ii) "a significant erosion of market discipline by those involved in the securitization processes, including originators [and] underwriters … related in part to failures to provide or obtain adequate risk disclosures."

15.     Finally, commensurate with the exponential increases in delinquency and default rates in the underlying mortgages and the Certificates' ratings collapse, the value of the Certificates has plummeted.

16.     As a result of Countrywide's systemic disregard for its underwriting guidelines, numerous statements set forth in the Offering Documents contained material misstatements and omissions, including regarding: (i) the high quality of the mortgage pools underlying the Issuing Trusts, resulting from the underwriting standards employed to originate the mortgages, the value of the collateral securing the mortgages, and the soundness of the appraisals used to arrive at this value; (ii) the mortgages' loan-to-value ("LTV") ratios; and (iii) other criteria that were used to qualify borrowers for mortgages.

17.     The widespread collapse of Countrywide mortgages not only resulted in damage to Certificate investors but also drove Countrywide toward the brink of bankruptcy.  To survive, Countrywide merged with Bank of America in a $4.1 billion stock exchange in January 2008.

## II.    JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 11,

12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

19.    Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c). Many of the acts and conduct complained of herein occurred in substantial part in this District, including the dissemination of the Offering Documents, which contained material misstatements and omissions, complained of herein.  In addition, Defendants conduct business in this District.

20.    In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

## III.    PARTIES

### A.    Plaintiffs

21.    **Iowa Public Employees' Retirement System** ("IPERS") is a public pension fund for employees of the State of Iowa.  IPERS acquired MBS pursuant and traceable to one or more Registration Statements and Prospectus Supplements. Each of these Registration Statements and Prospectus Supplements, as described herein, contained substantially similar or identical representations as every Registration Statement and Prospectus Supplement used to issue the MBS acquired by IPERS and/or the members of the Class, and this language was rendered materially misleading as a consequence of the same course of conduct by Defendants.   A certificate documenting IPERS' transactions in the subject securities and willingness to serve as a representative party in this litigation was filed with its motion for appointment as lead plaintiff.   IPERS purchased the following Certificates pursuant to the materially misleading Offering Documents:

| Offering | Class | Purchase | Price | Quantity |
|---|---|---|---|---|
| CWALT 2005-17 | 2B1 | 5/31/05 | $100.00 | $1,410,000 |
| CWALT 2005-24 | 2A1A | 5/10/05 | $97.14 | $3,500,103 |
| CWALT 2005-24 | 2A1A | 8/1/05 | $97.80 | $100,003 |
| CWALT 2005-56 | 1A1 | 10/9/07 | $100.00 | $9,200,000 |
| CWALT 2005-J4 | 2A2B | 5/5/05 | $100.00 | $2,250,000 |
| CWALT 2006-OA10 | 1A1 | 3/3/08 | $62.93 | $2,499,919 |
| CWALT 2006-OA21 | A1 | 3/27/08 | $73.75 | $8,900,000 |
| CWALT 2006-OC5 | 2A2A | 6/26/06 | $100.00 | $9,100,000 |
| CWALT 2007-5CB | 1A31 | 9/10/08 | $72.62 | $9,470,000 |
| CWALT 2007-J1 | 3A1 | 4/10/07 | $97.00 | $6,000,000 |
| CWHEQ 2006-S3 | A2 | 6/16/06 | $100.00 | $1,999,956 |
| CWHEQ 2006-S8 | A2 | 12/7/06 | $100.00 | $2,124,966 |
| CWHEQ 2006-S9 | A2 | 12/14/06 | $100.00 | $1,845,000 |
| CWHEQ 2007-E | A | 5/25/07 | $100.00 | $9,953,000 |
| CWHL 2005-HYB6 | 2A1 | 4/12/07 | $99.70 | $4,700,000 |
| CWHL 2006-3 | 2A1 | 4/12/07 | $71.00 | $13,200,000 |
| CWHL 2006-OA5 | 2A1 | 2/22/08 | $85.00 | $3,200,000 |
| CWHL 2006-OA5 | 3A1 | 4/12/07 | $100.00 | $12,700,000 |
| CWHL 2007-10 | A22 | 9/30/08 | $71.00 | $7,200,000 |
| CWHL 2007-16 | A1 | 8/30/07 | $99.95 | $8,600,000 |
| CWHL 2007-HYB1 | 2A1 | 5/1/07 | $97.00 | $9,800,000 |
| CWHL 2007-HYB2 | 3A1 | 8/23/07 | $94.00 | $4,000,000 |
| CWL 2005-11 | AF1 | 9/12/05 | $100.00 | $15,900,000 |
| CWL 2005-12 | 2A1 | 9/28/05 | $100.00 | $11,875,000 |
| CWL 2005-6 | M4 | 6/14/05 | $100.00 | $3,475,000 |
| CWL 2005-AB3 | 2A1 | 9/8/05 | $100.00 | $15,900,000 |
| CWL 2005-IM1 | A2 | 7/22/05 | $100.00 | $3,350,000 |
| CWL 2005-IM3 | A1 | 12/1/05 | $100.00 | $15,275,000 |
| CWL 2006-12 | 2A1 | 6/27/06 | $100.00 | $14,750,000 |
| CWL 2007-1 | 2A1 | 1/26/07 | $100.00 | $15,325,000 |
| CWL 2007-11 | 2A1 | 6/28/07 | $100.00 | $14,575,000 |
| CWL 2007-13 | 2A1 | 10/16/07 | $100.00 | $4,060,000 |

22.  **General Board of Pension and Health Benefits of the United Methodist Church** ("GBPHB") is the pension fund for the active and retired clergy and lay employees of the United Methodist Church.  GBPHB acquired MBS pursuant and traceable to one or more Registration Statements and Prospectus Supplements.  Each of these Registration Statements and Prospectus Supplements, as described herein, contained substantially similar or identical representations as every Registration Statement and Prospectus Supplement used to issue the MBS acquired by GBPHB and/or the members of the Class, and this language was

rendered materially misleading as a consequence of the same course of conduct by Defendants.   A certificate documenting GBPHB's transactions in the subject securities and willingness to serve as a representative party in this litigation was filed with its motion for appointment as lead plaintiff.   GBPHB purchased the following Certificates pursuant to the materially misleading Offering Documents:

| Offering | Class | Purchase | Price | Quantity |
|---|---|---|---|---|
| CWL 2006-6 | 2A2 | 7/23/07 | $0.9938 | 1,290,000.00 |
| CWL 2005-10 | AF4 | 01/30/07 | $0.9823 | 1,000,000.00 |
| CWL 2006-23 | 2A1 | 11/22/06 | $1.0000 | 1,800,000.00 |
| CWL 2005-6 | 2A1 | 11/08/05 | $1.0000 | 625,415.91 |
| CWL 2006-3 | M2 | 2/16/06 | $1.0000 | 2,500,000.00 |
| CWL 2005-13 | AF4 | 11/06/06 | $1.0056 | 1,250,000.00 |
| CWL 2005-13 | 3AV3 | 5/12/08 | $0.8800 | 925,000.00 |
| CWHEL 2005-K | 2A1 | 10/12/06 | $1.0014 | 1,393,944.51 |
| CWL 2006-9 | 1AF6 | 04/05/07 | $1.0150 | 500,000.00 |
| CWL 2005-17 | 4AV1 | 12/15/05 | $1.0000 | 645,000.00 |
| CWL 2006-15 | A1 | 08/23/06 | $1.0000 | 1,624,912.98 |
| CWL 2005-6 | 2A2 | 06/21/06 | $1.0011 | 5,000,000.00 |
| CWL 2006-16 | 2A1 | 08/18/06 | $1.0000 | 600,000.00 |
| CWL 2005-AB3 | 2A2A | 02/16/06 | $1.0016 | 6,000,000.00 |
| CWL 2006-19 | 2A1 | 9/27/06 | $1.0000 | 543,267.20 |
| CWL 2006-11 | 1AF4 | 9/28/06 | $1.0264 | 1,026,370.00 |
| CWL 2005-BC3 | 2A2 | 2/16/06 | $1.0017 | 6,500,000.00 |
| CWL 2006-22 | 2A1 | 11/14/06 | $1.0000 | 800,000.00 |
| CWL 2006-3 | 2A2 | 7/23/07 | $0.9938 | 1,030,000.00 |
| CWL 2005-11 | AF3 | 9/12/05 | $1.0000 | 1,000,000.00 |
| CWL 2006-24 | 2A1 | 10/12/07 | $0.9927 | 385,909.66 |
| CWL 2006-6 | 2A1 | 03/20/06 | $1.0000 | 300,000.00 |
| CWL 2006-5 | 2A2 | 7/23/07 | $0.9938 | 620,000.00 |
| CWL 2005-13 | AF6 | 03/07/06 | $0.9974 | 350,000.00 |
| CWL 2006-9 | 1AF3 | 4/27/07 | $1.0048 | 1,000,000.00 |
| CWL 2005-13 | 3AV4 | 06/05/08 | $0.8700 | 985,000.00 |
| CWL 2006-BC1 | 1A | 8/10/06 | $1.0011 | 1,216,490.45 |
| CWL 2005-4 | AF5B | 04/05/06 | $0.9598 | 700,000.00 |
| CWL 2006-15 | A6 | 01/03/07 | $1.0086 | 350,000.00 |
| CWL 2005-7 | 3AV2 | 2/16/06 | $1.0018 | 5,000,000.00 |
| CWL 2006-17 | 2A1 | 09/08/06 | $1.0000 | 945,092.84 |
| CWL 2005-IM1 | A1 | 07/22/05 | $1.0000 | 845,000.00 |
| CWL 2006-18 | 2A1 | 09/19/06 | $1.0000 | 544,753.34 |
| CWL 2006-17 | 2A2 | 10/21/09 | $0.6900 | 610,000.00 |
| CWL 2006-11 | 1AF3 | 9/14/07 | $0.9900 | 595,000.00 |
| CWL 2006-IM1 | A2 | 06/25/07 | $0.9989 | 4,430,000.00 |
| CWALT 2006-OC9 | A2B | 11/08/06 | $1.0000 | 255,000.00 |

| CWALT 2006-OC8 | 2A18 | 11/10/06 | $1.0000 | 675,348.46 |
| CWALT 2006-OA19 | A1 | 10/27/06 | $1.0000 | 1,100,207.42 |
| CWALT 2005-61 | 2A1 | 03/25/08 | $0.7625 | 92,855.56 |
| CWL 2006-11 | 3AV1 | 6/21/06 | $1.0000 | 896,242.75 |
| CWALT 2007-HY5R | 2A1A | 5/22/08 | $0.9025 | 1,086,675.54 |

23. **Orange County Employees' Retirement System** ("OCERS") is a public pension fund for the employees of Orange County, California. OCERS acquired MBS pursuant and traceable to one or more Registration Statements and Prospectus Supplements. Each of these Registration Statements and Prospectus Supplements, as described herein, contained substantially similar or identical representations as every Registration Statement and Prospectus Supplement used to issue the MBS acquired by OCERS and/or the members of the Class, and this language was rendered materially misleading as a consequence of the same course of conduct by Defendants. A certificate documenting OCERS' transactions in the subject securities and willingness to serve as a representative party in this litigation is attached hereto. OCERS purchased the following Certificates pursuant to the materially misleading Offering Documents:

| Offering | Class | Purchase | Price | Quantity |
|---|---|---|---|---|
| CWALT 2006-OA17 | 1A1A | 9/23/08 | $0.5915 | 774,986.90 |
| CWALT 2007-OA7 | A1A | 10/31/06 | $0.9986 | 1,000,000.00 |
| CWHL 2005-31 | 2A1 | 2/2/07 | $0.9950 | 876,271.64 |
| CWHL 2005-HYB6 | 1A1 | 6/21/07 | $0.9988 | 806,723.75 |
| CWHL 2005-HYB9 | 3A2A | 11/28/05 | $0.9972 | 400,000.00 |
| CWHL 2005-R2 | 1AF1 | 6/20/05 | $1.0000 | 700,000.00 |
| CWHL 2007-HY1 | 1A1 | 4/5/07 | $1.0041 | 1,851,049.61 |
| CWL 2007-S1 | A1B | 2/23/07 | $1.0000 | 3,000,000.00 |

24. **State of Oregon, by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board on behalf of the Oregon Public Employee Retirement Fund** ("OPERS") is a public pension fund for employees of the State of Oregon. OPERS acquired MBS pursuant and traceable to one or more Registration Statements and Prospectus Supplements. Each of these Registration Statements and Prospectus Supplements, as described herein, contained substantially similar or identical representations as every Registration

Statement and Prospectus Supplement used to issue the MBS acquired by OPERS and/or the members of the Class, and this language was rendered materially misleading as a consequence of the same course of conduct by Defendants.  A certificate documenting OPERS' transactions in the subject securities and willingness to serve as a representative party in this litigation is attached hereto. OPERS purchased the following Certificates pursuant to the materially misleading Offering Documents:

| Offering | Class | Purchase | Price | Quantity |
|----------|-------|----------|-------|----------|
| CWALT 2005-17 | 2A1 | 4/12/05 | $1.0000 | 1,100,000.00 |
| CWALT 2005-17 | 1A1 | 4/6/05 | $1.0000 | 1,100,000.00 |
| CWALT 2005-17 | 1A1 | 4/12/05 | $1.0000 | 1,100,000.00 |
| CWALT 2005-24 | 4A1 | 5/13/05 | $0.9997 | 1,100,000.00 |
| CWALT 2005-24 | 4A1 | 6/28/07 | $1.0002 | 1,496,519.17 |
| CWALT 2005-38 | A3 | 7/13/05 | $1.0000 | 32,100,000.00 |
| CWALT 2005-38 | A3 | 9/19/07 | $0.9833 | 120,978.12 |
| CWALT 2005-44 | 2A1 | 7/27/05 | $0.9998 | 25,500,000.00 |
| CWALT 2005-44 | 1A1 | 7/25/05 | $1.0000 | 1,200,000.00 |
| CWALT 2005-62 | A1 | 8/4/06 | $1.0003 | 8,446,540.84 |
| CWALT 2005-70CB | A4 | 10/29/08 | $0.6490 | 815,000.00 |
| CWALT 2005-72 | A1 | 12/21/05 | $1.0000 | 16,930,000.00 |
| CWALT 2005-72 | A1 | 12/15/05 | $1.0000 | 13,024,000.00 |
| CWALT 2005-J11 | 7A1 | 10/29/08 | $0.9907 | 414,712.16 |
| CWALT 2005-J11 | 1A3 | 10/29/08 | $0.9323 | 404,395.18 |
| CWALT 2005-J12 | 2A1 | 9/29/05 | $1.0000 | 24,930,000.00 |
| CWALT 2005-J12 | 2A1 | 1/2/07 | $0.8203 | 712,880.94 |
| CWALT 2005-J13 | 2A7 | 10/29/08 | $0.7744 | 1,100,000.00 |
| CWALT 2006-36T2 | 2A5 | 11/10/09 | $0.5550 | 400,000.00 |
| CWALT 2006-OA11 | A4 | 6/16/06 | $1.0000 | 1,400,000.00 |
| CWALT 2006-OA11 | A4 | 6/28/07 | $0.9998 | 1,530,023.38 |
| CWHEL 2005-F | 2A | 9/14/05 | $1.0000 | 1,200,000.00 |
| CWHEL 2005-G | 2A | 9/22/05 | $1.0000 | 21,700,000.00 |
| CWHEL 2005-G | 2A | 10/19/05 | $1.0001 | 1,200,000.00 |
| CWHL 2006-14 | A3 | 10/29/08 | $0.9036 | 1,133,752.23 |
| CWHL 2006-HYB3 | 2A1A | 4/27/06 | $1.0002 | 1,076,000.00 |
| CWHL 2006-HYB3 | 2A1A | 8/21/07 | $0.9919 | 154,493.47 |
| CWHL 2007-13 | A10 | 10/29/08 | $0.5272 | 1,600,000.00 |
| CWHL 2007-HY5 | 3A1 | 8/21/07 | $0.9863 | 1,623,099.40 |
| CWL 2005-17 | 1AF1 | 12/15/05 | $1.0000 | 13,270,000.00 |
| CWL 2005-1M2 | A1 | 10/18/05 | $1.0000 | 19,900,000.00 |
| CWL 2005-H | 2A | 9/27/05 | $1.0000 | 1,200,000.00 |
| CWL 2006-BC1 | 2A1 | 3/7/06 | $1.0000 | 24,150,000.00 |

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  12

**B.    Defendants**

25.    Plaintiffs allege that each and every Defendant is, to the maximum extent permitted by law, jointly and severally liable for the misconduct alleged in this Complaint.

1.    Countrywide Defendants

26.    Defendant **Countrywide Financial Corporation** ("CFC") was, at times relevant to this Complaint, a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California.  CFC was a holding company which, through its subsidiaries, was engaged in mortgage lending and other real estate finance related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting.  The Company operated through five business segments:  Mortgage Banking, which originated, purchased, sold and serviced non-commercial mortgage loans nationwide; Banking, which took deposits and invested in mortgage loans and home equity lines of credit; Capital Markets, which operated an institutional broker-dealer that primarily specialized in trading and underwriting MBS; Insurance, which offered property, casualty, life and disability insurance as an underwriter and as an insurance agency; and Global Operations, which licensed and supported technology for mortgage lenders in the United Kingdom.  As discussed below, CFC merged with and became Bank of America in 2008.

27.    Defendant **Countrywide Securities Corporation** ("CSC") is a broker-dealer within CFC.  According to CFC's Form 10-K for the year ended December 31, 2007, filed with the SEC on February 29, 2008 ("2007 Form 10-K"), CSC "primarily specializes in trading and underwriting MBS."  The financial results of CSC are set forth in the Capital Markets section of CFC's financial statements.  CFC further stated in its 2007 Form 10-K that it was "ranked fourth among Non-Agency MBS Underwriters" for 2007.

28.    Defendant **Countrywide Home Loans, Inc.** ("CHL") was, at times

relevant to this Complaint, a direct wholly-owned subsidiary of CFC. CHL was engaged in the mortgage banking business, and originated, purchased, sold and serviced mortgage loans. CHL's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. CHL served as the "Sponsor" or "Seller" of the Certificates, meaning that it played a central role in providing the pools of mortgage loans to the Issuing Trusts upon which the Certificates were based.

29. Defendant **Countrywide Capital Markets** ("CCM") was, at times relevant to this Complaint, a direct wholly-owned subsidiary of CFC. CCM's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. CCM operated through its two main wholly-owned subsidiaries, CSC and Countrywide Servicing Exchange. According to CFC's 2007 Form 10-K, "Capital Markets participates in both competitive bid and negotiated underwritings and performs underwriting services for CHL, Countrywide Bank and third parties." The financial results of CCM were set forth in the Capital Markets section of CFC's financial statements.

30. Defendant **Bank of America Corp.** ("Bank of America") is a successor to Defendant CFC, having *de facto* merged with CFC. On July 1, 2008, Defendant CFC completed a merger with Red Oak Merger Corporation ("Red Oak"), a wholly-owned subsidiary of Bank of America, pursuant to the terms of an Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank of America, Red Oak, and CFC. The acquisition was through an all-stock transaction involving a Bank of America subsidiary that was created for the sole purpose of facilitating the acquisition of CFC. The Countrywide brand was retired shortly after the merger and currently CFC's former website redirects to the Bank of America website. Moreover, Bank of America has assumed CFC's liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending allegedly committed by CFC. *See, e.g.,* Shayndi Raice and Marshall

Eckblad, Countrywide's Mess Billed to Bank of America, *Wall St. J.* (June 7, 2010). Substantially all of Countrywide's assets were transferred to Bank of America on November 7, 2008, in connection with Countrywide's integration with Bank of America's other businesses and operations, along with certain of Countrywide's debt securities and related guarantees. CFC ceased filing its own financial statements in November 2008, and instead its assets and liabilities have been included in Bank of America's financial statements. Further, many of the same locations, employees, assets and business operations that were formerly CFC continue under the Bank of America Home Loans brand. CSC, CHL and CCM likewise are now part of Bank of America.

31. Defendant **NB Holdings Corporation** is one of the shell entities used to effectuate the Bank of America-CFC merger, and is a successor to Defendant CHL. On July 3, 2008, Defendant CHL completed the sale of substantially all of its assets to NB Holdings Corporation, a wholly-owned subsidiary of Bank of America.

32. CFC, CSC, CCM, CHL, Bank of America and NB Holdings Corp. are collectively referred to as the "Countrywide Defendants."

2.    The Issuing Defendants

33. Defendant CFC structured Defendants CWALT, CWMBS, CWABS, and CWHEQ as limited purpose, wholly-owned, finance subsidiaries to facilitate its issuance and sale of the MBS. CWALT, CWMBS, CWABS, and CWHEQ were controlled directly by the Individual Defendants and CFC, including by the appointment of CFC executives as directors and officers of these entities. Revenues flowing from the issuance and sale of MBS issued by CWALT, CWMBS, CWABS and CWHEQ and the Issuing Trusts were passed through to CFC and consolidated into CFC's financial statements. Defendant CFC, therefore, exercised actual day-to-day control over Defendants CWALT, CWMBS, CWABS, and CWHEQ.

34.     Defendant **CWALT, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWALT's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC.  Defendant CWALT served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in Exhibit A in the accompanying Appendix and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Filer | Date | No. of Offerings |
|---|---|---|---|---|
| 333-110343 | $19,000,000,000.00 | CWALT, Inc. | January 13, 2004 | 1 |
| 333-117949 | $24,126,942,035.00 | CWALT, Inc. | September 23, 2004 | 15 |
| 333-123167 | $22,731,808,071.00 | CWALT, Inc. | April 21, 2005 | 26 |
| 333-125902 | $45,335,287,290.00 | CWALT, Inc. | July 25, 2005 | 62 |
| 333-131630 | $100,271,785,327.00 | CWALT, Inc. | March 6, 2006 | 93 |
| 333-140962 | $103,095,483,061.00 | CWALT, Inc. | April 24, 2007 | 29 |

35.     Defendant **CWHEQ, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWHEQ's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC.  Defendant CWHEQ served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in Exhibit A in the accompanying Appendix and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Filer | Date | No. of Offerings |
|---|---|---|---|---|
| 333-126790 | $30,685,000,000.00 | CWHEQ, Inc. | August 4, 2005 | 17 |
| 333-132375 | $26,572,949,813.00 | CWHEQ, Inc. | April 12, 2006 | 18 |
| 333-139891 | $31,717,192,508.00 | CWHEQ, Inc. | May 22, 2007 | 3 |

36.   Defendant **CWABS, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWABS' principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC.  Defendant CWABS served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in Exhibit A in the accompanying Appendix and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Filer | Date | No. of Offerings |
|---|---|---|---|---|
| 333-118926 | $60,598,485,932.00 | CWABS, Inc. | October 18, 2004 | 1 |
| 333-125164 | $46,598,657,434.00 | CWABS, Inc. | June 10, 2005 | 26 |
| 333-131591 | $34,327,892,523.00 | CWABS, Inc. | February 21, 2006 | 17 |
| 333-135846 | $40,000,000,000.00 | CWABS, Inc. | August 8, 2006 | 23 |
| 333-140960 | $113,336,555,700.00 | CWABS, Inc. | April 24, 2007 | 9 |

37.   Defendant **CWMBS, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWMBS' principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC.  Defendant CWMBS served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified

in Exhibit A in the accompanying Appendix and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Filer | Date | No. of Offerings |
|---|---|---|---|---|
| 333-100418 | $14,978,548,884.00 | CWMBS, Inc. | October 28, 2002 | 1 |
| 333-121249 | $20,863,464,518.00 | CWMBS, Inc. | February 8, 2005 | 3 |
| 333-125963 | $40,742,304,251.00 | CWMBS, Inc. | July 25, 2005 | 31 |
| 333-131662 | $60,846,662,430.00 | CWMBS, Inc. | March 6, 2006 | 29 |
| 333-140958 | $144,647,113,029.00 | CWMBS, Inc. | April 24, 2007 | 23 |

38.    CWALT, CWMBS, CWABS and CWHEQ, and CFC are collectively referred to herein as the "Issuing Defendants."

### 3.    The Underwriter Defendants

39.    As set forth above, Defendant CSC is an affiliate of CFC, and acted as an underwriter for the Certificates identified in Exhibit A, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.  As set forth above, Defendant CSC now operates as Bank of America.

40.    Defendant **J.P. Morgan Securities, Inc.** ("JPMSI") acted as an underwriter for the Certificates identified in Exhibit A, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

41.    Defendant **Deutsche Bank Securities Inc.** ("Deutsche Bank") acted as an underwriter for the Certificates identified in Exhibit A, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  18

42.     Defendant **Bear, Stearns & Co. Inc.** ("Bear Stearns") acted as an underwriter for the Certificates identified in Exhibit A, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.  By the end of 2005, Bear Stearns was the single largest underwriter of mortgage-backed securities in the world.  Bear Stearns served as the underwriter for all of the Certificates here, and assisted in drafting and disseminating the Offering Documents.  Bear Stearns was located at 383 Madison Avenue, New York, New York 10179.  Pursuant to a merger agreement effective May 30, 2008, Bear Stearns merged with Bear Stearns Merger Corporation, a wholly-owned subsidiary of Defendant **JPMorgan Chase, Inc.** ("JPMorgan"), making Bear Stearns a wholly-owned subsidiary of JPMorgan.  JPMorgan is an investment banking holding company incorporated in Delaware, and principally located at 270 Park Avenue, New York, New York 10017.  Defendant JPMSI is a wholly owned subsidiary of JPMorgan, and is the successor-in-interest to Bear Stearns.

43.     Defendant **Banc of America Securities LLC** ("BOFAS") acted as an underwriter for the Certificates identified in Exhibit A, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

44.     Defendant **UBS Securities LLC** ("UBS") acted as an underwriter for the MBS identified in Exhibit A, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

45.     Defendant **Morgan Stanley & Co., Inc.** ("Morgan Stanley") acted as an underwriter for the Certificates identified in Exhibit A, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

46.     Defendant **Edward D. Jones & Co., L.P.** ("Edward Jones") acted as

1  an underwriter for the Certificates identified in Exhibit A, within the meaning of
2  the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the
3  Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

4       47.     Defendant **Citigroup Global Markets, Inc.** ("Citigroup") acted as an
5  underwriter for the Certificates identified in Exhibit A, within the meaning of the
6  Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the
7  Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

8       48.     Defendant **Goldman, Sachs & Co.** ("Goldman Sachs") acted as an
9  underwriter for the Certificates identified in Exhibit A, within the meaning of the
10 Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the
11 Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

12      49.     Defendant **Credit Suisse Securities (USA) LLC f/k/a/ Credit Suisse**
13 **First Boston LLC** ("Credit Suisse") acted as an underwriter for the Certificates
14 identified in Exhibit A, within the meaning of the Securities Act, 15 U.S.C. §
15 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to
16 which the MBS were sold to Plaintiffs.

17      50.     Defendant **RBS Securities Inc. f/k/a RBS Greenwich Capital d/b/a**
18 **Greenwich Capital Markets, Inc.** ("RBS") acted as an underwriter for the
19 Certificates identified in Exhibit A, within the meaning of the Securities Act, 15
20 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements
21 pursuant to which the MBS were sold to Plaintiffs.

22      51.     Defendant **Barclays Capital, Inc.** ("Barclays") acted as an
23 underwriter for the Certificates identified in Exhibit A, within the meaning of the
24 Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the
25 Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

26      52.     Defendant **HSBC Securities (USA) Inc.** ("HSBC") acted as an
27 underwriter for the Certificates identified in Exhibit A, within the meaning of the
28 Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the

Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

53. Defendant **BNP Paribas Securities Corp.** ("BNP") acted as an underwriter for the Certificates identified in Exhibit A, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

54. Defendant **Merrill Lynch, Pierce, Fenner & Smith, Inc.** ("Merrill Lynch") acted as an underwriter for the Certificates identified in Exhibit A, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Merrill Lynch is a wholly-owned broker-dealer subsidiary of Merrill Lynch & Co., which on September 15, 2008, entered into an Agreement and Plan of Merger (as amended by Amendment No. 1 dated as of October 21, 2008) (the "Merger Agreement") with Bank of America. Pursuant to the Merger Agreement, on January 1, 2009, a wholly-owned subsidiary of Bank of America merged with and into Merrill Lynch, with Merrill Lynch continuing as the surviving corporation and as a subsidiary of Bank of America. In October 2009, Bank of America contributed the shares of Banc of America Investment Services, Inc. ("BAI"), one of Bank of America's wholly-owned broker-dealer subsidiaries, to Merrill Lynch & Co. Subsequent to the transfer, BAI was merged into Merrill Lynch.

55. Defendants CFC, CSC, JPMSI, Deutsche Bank, Bear Stearns, BOFAS, UBS, Morgan Stanley, Edward Jones, Citigroup, Goldman Sachs, Credit Suisse, RBS, Barclays, HSBC, BNP, and Merrill Lynch are referred to herein as the "Underwriter Defendants." "Underwriter Defendants" also includes Defendants Bank of America and JPMorgan as successors in interest as set forth above.

### 4. The Individual Defendants

56. Defendant **Stanford L. Kurland** ("Kurland") was, at relevant times, the Chief Executive Officer ("CEO"), President and Chairman of the Board of

Directors for CWALT, CWMBS, CWABS and CWHEQ.  Defendant Kurland signed: CWALT's January 13, 2004, September 23, 2004, April 21, 2005, July 25, 2005, and March 6, 2006 Registration Statements; CWMBS' October 28, 2002, February 8, 2005, July 25, 2005, and March 6, 2006 Registration Statements; CWABS' October 18, 2004, June 10, 2005, February 21, 2006, and August 8, 2006 Registration Statements; and CWHEQ's August 4, 2005, and April 12, 2006 Registration Statements.  Defendant Kurland was concurrently the Executive Vice President and Chief Operating Officer ("COO") of Defendant CFC.

57.    Defendant **David A. Spector** ("Spector") was, at relevant times, Vice President and a member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ.  Defendant Spector signed: CWALT's January 13, 2004, September 23, 2004, April 21, 2005, July 25, 2005, and March 6, 2006 Registration Statements; CWMBS' October 28, 2002, February 8, 2005, July 25, 2005, and March 6, 2006 Registration Statements; CWABS' October 18, 2004, June 10, 2005, February 21, 2006, and August 8, 2006 Registration Statements; and CWHEQ's August 4, 2005, and April 12, 2006 Registration Statements. Defendant Spector was concurrently the Senior Managing Director of Secondary Marketing of Defendant CFC.

58.    Defendant **Eric P. Sieracki** ("Sieracki") was, at relevant times, the Executive Vice President, CFO, Treasurer and member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ.  Defendant Sieracki signed: CWALT's April 21, 2005, July 25, 2005, March 6, 2006, and April 24, 2007 Registration Statements; CWMBS' July 25, 2005, March 6, 2006, and April 24, 2007 Registration Statements; CWABS' June 10, 2005, February 21, 2006, August 8, 2006, and April 24, 2007 Registration Statements; and CWHEQ's August 4, 2005, April 12, 2006 and May 22, 2007 Registration Statements.  Defendant Sieracki was concurrently the Executive Vice President and CFO of Defendant CFC.

59.   Defendant **N. Joshua Adler** ("Adler") was, at relevant times, President, CEO and a member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ.   Defendant Adler signed: CWALT's April 24, 2007 Registration Statement; CWMBS' April 24, 2007 Registration Statement; CWABS' April 24, 2007 Registration Statement; and CWHEQ's May 22, 2007 Registration Statement.

60.   Defendant **Ranjit Kripalani** ("Kripalani") was, at relevant times, a member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ. Defendant Kripalani signed: CWALT's April 24, 2007 Registration Statement; CWMBS' April 24, 2007 Registration Statement; CWABS' April 24, 2007 Registration Statement; and CWHEQ's May 22, 2007 Registration Statement.

61.   Defendant **Jennifer S. Sandefur** ("Sandefur") was, at relevant times, a member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ.   Defendant Sandefur signed: CWALT's April 24, 2007 Registration Statement; CWMBS' April 24, 2007 Registration Statement; CWABS' April 24, 2007 Registration Statement; and CWHEQ's May 22, 2007 Registration Statement.   Defendant Sandefur was concurrently the Senior Managing Director and Treasurer of Defendant CHL.

62.   Defendant **Thomas Keith McLaughlin** ("McLaughlin") was, at relevant times, a member of the Board of Directors for CWALT, CWMBS, and CWABS.   McLaughlin signed:  CWALT's January 13, 2004 and September 23, 2004 Registration Statements; CWMBS' October 28, 2002 and February 8, 2005 Registration Statements; and CWABS' October 18, 2004 Registration Statement.

63.   Defendant **Thomas H. Boone** ("Boone") was, at relevant times, a member of the Board of Directors for CWALT and CWMBS.   Boone signed: CWALT's January 13, 2004 Registration Statement; and CWMBS' October 28, 2002 Registration Statement.

64.   Defendant **Jeffrey P. Grogin** was, at relevant times, a member of the

Board of Directors for CWALT and CWMBS.  Grogin signed: CWALT's January 13, 2004 Registration Statement; and CWMBS' October 28, 2002 Registration Statement.

65.    Defendants Kurland, Spector, Sieracki, Adler, Kripalani, Sandefur, McLaughlin, Boone, and Grogin are collectively referred to hereinafter as the "Individual Defendants."

66.    Each of the Individual Defendants exercised control over the Issuing Defendants by, among other things, signing SEC filings on the Issuing Defendants' behalf.

### 5.    David A. Sambol

67.    Defendant **David A. Sambol** ("Sambol") was, at relevant times, the President and COO of Defendant CFC.  Defendant Sambol was a control person of the Countrywide Defendants and the Issuing Defendants.

### C.    The Issuing Trust Non-Parties

68.    The Issuing Trusts were set up by CWALT, CWMBS, CWABS and CWHEQ to issue hundreds of billions of dollars worth of Certificates pursuant to the Registration Statements and Prospectus Supplements.  Exhibits A and B set out in the accompanying Appendix hereto identify (1) each Issuing Trust, (2) the stated value of the Certificates it issued, (3) the Registration Statements and Prospectus Supplements pursuant to which the Certificates were issued and sold, and (4) the identities of the Underwriters, Sponsor/Seller, and Depositor/Issuer  for each issuance.

## IV.   BACKGROUND

### A.    Countrywide Was a Leading Issuer and Underwriter of Mortgage-Backed Securities

69.    As illustrated below, a mortgage securitization is where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  24



70.     When mortgage borrowers make interest and principal payments, the cash flow is distributed to the holders of MBS certificates in order of priority, based on the specific tranche held.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.  Because the lower tranches are designed to provide a cushion, diminished cash flows to the lower tranches results in impaired value of the higher tranches, as, among other reasons, there is less certainty of the continued cash flows to the higher tranches.

71.     The securitization of loans fundamentally shifts the risk of loss from mortgage loan originators to investors who purchase an interest in the securitized pool of loans.  When the originator holds a mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan.   As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  In securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing

1    borrower creditworthiness or a fair appraisal value of the property in the loan

2    origination process.

3          72.    In the 1980s and 1990s, securitizations were generally within the

4    domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National

5    Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage

6    Corporation ("Freddie Mac"), which would purchase loans from originators.

7    Investors in these early GSE securitizations were provided protections since the

8    underlying loans were originated pursuant to strict underwriting guidelines.

9          73.    Between 2001 and 2006, however, there was dramatic growth in non-

10   GSE loan originations and securitizations such that non-GSE securitizations grew

11   330%, becoming a $1.48 trillion industry.

12         74.    The market for adjustable rate mortgages ("ARMs"), including

13   interest-only and negative amortization loans, grew concurrently with the boom in

14   subprime and Alt-A loan originations and securitizations.  ARMs increased from

15   $355 billion in 2001 to $1.3 trillion in 2006.  Mortgage Market Statistical Annual,

16   Vol. 1 (2007), at 4.  Such growth coincided with the increase in popularity of so-

17   called "exotic" or non-traditional ARMs which had fixed interest rates for a limited

18   period before "resetting" during the life of the loan to significantly higher

19   adjustable rates.   These non-traditional ARMs included "2/28 or 3/27 ARMs"

20   (many with below-market teaser rates for two or three years before conversion to

21   the fully-indexed rate); interest-only ARMs (permitting interest-only payments for

22   a set period of time during which the rate may fluctuate, resulting in negative

23   amortization and rising principal); option payment ARMs (offering up to four

24   payment options, including minimum and interest-only payments, which, if

25   chosen, result in negative amortization and rising principal); and 40-year ARMs (in

26   which payments are calculated based on a 40-year payment term but where the

27   loan terminates in 30 years, resulting in a final balloon payment).  Origination of

28   non-traditional ARMs increased 278% between 2004 and 2006 – from $205 billion

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  26

1    to $775 billion.  Mortgage Market Statistical Annual, Vol. 1 (2007), at 6.

2        75.    Here, the Certificate collateral was composed of a substantial number

3    of non-traditional adjustable mortgages, interest-only and negative amortization

4    loans.  These types of loans presented the greatest potential for "payment shock" to

5    the borrower since they provided for initially small monthly payments based on

6    low fixed rates which then reset thereafter to significantly higher monthly payment

7    amounts based on adjustable interest rates.   Although these loans were not

8    traditional, the underwriting guidelines still required the loans to be originated

9    responsibly and in accordance with those guidelines.   Yet, Countrywide would

10   routinely provide loans to borrowers who could only afford the short-term "teaser"

11   rates (or, even to those that could not even afford the teaser rates) – not the full

12   payments that would be required after the short-term rates reset.  Although these

13   types of loans were designed for high net worth investors who were capable of

14   earning higher returns through investment than in making interest and principal

15   payments upfront, Countrywide routinely sold these loans to unsophisticated

16   borrowers who were unable to make the required payments after the loans reset –

17   and frequently, to those who could not even make the "teaser" payments, leading

18   to early defaults on the loans.

19       **B.    Countrywide's Origination and Securitization Operations**

20       76.    CFC set up Defendants CWALT, CWMBS, CWABS, and CWHEQ,

21   the Depositors in this case, as "limited purpose finance entities" solely for the

22   purpose of facilitating the issuance of the Certificates.  CHL acted as the servicer

23   of the mortgages and CSC, Countrywide's underwriting division, along with the

24   other Underwriter Defendants, marketed and sold the securities.   Although

25   Defendants CWALT, CWMBS, CWABS, and CWHEQ served as the Depositors

26   for the Issuing Trusts and issued the Registration Statements, this process was

27   directed and controlled by the Countrywide Defendants, the Individual Defendants,

28   and Sambol.

77.    With respect to the Certificates at issue here, the Registration Statements and each of the Prospectus Supplements contained material misstatements concerning, *inter alia*, the quality of the loans supporting the MBS associated with each trust, including, specifically, statements about (1) the underwriting process and standards by which mortgages held by the Issuing Trusts were originated, and (2) the values of the real estate securing the mortgages pooled in the Issuing Trusts, expressed in part as the average LTV ratios of the underlying mortgages and the appraisal standards by which such real estate values were obtained.

78.    Each MBS sold to Plaintiffs was sold pursuant to a Registration Statement.  The Registration Statement incorporated the Prospectus Supplements by reference, which were filed at the time that the Certificates were sold to Plaintiffs.  The Prospectus Supplements contained specific disclosures concerning each Issuing Trust.  Nonetheless, in each Prospectus Supplement, as set forth herein, the Issuing Defendants and the Underwriter Defendants made the same representations concerning CHL's standards in originating the mortgages and valuing the properties underlying the Issuing Trusts.

79.    CWALT filed six Registration Statements with the SEC, *see* Exhibit A, registering mortgage-backed securities backed primarily by:

    a)    first lien mortgage loans secured by one- to four-family residential properties;

    b)    mortgage loans secured by first liens on small multi-family residential properties, such as residential apartment buildings or projects containing five to fifty residential units;

    c)    collections arising from one or more types of the loans described above which are not used to make payments on securities issued by a trust fund, including excess servicing fees and prepayment charges;

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  28

d)   mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or

e)   mortgage-backed securities evidencing an interest in, or secured by, loans of the type that would otherwise be eligible to be loans included in a trust fund and issued by entities other than Ginnie Mae, Fannie Mae, or Freddie Mac.

80.   CWHEQ filed three Registration Statements with the SEC, *see* Exhibit A, registering mortgage-backed securities backed primarily by:

a)   first lien mortgage loans secured by first and/or subordinate liens on one- to four-family residential properties;

b)   closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties; or

c)   home improvement loans, secured by first or subordinate liens on one- to four-family residential properties or by personal property security interests, and home improvement sales contracts, secured by personal property security interests.

81.   CWABS filed five Registration Statements with the SEC, *see* Exhibit A, registering mortgage-backed securities backed primarily by:

a)   first lien mortgage loans secured by one- to four-family residential properties;

b)   mortgage loans secured by first liens on small multi-family residential properties, such as residential apartment buildings or projects containing five to fifty residential units;

c)   closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties; or

d)     home improvement loans, secured by first or subordinate liens on one-to four-family residential properties or by personal property security interests, and home improvement sales contracts, secured by personal property security interests.

82.     CWMBS filed one Registration Statement with the SEC, *see* Exhibit A, registering mortgage-backed securities backed primarily by:

a)     first lien mortgage loans secured by one- to four-family residential properties or participations in that type of loan;

b)     mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or

c)     private mortgage-backed securities backed by first lien mortgage loans secured by one- to four-family residential properties or participations in that type of loan.

83.     Prior to securitization, Countrywide sent the "Loan Level File" to the Rating Agencies to enable them to rate the Certificates.  Upon receipt of the "Loan Level File," S&P would run the loan tape through both its "LEVELS" and "SPIRE" Models.  Moody's would run the loan tape through its M-3 Model. These models analyzed 50-80 loan characteristics (*e.g.,* FICO score, LTV ratio, property location, etc.), in order to estimate the number of loans that were likely to default and the corresponding amount of the dollar loss resulting from such default.

84.     As a condition to the issuance of the Certificates, the Rating Agencies had to assign pre-determined ratings to the Certificates.  Yet, as detailed herein, the ratings at the time of issuance were vastly higher than they should have been and failed to represent the true value of the Certificates due to incorrect information provided by Countrywide and widespread misrepresentations in the origination process.   Accordingly, despite the fact that the Rating Agencies assigned investment-grade ratings, the Certificates were far riskier than other investments with the same ratings.

85.    The models purported to calculate the amount of "credit enhancement" required to assign a specific set of Certificates "AAA" ratings.  As a result of relatively low levels of credit enhancement being required, as reflected in Exhibit C in the accompanying Appendix, over 92% of the Certificates were assigned AAA/maximum safety ratings.

86.    These ratings, although based on inaccurate assumptions, were critical to institutional investors – public pension funds, banks, insurance companies and mutual funds – whose investment guidelines restrict investments based on a security's rating.

## V.    EVIDENCE OF SYSTEMIC DISREGARD OF STATED LOAN ORIGINATION GUIDELINES CONTAINED IN OFFERING DOCUMENTS

### A.    Exponential Increase in Certificate Default Rates in Months After Issuance No Matter When Offering Occurred Evidences Disregard of Origination Guidelines

87.    The defective nature of the mortgage collateral underlying the Certificates is reflected by the recurring pattern of exponential increases in borrower delinquencies in the months after each of the Offerings was commenced.

88.    Four months after each of the Offerings was commenced, borrower delinquency and default rates on the underlying mortgage collateral had increased by a staggering 625% – from an average of 0.4% to over 2.9% of the mortgage loan balance.  By the sixth month after issuance of the Certificates, delinquency and default rates had increased 1,025% to an average of 4.5% of the mortgage loan balance.  And shockingly, by 12 months after the Offering date, delinquency and default rates had increased 2,525% from issuance to 10.5% of the mortgage loan balance.   Borrower default and delinquency rates in the underlying mortgage collateral have continued to increase.

89.    These early payment defaults and delinquency rates are reflective of a

systematic disregard for underwriting guidelines.  As reported by the Federal Bureau of Investigation ("FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  The study cited by the FBI and conducted by Base Point Analytics found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not.  The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more and fictitious employers and falsified tax returns.  The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., in concluding that the top states for mortgage fraud – including the states where the MBS collateral was principally originated – were also the top states with the highest percentage of early payment defaults.

90.    As set forth above, it is now apparent that Countrywide mortgage originators routinely encouraged such misstatements in loan applications. Unsurprisingly, this has resulted in dismal performance of the loans.  As of the filing of the First Amended Complaint in *Luther v. Countrywide Home Loans Servicing LP*, No. BC 380698 (Cal. Super. Ct.), in October 2008, borrower delinquency and default rates had risen to an average of approximately 30% of the mortgage loan collateral underlying the Certificates, forcing the Rating Agencies to downgrade substantially all of the Certificates to at or near junk bond status.  As of the date of the filing of the complaint in the above-captioned action in January 2010, ***over 50%*** of mortgage collateral was considered to be in some form of delinquency or default, with ***over 77%*** of the mortgage loans underlying the Offerings issued by Depositor CWABS being delinquent or in default.

91.    Despite assurances by the Defendants in the Offering Documents that the mortgage loans collateralizing the Certificates were originated pursuant to Countrywide's stated guidelines, nothing could be further from the truth.

**B.     Rating Agencies Collapsed Certificate Ratings to "Junk Bond" Levels Due to Undisclosed "Aggressive Underwriting" Practices**

92.     The Rating Agencies rated the Certificates pursuant to the following twenty-three (23) level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

93.     As noted above, the Rating Agencies initially assigned the highest ratings of AAA/maximum safety to 92%, or $244.3 billion, of the Sampled Certificates.

94.     As of the filing of this Complaint, as set forth directly above, the underlying collateral has largely failed, with over 50% of the total mortgage loan balance now severely delinquent, in default, repossessed, in bankruptcy or in foreclosure.  This performance was an indication to the Rating Agencies, including S&P and Moody's, of pervasive underwriting failures in the origination of the

collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes.

95.    On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous Certificates because the performance of the underlying collateral "called into question" the accuracy of the loan data. This announcement triggered several government investigations which only began reporting their findings in 2008. Specifically, S&P announced that it was revising its methodology assumption to require increased "credit protection" for rated transactions. S&P reiterated that it would also seek in the future to review and minimize the incidence of potential underwriting abuse given "the level of *loosened underwriting* at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

96.    One day later, on July 11, 2007, Moody's announced it was also revising its methodology used to rate the Certificates, and anticipated Certificate downgrades in the future. Moody's did in fact significantly downgrade most of the Certificate classes, noting "aggressive underwriting" used in the origination of the collateral.

97.    As a result, the Certificates were downgraded as many as 22 levels with, for example, 94.0%, or $230 billion, of the total $244.3 billion of Certificates initially rated AAA/maximum safety now having been downgraded from AAA to "Ba1" or below, meaning these Certificates were not only designated "junk bonds," but were assessed to be in danger of "imminent default." Over 99%, or $255 billion, of the remaining Certificate tranches have now been downgraded, with 94%, or $248 billion, of the total Sampled Certificates having been downgraded to speculative "junk" status.

98.    Countrywide's systematic disregard for its underwriting guidelines led to dramatic downgrades of the Certificates as set forth directly above. Currently, 94% ($230 billion) of the $244.3 billion of Sampled Certificates initially rated

AAA/maximum safety have been downgraded to speculative "junk" status or below.  Current delinquency and default rates on the Countrywide loans in the Sampled Certificates have risen exponentially by over 12,000% since issuance of the Certificates – from 0.4% as of the respective Offering dates to **over 50%** as of May 2010.

99.    Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to the loan originators which further evidenced that they had engaged in underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statements and Prospectus Supplements.

## C.    Numerous Government Investigations Reveal the Falsity of the Offering Documents

100.    Although the poor performance of the MBS alone strongly suggests that Countrywide's lending practices were far from was disclosed in the Prospectus Supplements, there is substantial additional evidence that also indicates that the statements in the Prospectus Supplements about loan quality and loan underwriting practices were materially inaccurate.  Among this evidence are statements by former Countrywide employees, facts which have emerged in ongoing litigation involving the SEC (including a recent judicial opinion dealing with disclosures by Countrywide), facts set out in complaints filed by state attorneys general, facts set out in filings by private litigants and information from press reports and other sources.

101.    Taken together, these facts indicate that, while the Offering Documents represented that Countrywide's underwriting of mortgages was designed to ensure the borrower's ability to repay the mortgage and the adequacy of the collateral supporting the mortgage, in reality Countrywide's underwriting practices were actually designed to originate as many mortgage loans as possible without regard to the ability of borrowers to afford such mortgages.  Indeed,

contrary to the representations in the Registration Statements and Prospectus Supplements, it has now been revealed that Countrywide's loan originators systemically disregarded and/or manipulated the income, assets and employment status of borrowers seeking mortgage loans in order to qualify these borrowers for mortgages that were then pooled and used as collateral for the MBS sold to Plaintiffs. In many instances, this was done by inflating borrowers' stated income, or facilitating income inflation by encouraging ineligible borrowers to resort to "no documentation loans" and "stated income loans." In other cases, Countrywide customers were steered to more expensive, higher interest loans, such as subprime and "alternative" mortgages, which they would not likely be able to repay, because making such loans allowed Countrywide to increase the number of attractive mortgages it could sell to the secondary mortgage markets. As set forth below, Countrywide's notorious origination practices were pervasive throughout the United States and throughout the time period during which the Offerings were issued.

102. On or about March 10, 2008, the FBI disclosed that it had initiated a probe into Countrywide's mortgage lending practices, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and Countrywide's specific instructions to underwriters not to scrutinize certain types of loans it issued. The next day, *The Wall Street Journal* published an article detailing the FBI investigation of Countrywide's lending practices. According to the sources interviewed by *The Wall Street Journal*, federal investigators were finding that "Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients, according to people involved in the matter. The company packaged many of those mortgages into securities and sold them to investors, raising the additional question of whether Countrywide understated the risks such investments carried." Subsequently, on April 2, 2008, a federal

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  36

1  bankruptcy judge overseeing the proceedings of more than 300 Countrywide-
2  related bankruptcies ordered a further inquiry into the misconduct, and specifically,
3  the illegal inflation of fees throughout the loan process that had been occurring at
4  Countrywide.

5  103.  On June 4, 2009, the SEC filed a complaint against Mozilo,
6  Countrywide's former Chief Executive Officer, and against two Defendants in this
7  case, Sambol and Sieracki (the "SEC Complaint").  The SEC Complaint alleges
8  that the defendants in that case made material false statements in Countrywide's
9  SEC filings and in other forums about the quality of Countrywide's residential
10  mortgage loans and about the underwriting process for those loans.  According to
11  the SEC, the underwriting process for Countrywide loans was far less rigorous than
12  what the defendants in that case had stated and, consequently, the quality of
13  Countrywide's loans was much poorer than was indicated by those public
14  statements.

15  104.  The basis for the allegations in the SEC Complaint – that
16  Countrywide and its officers substantially overstated the quality of the company's
17  residential mortgage loan underwriting and, as a result, issued mortgage loans of a
18  far worse quality than Countrywide publicly disclosed – are materially similar to
19  the allegations made by Plaintiffs in this case.  Although the statements targeted by
20  the SEC were made to Countrywide's shareholders in SEC filings, statements
21  made in Offering Documents for securities that securitized the mortgage collateral
22  were similarly false and misleading to MBS investors.

23  105.  The SEC Complaint alleges, among other things:
24  • Countrywide embarked on a strategy of underwriting a
     higher number of exception loans. The SEC alleges that
25     "[t]he elevated number of exceptions resulted largely
     from Countrywide's use of exceptions as part of its
26     matching strategy to introduce new guidelines and
     product changes." SEC Complaint, ¶ 29.  By February
27     2007, internal risk management "noted that the
28     production divisions continued to advocate for, and

operated pursuant to, an approach based upon the matching strategy alone. ...  Additionally, [a senior risk management employee warned [Sambol] that, 'I doubt this approach would play well with regulators, investors, rating agencies etc. ***To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines*.'"  SEC Complaint, ¶ 44 (emphasis added).

- Countrywide's risk management reported to the credit risk committee on June 28, 2005, that there was "evidence of borrowers misrepresenting their income and occupation on reduced documentation loan applications." SEC Complaint, ¶ 37.

- By June 2006 "both Mozilo and Sambol were aware ... that a significant percentage of borrowers who were taking out stated income loans were engaged in mortgage fraud." SEC Complaint, ¶ 40.  For example, "[o]n June 2, 2006, Sambol received an email reporting on the results of a quality control audit at Countrywide Bank that showed that 50% of the stated income loans audited by the bank showed a variance in income from the borrowers' IRS filings of greater than 10%.  Of those, 69% had an income variance of greater than 50%." *Id.*

- Angelo Mozilo, Countrywide's CEO, noted in an April 13, 2006 email "that he had 'personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan [*sic*].'"  SEC Complaint, ¶ 49.

- A December 13, 2007 internal Countrywide memorandum reveals, "'Countrywide had reviewed limited samples of first- and second-trust-deed mortgages originated by Countrywide Bank during the fourth quarter of 2006 and the first quarter of 2007 in order to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures.  The review resulted in ... the finding that borrower repayment capacity was not adequately assessed by the bank during the underwriting

process for home equity loans.  More specifically, debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or any increase in interest.'"  SEC Complaint, ¶ 56.

- A senior risk management employee warned defendant Sambol on May 22, 2005 "of the likelihood of significantly higher default rates in loans made on an exception basis: '[t]he main issue is to make sure everyone's aware that we will see higher default rates.'"  SEC Complaint, ¶ 54.  According to the SEC Complaint, the senior risk management employee explained to Sambol "that exceptions are generally done at terms more aggressive than our guidelines,' and continued that '[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions.'  [The senior risk management employee further] warned [Sambol] that increased defaults would cause repurchase and indemnification requests to rise and the performance of Countrywide-issued MBS to deteriorate." *Id.*

106.   On November 3, 2009 U.S. District Judge John Walter denied in their entirety defendants' motions to dismiss the SEC Complaint, holding, among other things, that the SEC had adequately alleged that defendants in that case had made statements that materially exaggerated the quality of Countrywide's residential mortgage-backed loans.

107.   There was apparently no dispute in the SEC litigation that defendants in that case, like Defendants here, had repeatedly made statements asserting that Countrywide's residential mortgage loans were of high quality.  The defendants did not dispute that they had made the statements that the SEC said they had made – many of these statements were in SEC filings that the defendants had indisputably filed or caused to be filed.  Defendants did, however, ask the court to take judicial notice of numerous other SEC filings containing additional information relating to Countrywide's loans, a request that was granted.  Notably,

defendants used the judicially noticed documents they had brought to the court's attention to "argue that the majority of the misstatements and omissions were not material or misleading as a matter of law in light of Countrywide's extensive disclosures and the context of the alleged misstatements or omissions." *SEC v. Mozilo*, CV 09-3994-JFW (MANx), 2009 U.S. Dist. LEXIS 104689, at *25-26 (C.D. Cal. Nov. 3, 2009).

108.   Judge Walter flatly rejected this argument, explaining that "neither Countrywide's disclosures nor a careful review of the context of the statements convince this Court that the alleged omissions or misstatements were immaterial or not misleading as a matter of law. Accordingly, the Court concludes that the SEC on the whole has adequately alleged that Defendants have made false or misleading statements or omissions of material fact." *Id.* at *26.

109.   In addition, numerous attorneys general have initiated investigations into Countrywide's lending practices and also have alleged that Countrywide systematically departed from the underwriting standards it professed to use to originate residential loans.

110.   The Illinois Attorney General initiated a lawsuit against Countrywide and Mozilo, contending that the company and its executives sold borrowers costly and defective loans that quickly went into foreclosure. *See People of the State of Illinois v. Countrywide Fin. Corp.*, No. 08CH22994 (Cook County Ch. Ct.) (the "First Illinois AG Complaint").

111.   Additionally, the First Illinois AG Complaint alleges, based on evidence from Countrywide employees whom the Illinois Attorney General interviewed, that Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrower was able to repay the loan. Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of Countrywide's stated income loans were based on inflated estimates of borrowers' income.  For example,

according to the First Illinois AG Complaint: (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.   Furthermore, to supplement an employee's judgment as to whether a potential borrower's income was "reasonable," Countrywide required its employees to utilize a website, www.salary.com.  Even if the stated salary was outside of the range provided by the website, Countrywide employees could still approve the loan.  The Illinois Attorney General alleged that the "reasonableness" test contravened proper underwriting practices.

112.   As the Illinois Attorney General explained, "[t]his mounting disaster has had an impact on individual homeowners statewide and is having an impact on the global economy."   *The New York Times* reported that the complaint, derived from 111,000 pages of Countrywide documents and interviews with former employees, "paints a picture of a lending machine that was more concerned with volume of loans than quality."   *See* Gretchen Morgenson, "Illinois to Sue Countrywide," *N.Y. Times* (June 25, 2008).

113.   In a second complaint filed on June 29, 2010, the Illinois Attorney General further enumerated the problems with Countrywide's origination practices, including that Countrywide engaged in discriminatory and predatory lending.  *See People of the State of Illinois v. Countrywide Fin. Corp.,* No. 10CH27929 (Cook County Ch. Ct.) (the "Second Illinois AG Complaint").   There, the Illinois Attorney General sets forth how CFC incentivized its employees to sell riskier subprime loans with higher spreads, paying its brokers more for those riskier loans than for originating prime loans.

114.   California's Attorney General also commenced an investigation into Countrywide's lending activities and filed a complaint in the Northwest District of

the Superior Court for Los Angeles County, entitled *People of the State of California v. Countrywide Fin. Corp.*, No. LC081846 (Los Angeles Super. Ct.) (the "California AG Complaint").  The California AG Complaint also alleged that Countrywide routinely departed from its stated underwriting standards.

115.  For example, the California AG Complaint alleged that employees were incentivized to make exceptions to underwriting standards and failed to verify borrower documentation and information.  According to the California AG Complaint, Countrywide used a system called CLUES (Countrywide Loan Underwriting Expert System), to provide a loan analysis report that indicated whether the loan was within Countrywide's underwriting guidelines.  CLUES reports indicating a loan was not originated within the purview of Countrywide's underwriting guidelines often were ignored in order to effectuate the loan.

116.  Further, consistent with the allegations of the Illinois Attorney General, California Countrywide employees cited in the California AG Complaint also claimed to have utilized the website www.salary.com to purportedly confirm a borrower's stated income.  However, according to the California AG Complaint, California employees would know ahead of time the range of salaries that www.salary.com would provide for a particular job and, therefore, know by how much they could overstate a borrower's income.  A former California loan officer for Countrywide further explained that its loan officers typically told potential borrowers that "with your credit score of X, for this house, and to make X payment, X is the income that you need to make"; after which the borrower would state that he or she made X amount of income.

117.  Likewise, the Connecticut Attorney General filed a complaint in Superior Court, Judicial District of Hartford, entitled *State of Connecticut v. Countrywide Fin. Corp.*, No. CV08-40390945 (Hartford Super. Ct.), alleging that Countrywide's employees inflated borrowers' incomes in order to qualify them for loans they otherwise would not have received.

118.   Investigations in other states such as Washington, West Virginia, Indiana and Florida have confirmed many of the allegations in the Illinois, California, and Connecticut complaints.

119.   Further, the Massachusetts Attorney General set forth details of Underwriter Defendant Morgan Stanley's subprime conduct in a settlement agreement entered on June 24, 2010 in which Morgan Stanley agreed to pay $102 million in compensation to homeowners and the Commonwealth of Massachusetts. Although Morgan Stanley denied all wrongdoing, the Massachusetts Attorney General set out that Morgan Stanley routinely ignored warning reports from Clayton Holdings, Inc. ("Clayton"), a due diligence firm, showing that mortgages originated by another defunct subprime originator, New Century Financial ("New Century"), did not meet their underwriting guidelines. Despite being advised by Clayton of underwriting guideline violations, Morgan Stanley repeatedly purchased and securitized New Century loans that did not have sufficient compensating factors to offset their failure to meet the underwriting guidelines. Widespread government investigations suggest that Morgan Stanley was typical of banks such as the Underwriter Defendants in ignoring warnings from due diligence firms like Clayton.

120.   On July 24, 2008, *The Los Angeles Times* reported that "three big Southland lenders (are) under federal investigation; Sources say IndyMac, Countrywide and New Century [have been] subpoenaed." *The Los Angeles Times* further reported that officials have begun to investigate the value of mortgage-backed securities:

> A federal grand jury in Los Angeles has begun probing three of the nation's largest subprime mortgage lenders in the clearest sign yet that prosecutors are investigating whether fraud and other crimes contributed to the mortgage debacle.
>
> ***Grand jury subpoenas have been issued in recent weeks and months to Countrywide Financial Corp.,***

> New Century Financial Corp. and IndyMac Federal Bank seeking a wide range of information, according to sources with direct knowledge of the subpoenas.
>
> Officials have said they are beginning to investigate whether securities investors were defrauded about the value of subprime mortgages they purchased, as well as other possible crimes such as insider trading by corporate officials who sold stock knowing their holdings were about to deflate in value.

(emphasis added).

121.   On October 6, 2008, certain of the Countrywide Defendants settled lawsuits brought by eleven attorneys general.   The settlement, valued at *$8.4 billion,* detailed a program whereby existing loans would be modified:

> [B]orrowers were placed in the riskiest loans, including adjustable-rate mortgages whose interest rates reset significantly several years after the loans were made. Pay-option mortgages, under which a borrower must pay only a small fraction of the interest and principal, thereby allowing the loan balance to increase, also are included in the modification.

### D.   Allegations in Numerous Other Civil Lawsuits Show the Falsity of the Offering Documents

122.   On February 15, 2008, Countrywide shareholders filed a consolidated complaint in the U.S. District Court for the Central District of California alleging derivative claims against the officers and directors of Countrywide, in an action styled *In re Countrywide Fin. Corp. Derivative Litig.*, No. 07-CV-06923-MRP-(MANx) (C.D. Cal.) (the "Derivative Complaint").   The derivative litigation was subsequently dismissed because of the plaintiffs' lack of standing

123.   The Derivative Complaint cited information obtained from several confidential sources who were former Countrywide employees who stated that the vast majority of Countrywide's loans were underwritten in contravention of the company's stated underwriting standards.   According to one of the confidential

sources in that complaint, a former "Underwriter II" (a Countrywide employment classification) based in a Jacksonville, Florida processing center between June 2006 and April 2007, because of a campaign by Countrywide to increase the volume of loan originations, as much as 80% of the loans originated by Countrywide in that office involved significant variations from Countrywide's normal underwriting standards.

124.  According to another confidential witness cited in the Derivative Complaint, a Senior Underwriter in Roseville, California, from September 2002 to September 2006, Countrywide would regularly label loans as "prime" even if made to unqualified borrowers (including those who had recently gone through a bankruptcy and were still having credit problems).  According to that confidential witness, Countrywide's lending practices became riskier in 2006 and Countrywide more lax in enforcing its underwriting policies.

125.  Another confidential witness cited in the Derivative Complaint, an Executive Vice President of Production Operations and later an Executive Vice President of Process Improvement who worked at Countrywide for 17 years before leaving in October 2005, disclosed that Countrywide created a computer system (or "rules engine") that routed highly risky loans out of the normal loan approval process to a central underwriting group for evaluation.  The system was called the Exception Processing System.  According to that source, the Exception Processing System identified loans that violated Countrywide's underwriting requirements. However, according to the same source, loans identified by the Exception Processing System as violating underwriting standards were *not* rejected.  Rather, Countrywide executives wanted the company's Central Underwriting group to review such loans to evaluate whether these loans should require a higher price (upfront points) or a higher interest rate in light of the violation at issue.  Central Underwriting entered information into the Exception Processing System about its decisions to approve such loans and charge additional fees to the borrower.

126.   Yet another confidential source in the Derivative Complaint, an underwriter from Long Island, New York at Countrywide between March 2000 and January 2007, stated that Countrywide extended loans to individuals with increasing debt-to-income ratios.   Initially, Countrywide limited debt-to-income ratios to 38%, but this rose to 50%.   According to this source, Countrywide branch managers' compensation was tied to loan origination volume and not the quality of the loans.   Thus, according to this source, branch managers pushed originators to sell more loans despite the riskiness of these loans.   Additional confidential sources in the Derivative Complaint confirmed this.

127.   Indeed, according to yet another confidential source in the Derivative Complaint, Countrywide simply "didn't turn down loans."   Rather, Countrywide "'did whatever they had to do to close loans' including making exceptions to underwriting guidelines – everyone was motivated to increase loan volume and 'approv[e] things that should not have been approved.'"

128.   On January 6, 2009, purchasers of Countrywide common shares filed a second amended complaint in the U.S. District Court for the Central District of California, captioned *In re Countrywide Fin. Corp. Sec. Litig.*, No. 07-CV-05295-MRP-(MANx) (C.D. Cal.) (the "Securities Complaint").   Facts set forth in the Securities Complaint confirm major, systematic irregularities in Countrywide's loan origination practices.   The Securities Complaint cited information obtained from several confidential sources who were former Countrywide employees who stated that the vast majority of Countrywide's loans were underwritten in contravention of the company's stated underwriting standards.   The securities litigation recently settled for $624 million.

129.   Among numerous internal Countrywide sources cited in the Securities Complaint, one, a supervising underwriter at Countrywide until mid-2005 who oversaw the company's underwriting operations in several states (the "Supervising Underwriter"), stated that the underwriting guidelines were repeatedly lowered,

and "very loose and lax" and designed to help Countrywide make more loans (as opposed to protecting the entity that ended up taking on the credit risk that the borrower would default on the mortgage).

130.    The Supervising Underwriter further stated that from late 2004, Countrywide's Structured Loan Desks employed the Exception Processing System in order to obtain approval for loans that were exceptions to and should have been rejected by Countrywide's underwriting standards.  As many as 15% to 20% of the loans generated each day at the Company's Structured Loan Desks were run through the Exception Processing System and very few were ever rejected.

131.    The Supervising Underwriter further stated that if a potential borrower applying for a stated income, stated asset ("SISA") loan provided a bank name, address and account number for asset verification, it was the practice at Countrywide not to verify the bank balance.

132.    According to another confidential source identified in the Securities Complaint, and confirmed by an April 6, 2008 article in *The New York Times*, even though Countrywide had the right to verify stated income on an application through the Internal Revenue Service ("IRS") (and this check took less than one day to complete), income was verified with the IRS on only 3%-5% of all loans funded by Countrywide in 2006.

133.    The Securities Complaint also details that the appraisals obtained by Countrywide underwriters were not independent or accurate.  For example, since at least 2005, loan officers from all of Countrywide's origination divisions were permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that did not support loan transactions, and (iii) substitute more favorable appraisals by replacement appraisers when necessary to obtain a more favorable LTV ratio so as to qualify the loan for approval.  Countrywide loan officers were allowed to lobby appraisers to assign particular values to a property in order to support the closing of a loan.