134.   Further, according to allegations made by Capitol West Appraisals LLC ("Capitol West") a real estate appraisal company cited in the Securities Complaint, "Countrywide engaged in a pattern and practice of pressuring real estate appraisers to artificially increase appraisal values for properties underlying mortgages Countrywide originated and/or underwrote.  Capitol West stated that Countrywide loan officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions.  When Capitol West refused to vary the appraisal values from what it independently determined was appropriate, Countrywide retaliated.…"

135.   According to Capitol West's allegations in the Securities Complaint, "Countrywide maintained a database titled the 'Field Review List' containing the names of appraisers whose reports Countrywide would not accept unless the mortgage broker also submitted a report from a second appraiser.  Capitol West was placed on the Field Review List after refusing to buckle under pressure to inflate real estate values.  The practical effect of being placed on the Field Review List was to be blacklisted as no mortgage broker would hire an appraiser appearing on the Field Review List to appraise real estate for which Countrywide would be the lender because neither the broker nor the borrower would pay to have two appraisals done.  Instead, the broker would simply retain another appraiser who was not on the Field Review List."  The Securities Complaint further sets forth Capitol West's descriptions of the additional steps Countrywide took to enforce its blacklisting of appraisers that refused to artificially inflate their appraisals.

136.   On September 30, 2008, MBIA Insurance Corp. ("MBIA"), one of the largest providers of bond insurance, filed a complaint against Countrywide in New York state court, entitled *MBIA Ins. Corp. v. Countrywide*, No. 08/602825 (N.Y. Sup. Ct.) (the "MBIA Complaint").   The MBIA Complaint alleges that Countrywide fraudulently induced MBIA to provide insurance for certain investment certificates, including those contained in the following trusts: CWHEQ

2005-E; CWHEQ 2005-I; CWHEQ 2005-M; CWHEQ 2006-E; CWHEQ 2006-G; CWHEQ 2006-S8; CWHEQ 2007-E; CWHEQ 2007-S1; CWHEQ 2007-S2; and CWHEQ 2007-S3.

137. MBIA was able to obtain approximately 19,000 loan files for the Certificates it insured as a result of its contractual agreements with Countrywide. After reviewing the portfolios and re-underwriting each loan provided by Countrywide, MBIA discovered that there was "*an extraordinarily high incidence of material deviations from the underwriting guidelines Countrywide represented it would follow*." MBIA Complaint, ¶ 78 (emphasis added). MBIA discovered that many of the loan applications "lack[ed] key documentation, such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-income] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible exception)." MBIA Complaint, ¶ 79. Significantly, "MBIA's re-underwriting review ... revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies." On April 27, 2010, the Supreme Court of the State of New York, although determining that MBIA did not have a legal claim for negligent misrepresentation, denied a motion to dismiss MBIA's claims of fraud against several Countrywide entities and Bank of America.

138. On April 11, 2008, an amended complaint for violations of the federal securities laws was filed against Countrywide in the U.S. District Court for the Central District of California. *See Argent Classic Convertible Arbitrage Fund LP v. Countrywide Fin. Corp.*, No. 07-CV-7097-MRP-(MANx) (C.D. Cal.). The complaint identified specific deviations from Countrywide's stated underwriting guidelines. For example, in connection with the "No Income/No Asset Documentation Program," Countrywide represented that "[t]his program is limited

1   to borrowers with excellent credit histories."   However, Countrywide routinely

2   extended these loans to borrowers with weak credit and knew that such "low doc"

3   or "no doc" loans, particularly when coupled with nontraditional products like

4   ARMs, likely contained misinformation from the borrower, such as overstated

5   incomes, that increased the likelihood of defaults.   Because borrowers were

6   advised that their representations on loan applications would not be verified,

7   Countrywide employees referred to these products as "liar loans."

8       139.   Furthermore, in an action commenced against Countrywide for

9   wrongful termination, styled *Zachary v. Countrywide Fin. Corp.*, No. 4:08-cv-

10   00214, currently pending in the U.S. District Court for the Southern District of

11   Texas, the plaintiff, Mark Zachary ("Zachary"), a Regional Vice President of

12   Countrywide KB Home Loans, Inc. ("CWKB"), alleged that CWKB, a 50-50 joint

13   venture between Countrywide and KB Home Loans ("KB Home"), engaged in a

14   host of mortgage origination and underwriting activities that did not comport with

15   stated and standard practices.   Zachary described how loan officers would go so far

16   as to help the loan applicant submit a loan application with false income amounts,

17   so that the applicant would get the loan under false pretenses.

18       140.   According to Zachary, one of these practices involved CWKB's

19   practice of "flipping" a loan application from a "full documentation" loan program

20   to a "stated income" or "no income, no asset" loan program.   He learned that loans

21   were being canceled at the prime regional operations center as full documentation

22   loans and transferred to the subprime operations center in Plano, Texas, as stated

23   asset, stated income ("SISA") loans, a "low-doc" loan, or no income, no assets

24   ("NINA") loans, a "no-doc" loan.   Otherwise known as "liar loans," NINA loans

25   allowed a borrower to simply state their income without providing any

26   documentation or proof of this income.   Thus, rather than denying an applicant

27   based on the information revealed in the original mortgage application,

28   Countrywide pretended that it did not see the disqualifying information, such as

1    insufficient income or assets, and instead, allowed applicants to apply for a no
2    documentation loan, implicitly encouraging them to lie on these renewed
3    applications.

4        141. Furthermore, Zachary explained that while a material number of
5    Countrywide's loan applicants were not eligible for any loan program requiring
6    documentation based on the applicant's verified income level and/or job status,
7    CWKB loan officers would (1) cancel the application for the loan program that
8    required documentation, (2) re-do the application as a SISA or a NINA loan
9    through the company's subprime originators in Plano, Texas, and (3) coach the
10   loan applicant as to what income level he or she would need to have in order to
11   qualify for the low-doc or no-doc loan.

12       142. Moreover, according to Zachary, Countrywide blatantly ignored its
13   underwriting policies and procedures. Zachary stated that there was a problem
14   with appraisals performed on homes being purchased with Countrywide loans.
15   According to Zachary, the appraiser was being strongly encouraged to inflate
16   appraisal values by as much as 6% to allow the homeowner to "roll up" all closing
17   costs. According to Zachary, this inflated value put the buyer "upside down" on
18   the home immediately after purchasing it, *i.e.*, the borrower owed more than the
19   home's worth. Thus, the borrower was more susceptible to default. It also put the
20   lender and secondary market investor at risk because they were unaware of the true
21   value of their asset. According to Zachary, Countrywide performed an audit into
22   these matters in January 2007 which corroborates his story.

23       143. Another civil complaint, *Zaldana v. KB Home*, No. CV 08-3399
24   (EDL), currently pending in the U.S. District Court for the Northern District of
25   California (the "Zaldana Complaint"), further details Countrywide's failure to
26   follow standard appraisal practices. The Zaldana Complaint described a process
27   whereby KB Home paid Countrywide to make loans with subsidized initial
28   payments to KB borrowers, thereby allowing KB to prop up the ostensible sales

prices of KB homes and sell to buyers who would not otherwise be able to afford or qualify for the monthly mortgage payments.  In turn, Countrywide would have its appraisers ignore the subsidies in order to appraise the home at the full stated sales price, thereby inflating the actual value of the home (*i.e.*, the price that a buyer was truly willing to pay for it).

### E. Underwriter Defendants "Contracted Out" and Failed to Conduct Required Due Diligence of Loan Underwriting Guidelines Contained in Offering Documents

144.  Prior to securitization, a process of cursory "due diligence" on the mortgage loans was conducted.  The review's ostensible purpose was to determine whether the loans contained the requisite legal documentation, were based on an independent appraisal and were originated in accordance with Countrywide's loan underwriting guidelines, which were detailed in the Offering Documents.  The due diligence review that was conducted on the mortgage collateral was not specific to any securitized pool of mortgage loans.  Rather, the due diligence was periodically performed on a small sample of Countrywide's entire "warehouse" of mortgage loans.

145.  The Underwriter Defendants contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to outside firms – Clayton and The Bohan Group ("Bohan") – and then conducted limited oversight of these subcontractors' activities.

146.  As disclosed as part of an ongoing investigation of investment banking misconduct in underwriting MBS being conducted by, among others, the New York Attorney General (the "NYAG") and the Massachusetts Attorney General, Clayton and Bohan routinely provided investment banks with detailed reports of loans non-compliant with underwriting guidelines, but the investment banks just as routinely disregarded the non-compliant loans and included them in securitization pools anyway.  Further, the President of Bohan stated that, by the

1   time the Offerings of the Certificates took place, investment banks were requiring a

2   review of only 5% to 7% of the entire loan pools.

3       147.   The Underwriter Defendants contracted their due diligence work to

4   Clayton and Bohan.  The outside firms were supposed to examine the loans for

5   conformity with Countrywide's guidelines, as detailed in the Offering Documents.

6   Each loan reviewed was rated as category "1," "2" or "3."  Category "3" loans

7   were defective and recommended for exclusion from securitization, however such

8   loans were routinely included in securitizations despite being defective.  Because

9   the risk of default was passed on to investors in the Certificates rather than held by

10  the Underwriter Defendants or Countrywide, there was no incentive to remove

11  such category "3" loans from the Offerings, because if the Underwriter Defendants

12  rejected any significant portion of the loans, the size of the securitization, and thus

13  the size of the fees derived from the securitization, would decrease significantly.

14      148.   In June 2007, the NYAG subpoenaed documents from Clayton and

15  Bohan related to their due diligence efforts on behalf of the investment banks, such

16  as Bear Stearns, that underwrote mortgage-backed securities.  The NYAG, along

17  with Massachusetts and Connecticut attorneys general and the SEC (all of which

18  also subpoenaed documents), are investigating whether investment banks held

19  back information they should have provided in the disclosure documents related to

20  the sale of mortgage-backed securities to investors.

21      149.   In a December 6, 2007 article published in *The New York Times*, it

22  was reported that:

> Andrew Cuomo, the New York attorney-general, has subpoenaed RBS and about 15 of Wall Street's biggest sub-prime mortgage bond underwriters, such as Bear Stearns and Merrill Lynch, requesting information that will help to determine how much due diligence was conducted on the home loan-backed securities that they issued.

*        *        *

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  53

> Mr. Cuomo is also examining the relationship between mortgage lenders, third party-due diligence firms, the credit rating agencies and the underwriting banks to see if they colluded to ignore risks.
>
> Wall Street firms made hefty fees from buying high-risk sub-prime mortgages and packaging them into bonds backed by the home loans' interest payments. Investors, including Wall Street giants such as Citigroup, as well as hedge funds and pension funds, have collectively lost more than $50 billion this year on sub-prime-backed bonds after a surge in defaults on high-risk home loans forced down their valuations.
>
> Many of Wall Street's underwriters relied heavily on third-party vendors to examine the home loans that were used to back the mortgage bonds. This helped them to determine how reliable an income stream the underlying mortgages would produce and, in turn, how likely it was that the bonds' interest payments would be met.
>
> Since bond underwriters have an obligation to make sure that the statements made in the securities' Offering Documents are accurate, Mr. Cuomo is investigating how much, if any, due diligence they conducted themselves. He is also seeking to determine whether they should have done more.

150. In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on Loans," *The New York Times* further reported:

> An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.
>
> Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms. But the banks did not disclose the details of these reports to credit-rating agencies or investors.

The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter. Charges could be filed in coming weeks.

*       *       *

The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures. The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.

As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans. In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.

It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans. Some industry officials say such loans made up a quarter to a half of the portfolios they saw. In some cases, the loans accounted for as much as 80 percent. While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.

Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

*       *       *

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the

three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco. Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

\* \* \*

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said *lenders and investment banks routinely ignored concerns raised by these consultants.*

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said. "We stopped checking."

(emphasis added).

151. On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients. Both *The New York Times* (J. Anderson and V. Bajaj, "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," *N.Y. Times*, (Jan. 27, 2008)) and *The Wall Street Journal* (A. Efrati and R. Simon, "Due Diligence Firm to Aid New York Subprime Probe," *Wall St. J.* (Jan. 29, 2008)) ran articles describing the nature of the NYAG's investigation and Clayton's testimony. *The Wall Street Journal* reported that the NYAG's investigation was focused on "the broad language written in prospectuses about the risky nature of these securities,"

which "changed little in recent years, even as due diligence reports noted that the number of exception loans backing the securities was rising."  According to the *New York Times* article, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

152.   A March 23, 2008 *Los Angeles Times* article reported that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports" as follows:

> The reviewers' role was just one of several safeguards – including home appraisals, lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system.
>
> But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start.  Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.
>
> "The investors were paying us big money to filter this business," said loan checker Cesar Valenz.  "It's like with water.  If you don't filter it, it's dangerous.  And it didn't get filtered."
>
> As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.
>
> The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages.  And a presidential working group has blamed the subprime debacle in part

> on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

E. Scott Reckard, "Subprime Watchdogs Ignored," *L.A. Times* (Mar. 23, 2008).

### F.     Additional Government Investigations Further Confirm Systemic Disregard for Mortgage Loan Underwriting Guidelines

153.   In August 2007, following reports of defaults in mortgage loans underlying various MBS, downgrades of such MBS and potential downgrades of additional MBS in the future, and the resulting illiquidity in the credit markets, the President of the United States commissioned the Secretary of the Treasury, the SEC and the Commodities Futures Trading Commission ("CFTC") (hereinafter referred to as the "President's Working Group" or the "PWG") to investigate the causes of the market turmoil.  After a seven-month investigation, the PWG issued its report on March 13, 2008.  The PWG found as follows:

> • A significant erosion of market discipline by those involved in the securitization process, including *originators, underwriters, credit rating agencies, and global investors,* related in part to failures to provide or obtain adequate risk disclosures;
>
> • The turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages*…

(emphasis added).

154.   In December 2007, the Massachusetts Attorney General launched an investigation into Wall Street's securitization of subprime loans.  The investigation focused on the industry practices involved in the issuance and securitization of subprime loans to Massachusetts consumers.  According to a press release issued by the Massachusetts Attorney General's Office,

> The Office is investigating whether securitizers may have:

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  58

- facilitated the origination of "unfair" loans under Massachusetts law;
- failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;
- failed to take sufficient steps to avoid placing problem loans in securitization pools;
- been aware of allegedly unfair or problem loans;
- failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan diligence and the pre-securitization process, as well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

155.   On January 30, 2008, the FBI and SEC launched a joint investigation into 14 investment banks, loan providers and developers as part of a crackdown focusing on the subprime mortgage crisis.  According to the *Los Angeles Times*:

> We're looking at the whole range of those involved – including the investment banks and other entities that bundled the loans up for sale and the institutions that held them and reported [to investors] on their value…

### G.   Underwriter Defendants Employed Rating Shopping Practices to Ensure Inflated Investment Grade Ratings for All the Certificates

156.   The Underwriter Defendants derived their profits from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans.   For the Certificates to sell profitably, approximately 80% of the securitization had to be assigned the highest AAA rating by the Rating Agencies.

157.   As set forth above, the Underwriter Defendants ultimately engaged the Rating Agencies through a "ratings shopping" process.  Initially, a collateral analyst would send the preliminarily structured deal to the Rating Agencies for feedback.  The Underwriter Defendants' in-house rating agency personnel would oversee the communications with the Rating Agencies.  Then S&P, for example,

would run the loan tape through both its LEVELS and SPIRE Models again and provide the Underwriter Defendants with the results in an effort to obtain the ratings engagement.   Through the LEVELS Model, S&P would advise the Underwriter Defendants responsible for each deal, for example, that 94.25% of the Certificates would be rated AAA as long as 5.75% of the total collateral balance supporting those Certificates was subordinate.  This 5.75% was the amount of loss coverage required.  The Underwriter Defendants would then again "negotiate" with the Rating Agencies before they were hired, in order to get them to agree to the least amount of loss coverage and credit enhancement, and the highest percentage of AAA-designated Certificates.

158.   The Underwriter Defendants used this "ratings shopping" process to obtain the most profitable structure on the Offerings.  Ratings shopping resulted in **over 92%** of the Certificates being initially awarded the AAA/maximum-security rating.

159.   Finally however, in 2008, the practice was effectively ended by way of an agreement entered into between the Rating Agencies and the NYAG.  In June 2008, the NYAG announced that after an investigation of the Rating Agencies, it had reached an agreement with S&P, Moody's and Fitch which contemplated a complete overhaul of the then-current ratings procedures and guidelines and put an end to what had been termed "ratings shopping."  Instead of investment banks looking to issue mortgage-backed bonds going to all three agencies for a review, but only using, and paying for, the most optimistic rating, the Rating Agencies would now be paid upfront regardless of whether they were hired to assign a rating, a move expected to remove any potential for conflicts of interest.

## VI.   THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING AND APPRAISAL STANDARDS

160.   Countrywide was a principal originator for all 427 of the Offerings complained of herein.  The total value of the 427 Offerings for which Countrywide

was the principal originator was $351 billion, of which the Rating Agencies assigned initial ratings of AAA/maximum safety to over 92%.

161. Each Registration Statement for the Issuing Trusts contained an illustrative form of a Prospectus Supplement for use in the offering of the Certificates. Each Registration Statement was prepared by the Issuing Defendants and signed by the Individual Defendants. At the effective date of the offering of the Certificates, a final Prospectus Supplement was filed with the SEC containing a description of the mortgage pool underlying the Certificates and the underwriting standards by which the mortgages were originated. The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements.

162. Countrywide made clear in the Offering Documents that exceptions were made to the underwriting guidelines but only where "compensating factors were demonstrated by the borrowers. Each Registration Statement filed by CWALT and CWMBS, as well as the Prospectus Supplements issued pursuant to those Registration Statements, contained the following language concerning the underwriting standards by which the mortgages pooled into CWALT and CWMBS Offerings were originated:

> All of the Mortgage Loans have been originated or acquired by Countrywide Home Loans, Inc., in accordance with its credit, appraisal and underwriting standards.... Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.
>
> Countrywide Home Loans' underwriting standards are applied, by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage

insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis, varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. ***Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.***

*See* Appendix Exhibit D; *see also* Exhibit E.

163. The above statements concerning Countrywide's adherence to its underwriting standards and to federal and state underwriting standards, with respect to mortgages pooled into CWALT and CWMBS Issuing Trusts, contained material misstatements when made because:

a.   Defendants failed to disclose that Countrywide systematically ignored underwriting standards imposed by state and federal law in issuing the mortgages pooled into the Issuing Trusts;

b.   Countrywide did not, contrary to its statement above, properly "evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." Rather, as alleged herein, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans; and

c.   Countrywide's underwriting standards did not require that a borrower "generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard

insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." Instead, Countrywide's underwriting included the following practices, described *supra* at V, that disregarded a borrowers' ability to pay by:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed-rate" when the adjustable rate adjusted;

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies; and

- Systematically overriding flags identified by the CLUES system that was meant to weed out non-qualifying loans and nonetheless approving such loans.

164. Each Registration Statement and Prospectus Supplement issued by

CWABS and CWHEQ contained the following language concerning the underwriting standards by which the mortgages pooled into the Issuing Trusts were originated:

> Credit Blemished Mortgage Loans. The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit blemished mortgage loans.... Countrywide Home Loans produces its credit blemished mortgage loans through its Consumer Markets, Full Spectrum Lending, Correspondent Lending and Wholesale Lending Divisions. Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans. In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit blemished mortgage loan that it has not itself underwritten.

> Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. ***Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors. It is expected that a significant number of the Mortgage Loans will have been originated based on such underwriting exceptions.***

> Each prospective borrower completes an application which includes information with respect to the applicant's assets, liabilities income and employment

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  64

history, as well as certain other personal information. Countrywide Home Loans requires an independent credit bureau report on the credit history of each applicant in order to evaluate the applicant's prior willingness and/or ability to repay. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments, among other matters.  After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations.  The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income. The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 50%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

While more flexible, Countrywide Home Loans' underwriting guidelines still place primary reliance on a borrower's ability to repay; however, Countrywide Home Loans may require lower loan-to-value ratios than for loans underwritten to more traditional standards. Borrowers who qualify generally have payment histories and debt-to-income ratios which would not satisfy more traditional underwriting guidelines and may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies. Countrywide Home Loans' credit blemished mortgage loan underwriting guidelines establish the maximum permitted loan-to-value ratio for each loan type based upon these and other risk factors with more risk factors resulting in lower loan-to-value ratios.

*See* Appendix Exhibit F; *see also* Exhibit G.

165.  In addition, the Prospectus Supplements for CWHEQ Registration

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  65

Statements also contained additional language describing the standards by which CWHEQ's home equity loans and second lien mortgage loans were originated:

> The underwriting process is intended to assess the applicant's credit standing and repayment ability, and the value and adequacy of the real property security as collateral for the proposed loan. Exceptions to the applicable originator's underwriting guidelines will be made when compensating actors are present. These factors include the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan.

*See* Appendix Exhibit H.

166.    The Prospectus Supplements for CWHEQ Registration Statements also stated:

> After obtaining all applicable income, liability, asset, employment, credit, and property information, the applicable originator generally uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments (including any escrows for property taxes and hazard insurance premiums) and other monthly credit obligations. The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations (assuming the mortgage loan interest rate is based on the applicable fully indexed interest rate) to the borrower's gross monthly income. Based on this, the maximum monthly debt-to-income ratio is 45%. Variations in the monthly debt-to-income ratios limits are permitted based on compensating factors. The originators currently offer home equity loan products that allow maximum combined loan-to-value ratios up to 100%.

*See* Appendix Exhibit I.

167.    The above statements contained material misstatements of fact when

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  66

made because:

        a.     Contrary to the statements that Countrywide's underwriting standards were "primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan" and to evaluate "the borrower's credit standing and repayment ability," Countrywide subordinated its underwriting standards to originating and securitizing as many mortgage loans as it could so that it could garner fees in the secondary mortgage market. As alleged herein, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans. Rather, Countrywide designed its underwriting standards to ensure that it received the highest possible fees for originating loans without regard to the actual ability of its borrowers to repay the loan, or whether the mortgaged property had sufficient value to collateralize the loan.

        b.     Contrary to the representation above that "After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations," Countrywide's underwriting included the following practices, described *supra* at V, that disregarded a borrowers' ability to pay by:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  67

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted;

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies; and

- Systematically overriding flags identified by the CLUES system that were meant to weed out non-qualifying loans and, despite the flags, approving such loans.

c.    Contrary to the statement that "Exceptions to the applicable originator's underwriting guidelines will be made when compensating factors are present" and that those factors included "the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan," Countrywide adopted procedures to incentivize its employees to approve exceptions to loans regardless of whether any compensating factors were present.

168. Each Registration Statement issued by CWALT, CWABS, CWMBS and CWHEQ contained the following statement regarding Countrywide's assessment of a prospective borrower:

> Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  68

housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance). ***The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist.***

*See* Appendix Exhibit J.

169. Each Registration Statement issued by CWALT, CWABS, CWMBS and CWHEQ contained the following statement regarding Countrywide's review of information provided by a prospective borrower:

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is ***reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.***

*See* Appendix Exhibit K.

170. According to the Registration Statements and Prospectus Supplements issued by CWALT, Countrywide originated loans pursuant to a Preferred Processing Program, pursuant to which documentation requirements were waived for those applicants with favorable credit histories and higher FICO scores.

Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, ***which indicate a more favorable credit history***, and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years may be eligible for Countrywide Home Loans' processing program (the "Preferred Processing

Program"). ....Countrywide Home Loans may waive some documentation requirements for mortgage loans originated under the Preferred Processing Program.

*See* Appendix Exhibit L; *see also* Exhibit M.

171. Furthermore, under its CWALT Registration Statement, Countrywide also offered four programs where less than full borrower documentation of income, assets and employment were required, however, in all instances credit scores had to be obtained and any deficiencies or derogations fully explained to the loan officers and, except for the Streamlined Documentation Program which had limited application, independent appraisals of the mortgage properties obtained – with all appraisals conforming to Fannie Mae and Freddie Mac standards:

A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both. Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "Alternative Documentation Program"), a Reduced Documentation Loan Program (the "Reduced Documentation Program"), a CLUES Plus Documentation Loan Program (the "CLUES Plus Documentation Program"), a No Income/No Asset Documentation Loan Program (the "No Income/No Asset Documentation Program"), a Stated Income/Stated Asset Documentation Loan Program (the "Stated Income/Stated Asset Documentation Program") and a Streamlined Documentation Loan Program (the "Streamlined Documentation Program").

***For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loan obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All***

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  70

> *adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.*
>
> *Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.*

*See* Appendix Exhibit N; *see also* Exhibit O.

172.    In addition, the Offering Documents for the CWALT Offerings stated that the Alternative Documentation Program required, in addition to FICO scores and standard appraisals, W-2 forms instead of tax returns for two years and bank statements instead of deposits and employment verification:

> The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

*See* Appendix Exhibit P; *see also* Exhibit Q.

173.    The Reduced Documentation Program, according to the CWALT Offering Documents, was only applied where maximum LTV was equal to or less than 75% including secondary financing as follows:

> Under the Reduced Documentation Program, some underwriting documentation concerning income,

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  71

employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 75%.

*See* Appendix Exhibit R; *see also* Exhibit S.

174.   Furthermore, the CLUES Plus program also had a 75% LTV limit but required borrower bank statements and excluded cash out refinancing:

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

*See* Appendix Exhibit T; *see also* Exhibit U.

175.   Finally, pursuant to the CWALT Offering Documents, the Streamlined Documentation Program offered refinancing for non-delinquent borrowers who had originated their loans with Countrywide, but this program was limited:

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  72

> The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

*See* Appendix Exhibit V; *see also* Exhibit W.

176.    These statements contained material misstatements and omissions of fact when made because, contrary to its published statement that "a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan," Countrywide implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage, described *supra* at V, such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed-rate" when the adjustable rate adjusted;

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies;

- Systematically overriding flags identified by the CLUES system that were meant to weed out non-qualifying loans and, despite the flags, approving such loans; and

- Failing to determine whether stated income or stated assets were reasonable, failing to inform investors that Countrywide employees used www.salary.com in order to verify income and, often times, failing to check the veracity of information that was provided and easily verified (such as bank account balances).

177. Each Registration Statement and Prospectus Supplement issued by CWALT and CWMBS contained the following language concerning the collateral supporting each mortgage pooled in the Issuing Trusts and the appraisals by which the collateral was valued:

> Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged

property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

*See* Appendix Exhibit X; *see also* Exhibit Y.

178.   Each Registration Statement and Prospectus Supplement issued by CWABS and CWHEQ contained the following language concerning the collateral supporting each mortgage pooled in the Issuing Trusts and the appraisals by which the collateral was valued:

Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type.  Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan.

*See* Appendix Exhibit Z; *see also* Exhibit AA.

179.   In general, the Prospectus Supplements issued by CWHEQ contained representations concerning the appraisals done with respect to home equity and second mortgage liens.  They stated with respect to home equity loans:

Full appraisals are generally performed on all home equity loans.  These appraisals are determined on the

basis of an applicable originator-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac. For certain home equity loans that had at origination a credit limit between $100,000 and $250,000, determined by the FICO score of the borrower, a drive-by evaluation is generally completed by a state-licensed, independent third party, professional appraiser on forms approved by either Fannie Mae or Freddie Mac. The drive-by evaluation is an exterior examination of the premises by the appraiser to determine that the property is in good condition. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements, and generally must have been made not earlier than 180 days before the date of origination of the mortgage loan. For certain home equity loans with credit limits between $100,000 and $250,000, determined by the FICO score of the borrower, the applicable originator may have the related mortgaged property appraised electronically. The minimum and maximum loan amounts for home equity loans are generally $7,500 (or, if smaller, the state-allowed maximum) and $1,000,000, respectively.

*See* Appendix Exhibit BB.

180. In addition, and sometimes in place of the language directly above, with respect to closed-end second lien mortgage loans, the Prospectus Supplements for the CWHEQ Offerings stated the following:

Full appraisals are generally performed on all closed-end second lien mortgage loans that at origination had a loan amount of more than $100,000. These appraisals are determined on the basis of a sponsor-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac. For certain closed-end second lien mortgage loans that had at origination a loan amount between $100,000 and $250,000, determined by the FICO score of the borrower, a drive-by evaluation is generally completed by a state licensed, independent third-party, professional appraiser

on forms approved by either Fannie Mae or Freddie Mac. The drive-by evaluation is an exterior examination of the premises by the appraiser to determine that the property is in good condition. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements, and generally must have been made not earlier than 180 days before the date of origination of the mortgage loan. For certain closed-end second lien mortgage loans with loan amounts less than $250,000, determined by the FICO score of the borrower, Countrywide Home Loans may have the related mortgaged property appraised electronically. The minimum and maximum loan amounts for closed-end second lien mortgage loans are generally $7,500 (or, if smaller, the state-allowed maximum) and $1,000,000, respectively.

*See* Appendix Exhibit CC.

181. Finally, with respect to its CWALT Offerings, Countrywide also offered expanded underwriting allowing for higher LTV and loan amounts though loans would still be subject to certain standards:

> Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

> Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% on 1 unit properties with principal balances up to $333,700 ($500,550 in Alaska and Hawaii) and 2 unit properties with principal balances up to $427,150 ($640,725 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $516,300 ($774,450 in

Alaska and Hawaii) and 4 unit properties with principal balances of up to $641,650 ($962,475 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $333,700 ($500,550 in Alaska and Hawaii). Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% unit properties with principal balances up to $333,700 ($500,550 in Alaska and Hawaii) and 2 unit properties with principal balances up to $427,150 ($640,725 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $516,300 ($774,450 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $641,650 ($962,475 in Alaska and Hawaii).  Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines. The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative

Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines

*See* Appendix Exhibit DD.

182.  These statements contained material misstatements and omitted necessary facts when made because they failed to disclose that the value and adequacy of the mortgaged property was not appraised, on a consistent basis, using "market data analysis based on recent sales of comparable homes in the area, where deemed appropriate, replacement cost analysis based on the current costs of constructing a similar home" or "on the basis of an applicable originator-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac."  Instead, as alleged herein, Countrywide systematically inflated appraisals for properties used as collateral for mortgage loans underlying the Issuing Trusts. These inflated appraisals did not conform to the USPAP and were not market data analyses of comparable homes in the area or analyses of the cost of construction of a comparable home.

183.  Each Prospectus Supplement referenced and incorporated into each Registration Statement described the LTV ratio of the mortgages pooled into the Issuing Trusts. The LTV ratio of mortgages in the Issuing Trusts was described as equal to: (1) the principal balance of the mortgage loan at the date of origination, divided by (2) the collateral value of the related mortgaged property, where the "collateral value" was the lesser of either the appraised value based on an appraisal made for Countrywide by an independent fee appraiser at the time of the origination of the related mortgage loan, or the sales price of the mortgaged property at the time of origination. Each Prospectus Supplement then provided an average LTV ratio of the mortgage loans included in the Issuing Trusts and a disclosure concerning the maximum LTV ratio of mortgage loans included in the Issuing Trusts.  *See* Appendix Exhibit EE.

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  79

184.   The statements concerning the average LTV ratio of mortgages included in the Issuing Trusts and the maximum LTV ratio of mortgages included in the Issuing Trusts were materially misstated when made because these ratios were based on incorrect and/or inflated appraisal values assigned to the collateral supporting the mortgage loans pooled into each Issuing Trust.  For example, as explained above, the appraisals of the properties underlying the mortgage loans were inaccurate and inflated.   Furthermore, stated sales prices of properties underlying the mortgage loans did not accurately reflect the true values of the properties.   These inflated appraisals and misleading sales prices were used to calculate the LTV ratios listed in the Prospectus Supplements.   Incorporating an inflated appraisal into the LTV ratio calculation will result in a lower LTV ratio for a given loan.   For instance, as described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%.   If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).   Due to the inflated appraisals, the LTV ratios listed in the Prospectus Supplements were artificially low, making it appear that the loans underlying the trusts had greater collateral and thus were less risky than they actually were.

185.   The Offering Documents also stated that exceptions to underwriting standards could be granted if the borrower's loan application reflected "compensating factors" including "loan-to-value ratio."   As detailed above, however, the LTV ratios were deflated and inaccurate; therefore the use of this metric as a "compensating factor" further violated the stated underwriting standards.   These statements in the Offering Documents related to Countrywide's underwriting standards contained material misstatements and omissions because, as described herein, Countrywide: (1) systematically disregarded its stated underwriting standards and regularly made exceptions to its underwriting guidelines in the absence of sufficient compensating factors.   Despite assurances

that certain loans were limited to borrowers with excellent credit histories, Countrywide routinely extended these loans to borrowers with weak credit histories; and (2) largely disregarded appraisal standards and did not prepare appraisals in conformity with Fannie Mae or Freddie Mac appraisal standards.

## VII.   CLASS ACTION ALLEGATIONS

186.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a) and (b)(3), individually, and on behalf of a class consisting of all persons or entities who purchased or otherwise acquired beneficial interests in the Certificates identified herein issued pursuant and/or traceable to the Offering Documents defined above (the "Class") and were damaged thereby.

187.   This action is properly maintainable as a class action for the following reasons:

188.   The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members of the proposed Class, who may be identified from records maintained by the Issuing Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

189.   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class.  Accordingly, Plaintiffs are adequately representatives of the Class and will fairly and adequately protect the interests of the Class.

190.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of

conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

191.    A class action is superior to all other methods for a fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.  Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

192.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)    whether Defendants violated the Securities Act;

(b)    whether statements made by Defendants to the investing public in the Registration Statements, Prospectuses and Prospectus Supplements both omitted and misrepresented material facts about the underlying mortgages; and

(c)    the extent and proper measure of the damages sustained by the members of the Class.

## VIII. STANDING

193.    Plaintiffs have constitutional standing to advance the claims alleged herein. As set forth in Plaintiffs' certifications, Plaintiffs purchased Certificates alleged to have been damaged by Defendants, and can assert a claim directly against each Defendant.    Accordingly, Plaintiffs have alleged concrete and particularized invasions of legally protected interests for all of the claims alleged under the Securities Act.

## IX. CLAIMS

### COUNT I

**Violation of Section 11 of the Securities Act Against the Individual Defendants, the Issuing Defendants, and the Underwriter Defendants**

194. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the Defendants to defraud Plaintiffs or members of the Class. This Count is predicated upon Defendants' strict liability for material misstatements and omissions in the Registration Statements. This Count is brought pursuant to Section 11 of the Securities Act, on behalf of the Class, against the Individual Defendants, the Issuing Defendants, and the Underwriter Defendants.

195. The Registration Statements for the Offerings were materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

196. The Defendants named in this Count are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

197. The Individual Defendants signed the Registration Statements for the Offerings on behalf of the Issuing Defendants.

198. Defendant CSC, an affiliate of CFC, acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates. Defendant CSC was an underwriter for the Issuing Trusts as shown in Exhibit B. Defendant Bank of America is successor in interest to CSC.

199. Defendant JPMSI acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates. Defendant JPMSI was an underwriter for the Issuing Trusts as shown in Exhibit B.

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT 83

200.   Defendant Deutsche Bank acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates. Defendant Deutsche Bank was an underwriter for the Issuing Trusts as shown in Exhibit B.

201.   Defendant Bear Stearns acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates. Defendant Bear Stearns was an underwriter for the Issuing Trusts as shown in Exhibit B.  Defendant JPMorgan is successor in interest to Bear Stearns.

202.   Defendant BOFAS acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates.  Defendant BOFAS was an underwriter for the Issuing Trusts as shown in Exhibit B.

203.   Defendant UBS acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates. Defendant UBS was an underwriter for the Issuing Trusts as shown in Exhibit B.

204.   Defendant Morgan Stanley acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates.  Defendant Morgan Stanley was an underwriter for the Issuing Trusts as shown in Exhibit B.

205.   Defendant Edward Jones acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to disseminate the Offering Documents for the Certificates. Defendant Edward Jones was an underwriter for the Issuing Trusts as shown in Exhibit B.

206.   Defendant Citigroup acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates. Defendant Citigroup was an underwriter for the Issuing Trusts

1  as shown in Exhibit B.

2      207.  Defendant Goldman Sachs acted as an underwriter in the sale of the

3  Issuing Trusts' Certificates, and helped to draft and disseminate the Offering

4  Documents for the Certificates. Defendant Goldman Sachs was an underwriter for

5  the Issuing Trusts as shown in Exhibit B.

6      208.  Defendant Credit Suisse acted as an underwriter in the sale of the

7  Issuing Trusts' Certificates, and helped to draft and disseminate the Offering

8  Documents for the Certificates. Defendant Credit Suisse was an underwriter for the

9  Issuing Trusts as shown in Exhibit B.

10     209.  Defendant RBS acted as an underwriter in the sale of the Issuing

11  Trusts' Certificates, and helped to draft and disseminate the Offering Documents

12  for the Certificates. Defendant RBS was an underwriter for the Issuing Trusts as

13  shown in Exhibit B.

14     210.  Defendant Barclays acted as an underwriter in the sale of the Issuing

15  Trusts' Certificates, and helped to draft and disseminate the Offering Documents

16  for the Certificates. Defendant Barclays was an underwriter for the Issuing Trusts

17  as shown in Exhibit B.

18     211.  Defendant HSBC acted as an underwriter in the sale of the Issuing

19  Trusts' Certificates, and helped to draft and disseminate the Offering Documents

20  for the Certificates. Defendant HSBC was an underwriter for the Issuing Trusts as

21  shown in Exhibit B.

22     212.  Defendant BNP acted as an underwriter in the sale of the Issuing

23  Trusts' Certificates, and helped to draft and disseminate the Offering Documents

24  for the Certificates. Defendant BNP was an underwriter for the Issuing Trusts as

25  shown in Exhibit B.

26     213.  Defendant Merrill Lynch acted as an underwriter in the sale of the

27  Issuing Trusts' Certificates, and helped to draft and disseminate the Offering

28  Documents for the Certificates. Defendant Merrill Lynch was an underwriter for

1   the Issuing Trusts as shown in Exhibit B.  Merrill Lynch is now a subsidiary of

2   Bank of America.

3       214.   The Defendants named in this Count owed to Plaintiffs the duty to

4   make a reasonable and diligent investigation of the statements contained in the

5   Registration Statements at the time they became effective to ensure that such

6   statements were true and correct and that there was no omission of material facts

7   required to be stated in order to make the statements contained therein not

8   misleading.  The Defendants knew, or in the exercise of reasonable care should

9   have known, of the material misstatements and omissions contained in or omitted

10  from the Registration Statements as set forth herein.  As such, the Defendants are

11  liable to the Class.

12      215.  None of the Defendants named in this Count made a reasonable

13  investigation or possessed reasonable grounds for the belief that the statements

14  contained in the Registration Statements were true or that there was no omission of

15  material facts necessary to make the statements made therein not misleading.

16      216.   The Defendants named in this Count issued and disseminated, caused

17  to be issued and disseminated, and participated in the issuance and dissemination

18  of material misstatements to the investing public which were contained in the

19  Offering Documents, which misrepresented or failed to disclose, *inter alia*, the

20  facts set forth above.

21      217.   By reason of the conduct herein alleged, each of the Defendants

22  named in this Count violated Section 11 of the Securities Act.

23      218.   Plaintiffs acquired the Certificates pursuant and/or traceable to the

24  Registration Statements.

25      219.   At the time they obtained their Certificates, Plaintiffs and members of

26  the Class did so without knowledge of the facts concerning the misstatements or

27  omissions alleged herein.

28      220.   This claim is brought within one year after discovery of the untrue

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  86

1    statements and omissions in and from the Registration Statements which should

2    have been made through the exercise of reasonable diligence, and within three

3    years of the effective date of the Registration Statements.

4        221.  Plaintiffs and the Class have sustained damages.  The value of the

5    Certificates has declined substantially, subsequent to, and due to, the violations of

6    the Defendants named in this Count.

7        222.  By virtue of the foregoing, Plaintiffs and the other members of the

8    Class are entitled to damages under Section 11, as measured by the provisions of

9    Section 11(e), jointly and severally from each of the Defendants named in this

10   Count.

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act Against the Issuing Defendants and the Underwriter Defendants

14       223.  Plaintiffs repeat and reallege each and every allegation contained

15   above as if fully set forth herein.

16       224.  This Count is brought pursuant to Section 12(a)(2) of the Securities

17   Act on behalf of the Class, against the Issuing Defendants and the Underwriter

18   Defendants.

19       225.  The Issuing Defendants and the Underwriter Defendants promoted

20   and sold the Certificates pursuant to the defective Offering Documents.  Plaintiffs

21   and members of the Class purchased Certificates from the Underwriter Defendants

22   in connection with the Offerings.

23       226.  The Offering Documents contained untrue statements of material

24   facts, omitted to state other facts necessary to make the statements made not

25   misleading, and concealed and failed to disclose material facts.

26       227.  The Issuing Defendants and the Underwriter Defendants owed to

27   Plaintiffs, who purchased the Certificates pursuant to the Offering Documents, the

28   duty to make a reasonable and diligent investigation of the statements contained in

the Offering Documents, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.   The Issuing Defendants and Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents as set forth above.

228.   Plaintiffs and other members of the Class purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Offering Documents.  Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

229.   By reason of the conduct alleged herein, the Issuing Defendants and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs and members of the Class who purchased the Certificates pursuant to and/or traceable to the Offering Documents sustained material damages in connection with their purchases of the Certificates.   Plaintiffs and other members of the Class who hold the Certificates issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their Certificates, and hereby elect to rescind and tender their securities to the Issuing Defendants and the Underwriter Defendants. Class members who have sold their Certificates are entitled to rescissory damages.

230.   This claim is brought within three years from the time that the Certificates upon which this Count is brought were sold to the public, and within one year from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this action is based.

## COUNT III

### Violation of Section 15 of the Securities Act Against
### the Countrywide Defendants, the Individual Defendants, and Sambol

231.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

232.   This count is asserted against CFC, CSC, CCM, CHL, Bank of America, NB Holdings, the Individual Defendants, and Sambol and is based upon Section 15 of the Securities Act.

233.   Each of CFC, CSC, CCM, CHL, the Individual Defendants, and Sambol by virtue of his, her or its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of the Issuing Defendants within the meaning of Section 15 of the Securities Act.   CFC, CSC, CCM, CHL, the Individual Defendants, and Sambol had the power and influence and exercised the same to cause the Issuing Defendants to engage in the acts described herein.  Defendants Bank of America and NB Holdings are successors in interest to CFC, CSC, CCM, and CHL.

234.   CFC's, CSC's, CCM's, CHL's, the Individual Defendants', and Sambol's control, ownership and position made them privy to and provided them with knowledge of the material facts concealed from Plaintiffs and the Class.

235.   By virtue of the conduct alleged herein, CFC, CSC, CCM, CHL, the Individual Defendants, and Sambol are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered as a result. Defendants Bank of America and NB Holdings are liable for the same conduct as successors in interest to CFC, CSC, CCM, and CHL.

## X.    RELIEF REQUESTED

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    declaring this action properly maintainable as a class action and certifying Plaintiffs as class representatives;

No. 2:10-cv-00302: AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  89

1    (b)    awarding compensatory and/or rescissory damages in favor of

2    Plaintiffs and other Class members against all Defendants, jointly and severally,

3    for all damages sustained as a result of Defendants' wrongdoing, in an amount to

4    be proven at trial, including interest thereon;

5    (c)    awarding Plaintiffs and the Class their reasonable costs and expenses

6    incurred in this action, including counsel fees and expert fees; and

7    (d)    such other relief as the Court may deem just and proper.

8    **XI.    JURY DEMAND**

9    Plaintiffs hereby demand a trial by jury.

10

11   Dated:  July 13, 2010                        Respectfully submitted,

12                                                **GLANCY BINKOW & GOLDBERG**
                                                  **LLP**
13

14   _____

15                                                Lionel Z. Glancy
                                                  Michael Goldberg
16                                                1801 Avenue of the Stars, Suite 311
                                                  Los Angeles, California 90067
17                                                Telephone: (310) 201-9150
                                                  Facsimile: (310) 201-9160
18

19                                                *Liaison Counsel*

20

21                                                Steven J. Toll
                                                  Julie Goldsmith Reiser
22                                                Joshua S. Devore
                                                  Matthew B. Kaplan
23                                                S. Douglas Bunch
                                                  **COHEN MILSTEIN SELLERS**
24                                                  **& TOLL PLLC**
25                                                1100 New York Avenue, N.W.
26                                                Suite 500, West Tower
                                                  Washington, D.C. 20005
27                                                Telephone: (202) 408-4600
28                                                Facsimile: (202) 408-4699

*– and –*

Joel P. Laitman
Daniel B. Rehns
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
88 Pine Street, 14th Floor
New York, New York 10005
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745

*Lead Counsel for the Class*

## CERTIFICATION OF SECURITIES CLASS ACTION
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Julie Wyne, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the Assistant Chief Executive Officer, External & Legal Operations of the Orange County Employees' Retirement System ("OCERS").

2.      I have reviewed the Consolidated Amended Class Action Complaint (the "Complaint"), and authorize its filing in this action on behalf of OCERS.

3.      OCERS is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.      During the Class Period (as defined in the Complaint), OCERS purchased and/or sold the securities that are the subject of the Complaint as set forth on the attached Schedule A.

5.      OCERS did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.      OCERS has sought to serve or served as a representative party on behalf of a class in the following private action(s) arising under the Securities Act or the Exchange Act filed during the three-year period preceding the date of my signing this Certification:

*In re Wachovia Preferred Sec. and Bond/Notes Litig.*, No. 09-cv-06351-RJS (S.D.N.Y.)

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 12th day of July, 2010.

Julie Wyne
Assistant Chief Executive Officer, External &
Legal Operations

## SCHEDULE A

| Security Description | Transaction Date | Transaction Description | Price | Quantity | Transaction Amount |
|---|---|---|---|---|---|
| CWHL 2007-HY1 | 4/5/07 | Buy | $1.0041 | 1,851,049.61 | $1,858,564.87 |
| CWHL 2007-HY1 | 12/3/08 | Sell | $0.4500 | 1,496,713.62 | $673,521.13 |
| | | | | | |
| CWALT 2007-OA7 | 10/31/06 | Buy | $0.9986 | 1,000,000.00 | $998,632.81 |
| | | | | | |
| CWALT 2006-OA17 | 9/23/08 | Buy | $0.5915 | 774,986.90 | $458,404.75 |
| | | | | | |
| CWHL 2005-HYB6 | 6/21/07 | Buy | $0.9988 | 806,723.75 | $805,715.35 |
| CWHL 2005-HYB6 | 10/23/07 | Sell | $0.9969 | 736,221.38 | $733,920.69 |
| | | | | | |
| CWHL 2005-31 | 2/2/07 | Buy | $0.9950 | 876,271.64 | $871,890.28 |
| CWHL 2005-31 | 8/30/07 | Sell | $0.9969 | 841,722.83 | $839,092.45 |
| | | | | | |
| CWL 2007-S1 | 2/23/07 | Buy | $1.0000 | 3,000,000.00 | $3,000,000.00 |
| CWL 2007-S1 | 3/8/07 | Sell | $1.0009 | 243,064.51 | $243,292.38 |
| CWL 2007-S1 | 12/4/09 | Sell | $0.7986 | 790,665.26 | $631,455.71 |
| | | | | | |
| CWL 2006-16 | 8/16/06 | Buy | $1.0000 | 700,000.00 | $700,000.00 |
| | | | | | |
| CWHL 2005-R2 | 6/20/05 | Buy | $1.0000 | 700,000.00 | $700,000.00 |
| | | | | | |
| CWHL 2005-HYB9 | 11/28/05 | Buy | $0.9972 | 400,000.00 | $398,875.00 |

## CERTIFICATION OF SECURITIES CLASS ACTION
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Keith S. Dubanevich, on behalf Oregon Public Employees' Retirement System ("OPERS" or "Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the Consolidated Amended Class Action Complaint (the "Complaint"), and authorize its filing in this action on behalf of OPERS.

2.    OPERS is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

3.    During the Class Period (as defined in the Complaint), OPERS purchased and/or sold the securities that are the subject of the Complaint as set forth on the attached Schedule A.

4.    OPERS did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.    During the three-year period preceding the date of my signing this Certification, OPERS has served as a representative party on behalf of a class in the following private action(s) arising under the Securities Act or the Exchange Act:

*In re UBS AG Securities Litigation,* 07-cv-11225 (RJS) (S.D.N.Y)

7.    OPERS will not accept any payment for serving as a representative party on behalf of the class beyond PERS' *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of July 2010.

Keith S. Dubanevich

## SCHEDULE A

| Security Description | Transaction Date | Transaction Description | Price | Quantity | Transaction Amount |
|---|---|---|---|---|---|
| CWHL 2007-13 | 10/29/08 | Buy | $0.5272 | 1,600,000.00 | $843,481.44 |
| CWHL 2007-13 | 11/3/08 | Sell | $0.5600 | 1,600,000.00 | $896,000.00 |
| | | | | | |
| CWHL 2006-14 | 10/29/08 | Buy | $0.9036 | 1,133,752.23 | $1,024,484.82 |
| CWHL 2006-14 | 11/3/08 | Sell | $0.8350 | 1,119,147.21 | $934,487.92 |
| | | | | | |
| CWHL 2006-HYB3 | 4/27/06 | Buy | $1.0002 | 1,076,000.00 | $1,076,167.86 |
| CWHL 2006-HYB3 | 8/21/07 | Buy | $0.9919 | 154,493.47 | $153,238.22 |
| | | | | | |
| CWALT 2005-62 | 8/4/06 | Buy | $1.0003 | 8,446,540.84 | $8,449,180.38 |
| | | | | | |
| CWALT 2005-J11 | 10/29/08 | Buy | $0.9907 | 414,712.16 | $410,858.32 |
| CWALT 2005-J11 | 11/6/08 | Sell | $0.8025 | 410,669.00 | $329,561.87 |
| | | | | | |
| CWALT 2005-J11 | 10/29/08 | Buy | $0.9323 | 404,395.18 | $377,004.08 |
| CWALT 2005-J11 | 11/6/08 | Sell | $0.6800 | 397,863.21 | $270,546.99 |
| | | | | | |
| CWALT 2005-J13 | 10/29/08 | Buy | $0.7744 | 1,100,000.00 | $851,892.47 |
| CWALT 2005-J13 | 11/5/08 | Sell | $0.5150 | 1,100,000.00 | $566,500.00 |
| | | | | | |
| CWALT 2005-72 | 12/21/05 | Buy | $1.0000 | 16,930,000.00 | $16,930,000.00 |
| CWALT 2005-72 | 12/15/05 | Buy | $1.0000 | 13,024,000.00 | $13,024,578.79 |
| | | | | | |
| CWALT 2005-70CB | 10/29/08 | Buy | $0.6490 | 815,000.00 | $528,933.70 |
| CWALT 2005-70CB | 11/6/08 | Sell | $0.5100 | 815,000.00 | $415,650.00 |
| | | | | | |
| CWL 2005-H | 9/27/05 | Buy | $1.0000 | 1,200,000.00 | $1,200,000.00 |
| CWL 2005-H | 10/19/07 | Sell | $0.9678 | 373,924.78 | $361,889.50 |
| | | | | | |
| CWHEL 2005-G | 9/22/05 | Buy | $1.0000 | 21,700,000.00 | $21,700,000.00 |
| CWHEL 2005-G | 10/19/05 | Buy | $1.0001 | 1,200,000.00 | $1,200,093.76 |
| | | | | | |
| CWHEL 2005-F | 9/14/05 | Buy | $1.0000 | 1,200,000.00 | $1,200,000.00 |
| CWHEL 2005-F | 10/19/07 | Sell | $0.9653 | 224,450.86 | $216,665.22 |
| | | | | | |
| CWALT 2005-38 | 7/13/05 | Buy | $1.0000 | 32,100,000.00 | $32,100,000.00 |
| CWALT 2005-38 | 9/19/07 | Buy | $0.9833 | 120,978.12 | $118,955.52 |
| | | | | | |
| CWALT 2005-17 | 4/12/05 | Buy | $1.0000 | 1,100,000.00 | $1,100,000.00 |
| | | | | | |
| CWALT 2005-24 | 5/13/05 | Buy | $0.9997 | 1100000.00 | $1,099,618.44 |

| | | | | | |
|---|---|---|---|---|---|
| CWALT 2005-24 | 9/8/05 | Sell | $0.9987 | 1074437 | $1,073,093.92 |
| CWALT 2005-24 | 6/28/07 | Buy | $1.0002 | 1496519.17 | $1,496,753.02 |
| | | | | | |
| CWALT 2005-17 | 4/6/05 | Buy | $1.0000 | 1,100,000.00 | $1,100,000.00 |
| CWALT 2005-17 | 4/12/05 | Buy | $1.0000 | 1,100,000.00 | $1,100,000.00 |
| CWALT 2005-17 | 8/17/05 | Sell | $0.9994 | 2,149,562.91 | $2,148,219.41 |
| | | | | | |
| CWALT 2005-44 | 7/27/05 | Buy | $0.9998 | 25,500,000.00 | $25,496,015.63 |
| | | | | | |
| CWALT 2005-44 | 7/25/05 | Buy | $1.0000 | 1,200,000.00 | $1,200,000.00 |
| | | | | | |
| CWL 2006-BC1 | 3/7/06 | Buy | $1.0000 | 24,150,000.00 | $24,150,000.00 |
| CWL 2006-BC1 | 11/25/07 | Sell | $0.9960 | 1,647,188.52 | $1,640,560.20 |
| | | | | | |
| CWL 2005-17 | 12/15/05 | Buy | $1.0000 | 13,270,000.00 | $13,270,000.00 |
| CWL 2005-17 | 11/3/08 | Sell | $1.0000 | 57,750.19 | $57,750.19 |
| | | | | | |
| CWL 2005-1M2 | 10/18/05 | Buy | $1.0000 | 19,900,000.00 | $19,900,000.00 |
| CWL 2005-1M2 | 1/30/07 | Sell | $1.0000 | 266,484.65 | $266,484.52 |
| | | | | | |
| CWHL 2007-HY5 | 8/21/07 | Buy | $0.9863 | 1,623,099.40 | $1,600,781.78 |
| CWHL 2007-HY5 | 9/26/07 | Sell | $1.0002 | 1,608,694.70 | $1,608,946.06 |
| | | | | | |
| CWALT 2006-OA11 | 6/16/06 | Buy | $1.0000 | 1400000.00 | $1,400,000.00 |
| CWALT 2006-OA11 | 6/28/07 | Buy | $0.9998 | 1530023.38 | $1,529,784.31 |
| CWALT 2006-OA11 | 4/6/10 | Sell | $0.5106 | 1996659.08 | $1,019,544.22 |
| | | | | | |
| CWALT 2006-36T2 | 11/10/09 | Buy | $0.5550 | 400,000.00 | $222,000.00 |
| | | | | | |
| CWALT 2005-J12 | 9/29/05 | Buy | $1.0000 | 24,930,000.00 | $24,930,000.00 |
| CWALT 2005-J12 | 1/2/07 | Buy | $0.8203 | 712,880.94 | $584,785.15 |
| | | | | | |
| CWALT 2006-OA10 | 3/3/08 | Buy | $0.7600 | 3,187,798.81 | $2,422,727.10 |
| CWALT 2006-OA10 | 2/6/09 | Sell | $0.4047 | 3,038,593.19 | $1,229,688.28 |
| | | | | | |
| CWALT 2007-HY5R | 10/29/08 | Buy | $0.7514 | 1,431,371.74 | $1,075,589.98 |
| CWALT 2007-HY5R | 12/4/08 | Sell | $0.5200 | 1,387,891.38 | $721,703.52 |
| | | | | | |
| CWALT 2006-OA21 | 3/27/08 | Buy | $0.7375 | 10,639,333.20 | $7,846,508.21 |
| CWALT 2006-OA21 | 3/28/08 | Sell | $0.7377 | 2,033,990.16 | $1,500,385.55 |
| | | | | | |
| CWL 2007-1 | 1/26/07 | Buy | $1.0000 | 24,450,000.00 | $24,450,000.00 |
| | | | | | |
| CWHL 2007-10 | 9/30/08 | Buy | $0.7100 | 10,465,122.00 | $7,430,236.62 |

853755.1 1

| | | | | | |
|---|---|---|---|---|---|
| CWALT 2007-5CB | 9/10/08 | Buy | $0.7263 | 13,052,322.60 | $9,479,249.29 |
| CHL 2007-16 | 8/30/07 | Buy | $0.9995 | 12,843,402.10 | $12,837,381.76 |
| CWMBS 2006-OA5 | 2/22/08 | Buy | $0.8500 | 3,690,582.90 | $3,136,995.47 |
| CWABS 2005-IM3 | 11/16/05 | Buy | $1.0000 | 25,450,000.00 | $25,450,000.00 |
| CWABS 2005-IM3 | 9/25/07 | Sell | $0.9990 | 1,517,876.84 | $1,516,358.96 |