1   Lloyd Winawer (State Bar No. 157823)
    *lwinawer@goodwinprocter.com*
2   **GOODWIN PROCTER LLP**
    10250 Constellation Boulevard, 21st Floor
3   Los Angeles, CA 90067
    Telephone:  310-788-5177
4   Facsimile:  310-286-0992

5   Brian E. Pastuszenski (*pro hac vice*)
    *bpastuszenski@goodwinprocter.com*
6   Inez H. Friedman-Boyce (*pro hac vice*)
    *ifriedmanboyce@goodwinprocter.com*
7   Brian C. Devine (State Bar No. 222240)
    *bdevine@goodwinprocter.com*
8   **GOODWIN PROCTER LLP**
    53 State Street
9   Boston, MA 02109-2802
    Telephone:  617-570-1000
10  Facsimile:  617-523-1231

11  *Attorneys for Defendants*
    Countrywide Financial Corp.,
12  Countrywide Home Loans, Inc., CWALT,
    Inc., CWMBS, Inc., CWABS, Inc.,
13  CWHEQ, Inc., Countrywide Capital
    Markets, Countrywide Securities Corp.,
14  and N. Joshua Adler

15              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
16

17  MAINE STATE RETIREMENT              Case No. 2:10-CV-00302-MRP (MANx)
    SYSTEM, Individually and On Behalf
18  of All Others Similarly Situated,

                                        **COUNTRYWIDE DEFENDANTS'**
19              Plaintiffs,             **MEMORANDUM OF POINTS AND**
                                        **AUTHORITIES IN SUPPORT OF**
20        v.                            **MOTION TO DISMISS THE**
                                        **AMENDED CONSOLIDATED**
21  COUNTRYWIDE FINANCIAL               **CLASS ACTION COMPLAINT**
    CORPORATION, et al.,
22
                Defendants.
                                        Date:        October 18, 2010
23                                      Time:        11:00 a.m.
                                        Courtroom:   12
24                                      Judge:       Hon. Mariana R. Pfaelzer
25

26

27

28

---

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND ................................................................................6

ARGUMENT ......................................................................................................23

I.    PLAINTIFFS' CLAIMS ARE TIME-BARRED ..........................................23

    A.    The One-Year Limitations Period Has Expired For All Offerings.......23

    B.    The Three-Year Repose Period Has Expired As To The Vast Majority Of The Offerings ...............................................................24

    C.    Plaintiffs Fail To Allege Any Applicable Tolling Doctrine .................26

    D.    Class Action Tolling Based On *Luther* Is Inapplicable .......................27

II.   PLAINTIFFS LACK STANDING AS TO MBS THEY DID NOT BUY.....31

    A.    Plaintiffs Have Not Alleged Article III Standing ...............................31

    B.    Plaintiffs Have Not Alleged Statutory Standing..................................35

    C.    Plaintiffs Cannot Rely On The Shelf Registration Statements To Cure Their Standing Defects.................................................................36

III.  PLAINTIFFS DO NOT ALLEGE LEGALLY COGNIZABLE INJURY.....41

    A.    The Absence Of Legally Cognizable Injury Is Fatal ...........................41

    B.    Plaintiffs Have No Cognizable Injury As To The Vast Majority Of MBS Certificates They Claim To Have Purchased ........................................43

        1.    Payments Have Been Made As They Come Due ......................43

        2.    Decline In Trading Value In An Illiquid Market Is Not Loss.....46

IV.   NO MATERIAL MISSTATEMENTS OR OMISSIONS ARE ALLEGED  49

    A.    The Representations Concerning The Mortgage Loans Underlying The MBS Were Limited And Qualified......................................................49

    B.    Plaintiffs' Claims "Sound In Fraud" And Must Satisfy Rule 9(b).......53

    C.    Plaintiffs Have Not Alleged Material Misrepresentations Regarding Underwriting And Appraisal Standards.................................................56

        1.    No Misstatement Has Been Tied To Any Pool ..........................56

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

2.   The Characteristics Of The Mortgage Loans Underlying The MBS Were Disclosed In Detail In The Offering Documents ....59

3.   Appraisals Are Non-Actionable Opinions..................................62

4.   The Complaint Fails To Allege That Defendants Had Actual Knowledge of Deviations From Underwriting Guidelines ........65

5.   Allegations Taken From Other Complaints Or Media Reports Of Government Investigations Are Inadequate ...............................66

D.   The Section 12(a)(2) Claims Fail .........................................................69

1.   The Countrywide Defendants Are Not Alleged To Have Sold Securities To Plaintiffs.................................................................69

2.   Plaintiffs Do Not Adequately Allege That They Bought Their Securities In The Offerings........................................................72

V.   THE AMENDED COMPLAINT AFFIRMATIVELY PLEADS KNOWLEDGE OF THE ALLEGED MISREPRESENTATIONS ...............76

VI.   PLAINTIFFS HAVE FAILED TO PLEAD RELIANCE .............................77

VII.  PLAINTIFFS' SECTION 15 CLAIMS ARE SUBJECT TO DISMISSAL...79

CONCLUSION.........................................................................................................80

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**FEDERAL CASES**

4

*Affiliated Ute Citizens v. United States*
5
 406 U.S. 128 (1972) ....................................................................46

6

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*
7
 646 F. Supp. 2d 385 (S.D.N.Y. 2009) ...................................43, 44

8

*American Pipe & Constr. Co. v. Utah*
9
 414 U.S. 538 (1974) ............................................................passim

10

*APA Excelsior III L.P. v. Premiere Techs., Inc.*
 476 F.3d 1261 (11th Cir. 2007) .................................................78
11

12

*Ashcroft v. Iqbal*
 129 S. Ct. 1937 (2009) ........................................................53, 62
13

14

*Backman v. Polaroid Corp.*
 910 F.2d 10 (1st Cir. 1990) .......................................................61
15

16

*Barnes v. Osofsky*
 373 F.2d 269 (2d Cir. 1967) ......................................................35
17

18

*Basch v. Ground Round, Inc.*
 139 F.3d 6 (1st Cir. 1998) .........................................................28
19

20

*Bastian v. Petren Res. Corp.*
 892 F.2d 680 (7th Cir. 1990) .....................................................20
21

22

*Beck v. Caterpillar Inc.*
 50 F.3d 405 (7th Cir. 1995) .......................................................30
23

24

*Bell Atlantic Corp. v. Twombly*
 550 U.S. 544 (2007) ............................................................passim
25

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*
26
 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ..............................65

27

*Blue Chip Stamps v. Manor Drug Stores*
 421 U.S. 723 (1975) ..................................................................35

28

iii

*Brody v. Homestore, Inc.*
   2003 WL 22127108 (C.D. Cal. Aug. 8, 2003) .................................................. 54

*Caiafa v. Sea Containers Ltd.*
   2009 WL 1383457 (2d Cir. May 19, 2009) ........................................ 26, 74, 75

*Chardon v. Fumero Soto*
   462 U.S. 650 (1983) ..................................................................... 27, 28

*Christian v. Mattel, Inc.*
   286 F.3d 1118 (9th Cir. 2002) ......................................................... 66

*City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*
   2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010) ...............................passim

*City of Austin Police Ret. Sys. v. ITT Educ. Servs. Inc.*
   388 F. Supp. 2d 932 (S.D. Ind. 2005) ................................................ 66

*Clemens v. DaimlerChrysler Corp.*
   534 F.3d 1017 (9th Cir. 2008) ......................................................... 27

*Commercial Union Assurance Co. plc v. Milken*
   17 F.3d 608 (2d Cir.1994) .............................................................. 42

*Cooperman v. Individual Inc.*
   171 F.3d 43 (1st Cir. 1999) ............................................................. 79

*Crown, Cork & Seal Co., Inc. v. Parker*
   462 U.S. 345 (1983) ..................................................................... 27, 28

*D.E. & J. Ltd. P'ship v. Conaway*
   284 F. Supp. 2d 719 (E.D. Mich. 2003) ............................................. 20

*DeMaria v. Andersen*
   318 F.3d 170 (2d Cir. 2003) ............................................................ 61

*Dent v. U.S. Tennis Ass'n*
   2008 WL 2483288 (E.D.N.Y. June 17, 2008) ................................... 67

*Dodds v. Cigna Sec., Inc.*
   12 F.3d 346 (2d Cir. 1993) ............................................................. 47

*Dura Pharms., Inc. v. Broudo*
   544 U.S. 345 (2005) ..................................................................... 68, 69

iv

*Durant v. Husband*
     28 F.3d 12 (3d Cir. 1994) ................................................................. 29

*Durham v. Kelly*
     810 F. 2d 1500 (9th Cir. 1987) ........................................................ 79

*ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*
     553 F.3d 187 (2d Cir. 2009) ............................................................ 58

*Ferber v. Travelers Corp.*
     802 F. Supp. 698 (D. Conn. 1992) ................................................... 67

*Finkel v. Stratton Corp.*
     962 F.2d 169 (2d Cir. 1992) ............................................................ 25

*First Nationwide Bank v. Gelt Funding Corp.*
     27 F.3d 763 (2d Cir. 1994) ............................................... 44, 46, 62, 63

*Fouad v. Isilon Sys., Inc.*
     2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ............................... 72

*Fraker v. Bayer Corp.*
     2009 WL 5865687 (E.D. Cal. Oct. 6, 2009) ..................................... 68

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*
     528 U.S. 167 (2000) ........................................................................ 42

*Garber v. Legg Mason, Inc.*
     537 F. Supp. 2d 597 (S.D.N.Y. 2008) ......................................... 58, 65

*Geinko v. Padda*
     2002 WL 276236 (N.D. Ill. Feb. 27, 2002) ............................. 66-67, 68

*Guenther v. Cooper Life Scis., Inc.*
     759 F. Supp. 1437 (N.D. Cal. 1990) ................................................ 36

*Gustafson v. Alloyd Co.*
     513 U.S. 561 (1995) ................................................................. passim

*GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*
     580 F. Supp. 2d 321 (S.D.N.Y. 2008) ......................................... 23-24

*Haralson v. E.F. Hutton Group, Inc.*
     919 F.2d 1014 (5th Cir. 1990) ........................................................ 76

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

*Hertzberg v. Dignity Partners, Inc.*
    191 F.3d 1076 (9th Cir. 1999) .......................................................23, 78

*Hoffman v. UBS-AG*
    591 F. Supp. 2d 522 (S.D.N.Y. 2008) ...........................................34

*Holmes v. Bateson*
    583 F.2d 542 (1st Cir. 1978) .........................................................46

*In re Alliance Bernstein Mut. Fund Excessive Fee Litig.*
    2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005) ...............................34

*In re Am. Funds Sec. Litig.*
    556 F. Supp. 2d 1100 (C.D. Cal. 2008)........................................24

*In re Am. Home Mortg. Holdings, Inc.*
    411 B.R. 181 (Bankr. D. Del. 2009).............................................47

*In re Am. Mut. Funds Fee Litig.*
    2005 WL 3989803 (C.D. Cal. Dec. 16, 2005)........................34, 42

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) ..........................................42

*In re Britannia Bulk Holdings Inc. Sec. Litig.*
    665 F. Supp. 2d 404 (S.D.N.Y. 2009) ..........................................58

*In re Broderbund/Learning Co. Sec. Litig.*
    294 F.3d 1201 (9th Cir. 2002) ..................................................41-42

*In re Century Aluminum Co. Sec. Litig.*
    2010 WL 1729426 (N.D. Cal. Apr. 27, 2010)......................34, 36, 53

*In re CIT Group, Inc. Sec. Litig.*
    349 F. Supp. 2d 685 (S.D.N.Y. 2004) ..........................................54

*In re Colonial Ltd. P'ship Litig.*
    854 F. Supp. 64 (D. Conn. 1994) .................................................30

*In re Computervision Corp. Sec. Litig.*
    869 F. Supp. 56 (D. Mass. 1994).................................................61

*In re Connetics Corp. Sec. Litig.*
    542 F. Supp. 2d 996 (N.D. Cal. 2008)..........................................67

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

*In re Countrywide Fin. Corp. Sec. Litig.*
2009 WL 943271 (C.D. Cal. Apr. 6, 2009) .................................................25, 42

*In re Countrywide Fin. Corp. Sec. Litig.*
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ......................................................passim

*In re Crazy Eddie Sec. Litig.*
747 F. Supp. 850 (E.D.N.Y. 1990) .................................................................30

*In re Daou Sys., Inc.,*
411 F.3d 1006 (9th Cir. 2005) .................................................................41, 70

*In re Downey Sec. Litig.*
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) .................................................57

*In re Elscint, Ltd. Sec. Litig.*
674 F. Supp. 374 (D. Mass. 1987) .............................................................30, 31

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*
465 F. Supp. 2d 687 (S.D. Tex. 2006) ...........................................................27

*In re First Union Corp. Sec. Litig.*
128 F. Supp. 2d 871 (W.D.N.C. 2001) .........................................................44

*In re Fosamax Prods. Liab. Litig.*
694 F. Supp. 2d 253 (S.D.N.Y. 2010) ...........................................................27

*In re Gas Reclamation, Inc. Sec. Litig.*
733 F. Supp. 713 (S.D.N.Y. 1990) ................................................................70

*In re Gemstar-TV Guide, Int'l Inc. Sec. Litig.*
2003 U.S. Dist. LEXIS 25884 (C.D. Cal. Aug. 15, 2003) ...............................54

*In re Hansen Natural Corp. Sec. Litig.*
527 F. Supp. 2d 1142 (C.D. Cal. 2007) .........................................................66

*In re Health Mgmt. Sys., Inc. Sec. Litig.*
1998 WL 283286 (S.D.N.Y. June 1, 1998) .....................................................59

*In re IndyMac Mortgage-Backed Sec. Litig.*
2010 WL 2473243 (S.D.N.Y. June 21, 2010) .......................................32, 63, 64

*In re Initial Pub. Offering Sec. Litig.*
544 F. Supp. 2d 277 (S.D.N.Y. 2008) ...........................................................42

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

*In re Initial Pub. Offering Sec. Litig.*
    471 F.3d 24 (2d Cir. 2006) ................................................................. 76

*In re Lehman Bros. Sec. & ERISA Litig.*
    681 F. Supp. 2d 495 (S.D.N.Y. 2010) ............................................... 70

*In re Lehman Bros Sec. & ERISA Litig.*
    684 F. Supp. 2d 485 (S.D.N.Y. Feb. 17, 2010) ................................. 33

*In re Levi Strauss & Co. Sec. Litig.*
    527 F. Supp. 2d 965 (N.D. Cal. 2007)........................................passim

*In re Livent, Inc. Noteholders Sec. Litig.*
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ............................................... 76

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*
    218 F.R.D. 76 (S.D.N.Y. 2003)......................................................... 66

*In re Mesa Airlines Inc. Sec. Litig.*
    1996 WL 33419894 (D.N.M. May 31, 1996) .................................... 71

*In re Mut. Funds Inv. Litig.*
    384 F. Supp 2d 845 (D. Md. 2005) ................................................... 42

*In re Newbridge Networks Sec. Litig.*
    767 F. Supp. 275 (D.D.C. 1991)....................................................... 72

*In re Northpoint Commc'ns Group, Inc. Sec. Litig.*
    184 F. Supp. 2d 991 (N.D. Cal. 2001)............................................... 20

*In re Proxima Corp. Sec. Litig.*
    1994 WL 374306 (S.D. Cal. May 3, 1994) ................................. 26, 75

*In re Refco, Inc. Sec. Litig.*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................................... 73

*In re Salomon Smith Barney Mut. Fund Fees Litig.*
    441 F. Supp. 2d 579 (S.D.N.Y. 2006) ............................................... 34

*In re Stac Elecs. Sec. Litig.*
    89 F.3d 1399 (9th Cir. 1996) ......................................................passim

*In re Stratosphere Corp. Sec. Litig.*
    1 F. Supp. 2d 1096 (D. Nev. 1998) ................................................... 54

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*
   202 F. Supp. 2d 8 (S.D.N.Y. 2001) ................................................................. 65

*In re U.S. West, Inc. Sec. Litig.*
   65 Fed. Appx. 856 (3d Cir. 2003) ................................................................. 50

*In re Valence Tech. Sec. Litig.*
   1996 WL 37788 (N.D. Cal. Jan. 23, 1996) ............................................ 26, 73, 75

*In re Van Wagoner Funds, Inc. Sec. Litig.*
   382 F. Supp. 2d 1173 (N.D. Cal. 2004) ........................................................ 54

*In re VeriFone Sec. Litig.*
   11 F.3d 865 (9th Cir. 1993) ......................................................................... 61

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*
   694 F. Supp. 2d 1192 (W.D. Wash. 2009) ............................................ 26, 34, 74

*In re Wells Fargo Mortgage-Backed Cert. Litig.*
   2010 WL 1661534 (N.D. Cal. Apr. 22, 2010) ...................................... passim

*In re WorldCom, Inc. Sec. Litig.*
   2004 WL 1097786 (S.D.N.Y. May 18, 2004) ............................................... 79

*In re Worlds of Wonder Sec. Litig.*
   35 F.3d 1407 (9th Cir. 1994) ......................................................................... 60

*In re Worlds of Wonder Sec. Litig.*
   694 F. Supp. 1427 (N.D. Cal. 1988) ............................................................. 72

*Jackson Nat'l Life Ins. Co. v. Ligator*
   949 F. Supp. 200 (S.D.N.Y. 1996) ............................................................... 45

*Kirtdoll v. City of Topeka*
   315 F.3d 1234 (10th Cir. 2003) .................................................................... 26

*Kruse v. Wells Fargo Home Mortg., Inc.*
   2006 WL 1212512 (E.D.N.Y. May 3, 2006) ........................................ passim

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*
   501 U.S. 350 (1991) ........................................................................... 24-25, 30

*Leonard v. NetFRAME Sys., Inc.*
   1995 WL 798923 (N.D. Cal. Aug. 8, 1995) .................................................. 59

ix

*Lewis v. Casey*
    518 U.S. 343 (1996) ....................................................................... 34

*Lipsky v. Commonwealth United Corp.*
    551 F.2d 887 (2d Cir. 1976) ........................................................ 66

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*
    594 F.3d 383 (5th Cir. 2010) ...................................................passim

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*
    238 F.3d 363 (5th Cir. 2001) ........................................................ 71

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*
    652 F. Supp. 2d 576 (E.D. Pa. 2009)......................................... 20, 44

*Maher v. Durango Metals, Inc.*
    144 F.3d 1302 (10th Cir. 1998) .................................................... 71

*Mass. Bricklayers & Masons Funds v. Deutsche Alt-A Securities*
    2010 WL 1370962 (E.D.N.Y. Apr. 6, 2010).........................34, 51, 57

*Mayer v. Oil Field Sys. Corp.*
    803 F.2d 749 (2nd Cir. 1986) ...................................................... 76

*McMahan & Co. v. Wherehouse Entm't, Inc.*
    65 F. 3d 1044 (2d Cir. 1995) ....................................................... 46

*Metz v. United Counties Bancorp*
    61 F. Supp. 2d 364 (D.N.J. 1999)................................................ 42

*Miguel v. Country Funding Corp.*
    309 F.3d 1161 (9th Cir. 2002) ..................................................... 29

*Moore v. Kayport Package Express*
    885 F.2d 531 (9th Cir. 1989) ....................................................... 69

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*
    No. 08-CV-10783 (MGC), Transcript of Decision ....................passim

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*
    No. 08-CV-10783 (MGC), Transcript of Proceedings................44-45

*New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*
    2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010).............................passim

x

*New Jersey Carpenters Health Fund v. Residential Capital LLC*
  2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010)...................................................34

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scot. Group, PLC*
  2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010)......................................33, 37, 40

*Norte & Co. v. Huffines*
  288 F. Supp. 855 (S.D.N.Y. 1968) ......................................................47

*Nye v. Blyth Eastman Dillon & Co.*
  588 F.2d 1189 (8th Cir. 1978) ....................................................48, 49

*Ong v. Sears, Roebuck & Co.*
  2005 WL 2284285 (N.D. Ill. Sept. 14, 2005)........................................42

*P. Stolz Family P'ship L.P. v. Daum*
  355 F.3d 92 (2d Cir. 2004) ..............................................................25

*Palmer v. Stassinos*
  236 F.R.D. 460 (N.D. Cal. 2006) .......................................................30

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*
  538 F. Supp. 2d 662 (S.D.N.Y. 2008) ................................................65

*Pavelic & LeFlore v. Marvel Entm't Group*
  493 U.S. 120 (1989) .......................................................................66

*Pierce v. Morris*
  2006 WL 2370343 (W.D. Tex. Aug. 16, 2006) ...................................42

*Pinter v. Dahl*
  486 U.S. 622 (1988) .............................................................69, 70, 71

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance
  Corp.*
  658 F. Supp. 2d 299 (D. Mass. 2009)...........................................passim

*Public Emp. Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*
  2010 WL 2175875 (S.D.N.Y. June 1, 2010)..................................passim

*Republic Bank & Trust Co. v. Bear, Stearns & Co.*
  2010 WL 1489264 (W.D. Ky. Apr. 13, 2010) .........................57, 58, 61

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

*Rizika v. Merrill Lynch, Pierce, Fenner & Smith*, Inc.
   1981 WL 1619 (D. Md. Jan. 28, 1981) .................................................. 49

*Rosenzweig v. Azurix Corp.*
   332 F.3d 854 (5th Cir. 2003) .............................................................. 70

*RSM Prod. Corp. v. Fridman*
   643 F. Supp. 2d 382 (S.D.N.Y. 2009) ................................................ 66

*Rubke v. Capitol Bancorp Ltd.*
   460 F. Supp. 2d 1124 (N.D. Cal. 2006) ......................................... 76, 79

*Rubke v. Capitol Bancorp Ltd.*
   551 F.3d 1156 (9th Cir. 2009) ............................................................ 63

*Salameh v. Tarsadia Hotels*
   2010 WL 2839013 (S.D. Cal. July 20, 2010) ..................................... 72

*Saltares v. Hosp. San Pablo, Inc.*
   371 F. Supp. 2d 28 (D.P.R. 2005) ...................................................... 30

*S.E.C. v. Universal Express, Inc.*
   546 F. Supp. 2d 132 (S.D.N.Y. 2008) ................................................ 20

*Seigal v. Merrick*
   441 F. Supp. 587 (S.D.N.Y. 1977) ..................................................... 46

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir.1996) ......................................................... 71, 72

*Sheppard v. TCW/DW Term Trust 2000*
   938 F. Supp. 171 (S.D.N.Y. 1996) ..................................................... 47

*Siemers v. Wells Fargo & Co.*
   2006 WL 3041090 (N.D. Cal. Oct. 24, 2006) ................................. 34, 42

*Steel Co. v. Citizens for a Better Env't*
   523 U.S. 83 (1998) ............................................................................ 32

*Stone Container Corp. v. United States*
   229 F.3d 1345 (Fed. Cir. 2000) ......................................................... 28

*TAAM Assocs. Inc. v. Housecall Med. Resources, Inc.*
   1998 WL 1745361 (N.D. Ga. Mar. 30, 1998) .................................... 54

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*
    692 F. Supp. 2d 387 (S.D.N.Y. 2010) ........................................................passim

*United States v. Hays*
    515 U.S. 737 (1995) ............................................................................................... 32

*Vaught v. Showa Denko K.K.*
    107 F.3d 1137 (5th Cir. 1997) ............................................................................... 27

*Vess v. Ciba-Geigy Corp. USA*
    317 F.3d 1097 (9th Cir. 2003) ............................................................................... 53

*Virginia Bankshares, Inc. v. Sandberg*
    501 U.S. 1083 (1991) ............................................................................................. 63

*Wade v. Indus. Funding Corp.*
    1993 WL 650837 (N.D. Cal. Aug. 30, 1993)....................................................... 75

*Warth v. Seldin*
    422 U.S. 490 (1975) .....................................................................................31-32, 35

*Wasco Prods., Inc. v. Southwall Techs., Inc.*
    435 F.3d 989 (9th Cir. 2006) ................................................................................. 26


**CALIFORNIA CASES**

*Bunnell v. Dep't of Corrections*
    64 Cal. App. 4th 1360 (1998) ............................................................................... 30


**OTHER STATE CASES**

*Cunningham v. Ins. Co. of N. Am.*
    515 Pa. 486 (1987)................................................................................................. 30

*Hess v. I.R.E. Real Estate Income Fund, Ltd.*
    255 Ill. App. 3d 790 (1993) .................................................................................. 30

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

**FEDERAL STATUTES, REGULATIONS, AND RULES**

15 U.S.C. § 77d(3) .................................................................... 26, 74

15 U.S.C. § 77e(b) ........................................................................ 74

15 U.S.C. § 77k ....................................................................... passim

15 U.S.C. § 77*l*(a)(2) .............................................................. passim

15 U.S.C. § 77m ............................................................... 23, 24, 25

28 U.S.C. § 2072 .......................................................................... 28

17 C.F.R. § 229.1100 ................................................................... 18

17 C.F.R. § 229.1105 ................................................................... 18

17 C.F.R. § 229.1110 ................................................................... 65

17 C.F.R. § 229.1111 ............................................................. 60, 65

17 C.F.R. § 230.174 ..................................................................... 26

17 C.F.R. § 230.405 ..................................................................... 79

17 C.F.R. § 230.430B .................................................................. 25

FED. R. CIV. P. 8 .......................................................................... 63

FED. R. CIV. P. 9(b) ................................................................ passim

FED. R. CIV. P. 11 ................................................................. 58, 66

FED.R.CIV.P. 12(f) ...................................................................... 66

FED. R. CIV. P. 23 .................................................................. passim

FED. R. EVID. 201 .......................................................................... 6

SEC Rule 144A ...................................................................... 73, 74

**CALIFORNIA STATUTES**

California Evidence Code § 452(h) ................................................. 6

## OTHER AUTHORITIES

6 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg and Lowenfels on Securities Fraud and Commodities Fraud*, §§ 13:52, 13:102 (2d ed. 2009) ..... 48

Louis Loss & Joel Seligman, Fundamentals Of Securities Regulation 1224 (5th ed. 2004) ...................................................................................... 71

*Asset-Backed Securities*, Securities Act Release No. 8518, Exchange Act Release No. 50905, 70 Fed. Reg. 1506 (Jan. 7, 2007) .............................. passim

*Securities Offering Reform*, Securities Act Release No. 8591, Exchange Act Release No. 52056, 70 Fed. Reg. 44721 (Aug. 3, 2005) ................................... 25

## **PRELIMINARY STATEMENT**

This putative class action was filed in January 2010 by six sophisticated institutional investors on behalf of purchasers in 427 mortgage-backed securities offerings, after having filed essentially the same class action under the Securities Act of 1933 (the "1933 Act") in California Superior Court roughly two and a half years earlier.  They fought that entire two and a half years to keep this case away from the federal court and the requirement in federal court that securities plaintiffs file a certification disclosing the specific securities that they purchased.  In January 2010, the Superior Court dismissed the state action for lack of subject matter jurisdiction, state court concurrent jurisdiction over 1933 Act class actions having been abrogated by the Securities Litigation Uniform Standards Act of 1998.  When this suit was filed earlier this year in federal court, the 1933 Act's three-year statute of repose and/or one-year statute of limitations had run as to all of the offerings (the "Offerings") that this case challenges.  Because the first suit was filed in state court, federal class action tolling pursuant to the Supreme Court's decision in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), does not save those claims because *American Pipe* applies only to class actions filed in federal court under Federal Rule of Civil Procedure 23.  Thus, this case is time-barred and must be dismissed with prejudice. The staleness of these claims is dispositive, the product of the state plaintiffs and their lawyers doing everything they could to avoid federal court—a court in which they knew they likely would be displaced as lead plaintiff once they certified that they did not purchase in the vast majority of Offerings they targeted.

Not only is this case time-barred, but the claims in this case must be dismissed on numerous other grounds, including the following principal reasons:

***No Standing***:  Every one of the several court decisions to address the issue has concluded that a plaintiff lacks standing under both Article III of the U.S. Constitution and under Sections 11 and 12(a)(2) of the 1933 Act to represent the interests of investors in mortgage-backed securities ("MBS") offerings in which the plaintiffs did

1

not themselves buy.  Each MBS is backed by a pool of unique loans, and the repre-sentations made in the prospectus supplements accompanying the issuance of those securities are themselves unique, focused on the specific loans underlying each offer-ing and the specific underwriting standards and origination practices in effect at the time those specific loans were originated.  Thus, the representations made in one pro-spectus supplement regarding a particular MBS offering are substantively different from the representations made about another offering under a different prospectus supplement, even where there is a common registration statement.  In other words, because the representations concern different pools of loans and often different un-derwriting standards applicable to those pools, a purchaser in one deal is not injured by alleged misstatements made at a different time, about entirely different loans, that were originated pursuant to likely different underwriting standards and practices.  Here, Lead Plaintiff Iowa Public Employees' Retirement System ("IPERS") and the other three institutions that have joined it as named plaintiffs in this action (collec-tively, "Plaintiffs") bought in just 81 of the 427 Offerings that they challenge.  Ac-cordingly, even if this case were not time-barred in its entirety (which it is), Plaintiffs would have standing at most with respect to the 81 Offerings in which they actually purchased, only a small percentage of the 427 Offerings over which they sued;

***No Cognizable Injury***:  The prospectus supplements accompanying each Of-fering disclosed that the MBS entitled investors only to receive a cash flow stream as the mortgage loans underlying the certificates make monthly principal and interest payments, not to any market appreciation.  Virtually all of the MBS certificates that Plaintiffs bought here continue to make the cash flow distributions they were in-tended to make.  In fact, twenty-two of the 105 securities that Plaintiffs claim to have purchased (or 21%) have already been paid off in full.  Plaintiffs thus have received what they bargained for when they bought those securities and have incurred no eco-nomic loss associated with nearly all of those purchases.  Plaintiffs' attempt to create injury in fact by pointing to the alleged decline in the market prices of the securities

they bought is futile.  The alleged drop in prices in the wake of the economic crisis of the last three years is not injury, particularly where the securities continue to perform as structured and where—as here—the MBS investors were explicitly warned by the offering materials that no market for their MBS might ever exist, that any market could become illiquid (as the secondary mortgage market had become in the past from time to time), and that the price of the securities they were buying was highly sensitive to fluctuations in housing prices.  In short, Plaintiffs' claims based on MBS certificates that continue to perform as intended must be dismissed.  Plaintiffs have received the benefit of their bargain, and have incurred no cognizable loss—the speculative possibility that these MBS might some day in the future miss a payment is not actual loss;

***No Misstatements Have Been Alleged***:  Plaintiffs' claims must be dismissed for the separate and independent reason that they have utterly ignored the structure and wording of the offering documents accompanying the MBS they bought in arguing that material misstatements were made.  Despite their sophistication as investors, Plaintiffs would have this Court overlook the fact that the plain language of the offering materials makes clear that the challenged representations about loan credit quality and underwriting standards and practices associated with those loans were not absolute, but qualified.  Rather, those offering documents define and limit the representations that were made, and what those documents say cannot now be ignored.  More specifically, the offering documents stated that the mortgage loans in the pools underlying the MBS certificates ***either*** would comply with the stated characteristics ***or***, ***if they did not***, those loans would be cured or replaced, upon request in accordance with the underlying securitization documents.  Thus, the existence in the pools of loans that do not comply with the stated representations was both anticipated and not by itself a material misstatement.  For precisely this reason, the United States Court of Appeals for the Fifth Circuit recently affirmed the dismissal of similar 1933 Act claims challenging disclosures about loan credit quality in connection with an MBS offering in

3

1   *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010).

2   Here, as in *Lone Star*, plaintiffs have not alleged that any request to cure or replace

3   non-compliant loans was made, much less that the issuer failed to do so;

4   ***Materiality Has Not Been Alleged***:  The Amended Consolidated Class Action

5   Complaint ("Amended Complaint," or "AC") alleges no facts that would support an

6   inference of **material** misstatements or omissions in the offering documents for any

7   one of the 427 MBS Offerings at issue.  Rather, Plaintiffs principally parrot the allega-

8   tions of other litigants in other lawsuits about Countrywide's supposed loan origina-

9   tion practices, without alleging a single fact suggesting that any of the loans in any

10   specific pool failed to comply with the representations in the corresponding prospec-

11   tus supplement.  But Countrywide Home Loans originated almost a half-trillion dol-

12   lars annually of mortgage loans during the putative class period, and Plaintiffs' blun-

13   derbuss allegations about its origination practices do not support a plausible inference

14   that the loans in any particular pool was materially misdescribed.  Courts have dis-

15   missed complaints that—like the one here—fail to allege facts connecting the actual

16   loans underlying the specific MBS pools to their allegations of poor loan underwrit-

17   ing.  Moreover, the prospectus supplements provided investors with all the informa-

18   tion they needed to assess the credit risk of the loans underlying each deal (and the

19   likelihood of continued cash flow distributions in the future), including FICO credit-

20   worthiness scores, loan to value ratios, and information about whether the loans were

21   originated on the basis of no borrower documentation (or the borrower's unverified

22   representations) as to the borrower's income or assets.  Investors were also explicitly

23   warned of numerous risks associated with the MBS they purchased, including that the

24   performance of the pooled loans was highly sensitive to housing prices.  But, even as

25   the housing market cooled and then began to implode, Plaintiffs purchased still more

26   securities, including second-lien securities (backed by home equity lines of credit and

27   fixed interest rate second-lien loans) they were told would be the first to see their col-

28   lateral cushion erode in the event of a decline in home prices.  Given the mix of in-

4

formation Plaintiffs had, including detailed information about the credit risk profile of the pooled loans, any claimed misstatements or omissions about loan underwriting practices are simply not material as a matter of law;

**_Purchases Not In A Public Offering_**:  Section 12(a)(2) of the 1933 Act requires that plaintiffs have purchased from an underwriter or "statutory seller" in an initial public offering.  It is not sufficient for a plaintiff merely to allege—as Plaintiffs do here—that they purchased their shares "in or traceable" to a public offering.  And the Amended Complaint and the certifications they filed with the Amended Complaint (the "Certifications") confirm that Plaintiffs bought months or even years after some of the Offerings that Plaintiffs try to sweep into the case had concluded.

In sum, this putative class action must be dismissed.  It is stale, Plaintiffs do not have standing to represent investors in more than a small fraction of the MBS offerings they have sued over, and in any event they have suffered virtually no cognizable losses in the MBS they bought.  In reality, Plaintiffs here opportunistically seek to use the securities laws as a form of investor insurance to protect them against the market declines, illiquidity, and volatility that followed the dramatic drop in housing prices and the collapse of the secondary mortgage market in late 2007.  But the securities laws protect only against material misstatements and materially misleading omissions, and no such misstatements or omissions have been alleged.  These sophisticated investors were warned about the significant risks associated with the MBS they bought, including the sensitivity of these investments to declining home prices, the fact that loans were granted to borrowers whose income and asset information routinely was not required to be documented or verified, and the fact that the securities they were buying might be illiquid and unable to be resold at an acceptable price (or at all).  Plaintiffs made an informed investment decision and bought the securities anyway.  They may not now complain that the risks about which they were explicitly warned have been realized.  This time-barred suit should thus be dismissed in its entirety.

# FACTUAL BACKGROUND

From 2005 to 2007, Countrywide was the nation's largest residential mortgage lender. AC ¶ 4. During that period, Countrywide originated and purchased residential mortgages and home equity lines of credit ("HELOC") through its subsidiary Countrywide Home Loans ("CHL"). *Id.* at ¶ 28.[1] Between 2005 and 2007, CHL originated or purchased a total of approximately $1.4 ***trillion*** in mortgage loans (*i.e.*, between $400 and 500 billion annually). *See* Countrywide Fin. Corp. 2007 SEC Form 10-K (filed Feb. 29, 2008) at 29.[2] Countrywide's business strategy was to originate and purchase residential mortgage loans and then sell substantially all of those loans into the secondary market, principally as MBS. AC ¶ 4.

Plaintiffs allegedly bring this action "individually, and on behalf of a class of all persons or entities who purchased or otherwise acquired" certain MBS in the form of certificates (collectively the "Certificates") issued in 427 "separate" offerings (the "Offerings") between January 25, 2005 and November 29, 2007. AC ¶¶ 1, 5, 34-37, 186. Each Offering involved what is known as a "shelf" registration, pursuant to which an initial registration statement and prospectus was filed with the SEC describing the general form of a future offering. *See id.* ¶ 78. A prospectus supplement providing the specifics for each actual Offering of securities (including

---

[1] Plaintiffs have named as defendants, among other entities and individuals, Countrywide Financial Corporation ("CFC"), CHL, Countrywide Securities Corporation ("CSC"), Countrywide Capital Markets ("CCM"), CWALT, Inc. ("CWALT"), CWMBS, Inc. ("CWMBS"), CWABS, Inc. ("CWABS"), and CWHEQ, Inc. ("CWHEQ"), and N. Joshua Adler (collectively, the "Countrywide Defendants"). AC ¶¶ 27-29, 34-37. CSC, a broker-dealer specializing in mortgage securities, served as an underwriter, solely or in part, for 305 of the 427 securities offerings Plaintiffs challenge. *Id.* ¶ 27. CCM is a wholly owned subsidiary of CFC that, among other things, performed underwriting services for CHL and others. *Id.* ¶ 29. CWALT, CWMBS, CWABS, and CWHEQ are wholly-owned subsidiaries of CFC that served as the "Depositors" for the 427 Offerings. AC ¶¶ 34-37.

[2] CFC's 2007 Form 10-K is included in relevant part as Ex. 2. The full text is available at www.sec.gov/edgar/searchedgar/webusers.htm. All exhibits are attached to the Countrywide Defendants' Request for Judicial Notice. As the Request for Judicial Notice explains, the Court may consider publicly-filed documents and other exhibits because they are incorporated into the Complaint or are subject to judicial notice pursuant Federal Rule of Evidence 201.

descriptions of the unique pool of collateral underlying each Offering, the under-writing standards applicable to that collateral, the classes of Certificates offered, and the payment structure for the distribution of principal and interest payments to the Certificate holders) was subsequently filed with the SEC. *See id.* With respect to the Offerings here, 19 shelf registration statements (on SEC Forms S-3) and 427 separate prospectus supplements (on SEC Forms 424B5) were filed.[3] The registra-tion statements, prospectuses, prospectus supplements, and supplemental prospec-tuses are collectively referred to herein as the "Offering Documents."

***Countrywide's Mortgage-Backed Securitizations***

Countrywide allegedly issued Certificates "backed by pools of mortgages." AC ¶ 5. According to the Amended Complaint, the "Certificates entitled investors to receive monthly distributions of interest and principal . . . derived from cash flows from borrower repayment of the mortgage loans." *Id.* In each Offering, the Depositor[4] purchased mortgage loans originated or acquired by CHL (the "Mort-gage Loans")[5] pursuant to a "pooling and servicing agreement" ("PSA"). *See, e.g.,* Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-19-20, S-66-67.[6] Each pool of Mortgage

---

[3] Supplemental 424B5 forms were also filed for some of the Offerings, amending portions of the original 424B5 forms.

[4] Depending on the nature of the mortgage loans being pooled, the depositor for each Offering was one of four CFC subsidiaries: CWALT ("Alt-A" loans), CWMBS (typically 30-year, fixed rate traditional loans), CWABS (typically subprime loans), or CWHEQ (home equity lines of credit ("HELOC") and fixed-rate second liens). *See* AC ¶¶ 34-37, 79-82. Defendants CWALT, CWMBS, CWABS, CWHEQ, CFC, CHL, CCM, CSC, and Adler are referred to as the "Countrywide Defendants."

[5] In this brief, the term "Mortgage Loans" refers to the entire pool of mortgage loans underlying a particular securitization. On average, each securitization deal consisted of more than 4,000 Mortgage Loans, and some Offerings included more than 40,000 individual mortgage loans. *See, e.g.,* Ex. 10 (CWHEQ 2006-S9 Pro. Supp.) at A-2 (19,989 loans); Ex. 9 (CWHEQ 2007-E Pro. Supp.) at A-I-1 (13,213 loans).

[6] Although the Amended Complaint references 427 separate Offerings, each backed by a unique pool of Mortgage Loans and accompanied by its own prospectus sup-plement, the Countrywide Defendants will, whenever possible, use five specific pro-spectus supplements—one each from the CWALT, CWMBS, and CWABS Deposi-tors and two from the CWHEQ Depositor—as illustrative examples throughout this brief. Those prospectus supplements are: (1) Alternative Loan Trust, Series 2005-24 Prospectus Supplement, filed May 26, 2005 ("CWALT 2005-24 Pro. Supp.") (Ex. 5); (2) CHL Mortgage Pass-Through Trust, Series 2007-HYB2 Prospectus Supplement,

Loans was then transferred to a unique trust established specifically for the Offering (the "Issuing Trust"), which in turn issued Certificates to the Depositor in exchange for the Mortgage Loans.  AC ¶¶ 5, 7 34-37.[7]  In effect, each Issuing Trust was the equivalent of a separate, publicly traded company, issuing Certificates based on a unique pool of Mortgage Loans, each with its own unique rates, terms, and credit characteristics.  Those Certificates were registered with the SEC and sold to buyers in underwritten public offerings.  As required by SEC Regulation AB, 17 C.F.R. § 229.1100, *et. seq.*, Countrywide publicly filed with the SEC prospectus supplements in connection with each MBS Offering.  *See, e.g.*, Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-1, S-2.

The 427 Offerings in this case were not monolithic.  As an initial matter, the types of loans that were securitized differed from Offering to Offering, and included pay-option adjustable rate mortgages and other Alt-A mortgages (generally securitized in CWALT deals), HELOCs and fixed-rate second-lien loans (generally securitized in CWHEQ deals), subprime loans (generally securitized in CWABS deals), and traditional, fixed rate loans (generally securitized in CWMBS deals).  AC ¶¶ 34-37, 79-82.  Depending on the type of collateral in the pool, these deals could be more or less risky, and investors chose to invest on cash flows from particular col-

---

filed Mar. 29, 2007 ("CWMBS 2007-HYB2 Pro. Supp.") (Ex. 6); (3) CWABS Asset-Backed Certificates Trust, Series 2006-15 Prospectus Supplement, filed Sept. 27, 2006 ("CWABS 2006-15 Pro. Supp.") (Ex. 8); (4) CWHEQ Revolving Home Equity Loan Trust, Series 2007-E Prospectus Supplement, filed May 30, 2007("CWHEQ 2007-E Pro. Supp.") (Ex. 9); and (5) CWHEQ Home Equity Loan Trust, Series 2006-S9 Prospectus Supplement, filed Dec. 28, 2006 ("CWHEQ 2006-S9 Pro. Supp.") (Ex. 10).  All of these documents (like the SEC filings in all 427 deals) are available at www.sec.gov/edgar/searchedgar/webusers.htm.

[7] This "pass-through" structure was used to securitize almost all of the Offerings (400 out of 427 deals).  The remaining 27 Offerings (26 CWHEQ deals and one CWABS deals) utilized what is known as a "debt-for-tax" structure, in which investors received promissory notes that, like the Certificates, entitled the noteholder to a pro rata share of the monthly principal and interest payments from the securitized pool of mortgages underlying each deal.  *See e.g.*, Ex. 9 (CWHEQ 2007-E Pro. Supp) at S-13, S-27-29, S-32-33.  The structural difference between these two types of securitizations is not material to the disposition of this Motion, and the Amended Complaint makes no distinction between the two types of securities.

lateral types based on their desire for yield and appetite for risk. *Id.* ¶ 69. Additionally, there were often multiple "tranches" or "classes" of Certificates within any given Offering, each with a separate rating, and entitled to its own share of the principal and/or interest distributions and its own priority of payment. *Id.* ¶ 5. Again, investors chose among the available classes of Certificates in any given Offering based on their desire for yield and appetite for risk. *Id.* ¶ 69.

Further, even within similar types of Offerings, the Certificates were issued by *different* Issuing Trusts and backed by *unique* pools of Mortgage Loans. *See Id.* ¶¶ 1, 5, 69-70, 79-82. Each pool included different types of loans (*e.g.*, first-lien, home equity, fixed-rate, adjustable-rate, interest-only, pay option), with different risk characteristics (FICO score, loan-to-value ratios or "LTVs", loan documentation, and geographic location). Even offerings from the same shelf registration statement contained different types of collateral. For example, Plaintiffs challenge 62 Offerings issued under the CWALT 333-125902 registration statement from July 25, 2005 through February 24, 2006. *Id.* ¶ 34 & Ex. A. Those 62 deals were backed by a wide variety of collateral types include conforming balance loans (denominated as "CB" deals), proprietary channel hybrid adjustable rate mortgages ("ARM") ("HY" deals), conduit hybrid ARMs ("HYB" deals), conduit jumbo loans ("J" deals), and monthly pay-option ARMs ("OA" deals). *Id.* at Ex. A. In January 2006, alone, CWALT issued the following deals under the 333-125902 registration statement: CWALT 2006-HY3 (Jan. 22, 2006) (proprietary channel hybrid ARMs), CWALT 2006-OA1 (Jan. 24, 2006) (monthly pay-option ARMs), CWALT 2006-2CB (Jan. 27, 2006) (conforming balance loans), CWALT 2006-OA2 (Jan. 27, 2006) (monthly pay-option ARMs), and CWALT 2006-J1 (Jan. 27, 2006) (conduit jumbo loans). *Id.*

Additionally, because Countrywide's underwriting guidelines varied by product and changed over time (generally expanding during the period 2005 to 2007), the loan underwriting guidelines that were in effect at the time that the specific Mortgage Loans in a pool were underwritten also varied from deal to deal. *Id.* ¶¶ 74-75, 79-82,

1    105, 129.  Moreover, the geographic distribution of the Mortgage Loans underlying

2    the offerings varied from pool to pool, as did the personnel who originated and un-

3    derwrote the Mortgage Loans and the appraisers who valued the collateral underlying

4    the Mortgage Loans.  Ex. 6 (CWMBS 2007-HYB2 Pro. Supp.) at S-4-5, S-28, S-34.

5    In other words, each of the 427 Offerings derived its value from a separate and distinct

6    pool of assets, which generated separate and distinct streams of cash flows, which was

7    subject to different underwriting guidelines, and which experienced different delin-

8    quency and default rates.

9         These differences were reflected in the structure of the Offering Documents.

10   For example, as Plaintiffs themselves allege, each shelf registration statement included

11   "an *illustrative form* of a Prospectus Supplement," which was replete with blanks and

12   empty placeholders instead of loan-specific representations.  AC ¶ 161.[8]  Further, the

13   shelf registration statement was filled with generalizations and disclaimers, and re-

14   peatedly directed investors to rely on the as-yet unfiled prospectus supplement for "the

15   specific terms of the securities"—including the underwriting standards applicable to

16   each offering.  Ex. 4 (Form S-3/A, CWMBS Reg. No. 333-131662) at Base Prospec-

17   tus Title Page, 1, 12.  It was not until the effective date of each particular Offering that

18   "a *final* Prospectus Supplement was filed with the SEC," containing "a description of

19   the mortgage pool underlying the Certificates and the underwriting standards by

20   which the mortgages were originated."  AC ¶ 161.  Those prospectus supplements

21   made various representations about the "Mortgage Loans" underlying the Offering,

22   which they specifically defined as the unique group of "mortgage loans in each loan

23   group in the mortgage pool."  *See, e.g.*, Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-19.

24   Accordingly, the representations in the prospectus supplements are tied to the *specific*

25   _____

26   [8] *See also* Ex. 4 (Form S-3/A, CWMBS Reg. No. 333-131662) at Title Page, S-2-4, S-34-37 (blanks for series title, closing date, original principal balance, average FICO score, average loan-to-value ratio, property type, lien priority, geographic information,

27   interest rates, delinquency/foreclosure rates), Title Page ("The information in this prospectus supplement is not complete and may be changed"), S-52 ("Underwriting Stan-

28   dards":  "[Below is an *example* of the disclosure to be provided…]").

_____

Mortgage Loans in the collateral pool underlying the *specific* Certificates being offered; they are not representations about Countrywide's mortgage originations generally, or about the Mortgage Loans in other pools underlying other Certificates.

"When mortgage borrowers make interest and principal payments, the cash flow is distributed to the holders of the MBS certificates in order of priority, based on the specific tranche" held by the MBS investors.  AC ¶ 70; *see also* Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-7, S-84-90.  Unlike different issuances of corporate bonds by the same corporation, which have a common payment source (the issuing corporation), the Certificates give the buyers the right to receive a *pro rata* share of the income and principal payment cash flows generated by the unique collection of Mortgage Loans in each securitized pool.  *Id.* at S-84, S-92, S-94, S-102.[9]  The Offering Documents filed with the SEC provide specific details as to these priority of payment provisions (known as "waterfall" provisions), describing the manner in which principal and interest payments are to be distributed and any losses are to be allocated among different tranches of Certificates.  *Id.* at S-7.  The Trustee (Bank of New York Mellon) posts monthly performance reports ("Distribution Reports") on its publicly-accessible website each month reflecting the amounts distributed to the holders of each class of Certificates and the cumulative loss, if any, realized by each class of Certificates.[10]

### *Disclosures Concerning Specific Risks of Investing in MBS, Including Illiquidity*

Investments in residential MBS by their nature are highly sensitive to any downturn in the national economy in general and home prices in particular.  Thus,

[9] Indeed, the prospectus supplements explicitly stated that the Certificates were obligations only of the Issuing Trusts, whose only assets were the Mortgage Loans and the payments they generated.  *See, e.g.*, Ex. 6 (CWMBS 2007-HYB2 Pro. Supp.) at 1 ("The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of CWMBS, Inc., Countrywide Home Loans, Inc. or any of their affiliates").

[10] These reports are available at http://www.bnyinvestorreporting.com/inquiry/list-of-series.jsp?partyId=1024&prodId=2000&prodNm=RMBS.  Relevant portions from the most recent monthly reports are attached as Exs. 12-14.  Plaintiffs explicitly plead that they relied on these Distribution Reports in bringing their claims.  AC at 1.

the Offering Documents expressly warned that "[t]here can be no assurance that factors beyond the control of [CHL] such as national or local economic conditions or downturns in the real estate markets of its lending areas, will not result in increased rates of delinquencies and foreclosure losses in the future." Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-74. With respect to the Mortgage Loans in the underlying pools, the Offering Documents explicitly cautioned that "[n]o assurance can be given that the value of any mortgaged property has remained or will remain at the level that existed on the appraisal or sales date." Ex. 6 (CWMBS 2007-HYB2 Pro. Supp.) at S-32. As the real estate market worsened in 2007, the Offering Documents warned even more strongly about the future impact of market changes. They warned: "Investors should note that delinquencies generally have been increasing with respect to securitizations sponsored by [CHL]." *Id.* at S-26.

The institutional investor Plaintiffs and other putative class members were also warned explicitly that they were buying potentially illiquid instruments for which there was no market. For example, the Offering Documents specifically cautioned investors that "[n]o market for any of the certificates will exist before they are issued," that "a secondary market for the offered certificates may not develop or provide certificateholders with liquidity of investment," and that "[c]onsequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield." Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-18-19. In addition, investors were advised in the Offering Documents that "[t]he secondary markets for asset backed securities have experienced periods of illiquidity and can be expected to do so in the future." *Id.* at S-19.

After home prices began falling in 2006, the Offering Documents issued the following additional warnings:

> Recently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the performance and market value of your securities. Delin-

12

quencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase, particularly in the subprime sector.  In addition, in recent months housing prices and appraisal values in many states have declined or stopped appreciating, after extended periods of significant appreciation.  *A continued decline or an extended flattening of those values may result in additional increases in delinquencies and losses on residential mortgage loans generally*.

Ex. 6 (CWMBS 2007-HYB2 Pro. Supp.) at S-25; *see also* Ex. 9 (CWHEQ 2007-E Pro. Supp.) at S-25.  (All emphases are added unless otherwise noted.)

As market conditions began to deteriorate significantly in the summer of 2007, the Offering Documents issued the following warnings:

The secondary mortgage markets are currently experiencing unprecedented disruptions resulting from reduced investor demand for mortgage loans and mortgage-backed securities and increased investor yield requirements for those loans and securities.  As a result, the secondary market for mortgage-backed securities is experiencing extremely limited liquidity.  These conditions may continue or worsen in the future. . . .

Limited liquidity in the secondary market for mortgage-backed securities has had a severe adverse affect on the market value of mortgage-backed securities.  Limited liquidity in the secondary market may continue to have a severe adverse affect on the market value of mortgage-backed securities . . . .

If only a portion of the certificates have been sold to the public, the market for the certificates could be illiquid because of the small amount of certificates held by the public.  In addition, the market overhang created by the existence of certificates that the market is aware may be sold to the public in the near future could adversely affect your ability to sell, and/or the price you may receive for your certificates.

*See, e.g.*, Ex. 7 (CWABS 2007-16 Pro. Supp.) at S-24-25.

13

The Offering Documents for MBS backed by second-lien loans (both HELOCs and fixed-rate second liens) also warned about the greater risks associated with such loans, stating: "In the case of loans secured by subordinate liens, declining property values could diminish or extinguish the value of a junior mortgage before reducing the value of a senior mortgage on the same property." Ex. 9 (CWHEQ 2007-E Pro. Supp.) at 9; Ex. 10 (CWHEQ 2006-S9 Pro. Supp.) at 9. These Offering Documents likewise warned:

> Mortgage loans secured by second mortgages are entitled to proceeds that remain from the sale of the related mortgaged property after the related senior mortgage loan and any related prior statutory liens have been satisfied. If a mortgage loan is in default, the master servicer may determine that such proceeds will be insufficient to cover more than the cost of foreclosure and may charge-off the mortgage loan as a bad debt.

Ex. 9 (CWHEQ 2007-E Pro. Supp.) at S-18; *see also* Ex. 10 (CWHEQ 2006-S9 Pro. Supp.) at S-14.

Although the Certificates were assigned initial investment ratings by the credit rating agencies, the Offering Documents also warned investors not to rely on those ratings. For example, the Offering Documents warned: "A rating is not a recommendation to buy, sell or hold securities. These ratings may be lowered or withdrawn at any time by either of the rating agencies." Ex. 6 (CWMBS 2007-HYB2 Pro. Supp.) at S-6; Ex. 5(CWALT 2005-24 Pro. Supp.) at S-4.

***Credit Enhancement***

The Offering Documents prominently and repeatedly cautioned that "distributions on the [C]ertificates are dependent upon the payments on the related [M]ortgage [L]oans." Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-15.[11]  But, as the Offering Documents explained, MBS purchasers also received various forms of protection—or

---

[11] CWALT 2005-24 is used as an example; substantially similar disclosures are contained in all deals at issue. *See* App. Tab 9.

14

"credit enhancement"—against possible future loss due to borrower delinquencies or defaults that might exceed expected levels.  With respect to the MBS securitizations involved in this case, credit enhancement took various forms.  For example, in nearly all of the CWHEQ transactions (37 of 38 deals) third-party insurance policies were purchased that "unconditionally and irrevocably guarantee" that the Certificates will continue to pay the anticipated monthly principal and interest distributions despite any potential defaults in the underlying Mortgage Loans.  *See, e.g.*, Ex. 9 (CWHEQ 2007-E Pro. Supp.) at S-11, S-57-59.  Other forms of credit enhancement included "subordination,"[12] "overcollateralization,"[13] and "cross-collateralization."[14]

### Disclosure of Loan Characteristics

The heart of Plaintiffs' claims is the allegation that they were deceived about the true credit quality of the loans underlying the MBS.  The Offering Documents, however, disclosed in granular detail the credit quality and credit risk attributes of the Mortgage Loans included in the securitized pools associated with the MBS.  For example, the Offering Documents disclosed the following:

- Specific descriptions of the loan underwriting guidelines used by CHL in originating the Mortgage Loans in a specific pool, including CHL's "expanded" and "alternative" guidelines, as well as numerical data showing the frequency of use of each program.  For example, the Offering Documents disclosed that under the No Income/No Asset Documentation Program, "no

---

[12] Subordination allocates losses within a loan group to certificate holders from junior tranches (often held by Countrywide itself) before certificate holders from senior tranches bear any losses.  *See, e.g.*, Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-14-15, S-98-99, S-117.

[13] In "overcollateralized" offerings, the principal balance of the pooled Mortgage Loans at inception exceeds the principal balance of the certificates, and the interest payments are expected to exceed the interest payable to the certificate holders, thus providing a cushion to offset potential losses.  *See, e.g.*, Ex. 5 (CWALT 2005-24 Pro. Supp.) at 42.

[14] "Cross-collateralization" involves using cash flows that normally would go to junior certificate holders in one loan group to offset losses that otherwise would be incurred by more senior certificate holders in another loan group.  *See, e.g.*, Ex. 8 (CWABS 2006-15 Pro. Supp.) at 46-47, 51.

---

15

documentation relating to a prospective borrower's income, employment or assets [wa]s required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis." Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-72.  And, in tabular form, the Offering Documents disclosed, *inter alia*, the number and percentage of loans originated under each documentation program.  For example, the Prospectus Supplement for CWMBS 2007-HYB2 disclosed that the Reduced Documentation Program was used for 206 of the 473 loans in Loan Group 2 (representing 44.92% of the aggregate principal balance of the loans in Loan Group 2), that the No Income/No Asset Documentation Program was used for 36 loans in Loan Group 2 (7.57% of the aggregate principal balance), and that the Stated Income/Stated Asset Documentation Program was used for 33 loans in Loan Group 3 (7.19% of aggregate principal balance).  Ex. 6 (CWMBS 2007-HYB2 Pro. Supp.) at A-32.[15]

- Information regarding the creditworthiness of the borrowers, including the ranges of FICO scores (a score assigned by credit rating agency Fair Isaac Corporation, designed to gauge likelihood of default based on credit history). *See* Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-31.  The Offering Documents for subprime offerings disclosed that the underlying Mortgage Loans were made to borrowers with blemished credit and could be made, for example, to borrowers who had been discharged from a personal bankruptcy just one day earlier.  Ex. 8 (CWABS 2006-15 Pro. Supp.) at S-34-35.

- Information regarding the range of LTVs for the loans in each securitized pool.  *See id.* at S-27, S-38, S-49, S-59.  LTV is an indicator of the amount of collateral value "cushion" above the principal amount of the mortgage loan. *See id.* at S-22.  The Offering Documents disclosed that the pools contained

---

[15] Registration Statements for certain Offerings provided disclosure separated by Loan Group, and specified which Loan Groups corresponded with which certificate class(es).  *See* Ex. 6 (CWMBS 2007-HYB2 Pro. Supp.) at S-4 - S-5.

Mortgage Loans with LTVs of 95% and 100%.  *See* Ex. 8 (CWABS 2006-15 Pro. Supp.) at A-4 (disclosing that 141 Mortgage Loans in pool had LTV of 90-95%, with the weighted average LTV of 94%, and 32 Mortgage Loans in pool had LTV of 95-100%, with the weighted average LTV of 99.7%).

- Details regarding the economic terms and other attributes of the Mortgage Loans, including interest rates, mortgage loan principal balances, geographical distribution of the properties (by state), loan purpose (*e.g.*, refinance), property type (*e.g.*, single family residence), and occupancy type (*e.g.*, primary residence). *Id.* at S-24-65.

These disclosures also revealed the extent of "layered risk" (*i.e.*, the combination of multiple risk attributes in a particular loan such as a lower FICO score combined with a higher LTV ratio or reduced borrower documentation) associated with each securitized loan.[16]  Largely set forth in straightforward tables, this data provided key information that an investor would wish to know about the loans that made up the pool and that thus would be the source of the payments on the investor's certificates.  *See, e.g.*, Ex. 10 (CWHEQ 2006-S9 Pro. Supp.) at S-2-4, 26, A-1-7.  As shown below, these charts break the loan pool into ranges, or bands.  *Id.*  For example, one chart in each prospectus supplement displayed borrowers' FICO scores in relation to other credit attributes.  The FICO-score table from one security, CWABS 2006-15, is as follows:

CREDIT BUREAU RISK SCORES(1) FOR THE MORTGAGE LOANS
IN THE STATISTICAL CALCULATION POOL

| RANGE OF CREDIT BUREAU RISK SCORES | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENTAGE OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING | AVERAGE CURRENT PRINCIPAL BALANCE | WEIGHTED AVERAGE GROSS MORTGAGE RATE | WEIGHTED AVERAGE REMAINING TERM (MONTHS) | WEIGHTED AVERAGE CREDIT BUREAU RISK SCORE | WEIGHTED AVERAGE LOAN-TO-VALUE RATIO |
|---|---|---|---|---|---|---|---|---|
| Greater than 820 | 9 | $ 109,622 | 0.02% | $ 109,622 | 6.000% | 179.00 | 822 | 14.7% |
| 801 - 820 | 15 | 4,470,544 | 0.69 | 298,036 | 6.165 | 374.37 | 808 | 61.6 |
| 781 - 800 | 30 | 8,170,382 | 1.26 | 272,346 | 6.130 | 359.31 | 790 | 60.4 |
| 761 - 780 | 40 | 11,687,430 | 1.80 | 292,186 | 6.328 | 372.14 | 770 | 70.3 |
| 741 - 760 | 47 | 13,135,632 | 2.02 | 279,482 | 6.318 | 370.48 | 751 | 66.3 |
| 721 - 740 | 42 | 12,655,538 | 1.95 | 301,322 | 6.391 | 369.31 | 731 | 70.5 |
| 701 - 720 | 72 | 20,670,395 | 3.18 | 287,089 | 6.500 | 363.01 | 709 | 73.6 |
| 681 - 700 | 115 | 31,244,680 | 4.81 | 267,049 | 6.732 | 385.45 | 689 | 74.3 |
| 661 - 680 | 186 | 42,452,915 | 6.53 | 228,241 | 6.999 | 376.13 | 670 | 76.8 |
| 641 - 660 | 307 | 68,175,748 | 10.49 | 222,071 | 7.228 | 373.82 | 649 | 75.5 |
| 621 - 640 | 360 | 71,604,034 | 11.02 | 198,900 | 7.601 | 378.57 | 630 | 77.4 |
| 601 - 620 | 509 | 101,681,466 | 15.64 | 199,767 | 7.668 | 378.85 | 610 | 76.2 |
| 581 - 600 | 455 | 85,312,495 | 13.13 | 187,500 | 7.934 | 377.54 | 590 | 74.9 |
| 561 - 580 | 415 | 73,588,964 | 11.32 | 177,323 | 8.139 | 374.11 | 571 | 74.2 |
| 541 - 560 | 305 | 50,469,885 | 7.76 | 165,475 | 8.465 | 380.73 | 551 | 73.1 |
| 521 - 540 | 200 | 33,137,749 | 5.10 | 165,689 | 8.670 | 387.82 | 531 | 71.5 |
| 501 - 520 | 128 | 20,108,490 | 3.09 | 157,098 | 8.968 | 385.91 | 512 | 68.7 |
| 500 or Less | 7 | 1,297,068 | 0.20 | 185,295 | 9.344 | 388.53 | 493 | 75.2 |
| Total/Avg./Wtd. Avg .. | 3,236 | $ 649,973,037 | 100.00% | | | | | |

---

[16] Every loan has these attributes, so every loan in that sense has a "layering" of risk.

17

This chart told a prospective investor, among many other things, that 66.4% of the borrowers have credit scores of lower than 660, generally considered to be a weak range for credit scores.  *Id.*

Access to this granular collateral and performance information on all Countrywide MBS deals also was (and continues to be) publicly available online at www.mortgageinvestorcountrywide.com (the "MBS Investor Website").  In addition, beginning in January 2006, SEC Regulation AB required that the trusts holding the pooled loans file with the SEC (on Form 8-K) the same credit risk attribute information found in the prospectus supplement, but on a loan-by-loan basis.  17 C.F.R. §§ 229.1105, 229.1111.  Countrywide provided this information prior to the adoption of Regulation AB as well, but on a less regular basis.

It should be noted that all of this disclosure—both in format and content— was made in compliance with the SEC's disclosure requirements, which were ultimately codified as Regulation AB.  17 C.F.R. § 229.1100, *et. seq.*  In adopting Regulation AB, the SEC observed that "[t]he predominant purchasers of asset-backed securities today are institutional investors, including financial institutions, pension funds, insurance companies, mutual funds and money managers," not "retail investors," and that such investors "are generally interested in the characteristics and quality of the underlying assets, the standards for their servicing, the timing and receipt of cash flows from those assets and the structure for distribution of those cash flows."  *Asset-Backed Securities*, Securities Act Release No. 8518, Exchange Act Release No. 50905, 70 Fed. Reg. 1506, 1510-11 (Jan. 7, 2005).  The SEC further noted that "an increasing number of investors possess or have access to the analytical capacity to perform their own models and scenarios on pool data," and therefore were interested in obtaining data "at the individual pool asset level, or 'loan level' data, instead of summarized charts and tables."  *Id.* at 1554.  The "comprehensive" disclosure regime that emerged as Regulation AB addresses these "advances in technology," requiring the inclusion of summarized charts and tables in the Offering

18

1   Documents, as well as the disclosure of loan level data files via Form 8-K.  *Id.* at

2   1554, 1581.

3   ***Underwriting-Related Disclosures***

4         The Offering Documents also described Countrywide's underwriting practices.

5   They included detailed descriptions of Countrywide's underwriting guidelines for the

6   type of loan collateral underlying the securitization.  *See* Ex. 5 (CWALT 2005-24

7   Pro. Supp.) at S-67-72.  They also discussed Countrywide's origination of loans as

8   exceptions:  "Exceptions to the applicable originator's underwriting guidelines may

9   be made when compensating factors are present."  *See, e.g.*, Ex. 9 (CWHEQ 2007-E

10  Pro. Supp.) at S-33; Ex. 10 (CWHEQ 2006-S9 Pro. Supp.) at S-31.  The Offering

11  Documents for subprime deals further stated:  "It is expected that a significant num-

12  ber of the Mortgage Loans will have been originated based on these types of under-

13  writing exceptions."  *See* Ex. 8 (CWABS 2006-15 Pro. Supp.) at S-33.

14  ***No Absolute Representations About Loan Quality Were Made***

15        Although the Offering Documents disclose in granular detail the credit quality

16  of the Mortgage Loans underlying each particular Offering and describe the guide-

17  lines pursuant to which those Mortgage Loans were underwritten, they do not repre-

18  sent categorically that every one of the thousands of loans backing each Offering

19  complies with the credit characteristics disclosed in the prospectus supplement.

20  Rather, the Offering Documents represent only that each loan will ***either*** comply

21  with the stated characteristics ***or*** (upon demand) any materially non-compliant loans

22  will be cured or replaced in accordance with the provisions of the securitization

23  documents.  More specifically, the prospectus supplements for each Offering repre-

24  sented that, if there is an "uncured breach of any representation or warranty relating

25  to the characteristics of the Mortgage Loans that materially and adversely affects the

26  interests of the certificateholders in that Mortgage Loan," the seller of the Mortgage

27  Loan "will be obligated to ***repurchase or substitute*** a similar mortgage loan . . . ."

28  *See, e.g.*, Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-20.  Plaintiffs, however, do not

allege that any non-compliant loans have been identified, much less that Countrywide has refused to honor any request to cure or replace any such loans.

### Unprecedented Home Price Decline and Collapse of Mortgage and Credit Markets

Certain of the risks highlighted in the Offering Documents have materialized on an unprecedented and entirely unforeseeable scale.  This Court can take judicial notice that, beginning in 2007, real estate prices plummeted across this country, causing the largest national decline in home prices since the Great Depression.[17]  Likewise, during this same period, the credit and capital markets in this country seized up (and remain largely shut), and the secondary mortgage market in which MBS (including those in this case) were traded disappeared (and remains largely inactive).  *See, e.g.*, Ex. 23, Edmund L. Andrews and Jeremy W. Peters, *Persistent Fear Drives Stocks Down Sharply*, N.Y. Times, August 29, 2007, at A1; Ex. 22, Annette Haddad, *Credit Fears May Curb Home Sales*, L.A. Times, August 13, 2007, at C-1.  These market dysfunctions had a substantial negative impact on the price of residential MBS.  *See* Ex. 24, Allen Ferrell & Atanu Saha, *Securities Litigation and the Housing Market Downturn*, 35 J. Corp. L. 97, 106-08 (2009) ("[T]here is substantial evidence in the academic literature that the decline in housing prices was in fact substantially more important as an explanatory factor for the spike in delinquencies and foreclosures in 2007 and 2008 than poor underwriting quality.")

The performance of residential MBS, including both prime and subprime MBS, has deteriorated substantially since the beginning of this crisis in 2007.  MBS

---

[17] Courts routinely take judicial notice of industry and economy-wide downturns, including "the widespread decline in property values over the past year" at issue here. *See, e.g.*, *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 578 (E.D. Pa. 2009) ( "the mortgage industry and the financing methods that the industry has historically relied upon 'have deteriorated significantly and in unprecedented fashion'"); *S.E.C. v. Universal Express, Inc.*, 546 F. Supp. 2d 132, 137 n.7 (S.D.N.Y. 2008) (taking judicial notice of "the widespread decline in property values" during the time period at issue here); *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990) (decline in oil and gas industry); *D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 & n.26 (E.D. Mich. 2003) (stock market decline after September 11, 2001); *In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 1004 (N.D. Cal. 2001) (decline of Internet industry in late 2000).

issued in 2006 and 2007 have been hit particularly hard.  Prime, subprime, and Alt-A MBS pools from those vintages all saw delinquency rates spike beginning in 2007, regardless of which entity issued those securities.  *See* Ex. 19 (Moody's Investor Service, Structured Finance Quick Check, July 19, 2010) at 2-3; Ex. 20 (Fitch RMBS Performance Update, Data as of July 2010) at 2.  The vast majority of MBS issued in those years have, like the Certificates, been downgraded by the ratings agencies.  For example, with respect to just MBS issued in 2007 with an initial AAA rating, 89% of all prime, 94 % of all Alt-A, and 90% of all subprime MBS—and virtually all lower-rated tranches—have been downgraded across the mortgage lending industry as of June 2010.  *Id.* at 4.

### *Procedural History of this Case*

This action was commenced on January 14, 2010, nearly five years after the earliest challenged Offering and more than two years after the last challenged Offering.  The plaintiffs and law firms that filed this action in federal court had previously litigated a separate case, involving the same group of Offerings, in California Superior Court.  That case, *Luther v. Countrywide Home Loans Servicing, LP*, No. BC 380698 (Cal. Super. Ct.), was dismissed with prejudice on January 6, 2010, when the Superior Court sustained the demurrer to the complaint, holding—as the Countrywide Defendants had long maintained—that the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") gave the federal courts exclusive subject matter jurisdiction over class action claims under the Securities Act of 1933.  Only then—after waging a more than two-year battle to keep this case out of federal court—did the *Luther* plaintiffs (represented by the law firms of Coughlin Stoia and Barroway Topaz Kessler Meltzer & Check, LLP) decide to bring their federal securities law claims in this Court.

On April 2, 2010, the six institutional plaintiffs in *Luther* filed a motion pursuant to the Private Securities Litigation Reform Act of 1995 seeking appointment as "lead plaintiffs" in this case.  On May 14, 2010, this Court denied that motion and appointed a competing movant, IPERS, as lead plaintiff, and its counsel, the firm of

Cohen Milstein Sellers & Toll PLC, as lead counsel.  In its Amended Complaint, filed July 13, 2010, IPERS added for the first time three other named plaintiffs General Board of Pension and Health Benefits of the United Methodist Church ("GBPHB"), Orange County Employees' Retirement System ("OCERS"), and Oregon Public Employee Retirement System ("OPERS").  In their Amended Complaint and Certifications, Plaintiffs claim that they collectively purchased a total of 105 separate securities (CUSIPs) in 81 Offerings, from May 5, 2005 through November 10, 2009.  AC ¶¶ 21-24.[18]  Despite the magnitude of their claimed purchases, however, none of the Plaintiffs ever filed a federal action to protect those claims prior to filing the Amended Complaint on July 13, 2010.

### *Plaintiffs Have Realized No Losses on Most of Their Certificates*

Plaintiffs have experienced no losses on virtually all of the securities that they purchased.  According to the Certifications and the Distribution Reports on which the Amended Complaint specifically relies:

- Only six of the 105 securities Plaintiffs claim to have purchased have realized any losses as of July 2010.  App. Tab 2.  In other words, 99 of the 105 securities that Plaintiffs purchased have paid all distributions to date, as they came due.[19]

- Twenty-two of the 105 securities Plaintiffs allegedly bought have repaid in full.  In other words, those securities have an outstanding principal balance of zero and no cumulative losses as of July 2010.  App. Tab 3.

---

[18] Plaintiffs actually allege purchases in 82 Offerings, but one of those 82—"CWHL 2005-R2"—is not included among the 427 Offerings listed in Appendix A of the Amended Complaint, which identifies the Offerings challenged in the case.  *See id.*

[19] According to the Certifications, however, two of these six securities (CWALT 2005-17 and CWHEQ 2005-K) were sold by Plaintiffs before they realized any cumulative losses.  As such, fully 101 of the 105 securities that Plaintiffs purchased were fully performing during the period that they held them.  App. Tab 2.

# ARGUMENT

## I.   PLAINTIFFS' CLAIMS ARE TIME-BARRED.

The Amended Complaint must be dismissed because the claims it asserts are time-barred by both the statute of limitations and the statute of repose in Section 13 of the 1933 Act.  Before this action was filed on January 14, 2010, the one-year limitations period had expired for all 427 MBS Offerings at issue, the three-year repose period had expired for the vast majority of the 427 MBS Offerings (specifically, 321 for Section 11 purposes and 302 for Section 12(a)(2) purposes), and Plaintiffs have failed to plead an applicable tolling doctrine that saves their claims.  Moreover, even if tolling did apply, at most it would be limited to the 61 Offerings for which the named plaintiffs in *Luther* had standing, requiring the dismissal of the claims based on the remaining 366 Offerings.  A summary of the reasons why claims based on each MBS Offering are time-barred is included in Tab 1 of the Appendix.

### A.   The One-Year Limitations Period Has Expired For All Offerings.

Section 13 of the 1933 Act required Plaintiffs to file this action "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m; *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 n.5 (9th Cir. 1999).  According to their own Amended Complaint, Plaintiffs' discovery of the alleged misstatements and omissions here occurred no later than late 2007 or early 2008, based on increased delinquencies and defaults in the pooled loans, government investigations, press reports, private lawsuits, and the allegedly "widespread collapse of Countrywide mortgages" that led to Countrywide's merger with Bank of America.[20]  *See GVA Mkt.*

---

[20] *See, e.g.*, AC ¶¶ 17 (Bank of America merger announced in January 2008), 87-89 ("staggering" increase in delinquency/default rates within four months of each Offering), 95-96 (rating agencies revised ratings methodology in July 2007 due to "aggressive underwriting"), 102 (March 2008 FBI investigation of Countrywide, Wall Street Journal article), 122 (*In re Countrywide Fin. Corp. Deriv. Litig.*, filed in February 2008), 128 (*In re Countrywide Fin. Corp. Sec. Litig.*, first consolidated complaint filed in April 2008), 138 (*Argent* case, first filed in October 2007), 148-52 (June 2007-March 2008 NY Attorney General investigation), 153 (August 2007-March 2008

23

*Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 329 (S.D.N.Y. 2008) (articles, lawsuits in complaint put plaintiff on notice).

Indeed, the initial complaint in *Luther* itself—which asserted exactly the same claims, for many of the same MBS Offerings, and obviously reflected the putative class's awareness of the alleged misstatements and the facts underlying the allegations—was filed on November 14, 2007.  Ex. 25.  Later, on June 12, 2008, another putative class action was filed in California state court by the Washington State Plumbing and Pipefitting Pension Trust, making essentially identical allegations as to a broader group of Offerings.  Ex. 27.  In October 2008, that case was consolidated into the *Luther* action, and the consolidated case encompassed all 427 Offerings at issue here.  By that time, all members of the putative class were aware of or reasonably could have discovered the alleged misstatements and other facts underlying the Amended Complaint.  As in *In re Am. Funds Sec. Litig.*, 556 F. Supp. 2d 1100, 1109 (C.D. Cal. 2008), "the very existence of the [*Luther/Washington State*] complaint . . . is nearly dispositive evidence that there was sufficient information in the public sphere to impart inquiry notice on reasonable investors of the existence of a claim against [Countrywide] for securities law violations."

Thus, even using the most generous discovery date possible, the one-year statute of limitations expired no later than sometime in 2009.  Because this action was not filed until January 14, 2010, it is therefore time-barred in its entirety.

**B.    The Three-Year Repose Period Has Expired As To The Vast Majority Of The Offerings.**

Section 13 of the 1933 Act states that "in no event" shall an action be brought "more than three years after the security was bona fide offered to the public [for Section 11 claims], or . . . the sale [for Section 12(a)(2) claims]."  15 U.S.C. § 77m.  This is "a period of repose," which operates as an "outside limit" and an absolute "cutoff"

---

President's Working Group investigation), 154 (December 2007 MA Attorney General investigation), 155 (January 2008 joint FBI/SEC investigation).

1   of liability, regardless of whether the plaintiff has discovered the claim.  *Lampf, Ple-*

2   *va, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991).[21]

3        For Section 11 claims, the statute of repose begins to run when the security is

4   "bona fide offered to the public."  15 U.S.C. § 77m.  For MBS Offerings pursuant to

5   shelf registration statements filed before December 1, 2005, the relevant date is "the

6   effective date of the registration statement."  *Finkel v. Stratton Corp.*, 962 F.2d 169,

7   173 (2d Cir. 1992).  For MBS Offerings pursuant to shelf registration statements

8   filed after December 1, 2005, the relevant date is the date of the prospectus supple-

9   ment for each specific Offering.  *See* 17 C.F.R. § 230.430B(f)(2).[22]  Here, this dis-

10  tinction does not affect the analysis.  Even using the later-in-time prospectus supple-

11  ment dates alleged in the Amended Complaint for all Offerings as the trigger dates

12  for the statute of repose, the trigger date for 321 of the 427 Offerings at issue was

13  prior to January 14, 2007—more than three years before this action was filed.  *See*

14  App. Tab 1.  As a result, the statute of repose has expired for those 321 Offerings for

15  purposes of Section 11 liability.

16       For Section 12(a)(2) claims, the statute of repose begins to run at the date of the

17  sale in the initial offering.  15 U.S.C. § 77m.  Generally, the period of the initial offer-

18  ing is measured as the date the prospectus supplement is filed with the SEC plus 40

19  _____

20  [21] *Accord P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 102 (2d Cir. 2004) ("Unlike a statute of limitations, a statute of repose is not a limitation of a plaintiff's

21  remedy, but rather . . . . affect[s] the availability of the underlying right:  That right is no longer available on the expiration of the specified period of time.").

22  [22] The Securities Offering Reform, adopted by the SEC effective December 1, 2005, changed the rules regarding the statute of repose trigger date for shelf offerings as they

23  relate to Section 11 liability for issuers and underwriters.  *See Securities Offering Re-form*, Securities Act Release No. 8591, Exchange Act Release No. 52056, Investment

24  Company Act Release No. 26993, 70 Fed. Reg. 44721, 44773-74 (Aug. 3, 2005) (for Section 11 purposes, "new effective date will be the date a prospectus supplement

25  filed in connection with the takedown or takedowns is deemed part of the relevant reg-istration statement"); *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at

26  *6-7 (C.D. Cal. Apr. 6, 2009) (only securities "traceable to registration statements on or after December 1, 2005" have "[n]ew effective dates . . . triggered by Rule

27  424(b)(2) [prospectus] supplements").  For directors and signing officers, however—including Defendant Adler—the relevant date remains the effective date of the shelf

28  registration statement.  *Id.*; 17 C.F.R. § 230.430B(f)(4).

1   days, which is derived from the prospectus delivery requirements of the 1933 Act.

2   *See In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1225

3   (W.D. Wash. 2009).[23]   Using the prospectus supplement dates alleged in the Amended

4   Complaint, the last day of the 40-day initial offering period—and hence the last day

5   on which a sale supporting a valid Section 12(a)(2) claim could have occurred—was

6   prior to January 14, 2007 in 302 of the 427 Offerings at issue.  *See* App. Tab 1.  Thus,

7   the statute of repose has expired for those 302 Offerings for purposes of Section

8   12(a)(2) liability.[24]

9        **C.      Plaintiffs Fail To Allege Any Applicable Tolling Doctrine.**

10        Because the statutes of limitations and repose both have expired, this action

11  must be dismissed unless Plaintiffs allege an applicable tolling doctrine.  They have

12  failed to do so.  In fact, the Amended Complaint does not even mention tolling at all;

13  instead, it merely contains boilerplate allegations that its claims are brought within the

14  one-year limitations period and the three-year repose period.  *See* AC ¶¶ 220, 230.

15  Because Plaintiffs bear the burden of alleging facts sufficient to establish tolling, this

16  pleading defect alone requires dismissal.  As the Ninth Circuit explained in *Wasco*

17  *Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006), "federal

18  courts have repeatedly held that plaintiffs seeking to toll the statute of limitations on

19  various grounds must have included the allegation in their pleadings."  *Accord Kirt-*

20  *doll v. City of Topeka*, 315 F.3d 1234, 1235 (10th Cir. 2003) (affirming dismissal for

21  failure to plead factual basis for tolling statute of limitations).

22  ---

[23] *Accord In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 983 (N.D. Cal.

23  2007) ("at most . . . § 12(a)(2) liability is coextensive with the prospectus-delivery re-
quirements set forth in § 4(3)"); *In re Valence Tech. Sec. Litig.*, 1996 WL 37788, at *4

24  (N.D. Cal. Jan. 23, 1996) ("§ 12(2) applies only to a transaction which requires a pro-
spectus to be delivered"); 15 U.S.C. § 77d(3); 17 C.F.R. § 230.174.  Purchases after

25  the 40-day period are considered to be in the aftermarket, and outside the scope of
Section 12(a)(2).  *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 571-72 (1995);

26  *Caiafa v. Sea Containers Ltd.*, 2009 WL 1383457, at *2 (2d Cir. May 19, 2009); *In re*
*Proxima Corp. Sec. Litig.*, 1994 WL 374306, at *10-11 (S.D. Cal. May 3, 1994).

27  [24] Plaintiffs' Section 12(a)(2) claims fail for several additional reasons, *see infra* at 31-
36, 69-76, including the fact that the Amended Complaint does not adequately allege

28  that Plaintiffs actually purchased in 346 of the 427 Offerings.  *See* AC ¶¶ 21-24.

### D.   Class Action Tolling Based On *Luther* Is Inapplicable.

Despite their failure to allege any tolling theories, Plaintiffs apparently intend to argue that the limitations and repose periods were tolled by the filing of the *Luther* class action in California state court, presumably pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).[25] Ex. 37 (Transcript of May 3, 2010 Lead Plaintiff Hearing) at 15, 21-23, 38-39, 51-52.  That argument is meritless.

*American Pipe* tolling does not apply to class actions filed in state court. Rather, as the Ninth Circuit has explained, "[t]he rule of *American Pipe* . . . allows tolling *within the federal court system* in federal question class actions."  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025 (9th Cir. 2008).  Indeed, this is clear from *American Pipe* itself, which expressly states that its scope is "limited" to "the relationship between a statute of limitations and the provisions of Federal Rule of Civil Procedure 23 regulating class actions *in the federal courts*."  414 U.S. at 540.  In *Chardon v. Fumero Soto*, 462 U.S. 650, 663 (1983) (dissenting opinion), Justice Rehnquist confirmed that *American Pipe* concerned only the "tolling of limitations periods during the pendency of a *class action brought under Federal Rule of Civil Procedure 23*."  Thus, the "federal tolling rule originally set forth in *American Pipe* does not address whether a class action filed in state court tolls the limitations period of an action filed in another jurisdiction."  *In re Fosamax Prods. Liab. Litig.*, 694 F. Supp. 2d 253, 257 (S.D.N.Y. 2010).[26]

This limitation makes sense.  *American Pipe* tolling is a federal common law procedural doctrine that the Supreme Court adopted for federal law claims with an

---

[25] In *American Pipe* and its progeny, the Supreme Court held that "[t]he filing of a class action tolls the statute of limitations as to all asserted members of the class." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 350 (1983).

[26] *Accord American Pipe*, 414 U.S. at 554 (tolling rule "consistent with *federal class action* procedure"); *Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1144 (5th Cir. 1997) ("*American Pipe* . . . involved the tolling effect of putative *federal class actions*"); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 465 F. Supp. 2d 687, 719 (S.D. Tex. 2006) ("In *American Pipe* and in *Crown* the tolling doctrine was applied where *federal court class actions* were brought under federal statutes").

eye towards enhancing the efficiency of the federal court docket.  414 U.S. at 545-56.

It is not a universally applicable rule of tolling that applies to every class action, re-

gardless of the court system in which it is filed or the nature of the claims at issue.

Instead, it is designed to serve a very specific purpose:  to promote and protect "the

efficiency and economy of litigation" brought under Federal Rule 23, "which is a

principal purpose of the [class action] procedure."  *Id*. at 553.  Without tolling, absent

class members would clog the federal courts with "needless" and "duplicati[ve]" pro-

tective filings to preserve their rights, *id*. at 554, "precisely the situation that Federal

Rule of Civil Procedure 23 . . . [was] designed to avoid."  *Crown, Cork*, 462 U.S. at

350-51.  In other words, *American Pipe* did not create a new individual right for ab-

sent class members in any class action in any court to bring stale claims years after a

statute of limitations or repose has expired; it merely interpreted *federal* Rule 23 to

permit limited tolling in *federal* class actions to improve the efficiency and manage

the docket of the *federal* courts.[27]

In fact, if *American Pipe* tolling did apply to state court class actions, it would

violate the Rules Enabling Act, which provides that federal rules of procedure "shall

not abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072(b).  Applied

as the Supreme Court intended it to be applied, *American Pipe* tolling does not run

afoul of the Rules Enabling Act because it serves a valid federal procedural interest

(promoting the efficiency and economy of Rule 23 class actions on the federal court

docket) and is "not inconsistent with the legislative purpose" of federal statutes of li-

---

[27] *See American Pipe*, 414 U.S. at 555-56 ("this interpretation of the Rule [23] is nonetheless necessary to insure effectuation of the purposes of litigative efficiency and economy that the Rule in its present form was designed to serve"); *Chardon*, 462 U.S. at 661 ("*American Pipe* simply asserts a federal interest in assuring the efficiency and economy of the class action procedure"); *id*. at 664 (Rehnquist, J., dissenting) ("the source of the tolling rule . . . was necessarily Rule 23") (emphasis omitted); *Stone Container Corp. v. United States*, 229 F.3d 1345, 1354 (Fed. Cir. 2000) ("*American Pipe* and *Crown, Cork & Seal* were not based on judge-made equitable tolling, but rather on the Court's interpretation of Rule 23"); *Basch v. Ground Round, Inc.*, 139 F.3d 6, 11 (1st Cir. 1998) ("respect for Rule 23 and considerations of judicial economy . . . animated the *Crown, Cork* and *American Pipe* tolling rules").

mitations.  414 U.S. at 556-59.  If applied to state court class actions, however—which have nothing to do with Rule 23 efficiency—the doctrine would be transformed into a substantive federal tolling rule that would apply to every class action, regardless of the court system in which it was filed, without any justification connected to federal procedure.  In effect, if interpreted that way, *American Pipe* would become a substantive application of Rule 23, inappropriately enlarging substantive federal rights in cases where Rule 23 is wholly inapplicable.[28]  Such a result would sharply conflict with the legislative intent of the 1933 Act (which does not include any general tolling provisions and states that "in no event" shall claims be brought after the three-year repose period), and would be beyond the power of the federal courts as constrained by the Rules Enabling Act.  *See American Pipe*, 414 U.S. at 557-58 ("[t]he proper test [under the Rules Enabling Act] is . . . whether tolling the limitation in a given context is consonant with the legislative scheme").[29]

Here, the *Luther* action was filed in California state court.  *See* Ex. 25.  It was not filed in federal court, and it did not implicate federal Rule 23.  Without any benefit to the efficiency of Rule 23 class actions or to the federal system generally, there is only one federal interest at stake:  enforcing the 1933 Act's one-year statute of limitations and three-year statute of repose in accordance with congressional intent.  Granting tolling effect to *Luther* would undercut that interest with no concomitant benefit to the federal courts.  Thus, by its very terms, *American Pipe* tolling is inapplicable and cannot save Plaintiffs' untimely claims.[30]

---

[28] For instance, an absent class member in *Luther* could bring an individual action asserting 1933 Act claims in state court and reap the benefit of *American Pipe* tolling based on a state court class action, even though the Federal Rules of Civil Procedure—and thus the entire policy foundation of the doctrine—never applied.

[29] *Cf. Miguel v. Country Funding Corp.*, 309 F.3d 1161, 1165 (9th Cir. 2002) (rejecting proposed application of Rule 15(c) to revive claim barred by statute of repose because, under Rules Enabling Act, Federal Rules of Civil Procedure "may not be used to extend federal jurisdiction"); *Durant v. Husband*, 28 F.3d 12, 15 (3d Cir. 1994) (under Rules Enabling Act, "where a conflict between [a procedural rule] and the substantive . . . statute exists, as here, the Rule must give way").

[30] Of course, the one-year limitations and three-year repose periods in Section 13 are also not subject to equitable tolling.  As the Supreme Court held unequivocally in

Even if tolling based on the *Luther* state court action were appropriate—and it is not—it would be limited in any event to only those claims as to which the *Luther* plaintiffs had standing. *See Palmer v. Stassinos*, 236 F.R.D. 460, 464-66 (N.D. Cal. 2006); *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 82 (D. Conn. 1994). As then District Judge Cabranes held in *Colonial*, "if the original plaintiffs lacked standing to bring their claims in the first place, the filing of a class action complaint does not toll the statute of limitations for other members of the purported class." 854 F. Supp. at 82. *Accord Pub. Emp. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 2010 WL 2175875, at *3 (S.D.N.Y. June 1, 2010); *Kruse v. Wells Fargo Home Mortg., Inc.*, 2006 WL 1212512, at *4-7 (E.D.N.Y. May 3, 2006); *In re Crazy Eddie Sec. Litig.*, 747 F. Supp. 850, 856 (E.D.N.Y. 1990); *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 377-79 (D. Mass. 1987); *Hess v. I.R.E. Real Estate Income Fund, Ltd.*, 255 Ill. App. 3d 790, 811 (1993); *Cunningham v. Ins. Co. of N. Am.*, 515 Pa. 486, 491-95 (1987).

The reason for this rule is simple: because a claim asserted by a plaintiff without standing is not a "case or controversy" under Article III, it cannot serve as a legitimate basis for tolling a federal statute of limitation or repose. As the *Palmer* court explained, "it would be beyond the constitutional power of a federal court to toll a period of limitations based on a claim that failed because the claimant had no power to bring it." *Palmer*, 236 F.R.D. at 465 n.6. The claims for which the *Luther* plaintiffs lacked standing were a nullity; to grant them tolling effect would "breathe life into a non-existent lawsuit." *Kruse*, 2006 WL 1212512, at *9. In addition, allowing tolling without standing would lead to abuse of the class action procedure, as

---

*Lampf*, 501 U.S. at 363, "the equitable tolling doctrine is fundamentally inconsistent with the 1-and-3-year structure" of the statute. California state law tolling principles are likewise inapplicable. Because both *Luther* and this case assert federal law claims governed by federal statutes of limitations and repose, federal law tolling principles apply—and state tolling law is irrelevant. *See Bunnell v. Dep't of Corrections*, 64 Cal. App. 4th 1360, 1370-72 (1998) ("where Congress has expressly set a limitations period on a federal claim . . . state tolling provisions[] do not apply"); *Beck v. Caterpillar Inc.*, 50 F.3d 405, 406-07 (7th Cir. 1995) (same); *Saltares v. Hosp. San Pablo, Inc.*, 371 F. Supp. 2d 28, 33 (D.P.R. 2005) ("In [a] federal question cause of action, [the] issue of whether the statute of limitations is tolled . . . is a federal question").

1   it would "condone or encourage attempts to circumvent the statute of limitation by

2   filing a lawsuit without an appropriate plaintiff and then searching for one who can

3   later intervene with the benefit of the tolling rule." *Elscint*, 674 F. Supp. at 378.[31]

4       It is well-settled that a plaintiff asserting 1933 Act claims in a MBS case has

5   standing to challenge only the specific offerings in which he purchased securities.

6   *See, e.g.*, *In re Wells Fargo Mortgage-Backed Cert. Litig.*, 2010 WL 1661534, at *3

7   (N.D. Cal. Apr. 22, 2010); *see infra*, at 31-36.  Here, the *Luther* plaintiffs collectively

8   purchased securities in—and thus could argue they had standing to challenge—just

9   61 of the 427 Offerings at issue.  *See* App. Tab 1.  Any possible tolling would there-

10  fore be restricted to a maximum of 61 Offerings, and claims related to the remaining

11  366 Offerings would be time-barred.[32]

12  **II.   PLAINTIFFS LACK STANDING AS TO MBS THEY DID NOT BUY.**

13      All claims related to 346 of the 427 challenged MBS Offerings also must be

14  dismissed because Plaintiffs lack standing to assert them under both Article III of the

15  United States Constitution and Sections 11 and 12(a)(2) of the 1933 Act.

16      **A.   Plaintiffs Have Not Alleged Article III Standing.**

17      Before a plaintiff can invoke the jurisdiction of a federal court, it must allege "a

18  personal stake in the outcome," "some threatened or actual injury resulting from the

19  putatively illegal action" that justifies "exercise of the court's remedial powers on his

---

20  [31] *See also American Pipe*, 414 U.S. at 561 (Blackmun, J., concurring) (class action

21  tolling rule "must not be regarded as encouragement to lawyers . . . to frame their
     pleadings as a class action, intentionally, to attract and save members of the purported

22  class who have slept on their rights").

23  [32] And the number of Offerings as to which the Luther named plaintiffs could assert
     standing may be smaller than 61.  The initial state court complaint was filed solely by

24  David Luther, and additional named plaintiffs were added to that action in September
     2008.  The *Luther* action was later consolidated with a complaint filed by Washing-

25  ton State Plumbing and Pipefitting Pension Trust, which added several new MBS Of-
     ferings not encompassed by the initial complaint (in which neither Luther himself nor

26  the other named plaintiffs added to the *Luther* action presumably had purchased) and
     also an additional named plaintiff (who presumably had bought MBS not purchased

27  by either Luther or the other named plaintiffs).  *See* Exs. 25-28.  The limitations
     and/or repose periods may well have expired as to particular MBS prior to the first

28  appearance in the case of a named plaintiff who had actually purchased those MBS
     and arguably had standing to assert claims relating to those MBS.

behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975).  If it fails to do so, then there is no "'case or controversy' . . . within the meaning of Article III," and federal courts have no power to hear the asserted claims.  *Id.*  In other words, "a plaintiff must demonstrate that it has personally suffered an *injury in fact* that is *fairly traceable to a defendant's alleged misconduct* and is *likely to be redressed* by a decision in the plaintiff's favor." *Wells Fargo*, 2010 WL 1661534, at *3.  These standing requirements are "inflexible and without exception," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998), and are "perhaps the most important of the jurisdictional doctrines." *United States v. Hays*, 515 U.S. 737, 742 (1995).[33]  Standing is a thus "threshold question in every federal case," because it "determin[es] the power of the court to entertain the suit." *Warth*, 422 U.S. at 498.

In MBS class actions like this one, every court to address the issue has held that no standing exists unless the named plaintiffs *actually purchased securities* in the *specific offerings* as to which they seek to represent other investors.  For example:

- In *Wells Fargo*, Judge Illston of the Northern District of California dismissed claims based on 37 MBS offerings for lack of standing, observing that other courts have "overwhelmingly held that the lead plaintiffs named in the complaint lack standing to challenge any offering through which no lead plaintiff actually purchased a security."  2010 WL 1661534, at *3-4.

- In *In re IndyMac Mortgage-Backed Sec. Litig.*, 2010 WL 2473243, at *3 (S.D.N.Y. June 21, 2010), Judge Kaplan held that "named plaintiffs have standing only with respect to offerings in which they purchased securities," and "the claims based on the [91] offerings in which named plaintiffs have not purchased are dismissed."

---

[33] *See also Wells Fargo*, 2010 WL 1661534, at *3 ("Standing . . . is particularly important in securities litigation, where strict application of standing principles is needed to avoid vexatious litigation and abusive discovery").

- In *Merrill Lynch*, 2010 WL 2175875, at *3, Judge Rakoff dismissed claims based on 65 of 84 MBS offerings at issue because plaintiffs had not purchased securities in those offerings.  He held that standing "requires plaintiffs to have been personally injured, and plaintiffs thus have no standing to assert claims in relation to [offerings] in which plaintiffs did not personally invest." *Id.*

- In *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, 2010 WL 1371417, at *7 (E.D.N.Y. Apr. 6, 2010), the court held that "Plaintiffs must be able to prove falsity with respect to statements . . . regarding the mortgages in which they purchased interests. . . .  If Plaintiffs did not purchase those securities, they lack standing to make any claim of injury."

- In *New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288, at *4 (S.D.N.Y. Mar. 29, 2010), the court held that "Plaintiff lacks standing to bring claims arising from Offerings in which it did not participate."

- In *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 2010 WL 1172694, at *8 (S.D.N.Y. Mar. 26, 2010), Judge Baer concluded that "Plaintiffs need to show an injury connected to the offerings they challenge as misleading, and therefore Plaintiffs' claims with regard to offerings they did not purchase are dismissed for lack of standing."

- In *In re Lehman Bros. Sec. and ERISA Litig.*, 684 F. Supp. 2d 485, 490 (S.D.N.Y. Feb. 17, 2010), the court granted defendants' motion to dismiss with respect to offerings in which plaintiffs did not purchase, holding that "[a]s no named plaintiff has alleged that he or she purchased Certificates in any of the other eighty-five offerings, none can have been injured with respect to those offerings," and "[n]one, therefore, has standing."

- Likewise, in *Plumbers' Union Local No. 12 Local Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303-04 (D. Mass. 2009), the court held that "the named plaintiffs are incompetent to allege an injury caused by the

1  purchase of Certificates that they themselves never purchased," and noted "the

2  overwhelming weight of authority" in favor of dismissal.[34]

3    Even Plaintiffs acknowledge the strong consensus of these cases.  At the lead

4  plaintiff hearing on May 3, 2010, counsel for IPERS conceded that the courts "have

5  limited [] standing to the certificates bought by the lead plaintiff," that Plaintiffs face

6  "a difficult road on the standing issue," and that "the standing issue [may be] a prob-

7  lem."  Ex. 37 at 35, 44, 59.  In short, it is well-settled that a plaintiff lacks standing to

8  assert claims arising from any MBS offerings in which it did not purchase, and all

9  such claims must be dismissed.

10   Here, according to their own Amended Complaint and Certifications, Plaintiffs

11  allege that they purchased MBS in only 81 of the 427 Offerings at issue.  *See* AC

12  ¶¶ 21-24; Exs. 31-34; App. Tab 1.  For the remaining 346 Offerings, Plaintiffs do

13  not—and cannot—allege any injury at all.  Because they did not purchase securities in

14  any of those 346 Offerings, they have no "personal stake in the outcome" and suffered

15  no harm that could be redressed by this Court.  As such, "[w]ithout the requisite dem-

16  onstration of an injury, none of the named Plaintiffs may seek relief on behalf of him-

17  self or any other member of the class."  *Siemers*, 2006 WL 3041090, at *7.[35]  They

---

18  [34] *Accord Mass. Bricklayers & Masons Funds v. Deutsche Alt-A Securities*, 2010 WL

19  1370962, at *1 (E.D.N.Y. Apr. 6, 2010) (dismissing securities claims related to MBS not purchased by plaintiffs for lack of standing); *New Jersey Carpenters Health Fund*

20  *v. Residential Capital LLC*, 2010 WL 1257528, at *4 (S.D.N.Y. Mar. 31, 2010) (same); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, Transcript of

21  Decision at 40-41 (S.D.N.Y. Jan. 28, 2010) (same, Ex. 35); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 391 (S.D.N.Y. 2010)

22  (same); *In re Century Aluminum Co. Sec. Litig.*, 2010 WL 1729426, at *12 (N.D. Cal. Apr. 27, 2010) (dismissing securities claims related to securities not purchased by

23  plaintiffs for lack of standing); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 2009 WL 3517630, at *18 (S.D.N.Y. Oct. 27, 2009) (same); *Hoffman v. UBS-AG*, 591

24  F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008) (same); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006) (same); *Siemers v. Wells*

25  *Fargo & Co.*, 2006 WL 3041090, at *7 (N.D. Cal. Oct. 24, 2006) (same); *In re Alliance Bernstein Mut. Fund Excessive Fee Litig.*, 2005 WL 2677753, at *9-10

26  (S.D.N.Y. Oct. 19, 2005) (same); *In re Am. Mut. Funds Fee Litig.*, 2005 WL 3989803, at *1-2 (C.D. Cal. Dec. 16, 2005) (same).

27  [35] *See also Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("even named plaintiffs who represent a class must allege and show that they personally have been injured, not

28  that injury has been suffered by other, unidentified members of the class").

---

34

1   have failed to establish Article III standing, and this Court therefore has no power to

2   hear those claims.  *See Warth*, 422 U.S. at 498 (standing "determin[es] the power of

3   the court to entertain the suit").  All such claims must be dismissed with prejudice.[36]

4   **B.    Plaintiffs Have Not Alleged Statutory Standing.**

5        Not only do Plaintiffs not satisfy the standing requirements of Article III, Plain-

6   tiffs also lack statutory standing under Sections 11 and 12(a)(2) of the 1933 Act.  That

7   is a separate and independently sufficient ground for dismissal.

8        Although Section 11 establishes potential liability for offering a security by

9   means of a registration statement that contains a material misstatement or omission, it

10   only provides a private right of action for a "narrow class of persons."  *Barnes v.*

11   *Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967).  As such, the only plaintiffs with standing

12   to assert a Section 11 claim as to a security are those who "acquir[e] *such security*."

13   15 U.S.C. § 77k.  Similarly, Section 12(a)(2) provides liability for offering or selling a

14   security by means of a prospectus that contains a material misstatement or omission,

15   but expressly limits standing to sue to "person[s] purchasing *such security* from him."

16   15 U.S.C. § 77*l*(a)(2).  As the Supreme Court explained in *Blue Chip Stamps v. Manor*

17   *Drug Stores*, 421 U.S. 723, 736 (1975), "[Section 11] confines the cause of action it

18   grants to 'any person acquiring such security' while the remedy granted by [Section

19   12] is limited to the 'person purchasing such security.'"

20        Against this backdrop, courts in MBS cases have consistently dismissed 1933

21   Act claims related to offerings in which the plaintiffs did not purchase for lack of

22   statutory standing (in addition to, and independent of, lack of constitutional standing).

23   For instance, in *Nomura*, the court held that "[t]he Act permits claims to be brought

24   only by persons who purchased the securities at issue."  658 F. Supp. 2d at 304 n.3.  In

25   *Wells Fargo*, the court explained that "the case law is clear that a named plaintiff has

26   _____

27   [36] As Judge Rakoff did in *Merrill Lynch*, the Court should deny leave to "add addi-
tional, as yet unnamed plaintiffs" to cure the current Plaintiffs' standing defects, be-
cause "the claims of any such new plaintiffs would be time-barred."  2010 WL

28   2175875, at *3. *See supra* at 33.

1   standing under Section 11 only as to the documents that governed his own purchase of

2   securities." 2010 WL 1661534, at *4.  Finally, in *Merrill Lynch*, the court held that

3   Section 12 standing is limited "to persons who have directly purchased the securities

4   . . . in the subject public offering." 2010 WL 2175875, at *6.[37]

5          Thus, to satisfy the standing requirements of the 1933 Act, Plaintiffs here must

6   allege that they actually purchased securities in each of the 427 MBS Offerings at is-

7   sue.  Because they allege purchases in only 81 of the 427 Offerings, *see* App. Tab 1,

8   Plaintiffs lack statutory as well as constitutional standing with respect to the remain-

9   ing 346 Offerings, and all claims based on those Offerings must be dismissed.

10        **C.     Plaintiffs Cannot Rely On The Shelf Registration Statements To Cure Their Standing Defects.**

11

12         Plaintiffs attempt to circumvent these well-settled standing requirements by al-

13   leging that there were misstatements common to the shelf registration statements and

14   the subsequent prospectus supplements, such that Plaintiffs supposedly suffered the

15   same "injury" as investors in other Offerings, even if they did not purchase the same

16   securities.  *See* AC ¶¶ 21-24, 78.  This argument lacks merit.  Not only has this argu-

17   ment been rejected by every court to consider it in the MBS context to date, but it ig-

18   nores the fundamental, structural differences between a mortgage-backed security and

19   the debt or equity securities of a single corporate issuer.

20         Courts in other MBS cases have uniformly rejected this argument.  For in-

21   stance, in *City of Ann Arbor*, 2010 WL 1371417, at *7-8, the court was "not persuaded

22   that standing was conferred by virtue of a common registration statement," and held

23   that "[a]llegations that disclosures in the commonly filed documents are the same . . .

24

25   [37] *Accord NECA-IBEW Health & Welfare Fund*, Transcript of Decision at 40-41 ("the Securities Act of 1933 permits claims to be brought only by purchasers of the securi-

26   ties sued on") (Ex. 35); *City of Ann Arbor*, 2010 WL 1371417 at *7 ("Section 11 re-quires a plaintiff to show that he was purchaser of the security at issue"); *Century*

27   *Aluminum*, 2010 WL 1729246, at *11 ("[t]o have standing to bring suit under Section 11, a plaintiff must have purchased [securities] in the offering at issue"); *Guenther v.*

28   *Cooper Life Scis., Inc.*, 759 F. Supp. 1437, 1440-41 (N.D. Cal. 1990) (same).

are unavailing" because of "the difference in the underlying pools of mortgages."  In *New Jersey Carpenters Vacation Fund*, the court similarly rejected plaintiffs' argument that "purchasers are not required for each offering where the claims arise out of common alleged misstatements and omissions," explaining:

> [T]he shelf registration statements and related base prospectuses are general in content and, as Plaintiffs themselves note, the statements point investors to specific details contained in the supplements to the individual and distinct prospectus for each offering.  Most of Plaintiffs' factual allegations focus on the underlying details contained in the . . . prospectus supplements and are unique to each of the offerings:  the downgrade in credit ratings, the particular guidelines used by the mortgage originator for that pool of loans, and the default and delinquency rates all differ based on the particular offering. . . .  Put another way, *the harm Plaintiffs may have suffered based on misstatements in the Offering Documents for the Certificates they purchased has no bearing on any harm suffered by other investors based on alleged misstatements in other offering documents with details about other offerings that Plaintiffs did not purchase.*

2010 WL 1172694, at *7.  For the same reasons, the *Wells Fargo* court likewise dismissed MBS claims for lack of standing, holding that "[a]lthough plaintiffs have alleged that the Prospectuses and Prospectus Supplements contained some similar false statements or omissions. . . .  plaintiffs cannot gain standing purely as a result of the common Registration Statements."  2010 WL 1661534, at *4.

The same result must follow here.  As the Amended Complaint itself acknowledges, the MBS at issue consisted of 427 "*separate*" Offerings, each issued by *different* special-purpose trusts, and each backed by a *unique* pool of Mortgage Loans.  AC ¶¶ 1, 5, 69-70, 79-82.  Even within a series of Offerings stemming from a common shelf registration statement, the types of loans included in one pool differed from the types of loans included in other pools.  For example, Plaintiffs challenge 62 Offerings

37

issued under the CWALT 333-125902 registration statement from July 25, 2005 through February 24, 2006.  AC ¶ 34 & Ex. A.  Those 62 deals were backed by a wide variety of collateral types include conforming balance loans (denominated as "CB" deals), proprietary channel hybrid ARMs ("HY" deals), conduit hybrid ARMs ("HYB" deals), conduit jumbo loans ("J" deals), and pay-option ARMs ("OA" deals). *Id.* at Ex. A.  In January 2006 alone, CWALT issued the following deals under the 333-125902 registration statement:  2006-HY3 (proprietary channel hybrid ARMs), 2006-OA1 (pay-option ARMs), 2006-2CB (conforming balance loans), 2006-OA2 (pay-option ARMs), and 2006-J1 (conduit jumbo loans).  *Id.*  Beyond these variations in the type of pooled loans, the specific loans in each pool also had different risk characteristics (*e.g.*, FICO score, loan-to-value ratios, loan documentation), different geographic distributions, and were originated, underwritten, and appraised by different personnel.  *See id.* ¶¶ 74-75, 79-82 & Ex. A.  Moreover, because Countrywide's underwriting guidelines varied by type of loan product and changed over time—the Amended Complaint itself alleges an "expansion in guidelines" during the relevant period—the particular guidelines in effect at the time of each specific Offering also varied from deal to deal.  AC ¶¶ 105, 129.  In other words, despite a common shelf registration statement, each specific MBS Offering derived its value from a separate and distinct pool of assets, which generated separate and distinct streams of cash flows, which experienced different delinquency and default rates, and importantly, which were subject to different disclosures.

These differences were reflected in the structure of the Offering Documents. For example, as Plaintiffs themselves allege, each shelf registration statement included "an *illustrative form* of a Prospectus Supplement," which was replete with blanks and empty placeholders instead of loan-specific representations.  AC ¶ 161.[38]

---

[38] *See also* Ex. 4 (Form S-3/A, CWMBS Reg. No. 333-131662) at Title Page, S-2-4, S-34-47 (blanks for series title, closing date, original principal balance, average FICO score, average LTV ratio, property type, lien priority, geographic information, interest rates, trustee, type of loans), Title Page ("The information in this prospectus supplement is not complete and may be changed"), S-52 ("Underwriting Standards": "[Be-

These documents were entirely skeletal.  All statements concerning the "Mortgage Loans" and "Mortgage Pool"—defined terms tied to a particular pool of loans that had yet to be created—were effectively meaningless, because they were divorced from the context of any specific Offering.  Ex. 3 at (CWALT Form S-3/A, Reg. No. 333-123167) at S-11-16.  Meanwhile, the base prospectus in the shelf registration statement was filled with generalizations and disclaimers, and repeatedly directed investors to refer to the as-yet unfiled prospectus supplement for "*the specific terms of the securities*," including the underwriting standards applicable to each Offering.  Ex. 4 (Form S-3/A, CWMBS Reg. No. 333-131662) at Base Prospectus Title Page Title Page, 1, 12.[39]  It was not until the effective date of each particular Offering that "a *final* Prospectus Supplement was filed with the SEC," containing "a description of the mortgage pool underlying the Certificates and the underwriting standards by which the mortgages were originated."  AC ¶ 161.

In light of these critical differences between and among different Offerings under a common registration statement, Plaintiffs' reliance on allegedly common false statements to establish standing is misplaced.  Even if certain Offering Documents used the same language, the true substance of these representations was *fundamentally different* for each Offering, because they were made in connection with a unique pool

---

low is an *example* of the disclosure to be provided…]"); Ex. 3 (Form S-3/A, CWALT Reg. No. 333-123167) at S-18-23 (entire "Underwriting Process" section bracketed as placeholder), S-23 ("Approximately []% of the mortgage loans . . . have been underwritten pursuant to . . . Expanded Underwriting Guidelines").

[39] *See also* Ex. 4 (Form S-3/A, CWMBS Reg. No. 333-131662) at Base Prospectus Title Page ("The Information In This Prospectus Is Not Complete And May Be Changed"; "[a] prospectus supplement for a series will specify all of the terms of the series"; "[t]he assets in each trust fund will be specified in the prospectus supplement for the particular trust"), 1 ("[T]his prospectus . . . provides general information, some of which may not apply to a particular series. . . .  The prospectus supplement will contain information about a particular series . . . and you should rely on that supplementary information in the prospectus supplement."), 15 ("Each prospectus supplement will contain information, as of the date of the prospectus supplement and to the extent then specifically known to the depositor, with respect to the loans contained in the related pool"); Ex. 3 (Form S-3/A, CWALT Reg. No. 333-123167) at 12 ("[w]henever the terms mortgage pool and certificates are used in this prospectus, those terms will be considered to apply . . . to one specific mortgage pool and the certificates representing certain undivided interests in a single trust fund").

of loans, to a unique group of borrowers, and potentially pursuant to a unique set of underwriting guidelines.  For instance, Plaintiffs assert that one of the allegedly false statements in the common shelf registration statements was that "[a]ll of the Mortgage Loans have been originated or acquired by Countrywide . . . in accordance with its credit, appraisal and underwriting standards."  AC ¶ 162.  But the meaning of this statement hinges on four different variables, each of which changed from Offering to Offering:  (1) the type of loans included in the pool; (2) the specific borrower and credit risk attributes for each loan included in the pool; (3) the specific underwriting standards applicable to the specific loans included in the pool, which would vary depending on the type of loan and when during the putative class period the loans were originated; and (4) the specific appraisals for each property that served as collateral for each specific loan in the pool.  In effect, although the same words may appear in common Offering Documents, those words were *new and different statements* in each unique prospectus supplement for each unique Offering.

Thus, as the court held in *New Jersey Carpenters Vacation Fund*, "the underlying details . . . are unique to each of the offerings," and "the harm Plaintiffs may have suffered based on misstatements in the Offering Documents for the Certificates they purchased has no bearing on any harm suffered by other investors based on alleged misstatements in other offering documents with details about other offerings that Plaintiffs did not purchase."  2010 WL 1172694, at *7; *accord New Jersey Carpenters Health Fund*, 2010 WL 1473288, at *4 (dismissing on standing grounds because "each of the [] Offerings were based upon a distinct pool of mortgages . . . and governed by a different prospectus supplement with different underwriting requirements and disclosures").  Because Plaintiffs did not purchase MBS in the vast majority of the challenged Offerings, the claims based on those Offerings must be dismissed.[40]

---

[40] Contrary to Plaintiffs' suggestion at the lead plaintiff hearing, *see* Ex. 37 at 35, this Court's decision in *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1164-67 (C.D. Cal. 2008), is inapposite.  That case involved ordinary corporate debt securities, which derived their value from a single source (the creditworthiness of a single corporate issuer) and involved supplemental filings that consisted merely of

III.   **PLAINTIFFS DO NOT ALLEGE LEGALLY COGNIZABLE INJURY**.

Plaintiffs' claims must be dismissed for the additional reason that it is apparent from the face of the Amended Complaint and the Certifications that Plaintiffs have not suffered any legally cognizable injury as to the vast majority of the MBS they allegedly bought.  More specifically, Plaintiffs claim to have purchased 105 CUSIPs (in 81 Offerings).  According to the Distribution Reports, however, only four of those 105 CUSIPs (associated with just three Offerings) realized *any losses whatsoever* during the period Plaintiffs held them.  With respect to the remaining 101 CUSIPs (from 78 Offerings), Plaintiffs either continue to receive all of the payments to which they are entitled or chose to sell fully performing securities into an illiquid market. In other words, Plaintiffs (and the putative class members they seek to represent) have gotten exactly what they paid for.

A.   **The Absence Of Legally Cognizable Injury Is Fatal.**

To recover under the 1933 Act, a plaintiff must suffer some form of actual—not speculative—injury of the sort that is cognizable under the Act.  *See* 15 U.S.C. §§ 77k(e), 77*l*(a)(2).  Where it is apparent from the face of the complaint and from documents which the Court may judicially notice that a plaintiff has not suffered actual injury, the claims must be dismissed.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005) ("The purchaser must also demonstrate damages to recover under section 12. . . . [T]here can be no recovery unless the purchaser has suffered a loss."); *In*

---

pricing and interest rate information for each series of securities.  These pricing supplements did not alter the substantive disclosures in the shelf registration statement, which all concerned the same corporate issuer and applied equally across all series of notes.  By contrast, the 427 separate Offerings here derive their value from separate pools of unique loans, were issued by 427 separate and unique issuers (the trusts that held the pools), and virtually all key substantive representations in the particular prospectus supplement for each Offering are specific to the particular loans backing each Offering.  Those particularized representations appear in the prospectus supplements for each of the 427 deals, not in the shelf registration statement and base prospectus. In *Countrywide*, the Court held that its analysis would be inapplicable where—as here—"later issuances . . . incorporate very different alleged violations and have in common only a minor common misrepresentation or omission."  *Id.* at 1167.  In such cases, "[t]he differences could be significant enough to lead a Court to deny standing for class plaintiffs on a motion to dismiss."  *Id.*  Such a denial is warranted here.

41

*re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1205 (9th Cir. 2002) (under §§ 11 and 12 "there can be no recovery unless the purchaser has suffered a loss"); *Commercial Union Assurance Co. plc v. Milken*, 17 F.3d 608, 615 (2d Cir. 1994) (affirming dismissal on summary judgment of § 12 claims because investors who received distributions and third-party settlement payments exceeding the full amount of their investment plus interest "have not suffered compensable" loss).[41]

As this Court noted in *In re Countrywide Fin. Corp. Sec. Litig.*, the absence of injury can be "addressed as a standing inquiry." 588 F. Supp. 2d at 1168. To satisfy the standing requirements of Article III of the U.S. Constitution, a plaintiff must show that it has suffered an "injury in fact" that is "fairly traceable to the challenged action of the defendant." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). As the district court noted in *Siemers v. Wells Fargo & Co.*, 2006 WL 3041090, at *7, (N.D. Cal. Oct. 24, 2006), "[w]ithout the requisite demonstration of an injury, none of the named Plaintiffs may seek relief on behalf of himself or any other member of the class." *Accord In re Am. Mut. Funds*, 2005 WL 3989803, at *1-2 (standing cannot be established through "the back door of a class action").

---

[41] *Accord In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 277, 299 (S.D.N.Y. 2008) ("If a plaintiff has no conceivable damages under Section 11, . . . her Section 11 claims must be dismissed."); *Pierce v. Morris*, 2006 WL 2370343, at *4 (N.D. Tex. Aug. 16, 2006) ("Where a plaintiff fails to allege any conceivable damages for violation of the Securities Act his claims must be dismissed."); *In re Mut. Funds Inv. Litig.*, 384 F. Supp 2d 845, 866-67 (D. Md. 2005) (dismissing § 11 claim where plaintiffs failed to "plead facts demonstrating that [they] suffered the particular type of injury contemplated by the statute"); *Ong v. Sears, Roebuck & Co.*, 2005 WL 2284285, at *14 (N.D. Ill. Sept. 14, 2005) ("[t]o recover under §§ 11 and 12(a)(2), a purchaser must have suffered damages"); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 246 (S.D.N.Y. 2004) (dismissing § 11 claim because complaint and documents appropriate for judicial notice demonstrated that plaintiff had not "suffered a cognizable injury under the statute"); *Metz v. United Counties Bancorp*, 61 F. Supp. 2d 364, 378 (D.N.J. 1999) (dismissing § 11 claims for failing to plead a cognizable loss, stating plaintiff "must plead a certain kind of injury"); *cf. In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1168 (holding that a § 11 claim must be dismissed if it appears on the face of the pleading that the "plaintiff cannot have suffered the type of injury contemplated by the statute").

---

**B.     Plaintiffs Have No Cognizable Injury As To The Vast Majority Of MBS Certificates They Claim To Have Purchased.**

**1.     Payments Have Been Made As They Come Due.**

As Plaintiffs themselves acknowledge, the Certificates are essentially securitized contract rights that "entitle[] investors to receive monthly distributions of interest and principal from the Issuing Trusts derived from cash flows from borrower repayment of the mortgage loans." AC ¶ 5. Those rights are fundamentally different from the interest of an investor in most equity or debt securities. Those cash flows are protected by principal repayment and by various credit enhancements, detailed in the Registration Statements, which prevent defaults on the underlying loans from causing defaults in the MBS payments. *Id.* ¶¶ 85, 157. Securities with the highest priority are first to receive payment and "last to absorb any losses." *Id.* ¶ 70.[42] Depending on their priority in the payment "waterfall" and the particular credit enhancement structure, Certificate holders may continue to receive all principal and interest payments even if there are defaults in the underlying loans and even if the "market prices" of the MBS decline.

Accordingly, courts have recognized that diminution of cash flows—not declines in market prices—is the proper measure of loss in cases involving MBS. *See AIG Global Secs. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009). As the *AIG* court explained, the "presumption that shares [of common stock] are purchased for the purpose of investment and their true value to the investor is the price at which they may later be sold" does not apply to MBS investors. *Id.* MBS investors purchase their securities "with the expectation that they would receive a stream of interest payments for the life of the securitization and, at the end of the securitization, the return of their principal." *Id.* The *AIG* court thus held that any loss suffered in that case "was not a decrease in market price, but a decrease in the amount of money returned to them over the course of the securitiza-

---

[42] Plaintiffs bought only AAA-rated or equivalent securities, with three exceptions (CWALT 2005-17, CWL 2005-6, and CWL 2006-3). *Id.* ¶¶ 21-24; App. Tab 2.

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

1    tion." *Id.*  This conclusion echoes the observations made by the SEC when it

2    adopted Regulation AB.  In the adopting release for Regulation AB, the SEC noted

3    that MBS investors "are generally interested in the characteristics and quality of the

4    underlying assets, the standards for their servicing, the timing and receipt of cash

5    flows from those assets and the structure for distribution of those cash flows." *Asset-*

6    *Backed Securities*, Securities Act Release No. 8518, Exchange Act Release No. 50,

7    905, 70 Fed. Reg. 1506, 1508, 1510-11 (Jan. 7, 2005).[43]

8        For these reasons, courts have dismissed MBS claims where the plaintiffs have

9    received all payments due.  In *Luminent Mortg. Capital*, 652 F. Supp. 2d at 590-92,

10   for example, the court dismissed the complaint for "failure to allege an economic

11   loss" where there was "no dispute that Plaintiffs received the payments due under the

12   Junior Certificates" that they purchased.  Likewise, in *NECA-IBEW Health & Wel-*

13   *fare Fund v. Goldman Sachs & Co*., No. 08-CV-10783 (MGC), Transcript of Deci-

14   sion at 30, 41-43 (S.D.N.Y. Jan. 28, 2010) (Ex. 35), Judge Cedarbaum dismissed

15   plaintiff's 1933 Act claims due to the absence of economic loss where "[t]here has

16   been no diminution in any payment to the plaintiff" from the MBS that it bought.

17   *Accord In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 894 n.22 (W.D.N.C.

18   2001) ("Valuation of mortgage-backed securities such as those at issue here essen-

19   tially is an exercise in estimating expected future cash flows.").  It is not sufficient to

20   allege—as Plaintiffs here do (AC ¶ 97)—that loss may be "imminent."  Rather, it is

21   well-established that Plaintiffs cannot allege the actual injury required under the law

22   "simply by claiming that [they] incurred additional risk of loss." *First Nationwide*

23

---

24   [43] Plaintiffs have acknowledged publicly that they purchased the Certificates for
     their cash flow stream and for their high yield compared to other securities, not for
     appreciation in the secondary market. *See* Ex. 16 (OCERS Comprehensive Annual
25   Financial Report ("CAFR") for Year Ended December 31, 2009) at 34 ("investment
     objective of holding derivative securities," including asset-backed securities, "is to
26   achieve favorable yields and advantageous risk/reward profiles"); Ex. 15 (OCERS
     CAFR for Year Ended December 31, 2008) at 31 (same); Ex. 18 (IPERS CAFR for
27   Year Ended June 30, 2009) at 51 ("The System invests in mortgage-backed securi-
     ties to diversify the portfolio and earn the return premium associated with prepay-
28   ment risk."); Ex. 17 (IPERS CAFR for Year Ended June 30, 2008) at 51 (same).

---

44

1   *Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994).[44]

2        Here, the vast majority of the Certificates Plaintiffs allegedly bought continue

3   to perform and have made all required payments.  According to the Distribution Re-

4   ports, only six of the 105 securities that Plaintiffs claim to have purchased have real-

5   ized any losses as of July 2010.  App. Tabs 2, 10.  In other words, 99 of the 105 se-

6   curities that Plaintiffs bought have paid all distributions to date, as they came due.[45]

7   Accordingly, Plaintiffs have suffered no cognizable loss with respect to those securi-

8   ties, and their claims as to those securities should be dismissed.

9        Moreover, the Amended Complaint, the Certifications, and the Distribution

10   Reports on which the Amended Complaint explicitly relies confirm that 21% of the

11   securities that Plaintiffs claim to have purchased (22 of 105 CUSIPs) have repaid in

12   full.  That is, these securities have an outstanding principal balance of zero and no

13   cumulative losses as of July 2010, and Plaintiffs have gotten all their money back.

14   App. Tabs 3, 10.  No losses have been or ever will be incurred on these securities.[46]

15        Likewise, just a very small number of the publicly-traded tranches of the 427

16   MBS at issue in this case have experienced any material realized losses.  More spe-

17   cifically, of the 4,396 AAA-rated classes of securities in the 427 Offerings at issue

18

19   ─────────────

20   [44] *See also NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 08-CV-10783 (MGC), Transcript of Proceedings at 10 (S.D.N.Y. May 27, 2010) (Ex.

21   36) ("But normally we can't sue on risks.  We can only sue on realized loss."); *Jackson Nat'l Life Ins. Co.* v. *Ligator*, 949 F. Supp. 200, 207-08 (S.D.N.Y. 1996) (be-

22   cause the notes were not due and the plaintiffs had not pleaded "the extent of their loss at the time," it was "impossible to determine the award that would make [plain-

23   tiffs] whole" and "a mere 'unlikelihood' [was] simply not sufficient to support an action at the time").

24   [45] According to the Certifications, however, two of these six securities (CWALT 2005-17 and CWHEQ 2005-K) were sold by Plaintiffs before they had realized any

25   losses.  As such, 101 of the 105 securities that Plaintiffs purchased had made all required payments during the period that Plaintiffs held them.  App. Tab 2.

26   [46] Only one of these securities (CWL 2006-BC1) was sold (by Plaintiff OPERS) be-fore it had paid off in full, but OPERS realized only an immaterial loss (less than

27   0.2% of its purchase amount) upon the sale.  App. Tabs 4, 5, 10.  Plaintiffs have sold their positions in another 8 of the 105 securities they bought at a gain or at an imma-

28   terial (less than 0.2% of purchase price) loss.  *Id.*

1   (which Plaintiffs acknowledge represent 92% of the MBS at issue in this case), only

2   207—fewer than 5%—have realized losses greater than $100.  AC ¶ 9; App. Tab 6.

3   **2.    Decline In Trading Value In An Illiquid Market Is Not Loss.**

4   Even if the securities in this case were not MBS, still Plaintiffs have not al-

5   leged a cognizable injury because the market in which the MBS trade is illiquid.

6   Unable to plead any diminution of cash flow from the vast majority of the MBS they

7   bought, Plaintiffs instead argue that they suffered loss because "[t]he value of the

8   Certificates has declined substantially, subsequent to, and due to, the violations of

9   the Defendants."  AC ¶ 221.  But, the use of market "value" as a measure of loss

10  here would be inappropriate because, as Plaintiffs acknowledge, the market for the

11  Certificates became illiquid in August 2007.  *Id.* ¶ 153 (noting the "illiquidity in the

12  credit markets" that began in August 2007).  Indeed, in their publicly-available

13  CAFRs, Plaintiffs have acknowledged the illiquidity of the fixed income market and

14  noted that their MBS are valued based on estimated future cash flows, as opposed to

15  the price they could fetch in this illiquid market.[47]

16  Courts have long recognized that "market price" is not an appropriate determi-

17  nant of "value" where, as in this case, the securities are not actively traded or there is

18  no real market.[48]  Rather, market prices reflect a security's current true value only if

19

20  [47] *See, e.g.*, Ex. 17 (IPERS CAFR for Year Ended June 30, 2008) at 51, 79, 81 ("a sig-
    nificant liquidity and solvency crisis ... has clearly shaken the [fixed income] markets"

21  and MBS are "reported in the Statement of Plan Net Assets at fair value based on es-
    timated future cash flows from the interest and principal payments of the underlying

22  mortgages"); Ex. 18 (IPERS CAFR for Year Ended June 30, 2009) at 51, 83 (same).

    [48] *See, e.g.*, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972) ("the

23  District Court, as the trier of fact on this record, is not restricted to actual sales pric-
    es in a market so isolated and so thin as this one"); *Holmes v. Bateson*, 583 F.2d

24  542, 563 (1st Cir. 1978) (market price should not be used in determining fair value
    where transaction was not on the open market, but rather a face-to-face negotiation);

25  *Seigal v. Merrick*, 441 F. Supp. 587, 590 (S.D.N.Y. 1977) (where no market for a
    security exists, its "value should be the actual value to actual recipients, not the val-

26  ue in a theoretical open market"), *appeal dism'd*, 590 F.2d 35 (2d Cir. 1978);
    *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F. 3d 1044, 1048-49 (2d Cir. 1995)

27  ("the value of a security may not be equivalent to its market price.  Congress' use of
    the term 'value' . . . indicates that, under certain circumstances, the market price

28  may not adequately reflect the security's value").

46

the market is active—*i.e.*, only if there are enough transactions, among enough market participants, that market participants are able to sell the security in orderly transactions (not forced liquidations or distressed sales).  A "market price is significant only where there is a free and open market and the volume of transactions and conditions make the market a fair reflection of the judgment of the buying and selling public." *Norte & Co. v. Huffines*, 288 F. Supp. 855, 859 (S.D.N.Y. 1968), *aff'd in part and remanded in part*, 416 F.2d 1189 (2d Cir. 1969).  If—as here—"the market is disrupted or dysfunctional one must use a different method to discover the value of the asset." *In re Am. Home Mortg. Holdings, Inc.*, 411 B.R. 181, 193 (Bankr. D. Del. 2009).

This is especially true where, as here, the offering documents contained extensive warnings about the potential illiquidity of the securities.  More specifically, under headings such as "**Certificates May Not Be Appropriate for Some Investors**," and "**You May Have Difficulty Reselling Certificates**," each prospectus supplement expressly disclosed that:  (i) the Certificates entitled holders only to a stream of mortgage pass-through payments (not to any market appreciation); (ii) no secondary market existed for the Certificates (and none might ever develop); (iii) Certificates could be wholly illiquid, as MBS historically have been during periods of economic turbulence; and (iv) such illiquidity could have an adverse effect on Certificate prices.[49] For example, the Prospectus Supplement for CWALT Series 2005-24, which both IPERS and OPERS claim to have purchased, warned explicitly:

- "[T]he offered certificates may be an inappropriate investment if you require a distribution of a particular amount of principal on a specific date or an otherwise predictable stream of distributions."  Ex. 5 at S-18.

---

[49] *See, e.g.*, *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 178-79 (S.D.N.Y. 1996) (dismissing section 11 and 12 claims where prospectus specifically disclosed the risk that trust investments might be illiquid); c*f. Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 351 (2d Cir. 1993) (dismissing §§ 11 and 12 claims as untimely because warnings in prospectus were "were sufficient to put a reasonable investor of ordinary intelligence on notice of . . . the illiquidity of these investments").

47

- "[A] secondary market for the offered certificates may not develop or provide certificateholders with liquidity of investment." *Id.*

- "No market for any of the certificates will exist before they are issued. . . . We cannot assure you that a secondary market will develop or, if it develops, that it will continue. Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield." *Id.* at S-19.

- "The market values of the securities are likely to fluctuate. Fluctuations may be significant and could result in significant losses to you." *Id.*

- "The secondary markets for mortgage backed securities have experienced periods of illiquidity and can be expected to do so in the future. Illiquidity can have a severely adverse effect on the prices of securities that are especially sensitive to prepayment, credit or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors." *Id.*[50]

Accordingly, price declines in the illiquid market for MBS are an improper measure of economic loss. *See NECA-IBEW Health & Welfare Fund*, Transcript of Decision at 42 (Ex. 35) (dismissing §§ 11 and 12(a)(2) claims where MBS were allegedly "no longer marketable at prices anywhere near the prices paid by plaintiff" because offering documents did not promise any particular value in the secondary market and warned that the MBS might not be resalable).[51]

---

[50] Similar disclosures, warning investors of the risks of market illiquidity, appeared in each of the prospectus supplements at issue in this case. *See* App. Tab 9.

[51] Plaintiffs may contend that they have "locked in" loss with respect to the positions they have sold with more than $100 in realized loss. The Distribution Reports, however, show that *every one* of the positions that Plaintiffs have liquidated was sold at a time when all distributions had been paid *in full*. *See* App. Tabs 4-5. Plaintiffs' decision to sell the MBS at a "loss" when they could have held the MBS and continued to receive all the payments for which they bargained is no different from a decision to hold securities in the hope of a gain rather than sell those securities and reinvest the proceeds elsewhere: both decisions "involve[] precisely that weighing of risk that constitutes an investment decision." *Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189, 1199 (8th Cir. 1978). Defendants cannot be liable for Plaintiffs' independent investment decisions after their initial decision to purchase the MBS, especially where the Offering Documents warned that investors may not be able to re-sell the MBS at

48

Moreover, if Plaintiffs were permitted to sue based on a decline in the market prices of the Certificates, they would stand to receive a double recovery tantamount to a windfall.  Plaintiffs could continue to receive the cash flow payments they bargained for, while also seeking compensation for the decline in market "value" of Certificates as to which they were explicitly told that no public market might *ever* exist.  Plaintiffs also would benefit from any future increase in market "value" as to MBS they still hold.  The securities laws do not entitle investors to windfalls.

## IV.   NO MATERIAL MISSTATEMENTS OR OMISSIONS ARE ALLEGED.

### A.   The Representations Concerning The Mortgage Loans Underlying The MBS Were Limited And Qualified.

Plaintiffs' securities claims are premised on a fundamental mischaracterization of the representations contained in the Offering Documents regarding the Mortgage Loans underlying the MBS.  Although Plaintiffs argue that the Offering Documents made *unqualified* statements about the credit characteristics of the Mortgage Loans and how they were originated, the representations in the Offering Documents were actually limited and disjunctive in nature:  they represented only that the Mortgage Loans underlying the MBS *either* possessed the described characteristics when the securities were issued *or*, if not, the non-compliant loans would be cured or replaced upon request in accordance with the underlying securitization documents.  Plaintiffs do not allege that these limited, qualified representations were materially false when made, or that any such request was made or, if made, not satisfied.

For this reason, the Fifth Circuit recently affirmed dismissal of federal securities claims brought by MBS investors based on virtually identical representations.  In *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 385 (5th Cir. 2010), the Fifth Circuit affirmed the district court's dismissal of claims by a purchaser

---

their purchase prices, or at all.  *See id.* at 1198-99; *Rizika v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1981 WL 1619, at *7-8 (D. Md. Jan. 28, 1981); 6 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg and Lowenfels on Securities Fraud and Commodities Fraud*, §§ 13:52, 13:102 (2d ed. 2009).

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

of MBS from defendants Barclays Bank PLC and Barclays Capital, Inc. ("Barclays"). The plaintiff alleged that the registration statements misrepresented "that there were no delinquent loans in the [certificates] when Lone Star purchased the securities." *Id.* at 388. Various prospectus supplements stated that Barclays had conducted diligence on the underlying mortgage loan pools and that no loans were delinquent. *Id.* at 388-89. The plaintiff alleged that these were material misstatements because numerous loans had been delinquent for thirty days or more. *Id.* at 386.

As the Fifth Circuit observed, the prospectuses (which cross-referenced a separate agreement containing representations and warranties from Barclays about certain credit characteristics of the loans) stated that Barclays would make representations and warranties with respect to each securitized mortgage loan, including the representation that except for specifically identified loans no delinquencies existed. *Id.* at 388. The prospectuses also stated that if a mortgage loan did not comply with Barclays' representations, Barclays' only obligation would be "to substitute or purchase" that mortgage loan. *Id.* at 389 n.6-7. The Fifth Circuit then held that, "as a whole, the prospectuses and warranties provide that the mortgages *should be* non-delinquent, but if some mortgages were delinquent, then Barclays would either re-purchase them or substitute performing mortgages into the trust." *Id.* The Court of Appeals thus concluded that "Barclays did not represent that the . . . mortgage pools were absolutely free from delinquent loans at the time of purchase. The agreements envision that the mortgage pools might contain delinquent mortgages, and they impose a 'sole' remedy to correct such mistakes." *Id.* at 389.[52] That the representa-

---

[52] Other courts also have held that the presence of a remedy disclosure like that in *Lone Star* and also in the Offering Documents here has "the effect of disclosing to present and future shareholders" that the defendants' representation "was not of unlimited scope." *In re U.S. West, Inc. Sec. Litig.*, 65 Fed. Appx. 856, 865 (3d Cir. 2003). In *U.S. West*, the plaintiffs argued that a proxy solicitation was false because it did not disclose that one of the parties allegedly did not intend to honor the "non-solicitation" clause of the merger agreement. The Third Circuit affirmed the dismissal of the complaint, concluding that the non-solicitation assurance had to be "read in conjunction with the 'Termination' provision" explicitly providing for the consequences in the event of its breach, and that plaintiffs' construction omitting the latter was "unreasonable." *Id.*

tions work this way makes sense, as the court noted:

> These provisions are sensible given the difficulties of investigating the
> underlying residential mortgages.  Even the best due diligence may over-
> look problems. . . . Because mistakes are inevitable, both seller and pur-
> chaser are protected by a promise that the mortgage pools will be free
> from later-discovered delinquent mortgages.  This is what [the seller]
> promised and [the purchaser] agreed.  As a sophisticated investor placing
> a $60 million investment in the trusts, [the purchaser] has no basis to ig-
> nore these provisions or their consequences.

*Id.*  The Fifth Circuit therefore sustained the dismissal of all claims, holding that
"Barclays made no actionable misrepresentations" because plaintiff had "not alleged
that Barclays failed to substitute or repurchase the delinquent mortgages." *Id.*

Other decisions as well have required plaintiffs to address how such "repur-
chase or cure" provisions affect the nature of any representations made in MBS offer-
ing materials.  For example, in *City of Ann Arbor*, 2010 WL 1371417, at *10, the
court required plaintiffs in a 1933 Act class action re-plead their complaint in order to
"put the court in a better position from which to evaluate the merits of the claims al-
leged, particularly . . . the impact of any promise to repurchase or substitute mortgages
that did not comply with the terms of the offering materials."  *Id.*; *accord Mass. Brick-
layers*, 2010 WL 1370962, at *1 (E.D.N.Y. Apr. 6, 2010) (same).

The same reasoning applies in this case.  As in *Lone Star*, the Offering
Documents state that the underlying mortgage loans would ***either*** meet the charac-
teristics described in the Offering Documents ***or***, if not, would be cured or replaced
in accordance with the provisions of the securitization documents.  More specifi-
cally, each of the Offering Documents represented that, if there is an "uncured
breach of any representation or warranty relating to the characteristics of the mort-
gage loans that materially and adversely affects the interests of the certificatehold-
ers," the seller of the Mortgage Loan "will be obligated to ***repurchase or substitute***

51

a similar mortgage loan . . . ."  *See, e.g.*, Ex. 6 (CWMBS 2007-HYB2 Pro. Supp.) at

S-27.  Thus, upon material breach of any representation or warranty, a request for

repurchase or substitution of affected Mortgage Loans may be made as provided for

in the Offering Documents.  *Id.*  The Offering Documents also prominently dis-

closed that, pursuant to the underlying pooling and servicing agreement (or other

referenced warranty provisions), CHL or the relevant seller of the loans "will make

certain representations, warranties and covenants to the depositor relating to . . . cer-

tain characteristics of the Mortgage Loans."  *See, e.g.*, Ex. 5 (CWALT 2005-24 Pro.

Supp.) at S-20 (referencing the PSA); *see also* Ex. 11 (PSA) at § 2.03 and Schedule

III-A.[53]  These representations concern, *inter alia*, the underwriting and origination

practices relevant to the mortgage loans underlying each securitization.[54]

 In short, as in *Lone Star*, the Offering Documents here represented that each

underlying Mortgage Loan **either** already had the relevant characteristics **or**, if one or

more did not have such characteristics, upon proper request any non-compliant loans

would be cured, repurchased or substituted.  As in *Lone Star*, the Offering Documents

expressly stated that "this cure, repurchase or substitution obligation constitutes the

sole remedy available to certificateholders or the trustee for omission of, or a material

defect in, a mortgage loan document."  Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-67.

And, as in *Lone Star*, the Offering Documents' representation about repurchasing or

curing non-compliant loans qualifies and limits all representations in the Offering

Documents regarding the characteristics of the Mortgage Loans.  Thus, the existence

of one or more non-compliant loans in a specific pool (assuming Plaintiffs had alleged

such non-compliance, which they have not), would not by itself constitute a material

misstatement.  To the contrary, the existence of the cure/replacement language con-

---

[53] Regardless of its securitization structure (pass-through or "debt-for-tax"), each
deal included a repurchase or substitution remedy that could be pursued on behalf of
all certificate holders.  *See, e.g.*, Ex. 9 (CWHEQ 2007-E Pro. Supp.) at S-68-70.

[54] A chart identifying the relevant representations as to each of the MBS is contained
in Tab 8 of the Appendix.

templates implicitly that one or more Mortgage Loans may not comply with the representations about loan quality, underwriting, and credit characteristics in the prospectus supplements.  Because Plaintiffs have not identified even one specific misrepresented Mortgage Loan and have not alleged that cure or replacement was ever requested, Plaintiffs have not alleged any breach of this disjunctive, limited representation.  As in *Lone Star*, Plaintiffs' failure requires dismissal of the Amended Complaint.

## B.    Plaintiffs' Claims "Sound In Fraud" And Must Satisfy Rule 9(b).

On a motion to dismiss, courts must consider whether the factual allegations of the complaint state a "plausible" claim for relief.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).  This requires "more than a sheer possibility that a defendant has acted unlawfully;" the factual allegations must be sufficient to move the claims "across the line from conceivable to plausible."  *Id.* at 1949, 1951 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of "entitlement to relief."  *Id.* at 1949.  To survive dismissal, a plaintiff must allege facts sufficient to raise a right to relief above the speculative level.  *Twombly*, 550 U.S. at 555.  A complaint that merely alleges "labels and conclusions" or "formulaic recitation of the elements of a cause of action" does not satisfy this requirement.  *Id.*  Courts are "not required to accept as true 'allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.'"  *Century Aluminum*, 2010 WL 1729426, at *3.

Claims "grounded in fraud" also must satisfy Rule 9(b)'s heightened pleading requirements.  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996).  A claim "sounds in fraud" when "plaintiffs allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim," or when plaintiffs "alleg[e] facts that necessarily constitute fraud (even if the word 'fraud' is not used)."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-05 (9th Cir. 2003).  As the Ninth Circuit made clear in *Stac*, in such circumstances Rule 9(b) requires a

1    plaintiff to plead "*precise* allegations explaining how the alleged misstatements

2    were misleading or untrue when made."  894 F.3d at 1409.

3        In an effort to avoid Rule 9(b), Plaintiffs have included a boilerplate dis-

4    claimer of an intent to plead fraud.  AC ¶¶ 3, 194.  In the Ninth Circuit, however,

5    substance prevails over form.  As the Court of Appeals held when it rejected similar

6    boilerplate:  "These nominal efforts are unconvincing where the gravamen of the

7    complaint is plainly fraud and no effort is made to show any other basis for the

8    claims levied at the Prospectus."[55]  *Stac*, 89 F.3d at 1405 n.2.  Courts have rejected

9    boilerplate disclaimers and applied Rule 9(b) to complaints asserting 1933 Act

10   claims when the plaintiffs, as in this case, allege that the defendants "knew" mate-

11   rial, undisclosed facts.  *See, e.g.*, *TAAM Assocs. Inc. v. Housecall Med. Resources,*

12   *Inc.*, 1998 WL 1745361 (N.D. Ga. Mar. 30, 1998); *In re CIT Group, Inc. Sec. Litig.*,

13   349 F. Supp. 2d 685, 690 n.4 (S.D.N.Y. 2004).

14       Here, the gravamen of the claims against the Countrywide Defendants is

15   plainly fraud.  Plaintiffs do not allege that the Countrywide Defendants negligently

16   or innocently misrepresented Countrywide's mortgage loan underwriting proce-

17   dures, but rather did so deliberately and systematically.  The following allegations

18   make this clear:

19   • Defendants allegedly "*coach[ed]" loan applicants to misstate their income*,

20       "steer[ed]" loan applicants toward more expensive loans, and "systematically"

21       ignored underwriting standards and guidelines (AC ¶¶ 101, 141, 163, 167, 176);

22

---

23   [55] *See, e.g.*, *In re Gemstar-TV Guide, Int'l Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS
24   25884, at *29 (C.D. Cal. Aug. 15, 2003) ("This requirement cannot be avoided by
     plaintiffs who merely recite that there are no allegations of fraud in the Section 11
     claims"); *Brody v. Homestore, Inc.*, 2003 WL 22127108, at *4 (C.D. Cal. Aug. 8,
25   2003) (concluding that § 11 claims sound in fraud despite plaintiffs' express dis-
     avowal of fraud claims); *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d
26   1173, 1180 (N.D. Cal. 2004).  Similarly, boilerplate allegations of negligence are in-
     sufficient when a complaint plainly sounds in fraud.  *In re Stratosphere Corp. Sec.*
27   *Litig.*, 1 F. Supp. 2d 1096, 1104 (D. Nev. 1998) (disclaimer of fraud-based liability
     insufficient even where plaintiffs alleged that "Defendants in some instances failed to
28   use due diligence" or "should have known" statements were inaccurate).

---

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

- Repeated references to federal investigations for "*fraud*" (*id.* ¶¶ 89, 105, 120); and civil lawsuits for "*fraud*" (*id.* ¶¶ 13, 136, 137);

- FBI "probe into Countrywide's mortgage lending practices, including *manipulation* of the subprime and non-traditional loan markets, *knowledge of* and disregard for underwriting inaccuracies and misrepresentations, and Countrywide's *specific instructions to underwriters* not to scrutinize certain types of loans it issued" (*id.* ¶ 102);

- "[Loan underwriting] guidelines were *systematically disregarded* to include borrowers who did not meet the aforementioned criteria" (*id.* ¶ 6; *see also id.* ¶¶ 10, 13, 109, 163, 185);

- "[W]hile the Offering Documents represented that Countrywide's underwriting of mortgages was designed to ensure the borrower's ability to repay the mortgage and the adequacy of the collateral supporting the mortgage, in reality Countrywide's underwriting practices *were actually designed to* originate as many mortgage loans as possible without regard to the ability of borrowers to afford such mortgages" (*id.* ¶ 101; *see also id.* ¶¶ 167, 176); and

- Numerous state Attorney General "investigations into Countrywide's lending practices and also have alleged that Countrywide *systematically departed* from the underwriting standards *it professed to use* to originate residential loans" (*id.* ¶¶ 109-18).

Accordingly, the Amended Complaint sounds in fraud, and Rule 9(b) applies.  The Amended Complaint, however, fails to allege fraud with the requisite factual particularity.  Plaintiffs do not plead facts demonstrating that any representation in the Offering Documents was false when made, let alone plead such facts with the precision required to satisfy Rule 9(b) in this Circuit.  Rather, Plaintiffs rely on rank speculation—lifting allegations from complaints filed by litigants in other actions without any independent verification of the reliability of those allegations, and conclusorily asserting that the opposite of what the Offering Documents said was the truth.  Thus,

55

1   far from satisfying Rule 9(b), Plaintiffs' Amended Complaint does not even satisfy

2   the less exacting *Iqbal/Twombly* standard.

3   **C.   Plaintiffs Have Not Alleged Material Misrepresentations Regarding
         Underwriting And Appraisal Standards.**

4

5       Plaintiffs allege that the Offering Documents misrepresented "(1) the under-

6   writing process and standards by which mortgages held by the Issuing Trusts were

7   originated, and (2) the values of the real estate securing the mortgages pooled in the

8   Issuing Trusts, expressed in part as the average LTV ratios of the underlying mort-

9   gages and the appraisal standards by which such real estate values were obtained."

10  AC ¶ 77.  Plaintiffs, however, have failed to allege any misstatements, let alone why

11  any statement made in any particular MBS Offering was materially false with re-

12  spect to the specific Mortgage Loans pooled in that Offering.

13          **1.      No Misstatement Has Been Tied To Any Pool.**

14      Sections 11 and 12(a)(2) require Plaintiffs to both plead and prove "(1) that

15  the registration statement contained an omission or misrepresentation, and (2) that

16  the omission or misrepresentation was material, that is, it would have misled a rea-

17  sonable investor about the nature of his or her investment."  *Stac*, 89 F.3d at 1403-

18  04.  Here, Plaintiffs allege that they purchased Certificates that were backed by spe-

19  cific assets (the Mortgage Loans) from which Plaintiffs were to receive cash flow

20  distributions.  *See, e.g.*, AC ¶¶ 5, 7, 70.  Plaintiffs acknowledge that the representa-

21  tions in each prospectus supplement regarding mortgage loan characteristics and un-

22  derwriting standards referred only to the specific Mortgage Loans underlying the

23  particular deal covered by the prospectus supplement:  "a final Prospectus Supple-

24  ment was filed with the SEC containing *a description of the mortgage pool under-

25  lying the Certificates* and the *underwriting standards by which the mortgages were

26  originated*."  *Id.* ¶ 161.  Thus, to prevail on their Section 11 and 12(a)(2) claims,

27  Plaintiffs must plead and ultimately prove that the loan origination and appraisal

28  practices alleged in the Amended Complaint concerned the specific Mortgage Loans

underlying the specific MBS they purchased—otherwise those alleged practices could not have concerned the "nature of their investment." *Stac*, F.3d at 1403-04.

Several courts have held recently, in MBS securities suits similar to this one, that a plaintiff must allege that the misstatements concerned the specific loans underlying the securities that were purchased—*i.e.*, it is *not* enough to allege generally that a defendant misdescribed its underwriting practices.  For example, in *Republic Bank & Trust Co. v. Bear*, *Stearns & Co., Inc.*, 2010 WL 1489264, at *6 (W.D. Ky. Apr. 13, 2010), the court dismissed the MBS investor's claim that the defendants had "failed to disclose that the originators of many of the mortgage loans performed inaccurate and unsound valuations of the properties involved, thereby leaving the mortgages inadequately secured."  Rather, the court held that "there [was] nothing in the complaint alleging anything wrong with the appraisals of the ***specific properties involved in this litigation***"—and without a nexus between the claimed misrepresentation and the properties at issue, the plaintiff had not stated a claim.  *Id.*[56]

Similarly, in *Tsereteli*, 692 F. Supp. 2d at 394, the plaintiffs alleged the MBS prospectuses misrepresented that property appraisals had been conducted in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP").  To support this allegation, plaintiffs cited a report of the U.S. Office of the Inspector General that allegedly stated that certain appraisals performed for IndyMac loans did not comply with USPAP.  *Id.* at 393-94.  The court held that such allegations were insufficient and dismissed plaintiffs' Section 11 and 12 claims because:

> The OIG Report . . . does not even remotely support the allegation that ***the loans in the pool underlying the Certificates [purchased by plaintiffs]***

---

[56] *Accord City of Ann Arbor*, 2010 WL 1371417, at *10 (ordering plaintiffs to show "how [alleged false] statements and/or omissions are tied to the loans in which they invested"); *Mass. Bricklayers*, 2010 WL 1370962, at *1 (same); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *6 (C.D. Cal. Aug. 21, 2009) (dismissing securities claims for failure "to plead any particularized facts" to support plaintiffs' "characterization of Downey's Option ARM loans as 'toxic' and 'horrible' because such loans were inherently bad and uncollectible, and [their] conclusion that Downey allegedly engaged in predatory lending practices").

were made on the same basis of appraisals that did not conform to USPAP. It said only that the appraisals supporting some of the twenty-two loans it examined did not do so.  Nor does it contain any suggestion that the loans the OIG examined were in the pools underlying the Certificates.

*Id.* at 394.  Likewise, in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 307 (D. Mass. 2009), the district court dismissed the plaintiffs' MBS claims under Section 11 and 12 where there was no indication that the plaintiffs' allegations "had any bearing on the two Trusts at issue. That questionable appraisal practices were a common problem in the industry as a whole, without more, tells nothing about the Trusts' underlying loans."[57]

Like the plaintiffs in *Republic Bank*, *Tsereteli*, and *Nomura*, Plaintiffs here fail to link their allegations regarding underwriting and appraisal practices to any of the specific Mortgage Loans underlying the MBS they bought.  The Amended Complaint thus lacks any facts that would support a plausible inference that the Offering Documents here were materially false.  Rule 11 prohibits Plaintiffs from substituting adequate pleading of facts with generalized criticisms about how Country-

---

[57] For the same reasons, the court dismissed the Section 11 and 12(a)(2) claims in *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 420 (S.D.N.Y. 2009). There, the plaintiff alleged that the offering documents for the common stock of Britannia, a shipping company, were misleading because "Britannia misstated or failed to disclose . . . that Britannia used FFAs [forward freight agreements] to hedge against increases, and not merely decreases, in charter rates." *Id.* at 406.  The court held that the plaintiff had not alleged a material misstatement because "the Complaint specifies only one FFA [out of 37 FFAs] as being inconsistent with its characterization of Britannia's disclosures." *Id.* at 416.  *Accord ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 204-05 (2d Cir. 2009) (affirming dismissal of Section 11 claims where plaintiffs failed to allege that a material percentage of loans were misrepresented); *Garber v. Legg Mason*, Inc. 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (Section 11 and 12(a)(2) claims were "too conclusory, as they offer no possibility at all of assessing materiality. . . ."). Here, Plaintiffs do not even attempt to identify the volume of loans in any of the mortgage pools that did not comply with the disclosures in the Offering Documents. Even assuming that some "non-complying" loans were included in some loan pool for some offering, Plaintiffs do not allege that these supposed deviations were material, either relative to the huge number of loans held in the mortgage pools or to the performance of similar loans made by other lenders during the housing meltdown.  Without any allegations to support an inference of materiality, Plaintiffs cannot state a claim. *See Stac*, 89 F.3d at 1404-05 (dismissing 1933 Act claims for failure to adequately allege materiality).

---

58

1   wide supposedly originated loans during the putative class period.  *See Twombly*,

2   550 U.S. at 555 (insufficient to plead facts giving rise to a mere suspicion of a le-

3   gally cognizable right of action).  Fundamentally, Plaintiffs have not pleaded any

4   facts showing that any loan that actually made its way into any of the pools underly-

5   ing the MBS sold in this case was originated improperly, much less that the descrip-

6   tion of the loans in the Offering Documents at issue was materially false.[58]  Lacking

7   these crucial facts, the Amended Complaint should be dismissed.

8           **2.      The Characteristics Of The Mortgage Loans Underlying The MBS Were Disclosed In Detail In The Offering Documents.**

9

10       Plaintiffs allege that the Offering Documents misstated that the loans underlying

11  the MBS were originated in accordance with CHL's "underwriting standards," and

12  that those standards complied with "applicable federal and state laws" and were ap-

13  plied "to evaluate the prospective borrower's credit standing and repayment ability

14  and the value and adequacy of the mortgaged property as collateral."  AC ¶ 162.

15  Plaintiffs, with no factual support, simply allege the opposite was true:  "Defendants

16  failed to disclose that Countrywide systematically ignored underwriting standards im-

17  posed by state and federal law in issuing the mortgages pooled into the Issuing

18  Trusts."  *Id.* ¶ 163.  Bald allegations such as this do not support an inference of falsity.

19  *See, e.g.*, *Leonard v. NetFRAME Sys., Inc.*, 1995 WL 798923, at *6 (N.D. Cal. Aug. 8,

20  1995) ("Plaintiff's conclusory attempt to plead as 'facts' the converse of the positive

21  statements made by defendants does not satisfy [Rule 9(b)'s] requirement that a plain-

22

---

23  [58] The inadequacy of Plaintiffs' sweeping generalizations becomes even starker when one realizes that Plaintiffs' overly generalized criticisms of the underwriting process

24  are being aimed at a mortgage business that originated more than $499 billion in mort-gages in 2005, more than $468 billion in 2006, and more than $415 billion in 2007,

25  for a total of more than $1.383 trillion from 2005-07.  *See* Ex. 2 (2007 SEC Form 10-K) at 29.  Therefore, even assuming that Plaintiffs had adequately pleaded that some

26  loans Countrywide made during the putative class period were originated in a manner different from the descriptions in the prospectus supplements (as generally alleged in

27  the Amended Complaint), the Amended Complaint contains not a single fact that would permit this Court to form any inference about what portion of the almost $1.4

28  trillion dollars of loans during the putative class period were originated in this way.

---

tiff identify particular facts indicating the falsity of defendants' statements"); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *5 (S.D.N.Y. June 1, 1998) ("conclusory allegations that the opposite of a statement in a press release is true, without further factual elaboration, is insufficient").  Plaintiffs have alleged no **facts** to support their misrepresentation claims; rather, they simply have parroted other litigants' allegations in other lawsuits or cited fact-gathering investigations allegedly being conducted by regulatory agencies.  Other litigants' **allegations** are not facts, and 1933 Act claims may not be predicated on them.  *See infra* at 66-69.

Moreover, the plausibility of Plaintiffs' allegations regarding the description of CHL's underwriting standards ultimately must be considered in context with the granular information provided in the Offering Documents regarding the credit risk attributes of the Mortgage Loans underlying the MBS.  *See, e.g.*, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994) (prospectus statements must be analyzed in the context in which they appear in the overall document).  Here, the Offering Documents provided hard data about the pooled loans such as FICO scores, LTV ratios, extent of required borrower documentation, among other loan details.  *See supra* at 15-19.  This information told investors all the material information needed to assess the credit risk associated with the pooled loans, and thus the risk associated with the prospect of continued cash flow distributions in the future.  Moreover, in accordance with SEC Regulation AB, the trusts holding the pooled Mortgage Loans filed with the SEC (on Form 8-K) the same credit risk attribute details included in the prospectus supplements, but on a loan-by-loan basis.  *See* 17 C.F.R. § 229.1111; Ex. 1 (example of Form 8-K).  As the SEC said in its adopting release for Regulation AB, the SEC considers inclusion of loan-by-loan data to be "comprehensive," "definitive" and "material[]" to investors.  70 Fed. Reg. at 1581, 1584, 1587.  Absent allegations demonstrating that this information was inaccurate, any alleged errors in the narrative descriptions of CHL's underwriting practices, when appropriately viewed in the context of the data tables, detailed risk disclo-

60

sures, and required SEC disclosures, were immaterial as a matter of law.  Thus, for example, in the context of the substantial credit risk information and risk disclosures in the MBS offering materials at issue, the court in *Republic Bank* rejected the plaintiff's claim that defendants had violated state securities laws by not warning that the loans underlying the MBS had been originated without regard to prudent underwriting standards.  *See* 2010 WL 1489264, at *5.  As the court noted, "plaintiff could have and should have inspected [the offering materials] . . . to learn exactly what it was buying." *Id.*[59]

Likewise, in *Nomura*, 658 F. Supp. 2d at 305, 312, the district court dismissed Section 11 and 12(a)(2) claims substantially similar to those here alleging that MBS registration statements misstated the originator's adherence to "underwriting guidelines [that] are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan."  The *Nomura* court explained that "[i]n addition to the fusillade of cautionary statements, the offering materials revealed the fact that the vast majority of the loans securing the . . . Certificates had been originated under limited documentation programs and that the borrower's income as a result had not been

---

[59] Rather than address the detailed data and risk disclosures that they were provided, Plaintiffs allege nondisclosure of information as to which no duty to disclose existed. In particular, Plaintiffs cite the results of one quality control audit and "reports" generated by Countrywide's Loan Underwriting Expert System ("CLUES").  AC ¶¶ 115, 163, 167, 174, 176.  A duty to disclose arises for purposes of Sections 11 and 12 only where a prospectus or registration statement either (a) "omitted to state a material fact required to be stated therein" or (b) omitted to state a material fact "necessary to make the statements therein not misleading."  15 U.S.C. §§ 77k(a), 77*l*(a)(2).  Plaintiffs have identified no statements that were rendered materially false by the omission of the alleged information.  Nor was such disclosure required under Regulation AB, which provides "***tailored disclosure requirements*** and guidance for Securities Act and Exchange Act filings involving asset-backed securities." 70 Fed. Reg. at 1581.  Accordingly, these allegations provide no basis for 1933 Act claims.  *See, e.g.*, *Stac*, 89 F.3d at 1399 (holding that issuers have no duty "to forecast future events or to caution that future prospects may not be as bright as past performance."); *In re Veri-Fone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993) (holding no duty to disclose "omitted forecasts that did not render the other statements that were made misleading"); *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (finding no duty to disclose information that "would be interesting, market-wise").

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

1    verified."[60]  *Id.* at 307.  The same is true here.

2        Finally, not only must the description of CHL's underwriting standards be evalu-

3    ated in context with the detailed credit risk disclosures in the Offering Documents, but

4    the plausibility of Plaintiffs' claims also should be assessed with reference to the

5    mortgage industry collapse.  *Iqbal*, 129 S. Ct. at 1950 (analyzing complaint is "a con-

6    text-specific task that requires the reviewing court to draw on its judicial experience

7    and common sense").  Plaintiffs allege that the Mortgage Loan pools have performed

8    poorly and the MBS they purchased have been downgraded, but the same thing can be

9    said with respect to similar loans and MBS from other originators.  *See supra* at 20-

10   21.  Thus, any inference that the performance of the MBS at issue in this case is at-

11   tributable to misrepresentations is inherently weak and speculative.  *Cf. First Nation-

12   wide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("[W]hen the plain-

13   tiff's loss coincides with a marketwide phenomenon causing comparable losses to

14   other investors, the prospect that the plaintiff's loss was caused by the fraud de-

15   creases").

16                    **3.      Appraisals Are Non-Actionable Opinions.**

17        Plaintiffs allege that the Offering Documents misrepresented that CHL ob-

18   tained appraisal reports that:  (1) were based on comparable home sales or replace-

19   ment cost (AC ¶¶ 171, 177), (2) conformed to Fannie Mae or Freddie Mac appraisal

20   standards (*id.*), and (3) were "prepared on a Uniform Residential Appraisal Report

21   (Form 1004) or other appraisal form as applicable to the specific mortgaged prop-

22   erty type" (*id.* ¶ 178).  Plaintiffs then allege that LTV data reported in the Offering

23   Documents was "materially misstated when made because these ratios were based

24

25   _____

     [60]  *See also DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (holding that an

26   allegedly inaccurate data table contained in a prospectus, when "taken together and
     in context" with other accurate tables and disclosures in the same prospectus, was
     immaterial); *In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56, 60 (D. Mass.

27   1994) (holding that the "central inquiry" in determining whether offering materials
     were materially misleading is whether the disclosures "*taken together and in con-*

28   *text*" would mislead "a reasonable investor about the nature of the investment").

                                              62

1   on incorrect and/or inflated appraisal values." *Id.* ¶ 184.

2   Plaintiffs, however, do not plead a single fact to support their appraisal allega-

3   tions.  Rather, they again simply allege the opposite of what the Offering Documents

4   represented, *i.e.*, that appraisals were not "based on recent sales of comparable homes

5   . . . replacement cost analysis . . . or . . . on forms approved by Fannie Mae or Freddie

6   Mac." *Id.* ¶ 182.  But, merely alleging the opposite of a statement was true does not

7   satisfy Rule 8, let alone Rule 9(b).  *See Nomura*, 658 F. Supp. 2d at 308.

8   In addition, the Supreme Court made clear twenty years ago that statements of

9   opinion are not actionable absent a showing that the opinion was believed to be false

10  when made.  *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090

11  (1991); *accord Rubke v. Capitol Bancorp. Ltd.*, 551 F.3d 1156, 1162 (9th Cir.

12  2009).  Accordingly, courts repeatedly have dismissed MBS securities claims based

13  on allegedly incorrect or inflated appraisals in the absence of allegations showing

14  that the appraisals were known to be inaccurate when they were prepared.  As one

15  district court recently stated in dismissing 1933 Act claims:

16  [N]either an appraisal nor a judgment that a property's value supports a par-

17  ticular loan amount is a statement of fact.  Each is instead a subjective opin-

18  ion based on the particular methods and assumptions the appraiser uses.  A

19  subjective opinion is actionable under the Securities Act only if the

20  amended complaint alleges that the speaker did not truly have the opinion

21  at the time it was made public.

22  *Tsereteli*, 692 F. Supp. 2d at 393.  Other courts have reached the same conclusion.

23  *See IndyMac*, 2010 WL 2473243, at *10-11 (dismissing claims based on allegations

24  that appraisals did not comply with USPAP standards); *N.J. Carpenters Health Fund*,

25  2010 WL 1473288, at *7-8 (dismissing allegations regarding appraisals, appraisal

26  practices, and LTV ratios).

27  There is no allegation that the Offering Documents misreported the valuation

28  opinion expressed in any appraisal.  Rather, Plaintiffs allege only that unspecified

1   appraisals—that is, opinions about the value of property as of certain dates—were

2   inflated.  Plaintiffs do not allege that any of the appraisers who valued the collateral

3   associated with the pooled loans knew that their appraisals were materially over-

4   stated, much less that the Countrywide Defendants knew that the loans underlying

5   the MBS at issue in this case were based on "inflated appraisals."  Instead, Plaintiffs

6   merely regurgitate allegations from other complaints regarding appraisal practices.

7   AC ¶¶ 133-35, 142.  Plaintiffs thus have alleged only disagreement with appraisal

8   values, which is not actionable as a matter of law.

9       Plaintiffs' claim relating to LTV ratios also should be dismissed "for the evi-

10  dent reason that it is dependent upon plaintiffs' unsubstantiated allegations . . . with

11  regard to appraisal methods."  *Nomura*, 658 F. Supp. 2d at 308; *accord IndyMac*,

12  2010 WL 2473243, at *11 (appraisals are not actionable statements of opinion unless

13  appraiser did not believe appraisal at time of issue); *Tsereteli*, 692 F. Supp. 2d at 393

14  (same); *N.J. Carpenters*, 2010 WL 1473288, at *7 (same).  Indeed, it is clear on the

15  face of the Amended Complaint that the LTV ratio allegations are duplicative of, and

16  derived entirely from, Plaintiffs' flawed appraisal allegations.  AC ¶ 184 (LTV ratios

17  "based on incorrect and/or inflated appraisals").

18      Plaintiffs' allegations regarding LTV ratios are specious for the additional rea-

19  son that they are based on the erroneous premise that use of allegedly inflated ap-

20  praisals in calculating LTV ratios artificially lowered those ratios, overstated bor-

21  rower equity, and made "it appear that the loans underlying the trusts . . . were less

22  risky than they actually were."  AC ¶ 184.  For purchase mortgages (which make up

23  a substantial portion of the Mortgage Loans underlying the MBS), however, the Of-

24  fering Documents define LTV ratios as the ratio between the principal balance of the

25  loan and "the **lesser** of the selling price of the related mortgage property *or* its ap-

26  praised value at the time of sale."  *See* Ex. 6 (CWMBS 2007-HYB2 Pro. Supp.) at S-

27  32.  Thus, the LTV ratio for a purchase mortgage in each case reflects the contracted

28  sales price for the property (what a willing buyer and seller in an arm's length trans-

1   action agreed was the value), or, ***if lower***, the appraised value.  This conservative ap-

2   proach to the calculation of LTVs undercuts Plaintiffs' allegations.

3          **4.     The Complaint Fails To Allege That Defendants Had Actual
                   Knowledge of Deviations From Underwriting Guidelines.**

4

5          As disclosed in the prospectus supplements, many of the Certificates were

6   backed, in whole or in part, by loans originated by third-party lenders unaffiliated

7   with the Countrywide Defendants.  *See, e.g.*, Ex. 6 (CWMBS 2007-HYB2 Pro.

8   Supp.) at S-3 (disclosing that certificates are backed in part by loans originated by

9   DHI Mortgage Co., Ltd., Home American Mortgage Corp., and Plaza Home Mort-

10  gage Inc.).[61]  Section 1111 of Regulation AB—which "comprehensively"

11  "provid[es] tailored disclosure requirements and guidance for [1933 Act] filings in-

12  volving asset-backed securities," 70 Fed. Reg. at 1581, requires disclosure of the ex-

13  tent to which underwriting criteria "are or could be overridden" only "*to the extent

14  known*."  17 C.F.R. § 229.1111(a)(3) (2010).  Even though scienter is not an element

15  of a 1933 Act claim, a "knowledge" requirement in an SEC regulation mandates that

16  "a plaintiff plead, with some specificity, facts establishing that the defendant had ac-

17  tual knowledge" of the information that the SEC regulation requires to be disclosed.

18  *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *9

19  (S.D.N.Y. Jan. 14, 2010).

20         Here, however, Plaintiffs assert only that "[t]he Defendants knew, or in the

21  exercise of reasonable care should have known" of the alleged misstatements in the

22  Offering Documents.  AC ¶¶ 214, 227.[62]  This equivocal assertion fails to allege any

23  facts showing that any Countrywide Defendant had *actual knowledge* of any alleg-

24  ───────────
    [61] SEC Regulation AB required that the underwriting practices of a third party origi-
25  nator be disclosed only when that originator accounted for 20% or more of the loan
    pool.  *See* 17 C.F.R. § 229.1110(b).

26  [62] And, to the extent Plaintiffs contend they are alleging actual knowledge of such de-
27  viations, they would need to plead that knowledge with particularity under Rule 9(b).
    *See Stac*, 89 F.3d at 1404-05 (claims that are "grounded in fraud" must satisfy Rule
    9(b)'s heightened pleading requirements).  The Amended Complaint, however, does
28  not come close to pleading any such knowledge with particularity.  *Supra* at 53-55.

───────────
65
COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

1  edly undisclosed deviations by unaffiliated originators from their own underwriting

2  guidelines (or, for that matter, of any such deviations by CHL from its underwriting

3  guidelines).[63]

### 5.    Allegations Taken From Other Complaints Or Media Reports Of Government Investigations Are Inadequate.

6    As numerous courts have held, "paragraphs in a complaint that are either

7  based on, or rely on, complaints in other actions that have been dismissed, settled, or

8  otherwise not resolved, are, as a matter of law, immaterial within the meaning of

9  Fed.R.Civ.P. 12(f)" and should be struck.  *RSM Prod. Corp. v. Fridman*, 643 F.

10  Supp. 2d 382, 403 (S.D.N.Y. 2009) (citing *Lipsky v. Commonwealth United Corp.*,

11  551 F.2d 887, 892-94 (2d Cir. 1976)), *aff'd*, 2010 WL 2838582 (2d Cir. July 21,

12  2010); *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218

13  F.R.D. 76, 78 (S.D.N.Y. 2003) (finding that allegations regarding unrelated litiga-

14  tion involving a different group of securities "have no place in a complaint").

15    Moreover, the Supreme Court has held that an attorney's duty to investigate

16  the factual basis for alleged claims is "nondelegable."  *Pavelic & LeFlore v. Marvel*

17  *Entm't Group*, 493 U.S. 120, 126 (1989).  Rule 11 requires that all pleadings contain

18  facts sufficient to show that a reasonable inquiry has been performed regarding the

19  allegations therein.  Fed. R. Civ. P. 11(b); *see also Twombly*, 550 U.S. at 555 (fac-

20  tual allegations must be sufficient to raise a right to relief above the speculative

21  level); *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) ("attorney has

22  a duty prior to filing a complaint [] to conduct a reasonable factual investigation").

23  Courts repeatedly have held that the mere recital of allegations from other com-

24  plaints and governmental investigations is insufficient to meet the mandates of Rule

---

25  [63] *See, e.g., Garber v. Legg Mason, Inc.*, 537 F. Supp. 597, 613-14 (S.D.N.Y.

26  2008) (dismissing § 11 claim where SEC regulation required disclosure of "known trends" and plaintiff failed to allege defendants' knowledge of omitted information);

27  *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669-74 (S.D.N.Y. 2008) (same); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F.

28  Supp. 2d 8, 13 (S.D.N.Y. 2001) (same).

11.  *See In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (rejecting inferences based on the existence of an SEC investigation); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) ("no authority" exists that would allow an attorney to "rely *entirely* on another complaint as the sole basis for his or her allegations"); *City of Austin Police Ret. Sys. v. ITT Educ. Servs. Inc.*, 388 F. Supp. 2d 932, 942 (S.D. Ind. 2005) (dismissing securities lawsuit alleging existence of federal and state regulatory investigations); *Geinko v. Padda*, 2002 WL 276236, at *6 (N.D. Ill. Feb. 27, 2002) (refusing to consider "hearsay allegations" about "red flags" alleged in other lawsuits); *Ferber v. Travelers Corp.*, 802 F. Supp. 698, 714 (D. Conn. 1992) (describing "emptiness" of complaint that "simply state[s] that the SEC is conducting an 'investigation'" without alleging facts independently supporting inference of wrongdoing).

There are sound reasons for refusing to permit a plaintiff to cast as "fact" unproved **allegations** made by a plaintiff in another case.  That is particularly so when, as in this case, the allegations relied upon were originally pleaded by other litigants on "information and belief" and predicated in large part on statements attributed to anonymous "confidential" sources.  Such sources may not actually have made the alleged statements attributed to them, their actual statements may have been distorted when restated in the complaints, and—perhaps when deposed by defense counsel— those sources may later have repudiated the statements attributed to them as wrong, misunderstood, or not based on actual personal knowledge as opposed to speculation. Other litigants relying on such so-called "confidential" witness allegations from other complaints also have no way of assessing the extent to which former employees who gave such statements may be disgruntled, and their remarks biased or otherwise untruthful.  Subsequent plaintiffs should not be permitted to piggyback on such allegations until they have been tested and demonstrated to bear at least some indicia of reliability.  *See Dent v. U.S. Tennis Ass'n*, 2008 WL 2483288, at *3 (E.D.N.Y. June 17, 2008) ("In addition to being inadmissible as hearsay, unproved allegations of miscon-

67

1   duct are not proof of anything.").

2       Yet, for the most part, Plaintiffs' 90-page Amended Complaint simply repeats

3   other litigants' allegations in other lawsuits (*see, e.g.*, AC ¶¶ 13, 90, 100, 122-143),

4   or cites media reports of investigations allegedly being conducted by governmental

5   agencies (*id.* ¶¶ 102, 120, 149-152).  Conspicuously absent from the Amended

6   Complaint, however, is any allegation that Plaintiffs did their own, independent in-

7   vestigation into their claims.  Nowhere do Plaintiffs profess to have interviewed or

8   otherwise spoken to *any* of the "confidential witnesses" cited in the other com-

9   plaints.  Moreover, the filing of other complaints or the alleged pendency of regula-

10  tory investigations, which themselves are simply fact-gathering exercises, does not

11  support any inference of wrongdoing.  As the court said in *Geinko*:  "if this Court

12  were to accept Plaintiffs' view of pleading fraud, two plaintiffs could file separate

13  actions each relying on the allegations in the other's complaint and both would state

14  a claim for fraud.  Clearly, Rule 11's requirements do not allow this type of pleading

15  loophole."  2002 WL 276236, at *6 n.8.  By failing to have conducted any meaning-

16  ful investigation of their own, Plaintiffs necessarily have engaged in exactly the type

17  of speculative pleading that *Iqbal* and *Twombly* prohibit.  550 U.S. at 555; *see also*

18  *Fraker v. Bayer Corp.*, 2009 WL 5865687, at *4 (E.D. Cal. Oct. 6, 2009) (holding

19  that plaintiff failed to satisfy *Twombly* because allegations supported only by con-

20  sent decree and FTC Order were not independently investigated).

21      At its core, the Amended Complaint's principal factual allegation is that the

22  MBS in this case did not perform as Plaintiffs expected.[64]  Mere disappointment in

23  the performance of a security, however, does not give rise to a legally cognizable

24  _____

25  [64] The rare instances in which Plaintiffs try to allege anything resembling a fact have
    little to no bearing on this case.  For example, Plaintiffs cite the July 10, 2007 S&P

26  ratings downgrade of numerous lenders' MBS.  AC ¶ 95.  S&P downgraded 612
    tranches of subprime MBS in this report.  Ex. 21.  Of the 612, only 16 (less than 3%)

27  were Countrywide-related, all from one CWABS subprime shelf offering.  Moreover,
    all 16 downgraded tranches were either B or M tranches.  But, of the 105 classes al-

28  legedly purchased by Plaintiffs, none were B tranches, only 2 were M tranches, and
    Plaintiffs did not buy any of the downgraded M tranches.  *Id.*; AC ¶¶ 21-24.

1   claim.  *See, e.g.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 345, 125 S. Ct. 1633

2   (2005) (securities fraud actions do not exist "to provide investors with broad insur-

3   ance against market losses, but to protect them against those economic losses that

4   misrepresentations actually cause").[65]

**D.     The Section 12(a)(2) Claims Fail.**

**1.     The Countrywide Defendants Are Not Alleged To Have Sold Securities To Plaintiffs.**

8   Plaintiffs assert claims under Section 12(a)(2) against, among other Defen-

9   dants, CWALT, CWMBS, CWABS, CWHEQ, CSC, and CFC.  AC ¶¶ 38, 39, 55,

10  224.  Plaintiffs contend that these Defendants "promoted and sold the Certificates"

11  pursuant to the Offering Documents, and that Plaintiffs "purchased Certificates from

12  the Underwriter Defendants" in connection with the Offerings.  *Id.* ¶ 225.  These al-

13  legations are insufficient to state a claim under Section 12(a)(2).

14  Section 12(a)(2) imposes liability on any person who "offers or sells a secu-

15  rity" by means of a materially false or misleading prospectus.  15 U.S.C. § 77*l*(a)(2).

16  The Supreme Court has interpreted the term "seller" in Section 12(a)(1) narrowly, to

17  mean just the "owner who passed title," along with any "person who successfully

18  solicits the purchase motivated at least in part by a desire to serve his own financial

---

[65] The Court can take judicial notice of the fact that the credit markets and secondary mortgage market suddenly seized up in the summer of 2007 as the result of broad ma-croeconomic forces, including the largest nationwide decline in housing prices since the Great Depression and large scale job losses.  *See supra* at 20-21.  These events— collapsing real estate prices and loss of employment in particular—triggered a spike in mortgage delinquencies and dilute any inferential value of rising delinquencies with respect to the accuracy of the representations in the Offering Documents.  Moreover, no negative inference can reasonably be drawn from increasing delinquencies given that the Offering Documents explicitly warned of this risk as early as 2006, cautioning that housing prices "have declined or stopped appreciating" and that that "*[a] contin-ued decline or an extended flattening of those values may result in additional in-creases in delinquencies and losses on residential mortgage loans* generally."  *See, e.g.*, Ex. 6 (CWMBS 2007-HYB2 Pro. Supp.) at S-25; *supra* at 11-14.  As market conditions worsened significantly in 2007, the Offering Documents warned that [t]he secondary mortgage markets are currently experiencing unprecedented disruptions" and that "these conditions may continue or worsen in the future."  *See* Ex. 7 (CWABS 2007-16 Pro. Supp.) at S-24-25.  Plaintiffs continued to buy these securities anyway.

1    interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647

2    (1988).[66]  As the *Pinter* Court observed, the language of Section 12 "contemplates

3    a buyer-seller relationship not unlike traditional contractual privity." *Id.* at 642.

4         The *Pinter* Court expressly rejected the contention that Section 12 imposes li-

5    ability for "mere participation" in unlawful sales transactions, even if that participa-

6    tion constitutes "a substantial factor in causing the transaction to take place."

7    *Pinter*, 486 U.S. at 649-50.  Rather, "[t]o establish liability under section 12(a)(2), a

8    plaintiff must allege that the defendants did more than simply urge another to pur-

9    chase a security; rather, the plaintiff must show that the defendants solicited pur-

10   chase of the securities for their own financial gain." *In re Daou Sys.*, 411 F.3d at

11   1029.  It is "'the defendant's relationship with the plaintiff-purchaser' rather than

12   'the defendant's degree of involvement in the securities transaction and its surround-

13   ing circumstances'" that is the relevant inquiry under Section 12(a)(2).  *In re Gas*

14   *Reclamation, Inc. Sec. Litig.*, 733 F. Supp. 713, 724 (S.D.N.Y. 1990) (quoting *Pin-*

15   *ter*, 486 U.S. at 651).[67]

16        Here, the Amended Complaint includes no allegations sufficient to impose

17   Section 12(a)(2) liability on CWALT, CWMBS, CWABS, CWHEQ, CSC, CFC, or

18   for that matter any other defendant.  Plaintiffs allege only that unspecified "Issuing

19   Defendants" and "Underwriting Defendants" "promoted and sold the Certificates

20

---

21   [66] *See also Moore v. Kayport Package Express*, 885 F.2d 531, 535-36 (9th Cir. 1989) (applying *Pinter* to §12(a)(2) claims); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.

22   Supp. 2d at 1183 (dismissing § 12(a)(2) claims for failure to plead that plaintiffs "purchased the securities directly from specific underwriters, or directly traceable to spe-

23   cific underwriters, as required").

     [67] This "statutory seller" rule applies to MBS as well as other types of securities.

24   *See, e.g., In re Lehman Bros. Sec. & ERISA Litig.*, 681 F. Supp. 2d 495, 499-500 (S.D.N.Y. 2010) (dismissing § 12(a)(2) claims against MBS rating agencies because

25   they are not statutory sellers, stating that *Pinter* "made clear that seller liability under Section 12(a)(2) is confined"); *NECA-IBEW Health & Welfare Fund*, Transcript

26   of Decision, at 43:15-16, 44:25 (dismissing § 12(a)(2) claims and requiring plaintiffs to identify specifically "whom they purchased from") (Ex. 35); *Nomura*, 658 F.

27   Supp. 2d at 304-05 (dismissing § 12(a)(2) claims where plaintiffs alleged only that they bought MBS "pursuant and/or traceable to" the registration statements and pro-

28   spectus supplements and did not identify specifically who they purchased from).

---

70

pursuant to the defective Offering Documents."  AC ¶ 225.  Plaintiffs have not, however, alleged that any defendant actually sold Certificates *directly* to Plaintiffs, or that Plaintiffs purchased *all*, or even *any*, of their Certificates *directly* from any defendant.  As such, the Section 12(a)(2) claims must be dismissed.  *See e.g.*, *Pinter*, 486 U.S. at 647.[68]

Plaintiffs likewise have not alleged that any defendant directly solicited Plaintiffs' investment for financial gain.  Instead, Plaintiffs allege only that:  (1) that "Defendants CWALT, CWMBS, CWABS, and CWHEQ served as the Depositors for the Issuing Trusts and issued the Registration Statements" (AC ¶ 76); (2) that CSC "drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs" (*id.* ¶ 39); and (3) that CFC "structured" and "controlled" Defendants CWALT, CWMBS, CWABS, and CWHEQ "to facilitate its issuance and sale of the MBS" and received "[r]evenues flowing from the issuance and sale of MBS issued by" those Depositor entities (*id.* ¶ 33).  Plaintiffs also generically allege that unspecified "Issuing Defendants" and "Underwriter Defendants" "promoted and sold the Certificates pursuant to the defective Offering Documents."  *Id.* ¶ 225.  These allegations are inadequate.

Indeed, courts assessing allegations of participation by defendants in the securities offering and sale process similar to those alleged by Plaintiffs here have held that such activity is not sufficient for Section 12(a)(2) liability under *Pinter*.  *See, e.g.*, *Rosenzweig*, 332 F.3d at 871 (dismissing § 12(a)(2) claims when defendants did not "di-

---

[68] *See also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (affirming dismissal of § 12(a)(2) claims where complaint failed to allege that any plaintiff "obtained title to the securities directly from defendants" or that defendants "actively solicited the plaintiffs to purchase"); *In re Mesa Airlines Sec. Litig.*, 1996 WL 33419894, at *10 (D.N.M. May 31, 1996) (dismissing § 12(a)(2) claims for failure to "plead with specificity the facts showing that [plaintiff] was either in privity with the Underwriters or that the Underwriters solicited [plaintiff] to purchase shares of Mesa's stock"); Louis Loss & Joel Seligman, Fundamentals Of Securities Regulation 1224 (5th ed. 2004) ("it seems quite clear that § 12 contemplates only an action by a buyer against *his or her immediate seller*.  That is to say, in the case of the typical firm commitment underwriting, the ultimate investor can recover only from the dealer who sold to him or her.") (emphasis in original).

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

rectly communicate with the buyer" or otherwise "assume[ ] the 'unusual' role of be-coming a 'vendor's agent'"); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 370 (5th Cir. 2001) (allegations that an issuer promoted an issue by preparing a prospectus or conducting a road show insufficient to plead seller liability under § 12(a)(2)); *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998) (fact that the defendants created the offering documents does not constitute "direct and active" solicitation of the "immediate sale" that Section 12(a)(2) liability requires); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir.1996) ("[N]either involve-ment in preparation of a registration statement or prospectus nor participation in 'ac-tivities' relating to the sale of securities, standing alone, demonstrates the kind of *rela-tionship between defendant and plaintiff* that could establish statutory seller status.") (emphasis in original).[69]   As such, the Section 12(a)(2) claims must be dismissed.

### 2.   Plaintiffs Do Not Adequately Allege That They Bought Their Securities In The Offerings.

Plaintiffs' Section 12(a)(2) claims must be dismissed for the additional reason that Plaintiffs have not adequately alleged that they acquired their Certificates *in* the challenged offerings.  Plaintiffs asserting claims under Section 12(a)(2) must allege that they purchased their securities in an initial public offering, as opposed to the af-termarket.  *See* 15 U.S.C. § 77*l*(a)(2) (permitting causes of action against a person who "offers or sells a security . . . by means of a prospectus."); *Gustafson v. Alloyd*

---

[69] *See also Salameh v. Tarsadia Hotels*, 2010 WL 2839013, at *4 (S.D. Cal. July 20, 2010) (dismissing § 12(a)(2) claim and finding "no allegations to support" plain-tiff's "contention that [defendants] solicited the purchase of securities"); *Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *7 (W.D. Wash. Dec. 29, 2008) (dismissing § 12(a)(2) claims against defendants who were alleged to have "issued and partici-pated in the preparation of the Prospectus and paid for and participated in 'road shows' to promote the sale of Isilon stock" for failure to adequately plead that they were statutory sellers); *In re Worlds of Wonder Sec. Litig.*, 694 F. Supp. 1427, 1435 (N.D. Cal. 1988) (dismissing § 12 claims against several defendants); *In re New-bridge Networks Sec. Litig.*, 767 F. Supp. 275, 280-81 (D.D.C. 1991) (dismissing § 12 claims against company and its officers based on absence of required relation-ship between defendant and plaintiff).

1   *Co., Inc.*, 513 U.S. 561, 578 (1995) (limiting § 12 claims to those who purchased in

2   the initial public offering).  Plaintiffs here have not done so.

3        Here, Plaintiffs generically allege that they "purchased or otherwise acquired

4   Certificates pursuant to *and/or traceable to* the defective Offering Documents" (AC

5   ¶ 228), and that each Plaintiff purchased their Certificates "pursuant *and traceable*

6   *to* one or more Registration Statements and Prospectus Supplements."  *Id.* ¶¶ 21-24.

7   Cases in this Circuit and elsewhere, however, have held virtually identical allega-

8   tions to be insufficient under the Supreme Court's decision in *Gustafson*, 513 U.S. at

9   578-84.  Rather, these cases have held that the mere fact that a security may be

10  "traceable" to an offering is insufficient to create standing on a Section 12(a)(2)

11  claim.  *See, e.g.*, *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 983

12  (N.D. Cal. 2007) (rejecting argument that "§ 12(a)(2) applies to all aftermarket

13  transactions so long as the transaction is traceable to the public offering"); *In re Va-*

14  *lence Tech. Sec. Litig.*, 1996 WL 37788, at *4 (N.D. Cal. Jan. 23, 1996) ("*Gustafson*

15  makes irrelevant whether the transaction is 'traceable' to a public offering.").[70]

16       In *Nomura*, for example, the court dismissed the MBS plaintiffs' Section

17  12(a)(2) claim, finding insufficient "[t]his precise pleading language—'issued pur-

18  suant to, or traceable to the [Notes Offering and] Registration Statement' . . . for its

19  failure to squarely allege that the securities at issue were purchased in a public offer-

20  ing."  658 F. Supp. 2d at 305.  The *Nomura* court continued:  "If plaintiffs did in fact

21  purchase the Certificates directly from the defendants, they should have said so.  An

22  evasive circumlocution does not suffice as a substitute."  *Id.*  The same evasiveness

23  is found in the Amended Complaint in this case.[71]

24  ─────────────────────
[70] *Accord N.J. Carpenters Health Fund*, 2010 WL 1473288, at *4 (dismissing

25  § 12(a)(2) claim for lack of statutory standing where plaintiff alleged only that it pur-
    chased MBS certificates "pursuant and traceable to" the offering documents); *NECA-*

26  *IBEW Health & Welfare Fund*, Transcript of Decision at 42:25-43:19 (dismissing
    MBS investor's § 12(a)(2) claim for failure "to plainly allege the purchase of the secu-

27  rities at issue in a public offering from a statutory seller") (Ex. 35).

    [71] The requirement that Plaintiffs specifically plead that they purchased in the Offer-
28  ings is especially important here, because CWALT, CWMBS, CWABS, and CWHEQ

─────────────────────
73

1    Not only have Plaintiffs not adequately alleged they purchased *in* a public of-

2 fering, but their own Certifications and the Amended Complaint confirm that many

3 of Plaintiffs' MBS purchases occurred after the expiration of the relevant prospectus

4 delivery period, and therefore outside of the challenged offerings.  Generally, the

5 offering period is measured as the date of prospectus supplement plus 40 days,

6 which is derived from the prospectus delivery requirements set forth in the Securi-

7 ties Act.  15 U.S.C. §§ 77d(3), 77e(b); *see also supra* at 25-26.[72]  This prospectus

8 delivery period establishes the outside date of the public offering; any purchases of

9 securities beyond the prospectus delivery period are, by definition, not "in" the of-

10 fering for the purpose of Section 12 liability.  *See infra* at 74-76.

11    Following the Supreme Court's decision in *Gustafson*, several courts have

12 dismissed Section 12 claims where it was evident from plaintiffs' pleadings that

13 they did not purchase during the prospectus delivery period, and therefore purchased

14 outside of the public offering.  For example, in *Caiafa v. Sea Containers Ltd.*, the

15 Second Circuit affirmed the district court's dismissal of the plaintiffs' Section

16 12(a)(2) claims, holding that "plaintiffs failed to allege that they purchased the secu-

17

18 issued Certificates pursuant to SEC Rule 144A as well as pursuant to various Regis-
tration Statements.  Indeed, the Issuing Trusts for the 427 Offerings at issue in this

19 case list an additional $118.6 billion in principal of "Non-Offered" certificates includ-
ing almost $114 billion in principal of residual certificates.  It is well established that a

20 plaintiff cannot state a claim based on certificates acquired through Rule 144A.  *See Levi Strauss*, 527 F. Supp. 2d at 978 (dismissing § 11 claims as to plaintiffs who re-

21 ceived registered bonds through exchange of unregistered bonds acquired in Rule 144A offerings); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 628-30 (S.D.N.Y.

22 2007) (holding that 144A purchases cannot be the basis for § 11 claims, even when later exchanged for registered securities).

23 [72] Section 5(b) of the 1933 Act prohibits the sale of new securities unless "accompa-
nied or preceded by a prospectus," and Section 4(3) of the 1933 Act establishes a

24 prospectus delivery period of "forty days after the effective date of [the] registration statement or . . .  after the first date upon which the security was bona fide offered to

25 the public by the issuer or by or through an underwriter after such effective date." *Id.* at §§ 77d(3), 77e(b).  For transactions in which "securities of the issuer have not

26 previously been sold pursuant to an earlier effective registration statement," includ-
ing initial public offerings ("IPO"), Section 4(3) provides for a 90-day prospectus

27 delivery period.  15 U.S.C. § 77d(3).  This longer period is inapplicable here, as each of the issuers (CWMBS, CWALT, CWABS and CWHEQ) had previously sold

28 securities pursuant to an earlier effective registration statement.  *Id.*

74

1  rities at issue *in* an initial public offering." 331 Fed. Appx. 14, 16-17 (2d Cir. May

2  19, 2009). In reaching this conclusion, the *Caiafa* court observed that "plaintiffs

3  have failed to allege that they purchased securities under circumstances requiring

4  the delivery of a prospectus and therefore fail to state a claim," and that "attached to

5  plaintiffs' complaint were certifications confirming that they acquired the securities

6  in a secondary market." *Id.* Under *Caiafa*, purchases beyond the applicable pro-

7  spectus delivery period are not "in" the offering and are insufficient to confer statu-

8  tory standing under Section 12. *Id.*[73]

9      Here, the Amended Complaint and the Certifications confirm that Plaintiffs

10  purchased 50 of the 105 CUSIPs that they claim to have purchased after the pro-

11  spectus delivery period, and those securities were therefore not purchased in the re-

12  spective Offerings as opposed to the aftermarket. App. Tabs 7, 10.[74] Under *Caiafa*,

13  Plaintiffs therefore did not purchase "in" these Offerings, and those MBS purchases

14  cannot support a Section 12(a)(2) claim. *Id.*[75] Furthermore, with respect to the re-

15  ─────────────────────

16  [73] *See also In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1225-26 (W.D. Wash. 2009) (dismissing § 12(a)(2) claims for lack of statutory stand-ing where plaintiff certified that it purchased the securities "over four months after the

17  initial offering," on grounds that such purchase was beyond the prospectus delivery period and therefore "outside the initial offering"); *In re Valence Tech. Sec. Litig.*, 1996 WL 37788, at *4 (dismissing § 12 claims and stating that "§ 12(2) applies only

18  to a transaction which requires a prospectus to be delivered"); *In re Proxima Corp. Sec. Lit.*, 1994 WL 374306 , at *11 (S.D. Cal. May 3, 1994) (citing prospectus deliv-ery requirement and holding that "plaintiffs have stated a claim for relief under §

19  12(2) only in so far as their purchases were made either in the IPO or within 90 days of the date of the IPO"); *Wade v. Indus. Funding Corp.*, 1993 WL 650837, at *5 (N.D.

20  Cal. Aug. 30, 1993) (citing prospectus delivery requirement and dismissing § 12(2) claims of all plaintiffs who did not purchase their IFC stock within 90 days of the ini-

21  tial public offering); *cf. Levi Strauss*, 527 F. Supp. 2d at 983 (dismissing § 12(a)(2) claims because "the complaint does not allege when plaintiffs' after market purchases

22  occurred" and "[i]n any event, the majority of the cases appear to hold that, based on *Gustafson*, § 12 is limited to transactions purchased pursuant to a public offering and,

23  therefore, does not extend to *any* after market transactions").

24  [74] For the Offerings to which 10 of those 50 CUSIPs correspond, Plaintiffs purchased other CUSIPs associated with other tranches of the same Offerings and did so within

25  the prospectus delivery period. *See* App. Tabs 7, 10. With respect to the 33 Offerings to which the remaining 40 CUSIPs correspond, no Plaintiff purchased any CUSIP

26  within the applicable prospectus delivery period, and Plaintiffs' Section 12(a)(2) claims respecting those 33 Offerings fail in their entirety. *See id.*

27  [75] That these purchases beyond the lapse of the prospectus delivery period were not

28  "in" the offerings is further evidenced by the fact that they were at prices very dif-

75

1   maining 48 Offerings, Plaintiffs allege only that their purchases were "in or trace-

2   able to" those Offerings, which is insufficient.  *Levi Strauss*, 527 F. Supp. 2d at 983.

3   For these reasons, Plaintiffs' Section 12 claims must be dismissed in their entirety.

4   **V.   THE AMENDED COMPLAINT AFFIRMATIVELY PLEADS
           KNOWLEDGE OF THE ALLEGED MISREPRESENTATIONS.**

5

6        Plaintiffs' Section 11 and 12(a)(2) claims must be dismissed for the separate

7   and independent reason that the Amended Complaint affirmatively demonstrates that

8   each of the Plaintiffs continued to purchase Certificates after the putative class claims

9   became aware of the alleged misstatements.  Section 11, however, only allows a per-

10  son acquiring a security to sue over a registration statement containing "an untrue

11  statement of a material fact or omit[ing] to state a material fact required to be stated

12  therein or necessary to make the statements therein not misleading . . . *unless it is*

13  *proved that at the time of such acquisition he knew of such untruth or omission . . . .*"

14  15 U.S.C. § 77k(a).  Similarly, Section 12(a)(2) only allows a person purchasing a se-

15  curity to sue over a prospectus "which includes an untrue statement of a material fact

16  or omits to state a material fact necessary in order to make the statements, in the light

17  of the circumstances under which they were made, not misleading (*the purchaser not*

18  *knowing of such untruth or omission*) . . . ."  15 U.S.C. § 77*l*(a)(2).  In other words,

19  under both Sections 11 and 12(a)(2), a plaintiff's knowledge of alleged misrepresenta-

20  tion or omission at time of acquisition is a complete bar to liability.  *See, e.g.*, *In re In-*

21  *itial Pub. Offering Sec. Litig.*, 471 F.3d 24, 43-44 (2d Cir. 2006) ("Plaintiffs must

22  show lack of knowledge to recover on their section 11 claims as well").[76]  "Plaintiffs

23  _____

24  ferent from the offering price.  MBS certificates are typically offered at "par,"
    meaning a price of $1.00 per unit.  Here, Certificates purchased months after the of-
    fering were often at prices substantially above or below $1.00 per unit.  For exam-

25  ple, GBPHB purchased CWABS 2005-4 on April 5, 2006—nearly ten months after
    the offering—at $0.9598 per unit.  AC ¶ 22.  Likewise, IPERS purchased CWALT

26  2006-OA21 on March 27, 2008—nearly fifteen months after the Offering—at
    $0.7375.  *Id*. ¶ 21.  Plainly, these purchases were not "in" their respective Offerings.

27  [76] *See also Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1032 (5th Cir. 1990)
    (§ 12(2) bars recovery to a plaintiff who "knows of" the misstatement or omission

28  upon which the plaintiff's securities fraud claim is based); *Mayer v. Oil Field Sys.*

1   . . . have the burden of proving that they did not know of the untrue statements or

2   omissions when they purchased the securities." *Rubke v. Capitol Bancorp Ltd.*, 460 F.

3   Supp. 2d 1124, 1134 (N.D. Cal. 2006).

4        Here, the Amended Complaint explicitly notes the pendency of the *Luther* case

5   in California Superior Court (AC ¶ 90).  Furthermore, Plaintiffs expressly rely on the

6   late 2007 filing of the *Luther* case as support for their contention that the statute of li-

7   mitations has been tolled and that this case is timely.  *See* Ex. 37 (Transcript of May 3,

8   2010 Lead Plaintiff Hearing) at 38:23-25 ("Mr. Toll:  The statute of limitations, they

9   filed the case in November '07.  It seems clear to us that that tolled the statute.").

10  Given Plaintiffs' heavy reliance on *Luther* and its factual allegations, they cannot deny

11  they had knowledge of the allegedly untrue statements as of November 14, 2007.

12  Plaintiffs chose to buy MBS anyway despite that knowledge, and any claims as to

13  those MBS are barred under Sections 11 and 12(a)(2).[77]

14  **VI.    PLAINTIFFS HAVE FAILED TO PLEAD RELIANCE.**

15       As the SEC observed in its Regulation AB adopting release, the performance of

16  MBS and other asset-backed securities "is primarily tied to a discrete pool of financial

17  assets that by their terms convert into cash."  70 Fed. Reg. at 1514.  Accordingly, in-

18  vestors in MBS "are generally interested in the characteristics and quality of the un-

19  derlying assets, the standards for their servicing, the timing and receipt of cash flows

20  from those assets and the structure for distribution of those cash flows."  *Id.* at 1510-

21  _____

22  *Corp.*, 803 F.2d 749, 755 (2nd Cir. 1986) ("Nor may [a plaintiff] recover under § 11
    . . . of the 1933 Act unless the defendant misrepresented or omitted a material fact and

23  the plaintiff had no knowledge of the untruth or omission."); *In re Livent, Inc. Note-
    holders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001) (dismissing certain

24  plaintiffs' §§ 11 and 12(a)(2) claims, and stating "[plaintiffs] may not recover . . . if
    they knew of the alleged untruth or omission at the time of purchase").

25  [77] Plaintiffs first purchased 18 of their 105 CUSIPs after November 14, 2007.  *See*
    App. Tabs 7, 10.  For the Offerings to which five of those CUSIPs correspond,

26  Plaintiffs purchased other CUSIPs associated with other tranches of the same Offer-
    ings and did so before November 14, 2007.  *Id.*  With respect to the remaining 12

27  Offerings to which the remaining 13 CUSIPs correspond, no Plaintiff purchased any
    CUSIP before November 14, 2007, and Plaintiffs' 1933 Act claims respecting those

28  12 Offerings fail in their entirety.  *See id.*

11.  For this reason, MBS issuers (both before and after the adoption of Regulation AB) have issued periodic cash flow distribution reports "that detail the payments and performance of the financial assets in the asset pool and payments on the securities backed by that pool."  *Id.* at 1509.  These distribution reports, generated monthly by the issuing trust and made available electronically to investors, provide information regarding the performance of the assets in the pool, delinquencies and losses, alloca-tion of cash flows, and distribution of payments on the MBS.  *Id.* at 1511, 1531, 1564-65.  As such, the Distribution Reports are the analogue of the earnings statements for a public operating company.

Under Section 11(a), once the issuer has made available an earnings statement covering at least a twelve-month period, an investor who thereafter purchases the se-curity can sue under Section 11 *only* if "that such person acquired the security *relying upon such untrue statement in the registration statement or relying upon the registra-tion statement and not knowing of such omission . . . .*"  15 U.S.C. § 77k(a).  Thus once enough time has lapsed and fresh information has entered the marketplace, a Section 11 plaintiff must show actual reliance on the alleged misstatement in the reg-istration statement.  *APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1275 (11th Cir. 2007).  As the Ninth Circuit explained in *Hertzberg v. Dignity Part-ners, Inc.*, "in all likelihood the purchase and price of the security purchased after pub-lication of such an earning statement will be predicated upon that statement rather than upon the information disclosed upon registration."  191 F.3d 1076, 1081-82 (9th Cir. 1999) (quoting H.R. Rep. No. 73-1838 at 41).

Here, as described above (*supra* at 41, 45), the Amended Complaint alleges numerous purchases of Certificates by each of the named Plaintiffs after twelve months of Distribution Reports had been issued.[78]  For all of these transactions, and

---

[78] Plaintiffs first purchased 30 of the 105 CUSIPs after the relevant twelve-month Distribution Report date.  *See* App. Tabs 7, 10.  For the Offerings to which six of those CUSIPs correspond, Plaintiffs purchased other CUSIPs associated with other tranches of the same Offerings and did so before the relevant twelve-month Distri-bution Report date.  *See id.*  With respect to the remaining 21 Offerings to which the

78

for others where Plaintiffs purchased more than a year after the offering, Plaintiffs must plead actual reliance on the Offering Documents, which they have not done.  For this reason as well, Plaintiffs' Section 11 claims arising out of these Offerings must be dismissed.

## VII.   PLAINTIFFS' SECTION 15 CLAIMS ARE SUBJECT TO DISMISSAL.

Plaintiffs assert claims for "control person" liability under Section 15 of the 1933 Act against, among others, CFC, CSC, CCM, CHL, and Adler.  AC ¶ 232.  To sustain a viable Section 15 claim, Plaintiffs must plead a primary violation of Section 11 or Section 12(a)(2) and that the "defendants had the power to control or influence the company."  *Rubke*, 460 F. Supp. 2d at 1134 (*citing Durham v. Kelly*, 810 F. 2d 1500, 1503 (9th Cir. 1987)).  The absence here of any predicate violation of Sections 11 or 12 requires dismissal of their Section 15 claims.  *Cooperman v. Individual Inc.*, 171 F.3d 43, 52 (1st Cir. 1999).

A separate and independent reason the Section 15 claims fail is that, to establish control, Plaintiffs must allege and ultimately prove that defendants had "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405 (providing definition of "control" under 1933 Act and regulations promulgated thereunder).  Here, Plaintiffs have pled no facts support-ing any plausible inference under *Twombly*, 550 U.S. at 556-57, 570, that CFC, CSC, CCM, CHL or Adler had the power "to direct or cause the direction of the manage-ment and policies" of any putative primary violator of the 1933 Act, arguing only that the requisite control may be inferred from these entities' corporate relationship.  AC ¶¶ 33, 76, 233-34.  It is well-established, however, that the parent/subsidiary relation-ship is an insufficient "basis from which to infer control . . . [because] a parent corpo-

---

remaining 24 CUSIPs correspond, no Plaintiff purchased any CUSIP before the rele-vant twelve-month Distribution Report date, and Plaintiffs' Section 11 claims re-specting those 21 Offerings fail in their entirety.  *See id.*

COUNTRYWIDE DEFENDANTS' MEMO OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

ration and its subsidiary are regarded as legally distinct entities." *In re WorldCom, Inc. Sec. Litig.*, 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004) (dismissing § 15 claims).  For precisely this reason, the court in *Merrill Lynch*, 2010 WL 2175875, at *17, dismissed with prejudice the Section 15 claims against various Merrill Lynch entities involved in the process of securitizing the mortgages that ultimately were pooled into the MBS at issue in that case, holding that "mere allegations of a corporate affiliation between defendants are insufficient to indicate control by one over another." Plaintiffs' Section 15 claims thus must be dismissed.

## CONCLUSION

For all of the above reasons, the Countrywide Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice in its entirety.[79]

Dated:  August 16, 2010          **GOODWIN PROCTER LLP**

/s/ Brian E. Pastuszenski
Brian E. Pastuszenski (*pro hac vice*)
Lloyd Winawer (State Bar No. 157823)
Inez H. Friedman-Boyce (*pro hac vice*)
Brian C. Devine (State Bar No. 222240)

*Counsel for the Countrywide Defendants*

---

[79] The application of the various grounds for dismissal to each of the 427 Offerings at issue is summarized in Tab 10 of the Appendix.