# EXHIBIT 2
# Part 2

The Company is also subject to U.S. Department of Housing and Urban Development, Fannie Mae, Freddie Mac and Government National Mortgage Association ("Ginnie Mae") net worth requirements. Management believes the Company is in compliance with those requirements.

### Cash Flow

Cash provided by operating activities was $15.3 billion for the six months ended June 30, 2008, compared to cash used by operating activities of $4.4 billion for the year–ago period. Cash provided by operating activities includes the proceeds from the sales and principal repayments of mortgage loans held for sale and the cash used for the origination and purchase of mortgage loans held for sale. We generally retain servicing rights and may retain other interests when these loans are sold. The recognition of the amounts retained is a non–cash investing activity. See Note 18—*Supplemental Cash Flow Information* in the financial statement section of this Report. In the six months ended June 30, 2008, funds used to originate and purchase mortgage loans exceeded proceeds from the sales of mortgage loans by $2.4 billion. In the year–ago period, funds used to originate and purchase mortgage loans exceeded proceeds from the sales and principal repayments of mortgage loans by $5.9 billion. Cash provided by operations was primarily due to a decrease in trading securities of $20.2 billion, partially offset by an increase in trading securities sold, not yet purchased.

Net cash provided by investing activities was $5.3 billion for the six months ended June 30, 2008, compared to cash used by investing activities of $10.0 billion for the year–ago period. The increase in net cash provided by investing activities was attributable to a $20.6 billion increase in net proceeds from investments in other financial instruments combined with a $2.1 billion decrease in securities purchased under agreements to resell, securities borrowed, and federal funds sold, partially offset by an increase of $3.8 billion in loans held for investment compared to a decrease of $5.2 billion in the year–ago period.

Net cash used by financing activities for the six months ended June 30, 2008 totaled $22.7 billion, compared to net cash provided by financing activities of $14.2 billion for the year–ago period. In the six months ended June 30, 2008, there was a $25.1 billion decrease in cash provided by short–term borrowings, including securities sold under agreements to repurchase. During the six months ended June 30, 2008, long–term debt decreased $7.6 billion compared to an increase in long–term debt of $2.7 billion in the six months ended June 30, 2007.

### Credit Risk Management

A significant risk for the Company is credit risk, which is the risk that a counterparty will not perform in accordance with the contractual terms of our agreement with them. Our primary credit counterparties are our loan borrowers and counterparties in securities transactions. We balance the level of credit risk against our expected returns in determining the level of credit risk we accept in our operations.

### Lending Activities

Our lending activities include the origination and purchase of loans for investment purposes (investment portfolio loans) and the origination and purchase of loans for sale to investors (mortgage banking).

Exhibit 2
100

The following table summarizes our portfolio of loans held for investment:

| | June 30, 2008 | | |
| | Investment Activities | Mortgage Banking Activities | Total Unpaid Principal Balance |
|---|---|---|---|
| | (in thousands) | | |
| Mortgage loans: | | | |
| Prime | | | |
| Pay option and payment advantage | $25,419,072 | $ 990,263 | $26,409,335 |
| Other | 27,439,262 | 2,632,521 | 30,071,783 |
| | 52,858,334 | 3,622,784 | 56,481,118 |
| Prime home equity | 32,354,051 | 510,526 | 32,864,577 |
| Subprime | 719,602 | 1,734,940 | 2,454,542 |
| | 85,931,987 | 5,868,250 | 91,800,237 |
| Commercial real estate | 181,390 | — | 181,390 |
| Total mortgage loans | $86,113,377 | $5,868,250 | $91,981,627 |

### Investment Lending Activities

Our investment in loans held for investment generally includes mortgage loans originated or purchased for investment purposes, previously salable mortgage loans transferred from our held for sale portfolio as a result of the market disruption that began in the third quarter of 2007 and mortgage loan warehouse lending advances. Loans transferred from our held for sale portfolio are transferred at the lower of cost or estimated fair value at the date of transfer.

Our loans held for investment relating to our mortgage banking activities include mortgage loans repurchased due to breaches of representations and warranties; government–guaranteed or insured loans repurchased from Ginnie Mae securitizations in place of continuing to advance delinquent principal and interest installments to security holders; and loans with identified defects that make them non–salable.

At the time of all transfers from mortgage loans held for sale to mortgage loans held for investment, management made the decision to hold those loans for the foreseeable future, which has been defined as the next twelve months from the time of transfer, and made an assessment that the Company had the ability to hold them for that time. This decision and assessment was made individually with respect to each transfer from mortgage loans held for sale to mortgage loans held for investment, including such transfers made in the fourth quarter of 2007. Management intends to maintain the same decision and assessment process with respect to future transfers from mortgage loans held for sale to mortgage loans held for investment.

### Mortgage Loans Held for Investment in Investment Activities

Our portfolio of mortgage loans held for investment in our investment activities consists primarily of Prime Mortgage and Prime Home Equity Loans, with unpaid principal balances that amounted to $85.9 billion at June 30, 2008.

We have taken steps in recent years to reduce the credit risk in our investment loan portfolio by acquiring supplemental mortgage insurance coverage. As of June 30, 2008, $20.8 billion of our investment portfolio's residential loan portfolio was covered by supplemental mortgage insurance purchased on specified pools of loans, of which $14.2 billion represents first loss coverage. The maximum loss coverage available under these policies on a combined basis is $1.4 billion. While these policies generally provide for first loss coverage, some policies require premium adjustments if claims

Exhibit 2
101

exceed specified levels. Furthermore, coverage limits vary by policy, with some policies having limits at the pool level, and others at the loan level. The effect of this insurance on our estimate of credit losses is to reduce our provision for loan losses for the six months ended June 30, 2008 by $340.1 million through the recognition of amounts recoverable from pool mortgage insurance. Our estimate of the effect of mortgage insurance on the loan loss provision contemplates the effect of claim disputes and considers the insurer's ability to pay as discussed below.

In the past, we purchased credit enhancement from those mortgage insurance providers that had an AA– rating or equivalent from the credit rating agencies. Currently, these mortgage insurance providers have no less than an A rating. This requirement is consistent with the eligibility requirements of the government–sponsored enterprises for mortgage insurers. We continue to monitor the respective capital positions of our mortgage insurance providers to assess their claims paying ability. While the mortgage insurance industry has experienced recent adverse financial results resulting in ratings downgrades with the likelihood of further deterioration over the near term, we have concluded that claims paying ability of our mortgage insurance providers is not impaired. If we conclude that this capacity is impaired in the future, we will adjust our provisions for loan losses and the mortgage insurance recoverable asset.

Following is a summary of our investment loan portfolio's residential mortgage loans, together with applicable mortgage insurance, by original combined loan–to–value ratio at June 30, 2008:

| Original Combined Loan–to–Value: | June 30, 2008 | | |
| --- | --- | --- | --- |
| | Unpaid Principal Balance "UPB"(1) | UPB with Lender Purchased Mortgage Insurance(2) | UPB with Borrower Purchased Mortgage Insurance |
| | (in thousands) | | |
| <50% | $ 3,952,852 | $ 368,940 | $ — |
| 50.01 – 60.00% | 3,768,125 | 544,747 | — |
| 60.01 – 70.00% | 9,708,039 | 2,045,408 | — |
| 70.01 – 80.00% | 25,788,908 | 7,816,350 | 1,654 |
| 80.01 – 90.00% | 25,026,073 | 6,908,610 | 2,597,634 |
| 90.01 – 100.00% | 17,517,047 | 3,043,462 | 1,493,963 |
| >100.00% | 170,943 | 42,434 | 32,119 |
| | $85,931,987 | $20,769,951 | $4,125,370 |

*(1)*      Excludes commercial real estate loans.

*(2)*      These amounts may include loans with borrower paid mortgage insurance.

While new originations of these products have virtually ceased by June 30, 2008, Banking Operations holds a substantial investment in pay option ARM and payment advantage ARM loans (collectively "pay option loans").

•      Pay-option ARM loans—have interest rates that adjust monthly and minimum required payments that adjust annually (subject to recast of the loan if minimum payments are made and deferred interest limits are reached). Annual payment adjustments are subject to a $7^1/2\%$ maximum change. To ensure that contractual loan payments are adequate to repay a loan, the fully amortizing loan payment amount is re-established after either five or ten years and again every five years thereafter. These payment adjustments are not subject to the $7^1/2\%$ payment limit and may be substantial due to changes in interest rates and the addition of unpaid interest to the loans' balances.

Exhibit 2
102

Payment advantage ARM loans—have interest rates that are fixed for an initial period of five years. Payments are subject to recast of the loan if minimum payments are made and deferred interest limits are reached. If interest deferrals cause the loan's principal balance to reach a certain maximum level within the first ten years of these loans, the payment is reset to the interest–only payment; then at the 10–year point, the fully amortizing payment is required.

The difference between the frequency of changes in the loans' interest rates and payments along with a limitation on changes in the minimum monthly payments to $7^1/2\%$ per year can result in payments that are not sufficient to pay all of the monthly interest charges. Unpaid interest charges are added to the loan balance until the loan's balance increases to a specified limit, which is no more than 115% of the original loan amount, at which time a new monthly payment amount adequate to repay the loan over its remaining contractual life is established.

Following is a summary of pay option loans held for investment by Banking Operations:

|  | June 30, 2008 | December 31, 2007 |
|---|---|---|
|  | (in thousands) | |
| Total pay option loan portfolio | $ 25,419,072 | $ 28,423,750 |
| Total principal balance of pay option loans with accumulated negative amortization | $ 23,358,463 | $ 25,935,223 |
| Accumulated negative amortization (from original loan balance) | $ 1,382,636 | $ 1,215,649 |
| Unpaid principal balance of pay option loans with supplemental mortgage insurance coverage | $ 17,423,786 | $ 18,374,251 |
| Average original loan–to–value ratio(1) | 76% | 76% |
| Average refreshed loan–to–value ratio(2) | 95% | — |
| Average original FICO score | 715 | 717 |
| Average refreshed FICO score | 680 | — |
| Loans underwritten with low or no stated income documentation | 83% | 81% |
| Borrowers electing to make less than full interest payments(4) | 72% | 81% |
| Loans delinquent 90 days or more(3) | 12.40% | 5.36% |

(1)    The ratio of the amount of the loan that is secured by the property to the lower of the original appraised value or purchase price of the property.

(2)    Estimated based upon April 2008 home value indices developed by the Mortgage Risk Assessment Corporation.

(3)    Based upon unpaid principal balance.

(4)    The ratio is calculated based on borrowers who made a payment during the last month of the reporting period and made less than a full interest payment.

The Company routinely forecasts its exposure to payment recast on negatively amortizing loans. The following assumptions were used to forecast this exposure as of June 30, 2008:

1)    18% Constant Prepayment Rate

2)    Use of forward interest rate curves to estimate interest rates in future periods

3)    Loans that do not pay off completely are assumed to negatively amortize 100% of the time.

Exhibit 2
103

Using these assumptions as of June 30, 2008, pay option loans that are expected to reset are shown in the following table:

| Twelve Months Ended June 30, | Projected Balance at Recast or Payoff |
|---|---|
| | (in thousands) |
| 2009 | $    174,339 |
| 2010 | 3,808,533 |
| 2011 | 6,955,560 |
| Thereafter | 2,463,522 |
| Loans assumed to repay before recast | 9,572,824 |
| | 22,974,778 |
| Loans serviced by others(1) | 3,117,303 |
| | $ 26,092,081 |

(1)     We do not maintain the loan level detail necessary to project payoff dates and balances for loans serviced by others.

The information in the table above is limited in that it was performed at a particular point in time and is subject to the accuracy of various assumptions used, including prepayment speeds, interest rates and the percentage of loans that negatively amortize.

Our primary credit risk management tool for our portfolio of loans held for investment is the origination and purchase of loans underwritten to balance our assessment of the borrower's credit risk against the expected return on the loan. We assess a loan by considering the borrower's credit profile and the value of collateral securing the loan. Where a proposed first mortgage loan's loan–to–value ratio is higher than a specified level, which is usually 80% for conventional loans, we generally require the borrower to supplement the collateral with primary mortgage insurance.

To minimize credit losses we actively monitor our portfolio of loans held for investment and work with borrowers who contact us or who become delinquent on their loans. Our portfolio monitoring activities may provide us with information that allows us to take actions to limit our loss exposure such as suspending borrowers' access to their home equity lines of credit when their loans or related senior liens reach a specified delinquency status or when their property values decline below a specified threshold.

We use several tools to establish communication with and assist borrowers in curing defaults on our loans, including frequent outreach efforts throughout the collection process using tools such as brochures, housing fairs, counseling letters and DVD mailings. Our objective in the loss mitigation process is to develop payment plans or workout options that have both the highest probability of successful resolution and minimal risk of loss to Countrywide. We have also developed loan modification programs designed to assist borrowers with refinancing their ARM and pay option ARM loans before their loans reset.

82

Exhibit 2
104

Our investment portfolio's nonperforming assets (comprised of non–accrual loans and foreclosed assets) and troubled debt restructurings, the allowances for credit losses and charge-offs are summarized as follows:

|  | June 30, 2008 | | December 31, 2007 | |
|---|---|---|---|---|
|  | Amount | % of Investment Portfolio Loans | Amount | % of Investment Portfolio Loans |
|  | | (dollar amounts in thousands) | | |
| Nonperforming assets: | | | | |
| Nonaccrual loans: | | | | |
| With third party credit enhancements(1) | $2,086,725 | 1.96% | $1,272,116 | 1.12% |
| Without third party credit enhancements | 3,263,833 | 3.06% | 1,611,951 | 1.43% |
| | 5,350,558 | 5.02% | 2,884,067 | 2.55% |
| Foreclosed residential real estate | 661,566 | 0.62% | 394,859 | 0.35% |
| Total nonperforming assets | $6,012,124 | 5.64% | $3,278,926 | 2.90% |
| Troubled debt restructuring on accrual status (2) | $1,068,179 | 1.00% | $ 6,320 | 0.01% |

|  | Amount | % of Nonaccrual Loans | Amount | % of Nonaccrual Loans |
|---|---|---|---|---|
| Allowances for credit losses: | | | | |
| Allowance for loan losses | $ 4,524,466 | | $ 2,141,247 | |
| Liability for losses on unfunded loan commitments | 57,606 | | 37,516 | |
| Estimated amounts recoverable from pool mortgage insurance | (895,925) | | (555,803) | |
| Allowances for credit losses, net of estimated pool mortgage insurance | $ 3,686,147 | 68.89% | $ 1,622,960 | 56.27% |

(1) Third party credit enhancements include borrower–paid mortgage insurance and pool insurance acquired by Banking Operations.

(2) During the quarter ended March 31, 2008, we changed our accrual policy for troubled debt restructurings to take into account the borrower's recent payment performance and prospects for repayment under the modified terms when determining the loan's accrual status on the date of modification.

|  | Six Months Ended June 30, | | | |
|---|---|---|---|---|
|  | 2008 | | 2007 | |
|  | Amount | Annualized Net Charge–offs as % of Average Investment Loans | Amount | Annualized Net Charge–offs as % of Average Investment Loans |
|  | | (dollar amounts in thousands) | | |
| Net charge–offs | $ 1,289,210 83 | 2.94% | $ 142,124 | 0.42% |

Exhibit 2
105

The following table shows investment loan charge-offs, net of recoveries, by product:

| | Six Months Ended June 30, | |
| | 2008 | 2007 |
| | (in thousands) | |
| Prime Home Equity | $ 779,715 | $103,059 |
| Prime Mortgage: | | |
|   Pay option and payment advantage | 371,850 | 26,381 |
|   Other | 129,031 | 12,684 |
| Subprime | 8,614 | — |
| Total net charge-offs | $1,289,210 | $142,124 |

The increase in our nonperforming assets and charge-offs from the year-ago period was driven by the effects that declining real estate collateral values and significant tightening of available credit resulting from the market disruption that began in the third quarter of 2007 had on delinquency and default trends as well as portfolio seasoning. We expect the level of nonperforming assets and credit losses to increase, both in absolute terms and as a percentage of our loan portfolio, as current weakness in the housing market develops and as our loan portfolio continues to season.

### *Mortgage Banking Portfolio Lending Activities*

The following table shows the unpaid balance of loans held for investment arising from our mortgage banking activities:

| | June 30, 2008 | December 31, 2007 |
| | (In thousands) | |
| Prime | $ 3,622,784 | $ 1,768,448 |
| Subprime | 1,734,940 | 2,045,875 |
| Prime Home Equity | 510,526 | 435,695 |
| | 5,868,250 | 4,250,018 |
| Defaulted FHA-insured and VA-guaranteed loans repurchased from securities | 3,411,386 | 2,691,563 |
| Total unpaid principal balance | $ 9,279,636 | $ 6,941,581 |

Our portfolio of loans held for investment arising from our mortgage banking activities includes loans that are nonsalable due to an identified defect or that we have repurchased—either to remedy a violation of a representation or warranty made in a loan sale, to minimize the cost of servicing a severely delinquent loan insured or partially guaranteed by the FHA or VA or in connection with a clean-up call (a clean-up call represents the repurchase of mortgage loans when the remaining outstanding balance of the mortgage loans falls to a level where the cost of servicing the loans becomes burdensome in relation to the benefits of servicing).

As discussed in the following section—*Lending Activities—Sale of Loans—Representations and Warranties*—we make provisions for losses that may arise from breaches of representations and warranties when we record the sale of loans and we adjust our estimates for losses quarterly. We record repurchased loans at their estimated fair value when they are repurchased and any resulting loss is charged against the liability.

We may determine that a portion of the loans that we originate or purchase for sale will not be sold because of a defect, which may include a document deficiency or deterioration of the credit status of the loan during the period it is held for sale. Such loans are transferred to our portfolio of loans

84

Exhibit 2
106

held for investment at the lower of cost or estimated fair value on an individual loan basis and any loss is recorded as a component of gain on sale of loans and securities in current period earnings. Subsequent losses that may result from deteriorations in the credit quality of the loans that have been transferred to the investment portfolio are included in our provision for loan losses.

### Mortgage Warehouse Lending Advances

We hold a portfolio of commercial loans made to other mortgage lenders to finance their inventories pending sale to Countrywide and other lenders. Our portfolio of mortgage loan warehouse advances totaled $0.9 billion and the average loan balance was $8.3 million at June 30, 2008. These loans are underwritten by assessing the creditworthiness of the warehouse lending borrowers. This includes reviewing both borrower−provided financial information and publicly available credit rating information and press coverage, as well as understanding the borrowers' operational controls and product risk and assessments of collateral.

We monitor the length of time that advances are outstanding against specific residential loans and may require the borrower to pay off aged advances. We also monitor the fair value of our collateral to ensure that the level of collateral posted is adequate to repay our advance in the event of default by our borrower and we require our warehouse lending borrowers to post specified levels of cash collateral to supplement the mortgage loan collateral. We also regularly review updated financial information of borrowers, including pipeline and hedging positions. We recorded $2.2 million of charge−offs related to this activity during the six months ended June 30, 2008 and no charge−offs in the year−ago period. Our advance rates and the collateral we advance funds against are limited to that which we can sell into the presently disrupted secondary market.

Our portfolio of mortgage banking−related nonperforming assets and troubled debt restructurings includes mortgage warehouse lending advances because we engage in warehouse lending activities primarily to support our mortgage banking activities. Loans held for investment and foreclosed assets from our mortgage banking activities and the related allowance for credit losses are summarized as follows:

| | June 30, 2008 | December 31, 2007 |
|---|---|---|
| | Amount | Amount |
| | (dollar amounts in thousands) | |
| **Nonperforming assets:** | | |
| Nonaccrual loans(1)(2): | | |
| Residential | | |
| Loans held for investment—credit risk retained by Countrywide(3) | $ 783,979 | $ 567,356 |
| Commercial(4) | 28,775 | 37,274 |
| Total nonaccrual loans | 812,754 | 604,630 |
| **Foreclosed assets:** | | |
| Residential real estate | 290,658 | 412,984 |
| Commercial(4) | 105 | — |
| Total foreclosed assets | 290,763 | 412,984 |
| Total nonperforming assets | $1,103,517 | $1,017,614 |
| Troubled debt restructurings on accrual status | $ 51,957 | $ — |

Exhibit 2
107

| | Amount | % of Nonaccrual Loans | Amount | % of Nonaccrual Loans |
|---|---|---|---|---|
| Allowances for credit losses: | | | | |
| Allowance for loan losses(5): | | | | |
| Residential | $ 502,524 | 64.10% | $ 247,106 | 43.55% |
| Commercial(4) | 8,661 | 30.10% | 11,138 | 29.88% |
| | 511,185 | 62.90% | 258,244 | 42.71% |
| Liability for losses on unfunded loan commitments | 6,048 | | 868 | |
| Total allowances for credit losses | $ 517,233 | 63.64% | $ 259,112 | 42.85% |

| | Six Months Ended June 30, | | | |
|---|---|---|---|---|
| | 2008 | | 2007 | |
| | Amount | Annualized Net Charge-offs as % of Average Investment Loans | Amount | Annualized Net Charge-offs as % of Average Investment Loans |
| | (dollar amounts in thousands) | | | |
| Net charge-offs | $ 247,029 | 4.22% | $ 50,912 | 1.82% |

(1)   Excludes $3,022.2 million and $2,171.1 million, at June 30, 2008 and December 31, 2007, respectively, of loans that we have the option (but not the obligation) to repurchase and we have not exercised such option. These loans are required to be reflected in our balance sheet regardless of our intention to exercise the option to repurchase the loans.

(2)   Excludes government-guaranteed mortgage loans held for investment totaling $376.4 million and $397.6 million at June 30, 2008 and December 31, 2007, respectively.

(3)   Generally these loans have been repurchased and recorded at fair value or transferred to loans held for investment at the lower of cost or estimated fair value. Fair value estimates incorporate the impaired status at the date of repurchase of the loans. Losses related to subsequent deterioration in the credit quality of the loans are recorded in the allowance for loan losses.

(4)   Comprised of warehouse lending advances secured by mortgage loans.

(5)   The allowance for loan losses excludes any reduction to the cost basis of loans recorded to reflect estimated fair value at repurchase or transfer to held for investment.

The increase in our nonperforming assets and charge-offs from June 30, 2007 was driven by the impact that the weakening housing market and significant tightening of available credit had on delinquencies and default trends as well as portfolio seasoning.

86

Exhibit 2
108

### Allowance for Loan Losses

Following is a summary of our consolidated allowance for loan losses by activity for the periods presented:

| | Six months ended June 30, 2008 | | | | |
|---|---|---|---|---|---|
| | Investment Portfolio | | | | |
| | Mortgage Lending | Commercial Real Estate | Warehouse Lending | Mortgage Banking | Total |
| | (dollar amounts in thousands) | | | | |
| Balance, beginning of period | $ 2,140,536 | $ 711 | $ 11,138 | $ 247,106 | $ 2,399,491 |
| Provision for loan losses | 3,326,787 | 5,215 | — | 500,275 | 3,832,277 |
| Change in estimate of amounts recoverable from pool mortgage insurance | 340,122 | — | — | — | 340,122 |
| Charge-offs | (1,310,759) | — | (2,172) | (258,692) | (1,571,623) |
| Recoveries | 21,549 | — | — | 13,835 | 35,384 |
| Reclassifications and other | 305 | — | (305) | — | — |
| Balance, end of period | $ 4,518,540 | $ 5,926 | $ 8,661 | $ 502,524 | $ 5,035,651 |
| Ending allowance as a percentage of loans receivable | 5.3% | 3.3% | 1.0% | 8.6% | 5.4% |

| | Six months ended June 30, 2007 | | | | |
|---|---|---|---|---|---|
| | Investment Portfolio | | | | |
| | Mortgage Lending | Commercial Real Estate | Warehouse Lending | Mortgage Banking | Total |
| | (dollar amounts in thousands) | | | | |
| Balance, beginning of period | $ 294,376 | $ 79 | $ 12,838 | $ 19,524 | $ 326,817 |
| Provision for loan losses | 365,269 | 120 | 145 | 79,352 | 444,886 |
| Change in estimate of amounts recoverable from pool mortgage insurance | 99,888 | — | — | — | 99,888 |
| Charge-offs | (147,343) | — | — | (51,173) | (198,516) |
| Recoveries | 5,219 | — | — | 261 | 5,480 |
| Reclassifications and other | (1,113) | — | 1,113 | — | — |
| Balance, end of period | $ 616,296 | $ 199 | $ 14,096 | $ 47,964 | $ 678,555 |
| Ending allowance as a percentage of loans receivable | 0.9% | 0.1% | 0.6% | 2.2% | 0.9% |

The increase in the allowance and provision for loan losses is due to increased losses inherent in the loan portfolio resulting from increased level of mortgage delinquencies, defaults and loss severities, as well as downward revisions in expectations of changes in home prices.

### Lending Activities—Sale of Loans

A significant portion of the mortgage loans that we originate or purchase are sold into the secondary mortgage markets primarily in the form of securities, and to a lesser extent as whole loans. When we sell or securitize our loans we retain varying degrees of credit risk from the representations and warranties or corporate guarantees issued or the continuing investments and/or obligations we

Exhibit 2
109

retain, either in the form of credit−enhancing subordinated interests or through the structure of certain of our securitizations.

Our Prime Mortgage Loans generally are sold on a non−recourse basis, while Prime Home Equity and Subprime Mortgage Loans generally were sold with limited recourse for credit losses. Regardless of whether our loans are sold with recourse, almost all of our loan sale transactions retain credit risk in the form of the representations and warranties we provide and that are customary for loan sales transactions.

### Representations and Warranties

When we sell a loan, we make various representations and warranties relating to, among other things, the following:

- our ownership of the loan

- the validity of the lien securing the loan

- the absence of delinquent taxes or liens against the property securing the loan

- the effectiveness of title insurance on the property securing the loan

- the process used in selecting the loans for inclusion in a transaction

- the loan's compliance with any applicable loan criteria (e.g., loan balance limits, property type, delinquency status) established by the buyer

- the condition of the property securing the loan

- the existence of hazard insurance

- the loan's compliance with applicable local, state and federal laws

- the absence of fraud in the loan.

The specific representations and warranties made by us depend on the nature of the transaction and the requirements of the buyer. Market conditions and credit−rating agency requirements may also affect representations and warranties and the other provisions we may agree to in loan sales.

In the event of a breach of our representations and warranties, we may be required to either repurchase the mortgage loans with the identified defects or indemnify the investor or insurer. In such cases, we bear any subsequent credit loss on the mortgage loans. Our representations and warranties are generally not subject to stated limits. However, our contractual liability arises only when the representations and warranties are breached and generally only when a loss results from the breach. We attempt to limit our risk of incurring these losses by structuring our operations to ensure consistent production of quality mortgages and servicing those mortgages at levels that meet secondary mortgage market standards. We make significant investments in personnel and technology to ensure the quality of our mortgage loan production.

We estimate our liability for representations and warranties when we sell loans and update our estimate quarterly. Our provision for estimated losses arising from loan sales is recorded as an

Exhibit 2
110

adjustment to gain on sale of loans and securities. Following is a summary of the activity in our liability for representations and warranties for the periods presented:

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (In thousands) | |
| Balance, beginning of period | $  639,637 | $390,111 |
| Provisions for losses | 1,183,527 | 90,435 |
| Charge–offs | (286,817) | (48,723) |
| Balance, end of period | $1,536,347 | $431,823 |

### Corporate Guarantees

Our corporate guarantees are contracts written to protect purchasers of our loans from credit losses up to a specified amount. We estimate the losses to be absorbed by the guarantees when we sell loans with guarantees and update our estimates every quarter. We record our provision for losses arising from the guarantees as a component of gain on sale of loans and securities. Following is a summary of the activity in our liability for corporate guarantees for the periods presented:

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (In thousands) | |
| Balance, beginning of period | $  46,202 | $  45,425 |
| Provisions for losses | 30,339 | 13,318 |
| Charge–offs | (2,553) | (2,727) |
| Balance, end of period | $  73,988 | $  56,016 |
| Corporate guarantees in excess of recorded liability, end of period | $463,416 | $506,286 |

### Subordinated Interests

Our exposure to credit losses related to subordinated interests is limited to the assets' carrying values plus the value of additional draws we may be required to subordinate if a rapid amortization event occurs in a securitization. We carry subordinated interests at their estimated fair values. The carrying values of our subordinated interests are as follows:

|  | June 30, 2008 | December 31, 2007 |
|---|---|---|
|  | (In thousands) | |
| Prime home equity retained interests | $154,091 | $  422,681 |
| Subprime retained interests | 81,900 | 293,048 |
| Subordinated mortgage–backed pass–through securities(1) | 94,914 | 270,744 |
| Prime residual securities | 29,733 | 20,557 |
|  | $360,638 | $ 1,007,030 |

_____

(1)      Included with mortgage–backed pass–through securities.

89

Exhibit 2
111

The losses absorbed by our subordinated interests are summarized as follows:

|  | Six Months Ended June 30, | |
|  | 2008 | 2007 |
|  | (in thousands) | |
| Prime home equity retained interests | $1,468,730 | $194,177 |
| Subprime retained interests | 644,180 | 127,000 |
| Prime residual securities | 6,750 | 4,350 |
|  | $2,119,660 | $325,527 |

We estimate our liability for impairment losses related to our future draw obligations and update our estimate quarterly. Our provision for estimated losses arising from future draw obligations is recorded as a component of impairment of retained interests. The accrued liability for impairment related to future expected funding obligations under a rapid amortization event was $637.5 million as of June 30, 2008.

Following is a summary of changes in the liability:

|  | Six Months Ended June 30, | |
|  | 2008 | 2007 |
|  | (in thousands) | |
| Beginning balance | $ 704,097 | $ — |
| Provision | 55,967 | — |
| Charge-offs | (122,571) | — |
| Ending balance | $ 637,493 | $ — |

### Mortgage Loans Held for Sale

At June 30, 2008, mortgage loans held for sale amounted to $11.8 billion. While loans are in inventory, we bear credit risk after taking into consideration primary mortgage insurance (which is generally required for conventional first mortgage loans with a loan-to-value ratio greater than 80%), FHA insurance or VA guarantees.

Loans held for sale that have been placed on nonaccrual status include loans whose credit quality has deteriorated during the time that they have been held for sale. Nonaccrual loans held for sale totaled $288.5 million and $206.7 million at June 30, 2008 and December 31, 2007, respectively.

Effective for loan originations beginning on January 1, 2008, most of our new loan production is carried at the loans' estimated fair values which take into account marketplace perceptions of the loan's credit risk. The remaining mortgage loans held for sale are carried at the lower of cost or estimated fair value in the aggregate, which takes into account a reduction in value for impaired loans.

### Mortgage Reinsurance

We provide mortgage reinsurance on certain mortgage loans included in our servicing portfolio through contracts with several primary mortgage insurance companies. Under these contracts, we provide aggregate excess loss coverage in a mezzanine layer in exchange for a portion of the pool's mortgage insurance premium. As of June 30, 2008, approximately $137.8 billion of mortgage loans in our servicing portfolio are covered by such mortgage reinsurance contracts. The reinsurance contracts place limits on our maximum exposure to losses. At June 30, 2008, the maximum aggregate losses under the reinsurance contracts were limited to $1,264.9 million. We are required to pledge securities

Exhibit 2
112

to cover this potential liability. The accumulated liability recorded for estimated reinsurance claims totaled $585.8 million and $148.8 million at June 30, 2008 and December 31, 2007, respectively. As of June 30, 2008, the liability for reinsurance claims includes case reserves totaling $332.6 million relating to certain of the pools of loans we have reinsured.

### Securities Trading and Derivatives Counterparty Credit Risk

We have exposure to credit loss in the event of contractual non–performance by our trading counterparties and counterparties to the over–the–counter derivative financial instruments that we use in our interest rate risk management activities. We manage this credit risk by selecting only counterparties we believe to be financially strong, spreading the credit risk among many such counterparties, by placing contractual limits on the amount of unsecured credit extended to any single counterparty and by entering into netting agreements with the counterparties, as appropriate.

The aggregate amount of counterparty credit exposure after consideration of relevant netting agreements, before and after collateral held by us, are as follows:

|  | June 30, 2008 | December 31, 2007 |
|---|---|---|
|  | (in millions) | |
| Aggregate credit exposure before collateral held | $ 4,107 | $   6,135 |
| Less: collateral held | (1,760) | (3,873) |
| Net aggregate unsecured credit exposure | $ 2,347 | $   2,262 |

For the six months ended June 30, 2008 and 2007 we incurred no credit losses due to non–performance of any of our counterparties.

## Loan Servicing

The following table sets forth certain information regarding our servicing portfolio of single–family mortgage loans, including loans held for sale, loans held for investment and loans serviced under subservicing agreements, for the periods indicated:

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (in millions) | |
| Beginning owned servicing portfolio | $1,451,990 | $1,280,119 |
| Add: Residential loan production(1) | 132,025 | 243,094 |
| Purchased MSRs (bulk acquisitions) | 152 | 20,450 |
| Less: Principal repayments | (121,906) | (144,454) |
| Ending owned servicing portfolio | 1,462,261 | 1,399,209 |
| Subservicing portfolio | 23,024 | 16,263 |
| Total servicing portfolio | $1,485,285 | $1,415,472 |
| MSR portfolio | $1,365,869 | $1,304,250 |
| Mortgage loans owned | 96,392 | 94,959 |
| Subservicing portfolio | 23,024 | 16,263 |
| Total servicing portfolio | $1,485,285 | $1,415,472 |

(1)     Excludes purchases from third parties in which servicing rights were not acquired.

91

Exhibit 2
113

|  | June 30, | |
|  | 2008 | 2007 |
|  | (dollar amounts in millions) | |
| Composition of owned servicing portfolio at period end: | | |
| Conventional mortgage | $1,236,048 | $1,173,002 |
| Subprime Mortgage | 98,862 | 123,438 |
| Prime Home Equity | 37,687 | 44,707 |
| Government: | | |
| FHA–insured mortgage | 71,066 | 42,781 |
| VA–guaranteed mortgage | 18,598 | 15,281 |
| Total owned portfolio | $1,462,261 | $1,399,209 |
| Delinquent mortgage loans(1): | | |
| 30 days | 3.23% | 2.73% |
| 60 days | 1.39% | 1.01% |
| 90 days or more | 2.92% | 1.24% |
| Total delinquent mortgage loans | 7.54% | 4.98% |
| Loans pending foreclosure(1) | 1.72% | 0.74% |
| Delinquent mortgage loans(1): | | |
| Conventional | 4.89% | 2.64% |
| Subprime Mortgage | 28.92% | 20.15% |
| Prime Home Equity | 7.18% | 3.70% |
| Government | 12.25% | 12.37% |
| Total delinquent mortgage loans | 7.54% | 4.98% |
| Loans pending foreclosure(1): | | |
| Conventional | 1.27% | 0.39% |
| Subprime Mortgage | 8.55% | 3.96% |
| Prime Home Equity | 0.08% | 0.12% |
| Government | 1.26% | 1.14% |
| Total loans pending foreclosure | 1.72% | 0.74% |

*(1)*        Expressed as a percentage of the total number of loans serviced, excluding subserviced loans and loans purchased at a discount due to their collection status.

We attribute the overall increase in delinquencies in our servicing portfolio from June 30, 2007 to June 30, 2008 to increased production of loans in recent years with higher loan–to–value ratios and reduced documentation requirements, combined with a weakening housing market and significant tightening of available credit and to portfolio seasoning. We believe the delinquency rates in our servicing portfolio are consistent with rates for similar mortgage loan portfolios in the industry.

**Off–Balance Sheet Arrangements and Aggregate Contractual Obligations**

*Off–Balance Sheet Arrangements and Guarantees*

In the ordinary course of our business we engage in financial transactions that are not reflected on our balance sheet. (See Note 2—*Summary of Significant Accounting Policies* in our 2007 Annual Report for a description of our consolidation policy.) Such transactions are structured to manage our interest rate, credit or liquidity risks, to diversify funding sources or to optimize our capital.

Most of our off–balance sheet arrangements relate to the securitization of mortgage loans. Our mortgage loan securitizations are normally structured as sales and involve the transfer of mortgage loans to qualifying special–purpose entities that are not subject to consolidation. In a securitization, an

Exhibit 2
114

entity transferring the assets is able to sell those assets for cash. Special–purpose entities used in such securitizations obtain cash by issuing securities representing beneficial interests in the transferred assets to investors. In a securitization, we customarily provide representations and warranties with respect to, and we generally retain the right to service, the transferred mortgage loans.

We also generally have the right to repurchase mortgage loans from the special–purpose entity pursuant to a clean–up call, which is exercised when the costs exceed the benefits of servicing the remaining loans.

Our Prime Mortgage Loans generally are securitized on a non–recourse basis, while Prime Home Equity and Subprime Mortgage Loans generally were securitized with limited recourse for credit losses. During the six months ended June 30, 2008, we did not securitize any Subprime Mortgage or Prime Home Equity Loans. Our exposure to credit losses related to our limited recourse securitization activities is limited to the carrying value of our subordinated interests, to losses that may arise from rapid amortization events that cause subsequent draws that we are contractually required to advance to be subordinated to all other interests in these securitizations and to the contractual limit of reimbursable losses under our corporate guarantees less the recorded liability for such guarantees.

Under the terms of our HELOC securitizations, we make advances to borrowers when they make a subsequent draw on their line of credit and we are reimbursed for those advances from the cash flows in the securitization. This reimbursement normally occurs within a short period after the advance. However, in the event that loan losses requiring draws on monoline insurer's policies (which protect the bondholders in the securitization) exceed a specified threshold or duration, reimbursement of our advances for subsequent draws occurs only after other parties in the securitization (including the senior bondholders and the monoline insurer) have received all of the cash flows to which they are entitled. This status, known as a rapid amortization event, has the effect of extending the time period for which our advances are outstanding, and may result in Countrywide not receiving reimbursement for all of the funds advanced. We evaluate all of our HELOC securitizations for their potential to experience a rapid amortization event by estimating the amount and timing of future losses on the underlying loans and the excess spread available to cover such losses and by evaluating any estimated shortfalls in relation to contractually defined triggers.

During the fourth quarter of 2007, our off–balance sheet obligations relating to rapid amortization events contained in our home equity line–of–credit securitizations were triggered as a result of actual and probable future losses relating to loans underlying these securitizations exceeding specified thresholds or durations. Normally, a rapid amortization event is not expected to occur and is deemed remote. However, sudden deterioration in the housing market experienced in late 2007 resulted in it becoming probable that a rapid amortization event would occur. Because of these events, we recorded impairment losses of $704.1 million in 2007 related to estimated future draw obligations on the home equity securitizations that have entered or are probable to enter rapid amortization status. During the six months ended June 30, 2008, we recorded impairment losses of $56.0 million.

As of June 30, 2008, 18 of 57 outstanding HELOC securitizations, representing 62.2% of the unpaid principal balance of our HELOC securitizations, were subject to rapid amortization events. We have identified seven additional HELOC securitizations, representing 14.2% of the unpaid principal balance of our HELOC securitizations, were probable to become subject to rapid amortization events.

The available credit lines for the securitizations subject to or probable to be subject to a rapid amortization event are approximately $1.7 billion at June 30, 2008. Substantially all of the remaining borrower draw periods for such securitizations ranged from 18 months to 47 months with a weighted average remaining borrower draw period of 35 months.

Due to the borrower's ability to pay down and redraw balances in HELOC loans, a maximum funding obligation related to rapid amortization events cannot be defined. The charges we will

93

Exhibit 2
115

ultimately record as a result of the rapid amortization events are dependent on the performance of the loans in the securitizations that are in rapid amortization; the amount of subsequent draws made by borrowers on such loans; and the timing of such losses, borrower draws, principal repayments and other cash flows related to the securitizations.

To mitigate the amount of additional draws we are required to fund as the result of rapid amortization and, more broadly, as the result of the credit performance of all the HELOC loans we service, we are taking actions that are provided for in the borrowers' line of credit agreements, including suspending borrowers' access to existing lines of credit when their loans or related senior liens reach a specified delinquency status or when their property values decline below a specified threshold; and not extending the draw period under existing lines of credit. Where appropriate, we are also modifying and repurchasing certain loans and soliciting certain borrowers to refinance their loans.

For a further discussion of our exposure to credit risk, see the section in this Report entitled  *Management's Discussion and Analysis of Financial Condition and Results of Operations—Credit Risk Management.*

We do not believe there are any other off-balance sheet arrangements that have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources.

Our material contractual obligations were summarized and included in our 2007 Annual Report. There have been no material changes outside the ordinary course of our business in the contractual obligations as summarized in our 2007 Annual Report during the six months ended June 30, 2008.

**Prospective Trends**

**Outlook**

We believe the current environment will provide significant continuing challenges for the financial services sector, including Countrywide. Specifically, in the near term, we have experienced and are likely to continue to experience:

- Continued declines in housing values

- Increasing delinquencies and foreclosures

- Continued disruptions in the secondary mortgage and debt capital markets and

- More restrictive legislative and regulatory environments.

As a result of these conditions, we are experiencing, among other things, the following:

- Lower loan production volumes

- Higher credit losses, impairment of subordinated interests and higher claims under representations and warranties

- Reduced access to secondary mortgage and debt capital markets

- Increased cost of debt

- Reduction of availability of credit enhancements for the loans and securities we sell and invest in.

Our outlook is subject to risks and uncertainties as discussed in the section *"Factors That May Affect Our Future Results."*

94

Exhibit 2
116

*Housing Values*

Housing values affect us in several ways. Declines in housing values affect us by negatively impacting the demand for mortgage financing, increasing risk of default by mortgagors and increasing risk of loss on defaulted loans. These factors are somewhat offset by reduced prepayments in our loan servicing portfolio.

Recently, we have seen broad-based declines in housing values. We expect housing values to continue to decrease during the near term which may increase our credit loss experience and which has affected our willingness to offer certain mortgage loan products. Both of these factors have and may continue to impact our results of operations.

*Secondary Mortgage Market Investor Demand*

Changes in investor demand for mortgage loans can have a significant impact on our ability to access the secondary mortgage market as a competitive outlet. In the second quarter of 2008, we saw a continuation of the illiquidity in the secondary mortgage market and a continuation of downgrades by certain credit rating agencies of large numbers of mortgage-backed securities. These factors have combined to severely decrease demand for and profitability of a large portion of the products we have historically produced. In response to these developments we have tightened our underwriting and program guidelines and substantially limited our production of non agency-eligible loans to our investment portfolio.

*Impact of Declines in Credit Performance*

With the current contraction in the U.S. housing market and the resulting declining housing prices, along with broad-based worsening of lenders' portfolio performances, we expect elevated credit losses in the near term. Since 2007, we have observed a marked decline in credit performance (as adjusted for age) for recent vintages, especially those loans with higher risk characteristics, including reduced documentation, higher loan-to-value ratios or low credit scores. Deterioration in the credit performance of these loans has resulted in materially increased credit losses, impairment of our related credit-subordinated interests, recognition of losses from rapid amortization events, higher claims under our representations and warranties and elimination of demand for our mortgage-backed securities and the availability of credit enhancements for the loans and securities we sell and invest in. We expect these factors to continue to and to be reflected in future results of operations.

## Regulatory Trends

The regulatory environments in which we operate have an impact on the activities in which we may engage, how the activities may be carried out and the profitability of those activities. Therefore, changes to laws, regulations or regulatory policies can affect whether and to what extent we are able to operate profitably.

On February 13, 2008, the Economic Stimulus Act of 2008 was signed into law. The law provides for, among other things, temporary increases in the loan limits for the FHA's Single-Family Program and the conforming loan limits for loans eligible for purchase by Fannie Mae and Freddie Mac. The limits are raised to as high as $729,750 from the current $362,790 for the FHA Single Family program and $417,000 for Fannie Mae and Freddie Mac. The temporary increase applies to loans originated between July 1, 2007 and December 31, 2008.

With rising delinquency and foreclosure rates in the mortgage market, policymakers at the state and federal level are increasingly looking to enact measures to delay or halt the foreclosure process and require servicers to mitigate the impact of foreclosures on local communities. Congress is considering several pieces of legislation to stem rising foreclosures. One of the major items under consideration is a

Exhibit 2
117

change to the bankruptcy law to allow borrowers to declare bankruptcy in order to have their loan balances reduced and other terms renegotiated (a so−called "cramdown"). In addition, federal legislation targeting mortgage servicing practices and the foreclosure process has been introduced and could be approved in 2009. At the state level, dozens of legislatures have already enacted or are preparing to enact legislation to slow the foreclosure process, up to and including consideration of foreclosure moratoria. Local governments are enacting ordinances that require servicers to better maintain real estate owned properties and that impose "impact fees" on servicers' real estate owned inventory. While providing some relief to mortgage borrowers, these measures could increase servicing costs and also could be construed as undermining legal certainty for investors, and could therefore have long term consequences for investments in mortgage−related securities, and, consequently, our operations.

On July 30, 2008, the Housing and Economic Recovery Act of 2008 was signed into law. In part, the act provides for permanent increases in the loan limits for the FHA's Single−Family Program and the conforming loan limits for loans eligible for purchase by Fannie Mae and Freddie Mac to no more than $625,000. The act also creates a new, temporary, voluntary program within FHA to provide FHA−insured mortgages to distressed borrowers. FHA−approved lenders for these refinancings will have to accept a discount on the original loan's principal, and borrowers will have to share the new equity and any future appreciation with the FHA should they sell or refinance the property. The FHA is authorized to insure up to $300 billion in mortgages under this program, which is to begin on October 1, 2008 and end on September 30, 2011. The act contains a number of provisions reforming regulatory oversight of Fannie Mae, Freddie Mac, and the Federal Home Loan Banks (collectively "GSEs") and modernizing elements of the FHA. The act also contains provisions to stimulate housing demand through tax credits and enhancements to revenue bond programs. Because new regulations will have to be promulgated to implement the new refinancing program, the potential impacts of new regulatory oversight of the GSEs are unknown and the reactions of the market to all of these changes are uncertain, we are unable to determine to what extent these changes may affect our operations.

The Federal Reserve has finalized new rules under the Truth−in−Lending Act and Home Ownership Equity Protection Act to strengthen disclosures and prohibit certain origination and servicing practices deemed unfair or deceptive. The new rules will take effect in 2008 and 2009. HUD unveiled in March 2008 a proposed revision to the RESPA rules to improve up front disclosures of mortgage costs, however it is not clear whether a final rule will be issued in 2008. After addressing foreclosure−related concerns, Congress and the states are expected to return their focus to matters intended to address the lending and underwriting practices that are perceived as causing the current market conditions, including:

- Substantially tightening restrictions on subprime and prime lending terms and features

- Imposing certain underwriting standards, up to and including suitability−style regulation of lenders and brokers

- Licensing and/or registering mortgage brokers and loan originators

- Increasing responsibilities of lenders and purchasers of mortgages on the secondary market.

The legislative and regulatory risks facing the mortgage industry should remain intense throughout 2008 and into 2009.

**Accounting Developments**

In December of 2007, The American Securitization Forum ("ASF") issued the *Streamlined Foreclosure and Loss Avoidance Framework for Securitized Adjustable Rate Mortgage Loans* (the "ASF Framework"). The ASF Framework was developed to address large numbers of subprime loans that are at risk of default when the loans reset from their initial fixed interest rates to variable rates during the

96

Exhibit 2
118

coming 18 months. The objective of the framework is to provide uniform guidelines for evaluating large numbers of loans for refinancing in an efficient manner while complying with the relevant tax regulations and off–balance sheet accounting standards for loan securitizations. The ASF Framework was developed with the participation of representatives of the mortgage securitization industry and the U.S. Government to provide streamlined borrower evaluation procedures in the evaluation of loan modification options for borrowers with subprime adjustable–rate loans meeting certain criteria. Specifically, the ASF Framework targets loans:

- originated between January 1, 2005 and July 31, 2007

- with initial fixed interest rate periods of 36 months or less and

- that are scheduled for their first interest rate reset between January 1, 2008 and July 31, 2010.

The ASF Framework requires the loan servicer to categorize the targeted loans into one of three segments and address the borrowers according to the assigned segment:

- Segment 1 loans: the borrower is likely to be able to refinance into any available mortgage product—the borrowers should refinance their loans into the available products if they are unwilling or unable to meet the reset payment

- Segment 2 loans: the loan is current but the borrower is unlikely to be able to refinance into any readily available mortgage industry product—these borrowers should be evaluated for streamlined (or "fast track") evaluation and modification

- Segment 3 loans: the loan is not current—the servicer should determine the appropriate loss mitigation strategy—other than a streamlined modification—that maximizes the recoveries to the securitization trust that holds the loan. Loss mitigation strategies may include loan modification, forbearance, short sale or foreclosure.

The ASF Framework specifies criteria that borrowers who are evaluated for streamlined modification must meet to qualify for a fast track modification, including property occupancy, credit score and an expected payment change threshold when the interest rate resets. Segment 2 borrowers who meet the specified criteria are identified for fast track loan modifications.

On January 8, 2008, the SEC's Office of the Chief Accountant issued a letter addressing the accounting issues relating to the ASF Framework. The letter concluded that the SEC would not object to continuing off–balance sheet accounting treatment for Segment 2 loans modified pursuant to the ASF Framework. The SEC's Office of the Chief Accountant also asked the FASB to address the issues related to the sales accounting guidance in the applicable accounting literature.

For those current loans that are accounted for off–balance sheet that are modified, but not as part of the ASF Framework above, the servicer must perform on an individual basis, an analysis of the borrower and the loan to demonstrate it is probable that the borrower will not meet the repayment obligation in the near term. Such analysis shall provide sufficient evidence to demonstrate that the loan is in imminent or reasonably foreseeable default. The SEC's Office of the Chief Accountant issued a letter in July 2007 stating that it would not object to continuing off–balance sheet accounting treatment for these loans.

The Company began fast–track evaluation for loan modifications under Segment 2 of the ASF framework in June 2008 and the off–balance sheet accounting treatment of QSPEs that hold those loans was not affected. Other workout activities relating to subprime ARM loans include repayment plans and modifications of loans evaluated on an individual basis.

As of June 30, 2008, the principal balance of beneficial interests issued by the QSPEs that hold subprime ARM loans totaled $57.8 billion. The fair value of beneficial interests related to those QSPEs held by CFC totaled $54.0 million as of June 30, 2008. Following is a summary of loans in QSPEs that

97

Exhibit 2
119

hold subprime ARM loans as of June 30, 2008 as well as workout and payoff activity for the subprime loans by ASF categorization for the six months then−ended:

| | Balance at June 30, 2008 | Activity during the six months ended June 30, 2008(1) | | | |
| | | Payoffs | Fast−track | Other Workout Activities | Foreclosures |
| | | | (in millions) | | |
| Subprime ARM loans: | | | | | |
| Segment 1 | $ 5,865.1 | $ 940.2 | $ — | $ 219.4 | $ 0.6 |
| Segment 2 | 6,450.4 | 304.5 | 411.5 | 750.5 | — |
| Segment 3 | 10,054.7 | 59.4 | — | 3,056.4 | 1,358.3 |
| Total subprime ARM loans | 22,370.2 | $1,304.1 | $ 411.5 | $4,026.3 | $ 1,358.9 |
| Other loans | 32,039.2 | | | | |
| Foreclosed real estate | 3,343.7 | | | | |
| | $57,753.1 | | | | |

*(1)*
        Segment classification was done as of December 31, 2007.

**Factors That May Affect Our Future Results**

    On July 1, 2008, Countrywide completed its Merger with Red Oak Merger Corporation, pursuant to the terms of the previously announced merger agreement. Upon consummation of the Merger, Red Oak Merger Corporation was renamed "Countrywide Financial Corporation." As a result of the Merger, actual results may differ significantly from historical results or those anticipated.

    We make forward−looking statements in this Report and in other reports we file with the SEC and in press releases. Our management may make forward−looking statements orally in a public forum to analysts, investors, the media and others. Generally, forward−looking statements include:

- Projections of our revenues, income, earnings per share, capital structure or other financial items

- Descriptions of our plans or objectives for future operations, products or services

- Forecasts of our future economic performance, interest rates, profit margins and our share of future markets

- Descriptions of assumptions underlying or relating to any of the foregoing.

    Readers are cautioned not to place undue reliance on forward−looking statements. Forward−looking statements speak only as of the date they are made. We do not undertake to update them to reflect changes that occur after the date they are made.

    Forward−looking statements give management's expectation about the future and are not guarantees. Words like "believe," "expect," "anticipate," "promise," "plan" and other expressions or words of similar meanings, as well as future or conditional verbs such as "will," "would," "should," "could" or "may" are generally intended to identify forward−looking statements. There are a number of factors, many of which are beyond our control, that could cause actual results to differ significantly from historical results or those anticipated include, but are not limited to the following:

- Changes in the Company's management, strategies, operations and business plans that occur as a result of its acquisition by Bank of America.

    Other risk factors are described in other reports and documents that we file with or furnish to the SEC including the 2007 Annual Report. Other factors that could also cause results to differ from our

Exhibit 2
120

expectations may not be described in any such report or document. Each of these factors could by itself, or together with one or more other factors, adversely affect our business, results of operations and/or financial condition.

**Item 4.** *Controls and Procedures*

    *Disclosure Controls and Procedures*

Our management has conducted an evaluation, with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a−15(e) and 15d−15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of the end of the period covered by this Report as required by paragraph (b) of Rules 13a−15 and 15d−15 under the Exchange Act. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Report.

    *Changes to Internal Control over Financial Reporting*

There has been no change in our internal control over financial reporting during the quarter ended June 30, 2008 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

99

Exhibit 2
121

## PART II. OTHER INFORMATION

**Item 1. *Legal Proceedings***

See Note 26—*Legal Proceedings* to the consolidated financial statements for litigation and regulatory disclosures.

**Item 6. *Exhibits***

*(a)*

Exhibits
See Index of Exhibits on page 102.

100

Exhibit 2
122

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

COUNTRYWIDE FINANCIAL CORPORATION
(Registrant)

Dated: August 11, 2008              By:      /s/ ANDREW GISSINGER III

                                             Andrew Gissinger III
                                             *Chief Executive Officer*

Dated: August 11, 2008              By:      /s/ ANNE D. MCCALLION

                                             Anne D. McCallion
                                             *Chief Financial Officer*

101

Exhibit 2
123

COUNTRYWIDE FINANCIAL CORPORATION
FORM 10−Q
June 30, 2008
INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 3.3* | Certificate of Incorporation of Countrywide Financial Corporation (the "Company") (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| 3.4* | Bylaws of the Company (incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| 4.63* | First Supplemental Indenture, dated July 1, 2008, among Red Oak Merger Corporation, the Company and The Bank of New York Mellon, as trustee, to the Subordinated Indenture between the Company, and The Bank of New York Mellon, as trustee, dated as of May 16, 2006 (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| 4.64* | First Supplemental Indenture, dated July 1, 2008, among Red Oak Merger Corporation, the Company, Countrywide Home Loans, Inc. ("CHL"), and The Bank of New York Mellon, as trustee, to the Indenture between the Company, CHL, and The Bank of New York, as trustee, dated as of February 1, 2005 (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| 4.65* | Second Supplemental Indenture, dated July 1, 2008, among Red Oak Merger Corporation, CHL, the Company, and The Bank of New York Mellon, as trustee, to the Indenture between Countrywide Funding Corporation, Countrywide Credit Industries, Inc., and The Bank of New York, as trustee dated as of January 1, 1992, as supplemented by First Supplemental Indenture, dated as of June 15, 1995, among CHL (formerly Countrywide Funding Corporation), the Company (formerly Countrywide Credit Industries, Inc.), and The Bank of New York, as trustee (incorporated by reference to Exhibit 4.3 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| 4.66* | First Supplemental Indenture, dated July 1, 2008, among Red Oak Merger Corporation, CHL, the Company, and The Bank of New York Mellon, as trustee, to the Indenture between CHL, Countrywide Credit Industries, Inc., and The Bank of New York, as trustee dated as of December 1, 2001 (incorporated by reference to Exhibit 4.4 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| 4.67* | First Supplemental Indenture, dated July 1, 2008, among Red Oak Merger Corporation, the Company, CHL, Bank of America Corporation, and The Bank of New York Mellon, as trustee, to the Indenture between the Company, CHL, and The Bank of New York, as trustee, dated as of May 22, 2007 (incorporated by reference to Exhibit 4.5 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |

Exhibit 2
124

| Exhibit No. | Description |
|---|---|
| 4.68* | Second Supplemental Indenture, dated July 1, 2008, among Red Oak Merger Corporation, the Company, CHL, and The Bank of New York Mellon, as trustee, to the Subordinated Indenture between the Company, CHL, and The Bank of New York, as trustee, dated as of April 11, 2003, as supplemented by the First Supplemental Indenture, dated as of April 11, 2003, among the Company, CHL, and The Bank of New York, as trustee (incorporated by reference to Exhibit 4.6 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| 4.69* | Second Supplemental Indenture, dated July 1, 2008, among Red Oak Merger Corporation, the Company, and The Bank of New York Mellon, as trustee, to the Junior Subordinated Indenture between the Company, and The Bank of New York, as trustee, dated as of November 8, 2006, as supplemented by the Supplemental Indenture, dated as of November 8, 2006, between the Company and The Bank of New York, as trustee (incorporated by reference to Exhibit 4.7 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| 4.70* | First Supplemental Indenture, dated July 1, 2008, among Red Oak Merger Corporation, CHL, the Company, and The Bank of New York Mellon, as trustee, to the Indenture among CHL, Countrywide Credit Industries, Inc. and The Bank of New York, as trustee, dated as of June 4, 1997 (incorporated by reference to Exhibit 4.8 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| 4.71* | Second Supplemental Trust Deed, dated July 1, 2008, among Red Oak Merger Corporation, the Company, CHL, and Deutsche Trustee Company Limited, as trustee, to the Trust Deed among the Company, CHL, and Deutsche Trustee Company Limited, as trustee, dated as of August 15, 2005, as supplemented and restated by First Supplemental Trust Deed, dated as of August 31, 2006, among CHL, the Company, and Deutsche Trustee Company Limited, as trustee (incorporated by reference to Exhibit 4.9 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| 4.72* | Fifth Supplemental Trust Deed, dated July 1, 2008, among Red Oak Merger Corporation, CHL, the Company, and Deutsche Trustee Company Limited, as trustee, to the Trust Deed among CHL, the Company (formerly Countrywide Credit Industries, Inc.), and Bankers Trustee Company Limited, as trustee, dated as of May 1, 1998, as supplemented and restated by Fourth Supplemental Trust Deed, dated as of January 29, 2002, among CHL, the Company (formerly Countrywide Credit Industries, Inc.), and Deutsche Trustee Company Limited, as trustee (incorporated by reference to Exhibit 4.10 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| 4.73* | First Supplemental Note Deed Poll, dated July 1, 2008, between Red Oak Merger Corporation and the Company to the Note Deed Poll by the Company, dated as of April 29, 2005 (incorporated by reference to Exhibit 4.11 to the Company's Current Report on Form 8−K, filed with the SEC on July 8, 2008). |
| +10.118 | The Company's Change in Control Severance Plan (As Amended and Restated June 24, 2008). |
| +10.119 | First Amendment dated June 18, 2008 to the Company's 401(k) Savings and Investment Plan, as amended and restated effective January 1, 2007. |
| 12.1 | Computation of the Ratio of Earnings to Fixed Charges. |

Exhibit 2
125

| Exhibit No. | Description |
|---|---|
| 31.1 | Certification of Principal Executive Officer Pursuant to Section 302 of the Sarbanes−Oxley Act of 2002. |
| 31.2 | Certification of Principal Financial Officer Pursuant to Section 302 of the Sarbanes−Oxley Act of 2002. |
| 32.1 | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350. |
| 32.2 | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350. |

\*      Incorporated by reference

+      Constitutes a management contract or compensatory plan or arrangement

Exhibit 2
126

QuickLinks

COUNTRYWIDE FINANCIAL CORPORATION FORM 10-Q June 30, 2008 TABLE OF CONTENTS
PART I. FINANCIAL INFORMATION
Financial Statements
COUNTRYWIDE FINANCIAL CORPORATION AND SUBSIDIARIES CONSOLIDATED BALANCE SHEETS
COUNTRYWIDE FINANCIAL CORPORATION AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF OPERATIONS
COUNTRYWIDE FINANCIAL CORPORATION AND SUBSIDIARIES CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDERS'
EQUITY
COUNTRYWIDE FINANCIAL CORPORATION AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CASH FLOWS
COUNTRYWIDE FINANCIAL CORPORATION AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)

Note 1—Basis of Presentation
Note 2—Subsequent Events—Merger and Subsequent Transactions with Bank of America Corporation
Note 3—Adoption of New Accounting Pronouncements
Note 4—(Loss) Earnings Per Share
Note 5—Fair Value

Note 6—Derivative Financial Instruments

Note 7—Mortgage Loans Held for Sale
Note 8—Trading Securities and Trading Securities Sold, Not Yet Purchased
Note 9—Securities Purchased Under Agreements to Resell, Securities Borrowed and Federal Funds Sold
Note 10—Loans Held for Investment, Net

Note 11—Investments in Other Financial Instruments, at Estimated Fair Value

Note 12—Mortgage Servicing Rights, at Estimated Fair Value
Note 13—Other Assets
Note 14—Deposit Liabilities
Note 15—Securities Sold Under Agreements to Repurchase
Note 16—Notes Payable
Note 17—Regulatory and Agency Capital Requirements
Note 18—Supplemental Cash Flow Information
Note 19—Net Interest Income
Note 20—Restructuring Charges
Note 21—Pension Plans
Note 22—Segments and Related Information

Note 23—Summarized Financial Information
Note 24—Borrower and Investor Custodial Accounts
Note 25—Loan Commitments
Note 26—Legal Proceedings
Note 27—Recently Issued Accounting Pronouncements

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

Credit Risk Management

Item 4. Controls and Procedures
PART II. OTHER INFORMATION

Item 1. Legal Proceedings
Item 6. Exhibits
SIGNATURES

Exhibit 2
127

# COUNTRYWIDE FINANCIAL CORP

4500 PARK GRANADA BLVD
CALABASAS, CA 91302
818. 225.3000

# EX−10.118

**EXHIBIT 10.118**
**10−Q Filed on 08/11/2008 − Period: 06/30/2008**
File Number 001−12331−01



Exhibit 2
128

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

QuickLinks — Click here to rapidly navigate through this document

Exhibit 10.118

**COUNTRYWIDE FINANCIAL CORPORATION**
**CHANGE IN CONTROL SEVERANCE PLAN**
**(As Amended and Restated June 24, 2008)**

WHEREAS, the Board of Directors (the "Board") of COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation (the "Company"), originally adopted this Plan on September 12, 1996, amended and restated it on February 23, 2005 and subsequently amended and restated it on June 14, 2006, recognizing that the threat of an unsolicited takeover or other change in control of the Company may occur which can result in significant distractions of its personnel and disrupt the business of the Company with respect to attracting and retaining employees of every level because of the uncertainties inherent in such a situation; and

WHEREAS, the Board has determined that it is essential and in the best interests of the Company and its shareholders to be able to retain the services of its personnel at a time when the Company is considering its strategic alternatives, including possible change in control transactions, in order to ensure their continued dedication and efforts without undue concern for their personal financial and employment security.

NOW, THEREFORE, in order to fulfill the above objectives, the following plan has been developed and is hereby adopted.

1.  *Purpose*

    It is the purpose of the Company, through this Plan, to provide a salary continuation payment and certain other benefits for each of its employees who is a Participant in the Plan and (a) who separates from service with the Company for Good Reason or (b) whose employment with the Company is involuntarily terminated (other than for Cause, death or an Excluded Termination), in either case, on or after the date on which a Change in Control occurs and within the time limits specified in Section 5.1.

    It is intended that the Plan shall be a "severance pay arrangement" within the meaning of Section 3(2)(B)(i) of ERISA, and that it shall meet the criteria for treatment as a "severance pay plan" set forth in 29 C.F.R. §2510.3−2(b). The Plan shall be interpreted and applied in accordance with the foregoing intention.

2.  *Contractual Right*

    Upon and after a Change in Control, each Participant shall have a fully vested, nonforfeitable contractual right, enforceable against the Company, to the benefits provided for under Section 6 of this Plan upon the occurrence of the conditions specified in Section 5.1. Such contractual right to receive such benefits if the conditions specified in Section 5.1 are fulfilled shall arise on the date on which the Change in Control occurs.

3.  *Duration*

    This Plan shall be effective as of the date the Plan is approved by the Board or such other date as the Board shall designate in its resolution approving the Plan. The Plan shall continue in effect until terminated in accordance with Section 11.

4.

    *Definitions.*   For purposes of this Plan, the following definitions shall apply:

    4.1

        *Affiliate:*   "Affiliate" shall mean with respect to any person or entity, any entity, directly or indirectly, controlled by, controlling or under common control with such person or entity.

    4.2

        *Board:*   "Board" shall mean the Board of Directors of Countrywide Financial Corporation.

Exhibit 2
129

4.3       *Cause:*   "Cause" shall exist where the Participant (a) intentionally and continually failed to perform reasonably assigned duties, (b) willfully engaged in misconduct which is demonstrably and materially injurious to the Company, monetarily or otherwise, (c) engaged in a transaction in connection with the performance of his or her duties to the Company for personal profit to himself or herself or (d) willfully violated any law, rule or regulation in connection with the performance of his or her duties (other than traffic violations or similar offenses). Failure by a Participant to perform the Participant's duties during any period of disability shall not constitute Cause.

4.4       *Change in Control:*   A "Change in Control" shall mean the occurrence during the term of this Plan, of any one of the following events:

(a)      An acquisition (other than directly from Company) of any common stock or other "Voting Securities" (as hereinafter defined) of Company by any "Person" (as the term person is used for purposes of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), immediately after which such Person has "Beneficial Ownership" (within the meaning of Rule 13d−3 promulgated under the Exchange Act) of twenty five percent (25%) or more of the then outstanding shares of Company's common stock or the combined voting power of Company's then outstanding Voting Securities; provided, however, in determining whether a Change in Control has occurred, Voting Securities which are acquired in a "Non−Control Acquisition" (as hereinafter defined) shall not constitute an acquisition which would cause a Change in Control. For purposes of this Plan, (1) "Voting Securities" shall mean Company's outstanding voting securities entitled to vote generally in the election of directors and (2) a "Non−Control Acquisition" shall mean an acquisition by (i) an employee benefit plan (or a trust forming a part thereof) maintained by (A) the Company or (B) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, directly or indirectly, by the Company (for purposes of this definition, a "Subsidiary"), (ii) the Company or any of its Subsidiaries, or (iii) any Person in connection with a "Non−Control Transaction" (as hereinafter defined);

(b)      During any period of twenty−four (24) consecutive months, the individuals who at the beginning of such period constitute the Board (the "Incumbent Board"), cease for any reason to constitute at least fifty percent (50%) of the members of the Board; provided, however, that if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least two−thirds of the Incumbent Board, such new director shall, for purposes of this Plan, be considered as a member of the Incumbent Board; provided, further, that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of either an actual or threatened "Election Contest" (as described in Rule 14a−11 promulgated under the Exchange Act) or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board (a "Proxy Contest") including by reason of any agreement intended to avoid or settle any Election Contest or Proxy Contest; or

(c)      The consummation of:

(i)      A merger, consolidation or reorganization involving the Company, unless such merger, consolidation or reorganization is a "Non−Control Transaction." A "Non−Control Transaction" shall mean a merger, consolidation or reorganization of the Company where:

(A)      the Company's stockholders, immediately before such merger, consolidation or reorganization, own directly or indirectly immediately following such merger,

2

Exhibit 2
130

consolidation or reorganization, at least fifty percent (50%) of the combined voting power of the outstanding Voting Securities of the corporation resulting from such merger, consolidation or reorganization (the "Surviving Corporation") in substantially the same proportion as their ownership of the Voting Securities immediately before such merger, consolidation or reorganization;

*(B)*

the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for such merger, consolidation or reorganization constitute at least fifty percent (50%) of the members of the board of directors of the Surviving Corporation, or in the event that, immediately following the consummation of such transaction, a corporation beneficially owns, directly or indirectly, a majority of the Voting Securities of the Surviving Corporation, the board of directors of such corporation; and

*(C)*

no Person other than (i) the Company, (ii) any Subsidiary, (iii) any employee benefit plan (or any trust forming a part thereof) maintained by the Company, the Surviving Corporation, or any Subsidiary, or (iv) any Person who, immediately prior to such merger, consolidation or reorganization had Beneficial Ownership of twenty five percent (25%) or more of the then outstanding Voting Securities or common stock of the Company, has Beneficial Ownership of twenty five percent (25%) or more of the combined voting power of the Surviving Corporation's then outstanding Voting Securities or its common stock;

*(ii)*

A complete liquidation or dissolution of the Company; or

*(iii)*

The sale or other disposition of all or substantially all of the assets of the Company to any Person (other than a transfer to a Subsidiary).

Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted amount of the then outstanding common stock or Voting Securities as a result of the acquisition of common stock or Voting Securities by the Company which, by reducing the number of shares of common stock or Voting Securities then outstanding, increases the proportional number of shares Beneficially Owned by the Subject Person; provided, however, that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of common stock or Voting Securities by the Company, and after such share acquisition by the Company, the Subject Person becomes the Beneficial Owner of any additional common stock or Voting Securities which increases the percentage of the then outstanding common stock or Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.

4.5

*Committee:*   "Committee" shall mean the Committee described in Section 9.

4.6

*Company:*   "Company" shall mean Countrywide Financial Corporation and any successor thereto, including, without limitation, any person (as such term is used in Sections 13(d) and 14(d)(2) of the Securities Exchange Act of 1934, as amended), partnership(s) or corporation(s) acquiring directly or indirectly all or substantially all of the business or assets of the Company.

4.7

*ERISA:*   "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended. References to ERISA include the valid and binding governmental regulations, court decisions and other regulatory and judicial authority issued or rendered thereunder.

4.8

*Excluded Termination:*   "Excluded Termination" shall have the meaning as set forth in Section 5.2 of this Plan.

3

Exhibit 2
131

4.9

*Good Reason:*   A Participant who immediately prior to a Change in Control is a member of employee classification X (as set forth in Appendix A) shall have "Good Reason" for terminating employment with the Company only if one or more of the following occurs, within twenty-four months after a Change in Control, without the Participant's express written consent:

*(a)*

a reduction by the Company in the Participant's base salary or the termination or reduction of award opportunities (other than equity-based opportunities) under any bonus or incentive award plan, practice or formula in which the Participant participates unless a comparable arrangement (embodied in an ongoing substitute or alternative plan, practice or formula) has been made with respect to the Participant's participation in such bonus or incentive award plan, practice or formula; or

*(b)*

a change in the Participant's title, position, duties or responsibilities which represents an adverse change from his or her title, position, duties or responsibilities as in effect immediately prior to such change; or

*(c)*

the relocation of the office at which the Participant is principally employed immediately prior to the Change in Control to a location more than fifty (50) miles from the location of such office, or the Participant being required to be based anywhere other than such office, except to the extent the Participant was not previously assigned to a principal location and except for required travel on the Company's business to an extent substantially consistent with the Participant's business travel obligations at the time of the Change in Control.

*(d)*

Notwithstanding the foregoing, the Participant shall not have Good Reason to terminate employment with the Company due solely to the fact that the Company shall cease to be a public company and shall become a subsidiary of another publicly-traded corporation, so long as the Participant retains his or her title and retains job authorities and responsibilities consistent in all material respects with those of the Participant's counterparts in the substantial subsidiaries of the parent.

Notwithstanding the foregoing, no action by the Company shall give rise to Good Reason if it results from the Participant's termination for Cause, death or an Excluded Termination.

4.10

*Operating Unit:*   "Operating Unit" shall mean any subsidiary, division or other business unit of Company or any Affiliate.

4.11

*Participant:*   "Participant" shall mean an active, full-time employee of the Company or any of its U.S. subsidiaries who, on the date immediately preceding the date of a Change in Control, is employed in one of the employee classifications set forth in Appendix A. Employees of the Company who are Executive Managing Directors and above who are covered under individual employment agreements shall not be Participants in this Plan.

4.12

*Plan:*   "Plan" shall mean the Countrywide Financial Corporation Change in Control Severance Plan (As Amended and Restated June 24, 2008).

4.13

*Post-Transaction Good Reason:*   "Post-Transaction Good Reason" shall mean, with respect to offered employment or the continued employment, as the case may be, to employees who immediately prior to a Change in Control are members of employee classification X (as set forth in Appendix A) with a Post-Transaction Employer (as defined in Section 5.2) following a Transaction (as defined in Section 5.2):

*(a)*

a reduction in the Participant's annual base salary or the termination or reduction of award opportunities (other than equity-based opportunities) under any bonus or incentive award plan, practice or formula in which the Participant participates unless a comparable

4

Exhibit 2
132

arrangement (embodied in an ongoing substitute or alternative plan, practice or formula) has been made with respect to the Participant's participation in such bonus or incentive award plan, practice or formula, in either case below the greater of the rate in effect (i) as of the date of the Transaction or (ii) on any date following the Transaction;

(b)    a change in the Participant's title, position, duties or responsibilities which represents an adverse change from his or her title, position, duties or responsibilities as in effect immediately prior to such change, in any case as determined by the Participant in good faith; or

(c)    the relocation of the office at which the Participant is principally employed immediately prior to the Transaction to a location more than fifty (50) miles from the location of such office, or the Participant being required to be based anywhere other than such office, except to the extent the Participant was not previously assigned to a principal location and except for required travel on the Company's business to an extent substantially consistent with the Participant's business travel obligations at the time of the Transaction;

4.14    *Senior Human Resources Manager:*  "Senior Human Resources Manager" shall mean the Senior Human Resources Officer of the Company prior to a Change in Control or such person's designee.

4.15    *Severance Benefit:*  "Severance Benefit" shall mean the benefits payable in accordance with Section 6 of this Plan.

**5.   *When Provisions Apply***

5.1    The benefits provided for under Section 6 shall be provided to each Participant who incurs a "Qualifying Termination." For purposes of this Plan, a "Qualifying Termination" shall occur only if a Change in Control occurs and

(a)    within twenty−four months after the Change in Control occurs, the Company terminates the Participant's employment other than for Cause; or

(b)    (i)   within twenty−four months after the Change in Control occurs, Good Reason occurs, and

(ii)    the Participant terminates employment with the Company within six months after the Good Reason occurs;

provided, however, that a Qualifying Termination shall not occur if the Participant's employment with the Company terminates by reason of Cause, the Participant's death, or an Excluded Termination (as defined in Section 5.2).

5.2    *Sale of Business or Assets.*  If, following a Change in Control, a Participant's employment with the Company and its Affiliates terminates in connection with the sale, divestiture or other disposition of any Operating Unit (or part thereof) (a "Transaction"), such termination shall not be a termination of employment of the Participant for purposes of the Plan, and (notwithstanding the rights provided to the Participant by Section 5.1) the Participant shall not be entitled to a Severance Benefit as a result of such termination of employment if (i) the Participant is offered continued employment, or continues in employment, with the divested Operating Unit or the purchaser of the assets of the Operating Unit, as the case may be, (the "Post−Transaction Employer") or their respective Affiliates on terms and conditions that would not constitute Post−Transaction Good Reason and (ii) the Company obtains an agreement from the acquirer of the stock or assets of the divested Operating Unit, enforceable by the Participant, to provide or cause the Post−Transaction Employer to provide severance pay and benefits, if the Participant accepts the offered employment or continues in employment with

5

Exhibit 2

133

the Post−Transaction Employer or its Affiliates following the Transaction, (A) at least equal to the Severance Benefit and (B) payable upon a termination of the Participant's employment with the Post−Transaction Employer and its Affiliates within the period described in Section 5.1 (or such part of it as is then remaining) for any reason other than Cause, the Participant's death or a termination by the Participant without Post−Transaction Good Reason. For purposes of this Section 5.2, the term Cause shall have the meaning ascribed to it in Section 4.3, but the term Company as it is used in Section 4.3 shall be deemed to refer to the entity employing the Participant after the Transaction.

A termination of employment described in this Section 5.2 is herein referred to as an "Excluded Termination." In the circumstances described in this Section 5.2, the Participant shall not be entitled to receive any Severance Benefit under this Plan whether or not the Participant accepts the offered employment or continues in employment. The provisions of this Section 5.2 do not create any entitlement to any Severance Benefit from the Company and its Affiliates in any circumstances whatsoever and are to be construed solely as a limitation on such entitlement in the circumstances herein set forth.

5.3

The fact that a Participant is eligible to immediately receive retirement benefits under the Countrywide Financial Corporation Defined Benefit Pension Plan or any other Company employee benefit plan, practice or policy shall not render him or her ineligible for the benefits under this Plan.

## 6. *Severance Benefits*

6.1

*Severance Payment.*

(a)

Each Participant entitled to benefits under this Plan shall receive as continuation of salary and bonus an amount as determined in accordance with Appendix A (the "Salary Separation Payment") (or, if greater, the amount determined pursuant to any individual employment, offer, letter or similar agreement by and between the Participant and the Company (an "Individual Agreement"), provided that notwithstanding anything to the contrary in such Individual Agreement any amounts payable under such Individual Agreement shall in all cases be payable in accordance with the payment schedules set forth in this Plan), and in no event shall a Participant be entitled to duplicate payments under the Plan and any Individual Agreement.

For purposes of calculating the Salary Separation Payment, (1) the Participant's "Base Pay" shall be the Participant's base annual salary as of the date of his or her termination of employment or, if greater, as of the date on which the Change in Control occurs, (2) the Participant's "Bonus" shall be the greater of (x) the average of the aggregate bonus and/or incentive award, if any, paid or payable to the Participant for each of the two (2) fiscal years preceding the fiscal year in which the Participant's termination of employment occurs (or such fewer number of fiscal years for which the Participant was eligible to receive a bonus and/or incentive award) and (y) the bonus and/or incentive award paid for the fiscal year immediately preceding the date of the Change in Control, and (3) the Participant's "Pay" for Classification C, D and E is base pay and bonus paid for the preceding twelve months (annualized for employees who have worked for less than twelve months) and converted to a weekly amount.

(b)

Except as required by Section 7, the Salary Separation Payment provided for in Section 6.1(a) shall be payable in addition to, and not in lieu of, all other accrued, vested, earned, or deferred compensation rights, options, or other benefits (other than severance pay or similar benefits) which may be payable or owing to a Participant following termination of his or her employment under any plan, including but not limited to

6

Exhibit 2
134

retirement and supplemental retirement benefits, bonus, accrued vacation or sick pay, compensation, or benefits payable under any of the Company's employee benefit plans, practices or policies.

(c)    The Salary Separation Payment shall not be offset or reduced by any unemployment insurance benefit, payment in lieu of notice required under any law or act, or income from subsequent employment that the Participant may receive.

(d)    Except as otherwise provided by Section 6.4, the Salary Separation Payment shall be paid in a series of substantially equal installments in accordance with the regular payroll practices of the Company (as in effect as of the date of termination) over the period used in computing the Salary Separation Payment pursuant to Section 6.1(a) (the "Salary Separation Pay Period"), commencing as soon as administratively practicable, but in no event more than sixty (60) days, following the Participant's Qualifying Termination (except as otherwise required by Section 16).

6.2    The Salary Separation Pay Period shall be included as accredited service for the purpose of receiving or accruing benefits under all employee benefit plans of the Company, including, but not limited to, group health and life insurance, long−term disability, the Countrywide Financial Corporation Defined Benefit Pension Plan (the "Pension Plan"), the Countrywide Financial Corporation 401(k) Savings and Investment Plan, the Countrywide Financial Corporation Supplemental Executive Retirement Plan, the Countrywide Financial Corporation Executive Deferred Compensation Plan, the Countrywide Financial Corporation Selected Employee Deferred Compensation Plan and the Countrywide Capital Market Nonqualified ERISA Pension Plan. With respect to the Pension Plan, the Company shall pay a Participant, as soon as administratively practicable, but in no event more than sixty (60) days, following such Participant's termination of employment a lump sum payment equal to the present value of the difference (if any) between the accrued benefit the Participant is entitled to receive under the Pension Plan upon the Participant's termination of employment and the accrued benefit the Participant would have been entitled to receive under the Pension Plan had the Participant been credited with additional years of service during the Salary Separation Pay Period. Such present value calculations shall be made by the Company using the actuarial assumptions applicable under the Pension Plan as of the date of the Participant's termination of employment.

6.3    For the period equal to the Salary Separation Pay Period and commencing on the date of Participant's termination of employment (the "Continuation Period"), the Company shall at its expense (and without contribution by the Participant) continue on behalf of the Participant and his or her dependents and beneficiaries (a) medical, health, dental and prescription drug benefits, (b) short and long−term disability coverage, (c) life insurance and other death benefits coverage and (d) individual outplacement services for members of employee classification X, A and B, (as set forth in Appendix A) and outplacement services at a level to be determined by the Senior Human Resources Manager for employee classification C, D and E. For a period of thirty−six (36) months for members of employee classification X and A, and commencing on the date of Participant's Qualifying Termination, the Company shall at its expense (and without contribution by the Participant) continue, on behalf of the Participant, financial planning, executive medical examination program and executive long term disability. The coverages and benefits (including deductibles, if any) provided under this Section 6.3 shall be no less favorable in the aggregate to the Participant and his or her beneficiaries than the most favorable of such coverages and benefits provided the Participant and his or her dependents during the 90−day period immediately preceding the Change in Control or as of any date following the Change in Control but preceding the date of Participant's termination. The obligation under this Section 6.3 with respect to the

7

Exhibit 2
135

foregoing benefits shall be limited if the Participant obtains any such benefits pursuant to a subsequent employer's benefit plans, in which case the Company may reduce or eliminate the coverage and benefits it is required to provide the Participant hereunder as long as the aggregate coverages and benefits of the combined benefit plans are no less favorable to the Participant than the coverages and benefits required to be provided hereunder. A Participant's qualifying event for purposes continuation coverage under §4980B of the Internal Revenue Code of 1986, as amended (the "Code"), will not occur until the end of the period during which benefits were provided pursuant to this Section 6.3. Notwithstanding anything contained in this Plan, the provision of the benefits to be provided for pursuant to this Section 6.3 shall comply with the foregoing provisions: any such benefits that are "deferred compensation" within the meaning of Code Section 409A (which, for example, would not include non–taxable medical benefits, "disability pay" or "death benefit" plans within the meaning of Treasury Regulation Section 1.409A–1(a)(5)) shall be provided and administered in a manner that complies with Treasury Regulation Section 1.409A–3(i)(1)(iv), which will require that (i) the amount of such benefits provided during one taxable year shall not affect the amount of such benefits provided in any other taxable year, except that to the extent such benefits consist of the reimbursement of expenses referred to in Section 105(b) of the Code, a maximum, if provided under the terms of the plan providing such benefit, may be imposed on the amount of such reimbursements over some or all of the period in which such benefit is to be provided to the Participant, as described in Treasury Regulation Section 1.409A–3(i)(iv)(B), (ii) to the extent that any such benefits consist of reimbursement of eligible expenses, such reimbursement must be made on or before the last day of the Participant's taxable year following the taxable year in which the expense was incurred and (iii) no such benefit may be liquidated or exchanged for another benefit.

6.4

Notwithstanding Section 6.1, a Participant in employee classification C, D or E (as set forth in Appendix A) may elect to receive the Salary Separation Payment in a lump sum, but only if the Company has first determined that no portion of the Salary Separation Payment is subject to the requirements of Code Section 409A. Benefits otherwise receivable by the Participant pursuant to clauses (a), (b) and (c) of Section 6.3 shall be discontinued if the Participant requests and receives a lump sum payment. If the Participant elects to receive the Salary Separation Payment as a lump sum, and the Participant accepts alternative employment with the Company, such Participant shall owe the Company the portion of the Salary Separation Payment which exceeds the amount of Base Pay the Participant would have earned had the Participant been actively employed by the Company from the date his or her termination of employment commenced to the new employment commencement date. The payment of a Participant's Salary Separation Payment as a lump sum under this Section 6.4 shall be made as soon as administratively practicable, but in no event more than sixty (60) days, following the Participant's Qualifying Termination.

6.5

Notwithstanding Section 6.1, benefits otherwise receivable by the Participant pursuant to clauses (a), (b) and (c) of Section 6.3 shall be discontinued if the Participant accepts alternative employment with the Company or any of its Affiliates. Payments under Section 6.1 shall also cease upon a Participant accepting alternative employment with the Company or any of its Affiliates.

6.6

Any termination of employment following a Change in Control by the Company or by the Participant shall be communicated by a Notice of Termination to the other party herein in accordance with Section 13. For purposes of this Plan, a "Notice of Termination" shall mean a written notice which shall indicate the specific Qualifying Termination provision in this Plan, if any, relied upon and shall set forth in reasonable detail the facts and circumstances that provide a basis for termination of the Participant's employment under the provision so

8

Exhibit 2
136

indicated and shall specify the effective date of the Qualifying Termination which shall not be less than thirty (30) days nor more than sixty (60) days from the date such Notice of Termination is given or such shorter or longer period as may be mutually agreed between the Company and the Participant. For purposes of this Plan, no such purported Qualifying Termination shall be effective without such Notice of Termination.

6.7     If a Participant who is entitled to Severance Benefits under this Plan dies before receiving the Salary Separation Payment, such Payment shall be made to the Participant's surviving spouse, or, if there is no surviving spouse, to the Participant's estate. If a Participant who is entitled to Severance Benefits under this Plan dies before the end of the Continuation Period, then for the balance of the Continuation Period, the Company shall be required to continue the benefits provided for under Section 6.3 to the Participant's spouse and dependents.

6.8     A Participant who is entitled to benefits under this Plan shall not be required to accept or to seek other employment as a condition of receiving such benefits, and a Participant's benefits provided under this Plan shall not be offset by any future compensation received by the Participant.

9

Exhibit 2
137

7. *Excise Tax*

7.1

*Excise Tax Limitation.*

(a)

With respect to any Participant who immediately prior to the Change in Control is a member of employee classification X or A (as set forth in Appendix A), except as provided in subsection (b), in the event it shall be determined that any payment or distribution of any type to a Participant, including accelerated vesting, to or for the benefit of the Participant, by the Company, any Affiliate of the Company, any Person (as the term "person" is used for purposes of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended) who acquires ownership or effective control of the Company or ownership of a substantial portion of the Company's assets (within the meaning of Section 280G of the Code, and the regulations thereunder) or any Affiliate of such Person, whether paid or payable or distributed or distributable pursuant to the terms of this Plan or otherwise (the "Payments"), is or will be subject to the excise tax imposed by Section 4999 of the Code or any interest or penalties with respect to such excise tax (such excise tax, together with any such interest and penalties, are collectively referred to as the "Excise Tax"), then the Participant shall be entitled to receive an additional payment (a "Gross−Up Payment") in an amount such that after payment by the Participant of all taxes (including any interest or penalties imposed with respect to such taxes), including any income tax, employment tax or Excise Tax imposed upon the Gross−Up Payment, the Participant retains an amount of the Gross−Up Payment equal to the Excise Tax imposed upon the Payments.

(b)

With respect to any Participant who immediately prior to the Change in Control is a member of employee classification X or A, notwithstanding Section (a) or any other provision of this Plan to the contrary, in the event that the Payments (excluding the payment provided for in subsection 7.1(a)) exceed by less than 10% or $100,000 the maximum amount of Payments which if made or provided to the Participant would not be subject to an Excise Tax, the Participant will not be entitled to a Gross−Up Payment and the Payments shall be reduced (but not below zero) to the extent necessary so that no Payment to be made or benefit to be provided to the Participant shall be subject to the Excise Tax; it being the intent of the parties that the Payments shall be reduced only if the economic detriment to the Participant (on a pre−tax basis) is less than the greater of $100,000 or 10% of the Payments. The Company shall reduce or eliminate the Payments under the Plan, by first reducing or eliminating the portion of the Payments under the Plan which are not payable in cash and then by reducing or eliminating cash payments under the Plan, in each case in reverse order beginning with payments or benefits which are to be paid the farthest in time from the "Determination" (as defined below).

(c)

With respect to any Participant who immediately prior to the Change in Control is a member of employee classification X or A , the determination of whether the Payments shall be reduced pursuant to this Plan and the amount of such reduction, all mathematical determinations, and all determinations as to whether any of the Payments are "parachute payments" (within the meaning of Section 280G of the Code), that are required to be made under this Section, including determinations as to whether a Gross−Up Payment is required, the amount of such Gross−Up Payment and amounts relevant to the last sentence of this subsection (c), shall be made by an independent accounting firm selected by the Company from among the four (4) largest accounting firms in the United States or any nationally recognized financial planning and benefits consulting company (the "Accounting Firm"), which shall provide its determination (the "Determination"), together with detailed supporting calculations regarding the amount of

10

Exhibit 2
138

any Gross−Up Payment and any other relevant matter, both to the Company and the Participant by no later than ten (10) days following the Termination Date, if applicable, or such earlier time as is requested by the Company or the Participant (if the Participant reasonably believes that any of the Payments may be subject to the Excise Tax). If the Accounting Firm determines that no Excise Tax is payable by the Participant, it shall furnish the Participant and the Company with an opinion reasonably acceptable to the Participant and the Company that no Excise Tax is payable (including the reasons therefor) and that the Participant has substantial authority not to report any Excise Tax on his federal income tax return. If a Gross−Up Payment is determined to be payable, it shall be paid (including through withholding of taxes) to the Participant no later than the due date for payment of the Excise Tax. Any determination by the Accounting Firm shall be binding upon the Company and the Participant, absent manifest error. As a result of uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm hereunder, it is possible that Gross−Up Payments not made by the Company should have been made ("Underpayment"), or that Gross−Up Payments will have been made by the Company which should not have been made ("Overpayment"). In either such event, the Accounting Firm shall determine the amount of the Underpayment or Overpayment that has occurred. In the case of an Underpayment, the amount of such Underpayment (together with any interest and penalties payable by the Participant as a result of such Underpayment) shall be promptly paid by the Company to or for the benefit of the Participant. In the case of an Overpayment, the Participant shall, at the direction and expense of the Company, take such steps as are reasonably necessary (including the filing of returns and claims for refund), follow reasonable instructions from, and procedures established by, the Company, and otherwise reasonably cooperate with the Company to correct such Overpayment, provided, however, that (i) the Participant shall not in any event be obligated to return to the Company an amount greater than the net after−tax portion of the Overpayment that he has retained or has recovered as a refund from the applicable taxing authorities and (ii) if a Gross−Up Payment is determined to be payable, this provision shall be interpreted in a manner consistent with an intent to make the Participant whole, on an after−tax basis, from the application of the Excise Tax, it being understood that the correction of an Overpayment may result in the Participant repaying to the Company an amount which is less than the Overpayment. The cost of all such determinations made pursuant to this Section shall be paid by the Company.

In order to ensure compliance with Section 409A of the Code, the Gross−Up Payment shall in all events be paid no later than the end of the Participant's taxable year next following the Participant's taxable year in which the Excise Tax (and any income or other related taxes or interest or penalties thereon) on a Payment are remitted to the Internal Revenue Service or any other applicable taxing authority or, in the case of amounts relating to a claim described in Section 7(c) that does not result in the remittance of any federal, state, local and foreign income, excise, social security and other taxes, the calendar year in which the claim is finally settled or otherwise resolved.

(d)

With respect to any Participant who immediately prior to the Change in Control is a member of employee classification B, C, D or E (as set forth in Appendix A), notwithstanding anything in this Plan to the contrary, in the event it shall be determined that any Payment to or for the benefit of a Participant would be subject to the Excise Tax, the Payments shall be reduced (but not below zero) if and to the extent that such reduction would result in Participant retaining a larger amount, on an after−tax basis (taking into account federal, state and local income taxes and the imposition of the Excise Tax), than if Participant received all of the Payments. The Company shall reduce or

11

Exhibit 2
139

eliminate the Payments, by first reducing or eliminating the portion of the Payments under the Plan which are not payable in cash and then by reducing or eliminating cash payments under the Plan and by reducing any pro rata bonus payment, in each case in reverse order beginning with payments or benefits which are to be paid the farthest in time from the determination. All determinations concerning the application of this paragraph shall be made by a nationally recognized firm of independent accountants or any nationally recognized financial planning and benefits consulting company, selected by Participant and satisfactory to Employer, whose determination shall be conclusive and binding on all parties. The fees and expenses of such accountants shall be borne by Participant.

The Company shall hold in confidence and not disclose, without the Participant's prior written consent, any information with regard to the Participant's tax position which the Company obtains pursuant to this Section.

Notwithstanding anything to the contrary in this Plan or otherwise or the fact that this Plan is subject to ERISA, any determinations made by the Accounting Firm and/or the Company with respect to the matters covered by this Section 7.1 shall be subject to de novo review.

7.2     *Pooling Transactions.*    Notwithstanding anything contained in this Plan to the contrary, in the event of a Change in Control which is also intended to be treated as a "pooling of interests" under generally accepted accounting principles (a "Pooling Transaction"), the Board shall take such actions, if any, as are specifically recommended by an independent accounting firm retained by the Company to the extent reasonably necessary in order to assure that the Pooling Transaction will qualify as such, including but not limited to (a) deferring the vesting, exercise, payment, settlement or lapsing of restrictions with respect to any option or award, (b) providing that the payment or settlement in respect of any option or award be made in the form of cash, shares of common stock or securities of a successor or acquirer of the Company, or a combination of the foregoing, (c) providing for the extension of the term of any option or award to the extent necessary to accommodate the foregoing, but not beyond the maximum term permitted for any option or award and (d) amending, deleting or making inapplicable to the Participant any provision in this Plan or other arrangement pursuant to which he or she receives compensation, payments or benefits.

## 8.   *Successor to Company*

This Plan shall bind any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company, in the same manner and to the same extent that the Company would be obligated under this Plan if no succession had taken place. In the case of any transaction in which a successor would not by the foregoing provision or by operation of law bound by this Plan, the Company shall require such successor expressly and unconditionally to assume and agree to perform the Company's obligations under this Plan, in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place. In the case any such successor fails to assume the Plan, the rights and benefits under the Plan shall automatically become the obligation of such successor as though such successor had expressly and unconditionally assumed and agreed to perform the Company's obligations under this Plan.

Exhibit 2
140

9.  *Administration*

9.1

*Plan Administrator.*  The Plan shall be administered by a Committee appointed from time to time by the Company. Members of the Committee may be Participants under the Plan. Any individual serving on the Committee who is a Participant shall not vote or act on any matter relating solely to himself or herself.

9.2

*Powers and Duties of the Committee.*  The Committee shall have the discretionary authority to determine eligibility for and to construe and interpret the terms of the Plan, including, without limitation, by supplying omissions from, correcting deficiencies in, or resolving inconsistencies or ambiguities in, the language of the Plan. The Committee shall have such other discretionary authority as may be necessary to enable it to discharge its responsibilities under the Plan, including, but not limited to, the power to:

(a)

Resolve disputes concerning eligibility and participation in the Plan and the amount of Severance Benefits available to a Participant, including the ability to make factual determinations;

(b)

Delegate responsibility for the administration of the Plan, including the authority to review denied claims, and appoint or employ one or more persons to assist in the administration of the Plan or to render advice with regard to any of its responsibilities under the Plan;

(c)

Adopt such rules as it deems appropriate for the administration of the Plan;

(d)

Prescribe procedures to be followed by Participants;

(e)

Prepare and distribute information relating to the Plan; and

(f)

Request from Participants such information as shall be necessary for the proper administration of the Plan. The decision of the Committee or its delegate upon any matter within its authority shall be final and binding on all parties, including the Company and Participants.

9.3

*Reliance Upon Information.*  In making decisions under the Plan, the Committee and its delegates may rely upon information furnished by, or at the request of, a Participant.

9.4

*Action by Committee:*  The Committee may act either at a meeting (in person or by telephone or similar means) or, in the absence of a meeting, by an instrument in writing signed by a majority of the Committee members. The Committee may elect one of its members as chairperson and appoint a secretary to keep a record of all meetings and forward any necessary communication to the Company. The Committee may adopt such bylaws for the conduct of its business as it deems desirable. All decisions of the Committee shall be made by a majority vote including actions taken without a meeting.

9.5

*Indemnity of Committee:*  The Company shall indemnify and hold harmless the members of the Committee, and any employee to whom the duties of the Committee may be delegated, against any and all claims, losses, damages, expenses or liabilities arising from any action or failure to act with respect to the Plan, except in the case of willful misconduct by the Committee or any of its members or any such employee.

10.  *Claims Procedures*

10.1

*Submitting a Claim:*  A Participant or other person ("claimant") who has a claim for Severance Benefits under the Plan must submit a written notice of such claim to the

13

Exhibit 2
141

Company. All such claims must be submitted within six (6) months from the date that the claim for benefits arose.

10.2    *Notification of Decision:*    If the claim is wholly or partially denied, the Committee shall notify the claimant of the adverse benefit determination within a reasonable period of time, but not later than ninety (90) days after receipt of the claim by the Plan, unless the Committee determines that special circumstances require an extension of time for processing the claim. If the Committee determines that an extension of time for processing is required, written notification of the extension shall be furnished to the claimant prior to the termination of the initial ninety (90)–day period. In no event shall such extension exceed a period of ninety (90) days from the end of such initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Committee expects to render the benefit determination. The notice of benefit determination shall set forth, in a manner calculated to be understood by the claimant, the following:

(a)     The specific reason or reasons for the adverse determination;

(b)     Reference to the specific Plan provisions on which the determination is based;

(c)     A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(d)     A description of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review.

10.3    *Review of Denied Claim:*    A claimant shall be entitled to a full and fair review of the claim and the adverse benefit determination. The claimant shall have sixty (60) days following receipt of a notification of an adverse benefit determination within which to appeal the determination. The claimant shall have the opportunity to submit written comments, documents, records and other information relating to the claim for benefits, and shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claimant's claim for benefits. The review shall take into account all comments, documents, records and other information the claimant submits relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

10.4    *Decision on Review:*    The Committee shall notify the claimant of its decision on review within a reasonable period of time, but not later than sixty (60) days after receipt of the claimant's request for review, unless the Committee determines that special circumstances require an extension of time for processing the claim. If the Committee determines that an extension of time for processing the claim is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial sixty (60)–day period. In no event shall such extension exceed a period of sixty (60) days from the end of the initial period. The extension notice shall indicate the special circumstances requiring the extension of time and the date by which the Committee expects to render the determination on review. The Committee shall provide a claimant with written notification of the Committee's benefit determination on review. In the case of an adverse benefit determination, the notification shall set forth, in a manner calculated to be understood by the claimant:

(a)     The specific reason or reasons for the adverse determination;

(b)     Reference to the specific Plan provisions on which the benefit determination is based;

14

Exhibit 2
142

(c)      A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claimant's claim for benefits;

(d)      A statement describing any voluntary appeal procedures offered by the Plan and the claimant's right to obtain information about such procedures; and

(e)      A statement of the claimant's right to bring an action under Section 502(a) of ERISA.

10.5      *Legal Actions:*   No legal action concerning the claim may be brought unless and until all of the following have occurred:

(a)      The claimant has submitted a proper written claim;

(b)      The claimant has been notified that the claim is denied;

(c)      The claimant has filed a written appeal with the Committee for review of the denied claim; and

(d)      The claimant has been notified in writing of the decision of the Committee or the Committee has failed to take any action on the request for review within the time prescribed above.

## 11. *Amendment and Plan Termination*

11.1      *Amendment and Termination.*   Prior to a Change in Control, the Plan may be amended or modified in any respect, and may be terminated, by resolution adopted by two–thirds of the Board; provided, however, that no such amendment, modification or termination, which would adversely affect the benefits or protections hereunder of any individual who is a Participant as of the date such amendment, modification or termination is adopted shall be effective as it relates to such individual unless no Change in Control occurs within six (6) months after such adoption, any such attempted amendment, modification or termination adopted within six (6) months prior to a Change in Control being null and void ab initio as it relates to all individuals who were Participants as of the date of such adoption; provided, further, however, that the Plan may not be amended, modified or terminated, (a) at the request of a third party who has indicated an intention or taken steps to effect a Change in Control and who effectuates a Change in Control or (b) otherwise in connection with, or in anticipation of, a Change in Control which actually occurs, if the amendment, modification or termination adversely affects the rights of any Participant under the Plan, any such attempted amendment, modification or termination being null and void ab initio. From and after the occurrence of a Change in Control, the Plan (x) may not be amended or modified in any manner that would in any way adversely affect the benefits or protections provided to any individual hereunder and (y) may not be terminated until the later of (i) twenty–four (24) months after the date of the Change in Control or (ii) the date that all Participants who have become entitled to a Severance Benefit hereunder shall have received such payments in full.

11.2      *Form of Amendment.*   Any amendment or termination of the Plan shall be effected by a written instrument signed by a duly authorized officer or officers of the Company, certifying that the amendment or termination has been approved by the Board.

## 12. *Employment Status/Waiver of Rights*

This Plan does not constitute a contract of employment or impose on the Company any obligation to retain the Participant as an employee, to change the status of the Participant's employment, or to change the Company's policies regarding termination of employment.

15

Exhibit 2
143

Following a Change in Control, no waiver of rights by the Participant in return for continued employment shall be effective with respect to the rights and benefits provided under this Plan.

**13.  *Notices***

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, if mailed by registered, certified or express mail, postage prepaid, or if delivered to a recognized courier service, addressed as follows:

If to the Participant:

To the address shown on the Company's records for tax reporting purposes.

If to the Company:

Countrywide Financial Corporation
4500 Park Granada
Calabasas, California 91302
Attention: Senior Human Resources Manager

Either party may change the address at which notice shall be given by a written notice given in the above manner.

**14.  *Severability***

If any provision of this Plan is held invalid or unenforceable, the remainder of this Plan shall nevertheless remain in full force and effect, and if any provision is held invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

**15.  *Governing Law***

To the extent not preempted by Federal law, the interpretation, construction and performance of this Plan shall in all respects be governed by the laws of the State of California.

**16.  *Code Section 409A***

This Plan is intended to comply with Code Section 409A, to the extent applicable. Notwithstanding any provision herein to the contrary, this Plan shall be interpreted, operated and administered consistent with this intent. Each separate installment of the Salary Separation Payment shall be treated as a separate payment for purposes of determining whether such payment is subject to or exempt from compliance with the requirements of Code Section 409A. In addition, in the event that any Participant is a "specified employee" within the meaning of Section 409A of the Code (as determined in accordance with the methodology established by the Company as in effect on the date of termination of such Participant's employee), any payment or benefits hereunder that are nonqualified deferred compensation subject to the requirements of Section 409A of the Code shall be provided to such Participant no earlier than six (6) months after the date of such Participant's "separation from service" within the meaning of Section 409A of the Code.

16

Exhibit 2
144

IN WITNESS WHEREOF, the Board of Directors having amended this Plan at its meeting of June 24, 2008 has caused this Amendment and Restatement to be executed this 24th day of June, 2008.

COUNTRYWIDE FINANCIAL CORPORATION

By:      /s/ LEORA I. GOREN

Title:   Senior Managing Director,
         Chief Human Resources Officer

Attest:    /s/ BECKY BAILEY

17

Exhibit 2
145

## APPENDIX A

| Eligible Employee Classifications | Members |
|---|---|
| X | Senior Managing Directors and above |
| A | Managing Directors |
| B | Executive Vice Presidents, Senior Vice Presidents, Presidents |
| C | First Vice Presidents, Vice Presidents, Regional Vice Presidents, CSC Directors, Branch Managers |
| D | All other Exempt Employees |
| E | All Non−Exempt Employees |

**Salary Separation Payment**

The Salary Separation Payment to which a Participant is entitled shall be based on the Participant's employee classification as of the date immediately preceding the date of the Participant's Qualifying Termination or, if greater, as of the date on which the Change in Control occurs, and shall equal the amount described in the table below:

| Employee Classifications | Salary Separation Payment |
|---|---|
| X | Three (3) years Base Pay (as defined in Section 6.1(a)) plus 300% Bonus (as defined in Section 6.1(a)) |
| A | Two (2) years Base Pay (as defined in Section 6.1(a)) plus 200% Bonus (as defined in Section 6.1(a)). |
| B | One (1) year Base Pay plus 100% Bonus. |
| C | Two (2) weeks Pay for each full year of service from first hire date with a minimum payment of eight (8) weeks Pay and a maximum payment of twenty−six (26) weeks Pay. |
| D | (2) weeks Pay for each full year of service from first hire date with a minimum payment of two (2) weeks Pay and a maximum payment of twelve (12) weeks Pay. |
| E | Two (2) weeks Pay from first hire date with a minimum payment of two (2) weeks Pay and a maximum payment of eight (8) weeks Pay. |

Exhibit 2
146

QuickLinks

Exhibit 10.118
COUNTRYWIDE FINANCIAL CORPORATION CHANGE IN CONTROL SEVERANCE PLAN (As Amended and Restated June 24, 2008)
APPENDIX A

Exhibit 2
147

# COUNTRYWIDE FINANCIAL CORP

4500 PARK GRANADA BLVD
CALABASAS, CA 91302
818. 225.3000

# EX−10.119

**EXHIBIT 10.119**
**10−Q Filed on 08/11/2008 − Period: 06/30/2008**
File Number 001−12331−01



Exhibit 2
148

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

QuickLinks — Click here to rapidly navigate through this document

Exhibit 10.119

**FIRST AMENDMENT**
**TO THE**
**COUNTRYWIDE FINANCIAL CORPORATION**
**401(k) SAVINGS AND INVESTMENT PLAN**

This First Amendment is made as of the 18th day of June, 2008, by the Countywide Financial Corporation Administrative Committee For Employee Benefit Plans (the "Committee").

*WITNESSETH:*

WHEREAS, Countrywide Financial Corporation (the "Company") maintains the Countrywide Financial Corporation 401(k) Savings and Investment Plan (the "Plan"), as most recently amended and restated by indenture generally effective as of January 1, 2007.

WHEREAS, the Committee wishes to amend the Plan in anticipation of the merger pursuant to the terms of that certain Agreement and Plan of Merger, dated as of January 11, 2008, by and among the Company, Bank of America Corporation and Red Oak Merger Corporation.

WHEREAS, the Committee also wishes to amend the Plan to clarify those existing provisions of Appendix A of the Plan addressing the adoption of final regulations by the Internal Revenue Service under Section 415 of the Internal Revenue Code, which regulations generally became effective for limitation years beginning on or after July 1, 2007.

NOW, THEREFORE, the Committee does hereby amend the Plan, pursuant to Article 16 thereof, effective as of the various dates set forth below, as follows:

    1.   By deleting, effective for contributions made on and after June 1, 2008, Section 3.6 in its entirety and by substituting therefor the following:

    "3.6   *Form of Contributions.*   Employer Contributions to be allocated to Participants who are Employees of the Primary Sponsor or a Plan Sponsor which is an Affiliate of the Primary Sponsor shall be made in the following forms:

    (a)   Employer Discretionary Contributions may be made at the discretion of the Primary Sponsor in cash and/or in shares of Company Stock issued by the Primary Sponsor or purchased on a national securities exchange.

    (b)   Employer Matching Contributions may be made at the discretion of the Primary Sponsor in cash and/or in shares of Company Stock issued by the Primary Sponsor or purchased on a national securities exchange.

    (c)   Employer Limited Profit Sharing Contributions shall be made in cash."

    2.   By deleting, effective January 1, 2008, the last paragraph of Section 5 of Appendix A and by substituting therefor the following:

    "Notwithstanding the foregoing provisions of this Section 5, any correction applied by the Plan Administrator to a situation where the annual additions allocated to a Participant's Account exceed the limitations of Section 1 of this Appendix A shall be made in a manner consistent with the correction methods then permitted under the Employee Plans Compliance Resolution System maintained by the Internal Revenue Service or any successor program."

Except as specifically amended hereby, the Plan shall remain in full force and effect prior to this First Amendment.

IN WITNESS WHEREOF, the Company has caused this First Amendment to be executed as of the day and year first above written.

Countrywide Financial Corporation

By:    /s/ MARSHALL M. GATES

Title:   SMD, Chief Administrative Officer

Attest   /s/ RONALD J. COOKE

    Title:   FVP/Sr. Counsel

Exhibit 2
149

QuickLinks

Exhibit 10.119
FIRST AMENDMENT TO THE COUNTRYWIDE FINANCIAL CORPORATION 401(k) SAVINGS AND INVESTMENT PLAN

Exhibit 2
150

# COUNTRYWIDE FINANCIAL CORP

4500 PARK GRANADA BLVD
CALABASAS, CA 91302
818. 225.3000

# EX-12.1

**EXHIBIT 12.1**
**10-Q Filed on 08/11/2008 - Period: 06/30/2008**
File Number 001-12331-01



Exhibit 2

151

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

QuickLinks — Click here to rapidly navigate through this document

**Exhibit 12.1**

**COUNTRYWIDE FINANCIAL CORPORATION AND SUBSIDIARIES**
**EXHIBIT 12.1—COMPUTATION OF THE RATIO OF EARNINGS TO FIXED CHARGES**

The following table sets forth the ratio of earnings to fixed charges of the Company for the six months ended June 30, 2008 and 2007 and the years ended December 31, 2007, 2006, 2005, 2004 and 2003, computed by dividing net fixed charges (interest expense on all debt plus the interest element (one–third) of operating leases) into earnings (earnings before income taxes and fixed charges).

| (dollar amounts in thousands) | Six Months Ended June 30, 2008 | 2007 | Years Ended December 31, 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|---|---|
| Net (loss) earnings | $(3,223,152) | $ 919,049 | $ (703,538) | $ 2,674,846 | $2,528,090 | $2,197,574 | $2,372,950 |
| Income tax (benefit) expense | (2,084,911) | 446,444 | (606,736) | 1,659,289 | 1,619,676 | 1,398,299 | 1,472,822 |
| Interest expense | 3,881,834 | 5,392,693 | 10,287,800 | 9,133,682 | 5,616,425 | 2,608,338 | 1,940,207 |
| Interest portion of rental | 43,976 | 43,218 | 85,528 | 77,055 | 62,104 | 53,562 | 36,565 |
| Earnings available to cover fixed charges | $(1,382,253) | $6,801,404 | $ 9,063,054 | $13,544,872 | $9,826,295 | $6,257,773 | $5,822,544 |
| Fixed charges: | | | | | | | |
| Interest expense | $ 3,881,834 | $5,392,693 | $10,287,800 | $ 9,133,682 | $5,616,425 | $2,608,338 | $1,940,207 |
| Interest portion of rental expense | 43,976 | 43,218 | 85,528 | 77,055 | 62,104 | 53,562 | 36,565 |
| Total fixed charges | $ 3,925,810 | $5,435,911 | $10,373,328 | $ 9,210,737 | $5,678,529 | $2,661,900 | $1,976,772 |
| Ratio of earnings to fixed charges | (0.35) | 1.25 | 0.87 | 1.47 | 1.73 | 2.35 | 2.95 |

Exhibit 2
152

QuickLinks

Exhibit 12.1
COUNTRYWIDE FINANCIAL CORPORATION AND SUBSIDIARIES EXHIBIT 12.1-COMPUTATION OF THE RATIO OF EARNINGS TO FIXED CHARGES

Exhibit 2
153

# COUNTRYWIDE FINANCIAL CORP

4500 PARK GRANADA BLVD
CALABASAS, CA 91302
818. 225.3000

# EX−31.1

**EXHIBIT 31.1**
**10−Q Filed on 08/11/2008 − Period: 06/30/2008**
File Number 001−12331−01

 **GSI**

Exhibit 2
154

QuickLinks — Click here to rapidly navigate through this document

**Exhibit 31.1**

## CERTIFICATION

I, Andrew Gissinger III, certify that:

1.
   I have reviewed this quarterly report on Form 10−Q of Countrywide Financial Corporation;

2.
   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.
   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.
   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f)) for the registrant and have:

   a.
      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.
      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.
      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.
      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.
   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.
      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.
      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 11, 2008

/s/ ANDREW GISSINGER III

Andrew Gissinger III
Chief Executive Officer

Exhibit 2
155

QuickLinks

Exhibit 31.1
CERTIFICATION

Exhibit 2
156

# COUNTRYWIDE FINANCIAL CORP

4500 PARK GRANADA BLVD
CALABASAS, CA 91302
818. 225.3000

# EX−31.2

**EXHIBIT 31.2**
**10−Q Filed on 08/11/2008 − Period: 06/30/2008**
File Number 001−12331−01



Exhibit 2
157

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

QuickLinks — Click here to rapidly navigate through this document

Exhibit 31.2

**CERTIFICATION**

I, Anne D. McCallion, certify that:

1.      I have reviewed this quarterly report on Form 10–Q of Countrywide Financial Corporation;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

     a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 11, 2008

/s/ ANNE D. MCCALLION

Anne D. McCallion
Chief Financial Officer

Exhibit 2
158

QuickLinks

<u>Exhibit 31.2</u>
<u>CERTIFICATION</u>

Exhibit 2
159

# COUNTRYWIDE FINANCIAL CORP

4500 PARK GRANADA BLVD
CALABASAS, CA 91302
818. 225.3000

# EX−32.1

**EXHIBIT 32.1**
**10−Q Filed on 08/11/2008 − Period: 06/30/2008**
File Number 001−12331−01



Exhibit 2

160

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

QuickLinks — Click here to rapidly navigate through this document

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10–Q of Countrywide Financial Corporation (the "Company") for the quarter ended June 30, 2008 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Andrew Gissinger III, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, that:

    1.    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

        /s/ ANDREW GISSINGER III

        Andrew Gissinger III
        Chief Executive Officer
        August 11, 2008

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to Countrywide Financial Corporation and will be retained by Countrywide Financial Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 2
161

QuickLinks

Exhibit 32.1
CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES–OXLEY ACT OF
2002

Exhibit 2
162

# COUNTRYWIDE FINANCIAL CORP

4500 PARK GRANADA BLVD
CALABASAS, CA 91302
818. 225.3000

# EX−32.2

**EXHIBIT 32.2**
**10−Q Filed on 08/11/2008 − Period: 06/30/2008**
File Number 001−12331−01



GSI

Exhibit 2
163

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

QuickLinks — Click here to rapidly navigate through this document

Exhibit 32.2

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10–Q of Countrywide Financial Corporation (the "Company") for the quarter ended June 30, 2008 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Anne D. McCallion, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, that:

    1.    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ ANNE D. MCCALLION

Anne D. McCallion
Chief Financial Officer
August 11, 2008

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to Countrywide Financial Corporation and will be retained by Countrywide Financial Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 2
164

QuickLinks

Exhibit 32.2
CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002

Exhibit 2
165