# EXHIBIT 3
# Part 1

# BANK OF AMERICA CORP /DE/ (BAC)

BANK OF AMERICA CORPORATE CENTER
100 N TRYON ST
CHARLOTTE, NC 28255
704. 386.8486

# S–4/A

**BANK OF AMERICA CORPORATION**
**Filed on 05/28/2008**
File Number 333–149204



Exhibit 3

166

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

As filed with the Securities and Exchange Commission on May 28, 2008

Registration No. 333−149204

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Amendment No. 4
to
# Form S−4
### REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

# BANK OF AMERICA CORPORATION
*(Exact Name of Registrant as Specified in its Charter)*

| **Delaware** | **6021** | **56−0906609** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**Bank of America Corporate Center**
**100 N. Tryon Street**
**Charlotte, North Carolina 28255**
**(704) 386−5681**
*(Address, including Zip Code, and Telephone Number, including Area Code, of Registrant's Principal Executive Offices)*

**Timothy J. Mayopoulos, Esq.**
**Executive Vice President and General Counsel**
**Bank of America Corporation**
**Bank of America Corporate Center**
**100 N. Tryon Street**
**Charlotte, North Carolina 28255**
**(704) 386−7484**
*(Name, Address, including Zip Code, and Telephone Number, including Area Code, of Agent for Service)*

*With copies to:*

| **John C. Murphy, Jr., Esq.**<br>**Paul J. Shim, Esq.**<br>**Cleary Gottlieb Steen & Hamilton LLP**<br>**2000 Pennsylvania Avenue, NW**<br>**Washington, DC 20006**<br>**(202) 974−1500** | **Susan E. Bow, Esq.**<br>**General Counsel and Corporate Secretary**<br>**Countrywide Financial Corporation**<br>**4500 Park Granada**<br>**Calabasas, California 91302**<br>**(818) 225−3000** | **Edward D. Herlihy, Esq.**<br>**Nicholas G. Demmo, Esq.**<br>**Wachtell, Lipton, Rosen & Katz**<br>**51 West 52nd Street**<br>**New York, New York 10019**<br>**(212) 403−1000** |
|---|---|---|

**Approximate date of commencement of the proposed sale of the securities to the public:** As soon as practicable after this Registration Statement becomes effective and upon completion of the merger described in the enclosed document.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act of 1933, as amended, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post−effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such dates as the Commission, acting pursuant to said Section 8(a), may determine.**

Exhibit 3
167

Table of Contents

Information contained herein is subject to completion or amendment. A registration statement relating to these securities has been filed with the Securities and Exchange Commission. These securities may not be sold nor may offers to buy be accepted prior to the time the registration statement becomes effective. This document shall not constitute an offer to sell or the solicitation of any offer to buy nor shall there be any sale of these securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction.

**PRELIMINARY — SUBJECT TO COMPLETION — DATED MAY 28, 2008**

                    

**MERGER PROPOSED — YOUR VOTE IS VERY IMPORTANT**

Dear Stockholder:

On January 11, 2008 Countrywide Financial Corporation and Bank of America Corporation announced a business combination in which Countrywide would merge with a subsidiary of Bank of America. If the merger is completed, you will have a right to receive 0.1822 of a share of Bank of America common stock for each share of Countrywide common stock you hold immediately prior to the merger.

The value of the merger consideration will fluctuate with the market price of Bank of America common stock. The following table shows the closing sale prices of Bank of America common stock and Countrywide common stock as reported on the New York Stock Exchange on January 9, 2008, the last trading day before the publication of press reports regarding a potential merger, and on May 27, 2008, the last practicable trading day before the distribution of this document. This table also shows the implied value of the merger consideration proposed for each share of Countrywide common stock, which we calculated by multiplying the closing price of Bank of America common stock on those dates by 0.1822, the exchange ratio.

|                    | Bank of America Common Stock | Countrywide Common Stock | Implied Value of One Share of Countrywide Common Stock |
|--------------------|:----------------------------:|:------------------------:|:-----------------------------------------------------:|
| At January 9, 2008 | $ 38.74                      | $ 5.12                   | $ 7.06                                                |
| At May 27, 2008    | $ 34.17                      | $ 4.59                   | $ 6.23                                                |

The market prices of both Bank of America common stock and Countrywide common stock will fluctuate before the merger. You should obtain current stock price quotations for Bank of America common stock and Countrywide common stock. Bank of America common stock is quoted on the NYSE under the symbol "BAC." Countrywide common stock is quoted on the NYSE under the symbol "CFC."

We cannot complete the merger unless Countrywide's common stockholders approve and adopt the merger agreement. Countrywide will hold a special meeting of its stockholders to vote on this merger proposal at the Learning Center Auditorium at Countrywide's corporate headquarters located at 4500 Park Granada, Calabasas, California 91302 at 9:00 a.m., local time, on June 25, 2008. **Your vote is important.** Regardless of whether you plan to attend the special stockholders' meeting, please take the time to vote your shares in accordance with the instructions contained in this document. Failing to vote will have the same effect as voting against the merger. **The Countrywide board of directors unanimously recommends that Countrywide stockholders vote FOR approval and adoption of the merger agreement.**

This document describes the special meeting, the merger, the documents related to the merger and other related matters. Please carefully read this entire document, including "Risk Factors" beginning on page 17 for a discussion of the risks relating to the proposed merger. You also can obtain information about our companies from documents that each of us has filed with the Securities and Exchange Commission.

ANGELO R. MOZILO
Chairman and Chief Executive Officer
Countrywide Financial Corporation

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the Bank of America common stock to be issued under this document or determined if this document is accurate or adequate. Any representation to the contrary is a criminal offense.**

The date of this document is [        ] 2008, and it is first being mailed or otherwise delivered to Countrywide stockholders on or about [        ] 2008.

Exhibit 3
168

Table of Contents

# COUNTRYWIDE FINANCIAL CORPORATION
### 4500 Park Granada
### Calabasas, California 91302

## NOTICE OF SPECIAL MEETING OF STOCKHOLDERS

Countrywide Financial Corporation will hold a special meeting of stockholders at the Learning Center Auditorium at Countrywide's corporate headquarters located at 4500 Park Granada, Calabasas, California 91302 at 9:00 a.m., local time, on June 25, 2008 to consider and vote upon the following matters:

- a proposal to approve and adopt the Agreement and Plan of Merger, dated as of January 11, 2008, by and among Countrywide Financial Corporation, Bank of America Corporation and Red Oak Merger Corporation, as such agreement may be amended from time to time; and

- a proposal to approve the adjournment of the special meeting, if necessary, to solicit additional proxies, in the event that there are not sufficient votes at the time of the special meeting to approve and adopt the merger agreement.

The Countrywide board of directors has fixed the close of business on April 28, 2008 as the record date for the special meeting. Only Countrywide stockholders of record at that time are entitled to notice of, and to vote at, the special meeting, or any adjournment or postponement of the special meeting. In order for the merger to be approved, the holders of at least a majority of the Countrywide shares outstanding and entitled to vote thereon must vote in favor of approval and adoption of the merger agreement.

**Regardless of whether you plan to attend the special meeting, please submit your proxy with voting instructions. Please vote as soon as possible. If you hold stock in your name as a stockholder of record, please complete, sign, date and return the accompanying proxy card in the enclosed self-addressed, stamped envelope. If you hold your stock in "street name" through a bank or broker, please direct your bank or broker to vote in accordance with the instructions you have received from your bank or broker.** This will not prevent you from voting in person, but it will help to secure a quorum and avoid added solicitation costs. Any holder of Countrywide common stock who is present at the special meeting may vote in person instead of by proxy, thereby canceling any previous proxy. In any event, a proxy may be revoked in writing at any time before the special meeting in the manner described in the accompanying document.

**The Countrywide board of directors has unanimously approved the merger and the merger agreement and unanimously recommends that Countrywide stockholders vote "FOR" approval and adoption of the merger agreement.**

BY ORDER OF THE BOARD OF DIRECTORS,

Susan E. Bow
*Secretary*

May 28, 2008

**YOUR VOTE IS IMPORTANT. PLEASE VOTE YOUR SHARES PROMPTLY, REGARDLESS OF WHETHER YOU PLAN TO ATTEND THE SPECIAL MEETING.**

Exhibit 3
169

Table of Contents

### REFERENCES TO ADDITIONAL INFORMATION

This document incorporates important business and financial information about Bank of America and Countrywide from documents that are not included in or delivered with this document. You can obtain documents incorporated by reference in this document, other than certain exhibits to those documents, by requesting them in writing or by telephone from the appropriate company at the following addresses:

<table>
<tr><td align="center"><strong>Bank of America Corporation</strong><br>Bank of America Corporate Center<br>100 N. Tryon Street<br>Charlotte, North Carolina 28255<br>Attention: Investor Relations<br>Telephone: (704) 386−5681</td><td align="center"><strong>Countrywide Financial Corporation</strong><br>4500 Park Granada<br>Calabasas, California 91302<br>Attention: Investor Relations<br>Telephone: (818) 225−3550</td></tr>
</table>

*You will not be charged for any of these documents that you request. Countrywide stockholders requesting documents should do so by June 18, 2008 in order to receive them before the special meeting.*

See "Where You Can Find More Information" on page 80.

Exhibit 3
170

# TABLE OF CONTENTS

| | Page |
|---|---|
| QUESTIONS AND ANSWERS ABOUT VOTING PROCEDURES FOR THE SPECIAL MEETING | 1 |
| SUMMARY | 3 |
| SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA OF BANK OF AMERICA | 10 |
| SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA OF COUNTRYWIDE | 12 |
| COMPARATIVE PER SHARE DATA | 15 |
| CAUTIONARY STATEMENT REGARDING FORWARD–LOOKING STATEMENTS | 16 |
| RISK FACTORS | 17 |
| THE COUNTRYWIDE SPECIAL MEETING | 21 |
| Matters to Be Considered | 21 |
| Proxies | 21 |
| Solicitation of Proxies | 22 |
| Record Date | 22 |
| Voting Rights and Vote Required | 22 |
| Recommendation of the Countrywide Board of Directors | 23 |
| Attending the Meeting | 23 |
| INFORMATION ABOUT THE COMPANIES | 24 |
| THE MERGER | 25 |
| Background of the Merger | 25 |
| Countrywide's Reasons for the Merger; Recommendation of the Countrywide Board of Directors | 29 |
| Opinions of Countrywide's Financial Advisors | 31 |
| Bank of America's Reasons for the Merger | 43 |
| Board of Directors and Management of Bank of America Following Completion of the Merger | 43 |
| Public Trading Markets | 44 |
| Bank of America's Dividend Policy | 44 |
| Countrywide Stockholders Do Not Have Dissenters' Appraisal Rights in the Merger | 44 |
| Regulatory Approvals Required for the Merger | 44 |
| Litigation Relating to the Merger | 46 |
| Countrywide's Officers and Directors Have Financial Interests in the Merger | 50 |
| THE MERGER AGREEMENT | 59 |
| Terms of the Merger | 59 |
| Treatment of Countrywide Stock Options and Other Equity–Based Awards | 59 |
| Treatment of Countrywide Indebtedness | 60 |
| Closing and Effective Time of the Merger | 61 |
| Conversion of Shares; Exchange of Certificates | 61 |
| Representations and Warranties | 62 |
| Covenants and Agreements | 64 |
| Reasonable Best Efforts of Countrywide to Obtain the Required Stockholder Vote | 66 |
| Agreement Not to Solicit Other Offers | 66 |
| Employee Matters | 68 |
| Indemnification and Insurance | 68 |
| Conditions to Complete the Merger | 68 |
| Termination of the Merger Agreement | 69 |
| Effect of Termination | 70 |
| Expenses and Fees | 70 |
| Amendment, Waiver and Extension of the Merger Agreement | 71 |
| ACCOUNTING TREATMENT | 71 |

Exhibit 3
171

Table of Contents

| | Page |
|---|---|
| FEDERAL INCOME TAX CONSEQUENCES OF THE MERGER | 71 |
| Tax Consequences of the Merger Generally | 72 |
| Cash Instead of a Fractional Share | 73 |
| Backup Withholding | 73 |
| Reporting Requirements | 73 |
| COMPARISON OF STOCKHOLDERS' RIGHTS | 74 |
| COMPARATIVE MARKET PRICES AND DIVIDENDS | 79 |
| LEGAL MATTERS | 80 |
| EXPERTS | 80 |
| OTHER MATTERS | 80 |
| Countrywide 2008 Annual Meeting | 80 |
| STOCKHOLDERS SHARING AN ADDRESS | 80 |
| WHERE YOU CAN FIND MORE INFORMATION | 81 |
| Exhibit 5(a) | |
| Exhibit 8(a) | |
| Exhibit 8(b) | |
| Exhibit 23(b) | |
| Exhibit 23(c) | |
| Exhibit 99(b) | |
| Exhibit 99(c) | |
| Exhibit 99(d) | |

**APPENDICES**

**APPENDIX A**
Agreement and Plan of Merger, dated as of January 11, 2008, by and among Countrywide Financial Corporation, Bank of America Corporation and Red Oak Merger Corporation ... A-1

**APPENDIX B**
Opinion of Goldman, Sachs & Co. ... B-1

**APPENDIX C**
Opinion of Sandler O'Neill & Partners, L.P. ... C-1

ii

Exhibit 3
172

Table of Contents

### QUESTIONS AND ANSWERS ABOUT VOTING PROCEDURES FOR THE SPECIAL MEETING

**Q:** **What do I need to do now?**

**A:** After you have carefully read this document and have decided how you wish to vote your shares, please vote your shares promptly. If you hold stock in your name as a stockholder of record, you must complete, sign, date and mail your proxy card in the enclosed postage paid return envelope as soon as possible. If you hold your stock in "street name" through a bank or broker, you must direct your bank or broker to vote in accordance with the instructions you have received from your bank or broker. Submitting your proxy card or directing your bank or broker to vote your shares will ensure that your shares are represented and voted at the special meeting.

**Q:** **Why is my vote important?**

**A:** If you do not vote by proxy or vote in person at the special meeting, it will be more difficult for us to obtain the necessary quorum to hold our special meeting. In addition, your failure to vote, by proxy or in person, will have the same effect as a vote against approval and adoption of the merger agreement. The merger agreement must be approved and adopted by the holders of a majority of the outstanding shares of Countrywide common stock entitled to vote at the special meeting. **The Countrywide board of directors unanimously recommends that you vote to approve and adopt the merger agreement.**

**Q:** **If my shares of common stock are held in street name by my broker, will my broker automatically vote my shares for me?**

**A:** *No.* Your broker cannot vote your shares without instructions from you. You should instruct your broker as to how to vote your shares, following the directions your broker provides to you. Please check the voting form used by your broker.

**Q:** **What if I abstain from voting or fail to instruct my broker?**

**A:** If you abstain from voting, the abstention will be counted toward a quorum at the special meeting, but it will have the same effect as a vote against approval and adoption of the merger agreement.

**Q:** **Can I attend the special meeting and vote my shares in person?**

**A:** *Yes.* All stockholders, including stockholders of record and stockholders who hold their shares through banks, brokers, nominees or any other holder of record, are invited to attend the special meeting. Holders of record of Countrywide common stock can vote in person at the special meeting. If you are not a stockholder of record, you must obtain a proxy, executed in your favor, from the record holder of your shares, such as a broker, bank or other nominee, to be able to vote in person at the special meeting. If you plan to attend the special meeting, you must hold your shares in your own name or have a letter from the record holder of your shares confirming your ownership and you must bring a form of personal photo identification with you in order to be admitted. We reserve the right to refuse admittance to anyone without proper proof of share ownership or without proper photo identification.

**Q:** **Can I change my vote?**

**A:** *Yes.* You may revoke any proxy at any time before it is voted by signing and returning a proxy card with a later date, delivering a written revocation letter to the Secretary of Countrywide, or by attending the special meeting in person, notifying the Secretary and voting by ballot at the special meeting. The Countrywide Secretary's mailing address is 4500 Park Granada, MS: CH−11B, Calabasas, California 91302.

Any common stockholder entitled to vote in person at the special meeting may vote in person regardless of whether a proxy has been previously given, but the mere presence (without notifying the Secretary of Countrywide) of a stockholder at the special meeting will not constitute revocation of a previously given proxy.

1

Exhibit 3
173

Table of Contents

**Q:   If I am a Countrywide stockholder, should I send in my Countrywide stock certificates now?**

A:   *No.* You should not send in your Countrywide stock certificates at this time. After the merger, Bank of America will send you instructions for exchanging Countrywide stock certificates for the merger consideration. Unless Countrywide stockholders specifically request to receive Bank of America stock certificates, the shares of Bank of America stock they receive in the merger will be issued in book-entry form.

**Q:   When do you expect to complete the merger?**

A:   We expect to complete the merger during the third quarter of 2008. However, we cannot assure you when or if the merger will occur. We must first obtain the approval of Countrywide stockholders at the special meeting and the necessary regulatory approvals.

**Q:   Whom should I call with questions?**

A:   Countrywide stockholders should call Innisfree M&A Incorporated, Countrywide's proxy solicitor, toll-free at (877) 750-9499 with any questions about the merger and related transactions.

2

Exhibit 3
174

Table of Contents

# SUMMARY

**This summary highlights material information from this document. It may not contain all of the information that is important to you. We urge you to carefully read the entire document and the other documents to which we refer in order to fully understand the merger and the related transactions. See "Where You Can Find More Information" on page 80. Each item in this summary refers to the page of this document on which that subject is discussed in more detail.**

### In the Merger, Countrywide Stockholders Will Have a Right to Receive 0.1822 of a Share of Bank of America Common Stock per Share of Countrywide Common Stock (page 58)

We are proposing the merger of Countrywide with and into Red Oak Merger Corporation, sometimes referred to in this document as Merger Sub, which is a wholly-owned subsidiary of Bank of America. If the merger is completed, Merger Sub will survive as a consolidated subsidiary of Bank of America under the name "Countrywide Financial Corporation" and you will have the right to receive 0.1822 of a share of Bank of America common stock for each share of Countrywide common stock you hold immediately prior to the merger. Bank of America will not issue any fractional shares of Bank of America common stock in the merger. Countrywide stockholders who would otherwise be entitled to a fractional share of Bank of America common stock will instead receive an amount in cash based on the average of the closing sale prices of Bank of America common stock on the five trading days immediately prior to the date on which the merger is completed.

*Example: If you hold 110 shares of Countrywide common stock, you will have a right to receive 20 shares of Bank of America common stock and a cash payment instead of the 0.042 shares of Bank of America common stock that you otherwise would have received (i.e., 110 shares x 0.1822 = 20.042 shares).*

### What Holders of Countrywide Stock Options and Other Equity-Based Awards Will Receive (page 58)

When we complete the merger, Countrywide stock options, stock appreciation rights, restricted share units and deferred equity units that are outstanding immediately before completion of the merger will become stock options, stock appreciation rights, restricted share units and deferred equity units on shares of Bank of America common stock (taking into account any accelerated vesting or other rights provided by the terms of the stock options, stock appreciation rights, restricted share units and deferred equity units). The number of common shares subject to these stock options, stock appreciation rights, restricted share units and deferred equity units, and the exercise price of the Countrywide stock options, will be adjusted based on the exchange ratio of 0.1822.

Upon the completion of the merger, each Countrywide restricted share outstanding immediately before completion of the merger will be converted into the right to receive the merger consideration (with the same terms as the Countrywide restricted shares, including transfer restrictions on the stock consideration to the extent the shares do not vest and transfer restrictions do not lapse upon completion of the merger).

### The Merger Is Intended to Be Tax-Free to Countrywide Stockholders as to the Shares of Bank of America Common Stock They Receive (page 70)

The merger is intended to qualify as a reorganization for U.S. federal income tax purposes, and it is a condition to our respective obligations to complete the merger that each of Bank of America and Countrywide receive a legal opinion to that effect. In addition, in connection with the mailing of this document, each of Bank of America and Countrywide has received a legal opinion, from Cleary Gottlieb Steen & Hamilton LLP and Wachtell, Lipton, Rosen & Katz, respectively, to the same effect as the opinions described above. Accordingly, the merger will generally be tax-free to you as to the shares of Bank of America common stock you receive in the merger, except for any gain or loss that may result from the receipt of cash instead of fractional shares of Bank of America common stock that you would otherwise be entitled to receive.

*The federal income tax consequences described above may not apply to all holders of Countrywide common stock. Your tax consequences will depend on your individual situation. Accordingly, we strongly urge*

3

Exhibit 3
175

Table of Contents

*you to consult your tax advisor for a full understanding of the particular tax consequences of the merger to you.*

**Comparative Market Prices and Share Information (pages 15 and 78)**

Bank of America common stock is quoted on the NYSE under the symbol "BAC." Countrywide common stock is quoted on the NYSE under the symbol "CFC." The following table shows the closing sale prices of Bank of America common stock and Countrywide common stock as reported on the NYSE on January 9, 2008, the last trading day before the publication of press reports regarding a potential merger, on January 10, 2008, the last trading day before we announced the merger, and on May 27, 2008, the last practicable trading day before the distribution of this document. This table also shows the implied value of the merger consideration proposed for each share of Countrywide common stock, which we calculated by multiplying the closing price of Bank of America common stock on those dates by the exchange ratio of 0.1822.

|  | Bank of America Common Stock | | Countrywide Common Stock | | Implied Value of One Share of Countrywide Common Stock | |
|---|---|---|---|---|---|---|
| At January 9, 2008 | $ | 38.74 | $ | 5.12 | $ | 7.06 |
| At January 10, 2008 | $ | 39.30 | $ | 7.75 | $ | 7.16 |
| At May 27, 2008 | $ | 34.17 | $ | 4.59 | $ | 6.23 |

*The market price of Bank of America common stock and Countrywide common stock will fluctuate prior to the merger. You should obtain current market quotations for the shares.*

At May 27, 2008, the implied value of the merger consideration for each share of Countrywide common stock was $6.23, which is less than the book value per Countrywide share at December 31, 2007 of $21.88. In reaching its conclusion to approve the merger and the agreement and recommend that Countrywide stockholders vote "FOR" approval and adoption of the merger agreement, the Countrywide board of directors was aware that the merger consideration per share in the transaction was substantially less than the net book value per share of Countrywide common stock as of September 30, 2007. See "The Merger — Background of the Merger" beginning on page 25 and "The Merger — Countrywide's Reasons for the Merger; Recommendation of the Countrywide Board of Directors" beginning on page 28.

**Goldman, Sachs & Co. and Sandler O'Neill & Partners, L.P. Have Each Provided an Opinion to the Countrywide Board of Directors Regarding the Merger Consideration (page 31)**

On January 10, 2008, each of Goldman, Sachs & Co., or Goldman Sachs, and Sandler O'Neill & Partners L.P., or Sandler O'Neill, rendered its opinion to the board of directors of Countrywide that as of the date of the opinion, and based upon and subject to the factors and assumptions set forth in the opinion, the exchange ratio of 0.1822 shares of Bank of America common stock to be received in respect of each share of Countrywide common stock pursuant to the merger agreement was fair from a financial point of view to the holders of Countrywide common stock. The full text of the written opinions of Goldman Sachs and Sandler O'Neill, which set forth the assumptions made, procedures followed, matters considered and limitations on the review undertaken in connection with each opinion, are attached to this document as Appendix B and Appendix C, respectively. **Goldman Sachs and Sandler O'Neill provided their respective opinions for the information and assistance of the Countrywide board of directors in connection with its consideration of the merger. Neither Goldman Sachs' opinion nor Sandler O'Neill's opinion is a recommendation as to how any holder of Countrywide common stock should vote with respect to the merger or any other matter.** Pursuant to an engagement letter dated January 10, 2008 between Countrywide and Goldman Sachs, Goldman Sachs is entitled to receive a fee of $12,750,000, of which $3,000,000 became payable upon execution of the merger agreement and the balance of which is contingent upon consummation of the merger. Pursuant to an engagement letter dated January 9, 2008 between Countrywide and Sandler O'Neill, Sandler O'Neill is entitled to receive a fee of $12,250,000, of which $2,000,000 became payable upon execution of the merger agreement, $1,000,000 became payable when Sandler O'Neill delivered its opinion to the Countrywide board of directors and the balance of which is contingent upon consummation of the merger.

4

Exhibit 3
176

Table of Contents

**The Countrywide Board of Directors Unanimously Recommends that Countrywide Stockholders Vote "FOR" Approval and Adoption of the Merger Agreement (page 28)**

The Countrywide board of directors believes that the merger is in the best interests of Countrywide and its stockholders and has unanimously approved the merger and the merger agreement. The Countrywide board of directors unanimously recommends that Countrywide stockholders vote "FOR" approval and adoption of the merger agreement.

**Countrywide's Officers and Directors Have Financial Interests in the Merger That Differ From Your Interests (page 49)**

Countrywide's executive officers and directors have financial interests in the merger that are different from, or in addition to, their interests as Countrywide stockholders. The independent members of Countrywide's board of directors were aware of and considered these interests, among other matters, in evaluating and negotiating the merger agreement and the merger, and in recommending to the stockholders that the merger agreement be approved and adopted.

Messrs. Mozilo and Sambol are parties to employment agreements and the other executive officers of Countrywide are covered by Countrywide's Change in Control Severance Plan, each of which provides severance and other benefits in the case of qualifying terminations of employment in connection with a change in control, including completion of the merger; however, in connection with the merger, Mr. Mozilo has waived his right to receive his cash severance and pro rata bonus payments under his employment agreement and consulting fees and benefits under a related consulting agreement upon termination of his employment following completion of the merger. Assuming that the merger is completed on July 1, 2008 and the executive experiences a qualifying termination of employment immediately thereafter, the amount of cash severance that would be payable to each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger and each of Countrywide's eight other executive officers (as a group), respectively, is approximately $0, $15 million, $6.7 million, $13.7 million, $9 million, $7.2 million and $29.6 million, and the value of continued benefits to be provided to each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger and each of Countrywide's eight other executive officers (as a group) respectively, is approximately $106,084, $46,493, $135,380, $206,596, $228,367, $210,494 and $1,402,083. In addition, in connection with entry into the merger agreement and a retention program previously implemented for other employees, Countrywide approved the grant of retention awards to David Sambol, Eric P. Sieracki, Ranjit M. Kripalani and Carlos M. Garcia, which consists of a retention incentive payment in respect of their annual bonus awards for Countrywide's 2007 fiscal year and cash−settled restricted stock units.

The Countrywide equity compensation plans and award agreements generally provide for the vesting of stock−based awards upon completion of the merger. Assuming that the merger is completed on July 1, 2008, the aggregate cash value of the stock−based awards based on the closing price of Bank of America's common stock as of May 27, 2008 (which amounts include the value of the retention awards described above and attribute no value to any unvested stock options and stock appreciation rights ("SARs") other than Mr. Mozilo's SARs with an exercise price of $6.22, since all such other options and SARs are underwater based on the May 27, 2008 closing price of Bank of America's common stock) that are held by each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger and each of Countrywide's eight other executive officers (as a group), and that would vest solely due to the completion of the merger is approximately $6,482,705, $11,693,871, $1,161,458, $795,843, $1,061,104, $1,061,104 and $3,971,301 (of which approximately $2,086,419, $927,298, $695,475 and $927,298 is attributable to the cash−settled restricted stock units granted to Messrs. Sambol, Sieracki, Kripalani and Garcia, respectively, in connection with Countrywide's retention program). Pursuant to the terms of Countrywide's supplemental executive retirement plan and certain other non−qualified deferred compensation arrangements, the benefits thereunder will vest and/or payment may be accelerated in connection with the merger.

In addition, assuming that the merger is completed on July 1, 2008 and the executive experiences a qualifying termination of employment immediately thereafter, the aggregate value of the cash severance and other severance benefits and the equity awards (other than those that would vest solely due to the completion

5

Exhibit 3
177

Table of Contents

of the merger as described in the prior paragraph) based on the closing price of Bank of America's common stock as of May 27, 2008 that would vest or be payable to each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger and each of Countrywide's eight other executive officers (as a group), respectively, is approximately $106,084, $15,023,993, $8,815,990, $15,426,929, $11,251,044, $9,437,619 and $39,057,434.

Executive officers and directors of Countrywide also have rights to indemnification and directors' and officers' liability insurance that will survive completion of the merger. Please see "The Merger — Countrywide's Officers and Directors Have Financial Interests in the Merger" beginning on page 49 for information about these financial interests. In addition, if the merger is consummated, plaintiffs in pending shareholder actions against certain Countrywide officers and directors may lose standing to assert derivative claims on behalf of Countrywide because the plaintiffs will no longer be stockholders of Countrywide. See "The Merger — Litigation Relating to the Merger" on page 45.

As discussed in more detail beginning on page 55, Mr. Sambol has entered into a new retention agreement with Merger Sub that will supersede his Countrywide employment agreement upon completion of the merger. As a result, Mr. Sambol will not receive any payments or benefits under his current employment agreement following completion of the merger. On May 28, 2008 Bank of America announced that Mr. Sambol will retire after assisting with the transition and closing of the merger. His termination of employment will be treated as a termination without cause and he will be eligible to receive the payments and benefits under his retention agreement. In addition, certain of the executive officers (including Mr. Gissinger) have entered into new retention agreements with Merger Sub that replace their right to participate in Countrywide's Change in Control Severance Plan.

### Holders of Countrywide Common Stock Do Not Have Appraisal Rights (page 43)

Appraisal rights are statutory rights that, if applicable under law, enable stockholders to dissent from an extraordinary transaction, such as a merger, and to demand that the corporation pay the fair value for their shares as determined by a court in a judicial proceeding instead of receiving the consideration offered to stockholders in connection with the extraordinary transaction. Appraisal rights are not available in all circumstances, and exceptions to these rights are provided under the Delaware General Corporation Law. As a result of one of these exceptions, the holders of Countrywide common stock are not entitled to appraisal rights in the merger.

### Conditions That Must Be Satisfied or Waived for the Merger to Occur (page 67)

Currently, we expect to complete the merger during the third quarter of 2008. As more fully described in this document and in the merger agreement, the completion of the merger depends on a number of conditions being satisfied or, where legally permissible, waived. These conditions include, among others, approval and adoption of the merger agreement by Countrywide stockholders, the receipt of all required regulatory approvals (including approval by the Board of Governors of the Federal Reserve System) without a condition or a restriction that would have a material adverse effect on Countrywide or Bank of America measured relative to Countrywide, the filing by Countrywide of its annual report on Form 10-K for the year ended December 31, 2007 including an unqualified audit opinion regarding the related consolidated financial statements and the receipt of legal opinions by each company regarding the tax treatment of the merger.

We cannot be certain when, or if, the conditions to the merger will be satisfied or waived, or that the merger will be completed.

### Termination of the Merger Agreement (page 68)

We may mutually agree to terminate the merger agreement before completing the merger, even after stockholder approval, as long as the termination is approved by each of our boards of directors.

In addition, either of us may decide to terminate the merger agreement, even after stockholder approval,

- if a governmental entity issues a non-appealable final order prohibiting the merger;

6

Exhibit 3
178

Table of Contents

- if a governmental entity which must grant a regulatory approval as a condition to the merger denies such approval of the merger and such action has become final and non–appealable;

- if the other party breaches the merger agreement in a way that would entitle the party seeking to terminate the agreement not to consummate the merger, subject to the right of the breaching party to cure the breach within 30 days following written notice (unless it is not possible due to the nature or timing of the breach for the breaching party to cure the breach);

- if the merger has not been completed by January 11, 2009, unless the reason the merger has not been completed by that date is a breach of the merger agreement by the company seeking to terminate the merger agreement; or

- if the other party has committed a substantial, bad faith breach of its obligations to restructure the transaction for the purpose of resubmitting a merger proposal for approval in the event Countrywide stockholder approval is not obtained in the first instance.

Bank of America may terminate the merger agreement if the Countrywide board withdraws or adversely changes its recommendation of the merger or recommends a competing takeover proposal to acquire Countrywide, or if Countrywide breaches its agreement not to solicit other offers or fails to hold the special meeting for the purpose of approving and adopting the merger agreement.

**Termination Fee (page 69)**

Countrywide would be obligated to pay Bank of America a $160 million termination fee if:

- Bank of America terminates the merger agreement because:

  - Countrywide's board of directors (1) fails to recommend the merger to Countrywide stockholders, (2) withdraws or adversely changes its recommendation of the merger, (3) recommends a competing takeover proposal to acquire Countrywide or (4) fails to recommend that Countrywide stockholders reject a tender offer or exchange offer that constitutes a competing takeover proposal within a specified period of time; or

  - Countrywide materially breaches its agreement not to solicit other offers or its obligation to hold a meeting of Countrywide stockholders for the purpose of approving and adopting the merger agreement; or

- the following circumstances occur:

  - (1) Bank of America terminates the merger agreement as a result of a knowing or intentional breach by Countrywide in a way that would entitle Bank of America not to consummate the merger or because of a substantial, bad faith breach by Countrywide of its obligation to use reasonable best efforts to restructure the transaction for the purpose of resubmitting a merger proposal for approval in the event Countrywide stockholder approval is not obtained in the first instance or (2) either party terminates the merger agreement because the transaction has not been completed by January 11, 2009 and the merger agreement has not been approved and adopted by Countrywide stockholders;

  - prior to any termination described in the bullet immediately above, a competing takeover proposal is received by Countrywide or publicly announced and not irrevocably withdrawn; and

  - Countrywide enters a definitive agreement regarding, or completes, a competing takeover proposal within twelve months of termination.

**Regulatory Approvals Required for the Merger (page 44)**

We have agreed to use our reasonable best efforts to obtain all regulatory approvals required to complete the transactions contemplated by the merger agreement. These approvals include approval from or notices to the Federal Reserve Board, state mortgage banking and insurance authorities, and various other federal, state and foreign regulatory authorities. Bank of America and Countrywide have completed, or will complete, the

7

Exhibit 3
179

Table of Contents

filing of applications and notifications to obtain the required regulatory approvals. In obtaining the required regulatory approvals, Bank of America is not required to agree to any restriction or condition that would have a material adverse effect on Countrywide or Bank of America, measured on a scale relative to Countrywide.

Although we do not know of any reason why we cannot obtain these regulatory approvals in a timely manner, we cannot be certain when or if we will obtain them.

### Board of Directors and Management of Bank of America following Completion of the Merger (page 43)

The directors of Countrywide and its subsidiaries will resign as of the effective time of the merger. The composition of Bank of America's board of directors and management is not anticipated to change in connection with the completion of the merger.

### The Rights of Countrywide Stockholders will Change as a Result of the Merger (page 73)

The rights of Countrywide stockholders will change as a result of the merger due to differences in Bank of America's and Countrywide's governing documents. This document contains descriptions of stockholder rights under each of the Bank of America and Countrywide governing documents, and describes the material differences between them.

### Countrywide will Hold its Special Meeting on June 25, 2008 (page 21)

The special meeting will be held on June 25, 2008, at 9:00 a.m., local time, at the Learning Center Auditorium at Countrywide's corporate headquarters located at 4500 Park Granada, Calabasas, California 91302. At the special meeting, Countrywide stockholders will be asked to:

- approve and adopt the merger agreement; and

- approve the adjournment of the special meeting, if necessary, to solicit additional proxies, in the event that there are not sufficient votes at the time of the special meeting to approve and adopt the merger agreement.

*Record Date.* Only holders of record at the close of business on April 28, 2008 will be entitled to vote at the special meeting. Each share of Countrywide common stock is entitled to one vote. As of the record date of April 28, 2008, there were 583,343,240 shares of Countrywide common stock entitled to vote at the special meeting.

*Required Vote.* To approve and adopt the merger agreement, the holders of a majority of the outstanding shares of Countrywide common stock entitled to vote must vote in favor of approving and adopting the merger agreement. Because approval is based on the affirmative vote of a majority of shares outstanding, a Countrywide stockholder's failure to vote or an abstention will have the same effect as a vote against approval and adoption of the merger agreement.

Approval of any necessary adjournment of the special meeting may be obtained by the affirmative vote of the holders of a majority of the shares present in person or by proxy, even if less than a quorum. Because approval of such adjournment is based on the affirmative vote of a majority of shares present in person or by proxy, abstentions will have the same effect as a vote against this proposal.

As of the record date, directors and executive officers of Countrywide and their affiliates had the right to vote 2,758,909 shares of Countrywide common stock, or 0.5% of the outstanding Countrywide common stock entitled to be voted at the special meeting. We currently expect that each of these individuals will vote their shares of Countrywide common stock in favor of the proposals to be presented at the special meeting. At that date, directors and executive officers of Bank of America and their affiliates did not have the right to vote any shares of Countrywide common stock entitled to be voted at the special meeting.

8

Exhibit 3
180

Table of Contents

### Information about the Companies (page 24)

#### Bank of America Corporation

Bank of America Corporation is a Delaware corporation, a bank holding company and a financial holding company under U.S. federal law. Bank of America is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk–management products and services. The company provides unmatched convenience in the United States, serving more than 59 million consumer and small business relationships with more than 6,100 retail banking offices, nearly 19,000 ATMs and award–winning online banking with more than 23 million active users. Bank of America is the No. 1 overall Small Business Administration (SBA) lender in the United States and the No. 1 SBA lender to minority–owned small businesses. The company serves clients in 175 countries and has relationships with 99 percent of the U.S. Fortune 500 companies and 80 percent of the Fortune Global 500. Bank of America Corporation common stock (NYSE: BAC) is listed on the New York Stock Exchange. As of December 31, 2007, Bank of America had total consolidated assets of approximately $1.7 trillion, total consolidated deposits of approximately $805 billion and total consolidated stockholders' equity of approximately $147 billion. The principal executive offices of Bank of America are located in the Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina 28255, and its telephone number is (704) 386–5681.

Additional information about Bank of America and its subsidiaries is included in documents incorporated by reference in this document. See "Where You Can Find More Information" on page 81.

#### Red Oak Merger Corporation

Red Oak Merger Corporation, a wholly–owned subsidiary of Bank of America, was formed solely for the purpose of consummating the merger. Red Oak Merger Corporation has not carried on any activities to date, except for activities incidental to its formation and activities undertaken in connection with the transactions contemplated by the merger agreement. The principal executive offices of Red Oak Merger Corporation are located in the Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina, and its telephone number is (704) 386–5681.

#### Countrywide Financial Corporation

Countrywide Financial Corporation is a Delaware corporation and holding company. Founded in 1969, Countrywide is a diversified financial services provider, which, through its subsidiaries, is engaged in mortgage lending and other real estate finance–related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting. Through this family of companies, Countrywide originates, purchases, securitizes, sells, and services residential and commercial loans; provides loan closing services such as credit reports, appraisals and flood determinations; offers banking services which include depository and home loan products; conducts fixed income securities underwriting and trading activities; provides property, life and casualty insurance; and manages a captive mortgage reinsurance company. Countrywide common stock (NYSE: CFC) is listed on the New York Stock Exchange and is a member of the S&P 500, Forbes 2000, and Fortune 500. The principal executive offices of Countrywide are located at 4500 Park Granada, Calabasas, California 91302, and its telephone number is (818) 225–3000.

Additional information about Countrywide and its subsidiaries is included in documents incorporated by reference in this document. See "Where You Can Find More Information" on page 80.

Exhibit 3
181

Table of Contents

## SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA OF BANK OF AMERICA

Set forth below are highlights derived from Bank of America's audited consolidated financial data as of and for the years ended December 31, 2003 through 2007 and Bank of America's unaudited consolidated financial data as of and for the three months ended March 31, 2008. The results of operations for the three months ended March 31, 2008 are not necessarily indicative of the results of operations for the full year or any other interim period. Bank of America management prepared the unaudited information on the same basis as it prepared Bank of America's audited consolidated financial statements. In the opinion of Bank of America management, this information reflects all adjustments, consisting of only normal recurring adjustments, necessary for a fair presentation of this data for those dates. You should read this information in conjunction with Bank of America's consolidated financial statements and related notes included in Bank of America's Annual Report on Form 10−K for the year ended December 31, 2007 and Bank of America's Quarterly Report on Form 10−Q for the quarter ended March 31, 2008, which are incorporated by reference in this document and from which this information is derived. See "Where You Can Find More Information" on page 80.

### Bank of America — Summary of Consolidated Financial Data

| | Three Months Ended March 31, | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2007 | 2006 | 2005 | 2004 | 2003 |
| | (Dollars in millions, except per share information) | | | | | | |
| **Income statement** | | | | | | | |
| Net interest income | $ 9,991 | $ 8,268 | $ 34,433 | $ 34,591 | $ 30,737 | $ 27,960 | $ 20,505 |
| Noninterest income | 7,012 | 9,887 | 31,886 | 37,989 | 26,438 | 22,729 | 18,270 |
| Total revenue, net of interest expense | 17,003 | 18,155 | 66,319 | 72,580 | 57,175 | 50,689 | 38,775 |
| Provision for credit losses | 6,010 | 1,235 | 8,385 | 5,010 | 4,014 | 2,769 | 2,839 |
| Noninterest expense, before merger and restructuring charges | 9,025 | 8,986 | 36,600 | 34,792 | 28,269 | 26,394 | 20,155 |
| Merger and restructuring charges | 170 | 111 | 410 | 805 | 412 | 618 | — |
| Income before income taxes | 1,798 | 7,823 | 20,924 | 31,973 | 24,480 | 20,908 | 15,781 |
| Income tax expense | 588 | 2,568 | 5,942 | 10,840 | 8,015 | 6,961 | 5,019 |
| Net income | 1,210 | 5,255 | 14,982 | 21,133 | 16,465 | 13,947 | 10,762 |
| Average common shares issued and outstanding (in thousands) | 4,427,823 | 4,432,664 | 4,423,579 | 4,526,637 | 4,008,688 | 3,758,507 | 2,973,407 |
| Average diluted common shares issued and outstanding (in thousands) | 4,461,201 | 4,497,028 | 4,480,254 | 4,595,896 | 4,068,140 | 3,823,943 | 3,030,356 |
| **Performance ratios** | | | | | | | |
| Return on average assets | 0.28% | 1.40% | 0.94% | 1.44% | 1.30% | 1.34% | 1.44% |
| Return on average common shareholders' equity | 2.90 | 16.16 | 11.08 | 16.27 | 16.51 | 16.47 | 21.50 |
| Total ending equity to total ending assets | 9.00 | 8.98 | 8.56 | 9.27 | 7.86 | 9.03 | 6.76 |
| Total average equity to total average assets | 8.77 | 8.78 | 8.53 | 8.90 | 7.86 | 8.12 | 6.69 |
| Dividend payout | N/M | 48.02 | 72.26 | 45.66 | 46.61 | 46.31 | 39.76 |
| **Per common share data** | | | | | | | |
| Earnings | $ 0.23 | $ 1.18 | $ 3.35 | $ 4.66 | $ 4.10 | $ 3.71 | $ 3.62 |
| Diluted earnings | 0.23 | 1.16 | 3.30 | 4.59 | 4.04 | 3.64 | 3.55 |
| Dividends paid | 0.64 | 0.56 | 2.40 | 2.12 | 1.90 | 1.70 | 1.44 |
| Book value | 31.22 | 29.74 | 32.09 | 29.70 | 25.32 | 24.70 | 16.86 |
| **Market price per share of common stock** | | | | | | | |
| Closing | $ 37.91 | $ 51.02 | $ 41.26 | $ 53.39 | $ 46.15 | $ 46.99 | $ 40.22 |
| High closing | 45.03 | 54.05 | 54.05 | 54.90 | 47.08 | 47.44 | 41.77 |
| Low closing | 35.31 | 49.46 | 41.10 | 43.09 | 41.57 | 38.96 | 32.82 |
| **Market capitalization** | $ 168,806 | $ 226,481 | $ 183,107 | $ 238,021 | $ 184,586 | $ 190,147 | $ 115,926 |

10

Exhibit 3
182

Table of Contents

| | Three Months Ended March 31, | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2007 | 2006 | 2005 | 2004 | 2003 |
| | (Dollars in millions, except per share information) | | | | | | |
| **Average balance sheet** | | | | | | | |
| Total loans and leases | $ 875,661 | $ 714,042 | $ 776,154 | $ 652,417 | $ 537,218 | $ 472,617 | $ 356,220 |
| Total assets | 1,764,927 | 1,521,418 | 1,602,073 | 1,466,681 | 1,269,892 | 1,044,631 | 749,104 |
| Total deposits | 787,623 | 686,704 | 717,182 | 672,995 | 632,432 | 551,559 | 406,233 |
| Long–term debt | 198,463 | 148,627 | 169,855 | 130,124 | 97,709 | 92,303 | 67,077 |
| Common shareholders' equity | 141,456 | 130,737 | 133,555 | 129,773 | 99,590 | 84,584 | 50,035 |
| Total shareholders' equity | 154,728 | 133,588 | 136,662 | 130,463 | 99,861 | 84,815 | 50,091 |
| **Asset Quality** | | | | | | | |
| Allowance for credit losses(1) | $ 15,398 | $ 9,106 | $ 12,106 | $ 9,413 | $ 8,440 | $ 9,028 | $ 6,579 |
| Nonperforming assets measured at historical cost | 7,827 | 2,059 | 5,948 | 1,856 | 1,603 | 2,455 | 3,021 |
| Allowance for loan and lease losses as a percentage of total loans and leases outstanding measured at historical cost(2) | 1.71% | 1.21% | 1.33% | 1.28% | 1.40% | 1.65% | 1.66% |
| Allowance for loan and lease losses as a percentage of total nonperforming loans and leases measured at historical cost | 203 | 443 | 207 | 505 | 532 | 390 | 215 |
| Net charge–offs | $ 2,715 | $ 1,427 | $ 6,480 | $ 4,539 | $ 4,562 | $ 3,113 | $ 3,106 |
| Net charge–offs as a percentage of average loans and leases outstanding measured at historical cost(2) | 1.25% | 0.81% | 0.84% | 0.70% | 0.85% | 0.66% | 0.87% |
| Nonperforming loans and leases as a percentage of total loans and leases outstanding measured at historical cost(2) | 0.84 | 0.27 | 0.64 | 0.25 | 0.26 | 0.42 | 0.77 |
| Nonperforming assets as a percentage of total loans, leases and foreclosed properties(2) | 0.90 | 0.29 | 0.68 | 0.26 | 0.28 | 0.47 | 0.81 |
| Ratio of the allowance for loan and lease losses at December 31 to net charge–offs | 1.36 | 1.51 | 1.79 | 1.99 | 1.76 | 2.77 | 1.98 |
| **Capital ratios (period end)** | | | | | | | |
| Risk–based capital: | | | | | | | |
| Tier 1 | 7.51% | 8.57% | 6.87% | 8.64% | 8.25% | 8.20% | 8.02% |
| Total | 11.71 | 11.94 | 11.02 | 11.88 | 11.08 | 11.73 | 12.05 |
| Tier 1 Leverage | 5.61 | 6.25 | 5.04 | 6.36 | 5.91 | 5.89 | 5.86 |

(1)  Includes the allowance for loan and lease losses, and the reserve for unfunded lending commitments.

(2)  Ratios do not include loans measured at fair value in accordance with SFAS 159 at and for the year ended December 31, 2007.
Loans measured at fair value were $4.59 billion at December 31, 2007.

11

Exhibit 3
183

Table of Contents

### SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA OF COUNTRYWIDE

Set forth below are highlights derived from Countrywide's audited consolidated financial data as of and for the years ended December 31, 2003 through 2007 and Countrywide's unaudited consolidated financial data as of and for the three months ended March 31, 2008. The results of operations for the three months ended March 31, 2008 are not necessarily indicative of the results of operations for the full year or any other interim period. The unaudited information was prepared on the same basis as Countrywide's audited consolidated financial statements. In the opinion of Countrywide management, this information reflects all adjustments, consisting of only normal recurring adjustments, necessary for a fair presentation of this data for those dates. You should read this information in conjunction with Countrywide's consolidated financial statements and related notes incorporated by reference within Countrywide's Annual Report on Form 10–K for the year ended December 31, 2007 and Countrywide's Quarterly Report on Form 10–Q for the quarter ended March 31, 2008, which are incorporated by reference in this document and from which this information is derived. See "Where You Can Find More Information" on page 80.

#### Countrywide Financial Corporation — Summary of Consolidated Financial Data

| | Three Months Ended March 31, | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2007 | 2006 | 2005 | 2004 | 2003 |
| | | | (dollar amounts in thousands, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | | | |
| **Revenues:** | | | | | | | |
| Gain on sale of loans and securities | $ 289,311 | $ 1,234,104 | $ 2,434,723 | $ 5,681,847 | $ 4,861,780 | $ 4,842,082 | $ 5,887,436 |
| Net interest (expense) income after provision for loan losses | (770,032) | 578,975 | 587,882 | 2,688,514 | 2,237,935 | 1,965,541 | 1,359,390 |
| Net loan servicing fees and other income (loss) from MSRs and retained interests | 455,457 | 98,251 | 909,749 | 1,300,655 | 1,493,167 | 465,650 | (463,050) |
| Net insurance premiums earned | 488,829 | 334,177 | 1,523,534 | 1,171,433 | 953,647 | 782,685 | 732,816 |
| Other | 215,309 | 160,269 | 605,549 | 574,679 | 470,179 | 510,669 | 462,050 |
| Total revenues | 678,874 | 2,405,776 | 6,061,437 | 11,417,128 | 10,016,708 | 8,566,627 | 7,978,642 |
| **Expenses:** | | | | | | | |
| Compensation | 1,053,985 | 1,075,408 | 4,165,023 | 4,373,985 | 3,615,483 | 3,137,045 | 2,590,936 |
| Occupancy and other office | 242,779 | 264,213 | 1,126,226 | 1,030,164 | 879,680 | 643,378 | 525,192 |
| Insurance claims | 355,651 | 57,305 | 525,045 | 449,138 | 441,584 | 390,203 | 360,046 |
| Advertising and promotion | 73,260 | 70,017 | 321,766 | 260,652 | 229,183 | 171,585 | 103,902 |
| Other | 445,426 | 238,038 | 1,233,651 | 969,054 | 703,012 | 628,543 | 552,794 |
| Total expenses | 2,171,101 | 1,704,981 | 7,371,711 | 7,082,993 | 5,868,942 | 4,970,754 | 4,132,870 |
| (Loss) earnings before income taxes | (1,492,227) | 700,795 | (1,310,274) | 4,334,135 | 4,147,766 | 3,595,873 | 3,845,772 |
| (Benefit) provision for income taxes | (599,174) | 266,814 | (606,736) | 1,659,289 | 1,619,676 | 1,398,299 | 1,472,822 |
| Net (loss) earnings | $ (893,053) | $ 433,981 | $ (703,538) | $ 2,674,846 | $ 2,528,090 | $ 2,197,574 | $ 2,372,950 |

Exhibit 3
184

Table of Contents

| | Three Months Ended March 31, | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2007 | 2006 | 2005 | 2004 | 2003 |
| | | | (dollar amounts in thousands, except per share data) | | | | |
| **Per Share Data:** | | | | | | | |
| (Loss) earnings | | | | | | | |
| Basic | $ (1.60) | $ 0.74 | $ (2.03) | $ 4.42 | $ 4.28 | $ 3.90 | $ 4.44 |
| Diluted | $ (1.60) | $ 0.72 | $ (2.03) | $ 4.30 | $ 4.11 | $ 3.63 | $ 4.18 |
| Cash dividends declared | $ 0.15 | $ 0.15 | $ 0.60 | $ 0.60 | $ 0.59 | $ 0.37 | $ 0.15 |
| Stock price at end of period | $ 5.50 | $ 33.64 | $ 8.94 | $ 42.45 | $ 34.19 | $ 37.01 | $ 25.28 |
| **Selected Financial Ratios:** | | | | | | | |
| Annualized return on average assets | (1.65)% | 0.76% | (0.30)% | 1.28% | 1.46% | 1.80% | 2.65% |
| Annualized return on average equity | (23.65)% | 11.53% | (4.57)% | 18.81% | 22.67% | 23.53% | 34.25% |
| Dividend payout ratio | N/M | 20.35% | N/M | 13.49% | 13.81% | 9.53% | 3.39% |
| **Selected Operating Data (in millions):** | | | | | | | |
| Loan servicing portfolio(1) | $ 1,484,157 | $ 1,351,598 | $ 1,476,203 | $ 1,298,394 | $ 1,111,090 | 838,322 | $ 644,855 |
| Volume of loans originated | $ 73,089 | $ 116,975 | $ 415,634 | $ 468,172 | $ 499,301 | $ 363,364 | $ 434,864 |
| Volume of Mortgage Banking loans sold | $ 61,417 | $ 108,599 | $ 375,937 | $ 403,035 | $ 411,848 | $ 326,313 | $ 374,245 |

(1) Includes warehoused loans and loans under subservicing agreements.

| | March 31, | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2007 | 2006 | 2005 | 2004 | 2003 |
| | | | (dollar amounts in thousands, except per share data) | | | | |
| **Selected Balance Sheet Data at End of Period:** | | | | | | | |
| Loans: | | | | | | | |
| Held for sale | $ 15,653,390 | $ 32,282,579 | $ 11,681,274 | $ 31,272,630 | $ 36,808,185 | $ 37,347,326 | $ 24,103,625 |
| Held for investment | 95,264,500 | 75,087,330 | 98,000,713 | 78,019,994 | 69,865,447 | 39,661,191 | 26,375,958 |
| | 110,917,890 | 107,369,909 | 109,681,987 | 109,292,624 | 106,673,632 | 77,008,517 | 50,479,583 |
| Securities purchased under agreements to resell, securities borrowed and federal funds sold | 7,786,346 | 28,851,069 | 9,640,879 | 27,269,897 | 23,317,361 | 13,456,448 | 10,448,102 |
| Investments in other financial instruments | 20,903,537 | 18,678,412 | 25,817,659 | 11,886,481 | 10,790,088 | 8,901,112 | 12,271,995 |

13

Exhibit 3
185

Table of Contents

| | March 31, | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2008 | 2007 | 2007 | 2006 | 2005 | 2004 | 2003 |
| | | | (dollar amounts in thousands, except per share data) | | | | |
| Mortgage servicing rights, at estimated fair value | 17,154,574 | 17,441,860 | 18,958,180 | 16,172,064 | — | — | — |
| Mortgage servicing rights, net | — | — | — | — | 12,610,839 | 8,729,929 | 6,863,625 |
| Other assets | 42,255,446 | 34,842,068 | 44,268,219 | 34,442,194 | 21,222,813 | 19,466,597 | 17,539,150 |
| Total assets | $ 199,017,793 | $ 207,183,318 | $ 208,366,924 | $ 199,063,260 | $ 174,614,733 | $ 127,562,603 | $ 97,602,455 |
| Deposit liabilities | $ 63,293,392 | $ 57,525,061 | $ 60,200,599 | $ 55,578,682 | $ 39,438,916 | $ 20,013,208 | $ 9,327,671 |
| Securities sold under agreements to repurchase | 17,862,890 | 44,085,743 | 18,218,162 | 42,113,501 | 34,153,205 | 20,465,123 | 32,013,412 |
| Notes payable | 87,651,431 | 74,322,902 | 97,227,413 | 71,487,584 | 76,187,886 | 66,613,671 | 39,948,461 |
| Other liabilities | 17,055,024 | 16,431,163 | 18,064,879 | 15,565,647 | 12,018,866 | 10,160,525 | 8,228,195 |
| Shareholders' equity | 13,155,056 | 14,818,449 | 14,655,871 | 14,317,846 | 12,815,860 | 10,310,076 | 8,084,716 |
| Total liabilities and shareholders' equity | $ 199,017,793 | $ 207,183,318 | $ 208,366,924 | $ 199,063,260 | $ 174,614,733 | $ 127,562,603 | $ 97,602,455 |
| **Selected Financial Ratios:** | | | | | | | |
| Average equity to average assets | 6.96% | 6.58% | 6.60% | 6.82% | 6.45% | 7.66% | 7.74% |
| MSR capitalization ratio at period end | 1.26% | 1.40% | 1.40% | 1.38% | 1.29% | 1.15% | 1.18% |
| Tier 1 leverage (core) capital ratio(1) | 7.7% | 8.1% | 7.2% | 6.9% | 6.3% | 7.8% | 8.3% |
| Tier 1 risk–based capital ratio(1) | 12.2% | 13.0% | 11.8% | 11.6% | 10.7% | 11.1% | 12.8% |
| Total risk–based capital ratio(1) | 13.4% | 13.5% | 14.4% | 12.8% | 11.7% | 11.7% | 13.7% |

(1) The 2007 capital ratios reflect the conversion of Countrywide Bank's charter from a national bank to a federal savings bank. Accordingly, the ratios for 2007 are for Countrywide Bank calculated using OTS guidelines and the ratios for the prior periods are calculated for Countrywide Financial Corporation in compliance with the guidelines of the Board of Governors of the Federal Reserve Bank.

Exhibit 3
186

Table of Contents

## COMPARATIVE PER SHARE DATA

The following table sets forth for Bank of America common stock and Countrywide common stock certain historical, pro forma and pro forma–equivalent per share financial information. In accordance with requirements of the Securities and Exchange Commission, which we refer to as the SEC, the pro forma and pro forma–equivalent per share information gives effect to the merger as if the merger had been effective on the dates presented, in the case of the book value data, and as if the merger had become effective on January 1, 2007, in the case of the net income and dividends declared data. The pro forma data in the tables assume that the merger is accounted for using the purchase method of accounting and represents a current estimate based on available information of the combined company's results of operations. The pro forma financial adjustments record the assets and liabilities of Countrywide at their estimated fair values and are subject to adjustment as additional information becomes available and as additional analyses are performed. See "Accounting Treatment" on page 70. The information in the following table is based on, and should be read together with, the historical financial information that we have presented in our prior filings with the SEC. See "Where You Can Find More Information" on page 80.

We anticipate that the merger will provide the combined company with financial benefits that include reduced operating expenses and revenue enhancement opportunities. The pro forma information, while helpful in illustrating the financial characteristics of the combined company under one set of assumptions, does not reflect the impact of possible business model changes as a result of current market conditions which may impact revenues, expense efficiencies, asset dispositions and share repurchases, among other factors, that may result as a consequence of the merger and, accordingly, does not attempt to predict or suggest future results. It also does not necessarily reflect what the historical results of the combined company would have been had our companies been combined during these periods. The Comparative Per Share Data Table for the three months ended March 30, 2008 and the year ended December 31, 2007 combines the historical income per share data of Bank of America and subsidiaries and Countrywide and subsidiaries giving effect to the merger as if the merger had become effective on January 1, 2007, using the purchase method of accounting. Upon completion of the merger, the operating results of Countrywide will be reflected in the consolidated financial statements of Bank of America on a prospective basis.

| | Bank of America Historical | Countrywide Financial Corporation | Pro Forma Combined(1) | Per Equivalent CFC Share(2) |
|---|---|---|---|---|
| **Income (loss) from continuing operations for the year ended December 31, 2007:** | | | | |
| Basic | $    3.35 | $    (2.03) | $    3.04 | $    0.55 |
| Diluted | 3.30 | (2.03) | 3.00 | 0.55 |
| **Income (loss) from continuing operations for the three months ended March 31, 2008:** | | | | |
| Basic | 0.23 | (1.60) | (0.09) | (0.02) |
| Diluted | 0.23 | (1.60) | (0.09) | (0.02) |
| **Dividends Paid:** | | | | |
| For the year ended December 31, 2007 | 2.40 | 0.60 | 2.40 | 0.44 |
| For the three months ended March 31, 2008 | 0.64 | 0.15 | 0.64 | 0.12 |
| **Book Value:** | | | | |
| As of December 31, 2007 | 32.09 | 21.88 | 32.24 | 5.87 |
| As of March 31, 2008 | 31.22 | 19.21 | 31.39 | 5.72 |

(1) Does not reflect the impact of business model changes as a result of current market conditions which may impact revenues, expense efficiencies, asset dispositions and share repurchases, among other factors, that may result as a consequence of the merger and, accordingly, does not attempt to predict or suggest future results.

(2) Reflects Countrywide shares at the exchange ratio of 0.1822.

Exhibit 3
187

Table of Contents

## CAUTIONARY STATEMENT REGARDING FORWARD–LOOKING STATEMENTS

This document contains or incorporates by reference a number of forward–looking statements, including statements about the financial conditions, results of operations, earnings outlook and prospects of Bank of America, Countrywide and the potential combined company and may include statements for the period following the completion of the merger. You can find many of these statements by looking for words such as "plan," "believe," "expect," "intend," "anticipate," "estimate," "project," "potential," "possible" or other similar expressions.

The forward–looking statements involve certain risks and uncertainties. The ability of either Bank of America or Countrywide to predict results or the actual effects of its plans and strategies, or those of the combined company, is subject to inherent uncertainty. Factors that may cause actual results or earnings to differ materially from such forward–looking statements include those set forth on page 17 under "Risk Factors," as well as, among others, the following:

- those discussed and identified in public filings with the SEC made by Bank of America or Countrywide;

- completion of the merger is dependent on, among other things, receipt of stockholder and regulatory approvals, the timing of which cannot be predicted with precision and which may not be received at all;

- the merger may be more expensive to complete than anticipated, including as a result of unexpected factors or events;

- the integration of Countrywide's business and operations with those of Bank of America may take longer than anticipated, may be more costly than anticipated and may have unanticipated adverse results relating to Countrywide's or Bank of America's existing businesses;

- the anticipated cost savings and other synergies of the merger may take longer to be realized or may not be achieved in their entirety, and attrition in key client, partner and other relationships relating to the merger may be greater than expected; and

- decisions to downsize, sell or close units or otherwise change the business mix of either company.

Because these forward–looking statements are subject to assumptions and uncertainties, actual results may differ materially from those expressed or implied by these forward–looking statements. You are cautioned not to place undue reliance on these statements, which speak only as of the date of this document or the date of any document incorporated by reference in this document.

All subsequent written and oral forward–looking statements concerning the merger or other matters addressed in this document and attributable to Bank of America or Countrywide or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this document. Except to the extent required by applicable law or regulation, Bank of America and Countrywide undertake no obligation to update these forward–looking statements to reflect events or circumstances after the date of this document or to reflect the occurrence of unanticipated events.

Exhibit 3
188

Table of Contents

## RISK FACTORS

*Because the market price of Bank of America common stock will fluctuate, Countrywide stockholders cannot be sure of the market value of the merger consideration they will receive.*

Upon completion of the merger, each share of Countrywide common stock will be converted into merger consideration consisting of 0.1822 of a share of Bank of America common stock. The market value of the merger consideration may vary from the closing price of Bank of America common stock on the date we announced the merger, on the date that this document was mailed to Countrywide stockholders, on the date of the special meeting of the Countrywide stockholders and on the date we complete the merger and thereafter. Any change in the market price of Bank of America common stock prior to completion of the merger will affect the market value of the merger consideration that Countrywide stockholders will receive upon completion of the merger. Accordingly, at the time of the special meeting, Countrywide stockholders will not know or be able to calculate the market value of the merger consideration they would receive upon completion of the merger. Neither company is permitted to terminate the merger agreement or resolicit the vote of Countrywide stockholders solely because of changes in the market prices of either company's stock. There will be no adjustment to the merger consideration for changes in the market price of either shares of Bank of America common stock or shares of Countrywide common stock. Stock price changes may result from a variety of factors, including general market and economic conditions, changes in our respective businesses, operations and prospects, and regulatory considerations. Many of these factors are beyond our control. You should obtain current market quotations for shares of Bank of America common stock and for shares of Countrywide common stock.

*We may fail to realize all of the anticipated benefits of the merger.*

The success of the merger will depend, in part, on our ability to realize the anticipated benefits and cost savings from combining the businesses of Bank of America and Countrywide. However, to realize these anticipated benefits and cost savings, we must successfully combine the businesses of Bank of America and Countrywide. If we are not able to achieve these objectives, the anticipated benefits and cost savings of the merger may not be realized fully or at all or may take longer to realize than expected.

Bank of America and Countrywide have operated and, until the completion of the merger, will continue to operate, independently. It is possible that the integration process could result in the loss of key employees, the disruption of each company's ongoing businesses or inconsistencies in standards, controls, procedures and policies that adversely affect our ability to maintain relationships with clients, customers, depositors and employees or to achieve the anticipated benefits of the merger. Integration efforts between the two companies will also divert management attention and resources. These integration matters could have an adverse effect on each of Countrywide and Bank of America during such transition period.

*The market price of Bank of America common stock after the merger may be affected by factors different from those affecting the shares of Countrywide or Bank of America currently.*

The businesses of Bank of America and Countrywide differ in important respects and, accordingly, the results of operations of the combined company and the market price of the combined company's shares of common stock may be affected by factors different from those currently affecting the independent results of operations of Bank of America and Countrywide. For a discussion of the businesses of Bank of America and Countrywide and of certain factors to consider in connection with those businesses, see the documents incorporated by reference in this document and referred to under "Where You Can Find More Information" beginning on page 80.

*Countrywide stockholders will have a reduced ownership and voting interest after the merger and will exercise less influence over management.*

Countrywide's stockholders currently have the right to vote in the election of the board of directors of Countrywide and on other matters affecting Countrywide. When the merger occurs, each Countrywide

17

Exhibit 3
189

Table of Contents

stockholder that receives shares of Bank of America common stock will become a stockholder of Bank of America with a percentage ownership of the combined organization that is much smaller than the stockholder's percentage ownership of Countrywide. It is expected that the former stockholders of Countrywide as a group will own less than 3% of the outstanding shares of Bank of America immediately after the merger. Because of this, Countrywide's stockholders will have less influence on the management and policies of Bank of America than they now have on the management and policies of Countrywide.

**The opinions obtained by Countrywide from its financial advisors will not reflect changes in circumstances between signing the merger agreement and the merger.**

Countrywide has not obtained updated opinions as of the date of this document from its financial advisors. Changes in the operations and prospects of Bank of America or Countrywide, general market and economic conditions and other factors that may be beyond the control of Bank of America and Countrywide, and on which each financial advisor's opinion was based, may significantly alter the value of Bank of America or Countrywide or the prices of shares of Bank of America common stock or Countrywide common stock by the time the merger is completed. Neither opinion speaks as of the time the merger will be completed or as of any date other than the date of such opinion. Because Countrywide currently does not anticipate asking either of its financial advisors to update its opinion, neither opinion will address the fairness of the merger consideration from a financial point of view at the time the merger is completed. The Countrywide board of directors' recommendation that Countrywide stockholders vote "FOR" approval and adoption of the merger agreement, however, is as of the date of this document. For a description of the opinions that Countrywide received from its financial advisors, please refer to "The Merger — Opinions of Countrywide's Financial Advisors" beginning on page 31. For a description of the other factors considered by Countrywide's board of directors in determining to approve the merger, please refer to "The Merger — Countrywide's Reasons for the Merger; Recommendation of the Countrywide Board of Directors" beginning on page 28.

**The merger agreement limits Countrywide's ability to pursue alternatives to the merger.**

The merger agreement contains "no shop" provisions that, subject to limited exceptions, limit Countrywide's ability to discuss, facilitate or commit to competing third-party proposals to acquire all or a significant part of the company, as well as a termination fee that is payable by Countrywide under certain circumstances. These provisions might discourage a potential competing acquiror that might have an interest in acquiring all or a significant part of Countrywide from considering or proposing that acquisition even if it were prepared to pay consideration with a higher per share market price than that proposed in the merger, or might result in a potential competing acquiror's proposing to pay a lower per share price to acquire Countrywide than it might otherwise have proposed to pay.

**The merger is subject to the receipt of consents and approvals from government entities that may impose conditions that could have an adverse effect on Bank of America.**

Before the merger may be completed, various approvals or consents must be obtained from the Federal Reserve Board and various domestic and foreign bank regulatory, antitrust, insurance and other authorities. These governmental entities, including the Federal Reserve Board, may impose conditions on the completion of the merger or require changes to the terms of the merger. Although Bank of America and Countrywide do not currently expect that any such conditions or changes would be imposed, there can be no assurance that they will not be, and such conditions or changes could have the effect of delaying completion of the merger or imposing additional costs on or limiting the revenues of Bank of America following the merger, any of which might have a material adverse effect on Bank of America following the merger. Bank of America is not obligated to complete the merger if the regulatory approvals received in connection with the completion of the merger include any conditions or restrictions that, in the aggregate, would reasonably be expected to have a material adverse effect on Countrywide or Bank of America, measured relative to Countrywide, but Bank of America could choose to waive this condition.

18

Exhibit 3
190

Table of Contents

***The 10% national deposit cap may restrict Bank of America's ability to make additional bank acquisitions in the U.S. in the future.***

Federal banking law contains provisions that limit the ability of the Federal Reserve Board to approve an application by a bank holding company to acquire domestic banks located outside of the acquiror's home state without regard to state law if the acquisition would result in the combined company holding more than 10% of the deposits held by insured depository institutions in the United States. Bank of America's home state is North Carolina. While the percentage of Bank of America's deposits will change from time to time, we expect that it will hold a percentage of deposits that approaches the 10% limit. While this limit does not impede Bank of America's ability to grow by attracting additional deposits from new or existing customers, by acquiring thrifts, such as Countrywide, or by other transactions that do not involve the acquisition of a domestic bank located outside of North Carolina, unless it is repealed or modified, or unless a transaction can be structured appropriately to comply with its application, the national deposit cap will restrict the ability of Bank of America to acquire additional domestic banks located outside of North Carolina that would result in Bank of America holding deposits in excess of the 10% limit. Repeal or modification of the national deposit cap would require an act of Congress. It is the responsibility of the Federal Reserve Board as part of its application approval process to determine if an acquisition would or would not surpass the 10% national limit.

***Bank of America, Countrywide and Countrywide's directors and officers are named parties to a number of actions relating to the merger.***

A number of actions are pending in California and Delaware state and federal courts relating to the merger. These include derivative actions against current and former Countrywide directors and officers, and class–action complaints on behalf of a putative Countrywide shareholder class against Countrywide's current directors and Bank of America. Depending on the outcome, these actions could have adverse financial effects or cause reputational harm to Bank of America. In addition, if the merger is consummated, plaintiffs in the pending derivative actions against current and former Countrywide directors and officers may lose standing to assert derivative claims on behalf of Countrywide because the plaintiffs will no longer be stockholders of Countrywide. See "The Merger — Litigation Relating to the Merger" on page 45.

***Countrywide officers and directors have financial interests in the merger that differ from the interests of Countrywide stockholders.***

Countrywide's executive officers and directors have financial interests in the merger that are different from, or in addition to, their interests as Countrywide stockholders. The independent members of Countrywide's board of directors were aware of and considered these interests, among other matters, in evaluating and negotiating the merger agreement and the merger, and in recommending to the stockholders that the merger agreement be approved and adopted.

Messrs. Mozilo and Sambol are parties to employment agreements and the other executive officers of Countrywide are covered by Countrywide's Change in Control Severance Plan, each of which provides severance and other benefits in the case of qualifying terminations of employment in connection with a change in control, including completion of the merger; however, in connection with the merger, Mr. Mozilo has waived his right to receive his cash severance and pro rata bonus payments under his employment agreement and consulting fees and benefits under a related consulting agreement upon termination of his employment following completion of the merger. Assuming that the merger is completed on July 1, 2008 and the executive experiences a qualifying termination of employment immediately thereafter, the amount of cash severance that would be payable to each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger and each of Countrywide's eight other executive officers (as a group), respectively, is approximately $0, $15 million, $6.7 million, $13.7 million, $9 million, $7.2 million and $29.6 million, and the value of continued benefits to be provided to each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger and each of Countrywide's eight other executive officers (as a group) respectively, is approximately $106,084, $46,493, $135,380, $206,596, $228,367, $210,494 and $1,402,083. In addition, in connection with entry into the merger agreement and a retention program previously implemented for other employees, Countrywide approved the grant of retention awards to David Sambol, Eric P. Sieracki, Ranjit M. Kripalani and Carlos M. Garcia, which

19

Exhibit 3
191

Table of Contents

consists of a retention incentive payment in respect of their annual bonus awards for Countrywide's 2007 fiscal year and cash–settled restricted stock units.

The Countrywide equity compensation plans and award agreements generally provide for the vesting of stock–based awards upon completion of the merger. Assuming that the merger is completed on July 1, 2008, the aggregate cash value of the stock–based awards based on the closing price of Bank of America's common stock as of May 27, 2008 (which amounts include the value of the retention awards described above and attribute no value to any unvested stock options and SARs other than Mr. Mozilo's SARs with an exercise price of $6.22, since all such other options and SARs are underwater based on the May 27, 2008 closing price of Bank of America's common stock) that are held by each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger and each of Countrywide's eight other executive officers (as a group), respectively, and that would vest solely due to the completion of the merger is approximately $6,482,705, $11,693,871, $1,161,458, $795,843, $1,061,104, $1,061,104 and $3,971,301 (of which approximately $2,086,419, $927,298, $695,475 and $927,298 is attributable to the cash–settled restricted stock units granted to Messrs. Sambol, Sieracki, Kripalani and Garcia, respectively, in connection with Countrywide's retention program). Pursuant to the terms of Countrywide's supplemental executive retirement plan and certain other non–qualified deferred compensation arrangements, the benefits thereunder will vest and/or payment may be accelerated in connection with the merger.

In addition, assuming that the merger is completed on July 1, 2008 and the executive experiences a qualifying termination of employment immediately thereafter, the aggregate value of the cash severance and other severance benefits and the equity awards (other than those that would vest solely due to the completion of the merger as described in the prior paragraph) based on the closing price of Bank of America's common stock as of May 27, 2008, that would vest or be payable to each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger and each of Countrywide's eight other executive officers (as a group), respectively, is approximately $106,084, $15,023,993, $8,815,990, $15,426,929, $11,251,044, $9,437,619 and $39,057,434.

Executive officers and directors of Countrywide also have rights to indemnification and directors' and officers' liability insurance that will survive completion of the merger. Please see "The Merger — Countrywide's Officers and Directors Have Financial Interests in the Merger" beginning on page 49 for information about these financial interests. In addition, if the merger is consummated, plaintiffs in pending shareholder actions against certain Countrywide officers and directors may lose standing to assert derivative claims on behalf of Countrywide because the plaintiffs will no longer be stockholders of Countrywide. See "The Merger — Litigation Relating to the Merger" on page 45.

As discussed in more detail beginning on page 55, Mr. Sambol has entered into a new retention agreement with Merger Sub that will supersede his Countrywide employment agreement upon completion of the merger. As a result, Mr. Sambol will not receive any payments or benefits under his current employment agreement following completion of the merger. On May 28, 2008 Bank of America announced that Mr. Sambol will retire after assisting with the transition and closing of the merger. His termination of employment will be treated as a termination without cause and he will be eligible to receive the payments and benefits under his retention agreement. In addition, certain of the executive officers (including Mr. Gissinger) have entered into new retention agreements with Merger Sub that replace their right to participate in Countrywide's Change in Control Severance Plan.

***The shares of Bank of America common stock to be received by Countrywide stockholders as a result of the merger will have different rights from the shares of Countrywide common stock.***

Upon completion of the merger, Countrywide stockholders will become Bank of America stockholders and their rights as stockholders will be governed by the certificate of incorporation and bylaws of Bank of America. The rights associated with Countrywide common stock are different from the rights associated with Bank of America common stock. Please see "Comparison of Stockholders' Rights" beginning on page 73 for a discussion of the different rights associated with Bank of America common stock.

20

Exhibit 3
192

Table of Contents

### THE COUNTRYWIDE SPECIAL MEETING

This section contains information about the special meeting of Countrywide stockholders that has been called to consider and approve and adopt the merger agreement.

Together with this document, we are also sending you a notice of the special meeting and a form of proxy that is solicited by the Countrywide board of directors. The special meeting will be held on June 25, 2008 at 9:00 a.m., local time, at the Learning Center Auditorium at Countrywide's corporate headquarters located at 4500 Park Granada, Calabasas, California 91302.

**Matters to Be Considered**

The purpose of the special meeting is to vote on a proposal for approval and adoption of the merger agreement.

You also will be asked to vote upon a proposal to approve the adjournment of the special meeting, if necessary, to solicit additional proxies in the event that there are not sufficient votes at the time of the special meeting to approve and adopt the merger agreement.

**Proxies**

Each copy of this document mailed to holders of Countrywide common stock is accompanied by a form of proxy with instructions for voting. If you hold stock in your name as a stockholder of record, you should complete and return the proxy card accompanying this document to ensure that your vote is counted at the special meeting, or at any adjournment or postponement of the special meeting, regardless of whether you plan to attend the special meeting.

If you hold your stock in "street name" through a bank or broker, you must direct your bank or broker to vote in accordance with the instructions you have received from your bank or broker.

If you hold stock in your name as a stockholder of record, you may revoke any proxy at any time before it is voted by signing and returning a proxy card with a later date, delivering a written revocation letter to Countrywide's Secretary, or by attending the special meeting in person, notifying the Secretary, and voting by ballot at the special meeting.

Any stockholder entitled to vote in person at the special meeting may vote in person regardless of whether a proxy has been previously given, but the mere presence (without notifying the Secretary) of a stockholder at the special meeting will not constitute revocation of a previously given proxy.

Written notices of revocation and other communications about revoking your proxy should be addressed to:

Countrywide Financial Corporation
4500 Park Granada
MS: CH–11B
Calabasas, California 91302
Attention:  Susan E. Bow
            Secretary

If your shares are held in "street name" by a bank or broker, you should follow the instructions of your bank or broker regarding the revocation of proxies.

All shares represented by valid proxies that we receive through this solicitation, and that are not revoked, will be voted in accordance with your instructions on the proxy card. If you make no specification on your proxy card as to how you want your shares voted before signing and returning it, your proxy will be voted "FOR" approval and adoption of the merger agreement and "FOR" approval of the proposal to adjourn the special meeting, if necessary, to solicit additional proxies in the event that there are not sufficient votes at the time of the special meeting to approve and adopt the merger agreement. According to the Countrywide amended and restated bylaws, business to be conducted at a special meeting of stockholders may only be brought before the meeting by means of Countrywide's notice of the meeting or otherwise properly brought

Exhibit 3
193

Table of Contents

before the meeting by or at the direction of the Countrywide board of directors. No matters other than the matters described in this document are anticipated to be presented for action at the special meeting or at any adjournment or postponement of the special meeting.

Countrywide stockholders should **not** send Countrywide stock certificates with their proxy cards. After the merger is completed, holders of Countrywide common stock will be mailed a transmittal form with instructions on how to exchange their Countrywide stock certificates for the merger consideration.

**Solicitation of Proxies**

Countrywide will bear the entire cost of soliciting proxies from you. In addition to solicitation of proxies by mail, Countrywide will request that banks, brokers, and other record holders send proxies and proxy material to the beneficial owners of Countrywide common stock and secure their voting instructions. Countrywide will reimburse the record holders for their reasonable expenses in taking those actions. Countrywide has also made arrangements with Innisfree M&A Incorporated to assist it in soliciting proxies and has agreed to pay them $100,000 plus an additional $50,000 if the merger agreement is adopted and approved by Countrywide stockholders, plus reasonable expenses for these services. If necessary, Countrywide may use several of its regular employees, who will not be specially compensated, to solicit proxies from Countrywide stockholders, either personally or by telephone, facsimile, letter or other electronic means.

**Record Date**

The close of business on April 28, 2008 has been fixed as the record date for determining the Countrywide stockholders entitled to receive notice of and to vote at the special meeting. At that time, 583,343,240 shares of Countrywide common stock were outstanding, held by approximately 1,847 holders of record.

**Voting Rights and Vote Required**

The presence, in person or by proxy, of the holders of a majority of the outstanding shares of Countrywide common stock entitled to vote is necessary to constitute a quorum at the special meeting. Abstentions will be counted for the purpose of determining whether a quorum is present.

Approval and adoption of the merger agreement requires the affirmative vote of the holders of a majority of the outstanding shares of Countrywide common stock entitled to vote at the special meeting. You are entitled to one vote for each share of Countrywide common stock you held as of the record date. Holders of shares of Countrywide preferred stock are not entitled to vote on the merger or otherwise at the special meeting.

Because the affirmative vote of the holders of a majority of the outstanding shares of Countrywide common stock entitled to vote at the special meeting is needed for us to proceed with the merger, the failure to vote by proxy or in person will have the same effect as a vote against the merger. Abstentions also will have the same effect as a vote against the merger. **Accordingly, the Countrywide board of directors urges Countrywide stockholders to promptly vote by completing, dating, and signing the accompanying proxy card and to return it promptly in the enclosed postage–paid envelope, or, if you hold your stock in "street name" through a bank or broker, by following the voting instructions of your bank or broker.**

Approval of the proposal to adjourn or postpone the meeting, if necessary, for the purpose of soliciting additional proxies requires the affirmative vote of the holders of a majority of the shares entitled to vote and present in person or by proxy, even if less than a quorum. Because approval of this proposal requires the affirmative vote of a majority of shares present in person or by proxy, abstentions will have the same effect as a vote against this proposal.

Stockholders will vote at the meeting by ballot. Votes cast at the meeting, in person or by proxy, will be tallied by Countrywide's transfer agent.

Exhibit 3
194

Table of Contents

As of the record date:

- Directors and executive officers of Countrywide, and their affiliates, had the right to vote 2,758,909 shares of Countrywide common stock, or 0.5% of the outstanding Countrywide common stock at that date. We currently expect that each of these individuals will vote their shares of Countrywide common stock in favor of the proposals to be presented at the special meeting.

- Directors and executive officers of Bank of America, and their affiliates, did not have the right to vote any shares of Countrywide common stock.

**Recommendation of the Countrywide Board of Directors**

The Countrywide board of directors has unanimously approved and adopted the merger agreement and the transactions it contemplates, including the merger. The Countrywide board of directors determined that the merger, merger agreement and the transactions contemplated by the merger agreement are advisable and in the best interests of Countrywide and its stockholders and unanimously recommends that you vote "FOR" approval and adoption of the merger agreement. See "The Merger — Countrywide's Reasons for the Merger; Recommendation of the Countrywide Board of Directors" on page 28 for a more detailed discussion of the Countrywide board of directors' recommendation.

**Attending the Meeting**

All holders of Countrywide common stock, including stockholders of record and stockholders who hold their shares through banks, brokers, nominees or any other holder of record, are invited to attend the special meeting. Stockholders of record can vote in person at the special meeting. If you are not a stockholder of record, you must obtain a proxy executed in your favor, from the record holder of your shares, such as a broker, bank or other nominee, to be able to vote in person at the special meeting. If you plan to attend the special meeting, you must hold your shares in your own name or have a letter from the record holder of your shares confirming your ownership and you must bring a form of personal photo identification with you in order to be admitted. We reserve the right to refuse admittance to anyone without proper proof of share ownership and without proper photo identification.

Exhibit 3
195

Table of Contents

## INFORMATION ABOUT THE COMPANIES

**Bank of America Corporation**

Bank of America Corporation is a Delaware corporation, a bank holding company and a financial holding company under U.S. federal law. Bank of America is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk-management products and services. The company provides unmatched convenience in the United States, serving more than 59 million consumer and small business relationships with more than 6,100 retail banking offices, nearly 19,000 ATMs and award-winning online banking with more than 23 million active users. Bank of America is the No. 1 overall Small Business Administration (SBA) lender in the United States and the No. 1 SBA lender to minority-owned small businesses. The company serves clients in 175 countries and has relationships with 99 percent of the U.S. Fortune 500 companies and 80 percent of the Fortune Global 500. Bank of America Corporation common stock (NYSE: BAC) is listed on the New York Stock Exchange. As of December 31, 2007, Bank of America had total consolidated assets of approximately $1.7 trillion, total consolidated deposits of approximately $805 billion and total consolidated stockholders' equity of approximately $147 billion. The principal executive offices of Bank of America are located in the Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina 28255, and its telephone number is (704) 386-5681.

Additional information about Bank of America and its subsidiaries is included in documents incorporated by reference in this document. See "Where You Can Find More Information" on page 80.

**Red Oak Merger Corporation**

Red Oak Merger Corporation, a wholly-owned subsidiary of Bank of America, was formed solely for the purpose of consummating the merger. Red Oak Merger Corporation has not carried on any activities to date, except for activities incidental to its formation and activities undertaken in connection with the transactions contemplated by the merger agreement. The principal executive offices of Red Oak Merger Corporation are located in the Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina, and its telephone number is (704) 386-5681.

**Countrywide Financial Corporation**

Countrywide Financial Corporation is a Delaware corporation and holding company. Founded in 1969, Countrywide is a diversified financial services provider, which, through its subsidiaries, is engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting. Through this family of companies, Countrywide originates, purchases, securitizes, sells, and services residential and commercial loans; provides loan closing services such as credit reports, appraisals and flood determinations; offers banking services which include depository and home loan products; conducts fixed income securities underwriting and trading activities; provides property, life and casualty insurance; and manages a captive mortgage reinsurance company. Countrywide common stock (NYSE: CFC) is listed on the New York Stock Exchange and is a member of the S&P 500, Forbes 2000, and Fortune 500. The principal executive offices of Countrywide are located at 4500 Park Granada, Calabasas, California 91302, and its telephone number is (818) 225-3000.

Additional information about Countrywide and its subsidiaries is included in documents incorporated by reference in this document. See "Where You Can Find More Information" on page 81.

24

Exhibit 3
196

Table of Contents

## THE MERGER

### Background of the Merger

Countrywide's board of directors has from time to time in recent years engaged with senior management in strategic reviews, and considered ways to enhance the company's performance and prospects in light of market, economic, regulatory, competitive and other factors. These reviews have included consideration of potential transactions with other financial institutions that would further its strategic objectives, and the potential benefits and risks of those transactions.

Countrywide and Bank of America have for many years had a number of significant commercial relationships, including the provision by Bank of America of financing to Countrywide in the ordinary course of business. As a result of these relationships, the companies and their senior managements have become well known to one another. Discussions between Countrywide and Bank of America's senior managements in recent years have from time to time included informal discussion of the possible strategic advantages of potential strategic transactions and joint ventures. Each of these discussions, however, remained exploratory and none led to any transaction.

During 2007, softening residential housing markets, increasing delinquency and default rates and increasingly volatile and constrained secondary credit markets began affecting the mortgage industry generally. Although these issues first appeared in the subprime mortgage market, the issues grew in significance and expanded into the prime mortgage market, with attendant impacts on Countrywide's operations, credit costs and portfolio of retained mortgage loans and related interests. One of the significant negative developments for Countrywide in early August was the disruption in the market for the sale of "non–conforming" loans (i.e., those that cannot be sold to housing–related government agencies and government sponsored entities such as Fannie Mae and Freddie Mac) and related mortgage–backed securities. As a result of this development and in light of the ensuing severe downturn in the short term and unsecured lending markets, Countrywide's board of directors began considering a range of options to enhance its liquidity and capital positions, and to address the broader downturn in the mortgage banking environment and the impact on Countrywide's business and operations. Given the roles of capital and liquidity as key drivers of the mortgage banking business, and given the increased capital needs resulting from the company's need to retain non–conforming loans on its balance sheet as a result of the severe disruptions in the secondary mortgage market, Countrywide's board and management determined to address liquidity and capital concerns promptly. As part of its efforts to help address the capital and liquidity concerns and maintain the confidence of Countrywide's stockholders, business counterparties, employees, rating agencies and regulators, the company took a number of steps in August 2007, including drawing on a previously unutilized $11.5 billion credit facility, obtaining a $2 billion investment by Bank of America in the form of a non–voting convertible preferred security, and accelerating the migration of its mortgage production operations into Countrywide Bank, FSB.

Countrywide's board of directors continued to meet frequently with senior management after its August actions, and the board and its management worked with their advisors, to consider the various implications of the economic and market environment and their impact on Countrywide's business, assets and liabilities, competitive position, legal and regulatory status, and prospects, among other things. During this time the Countrywide board of directors determined to take and began implementing several significant additional strategic actions to address continued constrained credit conditions and declining asset values and the resulting challenging operating conditions for the company. Among these additional actions were the modification of Countrywide's product guidelines in view of the limited opportunities to sell mortgages (including ceasing originations of subprime loans not eligible for sale or securitization under programs supported by government agencies and government sponsored entities) and workforce reductions. Countrywide's board of directors and senior management continued to monitor the challenging economic, competitive, legal and regulatory conditions in the mortgage industry generally and at Countrywide specifically. The board and management, together with their advisors, also worked during this period to evaluate additional possible operational and other strategic and financial measures to mitigate the various challenges and risks facing Countrywide, including the possibility of further capital raising and/or possible strategic transactions with other financial institutions. Other possible transactions considered during this period included the possibility of an investment

25

Exhibit 3
197

Table of Contents

by a financial buyer such as a private equity firm, although the Countrywide board of directors did not consider this to be a viable option as it would not resolve Countrywide's capital or liquidity concerns.

Beginning in November 2007, with the preliminary approval of the Countrywide board of directors, Countrywide and Bank of America agreed that it would be worthwhile to engage in discussions regarding a potential transaction, including a potential merger, and the parties entered into a confidentiality agreement. Thereafter, representatives of Countrywide and Bank of America commenced discussions regarding their companies and market conditions, the complementary aspects of their businesses and the potential benefits of a strategic combination of Countrywide and Bank of America, including the general potential for cost and revenue related synergies, and Bank of America employees and advisors commenced extensive due diligence investigations of Countrywide, its business, operations, financial condition and prospects. Based on these discussions Countrywide and Bank of America began initial discussions regarding potential indicative terms for a transaction. These discussions remained preliminary. Countrywide also continued during this period to consider and work with its advisors regarding other alternatives, including the potential to conduct further private or public capital raising activities or financial or balance sheet restructuring initiatives. No company other than Bank of America performed any due diligence investigation of Countrywide with respect to a potential merger during this time period. At a meeting on December 28, 2007, as a framework to discuss a potential transaction, a Bank of America representative provided Countrywide representatives with a preliminary illustrative transaction scenario reflecting a 10% premium to Countrywide's December 26, 2007 closing share price, which implied an exchange ratio of 0.2353 shares of Bank of America common stock per outstanding share of Countrywide common stock, or $9.96 per share. Later at that same meeting, the Countrywide representatives informed the Bank of America representatives for the first time that Countrywide had just learned that continuing deterioration in real estate market conditions had triggered certain provisions in various home equity loan securitizations that could have a negative impact on Countrywide's financial condition. In response, the Bank of America representatives indicated that Bank of America needed to undertake due diligence on this issue before proceeding further.

Senior management of Countrywide regularly apprised the board of directors of the discussions that were taking place with Bank of America, as well as the impact on Countrywide and its business, operations and financial condition of continued challenging market and economic conditions. In early January, Countrywide management discussed with Bank of America and reported to the Countrywide board of directors that its general business conditions were coming under continued pressure as a result of various factors, including continued worsening credit performance, continued difficulty raising funds at acceptable costs, origination volume declines, declining residential real estate prices, and anticipated adverse movements in credit costs and in mortgage loan and related asset valuations, which were putting increasing pressure on Countrywide's financial condition and would, in management's estimation, likely result in a loss for the fourth quarter of 2007. Countrywide management reported a continued worsening of the legal, political and regulatory environment for the mortgage banking industry generally and Countrywide — as a leading participant in the industry — specifically. It was also noted that market perceptions regarding Countrywide's capital, liquidity and business prospects were exacerbating the stress on the company's business and operations by making it more difficult to engage counterparties in important ordinary course transactions on reasonable terms, such as financing and hedging transactions. These adverse conditions also raised the potential for negative action by Countrywide's regulators and the rating agencies, including the possibility of a downgrade to below an investment grade rating if Countrywide were to report a loss for the fourth quarter of 2007. In addition, the company's stock continued to decline in December and January, which increased the cost and the potential dilutive effect on current stockholders of raising additional equity capital, thereby making further capital raising activities significantly less attractive as a potential strategic option for Countrywide.

At a meeting of the Countrywide board of directors held on January 4, 2008, representatives of Countrywide senior management and the board's advisors discussed the conversations between senior management of Countrywide and Bank of America to bring the full board of directors up to date on those discussions and other recent developments at Countrywide, including those discussed in the preceding paragraph. There was a strong consensus among the Countrywide directors that pursuing a transaction with Bank of America would be an attractive strategic and financial transaction for Countrywide in light of the

26

Exhibit 3
198

Table of Contents

deteriorating conditions and the increasingly severe business, operating, legal, political and regulatory environment in which Countrywide was operating, and it was noted that a transaction with Bank of America would help to provide stability to Countrywide.

At the January 4 meeting, representatives of Sandler O'Neill, which the board of directors of Countrywide had previously retained as financial advisor to the board in connection with its consideration of strategic alternatives, discussed financial matters relating to Countrywide, the general and mortgage banking environment, the preliminary illustrative transaction scenario presented by Bank of America at the December 28, 2007 meeting, and the board's future consideration of a potential transaction, representatives of Wachtell, Lipton, Rosen & Katz discussed the board's legal duties in connection with any such consideration of a possible transaction, and representatives of Promontory Financial Group, Countrywide's regulatory consultants, reported on the status of regulatory matters. Included in the discussion of regulatory matters was a report on the potential impact of the issues and challenges facing the mortgage industry generally and Countrywide specifically and on the views of the federal banking regulators, including the potential for regulatory actions if the regulators were to determine that conditions generally or at Countrywide specifically warranted intervention. The board of directors discussed that the risk of adverse regulatory action was increasing as credit market disruptions continued and worsened. Also discussed generally was the possible reaction of federal regulators to a transaction with Bank of America, the regulatory approvals required in connection with a potential transaction (as described under "— Regulatory Approvals") and the likelihood such approvals would be obtained. Following questions and discussions among the participants at the meeting, the Countrywide board of directors authorized and directed Countrywide's senior management and outside legal and financial advisors to continue discussions with Bank of America and work towards a transaction that could be presented to the board of directors for its review and consideration.

Following this meeting and continuing through the following week, Bank of America and Countrywide and their outside counsel began discussions and the drafting of a merger agreement and related transaction documents. In addition, during this period, Countrywide performed customary "reverse" due diligence of Bank of America. In connection with this due diligence, Bank of America made available to Countrywide and its financial advisors information regarding Bank of America's expectations for its fourth quarter 2007 results. Representatives of Countrywide had advised Bank of America by this time of the nature of Countrywide's potential exposure relating to certain home equity loan securitizations, and the parties continued discussions on the material terms of a proposed transaction. During the course of these discussions, and as discussed below in more detail, Countrywide experienced rapidly declining business and operating conditions, as well as significant trading price declines as rumors of a rating agency downgrade and Countrywide's possible bankruptcy circulated in the market. As described below, these rumors and Countrywide's declining stock price significantly exacerbated already challenging conditions and significantly increased the likelihood that any capital–raising transaction would be on terms that would be highly unfavorable to Countrywide's existing stockholders. On January 8, during a call initiated by Countrywide, representatives of Bank of America indicated a willingness to work toward entering into a transaction in which Bank of America would combine with Countrywide for consideration of 0.1822 shares of Bank of America common stock per outstanding share of Countrywide common stock, which, while less than in the prior preliminary discussions in December, reflected the significant declines in operating conditions in the mortgage industry generally and for Countrywide specifically (including the home equity loan securitization issue) and the results of Bank of America's ongoing due diligence. Countrywide and Bank of America thereafter continued discussions of the material terms of a potential transaction, and during the course of such discussions Bank of America reiterated that the 0.1822 exchange ratio was a firm price and that Bank of America was prepared to pursue a merger on that basis. Following discussions that continued through January 8 and 9, 2008, Bank of America and Countrywide ultimately agreed to an all–stock transaction with a 0.1822 exchange ratio, among other significant terms. At this time the parties determined to hold board meetings on January 10, 2008 for each party's board to consider the approval of such a transaction.

On the morning of January 10, 2008, the board of directors of Bank of America met and approved the proposed transaction.

27

Exhibit 3
199

Table of Contents

Also on January 10, 2008, the board of directors of Countrywide met to consider the proposed transaction. Management discussed with the Countrywide board of directors the continued challenging operating environment, noting that since the prior board meeting on January 4 the conditions discussed with the board had continued to deteriorate even further. Among other things, the board discussed the further and precipitous drop in Countrywide's stock price that had occurred earlier in the week following bankruptcy rumors and other adverse publicity. The new market rumors and the falling stock price further increased concerns among counterparties of Countrywide, which in turn resulted in further limitations in important trading related credit extensions, threatened the retention of retail and other deposits at Countrywide Bank, and also further diminished the attractiveness of equity capital raising activities as a potential strategic option. Management then reviewed with the board the background of discussions with Bank of America and the progress of negotiations, and reported on Countrywide's due diligence investigations of Bank of America. While management had previously anticipated that the fourth quarter of 2007 would be profitable, it had become apparent during the days preceding the meeting that due to changed market conditions adjustments relating to credit–related valuations would be necessary and that as a result the company would most likely experience a loss for the quarter. The board discussed that a credit downgrade would be likely in the event the company reported a fourth quarter loss and that additional adverse consequences, including adverse regulatory actions, could follow. The board also discussed the possibility that such consequences would further exacerbate the stress on Countrywide's business and operations and the adverse market perceptions about its capital, liquidity and business prospects.

On or about January 8, 2008, Goldman Sachs was retained as financial advisor to Countrywide in connection with the proposed merger, having acted as its financial advisor in connection with the August 2007 Bank of America investment and having continued to work with the company thereafter with respect to potential strategic and financial considerations. Goldman Sachs and Sandler O'Neill reviewed with the Countrywide board of directors the financial terms of the proposed transaction, and financial information regarding Bank of America, Countrywide and the transaction. In connection with the deliberation by the Countrywide board of directors, each of Goldman Sachs and Sandler O'Neill rendered to the Countrywide board of directors its oral opinion (subsequently confirmed in writing), as described under "— Opinions of Countrywide's Financial Advisors", that, as of the date of their opinions, and based upon and subject to the factors and assumptions set forth in their opinions, the exchange ratio of 0.1822 shares of Bank of America common stock to be received in respect of each share of Countrywide common stock pursuant to the merger agreement was fair from a financial point of view to Countrywide's stockholders.

Representatives of Wachtell, Lipton discussed with the Countrywide board of directors the legal standards applicable to its decisions and actions with respect to its evaluation of the proposed transaction, and reviewed the legal terms of the merger agreement and the related agreements. Representatives of Wachtell, Lipton also discussed with the Countrywide board of directors the stockholder and regulatory approvals that would be required to complete the transaction, and the possible timeframe for receiving such approvals, and reviewed with the board of directors a set of draft resolutions relating to the proposed transaction. In addition, representatives of Promontory Financial Group provided an updated report on the status of regulatory matters that had been discussed at the January 4 meeting.

Following these discussions, and extensive review and discussion among the members of the Countrywide board of directors, including consideration of the factors described under "— Countrywide's Reasons for the Merger; Recommendation of the Countrywide Board of Directors", the Countrywide board of directors unanimously determined that the merger and the other transactions contemplated by the merger agreement are advisable and in the best interests of Countrywide and its stockholders, and the Countrywide directors voted unanimously to approve the merger and to approve and adopt the merger agreement.

During the remainder of the day on January 10, 2008, the parties and their respective legal counsel worked to finalize the merger agreement and related materials. Thereafter the parties executed the merger agreement. The transaction was announced on the morning of January 11, 2008.

28

Exhibit 3

200

Table of Contents

**Countrywide's Reasons for the Merger; Recommendation of the Countrywide Board of Directors**

The Countrywide board of directors consulted with Countrywide management, as well as its legal and financial advisors, in its evaluation of the merger. In reaching its conclusion to approve and adopt the merger agreement and in determining that the merger is advisable and in the best interests of Countrywide and its stockholders, the Countrywide board considered a number of factors, including the following material factors:

- its understanding of Countrywide's business, operations, financial condition, earnings, and prospects as discussed above under "Background of the Merger" and below under "Opinions of Countrywide's Financial Advisors" (including factors such as worsening credit performance, continued funding limitations, declining mortgage originations, residential real estate price pressures, adverse movements in mortgage loan and related asset valuations), and potential strategic alternatives, and of Bank of America's business, operations, financial condition, earnings and prospects;

- the current and prospective environment in which Countrywide operates, which reflects challenging and uncertain mortgage industry conditions that the board of directors expected to continue in the near future, including:

  - highly constrained credit markets, including in particular greatly diminished availability of liquidity in the secondary mortgage markets;

  - increased level and rate of delinquency and default rates for mortgage loans;

  - lack of readily available sources of secured and unsecured financing and resulting liquidity at historical and reasonable cost levels;

  - continued softening real estate markets and generally declining residential real estate values;

  - lower levels of mortgage origination volumes;

  - uncertain and volatile valuations of mortgage loans and related assets; and

  - generally uncertain national and local economic conditions;

  as well as the competitive environment for financial institutions generally, the trend toward consolidation in the financial services industry generally and the consumer finance and the mortgage industry in particular, and the potential effects of these factors on Countrywide and the potential effects of these and other factors on Countrywide relative to Bank of America;

- the relative strength of Bank of America's (and the future combined company's) capital position, funding capabilities and liquidity as compared to Countrywide, and the ability of the substantially larger and more diversified Bank of America (and combined company) to weather continued economic and mortgage market weakness and further crises that might develop;

- the all stock and fixed exchange ratio aspects of the merger consideration, which would allow Countrywide stockholders to participate in a portion of any improvement in the Countrywide business and synergies resulting from the merger, and the value to Countrywide stockholders represented by that consideration;

- the reports to Countrywide's board of directors concerning the operations, financial condition and prospects of Bank of America and the expected financial impact of the merger on the combined company, including pro forma assets, earnings, deposits and regulatory capital ratios;

- the fact that Bank of America is one of the largest financial institutions in the world, and the board of directors' belief that its substantial capital resources will provide strong support for Countrywide's existing operations, as well as possible future growth;

- the fact that the complementary nature of the respective businesses, customer bases, products and skills of Countrywide and Bank of America are expected to result in opportunities to obtain synergies;

Exhibit 3
201

Table of Contents

- the scale, scope, strength and diversity of operations, product lines and delivery systems that could be achieved by combining Countrywide and Bank of America;

- the need to obtain stockholder and regulatory approvals to complete the merger, and the likelihood that such approvals will be obtained;

- the Countrywide board's understanding of Bank of America's prior track record and expertise in successfully completing and integrating substantial acquisitions;

- the historical and current market prices of Bank of America common stock and Countrywide common stock as well as comparative valuation analyses for the two companies;

- the terms of the merger agreement, including the provisions imposing restrictions on Countrywide from soliciting or pursuing alternative transactions and the termination fee of $160 million that Countrywide would be required to pay if the transaction agreement were terminated under certain circumstances, which could limit the willingness of a third party to propose a competing business combination transaction with Countrywide;

- the fact that Bank of America has the right, pursuant to the August 2007 $2 billion preferred stock investment agreement with Countrywide, to match the terms of any third party proposal to acquire Countrywide, which could limit the willingness of a third party to propose a competing business combination transaction with Countrywide;

- the expected tax treatment of the merger and of the receipt by Countrywide stockholders of the merger consideration;

- the financial presentation of Goldman Sachs and Sandler O'Neill, including their respective opinions dated January 10, 2008, to the Countrywide board of directors to the effect that, as of the date of the opinions, and based upon and subject to the factors and assumptions set forth in the opinions, the exchange ratio of 0.1822 shares of Bank of America common stock to be received in respect of each share of Countrywide common stock pursuant to the merger agreement was fair from a financial point of view to Countrywide's stockholders. See "— Opinions of Countrywide's Financial Advisors." As noted in "Risk Factors — The Opinions obtained by Countrywide from its financial advisors will not reflect changes in circumstances between signing the merger agreement and the merger", Countrywide does not currently anticipate asking either of its financial advisors to update its opinion; however, the Countrywide board of directors' recommendation that Countrywide stockholders vote "FOR" approval and adoption of the merger agreement is as of the date of this document;

- the potential impact of the transaction on Countrywide employees and other key constituencies;

- the challenges of integrating Countrywide's businesses, operations and workforce with those of Bank of America, and the risks associated with achieving anticipated cost savings and other synergies; and

- the fact that Countrywide directors and executive officers have interests in the merger that are in addition to their interests as Countrywide stockholders. See "— Countrywide's Directors and Officers Have Financial Interests in the Merger".

The foregoing discussion of the information and factors considered by the Countrywide board of directors is not exhaustive, but includes the material factors considered by the Countrywide board of directors. In view of the wide variety of factors considered by the Countrywide board of directors in connection with its evaluation of the merger and the complexity of these matters, the Countrywide board of directors did not consider it practical to, nor did it attempt to, quantify, rank or otherwise assign relative weights to the specific factors that it considered in reaching its decision. In reaching its decision to approve and adopt the merger agreement and recommend its approval and adoption by Countrywide stockholders, the Countrywide board of directors was aware that the merger consideration per share in the transaction was substantially less than the net book value per share of Countrywide common stock as of September 30, 2007. In light of all of the other factors considered by the board and described under "— Background of the Merger" and above in this section, in particular the challenging and uncertain mortgage industry conditions that the Countrywide board of

30

Exhibit 3
202

Table of Contents

directors expected to continue, and the resulting uncertain and volatile valuations of mortgage loans and related assets and expected fourth quarter losses, as well as the resurgence of rumors concerning a potential bankruptcy filing or ratings downgrade and their potentially debilitating effects on the ongoing business, the board did not consider net book value to be a material indicator of the value of Countrywide common stock in the current context. The Countrywide board of directors considered the opinions and analyses of Goldman Sachs and Sandler O'Neill taken as a whole, and in doing so was aware that, for example, with respect to the precedent transactions analysis described under "— Opinion of Countrywide's Financial Advisors — Precedent Transactions Analysis," certain of the multiples and ratios calculated for Countrywide and the proposed merger did not fall within the ranges derived for the selected transactions, and determined that the Goldman Sachs and Sandler O'Neill opinions and analyses overall supported its decision to approve and adopt the merger agreement and recommend the merger to the Countrywide stockholders. The Countrywide board of directors evaluated the factors described above, including by asking questions of Countrywide management and Countrywide legal and financial advisors, and reached consensus that the merger was advisable and in the best interests of Countrywide and Countrywide stockholders. In considering the factors described above, individual members of the Countrywide board of directors may have given different weights to different factors.

The Countrywide board of directors determined that the merger, the merger agreement and the transactions contemplated by the merger agreement are advisable and in the best interests of Countrywide and its stockholders. Accordingly, the Countrywide board of directors unanimously approved the merger and approved and adopted the merger agreement and unanimously recommends that Countrywide stockholders vote "FOR" approval and adoption of the merger agreement.

**Opinions of Countrywide's Financial Advisors**

*Goldman Sachs.* On January 10, 2008, Goldman Sachs rendered its opinion to the board of directors of Countrywide that as of the date of the opinion, and based upon and subject to the factors and assumptions set forth in the opinion, the exchange ratio of 0.1822 shares of Bank of America common stock to be received in respect of each share of Countrywide common stock pursuant to the merger agreement was fair from a financial point of view to the holders of Countrywide common stock.

The full text of the written opinion of Goldman Sachs, dated January 10, 2008, which sets forth the assumptions made, procedures followed, matters considered and limitations on the review undertaken in connection with the opinion, is attached to this document as **Appendix B**. Goldman Sachs provided its opinion for the information and assistance of the Countrywide board of directors in connection with its consideration of the transaction contemplated by the merger agreement. Goldman Sachs' opinion is not a recommendation as to how any holder of Countrywide common stock should vote with respect to the merger or any other matter.

In connection with rendering the opinion described above and performing its related financial analyses, Goldman Sachs reviewed, among other things:

- the merger agreement;

- annual reports to stockholders and annual reports on Form 10–K of Countrywide and Bank of America for the five years ended December 31, 2006;

- certain interim reports to stockholders and Quarterly Reports on Form 10–Q of Countrywide and Bank of America;

- certain other communications from Countrywide and Bank of America to their respective stockholders;

- certain publicly available research analyst reports for Countrywide and Bank of America; and

- certain internal financial analyses and forecasts regarding Countrywide prepared by its management, including certain projected cash flows, including from equity issuances, and certain analyses of Countrywide's sources of liquidity and its capital adequacy.

Exhibit 3
203

Table of Contents

Goldman Sachs held discussions with members of the senior managements of Countrywide and Bank of America regarding their assessment of the strategic rationale for, and the potential benefits of, the transaction contemplated by the merger agreement. Goldman Sachs also held discussions with members of the senior management of Countrywide regarding the past and current business operations, financial condition and future prospects of Countrywide, including their views of the risks and uncertainties of achieving future results. In that regard, Goldman Sachs was informed by members of the senior management of Countrywide that Countrywide had been negatively affected by and continued to have exposure to a number of risks, including deteriorating credit performance of its portfolio assets, significant reductions in the scope of its capital markets business and declining values of portions of its loan and residual interest portfolios. Countrywide advised Goldman Sachs that these exposures had negatively affected recent financial results and that there was a material risk that they would impact Countrywide in the future, which could lead to further ratings downgrades or regulatory actions, or both, which would substantially impair the operations of Countrywide. In addition, members of the senior management of Countrywide advised Goldman Sachs that Countrywide had limited access to the capital markets and that a failure to raise additional capital in the amounts and at the prices assumed by the forecasts for Countrywide would have a material negative effect on the ability of Countrywide to achieve the forecasts as contemplated.

The management of Bank of America did not make available to Goldman Sachs its forecasts of the future financial performance of Bank of America. With the consent of Countrywide, Goldman Sachs' review of Bank of America was limited to publicly−available information and a discussion with the senior management of Bank of America regarding the past and current business operations, financial condition and future prospects of Bank of America, which included a discussion of publicly available estimates issued by certain research analysts with respect to Bank of America.

In addition, Goldman Sachs reviewed the reported price and trading activity for the Countrywide common stock and Bank of America common stock, compared certain financial and stock market information for Countrywide and Bank of America with similar information for certain other companies the securities of which are publicly−traded, reviewed the financial terms of certain recent business combinations in the banking industry specifically and in other industries generally and performed such other studies and analyses, and considered such other factors, as it considered appropriate.

Goldman Sachs relied upon and assumed, without assuming any responsibility for independent verification, the accuracy and completeness of all of the financial, legal, regulatory, tax, accounting and other information provided to, discussed with or reviewed by it. Goldman Sachs did not review individual credit files, nor did it make an independent evaluation or appraisal of the assets and liabilities (including any derivative claims brought on Countrywide's behalf against its officers or directors, or any contingent, derivative or off−balance−sheet assets and liabilities) of Countrywide, Bank of America or any of their respective subsidiaries, and Goldman Sachs was not furnished with any such evaluation or appraisal. Goldman Sachs is not an expert in the evaluation of loan and lease portfolios for purposes of assessing the adequacy of the allowances for losses with respect thereto and, accordingly, with the consent of Countrywide, Goldman Sachs assumed, with respect to Bank of America, that such allowances are in the aggregate adequate to cover such losses. Goldman Sachs also assumed that all governmental, regulatory or other consents and approvals necessary for the consummation of the merger will be obtained without any adverse effect on Countrywide or Bank of America or on the expected benefits of the transaction contemplated by the merger agreement in any way meaningful to its analysis. Goldman Sachs' opinion does not address any legal, regulatory, tax or accounting matters.

Goldman Sachs' opinion does not address the underlying business decision of Countrywide to engage in the transaction contemplated by the merger agreement, or the relative merits of the transaction contemplated by the merger agreement as compared to any strategic alternatives that may be available to Countrywide. Goldman Sachs was not requested to solicit, and did not solicit, interest from other parties with respect to an acquisition of, or other business combination with, Countrywide or any other alternative transaction. Goldman Sachs noted that, pursuant to the terms of the private placement of Countrywide's 7.25% Series B Non−voting Convertible Preferred Stock to Bank of America in August 2007, Bank of America has the right to match third party proposals to acquire Countrywide. Goldman Sachs' opinion addresses only the fairness from a financial

32

Exhibit 3
204

Table of Contents

point of view, as of the date of the opinion, of the exchange ratio pursuant to the merger agreement. Goldman Sachs did not express any view on, and its opinion does not address, any other term or aspect of the merger agreement or the transaction contemplated by the merger agreement, including, without limitation, the fairness of the transaction contemplated by the merger agreement to, or any consideration received in connection therewith by, the holders of any other class of securities, creditors, or other constituencies of Countrywide or Bank of America, nor as to the fairness of the amount or nature of any compensation to be paid or payable to any of the officers, directors or employees of Countrywide or Bank of America, or class of such persons in connection with the transaction contemplated by the merger agreement, whether relative to the exchange ratio pursuant to the merger agreement or otherwise. In addition, Goldman Sachs did not express any opinion as to the prices at which shares of Bank of America common stock will trade at any time. Goldman Sachs' opinion is necessarily based on economic, monetary, market and other conditions as in effect on, and the information made available to it as of, the date of the opinion, including the recent dislocation in the mortgage market in particular and credit markets generally and the related uncertainty and risk regarding the extent and duration of this dislocation. Goldman Sachs assumed no responsibility for updating, revising or reaffirming its opinion based on circumstances, developments or events occurring after the date of its opinion. Goldman Sachs' opinion was approved by a fairness committee of Goldman Sachs.

Goldman Sachs and its affiliates are engaged in investment banking and financial advisory services, securities trading, investment management, principal investment, financial planning, benefits counseling, risk management, hedging, financing, brokerage activities and other financial and non-financial activities and services for various persons and entities. In the ordinary course of these activities and services, Goldman Sachs and its affiliates may at any time make or hold long or short positions and investments, as well as actively trade or effect transactions, in the equity, debt and other securities (or related derivative securities) and financial instruments (including bank loans and other obligations) of Countrywide, Bank of America and any of their respective affiliates or any currency or commodity that may be involved in the transaction contemplated by the merger agreement for their own account and for the accounts of their customers.

Goldman Sachs is acting as financial advisor to Countrywide in connection with the transaction contemplated by the merger agreement. In addition, Goldman Sachs has provided, and is currently providing, certain investment banking and other financial services to Countrywide and its affiliates, including having acted as dealer in various of Countrywide's unsecured and secured commercial paper programs, as lead or joint bookrunner or co-manager with respect to multiple public offerings of Countrywide's Medium Term Notes and Global Medium Term Notes, as financial advisor to Countrywide from May 2004 to May 2007, as co-manager with respect to a private placement of Countrywide's Subordinated Notes (aggregate principal amount of $1,300,000,000) in November 2006, as financial advisor with respect to a private placement of Countrywide's 7.25% Series B Non-voting Convertible Preferred Stock (aggregate principal amount of $2,000,000,000) to Bank of America in August 2007, and as a participant in certain of Countrywide's commercial paper backup facilities which were drawn on August 16, 2007 (aggregate principal amount of $11,500,000,000, of which $400,000,000 was funded by one of Goldman Sachs' affiliates). During the past two years, Goldman Sachs and its affiliates have received aggregate fees from Countrywide and its affiliates for services unrelated to the transaction of approximately $7 million. Goldman Sachs also acted as financial advisor to Bank of America in connection with its merger with FleetBoston Financial Corporation in April 2004. Goldman Sachs also may provide investment banking and other financial services to Countrywide, Bank of America and their respective affiliates in the future in connection with which it may receive compensation. Affiliates of Goldman Sachs also have co-invested with affiliates of Bank of America from time to time and may do so in the future.

Countrywide selected Goldman Sachs as its financial advisor because it is an internationally recognized investment banking firm that has substantial experience in transactions similar to the merger. Pursuant to a letter agreement, dated January 10, 2008, Countrywide engaged Goldman Sachs to act as its financial advisor in connection with the possible transaction with Bank of America. Pursuant to this letter agreement, Goldman Sachs is entitled to receive a fee of $12,750,000, of which $3,000,000 became payable upon execution of the merger agreement and the balance of which is contingent upon consummation of the merger. Countrywide has also agreed to reimburse Goldman Sachs for its reasonable expenses, including attorneys' fees and

33

Exhibit 3
205

Table of Contents

disbursements, and to indemnify Goldman Sachs against various liabilities, including certain liabilities under the federal securities laws.

*Sandler O'Neill.* Pursuant to a letter agreement dated January 9, 2008, Countrywide engaged Sandler O'Neill to act as its financial advisor in connection with a possible transaction with Bank of America. Pursuant to this letter agreement, Sandler O'Neill is entitled to receive a fee of $12,250,000, of which $2,000,000 became payable upon execution of the merger agreement, $1,000,000 became payable when Sandler O'Neill delivered its opinion to the Countrywide board of directors and the balance of which is contingent upon consummation of the merger. For the past two years, Sandler O'Neill received an aggregate of approximately $556,000 in fees for services performed for Countrywide and its affiliates. Sandler O'Neill is a nationally recognized investment banking firm whose principal business specialty is financial institutions. In the ordinary course of its investment banking business, Sandler O'Neill is regularly engaged in the valuation of financial institutions and their securities in connection with mergers and acquisitions and other corporate transactions.

Sandler O'Neill acted as financial advisor to Countrywide in connection with the proposed merger and participated in certain of the negotiations leading to the merger agreement. At the January 10, 2008 meeting at which Countrywide's board considered and approved the merger agreement, Sandler O'Neill delivered to the board its oral opinion, subsequently confirmed in writing that, as of such date, the merger consideration was fair to Countrywide's stockholders from a financial point of view. The full text of Sandler O'Neill's opinion is attached to this document as **Appendix C.** The opinion outlines the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken by Sandler O'Neill in rendering its opinion. The description of the opinion set forth below is qualified in its entirety by reference to the opinion. Countrywide stockholders are urged to read the entire opinion carefully in connection with their consideration of the proposed merger.

Sandler O'Neill's opinion speaks only as of the date of the opinion. The opinion is directed to Countrywide's board and speaks only to the fairness from a financial point of view of the merger consideration to Countrywide's stockholders. It does not address the underlying business decision of Countrywide to engage in the merger or any other aspect of the merger and is not a recommendation to any Countrywide stockholder as to how such stockholder should vote at the special meeting with respect to the merger or any other matter.

In connection with rendering its January 10, 2008 opinion, Sandler O'Neill reviewed and considered, among other things:

- the merger agreement;

- certain publicly available financial statements and other historical financial information of Countrywide that Sandler O'Neill deemed relevant;

- certain publicly available financial statements and other historical financial information of Bank of America that Sandler O'Neill deemed relevant;

- consensus earnings per share estimates for Countrywide for the years ending December 31, 2007 and 2008 as published by Institutional Brokerage Estimate Systems ("IBES") and reviewed with management of Countrywide;

- internal financial projections for Countrywide for the years ending December 31, 2007 through 2012 as prepared by and discussed with senior management of Countrywide;

- consensus earnings per share estimates for Bank of America for the years ending December 31, 2007 and 2008 and an estimated long−term growth rate as published by IBES and reviewed with senior management of Bank of America;

- the pro forma financial impact of the merger on Bank of America based on assumptions relating to transaction expenses, purchase accounting adjustments and cost savings as determined by the senior management of Bank of America;

34

Exhibit 3
206

Table of Contents

- the publicly reported historical price and trading activity for Countrywide's and Bank of America's common stock, including a comparison of certain financial and stock market information for Countrywide and Bank of America with similar publicly available information for certain other companies the securities of which are publicly traded;

- the financial terms of certain recent business combinations in the financial services industry, to the extent publicly available;

- the current market environment generally and the banking environment in particular; and

- such other information, financial studies, analyses and investigations and financial, economic and market criteria as Sandler O'Neill considered relevant.

Sandler O'Neill also discussed with certain members of senior management of Countrywide the business, financial condition, results of operations and prospects of Countrywide, including certain operating, liquidity, regulatory and other financial matters. Sandler O'Neill also held similar discussions with certain members of senior management of Bank of America regarding the business, financial condition, results of operations and prospects of Bank of America.

In performing its review, Sandler O'Neill relied upon the accuracy and completeness of all of the financial and other information that was available to it from public sources, that was provided by Countrywide and Bank of America or their respective representatives or that was otherwise reviewed by Sandler O'Neill and assumed such accuracy and completeness for purposes of rendering its opinion. Sandler O'Neill further relied on the assurances of management of Countrywide and Bank of America that they were not aware of any facts or circumstances that would make any of such information inaccurate or misleading. Sandler O'Neill was not asked to undertake, and did not undertake, an independent verification of any of such information and Sandler O'Neill did not assume any responsibility or liability for the accuracy or completeness thereof. Sandler O'Neill did not make an independent evaluation or appraisal of the specific assets (including any derivative claims brought on Countrywide's behalf against its officers and directors), the collateral securing assets or the liabilities (contingent or otherwise) of Countrywide or Bank of America or any of their subsidiaries, or the collectibility of any such assets, nor was Sandler O'Neill furnished with any such evaluations or appraisals.

Sandler O'Neill did not make an independent evaluation of the adequacy of the allowance for loan losses of Countrywide or Bank of America, nor did Sandler O'Neill review any individual credit files relating to Countrywide or Bank of America. Sandler O'Neill assumed, with Countrywide's consent, that the respective allowances for loan losses for both Countrywide and Bank of America were adequate to cover such losses and will be adequate on a pro forma basis for the combined entity.

Sandler O'Neill's opinion was necessarily based upon financial, economic, market and other conditions as they existed on, and could be evaluated as of, the date of its opinion. Sandler O'Neill assumed, in all respects material to its analysis that each party to the merger agreement would perform all of the material covenants required to be performed by such party under such agreements and that the conditions precedent in the merger agreement had not been waived. Sandler O'Neill also assumed that there had been no material change in Countrywide's and Bank of America's assets, financial condition, results of operations, business or prospects since the date of the last financial statements made available to them, that Countrywide and Bank of America would remain as going concerns for all periods relevant to its analyses, and that the merger would qualify as a tax–free reorganization for federal income tax purposes. Sandler O'Neill's opinion was approved by Sandler O'Neill's fairness opinion committee. Sandler O'Neill expressed no opinion as to the fairness of the amount or nature of the compensation to be received in the merger by Countrywide's officers, directors or employees or class of such persons, relative to the compensation to be received in the merger by any other stockholders of Countrywide. Sandler O'Neill expressed no opinion as to the legal, accounting, and tax advice Countrywide received relating to the merger agreement and the transactions contemplated by the merger agreement.

With respect to anticipated transaction costs, estimates of purchase accounting adjustments and expected cost savings and other information prepared by and/or reviewed with the senior management of Bank of America and used by Sandler O'Neill in its analyses, Bank of America's management confirmed to Sandler O'Neill that they reflected the best currently available estimates and judgments of such management with

35

Exhibit 3
207

Table of Contents

respect thereto, and Sandler O'Neill assumed that such performances would be achieved. Sandler O'Neill expressed no opinion as to such estimates and projections or the assumptions on which they were based. Those estimates and projections, as well as the other estimates used by Sandler O'Neill in its analysis, were based on numerous variables and assumptions which are inherently uncertain and, accordingly, actual results could vary materially from those set forth in such projections.

*Financial Analyses of Goldman Sachs and Sandler O'Neill.* The following is a summary of the material financial analyses prepared by Goldman Sachs and Sandler O'Neill in connection with rendering the opinions described above. The following summary, however, does not purport to be a complete description of the financial analyses performed by Goldman Sachs or Sandler O'Neill, nor does the order of analyses described represent relative importance or weight given to those analyses by Goldman Sachs or Sandler O'Neill. Some of the summaries of the financial analyses include information presented in tabular format. The tables must be read together with the full text of each summary and are alone not a complete description of the financial analyses. Except as otherwise noted, the following quantitative information, to the extent that it is based on market data, is based on market data as it existed on or before January 9, 2008, and is not necessarily indicative of current market conditions.

### Situation Overview

Goldman Sachs and Sandler O'Neill reviewed, based on discussions with Countrywide, certain sources of significant financial and operational distress on Countrywide over recent periods, including:

- significantly worsening credit performance

- deteriorating conditions in the mortgage market

- limited access to short term and unsecured sources of funding

- declining Prime, Alt−A and Subprime originations

- declining home price forecasts

Goldman Sachs and Sandler O'Neill also reviewed, based on discussions with Countrywide, certain events that contributed to an 89% decline from the historical high trading price of Countrywide common stock, including:

- earnings shortfalls and subsequent reductions in management guidance, resulting in a reduction of analyst earnings estimates, price targets and ratings

- Countrywide's inability to issue commercial paper, resulting in Countrywide's drawing down on its $11.5 billion credit facility to Countrywide on August 16, 2007, credit ratings downgrades by all three rating agencies on August 16, 2007 and by S&P on October 26, 2007, and the issuance of negative outlooks by rating agencies in October and November of 2007

- significant incremental loan loss provisions and negative marks−to−market with the potential for continuing value loss in Countrywide's balance sheet

- increased liquidity constraints and higher funding costs

- heightened litigation risk, the risk of additional negative rating agency action and insolvency rumors

In addition, Goldman Sachs and Sandler O'Neill reviewed numerous interrelated challenges identified by Countrywide that could cumulatively result in financial distress to Countrywide, including financial, liquidity and operational constraints, material risk of a ratings downgrade to non−investment grade, increased regulatory pressure, limited access to capital, litigation exposure, and general capital markets disruption. In view of these challenges and the several risks facing Countrywide, as well as the concern that these adverse events and others described above in "Background of the Merger" could continue and worsen, Countrywide management prepared for purposes of the financial analyses a set of illustrative projections for Countrywide for the years ending December 31, 2008 through 2013 that assumed a stress case scenario in which certain of these risks were in fact realized. The key assumptions under this scenario included limited growth in the originations

36

Exhibit 3
208

Table of Contents

market and diminishing market share for Countrywide, severe declines in housing price appreciation, increasing credit costs for 2008 and 2009, a below investment grade rating for 2008 and 2009 and the loss of all uninsured deposits. For purposes of the Goldman Sachs and Sandler O'Neill financial analysis, it was further assumed that, in the absence of a transaction with Bank of America, Countrywide would require additional capital and the analysis assumed a $1.5 billion common stock rights offering completed at the beginning of 2008 at a fifty percent discount to the then current Countrywide price per share of $5.12. The rights offering assumption was included in the analysis because Countrywide management was of the view that, in the absence of the transaction with Bank of America, it would likely be necessary for Countrywide to raise additional capital in order to maintain its business and that, as noted, any such capital–raising transaction would be on terms that would be highly unfavorable to Countrywide's existing shareholders. This internal stress case, dated January 9, 2008, which was prepared prior to the public announcement of the merger and has not been updated to take into account subsequent developments, was not prepared with a view towards public dissemination, was prepared in connection with the financial analyses and should not be viewed as indicative of actual future results. We refer to this scenario in this document as the "Stress Case". Goldman Sachs and Sandler O'Neill utilized the Stress Case in their analyses, including those described below under "— Discounted Cash Flow Analysis — Countrywide", because of the view of management and the board of directors of Countrywide that neither the publicly available analyst estimates nor management's prior estimates fully reflected the rapidly changing state of the market and continuing significant uncertainty and disruption in the mortgage industry generally and in Countrywide's operations specifically, including the significant worsening of conditions that accelerated in January of 2008. Among other things, these prior estimates generally reflected the assumption that Countrywide's fourth quarter of 2007 would be profitable and that Countrywide would continue to retain its investment–grade ratings. By January 10, 2008, however, management had concluded (and the board of directors was advised) that, due to continuing deterioration in real estate market and other conditions, Countrywide would likely experience a loss for the fourth quarter of 2007 and that, in the absence of a transaction with Bank of America, there was a substantial likelihood that Countrywide would suffer one or more rating agency downgrades to "non–investment–grade" status. The Stress Case also took into consideration the fact that certain of the risks discussed above, such as the risk of a ratings agency downgrade to "non–investment–grade" status, could, if realized, trigger the realization of other risks, such as a significant worsening of funding costs, the loss of uninsured deposits and the need to engage in a likely capital raising transaction involving substantial dilution to shareholders. The Stress Case was intended to reflect, based on the various assumptions listed above, the anticipated adverse impact on the mortgage industry and financial markets generally, and Countrywide's operations specifically, which, if realized, would result in adverse business, legal and regulatory conditions and negatively impacted financial results.

*Transaction Multiples Analysis*

Based upon the exchange ratio and the $38.74 closing market price of Bank of America common stock on January 9, 2008, Goldman Sachs and Sandler O'Neill calculated that each share of Countrywide common stock would be converted into Bank of America common stock with an implied market value of $7.06, representing a premium of 37.9% to the closing price of $5.12 of Countrywide common stock on January 9, 2008. Goldman Sachs and Sandler O'Neill also calculated the following multiples and percentage resulting from the implied value of the merger consideration:

- implied price as a multiple of Countrywide's estimated earnings per share, or EPS, for 2007, 2008 and 2009 based on median IBES estimates;

- implied price as a multiple of Countrywide's estimated EPS for 2007 based on the actual earnings for the first three quarters of 2007 and management's estimated EPS for the fourth quarter of 2007;

- implied price as a multiple of the Stress Case 2008 and 2009 EPS; and

- implied price as a percentage of Countrywide's tangible common equity as of September 30, 2007.

37

Exhibit 3
209

Table of Contents

The results of these analyses are summarized as follows:

| | Amount | Price as Multiple/Percentage |
|---|---|---|
| 2007 Estimated EPS | | |
| IBES | $ (1.12) | NM |
| Management | $ (1.35) | NM |
| 2008 Estimated EPS | | |
| IBES | $ 1.55 | 4.6x |
| Stress Case | $ (0.76) | NM |
| 2009 Estimated EPS | | |
| IBES | $ 2.64 | 2.7x |
| Stress Case | $ 0.73 | 9.7x |
| Tangible Common Equity | | |
| September 30, 2007 | $ 22.87 | 31% |

*Total Return Analysis — Countrywide*

Goldman Sachs and Sandler O'Neill reviewed the total returns (including reinvestment of dividends) of Countrywide common stock, the Standard & Poor's 500 Index and the common stock of the following selected banks for each of the periods beginning June 30, 2007, September 30, 2007, December 9, 2007 and January 2, 2008:

- Washington Mutual, Inc.

- Thornburg Mortgage, Inc.

- PHH Corporation

- Downey Financial Corp.

- IndyMac Bancorp, Inc.

- Flagstar Bancorp, Inc.

Although none of the selected banks is directly comparable to Countrywide, the banks included were chosen because they are publicly traded companies with operations that, for purposes of analysis, may be considered similar to certain operations of Countrywide.

The results of these analyses are summarized as follows:

| | Countrywide | S&P 500 Index | Range of Selected Banks |
|---|---|---|---|
| **Total Return Since** | | | |
| 6/30/2007 | (85.7)% | (5.3)% | (83.2)% – (47.4)% |
| 9/30/2007 | (72.8)% | (7.2)% | (79.7)% – (29.9)% |
| 12/9/2007 | (55.6)% | (6.2)% | (44.0)% – (20.4)% |
| 1/2/2008 | (43.1)% | (2.6)% | (27.5)% – (4.0)% |

*Selected Companies Analysis — Countrywide*

Goldman Sachs and Sandler O'Neill reviewed and compared certain financial information for Countrywide to corresponding financial information, ratios and public market multiples for the selected banks described under the "Total Return Analysis — Countrywide" above.

The multiples and ratios of the selected banks were based on market data as of January 9, 2008, financial data as of or for the period ended September 30, 2007 with no adjustments made for pending acquisitions and information obtained from SNL Financial. The multiples and ratios of Countrywide were calculated using both

38

Exhibit 3
210

Table of Contents

median IBES estimates and the Stress Case estimates. With respect to the selected banks and Countrywide, Goldman Sachs and Sandler O'Neill calculated:

- price as a percentage of tangible book value;

- price as a multiple of median IBES and Stress Case EPS for 2008 and 2009;

- price as a percentage of 52−week high and low share prices;

- dividend yield;

- the ratio of tangible equity to tangible assets (referred to as TE/TA);

- return on average equity for the last twelve months (referred to as LTM ROAE);

- return on average assets for the last twelve months (referred to as LTM ROAA); and

- net interest margin for the last twelve months (referred to as LTM NIM).

The results of these analyses are summarized as follows:

|  | Countrywide | | Selected Banks | |
| --- | --- | --- | --- | --- |
|  | IBES | Stress Case | Range | Median |
| Price as % of Tangible Book Value | 23% | 23% | 21% − 87% | 57% |
| Price/Estimated '08 EPS | 3.3x | NM | 7.9x − 15.7x | 9.6x |
| Price/Estimated '09 EPS | 1.9x | 7.0x | 3.7x − 13.9x | 8.1x |
| Price as % of 52−Week High | 11.3% | 11.3% | 10.7% − 52.1% | 32.6% |
| Price as % of 52−Week Low | 115.6% | 115.6% | 106.3% − 119.0% | 113.2% |
| Dividend Yield | 11.72% | 0.00% | 0.00% − 21.28% | 4.17% |
| TE/TA | 7.29% | 7.29% | 4.40% − 14.21% | 5.57% |
| LTM ROAE | 2.3% | 2.3% | (35.2)% − 11.5% | (0.9)% |
| LTM ROAA | 0.16% | 0.16% | (1.64)% − 0.87% | (0.05)% |
| LTM NIM | 1.62% | 1.62% | (3.20)% − 3.10% | 1.60% |

***Precedent Transactions Analysis***

Goldman Sachs and Sandler O'Neill analyzed certain publicly available financial information relating to 12 selected transactions involving the acquisition of mortgage lenders announced during the period from May 2005 through June 2007. The following is a list of those specified transactions:

**Acquiror / Seller**
- Lone Star Funds / Accredited Home Lenders
- C−BASS / Fieldstone Investment Corp.
- Barclays PLC / EquiFirst Corporation
- Merrill Lynch & Co. / First Franklin
- Morgan Stanley / Saxon Capital Inc.
- Deutsche Bank AG / MortgageIT Holdings Inc.
- RAIT Investment Trust / Taberna Realty Finance Trust
- Accredited Home Lenders / Aames Investment Corp.
- Fortress Investment Group LLC / Centex Corp.
- Wachovia Corp. / AmNet Mortgage Inc.
- Popular Inc. / E−LOAN Inc.
- New Century Financial Corp. / RBC Mortgage Company

While none of the transactions included in the precedent transactions analysis are directly comparable to the proposed merger, Goldman Sachs and Sandler O'Neill selected these transactions because each of the target companies in the selected transactions were involved in the mortgage lending business.

39

Exhibit 3
211

Table of Contents

For the selected transactions, Goldman Sachs and Sandler O'Neill reviewed, to the extent available:

- the multiple of the implied transaction price to the estimated earnings of the target for the fiscal year following the year in which the transaction was announced (FY1);

- the ratios of the implied transaction price to each of the stated common equity and the tangible common equity of the target, in each case based on the last publicly available financial statements of the target available prior to the announcement of the transaction; and

- the premium represented by the implied transaction price to the closing price per share of common stock of the target one trading day prior to the announcement of the transaction.

The results of these analyses are summarized as follows:

|  | High | Median | Low |
|---|---|---|---|
| Price/FY1 Earnings | 18.5x | 10.4x | 8.0x |
| Price/Stated Common Equity | 312% | 112% | 44% |
| Price/Tangible Common Equity | 313% | 123% | 44% |
| Premium (discount)/Market (1 day prior to announcement) | 47.1% | 5.4% | (14.6)% |

### Discounted Cash Flow Analysis — Countrywide

Goldman Sachs and Sandler O'Neill performed two illustrative discounted cash flow analyses to determine ranges of implied present values per share of Countrywide common stock. The illustrative terminal values were based upon multiples of share price to Stress Case earnings for 2009 and 2013, respectively. Goldman Sachs and Sandler O'Neill used discount rates ranging from 14% to 18%, reflecting estimates of Countrywide's weighted average cost of equity, Stress Case forecasts of Countrywide earnings per share, and terminal forward earnings multiples ranging from 4.0x to 9.0x.

Goldman Sachs and Sandler O'Neill assumed that the conversion price of Countrywide's 7.25% Series B Non-voting Convertible Preferred Stock would be reduced to $13.47 per share as a result of the rights offering described under "— Situation Overview" above. These analyses resulted in a range of implied present value per share of Countrywide common stock of $1.37 to $5.08 based on Stress Case earnings for 2009, and a range of $3.07 to $9.06 based on Stress Case earnings for 2013.

Using the same set of discount rates, terminal multiples and earnings, but assuming an issuance of Countrywide 10.0% convertible preferred stock with an aggregate principal amount of $1.5 billion and an assumed conversion price of $5.12 per share rather than the rights offering assumption described under "— Situation Overview," Goldman Sachs and Sandler O'Neill performed similar illustrative discounted cash flow analyses to determine ranges of implied present values per share of Countrywide common stock. In calculating the implied present values per share of Countrywide common stock, Goldman Sachs and Sandler O'Neill took into account the number of shares of common stock into which the newly issued convertible preferred stock described above would be convertible when the implied value per share was above $5.12. These analyses resulted in a range of implied present value per share of Countrywide common stock of $0.57 to $6.79 based on Stress Case earnings for 2009, and a range of $4.10 to $12.11 based on Stress Case earnings for 2013.

### Selected Companies Analysis — Bank of America

Goldman Sachs and Sandler O'Neill reviewed and compared certain financial information for Bank of America to corresponding financial information, ratios and public market multiples for the following publicly traded banks:

- Citigroup Inc.

- JPMorgan Chase & Co.

- Wells Fargo & Co.

- Wachovia Corp.

- U.S. Bancorp

40

Exhibit 3
212

Table of Contents

Although none of the selected banks is directly comparable to Bank of America, the banks included were chosen because they are publicly traded companies with operations that, for purposes of analysis, may be considered similar to certain operations of Bank of America.

The multiples and ratios of Bank of America and the selected banks were based on market data as of January 9, 2008, financial data as of or for the period ended September 30, 2007 with no adjustments made for pending acquisitions and information obtained from SNL Financial. With respect to the selected banks and Bank of America, Goldman Sachs and Sandler O'Neill calculated:

- price as a percentage of the tangible book value;

- price as a multiple of median IBES estimated earnings per share for 2007, 2008 and 2009;

- price as a percentage of 52−week high and low share prices;

- dividend yield;

- ratio of tangible equity to tangible assets (referred to as TE/TA);

- return on average equity for the last twelve months (referred to as LTM ROAE);

- the return on average assets for the last twelve months (referred to as LTM ROAA);

- net interest margin for the last twelve months (referred to as LTM NIM); and

- last twelve month efficiency ratio (referred to as LTM Efficiency).

The results of these analyses are summarized as follows:

|  | Bank of America | Selected Banks | |
|---|---|---|---|
|  |  | Range | Median |
| Price as % of Tangible Book Value | 272% | 176% − 477% | 223% |
| Price/Estimated '07 EPS | 11.1x | 9.0x − 18.0x | 11.3x |
| Price/Estimated '08 EPS | 8.7x | 7.4x − 10.5x | 8.9x |
| Price/Estimated '09 EPS | 7.9x | 6.8x − 9.8x | 8.1x |
| Price as % of 52−Week High | 71.5% | 49.5% − 78.8% | 71.2% |
| Price as % of 52−Week Low | 103.5% | 103.7% − 105.4% | 104.5% |
| Dividend Yield | 6.61% | 3.78% − 7.86% | 5.86% |
| TE/TA | 4.42% | 3.38% − 6.55% | 4.94% |
| LTM ROAE | 14.9% | 12.3% − 21.8% | 15.2% |
| LTM ROAA | 1.30% | 0.90% − 2.07% | 1.21% |
| LTM NIM | 2.64% | 2.38% − 4.82% | 3.00% |
| LTM Efficiency | 50.4% | 43.9% − 65.8% | 58.2% |

***Total Return Analysis — Bank of America***

Goldman Sachs and Sandler O'Neill reviewed the total returns (including reinvestment of dividends) of the Bank of America common stock, the Standard & Poor's Bank Index and the common stock of the five selected banks described under the "Selected Companies Analysis — Bank of America" above for each of the one, three and five-year periods ending January 9, 2008. Goldman Sachs and Sandler O'Neill also reviewed the total returns (including reinvestment of cash dividends) of the Bank of America common stock and the common stock of the selected banks for the 10 year period ending January 9, 2008.

41

Exhibit 3
213

Table of Contents

The results of these analyses are summarized as follows:

| | Bank of America | S&P Bank Index | Median of Selected Banks |
|---|---|---|---|
| **Total Return** | | | |
| 1 Year | (24.6)% | (40.5)% | (22.7)% |
| 3 Years | (2.0)% | (35.1)% | (5.9)% |
| 5 Years | 33.4% | (17.2)% | 30.1% |
| 10 Years | 83.4% | | 59.6% |

### Discounted Cash Flow Analysis — Bank of America

Goldman Sachs and Sandler O'Neill performed an illustrative discounted cash flow analysis to determine a range of implied present values per share of Bank of America common stock. The illustrative terminal values were based upon multiples of share price to estimated earnings for 2013. Goldman Sachs and Sandler O'Neill used discount rates ranging from 9% to 12%, reflecting estimates of Bank of America's weighted average cost of equity, forecasts of Bank of America earnings per share based on median IBES estimates for 2008, grown by the median IBES long–term growth rate of 7.5% thereafter, a ratio of tangible common equity to tangible assets of 4.3%, a dividend payout ratio of 46.0% and terminal earnings multiples ranging from 8.0x to 13.0x. This analysis resulted in a range of implied present value of $42.60 to $68.79 per share of Bank of America common stock (which, based on the exchange ratio in the merger of 0.1822, would result in a range of implied present value of the merger consideration of approximately $7.76 to $12.53 per share of Countrywide common stock).

Using the same set of projections, Goldman Sachs and Sandler O'Neill performed a sensitivity analysis to analyze the effect of a decrease in Bank of America's 2013 earnings by 5% to 25% assuming a constant terminal multiple of 10.1x. This analysis resulted in a range of implied present value of $41.06 to $56.78 per share of Bank of America common stock (which, based on the exchange ratio in the merger of 0.1822 per share of Countrywide, would result in a range of implied present value of the merger consideration of approximately $7.48 to $10.35 per share of Countrywide common stock).

### Pro Forma Analysis

Goldman Sachs and Sandler O'Neill prepared an illustrative pro forma analysis of the potential financial impact of the merger on Bank of America assuming a closing date of July 1, 2008 and using the estimated cost savings synergies and restructuring charges expected by Bank of America management to result from the merger as well as earnings estimates for Countrywide on a standalone basis prepared by Bank of America management, taking into account an assumed issuance of $2.0 billion of preferred stock with an effective dividend of 6.5% on an after–tax basis and an assumed annual dividend for Bank of America of $2.56 per share. This analysis indicated that the merger would be neutral to slightly dilutive to Bank of America in 2008 and accretive in 2009.

The preparation of a fairness opinion is a complex process involving subjective judgments as to the most appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances and is not necessarily susceptible to partial analysis or summary description. Selecting portions of the analyses or of the summary set forth above, without considering the analyses as a whole, could create an incomplete view of the process underlying the opinions of Goldman Sachs and Sandler O'Neill. In arriving at their fairness determinations, Goldman Sachs and Sandler O'Neill considered the results of all the analyses and did not attribute any particular weight to any factor or analysis considered by it. For example, with respect to the precedent transactions analysis described above, Goldman Sachs and Sandler O'Neill noted that certain of the multiples and ratios calculated for Countrywide and the proposed merger did not fall within the ranges derived for the selected transactions. They also noted, however, that the selected transactions were announced prior to the severe disruptions in the mortgage and capital markets beginning in August 2007, that a number of the precedent transactions did not have publicly–available multiples and that certain of the other merger ratios were within the ranges of the precedent transactions. Goldman Sachs and Sandler O'Neill made their determinations as to fairness on the basis of their experience and professional judgment after considering the

Exhibit 3
214

Table of Contents

results of all the analyses. No company or transaction used in the above analyses as a comparison is directly comparable to Countrywide, Bank of America or the contemplated merger.

Goldman Sachs and Sandler O'Neill prepared these analyses for the purposes of providing their opinions to the Countrywide board of directors as to the fairness from a financial point of view to the holders of Countrywide common stock of the exchange ratio of 0.1822 shares of Bank of America common stock to be received for each share of Countrywide common stock pursuant to the merger agreement. These analyses do not purport to be appraisals or necessarily reflect the prices at which businesses or securities actually may be sold. Accordingly, these analyses do not necessarily reflect the value of Countrywide's common stock or Bank of America's common stock or the prices at which Countrywide's or Bank of America's common stock may be sold at any time. Analyses based upon forecasts of future results are not necessarily indicative of actual future results, which may be significantly more or less favorable than suggested by these analyses. Because these analyses are inherently subject to uncertainty, being based upon numerous factors or events, including industry performance, business and economic conditions and various other matters, beyond the control of the parties or their respective advisors, none of Countrywide, Bank of America, Goldman Sachs, Sandler O'Neill or any other person assumes responsibility if future results are materially different from those forecast.

As described above, the opinions of Goldman Sachs and Sandler O'Neill to the Countrywide board of directors were two of a number of factors taken into consideration by the Countrywide board of directors in making its determination to approve the merger agreement and should not be viewed as determinative of the decision of Countrywide's board or management with respect to the merger. The foregoing summary does not purport to be a complete description of the analyses performed by Goldman Sachs and Sandler O'Neill in connection with the opinions and is qualified in its entirety by reference to the written opinions of Goldman Sachs and Sandler O'Neill attached as Appendix B and Appendix C to this document, respectively.

The merger consideration was determined through arms–length negotiations between Countrywide and Bank of America and was approved by Countrywide's board of directors. Goldman Sachs and Sandler O'Neill provided advice to Countrywide during these negotiations. Goldman Sachs and Sandler O'Neill did not, however, recommend any specific amount of consideration to Countrywide or its board of directors or that any specific amount of consideration constituted the only appropriate consideration for the merger.

The forward–looking financial information regarding Countrywide described above, including the Stress Case numbers, was prepared by Countrywide management and is the responsibility of Countrywide management. Neither Countrywide's nor Bank of America's independent auditors have compiled, examined, or performed any procedures with respect to this forward–looking financial information, nor have they expressed any opinion or any other form of assurance with respect thereto.

**Bank of America's Reasons for the Merger**

Bank of America's reasons for entering into the merger agreement include:

- Bank of America's understanding of the current environment in the financial services business, including the current outlook for the mortgage industry;

- Bank of America's assessment of Countrywide's business, assets, liability and business relationships;

- the unique opportunity presented to gain Countrywide's scale and management expertise in the mortgage industry; and

- the opportunity to acquire Countrywide's mortgage technology platform, including its extensive retail, wholesale and correspondent networks.

**Board of Directors and Management of Bank of America Following Completion of the Merger**

Upon completion of the merger, the current directors and officers of Bank of America are expected to continue in their current positions. Information about the current Bank of America directors and executive officers can be found in the documents listed under the heading "Bank of America SEC Filings" in the section entitled "Where You Can Find More Information" on page 80.

Exhibit 3
215

Table of Contents

### Public Trading Markets

Bank of America common stock trades on the NYSE under the symbol "BAC." Bank of America common stock is also listed on the London Stock Exchange, and certain shares are listed on the Tokyo Stock Exchange. Countrywide common stock trades on the NYSE under the symbol "CFC." Upon completion of the merger, Countrywide common stock will be delisted from the NYSE and deregistered under the Securities Exchange Act of 1934, as amended. The newly issued Bank of America common stock issuable pursuant to the merger agreement will be listed on the NYSE.

The shares of Bank of America common stock to be issued in connection with the merger will be freely transferable under the Securities Act of 1933, as amended, which we refer to as the Securities Act, except for shares issued to any stockholder who may be deemed to be an affiliate of Countrywide, as discussed in "The Merger Agreement — Resales of Bank of America Stock by Affiliates" on page 70.

### Bank of America's Dividend Policy

Bank of America currently pays a quarterly dividend of $0.64 per share. The Bank of America board of directors may change this dividend policy at any time, and the payment of dividends by financial holding companies is generally subject to legal and regulatory limitations.

### Countrywide Stockholders Do Not Have Dissenters' Appraisal Rights in the Merger

Appraisal rights are statutory rights that, if applicable under law, enable stockholders to dissent from an extraordinary transaction, such as a merger, and to demand that the corporation pay the fair value for their shares as determined by a court in a judicial proceeding instead of receiving the consideration offered to stockholders in connection with the extraordinary transaction. Appraisal rights are not available in all circumstances, and exceptions to these rights are provided under the Delaware General Corporation Law. As a result of one of these exceptions, the holders of Countrywide common stock are not entitled to appraisal rights in the merger.

### Regulatory Approvals Required for the Merger

Bank of America and Countrywide have each agreed to use reasonable best efforts to obtain all regulatory approvals required to complete the transactions contemplated by the merger agreement. These approvals include approvals from the Federal Reserve Board, state mortgage banking and insurance authorities, and various other federal, state and foreign regulatory authorities. Bank of America and Countrywide have completed, or will complete, the filing of applications and notifications to obtain the required regulatory approvals.

*Federal Reserve Board.* The merger is subject to approval by the Federal Reserve Board pursuant to Section 4 of the Bank Holding Company Act of 1956. Bank of America filed the required notification with the Federal Reserve Board for approval of the merger on February 15, 2008.

In order to approve the merger, the Federal Reserve Board must determine that the merger can reasonably be expected to produce benefits to the public that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices. As part of its evaluation of a proposal under these public interest factors, the Federal Reserve Board reviews the financial and managerial resources of Bank of America and Countrywide, the effect of the proposal on competition in the relevant markets, the record of the insured depository institution subsidiaries of Bank of America and Countrywide under the Community Reinvestment Act and other public interest factors. Each of the depository institution subsidiaries of Bank of America and Countrywide has received either an outstanding or a satisfactory rating in its most recent Community Reinvestment Act performance evaluation from its federal regulator. The Federal Reserve Board's review of these factors affects both its decision on the merger and the timing of that decision, as well as any conditions that might be imposed.

The Federal Reserve Board furnished a copy of the notification for approval of the merger to the Office of Thrift Supervision, which has 30 days to submit its views and recommendations to the Federal Reserve

Exhibit 3
216

Table of Contents

Board. A copy of the notice also was provided to the United States Department of Justice, or "DOJ," and the Federal Trade Commission, or "FTC," which will review the merger for adverse effects on competition. Furthermore, the Bank Holding Company Act and Federal Reserve Board regulations require published notice of, and the opportunity for public comment on, the notification submitted by Bank of America for approval of the merger, and authorize the Federal Reserve Board to hold a public hearing or meeting if the Federal Reserve Board determines that a hearing or meeting would be appropriate. The Federal Reserve Board published notification in the *Federal Register* on March 3, 2008. The Federal Reserve Board held public hearings on the notification submitted by Bank of America for approval of the merger in Chicago on April 22, 2008 and in Los Angeles on April 28–29, 2008. Any hearing, meeting or comments provided by third parties could prolong the period during which the notification is under review by the Federal Reserve Board.

*Department of Justice, Federal Trade Commission and Other Antitrust Authorities.* Because the merger involves activities that are not subject to review by the Federal Reserve Board under Section 4 of the Bank Holding Company Act, it is partially subject to the Hart–Scott–Rodino Antitrust Improvements Act of 1976, or the "HSR Act." The HSR Act and related rules prohibit the completion of transactions such as the merger unless the parties notify the FTC and the DOJ in advance. Bank of America and Countrywide filed the requisite HSR Act notification forms on February 25, 2008. The HSR Act further provides that a transaction or portion of a transaction that is notifiable under the Act, such as the merger, may not be consummated until the expiration of a 30 calendar–day waiting period, or the early termination of that waiting period, following the parties' filing of their respective HSR Act notification forms. If the DOJ or the FTC issues a Request for Additional Information and Documentary Material prior to the expiration of the waiting period, the parties must observe a second 30–day waiting period, which would begin to run only after both parties have substantially complied with the request for information, unless the waiting period is terminated earlier or extended with the consent of the parties.

At any time before or after the acquisition is completed, either the DOJ or FTC could take action under the antitrust laws in opposition to the merger, including seeking to enjoin the acquisition or seeking divestiture of substantial assets of Bank of America or Countrywide or their subsidiaries. Private parties also may seek to take legal action under the antitrust laws under some circumstances. Based upon an examination of information available relating to the businesses in which the companies are engaged, Bank of America and Countrywide believe that the completion of the merger will not violate U.S. antitrust laws. However, Bank of America and Countrywide can give no assurance that a challenge to the merger on antitrust grounds will not be made, or, if such a challenge is made, that Bank of America and Countrywide will prevail.

In addition, the merger may be reviewed by the state attorneys general in the various states in which Bank of America and Countrywide operate. While Bank of America and Countrywide believe there are substantial arguments to the contrary, these authorities may claim that there is authority, under the applicable state and federal antitrust laws and regulations, to investigate and/or disapprove the merger under the circumstances and based upon the review set forth in applicable state laws and regulations. There can be no assurance that one or more state attorneys general will not attempt to file an antitrust action to challenge the merger.

*Other Requisite Approvals, Notices and Consents.* Notifications and/or applications requesting approval must be submitted to various state regulatory authorities and self–regulatory organizations in connection with the change in control of certain businesses that are controlled by Countrywide. Notifications and/or applications requesting approval must be submitted to certain state mortgage banking and insurance authorities in connection with the change in control of Countrywide's licensed mortgage and insurance businesses. In addition, the change in control of Countrywide's registered broker–dealer subsidiaries is subject to review by the Financial Industry Regulatory Authority, or "FINRA." Bank of America and Countrywide have filed and submitted, or will shortly file and submit, all applications and notices required to be submitted to obtain these approvals and provide these notices.

*Certain Foreign Approvals.* Approvals also will be required from, and notices must be submitted to, certain foreign regulatory authorities in connection with the merger and the change in ownership of certain businesses that are controlled by Countrywide abroad. Bank of America and Countrywide have filed, or will

45

Exhibit 3
217

Table of Contents

shortly file, all applications and notices required to be submitted to obtain these approvals and any other approvals that may be required to complete the merger.

*Timing.* We cannot assure you that all of the regulatory approvals described above will be obtained and, if obtained, we cannot assure you as to the timing of any approvals, our ability to obtain the approvals on satisfactory terms or the absence of any litigation challenging such approvals. We also cannot assure you that the DOJ, the FTC or any state attorney general will not attempt to challenge the merger on antitrust grounds, and, if such a challenge is made, we cannot assure you as to its result.

Bank of America and Countrywide believe that the merger does not raise substantial antitrust or other significant regulatory concerns and that they will be able to obtain all requisite regulatory approvals on a timely basis without the imposition of any condition that would have a material adverse effect on Bank of America or Countrywide. The parties' obligation to complete the merger is conditioned upon the receipt of all required regulatory approvals. Bank of America is not required to agree to conditions or restrictions that would have a material adverse effect on either Countrywide or Bank of America, measured on a scale relative to Countrywide.

We are not aware of any material governmental approvals or actions that are required for completion of the merger other than those described above. It is presently contemplated that if any such additional governmental approvals or actions are required, those approvals or actions will be sought. There can be no assurance, however, that any additional approvals or actions will be obtained.

### Litigation Relating to the Merger

Several actions are pending in Delaware and California state and federal courts relating to the merger. Three such actions were filed in Delaware Chancery Court. On February 19, the Delaware Chancery Court consolidated those actions, and on February 25, lead plaintiffs filed a consolidated verified class action complaint against Countrywide, its directors, and Bank of America on behalf of a putative Countrywide stockholder class (the "Consolidated Delaware Action"). *In re Countrywide Corp. S'holders Litig.*, Consol. C.A. No. 3464–VCN (Del. Ch.). The complaint in the Consolidated Delaware Action alleges that Countrywide's directors breached their fiduciary duties of loyalty, good faith, due care, and candor in agreeing to the merger. Specifically, it alleges that the directors have discouraged competing bids by (i) granting Bank of America in connection with its $2 billion investment in a Countrywide non–voting convertible preferred security the right to match any acquisition offers for Countrywide, and (ii) agreeing to pay Bank of America $160 million if the merger were not to close in certain circumstances. It also alleges that the merger price is inadequate because (i) Countrywide's financial condition and general market conditions have allegedly improved since the merger agreement was executed, and (ii) it allegedly does not include the value (estimated by plaintiffs to be worth approximately $2 billion) of pending derivative claims against current and former Countrywide directors and officers (described below), and the merger's alleged benefit to Bank of America of allowing it to hold more than 10% of U.S. banking deposits nationwide. Plaintiffs allege that the directors agreed to the inadequate price to receive (a) indemnification that would allegedly protect them from liability on the existing derivative claims, and (b) allegedly large severance payments.

The complaint in the Consolidated Delaware Action also alleges that the directors filed a false and misleading S–4 registration statement on February 13, 2008 (the "Preliminary S–4"), that allegedly does not disclose (1) the Countrywide directors' view as to whether Bank of America's August 2007 investment in Countrywide affected the market for potential bidders; (2) the Countrywide directors' view on their potential liability in the pending derivative litigation; (3) that the fairness opinions that Countrywide's financial advisors provided to Countrywide's board are allegedly outdated because of Countrywide's improving financial condition and improving market conditions generally; (4) that the fairness opinions allegedly do not consider the derivative claims' value, the merger's synergies, or the positive developments in the mortgage market since January 10, 2008; (5) whether Countrywide's financial advisors performed a "premiums analysis" or "precedent transaction analysis" based on comparable–company transactions, which would allegedly show the merger consideration's inadequacy, as opposed to their allegedly misleading "transactions multiple analysis," which calculated the transaction premium based on Countrywide's stock price when it was allegedly severely

46

Exhibit 3
218

Table of Contents

depressed by anonymous bankruptcy rumors; and (6) Countrywide management's projections (other than the "stress case" scenario) on which its financial advisors relied, specifically whether management prepared or gave (or why it did not prepare or give) its advisors any "base-case" or "upside" projections against which to evaluate the merger consideration's fairness. In that regard, the complaint alleges that the Preliminary S–4 failed to disclose that the fairness opinions are largely based on unduly pessimistic "stress case" projections for Countrywide and does not present the range of values that would result from the use of a more optimistic set of projections. The complaint alleges that Countrywide's financial advisors wrongfully used the "stress case" projections to justify their fairness opinions to Countrywide's board. Plaintiffs seek (w) to require Countrywide's directors to undertake a process that will maximize stockholder value, (x) to enjoin the Countrywide stockholders' vote on the merger until that process is completed and complete disclosure is made, (y) unspecified damages caused by the defendants' alleged conduct, and (z) payment of reasonable attorneys' fees and expenses.

On February 25, 2008, the plaintiffs in the Consolidated Delaware Action filed a motion for expedited proceedings. On February 29, the Delaware Chancery Court entered a scheduling order agreed upon by the parties that provides for expedited discovery and briefing and a hearing on plaintiffs' motion for a preliminary injunction on May 20, 2008. On April 2, the court entered an amended scheduling order agreed upon by the parties rescheduling the hearing on plaintiffs' motion for a preliminary injunction for June 5, 2008.

On May 13, 2008, the plaintiffs filed a motion to preliminarily enjoin the Countrywide shareholders' vote on the merger until Countrywide and Bank of America make additional disclosures that plaintiffs contend are necessary to remedy the S–4's allegedly false and misleading statements, including, among other things, additional disclosures concerning the Background of the Merger and the Opinions of the Financial Advisors.

On May 27, 2008, the parties executed a Memorandum of Understanding ("MOU") that contains the terms on which they agreed in principle to settle the Consolidated Delaware Action. Under the terms of the MOU, the defendants agreed to make additional disclosures in this document as set forth in "The Merger — Background of the Merger" and "Opinions of Countrywide's Financial Advisors", and the plaintiffs agreed to withdraw their motion for a preliminary injunction. The parties also jointly agreed to prepare and present for the Court's approval a formal stipulation of settlement that would, among other things, (i) request for settlement purposes the conditional certification of the Consolidated Delaware Action as a class action on behalf of all Countrywide common stockholders from August 21, 2007 through the merger's consummation, and (ii) provide for the dismissal with prejudice of the Consolidated Delaware Action. The stipulation would further provide for the release of, among other things, all claims that the plaintiffs asserted or could have asserted against the defendants relating to the merger or the August 2007 investment agreement, but the release would exclude federal securities and ERISA claims not related to the merger or the August 2007 investment agreement, as well as the derivative claims brought on Countrywide's behalf in (i) *In re Countrywide Fin. Corp. Deriv. Litig.*, Lead Case No. 07–CV–06923–MRP (MANx) (C.D. Cal.); (ii) *In re Countrywide Fin. Corp. S'holder Deriv. Litig.*, Lead Case No. BC375275 (Cal. Super. Ct.); and (iii) *In re Countrywide Fin. Corp. Deriv. Litig.*, Case No. 07–cv–00372 (D. Del.), to the extent the claims in subpart (iii) are not related to the merger, the August 2007 investment agreement, this document, or any related disclosures. The parties further agreed in the MOU that (i) they will more fully describe the proposed settlement terms in a court–approved notice of settlement that will be distributed to the proposed class members; (ii) the settlement is not to be construed as an admission of any matter; and (iii) any award of plaintiffs' counsel's fees and expenses shall be determined by the Court or by the parties' agreement, subject to the Court's approval. The settlement reflected in the MOU is conditioned upon the Court's approval of the formal stipulation of settlement and its entry of a final order and judgment dismissing the Consolidated Delaware Action with prejudice.

Five actions relating to the merger are pending in California state and federal courts. First, on February 15, 2008, the lead Countrywide stockholder plaintiffs in an existing derivative action against current and former Countrywide directors and officers filed an amended complaint in the U.S. District Court for the Central District of California (the "California Federal Court") that asserts both derivative and class–action claims. The derivative claims against Angelo R. Mozilo, David Sambol, Jeffrey M. Cunningham, Robert J. Donato, Martin R. Melone, Robert T. Parry, Oscar P. Robertson, Keith P. Russell, Harley W. Snyder, Henry G. Cisneros,

47

Exhibit 3
219

Table of Contents

Michael E. Dougherty, Stanford L. Kurland, Carlos M. Garcia and Eric P. Sieracki allege (i) breaches of their fiduciary duties, (ii) gross mismanagement, (iii) corporate waste, (iv) insider trading under Cal. Corp. Code § 25402 and Section 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), (v) aiding and abetting breaches of fiduciary duty, (vi) violations of Exchange Act Section 10(b) and Rule 10b−5, (vii) violations of Exchange Act Section 20(a) as "controlling persons," and (viii) violations of Exchange Act Section 14(a) and Rule 14a−9 for making allegedly false or misleading proxy−statement disclosures. The claims on behalf of a putative Countrywide stockholder class against Countrywide's current directors and Bank of America allege that (a) the directors breached their fiduciary duties in agreeing to the merger and made false or misleading disclosures in the registration statement of which this document is a part; and (b) Bank of America aided and abetted the Countrywide directors' breaches of fiduciary duty. *In re Countrywide Fin. Corp. Deriv. Litig.*, Lead Case No. 07−CV−06923 − MRP (C.D. Cal.) (the "Arkansas Teachers Action").

Specifically, the complaint in the Arkansas Teachers Action alleges that the directors agreed to the merger at an inadequate price because they would allegedly receive indemnification from liability on plaintiffs' existing derivative claims. The derivative claims, in turn, are based on the directors' alleged mismanagement and sales of their Countrywide shares. In that regard, plaintiffs allege that the Countrywide defendants (i) allowed Countrywide to shift its lending practices to include subprime loans, without making adequate loan−loss reserves; (ii) inadequately controlled Countrywide's underwriting and credit−risk−exposure policies and practices; (iii) allowed Countrywide to file financial statements that were artificially inflated by understated loan−loss reserves, overstated loan−asset valuations, and ineffective hedges against mortgage−rate volatility that affected the value of Countrywide's mortgage−servicing rights and loans held for sale; (iv) compensated Mozilo and other senior executives disproportionately to Countrywide's performance; (v) permitted defendant Mozilo to alter his 10b5−1 plan that allowed him to sell his Countrywide shares; (vi) sold approximately $850 million of their Countrywide shares based on material, nonpublic information about Countrywide's deteriorating financial condition; and (vii) initiated a share−repurchase program under which several defendants sold their shares to Countrywide at artificially inflated prices. Plaintiffs allege that the consideration in the merger agreement does not incorporate the value to Countrywide of these derivative claims against its current and former officers and directors, and that neither Countrywide's current directors nor its financial advisors considered the derivative claims' value (if any) in, respectively, determining whether to approve the merger or forming their opinions regarding the fairness of the exchange ratio in the merger. Plaintiffs also allege that the merger would extinguish the derivative claims. Accordingly, plaintiffs request that the Court place the derivative claims in a constructive trust for the benefit of Countrywide's stockholders, or in the alternative, assign the claims to Countrywide's stockholders or enjoin the proposed merger and stockholder vote until the claims are resolved.

Plaintiffs in the Arkansas Teachers Action also allege that Countrywide's directors were conflicted when they approved the merger, which, plaintiffs assert, offers "no premium" to Countrywide stockholders. Plaintiffs allege that these conflicts include the alleged benefit to Countrywide directors, upon completion of the merger, from the potential extinguishment of the derivative claims against them and from their receipt of "millions in change−in−control premiums."

In addition, plaintiffs' class−action claims in the Arkansas Teachers Action allege that the Countrywide board breached its fiduciary duties by agreeing to the following terms in the merger agreement that allegedly discourage competing bids: (i) a "no−shop" clause that allegedly prevents Countrywide from soliciting other bids, (ii) a "no−talk" clause that allegedly prevents Countrywide from negotiating or discussing any competing proposals, (iii) a provision that requires Countrywide to submit the merger agreement to its stockholders' vote, and (iv) a termination−fee provision that requires Countrywide to pay Bank of America $160 million if the merger were not to close in certain circumstances. Plaintiffs also allege that the registration statement of which this document is a part is misleading because it allegedly does not disclose that (a) the merger's exchange ratio is based on Countrywide's value after its share price fell following the disclosure of the Countrywide defendants' alleged misconduct; (b) Countrywide did not provide its financial advisors with information to value the derivative claims; and (c) the merger consideration is artificially low because Countrywide's directors and Bank of America "have attempted to structure a transaction that they hope will not just deprive Lead Plaintiffs of 'standing' to prosecute the claims, but to eliminate the Individual Defendants' liability on those

48

Exhibit 3
220

Table of Contents

claims entirely." In addition to the relief described above regarding the merger and the derivative claims, the complaint also seeks
(1) disgorgement of the Countrywide defendants' stock–sale proceeds in an unspecified amount but including more than $848 million
from sales between 2004 and 2008; (2) restitution of the Countrywide defendants' compensation obtained from their alleged wrongful
conduct, in an unspecified amount but including compensation under Countrywide's 2005 Annual Incentive Plan and 2006 Equity
Incentive Plan; (3) rescission of the 2005 Annual Incentive Plan and 2006 Equity Incentive Plan; (4) disgorgement of the director
defendants' 2005–2007 compensation in an unspecified amount; (5) cancellation of the 2005–2007 stockholder votes electing the
director defendants; and (6) payment of reasonable attorneys' fees and expenses.

On February 15, 2008, plaintiffs in the Arkansas Teachers Action moved for expedited discovery and for a constructive trust and
preliminary injunction or, in the alternative a trial on their claims in advance of the completion of the proposed merger. In their motion,
plaintiffs asked the California Federal Court to place their derivative claims in a constructive trust for the benefit of Countrywide and its
current stockholders. On February 28, the defendants in the Arkansas Teachers Action cross–moved to enforce the mandatory stay
provision under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and, in addition, to stay the merger–related claims in
favor of the Consolidated Delaware Action. The California Federal Court held a hearing on plaintiffs' motion and defendants'
cross–motion on March 20, 2008. On March 28, 2008, the California Federal Court issued an order (1) staying the merger–related class
action claims in the Arkansas Teachers Action in favor of the Consolidated Delaware Action; (2) denying plaintiffs' motion for
constructive trust and preliminary injunction; and (3) denying plaintiffs' motion for expedited discovery, concluding that the PSLRA
mandates a stay of discovery in the Arkansas Teachers Action pending resolution of defendants' motion to dismiss.

In addition, on March 14, 2008, the Countrywide defendants in the Arkansas Teachers Action moved to dismiss all of the
derivative claims against them for failure to comply with Delaware demand requirements and failure to state a cause of action. On
May 14, 2008, the U.S. District Court for the Central District of California granted in part and denied in part that motion. Specifically,
the court excused the demand requirement with respect to all derivative claims except the claim for corporate waste based on the
Countrywide board's approval of compensation paid to Angelo Mozilo during the time period alleged in the complaint. The court also
denied the motion to dismiss the derivative claims for failure to state a claim or plead fraud with particularity under Rule 9(b) and the
Private Securities Litigation Reform Act, except that it dismissed (i) all claims against defendants Dougherty and Snyder, and (ii) the
insider–trading claim under Cal. Corp. Code § 25402 against all defendants.

As noted, there are four additional actions pending in California against Countrywide's directors and Bank of America relating to
the merger. First, the Countrywide stockholder plaintiffs in another existing derivative action, *In re Countrywide Fin. Corp. S'holder
Deriv. Litig.*, Lead Case No. BC375275 (the "Garber Action"), pending in the Superior Court of California (Los Angeles County) (the
"California State Court"), which asserted derivative claims similar to those asserted in the Arkansas Teachers Action, amended their
complaint on January 11 to add class claims relating to the merger similar to those set forth in the Arkansas Teachers Action and the
Consolidated Delaware Action. On January 22, 2008, with all defendants' consent, Bank of America removed the Garber Action to the
California Federal Court, which then remanded the Garber Action to the California State Court on February 22. On February 28, the
plaintiffs in the Garber Action made an ex parte application to the California State Court seeking expedited discovery and a prompt
injunction hearing and trial. On February 28, the California State Court ordered that discovery commence and tentatively scheduled a
trial and injunction hearing in the Garber Action for June 9, 2008, without prejudice to defendants' moving for a stay. On March 4,
2008, defendants in the Garber Action moved for a stay of the derivative claims in favor of the parallel derivative claims in the
Arkansas Teachers Action and for a stay of the class claims in favor of the Consolidated Delaware Action. At a hearing on March 17,
the California State Court issued its tentative ruling granting defendants' motion for a stay. At a hearing on March 26, the California
State Court reiterated its tentative ruling granting defendants' motion for a stay. On April 15, plaintiffs informed the California State
Court that they would submit to its tentative ruling granting a stay.

49

Exhibit 3
221

Table of Contents

The remaining three merger–related actions assert exclusively claims relating to the merger: *Adams, et al. v. Mozilo, et al.*, No. CV–08–00236 (MRP) (C.D. Cal.); *Feder, et al. v. Cunningham, et al.*, No. CV–08–00287 (MRP) (C.D. Cal.); and *Snyder, et al. v. Countrywide Fin. Corp., et al.*, No. BC 383840 (Superior Court of California, Los Angeles County). These three actions were filed between January 11 and January 14, 2008. All three actions (i) assert claims on behalf of a putative Countrywide stockholder class, (ii) challenge the merger as a breach of the Countrywide directors' fiduciary duties of care, good faith, candor, and loyalty, and (iii) claim that Bank of America aided and abetted the Countrywide directors' breaches of fiduciary duty. On January 15 and 16, with all defendants' consent, Bank of America removed each of these actions from the California State Court to the California Federal Court. Plaintiffs in the *Adams* and *Feder* cases subsequently consented to removal. On March 14, 2008, the California Federal Court remanded the *Snyder* case to the California State Court. Plaintiffs in *Adams*, *Feder*, and *Snyder* subsequently agreed to stays of their actions in favor of the Consolidated Delaware Action.

We believe that the plaintiff's complaints are available from the courts in which the complaints have been filed and, in certain cases, on the website of Bernstein Litowitz Berger & Grossman LLP, a plaintiff's law firm. Countrywide and Bank of America believe that all of these actions are without merit and intend to contest them vigorously. Upon consummation of the merger, the plaintiffs who have asserted derivative claims on behalf of Countrywide may lose standing to assert such claims on behalf of Countrywide because they will no longer be shareholders of Countrywide.

## Countrywide's Officers and Directors Have Financial Interests in the Merger

In considering the recommendation of the Countrywide board of directors that you vote to approve and adopt the merger agreement, you should be aware that some of Countrywide's executive officers and directors have financial interests in the merger that are different from, or in addition to, those of Countrywide's stockholders generally. The independent members of Countrywide's board of directors were aware of and considered these interests, among other matters, in evaluating and negotiating the merger agreement and the merger, and in recommending to the stockholders that the merger agreement be approved and adopted. For purposes of all of the Countrywide agreements and plans described below, the completion of the transactions contemplated by the merger agreement will constitute a change in control.

*Retention Arrangements.* In connection with entry into the merger agreement and a retention program previously implemented for other employees, Countrywide approved the grant of retention awards to David Sambol, Eric P. Sieracki, Ranjit M. Kripalani and Carlos M. Garcia who, along with Mr. Mozilo and Mr. Gissinger, are or were Countrywide's named executive officers at the time that versions of this Registration Statement were filed. Each of Messrs. Sambol, Sieracki, Kripalani and Garcia received a retention incentive payment on March 14, 2008 in respect of their annual bonus awards for Countrywide's 2007 fiscal year, and on February 1, 2008 were granted a cash–settled restricted stock unit award. These restricted stock units will vest as to 50% of the units granted on February 1, 2009, and 25% of the units granted on each of February 1, 2010 and February 1, 2011 and will otherwise have terms that are consistent with the cash–settled restricted stock units granted by Countrywide to certain employees in November 2007, including accelerated vesting in full on a change in control. Set forth below are the amount of the retention incentive payment and number of restricted stock units in respect of Countrywide common stock applicable to each of the four executive officers:

| Name | Retention Incentive Payments | Restricted Stock Units |
|---|---|---|
| David Sambol | $ 1,935,000 | 335,126 |
| Eric P. Sieracki | $ 1,500,000 | 148,945 |
| Ranjit M. Kripalani | $ 2,500,000 | 111,709 |
| Carlos M. Garcia | $ 1,450,000 | 148,945 |

For purposes of calculating severance benefits under Mr. Sambol's employment agreement with Countrywide and, with respect to Messrs. Sieracki, Kripalani and Garcia, under Countrywide's Change in Control Severance Plan, the retention incentive payments will be deemed the "bonus and/or incentive award" with

50

Exhibit 3
222

Table of Contents

respect to Countrywide's 2007 fiscal year. Mr. Gissinger was not granted any retention awards in connection with entry into the merger agreement. Rather, Mr. Gissinger participated in the initial phase of the retention program in November 2007 since he was not a named executive officer at that time. Pursuant to the retention program, Countrywide granted Mr. Gissinger 148,945 cash-settled restricted stock units (which are included in his total restricted stock unit award numbers described below) and a cash retention payment of $1,250,000, which was paid to Mr. Gissinger on March 14, 2008.

*Equity Compensation Awards and Deferred Equity Units.* The merger agreement provides that, upon completion of the merger, each then outstanding Countrywide stock option, stock appreciation right, restricted stock unit and deferred equity unit will be converted into a Bank of America stock option, stock appreciation right, restricted stock unit and deferred equity unit, respectively. In addition, upon completion of the merger, each then outstanding Countrywide restricted share will be converted into the right to receive the merger consideration (with the same terms as the Countrywide restricted shares, including transfer restrictions on stock consideration to the extent the Countrywide restricted shares do not vest and transfer restrictions do not lapse on the change in control). With limited exceptions, the terms of Countrywide's equity compensation plans and the applicable award agreements provide that upon a change in control of Countrywide unvested stock options, stock appreciation rights, restricted stock units, deferred equity units and shares of restricted stock will vest in full. Based on Countrywide equity compensation holdings as of April 1, 2008, and assuming a closing date of July 1, 2008, upon completion of the merger, (1) the number of unvested stock options and stock appreciation rights to acquire shares of Countrywide common stock (at exercise prices ranging from $32.73 to $38.58 and, with respect to 2,358,491 of Mr. Mozilo's stock appreciation rights, with an exercise price of $6.22) held by each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger, the eight other Countrywide executive officers (as a group), and the seven non-employee directors (as a group), that would vest are 3,203,088, 608,308, 130,986, 95,491, 130,986, 117,232, 480,969 and 0, respectively; (2) the number of unvested restricted stock units in respect of shares of Countrywide common stock held by each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger and the eight other Countrywide executive officers (as a group), and the seven non-employee directors (as a group) that would vest upon completion of the merger are 1,039,082, 1,878,300, 186,556, 127,830, 170,437, 170,437, 622,059 and 0, respectively, and the number that would not vest upon completion of the merger, but would vest upon a subsequent qualifying termination of employment (or otherwise in accordance with the terms of the restricted stock unit grant) are 0, 0, 321,544, 241,158, 321,544, 321,544, 1,288,108 and 0, respectively; (3) the number of shares of deferred equity units held by each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger, the eight other Countrywide executive officers (as a group) and the seven non-employee directors (as a group), that would vest are 0, 0, 0, 0, 0, 0, 0 and 106,107, respectively; and (4) the number of shares of restricted Countrywide common stock held by each of Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia, Gissinger, the eight other Countrywide executive officers (as a group) and the seven non-employee directors (as a group), that would vest and become free of restrictions are 0, 0, 0, 0, 0, 0, 15,822 and 141,476, respectively.

*Employment Agreements.* Countrywide has previously entered into employment agreements with each of Angelo R. Mozilo and David Sambol.

*Mozilo Employment Agreement — Waiver of Cash Severance and Other Payments.* Pursuant to a letter agreement entered into with Countrywide on January 25, 2008 (the "waiver letter"), Mr. Mozilo agreed to waive his entitlement to the cash severance and pro rata bonus payments described below upon a qualifying termination of his employment following completion of the merger. Such cash payments would have equaled approximately $36.4 million.

Mr. Mozilo's employment agreement provides for the payment of certain severance benefits in the event of a termination of his employment by Countrywide without "cause" (as defined in the agreement) or by Mr. Mozilo for "good reason" (as defined in the agreement, which includes a termination by Mr. Mozilo for any reason during the two-year period following a change in control), in either case following a change in control of Countrywide or during a six-month protected period prior to a change in control. In the event of a qualifying termination as described above, Mr. Mozilo would be entitled to receive a lump sum cash severance payment equal to three times the sum of (1) his base salary and (2) the greater of (A) the average bonus payable to him for the two fiscal years preceding the year in which termination occurs and (B) the bonus paid

Exhibit 3
223

Table of Contents

to him for the fiscal year preceding the change in control. In addition, upon a termination of his employment without cause or for good reason (whether or not in connection with a change in control), Mr. Mozilo would be entitled to receive a pro−rata portion of any annual incentive bonus that became earned based on Countrywide's performance for the year in which the termination occurred. As noted above, pursuant to the waiver letter, Mr. Mozilo waived his right to receive the cash severance and pro rata bonus payments if he experiences a qualifying termination following completion of the merger.

Under the terms of Mr. Mozilo's employment agreement, upon a termination of his employment without cause or for good reason (whether or not in connection with a change in control), Mr. Mozilo is still entitled to receive (1) full vesting of any outstanding performance−based restricted stock units and stock appreciation rights granted as part of his annual equity awards (which are more fully described below and which vest, in any event, upon a change in control), (2) continued coverage for Mr. Mozilo and his family under Countrywide's health and life insurance plans for up to three years and (3) pro−rata vesting of the outstanding restricted stock units granted to Mr. Mozilo under his employment agreement in connection with his agreement to remain Countrywide's Chief Executive Officer (which restricted stock units vest, in any event, on a pro−rata basis upon a change in control). Assuming that the merger is completed on July 1, 2008 and Mr. Mozilo experiences a qualifying termination of employment immediately thereafter, the value of the continued health and life benefits to be provided to Mr. Mozilo and his family is approximately $21,084.

In the event that Mr. Mozilo becomes subject to the excise tax under Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code"), his employment agreement generally provides for an additional payment to him such that he will be placed in the same after−tax position as if no such excise tax had been imposed, unless the payments exceed the limit on parachute payments by less than the greater of 10% or $100,000, in which case Mr. Mozilo's payments and benefits will be reduced to the minimum extent necessary so that no portion of the payments are subject to the excise tax.

Pursuant to his employment agreement, upon termination of his employment for any reason other than for "cause," Mr. Mozilo and his spouse are entitled to medical coverage for each of their respective lives (which, when combined with Medicare coverage, will be substantially similar to the coverage provided prior to termination of Mr. Mozilo's employment). Assuming that the merger is completed on July 1, 2008 and Mr. Mozilo experiences a qualifying termination of employment immediately thereafter, the value of the continued medical benefits to be provided to Mr. Mozilo and his spouse is approximately $85,000.

In addition, Mr. Mozilo's employment agreement subjects him to an ongoing confidentiality obligation and a 24−month post−employment (or, if later, post−directorship) non−solicitation and non−interference covenant with respect to Countrywide's employees, customers and material business relationships. Assuming that the merger is completed on July 1, 2008 and Mr. Mozilo experiences a qualifying termination of employment immediately thereafter, the aggregate value of the cash severance and other benefits that would be payable to Mr. Mozilo is approximately $106,084. Assuming the merger is completed on July 1, 2008, the aggregate cash value of the stock−based awards held by Mr. Mozilo that would vest upon completion of the merger, based on the closing price of Bank of America's common stock as of May 27, 2008 (which amount attributes no value to unvested stock options and SARs other than those SARs with an exercise price of $6.22, since all such other options and SARs are underwater based on the May 27, 2008 closing price of Bank of America's common stock), is approximately $6,482,705.

*Mozilo Consulting Agreement — Waiver.* Mr. Mozilo's employment agreement provides that, pursuant to a consulting agreement by and between Mr. Mozilo and Countrywide, following his termination of employment and service as the non−executive chairman, he would serve as a consultant to Countrywide until February 28, 2011 and receive during such period consulting fees of $400,000 and perquisites (consisting of office space and secretarial support, use of Countrywide's private jet for business purposes, financial consulting services and payment of country club dues). Pursuant to the waiver letter, Mr. Mozilo and Countrywide agreed that the consulting agreement will be terminated in connection with the merger. Accordingly, upon his termination of employment and service as a director following the consummation of the merger, Mr. Mozilo will not be entitled to receive the consulting fees and perquisites provided under the consulting agreement and will not be required to serve as a consultant to Countrywide.

52

Exhibit 3
224