# EXHIBIT 3
# Part 2

Table of Contents

*Sambol Employment Agreement.* Under the terms of Mr. Sambol's employment agreement, in the event of a termination of Mr. Sambol's employment by Countrywide without "cause" or by Mr. Sambol for "good reason" (as each term is defined in the agreement), in either case following a change in control of Countrywide, Mr. Sambol will become entitled to certain payments and benefits under the agreement. In the event of a qualifying termination as described above, Mr. Sambol will be entitled to receive a lump sum cash severance payment equal to three times the sum of (1) his base salary and (2) the greater of (A) the average bonus payable to him for the two fiscal years preceding the year in which termination occurs and (B) the bonus paid to him for the fiscal year preceding the change in control. Mr. Sambol is also entitled to receive full vesting of any outstanding performance–based restricted stock units and stock appreciation rights granted as part of his annual equity awards (which are more fully described below and which vest, in any event, upon a change in control) and continued coverage under Countrywide's health and life insurance plans for a period of up to three years. Assuming that the merger is completed on July 1, 2008 and Mr. Sambol experiences a qualifying termination of employment immediately thereafter, the amount of cash severance that would be payable to Mr. Sambol is approximately $15 million and the value of the continued health and life benefits to be provided to Mr. Sambol is approximately $46,493. Assuming that the merger is completed on July 1, 2008 and Mr. Sambol experiences a qualifying termination of employment immediately thereafter, the aggregate value of the cash severance and other severance benefits that would be payable to Mr. Sambol is approximately $15,023,993. Assuming the merger is completed on July 1, 2008, the aggregate cash value of the stock–based awards held by Mr. Sambol that would vest upon completion of the merger, based on the closing price of Bank of America's common stock as of May 27, 2008 (which amount includes the value of his retention award and attributes no value to any unvested stock options and SARs, since all such options and SARs are underwater based on the May 27, 2008 closing price of Bank of America's common stock), is approximately $11,693,871.

In the event that Mr. Sambol becomes subject to the excise tax under Section 4999 of the Code, his employment agreement generally provides for an additional payment to him such that he will be placed in the same after–tax position as if no such excise tax had been imposed, unless the payments exceed the limit on parachute payments by less than the greater of 10% or $100,000, in which case Mr. Sambol's payments and benefits will be reduced to the minimum extent necessary so that no portion of the payments are subject to the excise tax.

Countrywide may condition the payment of termination amounts and benefits to Mr. Sambol upon his delivery of a full release of claims in form and substance satisfactory to the board of directors of Countrywide. In addition, pursuant to his employment agreement, Mr. Sambol is subject to an ongoing confidentiality obligation, a 12–month post–employment non–competition covenant and a 12–month post–employment non–solicitation covenant with respect to Countrywide's employees and customers.

As discussed below, upon completion of the merger, Mr. Sambol's employment agreement will be superseded by a new retention agreement with the Merger Sub. The retention agreement will provide Mr. Sambol with a retention account that becomes vested and payable over two years in lieu of cash severance payments Mr. Sambol would have been entitled to receive under his employment agreement in the event of certain qualifying terminations following a change in control of Countrywide. The retention agreement will also provide certain other benefits in the event of certain qualifying terminations consistent with those provided under his current employment agreement. As a result, Mr. Sambol will not receive any payments or benefits under his current employment agreement following completion of the merger. On May 28, 2008 Bank of America announced that Mr. Sambol will retire after assisting with the transition and closing of the merger. His termination of employment will be treated as a termination without cause and he will be eligible to receive the payments and benefits under his retention agreement. Mr. Sambol's retention agreement is discussed in more detail below in "— Arrangements with Bank of America."

*Change in Control Severance Plan.* Countrywide's twelve other executive officers, including Messrs. Sieracki, Kripalani, Garcia and Gissinger, are not party to employment agreements with Countrywide, but are covered by Countrywide's Change in Control Severance Plan. Pursuant to the Change in Control Severance Plan, if, during the 24–month period following a change in control, Countrywide terminates an eligible executive's employment without "cause" or the executive resigns for "good reason" (as each term is

53

Exhibit 3
225

Table of Contents

defined in the Plan), the executive will be entitled to receive cash severance payments equal to three times the sum of (1) the executive's annual base salary and (2) the higher of (A) the average annualized bonus paid to the executive during the two fiscal years preceding the year of the executive's termination of employment or (B) the most recent annual bonus paid to the executive prior to the change in control. Assuming that the merger is completed on July 1, 2008 and the executive experiences a qualifying termination of employment immediately thereafter, the amount of cash severance that would be payable to each of Messrs. Sieracki, Kripalani, Garcia and Gissinger and the eight other executive officers (as a group), respectively, is approximately $6.7 million, $13.7 million, $9 million, $7.2 million and $29.6 million. Upon a qualifying termination, the executive will also be entitled to certain benefits, including the continuation of health care benefits, outplacement and financial planning services, and service credit (or the value thereof) under certain company retirement plans, in each case for three years. Assuming that the merger is completed on July 1, 2008 and the executive experiences a qualifying termination of employment immediately thereafter, the value of continued benefits to be provided to each of Messrs. Sieracki, Kripalani, Garcia and Gissinger and each of Countrywide's eight other executive officers (as a group) respectively, is approximately $135,380, $206,596, $228,367, $210,494 and $1,402,083.

Assuming that the merger is completed on July 1, 2008 and the executive experiences a qualifying termination of employment immediately thereafter, the aggregate value of the cash severance and other severance benefits and the equity awards (other than those that would vest solely due to the completion of the merger as described in the next sentence) based on the closing price of Bank of America's common stock as of May 27, 2008 that would vest or be payable to each of Messrs. Sieracki, Kripalani, Garcia, Gissinger and each of Countrywide's eight other executive officers (as a group), respectively, is approximately $8,815,990, $15,426,929, $11,251,044, $9,437,619 and $39,057,434. Assuming the merger is completed on July 1, 2008, the aggregate cash value of the stock−based awards held by each of Messrs. Sieracki, Kripalani, Garcia, Gissinger and each of Countrywide's eight other executive officers (as a group), respectively, that would vest solely due to the completion of the merger, based on the closing price of Bank of America's common stock as of May 27, 2008 (which amount includes the value of the retention awards and attributes no value to any unvested stock options and SARs, since all such options and SARs are underwater based on the May 27, 2008 closing price of Bank of America's common stock), is approximately $1,161,458, $795,843, $1,061,104, $1,061,104 and $3,971,301.

In addition, in the event that any of the executive officers becomes subject to the excise tax under Section 4999 of the Code, the Plan generally provides for an additional payment to the executive officer such that he or she will be placed in the same after−tax position as if no such excise tax had been imposed, unless the executive officer's payments exceed the limit on parachute payments by less than the greater of 10% or $100,000, in which case payments and benefits will be reduced to the minimum extent necessary so that no portion of the payments are subject to the excise tax.

*Nonqualified Deferred Compensation and Supplemental Retirement Plans.* Countrywide maintains the following nonqualified deferred compensation and supplemental retirement plans in which its executive officers are eligible to participate: the Countrywide Financial Corporation Supplemental Executive Retirement Plan, the Countrywide Financial Corporation Executive Contribution Account Plan, the Countrywide Financial Corporation Amended and Restated Deferred Compensation Plan and the Countrywide Financial Corporation Supplemental Savings and Investment Deferred Compensation Plan.

Pursuant to the terms of the Supplemental Executive Retirement Plan, participants vest in, and are entitled to a lump sum distribution of, their accounts within 60 days following the consummation of a change in control. Four executive officers, including Mr. Mozilo, are fully vested in their benefits under this plan, although the merger may result in the acceleration of the payment of their benefits. Six executive officers, including Messrs. Sambol, Sieracki and Garcia, will both vest in and be paid their benefits under this plan as a result of the merger. Four executive officers, including Messrs. Kripalani and Gissinger, do not participate in this plan.

Pursuant to the terms of the Executive Contribution Account Plan, participants vest in full in their benefits upon consummation of a change in control. Four executive officers, including Messrs. Kripalani and Gissinger,

54

Exhibit 3
226

Table of Contents

will vest in their benefits under the Executive Contribution Account Plan as a result of the merger. None of the other executive officers, including Messrs. Mozilo, Sambol, Sieracki and Garcia, participate in this plan.

Pursuant to the terms of the Amended and Restated Deferred Compensation Plan, participants vest in full in their benefits upon consummation of a change in control. Six executive officers, including Messrs. Mozilo and Gissinger, are fully vested in their benefits under this plan, and, accordingly the merger will not result in the accelerated vesting of their benefits. Five executive officers, including Messrs. Sambol, Sieracki and Garcia, will vest in their company matching contributions under this plan as a result of the merger. None of Countrywide's other executive officers, including Mr. Kripalani, participate in this plan.

Pursuant to the terms of the Supplemental Savings and Investment Deferred Compensation Plan, participants vest in full in their company contribution accounts upon a termination of their employment without "cause" during the two—year period following a change in control. Messrs. Mozilo, Sambol, Sieracki, Kripalani, Garcia and Gissinger do not participate in this plan. Only one executive officer participates in this plan, and he is fully vested in his benefits under this plan.

*Senior Management Incentive Plan.*  Countrywide maintains the Countrywide Financial Corporation Senior Management Incentive Plan in which six of Countrywide's executive officers, but none of its named executive officers, participate. Participants in the Senior Management Incentive Plan are eligible to receive annual cash and restricted stock bonus awards. Pursuant to the terms of this plan, in the event of a change in control, (1) earned but unpaid awards for the calendar year preceding the year of such change in control (the "Guaranteed Payment Year") must be paid within ten days of the change in control (due to the expected timing of the merger, this provision is not relevant), (2) earned but unpaid awards for the calendar year in which the change in control occurs must be paid no later than the last day of the month during which Countrywide historically pays awards and must be at least equal to the award paid to the participant for the Guaranteed Payment Year (participants must be employed as of the end of the calendar year in which the change in control occurs to receive payment) and (3) in the event a participant is eligible for a benefit under the Change in Control Severance Plan prior to the end of the calendar year in which the change in control occurs, the participant is entitled to a pro–rata cash award based on the award earned by the participant for the Guaranteed Payment Year, payable within ten days of termination of the participant's employment. Assuming that the merger is completed on July 1, 2008 and the applicable executive experiences a qualifying termination of employment entitling him or her to benefits under the Change in Control Severance Plan immediately thereafter, the pro–rata bonus (based upon the bonuses earned by the executives for 2007) that would be payable to the six executive officers who participate in the plan, as a group, is $1,106,500.

*Director Charitable Matching Program.*  Countrywide maintains the Countrywide Financial Corporation Director's Charitable Award Program in which its current and former directors are eligible to participate (the program was frozen to new participants in June 2007). Pursuant to this program, Countrywide contributes $200,000 to the charity or charities of a director's choice for each year of his service with Countrywide (up to $1 million in total per director). A director fully vests in his or her benefit under the program (i.e., is deemed to have completed five years of service) upon a change in control, and the program becomes irrevocable for all participating directors (and former vested directors) upon such change in control. Messrs. Melone and Russell will vest in the remaining 20% of their benefit (i.e., an additional $200,000 donation on their behalf) and Mr. Parry will vest in the remaining 40% of his benefit (i.e., an additional $400,000 donation on his behalf) as a result of the merger. All other current directors are already fully vested in their benefits under this program.

*Protection of Countrywide Directors and Officers Against Claims.*  Bank of America has agreed to cause the surviving corporation in the merger to indemnify and hold harmless each present and former director and officer of Countrywide from liability for matters arising at or prior to the completion of the merger to the fullest extent provided by applicable law. Bank of America also has agreed that it will maintain in place existing indemnification and exculpation rights in favor of Countrywide directors, officers and employees for six years after the merger and that it will maintain Countrywide's current policy of directors' and officers' liability insurance coverage, or an equivalent replacement policy for the benefit of Countrywide directors and officers, for six years following completion of the merger, except that Bank of America is not required to

55

Exhibit 3
227

Table of Contents

incur annual premium expense greater than 250% of Countrywide's current annual directors' and officers' liability insurance premium.

*Arrangements with Bank of America.* Merger Sub and Mr. Sambol have entered into a retention agreement regarding the terms of his employment following completion of the merger to supersede and replace his current employment agreement with Countrywide. In addition, certain other executive officers including Mr. Gissinger have entered into new retention agreements with Merger Sub that replace their right to participate in Countrywide's Change in Control Severance Plan. As of the date hereof, other than with respect to the retention agreements with Merger Sub, no discussions have occurred between members of Countrywide's current management and representatives of Bank of America, although certain other members of Countrywide's management team may enter into these types of arrangements with Bank of America. Any new arrangements are currently expected to be entered into on or prior to completion of the merger and would not become effective until after the merger is completed.

*Sambol Retention Agreement.* Mr. Sambol has entered into a retention agreement with the Merger Sub that becomes effective upon the completion of the merger. The retention agreement will supersede and replace Mr. Sambol's current employment agreement with Countrywide, and will provide for post–closing compensation arrangements, including a retention account and limited severance benefits.

The retention agreement sets forth the key components of Mr. Sambol's 2008 compensation, which compares to the compensation provided under his current employment agreement as follows:

| Feature | Retention Agreement | Current Employment Agreement |
|---|---|---|
| Annual base salary | $500,000 | $1,400,000 |
| Annual incentive award (target) | $4,000,000 A portion of this award may be delivered as a restricted stock award | $3,870,000 |
| Annual equity award (target) | 150,000 options with respect to Bank of America common stock; a portion of the stock options may be granted as restricted stock, based on a conversion methodology | $9,000,000; 50% provided as restricted stock units and 50% as stock appreciation rights |

The actual annual incentive award and stock option award under the retention agreement will be determined following the end of 2008 based on a review of Mr. Sambol's performance, and could be more or less than the target level based on that review. Mr. Sambol's annual equity awards will be subject to the same terms and conditions, including vesting conditions, applicable to similarly situated Bank of America senior managers.

The retention agreement provides Mr. Sambol with certain fringe benefits while he remains employed, but not beyond December 31, 2009, which is the end of the term under his current employment agreement. These fringe benefits, which are the same fringe benefits provided for under his current employment agreement, include use of a company–provided car (or car allowance), country club dues and financial consulting services. In addition, under his current employment agreement and a Countrywide security policy, Mr. Sambol currently has access to use of a company–provided aircraft for both business and personal travel. Under the retention agreement, he would continue to have access to a company–provided aircraft for such purposes while he remains employed, but not beyond December 31, 2009; however, the number of hours available for personal use would be limited.

The retention agreement provides for the establishment of an unfunded retention account for Mr. Sambol in the amount of $20 million. The retention account replaces the cash severance payments otherwise provided for under Mr. Sambol's current agreement for certain qualifying terminations following a change in control of Countrywide. The retention account becomes vested and payable to Mr. Sambol in two equal installments on each of the first and second anniversaries of the completion of the merger, with interest credited each month through the date of vesting at a rate based on one year treasury bill yields. Any unvested portion of the

56

Exhibit 3
228

Table of Contents

account will be immediately vested and paid in case of termination of employment due to death or disability. If Mr. Sambol's employment is terminated without "cause" or if he resigns for "good reason," any unvested portion of the account will continue to vest and be paid pursuant to the two–year vesting schedule, provided that he complies with certain covenants not to compete, not to solicit customers or employees and to preserve the confidentiality of certain company information. Any unvested portion of the account will be immediately forfeited in case of any other termination of employment, including a termination for "cause" or resignation without "good reason."

In addition, upon completion of the merger, Mr. Sambol will receive a one–time restricted stock unit award from Bank of America with a grant date value of $8 million, vesting in three equal annual installments beginning on the first anniversary of the closing date. Any unvested portion of the award will be immediately vested and paid in case of termination of employment due to death or disability. If Mr. Sambol's employment is terminated without "cause" or if he resigns for "good reason," any unvested portion of the award will continue to vest and be paid pursuant to the three–year vesting schedule, provided that he complies with certain covenants not to compete, not to solicit customers or employees and to preserve the confidentiality of certain company information. Any unvested portion of the award will be immediately forfeited in case of any other termination of employment, including a termination for "cause" or resignation without "good reason."

Mr. Sambol's current employment agreement includes the right to continuation of certain life and health insurance benefits for up to three years following termination of employment, if, on or before December 31, 2009, his employment is terminated without "cause" or he resigns for "good reason." The retention agreement continues to provide for this benefit.

For purposes of the retention agreement, "cause" is the same definition as in his current employment agreement, but "good reason" is limited to a post–merger reduction in base salary or annual incentive/equity award opportunity, an office relocation or an adverse change in title. This replaces the definition of "good reason" in his current employment agreement, which is a much broader definition that would likely have been triggered following the merger.

In addition, Mr. Sambol will be entitled to receive a gross up payment for "excess parachute payments" under terms identical to those provided in his current employment agreement. In the event that Mr. Sambol becomes subject to the excise tax under Section 4999 of the Code, Bank of America will make an additional payment to him such that he will be placed in the same after–tax position as if no such excise tax had been imposed, unless the payments exceed the limit on parachute payments by less than the greater of 10% or $100,000. In such case, Mr. Sambol's payments and benefits will be reduced to the minimum extent necessary so that no portion of the payments are subject to the excise tax.

Bank of America may condition the payment of termination amounts and benefits to Mr. Sambol upon his delivery of a full release of claims in form in general use by Bank of America on the date of termination. In addition, pursuant to his retention agreement, Mr. Sambol is subject to an ongoing confidentiality obligation and a 12–month post–employment non–solicitation covenant with respect to Bank of America's employees.

Mr. Sambol will retire after assisting with the transition and the completion of the merger. This will be treated as a termination without "cause" under Mr. Sambol's retention agreement, and as a result he will be eligible to receive the payments and benefits described above.

*Other Retention Agreements.*  Four other executive officers, including Mr. Gissinger, have entered into new retention agreements with Merger Sub that replace their right to participate in the Change in Control Severance Plan.

In order to encourage post–closing retention of the executive officers and to remove incentives under the Change in Control Severance Plan for them to terminate employment following completion of the merger, these retention agreements provide for the establishment of an unfunded retention account for each executive officer in an amount equal to 125% of the cash severance payments that otherwise would have been provided for the executive officer under the Change in Control Severance Plan had the executive officer experienced a qualifying termination immediately after completion of the merger. The retention account becomes vested and payable to the executive officer in two equal installments on each of the first and second anniversaries of the

57

Exhibit 3
229

Table of Contents

completion of the merger, with interest credited each month through the date of vesting at a rate based on one year treasury bill yields. Any unvested portion of the account will be immediately vested and paid in case of termination of employment due to death or disability, if employment is terminated without "cause" or if the executive resigns for "good reason." Any unvested portion of the account will be immediately forfeited in case of a termination for "cause" or resignation without "good reason."

The Change in Control Severance Plan currently provides for certain benefits upon a termination without "cause" or resignation for "good reason," including continuation of health care benefits, outplacement and financial planning services and service credit (or value thereof) under certain company retirement plans, in each case for three years. Each retention agreement continues to provide for these benefits.

For purposes of the retention agreement, "cause" is the same definition as in the Change in Control Severance Plan, but "good reason" is limited to a post–merger reduction in base salary or total compensation target or an office relocation. This replaces the definition of "good reason" currently in the Change in Control Severance Plan, which is a broader definition that would more easily have been triggered following the merger.

In addition, each executive officer will be entitled to receive a gross up payment for "excess parachute payments" under terms identical to those provided in the Change in Control Severance Plan. In the event that the executive officer becomes subject to the excise tax under Section 4999 of the Code, Bank of America will make an additional payment to him such that he will be placed in the same after–tax position as if no such excise tax had been imposed, unless the payments exceed the limit on parachute payments by less than the greater of 10% or $100,000. In such case, the executive officer's payments and benefits will be reduced to the minimum extent necessary so that no portion of the payments are subject to the excise tax.

Bank of America may condition the payment of termination amounts and benefits to each executive officer upon the executive officer's delivery of a full release of claims in form in general use by Bank of America on the date of termination.

We have also entered into retention arrangements with three other executive officers pursuant to which we have preserved their right to receive the cash severance and benefits payable pursuant to the Change in Control Severance Plan substantially under the circumstances set forth in that Plan although there may be variation in the timing of the payment, and agreed to pay each of these three executives an additional cash retention bonus of up to 25% of the cash severance payment he or she is eligible to receive under the Change in Control Severance Plan if he or she remains employed by us for a specified period following the closing of the merger.

The cash retention amounts payable to the executive officers (as a group, excluding Mr. Gissinger) under all the retention agreements as of the date hereof would be approximately $27,731,394 and the cash retention amount payable to Mr. Gissinger under his retention agreement would be approximately $9,031,600.

After the date hereof, we may enter into similar retention arrangements with other executive officers of Countrywide, although there may be variation in the payment dates and terms and conditions to receipt of payment. In addition, we have offered certain executive officers (and may offer other executive officers) a minimum guaranteed bonus for 2008 (if the executive officer remains employed for the full year), a pro rata bonus payment on termination without cause in 2008 or 2009, and/or the opportunity to be eligible for a discretionary cash performance bonus in 2009.

*Shareholder Derivative Claims.* If the merger is consummated, plaintiffs in pending shareholder actions against certain Countrywide officers and directors may lose standing to assert derivative claims on behalf of Countrywide because the plaintiffs will no longer be stockholders of Countrywide. See "—Litigation Relating to the Merger" on page 45.

Exhibit 3
230

Table of Contents

## THE MERGER AGREEMENT

*The following describes certain aspects of the merger, including material provisions of the merger agreement. The following description of the merger agreement is subject to, and qualified in its entirety by reference to, the merger agreement, which is attached to this document as Appendix A and is incorporated by reference in this document. We urge you to read the merger agreement carefully and in its entirety, as it is the legal document governing this merger.*

**Terms of the Merger**

Each of the Countrywide board of directors and the Bank of America board of directors has approved the merger agreement, which provides for the merger of Countrywide with and into Merger Sub. Merger Sub will be the surviving corporation in the merger and will remain a wholly−owned subsidiary of Bank of America. Each share of Countrywide common stock issued and outstanding immediately prior to the completion of the merger, except for specified shares of Countrywide common stock held by Countrywide and Bank of America, will be converted into the right to receive 0.1822 of a share of Bank of America common stock. If the number of shares of common stock of Bank of America changes before the merger is completed because of a reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split, or other similar event, then an appropriate and proportionate adjustment will be made to the number of shares of Bank of America common stock into which each share of Countrywide common stock will be converted.

Bank of America will not issue any fractional shares of Bank of America common stock in the merger. Instead, a Countrywide stockholder who otherwise would have received a fraction of a share of Bank of America common stock will receive an amount in cash rounded to the nearest cent. This cash amount will be determined by multiplying the fraction of a share of Bank of America common stock to which the holder would otherwise be entitled by the average closing price of Bank of America common stock over the five trading days immediately prior to the date on which the merger is completed.

At the effective time of the merger, the Merger Sub certificate of incorporation will be amended to provide that the name of the surviving corporation will be Countrywide Financial Corporation and, as so amended, will be the certificate of incorporation of the surviving corporation after completion of the merger. The merger agreement provides that Bank of America may change the structure of the merger if consented to by Countrywide (but Countrywide's consent cannot be unreasonably withheld or delayed). No such change will alter the amount or kind of merger consideration to be provided under the merger agreement, adversely affect the tax treatment of Countrywide's stockholders as a result of receiving the merger consideration or the tax treatment of the parties to the merger agreement, or materially impede or delay completion of the merger. Bank of America and Countrywide have agreed that Merger Sub shall not be converted into a Delaware limited liability company, as had originally been contemplated by the merger agreement.

**Treatment of Countrywide Stock Options and Other Equity−Based Awards**

Each outstanding option to acquire Countrywide common stock granted under Countrywide's stock incentive plans will be converted automatically at the effective time of the merger into an option to purchase Bank of America common stock and will continue to be governed by the terms of the Countrywide stock plan and related grant agreements under which it was granted (taking into account any accelerated vesting or other rights, such as the right to surrender for cash, provided by the terms of the options), except that:

- the number of shares of Bank of America common stock subject to each converted Bank of America stock option will be equal to the product of the number of shares of Countrywide common stock previously subject to the Countrywide stock option and 0.1822, rounded down to the nearest whole share; and

- the exercise price per share of Bank of America common stock subject to each converted Bank of America stock option will be equal to the exercise price for each share of Countrywide common stock previously subject to the Countrywide stock option divided by 0.1822, rounded up to the nearest cent.

Exhibit 3
231

Table of Contents

Stock appreciation rights in respect of Countrywide common stock outstanding immediately prior to the merger will be converted automatically at the effective time of the merger into stock appreciation rights in respect of shares of Bank of America common stock (taking into account any accelerated vesting or other rights, such as the right to surrender for cash, provided by the terms of the stock appreciation rights), except that:

- the number of whole shares of Bank of America common stock subject to each converted stock appreciation right will be equal to the product of the number of shares of Countrywide common stock previously subject to the Countrywide stock appreciation right and 0.1822, rounded down to the nearest whole share; and

- the base price per share of Bank of America common stock subject to each converted Bank of America stock appreciation right will be equal to the base price base price for each share of Countrywide common stock previously subject to the stock appreciation right divided by 0.1822, rounded up to the nearest cent.

Each outstanding restricted share of Countrywide common stock will be converted automatically at the effective time of the merger into the right to receive the merger consideration, on the same terms and conditions as applied to the restricted share immediately prior to the effective time of the merger (including transfer restrictions on the stock consideration to the extent the shares do not vest and transfer restrictions do not lapse on the completion of the merger).

Restricted share units in respect of Countrywide common stock outstanding immediately prior to the merger will be converted automatically at the effective time of the merger into restricted share units in respect of shares of Bank of America common stock (taking into account any accelerated vesting provided by the terms of the restricted share units). The number of shares of Bank of America common stock subject to each converted restricted share unit will be equal to the product of the number of shares of Countrywide common stock previously subject to the Countrywide restricted share unit and 0.1822, rounded to the nearest whole share. The Bank of America restricted share units will be payable or distributable in accordance with the terms of the agreement, plan or arrangement relating to the restricted share units.

Countrywide deferred equity units, which are amounts denominated in Countrywide common stock and held in participant accounts pursuant to certain of Countrywide's deferred compensation plans, will be converted automatically at the effective time of the merger into deferred equity units in respect of shares of Bank of America common stock (taking into account any accelerated vesting provided by the terms of the deferred equity units). The number of shares of Bank of America common stock subject to each converted deferred equity unit will be equal to the product of the number of shares of Countrywide common stock in which the Countrywide deferred equity unit was previously denominated and 0.1822, rounded to the nearest whole share. The deferred equity units will be payable or distributable in accordance with the terms of the Countrywide deferred compensation plans applicable to the deferred equity units.

The employee stock purchase plan portion of Countrywide's Global Stock Plan will be terminated prior to the effective time of the merger in accordance with the terms of the plan. Options to acquire Countrywide common stock under the UK ShareSave Scheme of Countrywide's Global Stock Plan will be treated in accordance with the terms of the plan, and if required pursuant to the terms of the plan, will be converted into the right to receive shares of Bank of America common stock in the same manner as described above for Countrywide stock options, or as otherwise required by applicable law.

Bank of America has agreed to reserve additional shares of Bank of America common stock to satisfy its obligations under the converted stock options and other equity–based awards and file a registration statement with the SEC on an appropriate form to the extent necessary to register Bank of America common stock subject to the converted stock options and other equity–based awards.

**Treatment of Countrywide Indebtedness**

As of December 31, 2007, Countrywide had outstanding indebtedness of approximately $97.23 billion. This amount includes revolving credit facilities with an aggregate principal balance of approximately

Exhibit 3
232

Table of Contents

$11.48 billion, which Bank of America expects will be repaid upon closing of the merger. The amount also includes FHLB advances to Countrywide Bank of approximately $47.68 billion, which Bank of America expects will remain outstanding until repaid by Countrywide Bank.

As part of its integration planning in connection with the merger, Bank of America is currently evaluating alternatives for the disposition of the remaining Countrywide indebtedness, including the possibility of redeeming, assuming or guaranteeing some or all of this debt, or allowing it to remain outstanding as obligations of Countrywide (and not Bank of America). Bank of America has made no determination in this regard, and there is no assurance that any of such debt would be redeemed, assumed or guaranteed. The portion of Countrywide's debt that does not comprise debt under its revolving credit facilities or FHLB advances would represent approximately 2.4% of Bank of America's total liabilities as of December 31, 2007.

## Closing and Effective Time of the Merger

The merger will be completed only if all of the following occur:

- the merger agreement is approved and adopted by Countrywide stockholders;

- we obtain all required governmental and regulatory consents and approvals without a condition or restriction that would have a material adverse effect on either Countrywide or Bank of America, measured on a scale relative to Countrywide; and

- all other conditions to the merger discussed in this document and the merger agreement are either satisfied or waived.

The merger will become effective when a certificate of merger is filed with the Secretary of State of the State of Delaware. However, we may agree to a later time for completion of the merger and specify that time in the certificate of merger in accordance with Delaware law. In the merger agreement, we have agreed to cause the completion of the merger to occur no later than the fifth business day following the satisfaction or waiver of the last of the conditions specified in the merger agreement, or on another mutually agreed date. If these conditions are satisfied or waived during the two weeks immediately prior to the end of a fiscal quarter of Bank of America, then Bank of America may postpone the closing until the first full week after the end of that quarter. It currently is anticipated that the effective time of the merger will occur during the third quarter of 2008, but we cannot guarantee when or if the merger will be completed.

## Conversion of Shares; Exchange of Certificates

The conversion of Countrywide common stock into the right to receive the merger consideration will occur automatically at the effective time of the merger. As soon as reasonably practicable after completion of the merger, the exchange agent will exchange certificates representing shares of Countrywide common stock for merger consideration to be received pursuant to the terms of the merger agreement. Prior to the completion of the merger, Bank of America will select a bank or trust company subsidiary of Bank of America or another bank or trust company reasonably acceptable to Countrywide to be the exchange agent, who will exchange certificates for the merger consideration and perform other duties as explained in the merger agreement.

### Letter of Transmittal

Soon after the completion of the merger, the exchange agent will mail a letter of transmittal to each holder of a Countrywide common stock certificate at the effective time of the merger. This mailing will contain instructions on how to surrender Countrywide common stock certificates in exchange for statements indicating book−entry ownership of Bank of America common stock and a check in the amount of cash to be paid instead of fractional shares. If a holder of a Countrywide common stock certificate makes a special request, however, Bank of America will issue to the requesting holder a Bank of America stock certificate in lieu of book−entry shares. When you deliver your Countrywide stock certificates to the exchange agent along with a properly executed letter of transmittal and any other required documents, your Countrywide stock certificates will be cancelled and you will receive statements indicating book−entry ownership of Bank of America common stock, or, if requested, stock certificates representing the number of full shares of Bank of

Exhibit 3
233

Table of Contents

America common stock to which you are entitled under the merger agreement. You also will receive a cash payment for any fractional shares of Bank of America common stock that would have been otherwise issuable to you as a result of the merger.

Holders of Countrywide common stock should not submit their Countrywide stock certificates for exchange until they receive the transmittal instructions and a form of letter of transmittal from the exchange agent.

If a certificate for Countrywide common stock has been lost, stolen or destroyed, the exchange agent will issue the consideration properly payable under the merger agreement upon receipt of appropriate evidence as to that loss, theft or destruction and appropriate and customary indemnification.

After completion of the merger, there will be no further transfers on the stock transfer books of Countrywide, except as required to settle trades executed prior to completion of the merger.

### *Withholding*

The exchange agent will be entitled to deduct and withhold from the cash in lieu of fractional shares payable to any Countrywide stockholder the amounts it is required to deduct and withhold under any federal, state, local or foreign tax law. If the exchange agent withholds any amounts, these amounts will be treated for all purposes of the merger as having been paid to the stockholders from whom they were withheld.

### *Dividends and Distributions*

Until Countrywide common stock certificates are surrendered for exchange, any dividends or other distributions declared after the effective time with respect to Bank of America common stock into which shares of Countrywide common stock may have been converted will accrue but will not be paid. Bank of America will pay to former Countrywide stockholders any unpaid dividends or other distributions, without interest, only after they have duly surrendered their Countrywide stock certificates.

Prior to the effective time of the merger, Countrywide and its subsidiaries may not declare or pay any dividend or distribution on its capital stock or repurchase any shares of its capital stock, other than:

- regular quarterly cash dividends on Countrywide common stock at a rate not to exceed $0.15 per share of Countrywide common stock with record dates and payment dates consistent with the prior year;

- dividends on Countrywide's Series B Preferred Stock, which is held by a subsidiary of Bank of America;

- dividends paid by any subsidiary of Countrywide to Countrywide or to any of its wholly−owned subsidiaries; and

- the acceptance of shares of Countrywide common stock in payment of the exercise of a stock option or stock appreciation rights or the vesting of restricted shares of Countrywide common stock granted under a Countrywide stock plan or deferred equity unit plan, in each case in accordance with past practice.

Countrywide and Bank of America have agreed to coordinate declaration of dividends so that holders of Countrywide common stock will not receive two dividends, or fail to receive one dividend, for any quarter with respect to their Countrywide common stock and any Bank of America common stock any holder receives in the merger.

### Representations and Warranties

The merger agreement contains customary representations and warranties of Countrywide and Bank of America relating to their respective businesses. With the exception of certain representations that must be true and correct in all material respects (or, in the case of specific representations and warranties regarding the capitalization of Countrywide, true and correct except to a de minimis extent), no representation or warranty will be deemed untrue, inaccurate or incorrect as a consequence of the existence or absence of any fact,

Exhibit 3
234

Table of Contents

circumstance or event unless that fact, circumstance or event, individually or when taken together with all other facts, circumstances or events, has had or would reasonably be expected to have a material adverse effect on the company making the representation. In determining whether a material adverse effect has occurred or would reasonably be expected to occur, the parties will disregard any effects resulting from (1) changes in generally accepted accounting principles or regulatory accounting requirements applicable generally to companies in the industries in which the relevant party and its subsidiaries operate (except to the extent that the effects of such a change are disproportionately adverse to such party as compared to other companies in such industries), (2) changes in laws, rules or regulations of general applicability to companies in the industries in which the relevant party and its subsidiaries operate (except to the extent that the effects of such a change are disproportionately adverse to the party as compared to other companies in such industries), (3) actions or omissions taken with the prior written consent of the other party, (4) changes in global or national political conditions or in general economic or market conditions generally affecting other companies in the industries in which the relevant party and its subsidiaries operate, or (5) public disclosure of the merger. The representations and warranties in the merger agreement do not survive the effective time of the merger.

Each of Bank of America and Countrywide has made representations and warranties to the other regarding, among other things:

- corporate matters, including due organization and qualification;

- capitalization;

- authority relative to execution and delivery of the merger agreement and the absence of conflicts with, or violations of, organizational documents or other obligations as a result of the merger;

- required governmental filings and consents;

- the timely filing of reports with governmental entities, and the absence of investigations by regulatory agencies;

- financial statements, internal controls and accounting;

- broker's fees payable in connection with the merger;

- the absence of material adverse changes;

- legal proceedings;

- taxes and tax returns;

- compliance with applicable laws;

- tax treatment of the merger; and

- the accuracy of information supplied for inclusion in this document and other similar documents.

In addition, Countrywide has made other representations and warranties about itself to Bank of America as to:

- employee matters, including employee benefit plans;

- material contracts;

- risk management instruments and derivatives;

- investment securities and commodities;

- warehouse loan portfolios;

- real property and intellectual property;

- environmental liabilities;

- mortgage banking operations and securitizations;

Exhibit 3
235

Table of Contents

- insurance operations;

- the inapplicability of state takeover laws and Countrywide's stockholder rights agreement;

- interested party transactions; and

- the receipt of financial advisors' opinions.

The representations and warranties described above and included in the merger agreement were made by each of Bank of America and Countrywide to the other. These representations and warranties were made as of specific dates, may be subject to important qualifications and limitations agreed to by Bank of America and Countrywide in connection with negotiating the terms of the merger agreement, and may have been included in the merger agreement for the purpose of allocating risk between Bank of America and Countrywide rather than to establish matters as facts. The merger agreement is described in, and included as an appendix to, this document only to provide you with information regarding its terms and conditions, and not to provide any other factual information regarding Countrywide, Bank of America or their respective businesses. Accordingly, the representations and warranties and other provisions of the merger agreement should not be read alone, but instead should be read only in conjunction with the information provided elsewhere in this document and in the documents incorporated by reference into this document. See "Where You Can Find More Information" on page 80.

## Covenants and Agreements

Each of Countrywide and Bank of America has undertaken customary covenants that place restrictions on it and its subsidiaries until the effective time of the merger. In general, each of Bank of America and Countrywide agreed to (1) conduct its business in the ordinary course in all material respects, (2) use reasonable best efforts to maintain and preserve intact its business organization and advantageous business relationships, including retaining the services of key officers and employees, and (3) take no action that is intended to or would reasonably be expected to adversely affect or materially delay its ability to obtain any necessary regulatory approvals, perform its covenants or complete the merger. Countrywide further agrees that, with certain exceptions and except with Bank of America's prior written consent, Countrywide will not, and will not permit any of its subsidiaries to, among other things, undertake the following extraordinary actions:

- incur indebtedness or in any way assume the indebtedness of another person, except in the ordinary course of business;

- adjust, split, combine or reclassify any of its capital stock;

- make, declare or pay any dividends or other distributions on any shares of its capital stock, except as set forth above in "— Conversion of Shares; Exchange of Certificates — Dividends and Distributions" (Bank of America has agreed to allow Countrywide to repurchase shares of Countrywide common stock in connection with the issuance of shares under Countrywide's stock incentive and deferred equity unit plans);

- issue or grant shares, stock options or other equity-based awards outside the parameters set forth in the merger agreement;

- except as (a) required under applicable law or the terms of any Countrywide benefit plan, (b) for increases in annual base salary in the ordinary course of business, consistent with past practice and not exceeding four percent in the aggregate, and (c) for promotions (other than for promotions to senior managing director or above) in the ordinary course of business consistent with past practice, (1) increase the compensation or benefits of any current or former directors, officers or employees; (2) pay any current or former directors, officers or employees any amounts not required by existing plans or agreements; (3) establish or terminate any employee benefit or compensation plan or agreement; (4) accelerate the vesting of certain benefits under any of Countrywide's employee benefit plans; or (5) hire employees in the position of senior vice president or above (or, in certain cases, regional vice president or above) or terminate (other than for cause) the employment of employees in the position of executive vice president or above;

Exhibit 3
236

Table of Contents

- other than in the ordinary course of business, sell, transfer, pledge, lease, license, mortgage, encumber or otherwise dispose of any material assets or properties or cancel, release or assign any material indebtedness;

- enter into any new line of business or change in any material respect its lending, investment, underwriting, risk and asset liability management and other banking, operating, securitization and servicing policies other than as required by applicable law;

- transfer ownership or grant rights to its material intellectual property, except for certain grants of licenses in the ordinary course of business;

- make any material investment either by purchase of securities, capital contributions, property transfers or purchase of property or assets;

- take any action or knowingly fail to take any action, which action or failure to act is reasonably likely to prevent the merger from qualifying as a reorganization for federal income tax purposes;

- amend any governing documents, take any action to exempt another person from any applicable takeover law or defensive charter or terminate, amend or waive any provisions of any confidentiality or standstill agreements in place with third parties;

- restructure or materially change its investment securities portfolio or its gap position;

- materially change its existing policies and procedures concerning mortgage loan operations;

- amend or knowingly violate certain material contracts or enter into any obligation that would impose material restrictions on the business of Countrywide, its subsidiaries or its affiliates;

- commence or settle any material claim;

- take or willfully fail to take any action that is intended, or may be reasonably expected, to cause any of the conditions to the merger to fail to be satisfied;

- implement or adopt any change in its tax accounting or financial accounting principles, practices or methods, except as required by applicable law, generally accepted accounting principles or regulatory guidelines;

- file or amend any tax return other than in the ordinary course of business, make or change any material tax election or settle or compromise any material tax liability; or

- agree to take or adopt any resolutions by the board of directors in support of any of the actions prohibited by the preceding bullets.

Bank of America agrees that, except with Countrywide's prior written consent, Bank of America will not, among other things, undertake the following extraordinary actions:

- amend any governing documents in a manner that would adversely affect Countrywide or its stockholders or the transactions contemplated by the merger agreement;

- take any action or knowingly fail to take any action reasonably likely to prevent the merger from qualifying as a reorganization for federal income tax purposes;

- take any action or willfully fail to take any action that is intended, or may be reasonably expected, to result in any of the conditions to the merger failing to be satisfied;

- take any action that would reasonably be expected to prevent, materially impede or materially delay completion of the merger; or

- agree to take or adopt any resolutions by the board of directors in support of any of the actions prohibited by the preceding bullets.

Exhibit 3
237

Table of Contents

The merger agreement also contains covenants relating to the preparation of this document and the holding of the special meeting of Countrywide stockholders, access to information of the other company and public announcements with respect to the transactions contemplated by the merger agreement.

In addition, Countrywide has agreed to consult with Bank of America regarding certain tax planning matters.

**Reasonable Best Efforts of Countrywide to Obtain the Required Stockholder Vote**

Countrywide has agreed to hold a meeting of its stockholders as soon as is reasonably practicable for the purpose of obtaining stockholder approval and adoption of the merger agreement. Countrywide will use its reasonable best efforts to obtain such approval and adoption. The merger agreement requires Countrywide to submit the merger agreement to a stockholder vote even if its board of directors no longer recommends approval and adoption of the merger agreement.

Countrywide and Bank of America have also agreed in good faith to use their reasonable best efforts to negotiate a restructuring of the merger if Countrywide's stockholders do not approve and adopt the merger agreement at the special meeting and to resubmit the transaction to Countrywide's stockholders for approval and adoption. However, in any restructuring neither party has any obligation to change the amount or kind of the merger consideration or the tax treatment of the merger in a manner adverse to that party or its stockholders.

**Agreement Not to Solicit Other Offers**

Countrywide also has agreed that it, its subsidiaries and their officers, directors, employees, agents and representatives will not, directly or indirectly:

- initiate, solicit, encourage or facilitate any inquiries or proposals for any "Alternative Proposal" (as defined below); or

- participate in any discussions or negotiations, or enter into any agreement, regarding any "Alternative Transaction" (as defined below).

However, prior to the special meeting, Countrywide may consider and participate in discussions and negotiations with respect to a bona fide Alternative Proposal if (1) it has first entered into a confidentiality agreement with the party proposing the Alternative Proposal on terms substantially similar to Countrywide's confidentiality agreement with Bank of America and (2) the Countrywide board of directors determines reasonably in good faith (after consultation with outside legal counsel) that failure to take these actions would cause the board to violate its fiduciary duties to Countrywide stockholders under applicable law.

Countrywide has agreed:

- to cease any existing discussions or negotiations with respect to any Alternative Proposal, and to use reasonable best efforts to cause all persons other than Bank of America who have been furnished with confidential information in connection with an Alternative Proposal within the 12 months prior to the date of the merger agreement to return or destroy such information;

- to notify Bank of America promptly (but no later than 24 hours) after it receives any Alternative Proposal, or any material change to any Alternative Proposal, or any request for nonpublic information relating to Countrywide or any of its subsidiaries, and to provide Bank of America with relevant information regarding the Alternative Proposal or request; and

- to keep Bank of America fully informed, on a current basis, of any material changes in the status and any material changes in the terms of any such Alternative Proposal.

As used in the merger agreement, an "Alternative Proposal" means any inquiry or proposal, including any indication of an intention to make a proposal, regarding any merger, share exchange, consolidation, sale of assets, sale of shares of capital stock (including by way of a tender offer) or similar transactions involving Countrywide or any of its subsidiaries that, if completed, would constitute an Alternative Transaction.

66

Exhibit 3
238

Table of Contents

As used in the merger agreement, "Alternative Transaction" means any of the following:

- a transaction in which any person or group (other than Bank of America or its affiliates), directly or indirectly, acquires or would acquire more than 15% of the outstanding shares of Countrywide or any of its subsidiaries or outstanding voting power or of any new series or new class of Countrywide preferred stock that would be entitled to a class or series vote with respect to a merger with Countrywide or any of its subsidiaries, whether from Countrywide or pursuant to a tender offer or exchange offer or otherwise;

- a merger, share exchange, consolidation or other business combination involving Countrywide or any of its subsidiaries (other than the merger being described here);

- any transaction in which any person or group (other than Bank of America or its affiliates) acquires or would acquire control of assets (including, for this purpose, the outstanding equity securities of subsidiaries of Countrywide and securities of the entity surviving any merger or business combination including any of Countrywide's subsidiaries) of Countrywide or any of its subsidiaries representing more than 15% of the fair market value of all the assets, net revenues or net income of Countrywide and its subsidiaries, taken as a whole, immediately prior to such transaction; or

- any other consolidation, business combination, recapitalization or similar transaction involving Countrywide or any of its subsidiaries, other than the transactions contemplated by the merger agreement.

The Countrywide board of directors has adopted a resolution recommending that the Countrywide stockholders approve and adopt the merger agreement. Under the merger agreement, the Countrywide board of directors may not (1) withdraw, modify or qualify, or propose publicly to withdraw, modify or qualify, its recommendation, (2) take any public action or make any public statement in connection with the meeting of Countrywide stockholders that is inconsistent with its recommendation, or (3) approve or recommend, or publicly propose to approve or recommend, or fail to recommend against, any Alternative Proposal. Any of these actions is referred to as a "Change of Recommendation."

However, the Countrywide board of directors may make a Change of Recommendation if:

- it receives an unsolicited Alternative Proposal that constitutes a Superior Proposal (as defined below) and that Superior Proposal has not been withdrawn;

- Countrywide has not materially breached its agreement not to solicit other offers or its agreement to use reasonable best efforts to obtain stockholder approval of the merger;

- after consultation with outside counsel, it reasonably determines in good faith that the failure to make the Change of Recommendation would cause the board to violate its fiduciary duties to Countrywide stockholders under applicable law;

- Countrywide provides five business days' notice to Bank of America of the board's intention to make a Change of Recommendation (and an additional two business days' notice of any subsequent change to the Alternative Proposal described in such notice); and

- during that five (or two) business day period Countrywide negotiates in good faith with Bank of America to adjust the terms of the merger agreement so that the Alternative Proposal would no longer constitute a Superior Proposal.

As used in the merger agreement, "Superior Proposal" means any third party proposal to acquire all of Countrywide's equity or assets that Countrywide's board of directors determines in good faith, after consultation with its financial advisor and outside counsel, would be more favorable, from a financial point of view, to the Countrywide stockholders than the transactions contemplated by the merger agreement and is reasonably capable of being completed.

Exhibit 3
239

Table of Contents

**Employee Matters**

Bank of America has agreed to maintain employee benefit plans and compensation opportunities for employees of Countrywide and its subsidiaries that are substantially comparable, in the aggregate, to those made available to employees of Bank of America and its subsidiaries. Initially, Bank of America may satisfy these obligations by providing continued coverage to these employees under Countrywide's and its subsidiaries' existing plans and compensation opportunities. Employees of Countrywide and its subsidiaries who are eligible to participate in Countrywide's change in control severance plan and whose employment is terminated within two years after completion of the merger are entitled to receive payments and benefits under the plan.

In addition, Bank of America has agreed, to the extent any Countrywide employee becomes eligible to participate in Bank of America benefit plans following the merger:

- generally to recognize each employee's service with Countrywide prior to the completion of the merger for purposes of eligibility, participation, vesting credits and, except under defined benefit pension plans (with certain exceptions), benefit accruals, in each case under the Bank of America plans to the same extent such service was recognized under comparable Countrywide plans prior to completion of the merger; and

- to use reasonable best efforts to waive any exclusion for pre–existing conditions or eligibility waiting periods under any Bank of America health, dental, vision or other welfare plans, to the extent such limitation would have been waived or satisfied under a corresponding Countrywide plan in which such employee participated, and recognize any health, dental or vision expenses incurred in the year in which the merger closes (or, if later, the year in which such employee is first eligible to participate) for purposes of applicable deductible and annual out–of–pocket expense requirements under any health, dental or vision plan of Bank of America.

Bank of America has agreed to honor specified Countrywide employment and change of control agreements and deferred compensation plans and agreements in accordance with the terms thereof. Bank of America has the right to amend or terminate Countrywide benefit plans to the extent permitted under the terms of such plans, and has no obligation to continue the employment of any Countrywide employee for any period following the merger.

**Indemnification and Insurance**

The merger agreement requires the current rights of the directors and officers of Countrywide and its subsidiaries to indemnification under these entities' organizational documents and other disclosed agreements to continue in effect for six years after completion of the merger. The merger agreement also provides that, upon completion of the merger, Bank of America will cause the surviving corporation to indemnify and hold harmless, and provide advancement of expenses to, all past and present officers and directors of Countrywide and its subsidiaries against all losses or liabilities incurred in their capacities as such to the fullest extent permitted by applicable laws.

The merger agreement requires Bank of America to maintain for a period of six years after completion of the merger Countrywide's current directors' and officers' liability insurance policy, or policies of at least the same coverage and amount and containing terms and conditions that are not less advantageous than the current policy, with respect to acts or omissions occurring prior to the effective time of the merger, except that Bank of America is not required to incur an annual premium expense greater than 250% of Countrywide's current annual directors' and officers' liability insurance premium.

**Conditions to Complete the Merger**

Our respective obligations to complete the merger are subject to the fulfillment or waiver of certain conditions, including:

- the approval and adoption of the merger agreement by Countrywide stockholders;

68

Exhibit 3
240

Table of Contents

- the approval of the listing of the Bank of America common stock to be issued in the merger on the NYSE, subject to official notice of issuance;

- the effectiveness of the registration statement of which this document is a part with respect to the Bank of America common stock to be issued in the merger under the Securities Act and the absence of any stop order or proceedings initiated or threatened by the SEC for that purpose; and

- the absence of any order, decree or injunction by any court or other governmental entity or other law that prohibits or makes illegal completion of the transactions contemplated by the merger agreement.

Each of Bank of America's and Countrywide's obligations to complete the merger is also separately subject to the satisfaction or waiver of a number of conditions including:

- the receipt by each of Bank of America and Countrywide of a legal opinion with respect to certain federal income tax consequences of the merger;

- the receipt and effectiveness of all governmental and other approvals, registrations and consents, and the expiration of all related waiting periods required to complete the merger (in the case of the condition to Bank of America's obligation to complete the merger, without any conditions or restrictions that would have a material adverse effect on either Countrywide or Bank of America, measured on a scale relative to Countrywide); and

- the truth and correctness of the representations and warranties of the other party in the merger agreement, subject to the materiality standard provided in the merger agreement, and the performance by the other party in all material respects of its obligations under the merger agreement and the receipt of certificates from the other party to that effect.

In addition, Bank of America's obligation to complete the merger is subject to the condition that Countrywide's annual report on Form 10−K for the year ended December 31, 2007 has been filed and includes an unqualified opinion of KPMG LLP (or another reasonably acceptable independent registered accounting firm) regarding Countrywide's consolidated financial statements, and that such opinion has not been withdrawn or otherwise qualified.

We cannot provide assurance as to when or if all of the conditions to the merger can or will be satisfied or waived by the appropriate party. As of the date of this document, we have no reason to believe that any of these conditions will not be satisfied.

**Termination of the Merger Agreement**

The merger agreement can be terminated at any time prior to completion by mutual consent if authorized by each of our boards of directors, or by either party in the following circumstances:

- if any of the required regulatory approvals are denied or completion of the merger has been prohibited or made illegal by a court or other governmental entity (and the denial or prohibition is final and nonappealable);

- if the merger has not been completed by January 11, 2009, unless the failure to complete the merger by that date is due to the terminating party's failure to abide by the merger agreement;

- if there is a breach by the other party that would cause the failure of the closing conditions described above, unless the breach is capable of being, and is, cured within 30 days of notice of the breach; or

- if the other party has committed a substantial, bad faith breach of its obligation to use reasonable best efforts to negotiate a restructuring of the merger and to resubmit the transaction to Countrywide's stockholders for approval, if Countrywide stockholders fail to approve and adopt the merger agreement.

In addition, Bank of America may terminate the merger agreement if:

- Countrywide's board of directors (1) fails to recommend the approval and adoption of the merger agreement by Countrywide stockholders, (2) makes any Change of Recommendation, (3) approves or

69

Exhibit 3
241

Table of Contents

recommends any Alternative Proposal or publicly proposes to do so, or (4) fails to recommend that the Countrywide stockholders reject any tender offer or exchange offer that constitutes an Alternative Transaction within the statutorily provided time for making such a recommendation; or

- Countrywide materially breaches its agreement not to solicit other offers or its obligation to hold a meeting of Countrywide stockholders for the purpose of approving and adopting the merger agreement.

**Effect of Termination**

If the merger agreement is terminated, it will become void, and there will be no liability on the part of Bank of America or Countrywide, except that (1) both Bank of America and Countrywide will remain liable for any knowing breach of the merger agreement and (2) designated provisions of the merger agreement will survive the termination, including those relating to the payment of fees and expenses (including the termination fee), the confidential treatment of information and publicity restrictions.

**Expenses and Fees**

In general, each of Bank of America and Countrywide will be responsible for all expenses incurred by it in connection with the negotiation and completion of the transactions contemplated by the merger agreement. However, the costs and expenses of printing and mailing this document, and all filing and other fees paid to the SEC in connection with the merger, shall be borne equally by Countrywide and Bank of America.

Countrywide also would be obligated to pay Bank of America a $160 million termination fee if:

- Bank of America terminates the merger agreement because:

  - Countrywide's board of directors (1) fails to recommend the merger to Countrywide stockholders, (2) makes any Change of Recommendation or (3) fails to recommend that Countrywide stockholders reject any tender offer or exchange offer that constitutes an Alternative Transaction within the statutorily provided time for making such a recommendation; or

  - Countrywide materially breaches its agreement not to solicit other offers or its obligation to hold a meeting of Countrywide stockholders for the purpose of approving and adopting the merger agreement; or

- the following circumstances occur:

  - (1) Bank of America terminates the merger agreement as a result of a knowing or intentional breach by Countrywide that would cause the failure of the closing conditions described above, (2) Bank of America terminates the merger agreement as a result of Countrywide's substantial, bad faith breach of its obligation to use reasonable best efforts to negotiate a restructuring of the merger and resubmit the transaction to Countrywide stockholders if Countrywide stockholders fail to approve and adopt the merger agreement or (3) either party terminates the merger agreement because the transaction has not been completed by January 11, 2009 and the merger agreement has not been approved and adopted by Countrywide stockholders;

  - prior to any termination described in the bullet immediately above, an Alternative Proposal is received by Countrywide or publicly announced and not irrevocably withdrawn; and

  - Countrywide enters a definitive agreement regarding, or completes, an Alternative Transaction within twelve months of termination.

For this purpose, an "Alternative Transaction" has the meaning described above in "— Agreement Not to Solicit Other Offers", except that (1) references to 25% are changed to 50%, and (2) references to any merger, share exchange, consolidation, recapitalization or any other similar transaction involving Countrywide or its subsidiaries refer only to transactions to which Countrywide is a party and in which Countrywide stockholders would not hold at least 66 2/3% of the total voting power of the surviving company or its public parent corporation.

70

Exhibit 3
242

Table of Contents

**Amendment, Waiver and Extension of the Merger Agreement**

Subject to applicable law, the parties may amend the merger agreement by action taken or authorized by their boards of directors or by written agreement. However, after any approval of the merger agreement by the Countrywide stockholders, there may not be, without further approval of those stockholders, any amendment of the merger agreement that requires further approval under applicable law.

At any time prior to the completion of the merger, each of us, by action taken or authorized by our respective boards of directors, to the extent legally allowed, may:

- extend the time for the performance of any of the obligations or other acts of the other party;

- waive any inaccuracies in the representations and warranties of the other party; or

- waive compliance by the other party with any of the other agreements or conditions contained in the merger agreement.

## ACCOUNTING TREATMENT

The merger will be accounted for as a "purchase," as that term is used under generally accepted accounting principles, for accounting and financial reporting purposes. Under purchase accounting, the assets (including identifiable intangible assets) and liabilities (including executory contracts and other commitments) of Countrywide as of the effective time of the merger will be recorded at their respective fair values and added to those of Bank of America. Any excess of purchase price over the fair values is recorded as goodwill. Financial statements of Bank of America issued after the merger would reflect these fair values and would not be restated retroactively to reflect the historical financial position or results of operations of Countrywide.

## FEDERAL INCOME TAX CONSEQUENCES OF THE MERGER

The following general discussion sets forth the anticipated material United States federal income tax consequences of the merger to U.S. holders (as defined below) of Countrywide common stock that exchange their shares of Countrywide common stock for shares of Bank of America common stock in the merger. This discussion does not address any tax consequences arising under the laws of any state, local or foreign jurisdiction, or under any United States federal laws other than those pertaining to income tax. This discussion is based upon the Internal Revenue Code of 1986, as amended, or the "Code", the regulations promulgated under the Code and court and administrative rulings and decisions, all as in effect on the date of this document. These laws may change, possibly retroactively, and any change could affect the accuracy of the statements and conclusions set forth in this discussion.

This discussion addresses only those Countrywide stockholders that hold their shares of Countrywide common stock as a capital asset within the meaning of Section 1221 of the Code. Further, this discussion does not address all aspects of United States federal income taxation that may be relevant to you in light of your particular circumstances or that may be applicable to you if you are subject to special treatment under the United States federal income tax laws, including if you are:

- a financial institution;

- a tax−exempt organization;

- an S corporation or other pass−through entity (or an investor in an S corporation or other pass−through entity);

- an insurance company;

- a mutual fund;

- a dealer or broker in stocks and securities, or currencies;

- a trader in securities that elects mark−to−market treatment;

71

Exhibit 3
243

Table of Contents

- a holder of Countrywide common stock subject to the alternative minimum tax provisions of the Code;

- a holder of Countrywide common stock that received Countrywide common stock through the exercise of an employee stock option, through a tax qualified retirement plan or otherwise as compensation;

- a person that is not a U.S. holder (as defined below);

- a person that has a functional currency other than the U.S. dollar;

- a holder of Countrywide common stock that holds Countrywide common stock as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; or

- United States expatriates.

Determining the actual tax consequences of the merger to you may be complex. They will depend on your specific situation and on factors that are not within our control. You should consult with your own tax advisor as to the tax consequences of the merger in your particular circumstances, including the applicability and effect of the alternative minimum tax and any state, local, foreign or other tax laws and of changes in those laws.

For purposes of this discussion, the term "U.S. holder" means a beneficial owner of Countrywide common stock that is for United States federal income tax purposes (i) an individual citizen or resident of the United States, (ii) a corporation organized in or under the laws of the United States or any state thereof or the District of Columbia or (iii) otherwise subject to U.S. federal income taxation on a net income basis in respect of the Countrywide common stock.

The United States federal income tax consequences to a partner in an entity or arrangement treated as a partnership, for United States federal income tax purposes, that holds Countrywide common stock generally will depend on the status of the partner and the activities of the partnership. Partners in a partnership holding Countrywide common stock should consult their own tax advisors.

**Tax Consequences of the Merger Generally**

The parties intend for the merger to qualify as a reorganization for United States federal income tax purposes. It is a condition to Bank of America's obligation to complete the merger that Bank of America receive an opinion from Cleary Gottlieb Steen & Hamilton LLP, dated the closing date of the merger, substantially to the effect that the merger will be treated as a reorganization within the meaning of Section 368(a) of the Code. It is a condition to Countrywide's obligation to complete the merger that Countrywide receive an opinion from Wachtell, Lipton, Rosen & Katz, dated the closing date of the merger, substantially to the effect that the merger will be treated as a reorganization within the meaning of Section 368(a) of the Code. In addition, in connection with the mailing of this document, each of Bank of America and Countrywide has received a legal opinion, from Cleary Gottlieb Steen & Hamilton LLP and Wachtell, Lipton, Rosen & Katz, respectively, to the same effect as the opinions described above. These opinions are and will be based on representation letters provided by Bank of America and Countrywide and on customary factual assumptions. None of the opinions described above will be binding on the Internal Revenue Service. Bank of America and Countrywide have not sought and will not seek any ruling from the Internal Revenue Service regarding any matters relating to the merger, and as a result, there can be no assurance that the Internal Revenue Service will not assert, or that a court would not sustain, a position contrary to any of the conclusions set forth below.

Accordingly, as a result of the merger being treated as a reorganization within the meaning of Section 368(a) of the Code, upon exchanging your Countrywide common stock for Bank of America common stock, you will generally not recognize gain or loss, except with respect to cash received instead of fractional shares of Bank of America common stock (as discussed below). The aggregate tax basis in the shares of Bank of America common stock that you receive in the merger, including any fractional share interests deemed received and redeemed as described below, will equal your aggregate adjusted tax basis in the Countrywide common stock you surrender. Your holding period for the shares of Bank of America common stock that you receive in the merger (including a fractional share interest deemed received and redeemed as described below)

72

Exhibit 3
244

Table of Contents

will include your holding period for the shares of Countrywide common stock that you surrender in the exchange.

**Cash Instead of a Fractional Share**

If you receive cash instead of a fractional share of Bank of America common stock, you will be treated as having received the fractional share of Bank of America common stock pursuant to the merger and then as having exchanged the fractional share of Bank of America common stock for cash in a redemption by Bank of America. As a result, assuming that the redemption of a fractional share of Bank of America common stock is treated as a sale or exchange and not as a dividend, you generally will recognize gain or loss equal to the difference between the amount of cash received and the basis in its fractional share of Bank of America common stock as set forth above. This gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if, as of the effective date of the merger, the holding period for the shares (including the holding period of Countrywide common stock surrendered therefor) is greater than one year. The deductibility of capital losses is subject to limitations.

**Backup Withholding**

If you are a non-corporate holder of Countrywide common stock you may be subject to information reporting and backup withholding (currently at a rate of 28%) on any cash payments you receive. You generally will not be subject to backup withholding, however, if you:

- furnish a correct taxpayer identification number, certify that you are not subject to backup withholding on the substitute Form W-9 or successor form included in the election form/letter of transmittal you will receive and otherwise comply with all the applicable requirements of the backup withholding rules; or

- provide proof that you are otherwise exempt from backup withholding.

Any amounts withheld under the backup withholding rules will generally be allowed as a refund or credit against your United States federal income tax liability, provided you timely furnish the required information to the Internal Revenue Service.

**Reporting Requirements**

If you receive shares of Bank of America common stock as a result of the merger, you will be required to retain records pertaining to the merger and you will be required to file with your United States federal income tax return for the year in which the merger takes place a statement setting forth certain facts relating to the merger.

73

Exhibit 3
245

Table of Contents

## COMPARISON OF STOCKHOLDERS' RIGHTS

Bank of America and Countrywide are both incorporated under Delaware law. Any differences, therefore, between the rights of Bank of America stockholders and the rights of Countrywide stockholders result solely from differences in the companies' respective certificates of incorporation and bylaws. Upon completion of the merger, you will exchange your shares of Countrywide common stock for shares of Bank of America common stock, and as a Bank of America stockholder your rights will be governed by the Bank of America certificate of incorporation and the Bank of America bylaws.

The following is a summary of the material differences between the rights of holders of Bank of America common stock and the rights of holders of Countrywide common stock, but does not purport to be a complete description of those differences. The Bank of America certificate of incorporation, the Countrywide certificate of incorporation and the Bank of America and Countrywide bylaws are subject to amendment in accordance with their terms. Copies of the governing corporate instruments are available, without charge, to any person, including any beneficial owner to whom this document is delivered, by following the instructions listed under "Where You Can Find More Information" on page 80.

| Countrywide | Bank of America |
|---|---|

### AUTHORIZED CAPITAL STOCK

#### Authorized Shares

| | |
|---|---|
| Countrywide is authorized under its certificate of incorporation to issue 1,001,500,000 shares, consisting of 1,000,000,000 shares of common stock, par value $0.05 per share, and 1,500,000 shares of preferred stock, par value $0.05 per share. | Bank of America is authorized under its certificate of incorporation to issue 7,600,000,000 shares, consisting of 7,500,000,000 shares of common stock, par value $0.01 per share, and 100,000,000 shares of preferred stock, par value $0.01 per share. |

#### Preferred Stock

| | |
|---|---|
| Countrywide's certificate of incorporation provides that shares of preferred stock may be issued from time to time in one or more series by the board of directors. The board can fix preferences, limitations and relative rights of each series of preferred stock. The rights of preferred stockholders may supersede the rights of common stockholders. Currently, (1) 250,000 shares are authorized as Countrywide Series A Participating Preferred Stock and (2) 20,000 shares are authorized as Series B Preferred Stock. | Bank of America's certificate of incorporation provides that shares of preferred stock may be issued from time to time in one or more series by the board of directors. The board can fix the preferences, limitations and relative rights of each series of preferred stock. The rights of preferred stockholders may supersede the rights of common stockholders. Currently, (1) 3,000,000 shares are authorized as Bank of America ESOP Convertible Preferred Stock, Series C, (2) 35,045 shares are authorized as Bank of America Cumulative Redeemable Preferred Stock, Series B, (3) 20,000,000 shares are authorized as Bank of America $2.50 Cumulative Convertible Preferred Stock, Series BB, (4) 85,100 shares are authorized as Bank of America Floating Rate Non–Cumulative Preferred Stock, Series E, (5) 34,500 shares are authorized as Bank of America 6.204% Non–Cumulative Series D Preferred Stock, (6) 7,001 shares are authorized as Bank of America Floating Rate Non–Cumulative Preferred Stock, Series F, (7) 8,501 shares are authorized as Bank of America Adjustable Rate Non–Cumulative Preferred Stock, Series G, (8) 25,300 shares are authorized as Bank of America 6.625% Non–Cumulative Preferred Stock, Series I, (9) 41,400 shares are authorized as Bank of America 7.25% Non–Cumulative Preferred Stock, Series J, (10) 240,000 shares are authorized as Bank of America Fixed–to–Floating Rate Non–Cumulative Preferred Stock, Series K, (11) 6,900,000 shares are designated as Bank of America 7.25% Non–Cumulative Perpetual Convertible Preferred Stock, Series L, (12) 124,200 shares are authorized as Bank of America 8.20% Non–Cumulative Preferred Stock, Series H and (13) 160,000 shares are authorized as Bank of America Fixed–to–Floating Rate Non–Cumulative Preferred Stock, Series M. |

Exhibit 3
246

Table of Contents

| Countrywide | Bank of America |
|---|---|

### AMENDMENT TO THE CERTIFICATE OF INCORPORATION

Under the Delaware General Corporation Law, an amendment to the certificate of incorporation requires (1) the approval of the board of directors, (2) the approval of the holders of a majority of the outstanding stock entitled to vote upon the proposed amendment, and (3) the approval of the holders of a majority of the outstanding stock of each class entitled to vote thereon as a class.

| | |
|---|---|
| The Countrywide certificate of incorporation additionally requires a vote of the holders of at least two−thirds (66 2/3%) of the voting power of all of the shares of Countrywide stock entitled to vote in the election of directors, voting together as a single class when the amendment pertains to (1) the requirements for amendments to the Countrywide certificate of incorporation or bylaws, (2) the classification of the Countrywide board of directors and removal and replacement of directors, (3) the prohibition on stockholder action by written consent and (4) the provisions described below under "— Purchases of Stock from Certain Persons" unless such amendment has been approved by two−thirds of the entire Countrywide board of directors and a majority of Countrywide's continuing directors, which are those directors who became members of the board of directors before any stockholder who beneficially owns 10% or more of the outstanding shares of Countrywide stock first became a 10% stockholder. | The Bank of America certificate of incorporation does not contain any provisions altering the standards for amendment. |

### AMENDMENT TO THE BYLAWS

Under the Delaware General Corporation Law, bylaws may be adopted, amended or repealed by the stockholders entitled to vote, and by the board of directors if the corporation's certificate of incorporation confers the power to adopt, amend or repeal the corporation's bylaws upon the directors.

| | |
|---|---|
| The Countrywide certificate of incorporation confers the power to adopt, amend or repeal the Countrywide bylaws upon the Countrywide board of directors and by a vote of the holders of at least two−thirds of Countrywide voting stock, unless such amendment has been approved by two−thirds of the entire Countrywide board of directors and a majority of Countrywide's continuing directors, which are those directors who became members of the board of directors before any stockholder who beneficially owns 10% or more of the outstanding shares of Countrywide stock first became a 10% stockholder. | The Bank of America certificate of incorporation confers the power to adopt, amend or repeal the Bank of America bylaws upon the Bank of America board of directors, subject to the power of the Bank of America stockholders to alter or repeal any bylaws adopted by the Bank of America board of directors. |

### SPECIAL MEETINGS OF STOCKHOLDERS

| | |
|---|---|
| The Countrywide bylaws provide that a special meeting of stockholders may be called for any purpose by the chairman of the board of directors or the chief executive officer, or upon the written request of a majority of the board of directors. | The Bank of America bylaws provide that a special meeting of stockholders may be called for any purpose by the board of directors, the chairman of the board of directors, the chief executive officer or the president, or the secretary acting under instructions of any of the foregoing or upon the written request of the record holders and at least 25% of Bank of America's outstanding common stock. |

75

Exhibit 3
247

Table of Contents

| Countrywide | Bank of America |
|---|---|

## STOCKHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING

The Countrywide certificate of incorporation prohibits stockholder action by written consent.

The Bank of America certificate of incorporation permits stockholders to act by written consent only if consents are signed by all stockholders entitled to vote on such action.

## STOCKHOLDER PROPOSALS AND NOMINATIONS

The Countrywide bylaws specify that nominations of individuals for election as directors may be made by or at the direction of a majority of the Countrywide board of directors or by any Countrywide stockholder of record entitled to vote at the annual meeting at which the election will take place who complies with the requisite notice procedure. The notice procedure requires that a stockholder's nomination of a candidate for election as a director must be delivered to, or mailed and received at, the Countrywide principal executive offices not less than 60 nor more than 90 days prior to the date of the scheduled annual meeting, regardless of postponements, deferrals, or adjournments of the meeting to a later date except that where less than 70 days' public notice of the date of the current annual meeting is given, notice must be delivered not later than the 10th day following the date on which notice was mailed or public disclosure of the meeting date was made, whichever is earlier. The notice must include certain information concerning the stockholder and the nominee.

The Countrywide bylaws specify that stockholder proposals may be made by or at the direction of a majority of the Countrywide board of directors or by any Countrywide stockholder who complies with the requisite notice procedure. The notice procedure requires that a stockholder's notice must be delivered to, or mailed and received at, the Countrywide principal executive offices not less than 120 days prior to the date of the proxy statement sent to stockholders for the preceding year's annual meeting except that where the date of the current annual meeting was changed by more than 30 days from the date of the preceding year's meeting or there was no meeting in the preceding year, notice must be received a reasonable time before the annual meeting proxy solicitation is made. The notice must include certain information concerning the stockholder and the matter the stockholder proposes to bring before the meeting. A stockholder may only submit one proposal.

The Bank of America bylaws specify that nominations of individuals for election as directors and stockholder proposals may be made pursuant to Bank of America's notice of meeting, by or at the direction of the Bank of America board of directors or by any holder of Bank of America stock entitled to vote on the election of directors who complies with the requisite notice procedure. The notice procedure requires that a stockholder's proposal or nomination of an individual for election as a director must be received by the secretary of Bank of America not later than the close of business on the 75th day nor earlier than the close of business on the 120th day prior to the first anniversary of the date Bank of America commenced mailing its proxy materials for the preceding year's annual meeting except that where the date of the current annual meeting differs significantly from the preceding year's meeting, notice must be delivered not earlier than the 120th day prior to the meeting and not later than the 75th day before the meeting or the 10th day following public announcement of the meeting. In the event of a special meeting of Bank of America stockholders at which directors are to be elected, any Bank of America stockholder entitled to vote may nominate an individual for election as director if the stockholder's notice is received by the secretary of Bank of America not later than the close of business on the 15th day following the day on which notice of the meeting is first mailed to Bank of America stockholders. The notice must include certain information concerning the stockholder, the matter the stockholder proposes to bring before the meeting and, in the case of a nomination for director, the nominee.

76

Exhibit 3
248

Table of Contents

| Countrywide | Bank of America |
|---|---|

With respect to the 2009 and subsequent annual meetings of stockholders, the notice procedures for any nominations of individuals for election of directors or any stockholder proposals require a stockholder to provide notice of a candidate or a stockholder proposal, as the case may be, to be delivered to, or mailed and received at, the Countrywide principal executive offices not less than 90 days nor more than 120 days prior to the date of the first anniversary of the immediately preceding year's annual meeting of stockholders, except that where the date of the current annual meeting differs more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder must be received (a) not earlier than the close of business on the 120th day prior to such annual meeting and (b) not later than the close of business on the later of (i) the 90th day prior to such annual meeting or (ii) the 10th day following the day on which public announcement of the date of such meeting of stockholders was first made.

## BOARD OF DIRECTORS

### Number of Directors

| Countrywide | Bank of America |
|---|---|
| The Countrywide bylaws provide that the Countrywide board of directors is to consist of not less than three nor more than 15 members, which number may be fixed from time to time by the Countrywide board of directors. Currently, the number of members of the Countrywide board of directors is nine. | The Bank of America bylaws provide that the Bank of America board of directors is to consist of not less than five nor more than 30 members, which number may be changed from time to time within such range by the Bank of America board of directors. Currently, the number of members of the Bank of America board of directors is 16. |

### Classification

| Countrywide | Bank of America |
|---|---|
| The Countrywide certificate of incorporation provides that the Countrywide board of directors will be divided into three classes, of equal size to the extent possible. Each class serves for a term of three years, subject to a director's earlier death, resignation or removal. | The Bank of America certificate of incorporation and the Bank of America bylaws do not provide for classification of the Bank of America board of directors. |

### Removal

| Countrywide | Bank of America |
|---|---|
| Countrywide stockholders may remove any Countrywide director only for cause and only upon an affirmative vote of the holders of two-thirds of the Countrywide voting stock. | Bank of America stockholders may remove one or all of the Bank of America directors with or without cause upon an affirmative vote of the holders of a majority of the Bank of America voting stock. |

### Special Meetings of the Board

| Countrywide | Bank of America |
|---|---|
| Special meetings of the Countrywide board of directors may be called by the chairperson of the board, the chief executive officer or the president, or the secretary upon the written request of a majority of the board. | Special meetings of the Bank of America board of directors may be called by the chairman of the board, the chief executive officer, the president, or the secretary acting under instructions from any of the foregoing persons, or upon the request of any three directors. |

Exhibit 3
249

Table of Contents

| Countrywide | Bank of America |
|---|---|

## STOCKHOLDER RIGHTS PLAN

Countrywide currently has a stockholder rights plan in effect, pursuant to which each share of Countrywide's common stock includes an attached preferred stock purchase right. The rights have certain anti-takeover effects. The rights will cause substantial dilution to any person or group that attempts to acquire a 15% share of the voting power of Countrywide without Countrywide's approval. Because the Countrywide board of directors can redeem the rights or approve an acquisition offer, the rights generally should not interfere with any merger or other business combination approved by the board of directors. The Countrywide board of directors may amend the terms of the rights in any manner prior to the time the rights are triggered.

In connection with the execution of the merger agreement, Countrywide and American Stock Transfer & Trust Company, as rights agent, entered into an amendment to the stockholder rights agreement, pursuant to which neither Bank of America nor its affiliates will be deemed to be an acquiring person as a result of the execution and delivery of the merger agreement, the consummation of the merger, or the consummation of the transactions contemplated by the merger agreement. Pursuant to the amendment, the execution of the merger agreement, the consummation of the merger, and the consummation of the transactions contemplated by the merger agreement will be deemed not to trigger the issuance or exercise of the rights. In addition, pursuant to the amendment, the stockholder rights agreement and the rights thereof will expire upon consummation of the merger.

Bank of America currently does not have a stockholder rights plan in effect, but under Delaware law the Bank of America board of directors could adopt such a plan without stockholder approval.

The Bank of America board of directors has adopted a policy of requiring stockholder approval prior to the adoption of any stockholder rights plan.

## PURCHASES OF STOCK FROM CERTAIN PERSONS

The Countrywide certificate of incorporation limits Countrywide's power to purchase shares of Countrywide voting stock from a five percent (or greater) holder at a price exceeding their fair market value, unless the holder has held its shares at least two years or the purchase is approved by holders of a majority of those voting shares (unless applicable law requires a greater vote) without the vote of that holder. Voting stock for this purpose is defined as capital stock that has the right to vote generally on matters relating to Countrywide and any security that is convertible into that stock.

The Bank of America certificate of incorporation and the Bank of America bylaws do not limit Bank of America's power to purchase shares of Bank of America stock from any person.

Exhibit 3
250

Table of Contents

## COMPARATIVE MARKET PRICES AND DIVIDENDS

Each of Bank of America common stock and Countrywide common stock is listed on the NYSE, among other stock exchanges. The following table sets forth the high and low sales prices of shares of Bank of America common stock and Countrywide common stock as reported on the NYSE, and the quarterly cash dividends declared per share for the periods indicated.

| | Bank of America Common Stock | | | Countrywide Common Stock | | |
|---|---|---|---|---|---|---|
| | High | Low | Dividend | High | Low | Dividend |
| **2006** | | | | | | |
| First Quarter | $ 47.24 | $ 42.92 | $ 0.50 | $ 37.23 | $ 31.86 | $ 0.15 |
| Second Quarter | 50.50 | 45.26 | 0.50 | 43.67 | 35.93 | 0.15 |
| Third Quarter | 54.00 | 47.59 | 0.56 | 39.99 | 32.20 | 0.15 |
| Fourth Quarter | 55.08 | 51.32 | 0.56 | 43.10 | 34.50 | 0.15 |
| **2007** | | | | | | |
| First Quarter | 54.21 | 48.36 | 0.56 | 45.26 | 33.13 | 0.15 |
| Second Quarter | 52.20 | 48.55 | 0.56 | 42.24 | 32.32 | 0.15 |
| Third Quarter | 52.78 | 46.52 | 0.64 | 37.52 | 15.00 | 0.15 |
| Fourth Quarter | 52.96 | 40.61 | 0.64 | 20.53 | 8.21 | 0.15 |
| **2008** | | | | | | |
| First Quarter | 45.08 | 33.12 | 0.64 | 9.27 | 3.95 | 0.15 |
| Second Quarter (through May 27, 2008) | 41.50 | 33.71 | 0.64 | 6.48 | 4.50 | 0.15 |

On January 9, 2008, the last full trading day before the publication of press reports regarding a potential merger, the high and low sales prices of shares of Bank of America common stock as reported on the New York Stock Exchange were $38.79 and $37.42, respectively. On January 10, 2008, the last full trading day before the public announcement of the merger agreement, the high and low sales prices of shares of Bank of America common stock as reported on the New York Stock Exchange were $39.81 and $37.90, respectively. On May 27, 2008, the last full trading day before the date of this document, the high and low sale prices of shares of Bank of America common stock as reported on the New York Stock Exchange were $34.35 and $33.71, respectively.

On January 9, 2008, the last full trading day before the publication of press reports regarding a potential merger, the high and low sales prices of shares of Countrywide common stock as reported on the New York Stock Exchange were $5.80 and $4.43, respectively. On January 10, 2008, the last full trading day before the public announcement of the merger agreement, the high and low sales prices of shares of Countrywide common stock as reported on the New York Stock Exchange were $8.91 and $4.82, respectively. On May 27, 2008, the last full trading day before the date of this document, the high and low sale prices of shares of Countrywide common stock as reported on the New York Stock Exchange were $4.68 and $4.54, respectively.

As of May 22, 2008, the last date prior to printing this document for which it was practicable to obtain this information, there were approximately 261,847 registered holders of Bank of America common stock and approximately 1,852 registered holders of Countrywide common stock.

Bank of America stockholders and Countrywide stockholders are advised to obtain current market quotations for Bank of America common stock and Countrywide common stock. The market price of Bank of America common stock and Countrywide common stock will fluctuate between the date of this document and the completion of the merger. No assurance can be given concerning the market price of Bank of America common stock or Countrywide common stock before or after the effective date of the merger.

Exhibit 3
251

Table of Contents

## LEGAL MATTERS

The validity of the Bank of America common stock to be issued in connection with the merger will be passed upon for Bank of America by Timothy J. Mayopoulos, Executive Vice President and General Counsel of Bank of America. Cleary Gottlieb Steen & Hamilton LLP on behalf of Bank of America, and Wachtell, Lipton, Rosen & Katz on behalf of Countrywide, will pass upon certain legal matters to the effect that the merger will constitute a tax−free "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code.

## EXPERTS

The financial statements and management's assessment of the effectiveness of internal control over financial reporting (which is included in Management's Report on Internal Control over Financial Reporting) incorporated in this document by reference to the Annual Report on Form 10−K of Bank of America Corporation for the year ended December 31, 2007 have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting.

The consolidated financial statements and financial statement schedules of Countrywide Financial Corporation and subsidiaries as of December 31, 2007 and 2006, and for each of the years in the three−year period ended December 31, 2007, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2007, have been incorporated by reference herein in reliance upon the reports of KPMG LLP, independent registered public accounting firm, as set forth in their reports thereon appearing in the Annual Report on Form 10−K of Countrywide Financial Corporation for the year ended December 31, 2007 and incorporated by reference herein, and upon the authority of said firm as experts in accounting and auditing. KPMG LLP's report on the aforementioned financial statements and schedules refers to the adoption of Statement of Financial Accounting Standards (SFAS) No. 123R, *Share−Based Payment;* SFAS No. 156, *Accounting for Servicing of Financial Assets,* an amendment of SFAS No. 140 and SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans.*

## OTHER MATTERS

According to the Countrywide amended and restated bylaws, business to be conducted at a special meeting of stockholders may only be brought before the meeting pursuant to a notice of meeting or otherwise properly brought before the meeting by or at the direction of the Countrywide board of directors. No matters other than the matters described in this document are anticipated to be presented for action at the special meeting or at any adjournment or postponement of the special meeting.

### Countrywide 2008 Annual Meeting

Countrywide will hold a 2008 annual meeting of stockholders only if the merger is not completed. If it is determined that the merger will not be completed as contemplated by the merger agreement, Countrywide will provide notice of the date fixed for the annual meeting, as well as the deadline for submitting stockholder proposals for such meeting and to have stockholder proposals included in Countrywide's proxy statement.

## STOCKHOLDERS SHARING AN ADDRESS

Only one copy of this document is being delivered to multiple stockholders of Countrywide sharing an address unless Countrywide has previously received contrary instructions from one or more of such stockholders. On written or oral request to the Secretary of Countrywide at 4500 Park Granada, Calabasas, California 91302, (818) 225−3000, Countrywide will deliver promptly a separate copy of this document to a stockholder at a shared address to which a single copy of the document was delivered. Stockholders sharing an address who wish, in the future, to receive separate copies or a single copy of Countrywide's proxy statements and annual reports should provide written or oral notice to the Secretary of Countrywide at the address and telephone number set forth above.

Exhibit 3
252

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

Bank of America has filed with the SEC a registration statement under the Securities Act that registers the distribution to Countrywide stockholders of the shares of Bank of America common stock to be issued in connection with the merger. The registration statement, including the attached exhibits and schedules, contains additional relevant information about Bank of America and Bank of America stock. The rules and regulations of the SEC allow us to omit certain information included in the registration statement from this document.

You may read and copy this information at the Public Reference Room of the SEC at 100 F Street, NE, Room 1580, Washington, D.C. 20549. You may obtain information on the operation of the SEC's Public Reference Room by calling the SEC at 1−800−SEC−0330. The SEC also maintains an internet website that contains reports, proxy statements and other information about issuers, like Bank of America and Countrywide, who file electronically with the SEC. The address of the site is http://www.sec.gov. The reports and other information filed by Bank of America with the SEC are also available at Bank of America's website at http://www.bankofamerica.com. The reports and other information filed by Countrywide with the SEC are also available at Countrywide's website at http://www.countrywide.com. We have included the web addresses of the SEC, Bank of America, and Countrywide as inactive textual references only. Except as specifically incorporated by reference into this document, information on those web sites is not part of this document.

The SEC allows Bank of America and Countrywide to incorporate by reference information in this document. This means that Bank of America and Countrywide can disclose important information to you by referring you to another document filed separately with the SEC. The information incorporated by reference is considered to be a part of this document, except for any information that is superseded by information that is included directly in this document.

This document incorporates by reference the documents listed below that Bank of America and Countrywide previously filed with the SEC. They contain important information about the companies and their financial condition.

**Bank of America SEC Filings**
**(SEC**
**File**
**No.**
**001−06523;**
**CIK**
**No. 0000070858)**

| | Period or Date Filed |
|---|---|
| Annual Report on Form 10−K | Year ended December 31, 2007 |
| Current Reports on Form 8−K | January 11, January 22, January 29, January 30, April 15, April 21, May 1 and May 23, 2008 (other than the portions of those documents not deemed to be filed) |

The description of Bank of America common stock set forth in a registration statement filed pursuant to Section 12 of the Exchange Act and any amendment or report filed for the purpose of updating those descriptions.

**Countrywide SEC Filings**
**(SEC**
**File**
**No.**
**001−12331−01;**
**CIK**
**No. 0000025191)**

| | Period or Date Filed |
|---|---|
| Annual Report on Form 10−K | Year ended December 31, 2007, as amended by the Annual Report on Form 10−K/A filed on April 24, 2008 |
| Current Reports on Form 8−K | January 9, January 11, January 17, January 30, January 31, February 15, March 13, April 3, and April 30, 2008 (other than the portions of those documents not deemed to be filed) |

In addition, Bank of America and Countrywide also incorporate by reference additional documents that either company files with the SEC under Sections 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as amended, between the date of this document and the date of the Countrywide special meeting. These documents include periodic reports, such as Annual Reports on Form 10−K, Quarterly Reports on Form 10−Q and Current Reports on Form 8−K, as well as proxy statements.

Exhibit 3
253

Table of Contents

Bank of America has supplied all information contained or incorporated by reference in this document relating to Bank of America, as well as all pro forma financial information, and Countrywide has supplied all information relating to Countrywide.

Documents incorporated by reference are available from Bank of America and Countrywide without charge, excluding any exhibits to those documents unless the exhibit is specifically incorporated by reference as an exhibit in this document. You can obtain documents incorporated by reference in this document by requesting them in writing or by telephone from the appropriate company at the following addresses:

| Bank of America Corporation | Countrywide Financial Corporation |
|---|---|
| Bank of America Corporate Center<br>100 N. Tryon Street<br>Charlotte, North Carolina 28255<br>Investor Relations<br>Telephone: (704) 386-5681 | Countrywide Financial Corporation<br>4500 Park Granada<br>Calabasas, California 91302<br>Attention: Investor Relations<br>Telephone: (818) 225-3550 |

*Countrywide stockholders requesting documents should do so by June 18, 2008 to receive them before the special meeting.* **You will not be charged for any of these documents that you request. If you request any incorporated documents from Bank of America or Countrywide, Countrywide will mail them to you by first class mail, or another equally prompt means, within one business day after it receives your request.**

**Neither Bank of America nor Countrywide has authorized anyone to give any information or make any representation about the merger or our companies that is different from, or in addition to, that contained in this document or in any of the materials that have been incorporated in this document. Therefore, if anyone does give you information of this sort, you should not rely on it. If you are in a jurisdiction where offers to exchange or sell, or solicitations of offers to exchange or purchase, the securities offered by this document or the solicitation of proxies is unlawful, or if you are a person to whom it is unlawful to direct these types of activities, then the offer presented in this document does not extend to you. The information contained in this document speaks only as of the date of this document unless the information specifically indicates that another date applies.**

**This document contains a description of the representations and warranties that each of Bank of America and Countrywide made to the other in the merger agreement. Representations and warranties made by Bank of America, Countrywide and other applicable parties are also set forth in contracts and other documents (including the merger agreement) that are attached or filed as exhibits to this document or are incorporated by reference into this document. These representations and warranties were made as of specific dates, may be subject to important qualifications and limitations agreed to between the parties in connection with negotiating the terms of the merger agreement, and may have been included in the agreement for the purpose of allocating risk between the parties rather than to establish matters as facts. These materials are included or incorporated by reference only to provide you with information regarding the terms and conditions of the agreements, and not to provide any other factual information regarding Countrywide, Bank of America or their respective businesses. Accordingly, the representations and warranties and other provisions of the merger agreement should not be read alone, but instead should be read only in conjunction with the other information provided elsewhere in this document or incorporated by reference into this document.**

Exhibit 3
254

Table of Contents

**APPENDIX A**

AGREEMENT AND PLAN OF MERGER

by and among

COUNTRYWIDE FINANCIAL CORPORATION,

BANK OF AMERICA CORPORATION

and

RED OAK MERGER CORPORATION

DATED AS OF JANUARY 11, 2008

Exhibit 3
255

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| Article I | THE MERGER | A–1 |
| 1.1 | The Merger | A–1 |
| 1.2 | Effective Time | A–1 |
| 1.3 | Effects of the Merger | A–1 |
| 1.4 | Conversion of Stock and LLC Interests | A–2 |
| 1.5 | Stock Options and Other Stock–Based Awards; ESPP | A–2 |
| 1.6 | Certificate of Formation and Limited Liability Company Agreement of the Surviving Company | A–4 |
| 1.7 | Directors and Officers | A–4 |
| 1.8 | Tax Consequences | A–5 |
| Article II | DELIVERY OF MERGER CONSIDERATION | A–5 |
| 2.1 | Exchange Agent | A–5 |
| 2.2 | Deposit of Merger Consideration | A–5 |
| 2.3 | Delivery of Merger Consideration | A–5 |
| Article III | REPRESENTATIONS AND WARRANTIES OF COMPANY | A–7 |
| 3.1 | Corporate Organization | A–7 |
| 3.2 | Capitalization | A–8 |
| 3.3 | Authority; No Violation | A–9 |
| 3.4 | Consents and Approvals | A–9 |
| 3.5 | Reports; Regulatory Matters | A–10 |
| 3.6 | Financial Statements | A–11 |
| 3.7 | Broker's Fees | A–12 |
| 3.8 | Absence of Certain Changes or Events | A–12 |
| 3.9 | Legal Proceedings | A–13 |
| 3.10 | Taxes and Tax Returns | A–13 |
| 3.11 | Employee Matters | A–14 |
| 3.12 | Compliance with Applicable Law | A–18 |
| 3.13 | Certain Contracts | A–18 |
| 3.14 | Risk Management Instruments | A–19 |
| 3.15 | Investment Securities and Commodities | A–19 |
| 3.16 | Warehouse Loan Portfolio | A–19 |
| 3.17 | Property | A–20 |
| 3.18 | Intellectual Property | A–20 |
| 3.19 | Environmental Liability | A–23 |
| 3.20 | Mortgage Banking Business | A–23 |
| 3.21 | Securitization Matters | A–29 |
| 3.22 | Insurance Matters | A–32 |
| 3.23 | State Takeover Laws | A–34 |
| 3.24 | Rights Agreement | A–34 |
| 3.25 | Interested Party Transactions | A–34 |
| 3.26 | Reorganization; Approvals | A–34 |
| 3.27 | Opinion | A–34 |
| 3.28 | Company Information | A–34 |

Exhibit 3
256

Table of Contents

| | | | Page |
|---|---|---|---|
| Article IV | REPRESENTATIONS AND WARRANTIES OF PARENT | | A–35 |
| 4.1 | Corporate Organization | | A–35 |
| 4.2 | Capitalization | | A–35 |
| 4.3 | Authority; No Violation | | A–36 |
| 4.4 | Consents and Approvals | | A–36 |
| 4.5 | Reports; Regulatory Matters | | A–37 |
| 4.6 | Financial Statements | | A–38 |
| 4.7 | Broker's Fees | | A–39 |
| 4.8 | Absence of Certain Changes or Events | | A–39 |
| 4.9 | Legal Proceedings | | A–39 |
| 4.10 | Taxes and Tax Returns | | A–39 |
| 4.11 | Compliance with Applicable Law | | A–39 |
| 4.12 | Reorganization; Approvals | | A–39 |
| 4.13 | Parent Information | | A–39 |
| | | | |
| Article V | COVENANTS RELATING TO CONDUCT OF BUSINESS | | A–40 |
| 5.1 | Conduct of Businesses Prior to the Effective Time | | A–40 |
| 5.2 | Company Forbearances | | A–40 |
| 5.3 | Parent Forbearances | | A–42 |
| | | | |
| Article VI | ADDITIONAL AGREEMENTS | | A–42 |
| 6.1 | Regulatory Matters | | A–42 |
| 6.2 | Access to Information | | A–43 |
| 6.3 | Stockholder Approval | | A–43 |
| 6.4 | Affiliates | | A–44 |
| 6.5 | NYSE Listing | | A–44 |
| 6.6 | Employee Matters | | A–44 |
| 6.7 | Indemnification; Directors' and Officers' Insurance | | A–45 |
| 6.8 | Additional Agreements | | A–46 |
| 6.9 | Advice of Changes | | A–46 |
| 6.10 | Exemption from Liability Under Section 16(b) | | A–46 |
| 6.11 | No Solicitation | | A–46 |
| 6.12 | Restructuring Efforts | | A–48 |
| 6.13 | Dividends | | A–49 |
| 6.14 | Tax Matters | | A–49 |
| | | | |
| Article VII | CONDITIONS PRECEDENT | | A–49 |
| 7.1 | Conditions to Each Party's Obligation To Effect the Merger | | A–49 |
| 7.2 | Conditions to Obligations of Parent | | A–49 |
| 7.3 | Conditions to Obligations of Company | | A–50 |
| | | | |
| Article VIII | TERMINATION AND AMENDMENT | | A–51 |
| 8.1 | Termination | | A–51 |
| 8.2 | Effect of Termination | | A–51 |
| 8.3 | Fees and Expenses | | A–52 |
| 8.4 | Termination Fee | | A–52 |

A–ii

Exhibit 3
257

Table of Contents

| | | | Page |
|---|---|---|---|
| 8.5 | | Amendment | A−52 |
| 8.6 | | Extension; Waiver | A−52 |
| Article IX | | GENERAL PROVISIONS | A−53 |
| 9.1 | | Closing | A−53 |
| 9.2 | | Standard | A−53 |
| 9.3 | | Nonsurvival of Representations, Warranties and Agreements | A−53 |
| 9.4 | | Notices | A−54 |
| 9.5 | | Interpretation | A−55 |
| 9.6 | | Counterparts | A−55 |
| 9.7 | | Entire Agreement | A−55 |
| 9.8 | | Governing Law; Jurisdiction | A−55 |
| 9.9 | | Publicity | A−55 |
| 9.10 | | Assignment; Third Party Beneficiaries | A−55 |

Exhibit A — Form of Affiliate Letter

A−iii

Exhibit 3
258

Table of Contents

## INDEX OF DEFINED TERMS

|  | Section |
|---|---|
| 409A Authorities | 3.11(k) |
| Adjusted Option | 1.5(a) |
| Advances | 3.20(a) |
| Agency(ies) | 3.20(a) |
| Agreement | Preamble |
| AJCA | 3.11(k) |
| Alternative Proposal | 6.11(a) |
| Alternative Transaction | 6.11(a) |
| Applicable Requirements | 3.20(a) |
| Bankruptcy and Equity Exception | 3.3(a) |
| BHC Act | 3.4 |
| BHCA Application | 3.4 |
| Certificate | 1.4(d) |
| Certificate Insurer | 3.20(a) |
| Certificate of Merger | 1.2 |
| Change of Recommendation | 6.11(d) |
| Change of Recommendation Notice | 6.11(d)(iv) |
| Claim | 6.7(a) |
| Closing | 9.1 |
| Closing Date | 9.1 |
| Code | Recitals |
| Collateral Certificate | 3.20(a) |
| Collateral Certificate Pool | 3.20(a) |
| Company | Preamble |
| Company Benefit Plans | 3.11(a) |
| Company By-laws | 3.1(b) |
| Company Capitalization Date | 3.2(a) |
| Company Certificate | 3.1(b) |
| Company Common Stock | 1.4(b) |
| Company Contract | 3.13(a) |
| Company Disclosure Schedule | Art. III |
| Company IP | 3.18(a) |
| Company Options | 1.5(a) |
| Company Preferred Stock | 3.2(a) |
| Company Regulatory Agreement | 3.5(b) |
| Company Requisite Regulatory Approvals | 7.3(d) |
| Company Restricted Shares | 1.5(b) |
| Company RSUs | 1.5(c) |
| Company SEC Reports | 3.5(b) |
| Company Securitization Documents | 3.21(m) |
| Company Securitization Interests | 3.21(m) |
| Company Securitization Trust | 3.21(m) |
| Company Sponsored Asset Securitization Transaction | 3.21(j) |
| Company Stock Plans | 1.5(a) |
| Confidentiality Agreements | 6.2(b) |
| Convertible Note Agreement | 4.2(a) |
| Controlled Group Liability | 3.11(d) |

Exhibit 3
259

Table of Contents

|  | Section |
| --- | --- |
| Copyrights | 3.18(a) |
| Covered Employees | 6.6(a) |
| Custodial Account | 3.20(a) |
| Custodial File | 3.20(a) |
| Customer Information | 3.18(a) |
| Derivative Transactions | 3.14(a) |
| DGCL | 1.1(a) |
| DLLCA | 1.1(a) |
| DPC Common Shares | 1.4(b) |
| Effective Time | 1.2 |
| Employees | 5.3(c) |
| Environmental Laws | 5.2(c) |
| Environmental Laws | 3.19 |
| ERISA | 3.11(a) |
| ERISA Affiliate | 3.11(d) |
| Exchange Act | 3.5(c) |
| Exchange Agent | 2.1 |
| Exchange Agent Agreement | 2.1 |
| Exchange Fund | 2.2 |
| Exchange Ratio | 1.4(c) |
| FDIC | 3.1(d) |
| Federal Reserve Board | 3.4 |
| FHA | 3.20(a) |
| FHLBA | 3.1(d) |
| FHLMC | 3.20(a) |
| FNMA | 3.20(a) |
| Foreclosure | 3.20(a) |
| Form S–4 | 3.4 |
| GAAP | 3.1(c) |
| GNMA | 3.20(a) |
| Governmental Entity | 3.4 |
| HUD | 3.20(a) |
| Home Owners' Loan Act | 3.1(d) |
| HSR Act | 3.4 |
| Indemnified Parties | 6.7(c) |
| Insurance Amount | 6.7(c) |
| Insurance Contracts | 3.22(d) |
| Insurance Department | 3.5(a) |
| Insurance Subsidiary | 3.22(a) |
| Insurer | 3.20(a) |
| Intellectual Property | 3.18(a) |
| Investment Commitment | 3.20(a) |
| Investor | 3.20(a) |
| IRS | 3.10(a) |
| Leased Properties | 3.16 |
| Letter of Transmittal | 2.3(a) |
| License Agreement | 3.18(a) |
| Licensed Company IP | 3.18(a) |

A–v

Exhibit 3

260

Table of Contents

| | Section |
|---|---|
| Liens | 3.2(b) |
| Loans | 3.20(a) |
| Loans Held for Sale | 3.20(a) |
| Master Servicing | 3.20(a) |
| Master Servicing Agreement | 3.20(a) |
| Material Adverse Effect | 3.8(a) |
| Materially Burdensome Regulatory Condition | 6.1(b) |
| Merger | Recitals |
| Merger Consideration | 1.4(c) |
| Merger Sub | Preamble |
| Merger Sub Preferred Stock | 1.4(e) |
| Mortgage | 3.20(a) |
| Mortgage Loan Documents | 3.20(a) |
| Mortgage Note | 3.20(a) |
| Mortgage Pool | 3.20(a) |
| Mortgaged Property | 3.20(a) |
| Mortgagor | 3.20(a) |
| Nonqualified Deferred Compensation Plan | 3.11(k) |
| NYSE | 2.3(f) |
| Open Source Software | 3.18(a) |
| Owned Company IP | 3.18(a) |
| Originator | 3.20(a) |
| Other Regulatory Approvals | 3.4 |
| OTS | 3.1(a) |
| Owned Properties | 3.16 |
| Paid Off Loan | 3.20(a) |
| Permitted Encumbrances | 3.17 |
| Parent | Preamble |
| Parent Bylaws | 4.1(a) |
| Parent Capitalization Date | 4.2(a) |
| Parent Certificate | 4.1(a) |
| Parent Closing Price | 1.5(a) |
| Parent Common Stock | 1.4(c) |
| Parent Disclosure Schedule | Art. IV |
| Parent Preferred Stock | 4.2(a) |
| Parent Regulatory Agreement | 4.5(b) |
| Parent Requisite Regulatory Approvals | 7.2(d) |
| Parent Restricted Share Right | 1.5(b) |
| Parent RSU | 1.5(c) |
| Parent SEC Reports | 4.5(c) |
| Parent Stock Plans | 4.2(a) |
| Patents | 3.18(a) |
| PBGC | 3.11(d) |
| Pipeline Loan | 3.20(a) |
| PMI Reinsurance Agreements | 3.22(k) |
| Policies, Practices and Procedures | 3.15(b) |
| Portfolio Loans | 3.20(a) |
| Previously Disposed of Loans | 3.20(a) |

A–vi

Exhibit 3
261

Table of Contents

|  | Section |
|---|---|
| Prior Servicer | 3.20(a) |
| Private Investors | 3.20(a) |
| Producer | 3.22(f) |
| Proxy Statement | 3.4 |
| Real Property | 3.16 |
| Recourse | 3.20(a) |
| Regulatory Agencies | 3.5(a) |
| Reinsurance Contracts | 3.22(g) |
| REMIC | 3.20(a) |
| REO | 3.20(a) |
| Restrictive Covenant | 3.18(a) |
| Retained Interest | 3.21(m) |
| Rights | 3.2(a) |
| Rights Agreement | 3.2(a) |
| Sarbanes–Oxley Act | 3.5(b) |
| SAP | 3.22(b) |
| SBA | 3.4 |
| SEC | 3.4 |
| Securities Act | 3.2(a) |
| Securitization Disclosure Documents | 3.21(j) |
| Seller and Servicing Guides | 3.20(a) |
| Series B Preferred Stock | 1.4(e) |
| Serviced Loan | 3.20(a) |
| Servicer | 3.20(a) |
| Servicer Default | 3.21(m) |
| Servicer Default or Termination | 3.21(c) |
| Servicing | 3.20(a) |
| Servicing Agreements | 3.20(a) |
| Servicing Compensation | 3.20(a) |
| Software | 3.18(a) |
| SRO | 3.4 |
| State Agency | 3.20(a) |
| Statutory Statements | 3.22(b) |
| Subsidiary | 3.1(c) |
| Superior Proposal | 6.11(d)(v) |
| Surviving Company | Recitals |
| Takeover Statutes | 3.23 |
| Tax(es) | 3.10(b) |
| Tax Return | 3.10(c) |
| Termination Fee | 8.4(a)(i) |
| Trademarks | 3.18(a) |
| Trade Secrets | 3.18(a) |
| Trust Account Common Shares | 1.4(b) |
| VA | 3.20(a) |
| VA Loans | 3.20(a) |
| Voting Debt | 3.2(a) |
| Warehouse Loans | 3.16(a) |
| WARN | 3.11(n) |

A–vii

Exhibit 3
262

Table of Contents

AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER, dated as of January 11, 2008 (this "Agreement"), among Countrywide Financial Corporation, a Delaware corporation ("Company"), Bank of America Corporation, a Delaware corporation ("Parent"), and Red Oak Merger Corporation, a Delaware corporation and wholly-owned subsidiary of Parent ("Merger Sub"):

W I T N E S S E T H :

WHEREAS, the Boards of Directors of Company, Parent and Merger Sub have determined that it is in the best interests of their respective companies and their stockholders to consummate the strategic business combination transaction provided for in this Agreement in which Company will, on the terms and subject to the conditions set forth in this Agreement, merge with and into, Merger Sub (the "Merger"), with Merger Sub as the surviving company in the Merger (sometimes referred to in such capacity as the "Surviving Company");

WHEREAS, prior to the Merger, Merger Sub shall be converted into a Delaware limited liability company;

WHEREAS, for federal income Tax purposes, it is the intent of the parties hereto that the Merger shall qualify as a "reorganization" under the provisions of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and this Agreement is intended to be and is adopted as a "plan of reorganization" for purposes of Sections 354 and 361 of the Code; and

WHEREAS, the parties desire to make certain representations, warranties and agreements in connection with the Merger and also to prescribe certain conditions to the Merger.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

ARTICLE I

THE MERGER

1.1 The Merger. (a) Subject to the terms and conditions of this Agreement, in accordance with the Delaware General Corporation Law (the "DGCL") and the Delaware Limited Liability Company Act (the "DLLCA"), at the Effective Time, Company shall merge with and into Merger Sub. Merger Sub shall be the Surviving Company in the Merger and shall continue its existence as a limited liability company under the laws of the State of Delaware. As of the Effective Time, the separate corporate existence of Company shall cease.

(b) Parent may at any time change the method of effecting the combination (including by providing for the merger of Company and a wholly-owned subsidiary of Parent other than Merger Sub) if and to the extent requested by Parent and consented to by Company (such consent not to be unreasonably withheld or delayed; provided, however, that no such change shall (i) alter or change the amount or kind of the Merger Consideration provided for in this Agreement, (ii) adversely affect the Tax treatment of Company's stockholders as a result of receiving the Merger Consideration or the Tax treatment of either party pursuant to this Agreement or (iii) materially impede or delay consummation of the transactions contemplated of this Agreement.

1.2 Effective Time. The Merger shall become effective as set forth in the certificate of merger (the "Certificate of Merger") that shall be filed with the Secretary of State of the State of Delaware on the Closing Date. The term "Effective Time" shall be the date and time when the Merger becomes effective as set forth in the Certificate of Merger.

1.3 Effects of the Merger. At and after the Effective Time, the Merger shall have the effects set forth in the DGCL and DLLCA.

A-1

Exhibit 3
263

Table of Contents

1.4 <u>Conversion of Stock and LLC Interests.</u>  At the Effective Time, by virtue of the Merger and without any action on the part of Parent, Merger Sub, Company, or the holder of any of the following securities:

(a) All limited liability company interests of Merger Sub issued and outstanding immediately prior to the Effective Time shall remain issued and outstanding and shall not be affected by the Merger.

(b) All shares of common stock, par value $0.05 per share, of Company issued and outstanding immediately prior to the Effective Time (the "<u>Company Common Stock</u>") that are owned by Company, Parent or any wholly-owned subsidiary of Company or Parent (other than shares of Company Common Stock held in trust accounts, managed accounts, mutual funds and the like, or otherwise held in a fiduciary or agency capacity, that are beneficially owned by third parties (any such shares, "<u>Trust Account Common Shares</u>") and other than shares of Company Common Stock held, directly or indirectly, by Company or Parent in respect of a debt previously contracted (any such shares, "<u>DPC Common Shares</u>")) shall be cancelled and shall cease to exist and no stock of Parent or other consideration shall be delivered in exchange therefor.

(c) Subject to Section 1.4(f), each share of the Company Common Stock, except for shares of Company Common Stock owned by Company, Parent or any wholly-owned subsidiary of Company or Parent (other than Trust Account Common Shares and DPC Common Shares), shall be converted, in accordance with the procedures set forth in Article II, into the right to receive 0.1822 (the "<u>Exchange Ratio</u>") of a share of common stock, par value $0.01 per share, of Parent ("<u>Parent Common Stock</u>") (the "<u>Merger Consideration</u>").

(d) All of the shares of Company Common Stock converted into the right to receive the Merger Consideration pursuant to this Article I shall no longer be outstanding and shall automatically be cancelled and shall cease to exist as of the Effective Time, and each certificate previously representing any such shares of Company Common Stock (each, a "<u>Certificate</u>") shall thereafter represent only the right to receive the Merger Consideration and/or cash in lieu of fractional shares into which the shares of Company Common Stock represented by such Certificate have been converted pursuant to this Section 1.4 and Section 2.3(f), as well as any dividends to which holders of Company Common Stock become entitled in accordance with Section 2.3(c).

(e) Each share of 7.25% Series B Non-Voting Convertible Preferred Stock, par value $0.05 per share, of Company (the "<u>Series B Preferred Stock</u>") issued and outstanding immediately prior to the Effective Time shall be cancelled and shall cease to exist and no stock of Parent or other consideration shall be delivered in exchange therefor.

(f) If, between the date of this Agreement and the Effective Time, the outstanding shares of Parent Common Stock shall have been increased, decreased, changed into or exchanged for a different number or kind of shares or securities as a result of a reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split, or other similar change in capitalization, an appropriate and proportionate adjustment shall be made to the Merger Consideration.

1.5 <u>Stock Options and Other Stock-Based Awards; ESPP.</u>

(a) As of the Effective Time, by virtue of the Merger and without any action on the part of the holders thereof, each option to purchase shares of Company Common Stock granted under the Amended and Restated 1993 Stock Option Plan, as amended, the 2000 Equity Incentive Plan and the 2006 Equity Incentive Plan (collectively, the "<u>Company Stock Plans</u>") that is outstanding immediately prior to the Effective Time (collectively, the "<u>Company Options</u>") shall be converted into an option (an "<u>Adjusted Option</u>") to purchase, on the same terms and conditions as applied to each such Company Option immediately prior to the Effective Time (taking into account any accelerated vesting or other rights, such as the right to surrender for cash, with respect to such Company Options in accordance with the terms thereof), the number of whole shares of Parent Common Stock that is equal to the number of shares of Company Common Stock subject to such Company Option immediately prior to the Effective Time multiplied by the Exchange Ratio (rounded down to the nearest whole share), at an exercise price per share of Parent Common Stock (rounded up to the nearest whole penny) equal to the exercise price for each such share of Company Common Stock subject to such Company Option immediately prior to the Effective Time divided by the Exchange Ratio <u>provided</u>, <u>further</u>, that, in the case of any Company Option to which Section 421 of the Code applies as of the Effective Time (after taking

A-2

Exhibit 3
264

Table of Contents

into account the effect of any accelerated vesting thereof) by reason of its qualification under Section 422 of the Code, the exercise price, the number of shares of Parent Common Stock subject to such option and the terms and conditions of exercise of such option shall be determined in a manner consistent with the requirements of Section 424(a) of the Code.

(b) As of the Effective Time, by virtue of the Merger and without any action on the part of the holders thereof, each stock appreciation right with respect to shares of Company Common Stock granted under a Company Stock Plan that is outstanding immediately prior to the Effective Time (collectively, the "Company SARs") shall be converted into a stock appreciation right (an "Adjusted SAR") with respect to, on the same terms and conditions as applied to each such Company SAR immediately prior to the Effective Time (taking into account any accelerated vesting or other rights, such as the right to surrender for cash, with respect to such Company SARs in accordance with the terms thereof), the number of whole shares of Parent Common Stock that is equal to the number of shares of Company Common Stock with respect to which such Company SAR is subject to immediately prior to the Effective Time multiplied by the Exchange Ratio (rounded down to the nearest whole share), at a base price per share of Parent Common Stock (rounded up to the nearest whole penny) equal to the base price for each such share of Company Common Stock subject to such Company SAR immediately prior to the Effective Time divided by the Exchange Ratio.

(c) As of the Effective Time, each restricted share of Company Common Stock granted under a Company Stock Plan that is outstanding immediately prior to the Effective Time (collectively, the "Company Restricted Shares") shall, by virtue of the Merger and without any action on the part of the holder thereof, be converted into a right to receive the "Parent Restricted Share Right"), on the same terms and conditions as applied to each such Company Restricted Share immediately prior to the Effective Time (including the same transfer restrictions taking into account any accelerated vesting of such Company Restricted Share in accordance with the terms thereof), the Merger Consideration; provided, however, that, upon the lapsing of restrictions with respect to each such Parent Restricted Share Right in accordance with the terms applicable to the corresponding Company Restricted Share immediately prior to the Effective Time, Parent shall be entitled to deduct and withhold such amounts as may be required to be deducted and withheld under the Code and any applicable state or local Tax law with respect to the lapsing of such restrictions.

(d) As of the Effective Time, each restricted share unit with respect to shares of Company Common Stock granted under a Company Stock Plan that is outstanding immediately prior to the Effective Time (collectively, the "Company RSUs") shall, by virtue of the Merger and without any action on the part of the holder thereof, be converted into a restricted share unit, on the same terms and conditions as applied to each such Company RSU immediately prior to the Effective Time (taking into account any accelerated vesting of such Company RSU in accordance with the terms thereof), with respect to the number of shares of Parent Common Stock that is equal to the number of shares of Company Common Stock subject to the Company RSU immediately prior to the Effective Time multiplied by the Exchange Ratio (rounded to the nearest whole share) (a "Parent RSU") The obligations in respect of the Parent RSUs shall be payable or distributable in accordance with the terms of the agreement, plan or arrangement relating to such Parent RSUs.

(e) As of the Effective Time, all amounts denominated in Company Common Stock and held in participant accounts (collectively, the "Company Deferred Equity Units") either pursuant to Company's 2003 Non-Employee Directors' Fee Plan, Company's 2004 Executive Equity Deferral Program or pursuant to any other nonqualified deferred compensation program or any individual deferred compensation agreements (collectively, the "Company Deferred Equity Unit Plans") shall, by virtue of the Merger and without any action on the part of the holder thereof, be converted into deferred equity units, on the same terms and conditions as applied to such Company Deferred Equity Units immediately prior to the Effective Time (taking into account any accelerated vesting of such Company Deferred Equity Units in accordance with the terms thereof), with respect to the number of shares of Parent Common Stock that is equal to the number of shares of Company Common Stock in which such Company Deferred Equity Units are denominated immediately prior to the Effective Time multiplied by the Exchange Ratio (rounded to the nearest whole share) (a "Parent Deferred Equity Unit"). The obligations in respect of the Parent Deferred Equity Units shall be payable or distributable in accordance with the terms of the Company Deferred Equity Unit Plan relating to such Parent Deferred Equity Units.

Exhibit 3
265

Table of Contents

(f) As of the Effective Time, Parent shall assume the obligations and succeed to the rights of Company under the Company Stock Plans with respect to the Company Options (as converted into Adjusted Options), the Company SARs (as converted into Adjusted SARs), the Company RSUs (as converted into Parent RSUs), the Company Deferred Equity Units (as converted into Parent Deferred Equity Units) and Company Restricted Shares (as converted into Parent Restricted Share Rights). Company and Parent agree that prior to the Effective Time each of the Company Stock Plans shall be amended, to the extent possible without requiring stockholder approval of such amendments, (i) if and to the extent necessary and practicable, to reflect the transactions contemplated by this Agreement, including the conversion of the Company Options, Company SARs, Company Restricted Shares and Company RSUs pursuant to paragraphs (a), (b), (c), (d) and (e) above and the substitution of Parent for Company thereunder to the extent appropriate to effectuate the assumption of such Company Stock Plans by Parent, (ii) to preclude any automatic or formulaic grant of options, restricted shares or other awards thereunder on or after the Effective Time (other than with respect to the dividend reinvestment feature of any such plan), and (iii) to the extent requested by Parent in a timely manner and subject to compliance with applicable law and the terms of the plan, to terminate any or all Company Stock Plans effective immediately prior to the Effective Time (other than with respect to outstanding awards thereunder). From and after the Effective Time, all references to Company (other than any references relating to a "Change in Control" of Company) in each Company Stock Plan and in each agreement evidencing any award of Company Options, Company SARs, Company Restricted Shares, Company RSUs or Company Deferred Equity Units shall be deemed to refer to Parent, unless Parent determines otherwise.

(g) Parent shall take all action necessary or appropriate to have available for issuance or transfer a sufficient number of shares of Parent Common Stock for delivery upon exercise of the Adjusted Options or the Adjusted SARs or settlement of the Parent RSUs or Parent Deferred Equity Units. All of the conversions and adjustments made pursuant to this Section 1.5, including without limitation, the determination of the number of shares of Parent Common Stock subject to any award and the exercise price of the Adjusted Options or base price of the Adjusted SARs, shall be made in a manner consistent with the requirements of Section 409A of the Code. Promptly after the Effective Time, Parent shall prepare and file with the SEC a post–effective amendment converting the Form S–4 to a Form S–8 (or file such other appropriate form) registering a number of shares of Parent Common Stock necessary to fulfill Parent's obligations under this paragraph (g).

(h) Company shall, prior to the Effective Time, take all actions necessary to terminate the employee stock purchase plan portion of Company's Global Stock Plan (such portion, the "Company ESPP") effective as of the Effective Time and all outstanding rights thereunder at the Effective Time. The offering period in effect as of immediately prior to the Effective Time shall end in accordance with the terms of the Company ESPP and each participant in the Company ESPP will be credited with the number of share(s) of Company Common Stock purchased for his or her account(s) under the Company ESPP in respect of the applicable offering period in accordance with the terms of the Company ESPP. The options to acquire Company Common Stock under the UK ShareSave Scheme of Company's Global Stock Plan (the "Company SAYE") shall be treated in accordance with Section 6 of the Company SAYE and, to the extent required thereunder to remain outstanding following the Effective Time and converted into the right to receive shares of Parent Common Stock in the same manner as provided in Section 1.5(a) or as otherwise required by applicable law.

1.6 Certificate of Formation and Limited Liability Company Agreement of the Surviving Company. At the Effective Time, the certificate of formation of Merger Sub shall, by virtue of the Merger, be amended and restated in its entirety to read as the certificate of formation of Merger Sub in effect immediately prior to the Effective Time, except that Item 1 thereof shall read as follows: "The name of the limited liability company is Countrywide Financial LLC," and as so amended, shall be the certificate of formation of the Surviving Company until thereafter amended in accordance with applicable law. The limited liability company agreement of Merger Sub, as in effect immediately prior to the Effective Time, shall be the limited liability company agreement of the Surviving Company until thereafter amended in accordance with applicable law and the terms of such limited liability company agreement.

1.7 Directors and Officers. The directors of Company and its Subsidiaries immediately prior to the Effective Time shall submit their resignations to be effective as of the Effective Time. The directors, if any, and officers of Merger Sub shall, from and after the Effective Time, become the directors and officers,

A–4

Exhibit 3

266

Table of Contents

respectively, of the Surviving Company until their successors shall have been duly elected, appointed or qualified or until their earlier death, resignation or removal in accordance with the limited liability company agreement of the Surviving Company.

1.8 <u>Tax Consequences.</u>  It is intended that the Merger shall constitute a "reorganization" within the meaning of Section 368(a) of the Code, and that this Agreement shall constitute a "plan of reorganization" for purposes of Sections 354 and 361 of the Code.

ARTICLE II

DELIVERY OF MERGER CONSIDERATION

2.1 <u>Exchange Agent.</u>  Prior to the Effective Time Parent shall appoint a bank or trust company Subsidiary of Parent or another bank or trust company reasonably acceptable to Company, or Parent's transfer agent, pursuant to an agreement (the "<u>Exchange Agent Agreement</u>") to act as exchange agent (the "<u>Exchange Agent</u>") hereunder.

2.2 <u>Deposit of Merger Consideration.</u>  At or prior to the Effective Time, Parent shall (i) authorize the Exchange Agent to issue an aggregate number of shares of Parent Common Stock equal to the aggregate Merger Consideration, and (ii) deposit, or cause to be deposited with, the Exchange Agent, to the extent then determinable, any cash payable in lieu of fractional shares pursuant to Section 2.3(f) (the "<u>Exchange Fund</u>").

2.3 <u>Delivery of Merger Consideration.</u>

(a) As soon as reasonably practicable after the Effective Time, the Exchange Agent shall mail to each holder of record of Certificate(s) which immediately prior to the Effective Time represented outstanding shares of Company Common Stock whose shares were converted into the right to receive the Merger Consideration pursuant to Section 1.4 and any cash in lieu of fractional shares of Parent Common Stock to be issued or paid in consideration therefor (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to Certificate(s) shall pass, only upon delivery of Certificate(s) (or affidavits of loss in lieu of such Certificates)) to the Exchange Agent and shall be substantially in such form and have such other provisions as shall be prescribed by the Exchange Agent Agreement (the "<u>Letter of Transmittal</u>") and (ii) instructions for use in surrendering Certificate(s) in exchange for the Merger Consideration, any cash in lieu of fractional shares of Parent Common Stock to be issued or paid in consideration therefor and any dividends or distributions to which such holder is entitled pursuant to Section 2.3(c).

(b) Upon surrender to the Exchange Agent of its Certificate or Certificates, accompanied by a properly completed Letter of Transmittal, a holder of Company Common Stock will be entitled to receive promptly after the Effective Time the Merger Consideration and any cash in lieu of fractional shares of Parent Common Stock to be issued or paid in consideration therefor in respect of the shares of Company Common Stock represented by its Certificate or Certificates. Until so surrendered, each such Certificate shall represent after the Effective Time, for all purposes, only the right to receive, without interest, the Merger Consideration and any cash in lieu of fractional shares of Parent Common Stock to be issued or paid in consideration therefor upon surrender of such Certificate in accordance with, and any dividends or distributions to which such holder is entitled pursuant to, this Article II.

(c) No dividends or other distributions with respect to Parent Common Stock shall be paid to the holder of any unsurrendered Certificate with respect to the shares of Parent Common Stock represented thereby, in each case unless and until the surrender of such Certificate in accordance with this Article II. Subject to the effect of applicable abandoned property, escheat or similar laws, following surrender of any such Certificate in accordance with this Article II, the record holder thereof shall be entitled to receive, without interest, (i) the amount of dividends or other distributions with a record date after the Effective Time theretofore payable with respect to the whole shares of Parent Common Stock represented by such Certificate and not paid and/or (ii) at the appropriate payment date, the amount of dividends or other distributions payable with respect to shares of Parent Common Stock represented by such Certificate with a record date after the Effective Time (but before

A–5

Exhibit 3
267

Table of Contents

such surrender date) and with a payment date subsequent to the issuance of the Parent Common Stock issuable with respect to such Certificate.

(d) In the event of a transfer of ownership of a Certificate representing Company Common Stock that is not registered in the stock transfer records of Company, the fractional shares of Parent Common Stock and cash in lieu of fractional shares of Parent Common Stock comprising the Merger Consideration shall be issued or paid in exchange therefor to a person other than the person in whose name the Certificate so surrendered is registered if the Certificate formerly representing such Company Common Stock shall be properly endorsed or otherwise be in proper form for transfer and the person requesting such payment or issuance shall pay any transfer or other similar Taxes required by reason of the payment or issuance to a person other than the registered holder of the Certificate or establish to the satisfaction of Parent that the Tax has been paid or is not applicable. The Exchange Agent (or, subsequent to the earlier of (x) the one-year anniversary of the Effective Time and (y) the expiration or termination of the Exchange Agent Agreement, Parent) shall be entitled to deduct and withhold from any cash in lieu of fractional shares of Parent Common Stock otherwise payable pursuant to this Agreement to any holder of Company Common Stock such amounts as the Exchange Agent or Parent, as the case may be, is required to deduct and withhold under the Code, or any provision of state, local or foreign Tax law, with respect to the making of such payment. To the extent the amounts are so withheld by the Exchange Agent or Parent, as the case may be, and timely paid over to the appropriate Governmental Entity, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of shares of Company Common Stock in respect of whom such deduction and withholding was made by the Exchange Agent or Parent, as the case may be.

(e) After the Effective Time, there shall be no transfers on the stock transfer books of Company of the shares of Company Common Stock that were issued and outstanding immediately prior to the Effective Time other than to settle transfers of Company Common Stock that occurred prior to the Effective Time. If, after the Effective Time, Certificates representing such shares are presented for transfer to the Exchange Agent, they shall be cancelled and exchanged for the Merger Consideration and any cash in lieu of fractional shares of Parent Common Stock to be issued or paid in consideration therefor in accordance with the procedures set forth in this Article II.

(f) Notwithstanding anything to the contrary contained in this Agreement, no fractional shares of Parent Common Stock shall be issued upon the surrender of Certificates for exchange, no dividend or distribution with respect to Parent Common Stock shall be payable on or with respect to any fractional share, and such fractional share interests shall not entitle the owner to vote or to any other rights of a stockholder of Parent. In lieu of the issuance of any such fractional share, Parent shall pay to each former stockholder of Company who otherwise would be entitled to receive such fractional share an amount in cash (rounded to the nearest cent) determined by multiplying (i) the average, rounded to the nearest one ten thousandth, of the closing sale prices of Parent Common Stock on the New York Stock Exchange (the "NYSE") as reported by The Wall Street Journal for the five trading days immediately preceding the date of the Effective Time by (ii) the fraction of a share (after taking into account all shares of Company Common Stock held by such holder at the Effective Time and rounded to the nearest thousandth when expressed in decimal form) of Parent Common Stock to which such holder would otherwise be entitled to receive pursuant to Section 1.4.

(g) Any portion of the Exchange Fund that remains unclaimed by the stockholders of Company as of the first anniversary of the Effective Time may be paid to Parent. In such event, any former stockholders of Company who have not theretofore complied with this Article II shall thereafter look only to Parent with respect to the Merger Consideration, any cash in lieu of any fractional shares and any unpaid dividends and distributions on the Parent Common Stock deliverable in respect of each share of Company Common Stock such stockholder holds as determined pursuant to this Agreement, in each case, without any interest thereon. Notwithstanding the foregoing, none of Parent, the Surviving Company, the Exchange Agent or any other person shall be liable to any former holder of shares of Company Common Stock for any amount delivered in good faith to a public official pursuant to applicable abandoned property, escheat or similar laws.

(h) In the event any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if reasonably required

A-6

Exhibit 3
268

Table of Contents

by Parent or the Exchange Agent, the posting by such person of a bond in such amount as Parent may determine is reasonably necessary as indemnity against any claim that may be made against it with respect to such Certificate, the Exchange Agent will issue in exchange for such lost, stolen or destroyed Certificate the Merger Consideration deliverable in respect thereof pursuant to this Agreement.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF COMPANY

Except as disclosed in the disclosure schedule (the "Company Disclosure Schedule") delivered by Company to Parent prior to the execution of this Agreement (which schedule sets forth, among other things, items the disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in this Article III, or to one or more of Company's covenants contained herein, provided, however, that disclosure in any section of such schedule shall apply only to the indicated Section of this Agreement except to the extent that it is reasonably apparent on the face of such disclosure that such disclosure is relevant to another Section of this Agreement, provided, further, that notwithstanding anything in this Agreement to the contrary, (i) no such item is required to be set forth in such schedule as an exception to a representation or warranty if its absence would not result in the related representation or warranty being deemed untrue or incorrect under the standard established by Section 9.2 and (ii) the mere inclusion of an item in such schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect (as defined in Section 3.8) on Company), Company hereby represents and warrants to Parent as follows:

3.1 Corporate Organization.

(a) Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware. Company has the requisite corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted, and is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary. Company is duly registered with the Office of Thrift Supervision ("OTS") as a savings and loan holding company under the Home Owners' Loan Act of 1933, as amended (the "Home Owners' Loan Act").

(b) True, complete and correct copies of the Restated Certificate of Incorporation of Company (the "Company Certificate"), and the Amended and Restated Bylaws of Company (the "Company Bylaws"), as in effect as of the date of this Agreement, have previously been made available to Parent.

(c) Each Subsidiary of Company (i) is duly incorporated or duly formed, as applicable to each such Subsidiary, and validly existing and in good standing under the laws of its jurisdiction of organization, (ii) has the requisite corporate power and authority or other power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted and (iii) is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary. The certificates of incorporation, by-laws and similar governing documents of each Subsidiary of Company, copies of which have previously been made available to Parent, are true, complete and correct copies of such documents as of the date of this Agreement. As used in this Agreement, the word "Subsidiary", when used with respect to either party, means any bank, corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, that is consolidated with such party for financial reporting purposes under U.S. generally accepted accounting principles ("GAAP").

(d) The deposit accounts of Countrywide Bank, fsb are insured by the Federal Deposit Insurance Corporation (the "FDIC") through the Deposit Insurance Fund to the fullest extent permitted by law, and all premiums and assessments required to be paid in connection therewith have been paid when due. Countrywide Bank, fsb is a member in good standing of the Federal Home Loan Bank of Atlanta (the "FHLBA").

A–7

Exhibit 3
269

Table of Contents

(e) The minute books of Company previously made available to Parent contain true, complete and correct records of all meetings and other corporate actions held or taken since January 1, 2005 of its stockholders and Board of Directors (including committees of its Board of Directors).

3.2 Capitalization.   (a)  The authorized capital stock of Company consists of 1,000,000,000 shares of Company Common Stock, par value $0.05 per share, of which, as of December 31, 2007 (the "Company Capitalization Date"), 578,919,834 shares, including all Company Restricted Shares, were issued and outstanding, and 1,500,000 shares of preferred stock, par value $0.05 per share (the "Company Preferred Stock"), of which, as of the Company Capitalization Date, (i) 250,000 shares were designated as Series A Participating Preferred Stock, none of which were outstanding, and (ii) 20,000 shares were designated, issued and outstanding as Series B Preferred Stock. As of the Company Capitalization Date, no shares of Company Common Stock or Company Preferred Stock were reserved for issuance except for (u) 49,693,066 shares of Company Common Stock reserved for issuance in connection with Company Options and Company SARs under the Company Stock Plans that are outstanding as of the Company Capitalization Date, (v) 1,056,172 shares of Company Common Stock reserved for issuance upon settlement of the Company RSUs and Company Deferred Equity Units that are outstanding as of the Company Capitalization Date, (w) 111,111,111 shares of Company Common Stock reserved for issuance upon conversion of the Series B Preferred Stock, (x) 72,300,000 shares of Company Common Stock reserved for issuance upon conversion of Company's Series A and Series B floating rate convertible debentures, (y) 26,601,024 shares of Company Common Stock reserved for issuance under Company's dividend reinvestment plan and 401(k) plan and (z) 250,000 shares of Series A Participating Preferred Stock reserved for issuance in accordance with the Amended and Restated Rights Agreement, dated as of November 27, 2001, as amended, between Company and American Stock Transfer & Trust Company, as Rights Agent (the "Rights Agreement"), pursuant to which Company has issued rights to purchase Series A Participating Preferred Stock ("Rights"). All of the issued and outstanding shares of Company Common Stock have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights, with no personal liability attaching to the ownership thereof. As of the date of this Agreement, no bonds, debentures, notes or other indebtedness having the right to vote on any matters on which shareholders of Company may vote ("Voting Debt") are issued or outstanding. As of the date of this Agreement, except pursuant to this Agreement, including with respect to the Company Stock Plans as set forth herein, the Certificate of Designation of the Series B Preferred Stock, and the Rights Agreement, Company does not have and is not bound by any outstanding subscriptions, options, warrants, calls, rights, commitments or agreements of any character calling for the purchase or issuance of, or the payment of any amount based on, any shares of Company Common Stock, Company Preferred Stock, Voting Debt or any other equity securities of Company or any securities representing the right to purchase or otherwise receive any shares of Company Common Stock, Company Preferred Stock, Voting Debt or other equity securities of Company. As of the date of this Agreement, except as provided in the Certificate of Designation of the Series B Preferred Stock, there are no contractual obligations of Company or any of its Subsidiaries (I) to repurchase, redeem or otherwise acquire any shares of capital stock of Company or any equity security of Company or its Subsidiaries or any securities representing the right to purchase or otherwise receive any shares of capital stock or any other equity security of Company or its Subsidiaries or (II) pursuant to which Company or any of its Subsidiaries is or could be required to register shares of Company capital stock or other securities under the Securities Act of 1933, as amended (the "Securities Act").

(b) Company has provided Parent with a true, complete and correct list of the aggregate number of shares of Company Common Stock issuable upon the exercise of each Company Option and Company SAR and settlement of each Company RSU and Company Deferred Equity Unit granted under the Company Stock Plans that were outstanding as of the Company Capitalization Date and the exercise price for each such Company Option and Company SAR. Other than the Company Options, Company SARs, Company Restricted Shares, Company RSUs and Company Deferred Equity Units that are outstanding as of the Company Capitalization Date, no other equity–based awards are outstanding as of the Company Capitalization Date. Since the Company Capitalization Date through the date hereof, Company has not (A) issued or repurchased any shares of Company Common Stock, Company Preferred Stock, Voting Debt or other equity securities of Company, other than the issuance of shares of Company Common Stock in connection with the exercise of Company Options or Company SARs or settlement of the Company RSUs or Company Deferred Equity Units granted

A–8

Exhibit 3
270

Table of Contents

under the Company Stock Plans or Company Deferred Equity Unit Plans that were outstanding on the Company Capitalization Date or (B) issued or awarded any options, stock appreciation rights, restricted shares, restricted stock units, deferred equity units, awards based on the value of Company capital stock or any other equity–based awards under any of the Company Stock Plans.

(c) Except for any director qualifying shares, all of the issued and outstanding shares of capital stock or other equity ownership interests of each Subsidiary of Company are owned by Company, directly or indirectly, free and clear of any liens, pledges, charges, claims and security interests and similar encumbrances ("Liens"), and all of such shares or equity ownership interests are duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights. No Subsidiary of Company has or is bound by any outstanding subscriptions, options, warrants, calls, commitments or agreements of any character calling for the purchase or issuance of any shares of capital stock or any other equity security of such Subsidiary or any securities representing the right to purchase or otherwise receive any shares of capital stock or any other equity security of such Subsidiary.

3.3 Authority; No Violation. (a) Company has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly, validly and unanimously approved by the Board of Directors of Company. The Board of Directors of Company has determined unanimously that this Agreement is advisable and in the best interests of Company and its stockholders and has directed that this Agreement be submitted to Company's stockholders for approval and adoption at a duly held meeting of such stockholders and has adopted a resolution to the foregoing effect. Except for the approval and adoption of this Agreement by the affirmative vote of the holders of a majority of the outstanding shares of Company Common Stock entitled to vote at such meeting, no other corporate proceedings on the part of Company are necessary to approve this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Company and (assuming due authorization, execution and delivery by Parent and Merger Sub) constitutes the valid and binding obligation of Company, enforceable against Company in accordance with its terms (except as may be limited by bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar laws of general applicability relating to or affecting the rights of creditors generally and subject to general principles of equity (the "Bankruptcy and Equity Exception")).

(b) Neither the execution and delivery of this Agreement by Company nor the consummation by Company of the transactions contemplated hereby, nor compliance by Company with any of the terms or provisions of this Agreement, will (i) violate any provision of the Company Certificate or Company Bylaws or (ii) assuming that the consents, approvals and filings referred to in Section 3.4 are duly obtained and/or made, (A) violate any law, judgment, order, injunction or decree applicable to Company, any of its Subsidiaries or any of their respective properties or assets or (B) violate, conflict with, result in a breach of any provision of or the loss of any benefit under, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, result in the termination of or a right of termination or cancellation under, accelerate the performance required by, or result in the creation of any Lien upon any of the respective properties or assets of Company or any of its Subsidiaries under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license, lease, franchise, permit, Company Securitization Document, agreement, by–law or other instrument or obligation to which Company or any of its Subsidiaries is a party or by which any of them or any of their respective properties or assets is bound.

3.4 Consents and Approvals. Except for (i) the filing of an application (the "BHCA Application") with the Board of Governors of the Federal Reserve System (the "Federal Reserve Board") under Section 4 of the Bank Holding Company Act of 1956, as amended (the "BHC Act") and approval of such application, (ii) the filing of any required applications, filings or notices with any foreign, federal or state banking, consumer finance, mortgage banking, insurance or other regulatory, self–regulatory or enforcement authorities or any courts, administrative agencies or commissions or other governmental authorities or instrumentalities (each a "Governmental Entity") and approval of or non–objection to such applications, filings and notices (the "Other Regulatory Approvals"), (iii) the filing with the Securities and Exchange Commission (the "SEC") of a Proxy Statement in definitive form relating to the meeting of Company's stockholders to be held in connection with

Exhibit 3
271

Table of Contents

this Agreement and the transactions contemplated by this Agreement (the "Proxy Statement") and of a registration statement on Form S–4 (the "Form S–4") in which the Proxy Statement will be included as a prospectus, and declaration of effectiveness of the Form S–4 and the filing and effectiveness of the registration statement contemplated by Section 1.5(e), (iv) the filing of the Certificate of Merger with the Secretary of State of the State of Delaware pursuant to the DGCL, (v) any notices to or filings with the Small Business Administration (the "SBA"), (vi) any consents, authorizations, approvals, filings or exemptions in connection with compliance with the rules and regulations of any applicable industry self–regulatory organization ("SRO"), and the rules of the NYSE, (vii) any notices or filings under the Hart–Scott–Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") and (viii) such filings and approvals as are required to be made or obtained under the securities or "Blue Sky" laws of various states in connection with the issuance of the shares of Parent Common Stock pursuant to this Agreement and approval of listing of such Parent Common Stock on the NYSE, no consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with the consummation by Company of the Merger and the other transactions contemplated by this Agreement. No consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with the execution and delivery by Company of this Agreement.

3.5 Reports; Regulatory Matters.

(a) Company and each of its Subsidiaries have timely filed all reports, registrations, statements and certifications, together with any amendments required to be made with respect thereto, that they were required to file since January 1, 2005 with (i) the OTS, (ii) the Federal Reserve Board, (iii) the FDIC, (iv) the Office of the Comptroller of the Currency, (v) the NYSE, (vi) any state consumer finance or mortgage banking regulatory authority or other Agency, (vii) any state agency charged with the regulation of the business of insurance (an "Insurance Department"), (viii) the SEC, (ix) any foreign regulatory authority and (x) any SRO (collectively, and together with applicable insurance regulatory authorities, "Regulatory Agencies") and with each other applicable Governmental Entity, and all other reports and statements required to be filed by them since January 1, 2005, including any report or statement required to be filed pursuant to the laws, rules or regulations of the United States, any state, any foreign entity, or any Regulatory Agency or other Governmental Entity, and have paid all fees and assessments due and payable in connection therewith. Except for normal examinations conducted by a Regulatory Agency or other Governmental Entity in the ordinary course of the business of Company and its Subsidiaries, no Regulatory Agency or other Governmental Entity has initiated since January 1, 2005 or has pending any proceeding, enforcement action or, to the knowledge of Company, investigation into the business, disclosures or operations of Company or any of its Subsidiaries. Since January 1, 2005, no Regulatory Agency or other Governmental Entity has resolved any proceeding, enforcement action or, to the knowledge of Company, investigation into the business, disclosures or operations of Company or any of its Subsidiaries. There is no unresolved, or, to Company's knowledge, threatened criticism, comment, exception or stop order by any Regulatory Agency or other Governmental Entity with respect to any report or statement relating to any examinations or inspections of Company or any of its Subsidiaries. Since January 1, 2005, there have been no formal or informal inquiries by, or disagreements or disputes with, any Regulatory Agency or other Governmental Entity with respect to the business, operations, policies or procedures of Company or any of its Subsidiaries (other than normal examinations conducted by a Regulatory Agency or other Governmental Entity in Company's ordinary course of business).

(b) Neither Company nor any of its Subsidiaries is subject to any cease–and–desist or other order or enforcement action issued by, or is a party to any written agreement, consent agreement or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, or is subject to any order or directive by, or has been ordered to pay any civil money penalty by, or has been since January 1, 2005 a recipient of any supervisory letter from, or since January 1, 2005 has adopted any policies, procedures or board resolutions at the request or suggestion of, any Regulatory Agency or other Governmental Entity that currently restricts in any material respect the conduct of its business (or to Company's knowledge that, upon consummation of the Merger, would restrict in any material respect the conduct of the business of Parent or any of its Subsidiaries), or that in any material manner relates to its capital adequacy, its ability to pay dividends, its credit, risk management or compliance policies, its internal controls, its management or its business, other than those of general application that apply to similarly situated savings and loan holding

A–10

Exhibit 3
272

Table of Contents

companies or their Subsidiaries (each item in this sentence, a "Company Regulatory Agreement"), nor has Company or any of its Subsidiaries been advised since January 1, 2005 by any Regulatory Agency or other Governmental Entity that it is considering issuing, initiating, ordering, or requesting any such Company Regulatory Agreement. To the knowledge of Company, there has not been any event or occurrence since January 1, 2005 that would result in a determination that Countrywide Bank, fsb is not "well capitalized" as a matter of U.S. federal banking law.

(c) Company has previously made available to Parent an accurate and complete copy of each (i) final registration statement, prospectus, report, schedule and definitive proxy statement filed with or furnished to the SEC by Company or any of its Subsidiaries pursuant to the Securities Act or the Securities Exchange Act of 1934, as amended (the "Exchange Act") since January 1, 2005 (the "Company SEC Reports") and prior to the date of this Agreement and (ii) communication mailed by Company to its stockholders since January 1, 2005 and prior to the date of this Agreement. No such Company SEC Report or communication, at the time filed, furnished or communicated (and, in the case of registration statements and proxy statements, on the dates of effectiveness and the dates of the relevant meetings, respectively), contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances in which they were made, not misleading, except that information as of a later date (but before the date of this Agreement) shall be deemed to modify information as of an earlier date. As of their respective dates, all Company SEC Reports complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto. Each current Subsidiary of Company that has filed since January 1, 2005 a Form S–3 registration statement with the SEC meets the requirements for the use of Form S–3, and no event has occurred that would reasonably be expected to result in Form S–3 eligibility requirements no longer being satisfied by any such Subsidiary. No executive officer of Company has failed in any respect to make the certifications required of him or her under Section 302 or 906 of the Sarbanes–Oxley Act of 2002 (the "Sarbanes–Oxley Act").

3.6 Financial Statements.

(a) The financial statements of Company and its Subsidiaries included (or incorporated by reference) in the Company SEC Reports (including the related notes, where applicable) (i) have been prepared from, and are in accordance with, the books and records of Company and its Subsidiaries, (ii) fairly present in all material respects the consolidated results of operations, cash flows, changes in stockholders' equity and consolidated financial position of Company and its Subsidiaries for the respective fiscal periods or as of the respective dates therein set forth (subject in the case of unaudited statements to recurring year–end audit adjustments normal in nature and amount), (iii) complied as to form, as of their respective dates of filing with the SEC, in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, and (iv) have been prepared in accordance with GAAP consistently applied during the periods involved, except, in each case, as indicated in such statements or in the notes thereto. The books and records of Company and its Subsidiaries have been, and are being, maintained in all material respects in accordance with GAAP and any other applicable legal and accounting requirements and reflect only actual transactions. KPMG LLP has not resigned or been dismissed as independent public accountants of Company as a result of or in connection with any disagreements with Company on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure.

(b) Neither Company nor any of its Subsidiaries has any material liability or obligation of any nature whatsoever (whether absolute, accrued, contingent, determined, determinable or otherwise and whether due or to become due), except for (i) those liabilities that are reflected or reserved against on the consolidated balance sheet of Company included in its Quarterly Report on Form 10–Q for the fiscal quarter ended September 30, 2007 (including any notes thereto) and (ii) liabilities incurred in the ordinary course of business consistent with past practice since September 30, 2007 or in connection with this Agreement and the transactions contemplated hereby.

(c) The records, systems, controls, data and information of Company and its Subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and direct control of Company or its

A–11

Exhibit 3
273

Table of Contents

Subsidiaries or accountants (including all means of access thereto and therefrom), except for any non–exclusive ownership and non–direct control that would not reasonably be expected to have a material adverse effect on the system of internal accounting controls described below in this Section 3.6(c). Company (x) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a–15(e) of the Exchange Act) to ensure that material information relating to Company, including its consolidated Subsidiaries, is made known to the chief executive officer and the chief financial officer of Company by others within those entities, and (y) has disclosed, based on its most recent evaluation prior to the date hereof, to Company's outside auditors and the audit committee of Company's Board of Directors (i) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a–15(f) of the Exchange Act) which are reasonably likely to adversely affect Company's ability to record, process, summarize and report financial information and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in Company's internal controls over financial reporting. These disclosures were made in writing by management to Company's auditors and audit committee, a copy of which has previously been made available to Parent. As of the date hereof, there is no reason to believe that Company's outside auditors, chief executive officer and chief financial officer will not be able to give the certifications and attestations required pursuant to the rules and regulations adopted pursuant to Section 404 of the Sarbanes–Oxley Act, without qualification, when next due.

(d) Since December 31, 2006, (i) neither Company nor any of its Subsidiaries nor, to the knowledge of Company, any director, officer, employee, auditor, accountant or representative of Company or any of its Subsidiaries has received or otherwise had or obtained knowledge of any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of Company or any of its Subsidiaries or their respective internal accounting controls, including any material complaint, allegation, assertion or claim that Company or any of its Subsidiaries has engaged in questionable accounting or auditing practices, and (ii) no attorney representing Company or any of its Subsidiaries, whether or not employed by Company or any of its Subsidiaries, has reported evidence of a material violation of securities laws, breach of fiduciary duty or similar violation by Company or any of its officers, directors, employees or agents to the Board of Directors of Company or any committee thereof or to any director or officer of Company.

3.7 Broker's Fees.  Neither Company nor any of its Subsidiaries nor any of their respective officers, directors, employees or agents has utilized any broker, finder or financial advisor or incurred any liability for any broker's fees, commissions or finder's fees in connection with the Merger or any other transactions contemplated by this Agreement, other than as set forth on Section 3.7 of the Company Disclosure Schedule and pursuant to letter agreements, true, complete and correct copies of which have been previously delivered to Parent.

3.8 Absence of Certain Changes or Events.  (a) Since September 30, 2007, no event or events have occurred that have had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Company. As used in this Agreement, the term "Material Adverse Effect" means, with respect to Parent or Company, as the case may be, a material adverse effect on (i) the financial condition, results of operations or business of such party and its Subsidiaries taken as a whole (provided, however, that, with respect to this clause (i), a "Material Adverse Effect" shall not be deemed to include effects to the extent resulting from (A) changes, after the date hereof, in GAAP or regulatory accounting requirements applicable generally to companies in the industries in which such party and its Subsidiaries operate, (B) changes, after the date hereof, in laws, rules or regulations of general applicability to companies in the industries in which such party and its Subsidiaries operate, (C) actions or omissions taken with the prior written consent of the other party, (D) changes, after the date hereof, in global or national political conditions or general economic or market conditions generally affecting other companies in the industries in which such party and its Subsidiaries operate or (E) the public disclosure of this Agreement or the transactions contemplated hereby, except, with respect to clauses (A) and (B), to the extent that the effects of such change are disproportionately adverse to the financial condition, results of operations or business of such party and its Subsidiaries, taken as a whole, as compared to other companies in the industry in which such party and its Subsidiaries operate) or (ii) the ability of such party to timely consummate the transactions contemplated by this Agreement.

A–12

Exhibit 3
274