LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com

*Liaison Counsel for Lead Plaintiff Iowa Public Employees' Retirement System*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

MAINE STATE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,

　　　　　　Plaintiff,

　　v.

COUNTRYWIDE FINANCIAL CORPORATION, et *al.*

　　　　　　Defendants.

No. 2:10-CV-00302 MRP (MAN)

<u>CLASS ACTION</u>

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND MOTION TO STRIKE**

Date:　　　　October 18, 2010
Time:　　　　11:00 a.m.
Courtroom:　 12
Judge:　　　 Hon. Mariana R. Pfaelzer

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

I. PRELMINARY STATEMENT ....................................................... 1

II. INTRODUCTION ............................................................................ 2

III. BACKGROUND ............................................................................. 7

    A. A Brief Primer On Mortgage-Backed Securities .................................. 8

    B. Countrywide's Role In Securitizing Hundreds Of Billions Of Dollars Of Improperly Underwritten Subprime Mortgages ................. 9

    C. The Underwriter Defendants' Role In The Securitization Process And Their Failure To Conduct Proper Due Diligence .......... 13

    D. The False Statements In The Offering Documents ........................... 15

    E. The Procedural History Of This Action ............................................ 19

IV. ARGUMENT .................................................................................. 22

    A. The Pleading Requirements For Securities Act Claims Are Easily Met Here ............................................................................... 22

    B. Plaintiffs' Claims Were Timely Filed ............................................... 25

        1. *American Pipe* Tolling Applies ............................................. 25

        2. The Statute Of Repose Is Treated The Same As The Statute Of Limitations ....................................................... 31

        3. Plaintiffs' Standing Is Not Relevant To Tolling ..................... 35

        4. Plaintiffs Were Not Required To Plead Compliance With The Statute Of Limitations ........................................ 38

        5. Even If *American Pipe* Tolling Does Not Apply, The One Year Statute of Limitations Does Not Bar Plaintiffs' Claims .............................................................. 39

    C. This Case Was Not Filed Too Early:  The Decline In Value Of The Certificates Plainly Results In Recoverable Damages Under The Securities Act ........................................................... 42

        1. The Loss Of Market Value For Mortgage-Backed Securities Is A Cognizable Injury Under Section 11 .............. 43

        2. The Liquidity Of The Market For Mortgage-Backed Securities Is Irrelevant To Whether Plaintiffs Have Suffered A Compensable Loss Under The Securities Act ........ 49

    D. Plaintiffs Have Standing To Assert All Of The Claims Set Forth In The Complaint ......................................................................... 50

        1. Plaintiffs Have Constitutional Standing ................................. 51

        2. Plaintiffs Have Statutory Standing ........................................ 58

        3. Pursuant to the Court's Prior Ruling, Plaintiffs Have Standing To Represent Others Who Purchased Pursuant To The Same Shelf Registration Statements ........................ 62

    E. Plaintiffs' Claims Do Not Sound In Fraud ....................................... 67

F. Plaintiffs Have Adequately Alleged The Offering Documents Contained Misrepresentations And Omissions Of Material Fact .......70

    1. Plaintiffs Need Not Identify Specific Deviant Loans To Allege Actionable Misstatements And Omissions ..................73

    2. Data Included In The Offering Documents Regarding The Mortgages Does Not Cure Alleged Misstatements And Omissions.................................................................................77

    3. Plaintiffs Have Adequately Alleged Misrepresentations And Omissions Regarding Appraisal Standards.......................79

    4. Plaintiffs' Allegations That Defendants Issued Materially Misleading Statements In The Offering Documents Satisfy The Requirements Established By The Securities Act .......................................................................82

G. The Allegations In The Complaint Are Properly Based On Corroborated Facts That There Is No Basis To Strike.......................85

H. Plaintiffs Do Not Need To Plead Reliance .........................................94

I. Plaintiffs Have Adequately Pled Section 12(a)(2) Claims..................96

    1. The Issuing Defendants And Underwriter Defendants Are Statutory Sellers ................................................................96

        a) The Issuing Defendants Are "Sellers" Within The Meaning Of Section 12(a)(2)............................................96

        b) The Underwriter Defendants Are "Sellers" Within The Meaning Of Section 12(a)(2) .................................98

    2. Plaintiffs Have Alleged Purchases In The Offerings............. 101

J. Plaintiffs Have Adequately Pled Control Person Liability ............. 102

    1. The Control Person Pleading Standard Is Not Demanding ................................................................................ 102

    2. Plaintiffs Have Adequately Pled Their Control Person Claims .................................................................................... 106

    3. Defendants' Arguments Are Unsupported By Precedent...... 110

K. JPMorgan Is Liable For The Conduct Of JPMSI............................. 114

L. Leave To Amend Should Be Granted If Any Portion Of The Complaint Is Dismissed ................................................................. 115

V. CONCLUSION........................................................................................ 115

1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abell v. Potomac Ins. Co.,*
  858 F.2d 1104 (5th Cir. 1988) ...............................................................46

*AIG Global Securities Lending Corp. v. Banc of America Securities, LLC,*
  646 F. Supp. 2d 385 (S.D.N.Y. 2009) ....................................................47

*Akerman v. Oryx Commc'ns, Inc.,*
  810 F.2d 336 (2d Cir. 1987) ...................................................................47

*Allen v. Wright,*
  468 U.S. 737, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984) ........................51

*American Pipe and Construction Co. v. Utah,*
  414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974)...............................passim

*Anwar v. Fairfield Greenwich Ltd.,*
  No. 09 Civ. 0118 (VM), 2010 WL 3022848 (S.D.N.Y. July 29, 2010).......58, 61

*Arivella v. Lucent Technologies, Inc.,*
  623 F. Supp. 2d 164 (D. Mass. 2009)......................................................34

*Atlas v. Accredited Home Lenders Holding Co.,*
  556 F. Supp. 2d 1142 (S.D. Cal. 2008) ...................................................73

*Ballard v. Tyco Int'l, Ltd.,*
  Nos. MDL 02-MD-1335-PB, 04-CV-1336-PB, 2005 WL 1683598
  (D.N.H. July 11, 2005) ...........................................................................34

*Barnes v. Osofsky,*
  373 F.2d 269 (2d Cir. 1967) ...................................................................59

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ...............22, 23, 70, 71

*Berry v. Valence Technology, Inc.,*
  175 F.3d 699 (9th Cir. 1999) .................................................................113

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.,*
  No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .......................85

*Blue Chip Stamps v. Manor Drug Stores,*
  421 U.S. 723, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975) ..........................59

*Carolina Cas. Ins. Co. v. Pinnacol Assurance,*
  425 F.3d 921 (10th Cir. 2005) ...............................................................58

*CashCall, Inc. v. Superior Court,*
  159 Cal. App. 4th 273, 71 Cal. Rptr. 3d 441 (Cal. Ct. App. 2008)...................36

*Catholic Social Services, Inc. v. Immigration and Naturalization Service*,
  232 F.3d 1139 (9th Cir. 2000) ................................................................27, 28

*Chardon v. Fumero Soto*,
  462 U.S. 650, 103 S. Ct. 2611, 77 L.Ed.2d 74 (1983) ...........................29

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010) ....................................................97

*City of Austin Police Ret. Sys. v. ITT Educational Services., Inc.*,
  388 F. Supp. 2d 932 (S.D. Ind. 2005)....................................................92

*Clemens v. DaimlerChrysler Corp.*,
  534 F.3d 1017 (9th Cir. 2008) ................................................................28

*Collins v. Signetics Corp.*,
  605 F.2d 110 (3d Cir. 1979) ...................................................................47

*Crown, Cork & Seal Co., Inc. v. Parker*,
  462 U.S. 345, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983) ...............25, 26, 27

*Cullen v. Margiotta*,
  811 F.2d 698 (2d Cir. 1987) .............................................................28, 42

*D'Alessio v. New York Stock Exchange, Inc.*,
  258 F.3d 93 (2d Cir. 2001) .....................................................................31

*Desaigoudar v. Meyercord*,
  223 F.3d 1020 (9th Cir. 2000) ................................................................71

*Dubois v. U.S. Dept. of Agric.*,
  270 F.3d 77 (1st Cir. 2001)......................................................................87

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ..............................................................115

*Erickson v. Pardus*,
  551 U.S. 89, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ...................104

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976) ........................82

*Fallick v. Nationwide Mutual Insurance Company*,
  162 F.3d 410 (6th Cir. 1998) ...........................................52, 53, 55, 57

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ............................................................71, 78

*Flood v. Miller*,
  35 Fed. Appx. 701 (9th Cir. 2002)....................................................103, 104

*Fouad v. Isilon Sys., Inc.*,
  No. C07-1764, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ...................105

*Fraker v. Bayer Corp.*,
    No. CV F 08-1564 AWI GSA, 2009 WL 5865687 (E.D. Cal. Oct. 6, 2009) ..................................................................................................90

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) ...............................................85

*Garcia v. Country Wide Fin. Corp.*,
    No. EDCV 07-1161-VAP (JCRx), 2008 WL 7842104
    (C.D. Cal. Jan. 17, 2008) .................................................................56

*Geinko v. Padda*,
    No. 00 C 5070, 2002 WL 276236 (N.D. Ill. Feb. 27, 2002) ...........91

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982) .........52, 57

*Goodman v. Lukens Steel Co.*,
    777 F.2d 113 (3d Cir. 1985) .............................................................54

*Graden v. Conexant Sys. Inc.*,
    496 F.3d 291 (3d Cir. 2007) .............................................................58

*Gratz v. Bollinger*,
    539 U.S. 244, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003) .........55, 60

*Gray v. First Winthrop Corp.*,
    82 F.3d 877 (9th Cir. 1996) .............................................................78

*Greenapple v. Detroit Edison Co.*,
    618 F.2d 198 (2d Cir. 1980) .............................................................82

*Greenwich Ins. Co. v. Rodgers*,
    No. EDCF 10-00430, 2010 WL 3070463 (C.D. Cal. July 23, 2010) ...............86

*Griffin v. PaineWebber, Inc.*,
    No. 99 Civ. 2292 (VM), 2001 WL 740764 (S.D.N.Y. June 29, 2001) ...........101

*Grubka v. WebAccess Int'l, Inc.*,
    445 F. Supp. 2d 1259 (D. Colo. 2006)..............................................34

*Gustafson v. Alloyd Co., Inc.*,
    513 U.S. 561, 574 (1995)................................................................101

*Harmsen v. Smith*,
    693 F.2d 932 (9th Cir. 1982) ...........................................................55

*Harris v. Amgen, Inc.*,
    573 F.3d 728 (9th Cir. 2009) ...........................................................58

*Hellerstein v. Mather*,
    360 F. Supp. 473 (D. Colo. 1973).....................................................34

*Herman & MacLean v. Huddleston*,
    459 U.S. 375, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983) ....................3, 22, 23, 82

*Hicks v. Morgan Stanley & Co.*,
  No. 01 Civ. 10071(HB), 2003 WL 21672085 (S.D.N.Y. July 16, 2003)..........55

*Hollinger v. Titan Capital Corp.*,
  914 F.2d 1564 (9th Cir. 1990) ...............................................................110, 111

*Howard v. Everex Sys.*,
  228 F.3d 1057 (9th Cir. 2000) ............................... 103, 104, 110, 111

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991) ...............................................................78

*In re Activision Sec. Litig.*,
  No. C-83-4639(A) MHP, 1986 WL 15339 (N.D. Cal. Oct. 20, 1986)...32, 33, 34

*In re AES Corp. Sec. Litig.*,
  825 F. Supp. 578 (S.D.N.Y. 1993) ................................................101

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) ............................................44

*In re Applied Micro Circuits Corp. Sec. Litig.*,
  No. 01-CV-0649K(AJB), 2002 U.S. Dist. LEXIS 22403 (S.D. Cal. Oct.
  3, 2002) ...............................................................................24

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009)...............................................68, 104

*In re Citigroup Inc. Bond Litig.*,
  No. 08 Civ. 9522, 2010 WL 2772439 (S.D.N.Y. July 12, 2010).......5, 62, 63, 66

*In re Connetics Corp. Sec. Litig.*,
  542 F. Supp. 2d 996 (N.D. Cal. 2008)...............................................56

*In re Connetics Corp. Sec. Litig.*,
  No. C 07-02940 SI, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ......22, 89, 90

*In re CornerStone Propane Partners, L.P. Sec. Litig.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005)..............................................78

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) .........................................74, 93

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ......................................passim

*In re Countrywide Financial Corp. Securities Litigation*,
  No. CV-07-05295-MRP....................................................................93

*In re CV Therapeutics Sec. Litig.*,
  No. C 03-03709 SI, 2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ...................24

*In re Cylink Sec. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001).......................................89, 93

*In re Daou Sys.*,
411 F.3d 1006 (9th Cir. 2005) ........................................................22, 70

*In re DDi Corp. Sec. Litig.*,
No. CV 03-7063 NM, 2005 WL 3090882 (C.D. Cal. July 20, 2005) ........99, 102

*In re Discovery Zone Sec. Litig.*,
181 F.R.D. 582 (N.D. Ill. 1998) ..........................................................34

*In re Downey Sec. Litig.*,
No. CV08-3261, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ....................111

*In re Dreyfus Aggressive Growth Mutual Fund Litigation*,
No. 98 Civ. 4318, 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000)...............54, 55

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
529 F. Supp. 2d 644 (S.D. Tex 2006) ....................................................34

*In re Epitope, Inc. Sec. Litig.*,
No. Civ. 92-759, 1992 WL 427842 (D. Or. Nov. 30, 1992) ..........................113

*In re First Union Corp. Securities Litigation*,
128 F. Supp. 2d. 871 (W.D.N.C. 2001) ..................................................48

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
352 F. Supp. 2d 429 (S.D.N.Y. 2005) ....................................................34

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
618 F. Supp. 2d 311 (S.D.N.Y. 2009) ....................................................78

*In re Fosamax Prods. Liab. Litig.*,
694 F. Supp. 2d 253 (S.D.N.Y. 2010) ....................................................28

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ............................................111, 112

*In re Homestore.Com, Inc. Sec. Litig.*,
347 F. Supp. 2d 790 (C.D. Cal. 2004) ............................................110, 111

*In re IndyMac Mortgage-Backed Sec. Litig.*,
No. 09-4583, 2010 WL 2473243 (S.D.N.Y. June 21, 2010) ..........................82

*In re Initial Pub. Offering Sec. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y. Feb. 19, 2003) ........................................47

*In re Juniper Networks, Inc. Sec. Litig.*,
542 F. Supp. 2d 1037 (N.D. Cal. 2008) ..................................................104

*In re La.-Pac. Corp. ERISA Litig.*,
No. Civ. 02-1023-KI, 2003 WL 21087593 (D. Ore. Apr. 24, 2003) ................56

*In re Lehman Bros. Sec. and ERISA Litig.*,
684 F. Supp. 2d 485 (S.D.N.Y 2010) ...............................38, 69, 72, 77, 84

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
218 F.R.D. 76 (S.D.N.Y. 2003) ....................................................................86, 93

*In re Network Assocs., Inc. II Sec. Litig.*,
No. C 00-CV-4849, 2003 WL 24051280 (N.D. Cal. Mar. 25, 2003) .............113

*In re Network Equip. Techs., Inc. Litig.*,
762 F. Supp. 1359 (N.D. Cal. 1991) ..............................................................24

*In re NPS Pharms. Sec. Litig., Inc.*,
No. 2:06-CV-00570, 2007 WL 1976589 (D. Utah July 3, 2007)......................24

*In re Philip Servs. Corp. Sec. Litig.*,
383 F. Supp. 2d 463 (S.D.N.Y. 2004) ..........................................................108

*In re PMA Capital Corp. Sec. Litig.*,
No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) ............................74

*In re PMI Group, Inc. Sec. Litig.*,
No. C 08-1405 SI, 2009 WL 3681669 (N.D. Cal. Nov. 2, 2009)......................73

*In re Scottish Re Group Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007) ......................................................99, 100

*In re Shoretel, Inc. Sec. Litig.*,
No. C 08-00271 CRB, 2009 WL 2588881 (N.D. Cal. Aug. 19, 2009).............46

*In re Stac Elecs. Sec. Litig.*,
89 F. 3d 1399 (9th Cir. 1996) ..............................................................67, 83

*In re Thoratec Corp. Sec. Litig.*,
No. C-04-03168 RMW, 2006 WL 1305226 (N.D. Cal. May 10, 2006) ...........78

*In re Thornburg Mortgage, Inc. Securities Litigation*,
683 F. Supp. 2d 1236 (D.N.M. 2010)..............................................................54

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
202 F. Supp. 2d 8 (S.D.N.Y. 2001) ..................................................................85

*In re U.S.A. Classic Sec. Litig.*,
No. 93 Civ. 6667, 1995 U.S. Dist. LEXIS 8327 (S.D.N.Y. June 19, 1995) ....101

*In re Valence Tech. Sec. Litig.*,
No. C 94-1542-SC, 1995 WL 274343 (N.D. Cal. May 8, 1995) ....................103

*In re VeriSign Sec. Litig.*,
No. C 02-02270 TW (PVT), 2005 WL 88969 (N.D. Cal. Jan. 13, 2005) ....51, 56

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
259 F.R.D. 490 (W.D. Wash. 2009) ..................................................................99

*In re Wash. Mut. Sec., Derivative & ERISA Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009) .......................................................73

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   823 F.2d 1349 (9th Cir. 1987) .................................................31

*In re Wells Fargo Mortgage-Backed Cert. Litig.*
   No. C 09-01376. 2010 WL 1661534 (N.D. Cal. Apr. 22, 2010)................passim

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996) ......................................................99

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) ...............................................95

*In re WorldCom, Inc. Sec. Litig.*,
   Nos. 02 Civ. 3288(DLC), 03 Civ. 0890, 2004 WL 1097786 (S.D.N.Y.
   May 18, 2004)............................................................105, 110

*Ingenito v. Bermec Corp.*,
   441 F. Supp. 525 (S.D.N.Y. 1977) ...........................................34

*Johns v. Bayer Corp.*,
   No. 09CV1935, 2010 WL 2573493 (S.D. Cal. June 24, 2010)..................91, 93

*Jones v. AIG Risk Mgmt., Inc.*,
   No. C-10-1374 EMC, 2010 WL 2867337 (N.D. Cal. July 20, 2010) ...............86

*Jones v. Johnson*,
   781 F.2d 769 (9th Cir. 1986) ..................................................114

*Joseph v. Wiles*,
   223 F.3d 1155 (10th Cir. 2000) .....................................32, 33, 38

*Kidder Peabody & Co., Inc. v. Unigestion Int'l, Ltd.*,
   903 F. Supp. 479 (S.D.N.Y. 1995) ...........................................49

*Kirtdoll v. City of Topeka*,
   315 F.3d 1234 (10th Cir. 2003) ...............................................39

*Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*,
   571 F.3d 672 (7th Cir. 2009) ..........................................53, 58

*Kraemer v. Grant County*,
   892 F.2d 686 (7th Cir. 1990) ..................................................93

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
   501 U.S. 350, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991) .................31, 32

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th 2001) ......................................................24

*Lentell v. Merrill Lynch & Co. Inc.*,
   396 F.3d 161 (2d Cir. 2005) ..................................................41

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir. 2003) ..................................................59

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,*
   594 F.3d 383 (5th Cir. 2010) ....................................................76, 77

*Lone Star Ladies Inv. Club v. Scholtzsky's, Inc.,*
   238 F.3d 363 (5th Cir. 2001) ..............................................................98

*Luminent Mortgage Capital v. Merrill Lynch & Co.,*
   652 F. Supp. 2d 576 (E.D. Pa. 2009)..................................................48

*Luther v. Countrywide Fin. Corp.,*
   No. 09-cv-06162-MRP-JWJ (C.D. Cal. filed Aug. 24, 2009)...........20

*Luther v. Countrywide Fin. Corp.,*
   No. 09-cv-06162-MRP-JWJ, 2009 WL 3271368 (C.D. Cal. Oct. 9, 2009).......21

*Luther v. Countrywide Fin. Corp.,*
   No. B222889 (Cal. Ct. App. filed Mar. 5, 2010)...............................21

*Luther v. Countrywide Home Loans Serv. LP,*
   No. 07-cv-08165 (C.D. Cal.) ...............................................19, 20, 21

*Luther v. Countrywide Home Loans Servicing LP,*
   No. BC 380698, slip op. (Cal. Super. Ct. Jan. 6, 2010) ....................20

*Madani v. Shell Oil Co.,*
   No. CV 08-1283, 2008 WL 7856015 (C.D. Cal. July 11, 2008).......27

*McMahan & Co. v. Wherehouse Entm't,*
   65 F.3d 1044 (2d Cir. 1995)...............................................................47

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
   521 F.3d 1097 (9th Cir. 2008) ...........................................................22

*Merck & Co., Inc. v. Reynolds,*
   130 S. Ct. 1784, 176 L. Ed. 2d 582 (2010) .......................................40

*Miller v. Thane Int'l, Inc.,*
   519 F.3d 879 (9th Cir. 2008) ......................................................71, 78

*Moss v. U.S. Secret Serv.,*
   572 F.3d 962 (9th Cir. 2009) ......................................................22, 70

*Mutchka v. Harris,*
   373 F. Supp. 2d 1021 (C.D. Cal. 2005) .............................................56

*N.J. Carpenters Health Fund v. Residential Capital, LLC,*
   No. 08 CV 8781 (HB), 2010 WL 1257528 (S.D.N.Y.
   Mar. 31, 2010)..................................................................69, 72, 77

*New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.,*
   No. 08 Civ. 5356(PAC), 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ....passim

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC,*
   No. 08 CV 5093(HB), 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010)........passim

*Palmer v. Stassinos*,
236 F.R.D. 460 (N.D. Cal. 2006)..................................................37

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008) .........................................85

*Paul F. Newton & Co. v. Tex. Commerce Bank*,
630 F.2d 1111 (5th Cir. 1980) ...................................................102

*Payan v. Aramark Mgmt. Serv. L.P.*,
495 F.3d 1119 (9th Cir. 2007) ......................................................38

*Payton v. County of Kane*,
308 F.3d 673 (7th Cir. 2002) ...................................................53, 57

*Plumbers' Union Local No. 12 Local Pension Fund v. Nomura Asset Acceptance Corp.*,
658 F. Supp. 2d 299 (D. Mass. 2009) .....................................passim

*Portwood v. Ford Motor Co.*,
183 Ill. 2d 459, 701 N.E.2d 1102 (Ill. 1998) ...............................28

*Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc.*,
No. 08 Civ. 10841, 2010 WL 2175875 (S.D.N.Y. June 1, 2010) ..............61, 110

*Randall v. Loftsgaarden*,
478 U.S. 647, 106 S. Ct. 3143, 92 L. Ed. 2d 525 (1986) ...................23

*Reed Elsevier, Inc. v. Muchnick*,
30 S. Ct. 1237, 176 L.Ed.2d 17 (2010)........................................58

*Republic Bank & Trust Co. v. Bear, Stearns Co., Inc.*,
No. 3:09-CV-287-S, 2010 WL 1489264 (W.D. Ky. Apr. 13, 2010)...........75, 76

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) .......................................................98

*RSM Prod. Corp. v. Fridman*,
643 F. Supp. 2d 382 (S.D.N.Y. 2009) ..........................................90

*Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ..................................................25, 42

*Schoenhaut v. Am. Sensors*,
986 F. Supp. 785 (S.D.N.Y. 1997) ..........................................99, 101

*SEC v. Mozilo*,
Case No. CV 09-3994-JFW (C.D. Cal.), Order....................................92

*Sewell v. D'Alessandro & Woodyard, Inc.*,
No. 2:07-cv-343, 2010 WL 2872053 (M.D. Fla. July 20, 2010)....................40

*Shurkin v. Golden State Vintners, Inc.*,
471 F. Supp. 2d 998 (N.D. Cal. 2006)..........................................24

*Siemers v. Wells Fargo & Co.*,
    No. C 05-04518 WHA, 2006 WL 2355411 (N.D. Cal. Aug. 14, 2006) ..........105

*Smith v. Pennington*,
    352 F.3d 884 (4th Cir. 2003) ................................................................37

*SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*,
    No. 09 Civ. 5066 (RMB), 2010 WL 2473595 (S.D.N.Y. June 17, 2010).........93

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) .............................55, 61

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) ................................22

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05 Civ. 1898(SAS), 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005) ............74

*Tooley v. Napolitano*,
    556 F.3d 836 (D.C. Cir. 2009)..............................................................71

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    92 F. Supp. 2d 387 (S.D.N.Y. 2010) .......................................................75, 82

*Tsirekidze v. Syntax-Brillian Corp.*,
    No. CV-07-02204-PHX-FJM, 2009 WL 275405 (D. Ariz. Feb. 4, 2009).......113

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008) ..................................................................49

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ...............................................................24

*United States v. S. Cal. Edison Co.*,
    300 F. Supp. 2d 964 (E.D. Cal. 2004) ......................................................24

*Vaccariello v. Smith & Nephew Richards, Inc.*,
    94 Ohio St. 3d 380, 763 N.E.2d 160 (Ohio 2002)...........................................28

*Valenzuela v. Kraft Inc.*,
    801 F.2d 1170 (9th Cir. 1986) .............................................................36, 37

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ................................................................71, 78

*Warth v. Seldin*,
    422 U.S. 490, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975) ...................................51

*Wojtunik v. Kealy*,
    No. CV-03-2161, 2006 WL 2821564 (D. Ariz. Sept. 30, 2006).....................103

*Wool v. Tandem Computers Inc.*,
    818 F.2d 1433 (9th Cir. 1987) ..............................................................103, 104

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STATUTES

15 U.S.C. § 15b ........................................................................... 30

15 U.S.C. § 77b(a)(4) .............................................................. 9, 96

15 U.S.C. § 77k .................................................................... passim

15 U.S.C. § 77l ..................................................................... passim

15 U.S.C. § 77m ............................................................ 25, 29, 39

15 U.S.C. § 77o .................................................................... passim

15 U.S.C. § 77z-1 ...................................................................... 21

## OTHER AUTHORITIES

17 C.F.R. § 229.1111(a)(3) ........................................................ 83

17 C.F.R. § 230.158 ............................................................. 94, 95

17 C.F.R. § 230.159A ................................................. 6, 96, 97, 98

Charles Alan Wright & Arthur W. Miller, Federal Practice and
    Procedure (3d ed. 2004) ..................................................... 39

Charles Alan Wright, et al., 7AA Federal Practice and Procedure (3d ed.) ........... 57

Fed. R. Civ. P. 8 ......................................................... 69, 70, 100, 102

Fed. R. Civ. P. 9 ................................................................... passim

Fed. R. Civ. P. 11 ........................................................ 85, 86, 90

Fed. R. Civ. P. 12 ................................................................. passim

Fed. R. Civ. P. 15 .................................................................... 115

Fed. R. Civ. P. 23 ................................................................. passim

Restatement (Second) of Judgments § 11 cmt A. ....................... 35

Securities & Exchange Commission Release, Securities Offering Reform,
    Release Nos. 33-8591, 34-52056, IC-26993, FR-75 ......................... 97

## I.     PRELMINARY STATEMENT

Lead Plaintiff Iowa Public Employees' Retirement System ("IPERS") and additional named plaintiffs the General Board of Pension and Health Benefits of the United Methodist Church ("GBPHB"), Orange County Employees' Retirement System ("OCERS"), and the State of Oregon, by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board on behalf of the Oregon Public Employee Retirement Fund ("OPERS"), respectfully submit this memorandum in opposition to the seven motions to dismiss the Amended Consolidated Class Action Complaint (the "Complaint," Dkt. No. 122) and joinders thereto, as well as one motion to strike.[1]  The primary motion to dismiss and memorandum was filed by the Countrywide Defendants,[2] and is referred to herein as "the Motion" or the "Defendants' Brief," and cited as "Br."  Dkt. No. 158-1.  A joinder to that Motion was filed by the Underwriter Defendants,[3] which

---

[1] All capitalized terms used herein have the same meaning as in the Complaint, and references thereto are in the form ¶ __.

[2] Defendant Countrywide Financial Corporation ("CFC") was a holding company which operated through several subsidiaries, including defendants Countrywide Securities Corporation ("CSC"), Countrywide Home Loans, Inc. ("CHL"), and Countrywide Capital Markets ("CCM").  Following CFC's collapse in July 2008 when its improper mortgage origination practices began to come to light, CFC and its subsidiaries merged with Bank of America Corp. ("BOA") and a BOA controlled shell company, NB Holdings Corp.  See ¶ 30.  These defendants are collectively referred to in the Complaint as the Countrywide Defendants.  However, in moving to dismiss, the following defendants have identified themselves as the "Countrywide Defendants": CFC, CSC, CHL, CCM, CWALT, Inc., CWMBS, Inc., CWABS, Inc., CWHEQ, Inc., and N. Joshua Adler.  Thus, as used herein, the term Countrywide Defendants refers to all of these defendants other than BOA and NB Holdings Corp.  Having been added to the case at the amended complaint filing, the time for BOA and NB Holdings to respond to the complaint was later, and supplemental briefing addresses the claims against those two defendants.

[3] The term "Underwriter Defendants" as used herein and in the Complaint differs slightly from the definition in the joinder of the "Underwriter Defendants" to the Motion.   In the Complaint, the term "Underwriters" or the "Underwriter Defendants" refers to Defendant Countrywide Securities Corporation ("CSC"), in addition to defendants Banc of America Securities LLC ("BOFAS"); Barclay's Capital, Inc. ("Barclay's"); Bear, Stearns & Co., Inc. ("Bear Stearns"); BNP Paribas Securities Corp. ("BNP Paribas"); Citigroup Global Markets, Inc. ("Citigroup"); Credit Suisse Securities (USA) LLC f/k/a Credit Suisse First Boston LLC ("Credit Suisse"); Deutsche Bank Securities Inc. ("Deutsche Bank"); Edward D. Jones & Co., L.P. ("Edward Jones"); Goldman, Sachs & Co. ("Goldman

is referred to herein as the "Underwriter Brief."   Dkt. No. 159.   A third memorandum was filed by individual defendants Ranjit Kripalani and Jennifer S. Sandefur and is referred to as the "Kripalani/Sandefur Brief."  Dkt. No. 153.  An additional memorandum was filed on behalf of defendant Stanford L. Kurland, and is referred to as the "Kurland Brief."  Dkt. No. 149.  Defendant David Sambol has submitted an additional memorandum, referred to as the "Sambol Brief."  Dkt. No. 157.  Defendant David Spector has filed yet another memorandum, referred to as the "Spector Brief." Dkt. No. 147.  Finally, Defendant Eric P. Sieracki has filed a joinder to the motion to dismiss, and a Motion to Strike Portions of [the] Complaint, referred to as the "Sieracki Brief" or the "Motion to Strike."  Dkt. No. 145.  Given the repetitive nature of those motions and memoranda, they are all addressed in this one memorandum.

## II.   INTRODUCTION

This action arises from the mass production and sale by CFC, its subsidiaries and 16 Underwriter Defendants of $351 billion of supposedly investment-grade mortgage-backed securities which collapsed in value and were revealed to be simply junk bond investments relatively soon after they were issued and sold to Plaintiffs and the Class.  These securities were sold in hundreds of Offerings between 2005 and 2007 using substantially similar Offering Documents which shared a number of critical elements.  The collateral for all of these securities was Countrywide mortgage loans, and the 19 common Registration Statements as well as the Prospectus Supplements filed in connection with the Offerings all detailed, in largely identical terms, the purported standards or guidelines used by

Sachs"); RBS Securities Inc. f/k/a RBS Greenwich Capital d/b/a Greenwich Capital Markets, Inc. ("RBS"); JPMorgan Chase & Co., erroneously named in the Complaint as JPMorgan Chase, Inc. ("JPMorgan"); J.P. Morgan Securities, Inc. ("JPMSI"); HSBC Securities (USA) Inc. ("HSBC"); Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"); Morgan Stanley & Co., Inc. ("Morgan Stanley"); and UBS Securities LLC ("UBS").  As used in the Underwriter Brief, the term Underwriter Defendants does not include CSC.

Countrywide to originate the mortgage loan collateral.   These guidelines purportedly ensured that there was an assessment of borrower creditworthiness and valuation of the mortgaged property even for loans originated based on limited borrower documentation.

However, after the Certificates were sold, evidence emerged indicating that the purported loan origination guidelines were systematically disregarded and that, as a result, the Offering Documents contained misstatements and omissions in violation of Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), which imposes nearly-strict liability on those that issue, underwrite and sell securities using such defective Offering Documents.

Specifically, the Complaint details that in the months following each Offering, no matter when the Offering occurred, the default rates increased exponentially; the Rating Agencies that originally assigned the highest investment grade ratings not only dramatically downgraded the Certificates to junk bond investments, but did so because of their findings that the underlying mortgage loans were originated pursuant to undisclosed "aggressive underwriting practices." Further, governmental and other investigations into Countrywide's loan origination practices during the period of time the mortgage loan collateral was underwritten confirmed Countrywide's systemic disregard of its own loan origination guidelines.   Plaintiffs' allegations to this effect more than satisfy the notice pleading requirements under Rule 8 applicable to Securities Act claims.

Wishing to avoid their "virtually absolute" liability under the Securities Act,[4] Defendants set forth a laundry list of standard arguments in an effort to narrow or eliminate their liability for the defective sale of $351 billion in Certificates.   But these are the same arguments that have repeatedly been rejected by numerous other courts in cases involving mortgage-backed securities.   None of

---

[4] *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983).

these arguments merits dismissal of Plaintiffs' claims, particularly where Defendants' arguments invite the Court to prematurely rule on questions of fact or class certification.

Defendants assert numerous defenses to this action on the basis that the claims asserted are untimely. But there can be no question that Defendants were notified of the claims against them well within the statute of limitations provided for in the Securities Act. An initial complaint apprising Defendants of the claims was filed nearly three years ago – in late 2007. That complaint, along with other complaints subsequently filed in State Court, was sufficient to toll the running of the statute of limitations for all of the claims that are now asserted in the Complaint pursuant to the tolling principles enunciated in *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974). Although there has been somewhat of a tortured procedural history to this action over those three years, Defendants do not, and cannot, claim not to have been on notice of the claims in this lawsuit – the purpose of the statute of limitations which they now seek to hide behind. Indeed, to reward Defendants with substantive immunity simply for filing a barrage of procedural motions that have resulted in a delay of consideration of the merits of this case for three years would be unconscionable.

Next, Defendants attempt to reduce the size of the case by arguing that Plaintiffs have no standing under Article III of the Constitution to assert Securities Act claims except for a fraction of the Offerings encompassed in the Complaint. However, as demonstrated below, circuit courts have consistently held that Article III requires only the allegation of *an injury* in order to confer standing, not that the plaintiff must have been injured in every offering the plaintiff seeks to represent in a class action. Whether such an individual can also represent the claims of others is decidedly a question under Rule 23 – which creates an exception to the ordinary rule that a plaintiff must have suffered the harm of which she complains – and is properly deferred until consideration of the motion to certify a class in this matter

and analyzed under the appropriate Rule 23 standard, not pursuant to Rule 12.  In all events, however, consistent with this Court's ruling in *In re Countrywide Fin. Corp. Sec. Litig.*,[5] and Judge Stein's recent decision in *In re Citigroup Inc. Bond Litig.*,[6] at the very least Plaintiffs have statutory standing under the Securities Act to assert claims based on 13 Registrations Statements they purchased pursuant to (and the 377 Offerings emanating from those Registration Statements) because the Registration Statements are alleged to have contained specific, common misstatements and omissions regarding Countrywide's loan origination practices.

At the same time they assert that the claims were filed too late, Defendants likewise assert that the claims must be dismissed because they were filed too early – before there has been a default in interest payments.  There is no provision in the Securities Act that limits bond damages to instances where there has been a default in interest payments or precludes damages when no default has yet occurred.  The clear language of the Securities Act requires only a diminution in the value of the securities under Section 11 or provides for rescission under Section 12 (or rescissory damages if those securities have already been sold at a loss).  Other courts confronted with the same flawed argument that plaintiffs have not been damaged in the absence of a default on the securities they purchased have rejected it out of hand, and this Court should do the same.  Plaintiffs need not wait for decades to determine whether they have been injured where the value of the securities has collapsed well before a default in interest payments.

Further, despite Defendants' arguments to the contrary, there can be little serious dispute that the Complaint adequately pleads under Rule 8 that the Offering Documents contained misstatements and omissions of material fact. The Complaint sets forth in over 50 pages how the Offering Documents misstated and omitted factual details concerning Countrywide's systemic disregard of its stated

---

[5] 588 F. Supp. 2d 1132 (C.D. Cal. 2008).

[6] No. 08 Civ. 9522, 2010 WL 2772439 (S.D.N.Y. July 12, 2010).

loan origination guidelines and underwriting standards, and flawed appraisal processes which relied on inflated appraisals from carefully chosen sources. Defendants are simply wrong that disclosure of FICO scores and loan-to-value ("LTV") ratios and warnings of potential or possible default can cure a blatant disregard for stated underwriting standards and inflated appraisals.

Far exceeding the applicable notice-pleading requirement of Rule 8, the Complaint also details the exponential increase in the default rates of the loans underlying the Certificates, the collapse of the Certificates' ratings to "junk" levels due to previously undisclosed "aggressive underwriting" practices, and the failure to perform requisite due diligence to validate that the loans actually complied with the stated underwriting guidelines. The Complaint also sets forth numerous facts – not simply uncorroborated allegations – that have emerged through a variety of press reports, investigations and lawsuits concerning Countrywide's practices that underscore the plausibility of Plaintiffs' claims. Defendant Sieracki would have the Court ignore some of these facts because they were revealed in other litigation – but there is no basis for the Court to ignore these corroborated facts, the inclusion of which is fully in compliance with Rule 11. Sieracki's claims that these facts should be stricken on the basis that Plaintiffs' counsel did not conduct an independent investigation of the claims in this action is simply wrong.

Defendants' additional arguments likewise fail, such as their erroneous claim that Plaintiffs have not adequately pled claims under Sections 12 or 15. In making these arguments, Defendants completely ignore controlling Securities and Exchange Commission ("SEC") rules and case law that directly contradict their arguments, such as SEC Rule 159A which contradicts the Issuing Defendants' claim that they are not "sellers" under Section 12; the SEC enacted this rule to make clear that the issuer of securities is a seller under Section 12 regardless of the form of underwriting used. Additionally, although courts have found allegations that a plaintiff purchased MBS "pursuant or traceable" to an initial offering

insufficient to satisfy the pleading standards, the allegations here of purchases "in connection with" the Offerings are sufficient to state a claim.

Defendants also ignore controlling Ninth Circuit precedent in attempting to escape their plain role as controlling persons.  The pleading standard for such claims is once again the minimal notice standard of Rule 8, and the allegations in the Complaint simply and succinctly set forth the nature of those claims and the parties against whom they are asserted.

Ultimately, all that is required to proceed beyond a motion to dismiss is that Plaintiffs' claims be plausible, and they are.  Defendants' motions should be denied in their entirety.

## III.   BACKGROUND

As set forth in the Complaint, from 2005 through 2007, Countrywide was the nation's largest residential mortgage lender.   ¶ 4.   Countrywide's massive lending was made possible by its ability to rapidly "securitize" the loans that it issued, so that it profited merely from the volume of its lending, rather than the quality.  *Id.*  The securitization of loans fundamentally shifts the risk of loss from mortgage loan originators to investors who purchase an interest in the securitized pool of loans. ¶ 71.  When the originator holds a mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan.  *Id.*  As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  *Id.*  However, in Countrywide's case, the loans it originated were immediately securitized, undermining its economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.  Through the Underwriter Defendants, Countrywide sold the mortgage loans it originated to investors as purportedly investment grade

mortgage-backed securities, passing the risk of the loans defaulting off to others while it and the other Defendants profited from the sales of the Certificates.  ¶ 4.

## A.    A Brief Primer On Mortgage-Backed Securities

Despite Defendants' effort to confuse the issue and make the Certificates appear distinct, each Offering at issue in this case in fact operated in the same manner, and was sold using substantially identical Offering Documents.  ¶¶ 5, 21-24, Exs. D-EE (indicating the same language appears repeatedly across different Offerings).  In a typical mortgage securitization like the type Countrywide and the other Defendants used, mortgage loans are pooled together and then sold to investors, who acquire rights in the income flowing from the mortgage pools.  ¶ 69.  The mortgage loans go through several steps before the ultimate sale of the mortgage-backed securities ("MBS"), as the MBS represent payments from the mortgages rather than individual mortgages themselves.

Once the mortgage loans are made, they are sold to a "depositor."  ¶ 7.  Here, the Depositors were all limited purpose entities created by CFC.[7]  *Id.*  For each Offering, a special-purpose Issuing Trust is created by the Depositor to hold the underlying mortgage loan collateral.  ¶ 5.  The Depositor then deposits the loans into the Issuing Trusts corresponding to the particular Offering and, along with the Underwriter Defendants and the Rating Agencies, designs the structure of each Offering.  ¶ 7.  Typically, each Offering has several "tranches" of Certificates with different seniority and hence different payment priority – but all are backed by the same pool of mortgages and sold by the same Offering Documents.  The Offering structure determines how the cash-flows from the mortgage loans are distributed to the different tranches of senior and subordinate classes of Certificates.  *Id.*  Finally, the Depositor registers the Certificates for sale with the

---

[7]  The Depositors were four acronym-named shell companies:  CWALT, Inc. ("CWALT"); CWABS, Inc. ("CWABS"); CWMBS, Inc. ("CWMBS"); and CWHEQ, Inc. ("CWHEQ") (CWALT, CWABS, CWMBS, and CWHEQ are collectively referred to herein as the "Depositors" or "Issuers").

SEC through largely-identical shelf Registration Statements and Prospectus Supplements, and sells the Certificates through the Underwriter Defendants.  ¶¶ 76, 78.  Thus, as it is the Depositor that registers the Certificates for sale, and despite the confusing nomenclature, the Depositor is the "Issuer" of the securities for purposes of the Securities Act, not the Issuing Trusts.   ¶ 10 n.1; 15 U.S.C. § 77b(a)(4).

The Certificates entitle investors to receive monthly distributions of interest and principal from the Issuing Trusts derived from borrower repayment of the mortgage loans.  ¶ 5.  When mortgage borrowers make interest and principal payments, the cash-flows from those mortgage loans are directed by a "servicer" (the bank you send your mortgage payment to) to the Issuing Trust, where they are divided amongst the different tranches of Certificates.  Here, CHL acted as the servicer of the mortgages.  ¶ 76.  Payments are then made to the holders of the Certificates in the order of priority determined at the time the Certificates were created.  ¶ 70.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.  *Id.*  Although the lower tranches are designed to provide a cushion against defaults by the homeowners who pay back the mortgages, any diminished cash flows affect all of the tranches of an issuance, as there is less certainty of the continued cash flows to the higher tranches since all of the tranches rely on payments from the same pool of mortgages.

### B.  Countrywide's Role In Securitizing Hundreds Of Billions Of Dollars Of Improperly Underwritten Subprime Mortgages

The assembly line created by Countrywide and the Underwriter Defendants for the mass production and sale of the Certificates began with Countrywide and its affiliates originating the mortgage loans.  ¶ 6.  The mortgage loan origination process required Countrywide to collect information from prospective borrowers

and, supposedly, analyze that information to be sure it complied with the necessary criteria to warrant making a loan.  *See, e.g.,* ¶ 162, 164.  This process, confusingly, is referred to as "underwriting" (but is distinct from "underwriting" the sale of the mortgage-backed securities).  Countrywide's mortgage loans that were eventually securitized into the Certificates were all purportedly underwritten pursuant to specific loan origination guidelines set forth in the Offering Documents.  ¶ 6, 161.  The guidelines set out the details of how Countrywide and its affiliates would assess borrower creditworthiness and appraise the value of the mortgaged property pursuant to standard appraisal methodologies.  *Id*.

Although Defendants correctly note that there were several different types of loans, including a number of alternative loan products such as "alternative documentation" or "stated income" loans included in the Certificates, these minor distinctions in the loan products are irrelevant to this case.  ¶ 171.  Regardless of the type of loan included, the Offering Documents represented that the underwriting guidelines for those loans had been followed.  ¶ 6.  But because they were not actually followed – meaning the borrowers of the mortgages were not qualified for the loans and could never have paid them back and/or the mortgaged properties were not worth the values claimed – regardless of the type of loan included or when each of the Offerings occurred the delinquency and default rates on the underlying mortgage collateral skyrocketed within just a few months of the Offerings. ¶ 88.

As detailed in the Complaint, these early payment defaults and delinquency rates are reflective of a systematic disregard for underwriting guidelines.   ¶ 89.  Due to the underwriting failures, as of the filing of the Complaint, ***more than half*** of the mortgage loans underlying the Certificates are now severely delinquent, in default, repossessed, in bankruptcy or in foreclosure. ¶ 90.

The Rating Agencies, who were responsible for analyzing the investment quality of the Certificates and, hence, the quality of the underlying mortgages took

note of these failings.  ¶ 94.  In reassessing its ratings analysis of MBS, S&P noted that the abysmal performance of loans sold to the public through MBS "called into question" the accuracy of the data about those loans.  ¶ 95.  Given what has now been described by Moody's as undisclosed "aggressive underwriting" practices, it is unsurprising that the Certificates have drastically declined in value.  Whereas over 90% of the Certificates were originally rated AAA – the safest, highest quality investments available – those ratings have plummeted, such that the Certificates are now rated as "junk."

Among the failures in Countrywide's origination practices that have emerged are that:

- Countrywide's loan originators systemically disregarded and/or manipulated the income, assets and employment status of borrowers seeking mortgage loans in order to qualify these borrowers for mortgages, ¶ 101;

- Countrywide customers were steered to more expensive, higher interest loans, such as subprime and "alternative" mortgages, which they would not likely be able to repay, because making such loans allowed Countrywide to increase the number of attractive mortgages it could sell to the secondary mortgage markets, ¶ 101;[8]

- "Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients…," *Wall St. J.,* March 11, 2008, ¶ 102;

- A review by MBIA Insurance Corp., one of the largest bond insurers, of 19,000 Countrywide mortgages found "an extraordinarily high incidence of material deviations from the underwriting guidelines Countrywide represented it would follow," ¶ 137;

---

[8] Alternative loan products tended to carry higher interest rates, and thus were more profitable loans to sell to investors.  ¶ 101.

- Internal Countrywide documents admitted that Countrywide was aware of "evidence of borrowers misrepresenting their income and occupation on reduced documentation loan applications," ¶ 105;

- An email to Defendant Sambol showed borrower income was frequently inflated on stated income loans by more than 50%, ¶ 105, and one of Countrywide's mortgage brokers, One Source Mortgage Inc., for example, routinely doubled the amount of the potential borrower's income on stated income mortgage applications, ¶ 111;

- Countrywide's CEO had "personally observed a serious lack of compliance within [Countrywide's] origination system …," ¶ 105;

- An internal Countrywide analysis determined that borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans, ¶ 105;

- A Countrywide employee indicated that as much as 80% of the loans originated by Countrywide in his office involved significant variations from Countrywide's normal underwriting standards, ¶ 123;

- Another Countrywide employee revealed that loans identified by the company's automated Exception Processing System as violating underwriting standards were *not* rejected, ¶ 125;

- According to an independent appraisal firm that refused to fabricate appraisals to meet Countrywide's requirements, "Countrywide engaged in a pattern and practice of pressuring real estate appraisers to artificially increase appraisal values for properties underlying mortgages Countrywide originated and/or underwrote," ¶ 134.

Once these improperly underwritten mortgage loans were made, Countrywide rapidly removed them from its loan inventory, and sold the payments from the mortgages and the attendant risks of default to Plaintiffs and the Class. In order to sell the mortgages that Countrywide originated, CFC set up Defendants

CWALT, CWMBS, CWABS, and CWHEQ, the Depositors in this case, as "limited purpose finance entities" solely for the purpose of facilitating the issuance of the Certificates.   ¶ 76.  As noted above, because the Depositors are the entities that actually issue the Certificates under the Securities Act, they are referred to as the "Issuing Defendants."   The Issuing Defendants were special-purpose entities set up and run by CFC and its subsidiaries and personnel, including the Individual Defendants Kurland, Spector, Sieracki, Adler, Kripalani, Sandefur, and Sambol.[9] ¶¶ 33-37.  The Individual Defendants were the board members of the Depositors, and signed the Registration Statements used to sell the Certificates.  ¶¶ 56-61; 65-66.

### C.     The Underwriter Defendants' Role In The Securitization Process And Their Failure To Conduct Proper Due Diligence

Once the mortgages were transferred to the Issuing Defendants, they were quickly sold through the Offerings by the Underwriter Defendants.   Unlike a typical public company which relies exclusively on outside underwriters to sell its securities, Countrywide had its own underwriting division in-house, CSC, which carried out much, though not all, of the underwriting and sale of the Certificates. The Complaint plainly alleges that Plaintiffs and the Class purchased securities from the Underwriter Defendants in the Offerings, and sets out in detail which Offerings were underwritten by which Underwriters.  ¶ 225, Compl. Ex. B (chart particularizing underwriters for each Offering).

The Underwriter Defendants (including CSC) had the all-important role of actually selling the Certificates to Plaintiffs and the other members of the Class. Prior to selling the Certificates to the public, the Underwriter Defendants were

---

[9] Defendant Sambol is not included in the definition of "Individual Defendants" in the Complaint because he did not sign the Issuing Defendants' SEC filings as the other Individual Defendants did.   Sambol was rather the President and COO of CFC, and in that role is alleged to be a control person of the Issuing Defendants. ¶¶ 67, 76.   Previously named Individual Defendants Boone, McLaughlin and Grogin are no longer parties to this action.

obligated to conduct a reasonable due diligence investigation into the merits of the Offerings. However, rather than do so, the Underwriter Defendants short-cut the due diligence process, and instead relied on outside contractors to conduct minimal reviews of small fractions of the loans that made up each Offering. ¶¶ 144-45. And when even these cursory reviews revealed problematic loans were contained in the pools of the mortgages, the Underwriter Defendants failed to take steps to resolve issues in the loan quality and instead sold the Certificates in the Offerings, defective loans included. ¶¶ 146-47.

This due diligence outsourcing was principally performed by two firms – Clayton and Bohan. ¶ 145. Clayton and Bohan were routinely tasked to examine loans for conformity with the underwriting guidelines that were detailed in the Offering Documents. ¶ 147. Each loan reviewed was rated in a three-tier system, with category "1" loans the best quality. *Id.* Category "3" loans, however, were defective and recommended for exclusion from securitization. *Id.* Such defective loans were still routinely included in securitizations because the risk of default was passed on to investors in the Certificates rather than held by the Underwriter Defendants or Countrywide. *Id.* Indeed, removing such loans would only reduce the size of the securitization, and thus the size of the Underwriters' fees as well. *Id.*

Clayton and Bohan have now admitted that their reviews revealed numerous problems in loans that were included in securitizations. Clayton, in agreeing to immunity with the New York Attorney General, admitted "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio." ¶ 151. The President of Bohan has indicated that as little as 5% of loans were actually reviewed. ¶ 146. And the chief executive of yet another firm that verified borrowers' incomes for mortgage companies, Rapid Reporting, told *The New York Times* that "lenders and

investment banks routinely ignored concerns raised by these consultants."  ¶ 150, *quoting* "Inquiry Focuses on Withholding of Data on Loans," N.Y. Times, Jan. 12, 2008.

Moreover, before they sold the Certificates, the Underwriter Defendants made sure that they could sell the Certificates at the highest price to often-conservative institutional investors by securing investment-grade credit ratings for the Certificates.  ¶ 8.   The Underwriter Defendants would "negotiate" with the Rating Agencies before they were hired, in order to get them to agree to the most profitable structures and the highest percentage of AAA-designated Certificates. ¶¶ 157-58.   Through these efforts, the Underwriter Defendants successfully achieved AAA/maximum-security ratings on over 92% of the Certificates.  ¶ 158.

And, now that the failures in Countrywide's origination practices and the Underwriters' due diligence efforts have come to light, just as large a percentage of those Certificates have been downgraded to "junk."  ¶ 12.

### D.   The False Statements In The Offering Documents

The Certificates created by the Depositors and sold by the Underwriters to Plaintiffs were all sold pursuant to Registration Statements filed with the SEC subject to the requirements of the Securities Act.  ¶ 1.  Each Registration Statement was prepared by the Issuing Defendants with the assistance of the Underwriter Defendants, and signed by the Individual Defendants.   ¶¶ 56-61, 161.   The Registration Statements were "shelf" registrations, allowing additional securities to be issued in series as additional mortgages were securitized.   Each Registration Statement contained an illustrative form of a Prospectus Supplement for use in the Offering of the Certificates.   ¶ 161.   For each successive Offering, a Prospectus Supplement was required, which further detailed each particular Offering, but remained incorporated in the Registration Statement and thus used the same set of representations for each Offering made under a particular Registration Statement. ¶ 78.   In particular, each Prospectus Supplement made the same representations

concerning CHL's standards in originating the mortgages and valuing the properties underlying the Issuing Trusts, and the Registration Statements contained identical, or nearly identical, language concerning the compliance with underwriting guidelines. ¶¶ 78, 161, 164-66, 170, 177-80. For example, each Registration Statement filed by CWALT and CWMBS, as well as the Prospectus Supplements issued pursuant to those Registration Statements, contained the same language below concerning the underwriting standards by which the mortgages pooled into CWALT and CWMBS Offerings were originated:

> All of the Mortgage Loans have been originated or acquired by Countrywide Home Loans, Inc., in accordance with its credit, appraisal and underwriting standards.... Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.
>
> Countrywide Home Loans' underwriting standards are applied, by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis, varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan

amount and credit history of the borrower.   In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs.   ***Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.***

¶ 162; Compl. Ex. D; *see also* Compl. Ex. E.  But the Offering Documents failed to disclose the rampant deviations from Countrywide's underwriting guidelines, and that, for the litany of reasons discussed above and in the Complaint, the loans were originated outside of the guidelines without any valid exceptions.  The Complaint sets out that these statements were materially false and misleading for, among other reasons, that:

- Defendants failed to disclose that Countrywide systematically ignored underwriting standards imposed by state and federal law in issuing the mortgages pooled into the Issuing Trusts;

- Countrywide did not, contrary to its statement above, properly "evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."   Rather, as alleged in the Complaint, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans; and

- Countrywide's underwriting standards did not require that a borrower "generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the

borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits."  Instead, Countrywide's underwriting included the following practices that disregarded a borrowers' ability to pay by:

- o Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- o Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- o Encouraging borrowers to borrow more than they could afford by suggesting "no income, no assets" ("NINA") and "stated income, stated asset" ("SISA") loans when they could not qualify for full documentation loans based on their actual incomes;

- o Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed-rate" when the adjustable rate adjusted;

- o Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- o Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies; and

- o Systematically overriding flags identified by Countrywide's automated underwriting system CLUES, which was meant to weed out non-qualifying loans, and nonetheless approving such

loans.

¶ 163.

Likewise, the Registration Statements for Certificates sold by CWABS and CWHEQ contained uniform representations about the underwriting standards applied to the loans securitized by those entities as well, similarly failing to describe the true state of Countrywide's loan origination shortcomings.  ¶¶ 164-67.  Moreover the Registration Statements for Certificates sold by all four of the Issuing Defendants contained the same misstatements regarding deviations for underwriting standards where appraisals indicated low LTV ratios, and that "stated income" loans were reviewed to be sure the stated income was reasonable.  ¶¶ 168-69.  Yet again, these statements failed to disclose that Countrywide's appraisal standards were disregarded and that incomes were wildly inflated in loan applications.  ¶¶ 176.  The Complaint provides in detail the other misstated and omitted information that was widespread throughout the Offering Documents, and the Exhibits to the Complaint plainly show that the same misstatements and the same rampant omissions occurred in all of the Offering Documents.  ¶¶ 170-85.

### E.   The Procedural History Of This Action[10]

On November 14, 2007, David H. Luther filed an action in the Superior Court of California, Los Angeles County (the "State Court"), on behalf of purchasers of MBS issued by Countrywide affiliates.  The complaint alleged that the Offering Documents for these MBS contained misrepresentations and omissions in violation of Sections 11, 12(a)(2), and 15 of the Securities Act.

On December 14, 2007, the defendants in the *Luther* action removed the action to federal court, claiming the Court had subject matter jurisdiction under the Class Action Fairness Act.  *See Luther v. Countrywide Home Loans Serv. LP,* No. 07-cv-08165 (C.D. Cal.), Dkt. No. 1.  This Court held that it did not, and granted

---

[10] This procedural history is set forth in this Court's previous Order Appointing Lead Plaintiff and Lead Counsel, at 2-4, Dkt. No. 120 (May 14, 2010).

Luther's motion to remand.  *Id.*, Dkt. No. 26.  The Ninth Circuit affirmed the
Court's ruling and the case returned to state court.  *Id.*, Dkt. No. 31.  After remand
and pursuant to the parties' stipulation, the State Court consolidated the *Luther*
action with another putative class action filed on June 12, 2008, and on October 6,
2008 designated the named plaintiffs as co-lead plaintiffs, and appointed the
plaintiffs' counsel, the law firms of Robbins Geller Rudman & Dowd LLP and
Barroway Topaz Kessler Meltzer & Check LLP, as co-lead counsel.  By then, the
*Luther* action had been amended, on September 9, 2008, to include other
institutional investors as additional named plaintiffs (the plaintiffs in the State
Court actions are referred to as the "State Plaintiffs" and the State Court actions are
referred to as the "State Litigation").  The claims of the proposed class in the State
Litigation encompassed all of the same Offerings and are based on the same
alleged misconduct as in this federal case.  *See* Br. at 21; *see also* Ex. 25 to
Countrywide Defendants' Request for Judicial Notice, Dkt. No. 160 (Aug. 16,
2010) (November 14, 2007 State Litigation complaint); Ex. 1 to Plaintiffs' Notice
of Request and Request for Judicial Notice which is being filed in conjunction with
this brief (June 12, 2008 State Litigation complaint).

The defendants in *Luther* then raised a further objection to the State Court's
jurisdiction, this time under the Securities Litigation Uniform Standards Act
("SLUSA").  On January 6, 2010, the State Court, after considering the issue,
stayed the *Luther* action and "ordered Plaintiffs to file a similar case in federal
court in order to provide the federal court the opportunity to address, in the first
instance, the federal statutory/jurisdiction issue."  *Luther v. Countrywide Home
Loans Servicing LP*, No. BC 380698, slip op. at 2:15-18 (Cal. Super. Ct. Jan. 6,
2010).  Consequently, on August 24, 2009, Luther filed a declaratory judgment
action before this Court asking the Court to declare that SLUSA did not prevent
him from maintaining the action in state court.  *See Luther v. Countrywide Fin.
Corp.*, No. 09-cv-06162-MRP-JWJ (C.D. Cal. filed Aug. 24, 2009).  Reasoning

that the case would serve no useful purpose within the meaning of the Declaratory Judgment Act since the State Court was equally competent to decide the issue, on October 9, 2009 this Court exercised its discretion to dismiss the action. *Luther v. Countrywide Fin. Corp.*, No. 09-cv-06162-MRP-JWJ, 2009 WL 3271368 (C.D. Cal. Oct. 9, 2009).

Subsequently, the State Court dismissed the *Luther* action for lack of subject matter jurisdiction.[11]  A week after the *Luther* action was dismissed, on January 14, 2010, the State Plaintiffs – with the exception of plaintiff David H. Luther – filed the complaint in the above-captioned action, "essentially bringing the *Luther* action to federal court."  Order Appointing Lead Plaintiff and Lead Counsel, at 3, Dkt. No. 120 (May 14, 2010).  Like the *Luther* action, this case is a class action brought against CFC, its various subsidiaries, officers and board members, and certain underwriters of the MBS for violations of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq*.

On May 14, 2010, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 77z-1, the Court appointed Iowa Public Employees' Retirement System ("IPERS") as Lead Plaintiff and its counsel, Cohen Milstein Sellers & Toll PLLC and Glancy Binkow & Goldberg LLP, as Lead Counsel and Liaison Counsel, respectively. *Id.* at 11-12.

On July 13, 2010, Lead Plaintiff IPERS filed the Complaint.  The Complaint was filed as a class action and named as Plaintiffs IPERS, GBPHB, OCERS, and OPERS.[12]  On August 16, 2010 Defendants filed their motions to dismiss and to strike, and supporting papers.  Dkt. Nos. 145-165.

---

[11]  Luther appealed the jurisdictional issue, and that appeal is still pending in state court.  *See Luther v. Countrywide Fin. Corp.*, No. B222889 (Cal. Ct. App. filed Mar. 5, 2010).

[12]  Although they were not appointed Lead Plaintiffs and are not specifically identified in the Complaint, the State Plaintiffs who initially filed this federal court action remain parties to this case.

IV.   **ARGUMENT**

A.   **The Pleading Requirements For Securities Act Claims Are Easily Met Here**

In assessing the Complaint, the Court must accept the allegations as true and construe them in the light most favorable to Plaintiffs. *In re Daou Sys.*, 411 F.3d 1006, 1013 (9th Cir. 2005). Dismissal is appropriate only where, viewed in its totality, a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (to survive a motion to dismiss, a complaint "must be plausibly suggestive of a claim entitling the plaintiff to relief").

Indeed, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). Dismissal under Fed. R. Civ. P. 12(b)(6) "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings." *In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 WL 3842938, at *2 (N.D. Cal. Aug. 14, 2008) (citing *United States v. City of Redwood*, 640 F.2d 963, 966 (9th Cir. 1981)).

Section 11 of the Securities Act provides a private cause of action against issuers, underwriters and other participants in any public securities offering made under a registration statement that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 imposes a "stringent standard of liability," that is "virtually absolute, even for innocent misstatements." *Herman & MacLean*, 459 U.S. at 381-82 (footnote

omitted).   A plaintiff "need only show a material misstatement or omission to establish his *prima facie* case," which "places a relatively minimal burden on a plaintiff." *Id.* at 382. Section 12(a)(2) of the Securities Act provides similar liability for untrue statements and omissions in the prospectuses.   *Randall v. Loftsgaarden*, 478 U.S. 647, 106 S. Ct. 3143, 92 L. Ed. 2d 525 (1986).

The Securities Act provides a "harsh, nearly strict-liability rule designed to make sure those involved in securities offerings meticulously prepare the registration statement." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1170 n.47 (C.D. Cal. 2008).   Congress implemented this harsh remedy because the Securities Act "'[aims] . . . to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation [and] to place adequate and true information before the investor.'"   *Loftsgaarden*, 478 U.S. at 659 (quoting S. Rep. No. 476-73, at 1 (1st Sess. 1933)).   Plaintiffs here assert claims under Section 11 against the Individual Defendants, the Issuing Defendants, and the Underwriter Defendants, and claims under Section 12(a)(2) against the Issuing Defendants and the Underwriter Defendants, who solicited and sold the Certificates in the Offerings to members of the Class.

As the Supreme Court recently reaffirmed in *Ashcroft v. Iqbal*, "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" though the complaint must offer more than just "a formulaic recitation of the elements of a cause of action."   129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).   Acknowledging *Twombly*, the Court stated that a pleader must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*"   *Id.* at 1944 (emphasis in original).

Here, the Complaint's allegations readily satisfy Rule 8.   Rather than accept as true the well-pleaded allegations, Defendants rely upon matters outside of the Complaint and on unwarranted factual inferences and assertions that are not proper

subjects for judicial notice.  *See* accompanying Opposition to Defendants' Request for Judicial Notice. "The Court should not use judicial notice to generate an evidentiary record and then weigh evidence – which plaintiffs have not had the opportunity to challenge – to dismiss plaintiffs' complaint."[13] "When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).  Defendants improperly seek "judicial notice" of SEC filings and other public documents to introduce disputed facts into the record, and then, on the basis of these disputed facts, assert that Lead Plaintiffs' allegations should not be accepted as true.  Under Ninth Circuit law, the Court may ***not*** take "judicial notice of disputed facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th 2001).[14]

---

[13] *In re Network Equip. Techs., Inc. Litig.*, 762 F. Supp. 1359, 1363 (N.D. Cal. 1991).  *See also In re CV Therapeutics Sec. Litig.*, No. C 03-03709 SI, 2004 WL 1753251, at *5 (N.D. Cal. Aug. 5, 2004) ("[c]haracterizations of the allegations and evidence will need to wait for the next stage of the litigation"); *In re NPS Pharms. Sec. Litig., Inc.*, No. 2:06-CV-00570, 2007 WL 1976589, at *1 (D. Utah July 3, 2007) (striking exhibits to motion to dismiss where defendants "made misleading statements regarding the safety, efficacy, potential for FDA approval, and potential market size of [a drug] in violation of § 10(b)"); *In re Applied Micro Circuits Corp. Sec. Litig.*, No. 01-CV-0649K(AJB), 2002 U.S. Dist. LEXIS 22403, at *8 (S.D. Cal. Oct. 3, 2002) (refusing to consider "extrinsic evidence").

[14]   Plaintiffs do not oppose consideration of certain public documents, the contents of which are proper subjects for judicial notice of the existence of statements therein. *See Shurkin v. Golden State Vintners, Inc.*, 471 F. Supp. 2d 998, 1011 (N.D. Cal. 2006) ("[T]he Court takes judicial notice of these documents, ***not for the truth of the statements contained therein***, but for the fact that these documents were publicly-filed and for the fact that the statements made therein were made to the public on the dates specified.") (emphasis added).  Plaintiffs object, however, to the consideration of any documents outside of the Complaint for the truth of the matters asserted therein. *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004) (court cannot take judicial notice "to prove the truth of the contents or any party's assertion of what the contents mean"). *See* Plaintiffs' Response to Defendants' Request for Judicial Notice, filed concurrently herewith.

## B.   Plaintiffs' Claims Were Timely Filed

Defendants argue that most of Plaintiffs' claims are time-barred.   In the Ninth Circuit, "[a] claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when the running of the statute is apparent on the face of the complaint."   *Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (quotations omitted) (petition for cert. pending).   To warrant dismissal, it must appear "beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim."   *Id.*

Defendants do not come close to meeting this heavy burden.   Section 13 of the Securities Act, 15 U.S.C. § 77m, provides that a claim must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence" or, in any event, within "three years after the security was *bona fide* offered to the public [for Section 11 claims], or … [its] sale [for Section 12(a)(2) claims]."   15 U.S.C. § 77m.   Because the claims in the State Litigation were filed within the limitations period, Plaintiffs' claims here are not time-barred.

Defendants acknowledge that the class proposed in the previously filed State Litigation was essentially the same as the class proposed here, *see* Br. at 21, and make no meaningful claim that the State Litigation was itself not filed within the limitations period.   Instead Defendants argue that the statute of limitations was not tolled while the State Litigation was pending.   If, as Plaintiffs argue, Defendants are wrong, and the State Litigation did toll the statute of limitations, Plaintiffs' claims are timely.

### 1.   *American Pipe* Tolling Applies

As Defendants recognize, the key to the disputed limitations issues is the applicability of the doctrine established in *American Pipe*, and expanded in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 103 S. Ct. 2392, 76 L. Ed. 2d 628

1    (1983).  Both cases arose after class actions were dismissed for reasons other than

2    their merits.  The members of the proposed classes then sought to pursue their

3    individual claims.  Defendants asserted that these claims were time-barred because

4    the statute of limitations had expired while the class actions were pending.  The

5    Supreme Court, however, held that the statute of limitations were suspended during

6    the pendency of the class actions and that the plaintiffs were entitled to pursue their

7    claims either by intervening in the failed class action (*American Pipe*) or by

8    bringing a new lawsuit (*Crown, Cork*).  414 U.S. at 552-53; 462 U.S. at 352.

9        In reaching these decisions the Supreme Court examined the policies

10   underlying both statutes of limitation and class actions.  It explained that class

11   actions are a "representative suit designed to avoid" unnecessary individual

12   litigation.  *Am. Pipe*, 414 U.S. at 550.  If the limitations period was not tolled

13   during the pendency of a class action it would be impossible to achieve this

14   objective –

15           [a] putative class member who fears that class certification may

16           be denied would have every incentive to file a separate action

17           prior to the expiration of his own period of limitations.  The

18           result would be a needless multiplicity of actions – precisely the

19           situation that Federal Rule of Civil Procedure 23 … [was]

20           designed to avoid.

21   *Crown, Cork*, 462 U.S. at 350-51.

22       The Supreme Court balanced this prospect of multiple actions against the

23   interests statutes of limitation are meant to protect.  It explained that "statutory

24   limitation periods are 'designed to promote justice by preventing surprises through

25   the revival of claims that have been allowed to slumber until evidence has been

26   lost, memories have faded, and witnesses have disappeared.'"  *Am. Pipe*, 414 U.S.

27   at 554 (quotations omitted).  Failing to toll the statute of limitation while a class

28   action is pending would not promote this purpose because, if the class action is

filed "[w]ithin the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation," regardless of whether the dispute is ultimately litigated as a class or as an individual action. *Id.* at 555.

Building on *American Pipe* and *Crown, Cork*, in *Catholic Social Services, Inc. v. Immigration and Naturalization Service*, 232 F.3d 1139 (9th Cir. 2000) (*en banc*), the Ninth Circuit held that an unsuccessful earlier-filed class action can toll the statute of limitations for a subsequent class action. The situation in *Catholic Services* was similar to the situation here: an initial class action (albeit filed in federal court) had been dismissed prior to a resolution on the merits. Here the State Court dismissed the State Litigation on jurisdictional grounds; in *Catholic Social Services* the Ninth Circuit had dismissed the earlier class action without reaching the merits. The *Catholic Social Services* defendants argued that *American Pipe* tolling applies only to subsequently filed individual actions, not subsequent class actions. The Ninth Circuit disagreed and allowed a second class action, noting that the plaintiffs, like Plaintiffs here, "are not attempting to relitigate an earlier denial of class certification" and that "[t]he substantive claims asserted in this action are … within the scope of those asserted in the earlier [class] action, and the dismissal of that action did not result from an adverse decision on the merits of any of those claims." *Id.* at 1149.[15]

_____

[15] Relying on *Madani v. Shell Oil Co.*, No. CV 08-1283, 2008 WL 7856015, at *2 (C.D. Cal. July 11, 2008), Defendants Kurland and Sambol assert that *Catholic Social Services* "has been limited to the unique facts of that case." Kurland Br. 11 n.6; *see also* Sambol Br. 11 n.11. While *Catholic Social Services* involved a change in immigration law after the filing of the initial class action, nothing in the opinion (or its dissents) limits it to those facts. *See Catholic Social Services*, 232 F.3d 1139 at 1153 (Kozinski, J., dissenting) ("The question is whether filing a class action tolls the statute of limitations for purposes of filing a subsequent class action."). In fact, the case focused not on the legislative change, but on a Ninth Circuit panel's earlier dismissal of the original class action without adjudicating its merits. *Catholic Social Services*, 232 F.3d at 1146. In any event, *Madani* is consistent with *Catholic Social Services* – the district court reasoned that a second class action could not proceed when there ***had been*** "an adverse decision ***on the merits***" in the first class action. 2008 WL 7856015, at *2 (emphasis added).

One of the teachings of *American Pipe, Crown, Cork* and *Catholic Social Services* is that the running of the statute of limitations is suspended during the pendency of a class action that is ultimately dismissed for reasons other than the merits.  This is true even when a subsequent suit is a new class action, provided that the second class action is not meant to circumvent an unfavorable decision on class certification in the earlier case.  This rule is fair and consistent with the purposes of both class actions and statutes of limitation.  Indeed, Defendants apparently do not dispute that this is the rule applied in this Circuit with respect to cases in the federal system; they complain, instead, that it does not apply here because the initial class action was filed in state court.  *See, e.g.*, Br. at 27 ("*American Pipe* tolling does not apply to class actions filed in state court.").  They do not, however, cite to any court that has held that *American Pipe* tolling does not apply to earlier-filed state court class actions when determining whether a subsequently filed federal lawsuit – class action or otherwise – is timely.

In fact, the Second Circuit has rejected Defendants' position.  In *Cullen v. Margiotta*, 811 F.2d 698 (2d Cir. 1987), it ruled that RICO claims filed in federal court were timely because the statute of limitations had been tolled by an earlier state court class action.  The court saw no reason why the fact that the initial lawsuit was filed in state court changed the *American Pipe* rule.  *Id.* at 720 ("the *American Pipe* doctrine has applicability to the present action").  The court's ruling came even though, in contrast to this case, there were significant differences between the state claims and the subsequent federal claims.  *Id*. at 720-21.[16]

---

[16] Defendants cite three cases that purportedly show that "cross jurisdictional" *American Pipe* tolling is not permitted.  But these cases refer to whether **state law** allows tolling when a class action is filed in another jurisdiction.  *See In re Fosamax Prods. Liab. Litig.*, 694 F. Supp. 2d 253, 257-58 (S.D.N.Y. 2010) (applying Virginia law, earlier class action filed in Tennessee) (Br. at 27); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025 (9th Cir. 2008) (Illinois class action did not toll limitations period under California law) (Kurland Br. at 10); *Portwood v. Ford Motor Co.*, 183 Ill. 2d 459, 464-66, 701 N.E.2d 1102 (Ill. 1998) (applying Illinois law) (Kurland Br. at 10); *but see Vaccariello v. Smith & Nephew Richards, Inc.*, 94 Ohio St. 3d 380, 383, 763 N.E.2d 160 (Ohio 2002) (Ohio law permits cross jurisdictional *American Pipe* tolling, rejecting *Portwood*).  These

No. 2:10-cv-00302: OPPOSITION TO MOTIONS TO DISMISS                28

Lacking legal authority, Defendants make several flawed policy arguments. Initially, they wrongly insist that the authority for *American Pipe* tolling is Rule 23 of the Federal Rules of Civil Procedure (which sets out class action procedures) and then, from this inaccurate premise, conclude that "if *American Pipe* tolling did apply to state court class actions, it would violate the Rules Enabling Act, which provides that federal rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" Br. at 28 (quoting 28 U.S.C. § 2072(b)). In fact, *American Pipe* itself rejected Defendants' argument. The *American Pipe* defendants, like Defendants here, relied on the Rules Enabling Act's prohibition on modifying substantive rights to argue that "the federal courts are powerless to extend the limitation period beyond the period set by Congress." *Am. Pipe*, 414 U.S. at 556; *see also id*. at n.26 (quoting Rules Enabling Act). The Court disagreed, explaining that the power to toll statutes of limitation reflected long established "considerations deeply rooted in our jurisprudence," and that the application of recognized rules of tolling is generally appropriate unless it would be inconsistent with Congress' purpose in enacting the statute at issue. *Id.* at 558-59 (quotations and brackets omitted). *American Pipe* involved a class action in federal court, but its reasoning applies equally when, as is the case here, the initial class action is filed in state court.[17]

---

Defendant-cited cases have nothing to do with whether federal courts, applying federal law, should apply *American Pipe* where there has been an earlier state class action, especially when, as is the case here, the state case was based entirely on federal law. Moreover, Defendants' citation to Justice Rehnquist's dissent in *Chardon v. Fumero Soto*, 462 U.S. 650, 103 S. Ct. 2611, 77 L.Ed.2d 74 (1983) (Br. at 27 & 28), for the inappropriateness of cross jurisdictional tolling in this case is strange. Rehnquist was arguing that *American Pipe* tolling **should** be applied by a federal court after an earlier filed state class action. *Id.* at 667-68. However, because (unlike here) there was no federal statute of limitations that applied to the plaintiffs' claims, the Court majority applied Puerto Rico's more generous tolling rule instead of *American Pipe*. *Id.* at 662.

[17] Defendants say that applying *American Pipe* here would be "beyond the power of the federal courts" because Section 13 of the Securities Act "does not include any general tolling provisions and states that "'in no event' shall [a claim] be brought" after the limitations period. Br. at 29. But the limitations provision of the antitrust claim that was tolled in *American Pipe* similarly provided that any

Defendants also argue that *American Pipe* should not be applied to state actions because avoiding judicial overload was a principal rationale behind *American Pipe* and, they say, refusing to toll the limitations period while a class action is pending on a federal securities claim in a state court would not "clog the federal courts with needless and duplicative" litigation.  Br. at 28 (quotations and brackets omitted).  Defendants' argument is wrong.  In this case, for example, there is every reason to think that, if Class members believed they were required to do so to preserve their rights in case the State Litigation was dismissed on grounds other than the merits, they would have filed individual claims while the State Litigation was pending.  Many Class members, who are spread throughout the country, would undoubtedly have filed in federal court, where the vast majority of cases under the federal securities laws are litigated, especially given Defendants' challenge to the State Court's jurisdiction.  And even if a significant number of these individual claims were brought in state courts, Defendants do not explain why the federal courts should be unconcerned about overloading the state systems with needless litigation.

After wrongly insisting that there is no threat of duplicative federal litigation if the Court rejects *American Pipe* tolling, Defendants claim that there is "only one federal interest at stake," the federal interest in enforcing statutes of limitation.  Br. at 29.  Consequently, they say the limitations period must be strictly enforced.  *Id*. But the interest served by statutes of limitation is "preventing surprises" and the loss of evidence.  *Am. Pipe*, 414 U.S. at 554.  Here, where what is essentially the same case was filed in state court within the limitations period, Defendants have not been surprised and have been on notice to preserve evidence.  Moreover, Defendants ignore the compelling federal interest in private enforcement of the

claim "shall be forever barred unless commenced within four years after the cause of action accrued" and contained no tolling provision.   414 U.S. at 541 n.2. (quoting 15 U.S.C. § 15b); *see also* 15 U.S.C. § 15b (no tolling provision).

securities laws.  *See, e.g., D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 100 (2d Cir. 2001) ("interpretation and application of the federal securities laws" is area of "undisputed strong federal interest"); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 823 F.2d 1349, 1359 (9th Cir. 1987) ("The underlying purpose of federal securities laws is to encourage private enforcement."). Allowing Defendants to escape liability on this procedural ground would be directly contrary to and inconsistent with this important federal interest, especially given what investors and the markets have seen over the past few years.

Thus, because *American Pipe* tolling applies to this case, the claims asserted in the Complaint are timely filed within the Securities Act's one-year statute of limitations.

### 2.      The Statute Of Repose Is Treated The Same As The Statute Of Limitations

Defendants argue that even if Section 13's clause limiting claims to one year from when the violation was or should have been discovered is tolled, its counterpart language, requiring that claims be filed within three years regardless of when discovery occurs, cannot be tolled.  Br. at 24-25 (citing 15 U.S.C. § 77m). But every court to consider whether this three year limit trumps *American Pipe* tolling has held that it does not, and this case is also timely under the Securities Act's three-year limitations period.

Defendants mistakenly rely principally on a non-class action case, *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991), in which the Court indicated that the "equitable tolling" doctrine of fraudulent concealment did not apply to Section 13's three-year limit.   But since *American Pipe* tolling is not "equitable tolling" *Lampf* is irrelevant.

The circumstances in *Lampf* were very different from the current situation. The justices in *Lampf* considered merely whether an assertion of fraudulent

concealment would toll the three-year statute of repose, and concluded it did not. The *Lampf* court apparently reasoned that, since Congress had already provided that Section 13's one-year statute of limitations did not begin to run until "the discovery of the facts constituting the violation," it would make no sense to think that Congress also intended the three-year cutoff provision to be tolled until "the discovery of the facts constituting the violation" – Congress must have meant the three year period to be an outer limit on how long equitable tolling arising from fraudulent concealment could extend the limitations period.  *Id.* at 363; *see also In re Activision Sec. Litig.*, No. C-83-4639(A) MHP, 1986 WL 15339, at *4 (N.D. Cal. Oct. 20, 1986) (explaining that, because "the fraudulent concealment doctrine has already been incorporated into the one-year limitations period," it would make "no sense" to allow fraudulent concealment to toll the three-year limit).

Defendants erroneously claim that *Lampf*'s language about "equitable tolling" means that "*American Pipe* tolling" cannot extend the three-year limitations period in this case, Br. at 24-25; but the courts that have considered the issue have uniformly disagreed.  The Tenth Circuit explicitly rejected Defendants' interpretation of *Lampf* in *Joseph v. Wiles*, 223 F.3d 1155 (10th Cir. 2000).[18] Joseph filed his Section 11 claim more than three years after the date on which the limitations period had started to run, but argued that the running of the three-year repose period had been suspended while an earlier, timely-filed class action encompassing his claims was pending.  *Id.* at 1166.  The court agreed, rejecting the argument, identical to that of Defendants here, that *Lampf* prohibited tolling of the repose period.  *Id.* at 1167-68.  It explained that, even if *Lampf* meant to impose a complete ban on all equitable tolling, *American Pipe* tolling is a form of legal, not

---

[18]   Countrywide ignores *Joseph* – only Defendant Kurland's brief mentions the case.   Kurland insists that *Joseph* is "flawed," but cites no cases that have disagreed with it and acknowledges that several courts have followed it.  Kurland Br. at 9-10.

1   equitable tolling and is fundamentally different from what was rejected in *Lampf*.

2   *Id*.

3          Indeed, in a sense, application of the *American Pipe* tolling

4          doctrine … does not involve 'tolling' at all.  Rather, [a class

5          member] has effectively been a party to an action against these

6          defendants since a class action covering him was requested but

7          never denied.

8   *Id*. at 1168.  The decision was a logical extension of *American Pipe*:

9          If all class members were required to file claims in order to

10         insure the limitations period would be tolled, the point of Rule

11         23 would be defeated.

12         ….

13         Statutes of limitation are intended to protect defendants from

14         being unfairly surprised … and to prevent plaintiffs from

15         sleeping on their rights.  "[T]hese ends are met when a class

16         action is commenced."

17  *Id*. at 1167-68 (citation omitted, quoting *Crown, Cork*, 462 U.S. at 352 (alteration

18  by the circuit court)).

19         The rulings of numerous other courts are consistent with *Joseph*.  For

20  example, some 14 years before the Tenth Circuit's decision, a court in this circuit

21  applied identical reasoning.  Like Defendants here, defendants in *Activision*

22  pointed to language in several cases which they claimed meant that the three-year

23  limitations period was "absolute and not subject to equitable tolling," but the court

24  found these cases inapposite because "none of these cases involved the class action

25  tolling rule.  Rather, they involved application of the equitable tolling rule based on

26  fraudulent concealment."   1986 WL 15339, at *4.  Like the Tenth Circuit in

27  *Joseph*, the *Activision* court observed that it was not faced with a conventional

28

tolling situation.  *Id.* ("[I]n a sense, application of the *American Pipe* doctrine to cases such as this one does not involve 'tolling' at all.").

*Arivella v. Lucent Technologies, Inc.*, 623 F. Supp. 2d 164 (D. Mass. 2009), where an ERISA statute of repose was at issue, also rejected the contention that *Lampf* barred tolling of statutes of repose.  After reviewing the case law the court concluded that "***all*** lower federal courts … to examine whether *American Pipe* tolling applies to statutes of repose ... have held that *American Pipe* requires the tolling of statutes of repose."  *Id.* at 177 (emphasis added).  "To hold otherwise would promote the exact evil that *American Pipe* sought to prevent – the filing of duplicative suits to protect putative class members' rights – without promoting the benefits of statutes of repose."[19]  *Id.* at 178; *see also In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 708 (S.D. Tex 2006) (filing of class action tolls Section 13's statute of repose); *Grubka v. WebAccess Int'l, Inc.*, 445 F. Supp. 2d 1259, 1267 (D. Colo. 2006) (same); *Ballard  v. Tyco Int'l, Ltd.*, Nos. MDL 02-MD-1335-PB, 04-CV-1336-PB, 2005 WL 1683598, at *6-7 (D.N.H. July 11, 2005) (same); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 455 & n.19 (S.D.N.Y. 2005) (same); *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 600 n.11 (N.D. Ill. 1998) (same); *Ingenito*, 441 F. Supp. at 542 (same); *Hellerstein v. Mather*, 360 F. Supp. 473, 475 (D. Colo. 1973) (same).

---

[19] *Arivella* agreed that *American Pipe* tolling is a form of legal tolling, but acknowledged that courts have used inconsistent terminology.  623 F. Supp. 2d at 176 n.7 (recognizing "that many Circuit court decisions have referred to *American Pipe* tolling as equitable tolling").  But, whatever the terminology they use to describe *American Pipe* tolling, all courts to rule on the issue have recognized both that *American Pipe* tolling differs from the more conventional tolling the Supreme Court discussed in *Lampf* and that *American Pipe* tolls statutes of repose.  Consequently, Defendant Spector's argument, which cites no authority, that *American Pipe* tolling is not legal tolling is irrelevant.  Spector Br. at 3; *see also Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 542 (S.D.N.Y. 1977) (describing *American Pipe* tolling as "class action tolling.").

Defendants' argument that *American Pipe* does not render this case timely filed within the three-year statute of repose is thus contrary to every authority to have considered the issue and accordingly should be rejected.

### 3.   Plaintiffs' Standing Is Not Relevant To Tolling

Defendants next insist that even if the Court were to find (correctly) that state court proceedings toll federal statutes of limitation and repose, the State Plaintiffs lacked standing to assert claims arising from many of the Offerings in this case and that, consequently, *American Pipe* did not toll the limitations period for these claims because the State Court had no jurisdiction over these claims. But the standing of the plaintiffs in the State Litigation is irrelevant to the tolling of any claim in this proceeding and, consequently, the limitations period for the purchasers of all the Offerings encompassed by the proposed class in the State Litigation, which is identical to the proposed Class here, have been tolled. *See* Br. at 21 (State Litigation "involve[ed] the same group of Offerings" as in this case).

As an initial matter, Defendants' explanation as to why the State Court lacked jurisdiction over purchases in Offerings which the State Plaintiffs had not purchased is based on a fundamental mistake. Defendants say jurisdiction is absent because, with respect to these Offerings, there is no "'case or controversy' under Article III" of the Constitution. Br. at 30-31. But state court jurisdiction is not defined by Article III.[20] Thus, the State Court plaintiffs, who asserted the same claims asserted here, had no need to be concerned with Article III. Further, Defendants do not and cannot dispute that the State Court plaintiffs had standing to

---

[20] "All courts and tribunals in the federal system are of restricted jurisdiction, in that they have subject matter jurisdiction only of such proceedings as are expressly or impliedly consigned to them. …. In contrast, the principal trial court in state court systems is a court of general jurisdiction." Restatement (Second) of Judgments § 11 cmt. A.

1  bring their own claims – as discussed below, this is all that is required for a class

2  action.[21]  *See infra* at Point IV. D.

3      But even accepting Defendants' premise that the State Plaintiffs lacked

4  standing for certain claims, *American Pipe* tolling still applies.  Although the

5  federal courts may only exercise jurisdiction over actual cases or controversies,

6  nothing in the Constitution or *American Pipe* requires a court to pretend that a case

7  dismissed on jurisdictional grounds never existed.  If plaintiffs in a subsequent

8  proceeding have standing, the court hearing the new case has jurisdiction over

9  them, and whether to toll the statute of limitations for reasons of judicial economy,

10  or in fairness to absent class members whose claims were asserted in a previous

11  but somehow procedurally defective class action filing, is neither a constitutional

12  nor jurisdictional issue.

13      In fact, federal courts have tolled statutes of limitation based on earlier-filed

14  cases that were dismissed for lack of subject matter jurisdiction.  In *Valenzuela v.*

15  *Kraft Inc.*, 801 F.2d 1170 (9th Cir. 1986), the court allowed tolling for a claim in

16  federal court where the plaintiff had mistakenly initially filed his case in a state

17  court which lacked jurisdiction.  The court's reasoning is on point:

18          Kraft's argument that equitable tolling is not available because

19          the action Valenzuela relies on to establish tolling was filed in a

20          court without subject matter jurisdiction is unpersuasive.  The

21          purpose of the statute, the notice to defendant, and the diligence

22          demonstrated by the plaintiff determine the availability of

23

24

---

25  [21] In any event, it appears that California courts allow class actions to proceed even
26  where a federal court may not, and even if the State Court plaintiffs had completely
   lacked standing – an argument Defendants do not advance – the State Court might
27  well have allowed the State Litigation to proceed.  *See, e.g., CashCall, Inc. v.*
   *Superior Court,* 159 Cal. App. 4th 273, 278, 299-300, 71 Cal. Rptr. 3d 441 (Cal.
28  Ct. App. 2008) (discovery to find new class representatives approved where no
   named plaintiff was member of proposed class).

No. 2:10-cv-00302: OPPOSITION TO MOTIONS TO DISMISS                36

1
2

tolling, not the presence or absence of subject matter jurisdiction.

3

*Id.* at 1175.[22]

4

The Fourth Circuit expressed a similar view in *Smith v. Pennington*, 352 F.3d 884 (4th Cir. 2003), a Section 12 case. The district court had dismissed the claim of a plaintiff and purported class representative on standing grounds because he had not purchased ***any*** of the securities at issue. *Id.* at 888. Despite the dismissal, the Fourth Circuit saw "no reason" why *American Pipe* would not protect absent members of the proposed class, but it declined to allow tolling by the appellants – proposed intervenors – ***because they were not members of the class*** that had been proposed by the initial plaintiff. *Id.* at 886-88, 893, 895.

5
6
7
8
9
10
11

12

Given the absence of any constitutional issue, the logic of *American Pipe* mandates tolling for any state court claims regardless of whether the state court had jurisdiction over the claims. A contrary rule would be extraordinarily unfair – through no fault of their own, absent class members would suddenly find themselves with billions of dollars of losses that would be unrecoverable even if they could prove Defendants acted illegally.[23] Moreover, such a rule would do

13
14
15
16
17

18
19
20

[22] Defendants' reliance on *Palmer v. Stassinos*, 236 F.R.D. 460 (N.D. Cal. 2006) (Br. at 30) for the proposition that claims made without jurisdiction cannot lead to tolling is unavailing. Palmer is inconsistent with Valenzuela's controlling authority, as are the out-of-circuit cases cited by Defendants.

21
22
23
24
25
26
27
28

[23] The Supreme Court has made clear that absent class members had no obligation to second guess how the State Plaintiffs conducted their case: "Not until the existence and limits of the class have been established and notice of membership has been sent does a class member have any duty to take note of the suit or to exercise any responsibility with respect to it" and this rule applies even to "asserted class members who were unaware of the proceedings brought in their interest." *Am. Pipe*, 414 U.S. at 552. Moreover, even if Defendants are right and the State Court lacked jurisdiction over Offerings in which named plaintiffs did not purchase, absent class members cannot be expected to have known this in 2007, when the State Litigation commenced. The principal cases Defendants rely on for their standing argument are not only inconsistent with other decisions, but were not issued until 2009 or 2010. *See* Br. at 32-33 (citing *In re Wells Fargo Mortgage-Backed Cert. Litig.* No. C 09-01376. 2010 WL 1661534 (N.D. Cal. Apr. 22, 2010); *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, No. CV 08-1418, 2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010); *New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5356(PAC),

1  nothing to advance the purposes of the statute of limitations, because Defendants

2  have been aware of the claims against them since the filing of the State Litigation.

3  And perhaps most importantly, such a rule would inundate the courts with lawsuits

4  by potential class members protecting themselves from the possibility that the class

5  action, or part of it, might be dismissed on jurisdictional grounds.

### 4.   Plaintiffs Were Not Required To Plead Compliance With The Statute Of Limitations

Failure to file a case within a limitations period is an affirmative defense.

Fed. R. Civ. P. 8; *see also Payan v. Aramark Mgmt. Serv. L.P.*, 495 F.3d 1119,

1122 (9th Cir. 2007) ("defendant bears the burden of proving that the plaintiff filed

beyond the limitations period").  Nevertheless, Defendants say Plaintiffs' failure to

affirmatively plead tolling of the statute of limitations "requires dismissal" of this

lawsuit.  Br. at 26.

Defendants misunderstand the applicable law.  Plaintiffs were not required

to plead their reliance on *American Pipe* in the Compliant.  Neither of the cases

cited by Defendants has anything to do with the *American Pipe* doctrine and, "in a

sense, application of the *American Pipe* tolling doctrine to cases such as this one

does not involve 'tolling' at all."  *Joseph*, 223 F.3d at 1168.  Moreover, the facts

about the State Litigation which give rise to Plaintiffs' *American Pipe* tolling

argument have been on the record in this case since it began, including in an

opinion of the Court, and *American Pipe* tolling was discussed at the lead plaintiff

hearing.  *See* Order Appointing Lead Plaintiff and Lead Counsel, at 2-4, Dkt. No.

120 (May 14, 2010) (discussing history of State Litigation); Tr. of Lead Plaintiff

Hearing at 38:22-39:10 (Lead Counsel says Plaintiffs believe State Litigation

2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010); *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, No. 08 CV 5093(HB), 2010 WL 1172694, at *8 (S.D.N.Y. Mar. 26, 2010); *In re Lehman Bros. Sec. and ERISA Litig.*, 684 F. Supp. 2d 485 (S.D.N.Y 2010); *Plumbers' Union Local No. 12 Local Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303-04 (D. Mass. 2009)).

tolled statute of limitations).  A court may properly consider "items appearing in the record of the case" on a motion to dismiss.  Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3rd ed. 2004) (cited with approval by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).  Indeed, in one of Defendants' cases, *Kirtdoll v. City of Topeka*, 315 F.3d 1234 (10th Cir. 2003) (Br. at 26), the court only affirmed dismissal after a "thorough" review of not only the complaint, but "the briefs and the record" in the case made it indisputably clear that the plaintiff had no viable argument that his claims were timely.  315 F.3d at 1235.

Furthermore, Defendants do not claim prejudice or unfair surprise from this supposed pleading failure and, since they spend a significant portion of their briefs arguing that *American Pipe* tolling should not apply in this case, it is obvious that there was no prejudice or surprise.  *See* Br. at 27-31; Spector Br. at 4 ("Plaintiffs will argue that the statute of repose was tolled … pursuant to *American Pipe*."). Moreover, the remedy to Defendants' complaint would be simply to have Plaintiffs amend the Complaint to state the obvious – *American Pipe* tolling applies to their claims.  But there is no practical reason to do so, and Defendants' argument should be rejected.

### 5.    Even If *American Pipe* Tolling Does Not Apply, The One Year Statute of Limitations Does Not Bar Plaintiffs' Claims

As noted above, Section 13 of the Securities Act provides that any claim under Sections 11 or Section 12(a)(2) must be brought "within one year after the discovery of the untrue statement or the omission" at issue or within one year "after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C § 77m.  Defendants assert that, absent *American Pipe* tolling, all Plaintiffs' claims are untimely because by some unspecified date more than a year before the original complaint in this Federal action was filed, Plaintiffs should have known that the Offering Documents at issue contained false statements.  Br.

1   at 23.  Defendants point to facts highlighted in the Complaint, such as increased

2   delinquencies after the Offerings and allegations of wrongdoing in numerous civil

3   actions.  Yet Defendants also say that the Complaint "lacks any facts that would

4   support a plausible inference that the Offering Documents were materially false,"

5   that complaints in other civil litigation "cannot be considered" because they are

6   unreliable, and that delinquencies reflect not false statements, but "the largest

7   nationwide decline in housing prices since the Great Depression."  Br. at 58, 66, 69

8   n. 65; Sieracki Br. at 7.

9        Defendants try to have it both ways – asserting both that no facts suggest

10  that Defendants made false statements and that evidence of false statements was so

11  obvious years ago that this case is self-evidently untimely.[24]  And the 2007 filing

12  of the State Litigation does not prove, as a matter of law, that Plaintiffs should

13  have had actual knowledge of false statements prior to January 2009, especially

14  when Defendants insist that there were (and are) no facts to support such a

15  conclusion.

16       Defendant Sambol's position varies slightly from the other Defendants, and

17  his argument is even more implausible.  Sambol insists that Plaintiffs should have

18  known that the challenged statements were false by June 13, 2007, one year prior

19  to the date he was made a defendant in the State Litigation.  Sambol Br. 11.  But

20  while Sambol tries to support his claim with a few carefully chosen documents

21  which suggest that some analysts knew of some problems in the mortgage market

22

---

23  [24] To the extent that some Defendants argue that the one-year statute of limitations
    runs not from when Plaintiffs actually did or should have "discover[ed] the "the
24  untrue statement or the omission," but from the point where Plaintiffs were put on
    "inquiry notice" in the sense that they had "evidence of the **possibility** of fraud,"
25  *see, e.g.,* Kripalani/Sandefur Br. at 8 (citation omitted, emphasis added), this is no
    longer good law (if it ever was in this circuit) after *Merck & Co., Inc. v. Reynolds*,
26  130 S. Ct. 1784, 176 L. Ed. 2d 582 (2010), which emphasized that it is actual
    "discovery," not inquiry notice that starts the running of the limitations period.  *Id.*
27  at 1797; *see also Sewell v. D'Alessandro & Woodyard, Inc.*, No. 2:07-cv-343, 2010
    WL 2872053 (M.D. Fla. July 20, 2010) (applying *Merck* to Securities Act statute
28  of limitations).

No. 2:10-cv-00302: OPPOSITION TO MOTIONS TO DISMISS                    40

as a whole, Sambol Br. at 11-12 (citing Def's Req. for Judicial Notice, Exs. 39-44), nothing in what he would have the Court consider even arguably supports a finding that, as a matter of law, Plaintiffs should have known by June 2007 of materially false and misleading statements in Countrywide's MBS Offering Documents.  *Cf. Lentell v. Merrill Lynch & Co. Inc.,* 396 F.3d 161, 170-71 (2d Cir. 2005) ("numerous generic articles" regarding industry-wide events did not trigger inquiry notice).  Indeed, Sambol's supposedly supporting exhibits suggest the contrary. *See, e.g.*, Defs' Req. for Judicial Notice, Ex. 39 at 1 (analyst report) ("Countrywide's management team … [is] one of the best in the industry."); Ex. 40 (analyst report) ("One of the key positives in the mortgage sector this year has been the nearly insatiable demand for mortgage-backed securities .... [e]ven in the subprime sector.").  And while Sambol emphasizes a May 3, 2007 analyst call in which another Countrywide executive mentions problems in the industry, he neglects to provide the Court with the transcript page in which Sambol himself says that Countrywide is retaining more subprime loans because they are selling "far below economic value" and are a good investment.  Q1 2007 Countrywide Financial Corporation Earnings Conference Call, Tr. at 13, Ex. 2 to Plaintiffs' Notice of Request and Request for Judicial Notice.[25]

The Countrywide Defendants also suggest in a footnote that, because additional plaintiffs were added to the State Litigation in September 2008, "[t]he limitations and/or repose periods *may* well have expired as to particular MBS prior to the first appearance in the case of a named plaintiff who had actually purchased those MBS," but they identify no specific claim as being untimely.  Br. at 31 n.32 (emphasis added).  This is nothing more than a reiteration of Defendants' flawed arguments about Plaintiffs' supposed lack of standing, which are discussed

---

[25] Defendants provide only a single page of this transcript as Exhibit 44 to their Request for Judicial Notice.  If the Court considers Defendants' Exhibit 44 it should do so in the context of the full text of the transcript, which Plaintiffs are providing the Court.

elsewhere.  And, in any event, this cursory assertion that an unspecified portion of Plaintiffs' claims *may* have been time-barred in the State Court does not even arguably provide a basis for the Court to conclude "beyond doubt," *Saher*, 592 F.3d at 969, that any of Plaintiffs' clams are time-barred because of when they were made in the State Litigation.

Defendants Kurland, Sieracki and Spector say that, although they have continuously been Section 11 defendants in the State Litigation from its inception, the Section 15 control person count initially brought against them in the State Litigation was subsequently dropped and a year passed before the initial complaint in this case again alleged that they had violated both Sections 11 and 15.  Kurland Br. at 12-13; Sieracki Br. at 2; Spector Br. at 1 n.2.  They assert that consequently, even if *American Pipe* tolling applies, the Section 15 counts against them are now time-barred.  Kurland Br. at 12-13.  But the authorities they cite do not stand for the proposition that the clock can run on the limitations period for one claim against a defendant while being suspended for a closely related claim against the same defendant arising from similar facts.  Moreover, *Cullen,* 811 F.2d at 720 (related state court claims toll RICO statute of limitations), teaches that *American Pipe* tolling applies to all claims arising from the same or similar facts.

Thus, for the foregoing reasons, this action was commenced within the applicable statutes of limitation and repose, and all of the claims asserted in the Complaint are timely.

**C.    This Case Was Not Filed Too Early:  The Decline In Value Of The Certificates Plainly Results In Recoverable Damages Under The Securities Act**

Directly contrary to their argument that this case was filed too late, Defendants assert that this case was also filed too soon, supposedly because Plaintiffs have not yet been damaged despite the overwhelming declines in the prices of the Certificates.  Defendants argue that the only legally cognizable injury that Plaintiffs could assert is that they failed to receive a timely principal or interest

payment pursuant to the Certificates.  Br. at 43-46.  Defendants are wrong.  The Complaint alleges that Plaintiffs and the Class have suffered damages as a result of Defendants' Sections 11 and 12(a)(2) violations that are precisely the type of damages provided for by those sections.  ¶¶ 194-230.  The value of the Certificates purchased by Plaintiffs and the Class has dramatically plummeted since the Offerings.  ¶¶ 221, 229.  At this stage, the Complaint need not allege more.

Defendants contend that Plaintiffs have not alleged a cognizable injury under the Securities Act based upon two arguments: (1) Plaintiffs purportedly cannot use a decline in market value as a basis to measure damages for mortgage-backed securities cases under Section 11; and (2) the market for mortgage-backed securities is supposedly illiquid and therefore purportedly precludes damages under Section 11.  Both of these arguments fail.

### 1.    The Loss Of Market Value For Mortgage-Backed Securities Is A Cognizable Injury Under Section 11

Section 11 of the Securities Act states that a plaintiff who purchases a security may "recover such damages as shall represent the difference between the amount paid for the security … and … the value thereof as of the time such suit was brought."  15 U.S.C. § 77k(e).  As this Court recognized, the type of injury that the statute contemplates is "a decline in investment value due to materially false or misleading information in the registration statement."  *Countrywide*, 588 F. Supp. 2d at 1168.[26]

Relying upon the mistaken premise that mortgage-backed securities "are essentially securitized contract rights" that "are fundamentally different from the

---

[26] Defendants suggest that whether Plaintiffs have suffered damages relates to standing.  Although Defendants refer to this Court's decision in *Countrywide* to support the proposition that the absence of injury can be addressed as a standing inquiry (Br. at 42), the Court in *Countrywide* **rejected** defendants' argument that plaintiffs failed to allege a compensable loss on the securities.  588 F. Supp. 2d at 1169-70.  Of course, a Plaintiff with no injury whatsoever would not have a claim, but Defendants do not, and cannot, prove at this juncture that the value of every one of the securities any Plaintiff purchased has not declined and therefore has suffered zero injury.

interest of an investor in most equity or debt securities," Br. at 43, Defendants claim that courts cannot measure losses in mortgage-backed securities based upon declines in the market value of such securities. They contend that investors in mortgage-backed securities are *solely* interested in the cash flow generated by the mortgage loans underlying these securities, and thus the only proper measure of loss is through a determination of whether the cash flow for the securities has ceased. Defendants' contentions are incorrect.

Mortgage-backed securities are not mere contractual vehicles to provide investors with streams of cash; rather, these investments are securities that many investors purchase to realize a profit through resale. Indeed, this Court recognized this principle when it determined that a diminution in the value of mortgage-backed securities is sufficient to allege a claim under Section 11:

> Plaintiffs here sufficiently allege that their securities suffered *a diminution in value*. Nothing on the face of the [complaint], nothing in the Plaintiffs' appended purchase and sale history, and nothing that the Court can take judicial notice of shows that Plaintiffs cannot have suffered the 'type of injury' – economic loss in connection with the purchase or sale of securities – that the law requires.

*Countrywide*, 588 F. Supp. 2d at 1170.[27]

---

[27] The market value of mortgage-backed securities is based, in part, upon the likelihood that all future payments will be made. Thus, there is a risk inherent in the market value that future payments will not be made depending upon the structure of the securities. "The riskiest tranches are, at least by design, the first to default, while the less risky – and thus higher rated - tranches are less likely to suffer losses caused by defaults within the underlying mortgage pool." *In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 248 (S.D.N.Y. 2010). Additionally, under Defendants' rationale, Defendants could control whether or not they face liability by continuing to provide cash flow through the Certificates – despite the decline in market value and increased likelihood of eventual default for various tranches – until such time as the statute of limitation runs, and then cease to make payments on the Certificates while simultaneously claiming that Plaintiffs are foreclosed from bringing suit.

The court in *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.,* No. 08 Civ. 5653(PAC), 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010), agreed, stating:

> Defendants argue that pleading market value loss is insufficient in the context of a mortgage-backed securities claim. With corporate securities, investors in publicly-traded stocks and bonds hope for an appreciation in market value to profit upon resale. According to Defendants, investors in mortgage-backed securities, however, bargain only for the repayment of principal plus interest, from the cash flows generated by the underlying mortgage loans.

> Since Plaintiff does not allege that it failed to receive any principal or interest payments due under its Certificates, Defendants argue that Plaintiff failed to allege a cognizable injury. The alleged injury – 79% diminution of market value – is said to be immaterial in the context of mortgage-backed securities Certificates. Plaintiff might suffer a loss from the impairment of cash flow, but loss of value is not a cognizable loss. This is too cramped a reading of damages.

> Many fixed-income debt securities, such as corporate bonds, do not trade on national exchanges and yet institutional investors routinely purchase corporate bonds hoping to realize a profit through resale. ***Plaintiff may have purchased the Certificates expecting to resell them, making market value the critical valuation marker for Plaintiff. This is a securities claim, not a breach of contract case. Mortgage-backed Certificates are a type of security, which is why, in fact, the SEC has adopted a regulatory scheme relating to pooled asset-backed securities:***

> ***17 C.F.R. § 229.1111.  At this stage all that may be said is Plaintiff's market value allegations are sufficient***.  *See In re Countrywide Financial Corp. Sec. Litig*., 588 F. Supp. 2d 1132, 1169-70 (C.D. Cal. 2008).*

*Id*. at *4-5 (emphasis added).[28]

Under Section 11, loss causation is not an element of Plaintiffs' *prima facie* case because loss causation is presumed.  *In re Shoretel, Inc. Sec. Litig*., No. C 08-00271 CRB, 2009 WL 2588881, at *2-4 (N.D. Cal. Aug. 19, 2009).  Section 11 provides Defendants with a partial affirmative defense, permitting Defendants to attempt to ***prove*** the absence of causation, *i.e*., that some diminution in the value of Plaintiffs' securities did ***not*** result from the alleged misrepresentations and omissions in the Offering Documents.  Section 11(e) states:

> [I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement therein not misleading, such portion of or all such damages shall not be recoverable.

15 U.S.C. § 77k(e).  Under Section 11(e), therefore, Defendants must ***disprove*** the

---

[28]  Indeed, the analogy provided by the court in *DLJ* between mortgage-backed securities and corporate bonds is particularly apt.  With bonds, "[t]he right to receive a specified stream of income is a property right distinguishable from possessory interests in the bonds themselves." *Abell v. Potomac Ins. Co*., 858 F.2d 1104, 1137 (5th Cir. 1988).  "The possessory interest allows the purchaser to hold or dispose of the bonds as the purchaser sees fit and entitles the holder to enjoy any subsidiary interests, including the right to receive any income stream which the bond pays, that have not been alienated from the possessory interest itself." *Id*.  "The right to receive income-stream payments (or, in the case of bonds, interest payments) is a distinct interest that is subsidiary to the purchaser's possessory interest." *Id*.  Similarly, many investors in mortgage-backed securities make their purchases in an attempt to realize a profit on resale – an interest which is distinct from the interest of receiving streams of income from the securities.

presumed causal link between the misrepresentations and the "depreciation in value" of the security. *Collins v. Signetics Corp.*, 605 F.2d 110, 114-15 & n.4 (3d Cir. 1979).[29] "Defendants' heavy burden reflects Congress's desire to allocate the risk of uncertainty to the defendants in these cases." *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987).   Thus, by claiming that Plaintiffs' allegations regarding losses are insufficient, Defendants are improperly attempting to impose a pleading burden upon Plaintiffs that is not required under Section 11. As this Court held,

> requiring a plaintiff to allege more would invert the burden of the defendants' causation defense, expressly framed as such in a statutory proviso.  15 U.S.C. § 77k(e).  The practical effect would be to try damages on the pleadings.

*Countrywide*, 588 F. Supp. 2d at 1170 n.45.[30]

Additionally, Defendants' reliance upon *AIG Global Securities Lending Corp. v. Banc of America Securities, LLC*, 646 F. Supp. 2d 385 (S.D.N.Y. 2009), is misplaced.  The plaintiffs in *AIG* did not allege a loss based upon the decline in market value of the securities.  Indeed, the court in *DLJ* recognized the importance of this distinction:

> *AIG Global* is not on point.  *AIG Global* does not hold that investors in mortgage-backed securities do not allege a cognizable injury when they allege a loss arising from a decrease in market value. … [T]he investors [in *AIG Global*]

---

[29] *See also McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048 (2d Cir. 1995) ("any decline in value is presumed to be caused by the misrepresentation" and defendants have the burden of proving "that any portion or all of such damages represents other than the depreciation in value of such security resulting from [the] part of the registration statement").

[30] Further, although "Section 11(e) sets the measure of damages for a plaintiff still holding her securities at the 'value' of those securities at the time of suit … the determination of value is a fact-intensive inquiry" that is "inappropriate to resolve at the motion to dismiss stage." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 351 n.80 (S.D.N.Y. 2003).

did not allege a loss from selling the securities at a reduced price.  Here, by contrast, Plaintiff does allege a drop in market value – not a failure to realize cash-flow from payments on the underlying mortgage loans.

*DLJ*, 2010 WL 1473288, at *5 (citations omitted).   Thus, the court in *DLJ* confirmed that even where there are no allegations concerning a failure to realize cash-flow from payments on the underlying mortgage loans, Plaintiffs still state a claim under Section 11 by alleging that the mortgage-backed securities suffered a drop in market value.[31]   Because Plaintiffs have alleged a decline in the market value of their mortgage-based securities (¶¶ 15, 97, 221), Plaintiffs have stated a cognizable claim under Section 11.[32]

---

[31]  The cases cited by Defendants are distinguishable.  The court's reasoning in *Luminent Mortgage Capital v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 590-92 (E.D. Pa. 2009), is inapplicable to Plaintiffs' action, as it dealt with non-tradeable certificates.  In *Luminent*, the plaintiffs were bringing a securities lawsuit based on potential losses to junior certificates that were not registered under the Securities Act, and were not eligible to be resold or transferred.  *Id.* at 582.  There was no allegation of, and could be no loss in market value of, a junior certificate that could not be transferred or sold, and thus the only "value" to the junior certificates was their payments under the principal and interest stream.  Since the plaintiffs did not allege any actual loss (saying they "might," "could" or "would" potentially have a loss) in value, there was no cognizable loss on which to base a claim.  *Id.* at 591-92.  In *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 08-CV-10783 (MGC), Transcript of Decision, (S.D.N.Y. Jan. 28, 2010) (Ex. 35 to Defendants' Request for Judicial Notice), the court made clear that the plaintiffs never alleged that there was a market or buyers for these mortgage-backed securities, and "that has to be alleged" if they wanted to show a loss of market value.  *Id.* at 17-18, 26, 30-33.  In addition, the plaintiffs did not indicate what tranche of securities they purchased, which made it impossible to determine how likely they would be to ever suffer a loss of principal or interest on their certificate ownership.  *Id.* at 32.  Moreover, the *NECA-IBEW* court simply said it was "unclear" whether the plaintiff had suffered injury based on the pleadings, and granted permission to amend.  *Id.* at 42.  In *re First Union Corp. Securities Litigation*, 128 F. Supp. 2d. 871 (W.D.N.C. 2001), is inapposite here because it is not a case where plaintiffs are claiming they were misled regarding the purchase and sale of mortgage-backed securities.  Rather, plaintiffs' claims in *First Union* relate to misleading statements about a corporate merger and deferred GAAP accounting writedowns.  *Id.* at 875-76.  The **only** mention of mortgage-backed securities in that case at all deals with GAAP accounting for these securities' future expected cash flows, which is a wholly different procedure than determining the market value of the securities.  *Id.* at 893-94.

[32]  Plaintiffs maintain that the determination of damages and cognizable injury are issues that are not appropriately decided at the motion to dismiss stage of the case

No. 2:10-cv-00302: OPPOSITION TO MOTIONS TO DISMISS                                    48

### 2. The Liquidity Of The Market For Mortgage-Backed Securities Is Irrelevant To Whether Plaintiffs Have Suffered A Compensable Loss Under The Securities Act

Without citing any applicable authority, Defendants contend that "Plaintiffs have not alleged a cognizable injury because the market in which the MBS trade is illiquid." Br. at 46-48. But nowhere in the Securities Act is there a requirement that the market be liquid for the determination of damages under Section 11(e) or rescission under Section 12 to apply. Defendants' argument on this point is devoid of logic or support, and is wholly without merit. The Securities Act simply provides that damages may be awarded for loss of value, or rescission may be had, when the Offering materials for a security contain false statements. 15 U.S.C. § 77k(e), l(a)(2). The existence, or lack thereof, of a liquid market for the securities is simply not a factor.

If anything, Defendants' argument merely provides further justification that the issue of whether and to what extent Plaintiffs have suffered damages is a fact question that cannot be decided on a motion to dismiss. That the measure of Plaintiffs' losses may be more difficult to calculate in a supposedly illiquid market does not mean that Plaintiffs have suffered no losses at all. *See United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008) ("We are mindful that illiquid securities for which there is no public market can be extremely difficult to value. Determination of the extent to which the misrepresentations here resulted in an overvaluation of the securities 'cannot be an exact science,' and we can only call on the district court to make a 'reasonable estimate' of the loss amount.") (citations omitted); *Kidder Peabody & Co., Inc. v. Unigestion Int'l, Ltd.*, 903 F. Supp. 479,

---

and will instead be the subject of expert testimony and analysis that only will become available in the discovery phase of the litigation. Even assuming, *arguendo*, that Defendants were correct in their arguments that Plaintiffs lack any ability to assert claims on Offerings for which Plaintiffs have been repaid in full (Br. at 44-46) and Offerings for which Plaintiffs have no cognizable injury due to the fact that the investments occurred after the date they were initially included in the *State Litigation* (Br. at 76-77), Plaintiffs still would have pled cognizable claims as to at least 58 of the Offerings purchased by Plaintiffs.

499 (S.D.N.Y. 1995).  Moreover, if Defendants were correct, then no court could have held that Plaintiffs could bring claims under the securities laws for damages suffered by the losses created by the decline in value of their mortgage-backed securities.  As demonstrated above, however, courts have held that Plaintiffs are, in fact, entitled to pursue securities claims based upon the loss of market value of mortgage-backed securities irrespective of any purported illiquidity of the market for such securities.  *DLJ*, 2010 WL 1473288, at *4-5.

Defendants also claim that the Offering Documents "contained extensive warnings about the potential illiquidity of these securities."  Br. at 47-49.  But this is a red herring beneath Defendants' own straw man.  Plaintiffs do not allege that they suffered losses due to the securities becoming illiquid; Plaintiffs claim that they suffered losses because Countrywide's loan origination process was misrepresented.  It is Defendants who now assert that Plaintiffs' losses were due to illiquidity.  And it is also Defendants who, conveniently, say that there were warnings that the securities would be illiquid.  This self-defeating argument is totally irrelevant.  The supposed illiquidity of the market for mortgage-backed securities does not negate the fact that Plaintiffs have suffered compensable losses, and regardless are entitled to rescission of their purchases.

### D.   Plaintiffs Have Standing To Assert All Of The Claims Set Forth In The Complaint

Recognizing that Plaintiffs' claims will survive their misplaced timing arguments, Defendants spend much of their brief on premature class certification issues.  One such premature issue is whether Plaintiffs can serve as class representatives for others who purchased similar securities in closely related Offerings.  This is a classic Rule 23 issue – it cannot be decided on a Rule 12 motion to dismiss.  Defendants make the wrong argument at the wrong time under the wrong standard regarding a false issue of "standing."

"Constitutional standing" and "statutory standing" are distinct concepts. Constitutional standing is based on Article III of the Constitution and is a jurisdictional prerequisite that must be met in every federal case.   Statutory standing, in contrast, is not jurisdictional and reflects the judiciary's understanding of who Congress intended to be a proper plaintiff in legislatively-created causes of action.   Defendants' assertion that Plaintiffs lack both constitutional and statutory standing is wrong.

## 1.   <u>**Plaintiffs Have Constitutional Standing**</u>

Defendants insist that, notwithstanding the Complaint's allegation of a pattern of virtually identical false and misleading statements or omissions, the named Plaintiffs lack constitutional standing to represent absent Class members who contemporaneously purchased similar securities from the same Defendants, but in different Offerings.   But "[i]n the class action context, Article III standing simply requires that the class representatives satisfy standing individually.   No more is required."   *In re VeriSign Sec. Litig.*, No. C 02-02270 TW (PVT), 2005 WL 88969, at * 4 (N.D. Cal. Jan. 13, 2005).

A plaintiff must have constitutional standing "to invoke the power of a federal court."   *Allen v. Wright*, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).   The concept arises from Article III's mandate that the federal courts only adjudicate "actual 'cases' and 'controversies.'"   *Id.*   "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute."   *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975).   To have standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."   *Allen*, 468 U.S. at 751.

Class actions are a unique procedural mechanism governed by Rule 23 of the Federal Rules of Civil Procedure.   A "principal purpose" of class actions is to

promote "efficiency and economy" in litigation.  *Am. Pipe*, 414 U.S. at 553.  They are

> peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class.  For in such cases, the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion.

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982) (quotations and brackets omitted).

Courts have developed two inconsistent views of how Article III standing applies to class actions.  Plaintiffs believe that the correct approach is the one adopted by every circuit court to deal with the issue: in class actions, the standing inquiry is simply whether one or more named plaintiff has constitutional standing to bring a claim against the defendants.  If so, there is a case or controversy before the court and the extent to which the named plaintiffs may represent others similarly situated is decided under Rule 23.  The alternative view, which is advocated by Defendants and has been erroneously adopted by some district courts in other cases involving MBS, is that, in a class action, Article III requires that the class representatives have standing not only for their own claims, but also for the claims asserted by all class members.  This incorrect view, however, misunderstands how Article III applies to class actions.

*Fallick v. Nationwide Mutual Insurance Company*, 162 F.3d 410 (6th Cir. 1998), succinctly and accurately discusses constitutional standing in class actions. Fallick, a member of a single ERISA plan administered by the Nationwide insurance company, sought to represent a class of all members of several plans administered by Nationwide who were allegedly harmed by Nationwide's conduct.

*Id.* at 411-12.  Mistakenly accepting the view urged by Defendants in this case, the district court in *Fallick* dismissed because "Fallick lacked standing under Article III of the U.S. Constitution to represent participants in benefit plans other than his own." *Id.* at 421.  The Sixth Circuit reversed, explaining that the district court had "*confuse[d] the issue of a plaintiff's standing under Article III vis-à-vis a defendant with the relationship between a potential class representative and absent class members, which is governed by Rule 23.*" *Id.* at 422 (emphasis added).  The court further explained that, while Article III requires that

> [a] potential class representative must demonstrate individual standing vis-à-vis the defendant …. once an individual has alleged a distinct and palpable injury to himself he has standing to challenge [the] practice …. ***Once his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23*** …. [t]he [district] court should … have analyzed whether Fallick satisfied the criteria of Rule 23 with respect to the absent class members.

*Fallick*, 162 F.3d 423 (citations omitted, emphasis added).

Numerous other courts have agreed with *Fallick*'s reasoning.  In *Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002), the Seventh Circuit, relying on *Fallick*, held that Article III did not bar plaintiffs alleging injury from illegal conduct by two Illinois counties from representing a class which included persons harmed by similar conduct by seventeen other counties.  *Id.* at 676, 678-80.  The relevant issue, it explained, was not standing, but whether the proposed named plaintiffs "fulfill all the requirements of Rule 23."  *Id.* at 681; *see also Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672, 676-77 (7th Cir. 2009)

1  (Posner, J.) (prior to class certification the issue is whether named plaintiff has

2  Article III standing for his own claim).

3  In *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985), the

4  defendants complained that the "the district court erred in allowing the individual

5  plaintiffs who asserted injury from specific discriminatory practices to represent a

6  broad class alleging violations beyond those of the named individuals." *Id.* at 122.

7  The Third Circuit disagreed – the question was "one of compliance with the

8  provisions of Rule 23, not one of Article III standing." *Id.* Standing existed

9  because "[e]ach of the named plaintiffs has presented claims of injury to himself

10  and has alleged facts which present a case or controversy." *Id.*

11  Similarly, in *In re Thornburg Mortgage, Inc. Securities Litigation*, 683 F.

12  Supp. 2d 1236, 1253-54 (D.N.M. 2010), the named plaintiffs in a Securities Act

13  case sought to represent a class of persons who had purchased securities in four

14  separate offerings, each of which issued a different security, even though the

15  plaintiffs had only purchased in two of the four offerings.  The court held that the

16  individual defendants had personal standing with respect to the two offerings in

17  which they had purchased, that this was sufficient to establish that a constitutional

18  "case or controversy exists," and that, consequently, Article III allowed plaintiffs

19  to represent purchasers of all four offerings.[33] *Id. In re Dreyfus Aggressive*

20  *Growth Mutual Fund Litigation*, No. 98 Civ. 4318, 2000 WL 1357509 (S.D.N.Y.

21  Sept. 20, 2000), applied the same reasoning to claims against two defendant-

22  sponsored mutual funds.  The court rejected the defendants' argument that class

23  claims against one of the funds could not proceed because no named plaintiff had

---

[33] As an alternate grounds for deciding this jurisdictional issue, the court held that, even if plaintiffs lacked Article III standing for claims against all four funds, the court nevertheless had jurisdiction under the supplemental jurisdiction statute, which "permits the Court to exercise 'supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.'" *Thornburg*, 683 F. Supp. 2d at 1254 (quoting 28 U.S.C. § 1367(a)).

lost money in that fund, explaining that the issue was not one of standing, but should be analyzed "pursuant to Rule 23(a)(3)'s typicality requirement." *Id.* at *3. Class certification was appropriate because "both Funds made similar misrepresentations and omissions in the Registration Statements" and other SEC filings and because the claims against both funds were "based on the same legal theories." *Id.* at *5. The court noted that "[c]ourts have repeatedly certified classes where the class representatives had not invested in all of the subject securities." *Id.* at *3 (collecting cases); *see also Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071(HB), 2003 WL 21672085, at *5 (S.D.N.Y. July 16, 2003) (whether an individual "can be appointed to represent a class that includes a claim for which he has not suffered an actual injury (but others in the class have) but where he undeniably suffered an injury and thus has standing with respect to a closely related claim" should be decided under Rule 23, not "doctrine of standing").

The Ninth Circuit has not spoken definitively on standing requirements in class actions, but its explanation in *Harmsen v. Smith*, 693 F.2d 932 (9th Cir. 1982), that class representatives had standing because "[t]he Constitution's 'case or controversy' requirement with respect to standing is met when plaintiffs allege that they have suffered ***some injury*** as a result of defendants' illegal conduct," is consistent with *Fallick*.[34]   *Id.* at 942 (citation omitted, emphasis added). Moreover,

---

[34] Like the Ninth Circuit, the Supreme Court has not spoken definitively on the issue, but in *Gratz v. Bollinger*, 539 U.S. 244, 262-63, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003), the Court allowed a class plaintiff denied admission to a university as a freshman to represent a class including both persons denied admission as freshmen ***and*** persons denied admission as transfer students. It responded to a suggestion that the class representative lacked Article III standing to represent the transfer students by suggesting that the issue might not be "a matter of Article III standing at all," but instead an issue of "the propriety of class certification pursuant to Federal Rule of Civil Procedure 23(a)," but it declined to decide the issue, which had not been briefed. *Id.* The Court would very likely have resolved the question if there was a meaningful Article III standing issue – *Gratz* was decided on the merits and the Supreme Court has held that in almost all cases Article III standing is "a threshold question that must be resolved in respondent's favor before proceeding to the merits." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998).

No. 2:10-cv-00302: OPPOSITION TO MOTIONS TO DISMISS                         55

district courts in the circuit have adopted *Fallick's* reasoning.   For example, *Mutchka v. Harris*, 373 F. Supp. 2d 1021 (C.D. Cal. 2005), citing *Fallick*, rejected defendants' motion to dismiss argument that owners of a single mutual fund could not represent shareholders of other funds harmed by similar conduct.   Judge Selna explained that the plaintiffs had

> pled facts which establish an actual controversy and injury with
> respect to each defendant, and that is sufficient for standing.
> Whether [they] can represent the holders of other funds on a
> class basis is a question to be addressed if and when they
> attempt to certify such a class.

*Id.* at 1024; *see also Countrywide,* 588 F. Supp. 2d at 1167 n.39 (although class members purchased in different offerings, plaintiffs had Article III standing because the "actual injuries Plaintiffs allegedly suffered arose from the same harmful conduct and is of the same type as the injuries to those they propose to represent") citing *Lewis v. Casey*, 518 U.S. 343, 357-58 (1996)); *In re La.-Pac. Corp. ERISA Litig.*, No. Civ. 02-1023-KI, 2003 WL 21087593, at *4-5 (D. Ore. Apr. 24, 2003) (citing *Fallick*, adopting its view of class action standing); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1004 (N.D. Cal. 2008) ("a lead plaintiff with some injuries in fact has established standing for purposes of Article III; once the general standing requirement is satisfied, any additional questions related to particular injuries are relevant only in the context of class certification") (citations omitted); *Garcia v. Country Wide Fin. Corp.*, No. EDCV 07-1161-VAP (JCRx), 2008 WL 7842104, at *8 (C.D. Cal. Jan. 17, 2008) ("Defendants argue that Plaintiff cannot establish standing to sue on behalf of potential class members of minority groups other than Hispanics.   To establish Article III standing, however, Plaintiff must only show that he has standing to sue on his own behalf. Whether he may represent the claims of the class is … governed by [Rule 23]") (citations omitted); *see also VeriSign* 2005 WL 88969, at *4 (same).

1          Although Defendants point to district court cases that have adopted a *per se*

2   rule that a class representative can only bring claims for MBS sold in the offering

3   in which he purchased, these cases contain little analysis of the issue and no

4   meaningful examination of the extensive case law to the contrary – none of the

5   cases Defendants cite, for example, even mentions *Fallick*.  Most of these cases

6   suggest that a lead plaintiff must have standing for every claim asserted by every

7   class member.  *See, e.g., Plumbers' Union Local No. 12 Local Pension Fund v.*

8   *Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303-04 (D. Mass. 2009).[35]

9   But the purpose of class actions is to permit representative parties to assert claims

10   for which they otherwise would not have standing—the representative seeks

11   compensation not only for the harm done to him, but for harm caused by similar

12   conduct to others similarly situated.  *Gen. Tel. Co. of Sw.*, 457 U.S. at 155 ("The

13   class-action device was designed as 'an exception to the usual rule that litigation is

14   conducted by and on behalf of the individual named parties only.'").  As *Fallick*,

15   *Payton*, and numerous other cases recognize, the issue is not one of standing, but a

16   question of whether the interests of the lead plaintiffs are sufficiently aligned to

17   those of the class, and whether the factual and legal issues have sufficient

18   commonality to allow class certification.  *See* Fed. R. Civ. P. 23(a) & (b) (setting

19   out class certification requirements).  To the extent that Defendants' cases have

20   "perpetuated from opinion to opinion with little second-guessing" a mistaken view

---

[35] Defendants rely heavily on *Nomura*, one of the first motion to dismiss decisions in an MBS case.  *Nomura* cites to a line of cases that correctly hold that if the named plaintiff herself has no standing to bring ***any*** claim she cannot be a class representative, *see id.* at 303-04, but these cases do not hold, as *Nomura* and several other Defendant-cited opinions seem to think, that a class plaintiff must be able to personally assert every claim of all class members.  Moreover, *Nomura*'s reliance on Wright and Miller is also misplaced.  *See* Charles Alan Wright, et al., 7AA Federal Practice and Procedure § 1785.1 (3d ed.) ("the question whether … [representative parties] may … present claims on behalf of others who have similar, but not identical, interests ***depends not on standing, but on an assessment of typicality and adequacy of representation***") (emphasis added).  In any event, *Nomura*, which is currently under appeal, is an out-of-circuit opinion.

that there is a uniquely restrictive rule of constitutional standing in MBS cases, this Court should not hesitate to reject this "unwitting perpetuation of error." *Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0118 (VM), 2010 WL 3022848, at *1, 3, 16 (S.D.N.Y. July 29, 2010) (Marrero, J.) (relying on "better reasoned and more persuasive authorities" to reject an interpretation of New York securities law that had been adopted with little discussion by "a significant body of judicial opinion," including many federal courts).

## 2.   **Plaintiffs Have Statutory Standing**

Defendants are also wrong in contending that claims on behalf of Class members who purchased in Offerings in which a named plaintiff did not also purchase must be dismissed because statutory standing for these claims is absent. "Statutory standing is simply statutory interpretation: the question it asks is whether Congress has accorded this injured plaintiff the right to sue the defendant to redress his injury." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007); *Kohen*, 571 F.3d at 677 (statutory standing "usually refers to a situation in which … the plaintiff … is suing under a statute … not intended to give him a right to sue").

Statutory standing is not a jurisdictional prerequisite.  In *Reed Elsevier, Inc. v. Muchnick*, 30 S. Ct. 1237, 176 L.Ed.2d 17 (2010), the Supreme Court held that a mandate in the copyright act that "no civil action for infringement … shall be instituted" until the copyright has been registered was not a jurisdictional limitation and, consequently, a settlement class in an infringement case including both registered and unregistered copyright holders could be certified.  *Id.* at 1241-42, 1247.   The Court emphasized that limitations on a statute's scope are not jurisdictional unless Congress "clearly states" the contrary.  *Id.* at 1244 (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515-516 (2006)); *accord Harris v. Amgen, Inc.*, 573 F.3d 728, 732 n.3 (9th Cir. 2009) ("a dismissal for lack of statutory standing is properly viewed as a dismissal for failure to state a claim"); *Carolina*

*Cas. Ins. Co. v. Pinnacol Assurance*, 425 F.3d 921, 927 (10th Cir. 2005) ("Unlike constitutional standing, however, statutory standing need not be resolved before consideration of the merits."); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 129 (2d Cir. 2003) (statutory standing in RICO case "is not a jurisdictional issue").  The statute relevant to this case, the Securities Act, sets out who can bring a civil action, but there is no indication Congress meant these provisions to be jurisdictional or to limit the scope of class actions.

Defendants' apparent contention is that a named plaintiff in a class action brought under Sections 11 or 12 of the Securities Act only has statutory standing to represent absent class members who purchased securities traceable to the same offering as the named plaintiff (under Section 11) or absent class members who purchased in the same initial offering as the named plaintiff (under Section 12), but there is no support for Defendants' position in the Securities Act.  Section 11 provides that if a security is sold pursuant to a registration statement that contains false or misleading statements, "any person acquiring such security … may … sue" an enumerated list of persons, 15 U.S.C. § 77k; Section 12 provides that if a security is sold pursuant to a "prospectus or oral communication" that contains false or misleading statements, the seller "shall be liable… to the person purchasing such security from him."  15 U.S.C. § 77l(a).  Defendants insist, correctly, that this language "only provides a private right of action for a 'narrow class of persons.'"  Br. at 35 (quoting *Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967)).  But the statute is referring to conventional individual actions – Congress was providing that only "a narrow class of persons, *i.e.*, those who purchase securities that are the direct subject of the prospectus and registration statement," could recover under the Securities Act.  *Barnes*, 373 F.2d at 273; *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 736, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975) (statutory language makes clear that Sections 11 and 12 are "expressly limited to purchasers or sellers of securities," holders may not

recover).  The language of the Securities Act, which became law some five years before the adoption of the Federal Rules of Civil Procedure and 33 years before those rules were amended in 1966 to establish modern class action procedure, is simply not relevant to what should be the question before the Court at class certification, namely whether the claims of a large group of persons, each with a valid individual Securities Act claim against a common group of Defendants, may properly be aggregated into a Class.  This is a Rule 23 issue, not a Rule 12 issue.

It is of course true that a plaintiff who sues in her individual capacity has no cause of action for someone else's losses on a security that the plaintiff did not purchase or sell.  But, as noted above, the purpose of class actions is to allow a representative of persons similarly injured to bring claims for which the representative would not normally have standing.  For example, outside the class action context a person harmed by a university's allegedly improper refusal to admit him as a freshman cannot assert a claim on behalf of someone harmed by the university's refusal to admit someone else as a transfer student.  But in *Gratz v. Bollinger*, 539 U.S. 244, 262-68, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003), discussed *supra* n. 31, the Supreme Court allowed a class represented by a single lead plaintiff who had been denied admission as a freshman to a university to represent a class comprised of both persons who had been denied admission as freshmen and persons who had been denied admission as transfer students from other schools.  Although the university's transfer and freshman admission policies were not identical, they "implicated" "the same set of concerns." *Id.*  In the same way it is proper here for Plaintiffs who purchased pursuant to one set of Offering Documents to advance both their own claims and the claims of others who purchased in closely-related Offerings which, *inter alia*, misrepresented and omitted the same material facts regarding Countrywide's flawed origination practices.  The issue – which the Court will determine in connection with Plaintiffs' motion for class certification – is not whether the other members of the

Class purchased MBS traceable to the same offerings as the MBS of one or more named plaintiffs, but whether the Class members' claims share common issues of fact and law and otherwise meet the requirements of Rule 23.

The authorities Defendants cite in their discussion of statutory standing do little to support their position.  For example, the passage Defendants rely on from *In re Wells Fargo Mortgage-Backed Certificates Litig.*, No. C 09-01376, 2010 WL 1661534, at *3 (N.D. Cal. Apr. 22, 2010) (Br. at 35), refers, not to statutory standing as Defendants suggest, but to constitutional standing.  2010 WL 1661534, at *3 (explaining requirements of "constitutional standing").  The same is true of another of Defendants' cases, *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc.*, No. 08 Civ. 10841, 2010 WL 2175875, at *3 (S.D.N.Y. June 1, 2010) (citing only to cases on Article III standing); *cf. Steel Co.*, 523 U.S. at 97 ("issue of statutory standing … has nothing to do with whether there is a case or controversy under Article III").  And this Court's decision in *Countrywide*, 588 F. Supp. 2d, seems to have simply assumed without significant discussion that purchasing pursuant to a common offering document was a prerequisite for statutory standing in a class action; it appears that the plaintiffs in that case did not challenge the defendants' argument on this point.  *Id.* at 1158, 1164-67.  Thus, the Court should not be concerned about concluding here that Plaintiffs need not have purchased in every Offering to represent a broader Class.[36]

---

[36] It is true that *Nomura*, 658 F. Supp. 2d 299, asserted that plaintiffs lacked statutory standing to represent a class who purchased in other securities offerings, but the opinion does not explain why the language of Section 11 and 12 should be interpreted as limiting the scope of class rather than individual actions.  With all due respect to the *Nomura* court, its view of the issue is wrong.  This court need not repeat the errors of other courts.  *Anwar*, 2010 WL 3022848, at *16. Moreover, since the case's holding is based on Article III standing, the passage Defendants cite, contained in a footnote, is presumably *dicta* and, in any event, is a non-binding decision from an out-of-circuit district court.  658 F. Supp. 2d at 304 n.3 (*cited in* Br. at 35).

### 3.   Pursuant to the Court's Prior Ruling, Plaintiffs Have Standing To Represent Others Who Purchased Pursuant To The Same Shelf Registration Statements

Even if the Court accepts Defendants' argument that Article III or Sections 11 and 12 limit the scope of a class action under the Securities Act, Plaintiffs in this case may nevertheless properly represent all others who purchased pursuant to the same shelf registration statements.

The securities encompassed by the proposed Class were issued pursuant to a shelf registration process.

> A "shelf registration" is an indication of an issuer's intent to offer a specified number of securities in the future, frequently through a series of incremental offerings.  A shelf registration – referred to colloquially as a "shelf" – is accompanied by a "shelf registration statement" which … provides certain required information to the market. …  When an issuer is then ready to offer some or all of the securities authorized by the shelf to market, it "pulls down" the shelf registration statement from the shelf and updates it by filing a "supplemental" prospectus.

*In re Citigroup Inc. Bond Litig.*, No. 08 Civ. 9522, 2010 WL 2772439, at *13 (S.D.N.Y. July 12, 2010) (citing *Countrywide*, 588 F. Supp. 2d at 1164).

In *Countrywide*, this Court held that, if an "initial shelf registration statement contain[s] an actionable statement or omission that is common to more than one issuance under the shelf registration," then someone who purchased in an offering pursuant to the shelf registration statement may represent a class of persons who purchased in any offering made pursuant to that shelf registration.  588 F. Supp. 2d at 1165-66.  The *Citigroup* court agreed, explaining that "where the actionable part of the registration statement is alleged to be common to all purchasers from the same shelf," a class representative can represent all purchasers pursuant to the

registration statement.  2010 WL 2772439, at *14 (named plaintiffs could represent class including purchasers in 29 offerings in which they did not participate, but arising from same shelf registration as plaintiffs' purchases).   In this case Defendants' liability arises, in substantial part, from allegedly false and misleading statements contained in their shelf registration statements.  *See, e.g.,* ¶¶ 162, 164, 168.   The proposed Class encompasses 427 Offerings, each of which was accompanied by a Prospectus Supplement which, in turn, was issued pursuant to 19 shelf Registration Statements.  Compl. Ex. A.

| Date of Shelf Registration[37] | Shelf Registration Statement No. | Total Offerings Registered | Total Offerings, by Registration Statement on Which Named Plaintiffs Purchased |
|---|---|---|---|
| October 28, 2002 | 333-100418 | 1 | 0 |
| January 13, 2004 | 333-110343 | 1 | 0 |
| September 23, 2004 | 333-117949 | 15 | 0 |
| October 18, 2004 | 333-118926 | 1 | 0 |
| February 8, 2005 | 333-121249 | 3 | 0 |
| April 21, 2005 | 333-123167 | 26 | 26 |
| June 10, 2005 | 333-125164 | 26 | 26 |
| July 25, 2005 | 333-125963 | 31 | 31 |
| July 25, 2005 | 333-125902 | 62 | 62 |
| August 4, 2005 | 333-126790 | 17 | 17 |
| February 21, 2006 | 333-131591 | 17 | 17 |
| March 6, 2006 | 333-131662 | 29 | 29 |
| March 6, 2006 | 333-131630 | 93 | 93 |
| April 12, 2006 | 333-132375 | 18 | 18 |
| August 8, 2006 | 333-135846 | 23 | 23 |
| April 24, 2007 | 333-140960 | 9 | 9 |
| April 24, 2007 | 333-140958 | 23 | 23 |
| April 24, 2007 | 333-140962 | 29 | 0 |
| May 22, 2007 | 333-139891 | 3 | 3 |
| **19 Registration Statements** | | **427 Offerings** | **377 Offerings** |

Defendants suggest that even if Plaintiffs generally have standing to assert the claims of all who purchased pursuant to the same shelf registration, Plaintiffs

---

[37] All Offerings at issue in this case took place during the period from January 25, 2005 through December 27, 2007, although the shelf registration may have been filed earlier.

cannot assert such claims in this case because the "differences between and among different Offerings under a common registration statement" are so great that "Plaintiffs' reliance on allegedly common false statements [in the shelf registration statements] to establish standing is misplaced." Br. at 39.  To make this point they cherry pick language from the thousands of pages of Offering Documents which they say show that the differences between the securities sold at different Offerings were substantial, Br. at 39-40, while at the same time ignoring Countrywide's uniform omission from every Offering the fact that, to a shocking degree, Countrywide was not following its underwriting guidelines.  But even if it is proper to consider such information on a motion to dismiss, the fact that there were some differences between the securities sold in each Offering does not have anything to do with standing; the issue is one of commonality and typicality and should be resolved during class certification proceedings.

In this case Plaintiffs allege that Defendants made numerous false and misleading statements in the shelf Registration Statements about Countrywide's underwriting guidelines and compliance with these guidelines, including the following:

- Each shelf Registration Statement at issue asserted that the loans underlying the securities to be issued had been made in accordance with Countrywide's underwriting standards and described those standards.  For example, each shelf Registration Statement contained identical language asserting, among other things, that in making the loans underlying the MBS, "a determination generally is made as to whether the prospective borrower has sufficient monthly income available" to make his payments; that this determination was based on the borrower's "employment, credit and property information" and that exceptions to standard underwriting criteria would be made only "where factors [such] as low Loan-to-Value Ratios or other favorable

credit factors" were present.  ¶ 168.

- Each shelf Registration Statement filed by two of the four Countrywide-controlled Issuers, CWALT and CWMBS (as well as the Prospectus Supplements issued pursuant to each of these shelf Registration Statements), contained identical language asserting, among other things, that "[a]ll of the Mortgage Loans have been originated or acquired by Countrywide Home Loans, Inc., in accordance with its credit, appraisal and underwriting standards," that these standards were applied in accordance with applicable law, that these standards "evaluate[d] the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral" and that this evaluation included examining the borrowers' "dept-to-income" ratio, the "Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower" and that each borrower had "sufficient cash resources to pay the down payment and closing costs."  ¶ 162.

- Each shelf Registration Statement filed by the other two Countrywide-controlled Issuers, CWABS and CWHEQ (as well as the Prospectus Supplements issued pursuant to these shelf Registration Statements) contained identical language asserting, among other things, that a borrower's "maximum monthly debt-to-income ratio … does not generally exceed 50%," that Countrywide's underwriting standards "establish the maximum permitted loan-to-value ratio … based upon … risk factors," and that exceptions might be made to underwriting guidelines on a "case-by-case" basis, but only based on "compensating factors" such as "low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors."  ¶ 164.

1    Defendants disingenuously insist that, because each Offering was associated

2    with a separate pool of mortgages, the identical words used in a shelf Registration

3    Statement had a different "meaning" for each Offering under that Registration

4    Statement.   Br. at 40; *see also id.* ("although the same words may appear in

5    common Offering Documents, those words were *new and different statements* in

6    each unique prospectus supplement for each unique offering") (emphasis in

7    original); *id.* at 39 ("even if certain Offering Documents used the same language,

8    the true substance of these representations was *fundamentally different*") (emphasis

9    in original).  This is nonsense – the same words in the same context mean the same

10   thing.  The fact that different mortgages were associated with different Offerings

11   has nothing to do with the meaning of language in the shelf Registration

12   Statements which applied to all Offerings made under that Registration Statement.

13   This common language is at the heart of Plaintiffs' case, which alleges a consistent

14   practice of including mortgages that were not underwritten in accordance with

15   uniform assurances provided to investors in the pools that backed the securities

16   sold in each Offering.

17   Defendants cite *New Jersey Carpenters Vacation Fund v. Royal Bank of*

18   *Scotland Group*, No. 08 CV 5093, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010)

19   (Br. at 40), and *Wells Fargo*, 2010 WL 1661534 (Br. at 40), for the proposition

20   that, in MBS cases, statutory standing prevents a plaintiff who purchases in one

21   offering from ever representing persons who purchased in separate offerings

22   pursuant to the same shelf registration statement.  But these opinions do not appear

23   to be based on factual issues unique to MBS offerings, as Defendants suggest, but

24   rather on those courts' disagreement with the holding of this Court and the

25   *Citigroup* court that, in appropriate circumstances, a class plaintiff may represent

26   all who purchased pursuant to the same shelf registration statement.  *See Wells*

27   *Fargo*, 2010 WL 1661534, at *4 (class representation based on common shelf

28

No. 2:10-cv-00302: OPPOSITION TO MOTIONS TO DISMISS                    66

registration impermissible); *Royal Bank of Scotland*, 2010 WL 1172694, at *8 (suggesting same).[38]  In Plaintiffs' view these cases were wrongly decided.

This Court should, at the least, adhere to its prior decision that plaintiffs can represent purchasers who purchased pursuant to the same shelf Registration Statement.  However, as set forth above, the proper time to consider how broad a Class Plaintiffs can represent is at class certification, under the standards of Rule 23.  Defendants' premature attempt to improperly resolve these issues under Rule 12 must be rejected.

### E.    Plaintiffs' Claims Do Not Sound In Fraud

As this Court has recognized, "'33 Act claims are subject to Rule 8(a)'s ordinary notice pleading requirements unless the allegations 'sound in fraud.'" *Countrywide*, 588 F. Supp. 2d at 1162-63.  Defendants' argument that the Complaint "sounds in fraud" has no basis in the law or the facts.  As this Court recently noted, "the particularity requirements of Rule 9(b) are applicable to § 11 claims 'where the gravamen of the Complaint is plainly fraud' and a plaintiff makes only 'nominal efforts' to disclaim fraud as to some defendants." *Id*. at 1163 (quoting *In re Stac Elecs. Sec. Litig*., 89 F. 3d 1399 (9th Cir. 1996)).  The Complaint here, which alleges *only* claims under the Securities Act and specifically disclaims any allegations of fraud (¶¶ 3, 194), certainly does not meet these criteria.  In fact, "where only non-fraud bases for liability are pled," courts in this Circuit have recognized that it is almost never appropriate to find that a claim "sounds in fraud."

> No published Ninth Circuit decision has been found . . .
> applying Rule 9(b)'s particularity requirement to a Section 11
> claim where, as here, the underlying conduct was not also

---

[38] Defendants also point to *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, No. 08 Civ 5653, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) (Br. at 40), but this case does not mention shelf registrations.

1         alleged to have constituted fraud.  Courts generally apply Rule

2         8 to Section 11 claims where only non-fraud bases for liability

3         are pled or where such claims are adequately distinguished

4         from fraud claims. … The Ninth Circuit has reached the same

5         result in unpublished opinions.  *Safron Capital Corp. v. Leadis*

6         *Tech., Inc.*, 274 Fed. Appx. 540 (9th Cir. 2008); *Knollenberg v.*

7         *Harmonic, Inc.*, 152 Fed. Appx. 674 (9th Cir. 2005).  This order

8         declines to characterize the claims as necessarily sounding in

9         fraud where plaintiffs have not expressly pled fraud and have

10        pled non-fraud bases for liability.

11 *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 545-46 (N.D. Cal. 2009).

12         The Complaint at issue here is no exception.  As alleged at the outset of the

13 Complaint:

14         Plaintiffs assert claims for violations of Sections 11, 12(a)(2)

15         and 15 of the Securities Act §§ 77k, 77l(a)(2) and 77o, arising

16         from material misstatements and omissions in the Registration

17         Statements, Prospectuses and subsequently-filed Prospectus

18         Supplements (collectively referred to herein as the "Offering

19         Documents").  Accordingly, this action involves negligence and

20         strict liability under the Securities Act.  The Complaint asserts

21         no allegations of fraud on the part of any Defendant.

22 Complaint at ¶ 3.

23         Out of the 235 paragraphs in Plaintiffs' Complaint, Defendants themselves

24 claim that they can identify only 22 paragraphs that they believe are related to

25 fraud.  *See* Br. at 54-55.  A brief examination of these 22 paragraphs reveals that

26 every single one of the paragraphs identified by Defendants has to do with

27 Countrywide's origination practices and these paragraphs (either collectively or

28

individually) do not and cannot make Plaintiffs' claims sound in fraud for two reasons.

First, Plaintiffs' Securities Act claims are only derivatively about Countrywide's origination practices in that they allege that the Offering Documents contained misstatements and omissions about the origination of the loans; there is nothing in the Complaint which alleges that Defendants knowingly or intentionally made those misstatements and omissions. Second, as this Court recently recognized, "a unified course of abandoning sound underwriting practices" does not necessarily constitute fraud. *See Countrywide*, 588 F. Supp. 2d at 1162-63 ("Plaintiffs here do not rely on a unified course of fraudulent conduct against all Defendants. Rather … Plaintiffs describe a unified course of abandoning sound underwriting practices. No fraud lies in changed practices alone."). Therefore, Plaintiffs' claims cannot be found to "sound in fraud."

When presented with the same question on very similar Securities Act claims also based on misstatements and omissions in offering documents for mortgage-backed securities, courts around the country have universally refused to find that any of these claims "sound in fraud." *See, e.g., Wells Fargo,* 2010 WL 1661534, at *2 (applying *Twombly/Iqbal* standard to claims); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2010 WL 1257528, at *3 (S.D.N.Y. Mar. 31, 2010) (rejecting Defendants' argument that Plaintiffs' claims sound in fraud and applying 8(a) standard); *DLJ,* 2010 WL 1473288, at *2 ("Since Plaintiff's allegations and claims sound in strict liability, not fraud, the Complaint is subject to the standards of Fed. R. Civ. P. 8(a), not to the heightened pleading requirements of Fed. R. Civ. P. 9(b)."); *Royal Bank of Scotland,* 2010 WL 1172694, at *4-5 (applying 8(a) standard to claims); *In re Lehman Bros. Sec. & ERISA Litig*., 684 F. Supp. 2d 485, 489-90 (S.D.N.Y. 2010) (applying 8(a) standard to claims).

For all these reasons, Plaintiffs claims do not "sound in fraud" and therefore should be "subject to Rule 8(a)'s ordinary notice pleading."[39]  *Countrywide*, 588 F. Supp. 2d at 1162-63.

### F.    Plaintiffs Have Adequately Alleged The Offering Documents Contained Misrepresentations And Omissions Of Material Fact

As mentioned above, in evaluating the Complaint the Court must accept Plaintiffs' allegations as true and construe them in the light most favorable to Plaintiffs.  *In re Daou Sys.*, 411 F.3d 1006, 1013 (9th Cir. 2005).  Where, as here, the claims are subject to a Rule 8(a) pleading standard, dismissal is appropriate only if, viewed in its totality, the Complaint fails to allege "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 547; *see also Moss,* 572 F.3d at 969 (to survive a motion to dismiss, a complaint "must be plausibly suggestive of a claim entitling the plaintiff to relief").

The Supreme Court clarified the contours of the "plausibility" requirement in *Iqbal*, 129 S. Ct. at 1950.  According to *Iqbal*, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 1949.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. Notably, the Court is not required, at this stage, to believe Plaintiffs' allegations. *Twombly*, 550 U.S. at 556 (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)) ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations.").  Indeed, even if a complaint "strikes a savvy judge that actual proof of [its] facts is improbable" and "that a recovery is very remote and unlikely," all *Twombly* requires is "enough fact to raise a reasonable expectation that discovery will reveal evidence" of wrongdoing.  *Id.*  Plaintiffs

---

[39]  But, even if this Court were to conclude otherwise, the Complaint is so substantially detailed in its allegations that it would meet Rule 9(b)'s heightened standard anyway.

1   must only "nudge[] their claims across the line from conceivable to plausible." *Id*.

2   at 570.   As discussed herein, the Complaint's allegations readily satisfy this

3   standard.

4           Section 11 liability exists when, as here, the registration statement

5   "contained an untrue statement of a material fact *or* omitted to state a material fact

6   required to be stated therein *or* necessary to make the statements therein not

7   misleading." 15 U.S.C. § 77k(a).   Defendants' demand for further detail

8   improperly seeks to require Plaintiffs *to prove* their claims at this stage of the

9   litigation.   *See Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009)

10  ("*Twombly* leaves the longstanding fundamentals of notice pleading intact.")

11  (quotations and citations omitted).

12          A complaint sufficiently pleads falsity where, as here, it includes (1) each

13  statement or omission alleged to have been misleading; (2) the reason or reasons

14  why the statement or omission is misleading; and (3) facts on which that belief is

15  formed. *See Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000).   The

16  Ninth Circuit "recognize[s] that statements literally true on their face may

17  nonetheless be misleading when considered in context." *Miller v. Thane Int'l, Inc.*,

18  519 F.3d 879, 886 (9th Cir. 2008).

19          A complaint may not be properly dismissed pursuant to Rule 12(b)(6) on the

20  ground that the alleged misstatements or omissions are not material unless it is "so

21  obvious that reasonable minds [could] not differ" as to the materiality of the

22  misstatement.   *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (quoting

23  *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)).   Whether

24  securities offering documents contain materially untrue statements is a mixed

25  question of fact and law and is generally inappropriate for determination on a

26  motion to dismiss. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

27  Here, the Complaint more than adequately alleges that the Offering Documents

28  contained untrue statements of material facts and omitted to state facts necessary to

make the statements made not misleading.  ¶¶ 160-85.  Specifically, the Complaint alleges that the Offering Documents failed to disclose that the stated underwriting guidelines purportedly used to originate the underlying mortgage loan collateral, including the reliance on stated maximum LTV ratios and various forms of standard appraisals, had been systematically disregarded.

The Complaint sets forth three separate categories of factual evidence demonstrating that these misstatements and omissions are actionable.  ¶¶ 9-15, 88-159.  First, no matter when the Offering occurred, the default and delinquency rates of the Certificates skyrocketed exponentially (from 0.4% to 10.5%) in the first twelve months after the loans were originated, reflecting *en mass* early payment defaults. ¶ 88.  Such early payment defaults are a strong indicator that the origination guidelines were disregarded.  ¶¶ 11, 88-89.  Second, shortly after issuance the Rating Agencies were forced to not only downgrade the Certificates from the highest rating of AAA (indicating maximum security) to junk bond levels, but also to revamp their entire MBS rating methodology because of, in material part, previously undisclosed "aggressive underwriting" used to originate the mortgages. ¶¶ 92-99.

Third, numerous independent investigations and hearings by government and regulatory agencies have detailed that during the period when these underlying mortgages were originated, Countrywide engaged in improper loan origination practices.  ¶¶ 100-43.  Such specific factual allegations have been found by other federal district courts to give rise to actionable claims under the Securities Act asserted on behalf of purchasers of similar mortgage-backed Certificates.  *See In re Lehman Bros.*, 684 F. Supp. 2d at 494-95; *see also Residential Capital*, 2010 WL 1257528, at *6 ("[H]ere, Plaintiffs link their allegations about the failures of the underlying loan pools to allegations that the mortgage originator disregarded underwriting guidelines."); *DLJ*, 2010 WL 1473288, at * 7 ("The allegations here are extreme, yet plausible in light of the rapid and precipitous decline in market

value, concurrent with skyrocketing mortgage loan delinquency rates and plummeting credit ratings.  The Complaint alleges that the Rating Agencies attributed their downgrades – from investment grade securities to junk bonds – to aggressive underwriting practices by the Originators."); *Royal Bank of Scotland*, 2010 WL 1172694, at *12 ("Plaintiffs have also sufficiently … connected these allegations to the offerings in question.  They allege a wholesale downgrade of credit ratings in the HVMLT offerings … and also point to very high rates of delinquency and default that occurred in the loan collateral that underlay the Certificates.").

### 1. Plaintiffs Need Not Identify Specific Deviant Loans To Allege Actionable Misstatements And Omissions

Defendants argue that no actionable claims have been alleged since Plaintiffs have not alleged that specific loans deviated from the underwriting guidelines.  Br. at 56-57.  However, this argument has been repeatedly rejected where, as here, it is alleged there was a systematic disregard of the underwriting guidelines.  *See Wells Fargo*, 2010 WL 1661534, at *11 (denying motion to dismiss claims of systematically disregarded underwriting guidelines in the origination of MBS collateral where no specific loans were identified in the complaint); *In re PMI Group, Inc. Sec. Litig*., No. C 08-1405 SI, 2009 WL 3681669, at *4 (N.D. Cal. Nov. 2, 2009) (statements regarding the quality of company's underwriting practices and exposure to risk were false and misleading); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (denying lending company's motion to dismiss and noting that "underwriting practices would be among the most important information looked to by investors"); *In re Wash. Mut. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1211 (W.D. Wash. 2009) (denying motion to dismiss where bank lowered its underwriting standards and pressured underwriters to approve loans outside the guidelines); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044,

1057 (C.D. Cal. 2008) (false statements included representations that Countrywide actively managed credit risk, applied more stringent underwriting standards for riskier loans such as ARMs, and only retained high credit quality mortgages in its loan portfolio); *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *10 (E.D. Pa. July 27, 2005) (misrepresentations regarding a company's underwriting practices are actionable); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898(SAS), 2005 WL 2148919, at *12 (S.D.N.Y. Sept. 6, 2005) (same).

As discussed above, *see supra* at Part III. B, the Complaint sets out extensive details on how Countrywide's loan underwriting deviated from accepted practice and the representations in the Offering Documents.  Such facts have been held sufficient to proceed at this stage of the litigation.  In *Wells Fargo*, a similar class action alleging misstatements and omissions in violation of the Securities Act in connection with the origination and securitization of MBS by Wells Fargo & Co. entities, Judge Illston rejected a similar argument made by defendants.  There, the court stated:

> Defendants argue that these allegations are insufficient because they are not linked to the specific types of prime mortgages that were packaged into the securities at issue in this case.  However, plaintiffs have alleged that the challenged conduct infected the entire underwriting process, including with respect to prime loans.  In the Court's view, plaintiffs' allegations with respect to defendants' underwriting practices are sufficiently specific to state a claim.

2010 WL 1661534, at *11.

In support of their argument, Defendants purport to rely on cases which either support denial of dismissal here or are inapposite.  For example, Defendants cite *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 92 F. Supp. 2d 387

(S.D.N.Y. 2010), in which the plaintiffs asserted claims under Sections 11 and 12 of the Securities Act on behalf of purchasers of mortgage-backed certificates. There, Judge Kaplan denied the underwriters' motion to dismiss the Securities Act claims with respect to the alleged misstatements and omissions in the offering documents relating to loan underwriting guidelines purportedly used to originate the mortgage loan collateral.  Significantly, Judge Kaplan found that the plaintiffs' claims of underwriting guideline misstatements were well pled based on specific allegations that the default rates on the mortgage loan collateral skyrocketed shortly after issuance, which led to the collapse in the certificates' ratings from the highest AAA rating to junk bond levels:

> The amended complaint … sufficiently alleges that there was widespread abandonment of underwriting guidelines at IndyMac Bank during the period of time at issue and that the percentage of "defaulting" loans rose dramatically shortly after the Certificates were issued.  These allegations create a sufficient nexus between the alleged underwriting standard abandonment and the loans underlying the Certificates.

*Id.* at 392.[40]

Defendants also cite the entirely inapplicable case *Republic Bank & Trust Co. v. Bear, Stearns Co., Inc.*, No. 3:09-CV-287-S, 2010 WL 1489264 (W.D. Ky. Apr. 13, 2010).  Br. at 57.  In *Republic*, plaintiff brought an action for common law

---

[40] Defendants again cite *Nomura*, 658 F. Supp. 2d 299 (Br. at 58), for the same argument.  The court in *Nomura* did not hold that plaintiffs failed to plead falsity.  Rather, the court held that the extensive risk disclosures there sufficiently warned of the potential perils of **subprime** mortgage loans (*i.e.*, that the loans in the mortgage pools may not conform to Fannie Mae and Freddie Mac standards, and therefore may experience rates of delinquency, foreclosure and borrower bankruptcy that are higher, and that may be significantly higher, than those experienced by mortgage loans underwritten in strict compliance with Fannie Mae or Freddie Mac guidelines).  *Id.* at 309-10.  Here, in stark contrast to *Nomura*, the purported disclosures are far more general.  Therefore, the deviations from underwriting standards – which are detailed in the Complaint – dramatically affected the total mix of information available to investors.

fraud and violations of Kentucky's blue sky law against Bear Stearns and one of its employees based on several alleged omissions, most of them verbal, in connection with the sale and purchase of residential MBS certificates.  Plaintiff alleged that Bear Stearns and one of its employees omitted, *inter alia*, to state that a substantial number of the loans backing the certificates were not adequately secured due to inaccurate or unsound valuation of the real properties securitizing the mortgages or otherwise.  *Id.* at *6.  However, in *Republic*, the complaint was devoid of any citations to any relevant excerpts of the offering documents and failed to recite any specific interaction between defendants and plaintiff where the alleged omissions occurred nor did the complaint include any allegations specific to the mortgage loans at issue.  In contrast, here Plaintiffs have sufficiently alleged, through at least three distinct levels of factual support, that the underwriting guidelines with respect to the specific mortgage loans underlying the Certificates were systematically disregarded.[41]

Additionally, the Countrywide Defendants argue, relying extensively on *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010), that language in a prospectus that the "sole remedy" for defects in "***a mortgage loan document***" is requesting such loans in the pools to be replaced precludes the assertion of claims under the Securities Act for material misstatements and omissions in ***Offering Documents***.  Br. at 51-52 (emphasis added).  That contention is plainly incorrect.  The relied upon "sole remedy" related to misstatements in specific underlying "mortgage loan document[s]," not misstatements in the Registration Statements or Prospectus Supplements.  Moreover, *Lone Star* has no application here since that case turned on a single alleged misrepresentation in the offering documents that there were no delinquent

---

[41] Moreover, Republic was a case alleging fraud, and in granting the dismissal motion, the court held that plaintiffs there had failed to meet Rule 9(b)'s particularity requirement.  But the Rule 9(b) standard is inapplicable here.

loans in the collateral pools.[42]   No such allegation has been made by Plaintiffs in the Compliant.   As such, the holding in *Lone Star* is limited to the narrow allegations at issue there where the status of specific loans was raised by the complaint; as opposed to here where Plaintiffs alleged that the stated underwriting guidelines in the Offering Documents had been systematically disregarded. Defendants do not, and cannot point to any language which bars certificate holders from pursuing the relief provided for in the Securities Act as a result of material misstatements and omissions made in the Offering Documents with respect to the failure to adhere to the stated underwriting guidelines.

Notably, Defendants' arguments for dismissal based on *Lone Star*'s "sole remedy" language have been asserted repeatedly in similar Securities Act class actions on behalf of MBS purchasers and have been rejected without so much as even a footnote discussion.  *See Royal Bank of Scotland*, 2010 WL 1172694; *DLJ Mortgage Capital*, 2010 WL 1473288; *Residential Capital*, 2010 WL 1257528; *Lehman Bros.*, 684 F. Supp. 2d.

### 2.   Data Included In The Offering Documents Regarding The Mortgages Does Not Cure Alleged Misstatements And Omissions

Defendants also argue that there can be no actionable omissions regarding underwriting standards because the Offering Documents provided "hard data about the pooled loans" which "told investors all the material information needed to assess the credit risk associated with the pooled loans."  Br. at 60.  However, this hard data disclosing, for example, debt-to-income ("DTI") and LTV ratios, FICO

---

[42] Specifically, the court ruled,

> ***All*** of Appellants' various claims are predicated upon Barclays' alleged misrepresentation that there were *no* delinquent loans in the BR2 and BR3 Trusts when Lone Star purchased the securities. Consequently, to prevail, Appellants must successfully allege [] that Barclays represented that the BR2 and BR3 Trusts had no delinquent mortgages . . . .

594 F.3d at 388.

scores and principal amounts says nothing about the alleged systematic disregard for the stated standards.  "[A] violation of Section 11 will be found when material facts have been omitted or presented in such a way as to obscure or distort their significance."  *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (quotation and citation omitted); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 320 (S.D.N.Y. 2009).

Moreover, "whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact."[43]  The adequacy of a disclosure should be resolved at the motion to dismiss stage, therefore, only when the adequacy is "'so obvious that reasonable minds [could] not differ.'"  *Fecht*, 70 F.3d at 1081. "It would be premature for this court to evaluate the actual materiality of defendants' omissions, because the materiality of an omission is a question reserved for a jury unless 'reasonable minds could not differ' on the adequacy of the disclosure and the question is appropriate for resolution as a matter of law."  *In re CornerStone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1086 (N.D. Cal. 2005); s*ee also Miller*, 519 F.3d at 888 ("Assessing materiality is a 'fact-specific inquiry' that 'depends on the significance the reasonable investor would place on the withheld or misrepresented information.'").

Moreover, Defendants' argument entirely ignores the widespread evidence that the loan data was itself inaccurate.  As S&P noted, the horrendous performance of MBS called into question the accuracy of the loan data underlying MBS.  ¶ 95.  Combined with the numerous facts suggesting that borrowers were widely encouraged by Countrywide to provide erroneous information in their applications, ¶¶ 89-90, 138-40, 163 there is every reason to suspect – or as *Iqbal*

---

[43]  *Fecht*, 70 F.3d at 1081; *see also Gray v. First Winthrop Corp.*, 82 F.3d 877, 883 (9th Cir. 1996); *Warshaw*, 74 F.3d at 959; *In re Thoratec Corp. Sec. Litig.*, No. C-04-03168 RMW, 2006 WL 1305226, at *10 (N.D. Cal. May 10, 2006) ("courts generally may not dismiss a complaint on the basis of a truth-on-the-market defense to a fraud-on-the-market theory").

would say, it is at least "plausible" – that this supposedly "hard data" was itself misleading.  But again, that is not the point of Plaintiffs' claims, which concern the systematic failures in Countrywide's underwriting practices.

### 3.    Plaintiffs Have Adequately Alleged Misrepresentations And Omissions Regarding Appraisal Standards

Plaintiffs have also adequately alleged that the Offering Documents were false and misleading because Defendants materially misstated the standards by which mortgage originators appraised the value of the properties underlying the loans, giving investors the impression that unbiased, adequate appraisals were obtained for the underlying collateral.   The fundamental basis upon which the Certificates are valued is the ability of borrowers to repay the mortgage loans, and the adequacy of the collateral for those loans in case of default.  ¶ 5.  Accordingly, accurate appraisals of the collateralized real estate, and the calculated LTV ratios, were essential to assessment of the price and risk of the Certificates.  ¶ 184.  Here, the Countrywide Defendants misrepresented how originators had appraised the underlying real estate securing the loans.  As a result, the Offering Documents gave the misleading impression that the ostensible collateral for the loans was artificially high and the corresponding LTV ratios were artificially low, making it appear that the loans underlying the Issuing Trusts, and thus the Certificates, were safer investments than they actually were.  ¶¶ 160-85.

The Complaint draws from a plethora of corroborating sources in detailing how Countrywide systematically inflated appraisals for properties used as collateral for mortgage loans underlying the Issuing Trusts.   The Complaint alleges, among other things: that Countrywide pressured appraisers to inflate the appraisal value in order to allow homeowners to "roll up" closing costs, ¶ 142; that Countrywide permitted its origination divisions to "hire appraisers of their own choosing" and "discard appraisals that did not support loan transactions," ¶ 133; that Countrywide retaliated against appraisers who did not "buckle under pressure

[from Countrywide] to inflate real estate values" by blacklisting those appraisers and replacing them, ¶¶ 134-35; and that Countrywide had its appraisers inflate the appraisal value of a home to the stated sales price of many of KB Home's properties that were already inflated to subsidize homebuyers' initial mortgage payments.[44] ¶ 143.

Notwithstanding Countrywide's undisclosed practice of inflating appraisals and thus lowering LTV ratios on underlying collateral, the Offering Documents contained material misstatements and omissions that gave investors the impression that unbiased, adequate appraisals were obtained for the underlying collateral. Contrary to the Offering Documents' misstatements: Countrywide did not properly "evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgage property as collateral," ¶¶ 162-63; Countrywide's underwriting standards were not "primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan" and to evaluate "the borrower's credit standing and repayment ability," ¶¶ 164-67; and the mortgaged properties were not appraised, on a consistent basis, using "market data analysis based on recent sales of comparable homes in the area" or "on the basis of an applicable originator-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac." ¶¶ 177-82. Indeed, as elaborated above and in the Complaint, Countrywide consistently sought to extend loans to *unqualified* buyers by directly and indirectly inflating the appraisals and lowering the LTV ratios on

---

[44] Thus, Defendants' observation that for purchase mortgages "the Offering Documents define LTV ratios as the ratio between the principal balance of the loan and the lesser of the selling price of the related mortgage property or its appraised value at the time of sale," Br. at 64 (emphasis and internal quotation marks omitted), is irrelevant. Countrywide actively pushed to inflate *both* the sales prices *and* the appraisal values in order to "roll up" closing costs or to subsidize initial mortgage payments for the buyers.

the underlying collateral.  The artificially lowered LTV ratios also rendered the Offering Documents materially false and misleading as the manipulated LTV ratios could not be properly used as a "compensating factor" in allowing exceptions to underwriting guidelines.  ¶¶ 183-85.

The court in *Wells Fargo* considered similar allegations and factual support and determined that the complaint sufficiently alleged untrue statements regarding loan appraisals and loan-to-value ratios.  2010 WL 1661534, at *11-12 (finding statements about LTV ratios and appraisals in the offering documents to be actionable where the plaintiffs alleged that Wells Fargo pushed for appraisals to be inflated).  "Plaintiff need not allege anything further" than that "Wells Fargo's practices permitted the pervasive and systematic use of inflated appraisals, affecting all types of mortgages." *Id.* at *12.

Defendants confidently trot out a straw man, contending that Plaintiffs' appraisal and LTV allegations should be dismissed because the ***individual appraisals*** were subjective statements of opinion, which would require allegations that the appraiser subjectively believed that the appraised home value was wrong. Br. at 62-65.  This argument is both legally insufficient and relies upon a mischaracterization of Plaintiffs' allegations, as the statements at issue are ***not*** the individual appraisals made by the appraisers, but rather the statements in the Offering Documents made by Defendants concerning the standards supposedly followed for those appraisals.  To wit, Plaintiffs identify statements in the Offering Documents indicating that originators relied on specific methods and standards in determining appraisal values and in reporting LTV ratios.  *See* ¶¶ 160-85. Plaintiffs further allege the pervasive abandonment of these disclosed standards. Such allegations do not allege that the ***individual appraisals*** were subjectively false, but rather that the standards ***disclosed in the Offering Documents*** were not followed and that the appraisal process in general was not consistent with what was represented in the Offering Documents.  Plaintiffs need not allege more. *See Wells*

1  *Fargo*, 2010 WL 1661534, at \*12 ("[P]laintiffs have alleged that Wells Fargo's

2  practices permitted the pervasive and systematic use of inflated appraisals,

3  affecting all types of mortgages.  Plaintiffs need not allege anything further in

4  order to state a claim.").[45]

5      **4.    Plaintiffs' Allegations That Defendants Issued Materially
Misleading Statements In The Offering Documents Satisfy
6      The Requirements Established By The Securities Act**

7         Scienter is unequivocally *not* an element of any of the claims asserted herein

8  – *i.e.,* §§ 11, 12(a)(2) or 15 of the Securities Act.  "If a plaintiff purchased a

9  security issued pursuant to a registration statement, he need only show a material

10  misstatement or omission to establish his *prima facie* case."  *Herman & MacLean*,

11  459 U.S. at 382; 15 U.S.C. § 77k(b).  "Liability against the issuer of a security is

12  virtually absolute, even for innocent misstatements."  *Herman & MacLean,* 459

13  U.S. at 382; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208, 96 S. Ct. 1375, 47 L.

14  Ed. 2d 668 (1976).  Thus, the Securities Act imposes a "form of strict liability for

15  material misstatements or omissions of fact in registration statements," *Greenapple*

16  *v. Detroit Edison Co.*, 618 F.2d 198, 203 (2d Cir. 1980), and defendants "will be

17

---

18  [45]  As such, the cases cited by Defendants are inapposite as the courts in those

19  cases ruled on whether the individual appraisals were statements of fact and ***not*** on

20  the offering documents' statements about whether the standards for those
appraisals were followed.  *See Tsereteli*, 692 F. Supp. 2d at 393 (ruling on the
21  underlying appraisals); *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583,
2010 WL 2473243, at \*10 (S.D.N.Y. June 21, 2010) (same).  The cases cited by
22  Defendants are also distinguishable as the plaintiffs in those cases relied only on
23  generalized or conclusory allegations of appraisal inflation, in contrast with
Plaintiffs' allegations here, drawing from varying and corroborating sources about
24  Countrywide-specific appraisal practices.  *See Tsereteli*, 692 F. Supp. 2d at 393
(appraisal allegations insufficient where "the only fact alleged in support of the
25  allegation[s]" is a government report); *Nomura,* 658 F. Supp. 2d at 307-08 (general
26  allegations of industry-wide inflated appraisals "tells nothing" about the collateral
at issue); *IndyMac*, 2010 WL 2473243, at \*10 (plaintiffs did not rely on sources
27  sufficiently linked to the appraisals on the collateral actually underlying the
securities at issue).
28

1    liable for innocent or negligent material misstatements and omissions." *In re Stac*
2    *Elecs.*, 89 F.3d at 1404-05 (citations omitted).

3            Despite this black letter law, Defendants attempt to use an SEC rule to graft
4    onto Securities Act claims a scienter pleading requirement where none exists.
5    Section 1111 of Regulation AB, 17 C.F.R. § 229.1111(a)(3), requires issuers of
6    securities to disclose, "to the extent known," specific mortgages which deviated
7    from stated underwriting guidelines.   It is not designed to impose a scienter
8    requirement where it is alleged that the stated guidelines contained both omissions
9    and misstatements because the guidelines were systematically disregarded.  *See*
10   *Royal Bank of Scotland*, 2010 WL 1172694, at *10.  While Regulation AB may be
11   relevant if a plaintiff brought a Securities Act claim based solely on an alleged
12   omission of the deviation of specific mortgages from their guidelines *and* alleges
13   that defendants had a duty to disclose the omitted information, where, as here, a
14   plaintiff alleges that defendants made ***affirmative misrepresentations***, courts have
15   uniformly rejected Regulation AB's knowledge requirement because plaintiffs
16   need not rely on Regulation AB to invoke a duty to disclose.  As stated by one
17   district court recently:

18           Because of the phrase "to the extent known" in the regulation
19           [Regulation AB], the RBS Defendants argue that Plaintiffs'
20           claims are insufficient because they fail to allege that the RBS
21           Defendants knew of the problems associated with the
22           underwriting guidelines beyond what they already disclosed.
23           ***Plaintiffs' allegations about the loan underwriting guidelines***
24           ***are not precluded by this regulation***.  Although Plaintiffs focus
25           largely on omissions in the Offering Documents, the
26           Consolidated Amended Complaint can be fairly read to include
27           allegations of affirmative misstatements with regard to the
28           underwriting guidelines.  ***Plaintiffs' [sic] allege not only that***

> ***RBS Defendants failed to disclose information about the underwriting guidelines, but that the statements about the guidelines were themselves incorrect because the originators "totally disregarded" them.***

*Id.* at *10-11 (citations omitted) (emphasis added).  As elaborated on similarly by another court:

> Next, the Individual Defendants argue that they were obliged to disclose only what they knew and that the complaint fails to allege that they knew about the exceptions to the underwriting guidelines.  If the plaintiffs' claim were based on omissions only, this theory might have some merit.  ***The complaint, however, fairly can be read to allege that the Offering Documents' description of the underwriting guidelines used in originating the loans was an affirmative misstatement because the guidelines allegedly were disregarded on a systematic basis.***  Regulation AB requires the truthful disclosure of the "underwriting criteria used to originate or purchase the pool assets," and the complaint alleges that the loans were originated using criteria different than those stated in the Offering Documents.  ***As this claim relies on Section 11 of the Securities Act, and not Section 10(b) of the Securities Exchange Act or Rule 10b-5, the Individual Defendants' knowledge is immaterial.  They are strictly liable for any misstatements in the Offering Documents that they signed unless they can establish the due diligence defense, an issue inappropriate for consideration on a motion to dismiss.***

*In re Lehman Bros. Sec. and ERISA Litig.*, 684 F. Supp. 2d 485, 493-94 (S.D.N.Y.

2010) (emphasis added).[46]   Accordingly, Plaintiffs need not allege actual knowledge to adequately state a claim under Section 11.

### G.   The Allegations In The Complaint Are Properly Based On Corroborated Facts That There Is No Basis To Strike

Defendants argue that Plaintiffs' allegations referencing other complaints, media or reports of government investigations are inadequate and must be stricken under Fed. R. Civ. P. 11.  Br. at 66-69; Sieracki Br. *passim*.  Defendant Sieracki argues in his Motion to Strike that certain portions of the Complaint should be stricken on the basis that the Complaint does not provide evidence that Plaintiffs' counsel personally investigated the allegations.  Sieracki Br. at 6.  This is false; the Complaint includes numerous corroborating factual sources of information uncovered as a result of Plaintiffs' counsel's investigation, each of which provides support for the references to the allegations in other lawsuits.[47]   And despite Sieracki's contentions, the allegations in these other lawsuits have been given weight in several courts, as detailed below, and these findings all lend support to Plaintiffs' allegations.[48]   Sieracki, however, contends that such references are

---

[46]   Thus, the cases cited by Defendants, all of which involve failures to disclose information pursuant to Item 303 of Regulation S-K, *see Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613-14 (S.D.N.Y. 2008); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669-74 (S.D.N.Y. 2008); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001), are inapposite as Plaintiffs here do not invoke a duty to disclose based on Item 303 but rather allege that Defendants made affirmative misrepresentations.

[47]   Sieracki and Countrywide have been the subjects of many investigations and complaints involving widespread disregard of stated underwriting practices and misleading public reporting, several of which contain materially similar allegations to those made by Plaintiffs in the instant case.  For example, the SEC Complaint filed on June 4, 2009, alleges that the defendants in that case, including Sieracki, made materially false statements in Countrywide's SEC filings and in other forums about the quality of Countrywide's residential mortgage loans and about the underwriting process for those loans.  *See* ¶¶ 103-08.

[48]   The lawsuits and outside investigations referenced in the Complaint which do not specifically name Sieracki as a defendant still rest on substantially similar claims related to the underlying misconduct at Countrywide, and detail its systematic disregard for its underwriting guidelines.  Plaintiffs allege Sieracki is liable as a control person for, among other things, signing multiple Registration

1    inadequate because they purportedly do not reflect Plaintiffs' counsel's

2    independent investigation and because such allegations are purportedly untested.

3           Sieracki carries a very heavy burden in bringing a motion to strike.  If a

4    reasonable investigation has been conducted and information within the complaint

5    is relevant, "motions to strike are viewed with disfavor and infrequently granted."

6    *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78

7    (S.D.N.Y. 2003) (citations omitted); *see also Greenwich Ins. Co. v. Rodgers*, No.

8    EDCF 10-00430, 2010 WL 3070463, at *2 (C.D. Cal. July 23, 2010); *Jones v. AIG

9    Risk Mgmt., Inc.*, No. C-10-1374 EMC, 2010 WL 2867337, at *10 (N.D. Cal. July

10   20, 2010).  A motion to strike should be denied "unless 'it can be shown that no

11   evidence in support of the allegation would be admissible.'" *Merrill Lynch*, 218

12   F.R.D. at 78.

13          Additionally, Rule 11 provides, in relevant part, that an attorney certifies the

14   submission of court pleadings "to the best of the person's knowledge, information,

15   and belief, formed after an inquiry reasonable under the circumstances."  Fed. R.

16   Civ. P. 11; Complaint at 1.  Plaintiffs' counsel do not dispute that Rule 11 of the

17   Federal Rules of Civil Procedure requires attorneys to conduct a reasonable

18   investigation to validate the contentions made in a complaint; but they firmly

19   disagree with any suggestion they have not done so here.  Plaintiffs' counsel

20   indeed conducted an extensive investigation, culminating in a Complaint that is

21   based upon numerous corroborating factual sources of information that

22   demonstrate Defendants made materially false and misleading statements in the

23   Offering Documents.  This thorough investigation of course uncovered information

24   from sources with knowledge of Countrywide's activities, but "'[a] signer's

25   obligation personally to comply with the requirements of Rule 11 clearly does not

26

27

28

---

Statements containing material misrepresentations about Countrywide's adherence to specific underwriting guidelines.

1  preclude the signer from any reliance on information from other persons.'" *Dubois*

2  *v. U.S. Dept. of Agric.*, 270 F.3d 77, 82 (1st Cir. 2001) (citation omitted).[49]

3        Sieracki's argument in support of striking Plaintiffs' references to the

4  allegations in other complaints is based upon the incorrect premise that bald

5  allegations from other complaints are the **sole** basis for Plaintiffs' claims when

6  they are plainly not.  The Complaint makes clear on the very first page that

7  Plaintiffs' counsel conducted thorough investigations of numerous sources in

8  addition to other court filings, for example: (i) review and analysis of the offering

9  materials for the Certificates and the Certificates' rating histories; (ii) examination

10 of the monthly service or remittance reports issued in connection with the

11 Certificates; (iii) examination of the SEC filings, press releases and other public

12 statements of Countrywide Financial Corporation ("Countrywide"); (iv) review

13 and analysis of media reports, congressional testimony and additional material; and

14 (v) analysis of the SEC's Summary Report of Issues Identified in the Commission

15 Staff's Examinations of Select Credit Rating Agencies and additional documents,

16 as are detailed in the Complaint at page 1.  This independent investigation,

17 combined with review of other court filings and investigations, forms the basis of

18 Plaintiffs' pleadings.

19        Moreover, Defendants fail to note that the Complaint relies extensively on

20 **facts** set out in other complaints, not simply unsupported allegations therein.  *See,*

21 *e.g.,* ¶ 111 (discussing information the Illinois Attorney General obtained from

22 Countrywide employees); ¶ 116 (discussing information the California Attorney

23 General obtained from Countrywide employees in California); ¶¶ 123-27 (citing

---

[49] There is no support for Sieracki's naked assertion that "[Federal Rule of Civil
Procedure] 11 should be read in conjunction with Rule 9(b)" to somehow create a
new, higher pleading standard.  Sieracki Br. at 8.  A straightforward reading of the
plain language of both Rule 9 and Rule 11 rejects Sieracki's proposed argument,
and he has cited no authority in support thereof.

facts revealed by Countrywide employees).  But Plaintiffs' claims are not simply based on these facts alone.

Several other sources of information set forth in the Complaint support the factual allegations contained in the referenced lawsuits.  Such sources include:

- The March 2008 Policy Statement of Financial Market Developments issued by the President's Working Group on Financial Markets that indicated that the underlying causes of the mortgage crises included, among other things, a breakdown in underwriting standards for subprime mortgages and a significant erosion of market discipline by those involved in the securitization processes, including originators and underwriters (¶¶ 14, 153);

- The 2007 Mortgage Market Statistical Annual Volume 1, which provided information regarding the market for adjustable rate mortgages and the growth of non-traditional adjustable rate mortgages (¶ 74);

- The 2006 and 2007 Mortgage Fraud Reports issued by the Federal Bureau of Investigation ("FBI") that provided information concerning default and delinquency rates for mortgages and the relationship between such defaults and delinquencies to misrepresentations in original loan applications (¶ 89);

- A March 11, 2008, *Wall Street Journal* article that detailed the initiation of an investigation by the FBI into Countrywide's mortgage lending practices (¶ 102);

- A July 24, 2008, *Los Angeles Times* article that described that Countrywide was under federal investigation and had been subpoenaed (¶ 120);

- An April 6, 2008, *New York Times* article that reported that although Countrywide had the right to verify stated income on applications

through the Internal Revenue Service ("IRS"), Countrywide verified income with the IRS on only 3%-5% of all loans funded by the Company in 2006 (¶ 132);

- A January 12, 2008, *New York Times* article that stated that lenders routinely waived their own credit guidelines (¶ 150);

- A January 27, 2008, *New York Times* article that described a deterioration of lending standards that started in 2005 and a parallel jump in lending exceptions (¶ 151);

- A January 29, 2008, *Wall Street Journal* article that described the broad language written in prospectuses and the risky nature of mortgage-backed securities that changed little even as due diligence reports noted that the number of exception loans backing the securities was rising (¶ 151); and

- A March 23, 2008, *Los Angeles Times* article that highlighted the disregard of lending standards in the mortgage industry and the lack of due diligence conducted by investment banks (¶ 152).

These sources of information corroborate the allegations of other lawsuits and government investigations referenced in the Complaint and demonstrate that Plaintiffs' claims are not based solely upon the allegations of other lawsuits. *See Connetics*, 2008 WL 3842938, at *4 ("Although plaintiffs continue to rely in part on the SEC complaint, plaintiffs have explained what other sources they rely on to formulate their factual allegations and have explained how these other sources corroborate some, though not all, of the allegations from the SEC complaint."); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1080-81 (N.D. Cal. 2001) (considering allegations from an SEC complaint in evaluating sufficiency of the plaintiffs' complaint). Here, for example, rather than relying solely upon the information from one of the confidential witnesses alleged in another complaint, Plaintiffs

independently corroborated such allegations with other publicly-available information.  For example, the Complaint states:

> According to another confidential source identified in the Securities Complaint, ***and confirmed by an April 6, 2008 article in** **The New York Times***, even though Countrywide had the right to verify stated income on an application through the Internal Revenue Service ("IRS") (and this check took less than one day to complete), income was verified with the IRS on only 3%-5% of all loans funded by Countrywide in 2006.

¶ 132 (emphasis added).[50]  Plaintiffs have thus satisfied Rule 11.  *Connetics*, 2008 WL 3842938, at *4 (rejecting the defendants' Rule 11 argument and holding that plaintiffs may "rely in part on the SEC complaint" so long as they rely on other corroborating sources).[51]

Likewise, the Complaint does not rest merely on the external governmental investigations of Countrywide's loan origination practices.  ¶¶ 88-143.  Rather, the government investigations are cited as additionally supportive of the Certificate-specific evidence, *i.e.,* the evidence that default rates skyrocketed immediately after issuance no matter when the issuance occurred (¶¶ 88-89) and that the rating

---

[50] It is important to note that pursuant to the discovery stay imposed by the Private Securities Litigation Reform Act, Plaintiffs are precluded from conducting formal discovery.   Additionally, to the extent that any witnesses identified in other complaints are currently employed by any of the Defendants, such witnesses would be unavailable for Plaintiffs to contact.

[51] Indeed, even the authorities cited by Sieracki are in agreement that allegations that are not ***solely*** based upon allegations in other complaints are proper.  *See RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 404 (S.D.N.Y. 2009) ("Because Paragraphs 18, 21, and 24 are not based solely on the stricken complaints, TNK-BP's request that the court strike those paragraphs is denied."); *Fraker v. Bayer Corp.*, No. CV F 08-1564 AWI GSA, 2009 WL 5865687, at *3 (E.D. Cal. Oct. 6, 2009) ("a complaint, while it may refer to allegations set forth in a complaint in a different action, may not 'rely *entirely* on another complaint as the *sole* basis for [its] allegations'" and "Plaintiff may refer to allegations set forth in a complaint in another action as a basis for 'a reasonable source of information and belief allegations'") (emphasis in original, citations omitted).

agencies downgraded the Certificates from AAA to junk bonds due, in material part, to undisclosed "aggressive underwriting practices." ¶¶ 92-99.

As a result, the lawsuits cited in the Complaint concern the same misconduct detailed through Certificate-specific evidence.  It was fully appropriate for the Complaint to detail the numerous independent investigations and hearings by government and regulatory agencies during the period when these underlying mortgages were originated, finding, *inter alia*, Countrywide's "manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations." ¶ 102;[52] *see also* ¶¶ 14, 74, 89, 120, 132, 150-53.

Moreover, the only case Sieracki cites in defense of his argument that courts should strike allegations from other complaints as violative of Rule 11 is inapposite and has been distinguished in California courts.  *See* Sieracki Br. at 6-7 (citing *Geinko v. Padda*, No. 00 C 5070, 2002 WL 276236, at *6 n. 8 (N.D. Ill. Feb. 27, 2002) (finding annexing unrelated complaints to a pleading insufficient to establish scienter where "Plaintiffs [did] not attest to independently examining the materials…")).  The Court in *Johns v. Bayer Corp.*, No. 09CV1935, 2010 WL 2573493 (S.D. Cal. June 24, 2010), found *Geinko* inapplicable, and denied defendants' motion to strike in that case because "Plaintiffs contend they have conducted an independent investigation and have provided the sources for publicly available information supporting their claims."  *Id.* at *2.  Likewise, the *Johns* Court found inclusion of allegations from other complaints "inevitable given that the same conduct underlies both cases." *Id.*  Like the plaintiffs in *Johns*, Plaintiffs here have conducted a thorough, independent investigation and have incorporated

---

[52] Such allegations have already been found by other federal district courts to give rise to actionable claims under the Securities Act asserted on behalf of purchasers of similar mortgage-backed Certificates.  *See supra*, Part IV. F.

1    allegations from other complaints involving substantially similar, if not identical,

2    allegations of underlying misconduct at Countrywide.[53]

3         Furthermore, not only do Plaintiffs' sources of information corroborate each

4    other, but some of them – other complaints alleging widespread disregard for

5    underwriting standards at Countrywide – have been legally tested and have been

6    sustained by courts as sufficient to survive a Rule 12(b)(6) dismissal motion.  For

7    example, on November 3, 2009, Judge John Walter denied in their entirety

8    defendants' motions to dismiss the complaint brought by the SEC, holding, among

9    other things, that the SEC had adequately alleged that defendants in that case had

10   made statements that materially exaggerated the loan quality and disregard of

11   underwriting standards at Countrywide.  ¶ 106.[54]  The Complaint's reference to the

12   SEC Complaint against Mozilo incorporates these allegations of Countrywide's

13   widespread disregard for its underwriting guidelines, and the fact that this

14   information was communicated up through the management ranks. ¶¶ 103-08.

15        Similarly, on April 27, 2010, a New York trial court denied a motion to

16   dismiss claims of fraud against several Countrywide entities and Bank of America,

17   also based on a "high incidence of material deviations from the underwriting

---

[53] Defendants' reliance on *City of Austin Police Ret. Sys. v. ITT Educational Services., Inc.*, 388 F. Supp. 2d 932 (S.D. Ind. 2005) (Br. at 67), is misplaced. There, the plaintiffs brought an action alleging securities fraud shortly after the defendant announced that it was the subject of an investigation by the SEC and the United States Attorney for the Southern District of Texas.  Plaintiffs' complaint relied heavily on the existence of the investigations as support for its allegations. Shortly after commencement both the SEC and U.S. Attorney's office informed ITT that no wrongdoing had been found and no action would be taken.   In dismissing plaintiffs' allegations the court held that the existence of the investigation *alone* cannot support the inference of wrongdoing or scienter. However, Plaintiffs here have alleged much more than the existence of government investigations – many of the investigations described by Plaintiffs have resulted in concrete findings which support the inference that Countrywide's underwriting guidelines were disregarded, including a report by the President's Working Group, ¶ 153, and numerous press investigations have published facts about Countrywide's practices that these investigations have uncovered.  *See, e.g.,* ¶ 102 (Wall St. J. reporting on FBI investigation findings).

[54] Referencing *SEC v. Mozilo*, Case No. CV 09-3994-JFW (C.D. Cal.), Order dated Nov. 3, 2008 (Dkt. No. 78).

guidelines Countrywide represented it would follow." ¶ 137.  In addition, this Court upheld allegations based on substantially similar underlying behavior against defendants in *In re Countrywide Financial Corp. Securities Litigation*, No. CV-07-05295-MRP (MANx), 2009 WL 943271 (C.D. Cal. Apr. 6, 2009); *In re Countrywide Financial Corp. Securities Litigation*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008); and *In re Countrywide Financial Corp. Derivative Litigation*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008).[55]  This theme of rife disregard for underwriting standards is echoed throughout the several other complaints and investigations referenced by Plaintiffs in the Complaint, and is fully supported by Plaintiffs' counsel's independent investigation.[56]

In any event, "[i]t is not necessary that an investigation into the facts be carried to the point of absolute certainty."  *Kraemer v. Grant County*, 892 F.2d 686, 689 (7th Cir. 1990).  Because Plaintiffs' Complaint includes numerous corroborating factual sources of information – including, among others, other complaints that have been sustained by this Court and others on motions to dismiss – that provide support for the allegations, Defendants' arguments to strike these materials should be rejected.

---

[55] Sieracki asserts that the only case against Countrywide that has reached a determination on the merits has "vindicated Countrywide's disclosures."  Sieracki Br. at 4 (citing *SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, No. 09 Civ. 5066 (RMB), 2010 WL 2473595 (S.D.N.Y. June 17, 2010)).  The *SRM* Court considered only alleged misstatements related to Countrywide's overall financial condition and liquidity, ***not*** misrepresentations within the Offering Documents, nor anything related to underwriting standards.  2010 WL 2473595, at *5-6.  Likewise, the *SRM* Court only discussed the adequacy of disclosures related to Countrywide's balance sheet exposure to pay-option ARM loans, which are not at issue in this litigation.  *Id.* at *9.

[56] Unlike the case in *Merrill Lynch*, 218 F.R.D. at 78-79, which involved the plaintiffs' reliance on untested, outside information from preliminary investigations, as explained above, the allegations referenced in the Complaint here *have* been found sufficient to survive motions to dismiss.  In any event, courts in this Circuit have allowed plaintiffs to rely on untested allegations from other sources such as SEC complaints.  *See, e.g.*, *Cylink*, 178 F. Supp. 2d at 1080-81 (considering allegations from SEC complaint that had not been adjudicated on the merits in evaluating sufficiency of complaint); *Johns*, 2010 WL 2573493, at *1-2.

### H.   <u>Plaintiffs Do Not Need To Plead Reliance</u>

As this Court recently recognized, "[r]eliance is not an element" of a claim under Section 11 of the Securities Act.  *Countrywide,* 588 F. Supp. 2d at 1162. Instead, reliance is "presumed" under this statute.  *Id*. at 1162 n. 34.  Defendants try to make an end-run around this presumption by claiming that they can avail themselves of 15 U.S.C. § 77k(a) which applies "where the issuer released an *earnings statement* that covers a twelve-month (or greater) period that began after the effective date.  In that case, aftermarket purchasers who acquired the security after the earnings statement must also prove reliance on the registration statement." *Countrywide*, 588 F. Supp. 2d at 1162 (emphasis added).  As no such earning statement actually exists here, Defendants attempt to force themselves within this exception by claiming, without any citation, that "the Distribution Reports are the **analogue** of the earnings statements for a public [ ] company."  Br. at 78 (emphasis added).  But being an "analogue" is not what the statute requires, and Defendants' argument is directly contradicted by statute and precedent which provide strict and explicit requirements for what constitutes an "earning statement" for purposes of Section 11 of the Securities Act.

17 C.F.R. § 230.158(a) provides the following definition of "earning statement" for purposes of Section 11:

> (a) An "earning statement" made generally available to security holders of the registrant pursuant to the last paragraph of section 11(a) of the Act shall be sufficient for the purposes of such paragraph if:

> (1) There is included the information required for statements of income contained either:

> (i) In Item 8 of Form 10-K (§239.310 of this chapter), part I, Item 1 of Form 10-Q ((§240.308a of this chapter), or Rule 14a-3(b) ((§240.14a-3(b) of this chapter) under the

Securities Exchange Act of 1934;

> (ii) In Item 17 of Form 20-F ((§249.220f of this chapter), if appropriate; or

> (iii) In Form 40-F ((§249.240f of this chapter); and

(2) The information specified in the last paragraph of section 11(a) is contained in one report or any combination of reports either:

> (i) On Form 10-K, Form 10-Q, Form 8-K ((§249.308 of this chapter), or in the annual report to security holders pursuant to Rule 14a-3 under the Securities Exchange Act of 1934 ((§240.14a-3 of this chapter); or

> (ii) On Form 20-F, Form 40-F or Form 6-K ((§249.306 of this chapter).

To count as an "earning statement" for purposes of Section 11, a report *must* meet these requirements.  *See In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267, 289 (S.D.N.Y. 2003) ("The 'earning statement' that triggers the requirement of proof of reliance may consist of 'one report or any combination of reports' either on SEC Forms 10-K, 10-KSB, 10-Q, 10-QSB, and 8-K, or in the annual report to securities holders issued pursuant to Rule 14a-3 of the Exchange Act.   17 C.F.R. § 230.158(a)(2).   The report or reports comprising the 'earning statement' must, however, include the specific information required by the SEC as set forth in Item 8 of Forms 10-K and 10-KSB (17 C.F.R. § 249.310), part I, Item 1 of Forms 10-Q 10-QSB (17 C.F.R. § 249.308a), or Rule 14a-3(b) (17 C.F.R. § 240.14a-3(b)). *See* 17 C.F.R. 230.158(a)(1).").

As Defendants do not, and cannot, assert that the so-called "Distribution Reports" are "on Form 10-K, Form 10-Q, Form 8-K" or any of the other Forms allowed for an "earning statement," and they do not contain all of the required information in 17 C.F.R. § 230.158(a)(1), they do not meet the specific statutory

requirements for an "earning statement."  The argument Defendants make that an "earning statement" requires Plaintiffs to plead reliance for their Section 11 claims fails.

## I.   Plaintiffs Have Adequately Pled Section 12(a)(2) Claims

### 1.   The Issuing Defendants And Underwriter Defendants Are Statutory Sellers

Plaintiffs have alleged that CWALT, CWMBS, CWABS, and CWHEQ (together with CFC, the "Issuing Defendants"), and CFC, CSC, and fifteen additional underwriters[57] (the "Underwriter Defendants"), are liable for misstatements in the Offering Documents as "sellers" within the meaning of Section 12(a)(2) of the Securities Act.  In response, these Defendants argue that they do not fit within the definition of "seller;" remarkably, however, they fail to acknowledge controlling authority and black-letter law which make their status as "sellers" straightforward and indisputable.

### a)   The Issuing Defendants Are "Sellers" Within The Meaning Of Section 12(a)(2)

CWALT, CWMBS, CWABS, and CWHEQ, under the direction and control of CFC, served as the "depositors" of the Issuing Trusts, and were therefore "issuers" of the Certificates within the meaning of the Securities Act.  ¶¶ 33-37; 15 U.S.C. § 77b(a)(4) (stating that "the term 'issuer' means the person or persons performing the acts and assuming the duties of depositor … pursuant to the provisions of the trust … under which such securities are issued").  Furthermore, SEC Rule 159A and associated guidance clearly state that an "issuer," regardless of any underwriting arrangement, is a "seller" for purposes of Section 12(a)(2).  *See* SEC Rule 159A, 17 C.F.R. § 230.159A ("For purposes of Section 12(a)(2) of the Act only, in a primary offering of securities of the issuer regardless of the underwriting method used to sell the issuer's securities, *seller* shall include the

---

[57]   These fifteen additional Underwriter Defendants have joined in the Countrywide Defendants' motion to dismiss.  Dkt. No. 159.

issuer of the securities sold to a person as part of the initial distribution of such securities, and the issuer shall be considered to offer or sell the securities to such person."); Securities Offering Reform, Release Nos. 33-8591, 34-52056, IC-26993, FR-75, *available at* http://www.sec.gov/rules/final/33-8591.pdf (July 19, 2005) (the "Adopting Release").  The Adopting Release states, in part:

> The issuer is selling its securities to the public, although the form of underwriting of such offering, such as a firm commitment underwriting, may involve the sale first by the issuer to the underwriter and then the sale by the underwriter to the public.  We believe that an issuer offering or selling its securities in a registered offering pursuant to a registration statement containing a prospectus that it has prepared and filed, or by means of other communications that are offers made by or on behalf of or used or referred to by the issuer, can be viewed as soliciting purchases of the issuer's registered securities. ***Therefore, we are adopting a rule providing that under Section 12(a)(2) an issuer in a primary offering of securities, regardless of the form of the underwriting arrangement, will be a seller and will be considered to offer or sell the securities to a purchaser in the initial distribution of the securities . . .***

*Id.* at 188-89 (footnotes omitted) (emphasis added);[58] *see also Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) (citing Rule 159A, and holding that "an issuer is a statutory seller for the purposes of Section 12(a)(2) regardless of the form of underwriting").  Through Rule 159A, the SEC has made it indisputable that issuers are liable as sellers within the meaning of Section 12(a)(2).  Accordingly, the Depositors here – CWALT, CWMBS,

---

[58] Each of the Offerings was a "primary offering" of MBS within the meaning of Rule 159A.

CWABS, and CWHEQ – are liable as sellers under Section 12(a)(2) *per se*, and their arguments to the contrary are frivolous.

Defendants fail to even acknowledge Rule 159A.  Instead, they cite cases from other jurisdictions ***pre-dating Rule 159A*** that held incorrectly that in order to be held liable as sellers, Defendants must have either passed title to the securities to Plaintiffs, or actively solicited Plaintiffs to purchase the securities.  *See* Br. at 71-72 & n. 68 (citing, *e.g.*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); *Lone Star Ladies Inv. Club v. Scholtzsky's, Inc.*, 238 F.3d 363 (5th Cir. 2001)).  Notably, however, in promulgating Rule 159A, the SEC criticized such a test as to an issuer's status as a seller, and explicitly rejected the authority on which Defendants rely.  *See* Adopting Release at n. 420 (noting that *Rosenzweig* and *Lone Star Ladies* caused "unwarranted uncertainty" regarding the liability of an issuer as seller under Section 12(a)(2)).

Accordingly, the Issuing Defendants are sellers within the meaning of Section 12(a)(2).

### b)    The Underwriter Defendants Are "Sellers" Within The Meaning Of Section 12(a)(2)

Plaintiffs have also alleged that CFC and CSC,[59] along with fifteen other Underwriters of the Certificates, are liable as "sellers" under Section 12(a)(2). ¶ 39.  Unable to dispute that they underwrote the securities Plaintiffs purchased, Defendants argue that Plaintiffs' claims fail because they do not specify the identity of the Underwriters from whom they purchased their Certificates.  Br. at 70-71.

As an initial matter, Defendants are incorrect that Plaintiffs have not specified from whom they purchased the Certificates.  On the contrary, Plaintiffs

---

[59]    CFC shares an identity of interests with its broker-underwriter affiliate, CSC.  Indeed, CFC includes CSC's financial results in the Capital Markets section of its financial statements.   ¶ 27.   In its 2007 Form 10-K, moreover, CFC represented the underwriting activities of CSC as its own, stating that CFC was "ranked fourth among Non-Agency MBS Underwriters" for 2007. *Id.*

1    have specified, for *every one of the 427 Offerings at issue in this case*, which

2    Underwriters sold the Certificates to them and all members of the Class.  *See*

3    Compl. Ex. B.  Defendants' argument fails on this basis alone.

4        Additionally, however, Defendants are wrong as a matter of law.  It is well-

5    established that "Plaintiffs need not allege 'which underwriter sold securities to

6    each plaintiff' to state a claim under Section 12(a)(2)."  *In re DDi Corp. Sec. Litig.*,

7    No. CV 03-7063 NM, 2005 WL 3090882, at *19 (C.D. Cal. July 20, 2005); *In re*

8    *Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 509 (W.D.

9    Wash. 2009) (same); *Schoenhaut v. Am. Sensors*, 986 F. Supp. 785, 790 n.6

10   (S.D.N.Y. 1997) (same).  In *DDi Corp.*, the court adopted the reasoning of the

11   Third Circuit in *In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir. 1996), which

12   found no support for the proposition that, "in order to [allege that underwriter

13   defendants are sellers], plaintiffs are required [at the pleading stage] to allege

14   which underwriter sold securities to each plaintiff."  *In re Westinghouse*, 90 F.3d at

15   718.  Rather, plaintiffs must only "provide a short and plain statement showing that

16   the underwriter defendants are statutory sellers and that plaintiffs purchased

17   securities from them."  *Id.*  Notably, when a plaintiff acquires securities in the

18   same offerings in which a firm commitment underwriter defendant sells those

19   securities to the public, this is sufficient to allow a plaintiff to bring a claim under

20   Section 12(a)(2) because it creates "[a] reasonable inference that plaintiffs acquired

21   their securities from the [exact] [u]nderwriter [d]efendants" they sued.  *In re*

22   *Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 400 (S.D.N.Y. 2007).

23       Here, the Complaint, in a short, plain statement that Defendants

24   conveniently ignore, alleges that

25            the Underwriter Defendants promoted and sold the Certificates

26            pursuant to the defective Offering Documents.  Plaintiffs and

27            members of the Class purchased Certificates from the

28            Underwriter Defendants in connection with the Offerings.

¶ 225.  Additionally, Exhibit B to the Complaint lists the specific underwriters for every Offering.  No more specificity is required under Rule 8(a).  *See Scottish Re*, 524 F. Supp. 2d at 400 ("[T]he Complaint adequately alleges that defendants, including the Underwriter Defendants, sold the securities as part of the Offerings, and Plaintiffs acquired securities in the Offerings.  A reasonable inference is that Plaintiffs acquired their securities from the Underwriter Defendants.").

Defendants' authorities do not support their argument that Plaintiffs must plead in any greater detail.  In the *Countrywide* securities litigation, the plaintiffs *conceded* that they had failed to plead precisely what Plaintiffs have pled here, namely, that they "purchased the securities directly from specific underwriters." *Countrywide*, 588 F. Supp. 2d at 1183.  The plaintiffs in *NECA-IBEW Health & Welfare Fund* – unlike Plaintiffs here – similarly failed to provide the identity of the underwriters from whom they purchased.  Defs' Req. for Judicial Notice, Ex. 35, at 44:25.  *Nomura*, despite Defendants' misleading parenthetical, does not deal at all with whether Plaintiffs must plead an underwriter's identity with particularity; in that case, the plaintiffs had failed to make even the basic allegation that they had purchased in a public offering.  *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 305 (D. Mass. 2009).  In all events, Plaintiffs' allegations here are far more detailed than those in the cases Defendants cite, and plainly satisfy the notice-pleading requirements of Rule 8(a).

Accordingly, Plaintiffs have adequately pled that the Underwriter Defendants are liable as "sellers" pursuant to Section 12(a)(2).[60]

---

[60]  Defendants also argue that Plaintiffs have not alleged that Defendants sufficiently "solicited" them to purchase the Certificates to trigger liability under Section 12(a)(2).  Plaintiffs respectfully submit that the Court need not even reach this argument, since Defendants' status as either issuers or underwriters is enough to make them sellers within the meaning of Section 12(a)(2), as noted above.  Even so, however, the Issuing Defendants and the Underwriter Defendants were the authors of the defective Offering Documents described in the Complaint, and were responsible for their drafting, filing with the SEC, and dissemination to Plaintiffs and members of the Class.  ¶¶ 34-37, 39, 198, 225.  That these activities amount to

## 2.   <u>Plaintiffs Have Alleged Purchases In The Offerings</u>

Defendants next complain that Plaintiffs, in an exercise of supposed "evasiveness" and "circumlocution," have not alleged that they purchased their securities in the Offerings at issue. Br. at 72-73. Once again, Defendants ignore Plaintiffs' allegations, which state that "Plaintiffs and members of the Class purchased Certificates from the Underwriter Defendants in connection with the Offerings." ¶ 225. Defendants' argument, which deliberately fails to cite this paragraph of the Complaint, falls flat.[61]

Defendants nonetheless assert that certain of Plaintiffs' MBS purchases occurred after the expiration of a 40-day prospectus delivery period, or at prices different from the offering price. Countrywide Br. at 74-75 & n.75. At most, however, these arguments go to the issue of class certification or ultimate issues of fact. As such, they are more appropriately resolved in the context of a motion for class certification, where Plaintiffs' typicality and adequacy as class

"solicitation" was the very reason the SEC promulgated Rule 159A to begin with. *See* Adopting Release at 188 ("We believe that an issuer offering or selling its securities in a registered offering pursuant to a registration statement containing a prospectus that it has prepared and filed … can be viewed as soliciting purchases of the issuer's registered securities.") (citing *Pinter v. Dahl*, 486 U.S. 622 (1988)). Courts have agreed that preparation of a prospectus amounts to "solicitation." *See, e.g., Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292 (VM), 2001 WL 740764, at *3 (S.D.N.Y. June 29, 2001) ("As set forth by the Supreme Court, 'the term 'prospectus' refers to a document soliciting the public to acquire securities.' *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574 (1995). … [A]llegations that issuer defendants, acting in their own financial interest with respect to the solicitation of sales, prepared and signed the Registration Statement and Prospectus, … adequately lead to an inference that [they] may be held liable as a seller[s] under § 12.").

[61]   Although Plaintiffs here have alleged far more – and, indeed, precisely what Defendants seem to say they should – Courts have held that even allegations that plaintiffs "purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Offering Documents," ¶ 228, standing alone, are sufficient to support a claim under Section 12(a)(2). *See Schoenhaut*, 986 F. Supp. at 789-90 ("[B]ecause plaintiffs have alleged that they purchased securities 'pursuant to or traceable to' a public offering, they have sufficiently alleged that they purchased their shares in the public offering at issue. *See In re U.S.A. Classic Sec. Litig.*, No. 93 Civ. 6667, 1995 WL 363841, at *2 (S.D.N.Y. June 19, 1995) (finding standing under § 12(2) where plaintiffs alleged purchase 'pursuant to' a registration statement); *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 593 (S.D.N.Y. 1993) (finding standing where plaintiffs alleged that they purchased securities 'traceable to' the public offering at issue).").

representatives will be assessed, or at trial. *See In re DDi Corp.*, 2005 WL 3090882, at *20 n.18 (whether certain plaintiffs purchased securities from certain underwriters in a public offering is "better addressed during the class certification stage in the proceedings") (citing *In re Westinghouse*, 90 F.3d at n. 22 ("While these concerns might be relevant on a motion for class certification, they do not address whether, as a threshold matter, plaintiffs properly stated a section 12(2) claim under Rule 12(b)(6).")).   While Defendants carefully note that "generally" the offering period is measured as the date of the prospectus plus 40 days, Defendants do not, and cannot prove at this juncture, that every Offering at issue here was actually completed within 40 days.[62]

Accordingly, Plaintiffs have properly alleged that they purchased their securities from Defendants in the Offerings.  This is all Section 12(a)(2), and Rule 8(a), require.

### J.   Plaintiffs Have Adequately Pled Control Person Liability

The Complaint properly pleads that Defendants CFC, CHL, CSC, CCM, Kurland, Adler, Spector, Sambol, Sieracki, Kripalani and Sandefur were control persons of the Defendants who issued Countrywide's MBS:  CWALT, CWMBS, CWABS and CWHEQ (collectively the Depositors).

### 1.   The Control Person Pleading Standard Is Not Demanding

Section 15 of the Exchange Act, 15 U.S.C. § 77o, imposes liability on persons who are "control persons" of violators of Section 11 or 12 of the Act. Congress enacted Section 15 "to address the specific evil of persons seeking to evade liability … by organizing 'dummies,' that, acting under their control, would commit the prohibited acts."  *Paul F. Newton & Co. v. Tex. Commerce Bank*, 630

---

[62] Plaintiffs do not dispute that not every single purchase by a named Plaintiff was in the Offering – as Defendants' note, some purchases were certainly made months later in the secondary market.  But the fact that Plaintiffs also made secondary market purchases is completely irrelevant to the fact the purchases were made in Offerings.

F.2d 1111, 1118 (5th Cir. 1980); s*ee also In re Valence Tech. Sec. Litig.*, No. C 94-1542-SC, 1995 WL 274343, at *16 (N.D. Cal. May 8, 1995) (Section 15 meant to hold accountable persons attempting to evade "liability under common law principles" by using others to "act in their place") (quoting *Worlds of Wonder*, 694 F. Supp. 1427, 1435 (N.D. Cal. 1988)).   As Defendants correctly note, courts interpret Section 15 "the same" as they do the similarly worded control person provision in Section 20 of the Exchange Act.  (Spector Br. at 9, n.4 (citing *Durham v. Kelly*, 810 F.2d 1500, 1503 (9th Cir. 1987)).  The control person provisions are meant "to cut through formal legal insulation and allocate liability" to deter violations of the federal securities laws and to compensate those harmed by such violations.  *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987).

To state a claim for control person liability, plaintiffs must allege: (1) a primary violation of the securities laws; and (2) that the defendant had the ability to "control" the primary violator.  *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *see also* 15 U.S.C. § 77o.  "It is ***not*** necessary to show actual participation [in the primary violation of the securities laws] or the exercise of actual power."  *Id.* (emphasis added).  The "definition of control person '… revolve[s] around the 'management and policies' of the corporation, not around discrete transactions.'"  *Wells Fargo,* 2010 WL 1661534, at *9 (quoting *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996)).

A person has the ability to exercise "power or control" if the person is able, "directly or indirectly, ***to exert influence*** on the policy and decisionmaking process of" a primary violator of the securities laws.  *Wool*, 818 F.2d at 1441 (emphasis added); *see also Flood v. Miller*, 35 Fed. Appx. 701, 703 (9th Cir. 2002) ("An allegation of controlling person liability … requires a showing that an individual defendant had the power to control ***or influence*** [a primary violator].") (emphasis added); *Wojtunik v. Kealy*, No. CV-03-2161, 2006 WL 2821564, at *4 (D. Ariz. Sept. 30, 2006) ("a complaint need only allege that the defendant had the power to

control *or influence* the primary violators") (citing *Wool*, emphasis added).  It is seldom appropriate to resolve a control person claim on a motion to dismiss – "the determination of who is a controlling person is 'an intensely factual question,' [and] credibility determinations and weighing of the evidence … are questions for the jury." *Flood*, 35 Fed. Appx. at 704 (citing *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 2003) and *Howard*, 228 F.3d at 1060); *see also Charles Schwab*, 257 F.R.D. at 550 (argument that defendant did not have power and ability to control "is a factual rebuttal inappropriate for a motion to dismiss"). At a much later stage in this case – trial – Defendants can attempt to escape control person liability by proving that they acted in good faith, but this affirmative defense is "properly asserted in Defendants' Answer, not a 12(b)(6) motion." *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1054 (N.D. Cal. 2008).

Control person pleading is governed by the liberal notice pleading requirements of Rule 8, which "requires only a short and plain statement of the claim showing that the pleader is entitled to relief.  Specific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007) (internal quotations omitted) (reversing dismissal on grounds allegations were "conclusory," citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964).  To survive a motion to dismiss on control person clams a plaintiff need only "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal*, 129 S. Ct. at 1944 (emphasis in original).  The key issue here is whether Plaintiffs have pled facts sufficient to show that it is *plausible* that the control person Defendants had the ability to "*influence* … the policy and decisionmaking process of," a primary violator, *Wool*, 818 F.2d at 1441 (emphasis added), and are thus control persons.

Despite this Court's prior holding to the contrary, two Defendants wrongly argue that Rule 9(b)'s heightened pleading requirements for fraud claims somehow applies because control is among the "circumstances constituting fraud" that must be pled with particularity.  Fed. R. Civ. P. 9(b); *Countrywide*, 588 F. Supp. 2d at 1201 ("Although [in an Exchange Act case] the circumstances of the primary violators' fraud must be pled with particularity under Rule 9(b) …, the control element is not a circumstance that constitutes fraud and therefore need not be pled with particularity." (quoting *In re LDK Solar Sec. Litig.*, No. C 07-05182 WHA, 2008 WL 4369987, at *12 (N.D. Cal. Sept. 24, 2008)).  Defendants Sambol and Spector wrongly insist that Rule 9(b) must be followed because, supposedly, Plaintiffs' predicate Section 11 and 12 claims against them are "grounded in fraud."  Sambol Br. at 4-5; Spector Br. at 6-8.  Sambol and Spector cite zero cases that have held control claims under the Securities Act subject to Rule 9(b) pleading requirements.   Indeed, courts routinely find Rule 9(b) inapplicable to control person claims even when, in contrast to this case, the underlying claims are based on violations of the Exchange Act's antifraud provision, claims necessarily grounded in fraud.  *See, e.g., Countrywide*, 588 F. Supp. 2d at 1201; *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 WL 2355411, at *14 (N.D. Cal. Aug. 14, 2006) ("control exerted … is not a circumstance that constitutes fraud. Plaintiff is only required to assert fraud with particularity as to the primary violations"); *Fouad v. Isilon Sys., Inc.*, No. C07-1764, 2008 WL 5412397, at *12 (W.D. Wash. Dec. 29, 2008) ("'Control' over another actor does not constitute a circumstance of fraud," normal pleading rules apply).[63]   Control person claims have nothing to do with fraud – they simply allege that defendants controlled

---

[63] Even otherwise inapposite out-of-circuit cases cited by Defendants agree on this point.  *See, e.g., In re WorldCom, Inc. Sec. Litig.*, Nos. 02 Civ. 3288(DLC), 03 Civ. 0890, 2004 WL 1097786, at *2 (S.D.N.Y. May 18, 2004) (*cited in* Br. at 80) (control person claim subject to normal pleading rules, not Rule 9(b)).

certain individuals or entities.   Thus, Rule 8's "plausibility" standard is all that applies to these claims.

### 2.  Plaintiffs Have Adequately Pled Their Control Person Claims

Plaintiffs have clearly met this undemanding pleading requirement.   This is appropriate since the circumstances of this case are what Congress had in mind when it enacted the control person provisions.   Instead of issuing the MBS itself, and assuming the liability Congress imposed on issuers, Countrywide and its top officers created four "dummy" entities, the Depositors, to act as issuers.   ¶¶ 7, 31-38.   But those who controlled the Depositors cannot so easily escape responsibility.   As the Complaint properly alleges, Defendants CFC, CHL, CSC, CCM, Adler, Kurland, Spector, Sambol, Sieracki, Kripalani and Sandefur are control persons of the Depositors and are consequently liable for the Depositors' false and misleading statements.[64]

The background of this case is important.   Plaintiffs' allegations do not concern an obscure aspect of Countrywide's business in which it is reasonable to think that top Countrywide executives might have been uninformed and uninvolved.   To the contrary, the residential mortgage business was Countrywide's principal business: the face value of the Offerings in this case total $351 billion and "[f]rom 2005 through 2007, Countrywide was the nation's largest residential mortgage lender."   ¶¶ 12 n.2, 4.   Countrywide's profitability depended on "its ability to rapidly package or securitize" mortgage loans and to "sell them to investors."   ¶ 4.

Defendant CFC was the parent company of the other Countrywide entities, which it fully controlled, including the Depositors.   ¶ 26.

CFC structured [the Depositors] as limited purpose, wholly-

---

[64] Bank of America and NB Holdings Corp. are liable as successors in interest to Countrywide; their arguments are addressed in a separate memorandum to be filed on September 16.

> owned, finance subsidiaries to facilitate its issuance and sale of the MBS.   [The Depositors] were controlled directly by the Individual Defendants and CFC, including by the appointment of CFC executives as directors and officers of these entities. Revenues flowing from the issuance and sale of MBS issued by [the Depositors] and the Issuing Trusts were passed through to CFC and consolidated into CFC's financial statements.

¶ 33.  CFC created the Depositors "solely for the purpose of" issuing MBS.  ¶ 76. Given these facts it is more than plausible that CFC had the ability to influence the Depositors and was consequently a control person of these Defendants.

The same is also true of Defendants CHL, CSC and CCM.  CHL was "a direct wholly-owned subsidiary of CFC" which "originated, purchased, sold and serviced mortgage loans."  ¶ 28.  "CHL served as the 'Sponsor' or 'Seller' of the Certificates, meaning that it played a central role" in creating the MBS which were nominally issued by the Depositors.  ¶ 28.  Among other things, CHL provided the pools of mortgage loans to the Issuing Trusts which used them to back the MBS involved in this lawsuit.  ¶ 28.  Defendant CSC underwrote most of the securities that are the subject of this lawsuit and was a wholly-owned subsidiary of Defendant CCM, which was, in turn, wholly-owned by CFC, and CSC's financial results were consolidated with CFC's publicly reported financial statements. ¶¶ 27, 29, 39.  Defendant CCM was, as noted, both a wholly-owned subsidiary of CFC and sole owner of CSC, and CCM's financial results were consolidated into Countrywide's publicly reported financial statements.  ¶ 29.

Defendant Sambol and the other individual Defendants are also control persons.  Sambol was President and Chief Operating Officer of CFC.  According to the SEC, while Sambol was at CFC internal risk managers and quality control personnel brought to his attention problems with the quality of Countrywide loans and he learned "that a significant percentage of borrowers who were taking out

1   stated income loans were engaged in mortgage fraud." ¶ 105.  It is reasonable to

2   think that a company's Chief Operating Officer would have supervisory authority

3   over subordinates engaged in a multibillion dollar activity – the process of turning

4   mortgage loans into MBS – that was his company's core activity during the Class

5   Period and an essential determinant of its profitability, especially when the

6   Complaint alleges that the Chief Operating Officer was actually provided with

7   reports on problems with the mortgages used to create the MBS.  It is at least

8   plausible that Sambol had the ability to influence the conduct of the Depositors

9   and, consequently, the control person claim against him has been adequately pled.

10          Defendant Kurland was the Chairman of the Board of Directors, President

11  and CEO of each of the Depositors and signed numerous Registration Statements

12  for MBS issued by them.  ¶ 56.  He also served concurrently as Chief Operating

13  Officer of CFC, prior to his replacement by Sambol.  ¶ 56.  It is self evident that,

14  given his position as Chairman and CEO of the Depositors, he could influence

15  these Defendants' conduct.  Moreover, this control necessarily extended to the

16  creation and issuance of MBS, which was the sole reason the Depositors existed.

17  Kurland's signing of the MBS Registration Statements further evidences control.

18  *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004)

19  (*outside* directors who signed registration statement were control persons,

20  explaining that "I share the view that it comports with common sense to presume

21  that a person who signs his name to a report has some measure of control over

22  those who write the report") (internal quotations omitted).  Furthermore,

23  independently of his positions with the Depositors, it is reasonable to infer that in

24  his capacity as Chief Operating Officer (prior to being replaced by Sambol)

25  Kurland, like Sambol, would have had some meaningful supervisory authority over

26  a multibillion dollar activity central to his company's business and profitability.  It

27  is plausible that Kurland had the ability to influence the conduct of the Depositors.

28

1   After Kurland's departure, Defendant Adler became Chairman of the Board

2   of Directors, President and CEO of each of the Depositors and, in that capacity,

3   signed numerous Registration Statements for MBS issued by them.  ¶ 59.  As was

4   the case with Kurland, given his positions with the Depositors there can be no

5   doubt that he could influence these Defendants' conduct.  Moreover, this control

6   necessarily extended to the creation and issuance of MBS, which was the only

7   reason the Depositors existed and Adler's signing of the MBS Registration

8   Statements further evidences his control over these entities.

9   Defendant Sieracki was Executive Vice President, Chief Financial Officer,

10  Treasurer and member of the Board of Directors of each of the Depositors and

11  signed numerous registration statements for the MBS issued by them.  ¶ 58.  He

12  also served concurrently as Chief Financial Officer and Executive Vice President

13  of CFC.  ¶ 58.  Given his position as Chairman and CEO of the Depositors, it is

14  reasonable to infer that he was able to influence the conduct of these Defendants.

15  Moreover, as is the case with Defendant Kurland, Sieracki's signing of MBS

16  Registration Statements further supports an inference that he controlled the

17  Depositors, including their conduct in issuing the MBS and in preparing associated

18  SEC filings.  Furthermore, independently of his positions with the Depositors,

19  Sieracki's status as CFC's Chief Financial Officer strongly suggests that he too had

20  some meaningful involvement in a multibillion dollar financial activity that was

21  one of his company's core activities and an essential determinant of its

22  profitability.  It is plausible that Kurland could have had the ability to influence the

23  conduct of the Depositors.

24  For similar reasons, Plaintiffs have adequately pled control person liability

25  with respect to Defendants Spector, Sandefur and Kripalani.  ¶¶ 57, 60-61.  Spector

26  signed many of the Offering Documents at issue, was Vice President and a

27  member of the Board of Directors of each of the Depositors and, concurrently,

28  Senior Managing Director of Secondary Marketing of Defendant CFC.  ¶ 57.

1   Sandefur signed many of the Offering Documents, was a member of the Board of
2   Directors of each of the Depositors and, concurrently, Senior Managing Director
3   and Treasurer of Defendant CHL.   ¶ 61.   Kripalani also signed many of the
4   Offering Documents and was a member of the Board of Directors of each of the
5   Depositors.   ¶ 60.   It is therefore at least plausible that Spector, Sandefur and
6   Kripalani had the ability to influence the conduct of the Depositors.

### 3.   **Defendants' Arguments Are Unsupported By Precedent**

8        The case law cited by Defendants provides little support for their position
9   that Plaintiffs have not pled enough facts to support their control claims.   In fact,
10  the cases suggest that Plaintiffs here have pled significantly more than is necessary
11  to survive a motion to dismiss.

12       As an initial matter, Defendants' reliance on Second Circuit district court
13  cases to argue that control person liability has been inadequately pled is
14  inappropriate; contrary to the clear holding of the Ninth Circuit, some district
15  courts in the Second Circuit have mistakenly grafted onto the plain language of the
16  control person provision a requirement that a plaintiff plead that the control person
17  engaged in "meaningful culpable conduct."   *See, e.g., Public Employees' Ret. Sys.*
18  *of Miss. v. Merrill Lynch & Co. Inc.*, No. 08 Civ. 10841(JSR), 2010 WL 2175875,
19  at *8 (S.D.N.Y. June 1, 2010) (*cited in* Br. at 80); *see also In re WorldCom, Inc.*
20  *Sec. Litig.*, Nos. 02 Civ. 3288 DLC, 03 Civ. 0890, 2004 WL 1097786, at *2
21  (S.D.N.Y. May 18, 2004) (*cited in* Br. at 80); ("a plaintiff must show that the
22  controlling person was in some meaningful sense a culpable participant in the
23  primary violation") (quotations omitted).   These cases are directly contrary to
24  controlling precedent here, and Defendants' reliance on them is disingenuous at
25  best.   In this Circuit the Court of Appeals has made clear that "Plaintiff need not
26  show that the defendant was a culpable participant in the violation" of the
27  securities laws.   *Howard*, 228 F.3d at 1065 (citing *Hollinger v. Titan Capital*
28  *Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) (*en banc*)); *see also In re*

1   *Homestore.Com, Inc. Sec. Litig.*, 347 F. Supp. 2d 790, 809 n.6 (C.D. Cal. 2004)

2   (*Hollinger* "overruled" prior Ninth Circuit law which had required showing that

3   "defendants were culpable participants in the company's alleged illegal activity")

4   (brackets omitted).

5       Furthermore, Defendants Kripalani, Sandefur and Spector's reliance on

6   isolated language in *Howard*, 228 F. 3d at 1065-66 (*cited in* Kripalani/Sandefur Br.

7   at 11-12, Spector Br. at 9), is misplaced – the key holding in that case, which

8   reversed a judgment as a matter of law that the defendant was not a control person,

9   is that ***the control person determination is generally a jury question***.   And,

10  although Kripalani, Sandefur and several other Defendants suggest that their

11  membership on the Board of each of the Depositors is unimportant, *Howard* makes

12  the obvious point that "a position as a Board member … [is] relevant to

13  ascertaining" whether a defendant is a control person.  228 F.3d at 1067 n.13.

14      Several Defendants cite Judge Walter's unpublished decision in *In re

15  Downey Sec. Litig.*, No. CV08-3261, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)

16  (*cited in* Sandefur/Kripalani Br. at 3, 12; Spector Br. at 9), which found control

17  person liability inadequately pled.  It appears that plaintiffs in that case may have

18  pled far fewer facts indicative of control than have Plaintiffs here.  *Id.* at *15.

19  Moreover, the court apparently felt that Plaintiffs were required to plead not only

20  control, but control that involved "an effort to induce [primary violators] to engage

21  in acts that violated the securities laws," *id.* at *15, a view inconsistent with the

22  binding Ninth Circuit precedent discussed above which holds that a plaintiff need

23  plead only control, not culpable conduct.  In any event, *Downey*'s discussion of

24  control person liability is *dicta* because the court had concluded that no underlying

25  violation of the securities laws had been pled, and, as Defendants correctly note,

26  without such a primary violation control person claims must be dismissed.  *Id.* at

27  *16; *see also* Br. at 79.  Similarly, Judge Walters' discussion of control person

28  liability in *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal.

2007) (*cited in* Sambol Br. at 9), is also *dicta* for the same reason.  Moreover, it appears that plaintiffs in that case, in contrast to Plaintiffs here, pled no specific facts indicative of control.  527 F. Supp. 2d at 1163.

Defendant Kurland says that the Section 15 claim against him should be dismissed because he was not employed by Countrywide during the entire Class Period.  Kurland Br. at 15.  But, as should be obvious, Plaintiffs would not ultimately contend that any defendant is liable as a control person during any time when they were not controlling one of the Depositors.  Kurland is free to assert in his answer that his departure from Countrywide ended his influence over the primary violators.  But on the current record, such a conclusion would require weighing facts and be premature – the fact that Kurland left Countrywide's employment does not itself prove that he no longer could influence the primary violators.

Kurland also argues in the alternative that the control person claims against him must also be dismissed because Plaintiffs' "allegations fail to draw any distinction between Kurland and the other Section 15 Defendants," but, aside from the fact that the Complaint does plead facts specific to Kurland (*see* ¶ 56), Plaintiffs need only plead that Kurland controlled a primary violator, not that his control was somehow different from the control exercised by his colleagues; the single case Kurland cites (*In re Sagent Tech., Inc. Derivative Litig.*, dealing with intentional wrongdoing in derivative litigation) suggests nothing to the contrary. Kurland Br. at 15.

Defendant Spector's argument that the Section 15 claim is not adequately pled against him because "[n]owhere do the Plaintiffs specify what acts or omissions [were committed] by Mr. Spector ….   [or] which alleged misrepresentations, if any, were made or approved by Mr. Spector" (Spector Br. at 9), misunderstands control person liability.  Plaintiffs need only plead that Spector

had the ability to control a primary violator, not that he committed specific acts, wrongful or otherwise.[65]

In fact, despite Defendants' argument to the contrary, Courts have had little difficulty finding control person liability sufficiently pled even in cases in which plaintiffs provide fewer indicia of control than Plaintiffs here.  For example, *In re Epitope, Inc. Sec. Litig.*, No. Civ. 92-759, 1992 WL 427842 (D. Or. Nov. 30, 1992), rejected an argument that four "outside" directors could not be considered control persons.  The plaintiffs in that case alleged that the directors "by virtue of their positions … had the ability to scrutinize all transactions involving the [c]ompany and had access to material, inside information and that they were able to and did control the conduct of [the defendant's] business and the content of the statements at issue," allegations which the court concluded established "the 'power to control,' which is the only element necessary for control person liability." *Epitope*, 1992 WL 427842, at *5.  In this case, of course, all control person Defendants are Countrywide insiders.  *See also Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-02204-PHX-FJM, 2009 WL 275405, at *7 (D. Ariz. Feb. 4, 2009) ("Plaintiffs specifically allege that defendants had the power and influence to control Syntax, which is sufficient to state a claim at this stage of the litigation.); *In re Network Assocs., Inc. II Sec. Litig.*, No. C 00-CV-4849, 2003 WL 24051280, at *14 (N.D. Cal. Mar. 25, 2003) ("'the fact that the named individual defendants held important positions in the company is sufficient at the pleadings stage' to state a claim that a defendant was a control person") *(quoting In re Adaptive Broadband Sec. Litig.,* No. C 01-1092 SC, 2002 WL 989478, at *19 (N.D. Cal. Apr. 2, 2002)).

---

[65] Spector's citation to *Berry v. Valence Technology, Inc.*, 175 F.3d 699, 707 (9th Cir. 1999) (Spector Br. at 10), is misleading.  That case unsurprisingly ordered dismissal of certain control person claims against a defendant because plaintiffs had not pled that a defendant had remained a control person "***after his resignation***." *Id.* at 707 (emphasis added).  Spector does not say he departed Countrywide during the Class Period.

### K.    JPMorgan Is Liable For The Conduct Of JPMSI

JPMorgan further argues that because Bear Stearns eventually merged with J.P. Morgan Securities Inc. not JPMorgan Chase & Co., and because JPMorgan Chase & Co., as corporate parent, does not share in the liabilities of J.P. Morgan Securities Inc., its subsidiary, the claims against it should be dismissed. Underwriter Br. at 1-2.   JPMorgan's SEC filings, however, do not support its contention that Bear Stearns simply merged with JPMSI and JPMorgan had nothing to do with the acquisition.   On March 16, 2008 and again on March 24, 2008, JPMorgan itself issued press releases, and filed those press releases with the SEC as attachments to Forms 8-K, which explicitly stated that "JPMorgan Chase & Co." was to acquire Bear Stearns.   *See* Plaintiffs' Notice of Request and Request for Judicial Notice Exs. 3 and 4 (attachments to Forms 8-K filed on March 16, 2008 and March 24, 2008, respectively).   Indeed, JPMSI is not mentioned once in these filings.   Similarly, JPMorgan's May 31, 2008 press release, announcing the completed merger, stated, "JPMorgan Chase & Co. (NYSE: JPM) announced today that it has completed its acquisition of The Bear Stearns Companies Inc., effective 11:59 p.m. EDT on May 30, 2008." *Id.* Ex. 5.[66]   That JPMorgan could announce to the world that it acquired Bear Stearns yet now seek to deny any liability for doing so should not be countenanced.   At the very least, these discrepancies raise a factual dispute inappropriate for resolution on a motion to dismiss.   *See, e.g., Jones v. Johnson*, 781 F.2d 769, 772 n.1 (9th Cir. 1986) ("Any weighing of [] evidence is inappropriate on a 12(b)(6) motion.").

---

[66]    JPMorgan's Form 8-K dated June 2, 2008, states that "a wholly-owned subsidiary of JPMorgan Chase & Co. merged with and into The Bear Stearns Companies Inc.," but does not mention the identity of the subsidiary.   In fact, according to JPMorgan's August 11, 2008 10-Q, cited by JPMorgan, the subsidiary was not JPMSI at all, but BSC Merger Corporation.   Mircheff Decl. Ex. 1, at 5 (Form 10-Q filed on Aug. 11, 2008).   It was not until October 1, 2008 that Bear Stearns (the entity which survived the merger with BSC Merger Corporation), in turn, merged with JPMSI.   Mircheff Decl. Ex. 2, at 73 (Form 10-K filed on Mar. 2, 2009).

### L. Leave To Amend Should Be Granted If Any Portion Of The Complaint Is Dismissed

In the event the Court decides to dismiss all or part of Plaintiffs' allegations, Plaintiffs respectfully request leave to amend the Complaint to rectify any defects identified by the Court, including by the inclusion of additional named plaintiffs if the Court believes that issues of standing preclude the current named plaintiffs from prosecuting some of their claims.  Lead Plaintiff believes that, if necessary, other named plaintiffs would likely step forward to represent the class including, presumably, the plaintiffs who initially filed this case in federal court, but who were not chosen to serve as Lead Plaintiff.  Federal Rule of Civil Procedure 15(a) sets forth a policy in favor of granting leave to amend, providing that "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a).  The Ninth Circuit has held that this policy is "to be applied with extreme liberality" and that dismissal with prejudice and without leave to amend is not appropriate unless it is clear "that the complaint could not be saved by amendment."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003).  Granting such leave would be in the interest of justice and would not cause any unfair prejudice to any Defendant.  The operative Complaint is the first complaint filed in this case by court appointed Lead Counsel.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that Defendants' motions should be denied.  In the event the Court decides to dismiss any part of Plaintiffs' claims, Plaintiffs respectfully request leave to replead and/or add additional Plaintiffs to cure any perceived standing defects.

Dated:  September 13, 2010

Respectfully submitted,

**GLANCY BINKOW & GOLDBERG LLP**

  /s/ Michael Goldberg
 Michael Goldberg
Lionel Z. Glancy
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160

*Liaison Counsel*

Steven J. Toll
Julie Goldsmith Reiser
Joshua S. Devore
Matthew B. Kaplan
S. Douglas Bunch
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

– and –

Joel P. Laitman
Daniel B. Rehns
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, New York 10005
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745

*Lead Counsel for the Class*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

On September 13, 2010, I caused to be served the following document:

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND MOTION TO STRIKE**

By posting the document to the ECF Website of the United States District Court for the Central District of California, for receipt electronically by the parties as listed on the attached Service List.

And on any non-ECF registered party:

**By Mail**: By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 13, 2010, at Los Angeles, California.

*s/Michael Goldberg*
Michael Goldberg

## Mailing Information for a Case 2:10-cv-00302-MRP -MAN

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Randall K Berger**
  rberger@kmllp.com

- **Leiv H Blad , Jr**
  leiv.blad@bingham.com

- **S Douglas Bunch**
  dbunch@cohenmilstein.com

- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,jillk@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christopher G Caldwell**
  caldwell@caldwell-leslie.com,martindale@caldwell-leslie.com,hammer@caldwell-leslie.com,pettit@caldwell-leslie.com,willingham@caldwell-leslie.com,hayes@caldwell-leslie.com,popescu@caldwell-leslie.com,strother@caldwell-leslie.com,wong@caldwell-leslie.com,wilson@caldwell-leslie.com

- **Matthew D Caplan**
  matthew.caplan@dlapiper.com,carmen.ferrera@dlapiper.com,DocketingLA@dlapiper.com

- **Peter Young Hoon Cho**
  petercho@paulhastings.com

- **Boyd Cloern**
  boyd.cloern@bingham.com

- **Matthew W Close**
  mclose@omm.com

- **David C Codell**
  codell@caldwell-leslie.com

- **Jeffrey B Coopersmith**
  jeff.coopersmith@dlapiper.com

- **Brian Charles Devine**
  bdevine@goodwinprocter.com

- **Joshua S Devore**
  jdevore@cohenmilstein.com

- **Daniel S. Drosman**
  ddrosman@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Thomas E Egler**
  tome@rgrdlaw.com,kathyj@rgrdlaw.com

- **Inez H Friedman-Boyce**
  ifriedmanboyce@goodwinprocter.com

- **Michael M Goldberg**
  mmgoldberg@glancylaw.com,dmacdiarmid@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Penelope A Graboys Blair**
  pgraboysblair@orrick.com,jcopoulos@orrick.com

- **Joshua G Hamilton**
  joshuahamilton@paulhastings.com,melmanahan@paulhastings.com

- **Jeffrey M Hammer**
  hammer@caldwell-leslie.com

- **Sean M Handler**
  shandler@btkmc.com

- **Jennifer L Joost**
  jjoost@btkmc.com,acashwell@btkmc.com,mswift@btkmc.com

- **Matthew B Kaplan**
  mkaplan@cohenmilstein.com,efilings@cohenmilstein.com

- **Dean J Kitchens**
  dkitchens@gibsondunn.com,MOstrye@gibsondunn.com

- **Joel P Laitman**
  jlaitman@cohenmilstein.com

- **Christopher Lometti**
  clometti@cohenmilstein.com

- **Jennifer B Luz**
  jluz@goodwinprocter.com

- **Azra Z Mehdi**
  amehdi@milberg.com

- **Alexander K Mircheff**
  amircheff@gibsondunn.com,dlanning@gibsondunn.com,inewman@gibsondunn.com

- **Nicolas Morgan**
  nicolas.morgan@dlapiper.com

- **Sharan Nirmul**
  snirmul@btkmc.com,azivitz@btkmc.com,ecf_filings@btkmc.com

- **Brian E Pastuszenski**
  bpastuszenski@goodwinprocter.com,ktayman@goodwinprocter.com

- **Lauren Wagner Pederson**
  lpederson@btkmc.com,neena.verma@btkmc.com,dpotts@btkmc.com

- **Ira M Press**
  ipress@kmllp.com,lmorris@kmllp.com

- **David A Priebe**
  david.priebe@dlapiper.com,stacy.murray@dlapiper.com

- **Daniel B Rehns**
  drehns@cohenmilstein.com,efilings@cohenmilstein.com

- **Julie G Reiser**
  jreiser@cohenmilstein.com

- **Christina A Royce**
  croyce@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Scott H Saham**
  scotts@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer M Sepic**
  jennifer.sepic@bingham.com

- **Arthur L Shingler , III**
  ashingler@scott-scott.com,efile@scott-scott.com

- **Richard A Speirs**
  rspeirs@cohenmilstein.com

- **William F Sullivan**
  williamsullivan@paulhastings.com,lisavermeulen@paulhastings.com

- **Steven J Toll**
  stoll@cohenmilstein.com

- **Michael D Torpey**
  mtorpey@orrick.com

- **Michael C Tu**
  mtu@orrick.com,fphan@orrick.com

- **Avi N Wagner**
  avi@thewagnerfirm.com,anwagneresq@hotmail.com

- **Shirli Fabbri Weiss**
  shirli.weiss@dlapiper.com,emiko.gonzales@dlapiper.com

- **Lloyd Winawer**
  lwinawer@goodwinprocter.com,ahsia@goodwinprocter.com,sasmith@goodwinprocter.com,monyeagbako@goodwinprocter.com,cburgos@goodwinprocter.com

- **Andrew L Zivitz**
  azivitz@btkmc.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Lauren G Kerkhoff**
Robbins Geller Rudman & Dowd LLP
655 West Broadway  Suite 1900
San Diego, CA 92101-8498

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SERVICE LIST (CONTINUED)**

**PARTIES  RECEIVING NOTICE VIA U.S. MAIL**

**(NOT ON COURT'S ECF SYSTEM)**

Mail service is made on the last known address or believed-to-be current address of the following parties:

**FOR DEFENDANTS**

Seth Aronson
Matthew W. Close
O'Melveny & Myers LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Email: mclose@omm.com

*Counsel for Bank of America Corporation and NB Holdings Corporation*