EXHIBIT 1

Christopher Kim, Esq. (Bar No. 82080)
Lisa J. Yang, Esq. (Bar No. 208971)
LIM, RUGER & KIM, LLP
1055 West Seventh Street, Suite 2800
Los Angeles, CA 90017
Telephone (213) 955-9500
Facsimile (213) 955-9511
Email: Christopher.kim@lrklawyers.com
      Lisa.yang@lrklawyers.com

Attorneys for Plaintiff

[Additional counsel appears on signature page.]

**FILED**
LOS ANGELES SUPERIOR COURT

JUN 1 2 2008

JOHN A. CLARKE, CLERK
BY MARY GARCIA, DEPUTY

Case assigned to 0324
Judge Victoria Chaney

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| WASHINGTON STATE PLUMBING & PIPEFITTING PENSION TRUST, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE SECURITIES CORPORATION, CWALT, INC., CWMBS, INC., CWABS, INC., CWHEQ, INC., J.P. MORGAN SECURITIES INC., DEUTSCHE BANK SECURITIES INC., BEAR, STEARNS & CO. INC., BANK OF AMERICA SECURITIES LLC, UBS SECURITIES, LLC, MORGAN STANLEY & CO. INCORPORATED, EDWARD D. JONES & CO., L.P., CITIGROUP GLOBAL MARKETS INC., GOLDMAN, SACHS & CO., CREDIT SUISSE SECURITIES (USA) LLC, GREENWICH CAPITAL MARKETS, INC., LEHMAN BROTHERS INC., BARCLAYS CAPITAL INC., HSBC SECURITIES (USA), BNP PARIBAS SECURITIES CORP., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, STANFORD L. KURLAND, DAVID A. SPECTOR, ERIC P. SIERACKI, N. JOSHUA ADLER, RANJIT KRIPALANI, JENNIFER S. SANDEFUR, DAVID SAMBOL, <br><br> [Caption continued on following pages.] | CASE NO. <br> **BC 3 9 2 5 7 1** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF §§ 11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933** <br><br> **JURY TRIAL DEMANDED** |

LIM, RUGER & KIM, LLP

CIT/CASE: BC392571 LE#/DEF#:
RECEIPT #: CCH#78057023
DATE PAID: 06/12/08 01:52:55 PM
PAYMENT: $870.00
RECEIVED:
  CHECK:
  CASH:       870.00
  CHANGE:
  CARD:              0310

00086628.doc

| | |
|---|---|
| 1 | ALTERNATIVE LOAN TRUST 2005-27, |
| | ALTERNATIVE LOAN TRUST 2005-28CB, |
| 2 | ALTERNATIVE LOAN TRUST 2005-30CB, |
| | ALTERNATIVE LOAN TRUST 2005-31, |
| 3 | ALTERNATIVE LOAN TRUST 2005-32T1, |
| | ALTERNATIVE LOAN TRUST 2005-33CB, |
| 4 | ALTERNATIVE LOAN TRUST 2005-34CB, |
| | ALTERNATIVE LOAN TRUST 2005-35CB, |
| 5 | ALTERNATIVE LOAN TRUST 2005-36, |
| | ALTERNATIVE LOAN TRUST 2005-37TL, |
| 6 | ALTERNATIVE LOAN TRUST 2005-38, |
| | ALTERNATIVE LOAN TRUST 2005-40CB, |
| 7 | ALTERNATIVE LOAN TRUST 2005-41, |
| | ALTERNATIVE LOAN TRUST 2005-42CB, |
| 8 | ALTERNATIVE LOAN TRUST 2005-43, |
| | ALTERNATIVE LOAN TRUST 2005-44, |
| 9 | ALTERNATIVE LOAN TRUST 2005-45, |
| | ALTERNATIVE LOAN TRUST 2005-46CB, |
| 10 | ALTERNATIVE LOAN TRUST 2005-47CB, |
| | ALTERNATIVE LOAN TRUST 2005-48TL, |
| 11 | ALTERNATIVE LOAN TRUST 2005-49CB, |
| | ALTERNATIVE LOAN TRUST 2005-50CB, |
| 12 | ALTERNATIVE LOAN TRUST 2005-51, |
| | ALTERNATIVE LOAN TRUST 2005-52CB, |
| 13 | ALTERNATIVE LOAN TRUST 2005-53T2, |
| | ALTERNATIVE LOAN TRUST 2005-54CB, |
| 14 | ALTERNATIVE LOAN TRUST 2005-55CB, |
| | ALTERNATIVE LOAN TRUST 2005-56, |
| 15 | ALTERNATIVE LOAN TRUST 2005-57CB, |
| | ALTERNATIVE LOAN TRUST 2005-58, |
| 16 | ALTERNATIVE LOAN TRUST 2005-59, |
| | ALTERNATIVE LOAN TRUST 2005-60T1, |
| 17 | ALTERNATIVE LOAN TRUST 2005-61, |
| | ALTERNATIVE LOAN TRUST 2005-62, |
| 18 | ALTERNATIVE LOAN TRUST 2005-63, |
| | ALTERNATIVE LOAN TRUST 2005-64CB, |
| 19 | ALTERNATIVE LOAN TRUST 2005-65CB, |
| | ALTERNATIVE LOAN TRUST 2005-67CB, |
| 20 | ALTERNATIVE LOAN TRUST 2005-70CB, |
| | ALTERNATIVE LOAN TRUST 2005-71, |
| 21 | ALTERNATIVE LOAN TRUST 2005-72, |
| | ALTERNATIVE LOAN TRUST 2005-73CB, |
| 22 | ALTERNATIVE LOAN TRUST 2005-74T1, |
| | ALTERNATIVE LOAN TRUST 2005-75CB, |
| 23 | ALTERNATIVE LOAN TRUST 2005-76, |
| | ALTERNATIVE LOAN TRUST 2005-77T1 , |
| 24 | ALTERNATIVE LOAN TRUST 2005-79CB, |
| | ALTERNATIVE LOAN TRUST 2005-80CB, |
| 25 | ALTERNATIVE LOAN TRUST 2005-81, |
| | ALTERNATIVE LOAN TRUST 2005-82, |
| 26 | ALTERNATIVE LOAN TRUST 2005-83CB, |
| | ALTERNATIVE LOAN TRUST 2005-84, |
| 27 | ALTERNATIVE LOAN TRUST 2005-85CB |
| | ALTERNATIVE LOAN TRUST 2005-86CB, |
| 28 | ALTERNATIVE LOAN TRUST 2005-AR1, |

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

**Pg. 7 - Exhibit 1**

| | |
|---|---|
| 1 | ALTERNATIVE LOAN TRUST 2005-IM1, |
| | ALTERNATIVE LOAN TRUST 2005-J10, |
| 2 | ALTERNATIVE LOAN TRUST 2005-J11, |
| | ALTERNATIVE LOAN TRUST 2005-J12, |
| 3 | ALTERNATIVE LOAN TRUST 2005-J13, |
| | ALTERNATIVE LOAN TRUST 2005-J14, |
| 4 | ALTERNATIVE LOAN TRUST 2005-J7, |
| | ALTERNATIVE LOAN TRUST 2005-J8, |
| 5 | ALTERNATIVE LOAN TRUST 2005-J9, |
| | ALTERNATIVE LOAN TRUST 2006-11CB, |
| 6 | ALTERNATIVE LOAN TRUST 2006-12CB, |
| | ALTERNATIVE LOAN TRUST 2006-13T1, |
| 7 | ALTERNATIVE LOAN TRUST 2006-14CB, |
| | ALTERNATIVE LOAN TRUST 2006-15CB, |
| 8 | ALTERNATIVE LOAN TRUST 2006-16CB, |
| | ALTERNATIVE LOAN TRUST 2006-17T1, |
| 9 | ALTERNATIVE LOAN TRUST 2006-18CB, |
| | ALTERNATIVE LOAN TRUST 2006-19CB, |
| 10 | ALTERNATIVE LOAN TRUST 2006-20CB, |
| | ALTERNATIVE LOAN TRUST 2006-21CB, |
| 11 | ALTERNATIVE LOAN TRUST 2006-23CB, |
| | ALTERNATIVE LOAN TRUST 2006-24CB, |
| 12 | ALTERNATIVE LOAN TRUST 2006-25CB, |
| | ALTERNATIVE LOAN TRUST 2006-26CB, |
| 13 | ALTERNATIVE LOAN TRUST 2006-27CB, |
| | ALTERNATIVE LOAN TRUST 2006-28CB, |
| 14 | ALTERNATIVE LOAN TRUST 2006-29T1, |
| | ALTERNATIVE LOAN TRUST 2006-2CB, |
| 15 | ALTERNATIVE LOAN TRUST 2006-30T1, |
| | ALTERNATIVE LOAN TRUST 2006-31CB, |
| 16 | ALTERNATIVE LOAN TRUST 2006-32CB, |
| | ALTERNATIVE LOAN TRUST 2006-33CB, |
| 17 | ALTERNATIVE LOAN TRUST 2006-34, |
| | ALTERNATIVE LOAN TRUST 2006-35CB, |
| 18 | ALTERNATIVE LOAN TRUST 2006-36T2, |
| | ALTERNATIVE LOAN TRUST 2006-37R, |
| 19 | ALTERNATIVE LOAN TRUST 2006-39CB, |
| | ALTERNATIVE LOAN TRUST 2006-40T1, |
| 20 | ALTERNATIVE LOAN TRUST 2006-41CB, |
| | ALTERNATIVE LOAN TRUST 2006-42, |
| 21 | ALTERNATIVE LOAN TRUST 2006-43CB, |
| | ALTERNATIVE LOAN TRUST 2006-45T1, |
| 22 | ALTERNATIVE LOAN TRUST 2006-46, |
| | ALTERNATIVE LOAN TRUST 2006-4CB, |
| 23 | ALTERNATIVE LOAN TRUST 2006-5T2, |
| | ALTERNATIVE LOAN TRUST 2006-69, |
| 24 | ALTERNATIVE LOAN TRUST 2006-6CB, |
| | ALTERNATIVE LOAN TRUST 2006-7CB, |
| 25 | ALTERNATIVE LOAN TRUST 2006-8T1, |
| | ALTERNATIVE LOAN TRUST 2006-9T1, |
| 26 | ALTERNATIVE LOAN TRUST 2006-HY10, |
| | ALTERNATIVE LOAN TRUST 2006-HY11, |
| 27 | ALTERNATIVE LOAN TRUST 2006-HY12, |
| | ALTERNATIVE LOAN TRUST 2006-HY13, |
| 28 | ALTERNATIVE LOAN TRUST 2006-HY3, |

| | |
|---|---|
| 1 | ALTERNATIVE LOAN TRUST 2006-J1, |
| | ALTERNATIVE LOAN TRUST 2006-J2, |
| 2 | ALTERNATIVE LOAN TRUST 2006-J3, |
| | ALTERNATIVE LOAN TRUST 2006-J4, |
| 3 | ALTERNATIVE LOAN TRUST 2006-J5, |
| | ALTERNATIVE LOAN TRUST 2006-J6, |
| 4 | ALTERNATIVE LOAN TRUST 2006-J7, |
| | ALTERNATIVE LOAN TRUST 2006-J8, |
| 5 | ALTERNATIVE LOAN TRUST 2006-OA1, |
| | ALTERNATIVE LOAN TRUST 2006-OA10, |
| 6 | ALTERNATIVE LOAN TRUST 2006-OA11, |
| | ALTERNATIVE LOAN TRUST 2006-OA12, |
| 7 | ALTERNATIVE LOAN TRUST 2006-OA14, |
| | ALTERNATIVE LOAN TRUST 2006-OA16, |
| 8 | ALTERNATIVE LOAN TRUST 2006-OA17, |
| | ALTERNATIVE LOAN TRUST 2006-OA18, |
| 9 | ALTERNATIVE LOAN TRUST 2006-OA19, |
| | ALTERNATIVE LOAN TRUST 2006-OA2, |
| 10 | ALTERNATIVE LOAN TRUST 2006-OA21, |
| | ALTERNATIVE LOAN TRUST 2006-OA22, |
| 11 | ALTERNATIVE LOAN TRUST 2006-OA3, |
| | ALTERNATIVE LOAN TRUST 2006-OA6, |
| 12 | ALTERNATIVE LOAN TRUST 2006-OA7, |
| | ALTERNATIVE LOAN TRUST 2006-OA8, |
| 13 | ALTERNATIVE LOAN TRUST 2006-OA9, |
| | ALTERNATIVE LOAN TRUST 2006-OC1, |
| 14 | ALTERNATIVE LOAN TRUST 2006-OC10, |
| | ALTERNATIVE LOAN TRUST 2006-OC11, |
| 15 | ALTERNATIVE LOAN TRUST 2006-OC2, |
| | ALTERNATIVE LOAN TRUST 2006-OC3, |
| 16 | ALTERNATIVE LOAN TRUST 2006-OC4, |
| | ALTERNATIVE LOAN TRUST 2006-OC5, |
| 17 | ALTERNATIVE LOAN TRUST 2006-OC6, |
| | ALTERNATIVE LOAN TRUST 2006-OC7, |
| 18 | ALTERNATIVE LOAN TRUST 2006-OC8, |
| | ALTERNATIVE LOAN TRUST 2006-OC9, |
| 19 | ALTERNATIVE LOAN TRUST 2007-10CB, |
| | ALTERNATIVE LOAN TRUST 2007-11T1, |
| 20 | ALTERNATIVE LOAN TRUST 2007-12T1, |
| | ALTERNATIVE LOAN TRUST 2007-13, |
| 21 | ALTERNATIVE LOAN TRUST 2007-14T2, |
| | ALTERNATIVE LOAN TRUST 2007-15CB, |
| 22 | ALTERNATIVE LOAN TRUST 2007-16CB, |
| | ALTERNATIVE LOAN TRUST 2007-17CB, |
| 23 | ALTERNATIVE LOAN TRUST 2007-18CB, |
| | ALTERNATIVE LOAN TRUST 2007-19, |
| 24 | ALTERNATIVE LOAN TRUST 2007-1T1, |
| | ALTERNATIVE LOAN TRUST 2007-20, |
| 25 | ALTERNATIVE LOAN TRUST 2007-21CB, |
| | ALTERNATIVE LOAN TRUST 2007-22, |
| 26 | ALTERNATIVE LOAN TRUST 2007-23CB, |
| | ALTERNATIVE LOAN TRUST 2007-24, |
| 27 | ALTERNATIVE LOAN TRUST 2007-25, |
| | ALTERNATIVE LOAN TRUST 2007-2CB, |
| 28 | ALTERNATIVE LOAN TRUST 2007-3T1, |

| | |
|---|---|
| 1 | ALTERNATIVE LOAN TRUST 2007-4CB,<br>ALTERNATIVE LOAN TRUST 2007-5CB, |
| 2 | ALTERNATIVE LOAN TRUST 2007-6,<br>ALTERNATIVE LOAN TRUST 2007-7T2, |
| 3 | ALTERNATIVE LOAN TRUST 2007-8CB,<br>ALTERNATIVE LOAN TRUST 2007-9T1, |
| 4 | ALTERNATIVE LOAN TRUST 2007-AL1,<br>ALTERNATIVE LOAN TRUST 2007-HY2, |
| 5 | ALTERNATIVE LOAN TRUST 2007-HY3,<br>ALTERNATIVE LOAN TRUST 2007-HY4, |
| 6 | ALTERNATIVE LOAN TRUST 2007-HY5R,<br>ALTERNATIVE LOAN TRUST 2007-HY6, |
| 7 | ALTERNATIVE LOAN TRUST 2007-HY7C,<br>ALTERNATIVE LOAN TRUST 2007-HY8C, |
| 8 | ALTERNATIVE LOAN TRUST 2007-HY9,<br>ALTERNATIVE LOAN TRUST 2007-J1, |
| 9 | ALTERNATIVE LOAN TRUST 2007-J2,<br>ALTERNATIVE LOAN TRUST 2007-OA10, |
| 10 | ALTERNATIVE LOAN TRUST 2007-OA11,<br>ALTERNATIVE LOAN TRUST 2007-OA2, |
| 11 | ALTERNATIVE LOAN TRUST 2007-OA3,<br>ALTERNATIVE LOAN TRUST 2007-OA4, |
| 12 | ALTERNATIVE LOAN TRUST 2007-OA6,<br>ALTERNATIVE LOAN TRUST 2007-OA7, |
| 13 | ALTERNATIVE LOAN TRUST 2007-OA8,<br>ALTERNATIVE LOAN TRUST 2007-OA9, |
| 14 | ALTERNATIVE LOAN TRUST 2007-OH1,<br>ALTERNATIVE LOAN TRUST 2007-OH2, |
| 15 | ALTERNATIVE LOAN TRUST 2007-OH3, |
| 16 | ALTERNATIVE LOAN TRUST RESECURITIZATION 2006-22R, |
| 17 | ALTERNATIVE LOAN TRUST RESECURITIZATION 2007-26R, |
| 18 | |
| 19 | CHL MORTGAGE PASS-THROUGH TRUST 2005-15,<br>CHL MORTGAGE PASS-THROUGH TRUST 2005-16, |
| 20 | CHL MORTGAGE PASS-THROUGH TRUST 2005-17,<br>CHL MORTGAGE PASS-THROUGH TRUST 2005-18, |
| 21 | CHL MORTGAGE PASS-THROUGH TRUST 2005-19,<br>CHL MORTGAGE PASS-THROUGH TRUST 2005-20, |
| 22 | CHL MORTGAGE PASS-THROUGH TRUST 2005-21,<br>CHL MORTGAGE PASS-THROUGH TRUST 2005-22, |
| 23 | CHL MORTGAGE PASS-THROUGH TRUST 2005-23,<br>CHL MORTGAGE PASS-THROUGH TRUST 2005-24, |
| 24 | CHL MORTGAGE PASS-THROUGH TRUST 2005-25,<br>CHL MORTGAGE PASS-THROUGH TRUST 2005-26, |
| 25 | CHL MORTGAGE PASS-THROUGH TRUST 2005-27,<br>CHL MORTGAGE PASS-THROUGH TRUST 2005-28, |
| 26 | CHL MORTGAGE PASS-THROUGH TRUST 2005-29,<br>CHL MORTGAGE PASS-THROUGH TRUST 2005-30, |
| 27 | CHL MORTGAGE PASS-THROUGH TRUST 2005-31,<br>CHL MORTGAGE PASS-THROUGH TRUST 2005-HYB10, |
| 28 | CHL MORTGAGE PASS-THROUGH TRUST 2005- |

HYB4,
CHL MORTGAGE PASS-THROUGH TRUST 2005-HYB5,
CHL MORTGAGE PASS-THROUGH TRUST 2005-HYB6,
CHL MORTGAGE PASS-THROUGH TRUST 2005-HYB7,
CHL MORTGAGE PASS-THROUGH TRUST 2005-HYB8,
CHL MORTGAGE PASS-THROUGH TRUST 2005-J2,
CHL MORTGAGE PASS-THROUGH TRUST 2005-J3,
CHL MORTGAGE PASS-THROUGH TRUST 2005-J4,
CHL MORTGAGE PASS-THROUGH TRUST 2006-1,
CHL MORTGAGE PASS-THROUGH TRUST 2006-10,
CHL MORTGAGE PASS-THROUGH TRUST 2006-11,
CHL MORTGAGE PASS-THROUGH TRUST 2006-12,
CHL MORTGAGE PASS-THROUGH TRUST 2006-13,
CHL MORTGAGE PASS-THROUGH TRUST 2006-14,
CHL MORTGAGE PASS-THROUGH TRUST 2006-15,
CHL MORTGAGE PASS-THROUGH TRUST 2006-16,
CHL MORTGAGE PASS-THROUGH TRUST 2006-17,
CHL MORTGAGE PASS-THROUGH TRUST 2006-18,
CHL MORTGAGE PASS-THROUGH TRUST 2006-19,
CHL MORTGAGE PASS-THROUGH TRUST 2006-20,
CHL MORTGAGE PASS-THROUGH TRUST 2006-21,
CHL MORTGAGE PASS-THROUGH TRUST 2006-3,
CHL MORTGAGE PASS-THROUGH TRUST 2006-6,
CHL MORTGAGE PASS-THROUGH TRUST 2006-8,
CHL MORTGAGE PASS-THROUGH TRUST 2006-9,
CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB1,
CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB2,
CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB3,
CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB4,
CHL MORTGAGE PASS-THROUGH TRUST 2006-HYB5,
CHL MORTGAGE PASS-THROUGH TRUST 2006-J1,
CHL MORTGAGE PASS-THROUGH TRUST 2006-J2,
CHL MORTGAGE PASS-THROUGH TRUST 2006-J3,
CHL MORTGAGE PASS-THROUGH TRUST 2006-J4,
CHL MORTGAGE PASS-THROUGH TRUST 2006-OA4,
CHL MORTGAGE PASS-THROUGH TRUST 2006-OA5,
CHL MORTGAGE PASS-THROUGH TRUST 2006-TM1,
CHL MORTGAGE PASS-THROUGH TRUST 2007-1,
CHL MORTGAGE PASS-THROUGH TRUST 2007-10,
CHL MORTGAGE PASS-THROUGH TRUST 2007-11,
CHL MORTGAGE PASS-THROUGH TRUST 2007-12,
CHL MORTGAGE PASS-THROUGH TRUST 2007-13,
CHL MORTGAGE PASS-THROUGH TRUST 2007-14,

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933
**Pg. 11 - Exhibit 1**

CHL MORTGAGE PASS-THROUGH TRUST 2007-15,
CHL MORTGAGE PASS-THROUGH TRUST 2007-16,
CHL MORTGAGE PASS-THROUGH TRUST 2007-17,
CHL MORTGAGE PASS-THROUGH TRUST 2007-18,
CHL MORTGAGE PASS-THROUGH TRUST 2007-19,
CHL MORTGAGE PASS-THROUGH TRUST 2007-2,
CHL MORTGAGE PASS-THROUGH TRUST 2007-20,
CHL MORTGAGE PASS-THROUGH TRUST 2007-21,
CHL MORTGAGE PASS-THROUGH TRUST 2007-3,
CHL MORTGAGE PASS-THROUGH TRUST 2007-4,
CHL MORTGAGE PASS-THROUGH TRUST 2007-5,
CHL MORTGAGE PASS-THROUGH TRUST 2007-6,
CHL MORTGAGE PASS-THROUGH TRUST 2007-7,
CHL MORTGAGE PASS-THROUGH TRUST 2007-8,
CHL MORTGAGE PASS-THROUGH TRUST 2007-9,
CHL MORTGAGE PASS-THROUGH TRUST 2007-HY1,
CHL MORTGAGE PASS-THROUGH TRUST 2007-HY3,
CHL MORTGAGE PASS-THROUGH TRUST 2007-HY4,
CHL MORTGAGE PASS-THROUGH TRUST 2007-HY5,
CHL MORTGAGE PASS-THROUGH TRUST 2007-HY6,
CHL MORTGAGE PASS-THROUGH TRUST 2007-HY7,
CHL MORTGAGE PASS-THROUGH TRUST 2007-HYB1,
CHL MORTGAGE PASS-THROUGH TRUST 2007-HYB2,
CHL MORTGAGE PASS-THROUGH TRUST 2007-J1,
CHL MORTGAGE PASS-THROUGH TRUST 2007-J2,
CHL MORTGAGE PASS-THROUGH TRUST 2007-J3,

CWABS ASSET-BACKED CERTIFICATES TRUST 2005-10,
CWABS ASSET-BACKED CERTIFICATES TRUST 2005-11,
CWABS ASSET-BACKED CERTIFICATES TRUST 2005-12,
CWABS ASSET-BACKED CERTIFICATES TRUST 2005-13,
CWABS ASSET-BACKED CERTIFICATES TRUST 2005-14,
CWABS ASSET-BACKED CERTIFICATES TRUST 2005-15,
CWABS ASSET-BACKED CERTIFICATES TRUST 2005-16,
CWABS ASSET-BACKED CERTIFICATES TRUST 2005-17,
CWABS ASSET-BACKED CERTIFICATES TRUST 2005-4,
CWABS ASSET-BACKED CERTIFICATES TRUST 2005-5,

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

**Pg. 12 - Exhibit 1**

| | |
|---|---|
| 1 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-6, |
| 2 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-7, |
| 3 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-8, |
| 4 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-9, |
| 5 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-AB2, |
| 6 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-AB3, |
| 7 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-AB4, |
| 8 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-AB5, |
| 9 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-BC3, |
| 10 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-BC4, |
| 11 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-BC5, |
| 12 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-HYB9, |
| 13 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-IM1, |
| 14 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-IM2, |
| 15 | CWABS ASSET-BACKED CERTIFICATES TRUST 2005-IM3, |
| 16 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-1, |
| 17 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-10, |
| 18 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-11, |
| 19 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-12, |
| 20 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-13, |
| 21 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-14, |
| 22 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-15, |
| 23 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-16, |
| 24 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-17, |
| 25 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-18, |
| 26 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-19, |
| 27 | CWABS ASSET-BACKED CERTIFICATES TRUST 2006-2, |
| 28 | CWABS ASSET-BACKED CERTIFICATES TRUST |

| | |
|---|---|
| 1 | 2006-20, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 2 | 2006-21, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 3 | 2006-22, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 4 | 2006-23, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 5 | 2006-24, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 6 | 2006-25, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 7 | 2006-26, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 8 | 2006-3, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 9 | 2006-4, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 10 | 2006-5, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 11 | 2006-6, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 12 | 2006-7, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 13 | 2006-8, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 14 | 2006-9, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 15 | 2006-ABC1, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 16 | 2006-BC1, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 17 | 2006-BC2, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 18 | 2006-BC3, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 19 | 2006-BC4, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 20 | 2006-BC5, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 21 | 2006-IM1, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 22 | 2006-SPS1, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 23 | 2006-SPS2, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 24 | 2007-1, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 25 | 2007-10, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 26 | 2007-11, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 27 | 2007-12, |
| | CWABS ASSET-BACKED CERTIFICATES TRUST |
| 28 | 2007-13, |

1  CWABS ASSET-BACKED CERTIFICATES TRUST 2007-2,
2  CWABS ASSET-BACKED CERTIFICATES TRUST 2007-3,
3  CWABS ASSET-BACKED CERTIFICATES TRUST 2007-4,
4  CWABS ASSET-BACKED CERTIFICATES TRUST 2007-5,
5  CWABS ASSET-BACKED CERTIFICATES TRUST 2007-6,
6  CWABS ASSET-BACKED CERTIFICATES TRUST 2007-7,
7  CWABS ASSET-BACKED CERTIFICATES TRUST 2007-8,
8  CWABS ASSET-BACKED CERTIFICATES TRUST 2007-9,
9  CWABS ASSET-BACKED CERTIFICATES TRUST 2007-BC1,
10 CWABS ASSET-BACKED CERTIFICATES TRUST 2007-BC2,
11 CWABS ASSET-BACKED CERTIFICATES TRUST 2007-BC3, .
12
13 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2006-S1,
14 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2006-S10,
15 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2006-S2,
16 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2006-S3,
17 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2006-S4,
18 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2006-S5,
19 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2006-S6,
20 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2006-S7,
21 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2006-S8,
22 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2006-S9,
23 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2007-S1,
24 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2007-S2,
25 CWHEQ HOME EQUITY LOAN TRUST, SERIES 2007-S3,
26 CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2005-C,
27 CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2005-D,
28 CWHEQ REVOLVING HOME EQUITY LOAN

1   TRUST, SERIES 2005-E,
    CWHEQ REVOLVING HOME EQUITY LOAN
2   TRUST, SERIES 2005-F,
    CWHEQ REVOLVING HOME EQUITY LOAN
3   TRUST, SERIES 2005-G,
    CWHEQ REVOLVING HOME EQUITY LOAN
4   TRUST, SERIES 2005-H,
    CWHEQ REVOLVING HOME EQUITY LOAN
5   TRUST, SERIES 2005-I,
    CWHEQ REVOLVING HOME EQUITY LOAN
6   TRUST, SERIES 2005-J,
    CWHEQ REVOLVING HOME EQUITY LOAN
7   TRUST, SERIES 2005-K,
    CWHEQ REVOLVING HOME EQUITY LOAN
8   TRUST, SERIES 2005-L,
    CWHEQ REVOLVING HOME EQUITY LOAN
9   TRUST, SERIES 2005-M,
    CWHEQ REVOLVING HOME EQUITY LOAN
10  TRUST, SERIES 2006-A,
    CWHEQ REVOLVING HOME EQUITY LOAN
11  TRUST, SERIES 2006-B,
    CWHEQ REVOLVING HOME EQUITY LOAN
12  TRUST, SERIES 2006-C,
    CWHEQ REVOLVING HOME EQUITY LOAN
13  TRUST, SERIES 2006-D,
    CWHEQ REVOLVING HOME EQUITY LOAN
14  TRUST, SERIES 2006-E,
    CWHEQ REVOLVING HOME EQUITY LOAN
15  TRUST, SERIES 2006-F,
    CWHEQ REVOLVING HOME EQUITY LOAN
16  TRUST, SERIES 2006-G,
    CWHEQ REVOLVING HOME EQUITY LOAN
17  TRUST, SERIES 2006-H,
    CWHEQ REVOLVING HOME EQUITY LOAN
18  TRUST, SERIES 2006-I,
    CWHEQ REVOLVING HOME EQUITY LOAN
19  TRUST, SERIES 2007-A,
    CWHEQ REVOLVING HOME EQUITY LOAN
20  TRUST, SERIES 2007-B,
    CWHEQ REVOLVING HOME EQUITY LOAN
21  TRUST, SERIES 2007-C,
    CWHEQ REVOLVING HOME EQUITY LOAN
22  TRUST, SERIES 2007-D,
    CWHEQ REVOLVING HOME EQUITY LOAN
23  TRUST, SERIES 2007-E,
    CWHEQ REVOLVING HOME EQUITY LOAN
24  TRUST, SERIES 2007-G,

25                    Defendants.

26

27

28

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

Pg. 17 - Exhibit 1

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and entities who acquired the Alternative Loan Trust Certificates of CWALT, Inc. ("CWALT"); the CWABS Asset-Backed Trust Certificates of CWABS, Inc. ("CWABS"); the CHL Mortgage Pass-Through Trust Certificates of CWMBS, Inc. ("CWMBS"); and the CWHEQ Home Equity Loan Trust and the CWHEQ Revolving Home Equity Loan Trust Certificates of CWHEQ, Inc. ("CWHEQ") (collectively referred to as the "Trusts" or "Certificates") pursuant or traceable to false and misleading Registration Statements, Prospectuses and Prospectus Supplements (collectively, the "Prospectuses") issued between June 13, 2005 and December 27, 2007 and who were damaged thereby.  This action involves solely *strict liability* and *negligence* claims brought pursuant to the Securities Act of 1933 (the "Securities Act").

2.      Between June 13, 2005 and December 27, 2007, the Issuing and Underwriting Defendants (defined herein) caused Prospectuses to be filed with the Securities and Exchange Commission ("SEC") in connection with, and for the purpose of, issuing hundreds of billions of dollars of Trust Certificates.  Each Trust was divided into several classes (or "tranches") which had different priorities of seniority, priorities of payment, exposure to default, and interest payment provisions.

3.      Each Trust owned a pool of mortgage loans purportedly valued as high as $2.99 billion per Trust.  The Prospectuses detailed the composition of the mortgage pools by type of loan, type of property, amount of loan, credit worthiness of the borrowers, and other criteria essential to investors' determination of the riskiness of the mortgage pool.

4.      Investors purchased their interest in the Trusts by way of Certificates issued by the Issuing and Underwriting Defendants.  These Certificates entitled investors to receive monthly interest and principal payments from the Trust in which they invested.

5.      To enable investors to assess the risk of investing in the underlying mortgages, the Prospectuses included detailed disclosures about the underwriting standards purportedly used in connection with the underlying mortgage loans.  The Prospectuses also included numerous representations about each Trust's mortgage pool/s such as the loan-to-value ("LTV") ratios used

- 1 -

1   to qualify borrowers, the appraisals of properties underlying the mortgages, and the borrowers'

2   debt-to-income ratios.  The Prospectuses contained numerous material misrepresentations and

3   omissions because, contrary to disclosures in the Prospectuses, many mortgages contained in the

4   Trusts were not originated in accordance with the stated underwriting standards and were not

5   originated in accordance with applicable regulations and laws.  Furthermore, the disclosures

6   regarding the mortgages' LTV ratios and debt-to-income ratios were manipulated by the Issuing

7   Defendants through systematic over-appraisal of property values, lax (and sometimes nonexistent)

8   income verification, and generally unsound underwriting practices.

9        6.      Based on the misrepresentations contained in the Prospectuses, the Issuing and

10  Underwriting Defendants were able to get AAA and AA credit ratings on many tranches of the

11  Certificates.[1]  However, by late-2007, the public began to learn about rapidly accelerating

12  delinquencies and defaults on the mortgages underlying the Certificates; problems that were

13  severely exacerbated (if not directly caused by) the Issuing Defendants' intentional and systemic

14  over-appraisal of homes and lax underwriting.  The Rating Agencies began to put negative-watch

15  labels on many of the Certificates, and ultimately downgraded many of them.  As a result of the

16  material misrepresentations and omissions in the Prospectuses, investors purchased securities far

17  riskier than they were led to believe.

18       7.      Countrywide is currently the target of multiple investigations for its business

19  practices, including many practices related to the origination of mortgages, and has received

20  subpoenas from the Federal Bureau of Investigation ("FBI") and the California and Illinois

21  Attorneys General.  It has been reported that the probes center on Countrywide's lending and loan

22  origination practices, and the role that it has played in the mortgage meltdown crisis.  The Florida

23  Attorney General is also investigating Countrywide for "unfair and deceptive trade practices,"

24  including its sales and marketing tactics and its subprime loan underwriting, and has stated that he

---

[1] The rating agencies that rated the various tranches for each Certificate issued are:  Moody's Investors Service, Inc. ("Moody's"), Fitch, Inc. ("Fitch") and/or Standard & Poor's Corporation ("S&P" and collectively, the "Rating Agencies").  The Rating Agencies are approved by the SEC as "Nationally Recognized Statistical Rating Organizations" and provide credit ratings which are used to distinguish among grades of creditworthiness of various securities under the federal securities laws.

1   is concerned that Countrywide may have put borrowers "into mortgages that in the first place they

2   couldn't afford or loans with rates that were not what they were advertising or that were

3   misleading." In other investigations, Bankruptcy Court regulators, which are a part of the U.S.

4   Justice Department, are investigating Countrywide's foreclosure practices and whether the

5   company tacked on improper fees and charges to loans in foreclosure. The SEC is also

6   investigating Countrywide's executives for their behavior during the mortgage meltdown crisis.

7       8.      Furthermore, courts across the country have castigated Countrywide for nearly every

8   aspect of its business practices in originating, servicing and securitizing mortgages. For example,

9   in *In re Countrywide Fin. Corp. Derivative Litig.*, --- F.Supp.2d ----, 2008 WL 2064977 (C.D. Cal.

10  May 14, 2008), District Judge Mariana R. Pfaelzer's opinion included an extensive discussion of

11  Countrywide's alleged violations of underwriting standards and concludes that:

12      ***The Court finds that Plaintiffs' numerous confidential witnesses***
        ***support a strong inference of a Company-wide culture that, at***
13      ***every level, emphasized increased loan origination volume in***
        ***derogation of underwriting standards.*** Supporting this Company-
14      wide inference, the confidential and non-confidential accounts
        cited in the Complaint (1) emanate from several geographic areas,
15      *see id.* [ ] (providing similar testimony from former employees in
        Jacksonville, FL, Roseville, CA, Long Island, NY, Anchorage,
16      AK, and Independence, OH); (2) span different levels of the
        Company hierarchy, *see id.* (underwriters, senior underwriters,
17      senior loan officers, vice presidents, auditors, and external
        consultants remarking on the lack of adherence to Company
18      standards in loan origination); and (3) remain consistent across
        different time periods, *see id.* (employees describing their
19      experiences in 2004, 2005, 2006, and 2007). ***Strikingly, they tell***
        ***what is essentially the same story – a rampant disregard for***
20      ***underwriting standards-from markedly different angles:***

21      • ***an auditor who assessed loans returned to the Company***
        ***found that many purported "prime" loans were issued to***
22      ***unqualified borrowers ... ;***

23      • a longtime executive who held two vice president
        positions discovered that particularly risky loans that were
24      routed out of the normal underwriting process (because
        they violated underwriting standards) were in fact regularly
25      being approved, with Defendant Sambol's involvement ... ;

26      • Mark Zachary, a vice president in Countrywide's joint
        venture with KB Homes, found that ***appraisers were***
27      ***inflating appraisal values, essentially raising the risk of***
        ***default on loans ... ;***

28

- 3 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

1    • *underwriters at various levels and offices attested to egregious instances of underwriting*, involving, for

2    example, previously declined loans that would "come back to life" when new information qualifying the applicants

3    would "miraculously appear," and loans that were provided pursuant to borrowers' patently ridiculous "stated incomes"

4    ... ; and

5    • a vice president in accounting left his job because he had been pressured to alter Countrywide's financials by

6    removing "bad loans" retroactively from the Company's loans held for investment, so as to create the impression of

7    a better hedging relationship ....

8    *Id.*, 2008 WL 2064977 at *10-11 (emphasis added).

9

10    9.    As a result of Defendants' wrongful acts and omissions Plaintiff and other Class

11    members have suffered significant losses and damages. The Certificates are no longer marketable

12    at prices anywhere near the prices paid by Plaintiff and the Class, and the holders of these

13    Certificates have been exposed to far greater risk than represented in the Prospectuses.

14                              **JURISDICTION AND VENUE**

15    10.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15

16    of the Securities Act (15 U.S.C. §§ 77k and 77o).

17    11.    This Court has jurisdiction over the subject matter of this action pursuant to Section

18    22 of the Securities Act (15 U.S.C. § 77v), which explicitly states that "[e]xcept as provided in

19    section 16(c), no case arising under this title and brought *in any State court* of competent

20    jurisdiction shall be removed to any court in the United States." Section 16(c) refers to "covered

21    class actions," which are defined as lawsuits brought as class actions or brought on behalf of more

22    than 50 persons asserting claims *under state or common law*. This is an action asserting federal

23    law claims. Thus, it does not fall within the definition of a "covered class action" under Section

24    16(b)-(c) and therefore is not removable to federal court under the Securities Litigation Uniform

25    Standards Act of 1998.

26    12.    The violations of law complained of herein occurred in this County, including the

27    preparation and dissemination of materially false and misleading statements complained of herein.

28    Countrywide, and many of its affiliated entities, maintain their principal executive offices in this

- 4 -

1   County, and each of the Underwriter Defendants conduct business and/or is headquartered in this

2   County.

3   **PARTIES**

4        13.    Plaintiff, Washington State Plumbing & Pipefitting Pension Trust, acquired

5   Certificates pursuant and/or traceable to the Prospectuses.

6        14.    Defendant Countrywide Financial Corporation ("CFC" or "Countrywide") is a

7   Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas,

8   California.  CFC is a holding company which, through its subsidiaries, is engaged in mortgage

9   lending and other real estate finance related businesses, including mortgage banking, banking and

10   mortgage warehouse lending, dealing in securities and insurance underwriting.  The Company

11   operates through five business segments:  Mortgage Banking, which originates, purchases, sells

12   and services non-commercial mortgage loans nationwide; Banking, which takes deposits and

13   invests in mortgage loans and home equity lines of credit; Capital Markets, which operates an

14   institutional broker-dealer that primarily specializes in trading and underwriting mortgage-backed

15   securities (MBS); Insurance, which offers property, casualty, life and disability insurance as an

16   underwriter and as an insurance agency; and Global Operations, which licenses and supports

17   technology to mortgage lenders in the United Kingdom.

18        15.    Defendant Countrywide Home Loans, Inc. ("CHL") is a direct wholly owned

19   subsidiary of CFC.  CHL is engaged in the mortgage banking business, and originates, purchases,

20   sells and services mortgage loans.  CHL's principal executive offices are located at 4500 Park

21   Granada, Calabasas, California, the same location as CFC.  CHL was a "Seller" and/or "Sponsor"

22   of many of the securitization transactions as detailed herein at ¶ 37, and an originator of the

23   majority of the underlying mortgages supporting the securitization transactions.

24        16.    Defendant CWALT is a Delaware corporation and a limited purpose financing

25   subsidiary of CFC.  CWALT's principal executive offices are located at 4500 Park Granada,

26   Calabasas, California, the same location as CFC.  CWALT was a "Depositor" in substantially all of

27   the Alternative Loan Trust securitization transactions as detailed herein at ¶ 37, and issued false

28

and misleading Prospectuses in connection therewith as discussed in more detail below.  CWALT also filed the following Amended Registration Statements with the SEC:

| Registration Number | Date Filed | Amount Registered |
|---|---|---|
| 333-125902 | July 25, 2005 | $45,335,287,290 |
| 333-131630 | March 6, 2006 | $100,271,785,327 |
| 333-140962 | April 24, 2007 | $103,095,483,061 |

17.   Defendant CWMBS is a Delaware corporation and a limited purpose financing subsidiary of CFC.  CWMBS' principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC.  Defendant CWMBS was a "Depositor" in substantially all of the CHL Mortgage Pass-Through Trust securitization transactions as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.  CWMBS also filed the following Amended Registration Statements with the SEC:

| Registration Number | Date Filed | Amount Registered |
|---|---|---|
| 333-125963 | July 25, 2005 | $40,742,304,251 |
| 333-131662 | March 6, 2006 | $60,846,662,430 |
| 333-140958 | April 24, 2007 | $144,647,113,029 |

18.   Defendant CWABS is a Delaware corporation and a limited purpose financing subsidiary of CFC.  CWABS' principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC.  Defendant CWABS was a "Depositor" in substantially all of the CWABS Asset-Backed Certificates Trust securitization transactions as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.  CWABS also filed the following Amended Registration Statements with the SEC:

| Registration Number | Date Filed | Amount Registered |
|---|---|---|
| 333-131591 | February 21, 2006 | $34,327,892,523 |
| 333-135846 | August 8, 2006 | $40,000,000,000 |

- 6 -

| Registration Number | Date Filed | Amount Registered |
|---|---|---|
| 333-140960 | April 24, 2007 | $113,336,555,700 |

19.     Defendant CWHEQ is a Delaware corporation and a limited purpose financing subsidiary of CFC. CWHEQ's principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC. CWHEQ was a "Depositor" in substantially all of the CWHEQ Home Equity Loan Trust and the CWHEQ Revolving Home Equity Loan Trust securitization transactions as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below. CWHEQ also filed the following Amended Registration Statements with the SEC:

| Registration Number | Date Filed | Amount Registered |
|---|---|---|
| 333-123790 | August 4, 2005 | $30,685,000,000 |
| 333-132375 | April 12, 2006 | $26,572,949,813 |
| 333-139891 | May 22, 2007 | $31,717,192,508 |

20.     Defendant Countrywide Securities Corporation ("CSC"), an affiliate of CFC, acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the Certificates. Defendant CSC was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.

21.     Defendant J.P. Morgan Securities Inc. ("JP Morgan") acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the Certificates. Defendant JP Morgan was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.

22.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the Certificates. Defendant Deutsche Bank was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

23.   Defendant Bear, Stearns & Co. Inc. ("Bear Stearns") acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the Certificates. Defendant Bear Stearns was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.

24.   Defendant Banc of America Securities LLC ("BoA") acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the Certificates. Defendant BoA was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.

25.   Defendant UBS Securities, LLC ("UBS") acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the Certificates.  Defendant UBS was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.

26.   Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the Certificates.  Defendant Morgan Stanley was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.

27.   Defendant Edward D. Jones & Co., L.P. ("Edward Jones") acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the Certificates. Defendant Edward Jones was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.

28.   Defendant Citigroup Global Markets Inc. ("Citigroup") acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the Certificates. Defendant Citigroup was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.

29.   Defendant Goldman, Sachs & Co. ("Goldman Sachs") acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the Certificates.

1  Defendant Goldman Sachs was an underwriter of the Trusts as detailed herein at ¶ 37, and issued

2  false and misleading Prospectuses in connection therewith as discussed in more detail below.

3       30.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") acted as an

4  underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the

5  Certificates.  Defendant Credit Suisse was an underwriter of the Trusts as detailed herein at ¶ 37,

6  and issued false and misleading Prospectuses in connection therewith as discussed in more detail

7  below.

8       31.    Defendant Greenwich Capital Markets, Inc. a.k.a. RBS Greenwich Capital ("RBS")

9  acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents

10  for the Certificates.  Defendant RBS was an underwriter of the Trusts as detailed herein at ¶ 37, and

11  issued false and misleading Prospectuses in connection therewith as discussed in more detail

12  below.

13       32.    Defendant Lehman Brothers Inc. ("Lehman") acted as an underwriter for the Issuing

14  Trusts, and drafted and disseminated the offering documents for the Certificates.  Defendant

15  Lehman was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and misleading

16  Prospectuses in connection therewith as discussed in more detail below.

17       33.    Defendant Barclays Capital Inc. ("Barclays") acted as an underwriter for the Issuing

18  Trusts, and drafted and disseminated the offering documents for the Certificates.  Defendant

19  Barclays was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and

20  misleading Prospectuses in connection therewith as discussed in more detail below.

21       34.    Defendant HSBC Securities (USA) ("HSBC") acted as an underwriter for the

22  Issuing Trusts, and drafted and disseminated the offering documents for the Certificates.

23  Defendant HSBC was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and

24  misleading Prospectuses in connection therewith as discussed in more detail below.

25       35.    Defendant BNP Paribas Securities Corp. ("BNP") acted as an underwriter for the

26  Issuing Trusts, and drafted and disseminated the offering documents for the Certificates.

27  Defendant BNP was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and

28  misleading Prospectuses in connection therewith as discussed in more detail below.

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

36.   Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") acted as an underwriter for the Issuing Trusts, and drafted and disseminated the offering documents for the Certificates.  Defendant Merrill Lynch was an underwriter of the Trusts as detailed herein at ¶ 37, and issued false and misleading Prospectuses in connection therewith as discussed in more detail below.

37.   The Trusts were set up by CWALT, CWMBS, CWABS, and CWHEQ to issue hundreds of billions of dollars worth of Certificates pursuant to the Prospectuses.  Collectively, the Trusts are referred to hereinafter as the "Issuing Trusts."  The Issuing Trusts are:

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Alternative Loan Trust 2005-27 | $1,524,298,100 | CWALT | UBS | CHL |
| Alternative Loan Trust 2005-28CB | $831,895,756 | CWALT | Deutsche Bank/JP Morgan | CHL |
| Alternative Loan Trust 2005-30CB | $521,202,999 | CWALT | Credit Suisse/CSC | CHL |
| Alternative Loan Trust 2005-31 | $971,317,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2005-32T1 | $354,959,907 | CWALT | Bear Stearns/CSC | CHL |
| Alternative Loan Trust 2005-33CB | $539,993,529 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-34CB | $416,789,991 | CWALT | Deutsche Bank/CSC/Edward Jones | CHL |
| Alternative Loan Trust 2005-35CB | $726,658,739 | CWALT | CSC/UBS | CHL |
| Alternative Loan Trust 2005-36 | $769,213,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-37T1 | $344,113,666 | CWALT | Morgan Stanley/CSC | CHL |
| Alternative Loan Trust 2005-38 | $1,817,402,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2005-40CB | $363,951,745 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-41 | $773,858,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-42CB | $415,379,470 | CWALT | Citigroup/CSC | CHL |

- 10 -
COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Alternative Loan Trust 2005-43 | $448,198,100 | CWALT | UBS | CHL |
| Alternative Loan Trust 2005-44 | $776,592,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-45 | $1,448,824,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-46CB | $1,146,008,499 | CWALT | Bear Stearns/JP Morgan | CHL |
| Alternative Loan Trust 2005-47CB | $414,809,863 | CWALT | Morgan Stanley/CSC | CHL |
| Alternative Loan Trust 2005-48T1 | $394,599,999 | CWALT | Deutsche Bank/Lehman | CHL |
| Alternative Loan Trust 2005-49CB | $520,739,090 | CWALT | RBS | CHL |
| Alternative Loan Trust 2005-50CB | $441,768,810 | CWALT | CSC/Morgan Stanley | CHL |
| Alternative Loan Trust 2005-51 | $1,771,320,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-52CB | $519,749,910 | CWALT | Deutsche Bank/CSC/Edward Jones | CHL |
| Alternative Loan Trust 2005-53T2 | $331,897,280 | CWALT | Bear Stearns | CHL |
| Alternative Loan Trust 2005-54CB | $959,309,669 | CWALT | Credit Suisse/CSC | CHL |
| Alternative Loan Trust 2005-55CB | $621,825,498 | CWALT | Bear Stearns/JP Morgan | CHL |
| Alternative Loan Trust 2005-56 | $2,494,019,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2005-57CB | $818,209,269 | CWALT | CSC/JP Morgan | CHL |
| Alternative Loan Trust 2005-58 | $774,000,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-59 | $2,178,000,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-60T1 | $420,247,503 | CWALT | Deutsche Bank | CHL |

- 11 -
COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Alternative Loan Trust 2005-61 | $765,519,100 | CWALT | UBS | CHL |
| Alternative Loan Trust 2005-62 | $1,559,819,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2005-63 | $719,536,100 | CWALT | UBS | CHL |
| Alternative Loan Trust 2005-64CB | $839,649,564 | CWALT | Bear Stearns/CSC | CHL |
| Alternative Loan Trust 2005-65CB | $978,645,126 | CWALT | Deutsche Bank/JP Morgan | CHL |
| Alternative Loan Trust 2005-67CB | $209,232,483 | CWALT | CSC/Lehman | CHL |
| Alternative Loan Trust 2005-70CB | $492,524,020 | CWALT | Citigroup/RBS | CHL |
| Alternative Loan Trust 2005-71 | $170,139,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2005-72 | $737,628,100 | CWALT | UBS | CHL |
| Alternative Loan Trust 2005-73CB | $359,722,468 | CWALT | Bear Stearns/RBS | CHL |
| Alternative Loan Trust 2005-74T1 | $365,544,950 | CWALT | UBS/Morgan Stanley | CHL |
| Alternative Loan Trust 2005-75CB | $414,233,182 | CWALT | CSC/Morgan Stanley | CHL |
| Alternative Loan Trust 2005-76 | $1,776,305,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2005-77T1 | $1,050,079,829 | CWALT | Bear Stearns/Lehman | CHL |
| Alternative Loan Trust 2005-79CB | $321,387,756 | CWALT | Citigroup/Morgan Stanley | CHL |
| Alternative Loan Trust 2005-80CB | $1,256,585,157 | CWALT | RBS/CSC | CHL |

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

Pg. 28 - Exhibit 1

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Alternative Loan Trust 2005-81 | $926,958,100 | CWALT | Goldman Sachs | CHL |
| Alternative Loan Trust 2005-82 | $333,593,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-83CB | $364,032,468 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-84 | $941,530,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2005-86CB | $989,999,224 | CWALT | Morgan Stanley/CSC | CHL |
| Alternative Loan Trust 2005-AR1 | $768,170,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-IM1 | $374,969,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-J10 | $507,732,857 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-J11 | $596,668,088 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-J12 | $604,102,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-J13 | $248,054,797 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-J14 | $504,455,633 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-J7 | $232,508,165 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-J8 | $194,930,382 | CWALT | CSC | CHL |
| Alternative Loan Trust 2005-J9 | $262,193,019 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-11CB | $763,457,959 | CWALT | RBS/CSC | CHL |
| Alternative Loan Trust 2006-12CB | $624,731,141 | CWALT | UBS/JP Morgan | CHL |
| Alternative Loan Trust 2006-13T1 | $493,728,887 | CWALT | BoA/Deutsche Bank | CHL |
| Alternative Loan Trust 2006-14CB | $519,223,126 | CWALT | Deutsche Bank/JPMorgan | CHL |

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Alternative Loan Trust 2006-15CB | $366,789,456 | CWALT | RBS/Lehman | CHL |
| Alternative Loan Trust 2006-16CB | $311,691,556 | CWALT | Bear Stearns/CSC | CHL |
| Alternative Loan Trust 2006-17T1 | $474,959,606 | CWALT | Credit Suisse/BoA | CHL |
| Alternative Loan Trust 2006-18CB | $1,040,024,215 | CWALT | Deutsche Bank/CSC | CHL |
| Alternative Loan Trust 2006-19CB | $1,558,637,921 | CWALT | Deutsche Bank/CSC | CHL |
| Alternative Loan Trust 2006-20CB | $551,732,773 | CWALT | Morgan Stanley/CSC | CHL |
| Alternative Loan Trust 2006-21CB | $520,536,856 | CWALT | Citigroup/BoA | CHL |
| Alternative Loan Trust 2006-23CB | $987,020,570 | CWALT | UBS/CSC | CHL |
| Alternative Loan Trust 2006-24CB | $880,451,378 | CWALT | Bear Stearns/Morgan Stanley | CHL |
| Alternative Loan Trust 2006-25CB | $518,814,998 | CWALT | Deutsche Bank/CSC | CHL |
| Alternative Loan Trust 2006-26CB | $395,599,061 | CWALT | BoA | CHL |
| Alternative Loan Trust 2006-27CB | $310,200,987 | CWALT | Morgan Stanley/CSC | CHL |
| Alternative Loan Trust 2006-28CB | $518,233,936 | CWALT | Citigroup/Morgan Stanley | CHL |
| Alternative Loan Trust 2006-29T1 | $785,759,998 | CWALT | Barclays/BoA | CHL |
| Alternative Loan Trust 2006-2CB | $876,481,015 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-30T1 | $469,299,928 | CWALT | RBS/CSC | CHL |
| Alternative Loan Trust 2006-31CB | $865,696,096 | CWALT | Deutsche Bank/Merrill Lynch | CHL |
| Alternative Loan Trust 2006-32CB | $619,686,154 | CWALT | Morgan Stanley | CHL |
| Alternative Loan Trust 2006-33CB | $619,062,482 | CWALT | Citigroup/CSC | CHL |

- 14 -
COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Alternative Loan Trust 2006-34 | $200,553,202 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-35CB | $619,050,252 | CWALT | Citigroup/Morgan Stanley | CHL |
| Alternative Loan Trust 2006-36T2 | $734,911,293 | CWALT | Bear Stearns/CSC | CHL |
| Alternative Loan Trust 2006-37R | $68,315,933 | CWALT | UBS | UBS |
| Alternative Loan Trust 2006-39CB | $808,983,132 | CWALT | Deutsche Bank/BoA | CHL |
| Alternative Loan Trust 2006-40T1 | $592,478,599 | CWALT | HSBC/CSC | CHL |
| Alternative Loan Trust 2006-41CB | $1,135,112,855 | CWALT | Credit Suisse/CSC | CHL |
| Alternative Loan Trust 2006-42 | $246,986,001 | CWALT | Barclays/CSC | CHL |
| Alternative Loan Trust 2006-43CB | $874,833,833 | CWALT | UBS/CSC/Deutsche Bank | CHL |
| Alternative Loan Trust 2006-45T1 | $1,113,036,850 | CWALT | Morgan Stanley/BoA | CHL |
| Alternative Loan Trust 2006-46 | $296,399,437 | CWALT | Barclays/Lehman | CHL |
| Alternative Loan Trust 2006-4CB | $683,680,636 | CWALT | UBS/RBS | CHL |
| Alternative Loan Trust 2006-5T2 | $370,765,076 | CWALT | CSC/BoA | CHL |
| Alternative Loan Trust 2006-69 | $500,429,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2006-6CB | $2,164,334,096 | CWALT | CSC/Deutsche Bank | CHL |
| Alternative Loan Trust 2006-7CB | $548,064,958 | CWALT | Credit Suisse/JP Morgan | CHL |
| Alternative Loan Trust 2006-8T1 | $355,528,517 | CWMBS | CSC/BoA | CHL |
| Alternative Loan Trust 2006-9T1 | $522,122,602 | CWALT | Bear Stearns/Credit Suisse | CHL |

- 15 -
COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Alternative Loan Trust 2006-HY10 | $529,427,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2006-HY11 | $445,727,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2006-HY12 | $791,111,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2006-HY13 | $883,972,100 | CWALT | UBS | CHL |
| Alternative Loan Trust 2006-HY3 | $249,703,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2006-J1 | $781,555,047 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-J2 | $245,087,019 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-J3 | $253,461,322 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-J4 | $428,134,055 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-J5 | $421,364,240 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-J6 | $185,251,552 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-J7 | $347,393,561 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-J8 | $462,029,521 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OA1 | $1,038,779,100 | CWMBS | CSC | CHL |
| Alternative Loan Trust 2006-OA10 | $2,768,599,100 | CWALT | UBS | CHL |
| Alternative Loan Trust 2006-OA11 | $1,237,208,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OA12 | $984,619,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OA14 | $949,619,100 | CWALT | BoA | CHL |
| Alternative Loan Trust 2006-OA16 | $1,336,380,100 | CWALT | CSC | CHL |

- 16 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Alternative Loan Trust 2006-OA17 | $1,560,610,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OA18 | $498,492,256 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OA19 | $1,199,267,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OA2 | $1,697,910,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OA21 | $1,292,642,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OA22 | $380,943,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OA3 | $753,195,100 | CWALT | UBS | CHL |
| Alternative Loan Trust 2006-OA6 | $1,034,375,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OA7 | $1,177,528,100 | CWALT | UBS | CHL |
| Alternative Loan Trust 2006-OA8 | $606,092,100 | CWALT | UBS | CHL |
| Alternative Loan Trust 2006-OA9 | $928,908,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OC1 | $1,196,264,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OC10 | $805,404,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OC11 | $1,089,000,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OC2 | $833,712,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OC3 | $671,248,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OC4 | $569,225,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OC5 | $789,079,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OC6 | $625,543,100 | CWALT | CSC | CHL |

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Alternative Loan Trust 2006-OC7 | $582,249,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OC8 | $1,693,916,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2006-OC9 | $546,528,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-10CB | $742,499,999 | CWALT | JP Morgan | CHL |
| Alternative Loan Trust 2007-11T1 | $587,626,182 | CWALT | HSBC/UBS | CHL |
| Alternative Loan Trust 2007-12T1 | $855,728,140 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-13 | $207,556,676 | CWALT | Deutsche Bank/CSC | CHL |
| Alternative Loan Trust 2007-14T2 | $409,317,845 | CWALT | Credit Suisse/CSC | CHL |
| Alternative Loan Trust 2007-15CB | $669,615,650 | CWALT | Credit Suisse/CSC | CHL |
| Alternative Loan Trust 2007-16CB | $1,615,596,399 | CWALT | Deutsche Bank/BoA | CHL |
| Alternative Loan Trust 2007-17CB | $745,477,658 | CWALT | Morgan Stanley/Credit Suisse | CHL |
| Alternative Loan Trust 2007-18CB | $719,917,790 | CWALT | Credit Suisse/CSC | CHL |
| Alternative Loan Trust 2007-19 | $1,166,488,020 | CWALT | Credit Suisse/Deutsche Bank | CHL |
| Alternative Loan Trust 2007-1T1 | $493,712,524 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-20 | $296,399,844 | CWALT | RBS/UBS | CHL |
| Alternative Loan Trust 2007-21CB | $769,186,604 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2007-22 | $791,348,018 | CWALT | UBS | CHL |
| Alternative Loan Trust 2007-23CB | $1,030,214,330 | CWALT | Bear Stearns | CHL |
| Alternative Loan Trust 2007-24 | $537,168,947 | CWALT | UBS | CHL |

- 18 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Alternative Loan Trust 2007-25 | $660,495,859 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-2CB | $1,018,739,168 | CWALT | Deutsche Bank/CSC | CHL |
| Alternative Loan Trust 2007-3T1 | $792,149,705 | CWALT | UBS/CSC/Morgan Stanley | CHL |
| Alternative Loan Trust 2007-4CB | $579,145,196 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-5CB | $1,559,847,536 | CWALT | Citigroup/CSC | CHL |
| Alternative Loan Trust 2007-6 | $366,513,427 | CWALT | Citigroup/CSC | CHL |
| Alternative Loan Trust 2007-7T2 | $365,759,889 | CWALT | HSBC/Lehman | CHL |
| Alternative Loan Trust 2007-8CB | $744,971,687 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2007-9T1 | $837,346,400 | CWALT | CSC/Deutsche Bank/BoA | CHL |
| Alternative Loan Trust 2007-AL1 | $228,622,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-HY2 | $508,705,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-HY3 | $989,260,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2007-HY4 | $1,432,682,100 | CWALT | Bear Stearns | CHL |
| Alternative Loan Trust 2007-HY5R | $553,116,614 | CWALT | Deutsche Bank | Deutsche Bank |
| Alternative Loan Trust 2007-HY6 | $869,708,100 | CWALT | BoA | CHL |
| Alternative Loan Trust 2007-HY7C | $1,022,825,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2007-HY8C | $453,460,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2007-HY9 | $34,861,100 | CWALT | Deutsche Bank | CHL |
| Alternative Loan Trust 2007-J1 | $583,156,580 | CWALT | CSC | CHL |

- 19 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Alternative Loan Trust 2007-J2 | $267,858,014 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-OA10 | $549,502,100 | CWALT | BoA | CHL |
| Alternative Loan Trust 2007-OA11 | $495,597,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-OA2 | $666,176,100 | CWALT | UBS | CHL |
| Alternative Loan Trust 2007-OA3 | $1,137,053,100 | CWALT | BoA | CHL |
| Alternative Loan Trust 2007-OA4 | $717,258,300 | CWALT | Goldman Sachs | CHL |
| Alternative Loan Trust 2007-OA6 | $561,485,100 | CWALT | Credit Suisse | CHL |
| Alternative Loan Trust 2007-OA7 | $771,733,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-OA8 | $666,706,100 | CWALT | BoA | CHL |
| Alternative Loan Trust 2007-OA9 | $391,151,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-OH1 | $495,113,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-OH2 | $984,602,100 | CWALT | CSC | CHL |
| Alternative Loan Trust 2007-OH3 | $579,826,100 | CWALT | CSC | CHL |
| Alternative Loan Trust Resecuritization 2006-22R | $416,626,008 | CWALT | RBS | RBS |
| Alternative Loan Trust Resecuritization 2007-26R | $41,798,027 | CWALT | Deutsche Bank | Deutsche Bank |
| Alternative Loan Trust-2005-85CB | $1,257,944,756 | CWALT | Deutsche Bank/Lehman/JP Morgan | CHL |
| CHL Mortgage Pass-Through Trust 2005-15 | $412,924,044 | CWMBS | Morgan Stanley/CSC/Edward Jones | CHL |

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CHL Mortgage Pass-Through Trust 2005-16 | $412,924,740 | CWMBS | Goldman Sachs/Lehman | CHL |
| CHL Mortgage Pass-Through Trust 2005-17 | $629,201,708 | CWMBS | UBS/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-18 | $413,919,844 | CWMBS | Goldman Sachs/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-19 | $398,521,241 | CWMBS | Bear Stearns | CHL |
| CHL Mortgage Pass-Through Trust 2005-20 | $413,919,460 | CWMBS | UBS/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-21 | $983,059,554 | CWMBS | RBS/UBS | CHL |
| CHL Mortgage Pass-Through Trust 2005-22 | $588,995,100 | CWMBS | UBS | CHL |
| CHL Mortgage Pass-Through Trust 2005-23 | $313,630,166 | CWMBS | Citigroup/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-24 | $1,036,789,285 | CWMBS | Goldman Sachs/CSC/Edward Jones | CHL |
| CHL Mortgage Pass-Through Trust 2005-25 | $363,174,579 | CWMBS | UBS/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-26 | $497,507,486 | CWMBS | Bear Stearns | CHL |
| CHL Mortgage Pass-Through Trust 2005-27 | $518,394,257 | CWMBS | Credit Suisse/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-28 | $414,914,141 | CWMBS | UBS/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-29 | $295,924,912 | CWMBS | CSC/BoA | CHL |

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CHL Mortgage Pass-Through Trust 2005-30 | $514,555,415 | CWMBS | UBS/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-31 | $620,690,100 | CWMBS | Goldman Sachs | CHL |
| CHL Mortgage Pass-Through Trust 2005-HYB10 | $1,010,798,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-HYB4 | $791,873,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-HYB5 | $791,278,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-HYB6 | $991,562,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-HYB7 | $1,017,720,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-HYB8 | $593,432,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-J2 | $806,148,679 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-J3 | $381,311,999 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2005-J4 | $200,059,714 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-1 | $373,367,486 | CWMBS | Lehman/RBS | CHL |
| CHL Mortgage Pass-Through Trust 2006-10 | $600,481,743 | CWMBS | Bear Stearns/BoA | CHL |
| CHL Mortgage Pass-Through Trust 2006-11 | $626,849,839 | CWMBS | Credit Suisse/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-12 | $652,719,878 | CWMBS | CSC | CHL |

- 22 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CHL Mortgage Pass-Through Trust 2006-13 | $519,389,436 | CWMBS | Credit Suisse/Morgan Stanley | CHL |
| CHL Mortgage Pass-Through Trust 2006-14 | $366,159,454 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-15 | $397,004,000 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-16 | $994,995,037 | CWMBS | Goldman Sachs/BoA | CHL |
| CHL Mortgage Pass-Through Trust 2006-17 | $518,379,893 | CWMBS | HSBC/Lehman | CHL |
| CHL Mortgage Pass-Through Trust 2006-18 | $517,384,203 | CWMBS | Credit Suisse/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-19 | $1,241,757,925 | CWMBS | Credit Suisse/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-20 | $1,035,793,979 | CWMBS | Credit Suisse | CHL |
| CHL Mortgage Pass-Through Trust 2006-21 | $1,016,881,735 | CWMBS | Bear Stearns/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-3 | $1,052,797,100 | CWMBS | UBS | CHL |
| CHL Mortgage Pass-Through Trust 2006-6 | $481,822,327 | CWMBS | RBS/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-8 | $778,089,936 | CWMBS | Credit Suisse/BoA | CHL |
| CHL Mortgage Pass-Through Trust 2006-9 | $415,909,999 | CWMBS | Barclays/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-HYB1 | $1,154,098,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-HYB2 | $653,891,100 | CWMBS | CSC | CHL |

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CHL Mortgage Pass-Through Trust 2006-HYB3 | $966,897,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-HYB4 | $443,360,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-HYB5 | $526,000,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-J1 | $406,869,042 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-J2 | $174,124,645 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-J3 | $216,167,679 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-J4 | $371,980,842 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2006-OA4 | $774,076,100 | CWMBS | Deutsche Bank | CHL |
| CHL Mortgage Pass-Through Trust 2006-OA5 | $1,364,317,100 | CWMBS | UBS | CHL |
| CHL Mortgage Pass-Through Trust 2006-TM1 | $902,091,850 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-1 | $746,249,967 | CWMBS | Goldman Sachs/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-10 | $646,730,067 | CWMBS | UBS/Lehman | CHL |
| CHL Mortgage Pass-Through Trust 2007-11 | $994,999,544 | CWMBS | BNP/CSC/Lehman | CHL |
| CHL Mortgage Pass-Through Trust 2007-12 | $414,914,963 | CWMBS | UBS/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-13 | $572,087,807 | CWMBS | Bear Stearns/CSC | CHL |

- 24 -

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CHL Mortgage Pass-Through Trust 2007-14 | $746,249,918 | CWMBS | BoA/Lehman | CHL |
| CHL Mortgage Pass-Through Trust 2007-15 | $1,031,170,625 | CWMBS | RBS/CSC/Lehman | CHL |
| CHL Mortgage Pass-Through Trust 2007-16 | $770,783,999 | CWMBS | HSBC | CHL |
| CHL Mortgage Pass-Through Trust 2007-17 | $872,433,848 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-18 | $410,362,919 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-19 | $441,172,477 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-2 | $362,933,532 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-20 | $297,592,472 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-21 | $778,228,036 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-3 | $1,141,241,764 | CWMBS | BNP/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-4 | $1,058,011,000 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-5 | $845,749,614 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-6 | $746,250,000 | CWMBS | JP Morgan/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-7 | $746,236,970 | CWMBS | RBS/CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-8 | $855,000,000 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-9 | $696,499,987 | CWMBS | Goldman Sachs/UBS | CHL |

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CHL Mortgage Pass-Through Trust 2007-HY1 | $394,190,100 | CWMBS | UBS | CHL |
| CHL Mortgage Pass-Through Trust 2007-HY3 | $579,898,100 | CWMBS | UBS | CHL |
| CHL Mortgage Pass-Through Trust 2007-HY4 | $613,573,100 | CWMBS | UBS | CHL |
| CHL Mortgage Pass-Through Trust 2007-HY5 | $360,740,100 | CWMBS | Deutsche Bank | CHL |
| CHL Mortgage Pass-Through Trust 2007-HY6 | $1,201,511,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-HY7 | $551,019,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-HYB1 | $623,894,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-HYB2 | $620,703,100 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-J1 | $309,676,683 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-J2 | $411,278,672 | CWMBS | CSC | CHL |
| CHL Mortgage Pass-Through Trust 2007-J3 | $223,874,843 | CWMBS | CSC | CHL |
| CWABS Asset-Backed Certificate Trust 2006-ABC1 | $396,600,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2005-10 | $695,001,100 | CWABS | CSC/Deutsche Bank/JP Morgan | CHL |
| CWABS Asset-Backed Certificates Trust 2005-11 | $1,929,704,100 | CWABS | CSC/Morgan Stanley/RBS | CHL |

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CWABS Asset-Backed Certificates Trust 2005-12 | $876,150,100 | CWABS | CSC/Deutsche Bank/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2005-13 | $1,950,700,100 | CWABS | CSC/BoA/Barclays | CHL |
| CWABS Asset-Backed Certificates Trust 2005-14 | $2,032,800,100 | CWABS | CSC/Bear Stearns/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2005-15 | $362,200,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2005-16 | $2,209,500,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2005-17 | $2,520,700,100 | CWABS | CSC/BNP/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2005-4 | $2,826,900,100 | CWABS | CSC/Bear Stearns/Merrill Lynch | CHL |
| CWABS Asset-Backed Certificates Trust 2005-5 | $788,400,100 | CWABS | CSC/BoA/Bear Stearns | CHL |
| CWABS Asset-Backed Certificates Trust 2005-6 | $1,694,050,100 | CWABS | CSC/Bear Stearns/JP Morgan | CHL |
| CWABS Asset-Backed Certificates Trust 2005-7 | $2,138,899,100 | CWABS | CSC/Bear Stearns/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2005-8 | $621,372,100 | CWABS | CSC/Lehman | CHL |
| CWABS Asset-Backed Certificates Trust 2005-9 | $1,281,150,100 | CWABS | CSC/RBS/Merrill Lynch | CHL |
| CWABS Asset-Backed Certificates Trust 2005-AB2 | $1,000,000,100 | CWABS | CSC/Bear Stearns/Credit Suisse | CHL |
| CWABS Asset-Backed Certificates Trust 2005-AB3 | $631,475,100 | CWABS | CSC/Barclays/BoA | CHL |

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CWABS Asset-Backed Certificates Trust 2005-AB4 | $1,592,000,100 | CWABS | CSC/Deutsche Bank/JP Morgan | CHL |
| CWABS Asset-Backed Certificates Trust 2005-AB5 | $695,800,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2005-BC3 | $800,000,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2005-BC4 | $755,338,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2005-BC5 | $921,500,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2005-HYB9 | $1,088,954,000 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2005-IM1 | $897,285,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2005-IM2 | $715,077,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2005-IM3 | $1,094,500,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-1 | $756,643,100 | CWABS | CSC/Lehman | CHL |
| CWABS Asset-Backed Certificates Trust 2006-10 | $585,515,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-11 | $1,846,600,100 | CWABS | CSC/Barclays/UBS | CHL |
| CWABS Asset-Backed Certificates Trust 2006-12 | $1,272,700,100 | CWABS | CSC/BNP/Lehman | CHL |
| CWABS Asset-Backed Certificates Trust 2006-13 | $1,602,525,100 | CWABS | CSC/Bear Stearns/Lehman | CHL |

- 28 -

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CWABS Asset-Backed Certificates Trust 2006-14 | $1,453,500,100 | CWABS | CSC/Deutsche Bank/HSBC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-15 | $937,000,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-16 | $486,500,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-17 | $972,000,100 | CWABS | CSC/Deutsche Bank/Lehman | CHL |
| CWABS Asset-Backed Certificates Trust 2006-18 | $1,653,250,100 | CWABS | CSC/Bear Stearns/Deutsche Bank | CHL |
| CWABS Asset-Backed Certificates Trust 2006-19 | $869,850,100 | CWABS | CSC/Bear Stearns | CHL |
| CWABS Asset-Backed Certificates Trust 2006-2 | $801,975,100 | CWABS | CSC/BoA/JP Morgan | CHL |
| CWABS Asset-Backed Certificates Trust 2006-20 | $976,000,100 | CWABS | CSC/Bear Stearns/HSBC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-21 | $1,069,750,100 | CWABS | CSC/JP Morgan/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2006-22 | $1,556,000,100 | CWABS | CSC/Barclays/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2006-23 | $1,553,600,100 | CWABS | CSC/JP Morgan/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2006-24 | $1,305,024,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2006-25 | $1,507,375,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2006-26 | $1,167,600,100 | CWABS | CSC/RBS | CHL |

- 29 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CWABS Asset-Backed Certificates Trust 2006-3 | $1,361,500,100 | CWABS | CSC/Barclays/Deutsche Bank | CHL |
| CWABS Asset-Backed Certificates Trust 2006-4 | $606,775,100 | CWABS | CSC/JP Morgan/Lehman | CHL |
| CWABS Asset-Backed Certificates Trust 2006-5 | $672,135,100 | CWABS | CSC/Bear Stearns/Lehman | CHL |
| CWABS Asset-Backed Certificates Trust 2006-6 | $1,762,200,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-7 | $1,017,378,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-8 | $1,946,000,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-9 | $563,832,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-BC1 | $506,885,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-BC2 | $629,525,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-BC3 | $579,300,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-BC4 | $579,000,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-BC5 | $729,003,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-IM1 | $697,200,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2006-SPS1 | $230,875,100 | CWABS | Credit Suisse/Deutche Bank | CHL |

- 30 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CWABS Asset-Backed Certificates Trust 2006-SPS2 | $456,500,100 | CWABS | CSC/Credit Suisse/Merrill Lynch | CHL |
| CWABS Asset-Backed Certificates Trust 2007-1 | $1,942,000,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2007-10 | $973,500,100 | CWABS | CSC/Barclays/Deutsche Bank | CHL |
| CWABS Asset-Backed Certificates Trust 2007-11 | $780,400,100 | CWABS | CSC/HSBC/Merrill Lynch | CHL |
| CWABS Asset-Backed Certificates Trust 2007-12 | $2,800,000 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2007-13 | $735,600,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2007-2 | $1,513,980,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2007-3 | $735,711,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2007-4 | $959,500,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2007-5 | $1,150,000,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2007-6 | $966,000,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2007-7 | $1,070,850,100 | CWABS | CSC/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2007-8 | $1,264,900,100 | CWABS | CSC/Lehman/RBS | CHL |
| CWABS Asset-Backed Certificates Trust 2007-9 | $1,171,200,100 | CWABS | CSC/Lehman/RBS | CHL |

- 31 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CWABS Asset-Backed Certificates Trust 2007-BC1 | $467,750,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2007-BC2 | $615,875,100 | CWABS | CSC | CHL |
| CWABS Asset-Backed Certificates Trust 2007-BC3 | $551,418,100 | CWABS | CSC | CHL |
| CWHEQ Home Equity Loan Trust, Series 2006-S1 | $860,000,100 | CWHEQ | CSC/Bear Stearns/ Lehman | CHL |
| CWHEQ Home Equity Loan Trust, Series 2006-S10 | $1,597,600,100 | CWHEQ | CSC/RBS | CHL |
| CWHEQ Home Equity Loan Trust, Series 2006-S2 | $1,050,000,100 | CWHEQ | CSC/BNP/JP Morgan | CHL |
| CWHEQ Home Equity Loan Trust, Series 2006-S3 | $1,000,000,100 | CWHEQ | CSC/Goldman Sachs/HSBC | CHL |
| CWHEQ Home Equity Loan Trust, Series 2006-S4 | $1,000,000,100 | CWHEQ | CSC/Bear Stearns/Credit Suisse | CHL |
| CWHEQ Home Equity Loan Trust, Series 2006-S5 | $900,000,100 | CWHEQ | CSC/Bear Stearns/BNP | CHL |
| CWHEQ Home Equity Loan Trust, Series 2006-S6 | $1,100,000,100 | CWHEQ | CSC/Bear Stearns | CHL |
| CWHEQ Home Equity Loan Trust, Series 2006-S7 | $994,500,100 | CWHEQ | CSC/Merrill Lynch/RBS | CHL |
| CWHEQ Home Equity Loan Trust, Series 2006-S8 | $1,000,000,100 | CWHEQ | CSC/RBS | CHL |
| CWHEQ Home Equity Loan Trust, Series 2006-S9 | $1,000,000,100 | CWHEQ | CSC/RBS | CHL |
| CWHEQ Home Equity Loan Trust, Series 2007-S1 | $1,600,000,100 | CWHEQ | CSC/RBS | CHL |

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CWHEQ Home Equity Loan Trust, Series 2007-S2 | $999,000,100 | CWHEQ | CSC/RBS | CHL |
| CWHEQ Home Equity Loan Trust, Series 2007-S3 | $700,000,100 | CWHEQ | CSC/RBS | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2005-C | $1,015,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2005-D | $2,000,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2005-E | $2,000,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2005-F | $2,706,750,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2005-G | $1,771,875,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2005-H | $1,771,875,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2005-I | $2,000,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2005-J | $1,500,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2005-K | $1,000,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2005-L | $400,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2005-M | $2,000,000,000 | CWHEQ | CSC/Lehman/HSBC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2006-A | $800,000,000 | CWHEQ | CSC | CHL |

- 33 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| CWHEQ Revolving Home Equity Loan Trust, Series 2006-B | $1,150,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2006-C | $1,850,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2006-D | $1,850,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2006-E | $1,500,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2006-F | $1,620,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2006-G | $1,000,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2006-H | $1,000,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2006-I | $2,100,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2007-A | $1,200,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2007-B | $950,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2007-C | $950,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2007-D | $900,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2007-E | $900,000,000 | CWHEQ | CSC | CHL |
| CWHEQ Revolving Home Equity Loan Trust, Series 2007-G | $566,952,000 | CWHEQ | CSC | CHL |

- 34 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

| Issuing Trust | Principal Amount | Depositor | Underwriter(s) | Sponsor |
|---|---|---|---|---|
| Total: | $332,190,973,655 | | | |

38.     Each of the Issuing Trusts, CWALT, CWMBS, CWABS, and CWHEQ is an
"issuer" as defined under the Securities Act and are collectively referred to herein as the "Issuing
Defendants."

39.     Defendants CSC, JP Morgan, Deutsche Bank, Bear Stearns, BoA, UBS, Morgan
Stanley, Edward Jones, Citigroup, Goldman Sachs, Credit Suisse, RBS, Lehman, Barclays, HSBC,
BNP, and Merrill Lynch are referred to herein as the "Underwriter Defendants."

40.     The Issuing Defendants and Underwriting Defendants are collectively referred to
herein as the "Issuing and Underwriting Defendants."

41.     Defendant Stanford L. Kurland ("Kurland") was, at relevant times, CWALT's,
CWMBS', CWABS', and CWHEQ's Chief Executive Officer ("CEO"), President and Chairman of
the Board of Directors.  Defendant Kurland signed CWALT's June 17, 2005, July 25, 2005,
February 7, 2006, and March 6, 2006 Registration Statements; CWMBS' June 20, 2005, July 25,
2005, February 8, 2006, and March 6, 2006 Registration Statements; CWABS' February 6, 2006,
February 21, 2006, July 18, 2006, and August 8, 2006 Registration Statements; and CWHEQ's
July 21, 2005, August 14, 2005, March 13, 2006, and April 12, 2006 Registration Statements.

42.     Defendant David A. Spector ("Spector") was, at relevant times, CWALT's,
CWMBS', CWABS', and CWHEQ's Vice President and a member of the Board of Directors.
Defendant Spector signed CWALT's June 17, 2005, July 25, 2005, February 7, 2006, and March 6,
2006 Registration Statements; CWMBS' June 20, 2005, July 25, 2005, February 8, 2006, and
March 6, 2006 Registration Statements; CWABS' February 6, 2006, February 21, 2006, July 18,
2006, and August 8, 2006 Registration Statements; and CWHEQ's July 21, 2005, August 14, 2005,
March 13, 2006, and April 12, 2006 Registration Statements.

43.     Defendant Eric P. Sieracki ("Sieracki") was, at relevant times, CWALT's,
CWMBS', CWABS', and CWHEQ's Executive Vice President, Chief Financial Officer ("CFO"),
Treasurer and member of the Board of Directors.  Defendant Sieracki signed CWALT's June 17,

1    2005, July 25, 2005, February 7, 2006, March 6, 2006, February 28, 2007, and April 24, 2007

2    Registration Statements; CWMBS' June 20, 2005, July 25, 2005, February 8, 2006, March 6, 2006,

3    February 28, 2007, and April 24, 2007 Registration Statements; CWABS' February 6, 2006,

4    February 21, 2006, July 18, 2006, August 8, 2006, February 28, 2007, and April 24, 2007

5    Registration Statements; and CWHEQ's July 21, 2005, August 14, 2005, March 13, 2006, April

6    12, 2006, January 10, 2007, March 2, 2007, April 17, 2007, and May 22, 2007 Registration

7    Statements.

8        44.    Defendant N. Joshua Adler ("Adler") was, at relevant times, CWALT's, CWMBS',

9    CWABS' and CWHEQ's President, CEO and a member of the Board of Directors. Defendant

10    Adler signed CWALT's February 28, 2007 and April 24, 2007 Registration Statements; CWMBS'

11    February 28, 2007 and April 24, 2007 Registration Statements; CWABS' February 28, 2007 and

12    April 24, 2007 Registration Statements; and CWHEQ's January 10, 2007, March 2, 2007, April 17,

13    2007 and May 22, 2007 Registration Statements.

14        45.    Defendant Ranjit Kripalani ("Kripalani") was, at relevant times, a member of

15    CWALT's, CWMBS', CWABS', and CWHEQ's Board of Directors. Defendant Kripalani signed

16    CWALT's February 28, 2007 and April 24, 2007 Registration Statements; CWMBS' February 28,

17    2007 and April 24, 2007 Registration Statements; CWABS' February 28, 2007 and April 24, 2007

18    Registration Statements; and CWHEQ's May 22, 2007 Registration Statement.

19        46.    Defendant Jennifer S. Sandefur ("Sandefur") was, at relevant times, a member of

20    CWALT's, CWMBS', CWABS', and CWHEQ's Board of Directors. Defendant Sandefur signed

21    CWALT's February 28, 2007 and April 24, 2007 Registration Statements; CWMBS' February 28,

22    2007 and April 24, 2007 Registration Statements; CWABS' February 28, 2007 and April 24, 2007

23    Registration Statements; and CWHEQ's May 22, 2007 Registration Statement.

24        47.    Defendant David Sambol ("Sambol") was, at relevant times, CWHEQ's CEO,

25    President, and Chairman of the Board of Directors. Defendant Sambol signed CWHEQ's January

26    10, 2007, March 2, 2007 and April 17, 2007 Registration Statements.

27        48.    Defendants Kurland, Spector, Sieracki, Adler, Kripalani, Sandefur, and Sambol are

28    collectively referred to hereinafter as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

49.     Securitization is a structured finance process in which assets are acquired, classified into pools, and offered as collateral for third-party investment.  It involves the selling of financial instruments which are backed by the cash flow or value of underlying illiquid assets. Securitization is common in the lending industry, where it is applied to lenders' claims on mortgages and other debts.  Securitization thus converts illiquid assets into liquid assets by pooling, underwriting and selling them in the form of asset-backed securities ("ABS").  There is nothing inherently wrong with securitization when done properly and disclosed accordingly.

50.     Although nearly any type of income-producing asset can be used in an ABS, mortgages were some of the most prevalent types of assets used in securitization.  The securitization of mortgages was accomplished through the creation of mortgage-backed securities ("MBS"), as illustrated below:



MBSs that contained residential mortgages are also referred to as residential mortgage-backed securities ("RMBS").

51.     A MBS pools together the cash-flow received when mortgage borrowers make interest and principal payments as required by the underlying mortgages.  That cash is then distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds.  Since the senior tranche is *first* to receive payments, it is also the *last* tranche to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage.  As a result, the senior tranches of most MBSs were rated AAA by the Rating Agencies.  After the senior tranche, the middle tranches (referred to as mezzanine tranches)

are next to receive their share of the proceeds.  In accordance to their order of priority, the mezzanine tranches were generally rated from AA to BB by the Rating Agencies.  The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.  This process is repeated each month and all investors receive the payments owed to them so long as the mortgage borrowers are current on their mortgages.



52.    As illustrated below, in the typical securitization transaction, participants in the transaction are the Sponsor (who is often the loan Servicer as well), the Depositor, the Underwriter, the Issuing Trust, and investors.  On the closing date of a Trust series, the mortgage loans supporting the Trust are first sold by the Sponsor of the securitization transaction to the Depositor in return for cash.  This has the effect of removing the loans from the Sponsor's financial statements.  The Depositor then sells those mortgage loans and related assets to the Trust, in exchange for the Trust issuing Certificates to the Depositor.  The Depositor then works with the Underwriter of the Trust to price and sell the Certificates to investors.



- 38 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

1       53.   Thereafter, the mortgage loans supporting the Trusts are serviced by the Servicer,

2   who earns monthly servicing fees by collecting principal and interest from mortgagors.  After

3   subtracting a servicing fee, the Servicer sends the remainder of the payments to a trustee for

4   administration and distribution to the Trust, and ultimately, to investors.

5       54.   The Certificates issued to investors are issued pursuant to Prospectuses.  These

6   documents are substantially similar from Trust to Trust, and each employ substantially-identical

7   representations and statements concerning important information for investors.  Investors utilize

8   this information in determining whether to invest in the Trust.  Some of the most important

9   information contained in the Prospectuses concerns the underwriting process for the mortgages, the

10  independence of the appraisals of the underlying properties, borrowers' income and credit history,

11  the loan-to-value ("LTV") ratio, and debt-to-income ratio.  Independent and accurate appraisals are

12  essential to the entire mortgage lending and securitization process.  Appraisals are intended to

13  provide borrowers, lenders, and the investors in MBSs an independent and accurate assessment of

14  the value of the mortgaged property.  This ensures that a mortgage or home equity loan is not

15  under-collateralized, which protects borrowers from financially over-extending themselves and

16  protects lenders and investors from losses when some borrowers default on the loans.

17      55.   In the instant case, investors were assured by the Issuing and Underwriting

18  Defendants that the loans supporting the Trusts were originated pursuant to stringent mortgage-

19  underwriting standards and that independent appraisals were conducted on the underlying

20  properties.  Investors were told that the appraisals were based on, among other things, the market

21  value of comparable homes and the cost of replacing the homes.  This was not the case for many of

22  the mortgage loans supporting the Trusts.

### THE FALSE AND MISLEADING STATEMENTS
### MADE IN THE PROSPECTUSES

25      56.   From June 13, 2005 to December 27, 2007, the Issuing and Underwriting

26  Defendants caused Prospectuses to be filed with the SEC in connection with, and for the purpose

27  of, issuing billions of dollars of Certificates.  Each of the Prospectuses issued by the Issuing and

28  Underwriting Defendants contained extensive disclosures about the standards purportedly used to

- 39 -
COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

1  underwrite the mortgages in the Trusts and stating: *"[a]ll of the mortgage loans in the trust fund

2  will have been originated or acquired by Countrywide Home Loans in accordance with its credit,

3  appraisal and underwriting standards....",* and that "Countrywide Home Loans' underwriting

4  standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective

5  borrower's credit standing and repayment ability and the value and adequacy of the mortgaged

6  property as collateral." Prospectus Supplement for CHL Mortgage Pass-Through Trust 2005-30

7  (Form 424B5), at S-22, 23 (Nov. 22, 2005) (emphasis added).[2] These statements in the

8  Prospectuses were false and misleading because:

9      (a)    a significant proportion of the mortgage loans did not meet the underwriting

10  guidelines disclosed in the Prospectuses;

11      (b)    the Issuing Defendants and their loan originators used a combination of "low

12  documentation" and "no documentation" programs to conceal, distort and inflate borrowers' true

13  income and their ability to repay the mortgages;

14      (c)    the Issuing Defendants and their loan originators paid special bonuses to mortgage

15  brokers who steered borrowers into higher cost loans than the borrowers could have otherwise

16  qualified for;

17      (d)    the value and adequacy of the mortgaged property as collateral was not evaluated in

18  an independent and objective manner because the Issuing Defendants and their loan originators had

19  [2] The Prospectuses uniformly used the same, or substantially similar, language. *Accord, e.g.*,

20  Prospectus Supplement for Alternative Loan Trust 2005-J7 (Form 424B5), at S-31 (June 29, 2005); Prospectus Supplement for Alternative Loan Trust 2005-63 (Form 424B5), at S-78 (Oct. 31, 2005);

21  Prospectus Supplement for Alternative Loan Trust 2006-6CB (Form 424B5), at S-58 (Mar. 29, 2006); Prospectus Supplement for Alternative Loan Trust 2007-12T1 (Form 424B5), at S-36 (Apr.

22  27, 2007); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB3 (Form 424B5), at S-97 (May 1, 2006); Prospectus Supplement for CHL Mortgage Pass-Through Trust

23  2006-11 (Form 424B5), at S-33 (Apr. 24, 2006); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2007-1 (Form 424B5), at S-30 (Jan. 29, 2007); Prospectus Supplement for CWABS

24  Asset-Backed Certificates Trust 2005-10 (Form 424B5), at S-21 (Sept. 15, 2005); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-1 (Form 424B5), at S-29 (Feb. 8,

25  2006); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-1 (Form 424B5), at S-29 (Feb. 8, 2007); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2006-

26  S2 (Form 424B5), at S-24 (Mar. 29, 2006); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2007-S3 (Form 424B5), at S-28 (Mar. 29, 2007); Prospectus Supplement for

27  CWHEQ Revolving Home Equity Loan Trust, Series 2005-I (Form 424B5), at S-31 (Dec. 22, 2005); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2006-B

28  (Form 424B5), at S-42 (Mar. 28, 2006); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2007-A (Form 424B5), at S-38 (Jan. 30, 2007).

1  pressured appraisers to over-value the properties used to collateralize the securities in violation of

2  federal and state regulations; and

3          (e)      the Issuing Defendants and their loan originators had substantially lowered their

4  underwriting standards, and increased the risk of loan default, by aggressively steering borrowers

5  to increasingly riskier loan products.

6          57.     The Prospectuses also contained false and misleading disclosures that "[e]xceptions

7  to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are

8  demonstrated by a prospective borrower."[3]  Contrary to these statements, however, the exceptions

9  swallowed the rule and were not made with any regard to purported "compensating factors."  For

10  example, although not limited to the Issuing Defendants, recent revelations about the conduct of

11  RMBS issuers and underwriters confirms that mortgage underwriting standards – like the

12  underwriting standards discussed in the Prospectuses – were systematically circumvented as a

13  matter of industry practice.  In fact, issuers and underwriters made so many "exceptions" to the

14  stated underwriting criteria for mortgages that industry insiders began referring to them as

15  "exception loans."  The perverse industry-insider practice of exception loans was detailed in a

16  January 12, 2008 *New York Times* article stating, *inter alia*:

17              An investigation into the mortgage crisis by New York State
                prosecutors is now focusing on whether Wall Street banks
18              withheld crucial information about the risks posed by investments
                linked to subprime loans.
19
                Reports commissioned by the banks raised red flags about high-
20              risk loans known as *exceptions*, which *failed to meet even the lax
                credit standards of subprime mortgage companies and the Wall
21              Street firms.  But the banks did not disclose the details of these
                reports to credit-rating agencies or investors.*
22
                The inquiry, which was opened last summer by New York's
23              attorney general, Andrew M. Cuomo, centers on how the banks
                bundled billions of dollars of *exception loans* and other subprime
24              debt into complex mortgage investments, according to people with
                knowledge of the matter.  Charges could be filed in coming weeks.
25
                                        . . . .
26

27

28   [3] *Id.*

                                        - 41 -
                COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

●                              ●

As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans. *In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.*

It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans. *Some industry officials say such loans made up a quarter to a half of the portfolios they saw.* *In some cases, the loans accounted for as much as 80 percent.* While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.

Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

*The banks also did not disclose how many exception loans were backing the securities they sold....*

. . . .

Investment banks that buy mortgages require lenders to maintain standards outlining who is eligible for loans and how much they can borrow based on their overall credit history. But as home prices surged, subprime lenders, which market to people with weak credit, relaxed their guidelines. They began lending to people who did not provide documents verifying their income – so-called no-doc loans – and made exceptions for borrowers who fell short of even those standards.

. . . .

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said lenders and investment banks routinely ignored concerns raised by these consultants.

*"Common sense was sacrificed on the altar of materialism,"* Mr. Meadows said. *"We stopped checking."*

And as mortgage lending boomed, many due diligence firms scaled back their checks at Wall Street's behest. *By 2005 , the firms were evaluating as few as 5 percent of loans in mortgage pools they were buying, down from as much as 30 percent at the start of the decade,* according to Kathleen Tillwitz, a senior vice president at DBRS, a credit-rating firm that has not been subpoenaed. These firms charged Wall Street banks about $350 to evaluate a loan, so *sampling fewer loans cost less.*

- 42 -

Vikas Bajaj and Jenny Anderson, *Inquiry Focuses on Withholding of Data on Loans*, The New York Times, Jan. 12, 2008 (emphasis added).

    A.    **The Appraised Values of The Mortgaged Properties Were Artificially Inflated By the Issuing Defendants**

    58.    The Uniform Standards of Professional Appraisal Practice ("USPAP") require, *inter alia*, that:

- "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests";

- "In appraisal practice, an appraiser must not perform as an advocate for any party or issue";

- "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions"; and

- "It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following: 1. the reporting of a predetermined result (*e.g.*, opinion of value); 2. a direction in assignment results that favors the cause of the client; 3. the amount of a value opinion; 4. the attainment of a stipulated result; or 5. the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose."[4]

    59.    One of the most important goals of the underwriting standards was to establish the value and adequacy of the collateral as determined through purportedly independent appraisals under USPAP. The Prospectuses stated that,

> *Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and <u>require</u> an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. <u>Each</u> appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180*

---

[4] Uniform Standards of Professional Appraisal Practice (*available at* http://commerce.appraisal foundation.org/html/ 2006%20USPAP/ethics_rule.htm).

1  days prior to the date of origination of the mortgage loan. *Every*
2  *independent appraisal is reviewed by a representative of*
   *Countrywide Home Loans before the loan is funded, and an*
3  *additional review appraisal is generally performed in connection*
   *with appraisals not provided by Landsafe Appraisals, Inc., a*
4  *wholly owned subsidiary of Countrywide Home Loans....*

5  Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-1 (Form 424B5), at S-
6  37 (Feb. 8, 2006) (emphasis added).[5] These statements in the Prospectuses were false and
7  misleading because:

8        (a)    underwriting and appraisal standards were routinely violated because the Issuing
9  Defendants and their loan originators pressured appraisers to over-value the properties used to
10  collateralize the securities in violation of federal and state regulations;

11       (b)    the Issuing and Underwriting Defendants knew that appraisers had over-inflated
12 property appraisals at their behest, violating applicable federal and state laws and regulations;

13       (c)    appraisals were not meant to determine the adequacy of the collateral, but rather to
14 ensure the largest dollar-volume of mortgages were quickly completed, enabling the Issuing and
15 Underwriting Defendants to securitize the mortgages, shifting all the risk to investors while
16 generating massive transaction and servicing fees for Defendants;

17       (d)    as a result of the over-appraisal of properties, the risk of mortgage defaults was far
18 greater than disclosed to investors;

---

19 [5] The Prospectuses uniformly used the same, or substantially similar, language. *Accord, e.g.*,
20 Prospectus Supplement for Alternative Loan Trust 2005-J7 (Form 424B5), at S-32 (June 29, 2005);
   Prospectus Supplement for Alternative Loan Trust 2005-63 (Form 424B5), at S-80 (Oct. 31, 2005);
   Prospectus Supplement for Alternative Loan Trust 2006-6CB (Form 424B5), at S-60 (Mar. 29,
21 2006); Prospectus Supplement for Alternative Loan Trust 2007-12T1 (Form 424B5), at S-37 (Apr.
   27, 2007); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB3 (Form
22 424B5), at S-99 (May 1, 2006); Prospectus Supplement for CHL Mortgage Pass-Through Trust
   2005-30 (Form 424B5), at S-23 (Nov. 22, 2005); Prospectus Supplement for CHL Mortgage Pass-
23 Through Trust 2006-11 (Form 424B5), at S-34 (Apr. 24, 2006); Prospectus Supplement for CHL
   Mortgage Pass-Through Trust 2007-1 (Form 424B5), at S-31 (Jan. 29, 2007); Prospectus
24 Supplement for CWABS Asset-Backed Certificates Trust 2005-10 (Form 424B5), at S-29 (Sept.
   15, 2005); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-1 (Form
25 424B5), at S-38 (Feb. 8, 2007); Prospectus Supplement for CWHEQ Home Equity Loan Trust,
   Series 2006-S2 (Form 424B5), at S-31 (Mar. 29, 2006); Prospectus Supplement for CWHEQ
26 Home Equity Loan Trust, Series 2007-S3 (Form 424B5), at S-36 (Mar. 29, 2007); Prospectus
   Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-I (Form 424B5), at S-
27 26 (Dec. 22, 2005); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust,
   Series 2006-B (Form 424B5), at S-33 (Mar. 28, 2006); Prospectus Supplement for CWHEQ
28 Revolving Home Equity Loan Trust, Series 2007-A (Form 424B5), at S-32 (Jan. 30, 2007).

1    (e)    as a result of the over-appraisal of properties, the value of the underlying mortgage

2    collateral was significantly lower than disclosed to investors; and

3    (f)    appraisals were *not* "based on recent sales of comparable homes in the area and,

4    where deemed appropriate, replacement cost analysis based on the current cost of constructing a

5    similar home," but rather, were based on predetermined values selected by the Issuing Defendants

6    and their loan originators so that they could successfully originate loans.

7    60.    The integrity of the appraisal process was of particular importance because the

8    appraised value of the property was used to calculate the LTV ratio of the mortgage loans, a

9    number that is considered in the mortgage industry to be one of the most important measures of a

10   borrower's ability to repay the loan.[6] As already noted herein, in addition to violating the stated

11   underwriting standards in the Prospectuses, the fraudulently inflated appraisals also rendered the

12   LTV ratios disclosed in the Prospectuses materially false and misleading.  The Prospectuses

13   described the process of calculating the LTV as follows:

14       Loan−to−Value Ratio.  The "LOAN−TO−VALUE RATIO" of a
         Mortgage Loan is equal to:
15
16       (1) the principal balance of the Mortgage Loan at the date of
         origination, divided by

17       (2) the Collateral Value of the related Mortgaged Property.

18       The "COLLATERAL VALUE" of a Mortgaged Property is the
         lesser of:
19
20       (1) the appraised value based on an appraisal made for
         Countrywide Home Loans by an independent fee appraiser at the
         time of the origination of the related Mortgage Loan, and
21
22       (2) the sales price of the Mortgaged Property at the time of
         origination.

23       With respect to a Mortgage Loan the proceeds of which were used
24       to refinance an existing mortgage loan, the Collateral Value is the
         appraised value of the Mortgaged Property based upon the
25       appraisal obtained at the time of refinancing.

26   ───────────────
     [6] *See* Joshua Rosner and Joseph R. Mason, *Where Did the Risk Go? How Misapplied Bond
     Ratings Cause Mortgage Backed Securities and Collateralized Debt Obligation Market
27   Disruptions*, SSRN Working Paper, May 3, 2007, available at http://ssrn.com/abstract=1027475
     ("traditionally the loan to value (LTV) and FICO score and the borrowers DTI are the three most
28   significant measures of credit risk on a mortgage.").

1  Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-1 (Form 424B5), at S-

2  31 (Feb. 8, 2006).[7] These statements in the Prospectuses were false and misleading because:

3         (a)    as a result of the over-appraisal of properties, the disclosed LTV ratios for

4  the underlying mortgages were materially higher than disclosed to investors, increasing

5  substantially the risk of mortgage defaults; and

6         (b)    the appraisals of the mortgaged properties were not "independent" and were

7  fraudulently inflated.

8      61.    In fact, some of the most damaging allegations regarding Countrywide's fraudulent

9  misconduct come from the Company's own executives.  For example, on January 8, 2008, Mark

10  Zachary ("Zachary") filed an action in Texas Federal Court alleging that Countrywide KB Home

11  Loans, Inc. ("CWKB"), a joint-venture between Countrywide and KB Home, wrongfully

12  terminated him after he refused to engage in illegal appraisal fraud and related misconduct in

13  underwriting mortgage loans that were deposited into the Issuing Trusts.[8]  Zachary, a Regional

14  Vice President of CWKB, alleges, *inter alia*, that:

> In September 2006, Mr. Zachary began questioning Countrywide
> executives as to a questionable practice on the part of Countrywide
> where *only one appraiser was being used* to appraise homes on
> behalf of KB Home as it related to CWKB.  *The appraiser, as
> known to Countrywide executives, was being strongly*

---

[7] The Prospectuses uniformly used the same, or substantially similar, language. *Accord, e.g.*, Prospectus Supplement for Alternative Loan Trust 2005-J7 (Form 424B5), at S-17 (June 29, 2005); Prospectus Supplement for Alternative Loan Trust 2005-63 (Form 424B5), at S-17 (Oct. 31, 2005); Prospectus Supplement for Alternative Loan Trust 2006-6CB (Form 424B5), at S-36 (Mar. 29, 2006); Prospectus Supplement for Alternative Loan Trust 2007-12T1 (Form 424B5), at S-32 (Apr. 27, 2007); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB3 (Form 424B5), at S-30 (May 1, 2006); Prospectus Supplement for CHL Mortgage Pass-Through 2005-30 (Form 424B5), at S-14 (Nov. 22, 2005); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-11 (Form 424B5), at S-24 (Apr. 24, 2006); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2005-10 (Form 424B5), at S-22 (Sept. 15, 2005); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2006-1 (Form 424B5), at S-31 (Feb. 8, 2006); Prospectus Supplement for CWABS Asset-Backed Certificates Trust 2007-1 (Form 424B5), at S-32 (Feb. 8, 2007); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2006-S2 (Form 424B5), at S-25 (Mar. 29, 2006); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2007-S3 (Form 424B5), at S-30 (Mar. 29, 2007); Prospectus for CWHEQ Asset Backed Securities (Form 424B5), at 19 (Aug. 4, 2005); Prospectus for CWHEQ Asset Backed Securities (Form 424B5), at 23 (Feb. 7, 2006); Prospectus for CWHEQ Asset Backed Securities (Form 424B5), at 23 (Nov. 15, 2006).

[8] *Zachary v. Countrywide Fin. Corp., et al.*, C.A. No. 4:08-cv-00214 (S.D. Tex. Jan. 17, 2008).

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

*encouraged to inflate the homes' appraised value by as much as
6% to allow the homeowner to "roll up" all closing costs. Not
only would the home buyer be duped by this act, the end investors
(the secondary market) providing funds for these loans were also
duped because they were not made aware that the actual home
value could actually be less than the loan amount tied to the
mortgage note.* This inflated value put the buyer upside down on
the home immediately after purchasing it; thus, setting up the
buyer to become more susceptible to defaulting on the loan. It also
put the lender and secondary market end investor at risk because
they were unaware of the true value of their asset.[9]

62.    Similarly, in their suit, Deborah and Lonnie Bolden (the "Boldens") allege that
CWKB inflated the appraisals in a KB Home development in Live Oak, California, also using a
single appraiser.[10] The Boldens uncovered CWKB's scheme when one of their neighbors refused
CWKB's pressure tactics and sought an alternative lender which caused the other lender to conduct
an independent appraisal of the property. To their neighbors' dismay, the independent appraiser
concluded that the property's value was $408,000, or *approximately 13% less than the $469,000
value appraised by CWKB*. Upon further investigation, the Boldens discovered that the appraisal
performed by CWKB fraudulently inflated the values of purportedly "comparable" properties.
Specifically, the Boldens' appraisal report listed two properties as having sold for $461,000 and
$480,500, while the public records from the county recorder's office indicate that the homes were
actually sold for $408,500 and $410,000, respectively.[11]

**B.    Borrowers' Income Was Artificially Inflated By The Issuing Defendants**

63.    Another extremely important aspect of the underwriting process was the Issuing
Defendants' determination and verification of borrowers' ability to repay the mortgages. The
Prospectuses stated that,

> Countrywide Home Loans' underwriting standards are applied by
> or on behalf of Countrywide Home Loans *to evaluate the
> prospective borrower's credit standing and repayment ability* and
> the value and adequacy of the mortgaged property as collateral.
> *Under those standards, a prospective borrower must generally
> demonstrate that the ratio of the borrower's monthly housing*

---

[9] *Id.* at ¶ 9 (emphasis added).

[10] *Bolden v. KB Home, et al.*, Case No. BC385040 (Sup. Ct. Cal. Feb. 6, 2008).

[11] *Id.* at ¶¶ 28-31 and Exhibit A.

*expenses* (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) *to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.* The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. *In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is __required__ to have sufficient cash resources to pay the down payment and closing costs.* Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

Prospectus Supplement for Alternative Loan Trust 2005-J7 (Form 424B5), at S-31 and S-35 (June 29, 2005) (emphasis added).[12] Although some mortgages were underwritten using the so-called "Full Documentation Program," where the Issuing Defendants and their loan originators purportedly reviewed borrowers' last W-2 to determine and verify income, many of the mortgages were underwritten using the "Reduced Documentation Program" and the "No Income/No Asset Documentation Program." Under the Reduced Documentation Program,

some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment.

---

[12] The Prospectuses uniformly used the same, or substantially similar, language. *Accord, e.g.*, Prospectus Supplement for Alternative Loan Trust 2006-6CB (Form 424B5), at S-59 (Mar. 29, 2006); Prospectus Supplement for Alternative Loan Trust 2005-63 (Form 424B5), at S-79 (Oct. 31, 2005); Prospectus Supplement for Alternative Loan Trust 2007-12T1 (Form 424B5), at S-37 (Apr. 27, 2007); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB3 (Form 424B5), at S-98 (May 1, 2006); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2005-30 (Form 424B5), at S-23 (Nov. 22, 2005); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-11 (Form 424B5), at S-34 (Apr. 24, 2006); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2007-1 (Form 424B5), at S-31 (Jan. 29, 2007); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2006-S2 (Form 424B5), at S-31 (Mar. 29, 2006); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2007-S3 (Form 424B5), at S-37 (Mar. 29, 2007); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-I (Form 424B5), at S-27 (Dec. 22, 2005); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2006-B (Form 424B5), at S-34 (Mar. 28, 2006); Prospectus Supplement for CWHEQ Revolving Home Equity Loan Trust, Series 2007-A (Form 424B5), at S-32 (Jan. 30, 2007).

- 48 -

Prospectus Supplement for Alternative Loan Trust 2007-12TI (Form 424B5), at S-39 (Apr. 27, 2007) (emphasis added).[13]  Correspondingly, under the No Income/No Asset Documentation Program, "no documentation relating to a prospective borrower's income, employment or assets is required." *Id.* The borrower's purported income would then be used to determine the borrower's housing-to-income and debt-to-income ratios.

64.    The representations about the Issuing Defendants' and the loan originators' underwriting procedures, borrowers' income, and borrowers' housing-to-income and debt-to-income ratios were materially false and misleading.  Contrary to the Issuing Defendants' representations in the Prospectuses, borrowers' income, assets and employment status were frequently disregarded and/or manipulated to inflate borrowers' perceived ability to repay the mortgages.  For example, the Issuing Defendants and their loan originators would frequently coach borrowers to intentionally inflate their income.  The Issuing Defendants and the loan originators would also frequently disregard borrowers' stated income, pressuring borrowers away from the full documentation program toward the reduced and no documentation programs, thereby qualifying them for higher loan amounts than the borrowers' actual income would support.  In some cases, even borrowers who could verify their incomes and had excellent credit scores were steered into subprime and "alternative" mortgages.[14]

65.    For example, in his complaint, Zachary, a Regional Vice President of CWKB, alleges, *inter alia*, that:

> Zachary continued to voice his concerns on other grave illegal issues which were being conducted by CWKB.  Another of such issues involved Countrywide's practice of ***flipping*** a loan

---

[13] The Prospectuses uniformly used the same, or substantially similar, language. *Accord, e.g.*, Prospectus Supplement for Alternative Loan Trust 2005-J7 (Form 424B5), at S-33 (June 29, 2005); Prospectus Supplement for Alternative Loan Trust 2006-6CB (Form 424B5), at S-61, 62 (Mar. 29, 2006); Prospectus Supplement for Alternative Loan Trust 2005-63 (Form 424B5), at S-81 (Oct. 31, 2005); Prospectus Supplement for CHL Mortgage Pass-Through Trust 2006-HYB3 (Form 424B5), at S-100 (May 1, 2006); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2006-S2 (Form 424B5), at S-30 (Mar. 29, 2006); Prospectus Supplement for CWHEQ Home Equity Loan Trust, Series 2007-S3 (Form 424B5), at S-36 (Mar. 29, 2007).

[14] As noted by Senator Charles Schumer from New York, "'Countrywide did more to contribute to the subprime mortgage crisis than anyone else.'"  Kevin Kingsbury, *Sambol Won't Stay On at B of A*, The Wall Street Journal, May 28, 2008 (*quoting* Senator Schumer).

---

- 49 -
COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

application from a "full doc" loan program to a "stated income" or "no income, no asset" loan program.  He learned that loans were being canceled at the prime regional operations center as full documentation loans and transferred to the sub-prime operations center in Plano, Texas as stated loans or No Income No Assets ("NINA") loans.  *Countrywide's representatives were aware that the applicant would not be eligible for any loan program based on their current income level and/or job status*.  So, *the loan officer would then coach the loan applicant as to what income level would be needed to qualify* when it was sent to the sub-prime originators in Plano, Texas.  The applicant would then apply with sub-prime and would qualify under the status of a "stated" or "NINA" loan application.  Indeed, loan officers would go so far as to actually assist the loan applicant with the application to submit to the prime or nonprime unit with *false income amounts*, so that the applicant would get the loan under false pretenses.[15]

66.    Similarly, in *In re Countrywide Fin. Corp. Derivative Litig.*, 2008 WL 2064977, District Judge Pfalezer found that:

Here, the witnesses cited in the Complaint, many of whom are labeled "confidential," paint *a compelling portrait of a dramatic loosening of underwriting standards in Countrywide branch offices across the United States.*  The Complaint alleges that underwriting standards were often abandoned entirely with respect to no-documentation loans (or "liar loans"), which "could be published without the 'burden' of paperwork."  At least one high-ranking witness even alleges that the Company regularly assisted applicants that had already been rejected for full-documentation loans in obtaining no-documentation loans instead.  *Significantly, these lapses in underwriting regularly extended to loans that Countrywide labeled as "prime," rather than subprime.*

According to the Complaint, *significant deviations in underwriting were permitted even when it was clear that borrowers might not be able to pay.*  For example, the confidential witnesses state that under-qualified individuals were given loans for which they could not afford to make payments in the long term—for example, if and when their teaser rate was reset to a higher rate....

*Id.* at *10 (citations omitted and emphasis added).

---

[15]  *Zachary v. Countrywide*, C.A. No. 4:08-cv-00214 at ¶ 11 (emphasis added); *see also id.* at ¶ 12 (noting that "on at least one occasion, a potential buyer known to Zachary continued to complain because the loan officer filled in an income that the buyer did not even meet.")

67.     Similar allegations of appraisal fraud and manipulation of loan documents have surfaced in other suits recently filed against Countrywide – and the Company is the subject of several investigations by State Attorneys General.[16]

68.     Press reports and articles further highlight the excess lending, lax underwriting, and corporate culture that existed at Countrywide during the relevant time period, when the mortgages supporting the Trusts were originated.  For example, on August 26, 2007, in an article entitled "Inside the Countrywide Lending Spree," *The New York Times* reported that:

> On its way to becoming the nation's largest mortgage lender, the [*sic*] Countrywide Financial Corporation encouraged its sales force to court customers over the telephone with a seductive pitch that seldom varied.  "I want to be sure you are getting the best loan possible," the sales representatives would say.

> But providing "the best loan possible" to customers wasn't always the bank's main goal, say some former employees.  *Instead, potential borrowers were often led to high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth-talking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives among the highest paid in America.*

> *Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to wring maximum profits out of the mortgage lending boom* no matter what it costs borrowers, according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided.  One document, for instance, shows that *until last September the computer system in the company's subprime unit excluded borrowers' cash reserves, which had the effect of steering them away from lower-cost loans to those that were more expensive to homeowners and more profitable to Countrywide.*

> . . . .

> But *few companies benefited more from the mortgage mania than Countrywide, among the most aggressive home lenders in*

---

[16] *See, e.g.,* Ruth Simon, *Illinois Probes Mortgage Firms*, The Wall Street Journal, Mar. 7, 2008, at A3 (stating that "[i]n Florida, Attorney General Bill McCollum is looking to determine whether Countrywide put borrowers into loans they couldn't afford or loans with rates that weren't what the company was advertising or were misleading" and that "[i]n Illinois, Attorney General Lisa Madigan is trying to determine whether Countrywide … put black and Latino borrowers in subprime or other high-cost loans when they could have qualified for a lower-cost loan.").

*the nation. As such, the company is Exhibit A for the lax and, until recently, highly lucrative lending that has turned a once-hot business ice cold and has touched off a housing crisis of historic proportions.*

*"In terms of being unresponsive to what was happening, to sticking it out the longest, and continuing to justify the garbage they were selling, Countrywide was the worst lender,"* said Ira Rheingold, executive director of the National Association of Consumer Advocates. *"And anytime states tried to pass responsible lending laws, Countrywide was fighting it tooth and nail."*

. . . .

Regulatory filings show that, as of last year, 45 percent of Countrywide's loans carried adjustable rates — the kind of loans that are set to reprice this fall and later, and which are causing so much anxiety among borrowers and investors alike. Countrywide has a huge presence in California: 46 percent of the loans it holds on its books were made there, and 28 percent of the loans it services are there. *Countrywide packages most of its loans into securities pools that it sells to investors.*

*Another big business for Countrywide is loan servicing, the collection of monthly principal and interest payments from borrowers and the disbursement of them to investors. Countrywide serviced 8.2 million loans as of the end of the year; in June the portfolio totaled $1.4 trillion. In addition to the enormous profits this business generates — $660 million in 2006, or 25 percent of its overall earnings — customers of the Countrywide servicing unit are a huge source of leads* for its mortgage sales staff, say former employees.

. . . .

*But Countrywide documents show that it, too, was a lax lender.* For example, it wasn't until March 16 that Countrywide eliminated so-called piggyback loans from its product list, loans that permitted borrowers to buy a house without putting down any of their own money. And Countrywide waited until Feb. 23 to stop peddling another risky product, loans that were worth more than 95 percent of a home's appraised value and required no documentation of a borrower's income.

. . . .

*The company would lend even if the borrower had been 90 days late on a current mortgage payment twice in the last 12 months, if the borrower had filed for personal bankruptcy protection, or if*

*the borrower had faced foreclosure or default notices on his or her property.*

*Such loans were made, former employees say, because they were so lucrative — to Countrywide. The company harvested a steady stream of fees or payments on such loans and busily repackaged them as securities to sell to investors.* As long as housing prices kept rising, everyone — borrowers, lenders and investors — appeared to be winners.

. . . .

As a result, former employees said, *the company's commission structure rewarded sales representatives for making risky, high-cost loans.* For example, according to another mortgage sales representative affiliated with Countrywide, adding a three-year prepayment penalty to a loan would generate an extra 1 percent of the loan's value in a commission. *While mortgage brokers' commissions would vary on loans that reset after a short period with a low teaser rate, the higher the rate at reset, the greater the commission earned, these people said.*

. . . .

*"The whole commission structure in both prime and subprime was designed to reward salespeople for pushing whatever programs Countrywide made the most money on in the secondary market,"* the former sales representative said.

. . . .

When borrowers tried to reduce their mortgage debt, Countrywide cashed in: *prepayment penalties generated significant revenue for the company — $268 million last year, up from $212 million in 2005. When borrowers had difficulty making payments, Countrywide cashed in again: late charges produced even more in 2006 — some $285 million.*

*The company's incentive system also encouraged brokers and sales representatives to move borrowers into the subprime category, even if their financial position meant that they belonged higher up the loan spectrum. Brokers who peddled subprime loans received commissions of 0.50 percent of the loan's value, versus 0.20 percent on loans one step up the quality ladder, known as Alternate-A, former brokers said. For years, a software system in Countrywide's subprime unit that sales representatives used to calculate the loan type that a borrower qualified for did not allow the input of a borrower's cash reserves, a former employee said.*

- 53 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

A borrower who has more assets poses less risk to a lender, and will typically get a better rate on a loan as a result. But, this sales representative said, *Countrywide's software prevented the input of cash reserves so borrowers would have to be pitched on pricier loans. It was not until last September that the company changed this practice, as part of what was called in an internal memo the "Do the Right Thing" campaign.*

According to the former sales representative, *Countrywide's big subprime unit also avoided offering borrowers Federal Housing Administration loans, which are backed by the United States government and are less risky.* But these loans, well suited to low-income or first-time home buyers, do not generate the high fees that Countrywide encouraged its sales force to pursue.

A few weeks ago, the former sales representative priced a $275,000 loan with a 30-year term and a fixed rate for a borrower putting down 10 percent, with fully documented income, and a credit score of 620. While a F.H.A. loan on the same terms would have carried a 7 percent rate and 0.125 percentage points, Countrywide's subprime loan for the same borrower carried a rate of 9.875 percent and three additional percentage points.

*The monthly payment on the F.H.A. loan would have been $1,829, while Countrywide's subprime loan generated a $2,387 monthly payment. That amounts to a difference of $558 a month, or $6,696 a year — no small sum for a low-income homeowner.*

. . . .

*Other documents from the subprime unit also show that Countrywide was willing to underwrite loans that left little disposable income for borrowers' food, clothing and other living expenses.* A different manual states that loans could be written for borrowers even if, in a family of four, they had just $1,000 in disposable income after paying their mortgage bill. A loan to a single borrower could be made even if the person had just $550 left each month to live on, the manual said.

Gretchen Morgenson, *Inside the Countrywide Lending Spree*, The New York Times, Aug. 26, 2007 (emphasis added).

69.     Further evidence is also emerging about how Countrywide executives disregarded warnings from the Company's risk-control managers as early as "late 2003." As was detailed by *The Wall Street Journal* on February 23, 2008:

- 54 -

1  [David] Sambol (Countrywide's President and Chief Operating Officer) *brushed aside warnings from risk-control managers at Countrywide that the company's lending standards were too lax, according to four current and former executives at Countrywide*, though another person familiar with the company disputes that view. Being too cautious would turn Countrywide into a "nice, little boutique," a former colleague recalls him saying.

. . . .

*Countrywide was "willing to cut corners to get market share,"* says Martin Eakes, CEO of the Center for Community Self-Help, a nonprofit credit union and consumer-advocacy group in Durham, N.C. "If Dave Sambol represents that value system," Mr. Eakes says, his new appointment at Bank of America is "disappointing."

*In late 2003, tensions between Mr. Sambol and Countrywide's risk managers boiled over at a meeting of dozens of executives in the company's headquarters.* Nick Krsnich, who as chief investment officer was responsible for pricing loans and managing risks, uttered a loud profanity and *walked out of the meeting to protest what he saw as imprudent lending, according to two people who attended the meeting. Mr. Krsnich left the company in early 2006.*

Another former executive says Mr. Sambol was "livid" at a meeting in the spring of 2005, because call-center employees weren't selling enough option adjustable-rate mortgages, which let borrowers start with minimal payments and face much higher ones later. This former executive says those loans were too complicated to be explained over the phone.

. . . .

*In the late 1990s, Countrywide was only a bit player in subprime mortgages. But its subprime market share jumped to 7.1% in 2005 from 2.4% in 1999*, according to Inside Mortgage Finance, a trade publication. *Internal documents show that risk analysts at Countrywide were pointing out by mid-2006 that subprime defaults were starting to run far higher than projected by a computer model then used by the company. Yet Countrywide continued to churn out subprime loans.* Subprime-loan volume declined a moderate 9% to $40.6 billion in 2006 from $44.6 billion a year earlier.

Countrywide was so focused on growth that oversized replicas of monthly bonus checks were hung above the cubicles in at least one building, so everyone could see which employees were most successful in their salesmanship.

*"The stress level was unbelievable," because of pressure from managers to boost loan volumes*, says another former Countrywide employee, Tenny Garner, who worked as a loan officer in Twin Falls, Idaho, until last September.

- 55 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

1    James R. Haggerty, *Mortgage Chief Picked by BofA Sparks Worries*, The Wall Street Journal, Feb.

2    23, 2008, at B1 (emphasis added).

3        70.    Even more alarming were public revelations of an extensive FBI investigation of

4    Countrywide in March 2008.  An article in *The Wall Street Journal* states, *inter alia*:

> The Federal Bureau of Investigation is probing subprime lender
> Countrywide Financial Corp. for possible securities fraud,
> according to law-enforcement officials and finance-industry
> executives.
>
> *The inquiry involves whether company officials made
> misrepresentations about the company's financial position and
> the quality of its mortgage loans in securities filings*, four people
> with knowledge of the matter said.  It is at an early stage, they
> emphasized.
>
> "We are not aware of an investigation being conducted by the
> FBI," Countrywide spokeswoman Jumana Bauwens said in an e-
> mail.  A spokesman for Bank of America Corp., which is in the
> midst of acquiring Countrywide, declined to comment.
>
> Fifteen other subprime companies also are under scrutiny by
> federal agents and prosecutors in a broad look at the subprime
> industry sparked by huge losses on residential mortgages and the
> securities used to fund them.  *The investigations are examining
> mortgage-origination fraud, conflicts of interest and undisclosed
> relationships within the industry, and the practices used to
> package mortgage-backed securities for sale to investors.*
>
> . . . .
>
> *Federal investigators are looking at evidence that may indicate
> widespread fraud in the origination of Countrywide mortgages,
> said one person with knowledge of the inquiry.  If borne out, that
> could raise questions about whether company executives knew
> about the prospect that Countrywide's mortgage securities would
> suffer many more defaults than predicted in offering documents.*
>
> Another potential issue facing the company is whether it has been
> candid in its accounting for losses. People familiar with the matter
> said that Countrywide's losses may be several times greater than it
> has disclosed.
>
> Countrywide, which agreed in January to be acquired by Bank of
> America for $4 billion, already is under investigation by the
> Securities and Exchange Commission for possibly improper
> accounting.   SEC investigators are working closely with FBI
> agents on several subprime investigations, officials said.   The
> attorneys general of Florida and Illinois have launched probes too.

Glenn R. Simpson and Evan Perez, *FBI Investigates Countrywide*, The Wall Street Journal, Mar. 8,

2008, at A3 (emphasis added).

- 56 -
COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

71.     On March 11, 2008, *The Wall Street Journal* published an article further detailing the FBI's investigation of Countrywide, stating:

> Federal investigators probing the business practices of Countrywide Financial Corp. are trying to figure out what Countrywide knew – or in some cases didn't know – about the incomes and assets of thousands of its borrowers.
>
> ***The investigators are finding that Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients***, according to people involved in the matter. ***The company packaged many of those mortgages into securities and sold them to investors, raising the additional question of whether Countrywide understated the risks such investments carried.***
>
> Countrywide, long the No. 1 mortgage company in the U.S. in terms of dollar value of loan originations, also was ***considered among the most aggressive in finding ways to make home loans to consumers whose qualifications couldn't be proved or seemed questionable***, mortgage industry executives and analysts said. ***The Federal Bureau of Investigation has begun looking into its practices in pursuing such business***, according to people close to the matter.
>
> . . . .
>
> A criminal case in Alaska offers a look at the kinds of practices that have caught the attention of federal prosecutors during the subprime-mortgage crisis and its fallout.  In that case, Kourosh Partow, a former Countrywide sales executive convicted of mortgage fraud, sought a lighter sentence on grounds that ***Countrywide and another subprime firm were aware that their loan documents "were fraught with inaccuracies,"*** his lawyer alleged in a court filing.  ***Executives at Countrywide and American Home Mortgage Investment Corp. "encouraged what could be characterized as manipulation," the filing alleges.***
>
> The FBI has said its investigations of the subprime industry are focusing on securitizations – the process of bundling mortgages into pools and selling tranches to investors.  "There are many disclosure issues" in a mortgage securitization, said Joshua Hochberg, former chief of the Justice Department's fraud section who now works at law firm McKenna Long & Aldridge LLP in Washington.  "You have to disclose what percentage of the loans are performing and the adequacy of how the loans are underwritten.  So there could be fraud if there are knowing and intentional lies in those financial statements."  Mr. Hochberg said prosecutors and the Securities and Exchange Commission will examine "whether as things started going south anybody made an effort to keep the problems hidden."
>
> In addition, he said, "The SEC will always look to see whether there is insider trading at a time when you have reason to believe that the loan portfolio is crumbling."  Countrywide Chief Executive Officer Angelo Mozilo is the subject of investor

- 57 -

lawsuits for selling more than $400 million in company stock in recent years. Mr. Mozilo said at a congressional hearing Friday that he began selling shares he obtained by exercising stock options in 2004 because he was heading toward retirement and wanted to diversify his investments.

. . . .

***"When you securitize a pool of loans, you vouch for the quality of those loans,"* said mortgage-fraud expert Constance Wilson** of software firm Interthinx Inc. ***"So they may be saying that if in fact Countrywide was aware of any [borrower] misrepresentation, then they couldn't represent and warrant the quality of those securities."***

Banking analyst Bert Ely of Ely & Associates said ***dubious mortgage underwriting apparently was widespread.*** "If Countrywide's got a problem, everybody's got a problem," he said. ***Like other subprime lenders, Countrywide had an elaborate process for documenting a borrower's income and assets. But some of its underwriting products required borrowers to provide little to no documentation of their creditworthiness. As the market heated up between 2003 and 2006 and standards loosened, the use of these products increased.***

In the Alaska case, Mr. Partow sold hundreds of loans for the company between 2001 and 2006, when he moved to American Home following an FBI inquiry into his loans at Countrywide. "During Partow's tenure the number of loans closed by Countrywide and American substantially increased," his lawyer's court filing states. "Both Countrywide and American profited by this approximate 2% to 10% increase in market share.

***"In order to stay competitive, and increase sales, the companies ... encouraged what could be characterized as manipulation,"*** the filing asserts, through the selective use of financial information. Internal underwriters at Countrywide and American were supposed to confirm a borrower's eligibility, and "The underwriter had the authority to reject the loan." Yet few loans were rejected, according to the filing.

. . . .

***Many of the suspected loans were called "stated" loans, in which a borrower was required to attest to his finances but wasn't required to provide proof. Underwriters allegedly were instructed not to check many details of these loans. "This was because those knowledgeable in the business understood that stated loan programs were fraught with inaccuracies,"*** the filing alleged.

Glenn R. Simpson, *Loan Data Focus of Probe*, The Wall Street Journal, Mar. 11 2008, at A3

(emphasis added).

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action pursuant to California Code of Civil Procedure § 382 on behalf of a class consisting of all persons and entities who purchased or acquired the Certificates of the Issuing Trusts pursuant or traceable to false and misleading Prospectuses issued between June 13, 2005 and December 27, 2007, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

73.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Issuing Defendants, and/or their agents, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Billions of dollars worth of Certificates were issued pursuant to the false and misleading Prospectuses complained of herein.

74.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

76.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether statements made by Defendants to the investing public in the Prospectuses misrepresented material facts about the mortgages underlying the Trusts; and

- 59 -
COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

(c)     the extent – and proper measure – of the damages sustained by the members of the Class.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### (Violation of Section 11 of the Securities Act Against

### The Individual Defendants and The Issuing and Underwriting Defendants)

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the Defendants to defraud Plaintiff or members of the Class.  This count is predicated upon Defendants' *strict liability* for making false and materially misleading statements in the Registration Statements, Prospectuses and Prospectus Supplements.  This Cause of Action is brought pursuant to Section 11 of the Securities Act, on behalf of the Class, against the Individual Defendants and the Issuing and Underwriting Defendants.

79.     The Prospectuses for the Certificate offerings were materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

80.     The Individual Defendants and the Issuing and Underwriting Defendants of the Certificates are strictly liable to Plaintiff and the Class for the misstatements and omissions.

81.     The Individual Defendants signed CWALT's, CWABS', CWMBS', and CWHEQ's Registration Statements as detailed herein, *supra* at ¶¶ 41-47.

- 60 -

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

1    82.    Defendant CSC, an affiliate of CFC, acted as an underwriter in the sale of the

2  Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the

3  Certificates.  Defendant CSC was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

4    83.    Defendant JP Morgan acted as an underwriter in the sale of the Issuing Trusts'

5  Certificates, and helped to draft and disseminate the offering documents for the Certificates.

6  Defendant JP Morgan was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

7    84.    Defendant Deutsche Bank acted as an underwriter in the sale of the Issuing Trusts'

8  Certificates, and helped to draft and disseminate the offering documents for the Certificates.

9  Defendant Deutsche Bank was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

10    85.    Defendant Bear Stearns acted as an underwriter in the sale of the Issuing Trusts'

11  Certificates, and helped to draft and disseminate the offering documents for the Certificates.

12  Defendant Bear Stearns was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

13    86.    Defendant BoA acted as an underwriter in the sale of the Issuing Trusts'

14  Certificates, and helped to draft and disseminate the offering documents for the Certificates.

15  Defendant BoA was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

16    87.    Defendant UBS acted as an underwriter in the sale of the Issuing Trusts'

17  Certificates, and helped to draft and disseminate the offering documents for the Certificates.

18  Defendant UBS was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

19    88.    Defendant Morgan Stanley acted as an underwriter in the sale of the Issuing Trusts'

20  Certificates, and helped to draft and disseminate the offering documents for the Certificates.

21  Defendant Morgan Stanley was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

22    89.    Defendant Edward Jones acted as an underwriter in the sale of the Issuing Trusts'

23  Certificates, and helped to draft and disseminate the offering documents for the Certificates.

24  Defendant Edward Jones was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

25    90.    Defendant Citigroup acted as an underwriter in the sale of the Issuing Trusts'

26  Certificates, and helped to draft and disseminate the offering documents for the Certificates.

27  Defendant Citigroup was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

28

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

91.     Defendant Goldman Sachs acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates. Defendant Goldman Sachs was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

92.     Defendant Credit Suisse acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates. Defendant Credit Suisse was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

93.     Defendant RBS acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates. Defendant RBS was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

94.     Defendant Lehman acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates. Defendant Lehman was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

95.     Defendant Barclays acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates. Defendant Barclays was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

96.     Defendant HSBC acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates. Defendant HSBC was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

97.     Defendant BNP acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the offering documents for the Certificates. Defendant BNP was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

98.     Defendant Merrill Lynch acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped and disseminate the offering documents for the Certificates.  Defendant Merrill Lynch was an underwriter for the Issuing Trusts as detailed at ¶ 37, *supra*.

99.     The Individual Defendants and the Issuing and Underwriting Defendants owed to the Plaintiff and other members of the Class the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts

- 62 -

required to be stated in order to make the statements contained therein not misleading.  The
Individual Defendants and the Issuing and Underwriting Defendants knew, or in the exercise of
reasonable care should have known, of the material misstatements and omissions contained in or
omitted from the Prospectuses as set forth herein.  As such, the Individual Defendants and the
Issuing and Underwriting Defendants are liable to the Class.

100.   None of the Individual Defendants or the Issuing and Underwriting Defendants
made a reasonable investigation or possessed reasonable grounds for the belief that the statements
contained in the Prospectuses were true or that there was no omission of material facts necessary to
make the statements made therein not misleading.

101.   The Individual Defendants and the Issuing and Underwriting Defendants issued and
disseminated, caused to be issued and disseminated, and participated in the issuance and
dissemination of, material misstatements to the investing public which were contained in the
Prospectuses, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.

102.   By reason of the conduct herein alleged, each of the Individual Defendants and the
Issuing and Underwriting Defendants violated Section 11 of the Securities Act.

103.   Plaintiff acquired the Certificates pursuant and/or traceable to the Prospectuses.

104.   At the time they obtained their Certificates, Plaintiff and members of the Class did
so without knowledge of the facts concerning the misstatements or omissions alleged herein.

105.   This action is brought within one year after discovery of the untrue statements and
omissions in and from the Prospectuses which should have been made through the exercise of
reasonable diligence, and within three years of the effective date of the Prospectuses.

106.   Plaintiff and the Class have sustained damages.  The value of the Certificates has
declined substantially, subsequent to, and due to, the Individual Defendants' and the Issuing and
Underwriting Defendants' violations.

107.   By virtue of the foregoing, Plaintiff and the other members of the Class are entitled
to damages under Section 11, as measured by the provisions of Section 11(e), jointly and severally
from each of the Individual Defendants and the Issuing and Underwriting Defendants.

COMPLAINT FOR VIOLATION OF §§11, 12(A)(2) AND 15 OF THE SECURITIES ACT OF 1933

## SECOND CAUSE OF ACTION

### (Violation of Section 12(a)(2) of The Securities Act

### Against The Issuing and Underwriting Defendants)

108.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

109.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against the Issuing Defendants and the Underwriting Defendants.

110.    The Issuing Defendants and the Underwriting Defendants promoted and sold the Certificates pursuant to the defective Prospectuses.

111.    The Prospectuses contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

112.    The Issuing Defendants and the Underwriting Defendants owed to Plaintiff, and other members of the Class who purchased the Certificates pursuant to the Prospectuses, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Issuing Defendants and the Underwriting Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses as set forth above.

113.    Plaintiff and other members of the Class purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Prospectuses.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses.

114.    By reason of the conduct alleged herein, the Issuing Defendants and the Underwriting Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who purchased the Certificates pursuant to and/or traceable to the Prospectuses sustained material damages in connection with their purchases of the Certificates.  Plaintiff and other members of the Class who hold the Certificates issued pursuant to the

- 64 -

1   Prospectuses have the right to rescind and recover the consideration paid for their Certificates.

2   Class members who have sold their Certificates are entitled to rescissory damages.

3        115.   This action is brought within three years from the time that the Certificates upon

4   which this Count is brought were sold to the public, and within one year from the time when

5   Plaintiff discovered or reasonably could have discovered the facts upon which this action is based.

6

7   ## THIRD CAUSE OF ACTION

8   ### (Violation of Section 15 of The Securities Act

9   ### Against CFC, CSC and CHL)

10        116.   Plaintiff repeats and realleges each and every allegation contained above as if fully

11   set forth herein.

12        117.   This count is asserted against CFC, CSC and CHL and is based upon Section 15 of

13   the Securities Act.

14        118.   Each of CFC, CSC and CHL by virtue of its control, ownership, offices,

15   directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein,

16   controlling persons of the Issuing Defendants within the meaning of Section 15 of the Securities

17   Act.  CFC, CSC and CHL had the power and influence and exercised the same to cause the Issuing

18   Defendants to engage in the acts described herein.

19        119.   CFC's, CSC's and CHL's control, ownership and position made them privy to and

20   provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

21        120.   By virtue of the conduct alleged herein, CFC, CSC and CHL are liable for the

22   aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered as a

23   result.

24

25

26

27

28

● ●

1

## PRAYER

2 **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

3      (a)     Determining that this action is a proper class action pursuant to California

4              Code of Civil Procedure § 382;

5      (b)     Awarding compensatory damages in favor of Plaintiff and the other Class

6              members against all Defendants, jointly and severally, for all damages

7              sustained as a result of Defendants' wrongdoing, in an amount to be proven

8              at trial, including interest thereon;

9      (c)     Awarding Plaintiff and the Class their reasonable costs and expenses

10             incurred in this action, including counsel fees and expert fees; and

11      (d)     Such other and further relief as the Court may deem just and proper.

12

13 Dated: June 12, 2008           Respectfully submitted,
LIM, RUGER & KIM, LLP

14

15                            Christopher Kim

16                            Lisa J. Yang
1055 West Seventh Street, Suite 2800

17                            Los Angeles, CA 90017

18                            Ph (213) 955-9500
Fax (213) 955-9511

19

20                           **SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**

21                            Darren J. Check
Sharan Nirmul

22                            Emanuel Shachmurove
280 King of Prussia Road

23                            Radnor, PA 19087
(610) 667-7706

24                            (610) 667-7056 (fax)

25

26                            *Attorneys for Plaintiff*

27

28

- 66 -

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Christopher Kim (Bar No. 82080)/Lisa J. Yang (Bar No. 208971)
LIM, RUGER & KIM, LLP
1055 West Seventh Street, Suite 2800, Los Angeles, CA 90017

TELEPHONE NO.: (213) 955-9500    FAX NO. (Name): (213) 955-9511
ATTORNEY FOR (Name): Plaintiff, Washington State Plumbing & Pipefitting

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

**FOR COURT USE ONLY**

**FILED**
LOS ANGELES SUPERIOR COURT

JUN 1 2 2008

JOHN A. CLARKE, CLERK
BY MARY GARCIA, DEPUTY

CASE NAME:
Washington State Plumbing & Pipefitting v. Countrywide Financial, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: **BC392571** |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter  ☐ Joinder | | JUDGE: |
| | | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☑ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☑ is ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☑ Large number of separately represented parties       d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve       e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence       f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action (specify):
5. This case ☑ is ☐ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: June 12, 2008

Lisa J. Yang
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | CIVIL CASE COVER SHEET | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courtinfo.ca.gov |
|---|---|---|

American LegalNet, Inc.
www.FormsWorkflow.com

**Pg. 83 Exhibit 1**

 

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or
toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil
harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer
or wrongful eviction)*
Contract/Warranty Breach–Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally
complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent
domain, landlord/tenant, or
foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex
case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-
domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-
harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified
above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

**Pg. 84 - Exhibit 1**

| SHORT TITLE:<br>Washington State Plumbing & Pipefitting v. Countrywide | CASE NUMBER<br>BC392571 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☑ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL __20__ ☐ HOURS/ ☑ DAYS

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check <u>one</u> Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV.  Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos  (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2.<br><br>2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4.<br>1., 2., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4.<br>1., 2., 4.<br>1., 2., 3.<br>1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort  (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |

LACIV 109  (Rev. 01/07)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 1 of 4

| SHORT TITLE: Washington State Plumbing & Pipefitting v. Countrywide | CASE NUMBER |
|---|---|

| **A** Civil Case Cover Sheet Category No. | **B** Type of Action (Check only one) | **C** Applicable Reasons -See Step 3 Above |
|---|---|---|
| Professional Negligence (25) | ☐ A6017  Legal Malpractice<br>☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| Other Employment (15) | ☐ A6024  Other Employment Complaint Case<br>☐ A6109  Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction)<br>☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019  Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff<br>☐ A6012  Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| Other Contract (37) | ☐ A6009  Contractual Fraud<br>☐ A6031  Tortious Interference<br>☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation      Number of parcels_____ | 2. |
| Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| Other Real Property (26) | ☐ A6018  Mortgage Foreclosure<br>☐ A6032  Quiet Title<br>☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |

Left margin labels: Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.) · Employment · Contract · Real Property · Unlawful Detainer · Judicial Review

| SHORT TITLE:<br>Washington State Plumbing & Pipefitting v. Countrywide | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br><br>(02) | ☐ A6151   Writ - Administrative Mandamus<br>☐ A6152   Writ - Mandamus on Limited Court Case Matter<br>☐ A6153   Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review<br>(39) | ☐ A6150   Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade<br>Regulation (03) | ☐ A6003   Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007   Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006   Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☑ A6035   Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental  (30) | ☐ A6036   Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ A6014   Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br><br>(20) | ☐ A6141   Sister State Judgment<br>☐ A6160   Abstract of Judgment<br>☐ A6107   Confession of Judgment (non-domestic relations)<br>☐ A6140   Administrative Agency Award (not unpaid taxes)<br>☐ A6114   Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112   Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033   Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br><br>(42) | ☐ A6030   Declaratory Relief Only<br>☐ A6040   Injunctive Relief Only (not domestic/harassment)<br>☐ A6011   Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000   Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance(21) | ☐ A6113   Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br><br>(43) | ☐ A6121   Civil Harassment<br>☐ A6123   Workplace Harassment<br>☐ A6124   Elder/Dependent Adult Abuse Case<br>☐ A6190   Election Contest<br>☐ A6110   Petition for Change of Name<br>☐ A6170   Petition for Relief from Late Claim Law<br>☐ A6100   Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

| SHORT TITLE:<br>Washington State Plumbing & Pipefitting v. Countrywide | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C<br>WHICH APPLIES IN THIS CASE<br>☑1. ☑2. ☐3. ☐4. ☐5. ☐6. ☐7. ☑8. ☐9. ☐10. | ADDRESS:<br>4500 Park Granada |
|---|---|
| CITY:<br>Calabasas | STATE:<br>CA | ZIP CODE:<br>91302 | |

Item IV. *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the _____ SUPERIOR _____ courthouse in the _____ CENTRAL _____ District of the Los Angeles Superior Court (Code Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: June 12, 2008 _____

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

| PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE: |
|---|

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form CM-010.

4. Complete Addendum to Civil Case Cover Sheet form LACIV 109 (Rev. 01/07), LASC Approved 03-04.

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form FL-935, if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 01/07)           **CIVIL CASE COVER SHEET ADDENDUM**          LASC, rule 2.0<br>LASC Approved 03-04            **AND STATEMENT OF LOCATION**            Page 4 of 4

**Pg. 88 - Exhibit 1**