# EXHIBIT G

Case 2:10-cv-00302-MRP-MAN   Document 186-7   Filed 09/16/10   Page 2 of 3   Page ID #:7461



Select 'Print' in your browser menu to print this document.

Copyright 2010. ALM Media Properties, LLC. All rights reserved. *Corporate Counsel* Online

Page printed from: http://www.corpcounsel.com

Back to Article

---

## Countrywide in Crosshairs as Mortgage Crisis Fuels Litigation
Amy Miller
Corporate Counsel
February 22, 2008

Sandor Samuels has, quite possibly, the least enviable in-house legal job right now in corporate America. As general counsel and litigation chief of embattled mortgage lender Countrywide Financial Corp., he's facing huge lawsuits on all fronts. Everyone from disgruntled investors and shareholders to mortgage customers and government regulators is taking Countrywide to court in a wave of suits that will probably be the litigation story for the next couple of years.

At least Samuels, one of 20 *Fortune* 250 GCs who also serve as litigation chiefs, won't have to face it alone. In January, Bank of America Corp. made a $4 billion buyout offer for Countrywide, which could be a much-needed lifeline for the country's largest home lender. How the acquisition will affect Samuels' in-house litigation team was unclear at press time; he and other Countrywide executives declined to comment for this story.

Still, the litigation could be a painful headache for Bank of America's David Onorato, another one of the *Fortune* 250 litigation bosses on our chart. The Charlotte-based bank will not only assume Countrywide's financial woes when the deal goes through later this year, but it will also take on the swelling number of suits against the Calabasas, Calif.-based Countrywide that began when the subprime mortgage market collapsed last year. Meanwhile, Bank of America faces its own lawsuits related to the subprime meltdown, and individual shareholders filed at least three class action suits against the bank in January challenging the purchase of Countrywide.

Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country. Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations. "We bought the company and all of its assets and liabilities," spokesman Scott Silvestri says. "We are aware of the claims and potential claims against the company and have factored these into the purchase."

In Countrywide's third-quarter report last year, officials denied that pending litigation would hurt the lender financially. Yet according to that same report, the company spent $52.4 million on legal, consulting, and accounting expenses, according to Securities and Exchange Commission records, up from $47.3 million during the same period the previous year.

At the center of the banking crisis are the adjustable-rate home loans given to borrowers with less-than-stellar credit histories. Countrywide and other lenders in 2006 issued more than $600 billion in subprime loans during the peak. In that year, 45 percent of Countrywide's loans carried adjustable rates, up from 18 percent only a few years earlier, according to company filings.

Subprime loans or not, Countrywide used to be a Wall Street favorite. In 2005 its share price was 561 percent higher than it had been a decade earlier. The lender boasted revenue of $11.4 billion and a pretax income of $4.3 billion. As recently as 2005, Barron's named Countrywide founder and CEO Angelo Mozilo one of the world's 20 most respected chief executives. Samuels, who had been a general counsel at First Interstate Bancorp before joining Countrywide, was named "Outstanding Corporate Counsel of the Year" in 2005 by the Los Angeles County Bar Association.

The accolades ceased last year when low subprime teaser rates began to expire, bumping borrowers' interest rates toward double digits. Many homeowners could no longer pay their mortgages, leading to a wave of delinquencies and defaults. And the fallout dealt a harsh blow to high-flying Countrywide. During the third quarter of last year, one-fourth of the subprime loans that Countrywide made were delinquent, up from 17 percent in 2006, according to company filings. It also posted a $1.2 billion loss in the third quarter. Shares in Countrywide lost nearly 80 percent of their value last year, and the company last year laid off more than 11,000 employees, according to a January analysis by mortgagedaily.com, an online trade publication.

The percentage of delinquencies will likely climb higher this year and next, says Keith Miller, a partner at Paul, Hastings, Janofsky & Walker, who specializes in subprime mortgage litigation. Interest rates on $362 billion in adjustable-rate subprime mortgages will jump in 2008, according to data calculated by Bank of America. "That's why people are so

concerned, after seeing what happened in 2007," Miller says. But Samuels and his legal team face more than dispossessed homeowners. Investors, too, are taking a hit. Subprime mortgages were bundled into securities and sold to individuals and organizations. When cash-strapped homeowners defaulted on their mortgages, those investments became practically worthless.

All of this means more work for lawyers, both for in-house and outside counsel. In fact, legal departments will need lots of outside help, says John Coffee, a securities law professor at Columbia University Law School. At the same time, litigation chiefs such as Onorato and Samuels should consider implementing new controls and new procedures on mortgage-backed securities and other asset-backed securities, to prevent future problems, Coffee says. "I don't think that's going to happen in the next six months," he says. "We've just had 'Jaws' come through the water, and no one is rushing back into the water right away."

For now, the lawyers defending Countrywide are wading through murky waters. Here's a sampling of the noteworthy cases filed against the company in federal court since the mortgage market soured:

**Investors:** In December two New York pension funds that bought mortgage-backed securities were named lead plaintiffs for five combined class action suits in Los Angeles federal district court. They allege that Countrywide and 26 securities underwriters misled investors by saying they could easily navigate turbulent real estate and credit markets and that Countrywide artificially boosted income by understating loan loss reserves in SEC filings.

As late as April 2007, Countrywide stated that Moody's, a credit rating agency, had upgraded its banking segment rating and that its home loans segment was also under review for possible upgrade, according to court documents. These statements hid growing loan delinquencies, which hurt the quality of Countrywide's collateralized debt obligations, earnings and profits. Once the truth was revealed, shares tumbled and investors lost money, plaintiffs claim. At press time Countrywide attorneys had not responded to the complaint.

**Employees:** In September a group of Countrywide employees filed a class action suit in California federal court against Countrywide CEO Angelo Mozilo and executives in charge of the company's retirement plan. The suit claims that executives concealed information from employees about the company's financial problems, which caused thousands of 401(k) plan participants to lose millions of dollars during the company's recent stock collapse. The suit claims that employees relied on information supplied by the company when they decided to contribute to the plan. Therefore, the company misled employees. At press time defense attorneys moved to dismiss; a hearing is scheduled for late March.

**Shareholders:** Not every investor who's suing Countrywide wants to get reimbursed directly. On behalf of Countrywide and its shareholders, both a lone shareholder and the International Brotherhood of Electrical Workers Local 98 filed shareholder derivative suits in Delaware federal court. The suits allege that Countrywide's board of directors, including Mozilo, gave shareholders false and misleading statements in 2006 and 2007 that concealed the true costs of Mozilo's compensation and failed to list the full cost of stock options granted to him since 2003.

The total amount of compensation listed for Mozilo in 2007 was $48 million for the 2006 fiscal year. It was actually $58 million, the pension fund says. In addition to misleading shareholders, the board grossly overcompensated Mozilo in comparison to chiefs of both much larger and comparably sized financial services companies. "This misconduct shocks the conscience," the union's complaint says. Three similar derivatives cases on behalf of Countrywide are also pending in California federal court, and defense attorneys have requested that all these cases be combined and moved to that court.

**Borrowers:** A class action filed in September in federal district court in Los Angeles claims that Countrywide violated the federal Racketeer Influenced and Corrupt Organizations Act by luring "unwary borrowers" into subprime mortgages when they could have qualified for lower-cost prime loans. Others have claimed racial discrimination. One lawsuit filed in federal district court in Boston by three African American borrowers alleges that subsidiaries Countrywide Home Loans Inc., and Countrywide Bank violated federal housing discrimination laws. Black homeowners paid higher fees to Countrywide agents than did white borrowers in similar financial situations, the plaintiffs allege. The suit seeks class action status and $100 million to reimburse black customers of Countrywide and its subprime subsidiary, Full Spectrum Lending Inc. Countrywide's attorneys have moved for dismissal.

When the wave of litigation tied to the current housing crisis will ebb is anyone's guess, experts and attorneys agree. And no one, it seems, is certain what the long-term effect will be. "I don't think anyone has any conclusions yet," says Faten Sabry, vice president of NERA Economic Consulting, which tracks subprime-related litigation across the country. "People are trying to sort through the information and trying to understand what is going on." But one thing is certain: The legal troubles plaguing mortgage lenders and banks won't end anytime soon, and will continue to spread across the world. "I don't think this is an isolated U.S. problem," Miller says. "It really is a global problem."