1
2
3
4
5

# APPENDIX

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MARSHALL FREIDUS, et al.,

                Plaintiffs,

          -against-                         09 Civ. 1049 (LAK)

ING GROEP N.V., et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

                  Andrew J. Brown
                  Lucas F. Olts
                  Eric Niehaus

                  Samuel H. Rudman
                  David A. Rosenfeld
                  Joseph F. Russello
                  COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP

                  Deborah R. Gross
                  LAW OFFICES OF BERNARD M. GROSS, P.C.
                  *Attorneys for Plaintiffs*

                  Mitchell A. Lowenthal
                  Giovanni P. Prezioso
                  CLEARY GOTTLIEB STEEN & HAMILTON LLP
                  *Attorneys for Defendants ING Groep N.C., ING Financial Holdings Corp, and ING Financial Markets LLC*

                  Stuart J. Baskin
                  Adam S. Hakki
                  Herbert S. Washer
                  SHEARMAN & STERLING LLP
                  *Attorneys for Defendants UBS Securities LLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Wachovia Capital Markets, LLC, Morgan*

*Stanley & Co. Incorporated, Banc of America Securities LLC, RBC Capital Markets Corporation, J.P. Morgan Securities Inc., Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., ABN AMRO Incorporated, and A.G. Edwards & Sons, Inc.*

LEWIS A. KAPLAN, *District Judge.*

The collapse of the residential mortgage market in the United States greatly affected the financial markets and the owners of securities issued by banks and other participants in the financial industry. This case concerns three perpetual hybrid capital securities (the "Securities") issued by ING Groep, N.V. ("ING") in offerings during June and September 2007 and June 2008 pursuant to a December 1, 2005 Shelf Registration Statement ("2005 SRS") and numerous prospectuses (collectively, the "Offering Materials"). The Securities are ordinary corporate debt instruments, rather than structured products backed by mortgage loans. Plaintiffs each purchased one of these securities and sue ING some of its affiliates, former officers and directors, and the securities' underwriters under Sections 11, 12, and 15 of the Securities Act of 1933[1] on a theory that the Offering Materials related to each of the three offerings contained materially false and misleading statements or omissions. The matter is before the Court on defendants' motion to dismiss the complaint for failure to state a claim upon which relief may be granted.

*Facts*

*Parties*

There are three groups of defendants in this case – the ING Defendants, the

---

[1]

15 U.S.C. §§ 77k, *l*, *o*.

3

Underwriter Defendants, and the Individual Defendants.

The ING Defendants include ING and two of its subsidiaries ING Financial Holdings Corporation ("ING Holdings") and Stichting ING Aandelen ("SING").[2]  ING is the registrant of the Offering Materials and the Securities' issuer.[3]  ING Holdings is a financial services company that provides banking, insurance and asset management services.[4]  SING is an administrative trust that holds approximately 99% of the outstanding ordinary shares of ING and issues bearer depository receipts for ING's ordinary and preference shares.[5]  Both ING Holdings and SING signed the 2005 SRS.[6]

The Underwriter Defendants include UBS, Citigroup Global Markets Inc., Merrill Lynch, Wachovia Capital Markets, LLC, Morgan Stanley & Co. Inc., Banc of America Securities LLC, RBC Capital Markets Corporation, J.P. Morgan Securities Inc., ING Financial Markets LLC, Credit Suisse Securities (USA) LLC, HSBC, ABN Amro Inc., and A.G. Edwards & Sons, Inc.[7]  Each is alleged to have acted as an underwriter in connection with the offerings of the Securities.[8]

The Individual Defendants are officers or executive board members of ING, ING

---

[2] Consolidated Amended Complaint ("CAC") ¶¶ 24-26.

[3] *Id.* ¶ 24.

[4] *Id.* ¶ 25.

[5] *Id.*  ¶¶ 25-26.

[6] *Id.*

[7] *Id.* ¶¶ 43-55.

[8] *Id.*

4

Holdings, or SING.[9]   Each of the Individual Defendants, except John C.R. Hele, signed the 2005

SRS.[10]  In addition, Mr van Barneveld signed ING's Forms 6-K dated May 22, 2007, June 4, 2007,

September 24, 2007, May 15, 2008 and May 19, 2008[11] and  Mr. Maas signed also the ING's 2006

Form 20-F.[12]  Mr. Hele signed ING's September 24, 2007 Form 6-K and 2007 Form 20-F only.[13]


*RMBS*

A mortgage backed security ("MBS") is a financial instrument based on a pool of

mortgage loans.  To create an MBS, mortgage loans typically are acquired, pooled together, and then

sold to a trust.  The trust in turn issues securities to purchasers who thus become trust beneficiaries.

The MBS holders receive distributions from the trustee according to the cash flow generated by the

pool of mortgages and the rights of the respective classes of securities.   The loans underlying

residential mortgage backed securities ("RMBS") usually are mortgages extended to borrowers for

residential properties.  Alt-A RMBS are based on loans to borrowers who, because of deficiencies

in their credit profiles, did not qualify for "prime" loans.  Subprime RMBS are based on mortgages

---

[9]
       *Id.* ¶¶ 27-41.

       The Individual Defendants are Michel J. Tilmant, John C.R. Hele, Cees Maas, J. Hans van
       Barneveld, Eric. F. Boyer de la Giroday, Fred S. Hubbell, Eli P. Leenaars, Alexander H.G.
       Rinnooy Kan, Hans K. Verkoren, John K. Egan, A.H.J. Risseeuw, H.J. Blaisse, P.M.L.
       Frentrop, T. Regtuijt, and J.J.M. Veraart.  *Id.*

[10]
       *Id.*

[11]
       *Id.* ¶ 30.

[12]
       *Id.* ¶ 29.

[13]
       *Id.* ¶ 28.

5

to subprime borrowers.[14]

   RMBS underwriters evaluate the likelihood of default on the loans underlying a particular RMBS asset to determine the predicted risk of default, which is known as the RMBS's "expected loss." The RMBS then is broken down into pieces – called "tranches" – based on the likelihood that a particular tranche will suffer loss. The lower tranches are the first to have their payments discontinued in the event that the underlying mortgagees default on their loans. Accordingly, these tranches usually have lower credit ratings. The higher tranches are protected from defaults on the underlying loans by the lower tranches. Accordingly, they receive higher credit ratings.[15]

*The Offerings*

   Securities issued in three offerings – the June and September 2007 Offerings, and the June 2008 Offering – are at issue in this case.

*The June 2007 Offering*

   On June 8, 2007,[16] ING filed a prospectus to issue $1 billion of 6.375 percent ING

---

[14]

  *See id.* ¶¶ 61-66; *see generally In re Lehman Bros. Sec. and ERISA Litig.*, 681 F. Supp. 2d 495, 498 (S.D.N.Y. 2010).

[15]

  *Id.* ¶ 62.

[16]

  Paragraph 59 of the CAC alleges that the June 2007 Prospectus was filed on June 6, 2007. *Id.* ¶ 59. Paragraph 115 alleges that it was filed on or about June 8, 2007. *Id.* ¶ 115. The SEC's online filing system, EDGAR, indicates that ING filed a prospectus pursuant to Rule 424(b) on June 8, 2007.

6

Perpetual Hybrid Capital Securities (the "June 2007 Securities") pursuant to the 2005 SRS.[17] The prospectus related to the June 2007 Securities (the "June 2007 Prospectus") incorporated by reference ING's 2006 Annual Report ("2006 20-F") and Forms 6-K filed on May 22, 2007 and June 4, 2007 (all collectively, the "June 2007 Offering Materials")[18]

The June 2007 Prospectus reported ING's shareholders' equity as €40.117 billion, total annual income as $62.378 billion, and net annual profit at $8.949 billion.[19] The 2006 20-F stated that ING's residential mortgage portfolio reached €69 billion and described changes to ING's risk management system.[20] The May 22, 2007 Form 6-K attached a May 16, 2007 press release, which stated that ING's capital position had strengthened and announced ING's plans to buy back €5 billion in shares.[21]

*The September 2007 Offering*

On September 27, 2007, ING filed a prospectus to issue $1.5 billion of 7.375 percent ING Perpetual Hybrid Capital Securities (the "September 2007 Securities") pursuant to the 2005 SRS. The prospectus related to the September 2007 Securities (the "September 2007 Prospectus") incorporated by reference ING's 2006 20-F and ING's Forms 6-K filed on September 24, 2007, June

---

[17]      *Id.* ¶ 59.

[18]      *Id.* ¶¶ 115-116.

[19]      *Id.* ¶¶ 116, 119.

[20]      *Id.* ¶¶ 117-18.

[21]      *Id.* ¶ 119.

4, 2007, and May 22, 2007 (all collectively, the "September 2007 Offering Materials").[22]

The September 24, 2007 6-K reported ING's condensed consolidated interim accounts for the six month period ending June 30, 2007.  It described "recent developments in credit markets," noted that credit markets had become "more turbulent amid concerns about subprime mortgages" among other assets, but stated that the

> "market disruption has had a limited impact on ING.  Overall, ING considers its subprime [and] Alt-A . . . exposure to be of limited size and of relatively high quality. . . . As of [July 31, 2007] subprime exposure amounted to EUR 3.2 billion, representing 0.24% of total assets, and Alt-A exposure amounted to EUR 28.7 billion, representing 2% of total assets.  The Group's exposure to subprime and Alt-A mortgages is almost entirely through asset-backed securities."[23]

It stated also that (1) ING's Alt-A portfolio had an average FICO score of 721 and a loan-to-value ("LTV") ratio of 70 percent, (2) 93 percent of ING's subprime assets and 99.9 percent of its Alt-A assets were rated AAA or AA, (3) as "of July 31, 2007, the negative revaluation[s], based on mark-to-market approach . . . were EUR 58 million (for subprime) and EUR 233 million (for Alt-A), respectively, despite the significant market downturn," and (4) shareholders' equity decreased by €0.1 billion or 0.3 percent to €38.2 billion.[24]

---

[22]
       *Id.* ¶¶ 121-22.

[23]
       *Id.* ¶ 124.

[24]
       *Id.* ¶¶ 124-25.

8

*The June 2008 Offering*

On June 12, 2008,[25] ING filed a prospectus to issue $2.0 billion of 8.50 percent ING Perpetual Hybrid Capital Securities (the "June 2008 Securities") pursuant to the 2005 SRS.  The prospectus related to the June 2008 Securities (the "June 2008 Prospectus") incorporated by reference ING's 2007 20-F and ING's Forms 6-K filed on May 27, 2008, May 19, 2008, and May 15, 2008 (all collectively, the "June 2008 Offering Materials").[26]

The June 2008 Offering Materials contained ING's reported 2007 and first quarter 2008 financial information.[27]  The 2007 20-F contained also numerous statements regarding ING's Alt-A and subprime RMBS.  ING's "exposure to the U.S. housing market [wa]s predominantly via highly rated RMBS investments."[28]  Eighty-nine percent of ING's asset backed securities ("ABS"), of which RMBS are a part, were rated AAA and ten percent were rated AA.[29]  In 2007, ING's subprime RMBS suffered €64 million in net impairments and trading losses, and a negative pre-tax revaluation of €307 million.  Ninety-six percent of the assets, however, were rated AA or higher,

---

[25]

Paragraph 59 of the CAC alleges that the June 2008 Prospectus was filed on June 10, 2008. *Id.* ¶ 59.  Paragraph 131 alleges that it was filed on or about June 12, 2008.  *Id.* ¶ 115.  The SEC's online filing system, EDGAR, indicates that ING filed a prospectus pursuant to Rule 424(b) on June 12, 2008.

[26]

CAC ¶¶ 59, 131-32.

[27]

*Id.* ¶ 134 (annual income of $117.707 billion, net annual profit of $14.202 billion), ¶ 138 (quarterly income of €19.998 billion, quarterly net profit of €1.564 billion).

[28]

*Id.* ¶ 134.

[29]

*Id.*

9

and the fair value of the assets was 90.1 percent.[30]

According to the June 2008 Offering Materials, at the end of 2007, ING had two

definitions of Alt-A assets, each of which referenced particular LTV ratios, FICO credit scores, and

documentation of the loans underlying the securities.  Under the "broad" definition, ING had €27.5

billion of exposure at December 31, 2007.  Under the "narrow" definition, ING had €9.7 billion of

exposure.  Ninety nine percent of the Alt-A RMBS under the "narrow" definition were rated AAA.

ING took no trading losses or impairments in its Alt-A portfolio in 2007, and valued them at 96.7

percent of fair value.[31]  ING stated that its "pressurised asset classes [e.g., U.S. subprime and Alt-A

RMBS, CDOs and CLOs] [were] of high quality and ha[d] not led to major impairments."[32]

The June 2008 Offering Materials contained also statements regarding ING's risk

management policies.  The 2007 20-F, for instance, stated that ING

> "ha[s] built a risk management function and fully integrated risk management into
> the daily management of all business units and strategic planning, embedding a
> philosophy of sound risk management at ING.  The turmoil in financial markets over
> recent months illustrated the importance of having sound risk management in times
> of stress.  ING has weathered this market turmoil with limited direct impact.
> . . . Moreover, with risk management fully integrated at all levels, ING is well-
> insulated from the worst effects of the market turmoil."[33]

ING's Form 6-K, which it filed with the SEC on May 15, 2008, and which was

incorporated by reference into the June 2008 Offering Materials, contained similar statements with

---

[30]

  *Id.* ¶¶ 134-35.

[31]

  *Id.* (first alteration in original).

[32]

  *Id.* ¶ 137.

[33]

  *Id.* ¶ 136.

10

respect to ING's risk management.[34]  It reported also (1) the impairments ING took on its

"pressurised asset classes," including €26 million on ING's subprime RMBS and €17 million on

ING's Alt-A RMBS, (2) their fair value, (3) that those assets had "high structural credit

protection,"and (4) that ING had a "strong" capital position even though the "adverse market

environment" had a "negative impact on" it.[35]


*The Consolidated Amended Complaint*

The CAC asserts claims under Securities Act Section 11 against all defendants,

Section 12 against ING and the Underwriter Defendants, and Section 15 against the Individual

Defendants and SING.

The CAC's key factual allegation is that ING's Alt-A and subprime RMBS portfolio,

at all times during the class period, was "extremely risky" because material portions of the loan

pools on which they were based were comprised of "risky" "option" mortgages and "negative

amortization loans" originated in the "risky" years of 2006 and 2007, some of which were for

properties located in the "risky" Florida and California markets.[36]  The essence of its claims is that

the Offering Materials were false and misleading because they omitted to disclose the "extremely

risky nature" of the ING's Alt-A and subprime RMBS, principally by failing to provide details about

the types of loans that made up the underlying pools and when and where those loans were

---

[34]     *Id.* ¶ 139.

[35]     *Id.* ¶ 140.

[36]     *See id.* ¶¶ 67-73, 120(b), 126(a), 141(a)

11

originated.[37]

       The CAC alleges that, as a result of these omissions, the Offering Materials failed to disclose the impact that ING's Alt-A and subprime RMBS had on its financial health, including its shareholder equity, liquidity, and capital position.[38]  It claims also that (1) the Offering Materials conveyed misleading LTV ratios, FICO scores, and credit ratings associated with the RMBS, (2) the June 2007 Offering Materials omitted to disclose ING's Alt-A and subprime RMBS holdings, (3) the September 2007 Offering Materials failed to explain ING's capital position even though ING previously had done so, and (4) the June 2008 Offering Materials failed to take required impairments on its Alt-A and subprime RMBS and financial institution debt securities and understated its loan loss reserves.[39]

       Defendants move to dismiss the CAC for failure to state a claim upon which relief may be granted and, in part, as barred by the statute of limitations.

*Discussion*

I.   *Legal Standard*

       In deciding a motion to dismiss, a court ordinarily accepts as true all well pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[40]  In order to survive

---

[37]    *Id.* ¶¶ 120(b), 126(a), 141(a).

[38]    *Id.* ¶¶ 3, 120, 126, 141.

[39]    *See*, *e.g.*, *id.* ¶¶ 120, 126, 141, 143-56.

[40]    *See Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

such a motion, however, "the plaintiff must provide the grounds upon which [its] claim rests through

factual allegations sufficient 'to raise a right to relief above the speculative level'" and to "state a

claim for relief that is plausible on its face."[41] Although such motions are addressed to the face of

the pleadings, the court may consider also documents attached to or incorporated by reference in the

complaint as well as legally required public disclosure documents and documents possessed by or

known to the plaintiff upon which it relied in bringing the suit.[42]


II.    *Applicable Law*

A.    *Securities Act*

Sections 11 and 12 of the Securities Act are "siblings with roughly parallel

elements."[43] They impose strict liability on certain enumerated parties for material misstatements

or omissions contained in relevant forms of communication.[44]  Section 11 applies to registration

---

[41]

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (declining to limit *Twombly* to antitrust cases).

[42]

*ATSI Commc'ns, Inc.*, 493 F.3d at 98; *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

On December 18, 2009, plaintiffs moved to strike Lowenthal Decl. Exhibits B, C, E, G, H, I, Z, and II.  On December 31, 2009, defendants opposed the motion.  On January 11, 2010, the Court issued an Order denying the motion and stating that the arguments would be considered, to the extent appropriate, in ruling on the motion to dismiss.  DI 91.  The Court has not considered Lowenthal Decl. Exhibits B, C, E, G, H, I, Z, or II in rendering this opinion.

[43]

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

[44]

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 358 ("Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities

13

statements, and limits liability to five categories of persons, including the issuer, those who sign the

registration statement, the issuer's directors, "experts" who have consented to having their reports

included in the registration statement, and the underwriters of the registered securities.[45]  Section

12 applies to prospectuses and oral communications and limits liability to "statutory sellers" – those

who either transferred title to the purchaser or successfully solicited it for financial gain.[46]  Section

15 imposes liability on individuals or entities that controlled any person liable for a primary

violation.[47]

   A misstatement or omission is actionable only if material, that is, if there is a

"substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information available."[48]  A statement is

actionable only if materially false or misleading at the time it is made.  Moreover, material

---

offering when the publicly filed documents used during the offering contain material
misstatements or omissions. Section 11 applies to registration statements, and section
12(a)(2) applies to prospectuses and oral communications."); 15 U.S.C. §§ 77k(a), 77*l*
(a)(2)).

[45]

  15 U.S.C. § 77k(a).

[46]

  15 U.S.C. § 77*l*(a)(2); *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987)
("Section 12(s) imposes liability on persons who offer or sell securities[.]"); *see also Pinter
v. Dahl*, 486 U.S. 622, 642 (1988); *Wilson v. Saintine Exploration & Drilling Corp.*, 872
F.2d 1124, 1126 (2d Cir.1988).

[47]

  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 358 (quoting 15 U.S.C. § 77*o*);
*Rombach v. Chang*, 255 F.3d 164, 177-78 (2d Cir. 2004).

[48]

  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus. ,Inc. v. Northway,
Inc.*, 426 U.S. 438, 449 (1976)).

14

omissions are actionable only if the speaker had a duty to disclose.[49]  Such a duty can arise from either (1) an "affirmative legal disclosure obligation" or (2) if "necessary to prevent existing disclosures from being misleading."[50]

B.      *Pleading Standard*

Claims under the Securities Act ordinarily need satisfy only the requirements of Rule 8 – in other words, the complaint ordinarily need "contain [only] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[51]  Rule 9(b) applies, however, when "the wording and imputations of the complaint are classically associated with fraud."[52]

Defendants here contend that Rule 9(b) applies because the CAC "is replete with 'wording and imputations . . . classically associated with fraud.'"[53]  They point to allegations that defendants acted intentionally because they allegedly "chose not to review" and "ignored" certain

---

[49]

In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 360-61; *Resnick v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); *In re Time Warner Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

[50]

In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 360-61; *In re Time Warner Sec Litig.*, 9 F.3d at 267; *I. Meyer Pincus & Assoc, PC v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991).

[51]

Iqbal, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

[52]

Rombach, 355 F.3d at 172; *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (Lynch, J.) ("'*Rombach* necessarily requires a case-by-case analysis of particular pleadings to determine whether 'the gravamen of the complaint is plainly fraud.'").

[53]

Def. Br. at 15.

15

evidence.[54]  The point also to the fact that the CAC alleges that ING had a motive to act as it did.[55]

After a careful review of the complaint, the Court concludes that it is premised on allegations sounding in negligence and strict liability, not fraud.  The allegations to which plaintiffs point as indicative of fraud are isolated.  Moreover, there are no allegations that the defendants' acted with knowledge that their statements were false or misleading or that they were reckless in not knowing their truth or falsity.[56]  To the contrary, the CAC repeatedly and specifically alleges that its claims are premised on strict liability and negligence and specifically disclaims any claim of fraud.[57]  Accordingly, Rule 8 governs the CAC's claims.

III.    *June 2007 Offering*

Defendants move to dismiss the claims based on the June 2007 Offering as barred by the statute of limitations.

Claims under Sections 11 and 12(2), and 15 of the Securities Act must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery

---

[54]

CAC ¶¶ 153, 174, 189.

[55]

*Id* ¶ 163 ("Had ING not engaged in [certain] improper practices, it would have had to recognize losses that would have caused the Company to be dangerously close to breaching regulatory capital standards, thereby exposing the Company's true capital inadequacy"), ¶ 168 (ING "incentivized not to record an impairment on its Alt-A and subprime RMBS and financial institution debt securities portfolio . . . in conformity with IFRS standards.").

[56]

*See OSRecovery, Inc. v. One Groupe Intern., Inc*., 354 F. Supp. 2d 357, 379-80 (S.D.N.Y.).

[57]

*See*, *e.g.*, CAC ¶¶ 1, 57, 120, 126, 141, 238, 248, 254.

16

should have been made by the exercise of reasonable diligence."[58]  The limitations period begins to run "after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge."[59]

Once plaintiffs are put on "inquiry notice" – that is, when the circumstances would suggest to an investor of ordinary intelligence the probability that a cause of action existed[60] – they have a duty to inquire.  The duty to inquire can be triggered by information contained in the financial press, mainstream media, and publicly filed documents.  Often referred to as "storm warnings,"[61] the "triggering information must relate directly to the misrepresentations and omissions the Plaintiffs allege in their action against the defendants."[62]  Once the duty to inquire arises, if the investor makes an inquiry, the court imputes knowledge of what a reasonable investor would have discovered in the exercise of reasonable diligence as of the date on which it would have been discovered.[63]  If the investor makes no inquiry, the court imputes knowledge as of the date the duty

---

[58]
   15 U.S.C. § 77m; *Dodds v. Cigna Sec. Inc.*, 12 F.3d 346, 349. & n.1 (2d Cir. 1993).

[59]
   *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 167 (2d Cir. 2005) (quoting *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003)).

[60]
   *Dodds*, 12 F.3d at 350.

[61]
   *See, e.g., LC Capital Partners, LP*, 318 F.3d at 151-53; *Lentell*, 396 F.3d at 169-72.

[62]
   *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 427 (2d Cir. 2008) (quoting *Newman v. Warnaco Group, Inc.*, 355 F.3d 187, 193 (2d Cir.2003)) (internal quotation marks and alterations omitted).

[63]
   *LC Capital Partners, LP*, 318 F.3d at 154.

17

to inquire arose.[64]

The essence of the CAC's claims with respect to the June 2007 Offering Materials is that they failed to disclose the amount and characteristics of ING's RMBS as well as the impact those assets had on its financial position. Defendants claim that three pieces of information put plaintiffs on inquiry notice of these claims no later than September 24, 2007.

First, the CAC alleges that, by August 8, 2007, ING had disclosed its holdings of subprime and Alt-A RMBS. It alleges that "[o]n August 8, 2007 . . . ING disclosed for the first time that it was holding €3.2 billion ($4.6 billion) in subprime RMBS and a dramatic €28.7 billion ($41.9 billion) in its Alt-A RMBS portfolio."[65] Second, ING's August 8, 2007 Form 6-K announced a negative revaluation of its subprime RMBS portfolio and provided details about its exposure to them. Specifically, it stated that "[t]he Group's total exposure of EUR 3.2 billion to subprime is through asset-backed securities which represent just 0.25% of total assets. Of these assets, 93% are rated AAA or AA. As of 31 July 2007, the negative revaluation on these assets was just EUR 58 million, despite the significant market downturn."[66] Third, ING's September 24, 2007 filing on Form 6-K  disclosed ING's holdings of Alt-A and subprime RMBS. Specifically, it disclosed that as of July 31, 2007, "subprime exposure amounted to EUR 3.2 billion, representing 0.24% of total assets, and Alt-A exposure amounted to EUR 28.7 billion, representing 2% of total assets. The

---

[64]

   *Id.*

[65]

   *See* CAC ¶ 7; *see also* ¶ 20(e) ("[A]s defendants would reveal shortly after the offering, during the quarter from March 2007 to June 2007, the unrealized losses on ING's debt portfolio – which includes the Company's RMBS securities – ***increased by more than 10-fold*** – from a loss of €347 million to €3.9 billion during that three month period.") (emphasis in original).

[66]

   Lowenthal Decl., Ex. Q ("8/8/07 6-K"), at 5.

18

Group's exposure to subprime and Alt-A mortgages is almost entirely through asset-backed securities."[67]  It further disclosed that, as of July 31, 2007, it had taken a "negative revaluation . . . [of] EUR 58 million (for subprime) and EUR 233 million (for Alt-A)" and that "[t]hese negative revaluations are reflected through equity and no net impairments have been necessary through the income statement."[68]

These statements disclosed enough of the essential facts that plaintiffs allege were omitted from the June 2007 Offering Materials – *viz.* that ING held Alt-A and subprime RMBS and they were losing value – to put plaintiffs on inquiry notice.[69]  The disclosures specifically related to ING, the specific assets it allegedly did not disclose in the June 2007 Offering Materials, and the fact that they were losing value.  They were contained in documents the issuer publicly filed with the SEC.  Especially in light of the allegation that by "early 2006, investors were increasingly concerned about financial institutions' exposure to mortgage-backed securities,"[70] plaintiffs would have learned from these disclosures a probability of the allegedly material omissions alleged in the CAC.  As the plaintiffs are not alleged to have undertaken any investigation following these disclosures, the plaintiffs were on inquiry notice of their claims no later than September 24, 2007,

---

[67]

Lowenthal Decl., Ex. D ("9/24/07 6-K"), at 4.

[68]

*Id.*

[69]

*LC Capital Partners, LP*, 318 F.3d at 155 (three substantial reserve charges taken within a short period of time sufficiently established inquiry notice); *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 702 (2d Cir. 1994) (disclosure that securities' underwriter had substantial holding of securities in the face of an all or none offering triggered a duty of inquiry); *see also Lentell,* 396 F.3d at 169.

[70]

CAC ¶ 75.

the date the last of these documents was filed.  The earliest complaint in this action was filed on

February 5, 2009, more than a year later.  Accordingly, the claims based on the June 2007 Offering

are untimely.

Plaintiffs' arguments to the contrary are unpersuasive.  They argue first that even if

ING disclosed its portfolio of Alt-A and subprime RMBS, the disclosures failed to notify investors

of the granular details – like the types of mortgages underlying the assets – alleged to have been

omitted.  It is well-established, however, that the facts placing one on inquiry notice "need not detail

every aspect of the alleged fraudulent scheme,"[71] but only enough in the totality of the circumstances

to establish a probability of the alleged claim.  In all the circumstances, including the allegation that

investors were especially focused on RMBS at this time, these disclosures did so.

Relying on *Newman v. Warnaco Group, Inc.*,[72] plaintiffs next argue that the

disclosures were "softened" by words of comfort from management and therefore were insufficient

to put them on inquiry notice.[73]  They point specifically to statements in the August 2007 6-K that

the "market disruption has had a limited impact on ING" and that ING considered its subprime

exposure to be "of limited size and of relatively high quality."[74]   *Newman*, however, is readily

distinguishable.

The complaint in *Newman* accused the defendants of fraudulent inventory and

---

[71]

      *Staehr*, 547 F.3d at 427 (quoting *Dodds*, 12 F.3d at 352).

[72]

      335 F.3d 187 (2d Cir. 2003).

[73]

      Pl. Br. at 15.

[74]

      *Id.*

forecasting practices.[75]   The defendants argued that the issuer's 1998 Form 10-K, which had disclosed large write-downs, placed plaintiffs on inquiry notice.  The court held that plaintiffs were not notified of the alleged fraud with sufficient clarity because the 1998 10-K specifically attributed the write-downs to the adoption of a new accounting policy.[76]   That is, the Form 10-K was insufficient to put plaintiffs on inquiry notice because it attributed the write-downs to a benign reason other than the alleged fraud.  Here, by contrast, the disclosures stated that ING held Alt-A and subprime RMBS and disclosed that they were being negatively revalued.  None of the surrounding language offers a confounding explanation as in *Newman*.

Plaintiffs finally argue that the disclosures could not have placed them on inquiry notice because they did not move the price of the June 2007 Securities.[77]   While stock price movements, in some circumstances, may be a "storm warning" sufficient to put plaintiffs on inquiry notice, they are not necessary.[78]   Moreover, the Court notes the contradiction between the CAC's allegations that the June 2007 Offering Materials were materially misleading because they omitted to disclose ING's RMBS holdings and plaintiffs' argument here that the subsequent disclosure of these facts was unimportant.

Accordingly, the claims based on the June 2007 Offering Materials are untimely.

---

[75]     *Newman*, 335 F.3d at 189.

[76]     *Id.* at 194.

[77]     Pl. Br. at 15-16; *See Newman*, 335 F.3d at 195.

[78]     *See Newman*, 353 F.3d at 195.

IV.    *September 2007 Offering*

The CAC alleges that the September 2007 Offering Materials contained material misstatements and omissions regarding (1) the nature of ING's Alt-A and subprime RMBS, (2) the FICO scores and LTV ratios of the loans underlying them, and (3) the RMBS's credit ratings.

A.    *Alleged omissions regarding Alt-A and subprime RMBS*

The essence of the CAC's allegations regarding the September 2007 Offering Materials is that they failed to disclose adequately details about ING's Alt-A and subprime RMBS portfolio, including their "extremely risky" nature and the "substantial risk" they posed to ING's reported financial health, including its capital adequacy.[79]  Plaintiffs, however, have failed to allege any basis for concluding that ING had a duty to disclose this information.[80]

An omission is actionable under the Securities Act only if (1) required by an affirmative disclosure obligation or (2) necessary to avoid rendering other representations misleading.[81]  Once an offering participant speaks about a particular topic, however, its statements

---

[79]    Pl. Br. at 33; CAC ¶ 126-27.

[80]    *See Resnik*, 303 F.3d at 154 ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor.  For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information."); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 267 ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.  Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.").

[81]    *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 361, 365.

must be "complete and accurate."[82]  In order for a disclosure duty to attach on this basis, the complaint must allege some way in which the representations made in the offering materials are inaccurate or incomplete.[83]  Securities Act Sections 11 and 12 do not require an offering participant to disclose information "merely because a reasonable investor would very much like to know" it.[84]

Plaintiffs here claim that ING had an obligation to disclose the details of its Alt-A and subprime RMBS assets, including information about the specific types of loans underlying the securities and the geographic areas in which they were originated, in order to render its (1) reported financial metrics and (2) statements that ING "considered its subprime [and] Alt-A . . . exposure to be of limited size and of relatively high quality" and that they had a "limited impact" on the Company, not misleading.[85]  The CAC, however, fails to allege that these statements were incomplete or inaccurate at the time they were made.  Plaintiffs therefore have failed to show that additional disclosures were required.

First, there are no allegations that any of ING's reported financial metrics were false at the time of the September 2007 Offering.  There are no allegations, for instance, that ING's

---

[82]

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366; *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002).

[83]

*Compare Resnik*, 303 F.3d at 153-54 (company had no obligation to disclose Black-Scholes value of stock options paid to directors because disclosures in proxy statement completely and accurately described director compensation) *with In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 267-68 ("[W]hen a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration.").

[84]

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366 (quoting *In re Time Warner Sec. Litig.*, 9 F.3d at 267).

[85]

CAC ¶ 124; Pl. Br. at 33.

23

shareholders' equity, total income, and net profit were not, respectively, €38.166 billion, €37.676 billion, and €4.594 billion as the Sept 2007 Offering Materials stated.[86]

      Second, there are no factual allegations that ING, at the time of the September 2007 Offering, did not consider its Alt-A and subprime exposure to be of "limited size,"[87] relative to ING's total assets, clearly the asserted reference point,[88] or that they were not 0.24 percent (subprime) and 2.0 percent (Alt-A) of ING's total assets.[89]

      Third, there are no allegations that ING's RMBS, as of September 2007, had had anything other than a "limited impact" on the company in amounts specifically disclosed in the

---

[86]

    *Id.* ¶¶ 122-23.

[87]

    *Id.* ¶ 124.

[88]

    In determining whether statements are materially misleading, the Court must consider the alleged misrepresentations in context. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 364 ("When analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety. The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context.") (citing *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir.1996); *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)) (internal citations and quotation marks omitted).

    Here, no reasonable investor could have been misled by ING's statement that the sizes of its Alt-A and subprime RMBS holdings were "limited" and that they were "limited" with reference to ING's total assets. The September 24, 2007 6-K, from which the CAC takes the "limited size" quotation states:

      "To date this market disruption has had a limited impact on ING. Overall, ING considers its subprime, Alt-A and CDO/CLO exposure to be of limited size and of relatively high quality. ING's total exposure to CDOs and CLOs was EUR 0.9 billion, or 0.07% of assets, as of July 31, 2007. As of that date, subprime exposure amounted to EUR 3.2 billion, representing 0.24% of total assets, and Alt-A exposure amounted to EUR 28.7 billion, representing 2% of total assets. The Group's exposure to subprime and Alt-A mortgages is almost entirely through asset-backed securities." CAC ¶ 124.

[89]

    CAC ¶ 124.

24

September 2007 Offering Materials.[90]

What is left then is the allegation that ING's statement that it considered its assets to be of "relatively high quality" was inaccurate or incomplete in September 2007 because it did not disclose the types of loans in the pools underlying ING's Alt-A and subprime RMBS or the places and years in which they were originated. The CAC's insufficiently alleges that this statement is inaccurate or incomplete.

Allegations of industry-wide or market-wide troubles alone ordinarily are insufficient to state a claim based on the securities or assets held by a defendant.[91] Here, none of the CAC's allegations concern ING's assets. The CAC describes the creation of the "housing bubble,"[92] the

---

[90]

*Id.* (negative revaluation of €58 million for subprime and €233 for Alt-A RMBS).

[91]

*Yu v. State St. Corp.*, 686 F. Supp. 2d 369, 380 (S.D.N.Y. 2010) ("To survive a motion to dismiss, plaintiffs must allege some facts to close the loop between the market turmoil and the accuracy of the Fund's valuations."); *Landamen Partners Inc. v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 545 (S.D.N.Y. 2009) (holding that complaint failed to state a claim under the Securities Act when it failed to allege any facts "linking the problems in the subprime residential mortgage market" to the defendant's "real estate investments, 85% of which were in commercial and hotel properties."); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.* ("*Nomura*"), 658 F. Supp. 2d 299, 308 (D. Mass. 2009) (holding allegation that "questionable appraisal practices were a common problem in the industry as a whole" was insufficient to allege that a registration statements' description of the appraisal practices used with respect to particular securities were false or misleading.).

Plaintiffs only response on this point – an attempt to distinguish *Landamen* – is unavailing. They argue, in essence, that the difference there between the "market" – residential assets – and the defendant's investments – commercial assets – was far larger than the difference here between ING's Alt-A and subprime RMBS and the troubles in the residential housing and credit markets. Pl. Br. at 20. This argument, however, does not dispute the principle that a complaint must sufficiently link market-wide troubles to the particular assets at issue in order to state a claim. Plaintiffs' real argument with respect to *Landamen*, then, is that they have sufficiently alleged a link where the complaint in that case did not. For the reasons stated above, the Court disagrees.

[92]

CAC ¶¶ 60-61.

types of mortgage loans issued during 2006 and 2007, and their delinquency and default rates "at the end of 2007" or later.[93]  It describes also the proportions of the pools underlying ING's RMBS that each of the allegedly "risky" types of loans constituted.[94]  It finally describes, in general terms, the market-wide increase in default rates on the mortgages underlying RMBS, the resulting "substantial distress" in the market for Alt-A and subprime RMBS, the downgrading of credit ratings attached to some tranches of RMBS, and the fact that other banks at different times beginning in October 2007 revealed losses on their mortgage-related assets.[95]

In many cases, these allegations post-date the statements in the offering materials alleged to be misleadingly incomplete.[96]  In most cases, they describe conditions related to the individual mortgage loans, not the securities structured around them.[97]  None describe ING's assets – the allegations concern the market generally,[98] other securities,[99] or the actions of other institutions.[100]  Perhaps most importantly, the only allegations that concern Alt-A and subprime RMBS – the categories of assets ING owned – before September 2007 discuss the performance of

---

[93]   *Id.* ¶¶ 67-73.

[94]   *Id.*

[95]   *Id.* ¶¶ 74-101.

[96]   *See*, *e.g.*, *id.* ¶¶ 87, 92, 93-96, 98-101.

[97]   *See*, *e.g.*, *id.* ¶¶ 74, 76, 78-81, 83-86.

[98]   *See*, *e.g.*, *id.* ¶¶ 74, 766, 77, 82, 89.

[99]   *See*, *e.g.*, *id*. ¶¶ 90-91, 93.

[100]   *See*, *e.g.*, *id.* ¶¶ 93-96.

26

tranches that were lower-rated, and therefore riskier and more prone to loss, than those that ING held.[101]

Such allegations are, at best, consistent with a theory that ING's assets were "extremely risk" or not of "relatively high quality" in September 2007 and therefore not of "relatively high quality."[102] But absent some factual allegations suggesting that ING's assets had been impacted by the general market conditions at the time the allegedly misleading statements were made, the CAC "stops short of the line between possibility and plausibility"[103] that the September 2007 Offering Materials were misleading in a way that required additional disclosure. It therefore fails to state a claim on this basis.[104]

---

[101]

See, e.g., id. ¶ 89 ("Beginning in October 2006, the ABX BBB and BBB- indices began suffering substantial declines[.]"), ¶ 90 ("By February and March 2007, the ABX index for BBB and BBB- RMBS tranches had suffered serious declines – some BBB dropped as much as 60% of par. During that time, market participants anticipated that the values of junior tranches RMBSs such as these were going to zero.") (emphasis omitted), ¶ 91 ("By September 30, 2007, the ABX triple-B indices had fallen to 30% of par, while the TABX indices for all junior mezzanine tranches showed such tranches to be effectively worthless. The TABX index for mezzanine super seniors had fallen to 33% of par. In addition, ABX indexes for higher RMBS tranches also showed substantial declines: single-A ABX indices were at 50% of par, while double-A ABX indices were at 80%.").

[102]

See Twombly, 550 U.S. at 557.

[103]

Id.

[104]

The cases on which plaintiffs rely to support the argument that ING was subject to a duty to disclose do not change this conclusion. Indeed, they only underscore the difference between this case and those where disclosure was necessary in order to render another statement not misleading. In In re Globalstar Sec. Litig., No. 01 Civ. 1748 (SHS), 2003 WL 2295316 (S.D.N.Y. Dec. 15, 2003), the company and its CEO predicted that, by the end of a particular fiscal year, it would have approximately 500,000 customers and $250 to $300 million in revenues, and repeated these predictions throughout that year. Id. at *3-4. The court found that these statements were materially misleading because plaintiffs had alleged that prior to and during the fiscal year, the company and its CEO knew it was having problems with its infrastructure that would significantly diminish its revenues. Id. The court in Caiola v. Citibank, N.A., 295 F.3d 312 (2d Cir. 2002) held that Citibank had a duty

Plaintiffs next allege that ING was obligated to disclose the allegedly omitted information by Item 503(c) of Regulation S-K ("Item 503").[105] Item 503 requires issuers to discuss "the most significant factors that make the offering speculative or risky."[106] But, as noted, the CAC fails to allege, in anything other than conclusory terms, that any of ING's Alt-A or subprime RMBS were "speculative or risky" at the time of the September 2007 Offering. Accordingly, it has failed to allege that Item 503 obligated ING to disclose more than it did.

Plaintiffs next argue that International Accounting Standard ("IAS") Nos. 30 and 32 required ING to disclose the allegedly omitted information. IAS 30 requires disclosure of significant concentrations of "assets, liabilities, and off balance sheet items."[107] IAS 32 requires disclosure of "significant concentrations of credit risk."[108] This claim fails for at least three reasons.

First, ING disclosed its Alt-A and subprime RMBS.[109] Plaintiffs have pointed to no authority requiring more detailed disclosures about the specific types of loans in the pools

---

to disclose to its customer that it would be discontinuing a particular hedging strategy after a merger that the customer used because Citibank had represented to the customer that their relationship would remain the same. *Id.* at 329. Finally, the plaintiffs in *Lapin v. Goldman Sachs Group, Inc.* 506 F. Supp. 2d 221 (S.D.N.Y. 2006), stated a claim when the defendants represented that their analyst reports were objective an unbiased even though they knew about allegedly pervasive conflicts of interests and their effects on the analyst reports. *Id.* at 240.

[105]

17 C.F.R. § 229.503(c).

[106]

*Id.* The discussion "must be concise and organized logically." *Id.*

[107]

*Id.* ¶ 130.

[108]

*Id.* ¶ 129.

[109]

*Id.* ¶ 124 (subprime exposure of €3.2 billion, Alt-A expoure of €28.1 billion).

28

underlying the RMBS and the years and places in which they were issued.

Second, the CAC fails to allege that ING's holdings of Alt-A and subprime RMBS were a "significant concentration of its assets, liabilities and off balance sheet items." At the time of the September 2007 Offering, ING's Alt-A and subprime RMBS respectively constituted two percent and 0.24 percent of its total assets.[110] Plaintiffs have pointed to no authority indicating that IAS 30 requires disclosure of such comparatively minor holdings.

Third, for the reasons noted above, the CAC fails to allege any facts indicating that ING's Alt-A and subprime RMBS were a significant concentration of credit risk at the time of the September 2007 Offering.[111] In consequence, the CAC fails to allege that IAS 30 or 32 obligated ING to disclose the allegedly omitted information.

Plaintiffs rely on three cases to support their position that these accounting principles required disclosure of the allegedly omitted information.[112] None helps their cause. None involved IAS 30 or IAS 32. More importantly, in each case, unlike here, the complaint alleged facts tending to demonstrate that the defendant had violated the relevant accounting principles.

---

[110]

    *Id.* ¶ 124.

[111]

    Plaintiffs allege in a conclusory manner that the September 2007 Offering Materials's failure to disclose the above information violated ING's "stated risk management policies and public representations." CAC ¶ 120(f). The CAC nowhere alleges what ING's risk management policies were in September 2007.

[112]

    They cite a fourth case in a footnote for the proposition that alleged accounting improprieties may not be resolved on a motion to dismiss. *See* Pl. Br. at 32 (citing *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001)). As in the other cases cited above, the plaintiffs there alleged that the defendants published statements with knowledge of facts indicating that crucial information in them had been discredited. *Id.* at 665.

The court in *In re RAIT Fin. Trust Sec. Litig.*,[113] found that plaintiffs had stated a claim by alleging that the defendant, RAIT, had violated Statement of Financial Accounting Standards ("SFAS") No. 115, which required RAIT to take "other-than-temporary, asset impairment charges" to certain securities.[114]   The court found that the plaintiffs had alleged facts supporting the conclusion that RAIT knew about "other-than-temporary impairments" that it would have had to take on those securities had it complied with the proper accounting policies, including RAIT insiders' knowledge that the securities' issuers were likely to default.[115]

Plaintiffs in *In re New Century*[116] alleged that New Century, a mortgage loan originator, was reducing the value of its Allowance for Loan Losses, a reserve to cover losses on mortgage loans it held for investment in violation of GAAP, even as the number of delinquent loans that New Century held on its books was increasing.[117]   In holding that plaintiffs had stated a claim, the court found that the complaint contained factual allegations about the "declining loan performance, an increase in defaults, and a concomitant rise in repurchase claims that were baldly disregarded" by New Century.[118]

Finally, the Court in *In re Washington Mutual, Inc. Sec., Derivative & ERISA*

---

[113]   No. 07 Civ. 3148 (LDD), 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008).

[114]   *Id.* at *7.

[115]   *Id.*

[116]   588 F. Supp. 2d 1206 (C.D. Cal. 2008).

[117]   *Id.* at 1215.

[118]   *Id.* 1227.

30

*Litig.*,[119] found that Washington Mutual ("WaMu") failed to take adequate reserves in violation of GAAP because its reserve calculation failed to account for other improper practices regarding its mortgage loan origination practice like inflated appraisals, deficient underwriting, and ineffective internal controls established by factual allegations in the complaint.[120]

Here, the CAC fails to make any factual allegations that tend to show that ING violated the applicable accounting policies. It therefore fails to state a claim on this basis.

B.     *FICO and LTV statements*

The September 2007 Offering Materials stated that "ING's Alt-A portfolio has an average FICO score of 721 and an LTV of 70%."[121]   The CAC alleges that these statements were false and misleading because the FICO scores and LTV ratios associated with the loans underlying ING's RMBS were determined at the time the loans were underwritten, but had deteriorated with the collapse of the housing market.[122]   They allege also that the statements were misleading because they presented the FICO and LTV scores as existing at the time of the offering when, in fact, they were determined at the time the loan first was underwritten.[123]   These claims are insufficient.

Plaintiffs have alleged no facts indicating that the FICO scores and LTV ratios stated

---

[119]

259 F.R.D. 490 (W.D. Wash. 2009).

[120]

*Id.* at 507.

[121]

CAC ¶ 124.

[122]

Pl. Br. at 34-35.

[123]

CAC ¶ 127.

in the September 2007 Offering Materials were false.  They have alleged only that "a FICO score

for a loan taken in 2005 was not necessarily the same homeowner's FICO score in 2007 or 2008,"

that "many Alt-A borrowers were counting on ever-increasing real estate values when they

purchased their homes," that "in many situations Alt-A borrowers took additional lines of credit out

or second mortgages on their homes, creating a total effective LTV ratio of 100%," and that "as

housing prices throughout the United States plummeted during 2006, 2007 and 2008, LTV ratios

quickly became out-dated and . . . significantly understated the risk of default."[124]  But as these

allegations say nothing about the LTV ratios and FICO scores of any of the loans underlying ING's

RMBS, they fail to state a sufficient claim for relief.

   ING's statement that its "Alt-A portfolio *has* an average FICO score of 721 and an

LTV of 70%" presents a closer question.[125]  Defendants appear to concede that the FICO scores and

LTV ratios were not determined on the date that the statements were made, but instead, spoke as of

the dates the loans were made.[126]  The distinction between historic and present ratios and scores in

this case is immaterial, however, as plaintiffs have failed to allege any facts indicating that the FICO

scores and LTV ratios for the loans underlying ING's RMBS had changed from the date they first

were underwritten.  Consequently, the CAC fails to state a claim for relief on this basis.

   C. *Credit rating statements*

   With respect to ratings, the September 2007 Offering Materials stated that

---

[124]

  *Id.* ¶ 155-56.

[125]

  *Id.* ¶ 124 (emphasis added).

[126]

  Def. Br. at 33.

"[a]s of July 31, 2007, 93% of the subprime assets and 99.9% of the Alt-A assets were rated AAA or AA.  ING is not responsible for these securities ratings, which are not a measure of liquidity and which may be changed or withdrawn without notice by the rating agencies."[127]

The CAC alleges that these statements "did not accurately reflect the risk of default"[128] and therefore were false and misleading because (1) the ratings were determined by out-of-date models based on out-of-date assumptions[129] that used  inaccurate data,[130] and (2) the ratings agencies relaxed their ratings criteria to get more business and were subject to conflicts of interest.[131]  They allege also that defendants' reliance on these ratings was "highly unreasonable" because they had "access to the necessary information to verify these ratings" and "made no effort to ensure that the ratings accurately reflected the risk" of default.[132]

As this Court previously has stated, ratings are opinions.[133]  Any given rating reflects

---

[127]

CAC ¶ 124.

[128]

*Id.* ¶¶ 97, 124, 127.

[129]

*Id.* ¶¶ 146-48.

[130]

*Id.* ¶¶ 150-51.

[131]

*Id.* ¶¶ 152-53.

[132]

*Id.* ¶ 127.

[133]

*See, e.g.*, *Tsereteli v. Residential Asset Securitization Trust 2006-A*, 692 F. Supp. 2d 387, 394-95 (holding that a rating is a "statement of opinion by each agency that it believed, based on the models it used and the factors it considered, that the credit quality of the mortgage pool underlying each Certificate was sufficient to support the assigned rating"); *In re Lehman Brothers Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 494 (S.D.N.Y. 2010) (holding that a rating is "a statement of opinion by each ratings agency that it believed, based on the methods and models it used, that the amount and form of credit enhancement built into each Certificate, along with the Certificate's other characteristics, was sufficient

the judgment of the particular rating agency that certain facts, when fed into a particular model based on a particular set of assumptions, support issuing a particular rating for a particular security.[134]  That opinion can be false or misleading only if the opinion-giver – here the rating agency – did not truly believe it to be the case at the time it was issued.[135]  There are no such allegations in the CAC.

    As the CAC has failed to allege that the ratings assigned to ING's RMBS were false or misleading, it has failed also to allege that ING's statements regarding them were false or misleading.[136]

## V.  *June 2008 Offering*

    Plaintiffs allege that ING's June 2008 Offering Materials were false and misleading because they (1) understated impairments on its Alt-A and subprime RMBS and understated also

---

[134]  to support the rating assigned to it.").

[135]  *In re Lehman Brothers Sec. & ERISA Litig.*, 684 F. Supp. 2d at 495.

    *Id.* at 494 (citing *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1131 (2d Cir.1994)  ("A statement of reasons, opinion or belief by such a person when recommending a course of action to stockholders can be actionable under the securities laws if the speaker knows the statement to be false.") (in turn citing *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1094-96, (1991))); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 210 (S.D.N.Y. 2003).

[136]  The CAC alleges also that the September 2007 Offering Materials were false and misleading because ING "failed to include . . . an explanation for the Company's capital position even though it had provided such detail in its report for the prior quarter."  CAC ¶ 126(d).  Plaintiffs do not press this point in their briefing.  The allegation is not actionable in any event.  First, the CAC fails to allege why ING was obliged to disclose this information.  The fact that previous quarterly reports did so is irrelevant as the September 24, 2007 6-K is not a quarterly report.  Second, it fails to allege how the allegedly omitted information would have been material, particularly in light of the quarterly reports that did disclose the information plaintiffs apparently sought.  *See* Lowenthal Decl. Exs. Q, BB.

its required loan loss reserves, (2) omitted details about the "risky nature" of its Alt-A and subprime RMBS, including the particular types of mortgages in the pools underlying them, the places and years in which those loans were originated, and their effect on the company's financial condition, (3) omitted to disclose ING's holdings of financial institution debt securities, (4) referred to LTV ratios, FICO scores, and credit ratings, and (5) violated a series of accounting principles.

###### A. Impairments and loan loss reserves

In the fall of 2008, ING announced a €409 million impairment charge related to its Alt-A and subprime RMBS,[137] a €416 million impairment charge on its debt securities, including securities related to certain unnamed Icelandic banks and WaMu, and approximately €400 million in loan loss reserve increases.[138] The CAC alleges that ING, based on market conditions,[139] should have taken these impairment charges and increased its loan loss reserves no later than March 31, 2008 and that the June 2008 Offering Materials were materially misleading because it failed to do so.[140] The sole basis for their allegation that ING should have taken larger impairment charges earlier than it did is that they were required to do so by IAS No. 39. The sole basis for the allegation

---

[137] The CAC alleges that ING should have taken impairments on the Collateralized Debt Obligations ("CDOs") and Collateralized Loan Obligations ("CLOs") that it held no later than March 31, 2008. ¶ 173. It does not allege the amount of the alleged impairment, and therefore provides no basis for the Court to determine materiality.

[138] CAC ¶ 163.

[139] See, e.g., ¶¶ 175, 180, 186, 210.

[140] Id. ¶ 162. The CAC alleges also that, as a result, ING's representations concerning net income, retained earnings, and capital were inaccurate. Id. ¶¶ 214-15.

that ING should have increased its loan loss reserves is the allegation that it was necessary in light of the allegedly unreported impairments.[141]

      Assuming without deciding that the CAC sufficiently alleges that IAS 39 required ING to take the impairments and loan loss reserves before the June 2008 Offering Materials were published, the CAC fails to allege how failing to do so was material. A statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[142] Both quantitative and qualitative factors must be considered.[143] As materiality is a mixed question of law and fact, a complaint may be dismissed on materiality grounds only if the alleged misstatements and omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."[144]

      Defendants claim that the allegedly omitted impairments with respect to the Alt-A and subprime RMBS, the financial institution debt securities, and the omitted loan loss reserves, were quantitatively and qualitatively immaterial.

      The quantitative aspect clearly favors defendants. The allegedly omitted impairments with respect to the Alt-A and subprime RMBS and the financial institution debt securities were,

---

[141]     *Id.* ¶¶ 212, 215.

[142]     *ECA*, 553 F.3d at 197; *Ganino*, 228 F.3d at 162.

[143]     *ECA*, 553 F.3d at 204.

[144]     *Id.* at 197.

respectively, €409 million and €416 million.[145]  At the time plaintiffs allege that these impairments should have been recognized, March 31, 2008, the value of ING's total assets exceeded €1,303 billion.[146]  Accordingly, each alleged impairment constituted just over 0.03 percent of ING's total assets.  The loan loss reserves allegedly were understated by €400 million,[147] an amount representing also just over 0.03 percent of ING's total assets.  Even aggregating all three numbers, as plaintiffs do in the CAC, the allegedly omitted impairments and understatements represented 0.09 percent of ING's net assets.  These amounts were not quantitatively material.[148]

Plaintiffs assert that the materiality of the impairments and loan loss reserve should be considered in the context of ING's total equity, not its total assets.[149]  But even on that view, the impairments and understatements each constituted approximately one percent of ING's total equity,

---

[145]

CAC ¶ 163.

[146]

See Lowenthal Decl. Ex. S ("5/15/08 6-K") at 16 (reporting ING's total assets as of March 31, 2008).

[147]

CAC ¶ 163.

[148]

See ECA, 553 F.3d at 204 (noting that SEC uses five percent numerical threshold for materiality and that an accounting decision that "affects less than one-third of a percent of total assets does not suggest materiality.").

[149]

Pl. Br. at 22-23 ("[D]efendants completely ignore the CAC's allegation that ING's RMBS portfolio was material because it equaled 75% of the Company's total equity, thereby posing a significant threat to the Company's Tier-1 capital ratio and its ability to function as a bank."), 49 ("[T]he material nature of the Company's impairment losses does not arise from their effect as a percentage of total assets, but their effect up the Company's capital ratio."); see also CAC ¶ 4 (comparing size of ING's Alt-A and subprime RMBS portfolio to its "total equity"), ¶ 7 (comparing size of ING's Alt-A and subprime RMBS portfolio to "reported shareholder equity of €40 billion and 'Capital and Reserves' of €40 billion) , ¶¶ 13-15 (stating importance to ING of being "well capitalized" and stating that Offerings allowed it to raise over $4.4 billion of "Tier 1" capital).

or, in the aggregate, 2.9 percent, also quantitatively immaterial.[150]

      The quantitative immateriality of the alleged impairments and understatements alone would not be grounds for dismissal if relevant qualitative factors would permit a finding of materiality. The qualitative factors "are intended to allow for a finding of materiality if the quantitative size of the misstatement is small, but the effect of the misstatement is large."[151] Plaintiffs' sole argument in this regard is that the impairments and understatements were qualitatively material because, in October and November 2008, they "forced ING to seek and receive a bail out by the Dutch Government to remain adequately capitalized and functioning."[152] There are at least two problems with this argument.

      First, the CAC connects only the Alt-A and subprime RMBS impairments to ING's need to obtain a bailout from the Dutch government.[153] There are no allegations that the unrecorded impairments with respect to the financial institution debt securities and the understated loan loss

---

[150]

      The CAC alleges that ING had approximately €31 billion of Alt-A and subprime RMBS, and that this represented approximately seventy-five percent of the Company's total equity. CAC ¶ 4. Assuming that to be true, ING's total equity would be approximately €41.3 billion.

[151]

      *ECA*, 553 F.3d at 205; *Ganino*, 228 F.3d at 163.

[152]

      Pl. Br. at 48; CAC ¶¶ 16-17, 105-07, 141(d).

[153]

      CAC ¶ 16 ("ING's RMBS portfolio was so toxic to the Company's balance sheet that on October 20, 2008 . . . it was forced to seek a €10 billion . . . bailout from the Dutch government. This bailout was due to the declines in the value of ING's RMBS assets during 2007 and 2008), ¶ 17 ("ING admitted that is RMBS portfolio threatened the bank's liquidity. To avert a total collapse, the Dutch government intervened and on January 26, 2009 took ownership of over 80% of the €27.7 billion . . . Alt-A portfolio on ING's books . . . ."), ¶¶ 105-07 (stating that ING needed Dutch bailout in context of declines in RMBS portfolio).

38

reserves "forced" ING to need a Dutch government bailout.[154]   Accordingly, even assuming the CAC's allegations could sufficiently make out qualitative materiality, they could do so only with respect to the Alt-A and subprime RMBS impairment.

Second, the fact, assumed here to be true, that ING was "forced" to accept a government bailout in October and November 2008 because of allegedly unreported impairments and understatements does not say anything about whether the same thing would have been the case in March or June 2008, particularly in light of the "distinctively unique financial crisis"[155] that was

---

[154]   The Court notes that the CAC once alleges that the allegedly omitted financial institution debt impairment, along with the allegedly omitted RMBS impairments and understated loan loss reserves "forced ING to procure capital from the Dutch government." *Id.* ¶ 141(d). The theory, based on a completely conclusory allegation, that ING's financial institution debt impairment "forced" the company to accept a government bailout, is not plausible in light of the CAC's contradictory allegations that the impairments to the €31 billion Alt-A and subprime RMBS asset portfolio were the driving factor.

Plaintiffs' memorandum of law states that ING was "forced" to take the bailout because of "increasing exposures in their 'pressurized asset classes' [i.e., its non-prime RMBS and debt securities]." Pl. Br. at 49.  The bracketed attempt to define "pressurized asset classes" – a term used by ING in its public filings – as including the financial institution debt securities is exceedingly misleading and is contradicted by the CAC.  According to the CAC, each time ING uses the phrase "pressurised [or pressurized] asset securities" it is in the context of Alt-A and subprime RMBS and not financial institution debt securities. *See*, *e.g.*, *id.*¶ 111 (ING announced €3 billion impairment and loss on pressurized assets, with €1.8 billion in the Alt-A RMBS portfolio), ¶ 137 ("ING's exposure to pressurised asset classes [e.g., U.S. subprime and Alt-A RMBS, CDOs and CLOs] is of high quality and has not led to major impairments.") (emphasis omitted) (alterations in CAC), ¶ 139 ("Losses on ING's investments in pressurised asset classes were limited to EUR 55 million after tax, reflecting the high structural credit protection of the securities in ING's subprime and Alt-A RMBS portfolios.").  Moreover, the CAC alleges that ING never disclosed its exposure to Icelandic Bank and WaMu debt securities, *id.* ¶ 211, further contradicting the argument that "pressurised asset classes" as used in the company's financial statements could have included those assets.

[155]   CAC ¶ 189.

particularly turbulent in the later period.[156]  There are no factual allegations that ING would have been "forced" to accept a bailout from the Dutch government had the impairments and understatements been recorded at the end of March 2008 or at the time of the June 2008 Offering.

Consequently, the CAC fails to allege facts sufficient to support an inference that the allegedly undisclosed impairments or loan loss reserves were material.

### B.    Alleged Omissions

#### 1.    Omissions relating to allegedly "risky nature" of Alt-A and subprime RMBS

Plaintiffs next argue that ING was obliged to disclose the details about its Alt-A and subprime RMBS, including the particular types of loans in the pools underlying the securities, as well as the places and years in which they were issued, because the June 2008 Offering Materials (1) described the assets as "near prime and of high-quality," (2) noted that ING was "well-insulated from the worst effects of the market turmoil," and (3) had "risk management fully integrated at all levels."[157]  As with the September 2007 Offering Materials, they argue that these statements "obligated [defendants] to speak fully and truthfully about [ING's] RMBS exposure.[158]

Defendants first contend that, like the September 2007 Offering Materials, the CAC fails to allege ING's assets were "extremely risky" so that disclosures about, for example, the types

---

[156]    Id. ¶ 106 (noting "deepening market turmoil" in third quarter of 2008).

[157]    Pl. Br. at 42.

[158]    Id.

40

of loans underlying them and the states in which the loans were originated were required.[159]  The
CAC's allegations with respect to the June 2008 Offering Materials, however, sufficiently allege a
connection between the general market conditions and ING's assets to plausibly suggest that they
were risky.

   In addition to the market-wide allegations described above,[160] the CAC specifically
alleges specific problems in ING's RMBS portfolio prior to the June 2008 Offering including:

- the AAA rated tranches of Alt-A RMBS had declined in value,[161]

- more than twenty percent of ING's RMBS had been downgraded from AAA
  credit rating to AA,[162]

- increases in the "60+ day delinquent, bankrupt, foreclosed and REOs
  mortgage loans" underlying the RMBS in some of ING's subsidiaries,[163] and

- declines in the notional values of ING's Alt-A RMBS.[164]

These allegations sufficiently link the troubles in the market-at large to ING's portfolio to support
a plausible inference, that ING's assets in June 2008 were "extremely risky," and could impact the
company's finances.   The fact that ING held these allegedly risky assets may have rendered

---

[159]   Def. Br. at 17-20, 38.

[160]   *See*, *e.g.*, CAC ¶¶ 74-101.

[161]   *Id.* ¶¶ 92, 185.

[162]   *Id.* ¶ 182.

[163]   *Id.*

[164]   *Id.*

misleading its statements that its assets were "near prime and of high quality" and that it was "well insulated" from the worst of the market if those risks were material.

Defendants next argue that the allegedly omitted information was immaterial in light of the extensive information the June 2008 Offering Materials disclosed about ING's Alt-A and subprime RMBS.[165]  As noted, an omission is material only if it "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."[166]  This "necessarily depends on all relevant circumstances of a particular case."[167]  In consequence, a complaint may not be dismissed for immateriality unless the alleged omissions "are so obviously unimportant that reasonable minds could not differ on the question of their importance."[168]

The June 2008 Offering Materials contained numerous disclosures about ING's Alt-A and subprime RMBS assets.  ING's 2007 20-F disclosed the size of ING's holdings,[169] and the negative revaluations taken on them,[170] the fact that the credit ratings on more than €10 million of them had been downgraded by the credit rating agencies.[171]  It warned also that "there can be no assurances that we will not experience further negative impacts to our shareholders equity or profit

---

[165] Def. Br. at 38.

[166] *Basic, Inc.*, 485 U.S. at 231-32.

[167] *Ganino*, 228 F.3d at 162.

[168] *Id.*

[169] CAC ¶ 114.

[170] *Id.* ¶¶ 134-35.

[171] *Id.*

and loss accounts from such assets in future periods."[172]  ING's May 15, 2008 6-K disclosed

additional details about the company's exposure to Alt-A and subprime RMBS, reporting €33

million in impairments on ING's subprime RMBS and €17 million on its Alt-A RMBS, as well as

declines in the fair value of its RMBS portfolio.[173]  It disclosed also, in a separate appendix called

"Direct Impact of Credit and Liquidity Crisis," that ING had taken negative revaluations of €528

million and €4.2 billion on its subprime and Alt-A assets, respectively.[174]

  The question whether these disclosures rendered the alleged omissions immaterial

is a close call.  They were extensive and described in some detail the risks that ING's subprime and

Alt-A RMBS posed to the company's financial health.  But they were undercut to some extent by

ING's statements that it had suffered "limited direct impact" from the credit and liquidity crisis and

that the further negative impacts to shareholder equity might occur as a result of "uncertainties

concerning valuations," as opposed to from the inherently risky nature of the securities it held.[175]

In all the circumstances, the Court cannot conclude as a matter of law that no reasonable investor

would have found additional disclosures about the nature of ING's Alt-A and subprime RMBS

immaterial as a matter of law.  Accordingly, the CAC states a claim on this basis for which relief

might be granted.[176]

---

[172]
  2007 20-F, at 10.

[173]
  *Id.* ¶ 139

[174]
  5/15/08 6-K, at 22.

[175]
  *Id.* at 1; 2007 20-F, at 10.

[176]
  The CAC's allegations that the June 2008 Offering Materials (1) contained false and
misleading risk management statements, (2) violated Item 503, and (3) omitted disclosures

2.    *Omissions related to financial institution debt securities*

Plaintiffs allege that the June 2008 Offering Materials were false and misleading because they failed to disclose "the actual risks associated with ING's investments in Icelandic Banks and WaMu debt securities."[177]  The CAC, however, fails to allege facts that would permit a conclusion that these disclosures were material.  It is devoid of any allegations about the extent of ING's exposure to Icelandic bank or WaMu debt securities or how they affected ING's financial position.  The closest it comes are allegations that ING failed to take €413 million in impairments on these assets that allegedly should have taken.  But, as noted above, this allegation is immaterial.  Accordingly, the CAC fails to state a claim on this basis.

3.    *LTV, FICO, and rating statements*

The June 2008 Offering Materials stated that "on average, the ING Direct Alt-A RMBS portfolio is near prime and of high-quality with a loan-to-value ratio of 71%, an average FICO [s]core of 723 and more than 99% of the portfolio is rated AAA."[178]  Plaintiffs allege that using the LTV ratios and FICO scores of the loans to support the assertion that ING's RMBS were "high quality" was false and misleading because those metrics were based on historic information provided by the borrowers at the time the mortgages were issued but were presented as statements

---

required by Form F-3 state a claim on this basis as well.  ¶¶ 141(e)-(f), 160.

[177]    CAC ¶ 159.

[178]    CAC ¶ 154.

of current fact.[179]  These statements are insufficient to state a claim for the reasons noted above.

Plaintiffs have failed to allege that any LTV ratios or FICO scores in the loans underlying ING's

RMBS had changed from the time the loans were originated.  The statements with respect to the

RMBS credit ratings fail also to state a claim for the reasons discussed above.

### 4.    Other alleged IFRS violations

The  CAC  alleges  also  that  ING  violated  several  other  accounting  principles,

including IAS numbers 1, 7, 10, and 34.[180]  These allegations are insufficient to state a claim

because, among other reasons, they fail to allege in anything other than a conclusory manner how

the alleged violations of these standards would have been material.[181]

### VI.    Section 15 claims

The CAC alleges that the Individual Defendants and SING are liable under Section

15 as ING's controlling persons.  As the CAC alleges a primary violation of the Securities Act only

with respect to the omissions regarding the risky nature of ING's Alt-A and subprime RMBS in the

June 2008 Offering Materials, it alleges a Section 15 claim only to that extent as well.

---

[179]    *Id.* ¶ 155-56.

[180]    *Id.* ¶¶ 219-226.

[181]    *Id.* ¶ 227 ("The violations of each of the foregoing standing alone, was a material breach of  IFRS  and/or  SEC  regulations  .  .  .  ."); *see Twombly*, 553  U.S.  at  555  ("Formulaic recitation of the elements of a cause of action will not do.").

*Conclusion*

For the foregoing reasons, defendants' motion to dismiss [DI 76] is granted except that it is denied with respect to the claims based on the allegedly omitted information regarding the "risky nature" of ING's Alt-A and subprime RMBS in the June 2008 Offering Materials and the Section 15 claims based thereon.

SO ORDERED.

Dated:          September 14, 2010

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)