Lloyd Winawer (State Bar No. 157823)
*lwinawer@goodwinprocter.com*
**GOODWIN PROCTER LLP**
10250 Constellation Boulevard, 21st Floor
Los Angeles, CA 90067
Telephone: 310-788-5177
Facsimile: 310-286-0992

Brian E. Pastuszenski (*pro hac vice*)
*bpastuszenski@goodwinprocter.com*
Inez H. Friedman-Boyce (*pro hac vice*)
*ifriedmanboyce@goodwinprocter.com*
Brian C. Devine (State Bar No. 222240)
*bdevine@goodwinprocter.com*
**GOODWIN PROCTER LLP**
53 State Street
Boston, MA 02109-2802
Telephone: 617-570-1000
Facsimile: 617-523-1231

*Attorneys for Defendants*
Countrywide Financial Corp.,
Countrywide Home Loans, Inc., CWALT,
Inc., CWMBS, Inc., CWABS, Inc.,
CWHEQ, Inc., Countrywide Capital
Markets, Countrywide Securities Corp.,
and N. Joshua Adler

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAINE STATE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTRYWIDE FINANCIAL CORPORATION, et al., <br><br> Defendants. | Case No. 2:10-CV-00302-MRP (MANx) <br><br> **COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> Date:  October 18, 2010 <br> Time:  11:00 a.m. <br> Courtroom:  12 <br> Judge:  Hon. Mariana R. Pfaelzer |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................. 1

ARGUMENT .......................................................................................... 6

I.    PLAINTIFFS' CLAIMS ARE TIME-BARRED ........................................ 6

    A.    Absent Tolling, Plaintiffs' Claims Are Time-Barred .......................... 6

    B.    *American Pipe* Tolling Does Not Apply  ........................................ 8

    C.    Even If *American Pipe* Tolling Did Apply, It Would Be Limited
        To The Offerings For Which The *Luther* Plaintiffs Had Standing ....... 15

    D.    Plaintiffs' Vague Invocation Of "Fairness" Cannot Transform An
        Exclusively Federal Rule Into One Also Applicable In State Court ..... 18

II.   PLAINTIFFS LACK STANDING AS TO 346 MBS OFFERINGS ............ 21

    A.    Plaintiffs Lack Constitutional Standing .................................... 21

    B.    Plaintiffs Lack Statutory Standing ........................................ 29

    C.    The Shelf Registration Statements Do Not Create Standing ............... 30

III.  NO LEGALLY COGNIZABLE INJURY HAS BEEN ALLEGED AS TO
     THE VAST MAJORITY OF THE MBS PLAINTIFFS BOUGHT .............. 37

    A.    The Certificates Purchased By Plaintiffs Are Still Performing .......... 37

    B.    Decline In Trading Value In An Illiquid Market Is Not Legally
        Cognizable Injury ....................................................... 39

IV.   NO MATERIAL MISSTATEMENTS OR OMISSIONS ARE ALLEGED . 44

    A.    The Representations Were Limited And Qualified ...................... 44

    B.    No Misrepresentations Have Been Tied To Any Pooled Loans .......... 46

    C.    Plaintiffs' Appraisal-Related Allegations Are Not Actionable ........... 48

    D.    The Alleged Misstatements About Compliance With Underwriting
        Guidelines Did Not Alter The "Total Mix" Of Information ............... 49

V.    THE SECTION 12(A)(2) CLAIMS FAIL ........................................ 50

    A.    Plaintiffs Fail To Allege "Seller" Liability Under Section 12(a)(2) ..... 50

i

1.   The Depositors And CFC Are Not Section 12(a)(2) "Sellers" .......................................................51

2.   Plaintiffs Have Not Pled That They Purchased Directly From CSC Or Any Other Underwriter ....................................53

3.   Plaintiffs Have Not Pled Direct Solicitation By Any Defendant ....................................................................54

B.   Plaintiffs Fail To Allege That They Purchased In The Offerings ........55

VI.   PLAINTIFFS HAVE NOT ALLEGED RELIANCE .....................................58

VII.   PLAINTIFFS DO NOT DISPUTE THAT CERTAIN OF THEIR PURCHASES WERE MADE WITH ACTUAL KNOWLEDGE .................59

VIII.   CONTROL PERSON LIABILITY HAS NOT BEEN ALLEGED...............60

CONCLUSION ............................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*420 East Ohio Ltd. P'ship v. Cocose,*
   980 F.2d 1122 (9th Cir. 1992) ................................................................40

*Abu Dhabi Comm. Bank v. Morgan Stanley & Co.,*
   651 F. Supp. 2d 155 (S.D.N.Y. 2009) .................................................25

*AIG Global Secs. Lending Corp. v. Banc of Am. Sec. LLC,*
   646 F. Supp. 2d 385 (S.D.N.Y. 2009) ............................................40, 42

*Allee v. Medrano,*
   416 U.S. 802 (1974) ..............................................................................26

*Am. Bankers Ass'n v. SEC,*
   804 F.2d 739 (D.C. Cir. 1986) ..............................................................52

*Am. Pipe & Constr. Co. v. Utah,*
   414 U.S. 538 (1974) ..................................................................... *passim*

*Am. Title Ins. Co. v. Lacelaw Corp.,*
   861 F.2d 224 (9th Cir. 1988) ................................................................57

*APA Excelsior III L.P. v. Premiere Tech., Inc.,*
   476 F.3d 1261 (11th Cir. 2007) ............................................................57

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) ..........................................................................42

*Atlas v. Accredited Home Lenders Holdings Co.,*
   556 F. Supp. 2d 1142 (C.D. Cal. 2009) ................................................47

*Bailey v. Carnival Cruise Lines,*
   774 F.2d 1577 (11th Cir. 1985) ............................................................20

*Baldwin County Welcome Ctr. v. Brown,*
   466 U.S. 147 (1984) ..............................................................................21

*Basch v. Ground Round, Inc.,*
  139 F.3d 6 (1st Cir. 1998) .........................................................................9

*Batwin v. Occam Networks, Inc.,*
  2008 WL 2676364 (C.D. Cal. July 1, 2008) .........................................62

*Beck v. Caterpillar Inc.,*
  50 F.3d 405 (7th Cir. 1995) ...................................................................11

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ...............................................................42, 46, 48

*Bridges v. Dept. of Maryland State Police,*
  441 F.3d 197 (4th Cir. 2006) .................................................................21

*Business Roundtable v. SEC,*
  905 F.2d 406 (D.C. Cir. 1990)...............................................................52

*Catholic Social Servs., Inc. v. INS,*
  232 F.3d 1139 (9th Cir. 2000) ...............................................................11

*Chamberlain Mfg. Corp. v. Maremont Corp.,*
  1991 WL 267801 (N.D. Ill. Dec. 3, 1991) ...........................................21

*Chardon v. Fumero Soto,*
  462 U.S. 650 (1983) ...................................................... 8-9, 10, 11

*Citiline Holdings, Inc. v. iStar Fin. Inc.,*
  701 F. Supp. 2d 506 (S.D.N.Y. 2010) ..................................................52

*City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.,*
  2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010)................................ *passim*

*Clemens v. DaimlerChrysler Corp.,*
  534 F.3d 1017 (9th Cir. 2008) .................................................................9

*Congregation of Ezra Sholom v. Blockbuster, Inc.,*
  504 F. Supp. 2d 151 (N.D. Tex. 2007).................................................26

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.,*
  52001 WL 300733 (S.D.N.Y. Mar. 28, 2001)......................................51

*Crown, Cork & Seal Co., Inc. v. Parker,*
    462 U.S. 345 (1983) ................................................................8, 9, 10, 12

*Cullen v. Margiotta,*
    811 F.2d 698 (2d Cir. 1987) .................................................................10, 11

*Dartley v. Ergobilt,*
    2001 WL 313964 (N.D. Tex. Mar. 29, 2001) ...............................53, 54

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) ........................................................................52

*Fallick v. Nationwide Mut. Ins. Co.,*
    162 F.3d 410 (6th Cir. 1998) ...........................................................27, 28

*Fin. Planning Ass'n v. SEC,*
    482 F.3d 481 (D.C. Cir. 2007).........................................................51

*Fouad v. Isilon Sys., Inc.,*
    2008 WL 5412397 (W.D. Wash. Dec. 29, 2008)...................52, 55, 62

*Garcia v. Countrywide Fin. Corp.,*
    2008 WL 7842104 (C.D. Cal. Jan. 17, 2008)...............................28

*Gen. Tel. Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982) ........................................................................27

*German v. Fed. Home Loan Mortg. Corp.,*
    885 F. Supp. 537 (S.D.N.Y. 1995) ................................................26

*Goodman v. Lukens Steel Co.,*
    777 F.2d 113 (3d Cir. 1985) ...........................................................27

*Gratz v. Bollinger,*
    539 U.S. 244 (2003) ........................................................................28

*Grimes v. Navigant Consulting, Inc.,*
    185 F. Supp. 2d 906 (N.D. Ill. 2002)..............................................57

*Guenther v. Cooper Life Scis., Inc.,*
    759 F. Supp. 1437 (N.D. Cal. 1990)................................................57

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995) ..............................................................................55

*Hakopain v. Mukasey,*
    551 F.3d 843 (9th Cir. 2008) ................................................................57

*Harmsen v. Smith,*
    693 F.2d 932 (9th Cir. 1982) ................................................................28

*Hicks v. Morgan Stanley & Co.,*
    2003 WL 21672085 (S.D.N.Y. July 16, 2003)....................................27

*Hoff v. Popular, Inc.,*
    2010 WL 3001710 (D.P.R. 2010) ........................................................52

*Hoffman v. UBS-AG,*
    591 F. Supp. 2d 522 (S.D.N.Y. 2008) ..................................................25

*Howard v. Everex Sys., Inc.,*
    228 F.3d 1057 (9th Cir. 2000) ..............................................................60

*In re Am. Funds Sec. Litig.,*
    556 F. Supp. 2d 1100 (C.D. Cal. 2008)..............................................6-7

*In re Century Aluminum Co. Sec. Litig.,*
    2010 WL 1729426 (N.D. Cal. Apr. 27, 2010)......................................56

*In re Charles Schwab Corp. Sec. Litig.,*
    257 F.R.D. 534 (N.D. Cal. 2009) .....................................................61-62

*In re Citigroup Inc. Bond Litig.,*
    2010 WL 2772439 (S.D.N.Y. July 12, 2010)........................30, 31, 36

*In re Colonial Ltd. P'ship Litig.,*
    854 F. Supp. 64 (D. Conn. 1994) .....................................................15, 16

*In re Connetics Corp. Sec. Litig.,*
    542 F. Supp. 2d 996 (N.D. Cal. 2008)..........................................29, 48

*In re Copper Antitrust Litig.,*
    436 F.3d 782 (7th Cir. 2006)....................................................12, 13, 19

*In re Countrywide Fin. Corp. Deriv. Litig.,*
554 F. Supp. 2d 1044 (C.D. Cal. 2008)................................................47

*In re Countrywide Fin. Corp. Sec. Litig.,*
588 F. Supp. 2d 1132 (C. D. Cal. 2008)........................................ *passim*

*In re Crazy Eddie Sec. Litig.,*
747 F. Supp. 850 (E.D.N.Y. 1990)................................................15

*In re Daou Sys., Inc.,*
411 F.3d 1006 (9th Cir. 2005)........................................50-51, 53, 54-55

*In re DDi Corp. Sec. Litig.,*
2005 WL 3090882 (C.D. Cal. July 10, 2005)................................54

*In re Downey Sec. Litig.,*
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)................................60

*In re Dreyfus Aggressive Growth Mut. Fund Litig.,*
2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000)................................27

*In re Eaton Vance Corp. Sec. Litig.,*
220 F.R.D. 162 (D. Mass. 2004) ................................................25

*In re Elscint, Ltd. Sec. Litig.,*
674 F. Supp. 374 (D. Mass. 1987)................................................15, 17

*In re Enron Corp. Sec., Deriv. & ERISA Litig.,*
465 F. Supp. 2d 687 (S.D. Tex. 2006)................................................9

*In re Fannie Mae 2008 Sec. Litig.,*
2009 WL 4067266 (S.D.N.Y. Nov. 24, 2009)................................20

*In re First Union Corp. Sec. Litig.,*
128 F. Supp. 2d 871 (W.D.N.C. 2001)................................................41

*In re Fosamax Prods. Liab. Litig.,*
694 F. Supp. 2d 253 (S.D.N.Y. 2010)................................................9

*In re Global Crossing, Ltd. Sec. Litig.,*
313 F. Supp. 2d 189 (S.D.N.Y. 2003)................................................25

*In re Hansen Natural Corp. Sec. Litig.,*
    527 F. Supp. 2d 1142 (C.D. Cal. 2007)...............................................................48

*In re IndyMac Mortgage-Backed Sec. Litig.,*
    2010 WL 2473243 (S.D.N.Y. June 21, 2010).....................................21-22, 48-49

*In re Infonet Servs. Corp. Sec. Litig.,*
    310 F. Supp. 2d 1080 (C.D. Cal. 2003)...............................................................53

*In re Juniper Networks, Inc. Sec. Litig.,*
    542 F. Supp. 2d 1037 (N.D. Cal. 2008).....................................................8, 60, 62

*In re King Pharms. Inc.,*
    230 F.R.D. 503 (E.D. Tenn. 2004) ......................................................................20

*In re La.-Pac. Corp. ERISA Litig.,*
    2003 WL 21087593 (D. Ore. Apr. 24, 2003) ......................................................28

*In re Lehman Bros. Sec. and ERISA Litig.,*
    684 F. Supp. 2d 485 (S.D.N.Y. Feb. 17, 2010) ................................22, 24, 25, 26

*In re McKesson HBOC, Inc., Sec. Litig.,*
    126 F. Supp. 2d 1248 (N.D. Cal. 2000)...............................................................68

*In re Media Vision Tech. Sec. Litig.,*
    1995 WL 787549 (N.D. Cal. Oct. 23, 1995) .......................................................54

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,*
    2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010) ........................................... *passim*

*In re PMI Group, Inc. Sec. Litig.,*
    2009 WL 3681669 (N.D. Cal. Nov. 2, 2009).......................................................47

*In re Prestige Brands Holding, Inc.,*
    2006 WL 2147719 (S.D.N.Y. July 10, 2006)........................................ 52, 55-56

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
    441 F. Supp. 2d 579 (S.D.N.Y. 2006) .................................................................25

*In re Scottish Re Group Sec. Litig.,*
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) .................................................................54

*In re Sonus Networks, Inc. Sec. Litig.,*
    2006 WL 1308165 (D. Mass. May 10, 2006) ...............................................51, 52

*In re Stac Elecs. Sec. Litig.,*
    89 F.3d 1399 (9th Cir. 1996) ................................................................................46

*In re Stratosphere Corp. Sec. Litig.,*
    1 F. Supp. 2d 1096 (D. Nev. 1998) ......................................................................55

*In re VeriSign, Inc. Sec. Litig.,*
    2005 WL 88969 (N.D. Cal. Jan. 13, 2005) ..........................................................29

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.,*
    694 F. Supp. 2d 1192 (W.D. Wash. 2009) ...........................................................47

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.,*
    259 F.R.D. 490 (W.D. Wash. 2009) ...............................................................53, 54

*In re Wells Fargo Mortgage-Backed Cert. Litig.,*
    2010 WL 1661534 (N.D. Cal. Apr. 22, 2010)............................................ *passim*

*In re Westinghouse Sec. Litig.,*
    90 F.3d 696 (3d Cir. 1996) ...................................................................................54

*In re WorldCom, Inc. Sec. Litig.,*
    2004 WL 1097786 (S.D.N.Y. May 18, 2004)........................................60, 61, 62

*In re WorldCom, Inc. Sec. Litig.,*
    219 F.R.D. 267 (S.D.N.Y. 2003).........................................................................59

*Jablon v. Dean Witter & Co.,*
    614 F.2d 677 (9th Cir. 1980) ..................................................................................8

*Jackvony v. RIHT Fin. Corp.,*
    873 F.2d 411 (1st Cir. 1989) ................................................................................42

*Knox v. Agria Corp.,*
    613 F. Supp. 2d 419 (S.D.N.Y. 2009) ...........................................................12, 20

*Kohen v. Pac. Inv. Mgmt. Co.,*
    571 F.3d 672 (7th Cir. 2009) ................................................................................28

*Kruse v. Wells Fargo Home Mortg., Inc.,*

   2006 WL 1212512 (E.D.N.Y. May 3, 2006)....................................................... 15

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,*

   501 U.S. 350 (1991) ....................................................................................2, 19

*Lewis v. Casey,*

   518 U.S. 343 (1996) ....................................................................................26, 30

*Lilley v. Charren,*

   936 F. Supp. 708 (N.D. Cal. 1996)......................................................................60

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,*

   2008 WL 4449508 (N.D. Tex. Sept. 30, 2008).....................................................45

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,*

   594 F.3d 383 (5th Cir. 2010) ..........................................................4, 43, 44, 45

*Luedde v. Devon Robotics, LLC,*

   2010 WL 2712293 (S.D. Cal. July 2, 2010)..........................................................57

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.,*

   652 F. Supp. 2d 576 (E.D. Pa. 2009)...................................................................40

*Mass. Bricklayers & Masons Funds v. Deutsche Alt-A Securities,*

   2010 WL 1370962 (E.D.N.Y. Apr. 6, 2010).........................................................22

*McMahan & Co. v. Wherehouse Entm't, Inc.,*

   65 F. 3d 1044 (2d Cir. 1995) .......................................................................42, 43

*Mutchka v. Harris,*

   373 F. Supp. 2d 1021 (C.D. Cal. 2005)................................................................28

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*

   No. 08-CV-10783 (MGC), Transcript of Decision ...................................... *passim*

*Nenni v. Dean Witter Reynolds, Inc.,*

   1999 WL 34801540 (D. Mass. Sept. 29, 1999)....................................................26

*New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.,*

   2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010)............................................ *passim*

*New Jersey Carpenters Health Fund v. Residential Capital LLC,*
   2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010)...............................................22, 49

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC,*
   2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010)............................................ *passim*

*O'Brien v. Nat'l Property Analysts Partners,*
   719 F. Supp. 222 (S.D.N.Y. 1989) ....................................................................40

*O'Shea v. Littleton,*
   414 U.S. 488 (1974) .........................................................................................25

*Palmer v. Stassinos,*
   236 F.R.D. 460 (N.D. Cal. 2006) .................................................................15, 16

*Payton v. County of Kane,*
   308 F.3d 673 (7th Cir. 2002) ............................................................................28

*Pinter v. Dahl,*
   486 U.S. 622 (1988) ...................................................................................... *passim*

*Plumbers' Union No. 12 Local Pension Fund v. Nomura Asset*
    *Acceptance Corp.,*
   658 F. Supp. 2d 299 (D. Mass. 2009).......................................................... *passim*

*Pub. Emp. Ret. Sys. of Miss. v. Merrill Lynch & Co.,*
   2010 WL 2175875 (S.D.N.Y. June 1, 2010)....................................15, 16, 24, 61

*Republic Bank & Trust Co. v. Bear, Stearns & Co.,*
   2010 WL 1489264 (W.D. Ky. Apr. 13, 2010) ............................................. 46-47

*Rovner v. Vonage Holdings Corp.,*
   2007 WL 446658 (D.N.J. Feb. 7, 2007)...........................................................20

*Schoenhaut v. Am. Senors,*
   986 F. Supp. 785 (S.D.N.Y. 1997) ..................................................................54

*SEC v. Seaboard Corp.,*
   677 F.2d 1301 (9th Cir. 1982) ...........................................................................7

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

*Seven-Up Bottling Co. v. Seven-Up Co.,*

    420 F. Supp. 1246 (D. Mo. 1976)........................................................................57

*Shaw v. Digital Equip. Corp.,*

    82 F.3d 1194 (1st Cir. 1996) .............................................................................51

*Smith v. Pennington,*

    352 F.3d 884 (4th Cir. 2003) .............................................................................16

*Stack v. Lobo,*

    903 F. Supp. 1361 (N.D. Cal. 1995).................................................................58

*Stone Container Corp. v. U.S.,*

    229 F.3d 1345 (Fed. Cir. 2000) .........................................................................10

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,*

    2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005) ..................................................47

*Tsereteli v. Residential Asset Securitization Trust 2006-A8,*

    692 F. Supp. 2d 387 (S.D.N.Y. 2010) ........................................................22, 48

*Valentin v. Ocean Ships, Inc.,*

    38 F. Supp. 2d 511 (S.D. Tex. 1999).................................................................21

*Valenzuela v. Kraft, Inc.,*

    801 F.2d 1170 (9th Cir. 1986) ...........................................................................16

*Vaught v. Showa Denko K.K.,*

    107 F.3d 1137 (5th Cir. 1997) .............................................................................9

*Wade v. Danek Med., Inc.,*

    182 F.3d 281 (4th Cir. 1999) .............................................................................13

*Warth v. Seldin,*

    422 U.S. 490 (1975) ..........................................................................................25

*Wojtunik v. Kealy,*

    2006 WL 2821564 (D. Ariz. Sept. 30, 2006)...................................................62

**CALIFORNIA CASES**

*Luther v. Countrywide Fin. Corp.,*

    No. BC 380698 (Cal. Super. Ct. Jan. 6, 2010) ............................................. *passim*

**OTHER STATE CASES**

*Cunningham v. Ins. Co. of N. Am.,*

    515 Pa. 486 (1987).............................................................................................15

*Hess v. I.R.E. Real Estate Income Fund, Ltd.,*

    255 Ill. App. 3d 790 (1993) ..........................................................................15, 18

**FEDERAL STATUTUES, REGULATIONS AND RULES**

15 U.S.C. § 77k................................................................................30, 37, 58

15 U.S.C. § 77l(a)(2) ..................................................................................30

15 U.S.C. § 77p(f).......................................................................................20

15 U.S.C. § 77m ...........................................................................................6

15 U.S.C. § 77v(a) ...............................................................................12, 20

28 U.S.C. § 2072.........................................................................................14

17 C.F.R. § 229.512.....................................................................................52

17 C.F.R. § 230.158 .............................................................................58-59

Fed. R. Civ. P. 9(b).....................................................................................46

Fed. R. Civ. P. 12(b)(6) .........................................................................7, 29

Fed. R. Civ. P. 23 ................................................................................. *passim*

**OTHER AUTHORITIES**

*Asset-Backed Securities*, Securities Act Release No. 8518, Exchange Act

Release No. 50905, 70 Fed. Reg. 1506 (2005).........................................50

*Securities Offering Reform*, Exchange Act Release No. 8591, 2005 WL 1692642 (2005)....................................................................................... 51-52

5 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 23.63[1][b] (3d ed. 2008).....25

Thomas Lee Hazen, *Treatise on the Laws of Securities Regulation* (4th ed. 2002) .55

## PRELIMINARY STATEMENT

The Countrywide Defendants identified six principal reasons in their moving brief ("Moving Brief" or "Br.") why the Amended Complaint must be dismissed, including expiration of the applicable limitations and repose periods, lack of standing, and lack of economic loss.[1]  Nothing in Plaintiffs' Opposition ("Opp.") warrants a different result.

***Untimeliness***:  This putative class action was filed in January 2010, more than two years after the *Luther* action was filed in California state court on November 14, 2007.  Plaintiffs admit in the Opposition that the *Luther* state court litigation involved the same claims, "the same alleged misconduct," and "all of the same Offerings" as this case.  *See* Opp. at 19-21.  Plaintiffs do not dispute that all of the facts alleged in the Amended Complaint that supposedly show the existence of misstatements and omissions were known to putative class members more than one year prior to the filing of the current action.  In addition, this action was filed more than three years after the vast majority of MBS challenged in this case were offered.  Accordingly, absent tolling, all of Plaintiffs' claims are time-barred under one or both of these periods.  Plaintiffs argue that both the limitations and repose periods were tolled by the filing of the *Luther* state court action pursuant to the class action tolling procedure that the Supreme Court adopted in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).  But *American Pipe* tolling does not apply to class actions filed in state court, and Plaintiffs do not cite a single case that has ever applied *American Pipe* tolling cross-jurisdictionally to toll a federal statute of limitations or repose based on a state court filing.  Plaintiffs' argument that considerations of fairness require cross-jurisdictional application of *American Pipe* tolling ignores the limitations that the Supreme Court itself placed on this procedural device.  In *American Pipe*, the Court explicitly held that the tolling rule it adopted in that case is an interpretation of Federal

---

[1] Capitalized terms not defined in this brief have the same meanings assigned to them in the Countrywide Defendants' Moving Brief.

Rule of Civil Procedure 23, intended to promote the efficiency of federal court class actions filed under that federal procedural rule and to help streamline the federal court docket. *American Pipe* tolling is not grounded on the vague equitable considerations Plaintiffs invoke in the Opposition, and invoking those considerations cannot change the limited applicability of this federal court procedural rule. Moreover, as Plaintiffs themselves concede, the Supreme Court in *Lampf* held that the one and three-year time periods found in the 1933 Act are not subject to equitable tolling in any event. Despite the state court's lack of subject matter jurisdiction, the plaintiffs and their counsel who filed the *Luther* case fought to keep this action out of federal court for over two years, and as those more than two years passed by, the 1933 Act's limitations and repose periods expired. This case is thus time-barred and must be dismissed with prejudice.

**No Standing**: Even if this case were not time-barred (which it is), Plaintiffs would have standing at most with respect to the 81 Offerings in which they allegedly purchased securities themselves. ***Every court*** that has addressed standing in MBS class actions has held that plaintiffs lack Article III standing to challenge MBS offerings in which they themselves did not purchase securities. Statutory standing under the 1933 Act is likewise narrow, extending only to those who actually purchased securities in the particular offering at issue. Plaintiffs' principal response to this unbroken line of cases is that they are unthinking, rote, lemming-like repetitions of some judge's unprincipled error. These cases, however, reached the result they did by thoughtfully examining the unique structure of MBS offerings, including the fact that the representations made in the prospectus supplement applicable to each offering are unique to that offering because they describe the unique pool of mortgage loans collateralizing that offering and the specific underwriting guidelines in effect at the time those specific loans were underwritten. Moreover, the cases Plaintiffs cite in the Opposition (which they argue are inconsistent with the MBS standing cases) are actually not inconsistent at all, just inapposite – neither involving MBS nor addressing

2

the unique characteristics of MBS.  Because standing concerns the court's power to hear a case, not whether the named plaintiff is an appropriate class representative, the case law requires that at least one named plaintiff have Article III standing to assert each claim.  Plaintiffs' argument that the standing question should be deferred until class certification thus ignores the jurisdictional nature of standing, and also ignores that each court to address this argument in a putative MBS class action has rejected it. In short, Plaintiffs lack standing to assert claims based on the 346 Offerings in which they did not purchase any securities, and all such claims must be dismissed.

**_No Cognizable Injury_**:  Plaintiffs acknowledge that the value of the MBS they allegedly purchased resides in the cash flows generated by the pools of Mortgage Loans that back each MBS Certificate.  Virtually all of the Certificates that Plaintiffs claim to have purchased performed fully during the period Plaintiffs held them, making all of the cash flow distributions they were intended to make.  Moreover, twenty-two of the 105 securities that Plaintiffs claim to have purchased (or 21%) have already been paid off in full.  Plaintiffs thus have received what they bargained for, and have incurred no economic loss associated with nearly all of their purchases. Plaintiffs do not dispute that they have received all these payments, or cite any authority entitling them to sue on a security that has been paid off in full.  Instead, Plaintiffs contend these issues are not appropriate for resolution at the motion to dismiss stage.  But, the absence of any legally cognizable injury flowing from 101 of the 105 Certificates that Plaintiffs allegedly bought is apparent from the Amended Complaint and the documents incorporated by reference in the Complaint, and is not subject to reasonable dispute.  Moreover, any decline in market value of the Certificates is no substitute for legally cognizable injury where the securities continue to perform as structured and the Offering Documents explicitly warned Plaintiffs that any market for the Certificates might be illiquid and that investors might not be able to resell their Certificates at all, much less at a profit.  In short, Plaintiffs have received the benefit of their bargain:  they have incurred no cognizable loss, and their claims

3

based on MBS that continue to perform as intended must be dismissed.

***No Misstatements Alleged***:  The Amended Complaint should be dismissed for the additional reason that Plaintiffs have not alleged an actionable misstatement.  The Offering Documents stated that the mortgage loans in the pools underlying each MBS Certificate ***either*** would comply with the stated characteristics ***or***, ***if they did not***, those loans would be cured or replaced, upon appropriate request.  Thus, the existence in the pools of Mortgage Loans that allegedly do not comply with the stated representations was anticipated and does not, by itself, constitute a material misstatement.  The Opposition does not dispute that the challenged representations are binary in nature, and Plaintiffs do not assert that any request to repurchase or replace Mortgage Loans was ever made under the securitization documents, much less that any such request was refused.  Plaintiffs' attempt to distinguish the Fifth Circuit's decision dismissing substantially identical 1933 Act claims in *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010), is specious.  That case addresses the same factual and legal issues before this Court, and compels dismissal of Plaintiffs' misstatement allegations.

***Materiality Not Alleged***:  Plaintiffs allege no facts that would support a plausible inference that the Offering Documents for any of the 427 MBS Offerings at issue here materially misdescribed the specific loans that collateralized that offering.  Plaintiffs do not dispute that they have failed to tie the Mortgage Loans underlying any specific MBS they challenge to their allegations of defective loan underwriting, in effect asking the Court simply to *assume* that a material portion of the Mortgage Loans that backed each MBS were misrepresented.  They ask the Court to make this assumption based on conclusory allegations that Countrywide "systematically" failed to comply with its underwriting guidelines.  Other courts, however, have refused to make this leap, and the factual allegations in the Amended Complaint that Plaintiffs claim support an inference of "systematic" abandonment of guidelines do not do so.  In any event, the Opposition does not show that the claimed misstatements about

compliance with underwriting guidelines would have altered the total mix of information disclosed to investors in the Offering Documents.  Underwriting guidelines can be narrow or broad, conservative or extremely liberal, and guidelines may – as they did in this case – expand over time.  A statement that a lender has complied with its guidelines ultimately tells an investor nothing about the actual credit quality and credit risk of the loans made under those guidelines.  Thus, given the detailed data disclosed to investors in the prospectus supplements in this case about the actual credit quality and credit risk attributes of the loans underlying each MBS deal, the alleged misstatements about compliance with guidelines did not alter the total mix of information and are immaterial as a matter of law.

**_Purchases Not In A Public Offering_**:  The Supreme Court (in _Pinter_) held that Section 12(a)(2) requires that plaintiffs have purchased from an underwriter or "statutory seller" in a public offering, as opposed to the secondary market.  Plaintiffs, however, have not alleged that they purchased directly from any of the Countrywide Defendants or the Underwriter Defendants, or that any of these Defendants actively solicited Plaintiffs' investments as required by _Pinter_.  Plaintiffs' argument that an SEC rule change in 2005 now makes issuers liable as statutory sellers whether or not they actually sold securities to a buyer is meritless:  the SEC has no power to rewrite statutory law as interpreted by the Supreme Court.  Moreover, Plaintiffs' nebulous allegations that they purchased securities "in connection with" or "pursuant to and/or traceable to" an offering have uniformly been found insufficient to state a claim in the Ninth Circuit.  Plaintiffs must allege that they purchased "in" an offering, and they have not done so here.  Their Section 12(a)(2) claims thus must be dismissed.

Plaintiffs are sophisticated institutional investors who were warned about the significant risks associated with the MBS they bought, including the fact that the securities they were buying were highly sensitive to changes in real estate prices, might be illiquid, and might be unable to be resold at an acceptable price (or at all).  Plaintiffs may not now complain that the risks about which they were explicitly

warned have been realized in the wake of the worst economic crisis since the Great Depression.  Given that virtually all of the MBS they allegedly bought have performed exactly as structured, they have received the benefit of their bargain, and this case – in addition to being time-barred – is in reality an impermissible attempt to use the securities laws as insurance against market declines.  For all these reasons, this case should be dismissed in its entirety.

## ARGUMENT

## I.   PLAINTIFF'S CLAIMS ARE TIME-BARRED.

### A.   Absent Tolling, Plaintiffs' Claims Are Time-Barred.

Plaintiffs do not dispute that – unless tolled – the 1933 Act's three-year statute of repose had expired prior to the filing of this action on January 14, 2010 for the vast majority of their claims.  *See* Opp. at 32-35 (asserting timeliness based solely on tolling).  More specifically, they do not dispute that the statute of repose had expired for Plaintiffs' Section 11 claims as to 321 of the 427 Offerings in the Amended Complaint before it was filed, and for Plaintiffs' Section 12 claims as to 302 of those 427 Offerings.  *See* Br. at 24-26; 15 U.S.C. § 77m.

The remaining Section 11 and 12 claims are likewise time-barred by the 1933 Act's one-year statute of limitations.  *See* Br. at 23-24.  Under Section 13 of the 1933 Act, a claim becomes untimely one year after a plaintiff discovers (or a reasonably diligent investor would have discovered) the alleged misstatement or omission.  *See* 15 U.S.C. § 77m.  Here, Plaintiffs do not dispute that all of the facts alleged in the Amended Complaint that supposedly show the existence of misstatements and omissions were known to the market more than one year prior to the filing of this action.  Indeed, Plaintiffs admit in the Opposition that the *Luther* state court litigation involved the same claims, "the same alleged misconduct," and "all of the same Offerings" as this case.  Opp. at 19-21.  That case was filed on November 14, 2007, more than two years before the filing of this case, and thus "is nearly dispositive evidence that there was sufficient information in the public sphere to impart inquiry

notice on reasonable investors" prior to January 14, 2009.  *In re Am. Funds Sec. Litig.*, 556 F. Supp. 2d 1100, 1109 (C.D. Cal. 2008), *vacated and remanded on other grounds*, 2010 WL 3679351 (9th Cir. Sept. 17, 2010).  Moreover, the Amended Complaint itself affirmatively asserts that the facts that allegedly show that misstatements and omissions were made in connection with the MBS Offerings had become public no later than 2008.  Those facts include delinquency and default rates that allegedly "skyrocketed *within just a few months of the Offerings*" (the last of which occurred in late 2007), credit rating downgrades that occurred in 2007 and 2008, the publication of media reports and the commencement of private lawsuits and government investigations in 2007 and 2008, and the alleged "widespread collapse of Countrywide mortgages" that led to the 2008 merger with Bank of America.  *See* AC ¶¶ 17, 87-89, 95-96, 102, 122, 128, 138, 148-55; Opp. at 3, 10-11, 72-73, 87-91.

Plaintiffs do *not* contend that they discovered the allegedly untrue statements *after* January 14, 2009 (one year prior to the filing of this case), or that they could not have discovered them through the exercise of reasonable diligence before that date.  Instead, their only argument is that it would be inconsistent for Defendants to argue "both that no facts suggest that Defendants made false statements and that evidence of false statements was so obvious years ago that this case is self-evidently untimely."  Opp. at 40.  But the issue is not what Defendants think of the sufficiency of Plaintiffs' factual allegations.  Rather, the only issue is whether the facts that allegedly support their claims were publicly known and available to Plaintiffs more than one year before this action was filed.[2]  The Amended Complaint itself and the nearly identical *Luther* litigation confirm this to be the case, and Plaintiffs nowhere contend otherwise.  In short, absent tolling, the one-year statute of limitations has expired for all claims.[3]

---

[2] *See, e.g.*, *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1308 (9th Cir. 1982) (§§ 11, 12 claims "must be brought within one year after the discovery of the untrue statement ... or after discovery should have been made by the exercise of reasonable diligence").

[3] Although untimeliness is an affirmative defense, *see* Opp. at 38, it is well-settled that Countrywide "may raise a statute of limitations defense in a Rule 12(b)(6) motion to dismiss" where – as here – "the expiration of the applicable statute of limitations is

7

**B.**   *American Pipe* **Tolling Does Not Apply.**

Plaintiffs argue that both the one-year statute of limitations and three-year statute of repose were tolled by the filing of the *Luther* action in California state court, pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).  But this argument is fundamentally flawed, because *American Pipe* tolling does not apply to class actions filed in state court.

Plaintiffs ignore the plain language of *American Pipe* and its progeny, which indisputably confirm that *American Pipe* tolling:  (1) is an interpretation and application of Federal Rule of Civil Procedure 23; (2) is designed to promote the economy of *federal* class action litigation and the efficiency of the *federal* court docket (by eliminating the risk of absent class members clogging the federal courts with "needless" and "duplicati[ve]" protective filings); and (3) is therefore limited to class actions filed under *Federal* Rule 23 in *federal* court.  *Id*. at 553-56; Br. at 27-29. For example, Plaintiffs fail to address the unambiguous language in the following cases, among many others (all emphases added, unless otherwise noted):

- *American Pipe*, 414 U.S. at 540:  "This case involves an aspect of the relationship between a statute of limitations and the provisions of *Federal Rule of Civil Procedure 23* regulating class actions in the *federal courts*."[4]

- *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 350-51 (1983): Without tolling, "[t]he result would be a needless multiplicity of actions – precisely the situation that *Federal Rule of Civil Procedure 23* and the tolling rule of *American Pipe* were designed to avoid."

- *Chardon v. Fumero Soto*, 462 U.S. 650, 661 (1983):  "*American Pipe* simply asserts a *federal* interest in assuring the efficiency and economy of the [Rule

apparent from the face of the complaint."  *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1050 (N.D. Cal. 2008); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

[4] *See also id.* at 555-56 ("this interpretation of the Rule [23] is nonetheless necessary to insure effectuation of the purposes of litigative efficiency and economy that the Rule in its present form was designed to serve").

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

23] class action procedure."

- *Clemens v. DaimerChrysler Corp.*, 534 F.3d 1017, 1025 (9th Cir. 2008): "The rule of *American Pipe* . . . allows tolling *within the federal court system* in federal question class actions."

- *In re Fosamax Prods. Liab. Litig.*, 694 F. Supp. 2d 253, 257 (S.D.N.Y. 2010): "The federal tolling rule originally set forth in *American Pipe* does not address whether a class action filed in state court tolls the limitations period of an action filed in another jurisdiction."[5]

- *Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1144 (5th Cir. 1997): "*American Pipe* . . . involved the tolling effect of putative *federal class actions* on federal statutes of limitations."

- *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 465 F. Supp. 2d 687, 719 (S.D. Tex. 2006): "In *American Pipe* and in *Crown* the tolling doctrine was applied where *federal court class actions* were brought under federal statutes."

- *Basch v. Ground Round, Inc.*, 139 F.3d 6, 11 (1st Cir. 1998): "[R]espect for Rule 23 and considerations of judicial economy . . . animated the *Crown, Cork* and *American Pipe* tolling rules."

Despite the absence of any ambiguity in these cases that *American Pipe* tolling is a federal court procedural device rooted in Federal Rule 23, Plaintiffs contend nonetheless that *American Pipe* is actually not based on Federal Rule 23 at all, but instead on unspecified "considerations deeply rooted in our jurisprudence." Opp. at 29. This is untrue. In *American Pipe*, the Supreme Court undertook an extensive analysis of Federal Rule 23 and explicitly held that the tolling rule it adopted in that case was "an interpretation of the Rule." *American Pipe*, 414 U.S. at 550-56. The

---

[5] Plaintiffs try to distinguish *Clemens* and *Fosamax* by arguing that they reject cross-jurisdictional tolling as a matter of state law, not federal law. *See* Opp. at 28 n.16. Although that is true, it also misses the point. Those cases also note that *American Pipe* tolling is limited to cases under federal law in federal court, as shown above.

9

Supreme Court did not state that the class action tolling rule it adopted was based on "considerations deeply rooted in our jurisprudence."  Rather, *those words appear in a quote from another case*.  That case involved equitable tolling, which Plaintiffs concede is inapplicable here (*see infra* at 18-21), and was cited by the Supreme Court for the unremarkable proposition that courts may fashion tolling rules in appropriate circumstances.  *Id*. at 558-59.[6]  In short, the foundation and scope of the *American Pipe* tolling rule are clear:  "*American Pipe* and *Crown, Cork & Seal* were not based on judge-made equitable tolling, but rather on the Court's interpretation of Rule 23."  *Stone Container Corp. v. U.S.*, 229 F.3d 1345, 1354 (Fed. Cir. 2000).  This procedural device applies only to class actions filed in federal court under Federal Rule 23, not to state court class actions like *Luther*.

It is thus not surprising that Plaintiffs do not cite *even a single case* that has applied *American Pipe* tolling to a state court class action.  The one case they cite for this proposition – *Cullen v. Margiotta*, 811 F.2d 698 (2d Cir. 1987) – in fact did not extend *American Pipe* to a state court class action and did not hold what Plaintiffs say it did.  Rather, *Cullen* applied *New York state law tolling principles* that mirrored the federal *American Pipe* rule.  More specifically, *Cullen* involved claims brought under RICO and the Civil Rights Act (42 U.S.C. § 1983), neither of which has its own federal limitations period.  Where Congress has not specified a statute of limitations or repose for a federal law claim, the Supreme Court has held that federal courts must "borrow" the state law limitations period applicable to the most analogous state law claim.  And, as the Supreme Court held in *Chardon*, 462 U.S. at 655-62, federal courts

---

[6] The passage in *American Pipe* in which these words appear is as follows:  "In *Glus*, the Court specifically rejected a contention by the defendant that when 'the time limitation is an integral part of a new cause of action . . . that cause is irretrievably lost at the end of the statutory period.'  To the contrary, the Court found that the strict command of the limitation period provided in the federal statute was to be suspended by considerations '(d)eeply rooted in our jurisprudence.'  These cases fully support the conclusion that the mere fact that a federal statute providing for substantive liability also sets a time limitation upon the institution of suit does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose."  414 U.S. at 558-59.

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

applying a state law statute of limitations must also borrow the applicable state law tolling principles. *See Cullen*, 811 F.2d at 719 ("when a federal court looks to state law to determine the most appropriate statute of limitations, it must also . . . apply the state's rules as to the tolling of the statute"). Thus, the Second Circuit observed in *Cullen* that "*New York law*" had adopted for its own courts the same rule of class action tolling that the Supreme Court had adopted for the federal court system in *American Pipe. Id.*[7]  *Cullen* is thus wholly inapposite because it concerned *state law* tolling principles, which are inapplicable to federal statutes like the 1933 Act which have their own statutes of limitations and repose. *See* Opp. at 28 n.16 (conceding state law inapplicable); *Beck v. Caterpillar, Inc.*, 50 F.3d 405, 406-07 (7th Cir. 1995) (state tolling principles do not apply to federal statutes of limitations).

Plaintiffs also misdescribe Justice Rehnquist's dissent in *Chardon*, claiming that he "argu[ed] that *American Pipe* tolling should be applied by a federal court after an earlier filed state class action." Opp. at 29 n.16 (emphasis omitted).  But Justice Rehnquist said no such thing, no more than *Cullen* applied *American Pipe* to a state court class action.  To the contrary, Justice Rehnquist confirmed that *American Pipe* "recognizes a federal rule of tolling applicable to class actions *brought under Federal Rule of Civil Procedure 23*," and that "the source of the tolling rule applied by the Court was *necessarily* Rule 23." *Chardon*, 462 U.S. at 663-65 (Rehnquist, J., dissenting).  Moreover, *Chardon* did not concern state court class actions in any way – the class action that served as the basis for tolling in that case was filed in federal court.  *See id.* at 651-52.[8]

Plaintiffs attempt to end-run the Supreme Court's unambiguous limitation of

---

[7] The *Cullen* court noted that "the New York courts have, in the interest of avoiding court congestion, wasted paperwork and expense, long embraced the principles of *American Pipe*." 811 F.2d at 719 (citing New York state law cases).

[8] *Catholic Social Services, Inc. v. Immigration & Naturalization Serv.*, 232 F.3d 1139 (9th Cir. 2000) (Opp. at 27), is also inapposite.  As Plaintiffs themselves acknowledge, that case permitted tolling based on a class action "filed in federal court," Opp. at 27, and did not address tolling based on state court class actions.

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

the *American Pipe* tolling rule to federal court class actions filed under Federal Rule 23 by making a policy argument.  They argue that not extending the rule to state court class actions like *Luther* somehow would lead to a flood of protective individual filings in federal court, one of the policy concerns that led the Supreme Court to adopt *American Pipe* tolling.  *See* Opp. at 30.  But "[n]ot only is there no suggestion in *American Pipe* or in *Crown, Cork* that these decisions construing Federal Rule of Civil Procedure 23 have any direct application to parallel state procedures, but the policies underlying *American Pipe* . . . simply do not apply in the cross-jurisdictional context."  *In re Copper Antitrust Litig.*, 436 F.3d 782, 794 (7th Cir. 2006).

Even if invoking those policies cross-jurisdictionally could override the Supreme Court's explicit language in *American Pipe* and its progeny, which they cannot, Plaintiffs' argument would make no sense in any event:

- First, Plaintiffs' argument assumes that, absent application of *American Pipe* tolling in state court, putative class members would file protective individual actions in *federal court* as opposed to *state court*.  But that assumption is unwarranted.  There is no reason to assume that where a class representative files a case in state court, individual class members who decide to file individual cases would do so other than in state court.  Unlike *class actions* asserting 1933 Act claims, which Judge Elias in *Luther* held must be filed in federal court and may no longer be brought in state court due to SLUSA's abrogation of concurrent jurisdiction over 1933 Act class actions, the state courts continue to have subject matter jurisdiction over *individual* 1933 Act cases.  *See* 15 U.S.C. § 77v(a); *Luther v. Countrywide Fin. Corp.*, No. BC380698, slip op. at 9 (Cal. Super. Ct. Jan. 6, 2010); *Knox v. Agria Corp.*, 613 F. Supp. 2d 419, 425 (S.D.N.Y. 2009).  There is thus no reason to assume that class members who file individual cases would jump to a different court system.  And, indeed, with only one exception, ***all individual securities cases filed to date by MBS investors who chose not to be part of***

12

*the Luther class action filed their cases in state court, not in federal court.*[9]

- Conversely, if a putative class member does not wish to be in a state forum, that investor will file an individual action in federal court *regardless* of the tolling rules applied to the state action.  Applying *American Pipe* tolling to a state court class action thus would not prevent filings in federal court by individual investors who prefer the federal forum over the state forum.  Such federal filings *would be made in any event*, despite the pendency of the state court class action and the proposed application of *American Pipe* tolling to the state court class action.  Hence, "there [would be] no efficiency gain here and no federal interest in tolling."  *Copper Antitrust*, 436 F.3d at 796 n.2.

- Next, given that there is no logical basis to assume that individual protective filings would be made anywhere other than in state court, any efficiency generated by extending *American Pipe* tolling to state court class actions would benefit the state courts, not the federal courts.  Yet this Court plainly "has no interest . . . in furthering the efficiency and economy of the class action procedures of another jurisdiction," *Wade v. Danek Med., Inc.*, 182 F.3d 281, 287 (4th Cir. 1999) – particularly at the expense of federal statutes of limitations and repose enacted by Congress.  And Plaintiffs point to

---

[9] *See* CW RJN Exs. 49-57; *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp., et al.*, No. BC444033 (Cal. Super. Ct. Aug. 18, 2010); *Charles Schwab Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.*, No. CGC-10-501151 (Cal. Super. Ct. June 29, 2010); *Fed. Home Loan Bank of S.F. v. Credit Suisse Sec. (USA) LLC, et al.*, No. CGC-10-497840 (Cal. Super. Ct. Mar. 15, 2010); *United Western Bank v. Countrywide Fin. Corp., et al.*, No. 2010CV3325 (Colo. Dist. Ct. Apr. 23, 2010); *Cambridge Place Inv. Mgmt, Inc. v. Morgan Stanley & Co., et al.*, No. SUCV2010-02741 (Mass. Super. Ct. July 9, 2010); *N.M. State Inv. Council, et al. v. Countrywide Fin. Corp., et al.*, No. D-0101-CV-2008-02289 (N.M. Dist. Ct. Aug. 15, 2008); *Fed. Home Loan Bank of Pittsburgh v. Countrywide Sec. Corp., et al.*, No. GD 09-018482 (Pa. Ct. Com. Pl. Oct. 13, 2009); *Fed. Home Loan Bank of Seattle v. Countrywide Sec. Corp., et al.*, No. 09-2-46321-2 SEA (Wash. Super. Ct. Dec. 23, 2009).  The only case filed in federal court is *Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 1:09-cv-04050-DLC (S.D.N.Y. Apr. 23, 2009), which was filed prior to the dismissal of *Luther*.

---

13

nothing in *American Pipe* or any other case that suggests otherwise.[10]

Not only are both the holding of *American Pipe* and the policy considerations underlying it inapplicable to state court class actions like *Luther*, but extending this federal court tolling rule to state court class actions would violate the Rules Enabling Act.  Plaintiffs argue that the Supreme Court held in *American Pipe* that applying this tolling rule to state court class actions would not violate the Rules Enabling Act.  *See* Opp. at 29.  That is utterly not true.  The Rules Enabling Act states that no federal procedural rule shall "abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072.  In *American Pipe*, the Supreme Court held that tolling a federal statute of limitations upon the filing of Rule 23 class actions would not violate the Act because doing so served a valid federal procedural interest – promoting "the efficiency and economy of litigation" in the federal courts under Federal Rule 23 – and would not be inconsistent with the Congressional scheme reflected in the federal limitations period at issue.  *American Pipe*, 414 U.S. at 553, 558.  If this procedural device were applied to state court class actions (which do not implicate Federal Rule 23 and federal court docket efficiency concerns), however, then this tolling rule would be divorced from its only legitimate purpose – maintaining the efficiency of Rule 23 class actions and managing the federal court docket.  Rather, its sole effect would be to enlarge improperly putative class members' substantive rights without any justification linked to federal procedure.  As such, Plaintiffs' proposed cross-jurisdictional application of the *American Pipe* tolling rule would violate the Rules Enabling Act, and would be beyond the power of the Court.[11]

---

[10] Plaintiffs argue that the "compelling federal interest in private enforcement of the securities laws" (Opp. at 30-31) somehow requires application of *American Pipe* tolling to the *Luther* state court action because those claims otherwise would now be untimely.  But Plaintiffs ignore that Congress enacted not only the substantive rights of action in Sections 11, 12, and 15, but also explicitly limited the enforcement of those rights through the limitations and repose periods in Section 13.  Plaintiffs may not cherry pick from Congress's enforcement scheme.  If the federal interest in private enforcement of the securities laws were alone sufficient to justify tolling, then no 1933 Act claim would ever be time-barred and Section 13 would be a dead letter.

[11] For the reasons set forth in the reply memoranda filed by Defendants Kurland and

14

**C.  Even If *American Pipe* Tolling Did Apply, It Would Be Limited To The 61 Offerings For Which The *Luther* Plaintiffs Had Standing.**

Even if it were appropriate to extend *American Pipe* tolling to the state court *Luther* class action, which it is not, the scope of any such tolling would be limited to only those claims that are based on the 61 MBS Offerings for which the *Luther* plaintiffs had standing.  "[I]f the original plaintiffs lacked standing to bring their claims in the first place, the filing of a class action complaint does not toll the statute of limitations for other members of the purported class."  *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 82 (D. Conn. 1994) (Cabranes, J.); *accord Palmer v. Stassinos*, 236 F.R.D. 460, 464-66 (N.D. Cal. 2006); *Pub. Emp. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 2010 WL 2175875, at *3 (S.D.N.Y. June 1, 2010).[12]  Plaintiffs argue that the standing-based limitation on *American Pipe* tolling recognized in *Colonial* and other cases is inapplicable to *Luther* because those cases involve Article III standing, and Article III does not apply in state court.  That argument is specious.

First, *American Pipe* is a federal rule of tolling applicable to Rule 23 class actions filed in federal court.  If, however, *American Pipe* tolling did apply to state court class actions as Plaintiffs contend, the limitations on that tolling rule adopted by the federal courts also necessarily would apply.  If Plaintiffs argue that this tolling rule applies, they must apply the entire rule, with all of its nuances and limitations, not just the part of the rule they like.  *American Pipe* is a federal tolling rule that is triggered by the filing of a specific kind of federal "case," *i.e.*, a class action.  Thus, if the class action filing does not constitute a "case or controversy" under federal law, by

---

Spector, Plaintiffs are also wrong that the 1933 Act's three-year statute of repose is subject to *American Pipe* tolling.  *See* Opp. at 31-35.  In any event, the Court need not reach this issue.  Even assuming the repose period *were* subject to *American Pipe* tolling, *American Pipe* tolling does not apply to state court class actions like *Luther*.

[12] *Accord Kruse v. Wells Fargo Home Mortg., Inc.*, 2006 WL 1212512, at *4-7 (E.D.N.Y. May 3, 2006); *In re Crazy Eddie Sec. Litig.*, 747 F. Supp. 850, 856 (E.D.N.Y. 1990); *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 377-79 (D. Mass. 1987); *Hess v. I.R.E. Real Estate Income Fund, Ltd.*, 255 Ill. App. 3d 790, 811 (1993); *Cunningham v. Ins. Co. of N. Am.*, 515 Pa. 486, 491-95 (1987).

1   definition it cannot trigger tolling. *Palmer*, 236 F.R.D. at 465 n.6 ("it would be

2   beyond the constitutional power of a federal court to toll a period of limitations based

3   on a claim that failed because the claimant had no power to bring it").[13]

4     <u>Second</u>, Plaintiffs' only substantive criticism of the standing-based limitation

5   reflected in *Palmer*, *Colonial*, *Merrill Lynch*, and the numerous other cases cited by

6   the Countrywide Defendants is found in a single footnote, which asserts that these

7   cases are inconsistent with the supposedly "controlling authority" of *Valenzuela v.*

8   *Kraft, Inc.*, 801 F.2d 1170 (9th Cir. 1986). Opp. at 37 n.22. *Valenzuela*, however, is

9   not "controlling" at all. In fact, it is inapposite. *Valenzuela* did not involve *American*

10  *Pipe* tolling, standing, class actions, or the relationship among them. Rather, the issue

11  in *Valenzuela* was "*equitable tolling*," based on a prior individual action over which

12  the court lacked subject matter jurisdiction but in which the plaintiff had standing.

13  801 F.2d at 1171-72. It is therefore irrelevant to the issue presented here.[14]

14    <u>Third</u>, Plaintiffs ignore that the language of *American Pipe* itself is limited to

15  class actions in which the named plaintiffs have standing. The Supreme Court

16  cautioned in *American Pipe* that it was *not* addressing a case where class certification

17  in the first-filed class action had been denied "for lack of standing of the

18  representative," and the Court then restricted tolling to only those class members

19  "who would have been parties had the suit been permitted to continue as a class

20  action." *American Pipe*, 414 U.S. at 553-54.

21   

---

22  [13] Plaintiffs' argument that "nothing . . . requires a court to pretend that a case

23  dismissed on jurisdictional grounds never existed" (Opp. at 36) ignores that court filings by plaintiffs who lack standing do not constitute a "case or controversy" in the first place. Thus, with respect to the 366 Offerings for which the *Luther* plaintiffs

24  lacked standing, there was never any actual "case or controversy" that could serve as a basis for tolling under *American Pipe*.

25  [14] *Smith v. Pennington*, 352 F.3d 884 (4th Cir. 2003) (Opp. at 37), similarly does not

26  justify the application of *American Pipe* to any claims as to which the *Luther* plaintiffs lacked standing. Although the *Smith* court "[saw] no reason" why the plaintiff's lack of standing should prevent absent class members from receiving the benefit of tolling,

27  that language was mere dicta and was unnecessary to the court's decision. Indeed, as Plaintiffs concede, *Smith* ultimately *declined* to apply *American Pipe* tolling, as the

28  proposed intervenors were not members of the putative class. *See* Opp. at 37.

**Fourth**, in arguing that the standing-based limitation on *American Pipe* tolling should not apply to the state court *Luther* case, Plaintiffs also disregard that one of the basic premises of *American Pipe* tolling is that the named plaintiff in a class action is representing – and vindicating the rights of – similarly situated absent class members. *See id*. at 554-55.  But that was not true in *Luther*.  Instead, as confirmed by the certifications filed in this Court by the institutional investor plaintiffs in *Luther*, the named plaintiffs in *Luther* had not purchased any securities in the vast majority of MBS Offerings as to which they sought to represent investors.  Rather, those other investors purchased different securities that were offered through different offering documents and were collateralized by different loan pools, and they therefore sustained different alleged injuries.  Without a named plaintiff with standing, no one was representing the interests of purchasers of 366 of the 427 MBS Offerings challenged here, and no one was vindicating their rights.  Thus, a fundamental prerequisite for tolling was missing.

**Finally**, Plaintiffs fail to address any of the cases that hold that allowing tolling without standing would lead to abuse of the class action procedure, as it would "condone or encourage attempts to circumvent the statute of limitation by filing a lawsuit without an appropriate plaintiff and then searching for one who can later intervene with the benefit of the tolling rule."  *Elscint*, 674 F. Supp. at 378.  In other words, it would invite overly ambitious counsel to sue first, and find named plaintiffs later.  Such manipulation of limitations periods is clearly not what *American Pipe* envisioned.  As Justice Blackmun wrote, the tolling rule "must not be regarded as encouragement to lawyers . . . to frame their pleadings as a class action, intentionally, to attract and save members of the purported class who have slept on their rights." *American Pipe*, 414 U.S. at 561 (Blackmun, J., concurring).[15]

---

[15] *See Elscint*, 674 F. Supp. at 378-80 (it is "improper to allow the filing of a class action by nominal plaintiffs who are wholly inadequate to represent the asserted class to have the effect of tolling limitation[s] to permit the otherwise untimely intervention of proper class representatives"); *Cunningham*, 515 Pa. at 493 (class actions "do not exist to sanction . . . initiating litigation on behalf of those who have slept on their

The current litigation exemplifies these concerns:  after nearly three years, two separate class actions, and eleven different named plaintiffs, there are still literally *hundreds* of Offerings at issue for which *no injured plaintiff has ever come forward*. Allowing complete tolling under these circumstances would effectively empower plaintiffs' counsel to toll statutes of limitations unilaterally for whomever they wish, simply by crafting an overbroad class definition.  For these reasons, even if *American Pipe* tolling did apply to state court cases like *Luther* – and it does not – such tolling should be limited to the 61 Offerings[16] for which the *Luther* plaintiffs had standing.[17]

### D.    Plaintiffs' Vague Invocation Of "Fairness" Cannot Transform An Exclusively Federal Rule Into One Also Applicable In State Court.

Plaintiffs repeatedly argue that it would be unfair not to apply *American Pipe* tolling cross-jurisdictionally to the *Luther* state court class action.  *See* Opp. at 4, 30,

---

rights"); *Hess*, 629 N.E.2d at 531-34 (plaintiffs "attempted to use the class action device to preserve the rights of potential plaintiffs who were sleeping on their rights").

[16] Plaintiffs do not dispute (*see* Opp. at 41-42) that the limitations and/or repose periods may have expired for some of those 61 Offerings before a named plaintiff with standing first appeared in the *Luther* state court case.  *See* Br. at 31 n.32.  Thus, the number of time-barred Offerings may be higher than 366.  Moreover, the filing of the *Luther* action could not toll any limitations or repose period as to any Offerings before those Offerings were included in an operative class action complaint.  *See In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 WL 3239430, at *9 n.9 (S.D.N.Y. Aug. 17, 2010) ("[b]ecause [the initial] class action complaint did not include claims regarding 2007-11AR and several other trusts mentioned in the [consolidated complaint], the statute of limitations was not tolled as to these claims pursuant to *American Pipe*").  Thus, as set forth in Exhibit 48 to Countrywide's Response In Support Of Request For Judicial Notice, the three-year statute of repose had already expired as to 34 Offerings for Section 11 purposes, and as to two Offerings for Section 12 purposes, prior to the date on which they were first included in any complaint in the *Luther* class action.  The subsequent inclusion of those Offerings in the *Luther* action could not revive those untimely claims.

[17] This standing-based limitation on *American Pipe* tolling conclusively bars all claims asserted against Mr. Adler.  Based on the lead plaintiff Certifications filed by the *Luther* plaintiffs in this case (*see* CW RJN Ex. 30), no named plaintiff in *Luther* actually purchased any securities in any of the seven Offerings that allegedly are traceable to the registration statements that Mr. Adler allegedly signed.  *See infra*, at n.39.  Plaintiff Luther did not file a certification, but he is alleged to have purchased securities traceable to two registration statements (File Nos. 333-123167 and 333-125902) different from those allegedly signed by Mr. Adler.  *Compare* CW RJN Ex. 29 at 1528 *with* AC ¶ 59.  Thus, because the *Luther* plaintiffs did not purchase in any of the seven Offerings allegedly traceable to the two registration statements allegedly signed by Mr. Adler, the limitations and repose periods applicable to those Offerings were not tolled by *Luther* and the claims premised on those Offerings are time-barred.

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

37-38 (Defendants "have been on notice," "have not been surprised"; not applying *American Pipe* would be "extraordinarily unfair," "unconscionable").  Plaintiffs' attempt to extend federal court class action tolling to state court on equitable grounds, however, cannot change the fact that *American Pipe* tolling is a rule limited to the federal court system.  Plaintiffs ignore that the explicit foundation of *American Pipe* tolling is efficiency of the federal docket (not vague equitable considerations), and further ignores the fact (as the Supreme Court held in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), and as Plaintiffs themselves concede) that the 1933 Act's limitations and repose periods are not subject to equitable tolling.

First, unlike equitable tolling, *American Pipe* tolling is not based on "fairness." Rather, the Supreme Court adopted this procedural device to promote the efficiency and economy of federal class actions filed under Federal Rule 23.  *See supra*, at 8-14. Although the Supreme Court noted in *American Pipe* that class action tolling is "consistent with" the general policies underlying statutes of limitations (*i.e.*, notice to defendants and barring plaintiffs who have slept on their rights), 414 U.S. at 554-55, "the driving force in that opinion is the gain to an efficient Rule 23 procedure." *Copper Antitrust*, 436 F.3d at 796.  "[N]otice alone is certainly not enough to toll the statute of limitations" pursuant to *American Pipe*.  *Id.*

Second, Plaintiffs do not dispute that the Supreme Court made clear in *Lampf* that equitable tolling is inapplicable to the 1933 Act's one-year limitations period and three-year statute of repose.  *See Lampf*, 501 U.S. at 363 ("the equitable tolling doctrine is fundamentally inconsistent with the 1-and-3 year structure" of the 1933 Act statute of limitations); Opp. at 31 ("since *American Pipe* tolling is not 'equitable tolling' *Lampf* is irrelevant").  Thus, any appeal to equitable notice considerations is out of place in this 1933 Act case.

Third, there is no basis to argue unfairness here in any event.  Prior to the January 2010 dismissal of *Luther* for lack of subject matter jurisdiction, every case to have addressed whether SLUSA abrogated state court concurrent jurisdiction over

19

1933 Act class action claims had ruled that it did.[18]  Despite this unbroken line of cases warning of the state court jurisdictional defect in *Luther*, neither the *Luther* plaintiffs, current Plaintiffs, nor any absent class members sought to protect their rights by filing an action in federal court.  Indeed, the *Luther* plaintiffs affirmatively fought *against* proceeding in federal court.[19]  And, it was not until after *Luther* was dismissed in January 2010 – over two years after it was filed, and nearly five years after the Offerings at issue began – that the *Luther* plaintiffs finally came to this Court seeking a second bite at the apple.  Given the cases unanimously holding that SLUSA had abrogated state court jurisdiction over 1933 Act class actions, and the *Luther* plaintiffs' efforts nonetheless to avoid federal court at every turn, it cannot reasonably be said that the consequences of those actions under the applicable limitations and repose periods are unfair.  As in *Bailey v. Carnival Cruise Lines*, 774 F.2d 1577, 1580-81 (11th Cir. 1985), "there are neither policy considerations in general nor equitable justifications in the facts of this case to warrant holding that federal claims

_____

[18] *See* 15 U.S.C. §§ 77p(f), 77v(a); *Knox*, 613 F. Supp. 2d at 425 ("Section 22(a) exempts covered class actions raising 1933 Act claims from concurrent jurisdiction"); *In re Fannie Mae 2008 Sec. Litig.*, 2009 WL 4067266, at *1 (S.D.N.Y. Nov. 24, 2009) ("SLUSA was designed to and does deprive State courts of jurisdiction over class actions alleging 1933 Act claims"); *Rovner v. Vonage Holdings Corp.*, 2007 WL 446658, at *3 (D.N.J. Feb. 7, 2007) ("numerous courts have recognized the exclusive jurisdiction that federal courts maintain over Securities Act class actions following the 1998 SLUSA amendments"); *In re King Pharms., Inc.*, 230 F.R.D. 503, 505 (E.D. Tenn. 2004) ("SLUSA amended § 77v(a) to divest state courts of concurrent jurisdiction over covered class actions").  As *Knox* perceptively observed in 2009, some cases had confused the issues by analyzing whether 1933 Act class actions could be *removed* to federal court under SLUSA's removal and preclusion provisions (which apply to state law securities claims) as opposed to whether state courts after SLUSA *no longer have jurisdiction* to hear such cases in the first place.  *See Knox*, 613 F. Supp. 2d at 422-25.

[19] Defendants removed *Luther* in 2007 under the Class Action Fairness Act, and the plaintiffs moved to remand to state court.  *See* Opp. at 19-21.  After remand, Defendants raised the state court's lack of subject matter jurisdiction.  Initially, the state court stayed the case, directing "Plaintiffs to file an action in Federal Court."  Instead of filing their *substantive claims* in federal court, the *Luther* plaintiffs merely filed a declaratory judgment action seeking an advisory opinion that the state court had jurisdiction – which this Court dismissed *sua sponte*.  It was not until January 14, 2010, after the state court had dismissed *Luther* with prejudice for lack of subject matter jurisdiction, and after nearly three years of trying to stay out of this court, that the *Luther* plaintiffs finally sought relief under the 1933 Act in federal court.  *See id.*

20

improperly filed in state courts are free from the risk of time bar." By purposefully avoiding federal court, Plaintiffs "chose a perilous path," were "aware of the risk [they were] running," and "wrote the scene that [they] must now play out." *Chamberlain Mfg. Corp. v. Maremont Corp.*, 1991 WL 267801, at *3-4 (N.D. Ill. Dec. 3, 1991) (denying equitable tolling); *accord Valentin v. Ocean Ships, Inc.*, 38 F. Supp. 2d 511, 512-13 (S.D. Tex. 1999) (plaintiff's "fail[ure] to act on the possibility that jurisdiction . . . was improper" was an example of "startling lack of diligence").

Finally, as the Supreme Court made clear in *American Pipe* and its progeny, *American Pipe* tolling is a procedural rule of limited application in the federal courts. Plaintiffs do not cite a single case that has held *American Pipe* tolling applies cross-jurisdictionally in state court, and no putative class member reasonably could have concluded that it does. And, no class member can now change *American Pipe*'s limited application to federal court class actions filed under Rule 23 by appealing to "fairness."[20] The scope of a procedural rule cannot be changed just because a plaintiff would be advantaged if it did. *See Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) ("[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants"). Because Plaintiffs' claims are untimely and no tolling doctrine applies, the Amended Complaint must be dismissed in its entirety.

## II.   PLAINTIFFS LACK STANDING AS TO 346 MBS OFFERINGS.

### A.   Plaintiffs Lack Constitutional Standing.

*Every court* that has addressed standing in MBS class actions has concluded that plaintiffs lack Article III standing to challenge MBS offerings in which they themselves did not purchase securities. *See* Br. at 32-34.[21] In fact, since the

---

[20] *Cf. Bridges v. Dept. of Maryland State Police*, 441 F.3d 197, 211-12 (4th Cir. 2006) (given clear rule that tolling ends upon denial of class certification, "no absentee class member could reasonably have relied on the named plaintiffs . . . to protect their interests in the period following the district court's 2001 certification denial").

[21] *See In re Wells Fargo Mortgage-Backed Cert. Litig.*, 2010 WL 1661534, at *3-5 (N.D. Cal. Apr. 22, 2010); *In re IndyMac Mortgage-Backed Sec. Litig.*, 2010 WL

1   Countrywide Defendants' Moving Brief was filed, yet another MBS case – *In re*

2   *Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 WL 3239430, at *5

3   (S.D.N.Y. Aug. 17, 2010) – reached the same conclusion, dismissing claims as to 29

4   of 31 MBS offerings because the named plaintiffs did not purchase in each of those

5   specific deals.  These cases require dismissal of all claims related to 346 of the 427

6   Offerings alleged in the Amended Complaint.  *See* App. Tab 1.

7        Plaintiffs do not deny any of this.  Their only response to this unbroken line of

8   cases is that these decisions are supposedly rote and unreasoned, "contain little

9   analysis," and are nothing more than an "unwitting perpetuation of error."  Opp. at 57-

10  58.  Nothing could be further from the truth.  The judges who issued these decisions

11  did not simply rubber-stamp some unthinking jurist's careless mistake.  Rather, these

12  *twelve* decisions contain thoughtful, reasoned analysis from *nine* highly respected

13  judges who sit in *four* different federal districts.[22]  Their decisions carefully examine

14  the unique nature of MBS offerings and then apply well-settled standing jurisprudence

15  to these unique securities.  For instance:

16       • In *Royal Bank of Scotland*, Judge Baer explained that "the shelf registration

17            statements and related base prospectuses are general in content," and that

18            "the underlying details contained in the . . . prospectus supplements"—such

19            as "credit ratings, the particular [underwriting] guidelines used by the

20  _____

21  2473243, at *3 (S.D.N.Y. June 21, 2010); *Merrill Lynch*, 2010 WL 2175875, at *3;
    *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, 2010 WL

22  1371417, at *7 (E.D.N.Y. Apr. 6, 2010); *New Jersey Carpenters Health Fund v. DLJ
    Mortg. Capital, Inc.*, 2010 WL 1473288, at *4 (S.D.N.Y. Mar. 29, 2010); *New Jersey

23  Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 2010 WL
    1172694, at *8 (S.D.N.Y. Mar. 26, 2010); *In re Lehman Bros. Sec. and ERISA Litig.*,

24  684 F. Supp. 2d 485, 490-91 (S.D.N.Y. Feb. 17, 2010); *Plumbers' Union Local No.
    12 Local Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303-

25  04 (D. Mass. 2009); *Mass. Bricklayers & Masons Funds v. Deutsche Alt-A Securities*,
    2010 WL 1370962, at *1 (E.D.N.Y. Apr. 6, 2010); *New Jersey Carpenters Health

26  Fund v. Residential Capital LLC*, 2010 WL 1257528, at *4 (S.D.N.Y. Mar. 31, 2010);
    *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, Tr. of Decision at 40-

27  41 (S.D.N.Y. Jan. 28, 2010) (Ex. 35).

    [22] *Supra*, n.21 (Judges Kaplan, Rakoff, Cedarbaum, Crotty, Baer, Swain of S.D.N.Y.;
28  Judge Wexler of E.D.N.Y.; Judge Stearns of D. Mass; Judge Ilston of N.D. Cal.).

                                        22

mortgage originator for that pool of loans, and the default and delinquency rates"—are "unique to each of the offerings."  Thus, the district court reasoned that "the harm Plaintiffs may have suffered based on misstatements in the Offering Documents for the Certificates they purchased has no bearing on any harm suffered by other investors based on alleged misstatements in other offering documents with details about other offerings that Plaintiffs did not purchase."  2010 WL 1172694, at *7.

- In *City of Ann Arbor*, Judge Wexler noted that plaintiffs' basic allegation was that "mortgages pooled into the Trusts were issued in violation of accepted standards."  Thus, "[a]s part of their case, Plaintiffs would have to show that the practices of which they complain occurred with respect to the mortgages in which they invested, and thereby caused injury."  But if plaintiffs "did not invest in any such pool of mortgages, they can make no such showing."  2010 WL 1371417, at *7-8.

- In the recent *Morgan Stanley* decision, Judge Swain explained that "[t]he particulars of the holdings, originators, policies, practices and ratings relevant to each trust were detailed in that trust's prospectus supplement only," and plaintiff "can make no viable claim of reliance on the alleged misrepresentations . . . concerning the particulars of certificates that it did not purchase, nor can it demonstrate that it has been injured by such misrepresentations."  2010 WL 3239430, at *5.

- In *Nomura*, Judge Stearns noted that the issuing trusts "each issued its own securities backed by different pools of mortgages," and applied the "bedrock principle" that a securities plaintiff "is not permitted to bootstrap claims arising out of investment decisions made in relation to other [offerings] in which he was not a participant."  658 F. Supp. 2d at 303.

- In *Wells Fargo*, Judge Ilston described how "each offering was associated with a separate Prospectus and Prospectus Supplement," and held that "a

23

1    named plaintiff has standing under Section 11 only as to the documents that

2    governed his own purchase of securities."  2010 WL 1661534, at *4.

3  Plaintiffs' characterization of these controlling cases as "unwitting" error "perpetuated

4  from opinion to opinion with little second-guessing" (Opp. at 57-58) is disrespectful

5  and untrue.

6       Next, Plaintiffs contend that the issues these judges addressed are actually not

7  standing issues at all, but "premature class certification issues" which supposedly

8  "cannot be decided on a Rule 12 motion to dismiss."  Opp. at 50.  In effect, Plaintiffs

9  argue that as long as the named plaintiffs in a class action have suffered "some injury"

10  attributable to the defendants, then Article III standing has been shown and the only

11  remaining issue – whether their injury is typical of the injuries of the putative class –

12  should be deferred until class certification, even if the named plaintiffs' injury is

13  entirely different from the injuries allegedly suffered by other putative class members

14  who purchased entirely different securities.  *See* Opp. at 52-56.

15      That is not the law.  Standing goes to the ***court's power*** to hear the case or

16  claim at all, not whether a named plaintiff is an appropriate class representative.  First,

17  as Plaintiffs concede, their attempt to recast the standing question as one of class

18  representative typicality has been expressly rejected by every MBS case to address the

19  issue.  *See, e.g.*, *Wells Fargo*, 2010 WL 1661534, at *4 ("the fact that the lead

20  plaintiffs . . . purchased Certificates through less than one-third of the offerings they

21  seek to challenge concerns the lead plaintiffs' standing, not their fitness as class

22  representatives"); *Lehman Bros.*, 684 F. Supp. 2d at 490-91 ("Plaintiffs suggest . . .

23  that this question goes only to their ability to serve as a class representative and not to

24  standing.  I disagree."); *DLJ Mortg. Capital*, 2010 WL 1473288, at *3 ("[c]ourts

25  should dismiss these claims even at the pre-class certification stage"); *accord Nomura*,

26  658 F. Supp. 2d at 303-04; *Royal Bank of Scotland*, 2010 WL 1172694, at *7-8;

27  *Merrill Lynch*, 2010 WL 2175875, at *3; *Morgan Stanley*, 2010 WL 3239430, at *4-5;

28  *NECA-IBEW*, Ex. 35 at 5-10.  As the Supreme Court has held, Article III standing is a

1    "threshold question in every federal case" – including class actions – because it

2    "determin[es] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S.

3    490, 498 (1975).  It is "antecedent to the class certification issue" because "a court can

4    only certify a class for claims over which it has power."  *Hoffman v. UBS-AG*, 591 F.

5    Supp. 2d 522, 530-32 (S.D.N.Y. 2008).  And, as Judge Ilston noted in *Wells Fargo*,

6    2010 WL 1661534, at *4, "the Ninth Circuit has stated in clear terms [] that standing

7    is a jurisdictional element that must be satisfied prior to class certification."[23]

8            Because standing concerns a court's power to hear a case, the law requires that

9    "at least one named plaintiff . . . must have Article III standing to raise each claim."

10   *Nomura*, 658 F. Supp. 2d at 304.[24]  If "none of the named plaintiffs purporting to

11   represent a class establishes the requisite of a case or controversy with the defendants,

12   none may seek relief on behalf of himself or any other member of the class," *O'Shea*

13   *v. Littleton*, 414 U.S. 488, 494 (1974), and the complaint must be dismissed.  Any

14   other rule would violate the jurisdictional requirements of Article III, and allow "any

15   plaintiff [to] sue a defendant against whom the plaintiff has no claim in a putative

16   class action, on the theory that some member of the hypothetical class, if a class were

17   certified, might have a claim."  *In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162,

18   169 (D. Mass. 2004).  Plaintiffs here do not satisfy that standard with respect to the

19   vast majority of the 427 MBS offerings at issue.

20   _____

21   [23] *Accord Merrill Lynch*, 2010 WL 2175875, at *3 ("[s]tanding therefore is a threshold issue – antecedent to class certification"); *Lehman Bros.*, 684 F. Supp. 2d at 490-91

22   (same); *Abu Dhabi Comm. Bank v. Morgan Stanley & Co., Inc.*, 651 F. Supp. 2d 155, 175 (S.D.N.Y. 2009) (same); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441

23   F. Supp. 2d 579, 607 (S.D.N.Y. 2006) (same).

     [24] *Accord DLJ Mortg. Capital*, 2010 WL 1473288, at *4 ("at least one named

24   plaintiff" must have standing "on each cause of action"); *Morgan Stanley*, 2010 WL 3239430, at *4-5 ("if the *named* plaintiffs have no cause of action in their own right,

25   their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim"); *Lehman Bros.*, 684 F. Supp. 2d at

26   490-91 ("[i]n a class action, as in any other lawsuit, the named plaintiffs must show that they personally have been injured"); *In re Global Crossing, Ltd. Sec. Litig.*, 313

27   F. Supp. 2d 189, 207 (S.D.N.Y. 2003) ("at least one named plaintiff must . . . have purchased shares traceable to the challenged offering"); 5 James Wm. Moore et al.,

28   MOORE'S FEDERAL PRACTICE § 23.63[1][b] (3d ed. 2008).

                                         25

Plaintiffs attempt to confuse things by arguing that "the purpose of class actions is to permit representative parties to assert claims for which they otherwise would not have standing." Opp. at 57, 60. Plaintiffs, however, have it backwards: the actual purpose of a class action is not to allow plaintiffs to assert claims without standing, but rather to allow similarly situated individuals – *all of whom have standing* – to aggregate their claims in one representative action, in order to promote the efficiency and economy of litigation. *American Pipe*, 414 U.S. at 553 ("principal purpose" of Rule 23 class actions is to promote "efficiency and economy of litigation"). As the Supreme Court has held:

> That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent the class must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of a class . . . which they purport to represent.

*Lewis v. Casey*, 418 U.S. 343, 357 (1996); *see also Allee v. Medrano*, 416 U.S. 802, 828-29 (1974) ("a named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs").[25] Moreover, "[i]t is black letter law that a rule of procedure cannot create standing." *Merrill Lynch*, 2010 WL 2175875, at *3. If Plaintiffs were correct that "Rule 23 . . . allow[s] plaintiffs to bring a claim for which they do not have standing," then that procedural rule would improperly "enlarge or modify" substantive rights, and "it would violate the Rules Enabling Act." *Lehman Bros.*, 684 F. Supp. 2d at 490 n.19.

---

[25] *Accord Allee*, 416 U.S. at 828 ("[s]tanding cannot be acquired through the back door of a class action"); *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 548 (S.D.N.Y. 1995) (plaintiffs "may not use the procedural device of a class action to bootstrap [themselves] into standing [they] lack[]"); *Nenni v. Dean Witter Reynolds, Inc.*, 1999 WL 34801540, at*2 (D. Mass. Sept. 29, 1999) ("named plaintiff cannot acquire standing . . . by bringing a cause of action on behalf of others who would have had standing had they been named plaintiffs"); *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 160 (N.D. Tex. 2007) ("a plaintiff who lacks standing . . . may not acquire such status through class representation").

26

1    Finally, Plaintiffs try to end-run the MBS standing cases by claiming that a split

2    of authority exists where none in fact does.  They argue that *Fallick v. Nationwide*

3    *Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998), and its progeny conflict with the MBS

4    standing cases, permitting class plaintiffs to assert claims without standing.  *See* Opp.

5    at 52-56 ("[c]ourts have developed two inconsistent views of how Article III standing

6    applies to class actions").  The truth, however, is that the cases Plaintiffs cite do not

7    conflict with the MBS standing cases, and are simply inapposite.

8    As an initial matter, *none* of the cases Plaintiffs cite involves MBS or analyzes

9    the unique characteristics of MBS, and several do not involve securities claims at all.

10   Still others do not even address standing, but instead concern motions for class

11   certification.  For instance, both *In re Dreyfus Aggressive Growth Mut. Fund Litig.*,

12   2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000), and *Hicks v. Morgan Stanley & Co.*,

13   2003 WL 21672085 (S.D.N.Y. July 16, 2003), were decided by Judge Baer, the same

14   judge who in *Royal Bank of Scotland* denied standing as to MBS offerings in which

15   the named plaintiffs had not purchased.  As Judge Baer himself made clear in *Royal*

16   *Bank of Scotland*, the *Dreyfus* case "only analyzed whether Plaintiffs had 'standing to

17   represent a class' in terms of the 'typicality' requirement for class actions in Rule

18   23(a)," and "[i]t did not directly pass upon the issue of plaintiffs' Article III standing."

19   2010 WL 1172694, at *7 n.8.  The same is true of *Hicks*, as well as two of the other

20   cases cited by Plaintiffs.[26]

21   In addition, neither *Fallick* nor any of the other cases Plaintiffs cite holds that

22   named plaintiffs in a class action may assert claims without standing.  Rather, they

23   merely hold that once named plaintiffs *have standing* to challenge certain alleged

24   misconduct, whether they may represent others, who suffered closely-related injuries

25

26

27   _____

[26] *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (addressing "propriety of a class certification" under Rule 23); *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 122 (3d Cir. 1985) (addressing "compliance with the provisions of Rule 23").

28

27

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1   *due to the exact same alleged misconduct*, is a class certification issue.[27]  These cases

2   did not authorize named plaintiffs to challenge conduct that did not injure them

3   personally, and they did not dispense with named plaintiffs' standing requirement.  In

4   fact, *Fallick* itself recognized that "[t]hreshold individual standing is a prerequisite for

5   all actions, including class actions," and that class representatives "cannot acquire

6   such standing merely by virtue of bringing a class action."  162 F.3d at 422.[28]

7          By contrast, Plaintiffs here seek to challenge alleged misconduct ***that is***

8   ***different from*** the alleged misconduct that supposedly caused injury to Plaintiffs.

9   More specifically, Plaintiffs seek to challenge statements made in connection with

10  MBS they never bought, each of which was collateralized by a *different* pool of

11  thousands of unique mortgage loans involving *different* credit risk attributes and

12  originated at *different* times under potentially *different* underwriting standards.  *See*

13  Br. at 36-40.  Because the statements made in connection with each MBS deal *were*

14  *specific to the unique loans underlying that particular Offering*, *see infra* at 31-36,

15  Plaintiffs suffered no injury whatsoever from the statements made in connection with

16  Offerings in which they did not actually purchase securities.  *See, e.g.*, *Royal Bank of*

---

17  [27] *See Fallick*, 162 F.3d at 421-24 (challenging reimbursement methodology applied

18  to multiple ERISA plans; "the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans"); *Garcia v. Countrywide Fin. Corp.*, 2008 WL

19  7842104, at *8 (C.D. Cal. Jan. 17, 2008) (challenging credit policy that discriminated against all putative class members); *Payton v. County of Kane*, 308 F.3d 673, 682 (7th

20  Cir. 2002) (named plaintiffs "personally injured by the operation of the same statute" that caused injury to all other class members); *In re La.-Pac. Corp. ERISA*

21  *Litig.*, 2003 WL 21087593, at *4-5 (D. Ore. Apr. 24, 2003) ("challenged practices were uniformly applied to both [ERISA] Plans" at issue); *Mutchka v. Harris*, 373 F.

22  Supp. 2d 1021, 1024 (C.D. Cal. 2005) (relying on *Fallick*); *Harmsen v. Smith*, 693 F.2d 932, 942 (9th Cir. 1982) ("[p]laintiffs here alleged . . . a conspiracy that caused

23  them damages"); *Gratz v. Bollinger*, 539 U.S. 244, 265 (2003) ("criteria used to determine whether a transfer application will contribute to the University's stated goal

24  of diversity are *identical* to that used to evaluate freshman applicants").

25  [28] Several other cases cited by Plaintiffs contain similar language.  *See, e.g.*, *Kohen v.*
    *Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009) ("*[b]efore* a class is certified

26  . . . the named plaintiff must have standing, because at that stage no one else has a legally protected interest in maintaining the suit"); *Payton*, 308 F.3d at 682 ("[t]his is

27  not a case where the named plaintiff is trying to piggy-back on the injuries of the unnamed class members," which "would be impermissible"); *La.-Pac. Corp.*, 203 WL

28  21087593, at *4 ("[a] potential class representative . . . cannot acquire such standing merely by virtue of bringing a class action").

---

28

1    *Scotland*, 2010 WL 1172694, at *7.  For these reasons, the *Wells Fargo* court rejected

2    the very same arguments Plaintiffs make here as well as some of the very same cases

3    Plaintiffs cite here:

> [I]n several district court decisions cited by plaintiffs, there was no dispute that
> the lead plaintiffs had individual standing; rather, the dispute concerned
> whether the lead plaintiffs could bring suit on behalf of a class of persons who
> suffered different injuries *stemming from the same conduct* by the
> defendants. . . .  *These cases did not address whether plaintiffs in a class action
> may bring suit on behalf of persons who have purchased securities through
> different offerings stemming from distinct offering documents*.

11   2010 WL 1661534, at *4 (Ilston, J.) (distinguishing *In re Connetics Corp. Sec. Litig.*,

12   542 F. Supp. 2d 996 (N.D. Cal. 2008) (Ilston, J.); cited in Opp. at 56).[29]

13   **B.    Plaintiffs Lack Statutory Standing.**

14   Plaintiffs similarly argue that statutory standing "is a Rule 23 issue, not a Rule

15   12 issue" and should be reserved until class certification.  Opp. at 60.  Once again,

16   however, every court to address the issue has held that a named plaintiff lacks

17   statutory standing under Sections 11 and 12 of the 1933 Act with respect to any MBS

18   offering in which it did not purchase, dismissing the claims as to any such offerings

19   pursuant to Rule 12(b)(6).  *See Wells Fargo*, 2010 WL 1661534, at *4; *Merrill Lynch*,

20   2010 WL 2175875, at *6; *Nomura*, 658 F. Supp. 2d at 304 n.3; *NECA-IBEW*, Ex. 35

21   at 40-41; *City of Ann Arbor*, 2010 WL 1371417 at *7.

22   Plaintiffs argue that two of these cases – *Wells Fargo* and *Merrill Lynch* –

23   "refer[] not to statutory standing . . . but to constitutional standing."  Opp. at 61.  This

24   is utterly false.  Both *Wells Fargo* and *Merrill Lynch* dismissed for lack of statutory

25   standing *as well as* lack of constitutional standing.  The relevant passages cited in the

26   Countrywide brief (*Wells Fargo* at *4, *Merrill Lynch* at *6) plainly refer to the

27   ───────────────────────
[29] As *Connetics* relied on *In re VeriSign, Inc. Sec. Litig.*, 2005 WL 88969 (N.D. Cal.
28   Jan. 13, 2005) (Opp. at 56), *Wells Fargo* necessarily distinguished *VeriSign* as well.

1   statutory standing issue.  *See* Br. at 35-36.  Plaintiffs, however, altered those page

2   cites in their Opposition, claiming that the Countrywide Defendants actually relied on

3   *Wells Fargo **at \*3***, and *Merrill Lynch **at \*3***.  They then misleadingly argue that those

4   passages are unrelated to statutory standing.  *See* Opp. at 61.  In any event, Plaintiffs

5   have no response to those cases (or to *Nomura*, which they simply say is "wrong"),

6   and they wholly ignore *City of Ann Arbor* and *NECA-IBEW*, both of which dismissed

7   MBS claims for lack of statutory standing on virtually identical facts.  Opp. at 61 n.36.

8       Next, Plaintiffs argue that the plain language of Sections 11 and 12 applies only

9   to "conventional individual actions," and that an unidentified special rule applies in

10  *class actions* that somehow exempts named plaintiffs from adequately alleging

11  statutory standing.  Opp. at 59-60.  Plaintiffs cite no authority for such a special rule,

12  and none exists.  To the contrary, the text of Sections 11 and 12 is unequivocal:  if a

13  plaintiff asserts claims based on a particular security, but cannot allege that it actually

14  "acquired *such security*" (and, in the case of Section 12, that it purchased such

15  security from a participant in the offering) it has failed to state a claim.  15 U.S.C. §§

16  77k, 77*l*(a)(2).  This required element may not be ignored just because the claim is

17  pursued in a class action.  *E.g.*, *Wells Fargo*, 2010 WL 1661534, at \*4 (class action);

18  *Merrill Lynch*, 2010 WL 2175875, at \*6 (class action); *Lewis*, 518 U.S. at 357 ("[t]hat

19  a suit may be a class action . . . adds nothing to the question of standing").

20      **C.      The Shelf Registration Statements Do Not Create Standing.**

21      Plaintiffs argue they have standing to represent investors who purchased MBS

22  pursuant to a common shelf registration statement, citing *In re Countrywide Fin.*

23  *Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1164-67 (C.D. Cal. 2008), and the similar

24  opinion in *In re Citigroup Inc. Bond Litig.*, 2010 WL 2772439, at \*13 (S.D.N.Y. July

25  12, 2010), neither of which involved MBS.[30]  *See* Opp. at 62-67.  Plaintiffs concede,

---

26  [30] Plaintiffs concede there are 50 Offerings covered by six shelf registration statements
    under which no named plaintiff purchased securities.  Thus, claims related to those 50
27  Offerings must be dismissed even if commonality of the registration statement could
    confer standing in an MBS case, which it cannot.  *See* Opp. at 61, 63 (chart showing
28  Plaintiffs did not buy MBS under six of the 19 registration statements at issue).

however, that this argument has been rejected by every MBS case that has addressed it.  *See id.*; *City of Ann Arbor*, 2010 WL 1371417, at *7-8; *Royal Bank of Scotland*, 2010 WL 1172694, at *7-8; *Wells Fargo*, 2010 WL 1661534, at *4-5; *NECA-IBEW*, Ex. 35 at 40-41.  Most recently, Judge Swain rejected this argument in *Morgan Stanley*, expressly holding that *Countrywide* is "inapposite" in the MBS context.  2010 WL 3239430, at *4 n.5.[31]

Contrary to what Plaintiffs say, *see* Opp. at 66, the cases that have dismissed MBS securities claims for lack of standing are not inconsistent with *Countrywide* or *Citigroup*.  Rather, the different results reached in these cases reflect the fundamental structural differences between MBS and ordinary corporate debt securities.  For the preferred stock and corporate bonds at issue in *Countrywide* and *Citigroup*, the shelf registration statements typically contain nearly all the key substantive representations applicable to each shelf offering, which in turn all concern the creditworthiness of a single corporate issuer.  The supplemental filings typically consist of price and interest rate data for a particular series of debt, and generally do not alter the substantive representations of the shelf registration statement.  *See, e.g.*, Exs. 46-47 (sample pricing supplements for debt securities at issue in *Countrywide*).

In MBS offerings, however, "the shelf registration statements and related base prospectuses are general in content," with all the pool-specific information left blank. *Royal Bank of Scotland*, 2010 WL 1172694, at *7.  Because no specific mortgage pool has yet been created at the time the shelf registration statement is filed, it merely "point[s] investors to specific details contained in the [not-yet-filed] supplements . . . for each offering."  *Id.*  When a particular Offering is issued, "the underlying details" for the newly created pool of loans collateralizing that deal are "contained in the . . .

---

[31] Plaintiffs also appear to argue that they may represent investors in MBS Offerings that do not share a common registration statement with Offerings in which the Plaintiffs did allegedly buy securities.  *See* Opp. at 61, 63.  Plaintiffs cite no authority for this argument, which is spurious on its face and conflicts even with the authorities Plaintiffs themselves cite (discussed *infra*, at 31-36).

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1    prospectus supplements" and are "unique to each of the offerings." *Id*.  As Judge

2    Swain explained in *Morgan Stanley*, "the particulars of the holdings, originators,

3    policies, practices, and ratings relevant to each [offering] were detailed in that

4    [offering]'s prospectus supplement *only*," and "the certificates were issued by separate

5    trusts pursuant to separate sets of operative documents notwithstanding the common

6    thread of the shelf registration statements and their generic disclosure content."  2010

7    WL 3239430, at *5.[32]

8        Thus, in MBS offerings, the representations made in the shelf registration

9    statements are modified, qualified, and given meaning by the detailed substantive

10   representations contained in each prospectus supplement.  Those representations are

11   inextricably linked to the unique mortgage loans comprising each pool, the governing

12   underwriting guidelines in effect when those loans were originated (not the less or

13   more expansive underwriting guidelines applicable to other loans originated at

14   different times), and the specific underwriting standards actually used in their

15   origination.  Indeed, in the MBS at issue here, the use of the defined term "Mortgage

16   Loans" in the shelf registration statements refers to the particular loans that will be

17   included in the particular pools that will collateralize future offerings – loans that may

18   not then even exist, and whose identity will not be known until they are included in

19   those pools.  And the description of the credit characteristics and underwriting

20   practices in each prospectus supplement refers to those specific Mortgage Loans, not

21   other mortgage loans collateralizing other offerings, past or future.  *See* Br. at 36-40.

22       That each Offering concerns a different pool of unique loans and a different set

23   of prospectus supplement representations unique to those loans directly affects the

24   alleged injury putative class members have supposedly suffered.  This is in part

25   _____

26   [32] *Accord City of Ann Arbor*, 2010 WL 1371417, at *7-8 (allegations that "disclosures in the commonly filed documents are the same . . . are unavailing" because of "the difference in the underlying pools of mortgages"); *Wells Fargo*, 2010 WL 1661534, at

27   *4 ("[a]lthough plaintiffs have alleged that the Prospectuses and Prospectus Supplements contained some similar false statements or omissions . . . . plaintiffs

28   cannot gain standing purely as a result of the common Registration Statements.").

because each MBS derives its value from a different source.  Each is issued by a separate trust that contains different Mortgage Loans, and the cash flows paid to the investor are determined by whether the specific borrowers to whom those specific loans were made make their monthly principal and interest payments.  In other words, the potential injury caused by an alleged misstatement will vary from Offering to Offering, depending on the quality and performance of the underlying assets.  Corporate bonds, on the other hand, derive their value from a single source – the creditworthiness of the single corporate issuer, and any alleged misstatements in the shelf registration statement about that issuer's future prospects or financial condition likely will affect all series of the bond equally, if at all.  For all these reasons, "the harm Plaintiffs may have suffered based on misstatements in the Offering Documents for the Certificates they purchased has no bearing on any harm suffered by other investors based on alleged misstatements in other offering documents with details about other offerings that Plaintiffs did not purchase."  *Royal Bank of Scotland*, 2010 WL 1172694, at *7.

In *Countrywide*, this Court implicitly recognized that the structural differences between MBS and other securities could result in loss of standing.  More specifically, this Court emphasized "the narrow application of [its] analysis," and made clear that "it is possible that later [securities] issuances could incorporate *very different alleged violations* and have in common only a *minor* common misrepresentation or omission." 588 F. Supp. 2d at 1167.  In those cases, such "differences could be significant enough to lead a Court to deny standing for class plaintiffs on a motion to dismiss."  *Id*.  That is exactly the case here.

Plaintiffs ignore the unique structural characteristics of MBS.  Instead, the Opposition cherry-picks isolated passages from the shelf registration statements and argue that they contain allegedly false language that "applied to all Offerings made under that Registration Statement."  Opp. at 64-66.  Plaintiffs, however, fail to mention the numerous blanks, placeholders, and disclaimers in the very same shelf

registration statements that repeatedly direct investors to the *prospectus supplements* for "the specific terms of the securities." CW RJN Ex. 4 (CWMBS Form S-3/A, Reg. No. 333-131662) at Prospectus Title Page, 1, 12. Rather than describe substantive characteristics of the Mortgage Loans or the underwriting standards under which they will be originated, the shelf registration statements make clear that the prospectus supplements will provide that information.

For instance, the shelf registration statements in this case state the following:

- "[T]his prospectus . . . provides general information, some of which may not apply to a particular series. . . . The *prospectus supplement* will contain information about a particular series . . . and *you should rely on that supplementary information in the prospectus supplement*." CW RJN Ex. 4 (CWMBS Form S-3/A, Reg. No. 333-131662) at 1.

- "Each *prospectus supplement* will contain information . . . *with respect to the loans contained in the related pool*." *Id*. at 15.

- "The applicable *prospectus supplement* will *specify the underwriting criteria pursuant to which the mortgage loans were originated*. . ." CW RJN Ex. 3 (CWALT Form S-3/A, Reg. No. 333-123167) at 23.

- "*Whenever the terms mortgage pool and certificates are used in this prospectus, those terms will be considered to apply . . . to one specific mortgage pool* and the certificates representing certain undivided interests in *a single trust*." *Id*. at 12.[33]

In fact, one of the statements that Plaintiffs claim applied to every CWALT and CWMBS Offering – "[a]ll of the Mortgage Loans have been originated or acquired by

---

[33] *See also* Br. at 38-39; CW RJN Ex. 4 at Title Page, S-2-4, S-34-47 (template for supplement includes blanks for series title, closing date, original principal balance, average FICO score, average LTV ratio, property type, lien priority, geographic information, interest rates, trustee, type of loans), S-52 ("Underwriting Standards": "[Below is an *example* of the disclosure to be provided…]"); CW RJN Ex. 3 at S-18-23 (entire "Underwriting Process" section bracketed as placeholder), S-23 ("Approximately []% of the mortgage loans . . . have been underwritten pursuant to . . . Expanded Underwriting Guidelines").

Countrywide Home Loans, Inc., in accordance with its credit, appraisal and underwriting standards," Opp. at 65 – clearly did *not* apply to every Offering equally. First, it was not included in the base prospectus portion of the shelf registration statement at all, which was part of the Offering Documents for each Offering.  Rather, it was included in the *prospectus supplement template* portion, which by definition was *superseded* by each specific prospectus supplement for each Offering.  *See* CW RJN Ex. 3 at S-18, Ex. 4 at S-52.[34]  Second, in most shelf registration statements the word "all" in the phrase "all of the Mortgage Loans" or the entire phrase itself was in brackets, indicating that it was a variable that would change from Offering to Offering.  Hence, this was not a representation that every Offering would consist entirely of Countrywide loans originated based on Countrywide's underwriting standards.  Instead, it acknowledged that some Offerings would – and in fact, did – include loans made by other originators pursuant to other underwriting standards.[35]

Even if this statement *did* apply to each Offering, Plaintiffs are also wrong that with respect to the Offerings at issue "the same words in the same context mean the same thing."  Opp. at 66.  That is just not true for these MBS Offerings.  Contrary to what Plaintiffs argue, this "identical language" had a fundamentally *different meaning* for each Offering, because it depended on two variables that were both unknowable at the time of the shelf registration statement:  (1) "Mortgage Loans," which was a defined term referring to a unique loan pool that as of the filing of the shelf registration statement had yet to be created; and (2) Countrywide's underwriting guidelines, which as the Complaint itself alleges, AC ¶¶ 105, 129, expanded or

---

[34] For efficiency purposes, the Countrywide Defendants have not submitted all 19 shelf registration statements and 427 prospectus supplements at issue.  Of course, the Countrywide Defendants will provide any or all of them at the Court's request.

[35] *Compare* CW RJN Ex. 3 at S-18 (shelf registration statement: "[. . . All of the mortgage loans in the trust fund will have been originated or acquired by [Countrywide Home Loans] in accordance with its credit, appraisal and underwriting standards. . . .]") *with* CW RJN Ex. 45 (CWALT 2005-J4 Pro. Supp.) at S-38 (prospectus supplement:  only 11% of loans in one group and 5% of loans in another group were "originated or acquired" by Countrywide "in accordance with its credit, appraisal and underwriting standards").

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1   contracted over time and may have varied for the same general kind of loans from one

2   Offering to another.  Without knowing both these variables for any particular

3   Offering, which were provided in the prospectus supplements, the representation in

4   the shelf registration statement was not meaningful.[36]  In short, this "identical

5   language" was not static, but dynamic, and constituted *a new and different statement*

6   with respect to each and every one of the 427 MBS Offerings as the variables

7   changed.[37]

8        For all these reasons, which are entirely consistent with *Countrywide* and

9   *Citigroup*,[38] Plaintiffs cannot rely on the common shelf registration statements to

10  create constitutional or statutory standing where none exists.  Plaintiffs therefore lack

11  standing to assert claims based on the 346 Offerings in which they did not purchase,

12  and all such claims must be dismissed.[39]

---

[36] For example, if the loans securitized in Offering #1 did not comply with the
guidelines in effect at the time – but the guidelines then expanded – it is possible that
an identical profile of loans in Offering #2 would actually comply with the guidelines.

[37] For the same reason, the argument that all Offering Documents suffered from a
"uniform omission" that "Countrywide was not following its underwriting guidelines"
also fails.  Opp. at 64.  Each Offering involved different loans and possibly different
guidelines, and there is nothing "uniform" about this alleged omission.

[38] *Cf. Countrywide*, 588 F. Supp. 2d at 1165 ("[an] amended statement only creates a
new claim for the purchasers that can trace their security to the registration statement
as amended. . . .  if a statement that was not materially false or misleading at the first
effective date becomes so (due to intervening events) by the second effective date,
buyers that can trace their purchase to the second effective date have a claim while
those who can only trace their purchase to the first do not").

[39] With respect to Mr. Adler, in particular, Plaintiffs lack standing to sue as to the vast
majority of the challenged Offerings.  Plaintiffs premise Mr. Adler's alleged Section
11 liability entirely on the allegation that he signed just four of the 19 challenged
registration statements:  CWALT's April 24, 2007 Registration Statement (File No.
333-140962), CWMBS's April 24, 2007 Registration Statement (File No. 333-
140958), CWABS's April 24, 2007 Registration Statement (File No. 333-140960),
and CWHEQ's May 22, 2007 Registration Statement (File No. 333-139891).  AC
¶¶ 59.  Of the 427 Offerings at issue, only 64 are traceable to the four registration
statements allegedly signed by Mr. Adler.  *Id*. at Ex. A.  In their Amended Complaint
and Certifications, Plaintiffs claim to have purchased in only seven of those 64
Offerings.  *Id*. ¶¶ 21-24 (CWHEQ 2007-E, CWHL 2007-10, CWHL 2007-16, CWL
2007-11, CWL 2007-13, CWHL 2007-13, and CWHL 2007-HY5).  Accordingly,
Plaintiffs' claims against Mr. Adler are limited to the seven specific Offerings in
which they claim to have purchased that were traceable to the registration statements
he is alleged to have signed.

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### III.   NO LEGALLY COGNIZABLE INJURY HAS BEEN ALLEGED AS TO THE VAST MAJORITY OF THE MBS PLAINTIFFS BOUGHT.

It is apparent from the face of the Amended Complaint, the Distribution Reports that the Complaint incorporates by reference, and the Certifications Plaintiffs filed that 101 of the 105 Certificates Plaintiffs allegedly bought made every payment they were required to make during the time Plaintiffs held them. Those same documents confirm that 22 of these 105 Certificates already have been paid off in full.  Br. at 41-49.  Plaintiffs thus have received what they bargained for, and have incurred no cognizable economic injury in connection with nearly all their purchases.  Plaintiffs do not dispute that they have received all the payments to which the Certificates entitled them.  Instead, Plaintiffs resort to mischaracterizing Defendants' arguments.  Contrary to what Plaintiffs say, the Countrywide Defendants are not arguing that Plaintiffs filed their case too soon.  Rather, Defendants contend that because Plaintiffs either continue to receive all the payments to which they are entitled as to the vast majority of the Certificates they purchased, or chose to sell fully performing securities into an illiquid market, it is plain from the face of the Amended Complaint and the incorporated documents that Plaintiffs have not suffered a legally cognizable injury.  In short, Plaintiffs are trying to get a windfall by suing for a remedy as to MBS that, years after their issuance, are performing exactly as they should.

### A.   The Certificates Purchased By Plaintiffs Are Still Performing.

Plaintiffs nowhere address, let alone dispute, that 101 of the 105 Certificates they allegedly purchased were fully performing during the period that Plaintiffs held them, or that 22 of those 105 Certificates have been paid in full.  Plaintiffs cite no case holding that they may sue on a security that has been paid off in full.  Nor could they. Damages under Section 11 are capped at the price paid for the security, but "not exceeding the price at which the security was offered to the public."  15 U.S.C.

§ 77k(e).  If Plaintiffs have received back the face amount of their Certificates, they have no conceivable damages under Section 11(e).  *Id.*

Plaintiffs' only response is that "the determination of damages and cognizable injury are issues that are not appropriately decided at the motion to dismiss stage of the case and will instead be the subject of expert testimony . . . in the discovery phase of the litigation."  Opp. at 48 n. 32.  But the specific securities Plaintiffs purchased and the performance of those securities is apparent from the Amended Complaint, the Certifications Plaintiffs were required by the PSLRA to file, and the Distribution Reports on which the Amended Complaint explicitly relies (AC p.1).  Accordingly, whether or not those Certificates have paid everything to which Plaintiffs were entitled is not subject to reasonable dispute, and Plaintiffs do not contend otherwise.  Expert testimony is not relevant – the Certificates have either made all required payments or they have not, and nothing any expert may say will alter that judicially noticeable fact.  Because the Court can determine whether the Certificates have made all required payments based on documents properly before it, this issue is appropriate for resolution on a motion to dismiss.

Plaintiffs also protest that Countrywide is improperly shifting to them the burden to plead loss causation.  Opp. at 46.  But Plaintiffs conflate cognizable injury and loss causation, each of which is a separate legal concept, and the cases Plaintiffs cite for the proposition that loss causation is an affirmative defense are inapposite.  Opp. at 46-47. Moreover, the case law is clear that where, as here, it is apparent from the face of the complaint and from documents which the Court may judicially notice that a plaintiff has not suffered a legally cognizable injury, the plaintiff's Section 11 and 12 claims must be dismissed.  Br. at 41-42.[40]

---

[40] Although this Court held in *Countrywide* that damages do not have to be alleged under Section 11, it also held that a Section 11 claim must be dismissed if it appears from the face of the pleading that the "plaintiff cannot have suffered the type of injury contemplated by the statute."  588 F. Supp. 2d at 1168.  That is precisely the case here because Plaintiffs have not alleged they have missed any required MBS payments.

Plaintiffs' contention that "[u]nder Defendants' rationale, Defendants could control whether or not they face liability by continuing to provide cash flow through the Certificates . . . until such time as the statute of limitation runs, and then cease to make payments on the Certificates while simultaneously claiming that Plaintiffs are foreclosed from bringing suit" (Opp. at 44 n. 27) is meritless.  As an initial matter, Plaintiffs nowhere allege that Countrywide ever "provided cash flow to the Certificates" beyond that generated by the underlying Mortgage Loans and credit enhancement features.  Moreover, this speculative assertion is contradicted by the Amended Complaint itself, which alleges that Certificateholders receive "monthly distributions of interest and principal from the Issuing Trusts derived from cash flows from borrower repayment of the mortgage loans."  AC ¶ 5.  Those cash flows are protected by various credit enhancements features in each MBS Offering, detailed in the registration statements, which prevent defaults on the underlying loans from causing defaults in the MBS payments.  *Id*. ¶¶ 85, 157.  In other words, the distributions that MBS investors receive come from "borrower repayment of the mortgage loans" and any credit enhancement the Certificates carry.  *Id*.  This payment structure is further confirmed by the Offering Documents themselves.  *See, e.g*., CW RJN Ex. 9 (CWHEQ 2007-E Pro. Supp.) at 19-20 ("[e]ach trust fund will consist of the trust fund assets . . . consisting of a pool comprised of loans as specified in the related prospectus supplement, together with payments relating to those loans as specified in the related prospectus supplement"; "[n]o trust fund is expected to have any source of capital other than its assets and any related credit enhancement"); *accord* CW RJN Ex. 6 (CWMBS 2007-HYB2 Pro. Supp.) at 12-13; CW RJN Ex. 8 (CWABS 2006-15 Pro. Supp.) at 14-15.

**B.    Decline In Trading Value In An Illiquid Market Is Not Legally Cognizable Injury.**

The prospectus supplements accompanying each Offering expressly disclosed that: (i) the Certificates entitled holders only to a stream of payments from the

1  underlying mortgages (not to any market appreciation); (ii) no secondary market

2  existed for the Certificates (and none might ever exist); (iii) the Certificates could be

3  wholly illiquid, as MBS historically have been during periods of economic

4  turbulence; and (iv) such illiquidity could have an adverse effect on Certificate prices.

5  Br. at 12-13, 47-48, App. Tab 9.  Indeed, the Amended Complaint acknowledges that

6  what investors got by purchasing the Certificates was simply the right "to receive

7  monthly distributions of interest and principal from the Issuing Trusts derived from

8  cash flows from borrower repayment of the mortgage loans."  AC ¶ 5.  Plaintiffs

9  nowhere in their Amended Complaint allege that they purchased the Certificates for

10  market appreciation; to the contrary, Plaintiffs have acknowledged publicly in their

11  annual reports that they purchased the Certificates for their cash flow stream and for

12  their high yield compared to other securities, rather than for appreciation in the

13  secondary market.  Br. at 44 n.43; CW RJN Exs. 15-18.

14          Plaintiffs now attempt to back away from their public statements, arguing that

15  "[m]ortgage-backed securities are not mere contractual vehicles to provide investors

16  with streams of cash; rather, these investments are securities that many investors

17  purchase to realize a profit through resale."  Plaintiffs, however, cannot amend their

18  complaint in a brief opposing a motion to dismiss.[41]  Moreover, the case law makes

19  clear that diminution of cash flows – not declines in market prices – is the proper

20  measure of loss in cases involving MBS.[42]

21  _____

22  [41] *See, e.g., 420 East Ohio Ltd. P'ship v. Cocose,* 980 F.2d 1122, 1125 (7th Cir. 1992)
   (refusing to consider new allegations contained in materials submitted with opposition

23  brief because they "did not constitute an amendment" of the complaint); *O'Brien v.
   Nat'l Property Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) (rejecting

24  new factual allegations raised in opposition brief because "it is axiomatic that the
   Complaint cannot be amended by the briefs in opposition to a motion to dismiss").

25  [42] *See NECA-IBEW*, Ex. 35 at 30, 41-43 (dismissing 1933 Act claims due to absence
   of economic loss where "[t]here has been no diminution in any payment to the

26  plaintiff" from the MBS that it bought); *Luminent Mortg. Capital v. Merrill Lynch &
   Co.,* 652 F. Supp. 2d 576, 590-92 (E.D. Pa. 2009) (dismissing for "failure to allege an

27  economic loss" where there was "no dispute that Plaintiffs received the payments due
   under the Junior Certificates" that they purchased); *AIG Global Secs. Lending Corp. v.
   Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009) (presumption in a

28  "typical stock drop case" that a security's value to an investor is the price at which the

40

It is the absence of economic loss that led Judge Cedarbaum to refuse the Police and Fire Retirement System of the City of Detroit permission to intervene in the *NECA-IBEW* MBS class action case, "even though the defendant ha[d] agreed to the intervention." *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 08-CV-10783 (MGC), Tr. at 2, 35, 37-38 (S.D.N.Y. May 27, 2010) (Ex. 36). In that case, the court denied the motion to intervene because it "ma[de] no sense" to intervene in an action that was "about to be dismissed." *Id.* at 25. Judge Cedarbaum observed:

> If you continue to receive everything the certificate promises you, you have not lost anything. These certificates expressly said this was an illiquid market. They could not be sold.

*Id.* at 9. Then, in response to plaintiff's counsel's contention that plaintiff had sold its MBS into an illiquid market because of the increased risk of future loss associated with those securities, Judge Cedarbaum stated: "[N]ormally we can't sue on risks. We can only sue on realized loss." *Id.* at 10. She continued:

> If you could keep that security and keep drawing what you were promised, I do not see how, just because you decided at some particular time to sell what you had been told was an illiquid security, that that constituted a loss, because you could have continued to receive exactly what you were promised.

*Id.* The court finally noted that she had "never had a securities claim that survived in which there was no loss, in which the loss was entirely theoretical." *Id.* at 35.

Here, as in *NECA-IBEW*, Plaintiffs' "losses" are almost entirely theoretical. 101 of the 105 Certificates Plaintiffs allegedly purchased made all required payments during the period Plaintiffs held them. Although Plaintiffs allege that they sold some

---

security may later be sold does not apply to asset-backed securities, where the appropriate measure of value is the payments to which the securityholder is entitled); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 894 n.22 (W.D.N.C. 2001) ("Valuation of mortgage-backed securities such as those at issue here essentially is an exercise in estimating expected future cash flows.").

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

of their Certificates, the Distribution Reports show that all monthly distributions of principal and interest had been paid *in full* at the time Plaintiffs sold those MBS.  *See* App. Tabs 2-3.  Plaintiffs' decision to sell some of their Certificates into an illiquid market was the result of an independent investment decision and cannot give rise to a compensable loss under the 1933 Act, particularly given that Plaintiffs were explicitly warned that they should not expect that "a secondary market will develop or, if it develops, that it will continue," and that investors "may not be able to sell [their] certificates readily or at prices that will enable [them] to realize [their] desired yield." CW RJN Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-19; *NECA-IBEW*, Ex. 36 at 10.

Plaintiffs cite *DLJ Mortg. Capital*, 2010 WL 1473288, the only case ever to hold that a decline in the market value of mortgage-backed securities represents cognizable 1933 Act damages.  But this case is inapposite.  Integral to the court's decision was its conclusion that "[p]laintiff may have purchased the Certificates *expecting to resell them*, making market value the critical valuation marker for Plaintiff." *Id.* at *5.  Here, in contrast, the Offering Documents unequivocally stated that the Certificates were illiquid, that no secondary market might ever develop, and that investors might not be able to sell their Certificates readily, at a favorable price, or at all.  It thus would have been patently unreasonable for Plaintiffs (or any investor) to *expect* to be able to resell their Certificates, much less at a profit.  *See Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 416-17 (1st Cir. 1989) (Breyer, J.) (reliance unreasonable where contrary to disclosures).  And, because it would have been unreasonable, there is no plausible basis to draw an inference of such investor expectations under *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Plaintiffs' citation of *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048 (2d Cir. 1995), is also misplaced.  *McMahan* is an example of the "typical stock drop case" that the *AIG* court found inapposite when considering MBS claims.  646 F. Supp. 2d at 403.  In an MBS case, the use of market value to determine damages

1   would result in a windfall to Plaintiffs.  Plaintiffs could continue to receive the cash

2   flow payments they bargained for, while also seeking compensation for the decline in

3   market "value" of Certificates as to which they were explicitly told that no public

4   market might *ever* exist.  Plaintiffs also would benefit from any future increase in

5   market "value" of the MBS they still hold.  The securities laws do not entitle investors

6   to windfalls.

7        The only other decision Plaintiffs cite is *Countrywide*, in which this Court held

8   that alleged diminution in value was sufficient to plead legally cognizable injury in

9   connection with 1933 Act claims based on Countrywide corporate bonds.  588 F.

10  Supp. 2d at 1169-70.  That decision, however, did not involve MBS, let alone MBS

11  which investors were explicitly warned were potentially illiquid and for which no

12  market existed.  In contrast, there was no question as to the liquidity of the market for

13  the debt securities in *Countrywide.  Countrywide* is inapposite.[43]

14       In sum, as to all but four of the 105 CUSIPs they claim to have purchased,

15  Plaintiffs' claimed damages arise from a decline in market "value" at a time when

16  the secondary mortgage market and the broader economy had collapsed and the

17  MBS continued to make all required payments.  Accordingly, Plaintiffs have failed

18  to allege economic loss, and their claims should be dismissed on this basis alone.

19  *See NECA-IBEW*, Ex. 35 at 42 (allegation that "the certificates are no longer

20  marketable at prices anywhere near the prices paid by plaintiff . . . in the face of a

21  specific warning in the offering documents about the possibility in any event that the

22  certificates may not be resalable" does not allege "facts permitting an inference that

23  the plaintiff suffered a cognizable loss").

24

25

---

26  [43] Plaintiffs imply that many courts hold that MBS purchasers are "entitled to pursue
    securities claims based upon the loss of market value of mortgage-backed securities
27  irrespective of any purported illiquidity of the market for such securities."  Opp. at 50.
    Because both *McMahan* and *Countrywide* are inapposite, however, Plaintiffs are left
28  with only a single, outlier decision by one court (*DLJ Mortg. Capital*).

---

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## IV. <u>NO MATERIAL MISSTATEMENT OR OMISSIONS ARE ALLEGED</u>.

### A. The Representations Were Limited And Qualified.

The Offering Documents represented that the Mortgage Loans *either* had the described characteristics *or* would be cured or replaced upon request in accordance with the underlying securitization documents.  As the Fifth Circuit held in *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 389-90 (5th Cir. 2010), the absence of any allegation that Defendants failed to comply with this representation precludes any claim that the Mortgage Loans themselves were misrepresented.

Plaintiffs contend that *Lone Star* is distinguishable, arguing that the cure-or-replace language in *Lone Star* "related to misstatements in the specific underlying 'mortgage loan document[s],' not misstatements in the Registration Statements or Prospectus Supplements."  Opp. at 76.  Plaintiffs are wrong.  The two prospectus supplements at issue in *Lone Star* "included, *inter alia*, representations and warranties guaranteeing the quality of the mortgage pools."  *Lone Star*, 594 F.3d at 386.  One such representation was that, subject to certain qualifications, none of the pooled loans were delinquent.  *Id.* at 388.  The Fifth Circuit accepted as true plaintiffs' contention "that there were delinquent mortgages in the trusts[.]"  *Id.* at 388.  But that was not sufficient to establish a misrepresentation because the Court held that the representation regarding the absence of delinquent loans could not be read in isolation.  Rather, this representation was qualified by language in the representation and warranties agreements under which the loans were deposited in the pools (language that was then repeated in the prospectus supplements) that Barclays would substitute or purchase loans that did not comply with its representations.  *Id.* at 389 n.6.  As the Fifth Circuit held, "[r]ead as a whole, the prospectuses and warranties provide that the mortgages *should be* non-delinquent, but if some mortgages were delinquent then Barclays would either repurchase them or substitute performing mortgages into the trusts."  *Id.* at 389 (emphasis in original).  Accordingly, to state 1933 Act claims, the plaintiffs needed to allege *both* that a material portion of the pooled loans were

delinquent *and* that Barclays failed to cure or purchase such loans upon appropriate request.  Because plaintiffs had not alleged that a repurchase/cure request had been made or refused, the Fifth Circuit affirmed dismissal.  *Id*. at 389-90.

The structure and wording of the Offering Documents here is substantially identical to the structure and wording of the offering documents in *Lone Star*.  Here, as in *Lone Star*, the prospectus supplements repeat language found in the underlying Pooling and Service Agreements and Representation and Warranties Agreements to the effect that loans would either comply with the stated characteristics or would be replaced or cured.[44]  As in *Lone Star*, Plaintiffs are sophisticated institutional investors who may not ignore the very documents that define what they bought – documents that contain "repurchase or substitute" language that, as the *Lone Star* court held, is "part of" and "change[d] the nature of" representations regarding the loan collateral. *Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC*, 2008 WL 4449508, at *11 (N.D. Tex. Sept. 20, 2008); *Lone Star*, 594 F.3d at 389-90.

Plaintiffs also unsuccessfully try to distinguish *Lone Star* by arguing that it "turned on a single alleged misrepresentation," Opp. at 76, namely that the loan pools contained no delinquent loans.  That is a distinction without a difference.  Whether the case involved one alleged misrepresentation or more than one, the issue in both *Lone Star* and this case is whether the credit quality of the mortgage loans underlying the MBS and the origination practices relating to them were materially misstated.[45]  And the alleged misstatement in *Lone Star* – concealed delinquency of the pooled loans – went to the heart of those loans' credit quality.

---

[44] A chart identifying the relevant representations as to each of the MBS is contained in Tab 8 of the Appendix in Support of Countrywide Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint (Dkt. 158).

[45] The cases Plaintiffs cite do not address – much less reject – the holding or rationale of *Lone Star*.  Opp. at 77.  It is not clear whether the defendants in each case even made a *Lone Star*-based argument, and to the extent that the courts in any of these cases did decline to apply *Lone Star* it is wholly unclear why (*e.g.*, was it the specific wording of the offering documents in those cases, some concern about the Fifth Circuit's analysis, or some other reason not relevant here?).

45

## B.     No Misrepresentations Have Been Tied To Any Pooled Loans.

The issue in this MBS case is whether the specific Mortgage Loans underlying the specific Offerings being challenged – not other loans that Countrywide or any other lender may have originated – were mischaracterized in the Offering Documents. Indeed, the Amended Complaint acknowledges that *the prospectus supplement for each deal* described the underwriting standards applicable to the particular Mortgage Loans that backed *that particular deal*:  "[A] final Prospectus Supplement was filed with the SEC containing **a description of the mortgage pool underlying the Certificates and the underwriting standards by which the mortgages were originated**."  AC ¶ 161.  Plaintiffs, however, have not alleged any facts showing that the specific loans underlying the specific Offerings in this case were misstated, let alone materially.

Plaintiffs do not dispute this, arguing instead that they need only generally allege a "systematic disregard of the underwriting guidelines."  Opp. at 73.  In effect, Plaintiffs ask the Court simply to *assume* that a material portion of the Mortgage Loans that backed each of the 427 MBS Offerings in this case was misrepresented.  But Plaintiffs never explain how the Court plausibly could make such an assumption consistent with *Twombly*, given that between 2005 and 2008 Countrywide originated approximately $1.4 trillion worth of mortgage loans.[46]  Other courts have refused to make this leap.  *See, e.g.*, *Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.*, --- F. Supp. 2d ---, 2010 WL 1489264, at *6 (W.D. Ky. Apr. 13, 2010) (plaintiffs must

---

[46] Rule 9(b) imposes additional burdens on Plaintiffs.  Plaintiffs argue that Rule 9(b) does not apply because the Complaint "alleges *only* claims under the Securities Act and specifically disclaims any allegations of fraud."  Opp. at 67.  But such boilerplate disclaimers of fraud are insufficient where the Complaint is grounded in fraud, as it is here.  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996) ("nominal efforts [to disclaim fraud] are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus.").  Here, Plaintiffs have alleged that Countrywide deliberately disregarded the very underwriting guidelines with which the Offering Documents said the pooled loans complied.  *See, e.g.*, AC ¶¶ 6, 10, 13, 101, 109-18, 163, 167, 176, 185.  As shown in the Moving Brief, such allegations bring the Amended Complaint within the ambit of Rule 9(b).

46

1  establish a nexus between misstatements and the securities actually at issue)[47]; *City of*

2  *Ann Arbor*, 2010 WL 1371417, at *10 (plaintiffs must allege how misstatements or

3  omissions were "tied to the loans in which they invested").

4       Plaintiffs' argument that this Court may assume the loans in each of the 427

5  MBS Offerings were materially misstated is based almost exclusively on *Wells Fargo*,

6  2010 WL 1661534.[48]  In *Wells Fargo*, however, the district court had a factual basis

7  for making inferences not found in the present complaint.  The *Wells Fargo* court

8  concluded that plaintiffs had adequately alleged misrepresentations related to Wells

9  Fargo's underwriting process based on allegations "that the challenged conduct

10  infected the entire underwriting process, including with respect to prime loans."  *Id.* at

11  *11.  Those allegations were based on plaintiffs' counsel's alleged interviews with

12  several "confidential witnesses," who allegedly said "that defendants' stated

13  underwriting guidelines were at odds with the reality of their practice" and that "Wells

14  Fargo '*systematically* did not follow its stated underwriting standards[.]'"  *Id.*

15       Here, by contrast, Plaintiffs have not identified ***any*** "confidential witnesses"

16  with whom Plaintiffs communicated and who corroborate their allegations.  And,

---

17  [47] Plaintiffs argue that *Republic Bank* is distinguishable because that complaint was

18  "devoid" of allegations that would support plaintiffs' claims (including citations to the offering documents or the specific mortgage loans), and here the Complaint alleges

19  that the "underwriting guidelines with respect to the specific mortgages underlying the Certificates were systematically disregarded."  Opp. at 76.  The court in *Republic*

20  *Bank*, however, simply stated that where plaintiffs alleged that underwriting standards were ignored or otherwise not followed, the complaint must contain "allegations on

21  this subject that are . . . ***specific to the loans and securities involved in [the] case***." *Id.*, 2010 WL 1489264, at *6.  That same principle applies with full force here.

22  [48] The other cases Plaintiffs cite are inapposite – none addresses whether an MBS plaintiff must establish a nexus between the alleged misstatements and the specific

23  loans underlying the securities at issue, and all but one did not even concern MBS. *See In re PMI Group, Inc. Sec. Litig.*, 2009 WL 3681669 (N.D. Cal. Nov. 2, 2009)

24  (common stock case; no discussion regarding tying misstatements to securities); *Atlas v. Accredited Home Lenders Holdings Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008)

25  (same); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192 (W.D. Wash. 2009) (same); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp.

26  2d 1044 (C.D. Cal. 2008) (typical corporate debt securities; same); *In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503 (E.D. Pa. July 27, 2005) (non-MBS case; same);

27  *but see Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005) (involved securitized mobile home mortgages,

28  but did not address tying of alleged misstatements to particular pooled loans).

---

47

Plaintiffs do not explain how their reliance on someone else's alleged factual investigation could be sufficient to support the plausible inference of wrongdoing that *Twombly* requires.[49]   Moreover, the **substance** of the allegations attributed to the so-called confidential witnesses in these other cases (Plaintiffs rely principally on "confidential witness" allegations in the *Countrywide* case) principally address Countrywide's alleged *expansion*, not abandonment, of underwriting guidelines.  *See e.g.*, AC ¶ 181; *In re Countrywide Fin. Corp. Sec. Litig.*, CV-07-05295 MRP (MANx), Second Amended Consolidated Class Action Complaint, ¶¶ 130-61 (regarding loosening of guidelines).  But there is no issue here regarding expansion of lending guidelines over time.  Expanding one's guidelines is not the same thing as abandoning those guidelines.  And, Plaintiffs do not – and cannot – argue that expansion of guidelines was concealed.  Indeed, the detailed disclosures in the prospectus supplements of the credit risk attributes of the pooled loans (including FICO scores, LTV ratios, and extent of required borrower documentation) reflected the expansion of underwriting standards during the relevant period.

### C.   Plaintiffs' Appraisal-Related Allegations Are Not Actionable.

An appraisal is a subjective opinion that "is actionable under the Securities Act only if the amended complaint alleges that the speaker did not truly have the opinion at the time it was made public."  *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010).  Several courts have rejected 1933 Act MBS claims based on the alleged inflation of property appraisals (and thus alleged understatement of LTVs) absent factual allegations showing that the appraisers' opinions were believed to be false when made.  *See, e.g.*, *IndyMac*, 2010 WL 2473243, at *10-11 (dismissing claims based on allegations that appraisals did

---

[49] Plaintiffs also do not adequately address how regurgitating the allegations found in another complaint without undertaking an independent factual investigation could possibly satisfy Rule 11.  *See In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (rejecting inferences based on the existence of an SEC investigation); *Connetics*, 542 F. Supp. 2d at 1005 (counsel may not just "rely entirely on another complaint as the sole basis for his or her allegations") (emphasis omitted).

not comply with USPAP standards); *Residential Capital*, 2010 WL 1257528, at *6 (credit ratings "are clearly opinion statements because they predict future value and reliability").  No such allegations are present here, and Plaintiffs' appraisal-related allegations thus must be dismissed.

Plaintiffs try to end-run these cases by contending that they are not challenging "the individual appraisals made by the appraisers, but rather the statements in the Offering Documents . . . concerning the standards supposedly followed for those appraisals."  Opp. at 81.  That contention, however, is contradicted by what they actually alleged in the Amended Complaint, which plainly asserts that "Countrywide systematically *inflated* appraisals" (AC ¶ 182).  *Accord id.* ¶¶ 134 (artificially increase appraisal values); 135 (artificially inflate appraisals); 142 (appraisers encouraged to inflate values); Opp. at 79-80 (referring to "*inflated* appraisals for properties used as collateral for mortgage loans underlying the Issuing Trusts" and "Countrywide's undisclosed practice of *inflating* appraisals and thus lowering LTV ratios on underlying collateral").  Plaintiffs may not recast what they have alleged, and the absence of any facts that appraisers did not believe the opinions they provided as to collateral value requires dismissal of these conclusory allegations.

**D.   The Alleged Misstatements About Compliance With Underwriting Guidelines Did Not Alter The "Total Mix" Of Information**.

Plaintiffs do not explain how disclosure that Countrywide allegedly was not following its underwriting guidelines would have altered the total mix of information available to MBS investors and, thus, would have been material.  *See* Br. at 59-62.  Underwriting guidelines can be good or bad, expansive or narrow, conservative or extremely liberal.  Because guidelines can vary in this way – and thus because the quality of the loans those guidelines produce can vary greatly in terms of credit risk, disclosure about whether a lender has complied with its guidelines ultimately tells the investor nothing about the credit quality and likely future performance of the loans that are actually originated.  Here, however, the prospectus supplements told investors

49

everything they needed to know – and that the SEC deemed investors needed and wanted to know – about the actual credit quality and credit risk attributes of the Mortgage Loans underlying each Offering (including FICO scores, LTV ratios, extent of required borrower documentation, etc.).  Indeed, in adopting Regulation AB, the SEC stated that the required disclosure of this very data is "comprehensive," definitive" and "material[]" to investors.  Asset-Backed Securities, Securities Act Release No. 8518, Exchange Act Release No. 50905, 70 Fed. Reg. 1506, 1581, 1584, 1587 (2005).  Given that investors knew the quality of the loans actually underlying the securities they bought, the challenged disclosures regarding compliance with guidelines – guidelines that Plaintiffs admit expanded during the relevant period – would not have altered the total mix and were immaterial as a matter of law.  *See, e.g.*, AC ¶¶ 95, 129, 181 (alleging expansion of guidelines); *Nomura*, 658 F. Supp. 2d at 305-07 (dismissing Section 11, 12(a)(2) claims; alleged misstatements regarding underwriting guidelines found immaterial given "fusillade of cautionary statements").

Plaintiffs' sole response is that there supposedly is "widespread evidence that the loan data was itself inaccurate."  Opp. at 78.  But Plaintiffs do not allege any facts showing that any of this data was inaccurate in any respect.  Although Plaintiffs argue that LTV ratios were understated because appraisals supposedly were "inflated," that allegation fails as explained above due to the absence of any facts suggesting that appraisers did not believe their opinions as to what collateral was worth.

## V. THE SECTION 12(a)(2) CLAIMS FAIL.

### A. Plaintiffs Fail To Allege "Seller" Liability Under Section 12(a)(2).

Plaintiffs' Section 12(a)(2) claims against CWALT, CWMBS, CWABS, CWHEQ, CFC, CSC, and the Underwriter Defendants should be dismissed because the Amended Complaint does not allege that these defendants either (i) passed title to Countrywide securities to Plaintiffs (*i.e.*, they were in privity with Plaintiffs); or (ii) were "directly involved" in the actual solicitation of the securities purchase, for their own financial gain or that of the securities holder.  *In re Daou Sys., Inc. Sec. Litig.*,

411 F.3d 1006, 1029 (9th Cir. 2005) (citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)).

## 1. The Depositors And CFC Are Not Section 12 (a)(2) "Sellers."

Plaintiffs do not and cannot allege that CWALT, CWMBS, CWABS, CWHEQ, or CFC passed title to investors.  This is because the Offerings all occurred through firm commitment underwritings, whereby the Depositor entities sold the Certificates or Notes to securities underwriters, who in turn sold them to the public.  *See, e.g.*, CW RJN Ex. 5 (CWALT 2005-24 Pro. Supp.) at S-128 ("the depositor has agreed to sell the offered certificates to the underwriter, and CSC has agreed to purchase from the depositor the offered certificates . . . ."); CW RJN Ex. 9 (CWHEQ 2007-E Pro. Supp.) at S-89 ("[T]he depositor has agreed to sell to the Underwriter and the Underwriter has agreed to purchase from the depositor, the principal amount of Notes indicated on the cover page of this prospectus supplement.").[50]  Accordingly, neither the Depositor entities nor CFC qualify as sellers under the first prong of *Pinter* because they did not pass title of the security directly to Plaintiffs.  *In re Sonus Networks, Inc. Sec. Litig.*, 2006 WL 1308165, at *10-11 (D. Mass. May 10, 2006); *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28, 2001).

Plaintiffs argue that the Supreme Court's limitation of Section 12(a)(2) liability in *Pinter* should be rejected because SEC Rule 159A, which was adopted as part of the 2005 Securities Offering Reform, provides that an "issuer," regardless of the form of the underwriting arrangement, is a "seller" for purposes of Section 12(a)(2).  Opp. at 96-98.[51]  Rule 159A ostensibly seeks to invalidate the Supreme Court's holding in *Pinter* that Section 12 imposes liability only on those in privity with, or who directly solicited, the purchaser.  *See* Securities Offering Reform, Exchange Act Rel. No.

---

[50] *See, e.g.*, *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1215 (1st Cir. 1996) ("In a firm commitment underwriting, the issuer of the securities sells all of the shares to be offered to one or more underwriters, at some discount from the offering price.  Investors purchase shares in the offering directly from the underwriters . . . not directly from the issuer.").

[51] This argument does not apply to CFC, which is neither alleged to be an issuer nor to have passed title to Plaintiffs.

1    8591, 2005 WL 1692642 at *136-137 (Aug. 3, 2005); 17 C.F.R. § 229.512 (2010).

2    Plaintiffs, however, may not rely on Rule 159A to amend Section 12(a)(2).

3         The SEC cannot through rulemaking expand liability beyond that created by

4    Congress in the underlying statute.  As the Supreme Court held in *Ernst & Ernst v.*

5    *Hochfelder*, which rejected the SEC's attempt to interpret SEC Rule 10b-5 in a

6    manner inconsistent with Section 10(b) of the Securities Exchange Act of 1934, "[t]he

7    rulemaking power granted to an administrative agency charged with the

8    administration of a federal statute is not the power to make law."  425 U.S. 185, 213-

9    14 (1976).[52]  Here, the Supreme Court has already articulated the limits of the liability

10   that Congress unambiguously created in Section 12(a)(2), holding in *Pinter* that only

11   those in privity with plaintiffs, or those who directly solicited them, can be held liable

12   under Section 12(a)(2).  486 U.S. at 642, 647.  Rule 159A ostensibly extends liability

13   to parties who are not in privity with plaintiffs and did not directly solicit them.  Rule

14   159A is therefore in direct conflict with the Supreme Court's construction of Section

15   12 in *Pinter* and thus exceeds the SEC's rulemaking authority.[53]

16

---

17   [52] *See, e.g., Business Roundtable v. SEC*, 905 F.2d 406, 417 (D.C. Cir. 1990) (holding
18   that SEC exceeded its statutory authority in promulgating Rule 19c-4 to bar national
     securities exchange and associations from listing stocks violative of one share/one
     vote principle); *Am. Bankers Ass'n v. SEC*, 804 F.2d 739, 753-56 (D.C. Cir. 1986)
19   (holding that SEC exceeded its authority in promulgating SEC Rule 3b-9 to require
     banks engaging in the securities brokerage business to register as broker-dealers under
20   the 1934 Act; *cf. Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 493 (D.C. Cir. 2007) (the
     SEC's "rulemaking power[s][are] limited to adopting regulations to carry into effect
21   the will of Congress as expressed in the statute").

22   [53] Given that the SEC overreached its authority in adopting Rule 159A, it is not
     surprising that numerous cases decided after the Rule's adoption in 2005 have
23   continued to hold that issuers are not sellers for purposes of Section 12(a)(2).  *See,
     e.g., Hoff v. Popular, Inc.,* --- F. Supp. 2d ---, 2010 WL 3001710, at *18-19 (D.P.R.
24   Aug. 2, 2010); *Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *7 (W.D. Wash. Dec.
     29, 2008); *Sonus Networks,* 2006 WL 1308165, at *10; *In re Prestige Brands
25   Holding, Inc.*, 2006 WL 2147719, at *10 (S.D.N.Y. July 10, 2006).  Plaintiffs cite
     only one case, *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512
26   (S.D.N.Y. 2010), as ostensible support for their contention that an issuer may be liable
     under Section 12(a)(2) even if it did not pass title or actively solicit the purchase of a
27   security.  Opp. at 97.  *Citiline*, however, is the only published decision ever to reach
     this conclusion, and the *Citiline* parties never addressed in their motion to dismiss
28   briefing whether Rule 159A was within the SEC's rulemaking authority.  *Id.*

---

52

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

2.    **Plaintiffs Have Not Pled That They Purchased Directly From CSC Or Any Other Underwriter.**

Plaintiffs contend that CSC and the Underwriter Defendants are liable under Section 12(a)(2) as underwriters.  Opp. at 98.  Plaintiffs nowhere allege, however, that CSC or the Underwriter Defendants passed title directly to Plaintiffs or were "directly involved" in the actual solicitation of the securities purchased by Plaintiffs for their own financial gain.  *Daou*, 411 F. 3d at 1029; Br. at 71-72.  This defect is fatal.  As the *Nomura* court aptly stated:  "If plaintiffs did in fact purchase the Certificates directly from the defendants, they should have said so.  An evasive circumlocution does not suffice as a substitute."  658 F. Supp. 2d at 305.

In the Opposition, Plaintiffs respond by pointing to Exhibit B of their Amended Complaint, which they contend specifies "for every one of the 427 Offerings at issue in this case, which Underwriters sold the Certificates to them and all members of the Class."  Opp. at 98-99.  Exhibit B, however, is simply a chart listing the underwriters for each of the 427 Offerings.  Nowhere does Exhibit B state that Plaintiffs purchased any Certificate directly from CSC (or any other underwriter).  Nor is this information supplied anywhere in the body of the Amended Complaint.  Rather, Plaintiffs merely allege generically that CSC and the other underwriters acted as "an underwriter for the Issuing Trusts as shown in Exhibit B," and that "Plaintiffs and members of the Class purchased Certificates from the Underwriter Defendants in connection with the Offerings."  AC ¶¶ 198, 225.  These allegations are inadequate to support liability under Section 12(a)(2) because they do not plead that CSC or the Underwriter Defendants passed title to a single Certificate directly to Plaintiffs, as required by *Pinter*.  486 U.S. at 642, 647; *see also In re Infonet Servs. Corp. Sec. Litig*., 310 F. Supp. 2d 1080, 1102 (C.D. Cal. 2003) ("Defendants cannot be statutory sellers for purposes of § 12 'absent any allegations of direct contact of any kind between defendants and plaintiff-purchasers[.]'").

Plaintiffs' argument that they need not allege which underwriter sold securities

53

to each plaintiff in order to state a claim under Section 12(a)(2), *see* Opp. at 98-100, misses the point.  Although Plaintiffs may not be required to tie each purchase to a specific underwriter, they must nonetheless allege that they purchased directly from (or were solicited directly by) each underwriter that they name as a defendant.  *See, e.g.*, *Dartley v. Ergobilt, Inc.*, 2001 WL 313964, at *2 (N.D. Tex. Mar. 29, 2001) ("If Plaintiffs did not buy from Cruttenden or Principal and were not solicited by them, they cannot sue Cruttenden or Principal for § 12(a)(2) violations."); *In re Media Vision Tech. Sec. Litig.*, 1995 WL 787549, at *2 (N.D. Cal. Oct. 23, 1995) (dismissing § 12(a)(2) claim where plaintiffs failed to plead purchase from underwriters).  Here, Plaintiffs have failed to allege that they purchased even a *single* Certificate directly from CSC or any specific Underwriter Defendant, instead lumping all of the underwriters together indiscriminately.  This allegation does not permit the Court to infer that CSC or any other underwriter passed title directly to any Plaintiff, a prerequisite for Section 12(a)(2) liability.[54]

### 3.   Plaintiffs Have Not Pled Direct Solicitation By Any Defendant.

Nor have Plaintiffs adequately alleged that CWALT, CWMBS, CWABS,

---

[54] Furthermore, in each of those cases, the plaintiffs – unlike Plaintiffs here – alleged purchases from, or active solicitation by, the defendants.  *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 718 (3d Cir. 1996) (plaintiffs alleged that "each of the underwriter defendants sold Westinghouse securities directly to plaintiffs and that each plaintiff purchased Westinghouse securities directly from an underwriter defendant"); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009) (complaint alleged that "the Underwriter Defendants . . . solicited and sold WaMu securities to members of the Class" and that plaintiff "purchased WaMu's 7.250% subordinated notes . . . on the [October 2007 Offering]"); *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *20 (C.D. Cal. July 21, 2005) ("Plaintiffs allege that each of the Underwriter Defendants sold DDi common stock directly to certain plaintiffs in the Offering, and that these plaintiffs . . . purchased the common stock directly from an underwriter defendant."); *Schoenhaut v. Am. Sensors*, 986 F. Supp. 785, 790 (S.D.N.Y. 1997) (complaint alleged that underwriter defendants directly "promoted the offering and solicited buyers at 'road shows'"); *see also In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 399 (S.D.N.Y. 2007) (complaint alleged that plaintiffs purchased in offering underwritten by defendants).  Moreover, despite Plaintiffs' heavy reliance on *Countrywide*, they fail to mention that this Court dismissed the Section 12(a)(2) claims in that case because the "plaintiffs fail[ed] to plead that they purchased the securities directly from specific underwriters, or directly traceable to specific underwriters, as required."  588 F. Supp. 2d at 1183.

CWHEQ, CFC, CSC, or any Underwriter Defendant actively and directly "solicited" Plaintiffs' investment for financial gain, as alternatively required by *Pinter*. 486 U.S. at 642, 647; *Daou*, 411 F. 3d at 1029. The Amended Complaint contains no allegations whatsoever that any of these entities directly solicited any investor to purchase the Certificates. Plaintiffs allege that the Depositor entities CWALT, CWMBS, CWABS, and CWHEQ prepared the Registration Statements (AC ¶ 161) and contend that mere "preparation of a prospectus amounts to 'solicitation.'" Opp. at 100-01 n.60. The cases are clear, however, that such conduct does not constitute "solicitation" under *Pinter*.[55]

**B.      Plaintiffs Fail To Allege That They Purchased In The Offerings.**

Plaintiffs' Section 12(a)(2) claims must be dismissed also because the Amended Complaint does not allege that Plaintiffs purchased their Certificates *in* the Offerings. Plaintiffs do not (and cannot) dispute that only investors who have purchased *in* a public offering may assert a Section 12 claim. *See, e.g.*, *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 577-78 (1995); Br. at 72-76. Plaintiffs contend, however, that the Amended Complaint's conclusory allegations that Plaintiffs "purchased Certificates from the Underwriter Defendants *in connection with* the Offerings" (AC ¶ 225) and "purchased or otherwise acquired Certificates *pursuant to and/or traceable to the*" Offering Documents (*id.* ¶ 228) are sufficient. Opp. at 101. They are not. To the contrary, numerous courts in the Ninth Circuit and elsewhere have held that such overly general formulations are insufficient to allege that a plaintiff actually purchased "in" an offering for purposes of Section 12(a)(2). *See, e.g.*, *Prestige Brands,* 2006

---

[55] *See, e.g.*, *Fouad*, 2008 WL 5412397, at *7 (allegations that Isilon "issued and participated in the preparation of the Prospectus and paid for and participated in 'road shows' to promote the sale of Isilon stock . . . do[] not constitute active solicitation under *Pinter*"); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1121 (D. Nev. 1998) ("simple involvement" in preparation of registration statement insufficient to establish the relationship between a buyer and seller required to establish § 12(a)(2) liability); Thomas Lee Hazen, *Treatise on the Laws of Securities Regulation* § 7.2 at 579 (4th ed. 2002) ("Even substantial involvement in the preparation of registration and offering materials will not create liability unless there is also active involvement in the negotiations leading to the sale in question."); Br. at 71-72.

WL 2147719, at *9 ("to the extent that shareholders allege, as here, merely that they bought shares "*traceable to*" or "*in connection with*" an IPO, they lack standing").

Plaintiffs cite three district court decisions from the Second Circuit, all more than a dozen years old, as ostensibly supporting their argument that conclusory assertions they bought "pursuant or traceable to" the Offerings should suffice.  Opp. at 101 n.61.  What Plaintiffs fail to tell the Court is that these cases have been ignored and overruled implicitly by more recent authority.[56]  Moreover, regardless of the viability of those three cases, courts in the Ninth Circuit have uniformly held virtually identical allegations to be insufficient.  *See, e.g.*, *In re Century Aluminum Co. Sec. Litig.*, 2010 WL 1729426, at *10 (N.D. Cal. Apr. 27, 2010) (allegation that plaintiffs purchased "*pursuant and/or traceable to the offering*" insufficient); *Wells Fargo*, 2010 WL 1661534, at *6 (allegation that plaintiffs "purchased *or otherwise acquired* Certificates pursuant *and/or traceable* to the defective Prospectuses" insufficient).

Furthermore, the dates of many of Plaintiffs' purchases, as set forth in the Amended Complaint and Certifications, are entirely inconsistent with any plausible inference that Plaintiffs purchased *in* the Offerings.[57]  Plaintiffs do not dispute that these purchases occurred long after the expiration of the prospectus delivery period,

---

[56] *See* Br. at 73; *Morgan Stanley*, 2010 WL 3239430, at *5 (dismissing § 12(a)(2) claim by purchaser who alleged only that it "acquired Certificates *pursuant and/or traceable to* the Offering Documents"); *DLJ Mortg. Capital*, 2010 WL 1473288, *4 (dismissing § 12(a)(2) claim where plaintiff alleged only that it purchased MBS certificates "*pursuant and traceable to*" the offering documents); *NECA-IBEW*, Ex. 35 at 42-43 (dismissing MBS investor's § 12(a)(2) claim for failure "to plainly allege the purchase of the securities at issue in a public offering from a statutory seller"); *Nomura*, 658 F. Supp. 2d at 305 (rejecting as insufficient under § 12(a)(2) "'[t]his precise pleading language—'issued pursuant to, or traceable to the [Notes Offering and] Registration Statement' . . . for its failure to squarely allege that the securities at issue were purchased in a public offering").

[57] Many of Plaintiffs' purchases occurred after the prospectus delivery period, in some cases months or years after the Certificates were issued.  Br. at 74-76.  For example, OCERS certified that it purchased its CWALT 2006-OA17 Certificates on September 23, 2008, but those Certificates were issued nearly two years earlier pursuant to a prospectus supplement dated September 28, 2006.  AC ¶ 23.  Similarly, GBPHB certified that it purchased its CWL 2005-12 certificates on January 30, 2007, but those certificates were issued more than sixteen months earlier pursuant to a prospectus supplement dated September 15, 2005.  *Id.* ¶ 22.

56

1   and thus outside the relevant Offerings.  Opp. at 102 n.62.[58]

2       Plaintiffs nowhere explain how purchases made after the expiration of the

3   prospectus delivery period, and indeed months or even years after the Offering, could

4   possibly be in that Offering, rather than in the aftermarket.  Instead, Plaintiffs merely

5   contend, without any support, that the issue of whether purchases after the prospectus

6   delivery period are in the Offering is inappropriate for resolution on a motion to

7   dismiss.  Opp. at 101-02.  This argument cannot be squared with the numerous cases

8   that have dismissed Section 12(a)(2) claims where the plaintiff certified that it

9   purchased the securities beyond the prospectus delivery period.  Br. at 74-75.  Here, as

10  in those cases, the admissions made by Plaintiffs themselves in both the Amended

11  Complaint and Certifications provide the Court with everything it needs to reach the

12  same conclusion.[59]

13  _____

14  [58] Additionally, according to Plaintiffs, a number of their purchases were made prior
    to the issuance of the prospectus supplements they are now challenging.  *See* CW RJN
15  Exs. 31-34.  If Plaintiffs entered into purchase commitments before the prospectus
    supplements were issued, their claims relating to those supplements are barred as a
16  matter of law because they would not be entitled to the statutory presumption of
    reliance.  *See, e.g.*, *APA Excelsior III L.P. v. Premiere Tech., Inc.*, 476 F.3d 1261,
17  1272-77 (11th Cir. 2007) (plaintiffs who enter into binding investment agreement
    prior to filing of registration statements cannot rely on presumption of reliance under
18  § 11); *Guenther v. Cooper Life Sciences, Inc.*, 759 F. Supp. 1437, 1440 (N.D. Cal.
    1990) (to rule in plaintiffs' favor "would enable investors . . . to bring a section 11
19  action even though at the time they purchased their shares they could not possibly
    have relied on misleading registration statements, since none had been filed.  Such a
20  result would clearly contravene the purpose of section 11.").

    [59] "Factual assertions in pleadings . . . , unless amended, are considered judicial
21  admissions conclusively binding on the party who made them."  *Am. Title Ins. Co. v.
    Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988); *see also Hakopain v. Mukasey*, 551
22  F.3d 843, 846 (9th Cir. 2008) (same).  In other words, plaintiffs can plead themselves
    out of court by alleging facts which show that they have no claim, and courts routinely
23  grant motions to dismiss based on judicial admissions contained in the pleadings and
    accompanying documents.  *See, e.g.*, *Luedde v. Devon Robotics, LLC*, 2010 WL
24  2712293, at *6 (S.D. Cal. July 2, 2010) (dismissing for improper venue where
    "Plaintiff admits – through her own breach of contract claim – the validity of the
25  Agreement containing the [forum selection clause]"); *Grimes v. Navigant Consulting,
    Inc.*, 185 F. Supp. 2d 906, 911-14 (N.D. Ill. 2002) (dismissing securities claim on
26  immateriality grounds where plaintiffs' certification showed that market did not react
    to press release cited in complaint); *Seven-Up Bottling Co. v. Seven-Up Co.*, 420 F.
27  Supp. 1246, 1251 (D. Mo. 1976) (dismissing where "plaintiff by judicial admission
    has established the existence of a present and valid licensing agreement" with
28  defendant and was thereby estopped from denying validity of trademarks).

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1    Plaintiffs' inability to allege squarely that they purchased their Certificates *in*

2    the Offerings, compounded by the timing of Plaintiffs' purchases, thus requires

3    dismissal of their Section 12(a)(2) claims.  *See Stack v. Lobo*, 903 F. Supp. 1361, 1375

4    (N.D. Cal. 1995) (where complaint "contains no allegations that Plaintiffs purchased

5    their shares in the IPO. . . .  Plaintiffs do not state a claim under § 12[a](2)").

6    **VI.    PLAINTIFFS HAVE NOT ALLEGED RELIANCE.**

7    Plaintiffs do not dispute that in 21 Offerings, all of the Certificates Plaintiffs

8    allegedly purchased were acquired after twelve months of Distribution Reports had

9    been issued.  As to these 21 Offerings, Section 11(a) requires that Plaintiffs both

10   plead and prove actual reliance upon the alleged misstatements.  15 U.S.C. § 77k(a);

11   Br. at 77-79.  They have not done so, and these claims must be dismissed.

12   Although reliance is not generally required under the 1933 Act, reliance must be

13   shown as to any purchases made after "the issuer [has] released an earning statement

14   that covers a twelve-month (or greater) period that began after the effective date."

15   *Countrywide*, 588 F. Supp. 2d at 1162 & n.34.  Plaintiffs argue, however, that the

16   Distribution Reports are not "earning statements" for purposes of Section 11(a).  More

17   specifically, they argue that such reports are not included as part of a periodic annual

18   or quarterly filing on Forms 10-K, 10-Q, and so forth, which Plaintiffs contend they

19   must be under Securities Act Rule 158, which defines "earnings statement" as used in

20   Section 11(a).  Opp. at 94-95.  This argument is specious, and requires ignoring the

21   parts of Rule 158 that the Opposition omits.  In fact, Rule 158 does not contain an

22   exhaustive list of forms on which "earning statements" must be disseminated.  To the

23   contrary, Rule 158 expressly states that "[a]n 'earning statement' not meeting the

24   requirements of this paragraph may otherwise be sufficient for purposes of the last

25   paragraph of section 11(a)," and that "[a] registrant may use other methods to make an

26   earning statement 'generally available to its security holders' for purposes of the last

27

28

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

paragraph of section 11(a)." 17 C.F.R. § 230.158(a) & (b) (2010).[60]  Plaintiffs also do not dispute that asset-backed securities issuers are not required to file 10-Qs and are not required to include financial statements in their 10-Ks.  For MBS and other asset-backed securities, the SEC has concluded that Distribution Reports provide the financial information most important to investors and are the equivalent of financial statements typically filed by corporate entities.  *See* Asset-Backed Securities, 70 Fed. Reg. at 1509-10 (2005).

## VII.   PLAINTIFFS DO NOT DISPUTE THAT CERTAIN OF THEIR PURCHASES WERE MADE WITH ACTUAL KNOWLEDGE.

A plaintiff's knowledge of alleged misrepresentations or omissions at the time it acquires a security is a complete bar to liability under Sections 11 and 12(a)(2).  Br. at 76-77.  Here, Plaintiffs do not dispute that they had such knowledge prior to their purchases in 12 Offerings.  To the contrary, Plaintiffs explicitly allege that they first purchased in 12 Offerings after the date on which the *Luther* case was filed in state court.  AC ¶¶ 21-24.  Plaintiffs seek to rely on the filing of *Luther* for tolling purposes, and the original complaint in *Luther* pled essentially the same allegedly false statements as the Amended Complaint in this action.  And, the Opposition essentially concedes knowledge, responding to the actual knowledge bar by saying only that "[a]ssuming, *arguendo* that Defendants were correct . . . that Plaintiffs lack any ability to assert claims on Offerings for which . . . the investments occurred after the date they were initially included in the State Litigation . . . , Plaintiffs still would have pled cognizable claims as to at least 58 of the Offerings purchased by Plaintiffs."  Opp. at 48 n.32 (emphasis omitted).  As such, Plaintiffs' claims as to the 12 Offerings in which they first purchased after November 14, 2007 are barred as a matter of law.

---

[60] In *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 293-94 (S.D.N.Y. 2003), cited by Plaintiffs, the court held that the earning statements did not satisfy Section 11 because the statements themselves contained misstatements.  There are no such allegations here.

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## VIII.  <u>CONTROL PERSON LIABILITY HAS NOT BEEN ALLEGED</u>.

Plaintiffs' Section 15 "control person" claims against CFC, CSC, CCM, CHL, and Mr. Adler must be dismissed because: (1) Plaintiffs have not alleged a predicate violation of Sections 11 or 12; and (2) Plaintiffs have alleged no facts supporting a plausible inference that any of these entities or Mr. Adler had the power "to direct or cause the direction of the management and policies" of any putative primary violator. Br. at 79-80.  To plead control person status, Plaintiffs must allege facts showing "the defendant's participation in the day-to-day affairs of the [primary violator] and the defendant's power to control [the primary violator's] corporate actions."  *Howard v. Everex Sys., Inc*., 228 F.3d 1057, 1065 (9th Cir. 2000).  To satisfy this requirement, the complaint must allege facts showing each defendant "exercised 'a *significant degree* of day-to-day operational control, amounting to the power to *dictate* another party's conduct or operations.'"  *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000).  The existence of a parent/subsidiary relationship is by itself insufficient to support control person liability,[61] and liability likewise cannot be premised solely on a defendant's position or title in a company.[62]

Here, Plaintiffs do nothing more than allege a corporate parent/subsidiary or affiliate/affiliate relationship, and do not allege the required facts showing that each of the alleged control persons (CFC, CSC, CCM, and CHL) actually participated in the day-to-day affairs of, and exercised actual power or control over, the alleged primary

[61]  *See, e.g.*, *Merrill Lynch,* 2010 WL 2175875, at *7 (dismissing § 15 claims against various Merrill Lynch entities involved in the process of securitizing mortgages and holding that "mere allegations of a corporate affiliation between defendants are insufficient to indicate control by one over another"); *In re WorldCom, Inc. Sec. Litig.*, 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004) (dismissing § 15 claims against corporate parents of allegedly controlled persons because "a parent corporation and its subsidiary are regarded as legally distinct entities").

[62]  *See, e.g.*, *In re Downey Sec. Litig*., 2009 WL 2767670, at *15 (C.D. Cal. Aug. 21, 2009) ("even a CEO is not automatically a 'controlling person'" and dismissing federal control person claims with prejudice for inadequate pleading); *Juniper Networks*, 542 F. Supp. 2d at 1053 ("A plaintiff must allege more than the defendant's position and committee membership."); *Lilley v. Charren*, 936 F. Supp. 708, 716-17 (N.D. Cal. 1996) (dismissing § 15 claims against officer defendants not involved in day-to-day management of the company).

1   violators (the Depositors).  *See* AC ¶¶ 26-29, 33-37, 233.  Rather, the Amended

2   Complaint contains (and the Opposition repeats) only boilerplate allegations that CFC

3   "was the parent company of the other Countrywide entities, which it fully controlled,

4   including the Depositors," and that CSC, CHL, and CCM were direct or indirect

5   subsidiaries of CFC.  Opp. at 106-07.  There is no allegation that CFC, CSC, CCM, or

6   CHL controlled the content of the disclosures that the Depositor entities are alleged to

7   have made in connection with the MBS Offerings in this case.[63]  In the Ninth Circuit,

8   that is not enough.

9       Plaintiffs argue that the *WorldCom* and *Merrill Lynch* decisions cited in the

10  Moving Brief are inapplicable because the Second Circuit – unlike the Ninth Circuit –

11  requires a plaintiff to allege "meaningful culpable conduct" by the control person.

12  Opp. at 110.  But, the portions of *WorldCom* and *Merrill Lynch* cited by the

13  Countrywide Defendants did not turn on the culpable participation element.  Rather,

14  the Section 15 claims were dismissed in both cases because the plaintiffs did not

15  adequately plead defendants' control over the primary violator.  *See Merrill Lynch,*

16  2010 WL 2175875, at *7 ("plaintiffs have failed to allege beyond 'formulaic

17  recitation' how Merrill, Merrill Sponsor, Merrill PFS, or First Franklin exercised

18  control over Merrill Depositor" and "merely allege that Merrill Depositor, Merrill

19  Sponsor, Merrill PFS, and First Franklin were Merrill subsidiaries and affiliates of

20  each other"); *WorldCom*, 2004 WL 1097786, at *3 (dismissing for failure to allege

21  any "basis for asserting that the . . . [d]efendants have the power to direct or cause the

22  direction of the management or policies of the defendant subsidiaries").  The

23  allegations of control here are as formulaic and conclusory as those found deficient in

24  *WorldCom* and *Merrill Lynch.*[64]

25  _____

26  [63] Neither CFC nor CCM is alleged to have had any role in the MBS Offerings, aside
    from their roles as parent and affiliate of other entities.  This is confirmed by the
27  Offering Documents.  *See, e.g.*, CW RJN Ex. 9 (CWHEQ 2007-E Pro. Supp.) at S-02,
    S-32.

28  [64] The cases Plaintiffs cite are inapposite because each involve allegations, absent
    here, of actual control.  *See, e.g.*, *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D.

61

1   With respect to Mr. Adler, Plaintiffs allege nothing more than his position, for a

2   brief period of time, as an officer and director of CWALT, CWMBS, CWABS and

3   CWHEQ and his signature on four of the challenged registration statements.  AC ¶ 59;

4   Opp. at 109.  Beyond that, they simply lump Mr. Adler together with other defendants

5   and allege conclusorily that this collective mass "controll[ed]" other groups of

6   defendants.  AC ¶¶ 231-35.  These boilerplate allegations are insufficient.  *See Batwin*

7   *v. Occam Networks, Inc.*, 2008 WL 2676364, *25 (C.D. Cal. July 1, 2008) (allegations

8   that defendants were directors who signed SEC filings "do not offer any indication

9   that [they] were involved in the day-to-day affairs of [the company and] do not present

10  a basis for control liability against these defendants").

## CONCLUSION

12  This is an opportunistic case that seeks a damages recovery in the wake of the

13  worst economic collapse in 70 years, even though virtually all of the MBS Plaintiffs

14  allegedly bought have not missed a single payment and have performed precisely as

15  expected and even though Plaintiffs thus have incurred no compensable loss.  The

16  case is also time-barred, and in any event Plaintiffs lack standing to represent

17  investors in the vast majority of the MBS Offerings they seek to challenge.  For all

18  these reasons, and the other grounds addressed in this brief and in the Moving Brief,

19  this case should be dismissed in its entirety, and with prejudice.

---

22  534, 550 (N.D. Cal. 2009) (parent companies allegedly oversaw operations of controlled subsidiaries and were in position to exercise actual control over offering); *Juniper Networks*, 542 F. Supp. 2d at 1054 (individual defendants allegedly controlled content of the corporate defendants' alleged misstatements, and participated in operation and management of its business affairs); *Wojtunik v. Kealy*, 2006 WL 2821564, at *4 (D. Ariz. Sept. 30, 2006) (defendant COO allegedly was directly involved in managing company's day-to-day affairs, including content of alleged financial misstatements).  Other cases cited by Plaintiffs actually dismissed Section 15 claims as inadequately pled.  *See Fouad*, 2008 WL 5412397, at *13 (Opp. at 105) ("Without additional allegations that the venture capital firms acted together to control Isilon, these allegations of control by virtue of collective ownership are conclusory and unconvincing."); *Wells Fargo*, 2010 WL 1661534, at *9 ("that the Rating Agencies were able to influence certain portions of the transactions at issue is insufficient to plead a control person theory").

1    Dated:  September 27, 2010          **GOODWIN PROCTER LLP**

2                                         /s/ Brian E. Pastuszenski
                                          Brian E. Pastuszenski (*pro hac vice*)
3                                         Lloyd Winawer (State Bar No. 157823)
                                          Inez H. Friedman-Boyce (*pro hac vice*)
4                                         Brian C. Devine (State Bar No. 222240)

5                                         *Counsel for the Countrywide Defendants*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNTRYWIDE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS