*EXHIBIT 50*

1  GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
2  ROBERT A. GOODIN, State Bar No. 061302
       rgoodin@goodinmacbride.com
3  FRANCINE T. RADFORD, State Bar No. 168269
       fradford@goodinmacbride.com
4  ANNE H. HARTMAN, State Bar No. 184556
       ahartman@goodinmacbride.com
5  505 Sansome Street, Suite 900
   San Francisco, California 94111
6  Telephone:    (415) 392-7900
7  Facsimile:    (415) 398-4321

8  THE CHARLES SCHWAB CORPORATION
   LOWELL HAKY, State Bar No. 178526
9  211 Main Street
   San Francisco, California 94105
10 Telephone:    (415) 667-0622
11 Facsimile:    (415) 667-1638

12 GRAIS & ELLSWORTH LLP
   DAVID J. GRAIS (*pro hac application submitted herewith*)
13 KATHRYN C. ELLSWORTH (*pro hac app. submitted herewith*)
   OWEN L. CYRULNIK (*pro hac application submitted herewith*)
14 LEANNE M. WILSON (*pro hac application submitted herewith*)
15 70 East 55th Street
   New York, New York 10022
16 Telephone:    (212) 755-0100
   Facsimile:    (212) 755-0052
17
18 Attorneys for Plaintiff
   The Charles Schwab Corporation
19

20          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

21          IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

22

23 THE CHARLES SCHWAB CORPORATION,        No.   CGC-10-501151

24          Plaintiff,                    **COMPLAINT FOR RESCISSION AND**
                                          **DAMAGES FOR:**
25 v.

26 MERRILL LYNCH, PIERCE, FENNER &        **(1) VIOLATIONS OF §§ 25401 AND**
   SMITH INC.;                            **25501 OF THE CALIFORNIA**
27 MERRILL LYNCH MORTGAGE                 **CORPORATE SECURITIES ACT;**
   INVESTORS, INC.;
28                                        **(2) VIOLATIONS OF §§ 11 AND 15 OF**

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SUMMONS ISSUED
**FILED**
San Francisco County Superior Court
JUN 2 9 2010
CLERK OF THE COURT
BY: _____
Deputy Clerk

CASE MANAGEMENT CONFERENCE SET

DEC − 3 2010 − 9:00 AM

DEPARTMENT 212

EXHIBIT 50 -355-

1  UBS SECURITIES, LLC;
   WELLS FARGO ASSET SECURITIES
2  CORPORATION;
   WELLS FARGO BANK, N.A.;
3  J.P. MORGAN SECURITIES, INC., F/K/A
   BEAR, STEARNS & CO. INC.;
4  BEAR STEARNS ASSET BACKED
5  SECURITIES I LLC;
   AND,
6  DOES 1-50,

7              Defendants.

8

9

**THE SECURITIES ACT OF 1933;**

**(3) VIOLATIONS OF §§ 12(a)(2) AND
15 OF THE SECURITIES ACT OF
1933;**

**(4) VIOLATIONS OF §§ 1572 AND 1710
OF THE CALIFORNIA CIVIL
CODE (NEGLIGENT
MISREPRESENTATION); and**

**(5) RESCISSION OF CONTRACTS
UNDER § 1689 ET SEQ. OF THE
CALIFORNIA CIVIL CODE**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

        Plaintiff, THE CHARLES SCHWAB CORPORATION complains of defendants

and for causes of action alleges as follows:

                    **NATURE OF THIS ACTION**

        1.      This is an action for rescission and damages as a result of the violation by the

Defendants of the California Corporate Securities Act, the California Civil Code, the federal

Securities Act of 1933, and the common law. As alleged in detail below, the Defendants sold or

issued to Charles Schwab Bank, N.A. (referred to in this complaint as **Schwab**) three certificates

in three securitization trusts backed by residential mortgage loans. Schwab paid $130 million for

those certificates. When they offered and then sold these certificates to Schwab, the Defendants

made numerous statements to Schwab about the certificates and the credit quality of the mortgage

loans that backed them. Many of those statements were untrue as to material facts. Moreover, the

Defendants omitted to state many material facts that were necessary in order to make their

statements not misleading. For example, the Defendants made untrue statements, or omitted

important information, about such material facts as the loan-to-value ratios of the mortgage loans,

the number of borrowers who did not live in the houses that secured their loans (that is, the

-2-
**COMPLAINT**

EXHIBIT 50  -356-

1   number of properties that were not primary residences), and the extent to which the entities that

2   made the loans departed from their own standards in doing so.

3       2.    Defendants made such untrue or misleading statements about at least the following

4   numbers of the loans in each of the three securitizations.

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 723 | 1,191 | 60.7% |
| 2 | 1,605 | 2,843 | 65.5% |
| 3 | 790 | 2,193 | 36.0% |

Plaintiff is informed and believes, and based thereon alleges, that even more mortgage loans than

those listed in the table above were the subject of untrue or misleading statements by the

Defendants.[1]

       3.    The certificates are "securities" within the meaning of the California Corporate

Securities Act and the Securities Act of 1933. Under those Acts, the California Civil Code, and

the common law, Plaintiff is entitled to rescind the purchase of the certificates or to be paid

damages for losses on the certificates.

       4.    Three securities dealers sold these certificates to Schwab. The three dealers are

Defendants Merrill Lynch, Pierce, Fenner & Smith Inc. (which sold to Schwab a certificate in one

securitization trust, which is referred to in this Complaint as Securitization No. 1), UBS

Securities, Inc. (one securitization, No. 2), and Bear Stearns & Co. Inc. (one securitization, No.

3). The other Defendants named in this Complaint are liable to Plaintiff because they were the

issuers of some of those certificates or because they controlled one of those issuers.

_____

[1] Allegations pled on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

-3-

**COMPLAINT**

EXHIBIT 50  -357-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**PARTIES**

5.    Plaintiff is a corporation organized under the laws of Delaware with its principal place of business in San Francisco, California.

6.    Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. (referred to as **Merrill Lynch**) is a corporation organized under the laws of Delaware. Merrill Lynch sold Schwab one of the certificates.

7.    Defendant Merrill Lynch Mortgage Investors, Inc. (referred to as **Merrill Lynch Mortgage**) is a corporation organized under the laws of Delaware. Merrill Lynch Mortgage was the issuer of the certificate that Merrill Lynch sold to Schwab.

8.    Defendant UBS Securities, LLC (referred to as **UBS**) is a limited liability company organized under the laws of Delaware. UBS sold Schwab one of the certificates.

9.    Defendant Wells Fargo Asset Securities Corporation (referred to as **Wells Fargo Asset**) is a corporation organized under the laws of Delaware. Wells Fargo Asset was the issuer of the certificate that UBS sold to Schwab.

10.   Defendant Wells Fargo Bank, N.A. (referred to as **Wells Fargo Bank**) is a national banking association organized under the laws of the United States. Plaintiff is informed and believes, and based thereon alleges, that Wells Fargo Asset exists for no purpose other than to receive and deposit loans into the trusts. During the relevant time period, Wells Fargo Bank controlled Wells Fargo Asset. Under Section 15 of the Securities Act, 15 U.S.C. § 77o, Wells Fargo Bank therefore is liable to Plaintiff jointly and severally with, and to the same extent as, Wells Fargo Asset.

11.   Defendant J.P. Morgan Securities, Inc. (formerly known as Bear, Stearns & Co. Inc. and referred to as **Bear Stearns**) is a corporation organized under the laws of Delaware. Bear Stearns sold Schwab one of the certificates.

12.   Defendant Bear Stearns Asset Backed Securities I LLC (referred to as **Bear Stearns Asset**) is a corporation organized under the laws of Delaware. Bear Stearns Asset was the issuer of the certificate that Bear Stearns sold to Schwab.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-4-

**COMPLAINT**

EXHIBIT 50  -358-

13.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1-50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of these Defendants when ascertained. Plaintiff is informed and believes that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged herein and proximately caused Plaintiff's damages.

## ASSIGNMENT OF CLAIMS

14.     Schwab is a national banking association organized under the laws of the United States and a wholly-owned subsidiary of Plaintiff. Its investments are managed by Charles Schwab Treasury, a division of Charles Schwab & Co., which is a wholly-owned subsidiary of Plaintiff. Charles Schwab Treasury is the entity to which the Defendants directed their solicitations to purchase all securities referred to in this complaint. Charles Schwab Treasury received those solicitations and executed the purchase of all securities referred to in this Complaint.

15.     On June 29, 2010, Schwab assigned all of its right, title, and interest in the claims made in this Complaint to Plaintiff. A copy of the assignment is attached as Exhibit A.

## JURISDICTION AND VENUE

16.     This action is an unlimited civil case within the meaning of California Code of Civil Procedure Section 88, in that, *inter alia*, the amount in controversy (as defined in California Code of Civil Procedure Section 85(a)) exceeds twenty-five thousand dollars ($25,000). This Court has subject-matter jurisdiction of Plaintiff's causes of action for rescission under Sections 25401 and 25501 of the California Corporate Securities Act, damages for negligent misrepresentation, and rescission of its contracts to purchase the certificates. Under Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), this Court also has jurisdiction over Plaintiff's causes of action for violation of Sections 11, 12(a)(2), and 15 of that Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

17.     Under Section 22(a) of the Securities Act, "no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court of the United

-5-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EXHIBIT 50  -359-

1   States." Because there is not complete diversity between the Plaintiff and the Defendants, the

2   Federal courts have no jurisdiction of this action under 28 U.S.C. § 1332(a). This action is not

3   removable to Federal court.

4       18.     Bear Stearns, Wells Fargo Bank, and UBS are subject to personal jurisdiction in

5   California because each of them is registered to do business, and does business, in California. All

6   of the Defendants are subject to personal jurisdiction in California because they offered and sold,

7   or controlled persons that offered and sold, the certificates to Schwab "in California" within the

8   meaning of Section 25008 of the California Corporate Securities Act.

9       19.     Venue is proper in this County because, among other reasons, the Defendants

10  offered and sold the certificates to Schwab in this County and because the violations of law

11  alleged in this Complaint, including the making of material untrue or misleading statements,

12  occurred in this County.

### SECURITIZATION OF MORTGAGE LOANS

14      20.     The securities that the Defendants sold Schwab are so-called **residential**

15  **mortgage-backed securities**, or **RMBS**, created in a process known as **securitization**.

16  Securitization begins with loans on which the borrowers are to make payments, usually monthly.

17  The entity that makes the loans is known as the **originator** of the loans. The process by which the

18  originator decides whether to make particular loans is known as the **underwriting** of loans. The

19  purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit

20  standing to repay them and only against sufficient collateral. In the loan underwriting process, the

21  originator applies its **underwriting standards**.

22      21.     In general, residential mortgage lenders may hold some of the mortgage loans they

23  originate in their own portfolio and may sell other mortgage loans they originate into

24  securitizations.

25      22.     In a securitization, a large number of loans, usually of a similar type, are grouped

26  into a **collateral pool**. The originator of those loans sells them (and, with them, the right to

27  receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The

28  trust raises the cash to pay for the loans by selling **bonds**, usually called **certificates**, to investors

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-6-
**COMPLAINT**

EXHIBIT 50  -360-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   such as Schwab. Each certificate entitles its holder to an agreed part of the cash flow from the

2   loans in the collateral pool.

3        23.    In a simple securitization, the holder of each certificate is entitled to a *pro rata* part

4   of the overall monthly cash flow from the loans in the collateral pool.

5        24.    In a more complex securitization, the cash flow is divided into different parts,

6   usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into

7   different **classes**, each with different rights. Each class of certificates is entitled to the cash flow

8   in the tranche corresponding to that class.

9        25.    One way in which the cash flow is divided — and the rights of different classes of

10   certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The

11   most **senior** class of certificates usually is entitled to be paid in full before the next most senior

12   class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool

13   are allocated first to the most **subordinate** class of certificates, then to the class above that, and so

14   on. The interest rate on each class of certificates is usually proportional to the amount of risk that

15   that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of

16   interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as

17   the **waterfall**.

18        26.    The risk of a particular class of certificate is a function of both the riskiness of the

19   loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying

20   loans are quite risky, the senior classes of certificates may bear so little of that risk that they may

21   be rated triple-A. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest

22   quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky

23   loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a

24   senior class of $50 million and a subordinate class of $50 million. Even though the underlying

25   loans are quite risky, the senior class of certificates would be paid in full as long as the $100

26   million of loans produced payments of at least $50 million plus interest, that is, unless the loss

27   rate on those loans exceeded 50%, fully 10 times the historical average.

28

**COMPLAINT**

EXHIBIT 50  -361-

1    27.    All of the certificates referred to in this Complaint were senior certificates that

2    were rated triple-A when Schwab purchased them.

3                                              *

4    28.    Each securitization has a **sponsor**, the prime mover of the securitization.

5    Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the

6    collateral pool usually contains loans made by the originator that is sponsoring the securitization.

7    Other times, the sponsor may be an investment bank, which purchases loans from one or more

8    originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The

9    sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which

10   then transfers title to the loans to the trust.

11   29.    The obligor of the certificates in a securitization is the trust that purchases the

12   loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it

13   may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law

14   therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

15                                             *

16   30.    **Securities dealers**, like three of the Defendants, play a critical role in the process

17   of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates

18   from the trust and then sell them to investors. Equally important, securities underwriters provide

19   to potential investors the information that they need to decide whether to purchase certificates.

20   31.    Because the cash flow from the loans in the collateral pool of a securitization is the

21   source of funds to pay the holders of the certificates issued by the trust, the credit quality of those

22   certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the

23   place of each certificate in the waterfall). The most important information about the credit quality

24   of those loans is contained in the files that the originator develops while making the loans, the so-

25   called loan files. For residential mortgage loans, each loan file normally contains comprehensive

26   information from such important documents as the borrower's application for the loan, credit

27   reports on the borrower, and an appraisal of the property that will secure the loan. The loan file

28   also includes notes from the person who underwrote the loan about whether and how the loan

-8-

**COMPLAINT**

EXHIBIT 50  -362-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1 complied with the originator's underwriting standards, including documentation of any

2 "compensating factors" that justified any departure from those standards.

3   32. Potential investors in certificates are not given access to loan files. Instead, the

4 securities dealers that underwrite the sale of the certificates in a securitization are responsible for

5 gathering, verifying, and presenting to potential investors the information about the credit quality

6 of the loans that will be deposited into the trust. They do so by using information about the loans,

7 which has been compiled into a database known as a **loan tape**. The securities dealers use the

8 loan tape to compile numerous statistics about the loans, which are presented to potential

9 investors in a **prospectus supplement**, a disclosure document that the dealers are required to file

10 with the Securities and Exchange Commission.

11   33. As alleged in detail below, the information that the Defendants presented to

12 Schwab about the credit quality of the loans in the collateral pools of the trusts contained many

13 statements that were material to the credit quality of those loans, but were untrue or misleading.

14        **TOLLING OF THE STATUTE OF LIMITATIONS**

15   34. Plaintiff is a putative member of the proposed class *In re Wells Fargo Mortgage-*

16 *Backed Certificates Litigation*, United States District Court for the Northern District of

17 California, No. 09-cv-01376-SI, filed on March 27, 2009, the pendency of which has tolled the

18 running of the statute of limitations on the causes of action alleged in this Complaint.

19         **THE SALES OF THE CERTIFICATES**

20   35. The Defendants sold to Schwab three certificates in Securitizations Nos. 1 through

21 3. Details of each trust and each certificate are stated in Item 35 of Schedules 1 through 3 of this

22 Complaint. The Schedules correspond to Securitizations Nos. 1 through 3. Plaintiff incorporates

23 into this paragraph 35, and alleges as though fully set forth in this paragraph, the contents of Item

24 35 of the schedules.

25   36. Defendants knew that Charles Schwab Treasury was responsible for locating,

26 analyzing, and making investments for Schwab.

27

28

**COMPLAINT**

EXHIBIT 50 -363-

1    37.    Representatives of Defendants sent communications and solicitations to Charles

2    Schwab Treasury in San Francisco for the purpose of inducing Charles Schwab Treasury to

3    purchase the bonds for Schwab.

4    38.    The sale of these certificates occurred in California because representatives of

5    Defendants directed communications about the certificates and solicitations to purchase the bonds

6    to Charles Schwab Treasury there, and because Charles Schwab Treasury received those

7    communications and solicitations there.

### DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

10    39.    In connection with their offers and sales of the certificates to Schwab, each of the

11    three dealer Defendants sent numerous documents to Charles Schwab Treasury at its office in San

12    Francisco. For each certificate, these documents included a term sheet (or its equivalent), the

13    prospectus supplement for the certificate that was filed with the SEC, and drafts of some of the

14    statistical tables to be included in the prospectus supplement. In each of these documents, each

15    dealer made statements of material fact about the certificate that it offered and sold to Schwab. A

16    true copy of the prospectus supplement for each securitization is available from the Securities and

17    Exchange Commission's website.[2]

18    40.    Many of the statements of material fact that each dealer made in these documents

19    were untrue or misleading. These untrue or misleading statements included the following.

20    **I.    Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

22    **A.    LTVs**

23    **1.    The materiality of LTVs**

24    41.    The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of

25    the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property

26    when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000

27

28    [2] A URL for each prospectus supplement is included in Item 35 of each schedule.

**COMPLAINT**

EXHIBIT 50 -364-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of

2   the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in

3   the collateral pool of a securitization are therefore one of the most crucial measures of the risk of

4   certificates sold in that securitization. LTV is a primary determinant of the likelihood of default.

5   The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less

6   likely it is that a decline in the value of the property will wipe out the owner's equity, and thereby

7   give the owner an incentive to stop making mortgage payments and abandon the property, a so-

8   called strategic default. LTV is also a primary determinant of the severity of losses for those loans

9   that do default. The lower the LTV, the lower the severity of losses on those loans that do default.

10  Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the

11  proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

12      42.    Beyond these fundamental effects on the likelihood and severity of default, LTVs

13  also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage

14  loans before maturity and when they do so) and therefore the expected lives of the loans and the

15  associated certificates. Prepayment patterns affect many aspects of certificates that are material to

16  the investors that purchase them, including the life of the certificate and the timing and amount of

17  cash that the investor will receive during that life.

18      43.    In addition, rating agencies use LTVs to determine the proper structuring and

19  credit enhancement necessary for securities, such as the certificates that Schwab purchased, to

20  receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a

21  securitization are incorrect, the ratings of certificates sold in that securitization will also be

22  incorrect.

23      44.    An accurate denominator (that is, the value of the property) is essential to an

24  accurate LTV. In particular, a too-high denominator will understate, sometimes greatly, the risk

25  of a loan. To return to the example above, if the property whose actual value is $500,000 is

26  valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to

27  54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the

28  LTV based on the incorrect appraised value understates the risk of the loan. It is also important to

-11-

**COMPLAINT**

EXHIBIT 50 -365-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   note that, the higher the correct LTV, the more the risk is understated by an error in value of any

2   given magnitude. In the example above, though the risk of a loan with an LTV of 60% is greater

3   than the risk of one with an LTV of 54.5%, both imply a relatively safe loan because of the large

4   equity cushions. But a loan with an LTV of 90% is much riskier than one with an LTV of 81.8%.

5   In the latter case, there is an equity cushion of 18.2% of the value of the property, in the former,

6   only 10%, just over half as much. Thus, a denominator that overvalues a property by just 10%

7   produces an overstatement of more than 80% in the homeowner's equity.

8       45.     For these reasons, a reasonable investor considers LTV critical to the decision

9   whether to purchase a certificate in a securitization of mortgage loans. Even small differences in

10  the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a

11  significant effect on both the risk and the rating of each certificate sold in that securitization and,

12  thus, are essential to the decision of a reasonable investor whether to purchase any such

13  certificate.

## 2.   Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations

16      46.     In the prospectus supplements and other documents they sent to Charles Schwab

17  Treasury, the Defendants made material untrue or misleading statements about the LTVs of the

18  mortgage loans in the collateral pools of these securitizations. Each such statement is identified in

19  Item 46 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 46, and

20  alleges as though fully set forth in this paragraph, the contents of Item 46 of the schedules.

21      47.     The mortgage loans in the collateral pools of these securitizations were divided

22  into groups. Payments on the certificates that Schwab purchased were to be made primarily from

23  the cash flows from the loans in the particular groups that were designated to support Schwab's

24  certificates. Because of the structure of the securitizations, however, in most cases the credit

25  quality of the loans in the other groups in the securitizations also was material to the risk of the

26  certificates that Schwab purchased.

27      48.     The Defendants made these statements as statements of fact. Plaintiff is informed

28  and believes, and based thereon alleges, that Defendants intended that these statements be

-12-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EXHIBIT 50 -366-

1    understood as statements of fact. Charles Schwab Treasury did understand the statements about

2    the LTVs as statements of fact. Plaintiff, Charles Schwab Treasury, and Schwab had no access to

3    appraisal reports or other documents or information from which it could verify the LTVs of the

4    mortgage loans other than the statements that the Defendants made about those LTVs.

3.    **These statements were untrue because the stated LTVs of many of
those mortgage loans were lower than their actual LTVs.**

7    49.    The stated LTVs of many of the mortgage loans in each securitization were

8    significantly lower than the true LTVs because the denominators (that is, the value of the

9    properties that secured those loans) that were used to determine the disclosed LTVs were

10   overstated to a material extent.[3] The weighted-average LTVs presented in the prospectus

11   supplements were also, therefore, untrue and misleading.

a.    **Use of an automated valuation model demonstrates that
Defendants' statements about LTVs were based on overstated
valuations of the properties in the collateral pools.**

14   50.    Using a comprehensive, industry-standard automated valuation model (AVM), it is

15   possible to determine the true market value of a certain property as of a selected date. An AVM is

16   based on objective criteria like the condition of the property and the actual sale prices of

17   comparable properties in the same locale shortly before the specified date and is more consistent,

18   independent, and objective than other methods of appraisal. AVMs have been in widespread use

19   for many years. The AVM on which these allegations are based incorporates a database of 500

20   million sales covering ZIP codes that represent more than 97% of the homes, occupied by more

21   than 99% of the population, in the United States. Independent testing services have determined

22   that this AVM is the most accurate of all such models.

23   51.    On many of the properties that secured the mortgage loans, the model reported that

24   LTVs were understated. In particular, the model reported that the denominator (that is, the

25   appraised value of the property as stated in the loan tape) that was used to determine the disclosed

27   [3] References in this Complaint and the schedules to the denominator in the LTVs are to the
appraised value of the properties as stated in the loan tapes. For the overwhelming majority of mortgage
28   loans, the appraised value was used to calculate the stated LTVs in the loan tapes.

-13-

**COMPLAINT**

EXHIBIT 50  -367-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   LTV was 105% or more of the true market value as determined by the model as of the time the

2   loan was originated. The model reported that the denominator that was used to determine the

3   disclosed LTV was 95% or less of the true market value on a much smaller number of properties.

4   Thus, the number of properties on which the value was overstated exceeded by far the number on

5   which the value was understated, and the aggregate amount overstated exceeded by far the

6   aggregate amount understated.

7       52.     To take an example, in Securitization No. 1, there were 1,191 mortgage loans in

8   the collateral pool. There was sufficient information for the model to determine the value of the

9   properties that secured 826 of those loans. On 340 of those 826 properties, the model reported

10  that the denominator that was used to determine the disclosed LTV was 105% or more of the true

11  market value and the amount by which the stated values of those properties exceeded their true

12  market values in the aggregate was $72,332,007. The model reported that the denominator that

13  was used to determine the disclosed LTV was 95% or less of true market value on only 175

14  properties, and the amount by which the true market values of those properties exceeded the

15  values reported in the denominator was $23,371,873. Thus, the number of properties on which the

16  value was overstated exceeded by nearly two times the number on which the value was

17  understated, and the aggregate amount overstated was more than three times the aggregate

18  amount understated.

19      53.     On one of the loans in Securitization No. 1, the amount of the loan was $585,600

20  and the stated value of the property was $737,000, resulting in a stated LTV of 80%. The model,

21  however, determined that the true value of the property was $456,000, resulting in a true LTV of

22  128%. Thus, the stated value was higher than the true value by 28.4%, and the stated LTV was

23  lower than the true LTV by 37%. Both of these were huge discrepancies that were material to the

24  credit quality of the loan.

25      54.     The overstated values of 340 properties made virtually every statement by

26  Defendants about the LTVs of the mortgage loans untrue or misleading. For example, Defendants

27  stated that all mortgage loans had an LTV of 100% or less. In fact, the mortgage loans on 42 of

28  the 826 properties valued by the model had LTVs of over 100%. Defendants also stated that the

-14-

**COMPLAINT**

EXHIBIT 50  -368-

weighted-average LTV of the loans was 68.02%. In fact, among the loans that the AVM was able to value, the weighted average LTV was 77.9%. These differences were material for the reasons stated above.

55.     The results of the valuations by the automated model in this example are summarized in the following table.

| Number of loans | 1,191 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 826 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 340 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $72,332,007 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 175 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $23,371,873 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 42 |
| Weighted-average LTV, as stated by Defendants (group 4) | 68.02% |
| Weighted-average LTV, as determined by the model (group 4) | 77.9% |

56.     The model produced similar results for the mortgage loans in the collateral pool of each securitization. Details of the results of the model for each securitization are stated in Item 56 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 56, and alleges as though fully set forth in this paragraph, the contents of Item 56 of the schedules.

        **b.      Subsequent sales of refinanced properties in the collateral pools indicate that Defendants' statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

57.     Of the mortgage loans in the collateral pools of these securitizations, many were taken out to refinance, rather than to purchase, properties. For those loans, the appraisal was the only basis for determining the value of the property because there is no sale price in a refinancing. A substantial number of those properties have since been sold. In nearly all the pools, those properties were sold for much less than the value ascribed to them in the LTV data reported in the prospectus supplements and other documents that the Defendants sent to Charles Schwab

-15-

**COMPLAINT**

EXHIBIT 50  -369-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Treasury. The differences cannot be explained by the declines in house prices in the areas in

2    which those properties were located. Analysis of indices that track home prices in various

3    geographic areas shows that the differences between the values ascribed to these properties and

4    the prices at which the properties were sold are significantly greater than the declines in house

5    prices in the same geographical areas over the same periods (that is, between the making of each

6    mortgage loan and the corresponding sale). Thus, the large differences show that the values

7    ascribed to those properties, and to all properties in the collateral pools, in the LTV data reported

8    in the prospectus supplements and other documents that the Defendants sent to Charles Schwab

9    Treasury were too high, that the resulting LTVs were too low, and thus that the statements in the

10   prospectus supplements and other documents sent to Charles Schwab Treasury about the LTVs

11   were untrue or misleading.

12        58.    To take an example of Securitization No. 2, of the 2,843 mortgage loans in the

13   collateral pool, 1,293 were taken out to refinance, rather than to purchase, properties. For those

14   1,293 loans, the value (denominator) in the LTV was an appraised value rather than a sale price.

15   Of those 1,293 properties, 111 were subsequently sold for a total of approximately $57,543,554.

16   The total value ascribed to those same properties in the LTV data reported in the prospectus

17   supplements and other documents sent to Charles Schwab Treasury was $81,356,000. Thus, those

18   properties were sold for 70.7% of the value ascribed to them, a difference of 29.3%. This

19   difference is significantly greater than would have been predicted by the declines in house prices

20   in the areas in which those properties were located.

21        59.    The results of this analysis for the securitizations are stated in Item 59 of the

22   schedules of this Complaint. Plaintiff incorporates into this paragraph 59, and alleges as though

23   fully set forth in this paragraph, the contents of Item 59 of the schedules.

24        **4.    These statements were misleading because the Defendants omitted to**

25   **state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

26        60.    As mentioned above, the LTV of a mortgage loan is a key determinant of the

27   likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the

28   less likely that a decline in the value of the property will wipe out the owner's equity and thereby

-16-

**COMPLAINT**

EXHIBIT 50  -370-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   give the owner an incentive to stop making mortgage payments and abandon the property.

2   Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to

3   predicting defaults and prepayments by borrowers. Also as mentioned above, LTV affects the

4   severity of loss on those loans that do default. The power of LTV to predict defaults,

5   prepayments, and severities is a major reason why reasonable investors consider the LTVs of

6   mortgage loans important to the decision whether to purchase a certificate in the securitization of

7   those loans.

8        61.    The predictive power of the LTV of a mortgage loan is much reduced if there are

9   additional liens on the same property. Additional liens reduce the owner's equity in the property

10  and thereby increase the owner's incentive to stop making mortgage payments and abandon the

11  property if the value of the property falls below the combined amount of all of the liens on the

12  property (a strategic default). Additional liens also exacerbate delinquencies and defaults because

13  they complicate the servicing of mortgage loans and the management of delinquencies and

14  defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also

15  with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may

16  want to grant a borrower forbearance while the borrower is unemployed and allow him or her to

17  add missed payments to the principal of the loan and to resume payments when he or she is

18  employed again. But the servicer of the second-lien mortgage may refuse such forbearance and

19  initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

20       62.    According to land records, many of the properties that secured mortgage loans in

21  the collateral pool of each securitization were subject to liens in addition to the lien of the

22  mortgage in the pool at the time of the closing of these securitizations.[4] In two of the

23  securitizations, the Defendants failed to disclose any of these additional liens in the prospectus

24  supplements and other documents they sent to Charles Schwab Treasury. These additional liens

25  reduced the equity of the owners of the properties subject to them, and thereby increased the risk

26  that those owners would default in payment of the mortgage loan in the pool.

27

28  [4] Additional liens referred to in this Complaint and the schedules exclude liens on the loan tapes that were originated on or before the date on which the mortgage loans in the pools were originated.

-17-

**COMPLAINT**

EXHIBIT 50  -371-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

63.    To take an example, of the 1,191 properties that secured the mortgage loans in

Securitization No. 1, at least 270 were subject to undisclosed liens in addition to the lien of the

mortgage in the pool. The undisclosed additional liens on these properties reduced the owners'

equity in those properties by a weighted average of 58.5% and by an aggregate amount of

$50,939,226.

64.    On one of the loans, the original balance of the mortgage loan was $390,000, the

represented value of the property was $555,000, the owner's ostensible equity was $165,000, and

the reported LTV was 70%. On the date of the closing of this securitization, however, there were

undisclosed additional liens on this property of $109,000. Thus, the owner's true equity was only

$56,000, 66% less than the equity implied by the disclosed loan amount and value of the property.

In many cases, the amounts of the undisclosed additional liens were precisely equal to the

owner's ostensible equity, thereby reducing that equity by 100%, to zero. And in some cases, the

amount of the undisclosed additional liens was much greater than the owner's ostensible equity,

putting the owner "under water" on the day on which this securitization closed.

65.    Similar numbers of additional undisclosed liens were found in each securitization

where Defendants did not disclose the existence of additional liens. Details of the undisclosed

additional liens in each securitization are stated in Item 65 of the schedules of this Complaint.

Plaintiff incorporates into this paragraph 65, and alleges as though fully set forth in this

paragraph, the contents of Item 65 of the schedules. Plaintiff is informed and believes, and based

thereon alleges, that discovery will demonstrate that the number of loans with additional liens is

substantially higher than those disclosed in the schedules.

66.    Because the Defendants did not disclose the existence or the amounts of these

additional liens, all statements that they made about the LTVs of the mortgage loans were

misleading.

**B.    Appraisals**

67.    As discussed above in paragraph 44, an accurate denominator (value of the

mortgaged property) is essential to an accurate LTV. An accurate appraisal of the property, in

turn, is essential to an accurate denominator.

-18-

**COMPLAINT**

EXHIBIT 50 -372-

68.     In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. The main instigators of this bias were mortgage brokers, real estate brokers, and loan officers who were not paid unless loans closed and properties changed hands, and who thus had a strong incentive to pressure appraisers to appraise properties at values high enough to enable transactions to close. (Furnishing an appraisal high enough to enable a transaction to close was known as "hitting the bid." In a purchase, this meant ensuring that the appraised value was equal to or greater than the agreed price. In a refinancing or second mortgage, "hitting the bid" meant ensuring that the appraised value was high enough to enable the proposed loan to comply with the lender's requirements for LTV.)

69.     This upward bias in appraisals caused the denominators that were used to determine the LTVs of many mortgage loans to be overstated and the LTVs themselves therefore to be understated. The statements that the Defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the Defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (USPAP), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

        **1.     These statements that the Defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

70.     Defendants omitted to state that brokers and loan officers pressured appraisers by threatening to withhold future assignments if an appraiser did not "hit the bid" and sometimes by refusing to pay for completed appraisals that did not "hit the bid." This pressure came in many forms, including the following:

        •   the withholding of business if the appraisers refused to inflate values,

-19-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EXHIBIT 50  -373-

- the withholding of business if the appraisers refused to guarantee a predetermined value,

- the withholding of business if the appraisers refused to ignore deficiencies in the property,

- refusing to pay for an appraisal that does not give the brokers and loans officers the property values that they want,

- black listing honest appraisers in order to use "rubber stamp" appraisers, etc.

71.     The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 57 through 59 above, the appraisals of refinanced properties that were subsequently sold were overstated. Moreover, as alleged in paragraphs 50 through 56, in each trust, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table.

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 1.9 | 3.1 |
| 2 | 7.2 | 9.6 |
| 3 | 2.9 | 4.8 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

72.     Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraiser's actual finding of the value of a property based on his or her objective valuation, but rather were the result of pressure on the appraiser to "hit the bid."

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-20-

**COMPLAINT**

EXHIBIT 50  -374-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**2.    The statements by the Defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

73.    Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

74.    USPAP includes the following provisions:

(a)    Third USPAP Ethics Conduct Rule: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."

(b)    Fifth USPAP Ethics Conduct Rule: "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."

(c)    Second USPAP Ethics Management Rule:

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.    the reporting of a predetermined result (*e.g.*, opinion of value);

2.    a direction in assignment results that favors the cause of the client;

3.    the amount of a value opinion;

4.    the attainment of a stipulated result; or

5.    the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

75.    The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 19 discusses "Unacceptable Assignment Conditions in Real Property Appraisal Assignments." As background, Advisory Opinion 19 notes that many appraisers report requests for their services accompanied by such conditions as: "Approximate (or Minimum) value needed:

-21-
**COMPLAINT**

EXHIBIT 50  -375-

1    ____"; "If this property will not appraise for at least _____, stop and call us immediately"; etc.

2    About such conditions, Advisory Opinion 19 states:

3        Certain types of conditions are unacceptable in any assignment
4    because performing an assignment under such conditions violates
    USPAP. Specifically, an assignment condition is unacceptable
5    when it:

6        &bull;  precludes an appraiser's impartiality. Because such a
       condition destroys the objectivity and independence
7           required for the development and communication of
       credible results;

8        &bull;  limits the scope of work to such a degree that the
       assignment results are not credible, given the intended use
9           of the assignment; or

10        &bull;  limits the content of a report in a way that results in the
       report being misleading.
11

12    76.    In the prospectus supplements and other documents they sent to Charles Schwab

13    Treasury, the Defendants made statements that the appraisals of properties that secured the

14    mortgage loans in the collateral pools were made in compliance with USPAP or with the

15    appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP.

16    Details of each such statement are stated in Item 76 of the schedules of this Complaint. Plaintiff

17    incorporates into this paragraph 76, and alleges as though fully set forth in this paragraph, the

18    contents of Item 76 of the schedules.

19    77.    Plaintiff is informed and believes, and based thereon alleges, that a material

20    number of mortgage loans in the collateral pools had appraisals conducted that deviated from

21    USPAP.

22    78.    Each of these statements referred to in paragraph 76 was untrue because the

23    appraisals of a material number of the properties referred to in each such statement did not

24    conform to USPAP.

25            *

26    79.    By each of the untrue and misleading statements referred to in paragraphs 46 and

27    76 above, the Defendants materially understated the risk of the certificates that they offered and

28    sold to Schwab.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-22-
**COMPLAINT**

EXHIBIT 50  -376-

**II.    Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

**A.    The materiality of occupancy status**

80.    Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

81.    Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

**B.    Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

82.    In the prospectus supplements and other documents they sent to Charles Schwab Treasury, the Defendants made statements about the number of properties in the collateral pool of each securitization that were the primary homes of their owners. To return to the example of Securitization No. 1, the Defendants stated that, of the 1,191 mortgage loans in the collateral pool, 1,118 were secured by primary residences and 73 were not. Details of each such statement in each securitization are stated in Item 82 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 82, and alleges as though fully set forth in this paragraph, the contents of Item 82 of the schedules.

83.    These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans not secured by primary residences was lower

-23-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EXHIBIT 50  -377-

1    than the actual number of loans in that category; or (iii) the Defendants omitted to state that the

2    occupancy status of a significant number of the properties that secured the mortgage loans in the

3    collateral pools was misstated because of fraud.

**C.    Basis of the allegations above that these statements about the occupancy
status of the properties that secured the mortgage loans in the collateral pools
were untrue or misleading**

6    84.    Because they are less risky than other mortgage loans, mortgage loans on primary

7    residences usually have more favorable terms, including lower interest rates and more lenient

8    underwriting standards, than mortgage loans on second homes and investment properties.

9    Applicants for loans on second homes and investment properties therefore have an incentive to

10    state that the property will be their primary residence even when it will not. Plaintiff is informed

11    and believes, and based thereon alleges, that borrowers many nonconforming securitized loans

12    did so.

13    85.    A significant number of the properties in the collateral pool of each securitization

14    that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and

15    believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the

16    loan files of many more of the mortgage loans in the collateral pool.

17    86.    With respect to some of the properties that were stated to be primary residences,

18    the borrower instructed local tax authorities to send the bills for the taxes on the property to the

19    borrower at an address other than the property itself. This is strong evidence that the mortgaged

20    property was not the borrower's primary residence.

21    87.    In some states and counties, owners of a property are able to designate whether

22    that property is his or her "homestead," which may reduce the taxes on that property or exempt

23    the property from assets available to satisfy the owner's creditors, or both. An owner may

24    designate only one property, which he or she must occupy, as his or her homestead. The fact that

25    an owner in one of these jurisdictions does not designate a property as his or her homestead when

26    he or she can do so is strong evidence that the property was not his or her primary residence. With

27    respect to some of the properties that were stated to be primary residences, the owner could have

28

-24-

**COMPLAINT**

EXHIBIT 50  -378-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   but did not designate the property as his or her homestead. That omission is strong evidence that

2   the property was not the borrower's primary residence.

3       88.    With respect to some of the properties that were stated to be primary residences,

4   the borrower owned three or more properties. Thus it was reasonably likely that the borrower did

5   not live in the property that was stated to be owner-occupied.

6       89.    When a borrower who lives in a mortgaged property falls behind in his or her

7   payments, it is normally many months before foreclosure ensues, during which time the borrower

8   tries to become current in his or her payments or to modify the mortgage so as not to lose his or

9   her home. During this time, the borrower becomes progressively more delinquent (30 days past

10  due, 60 days past due, etc.). In the very rare circumstances in which a mortgage loan goes straight

11  from being current to either foreclosure or ownership by the lender, it is usually because the

12  borrower did not live in the property and so made no effort to remain in it, but instead abandoned

13  the property to the lender soon after he or she became unable to make the payments. In many of

14  the securitizations, there were mortgage loans in the collateral pools that were secured by

15  properties that were stated to be primary residences and that went straight from current to

16  foreclosure or ownership by the lender. It is more likely than not that the properties that secured

17  these mortgage loans were actually not primary residences.

18      90.    In Securitization No. 1, 112 owners of properties that were stated to be primary

19  residences instructed local tax authorities to send the bills for the taxes on that property to them at

20  a different address; 276 owners of properties that were stated to be primary residences could

21  have, but did not, designate that property as their homestead; and 18 owners of properties that

22  were stated to be primary residences owned three or more properties. Eliminating duplicates, 354

23  properties that were stated to be primary residences actually were not, for one or more of these

24  reasons. Thus, of the 1,118 properties that were stated to be primary residences, 354 actually were

25  not, and the number of properties that were not primary residences was not 73, as Defendants

26  stated, but actually 427, a material difference. The numbers of such loans in the collateral pool of

27  each securitization are stated in Item 90 of the schedules of this Complaint. Plaintiff incorporates

28

-25-

**COMPLAINT**

EXHIBIT 50  -379-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   into this paragraph 90, and alleges as though fully set forth in this paragraph, the contents of Item

2   90 of the schedules.

3                                                    *

4        91.     By each of the untrue and misleading statements referred to in paragraph 82, the

5   Defendants materially understated the risk of the certificates that they offered and sold to Schwab.

6   **III.   Untrue or Misleading Statements About the Underwriting Standards of the
          Originators of the Mortgage Loans in the Collateral Pools**

7

8        **A.     The materiality of underwriting standards and the extent of an originator's
                departures from them**

9        92.     Originators of mortgage loans have written standards by which they underwrite

10  applications for loans. An important purpose of underwriting is to ensure that the originator

11  makes mortgage loans only in compliance with those standards and that its underwriting decisions

12  are properly documented. An even more fundamental purpose of underwriting mortgage loans is

13  to ensure that loans are made only to borrowers with credit standing and financial resources to

14  repay the loans and only against collateral with value, condition, and marketability sufficient to

15  secure the loans. An originator's underwriting standards, and the extent to which the originator

16  departs from its standards, are important indicators of the risk of mortgage loans made by that

17  originator and of certificates sold in a securitization in which mortgage loans made by that

18  originator are part of the collateral pool. A reasonable investor considers the underwriting

19  standards of originators of mortgage loans in the collateral pool of a securitization, and the extent

20  to which each originator departs from its standards, important to the decision whether to purchase

21  a certificate in that securitization.

22       **B.     Untrue or misleading statements about the underwriting standards of
                originators of the mortgage loans in the collateral pools and about the extent
                to which those originators departed from their standards**

23

24            **1.     The untrue or misleading statements**

25       93.     In the prospectus supplements and other documents they sent to Charles Schwab

26  Treasury, the Defendants made statements about the underwriting standards of the originators of

27  the mortgage loans in the collateral pool. Details of each such statement are stated in Item 93 of

28  the schedules of this Complaint. They included statements that the originators made mortgage

-26-

**COMPLAINT**

EXHIBIT 50  -380-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    loans in compliance with their underwriting standards and made exceptions to those standards

2    only when compensating factors were present. Plaintiff incorporates into this paragraph 93, and

3    alleges as though fully set forth in this paragraph, the contents of Item 93 of the schedules.

4        94.    Plaintiff is informed and believes, and based thereon alleges, that these statements

5    were untrue or misleading because the Defendants omitted to state that: (a) the originators were

6    departing extensively from those underwriting standards; (b) the originators were making

7    extensive exceptions to those underwriting standards when no compensating factors were present;

8    (c) the originators were making wholesale, rather than case-by-case, exceptions to those

9    underwriting standards; (d) the originators were making mortgage loans that borrowers could not

10   repay; and (e) the originators were failing frequently to follow quality-assurance practices

11   necessary to detect and prevent fraud intended to circumvent their underwriting standards.

> **2.  Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools, and about the extent of their departures from those standards, were untrue or misleading**
>
> **a.  The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

16       95.    Plaintiff is informed and believes, and based thereon alleges, before and during the

17   time of these securitizations, many originators of mortgage loans relaxed their actual lending

18   practices for loans they sold into securitizations, even though their stated underwriting standards

19   may have remained unchanged. As a result of this relaxation, securitized mortgage loans made

20   between 2004 and the dates of these securitizations have experienced high rates of delinquency

21   and default.

22       96.    Based on an extensive empirical study of mortgage loans made and sold into

23   securitizations during this period, economists at the University of Michigan and elsewhere found

24   that the high rates of delinquency and default were caused not so much by any deterioration in

25   credit characteristics of the loans that were expressly embodied in underwriting standards and

26   disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed

27   to investors.

28

EXHIBIT 50  -381-

97.     What these economists found about recent securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator Wells Fargo Bank as an example, Figure 1 shows the rising incidence of early payment defaults (or EPDs), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations by Wells Fargo Bank and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator departed from its underwriting standards in making the loan, often by failing to detect fraud in the application. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs in loans originated by Wells Fargo Bank that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by departures from its underwriting standards.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-28-

**COMPLAINT**

EXHIBIT 50  -382-



98.    Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, confirming the finding of the economists at the University of Michigan that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.

-29-
**COMPLAINT**

EXHIBIT 50  -383-



99.    Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for them are presented in Figures 1 and 2 of the following Exhibits to this Complaint:

| Exhibit | Originator |
| --- | --- |
| B | Washington Mutual Bank |
| C | Wells Fargo Bank |

Plaintiff incorporates into this paragraph 99, and alleges as though fully set forth in this paragraph, the contents of Figures 1 and 2 in each Exhibit.

**b.    The poor performance of the loans in these pools demonstrates that the originators departed extensively from their underwriting guidelines when making these loans.**

100.    As noted above, an EPD is strong evidence that the originator may have departed from its underwriting standards in making the loan. The mortgage loans in the collateral pools of these securitization experienced very high rates of EPDs, some much higher than the rate of EPDs

-30-

**COMPLAINT**

EXHIBIT 50  -384-

1   suffered by all securitized prime, non-agency (including Alt-A) mortgage loans made in the

2   United States during the same time in which those loans were made. This much higher-than-

3   normal rate of EPDs is strong evidence that the originators of those loans may have departed

4   extensively from their underwriting standards when making those loans. The number and percent

5   of the loans in each pool that suffered EPDs, and the percent of all securitized prime (including

6   Alt-A) mortgage loans made at the same time that suffered EPDs, are stated in Item 100 of the

7   schedules of this Complaint. Plaintiff incorporates into this paragraph 100, and alleges as though

8   fully set forth in this paragraph, the contents of Item 100 of the schedules.

9       101.   A higher-than-normal rate of delinquency at any time in a group of mortgage loans

10  is also evidence that the originators of those loans may have departed from their underwriting

11  standards in making the loans. A common measure of serious delinquency is the number of loans

12  on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage

13  loans in the collateral pools have experienced very high rates of delinquencies by this measure,

14  some much higher than the rate of such delinquencies suffered by all securitized prime (including

15  Alt-A) mortgage loans made in the United States during the same time in which those loans were

16  made. This much higher-than-normal rate of delinquencies is strong evidence that the originators

17  of those loans may have departed extensively from their underwriting standards when making

18  those loans. The number and percent of the loans in each pool that suffered 90 or more days

19  delinquencies, and the percent of all securitized prime (including Alt-A) mortgage loans made at

20  the same time that suffered such delinquencies, are stated in Item 101 of the schedules of this

21  Complaint. Plaintiff incorporates into this paragraph 101, and alleges as though fully set forth in

22  this paragraph, the contents of Item 101 of the schedules.

23      102.   A second common measure of delinquency is the number of loans on which the

24  borrowers are 30 or more days delinquent now. The mortgage loans in the collateral pools have

25  experienced very high rates of delinquencies by this measure, some as high as 56.7% of the loans

26  in some pools as of March 31, 2010. By contrast, only 14.7% of all mortgage loans made in the

27  United States (including millions of loans of lower ostensible credit quality) were 30 or more

28  days delinquent on the same date. This much higher-than-normal rate of delinquencies is strong

-31-
**COMPLAINT**

EXHIBIT 50  -385-

1   evidence that the originators of those loans may have departed extensively from their

2   underwriting standards when making those loans. The number and percent of the loans in each

3   pool that were 30 or more days delinquent on March 31, 2010, are stated in Item 102 of the

4   schedules of this Complaint. Plaintiff incorporates into this paragraph 102, and alleges as though

5   fully set forth in this paragraph, the contents of Item 102 of the schedules.

6                                             *

7          103.   By each of the untrue and misleading statements referred to in paragraph 93 above,

8   the Defendants materially understated the risk of the certificates that they offered and sold to

9   Schwab. Moreover, Plaintiff is informed and believes, and based thereon alleges, that discovery

10  will yield additional evidence that the originators departed extensively from their underwriting

11  guidelines when making the mortgage loans in the collateral pools of these securitizations.

12  **IV.   The Large Number of Mortgage Loans in the Collateral Pools About Which the
        Defendants Made Material Untrue or Misleading Statements Made Their Statements
13      about the Ratings of Schwab's Certificates Untrue and Misleading.**

14         104.   In the prospectus supplements and other documents they sent to Charles Schwab

15  Treasury, the Defendants made statements about the rating of each certificate by Moody's

16  Investors Service, Standard & Poor's Rating Service, and Fitch Ratings. They stated that one or

17  more of those agencies rated each such certificate triple-A or above. Details of each such

18  statement are stated in Item 104 of the schedules of this Complaint. Plaintiff incorporates into this

19  paragraph 104, and alleges as though fully set forth in this paragraph, the contents of Item 104 of

20  the schedules.

21         105.   The ratings were important to the decision of any reasonable investor whether to

22  purchase the certificates. Many investors, including Schwab, have investment policies that require

23  a certain minimum rating for all investments. The policy of Schwab was to purchase only

24  certificates that were rated triple-A.

25         106.   These statements by the Defendants about the ratings of the certificates they sold

26  to Schwab were misleading because the Defendants omitted to state that the ratings did not take

27  into account all the material untrue or misleading statements about specific mortgage loans in the

28  collateral pool. These include:

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                  -32-
                              **COMPLAINT**

EXHIBIT 50  -386-

(a)    loans in which the LTVs were materially understated;

(b)    loans in which the owner's equity in the property was reduced by 5% or more by undisclosed additional liens;

(c)    loans that suffered EPDs, strong evidence that the originators may have made undisclosed departures from the underwriting standards in making those loans; and

(d)    loans in which the properties were stated to be owner-occupied, but were not.

107.    In Securitization No. 1, there were 340 loans whose LTVs were materially understated, 270 loans with undisclosed additional liens, and 354 loans in which the properties were stated to be owner-occupied but were not. Eliminating duplicates, there were 723 loans (or 60.7% of the loans in the collateral pool) about which Defendants made untrue or misleading statements. The numbers of such loans in the collateral pool of each securitization are stated in Item 107 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 107, and alleges as though fully set forth in this paragraph, the contents of Item 107 of the schedules.

108.    Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents available only through discovery will prove that those statements were untrue or misleading with respect to many more loans as well.

109.    By these untrue and misleading statements, the Defendants materially understated the risk of the certificates that they offered and sold to Schwab. Moreover, Plaintiff is informed and believes, and based thereon alleges, that the Defendants materially understated the risk of the certificates that they offered and sold to Schwab.

## FIRST CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES
### (California Corporations Code §§ 25401, 25501)

110.    This cause of action is alleged against the following Defendants:

| Against Defendant: | In connection with Securitization: |
|---|---|
| Merrill Lynch | Securitization No. 1 |
| UBS | Securitization No. 2 |
| Bear Stearns | Securitization No. 3 |

-33-

COMPLAINT

EXHIBIT 50  -387-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1     111.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1

2 through 109.

3     112.    In doing the acts alleged in the sale to Schwab of the certificates in the

4 securitizations referred to above, the Defendants named above violated Sections 25401 and 25501

5 of the California Corporations Code by offering or selling securities in this State by means of

6 written communications that included untrue statements of material fact or omitted to state

7 material facts necessary in order to make the statements made, in light of the circumstances under

8 which they were made, not misleading.

9     113.    This action is brought within two years after the discovery of the untrue and

10 misleading statements in the prospectus supplements and other documents that the Defendants

11 sent to Charles Schwab Treasury, and within five years of Schwab's purchase of these

12 certificates, or within any applicable period as tolled by the pendency of the class actions referred

13 to above or others. Despite having exercised reasonable diligence, neither Plaintiff, Charles

14 Schwab Treasury, nor Schwab could reasonably have discovered earlier the untrue and

15 misleading statements in the prospectus supplements and other documents.

16     114.    Under California Corporations Code §§ 25401 and 25501, Plaintiff is entitled to

17 recover the consideration paid for each of these certificates, plus interest at the legal rate from the

18 date of purchase to the date on which it recovers the purchase price, minus the amount of income

19 received on the certificate. Pursuant to § 25501, and in anticipation of the remedies thereunder,

20 Plaintiff hereby offers to tender each certificate.

## SECOND CAUSE OF ACTION

**UNTRUE OR MISLEADING STATEMENTS
IN REGISTRATION STATEMENTS
(Section 11 of the Securities Act of 1933)**

115.    This cause of action is alleged against the following Defendants:

| Against Defendant: | In connection with Securitization: |
| --- | --- |
| UBS | Securitization No. 2 |
| Wells Fargo Asset | Securitization No. 2 |

-34-

**COMPLAINT**

EXHIBIT 50  -388-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

116.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 114.

117.    In doing the acts alleged, the Defendants named above violated Section 11 of the Securities Act of 1933 in connection with the sale to Schwab of the certificates in the securitizations referred to above.

118.    The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 35 of the schedules.

119.    Wells Fargo Asset is the depositor of the securitization listed above and therefore is the issuer of the certificates in those securitizations. UBS acted as underwriter of the certificate listed above.

120.    This action is brought within one year after the discovery of the untrue and misleading statements in the registration statements, as amended by the prospectus supplements, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, Plaintiff, Charles Schwab Treasury, and Schwab did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements.

121.    The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 39 through 109.

122.    Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the Securities Act of 1933.

**COMPLAINT**

EXHIBIT 50  -389-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    123.    Schwab did not know when it purchased these certificates that the statements in

2    the registration statements, as amended by the prospectus supplements, were untrue or

3    misleading.

4    124.    Schwab has suffered a loss on each of these certificates.

5    125.    Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

6    **THIRD CAUSE OF ACTION**

7    **UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES**
     **(Section 12(a)(2) of the Securities Act of 1933)**
8

9    126.    This cause of action is alleged against the following Defendants:

| Against Defendant: | In connection with Securitization: |
|---|---|
| UBS | Securitization No. 2 |
| Wells Fargo Asset | Securitization No. 2 |

13    127.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1

14    through 125.

15    128.    In doing the acts alleged, the Defendants named above violated Section 12(a)(2) of

16    the Securities Act of 1933 in the sale to Schwab of the certificates in the securitizations referred

17    to above.

18    129.    This action is brought within one year after the discovery of the untrue and

19    misleading statements in the prospectus supplements and other written offering materials and oral

20    communications that the dealers sent to Plaintiff, and within three years of these certificates

21    having been sold to the public, or within any applicable period as tolled by the pendency of the

22    class actions referred to above or others. Despite having exercised reasonable diligence, Plaintiff,

23    Charles Schwab Treasury, and Schwab did not and could not reasonably have discovered earlier

24    the untrue and misleading statements in the prospectus supplements and other written offering

25    materials and oral communications that the dealers sent to Charles Schwab Treasury.

26    130.    Wells Fargo Asset is the depositor of the securitization listed above and therefore

27    is the issuer of the certificates in that securitization. In connection with the offer and sale of these

28

-36-

**COMPLAINT**

EXHIBIT 50  -390-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   certificates to Schwab, the issuer also made all of the statements of material fact about these

2   certificates that were in the prospectus supplements and other written offering materials and oral

3   communications that that the dealers sent to Charles Schwab Treasury.

4       131.   Plaintiff expressly excludes from this cause of action any allegation that could be

5   construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely

6   on claims of strict liability or negligence under the Securities Act of 1933.

7       132.   The Defendants named above solicited Schwab to purchase these certificates, and

8   sold the certificates to Schwab, by means of the prospectus supplements and other written

9   offering materials and oral communications.

10       133.   The prospectus supplements and other written offering materials and oral

11   communications that the dealers sent to Charles Schwab Treasury contained untrue statements of

12   material fact and omitted to state material facts necessary in order to make the statements, in the

13   light of the circumstances under which they were made, not misleading.

14       134.   Schwab did not know when it purchased these certificates that the statements in

15   the prospectus supplements and other written offering materials and oral communications that the

16   dealers sent to Charles Schwab Treasury were untrue or misleading.

17       135.   Schwab has suffered a loss on each of these certificates.

18       136.   Plaintiff is entitled to recover the consideration paid for each of these certificates,

19   plus interest at the legal rate from the date of purchase to the date on which it recovers the

20   purchase price, minus the amount of income received on each certificate. Pursuant to Section

21   12(a)(2), and in anticipation of the remedies thereunder, Plaintiff hereby offers to tender each

22   certificate.

23

24

25

26

27

28

-37-

**COMPLAINT**

EXHIBIT 50  -391-

## FOURTH CAUSE OF ACTION

### LIABILITY OF CONTROLLING PERSON
### (Section 15 of the Securities Act of 1933)

137.   This cause of action is alleged against the following Defendant:

| *Against Defendant:* | *In connection with Securitization:* |
|---|---|
| Wells Fargo Bank | **Securitization No. 2** |

138.   Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 136.

139.   The Defendant named above is liable because, in doing the acts alleged, persons it controlled violated Sections 11 and 12(a)(2) of the Securities Act of 1933 in the sale to Schwab of the certificates in the securitizations referred to above.

140.   Wells Fargo Bank by or through stock ownership, agency, or otherwise, controlled Wells Fargo Asset within the meaning of Section 15 of the Securities Act of 1933.

141.   In doing the acts alleged, each controlled person named in paragraphs 140 is liable under Sections 11 and 12(a)(2) of the Securities Act of 1933 for the reasons alleged in paragraphs 1 through 136.

142.   The Defendant named above is therefore jointly and severally liable with and to the same extent as the person it controlled.

**COMPLAINT**

EXHIBIT 50  -392-

## FIFTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION
(California Civil Code §§ 1572 *et seq.* and 1709 *et seq.*, and Common Law)

143.    This cause of action is alleged against the following Defendants:

| *Against Defendant:* | *In connection with Securitization:* |
|---|---|
| Merrill Lynch | Securitization No. 1 |
| Merrill Lynch Mortgage | Securitization No. 1 |
| UBS | Securitization No. 2 |
| Wells Fargo Asset | Securitization No. 2 |
| Bear Stearns | Securitization No. 3 |
| Bear Stearns Asset | Securitization No. 3 |

144.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 142.

145.    As alleged above, the Defendants named above made untrue or misleading representations regarding the LTVs of the mortgage loans in the collateral pools of these securitizations, the occupancy status of properties that secured the mortgage loans in these securitizations, underwriting guidelines of the originators, and related matters.

146.    In making the representations referred to above, the Defendants intended to induce Schwab to rely on those representations in making its decision to purchase these certificates in these securitizations.

147.    When the Defendants made these representations, they had no reasonable ground for believing them to be true. Plaintiff is informed and believes, and based thereon alleges, that Defendants had access to the files on the mortgage loans in the collateral pools for these securitizations, and, had the Defendants inspected those files, they would have learned that the information they gave Charles Schwab Treasury contained untrue or misleading statements. In addition, Plaintiff is informed and believes, and based thereon alleges, that Defendants hired one or more "due-diligence contractors" to ascertain whether the mortgage loans in the collateral pools complied with the representations and warranties made about those loans, and these contractors reported to the Defendants that a material number of the loans in the collateral pools

-39-

**COMPLAINT**

EXHIBIT 50  -393-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

were different from the descriptions of those loans in the prospectus supplements. Thus, Plaintiff

is informed and believes, and based thereon alleges, that the Defendants had access to

information that either did make the Defendants aware, or should have made them aware had they

heeded that information, that the representations they made to Charles Schwab Treasury

contained material untrue or misleading statements about the mortgage loans in the collateral

pools.

148.    When it purchased these certificates, Schwab did not know about the untrue and

misleading statements alleged herein.

149.    Schwab reasonably and justifiably relied on the representations described above in

analyzing and deciding to purchase these certificates. Had the Defendants not made these false

and misleading representations, Schwab would not have purchased these certificates.

150.    As a direct and proximate result of the negligent misrepresentations by the

Defendants, Schwab was damaged in an amount to be proved at trial.

## SIXTH CAUSE OF ACTION

### RESCISSION OF CONTRACT
### (California Civil Code §§ 1689 and 1710, and Common Law)

151.    This cause of action is alleged against the following Defendants:

| *Against Defendant:* | *In connection with Securitization:* |
|---|---|
| **Merrill Lynch** | **Securitization No. 1** |
| **UBS** | **Securitization No. 2** |
| **Bear Stearns** | **Securitization No. 3** |

152.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1

through 150.

153.    Schwab purchased each certificate pursuant to a contract in writing between

Schwab and the dealer from which it purchased that certificate. Each contract stated the

consideration that Schwab paid each dealer for each certificate.

154.    In making each contract to purchase the certificates, Schwab relied on the truth of

the statements that the Defendants named above made in the prospectus supplements and other

-40-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EXHIBIT 50  -394-

1  offering materials. Because those statements were untrue or misleading, Schwab was mistaken

2  about its basic assumptions underlying its purchase of each certificate, and this mistake had a

3  material adverse effect on the agreed-upon exchange represented by Schwab's purchase of each

4  certificate. Because the Defendants named above were responsible to provide accurate

5  information in the prospectus supplements, Schwab did not assume, nor does it bear, the risk of

6  the fundamental mistake underlying its decision to purchase these certificates.

7      155.    The Defendants named above obtained the consent of Schwab to the contracts to

8  purchase the certificates by means of their assertion, as facts, of that which was not true, when

9  those Defendants had no reasonable ground for believing those assertions to be true.

10     156.    Pursuant to California Civil Code. § 1689 *et seq.*, Plaintiff is entitled to rescind,

11  and does hereby demand the rescission of, each contract for the sale and purchase of these

12  certificates. Plaintiff offers to restore all benefits that Schwab has received under those contracts

13  and is entitled to recover all consideration paid under them.

### PRAYER FOR RELIEF

15      WHEREFORE, Plaintiff respectfully demands judgment as follows:

16  A.      On the first cause of action, the consideration paid for each certificate with interest

17  thereon, less the amount of any income received thereon, upon Plaintiff's tender of each

18  certificate;

19  B.      On the second cause of action, damages in an amount to be determined at trial;

20  C.      On the third cause of action, the consideration paid for each certificate with

21  interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each

22  certificate;

23  D.      On the fourth cause of action, the consideration paid for each certificate with

24  interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each

25  certificate;

26  E.      On the fifth cause of action, damages in an amount to be determined at trial;

27

28

-41-

**COMPLAINT**

EXHIBIT 50 -395-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1      F.     On the sixth cause of action, the consideration paid for each certificate with

2  interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each

3  certificate;

4      G.    All together with the costs of this action, the reasonable fees of Plaintiff's

5  attorneys in this action, and such other and further relief as the Court may deem just.

6  Dated: June 29, 2010

GOODIN, MACBRIDE, SQUERI,
DAY & LAMPREY LLP

By _____
      Robert A. Goodin

LOWELL HAKY

GRAIS & ELLSWORTH LLP

Attorneys for Plaintiff
The Charles Schwab Corporation

-42-

**COMPLAINT**

EXHIBIT 50  -396-

*EXHIBIT 51*

1  GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
   ROBERT A. GOODIN, State Bar No. 061302
2         rgoodin@goodinmacbride.com
   FRANCINE T. RADFORD, State Bar No. 168269
3         fradford@goodinmacbride.com
   ANNE H. HARTMAN, State Bar No. 184556
4         ahartman@goodinmacbride.com
   505 Sansome Street, Suite 900
5  San Francisco, California  94111
   Telephone:    (415) 392-7900
6  Facsimile:    (415) 398-4321

7  GRAIS & ELLSWORTH LLP
   DAVID J. GRAIS (*pro hac application submitted herewith*)
8  KATHRYN C. ELLSWORTH (*pro hac app. submitted herewith*)
   OWEN L. CYRULNIK (*pro hac application submitted herewith*)
9  70 East 55th Street
   New York, New York 10022
10 Telephone:    (212) 755-0100
   Facsimile:    (212) 755-0052
11
   Attorneys for Plaintiff
12 Federal Home Loan Bank of San Francisco

**F I L E D**
Superior Court of California
County of San Francisco

MAR 1 5 2010

CLERK OF THE COURT
BY: *Param Natt*
                    Deputy Clerk

CASE MANAGEMENT CONFERENCE SET

AUG 1 3 2010   9:00 AM

DEPARTMENT 212

13

14                IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

15                IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

16

17 FEDERAL HOME LOAN BANK OF SAN        No.  CGC·10·497840
   FRANCISCO,
18                                      **COMPLAINT FOR RESCISSION AND**
            Plaintiff,                  **DAMAGES FOR:**
19
   v.                                   **(1) VIOLATIONS OF §§ 25401 AND**
20                                          **25501 OF THE CALIFORNIA**
   CREDIT SUISSE SECURITIES (USA) LLC,      **CORPORATE SECURITIES ACT;**
21 F/K/A CREDIT SUISSE FIRST BOSTON
   LLC;                                 **(2) VIOLATIONS OF §§ 11 AND 15 OF**
22 CREDIT SUISSE FIRST BOSTON              **THE SECURITIES ACT OF 1933;**
   MORTGAGE SECURITIES CORP.;
23 DEUTSCHE BANK SECURITIES, INC.;     **(3) VIOLATIONS OF §§ 12(a)(2) AND**
   DEUTSCHE ALT-A SECURITIES, INC.;       **15 OF THE SECURITIES ACT OF**
24 J.P. MORGAN SECURITIES, INC., F/K/A     **1933;**
   BEAR STEARNS & CO., INC.;
25 STRUCTURED ASSET MORTGAGE         **(4) VIOLATIONS OF §§ 1572 AND 1710**
   INVESTMENTS II, INC.;                  **OF THE CALIFORNIA CIVIL**
26 THE BEAR STEARNS COMPANIES, LLC,       **CODE (NEGLIGENT**
   F/K/A THE BEAR STEARNS COMPANIES,      **MISREPRESENTATION); and**
   INC.;
27 RBS SECURITIES, INC., F/K/A
   GREENWICH CAPITAL MARKETS, INC.;
28 RBS ACCEPTANCE, INC. F/K/A

CS8

**COMPLAINT**

| | | |
|---|---|---|
| 1 | GREENWICH CAPITAL ACCEPTANCE, INC.; | **(5) RESCISSION OF CONTRACTS UNDER § 1689 ET SEQ. OF THE CALIFORNIA CIVIL CODE** |
| 2 | MORGAN STANLEY & CO. INCORPORATED; | |
| 3 | UBS SECURITIES, LLC; | |
| 4 | MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; | |
| 5 | BANC OF AMERICA SECURITIES LLC; BANC OF AMERICA FUNDING CORPORATION; | |
| 6 | BANC OF AMERICA MORTGAGE SECURITIES, INC.; | |
| 7 | COUNTRYWIDE SECURITIES CORPORATION; | |
| 8 | CWALT, INC.; COUNTRYWIDE FINANCIAL | |
| 9 | CORPORATION; AND, DOES 1-50, | |
| 10 | | |
| 11 | Defendants. | |

12

13      Plaintiff, FEDERAL HOME LOAN BANK OF SAN FRANCISCO (referred to in

14  this complaint as the Bank), alleges, based upon its continuing investigation, including the

15  continuing investigation of its counsel, that the following allegations and other factual contentions

16  have evidentiary support or, where specifically identified as being pled "on information and

17  belief," are likely to have evidentiary support after a reasonable opportunity for further

18  investigation or discovery.

19                              **NATURE OF THIS ACTION**

20      1.      This is an action for rescission and damages as a result of the violation by the

21  Defendants of the California Corporate Securities Act, the federal Securities Act of 1933, the

22  California Civil Code, and the common law. As alleged in detail below, the Defendants sold or

23  issued to the Bank 98 certificates in 80 securitization trusts backed by residential mortgage loans.

24  The Bank paid more than $13.7 billion for those certificates. When they offered and then sold

25  these certificates to the Bank, the Defendants made numerous statements to the Bank about the

26  certificates and the credit quality of the mortgage loans that backed them. On information and

27  belief, many of those statements were untrue. Moreover, on information and belief, the

28  Defendants omitted to state many material facts that were necessary in order to make their

-2-

**COMPLAINT**

1   statements not misleading. For example, the Defendants made untrue statements, or omitted

2   important information, about such material facts as the percentage of equity that borrowers had in

3   their homes, the number of borrowers who actually lived in the houses that secured their loans,

4   the credit scores of the borrowers, and the business practices of the lenders that made the loans.

5   The Bank reasonably and justifiably relied on these untrue statements and omissions of important

6   information in deciding to purchase the certificates. The certificates are "securities" within the

7   meaning of the California Corporate Securities Act and the Securities Act of 1933. Under those

8   Acts, the California Civil Code, and the common law, the Bank is entitled to rescind its purchase

9   of the certificates or to be paid damages for its losses on the certificates.

10         2.      Eight securities dealers sold these certificates to the Bank. Those dealers are

11   Defendants Credit Suisse Securities (USA) LLC (which sold to the Bank certificates in 10

12   securitization trusts, which are referred to in this complaint as Securitizations Nos. 1 through 10),

13   Deutsche Bank Securities, Inc. (21 securitizations, Nos. 11 through 31), Bear Stearns & Co. Inc.

14   (10 securitizations, Nos. 32 through 41), Greenwich Capital Markets, Inc. (three securitizations,

15   Nos. 42 through 44), Morgan Stanley & Co. Inc. (three securitizations, Nos. 45 through 47), UBS

16   Securities, LLC (12 securitizations, Nos. 48 through 59), Banc of America Securities LLC (15

17   securitizations, Nos. 60 through 74), and Countrywide Securities Corporation (six securitizations,

18   Nos. 75 through 80). The other Defendants named in this complaint are liable to the Bank

19   because they were the issuers of some of those certificates or because they controlled one of those

20   issuers.

21                                    **PARTIES**

22         3.      Plaintiff is a bank created by the Federal Home Loan Bank Act. The headquarters

23   of the Bank are in the City and County of San Francisco. Under its Organization Certificate, the

24   Bank is to operate in Federal Home Loan Bank District 11, which comprises the States of

25   Arizona, California, and Nevada. The Bank does operate in each of those three States.

26         4.      Defendant Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse

27   First Boston LLC and referred to as **Credit Suisse**) is a limited liability company organized under

28   the laws of Delaware. Credit Suisse sold the Bank 10 of the certificates.

-3-
**COMPLAINT**

5.       Defendant Credit Suisse First Boston Mortgage Securities Corp. (referred to as **CSFB Mortgage Securities**) is a corporation organized under the laws of Delaware. CSFB Mortgage Securities was the issuer of five of the certificates that Credit Suisse sold to the Bank.

6.       Defendant Deutsche Bank Securities, Inc. (referred to as **Deutsche**) is a corporation organized under the laws of Delaware. Deutsche sold the Bank 21 of the certificates.

7.       Defendant Deutsche Alt-A Securities, Inc. (referred to as **Deutsche Alt-A**) is a corporation organized under the laws of Delaware. Deutsche Alt-A was the issuer of five of the certificates that Deutsche sold to the Bank.

8.       Defendant J.P. Morgan Securities, Inc. (formerly known as Bear, Stearns & Co. Inc. and referred to as **Bear Stearns**) is a corporation organized under the laws of Delaware. Bear Stearns sold the Bank 10 of the certificates.

9.       Defendant Structured Asset Mortgage Investments II, Inc. (referred to as **SAMI II**) is a corporation organized under the laws of Delaware. SAMI II was the issuer of six of the certificates that Bear Stearns sold to the Bank.

10.      Defendant The Bear Stearns Companies, LLC (formerly known as and referred to as **The Bear Stearns Companies, Inc.**) is a limited liability company organized under the laws of Delaware. The Bear Stearns Companies, Inc. controls or controlled SAMI II. Under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o, The Bear Stearns Companies, Inc. therefore is liable to the Bank jointly and severally with, and to the same extent as, SAMI II.

11.      Defendant RBS Securities, Inc. (formerly known as Greenwich Capital Markets, Inc. and referred to as **Greenwich Capital**) is a corporation organized under the laws of Delaware. Greenwich Capital sold the Bank three of the certificates.

12.      Defendant RBS Acceptance, Inc. (formerly known as Greenwich Capital Acceptance, Inc. and referred to as **Greenwich Capital Acceptance**) is a corporation organized under the laws of Delaware. Greenwich Capital Acceptance was the issuer of one of the certificates that Greenwich Capital sold to the Bank.

-4-
**COMPLAINT**

13.     Defendant Morgan Stanley & Co. Incorporated (referred to as **Morgan Stanley**) is a corporation organized under the laws of Delaware. Morgan Stanley sold the Bank three of the certificates.

14.     Defendant UBS Securities, LLC (referred to as **UBS**) is a limited liability company organized under the laws of Delaware. UBS sold the Bank 12 of the certificates.

15.     Defendant Mortgage Asset Securitization Transactions, Inc. (referred to as **MAST**) is a corporation organized under the laws of Delaware. MAST was the issuer of six of the certificates that UBS sold to the Bank.

16.     Defendant Banc of America Securities LLC (referred to as **Banc of America**) is a limited liability company organized under the laws of Delaware. Banc of America sold the Bank 15 of the certificates.

17.     Defendant Banc of America Funding Corporation (referred to as **Banc of America Funding**) is a corporation organized under the laws of Delaware. Banc of America Funding was the issuer of seven of the certificates that Banc of America sold to the Bank.

18.     Defendant Banc of America Mortgage Securities, Inc. (referred to as **Banc of America Mortgage Securities**) is a corporation organized under the laws of Delaware. Banc of America Mortgage Securities was the issuer of seven of the certificates that Banc of America sold to the Bank.

19.     Defendant Countrywide Securities Corporation (referred to as **Countrywide**) is a corporation organized under the laws of California. Countrywide sold the Bank six of the certificates.

20.     Defendant CWALT, Inc. (referred to as **CWALT**) is a corporation organized under the laws of Delaware. CWALT was the issuer of three of the certificates that Credit Suisse sold to the Bank, 15 of the certificates that Deutsche sold to the Bank, one of the certificates that Bear Stearns sold to the Bank, two of the certificates that Greenwich Capital Markets sold to the Bank, three of the certificates that Morgan Stanley sold to the Bank, six of the certificates that UBS sold to the Bank, one of the certificates that Banc of America sold to the Bank, and five of the certificates that Countrywide sold to the Bank.

-5-

**COMPLAINT**

1    21.    Defendant **Countrywide Financial Corporation** is a corporation organized under

2    the laws of Delaware. Countrywide Financial Corporation controls or controlled CWALT. Under

3    Section 15 of the Securities Act Countrywide Financial Corporation therefore is liable to the

4    Bank jointly and severally with, and to the same extent as, CWALT.

5    22.    Plaintiff is ignorant of the true names and capacities of Defendants sued herein as

6    Does 1-50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will

7    amend this complaint to allege the true names and capacities of these Defendants when

8    ascertained. Plaintiff is informed and believes that each of the fictitiously named Defendants

9    is responsible in some manner for the occurrences alleged herein and proximately caused

10   Plaintiff's damages.

11                              **JURISDICTION AND VENUE**

12   23.    This Court has subject-matter jurisdiction of this action. The Superior Court is a

13   court of general jurisdiction. The Bank seeks rescission under Sections 25401 and 25501 of the

14   California Corporate Securities Act, damages for negligent misrepresentation, and rescission of

15   its contracts to purchase the certificates, all of which relief this Court has jurisdiction to grant.

16   Under Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), this Court also has

17   jurisdiction over the Bank's causes of action for violation of Sections 11, 12(a)(2), and 15 of that

18   Act, 15 U.S.C. § 77l.

19   24.    Under Section 22(a) of the Securities Act of 1933, "no case arising under this title

20   and brought in any State court of competent jurisdiction shall be removed to any court of the

21   United States." Because its activities are not localized in one state, the Bank is not a citizen of any

22   state under 28 U.S.C. § 1332(c), so the Federal courts have no jurisdiction of this action under 28

23   U.S.C. § 1332(a). This action is not removable to Federal court.

24   25.    This Court has personal jurisdiction over Credit Suisse, Deutsche, Bear Stearns,

25   Greenwich Capital, Morgan Stanley, UBS, Banc of America, Countrywide, and CWALT because

26   each of them is registered to do business in California. This Court has personal jurisdiction over

27   all of the Defendants because they offered and sold the certificates to the Bank "in California"

28   within the meaning of Section 25008 of the California Corporate Securities Act.

**COMPLAINT**

26.     Venue is proper in this County because the Defendants offered and sold the certificates to the Bank in this County, and because the violations of law alleged in this complaint, including the making of materially untrue or misleading statements, occurred in this County.

## SECURITIZATION OF MORTGAGE LOANS

27.     The securities that the Defendants sold the Bank are so-called **asset-backed securities**, or **ABS**, created in a process known as **securitization**. Securitization begins with loans (for example, loans secured by mortgages on residential properties, credit card loans, etc.) on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. In the loan underwriting process, the originator applies various criteria to try to ensure that the loan will be repaid. Until the loans are securitized, the borrowers on the loans make their loan payments to the originator. Collectively, the payments on the loans are known as the **cash flow** from the loans.

28.     In a securitization, a large number of loans, usually of a similar type, are grouped into a **collateral pool**. The originator of those loans sells them (and, with them, the right to receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The trust raises the cash to pay for the loans by selling **bonds**, usually called **certificates**, to investors such as the Bank. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

29.     Thus, schematically, there are six steps in a securitization.

1.     Investors pay money to the trust.
2.     The trust issues certificates to the investors.
3.     The trust pays money to the originator.
4.     The originator sells to the trust the loans in the collateral pool, including the right to receive the cash flow from those loans.
5.     The trust collects cash flow from payments on the loans in the collateral pool.
6.     The trust pays each certificateholder its agreed part of the cash flow that the trust receives from payments on loans in the collateral pool.

-7-

**COMPLAINT**

\*

30.    A few other aspects of securitization are significant to the allegations of this complaint. Each securitization has a sponsor, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor,** which then transfers title to the loans to the trust.

31.    The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has no assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of an asset-backed certificate.

\*

32.    **Securities dealers,** like the eight that sold the certificates to the Bank, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

33.    Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool. The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called loan files. For residential mortgage loans, each loan file normally contains the information in such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan.

-8-

**COMPLAINT**

34.     Collateral pools usually include thousands of loans. Instead of potential investors reviewing thousands of loan files, the securities firms that will underwrite the sale of the certificates in a securitization are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. As will be alleged in detail below, the information that the Defendants presented to the Bank about the credit quality of the loans in the collateral pools of the 80 trusts contained many statements that were material to the credit quality of those loans, but, on information and belief, were untrue or misleading. Moreover, on information and belief, the Defendants were negligent in making those untrue or misleading statements to the Bank.

## TOLLING OF THE STATUTE OF LIMITATIONS

35.     The Bank is a member of the proposed classes in *Luther v. Countrywide Financial Corporation*, Superior Court for the State of California County of Los Angeles No. BC 380698, filed on November 11, 2007, *New Jersey Carpenters Health Fund v. Residential Capital LLC*, United States District Court for the Southern District of New York No. 08-cv-8781, filed on September 22, 2008, and *New Jersey Carpenters Health Fund v. Bear Stearns Mortgage Funding Trust 2006-AR1*, United States District Court for the Southern District of New York No. 08-cv-08093, filed on August 20, 2008, the pendency of which actions has tolled the running of the statute of limitations on causes of action alleged in this complaint.

## THE SALES OF THE CERTIFICATES

36.     The Defendants sold to the Bank 98 certificates in Securitizations Nos. 1 through 80. Details of each trust and each certificate are stated in Item 36 of Schedules 1 through 80 of this complaint, which correspond to Securitizations Nos. 1 through 80. The Bank incorporates into this paragraph 36, and alleges as though fully set forth in this paragraph, the contents of Item 36 of the schedules.

## MATERIAL UNTRUE OR MISLEADING STATEMENTS
## ABOUT THE CERTIFICATES

37.     In connection with their offers and sales of the certificates to the Bank, each of the eleven dealers sent numerous documents to the Bank at its office in San Francisco County. In

-9-

**COMPLAINT**

each case, these documents included a term sheet, the prospectus supplement for the certificates
that was filed with the SEC, drafts of some of the statistical tables to be included in the prospectus
supplement, and a computer model of the financial structure of the securitization. In each of these
documents, each dealer made statements of material fact about the certificate that it offered and
sold to the Bank.[1] A true copy of the prospectus supplement for each securitization is available
from the Securities Exchange Commission website.[2]

38.     On information and belief, many of the statements of material fact that each dealer
made in these documents were untrue or misleading. These untrue or misleading statements
included the following.

**A.     Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) and
Combined Loan-to-Value Ratios (CLTVs) of the Mortgage Loans in the Collateral
Pools of these Securitizations**

**1.     The materiality of LTVs and CLTVs**

39.     The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of
the mortgage loan to the value of the mortgaged property when the loan is made. For example, a
loan of $300,000 secured by property valued at $500,000 has an LTV of 60%; a loan of $450,000
on the same property has an LTV of 90%. LTV is one of the most important measures of the risk
of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization
are likewise one of the most important measures of the risk of certificates sold in that
securitization. LTV predicts the likelihood of default (the lower the LTV, the less likely that a
decline in the value of the property will wipe out the owner's equity, and thereby give the owner
an incentive to stop making mortgage payments and abandon the property). LTV also predicts the
severity of loss in the event of default (the lower the LTV, the greater the "cushion," so the

---

[1] Three of the certificates that the Bank purchased were certificates in re-securitizations of existing
certificates of mortgage-backed securities. In connection with the sale of those three certificates, the
dealers sent to the Bank a private placement memorandum for the re-securitization and prospectus
supplements filed with the SEC for the underlying securitizations. Details of the re-securitizations are
included in their respective schedules.

[2] A uniform resource locator for each prospectus supplement is included in Item 36 of each
schedule.

**COMPLAINT**

1    greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the

2    mortgage loan).

3          40.     The denominator in LTV (value of the mortgaged property) is determined by

4    either an appraisal or by the purchase price of the property. In a refinancing or home-equity loan,

5    there is no purchase price to use as the denominator. For a purchase, the agreed price may be

6    higher than the value of the property, and an appraisal should ensure that the LTV is calculated

7    using the actual value as the denominator. Sometimes in a purchase, the denominator is the lower

8    of the purchase price or the appraised value.

9          41.     Thus, an accurate appraisal is essential to an accurate LTV. In particular, a too-

10   high appraisal will understate, sometimes greatly, the risk of a loan. To return to the example

11   above, if the property whose actual value is $500,000 is appraised instead at $550,000, then the

12   LTV of the $300,000 loan falls from 60% to 54.5%, and the LTV of the $450,000 loan falls from

13   90% to 81.8%. In either case, the LTV based on the incorrect appraisal understates the risk of the

14   loan. It is also important to note that, the higher the correct LTV, the more the risk is understated

15   by an incorrect appraisal of any given magnitude. In the example above, there is little difference

16   in the risk of a loan with an LTV of 60% and one with an LTV of 54.5%; both are safe loans with

17   large equity cushions. But there is a very large difference in the risk of a loan with an LTV of

18   90% and one with an LTV of 81.8%. In the latter case, there is an equity cushion of 18.2% of the

19   value of the property, in the former, only 10%, just over half as much. Thus, an appraisal that

20   overvalues a property by just 10% produces an overstatement of more than 80% in the

21   homeowner's equity.

22         42.     LTV is an important measure of the risk of a mortgage loan, and the LTVs of the

23   mortgage loans in the collateral pool of a securitization are likewise an important measure of the

24   risk of certificates sold in that securitization. LTV helps to predict both the likelihood of default

25   and the severity of loss in case of default. A reasonable investor considers LTV important to the

26   decision whether to purchase a certificate in a securitization of mortgage loans. Even small

27   differences in the weighted average LTV of the mortgage loans in the collateral pool of a

28   securitization have a significant effect on the risk of each certificate sold in that securitization,

-11-
**COMPLAINT**

and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

\*

43.     Residential properties can secure more than one mortgage loan, a senior (or first) and one or more junior mortgage loans. The combined loan-to-value ratio (CLTV) is the ratio of the total outstanding principal balance of all loans (mortgages or home equity lines of credit) that the property secures to the appraised value of mortgaged property. To return to the example in paragraph 39, if a property valued at $500,000 secures a first mortgage loan of $300,000 and a second mortgage loan of $50,000, then it has a CLTV of 70%. If the first mortgage loan on the same property is $450,000 and the second is $50,000, then the CLTV is 100%.

44.     Like LTV, CLTV is an important measure of the risk of a mortgage loan, and the CLTVs of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. CLTV helps to predict the likelihood of default of a mortgage loan. A reasonable investor considers CLTV important to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average CLTV of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

**2.     Untrue or misleading statements about the LTVs and CLTVs of the mortgage loans in the collateral pools of these securitizations**

45.     In the prospectus supplement and other documents they sent to the Bank, the Defendants made statements about the LTVs and CLTVs of the mortgage loans in the collateral pools of these securitizations. Some of these statements were in so-called collateral stratification tables. Those tables divided the mortgage loans into several categories of LTV and CLTV and presented quantitative information about the loans in each category. All of the statements in each prospectus supplement about the LTVs and CLTVs of the mortgage loans in the collateral pools of Securitization Nos. 1 through 80 are incorporated herein by reference.

-12-
**COMPLAINT**

46.     On information and belief, these statements were materially untrue or misleading because (i) the stated LTVs and CLTVs of a significant number of those mortgage loans were lower than the actual LTVs or CLTVs; (ii) the Defendants omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pools were biased upward, so that stated LTVs and CLTVs based on those appraisals were lower than the true LTVs and CLTVs of those mortgage loans; or (iii) the stated CLTVs did not reflect second mortgages on a significant number of the properties that secured the mortgage loans in the collateral pools.

47.     Since the dates of Securitizations Nos. 1 through 80, loans in the collateral pools of each securitization have been foreclosed upon. In nearly all of the pools, the properties that secured those foreclosed loans were sold for much less than the value ascribed to those same properties in the LTV and CLTV data reported in the prospectus supplements and other documents that the Defendants sent to the Bank. The large difference cannot be explained by the declines in house prices in the areas in which those properties were located, even after taking account of the fact that properties in foreclosure sometimes sell for less than their fair market value. Analysis of data in an industry-standard database of securitized mortgage loans shows, for almost all of Securitizations Nos. 1 through 80, that the differences between the values ascribed to these properties and the prices at which the properties were sold in foreclosure are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding foreclosure sale). This unexplained difference is evidence that the values ascribed to those properties, and to all properties in the collateral pools, in the LTV and CLTV data reported in the prospectus supplements and other documents that the Defendants sent to the Bank were too high, the resulting LTVs and CLTVs were too low, and thus that the statements in the prospectus supplements and other documents sent to the Bank about the LTVs and CLTVs were untrue or misleading. The results of this analysis for nearly all of Securitizations Nos. 1 through 80 are stated in Item 47 of Schedules 1 through 80 of this complaint. The Bank incorporates into this

-13-

**COMPLAINT**

paragraph 47, and alleges as though fully set forth in this paragraph, the contents of Item 47 of the schedules.

48.     On information and belief, by these untrue and misleading statements, the Defendants materially understated the risk of every certificate that any of them sold to the Bank.

**B.   Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools of these Securitizations**

**1.   The materiality of occupancy status**

49.     Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less risky than mortgages on second homes and investment properties.

50.     Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan, and the percentage of loans in the collateral pool of a securitization that are secured by mortgages on primary residences rather than on second homes or investment properties is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans secured by primary residences, the lower the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans. Differences in the percentage of the mortgage loans in the collateral pool of a securitization that are secured by mortgages on primary residences have a significant effect on the risk of each certificate sold in that securitization and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

51.     Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not.

-14-

**COMPLAINT**

**2.**    **Untrue or misleading statements about the occupancy status of the properties
that secured the mortgage loans in the collateral pools of these securitizations**

52.    In the prospectus supplements and other documents that they sent to the Bank, the
Defendants made statements about the occupancy status of the properties that secured the
mortgage loans in the collateral pool of this securitization. Some of these statements were in so-
called collateral stratification tables. Those tables divided the mortgage loans into several
categories of occupancy status and presented quantitative information about the loans in each
category. All of the statements in the prospectus supplement and other documents about the
occupancy status of the mortgage loans in the collateral pool of this securitization are
incorporated herein by reference.

53.    On information and belief, these statements were materially untrue or misleading
because (i) the stated number of mortgage loans that were secured by primary residences was
higher than the actual number of loans in that category; (ii) the stated number of mortgage loans
that were secured by second homes was lower than the actual number of loans in that category;
(iii) the stated number of mortgage loans that were secured by investment properties was lower
than the actual number of loans in that category; or (iv) the Defendants omitted to state that the
occupancy status of a significant number of the properties that secured the mortgage loans in the
collateral pool was misstated because of fraud.

54.    On information and belief, by these untrue and misleading statements, the
Defendants materially understated the risk of every certificate that any of them sold to the Bank.

**C.    Failure to Disclose the Substantial Deterioration of LTV and Credit Score as
Predictors of the Performance of Mortgage Loans Securitized by the Defendant
Dealers**

55.    Investors in mortgage-backed securities, including the Bank, rely extensively on
certain characteristics of the mortgage loans in the collateral pool of a securitization to predict the
performance of those loans and thereby to determine the risk both of those loans and of the
certificates sold in that securitization. Reasonable investors consider information about these
characteristics important to the decision whether to purchase a certificate in a securitization of

-15-

**COMPLAINT**

mortgage loans. Among the most important of these characteristics are LTV, described above, and the credit score of the borrower.

56.     In the prospectus supplements and other documents they sent to the Bank, the Defendants made statements about the LTVs and credit scores of the mortgage loans in the collateral pools of each of Securitizations Nos. 1 through 80. All of those statements are incorporated herein by reference.

57.     During the time before each of Securitizations Nos. 1 through 80, the power of LTV and credit score to predict the performance of otherwise similar mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

58.     On information and belief, all statements that the Defendants made about the LTVs and credit scores of the mortgage loans in the collateral pools of these securitizations were misleading because the Defendants omitted to state that, in the time before these securitizations, loans that they or their affiliates securitized were nearly constant in reported weighted-average LTV and weighted-average credit score, yet performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

59.     On information and belief, by these misleading statements, the Defendants materially understated the risk of every certificate that any of them offered and sold to the Bank.

**D.     Untrue or Misleading Statements about the Underwriting Guidelines of the Originators of the Mortgage Loans in the Collateral Pools of these Securitizations**

**1.     The materiality of underwriting guidelines and the extent of compliance with them**

60.     Most or all originators of mortgage loans had written guidelines by which they evaluated applications for loans. An originator's guidelines, and the extent to which the originator complies with them, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are a substantial part of the collateral pool. A reasonable investor considers the

-16-

**COMPLAINT**

underwriting guidelines of each originator of a substantial part of the mortgage loans in the

collateral pool of a securitization, and the extent to which the originator complied with its

guidelines, important to the decision whether to purchase a certificate in that securitization.

Differences in those guidelines or in the extent to which an originator complied with them have a

significant effect on the risk of each certificate sold in that securitization and thus are important to

the decision of a reasonable investor whether to purchase any such certificate.

> **2.    Untrue or misleading statements by the Defendants about the underwriting
> guidelines of the originators of the mortgage loans in the collateral pools of
> these securitizations and about the extent of their compliance with those
> guidelines**

61.    In the prospectus supplements, the Defendants made statements about the

underwriting guidelines of the originators of the mortgage loans in the collateral pools of

Securitizations Nos. 1 through 80. Those statements are described in Item 61 of Schedules 1

through 80 of this complaint. The Bank incorporates into this paragraph 61, and alleges as though

fully set forth in this paragraph, the contents of Item 61 of the schedules.

62.    On information and belief, these statements were materially untrue or misleading

because the Defendants omitted to state that (a) the originators were making frequent, and

increasingly frequent, exceptions to those underwriting guidelines; (b) the originators were

making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no

compensating factor was present; and (c) the originators were failing frequently, and increasingly

frequently, to follow quality-assurance practices intended to detect and prevent fraud.

63.    On information and belief, by these untrue and misleading statements, the

Defendants materially understated the risk of every certificate that any of them offered and sold to

the Bank.

-17-

**COMPLAINT**

### FIRST CAUSE OF ACTION
## UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES
### (Cal. Corporations Code §§ 25401, 25501)

| *Against Defendant:* | *In connection with Securitizations:* |
|---|---|
| Credit Suisse | Securitizations Nos. 1 through 5, and 7 through 10 |
| Deutsche | Securitizations Nos. 11 through 16, and 18 through 31 |
| Bear Stearns | Securitizations Nos. 32 through 35, 40, and 41 |
| Greenwich Capital | Securitizations Nos. 42 and 44 |
| Morgan Stanley | Securitizations Nos. 45 through 47 |
| UBS | Securitizations Nos. 48 through 51, and 53 through 59 |
| Banc of America | Securitizations Nos. 60 through 70 |
| Countrywide | Securitizations Nos. 75 through 80 |

64.     The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 63.

65.     In doing the acts alleged, the Defendants named above violated Sections 25401 and 25501 of the California Corporations Code in the sale to the Bank of the certificates in the securitizations referred to above.

66.     This action is brought within two years after the discovery of the untrue and misleading statements in the prospectus supplements and other documents that the Defendants sent to the Bank, and within five years of the Bank's purchase of these certificates, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, the Bank did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements and other documents.

67.     Under Cal. Corp. Code §§ 25401 and 25501, the Bank is entitled to recover the consideration that it paid for each of these certificates, plus interest at the legal rate from the date of purchase to the date on which it recovers the purchase price, minus the amount of income it has received on the certificate. Pursuant to § 25501, the Bank will tender each certificate before entry of judgment.

-18-
**COMPLAINT**

## SECOND CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS IN REGISTRATION STATEMENTS
(Section 11 of the Securities Act of 1933)

| *Against Defendant:* | *In connection with Securitizations:* |
|---|---|
| Credit Suisse | Securitizations Nos. 7 through 10 |
| Deutsche | Securitizations Nos. 18 through 31 |
| Bear Stearns | Securitizations Nos. 40 and 41 |
| SAMI II | Securitization No. 40 |
| Greenwich Capital | Securitization No. 44 |
| Morgan Stanley | Securitizations Nos. 45 through 47 |
| UBS | Securitizations Nos. 54 through 59 |
| Countrywide | Securitizations Nos. 76 through 80 |
| CWALT | Securitizations Nos. 7, 9, 10, 18 through 31, 41, 44 through 47, 54 through 59, 76 through 80 |

68.    The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 67.

69.    In doing the acts alleged, the Defendants named above violated Section 11 of the Securities Act of 1933 in the sale to the Bank of the certificates in the securitizations referred to above.

70.    The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 36 of Schedules 1 through 80.

71.    SAMI II and CWALT are depositors of the securitizations listed above and therefore are the issuers of the certificates in those securitizations. Credit Suisse, Deutsche, Bear Stearns, Greenwich Capital, Morgan Stanley, UBS and Countrywide acted as underwriters of the certificates listed above.

72.    This action is brought within one year after the discovery of the untrue and misleading statements in the registration statements, as amended by the prospectus supplements, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others.

-19-

**COMPLAINT**

Despite having exercised reasonable diligence, the Bank did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements.

73.     The prospectus supplements contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 37 through 63.

74.     The Bank expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the Securities Act of 1933.

75.     Based upon the truth of the statements made in the prospectus supplements, the Bank purchased these certificates.

76.     The Bank did not know when it purchased these certificates that the statements in the prospectus supplements were untrue or misleading.

77.     The Bank has suffered a loss on each of these certificates.

78.     The Bank is entitled to recover damages as described in 15 U.S.C. § 77k(e).

### THIRD CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES
#### (Section 12(a)(2) of the Securities Act of 1933)

| Against Defendant: | In connection with Securitizations: |
| --- | --- |
| Credit Suisse | Securitizations Nos. 7 through 10 |
| Deutsche | Securitizations Nos. 18 through 31 |
| Bear Stearns | Securitizations Nos. 40 and 41 |
| SAMI II | Securitization No. 40 |
| Greenwich Capital | Securitization No. 44 |
| Morgan Stanley | Securitizations Nos. 45 through 47 |
| UBS | Securitizations Nos. 54 through 59 |
| Countrywide | Securitizations Nos. 76 through 80 |
| CWALT | Securitizations Nos. 7, 9, 10, 18 through 31, 41, 44 through 47, 54 through 59, 76 through 80 |

79.     The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 78.

-20-

**COMPLAINT**

80.     In doing the acts alleged, the Defendants named above violated Section 12(a)(2) of the Securities Act of 1933 in the sale to the Bank of the certificates in the securitizations referred to above.

81.     This action is brought within one year after the discovery of the untrue and misleading statements in the prospectus supplements, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, the Bank did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements.

82.     SAMI II and CWALT are depositors of the securitizations listed above and therefore are the issuers of the certificates in those securitizations. In connection with the offer and sale of these certificates to the Bank, the issuers also made all of the statements of material fact about these certificates that were in the prospectus supplement and other documents that the dealers sent to the Bank.

83.     The Bank expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the Securities Act of 1933.

84.     The Defendants named above, for their own financial gain, solicited the Bank to purchase these certificates, and sold the certificates to the Bank, by means of the prospectus supplements.

85.     Based upon the truth of the statements made in the prospectus supplements, the Bank purchased these certificates.

86.     The prospectus supplements contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

87.     The Bank did not know when it purchased these certificates that the statements in the prospectus supplements were untrue or misleading.

88.     The Bank has suffered a loss on each of these certificates.

-21-

**COMPLAINT**

89.     The Bank is entitled to recover the consideration that it paid for each of these certificates, plus interest at the legal rate from the date of purchase to the date on which it recovers the purchase price, minus the amount of income it has received on each certificate. The Bank will tender each certificate before entry of judgment.

### FOURTH CAUSE OF ACTION
### LIABILITY OF CONTROLLING PERSON
(Section 15 of the Securities Act of 1933)

| *Against Defendant:* | *In connection with Securitizations:* |
| --- | --- |
| **The Bear Stearns Companies, Inc..** | **Securitization No. 40** |
| **Countrywide Financial Corporation** | **Securitizations Nos. 7, 9, 10, 18 through 31, 41, 44 through 47, 54 through 59, 76 through 80** |

90.     The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 89.

91.     The Defendants named above are liable because, in doing the acts alleged, persons they controlled violated Sections 11 and 12(a)(2) of the Securities Act of 1933 in the sale to the Bank of the certificates in the securitizations referred to above.

92.     The Bear Stearns Companies, Inc. by or through stock ownership, agency, or otherwise, controlled SAMI II within the meaning of Section 15 of the Securities Act of 1933.

93.     Countrywide Financial Corporation by or through stock ownership, agency, or otherwise, controlled CWALT within the meaning of Section 15 of the Securities Act of 1933.

94.     In doing the acts alleged, each controlled person named in paragraphs 92 through 93 is liable under Sections 11 and 12(a)(2) of the Securities Act of 1933 for the reasons alleged in paragraphs 1 through 89.

95.     Each Defendant named above is therefore jointly and severally liable with and to the same extent as the person it controlled.

**COMPLAINT**

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

### (Cal. Civil Code §§ 1572 *et seq.* and 1709 *et seq.*, and Common Law)

| Against Defendant: | In connection with Securitizations: |
|---|---|
| Credit Suisse | Securitizations Nos. 1 through 10 |
| CSFB Mortgage Securities | Securitizations Nos. 1 through 3, 5, and 6 |
| Deutsche | Securitizations Nos. 11 through 31 |
| Deutsche Alt-A | Securitizations Nos. 12 through 16 |
| Bear Stearns | Securitizations Nos. 32 through 41 |
| SAMI II | Securitizations Nos. 32, 33, 35, 37, 39, and 40 |
| Greenwich Capital | Securitizations Nos. 42 through 44 |
| Greenwich Capital Acceptance | Securitization No. 42 |
| Morgan Stanley | Securitizations Nos. 45 through 47 |
| UBS | Securitizations Nos. 48 through 59 |
| MAST | Securitizations Nos. 48 through 53 |
| Banc of America | Securitizations Nos. 60 through 74 |
| Banc of America Funding | Securitizations Nos. 60 through 63, 68, 71, and 73 |
| Banc of America Mortgage Securities | Securitizations Nos. 64 through 67, 69, 70, and 72 |
| Countrywide | Securitizations Nos. 75 through 80 |
| CWALT | Securitizations Nos. 7, 9, 10, 17 through 31, 41, 43 through 47, 54 through 59, 74, and 76 through 80 |

96.     The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 95.

97.     As alleged above, the Defendants named above made untrue or misleading representations regarding the LTVs and CLTVs of the mortgage loans in the collateral pools of these securitizations, the occupancy status of properties that secured the mortgage loans in these securitizations, underwriting guidelines of the originators, and related matters.

98.     In making the representations referred to above, the Defendants intended to induce the Bank to rely on those representations in making its decision to purchase these certificates in these securitizations. The Defendants expected that the Bank would rely on those representations in deciding whether to purchase these certificates.

99.     When the Defendants made these representations, they had no reasonable ground for believing them to be true. Upon information and belief, the Defendants had access to the files on the mortgage loans in the collateral pools for these securitizations, and, had the Defendants

-23-

**COMPLAINT**

inspected those files, they would have learned that the information they gave the Bank contained untrue or misleading statements. In addition, upon information and belief, the Defendants hired one or more "due-diligence contractors" to ascertain whether the mortgage loans in the collateral pools complied with the representations and warranties made about those loans, and these contractors reported to the Defendants that a material number of the loans in the collateral pools were materially different from the descriptions of those loans in the prospectus supplements. Thus, on information and belief, the Defendants had access to information that either did make the Defendants aware, or would or could have made them aware had they heeded that information, that the representations they made to the Bank contained materially untrue or misleading statements about the mortgage loans in the collateral pools.

100.   The Bank reasonably and justifiably relied on the representations described above in analyzing and deciding to purchase these certificates. Had the Defendants not made these false and misleading representations, the Bank would not have purchased these certificates.

101.   When it purchased these certificates, the Bank did not know about the untrue and misleading statements alleged herein.

102.   As a direct and proximate result of the negligent misrepresentations by the Defendants, the Bank was damaged in an amount to be proved at trial.

## SIXTH CAUSE OF ACTION

### RESCISSION OF CONTRACT

**(California Civil Code §§ 1689 and 1710, and Common Law)**

| *Against Defendant:* | *In connection with Securitizations:* |
|---|---|
| Credit Suisse | Securitizations Nos. 1 through 10 |
| Deutsche | Securitizations Nos. 11 through 31 |
| Bear Stearns | Securitizations Nos. 32 through 41 |
| Greenwich Capital | Securitizations Nos. 42 through 44 |
| Morgan Stanley | Securitizations Nos. 45 through 47 |
| UBS | Securitizations Nos. 48 through 59 |
| Banc of America | Securitizations Nos. 60 through 74 |
| Countrywide | Securitizations Nos. 75 through 80 |

-24-

**COMPLAINT**

103.   The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 102.

104.   The Bank purchased each certificate pursuant to a contract in writing between the Bank and the dealer from which it purchased that certificate. Each contract stated the consideration that the Bank paid each dealer for each certificate.

105.   In making each contract to purchase the certificates, the Bank relied on the truth of the statements that the Defendants named above made in the prospectus supplements. Because those statements were untrue or misleading, the Bank was mistaken about its basic assumptions underlying its purchase of each certificate, and this mistake had a material adverse effect on the agreed-upon exchange represented by the Bank's purchase of each certificate. Because the Defendants named above were responsible to provide accurate information in the prospectus supplements, the Bank did not assume, nor does it bear, the risk of the fundamental mistake underlying its decision to purchase these certificates.

106.   The Defendants named above obtained the consent of the Bank to the contracts to purchase the certificates by means of their assertion, as facts, of that which was not true, when those Defendants had no reasonable ground for believing those assertions to be true.

107.   Pursuant to Cal. Civil Code. § 1689 et seq., the Bank is entitled to rescind, and does hereby demand the rescission of, each contract for the sale and purchase of these certificates. The Bank offers to restore all benefits that it has received under those contracts and is entitled to recover all consideration that it paid under them.

## PRAYER FOR RELIEF

WHEREFORE, the Bank respectfully demands judgment as follows:

On the first cause of action, the consideration that the Bank paid for each certificate with interest thereon, less the amount of any income that the Bank has received thereon, upon the Bank's tender of each certificate;

On the second cause of action, damages in an amount to be determined at trial;

-25-

**COMPLAINT**

1    On the third cause of action, the consideration that the Bank paid for each certificate with

2  interest thereon, less the amount of any income that the Bank has received thereon, upon the

3  Bank's tender of each certificate;

4    On the fourth cause of action, the consideration that the Bank paid for each certificate

5  with interest thereon, less the amount of any income that the Bank has received thereon, upon the

6  Bank's tender of each certificate;

7    On the fifth cause of action, damages in an amount to be determined at trial;

8    On the sixth cause of action, the consideration that the Bank paid for each certificate with

9  interest thereon, less the amount of any income that the Bank has received thereon, upon the

10  Bank's tender of each certificate;

11    All together with the costs of this action, the reasonable fees of the Bank's attorneys in

12  this action, and such other and further relief as the Court may deem just.

13                    **JURY DEMAND**

14    THE BANK DEMANDS TRIAL BY JURY OF ALL ISSUES SO TRIABLE.

15  Dated:  March 15, 2010                    GOODIN, MACBRIDE, SQUERI,
                                             DAY & LAMPREY, LLP
16
                                             GRAIS & ELLSWORTH LLP
17

18
                                             By _____
19
                                                  Robert A. Goodin
20                                           Attorneys for Plaintiff
                                             Federal Home Loan Bank of San Francisco
21  3428/001/X117443.v1

22

23

24

25

26

27

28

-26-
**COMPLAINT**

*EXHIBIT 52*

EX-10.1 2 d72557exv10w1.htm EX-10.1

**Exhibit 10.1**

| | | |
|---|---|---|
| ☐ Small Claims | ☐ County Court | ☑ District Court |
| ☐ Probate Court | ☐ Juvenile Court | ☐ Water Court |

Second Judicial District — City and County of Denver
Court Address: Denver District Court
1437 Bannock Street, Denver, CO 80202

---

**Plaintiff:** UNITED WESTERN BANK

v.

**Defendants:** COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME MORTGAGE LOANS, INC., CWALT, INC., CWMBS, INC., COUNTRYWIDE CAPITAL MARKETS, COUNTRYWIDE SECURITIES CORPORATION, ERIC P. SIERACKI, THOMAS K. MCLAUGHLIN, STANFORD L. KURLAND, DAVID A. SPECTOR, BANK OF AMERICA CORPORATION, and UBS SECURITIES LLC.

<u>Attorneys for Plaintiff:</u>

Kip B. Shuman (#23593)
Rusty E. Glenn (#39183)
THE SHUMAN LAW FIRM
885 Arapahoe Avenue
Boulder, CO 80302
(303) 861-3003
(303) 484-4886 (fax)

**EFILED Document**
**CO Denver County District Court 2nd JD**
**Filing Date: Apr 23 2010 4:06PM MDT**
**Filing ID: 30756945**
**Review Clerk: Colin D Quinn**

↑   **COURT**   ↑

---

Case Number:

Ctrm:

**COMPLAINT FOR VIOLATION OF THE COLORADO SECURITIES ACT, THE FEDERAL SECURITIES ACT OF 1933 AND JURY DEMAND**

**TABLE OF CONTENTS**

I. NATURE OF THE ACTION                                                                 1

II. THE PARTIES                                                                          2

III. JURISDICTION AND VENUE                                                             7

IV. BACKGROUND INFORMATION                                                             8

    A. Securitization of Mortgage Loans                             8

    B. Countrywide Covertly Abandons its Conservative Lending Practices    10

    C. Countrywide's Nontraditional and Risky Loan Products         12

        1. Interest Only Mortgage Loans         12

        2. Stated Income or "No Doc" Mortgage loans    13

V. REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS USED IN OFFERING THE
    SECURITIES FOR SALE TO THE PLAINTIFF                           14

    A. The CWMBS February 8, 2005 Registration Statement and Prospectus Supplements Issued Thereunder    14

    B. The CWMBS July 25, 2005 Registration Statement and Prospectus Supplements Issued Thereunder    15

    C. The CWALT, Inc. July 25, 2005 Registration Statement and Prospectus Supplements Issued Thereunder    15

VI. FALSE AND MISLEADING DISCLOSURES IN THE REGISTRATION STATEMENTS AND
    PROSPECTUS SUPPLEMENTS REGARDING COUNTRYWIDE'S ADHERENCE TO ITS
    UNDERWRITING GUIDELINES                                          16

    A. Independent Appraisals of Properties                         17

        1. Former Appraisers Describe Countrywide's Blacklisting of Appraisers    18

        2. Countrywide's Internal E-mails Show the Company's Inflated Appraisals    20

    B. The Mortgage Mortgage loans' Loan-to-Value (LTV) Ratio       20

    C. Reliance on Borrowers' Ability to Repay                      25

- i -

|  |  |
|---|---|
| 1. Countrywide's Internal Quality-Control Reviews Have Shown That the Company Did Not Adequately Assess Borrowers' Ability to Repay | 26 |
| 2. Former Countrywide Customers State That Countrywide Disregarded Borrowers' Ability to Repay | 28 |
| 3. Internal E-mails Reflect Countrywide's Disregard for Borrowers' Ability to Repay | 29 |
| D. Verification of Borrowers' Information | 32 |
| 1. Countrywide Created its Structured Loan Desk to Avoid Having to Verify Borrowers' Information | 33 |
| 2. Former Employees Describe Countrywide's Failure to Verify Borrowers' Information | 35 |
| 3. Countrywide Incentivized Employees to Not Verify Borrowers' Information | 37 |
| 4. Re-Underwriting of Loan Files Has Identified Failures to Verify Borrowers' Information | 39 |
| 5. Internal E-mails Show That Countrywide Knew That Borrowers' Information Was Not Being Verified | 40 |
| E. Case-by-Case Underwriting Exceptions | 41 |
| 1. Former Countrywide Employees Describe the Company's Willingness to Liberally Grant Underwriting Exceptions | 42 |
| 2. Internal E-mails Show That Countrywide Knew That the Company Was Abandoning Its Case-by-Case Underwriting Standards | 44 |
| F. Compliance With Laws | 44 |
| 1. States and Local Governments Have Sued Countrywide for Violation of State and Federal Laws | 44 |
| 2. Private Individuals Have Also Sued Countrywide for Violations of State and Local Laws | 46 |
| VII. PLAINTIFF AND OTHYER INVESTORS BEGIN TO LEARN THE TRUTH ABOUT COUNTRYWIDE'S LENDING PRACTICES | 46 |
| VIII. PLAINTIFF'S DAMAGES ARISING FROM THE FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS | 49 |

- ii -

IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR                                    50

X. THE WASHINGTON STATE PLUMBING, LUTHER AND MAINE STATE *RETIREMENT SYSTEM
ACTIONS AND TOLLING OF PLAINTIFF'S* CLAIMS                                       50

XI. PRAYER FOR RELIEF                                                           65

XII. JURY TRIAL REQUESTED                                                       65

- iii -

EXHIBIT   52   -427-

## I. NATURE OF THE ACTION

1. This Complaint is brought pursuant to the Colorado Securities Act and the federal Securities Act of 1933 on behalf of United Western Bank to recover losses suffered from its investments in certain mortgage-backed securities (the "Securities") issued by Countrywide Financial Corporation, and various of its subsidiaries (collectively referred to herein as "Countrywide").

2. Countrywide is the now-notorious originator and re-packager of mortgage loans into billions of dollars worth of mortgage-backed bonds, the value of which collapsed when disclosures regarding Countrywide's poor underwriting practices (resulting in poor quality collateral for the mortgage-backed bonds) came to light. Sen. Charles Schumer, a member of the U.S. Senate Banking Committee, opined that "Countrywide helped cause the housing crisis we're now in."

3. Plaintiff alleges that the Registration Statement and Prospectus Supplements used to market these Securities included numerous misrepresentations about: 1) the quality of the mortgage pools underlying the issuing trusts; 2) the underwriting standards employed by Countrywide in generating the billions of dollars of mortgage loans it used to collateralize its bond issuances, including the soundness of appraisals used in the process, the use of correct loan-to-value ratios, the failure to verify borrowers information and the huge volume of "exceptions" to underwriting standards that allowed unqualified applicants to be approved for mortgage loans.

4. Based upon the representations in the Registration Statements and Prospectuses used in the offerings of the Securities purchased by the Plaintiff, ratings agencies including Moody's and Standard & Poors assigned "AAA" ratings to the Securities.

- 1 -

5. As a result of the misrepresentations complained of herein, Plaintiff paid "AAA" bond prices for the Securities that were far riskier than represented.

6. By late 2007, the mortgage loans held by the issuing trusts began suffering delinquencies and foreclosures, which revealed that the underlying collateral was insufficient to protect bondholders against losses.

7. The Securities were downgraded by the ratings agencies, and currently trade at significantly below the issuing price. As a result, Plaintiff has suffered tens of millions of dollars in losses.

## II. THE PARTIES

8. Plaintiff United Western Bank is a federally chartered savings bank that originates commercial real estate, commercial, residential and commercial construction and development, multifamily, leasing, energy and consumer mortgage loans. At the time of the purchases at issue, Plaintiff was a wholesale lending institution known as Matrix Capital Bank that bought residential mortgage loans and mortgage-backed securities for its own portfolio. Matrix Capital Bank changed its name to United Western Bank in September of 2006. Its headquarters is within this judicial district at 700 17th Street, Suite 2100, Denver, Colorado.

9. Plaintiff purchased approximately $108.4 million in face value of Mortgage Pass-Through Securities (the "Securities") from Countrywide between July 29, 2005 and October 12, 2006 as follows:

a)    On or about July 29, 2005, Plaintiff purchased $31,500,000 in face value of CWALT Alternative Loan Trust 2005-J10, Class 2-A-3 (CUSIP No. 12668ABT1, Ticker No. CWALT 2005-J10 2A3) at a price of $98.50 per hundred dollars of face value;

- 2 -

b)   On or about October 6, 2005, Plaintiff purchased $16,227,000 in face value of CWALT Alternative Loan Trust 2005-43, Class 1-A-2 (CUSIP No. 12667G5T6, Ticker No. CWALT 2005-43 1A2) at a price of $99.64 from Defendant UBS Securities LLC;

c)   On or about October 5, 2005, Plaintiff purchased $20,000,000 in face value of CWALT Alternative Loan Trust 2005-J13, Class 1-A-3 (CUSIP No. 12668AB95, Ticker No. CWALT 2005-J13- 1A3) at a price of 98.09;

d)   On or about October 28, 2005, Plaintiff purchased $34,381,000 in face value of CWHL Mortgage Pass-Through Trust 2005-HYB8, Class 4-A-2 (CUSIP No. 126694QK7, Ticker No. CWHL 2005-HYB8 4A2) at a price of $99.81; and

e)   On or about November 22, 2005, Plaintiff purchased $2,965,173.33 in face value of CWHL Mortgage Pass-Through Trust 2005-HYB3, Class 2-A-3A (CUSIP No. 12669GE56, Ticker No. CWHL 2005-HYB3 2A3A) at a price of $98.30; and

f)   On or about October 12, 2006, Plaintiff purchased $2,855,292.86 in face value of CHL Mortgage Pass-Through Trust 2005-31, Class 2-A-1 (CUSIP No. 126694UL0, Ticker No. CWHL 2005-31-2-A-1) at a price of $99.50.

The value of each of these Securities is currently significantly lower than the purchase price, causing material damages to Plaintiff in an amount to be proven at trial.

10. Defendant Countrywide Financial Corporation ("CFC") is a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California.

- 3 -

EXHIBIT   52   -430-

Defendant CFC, itself or through its subsidiaries, writes, sells, and services single-family home mortgages, home equity mortgage loans and commercial mortgages. It also buys and sells mortgage loans, offers asset management and brokerage services, and provides insurance products. Defendant CFC acted as an underwriter for each of the Securities within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Securities were sold to Plaintiff.

11. Defendant Countrywide Home Mortgage loans, Inc. ("CHL") is a direct wholly-owned subsidiary of Defendant CFC. CHL is engaged in the mortgage banking business, and originates, purchases, sells and services mortgage loans. CHL's principal executive offices located at 4500 Park Granada, Calabasas, California.

12. Defendant CWALT, Inc. ("CWALT") is a Delaware corporation and a limited-purpose finance subsidiary of CFC with its principal executive offices at 4500 Park Granada, Calabasas, California. Defendant CWALT was the Depositor securitization of the Issuing Trusts and was the Registrant for the Registration Statements that it filed with the SEC, corresponding to the securitizations. Defendant CWALT served as the "sponsor" or "seller" of the Securities, meaning that it provided the pools of mortgage loans to the Issuing Trusts upon which the Securities were based, and was thus an "Issuer" of the Securities within the meaning of 15 U.S.C. § 77b(a)(4).

13. Defendant CWMBS, Inc. ("CWMBS") is a Delaware corporation and a limited-purpose finance subsidiary of CFC with its principal executive offices at 4500 Park Granada, Calabasas, California. Defendant CWMBS was the Depositor into the securitization of the Issuing Trusts and was the Registrant for the Registration Statements that it filed with the SEC. Defendant CWMBS served as the "sponsor" or "seller" of the Securities, meaning that it

- 4 -

EXHIBIT   52   -431-

provided the pools of mortgage loans to the Issuing Trusts upon which the Securities were based, and was thus an "Issuer" of the Securities within the meaning of 15 U.S.C. § 77b(a)(4).

14. Defendants CFC, CHL, CWALT and CWMBS are sometimes collectively referred to herein as the "Issuer Defendants."

15. Defendant Countrywide Capital Markets ("CCM") is a direct, wholly-owned subsidiary of Defendant CFC. CCM's principal executive offices are at 4500 Park Granada, Calabasas, California. Defendant CCM acted as an underwriter for each of the Securities within the meaning of 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant through which the Securities were sold to Plaintiff.

16. Defendant Countrywide Securities Corporation ("CSC"), a wholly-owned subsidiary of Defendant CCM, and an indirect subsidiary of CFC, is a California corporation with its principal executive offices at 4500 Park Granada, Calabasas, California. Defendant CSC trades securities and underwrites offerings of mortgage-backed securities. Defendant CSC acted as an underwriter for each of the Securities within the meaning of the Securities Act. 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Securities were sold to Plaintiff.

17. Defendant UBS Securities LLC ("UBS") acted as an underwriter for CWALT Alternative Loan Trust 2005-43 within the meaning of 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the Securities were sold to Plaintiff.

18. Defendants CFC, CCM, CSC and UBS are sometimes hereinafter collectively referred to as the "Underwriter Defendants."

19. Defendant Stanford L. Kurland ("Kurland") was, at all relevant times, the Chief Executive Officer, President and Chairman of the Board of Directors of Defendant CWALT and

- 5 -

exv10w1                                                                    Page 10 of 70
Case 2:10-cv-00302-MRP -MAN    Document 202-3    Filed 09/27/10    Page 81 of 141    Page ID
                                        #:8219

CWMBS. He was concurrently the Executive Vice President and Chief Operating Officer of Defendant CFC. Kurland signed the two Registration Statements at issue herein. Kurland resides at 6005 William Bent Road, Hidden Hills, California and is employed by PennyMac, a mortgage company in Calabasas, California, that invests in distressed mortgage loans of the type that Kurland helped originate as a Countrywide executive.

20. Defendant Eric P. Sieracki ("Sieracki") was, at all relevant times, the Executive Vice President, CFO, Treasurer and a member of the Board of Directors of Defendants CWALT and CWMBS. He was concurrently the Executive Managing Director and Chief Financial Officer of Defendant CFC. Sieracki signed the two Registration Statements at issue herein. Sieracki was sued by the SEC in June 2009, along with Countrywide's former CEO and COO—Angelo Mozilo and David Sambol, respectively—for securities fraud. *See Securities & Exchange Commission v. Mozilo*, 09-cv-03994 (VBF) (CD. Cal. 2009). The SEC complaint alleges that Sieracki and his former colleagues failed to disclose the risks that Countrywide undertook by issuing mortgage loans in violation of its stated underwriting guidelines. Sieracki resides at 3761 Berry Drive, Studio City, California.

21. Defendant Thomas K. McLaughlin ("McLaughlin") was Countrywide's Executive Managing Director and Chief Financial Officer from 2004 until his resignation effective April 1, 2005. Defendant McLaughlin was also Vice president, Chief Financial Officer, Treasurer and a Director of CWMBS until his resignation. Defendant McLaughlin signed the CWMBS February 2005 Registration Statement.

22. Defendant David A. Spector ("Spector") was, at all relevant times, Vice President and a member of the Board of Directors of Defendant CWALT and CWMBS. He was concurrently the Senior Managing Director of Secondary Marketing of Defendant CFC. Spector

- 6 -

signed the two Registration Statements at issue herein. Like Kurland, Spector is also employed by PennyMac.

23. Defendants Kurland, Sieracki, McLaughlin and Spector are sometimes hereinafter collectively referred to as the "Individual Defendants."

24. Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation with its principal executive offices at 100 North Tryon Street, Charlotte, North Carolina. Bank of America is one of the world's largest financial institutions, serving individual consumers, small and middle-market businesses and large corporations with a full range of banking, investing, asset-management and other financial and risk-management products and services. Countrywide merged with Bank of America on July 1, 2008 and Bank of America has consequently become the largest mortgage originator in the country. As discussed herein, Defendant Bank of America is fully combining its business with that of Countrywide.

25. At all relevant times, the Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Any allegations about the acts of corporate Defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

### III. JURISDICTION AND VENUE

26. Jurisdiction of this Court is founded upon C.R.S. § 13-1-124. The federal claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o. Pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v; and 28 U.S.C. § 1337, these claims may be filed in this court and may not be removed to federal court.

- 7 -

---

EXHIBIT   52   -434-

Case 2:10-cv-00302-MRP -MAN   Document 202-3   Filed 09/27/10   Page 83 of 141   Page ID
#:8221

27. Venue is proper in this District pursuant to C.R.C.P. 98; 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Defendants can be found and transact business in this judicial district, many of the acts and practices giving rise to Plaintiff's claims occurred in substantial part in this District and Denver is the county in which the alleged violation of the law took place.

## IV. BACKGROUND INFORMATION

28. Prior to the 1990s, mortgage loans were typically granted by a bank to a borrower, and the bank kept the risk of nonpayment on the loan, which gave the bank every incentive to make sure that the mortgage loans were prudent risks. With the advent of loan securitizations in the 1990s, the market changed to where banks and other loan "originators" sold the mortgage loans to packagers of mortgage-backed bonds.

### A. Securitization of Mortgage Loans

29. Traditionally, the model for a mortgage loan involved a bank extending a loan to a home owner in exchange for a promissory note from the home owner to repay the principal plus interest. The bank held a lien against the house as collateral in the event that the owner defaulted on the obligation. The bank held the loan until it matured and was subject to the risk of nonpayment by the owner. Under this simple model, the bank had a financial incentive to ensure that the owner had the financial ability to repay the note, and that the underlying collateral had sufficient value to fully secure the bank against any default.

30. Beginning in the 1990s, banks and other lenders introduced financial "innovations" in the form of asset securitization to finance an expanding mortgage market. In a securitization, large numbers of mortgage loans are sold to the issuer and pooled together as one large "pool" of collateral underlying bonds that are then sold to investors. Unlike the simple

- 8 -

EXHIBIT   52   -435-

lending model described above, the loan originator is no longer subject to the risk that the owner may default — this risk is sold along with the mortgage loans to the issuer of the bonds.

31. When mortgage borrowers make interest and principal payments as required by their mortgage loans, the cash-flow is distributed to the holders of the bonds in order of priority of the specific "tranche" or slice of the bond that the investor has purchased. The highest (sometimes called "senior") tranche is the first to receive its share of the mortgage proceeds and is the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgage loans. The senior tranches receive the highest ratings by ratings agencies (typically "AAA"), and pay a lower rate of interest to bondholders than less senior tranches.

32. In a typical securitization transaction, the participants are: 1) the servicer of the mortgage loans to be securitized (the "Servicer"); 2) the depositor of the mortgage loans in a trust for securitization (the "Depositor"); 3) the entity responsible for issuing the mortgage-backed bonds (the "Issuing Trust"); 4) the underwriter of the mortgage-backed bonds (the "Underwriter"); and 5) the investors in the mortgage-backed bonds.

33. The process of securitization begins with the sale of mortgage loans by the bank or other originator to the "Depositor" in exchange for cash. The originator makes a significant profit on these sales, and gets rid of the risk of non-payment by the borrower. The Depositor then sells these mortgage loans to the trust, in exchange for "Securities" issued to the Depositor. These Securities are then sold to (or through) an Underwriter, who sells the bonds to public investors. In each of these transactions, the Depositor, the Trust and the Underwriter each have an incentive to ensure the quality of the mortgage loans underlying the bonds.

34. In the securitizations at issue in this action, Countrywide entities filled roles 1 through 4 as identified in paragraph 32, above (with Defendant UBS also simultaneously acting

- 9 -

in role 4 as an underwriter of one of the Securities). Under this set-up, the transactions among the Sponsor, Depositor, Issuing Trusts and Underwriter were not arms-length transactions, as Countrywide controlled each entity. This structure provided essentially no "checks and balances" to the loan origination process, and provided every incentive for Countrywide to sacrifice loan quality for loan volume, because the greater the loan volume, the greater the revenue for Countrywide, and the risk of loss from bad mortgage loans was absorbed by unwitting investors.

**B. Countrywide Covertly Abandons its Conservative Lending Practices**

35.  Until 2003, Countrywide primarily made traditional first-lien home mortgage loans to individuals with strong credit histories. Such "conforming" mortgage loans are generally safe for lenders, and are regularly sold to Fannie Mae and Freddie Mac, the government-sponsored entities ("GSEs") that provide liquidity to the home mortgage market.[1]

36.  In May 2003, a "culture change" was implemented at Countrywide designed to increase Countrywide's market share of 13% to an enormous and unprecedented 30% share of all mortgage loans in the United States.

37.  During a conference call on July 22, 2003, Countrywide's CEO Angelo Mozilo stated that his goal for Countrywide was "to dominate the purchase market and to get our overall market share to the ultimate 30% by 2006, 2007." Mozilo reiterated this goal during a January 27, 2004 conference call, that Countrywide's "goal is market dominance, and we are talking 30% origination market share by 2008." When challenged about the ramifications that such massive growth of market share might have on loan quality, Mozilo assured the market that "going for

---

[1]  A "conforming" loan is one that conforms to GSE guidelines, including maximum loan amount, debt-to-income ratio limits, and documentation requirements. "Nonconforming" mortgage loans are those that do not conform to GSE guidelines.

- 10 -

30% mortgage share here is totally unrelated to quality of mortgage loans we go after . . . there will be no compromise in that as we grow market share."

38. Again, during a May 24, 2005 investor conference, Mozilo explained that "it's a question of dominance"—the Company did not want to be "second place or third place" to anyone in issuing mortgage loans. Defendant Kurland reiterated Mozilo's thoughts: "In the past, we talked about origination market share reaching 30% by 2008 and, as we've noted, this was intended to be a stretch goal as it is part of our culture, part of our nature to set aggressive targets."

39. According to a confidential witness cited by the Plaintiffs in *re Countrywide Financial Corporation Securities Litigation*, No. 07-05295 MRP (MANx) (C.D. Cal.), Mozilo's plan to capture 30% of the mortgage market was put into action, in a Company-wide mandate, by Mozilo and Countrywide's President and Chief Operating Officer David Sambol.[2] Under this mandate, Countrywide shifted its focus away from fixed-rate mortgage loans to nontraditional (and more lucrative) loan products, and put its loan production machine into overdrive. As a central part of this effort, but undisclosed to Plaintiff and other purchasers of Countrywide-sponsored MBS, Countrywide loosened and abandoned its purportedly sound loan underwriting standards that had been designed to produce "high quality mortgage loans," in order to increase market share by sweeping in borrowers that previously would not have qualified for a loan.

40. Countrywide expanded its pool of borrowers in order to increase its loan volumes and profitability, since the Company charged higher fees to riskier borrowers, and because it generated substantial income from reselling the mortgage loans as mortgage-backed securities.

---

[2]   The SEC has brought a claim for securities fraud against Angelo Mozilo, David Sambol and Defendant Sieracki for their roles in covertly changing Countrywide's underwriting policies, while the Company continued to sell billions of dollars of bonds and its own company stock. *Securities and Exchange Commission v. Mozilo, et al.*, No. 09-3994 VBF AJWx (C.D. Cal.).

- 11 -

Countrywide's aggressive underwriting was fueled by its ambitious quest for market share. In its zeal to retain and increase market share, Countrywide opted to match its competitors' loan products even when those products were unduly risky. Countrywide's expanding range of mortgage products was made possible by its willingness to loan money to a broader pool of borrowers with riskier credit profiles. As a former supervising underwriter at Countrywide put it, Countrywide's underwriting guidelines were "very loose and lax," and were designed to boost volume and profit rather than to effectively screen applicants for credit risk. Countrywide's willingness to lower its underwriting standards in pursuit of market share and profit led to the gradual abandonment of its stated underwriting standards, a fact which Countrywide did not disclose to Plaintiff or other investors.

**C. Countrywide's Nontraditional and Risky Loan Products**

41. Starting in 2004 and accelerating in 2005, Countrywide expanded its origination of riskier lines of products, including interest-only mortgage loans and stated income or "liar loans." In 2001, 50 percent of Countrywide's mortgage loans were prime, conforming mortgage loans; by 2006, that percentage had declined to 31.9 percent. Conversely, the percentage of nonconforming mortgage loans originated by Countrywide increased from 16.5 percent to 45.2 percent during the same period.

**1. Interest Only Mortgage Loans**

42. Interest-only mortgage loans allowed the borrower to pay only the interest accruing on the loan each month for a predetermined time period. The mortgage loans principal balance remained constant for the period. At the end of the initial time period, borrowers were required to pay interest plus principal, with the interest adjusting depending on whether the loan was an ARM or had a fixed rate.

- 12 -

**2. Stated Income or "No Doc" Mortgage loans**

43. The "Stated Income" or "No Doc" mortgage loans that Countrywide issued facilitated the falsification of loan information by allowing borrowers and the Company greater leeway to misrepresent key information such as income levels. These mortgage loans are widely known as "liar loans," because they were so susceptible to false representations in borrowers' applications. These "liar loans" allowed borrowers to misstate their income, employment, and other material information without requiring documentation, and allowed Countrywide's underwriters to accept mortgage loans which they knew or should have known contained false information.

44. No-documentation mortgage loans were traditionally given to professionals and business owners with strong credit who preferred not to disclose their financial information when applying for mortgage loans. But Countrywide began to issue these mortgage loans to individuals with lower credit ratings to avoid its own underwriting guidelines. Countrywide's mortgage loan underwriters knew that borrowers frequently exaggerated their income or assets, and in many cases they coached borrowers on what information to state on their applications to get them approved. At the same time, underwriters looked for documentation, such as reports from the website www.salary.com, which could plausibly substantiate borrowers' false information in order to make the loan files appear credible.

45. The flexible guidelines for Countrywide's stated-income mortgage loans gave Countrywide's loan officers broad discretion to determine whether a potential borrower's salary information was reasonable. Countrywide employees were motivated to use false loan information on mortgage loan applications, thereby originating overly risky mortgage loans. Countrywide thereby facilitated widespread falsification of borrowers' income, owner-occupancy intentions, and other material information regarding the mortgage loans.

- 13 -

EXHIBIT   52   -440-

46. While Countrywide disclosed the existence and number of stated-income mortgage loans in the Registration Statements and Prospectus Supplements, it did not disclose that borrowers' stated information in loan applications was frequently incorrect. That false information in turn rendered Countrywide's representations about its diligent underwriting and the statistical characteristics of the mortgage loans false.

47. Countrywide encouraged borrowers to apply for mortgage loans through its reduced-documentation programs even when those borrowers would have qualified for mortgage loans under traditional lending criteria, because the reduced-documentation mortgage loans were faster and easier to underwrite and sell. Such borrowers were steered into unnecessarily risky and costly mortgage loans, resulting in higher commissions for Countrywide brokers and higher profits for the Company. The risky mortgage loans and resulting increase in defaults harmed investors who purchased interests in the mortgage loans, including Plaintiff. Countrywide's Risk Management department performed studies which showed that mortgage loans with lower documentation were more likely to default, yet the Registration Statements and Prospectus Supplements failed to disclose these studies to Plaintiff or other investors.

## V. REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS USED IN OFFERING THE SECURITIES FOR SALE TO THE PLAINTIFF

CWMBS filed numerous Registration Statements throughout its existence for billions of dollars of Securities sold to the public. The following are the Registration Statements related to the Securities purchased by the Plaintiff.

**A.   The CWMBS February 8, 2005 Registration Statement and Prospectus Supplements Issued Thereunder**

48. On or about February 8, 2005, Defendant CWMBS, Inc. filed a Registration Statement (No. 333-121249) with the Securities and Exchange Commission (the "CWMBS February 2005 Registration Statement"). The CWMBS February 2005 Registration Statement

- 14 -

Case 2:10-cv-00302-MRP -MAN   Document 202-3   Filed 09/27/10   Page 90 of 141   Page ID
#:8228

was signed by Defendants Kurland, McLaughlin and Spector. Numerous Prospectus Supplements were issued pursuant to this Registration Statement, including the following, which was used to sell Securities to the Plaintiff:

- CHL Mortgage Pass-Through Trust 2005-HYB3, dated April 26, 2005.

**B.    The CWMBS July 25, 2005 Registration Statement and Prospectus Supplements Issued Thereunder**

49.  On or about July 25, 2005, Defendant CWMBS, Inc. filed a Registration Statement (No. 333-125963) with the Securities and Exchange Commission (the "CWMBS July 2005 Registration Statement"). The CWMBS July 2005 Registration Statement was signed by Defendants Kurland, Sieracki and Spector. Numerous Prospectus Supplements were issued pursuant to this Registration Statement, including the following, which was used to sell Securities to the Plaintiff:

- CHL Mortgage Pass-Through Trust 2005-HYB8, dated October 27, 2005; and

- CHL Mortgage Pass-Through Trust 2005-31, dated December 22, 2005.

**C.    The CWALT, Inc. July 25, 2005 Registration Statement and Prospectus Supplements Issued Thereunder**

50.  CWMBS filed numerous Registration Statements throughout its existence for billions of dollars of securities sold to the public. On or about July 25, 2005, Defendant CWALT, Inc. filed a Registration Statement (No. 333-1256902) with the Securities and Exchange Commission (the "CWALT Registration Statement"). The CWALT Registration Statement was signed by Defendants Kurland, Sieracki and Spector. Numerous prospectus supplements were issued under this Registration Statement, including the following three which were used to sell Securities to the Plaintiff:

- CWALT Alternative Loan Trust 2005-43, dated August 24, 2005;

- 15 -

- CWALT Alternative Loan Trust 2005-J10, dated August 29, 2005; and

- CWALT Alternative Loan Trust 2005-J13, dated October 27, 2005.

### VI. FALSE AND MISLEADING DISCLOSURES IN THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS REGARDING COUNTRYWIDE'S ADHERENCE TO ITS UNDERWRITING GUIDELINES

51. The Registration Statements and the Prospectus Supplements, which Countrywide used to market the Securities to Plaintiff, each contained untrue statements of material facts and omissions of material facts with regard to Countrywide's underwriting practices and the nature and characteristics of the loan pools and mortgage loans that serve as collateral for the Securities.

52. In the Registration Statements and Prospectus Supplements, Countrywide emphasized the meticulous underwriting guidelines it applied to assess the creditworthiness of potential borrowers before issuing mortgage loans to them. Specifically, Countrywide told Plaintiff and other investors that: A) it obtained independent appraisals of properties; B) it required a loan-to-value ratio of at least 95%; C) it relied upon an analysis of the borrower's ability to repay in making lending decisions; D) it verified borrower's information; E) it rarely granted underwriting exceptions; and F) it complied with all state and federal laws.

53. The mortgage pools and mortgage loans underlying the Securities have suffered delinquencies and foreclosures far above the rates that could have been anticipated based upon the Defendants' representations concerning the underwriting standards and quality of mortgage loans pooled in the Issuing Trusts. Further, the properties underlying the mortgage loans were valued far in excess of their true value. As a consequence, the Securities have lost value and Plaintiff has suffered significant damages.

- 16 -

## A. Independent Appraisals of Properties

54. Countrywide represented in the Registration Statements and Prospectus Supplements that it required independent appraisals of the properties on which the mortgage loans were issued, based on market data or replacement costs:[3]

Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, [Countrywide Home Mortgage loans] obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

55. Countrywide's assurance of independent appraisals for the mortgaged properties was a critical representation for Plaintiff. Independent appraisals assured the Plaintiff that there was an adequate basis for fairly assessing the value and risk of the mortgaged properties. The appraisals also factored into each property's loan-to-value ratio, another important measure of the mortgage loans' creditworthiness, as explained further below.

56. Countrywide's description of the supposedly independent home appraisals was false and misleading and omitted material facts. The supposedly independent appraisers were not

---

[3]    CWALT July 25, 2005 Registration Statement, page S-20; CHL Mortgage Pass-Through Trust 2005-HYB8, Prospectus Supplement dated October 27, 2005, page S-79; CWALT Alternative Loan Trust 2005-J10, Prospectus Supplement dated August 29, 2005, page S-42; CWALT Alternative Loan Trust 2005-43, Prospectus Supplement dated August 24, 2005, page S-75; CWALT Alternative Loan Trust 2005-J13, Prospectus Supplement dated October 27, 2005, page S-38; CHL Mortgage Pass-Through Trust 2005-HYB3, Prospectus Supplement dated April 26, 2005, page S-52; and CHL Mortgage Pass-Through Trust 2005-31, Prospectus Supplement dated December 22, 2005, page S-68. *See also* CWMBS February 8, 2005 Registration Statement, page S-21; CWMBS July 25, 2005 Registration Statement, page S-21 (virtually identical language).

- 17 -

independent. To accomplish their objective of artificially inflating appraisal values, Countrywide pressured appraisers to inflate the estimated value of mortgaged properties and/or to use inaccurate automated assessment techniques designed to streamline the approval of loan applications rather than to accurately calculate the value of the properties. These inflated appraisals allowed Countrywide to increase the approved amount of the mortgage loans and gave the illusion of a lower Loan-to-Value ("LTV") ratio (by increasing the supposed property value in relation to the loan amount).

57. In other words, Countrywide was more interested in having the property pass appraisal than it was in determining whether an appraisal represented a fair and accurate price, and was prepared in accordance with USPAP or other industry standards.[4]

**1. Former Appraisers Describe Countrywide's Blacklisting of Appraisers**

58. According to Capitol West Appraisals, LLC, a Boise, Idaho company that has provided real estate appraisals to mortgage brokers and lenders since 2005, Countrywide pressured real estate appraisers to artificially increase appraisal values for properties corresponding to mortgage loans that Countrywide underwrote. Capitol West stated that Countrywide loan officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions, and that when the company refused to change the appraisal values from what it independently determined was appropriate, Countrywide retaliated by blacklisting Capitol West.

59. Capitol West was placed into a Countrywide database called the "Field Review List," which contained the names of appraisers whose value estimates Countrywide would not accept unless the mortgage broker also submitted a report from a second appraiser. The Field

_____

[4]   "USPAP" stands for Uniform Standard of Professional Appraisal Practice.

- 18 -

exv10w1                                                      Page 23 of 70
Case 2:10-cv-00302-MRP -MAN   Document 202-3   Filed 09/27/10   Page 94 of 141   Page ID
#:8232

Review List had the impact of blacklisting appraisers because mortgage brokers would not retain appraisers appearing on the list to appraise real estate for which Countrywide would be the lender, because neither the broker nor the borrower would pay to have two appraisals done. Instead, the broker would simply retain another appraiser who was not on the Field Review List.

60. Countrywide reinforced the blacklisting of uncooperative appraisers by flagging properties on which a mortgage broker hired an appraiser on the Field Review List. Such properties were reappraised by LandSafe Appraisals, Inc. ("LandSafe"), a wholly-owned subsidiary of Countrywide, which would issue a second appraisal for the subject property that would "shoot holes" in the appraisal performed by the blacklisted appraiser, such that the mortgage transaction could not close based on that appraisal. In every instance, LandSafe would find defects in the appraisal from the blacklisted appraiser, even if another, non-blacklisted appraiser arrived at the same value for the underlying property and the non-blacklisted appraiser's appraisal was accepted. According to Capitol West, this exact set of facts happened with respect to an appraisal it submitted after it was placed on the Field Review List.

61. In order to protect their own business opportunities, appraisers sought to appease Countrywide and stay off of its blacklist by inflating their assessments of property values; Countrywide's practices had the effect of creating inflated assessments of property value.

62. Mark Zachary, a former Countrywide vice president and whistleblower, also described how the Company inflated home values. Zachary described how an appraiser was "strongly encouraged" to inflate homes' appraised value by as much as six percent so that the inflated appraisal would cover the borrower's closing costs.[5] Zachary complained about Countrywide's practices to more senior executives, eventually talking to people in the

_____

[5]   *See Zachary v. Countrywide*, No. 08-cv-214 (U.S.D.C. S.D. Tex.)

- 19 -

Company's Risk Management department, none of whom took action in response to his concerns. He was ultimately fired as a result of his whistleblowing.

63. Jonathan Simpson, a property appraiser who used to perform appraisals for Countrywide, similarly remarked that the Company stopped contacting him for work when he failed, on several occasions, to "make the number"—that is, to appraise properties with sufficiently high numbers. The appraiser suggests that he was "kicked off Countrywide's [and LandSafe's] lists" for not giving Countrywide and LandSafe the inflated estimates of property values for which they were looking.

### 2. Countrywide's Internal E-mails Show the Company's Inflated Appraisals

64. Internal e-mails among Countrywide's management also revealed the company's practices of inflating appraisals leading to inaccurate LTV ratios. In an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that mortgage loans had been originated "with disregard for process [and] compliance with guidelines," and emphasized that "I have personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of mortgage loans originated versus the pricing of those loan[s]."

### B. The Mortgage Loan-to-Value (LTV) Ratio

65. Higher LTV ratios are correlated with a higher risk of default and foreclosure because a borrower with a small equity position in a property has less to lose if he or she defaults on the loan. In particular, LTV ratios above 100 percent mean that the amount of the mortgage loan is greater than the value of the mortgaged property. Homeowners in this unfortunate position are "underwater," and their rate of delinquency, default, foreclosure, and bankruptcy are far higher than rates among homeowners who are not underwater.

- 20 -

66. The LTV ratio is a common metric for analysts and investors to evaluate the price and risk of mortgage-backed securities, and the stated LTV profile of the mortgage loans in each securitization was a material representation that Plaintiff relied upon in deciding to invest in the offerings.

67. The CWMBS July 25, 2005 Registration Statement provided that a loan-to-value ratio of no more than 95% would be required for all mortgage loans collateralizing the Securities:[6]

The Seller's underwriting standards permit first mortgage loans with loan-to-value ratios at origination of up to 95% and second mortgage loans with combined loan-to-value ratios at origination of up to 90%

68. The CWALT July 25, 2005 Registration Statement, the CWMBS February 8, 2005 and July 25, 2005 Registration Statements and the Prospectus Supplements for CWALT Alternative Loan Trust Series 2005-43 and 2005-J10 set forth strict underwriting guidelines that the collateral underlying the Securities was required to meet:[7]

Standard Underwriting Guidelines

Countrywide Home Mortgage loans' Standard Underwriting Guidelines for mortgage loans with nonconforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with

---

6    CWMBS July 25, 2005 Registration Statement, Page S-47.

7    *See* Amendment 1 to Registration Statement for CWALT, Inc. dated July 25, 2005 (Registration No. 333-125902), pages S-19 to S-22; Registration Statement for CWMBS, Inc. dated July 25, 2005 (Registration No. 333-125963), pages S-21 to S-22; CWALT Alternative Loan Trust Series 2005-J10, Prospectus Supplement dated August 29, 2005, pages S40-S45; and CWALT Alternative Loan Trust Series 2005-43, Prospectus Supplement dated August 24, 2005, pages S-75 to S-78. *See also* Amendment 1 to Registration Statement for CWMBS, Inc. dated July 25, 2005 (Registration No. 333-121249), page S-21 (similar discussion of 95% loan-to-value ratio).

- 21 -

original principal balances of up to $1,000,000, up to 65% for mortgage loans with balances of up to $2,000,000.

\* \* \*

Countrywide Home Mortgage loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 95% on 1 unit properties with principal balances up to $359,650 ($539,475 in Alaska and Hawaii) and 2 unit properties with principal balances up to $460,400 ($690,600 in Alaska and Hawaii) and up to 80% on 3 unit properties with principal balances of up to $556,500 ($834,750 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $691,600 ($1,037,400 in Alaska and Hawaii). On second homes, Countrywide Home Mortgage loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $359,650 ($539,475 in Alaska and Hawaii).

Countrywide Home Mortgage loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $359,650 ($539,475 in Alaska and Hawaii) and 2 unit properties with principal balances up to $460,400 ($690,600 in Alaska and Hawaii) and up to 75% on 3 unit properties with principal balances of up to $556,500 ($834,750 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $691,600 ($1,037,400 in Alaska and Hawaii).

\* \* \*

Expanded Underwriting Guidelines

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide Home Mortgage loans' Expanded Underwriting Guidelines for mortgage loans with nonconforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term

- 22 -

refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Mortgage loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

* * *

Countrywide Home Mortgage loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% on 1 unit properties with principal balances up to $359,650 ($539,475 in Alaska and Hawaii) and 2 unit properties with principal balances up to $460,400 ($690,600 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $556,500 ($834,750 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $691,600 ($1,037,400 in Alaska and Hawaii). On second homes, Countrywide Home Mortgage loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% . . .

69. Similarly, CWALT Alternative Loan Trust Series 2005-J13, CWMBS Mortgage Pass-Through Trust 2005-HYB3 and CWMBS Mortgage Pass-Through Trust 2005-31 provided that no mortgage loans in the trust could have an LTV Ratio higher than 95%, and any above 80% would be covered by mortgage insurance to alleviate the risk:[8]

No mortgage loans in any loan group had a Loan-to-Value Ratio at origination or at the closing date of more than 95.00%. Generally, each mortgage with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty

---

[8]    CWALT Alternative Loan Trust Series 2005-J13, Prospectus Supplement dated October 27, 2005, page S-18; CHL Mortgage Pass-Through Trust 2005-HYB3, Prospectus Supplement dated April 26, 2005, page S-17; and CHL Mortgage Pass-Through Trust 2005-31, Prospectus Supplement dated December 22, 2005, page S-16.

EXHIBIT    52    -450-

insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac.

70. Similarly, CHL Mortgage Pass-Through Trust 2005-HYB8 promised that loan-to-value ratios could never exceed 95%:

> Countrywide Home Mortgage loans' underwriting guidelines for fixed-period adjustable rate mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $500,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000 and up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000. Mortgage loans exceeding $650,000 are restricted to properties located in major metropolitan areas only.[9]

Each of the five Prospectus Supplements quoted above also had numerous tables and charts showing extremely favorable loan-to-value ratios under every scenario and condition, but these disclosures in the above-referenced Prospectus Supplements were untrue and failed to disclose the correct LTV ratios. The actual LTV ratios on a substantial percentage of the mortgage loans were substantially higher than the represented ratios; in fact, many of the LTV ratios were over 100 percent, because the data used to calculate the LTV ratios was frequently false.

71. The LTV ratios were misstated because the property values were overstated. Countrywide's appraisers routinely exaggerated the value of mortgaged properties in order to increase the amount of money that it could loan to a borrower. The appraisers also exaggerated the value of mortgaged properties in order to reduce their LTV ratios below 100%.

---

[9]    CHL Mortgage Pass-Through Trust 2005-HYB8, Prospectus Supplement dated October 27, 2005, page S-79.

- 24 -

72. In reality, the mortgaged properties were frequently worth far less than indicated by their appraisals, and therefore the LTV ratios for the properties were actually higher than what Countrywide represented. Based on realistic appraisal values, many of the mortgage loans in the CWALT and CWMBS securitizations exceeded the 100% LTV ratio cutoff stated in the Prospectus Supplements.

**C. Reliance on Borrowers' Ability to Repay**

73. Countrywide represented in the CWALT and CWMBS Registration Statements and the various Prospectus Supplements that its underwriting standards were focused on borrowers' ability to repay:[10]

Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral. In general, a prospective borrower applying for a mortgage loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source, typically the borrower's employer. The verification reports the length of employment with that organization, the borrower's current salary and whether it is expected that the borrower will continue employment in the future. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may

---

[10]   CWMBS February 8, 2005 Registration Statement, p. 27; CWMBS July 25, 2005 Registration Statement, p. S-21; CWALT July 25, 2005 Registration Statement, p. 22; and CWALT Alternative Loan Trust 2005-J-10 Prospectus Supplement dated August 29, 2005, p.23. *See also* CWALT Alternative Loan Trust 2005-J13, Prospectus Supplement dated October 27, 2005, page S-37; CWALT Alternative Loan Trust Series 2005-43, Prospectus Supplement dated August 24, 2005; CHL Mortgage Pass-Through Trust 2005-HYB3, Prospectus Supplement dated April 26, 2005, page S-51; CHL Mortgage Pass-Through Trust 2005-HYB8, Prospectus Supplement dated October 27, 2005, page S-78; and CHL Mortgage Pass-Through Trust 2005-31, Prospectus Supplement dated December 22, 2005, page S-67 (virtually identical).

- 25 -

also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.

74. Contrary to Countrywide's representations in the Registration Statements and Prospectus Supplements, Countrywide's underwriting standards, far from placing reliance on a borrower's ability to repay, actually ignored a borrower's ability to repay. Countrywide's focus, instead, was on profit and market share gained from the origination of large volumes of risky mortgage loans, regardless of a borrower's ability to repay.

75. Countrywide was not concerned with borrowers' ability to repay because it transferred much of the financial exposure of the risky mortgage loans to investors, such as Plaintiff, by reselling the mortgage loans as whole mortgage loans or packaging them as mortgage-backed securities. Indeed, the prospect of profitable resale on the secondary market, along with the fees it stood to earn in its many roles in originating and securitizing mortgage loans, allowed Countrywide to approve ever-increasing numbers of risky but profitable mortgage loans to less creditworthy investors while remaining protected from the financial fallout of its practices. Plaintiff, on the other hand, has been left fully exposed to the damage caused by Countrywide's materially false and misleading practices.

1.   **Countrywide's Internal Quality-Control Reviews Have Shown That the Company Did Not Adequately Assess Borrowers' Ability to Repay**

76. In performing internal quality-control reviews of its loan origination process, Countrywide has found discrepancies between its representations and the actual characteristics of its mortgage loans. For example, during a March 12, 2007 meeting of Countrywide's credit risk committee, the Risk Management department reported that 12 percent of Countrywide mortgage loans that were reviewed internally were rated "severely unsatisfactory" or "high risk" because the mortgage loans had loan-to-value ratios, debt-to-income ratios, or FICO scores outside of Countrywide's already wide underwriting guidelines.

- 26 -

77. Mark Zachary, a former Countrywide vice president who was fired by the Company for airing his concerns about its underwriting practices, told NBC News that he was pressured by the Company to approve unqualified borrowers. The Company's mentality, he said, was "what do we do to get one more deal done. It doesn't matter how you get there [i.e. how the employee closes the deal]...." Zachary confirmed that he was driven to issue mortgage loans even though he knew he was setting up the borrower to eventually lose that home.

78. Zachary further explained that if a borrower did not qualify for a conventional loan, he was often steered into riskier mortgage loans that did not require documentation, so-called "liar loans." He explained that "the income stated on those mortgage loans generally was not a true representation of what the person normally makes." He also recounted a pattern of inflated appraisals and Countrywide employees coaching borrowers to lie on their loan applications in order to obtain approval.

79. NBC News reported that it spoke to six other former Countrywide employees, who worked in different parts of the country, who described the same "anything goes" corrupt culture and practices. Some of those employees even said that borrowers' W-2 forms and other documents were falsified to allow for loan approval. One employee stated that "I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work," *i.e.* to allow the mortgage loan to comply with Countrywide's underwriting guidelines.

80. A former supervising underwriter at Countrywide stated that up to 15% or 20% of the mortgage loans that Countrywide generated were processed via the Exception Processing System, of which very few were ever rejected.

- 27 -

81. Other lawsuits against Countrywide incorporate testimonials from former Countrywide executives and underwriters regarding the Company's abandonment of its underwriting standards. For example, the complaint in *In re Countrywide Financial Corp. Securities Litigation*, 2:07-cv-05295 (CD. Cal. 2007) (MRP), incorporates information gleaned from many former Countrywide employees who describe their first-hand experiences with the abandonment of underwriting standards. The former employees observed that underwriting standards were progressively loosened over time to allow riskier lending. Countrywide did not disclose the extent of these changes in the Registration Statements and Prospectus Supplements.

**2.      Former Countrywide Customers State That Countrywide Disregarded Borrowers' Ability to Repay**

82. NBC News spoke with a former Countrywide customer who recalled that a Countrywide loan officer told her to claim she made more than twice her actual income, in order to gain loan approval. Another former customer, Julie Santoboni, described to NPR how a Countrywide loan officer offered to falsify the income listed in her application and encouraged her to falsify the information.

83. A third Countrywide borrower, Bruce Rose, recounted to Reuters that he refinanced his debts with a mortgage loan at a time when his annual income was around $16,000. He did not realize until later that his mortgage broker and Countrywide had used a stated-income loan for his mortgage, which allowed them to falsify his income and incorrectly state that he earned $12,166 a month, or over $145,000 a year.

84. These experiences reflect Countrywide's disregard of borrowers' ability to repay, since the Company was willing to falsify information in order to issue mortgage loans to borrowers that would be unable to repay those mortgage loans. Issuing mortgage loans to borrowers that would lose their home, including falsifying their income and inflating their

- 28 -

property appraisals, shows that Countrywide was not relying on the borrowers' ability to repay their mortgage loans when it issued such mortgage loans.

### 3.   Internal E-mails Reflect Countrywide's Disregard for Borrowers' Ability to Repay

85. Internal communications among Countrywide executives, which have recently been publicized by the SEC in its complaint against three of Countrywide's former officers, underscore the falsity of Countrywide's representations in the Registration Statements and Prospectus Supplements regarding its focus on borrowers' ability to repay the mortgage loans. The e-mails reflect internal discussions, within Countrywide's senior management, of the Company's abandonment of its underwriting standards, of which Countrywide's disregard for borrowers' ability to repay was illustrative.

86. The internal e-mails show that Mozilo and others were advised that Countrywide's lending practices were increasing the risk that borrowers would be unable to repay. For example, in a December 13, 2007 memo that was sent to Mozilo and others, Countrywide's enterprise risk assessment officer reported on an audit of Countrywide's mortgage loans. He found that "borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity mortgage loans."

87. In an April 13, 2006 e-mail, Mozilo wrote that he was concerned that the mortgage loans had been originated "with disregard for process [and] compliance with guidelines," resulting in the delivery of mortgage loans "with deficient documentation." Mozilo reiterated his urgent concerns about Countrywide's failure to follow its underwriting guidelines:

> I want Sambol to take all steps necessary to assure that our origination operation "follows guidelines" for every product that we originate. I have personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of mortgage loans originated versus the pricing of those loan [s]. In

- 29 -

my conversations with Sambol he calls the 100% sub prime seconds [second-lien mortgage loans with 100% financing] as the "milk" of the business. Frankly, I consider that product line to be the poison of ours. Obviously as CEO I cannot continue the sanctioning of the origination of this product until such time I can get concrete assurances that we are not facing a continuous catastrophe.

88. In a March 28, 2006 e-mail to Sambol and others, Mozilo directed the executives to implement a series of corrective measures to "avoid the errors of both judgment and protocol that have led to the issues that we face today caused by the buybacks mandated by HSBC." In early 2006, Asian banking giant HSBC had begun to contractually force Countrywide to buy back certain defective mortgage loans.

89. In a June 1, 2006 e-mail, Mozilo warned Sambol and other executives that borrowers "are going to experience a payment shock which is going to be difficult if not impossible for them to manage." Mozilo warned that "[w]e know or can reliably predict what's going to happen in the next couple of years," and he suggested certain measures to reduce Countrywide's exposure to risky mortgage loans, such as ceasing to issue mortgage loans with FICO scores below 680 unless the loan-to-value ratio was 75 percent or lower. He asked the executives to "assume the worst" and take corrective measures to try and avoid the disastrous consequences of Countrywide's lending policies, including reducing its exposure to mortgage loans with low FICO scores.

90. The e-mails disclosed by the SEC reflect numerous occasions where Countrywide management received internal reports, e-mails, and other communications that advised them of the risks of the mortgage products, such as 100-percent-financed subprime mortgage loans, that Countrywide was originating at a torrential pace. Countrywide's Risk Management department repeatedly warned Countrywide's senior management that Countrywide's liberalized origination guidelines—such as mortgage loans with high LTV ratios, mortgage loans with adjustable rates,

- 30 -

reduced-documentation mortgage loans, and interest-only mortgage loans—significantly increased Countrywide's credit risk because of borrowers' evident inability to pay their mortgage loans.

91. The Risk Management department warned Countrywide's senior officers of these risks as early as 2004. In September 2004, statistics showed that the percentage of conforming mortgage loans that Countrywide originated had fallen from 66 percent in July 2003 to 35 percent in July 2004, and subprime loan originations had risen from 2 percent to 10 percent over the same period. Those ratios continued to worsen between September 2004 and 2007, when Countrywide was sold.

92. John P. McMurray, Countrywide's then-Chief Risk Officer, gave repeated, explicit, and alarming warnings about the financial risks of Countrywide's origination practices, and advocated for stricter origination guidelines. On May 22, 2005, McMurray warned that mortgage loans which were originated as exceptions to Countrywide's stated origination guidelines would likely experience higher default rates. He wrote that "exceptions are generally done at terms more aggressive than our guidelines" and recommended that "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."

93. In June 2005, McMurray warned that "as a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas," adding that that "frontier" had "high expected default rates and losses."

94. Despite repeated and earnest warnings from Mozilo, McMurray, the Risk Management department, and others, Sambol, in particular, ignored the warnings and pressed ahead with Countrywide's wrongful practices. For example, in April 2006 Sambol resisted a

- 31 -

Risk Management department recommendation that Countrywide increase the FICO score required of certain 100-percent-financed mortgage loans because he believed that doing so would make the Company uncompetitive with subprime lenders.

95. On December 7, 2006, Mozilo circulated a memorandum to Countrywide's Board of Directors and managing directors which emphasized certain startling statistics regarding Countrywide's loan origination. Mozilo told them that Countrywide had expanded its subprime underwriting guidelines in every conceivable type of loan, that the Company's 2006-vintage mortgage loans were expected to perform worse than any mortgage loans on record, that the percentage of delinquencies was the highest in Countrywide's history and was expected to continue rising, and that an alarming 62 percent of Countrywide's subprime originations in the second quarter of 2006 were 100-percent-financed mortgage loans.

**D. Verification of Borrowers' Information**

96. The Registration Statements and Prospectus Supplements stated that Countrywide required a credit history for each loan applicant from an independent credit bureau; that it gathered information about an applicant's "assets, liabilities, income and employment history;" and that it used a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. The "debt-to-income ratio" or "DTI" is the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income. The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level. Under standard underwriting guidelines, Countrywide "generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%." Under its "Expanded Underwriting Guidelines," Countrywide "generally permits a

- 32 -

EXHIBIT   52   -459-

debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively ."[11]

97. These representations were untrue and misleading and omitted material facts necessary to make the statements not misleading. Contrary to Countrywide's representations, its underwriters frequently failed to verify the information on borrowers' loan applications and instead approved mortgage loans for borrowers whose representations about their income, and other material information regarding their ability to repay, were unreasonable on their face and could not have been accurately reported. Countrywide knew that borrowers' incomes were inflated based on realistic estimates of the salary range for borrowers' stated occupations and the Company's experience as one of the nation's largest, most sophisticated loan originators.

1.   **Countrywide Created its Structured Loan Desk to Avoid Having to Verify Borrowers' Information**

98. Countrywide established systems for approving large volumes of non-conforming mortgage loans, allowing it to override criteria that were meant to weed out non-conforming mortgage loans. The Registration Statements and Prospectus Supplements failed to disclose that Sambol and other executives had authorized the establishment of "The Structured Loan Desks"

---

[11]   CWALT July 25, 2005 Registration Statement, pages S-21 to S-22; CWMBS February 8, 2005 Registration Statement, pages S-22; CWMBS July 25, 2005 Registration Statement, page S-22; CWALT Alternative Loan Trust Series 2005-J10, Prospectus Supplement dated August 29, 2005, page S-43, S-45; CWALT Alternative Loan Trust Series 2005-43, Prospectus Supplement dated August 24, 2005, pages S-76 to S-77; CWALT Alternative Loan Trust Series 2005-J13, Prospectus Supplement dated October 25, 2005, pages S-39, S-41; CHL Mortgage Pass-Through Trust Series 2005-HYB3, Prospectus Supplement dated April 26, 2005, page S-52, CHL Mortgage Pass-Through Trust Series 2005-HYB8, Prospectus Supplement dated October 27, 2005, page S-79; and CHL Mortgage Pass-Through Trust Series 2005-31, Prospectus Supplement dated December 22, 2005, page S-68.

- 33 -

EXHIBIT   52   -460-

in Plano, Texas and California, which existed specifically to grant underwriting exceptions for high-risk loan applications that did not meet Countrywide's underwriting standards. The mortgage loans were processed through Countrywide's Exception Processing System, an in-house computer system created and overseen by Sambol to approve high-risk mortgage loans.

99. Countrywide granted exceptions liberally, further diluting its already minimal underwriting standards for making mortgage loans. Countrywide granted exception requests in a variety of circumstances where one or more basic underwriting criteria of the borrower did not meet loan product guidelines, including, for example, LTV or CLTV, loan amount and credit score. Countrywide placed borrowers in risky mortgage loans, based on stated but not verified income and assets, and then overlooked its few remaining underwriting indicia of risk.

100. To attract more business Countrywide promoted its relaxed underwriting standards and ready grant of exceptions to brokers. For example, Countrywide promoted "Unsurpassed Product Choices and Flexible Guidelines," including (a) "100% financing for purchase or refinancing" mortgage loans; (b) "80/20 combo mortgage loans for stated Self-Employed and Non Self-Employed;" (c) "Stated Self-Employed and Non Self-Employed loan programs with as low as a 500 credit score." Countrywide stated that its "Specialty Lending Group's experienced and knowledgeable loan experts are empowered to review all loan packages, make sound credit decisions and provide quality lending solutions — yes, even for 'hard to close' mortgage loans."

101. The Attorney General of California has alleged, based on information provided by a former Countrywide employee, that the Structured Loan Desk in Plano processed 15,000 to

- 34 -

20,000 mortgage loan applications a month in 2006, which represented approximately 7.5 percent to 10 percent of all mortgage loans actually originated.[12]

102. As explained by Marc Zachary, the Structured Loan Desk was established specifically to "flip" full-documentation mortgage loans to stated income or NINA ("No Income, No Asset") mortgage loans to receive authorization. Although the Registration Statements and Prospectus Supplements disclosed that Countrywide originated mortgage loans according to stated incomes, and provided statistics for the number of stated-income mortgage loans in the mortgage pools, the offering documents did not disclose that Countrywide had established a system for processing mortgage loans that could not qualify as full-documentation mortgage loans.

103. A former supervising underwriter at Countrywide stated that up to 15% or 20% of the mortgage loans that Countrywide generated were processed via the Exception Processing System, of which very few were ever rejected.

### 2. Former Employees Describe Countrywide's Failure to Verify Borrowers' Information

104. As previously noted, Countrywide's CEO wrote an internal e-mail stating that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of mortgage loans originated versus the pricing of those loan[s]." He further instructed Sambol to "take all steps necessary to assure that our origination operation 'follows guidelines' for every product that we originate." In his e-mail, Mozilo specifically points out the company's failure to properly document borrowers' information.

---

[12] *See The People of the State of California v. Countrywide Financial Corp., et al.*, No. LC081846 (Sup. Ct. Cal. Los Angeles), ¶ 100.

- 35 -

105. Zachary also told Larry King of CNN that Countrywide's loan origination was plagued by "outright misrepresent [ation of] mortgage loans to the secondary markets, to end investors, and to buyers." That misrepresentation reflected a failure to accurately verify borrowers' information. In his complaint against Countrywide, Zachary identifies e-mails in which he voiced concern about Countrywide's falsification of borrowers' information and "flipping" of mortgage loans from full-documentation to stated-income mortgage loans or NINA mortgage loans.

106. Countrywide employees sometimes falsified borrowers' loan information without their knowledge. A potential Countrywide customer known to Zachary complained to Countrywide in a September 19, 2006 e-mail that "I was told that my loan had been turned over to Countrywide's internal fraud department for review because a loan officer increased my income figures without authorization in order to get me approved for the stated income loan. I was told by several people at Countrywide that this was done just to get me qualified and that nobody would check on it."

107. Zachary explained that far from verifying borrowers' information, loan officers often coached borrowers to lie on their loan applications or falsified borrowers' loan applications in order to gain approval for their mortgage loans. One former customer told NBC News that her Countrywide loan officer told her to claim she made more than twice her actual income in order to gain approval for her loan.

108. Despite the prevalence of loan applications that contained highly suspicious reported employment income, Countrywide failed to take sufficient, if any, action to correct borrower fraud. On the contrary, Countrywide overlooked or even encouraged such falsification and failed to disclose this problem in the Registration Statements and Prospectus Supplements.

- 36 -

EXHIBIT   52   -463-

For example, a former senior underwriter at Countrywide reported that Countrywide regularly classified mortgage loans as "prime" even if they were issued to non-prime borrowers, including people who recently went through bankruptcy.

109. For stated-income mortgage loans, where Countrywide promised that it would exercise discretion, during the 2005-2006 period the Company directed loan officers to support their assessments by referring to the website www.salary.com. This practice was reported by former employees cited in the Illinois Attorney General's complaint against Countrywide, and in the complaint in *In re Countrywide Financial Corp. Securities Litigation*, 2:07-cv-05295 (CD. Cal. 2007) (MRP). The www.salary.com website did not provide specific salary information for any particular borrower, but provided a range of salaries for particular job titles based upon the borrower's zip code. Nevertheless, Countrywide's underwriters were not required to follow the website's stated salary ranges where the borrower's stated income was outside of the range provided.

### 3.   Countrywide Incentivized Employees to Not Verify Borrowers' Information

110. Countrywide's senior management imposed intense pressure on underwriters to approve mortgage loans, in some instances requiring underwriters to process 60 to 70 mortgage loan applications in a single day and to justify any rejections they made. A former Countrywide loan officer quoted by the Wall Street Journal said that "The stress level was unbelievable" because of pressure from managers to boost loan volumes. Another former employee mentioned in *In re Countrywide Financial Corp. Securities Litigation*, 2:07-cv-05295 (CD. Cal. 2007) (MRP), described working at Countrywide as a "sweatshop" because of the pressure to maximize loan volume.

111. That pressure even came from the most senior levels of management—a former executive reported that Sambol was "livid" at a 2005 meeting because call-center employees

- 37 -

were not selling enough adjustable-rate mortgage loans, which begin with "teaser" rates but quickly reset to higher rates and thus are highly profitable for Countrywide. The pressures placed on Countrywide's loan officers created an incentive for them not to review mortgage loans thoroughly but instead to rubber-stamp them.

112. Moreover, a substantial portion of the salary of Countrywide's sales employees was based on commissions, which gave the employees a strong incentive to maximize sales volume and close the maximum number of mortgage loans regardless of quality. For example, Countrywide's wholesale account executives, the employees who dealt with brokers, were paid only on commission—they had no base salary.

113. Senior management also expanded underwriters' authority to grant exceptions to mortgage loans that failed to meet Countrywide's underwriting standards, which made it easier to approve mortgage loans regardless of their deviation from Countrywide's underwriting standards. One former Countrywide employee remarked that he could "count on one finger" the number of mortgage loans that his supervisors permitted him to reject as an underwriter with Countrywide's Structured Loan Desks.

114. Countrywide's underwriters were actively involved in misrepresenting borrowers' income by coaching borrowers to exaggerate their income on loan applications in order to qualify for mortgage loans, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full-documentation loan programs. As reported by the Attorney General of California, a former Countrywide loan officer explained that loan officers might tell borrowers the income they needed to qualify for a certain mortgage, and consequently many borrowers would simply agree that they made the required minimum income needed for that mortgage.

- 38 -

#### 4.   Re-Underwriting of Loan Files Has Identified Failures to Verify Borrowers' Information

115. On January 29, 2009, Syncora Guarantee, Inc. ("Syncora") filed suit in the Supreme Court of the State of New York, New York County, against Countrywide, alleging that Countrywide made misrepresentations in connection with several securitizations of home equity mortgage loans originated and serviced by Countrywide, and for which Syncora Guarantee acted as credit enhancer, and seeking damages and other relief for fraud and breach of contract.

116. In this lawsuit, Syncora, which insured Countrywide securitizations and has since discovered that many of the insured mortgage loans violated Countrywide's underwriting guidelines, explained that Countrywide's employees used the reports to coach borrowers to inflate their reported income to help qualify for mortgage loans. Syncora noted that www.salary.com reports appear in some of the loan files for the securitizations that it insured, but are generally absent from files of non-performing mortgage loans with unreasonably excessive stated incomes. As Syncora explained, Countrywide's underwriters would discard the salary.com reports for stated-income mortgage loans where the reports indicated that the borrowers' stated incomes were unreasonably high for their stated employment.

117. This *ad hoc* system of assessing the reasonableness of borrowers' income violated prudent underwriting practices and facilitated rampant fraud by borrowers. The Attorney General of Illinois, in her lawsuit against Countrywide, cites various sources who confirmed that the Company did not adequately verify borrowers' incomes.[13]

118. For example, a Countrywide employee estimated that approximately 90 percent of all reduced documentation mortgage loans sold out of the employee's Chicago office had

---

[13]   *The People of the State of Illinois v. Countrywide Financial Corp., et al.*, No. 08-ch-22994 (Cir. Ct. Cook County).

- 39 -

inflated incomes. One of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications. The Illinois Attorney General reviewed the sales of Countrywide mortgage loans by an Illinois mortgage broker and found that the vast majority of the mortgage loans had inflated income, almost all without the borrowers' knowledge.

119. Likewise, a review of 100 stated income mortgage loans by the Mortgage Asset Research Institute revealed that 60 percent of the income amounts were inflated by more than 50 percent and that 90 percent of the mortgage loans had inflated income of at least 5 percent. Likewise, the Attorney General of Florida spoke with a former Countrywide employee who estimated that approximately 90 percent of all reduced-documentation mortgage loans sold out of the Countrywide branch where he worked had inflated incomes.

### 5.   Internal E-mails Show That Countrywide Knew That Borrowers' Information Was Not Being Verified

120. Countrywide's senior management was aware that Countrywide loan officers were facilitating the submission of materially false and misleading applications through the Company's reduced-documentation application programs, as evidenced by the internal Countrywide e-mails cited herein. The internal e-mails publicized by the SEC and discussed above show that Countrywide was originating mortgage loans without adequately verifying borrowers' information, particularly for stated-income mortgage loans, yet the problem was not resolved.

121. For example, as discussed above, Mozilo wrote to Sieracki and others on April 13, 2006 to say that he was concerned that mortgage loans had been originated "with disregard for process [and] compliance with guidelines," resulting in the delivery of mortgage loans "with deficient documentation." Mozilo emphasized that "I have personally observed a serious lack of

- 40 -

compliance with our origination system as it relates to documentation and generally a deterioration in the quality of mortgage loans originated versus the pricing of those loan[s]."

122. Taken as a whole, Countrywide's representations in the Registration Statements and Prospectus Supplements regarding its underwriting standards were collectively false and misleading and contained omissions of material facts. Although Countrywide represented in the offering documents that it was applying loosened underwriting standards to the mortgage loans, its representations nonetheless assured Plaintiff that Countrywide was a diligent, reputable mortgage company that would exercise responsible lending practices. Countrywide's representations assured Plaintiff that it would abide by the stated guidelines in issuing mortgage loans, even under the reduced-documentation standards it described.

123. Those stated representations were false because they belied the reality that Countrywide's profit-obsessed corporate culture had led to the complete abandonment of its underwriting standards. Plaintiff reasonably relied on Countrywide's representations in the Registration Statements and Prospectus Supplements and in public statements by the Company, and Plaintiff was harmed by Countrywide's failure to accurately disclose its true underwriting practices in those documents. If Plaintiff had known the reality of Countrywide's underwriting practices, Plaintiff would not have purchased or otherwise acquired the Securities.

**E. Case-by-Case Underwriting Exceptions**

124. Countrywide represented in the Registration Statements and Prospectus Supplements that "certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower."[14]

---

14   CWALT July 25, 2005 Registration Statement, page S-19; CWMBS February 8, 2005 Registration Statement, page S-21; CWMBS July 25, 2005 Registration Statement, page S-21; CWALT Alternative Loan Trust Series 2005-J10, Prospectus Supplement dated August 29, 2005, page S-41; CWALT Alternative Loan Trust Series 2005-43, Prospectus Supplement dated

- 41 -

125. This representation was false and misleading and omitted material facts because it incorrectly implied that Countrywide made exceptions to its underwriting guidelines on a limited basis, only after careful consideration of the "compensating factors."

126. In reality, Countrywide did not carefully consider the circumstances of each case before granting underwriting exceptions. On the contrary, in a corporate culture that prioritized profit at the expense of the Company's standards, Countrywide's underwriters, supervisors, and corporate leadership alike collectively abandoned their standards with regard to granting underwriting exceptions. Such exceptions were granted abundantly and without consideration of any "compensating factors" in order to increase Countrywide's profits and meet targeted objectives for market growth.

    **1.    Former Countrywide Employees Describe the Company's Willingness to Liberally Grant Underwriting Exceptions**

127. As Adam Michaelson, a former Senior Vice-president of Marketing at Countrywide explains in his book, Countrywide's booming loan underwriting was due in part to an increase in borrowers refinancing mortgage loans on their current homes.[15] As Michaelson explains, Countrywide "created more and more exotic loan products and lent money to anyone with a heartbeat so that everyone could Refi [refinance]."

128. Underwriters performed grossly inadequate due diligence in examining borrowers' loan applications. The underwriters were incentivized by bonuses and the threat of

August 24, 2005, page S-74; CWALT Alternative Loan Trust Series 2005-J13, Prospectus Supplement dated October 25, 2005, page S-37; CHL Mortgage Pass-Through Trust Series 2005-HYB3, Prospectus Supplement dated April 26, 2005, page S-51, CHL Mortgage Pass-Through Trust Series 2005-HYB8, Prospectus Supplement dated October 27, 2005, page S-81; and CHL Mortgage Pass-Through Trust Series 2005-31, Prospectus Supplement dated December 22, 2005, page S-67.

---

[15]    ADAM MICHAELSON, *The Foreclosure of America: The Inside Story of the Rise and Fall of Countrywide Home Mortgage loans, the Mortgage Crisis, and the Default of the American Dream* (Penguin Books 2009).

- 42 -

---

termination to grant mortgage loans quickly and via more profitable alternative types of mortgage loans, which types of mortgage loans presented a greater opportunity for misrepresenting borrowers' income and other material information. A substantial part of underwriters' compensation was based on the volume of mortgage loans they originated, with points awarded for each loan that they underwrote.

129. Countrywide's supervisors pushed their employees to maximize volume by ignoring the Company's stated underwriting standards in approving mortgage loans. Supervisors also scrutinized mortgage loans that were initially rejected to reconsider whether there was a basis for approving the mortgage loans, despite the risks. Countrywide's management, including Mozilo and Sambol, helped create and authorize a corporate culture that emphasized market share and profit and discouraged adherence to the Company's underwriting standards. Mozilo, Sambol, and other Countrywide managers facilitated the Company's rampant granting of underwriting exceptions through the formation of the Structured Loan Desks and other means, as alleged herein.

130. A former senior regional vice president of Countrywide was quoted in Business Week as saying that Countrywide "approached making mortgage loans like making widgets, focusing on cost to produce and not risk or compliance. Programs like 'Fast and Easy' where the income and assets were stated, not verified, were open to abuse and misuse. The fiduciary duty of making sure whether the loan should truly be [extended] was not as important as getting the deal done."

131. Granting underwriting exceptions became easy. A wide range of employees received authority to grant exceptions and to change the terms of a loan, including underwriters, their superiors, branch managers, and regional vice presidents. Even if Countrywide's computer

- 43 -

system recommended denying a loan, an underwriter could override that denial by obtaining permission from his or her supervisor.

**2.    Internal E-mails Show That Countrywide Knew That the Company Was Abandoning Its Case-by-Case Underwriting Standards**

132. On May 22, 2005, John McMurray in the Company's Risk Management department warned top management of the likelihood of significantly higher default rates in mortgage loans made on an exception basis: "[t]he main issue is to make sure everyone's aware that we'll see higher default rates." McMurray thereafter made repeated, dire warnings of the future consequences of Countrywide's abandonment of its underwriting standards. That abandonment was characterized by a failure to follow Countrywide's promise to Plaintiff and other investors that it would only grant underwriting exceptions on a "case-by-case basis," with adequate allowance for compensating factors.

**F. Compliance With Laws**

133. Countrywide represented in the Registration Statements and Prospectus Supplements that its underwriting standards "are applied in accordance with applicable federal and state laws and regulations."

134. This statement was false and misleading and omitted material facts, because Countrywide regularly engaged in predatory lending practices and other wrongdoing in violation of federal or state laws and regulations.

**1.    States and Local Governments Have Sued Countrywide for Violation of State and Federal Laws**

135. Countrywide has been sued dozens of times for its lending practices, with plaintiffs alleging detailed claims ranging from federal securities-law violations to violations of state consumer-protection laws.

- 44 -

_____

136. Among other suits, states and local jurisdictions have brought predatory-lending claims against Countrywide on the basis of consumer-protection statutes and other laws, alleging that Countrywide violated federal and state laws as a result of its predatory lending. For example, the Attorney General of California alleged in a lawsuit against Countrywide that the Company violated California law by making untrue or misleading statements to borrowers about the terms and payment obligations of its mortgage loans. The complaint details how certain types of Countrywide mortgage loans are designed to reset at a drastically higher interest rate, causing borrowers great financial hardship, which the applicable registration statements and prospectus supplements failed to adequately disclose and explain to Plaintiff.

137. Similarly, the Attorney General of Illinois alleged in a suit against Countrywide that the Company violated the state's consumer-fraud and fairness-in-lending laws. Among other sources, the complaint refers to testimonials by former Countrywide employees who recounted that Countrywide approved virtually any mortgage loan and was "aggressive" in granting mortgage loans pursuant to underwriting exceptions.

138. California, Illinois, Florida and other states settled their claims against Countrywide in October 2008, in a deal that could be worth more than $8.4 billion and could help up to 390,000 homeowners. The California Attorney General announced that the settlement was likely to become the largest predatory-lending settlement in history. The agreement included a mandatory no-fee loan-modification program that would modify loan terms for borrowers who are seriously delinquent or at risk of becoming delinquent when their interest rates reset (in the case of adjustable-rate mortgage loans). As a condition of the settlement, Bank of America also promised to attempt to refinance borrowers into government-backed mortgage loans or to reduce borrowers' interest rates.

- 45 -

**2.      Private Individuals Have Also Sued Countrywide for Violations of State and Local Laws**

139. Countrywide has also been sued dozens of times by private individuals for the Company's lending practices. Plaintiffs allege that Countrywide has broken laws ranging from federal securities laws to state consumer-protection laws.

140. For example, in *In re Countrywide Financial Corp. Mortgage Marketing & Sales Practices Litigation,* No. 3:08-md-01988 (CD. Cal. 2008), pending in the U.S. District Court for the Central District of California, class-action plaintiffs allege that Countrywide violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961, *et seq*., the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*., and the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*. Plaintiffs allege that the Countrywide defendants conspired to defraud borrowers, in violation of federal and state law, by steering them into subprime mortgage loans irrespective of whether (i) the borrower would have qualified for a "prime loan" or (ii) the borrower was unable to meet the financial terms of the subprime mortgage.

141. The Mortgage Marketing & Sales Practices Litigation complaint includes extensive, detailed descriptions of the plight of various borrowers that took out mortgage loans from Countrywide and suffered financially because of hidden fees, sharply increasing interest rates, and other aspects of predatory lending practices.

**VII. PLAINTIFF AND OTHYER INVESTORS BEGIN TO LEARN THE TRUTH
ABOUT COUNTRYWIDE'S LENDING PRACTICES**

142. Beginning on July 24, 2007, when Countrywide filed a Form 8-K with the Securities and Exchange Commission, the Defendants and numerous third-parties finally began to partially reveal the truth about matters concerning Countrywide's lending practices and failure to follow its promised underwriting standards. Some of these disclosures came from the

- 46 -

---

EXHIBIT   52   -473-

Defendants, and other disclosures came from governmental agencies (including the FBI, the SEC and various State Attorneys General), and others came from the business media and participants in the financial markets.

143. In this July 24, 2007 Form 8-K , Countrywide gave an indication of the generally poor quality of Countrywide mortgage loans, the company's lax underwriting standards, its inadequate loan loss reserves and the inflated values at which it carried loan-based assets on its balance sheet, which information was repeated on the conference call of the same date related to this quarterly disclosure, <u>Countrywide suggested for the first time that it had classified mortgage loans to borrowers with FICO scores as low as 500 as "prime" – which is far below the industry norm of requiring a FICO score of at least 660 in order for the loan to be considered as "prime."</u>

144. On the conference call, a Company representative falsely claimed that the term "prime" is one that "covers a very vast spectrum" and referred to "a prime loan with FICOs in the low 500s," thereby disclosing that, contrary to industry norms and all accepted definitions in the market, Countrywide was using its own misleading definition of "prime." In that same conference call, Countrywide's Chief Risk Officer falsely declared that "[t]here is a belief by many that prime FICOs stop at 620. That is not the case." This remark confirms that Countrywide was aware of the industry norms and standards regarding what constitutes a "prime" loan, but chose to covertly substitute its own-self-serving definition instead, without informing Plaintiff or other investors of this materially misleading definition.

145. On October 24, 2007, the WALL STREET JOURNAL published an article that further revealed major problems in Countrywide's loan origination and underwriting procedures.[16] This

---

[16]   Simon and Hagerty, *Countrywide Sees New Scare – Option ARM Delinquencies Bleed into Profitable Prime Mortgages*, THE WALL STREET JOURNAL, October 24, 2007 at C1.

- 47 -

article disclosed that many of Countrywide's mortgage loans were of far lesser quality than promised in the Registration Statements and Prospectuses:

> Subprime mortgages aren't the only challenge facing Countrywide Financial Corp., the nation's biggest home-mortgage lender. Some mortgage loans classified as prime when they were originated are now going bad at a rapid pace.

In addition, the newspaper quoted UBS analyst Shumin Li, who stated that Countrywide was "giving these mortgage loans to riskier and riskier borrowers."

146. On January 9, 2008, Countrywide issued a press release and filed a Form 8-K with the SEC releasing its operational data for December 2007. In this monthly operating report, Countrywide disclosed that its rate of pending foreclosures as a percentage of unpaid principal balance had more than doubled to 1.44%, from 0.70% in December 2006. Similarly, its rate of delinquency as a percentage of unpaid principal balance had increased by more than 50% to 7.20%, compared to 4.6% in December 2006.

147. On January 11, 2008, Bank of America announced that it had arrived at a definitive agreement to purchase Countrywide Financial Corp. in an all-stock transaction worth approximately $4 billion.

148. On March 8, 2008, the WALL STREET JOURNAL reported that "[t]he Federal Bureau of Investigation is probing . . . Countrywide Financial Corp. for possible securities fraud."[17] The *Journal* further reported that "[t]he inquiry involves whether company officials made misrepresentations about the company's financial position and the quality of its mortgage loans in securities filings, four people with knowledge of the matter said." The article

---

[17]   Simpson and Perez, *FBI Investigates Countrywide – U.S. Scrutinizes Filings on Financial Strength, Loan Quality for Fraud*, THE WALL STREET JOURNAL, March 8, 2008 at A3.

- 48 -

specifically provided that the FBI was investigating "widespread fraud" in Countrywide's loan origination process:

> Federal investigators are looking at evidence that may indicate widespread fraud in the origination of Countrywide mortgages, said one person with knowledge of the inquiry. If borne out, that could raise questions about whether company executives knew about the prospect that Countrywide's mortgage securities would suffer many more defaults than predicted in offering documents.

### VIII. PLAINTIFF'S DAMAGES ARISING FROM THE FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

149. The false and misleading statements of material facts and omissions of material facts in the Registration Statements and Prospectus Supplements directly caused tens of millions of dollars in damages to Plaintiff, because the Securities were in fact far riskier than Countrywide had described them to be. The mortgage loans underlying the Securities experienced default and delinquency at a much higher rate due to Countrywide's abandonment of its loan-origination guidelines, and the Securities' income stream was therefore much lower than it would have been. The disclosure of irregularities in Countrywide's underwriting practices also led to a decline in market value of the Securities.

150. Plaintiff's losses on the Securities have been much greater than they would have been if the mortgage loans were as Countrywide described them to be.

151. The drastic and rapid loss in value of Plaintiff's Securities was primarily and proximately caused by Countrywide's issuance of mortgage loans to borrowers who could not afford them, in contravention of the prudent underwriting guidelines described in the Registration Statements and Prospectus Supplements. The loss in value was not due to the recent decline in the American housing market and mortgage-backed securities markets. Those broader market declines occurred long after the Securities began to experience high rates of delinquency and default.

- 49 -

152. Countrywide's wrongdoing proximately caused tens of millions of dollars in damages to Plaintiff, in the form of lost principal and lost interest. The precise amount of Plaintiff's damages is to be determined at trial.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

153. The statutory safe harbor provided under the federal securities laws for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this Complaint. The statements alleged to be false and misleading all relate to historical facts or then-existing conditions, and were not identified as forward-looking statements. To the extent any of the false statements alleged herein may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly "forward-looking" statements. Alternatively, the safe harbor is not applicable because, at the time each statement was made, the speaker either knew the statement was false or lacked a factual basis for thinking that the statement was true.

## X. THE *WASHINGTON STATE PLUMBING, LUTHER* AND *MAINE STATE RETIREMENT SYSTEM* ACTIONS AND TOLLING OF PLAINTIFF'S CLAIMS

154. On November 14, 2007, a class action was filed against various Countrywide entities, former officers, and underwriters on behalf of all investors who purchased or otherwise acquired certain mortgage-backed securities that were issued, underwritten and/or sold by Countrywide. S*ee Luther v. Countrywide Home Mortgage loans Servicing LP*, BC380698 (Cal. Super. Ct. 2007). The Luther complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

- 50 -

155. On June 12, 2008, a different securities class action was filed against Countrywide in California state court, *Washington State Plumbing & Pipefitting Pension Trust v. Countrywide Financial Corp.*, BC392571 (Cal. Super. Ct. 2008). Like *Luther*, this action also alleged Section 11, 12(a)(2), and 15 claims against Countrywide, its former officers, and underwriters, although Washington State Plumbing based its claims on different securitizations than those in Luther. The *Washington State Plumbing* action was consolidated with the original *Luther* action on October 16, 2008.

156. On January 14, 2010, a different securities class action was filed against Countrywide in the U.S. District Court for the Central District of California, *Maine State Retirement System v. Countrywide Financial Corp., et al*, No, 10-0302 (U.S.D.C. C.D. Cal.) Like *Luther*, this action also alleged Section 11, 12(a)(2), and 15 claims against Countrywide, its former officers, and underwriters.

157. The Plaintiff in this action was therefore included in the putative *Luther* and *Maine* classes and the statute of limitations for Plaintiff's claims under the Securities Act of 1933 was tolled by the filing of *Luther* and *Maine*, pursuant to the tolling doctrine set forth in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). By filing this action, Plaintiff is now exercising its right to opt out of the *Luther* class and to bring its claims in an individual capacity in this action, pursuant to *In re WorldCom Securities Litigation*, 496 F.3d 245, 255 (2d Cir. 2007).

- 51 -

**Count I**

**for Violation of Section 11 of the Securities Act of 1933**
**(Against the Issuer Defendants, the Individual Defendants and UBS Securities LLC)**

158. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein. For the purposes of this Count, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

159. This claim is brought under Section 11 of the Securities Act of 1933, 15 U.S.C. §77k ("Section 11"), against the Issuer Defendants, the Individual Defendants and Defendant UBS Securities LLC arising from Plaintiff's purchases of the Securities.

160. The Registration Statements for the Securities offerings were materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

161. The Individual Defendants, the Issuer Defendants and Defendant UBS Securities LLC (the "Section 11 Defendants") are strictly liable to Plaintiff for these misstatements and omissions.

162. The Individual Defendants signed CWALT's and CWMBS' Registration Statements as detailed herein. These signatories are liable for signing the Registration Statements, in accordance with Section 11(a)(1) of the 1933 Act, 15 U.S.C. §77k(a)(1).

163. The Issuer Defendants issued and disseminated, caused to be issued and disseminated, directed other parties to disseminate at the time of the filing of the Registration Statements, and/or participated in the issuance and dissemination to Plaintiff of untrue statements

- 52 -

of material facts and omissions of material facts, which were contained in the Registration Statements and Prospectus Supplements.

164. Defendant UBS Securities LLC acted as an underwriter for the Series 2005-43 Mortgage Pass-Through Securities, as described herein, and helped to draft and disseminate the offering documents for the Securities.

165. The Issuer Defendants, the Individual Defendants and Defendant UBS Securities LLC each owed to the Plaintiff a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. These Defendants failed to exercise such due diligence by failing to conduct a reasonable investigation. On the contrary, they knew, or in the exercise of reasonable care should have known, of the untrue statements and omissions contained in or omitted from the Registration Statements filed in connection with the securitizations, as set forth herein.

166. The Issuer Defendants, the Individual Defendants and Defendant UBS Securities LLC each knew or should have known of the untrue statements and omissions in the Registration Statements at the time of the documents were filed with the SEC and at the time Plaintiff purchased the Securities.

167. This action is brought within one year of the discovery of the untrue statements and omissions in the Registration Statements and brought within three years of the effective date of the Registration Statements, by virtue of the timely filing of the *Luther* complaint and by the tolling of Plaintiff's claims afforded by that filing.

- 53 -

EXHIBIT   52   -480-

168. Plaintiff has sustained damages. Plaintiff's Securities lost a substantial portion of their value subsequent to and due to the untrue statements of material facts and omissions of material facts in the Registration Statements alleged herein.

169. By reason of the conduct herein alleged, the Issuer Defendants, the Individual Defendants and Defendant UBS Securities LLC violated Section 11 of the Securities Act of 1933 and are jointly and severally liable for their wrongdoing. By virtue of the foregoing, Plaintiff is entitled to damages from each of these Defendants.

170. Plaintiff purchased or otherwise acquired the Securities pursuant and/or traceable to the false and misleading Registration Statements, and within a year of the effective date of the Registration Statements.

## Count II

### for Violation of Section 12(a)(2) of the Securities Act of 1933
### (Against The Issuer Defendants and Defendant UBS Securities LLC)

171. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein. For the purposes of this Count, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

172. This Count is brought pursuant to Section 12(a)(2) of the Securities Act of 1933 (15 U.S.C. § 77l(a)(2)) against the Issuer Defendants and UBS Securities LLC (the "Section 12(a)(2) Defendants").

173. The Section 12(a)(2) Defendants promoted and sold the Securities pursuant to the defective Prospectuses and Prospectus Supplements, as alleged herein.

174. The Section 12(a)(2) Defendants offered and sold the Securities to Plaintiff by means of the defective Registration Statements and Prospectus Supplements. The Prospectuses

- 54 -

---

and Prospectus Supplements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts, as alleged herein.

175. Plaintiff purchased or otherwise acquired the Securities directly from the Section 12(a)(2) Defendants, pursuant to the false and misleading Registration Statements and Prospectus Supplements.

176. The Section 12(a)(2) Defendants owed to Plaintiff the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements and Prospectus Supplements, to ensure that such statements were true, and to ensure that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Section 12(a)(2) Defendants failed to exercise such reasonable care.

177. The Section 12(a)(2) Defendants knew, or in the exercise of reasonable care should have known, that the Registration Statements and Prospectus Supplements contained untrue statements of material facts and omissions of material facts, as set forth above, at the time of the offerings. Conversely, Plaintiff did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Registration Statements and Prospectus Supplements at the time they purchased the Securities.

178. Plaintiff acquired the Securities pursuant or traceable to the Registration Statements and Prospectus Supplements.

179. This action is brought within one year of the time when Plaintiff discovered or reasonably could have discovered the facts upon which this action is based, and within three years of the time that the Securities upon which this Cause of Action is brought were sold to the

- 55 -

_____

EXHIBIT   52   -482-

public, by virtue of the timely filing of the *Luther* complaint and by the tolling of Plaintiff's claims afforded by that filing.

180. By reason of the conduct alleged herein, the Section 12(a)(2) Defendants violated Section 12(a)(2) of the Securities Act of 1933 with regard to the securitizations.

181. Plaintiff has sustained material damages in connection with its investments in the Securities and accordingly has the right to rescind and recover the consideration paid for the Securities, with interest thereon, in exchange for tendering the Securities. Plaintiff hereby tenders its Securities and demands rescission.

### Count III

#### for Violation of Section 15 of the Securities Act of 1933
#### (Against CFC, CSC, CCM, CHL and the Individual Defendants)

182. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein. For the purposes of this Count, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

183. This is a claim brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o, against CFC, CSC, CCM, CHL and the Individual Defendants (the "Section 15 Defendants") for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above. The Section 15 Defendants were named as defendants in *Luther* for violation of Section 15 of the Securities Act.

184. The Section 15 Defendants are controlling persons within the meaning of Section 15 of the Securities Act by virtue of their actual power over, control of, ownership of, and/or directorship of the Section 11 Defendants and the Section 12(a)(2) Defendants, defined above, at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements and Prospectus Supplements.

- 56 -

EXHIBIT   52   -483-

185. The Section 15 Defendants had power and influence over the Section 11 and 12(a)(2) Defendants and exercised the same to cause those Defendants to engage in the acts described herein. By virtue of their control, ownership, offices, directorship and specific acts, the Section 15 Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Section 11 and 12(a)(2) Defendants named herein, including controlling the content of the Registration Statements and Prospectus Supplements.

186. The Section 15 Defendants' control, ownership, and position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff.

187. None of the Defendants named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true, were without omissions of any material fact, or were not misleading.

188. Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Registration Statements and Prospectus Supplements at the time it purchased the Securities.

189. Plaintiff purchased the Securities pursuant to and/or traceable to the Registration Statements and Prospectus Supplements, and was damaged thereby.

190. By virtue of the conduct alleged herein, The Section 15 Defendants are liable for the aforesaid wrongful conduct, jointly and severally with—and to the same extent as—the entities they controlled for the violations of Sections 11 and 12(a)(2) by the controlled entities. The Section 15 Defendants are liable to Plaintiff for damages suffered as a result of those violations.

- 57 -

EXHIBIT   52   -484-

## Count IV

### for Violation of the Colorado Securities Act
### <u>(Against All Defendants)</u>

191. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein. For the purposes of this Count, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

192. Defendants sold the Securities to Plaintiff in violation of C.R.S. § 11-51-501(1)(b) in that they made untrue statements of material fact and/or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

193. Plaintiff was unaware of the untrue statements and/or omissions at the time it purchased the Securities.

194. Alternatively, Defendants recklessly or knowingly sold the Securities to Plaintiff.

195. Pursuant to C.R.S. §§ 11-501-604(3) and 11-501-604(4), Defendants are liable to Plaintiff for the consideration paid for the Securities, together with interest at the statutory rate, costs and reasonable attorneys' fees. Plaintiff hereby tenders its Securities and demands rescission.

196. Defendants CFC, CSC, CCM, CHL directly or indirectly controlled Defendants CWMBS and CWALT and The Individual Defendants directly or indirectly controlled Defendants CFC, CSC, CCM, CHL, CWMBS and CWALT and are thereby liable pursuant to C.R.S. § 11-51-604(5)(b).

- 58 -

EXHIBIT   52   -485-

**Count V**

**Successor Liability (Against
<u>Defendant Bank of America)</u>**

197. Plaintiff realleges and incorporates each and every allegation contained above as if fully set forth herein.

198. Bank of America is liable for Countrywide's wrongdoing, in its entirety, as alleged herein, because they are Countrywide's successors at common law.

199. Bank of America acquired Countrywide on July 1, 2008 via a merger. CFC's shares were delisted on the New York Stock Exchange that month. CFC and its wholly-owned subsidiaries are now in the final stages of becoming fully combined with Bank of America's operations. (The Countrywide Defendants initially retained their pre-merger names because the Bank of America subsidiary was renamed Countrywide Financial Corporation upon execution of the merger, but the Countrywide Defendants are now in the final stages of combining their businesses with Bank of America.)

200. The Bank of America Defendants are liable for Countrywide's wrongdoing, in its entirety, under common law, because Bank of America and Countrywide merged or consolidated, because Bank of America has expressly or impliedly assumed Countrywide's tort liabilities, and because Defendant Bank of America are a mere continuation of the Countrywide Defendants.

201. Bank of America describes the integration of CFC as a "combination" of the two companies, and has shown that it intends to fully integrate Countrywide into Bank of America.

202. Bank of America and Countrywide have confirmed publicly that they have merged. The Bank of America website announced that the companies had merged. Bank of America noted on its website that it was "combining the valuable resources and extensive

- 59 -

EXHIBIT   52   -486-

product lines of both companies." In addition, the former Countrywide web address, www.countrywide.com, now takes users to the Bank of America website.

203. In its 2008 Annual Report, Bank of America confirmed that "On July 1, 2008, we acquired Countrywide through its merger with a subsidiary" of the bank. Bank of America stated that the merger "significantly improved our mortgage originating and servicing capabilities, making us a leading mortgage originator and servicer." In the Q&A section of the same report, the question was posed: "How do the recent acquisitions of Countrywide and Merrill Lynch fit into your strategy?" Bank of America responded that by acquiring Countrywide it became the "No. 1 provider of both mortgage originations and servicing" and "as a combined company," it would be recognized as a "responsible lender who is committed to helping our customers become successful homeowners." Similarly, in a July 1, 2008 Countrywide press release, Mozilo stated that "the combination of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world."

204. As is customary in large corporate mergers, at least some of the Countrywide Defendants retained their pre-merger corporate names following their merger with Bank of America. However, Countrywide's operations are becoming fully consolidated into Bank of America's and the Countrywide entities will soon lose any independent identity they have maintained following the merger. In a January 2008 press release announcing the "proposed merger" with Countrywide, Bank of America noted that it planned to operate Countrywide separately "under the Countrywide brand," and that integration would occur in 2009.

205. In a July 2008 Bank of America press release, Barbara Desoer, identified as the president of the "combined mortgage, home equity and insurance businesses" of Bank of America and Countrywide, said, "Now we begin to combine the two companies and prepare to

- 60 -

introduce our new name and way of operating." The press release stated that the bank "anticipates substantial cost savings from combining the two companies. Cost reductions will come from a range of sources, including the elimination of positions announced last week, and the reduction of overlapping technology, vendor and marketing expenses. In addition, the company is expected to benefit by leveraging its broad product set to deepen relationships with existing Countrywide customers."

206. In an April 27, 2009 press release, Bank of America announced that CHL would be rebranded as Bank of America Home Mortgage loans, which would represent the "combined operations of Bank of America's mortgage and home equity business and Countrywide Home Mortgage loans, which Bank of America acquired on July 1, 2008," and that the CHL brand would be "retired." The press release explained that Bank of America was in the process of rebranding former Countrywide "locations, account statements, marketing materials and advertising" as Bank of America Home Mortgage loans, and stated that "the full systems conversion" to Bank of America Home Mortgage loans would occur later in 2009. "Bank of America Home Mortgage loans" is thus a direct continuation of Countrywide's operations, although Defendant Bank of America have represented that Bank of America Home Mortgage loans is a "trade name" rather than a separate legal entity. It is a Bank of America trade name or brand and thus a part of Bank of America.

207. Countrywide's customers' assets have been moved to Bank of America. As of September 21, 2009, former Countrywide bank deposit accounts were reportedly converted to Bank of America accounts. And on November 9, 2009, online account services for Countrywide mortgage loans were reportedly transferred to Bank of America's Online Banking website.

- 61 -

208. Desoer was also interviewed for the May 2009 issue of Housing Wire magazine.

The article reported as follows:

> While the move to shutter the Countywide name is essentially complete, the operational effort to integrate across two completely distinct lending and service systems is just getting under way. One of the assets [Bank of America] acquired with Countywide was a vast technology platform for originating and servicing mortgage loans, and Desoer says that the bank will be migrating some aspects of [Bank of America]'s mortgage operations over to Countrywide's platforms.

Desoer explained that "We're done with defining the target, and we're in the middle of doing the development work to prepare us to be able to do the conversion of the part of the portfolio going to the legacy Countywide platforms." She stated that the conversion would happen in the "late fall" of 2009, and that the integration of the Countrywide and Bank of America platforms was a critical goal.

209. On information and belief, the real property of Countrywide has been transferred or assumed by Defendant Bank of America. Bank of America employs the former employees and management personnel of Countrywide, it has assumed Countrywide's contracts, including Countrywide's customer service contracts, and it has retired the "toxic" Countrywide name. In sum, and as widely reported in the press, Bank of America is completing its merger of its mortgage operations and related business operations with those of the former Countrywide entities into a single business.

210. Bank of America has generated substantial earnings from the absorption of Countrywide's mortgage business. For example, a Bank of America press release regarding the company's 2009 first quarter earnings stated that "[n]et revenue nearly quadrupled to $5.2 billion primarily due to the acquisition of Countrywide and from higher mortgage banking income as lower interest rates drove an increase in mortgage activity." Bank of America's President and

- 62 -

Chief Executive Officer, Kenneth D. Lewis, was quoted as saying, "We are especially gratified that our new teammates at Countrywide and Merrill Lynch had outstanding performance that contributed significantly to our success."

211. A press release regarding Bank of America's 2009 second quarter earnings similarly stated that "[n]et revenue rose mainly due to the acquisition of Countrywide and higher mortgage banking income as lower interest rates spurred an increase in refinance activity." The press release explained that "higher mortgage banking income, trading account profits and investment and brokerage services income reflected the addition of Merrill Lynch and Countrywide." Bank of America reported that its average retail deposits in the quarter increased $136.3 billion, or 26 percent, from a year earlier, including $104.3 billion in balances from Merrill Lynch and Countrywide. Bank of America has profited substantially from its merger with Countrywide.

212. Following its merger with Countrywide, Bank of America has also taken steps to expressly and impliedly assume Countrywide's liabilities. In an interview published on February 22, 2008 in the legal publication Corporate Counsel, a Bank of America spokesperson outright admitted that the Company had assumed Countrywide's liabilities:

> Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country. Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations. "We bought the company and all of its assets and liabilities," spokesman Scott Silvestri says. "We are aware of the claims and potential claims against the company and have factored these into the purchase."

Thus, Bank of America has officially acknowledged that it has assumed Countrywide's assets and liabilities. In purchasing Countrywide for 27 percent of its book value, Bank of America was fully aware of the pending claims and potential claims against Countrywide and factored them into the transaction.

- 63 -

EXHIBIT   52   -490-

213. Bank of America has made additional statements implying that it has assumed the liabilities of Countrywide. In a press release announcing the merger, Mr. Lewis stated that he was aware of the "issues within the housing and mortgage industries" and said that "the transaction [with Countrywide] reflects those challenges," which suggests that Lewis recognized that Bank of America was taking on Countrywide's liabilities in the merger.

214. Similarly, Mr. Lewis was recently quoted in an article reporting on the acquisition of Countrywide, in which he showed that Bank of America knew of Countrywide's legal liabilities and impliedly accepted those liabilities as part of the cost of the acquisition:

"We did extensive due diligence. We had 60 people inside the company for almost a month. It was the most extensive due diligence we have ever done. So we feel comfortable with the valuation," Mr. Lewis said. "We looked at every aspect of the deal, from their assets to potential lawsuits and we think we have a price that is a good price."

215. Pursuant to its assumption of Countrywide's liabilities, Bank of America has paid to restructure certain of Countrywide's home mortgage loans on its behalf, including settling the predatory-lending lawsuits brought by eleven state attorneys general, described above, by agreeing to modify up to 390,000 Countrywide mortgage loans. The settlement agreement was valued at up to $8.4 billion. Bank of America also restructured 300,000 home mortgage loans in 2008, of which 87 percent had been made or serviced by Countrywide.

216. For the reasons stated herein, the Countrywide Defendants and Defendant Bank of America are each jointly and severally liable for Countrywide's wrongdoing.

- 64 -

EXHIBIT   52   -491-

## XI. PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

An award of damages against Defendants in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a. Rescission and recovery of the consideration paid for the Securities, with interest thereon, pursuant to Plaintiff's Section 12(a)(2) and Colorado Securities Act claims;

b. Plaintiff's monetary losses, including lost principal and lost interest payments, on all other claims besides Plaintiff's Section 12(a)(2) claim;

c. Attorneys' fees and costs;

d. Prejudgment interest at the maximum legal rate; and

e. Such other and further relief as the Court may deem just and proper.

## XII. JURY TRIAL REQUESTED

Plaintiff hereby requests a jury of six persons on all issues triable by jury.

Dated: April 23, 2010                                Respectfully submitted,

                                                     */s/ Kip B. Shuman*
                                                     Kip B. Shuman
                                                     Rusty Glenn
                                                     **THE SHUMAN LAW FIRM**
                                                     885 Arapahoe Avenue
                                                     Boulder, Colorado 80302
                                                     Telephone: (303) 861-3003
                                                     Facsimile: (303) 484-4886
                                                     Email: kip@shumanlawfirm.com
                                                     Email: rusty@shumanlawfirm.com

- 65 -

Steve W. Berman
Karl P. Barth
Tyler Weaver
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Ave.
Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

John D. Jenkins
Geoffrey Bestor
**LEVETOWN & JENKINS LLP**
700 12th Street, NW, Suite 700
Washington, DC 20005
Telephone: (202) 379-4899
Facsimile: (866) 278-2973

*Counsel for Plaintiff*

- 66 -

EXHIBIT   52   -493-