*EXHIBIT 53*

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT
CIVIL ACTION NO.

| | |
|---|---|
| CAMBRIDGE PLACE INVESTMENT MANAGEMENT INC., <br><br>       Plaintiff, <br><br>    v. <br><br> MORGAN STANLEY & CO., INC.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE SECURITIES (USA) LLC; RBS SECURITIES, INC.; DEUTSCHE BANK SECURITIES, INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; UBS SECURITIES LLC; GOLDMAN, SACHS & CO.; J.P. MORGAN SECURITIES INC.; COUNTRYWIDE SECURITIES CORPORATION; FBR CAPITAL MARKETS & CO.; HSBC SECURITIES (USA), INC.; BANC OF AMERICA SECURITIES LLC; RESIDENTIAL FUNDING SECURITIES, LLC; BARCLAYS CAPITAL INC.; ACCREDITED MORTGAGE LOAN REIT TRUST; ACE SECURITIES CORPORATION; AEGIS ASSET BACKED SECURITIES CORPORATION; ALLIANCE SECURITIES CORPORATION; AMERICAN HOME MORTGAGE ASSETS LLC; AMERIQUEST MORTGAGE SECURITIES INC.; ARGENT SECURITIES INC.; ASSET BACKED FUNDING CORPORATION; ASSET BACKED SECURITIES CORPORATION; BANC OF AMERICA MORTGAGE SECURITIES, INC.; BCAP LLC; BEAR STEARNS ASSET BACKED SECURITIES I LLC; CITIGROUP MORTGAGE LOAN TRUST INC.; CREDIT SUISSE FIRST | COMPLAINT and   **10  2741** <br> JURY DEMAND <br><br><br><br><br><br><br><br><br> RECEIVED <br><br> JUL 0 9 2010 <br><br> SUPERIOR COURT · CIVIL <br> MICHAEL JOSEPH DONOVAN <br> CLERK / MAGISTRATE <br><br><br><br> [CAPTION CONTINUED ON NEXT PAGE] |

EXHIBIT  53  -494-

BOSTON MORTGAGE SECURITIES CORP.; CWABS, INC.; CWALT, INC.; FBR SECURITIZATION, INC.; FIELDSTONE MORTGAGE INVESTMENT CORPORATION; FINANCIAL ASSET SECURITIES CORP.; FREMONT MORTGAGE SECURITIES CORPORATION; GS MORTGAGE SECURITIES CORP.; HSI ASSET SECURITIZATION CORPORATION; J.P. MORGAN ACCEPTANCE CORPORATION I; LONG BEACH SECURITIES CORP.; MERRILL LYNCH MORTGAGE INVESTORS, INC.; MORGAN STANLEY ABS CAPITAL I INC.; MORGAN STANLEY CAPITAL I INC.; MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; NATIONSTAR FUNDING LLC; NEW CENTURY MORTGAGE SECURITIES LLC; NEW CENTURY MORTGAGE SECURITIES, INC.; NOVASTAR MORTGAGE FUNDING CORPORATION; PARK PLACE SECURITIES, INC.; PEOPLE'S CHOICE HOME LOAN SECURITIES CORP.; POPULAR ABS, INC.; RESIDENTIAL ACCREDIT LOANS, INC.; RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.; RESIDENTIAL ASSET SECURITIES CORPORATION; SACO I INC.; SAXON ASSET SECURITIES COMPANY; SECURITIZED ASSET BACKED RECEIVABLES LLC; STANWICH ASSET ACCEPTANCE COMPANY, L.L.C.; STRUCTURED ASSET MORTGAGE INVESTMENTS II INC.; and WASHINGTON MUTUAL MORTGAGE SECURITIES CORP.

Defendants.

EXHIBIT   53   -495-

# TABLE OF CONTENTS

Page

I.      NATURE OF THE ACTION ....................................................................................1

II.     JURISDICTION AND VENUE ...............................................................................3

III.    THE PARTIES..........................................................................................................3

        a.      Plaintiff ........................................................................................................3

        b.      The Wall Street Bank Defendants................................................................4

        c.      The Depositor Defendants ..........................................................................11

IV.     FACTUAL BACKGROUND .................................................................................16

        a.      The Mechanics of Mortgage Securitization...............................................16

        b.      Securitization of Mortgage Loans: The Traditional Model .......................17

        c.      The Systemic Violation of Underwriting and Appraisal Standards in the
                Mortgage Securitization Industry ..............................................................19

        d.      The Wall Street Banks Conduct Less Due Diligence .............................25

        e.      Plaintiff's Acquisition of the Securities.....................................................28

V.      THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF
        MATERIAL FACTS AND OMISSIONS ABOUT THE MORTGAGE
        ORIGINATORS' UNDERWRITING STANDARDS AND PRACTICES....................30

        a.      New Century Mortgage Corporation ..........................................................31

                1.      Defendants Made Untrue Statements of Material Facts About New
                        Century's Underwriting Standards and Practices ..................................... 31

                2.      New Century Violated Its Stated Underwriting Standards ...................... 34

        b.      Long Beach Mortgage Company ................................................................39

                1.      Defendants Made Untrue Statements of Material Facts About Long
                        Beach's Underwriting Standards and Practices ........................................ 39

                2.      Long Beach Violated Its Stated Underwriting Standards ........................ 41

        c.      WaMu ..........................................................................................................49

                1.      Defendants Made Untrue Statements of Material Facts About
                        WaMu's Underwriting  Standards and Practices ...................................... 49

i

EXHIBIT   53   -496-

2.      WaMu Violated Its Stated Underwriting Standards ................................. 50

d.      Fremont Investment & Loan .................................................................................60

        1.      Defendants Made Untrue Statements of Material Facts About
                Fremont's Underwriting Standards and Practices...................................... 60

        2.      Fremont Violated Its Stated Underwriting Standards ............................... 62

e.      WMC Mortgage Corporation ...............................................................................69

        1.      Defendants Made Untrue Statements of Material Facts About
                WMC's Underwriting Standards and Practices ......................................... 69

        2.      WMC Violated Its Stated Underwriting Standards ................................... 72

f.      The Ameriquest Loan Sellers ...............................................................................74

        1.      Defendants Made Untrue Statements of Material Facts About the
                Ameriquest Loan Sellers' Underwriting Standards and Practices........... 74

        2.      The Ameriquest Loan Sellers Violated Their Stated Underwriting
                Standards .................................................................................................... 77

g.      Option One ...........................................................................................................80

        1.      Defendants Made Untrue Statements of Material Facts About
                Option One's Underwriting Standards and Practices ............................... 80

        2.      Option One Violated Its Stated Underwriting Standards......................... 82

h.      Additional Mortgage Originators .........................................................................85

VI.   DEFENDANTS MADE MATERIAL UNTRUE STATEMENTS AND
      OMISSIONS ....................................................................................................................87

      a.      Morgan Stanley's Untrue Statements of Material Facts and Omissions ..............88

      b.      Bear Stearns' Untrue Statements of Material Facts and Omissions .....................95

      c.      Citigroup's Untrue Statements of Material Facts and Omissions.......................102

      d.      Credit Suisse's Untrue Statements of Material Facts and Omissions.................107

      e.      Greenwich Capital's Untrue Statements of Material Facts and Omissions.........113

      f.      Deutsche Bank's Untrue Statements of Material Facts and Omissions..............117

      g.      Merrill Lynch's Untrue Statements of Material Facts and Omissions ...............121

EXHIBIT   53   -497-

h.      UBS's Untrue Statements of Material Facts and Omissions ..............................126

i.      Goldman Sachs' Untrue Statements of Material Facts and Omissions ..............131

j.      J.P. Morgan's Untrue Statements of Material Facts and Omissions...................135

k.      Countrywide's Untrue Statements of Material Facts and Omissions .................139

l.      FBR's Untrue Statements of Material Facts and Omissions .............................144

m.      HSBC's Untrue Statements of Material Facts and Omissions ...........................147

        1.      HASC 2005-NC2 ................................................................................. 148

        2.      FFML 2006-FF5 .................................................................................. 150

n.      Banc of America's Untrue Statements of Material Facts and Omissions............153

o.      GMAC's Untrue Statements of Material Facts and Omissions ..........................157

p.      Barclays' Untrue Statements of Material Facts and Omissions..........................159

q.      The Depositor Defendants' Untrue Statements of Material Facts and
        Omissions..........................................................................................................163

VII.    THE PERFORMANCE AND VALUE OF THE SECURITIES ....................................165

VIII.   COUNT I AGAINST THE WALL STREET BANK DEFENDANTS:
        VIOLATION OF MASSACHUSETTS UNIFORM SECURITIES ACT, MASS.
        GEN. LAWS CH. 110A § 410(A)(2) .............................................................................174

IX.     COUNT II AGAINST THE DEPOSITOR DEFENDANTS: VIOLATION OF
        MASSACHUSETTS UNIFORM SECURITIES ACT, MASS. GEN. LAWS CH.
        110A § 410(A)(2) .........................................................................................................175

X.      COUNT III AGAINST THE WALL STREET BANK DEFENDANTS:
        VIOLATION OF MASSACHUSETTS UNIFORM SECURITIES ACT, MASS.
        GEN. LAWS CH. 110A § 410(B) ..................................................................................176

XI.     RELIEF REQUESTED....................................................................................................178

XII.    JURY DEMAND ............................................................................................................178

EXHIBIT   53   -498-

## I.        NATURE OF THE ACTION

1.        The Defendants identified below in ¶¶ 15-32 offered or sold approximately $2.4 billion of residential mortgage-backed securities (the "Securities" or "RMBS") to the investor Plaintiff (as defined in ¶¶ 11-13), by means of untrue statements of material facts and omissions of material fact.  As a result of Defendants' untrue statements to Plaintiff in Massachusetts, Plaintiff has incurred losses exceeding $1.2 billion.   Defendants' written and oral untrue statements concerned: (1) the mortgage originators' underwriting standards that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Securities; (2) the appraisal standards that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) the loan-to-value ("LTV") ratios, debt-to-income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (4) the Wall Street Bank Defendants' due diligence of the loans and the mortgage originators' underwriting practices; and (5) various forms of credit enhancement applicable to certain tranches of Securities.

2.        Defendants' statements of material facts were not true.  In reality, each of the Defendants offered to sell and sold Securities backed by mortgages that came from a small group of now notorious subprime mortgage originators that violated their own underwriting standards, used faulty appraisals that overvalued the mortgaged properties, and accepted untrue information in loan applications.

3.        The Wall Street Bank Defendants were complicit in creating an environment of improper lending practices by the mortgage originators; indeed, in many instances the Wall Street Banks had personnel on site at the mortgage originators to monitor their loan underwriting practices.   The Wall Street Bank Defendants also fostered the environment for, permitted, and profited from the mortgage originators' rampant violations of sound lending practices.  Driven to profit from the lucrative securitization business, the Wall Street Bank Defendants demanded enormous volumes of loans to securitize and sell to investors in the form of RMBS, leading to erosion in lending standards.

EXHIBIT  53  -499-

4.      As a result of the relationships between mortgage originators and the Wall Street Bank Defendants, the Wall Street Banks had superior access to information about the business and lending practices of the mortgage originators and data about the loans, such as loan attributes, beyond what was conveyed to investors in the offering documents for RMBS. Nevertheless, the Wall Street Bank Defendants repeated the untrue information from the mortgage originators in the offering documents used to sell the Securities to investors.

5.      While the Wall Street Banks stated to Plaintiff that they performed careful due diligence into the loans and the mortgage originators' underwriting practices, the Wall Street Banks  conducted inadequate due diligence and failed to satisfy their own responsibilities.  Thus, the statements of material facts that these Wall Street Banks made to Plaintiff in Massachusetts while offering or selling the Securities were untrue and omitted material information.

6.      In addition, the Wall Street Banks materially aided the Depositor Defendants, who also offered or sold the Securities to the Plaintiff.  The Depositor Defendants are Special Purpose Vehicles ("SPVs") that were created as part of the securitization process to acquire and securitize the loans for sale to investors.  Working together with the Wall Street Banks, the Depositor Defendants drafted the offering documents that contained the untrue statements of material facts and circulated them to investors.

7.      The Plaintiff brings this action to recover damages incurred as a result of the Defendants' offer or sale of securities in Massachusetts by means of untrue statements of material facts or omissions of material facts in violation of Mass. Gen. Laws Ch. 110A, § 410 (the "Massachusetts Securities Act").

8.      Plaintiff alleges the following upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters.  Plaintiff's information and belief are based on the investigation conducted by and through counsel.  The investigation included interviews with confidential witnesses; documents filed in connection with investigations and actions brought by the United States Securities and Exchange Commission (the "SEC"), the Attorneys General of Massachusetts, New York, and California, and private litigants; testimony

2

EXHIBIT  53  -500-

before the Federal Financial Crisis Inquiry Commission; a report of a court-appointed bankruptcy trustee; news reports; interviews published in the financial press; Congressional testimony; and other available information.  Some of the facts related to Plaintiff's allegations are known only by the Defendants named herein, or are exclusively within their custody or control.  Plaintiff believes that additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## II.     JURISDICTION AND VENUE

9.     Jurisdiction is proper because the offer or sale of the Securities by the Defendants occurred in Massachusetts (see Mass. Gen. Laws Ch. 110A, § 414).  In addition, Plaintiff's principal place of business is located in the Commonwealth of Massachusetts, and many of the Defendants have offices in Massachusetts.  The amount in controversy exceeds $25,000.

10.     Venue is proper pursuant to Mass. Gen. Laws Ch. 223, § 1 and Superior Court Administrative Directive No. 09-01 because many of the Defendants have usual places of business in Suffolk County.

## III.    THE PARTIES

### a.     **Plaintiff**

11.     Cambridge Place Investment Management Inc. ("CPIM") is a Delaware corporation with its principal place of business in Concord, Massachusetts.

12.     CPIM was responsible for the sourcing, review, analysis, and purchase decisions for U.S. investments for its clients, including Caliber Global Investment Ltd., CAMBER 3 PLC, CAMBER 4 PLC, CAMBER 5 Ltd, CAMBER 7 PLC, CPIM Structured Credit Fund 20 LP, CPIM Structured Credit Fund 500 LP, CPIM Structured Credit Fund 1000 LP, and CPIM Structured Credit Fund 1500 LP (collectively, the "Clients").

13.     CPIM is the exclusive assignee of, and the exclusive attorney-in-fact for and with respect to, all of the Clients' claims relating to the offer and sale of Securities that are the subject of this Complaint.  CPIM, as such exclusive assignee and attorney-in-fact of the Clients, is referred to herein as the "Plaintiff."

EXHIBIT  53  -501-

14.    Plaintiff was solicited in Massachusetts by investment firms, underwriters, and dealers (the "Wall Street Bank Defendants") and by the Depositor Defendants (as defined in ¶ 31), who offered or sold the Securities to Plaintiff.

   **b.    The Wall Street Bank Defendants**

15.    **Morgan Stanley & Co., Inc.**:  Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 1585 Broadway, New York, New York 10036 and an office located at 1 International Place, Boston, Massachusetts 02110.  The Defendant Morgan Stanley is the broker-dealer subsidiary of Morgan Stanley, a Delaware corporation headquartered in New York, New York.  Defendant Morgan Stanley offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Morgan Stanley sales representatives who offered or sold Securities to Plaintiff included Howard Hennick, Paul Knepple, and Ryan Rossitto.   Morgan Stanley, Knepple, and Rossitto are all licensed to sell securities in Massachusetts.  Other Morgan Stanley representatives who offered or sold Securities to Plaintiff included investment bankers Michael Dubeck, Howard Hubler, Steven Shapiro (who is also licensed to sell securities in Massachusetts), and Terry Smith.   The Securities that Morgan Stanley offered or sold to Plaintiff are listed in Appendix A.

16.    **Citigroup Global Markets, Inc.**:  Defendant Citigroup Global Markets, Inc. ("Citigroup") is a New York corporation and an SEC-registered broker-dealer with its principal place of business located at 388 Greenwich Street, New York, New York.   Citigroup representatives from Citigroup's office located at 2 International Place, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Citigroup sales representatives who offered or sold Securities to Plaintiff included Douglas Meyer, John W. Murray (the manager of Citigroup's Boston office), and David Crean.  Citigroup, Murray, and Crean are all licensed to sell securities in Massachusetts.  Other

EXHIBIT  53  -502-

Citigroup representatives who offered or sold Securities to Plaintiff included investment bankers James Demare, Matthew Cherwin, and Philip Seares (who is also licensed to sell securities in Massachusetts).   The Securities that Citigroup offered or sold to Plaintiff are listed in Appendix B.

17.     **Credit Suisse Securities (USA) LLC**:  Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at 11 Madison Avenue, New York, New York. Credit Suisse representatives from Credit Suisse's office located at 1 Federal Street, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Credit Suisse sales representatives who offered or sold Securities to Plaintiff included James "Jay" Allen (the manager of Credit Suisse's Boston office) and Andrew Mingle.   Credit Suisse, Allen, and Mingle are all licensed to sell securities in Massachusetts.  Other Credit Suisse representatives who offered or sold Securities to Plaintiff included syndicate manager Tricia Hazelwood and investment bankers Christopher Schoen, Patrick Dodman, Gregory Richter, and Mark Tecotzky.  The Securities that Credit Suisse offered or sold to Plaintiff are listed in Appendix C.

18.     **RBS Securities, Inc., f/k/a Greenwich Capital Markets, Inc.**:  Defendant RBS Securities, Inc., f/k/a Greenwich Capital Markets, Inc. ("Greenwich Capital"), is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 600 Washington Boulevard, Stamford, Connecticut.   Greenwich Capital representatives from Greenwich Capital's office located at 28 State Street, Boston, Massachusetts 02109, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Greenwich Capital sales representatives who offered or sold Securities to Plaintiff included Christopher J. Csrnko and Jeffrey Dimodica.  Greenwich Capital, Csrnko, and Dimodica are all licensed to sell securities in Massachusetts.   Other Greenwich Capital representatives who offered or sold

EXHIBIT  53   -503-

Securities to Plaintiff included investment banker Adam Smith.  The Securities that Greenwich Capital offered or sold to Plaintiff are listed in Appendix D.

19.  **Deutsche Bank Securities Inc.**:  Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 60 Wall Street, New York, New York.  Deutsche Bank representatives from Deutsche Bank's office located at 225 Franklin Street, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Deutsche Bank sales representatives who offered or sold Securities to Plaintiff included Alexandra DaCosta, Christopher Del Col, Laurence Pike, and Chris Walter.  Deutsche Bank, DaCosta, Del Col, and Pike are all licensed to sell securities in Massachusetts.  Other Deutsche Bank representatives who offered or sold Securities to Plaintiff included syndicate managers Fred Brettschneider (who is also licensed to sell securities in Massachusetts) and Brian Wiele, trader Greg Lippman, and investment bankers Michael Commaroto, Paul Mangione, Joseph Swartz, and Ryan Stark.  The Securities that Deutsche Bank offered or sold to Plaintiff are listed in Appendix E.

20.  **Merrill Lynch, Pierce, Fenner & Smith, Inc.**:  Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at One Bryant Park, New York, New York.  Merrill Lynch is a wholly owned subsidiary of Merrill Lynch & Co., which became a wholly owned subsidiary of Bank of America Corporation on January 1, 2009.  Merrill Lynch representatives from Merrill Lynch's office located at 1 Financial Center, Boston, Massachusetts 02111, offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Merrill Lynch sales representatives who offered or sold Securities to Plaintiff included William Farrell, James Peck, and Greg St. Pierre.  Merrill Lynch, Farrell, Peck, and St. Pierre are all licensed to sell securities in Massachusetts.  Other Merrill Lynch

EXHIBIT  53  -504-

representatives who offered or sold Securities to Plaintiff included investment bankers Matthew Whalen, Paul Park, and Ketan Parekh.  The Securities that Merrill Lynch offered or sold to Plaintiff are listed in Appendix F.

21.     **UBS Securities LLC**:  Defendant UBS Securities LLC ("UBS") is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at 677 Washington Boulevard, Stamford, Connecticut 06901 and an office located at 1 International Place, Boston, Massachusetts 02110.  UBS offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The UBS sales representatives who offered or sold Securities to Plaintiff included Blake Myers.  UBS and Myers are licensed to sell securities in Massachusetts.  Other UBS representatives who offered or sold Securities to Plaintiff included syndicate managers Jack McCleary and Richard Onkey and investment bankers Jeffrey "Jay" Lown, Carole Mortenson, and Ketan Parekh.  The Securities that UBS offered or sold to Plaintiff are listed in Appendix G.

22.     **Goldman, Sachs & Co.**:  Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a New York partnership and an SEC-registered broker-dealer with its principal place of business located at 200 West Street, New York, NY 10282.  Goldman Sachs maintains an office at 125 High Street, Boston, Massachusetts 02110.  Goldman Sachs offered or sold the Securities to Plaintiff in at least one face-to-face meeting and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Goldman Sachs sales representatives who offered or sold Securities to Plaintiff included Michael Cagnassola, Eric Feinstein, Samuel Hancock, and Lorin Radtke.  Goldman Sachs, Cagnassola, Feinstein, Hancock, and Radtke are all licensed to sell securities in Massachusetts.  Other Goldman Sachs representatives who offered or sold Securities to Plaintiff included investment banker Kevin Gasvoda, who is also licensed to sell securities in Massachusetts.  The Securities that Goldman Sachs offered or sold to Plaintiff are listed in Appendix H.

EXHIBIT   53   -505-

23.   **J.P. Morgan Securities Inc.:**   Defendant J.P. Morgan Securities Inc. ("J.P. Morgan") is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 383 Madison Avenue, New York, New York 10179.   J.P. Morgan is a wholly owned subsidiary of JPMorgan Chase & Co., a financial holding company with its principal place of business located at 270 Park Avenue, New York, New York 10017.   J.P. Morgan maintains an office at 2 International Place, Boston, Massachusetts 02110.   J.P. Morgan offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.   The J.P. Morgan sales representatives who offered or sold Securities to Plaintiff included James McLaughlin of J.P. Morgan's Boston office.   J.P. Morgan and McLaughlin are both licensed to sell securities in Massachusetts.   Other J.P. Morgan representatives who offered or sold Securities to Plaintiff included syndicate managers Andrew Cherna (who is also licensed to sell securities in Massachusetts) and Brian McDonald.   The Securities that J.P. Morgan offered or sold to Plaintiff are listed in Appendix I.

24.   **J.P. Morgan, successor to Bear Stearns:**   In addition to Plaintiff's claims based on J.P. Morgan's own offers or sales of Securities to Plaintiff, Plaintiff also brings claims against J.P. Morgan as successor-in-interest to Bear Stearns & Co., Inc. ("Bear Stearns"), which was a Delaware corporation and was an SEC-registered broker-dealer with its principal place of business located at 383 Madison Avenue, New York, New York 10179.   On October 1, 2008, J.P. Morgan merged with and into Bear Stearns, with the surviving entity being Defendant J.P. Morgan.   Bear Stearns representatives from Bear Stearns' office located at 1 Federal Street, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.   The Bear Stearns sales representatives who offered or sold Securities to Plaintiff included Daniel Kenslea, Jr., Felix Moy, Andrew Reese, and Steven Scari.   Bear Stearns was, and Kenslea, Moy, Reese, and Scarri all are, licensed to sell securities in Massachusetts.   Other Bear Stearns representatives who offered or sold Securities to Plaintiff

EXHIBIT   53   -506-

included investment bankers Scott Eichel, Keith Lind, and Chris Scott.  Eichel and Lind are also licensed to sell securities in Massachusetts.  The Securities that Bear Stearns offered or sold to Plaintiff are listed in Appendix J.

25.   **Countrywide Securities Corporation**:   Defendant Countrywide Securities Corporation ("Countrywide") is a California corporation with its principal place of business located at 4500 Park Granada, Calabasas, California.  Countrywide was an SEC-registered broker-dealer during the relevant period.  Countrywide was a subsidiary of Countrywide Financial Corporation, which merged on July 1, 2008 with a wholly owned subsidiary of Bank of America Corporation, making Countrywide an indirect wholly owned subsidiary of Bank of America.  Countrywide offered or sold the Securities to Plaintiff in Massachusetts by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Countrywide sales representatives who offered or sold Securities to Plaintiff included Matthew Kennedy, who is licensed to sell securities in Massachusetts, and Elaine Pang.  The Securities that Countrywide offered or sold to Plaintiff are listed in Appendix K.

26.   **FBR Capital Markets & Co., f/k/a/ Friedman, Billings, Ramsey & Co., Inc.**:  Defendant FBR Capital Markets & Co., formerly known as Friedman, Billings, Ramsey & Co., Inc. ("FBR"), is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 1001 Nineteenth Street North, Arlington, Virginia 22209.  FBR maintains an office at 100 Federal Street, Boston, Massachusetts 02110.  FBR offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The FBR sales representatives who offered or sold Securities to Plaintiff included John Calabrese.  Other FBR representatives who offered or sold Securities to Plaintiff included investment bankers Paul Miller and Scott Valentin.  FBR, Calabrese, Miller, and Valentin are all licensed to sell securities in Massachusetts.  The Securities that FBR offered or sold to Plaintiff are listed in Appendix L.

27.   **HSBC Securities (USA), Inc.**:   Defendant HSBC Securities (USA), Inc. ("HSBC") is a Delaware corporation and an SEC-registered broker-dealer with its principal place

EXHIBIT  53  -507-

of business located at 452 Fifth Avenue, New York, New York.  HSBC offered or sold the Securities to Plaintiff in Massachusetts by making telephone calls and sending documents to Plaintiff in Massachusetts.  The HSBC sales representatives who offered or sold Securities to Plaintiff included Michael Sheldon and Wendy Horn.  HSBC and Horn are licensed to sell securities in Massachusetts.  Other HSBC representatives who offered or sold Securities to Plaintiff included investment bankers Jon Voigtman, Martin Priest, and Thomas Benz.  The Securities that HSBC offered or sold to Plaintiff are listed in Appendix M.

28.     **Banc of America Securities LLC**:  Defendant Banc of America Securities LLC ("Banc of America") is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at One Bryant Park, New York, New York 10036.  Banc of America offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  Banc of America's sales representatives who offered or sold Securities to Plaintiff included Thomas Kanes and Kalefe Wright.  Banc of America, Kanes, and Wright are all licensed to sell securities in Massachusetts.  Other Banc of America representatives who offered or sold Securities to Plaintiff included syndicate manager Patrick Beranek (who is also licensed to sell securities in Massachusetts) and investment bankers Chris Henteman, Paul Jablansky (who is also licensed to sell securities in Massachusetts), and Jeff Willoughby.  The Securities that Banc of America offered or sold to Plaintiff are listed in Appendix N.

29.     **Residential Funding Securities, LLC, d/b/a GMAC RFC Securities**:  Defendant Residential Funding Securities, LLC, f/k/a Residential Funding Securities Corporation ("GMAC"), is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at One Meridan Crossings, Richfield, Minnesota 55423.  Representatives of GMAC offered or sold the Securities to Plaintiff in at least one meeting in Massachusetts and by making telephone calls and sending documents to Plaintiff in Massachusetts.  GMAC sales representatives who offered or sold Securities to Plaintiff

EXHIBIT  53  -508-

included Robert Djorup and Ted Kallina.  The Securities that GMAC offered or sold to Plaintiff are listed in Appendix O.

30. **Barclays Capital Inc.**:   Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation and an SEC-registered broker-dealer with its principal place of business located at 745 Seventh Avenue, New York, New York 10019, and an office at 125 High Street, Boston, Massachusetts 02110.  Barclays offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  Barclays' sales representatives who offered or sold Securities to Plaintiff included James Hurst and Maria Palermo.  Barclays and Hurst are licensed to sell securities in Massachusetts.  Other Barclays representatives who offered or sold Securities to Plaintiff included investment bankers John Carroll and Paul Menefee.  The Securities that Barclays offered or sold to Plaintiff are listed in Appendix P.

c.    **The Depositor Defendants**

31. To securitize and sell mortgage loans to investors, financial institutions created SPVs to serve various roles in the securitization process.  "Depositors" purchased or acquired the mortgage loans, securitized them, and were the "issuers" of the Securities.  *See* 17 CFR § 230.191.  Working together with the Wall Street Banks, the Depositor Defendants set forth in the table below prepared and circulated the registration statements, accompanying prospectuses, and subsequent prospectus supplements, or private placement memoranda, through which the Depositor Defendants and the Wall Street Bank Defendants offered and sold the Securities and filed the registration statements, prospectuses, and prospectus supplements with the SEC.

| Depositor Defendant, Principal Place of Business (State of Incorporation) | | Offerings |
|---|---|---|
| a | **Accredited Mortgage Loan REIT Trust**, 15253 Avenue of Science, San Diego, CA 92128 (Maryland) | ACCR 2005-3 |

EXHIBIT  53  -509-

| | Depositor Defendant, Principal Place of Business (State of Incorporation) | Offerings |
|---|---|---|
| b | **Ace Securities Corporation**, 6525 Morrison Blvd., Ste. 318, Charlotte, NC 28211 (Delaware) | ACE 2005-HE2, ACE 2005-HE5, ACE 2005-HE6, ACE 2005-HE7, ACE 2006-FM2, ACE 2006-HE1, ACE 2006-NC1, ACE 2006-NC2, ACE 2006-OP1, ACE 2006-SL1, ACE 2006-SL2, ACE 2007-HE2 |
| c | **Aegis Asset Backed Securities Corporation**, 3250 Briarpark, Ste 400, Houston, TX 77042 (Delaware) | AABST 2005-4, AABST 2005-5 |
| d | **Alliance Securities Corporation**,1000 Marina Blvd., Ste. 100, Brisbane, CA 94005 (Delaware) | ALBT 2007-S1 |
| e | **American Home Mortgage Assets LLC**, 538 Broadhollow Road, Melville, NY 11747 (Delaware) | AHMA 2007-3 |
| f | **Ameriquest Mortgage Securities Inc.**, 1100 Town & Country Road, Orange, CA 92868 (Delaware) | AMSI 2005-R6, AMSI 2005-R7, AMSI 2005-R8, AMSI 2006-R2 |
| g | **Argent Securities Inc.**, 1100 Town & Country Rd, Orange, CA 92868 (Delaware) | ARSI 2005-W2, ARSI 2005-W3, ARSI 2006-W1, ARSI 2006-W3, ARSI 2006-W5 |
| h | **Asset Backed Funding Corp.**, 214 North Tryon St, Charlotte, NC 28255 (Delaware) | ABFC 2005-HE1, ABFC 2006-OPT2 |
| i | **Asset Backed Securities Corporation**, 11 Madison Ave., New York, NY 10010 (Delaware) | ABSHE 2005-HE1, ABSHE 2005-HE3, ABSHE 2005-HE4, ABSHE 2005-HE5, ABSHE 2006-HE3, ABSHE 2006-HE6, ABSHE 2007-HE7 |
| j | **Banc of America Mortgage Securities, Inc.**, 214 North Tryon St., Charlotte, NC 28255 (Delaware) | BOAA 2006-6 |
| k | **BCAP LLC**, 200 Park Avenue, New York, NY 10166 (Delaware) | BCAP 2006-6, EQLS 2007-1 |

EXHIBIT   53   -510-

| | Depositor Defendant, Principal Place of Business (State of Incorporation) | Offerings |
|---|---|---|
| l | **Bear Stearns Asset Backed Securities I LLC**, 383 Madison Ave, New York, NY 10179 (Delaware) | AMIT 2005-1, BSABS 2005-AQ2, BSABS 2005-HE10, BSABS 2005-HE4, BSABS 2005-HE8, BSABS 2005-HE9, BSABS 2006-EC1, BSABS 2006-EC2, BSABS 2006-HE1, BSABS 2006-HE10, BSABS 2006-HE3, BSABS 2006-HE4, BSABS 2006-HE7, BSABS 2006-PC1, BSABS 2007-FS1, BSMF 2007-SL2, GPMF 2007-HE1, IRWHE 2005-A, SACO 2005-5, SACO 2005-7, SACO 2005-8, SACO 2005-WM3, SACO 2007-2 |
| m | **Citigroup Mortgage Loan Trust Inc.**, 390 Greenwich Street, Fl 4, New York, NY 10013 (Delaware) | CARR 2005-NC3, CMLTI 2005-9, CMLTI 2005-HE1, CMLTI 2005-HE3, CMLTI 2006-HE1, CMLTI 2006-WFH3, CMLTI 2007-FS1 |
| n | **Credit Suisse First Boston Mortgage Securities Corp.**, 11 Madison Ave., New York, NY 10010 (Delaware) | HEAT 2005-1, HEAT 2005-2, HEAT 2005-3, HEAT 2005-4, HEAT 2005-5, HEAT 2005-6, HEAT 2005-7, HEAT 2005-8, HEAT 2005-9, HEAT 2006-4, HEAT 2006-7, HEMT 2005-5, HEMT 2006-2 |
| o | **CWABS, Inc.**, 4500 Park Granada, Calabasas, CA 91302 (Delaware) | CWL 2005-11, CWL 2006-17, CWL 2006-18 |
| p | **CWALT, Inc.**, 4500 Park Granada, Calabasas, CA 91302 (Delaware) | CWALT 2005-82, CWALT 2005-J6 |
| q | **FBR Securitization, Inc.**, 1001 Nineteenth St. North, Arlington, VA 22209 (Delaware) | FBRSI 2005-5 |
| r | **Fieldstone Mortgage Investment Corporation**, 11000 Broken Land Parkway, Ste 600, Columbia, MD 21044 (Maryland) | FMIC 2007-1 |
| s | **Financial Asset Securities Corp.**, 600 Steamboat Road, Greenwich, CT 06830 (Delaware) | EMLT 2005-1, FFML 2006-FF8, FHLT 2005-1, MMLT 2005-2, SVHE 2005-1, SVHE 2005-A, SVHE 2005-DO1, SVHE 2006-OPT2, SVHE 2006-OPT5 |
| t | **Fremont Mortgage Securities Corp.**, 2727 East Imperial Highway, Brea, CA 92821 (Delaware) | FHLT 2005-A |
| u | **GS Mortgage Securities Corp.**, 85 Broad St, New York, NY 10004 (Delaware) | GSAMP 2005-HE6, GSAMP 2006-HE6, GSAMP 2006-S1 |

13

EXHIBIT   53   -511-

| | Depositor Defendant,<br>Principal Place of Business<br>(State of Incorporation) | Offerings |
|---|---|---|
| v | **HSI Asset Securitization Corporation**, 452 Fifth Ave, New York, NY 10018 (Delaware) | FFML 2006-FF5, HASC 2005-NC2, HASC 2006-OPT3 |
| w | **J.P. Morgan Acceptance Corporation I**, 60 Wall Street, New York, NY 10260 (Delaware) | JPMAC 2005-FLD1, JPMAC 2005-OPT1, JPMAC 2005-OPT2, JPMAC 2005-WMC1, JPMAC 2006-CH1, JPMAC 2006-CW2, JPMAC 2006-WMC1 |
| x | **Long Beach Securities Corp.**, 1100 Town & Country Road, Orange, CA 92868 (Delaware) | LBMLT 2005-1, LBMLT 2005-2, LBMLT 2005-WL1, LBMLT 2005-WL2; LBMLT 2006-7, LBMLT 2006-WL1 |
| y | **Merrill Lynch Mortgage Investors, Inc.**, 250 Vesey Street, 4 World Financial Center, 10 Fl. New York, NY 10080 (Delaware) | FFMER 2007-H1; MLMI 2005-AR1, MLMI 2005-NCB, MLMI 2005-SL2, MLMI 2005-SL3, MLMI 2005-WMC1, MLMI 2006-HE4, MLMI 2006-HE5, MLMI 2006-SL1, SURF 2005-BC1 |
| z | **Morgan Stanley ABS Capital I Inc.**, 1585 Broadway, New York, NY 10036 (Delaware) | AMIT 2005-4, IXIS 2005-HE2, IXIS 2005-HE3, IXIS 2005-HE4, IXIS 2006-HE3, MSAC 2005-HE4, MSAC 2005-NC2, MSAC 2005-WMC2, MSAC 2005-WMC3, MSAC 2005-WMC5, MSAC 2005-WMC6, MSAC 2006-HE3, MSAC 2007-HE3, MSHEL 2005-1, MSHEL 2006-1, NTIX 2007-HE2 |
| aa | **Morgan Stanley Capital I Inc.**, 1585 Broadway, New York, NY 10036 (Delaware) | MSAC 2006-HE1 |
| bb | **Mortgage Asset Securitization Transactions, Inc.**, 1285 Ave of the Americas, New York, NY 10019 (Delaware) | FFML 2005-FF7, MABS 2005-FRE1, MABS 2005-NC1, MABS 2006-AM2, MABS 2006-FRE2, MABS 2006-HE1, MABS 2006-NC2, MABS 2006-WMC4 |
| cc | **Nationstar Funding LLC**, 550 Highland Drive, Lewisville, TX 75067 (Delaware) | HELT 2007-FRE1 |
| dd | **New Century Mortgage Securities LLC**, 18400 Von Karman, Irvine, CA 92612 (Delaware) | NCHET 2005-3, NCHET 2005-4, NCHET 2005-D |
| ee | **New Century Mortgage Securities, Inc.**, 18400 Von Karman, Irvine, CA 92612 (Delaware) | NCHET 2005-B, NCHET 2005-C |
| ff | **NovaStar Mortgage Funding Corporation**, 8140 Ward Parkway, Ste. 300, Kansas City, MO 64114 (Delaware) | NHEL 2005-1, NHEL 2005-3 |

14

EXHIBIT   53   -512-

| | Depositor Defendant, Principal Place of Business (State of Incorporation) | Offerings |
|---|---|---|
| gg | **Park Place Securities, Inc.,** 1100 Town & Country Rd., Orange, CA 92868 (Delaware) | PPSI 2005-WHQ1, PPSI 2005-WHQ3 |
| hh | **People's Choice Home Loan Securities Corp.,** 7515 Irvine Center Drive, Irvine, CA 92618 (Delaware) | PCHLT 2005-2, PCHLT 2005-4 |
| ii | **Popular ABS, Inc.,** 103 Springer Building, 3411 Silverside Road, Wilmington, DE 19810 (Delaware) | POPLR 2005-5 |
| jj | **Residential Accredit Loans, Inc.,** 8400 Normandale Lake Boulevard Ste 250, Minneapolis, MN 55437 (Delaware) | RALI 2006-QS17 |
| kk | **Residential Asset Mortgage Products, Inc.,** 8400 Normandale Lake Boulevard Ste 250, Minneapolis, MN 55437 (Delaware) | RAMP 2005-EFC4, RAMP 2006-RZ3 |
| ll | **Residential Asset Securities Corporation,** 8400 Normandale Lake Boulevard Ste 250, Minneapolis, MN 55437 (Delaware) | RASC 2006-KS2, RASC 2006-KS6, RASC 2006-KS9 |
| mm | **SACO I Inc.,** 383 Madison Avenue, New York, NY 10179 (Delaware) | SACO 2005-1, SACO 2005-2, SACO 2005-3, SACO 2005-4, BSSLT 2007-SV1A |
| nn | **Saxon Asset Securities Company,** 4860 Cox Rd., Ste. 300, Glen Allen, VA 23060 (Virginia) | SAST 2005-2, SAST 2006-3, SAST 2007-2 |
| oo | **Securitized Asset Backed Receivables LLC,** 200 Park Avenue, New York, NY 10166 (Delaware) | SABR 2005-FR4, SABR 2005-FR5, SABR 2006-WM2 |
| pp | **Stanwich Asset Acceptance Company, L.L.C.,** 9 Greenwich Office Park, Greenwich, CT 06831 (Delaware) | CARR 2005-NC4, CARR 2005-NC5, CARR 2006-FRE1, CARR 2006-FRE2, CARR 2006-NC2, CARR 2006-NC4, CARR 2006-RFC1 |
| qq | **Structured Asset Mortgage Investments II Inc.,** 383 Madison Avenue, New York, NY 10179 (Delaware) | SAMI 2005-AR6 |
| rr | **Washington Mutual Mortgage Securities Corp.,** 1201 Third Avenue, WMT 1706, Seattle, WA 98101 (Delaware) | WAMU 2005-AR2 |

32.   The Defendants identified in ¶ 31 are collectively referred to herein as the "Depositor Defendants."

15

EXHIBIT   53   -513-

## IV.    FACTUAL BACKGROUND

### a.    <u>The Mechanics of Mortgage Securitization</u>

33.    Mortgage pass-through securities represent interests in a pool of mortgages; the securities are shares in the pool that are sold to investors.  The securities represent an equity interest in the "issuing trust" that holds the pool.  The pass-through securities entitle the holder to payments from the pool of mortgage loans.  Although the structure and underlying collateral of the mortgages may vary, the basic principle of pass-through securities remains the same:  The cash flow from the pool of mortgages is "passed through" to the securities holders when payments are made by the underlying mortgage borrowers.

34.    The first step in creating a mortgage pass-through security is the acquisition by a "depositor" of an inventory of loans from a "sponsor" or "seller," which either originates the loans or acquires the loans from other mortgage originators, in exchange for cash.  The type of loans in the inventory may vary, including conventional, fixed-rate or adjustable-rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity.  The depositor then transfers, or deposits, the acquired pool of loans to an "issuing trust."

35.    The depositor then securitizes the pool of loans in the issuing trust so that the rights to the cash flows from the inventory can be sold to investors.  The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches."  Tranches consist of multiple series of related RMBS offered as part of the same offering, each with a different level of risk and reward.  Any losses on the underlying loans - whether due to default, delinquency, or otherwise - are generally applied in reverse order of seniority.  As such, the most senior tranches of pass-through securities are rated as the best quality, or "AAA/Aaa."   Junior tranches, which usually obtained lower ratings, ranging from "AA/Aa" to "BB/Bb," are less insulated from risk, but offer greater potential returns.

36.    Once the tranches are established, the issuing trust passes the securities back to the depositor, who becomes the issuer of those securities, like the Depositor Defendants herein.

16

EXHIBIT   53   -514-

The depositor then passes the securities to one or more Wall Street banks, who offer and sell the securities to investors in exchange for cash that is passed back to the depositor, minus any fees owed to the Wall Street banks.

37.     Wall Street banks play a critical role in the securitization process.   They underwrite the sale of the securities, that is, they purchase the securities from the issuing trust through a depositor and then sell them to investors.   Importantly, the Wall Street banks provide the information that potential investors use to decide whether to purchase the securities.

38.     Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the securities issued by the trust, the credit quality of the securities depends upon the credit quality of the loans in the collateral pool.   The most important information about the credit quality of the loans is contained in the "loan files" that the mortgage originator develops while making the loans.   For residential mortgage loans, each loan file normally contains documents including the borrower's application for the loan; verification of the borrower's income, assets, and employment; references; credit reports on the borrower; an appraisal of the property that will secure the loan and provide the basis for important measures of credit quality, such as loan-to-value ratios; and a statement of the occupancy status of the property.

39.     The collateral pool of loans for each securitization usually includes thousands of loans.   Instead of each potential investor reviewing thousands of loan files, the Wall Street banks that underwrite the sale of the securities in a securitization are responsible for gathering, verifying, and presenting to potential investors accurate and complete information about the credit quality and characteristics of the loans that are deposited into the trust.

**b.     <u>Securitization of Mortgage Loans: The Traditional Model</u>**

40.     In the 1980s and 1990s, mortgage originators and Wall Street banks fulfilled their respective obligations to comply with underwriting standards and provide accurate information to investors.   The mortgage securitization business, therefore, functioned well, to the benefit of home buyers, financial institutions, and investors.   For the securitization model to work properly,

17

EXHIBIT   53   -515-

the mortgage originators and the Wall Street banks must perform their roles properly. In particular, it is necessary for the mortgage originators to underwrite loans and appraise properties in accordance with their stated standards and to assure accurate information is obtained from loan applicants. Likewise, it is necessary for the Wall Street banks to perform adequate due diligence into the loan pools and to provide accurate information to investors.

41. In the traditional mortgage model, a mortgage originator originated loans to borrowers, held the loans to maturity, and therefore retained the credit (default) risk. As such, under the traditional model, the mortgage originator had a financial incentive to ensure that (1) the borrowers had the financial ability to repay the loans, and (2) the underlying properties had sufficient value to enable the mortgage originator to recover its principal and interest if the borrowers defaulted on the loans.

42. Traditionally, mortgage originators financed their mortgage business primarily using funds from depositors, retained ownership of the mortgage loans they originated, and received a direct benefit from the income flowing from the mortgages. When a mortgage originator held a mortgage through the term of the loan, the mortgage originator received revenue from the borrower's payment of interest and fees. The mortgage originator also bore the risk of loss if the borrower defaulted and the value of the collateral was not sufficient to repay the loan. As a result, the mortgage originator had an economic incentive to verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate appraisal of the value of the underlying property before issuing the mortgage loan.

43. With the advent of securitization, the traditional "originate to hold" model gave way to the "originate to distribute" model, in which mortgage originators sell the mortgages and transfer credit risk to investors through the issuance and sale of RMBS. Through securitization, mortgage originators no longer hold the mortgage loans to maturity. By selling the mortgages to investors through Wall Street banks, the mortgage originators obtain funds, enabling them to make more loans. Securitization also enables mortgage originators to earn most of their income from transaction and loan-servicing fees, rather than from the spread between interest rates paid

18

EXHIBIT   53   -516-

on deposits and interest rates received on mortgage loans as in the traditional model.  Thus, securitization gives the mortgage originators an incentive to increase the number of mortgages they issue and reduces their incentive to ensure the mortgages' credit quality.  However, the contractual terms of the securitization transactions and good business practices obligate mortgage originators to underwrite loans in accordance with their stated policies and to obtain accurate appraisals of the mortgaged properties.

44.     During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits.  During that period, mortgage originators made loans in accordance with their stated underwriting and appraisal standards and provided accurate information about the loans, borrowers, and mortgaged properties to the Wall Street banks that securitized the loans.  In turn, the Wall Street banks provided accurate information about the loans, borrowers, and properties to investors in the RMBS.  In the 1980s and 1990s, most mortgage securitizations were conducted through the major Government Sponsored Enterprises (the "Agencies"), *i.e.*, the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage Association ("Ginnie Mae").  The Agencies purchased loans from mortgage originators and securitized the loans.  These Agency securitizations had high credit quality because the Agencies required the underlying loans to be originated in accordance with strict underwriting guidelines.  Most non-Agency mortgage securitizations during this period also complied with the Agencies' underwriting standards.

c.      **The Systemic Violation of Underwriting and Appraisal Standards in the Mortgage Securitization Industry**

45.     The securitization of mortgage loans fundamentally shifts the risk of loss from the mortgage originator to the investors who purchase RMBS.  As discussed in Section IV.b above, traditionally, the mortgage originator had an economic incentive to verify mortgage borrowers' creditworthiness and obtain accurate appraisals of the value of the underlying properties before

EXHIBIT  53   -517-

issuing mortgage loans because the mortgage originator held the loans to maturity.   In securitizations where the mortgage originator instead sells the loans to Wall Street banks, the mortgage originator does not have the same economic interest in verifying borrowers' creditworthiness or obtaining accurate appraisals in the loan origination process.   Nevertheless, the mortgage securitization process worked well during the 1980s and 1990s because both mortgage originators and Wall Street banks played by the rules and complied with their obligations to underwrite loans responsibly and provide accurate information to investors in RMBS.

46.   Mortgage originators began systematically to violate their stated underwriting and appraisal standards, made loans with little or no documentation, and accepted untrue information from loan applicants.   The mortgage originators also began to provide untrue information about their underwriting practices and about the borrowers, loans, appraisals, and mortgaged properties in connection with the securitization of the loans.   As a result of this pervasive breakdown of compliance with proper practices among the mortgage originators, the Wall Street Banks that securitized mortgages provided Plaintiff with untrue information about the mortgage originators' practices and about the underlying mortgage borrowers, loans, and properties.   The Wall Street Banks also provided Plaintiff with untrue information about their own due diligence of the mortgage originators and underlying loans.

47.   To fund their loans, the mortgage originators maintained credit facilities with warehouse lenders, including the Wall Street Banks.   The Wall Street Banks loaned money to the mortgage originators pursuant to "warehouse agreements," so that the mortgage originators could continue to make loans to home buyers.   The mortgage originators borrowed from these credit facilities to fund their loans, until the loans were sold and the warehouse agreement was repaid. When loans serving as collateral lost value, the Wall Street Banks made margin calls requiring the mortgage originators to pay cash back to the Wall Street Banks.   As a result of the warehouse arrangements between the mortgage originators and the Wall Street Banks, the Wall Street Banks had superior access to information about the mortgage originators' business and lending practices

20

EXHIBIT   53   -518-

and the mortgage loans' characteristics and performance, including early warning signs of poor credit quality in loans before the loans were securitized.

48.     Fannie Mae and Freddie Mac provided investors in Agency-sponsored RMBS with protection by guaranteeing that the investors would receive timely payments of principal and interest. If the borrower for one of the underlying mortgages failed to make scheduled principal or interest payments, the Agency that issued the RMBS would make the payments to the trust. Because the Agencies were perceived to be backed by the federal government, investors viewed their guarantees as essentially removing the credit risk from Agency-sponsored RMBS.

49.     Between 2001 and 2006, non-Agency loan originations and securitizations increased dramatically, while Agency loan originations and securitizations decreased moderately, as summarized in the following table:

|  | 2001 | 2006 |
|---|---|---|
| **Agency loan originations** | $1.433 trillion | $1.040 trillion |
| **Agency securitizations** | $1.087 trillion | $904 billion |
| **Non-Agency loan originations** | $680 billion | $1.480 trillion |
| **Non-Agency securitizations** | $240 billion (including $87.1 billion of subprime securitizations) | $1.033 trillion (including $448 billion of subprime securitizations) |

Source: *Inside Mortgage Finance* (2007).

50.     Thus, from 2001 to 2006, non-Agency loan originations grew by approximately 115%; non-Agency securitizations grew by approximately 330%; and non-Agency securitizations of subprime loans grew by approximately 415%. According to *Inside Mortgage Finance* (2009), non-Agency RMBS more than trebled in market share between 2003 and 2007, peaking at about 38% of the market in 2006, from 6% in 2003. Another measure of the dramatic growth of the non-Agency RMBS market is that "[t]he amount of all outstanding mortgages held in non-[Agency] MBS rose notably from only $670 billion in 2004 to over $2,000 billion in

EXHIBIT  53  -519-

2006."  Financial Crisis Inquiry Commission ("FCIC"), "Preliminary Staff Report: Securitization and the Mortgage Crisis," April 7, 2010.

51.     Starting in or about 2005, the growth in non-Agency mortgage securitizations was accompanied by widespread violation by the mortgage originators of their stated underwriting and appraisal standards.  According to Ben S. Bernanke, Chairman of the Federal Reserve Board, in a March 2008 speech, "[t]he deterioration in underwriting standards that appears to have begun in late 2005 is another important factor underlying the current crisis.  A large share of subprime loans that were originated during this time feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios."  The loan-to-value ("LTV") ratio is a significant measure of credit risk, because both the likelihood of default and the severity of loss are higher when borrowers have less equity to protect in the event of foreclosure.  The debt-to-income ratio is also a significant measure of credit risk, because borrowers who incur debt that is relatively high compared to their income are more likely to default on their loans.  In its March 2008 Policy Statement on Financial Market Developments, the President's Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning* in late 2004 and extending into early 2007." (Emphasis in original.)   As U.S. housing prices subsequently declined, the delinquency rates for such mortgages soared.

52.     An important aspect of the mortgage originators' violation of their stated underwriting standards was their reliance on faulty appraisals.  According to the April 7, 2010 FCIC testimony of Richard Bitner, a former executive of a subprime mortgage originator for 15 years and the author of the book *Confessions of a Subprime Lender*, "the appraisal process [was] highly susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't be trusted, [and] either the majority of appraisers were incompetent or they were influenced by brokers to increase the value."  He continued:

EXHIBIT  53  -520-

To put things in perspective, during my company's history, half of all the loans we underwrote were overvalued by as much 10%.  This meant one out of two appraisals were still within an acceptable tolerance for our end investors.  Our experience showed that 10% was the most an appraisal could be overvalued and still be purchased by these investors.  Another quarter that we reviewed were overvalued by 11-20%.  These loans were either declined or we reduced the property value to an acceptable tolerance level.  The remaining 25% of appraisals that we initially underwrote were so overvalued they defied all logic.  ***Throwing a dart at a board while blindfolded would've produced more accurate results.***[1]

53.    Mr. Bitner testified about the implications of inflated appraisals:

If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals.  The process then repeats itself.  We saw it on several occasions.  We'd close a loan in January and see the subject property show up as a comparable sale in the same neighborhood six months later.  Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more.  Of course, demand is a key component to driving value, but the defective nature of the appraisal process served as an accelerant.  In the end, the subprime industry's willingness to consistently accept overvalued appraisals significantly contributed to the run-up in property values experienced throughout the country.

*       *       *

If the appraisal process had worked correctly, a significant percentage of subprime borrowers would've been denied due to a lack of funds.  Inevitably, this would have forced sellers to drop their exorbitant asking prices to more reasonable levels.  The rate of property appreciation experienced on a national basis from 1998 to 2006 was not only a function of market demand, but was due, in part, to the subprime industry's acceptance of overvalued appraisals, coupled with a high percentage of credit-challenged borrowers who financed with no money down.

Mr. Bitner testified that the engine behind the increased malfeasance was the Wall Street Banks:  "[T]he demand from Wall Street investment banks to feed the securitization machines coupled with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

54.    Patricia Lindsay, a wholesale underwriter for 10 years at New Century Financial Corporation, testified before the FCIC on April 7, 2010, about the fraudulent practices of New Century's appraisers:

The role and practices of appraisers in subprime mortgage origination:

---

[1] Throughout this Complaint, emphasis in quotations is added except where otherwise noted.

EXHIBIT  53  -521-

Properly valuing a property . . . is one of the most important components in a loan. In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value", fearing if they didn't, they would lose future business and their livelihoods. They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value. Some appraisers would take boards off boarded up windows, to take the needed photos, then board the properties back up once the shots were taken. Or they would omit certain important elements of a property by angling the camera a certain way or zooming close in to make the property look the best possible. This level of appraiser activism compromises their objectivity.

55.     Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on Banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraisers "experience[d] systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists."

56.     A 2007 survey of 1,200 appraisers conducted by October Research Corp., which publishes *Valuation Review*, found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation." Adding to these problems was the fact that lenders were generally unable to assess the accuracy of the appraisals for loans originated by mortgage brokers, since the lenders were typically located far from the properties and knew little about the properties' neighborhoods.

57.     In addition, the mortgage securitization process was undermined by the widespread industry practice of originating types of loans that were inherently risky and extremely susceptible to delinquencies and default, including (1) stated income loans, where both the income and assets of the borrower were taken as stated on the credit application without verification; (2) "NINA" or No Income, No Asset loans, which were made without any

EXHIBIT  53  -522-

disclosure of the borrower's income or assets; and (3) "No Doc" loans, which were made to borrowers who did not disclose their income, assets, or employment history.

### d.    The Wall Street Banks Conduct Less Due Diligence

58.    As the Wall Street Banks that profited from securitizations sought increasing volumes of mortgage loans from mortgage originators, the mortgage originators gained bargaining power over the terms on which they would sell the loans.  Mortgage originators demanded that the Wall Street Banks limit quality control reviews (*i.e.*, due diligence) to smaller percentages of loans prior to purchase.  Additionally, if a Wall Street Bank chose to "kick out" a large number of loans from a pool – because the loans failed to conform to the mortgage originators' underwriting guidelines or did not contain adequate documentation – the Wall Street Bank risked being excluded from future loan purchases.  As a result, the Wall Street Banks performed increasingly cursory due diligence on the mortgage loans they securitized.  The sheer volume and pace of the securitization business during this period exacerbated such failures.

59.    The Wall Street Banks often acquired large quantities of loans for securitization from "loan auctions."  There, mortgage originators provided the Wall Street Banks with Bid Stipulation Sheets ("Bid Sheets") which stated the times and dates of the auctions and described the general characteristics of the loan pools.  The Bid Sheets also dictated: (1) the percentage of the pool on which the Wall Street Banks would be permitted to conduct due diligence (*e.g.*, 25%); and (2) the number of loans the Wall Street Banks could "kick-out" due to borrower deficiencies, payment delinquencies, early payment defaults, lack of requisite legal documentation, and similar deficiencies.  Prior to bid submission, mortgage originators also sent the Wall Street Banks spreadsheets known as "Loan Tapes" which typically contained 50 to 100 columns of data regarding the loans.  The Wall Street Banks were supposed to "crack" the Loan Tapes, analyze them, and determine what prices to bid for the loan pools.  Once this "bid package" analysis was complete, the Wall Street Banks submitted their bids.

60.    If the mortgage originator accepted a bid, the Wall Street Bank typically had a short period of time prior to the settlement date (when cash was paid to the mortgage originator

EXHIBIT  53  -523-

for the loans) to conduct due diligence on the loans.  The Wall Street Banks generally used their own investment bankers to conduct due diligence.  Many of the Wall Street Banks also hired third-party due diligence firms such as Clayton Holdings, Inc. ("Clayton") or the Bohan Group ("Bohan") to conduct this review under the supervision of the Wall Street Banks' investment bankers.  Clayton's Form 10-K filed March 14, 2008 specifically identified Wall Street Bank Defendants Morgan Stanley and Deutsche Bank among its clients.  Bohan's clients included Bear Stearns (predecessor-in-interest to Wall Street Bank Defendant J.P. Morgan Securities) and Wall Street Bank Defendant Merrill Lynch.

61.     For each loan pool, Clayton and Bohan reviewed the percentage of loans designated in the Bid Sheet to ensure, *inter alia*, that the loans: (1) conformed to the mortgage originators' underwriting guidelines; (2) contained loan data matching the loan data in the Loan Tape; and (3) contained the appropriate mortgage documents.  Upon completion of the review, Clayton and Bohan sent the Wall Street Bank a "due diligence report," which it was supposed to use to decide which loans should be "kicked out" of the pool prior to the settlement date.  Wall Street Banks, however, were incentivized to kick-out as few loans as possible because, as explained above, (1) mortgage originators would not invite Wall Street Banks that consistently kicked out large numbers of loans to future auctions; and (2) the securitization became smaller as loans were kicked out, thus decreasing the underwriting fee.

62.     As a result, the percentage of loans per pool that Clayton and Bohan were instructed to review declined with time.  Frank P. Filipps, Clayton's chairman and CEO, stated that "[e]arly in the decade, a securities firm might have asked Clayton to review 25% to 40% of the sub-prime loans in a pool, compared with typically 10% in 2006."  Bohan President Mark Hughes stated, "[b]y contrast, loan buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."

63.     In June 2007, New York Attorney General Andrew Cuomo ("NYAG") subpoenaed documents from Clayton and Bohan related to their due diligence efforts.  The NYAG's investigation focused on whether Wall Street banks failed to adequately disclose the

EXHIBIT  53  -524-

warnings they received regarding the number of loans that failed to meet lending guidelines. Clayton also received an information request from the SEC and information subpoenas from the Massachusetts and Connecticut Attorneys General.

64.     On January 12, 2008, in an article entitled "Inquiry Focuses on Withholding of Data on Loans," the *New York Times* reported:

> An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.  Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms.  ***But the banks did not disclose the details of these reports to credit-rating agencies or investors.***  The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments.

65.     On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in New York in exchange for providing documents and testimony regarding its due diligence reports.  That same day, in an article entitled "Loan Reviewer Aiding Inquiry Into Big Banks," the *New York Times* reported that a person familiar with the NYAG's investigation stated that as demand for loans surged, mortgage originators were in a superior bargaining position and required that Wall Street Banks have Clayton and other consultants review fewer loans.  Incredibly, "investment banks directed Clayton *to halve the sample of loans it evaluated in each portfolio*."

66.     On March 17, 2008, in an article entitled "Sub-Prime mortgage watchdogs kept on leash; loan checkers say their warnings of risk were met with indifference," the *Los Angeles Times* reported that Clayton and Bohan employees (including eight former loan reviewers who were interviewed for the article) "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports."

EXHIBIT  53   -525-

e.    **Plaintiff's Acquisition of the Securities**

67.    Plaintiff, located in Massachusetts, was responsible for the sourcing, review, analysis, and purchase decisions for the U.S. investments for the Clients, and made the decision in Massachusetts to purchase the Securities on behalf of the Clients.  At all relevant times, Plaintiff had numerous employees in Concord, Massachusetts, and Plaintiff continues to have employees in Concord.

68.    Plaintiff decided to purchase each Security on behalf of the Clients on the basis of the information contained in the applicable registration statement, prospectus, and prospectus supplements filed with the SEC or the applicable private placement memorandum (the "Offering Documents"), as identified in Appendices A-P, and based on additional information provided to Plaintiff by the Wall Street Bank Defendants, as described below.  In connection with their offers or sales of the Securities to Plaintiff, the Wall Street Bank Defendants sent to Plaintiff's office in Massachusetts the Offering Documents and additional documents, such as statistical tables to be included in the prospectus supplements.  These documents included term sheets, pooling and servicing agreements, data, computational material, data regarding the LTV and debt-to-income ratios of the pools, computer models of the financial structures of the securitizations, tabular sensitivity data, loan tapes, rating agency expected loss levels, emails, sampling data regarding credit/compliance/appraisal and due diligence, "kickout" criteria and data, and collateral characteristics.  ("Kickout" refers to the mortgage originator's contractual obligation under the terms of the securitization transaction documents to repurchase or replace any mortgage loan that had deficient documentation, an uncured material breach of a representation or warranty, a payment default within a specified time period, or other specified deficiencies.)

69.    These documents contained numerous statements of material facts about the Securities, including statements concerning: (1) the mortgage originators' underwriting guidelines that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Securities; (2) the appraisal guidelines that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) the LTV ratios,

EXHIBIT  53  -526-

debt to income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (4) the Wall Street Banks' due diligence of the loans and the mortgage originators' underwriting practices; and (5) various forms of credit enhancement applicable to certain tranches of Securities. For example, one form of credit enhancement is overcollateralization, which means that the total principal balance of the mortgage loans in the pool for a securitization (and therefore presumably the total value of the underlying properties) exceeds the aggregate amount of Securities issued and sold in the securitization. Another example of credit enhancement is excess interest, which means that the amount of interest collected on the mortgage loans underlying a securitization for each payment period is expected to be higher than the interest distributable on the Securities and fees and expenses payable by the trust for that period; excess interest may be applied both to absorb any interest shortfalls and to pay principal on the Securities to the extent needed to maintain the required level of overcollateralization.

70.     These statements of material facts were untrue because: (1) the mortgage originators violated their stated underwriting guidelines and did not consistently evaluate the borrowers' ability to repay the loans; (2) inflated appraisals caused the listed LTV ratios and levels of credit enhancement to be untrue; and (3) the actual numbers of riskier "second home" and "investment property" mortgagees were higher than the stated numbers. In addition, metrics such as debt-to-income ratios were untrue as a result of the mortgage originators' acceptance of untrue information from mortgage applicants. For example, the mortgage originators allowed applicants for "stated income" loans to provide untrue income information and did not verify the applicants' purported income. Stated income loans were therefore widely known among personnel of the mortgage originators as "liar loans."

71.     Often at meetings, including meetings in Massachusetts, the Wall Street Bank Defendants also showed Plaintiff "pitch books" and other materials regarding the credit quality of the Securities and the Wall Street Banks' due diligence of the mortgage originators' underwriting practices. Plaintiff, however, was not allowed to keep the pitch books. These pitch

EXHIBIT   53   -527-

books and other materials contained untrue statements similar to those described above.  In
addition to the untrue statements and omissions in the documents provided or shown to Plaintiff,
the Wall Street Bank Defendants made additional untrue oral statements to Plaintiff during face-
to-face meetings and by telephone between 2005 and 2007.  The representatives of the Wall
Street Bank Defendants who offered or sold the Securities to Plaintiff received compensation
based, directly or indirectly, on the volume of Securities they sold to investors, including the
Clients on whose behalf Plaintiff purchased Securities.

## V.   THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACTS AND OMISSIONS ABOUT THE MORTGAGE ORIGINATORS' UNDERWRITING STANDARDS AND PRACTICES

72.    Most of the mortgage loans underlying the Securities purchased by Plaintiff on
behalf of the Clients came from the following eight mortgage originators (the "Mortgage
Originators"): New Century Mortgage Corp. ("New Century"), Long Beach Mortgage Company
("Long Beach"), Washington Mutual ("WaMu"), Fremont Investment & Loan ("Fremont"),
WMC Mortgage Corporation ("WMC"), Argent Mortgage Company ("Argent"), Ameriquest
Mortgage ("Ameriquest"), and Option One Mortgage Corporation ("Option One").  Together
with Defendant Countrywide, which originated most of its own mortgage loans through its
affiliates, these eight Mortgage Originators accounted for approximately 70% of the loans
underlying the RMBS purchased by Plaintiff on behalf of the Clients.  The remaining 30% of the
loans were originated by approximately 80 other mortgage originators.  On information and
belief, the types of violations of underwriting and appraisal standards that are alleged below
specifically with respect to each of the eight larger Mortgage Originators were also prevalent
among the other, smaller mortgage originators.

73.    All eight of these large Mortgage Originators have now failed, and numerous
consumer and securities fraud cases – both private and regulatory – have been lodged against
them.  In an April 8, 2010 statement by John C. Dugan, Comptroller of the Currency, before the
FCIC, these Mortgage Originators were identified among the "Worst Ten in the Worst Ten," a list
of the worst mortgage originators based on the number of foreclosures in the nation's worst ten

EXHIBIT  53   -528-

metro areas (all except for WaMu, but WaMu's subsidiary Long Beach was on the "Worst Ten" list). During the time that Plaintiff, on the Clients' behalf, was purchasing Securities from the Wall Street Banks that contained mortgage loans provided by these Mortgage Originators, (1) the Mortgage Originators violated their stated underwriting standards when issuing loans to borrowers; (2) the underlying mortgages were based on appraisals that overstated the value of the mortgaged properties and therefore understated the LTV ratios of the mortgage loans; and (3) these underwriting deficiencies rendered the mortgage loans far less valuable and far riskier than disclosed. As a result, the Securities that were issued by the Depositor Defendants and offered or sold by the Wall Street Bank Defendants were backed by mortgage collateral that was much less valuable and posed a significantly greater risk of delinquencies, foreclosures, and other forms of default than the Wall Street Banks stated to Plaintiff.

### a.   New Century Mortgage Corporation

#### 1.   Defendants Made Untrue Statements of Material Facts About New Century's Underwriting Standards and Practices

74.   New Century originated Mortgage Loans that were included in the pools for the following offerings:

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| CARR 2005-NC4 | Carrington Mortgage Loan Trust | Bear Stearns |
| CARR 2005-NC3 | Carrington Mortgage Loan Trust | Citigroup |
| CARR 2005-NC5 | Carrington Mortgage Loan Trust | Citigroup |
| CARR 2006-NC2 | Carrington Mortgage Loan Trust | Citigroup |
| CARR 2006-NC4 | Carrington Mortgage Loan Trust | Citigroup |
| ABSHE 2005-HE1 | Asset Backed Securities Corp. Home Equity | Credit Suisse |
| ABSHE 2005-HE4 | Asset Backed Securities Corp. Home Equity | Credit Suisse |
| ACE 2006-HE1 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-NC1 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-NC2 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-SL1 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-SL2 | Ace Securities Corp. | Deutsche Bank |
| NCHET 2005-4 | New Century Home Equity Loan Trust | Deutsche Bank |

EXHIBIT  53  -529-

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| IXIS 2005-HE4 | IXIS Real Estate Capital Trust | Morgan Stanley |
| SVHE 2005-B | SoundView Home Loan Trust | Greenwich Capital |
| HASC 2005-NC2 | HSI Asset Securitization Corporation Trust | HSBC |
| MLMI 2005-NCB | Merrill Lynch Mortgage Investors | Merrill Lynch |
| IXIS 2005-HE2 | IXIS Real Estate Capital Trust | Morgan Stanley |
| IXIS 2005-HE3 | IXIS Real Estate Capital Trust | Morgan Stanley |
| IXIS 2006-HE3 | IXIS Real Estate Capital Trust | Morgan Stanley |
| MSAC 2005-NC2 | Morgan Stanley ABS Capital I | Morgan Stanley |
| MSAC 2006-HE3 | Morgan Stanley ABS Capital I | Morgan Stanley |
| MSAC 2007-HE3 | Morgan Stanley ABS Capital I | Morgan Stanley |
| NCHET 2005-3 | New Century Home Equity Loan Trust | Morgan Stanley |
| NCHET 2005-B | New Century Home Equity Loan Trust | Morgan Stanley |
| NCHET 2005-C | New Century Home Equity Loan Trust | Morgan Stanley |
| NCHET 2005-D | New Century Home Equity Loan Trust | Morgan Stanley |
| NTIX 2007-HE2 | Natixis Real Estate Capital Trust | Morgan Stanley |
| MABS 2005-NC1 | MASTR Asset Backed Securities Trust | UBS |
| MABS 2006-NC2 | MASTR Asset Backed Securities Trust | UBS |

75.     Defendants offered or sold to Plaintiff approximately $286.3 million of Securities for which New Century originated some or all of the underlying mortgage loans.

76.     The Offering Documents for these Securities all contained substantially similar, if not identical, statements of material fact regarding New Century's underwriting standards and practices.  For example, the prospectus supplement for Asset-Backed Securities Corporation Home Equity Loan Trust, ABSHE Series 2005-HE4 stated:

> The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan.  All of the mortgage loans in the mortgage pool were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market.  ***While the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also***

EXHIBIT  53  -530-

*considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property.*

\*      \*      \*

**The mortgage loans will have been originated in accordance with the underwriting guidelines.**  On a case-by-case basis, exceptions to the underwriting guidelines are made where compensating factors exist.  It is expected that a substantial portion of the Mortgage Loans will represent these exceptions.

\*      \*      \*

*Exceptions.*  As described above, the foregoing categories and criteria are guidelines only.  On a case by case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc.  **An exception may be allowed if the application reflects compensating factors, such as:** low loan-to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years.  An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more.  Accordingly, a mortgagor may qualify in a more favorable risk category than, in the absence of compensating factors, would satisfy only the criteria of a less favorable risk category.  It is expected that a substantial portion of the Mortgage Loans will represent these kinds of exceptions.

77.     The relevant Offering Documents also contained statements of material fact about the information contained in New Century's loan files.  For example, the same prospectus supplement stated:

Each applicant completes an application which includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  The underwriting guidelines require a credit report on each applicant from a credit reporting company.  The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments.

78.     The relevant Offering Documents also contained statements of material fact about New Century's appraisal standards and practices.  For example, the same prospectus supplement stated:

33

EXHIBIT  53   -531-

Mortgaged properties that are to secure mortgage loans are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. ***All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are on forms acceptable to Fannie Mae and Freddie Mac.*** The underwriting guidelines require a review of the appraisal by a qualified employee of the originator or by an appraiser retained by the originator.

79. These statements are substantially similar, if not identical, to statements concerning New Century's appraisal standards and practices found in the other Prospectus Supplements for the Securities whose underlying mortgage loans were originated by New Century.

80. The above statements of material facts were untrue when made because, as explained below in ¶¶ 81-95, they failed to disclose that New Century: (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume; and (iv) violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties in the loan origination and underwriting process.

## 2. New Century Violated Its Stated Underwriting Standards

81. Defendants J.P. Morgan (as successor-in-interest to Bear Stearns), Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Greenwich Capital, HSBC, Merrill Lynch, Morgan Stanley, and UBS offered or sold to Plaintiff Securities containing loans originated by New Century and made untrue statements to Plaintiff about New Century's underwriting and appraisal standards and practices and the loans underlying the Securities. These Wall Street Banks had extensive business relationships with New Century, had access to New Century's mortgage origination personnel and internal information, and conducted due diligence into New Century using their own personnel and third-party loan review firms. As a result of the Wall

34

EXHIBIT   53   -532-

Street Banks' access to and due diligence into New Century, they were or reasonably should have been aware of the untruth of the statements about New Century described above.

82.     The court-appointed Bankruptcy Examiner issued a detailed report explaining how New Century's "brazen obsession" with loan originations undermined sound underwriting standards.  Moreover, New Century's officers are the targets of both a civil class action and a regulatory action brought by the SEC based on their knowledge of and perpetuation of these practices, and allegations of New Century's deficient underwriting practices have been endorsed by several courts.  New Century topped the Comptroller of the Currency's list of the "Worst Ten in the Worst Ten," discussed above.

83.     Once one of the nation's largest mortgage origination companies, New Century collapsed and filed for bankruptcy on April 2, 2007.  Formed in 1996, New Century grew rapidly to become one of the country's largest subprime lenders, reporting $56.1 billion of total mortgage originations and purchases in 2005 alone.  Beginning in 2003, New Century secretly loosened its own underwriting standards and made unjustified exceptions to those already severely weakened standards.  These allegations have been substantiated by many sources, as discussed below.

84.     On February 29, 2008, following New Century's bankruptcy, Michael J. Missal, the Bankruptcy Court Examiner for New Century, issued a detailed report on the various deficiencies at New Century, including lax mortgage origination standards.  The Examiner's report detailed "serious loan quality issues at [New Century] beginning as early as 2004"; numerous "red flags" relating to loan quality; and the failure of New Century's senior management and board of directors to devote sufficient attention to improving loan quality until it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market."

85.     During the course of his investigation, the Examiner conducted 110 interviews of 85 witnesses and reviewed millions of pages of documents from New Century, its outside auditors, and others.  In his 550-page Final Report, the Examiner concluded that:

EXHIBIT   53   -533-

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006.  The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named "CloseMore University."   Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." (Examiner's Report, at 3.)

- "The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007.  Subprime loans can be appropriate for a large number of borrowers.  New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers."  *Id.*

- "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan.  A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.'  Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies.  Of the New Century loans rejected by investors, issues with appraisals were the cause of more than 25% of these 'kick-outs.'"  *Id.* at 3-4.

- "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. . . ."  *Id.* at 4.

- "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid- 2004.  The surge in real estate prices slowed and then began to decrease, and interest rates started to rise.  The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans.  Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages."  *Id.* at 4.

86.    The Examiner highlighted the severity of New Century's improper conduct:  "The Examiner recognizes that the subprime mortgage market collapsed with great speed and unprecedented severity, resulting in all of the largest subprime lenders either ceasing operations or being absorbed by larger financial institutions.  Taking these events into consideration and attempting to avoid inappropriate hindsight, the Examiner concludes that New Century engaged

36

EXHIBIT   53   -534-

in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes."

87.     According to Confidential Witness ("CW") 1, a former New Century fraud investigator and senior loan underwriter employed from January 1999 until April 2007 and who examined numerous New Century mortgage loans, New Century's problems began when it "started to abandon prudent underwriting guidelines" at the end of 2003 in order to "push more loans through" the system. According to CW 1, New Century, in effect, "stopped underwriting" and adopted an approach that the Company would be "okay if [it] could out run [its] delinquency rate."

88.     According to CW 2, a former New Century Senior Vice President employed from July 2005 until April 2006 in Irvine, California, New Century could only meet its increasing year-over-year sales projections by reducing the underwriting standards.  According to CW 2, in his position as Senior Vice President of New Century, he would approve just about any loan under New Century's "weak" underwriting standards.

89.     According to CW 3, a former New Century underwriting unit manager employed from 1998 through October 2006, underwriting standards were loosened in order to increase sales volume.  According to CW 3, exceptions to New Century's underwriting standards were "the norm" and employees were told to make loans "work."  At one meeting in the late spring of 2006, CW 3 and other underwriters were told by their operations manager that the underwriters had to do what was necessary to increase volume.

90.     Many lenders across the country allowed the sales personnel or account executives at their retail or in-house origination facilities to order and control appraisals and the appraisal process.  According to CW 4, a former New Century underwriter employed by the Company from May 2005 to March 2006 in Itasca, Illinois and, previously, from 2000 until 2003 in Cincinnati, Ohio, as an underwriter for New Century, he could not recall the last loan that he looked at that did not have an exception; he handled close to 200 loans a month; and nearly every loan had an exception such as debt ratio exceptions or loan-to-value exceptions.  According to

EXHIBIT   53   -535-

CW 4, "the guidelines were thrown against a wall," underwriters were instructed to "dig deep" in order to make loans work, and all decisions were volume driven. According to CW 4, appraisals even if turned down, were often accepted later as branch or regional sales managers "gave them hell" for rejecting appraisals.  According to CW 4, he was told by his superiors that New Century was a volume based company and that New Century needed to increase its volume to outrun "shrinkages" in the secondary market.

91.     On May 7, 2007, the front page of the *Washington Post* reported "Pressure at Mortgage Firm Led to Mass Approval of Bad Loans."  The *Washington Post* reported that a former New Century appraiser Maggie Hardiman recounted that "[y]ou didn't want to turn away a loan because all hell would break loose," and when she did reject a loan, "her bosses often overruled her and found another appraiser to sign off on it."

92.     On March 12, 2007, *USA Today* reported that, one day after New Century "said its lenders were cutting off financing because it didn't have enough money, or prospects of new assistance, to cover billions of dollars in obligations," New Century disclosed that the SEC was investigating the company.  *USA Today* also reported that "New Century also said Tuesday that it has received a grand jury subpoena requesting documents. The request is part of the U.S. Attorney in Los Angeles' criminal probe into the company."   On May 1, 2007, the *New York Times* (Today in Business) reported that New Century was facing investigations by both federal prosecutors and securities regulators, and on July 6, 2007, *Reuters* reported that the SEC had elevated its investigation of New Century to "formal status" which "gives the SEC subpoena power."

93.     On December 7, 2009, the SEC charged three of New Century's top officers with violations of the federal securities laws, and claimed that "New Century's business was anything but 'good' and it soon became evident that its lending practices, far from being 'responsible,' were the recipe for financial disaster."  SEC Complaint, ¶ 3.  The SEC Complaint further details the falsity of New Century's assurances to the market about its "adhere[nce] to high origination standards in order to sell [its] loan products in the secondary market," and its policy to "only

EXHIBIT  53  -536-

approve subprime loan applications that evidence a borrower's ability to repay the loan." *Id.*, ¶¶ 19-20.

94.     New Century's systematic disregard for its underwriting guidelines led to dramatic downgrades of the value of the Securities in which New Century acted as a mortgage originator. On December 6, 2007, the *New York Times* reported that "[l]oans made by New Century, which filed for bankruptcy protection …, have some of the highest default rates in the industry. . . , according to data from Moody's Investor Services."

95.     Allegations of New Century's dismal underwriting have been sustained by Courts in similar actions.  For example, in *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., et al.*, an investor brought class claims against the dealer, issuer, and underwriter of RMBS containing collateral loans underwritten by New Century, alleging that New Century failed to comply with its "loan-approval oversight and control mechanisms as represented in [its] underwriting guidelines."  The court substantially denied defendants' motion to dismiss, holding that the complaint properly alleged "systemic borrower defaults, complete lack of controls and oversight, and flagrant violations of the Guidelines," and that New Century, along with the dealer and issuer defendants, "acted with reckless abandon in their zeal to generate loan volume and profits."

>   **b.     Long Beach Mortgage Company**

>   **1.     Defendants Made Untrue Statements of Material Facts About
>   Long Beach's Underwriting Standards and Practices**

96.     Long Beach Mortgage Company ("Long Beach") originated mortgage loans that were included in the pools for the following offerings:

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| ACE 2006-SL2 | Ace Securities Corp. | Deutsche Bank |
| GSAMP 2006-S1 | GS Mortgage Securities Corp. | Goldman Sachs |
| LBMLT 2005-1 | Long Beach Mortgage Loan Trust | Greenwich Capital |
| LBMLT 2005-2 | Long Beach Mortgage Loan Trust | Goldman Sachs |
| LBMLT 2005-WL1 | Long Beach Mortgage Loan Trust | Greenwich Capital |
| LBMLT 2005-WL2 | Long Beach Mortgage Loan Trust | Credit Suisse |

39

EXHIBIT   53   -537-

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|----------|---------------------|----------------------------|
| LBMLT 2006-7 | Long Beach Mortgage Loan Trust | Goldman Sachs |
| LBMLT 2006-WL1 | Long Beach Mortgage Loan Trust | Goldman Sachs |
| SVHE 2005-B | SoundView Home Loan Trust | Greenwich Capital |

97.     Defendants offered or sold to Plaintiff approximately $123.0 million of Securities for which Long Beach originated some or all of the underlying mortgage loans.

98.     The Offering Documents all contained substantially similar, if not identical, statements of material facts regarding Long Beach's underwriting standards and practices. For example, prospectus supplement ACE 2006-SL2 stated:

> All of the mortgage loans owned by the trust that have been originated by Long Beach, have been originated by Long Beach through wholesale brokers or re-underwritten upon acquisition from correspondents by Long Beach generally in accordance with Long Beach's underwriting guidelines described in this section. Long Beach's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral.

> *        *        *

> The adequacy of the mortgaged property as collateral is generally determined by an appraisal of the mortgaged property that generally conforms to Fannie Mae and Freddie Mac appraisal standards and a review of that appraisal.  The mortgaged properties are appraised by licensed independent appraisers who have satisfied the servicer's appraiser screening process.

> *        *        *

> On a case-by-case basis and only with the approval of an employee with appropriate risk level authority, Long Beach may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under its underwriting risk category guidelines warrants an underwriting exception.

99.     The above statements of material facts were untrue when made because, as demonstrated below in ¶¶ 100-127, they failed to disclose that Long Beach: (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume; and (iv) violated its stated appraisal standards and in

EXHIBIT  53   -538-

many instances materially inflated the values of the underlying mortgage properties in the loan origination and underwriting process.

### 2.     Long Beach Violated Its Stated Underwriting Standards

100.    Defendants Credit Suisse, Deutsche Bank, Goldman Sachs, and Greenwich Capital offered or sold to Plaintiff Securities containing loans originated by Long Beach and made untrue statements to Plaintiff about Long Beach's underwriting and appraisal standards and practices and the loans underlying the Securities.   These Wall Street Banks had extensive business relationships with Long Beach, had access to Long Beach's mortgage origination personnel and internal information, and conducted due diligence into Long Beach using their own personnel and third-party loan review firms.  As a result of the Wall Street Banks' access to and due diligence into Long Beach, they were or reasonably should have been aware of the untruth of the statements about Long Beach described above.

101.    In 1999, Long Beach was acquired by WaMu, a Washington corporation headquartered at 1301 Second Avenue, Seattle, Washington 98101.  WaMu was founded in 1889 and, before its bankruptcy, was the largest savings and loan association in the country.  Long Beach served as WaMu's subprime loan origination division until January 1, 2006 and was thereafter known as WaMu's "specialty mortgage lending" channel.  According to CW 5, who served as a Long Beach Senior Underwriter in the Chicago area from 2004 through September 2007, WaMu sold subprime loans with interest-only and negative-amortization features, increasing the riskiness of these loans.

102.    The Senate Permanent Subcommittee on Investigations ("PSI"), after investigating and holding hearings on Long Beach's role in the recent financial crisis, concluded the following about the company:

> Subprime lending can be a responsible business.  Most subprime borrowers pay their loans on time and in full.  Long Beach, however, was not a responsible lender.   Its loans and mortgage backed securities were among the worst performing in the subprime industry.

EXHIBIT   53   -539-

103.    Long Beach financially rewarded its employees for closing higher-risk loans and instituted loan sales quotas.  Long Beach loan officers, for example, received more money per loan for originating higher-risk loans and for exceeding established loan targets.  Loan processing personnel were compensated according to the speed and number of the loans they processed. Loan officers and their sales associates received still more compensation if they charged borrowers higher interest rates or points than required in bank rate sheets specifying loan prices, or included prepayment penalties in the loan agreements.  That added compensation created incentives to increase loan profitability, but not loan quality.  Accordingly, Long Beach's employees targeted more and more borrowers who were less able to afford the loan payments they would have to make, and many of whom had no realistic ability to meet the obligations incident to the loans they were sold.

104.    According to CW 6, a First Vice President in the Capital Markets Group and Director of Investor Relations at WaMu Capital Corp. in New York, New York, from October 2004 until December 2007, Long Beach compensated its account executives and underwriters based on the volume of loans that they brought in and closed, and their compensation structure gave no consideration  to the quality of those loans.

105.    CW 7, an Account Executive for Long Beach in New Jersey from 1998 until October 2007, noted a shift in underwriting philosophy in 2005 toward increasing loan volume at all costs.  When CW 7 first joined the subprime business, Long Beach relied on "common sense underwriting" and was not exclusively focused on credit scores.  CW 7 noted the change away from a "know your borrower" focus beginning in the 2005 timeframe, with Long Beach relying more on credit scores and less on common sense.  The borrower needed to produce less and less documentation, and Fair Isaac Credit Organization ("FICO") credit scores became more important than verifying income for Long Beach.  In response, "volume really went through the roof."

106.    Long Beach pushed through every loan it could close, through whatever means necessary.  CW 8, a Senior Underwriter for Long Beach in Dallas, Texas, from 2004 through

42

EXHIBIT  53  -540-

April 2007, reported that on occasion CW 8 would express concerns to her manager over funding some of the loans underwritten, but the manager's "direction from corporate" was simply to fund loans.  CW 8 also reported that at month-end team meetings, it was often discussed that the Company was trying to increase volume by getting more "borrowers to fit."

107.   CW 8 recalled that some of the "crazier" programs at Long Beach included stated-income loans for W-2 wage earners, a program that started in 2005.  Stated-income programs, to the extent that lenders accepted them, were traditionally reserved for self-employed borrowers with significant assets.  At Long Beach, however, these "liar's loans" were common, even for those borrowers who were not self-employed.  Long Beach would also approve 100% financing for stated-income borrowers with FICO scores as low as 500.

108.   CW 8 also described a "three letters of reference" program for self-employed borrowers, where a borrower only had to submit three letters of reference from anyone for whom they supposedly worked.  CW 8 said no attempt was made to verify the information in the letters.  CW 8 related that some of the accepted letters included statements such as: "So-and-so cuts my lawn and does a good job."  At Long Beach, FICO scores ranged from 500-620, but CW 8 said that if Long Beach salespeople had a borrower with a 620, they were "hooping and hollering" about having a borrower with good credit.

109.   CW 8 also relayed that borrowers could get a loan with no established FICO score merely by providing "three alternative trade lines."  An "alternative trade line" was anything that did not appear on the borrower's credit report, including documentation of car insurance payments, verification of rent payment, or a note from a person claiming the borrower had repaid a personal debt.  CW 8 said that Long Beach originated "a significant amount" of these types of problematic loans.  CW 8 commented: "It was just a disaster."  Furthermore, CW 8 said that these loans made up the majority of first payment defaults – *i.e.*, loans on which the borrower failed to make even the first payment – in the end of 2006.

110.   CW 9 was a Wholesale Mortgage Underwriter at the Long Beach loan processing center located in Lake Oswego, Oregon from August 2005 until December 2006.  CW 9 first

43

EXHIBIT  53  -541-

joined WaMu in Lake Oswego in 2003 as a Senior Credit Analyst and subsequently joined Long Beach in 2004 as a Senior Loan Coordinator, ultimately becoming a Wholesale Mortgage Underwriter.  CW 9 said that at Long Beach there was always a sense of "working the underwriting guidelines" to close loans, rather than to mitigate Long Beach's credit risk.  CW 9 said that there was simply an environment in the loan processing center to "approve, approve, approve" and that any exception that was needed to approve a loan was not only done, but was "sought after."  CW 9 felt that Long Beach consistently pressured its underwriters to "find a way to make it work."

111.    According to CW 5, even the few loans that Long Beach underwriters refused to approve were regularly pushed through by Long Beach management by granting exceptions to the guidelines.  According to CW 5, "There were so many exceptions."  Long Beach allowed LTV ratio exceptions, and the "rate exceptions were ridiculous."  According to CW 5, WaMu allowed even the salespeople to give interest-rate exceptions to borrowers to push loans through.  CW 5 explained: "There were really no restrictions to approve a loan," and some "really bad loans" went through the office.  The attitude at WaMu was "push, push, push."

112.    Numerous other Long Beach employees agreed that exceptions to Long Beach's guidelines were commonplace.  CW 10, a Senior Underwriter with WaMu in Livermore, California from 2003 through September 2007, said that if Long Beach's competitors could not approve a loan, it was known to send the loan to Long Beach and they would make an exception to get the loan through.  CW 10 said that guidelines were "loose to the point of disbelief."  CW 10 described Long Beach's lending approach as follows: "If [potential borrowers] were breathing and had a heart beat, you could probably get the loan done."

113.    CW 9 stated that many employees at Long Beach were disappointed about the decisions that were being made about loan quality, but they were resigned to simply "keep their heads down."  According to CW 5, several WaMu employees contacted corporate headquarters about the incessant underwriting exceptions, including issuing loans to unqualified borrowers.  CW 5 stated, "[w]e did a lot of underhanded stuff."  CW 5 stated that if an underwriter at Long

EXHIBIT   53   -542-

Beach refused to force a file through, they would be written up, not because they made a bad decision but because the sales team did not like their decision.  CW 5 said: "Basically, sales is what ran Long Beach Mortgage, it wasn't the Operations part."

114.    CW 11 served as a Quality Assurance Manager in the Long Beach Loan Fulfillment Center ("LFC") in Dallas, Texas from November 2005 until his termination in August 2007.  CW 11 explained that the Quality Assurance group in Dallas performed a monthly audit on a random selection of subprime loans from the various loan origination centers around the country.  This analysis was not focused on loan-specific issues, but instead concerned WaMu/Long Beach-wide trends that might suggest necessary changes in underwriting guidelines, compliance standards, or other systems.

115.    CW 11 observed that, despite the extensive analysis that the group performed to determine the causes for WaMu/Long Beach-wide loan problems, WaMu/Long Beach ignored the results.  CW 11's group continued to identify the same problematic trends again and again without WaMu/Long Beach taking any steps to address the causes.  According to CW 11, although WaMu/Long Beach was "going through the motions" to present a façade of legitimate quality control, in reality there was nothing but a "free for all to approve loans by the thousands."

116.    According to CW 12, an employee of Long Beach from 2001 until October 2006, serving as an underwriter and later becoming a Quality Assurance Manager, a group of WaMu employees regularly reviewed a percentage (typically around 20%) of Long Beach's loans to monitor Long Beach's underwriting.  CW 12 forwarded the report to Long Beach's Loan Servicing Center managers.  The Long Beach managers receiving the reports had a certain number of days to go through the loan files in question and respond to the findings in the reports.

117.    According to CW 13, a Senior Default Foreclosure Loan Specialist with Long Beach in Chatsworth, California from 2002 to September 2006, her department received statistics every month that showed the number of first payment defaults from the prior month.  According to CW 13, at the end of 2004, the default numbers were at 6-7% and, "although they may have increased slightly, did not go over 9%."  Suddenly, however, they increased "all at

EXHIBIT  53  -543-

once" to as high as 14%. According to CW 13, first payment defaults just "seemed to go up and up."

118. In his opening statement at the first PSI hearing on Wall Street and the Financial Crisis (related to the role of high risk home loans), Senator Carl Levin noted that an internal WaMu audit of Long Beach in 2005 found that "relaxed credit guidelines, breakdowns in manual underwriting processes, and inexperienced subprime personnel . . . coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool" led to deteriorating loans. Many of the loans defaulted within three months of being sold to investors. Investors demanded that Long Beach repurchase them. Long Beach had to repurchase over $875 million in loans in 2005 and 2006, lost over $107 million from the defaults, and had to cover a $75 million shortfall in its repurchase reserves.

119. Senator Levin also noted that in response to the repurchase requests, WaMu "fired Long Beach's senior management and moved the company under the direct supervision of the President of WaMu's Home Loans Division, David Schneider" and that "WaMu promised its regulator that Long Beach would improve. But it didn't." In April 2006, WaMu's President, Steve Rotella, emailed the CEO, Kerry Killinger, that Long Beach's "delinquencies are up 140% and foreclosures close to 70%. . . . It is ugly." Five months later, in September, he emailed that Long Beach is "terrible. . . . Repurchases, [early payment defaults], manual underwriting, very weak servicing/collections practices and a weak staff." Two months after that, in November 2006, the head of WaMu Capital Markets in New York, David Beck, wrote to Mr. Schneider that "LBMC [Long Beach] paper is among the worst performing in the [market]."

120. In June 2007, WaMu shut down Long Beach and took over its subprime lending operations. Currently, Long Beach mortgage backed securities report loan delinquency rates in excess of 40%. At the end of 2007, a Long Beach employee was indicted for having taken kickbacks to process fraudulent or substandard loans.

121. In April 2010, the Senate Permanent Subcommittee on Investigations ("PSI") held a series of hearings "to examine some of the causes and consequences of the crisis." The goals

EXHIBIT  53   -544-

of the hearings were threefold: (1) to construct a public record of the facts to deepen public understanding of what happened and to try to hold some of the perpetrators accountable; (2) to inform the legislative debate about the need for financial reform; and (3) to provide a foundation for building better defenses to protect Main Street from the excesses of Wall Street.

122.   The hearings were based on an in-depth bipartisan investigation that began in November 2008.  The PSI conducted over 100 detailed interviews and depositions, consulted with dozens of experts, and collected and reviewed millions of pages of documents.  Given the extent of the economic damage and the complexity of its root causes, the Subcommittee's approach has been to develop detailed case studies to examine each stage of the crisis.

123.   On April 13, 2010, the PSI held a hearing that focused on the role high risk loans played in the financial crisis, using WaMu as a case history.  It showed how WaMu originated and sold hundreds of billions of dollars in high risk loans to Wall Street Banks in return for big fees, polluting the financial system with toxic mortgages.

124.   The PSI reached the following findings of fact following the April 13, 2010 hearing:

> **1.     High Risk Lending Strategy**.  Washington Mutual ("WaMu") executives embarked upon a high risk lending strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.
>
> **2.     Shoddy Lending Practices.**   WaMu and its affiliate, Long Beach Mortgage Company ("Long Beach"), used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.
>
> **3.     Steering Borrowers to High Risk Loans**.  WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.
>
> **4.     Polluting the Financial System**.  WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and

EXHIBIT   53   -545-

*polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.*

**5.     Securitizing Delinquency-Prone and Fraudulent Loans**.   At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

**6.     Destructive Compensation**.   WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when its high risk lending strategy placed the bank in financial jeopardy.

125.    The PSI also concluded that "from 2004 to 2007, in exchange for lucrative fees, Goldman Sachs helped lenders like Long Beach, Fremont, and New Century, securitize high risk, poor quality loans, obtain favorable credit ratings for the resulting residential mortgage backed securities (RMBS), and sell the RMBS securities to investors, pushing billions of dollars of risky mortgages into the financial system."

126.    Long Beach and WaMu's appraisal practices have also been the target of governmental investigations.  On November 1, 2007, New York State Attorney General Andrew Cuomo announced that he was suing eAppraiseIT and its parent company First American Corporation, charging them with caving into pressure from WaMu to use a list of preferred "Proven Appraisers" who provided inflated appraisals on homes.  *People of the State of New York v. First Am. Corp. and First Am. eAppraiseIT*, Index No. 406796/2007 (N.Y. Sup. Ct.).  Cuomo's suit alleged that eAppraiseIT colluded with WaMu (the parent of Mortgage Originator Long Beach) to inflate the appraisal values of homes.  According to Cuomo, between April 2006 and October 2007, First American performed 262,000 appraisals for WaMu. When WaMu loan officers began complaining that valuations by eAppraiseIT's independent roster were coming in too low, WaMu allegedly pressured First American to assign only appraisers on WaMu's approved list when appraising WaMu mortgage-related properties. WaMu allegedly threatened to take its business elsewhere, and dangled the prospect of greater use of First American's other

EXHIBIT   53   -546-

settlement services, to convince eAppraiseIT to accede to its demands. In a press release that accompanied the suit, Cuomo stated:

> The independence of the appraiser is essential to maintaining the integrity of the mortgage industry. First American and eAppraiseIT violated that independence when Washington Mutual strong-armed them into a system designed to ripoff homeowners and investors alike . . . . The blatant actions of First American and eAppraiseIT have contributed to the growing foreclosure crisis and turmoil in the housing market. By allowing Washington Mutual to hand-pick appraisers who inflated values, First American helped set the current mortgage crisis in motion.

127.   On June 8, 2010, the New York State Appellate Division, First Department, issued a decision upholding Attorney General Cuomo's complaint.

**c.   WaMu**

**1.   Defendants Made Untrue Statements of Material Facts About WaMu's Underwriting Standards and Practices**

128.   In addition to the loan originations by WaMu's Long Beach subsidiary discussed above, WaMu originated mortgage loans that were included in the pools for the following Offerings:

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| SACO 2005-WM3 | SACO I Trust | Bear Stearns |
| WAMU 2005-AR2 | Washington Mutual | Greenwich Capital |

129.   Defendants offered or sold to Plaintiff approximately $25.6 million of Securities for which WaMu originated some or all of the underlying mortgage loans.

130.   The Offering Documents all contained substantially similar, if not identical, statements of material facts regarding WaMu's underwriting standards and practices. For example, prospectus supplement WAMU 2005-AR2 stated:

> [WaMu]'s underwriting standards are intended to evaluate the prospective Mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed Mortgaged Property as collateral. In the loan application process, prospective Mortgagors will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items. Each prospective Mortgagor will also provide an authorization to apply for a credit report which summarizes the Mortgagor's credit history. With respect to establishing the prospective Mortgagor's ability to

EXHIBIT   53   -547-

make timely payments, the Company will require evidence regarding the Mortgagor's employment and income, and of the amount of deposits made to financial institutions where the Mortgagor maintains demand or savings accounts. In some instances, Mortgage Loans which were originated under a Limited Documentation Origination Program may be sold to the Company.  For a mortgage loan originated under a Limited Documentation Origination Program to qualify for purchase by the Company, the prospective mortgagor must have a good credit history and be financially capable of making a larger cash down payment, in a purchase, or be willing to finance less of the appraised value, in a refinancing, than would otherwise be required by the Company.  Currently, the Company's underwriting standards provide that only mortgage loans with certain loan-to-value ratios will qualify for purchase.  If the mortgage loan qualifies, the Company waives some of its documentation requirements and eliminates verification of income and employment for the prospective mortgagor.

The Company's underwriting standards generally follow guidelines acceptable to Fannie Mae and Freddie Mac.  In determining the adequacy of the property as collateral, an independent appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed.  The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property.

131.   The above statements of material facts were untrue when made because, as demonstrated below in ¶¶ 132-158, they failed to disclose that WaMu: (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume; and (iv) violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgage properties in the loan origination and underwriting process.

## 2.    WaMu Violated Its Stated Underwriting Standards

132.   J.P. Morgan (as successor-in-interest to Bear Stearns) and Greenwich Capital offered or sold to Plaintiff Securities containing loans originated by WaMu and made untrue statements to Plaintiff about WaMu's underwriting and appraisal standards and practices and the loans underlying the Securities.  These Wall Street Banks had extensive business relationships with WaMu, had access to WaMu's mortgage origination personnel and internal information, and conducted due diligence into WaMu using their own personnel and third-party loan review firms.

EXHIBIT  53  -548-

As a result of the Wall Street Banks' access to and due diligence into WaMu, they were or reasonably should have been aware of the untruth of the statements about WaMu described above.

133.   In addition to the facts alleged above regarding improper underwriting and appraisal practices by Long Beach, WaMu's subprime mortgage subsidiary, WaMu also pervasively violated its stated underwriting and appraisal standards in its purportedly prime mortgage business.  In order to generate a greater volume of risky loan products, WaMu financially rewarded loan origination personnel for closing higher-risk loans and instituted minimum loan sales quotas.  Accordingly, WaMu's employees targeted more and more borrowers who were less able to afford the loan payments they would have to make, and many of whom had no realistic ability to make payments on the loans they were sold.

134.   CW 14, a WaMu Vice President and Senior Credit Quality Manager from 2005 until February 2008 and a Senior Credit Risk Manager from April 2004 through March 2005, explained with regard to WaMu's loans, "[t]he more you slammed out, the more you made." Similarly, CW 15, a Senior Loan Consultant with WaMu from 2005 to 2007, observed that sometimes mortgage originators were surprised by the loans they could get approved.  However, as a loan officer, if CW 15 could personally earn $2,000 - $3,000 by closing a loan, then CW 15's only concern was getting the loan approved.  According to CW 15: "Once you get paid, you don't care what happens."  CW 16, a Senior Loan Coordinator for WaMu's Home Loan Center in Bethel Park, Pennsylvania from February 1998 until September 2007, felt that WaMu employees were "greedy" and that the borrowers suffered as a result.  CW 16 concluded, "[w]e could never figure it out why people came to us [for loans]."

135.   In a November 2, 2008 *New York Times* article titled "Was There a Loan It Didn't Like?," former WaMu Senior Mortgage Underwriter Keysha Cooper, who started at WaMu in 2003 and left in 2007, explained that "***[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify.*** Instead, it was how many loans did you guys close and fund?"  According to the article, "[i]n

EXHIBIT  53  -549-

February 2007, . . . the pressure became intense. WaMu executives told employees they were not making enough loans and had to get their numbers up . . . ."  Ms. Cooper concluded, "I swear 60 percent of the loans I approved I was made to. . . .  If I could get everyone's name, I would write them apology letters."

136.    Other former employees agreed that the primary factor driving WaMu's mortgage lending practices was to produce as much volume as possible.  CW 17, who was a Closing Loan Coordinator at WaMu in Bethel Park, Pennsylvania, from 2003 until July 2007, explained that WaMu's priority regarding loans was "always quantity rather than quality," and her branch closed an "insane" number of loans every day.  WaMu loan personnel could meet these volume expectations only because "[i]f you flew by the seat of your pants and didn't look at everything, you could get it done."  CW 17 observed that the branch goal was "hitting certain numbers every month."  WaMu rewarded high-performing loan officers with "fabulous vacations" if they made their numbers.  CW 17 noted, "It was all about sell, sell, sell."

137.    Similarly, according to CW 18, a Loan Coordinator/Mortgage Processor for WaMu in Jacksonville, Florida from March 2007 until December 2007, there was a company-wide culture that required WaMu employees to do "whatever it took to get loans closed."  WaMu managers would constantly press WaMu underwriters and salespeople to "push, push, push" to close loans.  CW 16 stated that "*WaMu's top priority was to get as many loans closed as quickly as they could close and not worry – they just wanted the volume, and it didn't seem to matter how they got it . . . . Everybody just wanted their chunk of the money*."  Not only did loan coordinators receive bonuses for loans they closed, but also CW 16 understood that if loan officers did not meet their quotas, WaMu fired them.

138.    Mortgage originators were also paid more for originating loans that carried higher profit margins for WaMu and had commensurately higher credit risk.  For example, CW 19, a Senior Loan Consultant with WaMu at Riverside, California, from 2005 through December 2007, reported that "every year [WaMu] came out with a new commission outline and [WaMu's] extra commissions for teaser rate loans."  Further, according to CW 19, occasionally WaMu would

EXHIBIT  53  -550-

send out emails to mortgage originators about commission "specials."   One of WaMu's
"specials," CW 19 recalls, was to give mortgage originators extra commissions for Option ARM
loans.  In addition, ***WaMu paid additional commissions for non-conforming loans***.  According
to CW 19, at WaMu "[i]t's not about what's best for the client; it's about what's best for the
Company."  According to CW 20, a Sales Manager with WaMu for twenty years until October
2006, WaMu managers also received increases in their bonuses if their group closed a certain
percentage of Option ARM loans.

139.    CW 21, a former Loan Consultant for WaMu in Riverside, California, reported
that because of WaMu's additional incentive compensation, WaMu salespeople undertook
particularly aggressive tactics to sell Option ARM loans.  As CW 22, who served as a Senior
Underwriter with WaMu through a private mortgage insurance company, put it, "WaMu's biggest
things are ARMs – they push those things like cotton candy."  According to CW 21, "most
borrowers" who came to WaMu "wanted the fixed rate loans."  Thus, selling Option ARM loans
required "pushing" them, which was done in a "nasty" way.  ***WaMu loan officers would fail to
educate the borrower, so that Option ARM loan borrowers "would think they were paying the
fully-indexed rate, when they were only paying a portion of the interest" because the loan
consultants did not explain the programs thoroughly***.  WaMu loan consultants were under "a lot
of pressure" from their managers to promote and sell Option ARM loans.  CW 21 originated only
"one or two" Option ARM loans because CW 21 was so morally opposed to these "risky" loans.
As a result, CW 21 was frequently reprimanded by CW 21's managers at WaMu.

140.    CW 23 was an employee at WaMu from 1993 to 2006 and was a "Senior Trainer"
from 2000-2004, training employees on processing, closing, underwriting, leadership, products,
and pricing.  According to CW 23, Option ARM loans were suitable only for rental, non-owner
occupied properties or for "savvy investment people who play the stock market."  However,
many of the WaMu sales people in CW 23's class did not understand the concept of negative
amortization and could not explain it to borrowers.

EXHIBIT   53   -551-

141.    Indeed, an internal WaMu presentation on Option ARM loans shows that WaMu focused on unsophisticated borrowers for its high-risk Option ARM loans.  The internal WaMu presentation states that appropriate "Option ARM Candidates" are:

- Savvy Investors
- ***First Time Home Buyers***
- High Income Earners
- ***Self Employed Borrowers***
- ***Retired Borrowers***
- Real Estate Agents

The next page of the same presentation further explained that WaMu's target borrowers were of:

- ***All Ages***
- ***Any Social Status***
- ***All Economic Levels***

In other words, WaMu pushed its Option ARM loans on borrowers regardless of their sophistication, income level, or financial stability.

142.    WaMu financially incentivized its underwriters, who supposedly served as WaMu's "gatekeepers" of loan credit quality, to approve an enormous volume of loans without regard to loan quality.

143.    CW 24, a Senior Underwriter with WaMu in Livermore, California, from 2003 through September 2007, confirmed that loan underwriters received commissions based upon volume of loans underwritten and closed.  CW 6 confirmed that underwriters were compensated on the volume of loans brought in and closed, with no consideration given to the quality of the loans.

144.    According to CW 14, underwriters were required to underwrite a minimum of nine loans a day, and any loans underwritten in excess of that number provided for bonus payments.  Indeed, certain senior underwriters earned in excess of $100,000 annually because of these bonuses; some underwriters received monthly bonus payments of $5,000 for underwriting a high volume of loans.

EXHIBIT   53   -552-

145.     Notwithstanding underwriters' exorbitant volume-based bonuses, according to CW 25, who worked at WaMu from 1997 to February 2008 and served as a Credit Quality Manager and an Area Underwriting Manager, WaMu's senior management believed that if underwriters knew about underwriting problems that led to problem loans, WaMu's underwriters would "by nature" have tightened up WaMu's lending standards.   Thus, WaMu refused to provide loan delinquency data to its underwriters.

146.     Highly experienced mortgage underwriters who worked at WaMu during the relevant period were shocked by how lenient WaMu was in its lending.   CW 26 was a Senior Underwriter in the Washington Mutual Wholesale loan fulfillment center in Lake Success, New York, from June 2005 through February 2008.   CW 26 had twenty-plus years of experience underwriting home loans.   When CW 26 arrived at WaMu, CW 26 was stunned to find that WaMu's supposedly "A paper" (*i.e.*, prime loans) consisted of loans made to borrowers with credit scores in the 500s, high LTV ratios, and Option ARM loans.   CW 26 reported that there was "only so much you could do" with the loans she underwrote, because they met WaMu's lenient underwriting guidelines and CW 26 did not want to discriminate among borrowers by denying loans to some borrowers who met WaMu's loose guidelines merely because CW 26 did not think that borrower could actually repay the loan that WaMu had sold.

147.     Similarly, CW 27, who served as a Senior Underwriter with WaMu through a private mortgage insurance company for most of 2007, was appalled by the lenient standards in place at WaMu.   CW 27 reported that WaMu's reputation in the mortgage industry was that "if you had a pulse, WaMu would give you a loan."   CW 27 stated that the underwriting guidelines at WaMu "changed every minute. . . .   You would literally be getting an email every second that the guidelines changed or would have a pissed off account executive at your desk asking why the loan can't go through."   Often, CW 27 reported, loans would be taken away from her to be approved by another underwriter who was not as conscientious.   CW 27 often saw active or approved loans in the system that CW 27 had refused to underwrite and were ultimately signed

EXHIBIT   53   -553-

off on by someone else.  According to CW 27, "They would give it to one of their 'lead
underwriters' to approve."

148.    Before a loan came to CW 27's desk, it could be automatically underwritten
through a computer program, modeled after Fannie Mae's "Desktop Underwriter" ("DU")
program.  Loans that could be underwritten using the DU system could be approved by a loan
processor without any involvement from an underwriter.  CW 27 recalled that regularly, if a loan
was rejected by the computer, the loan consultant would repeatedly re-enter the loan's
information, changing the information a little each time, "tweak[ing] the system."

149.    CW 16 recalled, "I saw underwriting managers and other managers waive a lot [of
supposed underwriting rules]."  According to CW 16, "[o]nce a week you'd go in with your
manager, [and he'd say] 'why didn't this loan close, why didn't that one close?'"  CW 16 said
*the pressure "was coming from the very top, the managers had to listen to the head manager,
who had to listen to corporate*."  CW 16 added, "I almost had a nervous breakdown."  According
to CW 16, the underwriting procedures progressively loosened and "got really bad in 2006."
*WaMu's "top priority was to get as many loans closed as quickly as they could close and not
worry – they just wanted the volume, and it didn't seem to matter how they got it."*

150.    Notwithstanding the fact that, according to regulatory agencies including the
Federal Deposit Insurance Corporation and the Office of Thrift Supervision, "prime" loans
should have been available only to borrowers with FICO scores of 660 or above, WaMu
regularly made loans to borrowers with FICO scores well below this standard.  A WaMu training
document for subprime loan production employees, entitled "Specialty Lending UW
[Underwriter] HLCA [Home Loans Credit Authority] Training," revised September 26, 2007,
makes clear that, regardless of a borrowers' credit history or actual potential to repay a loan, if
the borrower WaMu targeted for one of its "prime" loans had a FICO score over 619, that
borrower was considered a "prime" borrower.

151.    In one stunning example of how WaMu abused the watered-down "standard"
above, the Company instructed in an internal WaMu document to its underwriters that if a

56

EXHIBIT  53   -554-

borrower applied for a "5/1 Amortizing ARM" and the borrower had a bankruptcy "less than 4 years ago," but had a FICO score of 621, WaMu would consider that borrower prime.  In fact, CW 28, a Loan Consultant for WaMu in New York from 2003 to 2006, stated that borrowers with credit scores as low as 540 (well below any accepted prime threshold) were approved for "prime" loans during the relevant period.

152.    Various witnesses with direct experience in WaMu's underwriting operations have explained that during the relevant period, exceptions to WaMu's already low prime underwriting guidelines were the rule.

153.    As observed by CW 29, who worked for WaMu from 1995 through 2008, most recently as Assistant Vice President Credit Level 3, Underwriting Supervisor, no exception to the underwriting guidelines was needed for many questionable loans, because WaMu's "guidelines were so generous."  However, for those loans that did not fit within the loose guidelines of WaMu's underwriting standards, exceptions were encouraged and readily available.  CW 30, a Senior Underwriter at the WaMu home loan center in Lake Success, New York from 2007 to 2008, agreed, stating that guideline exceptions were "part of the norm . . . it was so commonplace to go outside of the guidelines."  ***Underwriting exceptions that were sent to management for approval "were always approved, so it was just business as usual and something that they were comfortable with."***  CW 14 explained that WaMu encouraged loan consultants to obtain exceptions to the underwriting guidelines whenever necessary to close more loans.  CW 31, a Senior Loan Processor at WaMu in Pittsburgh from 2004 through 2006 and again in 2007, agreed that WaMu's loans were exception-ridden: "You could pretty much get an exception on any loan you wanted to."

154.    As an Area Underwriting Manager, CW 25 was one of four senior underwriters with the Company charged with approving exceptions to WaMu underwriting guidelines for loans greater than $3 million and exceptions beyond those that WaMu underwriting managers were allowed to make.  CW 25 stated that she and others in her position at WaMu were required to make numerous exceptions to WaMu's stated underwriting guidelines.  Indeed, CW 25 stated

EXHIBIT  53   -555-

that the Negotiated Transaction Managers would be under a great deal of pressure to approve certain loans, especially where loan consultants had "important relationships."  Those loans for which CW 25 and the other Negotiated Transaction Managers refused to make exceptions, even after being pressured, were referred up WaMu's chain of command to Mark Brown, National Underwriting Manager, or Cheryl Feltgen, Division Executive Chief Risk Officer, for approval where the loans would readily be approved.

155.    According to CW 32, an underwriter with WaMu from 2002 through 2006 in Portland, Oregon, even when "borrowers were simply not qualified," WaMu's loose underwriting guidelines allowed borrowers to meet stated-income loan guidelines because of their credit scores.  For example, CW 32 recalled multiple times where underwriters wanted to lower the stated income on the loan application, based on an evaluation of the borrower's actual circumstances, but WaMu would not allow such revisions.  CW 32 said that stated income loans were commonly referred to at WaMu as "lie-to-me loans."  Indeed, CW 32 reported that, over underwriter objections, the Company began to accept a job description in lieu of proof of employment for stated-income loans.  CW 32 recalled that the borrower's job description did not even have to be produced by the borrower's employer or have to be on their employer's letterhead:  "it was sufficient to print out a job description found online."

156.    WaMu also did not underwrite its Option ARM loans to the fully-indexed rate. CW 33, a Retail Loan Consultant with WaMu from 2002 through 2007, reported that throughout the relevant period *until late 2007, WaMu had underwritten its Option ARM loans to ensure only that the borrower could make monthly payments at the "teaser" rate*.  When, in late 2007, the Company changed its guidelines to finally require its underwriters to underwrite the loans to the fully-indexed rate, it was a major change for the underwriters.  CW 33 observed that "At the time the loans started falling out of favor, they started underwriting based on the index rate and it just snowballed from there."  CW 34, a WaMu Retail Loan Consultant in Kensington, Maryland from 2001 through December 2007, confirmed that WaMu underwrote Option ARM loans to the teaser rate, rather than the fully-indexed rate.  In 2007, according to CW 34, WaMu's new

EXHIBIT  53  -556-

guidelines resulted in fewer borrowers being able to qualify for Option ARM loans based on the fully-indexed rate.  Similarly, CW 35, a Senior Underwriter at WaMu's Lake Success, New York branch from June 2005 until February 2008, and CW 21 also confirmed that WaMu underwrote its Option ARM loans to the "teaser" rate, rather than the fully-indexed rate.

157.   Witnesses in other divisions of WaMu also have confirmed that WaMu underwrote its Option ARM loans to their "teaser" rates, at least until August 2007.  According to CW 36, a Due Diligence Director in the WaMu Transaction Management group in Anaheim and subsequently Fullerton, California, who spent over 17 years with WaMu from 1991 until 2008, WaMu required loans that it purchased from third parties to conform with underwriting guidelines that WaMu applied to the loans that it originated.  Thus, WaMu periodically updated its "Bulk Seller Guide" to conform to WaMu's own underwriting requirements.  WaMu's "Mortgage Securities Corp. Seller Guide Update – Announcement Concerning Qualifying Rate and Qualifying Payment for Hybrid ARM, IO, and Option ARM Products" indicates that, effective August 1, 2007, WaMu Option ARM loan underwriting shifted to require qualification for such loans only at the fully-indexed rate.

158.   On November 1, 2007, New York State Attorney General Andrew Cuomo filed a complaint against First American Corporation and eAppraiseIT, which detailed that WaMu pressured appraisers to inflate appraisal values.  According to a November 2, 2007 *New York Times* article, the complaint was filed after "investigators had spent nine months interviewing hundreds of mortgage industry executives and poring over millions of documents obtained through subpoenas."  The complaint alleges, on the basis of numerous internal emails, that WaMu executives pressured eAppraiseIT to increase the appraised value of homes and that eAppraiseIT improperly allowed WaMu's loan production staff to hand-pick appraisers who brought in appraisal values high enough to permit WaMu's loans to close. Additionally, the New York Attorney General's complaint alleges that WaMu repeatedly pressured eAppraiseIT appraisers to change appraisal values that were too low to permit loans to close.

EXHIBIT  53  -557-

### d.   Fremont Investment & Loan

#### 1.   Defendants Made Untrue Statements of Material Facts About Fremont's Underwriting Standards and Practices

159.   Fremont Investment & Loan ("Fremont") originated mortgage loans that were included in the pools for the following offerings:

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| ACE 2005-HE2 | Ace Securities Corp. | Deutsche Bank |
| ACE 2005-HE5 | Ace Securities Corp. | Deutsche Bank |
| ACE 2005-HE6 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-FM2 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-HE1 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-SL1 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-SL2 | Ace Securities Corp. | Deutsche Bank |
| BSABS 2005-HE10 | Bear Stearns Asset Backed Securities Inc. | Bear Stearns |
| BSABS 2006-HE4 | Bear Stearns Asset Backed Securities Inc. | Bear Stearns |
| CARR 2006-FRE1 | Carrington Mortgage Loan Trust | Barclays Capital |
| CARR 2006-FRE2 | Carrington Mortgage Loan Trust | Barclays Capital |
| FHLT 2005-1 | Fremont Home Loan Trust | Greenwich Capital |
| FHLT 2005-A | Fremont Home Loan Trust | Credit Suisse |
| GSAMP 2005-HE6 | GS Mortgage Securities Corp. | Goldman Sachs |
| HELT 2007-FRE1 | Home Equity Loan Trust | Greenwich Capital |
| IXIS 2005-HE2 | IXIS Real Estate Capital Trust | Morgan Stanley |
| IXIS 2005-HE4 | IXIS Real Estate Capital Trust | Goldman Sachs |
| MABS 2005-FRE1 | MASTR Asset Backed Securities Trust | UBS |
| MABS 2006-FRE2 | MASTR Asset Backed Securities Trust | UBS |
| MABS 2006-HE1 | MASTR Asset Backed Securities Trust | UBS |
| MLMI 2005-SL2 | Merrill Lynch Mortgage Investors | Merrill Lynch |
| MLMI 2006-HE4 | Merrill Lynch Mortgage Investors | Merrill Lynch |
| MSAC 2007-HE3 | Morgan Stanley ABS Capital I | Morgan Stanley |
| SABR 2005-FR4 | Securitized Asset Backed Receivables | Barclays Capital |
| SABR 2005-FR5 | Securitized Asset Backed Receivables | Barclays Capital |
| SABR 2006-FR1 | Securitized Asset Backed Receivables | Barclays Capital |
| SVHE 2005-A | SoundView Home Loan Trust | Greenwich Capital |
| SVHE 2005-B | SoundView Home Loan Trust | Greenwich Capital |

EXHIBIT   53   -558-

160.   Defendants offered or sold to Plaintiff approximately $275.5 million of Securities for which Fremont originated some or all of the underlying mortgage loans.

161.   The Offering Documents all contained substantially similar, if not identical, statements of material facts regarding Fremont's underwriting and appraisal standards and practices.  For example, the prospectus supplement for MLMI 2005-FM1 stated:

> Mortgage loans are underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ("Scored Programs"), subject to various exceptions as described in this section.  Fremont's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  The Scored Programs assess the risk of default by using Credit Scores as described below along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratio as an aid to, not a substitute for, the underwriter's judgment.  All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market.

> *       *       *

> All of the mortgage loans were underwritten by Fremont's underwriters having the appropriate approval authority.  Each underwriter is granted a level of authority commensurate with their proven judgment, experience and credit skills. **On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio**, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  It is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions.

> There are the three documentation types, Full Documentation ("Full Documentation"), Easy Documentation ("Easy Documentation") and Stated Income ("Stated Income").  Fremont's underwriters verify the income of each applicant under various documentation types as follows: under Full Documentation, applicants are generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile; under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application.  The income is not verified under

EXHIBIT   53   -559-

the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work.

Fremont originates loans secured by 1-4 unit residential properties made to eligible borrowers with a vested fee simple (or in some cases a leasehold) interest in the property. **Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal**. Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states. Review appraisals may only be provided by appraisers approved by Fremont. In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont. Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises.

162.    The above statements of material facts were untrue when made because, as demonstrated below in ¶¶ 163-182, they failed to disclose that Fremont: (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume; and (iv) violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgage properties in the loan origination and underwriting process.

## 2.    Fremont Violated Its Stated Underwriting Standards

163.    Defendants Barclays, J.P. Morgan (as successor-in-interest to Bear Stearns), Credit Suisse, Deutsche Bank, Goldman Sachs, Greenwich Capital, Merrill Lynch, Morgan Stanley, and UBS offered or sold to Plaintiff Securities containing loans originated by Fremont and made untrue statements to Plaintiff about Fremont's underwriting and appraisal standards and practices and the loans. These Wall Street Banks had extensive business relationships with Fremont, had access to Fremont's mortgage origination personnel and internal information, and conducted due diligence into Fremont using their own personnel and third-party loan review

EXHIBIT  53  -560-

firms.  As a result of the Wall Street Banks' access to and due diligence into Fremont, they were or reasonably should have been aware of the untruth of the statements about Fremont described above.

164.    Fremont originated subprime residential real estate loans nationwide on a wholesale basis through independent loan brokers in nearly all 50 states.  Fremont was one of the country's largest subprime lenders until March 2007, when the Federal Deposit Insurance Corporation ("FDIC") effectively forced Fremont out of the subprime lending business for extending subprime credit "in an unsafe and unsound manner" and committing violations of law and FDIC regulations.  Fremont later filed for bankruptcy.

165.    On March 7, 2007, following an extensive investigation, the FDIC issued a Cease & Desist Order to Fremont, concluding that Fremont was, in fact, "operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by [Fremont]," "operating with a large volume of poor quality loans," and "engaging in unsatisfactory lending practices."

166.    According to the FDIC's March 7, 2007 press release:

> In taking this action, the FDIC found that [Fremont] was operating without effective risk management policies and procedures in place in relation to its subprime mortgage and commercial real estate lending operations.  The FDIC determined, among other things, that the bank had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending subprime mortgage loans in a way that substantially increased the likelihood of borrower default or other loss to the bank.

167.    In response to Fremont's dangerous subprime lending practices, on October 4, 2007, the Commonwealth of Massachusetts, through its Attorney General, brought an enforcement action against Fremont for an array of "unfair and deceptive business conduct," "on a broad scale."  *Massachusetts v. Fremont Investment & Loan and Fremont General Corp.*, No. 07-4373 (Sup. Ct. Mass.) (the "Massachusetts Action").  Specifically, the Massachusetts Action alleged that Fremont abdicated its underwriting standards, provided misleading or incomplete

EXHIBIT   53   -561-

information to borrowers, made subprime loans that it knew would fail, and participated in predatory lending.

168.     According to the Massachusetts Attorney General's complaint, Fremont's loans were "structurally unfair due to their multiple layers of risk with no meaningful consideration whether borrowers [could] afford to pay the loans." Fremont "approve[ed] borrowers without considering or verifying the relevant documentation related to the borrower's credit qualifications, including the borrower's income"; "approv[ed] borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses"; "failed to meaningfully account for [ARM] payment adjustments in approving and selling loans"; "approved borrowers for these ARM loans based only on the initial fixed 'teaser' rate, without regard for borrowers' ability to pay after the initial two year period"; "consistently failed to monitor or supervise brokers' practices or to independently verify the information provided to Fremont by brokers"; and "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores."

169.     On December 9, 2008, the Supreme Judicial Court of Massachusetts affirmed a preliminary injunction obtained in conjunction with the Massachusetts Action that prevented Fremont from foreclosing on thousands of its loans issued to Massachusetts residents. As a basis for its unanimous ruling, the Supreme Judicial Court found evidence that "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'" and that "Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow."

170.     In reaching its decision, the Supreme Judicial Court relied in part on the affidavits of two outside account executives who marketed Fremont's loan products to brokers in Massachusetts. Once loans were produced, these account executives worked with Fremont

EXHIBIT  53   -562-

employees, such as underwriters and account managers, to process and close the loans. According to their affidavits filed in the Massachusetts Action, both outside account executives attested that Fremont purposefully relaxed its underwriting standards and made loans based on documents known to be untrue.

171.     The terms of the preliminary injunction were made permanent by a settlement of the Massachusetts Action, reached on June 9, 2009.  In addition to agreeing to the protections for borrowers that would prevent Fremont from foreclosing on "unfair" loans, Fremont agreed to pay the Commonwealth of Massachusetts $10 million in consumer relief, penalties, and costs.

172.     Numerous confidential witnesses interviewed by Plaintiff's counsel also corroborate the findings of the FDIC and the Massachusetts Action.  According to CW 37, an Assistant Vice President, Regulatory Risk Examiner at Fremont, who was involved in the FDIC's investigation of Fremont, Fremont's Regulatory Risk Management group (of which CW 37 was a member) submitted numerous, repeated adverse written findings to senior Fremont executives in 2005 and 2006, which "mirrored" the FDIC's eventual Cease & Desist Order, one to two years later.  CW 37 stated that these repeated adverse reports specifically highlighted, among other things, unfair and deceptive acts in which Fremont was engaging, "pretty obvious" poor underwriting, and problematic incentive compensation.  CW 37 stated that these reports were based on reviews performed by the Regulatory Risk Management group, including interviews of underwriters, quality control, and other Fremont personnel.  CW 37 stated that Fremont filed repeated Suspicious Activity Reports ("SARs") regarding broker fraud as to the same brokers, but Fremont executives would not end relationships with the identified brokers.  CW 37 stated that some of the fraud was "so egregious" including "ridiculous" stated income applications, yet nothing was being done about "obvious problems" including repeated broker fraud.

173.     The personal accounts of other former employee confidential witnesses confirm that Fremont failed to adhere to its established underwriting guidelines and promoted the wide use of exceptions to Fremont's underwriting standards in order to drive loan quantity at the expense of quality.   For example, Fremont underwriters were instructed that Fremont's

EXHIBIT   53   -563-

guidelines and underwriting policies were a mere "guide," and that they were to "think outside the box" (according to CW 38, a senior underwriter from 2004 through March 2007 at Fremont's Downers Grove, Illinois center), "make it work" (according to CW 39, an underwriter at Fremont's Downers Grove center from August 2002 to January 2007, and CW 40, an assistant operations manager at Fremont's Anaheim, California center from October 2003 to January 2007), or "massage the file" (according to CW 41, a senior account manager at Fremont's Downers Grove, Illinois center from July 2001 to February 2007) to get loans approved.

174.    As explained by CW 42, a former Fremont sales manager from August 1998 through March 2007, not only were Fremont's guidelines loose, but there were frequent granted exceptions to the guidelines.   Underwriters made several types of exceptions "everyday," according to CW 43, an operations manager at Fremont's Anaheim, California center from April 2004 to January 2007, and a lot of them were not warranted, according to CW 40.   Indeed, an estimated 30% of Fremont's loans had some sort of exception, partly because anyone from an assistant manager on up had the authority to sign off on exceptions, according to CW 44, an underwriter at Fremont's Anaheim, California center from May 2005 to March 2007.

175.    According to CW 44 and CW 45 (an account manager at Fremont's Downers Grove, Illinois center from August 2005 to January 2007), when borrowers were rejected for failing to meet Fremont's underwriting criteria for fully documented loans, the loans were simply converted to "stated income" loans – with a higher reported income than previously documented – and approved.   According to the separate accounts of CW 39 and CW 41, Fremont approved loans with unrealistic stated incomes, including "pizza delivery men" with reported monthly income of $5,000 or $6,000.   Fremont accepted claims that "landscapers and housekeepers" earned $10,000 in monthly income, according to CW 46 (a former senior underwriter at Fremont's Anaheim and Ontario, California centers from 2002 to 2007), and that "window washers" made $75,000 per year, according to CW 41.   In addition, Fremont continually ignored obviously fraudulent documents when approving loans, according to CW 47, an account manager from 2005 through May 2007.   By way of specific example, Fremont ignored a case

66

EXHIBIT  53  -564-

where 40 loan files from the same broker had the exact same banking statements, according to CW 48, a former quality control investigator at Fremont from 2002 until March 2007.  Indeed, fraudulent bank statements and W2s were discovered and ignored every day, according to CW 49, a quality control auditor with Fremont from May 2005 to February 2007.  And, when Fremont could not ignore fraudulent information, such as a false pay stub, Fremont simply removed the information from the file or replaced it, according to CW 40.

176.    According to CW 50, a senior underwriter at Fremont's Anaheim, California center from 1997 to September 2007, Fremont also loosened its debt-to-income-ratio requirements.  Before 2004, Fremont generally did not approve loans with more than a 50% debt-to-income ratio. Thereafter, according to CW 50, Fremont approved loans with a 55% debt-to-income ratio. And when CW 50 reviewed the loan files, he often determined that the debt-to-income ratios actually were between 65% or 70%, or even up to 90%.  In addition, CW 50 stated that Fremont routinely approved stated-income loans with claimed incomes that were simply "off the wall figures."

177.    In addition, according to CW 51, an account manager at Fremont's Downers Grove, Illinois center from January 2002 to July 2006, CW 51's superiors would call property appraisers and request that they inflate their appraisal values by at least a few thousand dollars, and the appraisers would do so.  According to CW 51, while auditing loans in the Due Diligence Department and later, in connection with CW 51's review of investor repurchase claims, CW 51 discovered, among other things, incomplete appraisals, appraisals that did not match the address of the property, and appraisals that described the home as owner-occupied when it was rented, on the large majority of the loans.

178.    Further corroborating Fremont's poor underwriting practices, Fremont's business partners have alleged that Fremont originated and sold large amounts of loans that were terribly underwritten.  In October of 2007, Morgan Stanley Mortgage Capital Holdings LLC sued Fremont for breach of contract for Fremont's failure to repurchase loans that Fremont sold from May of 2005 through December of 2006 to Morgan Stanley's predecessor-in-interest, Morgan

EXHIBIT  53  -565-

Stanley Mortgage Capital, Inc. (referred to collectively with Morgan Stanley Mortgage Capital Holdings LLC as "Morgan Stanley").  That action was captioned *Morgan Stanley Mortgage Capital Holdings LLC, as Successor-in-Interest to Morgan Stanley Mortgage Capital Inc. v. Fremont Investment & Loan*, No. 07-Civ.-9457 (S.D.N.Y.).  According to the complaint, when Fremont sold the loans at issue, Fremont warranted, among other things, that the loans met its underwriting criteria and that Fremont had adequately verified the underlying information, such as the borrowers' income, credit history, and assets.  Further, according to the complaint, Fremont agreed to repurchase any loans that materially violated the warranties and indemnify Morgan Stanley for any damages it suffered due to the defective loans.

179.    Morgan Stanley alleged that it discovered "hundreds" of improperly underwritten loans shortly after they were purchased.  In particular, Morgan Stanley alleged that the "loans fail[ed] to meet Fremont's underwriting guidelines" because Fremont had "fail[ed] to verify assets prior to closing," performed "defective verification of rent, failed[ed] to obtain the minimum credit history information, and [made] loans . . . to borrowers that did not have the requisite credit score."  Morgan Stanley also alleged, consistent with the statements of former Fremont employees set forth herein, that the "loan documents" contained "misrepresentations of the income or employment of the borrower" and "misrepresentations concerning appraisal values."  Morgan Stanley further alleged that the loans contained "misrepresentations of the occupancy of the residence," "misrepresentations of the assets of the borrower," and "misrepresentations of the condition of the property."

180.    Morgan Stanley is not the only one of Fremont's business partners to sue the Company for its improper underwriting.  In June of 2007, Lehman Brothers Holdings, Inc. and Lehman Brothers Bank, FSB (collectively, "Lehman Brothers") also sued Fremont for breach of contract and unjust enrichment for Fremont's failure to repurchase loans that Lehman Brothers had purchased beginning in March of 2004.  That action was captioned *Aurora Loan Services LLC, et al. v. Fremont Investment & Loan Corp.*, No. 07-cv-01284-RPM (D. Colo.).

EXHIBIT  53   -566-

181.    In that case, Lehman Brothers, just like Morgan Stanley, alleged that when Fremont sold the loans at issue, Fremont warranted that the loans met its underwriting criteria and that the underlying documentation was accurate as to the borrowers' identity, income, employment, credit history, and assets, among other things.  Furthermore, Fremont agreed to repurchase those loans that violated the warranties and indemnify Lehman Brothers for any damages it suffered due to the defective loans.

182.    After Lehman Brothers purchased the loans, according to its complaint, loan servicers and other third parties notified Lehman Brothers of "certain issues" concerning the loans.  When Lehman Brothers "conducted further due diligence," it "confirmed that Fremont breached one or more representations and/or warranties" concerning the loans.  According to the Lehman complaint, the breached warranties included "[t]he conformance of the Mortgage Loans with applicable underwriting guidelines and loan program requirements"; "[t]he accuracy and integrity of all information and documentation regarding borrower identity, income, employment, credit, assets, and liabilities used to originate the Mortgage Loans"; "[t]he validity of all Mortgage Loan documentation"; "[t]he ownership, nature, condition, and value of the real property securing the respective Mortgage Loans"; and "[b]orrower occupancy of the property securing the Mortgage Loans."

**e.      WMC Mortgage Corporation**

**1.      Defendants Made Untrue Statements of Material Facts About WMC's Underwriting Standards and Practices**

183.    WMC originated Mortgage Loans that were included in the pools for the following offerings:

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| ABSHE 2005-HE1 | Asset Backed Securities Corp. Home Equity | Credit Suisse |
| ABSHE 2005-HE3 | Asset Backed Securities Corp. Home Equity | Credit Suisse |
| ABSHE 2005-HE5 | Asset Backed Securities Corp. Home Equity | Credit Suisse |
| ACE 2005-HE5 | Ace Securities Corp. | Deutsche Bank |

EXHIBIT   53   -567-

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| ACE 2005-HE7 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-HE1 | Ace Securities Corp. | Deutsche Bank |
| ACE 2007-HE2 | Ace Securities Corp. | Deutsche Bank |
| CMLTI 2005-HE1 | Citigroup Mortgage Loan Trust | Citigroup |
| CMLTI 2005-HE3 | Citigroup Mortgage Loan Trust | Citigroup |
| JPMAC 2005-WMC1 | J.P. Morgan Mortgage Acquisition Corp. | JP Morgan |
| JPMAC 2006-WMC1 | J.P. Morgan Mortgage Acquisition Corp. | JP Morgan |
| MABS 2006-WMC4 | MASTR Asset Backed Securities Trust | UBS |
| MLMI 2005-WMC1 | Merrill Lynch Mortgage Investors | Merrill Lynch |
| MSAC 2005-HE4 | Morgan Stanley ABS Capital I | Morgan Stanley |
| MSAC 2005-WMC2 | Morgan Stanley ABS Capital I | Morgan Stanley |
| MSAC 2005-WMC3 | Morgan Stanley ABS Capital I | Morgan Stanley |
| MSAC 2005-WMC5 | Morgan Stanley ABS Capital I | Morgan Stanley |
| MSAC 2005-WMC6 | Morgan Stanley ABS Capital I | Morgan Stanley |
| MSAC 2006-HE1 | Morgan Stanley Capital I | Morgan Stanley |
| MSAC 2006-HE3 | Morgan Stanley ABS Capital I | Morgan Stanley |
| SABR 2006-WM2 | Securitized Asset Backed Receivables | Barclays Capital |
| SVHE 2005-1 | SoundView Home Loan Trust | Greenwich Capital |
| SVHE 2005-B | SoundView Home Loan Trust | Greenwich Capital |

184.   Defendants offered or sold to Plaintiff approximately $253.9 million of Securities for which WMC originated some or all of the underlying mortgage loans.

185.   The Offering Documents all contained substantially similar, if not identical, statements of material facts regarding WMC's underwriting and appraisal standards and practices.  For example, the prospectus supplement for ABSHE 2005-HE5 stated:

*Underwriting Standards*. The mortgage loans have been originated generally in accordance with the underwriting guidelines established by it (collectively, the "Underwriting Guidelines"). **WMC Mortgage Corp. also originates certain other mortgage loans that are underwritten to the guidelines of specific investors, which mortgage loans are not included among those sold to the trust as described herein. The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the**

EXHIBIT   53   -568-

**related mortgaged property will provide sufficient value to recover the investment if the borrower defaults. On a case-by-case basis WMC Mortgage Corp. may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt-to-income ratio ("Debt Ratio")**, good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address. It is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions.

The mortgage loans in the trust will fall within the following documentation categories established by WMC Mortgage Corp.: Full Documentation, Full-Alternative Documentation, Limited Documentation, Lite Documentation, Stated Income Documentation and Stated Income/Verified Assets (Streamlined) Documentation. In addition to single-family residences, certain of the mortgage loans will have been underwritten (in many cases, as described above, subject to exceptions for compensating factors) in accordance with programs established by WMC Mortgage Corp. for the origination of mortgage loans secured by mortgages on condominiums, vacation and second homes, manufactured housing, two- to four-family properties and other property types. In addition, WMC Mortgage Corp. has established specific parameters for jumbo loans, which are designated in the Underwriting Guidelines as mortgage loans with original principal balances in excess of $650,000. However, WMC Mortgage Corp. sometimes increases the original principal balance limits if borrowers meet other compensating credit factors.

Under the Underwriting Guidelines, WMC Mortgage Corp. verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines. **The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC Mortgage Corp.-approved appraiser or by WMC Mortgage Corp.'s in-house collateral auditors (who may be licensed appraisers), which audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model.**

186.    The above statements of material facts were untrue when made because, as demonstrated below in ¶¶ 187-193, they failed to disclose that WMC: (i) systematically failed to

EXHIBIT  53   -569-

follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume; and (iv) violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgage properties in the loan origination and underwriting process.

### 2.    WMC Violated Its Stated Underwriting Standards

187.    Defendants Barclays, Citigroup, Credit Suisse, Deutsche Bank, Greenwich Capital, J.P. Morgan, Merrill Lynch, Morgan Stanley, and UBS offered or sold to Plaintiff Securities containing loans originated by WMC and made untrue statements to Plaintiff about WMC's underwriting and appraisal standards and practices and the loans.  These Wall Street Banks had extensive business relationships with WMC, had access to WMC's mortgage origination personnel and internal information, and conducted due diligence into WMC using their own personnel and third-party loan review firms.  As a result of the Wall Street Banks' access to and due diligence into WMC, they were or reasonably should have been aware of the untruth of the statements about WMC described above.

188.    According to Reuters, WMC originated "some of the worst-performing loans in the . . . $575 billion market for home equity asset-backed securities."  According to a lawsuit filed in September 2009, a review of WMC's mortgage loan files showed that "in reality [WMC] followed few, if any, objective standards or criteria in underwriting [mortgage loans] and showed little concern if any, for any borrower's ability to repay."   WMC's reckless underwriting standards and practices resulted in a huge amount of foreclosures, ranking WMC fourth in the Comptroller of the Currency's "Worst Ten of the Worst Ten" list presented in April 2010 to the FCIC.

189.    In 2004, WMC, then the sixth-largest subprime lender in the nation, was purchased by General Electric from private equity firm Apollo Management.   WMC's concentration was in nonprime loans and jumbo loans up to $1 million dollars.  According to a March 2007 article published by *MortgageDaily.com*, WMC was faced with growing

EXHIBIT  53  -570-

delinquencies, and announced that it would no longer write mortgages with no down payments. Soon after, on September 20, 2007, General Electric closed WMC's operations, taking a $400 million charge as a result.

190.    The market has now become aware of WMC's reckless loan originating practices. For example, on September 2, 2009, PMI Mortgage Insurance Co. ("PMI") sued WMC in California state court for misrepresentations and failure to adhere to its contractual repurchase obligations relating to the securitization of a pool of certain subprime mortgage loans originated by WMC ("PMI Complaint").   PMI alleged that WMC "made extensive representations and warranties" about the underwriting of its mortgage loans and the accuracy of the information underlying such loans.  PMI Complaint, ¶¶ 21, 33.  According to PMI, an external investigation by Clayton into a sample of some of the thousands of WMC-originated loans revealed that WMC "breached various representations and warranties . . . because, *inter alia*, the loan-to-value ratio at the time of origination was greater than 100%; fraud, errors, misrepresentations, or gross negligence took place on the part of WMC . . . ; the loans did not comply with WMC's own underwriting standards at the time of origination; certain documents were missing; and/or WMC had failed to utilize a methodology in underwriting the loans that employed objective mathematical principles designed to determine that, at the time of origination, the borrower had the reasonable ability to make timely payments on the [m]ortgage [l]oans."  Id., ¶ 35.

191.    According to the PMI Complaint, the Clayton investigation "demonstrate[d] a systemic failure by WMC to apply sound underwriting standards and practices which cuts across all of the [loans in the securitization]."  In the defective loans, "Clayton discovered unreasonable stated income and/or misrepresentations of income and/or employment by the borrower, the large majority of which could have been discovered by WMC prior to transfer via simple diligence procedures."  ¶ 36.  Moreover, nearly a quarter of the loans sampled by Clayton were shown to contain "misrepresentations of occupancy by the borrower, another factor that could have easily been verified by WMC."  *Id*.

EXHIBIT   53   -571-

192.    WMC's reckless loan originating practices were noticed by the regulatory authorities as well.  In June 2008, the Washington State Department of Financial Institutions, Division of Consumer Services filed a Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees against WMC Mortgage and its principal owners individually: Amy C. Brandt, WMC's CEO and President; Mark Walter, WMC's executive vice president; and Marc Becker, WMC's Director. The Statement of Charges was the result of a lengthy investigation in which WMC's and its business partners' books were subpoenaed.  The investigation found that WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on multiple loans, understated amounts of payments made to escrow companies, understated annual percentage rates by almost one-half of 1%, and committed many other violations of Washington State deceptive and unfair practices laws.  This investigation is ongoing.

193.    In January 2009, WMC Mortgage was sued in the United States District Court for the Eastern District of California for violations of the Truth In Lending Act, 15 U.S.C. § 1601, *et seq*.  The plaintiff in that action is a mortgage borrower who alleges that, in an effort to maximize the number of loans sold to consumers and to maximize WMC's profits, WMC assured the plaintiff throughout the loan application process that the plaintiff would have low mortgage payments and failed to disclose the correct payment amounts or finance charges.

**f.     The Ameriquest Loan Sellers**

**1.     Defendants Made Untrue Statements of Material Facts About the Ameriquest Loan Sellers' Underwriting Standards and Practices**

194.    ACC Capital Holdings ("ACC Capital") was the nation's largest subprime lender. Argent was a wholly owned mortgage subsidiary of ACC Capital.  Citigroup purchased Argent on August 31, 2007.  Ameriquest Mortgage Company ("Ameriquest") was ACC Capital's wholly owned retail lending subsidiary.  On August 1, 2007, Ameriquest announced that it would no

EXHIBIT  53  -572-

longer be accepting loan applications.  Ameriquest and Argent are, at times, collectively referred to herein as the "Ameriquest Loan Sellers."

195.    Together, the Ameriquest Loan Sellers originated mortgage loans that were included in the pools for the following offerings:

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| ABSHE 2006-HE6 | Asset Backed Securities Corp. Home Equity | Credit Suisse |
| ABSHE 2006-HE7 | Asset Backed Securities Corp. Home Equity | Credit Suisse |
| ACE 2005-HE2 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-SL1 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-SL2 | Ace Securities Corp. | Deutsche Bank |
| AMSI 2005-R6 | Ameriquest Mortgage Securities Inc. | Credit Suisse |
| AMSI 2005-R7 | Ameriquest Mortgage Securities Inc. | UBS |
| AMSI 2005-R8 | Ameriquest Mortgage Securities Inc. | Credit Suisse |
| AMSI 2006-R2 | Ameriquest Mortgage Securities Inc. | Credit Suisse |
| BSABS 2005-AQ2 | Bear Stearns Asset Backed Securities Inc. | Bear Stearns |
| BSABS 2006-HE3 | Bear Stearns Asset Backed Securities Inc. | Bear Stearns |
| CMLTI 2005-9 | Citigroup Mortgage Loan Trust | Citigroup |
| CMLTI 2007-AMC2 | Citigroup Mortgage Loan Trust | Citigroup |
| GSAMP 2006-HE6 | GS Mortgage Securities Corp. | Goldman Sachs |

196.    Defendants offered or sold to Plaintiff approximately $207.4 million of Securities for which the Ameriquest Loan Sellers originated some or all of the underlying mortgage loans.

197.    The Offering Documents for all these Securities contained substantially if not exactly the same statements of material facts regarding the Ameriquest Loan Sellers' underwriting standards and practices.  For example, the prospectus supplement for AMSI 2005-R8 stated:

> The Mortgage Loans were originated generally in accordance with guidelines (the "Underwriting Guidelines") established by the Originator with one of the following income   documentation types: "Full Documentation," "Limited Documentation" or "Stated Income."  **The Underwriting Guidelines are primarily intended to evaluate: (1) the applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property**

EXHIBIT   53   -573-

**as collateral.  On a case-by-case basis, the Originator may determine that, based upon compensating factors, a loan applicant, not strictly qualifying under one of the Risk Categories described below, warrants an exception to the  requirements set forth in the Underwriting Guidelines**.  Compensating factors may include, but are not limited to, loan-to-value ratio, debt-to-income ratio, good credit history, stable employment history, length at current employment and time in residence at the applicant's current address.  It is expected that a substantial number of the Mortgage Loans to be included in the mortgage pool will represent such underwriting exceptions.

198.    The relevant Offering Documents also made statements of material facts about the Ameriquest Loan Sellers' appraisal standards and practices.  For example, the same prospectus supplement stated:

The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires either (A) (i) an appraisal of the mortgaged property which conforms to the Uniform Standards of Professional Appraisal Practice and are generally on forms similar to those acceptable to Fannie Mae and Freddie Mac and (ii) a review of such appraisal, which review may be conducted by a representative of the Originator or a fee appraiser and may include a desk review of the original appraisal or a drive-by review appraisal of the mortgaged property or (B) an insured automated valuation model.  The Underwriting Guidelines permit loans with loan-to-value ratios at origination of up to 95%, subject to certain Risk Category limitations (as further described in that section).  The maximum allowable loan-to-value ratio varies based upon the income documentation, property type, creditworthiness, debt service-to-income ratio of the applicant and the overall risks associated with the loan decision.  Under the Underwriting Guidelines, the maximum loan-to-value ratio, including any second deeds of trust subordinate to the Originator's first deed of trust, is 100%.

199.    These statements are substantially similar, if not identical, to statements concerning the Ameriquest Loan Sellers' underwriting standards and practices found in the other Prospectus Supplements for the Securities whose underlying mortgage loans were originated by Ameriquest and Argent.

200.    The above statements of material facts were untrue when made because, as demonstrated below in ¶¶ 201-210, they failed to disclose that the Ameriquest Loan Sellers: (i) systematically failed to follow their stated underwriting standards; (ii) allowed pervasive exceptions to their stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume; and (iv) violated their

EXHIBIT   53   -574-

stated appraisal standards and in many instances materially inflated the values of the underlying mortgage properties in the loan origination and underwriting process.

### 2. The Ameriquest Loan Sellers Violated Their Stated Underwriting Standards

201.    Defendants Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, J.P. Morgan (as successor-in-interest to Bear Stearns), and UBS offered or sold to Plaintiff Securities containing loans originated by the Ameriquest Loan Sellers and made untrue statements to Plaintiff about the Ameriquest Loan Sellers' underwriting and appraisal standards and practices and the loans.  These Wall Street Banks had extensive business relationships with the Ameriquest Loan Sellers, had access to the Ameriquest Loan Sellers' mortgage origination personnel and internal information, and conducted due diligence into the Ameriquest Loan Sellers using their own personnel and third-party loan review firms.  As a result of the Wall Street Banks' access to and due diligence into the Ameriquest Loan Sellers, they were or reasonably should have been aware of the untruth of the statements about the Ameriquest Loan Sellers described above.

202.    Both of the Ameriquest Loan Sellers appeared in the Comptroller of the Currency's list of the "Worst Ten in the Worst Ten," discussed above.

203.    While the Ameriquest Loan Sellers and the Wall Street Banks stated that the Ameriquest Loan Sellers' underwriting of mortgages was designed to ensure a prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, these statements were untrue.  In fact, the Ameriquest Loan Sellers' underwriting practices were designed to originate as many mortgage loans as possible without regard to the ability of the borrowers to repay such mortgages, and the Ameriquest Loan Sellers systematically disregarded or misstated the income, assets, and employment status of borrowers seeking mortgage loans.  Indeed, Argent and Ameriquest were the third and ninth among the Comptroller of the Currency's "Worst Ten" Mortgage Originators, respectively, based on the number of foreclosures as of March 22, 2010 on loans originated between 2005 and 2007.

EXHIBIT  53   -575-

204.     According to a December 7, 2008, article in the *Miami Herald*, employees of Argent, including a former vice president named Orson Benn who is currently in prison for his role in the mortgage fraud schemes at Argent, actively assisted mortgage brokers in falsifying borrowers' financial information by "tutoring . . . mortgage brokers in the art of fraud." Employees "taught [brokers] how to doctor credit reports, coached them to inflate [borrower] income on loan applications, and helped them invent phantom jobs for borrowers" so that loans could be approved.  According to Mr. Benn himself, "the accuracy of loan applications was not a priority."  The *Miami Herald* examined the applications for 129 loans funded by Argent and "found at least 103 that contained false and misleading information" and "red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth." As noted by the article, "[t]he simplest way for a bank to confirm someone's income is to call the employer.  But in at least two dozen cases, the applications show bogus telephone numbers for work references . . . ."  Argent's lack of verification was so extreme that a "borrower [who] claimed to work a job that didn't exist . . . got enough money to buy four houses."  Another borrower "claimed to work for a company that didn't exist – and got a $170,000 loan."

205.     Moreover, according to a May 11, 2008 *Cleveland Plain Dealer* article, Jacquelyn Fishwick, who worked for more than two years at an Argent loan processing center near Chicago as an underwriter and account manager, noted that "some Argent employees played fast and loose with the rules" and stated "I personally saw some stuff I didn't agree with."  Ms. Fishwick "saw [Argent] account managers remove documents from files and create documents by cutting and pasting them."

206.     In the summer of 2007, Citigroup acquired Ameriquest and Argent.  Richard Bowen, III, was Citibank's Business Chief Underwriter for correspondent lending who supervised 220 professional underwriters and exercised direct oversight of more than $90 billion of correspondent residential mortgages annually.  Mr. Bowen was involved in the due diligence for that acquisition.  In his April 7, 2010 testimony before the FCIC, Mr. Bowen testified that he advised against the acquisition because "we sampled loans that were originated by Argent and

EXHIBIT  53  -576-

we found large numbers that did not – that were not underwritten according to the representations that were there."  He further testified that the number of loans that contained untrue representations was significant enough to support his decision to oppose the acquisition (although Citigroup did not follow his recommendation).

207.    Argent has been the subject of several lawsuits alleging fraud in its underwriting and lending practices.  In January 2010, Argent, along with its parent company, Ameriquest, participated in a $22 million settlement of claims brought in the Northern District of Illinois by those who purchased mortgages after December 14, 2001 and who alleged fraudulent mortgage lending practices.

208.    On August 20, 2007, *Business Week* reported in an article titled "Did Big Lenders Cross the Line?" that lawsuits by mortgage borrowers are increasingly blaming lenders' lax underwriting standards for loan delinquency.  In one lawsuit against Ameriquest, plaintiff Mary Overton alleges that loan officers at a Brooklyn, New York branch of Ameriquest coerced Overton into signing a loan.  Unbeknownst to Ms. Overton, Ameriquest created fake tax returns, employment records, and a 401(k) to make it appear that the loan was affordable. According to other court filings, at least 40 other borrowers allege Ameriquest doctored loan documents or overstated borrowers' income.  According to *Business Week*, large lenders, such as Ameriquest, were motivated to engage in these practices to keep up loan volume and generate sales.  The nationwide nature of these practices was confirmed by former Ameriquest employees in a National Public Radio broadcast on May 12, 2007.  A former Ameriquest loan officer in Tampa, Florida, recalled that in order to sell a loan "at any cost," "managers encouraged loan officers to conceal the actual cost and interest rates on loans," and "would white out numbers on W2s and bank statements and fill in bigger amounts basically to qualify people for loans that they couldn't afford," a practice "called taking the loan to the art department."  According to the National Public Radio broadcast, these practices were not isolated and were confirmed by former employees from Ameriquest offices around the country.

EXHIBIT  53  -577-

209.    On October 22, 2007, *Mortgage Daily* reported that Wachovia filed a lawsuit against Ameriquest alleging that Ameriquest had not complied with repurchase requests on loans with fraudulent files. According to Wachovia's complaint, the 135 nonperforming loans sold to Wachovia on December 29, 2005, contained incorrect credit scores, incorrect employment status, and misstatements of the kind of home being financed. In addition, the complaint stated that the loans had not been underwritten pursuant to the underwriting procedures that Ameriquest agreed to apply and thus Ameriquest's representations and warranties regarding the loans were untrue and were breached by Ameriquest.  *Mortgage Daily*, "Wachovia v. Ameriquest," October 22, 2007.

210.    In her January 14, 2010 testimony before the FCIC, Illinois Attorney General Lisa Madigan explained how a multistate investigation of Ameriquest "revealed that the company engaged in the kinds of fraudulent practices that other predatory lenders subsequently emulated on a wide scale . . . includ[ing]: inflating home appraisals."

### g.    Option One

#### 1.    Defendants Made Untrue Statements of Material Facts About Option One's Underwriting Standards and Practices

211.    Option One originated Mortgage Loans that were included in the pools for the following offerings:

| Offering | Depositor Defendant | Wall Street Bank Defendant |
| --- | --- | --- |
| ABFC 2005-HE1 | Asset Backed Funding Certificates NIM | Bank of America |
| ABFC 2006-OPT2 | Asset Backed Funding Corporation | Bank of America |
| CMLTI 2006-HE1 | Citigroup Mortgage Loan Trust | Citigroup |
| ABSHE 2006-HE3 | Asset Backed Securities Corp. Home Equity | Credit Suisse |
| ACE 2005-HE7 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-OP1 | Ace Securities Corp. | Deutsche Bank |
| ACE 2007-HE2 | Ace Securities Corp. | Deutsche Bank |
| GSAMP 2006-S1 | GS Mortgage Securities Corp. | Goldman Sachs |
| SVHE 2006-OPT2 | SoundView Home Loan Trust | Greenwich Capital |
| SVHE 2006-OPT5 | SoundView Home Loan Trust | Greenwich Capital |

EXHIBIT  53   -578-

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|----------|--------------------|-----------------------------|
| HASC 2006-OPT3 | HSI Asset Securitization Corporation Trust | HSBC |
| JPMAC 2005-OPT1 | J.P. Morgan Mortgage Acquisition Corp. | JP Morgan |
| JPMAC 2005-OPT2 | J.P. Morgan Mortgage Acquisition Corp. | JP Morgan |
| MLMI 2005-SL2 | Merrill Lynch Mortgage Investors | Merrill Lynch |
| MLMI 2005-SL3 | Merrill Lynch Mortgage Investors | Merrill Lynch |
| MLMI 2006-SL1 | Merrill Lynch Mortgage Investors | Merrill Lynch |

212.    Defendants offered or sold to Plaintiff approximately $137.5 million of Securities for which Option One originated some or all of the underlying mortgage loans.

213.    The Offering Documents all contained substantially similar, if not identical, statements of material facts regarding Option One's underwriting and appraisal standards and practices.  For example, the prospectus supplement for ABSHE 2006-HE3 stated:

> **The Mortgage Loans will have been originated generally in accordance with Option One's Guidelines** (the "Option One Underwriting Guidelines").  The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan.  The Mortgage Loans were also generally underwritten with a view toward resale in the secondary market.  The Mortgage Loans generally bear higher rates of interest than mortgage loans that are originated in accordance with customary Fannie Mae and Freddie Mac standards.
>
> On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist.  Except as specifically stated herein, the Option One Underwriting Guidelines are the same for first lien mortgage loans and second lien mortgage loans.
>
> Each mortgage loan applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  The Option One Underwriting Guidelines require a credit report and, if available, a credit score on each applicant from a credit-reporting agency.  The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments.  A credit score is a statistical ranking of likely future credit performance developed by Fair, Isaac and Co., Inc. and made available through the three national credit data repositories—Equifax, TransUnion and Experian.

EXHIBIT  53   -579-

Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. **All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac.**

The Option One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and require Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal, supports the loan balance.

214.    The above statements of material facts were untrue when made because, as demonstrated below in ¶¶ 215-223, they failed to disclose that Option One: (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume; and (iv) violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgage properties in the loan origination and underwriting process.

### 2.    Option One Violated Its Stated Underwriting Standards

215.    Defendants Banc of America, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Greenwich Capital, HSBC, J.P. Morgan, and Merrill Lynch offered or sold to Plaintiff Securities containing loans originated by Option One and made untrue statements to Plaintiff about Option One's underwriting and appraisal standards and practices and the loans. These Wall Street Banks had extensive business relationships with Option One, had access to Option One's mortgage origination personnel and internal information, and conducted due diligence into Option One using their own personnel and third-party loan review firms. As a result of the Wall Street Banks' access to and due diligence into Option One, they were or reasonably should have been aware of the untruth of the statements about Option One described above.

EXHIBIT  53  -580-

216.    Option One was a national mortgage lender formerly owned by H&R Block, Inc., until its assets were sold to American Home Mortgage Servicing, Inc., in April 2008.  Option One is the sixth worst mortgage originator, by number of foreclosures as of March 22, 2010, according to the Comptroller of the Currency's "Ten Worst in the Ten Worst" list.

217.    Former employees with first-hand knowledge have confirmed that Option One violated its stated standards for underwriting and appraisals.  For example, CW 52, a former underwriter at Option One in Atlanta, Georgia from 2005 to 2006, said that if an underwriter denied a loan and an account executive complained, the loan was escalated to the branch manager, who then got in touch with the underwriter. With account executives, "the biggest screamer and shaker of trees gets the most fruit."  For a "top-producing" account executive, whatever red flags there were would be "overlooked," and invariably the loan would be pushed through.  CW 52 estimated that at least 50% of the total loan volume in Option One's Atlanta branch was approved in this manner.  CW 52 also stated that a loan applicant could tell "a straight up lie" about his income, but the untrue information would be overlooked and the loan would be approved, despite CW 52's initial rejection of the application.

218.    Similarly, CW 53, an underwriter at Option One's Marietta, Georgia office in 2005, reported that Option One approved stated income loans "knowing good and well that those people did not make that much money in the position they were in."  Likewise, CW 54, an underwriter for Option One in Hawaii from November 2004 to January 2006, stated that "the overwhelming majority of stated income loans were crafted," meaning that the borrowers were not making "anywhere near" what they claimed.  However, CW 54 stated that he felt pressured to push loans through because every loan generated income and "[i]f you applied any level of rational thought, you were frowned upon."

219.    With respect to artificially inflated appraisals, CW 52 stated that "[o]f course they inflated values" and that if an underwriter questioned the appraised value, the account executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file.  Similarly, CW 55, a staff review appraiser for Option One working throughout the

EXHIBIT  53   -581-

western United States from January 2004 to May 2007, stated that the appraisals "were all bad."
He considered the appraisals borderline fraudulent, not merely incompetent, but was unable to
prevent loans based on the flawed appraisals.  He explained, "Our job is supposed to be stopping
bad loans, but no one stopped them."   When CW 55 objected to loans because of flawed
appraisals, the loan officer would complain to the branch manager, who would complain to the
Appraisals Department at headquarters in Irvine, California, and on up the chain until someone
high enough in the Underwriting and Sales Department said to go forward with the loan.

220.    Option One was motivated to violate its underwriting and appraisal standards in
order to increase the volume of loans it could sell to Wall Street Banks to be securitized.  CW 56,
an Assistant Vice President of Option One from 2005 to 2007, worked in the Correspondent
Lending department, which purchased loans from small mortgage companies.  CW 56 stated that
Option One purchased loans that raised concerns under the stated guidelines and that when he
raised such concerns he was essentially told, "Shut up, Wall Street will buy it; don't worry about
it."

221.    Similarly, CW 57, who was an underwriter at Option One in Pleasanton,
California from October 2005 to October 2007, stated that "[i]f [a borrower] had a FICO and a
pulse, they could get a loan" from Option One.  CW 57 also stated that:

> I caught blatant fraud, and the [account executive] would still fight for it.  [The
> account executives and managers] would fight me because they didn't care.  They
> knew they were going to sell it on the secondary market, and they didn't care
> because it wasn't their money.  They were going to get paid regardless. . . . At
> Option One they didn't have a portfolio; they sold everything, so they didn't
> care. . . . [Option One] didn't have to worry about it, because once they're done
> with these crappy loans, they'd sell them off.  They were the investors' problem.

222.    On June 3, 2008, the Attorney General for the Commonwealth of Massachusetts
filed an action against Option One, and its past and present parent companies, for their unfair and
deceptive origination and servicing of mortgage loans (the "Massachusetts Option One
Complaint").   According to the Attorney General, since 2004, Option One "increasingly
disregarded underwriting standards, created incentives for loan officers and brokers to disregard

EXHIBIT  53   -582-

the interests of the borrowers and steer them into high-cost loans, and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." Massachusetts Option One Complaint, ¶ 4.   The Attorney General's complaint alleges that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home," and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices."  *Id.*, ¶ 8.  Option One's "origination policies . . . employed from 2004 through 2007 have resulted in an explosion of foreclosures."  *Id.*, ¶ 10.

223.   On June 4, 2008, the *Wall Street Journal* reported that the Massachusetts Attorney General's lawsuit "charges Option One with 'recklessly facilitating the foreclosure of borrowers' homes,'" and that Option One "proposed terms 'that are as unfair and unsustainable as the original loans."

### h.   Additional Mortgage Originators

224.   Other mortgage originators that provided loans for the pools underlying the Securities that the Defendants offered or sold to Plaintiff included Aames, Accredited Home Lenders, Inc. ("Accredited"), DLJ Mortgage Capital, and Equifirst, among others.  The Offering Documents for each securitization in which Defendants offered or sold Securities to Plaintiff set forth the underwriting standards for the mortgage originators of the loans included in that securitization.  These statements of material facts were untrue and omitted material facts because mortgage originators industry-wide systematically failed to follow their stated underwriting standards.

225.   For example, former employees of Accredited confirm the lack of underwriting and appraisal standards.  According to CW 58, a Corporate Underwriter at Accredited between June 2004 and March 2005, managers on the sales side frequently overruled underwriting decisions.   CW 58 noted such loans were tracked internally, and it was well-known they

EXHIBIT  53  -583-

performed poorly.  Moreover, according to CW 58, in early 2005, Accredited approved risky loans that did not comply with its own underwriting guidelines in an effort to reach monthly production targets.

226.    According to CW 59, a Corporate Underwriter at Accredited between August 2003 and February 2006 in Tampa, Florida, Operations Managers and Senior Operations Managers constantly overruled decisions to reject loan applications.  According to CW 59, "The problem with the whole system was the overrides.  The overrides were rampant.  If the borrower breathed, he got the loan."

227.    According to CW 60, a Corporate Underwriter at Accredited in San Diego between May 2002 and November 2006, Accredited's underwriters who reviewed and approved or denied loans were being overridden, frequently resulting in loans that did not comply with underwriting guidelines.  According to CW 60, the number of overrides grew so large that Accredited was forced to institute a system to track such overrides.  The system included a box on the loan file that an underwriter needed to check if a higher-level manager approved the loan "as a business decision" over the recommendation of the underwriter.

228.    According to CW 61, a Corporate Underwriter at Accredited between June 2000 and March 2007 in both the San Diego, California, and Austin, Texas, offices, "[a]t the end of the month, we were handed loan files and told to just sign them with no audit."

229.    According to CW 62, the Chief Appraiser at Accredited for five years between 2002 and June 2007, Accredited allowed both corporate underwriters and sales managers to override the decisions of licensed property appraisers.  In many cases, an appraisal reviewer working for Accredited would reject a loan application after concluding that the appraisal submitted with the application was inflated.  According to CW 62, the account executive who submitted the loan application would become annoyed by the rejection and appeal the decision to a sales manager who then would overturn the appraisal reviewer's decision without any valid justification.  According to CW 62, overrides of appraisers' decisions were rampant: "As of June 2006, between 12% and 15% of our business was being done through management overrides."

EXHIBIT  53  -584-

230.    On May 1, 2009, Accredited filed for bankruptcy.   Accredited faced huge demands from Wall Street Banks to repurchase loans.  In bankruptcy filings, Accredited stated that it faces more than $200 million in repurchase claims.  The Wall Street Banks assert that certain loans they purchased are defective and violate the purchase agreements they made with Accredited because they contain serious mistakes or borrowers defaulted too quickly.

231.    On information and belief, substantially similar violations of underwriting and appraisal standards were commonplace at Aames, DLJ Mortgage Capital, Equifirst, and the other mortgage originators whose loans were included in the securitizations in which Defendants offered or sold Securities to Plaintiff.

## VI.    DEFENDANTS MADE MATERIAL UNTRUE STATEMENTS AND OMISSIONS

232.    The Depositor Defendants acquired mortgage loans and deposited them into issuing trusts, and the Wall Street Bank Defendants offered or sold the Securities to Plaintiff through the Offering Documents, other documents as described herein, and oral statements made directly to Plaintiff.  Each Depositor Defendant and Wall Street Bank Defendant participated in drafting the prospectus supplement or private placement memorandum for each securitization issued by that Depositor or underwritten by that Wall Street Bank.  In addition, each Depositor Defendant and Wall Street Bank Defendant was identified in these documents as the issuer or underwriter, respectively, of the Securities, and approved the versions of these documents that were delivered by the Wall Street Bank to Plaintiff.

233.    The Defendants' Offering Documents contained statements of material facts regarding, *inter alia*, (i) the underwriting process and standards by which the loans held in the issuing trusts were originated; (ii) the standards and guidelines used by the Depositor Defendants and Wall Street Bank Defendants when evaluating and acquiring the loans; and (iii) the value of the underlying real estate securing the loans pooled in the issuing trusts, including the loan-to-value ratios and the appraisal standards by which such real estate values were measured.

234.    The Offering Documents emphasized the underwriting standards used to originate the underlying mortgage loans.  Indeed, each Prospectus Supplement set forth the underwriting

EXHIBIT  53   -585-

standards for the Mortgage Originators who originated a substantial portion of the underlying mortgages in that issuing trust.  Contrary to these statements of material facts, many of these Mortgage Originators of the underlying mortgages did not originate loans in accordance with their stated underwriting standards.  Rather, as set forth above, these Mortgage Originators extended loans that did not comply with their underwriting standards in order to increase loan volume regardless of the borrowers' ability to meet their obligations.

235.    Additionally, the Offering Documents often made the statement of material facts, in sum or substance, that "all prospective Mortgage Loans will be subject to the underwriting standards adopted" herein; provided the Wall Street Banks' underwriting standards; or identified significant Mortgage Originators and provided the underwriting standards utilized by those Originators.

236.    The written and oral statements of material facts regarding the underwriting and appraisal standards utilized by the Mortgage Originators and the Defendants' own due diligence were untrue and omitted material facts.  Indeed, as detailed above, many of the identified Mortgage Originators systematically violated their stated underwriting and appraisal guidelines, and the Wall Street Bank Defendants made untrue statements about their own due diligence.

### a.    Morgan Stanley's Untrue Statements of Material Facts and Omissions

237.    Morgan Stanley offered or sold Securities to Plaintiff in Massachusetts in 2005, 2006 and 2007 for a total price of $219,379,620.  A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix A.

238.    Morgan Stanley sought to compete with its Wall Street peers and to expand its share of the RMBS market by aggressively pursuing subprime lenders to purchase loans, offering to pay more for mortgages than competing Wall Street Banks, and offering to perform less due diligence than competitors.  According to a December 6, 2007 article in the *New York Times*, "Wary of Risk, Bankers Sold Shaky Mortgage Debt," Morgan Stanley cultivated a relationship

EXHIBIT   53   -586-

with New Century.  As a result of this relationship, Morgan Stanley expanded its subprime underwriting business by 25% from 2004 to 2006.  According to a former New Century executive, Morgan Stanley agreed to pay above-market prices for loans in return for a steady supply of mortgages.  According to the article, the former New Century executive said: "Morgan would be aggressive and say, 'We want to lock you in for $2 billion a month.'"

239.    Through its affiliates and subsidiaries, Morgan Stanley was able to control nearly every step in the mortgage securitization process.  For example, Morgan Stanley formed numerous SPVs including: (1) Depositor Defendant Morgan Stanley ABS Capital I Inc., which served as the depositor and issuer for offerings of RMBS; (2) Morgan Stanley Capital I Inc., which served as the depositor and issuer for offerings of RMBS; and (3) Morgan Stanley Mortgage Capital Inc., which originated or otherwise acquired residential mortgage loans to be securitized and served as the sponsor in numerous offerings of RMBS.  Defendant Morgan Stanley offered or sold the Securities to Plaintiff.  Morgan Stanley also provided financial research on RMBS and related structured products.

240.    In connection with its offer or sale of Securities to Plaintiff, Morgan Stanley sent numerous documents to Plaintiff in Massachusetts.  These documents included registration statements, prospectuses, and prospectus supplements.  Morgan Stanley also sent Plaintiff numerous other documents, including term sheets and "loan tapes."  The loan tapes Morgan Stanley sent to Plaintiff consisted of Excel spreadsheets that contained dozens of categories of information related to the individual loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  Often, Morgan Stanley also showed Plaintiff "pitch books" and other materials promoting the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting Securities, the data, and Morgan Stanley's due diligence of the Mortgage Originators' underwriting practices. Morgan Stanley did not allow Plaintiff to keep the pitch books.

241.    In the Offering Documents, Morgan Stanley made numerous statements of material facts regarding the underwriting standards that had been followed in originating the

EXHIBIT  53  -587-

underlying mortgage loans.  For example, in offerings for which New Century originated all or a significant amount of the underlying mortgage loans, Morgan Stanley reprinted New Century's "Underwriting Guidelines," which stated, in sum or substance, that (a) New Century's guidelines were "intended to assess the borrower's ability to repay the mortgage loan"; (b) New Century reviewed not only the value of the property, but also considered "the mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type of use of the mortgaged property"; (c) "the mortgage loans [were] originated in accordance with the underwriting guidelines"; and (d) exceptions to these guidelines would only be made "on a case-by-case basis . . . where compensating factors exist."  *See* ¶ 76.  Morgan Stanley made similar statements of material facts for mortgage loans originated by other Mortgage Originators, including WMC. *See* ¶ 185.

242.   Moreover, the Offering Documents made statements of material facts regarding the appraisal guidelines and practices of the relevant Mortgage Originators.  Morgan Stanley stated, for example, that New Century commissioned appraisals of mortgaged properties by "qualified independent appraisers" who prepared appraisal reports that were "required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are on forms acceptable to Fannie Mae and Freddie Mac," and that were reviewed "by a qualified employee" of New Century or by an appraiser retained by New Century.   *See* ¶ 78.  Morgan Stanley made similar statements of material facts for appraisals commissioned, performed, or reviewed by other Mortgage Originators, including WMC.  *See* ¶ 185.  In offerings in which a Mortgage Originator was not identified in the Offering Documents, Morgan Stanley stated that "the depositor will not include any loan in the trust fund for any series of securities if anything has come to the depositor's attention that could cause it to believe that the representations and warranties of a seller or originator will not be accurate and complete in all material respects in respect of the loan as of the date of initial issuance of the related series of securities."

EXHIBIT   53   -588-

243.    In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes" and "pitch books," Morgan Stanley made additional statements of material facts regarding the particular Securities and their underlying data, data quality, Mortgage Originator practices and guidelines applicable to the loans underlying those Securities, and Morgan Stanley's due diligence of the Mortgage Originators' underwriting practices.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flows, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

244.    Morgan Stanley made additional oral statements of material facts about the Securities it offered or sold to Plaintiff.  Some of Plaintiff's meetings with Morgan Stanley representatives occurred on or about July 13, July 22, and September 9, 2004 and May 16 and and October 3, 2006. Some of these meetings occurred in Plaintiff's offices in Concord, Massachusetts.  During these meetings, Morgan Stanley made statements of material facts regarding Morgan Stanley's upcoming RMBS deals, and assured Plaintiff that Morgan Stanley conducted due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines, including by sampling loans in order to check underwriting process, documentation, valuations, and compliance.  Specifically, Morgan Stanley made oral statements of material facts that it performed strong due diligence of New Century, stating to Plaintiff that Morgan Stanley even had an employee on site at New Century to ensure compliance with the underwriting standards described in the Offering Documents.

245.    Each of the statements of material facts identified above regarding underwriting and appraisal standards was untrue and contained material omissions.  As detailed below, the principal Mortgage Originators in the Morgan Stanley deals violated their stated underwriting and appraisal standards.  Moreover, Morgan Stanley's statements regarding its own due diligence were untrue and contained material omissions.

246.    Morgan Stanley outsourced some due diligence by contracting with external firms including Clayton to review whether the loans included in the RMBS that it underwrote complied with the Mortgage Originators' stated standards.  As discussed in ¶¶ 63-66, Clayton

EXHIBIT  53   -589-

and Bohan have been investigated by the New York Attorney General, SEC, and Massachusetts and Connecticut regulators for engaging in improper underwriting practices, and in January 2008, the New York Attorney General granted Clayton immunity from prosecution in exchange for documents and testimony regarding its due diligence reports.

247.    In its most recent annual report, filed on Form 10-K with the SEC on February 26, 2010, Morgan Stanley confirmed that it is under direct investigation and is "responding to subpoenas and requests for information from certain regulatory and Governmental entities concerning the origination, purchase, securitization and servicing of subprime and non-subprime residential mortgages and related issues including collateralized debt obligations and credit default swaps backed by or referencing mortgage pass through certificates."

248.    On June 24, 2010, the Massachusetts Attorney General announced that Morgan Stanley had agreed to pay $102 million to the Commonwealth and mortgage borrowers in the Commonwealth to settle charges related to "Morgan Stanley's role in facilitating predatory lending by New Century."  Attorney General Coakley stated that:

> Morgan Stanley funded, purchased and securitized New Century loans. Morgan developed an intimate knowledge of New Century's business over time.  And they uncovered signals pretty early on that the lending practices of New Century were not sound.  Morgan Stanley continued to fund and securitize subprime loans even as New Century's bad loans were causing the lender to collapse . . . .

> Morgan knew because as part of its business it had to review New Century's loan portfolio in that relationship.  Morgan discovered that New Century was making loans that we allege were designed to fail.  They started with low teaser rates, but then they kicked to higher interest rates that borrowers predictably could not afford and borrowers could only repay by financing.

> ***

> Morgan Stanley had a number of red flags that these practices were unfair.  For instance, Morgan Stanley knew that New Century was using what we call "no doc loans," that is no documentation, loans with no paperwork, to the point of abuse. New Century was not following its own underwriting guidelines for these loans and New Century failed to account for whether borrowers could actually make payments after the introductory or the so-called teaser rates on the loans have expired.

EXHIBIT   53   -590-

Morgan initially refused to fund these loans, but after New Century threatened to pull their business, a Morgan banker approved hundreds of loans that their own compliance team had rejected and Morgan then softened its oversight to let New Century's business continue.  [Morgan Stanley c]ontinued to fund New Century and provided the key financing that was needed to so that New Century could continue to make those loans.

***

[O]ur investigation revealed that Morgan Stanley backed loans for homeowners that they knew, or should have known, were destined to fail and then they failed to disclose the riskiness of those loans to investors.

249.    The Assurance of Discontinuance that the Massachusetts Attorney General filed in

Court in connection with the Morgan Stanley settlement specifically identifies untrue statements

in the loan tapes Morgan Stanley provided to investors such as Plaintiff:

On the loan tapes provided to investors in Morgan Stanley securitizations of New Century loans, the DTI ratio was typically calculated based on the teaser rate and did not reflect the Fully Indexed Mortgage Payment.  Incorporating the Fully Indexed Mortgage Payment in the DTI ratio using Morgan Stanley's reset DTI analysis described above, the average DTI on the New Century tapes would be substantially higher.  A large number of the ARM loans would have Fully Indexed DTI Ratios on this basis that were greater than 55%.  Based on Morgan Stanley's analysis described above, such borrowers could not afford to repay these loans in accordance with their terms without refinancing.  Such loans comprised a significant portion of the overall loan pools.

***

As early as October 2005, Morgan Stanley's diligence team determined, in reviewing and rejecting loans for purchase, that the stated income on a number of New Century loans was unreasonable.  In early 2006, a Morgan Stanley employee commented that stated income credit was not adequately evaluated by New Century.  About 36% of the loans originated by New Century and reviewed by Clayton in the diligence process were stated income loans.  On average, the stated income of these borrowers was approximately 42% higher than the income of fully documented borrowers.  The average stated income of these borrowers on an annual basis was about $115,000.

Assuming that the stated income was closer to or similar to fully documented income, the average actual DTI ratio for stated income borrowers would be much higher than the DTI ratios reported by New Century in the loan tapes (averaging 41% for stated income loans), and a substantial number of these borrowers would have DTI ratios on this basis exceeding 55%.

EXHIBIT  53  -591-

250.     The statements of material facts in the documents Morgan Stanley sent to Plaintiff were untrue because the Mortgage Originators violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines.   For example, subsequent investigations and lawsuits have demonstrated that New Century made frequent exceptions to its underwriting guidelines for borrowers who would not otherwise qualify for loans; New Century management "turned a blind eye" to risky loan originations; and "New Century engaged in a number of significant improper and imprudent practices related to its loan originations."   *See* ¶¶ 82-95.     Moreover, former New Century employees witnessed firsthand how exceptions to New Century's underwriting became the "norm" because employees had to do whatever was necessary to increase loan originations. *See* ¶¶ 89-91.  The SEC recently charged former New Century officers with making untrue assurances to the market about the company's "adhere[nce] to high origination standards in order to sell [its] loan products in the secondary market."  *See* ¶ 93.  The other Mortgage Originators of loans underlying the Morgan Stanley Securities similarly violated their stated underwriting guidelines in exchange for dramatically increased loan production.  *See* Section V.

251.     The statements of material facts in the documents Morgan Stanley sent to Plaintiff were also untrue because the Mortgage Originators either knew of or participated in the inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.   *See, e.g.*, ¶¶ 51-57.  A former New Century underwriter recently confirmed New Century's use of inflated appraisals in testimony before the FCIC, stating that New Century hired fee appraisers who were "pressured" into inflating property values, at times by tampering with the property, "fearing if they didn't, they would lose future business and their livelihoods."  ¶ 54.   Another industry insider testified before the FCIC that, in his experience, subprime appraisals were so overvalued that "throwing a dart at a board while blindfolded would've produced more accurate results."  ¶ 52.  Surveys performed in 2007 demonstrated that

EXHIBIT  53   -592-

90% of appraisers felt pressured to raise property values in order to enable deals to go through. ¶ 56.

252.    Morgan Stanley's statements of material facts were also untrue because other key data provided to Plaintiff by Morgan Stanley were untrue.  For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties.  The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

253.    The result of the untrue statements and omissions described above is that the Securities Morgan Stanley offered or sold to Plaintiff have all been downgraded, and their value has collapsed.  As of June 25, 2010, over 48% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by Morgan Stanley to Plaintiff.

### b.    Bear Stearns' Untrue Statements of Material Facts and Omissions

254.    Bear Stearns offered or sold Securities to Plaintiff in Massachusetts in 2005, 2006 and 2007 for a total price of $536,398,119.  A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix J.

255.    Bear Stearns was a pioneer in mortgage securitization.  Through its affiliates and subsidiaries, Bear Stearns was able to control nearly every step in the mortgage securitization process.  For example, to make certain the mortgage pipeline was always full, Bear Stearns owned and operated three mortgage loan origination subsidiaries – EMC Mortgage Corporation ("EMC"), Bear Stearns Residential Mortgage Corporation ("Bear Stearns Mortgage Corp."), and Encore Credit Corp. ("Encore").  EMC originated loans that were securitized by Bear Stearns, served as the sponsor for many of Bear Stearns' offerings, and serviced the loans underlying the offerings after the offerings were complete.

EXHIBIT   53   -593-

256.    Bear Stearns also formed numerous SPVs to facilitate the issuance of RMBS. These entities included Depositor Defendants Structured Asset Mortgage Investments II, Inc. ("SAMI") and Bear Stearns Asset Backed Securities I, LLC ("BSABS"), which served as the depositors and issuers for Bear Stearns' offerings.  Bear Stearns offered or sold the Securities to Plaintiff.   Bear Stearns also provided financial research on RMBS and related structured products.

257.    Bear Stearns profited at every step in the securitization process, as it collected: (1) loan-origination fees; (2) gains on sale of the mortgages to securitization trusts; (3) management fees from hedge funds and other investment vehicles that purchased mortgage-backed structured products; (4) underwriting fees; and (5) servicing fees.   Bear Stearns summarized its securitization business as follows: "Our vertically integrated franchise allows us to access every step of the mortgage process, including origination, securitization, distribution and servicing." According to *Inside Mortgage Finance*, a leading trade publication whose data is used by the federal government, from 2004 to 2007 Bear Stearns underwrote more than $97 billion in subprime RMBS.

258.    In connection with its offer or sale of Securities to Plaintiff, Bear Stearns sent numerous documents to Plaintiff in Massachusetts.   These documents included registration statements, prospectuses, and prospectus supplements.  Bear Stearns also sent Plaintiff numerous other documents, including term sheets and "loan tapes."  The loan tapes Bear Stearns sent to Plaintiff consisted of Excel spreadsheets that contained dozens of categories of information related to the individual loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  Often, Bear Stearns also showed Plaintiff "pitch books" and other materials promoting the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting the Securities, the data, and Bear Stearns' due diligence of the Mortgage Originators' underwriting practices.  Bear Stearns did not allow Plaintiff to keep the pitch books.

EXHIBIT  53  -594-

259.    In the Offering Documents, Bear Stearns made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans.   For example, Bear Stearns stated that: (1) the Mortgage Originators' underwriting guidelines were intended to assess the borrowers' ability to repay the mortgage loans and considered the borrowers' credit history, repayment ability, debt service-to-income ratio, and other factors; (2) the Mortgage Originators assessed the value of the properties; and (3) exceptions to the Mortgage Originators' underwriting guidelines would only be made where compensating factors existed.

260.    Moreover, the Offering Documents included statements of material facts regarding the originators' appraisal guidelines.   Bear Stearns stated, for example, that the Mortgage Originators commissioned appraisals by qualified independent appraisers who prepared appraisals that conformed to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation.

261.    In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes," and "pitch books," Bear Stearns made additional statements of material facts regarding the particular Securities and their underlying data, data quality, Mortgage Originator practices and guidelines applicable to the loans underlying those Securities, and Bear Stearns' due diligence of the Mortgage Originators' underwriting practices.   This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flow, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

262.    Bear Stearns made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff.   Some of Plaintiff's meetings with Bear Stearns representatives occurred on or about March 18, September 22, and November, 14, 2005, and May 25, July 19, and August 3, 2006.   Some of these meetings occurred in Plaintiff's offices in Concord, Massachusetts, and others were via teleconference.   During these meetings, Bear Stearns employees made statements of material facts regarding upcoming RMBS deals, and assured Plaintiff that Bear Stearns conducted due diligence to ensure that the Mortgage

EXHIBIT   53   -595-

Originators complied with their stated underwriting guidelines.   Among other things, Bear Stearns stated that its due diligence included sampling loans to check underwriting process, documentation, valuations, and compliance.

263.   Specifically, Bear Stearns repeatedly stated that it used Clayton to perform due diligence on the mortgage loans and to ensure mortgage originator compliance with stated underwriting standards.   In June of 2007, the New York Attorney General subpoenaed documents from Clayton and another due diligence firm, Bohan Group ("Bohan"), seeking information regarding whether Wall Street Banks withheld information that should have been disclosed to investors.   Similar subpoenas were issued by the SEC and Massachusetts and Connecticut regulators.

264.   On January 27, 2008, the New York Attorney General entered into an agreement with Clayton for immunity from prosecution in exchange for additional documents and testimony regarding its due diligence reports.   Both the *New York Times* and *Wall Street Journal* published articles detailing the agreement and Clayton's expected testimony.   According to the *New York Times* (J. Anderson and V. Bajaj, "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," Jan. 27, 2008), Clayton "communicated daily with bankers putting together securities," and that "starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending exceptions."   In response, rather than change the "broad language written in prospectuses" to reflect the environment, "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

265.   An article in the *Los Angeles Times* (E. Reckard, "Sub-prime Mortgage Watchdogs Kept On Leash; Loan Checkers Say Their Warnings of Risk Met With Indifference," March 18, 2008) revealed that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored, and stricken from the reports."

EXHIBIT   53   -596-

266.    Each of Bear Stearns' statements of material facts identified above regarding underwriting and appraisal standards was untrue and contained material omissions.  As detailed below, the principal Mortgage Originators in the Bear Stearns deals systematically violated their stated underwriting and appraisal standards.  Moreover, Bear Stearns' additional statements of material facts regarding its own due diligence were untrue and contained material omissions.

267.    In late 2008, Ambac Assurance Corp. ("Ambac") commenced an action against EMC and Bear Stearns in the United States District Court for the Southern District of New York alleging that the companies had built a "house of cards" through rampant misrepresentations in the origination of mortgage loans used in securitizations.  *Ambac Assurance Corp. v. EMC Mortgage Corp.*, No. 08-cv-9464 (S.D.N.Y.) (the "Ambac Complaint").  On November 6, 2008, an article in the Associated Press reported the following with respect to the Ambac Complaint:

> Bear Stearns leveraged its reputation and dominance in mortgage finance to entice companies such as Ambac to insure loans plagued by rampant fraud. . . . Bear Stearns promised that its mortgage loans originated through proper means and didn't result from fraud, misrepresentation or gross negligence. Yet . . . Ambac discovered widespread breaches of representations in almost 80 percent of the documents supporting 695 defaulted loans it studied.

Larry Neumeister, *Lawsuit: Bear Stearns Built A 'House of Cards,'* Associated Press, November 6, 2008.

268.    According to the Ambac Complaint, after incurring more than $640 million in losses, Ambac conducted a study of 1,486 loans with an aggregate principal of approximately $86.9 million.  The results of that review found:

> Of these 1486 loans, 1332, over 89%, breached one or more of the representations and warranties that EMC had made to Ambac.  The most prevalent and troubling of the breaches identified by Ambac across all four Transactions involve (1) rampant misrepresentations about borrower income, employment, assets, and intentions to occupy the purchased properties, and (2) the loan originators' abject failures to adhere to proper and prudent mortgage-lending practices, including their own underwriting guidelines.

Ambac Complaint at ¶ 6.

EXHIBIT  53  -597-

269.    The Ambac Complaint lays out, in detail, the Bear Stearns "securitization machine" and EMC's crucial, and damaging, role within that machine:

> [EMC] acted both as an "originator" and an "aggregator" of an enormous volume of residential mortgage loans, "with the ultimate strategy of securitization into an array of Bear Stearns's securitizations." EMC repeatedly executed on that strategy, in many cases retaining the rights to act as servicer of the mortgage loans that it securitized. In its role as aggregator, EMC prescribed loan origination standards and approved the underwriting guidelines of a large number of mortgage lenders…

*Id.* at ¶ 18.

270.    EMC expanded its loan generation to supply Bear Stearns' securitizations and, at the same time, reassured the market that it would maintain the quality of the securitizations. *Id.* at ¶ 26. But, in fact, "EMC's inventory of mortgage loans was replete with loans (i) originated by fraud, material misrepresentations, or omissions and (ii) underwritten without regard to prudent standards or the fundamental principles of mortgage lending, which require a good-faith assessment of the borrower's ability and willingness to repay the loan." *Id.* at ¶ 27. EMC "convince[d] investors that the securities it sold were a safe and profitable investment, despite the fact that, unbeknownst to Ambac and the market at large, those securities were backed by unjustifiably risky loans." *Id.* at ¶ 25.

271.    The Ambac Complaint further makes clear that EMC and Bear Stearns expanded acceptance and financing of "no doc" and "low doc" loan products "with a marked and dangerous decline in the rigor and discipline with which [the companies] approached loan origination and underwriting." *Id.* at ¶ 28. Thus, EMC's inventory of mortgage loans "was replete with loans originated by fraud or underwritten pursuant to imprudent or non-existent standards." *Id.* at ¶¶ 29-30.

272.    On March 16, 2009, the District Court denied EMC's motion to strike portions of Ambac's Complaint that EMC asserted were "inflammatory" because they portrayed Bear Stearns and EMC as "corporate villains . . . responsible for the mortgage-backed security crisis." In its decision denying EMC's motion, the Court held that allegations such as that "[t]he Bear

EXHIBIT   53   -598-

Stearns securitization machine was a house of cards, supported not by real value and sound practices but by Bear Stearns' appetite for loans and disregard as to the risks those loans presented" were not unfairly prejudicial, but rather were relevant to whether EMC "'materially breached its representations and warranties' . . . regarding, among other things, 'the origination, underwriting, servicing, and other key attributes of the loans[.]'" (Quoting Ambac's Complaint; alterations in original.)  Ambac's action against EMC is ongoing, and the parties are currently engaged in pretrial discovery.

273.   Matt Van Leeuwen, a mortgage analyst with EMC between 2004 and 2006, has also confirmed the above allegations of negligent underwriting practices.  Van Leeuwen revealed that (a) Bear Stearns pushed EMC analysts to perform their loan analyses of the underlying mortgages in only one to three days so that Bear Stearns would not have to hold the loans on its books; (b) EMC analysts were encouraged to falsify loan data (such as FICO scores) if that information was missing from the loan data and the mortgage originators did not respond to requests for that information; (c) the documentation level (*i.e.,* no documentation, partial documentation) of the loans was often incorrectly identified; and (d) rather than going back to the mortgage originator for clarification, such as verification of income, Bear Stearns would avoid investigating and make the loan "fit."  Teri Buhl, "More Corruption: Bear Stearns Falsified Information as Raters Shrugged," *The Atlantic*, May 2010.

274.   The statements of material facts in the documents Bear Stearns sent to Plaintiff were untrue because the Mortgage Originators systematically violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines.

275.   The statements of material facts in the documents Bear Stearns sent to Plaintiff were also untrue because the Mortgage Originators either knew of or participated in the inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.  *See, e.g.*, ¶¶ 51-57.  An industry insider testified before the FCIC and

EXHIBIT  53  -599-

stated that, in his experience, subprime appraisals were so overvalued that "throwing a dart at a board while blindfolded would've produced more accurate results."  ¶ 52.  Surveys performed in 2007 demonstrated that 90% of appraisers felt pressured to raise property values in order to enable deals to go through.  ¶ 56.

276.    Bear Stearns' statements of material facts were also untrue because other key data provided to Plaintiff were untrue and contained material omissions.  For example, the data often identified properties as "owner occupied" when they were really second homes or investment properties.  The untruth of this information was material to Plaintiff's analysis of credit quality and likelihood of default.

277.    The result of the untrue statements and omissions described above is that the Securities Bear Stearns offered or sold to Plaintiff have all been downgraded, and their value has collapsed.  As of June 25, 2010, over 47% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by Bear Stearns to Plaintiff.

278.    Defendant J.P. Morgan is the successor-in-interest to Bear Stearns as a result of the merger of Bear Stearns with and into J.P. Morgan on October 1, 2008, with J.P. Morgan Securities as the surviving entity.

### c.    Citigroup's Untrue Statements of Material Facts and Omissions

279.    Citigroup offered or sold Securities to Plaintiff in Massachusetts in 2005, 2006 and 2007 for a total price of $220,839,945.  A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix B.

280.    Citigroup sought to compete with its Wall Street peers and to expand its share of the RMBS market by aggressively pursuing subprime mortgage originators including New Century, Argent, and WMC for the purchase of subprime loans to be pooled and securitized as Securities, offering to pay more for mortgages than competing Wall Street Banks, and offering to

EXHIBIT  53   -600-

perform less due diligence than competitors.  New Century, Argent and WMC were some of the largest Mortgage Originators in these Citigroup Securities.

281.   To facilitate the sale of RMBS, Citigroup formed SPVs including Depositor Defendant Citigroup Mortgage Loan Trust Inc., which originated or otherwise acquired residential mortgage loans to be securitized and served as the sponsor, depositor, and issuer in numerous offerings of RMBS.  Defendant Citigroup offered or sold the Securities to Plaintiff. Citigroup also provided financial research on RMBS and related structured products.

282.   In connection with its offer or sale of Securities to Plaintiff, Citigroup sent numerous documents to Plaintiff in Massachusetts.  These documents included registration statements, prospectuses, and prospectus supplements, and for one deal, a private placement agreement.  Citigroup also sent Plaintiff numerous other documents, including term sheets and "loan tapes."  The loan tapes Citigroup sent to Plaintiff consisted of Excel spreadsheets that contained over 60 categories of information related to the individual loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  Citigroup also showed Plaintiff "pitch books" promoting, *inter alia*, the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting the Securities, the data, and Citigroup's due diligence of the Mortgage Originators' underwriting practices.  Citigroup did not allow Plaintiff to keep the pitch books.

283.   In the Offering Documents, Citigroup made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans.  For example, in offerings for which New Century originated all or a significant amount of the underlying mortgage loans, Citigroup reprinted New Century's "Underwriting Guidelines," which stated in sum or substance, that (a) New Century's guidelines were "intended to assess the borrower's ability to repay the mortgage loan"; (b) New Century not only reviewed the value of the property, but also considered "the mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type of use of the mortgaged property"; (c) "the mortgage loans [were] originated in accordance with the underwriting guidelines"; and (d)

EXHIBIT  53  -601-

exceptions to these guidelines would only be made "on a case-by-case basis . . . where compensating factors exist." *See* ¶ 76.   Citigroup made similar statements of material facts for loans originated by other Mortgage Originators, including Argent and WMC. *See* Section V.

284.    Moreover, the Offering Documents made statements of material facts regarding the appraisal guidelines and practices of the relevant Mortgage Originators.  Citigroup stated, for example, that New Century commissioned an appraisal of mortgaged properties by "qualified independent appraisers" who prepared an appraisal report that is "required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are on forms acceptable to Fannie Mae and Freddie Mac," and that was reviewed "by a qualified employee" of New Century or by an appraiser retained by New Century.   *See* ¶ 78.   Citigroup made similar statements of material facts for appraisals commissioned by or performed or reviewed by other Mortgage Originators, including Argent and WMC. *See* Section V.

285.    In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes," and "pitch books," Citigroup made additional statements of material facts regarding the particular Securities and their underlying data, data quality, Mortgage Originator practices and guidelines applicable to the loans underlying those Securities, and Citigroup's due diligence of the Mortgage Originators' underwriting practices.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flow, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

286.    Citigroup made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff.  Some of Plaintiff's meetings with Citigroup occurred on or about September 30, 2004; June 23, October 31, and December 8, 2005; and May 22, August 14, and December 7, 2006.   Some of these meetings occurred in Plaintiff's offices in Concord, Massachusetts.  During these meetings, Citigroup made statements of material facts regarding Citigroup's upcoming RMBS deals, and assured Plaintiff that Citigroup conducted due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines,

EXHIBIT   53   -602-

including by sampling loans in order to check underwriting process, documentation, valuations, and compliance.

287.    Each of the statements of material facts identified above regarding underwriting and appraisal standards were untrue and contained material omissions.  As detailed below, New Century, Argent, and WMC, the principal Mortgage Originators in the Citigroup deals, systematically violated their stated underwriting and appraisal standards.  Moreover, Citigroup's additional statements of material facts regarding its own due diligence were untrue and contained material omissions.

288.    Citigroup stated that it retained external firms, including Clayton and Bohan, to review whether the loans included in the RMBS that Citigroup underwrote complied with the Mortgage Originators' stated standards.  As discussed in ¶¶ 63-66, Clayton and Bohan have been investigated by the New York Attorney General, the SEC, and Massachusetts and Connecticut regulators for improper activity in their mortgage due diligence services.

289.    In its most recent annual report, filed on Form 10-K with the SEC on February 26, 2010, Citigroup Inc. (the parent company of Defendant Citigroup) confirmed that "beginning in the fourth quarter of 2007, certain of Citigroup's regulators and other state and federal government agencies commenced formal and informal investigations and inquiries, and issued subpoenas and requested information, concerning Citigroup's subprime mortgage-related conduct and business activities."

290.    The statements of material facts in the documents Citigroup sent to Plaintiff were untrue because the Mortgage Originators systematically violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines.  For example, as described above, New Century's statements that it underwrote loans in accordance with its stated underwriting guidelines were untrue.  *See* ¶¶ 82-95.  The other two Mortgage Originators underlying the Citigroup Securities, Argent and WMC, similarly violated their stated underwriting guidelines in exchange for dramatically increased loan production.  *See*

EXHIBIT  53   -603-

Section V.   Citigroup's statements of material facts about the appraisals of the underlying properties were also untrue.

291.    Citigroup's statements of material facts were also untrue because other key data provided to Plaintiff by Citigroup was untrue.  For example, the data often identified properties as "owner occupied" when they were really second homes or investment properties.  The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

292.    The Financial Crisis Inquiry Commission (the "FCIC") investigated Citigroup as part of its statutory mission to determine "the causes … of the current financial and economic crisis in the United States."  Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 5(a) (May 20, 2009).  In connection with its investigation, the FCIC interviewed senior Citigroup executives with direct responsibility for the Company's mortgage operations; subpoenaed and reviewed thousands of internal Citigroup documents concerning those operations; and held hearings on April 7-9, 2010.

293.    The FCIC heard testimony from Richard M. Bowen, III, who was the Senior Vice President and Chief Underwriter for Correspondent and Acquisitions for Citifinancial Mortgage (Citigroup's subprime mortgage lending subsidiary) from 2002 through 2005 and was promoted in early 2006 to Business Chief Underwriter for Correspondent Lending in Citigroup's Consumer Lending Group (which included Citigroup's prime mortgage lending, subprime mortgage lending, and prime second lien mortgage businesses).  As Business Chief Underwriter for Correspondent Lending, Mr. Bowen was one of Citigroup's most senior mortgage executives, supervising 220 professional underwriters and exercising direct oversight over the underwriting of more than $90 billion of residential mortgages annually.

294.    Mr. Bowen testified that each year since 2005, Citigroup's mortgage operation systematically acquired tens of billions of dollars of risky loans that violated Citigroup's own underwriting criteria and were likely to default.  He also testified that Citigroup's Wall Street Chief Risk Officer routinely overruled underwriters' rejections of pools of subprime mortgages

106

EXHIBIT  53  -604-

that did not satisfy Citigroup's underwriting criteria for purchase by the "Correspondent Wall Street channel," thus causing Citigroup to purchase billions of dollars of loan pools that fell far short of underwriting standards.  In sum, Mr. Bowen testified that "[d]uring 2006 and 2007, I witnessed business risk practices which made a mockery of Citi credit policy. . . ."

295.   Mr. Bowen also testified that he recommended that Citigroup not purchase Ameriquest, because his due diligence found that Argent's loans did not meet the standards they had represented to Citigroup.  Specifically, Mr. Bowen testified that "we sampled the loans that were originated by Argent and we found large numbers that did not – that were not underwritten according to the representations that were there."

296.   As a result of the untrue statements and omissions described above, the Securities Citigroup offered or sold to Plaintiff have all been downgraded, and their value has collapsed. As of  June 25, 2010, 50% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by Citigroup to Plaintiff.

### d.   Credit Suisse's Untrue Statements of Material Facts and Omissions

297.   Credit Suisse offered or sold Securities to Plaintiff in Massachusetts in 2005, 2006 and 2007 for a total price of $387,100,311.  A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix C.

298.   Credit Suisse acquired hundreds of thousands of subprime mortgages and securitized the mortgage loans into billions of dollars of RMBS, some of which were then offered or sold to Plaintiff in a series of offerings containing subprime mortgage loans from several different Mortgage Originators, including New Century, Ameriquest, WMC, Long Beach, Argent, and Option One.

299.   To facilitate the sale of RMBS, Credit Suisse's parent company formed SPVs, including Depositor Defendants Credit Suisse First Boston Mortgage Securities Corporation and

EXHIBIT  53   -605-

Asset Backed Securities Corporation, which issued and were the depositors for numerous offerings of RMBS. Defendant Credit Suisse offered or sold the Securities to Plaintiff. Credit Suisse also provided financial research on RMBS and related structured products.

300.    In connection with its offer or sale of Securities to Plaintiff, Credit Suisse sent numerous documents to Plaintiff in Massachusetts. These documents included registration statements, prospectuses, and prospectus supplements. Credit Suisse also sent Plaintiff numerous other documents, including term sheets and "loan tapes." The loan tapes Credit Suisse sent to Plaintiff consisted of Excel spreadsheets that contained dozens of categories of information related to the individual loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores. Often, Credit Suisse also showed Plaintiff "pitch books" and other materials promoting the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting the Securities, the data, and Credit Suisse's due diligence of the Mortgage Originators' underwriting practices. Credit Suisse did not allow Plaintiff to keep the pitch books.

301.    In the Offering Documents, Credit Suisse made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans. For example, in offerings for which New Century originated all or a significant amount of the underlying mortgage loans, Credit Suisse reprinted New Century's "Underwriting Guidelines," which stated in sum or substance, that (a) New Century's guidelines were "intended to assess the borrower's ability to repay the mortgage loan"; (b) New Century reviewed not only the value of the property, but also considered "the mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type of use of the mortgaged property"; (c) "the mortgage loans [were] originated in accordance with the underwriting guidelines"; and (d) exceptions to these guidelines would only be made "on a case-by-case basis . . . where compensating factors exist." *See* ¶ 76. Credit Suisse made similar statements of material facts for Mortgage Loans originated by other mortgage originators, including Ameriquest, Argent, Long Beach, WMC, and Option One. *See* Section V.

EXHIBIT  53   -606-

302.    Moreover, the Offering Documents made statements of material facts regarding the appraisal guidelines and practices of the relevant Mortgage Originators.  Credit Suisse stated, for example, that New Century commissioned appraisals of mortgaged properties by "qualified independent appraisers" who prepared appraisal reports that were "required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are on forms acceptable to Fannie Mae and Freddie Mac," and that were reviewed "by a qualified employee" of New Century or by an appraiser retained by New Century.  *See* ¶ 78.  Credit Suisse made similar statements of material facts for appraisals commissioned, performed, or reviewed by other Mortgage Originators, including Argent and WMC.  *See* Section V.

303.    In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes" and "pitch books," Credit Suisse made additional statements of material facts regarding the particular Securities and their underlying data, data quality, Mortgage Originator practices and guidelines applicable to the loans underlying those Securities' and Credit Suisse's due diligence of the Mortgage Originators' underwriting practices.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flow, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

304.    Credit Suisse made additional, oral statements of material facts about the Securities to Plaintiff in meetings, including meetings at Plaintiff's offices in Concord, Massachusetts.  Some of Plaintiff's meetings with Credit Suisse occurred on or about September 9, 2004; August 29 and October 26, 2005; and March 2, May 17, and December 31, 2006. During these meetings, Credit Suisse made statements of material facts regarding Credit Suisse's upcoming RMBS deals, and assured Plaintiff that Credit Suisse conducted due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines, including by reviewing loans in order to check underwriting process, documentation, valuations, and compliance.

EXHIBIT  53   -607-

305.   For example, Credit Suisse made oral statements of material facts to Plaintiff about the strength and quality of the due diligence Credit Suisse performed on the "HEAT" series of deals, in which Plaintiff purchased over $182,004,054 of Securities on behalf of the Clients between 2005 and 2006.  *See* Appendix C.  Specifically, Credit Suisse stated to Plaintiff that Credit Suisse performed a valuation review of 100% of the underlying loans, meaning that Credit Suisse should have reviewed the data and documentation for each underlying loan before accepting the loan for inclusion in the pool.  In fact, Credit Suisse stated to Plaintiff that the due diligence for the HEAT transactions was "superior" to the due diligence for most other RMBS transactions because of this 100% valuation review.

306.   Each of the statements of material facts identified above regarding underwriting and appraisal standards was untrue and contained material omissions. As detailed below, Ameriquest, New Century, WMC, Long Beach, Argent, and Option One, the principal Mortgage Originators of loans included in the Credit Suisse deals, systematically violated their stated underwriting and appraisal standards.  Moreover, Credit Suisse's statements of material facts regarding its own due diligence were untrue and contained material omissions.

307.   Credit Suisse contracted with external firms including Clayton and Bohan to review whether the loans included in the RMBS that Credit Suisse underwrote complied with the Mortgage Originators' stated standards.  As discussed in ¶¶ 63-66, Clayton and Bohan have been investigated by the New York Attorney General, SEC, and Massachusetts and Connecticut regulators for engaging in improper underwriting practices.  In January 2008, the New York Attorney General granted Clayton immunity from prosecution in exchange for documents and testimony regarding its due diligence reports.

308.   The statements of material facts in the documents Credit Suisse sent to Plaintiff were untrue because the Mortgage Originators systematically violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines.  For example, investigations and lawsuits have demonstrated that New Century made

110

EXHIBIT  53  -608-

frequent exceptions to its underwriting guidelines for borrowers who would not otherwise qualify for loans; New Century management "turned a blind eye" to the risky loan originations; and "New Century engaged in a number of significant improper and imprudent practices related to its loan originations." *See* ¶¶ 82-95.   Moreover, former New Century employees witnessed firsthand how exceptions to New Century's underwriting became the "norm" because employees had to do what was necessary to increase loan originations. *See* ¶¶ 89-91.  The SEC has charged former New Century officers with making untrue assurances to the market about the company's "adhere[nce] to high origination standards in order to sell [its] loan products in the secondary market." *See* ¶ 93.  The other Mortgage Originators underlying the Credit Suisse Securities – Ameriquest, WMC, Long Beach, Argent, and Option One – similarly violated their stated underwriting guidelines in exchange for dramatically increased loan production. *See* Section V. Indeed, the Senate Permanent Subcommittee on Investigations recently concluded that "Long Beach . . . was not a responsible lender.  Its loans and mortgage backed securities were among the worst performing in the subprime industry." ¶ 102.

309.   The statements of material facts in the documents Credit Suisse sent to Plaintiff were also untrue because the Mortgage Originators either knew of or participated in the inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue. *See, e.g.*, ¶¶ 51-57.  For example, a former New Century underwriter recently confirmed New Century's use of inflated appraisals in testimony before the FCIC, stating that New Century hired fee appraisers who were "pressured" into inflating property values, at times by tampering with the property, "fearing if they didn't, they would lose future business and their livelihoods." ¶ 54.   The Illinois Attorney General testified before the FCIC that a multistate investigation "revealed that [Ameriquest] engaged in the kinds of fraudulent practices that other predatory lenders subsequently emulated on a wide scale . . . includ[ing]: inflating home appraisals." ¶ 210.  An industry insider testified before the FCIC that, in his experience, subprime appraisals were so overvalued that "throwing a dart at a board while blindfolded would've produced more accurate results." ¶ 52.  Surveys performed in 2007

EXHIBIT  53  -609-

demonstrated that 90% of appraisers felt pressured to raise property values in order to enable deals to go through.  ¶ 56.

310.   Credit Suisse's statements were also untrue because other material data provided by Credit Suisse to Plaintiff were untrue.  For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties. The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

311.   Credit Suisse is a defendant in numerous lawsuits directly related to its conduct as an underwriter of RMBS.  On March 29, 2010, the United States District Court for the Southern District of New York sustained claims against Credit Suisse brought on behalf of a class of investors who purchased subprime RMBS issued in 2006 and 2007 that contained underlying mortgage loans from Mortgage Originators including New Century and WMC.  *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, Docket No. 08-CV-5653 (PAC) (S.D.N.Y.) (the "Credit Suisse RMBS Action").  The class's claims in that action under the Securities Act of 1933 are substantially similar legally and factually to Plaintiff's claims in this action.

312.   In the Credit Suisse RMBS Action, the District Court held that the plaintiffs adequately alleged that Credit Suisse's offering documents "contain[ed] materially misleading statements and omissions" relating to Credit Suisse's "systematic disregard of loan-approval oversight and control mechanisms as represented in underwriting guidelines by the Originators," which Credit Suisse failed to detect "because of wholly inadequate due diligence procedures." Like Plaintiff here, the plaintiffs in the Credit Suisse RMBS Action, allege that:

> **The [Securities] were issued pursuant to a number of core representations in the Offering Documents each of which contained material misstatements and omissions. It was represented that the home equity loans were originated pursuant to underwriting guidelines detailed in both in the Registration Statement and the Supplemental Prospectuses.**  These guidelines required an analysis of borrower creditworthiness (i.e., ability to repay the loan) and an appraisal of the mortgaged property pursuant to standard appraisal practices and procedures. The guidelines also described that when loans were issued with

EXHIBIT  53  -610-

limited or no borrower documentation there were compensating factors such as the lender's reliance primarily on the valuation of the mortgaged properties.

***

The Rating Agencies in downgrading the [Securities] from the highest investment grade to junk bond status specifically attributed their actions to "aggressive underwriting" deployed in originating the loans. **Further, well after the completion of the Offerings, disclosures began to emerge that the principal home equity loan Originators - i.e., New Century, Accredited and WMC - engaged in origination practices which flagrantly violated underwriting guidelines set forth in the Offering Documents**.

**Credit Suisse conducted inadequate due diligence to ensure compliance with the underwriting guidelines stated in the Offering Documents.** It was incentivized to acquire and securitize as many loans as possible since its profit was achieved upon the sale of the securities. **The due diligence Credit Suisse did perform was in the period when it was acquiring the loans from third parties – not in underwriting the issuance of the [Securities] - when there was a serious disincentive for Credit Suisse to reject loans submitted for auction by originators, for fear that they would be cut-off from access to further loans for future securitization.**

Credit Suisse RMBS Action Complaint, ¶¶ 10-12 (internal citations omitted).

313.    As a result of the untrue statements of material facts and omissions described above, the Securities that Credit Suisse offered or sold to Plaintiff have all been downgraded, and their value has collapsed. As of June 25, 2010, over 42% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession. Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by Credit Suisse to Plaintiff.

### e.    Greenwich Capital's Untrue Statements of Material Facts and Omissions

314.    Greenwich Capital offered or sold Securities to Plaintiff in Massachusetts in 2005, 2006 and 2007 for a total price of $260,371,635. A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix D.

113

EXHIBIT  53  -611-

315.    Greenwich Capital underwrote more than $180 billion in securities backed by subprime mortgages between 2002 and 2006.  In particular, between 2005 and 2006, Greenwich Capital sought to compete with its Wall Street peers and to expand its share of the RMBS market by aggressively pursuing subprime lenders including Long Beach, Argent, Fremont, Option One, and Meritage for the purchase of subprime loans to be pooled and securitized as Securities, offering to pay more for mortgages than competing Wall Street Banks, and offering to perform less due diligence than competitors.

316.    To facilitate the sale of RMBS, Greenwich Capital formed SPVs, including Depositor Defendant Financial Asset Security Corporation, which issued and was the depositor for numerous offerings of RMBS.  Defendant Greenwich Capital offered or sold the Securities to Plaintiff.  Greenwich Capital also provided financial research on RMBS and related structured products.

317.    In connection with its offer or sale of Securities to Plaintiff, Greenwich Capital sent numerous documents to Plaintiff in Massachusetts.  These documents included registration statements, prospectuses, and prospectus supplements.  Greenwich Capital also sent Plaintiff numerous other documents, including term sheets and "loan tapes."  The loan tapes Greenwich Capital sent to Plaintiff consisted of Excel spreadsheets that contained dozens of categories of information related to the individual loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  Often, Greenwich Capital also showed Plaintiff "pitch books" and other materials promoting the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting the Securities, the data, and Greenwich Capital's due diligence of the Mortgage Originators' underwriting practices.  Greenwich Capital did not allow Plaintiff to keep the pitch books.

318.    In the Offering Documents, Greenwich Capital made numerous statements of material facts regarding the underwriting standards and appraisal practices that had been followed in originating the underlying mortgage loans. For example, for the offerings in which Long Beach originated all or a significant amount of the underlying mortgage loans, Greenwich

EXHIBIT   53   -612-

Capital reprinted Long Beach's "Underwriting Guidelines," which stated that: (1) Long Beach's guidelines were primarily intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral; (2) appraisal of the mortgaged property generally conformed to Fannie Mae and Freddie Mac appraisal standards; (3) appraisals were generally performed by licensed independent appraisers who had satisfied the loan servicer's appraiser screening process; and (4) exceptions were only granted with the approval of an employee with appropriate "risk level authority" and in the presence of compensating factors. *See* ¶ 98.

319.   In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes" and "pitch books," Greenwich Capital made additional statements of material facts regarding the particular Securities and their underlying data, data quality, the relevant Mortgage Originators' practices and guidelines, and Greenwich Capital's due diligence of the Mortgage Originators' underwriting practices.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flows, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

320.   Greenwich Capital made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff, including during meetings in Plaintiff's offices in Concord, Massachusetts.  Some of Plaintiff's meetings with Greenwich Capital occurred on or about May 13 and September 2, 2004; March 2 and August 16, 2006; and January 10, 2007. During these meetings, Greenwich Capital made statements of material facts regarding Greenwich Capital's upcoming RMBS deals, and stated that Greenwich Capital conducted due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines, including by sampling loans in order to check underwriting process, documentation, valuations, and compliance.

321.   Each of the statements of material facts identified above regarding underwriting and appraisal standards was untrue and contained omissions.  As detailed above and below, the principal Mortgage Originators of the underlying loans systematically violated their stated

EXHIBIT   53   -613-

underwriting and appraisal standards.  Moreover, Greenwich Capital's statements of material facts regarding its own due diligence were untrue and contained material omissions.

322.   For example, the statements of material facts in the documents Greenwich Capital sent to Plaintiff was untrue because Long Beach violated its stated underwriting guidelines, did not consistently evaluate the borrower's ability to repay, and made exceptions to its underwriting standards in the absence of "compensating factors."  Subsequent investigations and lawsuits have demonstrated that Long Beach ignored and made frequent exceptions to its underwriting guidelines.  *See* ¶¶ 102-127.   Moreover, former Long Beach employees witnessed firsthand how variance from Long Beach's stated underwriting standard became the "norm" because employees were incentivized to increase loan volume.   *Id.*   The Senate Permanent Subcommittee on Investigations stated: "Long Beach . . . was not a responsible lender.  Its loans and mortgage backed securities were among the worst performing in the subprime industry."  *See* ¶ 102.

323.   Likewise, subsequent investigations and lawsuits have demonstrated that Fremont, another Mortgage Originator whose loans Greenwich Capital securitized, "engage[ed] in unsatisfactory lending practices"; "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores"; purposefully relaxed its underwriting standards and made loans based on documents it knew to be untrue; made "everyday" exceptions to its underwriting guidelines for borrowers who would not otherwise qualify for a loan; and continually ignored fraudulent documents when approving loans.  *See* ¶¶ 165-182.   The other Mortgage Originators of loans underlying the Greenwich Capital Securities similarly violated their stated underwriting guidelines in exchange for dramatically increased loan production.  *See* Section V.

324.   The statements of material facts in the documents Greenwich Capital sent to Plaintiff were also untrue because the inflated appraisals caused the listed LTV ratios and levels of credit enhancement to be untrue.  *See, e.g.*, ¶¶ 51-57.  For example, a former Fremont account manager described how superiors would call appraisers and directly request that they inflate their appraisal values in order to close a deal.  ¶ 177.  Another Fremont employee audited loans that

EXHIBIT  53   -614-

the company was asked to repurchase, and found alarming problem with the appraisals, including appraisals that were incomplete, did not match the address of the property, or described the home as owner-occupied when it was rented, on the large majority of the loans. *Id*. An industry insider testified before the FCIC that, in his experience, subprime appraisals were so overvalued that "throwing a dart at a board while blindfolded would've produced more accurate results." ¶ 52. Surveys performed in 2007 demonstrated that 90% of appraisers felt pressured to raise property values in order to enable deals to go through. ¶ 56.

325.    Greenwich Capital's statements of material facts were also untrue because other material data provided to Plaintiff by Greenwich Capital was untrue. For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties. The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

326.    On March 8, 2008, RBS confirmed that its Greenwich Capital unit was subject to an SEC investigation into the collapse of the subprime market and had been ordered to turn over financial documents to the SEC regarding, among other things, the origination of mortgages, accounting, due diligence, sales, and insider trading.

327.    As a result of the untrue statements of material facts and omissions described above, the Securities that Greenwich Capital offered or sold to Plaintiff have all been downgraded, and their value has collapsed. As of June 25, 2010, 45% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession. Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by Greenwich Capital to Plaintiff.

### f.    Deutsche Bank's Untrue Statements of Material Facts and Omissions

328.    Deutsche Bank offered or sold Securities to Plaintiff in Massachusetts in 2005, 2006 and 2007 for a total price of $137,103,585. A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and

EXHIBIT  53   -615-

Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix E.

329.   Deutsche Bank acquired and then converted subprime mortgages into billions of dollars of RMBS, some of which Deutsche Bank offered or sold to Plaintiff in a series of offerings and sales pursuant to the relevant Offering Documents and other statements.

330.   Deutsche Bank offered or sold Securities to Plaintiff, and Plaintiff purchased Securities on behalf of the Clients from Deutsche Bank, in four offerings and sales containing subprime mortgage loans from several different Mortgage Originators, including Fremont, Long Beach, and Option One.

331.   To facilitate the sale of RMBS, Deutsche Bank formed SPVs, including Depositor Defendant Ace Securities Corporation, which issued and was the depositor for numerous offerings of RMBS.   Defendant Deutsche Bank offered or sold the Securities to Plaintiff. Deutsche Bank also provided financial research on RMBS and related structured products.

332.   In connection with its offer or sale of Securities to Plaintiff, Deutsche Bank sent numerous documents to Plaintiff in Massachusetts.   These documents included registration statements, prospectuses, and prospectus supplements.   Deutsche Bank also sent Plaintiff numerous other documents, including term sheets and "loan tapes."   The loan tapes Deutsche Bank sent to Plaintiff consisted of Excel spreadsheets that contained dozens of categories of information related to the individual loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.   Often, Deutsche Bank also showed Plaintiff "pitch books" and other materials promoting the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting the Securities, the data, and Deutsche Bank's due diligence of the Mortgage Originators' underwriting practices. Deutsche Bank did not allow Plaintiff to keep the pitch books.

333.   In the Offering Documents, Deutsche Bank made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans.   For example, in offerings for which Fremont originated all or a

EXHIBIT   53   -616-

significant amount of the underlying mortgage loans, Credit Suisse reprinted Fremont's "Underwriting Guidelines," which stated in sum or substance, that (a) Fremont's guidelines were "intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan"; (b) "the Fremont mortgage loans were originated in accordance with the[se] underwriting criteria"; and (c) exceptions to these guidelines would only be made "on a case-by-case basis . . . based upon compensating factors." *See* ¶ 161.   Deutsche Bank made similar statements of material facts for mortgage loans originated by other Mortgage Originators, including Long Beach and Option One. *See* Section V.

334.    Deutsche Bank's Offering Documents also made statements of material facts regarding the appraisal guidelines and practices of the relevant Mortgage Originators.  Deutsche Bank stated, for example, that "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal," and that Fremont commissioned appraisals of mortgaged properties by "qualified independent appraisers" who prepared appraisal reports that were reviewed by Fremont.   *See* ¶ 161.  Deutsche Bank made similar statements of material facts for appraisals commissioned, performed, or reviewed by other Mortgage Originators, including Long Beach and Option One. *See* Section V.

335.    In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes" and "pitch books," Deutsche Bank made additional statements of material facts regarding the particular Securities and their underlying data, data quality, Mortgage Originator practices and guidelines applicable to the loans underlying those Securities, and Deutsche Bank's due diligence of the Mortgage Originators' underwriting practices.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flows, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

336.    Deutsche Bank made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff in meetings, some of which occurred in Plaintiff's offices

EXHIBIT   53   -617-

in Concord, Massachusetts.  Some of Plaintiff's meetings with Deutsche Bank occurred on or about October 28 and 31, 2005 and November 3 and December 6, 2006.  During these meetings, Deutsche Bank made statements of material facts regarding Deutsche Bank's upcoming RMBS deals, and stated that Deutsche Bank conducted due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines, including by sampling loans in order to check underwriting process, documentation, valuations, and compliance.

337.  Each of the statements of material facts identified above regarding underwriting and appraisal standards was untrue and contained material omissions.  As detailed below, Fremont, Long Beach, and Option One, the principal Mortgage Originators of loans included in the Deutsche Bank deals, violated their stated underwriting and appraisal standards.  Moreover, Deutsche Bank's statements of material facts regarding its own due diligence were untrue and contained material omissions.

338.  The statements of material facts in the documents Deutsche Bank sent to Plaintiff were also untrue because the Mortgage Originators violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines.  For example, investigations and lawsuits have demonstrated that Fremont "engage[ed] in unsatisfactory lending practices"; "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores"; purposefully relaxed its underwriting standards and made loans based on documents it knew to be untrue; made "everyday" exceptions to its underwriting guidelines for borrowers who would not otherwise qualify for loans; and continually ignored fraudulent documents when approving loans.  *See* ¶¶ 165-182.  The other two principal Mortgage Originators of loans underlying the Deutsche Bank Securities, Long Beach and Option One, similarly violated their stated underwriting guidelines in exchange for dramatically increased loan production.  *See* Section V.

EXHIBIT  53   -618-

339.   The statements of material facts in the documents Deutsche Bank sent to Plaintiff were also untrue because the Mortgage Originators either knew of or participated in the inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.   *See, e.g.*, ¶¶ 51-57.   For example, a former Fremont account manager described how superiors would call appraisers and directly request that they inflate their appraisal values in order to close a deal.   ¶ 177.   Another Fremont employee audited loans that the company was asked to repurchase, and found alarming problems with the appraisals on the large majority of the loans, including appraisals that were incomplete, did not match the address of the property, or described the home as owner-occupied when it was rented.   *Id.*

340.   Deutsche Bank's statements of material facts were also untrue because other key data provided to Plaintiff by Deutsche Bank was untrue.   For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties.   The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

341.   Deutsche Bank is one of eight Wall Street Banks targeted by New York State Attorney General Andrew Cuomo, who, according to a May 12, 2010 article in the *New York Times*, is investigating these Wall Street Banks to determine whether they provided untrue information to rating agencies in order to inflate the ratings of mortgage securities.

342.   As a result of the untrue statements of material facts and omissions described above, the Securities that Deutsche Bank offered or sold to the Plaintiff have all been downgraded, and their value has collapsed.   As of June 25, 2010, over 52% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.   Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by Deutsche Bank to Plaintiff.

**g.**   **Merrill Lynch's Untrue Statements of Material Facts and Omissions**

343.   Merrill Lynch offered or sold Securities to Plaintiff in Massachusetts in 2005, 2006 and 2007 for a total price of $123,888,595.   A full list of these offerings and sales, along

EXHIBIT  53   -619-

with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix F.

344.     Merrill Lynch & Co. sought to compete with its Wall Street peers and to expand its share of the RMBS market by aggressively pursuing subprime lenders including Fremont, WMC, and Option One for the purchase of subprime loans to be pooled and securitized as Securities, offering to pay more for mortgages than competing Wall Street Banks, and offering to perform less due diligence than competitors.

345.     To facilitate the sale of RMBS, Merrill Lynch & Co. formed numerous SPVs including: (1) Depositor Defendant Merrill Lynch Mortgage Investors, Inc., which served as the depositor and issuer for offerings of RMBS; and (2) Merrill Lynch Mortgage Lending, Inc., which acquired residential mortgage loans to be securitized and served as the sponsor in numerous offerings of RMBS.   Defendant Merrill Lynch offered or sold the Securities to Plaintiff.   Merrill Lynch also provided financial research on RMBS and related structured products.

346.     In connection with its offer or sale of Securities to Plaintiff, Merrill Lynch sent numerous documents to Plaintiff in Massachusetts.   These documents included registration statements, prospectuses, and prospectus supplements.   Merrill Lynch also sent Plaintiff numerous other documents, including term sheets, collateral and computational materials, and "loan tapes."   The loan tapes Merrill Lynch sent to Plaintiff consisted of Excel spreadsheets that contained over 60 categories of information related to the individual loans including, inter alia, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.   Merrill Lynch also showed Plaintiff "pitch books" promoting, *inter alia*, the quality of the Securities and Merrill Lynch's due diligence of the Mortgage Originators' underwriting practices.   Merrill Lynch did not allow Plaintiff to keep the pitch books.

347.     In the Offering Documents, Merrill Lynch made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying

EXHIBIT   53   -620-

mortgage loans.  For example, in offerings for which Fremont originated all or a significant amount of the underlying mortgage loans, Merrill Lynch reprinted Fremont's "Underwriting Guidelines," which stated in sum or substance, that (a) Fremont's guidelines were "intended to assess the borrower's ability and willingness of the borrower to repay the debt"; (b) the "mortgage loans [were] underwritten in accordance with Fremont's current underwriting programs"; and (c) exceptions to these guidelines would only be made "on a case-by-case basis . . . based on compensating factors."  *See* ¶ 161.  Merrill Lynch made similar statements of material facts for mortgage loans originated by other Mortgage Originators, including WMC and Option One.  *See* ¶¶ 185, 213.

348.    Moreover, the Offering Documents made statements of material facts regarding the appraisal guidelines and practices of the relevant Mortgage Originators.  Merrill Lynch stated, for example, that "underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal" and that Fremont commissioned appraisals of mortgaged properties by "qualified independent appraisers."  *See* ¶ 161.  Merrill Lynch made similar statements of material facts for appraisals commissioned, performed, or reviewed by other Mortgage Originators, including WMC and Option One.  *See* ¶¶ 185, 213.

349.    In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes," and "pitch books," Merrill Lynch made additional statements of material facts regarding the particular Securities and their underlying data, data quality, Mortgage Originator practices and guidelines applicable to mortgage loans underlying those Securities, and Merrill Lynch's due diligence of the Mortgage Originators' underwriting practices.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flows, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

350.    Merrill Lynch also made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff.  Some of Plaintiff's meetings with Merrill Lynch representatives occurred on or about June 25, 2004 and September 21, 2006.  During these

EXHIBIT  53  -621-

meetings, Merrill Lynch made statements of material facts regarding Merrill Lynch's upcoming RMBS deals, and assured Plaintiff that Merrill Lynch conducted due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines, including by sampling loans in order to check underwriting process, documentation, valuations, and compliance.

351.    Each of the statements of material facts identified above regarding underwriting and appraisal standards were untrue and contained material omissions.  As detailed below, Fremont, Option One, and WMC, the principal Mortgage Originators of loans underlying the Merrill Lynch deals, violated their stated underwriting and appraisal standards.  Moreover, Merrill Lynch's statements of material facts regarding its own due diligence were untrue and contained material omissions.

352.    Merrill Lynch contracted with external firms including Clayton and Bohan to review whether the loans included in the Securities that Merrill Lynch underwrote complied with the Mortgage Originators' stated standards, as discussed in ¶¶ 63-66.

353.    The statements of material facts in the documents Merrill Lynch sent to Plaintiff were untrue because the Mortgage Originators violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards in the absence of the "compensating factors" required by their guidelines. For example, investigations and lawsuits have demonstrated that Fremont made frequent exceptions to its underwriting guidelines for borrowers who would not otherwise qualify for loans; Fremont management encouraged risky loan originations; and Fremont was "operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by [Fremont]."  *See* ¶¶ 165-182.   Moreover, former Fremont employees witnessed firsthand how exceptions to Fremont's underwriting became the "norm" because employees had to do what was necessary to increase loan originations.  *Id.*  The FDIC ultimately issued a Cease & Desist Order to Fremont for extending subprime credit "in an unsafe and unsound manner" and violating laws and FDIC regulations.  *See* ¶¶ 165-166.  The other Mortgage Originators of loans underlying the Merrill Lynch Securities, including Option One and WMC, similarly

EXHIBIT  53  -622-

violated their stated underwriting guidelines in exchange for dramatically increased loan production.  *See* Section V.

354.    The statements of material facts in the documents Merrill Lynch sent to Plaintiff were also untrue because the Mortgage Originators either knew of or participated in the inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.  *See, e.g.*, ¶¶ 51-57.

355.    Merrill Lynch's statements of material facts were also untrue because other material data provided to Plaintiff by Merrill Lynch was untrue.  For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties.  The untruth of this information was material to Plaintiff's analysis of the loan's credit quality and likelihood of default.

356.    Merrill Lynch pressured Mortgage Originators to loosen their underwriting practices in order to generate more loans to be securitized.  For example, a *New York Times* article titled "East Coast Money Lent Out West," dated May 8, 2007, reported that "William D. Dallas, the founder and chief executive of Ownit [Mortgage Solutions, a Mortgage Originator], acknowledges loosening lending standards but says he did so reluctantly and under pressure from his investors, particularly Merrill Lynch [which purchased a 20 percent stake in Ownit in 2005], which wanted more loans to package into lucrative securities.  He recalls being asked to make more 'stated income' loans . . . . The message, he said, was simple: You are leaving money on the table – do more of them."

357.    Among other investigations by various State Attorneys General and the SEC, the New York Attorney General initiated an investigation to determine whether Merrill Lynch concealed information, including the warnings it received about exceptions or mortgages that did not meet minimum lending standards, in an effort to bolster ratings of RMBS and make them more attractive to buyers.  *See* Kate Kelly, Amir Efrati & Ruth Simon, "State Subprime Probe Takes a New Track," *Wall Street Journal*, Jan. 31, 2008.

EXHIBIT  53   -623-

358.     Merrill Lynch is also a defendant in a number of lawsuits which directly relate to its conduct as an underwriter of RMBS.  For example, in December 2008, investors filed a class action alleging violations of the Securities Act of 1933 arising from Merrill Lynch's sale of RMBS using untrue offering documents.  *See Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc., et al.*, 08-cv-10841 (JRS) (S.D.N.Y.).  The consolidated complaint in that action alleges that the Merrill Lynch offering documents contained untrue statements related to (1) the underwriting guidelines used to originate the mortgage loans underlying the Securities; (2) the accuracy of the appraisals for the properties underlying the Securities; (3) the maximum LTV ratios used to qualify borrowers; (4) the debt-to-income ratios permitted on the loans underlying the Securities; and (5) the credit ratings of the Securities.  On June 1, 2010, the District Court denied motions to dismiss the action and sustained Section 11 claims against Merrill Lynch.  Specifically, the Court held that "the alleged repeated deviation from established underwriting standards is enough to render misleading the assertion in the registration statements that underwriting guidelines were generally followed."

359.     As a result of Merrill Lynch's untrue statements of material facts and omissions, the Securities that Merrill Lynch offered or sold to Plaintiff have all been downgraded, and their value has collapsed.  As of June 25, 2010, over 50% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by Merrill Lynch to Plaintiff.

     **h.**     **UBS's Untrue Statements of Material Facts and Omissions**

360.     UBS offered or sold Securities to Plaintiff in Massachusetts during 2005 and 2006 for a total price of $ 55,295,897.  A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix G.

EXHIBIT   53   -624-

361.    UBS was one of the leading underwriters of RMBS.  UBS and its affiliates formed numerous SPVs to facilitate RMBS issuances including: (1) UBS Real Estate Securities Inc., which served as the sponsor and seller for many of UBS's RMBS offerings; and (2) Depositor Defendant Mortgage Asset Securitization Transactions, Inc. ("MASTR"), a wholly owned limited purpose finance subsidiary of UBS, which served as the depositor and issuer for UBS's RMBS offerings.  Defendant UBS offered or sold RMBS to Plaintiff.  UBS also provided financial research on RMBS and related structured products.

362.    In connection with its offer or sale of Securities to Plaintiff, UBS sent numerous documents to Plaintiff in Massachusetts.  These documents included registration statements, prospectuses, and prospectus supplements.  UBS also sent Plaintiff numerous other documents, including term sheets and "loan tapes."  The loan tapes UBS sent consisted of Excel spreadsheets containing dozens of categories of information related to the individual loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  Often, UBS also showed Plaintiff "pitch books" and other materials promoting the quality of the Securities and UBS's due diligence of the Mortgage Originators' underwriting practices.  UBS did not allow Plaintiff to keep the pitch books.

363.    In the Offering Documents, UBS made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans.  For example, in offerings for which Fremont originated all or a significant amount of the underlying mortgage loans, UBS reprinted Fremont's "Underwriting Guidelines," which stated that (a) Fremont's guidelines were "intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan"; (b) "the Fremont mortgage loans were originated in accordance with the[se] underwriting criteria"; and (c) exceptions to these guidelines would only be made "on a case-by-case basis . . . based upon compensating factors."  *See* ¶ 161.  UBS made similar statements of material facts for mortgage loans originated by other Mortgage Originators, including Aames. *See* Section V.

127

EXHIBIT   53   -625-

364.     Moreover, UBS's Offering Documents made statements of material facts regarding the appraisal guidelines and practices of Fremont and the other relevant Mortgage Originators.   UBS stated, for example, that "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal," and that Fremont commissioned appraisals of mortgaged properties by "qualified independent appraisers" who prepared appraisal reports that were reviewed by Fremont.  *See* ¶ 161.  UBS made similar statements of material facts for appraisals commissioned, performed, or reviewed by other Mortgage Originators, including Aames.  *See* Section V.

365.     In the other documents including term sheets, loan tapes, and pitch books UBS sent or showed to Plaintiff, UBS made additional statements of material facts regarding the particular Securities and their underlying data, data quality, and Mortgage Originator practices and guidelines applicable to the loans underlying those Securities.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flows, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

366.     UBS made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff.  Some of Plaintiff's meetings with UBS representatives occurred on or about July 12, July 14, and November 3, 2004; April 11, November 30, and December 5, 2005; May 18, September 28, and November 21, 2006; and March 12, April 11, April 16, July 18, and August 3, 2007.   During these meetings, UBS made statements of material facts regarding upcoming RMBS deals, and assured Plaintiff that UBS conducted due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines.

367.     On March 5, 2008, investors commenced an action against UBS relating to mortgage-related securities purchases.  *Pursuit Partners, LLC v. UBS AG, et al.*, 05-CV-08-4013452 (Conn. Super Ct.).  The plaintiffs in that action alleged that UBS marketed junk Securities as investment-grade.  Between July and October 2007, the plaintiffs in that action purchased more than $50 million of mortgage-related Securities from UBS, and on October 10,

EXHIBIT  53  -626-

2007, the securities were downgraded to junk status.  On September 8, 2009, the Connecticut Superior Court ordered UBS to set aside $35.5 million to cover a potential judgment against it, finding that plaintiffs had "presented sufficient evidence to satisfy the probable cause standard." The court summarized the case as follows: "Through direct and circumstantial evidence, Pursuit has established probable cause to sustain the validity of a claim that the UBS defendants were in possession of material nonpublic information regarding imminent ratings downgrades on the Notes it sold to the Plaintiffs, information UBS withheld from the Plaintiffs."

368.    On February 22, 2010, a pension fund commenced an action against UBS in the United States District Court for the District of New Jersey regarding the issuance of RMBS. *Local 302 & 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust v. Mortgage Asset Securitization Transactions, Inc. et al.*, 10-cv-00898-DMC (D.N.J.).   The pension fund plaintiff in that case alleges that the Offering Documents pursuant to which UBS offered RMBS contained misstatements and material omissions regarding: (1) the underwriting standards pursuant to which the underlying mortgage collateral was originated; (2) the Securities' true investment risk and credit ratings; and (3) the amount and quality of the credit enhancement or credit support.  The plaintiff in that case also alleges that UBS failed to conduct adequate, or in many cases any, due diligence on the mortgage loan applications and mortgaged properties before or during the securitization process.  The mortgage loans underlying the Securities in that case were principally originated by Countrywide and IndyMac Bank, F.S.B. ("IndyMac").

369.    According to a May 12, 2010 article in the *New York Times*, UBS received a subpoena from the New York State Attorney General in connection with an investigation into whether UBS provided untrue information to rating agencies in order to inflate ratings of RMBS.

370.    Each of the statements of material facts identified above made by UBS regarding underwriting and appraisal standards was untrue and contained material omissions.  As detailed below, Fremont and the other Mortgage Originators of loans underlying the UBS Securities systematically violated their stated underwriting and appraisal standards.  Moreover, UBS's

EXHIBIT  53   -627-

statements of material facts regarding its own due diligence were untrue and contained material omissions.

371.    The statements of material facts in the documents UBS sent to Plaintiff were untrue because Fremont and the other relevant Mortgage Originators systematically violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines.   For example, subsequent investigations and lawsuits have demonstrated that Fremont made frequent exceptions to its underwriting guidelines for borrowers who would not otherwise qualify for loans; Fremont management encouraged risky loan originations; and Fremont was "operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by [Fremont]."  *See* ¶¶ 165-182. Moreover, former Fremont employees witnessed firsthand how exceptions to Fremont's underwriting became the "norm" because employees had to do whatever was necessary to increase loan originations.  *Id.*  The FDIC ultimately issued a Cease & Desist Order to Fremont for extending subprime credit "in an unsafe and unsound manner" and violating laws and FDIC regulations.  *See* ¶¶ 165-166.  The other Mortgage Originators of loans underlying the UBS Securities, including Aames, similarly violated their stated underwriting guidelines in order to increase loan volume.  *See* Section V.

372.    The statements of material facts in the documents UBS sent to Plaintiff were also untrue because the appraisals of the mortgaged properties were systematically inflated, which caused the listed LTV ratios and credit enhancement levels to be untrue.  *See, e.g.*, ¶¶ 52-57.

373.    UBS's statements of material facts were also untrue because other material data provided to Plaintiff by UBS was untrue.  For example, the data often identified properties as "owner occupied" when they were really second homes or investment properties.  The untruth of this information was material to Plaintiff's analysis of the loan's credit quality and likelihood of default.  *See* Section V.

EXHIBIT  53  -628-

374.     As a result of the untrue statements of material facts and omissions described above, all of the Securities that UBS offered or sold to Plaintiff have been downgraded, and their value has collapsed.  As of June 25, 2010, over 49% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by UBS to Plaintiff.

### i.     **Goldman Sachs' Untrue Statements of Material Facts and Omissions**

375.     Goldman Sachs offered or sold Securities to Plaintiff in Massachusetts in 2005 and 2006 for a total price of $50,792,745.  A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix H.

376.     Goldman Sachs had several trading desks responsible for purchasing and selling mortgage-related assets, including RMBS.  From 2004 through 2007, Goldman Sachs actively participated in the securitization markets and worked extensively with subprime Mortgage Originators Long Beach, Fremont, and New Century.

377.     To facilitate the sale of RMBS, Goldman Sachs formed numerous SPVs including: (1) Goldman Sachs Mortgage Company, which served as the sponsor for many of Goldman Sachs' offerings; and (2) Depositor Defendant GS Mortgage Securities Corp., which served as the depositor and issuer for Goldman Sachs' offerings.  Goldman Sachs offered or sold the Securities to Plaintiff.  Goldman Sachs also provided financial research on RMBS and related structured products.

378.     In connection with its offer or sale of Securities to Plaintiff, Goldman Sachs sent numerous documents to Plaintiff in Massachusetts.  These documents included registration statements, prospectuses, and prospectus supplements that were, or would become, publicly available when filed with the SEC.  Goldman Sachs also sent Plaintiff other documents, including term sheets and "loan tapes."  The loan tapes Goldman Sachs sent to Plaintiff consisted of Excel spreadsheets that contained over 60 categories of information related to the individual

EXHIBIT  53  -629-

loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  Often, Goldman Sachs also showed Plaintiff "pitch books" and other materials promoting the quality of the Securities and Goldman Sachs' due diligence of the Mortgage Originators' underwriting practices.  Goldman Sachs did not allow Plaintiff to keep the pitch books.

379.   In the Offering Documents, Goldman Sachs made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans.  For example, Long Beach originated all or a significant amount of the underlying mortgage loans in the Goldman Sachs offerings Plaintiff purchased on behalf of the Clients.  In the Offering Documents, Goldman Sachs reprinted Long Beach's "Underwriting Guidelines," which stated that: (1) Long Beach's guidelines were primarily intended to evaluate the prospective borrowers' credit standing and repayment ability as well as the value and adequacy of the mortgaged properties as collateral; (2) appraisals of the mortgaged properties generally conformed to Fannie Mae and Freddie Mac standards; (3) appraisals were generally performed by licensed independent appraisers who had satisfied the loan servicer's appraiser screening process; and (4) exceptions were only granted with the approval of an employee with appropriate "risk level authority" and in the presence of compensating factors.  *See* ¶ 98.

380.   In the other documents sent or shown to Plaintiff, including "term sheets," "loan tapes" and "pitch books," Goldman Sachs made additional statements of material facts regarding the particular Securities and their underlying data, data quality, Long Beach's practices and guidelines, and Goldman Sachs' due diligence of the Mortgage Originators' underwriting practices.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flows, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

381.   The statements of material facts in the documents Goldman Sachs sent to Plaintiff were untrue because Long Beach violated its stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay, and made exceptions to its underwriting standards in the

EXHIBIT  53  -630-

absence of "compensating factors."  Subsequent investigations and lawsuits have demonstrated that Long Beach ignored and made frequent exceptions to its underwriting guidelines.  *See* ¶¶ 102-127.  Moreover, former Long Beach employees witnessed firsthand how variance from Long Beach's stated underwriting standard became the "norm" because employees were incentivized to increase loan volume.  *Id.*  The PSI summed up Long Beach's conduct by stating: "Long Beach…was not a responsible lender.  Its loans and mortgage backed securities were among the worst performing in the subprime industry."  *See* ¶ 102.

382.     The statements of material facts in the documents Goldman Sachs sent to Plaintiff were also untrue because inflated appraisals caused the listed LTV ratios and levels of credit enhancement to be untrue.   *See, e.g.*, ¶¶ 51-57.  An industry insider who testified before the FCIC stated that, in his experience, subprime appraisals were so overvalued that "throwing a dart at a board while blindfolded would've produced more accurate results."   ¶ 52.  Surveys performed in 2007 demonstrated that 90% of appraisers felt pressured to raise property values in order to enable deals to go through.  ¶ 56.

383.     Goldman Sachs' statements of material facts were also untrue because other material data provided to Plaintiff by Goldman Sachs was untrue.  For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties.  The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

384.     Goldman Sachs also made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff.  For example, in connection with the sale of the LBMLT 2005-2 deal, Goldman Sachs stated that in the 18 months before the deal, Long Beach had shifted to significantly higher-quality collateral.  Goldman Sachs also stated to Plaintiff that Long Beach had stopped originating mortgages on mobile homes and that the concentrations of loan balances in the pools below $50,000 were very small.  Plaintiff met with Goldman Sachs representatives on or about April 6 and June 15, 2004.  During these meetings, Goldman Sachs representatives made statements of material facts regarding upcoming RMBS deals, and assured

EXHIBIT  53   -631-

Plaintiff that Goldman Sachs conducted due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines. Among other things, Goldman Sachs stated that its due diligence included sampling loans to check underwriting process, documentation, valuations, and compliance. Specifically, Goldman Sachs repeatedly stated that it performed due diligence on the mortgage loans and to ensure Mortgage Originator compliance with stated underwriting standards.

385. Goldman Sachs' oral statements of material facts were untrue for the same reasons listed in ¶ 381, above. Moreover, the statements of material facts were untrue because Goldman Sachs failed to conduct adequate due diligence on the Mortgage Originators and the mortgage loans underlying the Securities in accordance with its statements.

386. The PSI investigated Goldman Sachs and concluded that from 2004 to 2007, Goldman Sachs "helped lenders like Long Beach, Fremont, and New Century, securitize high risk, poor quality loans, obtain favorable credit ratings for the resulting [RMBS], and sell the [RMBS] to investors, pushing billions of dollars of risky mortgages into the financial system."

387. The PSI specifically profiled Goldman Sachs' relationship with Long Beach, which originated all the mortgages in the LBMLT 2005-2 deal Plaintiff purchased on behalf of the Clients. A PSI exhibit showed that WaMu (Long's Beach's parent company), Long Beach, and Goldman Sachs collaborated on at least $14 billion in loan sales and securitizations. The PSI also stated that in 2005 and 2006, Long Beach's RMBS were among the worst performing in the market.

388. The PSI highlighted one example of how Goldman Sachs securitized Long Beach mortgage loans, despite the fact that Long Beach was "one of the nation's worst mortgage lenders." In May 2006, Goldman Sachs, along with its co-lead underwriter WaMu, sold $495 million in Securities backed by Long Beach loans. In less than a year, delinquencies and defaults on the underlying loans began to skyrocket. By May 2007, the cumulative net loss on the underlying mortgage pool was over 12 percent, erasing the deal's loss protection and causing downgrades of 6 out of 7 of the mezzanine tranches. By May 2008 – only two years later – even

EXHIBIT 53  -632-

the AAA securities in the May 2006 deal had been downgraded to "default," and by March 2010 the securities had recorded a cumulative net loss of over 66 percent.

389.    Massachusetts Attorney General Martha Coakley recently investigated Goldman Sachs' role in securitizing loans in the Commonwealth.  The investigation examined whether Goldman Sachs engaged in the following practices:

- Failing to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;

- Failing to take sufficient steps to avoid placing problem loans in securitization pools;

- Failing to correct inaccurate information in securitization trustee reports concerning repurchases of loans; and

- Failing to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan due diligence and the pre-securitization process, as well as information concerning Goldman Sachs' practices in making repurchase claims relating to loans both in and out of securitizations.

390.    On May 7, 2009, Goldman Sachs entered into a settlement agreement with the Massachusetts Attorney General in order "[t]o resolve any potential claims stemming from the Attorney General's investigation . . . ."  Under the agreement, among other things, Goldman Sachs paid $10 million to the Commonwealth.

391.    As a result of the untrue statements of material facts and omissions described above, the Securities that Goldman Sachs offered or sold to Plaintiff have all been downgraded, and their value has collapsed.  As of June 25, 2010, 50% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by Goldman Sachs to Plaintiff.

### j.      J.P. Morgan's Untrue Statements of Material Facts and Omissions

392.    J.P. Morgan offered or sold Securities to Plaintiff in Massachusetts in 2005 and 2006 for a total price of $41,802,784.  A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage

EXHIBIT  53   -633-

Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix I.

393.    J.P. Morgan, seeking to compete with its Wall Street peers, formed numerous entities to facilitate the sale of RMBS, including: (1) J.P. Morgan Chase Bank ("Chase Bank"), which originated various types of mortgage loans to various types of borrowers, and also acted as the servicers of the mortgage loans following their securitization; (2) Depositor Defendant J.P. Morgan Acceptance Corporation I, which served as the depositor and issuer for offerings of RMBS; and (3) J.P. Morgan Mortgage Acquisition Corporation, which acquired residential mortgage loans to be securitized and served as the sponsor in numerous offerings of RMBS. Defendant J.P. Morgan offered or sold the Securities to Plaintiff.  J.P. Morgan also provided financial research on RMBS and related structured products.

394.    In connection with its offer or sale of Securities to Plaintiff, J.P. Morgan sent numerous documents to Plaintiff in Massachusetts.  These documents included registration statements, prospectuses, and prospectus supplements.  J.P. Morgan also sent Plaintiff numerous other documents, including term sheets, collateral and computational materials, and "loan tapes." The loan tapes J.P. Morgan sent to Plaintiff consisted of Excel spreadsheets that contained over 60 categories of information related to the individual loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  J.P. Morgan also showed Plaintiff "pitch books" promoting, *inter alia*, the quality of the Securities and J.P. Morgan's due diligence of the Mortgage Originators' underwriting practices. J.P. Morgan did not allow Plaintiff to keep the pitch books.

395.    In the Offering Documents, J.P. Morgan made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans.  For example, in offerings for which Option One originated all or a significant amount of the underlying mortgage loans, J.P. Morgan reprinted Option One's "Underwriting Guidelines," which stated that (a) Option One's guidelines were "intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage

EXHIBIT   53   -634-

loan and to assess the applicant's ability to repay the mortgage loan"; (b) the "Mortgage Loans [were] originated generally in accordance with Option One's [Underwriting] Guidelines"; and (c) exceptions to these guidelines would only be made "on a case-by-case basis . . . where compensating factors exist."  *See*, ¶ 213.   The Offering Documents for Securities that J.P. Morgan offered or sold to Plaintiff made similar statements of material facts regarding mortgage loans originated by Countrywide, WMC, Chase Bank and Fieldstone Mortgage Company ("Fieldstone").  *See* Section V.

396.   Moreover, the Offering Documents for Securities that J.P. Morgan offered or sold to Plaintiff contained statements of material facts regarding appraisal guidelines and practices. For example, the Offering Documents for the JPMAC 2006-CW2 Trust stated that Countrywide's underwriting standards "require an independent appraisal of the mortgaged property" and the Offering Documents for the JPMAC 2005-WMC1 stated that WMC's underwriting standards required an appraisal of the mortgaged property "which conforms to Uniform Standards of Professional Appraisal Practice."  The Offering Documents made similar statements of material facts regarding appraisals for loans originated by Option One, Chase Bank and Fieldstone.  *See* Section V.

397.   In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes," and "pitch books," J.P. Morgan made additional statements of material facts regarding the particular Securities and their underlying data, Mortgage Originator practices and guidelines, and J.P. Morgan's due diligence of those practices and guidelines.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flows, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

398.   J.P. Morgan also made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff.   Some of Plaintiff's meetings with J.P. Morgan representatives occurred on or about April 13, April 28, September 29, and November 7, 2005, and May 3 and November 7, 2006.  During these meetings, J.P. Morgan made statements of material facts regarding J.P. Morgan's upcoming RMBS deals and assured Plaintiff that J.P.

EXHIBIT  53  -635-

Morgan conducted due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines, including by sampling loans to check underwriting process, documentation, valuations, and compliance.

399.    Each of the statements of material facts identified above regarding underwriting and appraisal standards were untrue and contained material omissions.  Option One, WMC, Countrywide, Chase Bank, and Fieldstone, the principal Mortgage Originators of loans underlying the J.P. Morgan deals, violated their stated underwriting and appraisal standards. Moreover, J.P. Morgan's statements of material facts regarding its own due diligence were untrue and contained material omissions.

400.    The statements of material facts in the documents J.P. Morgan sent to Plaintiff were untrue because the Mortgage Originators violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards in the absence of the "compensating factors" required by their guidelines. For example, the Massachusetts Attorney General brought a lawsuit against Option One charging that the company "increasingly disregard[ed] underwriting standards, creat[ed] incentives for loan officers and brokers to disregard the interests of the borrowers and steer them into high-cost loans, and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market."  The other Mortgage Originators of loans underlying the J.P. Morgan Securities, WMC, Countrywide, Chase Bank and Fieldstone, similarly violated their stated underwriting guidelines in an effort to increase loan production.  *See* Section V.

401.    The statements of material facts in the documents J.P. Morgan sent to Plaintiff were also untrue because the Mortgage Originators either knew of or participated in the inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.  *See, e.g.*, ¶¶ 51-57.

EXHIBIT  53  -636-

402.     J.P. Morgan's statements of material facts were also untrue because other material data provided to Plaintiff by J.P. Morgan was untrue.  For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties.  The untruth of this information was material to Plaintiff's analysis of the loan's credit quality and likelihood of default.

403.     According to a May 13, 2010 Reuters news article, the SEC and "U.S. prosecutors are conducting a broad criminal investigation of six major Wall Street Banks, including J.P. Morgan" about whether they misled investors about mortgage-securities deals.

404.     As a result of J.P. Morgan's untrue statements of material facts and omissions, the Securities that J.P. Morgan offered or sold to Plaintiff have all been downgraded, and their value has collapsed.  As of June 25, 2010, over 45% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by J.P. Morgan to Plaintiff.

### k.     Countrywide's Untrue Statements of Material Facts and Omissions

405.     Countrywide offered or sold Securities to Plaintiff in Massachusetts in 2005 and 2006 for a total price of $93,807,045.  A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix K.

406.     As one of the nation's largest subprime Mortgage Originators, Countrywide Financial was able to buy and sell vast amounts of subprime loans which were pooled and securitized as Securities.  In 2005 and 2006 alone, Countrywide Financial originated in excess of $850 billion in home loans throughout the United States.

407.     Through its affiliates and subsidiaries, Countrywide Financial was able to control nearly every step in the mortgage securitization process.  To facilitate the sale of RMBS, Countrywide Financial formed numerous SPVs including: (1) Depositor Defendants CWABS, Inc. and CWALT, Inc., which served as the depositors and issuers for offerings of Securities; and

EXHIBIT   53   -637-

(2) Countrywide Home Loans, Inc. ("Countrywide Home"), which originated or otherwise acquired residential mortgage loans to be securitized and served as the sponsor in numerous offerings of Securities. Defendant Countrywide offered or sold Securities containing loans originated by these SPEs to Plaintiff.  Countrywide also offered or sold to Plaintiff Securities containing loans originated by other mortgage originators such as Aames Investment Corporation.  Countrywide also provided financial research on RMBS and related structured products.

408.    In connection with its offer or sale of Securities to Plaintiff, Countrywide sent numerous documents to Plaintiff in Massachusetts.  These documents included registration statements, prospectuses, and prospectus supplements, and other documents that were, or would become, publicly available when filed with the SEC.  Countrywide also sent Plaintiff numerous other documents, including term sheets, loan tapes, collateral tables, and summaries of loans reports.  The "loan tapes" Countrywide sent to Plaintiff consisted of Excel spreadsheets that contained over 100 categories of information related to the individual loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  Countrywide also showed Plaintiff "pitch books" promoting, *inter alia*, the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting the Securities, the data, and Countrywide's due diligence of the Mortgage Originators' underwriting practices.  Countrywide did not allow Plaintiff to keep the pitch books.

409.    In the Offering Documents, Countrywide made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans.  For example, in offerings for which Countrywide Home originated all or a significant amount of the underlying mortgage loans, Countrywide reprinted Countrywide Home's "Underwriting Guidelines," which stated, in sum or substance, that (a) Countrywide Home's guidelines were "intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability"; (b) Countrywide Home reviewed not only the value of the property, but also considered

140

EXHIBIT  53  -638-

"applicant's assets, liabilities, income and employment history, as well as certain other personal information"; (c) the mortgage loans were originated in accordance with the underwriting guidelines; and (d) exceptions to these guidelines would only be made "[o]n a case by case basis . . . based upon compensating factors."  CWL 2005-11 Prospectus Supplement.   Countrywide made similar statements with respect to loans originated by other mortgage originators, including Aames Home Loan.

410.   Moreover, the Offering Documents made statements of material facts regarding the Mortgage Originators' appraisal guidelines.  Countrywide stated, for example, that the Mortgage Originators commissioned appraisals by qualified independent appraisers who prepared appraisals that conformed to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation.

411.   In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes," and "pitch books," Countrywide made additional statements of material facts regarding the particular Securities and their underlying data, data quality, Mortgage Originator practices and guidelines applicable to the loans underlying those Securities, and Countrywide's due diligence of the Mortgage Originators' underwriting practices.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flow, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

412.   Countrywide also made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff.  For example, on April 4, 2006, Plaintiff made a due diligence visit to Countrywide's offices to meet with Countrywide's origination and servicing staff.  During these meetings, Countrywide representatives made statements of material facts regarding Countrywide's upcoming RMBS deals, and assured Plaintiff that Countrywide conducted due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines, including by sampling loans in order to check underwriting process, documentation, valuations, and compliance.

EXHIBIT  53  -639-

413.    Each of the statements of material facts identified above regarding underwriting and appraisal standards were untrue and contained material omissions.  The principal Mortgage Originators in the Countrywide deals systematically violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines, and either knew of or participated in the inflated appraisals of the mortgaged properties.    Moreover, Countrywide's additional statements of material facts regarding its own due diligence were untrue and contained material omissions.

414.    Countrywide's statements of material facts were also untrue because other material data provided to Plaintiff by Countrywide was untrue.  For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties.  The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

415.    Countrywide Financial's lending practices, including the subjects of the untrue statements of material facts and omissions in the Offering Documents, are currently the target of multiple state and federal investigations and proceedings.  Various State Attorneys General, including those from Massachusetts, California, Connecticut, Illinois, Florida, and Indiana, have brought lawsuits or initiated investigations against Countrywide based on its lending, underwriting, and appraisal practices for mortgage loans.

416.    On March 24, 2010, Massachusetts Attorney General Coakley filed a Complaint and Final Judgment by Consent against Countrywide's parent, Countrywide Financial Corporation, and its affiliates Countrywide Home Loans, Inc., Countrywide Mortgage Ventures LLC, and Full Spectrum Lending, Inc.  The Attorney General's Complaint alleged that:

> During 2006 and 2007, Countrywide was the largest lender in Massachusetts and the nation and the largest subprime lender in Massachusetts. In originating residential mortgage loans in Massachusetts from 2005 to 2007 ("loans"), Countrywide engaged in unfair loan origination practices including approving risk-layered loans that, at times, led to predictable borrower "payment shock" -- that is, a significant increase in a borrower's payment based on changes to the

EXHIBIT   53   -640-

calculation of a monthly payment, frequently attributable to a change in interest rate for an adjustable rate mortgage ("ARM") or the deferral of the payment of principal on interest only or Pay Option ARMs. When originating these loans, Countrywide knew or should have known that a substantial number of its borrowers could not reasonably repay these loans according to the loans' terms and that the loans would be subject to predictable delinquency and default.

417.   The Attorney General's Complaint quotes emails sent by the Chairman of Countrywide, Angelo Mozilo, in March and April 2006 in which Mozilo referred to Countrywide's 100% LTV subprime loans as "the most dangerous product in existence and there can be nothing more toxic," and "[i]n all my years in the business, I have never seen a more toxic pr[o]duct."  Despite Mozilo's awareness in early 2006 that such loans were toxic, the Attorney General's Complaint alleges that Countrywide continued to make such loans through 2007 and into 2008.

418.   The Attorney General's settlement with Countrywide Financial Corporation, in combination with settlements by other State Attorneys General, provides for $18 million in loan modifications for Massachusetts homeowners, $3 billion in loan modifications for homeowners across the country, and a $4.1 million payment by Countrywide Financial Corporation to the Commonwealth.

419.   Countrywide's underwriting standards are also the subject of an investigation by the Federal Bureau of Investigation ("FBI"), which was first reported on March 8, 2008 by *The Wall Street Journal* in an article entitled "FBI Investigates Countrywide – U.S. Scrutinizes Filings on Financial Strength, Loan Quality for Fraud." The FBI investigation is focused on "whether company officials made misrepresentations about the company's financial position and the quality of its mortgage loans in securities filings."

420.   On March 11, 2008, the *Wall Street Journal* published another article detailing the FBI's investigation of Countrywide's lending practices.  According to the sources interviewed by the *Wall Street Journal*, federal investigators found that "Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients, according to people involved in the matter. The company packaged many of those mortgages into securities

143

EXHIBIT  53   -641-

and sold them to investors, raising the additional question of whether Countrywide understated the risks such investments carried."

421.   As a result of the untrue statements of material facts and omissions described above, the Securities that Countrywide offered or sold to Plaintiff have all been downgraded, and their value has collapsed.  As of June 25, 2010, over 57% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by Countrywide to Plaintiff.

### l.   FBR's Untrue Statements of Material Facts and Omissions

422.   FBR offered or sold Securities to Plaintiff in Massachusetts in 2005 for a total price of $22,149,863.  A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix L.

423.   FBR sought to expand its share of the RMBS market by aggressively pursuing subprime mortgage originators including Aames, offering to pay more for their mortgages than competing Wall Street Banks, and offering to perform less due diligence than competitors.  In an effort to expand its subprime origination, servicing, and securitization business, FBR acquired First NLC Financial Services, a mortgage originator headquartered in Florida, in 2005.

424.   To facilitate the sale of RMBS, FBR formed SPVs, including Depositor Defendant FBR Securitization, Inc., which served as the depositor and issuer for many of FBR's offerings. FBR offered or sold the Securities to Plaintiff.  FBR also provided financial research on RMBS and related structured products.

425.   In connection with its offer or sale of Securities to Plaintiff, FBR sent numerous documents to Plaintiff in Massachusetts.  These documents included registration statements, prospectuses, and prospectus supplements.  FBR also sent Plaintiff numerous other documents, including term sheets, private placement term sheets, confidential offering memoranda, computational materials, collateral terms sheets, and "loan tapes."  The loan tapes FBR sent to

EXHIBIT  53   -642-

Plaintiff consisted of Excel spreadsheets that contained over 60 categories of information related to the individual loans including, *inter alia*, the data, the mortgage originators' underwriting practices and guidelines for the mortgages supporting the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.   FBR also showed Plaintiff "pitch books" promoting, *inter alia*, the mortgage originators' underwriting practices and guidelines for the mortgages supporting the Securities, the data, and FBR's due diligence of the mortgage originators' underwriting practices.   FBR did not allow Plaintiff to keep the pitch books.

426.   In the Offering Documents, FBR made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans.   For example, in an offering for which Aames originated all of the underlying mortgage loans, FBR stated, in sum or substance, that (a) Aames' guidelines were intended to assess the borrower's ability and willingness to repay the debt; (b) the mortgage loans underwritten in accordance with Aames' underwriting standards; and (c) exceptions to these standards would only be made on a case-by-case basis based on compensating factors.   FBR made similar statements of material facts for mortgage loans originated by other mortgage originators.

427.   Moreover, the Offering Documents made statements of material facts regarding the relevant mortgage originators' compliance with their appraisal guidelines.

428.   In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes," and "pitch books," FBR made additional statements of material facts regarding the particular Securities and their underlying data, data quality, and mortgage originator practices and guidelines applicable to mortgage loans underlying those Securities.   This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flow, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

429.   FBR also made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff in meetings, some of which were at Plaintiff's offices in Concord,

EXHIBIT   53   -643-

Massachusetts on or about August 9 and 11, 2004.  Among other things, FBR stated that it retained Clayton to conduct due diligence for credit, compliance, and appraisals on 100% of the loans in FBRSI 2005-5, a securitization for which Aames originated all the loans.

430.    Each of the statements of material facts identified above regarding underwriting and appraisal standards were untrue and contained material omissions.  The mortgage originators in the FBR deals systematically violated their stated underwriting and appraisal standards. Moreover, FBR's additional statements of material facts regarding its own due diligence were untrue and contained material omissions.

431.    The statements of material facts in the documents FBR sent to Plaintiff were untrue because the mortgage originators systematically violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines.

432.    The statements of material facts in the documents FBR sent to Plaintiff were also untrue because of the inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.

433.    FBR's statements of material facts were also untrue because other material data provided to Plaintiff by FBR was untrue.  For example, the data incorrectly identified properties as "owner occupied" when they were really second homes or investment properties.  The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

434.    As a result of FBR's untrue statements of material facts and omissions, the Securities that FBR offered or sold to Plaintiff  have all been downgraded, and their value has collapsed.  As of June 25, 2010, over 47% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by FBR to Plaintiff.

EXHIBIT   53   -644-

**m.**   **HSBC's Untrue Statements of Material Facts and Omissions**

435.   HSBC offered or sold Securities to Plaintiff in Massachusetts in 2005 and 2006 for a total price of $64,313,293.  A full list of these offerings and sales, including the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix M.

436.   To facilitate the sale of RMBS, HSBC formed other special-purpose entities including Depositor Defendant HSI Asset Securitization Corporation, which acquired residential mortgage loans to be securitized and served as the depositor and issuer in numerous offerings of RMBS.  The Defendant HSBC offered or sold the Securities to Plaintiff.  HSBC also provided financial research on RMBS and related structured products.

437.   In connection with its offer or sale of Securities to Plaintiff, HSBC sent numerous documents to Plaintiff in Massachusetts.  These documents included registration statements, prospectuses, and prospectus supplements and, for FFML 2006-FF5, a Confidential Offering Memorandum, prospectus, and prospectus supplement.   HSBC also sent Plaintiff other documents, including term sheets and "loan tapes."  The loan tapes HSBC sent to Plaintiff consisted of Excel spreadsheets that contained over 60 categories of information related to the individual loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  HSBC also showed Plaintiff "pitch books" promoting, *inter alia*, the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting Securities, the data, and HSBC's due diligence of the Mortgage Originators' underwriting practices.  HSBC did not allow Plaintiff to keep the pitch books.

438.   This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flows, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

439.   As discussed further below, the Offering Documents and other documents provided by HSBC to Plaintiff contained statements of material facts regarding underwriting and

EXHIBIT  53   -645-

appraisal standards applicable to the mortgage loans underlying the Securities.  These statements of material facts were untrue and contained material omissions.  As detailed below, the principal Mortgage Originators of loans underlying the HSBC deals violated their stated underwriting and appraisal standards.

440.    HSBC's statements of material facts were also untrue because other material data provided to Plaintiff by HSBC was untrue.  For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties. The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

441.    HSBC met with Plaintiff on or about December 5, 2005 and November 22, 2006. During the meetings, HSBC reiterated many of the statements of material facts in the documents provided to Plaintiff.  In addition, HSBC stated that HSBC conducted due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines, including by sampling loans in order to check underwriting process, documentation, valuations, and compliance.

442.    These oral statements of material facts were untrue for the same reasons listed in ¶¶ 446-47.   In addition, the statements of material facts were untrue because HSBC failed to conduct adequate due diligence on the Mortgage Originators and the mortgage loans underlying the Securities in accordance with its statements.

### 1.    HASC 2005-NC2

443.    The HASC 2005-NC2 Securities were offered or sold to Plaintiff pursuant to a Registration Statement, a Prospectus Supplement, and a term sheet, and the M-10 class of HASC 2005-NC2 Securities was also offered or sold to Plaintiff pursuant to a private placement agreement.

444.    In the Offering Documents, HSBC made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans, most of which were originated by New Century.  For example, HSBC reprinted

EXHIBIT  53   -646-

New Century's "Underwriting Guidelines," which stated, in sum or substance, that (a) New Century's guidelines were "intended to assess the borrower's ability to repay the mortgage loan"; (b) New Century reviewed not only the value of the property, but also considered "the mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type of use of the mortgaged property"; (c) "the mortgage loans [were] originated in accordance with the underwriting guidelines"; and (d) exceptions to these guidelines would only be made "on a case-by-case basis . . . where compensating factors exist." *See* ¶ 76.   HSBC made similar statements of material facts for Mortgage Loans originated by other Mortgage Originators.

445.   Moreover, the Offering Documents made statements of material facts regarding the appraisal guidelines and practices of the relevant Mortgage Originators.  HSBC stated, for example, that New Century commissioned appraisals of mortgaged properties by "qualified independent appraisers" who prepared appraisal reports that were "required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are on forms acceptable to Fannie Mae and Freddie Mac," and that were reviewed "by a qualified employee" of New Century or by an appraiser retained by New Century.   *See* ¶ 78.   HSBC made similar statements of material facts for appraisals commissioned, performed, or reviewed by other Mortgage Originators.

446.   The statements of material facts in the documents HSBC sent to Plaintiff were untrue because the Mortgage Originators violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines.  For example, subsequent investigations and lawsuits have demonstrated that New Century made frequent exceptions to its underwriting guidelines for borrowers who would not otherwise qualify for loans; New Century management "turned a blind eye" to risky loan originations; and "New Century engaged in a number of significant improper and imprudent practices related to its loan originations." *See* ¶¶ 82-95.   Moreover, former New Century employees witnessed firsthand how exceptions to New Century's underwriting became the "norm" because employees

EXHIBIT   53   -647-

had to do what was necessary to increase loan originations.  *See* ¶¶ 89-91.  The SEC has recently charged former New Century officers with making untrue assurances to the market about the company's "adhere[nce] to high origination standards in order to sell [its] loan products in the secondary market."  *See* ¶ 93.  The other Mortgage Originators underlying the HSBC Securities similarly violated their stated underwriting guidelines in exchange for dramatically increased loan production.

447.   The statements of material facts in the documents HSBC sent to Plaintiff were also untrue because the Mortgage Originators either knew of or participated in the inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.   *See, e.g.*, ¶¶ 51-57.  A former New Century underwriter recently confirmed New Century's use of inflated appraisals in testimony before the FCIC, stating that New Century hired fee appraisers who were "pressured" into inflating property values, at times by tampering with the property, "fearing if they didn't, they would lose future business and their livelihoods."  ¶ 54.   Another industry insider testified before the FCIC that, in his experience, subprime appraisals were so overvalued that "throwing a dart at a board while blindfolded would've produced more accurate results."  ¶ 52.  Surveys performed in 2007 demonstrated that 90% of appraisers felt pressured to raise property values in order to enable deals to go through. ¶ 56.

### 2.   FFML 2006-FF5

448.   In the Offering Documents for FFML 2006-FF5, HSBC made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans, substantially all of which were originated by First Franklin, a division of National City Bank of Indiana ("First Franklin"), and were sold by First Franklin to its affiliate First Franklin Financial Corporation (the "Mortgage Loan Seller"), which in turn sold the mortgage loans to HSBC to be securitized.

449.   HSBC stated that First Franklin originated the mortgage loans in accordance with the underwriting criteria described in the Offering Documents, which stated that:

EXHIBIT  53   -648-

The Mortgage Loan Seller's acquisition underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The standards established by the Mortgage Loan Seller require that the mortgage loans of a type similar to the Mortgage Loans were underwritten by the third party originators [*i.e.*, primarily First Franklin] with a view toward the resale of the mortgage loans in the secondary mortgage market. In accordance with the Mortgage Loan Seller's guidelines for acquisition, the third party originators must consider, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio ("Debt Ratio"), as well as the value, type and use of the mortgaged property.

*   *   *   *

In accordance with the Mortgage Loan Seller's guidelines for acquisition, all of the mortgage loans of a type similar to the Mortgage Loans were required to be underwritten by the third party originator's underwriters having the appropriate signature authority. Each underwriter is granted a level of authority commensurate with their proven judgment, maturity and credit skills. On a case by case basis, a third party originator may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at S-42 the applicant's current address. It is expected that a substantial portion of the Mortgage Loans may represent such underwriting exceptions.

450.   Moreover, the Offering Documents made statements of material facts regarding

First Franklin's appraisal guidelines and practices.  HSBC stated, for example, that:

In accordance with the Mortgage Loan Seller's guidelines for acquisition, the third party originators [i.e., primarily First Franklin] are required to comply with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards; and if appropriate, a review appraisal. Generally, appraisals are provided by appraisers approved by the Mortgage Loan Seller. Review appraisals may only be provided by appraisers approved by the Mortgage Loan Seller. In some cases, the third party originator may rely on a statistical appraisal methodology provided by a third party.

Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with the third party originators. Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review

EXHIBIT  53  -649-

appraisal may be an enhanced desk, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises.

451.    The statements of material facts in the documents HSBC sent to Plaintiff were untrue because First Franklin violated its stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to its underwriting standards absent the "compensating factors" required by the guidelines.

452.    The statements of material facts in the documents HSBC sent to Plaintiff were also untrue because of inflated appraisals for the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.  CW 63, a Corporate Underwriter at First Franklin from 2006 until June 2007 who audited appraisals, estimated that one in four appraisals reviewed at First Franklin was inflated. CW 63 stated that most lenders maintained blacklists for appraisers who submitted appraisals with inflated values or unsupported comparables.  First Franklin, however, maintained no such lists.  Frequently CW 63 rejected loans with overinflated appraisals, only to have them approved by managers.

453.    In December 2006, Merrill Lynch purchased First Franklin from National City Corporation ("National City") for $1.3 billion.  In April 2007, National City received a dispute notice from Merrill Lynch asserting that the closing date net asset values and related purchase price were overstated by $67 million.  Merrill Lynch's dispute notice alleged that National City had breached representations or warranties concerning First Franklin's alleged losses associated with its obligation to repurchase defective loans.  In May 2008, Merrill Lynch announced that it would stop funding loans at First Franklin and explore selling the company.  Thereafter, in June 2008, National City was notified that the SEC was investigating National City, and the SEC requested documents concerning National City's loan underwriting experience and the sale of First Franklin.  In November 2008, after Bank of America had agreed to acquire Merrill Lynch, Bank of America determined that Merrill Lynch would have to take a goodwill charge of $2.3 billion, due in part to the failure of First Franklin.

EXHIBIT  53   -650-

454.    As a result of the untrue statements of material facts and omissions described above, the Securities that HSBC offered or sold to Plaintiff have all been downgraded, and their value has collapsed.   As of June 25, 2010, over 46% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.   Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by HSBC to Plaintiff.

### n.    Banc of America's Untrue Statements of Material Facts and Omissions

455.    Banc of America Securities, LLC offered or sold Securities to Plaintiff in Massachusetts in 2005 and 2006 for a total price of $50,407,959.   A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix N.

456.    Banc of America sought to expand its share of the mortgage securities market by aggressively pursuing subprime Mortgage Originators including Option One, Accredited, and GMAC Mortgage, offering to pay more for their mortgages than competing Wall Street Banks, and offering to perform less due diligence than competitors.   Option One was one of the the largest Mortgage Originators in the Banc of America Securities.

457.    To facilitate the sale of mortgage-backed securities, Banc of America's parent company formed SVPs, including Depositor Defendants Asset Backed Funding Corporation ("ABFC") and Banc of America Mortgage Securities, Inc., which served as the depositors and issuers for many of its offerings. Banc of America offered or sold the Securities to Plaintiff. Banc of America also provided financial research on RMBS and related structured products.

458.    In connection with its offer or sale of Securities to Plaintiff, Banc of America sent numerous documents to Plaintiff in Massachusetts.   These documents included registration statements, prospectuses, and prospectus supplements.   Banc of America also sent Plaintiff numerous other documents, including term sheets, private placement term sheets, confidential offering memoranda, computational materials, collateral terms sheets, and "loan tapes."   The

EXHIBIT   53   -651-

loan tapes Banc of America sent to Plaintiff consisted of Excel spreadsheets that contained over 60 categories of information related to the individual loans including, *inter alia*, the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  Banc of America also showed Plaintiff "pitch books" promoting, *inter alia*, the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting the Securities, the data, and Banc of America's due diligence of the Mortgage Originators' underwriting practices.  Banc of America did not allow Plaintiff to keep the pitch books.

459.    In the Offering Documents, Banc of America made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans.  For example, in offerings for which Option One originated all or a significant amount of the underlying mortgage loans, Banc of America reprinted Option One's "Underwriting Guidelines," which stated that (a) Option One's guidelines were "intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan"; (b) the "Mortgage Loans [were] originated generally in accordance with Option One's [Underwriting] Guidelines"; and (c) exceptions to these guidelines would only be made "on a case-by-case basis . . . where compensating factors exist."  *See*, ¶ 213.   Banc of America made similar statements of material facts for mortgage loans originated by other mortgage originators, including Accredited and GMAC Mortgage.  *See* Section V.

460.    Moreover, the Offering Documents made statements of material facts regarding the appraisal guidelines and practices of the relevant Mortgage Originators.  Banc of America stated, for example that Option One's guidelines required that "[a]ll appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac," and that Option One commissioned an appraisal of mortgaged properties by "qualified independent appraisers" and "require[d] that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations

EXHIBIT  53   -652-

and require Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal, supports the loan balance." *See* ¶ 213.  Banc of America made similar statements of material facts for appraisals commissioned, performed, or reviewed by other mortgage originators, including Accredited and GMAC Mortgage.  *See* Section V.

461.   In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes," and "pitch books," Banc of America made additional statements of material facts regarding the particular Securities and their underlying data, data quality, and Mortgage Originator practices and guidelines applicable to the mortgage loans underlying those Securities. This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flow, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

462.   Banc of America also made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff in calls and meetings, some of which took place in Plaintiff's Massachusetts offices.   Some of Plaintiff's meetings with Banc of America representatives occurred on or about September 15, 2004; April 4, June 2, November 28, November 29, and December 5, 2005; January 2, January 31, May 23, and October 10, 2006; and January 4, 2007.   During these meetings, Banc of America's employees made statements of material facts regarding Banc of America's upcoming RMBS deals, and assured Plaintiff that Banc of America conducted its own due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines, including by sampling loans in order to check underwriting process, documentation, valuations, and compliance.

463.   Each of the statements of material facts identified above regarding underwriting and appraisal standards were untrue and contained material omissions.   As detailed above, Option One, the principal Mortgage Originator in the Banc of America deals, systematically violated its stated underwriting and appraisal standards.   Moreover, Banc of America's additional statements of material facts regarding its own due diligence were untrue and contained material omissions.

EXHIBIT  53   -653-

464.    The statements of material facts in the documents Banc of America sent to Plaintiff were untrue because the Mortgage Originators systematically violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines.  For example, a subsequent lawsuit brought by the Attorney General for the Commonwealth of Massachusetts against Option One, and its past and present parent companies, alleged that Option One "increasingly disregard[ed] underwriting standards, creat[ed] incentives for loan officers and brokers to disregard the interests of the borrowers and steer them into high-cost loans, and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market."  The other Mortgage Originators of loans underlying the Banc of America Securities, including Accredited and GMAC Mortgage, similarly violated their stated underwriting guidelines in exchange for dramatically increased loan production.

465.    The statements of material facts in the documents Banc of America sent to Plaintiff were also untrue because the Mortgage Originators either knew of or participated in the inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.  *See, e.g.*, ¶¶ 51-57.

466.    Banc of America's statements of material facts were also untrue because other material data provided to Plaintiff by Banc of America was untrue.  For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties.  The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

467.    As a result of Banc of America's untrue statements of material facts and omissions, the Securities that Banc of America offered or sold to Plaintiff have all been downgraded, and their value has collapsed.  As of June 25, 2010, over 42% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or

EXHIBIT  53   -654-

repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by Banc of America to Plaintiff.

### o.    GMAC's Untrue Statements of Material Facts and Omissions

468.    GMAC offered or sold Securities to Plaintiff in Massachusetts in 2005 and 2006 for a total price of $11,350,513.  A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix O.

469.    GMAC sought to expand its share of the RMBS market by aggressively pursuing subprime mortgage originators, offering to pay more for their mortgages than competing Wall Street Banks, and offering to perform less due diligence than competitors.

470.    To facilitate the sale of RMBS, GMAC formed SPVs, including Depositor Defendants Residential Asset Securities Corporation ("RASC"), Residential Accredit Loans, Inc., and Residential Asset Mortgage Products Inc. ("RAMP"), which served as the depositors and issuers for many of GMAC's offerings. GMAC offered or sold the Securities to Plaintiff. GMAC also provided financial research on RMBS and related structured products.

471.    In connection with its offer or sale of Securities to Plaintiff, GMAC sent numerous documents to Plaintiff in Massachusetts.  These documents included registration statements, prospectuses, and prospectus supplements.  GMAC also sent Plaintiff numerous other documents, including term sheets, private placement term sheets, confidential offering memoranda, computational materials, collateral terms sheets, and "loan tapes."  The loan tapes GMAC sent to Plaintiff consisted of Excel spreadsheets that contained over 60 categories of information related to the individual loans including, *inter alia*, the data, the mortgage originators' underwriting practices and guidelines for the mortgages supporting the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  GMAC also showed Plaintiff "pitch books" promoting, *inter alia*, the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting the Securities,

EXHIBIT  53   -655-

the data, and GMAC's due diligence of the Mortgage Originators' underwriting practices. GMAC did not allow Plaintiff to keep the pitch books.

472.   In the Offering Documents, GMAC made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans.  For example, in an offering for which Equifirst originated all of the underlying mortgage loans, GMAC stated, in sum or substance, that (a) Equifirst's guidelines were intended to assess the borrower's ability and willingness to repay the debt; (b) the mortgage loans underwritten in accordance with Equifirst's underwriting standards; and (c) exceptions to these standards would only be made on a case-by-case basis based on compensating factors.

473.   Moreover, the Offering Documents made statements of material facts regarding the relevant Mortgage Originators' compliance with their appraisal guidelines.

474.   In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes," and "pitch books," GMAC made additional statements of material facts regarding the particular Securities and their underlying data, data quality, and Mortgage Originator practices and guidelines applicable to mortgage loans underlying those Securities.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flow, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

475.   GMAC also made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff in a meeting at Plaintiff's offices in Massachusetts on or about August 17, 2005.  Among other things, GMAC stated that it performed due diligence on 100% of the loans it purchased from Equifirst for the RAMP 05-EFC4 securitization.

476.   Each of the statements of material facts identified above regarding underwriting and appraisal standards were untrue and contained material omissions.  The Mortgage Originators in the GMAC deals systematically violated their stated underwriting and appraisal standards.  Moreover, GMAC's additional statements of material facts regarding its own due diligence were untrue and contained material omissions.

EXHIBIT  53   -656-

477.    The statements of material facts in the documents GMAC sent to Plaintiff were untrue because the Mortgage Originators systematically violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines.

478.    The statements of material facts in the documents GMAC sent to Plaintiff were also untrue because of the inflated appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.

479.    GMAC's statements of material facts were also untrue because other material data provided to Plaintiff by GMAC was untrue.  For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties. The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

480.    As a result of GMAC's untrue statements of material facts and omissions, the Securities that GMAC offered or sold to Plaintiff have all been downgraded, and their value has collapsed.  As of June 25, 2010, over 40% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by GMAC to Plaintiff.

**p.    Barclays' Untrue Statements of Material Facts and Omissions**

481.    Barclays offered or sold Securities to Plaintiff in Massachusetts in 2005, 2006 and 2007 for a total price of $141,298,323.  A full list of these offerings and sales, along with the relevant Offering Documents, the identities of the relevant Depositor Defendants and Mortgage Originators, the dates of the purchases, and the amounts invested is contained in the attached Appendix P.

482.    Barclays sought to expand its share of the RMBS market by aggressively pursuing subprime Mortgage Originators including Fremont, WMC, Decision One, Option One, and Encore, offering to pay more for their mortgages than competing Wall Street Banks, and offering

EXHIBIT  53  -657-

to perform less due diligence than competitors.  Fremont was one of the largest Mortgage Originators of loans underlying the Barclays Securities.  In an effort to expand its subprime origination, servicing, and securitization business in the United States, Barclays acquired two large U.S.-based mortgage companies: HomEq Servicing Corporation in June 2006, and EquiFirst Corporation in 2007.

483.   To facilitate the sale of RMBS, Barclays' parent company formed SPVs, including Depositor Defendant Securitized Asset Backed Receivables LLC ("SABR"), which served as the depositor and issuer for many of Barclays' offerings.  Barclays offered or sold the Securities to Plaintiff.  Barclays also provided financial research on RMBS and related structured products.

484.   In connection with its offer or sale of Securities to Plaintiff, Barclays sent numerous documents to Plaintiff in Massachusetts.  These documents included registration statements, prospectuses, and prospectus supplements.  Barclays also sent Plaintiff numerous other documents, including term sheets, private placement term sheets, confidential offering memoranda, computational materials, collateral terms sheets, and "loan tapes."  The loan tapes Barclays sent to Plaintiff consisted of Excel spreadsheets that contained over 60 categories of information related to the individual loans including, *inter alia*, the data, the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting the purpose of the mortgage loans; the type of properties; the owner-occupancy status; and borrower FICO scores.  Barclays also showed Plaintiff "pitch books" promoting, *inter alia*, the Mortgage Originators' underwriting practices and guidelines for the mortgages supporting the Securities, the data, and Barclays' due diligence of the Mortgage Originators' underwriting practices.  Barclays did not allow Plaintiff to keep the pitch books.

485.   In the Offering Documents, Barclays made numerous statements of material facts regarding the underwriting standards that had been followed in originating the underlying mortgage loans.  For example, in offerings for which Fremont originated all or a significant amount of the underlying mortgage loans, Barclays reprinted Fremont's "Underwriting Guidelines," which stated, in sum or substance, that (a) Fremont's guidelines were "intended to

EXHIBIT  53  -658-

assess the borrower's ability and willingness of the borrower to repay the debt"; (b) the "mortgage loans [were] underwritten in accordance with Fremont's current underwriting programs"; and (c) exceptions to these guidelines would only be made "on a case-by-case basis . . . based on compensating factors."  *See*, ¶ 161.   Barclays made similar statements of material facts for Mortgage Loans originated by other Mortgage Originators, including WMC.  *See* ¶ 185.

486.    Moreover, the Offering Documents made statements of material facts regarding the appraisal guidelines and practices of the relevant Mortgage Originators.  Barclays stated, for example, that "underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal" and that Fremont commissioned appraisals of mortgaged properties by "qualified independent appraisers."  *See* ¶ 161.  Barclays made similar statements of material facts for appraisals commissioned, performed, or reviewed by other Mortgage Originators, including WMC.  *See* ¶ 185.

487.    In other documents sent or shown to Plaintiff, including "term sheets," "loan tapes," and "pitch books," Barclays made additional statements of material facts regarding the particular Securities and their underlying data, data quality, and Mortgage Originator practices and guidelines applicable to mortgage loans underlying those Securities.  This information was material as it allowed Plaintiff to perform sensitive calculations regarding the risk, cash flow, and value of a Security and to determine whether to purchase the Security on behalf of the Clients.

488.    Barclays also made additional, oral statements of material facts about the Securities it offered or sold to Plaintiff.  Some of Plaintiff's meetings with Barclays occurred on or about July 13 and October 27, 2004; January 19, 2005; and March 14 and November 6, 2006.  During these meetings, Barclays representatives made statements of material facts regarding Barclays' upcoming RMBS deals, and assured Plaintiff that Barclay conducted its own due diligence to ensure that the Mortgage Originators complied with their stated underwriting guidelines, including by sampling loans in order to check underwriting process, documentation, valuations, and compliance.  For example, Plaintiff met with Barclays at the ABS East industry

161

EXHIBIT   53   -659-

conference during November 2006.  At this meeting, Barclays stated that Barclays employees were on-site with the largest Mortgage Originators, "QCing" (*i.e.*, quality controlling) the underwriting and pool construction process, and that every exception to the Mortgage Originators' underwriting standards was supposed to be QC'ed by a Barclays employee.

489.   Each of the statements of material facts identified above regarding underwriting and appraisal standards were untrue and contained material omissions.  As detailed below, Fremont, the principal Mortgage Originator in the Barclays deals, systematically violated its stated underwriting and appraisal standards.  Moreover, Barclays' additional statements of material facts regarding its own due diligence were untrue and contained material omissions.

490.   The statements of material facts in the documents Barclays sent to Plaintiff were untrue because the Mortgage Originators systematically violated their stated underwriting guidelines, did not consistently evaluate the borrowers' ability to repay the loans, and made exceptions to their underwriting standards absent the "compensating factors" required by their guidelines.   For example, subsequent investigations and lawsuits have demonstrated that Fremont made frequent exceptions to its underwriting guidelines for borrowers who would not otherwise qualify for a loan; Fremont management encouraged risky loan originations; and Fremont was "operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by [Fremont]."  *See* ¶¶ 165-182.   Moreover, former Fremont employees witnessed firsthand how exceptions to Fremont's underwriting became the "norm" because employees had to do what was necessary to increase loan originations.  *Id.*   The FDIC ultimately issued a Cease & Desist Order to Fremont for extending subprime credit "in an unsafe and unsound manner" and committing violations of laws and FDIC regulations.  *See* ¶¶ 165-166. The other Mortgage Originators of loans underlying the Barclays Securities, including WMC, similarly violated their stated underwriting guidelines in exchange for dramatically increased loan production.  *See* Section V.

491.   The statements of material facts in the documents Barclays sent to Plaintiff were also untrue because the Mortgage Originators either knew of or participated in the inflated

EXHIBIT   53   -660-

appraisals of the mortgaged properties, which caused the listed LTV ratios and levels of credit enhancement to be untrue.  *See, e.g.*, ¶¶ 51-57.

492.   Barclays' statements of material facts were also untrue because other material data provided to Plaintiff by Barclays was untrue.  For example, the data often incorrectly identified properties as "owner occupied" when they were really second homes or investment properties. The untruth of this information was material to Plaintiff's analysis of the loans' credit quality and likelihood of default.

493.   As a result of Barclay's untrue statements of material facts and omissions, the Securities that Barclays offered or sold to Plaintiff have all been downgraded, and their value has collapsed.  As of June 25, 2010, over 52% of the mortgage loans underlying the Securities are in delinquency, default, foreclosure, bankruptcy, or repossession.  Plaintiff and the Clients have suffered significant losses on the Securities offered or sold by Barclays to Plaintiff.

q.   **The Depositor Defendants' Untrue Statements of Material Facts and Omissions**

494.   For their securitization businesses, financial institutions created SPVs, wholly-owned subsidiaries, to serve as depositors that purchased or acquired the loans for securitization and sale to investors.  The limited corporate purpose of depositors was to package and sell loans for the benefit of their parent banks.  Revenues from the depositors' securitization activities were passed up to the parent banks.

495.   Each of the Depositor Defendants served as a "depositor" for the sale of the Securities.  The Depositor Defendants, as "issuers" under Regulation AB (17 CFR § 230.191), were sellers of the Securities and made false statements of material facts in the Offering Documents.

496.   Prior to issuing the Securities, the Depositor Defendants prepared and filed with the SEC on Form S-3 registration statements under the Securities Act of 1933, 15 U.S.C § 77k, indicating their intention to sell the Securities.  The Depositors then issued the Securities pursuant to the registration statements, accompanying prospectuses, and subsequent prospectus

EXHIBIT  53   -661-

supplements, or private placement memoranda.  The Depositor Defendants and the Wall Street Banks drafted the prospectus supplements or private placement memoranda and circulated these documents to investors, including Plaintiff.  The Depositor Defendants filed the prospectus supplements with the SEC.

497.    As alleged above, the prospectus supplements or private placement memoranda purported to describe the mortgage pools underlying the Securities that the Depositor Defendants offered and sold, making statements about the loan origination process, the quality of the loans, and the adequacy of the collateral.  Each prospectus supplement or private placement memorandum included tables with data concerning the loans underlying the Securities, including (but not limited to) the type of loans, the number of loans, the mortgage rate and net mortgage rate, the aggregate scheduled principal balance of the loans, the purported weighted average of original combined LTV ratios, the occupancy status of the mortgaged properties, and the geographic concentration of the properties.

498.    The prospectus supplements or private placement memoranda contained the untrue statements of material facts set forth above in Section VI concerning the Securities, including untrue statements regarding: (1) the Mortgage Originators' underwriting guidelines that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Securities; (2) the appraisal guidelines that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) the LTV ratios, debt-to-income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; and (4) various forms of credit enhancement applicable to certain tranches of Securities.

499.    As detailed above, these statements of material facts concerning the Securities were untrue because: (1) the Mortgage Originators violated their stated underwriting guidelines and did not consistently evaluate the borrowers' ability to repay the loans; (2) inflated appraisals caused the listed LTV ratios and levels of credit enhancement to be inaccurate; and (3) the stated numbers of riskier "second home" and "investment property" mortgagees were lower than the

EXHIBIT  53  -662-

actual numbers, and the stated numbers of less risky "owner occupied" mortgage loans were higher than the actual numbers.  In addition, metrics such as debt-to-income ratios were untrue as a result of the Mortgage Originators' acceptance of untrue information from mortgage applicants.

## VII.    THE PERFORMANCE AND VALUE OF THE SECURITIES

500.    The rates of delinquency, foreclosure, and real estate owned (*i.e.*, foreclosed and not yet sold) on the Securities' underlying mortgages have soared since issuance.  As reflected in the charts below  (in which all figures are expressed as percentages), as of May 2010, the percentage of those underlying loans that are currently either 60 days or more delinquent, in foreclosure, or real estate owned exceeds 38%, on average, for the Securities offered or sold to Plaintiff by each Wall Street Bank Defendant.  These data provide a snapshot of the pools as currently constituted and do not include loans that have been liquidated out of the original pools. The pools and the related Securities suffered significant additional losses as a result of the liquidation of defaulted loans that are not included in the tables below.

EXHIBIT  53  -663-

### 501.   Morgan Stanley Performance

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| ACCR 2005-3 | 2.39 | 19.45 | 9.34 | 3.73 | 34.91 |
| AMIT 2005-4 | 2.26 | 22.20 | 11.04 | 4.94 | 40.44 |
| IXIS 2005-HE2 | 1.72 | 8.62 | 39.58 | 5.15 | 55.07 |
| IXIS 2005-HE3 | 1.85 | 9.03 | 34.11 | 4.98 | 49.97 |
| IXIS 2006-HE3 | 1.75 | 31.89 | 15.61 | 3.71 | 52.96 |
| MSAC 2005-HE4 | 2.15 | 22.97 | 14.83 | 5.41 | 45.36 |
| MSAC 2005-NC2 | 2.66 | 25.60 | 10.45 | 3.99 | 42.70 |
| MSAC 2005-WMC2 | 2.65 | 28.42 | 17.06 | 2.74 | 50.87 |
| MSAC 2005-WMC3 | 3.17 | 25.31 | 17.93 | 5.71 | 52.12 |
| MSAC 2005-WMC5 | 2.83 | 31.79 | 14.19 | 3.97 | 52.78 |
| MSAC 2005-WMC6 | 2.03 | 32.35 | 12.78 | 3.83 | 50.99 |
| MSAC 2006-HE1 | 1.93 | 13.97 | 26.76 | 1.49 | 44.15 |
| MSAC 2006-HE3 | 2.36 | 17.74 | 18.63 | 7.97 | 46.70 |
| MSAC 2007-HE3 | 2.44 | 27.72 | 16.03 | 4.34 | 50.53 |
| MSHEL 2005-1 | 2.24 | 7.19 | 13.17 | 2.70 | 25.30 |
| MSHEL 2006-1 | 2.83 | 13.30 | 11.99 | 5.67 | 33.79 |
| NCHET 2005-3 | 2.30 | 13.47 | 12.41 | 7.94 | 36.12 |
| NCHET 2005-B | 1.91 | 7.65 | 12.15 | 6.62 | 28.33 |
| NCHET 2005-C | 1.86 | 9.69 | 23.99 | 1.33 | 36.87 |
| NCHET 2005-D | 2.89 | 11.44 | 23.51 | 1.78 | 39.62 |
| NTIX 2007-HE2 | 2.66 | 27.98 | 17.76 | 4.10 | 52.50 |
| SAST 2006-3 | 1.88 | 14.76 | 20.46 | 4.96 | 42.06 |
| | | | | **Average Delinquency for Morgan Stanley** | **43.82** |

### 502.   Bear Stearns Performance

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| AABST 2005-5 | 2.68 | 8.17 | 13.88 | 5.52 | 30.25 |
| AMIT 2005-1 | 2.75 | 13.75 | 20.81 | 8.19 | 45.50 |
| BSABS 2005-AQ2 | 2.10 | 38.31 | 16.89 | 3.08 | 60.38 |
| BSABS 2005-HE10 | 3.31 | 38.96 | 10.02 | 1.72 | 54.01 |
| BSABS 2005-HE4 | 2.56 | 31.63 | 8.01 | 2.84 | 45.04 |
| BSABS 2005-HE8 | 2.18 | 29.13 | 8.75 | 1.92 | 41.98 |
| BSABS 2005-HE9 | 2.22 | 33.69 | 8.21 | 2.07 | 46.19 |
| BSABS 2006-EC1 | 3.73 | 42.97 | 9.24 | 1.57 | 57.51 |
| BSABS 2006-EC2 | 2.09 | 46.70 | 9.59 | 2.75 | 61.13 |
| BSABS 2006-HE1 | 2.43 | 37.55 | 8.54 | 0.95 | 49.47 |
| BSABS 2006-HE10 | 2.13 | 40.97 | 11.51 | 1.83 | 56.44 |
| BSABS 2006-HE3 | 2.10 | 33.97 | 14.16 | 3.78 | 54.01 |
| BSABS 2006-HE4 | 2.47 | 21.93 | 18.85 | 5.17 | 48.42 |
| BSABS 2006-HE7 | 2.05 | 40.94 | 9.84 | 1.71 | 54.54 |

EXHIBIT   53   -664-

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| BSABS 2006-PC1 | 2.99 | 37.42 | 8.03 | 0.62 | 49.06 |
| BSABS 2007-FS1 | 2.75 | 37.74 | 7.99 | 2.59 | 51.07 |
| BSMF 2007-SL2 | 4.73 | 23.86 | 0.00 | 0.00 | 28.59 |
| BSSLT 2007-SV1A | 1.73 | 5.35 | 1.37 | 0.15 | 8.60 |
| CARR 2005-NC4 | 2.08 | 8.78 | 11.34 | 24.92 | 47.12 |
| CARR 2006-RFC1 | 2.07 | 15.87 | 12.86 | 17.72 | 48.52 |
| GPMF 2007-HE1 | 2.68 | 8.49 | 0.00 | 0.00 | 11.17 |
| IRWHE 2005-A | 0.37 | 1.90 | 0.00 | 0.00 | 2.27 |
| PCHLT 2005-2 | 2.82 | 15.59 | 18.27 | 8.54 | 45.22 |
| PCHLT 2005-4 | 3.25 | 16.14 | 22.52 | 10.46 | 52.37 |
| SACO 2004-3A | 2.24 | 8.88 | 0.00 | 0.00 | 11.12 |
| SACO 2005-1 | 2.09 | 9.49 | 0.00 | 0.00 | 11.58 |
| SACO 2005-2 | 2.24 | 9.27 | 0.00 | 0.00 | 11.51 |
| SACO 2005-3 | 2.67 | 11.86 | 0.14 | 0.00 | 14.67 |
| SACO 2005-4 | 2.18 | 10.45 | 0.12 | 0.00 | 12.75 |
| SACO 2005-5 | 2.24 | 10.76 | 0.19 | 0.00 | 13.19 |
| SACO 2005-7 | 2.41 | 13.18 | 0.05 | 0.00 | 15.64 |
| SACO 2005-8 | 2.60 | 11.73 | 0.15 | 0.00 | 14.48 |
| SACO 2005-WM3 | 5.12 | 8.76 | 0.00 | 0.00 | 13.88 |
| SACO 2007-2 | 3.96 | 9.72 | 0.31 | 0.00 | 13.99 |
| SAMI 2005-AR6 | 1.92 | 19.94 | 9.79 | 2.26 | 33.91 |
| | | | | Average Delinquency for Bear Stearns | 34.73 |

167

EXHIBIT   53   -665-

### 503.   Citigroup Performance

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| AMIT 2005-2 | 0.73 | 5.13 | 27.06 | 11.92 | 44.84 |
| ARSI 2005-W2 | 2.25 | 5.63 | 20.30 | 3.53 | 31.71 |
| ARSI 2006-W1 | 2.41 | 6.63 | 27.83 | 5.00 | 41.87 |
| CARR 2005-NC3 | 1.77 | 10.87 | 11.82 | 16.92 | 41.38 |
| CARR 2005-NC5 | 1.62 | 12.03 | 12.50 | 28.08 | 54.23 |
| CARR 2006-NC2 | 1.97 | 12.29 | 12.22 | 27.17 | 53.65 |
| CARR 2006-NC4 | 1.98 | 13.39 | 13.54 | 21.78 | 50.69 |
| CMLTI 2005-9 | 1.59 | 5.02 | 4.72 | 1.38 | 12.71 |
| CMLTI 2005-HE1 | 2.67 | 7.55 | 20.12 | 5.90 | 36.24 |
| CMLTI 2005-HE3 | 1.71 | 28.81 | 18.11 | 6.79 | 55.42 |
| CMLTI 2006-HE1 | 2.27 | 12.83 | 16.44 | 5.20 | 36.74 |
| CMLTI 2006-WFH3 | 2.49 | 14.61 | 12.59 | 6.30 | 35.99 |
| CMLTI 2007-AMC2 | 2.21 | 18.60 | 18.42 | 5.61 | 44.84 |
| CMLTI 2007-FS1 | 2.30 | 21.72 | 14.89 | 3.84 | 42.75 |
| | | | | Average Delinquency for Citigroup | 41.65 |

### 504.   Credit Suisse Performance

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| AABST 2005-4 | 2.32 | 6.63 | 11.88 | 4.67 | 25.50 |
| ABSHE 2005-HE1 | 1.40 | 12.70 | 16.21 | 4.30 | 34.61 |
| ABSHE 2005-HE3 | 1.93 | 33.76 | 16.05 | 3.43 | 55.17 |
| ABSHE 2005-HE4 | 2.34 | 10.82 | 11.93 | 1.48 | 26.57 |
| ABSHE 2005-HE5 | 1.18 | 25.77 | 24.87 | 3.27 | 55.09 |
| ABSHE 2006-HE3 | 1.79 | 11.04 | 19.57 | 2.20 | 34.60 |
| ABSHE 2006-HE6 | 2.68 | 13.24 | 15.26 | 4.63 | 35.81 |
| ABSHE 2006-HE7 | 2.72 | 20.61 | 13.46 | 4.30 | 41.09 |
| AMSI 2005-R6 | 2.28 | 5.73 | 16.78 | 2.39 | 27.18 |
| AMSI 2005-R8 | 1.52 | 3.87 | 17.91 | 4.45 | 27.75 |
| AMSI 2006-R2 | 1.99 | 7.16 | 18.80 | 3.47 | 31.42 |
| FHLT 2005-A | 2.89 | 16.84 | 19.16 | 9.19 | 48.08 |
| FMIC 2007-1 | 3.30 | 14.59 | 13.35 | 6.96 | 38.20 |
| HEAT 2005-1 | 2.21 | 11.94 | 12.11 | 5.40 | 31.66 |
| HEAT 2005-2 | 1.65 | 12.13 | 9.85 | 5.46 | 29.09 |
| HEAT 2005-3 | 2.81 | 14.41 | 15.10 | 6.65 | 38.97 |
| HEAT 2005-4 | 2.10 | 10.82 | 10.93 | 5.72 | 29.57 |
| HEAT 2005-5 | 2.40 | 12.83 | 10.32 | 4.59 | 30.14 |
| HEAT 2005-6 | 3.32 | 11.55 | 11.96 | 3.93 | 30.76 |
| HEAT 2005-7 | 2.02 | 15.64 | 15.30 | 5.03 | 37.99 |
| HEAT 2005-8 | 2.67 | 16.51 | 11.72 | 5.21 | 36.11 |
| HEAT 2005-9 | 3.19 | 15.23 | 13.63 | 5.83 | 37.88 |

168

EXHIBIT   53   -666-

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| HEAT 2006-4 | 1.96 | 15.34 | 19.81 | 5.43 | 42.54 |
| HEAT 2006-7 | 2.85 | 24.23 | 14.81 | 6.27 | 48.16 |
| HEMT 2005-5 | 2.21 | 7.92 | 0.32 | 0.00 | 10.45 |
| HEMT 2006-2 | 2.47 | 5.49 | 1.46 | 0.00 | 9.42 |
| LBMLT 2005-WL2 | 2.91 | 25.05 | 13.44 | 4.20 | 45.60 |
| PPSI 2005-WHQ3 | 1.72 | 7.09 | 9.88 | 4.45 | 23.14 |
| SAST 2005-2 | 2.34 | 9.56 | 14.59 | 4.02 | 30.51 |
| | | | | Average Delinquency for Credit Suisse | 34.24 |

505.  **Greenwich Capital Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| AHMA 2007-3 | 1.41 | 5.36 | 24.07 | 13.40 | 44.24 |
| ARSI 2006-W5 | 2.38 | 7.24 | 27.24 | 5.13 | 41.99 |
| EMLT 2005-1 | 1.59 | 11.03 | 12.77 | 1.86 | 27.25 |
| FFML 2006-FF8 | 2.31 | 14.07 | 17.69 | 4.79 | 38.86 |
| FHLT 2005-1 | 2.99 | 19.89 | 17.57 | 5.82 | 46.27 |
| HELT 2007-FRE1 | 2.09 | 8.78 | 16.63 | 5.88 | 33.38 |
| LBMLT 2005-1 | 2.75 | 20.98 | 10.72 | 2.51 | 36.96 |
| LBMLT 2005-WL1 | 3.60 | 26.94 | 14.77 | 5.32 | 50.63 |
| MMLT 2005-2 | 1.75 | 13.35 | 21.32 | 3.83 | 40.25 |
| NAA 2007-S1 | 3.14 | 9.24 | 0.45 | 0.00 | 12.83 |
| NHEL 2005-1 | 2.04 | 9.55 | 20.67 | 4.32 | 36.58 |
| NHEL 2005-3 | 2.17 | 9.85 | 24.99 | 6.01 | 43.02 |
| SVHE 2005-1 | 3.61 | 14.25 | 6.50 | 3.66 | 28.02 |
| SVHE 2005-A | 3.99 | 10.76 | 0.08 | 0.00 | 14.83 |
| SVHE 2005-B | 3.23 | 8.45 | 0.16 | 0.00 | 11.84 |
| SVHE 2005-DO1 | 2.30 | 27.99 | 13.05 | 3.06 | 46.40 |
| SVHE 2006-OPT2 | 2.85 | 7.29 | 22.61 | 3.80 | 36.55 |
| SVHE 2006-OPT5 | 2.55 | 8.76 | 22.62 | 3.35 | 37.28 |
| WAMU 2005-AR2 | 3.72 | 10.15 | 16.56 | 2.15 | 32.58 |
| | | | | Average Delinquency for Greenwich Capital | 34.72 |

EXHIBIT  53  -667-

506.  **Deutsche Bank Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| ACE 2005-HE2 | 2.16 | 6.11 | 13.61 | 5.89 | 27.77 |
| ACE 2005-HE5 | 2.87 | 18.66 | 21.46 | 7.67 | 50.66 |
| ACE 2005-HE6 | 1.95 | 10.16 | 15.12 | 8.02 | 35.25 |
| ACE 2005-HE7 | 1.34 | 17.31 | 23.65 | 7.31 | 49.61 |
| ACE 2006-FM2 | 2.16 | 34.03 | 29.98 | 5.77 | 71.94 |
| ACE 2006-HE1 | 1.96 | 18.64 | 22.74 | 7.58 | 50.92 |
| ACE 2006-NC1 | 2.18 | 9.88 | 22.27 | 2.69 | 37.02 |
| ACE 2006-NC2 | 2.23 | 41.35 | 20.43 | 4.56 | 68.57 |
| ACE 2006-OP1 | 2.58 | 7.51 | 20.25 | 3.40 | 33.74 |
| ACE 2006-SL1 | 2.64 | 7.07 | 0.29 | 0.00 | 10.00 |
| ACE 2006-SL2 | 3.26 | 8.51 | 0.36 | 0.00 | 12.13 |
| ACE 2007-HE2 | 2.52 | 10.79 | 14.46 | 7.94 | 35.71 |
| ALBT 2007-S1 | 6.14 | 15.70 | 0.00 | 0.00 | 21.84 |
| NCHET 2005-4 | 1.85 | 12.11 | 12.12 | 11.17 | 37.25 |
| | | | | Average Delinquency for Deutsche Bank | **38.74** |

507.  **Merrill Lynch Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| FFMER 2007-H1 | 2.29 | 20.27 | 20.70 | 6.03 | 49.29 |
| MLMI 2005-AR1 | 2.29 | 25.40 | 20.99 | 4.83 | 53.51 |
| MLMI 2005-NCB | 5.46 | 3.47 | 0.48 | 0.00 | 9.41 |
| MLMI 2005-SL2 | 5.93 | 5.81 | 0.00 | 0.00 | 11.74 |
| MLMI 2005-SL3 | 2.38 | 5.00 | 0.00 | 0.02 | 7.40 |
| MLMI 2005-WMC1 | 3.94 | 12.20 | 14.35 | 1.84 | 32.33 |
| MLMI 2006-HE4 | 3.58 | 24.90 | 30.78 | 4.36 | 63.62 |
| MLMI 2006-HE5 | 3.08 | 22.73 | 27.41 | 3.58 | 56.80 |
| MLMI 2006-SL1 | 1.86 | 4.72 | 0.00 | 0.00 | 6.58 |
| PPSI 2005-WHQ1 | 2.75 | 7.93 | 13.13 | 4.04 | 27.85 |
| RALI 2006-QS17 | 3.01 | 7.65 | 15.78 | 3.10 | 29.54 |
| SURF 2005-BC1 | 4.56 | 13.10 | 11.92 | 4.65 | 34.23 |
| | | | | Average Delinquency for Merrill Lynch | **31.86** |

170

EXHIBIT  53   -668-

508.    **UBS Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|---|---|---|---|---|---|
| AMSI 2005-R7 | 1.35 | 4.10 | 15.94 | 4.14 | 25.53 |
| ARSI 2006-W3 | 2.07 | 8.08 | 28.62 | 4.97 | 43.74 |
| FFML 2005-FF7 | 2.46 | 26.07 | 18.03 | 4.56 | 51.12 |
| MABS 2005-FRE1 | 3.31 | 11.56 | 15.53 | 7.54 | 37.94 |
| MABS 2005-NC1 | 1.87 | 5.96 | 9.28 | 5.29 | 22.40 |
| MABS 2006-AM2 | 2.48 | 18.82 | 27.77 | 7.67 | 56.74 |
| MABS 2006-FRE2 | 1.08 | 19.90 | 22.14 | 9.16 | 52.28 |
| MABS 2006-HE1 | 2.33 | 20.31 | 17.28 | 6.41 | 46.33 |
| MABS 2006-NC2 | 3.19 | 14.35 | 15.60 | 6.95 | 40.09 |
| MABS 2006-WMC4 | 2.55 | 27.28 | 15.84 | 2.43 | 48.10 |
| | | | | **Average Delinquency for UBS** | **42.43** |

509.    **Goldman Sachs Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|---|---|---|---|---|---|
| CBASS 2006-SL1 | 3.46 | 15.96 | 0.00 | 0.00 | 19.42 |
| GSAMP 2005-HE6 | 2.13 | 7.36 | 14.65 | 6.16 | 30.30 |
| GSAMP 2006-HE6 | 3.56 | 17.50 | 23.26 | 7.07 | 51.39 |
| GSAMP 2006-S1 | 6.21 | 18.39 | 0.08 | 0.00 | 24.68 |
| IXIS 2005-HE4 | 2.90 | 25.64 | 13.98 | 5.42 | 47.94 |
| LBMLT 2005-2 | 2.16 | 23.23 | 11.61 | 4.43 | 41.43 |
| LBMLT 2006-7 | 3.00 | 28.40 | 13.78 | 3.26 | 48.44 |
| LBMLT 2006-WL1 | 2.92 | 24.47 | 14.78 | 3.67 | 45.84 |
| | | | | **Average Delinquency for Goldman Sachs** | **38.68** |

171

EXHIBIT   53   -669-

510.    **J.P. Morgan Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| JPMAC 2005-FLD1 | 2.07 | 10.69 | 22.69 | 1.58 | 37.03 |
| JPMAC 2005-OPT1 | 5.12 | 7.90 | 14.58 | 2.05 | 29.65 |
| JPMAC 2005-OPT2 | 2.91 | 7.56 | 14.15 | 1.52 | 26.14 |
| JPMAC 2005-WMC1 | 2.13 | 11.39 | 24.73 | 1.75 | 40.00 |
| JPMAC 2006-CH1 | 1.67 | 11.01 | 18.96 | 1.00 | 32.64 |
| JPMAC 2006-CW2 | 2.20 | 22.94 | 26.74 | 5.10 | 56.98 |
| JPMAC 2006-WMC1 | 2.26 | 12.35 | 25.21 | 1.79 | 41.61 |
| RASC 2006-KS6 | 2.83 | 12.77 | 17.03 | 3.33 | 35.96 |
| | | | | Average Delinquency for J.P. Morgan | **37.50** |

511.    **Countrywide Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| CWALT 2005-82 | 4.61 | 22.05 | 18.35 | 3.04 | 48.05 |
| CWALT 2005-J6 | 1.48 | 2.28 | 3.58 | 0.83 | 8.17 |
| CWL 2005-11 | 3.09 | 28.96 | 8.64 | 1.99 | 42.68 |
| CWL 2006-17 | 2.89 | 38.18 | 15.17 | 2.83 | 59.07 |
| CWL 2006-18 | 3.19 | 37.13 | 15.54 | 3.36 | 59.22 |
| | | | | Average Delinquency for Countrywide | **43.44** |

512.    **FBR Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|------|------|------|------|------|
| FBRSI 2005-5 | 1.37 | 20.11 | 19.06 | 3.73 | 44.27 |
| POPLR 2005-5 | 2.66 | 13.22 | 15.74 | 5.80 | 37.42 |
| | | | | Average Delinquency for FBR | **40.85** |

172

EXHIBIT   53   -670-

513.    **HSBC Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|--------------------|--------------------|----------------|-------------------|-------------------|
| FFML 2006-FF5 | 2.66 | 12.14 | 20.03 | 4.22 | 39.05 |
| HASC 2005-NC2 | 3.05 | 29.43 | 13.6 | 2.64 | 48.72 |
| HASC 2006-OPT3 | 2.70 | 7.33 | 17.91 | 3.38 | 31.32 |
| | | | | Average Delinquency for HSBC | **39.70** |

514.    **Banc of America Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|--------------------|--------------------|----------------|-------------------|-------------------|
| ABFC 2005-HE1 | 2.58 | 6.58 | 16.7 | 3.88 | 29.74 |
| ABFC 2006-OPT2 | 3.1 | 6.97 | 27.02 | 4.63 | 41.72 |
| BOAA 2006-6 | 2.3 | 10.44 | 10.41 | 1.04 | 24.19 |
| RAMP 2006-RZ3 | 2.55 | 11.71 | 18.40 | 1.34 | 34.00 |
| | | | | Average Delinquency for Banc of America | **32.41** |

515.    **GMAC Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|--------------------|--------------------|----------------|-------------------|-------------------|
| RAMP 2005-EFC4 | 2.77 | 10.7 | 19.45 | 0.87 | 33.79 |
| RASC 2006-KS2 | 2.50 | 14.93 | 19.82 | 1.28 | 38.53 |
| | | | | Average Delinquency for GMAC | **36.16** |

516.    **Barclays Performance**

| Deal | 60 Days Delinquent | 90 Days Delinquent | In Foreclosure | Real Estate Owned | Total Delinquency |
|------|--------------------|--------------------|----------------|-------------------|-------------------|
| ARSI 2005-W3 | 2.2 | 6.25 | 22.22 | 4.16 | 34.83 |
| BCAP 2006-AA2 | 2.13 | 9.34 | 19.8 | 6.29 | 37.56 |
| CARR 2006-FRE1 | 2.28 | 16.18 | 18.04 | 23.03 | 59.53 |
| CARR 2006-FRE2 | 2.11 | 16.23 | 17.44 | 20.21 | 55.99 |
| EQLS 2007-1 | 2.64 | 10.25 | 13.01 | 4.48 | 30.38 |
| RASC 2006-KS9 | 2.07 | 12.57 | 27.88 | 1.61 | 44.13 |
| SABR 2005-FR4 | 2.95 | 10.06 | 37.61 | 6.46 | 57.08 |
| SABR 2005-FR5 | 1.67 | 11.05 | 40.59 | 12.84 | 66.15 |
| SABR 2006-FR1 | 1.53 | 10.97 | 21.03 | 5.51 | 39.04 |

EXHIBIT   53   -671-

| | | | | | |
|---|---|---|---|---|---|
| SABR 2006-WM2 | 3.26 | 7.43 | 28.12 | 2 | 40.81 |
| SAST 2007-2 | 2.43 | 22.48 | 13.60 | 3.16 | 41.67 |

| Average Delinquency for Barclays | |
|---|---|
| | **46.11** |

## VIII.   COUNT I AGAINST THE WALL STREET BANK DEFENDANTS: VIOLATION OF MASSACHUSETTS UNIFORM SECURITIES ACT, MASS. GEN. LAWS CH. 110A § 410(A)(2)

517.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 516.

518.   Each of the Securities was offered or sold to the Plaintiff in Massachusetts and purchased directly or for the benefit of the Clients.  Each Wall Street Bank Defendant offered or sold Securities to Plaintiff in Massachusetts.

519.   Massachusetts General Laws Chapter 110A, § 101 provides that "it is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly (1) to employ any device, scheme or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

520.   Massachusetts General Laws Chapter 110A, § 410(a)(2) provides for civil liability in the event of any offer or sale of securities by means of an untrue statement or material omission.

521.   Each Wall Street Bank Defendant made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made not misleading, in connection with the offer or sale of the Securities to Plaintiff.

522.   In connection with the offer or sale of the Securities to Plaintiff, each Wall Street Bank Defendant violated § 410(a)(2) by making an untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made not misleading, concerning, *inter alia*, (1) the Mortgage Originators' underwriting standards that were

174

EXHIBIT  53  -672-

purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Securities; (2) the appraisal standards that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) the LTV ratios, debt-to-income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (4) the Wall Street Bank Defendants' due diligence of the loans and the Mortgage Originators' underwriting practices; and (5) various forms of credit enhancement applicable to certain tranches of Securities.  Plaintiff made the decision to purchase the Securities on behalf of the Clients not knowing of the Defendants' untruths or omissions.

523.    The Wall Street Bank Defendants' actions and conduct violated Massachusetts General Laws Ch. 110A.

524.    Plaintiff has been damaged by the Wall Street Bank Defendants' violations of the Massachusetts Securities Act.

## IX.    COUNT II AGAINST THE DEPOSITOR DEFENDANTS: VIOLATION OF MASSACHUSETTS UNIFORM SECURITIES ACT, MASS. GEN. LAWS CH. 110A § 410(A)(2)

525.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 524.

526.    Each of the Securities was offered or sold to the Plaintiff in Massachusetts and purchased directly or for the benefit of the Clients.  Each Depositor Defendant offered or sold Securities to Plaintiff in Massachusetts.

527.    Massachusetts General Laws Chapter 110A, § 101 provides that "it is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly (1) to employ any device, scheme or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

EXHIBIT  53  -673-

528.     Massachusetts General Laws Chapter 110A, § 410(a)(2) provides for civil liability in the event of any offer or sale of securities by means of an untrue statement or material omission.

529.     Each Depositor Defendant made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made not misleading, in connection with the offer or sale of the Securities to Plaintiff.

530.     In connection with the offer or sale of the Securities to Plaintiff, each Depositor Defendant violated § 410(a)(2) by making an untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made not misleading, concerning, *inter alia*, (1) the Mortgage Originators' underwriting standards that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Securities; (2) the appraisal standards that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) the LTV ratios, debt-to-income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (4) the Wall Street Bank Defendants' due diligence of the loans and the Mortgage Originators' underwriting practices; and (5) various forms of credit enhancement applicable to certain tranches of Securities.  Plaintiff made the decision to purchase the Securities on behalf of the Clients not knowing of the Defendants' untruths or omissions.

531.     The Depositor Defendants' actions and conduct violated Massachusetts General Laws Ch. 110A.

532.     Plaintiff has been damaged by the Depositor Defendants' violations of the Massachusetts Securities Act.

## X.     COUNT III AGAINST THE WALL STREET BANK DEFENDANTS: VIOLATION OF MASSACHUSETTS UNIFORM SECURITIES ACT, MASS. GEN. LAWS CH. 110A § 410(B)

533.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 532.

EXHIBIT  53   -674-

534.    Each of the Securities was offered or sold to the Plaintiff in Massachusetts and purchased directly or for the benefit of the Clients.  Each Wall Street Bank Defendant offered or sold Securities to Plaintiff in Massachusetts.

535.    Massachusetts General Laws Chapter 110A, § 101 provides that "it is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly (1) to employ any device, scheme or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

536.    Massachusetts General Laws Chapter 110A, § 410(b) provides that "every broker-dealer or agent who materially aids in the sale [of securities by a seller liable under subsection (a) is] also liable jointly and severally with and to the same extent as the seller . . . ."

537.    Each Wall Street Bank Defendant materially aided in the offer or sale of Securities to Plaintiff pursuant to an untrue statement of a material fact or omission to state a material fact necessary in order to make the statements made not misleading, in connection with the offer or sale of the Securities to Plaintiff.

538.    In connection with the offer or sale of the Securities to Plaintiff, each Wall Street Bank Defendant violated § 410(b) by materially aiding the offer or sale of Securities pursuant to an untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made not misleading, concerning, *inter alia*, (1) the Mortgage Originators' underwriting standards that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Securities; (2) the appraisal standards that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) the LTV ratios, debt-to-income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (4) the Wall Street Bank Defendants' due diligence of the loans and the Mortgage Originators' underwriting practices; and (5) various forms of credit enhancement applicable to

EXHIBIT  53   -675-

certain tranches of Securities.  Plaintiff made the decision to purchase the Securities on behalf of the Clients not knowing of the Defendants' untruths or omissions.

539.    The Wall Street Bank Defendants' actions and conduct violated Massachusetts General Laws Ch. 110A.

540.    Plaintiff has been damaged by the Wall Street Bank Defendants' violations of the Massachusetts Securities Act.

## XI.    RELIEF REQUESTED

WHEREFORE, Plaintiff requests entry of final judgment, as expressly provided by Mass. Gen. Laws Ch. 110A, § 410, as follows:  (i) recovery of the consideration paid for the Securities, together with statutory interest from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the Securities, upon the tender of the Securities, or (ii) damages in the amount that would be recoverable upon a tender of the Securities less the value of the Securities when the buyer disposed of them, statutory interest from the date of disposition, costs, and reasonable attorneys' fees.  In addition, Plaintiff requests such other and further relief as the Court deems just and proper.

## XII.    JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.


[Remainder of Page Intentionally Left Blank]

EXHIBIT  53   -676-

Dated: July 9, 2010.

**CAMBRIDGE PLACE INVESTMENT MANAGEMENT INC.**

By its attorneys,

T. Christopher Donnelly
(BBO # 129930)
Michael S. D'Orsi
(BBO # 566960)
**DONNELLY, CONROY & GELHAAR, LLP**
One Beacon Street, 33d Floor
Boston, MA 02108
Tel:  (617) 720-2880
Fax:  (617) 720-3554
tcd@dcglaw.com
msd@dcglaw.com

Of Counsel (*pro hac vice* applications forthcoming):

**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
Gerald H. Silk
David L. Wales
Jai K. Chandrasekhar
Lauren A. McMillen
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
jerry@blbglaw.com
dwales@blbglaw.com
jai@blbglaw.com
lauren@blbglaw.com

 -and-

David R. Stickney
Timothy A. Delange
Takeo Kellar
Matthew Jubenville
12481 High Bluff Drive, Suite 300
San Diego, CA 92130

179

EXHIBIT   53   -677-

Tel:  (858) 793-0070
Fax:  (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com
takeok@blbglaw.com
matthewj@blbglaw.com

EXHIBIT  53  -678-

**Appendix A**
Morgan Stanley Certificates Purchased

| Morgan Stanley Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| ACCR 2005-3 | Prospectus, dated 6/14/2005 Prospectus Supplement, dated 8/22/2005 | Accredited Mortgage Loan REIT Trust | Accredited | 08/25/05 | $5,820,000 |
| AMIT 2005-4 | Prospectus, dated 5/10/2005 Prospectus Supplement, dated 9/7/2005 | Morgan Stanley ABS Capital I Inc. | Aames | 09/12/05 | $20,044,642 |
| IXIS 2005-HE2 | Prospectus, dated 1/19/2005 Prospectus Supplement, dated 5/23/2005 | Morgan Stanley ABS Capital I Inc. | Accredited (7%) Aegis BNC Encore (5%) First Banc (10%) First Horizon Fremont Home Loan Impac (5%) Lime Master Financial New Century (8%) Other Peoples Choice ResMae (10%) Unknown | 05/26/05 | $9,234,072 |

EXHIBIT   53   -679-

| Morgan Stanley Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| IXIS 2005-HE3 | Prospectus, dated 5/10/2005 Prospectus Supplement, dated 8/29/2005 | Morgan Stanley ABS Capital I Inc. | Accredited Encore First Banc (7%) First Horizon (5%) First NLC (11%) Impac Lime (8%) Master Financial New Century (16%) Other ResMae Unknown | 08/30/05 | $6,241,281 |
| IXIS 2005-HE4 | Prospectus, dated 5/10/2005 Prospectus Supplement, dated 11/18/2005 | Morgan Stanley ABS Capital I Inc. | Accredited Chapel Encore First Horizon First NLC Fremont Impac Lime New Century NULL Other ResMae Unknown | 11/23/05 | $3,705,708 |

EXHIBIT   53   -680-

| Morgan Stanley Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| IXIS 2006-HE3 | Prospectus, dated 8/18/2006 Prospectus Supplement, dated 9/26/2006 | Morgan Stanley ABS Capital I Inc. | New Century (16%) Accredited (12%) Encore (9%) Unknown (61%) | 09/29/06 | $4,137,654 |
| MSAC 2005-HE4 | Prospectus, dated 5/10/2005 Prospectus Supplement, dated 8/23/2005 | Morgan Stanley ABS Capital I Inc. | Accredited Decision One WMC | 08/26/05 | $4,500,000 |
| MSAC 2005-NC2 | Prospectus, dated 2/17/2005 Prospectus Supplement, dated 4/22/2005 | Morgan Stanley ABS Capital I Inc. | New Century (100%) | 04/29/05 | $19,758,000 |
| MSAC 2005-WMC2 | Prospectus, dated 2/17/2005 Prospectus Supplement, dated 3/24/2005 | Morgan Stanley ABS Capital I Inc. | WMC (100%) | 03/30/05 | $5,000,000 |
| MSAC 2005-WMC3 | Prospectus, dated 2/17/2005 Prospectus Supplement, dated 5/4/2005 | Morgan Stanley ABS Capital I Inc. | WMC (100%) | 05/06/05 | $7,827,000 |
| MSAC 2005-WMC5 | Prospectus, dated 5/10/2005 Prospectus Supplement, dated 6/24/2005 | Morgan Stanley ABS Capital I Inc. | WMC (100%) | 07/01/05 | $22,716,000 |

EXHIBIT  53  -681-

| Morgan Stanley Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| MSAC 2005-WMC6 | Prospectus, dated 5/10/2005 Prospectus Supplement, dated 8/8/2005 | Morgan Stanley ABS Capital I Inc. | WMC (100%) | 08/11/05 | $10,051,000 |
| MSAC 2006-HE1 | Prospectus, dated 7/27/2005 Prospectus Supplement, dated 2/24/2006 | Morgan Stanley Capital I Inc. | Decision One WMC | 02/28/06 | $1,484,594 |
| MSAC 2006-HE3 | Prospectus, dated 3/14/2006 Prospectus Supplement, dated 5/22/2006 | Morgan Stanley ABS Capital I Inc. | Decision One New Century WMC | 05/25/06 | $2,889,000 |
| MSAC 2007-HE3 | Prospectus, dated 2/22/2007 Prospectus Supplement, dated 2/27/2007 | Morgan Stanley ABS Capital I Inc. | Fremont New Century | 02/28/07 | $23,300,000 |
| MSHEL 2005-1 | Prospectus, dated 11/12/2004 Prospectus Supplement, dated 1/24/2005 | Morgan Stanley ABS Capital I Inc. | First NLC Meritage MILA Wilmington | 01/28/05 | $9,118,000 |

EXHIBIT   53   -682-

| Morgan Stanley Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| MSHEL 2006-1 | Prospectus, dated 5/10/2005 Prospectus Supplement, dated 1/24/2006 | Morgan Stanley ABS Capital I Inc. | Accredited Countrywide Decision One First NLC Meritage Wilmington | 01/26/06 | $4,000,000 |
| NCHET 2005-3 | Prospectus, dated 4/20/2005 Prospectus Supplement, dated 6/21/2005 | New Century Mortgage Securities LLC | New Century (100%) | 06/24/05 | $20,000,000 |
| NCHET 2005-B | Prospectus, dated 8/12/2005 Prospectus Supplement, dated 9/27/2005 | New Century Mortgage Securities, Inc. | New Century | 09/29/05 | $7,500,000 |
| NCHET 2005-C | Prospectus, dated 9/27/2005 Prospectus Supplement, dated 11/23/2005 | New Century Mortgage Securities, Inc. | New Century | 01/13/06 | $4,689,248 |
| NCHET 2005-D | Prospectus, dated 9/27/2005 Prospectus Supplement, dated 12/22/2005 | New Century Mortgage Securities LLC | New Century (100%) | 03/02/06 12/25/05 | $10,413,421 |

EXHIBIT   53   -683-

| Morgan Stanley Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| NTIX 2007-HE2 | Prospectus, dated 2/22/2007 Prospectus Supplement, dated 4/25/2007 | Morgan Stanley ABS Capital I Inc. | Accredited CIT First Horizon First NLC Lenders Direct Lime Mandalay Master Financial New Century Platinum Capital Unknown | 04/30/07 | $9,500,000 |
| SAST 2006-3 | Prospectus, dated 4/26/2006 Prospectus Supplement, dated 10/5/2006 | Saxon Asset Securities Company | Saxon (100%) | 10/10/06 | $7,450,000 |

EXHIBIT   53   -684-

**Appendix B**
Citigroup Certificates Purchased

| Citigroup Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| ARSI 2005-W2 | Prospectus, dated 4/15/2005 Prospectus Supplement, dated 9/23/2005 | Argent Securities Inc. | Argent (100%) | 09/27/05 09/27/05 | $17,397,300 |
| ARSI 2006-W1 | Prospectus, dated 4/15/2005 Prospectus Supplement, dated 1/27/2006 | Argent Securities Inc. | Argent | 02/07/06 | $2,434,260 |
| CARR 2005-NC3 | Prospectus, dated 5/3/2005 Prospectus Supplement, dated 6/3/2005 | Citigroup Mortgage Loan Trust Inc. | New Century (100%) | 06/07/05 | $19,940,000 |
| CARR 2005-NC5 | Prospectus, dated 7/7/2005 Prospectus Supplement, dated 9/29/2005 | Stanwich Asset Acceptance Company, L.L.C. | New Century (100%) | 10/04/05 | $31,027,100 |
| CARR 2006-NC2 | Prospectus, dated 5/16/2006 Prospectus Supplement, dated 6/16/2006 | Stanwich Asset Acceptance Company, L.L.C. | New Century (100%) | 06/21/06 | $2,515,026 |
| CARR 2006-NC4 | Prospectus, dated 8/1/2006 Prospectus Supplement, dated 9/25/2006 | Stanwich Asset Acceptance Company, L.L.C. | New Century (100%) | 09/28/06 | $5,000,000 |

EXHIBIT  53  -685-

| Citigroup Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| CMLTI 2005-9 | Prospectus, dated 9/29/2005 Prospectus Supplement, dated 11/29/2005 | Citigroup Mortgage Loan Trust Inc. | Ameriquest | 01/13/06 | $9,691,438 |
| CMLTI 2005-HE1 | Prospectus, dated 4/15/2005 Prospectus Supplement, dated 9/23/2005 | Citigroup Mortgage Loan Trust Inc. | WMC (69%) Argent (20%) Mortgage IT (10%) ResMae | 05/10/05 | $6,926,512 |
| CMLTI 2005-HE3 | Prospectus, dated 5/3/2005 Prospectus Supplement, dated 9/9/2005 | Citigroup Mortgage Loan Trust Inc. | Accredited First Horizon Impac MortgageIT WMC | 09/13/05 | $9,968,729 |
| CMLTI 2006-HE1 | Prospectus, dated 9/29/2005 Prospectus Supplement, dated 3/28/2006 | Citigroup Mortgage Loan Trust Inc. | Centex First Horizon MortgageIT Option One Other | 03/30/06 | $1,739,320 |
| CMLTI 2006-WFH3 | Prospectus, dated 6/29/2006 Prospectus Supplement, dated 10/4/2006 | Citigroup Mortgage Loan Trust Inc. | Wells Fargo | 10/31/06 | $30,000,000 |
| CMLTI 2007-AMC2 | Prospectus, dated 12/13/2006 Prospectus Supplement, dated 2/15/2007 | Park Place Securities, Inc. | Ameriquest Argent | 03/30/07 | $77,000,000 |
| CMLTI 2007-FS1 | Private Placement Memorandum | Citigroup Mortgage Loan Trust Inc. | Fieldstone | 12/12/07 | $3,509,794 |

EXHIBIT   53   -686-

**Appendix C**
Credit Suisse Certificates Purchased

| Credit Suisse Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| AABST 2005-4 | Prospectus, dated 6/10/2005 Prospectus Supplement, dated 8/18/2005 | Aegis Asset Backed Securities Corporation | Aegis | 08/30/05 | $14,416,310 |
| ABSHE 2005-HE1 | Prospectus, dated 11/22/2004 Prospectus Supplement, dated 2/1/2005 | Asset Backed Securities Corporation | New Century WMC | 02/04/05 | $4,513,000 |
| ABSHE 2005-HE3 | Prospectus, dated 3/1/2005 Prospectus Supplement, dated 3/31/2005 | Asset Backed Securities Corporation | WMC | 04/04/05 | $4,484,000 |
| ABSHE 2005-HE4 | Prospectus, dated 3/1/2005 Prospectus Supplement, dated 5/3/2005 | Asset Backed Securities Corporation | New Century | 05/05/05 05/03/05 | $8,046,700 |
| ABSHE 2005-HE5 | Prospectus, dated 3/1/2005 Prospectus Supplement, dated 6/1/2005 | Asset Backed Securities Corporation | WMC | 06/06/05 | $6,871,000 |
| ABSHE 2006-HE3 | Prospectus, dated 4/5/2006 Prospectus Supplement, dated 4/5/2006 | Asset Backed Securities Corporation | Option One | 04/17/06 | $6,110,113 |

EXHIBIT  53  -687-

| Credit Suisse Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| ABSHE 2006-HE6 | Prospectus, dated 11/29/2006 Prospectus Supplement, dated 11/29/2006 | Asset Backed Securities Corporation | Ameriquest Argent Unknown | 11/30/06 | $9,946,000 |
| ABSHE 2006-HE7 | Prospectus, dated 11/29/2006 Prospectus Supplement, dated 11/29/2006 | Asset Backed Securities Corporation | Ameriquest Argent | 11/30/06 | $23,414,000 |
| AMSI 2005-R6 | Prospectus, dated 4/22/2005 Prospectus Supplement, dated 7/27/2005 | Ameriquest Mortgage Securities Inc. | Ameriquest | 07/29/05 | $31,583,752 |
| AMSI 2005-R8 | Prospectus, dated 4/22/2005 Prospectus Supplement, dated 9/23/2005 | Ameriquest Mortgage Securities Inc. | Ameriquest | 09/28/05 | $8,942,659 |
| AMSI 2006-R2 | Prospectus, dated 3/9/2006 Prospectus Supplement, dated 3/9/2006 | Ameriquest Mortgage Securities Inc. | Ameriquest | 03/29/06 | $5,960,655 |
| FHLT 2005-A | Prospectus, dated 2/18/2005 Prospectus Supplement, dated 2/18/2005 | Fremont Mortgage Securities Corporation | Fremont | 02/22/05 | $8,000,000 |

EXHIBIT  53  -688-

| Credit Suisse Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| FMIC 2007-1 | Prospectus, dated 6/8/2006 Prospectus Supplement, dated 4/11/2007 | Fieldstone Mortgage Investment Corporation | AHM Centex Fidelity Fieldstone First Horizon Gateway GMAC Home Loan National City Novastar | 04/12/07 | $9,750,000 |
| HEAT 2005-1 | Prospectus, dated 1/25/2005 Prospectus Supplement, dated 1/26/2005 | Credit Suisse First Boston Mortgage Securities Corp. | DLG Mortgage Capital | 01/31/05 | $17,354,611 |
| HEAT 2005-2 | Prospectus, dated 1/25/2005 Prospectus Supplement, dated 3/29/2005 | Credit Suisse First Boston Mortgage Securities Corp. | DLG Mortgage Capital | 04/01/05 | $2,996,343 |
| HEAT 2005-3 | Prospectus, dated 1/25/2005 Prospectus Supplement, dated 4/26/2005 | Credit Suisse First Boston Mortgage Securities Corp. | DLG Mortgage Capital | 04/29/05 | $8,196,028 |
| HEAT 2005-4 | Prospectus, dated 1/25/2005 Prospectus Supplement, dated 7/1/2005 | Credit Suisse First Boston Mortgage Securities Corp. | DLG Mortgage Capital | 07/05/05 | $29,038,288 |

EXHIBIT   53   -689-

| Credit Suisse Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| HEAT 2005-5 | Prospectus, dated 1/25/2005 Prospectus Supplement, dated 8/1/2005 | Credit Suisse First Boston Mortgage Securities Corp. | DLG Mortgage Capital | 08/02/05 | $22,353,094 |
| HEAT 2005-6 | Prospectus, dated 1/25/2005 Prospectus Supplement, dated 8/30/2005 | Credit Suisse First Boston Mortgage Securities Corp. | DLG Mortgage Capital | 09/02/05 | $9,227,237 |
| HEAT 2005-7 | Prospectus, dated 1/25/2005 Prospectus Supplement, dated 9/29/2005 | Credit Suisse First Boston Mortgage Securities Corp. | DLG Mortgage Capital | 10/04/05 | $10,751,089 |
| HEAT 2005-8 | Prospectus, dated 1/25/2005 Prospectus Supplement, dated 10/31/2005 | Credit Suisse First Boston Mortgage Securities Corp. | DLG Mortgage Capital | 11/02/05 | $13,388,905 |
| HEAT 2005-9 | Prospectus, dated 6/1/2005 Prospectus Supplement, dated 12/02/2005 | Credit Suisse First Boston Mortgage Securities Corp. | Unknown (100%) | 05/18/06 | $3,480,440 |
| HEAT 2006-4 | Prospectus, dated 4/26/2006 Prospectus Supplement, dated 5/1/2006 | Credit Suisse First Boston Mortgage Securities Corp. | Aames Aegis Finance America Other Wells Fargo | 05/05/06 05/01/06 | $16,761,283 |

EXHIBIT   53   -690-

| Credit Suisse Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| HEAT 2006-7 | Prospectus, dated 8/28/2006 Prospectus Supplement, dated 9/29/2006 | Credit Suisse First Boston Mortgage Securities Corp. | DLJ Mortgage Capital | 10/03/06 | $50,000,000 |
| HEMT 2005-5 | Prospectus, dated 4/22/2005 Prospectus Supplement, dated 7/27/2005 | Credit Suisse First Boston Mortgage Securities Corp. | Unknown (100%) | 12/29/05 | $5,860,000 |
| HEMT 2006-2 | Prospectus, dated 4/5/2006 Prospectus Supplement, dated 4/26/2006 | Credit Suisse First Boston Mortgage Securities Corp. | Unknown (100%) | 04/28/06 | $5,282,988 |
| LBMLT 2005-WL2 | Prospectus, dated 2/10/2004 Prospectus Supplement, dated 8/25/2005 | Long Beach Securities Corp. | Long Beach | 08/30/05 11/04/05 | $21,662,382 |
| PPSI 2005-WHQ3 | Prospectus, dated 1/21/2005 Prospectus Supplement, dated 5/24/2005 | Park Place Securities, Inc. | Argent | 05/26/05 | $8,719,436 |
| SAST 2005-2 | Prospectus, dated 10/21/2004 Prospectus Supplement, dated 6/1/2005 | Saxon Asset Securities Company | Saxon | 06/07/05 | $19,990,000 |

EXHIBIT   53   -691-

**Appendix D**
Greenwich Certificates Purchased

| Greenwich Capital Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| AHMA 2007-3 | Prospectus, dated 4/21/2006 Prospectus Supplement, dated 8/29/2006 | American Home Mortgage Assets LLC | AHM | 06/12/07 | $15,014,175 |
| ARSI 2006-W5 | Prospectus, dated 3/31/2006 Prospectus Supplement, dated 5/12/2006 | Argent Securities Inc. | Argent (100%) | 05/25/06 | $5,250,525 |
| EMLT 2005-1 | Prospectus, dated 2/22/2005 Prospectus Supplement, dated 3/14/2005 | Financial Asset Securities Corp. | Equifirst | 03/17/05 | $10,082,098 |
| FFML 2006-FF8 | Prospectus, dated 4/26/2006 Prospectus Supplement, dated 6/6/2006 | Financial Asset Securities Corp. | First Franklin | 06/29/06 | $1,325,146 |
| FHLT 2005-1 | Prospectus, dated 2/22/2005 Prospectus Supplement, dated 3/24/2005 | Financial Asset Securities Corp. | Fremont | 03/29/05 | $4,000,000 |
| HELT 2007-FRE1 | Prospectus, dated 6/26/2007 Prospectus Supplement, dated 6/28/2007 | Nationstar Funding LLC | Fremont | 07/10/07 | $12,580,000 |

EXHIBIT  53  -692-

| Greenwich Capital Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| LBMLT 2005-1 | Prospectus, dated 2/10/2005 Prospectus Supplement, dated 1/3/2005 | Long Beach Securities Corp. | Long Beach | 03/11/05 01/06/05 | $17,500,000 |
| LBMLT 2005-WL1 | Prospectus, dated 2/10/2004 Prospectus Supplement, dated 7/13/2005 | Long Beach Securities Corp. | Long Beach (100%) | 09/15/06 07/15/05 | $24,094,375 |
| MMLT 2005-2 | Prospectus, dated 2/22/2005 Prospectus Supplement, dated 6/17/2005 | Financial Asset Securities Corp. | Meritage (100%) | 06/22/05 | $17,536,250 |
| NAA 2007-S1 | Private Placement Memorandum | Nomura Asset Acceptance Corporation | Unknown | 02/14/07 | $34,005,213 |
| NHEL 2005-1 | Prospectus, dated 12/27/2004 Prospectus Supplement, dated 2/16/2005 | NovaStar Mortgage Funding Corporation | Novastar (100%) | 02/22/05 | $11,500,000 |
| NHEL 2005-3 | Prospectus, dated 12/27/2004 Prospectus Supplement, dated 9/19/2005 | NovaStar Mortgage Funding Corporation | Novastar (100%) | 09/22/05 | $15,500,000 |

EXHIBIT  53  -693-

| Greenwich Capital Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| SVHE 2005-1 | Prospectus, dated 2/22/2005 Prospectus Supplement, dated 2/24/2005 | Financial Asset Securities Corp. | Accredited Argent CIT ResMae WMC | 02/28/05 11/01/06 | $11,783,000 |
| SVHE 2005-A | Prospectus, dated 2/22/2005 Prospectus Supplement, dated 6/17/2005 | Financial Asset Securities Corp. | Countrywide (54%) Aames (20%) Fremont (18%) Meritage (5%) Other | 06/23/05 | $34,573,672 |
| SVHE 2005-B | Prospectus, dated 9/26/2005 Prospectus Supplement, dated 10/21/2005 | Financial Asset Securities Corp. | Aames Countrywide Fremont Long Beach Meritage New Century WMC | 10/25/05 | $12,681,338 |
| SVHE 2005-DO1 | Prospectus, dated 2/22/2005 Prospectus Supplement, dated 5/12/2005 | Financial Asset Securities Corp. | Decision One (100%) | 05/13/05 | $6,319,594 |
| SVHE 2006-OPT2 | Prospectus, dated 9/26/2005 Prospectus Supplement, dated 3/14/2006 | Financial Asset Securities Corp. | Option One | 04/07/06 | $872,813 |

EXHIBIT   53   -694-

| Greenwich Capital Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| SVHE 2006-OPT5 | Prospectus, dated 4/26/2006 Prospectus Supplement, dated 5/24/2006 | Financial Asset Securities Corp. | Option One (100%) | 06/19/06 | $5,581,438 |
| WAMU 2005-AR2 | Prospectus, dated 2/10/2004 Prospectus Supplement, dated 1/21/2005 | Washington Mutual Mortgage Securities Corp. | WaMu | 01/26/05 | $20,172,000 |

EXHIBIT  53   -695-

**Appendix E**
Deutsche Bank Certificates Purchased

| Deutsche Bank Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| ACE 2005-HE2 | Prospectus, dated 9/23/2004 Prospectus Supplement, dated 3/23/2005 | Ace Securities Corp. | Ameriquest Argent Chapel First Street Financial Fremont Millenium Other OwnIT Wells Fargo | 03/29/05 | $3,743,000 |
| ACE 2005-HE5 | Prospectus, dated 6/23/2005 Prospectus Supplement, dated 8/23/2005 | Ace Securities Corp. | Fremont (86%) Impac Lenders Direct Other Peoples Choice WMC | 08/26/05 | $17,410,623 |
| ACE 2005-HE6 | Prospectus, dated 6/23/2005 Prospectus Supplement, dated 9/272005 | Ace Securities Corp. | Chapel (7%) CIT First Street Financial Fremont (61%) Lenders Direct Master Financial MortgageIT Novastar (9%) Other | 09/28/05 | $11,660,978 |

EXHIBIT  53  -696-

| Deutsche Bank Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| ACE 2005-HE7 | Prospectus, dated 6/23/2005 Prospectus Supplement, dated 11/23/2005 | Ace Securities Corp. | Chapel Countrywide Lenders Direct Mandalay Master Financial Option One Other ResMae WMC | 11/28/05 | $8,015,217 |
| ACE 2006-FM2 | Prospectus, dated 4/18/2006 Prospectus Supplement, dated 10/26/2006 | Ace Securities Corp. | Fremont | 10/30/06 | $12,000,000 |
| ACE 2006-HE1 | Prospectus, dated 6/23/2005 Prospectus Supplement, dated 2/24/2006 | Ace Securities Corp. | Fieldstone First Street Financial Fremont GreenPointLenders DirectMillenium New Century Other OwnIT WMC | 02/28/06 | $7,623,560 |
| ACE 2006-NC1 | Prospectus, dated 6/23/2005 Prospectus Supplement, dated 2/24/2006 | Ace Securities Corp. | New Century | 03/13/07 01/30/06 | $6,951,339 |

EXHIBIT   53   -697-

| Deutsche Bank Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| ACE 2006-NC2 | Prospectus, dated 4/18/2006 Prospectus Supplement, dated 9/14/2006 | Ace Securities Corp. | New Century | 09/15/06 | $1,470,000 |
| ACE 2006-OP1 | Prospectus, dated 4/18/2006 Prospectus Supplement, dated 5/17/2006 | Ace Securities Corp. | Option One (100%) | 05/25/06 | $2,552,242 |
| ACE 2006-SL1 | Prospectus, dated 6/23/2005 Prospectus Supplement, dated 1/26/2006 | Ace Securities Corp. | Ameriquest Mortgage Company Fremont Investment & Loan New Century Other | 01/27/06 | $6,224,000 |
| ACE 2006-SL2 | Prospectus, dated 6/23/2005 Prospectus Supplement, dated 3/24/2006 | Ace Securities Corp. | Ameriquest Fremont (30%) Lime Long Beach (60%) Millenium MortgageIT New Century Other Unknown | 03/28/06 05/12/06 | $10,891,208 |

EXHIBIT   53   -698-

| Deutsche Bank Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| ACE 2007-HE2 | Free Writing Prospectus dated 2/26/2007 | Ace Securities Corp. | CIT<br>First NLC<br>First Street Financial<br>Impac<br>Lenders Direct<br>Lime<br>MortgageIT<br>Option One<br>Other<br>Peoples Choice<br>WMC | 03/08/07 | $24,861,965 |
| ALBT 2007-S1 | Private Placement Memorandum | Alliance Securities Corp. | Alliance Bancorp | 04/13/07 | $14,199,454 |
| NCHET 2005-4 | Prospectus, dated 8/12/2005<br>Prospectus Supplement, dated 8/12/2005 | New Century Mortgage Securities LLC | New Century Mortgage Corporation | 08/17/05 | $9,500,000 |

EXHIBIT   53   -699-

**Appendix F**
Merrill Lynch Certificates Purchased

| Merrill Lynch Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| FFMER 2007-H1 | Prospectus, dated 5/15/2007 Prospectus Supplement, dated 10/9/2007 | Merrill Lynch Mortgage Investors, Inc. | First Franklin (100%) | 10/17/07 | $9,818,715 |
| MLMI 2005-AR1 | Prospectus, dated 8/26/2005 Prospectus Supplement, dated 9/27/2005 | Merrill Lynch Mortgage Investors, Inc. | Argent | 09/29/05 | $6,699,596 |
| MLMI 2005-NCB | Prospectus, dated 8/26/2005 Prospectus Supplement, dated 11/22/2005 | Merrill Lynch Mortgage Investors, Inc. | New Century | 11/29/05 | $7,272,506 |

EXHIBIT   53   -700-

| Merrill Lynch Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| MLMI 2005-SL2 | Prospectus, dated 1/19/2005 Prospectus Supplement, dated 6/24/2005 | Merrill Lynch Mortgage Investors, Inc. | Accredited Acoustic CDC Decision One (14%) Fieldstone (10%) First Franklin First NLC Fremont (14%) Lime (6%) MILA (13%) Oakmont Option One (16%) Other Unknown | 06/28/05 | $8,970,030 |
| MLMI 2005-SL3 | Prospectus, dated 8/26/2005 Prospectus Supplement, dated 11/8/2005 | Merrill Lynch Mortgage Investors, Inc. | Accredited Acoustic Option One Other | 11/10/05 12/30/05 | $16,320,059 |
| MLMI 2005-WMC1 | Prospectus, dated 1/19/2005 Prospectus Supplement, dated 1/25/2005 | Merrill Lynch Mortgage Investors, Inc. | WMC | 01/27/05 04/11/06 | $14,970,065 |

EXHIBIT   53   -701-

| Merrill Lynch Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| MLMI 2006-HE4 | Prospectus, dated 3/21/2006 Prospectus Supplement, dated 7/21/2006 | Merrill Lynch Mortgage Investors, Inc. | First Horizon First NLC (44%) First Street Financial (5%) Fremont Impac Lenders Direct (17%) Novastar (32%) | 07/25/06 | $4,000,000 |
| MLMI 2006-HE5 | Prospectus, dated 3/31/2006 Prospectus Supplement, dated 9/26/2006 | Merrill Lynch Mortgage Investors, Inc. | Accredited (13%) Aegis (45%) Alliance Encore Equifirst Fieldstone (7%) First Street Financial Indy Mac (12%) Meritage Millenium Other Unknown | 09/28/06 | $17,000,000 |

EXHIBIT   53   -702-

| Merrill Lynch Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| MLMI 2006-SL1 | Prospectus, dated 1/18/2006 Prospectus Supplement, dated 1/24/2006 | Merrill Lynch Mortgage Investors, Inc. | Accredited Acoustic Citigroup GreenPoint Home Loan Lime Option One Other Unknown | 01/26/06 | $10,302,000 |
| PPSI 2005-WHQ1 | Prospectus, dated 1/21/2005 Prospectus Supplement, dated 2/22/2005 | Park Place Securities, Inc. | Argent Unknown | 02/24/05 | $12,000,000 |
| RALI 2006-QS17 | Prospectus, dated 12/6/2006 Prospectus Supplement, dated 12/22/2006 | Residential Accredit Loans, Inc. | GMAC | 01/10/07 | $10,023,625 |
| SURF 2005-BC1 | Prospectus, dated 1/19/2005 Prospectus Supplement, dated 3/3/2005 | Merrill Lynch Mortgage Investors, Inc. | Unknown | 03/07/05 | $6,512,000 |

EXHIBIT  53  -703-

**Appendix G**
UBS Certificates Purchased

| UBS Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| AMSI 2005-R7 | Prospectus, dated 4/22/2005 Prospectus Supplement, dated 8/23/2005 | Ameriquest Mortgage Securities Inc. | Ameriquest | 08/26/05 | $10,550,263 |
| ARSI 2006-W3 | Prospectus, dated 4/15/2005 Prospectus Supplement, dated 3/15/2006 | Argent Securities Inc. | Argent | 03/29/06 | $1,264,028 |
| FFML 2005-FF7 | Prospectus, dated 6/2/2005 Prospectus Supplement, dated 8/22/2005 | Mortgage Asset Securitization Transactions, Inc. | First Franklin | 08/26/05 | $3,000,000 |
| MABS 2005-FRE1 | Prospectus, dated 6/2/2005 Prospectus Supplement, dated 11/23/2005 | Mortgage Asset Securitization Transactions, Inc. | Fremont | 11/29/05 | $4,435,498 |
| MABS 2005-NC1 | Prospectus, dated 10/25/2004 Prospectus Supplement, dated 1/13/2005 | Mortgage Asset Securitization Transactions, Inc. | New Century | 01/20/05 | $5,000,000 |
| MABS 2006-AM2 | Private Placement Memorandum | Mortgage Asset Securitization Transactions, Inc. | Aames | 07/28/06 | $3,588,417 |

EXHIBIT  53  -704-

| UBS Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| MABS 2006-FRE2 | Prospectus, dated 4/18/2006 Prospectus Supplement, dated 5/4/2006 | Mortgage Asset Securitization Transactions, Inc. | Fremont | 05/30/06 | $2,053,596 |
| MABS 2006-HE1 | Prospectus, dated 6/2/2005 Prospectus Supplement, dated 2/22/2006 | Mortgage Asset Securitization Transactions, Inc. | First Street Financial Fremont Impac National City Unknown | 03/02/06 | $4,954,096 |
| MABS 2006-NC2 | Prospectus, dated 8/3/2006 Prospectus Supplement, dated 8/21/2006 | Mortgage Asset Securitization Transactions, Inc. | New Century | 09/28/06 | $1,450,000 |
| MABS 2006-WMC4 | Prospectus, dated 10/17/2006 Prospectus Supplement, dated 11/3/2006 | Mortgage Asset Securitization Transactions, Inc. | WMC | 11/30/06 | $19,000,000 |

EXHIBIT   53   -705-

**Appendix H**
Goldman Sachs Certificates Purchased

| Goldman Sachs Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| CBASS 2006-SL1 | Private Placement Memorandum dated 9/7/2006 | Credit-Based Asset Servicing and Securitization LLC | Unknown | 09/08/06 | $8,997,000 |
| GSAMP 2005-HE6 | Prospectus, dated 11/17/2005 Prospectus Supplement, dated 12/22/2005 | GS Mortgage Securities Corp. | Acoustic First NLC Fremont Meritage Unknown | 12/29/05 | $3,346,720 |
| GSAMP 2006-HE6 | Prospectus, dated 8/3/2006 Prospectus Supplement, dated 9/13/2006 | GS Mortgage Securities Corp. | Ameriquest Other OwnIT Unknown | 09/14/06 | $2,250,000 |
| GSAMP 2006-S1 | Prospectus, dated 11/17/2005 Prospectus Supplement, dated 1/23/2006 | GS Mortgage Securities Corp. | Alliance Goldman Long Beach M&T NULL Option One Other RFC Southstar Unknown | 01/27/06 | $6,800,000 |

EXHIBIT   53   -706-

| Goldman Sachs Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| LBMLT 2005-2 | Prospectus, dated 2/10/2004 Prospectus Supplement, dated 3/31/2005 | Long Beach Securities Corp. | Long Beach (100%) | 04/05/05 | $23,000,000 |
| LBMLT 2006-7 | Prospectus, dated 7/21/2006 Prospectus Supplement, dated 8/24/2006 | Long Beach Securities Corp. | Long Beach (100%) | 08/30/06 | $2,399,025 |
| LBMLT 2006-WL1 | Prospectus, dated 2/10/2004 Prospectus Supplement, dated 1/25/2006 | Long Beach Securities Corp. | Long Beach | 02/08/06 | $4,000,000 |

EXHIBIT   53   -707-

**Appendix I**
J.P. Morgan Certificates Purchased

| J.P. MorganCertificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| JPMAC 2005-FLD1 | Prospectus, dated 7/27/2005 Prospectus Supplement, dated 7/29/2005 | J.P. Morgan Acceptance Corporation I | Fieldstone | 08/03/05 | $8,258,508 |
| JPMAC 2005-OPT1 | Prospectus, dated 6/27/2005 Prospectus Supplement, dated 7/21/2005 | J.P. Morgan Acceptance Corporation I | Option One | 07/26/05 | $3,566,333 |
| JPMAC 2005-OPT2 | Prospectus, dated 8/25/2005 Prospectus Supplement, dated 12/15/2005 | J.P. Morgan Acceptance Corporation I | Option One | 12/21/05 | $4,639,353 |
| JPMAC 2005-WMC1 | Prospectus, dated 8/25/2005 Prospectus Supplement, dated 10/24/2005 | J.P. Morgan Acceptance Corporation I | WMC | 10/27/05 | $9,000,000 |
| JPMAC 2006-CH1 | Prospectus, dated 9/21/2006 Prospectus Supplement, dated 10/26/2006 | J.P. Morgan Acceptance Corporation I | Chase | 11/14/06 | $6,546,000 |
| JPMAC 2006-CW2 | Prospectus, dated 4/24/2006 Prospectus Supplement, dated 8/2/2006 | J.P. Morgan Acceptance Corporation I | Countrywide | 08/08/06 | $5,000,000 |

EXHIBIT   53   -708-

| J.P. MorganCertificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| JPMAC 2006-WMC1 | Prospectus, dated 8/25/2005 Prospectus Supplement, dated 3/16/2006 | J.P. Morgan Acceptance Corporation I | WMC | 03/30/06 | $1,302,225 |
| RASC 2006-KS6 | Prospectus, dated 7/18/2006 Prospectus Supplement, dated 7/26/2006 | Residential Asset Securities Corporation | Unknown | 07/28/06 | $3,490,365 |

EXHIBIT   53   -709-

**Appendix J**
Bear Stearns Certificates Purchased

| Bear Stearns Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| AABST 2005-5 | Private Placement Memorandum, dated 10/27/2005 | Aegis Asset Backed Securities Corporation | Aegis | 10/28/05 | $3,380,671 |
| AMIT 2005-1 | Prospectus, dated 4/26/2004 Prospectus Supplement, dated 2/17/2005 | Bear Stearns Asset Backed Securities I LLC | Aames | 02/24/05 | $8,986,369 |
| BSABS 2005-AQ2 | Prospectus, dated 6/24/2005 Prospectus Supplement, dated 11/17/2005 | Bear Stearns Asset Backed Securities I LLC | Ameriquest | 12/08/05 | $4,489,745 |
| BSABS 2005-HE10 | Prospectus, dated 6/24/2005 Prospectus Supplement, dated 10/27/2005 | Bear Stearns Asset Backed Securities I LLC | Acoustic (9%) Century First Horizon Fremont Maribella Mortgage MortgageIT (8%) Oak Street Mortgage Opteum Other Peoples Choice (10%) ResMae (41%) | 10/31/05 12/21/05 02/09/06 | $18,546,031 |

EXHIBIT   53   -710-

| Bear Stearns Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| BSABS 2005-HE4 | Prospectus, dated 4/26/2004 Prospectus Supplement, dated 4/26/2005 | Bear Stearns Asset Backed Securities I LLC | Acoustic (12%) Fieldstone (10%) First Horizon HomEq Homestar MLN (5%) MortgageIT Other Peoples Choice Platinum Capital Sebring Capital (11%) | 04/29/05 05/09/05 | $10,735,486 |
| BSABS 2005-HE8 | Prospectus, dated 6/24/2005 Prospectus Supplement, dated 8/29/2005 | Bear Stearns Asset Backed Securities I LLC | Aames (8%) Acoustic AHM Alliance Cendant Century CIT (13%) First Horizon Maribella Mortgage Millenium MortgageIT Oak Street Mortgage Other Platinum Capital ResMae (21%) | 08/31/05 | $4,773,115 |

EXHIBIT   53   -711-

| Bear Stearns Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| BSABS 2005-HE9 | Prospectus, dated 4/26/2004 Prospectus Supplement, dated 9/28/2005 | Bear Stearns Asset Backed Securities I LLC | Aames Acoustic Alliance Century CIT Encore First Horizon Maribella Mortgage MortgageIT (13%) Oak Street Mortgage Opteum Other Platinum Capital ResMae (43%) | 09/30/05 | $25,820,000 |
| BSABS 2006-EC1 | Prospectus, dated 6/24/2005 Prospectus Supplement, dated 1/26/2006 | Bear Stearns Asset Backed Securities I LLC | Encore | 01/30/06 | $4,200,000 |
| BSABS 2006-EC2 | Prospectus, dated 6/24/2005 Prospectus Supplement, dated 2/21/2006 | Bear Stearns Asset Backed Securities I LLC | Encore | 04/27/06 | $4,883,746 |

EXHIBIT   53   -712-

| Bear Stearns Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| BSABS 2006-HE1 | Prospectus, dated 06/24/2005 Prospectus Supplement, dated 1/26/2006 | Bear Stearns Asset Backed Securities I LLC | Encore First Horizon Maribella Mortgage MILA MLN MortgageIT Oak Street Mortgage Other Peoples Choice Platinum Capital ResMae Unknown Wilmington | 01/30/06 | $2,769,000 |
| BSABS 2006-HE10 | Prospectus, dated 12/18/2006 Prospectus Supplement, dated 12/28/2006 | Bear Stearns Asset Backed Securities I LLC | Unknown Other Oak Street Mortgage Millenium Encore Century Bear Stearns | 12/29/06 | $50,000,000 |

EXHIBIT  53  -713-

| Bear Stearns Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| BSABS 2006-HE3 | Prospectus, dated 6/24/2005 Prospectus Supplement, dated 3/27/2006 | Bear Stearns Asset Backed Securities I LLC | Acoustic Alliance Ameriquest Century CIT Encore First American Maribella Mortgage MILA MortgageIT Oak Street Mortgage Opteum Other Platinum Capital Unknown | 03/30/06 | $2,721,125 |

EXHIBIT   53   -714-

| Bear Stearns Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| BSABS 2006-HE4 | Prospectus, dated 4/5/2006 Prospectus Supplement, dated 4/25/2006 | Bear Stearns Asset Backed Securities I LLC | Aames Acoustic Alliance Cendant Century Encore Fremont Maribella Mortgage MortgageIT Oak Street Mortgage Opteum Other Peoples Choice ResMae Unknown | 04/28/06 | $8,282,688 |

EXHIBIT  53  -715-

| Bear Stearns Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| BSABS 2006-HE7 | Prospectus, dated 6/7/2006 Prospectus Supplement, dated 8/28/2006 | Bear Stearns Asset Backed Securities I LLC | Alliance Century CIT First NLC (28%) Gateway HomeBanc Kensington Millenium Oak Street Mortgage (5%) Opteum Other Peoples Choice (18%) Platinum Capital Provident Southstar Sterling Unknown (6%) Wachovia | 08/30/06 | $3,165,477 |
| BSABS 2006-PC1 | Prospectus, dated 6/24/2005 Prospectus Supplement, dated 1/25/2006 | Bear Stearns Asset Backed Securities I LLC | Peoples Choice | 01/30/06 | $1,650,000 |
| BSABS 2007-FS1 | Prospectus, dated 12/18/2006 Prospectus Supplement, dated 2/27/2007 | Bear Stearns Asset Backed Securities I LLC | Fieldstone | 02/28/07 | $75,000,000 |

EXHIBIT   53   -716-

| Bear Stearns Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| BSMF 2007-SL2 | Prospectus, dated 12/18/2006 Prospectus Supplement, dated 2/27/2007 | Bear Stearns Asset Backed Securities I LLC | AHM Aurora Bear Stearns Centex Encore Fidelity Fieldstone First American First NLC Frontier Gateway HomeBanc Millenium National City Opteum Other PHH Pinnacle Platinum Capital Provident Sterling Unknown Wilshire | 02/28/07 | $55,000,000 |
| BSSLT 2007-SV1A | Private Placement Memorandum | SACO I Inc. | Unknown | 03/30/07 | $14,000,000 |
| CARR 2005-NC4 | Prospectus, dated 7/7/2005 Prospectus Supplement, dated 8/11/2005 | Stanwich Asset Acceptance Company, L.L.C. | New Century | 08/16/05 | $8,379,119 |

EXHIBIT  53  -717-

| Bear Stearns Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| CARR 2006-RFC1 | Prospectus, dated 5/16/2006 Prospectus Supplement, dated 5/19/2006 | Stanwich Asset Acceptance Company, L.L.C. | GMAC (100%) | 05/24/06 | $2,078,775 |
| GPMF 2007-HE1 | Prospectus, dated 12/18/2006 Prospectus Supplement, dated 3/5/2007 | Bear Stearns Asset Backed Securities I LLC | GreenPoint | 03/06/07 | $50,000,000 |
| IRWHE 2005-A | Prospectus, dated 4/26/2004 Prospectus Supplement, dated 1/25/2005 | Bear Stearns Asset Backed Securities I LLC | Irwin | 01/28/05 12/13/07 | $37,062,000 |
| PCHLT 2005-2 | Prospectus, dated 4/26/2005 Prospectus Supplement, dated 4/26/2005 | People's Choice Home Loan Securities Corp. | Peoples Choice (100%) | 04/28/05 | $8,421,000 |
| PCHLT 2005-4 | Prospectus, dated 6/10/2005 Prospectus Supplement, dated 10/24/2005 | People's Choice Home Loan Securities Corp. | Peoples Choice (100%) | 10/26/05 | $3,365,049 |
| SACO 2004-3A | Private Placement Memorandum dated 12/30/2004 | Unknown | Unknown | 01/31/05 | $3,049,464 |
| SACO 2005-1 | Private Placement Memorandum | SACO I Inc. | First Horizon Opteum Other OwnIT Waterfield | 02/28/05 | $13,867,028 |

EXHIBIT   53   -718-

| Bear Stearns Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| SACO 2005-2 | Private Placement Memorandum | SACO I Inc. | American Home First Horizon Other Southstar Waterfield | 04/29/05 | $4,333,934 |
| SACO 2005-3 | Private Placement Memorandum | SACO I Inc. | American Home Indy Mac MILA Opteum Other ResMae | 05/31/05 | $16,552,828 |
| SACO 2005-4 | Private Placement Memorandum | SACO I Inc. | Aames American Home Other Union Federal | 06/30/05 07/05/05 | $18,713,424 |
| SACO 2005-5 | Prospectus, dated 6/24/2005 Prospectus Supplement, dated 7/28/2005 | Bear Stearns Asset Backed Securities I LLC | Southstar (15%) Finance America (13%) Other (71%) | 07/29/05 | $19,500,349 |
| SACO 2005-7 | Prospectus, dated 6/24/2005 Prospectus Supplement, dated 9/28/2005 | Bear Stearns Asset Backed Securities I LLC | American Home Finance America Opteum Other | 09/30/05 | $5,002,000 |

EXHIBIT   53   -719-

| Bear Stearns Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| SACO 2005-8 | Prospectus, dated 6/24/2005 Prospectus Supplement, dated 10/27/2005 | Bear Stearns Asset Backed Securities I LLC | Opteum (14%) Other (85%) | 10/28/05 | $5,337,000 |
| SACO 2005-WM3 | Prospectus, dated 6/24/2005 Prospectus Supplement, dated 10/26/2005 | Bear Stearns Asset Backed Securities I LLC | WaMu | 06/29/07 12/30/05 | $5,388,387 |
| SACO 2007-2 | Prospectus, dated 12/15/2006 Prospectus Supplement, dated 2/27/2007 | Bear Stearns Asset Backed Securities I LLC | Southstar Other | 02/28/07 | $27,000,000 |
| SAMI 2005-AR6 | Prospectus, dated 12/20/2004 Prospectus Supplement, dated 7/27/2005 | Structured Asset Mortgage Investments II Inc. | Century Countrywide First Horizon GreenPoint Millenium Other Platinum Capital Southstar Winstar | 09/08/05 | $9,944,306 |

EXHIBIT   53   -720-

**Appendix K**
Countrywide Securities Corporation Certificates Purchased

| Countrywide Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| CWALT 2005-82 | Prospectus, dated 10/25/2005 Prospectus Supplement, dated 12/23/2005 | CWALT, Inc. | Countrywide Home Loans | 12/29/05 | $3,891,000 |
| CWALT 2005-J6 | Prospectus, dated 4/21/2005 Prospectus Supplement, dated 05/27/2005 | CWALT, Inc. | Countrywide Home Loans, Inc. Flagstar Bank Greenpoint Mortgage Funding | 05/31/05 | $14,954,131 |
| CWL 2005-11 | Prospectus, dated 6/10/2005 Prospectus Supplement, dated 9/23/2005 | CWABS, Inc. | Unknown (100%) | 09/30/05 | $9,961,913 |
| CWL 2006-17 | Prospectus, dated 8/28/2006 Prospectus Supplement, dated 9/22/2006 | CWABS, Inc. | Countrywide | 09/25/06 | $40,000,000 |
| CWL 2006-18 | Prospectus, dated 8/28/2006 Prospectus Supplement, dated 9/27/2006 | CWABS, Inc. | Countrywide | 09/28/06 | $25,000,000 |

EXHIBIT  53  -721-

**Appendix L**
FBR Certificates Purchased

| Friedman Billings Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| FBRSI 2005-5 | Prospectus, dated 9/7/2005 Prospectus Supplement, dated 12/9/2005 | FBR Securitization, Inc., | Aames | 12/15/05 | $9,659,265 |
| POPLR 2005-5 | Prospectus, dated 10/17/2005 Prospectus Supplement, dated 10/17/2005 | Popular ABS, Inc. | Accredited Encore First Street Financial Franklin Mortgage MILA Other Unknown Wilmington | 10/21/05 | $12,490,598 |

EXHIBIT  53  -722-

**Appendix M**
HSBC Certificates Purchased

| HSBC Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| FFML 2006-FF5 | Prospectus, dated 4/3/2006 Prospectus Supplement, dated 5/2/2006 | HSI Asset Securitization Corporation | First Franklin (100%) | 05/22/06 | $47,000,000 |
| HASC 2005-NC2 | Prospectus, dated 7/11/2005 Prospectus Supplement, dated 10/6/2005 | HSI Asset Securitization Corporation | New Century (100%) | 10/11/05 | $16,461,005 |
| HASC 2006-OPT3 | Prospectus, dated 4/3/2006 Prospectus Supplement, dated 4/3/2006 | HSI Asset Securitization Corporation | Option One | 04/05/06 | $852,288 |

EXHIBIT   53   -723-

**Appendix N**
Banc of America Certificates Purchased

| Banc of America Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| ABFC 2005-HE1 | Prospectus, dated 3/28/2005 Prospectus Supplement, dated 3/28/2005 | Asset Backed Funding Corporation | Accredited Option One | 08/04/05 | $11,848,520 |
| ABFC 2006-OPT2 | Prospectus, dated 10/3/2006 Prospectus Supplement, dated 10/10/2006 | Asset Backed Funding Corporation | Option One | 10/23/06 | $27,734,562 |
| BOAA 2006-6 | Prospectus, dated 6/27/2006 Prospectus Supplement, dated 6/28/2006 | Banc of America Mortgage Securities, Inc. | Bank of America | 06/30/06 | $12,263,956 |
| RAMP 2006-RZ3 | Prospectus, dated 7/17/2006 Prospectus Supplement, dated 8/2/2006 | Residential Asset Mortgage Products, Inc. | GMAC | 08/04/06 | $1,853,491 |

EXHIBIT  53  -724-

**Appendix O**
GMAC Certificates Purchased

| GMAC Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| RAMP 2005-EFC4 | Prospectus, dated 7/26/2005 Prospectus Supplement, dated 9/22/2005 | Residential Asset Mortgage Products, Inc. | Equifirst | 09/29/05 | $10,193,160 |
| RASC 2006-KS2 | Prospectus, dated 2/7/2006 Prospectus Supplement, dated 2/22/2006 | Residential Asset Securities Corporation | GMAC | 02/27/06 | $5,471,124 |

EXHIBIT   53   -725-

**Appendix P**
Barclays Certificates Purchased

| Barclays Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| ARSI 2005-W3 | Prospectus, dated 4/15/2006 Prospectus Supplement, dated 10/26/2005 | Argent Securities Inc. | Argent | 10/28/05 | $3,365,396 |
| BCAP 2006-AA2 | Prospectus, dated 11/28/2006 Prospectus Supplement, dated 11/29/2006 | BCAP LLC | Indy Mac Countrywide | 11/30/06 | $40,000,000 |
| CARR 2006-FRE1 | Prospectus, dated 5/16/2006 Prospectus Supplement, dated 6/20/2006 | Stanwich Asset Acceptance Company, L.L.C. | Fremont | 06/28/06 | $2,347,000 |
| CARR 2006-FRE2 | Prospectus, dated 10/4/2006 Prospectus Supplement, dated 10/10/2006 | Stanwich Asset Acceptance Company, L.L.C. | Fremont | 10/18/06 | $20,000,000 |
| EQLS 2007-1 | Prospectus, dated 3/14/2007 Prospectus Supplement, dated 6/26/2007 | BCAP LLC | Equifirst | 06/27/07 | $3,609,371 |
| RASC 2006-KS9 | Prospectus, dated 10/26/2006 Prospectus Supplement, dated 10/19/2006 | Residential Asset Securities Corporation | GMAC | 10/27/06 | $8,000,000 |

EXHIBIT  53  -726-

| Barclays Certificates Purchased | Offering Documents | Depositor Defendant | Originator(s) | Acquisition Date(s) | Total Amount Paid |
|---|---|---|---|---|---|
| SABR 2005-FR4 | Prospectus, dated 5/20/2005 Prospectus Supplement, dated 9/22/2005 | Securitized Asset Backed Receivables LLC | Fremont | 09/29/05 | $10,761,740 |
| SABR 2005-FR5 | Prospectus, dated 5/20/2005 Prospectus Supplement, dated 11/1/2005 | Securitized Asset Backed Receivables LLC | Fremont | 11/03/05 | $8,172,085 |
| SABR 2006-FR1 | Prospectus, dated 5/20/2005 Prospectus Supplement, dated 2/21/2006 | Securitized Asset Backed Receivables LLC | Fremont | 02/23/06 | $1,980,428 |
| SABR 2006-WM2 | Prospectus, dated 10/4/2006 Prospectus Supplement, dated 10/19/2006 | Securitized Asset Backed Receivables LLC | WMC | 10/26/06 | $40,000,000 |
| SAST 2007-2 | Prospectus, dated4/26/2006 Prospectus Supplement, dated 4/25/2007 | Saxon Asset Securities Company | Saxon | 05/17/07 | $3,062,303 |

EXHIBIT   53   -727-