*EXHIBIT 54*

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

NEW MEXICO STATE INVESTMENT COUNCIL,
NEW MEXICO EDUCATIONAL RETIREMENT
BOARD, and NEW MEXICO PUBLIC EMPLOYEES'
RETIREMENT ASSOCIATION,

         Plaintiffs,

v.

COUNTRYWIDE FINANCIAL CORPORATION,
COUNTRYWIDE SECURITIES CORPORATION,
COUNTRYWIDE HOME LOANS, INC.,
CWHEQ, INC., CWMBS, INC., CWALT, INC.,
COUNTRYWIDE BANK, FSB, CWHEQ REVOLVING
HOME EQUITY LOAN TRUST SERIES 2005-I,
CWHEQ REVOLVING HOME EQUITY LOAN
TRUST SERIES 2006-C, CWHEQ REVOLVING
HOME EQUITY LOAN TRUST SERIES 2006-E,
CWHEQ REVOLVING HOME EQUITY LOAN
TRUST SERIES 2006-F, CWHEQ REVOLVING
HOME EQUITY LOAN TRUST SERIES 2007-B,
CWHEQ REVOLVING HOME EQUITY LOAN
TRUST SERIES 2007-C, CWHEQ REVOLVING HOME
EQUITY LOAN TRUST SERIES 2007-E, CWHEQ
REVOLVING HOME EQUITY LOAN TRUST SERIES
2007-G, CWHEQ REVOLVING HOME EQUITY LOAN
TRUST SERIES 2007-S3, CWHEQ HOME EQUITY LOAN
TRUST SERIES 2006-S9, CHL MORTGAGE
PASS-THROUGH TRUST 2005-26, CHL MORTGAGE
PASS-THROUGH TRUST 2006-HYB1, CHL MORTGAGE
PASS-THROUGH TRUST 2007-HYB2, ALTERNATIVE
LOAN TRUST 2005-46CB, ALTERNATIVE
LOAN TRUST 2005-72, BEAR STEARNS & CO.,
JPMORGAN SECURITIES, INC., UBS SECURITIES LLC,
STANFORD L. KURLAND, ERIC P. SIERACKI, DAVID
SAMBOL, N. JOSHUA ADLER AND DAVID SPECTOR,

         Defendants.

**ENDORSED**
First Judicial District Court

AUG 1 5 2008

Santa Fe, Rio Arriba &
Los Alamos Counties
PO Box 2268
Santa Fe, NM 87504-2268

No. D 0101-CV-2008-
02289

**JURY TRIAL DEMANDED**

**COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
FOR NEGLIGENT MISREPRESENTATION**

EXHIBIT  54  -728-

COME NOW Plaintiffs New Mexico State Investment Council ("SIC"), New Mexico

Educational Retirement Board ("ERB"), and New Mexico Public Employees' Retirement

Association ("PERA") by and through their attorneys of record, Freedman Boyd Hollander

Goldberg & Ives, PA (Joseph Goldberg, Zachary Ives and Josh Ewing) and Pomerantz Haudek

Block Grossman & Gross LLP (Stanley Grossman and Joshua Silverman) and pursuant to Rule

1-008(A) NMRA, file this Complaint for violation of Sections 11, 12 and 15 of the federal

Securities Act of 1933, 15 U.S.C. § 77a, *et. seq.*, and for New Mexico common law Negligent

Misrepresentation ("Complaint") seeking damages and rescission for Defendants' conduct as

alleged herein. In support of their Complaint, Plaintiffs state:

    1.    This case arises out of Defendants' false and misleading statements in the

registration statements and prospectuses for fifteen home equity loan asset-backed security

("ABS") and mortgage-backed security ("MBS") Certificates: (i) Alternative Loan Trust 2005-

46 CB, (ii) Alternative Loan Trust 2005-72, (iii) CHL Mortgage Pass-Through Trust 2005-26,

(iv) CHL Mortgage Pass-Through Trust 2006-HYB1, (v) CHL Mortgage Pass-Through Trust

2007-HYB2, (vi) CWHEQ Revolving Home Equity Loan Trust Series 2005-I , (vii) CWHEQ

Revolving Home Equity Loan Trust Series 2006-C, (viii) CWHEQ Revolving Home Equity

Loan Trust Series 2006-E, (ix) CWHEQ Revolving Home Equity Loan Trust Series 2006-F, (x)

CWHEQ Home Equity Loan Trust Series 2006-S9, (xi) CWHEQ Revolving Home Equity Loan

Trust Series 2007-B, and (xii) CWHEQ Revolving Home Equity Loan Trust Series 2007-C,

(xiii) CWHEQ Revolving Home Equity Loan Trust Series 2007-E, (xiv) CWHEQ Revolving

Home Equity Loan Trust Series 2007-G, and (xv) CWHEQ Revolving Home Equity Loan Trust

Series 2007-S3.  Plaintiffs purchased Certificates offered by each of these trusts, and have been

damaged by the misrepresentations and conduct alleged herein.

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

EXHIBIT 34 - 100

2.    In the registration statements and prospectuses referred to above and further

identified in this Complaint, Defendants falsely represented that the loans backing the ABS and

MBS securities were originated and verified using prudent, defined loan underwriting guidelines.

They were not.  Defendants and their subsidiaries routinely ignored their own stated

underwriting procedures and guidelines in an effort to generate high volume loan business

regardless of the credit risk, and shifted bad loans upon unsuspecting ABS and MBS investors,

including Plaintiffs.  As a result of these practices, many of the loans packaged in Defendants'

ABS and MBS securities were extended by the lender employing underwriting procedures and

guidelines that were unsafe and departed from those represented in the registration statements

and prospectuses and as a consequence began to fail at record rates, causing investors like

Plaintiffs to incur devastating losses.[1]

### BACKGROUND

3.    The vast majority of mortgages and home equity loans originated in the United

States are not retained on the books of the companies that write the loans, but are instead resold

to trusts or other entities that "securitize" the loans as collateral for ABS securities.  Mortgage-

backed MBS securities are an important subset of ABS securities.  Securitization describes the

process by which cash-flow producing instruments like mortgages are assembled into a pool, the

pool is transferred into a trust, "certificates" (bonds, actually) representing various classes in the

trust are registered in most cases with the Securities and Exchange Commission ("SEC") or other

---

[1] The registration statements and prospectuses referred to in this Complaint are too voluminous
to attach.  They are available free of charge at:
http://www.sec.gov/edgar/searchedgar/webusers.htm.

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND**
**NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

regulatory bodies, and the certificates are marketed and sold in various classes to fixed-income

investors.   The securitization process is illustrated below:[2]



4.     The investors, or "certificateholders," typically receive monthly payments derived

from the cash flow on the underlying loans.  The risk of default on the underlying loans is also

generally borne by the certificateholders.  However, the certificates do not share equally in the

income and losses of the trust.  Instead, ABS/MBS certificates are categorized into classes called

"tranches" reflecting various levels of debt subordination, and consequently, various levels of

risk.

---

[2] Illustration courtesy of THE WALL STREET JOURNAL (modified to fit page).

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**
EXHIBIT 4 - Page 54 of 109 -1-

5.      The most senior tranche represents the most solid investment (*i.e.*, least amount of

risk).  The most senior tranche is the first tranche to be paid from the cash flow from the

underlying loans, and is also the last tranche to absorb losses from delinquent or defaulting

borrowers.  As a result, at all times relevant to this action, senior tranches of ABS/MBS

securities were marketed and sold as extremely safe investments.  All of Plaintiffs' Certificates

were among the senior tranches of the respective offerings.

6.      After the senior tranches are paid, cash flow is then allocated to the middle, or

"mezzanine" tranches, and finally to the most junior, or "equity" tranche.   The illustration below

demonstrates the tranching of an ABS/MBS and the allocation of cash flow and risks between

the tranches:[3]



---

[3] Illustration courtesy of the Bond Market Association.

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

EXHIBIT C - Page 54 of 193
-32-

7.     The parties involved in an ABS or MBS generally include:

a.     **borrowers**: real estate owners solicited to enter into loans;  the borrowers are the persons obligated to make the payments on the mortgage loans that back the securities (certificates) ultimately issued.

b.     **mortgage brokers:** solicit loans from borrowers, assist borrowers with the paperwork, and shepherd the paperwork through a sponsor's origination process.

c.     **sellers (including the sponsor and other originators):**  sellers are the mortgage lenders that actually originate and fund the loans to the borrowers and oversee the entire securitization process.  Sellers establish, define and enforce underwriting guidelines and standards, and are expected by the market to fund loans in conformance with those standards.  The main seller is generally also called the "sponsor."  Other sellers are sometimes referred to as "originators."

d.     **depositor:**  the sponsor sells the loans to the depositor, an affiliated entity which collects and securitizes the loans.  Together with the sellers, the depositor oversees the securitization process.

e.     **issuing trust:** the depositor in turn sells the collected loans to an affiliated special-purpose financial vehicle known as an issuing trust, also called "the trust" or "the issuer," in exchange for certificates (bonds) representing interests in the trust, which are marketed and sold to investors with the assistance of one or more underwriters.

f.     **trustee:**  the trustee is required by its indenture to administer the deposited pool of loans for the benefit of the certificateholders.

g.   **underwriter:** the underwriter markets and sells the certificates to investors.

h.   **servicer:** the servicer handles the day-to-day interactions between the trust and the borrowers. The servicer is responsible for collecting loan proceeds and enforcing the terms of the loans.

i.   **custodian:** some trusts use a separate custodian to hold custody of the loan paperwork.

8.   With the cooperation of all of the participants identified in Paragraph 7 above, and under the requirements of the Securities Act of 1933, 15 U.S.C. § 77a, *et. seq.*, the depositor files a registration statement with the SEC covering a range of ABS or MBS securities that will be offered over a period of time. The registration statement typically contains a template prospectus that will be supplemented and issued to investors with each offering, or series, of ABS/MBS securities. When the depositor has collected sufficient assets to package into a security, it files a supplemental prospectus defining the particular security, or series, to be offered. The supplemental prospectus, as amended, is disseminated to investors in connection with the offering.

9.   The registration statements and prospectuses contain crucial disclosures to potential investors regarding the origination and underwriting practices used to obtain the underlying loans, and hence the safety of the collateral securing the potential investment. Investors utilize this information in determining whether to invest in the ABS/MBS certificates. Some of the most important information contained in the registration statements and prospectuses concerns the lender's practices for originating and underwriting mortgages and home equity loans, appraising the underlying properties securing the mortgages and home equity

loans, the lender's requirements for borrowers' income and credit history, and the loan-to-value and debt-to-income ratio required for loans securing the ABS/MBS certificates. All of this information addresses the quality and security of the underlying loans.

10.     Independent and accurate appraisals are essential to the entire mortgage lending and securitization process. Appraisals of the underlying properties are intended to provide an independent and accurate assessment of the value of the mortgaged property. This ensures that a mortgage or home equity loan is not under-collateralized and protects the investors in the securitized loans from losses upon default.

## THE PARTIES

11.     Plaintiff SIC is a non-cabinet level agency of the State of New Mexico reporting to the Governor. The SIC, which was established by an act of the 23rd Legislature, and subsequently, by a constitutional amendment adopted by the citizens of New Mexico, is identified as the entity to establish policies for investment of certain state funds. The SIC is responsible for the investment of New Mexico's Land Grant Permanent Fund, Severance Tax Permanent Fund, Tobacco Settlement Permanent Fund, and Water Trust Permanent Fund, as well as of other funds.

12.     Plaintiff SIC purchased the following eight ABS/MBS Certificates issued pursuant to the registration statements and prospectuses described herein:[4]

| Issuing Trust | Tranche | Cost | Sponsor/ Seller and other Originators | Depositor |
|---|---|---|---|---|
| Alternative Loan Trust 2005-46 CB | A9 | $32,484,872 | Countrywide HL, both directly and through special purpose conduit | CWALT |

[4] The following abbreviations will be used hereafter: **Countrywide FC = Countrywide Financial Corp.; Countrywide HL = Countrywide Home Loans, Inc.; Countrywide Bank = collectively, Countrywide Bank, F.S.B. and its predecessor, Countrywide Bank, N.A.; Countrywide SC = Countrywide Securities Corporation; CWALT = CWALT, Inc.; CWMBS = CWMBS, Inc.; CWHEQ = CWHEQ, Inc.**

| | | | entities established by Countrywide FC | |
|---|---|---|---|---|
| CHL Mortgage Pass-Through Trust 2005-26 | 1A 10 | $35,826,801 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC | CWMBS |
| CWHEQ Revolving Home Equity Loan Trust Series 2005-I | 2A | $37,089,431.40 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC | CWHEQ |
| CWHEQ Revolving Home Equity Loan Trust Series 2006-C | 2A | $16,175,457.19 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC; Countrywide Bank | CWHEQ |
| CWHEQ Revolving Home Equity Loan Trust Series 2006-E | 2A | $40,602,466.05 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC | CWHEQ |
| CWHEQ Revolving Home Equity Loan Trust Series 2006-F | 2A 1A | $48,728,508.12 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC | CWHEQ |
| CWHEQ Revolving Home Equity Loan Trust Series 2007-B | A | $85,784,271.84 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC; Countrywide Bank | CWHEQ |
| CWHEQ Revolving Home Equity Loan Trust Series 2007-C | A | $76,040,919.70 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC; Countrywide Bank | CWHEQ |

| Issuing Trust | Trustee | Custodian | Servicer | Underwriter |
|---|---|---|---|---|
| Alternative Loan Trust 2005-46 CB | Bank of New York | Not specified | Countrywide Home Loans Servicing LP, a subsidiary of Countrywide HL | JPMorgan Securities Inc. and Bear Stearns & Co. Inc. |
| CHL Mortgage Pass-Through Trust 2005-26 | Bank of New York | Not specified | Countrywide Home Loans Servicing LP, a subsidiary of Countrywide HL | Bear Stearns & Co. Inc. |

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

| CWHEQ Revolving Home Equity Loan Trust Series 2005-I | JPMorgan Chase Bank, N.A. (indenture trustee); Wilmington Trust Company (owner trustee) | Treasury Bank, a division of Countrywide Bank | Countrywide HL | Countrywide SC |
|---|---|---|---|---|
| CWHEQ Revolving Home Equity Loan Trust Series 2006-C | JPMorgan Chase Bank, N.A. (indenture trustee); Chase Bank USA, N.A. (co-trustee); Wilmington Trust Company (owner trustee) | Treasury Bank, a division of Countrywide Bank | Countrywide HL | Countrywide SC |
| CWHEQ Revolving Home Equity Loan Trust Series 2006-E | JPMorgan Chase Bank (Indenture Trustee) Chase Bank USA (Co-Trustee) Wilmington Trust Company (Owner Trustee) | Treasury Bank, a division of Countrywide Bank | Countrywide HL | Countrywide SC |
| CWHEQ Revolving Home Equity Loan Trust Series 2006-F | JPMorgan Chase Bank, N.A. (indenture trustee); Wilmington Trust Company (owner trustee); Chase Bank USA, N.A. (co-trustee) | Treasury Bank, a division of Countrywide Bank | Countrywide HL | Countrywide SC |
| CWHEQ Revolving Home Equity Loan Trust Series 2007-B | The Bank of New York (indenture trustee); Wilmington Trust Company (owner trustee); | Treasury Bank, a division of Countrywide Bank | Countrywide HL | Countrywide SC |
| CWHEQ Revolving Home Equity Loan Trust Series 2007-C | Bank of New York (Indenture Trustee) Wilmington Trust Company (Owner Trustee) | Treasury Bank, , a division of Countrywide Bank | Countrywide HL | Countrywide SC |

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

EXHIBIT 1 -197- PAGE 164 of 197

13.     Plaintiff ERB is the legal body responsible for administering the Educational Retirement Act. The ERB manages a defined benefit retirement plan for 63,000 active, 30,000 retired, and 21,000 inactive members.

14.     Plaintiff ERB purchased the following ABS Certificate issued pursuant to the registration statements and prospectuses described herein:

| Issuing Trust | Tranche | Cost | Sponsor/Seller and other Originators | Depositor |
|---|---|---|---|---|
| CWHEQ Revolving Home Equity Loan Trust Series 2007-S3 | A1 | $2,330,000 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC | CWHEQ |

| Issuing Trust | Trustee | Custodian | Servicer | Underwriter |
|---|---|---|---|---|
| CWHEQ Revolving Home Equity Loan Trust Series 2007-S3 | Bank of New York | Not indicated | Countrywide HL | Countrywide SC |

15.     Plaintiff PERA operates and oversees New Mexico's public employee retirement system, and manages defined benefit retirement plans covering municipal employees, county employees, state employees, municipal police, municipal firefighters, judges, magistrates, legislators, volunteer firefighters and special districts and authorities created by the legislature.

16.     Plaintiff PERA purchased the following six ABS/MBS Certificates issued pursuant to the registration statements and prospectuses described herein:

| Issuing Trust | Tranche | Cost | Sponsor/Seller and other Originators | Depositor |
|---|---|---|---|---|
| Alternative Loan Trust 2005-72 | A1 | $1,102,236.23 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC | CWALT |
| CHL Mortgage Pass-Through Trust 2006-HYB1 | 1A1 | $1,421,769.09 | Countrywide HL, American Home Mortgage Corp., and others | CWMBS |
| CWHEQ Home Equity Loan Trust Series 2006- | A1 | $2,261,517.95 | Countrywide HL, both directly and through | CWHEQ |

| | | | | |
|---|---|---|---|---|
| S9 | | | special purpose conduit entities established by Countrywide FC | |
| CHL Mortgage Pass-Through Trust 2007-HYB2 | 3A1 | $689,443.05 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC, DHI Mortgage Co., and others | CWMBS |
| CWHEQ Revolving Home Equity Loan Trust Series 2007-E | A | $8,524,501.81 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC; Countrywide Bank | CWHEQ |
| CWHEQ Revolving Home Equity Loan Trust Series 2007-G | A | $6,433,010.98 | Countrywide HL, both directly and through special purpose conduit entities established by Countrywide FC | CWHEQ |

| Issuing Trust | Trustee | Custodian | Servicer | Underwriter |
|---|---|---|---|---|
| Alternative Loan Trust 2005-72 | The Bank of New York | Not indicated | Countrywide Home Loans Servicing LP, a subsidiary of Countrywide HL | UBS Securities, LLC |
| CHL Mortgage Pass-Through Trust 2006-HYB1 | The Bank of New York | Not indicated | Countrywide Home Loans Servicing LP, a subsidiary of Countrywide HL | Countrywide SC |
| CWHEQ Home Equity Loan Trust Series 2006-S9 | The Bank of New York | Not indicated | Countrywide Home Loans Servicing LP, a subsidiary of Countrywide HL | Countrywide SC |
| CHL Mortgage Pass-Through Trust 2007-HYB2 | The Bank of New York | Not indicated | Countrywide Home Loans Servicing LP, a subsidiary of Countrywide HL | Countrywide SC |
| CWHEQ Revolving Home Equity Loan Trust Series 2007-E | The Bank of New York | Treasury Bank, a division of Countrywide Bank | Countrywide HL | Countrywide SC |
| CWHEQ Revolving Home Equity Loan Trust Series 2007-G | The Bank of New York (indenture trustee); Wilmington Trust Co. (owner trustee) | Treasury Bank, a division of Countrywide Bank | Countrywide HL | Countrywide SC |

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

EXHIBIT 1 Page 134 of 1009 -Page 134 of 709-

17.     Defendant Countrywide FC is a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California. Countrywide FC is a holding company which, through its subsidiaries, is engaged in home equity loan and mortgage lending, servicing, packaging, securitizing, banking and underwriting.  Countrywide FC holds itself out as the nation's top provider of home loans.  At all times relevant hereto, Countrywide FC controlled the other Defendants identified in this Complaint.  Countrywide FC also participated as a seller in many of the above-referenced securitizations through special-purpose conduits it established to purchase loans from the sponsor and resell the loans to the depositor.  On July 1, 2008, Countrywide FC was acquired by Bank of America Corporation.

18.     Defendant CWHEQ is a Delaware corporation and a limited purpose financing subsidiary of Countrywide FC.  CWHEQ's principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as Countrywide FC.  CWHEQ was a "Depositor" in all of the CWHEQ Revolving Home Equity Loan Trust and CWHEQ Home Equity Loan Trust securitizations described herein, and issued false and misleading Prospectuses and caused to be filed false and misleading Registration Statements in connection with these offerings.

19.     Defendant CWALT is a Delaware corporation and a limited purpose financing subsidiary of Countrywide FC.  CWALT's principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as Countrywide FC.  CWALT was a "Depositor" in the Alternative Loan Trust securitizations described herein, and issued false and misleading Prospectuses and caused to be filed false and misleading Registration Statements in connection with this offering.

20.     Defendant CWMBS is a Delaware corporation and a limited purpose financing
subsidiary of Countrywide FC. CWMBS's principal executive offices are located at 4500 Park
Granada, Calabasas, California, the same location as Countrywide FC. CWMBS was a
"Depositor" in the Mortgage Pass-Through Trust securitizations described herein, and issued
false and misleading Prospectuses and caused to be filed false and misleading Registration
Statements in connection with this offering.

21.     Defendant CWHEQ Revolving Home Equity Loan Trust Series 2005-I
("CWHEQ 2005-I") is a Delaware statutory trust organized by CWHEQ and the other
Defendants for the purposes of issuing ABS Certificates to investors pursuant to a Registration
Statement and Prospectus filed with the Securities and Exchange Commission ("SEC").
Plaintiff SIC purchased and owns Class 2A Certificates issued by CWHEQ 2005-I.

22.     Defendant CWHEQ Revolving Home Equity Loan Trust Series 2006-C
("CWHEQ 2006-C") is a Delaware statutory trust organized by CWHEQ and the other
Defendants for the purposes of issuing ABS Certificates to investors pursuant to a Registration
Statement and Prospectus filed with the SEC.   Plaintiff SIC purchased and owns Class 2A
Certificates issued by CWHEQ 2006-C.

23.     Defendant CWHEQ Revolving Home Equity Loan Trust Series 2006-E
("CWHEQ 2006-E") is a Delaware statutory trust organized by CWHEQ and the other
Defendants for the purposes of issuing ABS Certificates to investors pursuant to a Registration
Statement and Prospectus filed with the SEC.   Plaintiff SIC purchased and owns Class 2A
Certificates issued by CWHEQ 2006-E.

24.     Defendant CWHEQ Revolving Home Equity Loan Trust Series 2006-F
("CWHEQ 2006-F") is a Delaware statutory trust organized by CWHEQ and the other

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

Defendants for the purposes of issuing ABS Certificates to investors pursuant to a Registration Statement and Prospectus filed with the SEC.   Plaintiff SIC purchased and owns Class 2A1A Certificates issued by CWHEQ 2006-F.

25.    Defendant CWHEQ Home Equity Loan Trust, Series 2006-S9 ("CWHEQ 2006-S9") is a common law trust formed under the laws of the State of New York by CWHEQ and the other Defendants for the purposes of issuing ABS Certificates to investors pursuant to a Registration Statement and Prospectus filed with the SEC.   Plaintiff PERA purchased and owns Class A1 Certificates issued by CWHEQ 2006-S9.

26.    Defendant CWHEQ Revolving Home Equity Loan Trust Series 2007-B ("CWHEQ 2007-B") is a Delaware statutory trust organized by CWHEQ and the other Defendants for the purposes of issuing ABS Certificates to investors pursuant to a Registration Statement and Prospectus filed with the SEC.   Plaintiff SIC purchased and owns Class A Certificates issued by CWHEQ 2007-B.

27.    Defendant CWHEQ Revolving Home Equity Loan Trust Series 2007-C ("CWHEQ 2007-C") is a Delaware statutory trust organized by CWHEQ and the other Defendants for the purposes of issuing ABS Certificates to investors pursuant to a Registration Statement and Prospectus filed with the SEC.   Plaintiff SIC purchased and owns Class A Certificates issued by CWHEQ 2007-C.

28.    Defendant CWHEQ Revolving Home Equity Loan Trust Series 2007-E ("CWHEQ 2007-E") is a Delaware statutory trust organized by CWHEQ and the other Defendants for the purposes of issuing ABS Certificates to investors pursuant to a Registration Statement and Prospectus filed with the SEC.   Plaintiff PERA purchased and owns Class A Certificates issued by CWHEQ 2007-E.

29.     Defendant CWHEQ Revolving Home Equity Loan Trust Series 2007-G

("CWHEQ 2007-G") is a Delaware statutory trust organized by CWHEQ and the other

Defendants for the purposes of issuing ABS Certificates to investors pursuant to a Registration

Statement and Prospectus filed with the SEC.   Plaintiff PERA purchased and owns Class A

Certificates issued by CWHEQ 2007-G.

30.     Defendant CWHEQ Revolving Home Equity Loan Trust Series 2007-S3

("CWHEQ 2007-S3") is a common law trust formed under the laws of the State of New York by

CWHEQ and the other Defendants for the purposes of issuing ABS Certificates to investors

pursuant to a Registration Statement and Prospectus filed with the SEC.   Plaintiff ERB

purchased and owns Class A1 Certificates issued by CWHEQ 2007-S3.

31.     Defendant Alternative Loan Trust 2005-46 CB ("CWALT 2005-46") is a trust

organized by CWALT and the other Defendants for the purposes of issuing MBS Certificates to

investors pursuant to a Registration Statement and Prospectus filed with the SEC.   Plaintiff SIC

purchased and owns Class A9 Certificates issued by CWALT 2005-46.

32.     Defendant Alternative Loan Trust 2005-72 ("CWALT 2005-72") is a trust

organized by CWALT and the other Defendants for the purposes of issuing MBS Certificates to

investors pursuant to a Registration Statement and Prospectus filed with the SEC.   Plaintiff

PERA purchased and owns Class A1 Certificates issued by CWALT 2005-72.

33.     Defendant CHL Mortgage Pass-Through Trust 2005-26 ("CWHL 2005-26") is a

Delaware statutory trust organized by CWALT and the other Defendants for the purposes of

issuing MBS Certificates to investors pursuant to a Registration Statement and Prospectus filed

with the SEC.   Plaintiff SIC purchased and owns Class 1A 10 Certificates issued by CWHL

2005-26.

34.     Defendant CHL Mortgage Pass-Through Trust 2006-HYB1 ("CWHL 2006-HYB1") is a common law trust formed under the laws of the State of New York by CWMBS and the other Defendants for the purpose of issuing MBS Certificates to investors pursuant to a Registration Statement and Prospectus filed with the SEC.  Plaintiff PERA purchased and owns Class 3A1 Certificates issued by CWHL 2006-HYB1.

35.     Defendant CHL Mortgage Pass-Through Trust 2007-HYB2 ("CWHL 2007-HYB2") is a common law trust formed under the laws of the State of New York by CWMBS and the other Defendants for the purpose of issuing MBS Certificates to investors pursuant to a Registration Statement and Prospectus filed with the SEC.  Plaintiff PERA purchased and owns Class 1A1 Certificates issued by CWHL 2007-HYB2.  The trusts identified in Paragraphs 21-35 above are collectively referenced hereafter as the "Issuing Trusts."

36.     Defendant Countrywide HL is a New York Corporation with its principal executive offices at 4500 Park Granada, Calabasas, California, a location it shares with Countrywide FC. Countrywide HL is a direct wholly owned subsidiary of Countrywide FC. Countrywide HL is engaged in the business of originating, purchasing, selling, and servicing residential mortgages and home equity loans.  Countrywide HL was a "Seller" and "Sponsor" of the securitizations detailed herein and an originator of most of the mortgages securitized supporting the securitization transactions.

37.     Defendant Countrywide Bank is a national bank which, *inter alia*, originates and sells mortgage loans and home equity loans.  Countrywide Bank was listed as a "Seller" or "Originator" of the securitized mortgages and/or home equity loans in the Prospectuses for the Certificates offered by the CWHEQ 2006-C, CWHEQ 2007-B CWHEQ 2007-C, and CWHEQ

2007-E Issuing Trusts, and its Treasury Bank Division was also designated as the "Custodian" for most of the Certificates offered by CWHEQ Issuing Trusts.

38.     Defendant Countrywide SC is an affiliate of Countrywide FC and served as an underwriter for all of the offerings identified in this Complaint except for the Certificates offered by the CWALT 2005-46, CWALT 2005-72 and the CWHL 2005-26 Issuing Trusts.

39.     In this capacity, Countrywide SC was responsible for drafting and disseminating the offering documents for the Certificates offered by the CWHEQ Issuing Trusts, and caused the false and misleading Prospectuses set forth below to be issued in connection with these offerings and filed with the SEC.

40.     Defendant Bear, Stearns & Co. Inc. ("Bear Stearns") acted as co-lead manager/ underwriter for the offering of Certificates by the CWALT 2005-46 Issuing Trust and as lead manager/underwriter for the offering of Certificates by the CWHL 2005-26 Issuing Trust. Together with the other Defendants, Bear Stearns drafted and disseminated the false and misleading offering documents for these Issuing Trusts, and caused false and misleading Prospectuses to be issued in connection with these offerings and filed with the SEC.

41.     Defendant JPMorgan Securities Inc. ("JPMorgan") acted as co-lead manager/ underwriter for the offering of Certificates by the CWALT 2005-46 Issuing Trust, and, together with the other Defendants, drafted and disseminated the false and misleading offering documents for this Issuing Trust, and caused a false and misleading Prospectus to be issued in connection with this offering and filed with the SEC.

42.     Defendant UBS Securities, LLC ("UBS") acted as lead manager/underwriter for the offering of Certificates by the CWALT 2005-72 Issuing Trust, and, together with the other Defendants, drafted and disseminated the false and misleading offering documents for this

Issuing Trust, and caused a false and misleading Prospectus to be issued in connection with this offering and filed with the SEC.

43. Defendant Stanford L. Kurland ("Kurland") was, at relevant times, Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors for CWMBS, CWALT, and CWHEQ. Defendant Kurland signed CWALT's June 17, 2005 and July 25, 2005 Registration Statements; CWMBS's June 20, 2005, July 25, 2005, and March 6, 2006 Registration Statements; and CWHEQ's July 21, 2005, August 4, 2005, March 13, 2006, and April 12, 2006 Registration Statements.

44. Defendant Eric P. Sieracki ("Sieracki") was, at relevant times, the Executive Vice President, Chief Financial Officer ("CFO"), Treasurer and member of the Board of Directors of CWALT, CWMBS, and CWHEQ. Defendant Sieracki signed CWALT's June 17, 2005 and July 25, 2005 Registration Statements; CWMBS's June 20, 2005, July 25, 2005, and March 6, 2006 Registration Statements; and CWHEQ's July 21, 2005, August 4, 2005, March 13, 2006, April 12, 2006, January 10,2007, March 2, 2007, April 17, 2007, and May 22, 2007 Registration Statements.

45. Defendant David Spector ("Spector") was, at relevant times, the Vice-President and a member of the Board of Directors of CWALT, CWMBS, and CWHEQ. Defendant Spector signed CWALT's June 17, 2005 and  July 25, 2005 Registration Statements; CWMBS's June 20, 2005, July 25, 2005 and March 6, 2006 Registration Statements; and CWHEQ's July 21, 2005, August 4, 2005, March 13, 2006, and April 12, 2006 Registration Statements.

46. Defendant N. Joshua Adler ("Adler") was, at relevant times, the President, CEO and a member of the Board of Directors of CWHEQ. Defendant Adler signed CWHEQ's January 10, 2007, March 2, 2007, April 17, 13 2007 and May 22, 2007 Registration Statements.

47.     Defendant David Sambol ("Sambol") was, at relevant times, the President and Chief Operating Officer of Defendant Countrywide HL and a member of the Executive Committee of Defendant Countrywide FC.  Defendant Sambol also established and served as President and CEO of Countrywide Capital Markets, of which Defendant Countrywide SC is a wholly-owned and controlled subsidiary.

## JURISDICTION AND VENUE

48.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, and 77o, and New Mexico state law.

49.     This Court has jurisdiction over the subject matter of this action pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, which allows claims to be brought not just in federal court, but rather "in any court of competent jurisdiction."  Section 22 of the Securities Act, 15 U.S.C. § 77v, explicitly prohibits removal of this claim to federal court: "Except as provided in section 16(c) [of the Securities Act, which relates only to class actions], no case arising under this title and brought in any state court of competent jurisdiction shall be removed to any court in the United States."

50.     This Court is a court of competent jurisdiction.  This Court is a court of general jurisdiction with authority to hear claims asserted by the Plaintiffs, agencies of the State of New Mexico, both under the Securities Act and New Mexico state law.   Sufficient minimum contacts exist to exercise general personal jurisdiction over Defendants because:

      a.   Defendants regularly and purposely directed business efforts into this jurisdiction including:

            i.   Originating mortgages and home equity loans in New Mexico;

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

EXHIBIT 2 of 107-
Page 264 109

ii.  Servicing mortgages and home equity loans in New Mexico;

iii.  Packaging and securitizing mortgages and home equity loans originated and serviced in New Mexico, and secured by New Mexico real estate;

iv.  Recording liens, deeds, assignments and other business documents with agencies of New Mexico state and/or county governments;

v.  Offering and selling ABS and MBS investments to New Mexico investors or causing or participating in the offering and sale of ABS and MBS investments in New Mexico;

vi.  Engaging in a joint venture with KB Homes, one of New Mexico's largest homebuilders, to solicit business from New Mexico consumers.  Pursuant to this joint venture KB Homes required New Mexico consumers to obtain mortgages and/or home equity loans from the joint venture, or forego lucrative incentives, when purchasing homes from it built and located in New Mexico;

vii.  Repeatedly availing themselves of the courts of the state of New Mexico to effect foreclosures of New Mexico residents from New Mexico properties.  *See, e.g., Countrywide Bank, N.A. v. Hitzemann, et al.*, No. CV-2008-5317 (2d Judicial District – Bernalillo County); *Countrywide Home Loans, Inc. v. Sandoval, et al.*, No. CV 2008-6377 (2d Judicial District – Bernalillo County).

viii.  For the individual defendants, personally overseeing and directing the activities described in this paragraph;

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

EXHIBIT 2 Page 254 of 1098- PAGE 1098-

b. Defendant Countrywide HL maintains an active registration with the New Mexico Public Regulation Commission to conduct business in the State of New Mexico. Defendant Countrywide FC was previously registered to conduct business in the name of its joint venture with KB Homes, Countrywide Mortgage Ventures LLC.

c. Defendant Kurland is listed as a director of Countrywide HL on its registration to conduct business in the State of New Mexico. Defendant Kurland was also listed as a director of another Countrywide subsidiary, Landsafe Title Agency, Inc., on its registration to conduct business in the State of New Mexico.

d. Defendant Sieracki was listed as a director of another former Countrywide subsidiary, Countrywide Home Loans of New Mexico, Inc., on its registration to conduct business in the State of New Mexico.

e. Defendant Sieracki was listed as a director of Countrywide spinoff Indymac, Inc. on its registration to conduct business in the State of New Mexico.

f. Bear Stearns Companies, Inc., the parent of Defendant Bear Stearns & Co., maintains an active registration to conduct business in the State of New Mexico.

51. This Court also has specific personal jurisdiction over Defendants with respect to the offering and sale of the Certificates in the fifteen Issuing Trusts identified herein. According to the prospectuses and other SEC filings, Defendants have conceded that the Issuing Trusts contain (or at least contained at the time of the filing) the following volume of loans extended to New Mexico consumers and secured by real estate located in New Mexico:

| Issuing Trust | # of New Mexico Loans |
|---|---|
| CWALT 2005-46 | Not specified but Prospectus indicates loans may come from "any one of the fifty states" |
| CWALT 2005-72 | 2 |
| CWHL 2005-26 | Not specified but Prospectus indicates loans may come from "any one of the fifty states" |

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW

EXHIBIT 2 Page 254 1049-

| CWHL 2006-HYB1 | 6 |
| CWHL 2007-HYB2 | 24 |
| CWHEQ 2005-I | 112 |
| CWHEQ 2006-C | 53 |
| CWHEQ 2006-E | 61 |
| CWHEQ 2006-S9 | 162 |
| CWHEQ 2006-F | 118 |
| CWHEQ 2007-B | 44 |
| CWHEQ 2007-C | 59 |
| CWHEQ 2007-E | 55 |
| CWHEQ 2007-G | 178 |
| CWHEQ 2007-S3 | 82 |

52.     The origination and servicing of the *over nine hundred New Mexico loans* indicated in the chart above involved *literally tens of thousands of contacts* by Defendants (directly or through their designated agents) and this jurisdiction. Specifically, *for each such loan*, Defendants:

a.   Advertised to consumers in New Mexico and held themselves out as providers of mortgages and home loans for homeowners located in New Mexico;

b.   Maintained places of business in New Mexico to facilitate origination and servicing of loans to New Mexico consumers;

c.   Gathered loan applications in New Mexico;

d.   Ordered and/or conducted appraisals of real estate located in New Mexico;

e.   Ordered and/or conducted title searches for real estate located in New Mexico;

f.   Retained the rights to verify, and at times did verify, applicant income and job status with businesses in New Mexico;

g.   Participated, in many cases, in real estate closings located in New Mexico;

h.   Recorded liens and assignments of liens on property located in New Mexico with New Mexican county governments;

    i.   Each month, directed mail, electronic mail, telephone calls, or other

communications to borrowers located in New Mexico to solicit payments for the

loans.  Frequently, the payments provided would be drawn from a bank located in

New Mexico; and

    j.   Reserved the right upon default to avail themselves of New Mexican courts and

law enforcement personnel to foreclose on the loan and evict the borrower from

his or her New Mexican home.

53.    This Court also has specific personal jurisdiction over Defendants with respect to

the transactions at issue here because a substantial portion of the Certificates offered by

Defendants and secured by these loans were offered and sold to Plaintiffs, instrumentalities of

the State of New Mexico, and, on information and belief, were offered to other residents of the

State of New Mexico.  Accordingly, certain monthly income payments for these Certificates are

directed into this jurisdiction.  As a result, the identified transactions involve the flow of money

originating in, and ending in, this jurisdiction.

54.    Defendant Bear Stearns is further subject to specific personal jurisdiction because

it offered securities in the State of New Mexico within the meaning of  NMSA 1978, § 58-13B-

54(C)(2) (1986) by directing offers to sell securities to destinations in this state, where they were

received as directed.

55.    Venue is proper in this County under NMSA 1978, §§ 38-3-1(A) & -1(F) (1988)

because Plaintiffs are instrumentalities of the State of New Mexico located in this County, and

because a substantial part of the claims asserted herein occurred in this County, as the materially

false and misleading statements identified below were disseminated via Registration Statements

and Prospectuses to Plaintiffs at their offices in this County, and Plaintiffs sustained injuries in

this County.

## SUBSTANTIVE ALLEGATIONS

56.     To offer and sell Certificates in the Issuing Trusts to Plaintiffs and other investors,

Defendants filed with the SEC Prospectuses and Registration Statements containing false and

misleading statements, and otherwise made false and misleading statements or omissions,

including, *inter alia*, incorrectly representing to investors (i) that the loans backing the ABS and

MBS securities were originated pursuant to stringent mortgage-underwriting standards, (ii) that

honest, independent appraisals were conducted on the underlying properties, and (iii) that the

loans were selected and serviced in a manner designed to benefit certificateholders, all as

detailed in Paragraphs 57 to 72 herein.

## IN ORDER TO BOOST LOAN VOLUME, COUNTRYWIDE TURNS ITS BACK ON UNDERWRITING GUIDELINES AND LEGAL REQUIREMENTS

57.     In a conference call with analysts on January 27, 2004, Countrywide FC CEO

Angelo Mozilo announced that Countrywide would seek "market dominance," growing its

market share in the residential lending market from about 13% to an astounding 30% by 2008.

Mozilo assured investors that Countrywide would not sacrifice loan quality to achieve its

growth: ***"Going for 30% mortgage share here is totally unrelated to quality of loans we go***

***after. . . . There will be no compromise in that as we grow market share. Nor is there a***

***necessity to do that."***

58.     Consistent with its public statements, the Registration Statements and

Prospectuses issued to Countrywide ABS/MBS investors and identified in this Complaint gave

no indication that Countrywide had sacrificed its lending standards in any respect.  However, as

detailed below, Countrywide did compromise loan quality to achieve its breakneck growth. In fact, Countrywide regularly departed from its own stated underwriting guidelines and violated regulations intended to curb predatory loans. Because the bad loans resulting from these practices were quickly securitized and sold, the risk shifted to investors like Plaintiffs.

59. Defendant Sambol spearheaded these unsafe practices. According to the Wall Street Journal:

> *The 48-year-old Mr. Sambol embraced Countrywide's pursuit of subprime and other risky loans,* which helped turn the Calabasas, Calif., company into the nation's largest mortgage lender in terms of volume. That left Countrywide even more vulnerable to falling house prices and surging mortgage defaults.

> *Mr. Sambol brushed aside warnings from risk-control managers* at Countrywide that the company's lending standards were too lax, according to four current and former executives at Countrywide, though another person familiar with the company disputes that view. Being too cautious would turn Countrywide into a "nice, little boutique," a former colleague recalls him saying.

> \*\*\*\*

> *Countrywide was "willing to cut corners to get market share,"* says Martin Eakes, CEO of the Center for Community Self-Help, a nonprofit credit union and consumer-advocacy group in Durham, N.C. "If Dave Sambol represents that value system," Mr. Eakes says, his new appointment at Bank of America is "disappointing."

> In late 2003, tensions between Mr. Sambol and Countrywide's risk managers boiled over at a meeting of dozens of executives in the company's headquarters. Nick Krsnich, who as chief investment officer was responsible for pricing loans and managing risks, uttered a loud profanity and walked out of the meeting to protest what he saw as imprudent lending, according to two people who attended the meeting. Mr. Krsnich left the company in early 2006.

> Another former executive says Mr. Sambol was "livid" at a meeting in the spring of 2005, because call-center employees weren't selling enough option adjustable-rate mortgages, which let borrowers start with minimal payments and face much higher ones later. This former executive says those loans were too complicated to be explained over the phone.

****

*"The stress level was unbelievable," because of pressure from managers to boost loan volumes,* says another former Countrywide employee, Tenny Garner, who worked as a loan officer in Twin Falls, Idaho, until last September.

J. Haggerty, "Mortgage Chief Picked by BofA Sparks Worries," THE WALL STREET JOURNAL,

Feb. 23, 2008 (emphasis added).

60.     For several years, record appreciation in home prices concealed the risks that

Defendants were taking. However, as mortgage markets deteriorated in late August, 2007,

questions began to arise regarding Countrywide's origination practices. On August 26, 2007

THE NEW YORK TIMES published an article by influential stock market reporter Gretchen

Morgenson entitled "Inside the Countrywide Lending Spree." According to the article:

> *[P]roviding "the best loan possible" to customers wasn't always [Countrywide's] main goal, say some former employees. Instead, potential borrowers were often led to high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth-talking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives among the highest paid in America.*
> ****
>
> But few companies benefited more from the mortgage mania than Countrywide, among the most aggressive home lenders in the nation. As such, the company is Exhibit A for the lax and, until recently, highly lucrative lending that has turned a once-hot business ice cold and has touched off a housing crisis of historic proportions.
>
> "In terms of being unresponsive to what was happening, to sticking it out the longest, and continuing to justify the garbage they were selling, Countrywide was the worst lender," said Ira Rheingold, executive director of the National Association of Consumer Advocates. "And anytime states tried to pass responsible lending laws, Countrywide was fighting it tooth and nail."
> ****
>
> Countrywide packages most of its loans into securities pools that it sells to investors.

Another big business for Countrywide is loan servicing, the collection of monthly principal and interest payments from borrowers and the disbursement of them to investors. Countrywide serviced 8.2 million loans as of the end of the year; in June the portfolio totaled $1.4 trillion. In addition to the enormous profits this business generates — $660 million in 2006, or 25 percent of its overall earnings — customers of the Countrywide servicing unit are a huge source of leads for its mortgage sales staff, say former employees.

*In a mid-March interview on CNBC, Mr. Mozilo said Countrywide was poised to benefit from the spreading crisis in the mortgage lending industry. "This will be great for Countrywide," he said, "because at the end of the day, all of the irrational competitors will be gone."*

*But Countrywide documents show that it, too, was a lax lender. For example, it wasn't until March 16 that Countrywide eliminated so-called piggyback loans from its product list, loans that permitted borrowers to buy a house without putting down any of their own money. And Countrywide waited until Feb. 23 to stop peddling another risky product, loans that were worth more than 95 percent of a home's appraised value and required no documentation of a borrower's income.*

As recently as July 27, Countrywide's product list showed that it would lend $500,000 to a borrower rated C-minus, the second-riskiest grade. As long as the loan represented no more than 70 percent of the underlying property's value, Countrywide would lend to a borrower even if the person had a credit score as low as 500. (The top score is 850.)

The company would lend even if the borrower had been 90 days late on a current mortgage payment twice in the last 12 months, if the borrower had filed for personal bankruptcy protection, or if the borrower had faced foreclosure or default notices on his or her property.

*Such loans were made, former employees say, because they were so lucrative — to Countrywide. The company harvested a steady stream of fees or payments on such loans and busily repackaged them as securities to sell to investors.*

****

As a result, former employees said, *the company's commission structure rewarded sales representatives for making risky, high-cost loans.*

****

*When borrowers tried to reduce their mortgage debt, Countrywide cashed in:* prepayment penalties generated significant revenue for the company — $268 million last year, up from $212 million in 2005. *When borrowers had difficulty making payments, Countrywide cashed in again:* late charges produced even more in 2006 — some $285 million.

*The company's incentive system also encouraged brokers and sales representatives to move borrowers into the subprime category, even if their financial position meant that they belonged higher up the loan spectrum.*

\*\*\*\*

*Other documents from the subprime unit also show that Countrywide was willing to underwrite loans that left little disposable income for borrowers' food, clothing and other living expenses.* A different manual states that loans could be written for borrowers even if, in a family of four, they had just $1,000 in disposable income after paying their mortgage bill. A loan to a single borrower could be made even if the person had just $550 left each month to live on, the manual said.

\*\*\*\*

Appraisals are another profit center for Countrywide, brokers said, because it often requires more than one appraisal on properties, especially if borrowers initially choose not to use the company's own internal firm. Appraisal fees at Countrywide totaled $137 million in 2006, up from $110 million in the previous year.

G. Morgenson, "Inside the Countrywide Lending Spree," THE NEW YORK TIMES, Aug. 26, 2007 (emphasis added).

61.     In an August 29, 2007 press conference reported in BLOOMBERG, Senator Charles Schumer, Chairman of a Senate panel investigating predatory lending practices, stated "Countrywide's most lucrative brokers are those that make bad loans that are largely designed to fail the borrower." The implications for this incentive system were disastrous for investors in Countrywide securitizations, because they bore most, or in some cases all, of the loss of failed loans.

62.     To allay investor concerns, Defendants continued to deny these and all other

charges of wrongdoing throughout 2007.  In a fall 2007 conference, Countrywide FC CEO

Angelo Mozilo actually blamed *borrowers* for Defendants' decision to loosen their lending

practices:

> **To this day, he says his beleaguered company did nothing wrong**
> during the loose-lending craze that is now unraveling nationwide
> with record foreclosures and mountainous losses.  Instead, Mr.
> Mozilo considers himself and his company to be victims of
> financial forces beyond their control.
>
> At a conference sponsored by the Milken Institute about two weeks
> ago, for example, he explained that borrowers forced lenders like
> Countrywide to lower their mortgage standards.

G. Morgenson and G. Fabrikant, "Countrywide's Chief Salesman and Defender," THE NEW

YORK TIMES, Nov. 11, 2007 (emphasis added).

63.     In a complaint filed on January 17, 2008 in the United States District Court for the

Southern District of Texas, a former vice-president of Countrywide Mortgage Ventures, LLC

d/b/a Countrywide KB, the Countrywide mortgage-origination joint venture with KB Homes,

disclosed:

- that "grave illegal issues . . . . were being conducted by CWKB. Another of such
  issues involved Countrywide's practice of flipping a loan application from a 'full
  doc' loan program to a 'stated income' or 'no income, no asset' loan program. He
  learned that loans were being canceled at the prime regional operations center as
  full documentation loans and transferred to the sub-prime operations center in
  Plano, Texas as stated loans or No Income No Assets ('NINA') loans.
  Countrywide's representatives were aware that the applicant would not be eligible
  for any loan program based on their current income level and/or job status. So, the
  loan officer would then coach the loan applicant as to what income level would be
  needed to qualify . . . ."[5]

---

[5]   Stated loans and "no income, no asset loans" are variations of reduced documentation / no
documentation loan programs offered by Defendants.  Such programs permit borrowers to obtain
loans with less than the normal level of documentation as to the borrower's finances and
employment as well as other pertinent information.

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW
EXHIBIT 1
Page 30 of 109
-54-

- that "loan officers would go so far as to actually assist the loan applicant with the application to submit to the prime or nonprime unit with false income amounts, so that the applicant would get the loan under false pretenses."

- that he was required to unconditionally approve a certain percentage of backlogged loans each day regardless of whether they qualified under stated standards.

- that the approval of a certain percentage of loans regardless of quality was encouraged and considered a performance metric by Countrywide executives.

Complaint, *Zachary v. Countrywide Financial Corp., et al.*, No. 4:08-cv-00214, at ¶¶ 11-15

(S.D. Tex.). In an interview aired on or around July 11, 2008 on NBC's "The Today Show," Mr. Zachary confirmed that Countrywide employees were coaching applicants to lie, including overstating their income by as much as 100% to qualify for a loan. Mr. Zachary also confirmed that Countrywide inflated home appraisals and "flipped" loans to move buyers into more expensive loans knowing they couldn't afford it.

64. By March 2008, the Federal Bureau of Investigation began to investigate whether Defendants' misrepresentations regarding origination and lending practices were used to fraudulently package and sell mortgage-backed securities to investors. THE WALL STREET JOURNAL reported that:

> *Federal investigators probing the business practices of Countrywide Financial Corp. are trying to figure out what Countrywide knew -- or in some cases didn't know -- about the incomes and assets of thousands of its borrowers.*
>
> *The investigators are finding that Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients, according to people involved in the matter. The company packaged many of those mortgages into securities and sold them to investors, raising the additional question of whether Countrywide understated the risks such investments carried.*
>
> Countrywide, long the No. 1 mortgage company in the U.S. in terms of dollar value of loan originations, also was considered among the most aggressive in finding ways to make home loans to

consumers whose qualifications couldn't be proved or seemed questionable, mortgage industry executives and analysts said. The Federal Bureau of Investigation has begun looking into its practices in pursuing such business, according to people close to the matter.

\*\*\*\*

A criminal case in Alaska offers a look at the kinds of practices that have caught the attention of federal prosecutors during the subprime-mortgage crisis and its fallout. In that case, Kourosh Partow, a former Countrywide sales executive convicted of mortgage fraud, sought a lighter sentence on grounds that Countrywide and another subprime firm were aware that their loan documents "were fraught with inaccuracies," his lawyer alleged in a court filing. Executives at Countrywide and American Home Mortgage Investment Corp. "encouraged what could be characterized as manipulation," the filing alleges.

*The FBI has said its investigations of the subprime industry are focusing on securitizations -- the process of bundling mortgages into pools and selling tranches to investors.* "There are many disclosure issues" in a mortgage securitization, said Joshua Hochberg, former chief of the Justice Department's fraud section who now works at law firm McKenna Long & Aldridge LLP in Washington. "You have to disclose what percentage of the loans are performing and the adequacy of how the loans are underwritten. So there could be fraud if there are knowing and intentional lies in those financial statements." Mr. Hochberg said prosecutors and the Securities and Exchange Commission will examine "whether as things started going south anybody made an effort to keep the problems hidden."

\*\*\*\*

*"When you securitize a pool of loans, you vouch for the quality of those loans," said mortgage-fraud expert Constance Wilson of software firm Interthinx Inc. "So they may be saying that if in fact Countrywide was aware of any [borrower] misrepresentation, then they couldn't represent and warrant the quality of those securities."*

"Loan Data Focus of Probe – Countrywide Files May Have Included Dubious Information," THE

WALL STREET JOURNAL, March 11, 2008 (emphasis added).

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW

EXHIBIT 4 - 159-
Page 32 of 109

65.   In a class-action lawsuit brought by Countrywide shareholders, United States District Judge Mariana Pfaelzer found that information supplied by numerous *"Confidential Witnesses give rise to a strong inference that significant deviations from underwriting standards were widespread, and not isolated indiscretions by a few low level employees."* Judge Pfaelzer further stated that:

> Plaintiffs allege that in practice, the origination of these "riskier" loans often violated the Company's own loan underwriting policies. *The Complaint offers the accounts of numerous confidential witnesses, who are mostly former employees such as underwriters and loan officers, relating how Countrywide departed from its strict underwriting standards by generating large numbers of loans without proper regard for their quality.* See PP147-158 (noting standards were also loosened with respect to loans labeled and marketed as "prime"). *The Complaint also provides the accounts of several former vice presidents at Countrywide who similarly attest that Countrywide was simply pushing through loans without adherence to underwriting standards.*
>
> ****
>
> *The Court finds that Plaintiffs' numerous confidential witnesses support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards.*
>
> ****
>
> The lowest level employees report that the impetus to "push" loans through came from above. *See id.* P147e (explanation of former Senior Underwriter that it was Company philosophy to close loans, even if it meant approving things that should not have been approved or making exceptions to the rules); *Id.* P147 (relating belief of CW's 1-3, former underwriters, that management, who pressured them to approve loans, were in turn pressured from "up top"). *See also id.* P162 (describing assertion of CW10, a former executive vice president, that Countrywide's senior management, and Sambol in particular, "didn't want to have to turn down any loan applications because [they] wanted to grow market share"). They also allege that the compensation structure promoted these practices by rewarding Company employees -- from executives and management down to the underwriters -- for increasing loan volume, but not for generating quality loans.

*In re Countrywide Financial Corp. Derivative Litig.*, 2008 U.S. Dist. LEXIS 40754 (C.D. Cal. May 14, 2008).

66.     In June and July 2008, the Attorneys General of California, Connecticut, Florida and Illinois all filed lawsuits against Defendants Countrywide FC and Countrywide HL, among others, charging that they engaged in illegal and predatory lending practices.

67.     The State of California complaint charged that Defendants there "did whatever it took to sell more loans, faster – including by easing its underwriting criteria and disregarding the minimal criteria it claimed to require." The purpose of this scheme was to "supply the secondary market with as many loans as possible."[6] The California complaint further charged that:

- Countrywide sold "piggyback" HELOC (home equity line of credit) and primary mortgage combinations, *which together could encumber **more than 100%** of the home's equity.*

- Countrywide would even loan 100% or more of a home's value where the primary mortgage was an extremely risky negative amortization or option ARM loan.

- Countrywide typically urged HELOC borrowers to fully draw down their entire line of credit right away, increasing default risk but generating a higher prospect of fee and interest income for Defendants.

- Loan brokers either wrote false income amounts into loan applications themselves, or coached the applicants to falsify stated income.

---

[6] Complaint, *California v. Countrywide Fin. Corp., et al.*, No. LC081846 (Cal. Sup. Ct., Los Angeles Cty.), at ¶¶ 25, 85. *See also id.* at ¶ 23 (Defendants "propelled . . . branch managers to meet high production goals and close as many loans as they could without regard to borrower ability to repay.").

- Countrywide often encouraged borrowers to take on large, risky loans that they could not afford by assuring them that their property would increase and they would be able to refinance in the near future based on the appreciated amount.

- To close these risky loans, Countrywide frequently misrepresented their terms, such as misleading potential borrowers about hefty prepayment penalties and other fees.

- By these practices, Defendants systematically violated consumer protection laws.

68.    The State of Connecticut Complaint charged that:

- Countrywide FC controlled and operated Countrywide HL.

- Defendants convinced homeowners to enter into loans they could not afford by misrepresenting the terms of the loans and by falsely promising that the homeowners could refinance at a later date on more favorable terms.

- Defendants systematically and routinely imposed excessive fees on homeowners to which they were not entitled, knowing that the excessive fees increased the risk of default.

- Defendants systematically violated the Connecticut Unfair Trade Practices Act and Connecticut Banking Laws.[7]

69.    The State of Florida Complaint charged that the defendants "did not adhere to underwriting standards," and instead underwrote loans "irrespective of the borrowers' ability to document income and assets." The Florida Complaint further charged that the failure to adhere to

---

[7]   Complaint, *Connecticut, et al. v. Countrywide Fin. Corp., et al.*, No. _____ (Conn. Sup. Ct., Hartford Judicial Dist.).

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

EXHIBIT 35 of 102- PAGE 356

standards "engendered fraud," and that Defendants' predatory lending practices violated
consumer protection laws.[8]

70.     The State of Illinois Complaint charged that Countrywide used securitization "as
a way of shedding much of the credit risk associated with non-confirming loans" that it
originated.[9]  The Illinois Complaint contained similar charges as the California, Connecticut and
Florida Complaints, and further charged that:

- Countrywide continually disregarded even lowered lending standards.

- Reduced documentation programs were used to qualify borrowers for loans that they
  could not afford.

- Loan brokers coached applicants to put false salary figures – derived from a database
  called salary.com – on the applications, regardless of the applicants' actual salaries.

- Some brokers also inflated applicants' income figures without the applicants'
  knowledge.  At least one broker reviewed inflated "the vast majority" of the loans it
  originated.

- Countrywide's practices encouraged "rampant fraud" in the low documentation
  products.

- By these deceptive and predatory lending practices, Countrywide consistently violated
  consumer protection statutes.

71.     Countrywide's repeated violation of California, Connecticut, Florida, and Illinois
laws could have a devastating effect on purchasers of mortgage-backed securities backed by
Countrywide loans.  In particular, the California and Illinois Complaints seek rescission of the

---

[8] Complaint, *Florida v. Countrywide Fin. Corp., et al.*, No. 08 30105 (Fla. Cir. Ct., Broward Cty.
(17th Cir.)).
[9] Complaint, *Illinois v. Countrywide Fin. Corp., et al.*, No. 08 CH 2294 (Ill. Cir. Ct., Cook Cty.).

fraudulently-originated loans, even though they have already been securitized and sold off to
investors.

72.     The State of Washington has also sought to revoke Countrywide's license to
engage in business in that state, as a result of Countrywide's repeated violations of Washington
state law.

## THE FALSE AND MISLEADING STATEMENTS
## MADE IN REGISTRATION STATEMENTS

### CWALT Registration Statements

73.     On or about July 25, 2005, Defendant CWALT filed an amended registration
statement with the SEC on Form S-3/A covering the offering, from time to time under SEC Rule
415, of over $45 billion in MBS Certificates to be offered in series designated "Alternative Loan
Trust 2005-_" followed by a number indicating the sequential designation of the particular
offering within the series (hereafter "the CWALT July 25, 2005 Registration Statement"). The
CWALT July 25, 2005 Registration Statement contains numerous misrepresentations and
omissions, as described below.

74.     The CWALT July 25, 2005 Registration Statement amends a June 17, 2005
Registration Statement that contains substantially identical misrepresentations and omissions.

75.     The CWALT July 25, 2005 Registration Statement lists Defendant CWALT as
the Depositor, Defendant Countrywide HL, together with other subsidiaries of Defendant
Countrywide FC, as the Sellers/Sponsors, Countrywide Home Loans Servicing, LP as the
servicer, and the Bank of New York as the trustee.

76.     The CWALT July 25, 2005 Registration Statement stated:

    All of the mortgage loans in the trust fund will have been originated or
    acquired by [Countrywide Home Loans] in accordance with its credit, appraisal

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

and underwriting standards. [Countrywide Home Loans]' underwriting standards
are applied in accordance with applicable federal and state laws and
regulations.

77.    The statements set forth in Paragraph 76 above were false and misleading

because:

    a.   All of the mortgages in the pool were not originated or acquired by Countrywide

       HL in accordance with its credit, appraisal and underwriting standards.

    b.   Countrywide HL did not apply underwriting standards in accordance with

       applicable federal and state laws.  In fact, Countrywide HL has been sued by the

       States of California, Connecticut, Florida, Illinois, and Washington for

       systematically violating state laws, and is reported to be under investigation by

       the Federal Bureau of Investigation and the SEC for violating federal laws.

78.   The CWALT July 25, 2005 Registration Statement further stated:

As part of its evaluation of potential borrowers, [Countrywide Home
Loans][10] generally requires a description of income. If required by its
underwriting guidelines, [Countrywide Home Loans] obtains employment
verification providing current and historical income information and/or a
telephonic employment confirmation. Such employment verification may be
obtained, either through analysis of the prospective borrower's recent pay
stub and/or W-2 forms for the most recent two years, relevant portions of the
most recent two years' tax returns, or from the prospective borrower's
employer, wherein the employer reports the length of employment and current
salary with that organization. Self-employed prospective borrowers generally
are required to submit relevant portions of their federal tax returns for the
past two years.

    In assessing a prospective borrower's creditworthiness, [Countrywide
Home Loans] may use FICO Credit Scores. "FICO Credit Scores" are statistical
credit scores designed to assess a borrower's creditworthiness and likelihood
to default on a consumer obligation over a two-year period based on a
borrower's credit history. FICO Credit Scores were not developed to predict
the likelihood of default on mortgage loans and, accordingly, may not be
indicative of the ability of a mortgagor to repay its mortgage loan. FICO
Credit Scores range from approximately 250 to approximately 900, with higher
scores indicating an individual with a more favorable credit history compared
to an individual with a lower score. Under [Countrywide Home Loans]'
underwriting guidelines, borrowers possessing higher FICO Credit Scores,
which indicate a more favorable credit history, and who give [Countrywide
Home Loans]' the right to obtain the tax returns they filed for the preceding

<hr>

[10] Brackets appear in the original filing and have not been added by Plaintiff.

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW
EXHIBIT 3 -385- Page 385 of 1065

two years may be eligible for [Countrywide Home Loans]' processing program
(the "Preferred Processing Program"). Approximately [ ]% of the mortgage
loans by aggregate Stated Principal Balance as of the cut-off date have been
underwritten pursuant to [Countrywide Home Loans]' Preferred Processing
Program. [Countrywide Home Loans] may waive some documentation requirements
for mortgage loans originated under the Preferred Processing Program.

    Periodically the data used by [Countrywide Home Loans] to complete the
underwriting analysis may be obtained by a third party, particularly for
mortgage loans originated through a loan correspondent or mortgage broker. In
those instances, the initial determination as to whether a mortgage loan
complies with [Countrywide Home Loans]' underwriting guidelines may be made
by an independent company hired to perform underwriting services on behalf of
[Countrywide Home Loans], the loan correspondent or mortgage broker.

****

    [Countrywide Home Loans]' underwriting standards are applied by or on
behalf of [Countrywide Home Loans] to evaluate the prospective borrower's
credit standing and repayment ability and the value and adequacy of the
mortgaged property as collateral. Under those standards, a prospective
borrower must generally demonstrate that the ratio of the borrower's monthly
housing expenses (including principal and interest on the proposed mortgage
loan and, as applicable, the related monthly portion of property taxes,
hazard insurance and mortgage insurance) to the borrower's monthly gross
income and the ratio of total monthly debt to the monthly gross income (the
"debt-to-income" ratios) are within acceptable limits. The maximum acceptable
debt-to-income ratio, which is determined on a loan-by-loan basis varies
depending on a number of underwriting criteria, including the Loan-to-Value
Ratio, loan purpose, loan amount and credit history of the borrower. In
addition to meeting the debt-to-income ratio guidelines, each prospective
borrower is required to have sufficient cash resources to pay the down
payment and closing costs.

79. The statements in Paragraph 78 above were false and misleading because:

   a. The primary focus of the Countrywide origination process was not "to evaluate
      the prospective borrower's credit standing and repayment ability and the value
      and adequacy of the mortgaged property as collateral," but instead to originate
      and accept a high volume of loans to be passed off to investors, regardless of the
      quality of the loan.

   b. Countrywide did not tailor its lending to an applicant's actual income, but instead
      routinely coached applicants to inflate their income on applications.

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

c. Countrywide did not tailor its lending to an applicant's actual repayment ability. Instead, predatory loans that generated high levels of fee income were routinely underwritten even though they were highly likely to fail.

d. Exceptions to stated underwriting guidelines were made as a matter of course, often through an automated system designed to ensure acceptance of loans regardless of their quality.

e. Although Countrywide had the right to verify income and generally required applicants to consent to the release of income tax forms as a means of verification, Defendants often neglected to use the consent to verify the applicant's income as stated on the application with the actual information reported to the Internal Revenue Service.

f. Each prospective borrower was not "required to have sufficient cash resources to pay the down payment and closing costs." Instead, borrowers were routinely permitted to satisfy the down payment using funds borrowed with a piggyback home equity loan, or other borrowing, and roll the closing costs into the cost of the mortgage by inflating the designated property value.

g. Where loan officers knew that an application would not be approved on the basis of the applicant's actual financial condition, even through the exception program, they frequently steered applicants into no documentation products which still provided a commission but had the effect of adding loans to the pool that were almost certain to fail.

h.  Countrywide's origination practices violated California, Connecticut, Illinois, Florida and Washington state law, subjecting the loans generated in these states to the possibility of rescission.

i.  Although these practices made the loans collateralizing the securities issued to investors unsafe, they were encouraged because they generated higher levels of commissions and fee income for Defendants.

80.  The CWALT July 25, 2005 Registration Statement further stated:

Exceptions to [Countrywide Home Loans]' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

81.  The statements in Paragraph 80 above were false and misleading because exceptions to the underwriting guidelines were routinely made and approved regardless of whether compensating factors were demonstrated by a prospective borrower.

82.  The CWALT July 25, 2005 Registration Statement further stated:

Subject to the limitations described in the next sentence and under "--Assignment of the Mortgage Loans," [[Countrywide Home Loans] (or the related seller, in the case of the representation regarding good title)] will be obligated to repurchase or substitute a similar mortgage loan for any mortgage loan as to which there exists deficient documentation or as to which there has been an uncured breach of any representation or warranty relating to the characteristics of the mortgage loans that materially and adversely affects the interests of the certificateholders in that mortgage loan. [Countrywide Home Loans] will represent and warrant to the depositor in the pooling and servicing agreement that the mortgage loans were selected from among the outstanding one- to four-family mortgage loans in [Countrywide Home Loans]'s portfolio as to which the representations and warranties set forth in the pooling and servicing agreement can be made and that the selection was not made in a manner intended to affect the interests of the certificateholders adversely.

83.  The statements in Paragraph 82 above were false and misleading because:

a.  A substantial portion of the loans in the mortgage pools were deficiently documented in ways that adversely affected the certificateholders, as described herein at Paragraphs 57 to 72, yet Defendants did not intend to and did not attempt in any meaningful way to cure these deficiencies.

b.   The loans for the securitizations were selected with the intention of clearing bad

loans off of Defendants' books, even including predatory loans likely to fail, loans

supported by artificially inflated appraisals or falsified loan applications, practices

known to Defendants.  Accordingly, they were selected in a manner that would

unquestionably "affect the interests of the certificateholders adversely."

84.  The CWALT July 25, 2005 Registration Statement further stated that:

The "Loan-to-Value Ratio" of a mortgage loan at any given time is a
fraction, expressed as a percentage, the numerator of which is the principal
balance of the related mortgage loan at the date of determination and the
denominator of which is

    o   in the case of a purchase, the lesser of the selling price of the
        mortgaged property or its appraised value at the time of sale, or

    o   in the case of a refinance, the appraised value of the mortgaged
        property at the time of the refinance, except in the case of a
        mortgage loan underwritten pursuant to [Countrywide Home Loans]'s
        Streamlined Documentation Program as described under "--
        Underwriting Process."

[With respect to mortgage loans originated pursuant to the Streamlined
Documentation Program,

    o   if the loan-to-value ratio at the time of the origination of the
        mortgage loan being refinanced was 80% or less and the loan amount
        of the new loan being originated is $650,000 or less, then the
        "Loan-to-Value Ratio" will be the ratio of the principal amount of
        the new mortgage loan being originated divided by the appraised
        value of the related mortgaged property at the time of the
        origination of the mortgage loan being refinanced, as reconfirmed
        by Countrywide Home Loans using an automated property valuation
        system; or

    o   if the loan-to-value ratio at the time of the origination of the
        mortgage loan being refinanced was greater than 80% or the loan
        amount of new loan being originated is greater than $650,000, then
        the "Loan-to-Value Ratio" will be the ratio of the principal amount
        of the new mortgage loan being originated divided by the appraised
        value of the related mortgaged property as determined by an
        appraisal obtained by [Countrywide Home Loans] at the time of the
        origination of the new mortgage loan. See "-- Underwriting Process"
        in this prospectus supplement.]

No assurance can be given that the value of any mortgaged property has
remained or will remain at the level that existed on the appraisal or sales
date. If residential real estate values generally or in a particular

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW

EXHIBIT 42 Page 42 of 109 -Page 51 of 106-

geographic area decline, the Loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the mortgage loans.

85.    The statements set forth in Paragraph 84 above were false and misleading because:

      a.  The value of homes as listed on the loan paperwork was frequently inflated, and was only confirmed because Defendants pressured appraisers to inflate the appraisal amounts and/or utilized inaccurate automated techniques designed to streamline the approval of loan applications rather than accurately calculate the value of real estate.

      b.  The appraisers utilized were frequently not independent, but were subjected to and yielded to overwhelming economic pressure from Defendants.

      c.  The value of the mortgaged property frequently fell below the appraised amount rendering the loan-to-value figure an inaccurate indicator from the outset due to the inflation of appraisals, not just because of a subsequent decline in residential real estate prices.

86.    The CWALT July 25, 2005 Registration Statement further stated that:

    [Countrywide Home Loans] may provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%.

87.    The statements in Paragraph 86 above were false and misleading because due to inflated appraisals, loans were underwritten on properties that had an actual value that was less than the loan amount.

88.    The CWALT July 25, 2005 Registration Statement further stated:

Except with respect to mortgage loans originated pursuant to its

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

EXHIBIT 5 -170-

```
Streamlined Documentation Program, [Countrywide Home Loans] obtains
appraisals from independent appraisers or appraisal services for properties
that are to secure mortgage loans. The appraisers inspect and appraise the
proposed mortgaged property and verify that the property is in acceptable
condition. Following each appraisal, the appraiser prepares a report which
includes a market data analysis based on recent sales of comparable homes in
the area and, when deemed appropriate, a replacement cost analysis based on
the current cost of constructing a similar home. All appraisals are required
to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.
```

89. The statements in Paragraph 88 above were false and misleading because:

a. Appraisers were not independent but instead dependent upon Countrywide and its

subsidiaries for a substantial portion of their income, a circumstance which

Defendants used to exert pressure on appraisers to issue inflated appraisals.

b. The appraisals issued did not conform with the Fannie Mae/Freddie Mac appraisal

standards then in effect, which required honest appraisals adhering to Uniform

Standards of Professional Appraisal Practice ("USPAP"). Specifically,

Countrywide's influence and pressure upon its appraisers violated the USPAP

requirements that: (i) an appraiser perform assignments with "impartiality,

objectivity and independence;" (ii) that an appraiser "must not perform as an

advocate of any party or interest;" (iii) that an appraiser "must not accept an

assignment that includes the reporting of predetermined opinions and

conclusions;" and (iv) that appraisers must not accept financial arrangements that

compromise their independence.

c. The appraisals were not intended to determine the adequacy of the collateral in

the event of a default, but instead to ensure that a large volume of mortgages were

quickly originated, underwritten and securitized.

90. The CWALT July 25, 2005 Registration Statement further stated:

```
[T]he depositor will not include any mortgage loan in the trust fund for any
series of certificates if anything has come to the depositor's attention that
would cause it to believe that the representations and warranties of a seller
```

or originator will not be accurate and complete in all material respects in
respect of the mortgage loan as of the date of initial issuance of the
related series of certificates.

91.     The statements in Paragraph 90 above were false and misleading because the

depositor, CWALT, did in fact include mortgage loans in the issuing trust fund after it had come

to its attention that the representations of the sponsors/sellers were not accurate and complete in

material respects, including, among other things: (a) that representations regarding property

values and loan-to-value ratios were often inaccurate due to inflated appraisals; (b) that

representations regarding income were often inaccurate due to the coaching of loan officers to

borrowers to state false income on loan applications and the failure to properly verify income

representations; and (c) that representations that each loan complied with state and federal laws

were simply untrue, and that Countrywide HL systematically engaged in predatory lending

practices that violated the laws of various states.

**CWMBS Registration Statements**

92.     On or about July 25, 2005, Defendant CWMBS filed an amended registration

statement with the SEC on Form S-3/A covering the offering, from time to time under SEC Rule

415, of over $40 billion in MBS Certificates to be offered in series designated "CHL Mortgage

Pass-Through Trust 2005-_" followed by a number indicating the sequential designation of the

particular offering within the series (hereafter "the CWMBS July 25, 2005 Registration

Statement"). The CWMBS July 25, 2005 Registration Statement contains numerous

misrepresentations and omissions, as described below.

93.     The CWMBS July 25, 2005 Registration Statement amended a June 20, 2005

Registration Statement that contains substantially identical misrepresentations and omissions.

94.     The CWMBS July 25, 2005 Registration Statement stated:

All of the mortgage loans in the trust fund will have been originated or
acquired by [Countrywide Home Loans] in accordance with its credit, appraisal

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

and underwriting standards. [Countrywide Home Loans]' underwriting standards are applied in accordance with applicable federal and state laws and regulations.

95. The statements set forth in Paragraph 94 above were false and misleading because:

    a. All of the mortgages in the pool were not originated or acquired by Countrywide HL in accordance with its credit, appraisal and underwriting standards.

    b. Countrywide HL did not apply underwriting standards in accordance with applicable federal and state laws. In fact, Countrywide HL has been sued by the States of California, Connecticut, Florida, Illinois, and Washington for systematically violating state laws, and is reported to be under investigation by the Federal Bureau of Investigation and the SEC for violating federal laws.

96. The CWMBS July 25, 2005 Registration Statement further stated:

As part of its evaluation of potential borrowers, [Countrywide Home Loans] generally requires a description of income. If required by its underwriting guidelines, [Countrywide Home Loans] obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

In assessing a prospective borrower's creditworthiness, [Countrywide Home Loans] may use FICO Credit Scores. "FICO Credit Scores" are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. FICO Credit Scores were not developed to predict the likelihood of default on mortgage loans and, accordingly, may not be indicative of the ability of a mortgagor to repay its mortgage loan. FICO Credit Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. Under [Countrywide Home Loans]' underwriting guidelines, borrowers possessing higher FICO Credit Scores, which indicate a more favorable credit history, and who give [Countrywide Home Loans] the right to obtain the tax returns they filed for the preceding two years may be eligible for [Countrywide Home Loans]' processing program

(the "Preferred Processing Program"). Approximately [ ]% of the mortgage loans by aggregate Stated Principal Balance as of the cut-off date have been underwritten pursuant to [Countrywide Home Loans]' Preferred Processing Program. [Countrywide Home Loans] may waive some documentation requirements for mortgage loans originated under the Preferred Processing Program.

****

     [Countrywide Home Loans]' underwriting standards are applied by or on behalf of [Countrywide Home Loans] to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs.

97.     The statements in Paragraph 96 above were false and misleading because:

a.     The primary focus of the Countrywide origination process was not "to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral," but instead to originate and accept a high volume of loans to be passed off to investors, regardless of the quality of the loan.

b.     Countrywide did not tailor its lending to an applicant's actual income, but instead routinely coached applicants to inflate their income on applications.

c.     Countrywide did not tailor its lending to an applicant's actual repayment ability. Instead, predatory loans that generated high levels of fee income were routinely underwritten even though they were highly likely to fail.

d. Exceptions to stated underwriting guidelines were made as a matter of course, often through an automated system designed to ensure acceptance of loans regardless of their quality.

e. Although Countrywide had the right to verify income and generally required applicants to consent to the release of income tax forms as a means of verification, Defendants often neglected to use the consent to verify the applicant's income as stated on the application with the actual information reported to the Internal Revenue Service.

f. Each prospective borrower was not "required to have sufficient cash resources to pay the down payment and closing costs." Instead, borrowers were routinely permitted to satisfy the down payment using funds borrowed with a piggyback home equity loan, or other borrowing, and roll the closing costs into the cost of the mortgage by inflating the designated property value.

g. Where loan officers knew that an application would not be approved on the basis of the applicant's actual financial condition, even through the exception program, they frequently steered applicants into no documentation products which still provided a commission but had the effect of adding loans to the pool that were almost certain to fail.

h. Countrywide's origination practices violated California, Connecticut, Illinois, Florida and Washington state law, subjecting the loans generated in these states to the possibility of rescission.

i.  Although these practices made the loans collateralizing the securities issued to investors unsafe, they were encouraged because they generated higher levels of commissions and fee income for Defendants.

98.   The CWMBS July 25, 2005 Registration Statement further stated:

Exceptions to [Countrywide Home Loans]' underwriting guidelines may be made
if compensating factors are demonstrated by a prospective borrower.

99.   The statements in Paragraph 98 above were false and misleading because exceptions to the underwriting guidelines were routinely made and approved regardless of whether compensating factors were demonstrated by a prospective borrower.

100.   The CWMBS July 25, 2005 Registration Statement further stated:

Subject to the limitations described in the next sentence and under "--
Assignment of the Mortgage Loans," [Countrywide Home Loans] or the related
seller, in the case of the representation regarding good title)] will be
obligated to repurchase or substitute a similar mortgage loan for any
mortgage loan as to which there exists deficient documentation or as to which
there has been an uncured breach of any representation or warranty relating
to the characteristics of the mortgage loans that materially and adversely
affects the interests of the certificateholders in that mortgage loan.
[Countrywide Home Loans] will represent and warrant to the depositor in the
pooling and servicing agreement that the mortgage loans were selected from
among the outstanding one- to four-family mortgage loans in [Countrywide Home
Loans]' portfolio as to which the representations and warranties set forth in
the pooling and servicing agreement can be made and that the selection was
not made in a manner intended to affect the interests of the
certificateholders adversely.

101.   The statements in Paragraph 100 above were false and misleading because:

a.  A substantial portion of the loans in the mortgage pools were deficiently documented in ways that adversely affected the certificateholders, as described herein at Paragraphs 57 to 72, yet Defendants did not intend to and did not attempt in any meaningful way to cure these deficiencies.

b.  The loans for the securitizations were selected with the intention of clearing bad loans off of Defendants' books, even including predatory loans likely to fail, loans supported by artificially inflated appraisals or falsified loan applications, practices

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

known to Defendants.  Accordingly, they were selected in a manner that would

unquestionably "affect the interests of the certificateholders adversely."

102.    The CWMBS July 25, 2005 Registration Statement further stated:

```
    The "Loan-to-Value Ratio" of a mortgage loan at any given time is a
fraction, expressed as a percentage, the numerator of which is the principal
balance of the related mortgage loan at the date of determination and the
denominator of which is,

    o    in the case of a purchase, the lesser of the selling price of the
         mortgaged property or its appraised value at the time of sale, or

    o    in the case of a refinance, the appraised value of the mortgaged
         property at the time of the refinance, except as described in the
         following sentence.

If the mortgagor is refinancing an existing mortgage loan that was originated
or acquired by [Countrywide Home Loans], and that existing mortgage loan
meets the delinquency criteria set forth in the pooling and servicing
agreement,
then with respect to the refinanced mortgage loan,

    o    if the loan-to-value ratio at the time of the origination of the
         mortgage loan being refinanced was 80% or less and the loan amount
         of the new loan being originated is $650,000 or less, then the
         "Loan-to-Value Ratio" will be the ratio of the principal amount of
         the new mortgage loan being originated divided by the appraised
         value of the related mortgaged property at the time of the
         origination of the mortgage loan being refinanced, or

    o    if the loan-to-value ratio at the time of the origination of the
         mortgage loan being refinanced was greater than 80% or the loan
         amount of the new loan being originated is greater than $650,000,
         then the "Loan-to-Value Ratio" will be the ratio of the principal
         amount of the new mortgage loan being originated divided by the
         appraised value of the related mortgaged property as determined by
         a limited appraisal report at the time of the origination of the
         new mortgage loan. See "--Underwriting Process" in this prospectus
         supplement.

No assurance can be given that the value of any mortgaged property has
remained or will remain at the level that existed on the appraisal or sales
date. If residential real estate values generally or in a particular
geographic area decline, the Loan-to-Value Ratios might not be a reliable
indicator of the rates of delinquencies, foreclosures and losses that could
occur with respect to the mortgage loans.
```

103.    The statements set forth in Paragraph 102 above were false and misleading

because:

a. The value of homes as listed on the loan paperwork was frequently inflated, and
was only confirmed by false appraisals because Defendants pressured appraisers
to inflate the appraisal amounts and/or utilized inaccurate automated techniques
designed to streamline the approval of loan applications rather than accurately
calculate the value of real estate.

b. The appraisers utilized were frequently not independent, but were subjected to
and yielded to overwhelming economic pressure from Defendants.

c. The value of the mortgaged property frequently fell below the appraised amount
rendering the loan-to-value figure an inaccurate indicator from the outset due to
the inflation of appraisals, not just because of a subsequent decline in residential
real estate prices.

104. The CWMBS July 25, 2005 Registration Statement further stated:

[Countrywide Home Loans] may provide secondary financing to a mortgagor
contemporaneously with the origination of a mortgage loan, subject to the
following limitations: the Loan-to-Value Ratio of the senior (i.e., first)
lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed
100%.

105. The statements in Paragraph 104 above were false and misleading because due to
inflated appraisals, loans were underwritten on properties that had an actual value that was less
than the loan amount.

106. The CWMBS July 25, 2005 Registration Statement further stated:

Generally, [Countrywide Home Loans] obtains appraisals from independent
appraisers or appraisal services for properties that are to secure mortgage
loans, except with respect to selected borrowers that are refinancing an
existing mortgage loan that was originated or acquired by [Countrywide Home
Loans] where, among other things, the mortgage loan has not been more than 30
days delinquent in payment during the previous twelve-month period. The
appraisers inspect and appraise the proposed mortgaged property and verify
that the property is in acceptable condition. Following each appraisal, the
appraiser prepares a report which includes a market data analysis based on
recent sales of comparable homes in the area and, when deemed appropriate, a
replacement cost analysis based on the current cost of constructing a similar
home. All appraisals are required to conform to Fannie Mae or Freddie Mac

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

appraisal standards then in effect.

107.   The statements in Paragraph 106 above were false and misleading because:

a.   Appraisers were not independent but instead dependent upon Countrywide and its subsidiaries for a substantial portion of their income, a circumstance which Defendants used to exert pressure on appraisers to issue inflated appraisals.

b.   The appraisals issued did not conform with the Fannie Mae/Freddie Mac appraisal standards then in effect, which required honest appraisals adhering to USPAP. Specifically, Countrywide's influence and pressure upon its appraisers violated the USPAP requirements that: (i) an appraiser perform assignments with "impartiality, objectivity and independence;" (ii) that an appraiser "must not perform as an advocate of any party or interest;" (iii) that an appraiser "must not accept an assignment that includes the reporting of predetermined opinions and conclusions;" and (iv) that appraisers must not accept financial arrangements that compromise their independence.

c.   The appraisals were not intended to determine the adequacy of the collateral in the event of a default, but instead to ensure that a large volume of mortgages were quickly originated, underwritten and securitized.

108.   The CWMBS July 25, 2005 Registration Statement further stated:

[T]he depositor will not include any mortgage loan in the trust fund for any series of certificates if anything has come to the depositor's attention that would cause it to believe that the representations and warranties of a seller or originator will not be accurate and complete in all material respects in respect of the mortgage loan as of the date of initial issuance of the related series of certificates.

109.   The statements in Paragraph 108 above were false and misleading because the depositor, CWMBS, did in fact include mortgage loans in the issuing trust fund after it had come to its attention that the representations of the sponsors/sellers were not accurate and complete in

material respects, including, among other things, (a) that representations regarding property values and loan-to-value ratios were often inaccurate due to inflated appraisals; (b) that representations regarding income were often inaccurate due to the coaching of loan officers to borrowers to state false income on loan applications and the failure to properly verify income representations; and (c) that representations that each loan complied with state and federal laws were simply untrue, and that Countrywide HL systematically engaged in predatory lending practices that violated the laws of various states.

110. On or about March 6, 2006, Defendant CWMBS filed a registration statement with the SEC on Form S-3/A covering the offering, from time to time under SEC Rule 415, of over $60 billion in MBS Certificates to be offered in series designated "CHL Mortgage Pass-Through Trust 200_-_" to be completed to indicate the year in which the actual offering took place followed by a designation indicating the particular offering within the series (hereafter "the CWMBS March 6, 2006 Registration Statement").

111. The CWMBS March 6, 2006 Registration Statement stated:

```
[All] of the Mortgage Loans were originated by Countrywide Home Loans
in accordance with its credit, appraisal and underwriting standards.
[Countrywide Home Loans] has been originating mortgage loans since 1969.
Countrywide Home Loans' underwriting standards are applied in accordance with
applicable federal and state laws and regulations.
```

112. The statements set forth in Paragraph 111 above were false and misleading because:

    a. All of the mortgages in the pool were not originated or acquired by Countrywide HL in accordance with its credit, appraisal and underwriting standards.

    b. Countrywide HL did not apply underwriting standards in accordance with applicable federal and state laws. In fact, Countrywide HL has been sued by the States of California, Connecticut, Florida, Illinois, and Washington for

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

EXHIBIT 53 Page 54 of 110 -80-

systematically violating state laws, and is reported to be under investigation by

the Federal Bureau of Investigation and the SEC for violating federal laws.

113.   The CWMBS March 6, 2006 Registration Statement further stated:

As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

In assessing a prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores. "FICO Credit Scores" are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. FICO Credit Scores were not developed to predict the likelihood of default on mortgage loans and, accordingly, may not be indicative of the ability of a borrower to repay its Mortgage Loan. FICO Credit Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, which indicate a more favorable credit history and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years, may be eligible for Countrywide Home Loans' processing program (the "Preferred Processing Program"). As of the Cut-off Date, approximately [ ]%, [ ]%, and [ ]% of the Mortgage Loans in Loan Groups 1, 2 and 3, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that Loan Group as of the Cut-off Date, have been underwritten pursuant to Countrywide Home Loans' Preferred Processing Program. Countrywide Home Loans may waive some documentation requirements for Mortgage Loans originated under the Preferred Processing Program.
****
Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.
****
In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs.

114.   The statements set forth in Paragraph 113 above were false and misleading because:

    a.   The primary focus of the Countrywide origination process was not "to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral," but instead to originate and accept a high volume of loans to be passed off to investors, regardless of the quality of the loan.

    b.   Countrywide did not tailor its lending to an applicant's actual income, but instead routinely coached applicants to inflate their income on applications.

    c.   Countrywide did not tailor its lending to an applicant's actual repayment ability. Instead, predatory loans that generated high levels of fee income were routinely underwritten even though they were highly likely to fail.

    d.   Exceptions to stated underwriting guidelines were made as a matter of course, often through an automated system designed to ensure acceptance of loans regardless of their quality.

    e.   Although Countrywide had the right to verify income and generally required applicants to consent to the release of income tax forms as a means of verification, Defendants often neglected to use the consent to verify the applicant's income as stated on the application with the actual information reported to the Internal Revenue Service.

    f.   Each prospective borrower was not "required to have sufficient cash resources to pay the down payment and closing costs." Instead, borrowers were routinely permitted to satisfy the down payment using funds borrowed with a piggyback

home equity loan, or other borrowing, and roll the closing costs into the cost of

the mortgage by inflating the designated property value.

g.   Where loan officers knew that an application would not be approved on the basis

of the applicant's actual financial condition, even through the exception program,

they frequently steered applicants into no documentation products which still

provided a commission but had the effect of adding loans to the pool that were

almost certain to fail.

h.   Countrywide's origination practices violated California, Connecticut, Illinois,

Florida and Washington state law, subjecting the loans generated in these states to

the possibility of rescission.

i.   Although these practices made the loans collateralizing the securities issued to

investors unsafe, they were encouraged because they generated higher levels of

commissions and fee income for Defendants.

115.   The CWMBS March 6, 2006 Registration Statement further stated:

Exceptions to Countrywide Home Loans' underwriting guidelines may be made if
compensating factors are demonstrated by a prospective borrower.

116.   The statements set forth in Paragraph 115 above were false and misleading

because exceptions to the underwriting guidelines were routinely made and approved regardless

of whether compensating factors were demonstrated by a prospective borrower.

117.   The CWMBS March 6, 2006 Registration Statement further stated:

Countrywide Home Loans obtains appraisals from independent appraisers or
appraisal services for properties that are to secure Mortgage Loans. The
appraisers inspect and appraise the proposed mortgaged property and verify
that the property is in acceptable condition. Following each appraisal,
the appraiser prepares a report which includes a market data analysis based
on recent sales of comparable homes in the area and, when deemed appropriate,
a replacement cost analysis based on the current cost of constructing a
similar home. All appraisals are required to conform to Fannie Mae or Freddie
Mac appraisal standards then in effect.

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

118.    The statements set forth in Paragraph 117 above were false and misleading because:

a.    The value of homes as listed on the loan paperwork was frequently inflated, and was only confirmed by false appraisals because Defendants pressured appraisers to inflate the appraisal amounts and/or utilized inaccurate automated techniques designed to streamline the approval of loan applications rather than accurately calculate the value of real estate.

b.    The appraisers utilized were frequently not independent, but were subjected to and yielded to overwhelming economic pressure from Defendants.

c.    The appraisals issued did not conform with the Fannie Mae/Freddie Mac appraisal standards then in effect, which required honest appraisals adhering to USPAP. Specifically, Countrywide's influence and pressure upon its appraisers violated the USPAP requirements that: (i) an appraiser perform assignments with "impartiality, objectivity and independence;" (ii) that an appraiser "must not perform as an advocate of any party or interest;" (iii) that an appraiser "must not accept an assignment that includes the reporting of predetermined opinions and conclusions;" and (iv) that appraisers must not accept financial arrangements that compromise their independence.

119.    With respect to these and other CWMBS offerings, SEC staff warned Defendants of their obligations under the Securities Act of 1933:

> *We urge all persons who are responsible for the accuracy and adequacy of the disclosure in the filing to be certain that the filing includes all information required under the Securities Act of 1933 and that they have provided all information investors require for an informed investment decision. Since the company and its management are in possession of all of the facts relating*

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW

EXHIBIT 5 Page 54 of 198 -184-

> *to a company's disclosure, they are responsible for the accuracy
> and adequately [sic] of the disclosures they have made.*

Staff Letter Dated March 2, 2006 (emphasis added). Defendants ignored these requirements and

instead filed Registration Statements containing the misrepresentations and omissions set forth

above.

## CWHEQ Registration Statements

120.    On or about August 4, 2005, Defendant CWHEQ filed a registration statement

with the SEC on Form S-3/A covering the offering, from time to time under SEC Rule 415, of

over $30 billion in ABS Certificates to be offered in series designated "Home Equity Loan

Asset-Backed Notes 200_-_" or "Revolving Home Equity Loan Asset-Backed Notes 200_-_," to

be completed to indicate the year in which the actual offering took place followed by a letter

indicating the sequential designation of the particular offering within the series (hereafter "the

CWHEQ August 4, 2005 Registration Statement"). The CWHEQ August 4, 2005 Registration

Statement contains numerous misrepresentations and omissions, as described below.

121.    The CWHEQ August 4, 2005 Registration Statement amended a registration

statement filed on Form S-3 on or about July 21, 2005, which contained substantially identical

misrepresentations and omissions.

122.    The CWHEQ August 4, 2005 Registration Statement stated:

```
Underwriting Procedures Relating to Home Equity Loans

     The following is a description of the underwriting procedures
customarily employed by the sponsor with respect to home equity loans. The
underwriting process is intended to assess the applicant's credit standing
and repayment ability, and the value and adequacy of the real property
security as collateral for the proposed loan. Exceptions to the sponsor's
underwriting guidelines will be made when compensating factors are present.
These factors include the borrower's employment stability, favorable credit
history, equity in the related property, and the nature of the underlying
first mortgage loan.
```

123.   The statements set forth in Paragraph 122 above were false and misleading because:

a.   The primary focus of the Countrywide origination process was not "to assess the applicant's credit standing and repayment ability and the value and adequacy of the real property security as collateral," but instead to originate and accept a high volume of loans to be passed off to investors, regardless of the quality of the loan.

b.   Countrywide did not tailor its lending to an applicant's actual income, but instead routinely coached applicants to inflate their income on applications.

c.   Countrywide did not tailor its lending to an applicant's actual repayment ability. Instead, predatory loans that generated high levels of fee income were routinely underwritten even though they were highly likely to fail.

d.   Exceptions to stated underwriting guidelines were made as a matter of course, often through an automated system designed to ensure acceptance of loans regardless of their quality.

e.   Where loan officers knew that an application would not be approved on the basis of the applicant's actual financial condition, even through the exception program, they frequently steered applicants into no documentation products which still provided a commission but had the effect of adding loans to the pool that were almost certain to fail.

f.   Each prospective borrower was not "required to have sufficient cash resources to pay the down payment and closing costs." Instead, borrowers were routinely permitted to satisfy the down payment using funds borrowed with a piggyback

home equity loan, or other borrowing, and roll the closing costs into the cost of the mortgage by inflating the designated property value.

g.  Countrywide's origination practices violated California, Connecticut, Illinois, Florida and Washington state law, subjecting the loans generated in these states to the possibility of rescission.

h.  Although these practices made the loans collateralizing the securities issued to investors unsafe, they were encouraged because they generated higher levels of commissions and fee income for Defendants.

124.  The CWHEQ August 4, 2005 Registration Statement further stated:

The sponsor originates or acquires mortgage loans pursuant to alternative sets of underwriting criteria under its Full Documentation Program, its Alternative Documentation Program, its Reduced Documentation Program, its Streamlined Documentation Program, and its Super-Streamlined Documentation Program. Generally, the Full Documentation Program will provide a complete and executed Verification of Employment covering a two year period, as well as current paystubs covering one month and two years of W-2s or tax returns. The Alternative Documentation Program permits a salaried borrower to provide paystubs and W-2 forms covering the most recent two years, in lieu of providing a Verification of Employment. Under the Reduced Documentation Program certain credit underwriting documentation concerning income and employment verification is waived. The Reduced Documentation Program requires applicants to list their assets and also permits bank statements in lieu of verifications of deposits. Borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion are eligible for the Reduced Documentation Program. The Streamlined Documentation Program allows for a single paystub with year-to-date earnings for salaried borrowers and the most recent year's tax returns for borrowers who are self-employed or commissioned. The Super-Streamlined Documentation program is available for first lien borrowers with good credit and mortgage history with Countrywide. The Super-Streamlined Documentation Loan Program is available for borrowers who have recently purchased or refinanced (rate or term) with the sponsor if they have not been 30 days delinquent in payment during the previous twelve month period. Under the Super-Streamlined Documentation Program, the value used in conjunction with obtaining the first lien from the sponsor is used in lieu of a new appraisal and subsequently used to determine the combined loan-to-value ratios for the new home equity line of credit. In most instances, the maximum loan amount is limited to the lesser of 25% of the first lien balance and an amount between $50,000 and $125,000 determined by the FICO score of the borrower. Although a credit review is conducted, no debt ratio, income documentation, or asset verification is generally required. A telephonic verification of employment is required before loan closing.

125.     The statements set forth in Paragraph 124 above were false and misleading because:

    a.  Exceptions to stated underwriting guidelines were made as a matter of course, often through an automated system designed to ensure acceptance of loans regardless of their quality.

    b.  Where loan officers knew that an application would not be approved on the basis of the applicant's actual financial condition, even through the exception program, they frequently steered applicants into no documentation products which still provided a commission but had the effect of adding loans to the pool that were almost certain to fail.

126.     The CWHEQ August 4, 2005 Registration Statement further stated:

```
Full appraisals are generally performed on all home equity loans. These
appraisals are determined on the basis of a sponsor-approved, independent
third-party, fee-based appraisal completed on forms approved by Fannie Mae or
Freddie Mac.
```

127.     The statements in Paragraph 126 above were false and misleading because:

    a.  Full appraisals were only performed on some home equity loans.

    b.  Even when a "full appraisal" was utilized, the appraisers were not independent but instead dependent upon Countrywide and its subsidiaries for a substantial portion of their income, a circumstance which Defendants used to exert pressure on appraisers to issue inflated appraisals.

    c.  The appraisals issued did not conform with the Fannie Mae/Freddie Mac appraisal standards then in effect, which required honest appraisals adhering to USPAP. Specifically, Countrywide's influence and pressure upon its appraisers violated the USPAP requirements that: (i) an appraiser perform assignments with

"impartiality, objectivity and independence;" (ii) that an appraiser "must not perform as an advocate of any party or interest;" (iii) that an appraiser "must not accept an assignment that includes the reporting of predetermined opinions and conclusions;" and (iv) that appraisers must not accept financial arrangements that compromise their independence.

d.    The appraisals were not intended to determine the adequacy of the collateral in the event of a default, but instead to ensure that a large volume of mortgages were quickly originated, underwritten and securitized.

128.    The CWHEQ August 4, 2005 Registration Statement further stated:

After obtaining all applicable income, liability, asset, employment, credit, and property information, the sponsor generally uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments (including any escrows for property taxes and hazard insurance premiums) and other monthly credit obligations. The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations (assuming the mortgage loan interest rate is based on the applicable fully indexed interest rate) to the borrower's gross monthly income. Based on this, the maximum monthly debt-to-income ratio is 45%. Variations in the monthly debt-to-income ratios limits are permitted based on compensating factors. The sponsor currently offers home equity loan products that allow maximum combined loan-to-value ratios up to 100%.

129.    The statements in Paragraph 128 above were false and misleading because:

a.    Loan officers frequently coached applicants to overstate their income on loan applications.

b.    As a result, the critical debt-to-income ratio was not accurate and did not reflect "the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income."

c.    The value of homes as listed on certain loan paperwork was manipulated using inflated appraisals.

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

d. The value of the mortgaged property frequently fell below the appraised amount rendering the loan-to-value figure an inaccurate indicator from the outset due to the inflation of appraisals, not just because of a subsequent decline in residential real estate prices.

e. Due to inflated appraisals, loans were underwritten on properties that had an actual value that was less than the loan amount (*i.e.* a loan-to-value ration in excess of 100%).

f. "Variations" or exceptions were permitted even without compensating factors.

130. On or about April 12, 2006, Defendant CWHEQ filed an amended registration statement with the SEC on Form S-3/A covering the offering, from time-to-time, of over $26 billion in ABS Certificates to be offered in series designated "Revolving Home Equity Loan Asset-Backed Notes 200_-_," to be completed to indicate the year in which the actual offering took place followed by a letter indicating the sequential designation of the particular offering within the series (hereafter "the CWHEQ April 12, 2006 Registration Statement").

131. The CWHEQ April 12, 2006 Registration Statement contained misrepresentations and omissions substantially identical to those contained in the CWHEQ August 4, 2005 Registration Statement. The CWHEQ April 12, 2006 Registration Statement amended a registration statement filed with the SEC on Form S-3 on or about March 3, 2006 that also contained substantially identical misrepresentations and omissions.

132. On or about May 22, 2007, Defendant CWHEQ filed an amended registration statement with the SEC on Form S-3/A covering the offering, from time-to-time, of over $31 billion in ABS Certificates to be offered in series designated "Home Equity Loan Asset-Backed Notes 200_-_" or "Revolving Home Equity Loan Asset-Backed Notes 200_-_," to be completed

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW

EXHIBIT 6 Page 634 of 790 -190-

to indicate the year in which the actual offering took place followed by a letter indicating the sequential designation of the particular offering within the series (hereafter "the CWHEQ May 22, 2007 Registration Statement").

133.    The CWHEQ May 22, 2007 Registration Statement contained misrepresentations and omissions substantially identical to those contained in the CWHEQ August 4, 2005 Registration Statement.  The CWHEQ May 22, 2007 Registration Statement amended registration statements filed with the SEC on Form S-3 or S-3/A on or about January 10, 2007, March 2, 2007, and April 12, 2007, all of which also contained substantially identical misrepresentations and omissions.

134.    With respect to these and other CWHEQ offerings, SEC staff issued repeated letters warning Defendants of their obligations under the Securities Act of 1933:

> *We urge all persons who are responsible for the accuracy and adequacy of the disclosure in the filing to be certain that the filing includes all information required under the Securities Act of 1933 and that they have provided all information investors require for an informed investment decision. Since the company and its management are in possession of all of the facts relating to a company's disclosure, they are responsible for the accuracy and adequately [sic] of the disclosures they have made.*

Staff Letter Dated April 3, 2006 (emphasis added); *see also* Staff Letter Dated February 6, 2007 (admonishing same).  Defendants ignored these requirements and instead filed Registration Statements containing the misrepresentations and omissions set forth above.

## FALSE AND MISLEADING STATEMENTS MADE IN PROSPECTUSES

### Alternative Loan Trust Series 2005-46 Prospectus

135.    On or about August 30, 2005, Defendant CWALT filed a Prospectus Supplement with the SEC on Form 424B5 for the offering of Certificates by the Alternative Loan Trust

Series 2005-46CB (the "Alternative Loan Trust 2005-46 Prospectus"), which supplemented the

template prospectus incorporated in the Amended Registration Statement it filed on July 25,

2005 and amended a previous prospectus supplement it filed on August 26, 2005.  The

Alternative Loan Trust 2005-46 Prospectus contained numerous misrepresentations and

omissions, as described below.

136.    The Alternative Loan Trust Series 2005-46 Prospectus stated:

```
    All of the mortgage loans in the trust fund will have been originated or
acquired by Countrywide Home Loans in accordance with its credit, appraisal
and underwriting standards. Countrywide Home Loans' underwriting standards
are applied in accordance with applicable federal and state laws and
regulations.
```

137.    The statements set forth in Paragraph 136 above were false and misleading

because:

   a.   All of the mortgages in the pool were not originated or acquired by Countrywide

        HL in accordance with its credit, appraisal and underwriting standards.

   b.   Countrywide HL did not apply underwriting standards in accordance with

        applicable federal and state laws.  In fact, Countrywide HL has been sued by the

        States of California, Connecticut, Florida, Illinois, and Washington for

        systematically violating state laws, and is reported to be under investigation by

        the Federal Bureau of Investigation and the SEC for violating federal laws.

138.    The Alternative Loan Trust Series 2005-46 Prospectus further stated:

```
    As part of its evaluation of potential borrowers, Countrywide Home Loans
generally requires a description of income. If required by its underwriting
guidelines, Countrywide Home Loans obtains employment verification providing
current and historical income information and/or a telephonic employment
confirmation. Such employment verification may be obtained, either through
analysis of the prospective borrower's recent pay stub and/or W-2 forms for
the most recent two years, relevant portions of the most recent two years'
tax returns, or from the prospective borrower's employer, wherein the
employer reports the length of employment and current salary with that
organization. Self-employed prospective borrowers generally are required to
submit relevant portions of their federal tax returns for the past two years.
```

In assessing a prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores. "FICO Credit Scores" are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. FICO Credit Scores were not developed to predict the likelihood of default on mortgage loans and, accordingly, may not be indicative of the ability of a mortgagor to repay its mortgage loan. FICO Credit Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, which indicate a more favorable credit history, and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years may be eligible for Countrywide Home Loans' processing program (the "Preferred Processing Program"). Approximately 23.74% of the Initial Mortgage Loans, by aggregate Stated Principal Balance as of the initial cut-off date, have been underwritten pursuant to Countrywide Home Loans' Preferred Processing Program. Countrywide Home Loans may waive some documentation requirements for mortgage loans originated under the Preferred Processing Program.

\*\*\*\*

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs.

139.   The statements in Paragraph 138 above were false and misleading because:

a.   The primary focus of the Countrywide origination process was not "to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral," but instead to originate and accept a high volume of loans to be passed off to investors, regardless of the quality of the loan.

b.  Countrywide did not tailor its lending to an applicant's actual income, but instead
    routinely coached applicants to inflate their income on applications.

c.  Countrywide did not tailor its lending to an applicant's actual repayment ability.
    Instead, predatory loans that generated high levels of fee income were routinely
    underwritten even though they were highly likely to fail.

d.  Exceptions to stated underwriting guidelines were made as a matter of course,
    often through an automated system designed to ensure acceptance of loans
    regardless of their quality.

e.  Although Countrywide had the right to verify income and generally required
    applicants to consent to the release of income tax forms as a means of
    verification, Defendants often neglected to use the consent to verify the
    applicant's income as stated on the application with the actual information
    reported to the Internal Revenue Service.

f.  Each prospective borrower was not "required to have sufficient cash resources to
    pay the down payment and closing costs." Instead, borrowers were routinely
    permitted to satisfy the down payment using funds borrowed with a piggyback
    home equity loan, or other borrowing, and roll the closing costs into the cost of
    the mortgage by inflating the designated property value.

g.  Where loan officers knew that an application would not be approved on the basis
    of the applicant's actual condition, even through the exception program, they
    frequently steered applicants into no documentation products which still provided
    a commission but had the effect of adding loans to the pool that were almost
    certain to fail.

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**
EXHIBIT 6 at 1094-

    h.   Countrywide's origination practices violated California, Connecticut, Illinois,

         Florida and Washington state law, subjecting the loans generated in these states to

         the possibility of rescission.

    i.   Although these practices made the loans collateralizing the securities issued to

         investors unsafe, they were encouraged because they generated higher levels of

         commissions and fee income for Defendants.

140.    The Alternative Loan Trust Series 2005-46 Prospectus further stated:

```
Exceptions to Countrywide Home Loans' underwriting guidelines may be made if
compensating factors are demonstrated by a prospective borrower.
```

141.    The statements in Paragraph 140 above were false and misleading because

exceptions to the underwriting guidelines were routinely made and approved regardless of

whether compensating factors were demonstrated by a prospective borrower.

142.    The Alternative Loan Trust Series 2005-46 Prospectus further stated:

```
Subject to the limitations described in the next sentence and under "--
Assignment of the Mortgage Loans," Countrywide Home Loans (or the related
seller, in the case of the representation regarding good title) will be
obligated to repurchase or substitute a similar mortgage loan for any
mortgage loan as to which there exists deficient documentation or as to which
there has been an uncured breach of any representation or warranty relating
to the characteristics of the mortgage loans that materially and adversely
affects the interests of the certificateholders in that mortgage loan.
Countrywide Home Loans will represent and warrant to the depositor in the
pooling and servicing agreement that the mortgage loans were selected from
among the outstanding one- to four-family mortgage loans in Countrywide Home
Loans' portfolio as to which the representations and warranties set forth in
the pooling and servicing agreement can be made and that the selection was
not made in a manner intended to affect the interests of the
certificateholders adversely.
```

143.    The statements in Paragraph 142 above were false and misleading because:

    a.   A substantial portion of the loans in the mortgage pools were deficiently

         documented in ways that adversely affected the certificateholders, as described

         herein at Paragraphs 57 to 72, yet Defendants did not intend to and did not

         attempt in any meaningful way to cure these deficiencies.

b. The loans for the securitizations were selected with the intention of clearing bad loans off of Defendants' books, even including predatory loans likely to fail, loans supported by artificially inflated appraisals or falsified loan applications, practices known to Defendants. Accordingly, they were selected in a manner that would unquestionably "affect the interests of the certificateholders adversely."

144. The Alternative Loan Trust Series 2005-46 Prospectus further stated:

The "Loan-to-Value Ratio" of a mortgage loan at any given time is a fraction, expressed as a percentage, the numerator of which is the principal balance of the related mortgage loan at the date of determination and the denominator of which is,

- in the case of a purchase, the lesser of the selling price of the mortgaged property or its appraised value at the time of sale, or

- in the case of a refinance, the appraised value of the mortgaged property at the time of the refinance, except in the case of a mortgage loan underwritten pursuant to Countrywide Home Loans' Streamlined Documentation Program as described under "—Underwriting Process."

With respect to mortgage loans originated pursuant to the Streamlined Documentation Program,

- if the loan-to-value ratio at the time of the origination of the mortgage loan being refinanced was 80% or less and the loan amount of the new loan being originated is $650,000 or less, then the "Loan-to-Value Ratio" will be the ratio of the principal amount of the new mortgage loan being originated divided by the appraised value of the related mortgaged property at the time of the origination of the mortgage loan being refinanced, as reconfirmed by Countrywide Home Loans using an automated property valuation system; or

- if the loan-to-value ratio at the time of the origination of the mortgage loan being refinanced was greater than 80% or the loan amount of new loan being originated is greater than $650,000, then the "Loan-to-Value Ratio" will be the ratio of the principal amount of the new mortgage loan being originated divided by the appraised value of the related mortgaged property as determined by an appraisal obtained by Countrywide Home Loans at the time of the origination of the new mortgage loan. See "-- Underwriting Process" in this prospectus supplement.

No assurance can be given that the value of any mortgaged property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values generally or in a particular geographic area decline, the Loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the mortgage loans.

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW
EXHIBIT 6 -154- PAGE 196

145.    The statements set forth in Paragraph 144 above were false and misleading because:

    a.    The value of homes as listed on the loan paperwork was frequently inflated, and was only confirmed because Defendants pressured appraisers to inflate the appraisal amounts and/or utilized inaccurate automated techniques designed to streamline the approval of loan applications rather than accurately calculate the value of real estate.

    b.    The appraisers utilized were frequently not independent, but were subjected to and yielded to overwhelming economic pressure from Defendants.

    c.    The value of the mortgaged property frequently fell below the appraised amount rendering the loan-to-value figure an inaccurate indicator from the outset due to the inflation of appraisals, not just because of a subsequent decline in residential real estate prices.

146.    The Alternative Loan Trust Series 2005-46 Prospectus further stated:

Countrywide Home Loans may provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%.

147.    The statements in Paragraph 146 were false and misleading because due to inflated appraisals, loans were underwritten on properties that had an actual value that was less than the loan amount.

148.    The Alternative Loan Trust Series 2005-46 Prospectus further stated:

Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program and 191 Initial Mortgage Loans with an aggregate Stated Principal Balance as of the Initial Cut-off Date of approximately $35,212,925.28 whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW

EXHIBIT 7 Page 764 of 1097 -767-

that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

149.   The statements in Paragraph 148 above were false and misleading because:

a.   Appraisers were not independent but instead dependent upon Countrywide and its subsidiaries for a substantial portion of their income, a circumstance which Defendants used to exert pressure on appraisers to issue inflated appraisals.

b.   The appraisals issued did not conform with the Fannie Mae/Freddie Mac appraisal standards then in effect, which required honest appraisals adhering to USPAP. Specifically, Countrywide's influence and pressure upon its appraisers violated the USPAP requirements that: (i) an appraiser perform assignments with "impartiality, objectivity and independence;" (ii) that an appraiser "must not perform as an advocate of any party or interest;" (iii) that an appraiser "must not accept an assignment that includes the reporting of predetermined opinions and conclusions;" and (iv) that appraisers must not accept financial arrangements that compromise their independence.

c.   The appraisals were not intended to determine the adequacy of the collateral in the event of a default, but instead to ensure that a large volume of mortgages were quickly originated, underwritten and securitized.

150.   The Alternative Loan Trust Series 2005-46 Prospectus further stated:

[T]he depositor will not include any mortgage loan in the trust fund for any series of certificates if anything has come to the depositor's attention that would cause it to believe that the representations and warranties of a seller or originator will not be accurate and complete in all material respects in respect of the mortgage loan as of the date of initial issuance of the related series of certificates.

151.    The statements in Paragraph 150 above were false and misleading because the

depositor, CWALT, did in fact include mortgage loans in the issuing trust fund after it had come

to its attention that the representations of the sponsors/sellers were not accurate and complete in

material respects, including, among other things, (a) that representations regarding property

values and loan-to-value ratios were often inaccurate due to inflated appraisals; (b) that

representations regarding income were often inaccurate due to the coaching of loan officers to

borrowers to state false income on loan applications and the failure to properly verify income

representations; and (c) that representations that each loan complied with state and federal laws

were simply untrue, and that Countrywide HL systematically engaged in predatory lending

practices that violated the laws of various states.

**Alternative Loan Trust Series 2005-72 Prospectus**

152.    On or about November 29, 2005 Defendant CWALT filed a Prospectus

Supplement with the SEC on Form 424B5 for the offering of Certificates by the Alternative

Loan Trust Series 2005-72 Issuing Trust ("the Alternative Loan Trust Series 2005-72

Prospectus"), which supplemented a prospectus filed on or about October 25, 2005.  The

Alternative Loan Trust Series 2005-72 Prospectus contained misrepresentations and omissions

substantially identical to those contained in the Alternative Loan Trust Series 2005-46

Prospectus, as described above in Paragraphs 135 to 151.

**CHL Mortgage Pass-Through Trust Series 2005-26 Prospectus**

153.    On or about September 27, 2005, Defendant CWMBS filed a Prospectus

Supplement with the SEC on Form 424B5 for the offering of Certificates by the CHL Mortgage

Pass-Through Trust Series 2005-26 ("the CHL Mortgage Pass-Through Trust Series 2005-26

Prospectus"),  which supplemented the template prospectus incorporated in the Amended

Registration Statement it filed on July 25, 2005.   The CHL Mortgage Pass-Through Trust Series

2005-26 Prospectus contained numerous misrepresentations and omissions, as described below.

154.    The CHL Mortgage Pass-Through Trust Series 2005-26 Prospectus stated:

    All of the mortgage loans in the trust fund will have been originated or
acquired by Countrywide Home Loans in accordance with its credit, appraisal
and underwriting standards. Countrywide Home Loans' underwriting standards
are applied in accordance with applicable federal and state laws and
regulations.

155.    The statements set forth in Paragraph 154 above were false and misleading

because:

   a.  All of the mortgages in the pool were not originated or acquired by Countrywide

       HL in accordance with its credit, appraisal and underwriting standards.

   b.  Countrywide HL did not apply underwriting standards in accordance with

       applicable federal and state laws.  In fact, Countrywide HL has been sued by the

       States of California, Connecticut, Florida, Illinois, and Washington for

       systematically violating state laws, and is reported to be under investigation by

       the Federal Bureau of Investigation and the SEC for violating federal laws.

156.    The CHL Mortgage Pass-Through Trust Series 2005-26 Prospectus further stated:

    As part of its evaluation of potential borrowers, Countrywide Home Loans
generally requires a description of income. If required by its underwriting
guidelines, Countrywide Home Loans obtains employment verification providing
current and historical income information and/or a telephonic employment
confirmation. Such employment verification may be obtained, either through
analysis of the prospective borrower's recent pay stub and/or W-2 forms for
the most recent two years, relevant portions of the most recent two years'
tax returns, or from the prospective borrower's employer, wherein the
employer reports the length of employment and current salary with that
organization. Self-employed prospective borrowers generally are required to
submit relevant portions of their federal tax returns for the past two years.

    In assessing a prospective borrower's creditworthiness, Countrywide Home
Loans may use FICO Credit Scores. "FICO Credit Scores" are statistical credit
scores designed to assess a borrower's creditworthiness and likelihood to
default on a consumer obligation over a two-year period based on a borrower's
credit history. FICO Credit Scores were not developed to predict the
likelihood of default on mortgage loans and, accordingly, may not be
indicative of the ability of a borrower to repay its mortgage loan. FICO

Credit Scores range from approximately 250 to approximately 900, with higher
scores indicating an individual with a more favorable credit history compared
to an individual with a lower score. Under Countrywide Home Loans'
underwriting guidelines, borrowers possessing higher FICO Credit Scores,
which indicate a more favorable credit history, and who give Countrywide Home
Loans the right to obtain the tax returns they filed for the preceding two
years may be eligible for Countrywide Home Loans' processing program (the
"Preferred Processing Program"). Approximately 51.53% and approximately
53.94% of the mortgage loans or applicable fractions thereof related to
collateral allocation group 1 and collateral allocation group 2,
respectively, in each case by the Applicable Fractions of the Stated
Principal Balances of the related mortgage loans as of the cut-off date, have
been underwritten pursuant to Countrywide Home Loans' Preferred Processing
Program. Countrywide Home Loans may waive some documentation requirements for
mortgage loans originated under the Preferred Processing Program.

    ****

    Countrywide Home Loans' underwriting standards are applied by or on
behalf of Countrywide Home Loans to evaluate the prospective borrower's
credit standing and repayment ability and the value and adequacy of the
mortgaged property as collateral. Under those standards, a prospective
borrower must generally demonstrate that the ratio of the borrower's monthly
housing expenses (including principal and interest on the proposed mortgage
loan and, as applicable, the related monthly portion of property taxes,
hazard insurance and mortgage insurance) to the borrower's monthly gross
income and the ratio of total monthly debt to the monthly gross income (the
"debt-to-income" ratios) are within acceptable limits. The maximum acceptable
debt-to-income ratio, which is determined on a loan-by-loan basis varies
depending on a number of underwriting criteria, including the Loan-to-Value
Ratio, loan purpose, loan amount and credit history of the borrower. In
addition to meeting the debt-to-income ratio guidelines, each prospective
borrower is required to have sufficient cash resources to pay the down
payment and closing costs.

157.    The statements in Paragraph 156 above were false and misleading because:

    a.    The primary focus of the Countrywide origination process was not "to evaluate
the prospective borrower's credit standing and repayment ability and the value
and adequacy of the mortgaged property as collateral," but instead to originate
and accept a high volume of loans to be passed off to investors, regardless of the
quality of the loan.

    b.    Countrywide did not tailor its lending to an applicant's actual income, but instead
routinely coached applicants to inflate their income on applications.

Edit

c. Countrywide did not tailor its lending to an applicant's actual repayment ability. Instead, predatory loans that generated high levels of fee income were routinely underwritten even though they were highly likely to fail.

d. Exceptions to stated underwriting guidelines were made as a matter of course, often through an automated system designed to ensure acceptance of loans regardless of their quality.

e. Although Countrywide had the right to verify income and generally required applicants to consent to the release of income tax forms as a means of verification, Defendants often neglected to use the consent to verify the applicant's income as stated on the application with the actual information reported to the Internal Revenue Service.

f. Each prospective borrower was not "required to have sufficient cash resources to pay the down payment and closing costs." Instead, borrowers were routinely permitted to satisfy the down payment using funds borrowed with a piggyback home equity loan, or other borrowing, and roll the closing costs into the cost of the mortgage by inflating the designated property value.

g. Where loan officers knew that an application would not be approved on the basis of the applicant's actual financial condition, even through the exception program, they frequently steered applicants into no documentation products which still provided a commission but had the effect of adding loans to the pool that were almost certain to fail.

h. Countrywide's origination practices violated California, Connecticut, Illinois, Florida and Washington state law, subjecting the loans generated in these states to the possibility of rescission.

i. Although these practices made the loans collateralizing the securities issued to investors unsafe, they were encouraged because they generated higher levels of commissions and fee income for Defendants.

158. The CHL Mortgage Pass-Through Trust Series 2005-26 Prospectus further stated:

```
    Exceptions to Countrywide Home Loans' underwriting guidelines may be made
if compensating factors are demonstrated by a prospective borrower.
```

159. The statements in Paragraph 158 above were false and misleading because exceptions to the underwriting guidelines were routinely made and approved regardless of whether compensating factors were demonstrated by a prospective borrower.

160. The CHL Mortgage Pass-Through Trust Series 2005-26 Prospectus further stated:

```
    Subject to the limitations described in the next sentence and under "-
Assignment of the Mortgage Loans," Countrywide Home Loans (or the related
seller, in the case of the representation regarding good title) will be
obligated to repurchase or substitute a similar mortgage loan for any
mortgage loan as to which there exists deficient documentation or as to which
there has been an uncured breach of any representation or warranty relating
to the characteristics of the mortgage loans that materially and adversely
affects the interests of the certificateholders in that mortgage loan.
Countrywide Home Loans will represent and warrant to the depositor in the
pooling and servicing agreement that the mortgage loans were selected from
among the outstanding one- to four-family mortgage loans in Countrywide Home
Loans' portfolio as to which the representations and warranties set forth in
the pooling and servicing agreement can be made and that the selection was
not made in a manner intended to affect the interests of the
certificateholders adversely.
```

161. The statements in Paragraph 160 above were false and misleading because:

a. A substantial portion of the loans in the mortgage pools were deficiently documented in ways that adversely affected the certificateholders, as described

herein at Paragraphs 57 to 72, yet Defendants did not intend to and did not

attempt in any meaningful way to cure these deficiencies.

b. The loans for the securitizations were selected with the intention of clearing bad

loans off of Defendants' books, even including predatory loans likely to fail, loans

supported by artificially inflated appraisals or falsified loan applications, practices

known to Defendants. Accordingly, they were selected in a manner that would

unquestionably "affect the interests of the certificateholders adversely."

162. The CHL Mortgage Pass-Through Trust Series 2005-26 Prospectus further stated:

The "Loan-to-Value Ratio" of a mortgage loan at any given time is a fraction, expressed as a percentage, the numerator of which is the principal balance of the related mortgage loan at the date of determination and the denominator of which is,

• in the case of a purchase, the lesser of the selling price of the mortgaged property or its appraised value at the time of sale, or

• in the case of a refinance, the appraised value of the mortgaged property at the time of the refinance, except as described in the following sentence.

If the borrower is refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans, and that existing mortgage loan meets the delinquency criteria set forth in the pooling and servicing agreement, then with respect to the refinanced mortgage loan,

• if the loan-to-value ratio at the time of the origination of the mortgage loan being refinanced was 80% or less and the loan amount of the new loan being originated is $650,000 or less, then the "Loan-to-Value Ratio" will be the ratio of the principal amount of the new mortgage loan being originated divided by the appraised value of the related mortgaged property at the time of the origination of the mortgage loan being refinanced; or

• if the loan-to-value ratio at the time of the origination of the mortgage loan being refinanced was greater than 80% or the loan amount of new loan being originated is greater than $650,000, then the "Loan-to-Value Ratio" will be the ratio of the principal amount of the new mortgage loan being originated divided by the appraised value of the related mortgaged property as determined by a limited appraisal report at the time of the origination of the new mortgage loan. See "— Underwriting Process" in this prospectus supplement.

No assurance can be given that the value of any mortgaged property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values generally or in a particular geographic area decline, the Loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the mortgage loans.

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW

163.   The statements set forth in Paragraph 162 above were false and misleading because:

   a.   The value of homes as listed on the loan paperwork was frequently inflated, and was only confirmed because Defendants pressured appraisers to inflate the appraisal amounts and/or utilized inaccurate automated techniques designed to streamline the approval of loan applications rather than accurately calculate the value of real estate.

   b.   The appraisers utilized were frequently not independent, but were subjected to and yielded to overwhelming economic pressure from Defendants.

   c.   The value of the mortgaged property frequently fell below the appraised amount rendering the loan-to-value figure an inaccurate indicator from the outset due to the inflation of appraisals, not just because of a subsequent decline in residential real estate prices.

164.   The CHL Mortgage Pass-Through Trust Series 2005-26 Prospectus further stated:

   Generally, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans, except with respect to selected borrowers that are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans where, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

165.   The statements in Paragraph 164 above were false and misleading because:

   a.   Appraisers were not independent but instead dependent upon Countrywide and its subsidiaries for a substantial portion of their income, a circumstance which

Defendants used to exert pressure on appraisers to issue inflated appraisals.

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**
EXHIBIT 4
Page 784 of 805
-105-

b. The appraisals issued did not conform with the Fannie Mae/Freddie Mac appraisal standards then in effect, which required honest appraisals adhering to USPAP. Specifically, Countrywide's influence and pressure upon its appraisers violated the USPAP requirements that: (i) an appraiser perform assignments with "impartiality, objectivity and independence;" (ii) that an appraiser "must not perform as an advocate of any party or interest;" (iii) that an appraiser "must not accept an assignment that includes the reporting of predetermined opinions and conclusions;" and (iv) that appraisers must not accept financial arrangements that compromise their independence.

c. The appraisals were not intended to determine the adequacy of the collateral in the event of a default, but instead to ensure that a large volume of mortgages were quickly originated, underwritten and securitized.

166.    The CHL Mortgage Pass-Through Trust Series 2005-26 Prospectus further stated:

> However, the depositor will not include any mortgage loan in the trust fund for any series of certificates if anything has come to the depositor's attention that would cause it to believe that the representations and warranties of a seller or originator will not be accurate and complete in all material respects in respect of the mortgage loan as of the date of initial issuance of the related series of certificates.

167.    The statements in Paragraph 166 above were false and misleading because the depositor, CWMBS, did in fact include mortgage loans in the issuing trust fund after it had come to its attention that the representations of the sponsors/sellers were not accurate and complete in material respects, including, among other things, (a) that representations regarding property values and loan-to-value ratios were often inaccurate due to inflated appraisals; (b) that representations regarding income were often inaccurate due to the coaching of loan officers to borrowers to state false income on loan applications and the failure to properly verify income

representations; and (c) that representations that each loan complied with state and federal laws were simply untrue, and that Countrywide HL systematically engaged in predatory lending practices that violated the laws of various states.

## CHL Mortgage Pass-Through Trust Series 2006-HYB1 Prospectus

168.    On or about January 27, 2006 Defendant CWMBS filed a Prospectus Supplement on Form 424B5 for the offering of Certificates by the CHL Mortgage Pass-Through Trust Series 2006-HYB1 ("the CHL Mortgage Pass-Through Trust Series 2006-HYB1 Prospectus"), which supplemented a prospects filed on or about January 25, 2006.  The CHL Mortgage Pass-Through Trust Series 2006-HYB1 Prospectus contained numerous misrepresentations and omissions, as described below.

169.    The CHL Mortgage Pass-Through Trust Series 2006-HYB1 Prospectus stated:

> Approximately 24.64%, 37.88% and 47.87% of the Mortgage Loans in loan groups 1, 2 and 3, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans has been originating mortgage loans since 1969. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.

170.    The statements set forth in Paragraph 169 above were false and misleading because:

   a.    The mortgages originated by Countrywide HL were not all originated in accordance with its credit, appraisal and underwriting standards.

   b.    Countrywide HL did not apply underwriting standards in accordance with applicable federal and state laws.  In fact, Countrywide HL has been sued by the States of California, Connecticut, Florida, Illinois, and Washington for systematically violating state laws, and is reported to be under investigation by the Federal Bureau of Investigation and the SEC for violating federal laws.

171.    The CHL Mortgage Pass-Through Trust Series 2006-HYB1 Prospectus further

stated:

As part of its evaluation of potential borrowers, Countrywide Home Loans
generally requires a description of income. If required by its underwriting
guidelines, Countrywide Home Loans obtains employment verification providing
current and historical income information and/or a telephonic employment
confirmation. Such employment verification may be obtained, either through
analysis of the prospective borrower's recent pay stub and/or W-2 forms for
the most recent two years, relevant portions of the most recent two years'
tax returns, or from the prospective borrower's employer, wherein the
employer reports the length of employment and current salary with that
organization. Self-employed prospective borrowers generally are required to
submit relevant portions of their federal tax returns for the past two years.

In assessing a prospective borrower's creditworthiness, Countrywide
Home Loans may use FICO Credit Scores. "FICO Credit Scores" are statistical
credit scores designed to assess a borrower's creditworthiness and likelihood
to default on a consumer obligation over a two-year period based on a
borrower's credit history. FICO Credit Scores were not developed to predict
the likelihood of default on mortgage loans and, accordingly, may not be
indicative of the ability of a borrower to repay its mortgage loan. FICO
Credit Scores range from approximately 250 to approximately 900, with higher
scores indicating an individual with a more favorable credit history compared
to an individual with a lower score. Under Countrywide Home Loans'
underwriting guidelines, borrowers possessing higher FICO Credit Scores,
which indicate a more favorable credit history and who give Countrywide Home
Loans the right to obtain the tax returns they filed for the preceding two
years, may be eligible for Countrywide Home Loans' processing program (the
"Preferred Processing Program"). As of the cut-off date, approximately 5.62%,
16.12% and 20.33% of the Mortgage Loans in loan groups 1, 2 and 3,
respectively, in each case, by aggregate Stated Principal Balance of the
Mortgage Loans in that loan group as of the cut-off date, have been
underwritten pursuant to Countrywide Home Loans' Preferred Processing
Program. Countrywide Home Loans may waive some documentation requirements for
mortgage loans originated under the Preferred Processing Program.
****
Countrywide Home Loans' underwriting standards are applied by or on
behalf of Countrywide Home Loans to evaluate the prospective borrower's
credit standing and repayment ability and the value and adequacy of the
mortgaged property as collateral. Under those standards, a prospective
borrower must generally demonstrate that the ratio of the borrower's monthly
housing expenses (including principal and interest on the proposed mortgage
loan and, as applicable, the related monthly portion of property taxes,
hazard insurance and mortgage insurance) to the borrower's monthly gross
income and the ratio of total monthly debt to the monthly gross income (the
"debt-to-income" ratios) are within acceptable limits.

172.    The statements set forth in Paragraph 171 above were false and misleading

because:

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**
EXHIBIT 5 of 108-

a. The primary focus of the Countrywide origination process was not "to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral," but instead to originate and accept a high volume of loans to be passed off to investors, regardless of the quality of the loan.

b. Countrywide did not tailor its lending to an applicant's actual income, but instead routinely coached applicants to inflate their income on applications.

c. Countrywide did not tailor its lending to an applicant's actual repayment ability. Instead, predatory loans that generated high levels of fee income were routinely underwritten even though they were highly likely to fail.

d. Exceptions to stated underwriting guidelines were made as a matter of course, often through an automated system designed to ensure acceptance of loans regardless of their quality.

e. Although Countrywide had the right to verify income and generally required applicants to consent to the release of income tax forms as a means of verification, Defendants often neglected to use the consent to verify the applicant's income as stated on the application with the actual information reported to the Internal Revenue Service.

f. Where loan officers knew that an application would not be approved on the basis of the applicant's actual financial condition, even through the exception program, they frequently steered applicants into no documentation products which still provided a commission but had the effect of adding loans to the pool that were almost certain to fail.

g.  Countrywide's origination practices violated California, Connecticut, Illinois,

Florida and Washington state law, subjecting the loans generated in these states to

the possibility of rescission.

h.  Although these practices made the loans collateralizing the securities issued to

investors unsafe, they were encouraged because they generated higher levels of

commissions and fee income for Defendants.

173.   The CHL Mortgage Pass-Through Trust Series 2006-HYB1 Prospectus further

stated:

Exceptions to Countrywide Home Loans' underwriting guidelines may be made
if compensating factors are demonstrated by a prospective borrower.

174.   The statements set forth in Paragraph 173 above were false and misleading

because exceptions to the underwriting guidelines were routinely made and approved regardless

of whether compensating factors were demonstrated by a prospective borrower.

175.   The CHL Mortgage Pass-Through Trust Series 2006-HYB1 Prospectus further

stated:

Countrywide Home Loans obtains appraisals from independent appraisers or
appraisal services for properties that are to secure mortgage loans. The
appraisers inspect and appraise the proposed mortgaged property and verify
that the property is in acceptable condition. Following each appraisal, the
appraiser prepares a report which includes a market data analysis based on
recent sales of comparable homes in the area and, when deemed appropriate, a
replacement cost analysis based on the current cost of constructing a similar
home. All appraisals are required to conform to Fannie Mae or Freddie Mac
appraisal standards then in effect.

176.   The statements set forth in Paragraph 175 above were false and misleading

because:

a.  The value of homes as listed on the loan paperwork was frequently inflated, and

was only confirmed by false appraisals because Defendants pressured appraisers

to inflate the appraisal amounts and/or utilized inaccurate automated techniques

designed to streamline the approval of loan applications rather than accurately calculate the value of real estate.

b. The appraisers utilized were frequently not independent, but were subjected to and yielded to overwhelming economic pressure from Defendants.

c. The appraisals issued did not conform with the Fannie Mae/Freddie Mac appraisal standards then in effect, which required honest appraisals adhering to USPAP. Specifically, Countrywide's influence and pressure upon its appraisers violated the USPAP requirements that: (i) an appraiser perform assignments with "impartiality, objectivity and independence;" (ii) that an appraiser "must not perform as an advocate of any party or interest;" (iii) that an appraiser "must not accept an assignment that includes the reporting of predetermined opinions and conclusions;" and (iv) that appraisers must not accept financial arrangements that compromise their independence.

## CHL Mortgage Pass-Through Trust Series 2007-HYB2 Prospectus

177. On or about March 29, 2007, Defendant CWMBS filed a Prospectus Supplement on Form 424B5 for the offering of Certificates by the CHL Mortgage Pass-Through Trust Series 2007-HYB2 ("the CHL Mortgage Pass-Through Trust Series 2007-HYB2 Prospectus"), which supplemented a prospects filed on or about November 14, 2006. The CHL Mortgage Pass-Through Trust Series 2007-HYB2 Prospectus contained numerous misrepresentations and omissions, as described below.

178. The CHL Mortgage Pass-Through Trust Series 2007-HYB2 Prospectus stated:

Approximately 100.00%, 52.28%, 40.86% and 85.45% of the Mortgage Loans in loan groups 1, 2, 3 and 4, respectively, in each case, by aggregate Stated Principal Balance of the Mortgage Loans in that loan group as of the cut-off date, were originated by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans has been originating mortgage loans since 1969. Countrywide Home Loans' underwriting

standards are applied in accordance with applicable federal and state laws
and regulations.

179.   The statements set forth in Paragraph 178 above were false and misleading

because:

a.   The mortgages originated by Countrywide HL were not all originated in

accordance with its credit, appraisal and underwriting standards.

b.   Countrywide HL did not apply underwriting standards in accordance with

applicable federal and state laws.  In fact, Countrywide HL has been sued by the

States of California, Connecticut, Florida, Illinois, and Washington for

systematically violating state laws, and is reported to be under investigation by

the Federal Bureau of Investigation and the SEC for violating federal laws.

180.   The CHL Mortgage Pass-Through Trust Series 2007-HYB2 Prospectus further

stated:

As part of its evaluation of potential borrowers, Countrywide Home
Loans generally requires a description of income. If required by its
underwriting guidelines, Countrywide Home Loans obtains employment
verification providing current and historical income information and/or a
telephonic employment confirmation. Such employment verification may be
obtained, either through analysis of the prospective borrower's recent pay
stub and/or W-2 forms for the most recent two years, relevant portions of the
most recent two years' tax returns, or from the prospective borrower's
employer, wherein the employer reports the length of employment and current
salary with that organization. Self-employed prospective borrowers generally
are required to submit relevant portions of their federal tax returns for the
past two years.

In assessing a prospective borrower's creditworthiness, Countrywide
Home Loans may use FICO Credit Scores. *"FICO Credit Scores"* are statistical
credit scores designed to assess a borrower's creditworthiness and likelihood
to default on a consumer obligation over a two-year period based on a
borrower's credit history. FICO Credit Scores were not developed to predict
the likelihood of default on mortgage loans and, accordingly, may not be
indicative of the ability of a borrower to repay its mortgage loan. FICO
Credit Scores range from approximately 250 to approximately 900, with higher
scores indicating an individual with a more favorable credit history compared
to an individual with a lower score. Under Countrywide Home Loans'
underwriting guidelines, borrowers possessing higher FICO Credit Scores,
which indicate a more favorable credit history and who give Countrywide Home
Loans the right to obtain the tax returns they filed for the preceding two
years, may be eligible for Countrywide Home Loans' processing program (the

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW
EXHIBIT 5 of 18 -85-
-192-

"*Preferred Processing Program*"). As of the cut-off date, approximately 0.00%,
5.33%, 18.18% and 14.01% of the Mortgage Loans in loan groups 1, 2, 3 and 4,
respectively, in each case, by aggregate Stated Principal Balance of the
Mortgage Loans in that loan group as of the cut-off date have been
underwritten pursuant to Countrywide Home Loans' Preferred Processing
Program. Countrywide Home Loans may waive some documentation requirements for
Mortgage Loans originated under the Preferred Processing Program.
****
         Countrywide Home Loans' underwriting standards are applied by or on
behalf of Countrywide Home Loans to evaluate the prospective borrower's
credit standing and repayment ability and the value and adequacy of the
mortgaged property as collateral. Under those standards, a prospective
borrower must generally demonstrate that the ratio of the borrower's monthly
housing expenses (including principal and interest on the proposed mortgage
loan and, as applicable, the related monthly portion of property taxes,
hazard insurance and mortgage insurance) to the borrower's monthly gross
income and the ratio of total monthly debt to the monthly gross income (the
"*debt-to-income*" ratios) are within acceptable limits.
****
In addition to meeting the debt-to-income ratio guidelines, each prospective
borrower is required to have sufficient cash resources to pay the down
payment and closing costs.

181. The statements in Paragraph 180 above were false and misleading because:

a. The primary focus of the Countrywide origination process was not "to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral," but instead to originate and accept a high volume of loans to be passed off to investors, regardless of the quality of the loan.

b. Countrywide did not tailor its lending to an applicant's actual income, but instead routinely coached applicants to inflate their income on applications.

c. Countrywide did not tailor its lending to an applicant's actual repayment ability. Instead, predatory loans that generated high levels of fee income were routinely underwritten even though they were highly likely to fail.

d. Exceptions to stated underwriting guidelines were made as a matter of course, often through an automated system designed to ensure acceptance of loans regardless of their quality.

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**

EXHIBIT 8 -164-
Page 86 of 183

e.  Although Countrywide had the right to verify income and generally required applicants to consent to the release of income tax forms as a means of verification, Defendants often neglected to use the consent to verify the applicant's income as stated on the application with the actual information reported to the Internal Revenue Service.

f.  Each prospective borrower was not "required to have sufficient cash resources to pay the down payment and closing costs." Instead, borrowers were routinely permitted to satisfy the down payment using funds borrowed with a piggyback home equity loan, or other borrowing, and roll the closing costs into the cost of the mortgage by inflating the designated property value.

g.  Where loan officers knew that an application would not be approved on the basis of the applicant's actual financial condition, even through the exception program, they frequently steered applicants into no documentation products which still provided a commission but had the effect of adding loans to the pool that were almost certain to fail.

h.  Countrywide's origination practices violated California, Connecticut, Illinois, Florida and Washington state law, subjecting the loans generated in these states to the possibility of rescission.

i.  Although these practices made the loans collateralizing the securities issued to investors unsafe, they were encouraged because they generated higher levels of commissions and fee income for Defendants.

182.  The CHL Mortgage Pass-Through Trust Series 2007-HYB2 Prospectus further stated:

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW

EXHIBIT 8 Page 854 of 1894-

Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

183.   The statements in Paragraph 182 above were false and misleading because exceptions to the underwriting guidelines were routinely made and approved regardless of whether compensating factors were demonstrated by a prospective borrower.

184.   The CHL Mortgage Pass-Through Trust Series 2007-HYB2 Prospectus further stated:

Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

185.   The statements in Paragraph 184 above were false and misleading because:

   a.   The value of homes as listed on the loan paperwork was frequently inflated, and was only confirmed by false appraisals because Defendants pressured appraisers to inflate the appraisal amounts and/or utilized inaccurate automated techniques designed to streamline the approval of loan applications rather than accurately calculate the value of real estate.

   b.   The appraisers utilized were frequently not independent, but were subjected to and yielded to overwhelming economic pressure from Defendants.

   c.   The appraisals issued did not conform with the Fannie Mae/Freddie Mac appraisal standards then in effect, which required honest appraisals adhering to USPAP. Specifically, Countrywide's influence and pressure upon its appraisers violated the USPAP requirements that: (i) an appraiser perform assignments with

"impartiality, objectivity and independence;" (ii) that an appraiser "must not perform as an advocate of any party or interest;" (iii) that an appraiser "must not accept an assignment that includes the reporting of predetermined opinions and conclusions;" and (iv) that appraisers must not accept financial arrangements that compromise their independence.

## CWHEQ Revolving Home Equity Trust Series 2005-I Prospectus

186.    On or about December 22, 2005 Defendant CWHEQ filed a Prospectus Supplement with the SEC on Form 424B5 for the offering of Certificates by the CWHEQ Revolving Home Equity Trust Series 2005-I ("the CWHEQ Revolving Home Equity Trust Series 2005-I Prospectus"), which supplemented a prospectus filed on or about August 4, 2005.   The CWHEQ Revolving Home Equity Trust Series 2005-I Prospectus contained numerous misrepresentations and omissions, as described below.

187.    The CWHEQ Revolving Home Equity Trust Series 2005-I Prospectus stated:

The following is a description of the underwriting procedures customarily employed by the sponsor with respect to home equity loans. The underwriting process is intended to assess the applicant's credit standing and repayment ability, and the value and adequacy of the real property security as collateral for the proposed loan. Exceptions to the sponsor's underwriting guidelines will be made when compensating factors are present. These factors include the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan.

Each applicant for a home equity loan must complete an application that lists the applicant's assets, liabilities, income, employment history, and other demographic and personal information. If information in the loan application demonstrates that the applicant has sufficient income and there is sufficient equity in the real property to justify making a home equity loan, the sponsor will conduct a further credit investigation of the applicant. This investigation includes obtaining and reviewing an independent credit bureau report on the credit history of the applicant to evaluate the applicant's ability and willingness to repay. The credit report typically contains information relating to such matters as credit history with local merchants and lenders, installment and revolving debt payments, and any record of delinquencies, defaults, bankruptcy, collateral repossessions, suits, or judgments, among other matters.

The sponsor originates or acquires mortgage loans pursuant to alternative sets of underwriting criteria under its Full Documentation Program, its Alternative Documentation Program, its Reduced Documentation Program, its Streamlined Documentation Program, and its Super-Streamlined Documentation Program. Generally, the Full Documentation Program will provide a complete and executed Verification of Employment covering a two year period, as well as current paystubs covering one month and two years of W-2s or tax returns. The Alternative Documentation Program permits a salaried borrower to provide paystubs and W-2 forms covering the most recent two years, in lieu of providing a Verification of Employment. Under the Reduced Documentation Program, certain credit underwriting documentation concerning income and employment verification is waived. The Reduced Documentation Program requires applicants to list their assets and also permits bank ·statements in lieu of verifications of deposits. Borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion are eligible for the Reduced Documentation Program. The Streamlined Documentation Program allows for a single paystub with year-to-date earnings for salaried borrowers and the most recent year's tax returns for borrowers who are self-employed or commissioned. The Super-Streamlined Documentation program is available for first-lien borrowers with good credit and mortgage history with Countrywide. The Super-Streamlined Documentation Loan Program is available for borrowers who have recently purchased or refinanced (rate or term) with the sponsor if they have not been 30 days·delinquent in payment during the previous twelve-month period. Under the Super-Streamlined Documentation Program, the value used in conjunction with obtaining the first lien from the sponsor is used in lieu of a new appraisal and subsequently used to determine the combined loan-to-value ratios for the new home equity line of credit. In most instances, the maximum loan amount is limited to the lesser of 25% of the first lien balance and an amount between $50,000 and $125,000 determined by the FICO score of the borrower. Although a credit review is conducted, no debt ratio, income documentation, or asset verification is generally required. A telephonic verification of employment is required before loan closing.

188.   The statements in Paragraph 187 above were false and misleading because:

a.   The described underwriting procedures were not "customarily employed" by the

sponsor, but were instead replaced by a series of procedures designed to ensure

the acceptance of substandard loans.

b.   Exceptions were made as a matter of course, often on an automated basis, whether

or not compensating factors were present.

c.   Countrywide routinely processed loan applications and underwrote loans even

where information in the loan application did not "demonstrate[] that the

applicant has sufficient income and there is sufficient equity in the real property to justify making a home equity loan."

d. Though Countrywide had the right to verify income and required applicants to agree to release their income tax forms as a means of verification, it often did not utilize the consent to verify that the applicant's income as stated on the application with the actual income reported to the IRS.

e. Countrywide engaged in a series of predatory lending practices, as detailed in the complaints filed by the attorneys general of California, Connecticut, Illinois, and Florida, all having the effect of getting consumers into loans they could not afford and, as a result, ensuring excessively high default rates.

f. Countrywide's origination practices violated California, Connecticut, Illinois, Florida and Washington state law, subjecting the loans generated in these states to the possibility of rescission.

g. Although these practices made the loans collateralizing the securities issued to investors unsafe, they were encouraged because they generated higher levels of commissions and fee income for Defendants.

189. CWHEQ Revolving Home Equity Trust Series 2005-I Prospectus further stated:

Full appraisals are generally performed on all home equity loans. These appraisals are determined on the basis of a sponsor-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac. For certain home equity loans that had at origination a credit limit between $100,000 and $250,000, determined by the FICO score of the borrower, a drive-by evaluation is generally completed by a state-licensed, independent third-party, professional appraiser on forms approved by either Fannie Mae or Freddie Mac. The drive-by evaluation is an exterior examination of the premises by the appraiser to determine that the property is in good condition. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements, and generally must have been made not earlier than 180 days before the date of origination of the mortgage loan. For certain home equity loans with credit limits between $100,000 and $250,000, determined by the FICO score of the borrower, Countrywide may have the related mortgaged

property appraised electronically. The minimum and maximum loan amounts for
home equity loans are generally $7,500 (or, if smaller, the state-allowed
maximum) and $1,000,000, respectively. Borrowers may draw under the home
equity loans in minimum amounts of $250 and maximum amounts up to the
remaining available credit, in each case after giving effect to all prior
draws and payments on the credit line. The minimum amount for draws does not
apply to borrowers that are access card holders.

190.    The statements identified in Paragraph 189 above were false and misleading

because:

a.   Appraisers were not independent but instead dependent upon Countrywide and its

subsidiaries for a substantial portion of their income, a circumstance which

Defendants used to exert pressure on appraisers to issue inflated appraisals.

b.   The appraisals issued did not conform with the Fannie Mae/Freddie Mac appraisal

standards then in effect, which required honest appraisals adhering to USPAP.

Specifically, Countrywide's influence and pressure upon its appraisers violated

the USPAP requirements that: (i) an appraiser perform assignments with

"impartiality, objectivity and independence;" (ii) that an appraiser "must not

perform as an advocate of any party or interest;" (iii) that an appraiser "must not

accept an assignment that includes the reporting of predetermined opinions and

conclusions;" and (iv) that appraisers must not accept financial arrangements that

compromise their independence.

c.   The appraisals were not intended to determine the adequacy of the collateral in

the event of a default, but instead to ensure that a large volume of mortgages were

quickly originated, underwritten and securitized.

191.    The CWHEQ Revolving Home Equity Trust Series 2005-I Prospectus further

stated:

After obtaining all applicable income, liability, asset, employment,
credit, and property information, the sponsor generally uses a debt-to-income

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**
EXHIBIT 9 Page 954 of 1039-

ratio to assist in determining whether the prospective borrower has
sufficient monthly income available to support the payments on the home
equity loan in addition to any senior mortgage loan payments (including any
escrows for property taxes and hazard insurance premiums) and other monthly
credit obligations. The *"debt-to-income ratio"* is the ratio of the borrower's
total monthly credit obligations (assuming the mortgage loan interest rate is
based on the applicable fully indexed interest rate) to the borrower's gross
monthly income. Based on this, the maximum monthly debt-to-income ratio is
45%. Variations in the monthly debt-to-income ratios limits are permitted
based on compensating factors. The sponsor currently offers home equity loan
products that allow maximum combined loan-to-value ratios up to 100%.

192.    The statements identified in Paragraph 191 above were false and misleading

because:

    a.  Countrywide loan officers routinely coached applicants to state an income that

        would get a loan approved, regardless of whether it matched the applicant's actual

        income.

    b.  Where Countrywide loan officers knew that an application would not be approved

        on the basis of the applicant's actual financial condition, even through the

        exception program, they frequently steered applicants into no documentation loan

        products, which still provided them with a commission but had the effect of

        adding loans to the pool that were almost certain to fail.

    c.  Due to the inflated appraisals, Countrywide offered home equity loans exceeding

        a 100% combined loan-to-value ratio.

    d.  Because Countrywide typically originated both the primary 80% mortgage and

        the 20% piggyback HELOC, and serviced both loans, an enormous moral hazard

        was created whereby Countrywide was incentivized to protect its larger primary

        mortgage at the cost of sacrificing the smaller HELOC.

## CWHEQ Revolving Home Equity Trust Series 2006-C Prospectus

193.    On or about March 31, 2006, Defendant CWHEQ filed a Prospectus Supplement

with the SEC on Form 424B5 for the offering of Certificates by the CWHEQ Revolving Home

Equity Trust Series 2006-C  ("the CWHEQ Revolving Home Equity Trust Series 2006-C

Prospectus"), which supplemented a prospectus filed on or about February 7, 2006.   The

CWHEQ Revolving Home Equity Trust Series 2006-C Prospectus contained numerous

misrepresentations and omissions, as described below.

194.    The CWHEQ Revolving Home Equity Trust Series 2006-C Prospectus stated:

> The following is a description of the underwriting procedures customarily
> employed by the sponsor and Countrywide Bank, N.A. (*"Countrywide Bank"* and,
> collectively with the sponsor, the *"originators"*) with respect to home equity
> loans. The underwriting procedures employed by the sponsor and Countrywide
> Bank are identical in all material respects, as discussed below, but do
> differ in some minor details. The underwriting process is intended to assess
> the applicant's credit standing and repayment ability, and the value and
> adequacy of the real property security as collateral for the proposed loan.
> Exceptions to the applicable originator's underwriting guidelines will be
> made when compensating factors are present. These factors include the
> borrower's employment stability, favorable credit history, equity in the
> related property, and the nature of the underlying first mortgage loan.
>
> Each applicant for a home equity loan must complete an application that
> lists the applicant's assets, liabilities, income, employment history, and
> other demographic and personal information. If information in the loan
> application demonstrates that the applicant has sufficient income and there
> is sufficient equity in the real property to justify making a home equity
> loan, the applicable originator will conduct a further credit investigation
> of the applicant. This investigation includes obtaining and reviewing an
> independent credit bureau report on the credit history of the applicant to
> evaluate the applicant's ability and willingness to repay. The credit report
> typically contains information relating to such matters as credit history
> with local merchants and lenders, installment and revolving debt payments,
> and any record of delinquencies, defaults, bankruptcy, collateral
> repossessions, suits, or judgments, among other matters.
>
> The applicable originator originates or acquires mortgage loans pursuant
> to alternative sets of underwriting criteria under its Full Documentation
> Program, its Alternative Documentation Program, its Reduced Documentation
> Program, its Streamlined Documentation Program, and its Super-Streamlined
> Documentation Program. Generally, the Full Documentation Program will provide
> a complete and executed Verification of Employment covering a two year
> period, as well as current paystubs covering one month and two years of W-2s
> or tax returns. The Alternative Documentation Program permits a salaried
> borrower to provide paystubs and W-2 forms covering the most recent two
> years, in lieu of providing a Verification of Employment. Under the Reduced

Documentation Program, certain credit underwriting documentation concerning
income and employment verification is waived. The Reduced Documentation
Program requires applicants to list their assets and also permits bank
statements in lieu of verifications of deposits. Borrowers with credit
histories that demonstrate an established ability to repay indebtedness in a
timely fashion are eligible for the Reduced Documentation Program. The
Streamlined Documentation Program allows for a single paystub with year-to-
date earnings for salaried borrowers and the most recent year's tax returns
for borrowers who are self-employed or commissioned. The Super-Streamlined
Documentation program is available for first-lien borrowers with good credit
and mortgage history with the applicable originator. The Super-Streamlined
Documentation Loan Program is available for borrowers who have recently
purchased or refinanced (rate or term) with the applicable originator if they
have not been 30 days delinquent in payment during the previous twelve-month
period. Under the Super-Streamlined Documentation Program, the value used in
conjunction with obtaining the first lien from the applicable originator is
used in lieu of a new appraisal and subsequently used to determine the
combined loan-to-value ratios for the new home equity line of credit. In most
instances, the maximum loan amount is limited to the lesser of 25% of the
first lien balance and an amount between $50,000 and $125,000 determined by
the FICO score of the borrower. Although a credit review is conducted, no
debt ratio, income documentation, or asset verification is generally
required. A telephonic verification of employment is required before loan
closing.

195.   The statements in Paragraph 194 above were false and misleading because:

a.   the described underwriting procedures were not "customarily employed" by the
     sponsor, but were instead replaced by a series of procedures designed to ensure
     the acceptance of substandard loans.

b.   exceptions were made as a matter of course, often on an automated basis, whether
     or not compensating factors were present.

c.   Countrywide routinely processed loan applications and underwrote loans even
     where information in the loan application did not "demonstrate[] that the
     applicant has sufficient income and there is sufficient equity in the real property
     to justify making a home equity loan."

d.   Though Countrywide had the right to verify income and required applicants to
     agree to release their income tax forms as a means of verification, it often did not

utilize the consent to verify that the applicant's income as stated on the

application with the actual income reported to the IRS.

e. Countrywide engaged in a series of predatory lending practices, as detailed in the

complaints filed by the attorneys general of California, Connecticut, Illinois, and

Florida, all having the effect of getting consumers into loans they could not afford

and, as a result, ensuring excessively high default rates.

196.   The CWHEQ Revolving Home Equity Trust Series 2006-C Prospectus further

stated:

> Full appraisals are generally performed on all home equity loans. These
> appraisals are determined on the basis of an originator-approved, independent
> third-party, fee-based appraisal completed on forms approved by Fannie Mae or
> Freddie Mac. For certain home equity loans that had at origination a credit
> limit between $100,000 and $250,000, determined by the FICO score of the
> borrower, a drive-by evaluation is generally completed by a state-licensed,
> independent third-party, professional appraiser on forms approved by either
> Fannie Mae or Freddie Mac. The drive-by evaluation is an exterior examination
> of the premises by the appraiser to determine that the property is in good
> condition. The appraisal is based on various factors, including the market
> value of comparable homes and the cost of replacing the improvements, and
> generally must have been made not earlier than 180 days before the date of
> origination of the mortgage loan. For certain home equity loans with credit
> limits between $100,000 and $250,000, determined by the FICO score of the
> borrower, the applicable originator may have the related mortgaged property
> appraised electronically. The minimum and maximum loan amounts for home
> equity loans are generally $7,500 (or, if smaller, the state-allowed maximum)
> and $1,000,000, respectively. Borrowers may draw under the home equity loans
> in minimum amounts of $250 and maximum amounts up to the remaining available
> credit, in each case after giving effect to all prior draws and payments on
> the credit line. The minimum amount for draws does not apply to borrowers
> that are access card holders.

197.   The statements identified in Paragraph 196 above were false and misleading

because:

a. Appraisers were not independent but instead dependent upon Countrywide and its

subsidiaries for a substantial portion of their income, a circumstance which

Defendants used to exert pressure on appraisers to issue inflated appraisals.

    b.   The appraisals issued did not conform with the Fannie Mae/Freddie Mac appraisal standards then in effect, which required honest appraisals adhering to USPAP. Specifically, Countrywide's influence and pressure upon its appraisers violated the USPAP requirements that: (i) an appraiser perform assignments with "impartiality, objectivity and independence;" (ii) that an appraiser "must not perform as an advocate of any party or interest;" (iii) that an appraiser "must not accept an assignment that includes the reporting of predetermined opinions and conclusions;" and (iv) that appraisers must not accept financial arrangements that compromise their independence.

    c.   The appraisals were not intended to determine the adequacy of the collateral in the event of a default, but instead to ensure that a large volume of mortgages were quickly originated, underwritten and securitized.

    198.   The CWHEQ Revolving Home Equity Trust Series 2006-C Prospectus further stated:

> After obtaining all applicable income, liability, asset, employment, credit, and property information, the applicable originator generally uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments (including any escrows for property taxes and hazard insurance premiums) and other monthly credit obligations. The "*debt-to-income ratio*" is the ratio of the borrower's total monthly credit obligations (assuming the mortgage loan interest rate is based on the applicable fully indexed interest rate) to the borrower's gross monthly income. Based on this, the maximum monthly debt-to-income ratio is 45%. Variations in the monthly debt-to-income ratios limits are permitted based on compensating factors. The originators currently offer home equity loan products that allow maximum combined loan-to-value ratios up to 100%.

    199.   The statements identified in Paragraph 198 above were false and misleading because:

a. Countrywide loan officers routinely coached applicants to state an income that would get a loan approved, regardless of whether it matched the applicant's actual income.

b. Where Countrywide loan officers knew that an application would not be approved on the basis of the applicant's actual financial condition, even through the exception program, they frequently steered applicants into no documentation loan products, which still provided them with a commission but had the effect of adding loans to the pool that were almost certain to fail.

c. Due to the inflated appraisals, Countrywide offered home equity loans exceeding a 100% combined loan-to-value ratio.

d. Because Countrywide typically originated both the primary 80% mortgage and the 20% piggyback HELOC, and serviced both loans, an enormous moral hazard was created whereby Countrywide was incentivized to protect its larger primary mortgage at the cost of sacrificing the smaller HELOC.

**CWHEQ Revolving Home Equity Trust Series 2006-E Prospectus**

200. On or about June 28, 2006 Defendant CWHEQ filed a Prospectus Supplement with the SEC on Form 424B5 for the offering of Certificates by the CWHEQ Revolving Home Equity Trust Series 2006-E ("the CWHEQ Revolving Home Equity Trust Series 2006-E Prospectus"), which supplemented a prospectus filed on or about April 14, 2006. The CWHEQ Revolving Home Equity Trust Series 2006-E Prospectus contained misrepresentations and omissions substantially identical to those contained in the CWHEQ Revolving Home Equity Trust Series 2005-I Prospectus, as described above in Paragraphs 186 to 192.

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW

EXHIBIT 9 Page 98 of 185 -195-

**CWHEQ Revolving Home Equity Trust Series 2006-F Prospectus**

201.    On or about June 29, 2006 Defendant CWHEQ filed a Prospectus Supplement with the SEC on Form 424B5 for the offering of Certificates by the CWHEQ Revolving Home Equity Trust Series 2006-F ("the CWHEQ Revolving Home Equity Trust Series 2006-F Prospectus"), which supplemented a prospectus filed on or about April 14, 2006.   The CWHEQ Revolving Home Equity Trust Series 2006-F Prospectus contained misrepresentations and omissions substantially identical to those contained in the CWHEQ Revolving Home Equity Trust Series 2005-I Prospectus, as described above in Paragraphs 186 to 192.

**CWHEQ Home Equity Trust Series 2006-S9 Prospectus**

202.    On or about December 28, 2006 Defendant CWHEQ filed a Prospectus Supplement with the SEC on Form 424B5 for the offering of Certificates by the CWHEQ Home Equity Trust Series 2006-S9 ("the CWHEQ Home Equity Trust Series 2006-S9 Prospectus"), which supplemented a prospectus filed on or about November 15, 2006.   The CWHEQ Home Equity Trust Series 2006-S9 Prospectus contained misrepresentations and omissions substantially identical to those contained in the CWHEQ Revolving Home Equity Trust Series 2006-C Prospectus, as described above in Paragraphs 193 to 199.

**CWHEQ Revolving Home Equity Trust Series 2007-B Prospectus**

203.    On or about March 28, 2007 Defendant CWHEQ filed a Prospectus Supplement with the SEC on Form 424B5 for the offering of Certificates by the CWHEQ Revolving Home Equity Trust Series 2007-B ("the CWHEQ Revolving Home Equity Trust Series 2007-B Prospectus"), which supplemented a prospectus filed on or about November 15, 2006.   The CWHEQ Revolving Home Equity Trust Series 2007-B Prospectus contained misrepresentations

and omissions substantially identical to those contained in the CWHEQ Revolving Home Equity Trust Series 2006-C Prospectus, as described above in Paragraphs 193 to 199.

## CWHEQ Revolving Home Equity Trust Series 2007-C Prospectus

204.    On or about March 29, 2007 Defendant CWHEQ filed a Prospectus Supplement with the SEC on Form 424B5 for the offering of Certificates by the CWHEQ Revolving Home Equity Trust Series 2007-B ("the CWHEQ Revolving Home Equity Trust Series 2007-B Prospectus"), which supplemented a prospectus filed on or about November 15, 2006. The CWHEQ Revolving Home Equity Trust Series 2007-B Prospectus contained misrepresentations and omissions substantially identical to those contained in the CWHEQ Revolving Home Equity Trust Series 2006-C Prospectus, as described above in Paragraphs 193 to 199.

## CWHEQ Revolving Home Equity Trust Series 2007-E Prospectus

205.    On or about May 30, 2007 Defendant CWHEQ filed a Prospectus Supplement with the SEC on Form 424B5 for the offering of Certificates by the CWHEQ Revolving Home Equity Trust Series 2007-E ("the CWHEQ Revolving Home Equity Trust Series 2007-E Prospectus"), which supplemented a prospectus filed on or about May 2, 2007. The CWHEQ Revolving Home Equity Trust Series 2007-E Prospectus contained misrepresentations and omissions substantially identical to those contained in the CWHEQ Revolving Home Equity Trust Series 2006-C Prospectus, as described above in Paragraphs 193 to 199.

## CWHEQ Revolving Home Equity Trust Series 2007-G Prospectus

206.    On or about August 14, 2007 Defendant CWHEQ filed a Prospectus Supplement with the SEC on Form 424B5 for the offering of Certificates by the CWHEQ Revolving Home Equity Trust Series 2007-G ("the CWHEQ Revolving Home Equity Trust Series 2007-G Prospectus"), which supplemented a prospectus filed on or about August 10, 2007. The

CWHEQ Revolving Home Equity Trust Series 2007-G Prospectus contained misrepresentations and omissions substantially identical to those contained in the CWHEQ Revolving Home Equity Trust Series 2006-C Prospectus, as described above in Paragraphs 193 to 199.

**CWHEQ Revolving Home Equity Trust Series 2007-S3 Prospectus**

207.   On or about March 29, 2007 Defendant CWHEQ filed a Prospectus Supplement with the SEC on Form 424B5 for the offering of Certificates by the CWHEQ Revolving Home Equity Trust Series 2007-S3 ("the CWHEQ Revolving Home Equity Trust Series 2007-S3 Prospectus"), which supplemented a prospectus filed on or about November 15, 2006.   The CWHEQ Revolving Home Equity Trust Series 2007-S3 Prospectus contained misrepresentations and omissions substantially identical to those contained in the CWHEQ Revolving Home Equity Trust Series 2006-C Prospectus, as described above in Paragraphs 193 to 199.

## COUNT I

### Violations of § 11 of the Securities Act Against the Issuing Trusts, the Underwriter Defendants, Kurland, Sieracki, Adler and Spector

208.   Plaintiffs repeat and incorporate the allegations set forth in Paragraphs 1 to 207 above, as if fully set forth herein.

209.   This claim of action is brought pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. §77k against the Issuing Trusts identified in Paragraphs 21 to 35 above, the Underwriter Defendants identified in Paragraphs 38 to 42 above, and the Individual Defendants identified in Paragraphs 43 to 46 above.

210.   The Registration Statements for the ABS/MBS Certificates purchased by Plaintiffs and identified herein contained untrue statements of material facts, and omitted to state facts necessary to make the statements not misleading.

211.    The Issuing Trust Defendants are strictly liable to Plaintiffs for the misrepresentations and omissions in the Registration Statements pursuant to which the Certificates for the respective Issuing Trusts were registered with the SEC.

212.    Countrywide SC was the lead manager/underwriter for the offering of Certificates by all of the CWHEQ Issuing Trusts, and is strictly liable for the misrepresentations and omissions in the Registration Statements pursuant to which those Certificates were registered with the SEC.

213.    Bear Stearns & Co. was the lead manager/underwriter, or co-lead manager/underwriter, for the offering of Certificates by the CWALT 2005-46 and CWHL 2005-26 Issuing Trusts, and is strictly liable for the misrepresentations and omissions in the Registration Statements pursuant to which those Certificates were registered with the SEC.

214.    JP Morgan Securities was the co-lead manager/underwriter for the offering of Certificates by the CWALT 2005-46 Issuing Trust, and is strictly liable for the misrepresentations and omissions in the Registration Statements pursuant to which those Certificates were registered with the SEC.

215.    UBS was the lead manager/underwriter for the offering of Certificates by the CWALT 2005-72 Issuing Trust, and is strictly liable for the misrepresentations and omissions in the Registration Statements pursuant to which those Certificates were registered with the SEC.

216.    Defendant Kurland signed CWALT's June 17, 2005 and July 25, 2005 Registration Statements, CWMBS's June 20, 2005, July 25, 2005 Registration Statements, and CWHEQ's July 21, 2005, August 4, 2005, March 13, 2006, and April 12, 2006 Registration Statements, and is strictly liable for the misrepresentations and omissions in those Registration Statements.

217.    Defendant Sieracki signed CWALT's June 17, 2005 and July 25, 2005

Registration Statements, CWMBS's June 20, 2005, July 25, 2005 and March 6, 2006

Registration Statements; and CWHEQ's July 21, 2005, August 4, 2005, March 13, 2006, April

12, 2006, January 10, 2007, March 2, 2007, April 17, 13 2007 and May 22, 2007 Registration

Statements, and is strictly liable for the misrepresentations and omissions in those Registration

Statements.

218.    Defendant Spector signed CWALT's June 17, 2005 and July 25, 2005

Registration Statements, CWMBS's June 20, 2005, July 25, 2005 and March 6, 2006

Registration Statements; and CWHEQ's July 21, 2005, August 4, 2005, March 13, 2006, and

April 12, 2006 Registration Statements, and is strictly liable for the misrepresentations and

omissions in those Registration Statements.

219.    Defendant Adler signed CWHEQ's January 10, 2007, March 2, 2007, April 17, 13

2007 and May 22, 2007 Registration Statements, and is strictly liable for the misrepresentations

and omissions in those Registration Statements.

220.    None of the Defendants named herein conducted a reasonable investigation or

possessed reasonable grounds for the belief that the statements contained in the Registration

Statements were true, were without omissions of any material fact, and were not misleading.

221.    By reason of the conduct alleged herein, each Defendant named in this Count

violated § 11 of the Securities Act of 1933.

222.    Plaintiffs acquired the Certificates identified in Paragraphs 1, 12, 14 and 16 above

pursuant to or traceable to the Registration Statements and Prospectus Supplements.

223.    Plaintiffs have sustained enormous damages because the value of their

Certificates has declined precipitously.

224.    At the time of its purchases of Certificates, Plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year before the filing of this Complaint. This Complaint has been filed within three years of the time that each of the identified Certificates was first offered to the public.

## COUNT II

### Violations of § 12(a)(2) of the Securities Act Against All Defendants

225.    Plaintiffs repeat and incorporate the allegations set forth in Paragraphs 1 to 224 above, as if fully set forth herein.

226.    This claim of action is brought pursuant to Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §77l, against all Defendants.

227.    By means of the Registration Statements and Prospectus Supplements identified above, Defendants offered, promoted and sold ABS/MBS Certificates to Plaintiffs and other investors.

228.    The Registration Statements (which included and incorporated template prospectuses) and Prospectus Supplements contained untrue statements of material facts, and omitted to state facts necessary to make the statements not misleading.

229.    None of the Defendants named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements or Prospectus Supplements were true, were without omissions of any material fact, and were not misleading.

230.    By reason of the conduct alleged herein, each Defendant named in this Count violated § 12(a)(2) of the Securities Act of 1933.

231.    Plaintiffs acquired the Certificates identified in Paragraphs 1, 12, 14 and 16 above pursuant and/or traceable to the Registration Statements and Prospectus Supplements.

232.    Plaintiffs have sustained enormous damages because the value of their Certificates has declined precipitously.

233.    Plaintiffs hereby tender their Certificates to Defendants and demand rescission.

## COUNT III

### Violation of § 15 of the Securities Act of 1933 Against Countrywide FC, Countrywide HL, CWALT, CWMBS, CWHEQ, and the Individual Defendants

234.    Plaintiffs repeat and incorporate the allegations set forth in Paragraphs 1 to 233 above, as if fully set forth herein.

235.    This claim of action is brought pursuant to Section 15 of the Securities Act of 1933, 15 U.S.C. §77o, against Defendants Countrywide FC, Countrywide HL, CWALT, CWMBS, CWHEQ, and the Individual Defendants.

236.    Defendant Countrywide FC controls and oversees all aspects of the lending, origination, securitization and other activities its subsidiaries conduct through special purpose trusts.  Defendant Countrywide FC culpably participated in the violations of Section 11 and 12(a)(2) of the Securities Act of 1933 set forth above, by allowing its subsidiaries to falsely describe their origination and underwriting practices and/or allowing its subsidiaries to engage in origination and underwriting practices inconsistent with their stated descriptions, and by establishing special purpose financial entities to serve as conduits for loans originated by Countrywide HL.

237.    Defendant Countrywide HL was the seller and sponsor for all of the offerings of Certificates identified herein, and also is either itself or indirectly through its subsidiary the

COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW

EXHIBIT 54 -832-
Page 105 of 109

servicer of the loans securing each of the Certificates identified herein. Defendant Countrywide HL was a control person of each of the Issuing Trusts and culpably participated in the violations of Section 11 and 12(a)(2) of the Securities Act of 1933 set forth above with respect to the offerings of these Certificates.

238. Defendant CWALT was the depositor for the Certificates offered by the CWALT 2005-46 and CWALT 2005-72 Issuing Trust and a control person of these Issuing Trusts. Defendant CWALT culpably participated in the violations of Section 11 and 12(a)(2) of the Securities Act of 1933 set forth above with respect to the offerings of these Certificates.

239. Defendant CWMBS was the depositor for the Certificates offered by the CWHL 2005-26, CWHL 2006-HYB1 and CWHL 2007-HYB2 Issuing Trusts and a control person of these Issuing Trusts. Defendant CWMBS culpably participated in the violations of Section 11 and 12(a)(2) of the Securities Act of 1933 set forth above with respect to the offerings of these Certificates.

240. Defendant CWHEQ was the depositor for the Certificates offered by the CWHEQ 2005-I, CWHEQ 2006-C, CWHEQ 2006-E, CWHEQ 2006-F, CWHEQ 2006-S9, CWHEQ 2007-B, CWHEQ 2007-C, CWHEQ 2007-E, CWHEQ 2007-G, and CWHEQ 2007-S3 Issuing Trusts. Defendant CWHEQ culpably participated in the violations of Section 11 and 12(a)(2) of the Securities Act of 1933 set forth above with respect to the offerings of these Certificates.

241. Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act of 1933 set forth above, based on his signature on Registration Statements and control of depositors with respect to Defendants Kurland, Sieracki, Spector, and Adler, or management and oversight of depositors, sponsor, servicer and

underwriter, with respect to Defendant Sambol, and the oversight by all Individual Defendants of the securitization and offering of the Certificates.

242.    None of the Defendants named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true, were without omissions of any material fact, and were not misleading.

243.    By virtue of their status as control persons, the Defendants identified in this Count are jointly and severally liable with, and to the same extent as, the entities they controlled for the violations of Sections 11 and 12(a)(2) of the Securities Act of 1933 by the controlled entities.

## COUNT IV

### Negligent Misrepresentation Against All Defendants

244.    Plaintiffs repeat and incorporate the allegations set forth in Paragraphs 1 to 207 above, as if fully set forth herein.

245.    This claim of action is brought under New Mexico common law for negligent misrepresentation against all Defendants.

246.    The Registration Statements and Prospectus Supplements identified above contained untrue statements of material facts, and omitted to state facts necessary to make the statements not misleading.  In addition, Defendants made other false and misleading statements as described in this Complaint.

247.    None of the Defendants named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements or Prospectus Supplements were true, were without omissions of any material fact, and were not misleading.

248.    Defendants intended to induce investors like Plaintiffs to rely upon the

Registration Statements and Prospectuses, and the statements they caused to be made therein.

249.    Plaintiffs acquired the Certificates identified in Paragraphs 1, 12, 14 and 16 above

in reliance upon the Registration Statements and Prospectus Supplements.

250.    Plaintiffs have sustained enormous damages as a result of these

misrepresentations and omissions.  The value of its Certificates has declined precipitously.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      Awarding compensatory damages in favor of Plaintiffs and against Defendants in

an amount to be proven at trial, including statutory interest thereon;

B.      Awarding Plaintiffs their reasonable costs and expenses, including reasonable

attorneys' fees;

C.      Awarding rescission or a rescissory measure of damages; and

D.      Granting such further relief as this Court may deem necessary.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: August 15, 2008                Respectfully submitted,

Joseph Goldberg
Zachary A. Ives
Josh Ewing
Freedman Boyd Hollander
  Goldberg & Ives, PA
20 First Plaza # 700
Albuquerque, NM 87102
(505) 842-9960

**COMPLAINT FOR VIOLATIONS OF §§ 11, 12 AND 15 OF THE SECURITIES ACT OF 1933 AND
NEGLIGENT MISREPRESENTATION UNDER NEW MEXICO COMMON LAW**
EXHIBIT 54   -835-

Stanley M. Grossman
Joshua B. Silverman
Pomerantz Haudek Block
    Grossman & Gross LLP
One North LaSalle Street, Suite 2225
Chicago, IL  60602
(312) 377-1181

100 Park Avenue, 26th Floor
New York, NY  10017
(212) 661-1100

COUNSEL FOR PLAINTIFFS