*EXHIBIT 55*

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL HOME LOAN BANK OF PITTSBURGH, | ) ) ) | CIVIL DIVISION |
| Plaintiff, | ) ) ) | No. |
| v. | ) ) ) | |
| | ) ) | **COMPLAINT** |
| COUNTRYWIDE SECURITIES CORPORATION, COUNTRYWIDE HOME LOANS, INC., CWALT, INC., CWMBS, INC., COUNTRYWIDE FINANCIAL CORPORATION, MOODY'S CORPORATION, MOODY'S INVESTORS SERVICE, INC., THE MCGRAW-HILL COMPANIES, INC., and FITCH, INC., | ) ) ) ) ) ) ) ) ) | Filed on behalf of: Plaintiff. |
| Defendants. | ) ) ) ) | Counsel of Record For this Party: Lynch Weis, LLC Daniel P. Lynch PA ID No. 68280 dlynch@lynchweis.com William J. Wyrick PA ID No. 70656 bwyrick@lynchweis.com 501 Smith Drive, Suite 3 Cranberry Twp., PA 16066 T: (724) 776-8000 F: (724) 776-8001 |
| **JURY TRIAL DEMANDED** | ) ) | |

81040543. 1

1

EXHIBIT  55   -837-

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL HOME LOAN BANK OF PITTSBURGH, | ) ) ) | CIVIL DIVISION |
| Plaintiff, | ) ) ) | No. |
| v. | ) ) ) | |
| COUNTRYWIDE SECURITIES CORPORATION, COUNTRYWIDE HOME LOANS, INC., CWALT, INC., CWMBS, INC., COUNTRYWIDE FINANCIAL CORPORATION, MOODY'S CORPORATION, MOODY'S INVESTORS SERVICE, INC., THE MCGRAW-HILL COMPANIES, INC., and FITCH, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## **NOTICE TO DEFEND**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service
The Allegheny County Bar Association
920 City County Building
414 Grant Street
Pittsburgh, PA 15219
(412) 261-5555

81040543. 1

EXHIBIT  55  -838-

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

FEDERAL HOME LOAN BANK OF
PITTSBURGH,

             Plaintiff,

      v.

COUNTRYWIDE SECURITIES
CORPORATION, COUNTRYWIDE
HOME LOANS, INC., CWALT, INC.,
CWMBS, INC., COUNTRYWIDE
FINANCIAL CORPORATION,
MOODY'S CORPORATION,
MOODY'S INVESTORS SERVICE,
INC., THE MCGRAW-HILL
COMPANIES, INC., and FITCH, INC.,

             Defendants.

CIVIL DIVISION

No.

## COMPLAINT

AND NOW, comes the Plaintiff, Federal Home Loan Bank of Pittsburgh ("Pittsburgh FHLB"), by and through its undersigned counsel, Daniel P. Lynch, William J. Wyrick, and the law firm of Lynch Weis, LLC, and files the within Complaint, and in support thereof, states as follows:

## PARTIES

1.     Pittsburgh FHLB is a federally chartered bank, which is owned by its approximately 320 member financial institutions located in Delaware, Pennsylvania, and West Virginia, with headquarters at 601 Grant Street, Pittsburgh, Allegheny County, Pennsylvania 15219.

2.     Defendant Countrywide Securities Corporation ("Countrywide Securities") is a California corporation with headquarters at 4500 Park Granada, Calabasas, California 91302.

3

81040543. 1

EXHIBIT 55  -839-

3.      Countrywide Securities acted as a seller and participant in the distribution of all the securities in this action.

4.      Defendant Countrywide Home Loans, Inc. ("Countrywide Home Loans") is a New York corporation whose address is 4500 Park Granada, Calabasas, California 91302.

5.      Countrywide Home Loans acted as a "seller/sponsor" and participant in the distribution of all the securities in this action.

6.      Defendant CWALT, Inc. ("CWALT") is a limited purpose Delaware corporation whose address is 4500 Park Granada, Calabasas, California 91302.

7.      CWALT was the "depositor" and acted as a participant in the distribution of the securities bearing the CUSIPs 021469AC5, 23244EAC1, 23246KAB7, and 02149MAA7.

8.      Defendant CWMBS, Inc. ("CWMBS") is a limited purpose Delaware corporation whose address is 4500 Park Granada, Calabasas, California 91302.

9.      CWMBS was the "depositor" and acted as a participant in the distribution of the securities bearing the CUSIP 17025QAJ6.

10.     Countrywide Financial Corporation ("CFC" and together with Countrywide Securities, Countrywide Home Loans, CWALT, and CWMBS, "Countrywide") is a Delaware corporation, with headquarters at 4500 Park Granada, Calabasas, California 91302.

11.     CFC owned and/or controlled Countrywide Securities, Countrywide Home Loans, CWALT, and CWMBS during the relevant time period.

12.     In July 2008, Bank of America Corporation ("Bank of America") acquired CFC. In 2009, CFC became known as Bank of America Home Loans, which became a diary of Bank of America.

4

EXHIBIT  55  -840-

14.     Defendants Moody's Corporation and its wholly owned subsidiary Moody's Investors Service, Inc. (collectively, "Moody's") are Delaware corporations with their headquarters at 250 Greenwich, New York, New York 10007.

15.     Moody's provides credit rating services and assists in the structuring of mortgage pools and was a participant in the distribution of the securities bearing CUSIPs 23244EAC1, 23246KAB7, 02149MAA7, and 17025QAJ6.

16.     Defendant The McGraw-Hill Companies, Inc. and, at all relevant times, its business division Standard & Poor's Ratings Services (collectively, "S&P) is a New York corporation with headquarters at 1221 Avenue of the Americas, New York, New York 10020.

17.     S&P provides credit rating services and assists in the structuring of mortgage pools and was a participant in the distribution of all of the securities at issue here.

18.     As of January 1, 2009, the rating and structuring business of The McGraw-Hill Companies, Inc. operates as Standard & Poor's Financial Services LLC, a wholly owned subsidiary of The McGraw-Hill Companies, Inc.

19.     Defendant Fitch, Inc. ("Fitch" and together with Moody's and S&P, the "Rating Agencies") is a Delaware corporation with headquarters at One State Street Plaza, New York, New York 10004 and is a wholly owned subsidiary of Fitch Group, which in turn is primarily owned by Fimalac, a French holding company.

20.     Fitch, which is also known as Fitch Ratings, provides credit rating services and assists in the structuring of mortgage pools and.

21.     Fitch was a participant in the distribution of the securities bearing CUSIPs 021469AC5, 23244EAC1, 23246KAB7, and 02149MAA7.

81040543. 1

EXHIBIT  55  -841-

## JURISDICTION AND VENUE

22.     The claims asserted in this Complaint arise in part under §§ 11, 12, and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, and 77o, and Pennsylvania statutory and common law.

23.     The claims under §§ 11, 12 and 15 may be brought in state or federal court, and when brought in state court are not removable.

24.     Section 22 of the Securities Act states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court in the United States."

25.     Section 16(c) refers to "covered class actions," but this action is not brought on behalf of a class.

26.     Accordingly, the present action is not a "covered class action" under Section 16(c) and is not removable to federal court.

27.     Pittsburgh FHLB is a federally chartered organization that operates nationwide and is therefore a citizen of every state.

28.     Accordingly, this action does not involve diversity jurisdiction.

29.     Personal jurisdiction over the Defendants is proper under 42 Pa.C.S.A. § 5322 and 42 Pa.C.S.A. § 5301(a)(2)(iii).

30.     Venue in this Court is proper under Rules 1006 and 2179 of the Pennsylvania Rules of Civil Procedure because the violations of law set forth in this Complaint occurred in this County, including the dissemination of materially false and misleading statements.

31.     The Defendants conduct or conducted business in this County.

6

EXHIBIT  55  -842-

## SUBSTANTIVE ALLEGATIONS

**A.**    **Introduction**

32.    Pittsburgh FHLB is one of twelve Federal Home Loan Banks created by Congress
in 1932 to ensure available funding for mortgage loans.

33.    Throughout its existence, the Federal Home Loan Bank System has been a
fundamental part of the country's financial system, like the Federal Reserve System or the
Federal Deposit Insurance Corporation.

34.    More than 8,000 U.S. lending institutions—about 80% of those eligible—are
members of a Federal Home Loan Bank and rely on a Federal Home Loan Bank for funds.

35.    The primary purpose of the Federal Home Loan Banks is to ensure the flow of
credit and other services for housing and community development to member financial
institutions.

36.    This liquidity serves the public by enhancing the availability of residential
mortgage and community investment funds.

37.    As cooperatives, the Federal Home Loan Banks seek to maintain a balance
between their public policy mission and their obligation to provide adequate returns on the
capital supplied by members.

38.    The Federal Home Loan Banks achieve this balance by delivering low-cost
financing, providing members a viable alternative to the secondary mortgage market through
their mortgage programs, and through the payment of dividends—at least Pittsburgh FHLB did
so until the losses caused by the Defendants and others forced it to suspend the payment of a
dividend in late 2008.

81040543. 1

EXHIBIT  55  -843-

39.     Each Federal Home Loan Bank also helps members with other local housing and community development needs through self-funded affordable housing programs.

40.     To generate profits that it can use to support affordable housing programs and to provide dividends to its members, Pittsburgh FHLB maintains an investment portfolio that includes investments in bonds known as residential mortgage-backed securities ("MBS").

41.     A residential mortgage-backed security, also called a bond or certificate, represents the right to receive a portion of the cash flows generated by a collection of residential home mortgage loans.

42.     The residential home mortgage loans are selected by a sponsoring entity and placed into a special purpose vehicle called a Trust.

43.     The mortgage loans in the Trust have varying underwriting characteristics such as the type and extent of documentation relied on by the loan originator, loan-to-value ratio (LTV), borrower's credit score (known as the FICO score), the location of the property.

44.     For the most part, Pittsburgh FHLB did not invest in MBS that were backed by subprime mortgage loans.

45.     Because of its mission to provide liquidity to its members, Pittsburgh FHLB had negligible exposure to the subprime market and generally limited its investments in MBS to pools made up of loans to "prime" borrowers—the most creditworthy borrowers—or "Alt-A" borrowers.

46.     "Alt-A" loans are provided to borrowers who have good credit history, but with less than full documentation of employment, income, assets, and/or debt.

81040543. 1

EXHIBIT  55   -844-

47.     The sponsor of the Trust or the seller of the bonds to be issued by the Trust—the arranger—work with the Rating Agencies to structure the pool of mortgage loans and divide the cash flows from these mortgage loans—the payments of principal and interest—into "tranches."

48.     A pool of mortgage loans is typically structured so that senior tranches receive payments ahead of junior or subordinate tranches, and therefore the junior tranches absorb losses before those losses affect the more senior tranches.

49.     The form of credit support or enhancement described in the preceding paragraph for the senior tranches is known as subordination.

50.     The arranger works with the credit rating agencies to determine the level of credit enhancement for each tranche.

51.     The Rating Agencies then assign a rating to some or all of the tranches, for which they are paid a fee by the arranger.

52.     Bonds with the highest quality are rated AAA by S&P and Fitch and rated Aaa by Moody's. (The highest rating by each of the Rating Agencies will be referred to herein as "AAA.")

53.     Although the rating symbols used by each of the Rating Agencies vary somewhat, generally bonds are rated on a scale that runs from AAA, AA, A, BBB, BB, B, CCC, CC to D.

54.     Bonds that are considered investment grade are rated BBB and above.

55.     Bonds that are considered non-investment grade ("junk bonds") are rated BB and below, and these bonds are considered either speculative or highly speculative ("B" grades), extremely speculative ("C" grades) or in default ("D").

56.     Interest rates generally increase as the rating on the bond decreases to reflect the level of risk assumed by the investor.

81040543. I

EXHIBIT   55   -845-

57.     Credit ratings are intended to be comparable across different types of fixed
income instruments.

58.     In 1994, a Moody's executive stated that "no matter what types of instruments the
ratings apply to, no matter where the issuer resides, and no matter what currency or market in
which the security is issued, Moody's ratings are intended to have the same relative meanings in
terms of expected credit loss."

59.     Similarly, in a May 29, 2007 publication, S&P stated: "Our ratings represent a
uniform measure of credit quality globally and across all types of debt instruments.  In other
words, an 'AAA' rated corporate bond should exhibit the same degree of credit quality as an
'AAA' rated securitized issue."

60.     The default rate on investment grade corporate bonds from 1981 to 2008 has
averaged about 0.106% with no year higher than 0.41%.

61.     The default rate described in the preceding paragraph is consistent with the
charge-off rate for 1-4 family first-lien home mortgage loans made at commercial banks.
Between 1992 and 2006 the average charge-off rate was 0.168% and never exceeded 0.348%
annually.

62.     In short, a purchaser of an AAA-rated residential MBS should have virtually no
risk of incurring any loss.

63.     Even though all the bonds purchased by Pittsburgh FHLB at issue here were
backed by "prime" or "Alt-A" loans, were senior securities in the structures devised by the
Defendants, and were rated "AAA" by at least two credit rating agencies, Pittsburgh FHLB has
been forced to recognize substantial losses on its investments in these bonds and the bonds'
current ratings indicate that their credit quality is actually that of junk bonds.

81040543. 1

10

EXHIBIT   55   -846-

## B.  Pittsburgh FHLB's Purchasing Decisions

64.   In 2006 and 2007, Pittsburgh FHLB purchased the following Certificates from Countrywide, each identified by the last three or four characters of their respective CUSIPs:

| Issuing Trust & CUSIP | Date Purchased by Pittsburgh FHLB | Underwriters |
|---|---|---|
| Alternative Loan Trust 2006-J3<br>CUSIP: 021469AC5 ("AC5") | 6/9/2006 | Countrywide, S&P, Fitch |
| Alternative Loan Trust 2007-J6<br>CUSIP: 23244EAC1 ("EAC1") | 6/28/2007 | Countrywide, S&P, Moody's, Fitch |
| Alternative Loan Trust 2007-1T1<br>CUSIP: 23246KAB7 ("KAB7") | 1/17/2007 | Countrywide, S&P, Moody's, Fitch |
| Alternative Loan Trust 2007-J1<br>CUSIP: 02149MAA7 ("MAA7") | 1/31/07 | Countrywide, S&P, Moody's, Fitch |
| CHL Mortgage Pass-Through Trust 2007-J3<br>CUSIP: 17025QAJ6 ("QAJ6") | 6/28/2007 | Countrywide, S&P, Moody's |

**(i)    AC5**

65.   Countrywide, S&P, and Fitch represented that Alternative Loan Trust 2006-J3 consisted of approximately 699 loans with an aggregate principal balance of about $253 million.

66.   Countrywide, S&P, and Fitch divided the loans into 4 groups, each with multiple senior tranches, and with subordinated tranches that would absorb losses before the senior tranches in the groups were affected.

11

EXHIBIT  55   -847-

67.     Pittsburgh FHLB purchased a senior bond, AC5, in the face amount of
$56,055,000. (AC5 Asset Purchase (Exhibit 4).)

68.     The AC5 bond was associated with the loans in Group 1, which Countrywide,
S&P, and Fitch represented consisted of 481 loans with average FICO scores of 727 and average
LTVs of approximately 72%, which are characteristics of "prime" or "Alt-A" borrowers.

69.     Countrywide, S&P, and Fitch also provided for credit enhancement in the form of
subordination that would protect AC5 by absorbing losses representing about 3.5% of the
principal balance of the aggregate pool of all 699 loans.

70.     Because of this subordination, and assuming that the losses occurred pro-rata
across the loan groups, the losses in Group 1 would have to be about $5.3 million before the
bond purchased by Pittsburgh FHLB was affected.

71.     S&P and Fitch rated the bond purchased by Pittsburgh FHLB as AAA.

72.     Based on the representations of Countrywide, S&P, and Fitch, Pittsburgh FHLB
believed it had made a safe investment.

73.     However, as of June 25, 2009, the principal balance of the nonperforming
mortgage loans (loans more than 30 days delinquent) for Group 1 was 16.9% and seriously
delinquent mortgage loans (mortgages more than 90 days delinquent, in bankruptcy, in
foreclosure, and that are real estate owned) totaled $12 million, which means that all of the
subordination available to protect AC5 from losses has eroded.

74.     Additionally, in 2009, Fitch downgraded AC5 to CC and estimated that
approximately 29% of the remaining mortgages will default in the future.

81040543. 1

EXHIBIT   55   -848-

**(ii)   EAC1**

75.     Each Defendant represented that Alternative Loan Trust 2006-J6 consisted of approximately 344 loans with an aggregate principal balance of about $185 million.

76.     Each Defendant placed all the loans into one aggregate pool and divided the pool into several senior tranches, some with their own subordinate tranche, and into subordinated tranches associated with the aggregate pool.

77.     Pittsburgh FHLB purchased a senior bond, EAC1, with a face amount of $59,856,999 on the acquisition date, June 28, 2007.  (EAC1 Asset Purchase (Exhibit 6).)

78.     The EAC1 bond was associated with the aggregate pool consisting of loans with average FICO scores of 726 and average LTVs of approximately 73%, which are characteristics of "prime" or "Alt-A" borrowers.

79.     Working together, the Defendants provided for credit enhancement in the form of subordination that would protect EAC1 by absorbing losses representing about 5.5% of the principal balance of the aggregate pool.

80.     Thus, the entire pool would need to experience losses of approximately $10.2 million before the bond purchased by Pittsburgh FHLB was affected.

81.     S&P, Moody's, and Fitch rated the bond purchased by Pittsburgh FHLB as AAA.

82.     Based on the representations of each of the Defendants, Pittsburgh FHLB believed it had made a safe investment.

83.     However, as of August 25, 2009, the principal balance of the nonperforming loans was 13.7% of the entire pool and the seriously delinquent loans totaled $18.9 million, which means that all of the subordination available to protect EAC1 from losses has eroded.

13

EXHIBIT  55  -849-

84.     Additionally, in 2009, Fitch downgraded the EAC1 bond to CC and estimates that approximately 34% of the remaining mortgages will default in the future.

**(iii)    KAB7**

85.     Each Defendant represented that Alternative Loan Trust 2007-1T1 consisted of approximately 733 loans with an aggregate principal balance of about $493 million.

86.     Each Defendant divided the loans into 2 groups, each with multiple senior tranches, and with subordinated tranches that would absorb losses before the tranches in the groups were affected.

87.     Pittsburgh FHLB purchased a super senior bond, KAB7, in the face amount of $50,000,000.  (KAB7 Asset Purchase (Exhibit 8).)

88.     The KAB7 bond was associated with the loans in Group 1, which the Defendants represented consisted of 491 loans with a principal balance of about $335 million and average FICO scores of 708 and average LTVs of approximately 73%, which are characteristics of "prime" or "Alt-A" borrowers.

89.     The Defendants together provided for credit enhancement in the form of subordination that would protect KAB7 by absorbing losses of over 13% of the principal balance of the aggregate pool.

90.     Thus, assuming the losses occurred pro-rata across the groups, Group 1 would have to experience losses of about $25.2 million before the bond purchased by Pittsburgh FHLB was affected.

91.     S&P, Moody's, and Fitch rated the bond purchased by Pittsburgh FHLB as AAA.

92.     Based on the representations of each of the Defendants, Pittsburgh FHLB believed it had made a safe investment.

14

81040543. 1

EXHIBIT   55   -850-

93.     However, as of August 25, 2009, the principal balance of the nonperforming mortgage loans for Group 1 was 30.6% and seriously delinquent loans in Group 1 totaled $61.9 million, which means that all of the subordination available to protect KAB7 from losses has eroded.

94.     Additionally, in 2009, Fitch downgraded KAB7 to CC and estimates that approximately 48% of the remaining mortgages will default in the future.

**(iv)    MAA7**

95.     Each Defendant represented that Alternative Loan Trust 2007-J1 consisted of approximately 1,447 loans with an aggregate principal balance of about $583 million.

96.     Each Defendant divided the loans into groups—Group I and Group II, with Group I divided into Loan Group 1 and Loan Group 2, and Group II consisting of Loan Group 3.

97.     Groups I and II each had their own subordinated bonds applying only to their groups.

98.     Pittsburgh FHLB purchased a super senior bond, MAA7, in the face amount of $125,000,000.  (MAA7 Asset Purchase (Exhibit 10).)

99.     MAA7 was associated with Loan Group 1 (part of Group I), which the Defendants represented consisted of 297 loans with a principal balance of approximately $183 million and average FICO scores of 693 and average LTVs of approximately 69%, which are characteristics of "prime" or "Alt-A" borrowers.

100.    The Defendants together provided for credit enhancement in the form of subordination for MAA7 of 7.2% of the principal balance of Group I (Loan Groups 1 and 2).

101.    Thus, Group I (Loan Groups 1 and 2) would have to experience losses of about $26 million before the bond purchased by Pittsburgh FHLB was affected.

15

81040543. 1

EXHIBIT  55  -851-

102.    S&P, Moody's, and Fitch rated the bond purchased by Pittsburgh FHLB as AAA.

103.    Based on the representations of each of the Defendants, Pittsburgh FHLB believed it had made a safe investment.

104.    However, as of August 25, 2009, the principal balance of the nonperforming mortgage loans for Loan Group 1 was 26.1% and seriously delinquent loans totaled $74.1 million for Group I (Loan Group 1 totaled $25.3 million and Loan Group 2 totaled $48.8 million), which means that all of the subordination available to protect MAA7 from losses has eroded.

105.    Additionally, in 2009, Fitch downgraded the MAA7 bond to CC and estimates that approximately 54% of the remaining mortgages will default in the future.

   **(v)    QAJ6**

106.    Countrywide, S&P, and Moody's represented that CHL Mortgage Pass-Through Trust 2007-J3 consisted of approximately 336 loans with an aggregate principal balance of about $223 million.

107.    Countrywide, S&P, and Moody's placed all the loans into one aggregate pool and divided the pool into several senior tranches, some with their own supporting tranches, and into subordinated tranches associated with the aggregate pool.

108.    Pittsburgh FHLB purchased a senior bond, QAJ6, in the face amount of $75,095,773. (QAJ6 Asset Purchase (Exhibit 14).)

109.    The QAJ6 bond was associated with the aggregate pool consisting of loans with average FICO scores of 744 and average LTVs of approximately 73%, which are characteristics of "prime" borrowers.

16

81040543. 1

EXHIBIT  55   -852-

110.     Countrywide, S&P, and Moody's provided for credit enhancement in the form of subordination that would protect QAJ6 from losses up to about 4.9% of the principal balance of the aggregate pool.

111.     Thus, the aggregate pool would need to experience losses of about $10.5 million before the bond purchased by Pittsburgh FHLB was affected.

112.     S&P and Moody's rated the bond purchased by Pittsburgh FHLB as AAA.

113.     Based on the representations of Countrywide, S&P and Moody's, Pittsburgh FHLB believed it had made a safe investment.

114.     However, as of June 25, 2009, the principal balance of the nonperforming loans in the aggregate pool was 15.7% and seriously delinquent loans totaled $17.7 million, which means that all of the subordination available to protect QAJ6 from losses has eroded.

115.     In 2009, S&P downgraded QAJ6 to CCC and Moody's downgraded the bond to Caa1.

116.     The mortgage pool associated with QAJ6 is expected to deteriorate further in the future.

**C.     The Credit Rating Process**

117.     Countrywide worked with Moody's, S&P, and Fitch in an iterative and collaborative process to structure the pools and establish the nature and level of the credit enhancement for the senior tranches.

118.     The rating process included two distinct steps:  (1) estimating expected losses or the probability of default and (2) simulating the cash flows.

119.     Fitch and S&P evaluate the borrower's ability to meet its financial obligation and therefore the rating is considered an estimate of probability of default.

17

120.    Moody's estimate the expected loss, which it describes as the probability of default times the loss given default, but as a practical matter, not much difference exists between Moody's methodology and the methodology of Fitch and S&P.

121.    To estimate the expected losses or probability of default, the Rating Agencies used historical data to estimate the likely sensitivity of the expected loss or probability of default to underwriting characteristics of the loan, the experience of the originator and servicer, and the local and national economic conditions.

122.    In making its rating determination, Moody's, for example, in an October 4, 2006 presentation, claimed that "all default scenarios and its impacts on the tranches are taken into account," and that it will capture default, loss, and volatility for all aspects of the underlying loans and properties.

123.    Based on the expected losses or the probability of default, the cash flows available to each of the tranches can be simulated.

124.    Once the cash flows were simulated, the Rating Agencies and Countrywide then determined how much credit enhancement would be made available to each tranche.

125.    The ultimate goal of this iterative and collaborative process was to create a structure that could be sold in the market for the greatest profit possible to Countrywide.

126.    Countrywide pays the Rating Agencies for their structuring help and ratings, and the fees paid to the Rating Agencies for their work on structured finance investments is much greater than the fees they received for rating a corporate bond.

127.    Rating structured financial products was a very lucrative business for the Rating Agencies.

18

EXHIBIT   55   -854-

128.    For example, Moody's net income grew from $159 million in 2000 to $705 million in 2006 with 44% of its revenue in 2006 coming from its structured investment product activities.

129.    Therefore, although they publicly present themselves as independent parties serving the interests of investors, the Rating Agencies have the incentive to help create a structure that is the least expensive to Countrywide.

130.    The least expensive structure of mortgage pools is one that has the largest possible percentage of the bonds paying the lowest possible interest rate and the least amount of credit enhancement.

131.    The lowest possible interest rate is assigned to bonds of the highest quality, meaning the least likely to incur losses.

132.    Bonds rated AAA are deemed to be the bonds least likely to incur losses.

133.    Residential MBS are sold to a limited group of institutional investors who either by mandate, in the case of Pittsburgh FHLB, or by policy, will only invest in AAA-rated bonds.

134.    To maximize the profits to Countrywide, therefore, the goal of the structuring process was to create a structure with the greatest possible percentage of AAA-rated bonds and the least amount of credit enhancement.

135.    Each Rating Agency was also aware that if it did not provide an AAA rating on a significant portion of the bonds or if it concluded that it lacked sufficient information to provide a rating, the Rating Agency was likely to lose Countrywide's business to another Rating Agency.

**D.    Underwriting Standards**

136.    Each Defendant represented the underwriting standards for the particular mortgage pools at issue through the registration statement, prospectus, and supplemental prospectus (collectively, "Offering Documents") (Registration Statement No. 333-131630 and

19

EXHIBIT  55  -855-

Placeholder Prospectus (Exhibit 1), Amendment No. 1 to Registration Statement No. 333-131630

and Placeholder Prospectus (Exhibit 2), AC5 Prospectus Supplement (Exhibit 3), EAC1

Prospectus Supplement (Exhibit 5), KAB7 Prospectus Supplement (Exhibit 7), MAA7

Prospectus Supplement (Exhibit 9), Registration Statement No. 333-140958 and Placeholder

Prospectus (Exhibit 11), Amendment No. 1 to Registration Statement No. 333-140958 and

Placeholder Prospectus (Exhibit 12), and QAJ6 Prospectus Supplement (Exhibit 13)), and

verbally.

137.    According to the Offering Documents, the loans in each pool were originated

primarily by Countrywide Home Loans and American Home Mortgage Corp.

138.    Each Defendant misrepresented the underwriting, lending, and appraisal standards

employed by Countrywide Home Loans and American Home Mortgage Corp.

139.    Each Defendant also omitted material information from the underwriting, lending,

and appraisal standards.

### (i)    Countrywide Home Loans

140.    The Offering Documents explained that Countrywide Home Loans' underwriting

standards are applied "to evaluate the prospective borrower's credit standing and repayment

ability and the value and adequacy of the mortgaged property as collateral." (Exhibit 3 at S-68 to

S-74; Exhibit 5 at S-42 to S-46; Exhibit 7 at S-37 to S-42; Exhibit 9 at S-59 to S-65; Exhibit 13 at

S-34 to S-36.)

141.    The Offering Documents represented that Countrywide Home Loans "generally

requires a description of income" from applicants and, if required, obtains employment

verification. (*Id.*)

81040543. 1

20

EXHIBIT   55   -856-

142.     The Offering Documents also represented that Countrywide Home Loans also used FICO scores to assess borrower creditworthiness and likelihood of default over a two-year period.

143.     The Offering Documents stated that third parties periodically obtained the data used by Countrywide to complete the underwriting analysis and that in those cases, while the initial determination of whether a mortgage loan complied with Countrywide Home Loans' underwriting standards would not be made by Countrywide Home Loans, Countrywide  Home Loans would conduct "a quality review of a sample of the mortgage loans." (*Id.*)

144.     Additionally, the Offering Documents explained the appraisal process.

145.     Countrywide Home Loans required its appraisals to conform to Fannie Mae's and Freddie Mac's standards and to be conducted by independent appraisers.

146.     For Countrywide Home Loans' full documentation loans, the Offering Documents explained that Countrywide Home Loans verified the information in the application submitted by the prospective borrower.

147.     For Countrywide Home Loans' alternative documentation loans, the Offering Documents noted that Countrywide Home Loans allowed documentation of income or assets using different methods than those required under full documentation loans.

148.     For all loans, the Offering Documents represented that Countrywide Home Loans required certain loan-to-value ratios, and limited original principal balance amounts.

**(ii)     American Home Mortgage Corp.**

149.     The Offering Documents represented that American Home's mortgage loans were "purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program

21

EXHIBIT  55   -857-

(GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home." (Exhibit 3 at S-74 to S-77; Exhibit 5 at S-47 to S-49; Exhibit 9 at S-65 to S-68.)

150.    They further stated that American Home's conforming conventional loans had to be approved by Fannie Mae's and Freddie Mac's automated underwriting systems and that their non-conforming guidelines were similar to Fannie Mae's and Freddie Mac's but did not conform to maximum loan amounts and "in some cases" the underwriting guidelines. (*Id.*)

151.    The Offering Documents represented American Home's underwriting philosophy which was to "weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt." (*Id.*)

152.    The Offering Documents represented that in addition to a potential borrower's credit history and credit score, American Home underwriters closely reviewed the potential borrower's housing payment history.

153.    The Offering Documents also noted that exceptions to the underwriting standards may be permitted "where compensating factors are present." (*Id.*)

154.    The Offering Documents explained that American Home expected its underwriters to exercise professional judgment based on their experience making lending decisions, and that American Home "underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring." (*Id.*)

155.    The Offering Documents further represented that each application was weighed "individually on its own merits and exceptions to American Home's underwriting guidelines are

81040543. 1

22

EXHIBIT  55  -858-

allowed if sufficient compensating factors exist to offset any additional risk due to the exception." (*Id.*)

156.   With regard to Alt-A products, the Offering Documents represented that those with less verification documentation "generally have other compensating factors such as higher credit score or lower loan-to-value requirements." (*Id.*)

### (iii)   Underwriting Standards from the Countrywide Prospectuses

157.   Each of the Defendants, through the Offering Documents of all of the Trusts, also disclosed general information regarding underwriting standards used by other loan originators whose loans were included in the Trusts.

158.   The prospectuses represented that the parties who originated the loans employed underwriting standards to "evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral." (Exhibit 3 at S-77; Exhibit 5 at S-49; Exhibit 7 at S-37 to S-42; Exhibit 9 at S-68 to S-71; Exhibit 13 at S-36.)

159.   The prospectuses represented that the originators required a prospective borrower applying for a loan to fill out a "detailed" application designed to provide the underwriting officer with pertinent credit information. (*Id.*)

160.   The prospectuses represented that the originators generally required a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply for a credit report.

161.   The prospectuses further explained that in most cases—that is, in the majority of circumstances—the originators obtained employment verification from an independent source (often the employer or through tax documents for self-employed individuals), including, "among

23

EXHIBIT   55   -859-

other things," the length of employment, current salary, and whether the employment is likely to
continue. (*Id.*)

162.   The prospectuses specifically represented that the originators would make a
determination, based on the information provided by the applicant, that "the prospective
borrower has sufficient monthly income available to meet monthly housing expenses and other
financial obligations and monthly living expenses and to meet the borrower's monthly
obligations on the proposed mortgage loan . . . and other expenses related to the mortgaged
property such as taxes and hazard insurance." (*Id.*)

163.   The prospectuses also explained that the underwriting standards "may be varied in
appropriate cases where factors such as low Loan-to-Value Ratios or other favorable credit
factors exist." (*Id.*)

164.   The prospectuses further explained that the loans may be "recently developed" or
involve "additional uncertainties" not present in traditional loans, but that they are underwritten
"on the basis of a judgment that the borrowers have the ability to make the monthly payments
required initially." (*Id.*)

165.   The prospectuses further stated that while a potential borrower's income alone
might not be sufficient to make monthly payments as they increase, the loans may be
"underwritten primarily upon the basis of Loan-to-Value Ratios or other favorable credit
factors." (*Id.*)

166.   Thus, each of the Defendants represented that the originators' decisions to use
non-traditional loan types were based on factors beyond income that would provide a reasonable
basis to conclude that borrowers could make their monthly payments.

24

EXHIBIT  55  -860-

167.   Additionally, the prospectuses explained that an appraisal of the property may be made.

168.   The appraisals generally included an inspection of the property, a report on the property's condition and, if applicable, the verification that new construction was completed.

169.   The appraisal would also be based on the market value of comparable homes, estimated rental value (where applicable), and cost of replacing the home.

**E.   Credit Ratings**

170.   Each Defendant represented in the Offering Documents and verbally that each of the bonds purchased by Pittsburgh FHLB was worthy of being rated "AAA," signifying that the risk of loss was virtually non-existent.

171.   By providing a rating, each Defendant represented that they had sufficient reliable facts on which to base a rating.

172.   Each Defendant further represented in the Offering Documents that:

> The ratings assigned . . . to mortgage pass through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued.  [Such] ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates.

(Exhibit 3 at S-146 to S-147; Exhibit 5 at S-105 to S-106; Exhibit 7 at S-115 to S-116; Exhibit 9 at S-187 to S-188; Exhibit 13 at S-98 to S-99.)

**F.   Omissions and Misrepresentations**

173.   The Defendants made materially false and misleading representations and omissions concerning information in the Certificates' Offering Documents and concerning the ratings of the Certificates.

25

EXHIBIT  55  -861-

174.    The materially false and misleading statements were communicated to and relied on by Pittsburgh FHLB.

175.    The Defendants made the false representations and omissions either knowing of their falsity or with recklessness as to whether the representations were false.

176.    The Defendants made the materially misleading statements and omissions with the intent that Pittsburgh FHLB rely on the statements and for the purpose of inducing Pittsburgh FHLB to buy and retain the Certificates.

177.    The Defendants owed investors, including Pittsburgh FHLB, a duty to disclose all material information, including adverse information, about the Certificates, given Countrywide's knowledge that Pittsburgh FHLB and other investors would depend on the information in the Offering Documents in making their investment decisions.

> (i)     **The Offering Documents Contained Material Misrepresentations and Omissions Regarding Underwriting Standards.**

178.    The Offering Documents contained materially false and misleading information and/or contained material omissions with respect to underwriting standards.

179.    Defendants omitted from its disclosures that the originators were not following their own underwriting standards and that "exceptions" to the guidelines became the rule.

180.    For example, a June 2009 complaint filed by the Securities and Exchange Commission ("SEC") revealed that Countrywide was aware internally that its own underwriting guidelines were being ignored and that borrowers were lying about their income in the reduced-documentation application process.

181.    In an April 13, 2006 email, Countrywide's former Chairman of the Board and Chief Executive Officer, Angelo Mozilo, wrote other top Countrywide executives identifying

EXHIBIT  55   -862-

that Countrywide was originating home mortgage loans "through our channels with disregard for
process [and] compliance with guidelines."

182.    Mozilo stated that he had "personally observed a serious lack of compliance
within our origination system as it relates to documentation and generally a deterioration in the
quality of loans originated versus the pricing of those loan[s]."

183.    Similarly, according to the SEC, the poor quality of the loans originated through
Countrywide's exception process became even more obvious in the first quarter of 2007, just as
the Defendants were offering and selling KAB7 and MAA7, and before they offered and sold
QAJ6 to Pittsburgh FHLB.

184.    In documents distributed at a March 12, 2007 meeting of Countrywide's credit
risk committee, Countrywide's Risk Management group reported that almost 12% of the loans
Countrywide reviewed in an internal quality control process were rated "severely unsatisfactory"
or "high risk."

185.    According to the SEC, the causes for those low ratings were debt to income ratios,
loan to value ratios, or FICO scores outside of Countrywide's underwriting guidelines.

186.    Similarly, by the second quarter of 2007, before the Defendants offered and sold
QAJ6, Countrywide's Risk Management Group began to report a serious deterioration in the
performance of exception loans.

187.    In a December 13, 2007 internal Countrywide memorandum, a Countrywide risk
assessment officer noted that Countrywide was not adequately assessing borrower repayment
capacity:

> Countrywide had reviewed limited samples of first- and second-trust deed
> mortgages originated by Countrywide Bank during the fourth quarter of
> 2006 and the first quarter of 2007 in order to get a sense of the quality of
> file documentation and underwriting practices, and to assess compliance

27

EXHIBIT  55   -863-

with internal policies and procedures. The review resulted in . . . the
finding that borrower repayment capacity was not adequately assessed by
the bank during the underwriting process for home equity loans. More
specifically, debt-to-income (DTI) ratios did not consider the impact of
principal [negative] amortization or an increase in interest.

188.   Defendants did not disclose any of the material facts described in paragraphs 179-
87 to Pittsburgh FHLB.

189.   At the same time, Countrywide officials made public statements to investors that
misrepresented the internal information known by the same individuals.

190.   For example, according to the SEC, on September 13, 2006, at a Fixed Income
Investor Forum, Countrywide's founder and then chairman and CEO, Mozilo, stated that
Countrywide was a "role model to others in terms of responsible lending."

191.   Similarly, according to the SEC, in a March 13, 2007 interview with Maria
Bartiromo on CNBC, Mozilo stated that it would be a "mistake" to compare monoline subprime
lenders to Countrywide and that the subprime market disruption in the first quarter of 2007
would "be great for Countrywide at the end of the day because all of the irrational competitors
will be gone."

192.   According to the SEC, neither Mozilo nor other Countrywide executives revealed
the true state of Countrywide's underwriting practices or financial situation to investors.

193.   Indeed, Pittsburgh FHLB was unaware that Countrywide was not following the
standards it disclosed in the prospectuses and prospectus supplements.

194.   The loans originated by American Home were also not made according to
reasonable underwriting standards.

81040543. 1

EXHIBIT  55  -864-

195.    On information and belief, but unknown to Pittsburgh FHLB at the time, American Home permitted numerous "exceptions" to its underwriting standards so that loans could be closed.

196.    On information and belief, but unknown to Pittsburgh FHLB at the time, a former American Home employee stated that exceptions to underwriting guidelines were made "all the time."

197.    On information and belief, but unknown to Pittsburgh FHLB at the time, before the Defendants offered and sold the bonds to Pittsburgh FHLB, an October 2005 Credit Update presentation stated that American Home's number one policy statement guideline was to "obtain the least amount of documentation."

198.    On information and belief, the same update also addressed the exceptions process and the need to "enhance our exception process."

199.    Similarly, on information and belief, American Home placed restrictions on the due diligence that purchasers could conduct on the loans they sought to purchase.

200.    On information and belief, but unknown to Pittsburgh FHLB at the time, by late 2006, other banks had stopped buying loans from American Home due to the delinquency rates they were seeing in mid-2006.  By late 2006, Washington Mutual had stopped buying loans from American Home, and Wells Fargo rejected blocks of American Home loans.

201.    Overall, Pittsburgh FHLB was not aware at the time of its purchases of the bonds at issue that the originators of the loans had departed from underwriting guidelines described in the Offering Documents.

81040543. 1

EXHIBIT  55   -865-

202.    However, the default rates that are now evident in the mortgage pools backing the bonds at issue indicate that the failures by the originators did in fact impact the loans in these mortgage pools.

**(ii)    The Defendants Materially Misrepresented the Risk Associated with the Certificates Based on the Ratings Given to Each Certificate.**

203.    The Offering Documents contained materially false and misleading information and/or contained material omissions with respect to the ratings of each Certificate.

204.    The Defendants misrepresented that the AAA ratings were an accurate reflection of the credit quality of the bonds.  The Defendants did not reasonably or genuinely believe that the bonds were AAA-quality.  The AAA ratings were without basis in fact.

205.    The Defendants misrepresented that they had sufficient reliable information to rate the bonds and failed to state that they did not have sufficient reliable information to rate the bonds.

206.    The Defendants misrepresented that the ratings addressed the likelihood of investors receiving the payments they expected on the bonds because without sufficient reliable information to rate the bonds they were incapable of making a reasonable assessment of the likelihood of payment.

207.    The Defendants knew these representations were false and misleading or were reckless in not knowing that these statements were false and misleading.

208.    The Defendants knew that loans were being made without full documentation, and that contrary to the represented underwriting standards, compensating factors justifying less than full documentation did not exist.

81040543. 1

EXHIBIT  55  -866-

209.    The Defendants knew that fraud (by either the borrower, the loan broker, or the loan originator) was increasing, and that without complete and accurate information about the borrower and the loan characteristics their predictive modeling was useless.

210.    As a result, the Defendants knew or were reckless in not knowing that they were incapable of addressing the likelihood that the holders of the certificates would receive the payments they expected, and further failed to reveal that the rating models were unable to properly examine the relevant and necessary factors for rating certificates.

211.    It is now apparent that the predictive modeling used by the Rating Agencies was inadequate to assess the risk of default of the loans in the mortgage pools at issue and that the Defendants knew or should have known of those inadequacies.

212.    Moreover, since the Rating Agencies' predictive modeling was inadequate, Defendants knew or should have known that the level of credit enhancement necessary to give a tranche AAA quality was either inadequate or unknowable.

213.    The inadequacy of the Rating Agencies' predictive models is reflected not only in the downgrades of the bonds at issue here, but also in the number of recent downgrades of other residential MBS.

214.    In 2008, Fitch downgraded 17.9% of all AAA-rated residential MBS compared to an average of 2.8% for the 1991-2007 period.

215.    The downgrades in 2008 were predominantly for bonds issued in 2006 and 2007.

216.    The models used by the Rating Agencies were particularly unable to predict the performance of no documentation or low documentation loans.

81040543. 1

EXHIBIT  55  -867-

217.   For the bonds at issue, the percentage of underlying loans acquired or originated under low or no documentation programs ranged from 42.48% to as high as 65.48% of the aggregate principal balance outstanding.

218.   None of the Defendants disclosed to Pittsburgh FHLB that they were unable to predict defaults of loans made under low or no documentation programs.

219.   The failure of the Rating Agencies' predictive models cannot be explained by changes in housing prices that were unforeseen or unexpected.

220.   Empirical studies, the results of which have only recently been available, show that ratings did not fully incorporate information on mortgage risk factors that were part of the set of information available to the Rating Agencies at the time of the deal.

221.   In addition, Fitch has admitted that the Alt-A collateral performance is reflective of borrowers who purchased a home they could not afford (a failure on the part of originators to adhere to underwriting standards) or those who engaged in mortgage fraud for the purpose of property speculation (which the no documentation or low documentation programs would fail to detect).

**(iii)    The So-Called Risk Factors Were Misleading.**

222.   The Offering Documents contained materially false and misleading information and/or contained material omissions with respect to the risk factors associated with the Certificates.

223.   Defendants made general statements in the 2006 Offering Documents concerning certain "Risk Factors," but these statements did not disclose or otherwise correct the false and materially misleading information contained in the Offering Documents regarding the underwriting process and standards supposedly adhered to by loan originators, the quality of the underlying loans, and the adequacy of the Rating Agencies' predictive modeling to assess the

32

EXHIBIT  55   -868-

risk of default and determine the proper level of credit enhancement.  (Exhibit 3 at S-22 to S-29;
Exhibit 5 at S-17 to S-24.)

224.    For instance, although the Offering Documents made the general statement that
credit enhancement may not be sufficient to protect the senior certificates from losses, this
disclosure did not indicate that the Rating Agencies would not be conducting or were not able to
conduct an adequate analysis of the underlying loans and underwriting process and did not have
sufficient reliable information to provide an AAA rating.

225.    This disclosure also did not indicate that the Defendants did not genuinely or
reasonably believe that the AAA rating for the bonds purchased by Pittsburgh FHLB was
appropriate, or that the Defendants were rating the bonds purchased by Pittsburgh FHLB as
AAA even though they did not have a reasonable factual basis to support that rating.

226.    Pittsburgh FHLB is not in the business of performing the predictive modeling
conducted by Countrywide and the Rating Agencies.

227.    Pittsburgh FHLB does not receive loan-by-loan detail on the underwriting
characteristics of each loan, nor does it maintain a database of historical performance that can be
used to predict the probability of default of any particular loan.

228.    Instead, Pittsburgh FHLB is provided with aggregate data about the characteristics
of the loans in the pool(s).

229.    For example, Pittsburgh FHLB is provided data about the location of the
borrowers, the range of FICO scores, and the range of LTVs, but it is not told whether a
particular loan that was originated in California was also made to a borrower with a FICO score
of 610 or 750, or whether the LTV on that particular loan was 60% or 85%.

33

81040543. 1

EXHIBIT  55  -869-

230.    All of the information, however, described in the preceding paragraph was available to Countrywide and the Rating Agencies.

231.    Therefore, Pittsburgh FHLB necessarily relies on the Defendants to assess and rate the risk of the bonds offered for investment.

232.    When the Defendants assigned the Certificates the highest rating possible, they indicated that the bonds were of the highest quality and with virtually no risk of default.

233.    If the risk factors set forth in the Offering Documents were intended to inform Pittsburgh FHLB that it should not believe that the rating was provided in good faith, then the risk factor disclosures were misleading.

234.    Under the general heading, "Your Yield May Be Affected By The Interest-Only Feature Of Some Of The Mortgage Loans," the Defendants noted that "[i]nterest only loans have only recently been originated in significant volumes. As a result, the long-term performance characteristics of interest only loans are largely unknown." (Exhibit 3 at S-23; Exhibit 5 at S-18; Exhibit 7 at S-24; Exhibit 9 at S-37; Exhibit 13 at S-20.)

235.    But each of the Defendants also assigned the highest rating of AAA to the Certificates purchased by Pittsburgh FHLB.

236.    By rating the Certificates, the Rating Agencies were representing that the long-term performance characteristics of interest-only loans were known to them, or could reasonably be predicted, or that the lack of information about interest-only loans was not material to their ratings.

237.    By including the ratings in the Offering Documents, Countrywide was representing the same.

34

81040543. 1

EXHIBIT   55   -870-

238.   In the 2007 Offering Documents, Defendants disclosed some of the same "Risk

Factors" and inserted some additional risk factors for MAA7 and QAJ6, including a recognition

of recent developments in the subprime residential mortgage market.  (Exhibit 7 at S-24 to S-S-

31; Exhibit 9 at S-36 to S-49; Exhibit 13 at S-19 to S-26.)

239.   Despite the information about recent developments in the subprime mortgage

market described in paragraph 238, Defendants still assigned the Certificates purchased by

Pittsburgh FHLB the highest rating possible, AAA, indicating that these MBS were of the

highest quality with virtually no risk of default.

240.   For QAJ6 only, Defendants noted the increase in delinquencies for earlier

securitizations sponsored by Countrywide Home Loans and directed Pittsburgh FHLB to the

"Static Pool Data" section in the prospectus supplement.  (Exhibit 13 at S-26.)

241.   But the "Static Pool Data" section expressly provides that the static pool data is

not part of the Offering Documents, "the characteristics of the mortgage loans in those

securitized pools differ from the characteristics of the issuing entity's mortgage loans," and these

differences "make it unlikely that the issuing entity's mortgage loans will perform in the same

way that any of those pools have performed."  (Exhibit 13 at S-42.)

242.   The "Risk Factor" described in paragraph 240 therefore did not really disclose

anything to Pittsburgh FHLB.

243.   The risk factors statements described in paragraphs 223-40 created the misleading

impression that the Defendants were disclosing all material risk factors to Pittsburgh FHLB, but

these risk factor statements did not disclose the Defendants' material misrepresentations about

the underwriting standards actually used in making the mortgage loans and about the real credit

quality of the AAA-rated tranches.

35

81040543. 1

EXHIBIT  55  -871-

### G.   The Impact on Pittsburgh FHLB

244.   Pittsburgh FHLB justifiably relied on each of the Defendants' materially misleading statements and omissions in the Offering Documents and ratings because these misleading statements and omissions were among the only information available to Pittsburgh FHLB, were central to Pittsburgh FHLB's investment decisions, and Pittsburgh FHLB based its investment decisions on these misleading statements and omissions.

245.   The Offering Documents and statements contained therein, and the ratings, indicated the amount of risk associated with the Certificates, as well as the likelihood of expected return on the investment associated with the Certificates.

246.   The Certificates would have been unmarketable and would not have issued but for the Defendants' false and misleading representations and omissions.

247.   Indeed, Pittsburgh FHLB would not have even been able to purchase the Certificates with a lower rating than those given to the Certificates.

248.   The misrepresentations and omissions of material fact made by the Defendants have had a substantial impact on Pittsburgh FHLB.

249.   All of the bonds that Pittsburgh FHLB purchased from Countrywide at issue here have been significantly downgraded from their initial AAA rating.

250.   In fact, according to Fitch, AC5, EAC1, KAB7, and MAA7 all have a CC rating, which indicates that the likelihood of full payment on the bonds is extremely speculative.

251.   S&P has downgraded all the bonds to CCC, which means that the bonds are expected to experience a principal shortfall within twelve months.

252.   Moody's has downgraded EAC1 and QAJ6 to Caa1 and downgraded KAB7 and MAA7 to Caa2.

81040543. 1

EXHIBIT  55  -872-

253.    For AC5, EAC1, KAB7, and MAA7, Fitch has reported the "bond break loss," which is Fitch's determination of the percentage of remaining principal balances that can be charged off to junior tranches before the bonds begin to incur losses.

254.    Fitch has also reported the estimated current loss for each bond.

255.    For example, Fitch estimates the "bond break loss" of AC4 as 4.07% and estimates the total current loss at 15.70%, which means that the coverage ratio (estimated current loss divided by bond break loss) is 0.26.

256.    Any coverage ratio less than 1.00 means that the bond will incur losses.

257.    Fitch has also projected the defaults on remaining mortgages in the pools supporting the bonds.

258.    The information reported by Fitch, as of August 6, 2009, is summarized below:

| Bond | Rating | Coverage Ratio | Projected Default on Remaining Mortgages |
|------|--------|----------------|------------------------------------------|
| AC5  | CC     | 0.26           | 29%                                      |
| EAC1 | CC     | 0.39           | 34%                                      |
| KAB7 | CC     | 0.33           | 48%                                      |
| MAA7 | CC     | 0.32           | 54%                                      |

259.    As reflected by the coverage ratio (estimated current loss divided by bond break loss), which is less than 1.00 in all instances, each of these bonds will incur losses.

260.    In light of the estimates described in paragraphs 253-59, each of the bonds is currently trading well below its par value.

261.    The current price of the bonds as a percentage of par is set forth below:

| AC5 | 58% |
|-----|-----|

37

EXHIBIT  55  -873-

| EAC1 | 69% |
|------|-----|
| KAB7 | 59% |
| MAA7 | 62% |
| QAJ6 | 68% |

262.    As a result, beginning in the fourth quarter of 2008 and continuing through its most recent reporting period, Pittsburgh FHLB has reported an OTTI adjustment on all of these bonds and, as of June 30, 2009, reported a cumulative credit loss in excess of $9 million and Other Comprehensive Income losses over $100 million.

263.    In addition to the substantial financial losses that Pittsburgh FHLB has experienced and will experience, the Defendants' conduct has also affected the members of Pittsburgh FHLB and their communities.

264.    As mentioned in paragraph 38, because of the conduct of the Defendants (and others), Pittsburgh FHLB announced in late December 2008 that it was suspending its dividends to its members.

265.    Shortly after late December 2008, Pittsburgh FHLB also announced that it was dramatically reducing its funding of its charitable program which provides assistance with closing costs and down payments for certain first-time home buyers.

### Count I – Fraud
### (Defendants Countrywide)

266.    For this claim against Defendants Countrywide, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

267.    Pittsburgh FHLB alleges common law fraud against Countrywide regarding AC5, EAC1, KAB7, MAA7, and QAJ6.

81040543. 1

EXHIBIT  55  -874-

268.    Countrywide made materially false and misleading representations and omissions concerning information in the Certificates' Offering Documents and concerning the ratings of the Certificates, as set forth with particularity in paragraphs 136-72, 222-43.

269.    These materially false and misleading statements were communicated to, and relied on by, Pittsburgh FHLB.

270.    Countrywide made the false representations and omissions either knowing of their falsity or with recklessness as to whether the representations were false.

271.    Countrywide and the Rating Agencies worked together to structure the tranches and assign them credit ratings.

272.    Countrywide obtained the ratings for the Certificates from the Rating Agencies and then provided the misleading AAA credit ratings to Pittsburgh FHLB, with the Rating Agencies' knowledge, participation, and approval.

273.    Countrywide had the motive and opportunity to commit fraud.

274.    Countrywide earned its fees by selling the MBS.

275.    Countrywide knew that Pittsburgh FHLB would buy only AAA-rated MBS.

276.    In fact, the AAA rating was a condition precedent to the offering of the Certificates.

277.    Consequently, Countrywide needed the Rating Agencies to assign the AAA credit rating to the tranches in order to sell the Certificates to Pittsburgh FHLB, thereby allowing Countrywide to receive its fees.

278.    Countrywide exerted its influence over the Rating Agencies and the issuance of the ratings.

39

EXHIBIT  55  -875-

279.   Countrywide then distributed to Pittsburgh FHLB the Offering Documents
containing the false and misleading ratings and orally communicated the same to Pittsburgh
FHLB.

280.   Countrywide made the materially misleading statements and omissions with the
intent that Pittsburgh FHLB rely on the statements and for the purpose of inducing Pittsburgh
FHLB to buy and retain the Certificates.

281.   Pittsburgh FHLB justifiably relied on Countrywide's materially misleading
statements and omissions in the Offering Documents and ratings because they went to the core of
Pittsburgh FHLB's investment decision regarding the Certificates.

282.   Pittsburgh FHLB has suffered damages.

283.   Pittsburgh FHLB's damages are the proximate result of Countrywide's fraudulent
conduct, misrepresentations and omissions in an amount to be determined at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB
  against Countrywide jointly and severally for all damages sustained as a result of
  Countrywide's wrongdoing, in an amount to be proven at trial, including interest
  thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate
  by the Court, plus attorneys' fees and costs of suit.

### Count II – Fraud
### (Defendants Moody's)

284.   For this claim against Defendant Moody's, Pittsburgh FHLB incorporates by
reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

81040543. 1

EXHIBIT  55  -876-

285.    Pittsburgh FHLB alleges common law fraud against Moody's regarding EAC1, KAB7, MAA7, and QAJ6.

286.    Moody's worked with Countrywide to structure the tranches and assign them credit ratings.

287.    AAA ratings for the Certificate were obtained directly from Moody's and were then provided to Pittsburgh FHLB, with Moody's knowledge, participation, and approval.

288.    By providing a rating on the bond, Moody's represented that it had sufficient reliable facts to provide a rating.

289.    Moody's omitted to state that it did not have sufficient reliable facts to provide the ratings.

290.    Even as opinions, the ratings were fraudulent because Moody's did not genuinely or reasonably believe the ratings, and/or the ratings were without basis in fact.

291.    Moody's also approved the disclosure in the Offering Documents, as set forth in paragraph 172, that the ratings addressed the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificate.

292.    This representation was false and misleading because Moody's lacked sufficient reliable information to reasonably or genuinely assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

293.    As alleged in paragraphs 203-20, Moody's knew or was reckless in not knowing that it lacked sufficient reliable information to assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificate.

294.    Moody's had the motive and opportunity to commit fraud.

81040543. 1

EXHIBIT 55  -877-

295.   Moody's sought Countrywide's business because it received higher-than-usual fees for rating MBS and other structured financial products.

296.   Moody's knew that Pittsburgh FHLB would buy only AAA-rated MBS.

297.   In fact, the AAA rating was a condition precedent to the offering of the Certificates.

298.   Moody's further knew that if it did not offer an AAA rating, Countrywide would take its business elsewhere.

299.   Pittsburgh FHLB justifiably relied on Moody's materially misleading representations and omissions as they went to the core of its investment decision regarding the Certificate.

300.   Pittsburgh FHLB was damaged by its reliance on Moody's misrepresentations and omission of material facts.

301.   Pittsburgh FHLB's injury was the proximate result of Moody's fraudulent conduct, misrepresentations and omissions in an amount to be determined at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Moody's for all damages sustained as a result of Moody's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

42

EXHIBIT  55  -878-

### Count III – Fraud
### (Defendant S&P)

302.    For this claim against Defendant S&P, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

303.    Pittsburgh FHLB alleges common law fraud against S&P regarding AC5, EAC1, KAB7, MAA7, and QAJ6.

304.    S&P worked with Countrywide to structure the tranches and assign them credit ratings.

305.    AAA ratings for the Certificates were obtained directly from S&P and were then provided to Pittsburgh FHLB, with S&P's knowledge, participation, and approval.

306.    By providing a rating on the bonds, S&P represented that it had sufficient reliable facts to provide a rating.

307.    S&P omitted to state that it did not have sufficient reliable facts to provide the ratings.

308.    Even as opinions, the ratings were fraudulent because S&P did not genuinely or reasonably believe the ratings, and/or the ratings were without basis in fact.

309.    S&P also approved the disclosure in the Offering Documents, as set forth in paragraph 172, that the ratings addressed the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

310.    This representation was false and misleading because S&P lacked sufficient reliable information to reasonably or genuinely assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

81040543. 1

EXHIBIT  55   -879-

311.    As alleged in paragraphs 203-20, S&P knew or was reckless in not knowing that it lacked sufficient reliable information to assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

312.    S&P had the motive and opportunity to commit fraud.

313.    S&P sought Countrywide's business because it received higher-than-usual fees for rating MBS and other structured financial products.

314.    S&P knew that Pittsburgh FHLB would buy only AAA-rated MBS.

315.    In fact, the AAA rating was a condition precedent to the offering of the Certificates.

316.    S&P further knew that if it did not offer an AAA rating, Countrywide would take its business elsewhere.

317.    Pittsburgh FHLB justifiably relied on S&P's materially misleading representations and omissions as they went to the core of its investment decision regarding the Certificates.

318.    Pittsburgh FHLB was damaged by its reliance on S&P's misrepresentations and omission of material facts.

319.    Pittsburgh FHLB's injury was the proximate result of S&P's fraudulent conduct, misrepresentations and omissions in an amount to be determined at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

• Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against S&P for all damages sustained as a result of S&P's wrongdoing, in an amount to be proven at trial, including interest thereon;

• Awarding rescission or a rescissory measure of damages; and

81040543. 1

EXHIBIT  55  -880-

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count IV – Fraud
### (Defendant Fitch)

320.   For this claim against Defendant Fitch, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

321.   Pittsburgh FHLB alleges common law fraud against Fitch regarding AC5, EAC1, KAB7, and MAA7.

322.   Fitch worked with Countrywide to structure the tranches and assign them credit ratings.

323.   AAA ratings for the Certificates were obtained directly from Fitch and were then provided to Pittsburgh FHLB, with Fitch's knowledge, participation, and approval.

324.   By providing a rating on the bonds, Fitch represented that it had sufficient reliable facts to provide a rating.

325.   Fitch omitted to state that it did not have sufficient reliable facts to provide the ratings.

326.   Even as opinions, the ratings were fraudulent because Fitch did not genuinely or reasonably believe the ratings, and/or the ratings were without basis in fact.

327.   Fitch also approved the disclosure in the Offering Documents, as set forth in paragraph 172, that the ratings addressed the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

328.   This representation was false and misleading because Fitch lacked sufficient reliable information to reasonably or genuinely assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

45

EXHIBIT   55   -881-

329.    As alleged in paragraphs 203-21, Fitch knew or was reckless in not knowing that it lacked sufficient reliable information to assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

330.    Fitch had the motive and opportunity to commit fraud.

331.    Fitch sought Countrywide's business because it received higher-than-usual fees for rating MBS and other structured financial products.

332.    Fitch knew that Pittsburgh FHLB would buy only AAA-rated MBS.

333.    In fact, the AAA rating was a condition precedent to the offering of the Certificates.

334.    Fitch further knew that if it did not offer an AAA rating, Countrywide would take its business elsewhere.

335.    Pittsburgh FHLB justifiably relied on Fitch's materially misleading representations and omissions as they went to the core of its investment decision regarding the Certificates.

336.    Pittsburgh FHLB was damaged by its reliance on Fitch's misrepresentations and omission of material facts.

337.    Pittsburgh FHLB's injury was the proximate result of Fitch's fraudulent conduct, misrepresentations and omissions in an amount to be determined at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Fitch for all damages sustained as a result of Fitch's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

81040543. 1

EXHIBIT   55   -882-

- Awarding such additional equitable/injunctive or other relief as deemed appropriate
  by the Court, plus attorneys' fees and costs of suit.

### Count V – Negligent Misrepresentation
### (Defendants Countrywide)

338.    For this claim against Defendants Countrywide, Pittsburgh FHLB incorporates by
reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

339.    Pittsburgh FHLB alleges negligent misrepresentation against Countrywide
regarding AC5, EAC1, KAB7, MAA7, and QAJ6.

340.    Countrywide made materially false and misleading representations and omissions
in the Certificates' Offering Documents concerning the underwriting guidelines and concerning
the credit quality of the Certificates, as set forth with particularity in paragraphs 136-72, 222-43.

341.    These false and misleading representations and omissions were communicated to,
and relied on by, Pittsburgh FHLB.

342.    Countrywide made false and misleading representations in the course of their
business as issuers of Certificates and had a pecuniary interest therein.

343.    Countrywide had a duty to conduct a reasonable investigation of the truthfulness
of their representations as the information presented concerned the quality of the Certificates.

344.    It was foreseeable to Countrywide that Pittsburgh FHLB, one of the investors,
would rely on the information concerning the quality of the Certificates presented by them and
the ratings assigned by the Rating Agencies.  The ratings were distributed to a limited audience
of institutional investors for the purpose of demonstrating a likelihood of default and/or loss.

345.    Countrywide knew at all times of Pittsburgh FHLB to whom the false and
misleading credit ratings would be communicated.

81040543. 1

EXHIBIT  55  -883-

346.    The credit ratings were solicited and paid for by Countrywide so that Countrywide could offer the Certificates for investment to Pittsburgh FHLB.

347.    The ratings were not offered gratuitously or as a report for a general interest publication.

348.    The ratings on the bonds were not a matter of public interest or concern.

349.    Countrywide understood that the potential investors who would rely on the ratings were a limited number of institutional investors with specific requirements regarding investing only in AAA-rated bonds.

350.    Countrywide knew at all times that Pittsburgh FHLB to whom the false and misleading credit ratings and underwriting standards were communicated, would and did rely on their misrepresentations and omissions, as pled with particularity above.

351.    Pittsburgh FHLB justifiably relied on Countrywide's materially misleading statements and omissions in the Offering Documents and ratings as pled above.

352.    Pittsburgh FHLB suffered injury by acting in justifiable reliance on the misrepresentations and omissions contained in the Offering Documents in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Countrywide, jointly and severally, for all damages sustained as a result of Countrywide's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

48

81040543. 1

EXHIBIT  55   -884-

- Awarding such additional equitable/injunctive or other relief as deemed appropriate
  by the Court, plus attorneys' fees and costs of suit.

## Count VI – Negligent Misrepresentation
### (Defendants Moody's)

353.   For this claim against Moody's, Pittsburgh FHLB incorporates by reference all
preceding paragraphs as if fully set forth herein and further alleges as follows:

354.   Pittsburgh FHLB alleges negligent misrepresentation against Moody's regarding
EAC1, KAB7, MAA7, and QAJ6.

355.   Moody's assigned materially false and misleading credit ratings to the Certificate.

356.   This false and misleading information was communicated to, and relied on by,
Pittsburgh FHLB.

357.   Moody's made materially false and misleading misrepresentations and omissions
concerning the meaning of their ratings and what they purported to measure, which were
communicated to Pittsburgh FHLB, as alleged with particularity in paragraphs 170-72, 203-20.

358.   Moody's made false and misleading representations in the course of their business
as raters of Certificates and had a pecuniary interest therein.

359.   Moody's had an incentive to ensure that the investments offered in the Certificates
received AAA ratings in that Moody's received higher compensation for rating structured
investment products and if the bonds had not been rated AAA, Moody's would not have been
paid.

360.   Moody's held special expertise in their ability to rate the Certificates and had a
duty to conduct a reasonable investigation of the truthfulness of their representations regarding
the credit ratings assigned to the Certificates.

81040543. 1

EXHIBIT   55   -885-

361.   It was foreseeable to Moody's that Pittsburgh FHLB, one of the investors, would rely on the information concerning the credit quality of the Certificates and the ratings assigned by Moody's, as the ratings were distributed to a limited audience of institutional investors for the purpose of demonstrating a likelihood of default and/or loss.

362.   The credit ratings were solicited and paid for by Countrywide so that Countrywide could offer the Certificates for investment to Pittsburgh FHLB.

363.   The ratings were not offered gratuitously or as a report for a general interest publication.

364.   The ratings on the bonds were not a matter of public interest or concern.

365.   Moody's understood that the potential investors who would rely on the ratings were a limited number of institutional investors with specific requirements that restricted them from investing in anything but AAA-rated bonds.

366.   Moody's knew at all times that Pittsburgh FHLB to whom the false and misleading credit ratings and underwriting standards were communicated, would and did rely on their misrepresentations and omissions, as alleged with particularity above.

367.   Pittsburgh FHLB justifiably relied on Moody's materially misleading statements and omissions, as pled with particularity above.

368.   Pittsburgh FHLB suffered injury by acting in justifiable reliance on the misrepresentations and omissions of Moody's in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Moody's for all damages sustained as a result of Moody's wrongdoing, in an amount to be proven at trial, including interest thereon;

50

EXHIBIT  55  -886-

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate
  by the Court, plus attorneys' fees and costs of suit.

### Count VII – Negligent Misrepresentation
### (Defendant S&P)

369.    For this claim against S&P, Pittsburgh FHLB incorporates by reference all
preceding paragraphs as if fully set forth herein and further alleges as follows:

370.    Pittsburgh FHLB alleges negligent misrepresentation against S&P regarding AC5,
EAC1, KAB7, MAA7, and QAJ6.

371.    S&P assigned materially false and misleading credit ratings to the Certificates.

372.    This false and misleading information was communicated to, and relied on by,
Pittsburgh FHLB.

373.    S&P made materially false and misleading misrepresentations and omissions
concerning the meaning of its ratings and what they purported to measure, which were
communicated to Pittsburgh FHLB, as alleged with particularity in paragraphs 170-72, 203-20.

374.    S&P made false and misleading representations in the course of its business as
raters of Certificates and had a pecuniary interest therein.

375.    S&P had an incentive to ensure that the investments offered in the Certificates
received AAA ratings in that S&P received higher compensation for rating structured investment
products and if the bonds had not been rated AAA, S&P would not have been paid.

376.    S&P held special expertise in its ability to rate the Certificate and had a duty to
conduct a reasonable investigation of the truthfulness of its representations regarding the credit
ratings assigned to the Certificates.

51

EXHIBIT  55   -887-

377.   It was foreseeable to S&P that Pittsburgh FHLB, one of the investors, would rely on the information concerning the credit quality of the Certificates and the ratings assigned by S&P as the ratings were distributed to a limited audience of institutional investors for the purpose of demonstrating a likelihood of default and/or loss.

378.   The credit ratings were solicited and paid for by Countrywide so that Countrywide could offer the Certificates for investment to Pittsburgh FHLB.

379.   The ratings were not offered gratuitously or as a report for a general interest publication.

380.   The ratings on the bonds were not a matter of public interest or concern.

381.   S&P understood that the potential investors who would rely on the ratings were a limited number of institutional investors with specific requirements that restricted them from investing in anything but AAA-rated bonds.

382.   S&P knew at all times that Pittsburgh FHLB to whom the false and misleading credit ratings and underwriting standards were communicated, would and did rely on its misrepresentations and omissions, as alleged with particularity above.

383.   Pittsburgh FHLB justifiably relied on S&P's materially misleading statements and omissions, as pled with particularity above.

384.   Pittsburgh FHLB suffered injury by acting in justifiable reliance on the misrepresentations and omissions of S&P in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against S&P for all damages sustained as a result of S&P's wrongdoing, in an amount to be proven at trial, including interest thereon;

52

EXHIBIT  55   -888-

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count VIII – Negligent Misrepresentation
### (Defendant Fitch)

385.   For this claim against Fitch, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

386.   Pittsburgh FHLB alleges negligent misrepresentation against Fitch regarding AC5, EAC1, KAB7, and MAA7.

387.   Fitch assigned materially false and misleading credit ratings to the Certificates.

388.   This false and misleading information was communicated to, and relied on by, Pittsburgh FHLB.

389.   Fitch made materially false and misleading misrepresentations and omissions concerning the meaning of its ratings and what they purported to measure, which were communicated to Pittsburgh FHLB, as alleged with particularity in paragraphs 170-72, 203-21.

390.   Fitch made false and misleading representations in the course of its business as raters of Certificates and had a pecuniary interest therein.

391.   Fitch had an incentive to ensure that the investments offered in the Certificates received AAA ratings in that Fitch received higher compensation for rating structured investment products and if the bonds had not been rated AAA, Fitch would not have been paid.

392.   Fitch held special expertise in its ability to rate the Certificate and had a duty to conduct a reasonable investigation of the truthfulness of its representations regarding the credit ratings assigned to the Certificates.

81040543. 1

EXHIBIT   55   -889-

393.    It was foreseeable to Fitch that Pittsburgh FHLB, one of the investors, would rely on the information concerning the credit quality of the Certificates and the ratings assigned by Fitch as the ratings were distributed to a limited audience of institutional investors for the purpose of demonstrating a likelihood of default and/or loss.

394.    The credit ratings were solicited and paid for by Countrywide so that Countrywide could offer the Certificates for investment to Pittsburgh FHLB.

395.    The ratings were not offered gratuitously or as a report for a general interest publication.

396.    The ratings on the bonds were not a matter of public interest or concern.

397.    Fitch understood that the potential investors who would rely on the ratings were a limited number of institutional investors with specific requirements that restricted them from investing in anything but AAA-rated bonds.

398.    Fitch knew at all times that Pittsburgh FHLB to whom the false and misleading credit ratings and underwriting standards were communicated, would and did rely on their misrepresentations and omissions, as alleged with particularity above.

399.    Pittsburgh FHLB justifiably relied on Fitch's materially misleading statements and omissions, as pled with particularity above.

400.    Pittsburgh FHLB suffered injury by acting in justifiable reliance on the misrepresentations and omissions of Fitch in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Fitch for all damages sustained as a result of Fitch's wrongdoing, in an amount to be proven at trial, including interest thereon;

54

81040543. 1

EXHIBIT  55  -890-

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate

  by the Court, plus attorneys' fees and costs of suit.

### Count IX – Violation of the Pennsylvania Securities Act of 1972
### (Defendants Countrywide)

401.    For this claim against Defendants Countrywide, Pittsburgh FHLB incorporates by

reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

402.    Pittsburgh FHLB brings this count pursuant to the Pennsylvania Securities Act of

1972, 70 P.S. §1-501, against Countrywide regarding AC5, EAC1, KAB7, MAA7, and QAJ6.

403.    Countrywide misrepresented the underwriting standards that were used in making

the loans that were in the mortgage loan pools and misrepresented the credit quality of AAA-

rated bonds issued from each Trust purchased by Pittsburgh FHLB, as pled with particularity in

paragraphs 136-72, 222-43.

404.    Countrywide and the Rating Agencies worked together to structure the tranches

and assign them credit ratings.  Countrywide obtained the ratings for the Certificates from the

Rating Agencies and then provided the misleading AAA credit ratings to Pittsburgh FHLB, with

the Rating Agencies' knowledge, participation, and approval, as pled with particularity above.

405.    By providing ratings, Countrywide was representing that it had sufficient facts to

provide those ratings.  To the extent that Countrywide may claim the ratings are opinions, the

ratings were nonetheless fraudulent because Countrywide did not genuinely and reasonably

believe them and they were without basis in fact.

406.    Countrywide had the motive and opportunity to commit fraud, as pled with

particularity in paragraphs 273-79.

81040543. 1

EXHIBIT  55  -891-

407.     Countrywide offered and sold the Certificates by means of the Offering Documents, which included the registration statement, prospectus, supplemental prospectus, and oral communication. The Offering Documents each contained untrue statements of material facts. The Offering Documents also omitted to state material facts required to be stated therein, or omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading, as pled with particularity above.

408.     Countrywide knew or, in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Offering Documents, as pled with particularity in paragraphs 136-72, 222-43.

409.     Countrywide made the materially misleading statements and omissions with the intent that Pittsburgh FHLB rely on the statements and for the purpose of inducing Pittsburgh FHLB to buy and retain the Certificates.

410.     Countrywide made the material misrepresentations and/or omissions of material fact in connection with the sale of the securities AC5, EAC1, KAB7, MAA7, and QAJ6.

411.     Pittsburgh FHLB justifiably relied on Countrywide's materially misleading statements and omissions in the Offering Documents, as pled with particularity above.

412.     All losses sustained by Pittsburgh FHLB associated with the securities at issue resulted from Pittsburgh FHLB's reliance on Countrywide's material misrepresentations and omissions, in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

•   Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Countrywide, jointly and severally, for all damages sustained as a result of

81040543. 1

EXHIBIT  55  -892-

Countrywide's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count X – Violation of § 11
### (Defendants Countrywide)

413.    For this claim against Defendants Countrywide, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein except that for the purposes of this count, Pittsburgh FHLB expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

414.    Pittsburgh FHLB brings this count pursuant to section 11 of the 1933 Act, 15 U.S.C. § 77k, against Countrywide regarding AC5, EAC1, KAB7, MAA7, and QAJ6.

415.    Pittsburgh FHLB purchased the securities from the Defendants, as displayed in the chart in paragraph 64, pursuant to the Offering Documents, which included the registration statement, prospectus, and supplemental prospectus, and the ratings from the Rating Agencies.

416.    Countrywide purchased the Certificates from the issuing Trust with an intent to distribute them, or to offer or sell the Certificates in connection with the distribution.

417.    The Offering Documents and ratings, and corresponding oral and written representations, contained untrue statements of material facts. The Offering Documents and ratings also omitted to state material facts required to be stated therein, or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

81040543. 1

EXHIBIT  55   -893-

418.    Countrywide had a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained in the Offering Documents not misleading.

419.    Countrywide should have known, in the exercise of reasonable care, of the material misstatements and omissions contained in the Offering Documents.

420.    Countrywide did not have a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and that there were no omissions of material facts necessary to make the statements contained therein not misleading.

421.    When Pittsburgh FHLB purchased the Certificates, it did not know that the Defendants' statements were untrue and did not know that Defendants' statements contained material omissions.  In the exercise of reasonable care, Pittsburgh FHLB could not have known that the statements were untrue and/or omitted material facts at the time it purchased the Certificates.

422.    Pittsburgh FHLB was without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered the facts more than one year before the commencement of this action.  Less than three years have elapsed between the time the securities upon which this count is based were offered to the public and the time Pittsburgh FHLB filed this complaint, or the time other plaintiffs proceeding as class representatives, filed complaints regarding the same Certificates.

81040543. 1

EXHIBIT  55   -894-

423.   All losses sustained by Pittsburgh FHLB associated with the securities at issue resulted from Countrywide's untrue statements and/or omissions of material facts in the Offering Documents, in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Countrywide jointly and severally, for all damages sustained as a result of Countrywide's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count XI – Violation of § 11
### (Defendants Moody's)

424.   For this claim against Defendants Moody's, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein except that for the purposes of this count, Pittsburgh FHLB expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

425.   Pittsburgh FHLB brings this count pursuant to section 11 of the 1933 Act, 15 U.S.C. § 77k, against Moody's regarding EAC1, KAB7, MAA7, and QAJ6.

426.   Pittsburgh FHLB purchased the securities from the Defendants, as displayed in the chart in paragraph 64, pursuant to the Offering Documents, which included the registration statement, prospectus, and supplemental prospectus.

59

EXHIBIT  55  -895-

427.    Countrywide purchased the Certificates from the issuing Trust with an intent to distribute them, or to offer or sell the Certificates in connection with the distribution.

428.    The Rating Agencies, including Moody's, also acted as underwriters in the sale of the Certificates. The Rating Agencies participated in the distribution of the Certificates, participated in the structuring of the MBS, participated in establishing the necessary level of credit enhancements required for a Certificate's particular credit rating, and participated in the preparation of the Offering Documents. The Rating Agencies were necessary to the distribution of the Certificates.

429.    The Offering Documents, and corresponding oral and written representations, contained untrue statements of material facts regarding the loan underwriting standards and what the ratings purported to measure. The Offering Documents also omitted to state material facts required to be stated therein, or omitted to state material facts necessary in order to make these statements, in the light of the circumstances under which they were made, not misleading.

430.    For the purposes of this Count, Pittsburgh FHLB does not seek to hold Moody's liable for the false AAA ratings assigned to the Certificates.

431.    Moody's had a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained in the Offering Documents not misleading.

432.    Moody's should have known, in the exercise of reasonable care, of the material misstatements and omissions contained in the Offering Documents regarding the loan underwriting standards and what the ratings purported to measure.

81040543. 1

EXHIBIT  55  -896-

433.    Moody's did not have a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that these statements contained in the Offering Documents were true and that there were no omissions of material facts necessary to make the statements contained therein not misleading.

434.    When Pittsburgh FHLB purchased the Certificates, it did not know that the Offering Documents' statements were untrue and did not know that the Offering Documents contained material omissions.  In the exercise of reasonable care, Pittsburgh FHLB could not have known that the statements were untrue and/or omitted material facts at the time it purchased the Certificates.

435.    Pittsburgh FHLB was without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered the facts more than one year before the commencement of this action.  Less than three years have elapsed between the time the securities upon which this count is based were offered to the public and the time Pittsburgh FHLB filed this complaint, or the time other plaintiffs proceeding as class representatives, filed complaints regarding the same Certificates.

436.    All losses sustained by Pittsburgh FHLB associated with the securities at issue resulted from the untrue statements and/or omissions of material facts in the Offering Documents, in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Moody's for all damages sustained as a result of Moody's' wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

81040543. 1

EXHIBIT  55   -897-

- Awarding such additional equitable/injunctive or other relief as deemed appropriate
   by the Court, plus attorneys' fees and costs of suit.

### Count XII – Violation of § 11
### (Defendant S&P)

437.   For this claim against Defendants S&P, Pittsburgh FHLB incorporates by
reference all preceding paragraphs as if fully set forth herein except that for the purposes of this
count, Pittsburgh FHLB expressly excludes and disclaims any allegation that could be construed
as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on
claims of strict liability and/or negligence under the 1933 Act.

438.   Pittsburgh FHLB brings this count pursuant to section 11 of the 1933 Act, 15
U.S.C. § 77k, against S&P regarding AC5, EAC1, KAB7, MAA7, and QAJ6.

439.   Pittsburgh FHLB purchased the securities from the Defendants, as displayed in
the chart in paragraph 64, pursuant to the Offering Documents, which included the registration
statement, prospectus, and supplemental prospectus.

440.   Countrywide purchased the Certificates from the issuing Trust with an intent to
distribute them, or to offer or sell the Certificates in connection with the distribution.

441.   The Rating Agencies, including S&P, also acted as underwriters in the sale of the
Certificates. The Rating Agencies participated in the distribution of the Certificates, participated
in the structuring of the MBS, participated in establishing the necessary level of credit
enhancements required for a Certificate's particular credit rating, and participated in the
preparation of the Offering Documents. The Rating Agencies were necessary to the distribution
of the Certificates.

442.   The Offering Documents, and corresponding oral and written representations,
contained untrue statements of material facts regarding the loan underwriting standards and what

81040543. 1

EXHIBIT  55  -898-

the ratings purported to measure. The Offering Documents also omitted to state material facts

required to be stated therein, or omitted to state material facts necessary in order to make these

statements, in the light of the circumstances under which they were made, not misleading.

443.   For the purposes of this Count, Pittsburgh FHLB does not seek to hold S&P liable

for the false AAA ratings assigned to the Certificates.

444.   S&P had a duty to make a reasonable and diligent investigation of the statements

contained in the Offering Documents at the time they became effective to ensure that such

statements were true and correct and that there was no omission of material facts required to be

stated in order to make the statements contained in the Offering Documents not misleading.

445.   S&P should have known, in the exercise of reasonable care, of the material

misstatements and omissions contained in the Offering Documents regarding the loan

underwriting standards and what the ratings purported to measure.

446.   S&P did not have a reasonable basis for believing, and failed to make a reasonable

investigation to ensure, that these statements contained in the Offering Documents were true and

that there were no omissions of material facts necessary to make the statements contained therein

not misleading.

447.   When Pittsburgh FHLB purchased the Certificates, it did not know that the

Offering Documents' statements were untrue and did not know that the Offering Documents

contained material omissions. In the exercise of reasonable care, Pittsburgh FHLB could not

have known that the statements were untrue and/or omitted material facts at the time it purchased

the Certificates.

448.   Pittsburgh FHLB was without knowledge of the facts concerning the wrongful

conduct alleged herein and could not reasonably have discovered the facts more than one year

81040543. 1

EXHIBIT  55  -899-

before the commencement of this action. Less than three years have elapsed between the time the securities upon which this count is based were offered to the public and the time Pittsburgh FHLB filed this complaint, or the time other plaintiffs proceeding as class representatives, filed complaints regarding the same Certificates.

449.    All losses sustained by Pittsburgh FHLB associated with the securities at issue resulted from the untrue statements and/or omissions of material facts in the Offering Documents, in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against S&P for all damages sustained as a result of S&P's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count XIII – Violation of § 11
### (Defendant Fitch)

450.    For this claim against Defendant Fitch, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein except that for the purposes of this count, Pittsburgh FHLB expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

451.    Pittsburgh FHLB brings this count pursuant to section 11 of the 1933 Act, 15 U.S.C. § 77k, against Fitch regarding AC5, EAC1, KAB7, and MAA7.

81040543. 1

EXHIBIT  55  -900-

452.     Pittsburgh FHLB purchased the securities from the Defendants, as displayed in
the chart in paragraph 64, pursuant to the Offering Documents, which included the registration
statement, prospectus, and supplemental prospectus.

453.     Countrywide purchased the Certificates from the issuing Trust with an intent to
distribute them, or to offer or sell the Certificates in connection with the distribution.

454.     The Rating Agencies, including Fitch, also acted as underwriters in the sale of the
Certificates.  The Rating Agencies participated in the distribution of the Certificates, participated
in the structuring of the MBS, participated in establishing the necessary level of credit
enhancements required for a Certificate's particular credit rating, and participated in the
preparation of the Offering Documents.  The Rating Agencies were necessary to the distribution
of the Certificates.

455.     The Offering Documents and ratings, and corresponding oral and written
representations, contained untrue statements of material facts regarding the loan underwriting
standards and what the ratings purported to measure.  The Offering Documents also omitted to
state material facts required to be stated therein, or omitted to state material facts necessary in
order to make the statements, in the light of the circumstances under which they were made, not
misleading.

456.     For the purposes of this Count, Pittsburgh FHLB does not seek to hold Fitch liable
for the false AAA ratings assigned to the Certificates.

457.     Fitch had a duty to make a reasonable and diligent investigation of the statements
contained in the Offering Documents at the time they became effective to ensure that such
statements were true and correct and that there was no omission of material facts required to be
stated in order to make the statements contained in the Offering Documents not misleading.

81040543. 1

EXHIBIT  55  -901-

458.     Fitch should have known, in the exercise of reasonable care, of the material

misstatements and omissions contained in the Offering Documents regarding the loan

underwriting standards and what the ratings purported to measure.

459.     Fitch did not have a reasonable basis for believing, and failed to make a

reasonable investigation to ensure, that these statements contained in the Offering Documents

were true and that there were no omissions of material facts necessary to make the statements

contained therein not misleading.

460.     When Pittsburgh FHLB purchased the Certificates, it did not know that the

Offering Documents' statements were untrue and did not know that the Offering Documents

statements contained material omissions.  In the exercise of reasonable care, Pittsburgh FHLB

could not have known that the statements were untrue and/or omitted material facts at the time it

purchased the Certificates.

461.     Pittsburgh FHLB was without knowledge of the facts concerning the wrongful

conduct alleged herein and could not reasonably have discovered the facts more than one year

before the commencement of this action.  Less than three years have elapsed between the time

the securities upon which this count is based were offered to the public and the time Pittsburgh

FHLB filed this complaint, or between the time other plaintiffs proceeding as class

representatives, filed complaints regarding the same Certificates.

462.     All losses sustained by Pittsburgh FHLB associated with the securities at issue

resulted from the untrue statements and/or omissions of material facts in the Offering

Documents, in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

81040543. 1

EXHIBIT   55   -902-

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB
  against Fitch for all damages sustained as a result of Fitch's wrongdoing, in an
  amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate
  by the Court, plus attorneys' fees and costs of suit.

### Count XIV – Violation of § 12
### (Defendants Countrywide)

463.    For this claim against Defendants Countrywide, Pittsburgh FHLB incorporates by
reference all preceding paragraphs as if fully set forth herein except that for the purposes of this
count, Pittsburgh FHLB expressly excludes and disclaims any allegation that could be construed
as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on
claims of strict liability and/or negligence under the 1933 Act.

464.    Pittsburgh FHLB brings this count pursuant to section 12 of the 1933 Act, 15
U.S.C. § 77l, against Countrywide regarding AC5, EAC1, KAB7, MAA7, and QAJ6.

465.    Countrywide offered and sold the Certificates by means of the Offering
Documents, which included the registration statement, prospectus, supplemental prospectus, and
oral communication.  As pled with particularity above, the Offering Documents contained untrue
statements of material facts.  The Offering Documents also omitted to state material facts
required to be stated therein, or omitted to state material facts necessary in order to make the
statements, in the light of the circumstances under which they were made, not misleading.

466.    Countrywide used the mails or interstate commerce in the offer and sale of the
Certificates.

81040543. 1

EXHIBIT  55  -903-

467.    Countrywide had a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained in the Offering Documents not misleading.

468.    Countrywide should have known, in the exercise of reasonable care, of the material misstatements and omissions contained in the Offering Documents.

469.    When Pittsburgh FHLB purchased the Certificates, Pittsburgh FHLB did not know that the Offering Documents' statements were untrue and did not know that the Offering Documents contained material omissions.  In the exercise of reasonable care, Pittsburgh FHLB could not have known that the statements were untrue and/or omitted material facts at the time Pittsburgh FHLB purchased the Certificates.

470.    Pittsburgh FHLB was without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered the facts more than one year before the commencement of this action.  Less than three years have elapsed between the time the securities upon which this count is based were offered to the public and the time the Pittsburgh FHLB filed this complaint, or the time other investors preceding as class representatives, filed complaints regarding the same certificates.

471.    Pittsburgh FHLB purchased the securities from the Defendants, as displayed in the chart in paragraph 64.

472.    All losses sustained by Pittsburgh FHLB associated with the securities at issue resulted from Countrywide's untrue statements and/or omissions of material fact in the Offering Documents, in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

68

EXHIBIT  55   -904-

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Countrywide, jointly and severally, for all damages sustained as a result of Countrywide's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count XV – Violation of § 15
### (Defendant CFC)

473.    For this claim against Defendant CFC, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein except that for the purposes of this count, Pittsburgh FHLB expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

474.    Pittsburgh FHLB brings this count pursuant to section 15 of the 1933 Act, 15 U.S.C. § 77o, against CFC regarding AC5, EAC1, KAB7, MAA7, and QAJ6.

475.    CFC, by virtue of its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein, a controlling person, within the meaning of Section 15 of the Securities Act, of Countrywide Securities, Countrywide Home Loans, CWALT, and CWMBS.

476.    CFC had the power to influence and exercised that power to control the general affairs and policies of Countrywide Securities, Countrywide Home Loans, CWALT, and CWMBS.

69

EXHIBIT  55  -905-

477.    Countrywide Securities, Countrywide Home Loans, CWALT, and CWMBS violated Sections 11 and 12 of the Securities Act.

478.    Pittsburgh FHLB was without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered the facts more than one year before the commencement of this action.  Less than three years have elapsed between the time the securities upon which this count is based were offered to the public and the time the Pittsburgh FHLB filed this complaint, or the time other investors proceeding as class representatives, filed complaints regarding the same certificates.

479.    By virtue of the wrongful conduct alleged herein, CFC is liable to Pittsburgh FHLB.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against CFC, for all damages sustained as a result of CFC's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

**JURY DEMAND**

Pittsburgh FHLB hereby demands a trial by jury.

81040543. 1

EXHIBIT  55  -906-

Respectfully submitted,

LYNCH WEIS, LLC

Daniel P. Lynch
PA ID No. 68280
William J. Wyrick
PA ID No. 70656
501 Smith Drive, Suite 3
Cranberry Twp., PA 16066
(724) 776-8000 (Telephone)
(724) 776-8001 (Facsimile)
*Counsel for Plaintiff*

81040543. 1

EXHIBIT 55 -907-

## **VERIFICATION**

I, Kristina K. Williams, hereby verify that I am authorized to make this verification on behalf of Plaintiff, Federal Home Loan Bank of Pittsburgh, and that the statements contained in the foregoing Complaint are true and correct to the best of my knowledge, information or belief. I understand that false statements herein made are subject to the penalties of 18 Pa. C.S. Section 4904 relating to unsworn falsification to authorities.

Date: October 13, 2009

Name: Kristina K. Williams
Title: Chief Financial Officer

EXHIBIT   55   -908-

*EXHIBIT 56*

FILED

09 DEC 23 PM 2:13

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 09-2-46321-2 SEA

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF SEATTLE, a bank created by federal law, | No. |
| Plaintiff, | COMPLAINT FOR RESCISSION |
| v. | |
| COUNTRYWIDE SECURITIES CORPORATION, a California corporation; CWALT, INC., a Delaware corporation; COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; MERRELL LYNCH MORTGAGE INVESTORS, INC., a Delaware corporation; and MERRILL LYNCH MORTGAGE CAPITAL, INC., a Delaware corporation, | |
| Defendants. | |

## I. SUMMARY OF THIS COMPLAINT

1.      This is an action under the Securities Act of Washington, RCW 21.20.005 *et seq.*, to rescind the purchase and sale of six certificates backed by residential mortgage loans, which the defendants sold the plaintiff for $79,273,133, $150,000,000, $75,000,000, $47,632,633, $100,000,000, and $9,944,998, respectively. When they offered and then sold these certificates to the plaintiff, the defendants made numerous statements to the plaintiff

COMPLAINT FOR RESCISSION – Page 1

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 909-

about the certificates and the credit quality of the mortgage loans that backed them. Many of those statements were untrue. Moreover, the defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the defendants made untrue statements, or omitted important information, about such material facts as the percentage of equity that borrowers had in their homes (reflected in the loan-to-value ratio, or the ratio of the amount of the mortgage loan to the value of the house that secured the loan), the number of borrowers who actually lived in the houses that secured their loans, the credit scores of the borrowers, and the business practices of the lenders that made the loans. Plaintiff reasonably relied on these untrue statements and omissions of important information in deciding to purchase the certificates. Under the Act, plaintiff therefore is entitled to rescind its purchase of these certificates, and the defendants are required to repurchase the certificates from the plaintiff for their original purchase prices, plus interest at 8% per annum, plus the costs and legal fees that plaintiff will incur in this action, minus distributions that plaintiffs have received on the certificates.

## II. PARTIES

2.      The plaintiff, Federal Home Loan Bank of Seattle (referred to in this complaint as Seattle Bank), is a bank created by the Federal Home Loan Bank Act. Under its Organization Certificate, Seattle Bank is to operate in Federal Home Loan Bank District Number 12, which comprises the States of Alaska, Hawaii, Idaho, Montana, Oregon, Utah, Washington, and Wyoming, as well as certain territories of the United States. Seattle Bank does operate throughout those States and territories.

COMPLAINT FOR RESCISSION – Page 2

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 910-

3.      Defendant Countrywide Securities Corporation (referred to as Countrywide Securities) is a corporation organized under the laws of California.

4.      Defendant CWALT, Inc. (referred to as CWALT) is a corporation organized under the laws of Delaware.

5.      Defendant Countrywide Financial Corporation is a corporation organized under the laws of Delaware.

6.      Defendant Merrill Lynch Mortgage Investors, Inc. (referred to as Merrill Lynch Mortgage Investors) is a corporation organized under the laws of Delaware.

7.      Defendant Merrill Lynch Mortgage Capital, Inc. is a corporation organized under the laws of Delaware.

8.      On information and belief, Countrywide Financial Corporation participated in the operations of CWALT and had the power to control the conduct of CWALT in the transactions involved in this complaint. Under RCW 21.20.430(3), Countrywide Financial Corporation directly or indirectly controlled CWALT and is therefore liable to Seattle Bank jointly and severally with and to the same extent as CWALT.

9.      On information and belief, Merrill Lynch Mortgage Capital, Inc. participated in the operations of Merrill Lynch Mortgage Investors and had the power to control the conduct of Merrill Lynch Mortgage Capital in the transactions involved in this complaint. Under RCW 21.20.430(3), Merrill Lynch Mortgage Capital, Inc. directly or indirectly controlled Merrill Lynch Mortgage Investors and is therefore liable to Seattle Bank jointly and severally with and to the same extent as Merrill Lynch Mortgage Investors.

### III. JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction under RCW 2.08.010.

COMPLAINT FOR RESCISSION – Page 3

11.     This Court has personal jurisdiction over each of the defendants because each of them offered and sold the securities referred to in this complaint to Seattle Bank in King County.

12.     Venue is proper in this Court pursuant to RCW 4.12.025 because one or more defendants transacts business in King County.

## IV. SECURITIZATION OF MORTGAGE LOANS

13.     The securities that the defendants sold Seattle Bank are so-called **asset-backed securities**, or **ABS**, created in a process known as **securitization**. Securitization begins with loans (for example, loans secured by mortgages on residential properties, credit card loans, etc.) on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. In the loan underwriting process, the originator applies various criteria to try to ensure that the loan will be repaid. Until the loans are securitized, the borrowers on the loans make their loan payments to the originator. Collectively, the payments on the loans are known as the **cash flow** from the loans.

14.     In a securitization, a large number of loans, usually of a similar type, are grouped into a **collateral pool**. The originator of those loans sells them (and, with them, the right to receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The trust raises the cash to pay for the loans by selling **bonds**, usually called **certificates**, to investors such as Seattle Bank. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

COMPLAINT FOR RESCISSION – Page 4

15. Thus, schematically, there are six steps in a securitization.

    1. Investors pay money to the trust.

    2. The trust issues certificates to the investors.

    3. The trust pays money to the originator.

    4. The originator sells to the trust the loans in the collateral pool, including the right to receive the cash flow from those loans.

    5. The trust collects cash flow from payments on the loans in the collateral pool.

    6. The trust pays each certificateholder its agreed part of the cash flow that the trust receives from payments on loans in the collateral pool.

\*

16. A few other aspects of securitization may be useful in reading the allegations of this complaint. Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The entity that transfers the loans in the collateral pool to the trust is known as the **depositor**.

17. The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has no assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore considers the **issuer** of an asset-backed certificate to be not the trust that is the obligor on the certificate, but rather the depositor.

18. Finally, certificates issued in securitizations are purchased from the trust and sold to investors by firms acting as **securities underwriters**.

COMPLAINT FOR RESCISSION – Page 5

\*

19.    When a traditional company issues common shares, bonds, or other securities, it and its underwriters must disclose material information about the business and management of the company to potential investors in those securities. In a securitization trust, however, there is no business or management to describe. Rather, the necessary disclosures are about the structure of the transaction and especially about the credit quality of the loans in the collateral pool, the sole source of cash from which to pay the certificateholders.

\*

20.    Defendants sold to Seattle Bank certificates in six securitizations.

## V. FIRST CLAIM FOR RELIEF

|  |  |
|---|---|
| *Certificate*: | One certificate in tranche A-1-A of Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-OH3 |
| *Date of Purchase*: | August 6, 2007 |
| *Consideration Paid*: | $79,273,133 |
| *Underwriter*: | Countrywide Securities |
| *Depositor/Issuer*: | CWALT |
| *Controlling Person of Depositor/Issuer*: | Countrywide Financial Corporation |

21.    Seattle Bank repeats paragraphs 1 through 20.

22.    Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-OH3 was a securitization in July 2007 of approximately 1,257 mortgage loans, in one group, with an aggregate principal balance of approximately $587,463,192. The mortgage loans were originated by Countrywide Home Loans, Inc., Flagstar Bank, FSB, and various other undisclosed originators. Countrywide Home Loans, Inc. originated 84.7%, by

COMPLAINT FOR RESCISSION – Page 6

aggregate principal balance, of the mortgage loans in the collateral pool and Flagstar Bank, FSB originated 14.38%. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.[1]

23.     Countrywide Securities and CWALT offered and sold Seattle Bank a senior certificate in this securitization, in tranche A-1-A, for which Seattle Bank paid $79,273,133 on August 6, 2007.

24.     In connection with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and CWALT sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[2] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Countrywide Securities and CWALT made statements of material fact about the certificate that they offered and sold to Seattle Bank.

25.     Seattle Bank relied on the statements by Countrywide Securities and CWALT in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

26.     Many of the statements of material fact that Countrywide Securities and CWALT made in these documents were untrue or misleading. These untrue or misleading statements included the following.

---

[1] Nonconforming loans include both "alt-A" and "subprime" loans, but there are no precise definitions of those terms.

[2] The prospectus supplement for CWALT 2007-OH3 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1269518/000114420407039680/v082380_424b5.htm.

COMPLAINT FOR RESCISSION – Page 7

**A.**   **Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) and Combined Loan-to-Value Ratios (CLTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.**   **The materiality of LTVs and CLTVs**

27.   The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the value of the mortgaged property when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most important measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are likewise one of the most important measures of the risk of certificates sold in that securitization. LTV predicts the likelihood of default (the lower the LTV, the less likely that a decline in the value of the property will wipe out the owner's equity, and thereby give the owner an incentive to stop making mortgage payments and abandon the property). LTV also predicts the severity of loss in the event of default (the lower the LTV, the greater the "cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan).

28.   The denominator in LTV (value of the mortgaged property) is determined by either an appraisal or by the purchase price of the property. In a refinancing or home-equity loan, there is no purchase price to use as the denominator. For a purchase, the agreed price may be higher than the value of the property, and an appraisal should ensure that the LTV is calculated using the actual value as the denominator. Sometimes in a purchase, the denominator is the lower of the purchase price or the appraised value.

29.   Thus, an accurate appraisal is essential to an accurate LTV. In particular, a too-high appraisal will understate, sometimes greatly, the risk of a loan. To return to the

COMPLAINT FOR RESCISSION – Page 8

example above, if the property whose actual value is $500,000 is appraised instead at $550,000, then the LTV of the $300,000 loan falls from 60% to 54.5%, and the LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraisal understates the risk of the loan. It is also important to note that, the higher the correct LTV, the more the risk is understated by an incorrect appraisal of any given magnitude. In the example above, there is little difference in the risk of a loan with an LTV of 60% and one with an LTV of 54.5%; both are safe loans with large equity cushions. But there is a very large difference in the risk of a loan with an LTV of 90% and one with an LTV of 81.8%. In the latter case, there is an equity cushion of 18.2% of the value of the property, in the former, only 10%, just over half as much. Thus, an appraisal that overvalues a property by just 10% produces an overstatement of more than 80% in the homeowner's equity.

30.     LTV is an important measure of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. LTV helps to predict both the likelihood of default and the severity of loss in case of default. A reasonable investor considers LTV important to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTV of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

*

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56    917-

31.     Residential properties can secure more than one mortgage loan, a senior (or first) and one or more junior mortgage loans. The combined loan-to-value ratio (CLTV) is the ratio of the total outstanding principal balance of all loans (mortgages or home equity lines of credit) that the property secures to the appraised value of mortgaged property. To return to the example in paragraph 27, if a property valued at $500,000 secures a first mortgage loan of $300,000 and a second mortgage loan of $50,000, then it has a CLTV of 70%. If the first mortgage loan on the same property is $450,000 and the second is $50,000, then the CLTV is 100%.

32.     Like LTV, CLTV is an important measure of the risk of a mortgage loan, and the CLTVs of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. CLTV helps to predict both the likelihood of default and the severity of loss in case of default. A reasonable investor considers CLTV important to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average CLTV of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

**2.     Untrue or misleading statements by Countrywide Securities and CWALT about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization**

33.     In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the LTVs and CLTVs of the mortgage loans in the collateral pool in this securitization.

COMPLAINT FOR RESCISSION – Page 10

a.      The weighted average original LTV of all the loans in the collateral pool was 74.96%. CWALT 2007-OH3 Pros. Sup. S-2.

b.      The percentage of mortgage loans with an original LTV greater than 80% was 6.34%. CWALT 2007-OH3 Pros. Sup. S-2.

c.      "No Mortgage Loan had a Loan-to-Value Ratio at origination of more than 95%." CWALT 2007-OH3 Pros. Sup. S-39.

d.      In Annex A of the prospectus supplement ("The Mortgage Pool"), Countrywide Securities and CWALT presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balances) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio" and the "Weighted Average Combined Loan-to-Value Ratio" of the loans in each category. There were 23 such tables in Annex A for all loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from one to 43. Thus, in Annex A, Countrywide Securities and CWALT made hundreds of statements about the weighted average original LTVs and CLTVs of the loans in the collateral pool. CWALT 2007-OH3 Pros. Sup. A-1 to A-10.

e.      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 74.96%." CWALT 2007-OH3 Pros. Sup. A-4.

COMPLAINT FOR RESCISSION – Page 11

34.     These statements were untrue or misleading because (i) the stated LTVs and
CLTVs of a significant number of those mortgage loans were lower than the actual LTVs
and CLTVs; (ii) Countrywide Securities and CWALT omitted to state that the appraisals of
a significant number of the properties that secured the mortgage loans in the collateral pool
were biased upward, so that stated LTVs and CLTVs based on those appraisals were lower
than the true LTVs and CLTVs of those mortgage loans; or (iii) the stated LTVs and
CLTVs did not reflect second mortgages on a significant number of the properties that
secured the mortgage loans in the collateral pool.

35.     By these untrue and misleading statements, Countrywide Securities and
CWALT materially understated the risk of the certificate issued by Alternative Loan Trust
2007-OH3 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide
Securities and CWALT about the LTVs and CLTVs of the mortgage
loans in the collateral pool of this securitization were untrue or
misleading**

**a.      Upward bias in appraisals**

36.     As noted above, an accurate appraisal is essential to an accurate LTV and
CLTV. During the time before this securitization, however, there was widespread upward
bias in appraisals of properties that secured nonconforming mortgage loans and consequent
understatement of the LTVs and CLTVs of those loans. The main instigators of this bias
were mortgage brokers, real estate brokers, and loan officers who were not paid unless
loans closed and properties changed hands, and who thus had a strong incentive to
importune appraisers to appraise properties at values high enough to enable transactions to
close. (Furnishing an appraisal high enough to enable a transaction to close was known as

COMPLAINT FOR RESCISSION – Page 12

"hitting the bid." In a sale, this meant ensuring that the appraised value was equal to or greater than the agreed price. In a refinancing or second mortgage, "hitting the bid" meant ensuring that the appraised value was high enough to enable the proposed loan to comply with the lender's requirements for LTV.)

37.    Brokers and loan officers importuned appraisers by threatening to withhold future assignments if an appraiser did not "hit the bid" and sometimes by refusing to pay for completed appraisals that did not "hit the bid."

38.    There is abundant evidence of upward bias in appraisals throughout the mortgage loan industry before the date of this securitization. Starting in 2000 and continuing until 2009, 11,000 appraisers signed a petition addressed to the Appraisal Subcommittee of the Federal Financial Institutions Examination Council, an agency of the United States Government whose "mission is to ensure that real estate appraisers, who perform appraisals in real estate transactions that could expose the United States government to financial loss, are sufficiently trained and tested to assure competency and independent judgment according to uniform high professional standards and ethics." In the petition, the 11,000 appraisers wrote:

> We, the undersigned, represent a large number of licensed and certified real estate appraisers in the United States, who seek your assistance in solving a problem facing us on a daily basis. Lenders (meaning any and all of the following: banks, savings and loans, mortgage brokers, credit unions and loan officers in general; not to mention real estate agents) have individuals within their ranks, who, as a normal course of business, apply pressure on appraisers to hit or exceed a predetermined value.
>
> This pressure comes in many forms and includes the following:
> - the withholding of business if we refuse to inflate values,

COMPLAINT FOR RESCISSION – Page 13

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -921-

- the withholding of business if we refuse to guarantee a predetermined value,

- the withholding of business if we refuse to ignore deficiencies in the property,

- refusing to pay for an appraisal that does not give them what they want,

- black listing honest appraisers in order to use "rubber stamp" appraisers, etc.

We request that action be taken to hold the lenders responsible for this type of violation and provide for a penalty on any person or business who engages in the practice of pressuring appraisers to do dishonest appraisals that do not provide for independent judgment. We believe that this practice has adverse effects on our local and national economies and that the potential for great financial loss exists. We also believe that many individuals have been adversely affected by the purchase of homes which have been over-valued.

39.     The first-hand statements of the 11,000 appraisers are corroborated by a

nationwide survey of 1,200 appraisers during the second half of 2006, which was conducted

by October Research Corporation and reviewed by the statistical consulting service of a

major state university. The margin of error in the survey was plus or minus 3.2%. The

respondents were asked about their experiences over as much as five years before the date

of the survey. The results of the 2006 survey confirmed and elaborated on the findings of a

2003 survey which had found that 55% of appraisers felt "uncomfortable pressure to

overstate property values in greater than half of their appraisals."

40.     Specific findings of the survey included:

- "90% of respondent appraisers indicated that they felt pressure to restate/adjust/change property valuations."

- "71% of appraisers indicated that they felt uncomfortable pressure from mortgage brokers to overstate property valuations."

COMPLAINT FOR RESCISSION – Page 14

- "Real estate agents and brokers exerted similar pressure 56% of the time."

- "96% of respondents felt that appraisers in their market, when pressured to restate/adjust/change values, did modify property values."

- 75% of respondents stated that their business was negatively affected when they refused to change a valuation.

- 68% of respondents lost the client when they refused to restate/adjust/change an appraised value.

- 45% of respondents did not get paid for their appraisals when they refused to restate/adjust/change an appraised value.

41.     It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

                b.     **Evidence of untrue or misleading statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization specifically**

42.     Since the date of this securitization, 36 of the 1,257 mortgage loans in the collateral pool have been foreclosed upon. Those 36 properties were sold for a total of approximately $10,069,016 in foreclosure. The total value ascribed to those same properties in the LTV and CLTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank was $17,793,000. Thus, those properties were sold for 56.6% of the value ascribed to them, a difference of 43.4%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV and CLTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank were too high,

COMPLAINT FOR RESCISSION – Page 15

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 5 56923-

the resulting LTVs and CLTVs were too low, and thus that the statements in the prospectus supplement and other documents sent to Seattle Bank about the LTVs and CLTVs were untrue or misleading. The difference cannot be explained by the declines in house prices in the areas in which those properties were located (even after taking account of the fact that properties in foreclosure may sometimes sell for less than their fair market value). Analysis of data in an industry-standard database of securitized mortgage loans shows that the differences between the values ascribed to these properties and the prices at which the properties were sold in foreclosure are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding foreclosure sale).

c.     Undisclosed "silent second" mortgages

43.     During the time before this securitization, so-called "silent second" mortgages were pervasive in the nonconforming mortgage loan industry. A silent second is a second mortgage loan made by someone other than the first mortgage lender that is not disclosed to the first mortgage lender at the time of the first mortgage loan. (Often, a silent second was made by the seller of a property to enable the buyer to make the down payment required by the first mortgage lender.) Two economists at the Federal Reserve Bank of New York studied millions of nonconforming first mortgage loans securitized starting in 2005 and found silent seconds on the properties that secured 25% or more of them.

44.     It is very probable that, because 25% or more of all securitized nonconforming first mortgage loans in the United States had silent seconds during the time

COMPLAINT FOR RESCISSION – Page 16

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 924-

period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had silent seconds.

**B.   Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

**1.   The materiality of occupancy status**

45.   Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less risky than mortgages on second homes and investment properties.

46.   Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan, and the percentage of loans in the collateral pool of a securitization that are secured by mortgages on primary residences rather than on second homes or investment properties is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans secured by primary residences, the lower the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans. Differences in the percentage of the mortgage loans in the collateral pool of a securitization that are secured by mortgages on primary residences have a significant effect on the risk of each certificate sold in that securitization and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

COMPLAINT FOR RESCISSION – Page 17

**2.     Untrue or misleading statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

47.     In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a.      In Annex A of the prospectus supplement described in paragraph 33, Countrywide Securities and CWALT presented a table entitled "Occupancy Types." This table divided the loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." For each category, the table stated the number of mortgage loans in that category and gave eight other items of information about them. CWALT 2007-OH3 Pros. Sup. A-6.

b.      In the "Occupancy Types" table, Countrywide Securities and CWALT stated that 81.68% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary Residence," 12.99% were secured by an "Investment Property," and 5.33% were secured by a "Secondary Residence." CWALT 2007-OH3 Pros. Sup. A-6.

48.     These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary Residence" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment Property" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Secondary Residence" was lower than the actual number of loans in that category; or (iv) Countrywide Securities and CWALT omitted to state that

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -926-

the occupancy status of a significant number of the properties that secured the mortgage

loans in the collateral pool was misstated because of fraud.

49.     By these untrue and misleading statements, Countrywide Securities and

CWALT materially understated the risk of the certificate issued by Alternative Loan Trust

2007-OH3 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide
Securities and CWALT about the occupancy status of the properties
that secured the mortgage loans in the collateral pool of this
securitization were untrue or misleading**

50.     Because they are less risky than other mortgage loans, mortgage loans on

primary residences usually have more favorable terms, including lower interest rates, than

mortgage loans on second homes and investment properties. Applicants for loans on second

homes and investment properties therefore have an incentive to state that the property will

be their primary residence even when it will not.

51.     This type of "occupancy fraud" was widespread throughout the

nonconforming mortgage loan industry during the time before this securitization. BasePoint

Analytics LLC, a consultant about fraud, studied millions of mortgage loans for evidence of

fraud. BasePoint concluded that occupancy fraud comprised 20% of all mortgage fraud. In

November 2007, Fitch conducted a detailed review of files on 45 subprime mortgage loans

made in 2006 that had defaulted early in their terms. Fitch found that, in fully two-thirds of

the loans, the borrowers had stated that the properties were to be owner-occupied, but in

fact, they were not.

52.     It is very probable that, because there was widespread occupancy fraud

throughout the nonconforming mortgage loan industry during the time period before this

COMPLAINT FOR RESCISSION – Page 19

securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

**C.      Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.      The materiality of FICO scores**

53.      A credit score (also called a FICO score after Fair Isaac Corporation, which devised the score) is a measure of a person's creditworthiness. The highest score is 850, the lowest 300. The score is calculated from such factors as the length of a person's credit history, the number of times a person has been late in paying bills, the amount of credit a person has available, etc. The higher a borrower's FICO score, the lower the risk that that borrower will default on payment of his or her mortgage.

54.      A borrower's FICO score is an important measure of the risk of a mortgage loan to that borrower, and the FICO scores of borrowers of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. A reasonable investor considers FICO scores important to the decision whether to purchase a certificate in a securitization of mortgage loans. Differences in the weighted average FICO scores of borrowers of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

COMPLAINT FOR RESCISSION – Page 20

**2.    Misleading statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

55.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

a.    The FICO scores of the borrowers of the mortgage loans in the collateral pool ranged from 620 to 824 with a weighted average of 724. CWALT 2007-OH3 Pros. Sup. S-2.

b.    The number of mortgage loans with unknown FICO scores was two. This was 0.26% of the mortgage loans. CWALT 2007-OH3 Pros. Sup. S-2.

c.    In Annex A of the prospectus supplement described in paragraph 33, Countrywide Securities and CWALT presented 23 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from one to 43. Among the data presented in each table was the "Weighted Average FICO Credit Score" of the loans in each category. Thus, in Annex A, Countrywide Securities and CWALT made hundreds of statements about the weighted average FICO credit scores of the loans in the collateral pool. CWALT 2007-OH3 Pros. Sup. A-1 to A-10.

d.    "As of the cut-off date, the weighted average FICO Credit Score of the borrowers related to the Mortgage Loans was approximately 724." CWALT 2007-OH3 Pros. Sup. A-7.

56.    These statements were misleading because Countrywide Securities and CWALT omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their FICO scores.

COMPLAINT FOR RESCISSION – Page 21

YARMUTH WILSON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -929-

57.     By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH3 that they offered and sold to Seattle Bank.

**3.     Basis of the allegations above that these statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

58.     A person's credit or FICO score is an important factor in his or her eligibility for a mortgage loan. In order to make themselves eligible for loans they would not otherwise be eligible for (or for larger loans than they would otherwise be eligible for), many borrowers used a practice known as "tradeline renting." As Fair Isaac itself described this practice in testimony to Congress, "customers with good FICO scores . . . add strangers with poor FICO scores to their credit card accounts as authorized users." (The strangers do not actually have the use of the account.) By this process, a person can raise his or her FICO score by as much as 75 points. By repeating the process, a person can raise his or her FICO score by as much as 200 points. Tradeline renting was available from "credit repair" sites on the Internet, which charged as much as $2,000 for the service. Tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization.

59.     In its review of subprime mortgage loans in November 2007, Fitch found that the FICO scores of 16% of the borrowers that it studied reflected tradeline renting.

60.     It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many

COMPLAINT FOR RESCISSION – Page 22

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -930-

of the borrowers of the mortgage loans in the collateral pool of this securitization raised their FICO scores by tradeline renting.

**D.    Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities or Originated by Countrywide Home Loans, Inc.**

61.    Seattle Bank repeats paragraphs 27 through 60.

62.    Investors in mortgage-backed securities, including Seattle Bank, rely extensively on certain characteristics of the mortgage loans in the collateral pool of a securitization to predict the performance of those loans and thereby to determine the risk both of those loans and of the certificates sold in that securitization. Reasonable investors consider information about these characteristics important to the decision whether to purchase a certificate in a securitization of mortgage loans. Among the most important of these characteristics are LTV and FICO score.

63.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made statements about the LTVs and FICO scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

64.    During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

COMPLAINT FOR RESCISSION – Page 23

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -931-

65.     This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Countrywide Securities or its affiliates (including CWALT). The lines in Figure 1 show, for all nonconforming loans securitized by Countrywide Securities or its affiliates, that the weighted-average reported LTV and weighted-average reported FICO score were nearly constant. Despite the stability of these important credit characteristics, however, the actual credit quality of nonconforming loans securitized by Countrywide Securities or its affiliates deteriorated steadily during the time before this securitization. The bars in Figure 1 show early payment defaults, that is, the percent of loans (by outstanding principal balance) that became 60 or more days delinquent within six months after they were made. An early payment default is usually the result of poor credit quality and poor underwriting of the loan when it was made, rather than of macroeconomic factors after it was made. As Figure 1 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

COMPLAINT FOR RESCISSION – Page 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15        66.      Figure 2 further illustrates the undisclosed deterioration in the credit quality

16   of nonconforming loans securitized by Countrywide Securities or its affiliates, which had

17   nearly constant weighted-average reported LTVs and FICO scores. Figure 2 shows, for

18   each month after origination, the percentage (by outstanding principal balance) of

19   nonconforming mortgage loans made in each of 2004, 2005, 2006, and 2007 and securitized

20   by Countrywide Securities or its affiliates that were 60 or more days delinquent. As Figure

21   2 makes clear, the credit quality of the loans securitized by Countrywide Securities or its

22   affiliates deteriorated steadily from 2004 to 2007, even though those loans had very similar

23   reported LTVs and FICO scores.

24
25
26

COMPLAINT FOR RESCISSION – Page 25



67.     This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true not only of nonconforming mortgage loans securitized by Countrywide Securities but also of nonconforming mortgage loans originated by Countrywide Home Loans, Inc., which originated 84.7% of the mortgage loans in this securitization. The lines in Figure 3 show, for all nonconforming loans originated by Countrywide Home Loans, Inc., that the weighted-average reported LTV and weighted-average reported FICO score were nearly constant. Despite the stability of these important credit characteristics, however, the actual credit quality of nonconforming loans originated by Countrywide Home Loans, Inc. deteriorated steadily during the time before this securitization. Like the bars in Figure 1, the bars in Figure 3 show early payment defaults. As Figure 3 makes clear, the credit quality of the loans originated by Countrywide Home

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -934-

1    Loans, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though

2    those loans had very similar reported LTVs and FICO scores.



Figure 3: Percent of Loans Originated by Countrywide Home Loans, Inc. 60+ Delinquent Six Months After Origination, by Quarter of Origination

15        68.     Figure 4 further illustrates the undisclosed deterioration in the credit quality

16   of nonconforming loans originated by Countrywide Home Loans, Inc., which had nearly

17   constant weighted-average reported LTVs and FICO scores. Figure 4 shows, for each

18   month after origination, the percentage (by outstanding principal balance) of

19   nonconforming mortgage loans originated by Countrywide Home Loans, Inc. in each of

20   2004, 2005, 2006, and 2007 that were 60 or more days delinquent. As Figure 4 makes clear,

21   the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated

22   steadily from 2004 to 2007, even though those loans had very similar reported LTVs and

23   FICO scores.

COMPLAINT FOR RESCISSION – Page 27

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -935-



69.     All statements that Countrywide Securities and CWALT made about the LTVs and FICO scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that each of them securitized or that Countrywide Home Loans, Inc. originated were nearly constant in weighted average LTV and weighted average FICO score, yet performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

70.     By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH3 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 28

1

**E.    Untrue or Misleading Statements about the Underwriting Guidelines of the Originators of the Mortgage Loans in the Collateral Pool of this Securitization**

2

3

    **1.    The materiality of underwriting guidelines and the extent of compliance with them**

4

5

    71.    Most or all originators of nonconforming mortgage loans had written

6

guidelines by which they evaluated applications for loans. An originator's guidelines, and

7

the extent to which the originator complies with them, are important indicators of the risk of

8

mortgage loans made by that originator and of certificates sold in a securitization in which

9

mortgage loans made by that originator are a substantial part of the collateral pool. A

10

reasonable investor considers the underwriting guidelines of each originator of a substantial

11

part of the mortgage loans in the collateral pool of a securitization, and the extent to which

12

the originator complied with its guidelines, important to the decision whether to purchase a

13

certificate in that securitization. Differences in those guidelines or in the extent to which an

14

originator complied with them have a significant effect on the risk of each certificate sold in

15

that securitization and thus are important to the decision of a reasonable investor whether to

16

purchase any such certificate.

17

18

    **2.    Untrue or misleading statements by Countrywide Securities and CWALT about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

19

20

21

    72.    On pages S-42 through S-47 of the prospectus supplement, Countrywide

22

Securities and CWALT made statements about the underwriting guidelines of Countrywide

23

Home Loans, Inc., which originated 84.7% of the mortgage loans in the collateral pool of

24

this securitization. All of those statements are incorporated here by reference.

25

26

COMPLAINT FOR RESCISSION – Page 29

73.     One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2007-OH3 Pros. Sup. S-43.

74.     On information and belief, these statements were untrue or misleading because Countrywide Securities and CWALT omitted to state that: (a) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) Countrywide Home Loans, Inc. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

75.     By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH3 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide Securities and CWALT about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

76.     During the time before this securitization, most or all originators of nonconforming mortgage loans relaxed their actual lending standards, notwithstanding their stated underwriting guidelines. Based on an empirical study of subprime loan applications, economists at the International Monetary Fund found "robust evidence that lending standards eased in the subprime mortgage industry during the fast expansion of the past few years [i.e. 2005-2007]." This general relaxation of lending standards included: (a) frequent,

COMPLAINT FOR RESCISSION – Page 30

and increasingly frequent, exceptions to stated underwriting guidelines; (b) frequent, and increasingly frequent, exceptions to underwriting guidelines when no compensating factor was present; (c) wholesale, rather than case-by-case, exceptions to underwriting guidelines; and (d) frequent, and increasingly frequent, failure to follow quality-assurance practices intended to detect and prevent fraud.

77.     The general relaxation of lending standards that took place before the time of this securitization in most or all originators of nonconforming mortgage loans took place specifically at Countrywide Home Loans, Inc., the originator of 84.7% of the mortgage loans in the collateral pool of this securitization. A federal investigation into Countrywide's lending practices revealed that "loan documents were often marked by dubious or erroneous information." One former Countrywide manager, who pleaded guilty to two counts of wire-fraud, said that "If you had a pulse, [Countrywide] gave you a loan," and that the practice of pushing through loans with false information was common. Another account manager claimed that Countrywide was "infested" with employees who violated company standards to underwrite loans. For instance, one borrower, a personal trainer who made less than $20,000 per year, claimed that her Countrywide loan application listed her income as more than four times that amount, and qualified her for a mortgage where the payment was $500 more than her monthly income.

78.     During the time before this securitization, when Countrywide Securities or its affiliates (including CWALT) securitized a pool of loans, a small percentage of the loans to be placed in the pool were audited to verify that the information in the loan files complied with the underwriting guidelines. If a loan failed the audit (for example, documents were missing from the loan file), then it was dropped from the pool. On

COMPLAINT FOR RESCISSION – Page 31

YARMUTH  WILSON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

EXHIBIT  56 -939-

1   information and belief, Countrywide Securities and its affiliates had a "three-strikes"

2   policy, that is, unless the rejected loan had been selected for audit and rejected three times,

3   it would simply be placed into a different securitization. Because only a small percentage of

4   the loans in each pool were audited, it is highly unlikely that a loan that had been rejected

5   and placed into a different securitization would again be selected for an audit. Thus, it is

6   likely that this collateral pool contained loans that Countrywide Securities knew failed to

7   comply with the underwriting guidelines.

8   

9   **F.    Claim for Rescission**

10  79.    Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover

11  the consideration that it paid for this certificate, $79,273,133, plus interest of 8% per annum

12  from August 6, 2007, to the date on which it recovers the $79, 273,133, plus its costs and

13  the reasonable fees of its attorneys in this action, minus the amount of income it has

14  received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the

15  certificate before entry of judgment.

16  

17  

18                          **VI. SECOND CLAIM FOR RELIEF**

19  *Certificate*:    One certificate in tranche A-1-A of Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-OH2

20  

21  *Date of Purchase*:    June 29, 2007

22  *Consideration Paid*:    $150,000,000

23  *Underwriter*:    Countrywide Securities

24  *Depositor/Issuer*:    CWALT

25  *Controlling Person of Depositor/Issuer*:    Countrywide Financial Corporation

26  80.    Seattle Bank repeats paragraphs 1 through 20.

COMPLAINT FOR RESCISSION – Page 32

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56  -940-

81.     Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-OH2 was a securitization in June 2007 of approximately 2,348 mortgage loans, in one group, with an aggregate principal balance of approximately $1,003,671,995. The mortgage loans were originated by Countrywide Home Loans, Inc., Flagstar Bank, FSB, and various other undisclosed originators. Countrywide Home Loans, Inc. originated 72.66%, by aggregate principal balance, of the mortgage loans and Flagstar Bank, FSB, originated 23.18%. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

82.     Countrywide Securities and CWALT offered and sold Seattle Bank a senior certificate in this securitization, in tranche A-1-A, for which Seattle Bank paid $150,000,000 on June 29, 2007.

83.     In connection with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and CWALT sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[3] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Countrywide Securities and CWALT made statements of material fact about the certificate that they offered and sold to Seattle Bank.

84.     Seattle Bank relied on the statements by Countrywide Securities and CWALT in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

COMPLAINT FOR RESCISSION – Page 33

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 941-

85.     Many of the statements of material fact that Countrywide Securities and CWALT made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**A.      Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) and Combined Loan-to-Value Ratios (CLTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

     **1.      The materiality of LTVs and CLTVs**

86.     Seattle Bank repeats paragraphs 27 through 32.

     **2.      Untrue or misleading statements by Countrywide Securities and CWALT about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization**

87.     In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the LTVs and CLTVs of the mortgage loans in the collateral pool in this securitization.

     a.      The weighted average original LTV ratio of all the loans in the collateral pool was 74.52%. CWALT 2007-OH2 Pros. Sup. S-2.

     b.      The percentage of loans with an original LTV greater than 80% was 6.92%. CWALT 2007-OH2 Pros. Sup. S-2.

     c.      "No Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2007-OH2 Pros. Sup. S-38.

     d.      In Annex A of the prospectus supplement ("The Mortgage Pool"), Countrywide Securities and CWALT presented tables of statistics about the mortgage loans

---

[3] The prospectus supplement for CWALT 2007-OH2 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1269518/000114420407035146/v079879_424b5.htm.

COMPLAINT FOR RESCISSION – Page 34

in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balances) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio" and the "Weighted Average Combined Loan-to-Value Ratio" of the loans in each category. There were 23 such tables in Annex A for all loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from one to 45. Thus, in Annex A, Countrywide Securities and CWALT made hundreds of statements about the weighted average original LTVs and CLTVs of the loans in the collateral pool. CWALT 2007-OH2 Pros. Sup. A-1 to A-10.

e.     "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 74.52%." CWALT 2007-OH2 Pros. Sup. A-4.

88.     These statements were untrue or misleading because (i) the stated LTVs and CLTVs of a significant number of those mortgage loans were lower than the actual LTVs and CLTVs; (ii) Countrywide Securities and CWALT omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs and CLTVs based on those appraisals were lower than the true LTVs and CLTVs of those mortgage loans; or (iii) the stated LTVs and CLTVs did not reflect second mortgages on a significant number of the properties that secured the mortgage loans in the collateral pool.

COMPLAINT FOR RESCISSION – Page 35

YARMUTH WILSON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -943-

89.     By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH2 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide Securities and CWALT about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

**a.      Upward bias in appraisals**

90.     Seattle Bank repeats paragraphs 36 through 40.

91.     It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

**b.      Evidence of untrue or misleading statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization specifically**

92.     Since the date of this securitization, 64 of the 2,348 mortgage loans in the collateral pool have been foreclosed upon. Those 64 properties were sold for a total of approximately $21,717,451 in foreclosure. The total value ascribed to those same properties in the LTV and CLTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank was $37,078,692. Thus, those properties were sold for 58.6% of the value ascribed to them, a difference of 41.4%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV and CLTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank were too high,

COMPLAINT FOR RESCISSION – Page 36

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 36 -944-

the resulting LTVs and CLTVs were too low, and thus that the statements in the prospectus supplement and other documents sent to Seattle Bank about the LTVs and CLTVs were untrue or misleading. The difference cannot be explained by the declines in house prices in the areas in which those properties were located (even after taking account of the fact that properties in foreclosure may sometimes sell for less than their fair market value). Analysis of data in an industry-standard database of securitized mortgage loans shows that the differences between the values ascribed to these properties and the prices at which the properties were sold in foreclosure are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding foreclosure sale).

c.     **Undisclosed "silent second" mortgages**

93.     Seattle Bank repeats paragraph 43.

94.     It is very probable that, because 25% or more of all securitized nonconforming first mortgage loans in the United States had silent seconds during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had silent seconds.

B.     **Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

1.     **The materiality of occupancy status**

95.     Seattle Bank repeats paragraphs 45 through 46.

COMPLAINT FOR RESCISSION – Page 37

**2.     Untrue or misleading statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

96.     In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a.     In Annex A of the prospectus supplement described in paragraph 87, Countrywide Securities and CWALT presented a table entitled "Occupancy Types." This table divided the loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." For each category, the table stated the number of mortgage loans in that category and gave eight other items of information about them. CWALT 2007-OH2 Pros. Sup. A-6.

b.     In the "Occupancy Types" table, Countrywide Securities and CWALT stated that 84.46% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary Residence," 11.12% were secured by an "Investment Property," and 4.42% were secured by a "Secondary Residence." CWALT 2007-OH2 Pros. Sup. A-6.

97.     These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary Residence" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment Property" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Secondary Residence" was lower than the actual number of loans in that category; or (iv) Countrywide Securities and CWALT omitted to state that

COMPLAINT FOR RESCISSION – Page 38

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3803 F 206.516.3888

EXHIBIT 56 -946-

1   the occupancy status of a significant number of the properties that secured the mortgage

2   loans in the collateral pool was misstated because of fraud.

3        98.    By these untrue and misleading statements, Countrywide Securities and

4   CWALT materially understated the risk of the certificate issued by Alternative Loan Trust

5   2007-OH2 that they offered and sold to Seattle Bank.

6

7        **3.    Basis of the allegations above that these statements by Countrywide
8            Securities and CWALT about the occupancy status of the properties
9            that secured the mortgage loans in the collateral pool of this
             securitization were untrue or misleading**

10       99.    Seattle Bank repeats paragraphs 50 through 51.

11       100.   It is very probable that, because there was widespread occupancy fraud

12  throughout the mortgage loan industry during the time before this securitization, a

13  significant number of the applicants for mortgage loans in the collateral pool of this

14  securitization stated incorrectly that the properties that would secure the mortgage loans

15  were to be their primary residences.

16

17  **C.   Misleading Statements about the FICO Scores of the Borrowers Whose
        Mortgage Loans Were in the Collateral Pool of this Securitization**

18       **1.    The materiality of FICO scores**

19       101.   Seattle Bank repeats paragraphs 53 through 54.

20

21       **2.    Misleading statements by Countrywide Securities and CWALT about
            the FICO scores of the borrowers whose mortgage loans were in the
22           collateral pool of this securitization**

23       102.   In the prospectus supplement and other documents they sent to Seattle Bank,

24  Countrywide Securities and CWALT made the following statements about the FICO scores

25  of the borrowers whose mortgage loans were in the collateral pool of this securitization.

26

COMPLAINT FOR RESCISSION – Page 39

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -947-

a.      The FICO scores of the borrowers of the mortgage loans in the collateral pool ranged from 499 to 822 with a weighted average of 724. CWALT 2007-OH2 Pros. Sup. S-2.

b.      No mortgage loan had an unknown FICO score. CWALT 2007-OH2 Pros. Sup. S-2.

c.      In Annex A of the prospectus supplement described in paragraph 87, Countrywide Securities and CWALT presented 23 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from one to 45. Among the data presented in each table was the "Weighted Average FICO Credit Score" of the loans in the collateral pool. Thus, in Annex A, Countrywide Securities and CWALT made hundreds of statements about the weighted average FICO scores of the loans in the collateral pool. CWALT 2007-OH2 Pros. Sup. A-1 to A-10.

d.      "As of the cut-off date, the weighted average FICO Credit Score of the borrowers related to the Mortgage Loans was approximately 724." CWALT 2007-OH2 Pros. Sup. A-7.

103.    These statements were misleading because Countrywide Securities and CWALT omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their FICO scores.

104.    By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH2 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 40

      **3.**     **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

105.    Seattle Bank repeats paragraphs 58 through 59.

106.    It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their FICO scores by tradeline renting.

**D.**    **Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities or Originated by Countrywide Home Loans, Inc.**

107.    Seattle Bank repeats paragraphs 86 through 106.

108.    Seattle Bank repeats paragraph 62.

109.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made statements about the LTVs and FICO scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

110.    During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

COMPLAINT FOR RESCISSION – Page 41

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -949-

111.   This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Countrywide Securities or its affiliates. As Figure 1 in paragraph 65 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 2 in paragraph 66 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

112.   This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true also in particular of nonconforming loans originated by Countrywide Home Loans, Inc., which originated 72.66% of the loans in the collateral pool of this securitization. As Figure 3 in paragraph 67 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 4 in paragraph 68 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

113.   All statements that Countrywide Securities and CWALT made about the LTVs and FICO scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that each of them securitized or that Countrywide Home Loans, Inc. originated were nearly constant in weighted average LTV and weighted average FICO

COMPLAINT FOR RESCISSION – Page 42

score, yet performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

114.    By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH2 that they offered and sold to Seattle Bank.

E.    **Untrue or Misleading Statements about the Underwriting Guidelines of the Originators of the Mortgage Loans in the Collateral Pool of this Securitization**

1.    **The materiality of underwriting guidelines and the extent of compliance with them**

115.    Seattle Bank repeats paragraph 71.

2.    **Untrue or misleading statements by Countrywide Securities and CWALT about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

116.    On pages S-42 through S-47 of the prospectus supplement, Countrywide Securities and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated 72.66% of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

117.    One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2007-OH2 Pros. Sup. S-43.

118.    On information and belief, these statements were untrue or misleading because Countrywide Securities and CWALT omitted to state that: (a) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and

COMPLAINT FOR RESCISSION – Page 43

increasingly frequent, exceptions to those underwriting guidelines when no compensating

factor was present; and (c) Countrywide Home Loans, Inc. was failing frequently, and

increasingly frequently, to follow quality-assurance practices intended to detect and prevent

fraud.

119.   By these untrue or misleading statements, Countrywide Securities and

CWALT materially understated the risk of the certificate issued by Alternative Loan Trust

2007-OH2 that they offered and sold to Seattle Bank.

> **3.  Basis of the allegations above that these statements by Countrywide Securities and CWALT about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

120.   Seattle Bank repeats paragraphs 76 through 78.

121.   Thus, it is likely that this collateral pool contained loans that Countrywide

Securities knew failed to comply with the underwriting guidelines.

**F.   Claim for Rescission**

122.   Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover

the consideration that it paid for this certificate, $150,000,000, plus interest of 8% per

annum from June 29, 2007, to the date on which it recovers the $150,000,000, plus its costs

and the reasonable fees of its attorneys in this action, less the amount of income it has

received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the

certificate before entry of judgment.

COMPLAINT FOR RESCISSION – Page 44

EXHIBIT 56 -952-

## VII. THIRD CLAIM FOR RELIEF

|  |  |
|---|---|
| *Certificate*: | One certificate in tranche A-1 of Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA19 |
| *Date of Purchase*: | November 30, 2006 |
| *Consideration Paid*: | $75,000,000 |
| *Underwriter*: | Countrywide Securities |
| *Depositor/Issuer*: | CWALT |
| *Controlling Person of Depositor/Issuer*: | Countrywide Financial Corporation |

123.    Seattle Bank repeats paragraphs 1 through 20.

124.    Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA19 was a securitization in November 2006 of approximately 2,415 mortgage loans, in one group, with an aggregate principal balance of approximately $921,320,354. The mortgage loans were originated by Countrywide Home Loans, Inc. and various other undisclosed originators. Countrywide Home Loans, Inc. originated 87.2% by aggregate principal balance of the mortgage loans in the collateral pool. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

125.    Countrywide Securities and CWALT offered and sold Seattle Bank a senior certificate in this securitization, in tranche A-1, for which Seattle Bank paid $75,000,000 on November 30, 2006.

126.    In connection with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and CWALT sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC

COMPLAINT FOR RESCISSION – Page 45

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -953-

for this securitization,[4] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Countrywide Securities and CWALT made statements of material fact about the certificate that they offered and sold to Seattle Bank.

127.     Seattle Bank relied on the statements by Countrywide Securities and CWALT in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

128.     Many of the statements of material fact that Countrywide Securities and CWALT made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**A.     Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) and Combined Loan-to-Value Ratios (CLTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.     The materiality of LTVs and CLTVs**

129.     Seattle Bank repeats paragraphs 27 through 32.

**2.     Untrue or misleading statements by Countrywide Securities and CWALT about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization**

130.     In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the LTVs and CLTVs of the mortgage loans in the collateral pool in this securitization.

---

[4] The prospectus supplement for CWALT 2006-OA19 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1269518/000114420406051130/v059459_424b5.htm.

COMPLAINT FOR RESCISSION – Page 46

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT  56  -954-

a.      The weighted average original LTV ratio of all the loans in the collateral pool was 75.41%. CWALT 2006-OA19 Pros. Sup. S-5.

b.      The percentage of loans with an original LTV ratio greater than 80% was 9.13%. CWALT 2006-OA19 Pros. Sup. S-5.

c.      "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than 95.00%." CWALT 2006-OA19 Pros. Sup. S-36.

d.      In "The Mortgage Pool" section of the prospectus supplement, Countrywide Securities and CWALT presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balances) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of less than $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio" of the loans in each category. There were 22 such tables in "The Mortgage Pool" section for all loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from two to 45. Thus, in this section, Countrywide Securities and CWALT made hundreds of statements about the weighted average original LTVs and CLTVs of the loans in the collateral pool. CWALT 2006-OA19 Pros. Sup. S-39 to S-53.

e.      "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans was approximately 75.41%." CWALT 2006-OA19 Pros. Sup. S-43.

COMPLAINT FOR RESCISSION – Page 47

f.      "The Mortgage Pool" section of the prospectus supplement presented a table entitled "Combined Loan-to-Value Ratios" for all the loans in the collateral pool. In this table, Countrywide Securities and CWALT divided the table into 11 different categories of CLTV (for example, 0.01% to 50 %, 50.01% to 55%, 55.01% to 60%, etc.). For each category, the table stated the number of mortgage loans in that category and gave seven other items of information about them. CWALT 2006-OA19 Pros. Sup. S-44.

131.    These statements were untrue or misleading because (i) the stated LTVs and CLTVs of a significant number of those mortgage loans were lower than the actual LTVs and CLTVs; (ii) Countrywide Securities and CWALT omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs and CLTVs based on those appraisals were lower than the true LTVs and CLTVs of those mortgage loans; or (iii) the stated LTVs and CLTVs did not reflect second mortgages on a significant number of the properties that secured the mortgage loans in the collateral pool.

132.    By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA19 that they offered and sold to Seattle Bank.

3.      **Basis of the allegations above that these statements by about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

a.      **Upward bias in appraisals**

133.    Seattle Bank repeats paragraphs 36 through 40.

134.    It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time period before this securitization, a

COMPLAINT FOR RESCISSION – Page 48

YARMUTH WILSON CALFO

significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

        **b.**    **Evidence of untrue or misleading statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization specifically**

     135.   Since the date of this securitization, 228 of the 2,415 mortgage loans in the collateral pool have been foreclosed upon. Those 228 properties were sold for a total of approximately $63,948,130 in foreclosure. The total value ascribed to those same properties in the LTV and CLTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank was $113,389,587. Thus, those properties were sold for 56.4% of the value ascribed to them, a difference of 43.6%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV and CLTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank were too high, the resulting LTVs and CLTVs were too low, and thus that the statements in the prospectus supplement and other documents sent to Seattle Bank about the LTVs and CLTVs were untrue or misleading. The difference cannot be explained by the declines in house prices in the areas in which those properties were located (even after taking account of the fact that properties in foreclosure may sometimes sell for less than their fair market value). Analysis of data in an industry-standard database of securitized mortgage loans shows that the differences between the values ascribed to these properties and the prices at which the properties were sold in foreclosure are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding foreclosure sale).

COMPLAINT FOR RESCISSION – Page 49

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -957-

c.    Undisclosed "silent second" mortgages

136.    Seattle Bank repeats paragraph 43.

137.    It is very probable that, because 25% or more of all securitized nonconforming first mortgage loans in the United States had silent seconds during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had silent seconds.

**B.    Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

**1.    The materiality of occupancy status**

138.    Seattle Bank repeats paragraphs 45 through 46.

**2.    Untrue or misleading statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

139.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a.    In "The Mortgage Pool" section of the prospectus supplement described in paragraph 130, Countrywide Securities and CWALT presented a table entitled "Occupancy Types." This table divided the loans in the collateral pool into the categories "Owner Occupied," "Investment Property," and "Secondary Residence." For each category, the table stated the number of mortgage loans in that category and gave seven other items of information about them. CWALT 2006-OA19 Pros. Sup. S-46.

COMPLAINT FOR RESCISSION – Page 50

EXHIBIT 56 -958-

b.      In the "Occupancy Types" table, Countrywide Securities and CWALT stated that 83.47% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Owner Occupied" property, 10.51% were secured by an "Investment Property," and 6.03% were secured by a "Secondary Residence." CWALT 2006-OA19 Pros. Sup. S-46.

140.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Owner Occupied" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment Property" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Secondary Residence" was lower than the actual number of loans in that category; or (iv) Countrywide Securities and CWALT omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

141.    By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA19 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

142.    Seattle Bank repeats paragraphs 50 through 51.

143.    It is very probable that, because there was widespread occupancy fraud throughout the mortgage loan industry during the time before this securitization, a significant number of the applicants for mortgage loans in the collateral pool of this

COMPLAINT FOR RESCISSION – Page 51

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888
EXHIBIT 56 -959-

securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

**C.     Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

      **1.     The materiality of FICO scores**

      144.    Seattle Bank repeats paragraphs 53 through 54.

      **2.     Misleading statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

      145.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

      a.    The FICO scores of the borrowers of the mortgage loans in the collateral pool ranged from 597 to 823 with a weighted average of 706. CWALT 2006-OA19 Pros. Sup. S-5.

      b.    The number of mortgage loans with unknown FICO scores was six. This was 0.11% of the mortgage loans. CWALT 2006-OA19 Pros. Sup. S-5.

      c.    In "The Mortgage Pool" section of the prospectus supplement described in paragraph 130, Countrywide Securities and CWALT presented 22 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from two to 45. Among the data presented in each table was the "Weighted Average FICO Credit Score" of the loans in each category. Thus, in this section, Countrywide Securities and CWALT made hundreds of

COMPLAINT FOR RESCISSION – Page 52

statements about the weighted average FICO scores of the loans in the collateral pool.

CWALT 2006-OA19 Pros. Sup. S-39 to S-53.

          d.    "As of the initial cut-off date, the weighted average FICO Credit

Score of the mortgagors related to the Initial Mortgage Loans was approximately 706."

CWALT 2006-OA19 Pros. Sup. S-48.

      146.    These statements were misleading because Countrywide Securities and

CWALT omitted to state that a significant number of borrowers of the mortgage loans in

the collateral pool of this securitization inflated their FICO scores.

      147.    By these misleading statements, Countrywide Securities and CWALT

materially understated the risk of the certificate issued by Alternative Loan Trust 2006-

OA19 that they offered and sold to Seattle Bank.

      **3.**    **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

      148.    Seattle Bank repeats paragraphs 58 through 59.

      149.    It is very probable that, because tradeline renting was widespread throughout

the nonconforming mortgage loan industry during the time before this securitization, many

of the borrowers of the mortgage loans in the collateral pool of this securitization raised

their FICO scores by tradeline renting.

**D.**    **Failure to Disclose the Substantial Deterioration of LTV and FICO score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities or Originated by Countrywide Home Loans, Inc.**

      150.    Seattle Bank repeats paragraphs 129 through 149.

      151.    Seattle Bank repeats paragraph 62.

COMPLAINT FOR RESCISSION – Page 53

152.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made statements about the LTVs and FICO scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

153.    During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2006 than if they were made in 2005, worse if made in 2005 than if made in 2004, etc.

154.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Countrywide Securities or its affiliates. As Figure 1 in paragraph 65 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 2 in paragraph 66 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

155.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true also in particular of nonconforming loans originated by Countrywide Home Loans, Inc., which originated 87.2% of the mortgage loans in the collateral pool of this securitization. As Figure 3 in paragraph 67 makes clear, the credit

COMPLAINT FOR RESCISSION – Page 54

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -962-

quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 4 in paragraph 68 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

156.   All statements that Countrywide Securities and CWALT made about the LTVs and FICO scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that each of them securitized or that Countrywide Home Loans, Inc. originated were nearly constant in weighted average LTV and weighted average FICO score, yet performed worse if the loans were made in 2006 than if they were made in 2005, worse if made in 2005 than if made in 2004, etc.

157.   By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA19 that they offered and sold to Seattle Bank.

**E.    Untrue or Misleading Statements about the Underwriting Guidelines of the Originators of the Mortgage Loans in the Collateral Pool of this Securitization**

   **1.    The materiality of underwriting guidelines and the extent of compliance with them**

158.   Seattle Bank repeats paragraph 71.

COMPLAINT FOR RESCISSION – Page 55

**2.   Untrue or misleading statements by Countrywide Securities and CWALT about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

159.   On pages S-57 through S-62 of the prospectus supplement, Countrywide Securities and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated 87.2% of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

160.   One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-OA19 Pros. Sup. S-58.

161.   On information and belief, these statements were untrue or misleading because Countrywide Securities and CWALT omitted to state that: (a) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) Countrywide Home Loans, Inc. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

162.   By these untrue or misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA19 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 56

**3.** **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines**

163.    Seattle Bank repeats paragraphs 76 through 78.

164.    Thus, it is likely that this collateral pool contained loans that Countrywide Securities knew failed to comply with the underwriting guidelines.

**F.    Claim for Rescission**

165.    Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover the consideration that it paid for this certificate, $75,000,000, plus interest of 8% per annum from November 30, 2006, to the date on which it recovers the $75,000,000, plus its costs and the reasonable fees of its attorneys in this action, less the amount of income it has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate before entry of judgment.

## VIII. FOURTH CLAIM FOR RELIEF

| | |
|---|---|
| *Certificate:* | One certificate in tranche 1A-2 of Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA6 |
| *Date of Purchase:* | April 28, 2006 |
| *Consideration Paid:* | $47,632,633 |
| *Underwriter:* | Countrywide Securities |
| *Depositor/Issuer:* | CWALT |
| *Controlling Person of Depositor/Issuer:* | Countrywide Financial Corporation |

166.    Seattle Bank repeats paragraphs 1 through 20.

167.    Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA6 was a securitization in May 2006 of approximately 2,689 mortgage loans, in two

COMPLAINT FOR RESCISSION – Page 57

groups, with an aggregate principal balance of approximately $1,043,247,104. The mortgage loans were originated by Countrywide Home Loans, Inc., MortgageIT, Inc., and other various undisclosed originators. Countrywide Home Loans, Inc. originated 85.18%, by aggregate principal balance, of the mortgage loans in Group 1 (from which Seattle Bank's certificate was to be paid), and MortgageIT, Inc. originated 12.97%. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

168.    Countrywide Securities and CWALT offered and sold Seattle Bank a senior certificate in this securitization, in tranche 1A-2, for which Seattle Bank paid $47,632,633 on April 28, 2006.

169.    In connection with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and CWALT sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[5] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Countrywide Securities and CWALT made statements of material fact about the certificate that they offered and sold to Seattle Bank.

170.    Seattle Bank relied on the statements by Countrywide Securities and CWALT in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

---

[5] The prospectus supplement for CWALT 2006-OA6 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1269518/000089109206001278/e23764_424b5.txt.

COMPLAINT FOR RESCISSION – Page 58

YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

EXHIBIT 56 -966-

171.    Many of the statements of material fact that Countrywide Securities and CWALT made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**A.      Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.      The materiality of LTVs**

172.    Seattle Bank repeats paragraphs 27 through 30.

**2.      Untrue or misleading statements by Countrywide Securities and CWALT about the LTVs of the mortgage loans in the collateral pool of this securitization**

173.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool in this securitization.

a.      The weighted average original LTV of the subset of loans in Group 1 (from which Seattle Bank's certificate was to be paid) was 72.86%. CWALT 2006-OA6 Pros. Sup. S-5.

b.      The percentage of the subset of loans in Group 1 with an Original Loan-to-Value Ratio greater than 80% was 5.87%. CWALT 2006-OA6 Pros. Sup. S-5.

c.      "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2006-OA6 Pros. Sup. S-33.

d.      In "The Mortgage Pool" section of the prospectus supplement, Countrywide Securities and CWALT presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2006-OA6 Pros. Sup. S-37 to S-49. Each table focused on a certain characteristic of the loans (for example, current principal balances) and divided the

COMPLAINT FOR RESCISSION – Page 59

loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each group. Among these data was the "Weighted Average Original Loan-to-Value Ratio" of the loans in each category. There were 20 such tables in "The Mortgage Pool" section for all loans in the collateral pool. In each table, the number of groups into which the loans are divided ranged from two to 45. Thus, in this section, Countrywide Securities and CWALT made hundreds of statements about the weighted average original LTVs of the loans in the collateral pool. CWALT 2006-OA6 Pros. Sup. S-37 to S-49.

e.      "The Mortgage Pool" section of the prospectus supplement also presented similar tables of statistics about the subset of loans in Group 1. In these tables, Countrywide Securities and CWALT similarly made hundreds of statements about the weighted average LTVs of the loans in Group 1. CWALT 2006-OA6 Pros. Sup. S-50 to S-60.

f.      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 72.87%." CWALT 2006-OA6 Pros. Sup. S-41.

g.      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in Loan Group 1 was approximately 72.86%." CWALT 2006-OA6 Pros. Sup. S-53.

174.    These statements were untrue or misleading because (i) the stated LTVs of a significant number of those mortgage loans were lower than the actual LTVs or (ii) Countrywide Securities and CWALT omitted to state that the appraisals of a significant

COMPLAINT FOR RESCISSION – Page 60

number of the properties that secured the mortgage loans in the collateral pool were biased

upward, so that stated LTVs based on those appraisals were lower than the true LTVs of

those mortgage loans.

175. By these untrue and misleading statements, Countrywide Securities and

CWALT materially understated the risk of the certificate issued by Alternative Loan Trust

2006-OA6 that they offered and sold to Seattle Bank.

**3.** **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the LTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

**a.** **Upward bias in appraisals**

176. Seattle Bank repeats paragraphs 36 through 40.

177. It is very probable that, because there was upward bias in appraisals

throughout the mortgage loan industry during the time period before this securitization, a

significant number of mortgage loans in the collateral pool of this securitization had

upwardly biased appraisals.

**b.** **Evidence of untrue or misleading statements about the LTVs of the mortgage loans in the collateral pool of this securitization specifically**

178. Since the date of this securitization, 191 of the 2,689 mortgage loans in the

collateral pool have been foreclosed upon. Those 191 properties were sold for a total of

approximately $62,156,245 in foreclosure. The total value ascribed to those same properties

in the LTV data reported in the prospectus supplement and other documents Countrywide

Securities and CWALT sent to Seattle Bank was $105,848,400. Thus, those properties were

sold for 58.7% of the value ascribed to them, a difference of 41.3%. This large difference is

evidence that the values ascribed to those properties, and to all properties in the collateral

COMPLAINT FOR RESCISSION – Page 61

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -969-

pool, in the LTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank were too high, the resulting LTVs were too low, and thus that the statements in the prospectus supplement and other documents sent to Seattle Bank about the LTVs were untrue or misleading. The difference cannot be explained by the declines in house prices in the areas in which those properties were located (even after taking account of the fact that properties in foreclosure may sometimes sell for less than their fair market value). Analysis of data in an industry-standard database of securitized mortgage loans shows that the differences between the values ascribed to these properties and the prices at which the properties were sold in foreclosure are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding foreclosure sale).

**B.    Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

    **1.    The materiality of occupancy status**

    179.    Seattle Bank repeats paragraphs 45 through 46.

    **2.    Untrue or misleading statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

    180.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

COMPLAINT FOR RESCISSION – Page 62

a.      In "The Mortgage Pool" section of the prospectus supplement described in paragraph 173, Countrywide Securities and CWALT presented a table entitled "Occupancy Types." This table divided the loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." For each category, the table stated the number of mortgage loans in that category and gave seven other items of information about them. CWALT 2006-OA6 Pros. Sup. S-43.

b.      In the "Occupancy Types" table, Countrywide Securities and CWALT stated that 80.87% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary Residence," 11.65% were secured by an "Investment Property," and 7.48% were secured by a "Secondary Residence." CWALT 2006-OA6 Pros. Sup. S-43.

c.      "The Mortgage Pool" section of the prospectus supplement also presented a similar table divided into three categories of occupancy status for the subset of loans in Group 1. In this table, Countrywide Securities and CWALT stated that 83.07% of the mortgage loans in Group 1, by aggregate principal balance outstanding, were secured by an "Owner Occupied" property, 10.00% were secured by an "Investment Property," and 6.92% were secured by a "Secondary Residence." CWALT 2006-OA6 Pros. Sup. S-55.

181.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary Residence" or "Owner Occupied" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment Property" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Secondary Residence" was lower than the actual number of loans in that category; or (iv) Countrywide Securities and

COMPLAINT FOR RESCISSION – Page 63

CWALT omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

182.    By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA6 that they offered and sold to Seattle Bank.

### 3. Basis of the allegations above that these statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading

183.    Seattle Bank repeats paragraphs 50 through 51.

184.    It is very probable that, because there was widespread occupancy fraud throughout the mortgage loan industry during the time before this securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

### C. Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization

#### 1. The materiality of FICO scores

185.    Seattle Bank repeats paragraphs 53 through 54.

#### 2. Misleading statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization

186.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

COMPLAINT FOR RESCISSION – Page 64

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -972-

a.      The FICO scores of the borrowers of the subset of loans in Group 1 ranged from 502 to 820 with a weighted average of 695. CWALT 2006-OA6 Pros. Sup. S-5.

b.      The number of loans in the subset of loans in Group 1 with unknown FICO scores was 33. This was 1.08% of the mortgage loans in Group 1. CWALT 2006-OA6 Pros. Sup. S-5.

c.      In "The Mortgage Pool" section of the prospectus supplement described in paragraph 173, Countrywide Securities and CWALT presented 20 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of groups into which the loans are divided ranged from two to 45. Among the data presented in each table was the "Weighted Average FICO Credit Score" of the loans in each category. Thus, in this section, Countrywide Securities and CWALT made hundreds of statements about the weighted average FICO scores of the loans in the collateral pool. CWALT 2006-OA6 Pros. Sup. S-37 to S-49.

d.      "The Mortgage Pool" section of the prospectus supplement also presented similar tables of statistics about the subset of loans in Group 1. In those tables, Countrywide Securities and CWALT made hundreds of statements about the weighted average FICO scores of the loans in Group 1. CWALT 2006-OA6 Pros. Sup. S-50 to S-60.

e.      "As of the cut-off date, the weighted average FICO Credit Score of the mortgagors related to the Mortgage Loans was approximately 696." CWALT 2006-OA6 Pros. Sup. S-45.

COMPLAINT FOR RESCISSION – Page 65

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56   973-

f.    "As of the cut-off date, the weighted average FICO Credit Score of the mortgagors related to the Mortgage Loans in Loan Group 1 was approximately 695." CWALT 2006-OA6 Pros. Sup. S-57.

187.   These statements were misleading because Countrywide Securities and CWALT omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their FICO scores.

188.   By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA6 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

189.   Seattle Bank repeats paragraphs 58 through 59.

190.   It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their FICO scores by tradeline renting.

**D.    Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities or Originated by Countrywide Home Loans, Inc. or MortgageIT, Inc.**

191.   Seattle Bank repeats paragraphs 172 through 190.

192.   Seattle Bank repeats paragraph 62.

193.   In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made statements about the LTVs and FICO scores of

COMPLAINT FOR RESCISSION – Page 66

the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

194.     During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2006 than if they were made in 2005, worse if made in 2005 than if made in 2004, etc.

195.     This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Countrywide Securities or its affiliates. As Figure 1 in paragraph 65 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 2 in paragraph 66 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

196.     This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true also in particular of nonconforming loans originated by Countrywide Home Loans, Inc., which originated 85.18% of the subset of loans in Group 1. As Figure 3 in paragraph 67 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As

COMPLAINT FOR RESCISSION – Page 67

Figure 4 in paragraph 68 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

197.     This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true also of nonconforming mortgage loans originated by MortgageIT, Inc., which originated 12.97% of the subset of loans in Group 1. The lines in Figure 5 show, for all nonconforming loans originated by MortgageIT, Inc., that the weighted-average reported LTV and weighted-average reported FICO score were nearly constant. Despite the stability of these important credit characteristics, however, the actual credit quality of nonconforming loans originated by MortgageIT, Inc. deteriorated steadily during the time before this securitization. Like the bars in Figure 1, the bars in Figure 5 show early payment defaults. As Figure 5 makes clear, the credit quality of the loans originated by MortgageIT, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

COMPLAINT FOR RESCISSION – Page 68



198.     Figure 6 further illustrates the undisclosed deterioration in the credit quality of nonconforming loans originated by MortgageIT, Inc., which had nearly constant weighted-average reported LTVs and FICO scores. Figure 6 shows, for each month after origination, the percentage (by outstanding principal balance) of nonconforming mortgage loans originated by MortgageIT, Inc. in each of 2004, 2005, 2006, and 2007 that were 60 or more days delinquent. As Figure 6 makes clear, the credit quality of the loans originated by MortgageIT, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

COMPLAINT FOR RESCISSION – Page 69



Figure 6: Percent of Loans Originated by MortgageIT, Inc. or its Affiliates 60+ Delinquent in Each Month After Origination, by Year of Origination

199.    All statements that Countrywide Securities and CWALT made about the

LTVs and FICO scores of the mortgage loans in the collateral pool of this securitization

were misleading because those defendants omitted to state that, in the time before this

securitization, loans that each of them securitized or that Countrywide Home Loans, Inc. or

MortgageIT, Inc. originated were nearly constant in weighted average LTV and weighted

average FICO score, yet performed worse if the loans were made in 2006 than if they were

made in 2005, worse if made in 2005 than if made in 2004, etc.

200.    By these misleading statements, Countrywide Securities and CWALT

materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA6

that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 70

**E.    Untrue or Misleading Statements about the Underwriting Guidelines of the Originators of the Mortgage Loans in the Collateral Pool of this Securitization**

      **1.    The materiality of underwriting guidelines and the extent of compliance with them**

201.    Seattle Bank repeats paragraph 71.

      **2.    Untrue or misleading statements by Countrywide Securities and CWALT about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

202.    On pages S-72 through S-78 of the prospectus supplement, Countrywide Securities and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated 85.18% of the subset of loans in Group 1 of this securitization. All of those statements are incorporated here by reference.

203.    One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-OA6 Pros. Sup. S-74.

204.    On information and belief, these statements were untrue or misleading because Countrywide Securities and CWALT omitted to state that: (a) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) Countrywide Home Loans, Inc. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

COMPLAINT FOR RESCISSION – Page 71

1

205.    By these untrue or misleading statements, Countrywide Securities and

2

CWALT materially understated the risk of the certificate issued by Alternative Loan Trust

3

2006-OA6 that they offered and sold to Seattle Bank.

4

5       **3.    Basis of the allegations above that these statements by Countrywide**

6       **Securities and CWALT about the underwriting guidelines of the**
        **originators of the mortgage loans in the collateral pool of this**
        **securitization, and about the extent of their compliance with those**

7       **guidelines, were untrue or misleading**

8

206.    Seattle Bank repeats paragraphs 76 through 78.

9

207.    Thus, it is likely that this collateral pool contained loans that Countrywide

10

Securities knew failed to comply with the underwriting guidelines.

11

12      **F.    Claim for Rescission**

13

208.    Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover

14

the consideration that it paid for this certificate, $47,632,633, plus interest of 8% per annum

15

from April 28, 2006, to the date on which it recovers the $47,632,633, plus its costs and the

16

reasonable fees of its attorneys in this action, less the amount of income it has received on

17

the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate

18

before entry of judgment.

19

20

21

22

23

24

25

26

COMPLAINT FOR RESCISSION – Page 72

# IX. FIFTH CLAIM FOR RELIEF

*Certificate:*      One certificate in tranche A-1 of Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA2

*Date of Purchase*:      March 30, 2006

*Consideration Paid:*      $100,000,000

*Underwriter:*      Countrywide Securities

*Depositor/Issuer:*      CWALT

*Controlling Person of Depositor/Issuer:*      Countrywide Financial Corporation

209.      Seattle Bank repeats paragraphs 1 through 20.

210.      Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA2 was a securitization in March 2006 of approximately 4,107 mortgage loans, in one group, with an aggregate principal balance of approximately $1,750,428,288. The mortgage loans were originated by Countrywide Home Loans, Inc. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

211.      Countrywide Securities and CWALT offered and sold Seattle Bank a senior certificate in this securitization, in tranche A-1, for which Seattle Bank paid $100,000,000 on March 30, 2006.

212.      In connection with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and CWALT sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[6] drafts of some of the statistical tables to be included in the

---

[6] The prospectus supplement for CWALT 2006-OA2 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1269518/000089109206000831/e23607_424b5.txt.

COMPLAINT FOR RESCISSION – Page 73

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -981-

prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Countrywide Securities and CWALT made statements of material fact about the certificate that they offered and sold to Seattle Bank.

213.    Seattle Bank relied on the statements by Countrywide Securities and CWALT in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

214.    Many of the statements of material fact that Countrywide Securities and CWALT made in these documents were untrue or misleading. These untrue or misleading statements included the following.

A.    **Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

1.    **The materiality of LTVs**

215.    Seattle Bank repeats paragraphs 27 through 30.

2.    **Untrue or misleading statements by Countrywide Securities and CWALT about the LTVs of the mortgage loans in the collateral pool of this securitization**

216.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the LTV of the mortgage loans in the collateral pool in this securitization.

a.    The weighted average original LTV of all the loans in the collateral pool was 76.56%. CWALT 2006-OA2 Pros. Sup. S-4.

b.    The percentage of mortgage loans with an original LTV greater than 80% was 6.62%. CWALT 2006-OA2 Pros. Sup. S-4.

COMPLAINT FOR RESCISSION – Page 74

c.      "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 95.00%." CWALT 2006-OA2 Pros. Sup. S-33.

d.      In "The Mortgage Pool" section of the prospectus supplement, Countrywide Securities and CWALT presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balances) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio" of the loans in each category. There were 20 such tables in "The Mortgage Pool" section for all loans in the collateral pool. In each table, the number of groups into which the loans are divided ranged from one to 48. Thus, in this section, Countrywide Securities and CWALT made hundreds of statements about the weighted average original LTVs of the loans in the collateral pool. CWALT 2006-OA2 Pros. Sup. S-36 to S-47.

e.      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 76.56%." CWALT 2006-OA2 Pros. Sup. S-40.

217.    These statements were untrue or misleading because (i) the stated LTVs of a significant number of those mortgage loans were lower than the actual LTVs or (ii) Countrywide Securities and CWALT omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased

COMPLAINT FOR RESCISSION – Page 75

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT  56   -983-

upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.

218.    By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA2 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Countrywide Securities and CWALT about the LTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

**a.    Upward bias in appraisals**

219.    Seattle Bank repeats paragraphs 36 through 40.

220.    It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

**b.    Evidence of untrue or misleading statements about the LTVs of the mortgage loans in the collateral pool of this securitization specifically**

221.    Since the date of this securitization, 425 of the 4,107 mortgage loans in the collateral pool have been foreclosed upon. Those 425 properties were sold for a total of approximately $147,545,687 in foreclosure. The total value ascribed to those same properties in the LTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank was $240,255,248. Thus, those properties were sold for 61.4% of the value ascribed to them, a difference of 38.6%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV data reported in the prospectus supplement and other

COMPLAINT FOR RESCISSION – Page 76

EXHIBIT 56 -984-

documents Countrywide Securities and CWALT sent to Seattle Bank were too high, the resulting LTVs were too low, and thus that the statements in the prospectus supplement and other documents sent to Seattle Bank about the LTVs were untrue or misleading. The difference cannot be explained by the declines in house prices in the areas in which those properties were located (even after taking account of the fact that properties in foreclosure may sometimes sell for less than their fair market value). Analysis of data in an industry-standard database of securitized mortgage loans shows that the differences between the values ascribed to these properties and the prices at which the properties were sold in foreclosure are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding foreclosure sale).

**B.     Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

      **1.     The materiality of occupancy status**

222.     Seattle Bank repeats paragraphs 45 through 46.

      **2.     Untrue or misleading statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

223.     In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

      a.     In "The Mortgage Pool" section of the prospectus supplement described in paragraph 216, Countrywide Securities and CWALT presented a table entitled

COMPLAINT FOR RESCISSION – Page 77

"Occupancy Types." This table divided the loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." For each category, the table stated the number of mortgage loans in that category and gave seven other items of information about them. CWALT 2006-OA2 Pros. Sup. S-42.

b.      In the "Occupancy Types" table, Countrywide Securities and CWALT stated that 82.82% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary Residence," 12.48% were secured by an "Investment Property," and 4.70% were secured by a "Secondary Residence." CWALT 2006-OA2 Pros. Sup. S-42.

224.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary Residence" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment Property" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Secondary Residence" was lower than the actual number of loans in that category; or (iv) Countrywide Securities and CWALT omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

225.    By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA2 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 78

1

**3.      Basis of the allegations above that these statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

2

3

226.     Seattle Bank repeats paragraphs 50 through 51.

4

227.     It is very probable that, because there was widespread occupancy fraud

5

6

throughout the mortgage loan industry during the time before this securitization, a

7

significant number of the applicants for mortgage loans in the collateral pool of this

8

securitization stated incorrectly that the properties that would secure the mortgage loans

9

were to be their primary residences.

10

11

**C.      Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

12

**1.      The materiality of FICO scores**

13

228.     Seattle Bank repeats paragraphs 53 through 54.

14

15

**2.      Misleading statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

16

17

229.     In the prospectus supplement and other documents they sent to Seattle Bank,

18

Countrywide Securities and CWALT made the following statements about the FICO scores

19

of the borrowers whose mortgage loans were in the collateral pool of this securitization.

20

a.       The FICO scores of the borrowers of the loans in the collateral pool

21

ranged from 585 to 817 with a weighted average of 695. CWALT 2006-OA2 Pros. Sup. S-

22

4.

23

24

b.       The number of loans in the collateral pool with unknown FICO

25

scores was 16. This was 0.30% of the mortgage loans in the collateral pool. CWALT 2006-

26

OA2 Pros. Sup. S-4.

COMPLAINT FOR RESCISSION – Page 79

c.      In "The Mortgage Pool" section of the prospectus supplement described in paragraph 216, Countrywide Securities and CWALT presented 20 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from one to 48. Among the data presented in each table was the "Weighted Average FICO Credit Score" of the loans in each category. Thus, in this section, Countrywide Securities and CWALT made hundreds of statements about the weighted average FICO credit scores of the loans in the collateral pool. CWALT 2006-OA2 Pros. Sup. S-36 to S-47.

d.      "As of the cut-off date, the weighted average FICO Credit Score of the mortgagors related to the Mortgage Loans was approximately 695." CWALT 2006-OA2 Pros. Sup. S-44.

230.    These statements were misleading because Countrywide Securities and CWALT omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their FICO scores.

231.    By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA2 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

232.    Seattle Bank repeats paragraphs 58 through 59.

233.    It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many

COMPLAINT FOR RESCISSION – Page 80

of the borrowers of the mortgage loans in the collateral pool of this securitization raised

their FICO scores by tradeline renting.

**D.      Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities or Originated by Countrywide Home Loans, Inc.**

234.    Seattle Bank repeats paragraphs 215 through 233.

235.    Seattle Bank repeats paragraph 62.

236.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made statements about the LTVs and FICO scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

237.    During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2006 than if they were made in 2005, worse if made in 2005 than if made in 2004, etc.

238.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Countrywide Securities or its affiliates. As Figure 1 in paragraph 65 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 2 in paragraph 66 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated

COMPLAINT FOR RESCISSION – Page 81

steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

239.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true also in particular of nonconforming loans originated by Countrywide Home Loans, Inc., which originated the mortgage loans in the collateral pool of this securitization. As Figure 3 in paragraph 67 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 4 in paragraph 68 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

240.    All statements that Countrywide Securities and CWALT made about the LTVs and FICO scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that each of them securitized or that Countrywide Home Loans, Inc. originated were nearly constant in weighted average LTV and weighted average FICO score, yet performed worse if the loans were made in 2006 than if they were made in 2005, worse if made in 2005 than if made in 2004, etc.

241.    By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA2 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 82

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 5   -990-

1

2

**E.   Untrue or Misleading Statements about the Underwriting Guidelines of the Originator of the Mortgage Loans in the Collateral Pool of this Securitization**

    **1.   The materiality of underwriting guidelines and the extent of compliance with them**

3

4

    242.   Seattle Bank repeats paragraph 71.

5

6

7

    **2.   Untrue or misleading statements by Countrywide Securities and CWALT about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

8

9

    243.   On pages S-49 through S-55 of the prospectus supplement, Countrywide

10

Securities and CWALT made statements about the underwriting guidelines of Countrywide

11

Home Loans, Inc., which originated the mortgage loans in the collateral pool of this

12

securitization. All of those statements are incorporated here by reference.

13

    244.   One of these statements was that: "Exceptions to Countrywide Home Loans'

14

underwriting guidelines may be made if compensating factors are demonstrated by a

15

prospective borrower." CWALT 2006-OA2 Pros. Sup. S-51.

16

    245.   On information and belief, these statements were untrue or misleading

17

because Countrywide Securities and CWALT omitted to state that: (a) Countrywide Home

18

Loans, Inc. was making frequent, and increasingly frequent, exceptions to those

19

underwriting guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and

20

increasingly frequent, exceptions to those underwriting guidelines when no compensating

21

factor was present; and (c) Countrywide Home Loans, Inc. was failing frequently, and

22

increasingly frequently, to follow quality-assurance practices intended to detect and prevent

23

fraud.

24

25

26

COMPLAINT FOR RESCISSION – Page 83

246.    By these untrue or misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA2 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Countrywide Securities and CWALT about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

247.    Seattle Bank repeats paragraphs 76 through 78.

248.    Thus, it is likely that this collateral pool contained loans that Countrywide Securities knew failed to comply with the underwriting guidelines.

**F.    Claim for Rescission**

249.    Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover the consideration that it paid for this certificate, $100,000,000, plus interest of 8% per annum from March 30, 2006, to the date on which it recovers the $100,000,000, plus its costs and the reasonable fees of its attorneys in this action, less the amount of income it has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate before entry of judgment.

COMPLAINT FOR RESCISSION – Page 84

# X. SIXTH CLAIM FOR RELIEF

|  |  |
|---|---|
| *Certificate:* | One certificate in tranche A-1 of Merrill Lynch Mortgage Investors Trust, Mortgage Pass-Through Certificates, Series 2004-C |
| *Date of Purchase:* | September 1, 2004 |
| *Consideration Paid:* | $9,944,998 |
| *Underwriter:* | Countrywide Securities |
| *Depositor/Issuer:* | Merrill Lynch Mortgage Investors |
| *Controlling Person of Depositor/Issuer:* | Merrill Lynch Mortgage Capital Inc. |

250.    Seattle Bank repeats paragraphs 1 through 20.

251.    Merrill Lynch Mortgage Investors Trust, Mortgage Pass-Through Certificates, Series 2004-C was a securitization in June 2004 of approximately 2,310 mortgage loans, in three pools, with an aggregate principal balance of approximately $900,006,454. The mortgage loans were originated or acquired by Merrill Lynch Credit Corporation. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

252.    Countrywide Securities and Merrill Lynch Mortgage Investors offered and sold to Seattle Bank a senior certificate in this securitization, in tranche A-1, for which Seattle Bank paid $9,944,998 on September 1, 2004.

253.    In connection with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[7] drafts of some of the statistical tables

---

[7] The prospectus supplement for MLCC 2004-C was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/809940/000095012304007676/y98307e424b5.txt.

COMPLAINT FOR RESCISSION – Page 85

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -993-

to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Countrywide Securities and Merrill Lynch Mortgage Investors made statements of material fact about the certificate that they offered and sold to Seattle Bank.

254.    Seattle Bank relied on the statements by Countrywide Securities and Merrill Lynch Mortgage Investors in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

255.    Many of the statements of material fact that Countrywide Securities and Merrill Lynch Mortgage Investors made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**A.    Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.      The materiality of LTVs**

256.    Seattle Bank repeats paragraphs 27 through 30.

**2.      Untrue or misleading statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the LTVs of the mortgage loans in the collateral pool of this securitization**

257.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors made the following statements about the LTVs of the mortgage loans in the collateral pool in this securitization.

a.      "None of the Mortgage Loans had a Loan-to-Value Ratio at origination of more than 100.00%." MLCC 2004-C Pros. Sup. S-15.

COMPLAINT FOR RESCISSION – Page 86

YARMUTH WILSDON CALFO

b.      "The weighted average Effective Loan-to-Value Ratio at origination of the Mortgage Loans was approximately 66.33%, and no Mortgage Loan had an Effective Loan-to-Value Ratio at origination exceeding 95.00%."[8] MLCC 2004-C Pros. Sup. S-18.

c.      In the section of the prospectus supplement entitled "Tabular Characteristics of the Mortgage Loans," Countrywide Securities and Merrill Lynch Mortgage Investors presented tables of statistics about the mortgage loans in the collateral pool. MLCC 2004-C Pros. Sup. S-18 to S-51. Each table focused on a certain characteristic of the loans (for example, cut-off date stated principal balance) and divided the loans into categories based on that characteristic (for example, loans with stated principal balances as of the cut-off date of $0.01 to $100,000, $100,000.01 to $200,000, $200,000.01 to $300,000, etc.). Each table then presented various data about the loans in each category. Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios," divided the loans in the collateral pool into 13 categories of original LTV (for example, 0.01% to 10.00%, 10.01% to 20%, 20.01% to 30%, etc.). For each category, the table stated the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding. MLCC 2004-C Pros. Sup. S-21.

---

[8] For some mortgage loans, the borrower, or a relative of the borrower, pledged additional collateral, such as securities, to secure the mortgage loans. In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors defined the term Effective Loan-to-Value Ratio as "a fraction, the numerator of which is the original Stated Principal Balance of the related Mortgage Loan, less the amount secured by the Additional Collateral required at the time of origination, if any, and the denominator of which is the appraised value of the related Mortgaged Property." MLCC 2004-C Pros. Sup. S-16.

COMPLAINT FOR RESCISSION – Page 87

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -995-

d.     The "Tabular Characteristics of the Mortgage Loans" section also provided a similar table divided into 12 ranges of effective LTV for all of the mortgage loans in the collateral pool. MLCC 2004-C Pros. Sup. S-21.

e.     The "Tabular Characteristics of the Mortgage Loans" section also provided a similar table divided into 13 ranges of original LTV for the subset of mortgage loans in Pool 1 (from which Seattle Bank's certificate was to be paid). MLCC 2004-C Pros. Sup. S-30.

f.     The "Tabular Characteristics of the Mortgage Loans" section also provided a similar table divided into 12 ranges of effective LTV for the subset of mortgage loans in Pool 1. MLCC 2004-C Pros. Sup. S-30.

g.     "As of the Cut-off Date, the weighted average Original Loan-to-Value Ratio of the Mortgage Loans was approximately 71.69%." MLCC 2004-C Pros. Sup. S-21.

h.     "As of the Cut-off Date, the weighted average Effective Loan-to-Value Ratio of the Mortgage Loans was approximately 66.33%." MLCC 2004-C Pros. Sup. S-21.

i.     "The weighted average Effective Loan-to-Value Ratio at origination of the Pool 1 Mortgage Loans was approximately 65.87%, and no Pool 1 Mortgage Loan had an Effective Loan-to-Value Ratio at origination exceeding 95.00%." MLCC 2004-C Pros. Sup. S-27.

j.     "As of the Cut-off Date, the weighted average Original Loan-to-Value Ratio of the Mortgage Loans in Pool 1 was approximately 71.32%." MLCC 2004-C Pros. Sup. S-30.

COMPLAINT FOR RESCISSION – Page 88

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -996-

k.      "As of the Cut-off Date, the weighted average Effective Loan-to-Value Ratio of the Mortgage Loans in Pool 1 was approximately 65.87%." MLCC 2004-C Pros. Sup. S-30.

258.    These statements were untrue or misleading because (i) the stated LTVs of a significant number of those mortgage loans were lower than the actual LTVs or (ii) Countrywide Securities and Merrill Lynch Mortgage Investors omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.

259.    By these untrue and misleading statements, Countrywide Securities and Merrill Lynch Mortgage Investors materially understated the risk of the certificate issued by Merrill Lynch Mortgage Investors Trust 2004-C that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the LTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

260.    Seattle Bank repeats paragraphs 36 through 40.

261.    It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

**B.      Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

**1.      The materiality of occupancy status**

262.    Seattle Bank repeats paragraphs 45 through 46.

COMPLAINT FOR RESCISSION – Page 89

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -997-

**2.**    **Untrue or misleading statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

263.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a.    In the section of the prospectus supplement entitled "Tabular Characteristics of the Mortgage Loans" described in paragraph 257, Countrywide Securities and Merrill Lynch Mortgage Investors presented a table entitled "Occupancy Type." This table divided the loans in the collateral pool into the categories "Primary," "Second Home," and "Investment." For each category, the table stated the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding. MLCC 2004-C Pros. Sup. S-23.

b.    In the "Occupancy Type" table, Countrywide Securities and Merrill Lynch Mortgage Investors stated that 80.91% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary" residence, 15.28% were secured by a "Second Home," and 3.81% were secured by an "Investment" property. MLCC 2004-C Pros. Sup. S-23.

c.    The "Tabular Characteristics of the Mortgage Loans" section of the prospectus supplement also presented a similar table divided into three categories of occupancy status for the subset of loans in Pool 1. In this table, Countrywide Securities and Merrill Lynch Mortgage Investors stated that 81.71% of the loans in Pool 1, by aggregate principal balance outstanding, were secured by a "Primary" residence, 14.34% were

COMPLAINT FOR RESCISSION – Page 90

secured by a "Second Home," and 3.95% were secured by an "Investment" property. MLCC 2004-C Pros. Sup. S-32.

264.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Second Home" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Investment" was lower than the actual number of loans in that category; or (iv) Countrywide Securities and Merrill Lynch Mortgage Investors omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

265.    By these untrue and misleading statements, Countrywide Securities and Merrill Lynch Mortgage Investors materially understated the risk of the certificate issued by Merrill Lynch Mortgage Investors Trust 2004-C that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

266.    Seattle Bank repeats paragraphs 50 through 51.

267.    It is very probable that, because there was widespread occupancy fraud throughout the mortgage loan industry during the time before this securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

COMPLAINT FOR RESCISSION – Page 91

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -999-

**C.**     **Misleading Statements about the Credit Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.**     **The materiality of credit scores**

268.     Seattle Bank repeats paragraphs 53 through 54.

**2.**     **Misleading statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

269.     In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors made the following statements about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

a.     In the section of the prospectus supplement entitled "Tabular Characteristics of the Mortgage Loans" described in paragraph 257, Countrywide Securities and Merrill Lynch Mortgage Investors presented a table entitled "Credit Score." This table divided the loans in the collateral pool into 12 categories of credit scores (for example, Not Available, 551 to 575, 576 to 600, etc.). For each category, the table stated the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding. MLCC 2004-C Pros. Sup. S-22.

b.     The "Tabular Characteristics of the Mortgage Loans" section of the prospectus supplement also presented a similar table divided into 11 categories of credit scores for the subset of loans in Pool 1. MLCC 2004-C Pros. Sup. S-31.

c.     "As of the Cut-off Date, the weighted average Credit Score of the Mortgage Loans with available Credit Scores was approximately 733." MLCC 2004-C Pros. Sup. S-22.

COMPLAINT FOR RESCISSION – Page 92

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

EXHIBIT 56 -1000-

d.      "As of the Cut-off Date, the weighted average Credit Score of the Mortgage Loans in Pool 1 with available Credit Scores was approximately 733." MLCC 2004-C Pros. Sup. S-31.

270.    These statements were misleading because Countrywide Securities and Merrill Lynch Mortgage Investors omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their credit scores.

271.    By these misleading statements, Countrywide Securities and Merrill Lynch Mortgage Investors materially understated the risk of the certificate issued by Merrill Lynch Mortgage Investors Trust 2004-C that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

272.    Seattle Bank repeats paragraphs 58 through 59.

273.    It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their credit scores by tradeline renting.

**D.    Failure to Disclose the Substantial Deterioration of LTV and Credit Score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities**

274.    Seattle Bank repeats paragraphs 256 through 273.

275.    Seattle Bank repeats paragraph 62.

276.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors made statements about the

COMPLAINT FOR RESCISSION – Page 93

LTVs and credit scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

277.    During the time before this securitization, the power of LTV and credit score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2004 than if they were made in 2003, worse if made in 2003 than if made in 2002, etc.

278.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Countrywide Securities or its affiliates. As Figure 1 in paragraph 65 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and credit scores. As Figure 2 in paragraph 66 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and credit scores.

279.    All statements that Countrywide Securities and Merrill Lynch Mortgage Investors made about the LTVs and credit scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that Countrywide Securities securitized were nearly constant in weighted average LTV and weighted average credit score, yet performed

COMPLAINT FOR RESCISSION – Page 94

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

EXHIBIT 56 -1002-

worse if the loans were made in 2004 than if they were made in 2003, worse if made in

2003 than if made in 2002, etc.

280.     By these misleading statements, Countrywide Securities and Merrill Lynch

Mortgage Investors materially understated the risk of the certificate issued by Merrill Lynch

Mortgage Investors Trust 2004-C that they offered and sold to Seattle Bank.

**E.      Untrue or Misleading Statements about the Underwriting Guidelines of the Originator of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.      The materiality of underwriting guidelines and the extent of compliance with them**

281.     Seattle Bank repeats paragraph 71.

**2.      Untrue or misleading statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

282.     On pages S-53 through S-58 of the prospectus supplement, Countrywide

Securities and Merrill Lynch Mortgage Investors made statements about the underwriting

guidelines of Merrill Lynch Credit Corporation, which originated or acquired all of the

mortgage loans in the collateral pool of this securitization. All of those statements are

incorporated here by reference.

283.     One of these statements was that: "The above described underwriting

guidelines may be varied in certain cases, on the basis of compensating factors, as deemed

appropriate by MLCC's underwriting personnel." MLCC 2004-C Pros. Sup. S-58.

284.     On information and belief, these statements were untrue or misleading

because Countrywide Securities and Merrill Lynch Mortgage Investors omitted to state that:

(a) Merrill Lynch Credit Corporation was making frequent, and increasingly frequent,

COMPLAINT FOR RESCISSION – Page 95

1    exceptions to those underwriting guidelines; (b) Merrill Lynch Credit Corporation was

2    making frequent, and increasingly frequent, exceptions to those underwriting guidelines

3    when no compensating factor was present; (c) Merrill Lynch Credit Corporation was

4    making wholesale, rather than case-by-case, exceptions to underwriting guidelines; and (d)

5    Merrill Lynch Credit Corporation was failing frequently, and increasingly frequently, to

6    follow quality-assurance practices intended to detect and prevent fraud.

7

8        285.   By these untrue or misleading statements, Countrywide Securities and

9    Merrill Lynch Mortgage Investors materially understated the risk of the certificate issued by

10   Merrill Lynch Mortgage Investors Trust 2004-C that they offered and sold to Seattle Bank.

11

12       **3.   Basis of the allegations above that these statements by Countrywide
          Securities and Merrill Lynch Mortgage Investors about the
13        underwriting guidelines of the originator of the mortgage loans in the
          collateral pool of this securitization, and about the extent of their
14        compliance with those guidelines, were untrue or misleading**

15       286.   Seattle Bank repeats paragraph 76.

16

**F.   Claim for Rescission**

17       287.   Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover

18   the consideration that it paid for this certificate, $9,944,998, plus interest of 8% per annum

19   from September 1, 2004, to the date on which it recovers the $9,944,998, plus its costs and

20   the reasonable fees of its attorneys in this action, less the amount of income it has received

21   on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate

22   before entry of judgment.

23

24

25

26

COMPLAINT FOR RESCISSION – Page 96

# XI. PRAYER FOR RELIEF

WHEREFORE, Seattle Bank respectfully demands payment of the amount it paid to purchase each certificate, together with interest on that amount at the rate of 8% per annum from the date on which Seattle Bank purchased each certificate until the date on which it receives payment, and its costs and attorneys' fees in this action, all as provided by RCW 21.20.430(1).

## JURY DEMAND

SEATTLE BANK DEMANDS TRIAL BY SIX PERSON JURY OF ALL ISSUES SO TRIABLE.

Dated: December 23, 2009

YARMUTH WILSDON CALFO PLLC

By: _____
Richard C. Yarmuth, WSBA #4990
Matthew Carvalho, WSBA #31201

818 Stewart Street
Seattle, Washington 98101
(206) 516-3800
(206) 516-3888 (fax)

GRAIS & ELLSWORTH LLP
70 East 55th Street
New York, New York 10022
(212) 755-0100
(212) 755-0052 (fax)

COMPLAINT FOR RESCISSION – Page 97

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800 F 206.516.3888

600.01 jl233502 12/23/09

EXHIBIT 56 -1005-