*EXHIBIT 57*

JUDGE COTE '09 CIV 4050

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOOTBRIDGE LIMITED TRUST AND OHP
OPPORTUNITY LIMITED TRUST

         Plaintiffs,

-against-

COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE HOME LOANS
SERVICING LP, COUNTRYWIDE
FINANCIAL CORP., COUNTRYWIDE
SECURITIES CORP., CWABS, INC.,
CWABS ASSET-BACKED CERTIFICATES
TRUST 2006-SPS1, CWABS ASSET-
BACKED CERTIFICATES TRUST 2006-
SPS2, ANGELO R. MOZILO, DAVID
SAMBOL, AND BANK OF AMERICA
CORP.,

         Defendants.

---

09 CIV _____ (\_\_\_)

**COMPLAINT**

**JURY TRIAL DEMANDED**



Plaintiffs Footbridge Limited Trust ("Footbridge") and OHP Opportunity Limited

Trust ("Opportunity") (collectively "Plaintiffs"), by their attorneys, Quinn Emanuel Urquhart

Oliver & Hedges, LLP, for their Complaint herein against Countrywide Home Loans, Inc.

("CHL"), Countrywide Home Loans Servicing LP ("CHLS"), Countrywide Financial

Corporation ("CFC"), Countrywide Securities Corporation ("CSC"), CWABS, Inc. ("CWABS"),

CWABS Asset-Backed Certificates Trust 2006-SPS1 (the "SPS1 Trust"), CWABS Asset-Backed

Certificates Trust 2006-SPS2 (the "SPS2 Trust"), Angelo R. Mozilo and David Sambol (Mozilo

and Sambol, collectively, "the Individual Defendants") (collectively, "Countrywide" or the

"Countrywide Defendants"), and Bank of America Corporation ("Bank of America")

(collectively, "Defendants"), allege as follows:

EXHIBIT 57 -1006-

## NATURE OF ACTION

1.     This action arises out of fraudulent acts of Countrywide related to its sale of certain mortgage-backed securities to Plaintiffs Footbridge and Opportunity.

2.     Countrywide, one of the largest residential mortgage originators and servicers in the United States, originated mortgage loans and then sold interests in those loans to investors through Countrywide subsidiaries, in the form of mortgage-backed securities.  The securities were sold in batches, or "Classes," organized according to the expected credit rating of the pooled mortgage loans in each Class.  The securities were expected to generate income for investors from the cash flow on the underlying loans, in the form of borrowers' payments of interest and principal.  Thus, the credit quality of the underlying mortgages was of critical importance to Plaintiffs and other investors who bought mortgage-backed securities from Countrywide.

3.     Plaintiffs Footbridge and Opportunity are investment funds that are managed by Old Hill Partners, Inc. ("Old Hill").  Old Hill is a Connecticut investment company that acts as the Investment Manager for domestic and foreign investment companies, including Footbridge and Opportunity, and makes investment decisions on their behalf.

4.     Plaintiffs purchased approximately $43,375,000 in residential mortgage-backed securities ("the Securities") from Countrywide between June and October 2006 through two public offerings issued by Countrywide ("the Securitizations").  The Securitizations were the CWABS Asset-Backed Certificates, Series 2006-SPS1 (the "SPS1 Securitization") and the CWABS Asset-Backed Certificates, Series 2006-SPS2 (the "SPS2 Securitization").  Plaintiffs have suffered severe losses of interest and principal on the Securities, resulting in a near-total

EXHIBIT  57  -1007-

loss of their investment, as a direct result of Countrywide's fraud and other wrongdoing, as explained herein.

5.      The Mortgage Loans that Countrywide issued to borrowers and pooled together in the SPS1 and SPS2 Securitizations were credit-blemished, closed-end, fixed rate loans that were secured by second liens on one- to four-family residential properties. As Countrywide stated in the offering documents, credit-blemished mortgage loans are generally made to borrowers with credit difficulties. Countrywide's stated underwriting standards were "more flexible" for these credit-blemished loans than for traditional mortgage loans. Plaintiffs understood that Countrywide would originate the Mortgage Loans under the underwriting standards that were stated in the Prospectus Supplement and other offering documents. What Plaintiffs did not know—and were not told by Countrywide—is that Countrywide had *abandoned* its underwriting guidelines, deviating even from the loosened guidelines described in the offering documents for credit-blemished, second-lien loans, in its effort to maximize profit at the expense of Plaintiffs and other investors.

6.      As the *New York Times* concluded in August 2007, based on interviews with former Countrywide employees, "Countrywide's entire operation . . . is intended to wring maximum profits out of the mortgage lending boom no matter what it costs borrowers." The adverse effect of Countrywide's fraudulent business practices on borrowers—many of whom were unable to pay their mortgage loans, as Countrywide knew or should have known—also harmed Plaintiffs and other investors, who relied upon the income stream from borrowers' mortgage payments to generate profit and value on their investments in the Securitizations. Countrywide's abandonment of its stated origination standards resulted in the issuance of

3

EXHIBIT  57  -1008-

mortgage loans to borrowers who could not afford the loans, leading to high rates of default and drastically reducing the interest payments on Plaintiffs' Securities as well as their market value.

7.      Plaintiffs' investment in the Securities was induced by Countrywide's extensive misrepresentations and omissions of material facts regarding its mortgage-backed securities and its underwriting practices.  Those misrepresentations and omissions of material facts were contained in Countrywide's public statements, in offering documents related to the Securitizations that were transmitted by Countrywide to Plaintiffs, and in communications between Countrywide and Plaintiffs.

8.      Among other misrepresentations, Countrywide falsely stated that *over 99 percent* of the mortgage loans underlying the SPS1 and SPS2 Securitizations (the "Mortgage Loans") involved owner-occupied properties, versus secondary residences or investment properties.  The representations concerning the high percentage of owner-occupied properties in the underlying portfolio made the Securities more attractive to Plaintiffs and induced them to invest in the Securities.

9.      Countrywide also falsely stated to Plaintiffs that *over 90 percent* of the Mortgage Loans in the SPS1 and SPS2 Securitizations were "Grade A," meaning they merited Countrywide's highest rating in its internal credit scoring system for credit-blemished, second-lien loans.  The scoring system was allegedly based on Countrywide's analysis of borrowers' mortgage and credit history.  Countrywide's representation regarding the Loans' credit scores also made the Securities more attractive to Plaintiffs and induced them to invest in the Securities—the "A" grade that was given to 90 percent of the Securities indicated to Plaintiffs that the Securities were safe investments even though the underlying Loans were credit-blemished and second-lien.

EXHIBIT  57  -1009-

10.     Plaintiffs have since learned that several material representations made by Countrywide were false and misleading and failed to disclose important facts. For example, Countrywide has admitted to Plaintiffs that its representations regarding the percentage of Mortgage Loans on owner-occupied properties were false and misleading.

11.     Countrywide acknowledged during a conference call with Old Hill that the Securities had performed worse than even comparable credit-blemished, second-lien mortgage-backed securities. However, it blamed the problem on borrowers who—according to Countrywide—represented to Countrywide that they lived or would live in the mortgaged properties, when in fact many borrowers were allegedly real-estate speculators who had no intention of living in the properties. In reality, and contrary to Countrywide's false and self-serving account, real-estate speculators did not cause the enormous decline in value of Plaintiffs' Securities. To the extent that borrowers lied on their applications, Countrywide's systematic failure to follow its own underwriting guidelines *allowed* borrowers' misstatements and other credit risks to go undetected, unregulated, or simply ignored by the lender.

12.     Countrywide also confessed to Plaintiffs that its representation that over 99 percent of the Mortgage Loans in the Securitizations were applied to owner-occupied properties was incorrect. When pressed for an answer by Plaintiffs, Countrywide estimated that approximately *15 percent* of the Mortgage Loans were applied to investment properties, as compared to owner-occupied properties, which shows that its representations in the Securitizations' offering documents on this subject were false. Countrywide had represented in the Preliminary Term Sheet and Prospectus Supplement for SPS1 that *none* of the Mortgage Loans in the Securitization were applied to investment properties and only 0.12 percent of the Mortgage Loans (four of the 3,485 Loans) were applied to secondary residences. The other

EXHIBIT  57  -1010-

99.88 percent of the Loans in the SPS1 Securitization were allegedly applied to owner-occupied properties. Countrywide represented in the Preliminary Term Sheet and Prospectus Supplement for SPS2 that *only 0.21 percent* of the Mortgage Loans in the Securitization were applied to investment properties and only 0.27 percent of the Loans were applied to secondary residences. The other 99.53 percent of the Loans in the SPS2 Securitization were allegedly applied to owner-occupied properties.

13.     Countrywide knew that its representations about the quality of its underwriting practices and its mortgage-backed securities, such as its representations about the percentage of owner-occupied properties in the Securitizations, were false and misleading at the time they were made, or, at the very least, Countrywide recklessly disregarded the truth about those statements through willful blindness. Under the direction of former Chief Executive Officer Angelo Mozilo and former President and Chief Operating Officer David Sambol, Countrywide developed a pattern of knowingly or recklessly lending to borrowers who committed fraud in their loan applications, who could not afford to repay the loans, or who otherwise did not satisfy the basic risk criteria for prudent and responsible lending that Countrywide claimed to use.

14.     By abandoning its underwriting guidelines, Countrywide was able to issue mortgages to a broad population of would-be homeowners, thereby increasing its revenue as it aggressively sought to expand its already enormous share of the market during the mortgage-lending boom of the past several years. As alleged by the California Attorney General,

> [Countrywide's] deceptive scheme had one primary goal—to supply the secondary market with as many loans as possible, ideally loans that would earn the highest premiums. Over a period of several years, Defendants constantly expanded Countrywide's share of the consumer market for mortgage loans through a wide variety of deceptive practices . . . in order to maximize its profits from the sale of those loans to the secondary market.

6

EXHIBIT  57  -1011-

15.     As the *New York Times* learned from speaking with former Countrywide employees, Countrywide offered mortgages to borrowers with little or no regard for their creditworthiness because the loans "were so lucrative—to Countrywide. The company harvested a steady stream of fees or payments on [risky] loans and busily repackaged them as securities to sell to investors" such as Plaintiffs. Loaning to borrowers with poor credit was highly profitable to Countrywide because of the high interest and fees generated by such loans, which increased Countrywide's incentive to originate such lower-quality loans. Countrywide issued these loans without regard to its stated underwriting standards, contrary to its representations to Plaintiffs and other investors, and contrary to Plaintiffs' and other investors' interests.

16.     While Countrywide pursued its own interests by aggressively expanding its loan-origination practices, it continued to make false representations and omissions to Plaintiffs and other investors to induce them to continue investing in Countrywide's securitizations. Countrywide did not disclose to Plaintiffs that it had abandoned its loan-origination guidelines, but instead made affirmative representations that it originated mortgage loans in strict compliance with its underwriting standards. Countrywide knew that these representations were false when it sold the Securities to Plaintiffs, and it knew that Plaintiffs would rely on those representations in purchasing and holding the Securities.

17.     Countrywide's abandonment of its stated loan practices increased the risk profile of the Mortgage Loans backing the Securities that Plaintiffs purchased from Countrywide, as Countrywide knew or should have known, because the company was issuing loans to borrowers that it knew or should have known could not afford them. Consequently, the number of delinquencies and defaults on the Loans skyrocketed immediately after issuance in mid-2006, shortly after the Securities were sold to Plaintiffs and long before the general housing slump

7

EXHIBIT  57  -1012-

began in the United States. Plaintiffs did not learn about these defaults until much later. As a direct result of Countrywide's deliberate misconduct, thousands of the Mortgage Loans underlying Plaintiffs' Securities are in default and/or foreclosure that would not have been if Countrywide had followed its claimed loan-origination practices. The Securities drastically lost value after they were issued, never paid a penny of principal, and today are worthless, as a direct result of Countrywide's wrongdoing. Indeed, the Securitizations' Trustee, The Bank of New York, has since written off the entire value of the Securities and does not expect to collect and distribute any further payments of principal and interest to investors.

18. As the United States District Court for the Central District of California stated in a December 2008, Countrywide appears to be

> a company obsessed with loan production and market share with little regard for the attendant risks, despite the company's repeated assurances to the market. With respect to loan origination practices, [plaintiffs] raise strong inferences that (1) borrower requirements were progressively loosened over [time]; (2) in many instances, the actual loan quality was lower than the borrower's [credit] score and [loan-to-value] ratio suggested because Countrywide misrepresented how lax its verification practices became; and (3) Countrywide management routinely circumvented the normal underwriting process by approving highly risky loans for sale into the secondary market.

*In re Countrywide Financial Corporation Securities Litigation*, 588 F.Supp.2d 1132, 1186 (C.D. Cal. 2008).

19. Bank of America is also liable for Countrywide's wrongdoing, according to the Pooling and Servicing Agreements governing the Securitizations and New York common law, because Bank of America is Countrywide's successor. Countrywide merged into a Bank of America subsidiary on July 1, 2008, and the companies' operations are in the last stages of being fully combined.

EXHIBIT 57 -1013-

20.     Accordingly, Plaintiffs now bring this action against the Countrywide Defendants for securities fraud, common-law fraud, and negligent misrepresentation, and against Bank of America for its successor liability for the Countrywide Defendants' wrongdoing.

### THE PARTIES

21.     Plaintiff Footbridge Limited Trust ("Footbridge") is a Bermuda Trust with a registered address of Butterfield Fund Services (Bermuda) Limited, 65 Front Street, Hamilton HM 12, Bermuda and a principal place of business c/o Old Hill Partners Inc., 1120 Post Road, Second Floor, Darien, Connecticut.

22.     Plaintiff OHP Opportunity Limited Trust ("Opportunity") is a Bermuda Trust with a registered address of Butterfield Fund Services (Bermuda) Limited, 65 Front Street, Hamilton HM 12, Bermuda and a principal place of business c/o Old Hill Partners Inc., 1120 Post Road, Second Floor, Darien, Connecticut.

23.     Defendant Countrywide Financial Corporation ("CFC") is a Delaware corporation with its principal executive offices at 4500 Park Granada, Calabasas, California. CFC, itself or through its subsidiaries, writes, sells, and services single-family home mortgages, home equity loans, commercial mortgages, and subprime mortgages. It also buys and sells mortgages, offers asset management and brokerage services, and provides insurance products.

24.     Defendant Countrywide Home Loans, Inc. ("CHL"), a wholly-owned subsidiary of CFC, is a New York corporation with its principal executive offices at 4500 Park Granada, Calabasas, California. CHL is engaged primarily in the mortgage banking business, and as part of that business, it originates, purchases, sells, and services mortgage loans.

25.     Defendant Countrywide Home Loans Servicing LP ("CHLS"), a wholly-owned subsidiary of CFC, is a limited partnership organized under the laws of Texas with its principal

9

EXHIBIT  57  -1014-

place of business at 7105 Corporate Drive, Plano, Texas. CHLS services mortgage loans originated by Countrywide Home Loans.

26. Defendant Countrywide Securities Corporation ("CSC"), a wholly-owned subsidiary of CFC, is a California corporation with its principal executive offices at 4500 Park Granada, Calabasas, California. CSC trades securities and underwrites offerings of mortgage-backed securities.

27. Defendant CWABS, Inc. ("CWABS") is a Delaware corporation and a limited-purpose finance subsidiary of CFC with its principal executive offices at 4500 Park Granada, Calabasas, California. CWABS was the Depositor for the SPS1 and SPS2 Securitizations.

28. CWABS Asset-Backed Certificates Trust 2006-SPS1 (the "SPS1 Trust") is a common-law trust formed by the Depositor, CWABS, under the laws of the State of New York pursuant to the SPS1 Securitization's Pooling and Servicing Agreement. The SPS1 Trust was the Issuing Entity for the SPS1 Securitization.

29. CWABS Asset-Backed Certificates Trust 2006-SPS2 (the "SPS2 Trust") is a common-law trust formed by the Depositor, CWABS, under the laws of the State of New York pursuant to the SPS2 Securitization's Pooling and Servicing Agreement. The SPS2 Trust was the Issuing Entity for the SPS2 Securitization.

30. Defendant Angelo R. Mozilo ("Mozilo"), Countrywide's co-founder, was Chairman of Countrywide's Board of Directors starting in March 1999 and Chief Executive Officer ("CEO") starting in February 1998. Mozilo was a member of Countrywide's Board beginning in 1969, when the company was founded, and served in other executive roles since then. He left Countrywide on July 1, 2008.

EXHIBIT 57 -1015-

31.     Defendant David Sambol ("Sambol") was Countrywide's President and Chief Operating Officer ("COO") from September 2006 through his retirement in mid-2008. Sambol was also Chairman and CEO of CHL and a member of the Board of Directors, both beginning in 2007. Sambol previously held numerous management positions in the Countrywide companies, including President and COO of CHL from 2004 to 2006.

32.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation with its principal executive offices at 100 North Tryon Street, Charlotte, North Carolina. Bank of America is one of the world's largest financial institutions, serving individual consumers, small- and middle-market businesses and large corporations with a full range of banking, investing, asset-management and other financial and risk-management products and services. The Countrywide Defendants became wholly-owned subsidiaries of Bank of America following the merger of CFC into a Bank of America subsidiary on July 1, 2008.

## JURISDICTION AND VENUE

33.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1331. The federal claims asserted herein arise under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5; 28 U.S.C. § 1337; and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

34.     Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; Plaintiffs are citizens of Bermuda; and Defendants are citizens of Delaware, New York, Texas, and California.

35.     Supplemental jurisdiction over Plaintiffs' state-law claims is founded upon 28 U.S.C. § 1367.

EXHIBIT  57  -1016-

36.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Defendants can be found and transact business in this District and many of the acts and practices giving rise to Plaintiffs' claims occurred in substantial part in this District.  Defendants are also subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### A.  Countrywide Promotes Itself as a Reputable and Conservative Loan Originator

37.     Co-founded in 1969 by Angelo Mozilo, Countrywide is a leader of the residential mortgage lending industry.  As of March 3, 2009, Countrywide was one of the top residential mortgage-lending firms in the United States—it has the third-highest loan volume.  The company has 50,000 employees and is ranked among America's largest corporations.  In 2007 alone, Countrywide generated $25.1 billion in revenue, up from $15.6 billion in 2005.

38.     In addition to originating and servicing residential mortgage loans, Countrywide, itself or through affiliates, purchases and sells mortgage loans, provides loan closing services, provides residential real estate and home-appraisal services in connection with loan origination and servicing, manages a captive mortgage reinsurance company, packages and arranges securitizations of mortgage loan pools, and underwrites public offerings of mortgage-backed securities in the secondary market.

39.     On information and belief, prior to 2004, a substantial majority of the mortgage loans that Countrywide originated each year were traditional long-term, fixed-rate, first-lien mortgage loans to prime borrowers; these mortgages met the guidelines for sale to the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Fannie Mae and Freddie Mac are authorized to purchase only mortgage loans that conform to specific regulatory guidelines (known in the industry as

12

EXHIBIT  57  -1017-

"conforming loans"). Conforming loans, if properly underwritten and serviced, historically were the most conservative loans in the residential mortgage industry, with the lowest rates of delinquency and default. Mortgage loans that fail to meet the regulatory guidelines are known in the industry as "non-conforming loans."

40.     Countrywide extolled its conservative Credit Policy, which it proclaimed was "designed to produce high quality loans through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews." In its 2004 annual report, Countrywide summarized the comprehensive standards and procedures of its Credit Policy:

> Our Credit Policy establishes standards for the determination of acceptable credit risks. Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures. Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through the use of credit scores, application of a mortgage scorecard, and manual or automated underwriting of additional credit characteristics . . . . Our loan origination standards and procedures are designed to produce high quality loans. These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and ongoing review of their work. We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology. We also have a comprehensive training program for the continuing development of both our existing staff and new hires. In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

41.     In addition, Countrywide described the extensive post-origination Credit Policy procedures that it had implemented to ensure consistency, accuracy, and fraud detection in loan origination:

> In addition to our pre-funding controls and procedures, we employ an extensive post-funding quality control process. Our Quality Control Department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in-depth underwriting and appraisal review, and

13

EXHIBIT  57  -1018-

if necessary, a fraud investigation. We also employ a pre- and post-funding proprietary loan performance evaluation system. This system identifies fraud and poor performance of individuals and business entities associated with the origination of our loans. The combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines and compliance with laws and regulations.

42.     Countrywide claimed that its disciplined underwriting standards distinguished it from other lenders in the industry and reflected enviable best practices. For example, in a Fixed Income Investor Forum hosted by Countrywide in September 2006, Mozilo explained that Countrywide led the industry in responsible lending: "[A]s an industry leader we served as a role model to others in terms of responsible lending. We take seriously the role of a responsible lender for all of our constituencies . . . . *To help protect our bond holder customers, we engage in prudent underwriting guidelines.*" (Emphasis added.) At the same forum, President and Chief Operating Officer David Sambol added that:

> [W]e have an intense and ongoing focus on share growth while at the same time maintaining a very strong internal control environment and what we believe is best-of-class governance . . . . *[O]ur culture is also characterized by a very high degree of ethics and integrity in everything that we do.* (Emphasis added.)

## B.     Countrywide Begins to Originate and Resell Riskier Mortgage Loans

43.     In or around 2003, there was rising demand on Wall Street for "private-label" securitizations of non-conforming loans. Private-label securitizations are arranged and underwritten by private firms (rather than the government-sponsored entities Fannie Mae and Freddie Mac), and thus can include non-conforming loans. Given the higher risk associated with non-conforming loans, private-label securitizations generate higher returns for investors.

44.     The promise of increased revenue and profit drove Countrywide to increase loan generation so that there would be sufficient loans to package into securitizations for the

14

EXHIBIT 57 -1019-

secondary "private-label" market. At the same time, Countrywide pledged that its growth in originations would not compromise its strict underwriting standards. In a January 2004 call with analysts, Mozilo announced that Countrywide, already the industry leader with nearly a 15 percent loan-origination market share, planned to double its share within four years: "Our goal is market dominance, and we are talking 30% origination market share by 2008." Mozilo pledged, however, that Countrywide would not undermine its rigorous underwriting standards: *"Going for 30% mortgage share here is totally unrelated to[the] quality of loans we go after . . . . There will be no compromise in that as we grow market share.* Nor is there a necessity to do that." (Emphasis added.)

45.      Starting in 2004 and accelerating in 2005, Countrywide expanded its origination and securitization of riskier lines of products, including subprime mortgages, interest-only loans, Pay Option ARMs (an adjustable-rate mortgage loan that allows a borrower to make initial minimum monthly payments less than the mortgage's monthly accrued interest), closed-end second liens ("CES"), and home equity lines of credit ("HELOCs"). Countrywide's greatly expanded range of mortgage products was made possible by its willingness to loan money to a broader pool of borrowers with riskier credit profiles, leading to the abandonment of Countrywide's stated underwriting standards.

46.      Borrowers' risky credit profiles were not the only factor decreasing the quality of Countrywide's new loan offerings. For example, HELOCs and CESs, because they are both second liens, are junior in priority to the first lien on a property, such that if the property is foreclosed upon, the proceeds must be used to fully satisfy the first lien before the second lien is paid.

EXHIBIT   57   -1020-

47.     Even while Countrywide was loosening its underwriting practices, Countrywide reassured investors such as Plaintiffs that its underwriting procedures and credit risk management remained highly rigorous.  In the SPS1 and SPS2 Prospectus Supplements, for example, Countrywide touted in detail the meticulous underwriting guidelines it applied to assess the creditworthiness of potential borrowers before issuing loans to them.  Even though the Securitizations were composed of credit-blemished, second-lien Mortgage Loans, Countrywide told investors that it thoroughly researched borrowers' credit histories;  it obtained information about applicants' assets, liabilities, income and employment history; it obtained an independent credit bureau report on each applicant; and it used a debt-to-income ratio "to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan."

48.     Countrywide also represented in the Securitizations' Prospectus Supplements that its underwriting standards were applied in accordance with applicable federal and state laws and regulations, that mortgaged properties were both independently appraised and appraised by Countrywide, and that in most cases, Countrywide would not write loans on properties that were in below-average condition.

49.     Because its loan-origination guidelines are ostensibly designed to ensure that loans perform over time, Countrywide knew that the rigorousness of its guidelines—and its adherence to those guidelines—would materially affect the risk of investing in its securitizations.

50.     Throughout Countrywide's expansion, Mozilo consistently represented that Countrywide would not sacrifice the strict and disciplined underwriting standards that had made it an industry leader in responsible lending.  During a March 15, 2005 conference with analysts,

16

EXHIBIT  57  -1021-

Mozilo responded to a question about Countrywide's strategy for increasing market share by assuring Countrywide's constituents:

> Your question is 30 percent, is that realistic, the 30 percent [market share] goal that we set for ourselves in 2008? . . . Is it achievable? Absolutely . . . . But I will say this to you, that *under no circumstances will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30 percent market share.* (Emphasis added.)

51.     Other Countrywide senior officers reiterated that Countrywide had not strayed from its underwriting standards, and would not. For example, in an April 2005 conference call with analysts, Eric Sieracki, Countrywide's Chief Financial Officer, responded to a question asking whether Countrywide had changed its underwriting protocols: "I think [FICO scores, combined loan-to-value ratios, and debt-to-income ratios] will remain . . . consistent with the first quarter and most of what we did in 2004. *We don't see any change in our protocol relative to the volume [of] loans that we're originating.*" Sieracki added that, as for the Countrywide-originated HELOCs, "*The credit quality of our home equities should be emphasized here as well. We are 730 FICO on these home equities, and that's* extraordinary *throughout the industry*" (emphases added). The "FICO" score is a common measure of credit risk, and is used to assess the likelihood that a borrower will default on a loan.

52.     In the offering documents for the SPS1 and SPS2 Securitizations, Countrywide noted that the credit-blemished, second-lien Mortgage Loans that were pooled together in the Securitizations posed a greater credit risk than first-lien conventional mortgage loans. The Mortgage Loans were secured by second liens, which means that senior mortgage loans and prior statutory liens have priority. Countrywide also noted that its underwriting standards for credit-blemished, second-lien loans are "more flexible than the standards generally used by banks for borrowers with non-blemished credit histories," as explained further *infra* § D(2).

EXHIBIT  57  -1022-

53. Nonetheless, as explained herein, Countrywide deviated from the loan-origination practices that it represented in the offering documents, effectively *abandoning* rather than loosening its loan-origination standards. Countrywide failed to disclose to Plaintiffs the degree to which it abandoned its loan-origination practices, even compared with the looser underwriting standards it described for credit-blemished, second-lien Loans. Plaintiffs were injured as a direct result of Countrywide's lending practices and its failure to disclose those practices to Plaintiffs and other investors.

## C.  **Plaintiffs' Purchase of the Securities**

54. Plaintiffs purchased approximately $43,375,000 in residential mortgage-backed securities from Countrywide between June and October 2006. They purchased the Securities through two public offerings of mortgage-backed securities issued by Countrywide, the SPS1 and SPS2 Securitizations. The Securities were identified by Countrywide as "Certificates." Both of the Securitizations were structured through a similar series of agreements.

55. Plaintiffs purchased approximately $20,375,000 in Certificates issued by the SPS1 Trust. Plaintiffs purchased the Certificates on June 27, 2006, from five different Classes within the SPS1 Securitization. The Certificates had the following face values: $3 million in Certificates from the "M-3" Class, $4 million from the "M-4" Class, $3,375,000 from the "M-5" Class, $4 million from the "M-6" Class, and $6 million from the "M-7" Class. These Classes were subordinate to the "A" Class of Securities in the Securitization. The expected credit ratings for the SPS1 Classes that Plaintiffs invested in ranged from AA/Aa3 (S&P/Moody's) for the M-3 Class to BBB+/Baa2 (S&P/Moody's) for the M-7 Class. In other words, the Securities that Plaintiffs invested in were expected to be investment-grade.

EXHIBIT 57 -1023-

56.     Plaintiffs purchased approximately $23,000,000 in Certificates issued by the SPS2 Trust. They purchased $12.5 million in Certificates from the "M-4" Class on August 29, 2006; $7,250,000 million from the "M-7" Class on September 12, 2006; and $3,250,000 from the "M-5" Class on October 3, 2006. These Classes were subordinate to the "A" Class of Securities in the Securitization. The expected credit ratings for the SPS2 Classes that Plaintiffs invested in ranged from A+/A1 (S&P/Moody's) for the M-4 Class to BBB+/Baa1 (S&P/Moody's) for the M-7 Class. Like the SPS1 Securities, the SPS2 Securities that Plaintiffs invested in were therefore expected to be investment-grade.

### 1.     How the Securitizations Were Structured

57.     The SPS1 and SPS2 Securitizations were structured in substantially similar ways. Countrywide issued mortgage loans to individuals for purchases or refinancings of residential properties. Countrywide, through its CHL subsidiary and other Sellers, then sold, transferred, or otherwise conveyed title to those Mortgage Loans to the Depositor, CWABS, pursuant to the PSAs. CWABS then sold, transferred, or otherwise conveyed the Mortgage Loans to the Trustee, The Bank of New York, which held the Loans in the SPS1 and SPS2 Trusts for the benefit of Certificateholders. The SPS1 and SPS2 Trusts acted as Issuing Entities in selling the Certificates (i.e. Securities) to investors. The Securities were intended to provide interest on the income stream generated by the Mortgage Loans in the Trusts. The securities were sold in subgroups, or "Classes," according to the Classes' expected credit ratings.

58.     Countrywide acted in several capacities on the Securitizations, in each of which it stood to profit. CHL originated or acquired all the Mortgage Loans for the Securitizations, and sold (or otherwise conveyed) the Mortgage Loans to the Depositor, CWABS, which conveyed the Loans to the Trustee. The SPS1 and SPS2 Trusts held the Loans and issued the Certificates

19

EXHIBIT   57   -1024-

to Plaintiffs and other investors. CHLS acted as servicer for the Mortgage Loans in the Securitizations, while CSC underwrote and marketed the Securitizations. CHL was the Seller, CHLS the Master Servicer, and CSC was the Lead Manager of the underwriters.

59.    In addition to CSC, SPS1 was also underwritten by Credit Suisse First Boston and Deutsche Bank. SPS2 was also underwritten by Credit Suisse Securities and Merrill Lynch, Pierce, Fenner & Smith Incorporated.

60.    The SPS1 Securitization contained Mortgage Loans with a total face value of approximately $230,875,000, according to the Preliminary Term Sheet and the Prospectus Supplement. The majority of those loans were issued via Certificates in the "A" Class, with an expected credit rating of AAA/Aaa (S&P/Moody's). The remaining loans were issued through Certificates in the M-1 through M-9 Classes and the B Class, with lower credit ratings. The latter loans were subordinate to the Certificates in the A Class, with a corresponding priority of distribution of income to the Certificates.

61.    The SPS2 Securitization contained Mortgage Loans with a total face value of approximately $426,500,000, according to the Preliminary Term Sheet and the Prospectus Supplement. The majority of those loans were issued via Certificates in the "A" Class, with an expected credit rating of AAA/Aaa (S&P/Moody's). The remaining loans were issued through Certificates in the M-1 through M-9 Classes and the B Class, with lower credit ratings. The latter loans were subordinate to the Certificates in the A Class, with a corresponding priority of distribution of income to the Certificates.

62.    Both the SPS1 and SPS2 Securitizations included at least three principal offering documents. A Pooling and Servicing Agreement ("PSA"), entered into by certain Countrywide entities and The Bank of New York, as Trustee, provided for the conveyance and servicing of the

EXHIBIT   57   -1025-

Mortgage Loans. A Preliminary Term Sheet provided summary information about the Securitizations to investors, while a Prospectus and Prospectus Supplement for the Securitizations provided further detail about the investments.

63. The PSA for the SPS1 Securitization, dated as of June 1, 2006, was entered into by the Depositor, CWABS, Inc.; the Sellers, CHL and three other Countrywide subsidiaries; the Master Servicer, CHLS; and the Trustee, The Bank of New York. The SPS1 PSA was attached to a Form 8-K filed with the Securities and Exchange Commission on July 12, 2006. The PSA set forth the parties' rights and responsibilities with regard to the conveyance and servicing of the Mortgage Loans underlying the SPS1 Securitization.

64. The PSA for the SPS2 Securitization, dated as of August 1, 2006, was also entered into by the Depositor, CWABS, Inc.; the Sellers, CHL and three other Countrywide subsidiaries; the Master Servicer, CHLS; and the Trustee, The Bank of New York. The SPS2 PSA was attached to a Form 8-K filed with the Securities and Exchange Commission on September 12, 2006. The PSA set forth the parties' rights and responsibilities with regard to conveyance and servicing of the Mortgage Loans underlying the SPS2 Securitization.

**D.     Countrywide's Fraudulent Misrepresentations and Omissions Regarding the Securities**

65. Countrywide committed fraud through a pattern and practice of misrepresenting its underwriting practices and the quality of its mortgage-backed securities, as reflected in the offering documents supplied to Plaintiffs on the Securitizations, statements by Countrywide representatives to Plaintiffs, and statements by Countrywide representatives to the broader public (for example, through SEC filings and investor forums), as described herein. Countrywide made these materially false and misleading statements and omissions of material fact with scienter.

EXHIBIT  57  -1026-

66.     Plaintiffs reasonably relied on Countrywide's representations, which they did not know were materially false and misleading at the time Plaintiffs invested in the Securities, to Plaintiffs' enormous financial detriment.

### 1.     Misrepresentations Regarding the Percentage of Owner-Occupied Properties in the Securitizations

67.     In the most glaring example of Countrywide's fraud, the company has admitted to Plaintiffs that a key representation in the offerings—that the Mortgage Loans underlying the Securities were made on properties that were over 99 percent owner-occupied—was false and misleading and omitted material facts necessary to make the statements not misleading, as set forth below.

68.     A "Detailed Report" included in the SPS1 and SPS2 Preliminary Term Sheets presented an overview of certain statistics regarding the pool of Mortgage Loans in the SPS1 and SPS2 Securitizations.  The Detailed Report for the SPS1 Securitization stated that *99.88 percent* of the mortgaged properties in the Securitization were owner-occupied, while only 0.12 percent were secondary residences.  A similar report in the Preliminary Term Sheet for SPS2 stated that *99.53 percent* of the mortgaged properties in that Securitization were owner-occupied, 0.27 percent were secondary residences, and 0.21 percent were investment properties.

69.     Countrywide represented that of the 3,489 loans in the SPS1 Securitization, only *four* were issued to secondary residences and *none* to investment properties; the other 3,485 were allegedly issued to owner-occupied properties.  Similarly, of the 11,559 loans in the SPS2 Securitization, *only 31* were issued to secondary residences and 25 to investment properties; 11,503 of those loans were allegedly issued to owner-occupied properties.  These percentages and numbers of owner-occupied properties seemed impressively high to Plaintiffs, as

22

EXHIBIT  57  -1027-

Countrywide intended, since Countrywide intended to bolster the perceived quality of the Mortgage Loans and thereby induce Plaintiffs to purchase its mortgage-backed securities. Plaintiffs reasonably believed, as Countrywide intended, that this high percentage of owner occupancy made the Securities safer investments, since homeowners who reside in mortgaged properties are more likely to make required principal and interest payments than owners who purchase the homes as investments and live elsewhere.

70.     The Prospectus Supplements for the SPS1 and SPS2 Securitizations reiterated the data in Countrywide's Preliminary Term Sheets regarding the allegedly very high percentage of mortgaged properties that were owner-occupied. Annex A of the Prospectus Supplements contained statistical information based on scheduled principal balances for the pool of Mortgage Loans to be included in the Securitizations. Annex A of the SPS1 Prospectus Supplement stated that 99.88 percent of the Mortgage Loans in the SPS1 Securitization were applied to owner-occupied properties and the remaining 0.12 percent were applied to secondary residences. Annex A for the SPS2 Prospectus Supplement stated that 99.53 percent of the SPS2 Loans were applied to owner-occupied properties, 0.27 percent were applied to secondary residences, and 0.21 percent were applied to investment properties.

71.     Countrywide has since admitted in a conference call Plaintiffs that its statements regarding the percentage of owner-occupied properties were false and misleading. Plaintiffs noted during the call that the SPS1 and SPS2 Securities were experiencing higher rates of delinquency and greater losses than even comparable mortgage-backed securities based on credit-blemished, second-lien loans. Plaintiffs had expected the Securities to outperform the market for such securities because Countrywide had represented in the Preliminary Term Sheets and Prospectus Supplements that over 99 percent of the underlying mortgaged properties were

EXHIBIT   57   -1028-

owner-occupied, which Plaintiffs observed was a higher percentage of owner occupancy than advertised by comparable securities.

72.     During the conference call, Plaintiffs asked Countrywide to explain why the Mortgage Loans underlying the SPS1 and SPS2 Securitizations were experiencing a higher rate of default than similarly situated bonds in the market. Countrywide admitted that the Mortgage Loans were defaulting at an "incredibly high" rate, for which it apologized. Nonetheless, Countrywide sought to blame the high default rates on real-estate speculators, alleging that the "biggest driver" of losses had been a large number of borrowers who "are participating in the real estate flipping market."

73.     Countrywide said that such speculators had represented to Countrywide that they would occupy the mortgaged properties in order to gain financing and favorable interest rates, when in reality the borrowers hoped quickly to resell the properties for a profit without ever living in them. When the real-estate market collapsed toward the end of 2006, Countrywide said, these borrowers were unable to sell the properties as intended and instead began to default at high rates.

74.     In blaming the Securitizations' high default rate on alleged "real-estate speculators," Countrywide conceded the falsity of its representation that over 99 percent of the underlying properties were owner-occupied. As Countrywide said during the call, the "primary driver" of losses on the Securitizations allegedly was defaults by investors who did not occupy their properties. In fact, during a subsequent conversation between Plaintiffs and Countrywide, Countrywide estimated—but only after Plaintiffs insisted on an answer—that approximately *15 percent* of the Mortgage Loans were applied to investment properties, as compared to owner-occupied properties.

EXHIBIT  57  -1029-

75.    Countrywide's estimate that approximately 15 percent of the Mortgage Loans were applied to investment properties shows that its representations in the Securitizations' offering documents on the subject of owner occupancy were false.  In the Preliminary Term Sheet and Prospectus Supplement for SPS1, Countrywide had represented that *none* of the Mortgage Loans in the Securitization were applied to investment properties and only 0.12 percent of the Mortgage Loans (four of the 3,485 Loans) were applied to secondary residences. The other 99.88 percent of Loans in the SPS1 Securitization were allegedly applied to owner-occupied properties.  The Preliminary Term Sheet and Prospectus Supplement for SPS2 represented that *only 0.21 percent* of the Mortgage Loans in the Securitization were applied to investment properties and only 0.27 percent of the Loans were applied to secondary residences. The other 99.53 percent of Loans in the SPS2 Securitization were allegedly applied to owner-occupied properties.

76.    Upon information and belief, Countrywide's estimate that 15 percent of the Mortgage Loans were issued to investment properties still understated the percentage of owner-occupied properties in the Mortgage Pools, thus constituting an additional misrepresentation on this subject.  As Countrywide admitted, the *primary driver* of the severe losses on Plaintiffs' Securities was the number of real-estate speculators who purchased Loans in the Securitizations. Moreover, Countrywide had abandoned its loan-origination standards and failed to follow its stated procedures for investigating facts such as the borrowers' mortgage histories, which would have alerted Countrywide to the fact that a great number of borrowers were real-estate speculators who would subsequently default on their loans at a higher rate than borrowers who occupied the mortgaged properties.

25

EXHIBIT  57  -1030-

77.      Countrywide furthered its fraud during the call by blaming the phenomenon on real-estate "flippers," rather than admitting that its loan-origination practices were entirely responsible for any fraud in the loan-application process, or, alternately, admitting that Countrywide facilitated and participated in any fraud by borrowers. Countrywide's fraud during the loan-origination process, or facilitation of borrowers' fraud, was in contravention of its representations to Plaintiffs regarding its underwriting standards.

78.      Countrywide is a sophisticated loan originator, one of the largest issuers of residential home mortgages in the country. It was not blindsided and misled by real-estate speculators who allegedly lied on their loan applications. Rather, the company knew that its representations regarding the percentage of owner-occupied properties were false and misleading at the time they were made, and Countrywide failed to disclose material facts related to the percentage of owner-occupied properties to Plaintiffs. At the very least, the company recklessly disregarded the truth about borrowers' statements in loan applications through its own willful blindness. To the extent that borrowers committed fraud on their loan applications, Countrywide facilitated and furthered that fraud by turning a blind eye to it, failing to enforce its underwriting standards, failing to exercise proper oversight of loan origination, and/or by other means.

79.      Countrywide knew that its representation that over 99 percent of mortgaged properties were owner-occupied—and similar representations and reassurances about the Mortgage Loans and its lending practices—were material to investors such as Plaintiffs but were also false, misleading, and omitted material facts necessary to make those representations not misleading. Countrywide also knew that its representation about the percentage of owner-occupied properties, like its representations about the quality of its collateral and its disciplined underwriting practices, would induce Plaintiffs to buy its securities.

26

EXHIBIT  57  -1031-

80.     Countrywide engaged in fraud while representing to Plaintiffs and other innocent parties that it was upholding strict, prudent underwriting standards. Countrywide's admitted misstatements regarding the percentage of owner-occupied properties in the SPS1 and SPS2 Securitizations are part of a broader pattern and practice of Countrywide's fraud regarding its loan origination and underwriting practices.

### 2.     Misrepresentations Regarding Countrywide's Adherence to Its Underwriting Guidelines

81.     Countrywide made various misrepresentations in the offering documents and in communications with Plaintiffs regarding its underwriting guidelines, as explained herein.

82.     Countrywide represented in the PSAs that its "origination, underwriting, servicing and collection practices with respect to each Mortgage Loan have been in all respects legal, proper, prudent and customary in the mortgage lending and servicing business." This statement was materially false and misleading and omitted material facts necessary to make the statements not misleading. As alleged herein, Countrywide abandoned its loan-origination guidelines and those of the industry in order to maximize its revenue from the origination, servicing, and securitization of mortgage loans. Countrywide also failed to disclose the full extent of its liberalized underwriting guidelines to Plaintiffs and other investors, and it omitted material facts regarding its underwriting practices that affected Plaintiffs' decision to invest in the Securities by improving their perception of the Securities' creditworthiness.

83.     Countrywide's Prospectus and Prospectus Supplements for the SPS1 and SPS2 Securitizations described the underwriting standards that it would apply to the credit-blemished, second-lien Mortgage Loans in the Securitizations. Although Countrywide revealed that it was using more flexible loan-origination standards for the credit-blemished, second-lien mortgage loans to be included in the Securitizations, Countrywide's description of its underwriting

27

EXHIBIT 57 -1032-

practices was nonetheless intended to reassure Plaintiffs and other investors that the loans it issued—and hence the Securitizations—were safe investments.

84.     For example, Countrywide trumpeted its internal credit scoring system for credit-blemished, second-lien mortgage loans, which "utilize[d] credit grade categories to grade the likelihood that the borrower will satisfy the repayment conditions of the mortgage loans. In general, a credit grade category is assigned by evaluating a borrower's mortgage history, time since bankruptcy, and time since foreclosure or notice of default." *Over 90 percent* of the Mortgage Loans in the SPS1 and SPS2 Securitizations—90.76 percent of the SPS1 Loans and 90.66 percent of the SPS2 Loans—were listed as "Grade A," Countrywide's highest category of credit grade.

85.     Countrywide's statement that over 90 percent of the Mortgage Loans were "Grade A" was false and misleading and failed to disclose material facts necessary to make the statements not misleading, because even under Countrywide's own internal scoring system, the Loans did not in fact conform to the grades given. In truth, only a far smaller percentage of Mortgage Loans should have been classified as Grade "A," even under Countrywide's internal grading system, because Countrywide abandoned its stated loan-origination guidelines and regularly issued loans to borrowers with a far worse credit profile than Countrywide represented, with little or no regard for their creditworthiness, in its effort to maximize revenue from loan origination, servicing, and securitization.

86.     The Securitizations' offering documents contained various other misrepresentations regarding Countrywide's origination guidelines. For example, Countrywide represented in its Prospectus Supplement that it required independent appraisals of the properties that the Mortgage Loans were applied to. Countrywide stated that "Every independent appraisal

28

EXHIBIT 57 -1033-

is reviewed by a representative of Countrywide Home Loans before the loan is funded, and an additional review appraisal is generally performed in connection with appraisals not provided by Landsafe Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans."

87.     Countrywide's description of the supposed independent home appraisals was false and misleading and failed to disclose material facts necessary to make the statement not misleading, because Countrywide regularly pressured appraisers to give inflated assessments of property values by threatening to blacklist them.  Inflated appraisals of home values often resulted in homebuyers owing more on their mortgages than their houses were worth, which increased the likelihood of borrowers' default and thus directly affected the value of the Securities purchased by Plaintiffs.

88.     Countrywide also stated that its underwriting standards "are applied in accordance with applicable federal and state laws and regulations."  This statement was false and misleading and failed to disclose material facts necessary to make the statement not misleading, because in fact Countrywide regularly engaged in predatory lending practices in violation of federal or state laws and regulation.  As explained by the *New York Times*, Countrywide steered borrowers to more expensive mortgage products in order to increase its profits:  "[P]otential borrowers were often led to high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smoothtalking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives among the highest paid in America."  By directing borrowers to more expensive products, Countrywide was considering its interests—it was maximizing its own revenue and profit—at the expense of its borrowers and investors such as Plaintiffs.  Borrowers who incurred higher fees and were burdened with

EXHIBIT  57  -1034-

unfavorable Mortgage Loans were more likely to default on those Loans, which increased the risk of the Securities backing those Loans and therefore also decreased their value.

89.     Countrywide did not disclose to Plaintiffs and other investors that, for a vast majority of the Mortgage Loans it issued and pooled together in the SPS1 and SPS2 Securitizations, Countrywide ignored its stated underwriting criteria and instead issued loans to people that it knew or should have known could not repay the loans, in violation of its underwriting standards. Countrywide abandoned its origination guidelines and opened the floodgates to borrowers with little or no regard to their creditworthiness in order to maximize its revenue from loan origination, servicing, and securitization, without advising Plaintiffs and other investors.

90.     Countrywide also made representations about its rigorous underwriting standards to Plaintiffs in an effort to reassure them about their investments in the Securitizations. For example, Countrywide told Plaintiffs' investment advisor, Old Hill, that it checked to see whether borrowers were first-time homebuyers—which tends to show that borrowers are not real-estate speculators—by looking for evidence of mortgages on the borrowers' credit report. Countrywide told Old Hill that in 2006 it raised the minimum FICO score it required of borrowers, particularly on its 100-percent-financed mortgages, because the loan guidelines in the mortgage industry had become too liberal. Countrywide also explained that its ongoing quality-control measures, which it said included random audits of its loan origination for regulatory purposes as well as targeted audits of risky loans. Countrywide claimed that the company would challenge the departments originating risky loans as to why they originated such loans, and claimed that it would punish the departments for issuing low-quality loans by reducing employees' bonuses.

EXHIBIT  57  -1035-

91.     These representations were also false and misleading and contained omissions of material facts because in reality, Countrywide offered mortgage brokers financial incentives for originating large volumes of loans and for originating risky loans. As the *New York Times* learned from speaking with former Countrywide employees, "the company's commission structure rewarded sales representatives for making risky, high-cost loans. For example . . . adding a three-year prepayment penalty to a loan would generate an extra 1 percent of the loan's value in a commission."

92.     Countrywide represented to Plaintiffs and other investors that it punished brokers for issuing risky mortgages, but the reality was exactly opposite—Countrywide gave financial incentives for employees to issue loans that generated greater profit for Countrywide but did so at the expense of borrowers, in the form of higher payments and fees and a greater likelihood of default from higher and unexpected costs. Countrywide's incentives for employees to issue risky loans also greatly harmed Plaintiffs and other investors, who relied on the income from payments on the Mortgage Loans, since the risk of borrowers defaulting on the Loans was greatly increased by the higher and unforeseen charges that Countrywide's brokers often imposed on borrowers.

93.     Countrywide's representations about its supposed increase in the minimum FICO score were also false and misleading and contained omissions of material facts. Although Countrywide said that it had raised its FICO scores for the borrowers that received Mortgage Loans because loan standards in the industry had become too "liberal," Countrywide was in fact an egregious example of those badly liberalized underwriting standards. Countrywide abandoned its loan-origination guidelines and issued loans to borrowers with poor credit histories, giving them mortgages that Countrywide knew or should have known the borrowers

31

EXHIBIT  57  -1036-

could not afford given their income and the mortgages' costs (some of which were not readily apparent or only appeared over time, as when a mortgage's interest rate automatically reset after a given period of time).

94.     Moreover, although Countrywide implied that its increased FICO scores would promote responsible lending practices, in fact Countrywide continued to issue mortgages to borrowers with low FICO scores and who were otherwise not creditworthy. By issuing the Mortgage Loans to borrowers with poor credit histories or to borrowers who could not afford the Loans, Countrywide greatly increased the risk of borrowers' default, thereby increasing the risk and lowering the value of the Securities held by Plaintiffs and other investors.

95.     Elsewhere in the Prospectus Supplements for the SPS1 and SPS2 Securitizations, Countrywide conveyed to Plaintiffs and other investors that the company upheld principled underwriting standards, regardless of its loosened standards for credit-blemished, second-lien loans. Countrywide stated that its credit-blemished, second-lien loans were handled by "a specialized group of underwriters who are familiar with the unique characteristics" of these loans, and Countrywide said that CHL would not purchase any such loans (for use in the Securitizations) that had not been originated by Countrywide. Countrywide stated that it required a credit history for each loan applicant from an independent credit bureau; that it gathered information about an applicant's "assets, liabilities, income and employment history;" and that it used a debt-to-income ratio

> to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income. The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 55%.

32

EXHIBIT 57 -1037-

Countrywide summarized the thorough procedures it used to verify applicants' information:

> Countrywide Home Loans verifies the loan applicant's sources and amounts of income (except under the Stated Income Program where the amount of income is not verified), calculates the amount of income from all sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the appraisal of the mortgaged property for compliance with Countrywide Home Loans' underwriting standards.

96.     These representations were also false and misleading and omitted material facts necessary to make the statements not misleading. Countrywide represented in the Prospectus and Prospectus Supplement that it followed rigorous underwriting guidelines—despite the allowance for reduced-documentation loan origination, as stated in the guidelines—but in reality, Countrywide abandoned those guidelines and issued the Mortgage Loans with little or no consideration of borrowers' ability to repay. Indeed, Countrywide knew that certain borrowers would be unable to repay the Loans, but individual Countrywide mortgage brokers and Countrywide as a whole were motivated to maximize revenue and profit from loan origination and fees. Countrywide disregarded borrowers' ability to pay their mortgages and disregarded the interests of Plaintiffs and other investors that relied on the creditworthiness of the Mortgage Loans to ensure an income stream and continuing value for the Securities.

97.     Plaintiffs understood that Countrywide's origination standards for credit-blemished, second-lien loans were more flexible than the standards for non-credit-blemished mortgage loans, as described in the offering documents. However, Plaintiffs were nonetheless misled by Countrywide because Countrywide failed to adhere even to the lowered underwriting standards described in the Prospectus Supplement. Countrywide *abandoned*, rather than loosened, its underwriting guidelines. It could not or did not adhere even to the loosened standards represented in the Prospectus Supplement, such that its many representations about

33

EXHIBIT 57 -1038-

underwriting standards and due diligence were false and misleading and contained omissions of material fact.

98.    Plaintiffs were also reassured about the creditworthiness and quality of their investments because the Certificates they purchased in the Securitizations were expected to have investment-grade credit ratings.  Plaintiffs purchased Certificates from the M-3 through M-7 Classes of the SPS1 Securitization.  Those Classes had expected credit ratings ranging from AA/Aa3 (S&P/Moody's) for the M-3 Class to BBB+/Baa2 (S&P/Moody's) for the M-7 Class. Plaintiffs purchased Certificates from the M-4, M-5, and M-7 Classes of the SPS2 Securitization. The expected credit ratings for the SPS2 Classes ranged from A+/A1 (S&P/Moody's) for the M-4 Class to BBB+/Baa1 (S&P/Moody's) for the M-7 Class.  Countrywide stated in the Prospectus Supplement that the issuance of Certificates in each Class was conditioned on obtaining ratings from Moody's, Standard & Poor's, Fitch Ratings and Dominion Bond Rating Service that are "at least as high" as the ratings that Countrywide stated in the Prospectus Supplement.

99.    Countrywide's representations in the Prospectus Supplement and other offering documents regarding the quality of the SPS1 and SPS2 Securitizations—for example, that 99 percent of Loans were issued to owner-occupied properties, that 90 percent of Loans were "Grade A" in quality, and that Countrywide followed detailed and thorough underwriting guidelines (despite its loosened guidelines for credit-blemished, second-lien mortgage loans)— affected the credit rating assigned to the Securities.  By falsely representing that its Securities were high-quality, Countrywide increased the likelihood that it would obtain the credit ratings on the SPS1 and SPS2 Securitizations that it advertised to Plaintiffs.  Countrywide knew or should have known that the Securities it offered did not merit the investment-grade ratings that they received from the ratings agencies.

EXHIBIT  57  -1039-

100.   Countrywide adopted an aggressive strategy to drive up revenue by issuing mortgages to a much broader and riskier group of borrowers, which caused significant changes to its underwriting practices. Countrywide knew that these changes would result in the origination of mortgage loans that were materially inconsistent with what they had been represented to be, even under the more "flexible" standards applied to credit-blemished, second-lien mortgages, as stated in the offering documents. Countrywide did not disclose to Plaintiffs and other investors the extent to which its underwriting practices deviated even from the standards for origination of credit-blemished, second-lien Mortgage Loans as stated in the Prospectus Supplement.

101.   Countrywide also failed to disclose that it had approved employee compensation plans that offered incentives for new mortgage loan originations, with higher incentives for riskier nonprime mortgage loans. According to the California Attorney General, Countrywide's senior management imposed intense pressure on underwriters to approve mortgage loans, in some instances requiring underwriters to process 60 to 70 mortgage loan applications in a single day and to justify each rejection of a proposed loan. This created an incentive for Countrywide employees not to review loans thoroughly but instead simply to approve them. Had Countrywide disclosed those facts to Plaintiffs, Plaintiffs would not have invested in Countrywide's mortgage-backed securities.

102.   Countrywide also failed to disclose that Mozilo and Sambol had authorized the establishment of a Structured Loan Desk in Plano, Texas, which was created specifically to grant underwriting exceptions for high-risk loan applications that did not meet Countrywide's underwriting standards. The loans were processed through Countrywide's Exception Processing System, an in-house computer system created and overseen by Sambol to approve high-risk

35

EXHIBIT  57  -1040-

loans. According to the California Attorney General's complaint against Countrywide, based on information provided by a former Countrywide employee, the Structured Loan Desk processed 15,000 to 20,000 mortgage loan applications a month in 2006. Countrywide failed to disclose to Plaintiffs the fact that it was originating mortgage loans, to this degree, that did not conform to its stated underwriting standards. The scale of Countrywide's issuance of Mortgage Loans based on underwriting exceptions was a material fact that would have affected Plaintiffs' decision to invest in the Securities.

103. Taken as a whole, Countrywide's representations regarding its underwriting practices were false and misleading and omitted material facts necessary to make the statements not misleading, because Countrywide failed to disclose the extent to which it was straying from its stated underwriting standards. Had Countrywide disclosed to Plaintiffs the extent to which it was approving tens of thousands of loans that did not meet its underwriting standards, even under the loosened standards applied to the credit-blemished, second-lien Mortgage Loans in the SPS1 and SPS2 Securitizations, Plaintiffs would not have purchased or otherwise acquired the Securities.

### 3. Misrepresentations Regarding Adverse Effect on Investors' Interests

104. Countrywide's representation in the PSAs that the Mortgage Loans in the Securitizations were not selected "in a manner that would adversely affect the interests of Certificateholders" was also materially false and misleading and omitted material facts necessary to make the statement not misleading. As alleged in the foregoing paragraphs, Countrywide issued loans to borrowers whom it knew were unlikely to repay, which led to high rates of delinquency and default and reduced the income on the Securities as well as their value.

EXHIBIT 57 -1041-

Countrywide therefore knew that its underwriting practices would have an adverse effect on the purchasers of its Securities, including Plaintiffs.

### 4. Omissions of Material Facts Concerning the Extent to Which Fraudulent Applications Were Processed Through Reduced-Documentation Application Programs

105.     Countrywide adopted reduced-documentation application programs, or "Stated Income" programs, which excused qualified borrowers from the general requirement of submitting documentation to confirm income and assets. Countrywide has publicly admitted that such loans will result in higher delinquencies. In a July 2007 call with analysts, John McMurray, Countrywide's Chief Risk Officer, acknowledged that "[D]ocumentation matters. The less documentation, the higher the serious delinquency, all else equal."

106.     Countrywide failed to adequately control its issuance of reduced-documentation loans. While it claimed that reduced-documentation applications were designed for self-employed professionals and business owners with high credit scores, in reality Countrywide made its reduced-documentation applications widely available to consumers without careful oversight, which was a material risk that it failed to disclose to Plaintiffs or other investors.

107.     Countrywide misrepresented or failed to disclose to Plaintiffs its practices with regard to obtaining employment and current salary information from loan applicants before approving a Mortgage Loan. In the Prospectus, Countrywide represented that, in most cases, "employment verification is obtained from an independent source (typically the borrower's employer) which verification reports, among other things, the length of employment with that organization and the borrower's current salary." This representation was false and misleading and omitted material facts necessary to make the statements not misleading; on information and

EXHIBIT 57 -1042-

belief, Countrywide failed to obtain independent verification of borrowers' income at a far greater rate than represented.

108. Even under Countrywide's "Stated Income" program, which allowed borrowers to apply for mortgage loans with lesser documentation requirements, Countrywide represented in the Prospectus Supplement that "[t]he borrower's income as stated must be reasonable for the related occupation and the determination as to reasonableness is subject to the loan underwriter's discretion." This representation was also false and misleading and omitted material facts necessary to make the statements not misleading. Countrywide's underwriters abused their discretion by abandoning Countrywide's stated loan-origination standards and knowingly approving loans for borrowers whose representations about their income, and other material information regarding their ability to repay the loans, were false. The underwriters failed to exercise proper discretion because Countrywide encouraged them to abandon the stated loan-origination guidelines through financial incentives that rewarded loan officers for increased loan originations and for originations of riskier (and hence more profitable) loans. As a former sales representative interviewed by the *New York Times* said, "The whole commission structure in both prime and subprime [loan categories] was designed to reward salespeople for pushing whatever programs Countrywide made the most money on in the secondary market."

109. Countrywide also approved mortgage loans in which the borrower's stated income was unreasonable on its face and could not have been accurately reported. Countrywide was required to exercise meaningful oversight over its borrowers, pursuant to professional standards of the underwriting industry. It is standard practice among mortgage lenders generally to try to verify employment income that appears suspicious. A borrower who inflates his income is less likely to be able to repay his loan, which leads to a higher incidence of delinquencies and

EXHIBIT 57 -1043-

defaults on the mortgage loans. Despite the prevalence of a substantial number of loan applications that contained highly suspicious reported employment income, Countrywide failed to take sufficient, if any, corrective action. Countrywide failed to disclose these practices or misrepresented them in the SPS1 and SPS2 offering documents.

110. On information and belief, Countrywide's senior management was aware that Countrywide loan officers were participating in submitting fraudulent applications through the company's reduced-documentation application programs. According to Mark Zachary, a former Countrywide executive, in and around 2006, Countrywide loan officers engaged in a practice known within Countrywide as "flipping" an application. Loan officers who learned that a loan application submitted under the full-documentation program was unlikely to be approved would "flip" the application for consideration under a reduced-documentation application program.

111. According to Zachary, loan officers would coach applicants on the level of employment income needed to qualify for a mortgage loan and would then accept a revised loan application containing an inflated reported income. The loan officer would submit the revised loan application under a reduced-documentation program for consideration by the subprime mortgage loan operations unit in Plano, Texas. According to Zachary, he complained to Countrywide's regional management but his complaints were ignored.

### 5. **Misrepresentations Regarding Countrywide's Servicing of Loans**

112. Countrywide represented in the PSAs that "[f]or and on behalf of the Certificateholders, the Master Servicer shall service and administer the Mortgage Loans in accordance with customary and usual standards of practice of prudent mortgage loan lenders in the respective states in which the Mortgaged Properties are located . . . ." This representation

EXHIBIT 57 -1044-

was also materially false and misleading and omitted material facts necessary to make the statements made not misleading.

113.    Countrywide's servicing of its mortgage loans has lagged behind the standards of the industry, contrary to Countrywide's representations.  Countrywide failed to allocate sufficient resources to service and administer the loans, such as personnel to address customer inquiries and to conduct follow-up efforts with delinquent borrowers.  Countrywide has also provided inadequate resources for work-out plans.  These failures are exacerbated by the company's break-neck origination of loans in disregard of its own underwriting guidelines, which has led to an extraordinary increase in delinquencies, defaults, foreclosures, bankruptcies, litigation, and other proceedings.  Countrywide misrepresented these practices or failed to disclose them in the SPS1 and SPS2 offering documents.

114.    In some cases, conversely, Countrywide has continued to service mortgage loans—and charge servicing fees and late fees to borrowers—long after any reasonable expectation that defaulted loans might still generate payments.  It is standard in the industry to charge off a loan after it has been delinquent for 180 days, as Countrywide itself acknowledged in the Supplemental Prospectus for SPS1, where it defined a charged-off loan as one that had been delinquent for more than 180 days.  In some cases, however, on information and belief, Countrywide has continued to service mortgage loans more than 270 days after the last payment on amounts owed on the loans had been received, in order to extract further payments from borrowers.  Countrywide misrepresented these practices or failed to disclose them in the SPS1 and SPS2 offering documents.

115.    On information and belief, Countrywide has also failed to service its mortgage loans consistent with industry standards, including, for example, by refusing to accept partial

EXHIBIT  57  -1045-

payments from borrowers. Countrywide has also charged off loans where the borrower has made payments after the date of the charge-off, to the direct detriment of Plaintiffs. Countrywide misrepresented these practices or failed to disclose them in the SPS1 and SPS2 offering documents.

**E.**      **The Countrywide Defendants' Roles in the Securitizations**

116.      The Countrywide Defendants each had a distinct and specific role in the administration of the SPS1 and SPS2 Securitizations. Each Countrywide Defendant participated in and furthered Countrywide's extensive fraud through their participation in the Securitizations. The Countrywide Defendants' roles in the Securitizations were as follows:

         a.      Defendant CHL acted as the sponsor of the SPS1 and SPS2 Securitizations and as one of the Sellers. CHL originated the Mortgage Loans that were pooled together in the Securitizations and transferred those loans to the Securitizations. Upon information and belief, CHL's loan-processing practices were characterized by blatant borrower fraud, inadequate documentation, missing verifications (for example, of borrower assets and income), title defects, excessive debt-to-income ratios, inadequate credit scores, and other material violations of underwriting guidelines established by CHL and the industry. CHL's violations caused Countrywide's representations regarding its loan-origination practices and the characteristics of its Mortgage Loans—such as its representations regarding the percentage of owner-occupied properties—to be materially false and misleading.

         b.      Defendant CHLS acted as the Master Servicer for the SPS1 and SPS2 Securitizations. In that capacity, CHLS shared responsibility with CHL for servicing the Mortgage Loans that had been pooled in the Securitizations. Among other roles, CHLS established policies for servicing and collecting the Mortgage Loans, including supervision of

EXHIBIT 57 -1046-

delinquent loans and making required inspections of the mortgaged properties. CHLS failed to service the Mortgage Loans consistent with industry standards, including, for example, by refusing to accept partial payments from borrowers, failing to allocate sufficient resources to service and administer the loans, and providing inadequate resources for work-out plans. Countrywide misrepresented these practices or failed to disclose them in the SPS1 and SPS2 offering documents.

   c. Defendant CSC was the Lead Manager of the underwriters for the SPS1 and SPS2 Securitizations. In that role, it was responsible for underwriting and managing the Securitizations' sale of Certificates to Plaintiffs and other investors. By packaging and selling the Mortgage Loans underlying the Securitizations, CSC thereby transferred the substantial risks associated with those Loans to Plaintiffs and other investors. Those risks were material facts that the Countrywide Defendants did not fully disclose or failed to disclose to Plaintiffs and other investors. Although the securities were collateralized by underlying Mortgage Loans, CSC marketed the securities by fraudulently representing that the Mortgage Loans had been originated consistent with CFC and CHL's underwriting standards for credit-blemished, second-lien loans and the strength of their reputation for conservative lending practices and high-quality loans.

   d. Defendant CFC is the corporate parent of CHL, CHLS, and CSC. In that capacity, it directed and controlled the other Countrywide Defendants' activities related to the Securitizations. In addition, CFC and/or CHL guaranteed CHLS's loan-servicing activities when required by the owner of the Mortgage Loans. As part of Countrywide's fraudulent disclosures and omissions, CFC and CHL expanded their origination of mortgage loans in order to increase overall origination revenue, as well as to increase the inventory of mortgage loans available to securitize.

EXHIBIT 57 -1047-

e.    Defendant CWABS was the Depositor for the SPS1 and SPS2 Securitizations.  CWABS purchased the SPS1 and SPS2 Mortgage Loans from CHL and one or more other Sellers pursuant to the SPS1 and SPS2 PSAs.  CWABS caused the Mortgage Loans to be assigned to the Trustee for the benefit of the holders of the Certificates, which were Plaintiffs and other investors.

f.    The SPS1 Trust was the Issuing Entity for the SPS1 Securitization.  It issued the Certificates in the SPS1 Securitization that were purchased by Plaintiffs and other investors.

g.    The SPS2 Trust was the Issuing Entity for the SPS2 Securitization.  It issued the Certificates in the SPS2 Securitization that were purchased by Plaintiffs and other investors.

117.    The attached flowchart, which was contained in the Securitizations' Prospectus Supplements, explains the roles of each Countrywide Defendant (with the exception of the Individual Defendants, whose roles in the Securitizations are described further below):

43

EXHIBIT  57  -1048-

## SUMMARY OF TRANSACTION PARTIES



118.     As indicated by the flowchart above, CHL, as Sponsor of the Securitization and one of its Sellers (along with other Countrywide entities acting as Sellers), sold the Mortgage Loans that would be pooled together in the Securitization to the Depositor, CWABS.  CWABS

EXHIBIT  57  -1049-

then conveyed the Loans to the Trustee, The Bank of New York, which held the Loans in the SPS1 and SPS2 Trusts for the benefit of Certificateholders. The SPS1 and SPS2 Trusts issued Certificates to investors such as Plaintiffs; the Certificates represented interests in the income stream of the Loans. The Master Servicer, CHLS, serviced the Loans held by the Trusts in accordance with the PSA.

119. The Individual Defendants, Mozilo and Sambol, were among Countrywide's senior management at the time the Mortgage Loans were issued, the Securitizations were created, and the Securities were sold to Plaintiffs. They were closely involved in every aspect of Countrywide's core operations, including its policies and procedures with regard to underwriting loans. Mozilo and Sambol's positions within Countrywide allowed them to control Countrywide's practices with regard to loan origination, for example, which directly affected the quality of the Mortgage Loans that were pooled together in the Securitizations and sold to Plaintiffs. Mozilo and Sambol also had the ability to control the content of Countrywide's public statements, such as its representations to investors during investor forums (where, in some cases, as cited herein, Mozilo and Sambol spoke on behalf of Countrywide), by virtue of their senior position. Moreover, Mozilo and Sambol had the ability to control the content of documents provided to Plaintiffs pursuant to their investment in the Securitizations, such as the PSAs, Preliminary Term Sheets, and Prospectuses and Prospectus Supplements, because of their senior positions within Countrywide. Therefore Mozilo and Sambol are also responsible for the fraudulent content of the SPS1 and SPS1 PSAs and other documents issued by Countrywide on which Plaintiffs relied.

120. The Countrywide Defendants provided materially false and misleading information to Plaintiffs regarding the Securitizations when Countrywide transmitted certain

EXHIBIT 57 -1050-

offering documents regarding the Securitizations to Plaintiffs. For example, Countrywide provided materially false information to Plaintiffs concerning the SPS1 Securitization in a June 26, 2006 e-mail from Randy Petsoff, a Countrywide employee, to Old Hill, as Plaintiffs' Investment Manager, in which Petsoff transmitted the Preliminary Term Sheet for SPS1 to Plaintiffs. The Preliminary Term Sheet contained misrepresentations and omissions regarding, for example, the percentage of owner-occupied properties underlying the Securitization and the percentage of "Grade A" Mortgage Loans in the Securitization.

### F.     <u>Countrywide's Scienter</u>

121.    The Countrywide Defendants had the motive and opportunity to commit fraud against Plaintiffs, as described herein. Countrywide profited enormously from its fraud in the form of increased revenue via the origination, servicing, and sale of the Mortgage Loans through the Securitizations. In fact, the riskiest loans that Countrywide originated—the credit-blemished, second-lien mortgages that were the collateral in the Securitizations that Plaintiffs invested in— generated the highest profits for Countrywide, since the interest rates on those mortgage rates were higher than rates on traditional prime loans. Moreover, Countrywide was motivated to securitize the Mortgage Loans and convince Plaintiffs and other investors to purchase its securities because securitization transferred Countrywide's risk of losses on the Loans to Plaintiffs and other investors.

122.    Countrywide had the opportunity to commit fraud because it possessed information regarding the Mortgage Loans and its origination practices that was not available to Plaintiffs, since the underlying loan information and information about Countrywide's actual (as compared to represented) origination practices was not available to public investors. Information about the Mortgage Loans underlying the Securitizations, which Countrywide refused to provide

to Plaintiffs in subsequent communications with Old Hill, would have shown Countrywide's representations about the Mortgage Loans and the Securities to be incorrect and intentionally misleading. Countrywide perpetuated its fraud by keeping information regarding the underlying Mortgage Loans and its corporate practices from Plaintiffs and other investors.

123. Countrywide's statements during its conference call with Plaintiffs provide strong circumstantial evidence of conscious misbehavior or recklessness. Countrywide sought during the call to redirect blame on borrowers rather than on its own fraud and negligence, and it sought to reassure Plaintiffs of the quality of the Securities' collateral and its underwriting and servicing practices, in the face of considerable evidence to the contrary. Countrywide, but not Plaintiffs, knew the truth regarding its underwriting practices but did not share that information with them. Countrywide sought to reassure Plaintiffs during the call in the hopes of ensuring ongoing investments from Plaintiffs—indeed, in the weeks before the conference call Countrywide had asked Plaintiffs to make margin calls on the Securities.

124. Countrywide's underwriting practices also provide strong circumstantial evidence of conscious misbehavior or recklessness. Countrywide adopted a new corporate culture under the direction of Mozilo and Sambol of writing as many mortgage loans as possible—and at the highest interest rates and fees possible—regardless of the creditworthiness of the borrower. Once Mozilo and Sambol had determined that profit growth through securitization required substantially increased levels of loan origination, Countrywide motivated its loan officers and external brokers to drive up loan volume regardless of material deviations from stated underwriting guidelines.

125. Countrywide's deteriorating underwriting practices enabled the processing of loan applications characterized by blatant borrower fraud, inadequate documentation, missing

47

EXHIBIT 57 -1052-

verifications (for example, of borrower assets and income), title defects, excessive debt-to-income ratios, inadequate credit scores, and other material violations of underwriting guidelines established by Countrywide and the industry. These violations made Countrywide's related representations regarding the Mortgage Loans materially false and misleading.

126. Upon information and belief, the incidence of material discrepancies in the Loans underlying the Securities is so high that it could not have been the result of human error. Rather, the discrepancies suggest conscious misbehavior or recklessness by Countrywide. Countrywide ignored sound underwriting methodology, and it knew that its failure to uphold its own underwriting guidelines would result in the issuance of loans to borrowers that they would be unable to repay. These failures fundamentally changed the Mortgage Loans' risk profile, as Countrywide knew, increasing the likelihood of losses through defaults compared with Plaintiffs' reasonable expectations and the performance of comparable mortgage-backed securities in the market.

127. Countrywide knew or should have known that the statements it made to investors in the SPS1 and SPS2 offering documents contained material misrepresentations and omissions with regard to its underwriting practices, because those statements were at odds with its practice of issuing highly risky mortgage loans to non-creditworthy borrowers, often without requiring adequate documentation to verify the borrowers' income or collateral. The *New York Times* has disclosed internal Countrywide documents showing that the company endorsed the issuance of risky mortgage loans, such as adjustable-rate mortgages, to borrowers without regard to their creditworthiness.

128. The U.S. District Court for the Central District of California concluded in its 2008 order in *In re Countrywide* that the plaintiffs in that action had presented a "cogent and

EXHIBIT 57 -1053-

compelling inference of scienter" as to each defendant, based on similar allegations and facts as in this Complaint. 588 F.Supp.2d at 1156. The court stated that Countrywide's public representations about its loan origination, servicing, and other topics "go to scienter because they . . . directly contradict the [complaint's] allegations about Countrywide's core operations[, such as the allegation that Countrywide abandoned its underwriting standards]. If the [complaint's] allegations are accurate, these statements [by Countrywide] are so objectively out of line with Countrywide's practices that they contribute to a strong inference of scienter." *Id.* at 1185.

129. As for the Individual Defendants, in particular, Mozilo and Sambol had the motive and opportunity to commit fraud and there is strong circumstantial evidence of their conscious misbehavior or recklessness. Mozilo and Sambol benefitted from the fraud in the form of increased revenue for the corporation they led, which personally benefited them in the form of increased compensation and increased value of their Countrywide investments, among other ways. Mozilo and Sambol knew facts or had access to information suggesting that their public statements, and the statements of the Countrywide Defendants, were incorrect, but they failed to disclose that information or adequately investigate whether the statements were in fact incorrect.

130. Mozilo and Sambol were closely involved in the daily management of all aspects of Countrywide's core operations. During a conference call with analysts in 2005, Mozilo stated that "I do participate every day in originations myself, and it keeps me apprised of what's happening." Mozilo and Sambol were also involved with management committees and the Board of Directors, which kept them apprised of developments in Countrywide's business practices and the mortgage industry. Mozilo and Sambol were also responsible for making or

EXHIBIT  57  -1054-

overseeing many of the public statements issued by Countrywide that contained material misrepresentations.

131. The court in *In re Countrywide* also recognized that Mozilo and Sambol's actions give rise to a strong inference of scienter. The court concluded that "Some of [Mozilo's] public statements appear to demonstrate that he knew others of his statements were false when made." *Id.* at 1192. The court highlighted many examples in which Mozilo offered upbeat analyses of Countrywide's business practices despite his apparent knowledge that Countrywide was abandoning its loan-origination standards. The court concluded that "Accepting the [complaint's] extensive allegations regarding Mozilo's understanding of Countrywide's day-to-day operations—his self-proclaimed 'hands on' approach, his long career with Countrywide, and the detailed loan and exception statistics [that Mozilo presented publicly]—the [complaint] supports the inference that Mozilo intended his statements to mislead the market . . . ." *Id.* at 1193.

132. As for Sambol, in light of his senior management position as President and Chief Operating Officer, the court held that "Taken together, Sambol's job positions, duties, and access to corporate reports and information systems give rise to a strong inference of scienter." The same reasoning applies in this case: Mozilo and Sambol had the motive and opportunity to commit fraud against Plaintiffs, as described herein, by virtue of their senior management positions in Countrywide.

### G. Plaintiffs' Reliance on Countrywide's Fraudulent Statements

133. Plaintiffs relied on Countrywide's false representations and omissions of material fact regarding its underwriting standards and the characteristics of its loans when they purchased the Securities. But for Countrywide's fraudulent representations and omissions—such as

50

EXHIBIT 57 -1055-

Countrywide's representation that over 99 percent of the Mortgage Loans were applied to owner-occupied properties—Plaintiffs would not have purchased or otherwise acquired the Securities, because those representations and omissions were necessary to assure Plaintiffs that the Securities were safe investments.

134. Countrywide's false statements and misrepresentations and omissions of material fact caused Plaintiffs to suffer losses on the Securities, because the Securities were in fact far riskier—and their rate of default far higher—than Countrywide had described them to be. The Mortgage Loans underlying the Securities experienced default and delinquency at a much higher rate due to Countrywide's abandonment of its loan-origination guidelines. Plaintiffs' losses have been much greater than they would have been if the Mortgage Loans were as Countrywide described them to be (i.e. much higher quality investments).

### H. Countrywide's Corrupt Practices are Publicly Revealed

135. Countrywide's campaign to increase loan origination revenue by lowering and ultimately abandoning its underwriting standards has been a disaster for its investors. Countrywide's market capitalization declined by more than 90% in just one year, losing $25 billion in value. Bank of America acquired Countrywide on July 1, 2008 for just 27% of Countrywide's stated $15.3 billion book value.

136. The scope and breadth of Countrywide's fraudulent schemes and other unlawful conduct have prompted a considerable number of public and private investigations and legal actions. The enormous amount of evidence of Countrywide's wrongdoing that is reflected in those investigations and actions reinforces the fraudulent basis of Countrywide's representations to Plaintiffs in this action, including its representations in the Securities' offering documents and in Countrywide's communications with Plaintiffs.

EXHIBIT 57 -1056-

137.    On information and belief, the Department of Justice and the Securities and Exchange Commission are investigating Countrywide's allegations that Countrywide engaged in securities fraud in offerings of mortgage-backed securities in the secondary market, that false and misleading disclosures were made to influence the trading price of Countrywide's stock, and that Mozilo and Sambol engaged in insider trading.

138.    Many states and municipalities have announced investigations of Countrywide's lending practices, and several have commenced actions against Countrywide, including the following:

a.      In *People of the State of California v. Countrywide Financial Corp.,* the California Attorney General filed a civil action on behalf of Countrywide borrowers in California against Countrywide, Mozilo and Sambol, asserting statutory claims for false advertising and unfair competition based on their plan to increase the volume of mortgage loans for securitization without regard to borrower creditworthiness.

b.      In *People of the State of Illinois v. Countrywide Financial Corp.,* the Illinois Attorney General filed a civil suit on behalf of Illinois borrowers against Countrywide and Mozilo, on the basis of state consumer-protection and unfair-competition statutes.  The Attorney General alleges that, beginning in or around 2004, Countrywide engaged in unfair and deceptive practices, including lowering underwriting standards, structuring risky loan products, and engaging in misleading marketing and sales practices.

c.      In *State of Connecticut v. Countrywide Financial Corp.,* the Connecticut Insurance Commissioner commenced a civil action asserting that Countrywide violated state unfair and deceptive practices laws by deceiving consumers into obtaining mortgage loans which they were not suited for and could not afford.

52

EXHIBIT  57  -1057-

d. In *Office of the Attorney General for the State of Florida v. Countrywide Financial Corp.*, the Florida Attorney General commenced a civil action against Countrywide and Mozilo, asserting statutory unfair-practices claims. The Attorney General alleged that Countrywide promoted a deceptive scheme to issue subprime mortgage loans to unqualified borrowers. The Attorney General alleged that Countrywide falsely represented that it originated loans in accordance with its underwriting guidelines and that each borrower had the ability to repay those loans. The Attorney General also asserted state securities-law claims, alleging that Countrywide sold mortgage-backed securities based on fraudulent misrepresentations.

e. In *State of Washington v. Countrywide Financial Corp.*, the Washington Attorney General filed a civil action asserting that Countrywide violated state anti-discrimination laws in 2005 and 2006 by engaging in racially-discriminatory lending.

f. In *State of Indiana v. Countrywide Financial Corp.*, the State of Indiana filed a civil action asserting that Countrywide violated the state's unfair and deceptive practices law by deceiving consumers into obtaining mortgage loans that they were not suited for and could not afford.

g. In *State of West Virginia v. Countrywide Financial Corp.*, the West Virginia Attorney General asserted civil claims against Countrywide alleging violations of state unfair-competition statutes.

h. In *City of Cleveland v. Countrywide Financial Corp.*, the city has asserted claims against Countrywide for, among other things, extending loans to borrowers when it knew that those borrowers could not afford to repay them.

EXHIBIT  57  -1058-

i.     In *City of San Diego  v. Countrywide Financial Corp.,* the city has asserted claims against Countrywide for engaging in predatory lending practices in violation of consumer-protection statutes.

139.    In addition to these numerous actions by states or state officials, the Department of Justice and the U.S. Trustees for federal bankruptcy courts in several judicial districts, including the Districts of Rhode Island, Western Pennsylvania, Texas, Florida and Georgia, have commenced investigations of Countrywide's allegedly fraudulent foreclosure practices.  For example, in the Western District of Pennsylvania, on information and belief, Countrywide's practices were under investigation in connection with at least 300 debtors' proceedings in that district.  Similarly, the Assistant U.S. Trustee for the District of Rhode Island, in testimony about his investigation, explained that after reviewing cases filed since 2002, "we have a specific and grave concern" that Countrywide is trying to obtain money and property from debtors "under false pretenses."  The U.S. Trustee for the District of Georgia filed suit against Countrywide, noting that "In recent years, Countrywide and its representatives have been sanctioned for filing inaccurate pleadings and other similar abuses within the bankruptcy system."

140.    Furthermore, dozens of private actions have been commenced against Countrywide, including shareholder actions challenging the accuracy and completeness of its statements in and around the period between 2004 and 2007, particularly allegations that Countrywide failed to disclose the expansion of its origination of subprime and other higher-risk mortgage loans, as well as consumer actions challenging Countrywide's lending practices. Plaintiffs have defeated Countrywide's motions to dismiss in at least three litigations brought under the federal securities laws:  *In Re Countrywide Financial Corp. Securities Litigation*, 588 F.Supp.2d 1132 (C.D. Cal. 2008); *Argent Classic Convertible Arbitrage Fund L.P. v.*

EXHIBIT  57  -1059-

*Countrywide Financial Corp.*, 2:07-CV-07097-MRP (C.D. Cal. March 19, 2009) (order denying

all defendants' motion to dismiss except for Bank of America); *New Mexico State Investment*

*Council v. Countrywide Financial Corp.*, D-0101-CV-2008-02289 (1st Judicial Dist. Ct. April

14, 2008) (order denying defendants' motion to dismiss but granting motion to dismiss for lack

of personal jurisdiction).

## I.     **Plaintiffs' Damages Arising From Countrywide's Fraud**

141.     Countrywide's fraud has caused millions of dollars in damages to Plaintiffs.

142.     Countrywide originated and conveyed an enormous number of Mortgage Loans to

the Trusts, which were intended to generate income for the Securities that Plaintiffs purchased,

that materially failed to comply with Countrywide's stated underwriting guidelines, even under

the loosened standard that Countrywide stated applied to the credit-blemished, second-lien

Mortgage Loans in the Securitizations. Countrywide issued the Loans to borrowers that

Countrywide knew or should have known would not be able to repay the Loans, thus leading to

high rates of delinquency and default that greatly damaged Plaintiffs and other investors.

143.     The Mortgage Loans also failed to live up to other representations made by

Countrywide, such as its representation that over 99 percent of the underlying Mortgage Loans

were given to owner-occupied properties. The fact that the Mortgage Loans were not applied to

owner-occupied properties at the stated rate of over 99 percent made the Mortgage Loans more

prone to default than they would have been if the Loans were in fact applied to owner-occupied

properties at a rate of over 99 percent. Owners who do not occupy their properties are more

likely to default on their loans, which made the Securities that Plaintiffs purchased poorer

investments, accelerated the Securities' decline in value, and greatly worsened Plaintiffs' losses.

EXHIBIT 57 -1060-

For this and other reasons, because of Countrywide's fraudulent and negligent lending practices, the rate of delinquency and default in the Securities has been extremely high.

144. The drastic and rapid loss in value of Plaintiffs' Securities was caused by Countrywide's issuance of loans to borrowers who could not afford them, not due to the recent decline in the American housing market and mortgage-backed securities markets. Those broader market declines occurred long after the Securities experienced high rates of delinquency and default. If the Loans that Countrywide pooled in the Securitizations had reflected the characteristics that Countrywide falsely represented they possessed—for example, if 99 percent of the Loans had been applied to owner-occupied properties—the rates of default and decline on the Loans would have been much lower and the Securities would have preserved much more of their value.

145. Countrywide's fraud has caused millions of dollars in damages to Plaintiffs, in the form of lost principal and lost interest. Footbridge and Opportunity have lost nearly their entire investment of approximately $43,375,000 in the Securities. Plaintiffs have written off all but one of the Securities as complete losses and have sold one Security at a fraction of the purchase price. Due to the decline in the Securities' value, which was caused by Countrywide's fraud and negligent misrepresentations, and due to the consequent writing off and sale of the Securities, Plaintiffs have also been deprived of millions of dollars in interest payments on the Securities which otherwise would have accrued.

146. Plaintiffs have also suffered opportunity costs arising from the Securities in the form of financial and personnel resources that could otherwise have been directed towards non-fraudulent investments that would have offered better investment value.

EXHIBIT 57 -1061-

147.    The precise amount of Plaintiffs' opportunity costs and other losses is to be determined at trial.

## FIRST CAUSE OF ACTION

### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Countrywide Defendants)

148.    Plaintiffs reallege and incorporate each and every allegation contained above as if fully set forth herein.

149.    The Countrywide Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

150.    The Countrywide Defendants are each liable as primary participants in the wrongful conduct charged herein or as controlling persons, as set forth in paragraph 115, *supra*, and elsewhere herein.

151.    The Countrywide Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Securitizations from Plaintiffs.  The course of conduct whereby the Countrywide Defendants concealed material information from Plaintiffs is reflected in the misrepresentations and omissions set forth in paragraphs 64 through 111, *supra*, and elsewhere herein.  This course of conduct included, for example, Countrywide's failure to disclose the extent of its liberalized underwriting practices and its attempt during the parties' conference call to blame the Securities'

EXHIBIT  57  -1062-

decline in value on alleged real-estate speculators rather than on its fraudulent origination practices.

152.    The Countrywide Defendants conveyed these material misrepresentations and omissions to Plaintiffs through the use of interstate mail, electronic mail, and telephone conversations. For example, Countrywide's conference call with Old Hill, during which Countrywide sought to blame alleged real-estate speculators for the decline in value of the Securities, took place with participants in California, Connecticut, and New York. Countrywide also transmitted documents containing material misrepresentations by email between Countrywide representatives, who upon belief were located in California (where Countrywide is headquartered), with Plaintiffs' representatives in Connecticut.

153.    The Countrywide Defendants employed devices, schemes and artifices to defraud Plaintiffs while in possession of material, adverse, non-public information, including their failure to fully disclose the full extent of Countrywide's loosened loan-origination practices and their refusal to fully disclose information regarding the Mortgage Loans, as alleged in paragraphs 64 through 111 and paragraph 118, *supra*, and elsewhere herein.

154.    The Countrywide Defendants engaged in acts, practices, and a course of conduct in an effort to assure Plaintiffs of the value and investment potential of the Securitizations. Those efforts included making or participating in making untrue statements of material fact, as well as omitting material facts that were necessary to make its statements about the Securitizations, in the light of the circumstances under which they were made, not misleading, as alleged in paragraphs 64 through 111, *supra*, and elsewhere herein. The Countrywide Defendants also engaged in transactions, practices, and a course of business which operated as a

58

EXHIBIT  57  -1063-

fraud and deceit upon Plaintiffs, for example by issuing loans to borrowers that they knew or should have known could not afford to repay the loans, as alleged herein.

155.    The Countrywide Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or by deliberately refraining from taking those steps necessary to discover whether the material facts were false or misleading. The Countrywide Defendants' material misrepresentations and/or omissions of material facts were made knowingly or with a reckless disregard for the truth and for the purpose and effect of concealing their fraudulent business practices from Plaintiffs, as alleged herein.

156.    The Individual Defendants, in addition to the bases of liability described herein as applied generally to the Countrywide Defendants, are also liable for Countrywide's fraud, both primarily and as controlling persons, because they were senior executives and Directors of Countrywide at all relevant times; they were privy to and participated in the dissemination of materially false and misleading statements and omissions of material fact on behalf of Countrywide; and they knew or recklessly disregarded the fact that Countrywide was making representations to Plaintiffs that were materially false and misleading and omitted material facts necessary to make the statements not misleading.

157.    As a result of the Countrywide Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs were misled into believing that the Securities were more creditworthy investments than they actually were.

158.    Plaintiffs purchased the Securities without knowing that Countrywide had misstated or omitted material facts about the Securitizations—for example, by misstating the

59

EXHIBIT  57   -1064-

percentage of Mortgage Loans applied to owner-occupied properties—as set forth in paragraphs 64 through 111, *supra*, and elsewhere herein. In purchasing the Securities, Plaintiffs relied directly or indirectly on false and misleading statements made by Countrywide, and/or an absence of material adverse information that was known to Countrywide or recklessly disregarded by it but not disclosed in Countrywide's public statements or its communications with Plaintiffs. Plaintiffs were damaged as a result of their reliance on Countrywide's false statements and misrepresentations and omissions of material facts, as described in paragraphs 64 through 111, *supra*, and elsewhere herein.

159. At the time of said false statements, misrepresentations and omissions, Plaintiffs were ignorant of their falsity and believed them to be true. Had Plaintiffs known the truth regarding Countrywide's abandonment of its loan origination guidelines, which was not disclosed by Countrywide, Plaintiffs would not have purchased or otherwise acquired the Securities.

160. By virtue of the foregoing, the Countrywide Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

161. As a direct and proximate result of Countrywide's wrongful conduct, Plaintiffs have suffered damages in connection with the purchase and subsequent sale and writing off of the Securities.

## SECOND CAUSE OF ACTION

### (Violation of § 20(a) of the Securities Exchange Act of 1934 Against the Individual Defendants)

162. Plaintiffs reallege and incorporate each and every allegation contained above as if fully set forth herein.

EXHIBIT 57 -1065-

163.    Each of the Countrywide Defendants is liable as a direct participant and primary violator with respect to the wrongdoing discussed in this Complaint. In addition, the Individual Defendants, by reason of their status as senior executive officers and Directors of Countrywide, directly or indirectly controlled the conduct of Countrywide's business and its representations to Plaintiffs, including its representations through investor forums, SEC filings, and other public communications, within the meaning of § 20(a) of the Exchange Act. The Individual Defendants, also by reason of their status as senior executive officers and Directors of Countrywide, directly or indirectly controlled the content of the SPS1 and SPS2 PSAs, Preliminary Term Sheets, Prospectuses and Prospectus Supplements, and other documents provided to Plaintiffs, within the meaning of § 20(a) of the Exchange Act. Therefore the Individual Defendants are jointly and severally liable for Countrywide's fraud, as alleged herein.

164.    The Individual Defendants, as senior executive officers and directors of Countrywide, had regular access to non-public information about Countrywide's business, operations, and performance through access to internal corporate documents and information and through communications with Countrywide officers, board members, and employees. Moreover, because of the Individual Defendants' high-level management positions within Countrywide, they controlled and/or had the authority to control the content of certain of Countrywide's documents, including the Securities' PSAs and Prospectuses, which Plaintiffs allege contained material misstatements. Upon information and belief, the Individual Defendants had the opportunity to review such documents and other communications that contained public representations by Countrywide, such as SEC filings and press releases, prior to their issuance, or to prevent their issuance or cause them to be corrected.

EXHIBIT 57 -1066-

165.    Given their high-level, informed knowledge of Countrywide mortgage-lending practices, and given their control over Countrywide's operations, the Individual Defendants knew or recklessly disregarded the risks associated with originating loans to borrowers who could not afford them and otherwise loosening or abandoning Countrywide's loan-origination guidelines.  Defendants also knew or recklessly disregarded the fact that Countrywide's representations about the Securitizations were materially false and misleading and/or omitted material facts when made.  In so doing, the Individual Defendants did not act in good faith.

166.    By virtue of their high-level positions, participation in, and awareness of Countrywide's operations and public statements, the Individual Defendants were able to and did influence and control Countrywide's decision-making, directly or indirectly, including controlling the content and dissemination of the documents that Plaintiffs contend contained materially false and misleading information and on which Plaintiffs relied.  The Individual Defendants had the ability to prevent the issuance of the false statements or to cause the statements to be corrected, but they did not do so.

167.    The Individual Defendants had direct and supervisory involvement in Countrywide's day-to-day operations through, among other means, their duties as the highest-level officers of Countrywide; their positions on Countrywide Board of Directors committees that were directly responsible for monitoring and planning Countrywide's risk management and other activities; and their participation in meetings regarding Countrywide's significant credit risk exposure and losses arising from its lending practices.  Because of their intimate involvement, the Individual Defendants are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein.

62

EXHIBIT  57  -1067-

168.     As set forth above, Countrywide and the Individual Defendants each violated §
10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged in
this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are
also liable pursuant to § 20(a) of the Exchange Act.

169.     As a direct and proximate result of Defendants' wrongful conduct, including the
wrongful conduct of the Individual Defendants, Plaintiffs suffered damages in connection with
their purchase of the Securities.

## THIRD CAUSE OF ACTION

### (Common-Law Fraud Against the Countrywide Defendants)

170.     Plaintiffs reallege and incorporate each and every allegation contained above as if
fully set forth herein.

171.     Countrywide has made fraudulent and false statements of material fact, and has
omitted material facts necessary in order to make its statements, in light of the circumstances
under which they were made, not misleading, as alleged in paragraphs 64 through 111, *supra*,
and elsewhere herein.  Countrywide knew at the time it entered into each agreement that the
foregoing statements were false or, at the very least, made recklessly, without any belief in the
truth of the statements.

172.     Countrywide's misrepresentations of facts, and omissions of fact that caused other
statements of fact to be misleading, relate to its own acts and omissions.  It was only by making
such representations that Countrywide was able to induce Plaintiffs to purchase the Securities,
because Plaintiffs would not have purchased or otherwise acquired the Securities but for
Countrywide's fraudulent representations and omissions about the Securities' quality and
security, such as the representation that over 99 percent of the properties receiving Mortgage

EXHIBIT  57  -1068-

Loans were owner-occupied and the representation that over 90 percent of the properties were Grade A in quality.

173.    Countrywide intended to defraud Plaintiffs. Countrywide knew that Plaintiffs were relying on its expertise, and it encouraged such reliance through the offering documents, during the parties' conference call and other communications, and through its public representations, as described herein. Countrywide knew that Plaintiffs would rely upon its representations in connection with Plaintiffs' decision to purchase the Securities. Based on Countrywide's expertise and specialized knowledge, and in light of its false and misleading representations, Countrywide owed a duty to Plaintiffs to disclose material facts about the Securitizations.

174.    Plaintiffs or their predecessors justifiably, reasonably, and foreseeably relied on Countrywide's representations and false statements regarding the Mortgage Loans and the Securities. Countrywide's representations substantially influenced Plaintiffs' decision to purchase the Securities. Plaintiffs would not have purchased or otherwise acquired the Securities had they known that Countrywide's representations about the Mortgage Loans and the Securities were false and misleading and that Countrywide had omitted material information about the Loans and Securities.

175.    As a result of Countrywide's false and misleading statements and omissions, as alleged herein, Plaintiffs have suffered damages that include, but are not limited to, an almost complete loss of Plaintiffs' investment in the Securities, lost interest payments, and lost opportunity costs.

176.    Because Countrywide committed these acts and omissions maliciously, wantonly and oppressively, and because the consequences of Countrywide's acts knowingly affected the

EXHIBIT  57  -1069-

general public, including but not limited to all persons with interests in the Securitizations, Plaintiffs are entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION

### (Negligent Misrepresentation Against the Countrywide Defendants)

177.    Plaintiffs reallege and incorporate each and every allegation contained above as if fully set forth herein.

178.    Countrywide was aware that Plaintiffs relied on its expertise and experience and depended upon it for accurate and truthful information.  Countrywide also knew that the facts regarding Countrywide's compliance with its underwriting standards, servicing practices, and other business activities were exclusively within its control.  Plaintiffs did not have full access to information in Countrywide's possession regarding Countrywide's loan origination practices and regarding the Mortgage Loans underlying the Securities.

179.    Countrywide had a duty to provide Plaintiffs complete, accurate, and timely information regarding the Mortgage Loans, Securitizations, and Securities, which it held out for sale knowing that Plaintiffs and other investors would reasonably rely on the information Countrywide provided to them.  Countrywide breached its duty to provide complete, accurate, and timely information to Plaintiffs.

180.    Plaintiffs reasonably relied on the information that Countrywide provided to them and were damaged as a result of Countrywide's misrepresentations and omissions.

## FIFTH CAUSE OF ACTION

### (Vicarious Liability Against Bank of America)

181.    Plaintiffs reallege and incorporate each and every allegation contained above as if fully set forth herein.

EXHIBIT  57  -1070-

182.    Bank of America is liable for Countrywide's wrongdoing, in its entirety, as alleged in the foregoing paragraphs, because it is Countrywide's successor, as provided by the agreements governing the Securitizations and common law.

183.    The PSAs that govern the SPS1 and SPS2 Securitizations expressly provide that if the Depositor, CWABS, Inc.; the Master Servicer, CHLS; or any Seller, including CHL and certain other Countrywide entities, merge into another entity, that entity shall be its successor. The same Countrywide entities, including CHLS and CHL, are defined in the PSAs to include their "successors and assigns."

184.    CFC, an individual Countrywide Defendant and the parent of the wholly-owned subsidiaries that comprise the other Countrywide Defendants (besides the Individual Defendants), merged into a wholly-owned Bank of America subsidiary on July 1, 2008. As a result, CFC and its wholly-owned subsidiaries are now collectively wholly-owned subsidiaries of Bank of America, and are in the process of becoming fully merged into Bank of America. The Countrywide Defendants have retained their pre-merger names, for now, because the Bank of America subsidiary was renamed Countrywide Financial Corporation upon execution of the merger and because the Countrywide Defendants are in the process of combining their businesses with Bank of America's.

185.    Because CFC has merged with Bank of America, the subsidiaries named in the PSAs—CWABS, Inc.; CHL and the other Sellers; and CHLS—thereby also merged into Bank of America. Under the express terms of the PSAs, Bank of America is the successor to the Countrywide Defendants CHL and CHLS.

186.    Bank of America is also liable for Countrywide's wrongdoing, in its entirety, under New York common law, because Bank of America and Countrywide merged or

consolidated and because Bank of America has expressly or impliedly assumed Countrywide's tort liabilities.

187.     Bank of America and Countrywide have confirmed publicly that they have merged.  For example, the Bank of America website announces that the companies have merged, and the Countrywide website links to the Bank of America webpage regarding the merger.  Bank of America notes on its website that it is "combining the valuable resources and extensive product lines of both companies," Bank of America and Countrywide.  In its 2008 Annual Report, Bank of America confirmed that "On July 1, 2008, we acquired Countrywide through its merger with a subsidiary" of the Bank, and it stated that the merger "significantly improved our mortgage originating and servicing capabilities, making us a leading mortgage originator and servicer."

188.     As is customary in large corporate mergers, at least some of the Countrywide Defendants have retained their pre-merger corporate names following the merger with Bank of America.  Countrywide's operations will soon be fully merged into Bank of America and the Countrywide entities will lose any independent identity they have maintained following the merger.  In a January 2008 press release announcing the upcoming merger with Countrywide, Bank of America noted that it planned "to operate Countrywide separately under the Countrywide brand," and that integration would occur in 2009.  Bank of America has more recently announced that it will change Countrywide's name to "Bank of America Home Loans" on April 27, 2009.  The bank's 2008 Annual Report confirms that in late April "we'll begin rebranding all Countrywide operations as Bank of America Home Loans."

189.     Following its merger with Countrywide, Bank of America has also taken steps to expressly and impliedly assume Countrywide's liabilities.  Substantially all of CFC and CHL's

EXHIBIT  57  -1072-

assets were transferred to Bank of America on November 7, 2008, "in connection with Countrywide's integration with Bank of America's other businesses and operations," along with certain of Countrywide's debt securities and related guarantees.  Countrywide ceased filing its own financial statements in November 2008, and instead its assets and liabilities have been included in Bank of America's recent financial statements.  Bank of America has paid to restructure certain of Countrywide's home loans on its behalf, including settling a predatory-lending lawsuit brought by state attorneys general by agreeing to modify up to 390,000 Countrywide loans, an agreement valued at up to $8.4 billion.  Bank of America restructured 300,000 home loans in 2008, of which 87% had been made or serviced by Countrywide.

190.    Under the terms of the PSAs that govern the SPS1 and SPS2 Securitizations and common law, Countrywide and Bank of America are each jointly and severally liable for Countrywide's wrongdoing, as it is alleged herein.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for relief as follows:

An award of damages against Defendants, in an amount to be proven at trial, but including at a minimum:

a.    Plaintiffs' losses, including lost principal, lost interest payments, and lost opportunities;

b.    Punitive damages for Plaintiffs' common-law fraud claim;

c.    Attorneys' fees and costs;

d.    Prejudgment interest at the maximum legal rate; and

e.    Such other and further relief as the Court may deem just and proper.

EXHIBIT  57   -1073-

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by

jury on all issues triable by jury.

DATED:   New York, New York
          April 23, 2009

                    QUINN EMANUEL URQUHART OLIVER &
                      HEDGES, LLP

By: _____
     Daniel L. Brockett
     David D. Burnett
     51 Madison Avenue, 22nd Floor
     New York, New York  10010-1601
     Telephone:  (212) 849-7000
     Fax:  (212) 849-7100
     danbrockett@quinnemanuel.com
     daveburnett@quinnemanuel.com

     Marshall M. Searcy III
     865 S. Figueroa St. 10th Floor
     Los Angeles, California 90017
     Telephone:  (213) 443-3000
     Fax:  (213) 443-3100
     marshallsearcy@quinnemanuel.com

     *Attorneys for Plaintiffs Footbridge Limited*
     *Trust and OHP Opportunity Limited Trust*

EXHIBIT  57  -1074-