# EXHIBIT A

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
FOOTBRIDGE LIMITED TRUST AND OHP
OPPORTUNITY LIMITED TRUST,

                                    Plaintiffs,                    09 Civ. 4050 (PKC)

              -against-                                            MEMORANDUM AND ORDER

COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE HOME LOANS
SERVICING LP, COUNTRYWIDE
SECURITIES CORP., CWABS, INC.,
CWABS ASSET-BACKED CERTIFICATES
TRUST 2006-SPS1, CWABS ASSET-
BACKED CERTIFICATES TRUST 2006-
SPS2, ANGELO R. MOZILO, DAVID
SAMBOL, BANK OF AMERICA CORP.
AND BAC HOME LOANS SERVICING, LP,

                                    Defendants.
--------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

              Plaintiffs Footbridge Limited Trust and OHP Opportunity Limited Trust

(the "Funds") assert claims for violations of section 10(b) of the Securities Exchange Act

of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R.

§ 240.10b-5, and a state-law claim for common-law fraud.  The claims arise out of

plaintiffs' purchase of mortgage-backed securities ("MBS") from Countrywide through

two public offerings (the "Securitizations").  Defendants move to strike certain portions

of the Second Amended Complaint (the "SAC").  Defendants also move to dismiss the

SAC under Rules 9(b) and 12(b)(6), Fed. R. Civ. P.  For the reasons stated below,

defendants' motion to strike is granted in part and denied in part and the motion to

dismiss (Docket No. 37) is granted.

BACKGROUND

I.      Factual History

        The facts below are taken from the SAC.  Non-conclusory factual

allegations are taken as true for purposes of this motion.  See Ashcroft v. Iqbal, 129

S.Ct. 1937, 1949-50 (2009).

        1.      The Parties

        Plaintiff Footbridge Limited Trust ("Footbridge") is a Bermuda Trust with

a principal place of business in Connecticut.  (SAC ¶ 9.)  Plaintiff OHP Opportunity

Limited Trust ("OHP") is a Bermuda Trust with a principal place of business in

Connecticut.  (Id. ¶ 10.)  Plaintiffs are investment funds managed by Old Hill Partners,

Inc. ("Old Hill"), a Delaware corporation whose principal place of business is not

alleged.  (Id. ¶ 11.)  Old Hill acts as an investment manager for Footbridge and OHP and

makes investment decisions on their behalf.  (Id.)

        Defendant Countrywide Financial Corporation ("CFC") is a Delaware

corporation with its principal place of business in California.  (Id. ¶ 12.)  "CFC, itself or

through its subsidiaries, writes, sells, and services single-family home mortgages, home

equity loans, commercial mortgages, and subprime mortgages.  It also buys and sells

mortgages, offers asset management and brokerage services, and provides insurance

products."  (Id.)

        Defendant Countrywide Home Loans, Inc. ("CHL") is a wholly-owned

subsidiary of CFC and is a New York corporation with its principal place of business in

California.  (Id. ¶ 13.)  "CHL is engaged primarily in the mortgage banking business, and

as part of that business, it originates, purchases, sells, and services mortgage loans."  (Id.)

EXHIBIT A  -7-

Defendant Countrywide Home Loans Servicing LP ("CHLS") is a wholly-owned subsidiary of CFC and is a limited partnership organized under the laws of Texas with its principal place of business in Texas. (Id. ¶ 14.) "CHLS services mortgage loans that are originated by CHL." (Id.)

Defendant Countrywide Securities Corporation ("CSC") is a wholly-owned subsidiary of CFC and is a California corporation with its principal place of business in California. (Id. ¶ 15.) "CSC trades securities and underwrites offerings of mortgage-backed securities." (Id.)

Defendant CWABS, Inc. ("CWABS") is a Delaware corporation and a limited-purpose finance subsidiary of CFC with its principal place of business in California. (Id. ¶ 16.) CWABS was the Depositor for the SPS1 and SPS2 Securitizations. (Id.)

Defendants CWABS Asset-Backed Certificates Trust 2006-SPS1 (the "SPS1 Trust") and CWABS Asset-Backed Certificates Trust 2006-SPS2 (the "SPS2 Trust) are common-law trusts formed by CWABS under the laws of New York. (Id. ¶¶ 17-18.) The SPS1 Trust and the SPS2 Trust were the Issuing Entities for the SPS1 and SPS2 Securitizations, respectively. (Id.) All claims against the SPS1 Trust and the SPS2 Trust were dismissed without prejudice pursuant to a stipulation and order of voluntary dismissal entered on November 12, 2009. (Docket No. 60.)

Defendant Angelo R. Mozilo is Countrywide's co-founder. (SAC ¶ 19.) Mozilo served as Chairman of CFC's Board of Directors from March 1999 until July 1, 2008. (Id.; Decl. of David Spears, Ex. A, Form DEF 14A for CFC dated Apr. 28, 2006 ("CFC Apr. 2006 Form DEF"), at 8.) Mozilo also served as CEO of CFC from February

1998 until July 1, 2008. (SAC ¶ 19; CFC Apr. 2006 Form DEF at 8.) He was also President of CFC from March 2000 through December 2003 and has been a member of CFC's Board since the time it was founded in 1969. (SAC ¶ 19; CFC Apr. 2006 Form DEF at 8.) Mozilo also served in "other executive roles" until the time he left Countrywide on July 1, 2008. (SAC ¶ 19.)

Defendant David Sambol "joined Countrywide" in 1985 and served as CFC's President and COO from September 2006 until his retirement in 2008. (Id. ¶ 20.) Sambol also served as Chairman, CEO, and a member of the Board of Directors of CHL beginning in 2007. (Id.) Sambol held "numerous management positions in Countrywide companies," including his position as President and COO of CHL and Executive Managing Director for Business Segment Operations from 2004 until 2006. (Id.)

The SAC collectively refers to CFC, CHL, CHLS, CSC, CWABS, the SPS1 Trust, the SPS2 Trust, Mozilo, and Sabol as "Countrywide" or "the Company" or the "Countrywide Defendants." I employ plaintiffs' chosen terminology here.

Defendant Bank of America Corporation ("BofA") is a Delaware corporation with its principal place of business in North Carolina. (Id. ¶ 21.) According to the SAC, CFC "merged into a wholly-owned [BofA] subsidiary on July 1, 2008." (Id. ¶ 259.) BofA "is in the final stages of fully combining its business with that of the Countrywide Defendants." (Id. ¶ 21.)

Defendant BAC Home Loans Servicing, LP ("BAC HLS") is a subsidiary of BofA and is "the continuation of CHLS." (Id. ¶ 22.)

2.  The Securitizations

In June and October 2006, plaintiffs purchased over $43 million in residential mortgage-backed securities (the "Securities") from Countrywide through two public offerings (the "Securitizations").  (Id. ¶¶ 1-2.)  The Securitizations included CWABS Asset-Backed Certificates, Series 2006-SPS1 (the "SPS1 Securitization"), which plaintiffs purchased on June 27, 2006, and the CWABS Asset-Backed Certificates, Series 2006-SPS2 (the "SPS2 Securitization"), which plaintiffs purchased on August 29, 2006, September 12, 2006, and October 3, 2006.  (Id. ¶¶ 2 n.1, 58-60.)  The SPS1 and SPS2 Securitizations were "structured through a similar set of agreements."  (Id. ¶ 58.) "The mortgage loans underlying the Securities (the "Mortgage Loans") consisted of "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties."  (Id. ¶ 2.)

The Securities were sold in "Classes."  (Id. ¶ 61.)  "The majority of the Certificates in each Securitization were contained in the 'A' Class."  (Id. ¶ 62.)  The remaining Certificates were issued in the M-1 through M-9 Classes and the B Class, each of which carried lower ratings.  (Id.)  Plaintiffs purchased Securities in the M-3, M-4, M-5, M-6, and M-7 Classes for the SPS1 Securitizations and M-4, M-5, and M-7 Classes for the SPS2 Securitizations.  (Id. ¶¶ 59-60.)

Countrywide entities "acted in several capacities on the Securitizations." (Id. ¶ 61.)  Countrywide issued Mortgage Loans to individuals in connection with the purchase or refinance of residential properties.  (Id.)  CHL sold, transferred, or otherwise conveyed title to the Mortgage Loans to CWABS, acting as depositer.  (Id.)  CWABS then sold, transferred, or otherwise conveyed title to the Mortgage Loans to Bank of New

5

York ("BoNY"), acting as Trustee, which held the loans in the SPS1 and SPS2 Trusts for the benefit of Certificateholders. (Id.)  The SPS1 and SPS2 Trusts acted as the Issuing Entities and sold the Certificates to investors, including plaintiffs. (Id.)

Three offering documents were distributed to investors with respect to each of the Securitizations. (Id. ¶ 63.)  The Pooling and Servicing Agreements (the "PSAs") were entered into by CWABS, CHL, CHLS, and BoNY. (Id. ¶ 63.)  A Preliminary Term Sheet provided "summary information about the Securitizations, including a description of the parties, the Classes of Certificates and their credit ratings, the Certificates' credit enhancement provisions, and the characteristics of the pool of Mortgage Loans." (Id. ¶ 64.)  The Prospectus and Prospectus Supplement "provided further detail about the Securitizations, including a detailed description of the Mortgage Loans, the Certificates, and the procedures for servicing the loans." (Id.)  The Prospectuses were filed with the SEC and their Registration Statements were signed by three Countrywide executives, none of whom are named as defendants. (See id.)

The SAC alleges that the defendants made five categories of material misrepresentations and omissions in the offering documents and other various public statements to plaintiffs.  First, plaintiffs allege that the offering documents contained misstatements regarding the percentage of loans that were related to owner-occupied properties included in the Securitizations.  Second, plaintiffs allege that defendants made material misrepresentations about the nature and quality of the underwriting guidelines employed by Countrywide in the origination of the Mortgage Loans.  Third, plaintiffs allege that defendants made material misrepresentations and omitted material facts regarding the reduced application programs under which some Countrywide borrowers

received loans.  Fourth, the SAC alleges that the offering documents misrepresented that the Mortgage Loans would not be selected "in a manner that would adversely affect the interests of Certificateholders."  (Id. ¶ 123.)  Finally, plaintiffs allege that defendants made misrepresentations regarding Countrywide's servicing of the Loans.

Plaintiffs allege that a "corrupt culture" at Countrywide, combined with defendants' "lust for high yields and high profits" motivated defendants to make fraudulent misrepresentations to plaintiffs in order to induce them to invest in the Securities.  (See, e.g., id. ¶¶ 40, 48.)  Plaintiffs assert that they relied upon the misrepresentations and that they would not have purchased the Securities had they known the truth.  (See id. ¶ 36.)

The Securities began to experience "high rates of delinquency and default."  (See id. ¶ 223.)  This caused a "drastic and rapid loss in [the] value" of plaintiffs' Securities.  (Id.)  The SAC alleges that the loss in value was "proximately caused by Countrywide's issuance of loans to borrowers who could not afford them." (Id.)  Plaintiffs assert that they lost "tens of millions of dollars" as a result of their reliance on Countrywide's misrepresentations and omissions.  (Id. ¶ 222.)

I note at the outset that this is not a case where risky, subprime mortgage-backed securities were inserted into a structured investment product without adequate disclosure.  Plaintiffs acknowledge that they "knew, and do not deny, that the loans they purchased were risky."  (Pl. Opp. Mem. at 3.)  Plaintiffs do not dispute that they chose to invest in the Securitizations with knowledge that the loans underlying the Securities were "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties . . . ."  (SAC ¶¶ 2, 56.)  Plaintiffs allege that they

were misled because the level of risks they faced was higher than they perceived. Plaintiffs assert that defendants made material misrepresentations and omissions regarding the quality of the underlying loans and, more specifically the underwriting guidelines used in the origination process and that those misrepresentations and omissions caused plaintiffs to lose their investments.

II.    Procedural History

On April 23, 2009, plaintiffs filed the complaint asserting claims based on federal securities laws and common law fraud. (Docket No. 1.) Plaintiffs amended the complaint on June 2, 2009. (Docket No. 3.) By letter dated July 6, 2009, defendants requested permission to file a motion to dismiss the amended complaint, setting forth the bases for the proposed motion. (See Docket No. 20; see also Docket Nos. 23, 29.) Following a pre-motion conference held on July 14, 2009, plaintiffs further amended the complaint in response to defendants' pre-motion letter. (Docket No. 32.) Defendants then filed a motion to dismiss on September 18, 2009. (Docket No. 37.) Plaintiffs filed a motion for leave to further amend the complaint on October 30, 2009. (Docket No. 52.) On November 12, 2009, the parties filed a stipulation of voluntary dismissal of the claims against the SPS1 Trust and the SPS2 Trust on November 12, 2009. (Docket No. 60.) On November 23, 2009, I denied plaintiffs' motion to amend to assert 1933 Act Claims. (Docket No. 62.) Thereafter, plaintiffs filed a separate action asserting claims under the 1933 Act, which I accepted as a related case. See Footbridge Ltd. Trust v. Countrywide Fin. Corp., 10 Civ. 367 (PKC) (S.D.N.Y. filed Jan. 15, 2010).

EXHIBIT A  -13-

JURISDICTION AND VENUE

There is original jurisdiction over plaintiffs' federal securities claims brought pursuant to section 10(b) and Rule 10b-5.  28 U.S.C. § 1331.  There is also diversity jurisdiction because the citizenship of plaintiffs is diverse from that of defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.  See 28 U.S.C. § 1332.  Plaintiffs are citizens of Bermuda and defendants are citizens of Delaware, New York, Texas, and California.  (See SAC ¶ 25.)  I also have supplemental jurisdiction over plaintiffs' state law claims because they arise from the same set of facts as the federal securities claims.  See 28 U.S.C. § 1367(a).  Venue is proper because defendants transact business in this district.  15 U.S.C. § 78aa.

MOTION TO STRIKE

Defendants move to strike large portions of the SAC pursuant to Rule 12(f), Fed. R. Civ. P.  Rule 12(f) provides that "[t]he court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  "Motions to strike are viewed with disfavor and [are] infrequently granted."  RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 394 (S.D.N.Y. 2009).  The Second Circuit has instructed that, as a general proposition, "courts should not tamper with the pleadings unless there is a strong reason for doing so."  Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976).

Defendants first move to strike a series of paragraphs in the SAC that include allegations based on pleadings and settlements in other cases and government investigations.  Paragraphs in a complaint which are "based on, or rely on, complaints in

EXHIBIT A  -14-

other actions that have been dismissed, settled, or otherwise not resolved are, as a matter of law, immaterial within the meaning of Rule 12(f)."  RSM Prod., 643 F. Supp. 2d at 403; In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003); see also Lipsky, 551 F.2d at 893.  Therefore, defendants' motion to strike is granted with respect to the allegations in paragraphs 5, 6, 19, 20, 49, 113, 214, 215, 216(a)-(i), 217, 219, 220, and 221 insofar as they are based on pleadings, settlements, and government investigations in other cases.

     Defendants also complain that the SAC is riddled with conclusory allegations relating to what plaintiffs characterize as Countrywide's "corrupt culture." (E.g., id. ¶¶ 48, 55.)  Many of the allegations are taken from press reports relating to charges against Countrywide that have no relation to the claims in this case.  For example, although the Securitizations included only fixed-rate loans, the SAC includes allegations relating to Countrywide's "non-traditional mortgage offerings, such as Pay Option ARMs."  (Id. ¶ 50.)  The Securitizations included only "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties."  (SAC ¶ 2.)  There are also allegations related to loans underlying other transactions, such as a separate transaction with HSBC.  (See id. ¶ 150.)

     Plaintiffs claim that even those allegations that are not directly related to the Securitizations provide some evidence in support of their allegations of scienter. Defendants have failed to demonstrate that "no evidence in support of the[se] allegation[s] would be admissible."  See Lipsky, 551 F.2d at 893 ("[O]rdinarily neither a district court nor an appellate court should decide to strike a portion of the complaint—on the grounds that the material could not possibly be relevant—on the sterile field of the

EXHIBIT A  -15-

pleadings alone."). Therefore, defendants' motion to strike paragraphs 30, 38-39, 48, 50, 52-55, 57, 76, 80, 82-83, 88, 90-93, 97-98, 101-03, 106-07, 109, 114-15, 117-20, 123, 128-30, 134-35, 139-42, 173-82, 184, 188, 190-91, 193-202, 204-06, 223-25, 243-44, 246-47, 253, 259, 266, and 273 is denied.

DISCUSSION

I.   <u>Legal Standard</u>

Rule 8(a)(2), Fed. R. Civ. P., requires "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)) (ellipsis in original).  To survive a motion to dismiss under Rule 12(b)(6) "a complaint must contain sufficient factual matter accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Iqbal</u>, 129 S.Ct. at 1949 (quoting <u>Twombly</u>, 550 U.S. at 570); <u>ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 196 (2d Cir. 2009) (quoting <u>Ruotolo v. City of New York</u>, 514 F.3d 184, 188 (2d Cir. 2008)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" <u>Iqbal</u>, 129 S. Ct. at 1949 (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007)). When a complaint's allegations are "merely consistent" with liability, it falls short of alleging a plausible claim for relief.  <u>Id.</u>  A complaint's legal conclusions are not afforded the presumption of truth.  <u>Id.</u> at 1949-50.  Only nonconclusory factual allegations are to be accepted as true.  <u>S. Cherry St., LLC v. Hennessee Group LLC</u>, 573 F.3d 98, 100 (2d

Cir. 2009). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949. Plausibility is present "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

      Along with the standards of Rule 12(b)(6), "[a]ny complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." ECA, Local 134, 553 F.3d at 196 (citing Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)).

      Rule 9(b) applies to claims of fraud and requires a party to "state with particularity the circumstances constituting fraud or mistake." This pleading threshold gives a defendant notice of the plaintiff's claim, safeguards a defendant's reputation from "improvident" charges and protects against strike suits. See ATSI Commc'ns, Inc. v. Shaar Funds, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. at 99 (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)). Allegations of fraud may be "too speculative even on a motion to dismiss," particularly when premised on "'distorted inferences and speculations.'" Id. at 104 (quoting Segal v. Gordon, 467 F.2d 602, 606, 608 (2d Cir. 1972)).

      The PSLRA, for its part, has "imposed heightened pleading requirements and a loss causation requirement upon 'any private action' arising from the Securities

Exchange Act." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 165 (2008) (quoting 15 U.S.C. § 78u-4(b)). It requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(l).

"The [PSLRA] insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(1), (2)). As the Second Circuit has repeatedly required, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004); accord ATSI, 493 F.3d at 99 ("A securities fraud complaint based on misstatements must . . . explain why the statements were fraudulent. Allegations that are conclusory or unsupported by factual assertions are insufficient.") (citations omitted).

The PSLRA also "requires plaintiffs to state with particularity . . . the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976)). To qualify as "strong," the "inference of scienter must be more than merely

plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314. [1]

In considering a motion to dismiss, a court may consider documents annexed to the complaint or incorporated in the complaint by reference without converting the motion to dismiss into a motion for summary judgment. Rombach, 355 F.3d at 169 (citing Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991)).

II.     The Plaintiffs' Claims Under Section 10(b) and Rule 10b-5 Are Dismissed.

    a.  The Complaint Fails to Allege Fraud with Particularity.

Section 10(b) of the 1934 Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b).  "The SEC rule implementing the statute, Rule 10b-5, prohibits 'mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading.'" ECA, Local 134, 553 F.3d at 197 (alterations in original) (quoting Rule 10b-5).  As Judge Cote has observed, "[s]ection 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith."  In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007)

---

[1] After the motion was fully submitted, plaintiffs sent a flurry of letters purporting to advise the Court of recent decisions that are "directly relevant" to the issues raised in the motion.  Plaintiffs describe the cases as "reflect[ing] a crystallizing view in this District that allegations of systematic abandonment of underwriting guidelines made by holders of mortgage-backed securities satisfy the applicable pleading requirements for falsity and materiality under the securities laws."  (Letter of Daniel L. Brockett dated April 9, 2010).  The cases cited by plaintiffs involved claims under the 1933 Act that were decided under the pleading standard in Rule 8(a), and therefore were not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA.  As such, the decisions cited by plaintiffs are distinguishable from the claims asserted here.

(citing Ernst & Ernst, 425 U.S. at 206). The PSLRA also requires, with respect to allegations of false statements or omissions, that the complaint specify the statements alleged to have been misleading, the reasons for the belief that the statements were misleading and, if the allegation is made upon information and belief, the complaint must state, with particularity, the facts upon which the belief is formed. ATSI, 493 F.3d at 99.

"Statements that are opinions or predictions are not per se inactionable under the securities laws. Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact . . . ." In re Int'l Bus. Mach. Corporate Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998) (emphasis added) (citations omitted); see also Novak, 216 F.3d at 315 ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true.").

The defendants argue that the SAC fails to allege with particularity that the Fund's statements and omissions amounted to acts of fraud. Plaintiffs' opposition asserts that the SAC alleges five categories of material misstatements and omissions which amounted to fraud. I address each category of alleged misrepresentations in turn.

   i. <u>False Statements and Omissions.</u>

    1. Misrepresentations Regarding the Percentage of Owner-<br>      <u>Occupied Properties in the Securitizations.</u>

Plaintiffs allege that the Preliminary Term Sheets included a "Detailed Report" which "presented an overview of certain statistics regarding the initial pool of Mortgage Loans to be included in the SPS1 and SPS2 Securitizations." (Id. ¶ 68.) The SPS1 Detailed Report stated that 99.88 percent of the mortgaged properties to be

15

included in the SPS1 Securitization were owner-occupied, with the remaining .12 percent related to secondary residences. (Id. ¶ 69.) The SPS2 Detailed Report stated that 99.53 percent of the mortgaged properties to be included in the SPS2 Securitization were owner-occupied properties, with 0.27 percent related to secondary residences and 0.21 percent related to investment properties. (Id. ¶ 70.) The Prospectus Supplements also contained these representations. (Id. ¶ 72.)

The SAC alleges that "Countrywide meant to bolster the perceived quality of the Securities by emphasizing the overwhelming rate of owner occupancy" when it made the representations in the Detailed Reports. Plaintiffs believed that "homeowners who reside in mortgaged properties are more likely to make principal and interest payments than owners who purchase the homes as investments and live elsewhere." (Id. ¶ 71.) Plaintiffs allege that the statements regarding owner occupancy levels were false because the number of owner-occupied properties was lower than defendants represented. (See id. ¶¶ 67-83.)

Plaintiffs omit critical language from their citation of statements in the offering documents. The statements in the Detailed Reports include additional limiting language that explains that the percentages reported are "[b]ased upon representations of the related borrowers at the time of origination." (SPSI Term Sheet at 15; SPS2 Term Sheet at A-5.) The SPS1 and SPS2 Pooling and Servicing Agreements stated that

> [o]n the basis of representations made by the Mortgagors in their loan applications, no more than approximately the percentage specified in the Collateral Schedule of the Initial Mortgage Loans, respectively, are secured by investor properties, and no less than approximately the percentage specified in the Collateral Schedule of the Initial Mortgage Loans respectively, are secured by owner-occupied Mortgaged Properties that are primary residences.

(SPS1 PSA § 2.03(b)(36); SPS2 PSA § 2.03(b)(36) (emphasis added).) The SAC does not allege that the percentages reported in the Detailed Reports or the Prospectus Supplements are inaccurate representations of the data received from borrowers. Instead, the SAC alleges in conclusory fashion that because "Countrywide is a sophisticated loan originator, . . . [i]t was not blindsided and misled by speculators who allegedly lied on their loan applications" and therefore "it knew that its representations regarding owner occupancy were false and misleading at the time the representations were made." (SAC ¶ 76.) Such an allegation is insufficient to allege a misrepresentation under the heightened pleading requirements of Rule 9(b) and the PSLRA.

Furthermore, even if the statement could be read without the limiting language and, thus, deemed a misstatement, the SAC does not allege with any particularity how many properties were not actually owner-occupied. Plaintiffs contend that defendants "admitted" that these statements were false because Countrywide later estimated that "approximately 15 percent of" the Mortgage Loans in the Securitizations were applied to investment properties." (See id. ¶¶ 73-80, 177.) Plaintiffs further allege that, "[u]pon information and belief, Countrywide's estimate that 15 percent of the Mortgage Loans were applied to investor properties still vastly understated the actual percentage of such properties in the Securitizations." (Id. ¶ 80.) Plaintiffs do not allege with particularity what this belief is based upon other than to say that "real estate speculators" were the "primary driver of the defaults." (Id.) Plaintiffs do not identify any loans that defendants represented as being related to owner-occupied properties that were not actually occupied by the owners. Such an allegation fails to meet the heightened pleading requirements under Rule 9(b) and the PSLRA.

## 2. Misrepresentations Regarding Countrywide's Adherence to Its Underwriting Guidelines.

### a. General Compliance with the Guidelines.

The SAC alleges that Countrywide made misrepresentations in the offering documents and in communications with plaintiffs regarding its underwriting guidelines.  (Id. ¶ 84.)  Specifically, plaintiffs point to a statement in the PSAs in which Countrywide represented that its "origination, underwriting, servicing and collection practices with respect to each Mortgage Loan ha[d] been in all respects legal, proper, prudent and customary in the mortgage lending services business."  (Id. ¶ 85.)  Plaintiffs allege that this statement was materially false and misleading because "Countrywide abandoned its loan-origination guidelines and prudent guidelines of the industry in order to maximize its revenue from the origination, servicing, and securitization of mortgage loans."  (Id.)

The SAC alleges that the SPS1 and SPS2 Prospectus Supplements contained misrepresentations in which

> Countrywide emphasized the meticulous underwriting guidelines it applied to assess the creditworthiness of potential borrowers before issuing loans to them. Countrywide told investors that it thoroughly researched borrowers' credit histories; obtained information about applicants' assets, liabilities, income and employment history; obtained an independent credit bureau report on each applicant; and used a debt-to-income ratio to help determine whether the buyer would be able to afford the mortgage loan.

(Id. ¶ 41.)  The SAC goes on to allege that "Countrywide made many other representations in the Prospectus Supplements about its underwriting guidelines, which were intended to induce Plaintiffs and other investors to invest in the Securitizations."

(Id. ¶ 42.)  Specifically, "Countrywide represented that its underwriting standards were applied in accordance with applicable federal and state laws and regulations, that mortgaged properties were appraised both by Countrywide and by third parties, and that in most cases, Countrywide would not write loans on properties that were in below-average condition."  (Id.)

       The SAC acknowledges that "[i]n the offering documents for the SPS1 and SPS2 Securitizations, Countrywide noted that the credit-blemished, second-lien Mortgage Loans that were pooled together in the Securitizations posed a greater credit risk than first-lien conventional mortgage loans."  (Id. ¶ 56.)  Plaintiffs further acknowledge that "Countrywide also noted that its underwriting standards for credit-blemished second-lien loans were 'more flexible than the standards generally used by banks for borrowers with non-blemished credit histories.'"  (Id.; see also SPS1 PS at S-14; SPS2 PS at S-14.)  Plaintiffs argue, however, that "credit enhancement mechanisms—subordination, overcollateralization, and excess cashflow—appeared to mitigate the Securitizations' risks."  (Id.)  The SAC does not allege that defendants misrepresented that the Securitizations' risks were mitigated, but rather that they "appeared to" be mitigated by these other factors.  (Id.)  In fact, the offering documents warned investors that they should consider the potential risks of investing in subordinated securities.  (See SPS1 PS at S-16; SPS2 PS at S-15 ("You should fully consider the risks of investing in a subordinated certificate, including the risk that you may not fully recover your initial investment as a result of realized losses.").)

       Defendants also disclosed that there were risks associated with an investment in the Securitizations, but plaintiffs assert that they were "reassured [that] the

19

EXHIBIT A  -24-

credit enhancement mechanisms, including subordination, overcollateralization, and excess cash flow" would "protect them against the risk of loss." (Id. ¶ 111.) Plaintiffs argue that they believed that the subordination structure would protect them from losses, but that this was an incorrect perception because "the collateral underlying the Securitizations was extremely risky and low quality." (Id. ¶ 112.) Plaintiffs do not allege that defendants made inaccurate representations about the structure of the Securitizations.

Plaintiffs also acknowledge that the Prospectuses and Prospectus Supplements state that Countrywide would use "more flexible" loan-origination standards for loans underlying the Securitizations. (Id. ¶ 86.) Plaintiffs claim that, despite this disclosure, the statements regarding Countrywide's underwriting guidelines were false and misleading because Countrywide also represented that "Countrywide Home Loans' underwriting guidelines still place primary reliance on a borrower's ability to repay." (Id. ¶ 93.) The SAC alleges that "Countrywide's underwriting standards actually ignored a borrower's ability to repay. Countrywide's focus, instead, was on profit and market share gained from the origination of large volumes of risky loans, regardless of a borrower's ability to repay." (Id. (emphasis in original).) The SAC does not allege particular facts in support of this allegation.

The SAC also alleges that "Countrywide deviated from the loan-origination practices that it represented in the offering documents, effectively abandoning rather than loosening its loan-origination standards." (Id. ¶ 57.) The SAC does not allege which "practices" Countrywide represented that it would use or which practices were "effectively abandoned," nor does it describe the extent to which such practices were "effectively abandoned." (Id.)

20

The SAC also fails to allege which statements were made about the "more flexible" underwriting guidelines or the standards that were supposed to be used, who made the statements, that any specific standards under the "more flexible" guidelines were violated, the frequency of departures from the flexible guidelines, or that any loan not conforming with the "more flexible" guidelines was actually included in the Securitizations.

In essence, plaintiffs allege that they were told that the loans would be issued under a "more flexible" set of underwriting guidelines, but that defendants were too flexible in the underwriting decisions. Without more, such allegations are insufficient to set forth a plausible claim of fraud based on the heightened pleading requirements of Rule 9(b) and the PSLRA. The plausibility standard requires "more than a sheer possibility that [a] defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949. The SAC, read in the light most favorable to plaintiffs, fails to allege facts sufficient to support plaintiffs' claims that Countrywide did not use the underwriting guidelines that it represented it would use in originating the Mortgage Loans.

      b.   Verification of Application Information and <u>Underwriting Exceptions.</u>

The SAC alleges that the Prospectus Supplements contain a misrepresentation regarding the procedures that Countrywide used to verify applicants' information:

> Countrywide Home Loans verifies the loan applicant's sources and amounts of income (except under the Stated Income Program where the amount of income is not verified), calculates the amount of income from all sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and

> reviews the appraisal of the mortgaged property for compliance with Countrywide Home Loans' underwriting standards.

(Id. ¶ 105.)  Plaintiffs allege that this statement was false and misleading because "[i]n reality, Countrywide abandoned those guidelines and issued the Mortgage Loans with little or no consideration for borrowers' ability to repay."  (Id. ¶ 106.)  Plaintiffs do not allege that Countrywide did not collect information about borrowers' assets, liabilities, income, and employment history.  The SAC alleges that this statement is false and misleading because "Countrywide abandoned those guidelines and issued Mortgage Loans with little or no consideration for borrowers' ability to repay."  (Id. ¶ 106.)  This allegation is insufficient to plead a fraud claim under Rule 9(b) and the PSLRA.

Plaintiffs acknowledge that the Prospectus Supplements explained that CHL would grant underwriting exceptions on a "case by case basis" to "prospective borrower[s] not strictly qualifying under the underwriting risk category guidelines" outlined therein.  (Id. ¶ 96.)  Plaintiffs allege that this statement was false and misleading because it "incorrectly implied" that the exceptions would be made on a "limited ('case by case') basis, and with careful consideration of the 'compensating factors' of each case" when "[i]n reality" the "exceptions were granted abundantly and without restraint." (Id. ¶¶ 96-97.)  Again, plaintiffs do not tie the general allegations that Countrywide granted "abundant" exceptions under its underwriting guidelines to the Securitizations, nor do they allege the misstatement with requisite particularity under the PSLRA because they do not allege facts to explain the extent to which exceptions could be granted, other than to generally allege that they understood the documents to say that exceptions would be granted on a "limited basis."  (Id.)

Plaintiffs point to no language in the offering documents that limits defendants' ability to grant the underwriting exceptions, so long as each was considered on a "case by case" basis. Indeed, the Prospectus Supplements disclosed that "[i]t is expected that a <u>significant</u> number of mortgage loans will have been originated based on underwriting exceptions of these types." (SPS1 PS at S-14; SPS2 PS at S-14.) Plaintiffs do not point to any language in the offering documents in support of their contention that "a <u>significant</u> number" of exceptions granted on a "case by case basis" "incorrectly implied" that the underwriting exceptions would be granted "on a <u>limited</u> basis."

The offering documents stated that Countrywide required a credit history for each applicant to be undertaken by an independent credit bureau and that Countrywide would gather information about an applicant's "assets, liabilities, income, and employment history" in order to calculate the debt-to-income ratio which would be used to determine whether the prospective borrower would be able to afford the required payments of principal and interest on the Mortgage Loan. (<u>Id.</u> ¶ 104.)

### c. <u>Independent Appraisals.</u>

Countrywide also represented that "it required independent appraisals of the properties on which the Mortgage Loans were issued." (<u>Id.</u> ¶ 89.) Plaintiffs allege that this statement was false and misleading because "Countrywide regularly pressured appraisers to give inflated assessments of property values, threatening to blacklist them if they did not do so." (<u>Id.</u> ¶ 90.) Again, the SAC does not link this allegation to the Securitizations at issue here. The SAC also does not allege that Countrywide pressured appraisers to give inflated assessments of property underlying any Mortgage Loans in the Securizations or that any appraiser actually inflated an assessment of property underlying

the Mortgage Loans. The SAC contains no facts in support of the conclusion that Countrywide "regularly" pressured appraisers and it does not identify the source of the information for this allegation. Rule 9(b) and the PSLRA require that the plaintiffs do more than make a conclusory allegation of this nature.

### d. "In Accordance with Law."

Finally, plaintiffs allege that Countrywide's statement in the offering documents that its underwriting standards would be "applied in accordance with applicable federal and state laws and regulations" was false because Countrywide "regularly engaged in predatory lending practices in violation of federal or state laws and regulations." (Id. ¶ 91.) Plaintiffs allege that Countrywide "regularly steered borrowers to more expensive mortgage products in order to increase its profits." (Id. ¶ 92.) The SAC does not contain allegations that the loans included in the Securitizations suffered from this problem; rather, it makes general allegations about Countrywide's overall commercial practices. As explained above, such allegations are insufficient to plead a claim under the heightened pleading requirements of Rule 9(b) and the PSLRA.

### 3. Omissions of Material Facts Regarding Reduced-Documentation Application Programs.

Some of the Mortgage Loans were originated pursuant to Reduced-Documentation Programs. The offering documents explain that, for those loans originated pursuant to the Stated Income loan program, "the borrower's income as stated on the application [i]s not independently verified." (See SPS1 PS at S-34; SPS2 PS at S-34.) Plaintiffs allege that, elsewhere, the Prospectuses state that "employment verification is obtained from an independent source (typically the borrower's employer) which verification reports, among other things, the length of employment with that

organization and the borrower's current salary." (Id. ¶ 118.)  The SAC alleges that Countrywide represented in the Prospectuses that this was true for "most cases" but that, "[o]n information and belief, Countrywide failed to obtain independent verification of borrowers' income at a far greater rate than it represented." (Id.)

The SAC does not allege facts to support this allegation, such as the "rate" Countrywide represented exceptions would be granted or the "rate" at which exceptions were actually granted.  Under the heightened pleading requirements of the PSLRA, plaintiffs must "do more" than allege that, on information and belief that exceptions were granted "at a greater rate than it represented." (See id.)

The SAC also alleges that the Prospectus Supplements falsely state that "[t]he borrower's income as stated [in the applications under the Stated Income Program] must be reasonable for the related occupation and the determination as to reasonableness is subject to the loan underwriter's discretion." (Id. ¶ 119.)  The SAC alleges that the "underwriters abused their discretion by abandoning [the] loan-origination standards . . . ." (Id.)  While the SAC alleges that underwriters "failed to exercise proper discretion in judging borrower's statements," it does not allege that the representation that the underwriters would use their discretion in reviewing loan applications was a false statement.  Nor does it allege particularized facts in support of its conclusion that loan underwriters failed to exercise proper discretion.

Finally, the SAC alleges that "Countrywide failed to take sufficient, if any, action to correct borrowers' suspicious statements [regarding reported employment income]," (id. ¶ 120), and failed to disclose the results of "studies which showed that loans with lower documentation were more likely to default." (Id. ¶ 52.)  Again, the SAC

does not allege that any borrower who received a loan that was included in the Securitizations falsely reported his income.  Plaintiffs acknowledge that the offering documents disclosed that loan officers did not independently verify certain information and that borrowers qualified under the program were "excused" from the "general requirement of submitting documentation to confirm their income and assets."  (SAC ¶ 116; see also SPS1 PS at S-34.)

Furthermore, the SAC fails to allege a fiduciary duty that would obligate defendants to disclose that borrowers who received loans originated pursuant to lower documentation programs had an increased likelihood of default.  Although not specific to the Mortgage Loans originated in the reduced documentation programs, the offering documents contained a general disclosure that "THE CERTIFICATES ARE BACKED BY MORTGAGE LOANS THAT WILL EXPERIENCE HIGHER RATES OF DELINQUENCY AND LOSS THAN MORTGAGE LOANS UNDERWRITTEN TO MORE TRADITIONAL STANDARDS."  (SPS1 Prospectus Supplement at S-14; SPS2 Prospectus Supplement at S-14.)  As the Third Circuit noted, "the federal securities laws . . . do not compel [defendants] to state the obvious."  In re Donald Trump Casino Sec. Litig., 7 F.3d 357, 377 (3d Cir. 1993).

4.  Misrepresentations Regarding Adverse Effects on Investors' Interests.

The SAC alleges that "Countrywide represented in the PSAs and Prospectus Supplements that the Mortgage Loans in the Securitizations were not selected 'in a manner that would adversely affect the interests of Certificateholders.'"  (Id. ¶ 123.) Plaintiffs assert that this statement was fraudulent because "Countywide knew that by issuing unnecessarily risky and expensive loans to borrowers with poor credit histories

26

EXHIBIT A  -31-

and low incomes, the Company increased the likelihood that borrowers would default on their loans, thereby creating an adverse effect on Plaintiffs." (Id.) Again, plaintiffs acknowledge that they knew that the Securitizations were comprised of only "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties." (Id. ¶ 2.)

The SAC alleges that Countrywide failed to disclose that it had attempted to "sell the Mortgage Loans as whole loans," but was unable to do so successfully. (Id. ¶ 124.) Countrywide was able to sell the loans in the form of mortgage-backed securities "because the securitization process made the loans more attractive investments." (Id. ¶ 125.) Plaintiffs do not allege that defendants had any duty to inform plaintiffs that the loans had originally been marketed as whole loans.

Plaintiffs also allege that Countrywide knew that some of the Mortgage Loans were already experiencing defaults when the Securitizations were created. (Id. ¶ 129.) Defendants argue that plaintiffs do not "identify a material number (or any number of loans for that matter) that were allegedly in default or at a special risk of default." (Def. Mem. In Support at 17 n.27.) Defendants also argue that, in any event, when read as a whole, the offering documents actually represent that "[n]o Mortgage Loan is one payment or more delinquent as of the applicable Cut-off Date," but in the event that Mortgage Loans are delinquent as of that date, Countrywide promised to "cure" or "remove . . . and substitute" or "repurchase" the delinquent loans. (See SPS1 and SPS2 PSAs at § 2.03(b)(9), (f).) Defendants argue that plaintiffs' failure to allege that Countrywide refused to cure any deficiency or that Countrywide never intended to fulfill this promise is fatal to their fraud claims.

When read in context, the offering documents covenant that there ought
not be any Mortgage Loans in default at the time of the Securitizations, but acknowledge
the possibility that there could be delinquent loans and, in that event, Countrywide would
cure the delinquent loan in one manner or another. "[T]he prospectuses must be read 'as
a whole.'" Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996). As the
Fifth Circuit recently noted, such provisions

> are sensible given the difficulties of investigating the
> underlying residential mortgages. Even the best due
> diligence may overlook problems. A mortgage may
> become delinquent from a single missed payment. Some of
> the loans might fall into delinquency during the pendency
> of the transactions leading to an investor's purchases.
> Because mistakes are inevitable, both seller and purchaser
> are protected by a promise that the mortgage pools will be
> free from later-discovered delinquent mortgages.

Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC, 594 F.3d 383, 389 (5th Cir. 2010).

In opposition to defendants' motion, plaintiffs argue that such a result
would violate the anti-waiver provisions of the Securities Exchange Act of 1934 because
it would effectively allow a defendant to contract around federal securities laws. See 15
U.S.C. § 78cc(a) ("Any condition, stipulation, or provision binding any person to waive
compliance with any provision of [the Act] . . . shall be void."). As the Fifth Circuit held,

> [r]ather than waive [plaintiffs'] right to pursue claims of
> fraud, the 'repurchase or substitute' clauses change the
> nature of [Countrywide's] representation. If [plaintiffs] had
> alleged that [Countrywide] falsely represented to
> prospective investors that it would repurchase or substitute
> delinquent mortgages, they might have stated a case of
> fraud under the pertinent agreements. This is not their
> claim.

Lone Star Fund, 594 F.3d at 390.

28

EXHIBIT A  -33-

Furthermore, as discussed below, even if the statement in the offering documents were a misstatement, the SAC does not allege any facts which support plaintiffs' conclusory allegation that defendants had knowledge that some of the loans were defaulting when the Securitization pools were created.  (See SAC ¶ 129.)

     5.   <u>Misrepresentations Regarding Countrywide's Loan Servicing.</u>

The SAC alleges that "Countrywide's servicing of its mortgage loans lagged behind the standards of the industry, contrary to its representations" that it would "service and administer the Mortgage Loans in accordance with customary and usual standards of practice of prudent mortgage loan lenders . . . ."  (<u>Id.</u> ¶¶ 133-34.)  The SAC does not tie this allegation to any of the Mortgage Loans included in the Securitizations, but complains that Countrywide was generally "unhelpful in resolving customers' problems."  (<u>Id.</u> ¶ 135.)  Plaintiffs point to "[d]ozens of Countrywide customers" who "posted stories on the internet regarding their dealings with the Company's unhelpful, unprofessional, and harassing bureaucracy."  (<u>Id.</u>)

The SAC does not allege that any of the Mortgage Loans in the Securitizations were inadequately serviced.  Plaintiffs' broad allegations of poor customer service on the part of the Company as a whole are not supported by particularized facts and are insufficient to support a fraud claim.  Plaintiffs do not address these deficiencies in their opposition to the motion to dismiss.

    b.   <u>The Complaint Fails to Raise a Strong Inference of Scienter.</u>

As explained above, the SAC fails to allege that defendants made any material misstatements or omissions with sufficient particularity to survive the heightened pleading requirements of Rule 9(b) and the PSLRA.  This deficiency alone is

sufficient to compel dismissal; however, even if the allegations in the SAC alleged a

material misrepresentation or omission, the SAC fails to allege that the defendants made

the statements with the requisite scienter.

The PSLRA requires a plaintiff to "state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.

§ 78u-4(b)(2). The statute "unequivocally raise[d] the bar for pleading scienter."

Tellabs, 551 U.S. at 321 (alteration in original; quotation marks omitted). In scrutinizing

a complaint's allegations of scienter, a court is to consider "whether all of the facts

alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegation, scrutinized in isolation, meets that standard." Id. at 323 (emphasis

in original). A court also "must take into account plausible opposing inferences." Id. at

323. This requires close scrutiny of the factual allegations:

> The strength of an inference cannot be decided in a
> vacuum. The inquiry is inherently comparative: How
> likely is it that one conclusion, as compared to others,
> follows from the underlying facts? To determine whether
> the plaintiff has alleged facts that give rise to the requisite
> "strong inference" of scienter, a court must consider
> plausible nonculpable explanations for the defendant's
> conduct, as well as inferences favoring the plaintiff. The
> inference that the defendant acted with scienter need not be
> irrefutable, i.e., of the "smoking-gun" genre, or even the
> "most plausible of competing inferences[.] . . . Yet the
> inference of scienter must be more than merely
> "reasonable" or "permissible"—it must be cogent and
> compelling, thus strong in light of other explanations. A
> complaint will survive, we hold, only if a reasonable person
> would deem the inference of scienter cogent and at least as
> compelling as any opposing inference one could draw from
> the facts alleged.

Id. at 323-24. Defendants' pecuniary motive is a relevant consideration, although an

absence of motive is not alone dispositive. Id. at 325. Personal financial gain on the part

EXHIBIT A -35-

of a defendant weighs in favor of a scienter inference.  Id.  If a complaint contains ambiguities or omissions, those weigh against inferring scienter.  Id. at 326.

In the Second Circuit, scienter may be pleaded by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  ATSI, 493 F.3d at 99.  Circumstantial evidence may go toward showing "deliberate illegal behavior," or "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  Novak, 216 F.3d at 308 (quotation marks omitted).  "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount."  Id. at 308 (internal citation omitted).  As to recklessness, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."  Id. at 309.

Here, the SAC's allegations do not support a strong inference of scienter. The SAC does not raise an inference that the defendants intended to defraud the plaintiffs.  The plaintiffs have set forth only a conclusory allegation that defendants intended to deceive the plaintiffs in order to "maximize [their] own profits and market share."  (See, e.g., SAC ¶ 2.)  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep the stock prices high to increase officer compensation, do not constitute 'motive' for purposes of [a scienter] inquiry."  ECA, 553 F.3d at 198.

The Complaint elsewhere asserts that defendants engaged in recklessness and conscious "misbehavior" for inadequately disclosing the extent that Countywide relaxed its underwriting guidelines and the potential that borrower fraud was occurring in the reduced documentation programs.  (See id. ¶¶ 84-122.)

In opposition to the defendants' motion, plaintiffs have cited the following allegations which are discussed below as indicative of scienter.  I address each of them in turn, and note at the outset that, neither individually nor collectively do they raise a strong inference of scienter.  Tellabs, 551 U.S. at 322.

      i.   Scienter with Respect to Statements Regarding Owner Occupancy.

The SAC alleges that, during a conference call in May 2007, Countrywide "'admitted' that the Mortgage Loans were defaulting at an 'incredibly high' rate" and "sought to blame the high default rates on real-estate speculators, alleging that the 'biggest driver' of losses had been a large number of borrowers who 'are participating in the real estate flipping market.'"  (Id. ¶ 75.)  The SAC asserts that "Countrywide claimed that these speculators had represented to the Company that they would occupy the mortgaged properties, when in reality [the borrowers] hoped to quickly resell the properties for a profit without ever living in them."  (Id.)  Plaintiffs allege that, because "Countrywide is a sophisticated loan originator, . . . [i]t was not blindsided and misled by speculators who allegedly lied on their loan applications."  (Id. ¶ 76.)

The SAC contains no facts which, when read in the light most favorable to plaintiffs, plausibly allege that Countrywide was aware, at the time that it made the statements in the offering documents, that the borrowers' statements about owner-occupancy were false.  Instead, the SAC contains conclusory assertions regarding a

32

"corrupt culture" at Countrywide where "Countrywide facilitated and furthered borrowers' fraud by turning a blind eye to it, failing to enforce its underwriting standards, failing to exercise proper oversight or loan origination, and/or by other means." (Id.)

Plaintiffs also cite to internal email communications between Countrywide officers regarding concerns about borrower fraud with respect to other types of loans, such as Pay-Option ARMs, and other borrower information, such as the accuracy of stated-income amounts reported by borrowers. (Id. ¶ 77.) As explained above, plaintiffs do not tie the allegations about officers' concerns with other types of loan products or other transactions to the statements made with respect to the Securitizations at issue here.

The SAC does not allege that defendants knew that loans included in the Securitizations were related to properties that were not actually owner-occupied at the time that the statements were made. The SAC, read in the light most favorable to plaintiffs, alleges generally that defendants knew that borrowers, at times, lied on loan applications. However, the SAC does not allege that defendants knew that borrowers lied about their owner-occupied status, or that any of the loans contained in the Securitizations were related to fraudulent applications.

Also, the SAC's allegations regarding Countrywide's "admissions" during an investor call in May 2007 do not support plaintiffs' allegation that the statements amounted to fraud because plaintiffs do not allege facts to plausibly support their allegation that Countrywide knew that the statements were false at the time they were made, i.e. June and August of 2006. (See SAC ¶ 67 (alleging that "Countrywide's subsequent admission underscores the fact that it knew or should have known at the time it made the representations about owner occupancy . . . that such representations were

incorrect").)  Allegations of fraud by hindsight are insufficient as a matter of law.  <u>See</u>

<u>Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.</u>, 32 F.3d 697, 703 (2d Cir. 1994).

The SAC's allegation that Countrywide later estimated that approximately

15 percent of the Mortgage Loans in the Securitizations were applied to investment

properties is likewise deficient because plaintiffs do not allege facts to plausibly support

their conclusory allegation that Countrywide knew or should have known this

information at the time the statements about owner-occupancy were made.  (<u>See</u> SAC

¶ 79-80.)

> ii.  Scienter with Respect to Statements Relating to Underwriting
> <u>Guidelines.</u>

The SAC also fails to allege scienter with respect to the alleged

misstatements regarding the underwriting standards used for the loans included in the

Securitizations.  The SAC generally alleges that Countrywide's "senior management"

was aware that borrowers were submitting fraudulent loan applications, but there is no

allegation that loans relating to fraudulent applications were packaged as part of the

Securitizations, nor that Countrywide knew that any fraudulent loan applications related

to loans in the Securitizations.

There is also no allegation that Countrywide officials acted with scienter

when they made the statement that the loans in the Securitizations would be subject to

"more flexible" underwriting standards.  General allegations that loan officers—who are

not alleged to be senior corporate officials—were "participating in submitting fraudulent

loan applications" for approval or that loan officers engaged in "flipping" a loan

application from full documentation to reduced documentation in order to increase the

chance for approval, are insufficient under the PSLRA.  (<u>See</u> <u>id.</u> ¶¶ 121-22.)  The SAC

EXHIBIT A  -39-

fails to allege any facts which tie this allegation about loan officer practices to the Securitizations at issue here and does not allege with particularity facts that support the allegation.

The SAC also includes blanket statements about Countrywide's motives for lowering its underwriting standards as a general matter. For example, the SAC alleges that "[t]he inevitable result of Countywide's quest for increased market share, and specifically its hunger for increased production of risky loans, was a steep decline in the creditworthiness of its borrowers and its own underwriting standards." (Id. ¶ 53.) Plaintiffs do not tie the allegations about a general "corrupt corporate culture" to the Securitizations at issue in this case or the misrepresentations that plaintiffs assert constituted the fraud they claim here. As explained above, alone, a general allegation that defendants wanted to originate as many loans as possible in order to increase profits and market share, without more, is insufficient to set forth a strong inference of scienter.

The SAC also alleges that Countrywide "made representations about its rigorous underwriting standards directly to plaintiffs" during a May 2007 conference call. (Id. ¶ 99.) Because plaintiffs purchased the Securities during the period between June and August 2006, plaintiffs could not have relied on the statements made during the May 2007 conference call with respect to those purchases. Plaintiffs do not identify how such statements would demonstrate intent relating to statements made more than a year earlier.

The SAC fails to allege facts demonstrating that at the time the plaintiffs purchased the Certificates, defendants acted with scienter in making misstatements about the underwriting guidelines used in the origination of the Mortgage Loans. Indeed, the offering documents contained explicit warnings which disclosed that "[i]t is expected that

a significant number of the mortgage loans will have been originated based on underwriting exceptions . . . ." (SPS1 PS at S-14; SPS2 PS at S-14.) The offering documents also contained a warning that the Certificates were backed by mortgage loans that "WILL EXPERIENCE HIGHER RATES OF DELINQUENCY AND LOSS THAN MORTGAGE LOANS UNDERWRITTEN BY MORE TRADITIONAL STANDARDS." (SPS1 PS at S-14; SPS2 PS at S-14) (all capitals in originals). Defendants' disclosures about the risk inherent in the investment in the "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties," SAC ¶ 2, and the flexibility of the underwriting guidelines employed for originations of the Mortgage Loans are inconsistent with a state of mind going toward "deliberate illegal behavior" or "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." Novak, 216 F.3d at 308.

Plaintiffs have failed to raise a "strong inference" of scienter with respect to statements regarding the "more flexible" set of underwriting guidelines that defendants represented they used during the origination process for the Mortgage Loans underlying the Securitizations.

      iii.   Scienter with Respect to Statements Regarding Reduced Documentation Programs.

The SAC alleges that "Countrywide's senior management was aware that Countrywide loan officers were participating in submitting fraudulent applications through the Company's reduced documentation application programs, as evidence by internal Countrywide emails." (SAC ¶ 121.) The emails cited, however, are not alleged to be related to the Securitizations.

Plaintiffs quote from an email from defendant Mozilo regarding his perception that a deal with HSBC raised concerns about "a serious lack of compliance within our origination system as it relates to documentation and generally, a deterioration in the quality of loans originated versus the pricing of those loan[s]." (Id.; Supplemental Decl. of Victor Hou, Ex. A.) Plaintiffs do not link the allegations regarding Mozilo's concern with the origination of loans originated in the HSBC transaction to the Securitizations here. Indeed, there is no allegation that Mozilo had any role in plaintiffs' purchase or that the "more flexible" guidelines at issue here were involved in other transactions.

The SAC also alleges that a former Countrywide executive, Mark Zachary "complained to Countrywide's regional management" about "a practice known within Countrywide as 'flipping' an application" in which applications that were unable to get approval via the full-documentation program were "flipped" for consideration under a reduced-documentation program. (SAC ¶ 122.) Plaintiffs do not allege that any of the Mortgage Loans in the Securitizations were "flipped" or that applications that were submitted for approval in the reduced-documentation program did not meet the underwriting guidelines required for that program, the risks of which were disclosed to plaintiffs in the offering materials. Such allegations do not raise an inference of scienter with respect to the alleged misrepresentations regarding the reduced-documentation program because any alleged knowledge about the "flipping" of applications is not tied to any allegations about the Mortgage Loans here.

EXHIBIT A -42-

iv. Scienter with Respect to Statements Regarding Avoidance of Adverse
Effects on Investors' Interests.

Plaintiffs assert that Countrywide knew "that the loans were likely to perform poorly" because it "had payment histories on <u>some</u> of the Mortgage Loans that it added to the Securitizations' pools, in its role as servicer of the Loans, so it knew that certain Loans were already defaulting when the pools were created." (SAC ¶ 129 (emphasis added).)

The SAC does not allege facts that support the conclusory allegation that Countrywide knew that some of the Mortgage Loans were defaulting at the time when the Securitization pools were created. Plaintiffs do not identify which persons or entities had access to such information. Furthermore, the SAC does not allege facts that demonstrate that Countrywide had the motive and opportunity necessary for scienter with respect to this alleged misrepresentation. Pursuant to the PSAs, Countrywide was required to "cure," "remove . . . and substitute" or "repurchase" any noncompliant loans. (SPS1 PSA § 2.03(f); SPS2 PSA § 203(f).) The SAC does not allege that defendants did not intend to fulfill this obligation. Plaintiffs do not identify a motive that leads to an inference of scienter that is compelling in light of defendants' obligation to cure any noncompliant loan. Collectively, these allegations fail to raise a strong inference of scienter. <u>See Tellabs</u>, 551 U.S. at 322.

Plaintiffs also complain that based on information about other, similar mortgage loans' payment histories, Countrywide should have known that the SPS1 and SPS2 Mortgage Loans "were likely to experience high rates of default." (<u>Id.</u> ¶ 130.) As explained above, the offering documents disclosed this precise risk. (<u>See</u> SPS1 Prospectus Supplement at S-14; SPS2 Prospectus Supplement at S-14.) Again, such a

38

disclosure is inconsistent with the state of mind required to state a claim for securities fraud.  See Novak, 216 F.3d at 308.

      c.   Loss Causation

        I need not reach the issue of whether the SAC alleges loss causation because the SAC fails to allege a misstatement or that defendants acted with scienter.  I note, however, that there is a serious issue as to whether plaintiffs have plead loss causation because the SAC does not allege when, how, and to what extent the losses plaintiffs suffered were attributable to the alleged misstatements.  As the Second Circuit explained in Lentell v. Merrill Lynch & Co., where a "plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors . . . a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."  396 F.3d 161, 174 (2d Cir. 2005) (internal quotation marks and citation omitted).

        The SAC alleges in conclusory fashion that "[t]he loss in value was not due to the recent decline in the American housing market and the mortgage-backed securities markets . . . ."  (SAC ¶ 223 (emphasis in original).)  The SAC goes on to allege that "[t]hose broader market declines occurred long after the Securities began to experience high rates of delinquency and default."  (Id.)  The SAC does not, however, identify when the Securities began to experience "high rates of delinquency and default," when the "broader market declines" began, or the extent that plaintiffs' investments were affected by the delinquency and default.  The SAC does not include facts which, if proven, would show that the loss in value of plaintiffs' Securities was caused by the alleged misstatements as opposed to the "broader market declines."

EXHIBIT A  -44-

III.     Plaintiffs' Section 10(b) and Rule 10b-5 Claims Against Mozilo and Sambol are
         Dismissed.

        Because they are based on a slightly different theory of liability, I

separately address the securities fraud claims against Mozilo and Sambol.  As explained

more fully below, the claims against Mozilo and Sambol are dismissed because the SAC

fails to plausibly state a claim against them under the heightened pleading requirements

of Rule 9(b) and the PSLRA.

   a.   Mozilo.

            i.  The SAC Fails to Allege That Mozilo Made a Material Misstatement
                or Omission.

        The SAC does not allege that Mozilo had any personal involvement with

plaintiffs' investment in the Securitizations.  The SAC also does not allege any statement

made by Mozilo in connection with plaintiffs' purchase of securities.  Instead, the SAC

alleges that Mozilo is liable for misrepresentations in the offering documents as well as

general statements that he made about Countrywide's business.

                1.  The Group Pleading Doctrine.

        First, plaintiffs argue that Mozilo is liable for statements in the offering

documents under the group pleading doctrine.  The group pleading doctrine allows

plaintiffs, "for pleading purposes only, to 'rely on a presumption that . . . press releases,

or other group-published information, are the collective work of those individuals with

direct involvement in the everyday business of the company.  This allows plaintiffs, to a

limited extent, to circumvent the general pleading rule that fraudulent statements must be

linked directly to the party accused of the fraudulent intent.'"  In re BISYS Sec. Litig.,

397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (quoting In re NTL, Inc. Sec. Litig., 347 F.

EXHIBIT A  -45-

Supp. 2d 15, 22 n.26 (S.D.N.Y. 2004)). The group pleading doctrine is only available

against a defendant if the plaintiff has "alleged facts indicating that the defendant was a

corporate insider or affiliate with direct involvement in the daily affairs of the company."

Id. at 440-41.[2]

      As explained above, the SAC fails to plausibly allege that the offering

documents contained material misrepresentations. Furthermore, plaintiffs fail to

plausibly allege that Mozilo's position as a "corporate insider" at the parent corporation,

CFC, made him a "corporate insider or affiliate with direct involvement" in the various

subsidiaries' actions related to the Securitizations. As other courts in this district have

noted, "even if the group pleading doctrine applied to the statements at issue, it would not

link . . . the corporate parent . . . to statements attributable to [its subsidiary]. The

defendants must be directly involved in the daily business of the company responsible for

the statements for the exception to apply." See, e.g., Defer L.P. v. Raymond James Fin.,

Inc., 654 F. Supp. 2d 204, 214 (S.D.N.Y. 2009); Yung v. Lee, 2002 WL 31008970, at *3

(S.D.N.Y. Sept. 5, 2002), aff'd, 160 Fed. App'x 37, 42 (2d Cir. 2005) (allegation that

defendant "owns and controls [subsidiaries] . . . is insufficient to plead [defendant's]

participation in the securities offer at issue, even under the group pleading doctrine").

      Therefore, plaintiffs' claim against Mozilo based on alleged

misrepresentations in the offering documents is dismissed.

---

[2] I recognize that whether the PSLRA has abrogated the group pleading doctrine is an open question in this Circuit, and that some courts, including the Fifth Circuit, have held that it has. Southland Sec. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d 353 (5th Cir. 2004). The majority of judges in this district who have addressed the issue have concluded that the group pleading doctrine has survived the PSLRA. In re BISYS Sec. Litig., 397 F. Supp. 2d at 439 n. 42 (collecting cases). For the purposes of this motion, I accept the conclusion that the group pleading doctrine has some continued viability. See, e.g., In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 641-42 (S.D.N.Y. 2007) (stating that there is no "apparent contradiction between the idea that each defendant's role must be pled with particularity and the fact that corporate officers may work as a group to produce particular document[s]").

ii. <u>Mozilo's Statements.</u>

In opposition to the motion to dismiss, plaintiffs' also argue that the SAC identifies six misrepresentations that Mozilo "made directly." (Pl. Opp. Mem. at 51.) The SAC alleges that Mozilo represented that Countrywide

> (i) "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities;" (ii) engaged in "prudent underwriting guidelines;" (iii) would not "compromise [its underwriting standards] as we grow market share;" (iv) under "no circumstances will . . . ever sacrifice sound lending and margins for the sake of getting to that 30 percent market share;" (v) had not experienced any loosening of underwriting standards that create[d] less of a quality of loan than [Countrywide] did in the past;" and (vi) kept "loan quality . . . extremely high."

(<u>Id.</u> (alterations in original)); SAC ¶¶ 33, 35, 38, 44, 169, 186.)

As explained above, the SAC does not allege facts that link these statements to the Securitizations at issue here. The statements include comments on Countrywide's business as a whole; they do not relate to the Certificates plaintiffs purchased. As explained more fully above, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." <u>Rombach v. Chang</u>, 355 F.3d 164, 174 (2d Cir. 2004). Plaintiffs' failure to allege how and why the statements above were misleading <u>with respect to the Securitizations they purchased</u> is fatal to their claim.

      b.   <u>Sambol.</u>

          i.  The SAC Fails to Allege that Sambol Made a Material Misstatement <u>or Omission.</u>

As explained above, Sambol was President and COO of CHL from 2004 to 2006 and President and COO of CFC from September 2006 until mid-2008. (<u>See</u> SAC ¶ 20.)

          1.  <u>The Group Pleading Doctrine.</u>

Plaintiffs do not point to any statements that were made by Sambol in connection with the Securitizations. The SAC acknowledges that Sambol was not a signatory to the prospectuses or registration. (<u>Id.</u> ¶ 64.) The SAC does not allege that Sambol had a role in Securitizations by virtue of his work for Countrywide, nor does it allege that Sambol had a role related to the Securitizations at issue here. As with their allegations against Mozilo, plaintiffs rely on the Group Pleading Doctrine in support of their assertion that Sambol is liable for misrepresentations in the offering documents. Because the plaintiffs have failed to allege that the offering documents contained a material misstatement, the group pleading doctrine does not save their claims against Sambol.

          2.  <u>Sambol's Statements.</u>

The SAC also alleges that Sambol made three direct misrepresentations, but does not allege that the misstatements were made with respect to the Securitizations here. First, plaintiffs allege that Sambol stated that "we have an intense and ongoing focus on share growth while at the same time maintaining a very strong internal control environment and what we believe is a best-of-class governance . . . . [O]ur culture is also

characterized by a very high degree of ethics and integrity in everything we do." (SAC ¶ 35.)

        Statements about corporate culture and integrity are typically considered to be inactionable puffery. See In re JP Morgan Chase sec. Litig., 2007 WL 950132, at *4, 12 (S.D.N.Y. Mar. 29, 2007), aff'd sub nom. ECA Local 134 IBEW Joint Pension Trust of Chi v. JP Morgan Chase, 553 F.3d 187 (2d Cir. 2009) (holding that statements regarding "integrity," "fiscal discipline" and "risk management" are "precisely the type of puffery that this and other circuits have consistently held to be inactionable"). Furthermore, the SAC does not allege facts that link this general statement about corporate culture to the Securitizations purchased by plaintiffs.

        The SAC also alleges that Sambol stated that "Countrywide required 'higher credit scores or lower loan to value ratios' as a condition to approving riskier adjustable-rate mortgages, in order to counter the increased risk." (SAC ¶ 172.) As explained above, statements about guidelines and practices relating to adjustable-rate mortgages are immaterial to the claims here because the Securitizations included only "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties." (Id. ¶ 2 (emphasis added).) The SAC does not contain any factual allegations which explain how Sambol's statement regarding adjustable-rate mortgage originations relates to the "fixed-rate loans" in the Securitizations.

        Finally, the SAC alleges that, in September 2006, Sambol stated that Countrywide was "on the sidelines" of the subprime market. (Id. ¶ 172.) The full statement made by Sambol was: "[W]e remain committed to having a subprime

presence. But there are no particular plans to accelerate growth. And, I think, that would characterize our current position as remaining on the sidelines . . . ." (Phillips Decl. Ex. D at 19.) Plaintiffs do not allege that this statement was false or how Sambol's characterization of Countrywide's overall business strategy were relevant to their purchase of the Securities. The percentage of Countrywide's business that related to subprime loans is immaterial with respect to the Securitizations because, as plaintiffs acknowledge, all of the loans included in the Securitizations were "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties." (Id. ¶ 2.) Plaintiffs do not contend that they were unaware of the number of subprime loans included in the Securitizations.

IV.    The Plaintiffs' Section 20(a) Claim is Dismissed.

        To state a claim of control person liability under Section 20(a), a plaintiff must allege (1) primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) meaningful culpable participation in the controlled person's acts of fraud. ATSI, 493 F.3d at 108. Because the Complaint fails to state a primary violation, the plaintiffs' section 20(a) claim is dismissed.

        The plaintiffs' section 20(a) claims are dismissed.

V.    The Plaintiffs' Claims for Successor Liability Against BofA Are Dismissed.

        The SAC alleges a claim against BofA and BAC HLS based on a theory of successor liability. (See SAC ¶¶ 257-74.) Because the SAC fails to state a claim against the Countrywide defendants, there is no basis for a claim based on successor liability against BofA and BAC HLS.

EXHIBIT A  -50-

VI.    The Plaintiffs' Claims of Common-Law Fraud Are Dismissed.

To state a claim for fraud under New York law, a plaintiff must allege "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." See May Dep't Stores Co. v. Int'l Leasing Corp., Inc., 1 F.3d 138, 141 (2d Cir.1993). As explained above, the SAC fails to allege a material, false representation or that defendants made such statements with an intent to defraud the plaintiffs. Therefore, for substantially the same reasons explained above, plaintiffs' claims against the Countrywide defendants for common-law fraud are dismissed. See Rule 9(b).

CONCLUSION

The defendants' motion to dismiss the SAC is GRANTED. (Docket No. 37.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        September 28, 2010

46

# EXHIBIT B

# EXHIBIT B

1                The Honorable Marsha J. Pechman

2

3

4

5

6

7

8        UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF WASHINGTON
9            AT SEATTLE

10 BOILERMAKERS NATIONAL ANNUITY
  TRUST FUND, on behalf of itself and all others   Case No. C09-00037MJP
11 similarly situated,

12          Plaintiff,    **ORDER ON DEFENDANTS'**
                    **MOTIONS TO DISMISS**
13     v.

14 WAMU MORTGAGE PASS TRHOUGH
  CERTIFICATES, SERIES AR1, et al.,
15

16         Defendants.

17

18     This matter is before the Court on Defendants' motions to dismiss Plaintiffs' second

19 amended consolidated complaint. (Dkt. Nos. 168, 170.) In addition filing responses to the

20 motions (Dkt. Nos. 177, 178), Plaintiffs have filed a motion to amend the complaint (Dkt. No.

21 179). Defendants have filed replies in support of their motions (Dkt. Nos. 184, 187), the Rating

22 Agency Defendants have filed a response to Plaintiffs' motion to amend (Dkt. No. 186), and

23 Plaintiffs have filed a reply in support of their motion to amend (Dkt. No. 190). For the reasons

24 set forth below, the Court GRANTS IN PART the WaMu Defendants' motion to dismiss,

25 GRANTS the Rating Agencies' motion to dismiss, and DENIES Plaintiffs' motion to amend.

26             **Background**

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 1      CASE NO. C09-00037MJP

EXHIBIT B  -52-

I.     <u>Procedural History</u>

A total of six complaints have been filed in this matter. On August 4, 2008, an action was filed in King County Superior Court. (C09-0134; Dkt. No. 1 (Notice of Removal).) On January 20, 2009, Plaintiff Boilermakers filed their complaint. (C09-0037; Dkt. No. 1.) The Doral Bank complaint was filed on October 2009. (C09-1557: Dkt. No. 1.) Plaintiffs filed their first consolidated complaint on November 23, 2009. On December 31, 2009, Plaintiffs filed an amended consolidated complaint. Finally, the Second Amended Complaint ("SAC") was filed on April 1, 2010. (Dkt. No. 164.[1]) The proceedings were delayed by a statutorily-mandated stay for claims against Washington Mutual Bank, Plaintiffs' error in providing adequate PSLRA notices, and Plaintiffs' request for leave to amend their complaint in light of this Court's rulings in the <u>In re Washington Mutual Securities, ERISA, and Derivative Litigation</u>, 08-md-1919 MJP.

II.     <u>Allegations in Second Amended Complaint</u>[2]

Lead Plaintiffs Doral Bank of Puerto Rico ("Doral Bank") and Policemen's Annuity and Benefit Fund of the City of Chicago ("Chicago PABF") and Plaintiff Boilermakers National Annuity Trust ("Boilermakers") bring this action on their own behalf and on behalf of a putative class of individuals and entities who purchased interests in certain Washington Mutual Mortgage Pass-Through Trusts ("Issuing Trusts"). (¶ 1.) Plaintiffs purchased mortgage-backed securities created by Washington Mutual Bank subsidiaries from 75,608 "mainly sub-prime first-lien hybrid adjustable rate" mortgage loans. (¶¶ 5-6.) The securities entitled purchasers to the proceeds of payments made on the underlying mortgages: "[a]s the original borrowers on each of the underlying mortgage loans paid their mortgages, distributions were made to investors through the Issuing Trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates." (¶ 7.)

---

[1] Unless otherwise noted, all references to the Complaint and all "¶" citations refer to the Second Amended Complaint

[2] The Court's summary of the Plaintiffs' allegations shall not be construed as an indication that any facts alleged have been established in fact.

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 2          CASE NO. C09-00037MJP

1   Washington Mutual Bank ("WMB"), which is no longer a named Defendant in this

2   matter, either originated or acquired the mortgage loans underlying the Certificates.  (¶ 23.)

3   Defendant Washington Mutual Asset Acceptance Corporation ("WMAAC"), a wholly-owned

4   subsidiary of Washington Mutual, Inc., purchased the mortgage loans from WMB and assigned

5   the mortgage loans to the trustee.  (¶ 24.)  WMAAC filed two Registration Statements pertinent

6   to the securities in this Complaint: (1) a December 2005 Form S-3, subsequently amended by a

7   January 2006 Form S-3/A (together "the 2006 Registration Statement") and (2) a March 2007

8   Form S-3, as subsequently amended by an April 2007 Form S-3/A (together "the 2007

9   Registration Statement").  (¶ 25.)  Defendant WaMu Capital Corporation ("WCC"), another

10   wholly-owned subsidiary of Washington Mutual, Inc., underwrote the offerings and "assisted in

11   drafting and disseminating the Offering Documents for the Offerings of Certificates" issued

12   pursuant to the Registration Statements.  (¶¶ 37-39.)  Plaintiffs refer to WMB, WMAAC, and

13   WCC collectively as "WaMu."  (¶ 5.)

14   Defendants David Beck, Diane Novak, Thomas Green, Rolland Jurgens, Richard

15   Careaga, Thoams, Lehmann, Stephen Fortunato, and Donald Wilhelm are officers of WMAAC

16   who signed the Registration Statements.  (¶¶ 4, 27-36.)  Plaintiffs name Moody's Investors

17   Services, Inc. ("Moody's") and McGraw Hill Companies, Inc. ("McGraw-Hill") (together

18   "Rating Agencies") as Defendants for their role in providing credit ratings to the certificates

19   which were published in the Prospectus Supplements.  (¶¶ 4, 11, 42-43.)

20   Unlike dividends issued to holders of common stock, the cash flow from mortgage-

21   backed securities ("MBS") is distributed "in order of priority, based on the specific tranche held

22   by the MBS investor."  (¶ 45.)  Thus, "[t]he highest tranche . . . is first to receive its share of the

23   mortgage proceeds and is also the last to absorb any losses should mortgage borrowers become

24   delinquent or default on their mortgages."  (Id.)  Plaintiffs allege Defendants made a number of

25   misrepresentations with respect to certificates issued in 36 public offerings between January 26,

26   2006 and June 26, 2007.  (¶ 2.)  Defendants amended the Registration Statements with

1  Certificate-specific Prospectus Supplements, which describe the mortgage pool underlying each

2  trust.  (¶¶ 61-62.)

3  **Discussion**

4  I.    Legal Standards

5         On a Rule 12(b)(6) motion to dismiss, the Court must assess the viability of the

6  Complaint.  Dismissal is appropriate where a complaint fails to allege "enough facts to state a

7  claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

8  (2007).  The Supreme Court has recently clarified that "[a] claim has facial plausibility when the

9  plaintiff plead factual content that allows the court to draw the reasonable inference that the

10  defendant is liable for the conduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); see

11  also Moss v. United States Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) ("In sum, for a

12  complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable

13  inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to

14  relief.") (citing Iqbal, 129 S. Ct. at 1949).  The Court must accept Plaintiffs' factual allegations

15  as true, but need not accord the same deference to legal conclusions.  Id. at 1949-150 (citing

16  Twombly, 550 U.S. at 555).  To the extent documents referenced in a complaint contradict a

17  plaintiff's conclusory allegations, the Court is not required to accept those allegations as true.

18  Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir. 1998).

19      Under a facial challenge to jurisdiction under Rule 12(b)(1), the Court's analysis mirrors its

20  Rule 12(b)(6) inquiry.  See James Wm. Moore, et al., Moore's Federal Practice § 12.30[4]; see

21  also Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2204) (distinguishing

22  between facial and factual challenges).

23  II.    Request for Judicial Notice

24         When deciding a motion to dismiss, the court "may generally consider only allegations

25  contained in the pleadings, exhibits attached to the complaint, and matters properly subject to

26  judicial notice."  Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007).  A court may

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 4                CASE NO. C09-00037MJP

consider "a writing referenced in the complaint but not explicitly incorporated therein" if a claim necessarily relies on the document and there is no dispute as to authenticity.  Id.  A court may take judicial notice of public documents filed with the SEC.  Dreiling v. American Express Co., 458 F.2d 942, 946 n.2 (9th Cir. 2006).

The WaMu Defendants seek judicial notice of (1) certain SEC filings (Dkt. No. 171 ("RJN"), Exs. 1-6, 21-22, 25), (2) the Mortgage Loan Purchase and Sale Agreement (id., Ex. 23), (3) summaries and supporting data related to the delinquency rates of the loans (id., Exs. 7, 8), and (4) a number of press releases, newspaper articles, and reports (id., Exs. 9-19).  Plaintiffs do not distinguish among the exhibits and object the Court taking judicial notice of any document.  (Dkt. No. 177 at 14 n.5.)  The Court GRANTS the request as to the SEC filings, which are referenced in the complaint, but DENIES the request as to the remainder of the documents, which do not bear on the Court's analysis.

III.    Sections 11 and 12(a)(2)

    a.    Standing under Section 11

The WaMu Defendants challenge Plaintiffs' standing to bring § 11 and § 12(a)(2) claims with respect to a number of the certificates.  Because the standard for standing differs under each statute, the Court analyzes standing as to these claims separately.  To establish standing under § 11, a plaintiff must allege "they purchased shares either (1) directly in the public offering for which the misleading registration statement was filed or (2) traceable to that public offering." Guenther v. Cooper Life Sciences, Inc., 759 F. Supp. 1437, 1439 (N.D. Cal. 1990); see also 15 U.S.C. § 77k(a).  This Court has previously observed that named plaintiffs who purchased certain types of notes lacked standing to pursue § 11 claims for other related notes which they did not purchase.  See In re Washington Mutual Securities Litig., 694 F. Supp. 2d 1192, 1220 (W.D. Wash. 2009); In re Wells Fargo Mortgage-Backed Certificates Litig., ___ F. Supp. 2d. ___, 2010 WL 1661534, at *4 (N.D. Cal. April 22, 2010) (same); accord, Casey v. Lewis, 4 F.3d 1516, 1519 (9th Cir. 1993) ("At least one named plaintiff must satisfy the actual injury

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 5               CASE NO. C09-00037MJP

1  component of standing in order to seek relief on behalf of himself or the class.") (emphasis in

2  original).

3        Doral Bank alleges it purchased WaMu Mortgage-Pass Through Certificates, Series

4  2006-AR17, 2006-AR18, 2007-OA4, and 2007-OA5 and WMALT Series 2007-OA5.  (¶ 20.)

5  Chicago PABF purchased WaMu Mortgage-Pass Through Certificates, Series 2006-AR5, 2006-

6  AR12, 2006-AR16, 2007-HY1, and 2006-HY1.  (¶ 21.)  Boilermakers purchased WaMu

7  Mortgage-Pass Through Certificates, Series 2006-AR7.  (¶ 22.)  Plaintiffs do not allege they

8  purchased any of the following certificates identified in the complaint: 2006-AR1, 2006-AR2,

9  2006-AR3, 2006-AR4, 2006-AR6, 2006-AR8, 2006-AR9, 2006-AR10, 2006-AR11, 2006-

10  AR13, 2006-AR14, 2006-AR15, 2006-AR19, 2006-HY2, 2006-HY3, 2006-HY4, 2006-HY5,

11  2006-HY6, 2006-HY7, 2006-OA6, WMALT 2007-OC1, WMALT 2007-OC2, WMALT 2007-1,

12  WMALT 2007-2, and WMALT 2007-3.  (See ¶¶ 38-39; Dkt. No. 170, Appx. B.)

13        Plaintiffs, relying primarily on In re Countrywide Financial Corp. Sec. Litig., 588

14  F. Supp. 2d 1132, 1166 (C.D. Cal. 2008), argue they have standing to sue on behalf of the class

15  because all the certificates were issued pursuant to either the 2006 or 2007 Registration

16  Statements.  (Dkt. No. 177 at 17; see also Dkt. No. 191 (notice of supplemental authority).)  The

17  Court is not persuaded to adopt Plaintiffs' expansive view of standing.  Unlike the scenario in

18  Countrywide, Plaintiffs here allege that certain statements in the supplemental prospectuses are

19  materially misleading.  (See ¶ 61.)  In instances where the misstatements extend beyond the shelf

20  registration materials, it is difficult to adopt the rationale that the common misstatements suffice

21  for standing. Plaintiffs lack standing to sue for losses related to the 25 certificates for which they

22  have failed to identify a purchaser.

23        Plaintiffs also urge the Court to defer ruling on the issue of standing because the issue is

24  "premature to raise on a motion to dismiss."  (Dkt. No. 177 at 15.)  Plaintiffs' argument and

25  selective quotation of authority invites this Court to commit error.  The courts in Global Crossing

26  Ltd. Sec. Litig., 313 F. Supp. 2d 189, 204-05 (S.D.N.Y 2003), and Hevesi v. Citigroup, Inc., 366

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 6            CASE NO. C09-00037MJP

1    F.3d 70, 82 (2d Cir. 2004), were contrasting the standing of the lead plaintiffs with that of the

2    named plaintiffs.  Thus, those courts contemplated revisiting the issue of standing in the context

3    of a Rule 23 typicality and adequacy of representation analysis.  See Global Crossing, 313 F.

4    Supp. 2d at 205 ("Lead Plaintiffs have a responsibility to identify and include named plaintiffs

5    who have standing to represent the various potential subclasses of plaintiff who may be

6    determined, at the class certification stage, to have distinct interests or claims.")  In this case,

7    Plaintiffs have not identified any named plaintiff who purchased 25 of the Certificates cited in

8    the Complaint.  Without any purchaser who suffered a loss, plaintiffs cannot identify an injury in

9    fact traceable to the offering as required for Article III standing.  See In re Lehman Brothers Sec.

10   and ERISA Litig., 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010).   Because Plaintiffs have not

11   alleged an injury in fact for the purposes of those certificates, the issue is properly addressed on a

12   motion to dismiss.

13        b.    Standing under Section 12(a)(2)

14        Standing under Section 12(a)(2) is more restrictive than under Section 11.  Section 12

15   "permits suit against a seller of a security by prospectus only by 'the person purchasing such

16   security from him,' thus specifying that a plaintiff must have purchased the security directly

17   from the issuer of the prospectus."  Hertzerg v. Dignity Partners, Inc., 191 F.3d 1076, 1081 (9th

18   Cir. 1999).  This Court has previously held that simply alleging a purchase was "traceable to" a

19   particular offering is insufficient to confer standing under Section 12.  WaMu II, 694 F. Supp. 2d

20   at 1226; see also In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 399 (S.D.N.Y. 2007)

21   (Plaintiffs' allegations that (1) underwriters sold securities as part of an offering and (2)

22   "plaintiffs acquired securities in the Offerings" were sufficient).

23        Plaintiffs allege they purchased certificates "pursuant to" the offending Registration

24   Statements and subsequent Prospectus Supplements.  (¶¶ 20-22.)  In their response brief,

25   Plaintiffs submit: "[t]he Complaint alleges that WCC sold the Certificates as part of the

26   Offerings, and that Plaintiffs acquired the Certificates sold as part of those Offerings."  (Dkt. No.

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 7          CASE NO. C09-00037MJP

177 at 19.)  However, an allegation that a plaintiff acquired certificates that had been—at some point in time—sold in an Offering is different from an allegation a plaintiff purchased certificates as part of an Offering.  As the Court in <u>Nomura</u> recognized, "[i]f plaintiffs did in fact purchase the Certificates directly from the defendants, they should have said so." <u>Plumbers' Union Local No. 12 Pension v. Nomura Asset Acceptance Corp.</u>, 658 F. Supp. 2d 299, 305 (D. Mass. 2009).  Plaintiffs' § 12 claims are dismissed for lack of standing.

       c.    <u>Misrepresentation</u>

Section 11 creates a private right of action for purchasers of a security when an issuer's coordinate registration statement includes "an untrue statement of a material fact or omit[s] to state a material fact required to be stated . . . to make the statements therein not misleading."  15 U.S.C. § 77k(a).  To prevail on a § 11 claim, "a plaintiff must prove '(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have mislead a reasonable investor about the nature of his or her investment.'"  <u>Rubke v. Capitol Bancorp, Ltd.</u>, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting <u>In re Daou Sys., Inc.</u>, 411 F.3d 1006, 1027 (9th Cir. 2005)).  Similarly, § 12(a)(2) imposes liability "on parties who sell securities with a false or misleading prospectus."  <u>In re Worlds of Wonder Sec. Litig.</u>, 35 F.3d 1407, 1423 (9th Cir. 1994).  The standard for § 12 materiality is the same as under § 11.  <u>Id.</u> at 1424.

"[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact."  <u>Fecht v. Price Co.</u>, 70 F.3d 1078, 1081 (9th Cir. 1995).  Thus, the court may only determine the issue of materiality as a matter of law where "the statement is so obvious that reasonable minds could not differ."  <u>Id.</u> (internal quotations omitted).

Following a familiar refrain, Plaintiffs allege the offering documents were materially misleading because (1) they misinformed investors about the nature of the mortgage loans' underwriting guidelines (¶¶136-149); (2) they failed to disclose the risks associated with the

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 8              CASE NO. C09-00037MJP

mortgage loan appraisals and misstated the loan-to-value ratios of the mortgages (¶¶ 150-159; 165-167), and (3) the prospectus supplements misstated the certificates' true credit ratings (¶¶168-171).  The Court analyzes each in turn.

    1. <u>Underwriting Guidelines</u>

  In <u>Wells Fargo</u>, the court denied dismissal of a complaint alleging improper deviations from underwriting guidelines where "plaintiffs allege[d] that the Offering Documents were misleading as to the extent to which Wells Fargo and the third-party originators deviated from their guidelines."  2010 WL 1661534, at *11; <u>see also</u> <u>Tsereteli</u>, 692 F. Supp. 2d at 392-93 (declining to dismiss complaint where plaintiffs alleged (1) abandonment of underwriting guidelines and (2) a dramatic rise in defaulting loans).  In contrast, the court in <u>Nomura</u> dismissed a complaint based on deviations from underwriting standards in the issuance of MBS certificates when a "fusillade of cautionary statements" muted plaintiffs' claim they were not on notice of soft underwriting standards.  658 F. Supp. 2d at 307.

  The Registration Statements provide:

> The mortgage loan seller's underwriting standards are intended to evaluate a prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgage property as collateral.  In the loan application process, prospective mortgagors generally will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items….

(¶ 138.)  Plaintiffs allege such statements are misleading because WaMu pressured appraisers into overstating the value of the properties, made no attempt to confirm underwriting standards for third party issuers, and did not investigate the validity of appraisal values of a sufficient number of loans prior to securitization.  (¶ 139.)  The Prospectus Supplements stated:

> The sponsor's underwriting guidelines [and Washington Mutual Bank's underwriting guidelines] generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 9    CASE NO. C09-00037MJP

1  (¶ 143.)  Plaintiffs allege these statements are misleading because WaMu failed to verify the

2  information contained in borrowers' mortgage loan applications, and ignored adverse

3  information about the borrowers.  (¶144.)  Defendants urge dismissal because the Prospectus

4  Supplements included warnings about a number of other documentation programs used to

5  evaluate mortgage loan applications.  (Dkt. No. 170 at 16; RJN, Ex. 3 at S-28.)  Even under these

6  alternative documentation programs, the Supplements indicated "exceptions to the sponsor's

7  loan program parameters may be made on a case-by-case basis if competing factors are present."

8  (RJN, Ex. 3 at S-30.)  The Prospectus Supplements identify the number of "full documentation"

9  and "reduced documentation" loans in each Certificate pool.  (RJN, Ex. 4 at S-111.)

10          Plaintiffs' underwriting allegations survive dismissal because the statements may be

11  misleading if they mask the extent to which the sponsor's underwriting guidelines were

12  disregarded.   In essence, Plaintiffs allege the underwriting guidelines ceased to exist.  If proven

13  true, the absence of underwriting standards could make the identified statements misleading.

14  The Court denies Defendants' motion to dismiss the underwriting guidelines.

15                    2.    Appraisal/LTV ratio Allegations

16          In Tsereteli, the court dismissed allegations based on faulty appraisal practices reasoning

17  that "neither an appraisal nor a judgment that a property's value supports a particular loan

18  amount is a statement of fact."  692 F. Supp. 2d at 393 (Plaintiffs failed to allege the speaker did

19  not have the opinion at the time he made the statement appraisals were conducted "in accordance

20  with the Uniform Standards of Practice.").  In contrast, the Wells Fargo court denied dismissal of

21  appraisal and LTV allegations where Plaintiffs supported their claims with numerous statements

22  from confidential witnesses that included estimates about the degree to which LTV ratios were

23  inaccurate for the Wells Fargo.  2010 WL 1661534, at *11-12.

24          Plaintiffs have not alleged actionable misrepresentations based on appraisals or loan-to-

25  value ratios.  Plaintiffs allege the statement that appraisals were completed in accordance with

26  the Uniform Standards of Professional Appraisal Practice was misleading because LTV ratios

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 10            CASE NO. C09-00037MJP

were manipulated to meet certain targets. (¶¶ 60-61.) Plaintiffs' allegations on this issue are simply too conclusory. For instance, the near wholesale reliance on the New York Attorney General's complaint against eAppraiseIT offers no nexus to the Certificates at issue here. (¶¶ 61-84.) The Court is left to assume there is an identity between these loans and the ones at issue in the eAppraiseIT complaint, even though the NYAG complaint focuses on events that post-date the vast majority of these offerings. (Dkt. No. 170 at 23.) Though Plaintiffs offer some appraisal values from reviews completed, they do not allege that the differences in valuation have any connection with any loan underlying the securities here. Thus, unlike the complaint in Wells Fargo, Plaintiffs have not substantiated their conclusory allegations with facts suggesting a viable claim. The appraisal and coordinate LTV ratio allegations must be dismissed.

### 3. Credit Ratings

Plaintiffs' credit ratings allegations are similarly insufficient. Plaintiffs allege the offering documents were misleading because the ratings were based on outdated models. (¶¶ 15-16, 105-113.) However, Plaintiffs fail to allege facts that would make this a material omission. Other courts have held that there is no duty to disclose the methods used by agencies in developing a rating. Tsereteli, 2010 WL 816623, at *5. The mere fact that the ratings would have been different under a different methodology is insufficient to state a claim.

Further, Plaintiffs allege that WaMu failed to disclose the Ratings Agencies' conflicts of interests. (¶¶ 91-97.) However, "the risk that the rating agencies operated under a conflict of interest because they were paid by the issuers had been known publicly for years." In re Lehman Bros. Sec. and ERISA Litig., 684 F. Supp. 2d 485, 492 (S.D.N.Y. 2010). Thus, because reasonable investors knew that the rating agencies were paid by the issuers, the alleged misstatement is immaterial. Id.

The Court dismisses the credit ratings allegations.

### 4. Purchase and Sale Agreements

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 11      CASE NO. C09-00037MJP

EXHIBIT B -62-

1    Defendants claim the Purchase and Sale agreements shield them from liability because it

2   provided that purchasers' sole remedy is the obligation to repurchase the certificates or substitute

3   the mortgage loans in the trust.  (Dkt. No. 170 at 33; RJN, Ex. 25.)  In <u>Lone Star Fund V</u>

4   <u>(U.S.) L.P. v. Barclays Bank PLC</u>, the Fifth Circuit held plaintiffs could not advance

5   misrepresentation claims based on statement "that there were no delinquent loans in the BR2 and

6   BR3 trusts" when the prospectuses provided the defendant would substitute performing

7   mortgages in the trusts.  594 F.3d 383, 388-90 (5th Cir. 2010).  The <u>Lone Star</u> Court reasoned the

8   "repurchase or substitute clauses change[d] the nature of [defendant's] representation."  <u>Id.</u> at

9   390.

10    Unlike the scenario in <u>Lone Star</u>, Plaintiffs allegations are not simply based on a

11   representation about the absence of delinquent loans.  As set forth above, Plaintiffs allege

12   misstatements and omissions regarding underwriting guidelines.  The purchase and sale

13   agreements thus cannot shield Defendants from liability at the pleadings stage.

14            5.    <u>Economic Loss</u>

15    Defendants urge dismissal because Plaintiffs do not allege they have failed to receive an

16   income stream from the Certificates and, as such, have failed to allege an economic loss.  (Dkt.

17   No. 170 at 35.)  The Court declines to dismiss the Complaint on this basis.

18   Plaintiffs allege the "delinquency, foreclosure, repossession, and bankruptcy rates for all the

19   collateral underlying the Certificates—arising from defective collateral and faulty origination

20   practices—triggered unprecedented downgrades of the Certificates' credit ratings by the Rating

21   Agencies and attendant declines in the value of the Certificates."  (¶¶ 191, 211.)  Section 11

22   allows damages for "the difference between the amount paid for the security . . . and  . . .  the

23   value thereof as of the time such suit was brought."  Here, Plaintiffs allegations of loss give rise

24   to the inference that the value of the security is much less than the purchase price.  The mere fact

25   that Plaintiffs may have difficulty substantiating the exact nature of their loss in an illiquid

26   market does not necessitate dismissal.

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 12            CASE NO. C09-00037MJP

6.      Risk Disclosures

Defendants argue all claims must be dismissed because the prospectus documents contained numerous risk disclosures.  The two cases on which Defendants rely, <u>In re Convergent Techs. Sec. Litig.</u>, 948 F.2d 507 (9thCir. 1991), and <u>Worlds of Wonder</u>, 35 F.3d at 1420-21, affirmed rulings granting summary judgment based on the sufficiency of risk disclosures.  The Court declines to analyze the sufficiency of the disclosures at the pleadings stage.   As the Ninth Circuit cautioned in <u>Fecht</u>: "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact."  70 F.3d at 1081.

d.      Control Persons—Section 15 Claims

The Court grants Defendants' motion to dismiss the Section 15 claims as to the Individual Defendants.  Section 15 of the Securities Act provides that "[e]very person who … controls any person liable under [Sections 11 or 12 of the Securities Act] shall also be liable jointly and severally with and to the same extent as such controlled person."  15 U.S.C. § 77o. To state a claim for control person liability, a plaintiff must allege: (1) a primary violation of securities law; and (2) that the defendant exercised control over the primary violator.  <u>See</u> <u>In re Washington Mutual Sec. Litig.</u>, 259 F.R.D. 490, 508-09 (W.D. Wash. 2009) (citing <u>Howard v. Everex, Sys.</u>, 228 F.3d 1057, 1065 (9th Cir. 2000)).  Control means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405; <u>see also</u> <u>Howard</u>, 228 F.3d at 1065 n.9.

Plaintiffs simply allege the Individual Defendants were either officers or directors of WMAAC and that they signed the Registration Statements.  (¶¶ 27-34.)  Based on nothing more, Plaintiffs claim each of the Individual Defendants are control persons "by virtue of his or her control, ownership, offices, [or] directorship."  (¶ 205.)  Such allegations, alone, are insufficient to state a claim.  First, making blanket allegations about the Individual Defendants makes no

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 13                    CASE NO. C09-00037MJP

1  sense when the Defendants apparently held different positions.  In other words, Plaintiffs should

2  have substantiated their allegations about the Individual Defendants with individualized facts.

3  Second, the allegations are entirely circular and couched as conclusions of law.  Plaintiffs allege

4  the Individual Defendants are control persons "by virtue of his or her control."  This offers no

5  factual content that would establish a plausible claim.

6  　　　The Court also dismisses the Section 15 claims as to WCC.  In opposition to Defendants'

7  motion on the issue, Plaintiffs cite paragraphs 55-60 and 82-84 from the Complaint.  (Dkt. No.

8  177 at 35.)  Tellingly, none of those paragraphs reference WCC.  Instead, they refer to WMB or

9  WaMu (as a way of referencing WMB, WMAAC, and WCC).  (See ¶ 5.)  But Plaintiffs cannot

10  plead control person liability simply through the use of shorthand.  Plaintiffs have not alleged

11  facts giving rise to WCC's status as a control person.  The Section 15 claims must be dismissed.

12  　　　　e.　　Inquiry Notice—Doral Bank Claims

13  　　　Defendants claim Doral Bank's claims are barred by the statute of limitations because

14  Plaintiffs were on notice as of the August 20, 2008 complaint in In re WaMu.  (Dkt. No. 170 at

15  40.)  Under 15 U.S.C. § 77m, the statute of limitations for Securities Act claims is "one year

16  after the discovery of the untrue statement or the omissions, or after such discovery should have

17  been by the exercise of reasonable diligence."  An amendment adding a plaintiff "relates back to

18  the date of the original pleading only when: 1) the original complaint gave defendant adequate

19  notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly

20  prejudice the defendant; and 3) there is an identity of interests between the original and newly

21  proposed plaintiff."  In re Syntex Corp. Sec. Litig., 95 F.3d 922, 935 (9th Cir. 1996) (no relation

22  back where new plaintiffs bought securities at different values and after different disclosures);

23  see also In re Morgan Stanley Mortgage Pass-Through Certificates Litig., No. 09-civ-2137, 2010

24  U.S. Dist. LEXIS 84146, at *22 (S.D.N.Y Aug. 17, 2010) ("Inquiry notice exists where

25  sufficient facts would suggest to a plaintiff of normal intelligence that wrongdoing is

26  probable, not merely possible.").

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 14　　　　　CASE NO. C09-00037MJP

Case 2:10-cv-00037-MJP   Document 201-95   Filed 09/28/00   Page 63 of 128   Page ID
Case 2:08-cv-01957-MRP-MAN   Document 161-95   Filed 09/28/00   Page 63 of 128   Page ID
#:8969

1    The original complaint in this action was filed on August 1, 2008.  Doral Bank filed its

2    complaint on October 30, 2009.  (C09-1557; Dkt. No. 1.)  Plaintiffs argue that the two cases

3    involved different securities and, thus, Doral could not have been on inquiry notice.  (Dkt. No.

4    177 at 38.)  Plaintiffs cannot, however, ignore their own allegations.  Plaintiffs' allegations are

5    based on substantially identical statements in the Offering Documents and focus almost

6    exclusively on the shelf Registration documents.  If these allegations are sufficient to state a

7    claim as to the earlier Certificates, they must also be sufficient to put other holders of WaMu

8    certificates on notice of underwriting and appraisal issues.  (See Dkt. No. 187 at 22.)  The Court

9    therefore dismisses claims to the extent they include the following Certificates: WaMu 2007-

10   OA4, WaMu 2007-OA5, and WMALT-OA5.

11        f.    Time Barred Appraisal Claims

12        The Court dismisses Plaintiffs appraisal allegations as to a number of the Certificates

13   because they are time barred.  Plaintiffs' appraisal allegations are predicated upon the NY

14   Attorney General's complaint against First American and eAppraiseIT, which was filed on

15   November 1, 2007.  (See ¶¶ 64-84.)  A number of plaintiffs filed their appraisal allegations more

16   than a year after the NYAG's complaint.  (See Dkt. No. 170 at 42 (Chicago PABF on March 16,

17   2009, Doral Bank on October 30, 2009, and Boilermakers on January 12, 2009).)

18        These claims were not equitably tolled by the filing of the New Orleans Action.  In

19   American Pipe & Const. Co. v. Utah, the Supreme Court held that "the commencement of a class

20   action suspends the applicable statute of limitations as to all asserted members of the class who

21   would have been parties had the suit been permitted to continue as a class action."  414 U.S. 538,

22   554 (1974).  Courts since American Pipe have found that the statute of limitations does not toll

23   for putative class actions whose named plaintiff lacks standing to advance claims in the first

24   place.  See Walters v. Edgar, 163 F.3d 430, 432 (7th Cir. 1998); Palmer v. Stassinos, 236 F.R.D.

25   46, 465-66 and n.6 (N.D. Cal. 2006) ("It is one thing to toll a period of limitations because of the

26   discretionary act of one judge seeking to manage his or her docket in an efficient manner, but it

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 15          CASE NO. C09-00037MJP

1    would be beyond the constitutional power of a federal court to toll a period of limitations based

2    on a claim that failed because the claimant had no power to bring it.")  Because there are no

3    allegations the New Orleans plaintiffs had standing to assert the appraisal claims on behalf of

4    Chicago PABF, Doral Bank, or Boilermakers, the only surviving certificates with coordinate

5    appraisal allegations are 2006-AR2, AR14, AR 16, AR18, 2007-HY2, HY4.  (See New Orleans

6    Complaint  ¶¶ 16, 17.)

7    IV.    Rating Agencies' Motion

8           The Rating Agencies move for dismissal of the § 15 claims against them because (1)

9    Plaintiffs' failed to identify a primary violation by the Issuing Trusts, (2) Plaintiffs failed to set

10   forth sufficient allegations of "control" against the Agencies, and (3) Plaintiffs' claims are time-

11   barred.  (Dkt. No. 168.)  In response, Plaintiffs concede that WMAAC—and not the Issuing

12   Trusts—should have been identified as the entity allegedly under the Rating Agencies' control.

13   (Dkt. No. 178 at 7.) Plaintiffs seek leave to amend their complaint "for the sole purpose of

14   correcting their misidentification of the 'issuer' that was the controlled entity" and maintain

15   amendment is appropriate because "the core supporting factual allegations" about the Rating

16   Agencies' control remain unchanged. (Dkt. No. 190 at 2.)   Because amendment would be futile,

17   the Court DENIES the motion to amend and GRANTS the Rating Agency's motion to dismiss.

18          As set forth above, to sustain a Section 15 claim, a plaintiff must allege: (1) a primary

19   violation of securities law; and (2) that the defendant exercised control over the primary violator.

20   Whether an individual is a "control person" is "an intensely factual question, involving scrutiny

21   of the defendant's participation in the day-to-day affairs the corporation and the defendant's

22   power to control corporate actions."  Kaplan v. Rose, 49 F.3d 1363, 1382 (9th Cir. 1994); see

23   also Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1162 (9th Cir. 1996)

24   ("As the definition suggests, our inquiry must revolve around the "management and policies" of

25   the corporation, not around discrete transactions.").  The Lehman Bros. court dismissed § 15

26   claims against rating agencies where plaintiffs alleged they "largely determined which loans

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 16          CASE NO. C09-00037MJP

1    were to be included in the securitization, the amount and form of credit enhancement for each

2    Certificate and the Certificate structure before they were actually engaged by Lehman. . . ."   In

3    re Lehman Bros. Sec. and ERISA Litig., 681 F. Supp. 2d 495, 500 (S.D.N.Y. 2010).  That court

4    reasoned plaintiffs allegations fell "considerably short of anything that could justify a reasonable

5    trier of fact in concluding that the decision making power lay entirely with the Rating Agencies."

6    Id. at 501.

7          Plaintiffs allege the Rating Agencies "determined the structure and credit support for

8    each of the Issuing Trusts [or WMAAC] which purportedly justified the ratings." (¶¶ 11, 42,

9    43.)   Plaintiffs further cite to a 2009 report from a Congressional oversight panel that suggests

10   certain agencies enabled and validated the decision-making behind the flawed mortgage-backed

11   securities market.  (¶ 97.)  Plaintiffs describe the methods the Rating Agencies used to rate the

12   Certificates.  (¶¶ 124-129.)  Even if the Court were to allow Plaintiffs to substitute WMAAC for

13   the Issuing Trusts, Plaintiffs' allegations are insufficient for the purposes of control person

14   liability.  Plaintiffs' allegations simply do not implicate WMAAC's management or policies, nor

15   do they suggest the ability to be involved in any day-to-day activities.

16         Indeed, Plaintiffs' allegations regarding the Rating Agencies' "ratings shopping" plainly

17   contradict any claim that the Rating Agencies controlled WMAAC.   The complaint suggests it

18   was the arrangers who "pressured" the Rating Agencies to reduce credit enhancement levels.

19   (¶ 94.)  WaMu purportedly "leveraged" the Rating Agencies of one another in order "to obtain

20   the most profitable structure—to WaMu—on the Offerings."  (¶¶ 114- 120.)  Read as a whole,

21   Plaintiffs' allegations regarding the Rating Agencies' control person liability simply fail to state

22   a claim.  Because Plaintiffs have failed to present a viable alternative Third Amended Complaint,

23   the Court's dismissal as to the Rating Agencies should be with prejudice.  In light of the

24   insufficiency of the allegations, the Court need not reach the question of whether the claims are

25   time-barred.

26   \\

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 17            CASE NO. C09-00037MJP

## Conclusion

First, Plaintiffs lack standing to sue for losses related to the 25 certificates for which they have failed to identify a purchaser.  The Court GRANTS the motions to dismiss these claims.  Second, the Court GRANTS the motions to dismiss Plaintiffs' § 12 claims for lack of standing.  Third, the Court rules on Plaintiffs' § 11 claims as follows: (1) Plaintiffs' underwriting allegations survive dismissal and the Court DENIES the motions on this issue; (2) the Court GRANTS the motions to dismiss Plaintiffs' § 11 misrepresentations claims based on appraisals or loan-to-value ratios; and (3) the Court GRANTS the motions to dismiss Plaintiffs' § 11 credit ratings allegations.  Fourth, the Court DENIES the motions to dismiss as to the arguments that the purchase and sale agreements shield Defendants from liability, that economic loss is not sufficiently alleged, and that the prospectuses contained numerous risk disclosures.  Fifth, the Court GRANTS Defendants' motion to dismiss the Section 15 claims against the Individual Defendants and WCC.  Sixth, the Court GRANTS Defendants' motions to dismiss Doral Banks' claims to the extent they include the following Certificates: WaMu 2007-OA4, WaMu 2007-OA5, and WMALT-OA5.  Seventh, the Court GRANTS the motions to dismiss on statute of limitation grounds as to Plaintiffs' appraisal allegations, except as to certain certificates.  Eighth, because amendment would be futile, the Court DENIES Plaintiffs' motion to amend, and GRANTS the Rating Agencies' motion to dismiss the Section 15 claims against them.

The Clerk is directed to send copies of this order to all counsel of record.

Dated this 28th day of September, 2010.

Marsha J. Pechman
United States District Judge

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 18          CASE NO. C09-00037MJP

# EXHIBIT C

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x


IN RE AMERICAN
INTERNATIONAL GROUP, INC.
2008 SECURITIES LITIGATION

MASTER FILE
No.  08 Civ. 4772 (LTS)


This Document Relates To:
All Actions



-------------------------------------------------------x

## OPINION AND ORDER

APPEARANCES:

BARRACK, RODOS & BACINE
 By: Leonard Barrack, Esq.
     Jeffrey W. Golan, Esq. (pro hac vice)
     M. Richard Komins, Esq.
     Robert A. Hoffman, Esq.
     Lisa M. Lamb, Esq.
     Julie B. Palley, Esq.
3300 Two Commerce Square, 2001 Market Street
Philadelphia, Pennsylvania 19103

     A. Arnold Gershon, Esq.
     Regina M. Calcaterra, Esq.
1350 Broadway, Suite 1001
New York, New York 10018

THE MILLER LAW FIRM, P.C.
 By: E. Powell Miller, Esq. (pro hac vice)
     Marc L. Newman, Esq. (pro hac vice)
     David H. Fink, Esq.
     Jayson E. Blake, Esq.
     Brian E. Etzel, Esq.
950 West University Drive, Suite 300
Rochester, Michigan 48307

*Attorneys for Lead Plaintiff, State of Michigan Retirement Systems,
and Lead Counsel for the Putative Class*

EXHIBIT C  -70-

WEIL, GOTSHAL & MANGES LLP
 By: Joseph S. Allerhand, Esq.
       Robert F. Carangelo, Esq.
       Paul Dutka, Esq.
       Stacy Nettleton, Esq.
767 Fifth Avenue
New York, New York 10153

*Attorneys for Defendant*
*American International Group, Inc.*

MAYER BROWN LLP
 By: Richard A. Spehr, Esq.
       Joseph De Simone, Esq.
       S. Christopher Provenzano, Esq.
       Bradford Jealous, III, Esq.
1675 Broadway
New York, New York 10019

*Attorneys for Defendant Steven J. Bensinger*

AKIN GUMP STRAUSS HAUER & FELD LLP
 By: James A. Diehl, Esq.
       David M. Murphy, Esq.
       Richard B. Zabel, Esq.
One Bryant Park
New York, New York 10036

WACHTELL, LIPTON, ROSEN & KATZ
 By: David M. Murphy, Esq.
       Meredith L. Turner, Esq.
51 West 52nd Street
New York, New York 10019

*Attorneys for Defendant Martin Sullivan*

EXHIBIT C  -71-

WILKIE FARR & GALLAGHER LLP
 By: Michael R. Young, Esq.
     Antonio Yanez, Jr., Esq.
     Mei Lin Kwan-Gett, Esq.
     Brian R. Faerstein, Esq.
787 Seventh Avenue
New York, New York 10019

*Attorneys for Defendant Robert E. Lewis*

WEIL, GOTSHAL & MANGES, LLP
 By: Joseph S. Allerhand, Esq.
767 Fifth Avenue
New York, New York 10153

*Attorneys for the Defendant David L. Herzog*

MILBANK, TWEED, HADLEY & McCLOY LLP
 By: Andrew E. Tomback, Esq.
     Dorothy Heyl, Esq.
     Tamieka Spencer Bruce, Esq.
1 Chase Manhattan Plaza
New York, New York 10005

*Attorneys for Defendant Alan Frost*

LATHAM & WATKINS LLP
 By: Richard D. Owens, Esq.
     David M. Brodsky, Esq.
     Lillian E. Gutwein, Esq.
885 Third Avenue
New York, New York 10022

*Attorneys for Defendant Andrew Forster*

GIBSON DUNN & CRUTCHER LLP
 By: Lee G. Dunst, Esq.
     Jim Walden, Esq.
     Georgia K. Winston, Esq.
     Julie I. Smith, Esq.
200 Park Avenue, 48th Floor
New York, New York 10166

*Attorneys for Defendant Joseph Cassano*

EXHIBIT C  -72-

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
 By: Richard A. Rosen, Esq.
      Brad S. Karp, Esq.
1285 Avenue of the Americas
New York, New York 10019-6064

      Charles E. Davidow, Esq.
2001 K Street, NW
Washington, D.C. 20006-1047

*Attorneys for the Underwriter Defendants*

CRAVATH, SWAINE & MOORE LLP
 By: Thomas G. Rafferty, Esq.
      Antony L. Ryan, Esq.
      Samira Shah, Esq.
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019

*Attorneys for Defendant PricewaterhouseCoopers LLP*

WEIL, GOTSHAL & MANGES, LLP
 By: Joseph S. Allerhand, Esq.
      Robert F. Carangelo, Esq.
      Stacy Nettleton, Esq.
767 Fifth Avenue
New York, New York 101534

*Attorneys for Defendant Edmund S.W. Tse*

SIMPSON THACHER & BARTLETT LLP
 By: James G. Gamble, Esq.
425 Lexington Avenue
New York, New York 10017-3954

*Attorneys for the Outside Director Defendants*

LAURA TAYLOR SWAIN, United States District Judge

EXHIBIT C  -73-

Lead Plaintiff State of Michigan Retirement Systems, as custodian of the

Michigan Public School Employees Retirement System, the State Employees Retirement System,

the Michigan State Police Retirement System, and the Michigan Judges Retirement System

("Lead Plaintiff"), brings this action on behalf of a putative class of investors ("Plaintiffs") who

purchased or otherwise acquired publicly traded securities issued by American International

Group, Inc. ("AIG" or the "Company"), between March 16, 2006, and September 16, 2008 (the

"Class Period").  Plaintiffs principally allege that Defendants violated the federal securities laws

by materially misstating the extent to which AIG had accumulated exposure to the subprime

mortgage market through its securities lending program and its credit default swap ("CDS")

portfolio.  That exposure, which placed the Company at risk in ways that Defendants allegedly

declined to disclose, ultimately led to a liquidity crisis that required an unprecedented bailout by

the United States Government.

Plaintiffs assert claims under the federal securities laws against AIG and various

current or former AIG executives, directors, accountants, and underwriters (collectively,

"Defendants").[1]  Specifically, in the Consolidated Class Action Complaint ("CCAC" or

"Complaint"), Plaintiffs assert the following claims: (i) against AIG and the "Section 10(b)

Defendants" (defined below) for alleged violations of Section 10(b) of the Securities Exchange

Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b-5 promulgated

thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5 "); (ii) against the "Executive Defendants"

---

[1]     On July 16, 2009, the Court severed the claims against defendant Thomas Athan.
Lead Plaintiff and Athan entered into a tolling agreement on July 27, 2009.  (See
docket entry nos. 109, 115, 116.)

EXHIBIT C  -74-

(defined below) for alleged violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t-1 ("Section 20(a)"); (iii) against AIG, the "Signing Executive Defendants" and the "Director Defendants" (defined below) for alleged violations of Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k ("Section 11 "); (iv) against the "Underwriter Defendants" (defined below) for alleged violations of Section 11; (v) against PricewaterhouseCoopers LLP ("PwC") for alleged violations of Section 11; (vi) against the Underwriter Defendants for alleged violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) ("Section 12(a)(2)") ; and (vii) against the Executive Defendants for alleged violations of Section 15 of the Securities Act, 15 U.S.C. § 77o ("Section 15").  The Court has jurisdiction of the claims pursuant to 28 U.S.C. § 1331.

Plaintiffs group the defendants in the following manner in the Complaint, and the Court uses the same nomenclature for the purposes of this opinion: Sullivan, Bensinger, Cassano, Forster, Herzog and Lewis are named as the "Section 10(b) Defendants."  (CCAC ¶ 50.)  All of the Section 10(b) Defendants occupied executive-level positions at the Company and were privy to material non-public information concerning AIG and AIGFP.  (CCAC ¶ 553.)  Moreover, Plaintiffs allege, all of the Section 10(b) Defendants "prepared, approved, signed, and/or disseminated" the documents and statements that contain the material misstatements and omissions upon which Plaintiffs' 10(b) claims are predicated.  (CCAC ¶ 552.)

The Section 10(b) Defendants and Frost are named as the "Executive Defendants."  (CCAC ¶ 49.)  Plaintiffs allege that all of the Executive Defendants exercised control over AIG and/or AIGFP during the Class Period through the key management roles they played and their direct involvement in the Company's day-to-day operations, including its

financial reporting and accounting functions.  (CCAC ¶ 566.)  Sullivan, Bensinger and Herzog

are named as the "Signing Executive Defendants."  (CCAC ¶ 608.)  Tse and the "Outside

Director Defendants" are named as the "Director Defendants."  (CCAC ¶ 70.)

       The following twelve defendants or groups of defendants, comprising all of the

served defendants,[2] have moved to dismiss the claims asserted against them:

(i)     AIG, a holding company which, through its subsidiaries, engages in a wide range of

       insurance and financial service activities in the United States and abroad (CCAC ¶ 40);

(ii)    Martin J. Sullivan, President and Chief Executive Officer of AIG from the beginning of

       the Class Period through his resignation on June 15, 2008, who signed the Company's

       Registration Statements and Forms 10-Q and 10-K throughout the Class Period, and

       made many of the statements Plaintiffs allege to have been false or misleading (CCAC ¶¶

       41, 485);

(iii)   Steven J. Bensinger, Executive Vice President and Chief Financial Officer of AIG

       throughout the Class Period, who signed the Company's Registration Statements and

       Forms 10-Q and 10-K throughout the Class Period, participated in the preparation of the

       allegedly false press releases and public filings at issue, and participated in the investor

       conference calls at issue as well (CCAC ¶¶ 42, 489);

(iv)   Joseph Cassano, who was President of AIG Financial Products ("AIGFP"), the division

---

[2]    Plaintiffs have named two additional underwriters as defendants, Banca I.M.I.
S.p.A. and Daiwa Securities SMBC Europe Ltd. Plaintiffs have not effected
service of process on these defendants and they have not appeared in this action.
More than 120 days have passed since the filing of the Complaint.  Accordingly,
the claims asserted against these two defendants are dismissed without prejudice
pursuant to Federal Rule of Civil Procedure 4(m).  Fed. R. Civ. P. 4(m).

EXHIBIT C  -76-

that managed the CDS portfolio that is at the center of this action, from the beginning of

the Class Period through his resignation on February 29, 2008 (CCAC ¶ 43);

(v)     Andrew Forster, Executive Vice President of the Asset Trading & Credit Products Group

of AIGFP during the Class Period, who was responsible for managing AIGFP's global

credit division (which contracted to sell the CDSs at issue) and who gave investor

presentations concerning the Company's management of the CDS portfolio (CCAC ¶¶

44, 124, 346);

(vi)    Alan Frost, Executive Vice President of AIGFP during the Class Period, who headed

AIGFP's business and marketing efforts in the United States (CCAC ¶ 45);

(vii)   David L. Herzog, Senior Vice President, Comptroller, and Principal Accounting Officer

of AIG throughout the Class Period, who signed the Company's Forms 10-Q and 10-K

throughout the Class Period and participated in the Company's calls with research

analysts throughout the Class Period (CCAC ¶¶ 46, 491);

(viii)  Robert Lewis, Senior Vice President and Chief Risk Officer throughout the Class Period,

who signed off on each of the CDS contracts and gave investor presentations concerning

the Company's exposure to the mortgage market (CCAC ¶¶ 47, 311, 329);

(ix)    34 financial institutions that served as underwriters of AIG offerings of notes, debentures,

and common stock during the Class Period (the "Underwriter Defendants") (CCAC ¶

51);[3]

---

[3]     Defendants contest the validity of Plaintiffs' service on defendant underwriter
        Calyon, which has nevertheless filed a Rule 7.1 Corporate Disclosure Statement
        (docket entry no. 145) and joined the Underwriter Defendants' motion to dismiss
        (docket entry no. 174).  Plaintiffs' request for leave to re-serve Calyon is granted.

EXHIBIT C  -77-

(x)     15 former and current outside directors (the "Outside Director Defendants") who signed
        various registration statements and annual reports filed with the U.S. Securities and
        Exchange Commission ("SEC") (CCAC ¶¶ 54-66, 68-69);

(xi)    Edmund S.W. Tse, a Board Member and Senior Vice Chairman for the Life Insurance
        Division of AIG throughout the Class Period (CCAC ¶ 67); and

(xii)   PricewaterhouseCoopers LLP, which served as an Independent Registered Public
        Accounting Firm for AIG and audited the Company's financial statements throughout the
        Class Period (CCAC ¶ 71).

        Plaintiffs have moved to strike certain exhibits submitted by Defendants in
support of their motions to dismiss.  The Court has reviewed thoroughly all of the parties'
submissions, including multiple notices of supplemental authority.  For the reasons that follow,
Defendants' motions to dismiss are denied.  In light of the resolution of the motions to dismiss,
Plaintiffs' motion to strike is moot.

## I.  BACKGROUND

        For the purposes of these motions, the Court takes as true the following facts
drawn from the Consolidated Class Action Complaint, the documents incorporated by reference
therein, and public filings of which the Court may take judicial notice.[4]  Plaintiffs' 284-page
pleading details Plaintiffs' allegations as to the causes of AIG's liquidity crisis, as well as their
allegations regarding attendant material misstatements and omissions on Defendants' part.  The
Court assumes the parties' familiarity with the record and limits the following summary of

---

[4]     See Citadel Equity Fund Ltd. v. Aquila, Inc., 168 Fed. App'x 474, 476 (2d Cir.
        2006) (SEC filings are amenable to judicial notice).

EXHIBIT C  -78-

Plaintiffs' factual allegations to matters that are material to the Court's legal conclusions.

      *A.     The Genesis of AIG's Exposure to the Subprime Mortgage Market*

        AIG was founded as an insurance agency in Shanghai, China, in 1919.  The Company moved to New York in 1949 and, under the leadership of Maurice "Hank" Greenberg, became a publicly held company in 1969.  AIG eventually grew into one of the world's largest insurance and financial services companies.  (CCAC ¶ 81.)

        Greenberg initiated AIG's foray into "swap" transactions in 1987 through a joint venture, called AIG Financial Services, which entered into contracts in which one party paid its counterparty a fee to assume the risk of a referenced transaction.  (CCAC ¶ 82.)  The joint venture was highly profitable and it became a division of AIG (AIGFP) in 1993.  (CCAC ¶¶ 83-85.)  In 1998, AIGFP, while led by Tom Savage, began entering into credit default swaps, in which AIGFP received regular premium payments in exchange for assuming the risk that an underlying debt security would not perform.  (CCAC ¶ 86.)   Savage rigorously analyzed each credit default swap transaction until he retired from AIGFP in 2001, at which time Cassano succeeded Savage as the President of AIGFP.  (CCAC ¶ 87.)  In the early years of Cassano's tenure, the division was scrutinized closely by AIG's management.  (CCAC ¶ 88.)

        A series of accounting scandals that occurred at AIG between 2000 and 2004 (arising out of misconduct unrelated to AIGFP) led to SEC and Department of Justice ("DOJ") investigations of the Company; AIG's disclosure of internal control failures and recognition of a $3.9 billion overstatement of reported income; AIG's payment of an $80 million fine and restatement of years of financial statements; a downgrade of AIG's AAA credit rating; and, in 2005, Greenberg's forced retirement.  (CCAC ¶¶ 89-91).  Following Greenberg's departure,

EXHIBIT C  -79-

AIG's senior management weakened or eliminated the risk controls that Greenberg had put in
place to supervise AIGFP.  (CCAC ¶ 129.)  Sullivan, Greenberg's replacement as CEO,
cancelled bi-weekly meetings with AIGFP and excepted AIGFP from AIG's rigorous company-
wide control procedures.  (CCAC ¶¶ 129, 133.)

       At approximately the same time that Greenberg retired, AIG's loss of its AAA
rating curtailed AIGFP's ability to engage in certain types of investments.  The credit default
swap market, however, remained available.  AIGFP decided to expand considerably its
underwriting of credit default swaps, particularly those in which it sold protection on
Collateralized Debt Obligations ("CDOs").  (CCAC ¶¶ 91-93.)

       CDOs are structured products created by a manager that has purchased asset-
backed securities, typically pools of residential mortgages (including subprime mortgages)
bundled into Residential Mortgage Backed Securities ("RMBS"), which serve as the underlying
collateral for the security.  The CDOs are divided into tranches such that the highest tranche
(often referred to as the "Super Senior" tranche) suffers losses only after the collateral pool has
been impaired to such an extent that all of the lower tranches have been wiped out.  In a financial
alchemy that has been much maligned, the highest tranches of CDOs composed of subprime
RMBS were assigned much higher credit ratings than the underlying collateral.  AIGFP only sold
protection on the highest tranche.  (CCAC ¶¶ 92-102.)

       AIGFP wrote approximately 220 new CDS contracts in 2005, which exceeded the
total number of such contracts it had written in the previous seven years combined.  By the end
of 2005, AIGFP had written, in the aggregate, approximately $80 billion of credit default swaps
relating to CDOs comprised of pools of securities backed by subprime mortgages.  (CCAC ¶

EXHIBIT C  -80-

102.)

Senior executives at AIGFP recognized signs in late 2005 that the Company's increased exposure to the subprime mortgage market carried greater risks than they had previously realized.  American General Financial Services, an AIG division in the mortgage lending business, "had become alarmed by the rapidly growing use of subprime mortgages" and "word spread from American General to AIGFP that the subprime business was a minefield." (CCAC ¶ 108.)  Eugene Park, who managed AIGFP's North American credit derivative portfolio, declined the opportunity to be placed in charge of marketing AIGFP's CDSs (which would have entailed a promotion) after concluding that the swaps were unacceptably risky. (CCAC ¶¶ 108-09.)  Most importantly, AIGFP executives realized that the model they were using to evaluate the risk involved with the CDSs (the "Gorton model," constructed by Professor Gary Gorton) "was not adequate to deal with the subprime mortgage debt underlying the insured CDOs."  (CCAC ¶¶ 111, 483.)  In fact, AIGFP executives Frost and Forster did not even provide Gorton with all the data he would have needed to develop a comprehensive model, even if it were possible to do so.  (CCAC ¶ 483.)

AIGFP decided at the end of 2005 to stop entering into new credit default swaps that provided protection on CDOs.  (CCAC ¶ 112.)  According to a confidential witness who was an AIGFP executive in 2005 with knowledge of this decision, the factors that led AIGFP to stop underwriting new CDSs – the declining quality of underwriting standards for subprime loans and the correlation between the types of collateral in the CDOs (which were supposed to be composed of diverse, non-correlated assets) – were already present in the majority of the CDSs that AIGFP had entered into in 2005.  (CCAC ¶ 112.)  AIGFP did not, however, extricate itself

from any of those contracts, nor did it hedge against the increased risk of those contracts. (CCAC ¶¶ 116, 124.) Rather, defendants Forster, Frost and Cassano rejected suggestions from other AIGFP personnel that AIGFP should hedge the CDS portfolio. (CCAC ¶ 351(d).) Although AIG stated in its public filings that it had the ability to hedge its positions (CCAC ¶ 259), and defendant Forster stated at a May 2007 investor conference that hedging the CDS portfolio was unnecessary due to its conservative profile, AIG actually declined to hedge because it would not have been economically feasible to do so. (CCAC ¶ 126.)

The CDS portfolio put the Company at risk in three ways. Most obviously, AIG would have to make large payments in the event that a significant proportion of the underlying reference securities defaulted, a risk known as "credit risk." Additionally, if AIG's credit rating were downgraded, or if the market value of the reference securities declined – due, for example, to a market perception that the mortgage-backed securities within the CDOs were increasingly likely to fall short of providing the expected cash flows because of increasing defaults on the underlying mortgages – AIG would be forced to post collateral to its counterparties to provide security that it could make good in the event of a default, a risk known as "collateral risk." Morever, in such a scenario AIG would be required to mark-to-market the declining value of the CDS assets in its financial statements. Such marking to market would cause it to recognize a loss on paper even before it experienced an actual economic loss, a risk known as "valuation risk." (CCAC ¶¶ 117-22.)

Despite the multitude of risks presented by the CDS portfolio, AIGFP did not subject these investments to strict control procedures. Cassano presided over weekly meetings with AIGFP executives (including defendants Forster and Frost) where risk management issues

across AIGFP's businesses were discussed, yet he deliberately excluded key risk management personnel from reviewing the Asset/Credit Group (which engaged in the CDS transactions). (CCAC ¶ 133.)  Cassano also did not subject the CDS investments to the rigorous risk analysis process to which the other business units at AIGFP were routinely subjected (CCAC ¶¶ 136-38), and Forster and Frost made valuation and risk management decisions with respect to AIGFP while controlling the flow of relevant information within the Company (CCAC ¶ 480).

AIGFP's CDS portfolio was not the only major source of exposure to RMBS at AIG.  The Company's securities lending program, which was housed within AIG Investments (a separate division from AIGFP), was intended to earn additional return on long-term financial assets by lending securities to banks and brokerage firms in exchange for cash collateral.  In an ambitious effort to generate additional income, it became significantly exposed to the subprime mortgage markets as well: by year-end 2005, the program was investing up to 75% of all the collateral it received from borrowers in RMBS and other mortgage-backed securities.[5]  (CCAC ¶ 219, 244-45, 266(g).)  The securities lending program's exposure to RMBS was particularly risky given that the program was obligated to repay or roll over most of its loans every 30 days.  Therefore, investing its collateral in this manner created the risk that a freeze in the RMBS market might quickly precipitate a liquidity crunch for AIG.  (CCAC ¶ 245.)

---

[5]     While Plaintiffs allege that AIG decided to invest "up to 75%" of all received collateral in RMBS and other mortgage-backed securities, the Underwriter Defendants point out that AIG's public filings indicate that the securities lending program actually invested only 60-66% of its collateral in that manner.  (See Underwriter Defendants' Mem. 15, n. 21.)  The distinction is immaterial for the purposes of this analysis.

B.    *The Fall of AIG*

In 2006, as has been widely documented, the previously soaring housing market faltered, leading to rising mortgage default rates, falling home values, failures of hedge funds that had long positions in the mortgage market, and bankruptcies of many subprime mortgage lenders. These events continued throughout 2006 and 2007. (CCAC ¶¶ 140-48.) In light of growing investor concern regarding exposure to the subprime mortgage market, AIG, on August 8, 2007 (during the second quarter 2007 investor call), November 8, 2007 (during the third quarter 2007 investor call), and December 5, 2007 (during a special investor meeting) gave three investor presentations addressing its own exposure. (CCAC ¶ 150.) These presentations, along with the Company's public filings and press releases, are the focus of many of Plaintiffs' allegations of material misstatements and omissions.

Plaintiffs' securities law claims are based principally on the contention that AIG consistently misled the market by failing to disclose the valuation and collateral risk of the CDS portfolio (which ultimately caused the Company's liquidity crisis) while emphasizing instead what AIG characterized as the "extremely remote" nature of the portfolio's credit risk. Plaintiffs also allege that AIG consistently trumpeted its risk controls and its careful structuring of its CDS portfolio despite its awareness that its risk controls were inadequate and its models were unable to evaluate the extent of the risk. (CCAC ¶ 152.) Plaintiffs allege as well that AIG failed to disclose the nature and extent of the risk to the Company presented by the securities lending program's aggressive foray into RMBS. (CCAC ¶ 266(g).)

On top of the warnings mentioned above – the alarm sounded by American General Financial Services, Park's refusal to take a leadership role in the CDS business, and the

recognition of the inadequacy of the Gorton model – Plaintiffs contend that AIG received

additional warnings regarding the inadequacy of the risk controls at AIGFP and the scope of the

risk presented by the CDS portfolio over the course of 2007.  One of those warnings was the

resignation of Joseph St. Denis, a former Assistant Chief Accountant at the SEC Enforcement

Division, who had been hired by AIG in June 2006 for the position of Vice President of

Accounting Policy.  The position was created as part of a company-wide effort to address

accounting problems in light of the Company's scandals earlier in the decade.  St. Denis worked

out of AIGFP's Connecticut office and was responsible for documenting the accounting of

AIGFP's proposed transactions.  (CCAC ¶¶ 156-58.)   However, when St. Denis became

concerned about the valuation of AIGFP's CDS portfolio, Cassano told him, "I deliberately

excluded you from the valuation of the Super Seniors because I was concerned you would pollute

the process." (CCAC ¶ 160.)  Cassano's various obstructions of St. Denis' efforts to do his job

and ensure that AIGFP properly accounted for its transactions led him to resign, which he first

attempted to do on September 9, 2007, and finally did on October 1, 2007.  (CCAC ¶¶ 162-64.)

St. Denis informed the AIGFP General Counsel that he believed that his exclusion from the CDS

portfolio placed AIG at great risk, and he relayed the same concern to both AIG's Chief Auditor

and the PwC engagement partner.  (CCAC ¶¶ 164-66.)

    AIG received another warning in August 2007, when Goldman Sachs, a

counterparty to an AIGFP credit default swap, demanded $1.5 billion in collateral due to the

declining value of the reference CDO.  After negotiation, AIGFP posted $450 million in

collateral.  In October 2007, Goldman Sachs demanded an additional $3 billion in collateral,

which AIGFP negotiated down to $1.5 billion.  (CCAC ¶ 154-55.)  These undisclosed collateral

EXHIBIT C  -85-

demands put AIGFP on notice that at least some of its counterparties were using models that were indicating a steeper decline in CDO values than those used by AIGFP. This was particularly problematic for AIGFP because many of the CDS contracts designated AIGFP's counterparty as the "Valuation Agent" with primary authority to determine the value of the reference CDOs and whether AIGFP was required to post collateral. (CCAC ¶ 320(d).) These collateral demands also put AIG – but not AIG's investors – on notice that the CDS portfolio's collateral risk would have significant consequences for AIG's liquidity.

PwC provided another critical warning to AIG management regarding risk control problems with AIGFP's CDS portfolio in a meeting attended by defendants Sullivan and Bensinger on November 29, 2007. PwC, concerned about an upcoming investor meeting that was scheduled for December 5, 2007, in which AIG was expected to discuss its exposure to the subprime mortgage market, warned AIG of "significant deficiencies, and a possible material weakness, in the valuation process concerning the CDS portfolio." (CCAC ¶ 171.) The Audit Committee meeting minutes reflect that Sullivan, Bensinger, and Lewis were all actively involved in discussions with PwC on this issue. (CCAC ¶ 182.) Despite PwC's warning, AIG proceeded with the December 5, 2007, presentation and did not disclose PwC's expressed concerns.

Following the December 5, 2007, investor meeting, AIG's stock rose over 4%, a rally that one report in the financial news media attributed to "statements from company executives . . . that its exposure to housing is 'manageable,' and that it has no exposure to structured investment vehicles, which hold a big load of the odorous mass known as collateralized debt obligations." (CCAC ¶ 181.) However, on February 11, 2008, AIG disclosed,

in a Form 8-K filed with the SEC, that the CDS portfolio loss estimates supplied in the December 5, 2007, meeting were inaccurate, and that the gross cumulative decline of its CDS portfolio was actually more than $4 billion greater than previously disclosed.  (CCAC ¶¶ 182-83.)  In the February 11, 2008, Form 8-K, AIG attributed the multi-billion dollar inaccuracy to the use of accounting mechanisms (specially, "cash flow diversion features" and "negative basis adjustments") that were unreliable.  (CCAC ¶¶ 183-85.)  The February 11, 2008, 8-K also revealed that AIG had been advised by PwC that AIG had a material weakness in its internal controls related to the CDS portfolio.  (CCAC ¶ 187.)  In response to the announcement, an article in the financial news media reported that "[i]nvestors sold AIG's shares aggressively." (CCAC ¶ 188.)

AIG's 2007 Form 10-K, filed on February 28, 2008, disclosed even greater losses in the CDS portfolio ($11.5 billion) and, in a conference call on February 29, 2008, defendant Bensinger conceded that recording a negative basis adjustment was not consistent with the fair value requirements of GAAP ("Generally Accepted Accounting Principles").  (CCAC ¶ 190.) That same day, defendant Sullivan reported that Cassano had resigned from AIG, although he did not disclose that AIG had agreed to retain Cassano at a salary of $1 million per month.  (CCAC ¶ 194.)

On May 8, 2008, AIG announced its results for the first quarter, including a pre-tax charge of $9.11 billion for a "net unrealized market valuation loss" related to the CDS portfolio.  (CCAC ¶ 198.)  AIG contemporaneously announced its intention to raise $12.5 billion in new capital, and on May 20, 2008, it revealed that it in fact had raised $20 billion in new capital.  (CCAC ¶ 200.)

EXHIBIT C  -87-

On June 6, 2008, it was reported that AIG was under investigation by the SEC and the DOJ and, on June 15, 2008, AIG's Board of Directors convened a special meeting and ousted Sullivan from his position as CEO.  (CCAC ¶¶ 207-08.)  The Company's second quarter results, announced on August 7, 2008, revealed another unrealized market valuation loss on the CDS portfolio of $5.6 billion, as well as $6.08 billion of losses arising from other investments in RMBS.  In response to these disclosures, and statements from AIG's new CEO recognizing the Company's overexposure to the U.S. housing market, the Company's share price declined another 18%.  (CCAC ¶¶ 210-12.)

The CDOs protected by AIGFP's CDS portfolio continued to decline in value throughout August and into September, requiring AIG to post billions of dollars of additional collateral to its CDS counterparties.  On September 15, 2008, AIG's credit rating was downgraded multiple levels by all three major rating agencies.  Standard & Poor's attributed the downgrade primarily to AIG's exposure to the mortgage market.  The downgrades required AIG to post an additional $14.5 billion of collateral and brought the Company to the brink of collapse.  (CCAC ¶¶ 214-18.)  On September 16, 2008, the federal government agreed to an $85 billion bailout of AIG in exchange for a 79.9% equity stake in the Company ("the September 2008 Government Bailout").  AIG stock, which had traded at a high of $72.65 per share during the Class Period, closed at $3.75, an 87% fall in six weeks.  (CCAC ¶¶ 212, 218, 516.)

C.    _Alleged Material Misstatements and Omissions_

Plaintiffs contend that Defendants began to mislead the market materially with regard to the riskiness of the Company's CDS portfolio and its exposure to RMBS in the Company's 2005 Form 10-K; that Defendants continued to mislead the market through various

EXHIBIT C  -88-

public filings and investor conferences throughout the Class Period; and that the material

misstatements and omissions were not cured until the announcement of the September 2008

Government Bailout at the close of the Class Period. Plaintiffs identify dozens of allegedly

actionable misstatements and omissions, the significance of many of which Defendants

vigorously contest. The Court need not determine the significance of each alleged material

misstatement and omission. The sampling of allegations included below, however, is sufficient

to support the legal analysis that follows.

### 1.    *AIG's 2005 10-K*

AIGFP entered into a much larger volume of CDS contracts in 2005 than it had in

previous years and, in the bulk of those CDS contracts, the Company assumed the credit risk of a

CDO. These CDOs were collateralized by portfolios of miscellaneous financial assets, most

commonly residential mortgage-backed securities. AIG's dramatic expansion into the CDS

market in 2005 thus had the effect of greatly increasing the Company's exposure to the

residential mortgage market, particularly the subprime mortgage market. These investments

exposed the Company to valuation risk and collateral risk as well as credit risk. The Company's

2005 Form 10-K, however, did not disclose that the Company's burgeoning CDS portfolio could

require AIG to post large sums of collateral in the event that the underlying CDOs declined in

value or were downgraded. (CCAC ¶ 266(f).) Rather, AIG's disclosures regarding its potential

obligations to post collateral were limited to the possibility that a downgrade of AIG could

trigger collateral posting obligations.

The 2005 Form 10-K also contained allegedly misleading disclosures regarding

AIGFP's ability to hedge the risk of the CDS portfolio. Whereas the filing states that "AIGFP

EXHIBIT C  -89-

maintains the ability opportunistically to economically hedge specific securities in a portfolio and thereby further limit its exposure to loss," two confidential witnesses with direct knowledge of AIGFP's credit default swap transactions allege that AIGFP in fact could not economically hedge the CDS portfolio.[6] (CCAC ¶¶ 125-26.)

AIG's disclosures in the Form 2005 10-K were misleading with respect to the Company's controls as well. The filing contained extensive discussion of the manner in which the Company had strengthened its controls in light of the accounting scandals of previous years (CCAC ¶¶ 255-58), but did not disclose that at the same time the Company had taken specific measures to weaken AIG management's control over AIGFP. (CCAC ¶ 129.)

With respect to the securities lending business, in the 2005 Form 10-K, AIG stated that

> AIG's insurance and asset management operations lend their securities and primarily take cash as collateral with respect to the securities lent. Invested collateral consists primarily of floating rate debt securities.

(CCAC ¶ 264.) The anodyne reference to "floating rate debt securities" was misleading because it concealed the fact that, rather than invest the collateral primarily in low-risk instruments, AIG had decided by the end of 2005 to invest up to 75% of the collateral in RMBS. (CCAC ¶ 266(g).)

2.  *AIG's 2006 Disclosures*

Plaintiffs allege that AIG repeated many of the false and misleading statements that were published in the 2005 Form 10-K in the Company's 2006 quarterly reports, 2006 annual report, 2006 quarterly and annual earnings press releases, and 2006 quarterly and annual

---

[6]    Forster made a similar misstatement on behalf of AIG at the May 31, 2007, investor conference. (CCAC ¶ 302.)

earnings conference calls. (CCAC ¶ 277.) In AIG's 2006 Form 10-K, AIG misrepresented the effectiveness of its internal controls and risk management and falsely implied that AIGFP operated under strict risk controls established and monitored by AIG. (CCAC ¶¶ 285-88.) AIG's 2006 Form 10-K failed to disclose the valuation risk and collateral risk presented by the CDS portfolio (CCAC ¶¶ 282, 289), and it also failed to disclose the increasing concentration in credit risk in subprime mortgage-backed securities created by the CDS portfolio and the securities lending business (CCAC ¶¶ 282, 290).

           3.    *AIG's 2007 Disclosures*

AIG held a special investor conference on May 31, 2007, at which Forster presented an overview of AIGFP's CDS portfolio. He assured investors that AIGFP could handle "the worst recession I can imagine"; that "it's actually fairly easy for us to hedge any of the risks that we perceive"; and that "given the conservatism . . . that we've built in these portfolios, we haven't had to do a huge amount of hedging over the years." (CCAC ¶ 301.) Forster failed to disclose, however, that AIGFP had elected not to hedge its CDS investments because it would not have been economically feasible to do so. (CCAC ¶ 302.) Moreover, Forster's bravado regarding the CDS portfolio's ability to withstand "the worst recession I can imagine" contradicted the Company's (undisclosed) recognition that its models were actually incapable of evaluating the risk presented by the CDS portfolio.

On August 8, 2007, AIG announced its financial results for the second quarter of the year and, on the following day, AIG held an investor conference at which it repeated many of the misstatements and omissions previously alleged. (See generally, CCAC ¶¶ 311-320.) Lewis emphasized the "strong risk management processes" in all areas related to the Company's

exposure to the mortgage market and he referred to the Company's exposure to that market as "prudent" and "understood and well managed." (CCAC ¶ 312.) He discussed the credit risk presented by the portfolio as a "very remote risk" and insisted that "risks to the mortgage market are identified, assessed, analyzed, monitored and managed at all levels of [the Company's] organization," without disclosing the true extent of the valuation and collateral risk posed by the CDS portfolio. (CCAC ¶¶ 314-15.) Sullivan and Cassano made similar remarks; Cassano went so far as to say, "it is hard for us, without being flippant, to even see a scenario within any kind of realm or reason that would see us losing $1 in any of those transactions." (CCAC ¶¶ 316, 317.)

In the face of increasing concern in the marketplace regarding exposure to the subprime mortgage market, as well as AIG's disclosure in the 2007 Third Quarter Form 10-Q of a $352 million market valuation loss in the CDS portfolio, AIG held another investor conference call on December 5, 2007. Sullivan stated that the Company had forecast the problems in the residential housing market in 2005 but he did not disclose that the Company, despite that forecast, had failed to take the natural step of hedging or paring back its existing CDS portfolio in any way. Nor did Sullivan, or any of the other AIG executives who participated in the conference call (which includes all of the Section 10(b) Defendants), disclose that the Company actually increased its exposure to RMBS through the securities lending program at the end of 2005. (CCAC ¶¶ 335-36.) With respect to the Company's estimates of the losses incurred in the CDS portfolio, Sullivan stated that AIG was "confident in [its] marks and the reasonableness of our valuation methods." (CCAC ¶ 338.)

Cassano gave a presentation at the December 5 investor conference as well, in which he also insisted that "we are highly confident that we will have no realized losses on these portfolios during the life of these portfolios."  (CCAC ¶ 339.)  None of the Section 10(b) Defendants disclosed the extent of the valuation or collateral risk presented by the CDS portfolio.[7]  (CCAC ¶¶ 171-182.)  Rather, Cassano characterized the response to the Company's GAAP-required markdown of the portfolio as "hysteria" disconnected from "economic reality" and dismissed the collateral demands AIG had received from CDS counterparties as "like a drive by in a way," suggesting that AIGFP had an ability to avoid collateral calls.  (CCAC ¶¶ 340-42.)

Bensinger spoke at the conference as well, trumpeting AIG's management of AIGFP risk and insisting that "there is not a lot of capital exposed in that business."  (CCAC ¶ 344.)  Forster described in detail the creation of the portfolio, stating that AIGFP conducted thorough due diligence on the managers of each CDO underlying a swap in which AIGFP sold protection.  (CCAC ¶¶ 346, 481.)  Forster's statement is contradicted by the confidential allegation of an executive who headed the CDO business of a major Wall Street investment bank that in each swap transaction between AIGFP and the bank, AIGFP, particularly Frost and Forster, merely requested the underlying and offering documents and did not request access to the counterparties' own valuation or analytical materials relating to the investment.  (CCAC ¶¶ 351(h), 481.)

---

[7]     Similarly, in the Third Quarter Form 10-Q, AIG warned that it could be obliged to post $830 million of collateral if the Company was downgraded but it did not disclose the much greater collateral risk presented by the possibility of downgrades or declines in value of the CDOs on which it had sold protection. (CCAC ¶ 326.)

EXHIBIT C  -93-

AIG led investors to believe at the December 5, 2007, investor meeting – and through its Form 8-K/A filed with the SEC two days later – that the total value of its CDS portfolio had declined between $1.4 and $1.5 billion through November 2007.  (CCAC ¶ 333.) A few months later, when AIG subsequently recognized that this figure under-reported losses by over $4 billion (triggering an 11.7% single-day drop in the stock price), it conceded that it had arrived at this figure by using improper accounting techniques.  (CCAC ¶¶ 183-86, 530.)  AIG presented its highly-erroneous estimates on the December 5, 2007, investor call with great confidence (as exemplified by Sullivan's statements quoted above) despite the fact that PwC had warned Sullivan, Bensinger, and AIG of the possibility that the Company had a material weakness relating to the valuation of the CDS portfolio.  (CCAC ¶ 187.)

### 4.    *AIG's 2008 Disclosures*

AIG hosted a conference call on February 29, 2008, discussing the financial results reported for the fourth quarter of 2007 in the Company's 2007 Form 10-K.  Sullivan, Bensinger, and Lewis all made presentations during the call.  (CCAC ¶ 379.)  Sullivan and Bensinger both insisted that investors should focus on the credit risk of the CDS portfolio and downplayed the impact of valuation risk.  (CCAC ¶ 380.)  Bensinger proclaimed that "AIG does believe that any credit impairment losses realized over time by AIGFP will not be material to AIG's consolidated financial position nor to its excess economic capital position" because "AIGFP underwrote its Super Senior credit derivative business to a zero loss standard, incorporating conservative stress scenarios at inception."  (CCAC ¶ 380.)  Sullivan, when asked how he could have appeared so confident in a figure that proved to be so drastically wrong during the Company's presentation of its loss estimates on the December 5, 2007, investor call, merely

claimed that the figures presented were "unaudited," without disclosing that in fact his expressed

confidence contradicted PwC's explicit warning given a week earlier regarding the potential

material weakness.  (CCAC ¶ 381.)

On May 8, 2008, AIG announced its first quarter financial results along with its

intention to raise $12.5 billion in new capital.  In a press release, AIG pronounced that it was

undertaking the capital raising effort "to fortify [AIG's] balance sheet and provide increased

financial flexibility."  (CCAC ¶ 385.)  During a May 20, 2008, investor conference, Sullivan

stated that the decision to raise capital "reflects both confidence in AIG's strong balance sheet

and the desire to position AIG with enhanced flexibility to take advantage of opportunities as

conditions warrant."  (CCAC ¶ 203.)  While emphasizing AIG's commitment to being

"proactive," its "opportunist start during the period," and its "invest[ing] in . . . the growth of our

business" (CCAC ¶ 203), Sullivan did not disclose that, in fact, the decision by the major ratings

agencies on May 8 and 9 to lower AIG's credit ratings and to place a number of the CDO

tranches it insured on credit watch precipitated multi-billion dollar collateral calls that would

swallow up most of the raised capital.  (CCAC ¶¶ 205, 417.)

In June 2008, Sullivan was forced out as CEO and replaced by Robert B.

Willumstad, who had served on the Company's Board of Directors since 1996 and is named as a

Director Defendant in this action.  (CCAC ¶ 68.)  Speaking of his assumption of the CEO

position in June 2008, Willumstad later stated that "I thought I knew the company well, but after

three weeks of digging and turning over rocks, I realized how fragile AIG's balance sheet was."

(Golan Decl., Ex. 2.)

AIG.Securities.wpd                     Version 9/27/2010                     22

EXHIBIT C  -95-

## II. DISCUSSION

### A.    *Legal Standards: Motions to Dismiss, Rules 9(b) and 12(b)(6), and the PSLRA*

In deciding a motion to dismiss a complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6), the Court accepts as true the non-conclusory factual allegations in the complaint, and draws all reasonable inferences in the plaintiff's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of elements of a cause of action will not do." Iqbal, 129 S. Ct. at 1949 (internal quotation marks and citation omitted). Rather, to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007). This Twombly standard applies to all civil actions. Id. at 1953.

Securities fraud claims are also subject to additional pleading requirements. Plaintiffs' Section 10(b) claims are subject to the heightened pleading standards of both Federal Rule of Civil Produce 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). See In re Scholastic Corp., 252 F.3d 63, 69-70 (2d Cir. 2001). Rule 9(b) requires that allegations of fraud be stated with particularity. Fed. R. Civ. P. 9(b). Additionally, under the PSLRA, in an action for money damages requiring proof of scienter, "the complaint [must] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u-4(b)(2) (West 2009). Particularity requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal

EXHIBIT C  -96-

quotation marks and citation omitted); Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir. 1999).

A court considering a motion to dismiss "is normally required to look only to the allegations on the face of the complaint." Roth, 489 F.3d at 509.  However, "[i]n certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6)." Id.  Courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  "If . . . allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true." In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008).  The Court may also consider matters that are subject to judicial notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

> B.      *Plaintiffs' Rule 10b-5 Claims Asserted Against AIG and the Section 10(b) Defendants*

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003) (citation omitted).  For the reasons that follow, the Court concludes that Plaintiffs have adequately pleaded this claim with respect to AIG and the Section 10(b) Defendants.

AIG.Securities.wpd                    Version 9/27/2010                    24

EXHIBIT C  -97-

*1.      Material False Statements and Omissions*

Rule 10b-5 provides: "It shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5 (2007). "A statement is material only if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." In re International Business Machines Corporate Sec. Litig. 163 F.3d 102, 106-07 (2d Cir. 1998) (citing Basic v. Levinson, 485 U.S. 224, 231-32 (1988)). Although "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact," In re Optionable Sec. Litig., 577 F. Supp. 2d at 692, once a corporation does speak, its communication creates "a duty to disclose all facts necessary to ensure the completeness and accuracy of [the corporation's] public statements," Marsh & McLennan Cos. Sec. Litig., 501 F. Supp. 2d 452, 469 (2d Cir. 2006).

Plaintiffs need not plead misstatements and omissions on the part of each of the Section 10(b) Defendants separately. Rather, the group pleading doctrine allows Plaintiffs to "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent." In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (citation omitted). The Section 10(b) Defendants – Sullivan, Bensinger, Cassano, Forster, Herzog and Lewis – are all alleged to have had "direct involvement in the everyday business of the company" and Plaintiffs are therefore entitled to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other

EXHIBIT C  -98-

group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." [8] <u>In re Oxford Health Plans, Inc.</u>, 187 F.R.D. 133, 142 (S.D.N.Y.1999) (internal quotation marks omitted). However, the group pleading doctrine is "extremely limited in scope," and "[o]ne such limitation is that it applies only to group-published documents, such as SEC filings and press releases." <u>Goldin Associates, L.L.C, v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, No. 00 Civ. 8688, 2003 WL 22218643, at *5 (S.D.N.Y. Sept. 25, 2003) (citations omitted). Furthermore, the doctrine does not permit plaintiffs to presume the state of mind of the defendants at the time the alleged misstatements were made. <u>See In re Citigroup, Inc. Sec. Litig.</u>, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) ("Although the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made." (citation omitted)).

Plaintiffs' allegations, as set forth above, are adequate to plead material misstatements and omissions on the part of AIG and the Section 10(b) Defendants throughout the Class Period. Plaintiffs' Complaint alleges with particularity that AIG and the Section 10(b) Defendants, through AIG's SEC filings, press releases, and investor conferences, beginning with the Company's 2005 Form 10-K and continuing through the Company's capital raising in May 2008, materially misled the market in the following ways: (i) failing to disclose the scope of AIGFP's expansive underwriting of CDSs in 2005; (ii) failing to disclose that up to 75% of the cash collateral of the securities lending program was invested in RMBS; (iii) falsely stating that

---

[8]     The statements of the Section 10(b) Defendants in their capacity as agents of AIG are all attributable to AIG as well.

EXHIBIT C  -99-

the Company engaged in extensive due diligence before entering into swap contracts; (iv)

repeatedly emphasizing the strength of the Company's risk controls when addressing investor

concerns related to exposure to the subprime mortgage market, without disclosing that the CDS

portfolio at AIGFP was in fact not subject to either the risk control processes that governed other

divisions of the Company or the risk control processes that previously had been in place at

AIGFP; (v) repeatedly pronouncing confidence in the Company's assessment of the risks

presented by the CDS portfolio, despite knowledge that the Company's models were incapable of

evaluating the risks presented; (vi) stating that the Company had the ability to hedge its CDS

portfolio when in fact it was not economically feasible to do so; (vii) leading investors to believe

that the primary risk presented by the CDS portfolio was credit risk, when in fact the CDS

portfolio entailed tremendous collateral risk and valuation risk; (viii) expressing confidence at

the December 5, 2007, investor conference in their estimates related to losses in the CDS

portfolio despite a warning from PwC that the Company may have a material weakness in

assessing that portfolio; and (ix) leading investors to believe that the Company was raising

capital in May 2008 to take advantage of opportunities in the marketplace when, in fact, the

capital was necessary to meet billions of dollars' worth of collateral obligations triggered by

recent downgrades of the Company's credit rating and the credit ratings of CDOs on which AIG

had sold protection.  Each of these allegations of misstatements and omissions plausibly and with

particularity frames a claim of concealment of either a significant decision taken by the Company

to expose itself to risk or a significant weakness in the Company's risk controls that "would have

been viewed by the reasonable investor as having significantly altered the total mix of

information made available."  See In re International Business Machines Corporate Sec. Litig.,

EXHIBIT C  -100-

163 F.3d at 106-07 (2d Cir. 1998); Hunt v. Alliance North American Government Income Trust, Inc., 159 F.3d 723, 728 (2d Cir. 1998) (allegations of a defendant's representations that hedging techniques are available and will be used, when made with the knowledge that such techniques are not in fact economically feasible and therefore will not be used, are sufficient to plead materially misleading statements); Sonnenberg v. Prospect Park Financial Corp., No. Civ. 91-435, 1991 WL 329755, at *9 n.5 (D.N.J. Aug. 20, 1991) ("The purpose of the federal securities laws is to ensure that investors have sufficient information to assess and avoid undue risks by refraining from purchasing securities that carry greater risks than the investor is willing to bear.").

   AIG and the Section 10(b) Defendants contend that many of the Company's statements cited above are not actionable because they were forward-looking statements that were accompanied by sufficient cautionary language identifying various risks of investment in AIG securities.  Forward-looking statements are protected under the "bespeaks caution" doctrine where they are accompanied by meaningful cautionary language.  In re Sina Corp. Sec. Litig., No. 05 Civ. 2154, 2006 WL 2742048, at *9 (S.D.N.Y. Sept. 26, 2006).  However, generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks.  In re Regeneron Pharm. Inc. Sec. Litig., No. 03 Civ. 3111, 2005 WL 225288, at *18 (S.D.N.Y. Feb. 1, 2005).  Moreover, statements of opinion and predictions may be actionable if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them.  In re International Business Machines Corporate Sec. Litig. 163 F.3d 102, 107 (2d Cir. 1998) (internal citations omitted).

   In Credit Suisse First Boston Corp. v. ARM Financial Group, Inc., the plaintiff

EXHIBIT C  -101-

investors alleged that the defendant issuer failed to disclose that the short-term funding contracts

upon which it relied could be redeemed on as little as seven days notice, creating a tremendous

liquidity risk that ultimately materialized, leading the issuer to suffer large losses and a

corresponding collapse of its stock price.  No. 99 Civ. 12046, 2001 WL 300733, at *1-2

(S.D.N.Y. Mar. 28, 2001).  The defendant sought shelter in the disclosure in its Form 10-K that

the funding contracts are "are designed and have historically been held by customers as long term

cash investments, even though under most contracts customers have the option to liquidate their

holdings with written notice of thirty days or less."  Id. at *9.  Judge Pauley held that this

disclosure was inadequate:

> [W]arnings of specific risks like those in the ARM Prospectus do
> not shelter defendants from liability if they fail to disclose hard facts
> critical to appreciating the magnitude of the risks described . . . .  As
> aptly put by Judge Pollack in the context of the bespeaks caution
> doctrine, disclosures of risk provide "no protection to someone who
> warns his hiking companion to walk slowly because there might be
> a ditch ahead when he knows with near certainty that the Grand
> Canyon lies one foot away."

Id. at *8.  Similarly, Plaintiffs here have adequately pleaded that the various general disclosures

cited by AIG and the Section 10(b) Defendants were insufficient to fulfill Defendants' disclosure

obligations under the federal securities laws in light of the undisclosed "hard facts critical to

appreciating the magnitude of the risks described," such as, to name but a few, the known

weaknesses of AIGFP's models; the deliberate weakening of AIGFP's risk controls; the scope of

the exposure to RMBS at AIGFP and the securities lending program; and the valuation and

collateral risk presented by the CDS portfolio that rendered misleading AIG's frequent placement

of emphasis on the "remote" credit risk.  These "hard facts" warrant the inference that the

EXHIBIT C  -102-

Section 10(b) Defendants could not have reasonably believed the alleged misstatements and, accordingly, they are not protected as forward-looking statements.  In re International Business Machines Corporate Sec. Litig., 163 F.3d at 107.  In the context of this motion to dismiss, in which the Court must draw all reasonable inferences in Plaintiffs' favor, the Court concludes that Plaintiffs have adequately stated a claim notwithstanding the cautionary language.  See Iowa Public Employees' Retirement System v. MF Global, Ltd., No. 09-3919-cv, 2010 WL 3547602, at *4 (2d Cir. Sept. 14, 2010) (bespeaks caution doctrine does not apply to omissions of present facts).

### 2.    Scienter

A plaintiff's allegations must "give rise to a strong inference of fraudulent intent" to adequately plead scienter; "fraud by hindsight" is an inadequate basis for a securities fraud claim.  Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000); Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999).  Scienter can be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (citation and internal quotation marks omitted).   In evaluating whether the pleadings suggest a strong inference of scienter, the "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." Tellabs, Inc., 551 U.S. at 326.  In order to survive Defendants' motions to dismiss, the inference of scienter that can be drawn from Plaintiffs' Complaint must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." Tellabs, Inc., 551 U.S. at 314.

AIG.Securities.wpd          Version 9/27/2010          30

EXHIBIT C  -103-

In <u>Novak</u>, the Second Circuit identified four types of allegations that may be sufficient to allege scienter:  "[D]efendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor"  <u>Novak</u>, 216 F.3d at 311 (citations omitted).  Plaintiffs rely principally on the third of the four <u>Novak</u> rubrics, alleging that AIG and the Section 10(b) Defendants knew facts or had access to information suggesting that their public statements were not accurate.  <u>Novak</u>, 216 F.3d at 311.  To plead scienter based on conscious misbehavior or recklessness, "the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."  <u>Ronconi v. Larkin</u>, 253 F.3d 423, 432 (9th Cir. 2001).  "Plaintiffs can plead conscious misbehavior or recklessness by alleging defendants' knowledge of facts or access to information contradicting their public statements."  <u>In re Bayer AG Sec. Litig.</u>, No. 03 Civ. 15462004, 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004) (citing <u>Novak</u>, 216 F.3d at 308).  "In cases in which scienter is pled in part by alleging that the defendant knew facts or had access to information suggesting that their public statements were not accurate, the scienter analysis is closely aligned with the analysis as to misleading statements."  <u>In re Alstom SA</u>, 406 F. Supp. 2d 433, 456 (S.D.N.Y. 2005) (internal citation and quotation marks omitted).

As set forth above, all of the Section 10(b) Defendants were allegedly privy to material non-public information concerning AIG and AIGFP, and all of the Section 10(b) Defendants allegedly "prepared, approved, signed, and/or disseminated" the documents and statements that contain the material misstatements and omissions upon which Plaintiffs' 10(b)

claims are predicated. Plaintiffs' factual allegations, pleaded amply and with particularity,

support an inference that is "at least as compelling as any opposing inference" that AIG and the

Section 10(b) Defendants knew facts or had access to information suggesting that their public

misstatements were not accurate.

According to the Complaint, AIG and the Section 10(b) Defendants knew,

beginning in 2005, that the Company had acquired billions of dollars' worth of exposure to

RMBS through the CDS portfolio, and knew that, while their model could not properly evaluate

the extent of the related risk, the portfolio carried considerable valuation risk and collateral risk

as well as credit risk. Moreover, AIG and the Section 10(b) Defendants knew that risk controls

had been weakened at AIGFP. AIG and the Section 10(b) Defendants deliberately declined,

nonetheless, to disclose these risks to the marketplace, and they similarly declined to disclose the

risk presented by the Company's aggressive expansion into RMBS through the securities lending

program. As the investment community became increasingly alarmed by the subprime mortgage

crisis, AIG and the Section 10(b) Defendants continued to proclaim – through their public filings,

conference calls with the investment community, and press releases – their confidence that the

CDS portfolio only presented "remote risk" and that the Company's controls were adequate to

evaluate that risk. AIG and the Section 10(b) Defendants did so despite various internal

indicators to the contrary, including the Company's recognition of the weakness of the Gorton

model; the resignation of St. Denis; PwC's warning of a potential material weakness; and the

multi-billion dollar collateral calls received from AIGFP's CDS counterparties.

Construing the allegations in the Complaint in the light most favorable to

Plaintiffs, the Court concludes that Plaintiffs have satisfied their burden of alleging facts giving

EXHIBIT C  -105-

rise to a strong inference of fraudulent intent.  See In re New Century, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008) (allegation that defendants certified financial statements despite knowledge of internal control problems states a claim for deliberately reckless misstatements); In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 631 (allegations that "[d]efendants either had actual knowledge of or ready access to facts that contradicted their public statements" adequately plead scienter).  No opposing inference is more compelling.  Accordingly, Plaintiffs' allegations are sufficient to satisfy their pleading obligation with regard to scienter.

3.    *Loss Causation*

The PSRLA requires that in order to sustain a securities fraud claim, a plaintiff must plead loss causation, which is the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003); 15 U.S.C. § 78u-4(b)(4).  An allegation that plaintiffs purchased securities at an artificially inflated price, absent any allegation that defendants' misrepresentations caused plaintiffs' economic loss, is insufficient to plead loss causation.  Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 340-46 (2005).  Loss causation may be adequately pleaded by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline.  Leykin v. AT & T Corp., 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006), aff'd, 216 F. App'x 14 (2d Cir. 2007).  With respect to the latter, "where some or all of the risk is concealed by the defendant's misrepresentation or omission, courts have found loss causation sufficiently pled."  Nathel v. Siegal, 592 F. Supp. 2d 452, 467 (S.D.N.Y. 2008).

Plaintiffs have adequately pleaded a causal link between the alleged misconduct

EXHIBIT C  -106-

and the economic harm they ultimately suffered.  The Complaint is replete with allegations that

AIG's stock price fell in response to AIG's corrective disclosures of previously undisclosed

information.  For instance, the Complaint alleges that, upon the disclosure in February 2008 that

the previously provided estimates of AIG's losses from its CDS portfolio were based on

improper accounting techniques and understated the actual losses by billions of dollars, AIG's

stock price fell over 11% in a single day of trading.  Additionally, the Complaint adequately

pleads that many of the principal risks concealed by AIG and the Section 10(b) Defendants'

material misstatements and omissions – such as the threat posed to the Company's liquidity by

the CDS portfolio's collateral risk – subsequently materialized to Plaintiffs' detriment.

        AIG and the Section 10(b) Defendants contend that the decline in AIG's stock

price is attributable to the decline experienced in the stock market generally, and in the financial

services sector specifically, during the severe economic recession that took hold during the Class

Period.  However, the sharp drops of AIG's stock price in response to certain corrective

disclosures, and the relationship between the risks allegedly concealed and the risks that

subsequently materialized, are sufficient to overcome this argument at the pleading stage.

Although Defendants may ultimately demonstrate that some or all of Plaintiffs' losses are

attributable to forces other than AIG and the Section 10(b) Defendants' material misstatements

and omissions, "[t]he existence of intervening events that break the chain of causation, such as a

general fall in the price of stocks in a certain sector, is a 'matter of proof at trial and not to be

decided on a Rule 12(b)(6) motion to dismiss.'"  Nathel v. Siegal, 592 F. Supp. 2d 452, 467

(S.D.N.Y. 2008) (quoting Emergent Capital, 343 F.3d at 197).  ____

EXHIBIT C  -107-

C.      *Plaintiffs' Claims for Control Person Liability under Section 20(a)*

Plaintiffs assert control person liability claims under Section 20(a) of the Exchange Act against the Executive Defendants – Sullivan, Bensinger, Cassano, Forster, Herzog, Lewis and Frost.  While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage.  Police and Fire Retirement System of the City of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 241 (S.D.N.Y. 2009).  "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation."  Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting SEC v. First Jersey Sec. Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)).  As demonstrated above, Plaintiffs have stated a claim under Rule 10b-5 with respect to AIG and the Section 10(b) Defendants' primary participation in AIG's material misrepresentations and omissions. Plaintiffs have thereby satisfied the first element.

With respect to the second element, "determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator."  Boguslavsky, 159 F.3d at 720.  At the pleading stage, allegations of a Section 20(a) defendant's control need not be set forth with particularity.  Sgalambo v. McKenzie, No. 09 Civ. 10087, 2010 WL 3119349, at *8, 16 (S.D.N.Y. Aug. 6, 2010) (allegations that defendants were senior officers and board members and possessed the power to cause the direction of the company's management and policies suffice to satisfy the second element of pleading control person liability).  A plaintiff must only show some indirect means of discipline or influence to plead control.  In re Moody's

EXHIBIT C  -108-

Sec. Litig., 599 F. Supp. 2d 493, 517 (S.D.N.Y. 2009).

        Of the seven named Executive Defendants, only Frost and Forster dispute that Plaintiffs have pleaded this element adequately.  Frost, Executive Vice President of AIGFP during the Class Period, headed AIGFP's business and marketing efforts in the United States and, along with Forster and other defendants, allegedly "control[led] the flow of information pertaining to AIGFP's super senior CDS portfolio and unilaterally [made] risk management and valuation decisions" on behalf of the Company.  (CCAC ¶¶ 480.)  Frost also allegedly had control over key decisions regarding the financial reporting on the CDS portfolio, which is an essential element of the alleged primary violations.  (CCAC ¶ 266(a).)  Forster, as Executive Vice President of the Asset Trading & Credit Products Group of AIGFP during the Class Period, was responsible for managing AIGFP's global credit division, which contracted to sell the CDSs.  (CCAC ¶ 41.)  Forster also gave investor presentations concerning the Company's management of the CDS portfolio.  (CCAC ¶¶ 124, 301.)  He thereby both managed the operations of the CDS portfolio and held himself out to investors as an authority on the CDS portfolio during the Company's conference calls.  These factual allegations are sufficient to satisfy the control element under the pleading standard of Rule 8(a) as to Frost and Forster.

        With respect to the third element of control person liability under Section 20(a), the pleading requirements for "culpable participation" are satisfied by the same allegations that satisfy the scienter pleading requirements.  In re AOL Time Warner, Inc. Sec. and ERISA Litig., 381 F. Supp. 2d 192, 235 (S.D.N.Y. 2004) ("allegations of scienter necessarily satisfy the [culpable participation] requirement").  The Section 10(b) Defendants therefore assert essentially the same arguments in opposition to Plaintiffs' allegations of Section 20(a) culpable conduct that

EXHIBIT C  -109-

they assert in opposition to Plaintiffs' allegations of Rule 10b-5 scienter, and those arguments are unavailing for substantially the reasons explained above in connection with the Section 10(b) claims.  The Court now turns to the allegations of culpable conduct on the part of Frost, the only Executive Defendant who is not also a Section 10(b) Defendant.

"In order to plead that a defendant culpably participated in an alleged fraud, plaintiffs must adequately allege that the defendant acted at least with recklessness, in the sense required by Section 10(b) of the Exchange Act and Rule 10b-5."  In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 307-08 (S.D.N.Y. 2008).  Plaintiffs' allegations that Frost (i) rejected suggestions to hedge the CDS portfolio despite being aware of its risks, many of which were not publicly disclosed; (ii) declined to provide Professor Gorton with data necessary to develop a comprehensive model to evaluate the risks of the CDS portfolio; and (iii) made unilateral decisions regarding risk management and valuation of the CDS portfolio without subjecting it to AIG's risk controls, are sufficient to plead plausibly that Frost acted with the recklessness required to satisfy the culpable participation element.  Accordingly, Plaintiffs have stated a claim for control person liability under Section 20(a) of the Exchange Act against each of the Executive Defendants.  See Take-Two Interactive Sec. Litig., 551 F. Supp. 2d at 307 (control person allegations evaluated under the standard set forth in Federal Rule of Civil Procedure 8(a)).

   D.    *Plaintiffs' Securities Act Claims*

Section 11 of the Securities Act of 1933 provides a private right of action for any investor who purchases securities pursuant to a registration statement that, at the time the registration statement became effective, "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements

EXHIBIT C   -110-

therein not misleading." 15 U.S.C. § 77k (West 2009).  With respect to any sale of a security pursuant to a misleading registration statement, Section 11 extends potential liability to issuing companies, executives and directors, underwriters, and accountants who provide their consent to being named as having prepared or certified any part of the registration statement or any report used in connection with the registration statement.  Id.   Section 12(a)(2) expands the potential liability of underwriters beyond that provided in Section 11 (whose scope is curtailed by the requirement that the material misstatement or omission occur in the registration statement) by providing a private right of action for any investor who purchases securities based on *any* prospectus or oral communication that includes a material misstatement or omission.  15 U.S.C. § 77l(a)(2).  Section 15 of the Securities Act further extends liability to any defendant that controlled a primary violator of Section 11.  15 U.S.C. § 77o.  "The test for whether a statement is materially misleading under Section 12(a)(2) is identical to that under Section 10(b) and Section 11: whether representations, viewed as a whole, would have misled a reasonable investor."  Rombach v. Chang, 355 F.3d 164, 178, n.11 (2d Cir. 2004).

Plaintiffs purchased AIG securities during the Class Period that were offered pursuant to AIG's 2003, 2007, and 2008 shelf registration statements.  (CCAC ¶ 616.).  AIG used these shelf registration statements in 101 separate offerings during the Class Period and Plaintiffs assert claims premised on all 101 offerings.  For each offering, the shelf registration statements were supplemented by a prospectus and either a prospectus supplement or a pricing supplement, and the offering materials always incorporated by reference the Company's Forms 10-Q, 10-K, and 8-K.  (CCAC ¶¶ 587-96.)  Plaintiffs assert claims against AIG, the Signing Executive Defendants, and the Director Defendants under Sections 11 and 15, against the Underwriter

EXHIBIT C  -111-

Defendants under Sections 11 and 12(a)(2), and against PwC under Section 11, based on their allegations that these registration statements and the documents incorporated therein, as well as additional offering memoranda (in the case of the Underwriter Defendants), contained untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading.

Defendants contend that Plaintiffs' Section 11 claims are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). However, Rule 9(b) is only applicable to Section 11 claims "insofar as the claims are premised on allegations of fraud." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 631 (S.D.N.Y. 2007) (quoting Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)); see also In re Morgan Stanley Information Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010) (Section 11 of the Securities Act, unlike Section 10(b) of the Exchange Act, does not require that the defendant acted with scienter). Plaintiffs go to great lengths in the Complaint to separate the allegations of fraud that underlie their Exchange Act claims from the allegations of negligence and non-intentional conduct that underlie their Securities Act claims, which is a permissible pleading tactic that spares the Court (and the parties) the burden of proceeding on separate complaints. Accordingly, the Court determines whether Plaintiffs' Securities Act claims survive the motions to dismiss under the notice pleading standard of Federal Rule of Civil Procedure 8(a), as elucidated in Twombly and Iqbal.

  1. *Plaintiffs' Standing to Assert Claims under the Securities Act*

Plaintiffs allege that they purchased securities in offerings pursuant to each of the shelf registration statements at issue herein. (CCAC ¶¶ 581-86.) These shelf registration statements each expressly incorporate by reference AIG's Forms 10-K, 10-Q, and 8-K, which

EXHIBIT C  -112-

include many of the alleged material misstatements and omissions set forth above.  (CCAC ¶
594.)  Plaintiffs contend that these purchases confer standing upon them to assert claims based on
all 101 offerings made by AIG pursuant to the same three shelf registration statements during the
Class Period, even offerings in which they admittedly did not purchase securities.

       Although the question of whether this is a sufficient basis for standing is
undecided in this Circuit, district courts, including a district court in this Circuit, have held that
where, as here, "a plaintiff alleges untrue statements in the shelf registration statement or the
documents incorporated therein . . . then that plaintiff has standing to raise claims on behalf of all
purchasers from the shelf."  <u>In re Citigroup Bond Litig.</u>, No. 08 Civ. 9522, 2010 WL 2772439, at
*14 (S.D.N.Y. July 12, 2010).  This conclusion was premised on allegations that purchasers in
each of the different offerings made pursuant to the same misleading shelf registration statement
can trace their injury to the same alleged underlying conduct on the part of the defendants.  It is
therefore appropriate to accord standing to a plaintiff to represent purchasers from those offerings
"because they have all suffered from the same alleged injury."  <u>Id.</u>  In that case, all of the relevant
claims were premised on statements or alleged omissions in company reports that had been
incorporated by reference in each of the registration statements at issue.

       This Court recently held that the fact that a plaintiff purchased securities in one
securities offering does not confer standing on that plaintiff to assert claims on behalf of
purchasers of different securities offerings in which the alleged material misstatements and
omissions occurred not in the elements of the registration statements that were common to all the
offerings but rather appeared in the prospectus supplements unique to each particular offering.  <u>In
re Morgan Stanley Mortgage Pass-Through Certificates Litig.</u>, No. 09 Civ. 2137, 2010 WL

EXHIBIT C  -113-

3239430, at *5 (S.D.N.Y. Aug. 17, 2010).  Here, Plaintiffs do not rely on the information

furnished in the prospectus and pricing supplements unique to each of the 101 offerings but

rather on the alleged material misstatements and omissions located in the common elements of

the three different registration statements: the Company's Forms 10-K, 10-Q, and 8-K

incorporated therein.  Plaintiffs therefore can trace the injury of the purchasers in each of the 101

offerings to the same underlying conduct on the part of the defendants.  Accordingly, the Court

concludes here that Plaintiffs have standing to assert claims premised upon all 101 offerings

alleged in the Complaint.[9]

> 2.      *The Timeliness of Plaintiffs' Securities Act Claims*

Section 13 of the Securities Act provides that

> No action shall be maintained to enforce any liability created under
> [Section 11 or 12(a)(2)] unless brought within one year after the
> discovery of the untrue statement or the omission, or after such
> discovery should have been made by the exercise of reasonable
> diligence . . . .  In no event shall any such action be brought to
> enforce a liability created under [Section 11] of this title more than
> three years after the security was bona fide offered to the public, or
> under [Section 12(a)(2)] of this title more than three years after the
> sale.

15 U.S.C.A. § 77m (West 2009).  A plaintiff in a Section 11 or Section 12(a)(2) case is required

to plead the time and circumstances of its discovery of the material misstatement or omission

---

[9]      None of the decisions cited by the Underwriter Defendants on this point is directly
apposite.  None of those decisions denied standing to a plaintiff who had
purchased securities pursuant to a misleading registration statement and sought to
assert a claim based on another offering made pursuant to that same registration
statement.  See Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 530-32 (S.D.N.Y.
2008); In re Authentidate Holding Corp. Litig., No. 05 Civ. 5232, 2006 WL
2034644, at *3 (S.D.N.Y. July 16, 2006); In re Friedman's Inc. Sec. Litig., 385 F.
Supp. 2d 1345, 1371 (N.D. Ga. 2005).

EXHIBIT C  -114-

upon which its claim is based. <u>In re Chaus Sec. Litig.</u>, 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992).

Plaintiffs allege that they did not know of the material misstatements and the omissions in the

Registration Statements until the September 17, 2008, announcement of the September 2008

Government Bailout. (CCAC ¶¶ 636-68, 692-94.) The Complaint was filed within one year of

that date, on May 19, 2009. (Docket entry no. 95.) All of the securities offerings at issue in

Plaintiffs' Section 11 claims, and all of the sales at issue in Plaintiffs' Section 12(a)(2) claims,

occurred within three years of that filing date. (CCAC ¶ 591.)

        Defendants contend that AIG's earlier disclosures, such as those contained in the

Company's February 11, 2008, Form 8-K and February 28, 2008, Form 10-K, put Plaintiffs on

inquiry notice of the misleading nature of the registration statements, requiring Plaintiffs to assert

their claims within a year of those dates. However, "[i]nquiry notice exists only when

uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have

discovered" the misconduct. <u>Nivram Corp. v. Harcourt Brace Jovanovick, Inc.</u>, 840 F. Supp.

243, 249 (S.D.N.Y. 1993). Although "[w]here . . . the facts needed for determination of when a

reasonable investor of ordinary intelligence would have been aware of the existence of

[actionable misconduct] can be gleaned from the complaint and papers . . . integral to the

complaint, resolution of the issue on a motion to dismiss is appropriate," <u>LC Capital Partners, LP</u>

<u>v. Frontier Ins. Group, Inc.</u>, 318 F.3d 148, 156 (2d Cir. 2003), Plaintiffs' allegations of

continuing misstatements and omissions throughout the Class Period (construed in the light most

favorable to Plaintiffs) support the inference that Plaintiffs were not on inquiry notice until the

September 2008 Government Bailout. The Court therefore denies the Defendants' motions

insofar as they seek dismissal on statute of limitations grounds.

EXHIBIT C  -115-

3.    *Plaintiffs' Section 11 and Section 15 Claims against AIG and the Signing Executive Defendants*

The alleged material misstatements and omissions in the documents incorporated by reference in the registration statements that were pleaded with respect to AIG and the Signing Executive Defendants (Sullivan, Bensinger, and Herzog) in the Exchange Act context suffice to state a claim against these defendants under Section 11.[10]  Similarly, the allegations that suffice for the purposes of control person liability under Section 20(a) of the Exchange Act similarly suffice to plead control person liability under Section 15 of the Securities Act.  See In re Global Crossing Ltd. Sec. Litig., No. 02 Civ. 910, 2005 WL 1907005, at *11 (S.D.N.Y. Aug. 8, 2005) (applying a single analysis in determining control person liability under Section 20(a) of the Exchange Act and Section 15 of the Securities Act).  Accordingly, Plaintiffs have adequately pleaded these claims with respect to AIG and the Signing Executive Defendants.

4.    *Plaintiffs' Section 11 Claims against the Director Defendants*

The sixteen Director Defendants (Tse and the fifteen Outside Director Defendants) do not dispute that, as directors of the Company who signed the registration statements, they can be held liable for material misstatements and omissions in the registration statements and documents incorporated by reference therein.  Their arguments for dismissal of the Complaint are the same as those advanced by AIG and the Signing Executive Defendants:

---

[10]    The Signing Executive Defendants' only contention to the contrary relies upon their argument, rejected above, that the heightened pleading standard of Rule 9(b) should apply to these claims.  (See Sullivan Mem. 4 (docket entry no. 159); Bensinger Mem. 18 (docket entry no. 173); Herzog Mem. 10 (docket entry no. 179).)

EXHIBIT C  -116-

they contend that the registration statements did not contain material misstatements and omissions; that Plaintiffs lack standing to assert certain claims, and that other claims are time-barred; and that the Rule 9(b) heightened pleading standard should apply to the Section 11 claims. These arguments have been rejected above and, accordingly, the Director Defendants' motions to dismiss the Complaint are denied.

However, Section 11 only imposes liability on directors who either signed the registration statement on which the claims are premised or served at the time the registration statement was filed.[11] The potential liability of defendants Bollenbach, Chia, Rometty, to whom Section 11 only applies to claims premised on one or two of the registration statements at issue, is therefore narrower than that of the other Director Defendants who signed all three of the registration statements.[12]

5.    *Plaintiffs' Section 11 and Section 12(a)(2) Claims against the Underwriter Defendants*

The Underwriter Defendants contend that none of the alleged material misstatements could have misled a reasonable investor and that there was no disclosure obligation as to any of the alleged material omissions. However, when viewed as a whole and in the light most favorable to Plaintiffs, the allegations regarding the shortcomings of the public filings incorporated by reference in the registration statements and offering materials are

---

[11]    Section 11(a)(3) also imposed liability on "every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner." 15 U.S.C.A. § 77k (West 2009).

[12]    Plaintiffs do not contest this point. (See Director Def.'s Mem. 5, n.2 (docket entry no. 168); Pl.'s Opp. (docket entry no. 192).)

EXHIBIT C  -117-

adequate to state a claim under Sections 11 and 12(a)(2), for substantially the reasons stated with

respect to the Court's analysis of these documents in the context of Plaintiffs' Exchange Act

claims.[13]  Rombach v. Chang, 355 F.3d 164, 178, n.11 (2d Cir. 2004).  The Underwriter

Defendants' standing and statute of limitations arguments also fail for the reasons stated above.

Accordingly, the Underwriter Defendants' motion to dismiss the Complaint is denied.

### 6.    Plaintiffs' Section 11 Claim against PwC

Under Section 11, PwC can only be held liable for the allegedly false and

misleading statements in the audited financial statements and annual reports on internal controls

prepared by PwC that were included in the Company's Forms 10-K.  15 U.S.C. § 77k(a)(4); see

Herman & MacLean v. Huddleston, 459 U.S. 375, 386 n.22 (1983) (accountants cannot be held

liable for parts of a registration statement that they are not named as having prepared or

certified).  Accountants may ordinarily avoid liability under Section 11 if they conduct audits that

comply with GAAS (Generally Accepted Accounting Standards) and identify any failures to

conform with GAAP (Generally Accepted Accounting Principles) on the part of the audited

company.  See In re WorldCom, Inc. Sec. Litig., 352 F. Supp. 2d 472, 492-93 (S.D.N.Y. 2005)

---

[13]    In light of this conclusion, the Court need not address whether Plaintiffs have
stated a claim against the Underwriter Defendants under the Securities Act for
their alleged failure to disclose adequately that some of the Underwriter
Defendants were counterparties of AIG with respect to its CDS portfolio and
securities lending program and that proceeds from the offerings at issue may have
been used for those Underwriter Defendants' benefit (CCAC ¶ 597).  See In re
WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 689 (S.D.N.Y. 2004)
("Information regarding relationships that undermine the independence of an
underwriter's judgment about the quality of the investment can be material to an
investor. As a consequence, non-disclosure of an underwriter or issuer's conflicts
of interest can constitute material omissions, even where no regulation expressly
compels the disclosure of such conflicts.").

EXHIBIT C  -118-

According to federal regulations, "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." 17 C.F.R. § 210.4-01(a)(1).

Plaintiffs allege that PwC's audited financial statements were not prepared in accordance with GAAP and that PwC did not conduct its audit in accordance with GAAS. (CCAC ¶¶ 434, 442-443, 646.) Specifically, Plaintiffs allege that PwC had certain obligations to assess the adequacy of AIG's internal controls. (CCAC ¶ 667.) Plaintiffs also allege that PwC had certain obligations to disclose the scope of AIG's potential collateral obligations pursuant to FIN 45, which sets forth disclosure requirements for gaurantees. (CCAC ¶ 442.) PwC's alleged failure to meet these obligations resulted in its signing unqualified opinions (included in the Comany's 2005 and 2006 Forms 10-K) that did not disclose adequately the risks posed by the CDS portfolio, the securities lending program, and the concentration of exposure to the subprime mortgage market, in violation of various accounting standards, including FAS 107 and 133. (CCAC ¶¶ 677-71.) Plaintiffs further allege that the Company's 2007 Form 10-K, while identifying a material weakness, also did not adequately disclose the extent of risks presented by the CDS portfolio. (CCAC ¶ 677.)

PwC contends that Plaintiffs' allegations do not show that there were GAAP or GAAS violations. PwC disputes Plaintiffs' interpretation of the relevant accounting standards, including standards governing the reporting of derivatives at fair value and disclosure of concentrations of credit risk, and argues that none of these standards imposed obligations on PwC with which it failed to comply. However, where a plaintiff has made well-pleaded

EXHIBIT C  -119-

allegations that an accountant blessed financial statements that violated certain identified GAAP principles and were "fundamentally misleading to investors," it is inappropriate to dispose of the claims at the motion to dismiss stage. In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 338-40 (S.D.N.Y. 2004). Rather, because "[e]ventual evidence on industry practice or expert testimony are likely to shed light on this question," the determination of whether AIG's accounting treatment of its CDS portfolio and its exposure to the subprime mortgage market comported with GAAP in the audited financial statements included in its Forms 10-K "cannot be determined in advance of the development of the record." Id. at 339. Accordingly, PwC's motion to dismiss the Complaint is denied.

CONCLUSION

Plaintiffs' claims asserted against Banca I.M.I. S.p.A. and Daiwa Securities SMBC Europe Ltd. are dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m). Plaintiffs' request for leave to re-serve defendant Calyon is granted. Defendants' motions to dismiss the Complaint are denied in all respects. This Opinion and Order resolves docket entry nos. 153, 156, 158, 160, 163, 165, 171, 174, 175, 178, 181, 184, 186 and 190. The Court will issue a separate order setting a pretrial conference.

SO ORDERED.

Dated: New York, New York
      September 27, 2010

                                         LAURA TAYLOR SWAIN
                                         United States District Judge

EXHIBIT C -120-

# PROOF OF SERVICE

I, Stephanie Wilson, declare:

I am employed in the County of San Francisco, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Three Embarcadero Center, 24th Floor, San Francisco, CA 94111.

On October 5, 2010, I served the following documents on the persons listed on the service list below:

**COUNTRYWIDE DEFENDANTS' NOTICE OF RECENT AUTHORITY IN SUPPORT OF MOTION TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

☑     (CM/ECF Electronic Filing) I caused the above document(s) to be transmitted to the office(s) of the addressee(s) listed below by electronic mail at the e-mail address(es) set forth below pursuant to Fed.R.Civ.P.5(d)(1). "A Notice of Electronic Filing (NEF) is generated automatically by the ECF system upon completion of an electronic filing. The NEF, when e-mailed to the e-mail address of record in the case, shall constitute the proof of service as required by Fed.R.Civ.P.5(d)(1). A copy of the NEF shall be attached to any document served in the traditional manner upon any party appearing pro se."

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction this service was made and that the foregoing is true and correct.

Executed on October 5, 2010, at San Francisco, California.


_____            _____
    Stephanie Wilson                                      (Signature)
    (Type or print name)

# SERVICE LIST

## MAINE STATE RETIREMENT SYSTEM v. COUNTRYWIDE FINANCIAL CORPORATION, et al.

### CASE NO. CV-10-00302-MRP-(MAN)

| | |
|---|---|
| Christopher Lometti<br>Daniel B. Rehns<br>Joel P. Laitman<br>**COHEN MILSTEIN SELLERS & TOLL PLLC**<br>88 Pine Street 14th Floor<br>New York, NY 10005 | *Attorneys for Lead Plaintiffs:*<br>**Iowa Public Employees' Retirement System** *Individually and On Behalf of All Others Similarly Situated*<br><br>Tel: 212-383-7797<br>Fax: 212-838-7745<br>clometti@cohenmilstein.com<br>drehns@cohenmilstein.com<br>jlaitman@cohenmilstein.com |
| Steven J. Toll<br>Joshua S. Devore<br>Matthew B. Kaplan<br>S. Douglas Bunch<br>Julie G. Reiser<br>**COHEN MILSTEIN SELLERS & TOLL PLLC**<br>1100 New York Avenue NW West Tower Suite 500<br>Washington, DC 20005-3964 | Tel: 202-408-4600<br>Fax: 202-408-4699<br>stoll@cohenmilstein.com<br>jdevore@cohenmilstein.com<br>mkaplan@cohenmilstein.com<br>dbunch@cohenmilstein.com<br>jreiser@cohenmilstein.com |
| Michael M. Goldberg<br>**GLANCY BINKOW & GOLDBERG LLP**<br>1801 Avenue of the Stars Suite 311<br>Los Angeles, CA 90067 | Tel: 310-201-9150<br>Fax: 310-201-9160<br>mmgoldberg@glancylaw.com |
| Christina A. Royce<br>Daniel S. Drosman<br>Scott H. Saham<br>Spencer Alan Burkholz<br>Thomas E. Egler<br>**ROBBINS GELLER RUDMAN & DOWD LLP**<br>655 West Broadway Suite 1900<br>San Diego, CA 92101<br><br>Andrew L. Zivitz<br>Jennifer L. Joost<br>Sharan Nirmul<br>Sean M. Handler<br>**BARROWAY TOPAZ KESSLER MELTZER & CHECK LLP**<br>280 King of Prussia Road<br>Radnor, PA 19087 | *Attorneys for Plaintiff:*<br>**Maine State Retirement System** *Individually and On Behalf of All Others Similarly Situated*<br><br>Tel: 619-231-1058<br>Fax: 619-667-7056<br>croyce@rgrdlaw.com<br>ddrosman@rgrdlaw.com<br>lkerkhoff@rgrdlaw.com<br>scotts@rgrdlaw.com<br>spenceb@rgrdlaw.com<br>tome@rgrdlaw.com<br><br>Tel: 610-667-7706<br>Fax: 610-667-7056<br>azivitz@btkmc.com<br>jjoost@btkmc.com<br>snirmul@btkmc.com<br>shandler@btkmc.com |

| | |
|---|---|
| Arthur L. Shingler, III<br>**SCOTT AND SCOTT LLP**<br>6424 Santa Monica Boulevard<br>Los Angeles, CA 90038 | *Attorney for Movant:*<br>**Putnam Bank**<br><br>Tel: 213-985-1274<br>Fax: 213-985-1278<br>ashingler@scott-scott.com |
| Avi N. Wagner<br>**THE WAGNER FIRM**<br>1801 Avenue of the Stars Suite 307<br>Los Angeles, CA 90067 | *Attorneys for Named Plaintiff:*<br>**United Methodist Churches Benefit Board, Inc.**<br><br>Tel: 310-491-7949<br>Fax: 310-491-7949<br>avi@thewagnerfirm.com |
| Ira M. Press<br>Randall K Berger<br>**KIRBY MCINERNEY LLP**<br>825 Third Avenue 16th Floor<br>New York, NY 10022 | Tel: 212-317-6600<br>Fax: 212-751-2540<br>ipress@kmllp.com<br>rberger@kmllp.com |
| Spencer Alan Burkholz<br>**ROBBINS GELLER RUDMAN & DOWD LLP**<br>655 West Broadway Suite 1900<br>San Diego, CA 92101 | *Attorneys for Movants:*<br>**Maine Public Employees Retirement System, Operating Engineers Annuity Plan, Pension Trust Fund for Operating Engineers, Vermont Pension Investment Committee, Washington State Plumbing & Pipefitting Pension Trust**<br><br>Tel: 619-231-1058<br>Fax: 619-667-7056<br>spenceb@rgrdlaw.com |
| Azra Z. Mehdi<br>**MILBERG LLP**<br>300 South Grand Avenue, Suite 3900<br>Los Angeles, CA 90071 | **Mashreqbank, P.S.C.**<br><br>Tel: 213-617-1200<br>Fax: 213-617-1975<br>amehdi@milberg.com |

| | |
|---|---|
| Alexander K. Mircheff<br>Dean J. Kitchens<br>**GIBSON DUNN & CRUTCHER LLP**<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197 | *Attorneys for Defendants:*<br>**J.P. Morgan Securities Inc., Deutsche Bank Securities Inc., Bear, Stearns & Co. Inc., Banc of America Securities LLC, UBS Securities, LLC, Morgan Stanley & Co. Incorporated, Edward D. Jones & Co., L.P., Citigroup Global Markets Inc., Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, Greenwich Capital Markets, Inc.** *formerly known as* RBS Greenwich Capital, **Barclays Capital Inc., HSBC Securities (USA), BNP Paribas Securities Corp. Merrill Lynch, Pierce, Fenner & Smith, Incorporated**<br><br>Tel: 213-229-7000<br>Fax: 213-229-7520<br>amircheff@gibsondunn.com<br>dkitchens@gibsondunn.com |
| Christopher G. Caldwell<br>David C. Codell<br>Jeffrey M. Hammer<br>**CALDWELL LESLIE AND PROCTOR**<br>1000 Wilshire Blvd Suite 600<br>Los Angeles, CA 90017 | *Attorneys for Defendant:*<br>**Stanford L. Kurland**<br><br>Tel : 213-629-9040<br>Fax: 213-629-9022<br>caldwell@caldwell-leslie.com<br>codell@caldwell-leslie.com<br>hammer@caldwell-leslie.com |
| Jennifer M. Sepic<br>**BINGHAM MCCUTCHEN LLP**<br>355 South Grand Avenue Suite 4400<br>Los Angeles, CA 90071<br><br><br>Leiv H. Blad, Jr.<br>Boyd Cloern<br>**BINGHAM MCCUTCHEN LLP**<br>2020 K Street NW<br>Washington, DC 20006-1806 | *Attorneys for Defendant:*<br>**David A. Spector**<br><br>Tel: 213-680-6400<br>Fax: 213-680-6499<br>jennifer.sepic@bingham.com<br><br>Tel: 202-373-6564<br>Fax: 202-373-6001<br>leiv.blad@bingham.com<br>boyd.cloern@bingham.com |
| Joshua G. Hamilton<br>**PAUL HASTINGS JANOFSKY AND WALKER LLP**<br>515 South Flower Street 25th Fl<br>Los Angeles, CA 90071-2228 | *Attorneys for Defendants:*<br>**Ranjit Kripalani, Jennifer S. Sandefur,**<br><br>Tel: 213-683-6000<br>Fax: 213-627-0705<br>joshuahamilton@paulhastings.com<br>petercho@paulhastings.com<br>williamsullivan@paulhastings.com |

4

1

Michael D. Torpey
Penelope A. Graboys Blair
**ORRICK HERRINGTON AND SUTCLIFFE LLP**
405 Howard Street
San Francisco, CA 94105-2669

*Attorneys for Defendant:*
**David A. Sambol**

Tel: 415-773-5700
Fax: 415-773-5759
mtorpey@orrick.com
pgraboysblair@orrick.com

Michael C. Tu
**ORRICK HERRINGTON AND SUTCLIFFE LLP**
777 South Figueroa Street Suite 3200
Los Angeles, CA 90017

Tel: 213-629-2020
Fax: 213-612-2499
mtu@orrick.com