# EXHIBIT A

OFFICE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOOTBRIDGE LIMITED TRUST AND OHP
OPPORTUNITY LIMITED TRUST,

          Plaintiffs,

          -against-

COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE HOME LOANS
SERVICING LP, COUNTRYWIDE
FINANCIAL CORP., COUNTRYWIDE
SECURITIES CORP., CWABS, INC.,
CWABS ASSET-BACKED CERTIFICATES
TRUST 2006-SPS1, CWABS ASSET-
BACKED CERTIFICATES TRUST 2006-
SPS2, ANGELO R. MOZILO, DAVID
SAMBOL, BANK OF AMERICA CORP.
AND BAC HOME LOANS SERVICING, LP,

          Defendants.

---

09 CIV 4050 (PKC)
ECF CASE

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**



Plaintiffs Footbridge Limited Trust ("Footbridge") and OHP Opportunity Limited

Trust ("Opportunity") (collectively "Plaintiffs"), by their attorneys, Quinn Emanuel Urquhart

Oliver & Hedges, LLP, for their Second Amended Complaint herein against Countrywide Home

Loans, Inc. ("CHL"), Countrywide Home Loans Servicing LP ("CHLS"), Countrywide Financial

Corporation ("CFC"), Countrywide Securities Corporation ("CSC"), CWABS, Inc. ("CWABS"),

CWABS Asset-Backed Certificates Trust 2006-SPS1 (the "SPS1 Trust"), CWABS Asset-Backed

Certificates Trust 2006-SPS2 (the "SPS2 Trust"), Angelo R. Mozilo and David Sambol (Mozilo

and Sambol, collectively, "the Individual Defendants") (collectively "Countrywide", "the

Company," or the "Countrywide Defendants"), Bank of America Corporation ("Bank of

America") and BAC Home Loans Servicing, LP (collectively "Bank of America Defendants") (all together, "Defendants"), allege as follows:

## NATURE OF ACTION

1.     This action arises out of Countrywide's extensive fraudulent misrepresentations and omissions of material facts in connection with its sale of certain residential mortgage-backed securities ("the Securities") to Plaintiff investment funds.  Countrywide, once the largest residential mortgage originator and servicer in the country, originated and sold pools of mortgage loans to trusts.  The trusts in turn securitized the underlying mortgage loans and issued securities which were sold to investors, including Plaintiffs.

2.     Between June and October 2006, Plaintiffs purchased over $43 million in the Securities from Countrywide through two public offerings ("the Securitizations").[1]  The mortgage loans underlying the Securities (the "Mortgage Loans") were credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties.  While acknowledging that its underwriting standards for such credit-blemished loans were "more flexible" than for traditional mortgage loans, Countrywide assured Plaintiffs that the Mortgage Loans would comply with specific, documented underwriting standards and credit guidelines set forth in the offering materials.  In reality, Countrywide abandoned such standards during the period leading up to and during Plaintiffs' investment.  Countrywide encouraged rampant fraud by borrowers and employees in order to maximize its own profits and market share, at the expense of borrowers and investors such as the Plaintiffs.

---

[1]   The Securitizations were the CWABS Asset-Backed Certificates, Series 2006-SPS1 (the "SPS1 Securitization") and the CWABS Asset-Backed Certificates, Series 2006-SPS2 (the "SPS2 Securitization").

3.      Countrywide also made misrepresentations about specific, material statistics affecting the quality of the underlying loans.  Most glaring were statements in the offering documents that *over 99 percent* of the Mortgage Loans were applied to owner-occupied properties, versus secondary residences or investment properties.  This representation, among other representations about the credit quality of the loans and the Company's underwriting practices, induced Plaintiffs to invest in the Securities because owner-occupied properties have a significantly lower rate of default, all else being equal, than investor-owned properties.  Countrywide representatives subsequently admitted to Plaintiffs that the actual owner occupancy rates were significantly lower than what had been represented to Plaintiffs, which Countrywide knew at the time but failed to disclose to Plaintiffs.

4.      In fact, the fraud against Plaintiffs was so egregious that a then-employee of Countrywide sent an internal e-mail to his colleagues stating that Countrywide had wronged Plaintiffs and asking the Company to remedy its wrongdoing.  Rather than addressing the deficient circumstances surround Plaintiffs' investment, Countrywide instead fired the whistleblower.

5.      The fraud against Plaintiffs was hardly an isolated incident.  As the Attorney General for the State of California concluded:

> Countrywide's deceptive scheme had one primary goal—to supply the secondary market with as many loans as possible, ideally loans that would earn the highest premiums.  Over a period of several years, Defendants constantly expanded Countrywide's share of the consumer market for mortgage loans through a wide variety of deceptive practices, undertaken with the direction, authorization, and ratification of [former Chief Operating Officer David] Sambol and [former Chief Executive Officer Angelo] Mozilo, in order to maximize its profits from the sale of those loans to the secondary market.

6. The allegations herein are confirmed and bolstered in great detail by a complaint filed on June 4, 2009 by the Security and Exchange Commission in the U.S. District Court for the Central District of California (the "SEC Complaint"). *SEC v. Angelo Mozilo, David Sambol, and Eric Sieracki*, CV 09-03994 (VBF). The SEC Complaint levies civil fraud charges against Countrywide Financial's three most senior former executives, Mozilo, Sambol and Eric Sieracki, the former Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer, respectively. It provides specific and extensive first-hand evidence, drawn from the officers' internal e-mails and other sources, demonstrating both the falsity of Defendants' representations to Plaintiffs and Defendants' knowledge that their representations and omissions were materially false and misleading.

7. As a direct result of Countrywide's fraud, thousands of the Mortgage Loans underlying Plaintiffs' Securities are in default and/or foreclosure. The Securities drastically lost value after they were issued, never paid a penny of principal, and today are worthless. Indeed, the Securitizations' Trustee, The Bank of New York, has since written off the entire value of the Securities and does not expect to collect and distribute any further payments of principal and interest to investors.

8. Accordingly, Plaintiffs now bring this action against the Countrywide Defendants for securities fraud and common-law fraud, and against their successor, Bank of America, for its successor liability.

## THE PARTIES

9. Plaintiff Footbridge Limited Trust ("Footbridge") is a Bermuda Trust with a registered address of Butterfield Fund Services (Bermuda) Limited, 65 Front Street, Hamilton

4

HM 12, Bermuda and a principal place of business c/o Old Hill Partners Inc., 1120 Post Road, Second Floor, Darien, Connecticut.

10.     Plaintiff OHP Opportunity Limited Trust ("Opportunity") is a Bermuda Trust with a registered address of Butterfield Fund Services (Bermuda) Limited, 65 Front Street, Hamilton HM 12, Bermuda and a principal place of business c/o Old Hill Partners Inc., 1120 Post Road, Second Floor, Darien, Connecticut.

11.     Footbridge and Opportunity are investment funds managed by Old Hill Partners, Inc. ("Old Hill").  Old Hill is a Delaware corporation doing business in Connecticut as an investment company.  It acts as the Investment Manager for domestic and foreign investment companies, including Footbridge and Opportunity, and makes investment decisions on their behalf.

12.     Defendant Countrywide Financial Corporation ("CFC") is a Delaware corporation with its principal executive offices at 4500 Park Granada, Calabasas, California.  CFC, itself or through its subsidiaries, writes, sells, and services single-family home mortgages, home equity loans, commercial mortgages, and subprime mortgages.  It also buys and sells mortgages, offers asset management and brokerage services, and provides insurance products.

13.     Defendant Countrywide Home Loans, Inc. ("CHL"), a wholly-owned subsidiary of CFC, is a New York corporation with its principal executive offices at 4500 Park Granada, Calabasas, California.  CHL is engaged primarily in the mortgage banking business, and as part of that business, it originates, purchases, sells, and services mortgage loans.

14.     Defendant Countrywide Home Loans Servicing LP ("CHLS"), a wholly-owned subsidiary of CFC, is a limited partnership organized under the laws of Texas with its principal

place of business at 7105 Corporate Drive, Plano, Texas.  CHLS services mortgage loans that are originated by CHL.

15.  Defendant Countrywide Securities Corporation ("CSC"), a wholly-owned subsidiary of CFC, is a California corporation with its principal executive offices at 4500 Park Granada, Calabasas, California.  CSC trades securities and underwrites offerings of mortgage-backed securities.

16.  Defendant CWABS, Inc. ("CWABS") is a Delaware corporation and a limited-purpose finance subsidiary of CFC with its principal executive offices at 4500 Park Granada, Calabasas, California.  CWABS was the Depositor for the SPS1 and SPS2 Securitizations.

17.  CWABS Asset-Backed Certificates Trust 2006-SPS1 (the "SPS1 Trust") is a common-law trust formed by the Depositor, CWABS, under the laws of the State of New York pursuant to the SPS1 Securitization's Pooling and Servicing Agreement.  The SPS1 Trust was the Issuing Entity for the SPS1 Securitization.

18.  CWABS Asset-Backed Certificates Trust 2006-SPS2 (the "SPS2 Trust") is a common-law trust formed by the Depositor, CWABS, under the laws of the State of New York pursuant to the SPS2 Securitization's Pooling and Servicing Agreement.  The SPS2 Trust was the Issuing Entity for the SPS2 Securitization.

19.  Defendant Angelo R. Mozilo ("Mozilo"), Countrywide's co-founder, was Chairman of Countrywide's Board of Directors starting in March 1999 and Chief Executive Officer ("CEO") starting in February 1998.  He was also President of Countrywide from March 2000 through December 2003.  Mozilo was a member of Countrywide's Board beginning in 1969, when the Company was founded, and served in other executive roles since then.  He left Countrywide on July 1, 2008.  Along with David Sambol and Eric Sieracki, Countrywide's

former Chief Financial Officer, Mozilo was recently charged by the Securities and Exchange Commission ("SEC") with securities fraud, for deliberately misleading investors about the significant credit risks being taken by Countrywide in efforts to build and maintain the Company's market share.  At all relevant times, Mozilo directed, authorized, and participated in Countrywide's wrongdoing, as alleged herein.

20.    Defendant David Sambol ("Sambol") joined Countrywide in 1985 and was CFC's President and Chief Operating Officer ("COO") from September 2006 through his retirement in mid-2008.  Sambol was also Chairman and CEO of CHL and a member of the Board of Directors, both beginning in 2007.  Sambol previously held numerous management positions in the Countrywide companies, including acting as President and COO of CHL from 2004 to 2006 and Executive Managing Director for Business Segment Operations from 2004 to 2006.  As discussed herein, Sambol was recently charged with securities fraud by the SEC.  At all relevant times, Sambol directed, authorized, and participated in Countrywide's wrongdoing, as alleged herein.

21.    Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation with its principal executive offices at 100 North Tryon Street, Charlotte, North Carolina.  Bank of America is one of the world's largest financial institutions, serving individual consumers, small- and middle-market businesses and large corporations with a full range of banking, investing, asset-management and other financial and risk-management products and services.  Countrywide merged with Bank of America on July 1, 2008.  As discussed herein, Bank of America is in the final stages of fully combining its business with that of the Countrywide Defendants.

22.     Defendant BAC Home Loans Servicing, LP is, upon information and belief, a subsidiary of Bank of America and the continuation of CHLS.  BAC Home Loans Servicing, LP is identified in mortgage contracts and other legal documents as "BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing, LP," meaning it was "formerly known as" CHLS.  This change reiterates the fact that Bank of America discontinued Countrywide's name as of April 27, 2009 and that the Bank of America Defendants are successors to the Countrywide Defendants.

23.     At all relevant times, the Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Second Amended Complaint.  Any allegations about acts of corporate Defendants means that those acts were committed through the acts of Mozilo and Sambol (as applicable) and other officers, directors, employees, agents, and/or representatives while they were acting within the actual or implied scope of their authority.

## JURISDICTION AND VENUE

24.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1331.  The federal claims asserted herein arise under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; 28 U.S.C. § 1337; and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

25.     Jurisdiction of this Court is also founded upon 28 U.S.C. § 1332.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; Plaintiffs are citizens of Bermuda; and Defendants are citizens of Delaware, New York, Texas, and California.

26.     Supplemental jurisdiction over Plaintiffs' state-law claims is founded upon 28 U.S.C. § 1367.

27.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Defendants can be found and transact business in this District and many of the acts and practices giving rise to Plaintiffs' claims occurred in substantial part in this District.  Defendants are also subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### A.     Countrywide Promotes Itself as a Reputable and Conservative Loan Originator

28.     Co-founded in 1969 by Angelo Mozilo, Countrywide is a leader of the residential mortgage lending industry.  As of March 3, 2009, Countrywide was one of the top residential mortgage-lending firms in the United States—it has the third-highest loan volume.  The Company has 50,000 employees and is ranked among America's largest corporations.  In 2007 alone, Countrywide generated $25.1 billion in revenue, up from $15.6 billion in 2005.

29.     In addition to originating and servicing residential mortgage loans, Countrywide, itself or through its affiliates, purchases and sells mortgage loans, provides loan closing services, provides residential real estate and home-appraisal services in connection with loan origination and servicing, manages a captive mortgage reinsurance company, packages and arranges securitizations of mortgage loan pools, and underwrites public offerings of mortgage-backed securities in the secondary market.

30.     Prior to 2004, a substantial majority of the mortgage loans that Countrywide originated each year were traditional long-term, fixed-rate, first-lien mortgage loans to prime borrowers.  These mortgages met the guidelines for sale to the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Fannie Mae and Freddie Mac are authorized to purchase only mortgage loans that conform to specific regulatory guidelines (known in the industry as "conforming loans").  Conforming loans,

9

if properly underwritten and serviced, historically were the most conservative loans in the residential mortgage industry, with the lowest rates of delinquency and default.  Mortgage loans that fail to meet the regulatory guidelines are known in the industry as "non-conforming loans."

31.    Countrywide extolled its conservative Credit Policy, which it proclaimed was "designed to produce high quality loans through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews."  In its 2004 annual report, Countrywide summarized the comprehensive standards and procedures of its Credit Policy:

> Our Credit Policy establishes standards for the determination of acceptable credit risks.  Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.  Borrower quality includes consideration of the borrower's credit and capacity to pay.  We assess credit and capacity to pay through the use of credit scores, application of a mortgage scorecard, and manual or automated underwriting of additional credit characteristics . . . .  Our loan origination standards and procedures are designed to produce high quality loans.  These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and ongoing review of their work.  We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology.  We also have a comprehensive training program for the continuing development of both our existing staff and new hires.  In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

32.    In addition, Countrywide described the extensive post-origination Credit Policy procedures that it had implemented to ensure consistency, accuracy, and fraud detection in the loan origination process:

> In addition to our pre-funding controls and procedures, we employ an extensive post-funding quality control process.  Our Quality Control Department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in-depth underwriting and appraisal review, and if necessary, a fraud investigation.  We also employ a pre- and post-funding proprietary loan performance evaluation system.  This system

identifies fraud and poor performance of individuals and business entities associated with the origination of our loans.  The combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines and compliance with laws and regulations.

33.     Countrywide also made many representations in public filings about the quality of its underwriting practices, in order to convey to Plaintiffs and other interested parties that it was a successful, trustworthy company characterized by high professional standards.  Its 10-K forms for 2005, 2006, and 2007 stated that Countrywide "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities."  The forms also promoted Countrywide's "proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help prevent fraud."  In its 2005 10-K filing, for example, which was filed in March 2006, in the period leading up to Plaintiffs; investments in the Securities, Countrywide stated that "[w]e ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages . . . .  We are focused on "ensuring the quality of our mortgage loan production . . . ."

34.     Countrywide's 2006 10-K also made representations about how the Company considered borrowers' ability to repay their loans when issuing mortgages:

> Our credit policy establishes standards for the determination of acceptable credit risks.  Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.  Borrower quality includes consideration of the borrower's credit and capacity to pay.  We assess credit and capacity to pay through the use of credit scores, application of a mortgage scorecard, and manual or automated underwriting . . . .  We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology.  We also employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

35.     Countrywide claimed that its disciplined underwriting standards distinguished it from other lenders in the industry and reflected enviable best practices.  For example, in a Fixed Income Investor Forum hosted by Countrywide in September 2006, Mozilo explained that Countrywide led the industry in responsible lending:  "[A]s an industry leader we served as a role model to others in terms of responsible lending.  We take seriously the role of a responsible lender for all of our constituencies . . . . *To help protect our bond holder customers, we engage in prudent underwriting guidelines*" (emphasis added).  At the same forum, President and Chief Operating Officer David Sambol added that:

> [W]e have an intense and ongoing focus on share growth while at the same time maintaining a very strong internal control environment and what we believe is best-of-class governance . . . . *[O]ur culture is also characterized by a very high degree of ethics and integrity in everything that we do.* (Emphasis added.)

36.     As explained herein, these public representations were false and misleading and omitted material facts because they directly contradicted the reality that Countrywide was knowingly originating an increasing number of poor-quality loans that did not comply with its stated underwriting guidelines, without the safeguards and standards which Countrywide described.  Plaintiffs relied upon such public representations and were induced to purchase the Securities by these and other statements, to their enormous financial detriment.

**B.     Countrywide Begins to Originate and Resell Riskier Mortgage Loans**

37.     In or around 2003, there was rising demand on Wall Street for "private-label" securitizations of non-conforming loans.  Private-label securitizations are arranged and underwritten by private firms, rather than the government-sponsored entities Fannie Mae and

Freddie Mac, and thus can include non-conforming loans. Given the higher risk associated with non-conforming loans, private-label securitizations generate higher returns for investors.

38.     The promise of increased revenue and profit drove Countrywide to increase loan generation so that there would be sufficient loans to package into securitizations for the secondary "private-label" market. At the same time, Countrywide pledged that its growth in originations would not compromise its strict underwriting standards. For example, in a January 2004 call with analysts, Mozilo announced that Countrywide, already the industry leader with nearly a 15 percent loan-origination market share, planned to double its share within four years: "Our goal is market dominance, and we are talking 30% origination market share by 2008." Mozilo pledged, however, that Countrywide would not undermine its rigorous underwriting standards: "*Going for 30% mortgage share here is totally unrelated to[the] quality of loans we go after . . . . There will be no compromise in that as we grow market share.* Nor is there a necessity to do that" (emphasis added). Mozilo and Countrywide did not disclose to investors that the increase in market share and profits came at the expense of its underwriting standards.

39.     Starting in 2004 and accelerating in 2005, Countrywide expanded its origination and securitization of riskier lines of products, including subprime mortgages, interest-only loans, pay-option adjustable-rate mortgages ("Pay Option ARMs," an type of adjustable-rate mortgage loan that allows a borrower to make initial minimum monthly payments less than the mortgage's monthly accrued interest), closed-end second liens ("CES"), and home equity lines of credit ("HELOCs"). Countrywide's expanding range of mortgage products was made possible by its willingness to loan money to a broader pool of borrowers with riskier credit profiles. That

willingness to reduce its underwriting standards in pursuit of market share and profit led to the gradual abandonment of Countrywide's stated underwriting standards.

40.     The Center for Public Integrity recently reported that Countrywide "topped the center's list of 25 lenders responsible for extending subprime mortgages to homeowners who might not otherwise have qualified for a mortgage," describing the drastic increase in risky loans prior to the mortgage crisis as a "lust for high yields and high profits."

41.     Even as Countrywide was loosening its underwriting practices, the Company reassured investors such as Plaintiffs that its underwriting procedures and credit risk management remained highly rigorous.  In the SPS1 and SPS2 Prospectus Supplements, for example, Countrywide emphasized the meticulous underwriting guidelines it applied to assess the creditworthiness of potential borrowers before issuing loans to them.  Countrywide told investors that it thoroughly researched borrowers' credit histories; obtained information about applicants' assets, liabilities, income and employment history; obtained an independent credit bureau report on each applicant; and used a debt-to-income ratio to help determine whether the buyer would be able to afford the mortgage loan.

42.     Countrywide made many other representations in the Prospectus Supplements about its underwriting guidelines, which were intended to induce Plaintiffs and other investors to invest in the Securitizations.  For example, Countrywide represented that its underwriting standards were applied in accordance with applicable federal and state laws and regulations, that mortgaged properties were appraised both by Countrywide and by third parties, and that in most cases, Countrywide would not write loans on properties that were in below-average condition.

43.     Because its loan-origination guidelines are ostensibly designed to ensure that loans perform over time, Countrywide knew that the rigorousness of its guidelines—and its

14

adherence to those guidelines—would materially affect the risk of investing in the Securitizations.

44.     Throughout Countrywide's expansion, Mozilo consistently represented that Countrywide would not sacrifice its strict and disciplined underwriting standards.  During a March 15, 2005 conference with analysts, Mozilo responded to a question about Countrywide's strategy for increasing market share by assuring Countrywide's constituents:

> Your question is 30 percent, is that realistic, the 30 percent [market share] goal that we set for ourselves in 2008? . . .  Is it achievable?  Absolutely . . . .  But I will say this to you, that *under no circumstances will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30 percent market share.*  (Emphasis added.)

45.     Other senior Countrywide officers reiterated that the Company had not strayed from its underwriting standards, and would not.  For example, in an April 2005 conference call with analysts, Eric Sieracki, Countrywide's Chief Financial Officer, responded to a question about whether Countrywide had changed its underwriting protocols:  "I think [FICO scores, combined loan-to-value ratios, and debt-to-income ratios] will remain . . . consistent with the first quarter and most of what we did in 2004.  *We don't see any change in our protocol relative to the volume [of] loans that we're originating.*"  Sieracki added that, as for the Countrywide-originated HELOCs, "*The credit quality of our home equities should be emphasized here as well. We are 730 FICO on these home equities, and that's extraordinary throughout the industry*" (emphases added).  The "FICO" score is a common measure of credit risk, and is used to assess the likelihood that a borrower will default on a loan.

46.     As explained herein, these representations are directly contradicted by internal communications among Mozilo, Sambol, and other Countrywide executives which show that the

officers knew that Countrywide had abandoned its prudent underwriting guidelines, resulting in a sharp increase in low-quality and risky loans.

### C.   Countrywide Abandons its Underwriting Guidelines

47.   Countrywide represented publicly that it was a responsible, reputable mortgage lender, and it assured Plaintiffs in the offering materials and elsewhere that the Securities were attractive investments and safeguarded by its prudent underwriting practices.

48.   Behind its public façade, however, and unbeknownst to Plaintiffs, Countrywide was engaged in a headlong pursuit of expanded market share, loan volume, and profitability at all costs, and at the expense of its borrowers and investors.  Countrywide expanded its loan production, profitability, and market share through a corporate culture that emphasized profits above all else and tolerated fraud, or indeed encouraged it, to that end.  Plaintiffs were not aware of this corrupt culture, and in fact Countrywide's public and private representations to Plaintiffs fraudulently hid the corrupt culture from them.  Plaintiffs would not have invested in the Securities if they had known the truth about the Company's underwriting practices.

49.   The non-traditional and risky types of mortgages that Countrywide created to increase loan volume and profits, such as stated-income loans, facilitated the Company's fraud by allowing borrowers and the Company greater leeway to misrepresent key information such as income levels.  The guidelines for the stated-income were intentionally open-ended, giving Countrywide's loan officers broad discretion to determine whether a potential borrower's stated income was reasonable.  By removing the need for proof and giving loan officers discretion coupled with financial incentives and pressure to increase the origination of risky loans, Countrywide set the stage for widespread fraud by borrowers and employees.  For example, the Attorney General of Florida spoke with a former Countrywide employee who estimated that

approximately *90 percent* of all reduced-documentation loans sold out of the Countrywide branch where he worked had inflated incomes.

50.     In abandoning its loan-origination standards and facilitating fraud in the origination process, Countrywide's intent was to issue mortgages to a broader population of would-be homeowners and profit from them in creative new ways.  Countrywide offered mortgages to borrowers with little or no regard for their creditworthiness precisely because the loans were lucrative for the Company.  Many of Countrywide's new non-traditional mortgage offerings, such as Pay Option ARMs, were characterized by hidden fees and misleading rates, which increased Countrywide's revenue while increasing its pool of loans to resell to investors such as Plaintiffs.  For example, Countrywide lured many borrowers to take out mortgages by offering mortgage loans that featured "teaser rates" with interest as low as one percent, without disclosing to the borrowers that those rates would reset within a few months to a much higher rate.

51.     Countrywide also created internal channels for approving risky loans.  Loans that were initially rejected by underwriters were automatically passed to supervisors for a second review, and under Sambol's management, a special Structured Loan Desk was established for the sole purpose of reviewing risky loans and approving them outside the normal underwriting criteria, via an Exception Processing System.  The goal of second-guessing and approving risky loans was laid bare by an internal Countrywide document, made public in *United States v. Partow*, No. 06-CR-00104 HRH (D. Alaska), a criminal proceeding against a former Countrywide employee, which described the objectives of the Exception Processing System to include "Approv[ing] virtually every borrower and loan profile," with extra fees if necessary to

offset the risk, and providing "Process and price exceptions on standard products for high risk borrowers."

52. Countrywide encouraged borrowers to apply for loans through its reduced-documentation programs even when those borrowers would have qualified for loans under traditional lending criteria, because the reduced-documentation loans were faster and easier to underwrite and sell. Such borrowers were steered into unnecessarily risky and costly loans, resulting in higher commissions for Countrywide brokers and higher profits for the Company, even though the risky terms of those loans increased the likelihood of borrowers' default, as Countrywide knew. The risky loans and resulting increase in defaults harmed investors who purchased interests in those mortgages, including Plaintiffs. Countrywide's Risk Management department performed studies which showed that loans with lower documentation were more likely to default, yet Countrywide failed to disclose these studies to Plaintiffs or other investors.

53. The inevitable result of Countrywide's quest for increased market share, and specifically its hunger for increased production of risky loans, was a steep decline in the creditworthiness of its borrowers and its own underwriting standards. In abandoning its underwriting guidelines, Countrywide issued loans to borrowers that it knew were not suitable for homeownership and posed a great risk of default on the loans, either due to poor credit history, low incomes relative to the size of the loan, or other reasons.

54. Since Countrywide resold most of the loans to investors such as Plaintiffs, either directly as whole loans or as mortgage-backed securities, Countrywide thereby passed on its risk of loss on these loans to investors. Countrywide's wrongdoing toward borrowers—in the form of interest rates that adjusted sharply upward, hidden fees, and otherwise unaffordable and

deceptive loans that Countrywide knew the borrowers were unsuited for—had a direct effect on Plaintiffs by reducing the profitability and value of the Securitizations that Plaintiffs invested in.

55. Countrywide knew that its aggressive strategy to drive up revenue by issuing mortgages to a much broader and riskier group of borrowers would result in the widespread origination of mortgage loans that were materially inconsistent with its representations, even under the more "flexible" standards applied to credit-blemished, second-lien mortgages, as stated in the offering documents. Countrywide fraudulently withheld the truth about its corrupt culture from Plaintiffs and other investors, through its material misstatements and omissions, because it wanted to continue to attract investors' funds while simultaneously encouraging fraud behind closed doors. To the extent that Countrywide did disclose its loosened loan guidelines to Plaintiffs, those disclosures merely scratched the surface, since Countrywide did not reveal that its lending practices were permeated by fraud.

56. In the offering documents for the SPS1 and SPS2 Securitizations, Countrywide noted that the credit-blemished, second-lien Mortgage Loans that were pooled together in the Securitizations posed a greater credit risk than first-lien conventional mortgage loans. The Mortgage Loans were secured by second liens, which means that senior mortgage loans and prior statutory liens have priority. Countrywide also noted that its underwriting standards for credit-blemished, second-lien loans were "more flexible than the standards generally used by banks for borrowers with non-blemished credit histories," as explained further herein. At the same time, credit enhancement mechanisms—subordination, overcollateralization, and excess cashflow—appeared to mitigate the Securitizations' risks.

57. Nonetheless, Countrywide deviated from the loan-origination practices that it represented in the offering documents, effectively *abandoning* rather than loosening its loan-

19

origination standards.  Plaintiffs were injured as a direct result of Countrywide's lending practices and its failure to fully disclose those practices.

**D.    Plaintiffs' Purchase of the Securities**

58.    Plaintiffs purchased approximately $43,375,000 in residential mortgage-backed securities from Countrywide between June and October 2006 through two public offerings issued by Countrywide.  The Securitizations were the CWABS Asset-Backed Certificates, Series 2006-SPS1 and the CWABS Asset-Backed Certificates, Series 2006-SPS2.  The Securities were identified by Countrywide as "Certificates."  Both of the Securitizations were structured through a similar set of agreements.

59.    Plaintiffs purchased approximately $20,375,000 in Certificates issued by the SPS1 Trust.  Plaintiffs purchased the Certificates on June 27, 2006, from five different Classes within the SPS1 Securitization.  The Certificates had the following face values:  $3 million in Certificates from the "M-3" Class, $4 million from the "M-4" Class, $3,375,000 from the "M-5" Class, $4 million from the "M-6" Class, and $6 million from the "M-7" Class.  The expected credit ratings for the SPS1 Classes that Plaintiffs invested in ranged from AA/Aa3 (S&P/Moody's) for the M-3 Class to BBB+/Baa2 (S&P/Moody's) for the M-7 Class.  In other words, the SPS1 Securities that Plaintiffs invested in were expected to be investment-grade.

60.    Plaintiffs purchased approximately $23,000,000 in Certificates issued by the SPS2 Trust.  They purchased $12.5 million in Certificates from the "M-4" Class on August 29, 2006; $7,250,000 million from the "M-7" Class on September 12, 2006; and $3,250,000 from the "M-5" Class on October 3, 2006.  The expected credit ratings for the SPS2 Classes that Plaintiffs invested in ranged from A+/A1 (S&P/Moody's) for the M-4 Class to BBB+/Baa1 (S&P/Moody's) for the M-7 Class, i.e. investment grade.

20

61.     Countrywide acted in several capacities on the Securitizations, in each of which it stood to profit.  Countrywide issued mortgage loans to individuals to purchase or refinance residential properties.  Through its CHL subsidiary and other Sellers, Countrywide then sold, transferred, or otherwise conveyed title to those Mortgage Loans to the Depositor, CWABS, pursuant to a Pooling and Servicing Agreement ("PSA").  CWABS then sold, transferred, or otherwise conveyed the Mortgage Loans to the Trustee, The Bank of New York, which held the Loans in the SPS1 and SPS2 Trusts for the benefit of Certificateholders.  The SPS1 and SPS2 Trusts acted as Issuing Entities in selling the Certificates to Plaintiffs and other investors.  The Securities were sold in subgroups, or "Classes," according to the Classes' expected credit ratings, and were intended to provide interest on the income stream generated by the Mortgage Loans in the Trusts.

62.     The SPS1 and SPS2 Securitizations contained Mortgage Loans with a total face value of approximately $230,875,000 and $426,500,000, respectively.  The majority of the Certificates in each Securitization were contained in the "A" Class, with an expected credit rating of AAA/Aaa (S&P/Moody's).  The remaining Certificates were issued in the M-1 through M-9 Classes and the B Class, and carried lower credit ratings.  The latter Classes were subordinate to the A Class, with a corresponding priority of distribution of income to the Certificates.

63.     The Securitizations included at least three principal offering documents:  first, the Pooling and Servicing Agreement, entered into by certain Countrywide entities and the Trustee, provided for the conveyance and servicing of the Mortgage Loans.  The PSAs were entered into by the Depositor, CWABS, Inc.; the Sellers, CHL and three other Countrywide subsidiaries; the Master Servicer, CHLS; and the Trustee, The Bank of New York.  The SPS1 and SPS2 PSAs

21

were dated June 1, 2006 and August 1, 2006, respectively.  They were filed with the SEC on July 12, 2006 and  September 12, 2006, respectively.

64.     Second, a Preliminary Term Sheet provided summary information about the Securitizations, including a description of the parties, the Classes of Certificates and their credit ratings, the Certificates' credit enhancement provisions, and the characteristics of the pool of Mortgage Loans.  Third, a bundled Prospectus and Prospectus Supplement provided further detail about the Securitizations, including a detailed description of the Mortgage Loans, the Certificates, and the procedures for servicing the loans.  The Prospectuses were filed with the SEC and their Registration Statements were signed by three Countrywide executives:  Stanford L. Kurland, Chairman of the Board, President and Director; Eric P. Sieracki, Executive Vice President, Chief Financial Officer; and David A. Spector, Vice President and Director.

### E.     Countrywide's Fraudulent Misrepresentations and Omissions Regarding the Securities

65.     Countrywide committed fraud through a pattern and practice of misrepresenting its underwriting practices and the quality of its mortgage-backed securities, as reflected in the offering documents supplied to Plaintiffs on the Securitizations, statements by Countrywide representatives directly to Plaintiffs, and statements by Countrywide representatives to the broader public, as described herein.  Countrywide made these materially false and misleading statements and omissions of material fact with scienter.

66.     Plaintiffs reasonably relied on these public and private representations by Countrywide, which they did not know were materially false and misleading at the time they invested in the Securities, to their enormous financial detriment.

22

### 1.    Misrepresentations Regarding the Percentage of Owner-Occupied
         Properties in the Securitizations

67.    In the most glaring example of Countrywide's fraud, the Company has admitted

to Plaintiffs that a key representation in the offerings—that the Mortgage Loans to be included in

the Securitizations were made on properties that were *over 99 percent owner-occupied*—was

false and misleading and omitted material facts necessary to make the statements not misleading,

as set forth herein.  Countrywide's subsequent admission underscores the fact that it knew or

should have known at the time it made the representations about owner occupancy, in person and

in the contract documents, that such representations were incorrect.

68.    A "Detailed Report" included in the SPS1 and SPS2 Preliminary Term Sheets

presented an overview of certain statistics regarding the initial pool of Mortgage Loans to be

included in the SPS1 and SPS2 Securitizations.  Although additional Loans could be added to the

Securitizations prior to the Closing Date, Countrywide represented that the characteristics of the

initial pool would be consistent with the final pool of Mortgage Loans delivered to the Trust on

the Closing Date.

69.    The SPS1 Detailed Report stated that an overwhelming *99.88 percent* of the

mortgaged properties to be included in the SPS1 Securitization were owner-occupied, while only

0.12 percent were secondary residences.  In other words, of the 3,489 loans to be included in

SPS1, Countrywide represented that only *four* were issued to secondary residences and *none* to

investment properties; the other 3,485 were allegedly issued to owner-occupied properties.

70.    Similarly, the SPS2 Detailed Report stated that *99.53 percent* of the mortgaged

properties to be included in the Securitization were owner-occupied, 0.27 percent were

secondary residences, and 0.21 percent were investment properties.  Of the 11,559 loans to be

included in the SPS2 Securitization, allegedly *only 31* were issued to secondary residences and *25* to investment properties; the other 11,503 loans were allegedly issued to owner-occupied properties.

71.     The percentages and numbers of owner-occupied properties among the Securitizations seemed impressively high to Plaintiffs, as Countrywide intended.  Countrywide meant to bolster the perceived quality of the Securities by emphasizing the overwhelming rate of owner occupancy.  Plaintiffs reasonably believed, as Countrywide intended, that the high percentage of owner occupancy on the Mortgage Loans made the Securities safer investments, since homeowners who reside in mortgaged properties are more likely to make principal and interest payments than owners who purchase the homes as investments and live elsewhere.

72.     The Prospectus Supplements for the SPS1 and SPS2 Securitizations repeated the data in Countrywide's Preliminary Term Sheets regarding the allegedly very high percentage of owner-occupied properties.  Annex A of the SPS1 Prospectus Supplement stated that 99.88 percent of SPS1's Mortgage Loans were applied to owner-occupied properties and the remaining 0.12 percent were applied to secondary residences.  Annex A for the SPS2 Prospectus Supplement stated that 99.53 percent of SPS2's Mortgage Loans were applied to owner-occupied properties, 0.27 percent were applied to secondary residences, and 0.21 percent were applied to investment properties.  As with the Preliminary Term Sheets, Countrywide represented that the statistical information in the Annexes was representative of the final composition of the pools.

73.     Countrywide has since admitted in a May 2007 conference call with Plaintiffs that its statements regarding owner occupancy were false and misleading.  Participating in the conference call were representatives of Plaintiffs' Investment Manager, Old Hill, including John Howe, President; Mark Samuel, Chief Operating Officer; Hahn Kang, Portfolio Manager; and

24

Gary Effman, Portfolio Manager. Also participating were senior Countrywide employees, including Scott Kurzban, the Executive Vice President of Mortgage Finance for CHL, and Frank Aguilera, who was responsible for risk management. Randy Petsoff, a Countrywide employee who brokered Plaintiffs' purchase of the Securities, also participated in the call.

74. Plaintiffs noted during the conference call that the SPS1 and SPS2 Securities were experiencing higher rates of delinquency and greater losses than even comparable mortgage-backed securities based on credit-blemished, second-lien loans. Plaintiffs had expected the Securities to outperform the market for comparable securities because the levels of owner occupancy on the Mortgage Loans underlying the Securities were higher than owner-occupancy levels represented by comparable securitizations.

75. During the call, Plaintiffs asked Countrywide to explain why the Mortgage Loans underlying the Securitizations were experiencing a higher rate of default than similarly situated bonds in the market. Countrywide admitted that the Mortgage Loans were defaulting at an "incredibly high" rate, for which it apologized. Nonetheless, Countrywide sought to blame the high default rates on real-estate speculators, alleging that the "biggest driver" of losses had been a large number of borrowers who "are participating in the real estate flipping market." Countrywide claimed that these speculators had represented to the Company that they would occupy the mortgaged properties, when in reality they hoped to quickly resell the properties for a profit without ever living in them. When the real-estate market began to turn toward the end of 2006, Countrywide said, these borrowers were unable to sell the properties as they intended and instead began to default at high rates.

76. As a primary matter, Countrywide is a sophisticated loan originator, one of the largest issuers of residential home mortgages in the country. It was not blindsided and misled by

speculators who allegedly lied on their loan applications.  Rather, it knew that its representations regarding owner occupancy were false and misleading at the time the representations were made, and it failed to disclose material facts related to the percentage of owner-occupied properties to Plaintiffs.  In fact, over the years Countrywide had refashioned its internal business model to encourage such fraud by employees and borrowers, in sharp contrast with the image of responsible lending the Company conveyed to the outside world.  Countrywide facilitated and furthered borrowers' fraud by turning a blind eye to it, failing to enforce its underwriting standards, failing to exercise proper oversight of loan origination, and/or by other means.

77.     Internal e-mail communications confirm that Countrywide's senior officers, including Mozilo and Sambol, knew that a significant percentage of borrowers who took out stated-income loans had engaged in mortgage fraud.  On June 1, 2006, Mozilo warned Sambol in an e-mail that there was evidence that borrowers were lying about their incomes in applying for Pay-Option ARMs.  The following day, on June 2, 2006, Sambol received an e-mail reporting on a quality control audit which advised him that *50 percent* of the stated-income loans originated by a Countrywide subsidiary showed a variance in income from those borrowers' IRS filings of greater than 10 percent, of which an astounding *69 percent* had an income variance of greater than 50 percent.

78.     Moreover, in blaming the Securitizations' high default rate on alleged "real-estate speculators," Countrywide conceded the falsity of its representations that over 99 percent of the Loans that would be included in the Securitizations were applied to owner-occupied properties. As Countrywide admitted during the call, the "primary driver" of losses on the Securitizations was defaults by investors who did not occupy their properties.  Because Countrywide had represented that only a *small handful* of the Mortgage Loans were given to investment

properties, the admission that investment properties constituted the "primary driver" of losses implies that a far greater proportion of the loans were investment properties than it represented.

79.     In fact, during a subsequent conversation between John Howe, the President of Old Hill, and a Countrywide representative, the Countrywide representative estimated—but only after Mr. Howe insisted on an answer—that approximately *15 percent of the Mortgage Loans were applied to investment properties*, as compared to owner-occupied properties.  This subsequent estimate reiterated the falsity of Countrywide's contemporaneous representations in the Securitizations' offering documents about owner occupancy.  As previously noted, Countrywide had represented that *none* of the Mortgage Loans to be included in the SPS1 Securitization were applied to investment properties and *only 0.21 percent* of the Mortgage Loans to be included in the SPS2 Securitization were applied to investment properties.

80.     Upon information and belief, Countrywide's estimate that 15 percent of the Mortgage Loans were applied to investor properties still vastly understated the actual percentage of such properties in the Securitizations.   As Countrywide admitted, the *primary driver* of the defaults was real-estate speculators.  Countrywide had abandoned its loan-origination standards, including failing to follow its stated procedures for investigating facts such as borrowers' mortgage histories, which would have alerted Countrywide to the fact that a great number of borrowers were speculators who had no intention to occupy the mortgaged properties.  Countrywide knew that a sizeable percentage of borrowers were investors, not homeowners occupying their homes, and it knew or should have known that such investors were very likely to default on their loans in a down market.

27

81.    Countrywide furthered its fraud during the parties' May 2007 conference call by blaming the Securities' decline in value on real-estate "flippers," rather than admitting that its loan-origination practices were entirely responsible for the fraud in the loan-application process, or, alternately, admitting that it facilitated and participated in the borrowers' fraud.

82.    Countrywide knew that its representation about owner occupancy, and similar representations and reassurances about the Mortgage Loans and its lending practices, were relevant to Plaintiffs' decision to invest in the Securitizations.  Countrywide knew that its representation would induce Plaintiffs to purchase the Securities.

83.    Countrywide engaged in this fraud while representing to Plaintiffs and other innocent parties that it was upholding strict, prudent underwriting standards.  Countrywide's admitted misstatements regarding the percentage of Mortgage Loans on owner-occupied properties are part of a broader pattern and practice of Countrywide's fraud regarding its loan origination and underwriting practices.

### 2.    Misrepresentations Regarding Countrywide's Adherence to Its Underwriting Guidelines

84.    Countrywide made misrepresentations in the offering documents and in communications with Plaintiffs regarding its underwriting guidelines, as explained herein.

85.    Countrywide represented in the PSAs that its "origination, underwriting, servicing and collection practices with respect to each Mortgage Loan have been in all respects legal, proper, prudent and customary in the mortgage lending and servicing business."  This statement was materially false and misleading and omitted material facts necessary to make the statement not misleading.  As alleged herein, Countrywide abandoned its loan-origination guidelines and prudent guidelines of the industry in order to maximize its revenue from the origination, servicing, and securitization of mortgage loans.

28

86.     The Prospectuses and Prospectus Supplements for the SPS1 and SPS2 Securitizations described the underwriting standards that Countrywide would apply to the credit-blemished, second-lien Mortgage Loans in the Securitizations. Although Countrywide revealed that it was using "more flexible" loan-origination standards, Countrywide nonetheless intended to reassure Plaintiffs, with its description of underwriting practices, that it issued the Mortgage Loans in accordance with its stated guidelines.

87.     For example, Countrywide trumpeted its internal credit scoring system for credit-blemished, second-lien mortgage loans, which "utilize[d] credit grade categories to grade the likelihood that the borrower will satisfy the repayment conditions of the mortgage loans. In general, a credit grade category is assigned by evaluating a borrower's mortgage history, time since bankruptcy, and time since foreclosure or notice of default." *Over 90 percent* of the Mortgage Loans to be included in the SPS1 and SPS2 Securitizations—90.76 percent of the SPS1 Loans and 90.66 percent of the SPS2 Loans—were listed as "Grade A," Countrywide's highest credit grade on its internal scale.

88.     Countrywide's statement that over 90 percent of the Mortgage Loans were "Grade A" was false and misleading and failed to disclose material facts necessary to make the statements not misleading, because even under Countrywide's own internal scoring system, the Loans did not in fact conform to the grades given. In truth, it is likely that a far smaller percentage of Mortgage Loans should have been classified as Grade "A." Countrywide regularly issued loans to borrowers with a far worse credit profile than it represented to Plaintiffs, with little or no regard for the borrowers' creditworthiness, in an effort to maximize revenue from loan origination, servicing, and securitization.

89.     The Securitizations' offering documents contained various other misrepresentations regarding Countrywide's origination guidelines.  For example, Countrywide represented in its Prospectus Supplement that it required independent appraisals of the properties on which  the Mortgage Loans were issued.  Countrywide stated that "Every independent appraisal is reviewed by a representative of Countrywide Home Loans before the loan is funded, and an additional review appraisal is generally performed in connection with appraisals not provided by Landsafe Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans."

90.     Countrywide's description of the supposedly independent home appraisals was false and misleading and failed to disclose material facts necessary to make the statement not misleading.  Countrywide regularly pressured appraisers to give inflated assessments of property values, threatening to blacklist them if they did not do so.  Inflated appraisals of home values often resulted in homebuyers owing more on their mortgages than their houses were worth, which increased the likelihood of borrowers' default and thus directly affected the value of the Securities purchased by Plaintiffs.

91.     Countrywide also stated that its underwriting standards "are applied in accordance with applicable federal and state laws and regulations."  This statement was false and misleading and failed to disclose material facts necessary to make the statement not misleading, because in fact Countrywide regularly engaged in predatory lending practices in violation of federal or state laws and regulations.  Countrywide has been sued dozens of times for its lending practices, with plaintiffs alleging detailed allegations ranging from federal securities-law violations to violations of state consumer-protection laws.

92. Countrywide regularly steered borrowers to more expensive mortgage products in order to increase its profits. By directing borrowers to more expensive products, Countrywide maximized its own revenue and profit at the expense of borrowers and investors such as Plaintiffs. Borrowers who were burdened with unfavorable mortgage loans and exorbitant fees were more likely to default on their loans, which increased the risk of the securities backing those loans and also decreased their value.

93. Countrywide also represented in the SPS1 and SPS2 Prospectus Supplements that "[w]hile more flexible" than underwriting guidelines for traditional loans, "Countrywide Home Loans' underwriting guidelines still place primary reliance on a borrower's ability to repay . . . ." This representation was also false and misleading and contained omissions of material facts, because as Plaintiffs have subsequently learned—and did not know at the time they purchased the Securities—Countrywide's underwriting standards actually *ignored* a borrower's ability to repay. Countrywide's focus, instead, was on profit and market share gained from the origination of large volumes of risky loans, regardless of a borrower's ability to repay.

94. Mozilo and others were advised that Countrywide's lending practices were increasing the risk that borrowers would be unable to repay. For example, in a December 13, 2007 memo that was sent to Mozilo and others, Countrywide's enterprise risk assessment officer reported on an audit of Countrywide mortgages. He found that "borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans."

95. Countrywide was not concerned with borrowers' ability to repay because it transferred much of its financial exposure to the risky mortgages it originated to investors, such as Plaintiffs, by reselling the mortgages as whole loans or packaging them as mortgage-backed securities. Indeed, the prospect of profitable resale on the secondary market, along with the fees

it stood to earn in its many roles in originating and securitizing mortgage loans, motivated Countrywide's drive to approve ever-increasing numbers of risky but profitable loans. Countrywide's transfer of risk to investors allowed it to issue riskier loans to less creditworthy investors while remaining protected from the financial fallout of its practices. Plaintiffs, on the other hand, have been left fully exposed to the damage caused by Countrywide's fraudulent practices.

96.    Countrywide also represented in the Prospectus Supplements that "*On a case by case basis*, [CHL] may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception" (emphasis added). This representation was also false and misleading and omitted material facts because it incorrectly implied that Countrywide made exceptions to its underwriting guidelines on a limited ("case by case") basis, and with careful consideration of the "compensating factors" of each case.

97.    In reality, Countrywide did not carefully consider the circumstances of each case before granting underwriting exceptions. On the contrary, in a corporate culture permeated by fraud and greed, Countrywide's underwriters, supervisors, and corporate leadership alike collectively abandoned their standards with regard to granting underwriting exceptions. Such exceptions were granted abundantly and without restraint in order to increase Countrywide's profits and meet targeted objectives for market growth. Loan officers facilitated fraud with grossly inadequate due diligence in examining borrowers' loan applications, because they were incentivized by bonuses and the threat of termination to grant loans quickly and via more profitable alternative types of mortgages, such as stated-documentation loans, which types also presented a greater opportunity for fraud.

98.     Countrywide supervisors also pushed their employees to maximize volume and lower underwriting standards to approve loans.  Supervisors also scrutinized loans that were initially rejected to reconsider whether there was a basis for approving the loans.  Countrywide's management, including Mozilo and Sambol, helped create and authorize a corporate culture that emphasized market share and profit and discouraged adherence to the Company's underwriting standards.  Mozilo, Sambol, and other Countrywide managers facilitated the Company's rampant granting of underwriting exceptions through the formation of the Structured Loan Desk and other means, as alleged herein.

99.     Countrywide also made representations about its rigorous underwriting standards directly to Plaintiffs, in an effort to reassure them about their investments in the Securitizations. During the parties' May 2007 conference call, Countrywide told representatives of Plaintiffs' Investment Advisor, Old Hill, that it had checked to see whether borrowers were first-time homebuyers—which tends to show that borrowers are not real-estate speculators—by looking for evidence of mortgages on the borrowers' credit reports.  Countrywide also told Old Hill that it raised the minimum FICO score it required of borrowers in 2006, particularly on its 100-percent-financed mortgages, because the loan guidelines in the mortgage industry had become too "liberal."

100.    Countrywide also described its ongoing quality-control measures, which it said included random audits of its loan origination for regulatory purposes as well as targeted audits of risky loans to root out internal corruption.  In its 2005 10-K , for example, which was filed in March 2006, Countrywide wrote that

> We supplement our loan origination standards and procedures with a post-funding quality control process.  Our Quality Control Department, under the direction of the Chief Credit Officer, is responsible for completing loan audits that may consist of a re-verification of loan documentation, an underwriting and appraisal

> review, and if necessary, a fraud investigation.  We also employ a pre-and post-
> funding proprietary loan performance evaluation system.  This system helps to
> identify fraud and poor performance of individuals and business entities
> associated with the origination of our loans.  The combination of this system and
> our audit results allows us to evaluate and measure adherence to prescribed
> underwriting guidelines and compliance with laws and regulations.

Plaintiffs relied upon this and other representations about the quality and rigorousness of

Countrywide's business practices, made prior to and during the period that Plaintiffs invested in

the Securitizations.  This and other representations induced Plaintiffs to invest in the

Securitizations, based on its reassurance that Countrywide was a reputable lender that upheld

high ethical and quality standards and had adequate safeguards in place to protect against fraud.

      101.    Yet the representations that Countrywide made to Plaintiffs were false and

misleading and contained omissions of material facts.  For example, Countrywide represented

that it scrutinized its origination practice in a rigorous quality-control process to root out fraud,

but in fact it encouraged such fraud by offering incentives for new mortgage loan originations,

with greater incentives for riskier nonprime mortgage loans.  These incentives put enormous

pressure on loan officers not to review loan applications thoroughly but instead simply to

approve them.  These incentives for abandoning the Company's underwriting guidelines greatly

harmed Plaintiffs, since the risk of borrowers' default was greatly increased by the unnecessarily

and unsuitably risky loans—characterized by high interest rates and high fees—that Countrywide

employees increasingly steered unqualified buyers into.  Had Countrywide disclosed those facts

to Plaintiffs, Plaintiffs would not have invested in Countrywide's mortgage-backed securities.

      102.    Countrywide's statements during the conference call about its supposed increase

in the minimum FICO score for borrowers were also false and misleading and contained

omissions of material facts.  Although Countrywide said that it had raised its FICO scores for

borrowers because loan standards in the industry had become too "liberal," Countrywide's

practices were in fact an egregious example of those severely liberalized underwriting standards. Countrywide issued loans to borrowers with poor credit histories, giving them mortgages that it knew they could not afford given their incomes and the mortgages' costs, some of which were not readily apparent or only appeared over time, as with adjustable-rate mortgages, whose interest rate automatically reset to a higher rate after a given period of time.

103.    Moreover, although Countrywide implied that its increased FICO scores would promote responsible lending practices, in fact Countrywide continued to issue mortgages to borrowers with low FICO scores and who were otherwise not creditworthy.  By issuing loans to borrowers with poor credit histories or to borrowers who could not afford the loans, Countrywide greatly increased the risk of borrowers' default, thereby increasing the risk and lowering the value of the Securities held by Plaintiffs.

104.    Elsewhere in the Prospectus Supplements for the SPS1 and SPS2 Securitizations, Countrywide assured Plaintiffs that it upheld principled underwriting standards, regardless of its loosened standards for credit-blemished, second-lien loans.  Countrywide stated that its credit-blemished, second-lien loans were handled by "a specialized group of underwriters who are familiar with the unique characteristics" of these loans, and it said that CHL would not add any such loans to the Securitizations if they had not been originated by Countrywide.  Countrywide stated that it required a credit history for each loan applicant from an independent credit bureau; that it gathered information about an applicant's "assets, liabilities, income and employment history;" and that it used a debt-to-income ratio

> to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations.  The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income.  The maximum monthly debt-to-income ratio

varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 55%.

105.    The Prospectus Supplement summarized the thorough procedures that Countrywide allegedly used to verify applicants' information:

> Countrywide Home Loans verifies the loan applicant's sources and amounts of income (except under the Stated Income Program where the amount of income is not verified), calculates the amount of income from all sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the appraisal of the mortgaged property for compliance with Countrywide Home Loans' underwriting standards.

106.    These representations were false and misleading and omitted material facts necessary to make the statements not misleading.  Countrywide represented in the Prospectuses and Prospectus Supplements that it followed rigorous underwriting guidelines, despite the allowance for reduced-documentation loan origination, as stated in the guidelines.  In reality, Countrywide abandoned those guidelines and issued the Mortgage Loans with little or no consideration for borrowers' ability to repay, as alleged herein.

107.    Plaintiffs understood that Countrywide's origination standards for credit-blemished, second-lien loans were more flexible than the standards for non-credit-blemished mortgage loans, as described in the offering documents.  However, Plaintiffs were nonetheless misled by Countrywide because it failed to adhere *even to the lowered underwriting standards described in the Prospectus Supplements*.  Countrywide abandoned rather than loosened its underwriting guidelines, failing to adhere even to the loosened standards represented in the Prospectus Supplements.  The Company's many representations about underwriting standards and due diligence were therefore false and misleading and contained omissions of material fact.

108.    Plaintiffs were also reassured about the creditworthiness and quality of their investment in the Securities because the Certificates they purchased were expected to have

investment-grade credit ratings.  Plaintiffs purchased Certificates from the M-3 through M-7 Classes of the SPS1 Securitization, which reflected expected credit ratings ranging from AA/Aa3 (S&P/Moody's) for the M-3 Class to BBB+/Baa2 (S&P/Moody's) for the M-7 Class.  Plaintiffs purchased Certificates from the M-4, M-5, and M-7 Classes of the SPS2 Securitization, which reflected expected credit ratings ranging from A+/A1 (S&P/Moody's) for the M-4 Class to BBB+/Baa1 (S&P/Moody's) for the M-7 Class.  Countrywide stated in the Prospectus Supplement that the issuance of Certificates in each Class was conditioned on obtaining ratings from Moody's, Standard & Poor's, Fitch Ratings and Dominion Bond Rating Service that are "at least as high" as the ratings that Countrywide stated in the Prospectus Supplement.

109.    Countrywide's representations in the Prospectus Supplements and other offering documents regarding the quality of the SPS1 and SPS2 Securitizations—for example, that 99 percent of properties corresponding to the Mortgage Loans were owner-occupied properties— affected the credit rating assigned to the Securities.  By falsely representing that its Loans were high-quality, Countrywide increased the likelihood that it would obtain the favorable credit ratings on the SPS1 and SPS2 Securitizations that it advertised to Plaintiffs.  Countrywide knew or should have known that the Securities it offered did not merit the investment-grade ratings that they received from the ratings agencies.  Therefore the expected credit ratings that Countrywide conveyed to Plaintiffs were false and misleading and failed to disclose material facts.

110.    The securitization process allowed Countrywide to repackage the Loans with the false and misleading appearance of being safe investments.  Countrywide obtained investment-grade credit ratings for the securitized assets and provided subordination and other credit

enhancements for the Securities, but those credit ratings and enhancements merely disguised the poor quality of the underlying Loans.

111.    Plaintiffs were also reassured by the credit enhancement mechanisms, including subordination, overcollateralization, and excess cash flow, which were included in the Securitizations.  Plaintiffs reasonably believed, as Countrywide intended, that these credit enhancements would protect them against the risk of loss.  For example, the Securitizations were composed of multiple Classes of Certificates, ranked in priority of payment, with lower-ranked classes absorbing losses before more senior classes.  Subordination is a measurement of the amount of loss protection for a given class of notes, as provided by the lower-ranked classes. The higher the percentage, the greater the loss protection from lower-ranked classes.  For example, the SPS2 Prospectus Supplements listed an Initial Target Subordination Percentage of 21.95% for the M-4 Class, 19.50% for the M-5 Class, and 14.70% for the M-7 Class that Plaintiffs invested in.  The credit protection from lower Classes and high target subordination rates reassured Plaintiffs that their investments would be protected from loss.

112.    Plaintiffs' investments were also allegedly protected by overcollateralization and excess cashflow, whereby Countrywide overfunded the pool of Mortgage Loans to provide an initial cushion against losses.  These structures reassured Plaintiffs and induced them to invest in the Securitizations, when in fact Countrywide knew or should have known that because the collateral underlying the Securitizations was extremely risky and low quality—contrary to its representations—these "credit enhancements" would not adequately protect Plaintiffs and other investors against losses.

113.    Countrywide also failed to disclose that Mozilo and Sambol had authorized the establishment of a "Structured Loan Desk" in Plano, Texas and Calabasas, California, which was

created specifically to grant underwriting exceptions for high-risk loan applications that did not meet Countrywide's underwriting standards. The loans were processed through Countrywide's Exception Processing System, an in-house computer system created and overseen by Sambol to approve high-risk loans. According to the California Attorney General's complaint against Countrywide, based on information provided by a former Countrywide employee, the Structured Loan Desk processed 15,000 to 20,000 mortgage loan applications a month in 2006. Countrywide failed to disclose to Plaintiffs that it was originating so many mortgage loans that did not conform to its stated underwriting standards. The alarming scale of Countrywide's allowance of underwriting exceptions was a material fact that the Company did not disclose and that would have affected Plaintiffs' decision to invest in the Securities.

114.    Taken as a whole, Countrywide's representations in the Securitizations' offering documents regarding its underwriting standards were collectively false and misleading and contained omissions of material facts. Although Countrywide represented in the offering documents that it was applying loosened underwriting standards to the Mortgage Loans, its representations nonetheless were intended to—and did—assure Plaintiffs that Countrywide was a diligent, reputable mortgage company that would exercise responsible lending practices. Countrywide's representations assured Plaintiffs that it would abide by the stated guidelines in issuing mortgage loans, even under the reduced-documentation standards it described.

115.    Those stated representations were false because they belied the reality that Countrywide's profit-obsessed corporate culture had led to the complete abandonment of its underwriting standards. Plaintiffs reasonably relied on Countrywide's representations in the Securitizations' offering documents and in public statements by the Company, and Plaintiffs were harmed by Countrywide's failure to accurately disclose its true underwriting practices in

those documents.  If Plaintiffs had known the reality of Countrywide's underwriting practices, Plaintiffs would not have purchased or otherwise acquired the Securities.

### 3. Omissions of Material Facts Concerning the Extent to Which Fraudulent Applications Were Processed Through Reduced-Documentation Application Programs

116.    Countrywide adopted reduced-documentation application programs, or "Stated Income" programs, which excused qualified borrowers from the general requirement of submitting documentation to confirm their income and assets.  Countrywide publicly admitted that such loans would result in higher delinquencies.  In a July 2007 call with analysts, John McMurray, Countrywide's then-Chief Risk Officer, acknowledged that "[D]ocumentation matters.  The less documentation, the higher the serious delinquency, all else equal."  As previously described, internal Countrywide e-mails show that Countrywide's senior officers knew as early as June 2006 that a significant percentage of borrowers who purchased stated-income mortgage loans were lying on their applications.

117.    Countrywide failed to adequately control its issuance of reduced-documentation loans.  While it claimed that reduced-documentation applications were designed for self-employed professionals and business owners with high credit scores, in reality the Company made its reduced-documentation applications widely available to consumers without careful oversight, which was a material risk that it failed to disclose to Plaintiffs.

118.    Countrywide misrepresented or failed to disclose to Plaintiffs its frequent failure to obtain employment and current salary information from loan applicants before approving a Mortgage Loan.  In the Prospectus, Countrywide represented that, in most cases, "employment verification is obtained from an independent source (typically the borrower's employer) which verification reports, among other things, the length of employment with that organization and the

borrower's current salary."  This representation was false and misleading and omitted material facts necessary to make the statement not misleading.  On information and belief, Countrywide failed to obtain independent verification of borrowers' income at a far greater rate than it represented.

119.    Even under Countrywide's Stated Income program, which allowed borrowers to apply for mortgage loans with lesser documentation requirements, Countrywide represented in the Prospectus Supplements that "[t]he borrower's income as stated must be reasonable for the related occupation and the determination as to reasonableness is subject to the loan underwriter's discretion."  This representation was also false and misleading and omitted material facts necessary to make the statement not misleading.  Countrywide's underwriters abused their discretion by abandoning Countrywide's stated loan-origination standards and knowingly approving loans for borrowers whose representations about their income, and other material information regarding their ability to repay the loans, were unreasonable on their face and could not have been accurately reported, based on realistic estimates of salary for given employment. The underwriters failed to exercise proper discretion in judging borrowers' statements on their applications because Countrywide encouraged underwriters to abandon the stated loan-origination guidelines with commissions that rewarded them for increased loan originations and for originations of riskier, more profitable loans.

120.    Countrywide was required to exercise meaningful oversight over its borrowers' representations, pursuant to professional standards of the underwriting industry.  It is standard practice among mortgage lenders generally to try to verify employment income that appears suspicious.  A borrower who inflates his income is less likely to be able to repay his loan, which leads to a higher incidence of delinquencies and defaults on the mortgage loans.  However,

41

despite the prevalence of loan applications that contained highly suspicious reported employment income, Countrywide failed to take sufficient, if any, action to correct borrowers' suspicious statements.  On the contrary, Countrywide overlooked or even encouraged such misrepresentations and failed to disclose them in the SPS1 and SPS2 offering documents.

121.    Countrywide's senior management was aware that Countrywide loan officers were participating in submitting fraudulent applications through the Company's reduced-documentation application programs, as evidenced by the internal Countrywide e-mails cited herein.  For example, on April 13, 2006 Mozilo wrote to Sambol and others to say that he had "*personally observed a serious lack of compliance within our origination system as it relates to documentation*" (emphasis added).

122.    According to Mark Zachary, a former Countrywide executive, in and around 2006 Countrywide loan officers engaged in a practice known within Countrywide as "flipping" an application.  Loan officers who knew that a loan application submitted under the full-documentation program was unlikely to be approved would "flip" the application for consideration under the reduced-documentation application program.  According to Zachary, loan officers would coach potential homeowners on the income levels needed to qualify for a given mortgage loan and would then accept revised loan applications from those borrowers which contained an inflated reported income.  The loan officer would submit the revised loan application under a reduced-documentation program for consideration by the subprime mortgage loan operations unit in Plano, Texas.  According to Zachary, he complained to Countrywide's regional management about these deceptive practices but his complaints were ignored.

###### 4.    Misrepresentations Regarding Adverse Effect on Investors' Interests

123.    Countrywide represented in the PSAs and Prospectus Supplements that the
Mortgage Loans in the Securitizations were not selected "in a manner that would adversely affect
the interests of Certificateholders."  This statement was also materially false and misleading and
omitted material facts necessary to make it not misleading.  As alleged herein, Countrywide was
obsessed with increasing market share, loan volume, and profitability, all at the expense of its
borrowers and investors such as Plaintiffs.  Countrywide knew that by issuing unnecessarily
risky and expensive loans to borrowers with poor credit histories and low incomes, the Company
increased the likelihood that borrowers would default on their loans, thereby creating an adverse
effect on Plaintiffs and other purchasers of its Securities.

124.    Remarkably, Countrywide has also admitted to Plaintiffs that it knew the
Mortgage Loans backing Plaintiffs' Securities were poor quality and would adversely affect
Plaintiffs' interests.  Long after Plaintiffs had purchased their Securities, Nancy Deliban, a senior
Countrywide manager, spoke with John Howe, Old Hill's President, regarding the poor
performance of the SPS1 and SPS2 Securitizations.  At the time, Countrywide was seeking
additional monies from Plaintiffs to meet margin calls on the Securities, which had already
steeply declined in value.  Deliban told Howe that Countrywide had originally sought to sell the
Mortgage Loans as whole loans, but the market bids for whole loans were too low and
Countrywide was "forced" to market the Mortgage Loans as mortgage-backed securities.

125.    Countrywide was able to sell the Loans to unsuspecting investors such as Old
Hill, in the form of mortgage-backed securities rather than whole loans, because the
securitization process made the loans more attractive investments.  Although risky, the Loans

appeared safer through the securitization process, since the Loans were given investment-grade credit ratings and appeared to be protected by credit enhancements such as subordination.

126. Deliban essentially confessed that the loans had been securitized to hide the risks and induce investors to buy them. She told John Howe that she wished Countrywide had been able to sell the Mortgage Loans as whole loans because "everyone would have been better off" that way.

127. Deliban was not the only Countrywide employee to admit the Company's wrongdoing toward Plaintiffs. Randy Petsoff, the Countrywide employee who brokered Plaintiffs' purchases of the Securities and acted as Countrywide's primary liaison to Plaintiffs, wrote an internal Countrywide memorandum in which he stated his belief that Countrywide had misled Plaintiffs by inducing them to invest in the SPS1 and SPS2 Securitizations. Petsoff suggested that Countrywide take action to redress its wrongdoing toward Plaintiffs.

128. Rather than follow Petsoff's suggestion and address the harm that it had caused Plaintiffs, Countrywide opted instead to "kill the messenger"—it terminated Petsoff's employment. The Company's reaction underscores Countrywide's awareness of its own wrongdoing and its desire to prevent such fraudulent conduct from coming to light.

129. In short, Countrywide created the SPS1 and SPS2 Securitizations as a means to repackage and offload the risk of bad assets onto Plaintiffs and other investors, with greater profit or smaller losses for Countrywide than it would have received by selling the Mortgage Loans as whole loans. By securitizing the Mortgage Loans and selling Certificates backed by them, Countrywide transferred the risk on the Loans to Plaintiffs and other investors, knowing that the loans were likely to perform poorly. Indeed, Countrywide had payment histories on some of the Mortgage Loans that it added to the Securitizations' pools, in its role as servicer of

the Loans, so it knew that certain Loans were already defaulting when the pools were created. Countrywide was well aware of the performance of its loan portfolios, and the deterioration in those portfolios, at the time it created the Securitizations' pools.

130.    Countrywide also had payment histories on similar mortgage loans that were not included in the Securitizations, so it knew that these loans were defaulting at an increasing rate. Indeed, Countrywide knew or should have known at the time it pooled the Mortgage Loans in the Securitizations, based on future projections from delinquency on similar loans, that the SPS1 and SPS2 Mortgage Loans were likely to experience high rates of default and that the Securities that Plaintiffs invested in were likely to decline steeply in value.

131.    Countrywide did not disclose these facts to Plaintiffs, since Countrywide knew that Plaintiffs would not have purchased the Securities if they had known that Countrywide had intentionally sought, in structuring the Securitizations, to offload the risk and financial burden of loans that Countrywide considered to be bad assets.  Plaintiffs also would not have purchased the Securities if they knew that Countrywide knew or could have reasonably predicted that the Securities had a significant risk of default, based on its familiarity with the servicing history of some of those loans and its familiarity with similar loans.

132.    By securitizing the Loans, Countrywide was also able to disguise their poor performance by delaying Plaintiffs' recognition that the Loans were experiencing much higher rates of default than expected.  The securities included an 180-day "charge off" provision that created a six-month lag time between when a loan became delinquent through late payment and when the loan was charged off, meaning the date that losses were realized and final proceeds distributed to investors.  Plaintiffs therefore did not begin to witness the severe default rate on the Mortgage Loans until long after they purchased the Securities.

### 5. Misrepresentations Regarding Countrywide's Servicing of Loans

133.    Countrywide represented in the PSAs that "[f]or and on behalf of the Certificateholders, the Master Servicer shall service and administer the Mortgage Loans in accordance with customary and usual standards of practice of prudent mortgage loan lenders in the respective states in which the Mortgaged Properties are located . . . ." This representation was also materially false and misleading and omitted material facts necessary to make the statement not misleading.

134.    Countrywide's servicing of its mortgage loans lagged behind the standards of the industry, contrary to its representations. Countrywide failed to allocate sufficient resources to service and administer the loans, such as personnel to address customer inquiries and to conduct follow-up efforts with delinquent borrowers. Countrywide has also provided inadequate resources for work-out plans. These failures were exacerbated by the Company's break-neck origination of loans in disregard of its own underwriting guidelines, which led to an extraordinary increase in delinquencies, defaults, foreclosures, bankruptcies, litigation, and other proceedings. Countrywide misrepresented these practices or failed to disclose them in the Securitizations' offering documents.

135.    Countrywide provided poor customer service to its borrowers, often proving unhelpful in resolving customers' problems and in frequently acting against its customers' interests by steering borrowers into repayment plans that worsened their financial problems and increased their indebtedness to the Company. When borrowers contacted Countrywide seeking help to avoid foreclosure proceedings, Countrywide frequently offered repayment plans that actually *increased* the borrowers' monthly mortgage payments, which thereby further increased the risk of default and foreclosure. Dozens of Countrywide customers have posted stories on the

Internet regarding their dealings with the Company's unhelpful, unprofessional, and harassing bureaucracy.  The stories describe false allegations of overdue payments and resulting foreclosure notices by the Company, dozens of phone calls to resolve simple problems, uninformed employees, and mishandled records.

### F.    The Countrywide Defendants' Roles in the Securitizations

136.   Each Countrywide Defendant participated in and furthered Countrywide's extensive fraud through their roles in administering the SPS1 and SPS2 Securitizations.  The Countrywide Defendants' roles in the Securitizations were as follows:

a.     Defendant CHL acted as the sponsor of the Securitizations and as one of the Sellers.  CHL originated the Mortgage Loans that were pooled together in the Securitizations and transferred those loans to the Securitizations.  CHL's loan-origination practices were characterized by blatant borrower fraud, inadequate documentation, missing verifications of borrower assets and income, title defects, excessive debt-to-income ratios, inadequate credit scores, and other material violations of underwriting guidelines established by CHL and the mortgage industry.  CHL's abandonment of its origination guidelines caused Countrywide's representations to Plaintiffs regarding its loan-origination practices and the characteristics of its Mortgage Loans, such as its representations regarding the percentage of owner-occupied properties corresponding to the Mortgage Loans, to be materially false and misleading.

b.     Defendant CHLS acted as the Master Servicer for the Securitizations.  In that capacity, CHLS shared responsibility with CHL for servicing the Mortgage Loans in the Securitizations.  Among other roles, CHLS supervised delinquent loans and made required inspections of the mortgaged properties.  CHLS failed to service the Mortgage Loans consistent with industry standards by, for example, refusing to accept partial payments from borrowers,

failing to allocate sufficient resources to service and administer the loans, and providing inadequate resources for work-out plans. Countrywide misrepresented these practices or failed to disclose them in the SPS1 and SPS2 offering documents.

        c.      Defendant CSC was the Lead Manager of the underwriters for the SPS1 and SPS2 Securitizations. In that role, it was responsible for underwriting and managing the Securitizations' sale of Certificates to Plaintiffs and other investors. By packaging and selling the Mortgage Loans underlying the Securitizations as mortgage-backed securities, CSC thereby transferred the substantial risks of those Loans from Countrywide to Plaintiffs and other investors. The risks were material facts that the Countrywide Defendants failed to disclose or did not fully disclose to Plaintiffs, as alleged herein. CSC marketed the Securities by fraudulently representing that the Mortgage Loans had been originated consistent with CFC and CHL's underwriting standards for credit-blemished, second-lien loans as well as the strength of their reputation for conservative lending practices and high-quality loans.

        d.      Defendant CFC is the corporate parent of CHL, CHLS, and CSC. In that capacity, it directed and controlled the other Countrywide Defendants' activities related to the Securitizations. In addition, CFC and/or CHL guaranteed CHLS's loan-servicing activities when required by the owner of the Mortgage Loans. As part of Countrywide's fraudulent disclosures and omissions, CFC and CHL expanded their origination of mortgage loans in order to increase overall origination revenue, as well as to increase the inventory of mortgage loans available to securitize.

        e.      Defendant CWABS was the Depositor for the SPS1 and SPS2 Securitizations. CWABS purchased the SPS1 and SPS2 Mortgage Loans from CHL and one or more other Sellers pursuant to the SPS1 and SPS2 PSAs. CWABS caused the Mortgage Loans

to be assigned to the Trustee, The Bank of New York, for the benefit of Plaintiffs and other Certificateholders.

        f.    The SPS1 Trust was the Issuing Entity for the SPS1 Securitization. It issued the Certificates in the SPS1 Securitization that were purchased by Plaintiffs and other investors.

        g.    The SPS2 Trust was the Issuing Entity for the SPS2 Securitization. It issued the Certificates in the SPS2 Securitization that were purchased by Plaintiffs and other investors.

    137.   The attached flowchart, which was contained in the Securitizations' Prospectus Supplements, explains the roles of each Countrywide Defendant in the Securitizations (with the exception of the Individual Defendants, whose roles in the Securitizations are described further below):

**SUMMARY OF TRANSACTION PARTIES**



138.     As indicated by the flowchart above, CHL, as Sponsor of the Securitization and one of its Sellers (along with other Countrywide entities acting as Sellers), sold the Mortgage Loans—the Loans to be pooled together in the Securitizations—to the Depositor, CWABS.

CWABS then conveyed the Loans to the Trustee, The Bank of New York, which held the Loans in the SPS1 and SPS2 Trusts for the benefit of Certificateholders. The Trusts issued Certificates, which represented interests in the income stream of the Loans, to Plaintiffs and other investors. The Master Servicer, CHLS, serviced the Loans held by the Trusts in accordance with the PSA.

139.    The Individual Defendants, Mozilo and Sambol, were among Countrywide's senior management during the entirety of the time period relevant to this action—when Mortgage Loans were issued, the Securitizations were created, and the Securities were sold to Plaintiffs. Mozilo and Sambol were closely involved in every aspect of Countrywide's core operations, including creating and monitoring its policies and procedures with regard to loan underwriting. Mozilo and Sambol's positions within Countrywide allowed them to control Countrywide's practices and policies with regard to loan origination, in particular, which directly affected the quality of the Mortgage Loans that were pooled in the Securitizations and sold as mortgage-backed securities to Plaintiffs.

140.    Mozilo and Sambol also controlled the content of Countrywide's public statements, such as its representations to investors during investor forums, by virtue of their senior leadership positions within Countrywide. Mozilo and Sambol frequently spoke on behalf of the Company in such public fora. Moreover, they could control the content of documents provided to Plaintiffs pursuant to their investment in the Securitizations, such as the PSAs, Preliminary Term Sheets, and Prospectuses and Prospectus Supplements, again due to their senior positions within Countrywide. Therefore Mozilo and Sambol are also responsible for the fraudulent content of the SPS1 and SPS2 PSAs and other public representations by Countrywide on which Plaintiffs relied.

141.    The Prospectuses for SPS1 and SPS2 were filed with the SEC and their Registration Statements were signed by Countrywide executives:  Stanford L. Kurland, Chairman of the Board, President and Director; Eric P. Sieracki, Executive Vice President, Chief Financial Officer; and David A. Spector, Vice President and Director.  Mozilo and Sambol, in their capacities as senior executives of Countrywide who played an active role in the everyday activities of the Company and who oversaw the personnel who created and signed the Registration Statements, Prospectuses, and Pooling and Servicing Agreements, did review or could have reviewed these and other document associated with the Securitizations prior to their issuance.  Mozilo and Sambol therefore knew or should have known that these documents contained misrepresentations of material fact, yet they failed to correct those misstatements.

142.    Just as Countrywide's loan-origination and servicing practices were plagued by pervasive fraud, the agreements that Countrywide entered into with regard to the Securitizations that Plaintiffs purchased reflected the same fraudulent intentions.  Countrywide entered into the Prospectuses and the PSAs under circumstances evidencing fraud and unconscionability, because the Company signed the agreements with the knowledge that its representations contained therein—with regard to its prudent business practices and the characteristics of the Mortgage Loans, for example, as alleged herein—were false.  Countrywide failed to correct those representations because it stood to profit from the transactions, and it knew that the other parties to the PSAs, and other interested parties to the PSAs and the Prospectuses, would be deterred by the truth about the Mortgage Loans and its business practices.

143.    Countrywide disseminated documents related to the Securitizations, including the Prospectuses and Pooling and Servicing Agreements, to Plaintiffs and other investors for the

purpose of inducing them to invest in the Securitizations. Countrywide conveyed these documents knowing that the documents contained fraudulent misrepresentations.

144. The following examples illustrate how the Countrywide Defendants provided materially false and misleading information to Plaintiffs regarding the Securitizations. Countrywide sent certain offering documents regarding the Securitizations to Plaintiffs, thereby conveying certain misrepresentations contained within those documents, in the following e-mails:

      a.   A June 26, 2006 e-mail from Randy Petsoff, a Countrywide employee, to Gary Effman and other employees of Old Hill, Plaintiffs' Investment Manager, in which Petsoff sent the Preliminary Term Sheet for SPS1 and a draft Prospectus. The Preliminary Term Sheet contained misrepresentations and omissions regarding, for example, the percentage of owner-occupied properties and "Grade A" Mortgage Loans that would be included in the Securitization, while the Prospectus misrepresented Countrywide's "prudent" underwriting and servicing practices.

      b.   An August 15, 2006 e-mail from Randy Petsoff to Gary Effman of Old Hill, attaching a "Detailed Report" of the loans in the SPS2 Securitization, a draft Prospectus, and a summary of loan-level information for SPS2. The Detailed Report contained misrepresentations about the percentage of owner-occupied properties and "Grade A" Mortgage Loans and the Prospectus again misrepresented Countrywide's "prudent" underwriting and servicing practices. The detailed list of loans falsely indicated that nearly every property would be owner-occupied, which reflected borrowers' fraud—and

53

Countrywide's complicity—in misrepresenting owners' intention to live in the purchased properties.

## G.    The Countrywide Defendants' Scienter

145.    The facts of this case, viewed as a whole, compel a strong inference of Countrywide's scienter, including that of the Individual Defendants. Despite internal concerns voiced repeatedly by the Company's Chief Risk Officer and others, no one disclosed to Plaintiffs and other investors the extreme degree to which Countrywide had abandoned its guidelines and responsible lending practices. Were such information disclosed, the Company would lose the ability to market its toxic mortgage-backed securities to unsuspecting buyers such as Plaintiffs. Instead, Countrywide continued to present a public image as a responsible, reputable corporation that upheld prudent lending practices, in stark contrast to the realities within the Company.

### 1.    Internal Communications From and To Countrywide Executives Show Their Knowledge of Countrywide's Fraud

146.    In particular, internal communications between Countrywide executives, including Mozilo and Sambol, demonstrate that the Company's leaders actively promoted the drastic increase in risky loan origination practices and abandonment of underwriting standards, ignoring warnings about what such deviations could mean for investors, borrowers, and the Company itself. These e-mails, excerpts of which have been published by the SEC, reflect an organization and executive leadership singularly focused on increasing their immediate profits and market share no matter what the long-term costs or damage to investors and borrowers. The evidence reflects Mozilo and Sambol's knowledge of the Company's wrongdoing, thereby reflecting the knowledge of the Company generally, which they led.

147.    Many of these unearthed e-mails were exchanged in 2006, during the same period in which Countrywide was marketing and selling the Securities to Plaintiffs (Plaintiffs' purchases occurred between June and October 2006).  These e-mails also occurred during the time that the Individual Defendants and Countrywide were making reassuring public statements, which Plaintiffs relied upon, that it was maintaining its prudent underwriting practices.  The overlapping time period underscores the fact that Countrywide, including Mozilo and Sambol, knew that their practices were fraudulent and that the sale of the Securities to Plaintiffs was irreparably tainted by that fraud.

148.    For example, in an April 13, 2006 e-mail, Mozilo wrote to Sambol and others that he was concerned that certain subprime, second-lien loans—such as the loans that Plaintiffs purchased—had been originated "with disregard for process [and] compliance with guidelines." He wrote that he had "*personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan* [sic]" (emphasis added).  Mozilo noted that, "[i]n my conversations with Sambol he calls the 100% sub prime seconds [second-lien mortgage loans with 100% financing] as the 'milk' of the business.  Frankly, I consider that product line to be the poison of ours."

149.    Other e-mails from Mozilo reiterate his concern about the terrible quality of the loans that Countrywide was originating and selling, including the loans that Countrywide sold to Plaintiffs.  Mozilo wrote to Sambol on April 17, 2006 to say that "In all my years in the business I have never seen a more toxic pr[o]duct [sic]" than subprime loans that provide 100% financing. "It's not only subordinated to the first, but the first is subprime.  In addition, the FICOs are below 600, below 500 and some below 400[.]  With real estate values coming down . . . the

product will become increasingly worse. *There has [sic] to be major changes in this program, including substantial increases in the minimum FICO . . .*" (emphasis added).

150.     In a March 28, 2006 e-mail to Sambol and others, Mozilo directed the executives to implement a series of corrective measures to "avoid the errors of both judgment and protocol that have led to the issues that we face today caused by the buybacks mandated by HSBC."  In early 2006, HSBC had begun to contractually force Countrywide to buy back certain defective loans.  Mozilo commented that subprime mortgage loans that provide 100 percent financing, which constituted the vast majority of Mortgage Loans that backed Plaintiffs' Securities, are "the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."

151.     Mozilo's comments irrefutably demonstrate his knowledge that Countrywide's origination policies would lead to high rates of default, which in turn would cause enormous losses for investors such as Plaintiffs.  In a June 1, 2006 e-mail regarding Pay-Option ARMs, Mozilo warned Sambol and other executives that borrowers "are going to experience a payment shock which is going to be *difficult if not impossible* for them to manage" (emphasis added). Mozilo warned that "[w]e know or can reliably predict what's going to happen in the next couple of years," and he suggested certain measures to reduce Countrywide's exposure to risky loans, such as reducing the number of loans with FICO scores below 680.  In the same e-mail, Mozilo reiterated his concern expressed that the majority of Pay-Option ARMs were originated using stated income, and that evidence suggested that borrowers were misstating their incomes.  He asked the executives to "assume the worst" and take corrective measures to try and avoid the disastrous consequences of Countrywide's lending policies, including reducing its exposure to loans with low FICO scores.  Even if Countrywide did take such corrective measures, however,

they were insufficient—the damage rendered by Countrywide's reckless loan practices had been done, as evidenced by the high default rate and loss in value of Plaintiffs' investments.

152.    Mozilo expressed his concerns about Countrywide's loan practices repeatedly, to no avail.  On April 4, 2006, Mozilo wrote that "[since] over 70% have opted to make the lower payment it appears that it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies."  Remarkably, neither Mozilo nor anyone at Countrywide ever warned Plaintiffs of such inevitabilities, even though the Securitizations were being negotiated during the very period in which these e-mails were sent.  Plaintiffs would not have purchased or otherwise acquired the Securities, which the Prospectuses said could include adjustable-rate mortgages or loans having "other special payment features," if they knew that Countrywide's borrowers were likely to face drastically higher delinquencies.

153.    Mozilo's own e-mails reflect his awareness that Countrywide needed to sell its toxic mortgage loans to unsuspecting investors in order to take those assets off its books.  Mozilo wrote a September 26, 2006 e-mail to Sambol and Sieracki in which he stated that *"[w]e have no way, with any reasonable certainty, to assess the real risk of holding these loans on our balance sheet . . . .*  The bottom line is that *we are flying blind* on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales" (emphasis added).  Mozilo further stated that "pay options are currently mispriced in the secondary market . . . ."

154.    The e-mails disclosed by the SEC reflect numerous occasions where Mozilo and Sambol received internal reports, e-mails, and other communications that advised them of the risks of the mortgage products, such as 100-percent-financed subprime mortgage loans, that Countrywide was originating at a torrential pace.  Countrywide's Risk Management department

repeatedly warned Countrywide's senior management, including Mozilo and Sambol, that Countrywide's liberalized origination guidelines—such as loans with high loan-to-value ratios, loans with adjustable rates, reduced-documentation loans, and interest-only loans—significantly increased Countrywide's credit risk.

155.    For example, on July 10, 2006, Mozilo received an internal report which showed that the percentage of borrowers with pay-option loans who opted to make only the monthly payment had *doubled, from 37 percent to 71 percent*, between September 2005 and June 2006. Those very high percentages foreshadowed the tide of delinquencies which soon affected Countrywide's loans, as borrowers with adjustable-rate mortgages experienced rapidly rising interest rates and others came to the realization that they could not afford their loans.  Plaintiffs were purchasing the Securities during this period, in the summer of 2006, yet neither Mozilo nor anyone else at Countrywide warned them of the Company's abandonment of its origination standards or the frightening condition of the Mortgage Loans backing their Securities.

156.    The Risk Management department warned Countrywide's senior officers— including Mozilo and Sambol—of these risks as early as September 2004.  In September 2004, statistics showed that the percentage of conforming loans that Countrywide originated had fallen from 66 percent in July 2003 to 35 percent in July 2004, and subprime loan originations had risen from 2 percent to 10 percent over the same period.  Those ratios continued to worsen between September 2004 and 2007, when Countrywide was sold.

157.    John P. McMurray, Countrywide's then-Chief Risk Officer, gave repeated, explicit, and alarming warnings to Sambol, Mozilo, and others about the financial risks of Countrywide's origination practices, and advocated for stricter origination guidelines.  On May 22, 2005, McMurray warned Sambol that loans which were originated as exceptions to

Countrywide's stated origination guidelines would likely experience higher default rates.  He wrote that "exceptions are generally done at terms more aggressive than our guidelines" and said that "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."

158.    In June 2005, McMurray warned Sambol in an e-mail exchange that "as a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas," adding that that "frontier" had "high expected default rates and losses."

159.    McMurray also provided explicit warnings to Mozilo and Sambol about the risk of Countrywide's aggressive decision to match any of the risky mortgage loans of its competitors, which quickened Countrywide's abandonment of its underwriting guidelines.  In a June 25, 2005 e-mail regarding Countrywide's matching strategy, McMurray told Sambol what should have been obvious, which was that by adopting other lender's most liberalized lending policies, Countrywide was adopting the "outer boundaries" of the mortgage market's offerings, making its lending policies "among the most aggressive in the industry."

160.    On November 2, 2006, McMurray asked Countrywide's chief investment officer, in an e-mail forwarded to Sambol, whether Countrywide "want[s] to effectively cede" its underwriting policies to the market.  He asked whether the Company's matching strategy is "'saleable' from a risk perspective to those constituents who may worry about our risk profile?"  Those "constituents" included Plaintiffs, who did not know and were not told by Countrywide that the Company was abandoning its stated underwriting guidelines, thereby drastically increasing the risk of default of Countrywide's investments.

161.    In a February 11, 2007 e-mail to Sambol, McMurray reiterated his concerns about Countrywide's strategy of matching any type of loan product offered by its competitors, which he said could expose the Company to the riskiest offerings in the market.  "I doubt this approach would play well with regulators, investors, rating agencies, etc," he wrote.  "*To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines*" (emphasis added).  Of course, this is precisely what Countrywide had done.  Indeed, as indicated by the Company's continued practice of originating risky loans, Sambol and Mozilo ignored repeated warnings from McMurray and others about the deleterious impact of Countrywide's practices.  In doing so, they neglected the dire warnings of a minority of concerned employees, instead choosing to steer Countrywide on a continued path of drastically increased risk in the interest of increased profit.

162.    McMurray also warned Sambol on May 22, 2005 that the Company was likely to experience higher default rates going forward, which would increase the risk to Countrywide.  McMurray emphasized that exceptions to Countrywide's stated underwriting guidelines "are generally done at terms more aggressive than our guidelines."  McMurray recommended that "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit out approach to exceptions."

163.    Despite repeated and earnest warnings from Mozilo, McMurray, the Risk Management department, and others, Sambol, in particular, ignored the warnings and pressed ahead with Countrywide's fraudulent practices.  Sambol resisted putting any limitations on Countrywide's embrace of risky mortgage loan products because he believed that such limits would deter from Countrywide's headlong pursuit of increased profits and market share.  For example, in April 2006 Sambol resisted a Risk Management department recommendation that

Countrywide increase the FICO score required of certain 100-percent-financed loans because he believed doing so would make the Company uncompetitive with subprime lenders. Sambol's shocking failure to redirect Countrywide away from taking on enormous risk in the face of explicit warnings from within the Company underscores his conscious wrongdoing.

164.    The e-mails publicized by the SEC show that awareness of Countrywide's reckless practices extended well beyond the Company's most senior officers. On December 7, 2006, Mozilo circulated a memorandum to Countrywide's Board of Directors and managing directors, including Sambol, which emphasized certain frightening and startling data points regarding the Company's loan origination. Mozilo told them that Countrywide had expanded its subprime underwriting guidelines in every conceivable type of loan, that the Company's 2006-vintage loans were expected to perform worse than any loans on record, that the percentage of delinquencies was the highest in Countrywide's history and was expected to continue rising, and that an alarming *62 percent* of Countrywide's subprime originations in the second quarter of 2006 were 100-percent-financed loans.

165.    Amazingly, despite explicit and repeated warnings by none other than Mozilo, a founder of the Company and its CEO, Countrywide's abandonment of prudent loan origination continued unabated. The reckless and fraudulent practices described in the above e-mails—of which the executives were obviously fully aware—resulted not only in the loss of Plaintiffs' investment, but eventually the implosion of the Company itself.

### 2.    Inconsistencies Between Countrywide's Internal Statements and Public Representations

166.    Countrywide's public statements during the period leading up to and during Plaintiffs' purchase of the Securities, professing business as usual at Countrywide, provide a

glaring contrast with the alarming tone of internal e-mails from Mozilo and others regarding their knowledge of the elevated risks Countrywide was taking on—and passing on to investors such as Plaintiffs—through its lending practices. Whereas Countrywide executives privately worried about increasing credit risk and its impact on the Company, borrowers, and investors, the Company publicly gave the impression that Countrywide was maintaining high ethical standards and not taking on undue risk.

167. The misrepresentations described below, and others described elsewhere herein, underscore Countrywide's knowledge that it had fraudulently misled Plaintiffs to purchase the Securities by misleading them about the enormous risks of those investments. Countrywide's public representations made *at the time of Plaintiffs' investments*, contrasted with the e-mail communications described herein at the time Plaintiffs purchased the Securities, underscore the fact that Countrywide knew at the time that its underwriting practices were fraudulent and would harm investors such as Plaintiffs.

168. Certain inconsistencies were conveyed in Countrywide's public statements. As previously stated in Section A, Countrywide represented in its 10-Ks that it used "proprietary underwriting systems . . . that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud." In contrast, Mozilo recognized that Countrywide was originating loans "*with disregard for process [and] compliance with guidelines*," and that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan [sic]."

169. Other misrepresentations came from Mozilo directly. In a July 26, 2005 earnings call, Mozilo claimed that he was "not aware of any change of substance in [Countrywide's]

62

underwriting policies" and that the Company had not "taken any steps to reduce the quality of its underwriting regimen." And on January 31, 2006, Mozilo stated in an earnings call that "[i]t is important to note that [Countrywide's] loan quality remains extremely high."

170.    On April 27, 2006, Mozilo stated in an earnings call that Countrywide's "pay option loan quality remains extremely high" and that its "origination activities [we]re such that, the consumer is underwritten at the fully adjusted rate of the mortgage and is capable of making a higher payment, should that be required, when they reach their reset period."  The reset period refers to the period after which a loan with an initially low so-called "teaser" rate is raised to a higher rate.  That statement was directly contradicted by Mozilo's own private comments.  Earlier in the same month, on April 4, 2006, Mozilo had written an internal e-mail about Countrywide's pay-option ARM portfolio, expressing concern that "[s]ince over 70% [of borrowers] have opted to make the lower payment *it appears that it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies*" (emphasis added).

171.    Similarly, during an investor forum on September 13, 2006, Mozilo upheld Countrywide as a "role model to others in terms of responsible lending" and said that the Company "engage[s] in prudent underwriting guidelines" with respect to pay-option loans.  Yet several months prior, Mozilo had told Sambol and others that he observed deterioration in the quality of loans versus their pricing.  While Mozilo publicly represented that the Company was a responsible lender, he privately observed that the Company was "flying blind" on how the risky loans it was issuing would perform, given the uncertainties in the market and the uncertainties inherent in the new, riskier types of loans Countrywide was originating.

172.     Like Mozilo, Sambol also misrepresented Countrywide's origination practices in order to reassure investors and conceal the truth regarding the Company's practices.  At a May 24, 2005 investor presentation, Sambol told analysts that Countrywide required "higher credit scores or lower loan to value ratios" as a condition to approving riskier adjustable-rate mortgages, in order to counter the increased risk.  And at a September 13, 2006 investor forum, Sambol falsely stated that Countrywide had been "on the sidelines" of the subprime market, again to reassure investors about its exposure to risky mortgages.  These statements were blatantly incorrect.  Countrywide did not tighten its underwriting standards in response to riskier loans; on the contrary, Countrywide abandoned its underwriting standards at the same time that it was drastically increasing its rate of approving riskier types of mortgages.  Moreover, Countrywide was not "on the sidelines" of the subprime market, but rather a central player in that business.

### 3.     Countrywide's Motive and Opportunity to Commit Fraud on Plaintiffs

173.     The Countrywide Defendants, including the Individual Defendants, had the motive and opportunity to commit fraud against Plaintiffs, as described herein.  Countrywide profited enormously from its fraud in the form of increased revenue via the origination, sale, and servicing of the Mortgage Loans through the Securitizations.  In fact, the loans that Plaintiffs invested in—credit-blemished, second-lien mortgages—generated among the highest profits for Countrywide.  The interest rates on these mortgage loans were higher than rates on traditional prime loans, and these loans frequently carried greater interest rates and fees.  Moreover, Countrywide was motivated to securitize the Mortgage Loans and induce Plaintiffs to purchase

the Securities because securitization transferred Countrywide's risk of losses on the Loans to Plaintiffs.

174.    Countrywide also had the opportunity to commit fraud because it possessed information regarding the Mortgage Loans and its origination practices that was not available to Plaintiffs. The underlying loan information and information about Countrywide's actual (as compared to represented) origination practices was not available to public investors. Detailed information about the Mortgage Loans underlying the Securitizations, which Countrywide refused to provide to Plaintiffs in communications with Old Hill following the parties' May 2007 conference call, would have shown Countrywide's representations about the Mortgage Loans and the Securities to be incorrect and intentionally misleading.

175.    Countrywide perpetuated its fraud by keeping information regarding the underlying Mortgage Loans and its corporate practices from Plaintiffs. Plaintiffs also did not learn until after they purchased the Securities that Countrywide had originally, and unsuccessfully, sought to market the Mortgage Loans as whole loans, and that Countrywide had securitized the Loans as a means to repackage undesirable and risky mortgage loans into marketable securities, thereby offloading risky assets from its balance sheets.

176.    Countrywide's statements in conversations with Plaintiffs also provide strong circumstantial evidence of conscious misbehavior or recklessness. For example, during the May 2007 conference call to discuss the Securities' losses, Countrywide sought to redirect blame on borrowers for misrepresentations regarding owner occupancy rather than admitting its own fraud, and it sought to reassure Plaintiffs of the quality of the Securities' collateral and of its underwriting and servicing practices. Countrywide, but not Plaintiffs, knew the truth regarding its underwriting practices and the highly inflated owner-occupancy rates on the properties

underlying the Mortgage Loans, and it knew these truths at the time the Loans were originated, but it did not share that information with Plaintiffs.  During the conference call, rather than admitting its ongoing fraud, Countrywide instead sought to reassure Plaintiffs in the hopes of ensuring ongoing investments from them—indeed, in the weeks before the conference call Countrywide had asked Plaintiffs to make margin calls on the Securities.

177.    Countrywide's conscious misbehavior or recklessness is also demonstrated by its admission in a separate conversation with Plaintiffs that it had falsely represented that 99 percent of the properties whose Mortgage Loans would be included in the Securitizations were owner-occupied, and that in fact at least *15 percent* of those properties were investment properties. Countrywide did not retrospectively learn that its owner-occupancy rates were false.  Rather, it knew they were false at the time they were made, when Plaintiffs invested in the Securities, because it knew that its abandoned underwriting guidelines were facilitating borrowers' (and employees') fraud and because it knew or should have known, based on professional experience as a leader in the mortgage industry, that the incomes stated by borrowers were exaggerated.

178.    Furthermore, a Countrywide senior manager, Nancy Deliban, admitted to John Howe, the President of Old Hill, that the Company had unsuccessfully sought to market the Loans as whole loans and instead securitized the Loans in order to sell them.  Countrywide knew that the Securities were risky investments and would perform poorly, with a likelihood of substantial defaults and other performance problems, based on its knowledge of the Loans' servicing history and its experience with comparable loans.  It also knew that the marketplace would not accept such risky loans as whole loans.  Countrywide therefore decided to securitize the Loans and market them to Plaintiffs and other investors, knowing that it could entice investors such as Plaintiffs by providing misleading credit ratings and credit enhancement to

disguise the extremely risky underlying collateral.  Countrywide was motivated to securitize the Loans in order to generate profit from securitization and sale of the Securities, and it also wanted to transfer the risk of the mortgage loans from its balance sheets.

179.    Countrywide's underwriting practices also provide strong circumstantial evidence of conscious misbehavior or recklessness.  Countrywide's new corporate culture, created under the direction of Mozilo and Sambol, encouraged the writing of as many mortgage loans as possible—and with the highest interest rates and fees possible—regardless of the creditworthiness of the borrower.  Mozilo and Sambol concluded that profit growth through securitization required substantially increased levels of loan origination, and they guided Countrywide in driving up loan volume regardless of material deviations from the Company's stated underwriting guidelines.

180.    Countrywide's deteriorating underwriting practices enabled the processing of loan applications characterized by blatant borrower fraud, inadequate documentation, missing verifications (for example, of borrower assets and income), title defects, excessive debt-to-income ratios, inadequate credit scores, and other material violations of underwriting guidelines established by Countrywide and the industry.  These violations made Countrywide's related representations regarding the Mortgage Loans materially false and misleading.

181.    Countrywide ignored sound underwriting methodology and its own promises to investors in pursuit of profits, and it knew that its failure to uphold its own underwriting guidelines would result in the issuance of loans to borrowers that they would be unable to repay.  These failures fundamentally changed the Mortgage Loans' risk profile, as Countrywide knew, increasing the likelihood of losses through defaults compared with Plaintiffs' reasonable expectations and the performance of comparable mortgage-backed securities in the market.

67

182.    Countrywide knew or should have known that the statements it made to investors in the SPS1 and SPS2 offering documents contained material misrepresentations and omissions with regard to its underwriting practices.  Those statements were at odds with its practice of issuing highly risky mortgage loans to non-creditworthy borrowers, often without requiring adequate documentation to verify the borrowers' income or collateral.  Countrywide's public representations about its loan origination and servicing, in which the Company sought to reassure investors such as Plaintiffs of its prudent and diligent underwriting, were also at odds with the reality of Countrywide's business practices, as reflected by Countrywide's internal e-mails.

### 4.    The Individual Defendants' Motive and Opportunity to Commit Fraud on Plaintiffs

183.    The Individual Defendants, in particular, also had the motive and opportunity to commit fraud.  They benefitted from Countrywide's fraud, and their roles in perpetuating that fraud, in the form of increased revenue for the corporation they led, increased value of their own Countrywide stock holdings, and increased compensation, among other means.  Mozilo and Sambol knew facts and had access to information suggesting that their public statements, and the statements of the other Countrywide Defendants, were incorrect.  They failed to disclose that information to Plaintiffs and failed to investigate whether their statements and the Company's statements were correct.  Most importantly, the internal e-mails that they sent and received make abundantly clear that they knew and understood that Countrywide was loosening its loan-origination guidelines to the point of complete abandonment, yet they made no attempt to disclose such compromised guidelines to Plaintiffs and did little or nothing during the period that Plaintiffs purchased the Securities, through changes in corporate practices, to reverse the deterioration of underwriting guidelines.

184.    Mozilo and Sambol masterminded the "culture change" described herein, in which Countrywide abandoned its loan-origination guidelines and pressured employees to originate increasing volumes of loans, particularly risky and profitable non-conforming loans such as stated-income loans, in pursuit of ever-increasing market share and profitability.  This culture change came at the expense of Countrywide's borrowers and Plaintiffs, by drastically increasing the costs and risks of borrowers' loans and increasing the risk of Plaintiffs' investments.

185.    Mozilo and Sambol were closely involved in the daily management of all aspects of Countrywide's core operations, as indicated by Mozilo's statement during a conference call with analysts in 2005 that "I do participate every day in originations myself, and it keeps me apprised of what's happening."  Mozilo and Sambol were involved with Countrywide's management committees and its Board of Directors, which kept them apprised of developments in Countrywide's business practices and the mortgage industry.  For example, Sambol was a member of Countrywide's credit risk committee and attended quarterly committee meetings at which he received detailed presentations about Countrywide's increased credit risk from origination of riskier loans.  Mozilo and Sambol were hands-on in managing all aspects of Countrywide's core business operations, including setting the Company's loan origination guidelines, lending and underwriting practices; managing Countrywide's credit and liquidity risk; setting reserves for loan losses; and ensuring adequate internal controls.

186.    Mozilo and Sambol were also responsible for making or overseeing many of the public statements issued by Countrywide that contained material misrepresentations, such as the public statements cited herein.  Those statements contradicted the reality of Countrywide's business practices, showing that the Individual Defendants knew or should have known that their

69

statements were false and misleading and omitted to disclose material facts.  For example, in a July 2005 conference call with analysts, Mozilo said that "I'm not aware of any change of substance in underwriting policies" and "I'm not aware of any loosening of underwriting standards that creates less of a quality loan than we did in the past."  In fact, Mozilo knew or should have known that Countrywide had begun loosening its origination standards at that time, with a direct detrimental effect on the quality of its loans.

187.    Mozilo and Sambol masterminded, approved, and oversaw Countrywide's efforts to aggressively expand market share, including the loosening and abandonment of underwriting standards and the expansion into new and risky loan practices, which made Countrywide's market expansion possible.  As reflected in the e-mails quoted by the SEC, Mozilo and Sambol were keenly aware and involved with the Company's shift towards riskier underwriting practices.

188.    Sambol spearheaded the Company's lunge for growth, leading Countrywide's pursuit of subprime and other risky loans, which helped turn Countrywide into the nation's largest mortgage lender in terms of volume.  Current and former employees have stated that Sambol ignored warnings from risk-control managers at Countrywide that the Company's lending standards were too lax.  For example, a former employee reported that in late 2003, tensions between Mr. Sambol and Countrywide's risk managers boiled over at a meeting of dozens of executives in the Company's headquarters," during which Countrywide's chief investment officer, who was responsible for pricing loans and managing risks, "uttered a loud profanity and walked out of the meeting to protest what he saw as imprudent lending."  In another meeting, Sambol was reportedly "livid" because Countrywide's call-center employees were not selling enough adjustable-rate mortgages.

189.     As described above, internal Countrywide e-mails that were recently publicized by the SEC also show that Sambol was repeatedly warned about the severe risks that Countrywide was adopting by abandoning its loan-origination guidelines.  Sambol did not heed these warnings because he was single-mindedly driven by the desire to increase Countrywide's loan volume, market share, and profits.

190.     Sambol was particularly involved in the abandonment of Countrywide's underwriting guidelines as the President and COO of CHL, the Countrywide entity that was responsible for originating loans.  In that role, for example, Sambol oversaw the creation of the Exception Processing System, a software program that allowed Countrywide to override its lending criteria—as applied to credit scores, for example—in order to approve riskier loans.  In that role, Sambol also oversaw or knew of the incentive system whereby Countrywide loan officers were given bonuses in exchange for originating large volumes of risky but profitable loans.  In so doing, Sambol sent a clear message to underwriting employees that issuing loans was far more important than determining whether or not the loans should be made because of borrower creditworthiness.

191.     Mozilo and Sambol, along with other Countrywide executives, had access to sophisticated electronic databases that allowed them to obtain information about Countrywide's loan production status, including types of loans, volume, underwriting characteristics, and the number of loans approved based on underwriting exceptions.  Mozilo and Sambol also received detailed "Exception Reports" that summarized the loans that were granted as exceptions to Countrywide's origination guidelines, as described herein.  Through access to the Exception Reports, through reports from the company's chief credit risk officer regarding Countrywide's loan origination—which Plaintiffs were not privy to—and through their management of other

Countrywide personnel, Mozilo and Sambol knew or should have known that the Mortgage
Loans backing Plaintiffs' Securities did not conform to their represented characteristics.  Mozilo
and Sambol, and Countrywide generally, hid this knowledge from Plaintiffs.

192.    Mozilo frequently offered upbeat analyses of Countrywide's business practices
despite his apparent knowledge that Countrywide was abandoning its loan-origination standards.
For example, in April 2004, Mozilo distinguished Countrywide's "very, very good solid
subprime business" from the "frothy business [in which lenders] are taking 400 FICOs with no
documentation."  Mozilo declared Countrywide's "very strong disciplines in the origination of
sub-prime loans" and assured the market that "maintaining that discipline is critically important
to" Countrywide.  Mozilo concluded, "[W]hen you look at sub-prime, you have to look at it in
tranches, and we are at the high end of that tranche."

### H.    The Individual Defendants' Stock Sales During The Relevant Period

193.    Plaintiffs purchased the Securitizations from Countrywide between July and
October 2006, as set forth in Section D, above.  During this same period and extending through
the first quarter of 2007, Mozilo and Sambol aggressively liquidated their stock holdings at an
enormous personal profit.   During the last quarter of 2006 alone, Mozilo and Sambol sold
Countrywide stock worth $33.5 million and $6.6 million, respectively.  The suspicious timing
and circumstances of these sales constitute further evidence of the Individual Defendants'
scienter.

194.    In October 2006, Countrywide's Board of Directors authorized a share repurchase
program of up to $2.5 billion, signaling to the market that the Board believed Countrywide's
shares to be underpriced.  The market reaction to this announcement was swift.  From
November 2006 to February 2007, Countrywide's share price rose over $6.50 per share to arrive

72

at an all-time high of $45.03 per share on February 2, 2007. While publicly proclaiming Countrywide shares to be a bargain, however, Mozilo and Sambol were aggressively liquidating their stock holdings because they knew that the Company was headed for collapse as a result of its reckless lending practices.

195. In the fourth quarter of 2006 alone, Countrywide spent $1.5 billion repurchasing 38,639,876 shares with an average price of $38.83 per share. At the same time, Mozilo and Sambol sold over 1 million shares of Countrywide stock, to correspond with the repurchase program and increased share price, for profits of over $40 million.

| Defendant | Date Of Sales | Shares Sold | Proceeds |
|---|---|---|---|
| Mozilo | 11/1/06 -12/18/06 | 841,999 | $33,575,809.81 |
| Sambol | 10/4/06 -12/28/06 | 168,000 | $6,632,446.40 |
| **TOTALS** | | **1,009,999** | **$40,208,256.21** |

196. Then, in the second quarter of 2007, the Company spent an additional $900 million to repurchase 21,503,512 shares at an average price of $40.37 per share. At the same time, Mozilo and Sambol sold over 2.3 million shares of Countrywide stock for profits of over $87 million while the Company repurchased shares, as detailed in the chart below.

| Defendant | Date Of Sales | Shares Sold | Proceeds |
|---|---|---|---|
| Mozilo | 3/1/07 – 6/19/07 | 2,274,000 | $84,985,729.40 |
| Sambol | 3/7/07 – 6/27/07 | 65,375 | $2,406,639.39 |
| **TOTALS** | | **2,339,375** | **$87,392,368.79** |

197. In effect, Countrywide was supporting its stock price while allowing insiders such as Mozilo and Sambol to sell their personal Countrywide stock holdings at inflated prices. The repurchase program was an attempt to propel Countrywide forward (by steadying the stock price or sending it upward) for a period of time before the weight of the Company's abandonment of its loan origination practices began taking its toll on Countrywide's operations and the value of

its stock.  While this was going on, insiders such as Mozilo and Sambol were offloading their stock at enormous personal gain.  Having misled Plaintiffs and other investors about the state of Countrywide's origination practices throughout 2006, the Individual Defendants were aggressively liquidating their holdings at the end of the year, making themselves absurdly rich before the Company's reckless lending destroyed its stock value.

### I.  Defendant Mozilo Frequently Amended His Automatic Stock Sale Plan To Sell Additional Shares Shortly After Plaintiffs Purchased The Securities

198.    Mozilo's repeated modifications to his plans for trading Countrywide stock provide further evidence of his scienter with regard to the wrongdoing alleged herein.  Under Rule 10b5-1, insiders design pre-determined trading plans, through which they can be shielded from insider trading liability if they entered into the plans before becoming aware of the insider information.  Trading plans provide no defense if they are entered into after learning of insider information.

199.    Mozilo, however, repeatedly modified his plans, exercising over five million stock options and selling the underlying shares pursuant to four separate sales plans, realizing gains of over $139 million from November 2006 through October 2007.  As mentioned above, in June 2009 the SEC brought insider trading charges against Mozilo based on his sale of Countrywide stock.

200.    Mozilo repeatedly modified his 10b5-1 Plans during the latter part of 2006. Starting in September 2004, Mozilo had a Rule 10b5-1 trading plan that lasted through May 2006.  During this time period, Mozilo sold 52,500 shares once a week.  The timing and increments were consistent throughout the life of the plan.  This amounted to sales of about 200,000 to 250,000 shares per month.

201.    On October 27, 2006, just as the Board was approving the massive share
repurchase described above, Mozilo amended his automatic stock sale plan, which had expired in
May 2006, to allow him to sell 350,000 shares per month.  Six weeks later, on December 12,
2006, Mozilo initiated a second automatic stock sale plan to allow him to sell 115,000 more
shares per month.  One month later, on January 12, 2007, Countrywide reported that foreclosures
from the previous month soared 48 percent over that of 2005.

202.    Less than two months later, on February 2, 2007, Mozilo amended his second
automatic stock sales plan to allow him to sell an additional 115,000 shares per month, for a total
allowance of 580,000 shares of stock per month.  On this same date, shares of Countrywide hit
an all-time high of $45.03 per share, and remained well above $30 per share until July 26,
2007—the day before investors caught the first true glimmer of the Individual Defendants'
misconduct.

203.    The following diagram, published in *The Los Angeles Times* in October 2007,
illustrates Mozilo's repeated amendments of his supposedly "passive" stock sales program just
before the collapse of Countrywide's stock price:



**Mozilo's trading plans**

Angelo Mozilo adopted a stock trading plan Oct. 27, when the share price was $38.30. He filed a new plan Dec. 12 and revised it Feb. 2. Most executives avoid making changes quickly, experts say.

Countrywide's share price, daily closes

Feb. 2, 2007: $45.03

Dec. 12, 2006: $40.50

Oct. 27 2006: $38.30

Friday: $19.01

**Oct. 27, 2006:** New plan allows Mozilo to sell 350,000 shares a month.

**Dec. 12, 2006:** Mozilo files trading plan to sell an additional 115,000 shares a month.

**Feb. 2, 2007:** Mozilo amends plan, can now sell 580,000 shares a month. Countrywide stock trades at an all-time high.

*Sources: Bloomberg News, Countrywide, regulatory filings, Times research*

*Los Angeles Times*

204.    Besides lining his own pockets before Countrywide imploded, it appears that Mozilo made sure to enrich his senior staff by telling them about the timing of his sales. There was rampant insider trading among Countrywide personnel which coincided with Mozilo's changes to his Rule 10b5-1 plan and/or the announcement of Countrywide's stock buyback program.

205.    As illustrated in the following charts, insider sales more than doubled in November 2006 compared to October 2006 and stayed at an elevated level in December 2006 and January 2007, spiking in February 2007 after Mozilo amended his Rule 10b5-1 plan. For

example, the week after Mozilo changed his Rule 10b5-1 plan in February 2007, all of Countrywide's insiders (Form 4 filers) sold 1,139,222 shares of the Company's stock—675,986 shares of which were sold from February 2, 2007 through February 9, 2007 (the week after Mozilo's change).  This compares with only 636,686 shares sold in all of January 2007, the month prior, 629,147 shares sold in December 2006 and 749,655 shares in November 2006. Insiders sold more the week of February 2 through February 9 than they had sold during either of the two preceding months.  Moreover, the total sales for February 2007 were almost double the average of the preceding three months:





206.    Mozilo's blatant pattern and practice of trading based on material, nonpublic information, resulting in the recent charges by the SEC, reinforces the evidence of Mozilo's knowledge that Countrywide's business practices were fraudulent and likely to cause losses to the Company, Plaintiffs, and other investors.  Even as Mozilo and others at Countrywide were publicly representing that the Company was upholding its prudent underwriting standards, Mozilo knew based on insider information that the Company had  abandoned its underwriting guidelines, which would inevitably lead to losses.  Mozilo and other insiders sold huge numbers of shares in the period preceding Countrywide's decline to realize gains before the Company collapsed.

**J.    Plaintiffs' Reliance on Countrywide's Fraudulent Statements**

207.    In deciding to purchase the Securities, Plaintiffs relied on Countrywide's false representations and omissions of material fact regarding its underwriting standards and the characteristics of the Mortgage Loans underlying the Securities.  But for Countrywide's fraudulent representations and omissions—such as its representation that over 99 percent of the Mortgage Loans to be included in the Securitizations were applied to owner-occupied properties—Plaintiffs would not have purchased or otherwise acquired the Securities, because those representations and omissions were necessary to assure Plaintiffs that the Securities were safe investments.

208.    Plaintiffs reasonably relied upon Countrywide's representations in the SPS1 and SPS2 offering documents.  Plaintiffs did not know at the time it purchased the Securities, and could not have known, that Countrywide had loosened its underwriting guidelines to the point of abandoning those guidelines, leading to a drastic increase in the origination of risky loans.

Plaintiffs also did not know that Countrywide facilitated borrowers' fraudulent representations about material facts such as their stated income and stated intentions to live in the mortgaged properties, which caused Countrywide's representations to Plaintiffs to be false.  And Plaintiffs did not know that Countrywide had originally tried to sell the Mortgage Loans underlying the SPS1 and SPS2 Securitizations as whole loans.  If Plaintiffs had known these and other material facts regarding Countrywide's fraudulent misrepresentations and omissions of material fact, Plaintiffs would not have purchased the Securities.

209.    Countrywide's false statements and misrepresentations and omissions of material facts caused Plaintiffs to suffer losses on the Securities, because the Securities were in fact far riskier—and their rate of default far higher—than Countrywide had described them to be.  The Mortgage Loans underlying the Securities experienced default and delinquency at a much higher rate due to Countrywide's abandonment of its loan-origination guidelines.  Plaintiffs' losses have been much greater than they would have been if the Mortgage Loans were as Countrywide described them to be, as investments of a much higher quality.

**K.    Countrywide's Corrupt Practices are Publicly Revealed**

210.    Countrywide's campaign to increase loan origination revenue by lowering and ultimately abandoning its underwriting standards has been a disaster for its investors. Countrywide's market capitalization declined by more than 90 percent in just one year, losing $25 billion in value.  Bank of America acquired Countrywide on July 1, 2008, for just 27 percent of Countrywide's stated $15.3 billion book value.

211.    The scope and breadth of Countrywide's fraudulent schemes and other unlawful conduct have prompted a considerable number of public and private investigations and legal actions, including investigations by the FBI, SEC, and numerous states' attorneys general, as

well as dozens of lawsuits by investors, consumers, and employees.  The enormous volume of evidence of Countrywide's wrongdoing that is reflected in these investigations and actions reinforces that Countrywide's misrepresentations to Plaintiffs in this action were made with scienter, including Countrywide's representations in the Securities' offering documents and in Countrywide's communications with Plaintiffs.

212.    Most notably, the SEC Complaint against Mozilo, Sambol, and Eric Sieracki, Countrywide's former Chief Financial Officer, quotes extensively from internal e-mails written by Mozilo and others; along with the other evidence cited in the complaint, it is  highly probative of the Individual Defendants' scienter, as well as Countrywide generally.  Some of the same e-mails are publicized on the SEC website.

213.    The internal e-mails irrefutably demonstrate that Countrywide's executives knew that the Company was abandoning the origination guidelines and underwriting standards that were represented to the public and thereby exposing borrowers and investors to undue risk.  The correspondence occurred during the same period that Plaintiffs negotiated with Countrywide and invested in the Securities.

214.    The FBI is also currently investigating Countrywide's loan-origination practices to determine whether Countrywide committed securities fraud through misrepresentations in securities filings about the quality of its mortgage loans.

215.    Many states and municipalities have also commenced lawsuits against Countrywide.  The wrongdoing described in these actions reiterates the allegations in this complaint regarding the wrongdoing that permeated Countrywide's businesses during the period that Plaintiffs negotiated and invested in the Securities, which wrongdoing led to Plaintiffs'

losses.  The complaints underscore the fact that Countrywide's fraudulent conduct toward Plaintiffs reflected a broad, systemic breakdown in Countrywide's internal controls.

216.    The lawsuits include the following:

a.      In *People of the State of California v. Countrywide Financial Corp.,* the California Attorney General filed a civil action on behalf of Countrywide borrowers against Countrywide, Mozilo and Sambol, asserting statutory claims for false advertising and unfair competition based on defendants' plan to increase the volume of mortgage loans for securitization without regard to borrower creditworthiness.  The Attorney General alleged that defendants originated loans "with little or no regard to borrowers' long-term ability to afford them and to sustain homeownership," because "Defendants cared only about selling increasing numbers of loans at any cost, in order to maximize Countrywide's profits on the secondary market."  The lawsuit alleges that defendants misled consumers into accepting risky and costly loans while pressuring employees to "close as many loans as they could without regard to borrower ability to pay."

b.      In *People of the State of Illinois v. Countrywide Financial Corp.,* the Illinois Attorney General sued Countrywide and Mozilo on the basis of state consumer-protection and unfair-competition statutes.  The Attorney General alleged that

> Countrywide, in pursuit of market share, engaged in unfair and deceptive practices including the loosening of underwriting standards, structuring unfair loan products with risky features, engaging in misleading marketing and sales techniques, and incentivizing employees and brokers to sell more and more loans with risky features.  Countrywide's business practices resulted in unaffordable mortgage loans and increased delinquencies and foreclosures for Illinois homeowners.

Those same business practices that resulted in increased delinquencies resulted in the diminished value of Countrywide's mortgage-backed securities, as well, to the direct detriment of Plaintiffs.

c.     In *State of Connecticut v. Countrywide Financial Corp.,* the state Attorney General asserted that Countrywide violated state unfair and deceptive practices laws by deceiving consumers into obtaining mortgage loans which they were not suited for and could not afford.  The lawsuit alleges that Countrywide publicly stated that it would not "sacrifice sound business practices" to reach its market goals and that the Company "expressly or impliedly represented that it made loans to consumers that were suitable and affordable, and made its lending decisions based upon a consumer's ability to pay."  In reality, the lawsuit alleges, Countrywide made loans that "were not suitable and affordable, were not appropriate for consumers' specific situations, and were not made based on consumers' ability to pay."  As the Connecticut Attorney General said in a statement at the time of filing, "Countrywide conned customers into loans that were clearly unaffordable and unsustainable, turning the American dream of homeownership into a nightmare."

d.     In *Office of the Attorney General, Department of Legal Affairs, State of Florida v. Countrywide Financial Corp.,* the Florida Attorney General commenced a civil action against Countrywide and Mozilo pursuant to the state's Deceptive and Unfair Trade Practices Act.  The Attorney General alleged that Countrywide made public representations about the quality of its mortgage loans and its strict underwriting standards while in practice it originated loans for borrowers who were unqualified for them—even under Countrywide's reduced-documentation programs—and who could not afford to repay the loans.  The Attorney General alleged that Countrywide promoted fraud by rewarding its underwriters with bonuses for loan volume and threatening to fire underwriters for "attempting to verify a borrower's ability to pay, or otherwise impeding loan approval."  The Attorney General also asserted state securities-law claims, alleging that Countrywide sold mortgage-backed securities to investors based on

83

fraudulent misrepresentations about its underwriting standards and borrowers' ability to repay the loans.  With regard to Mozilo, the Attorney General alleged that he managed, controlled, and participated in Countrywide's activities and "had actual knowledge or knowledge fairly implied on the basis of objective circumstances, that the acts of the officers, employees, agents, and representatives of [Countrywide] were unfair or deceptive and/or prohibited by law."

       e.      In *State of Washington v. Countrywide Financial Corp.,* the Washington Attorney General asserted that Countrywide violated state anti-discrimination laws in 2005 and 2006 by engaging in racially-discriminatory lending.

       f.      In *State of Indiana v. Countrywide Financial Corp.,* Indiana asserted that Countrywide violated the state's unfair and deceptive practices laws by deceiving consumers into obtaining mortgage loans that they were not suited for and could not afford.

       g.      In *State of West Virginia v. Countrywide Financial Corp.,* the West Virginia Attorney General asserted claims against Countrywide and Mozilo for violations of state laws outlawing unconscionable and unfair and deceptive trade practices.  The Attorney General alleged that "consumers either were not told about or did not understand [the] risky, unconscionable products or terms" of the mortgage loans that Countrywide sold them, and that Countrywide "made unconscionable loans to consumers when they knew there was no reasonable probability of payment in full . . . ."

       h.      In *City of Cleveland v. Countrywide Financial Corp.,* the city asserted claims against Countrywide for, among other things, extending loans to borrowers when it knew that those borrowers could not afford to repay them.

            i.      In *City of San Diego v. Countrywide Financial Corp.,* the city asserted claims against Countrywide for engaging in predatory lending practices in violation of consumer-protection statutes.

    217.    Many of the lawsuits brought by states and municipalities against Countrywide have settled, with Countrywide agreeing to pay huge sums of money and restructure borrowers' home loans. California, Illinois, Florida and other states settled their claims against Countrywide in October 2008, in a deal that could be worth more than $8.4 billion and could help up to 390,000 homeowners. The California Attorney General announced that the settlement was likely to become the largest predatory-lending settlement in history. Bank of America agreed to the settlement on behalf of Countrywide, since the companies have merged. The agreement included a mandatory no-fee loan-modification program that would modify loan terms for borrowers who are seriously delinquent or at risk of becoming delinquent when their interest rates reset (in the case of adjustable-rate mortgages). As a condition of the settlement, Bank of America also promised to attempt to refinance borrowers into government-backed loans or to reduce borrowers' interest rates.

    218.    In May 2009, the Illinois Attorney General also announced that Countrywide Home Loans has agreed to pay $2.8 million to settle a lawsuit brought by Illinois in August 2008 for deceptively marketing home loans to buyers based on low "teaser" interest rates without disclosing the sharp increase in interest rates that followed. The settlement also requires Bank of America, with which Countrywide merged, to open negotiations with its remaining Illinois mortgageholders to rework their loans.

    219.    The state of New Jersey recently announced that it had settled allegations that Countrywide steered borrowers into risky loans. Countrywide agreed to work with New Jersey

borrowers to modify their loans and agreed not to begin foreclosure proceedings until the Company determines whether a borrower is staying in his or her home.

220.     In addition to these numerous actions by states or state officials, the Department of Justice and the U.S. Trustees for federal bankruptcy courts in several judicial districts, including the Districts of Rhode Island, Western Pennsylvania, Texas, Florida and Georgia, have commenced investigations into Countrywide's allegedly fraudulent foreclosure practices.  For example, in the Western District of Pennsylvania, Countrywide's practices were under investigation in connection with at least 300 debtors' proceedings in that district.  Similarly, the Assistant U.S. Trustee for the District of Rhode Island, in testimony about his investigation, explained that after reviewing cases filed since 2002, "we have a specific and grave concern" that Countrywide is trying to obtain money and property from debtors "under false pretenses." The U.S. Trustee for the District of Georgia filed suit against Countrywide, noting that "In recent years, Countrywide and its representatives have been sanctioned for filing inaccurate pleadings and other similar abuses within the bankruptcy system."

221.     Dozens of private actions have also been commenced against Countrywide, including shareholder actions alleging that Countrywide failed to disclose the expansion of its origination of higher-risk mortgage loans as well as consumer actions challenging Countrywide's lending practices.  The allegations in the other private actions regarding Countrywide's pattern of fraudulent underwriting and failure to disclose material information mirror the pattern of fraudulent behavior alleged herein.  In particular, the complaints reiterate Plaintiffs' allegations that Countrywide knew that its practices were corrupt and that it intentionally concealed the evidence of its wrongdoing through misrepresentations and omissions of material fact.  The

complaints underscore the fact that Countrywide's fraudulent conduct toward Plaintiffs reflected a broader, systemic breakdown in Countrywide's internal controls.

### L. **Plaintiffs' Damages Arising From Countrywide's Fraud**

222.     Countrywide's fraudulent representations and omissions directly caused tens of millions of dollars in damages to Plaintiffs.

223.     The drastic and rapid loss in value of Plaintiffs' Securities was primarily and proximately caused by Countrywide's issuance of loans to borrowers who could not afford them, in contravention of the prudent underwriting guidelines that Countrywide represented to Plaintiffs.  The loss in value was *not* due to the recent decline in the American housing market and mortgage-backed securities markets, as Countrywide alleged during its May 2007 conference call with Old Hill.  Those broader market declines occurred long after the Securities began to experience high rates of delinquency and default.   Instead, Countrywide issued the Loans to borrowers who Countrywide knew would not be able to repay the Loans, and the Loans materially failed to comply with the underwriting guidelines represented to Plaintiffs.  This caused high rates of delinquency and default that, in turn, reduced the income stream and market value of Plaintiffs' securities.

224.     The Mortgage Loans also failed to live up to other representations made by Countrywide, such as its representation that over 99 percent of the Mortgage Loans that would be included in the Securitizations were given to owner-occupied properties.  The fact that the Mortgage Loans were not applied to owner-occupied properties at a rate of 99 percent, which Countrywide knew at the time it sold the Securities to Plaintiffs, made the Mortgage Loans more prone to default than they would have been if the Loans had been as advertised.  Owners who do not occupy their properties are more likely to default on their loans, which made the Securities

that Plaintiffs purchased poorer investments, accelerated the Securities' decline in value, and greatly worsened Plaintiffs' losses.

225.    If the Loans that Countrywide pooled in the Securitizations had reflected the characteristics that Countrywide represented they possessed, the rates of default and decline on the Loans would have been much lower, the Securities would have preserved much more of their income stream and market value, and Plaintiffs' losses would have been far less.

226.    Countrywide's fraud proximately caused tens of millions of dollars in damages to Plaintiffs, in the form of lost principal and lost interest.  Footbridge and Opportunity have lost nearly their entire investment of approximately $43,375,000 in the Securities.  Plaintiffs have also suffered opportunity costs arising from the Securities in the form of financial and personnel resources that could otherwise have been directed towards non-fraudulent investments that would have offered better investment value.

227.    The precise amount of Plaintiffs' damages is to be determined at trial.

### FIRST CAUSE OF ACTION
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Countrywide Defendants)

228.    Plaintiffs reallege and incorporate each and every allegation contained above as if fully set forth herein.

229.    The Countrywide Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

230.    The Countrywide Defendants are each liable as primary participants in the wrongful conduct charged herein or as controlling persons, as described in Section F, "The Countrywide Defendants' Roles in the Securitizations," and elsewhere herein.

231.    The Countrywide Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Securitizations from Plaintiffs.  The course of conduct whereby the Countrywide Defendants concealed material information from Plaintiffs is reflected in the misrepresentations and omissions set forth in Section E, "Countrywide's Fraudulent Misrepresentations and Omissions Regarding the Securities," and elsewhere herein.  This course of conduct included, but was not limited to, Countrywide's failure to disclose the extent of its loosened underwriting practices, its misleading statements about its underwriting practices, its failure to disclose that it had unsuccessfully tried to market the Loans as whole loans, and its attempt to blame the Securities' decline in value on alleged real-estate speculators.

232.    The Countrywide Defendants conveyed these material misrepresentations and omissions to Plaintiffs through the use of interstate mail, electronic mail, and telephone conversations.  For example, Countrywide's May 2007 conference call with Old Hill, during which Countrywide sought to blame alleged real-estate speculators for the decline in value of the Securities, took place with participants in California, Connecticut, and New York.  At least some of the negotiations and transactions related to Plaintiffs' purchase of the Securities occurred between Plaintiffs' representatives in Connecticut and Countrywide employees in California, where Countrywide was headquartered and had offices.  In the course of those negotiations and

purchases, Countrywide transmitted documents containing material misrepresentations by e-mail between California and Connecticut.

233.    The Countrywide Defendants employed devices, schemes and artifices to defraud Plaintiffs while in possession of material, adverse, non-public information, including their failure to fully disclose the full extent of Countrywide's loosened loan-origination practices and their refusal to fully disclose information regarding the Mortgage Loans, as alleged in Section E and elsewhere herein.

234.    The Countrywide Defendants engaged in acts, practices, and a course of conduct in an effort to assure Plaintiffs of the value and investment potential of the Securitizations. Those efforts included making or participating in making untrue statements of material fact, as well as omitting material facts that were necessary to make its statements about the Securitizations, in the light of the circumstances under which they were made, not misleading. The Countrywide Defendants also engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs by, for example, issuing loans to borrowers that they knew or should have known could not afford to repay the loans, as alleged herein.

235.    The Countrywide Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.  The Countrywide Defendants' material misrepresentations and/or omissions of material facts were made knowingly or with a reckless disregard for the truth and for the purpose and effect of concealing their fraudulent business practices from Plaintiffs, as alleged herein.

236.    The Individual Defendants, in addition to the grounds for liability described herein as applied to the Countrywide Defendants generally, are also liable for Countrywide's fraud, both primarily and as controlling persons.  They were senior executives and Directors of Countrywide at all relevant times, they masterminded Countrywide's "culture change" toward profit maximization at the expense of stated underwriting standards, and they were privy to and participated in the dissemination of materially false and misleading statements and omissions of material fact on behalf of Countrywide.  Internal e-mails publicized by the SEC show that the Individual Defendants knew of and participated in Countrywide's abandonment of its loan-origination guidelines.  The e-mails also show that the Individual Defendants knew that Countrywide's loan-origination practices were increasing the risks for investors, such as Plaintiffs, who invested in the Company's mortgage-backed securities.  As senior executives in the Company, the Individual Defendants also knew or recklessly disregarded the fact that Countrywide made representations to Plaintiffs that were materially false and misleading and omitted material facts necessary to make the statements not misleading.

237.    As a result of the Countrywide Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs were misled into believing that the Securities were more creditworthy investments than they actually were.

238.    Plaintiffs purchased the Securities without knowing that Countrywide had misstated or omitted material facts about the Securitizations—for example, by misstating the percentage of Mortgage Loans applied to owner-occupied properties.  In purchasing the Securities, Plaintiffs relied directly or indirectly on false and misleading statements made by Countrywide, and/or an absence of material adverse information that was known to Countrywide or recklessly disregarded by it but not disclosed in Countrywide's public statements or its

communications with Plaintiffs.  Plaintiffs were damaged as a result of their reliance on Countrywide's false statements and misrepresentations and omissions of material facts.

239.    At the time of Countrywide's false statements, misrepresentations and omissions, Plaintiffs were ignorant of their falsity and believed them to be true.  Plaintiffs would not have purchased or otherwise acquired the Securities had they known the truth about Countrywide's abandonment of its loan origination guidelines, its decision to fill the Securitizations' pools with mortgage loans that it was unable to sell as whole loans, or the true percentage of owner-occupied properties corresponding to the Mortgage Loans.

240.    By virtue of the foregoing, the Countrywide Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

241.    As a direct and proximate result of Countrywide's wrongful conduct, Plaintiffs have suffered damages in connection with the purchase and subsequent sale and writing off of the Securities.

## SECOND CAUSE OF ACTION
### (Violation of Section 20(a) of the Securities Exchange Act of 1934 Against the Individual Defendants)

242.    Plaintiffs reallege and incorporate each and every allegation contained above as if fully set forth herein.

243.    Each of the Countrywide Defendants is liable as a direct participant and primary violator with respect to the wrongdoing discussed in this Second Amended Complaint.  In addition, the Individual Defendants, by reason of their status as senior executive officers and Directors of Countrywide, directly or indirectly controlled the conduct of Countrywide's business and its representations to Plaintiffs, including its representations through investor forums, SEC filings, and other public communications, within the meaning of § 20(a) of the

Exchange Act. The Individual Defendants, again by reason of their status as senior executive officers and Directors of Countrywide, directly or indirectly controlled the content of the SPS1 and SPS2 PSAs, Preliminary Term Sheets, Prospectuses and Prospectus Supplements, and other documents provided by Countrywide to Plaintiffs related to their investments in the Securities, within the meaning of § 20(a) of the Exchange Act. Therefore the Individual Defendants are jointly and severally liable for Countrywide's fraud, as alleged herein.

244.     The Individual Defendants, as senior executive officers and directors of Countrywide, had regular access to non-public information about Countrywide's business, operations, and performance via their access to internal corporate documents and information and through communications with Countrywide officers, board members, and employees. Moreover, because of the Individual Defendants' high-level management positions within Countrywide, they controlled and/or had the authority to control the content of certain of Countrywide's documents, including the Securities' PSAs and Prospectuses, which Plaintiffs allege contained material misstatements. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review those documents prior to their issuance and therefore knew or should have known that those documents contained misrepresentations. The Individual Defendants also made public statements on behalf of Countrywide, such as comments at investor presentations, which Plaintiffs relied upon. The Individual Defendants reviewed or could have reviewed these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected. Mozilo and Sambol also created, reviewed, or could have reviewed public statements by Countrywide in SEC filings, press releases, and other documents that Plaintiffs relied upon.

245.     The Individual Defendants knew or recklessly disregarded the risks associated with abandoning Countrywide's loan-origination guidelines, filling the Securitizations with loans that Countrywide knew were unlikely to perform well, and other wrongdoing, as evidenced by internal Countrywide e-mails and described more fully herein.  Defendants also knew or recklessly disregarded the fact that Countrywide's representations about the Securitizations were materially false and misleading and/or omitted material facts when made.  In so doing, the Individual Defendants did not act in good faith.

246.     By virtue of their high-level positions and their participation in and awareness of Countrywide's operations and public statements, the Individual Defendants were able to and did influence and control Countrywide's decision-making, directly or indirectly, including controlling the content and dissemination of the documents that Plaintiffs contend contained materially false and misleading information and on which Plaintiffs relied.  The Individual Defendants had the ability to prevent the issuance of the false statements or to cause the statements to be corrected, but they did not do so.

247.     The Individual Defendants had direct and supervisory involvement in Countrywide's day-to-day operations through, among other means, their duties as the highest-level officers of Countrywide; their positions on Countrywide Board of Directors committees that monitored and planned Countrywide's risk management and other activities; and their participation in meetings about Countrywide's credit risks and losses arising from its lending practices.  Because of their intimate involvement in Countrywide's management, the Individual Defendants had the power to control or influence the particular transactions giving rise to the securities violations alleged herein.

248.    As set forth above, Countrywide and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged in this Second Amended Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to § 20(a) of the Exchange Act.

249.    As a direct and proximate result of Defendants' wrongful conduct, including the wrongful conduct of the Individual Defendants, Plaintiffs suffered damages in connection with their purchase of the Securities.

### THIRD CAUSE OF ACTION
### (Common-Law Fraud Against the Countrywide Defendants)

250.    Plaintiffs reallege and incorporate each and every allegation contained above as if fully set forth herein.

251.    Countrywide has made fraudulent and false statements of material fact, and has omitted material facts necessary in order to make its statements, in light of the circumstances under which they were made, not misleading, as alleged in Section E and elsewhere herein. Countrywide knew at the time it entered into each agreement that the foregoing statements were false or, at the very least, made recklessly, without any belief in the truth of the statements.

252.    Countrywide's misrepresentations of facts, and omissions of fact that caused other statements of fact to be misleading, relate to its own acts and omissions.  It was only by making such representations that Countrywide was able to induce Plaintiffs to purchase the Securities. Plaintiffs would not have purchased or otherwise acquired the Securities but for Countrywide's fraudulent representations and omissions about the Securities' quality, such as the representation that over 99 percent of the Mortgage Loans that would be included in the Securitizations were applied to owner-occupied properties and the representation that over 90 percent of the Loans were Grade A in quality.

253.     Countrywide intended to defraud Plaintiffs.  Countrywide knew that Plaintiffs were relying on its expertise, and it encouraged such reliance through the offering documents, during the parties' May 2007 conference call and other communications, and through its public representations, as described herein.  Countrywide knew that Plaintiffs would rely upon its representations in connection with Plaintiffs' decision to purchase the Securities.  Based on Countrywide's expertise and specialized knowledge, and in light of its false and misleading representations, Countrywide owed a duty to Plaintiffs to disclose material facts about the Securitizations.  Countrywide breached this duty by knowingly providing false information to Plaintiffs, with the intent of misrepresenting its origination practices and thereby persuading Plaintiffs to invest in Countrywide's Securities.

254.     Plaintiffs or their predecessors justifiably, reasonably, and foreseeably relied on Countrywide's representations and false statements regarding the Mortgage Loans and the Securities.  Countrywide's representations substantially influenced Plaintiffs' decision to purchase the Securities.  As Countrywide knew, Plaintiffs would not have purchased or otherwise acquired the Securities had they known that Countrywide's representations about the Mortgage Loans and the Securities were false and misleading and that Countrywide had omitted material information about the Loans and Securities.

255.     As a result of Countrywide's false and misleading statements and omissions, as alleged herein, Plaintiffs have suffered damages that include, but are not limited to, an almost total loss of their investment in the Securities, as well as lost interest payments and lost opportunity costs.

256.     Because Countrywide committed these acts and omissions maliciously, wantonly and oppressively, and because the consequences of Countrywide's acts knowingly affected the

general public, including but not limited to all persons with interests in the Securitizations, Plaintiffs are entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION
### (Successor Liability Against the Bank of America Defendants)

257.    Plaintiffs reallege and incorporate each and every allegation contained above as if fully set forth herein.

258.    The Bank of America Defendants are liable for Countrywide's wrongdoing, in its entirety, as alleged herein, because they are Countrywide's successors, as set forth in the agreements governing the Securitizations and at common law.

259.    CFC, an individual Countrywide Defendant and the parent of the wholly-owned subsidiaries that comprise the other Countrywide Defendants (except for the Individual Defendants), merged into a wholly-owned Bank of America subsidiary on July 1, 2008.  CFC's shares were delisted on the New York Stock Exchange that month.  CFC and its wholly-owned subsidiaries are in the final stages of becoming fully combined with Bank of America's operations.  (The Countrywide Defendants initially retained their pre-merger names because the Bank of America subsidiary was renamed Countrywide Financial Corporation upon execution of the merger, but the Countrywide Defendants are now in the final stages of combining their businesses with Bank of America's).

260.    The Bank of America Defendants are liable for Countrywide's wrongdoing, in its entirety, under New York common law, because Bank of America and Countrywide merged or consolidated, because Bank of America has expressly or impliedly assumed Countrywide's tort liabilities, and because the Bank of America Defendants are a mere continuation of the Countrywide Defendants.

261.    Bank of America and Countrywide have confirmed publicly that they have merged.  For example, the Bank of America website announced that the companies merged, and the now-discontinued Countrywide website previously redirected inquiries about the merger to the same Bank of America webpage regarding the merger.  Bank of America noted on its website that it was "combining the valuable resources and extensive product lines of both companies." In addition, the former Countrywide web address, www.countrywide.com, now takes users to the Bank of America website.

262.    In its 2008 Annual Report, Bank of America confirmed that "On July 1, 2008, we acquired Countrywide through its merger with a subsidiary" of the bank.  Bank of America stated that the merger "significantly improved our mortgage originating and servicing capabilities, making us a leading mortgage originator and servicer."  In the Q&A section of the same report, the question was posed:  "How do the recent acquisitions of Countrywide and Merrill Lynch fit into your strategy?"  Bank of America responded that by acquiring Countrywide it became the "No. 1 provider of both mortgage originations and servicing" and "as a *combined* company," it would be recognized as a "responsible lender who is committed to helping our customers become successful homeowners" (emphasis added).  Similarly, in a July 1, 2008 Countrywide press release, Mozilo stated that "the *combination* of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world" (emphasis added).

263.    As is customary in large corporate mergers, at least some of the Countrywide Defendants retained their pre-merger corporate names following their merger with Bank of America.  However, Countrywide's operations are becoming fully merged into Bank of America's and the Countrywide entities will soon lose any independent identity they have

maintained following the merger.  In a January 2008 press release announcing the "proposed merger" with Countrywide, Bank of America noted that it planned to operate Countrywide separately "under the Countrywide brand," and that integration would occur in 2009.

264.     In a July 2008 Bank of America press release, Barbara Desoer, identified as the president of the "combined mortgage, home equity and insurance businesses" of Bank of America and Countrywide, said "Now we begin to combine the two companies and prepare to introduce our new name and way of operating."  The press release stated that the bank "anticipates substantial cost savings from combining the two companies.  Cost reductions will come from a range of sources, including the elimination of positions announced last week, and the reduction of overlapping technology, vendor and marketing expenses.  In addition, the company is expected to benefit by leveraging its broad product set to deepen relationships with existing Countrywide customers."

265.     In an April 27, 2009 press release, Bank of America announced that CHL would be rebranded as Bank of America Home Loans, which would represent the "combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans, which Bank of America acquired on July 1, 2008," and that the CHL brand would be retired.  The press release explained that Bank of America was in the process of rebranding former Countrywide "locations, account statements, marketing materials and advertising" as Bank of America Home Loans, and stated that "the full systems conversion" to Bank of America Home Loans would occur later in 2009.  "Bank of America Home Loans" is thus a direct continuation of Countrywide's operations, although the Bank of America Defendants have represented that Bank of America Home Loans is a "trade name" rather than a separate legal entity.  It is a Bank of America trade name or brand and thus a part of Bank of America.

266. Mortgage contracts and legal documents state that BAC Home Loans Servicing, LP is the entity "formerly known as" CHLS, which clearly shows that BAC Home Loans Servicing, LP is the direct successor to CHLS, since it is a mere continuation of CHLS's business. The evidence regarding Bank of America Home Loans and BAC Home Loans Servicing, LP reiterates the fact that Countrywide is combining with Bank of America and that Bank of America is Countrywide's successor.

267. Desoer, the new president of Bank of America's combined mortgage business, was also interviewed for the May 2009 issue of *Housing Wire* magazine. The article reported that

> While the move to shutter the Countywide name is essentially complete, the operational effort to integrate across two completely distinct lending and service systems is just getting under way. One of the assets [Bank of America] acquired with Countywide was a vast technology platform for originating and servicing loans, and Desoer says that the bank will be migrating some aspects of [bank of America]'s mortgage operations over to Countrywide's platforms.

Desoer was quoted as follows: "We're done with defining the target, and we're in the middle of doing the development work to prepare us to be able to do the conversion of the part of the portfolio going to the legacy Countywide platforms." Desoer explained that the conversion would happen in the "late fall" of 2009, and that the integration of the Countrywide and Bank of America platforms was a critical goal.

268. On information and belief, the real property of Countrywide has been transferred or assumed by the Bank of America Defendants. Bank of America employs the former employees and management personnel of Countrywide, it has assumed Countrywide's contracts, including Countrywide's customer service contracts, and it has retired the "toxic" Countrywide name. In sum, and as widely reported in the press, Bank of America is completing its merger of

its mortgage operations and related business operations with those of the former Countrywide entities into a single business.

269.    Bank of America has generated substantial earnings from the absorption of Countrywide's mortgage business.  For example, a Bank of America press release regarding the company's 2009 first quarter earnings stated that "[n]et revenue nearly quadrupled to $5.2 billion primarily due to the acquisition of Countrywide and from higher mortgage banking income as lower interest rates drove an increase in mortgage activity."  Bank of America's President and Chief Executive Officer, Kenneth D. Lewis, was quoted as saying, "We are especially gratified that our new teammates at Countrywide and Merrill Lynch had outstanding performance that contributed significantly to our success."  A press release regarding Bank of America's 2009 second quarter earnings similarly stated that "[n]et revenue rose mainly due to the acquisition of Countrywide and higher mortgage banking income as lower interest rates spurred an increase in refinance activity."  The press release explained that "higher mortgage banking income, trading account profits and investment and brokerage services income reflected the addition of Merrill Lynch and Countrywide."  Bank of America reported that its average retail deposits in the quarter increased $136.3 billion, or 26 percent, from a year earlier, including $104.3 billion in balances from Merrill Lynch and Countrywide.  Plainly, Bank of America has profited substantially from its merger with Countrywide.

270.    Following its merger with Countrywide, Bank of America has also taken steps to expressly and impliedly assume Countrywide's liabilities.  In an interview published on February 22, 2008 in the legal publication *Corporate Counsel*, a Bank of America spokesperson outright admitted that the Company had assumed Countrywide's liabilities:

Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country. Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations. *"We bought the company and all of its assets and liabilities," spokesman Scott Silvestri says. "We are aware of the claims and potential claims against the company and have factored these into the purchase."* (emphasis added).

Thus, Bank of America has officially acknowledged that it has assumed Countrywide's assets *and* liabilities. In purchasing Countrywide for 27 percent of its book value, Bank of America was fully aware of the pending claims and potential claims against Countrywide and factored them into the transaction.

271. Bank of America has made additional statements implying that it has assumed the liabilities of Countrywide. In a press release announcing the merger, Mr. Lewis stated that he was aware of the "issues within the housing and mortgage industries" and said that "the transaction [with Countrywide] reflects those challenges," which suggests that Lewis recognized that Bank of America was taking on Countrywide's liabilities in the merger.

272. Similarly, Mr. Lewis was recently quoted in an article reporting on the acquisition of Countrywide, in which he showed that Bank of America knew of Countrywide's legal liabilities and impliedly accepted them as part of the cost of the acquisition:

"We did extensive due diligence. We had 60 people inside the company for almost a month. It was the most extensive due diligence we have ever done. So we feel comfortable with the valuation," Mr. Lewis said. "We looked at every aspect of the deal, *from their assets to potential lawsuits* and we think we have a price that is a good price." (Emphasis added).

273. Pursuant to its assumption of Countrywide's liabilities, Bank of America has paid to restructure certain of Countrywide's home loans on its behalf, including settling the predatory-lending lawsuits brought by eleven state attorneys general, described above, by agreeing to modify up to 390,000 Countrywide loans. The settlement agreement was valued at up to $8.4

102

billion.  Bank of America also restructured 300,000 home loans in 2008, of which 87 percent had been made or serviced by Countrywide.

274.    For the reasons stated herein, under the terms of the PSAs that govern the Securitizations and common law, the Countrywide Defendants and the Bank of America Defendants are each jointly and severally liable for Countrywide's wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for relief as follows:

An award of damages against Defendants, in an amount to be proven at trial, but including at a minimum:

a.    Plaintiffs' losses, including lost principal, lost interest payments, and lost opportunities;

b.    Punitive damages for Plaintiffs' common-law fraud claim;

c.    Attorneys' fees and costs;

d.    Prejudgment interest at the maximum legal rate; and

e.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues triable by jury.

DATED:   New York, New York
         August 4, 2009

                              QUINN EMANUEL URQUHART OLIVER &
                              HEDGES, LLP


                              By: _____
                                  Daniel L. Brockett
                                  David D. Burnett
                                  51 Madison Avenue, 22nd Floor
                                  New York, New York  10010-1601
                                  Telephone:  (212) 849-7000
                                  Fax:  (212) 849-7100
                                  danbrockett@quinnemanuel.com
                                  daveburnett@quinnemanuel.com

                                  Marshall M. Searcy III (admitted pro hac
                                  vice)
                                  Scott R. Commerson (admitted pro hac
                                  vice)
                                  865 S. Figueroa St. 10th Floor
                                  Los Angeles, California 90017
                                  Telephone:  (213) 443-3000
                                  Fax:  (213) 443-3100
                                  marshallsearcy@quinnemanuel.com
                                  scottcommerson@quinnemanuel.com

                                  *Attorneys for Plaintiffs Footbridge Limited
                                  Trust and OHP Opportunity Limited Trust*