Lloyd Winawer (State Bar No. 157823)
lwinawer@goodwinprocter.com
**GOODWIN PROCTER LLP**
10250 Constellation Boulevard, 21st Floor
Los Angeles, CA 90067
Telephone: 310-788-5177
Facsimile: 310-286-0992

Brian E. Pastuszenski (*pro hac vice*)
bpastuszenski@goodwinprocter.com
Inez H. Friedman-Boyce (*pro hac vice*)
ifriedmanboyce@goodwinprocter.com
Brian C. Devine (State Bar No. 222240)
bdevine@goodwinprocter.com
**GOODWIN PROCTER LLP**
53 State Street
Boston, MA 02109-2802
Telephone: 617-570-1000
Facsimile: 617-523-1231

*Attorneys for Defendants*
Countrywide Financial Corp.,
Countrywide Home Loans, Inc., CWALT,
Inc., CWMBS, Inc., CWABS, Inc.,
CWHEQ, Inc., Countrywide Capital
Markets, Countrywide Securities Corp.,
and N. Joshua Adler

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAINE STATE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTRYWIDE FINANCIAL CORPORATION, et al., <br><br> Defendants. | Case No. 2:10-CV-00302-MRP (MANx) <br><br> **COUNTRYWIDE DEFENDANTS' THIRD NOTICE OF RECENT AUTHORITY IN SUPPORT OF MOTION TO DISMISS** <br><br> Date: October 18, 2010 <br> Time: 1:00 p.m. <br> Courtroom: 12 <br> Judge: Hon. Mariana R. Pfaelzer |

Following up on the arguments made at yesterday's hearing on the pending motion to dismiss, the Countrywide Defendants respectfully notify the Court of today's final opinion in *In re Wells Fargo Mortgage-Backed Certificates Litig.*, No. 09-CV-01376-LHK (N.D. Cal. Oct. 19, 2010) ("*Wells Fargo*") (attached hereto as Exhibit A),[1] and submit the transcript of proceedings held and rulings made on September 22, 2010 in *NECA-IBEW Health and Welfare Fund v. Goldman, Sachs & Co.*, No. 08-CV-10783-MGC (S.D.N.Y. Sept. 22, 2010) ("*NECA-IBEW*") (attached hereto as Exhibit B).

In *Wells Fargo*, Judge Koh of the United States District Court for the Northern District of California dismissed with prejudice claims under the Securities Act of 1933 on behalf of a putative class of investors in 10 offerings of mortgage-backed securities ("MBS") issued by Wells Fargo.  The Countrywide Defendants respectfully draw the Court's attention to the following passages in *Wells Fargo*:

- "In *American Pipe* . . . the Supreme Court remarked that the Ninth Circuit was 'careful to note' that 'maintenance of the class action was denied *not* for . . . lack *of standing* of the representative. . . .'  Thus, *American Pipe* did not address the precise situation presented here.  In this case, unlike in *American Pipe*, the *Detroit* and *New Orleans* plaintiffs lacked standing to bring claims regarding the ten revived Offerings."  Ex. A at 6 (emphasis in original).

- "Consistent with the analysis in *American Pipe* and cases applying it, the Court finds that the facts in this case counsel against tolling the statute for the revived claims of the New Plaintiffs.  Unlike the new plaintiffs in *Flag Telecom* or *Enron*, the New Plaintiffs here had no reason to rely on the filing of the *Detroit* and *New Orleans* complaints to protect their claims.  The original complaints *did not allege that the named plaintiffs had any*

---

[1] At yesterday's hearing, counsel referenced a tentative order that had been issued in *Wells Fargo* on October 5, 2010.  The attached final order (which superseded the tentative order of October 5) was issued today, on October 19, 2010.

COUNTRYWIDE DEFENDANTS' THIRD NOTICE OF RECENT AUTHORITY

*ownership interest in the 37 dismissed Offerings*.  Thus, review of these complaints would have revealed that the Plaintiffs in the *Detroit* and *New Orleans* actions had *no standing* to bring claims as to the 37 dismissed Offerings."  Ex. A at 8 (emphasis added).

- "While the Court finds the *Walters* and *Palmer* decisions instructive, it is unnecessary to decide today that it is beyond the power of the Court to toll the statute of limitations where the lead plaintiff lacks standing.  Rather, the Court finds that *American Pipe* and the cases interpreting it support the declination to extend tolling to claims *over which the original named Plaintiffs asserted no facts supporting standing*.  As a result, the Court must dismiss the ten revived Offerings."  Ex. A at 10 (emphasis added).

- "The March 27, 2009 *Detroit* complaint and the April 13, 2009 *New Orleans* complaint stated many of the same factual bases now alleged in the ACC regarding these Offerings.  Specifically, these complaints cite to the same Registration Statements and Prospectuses (Offering Documents), and many of the same alleged misrepresentations and omissions within those Offering Documents. . . .  Although the ACC expands upon the allegations . . . the Court finds that the information in the original *Detroit* and *New Orleans* Complaints was sufficient to make New Plaintiffs aware of the basis for their claims. . . .  [T]he Court finds that New Plaintiffs knew or should have known of the basis for the revived claims more than a year before the ACC was filed on May 28, 2010. . . .  If the *Detroit* and *New Orleans* plaintiffs were first 'plausibly' on notice as of May 2008, and were able to file complaints alleging the basis for their claims as of March and April the following year, this indicates that a reasonably diligent investor should have been able to do the same."  Ex. A at 10-11.

In *NECA-IBEW*, Judge Cedarbaum clarified her earlier ruling on standing dated January 28, 2010 (which is attached to the Countrywide Defendants' motion to

dismiss as Exhibit 35).  The Countrywide Defendants respectfully draw the Court's attention to the following excerpts from the September 22, 2010 hearing transcript:

- "THE COURT:  But those are all—none of those has yet happened.

  MR. LEAHY:  Not to the particular tranche that my client—

  THE COURT:  That's what we are talking about; *that's all you can sue for, your own, not someone else's.*

  MR. LEAHY:  Actually, your Honor, we're suing on behalf of all purchasers of the trust, all tranches at this particular point.

  THE COURT:  But I have ruled against you on that already.  I have held that you must—*you may only represent the same certificate, not other people's purchases.*

  MR. LEAHY:  That's not how we understand your Honor's order.

  THE COURT:  Well, *that was my understanding of how I ruled. . . .*  To be a class representative, *you can only represent the class of persons or entities that purchased the particular—the certificate from the particular tranche from the particular trust that you purchased.*

  MR. LEAHY:  Your Honor, actually, your earlier ruling was a little bit bigger than that.  You basically said you can only sue on behalf of trusts that you purchased in.  So we're only suing on behalf all purchasers in the two trusts that my client bought in.

  THE COURT:  Right.  *But it must be the same tranche as yours. . . .  [T]he effects are very different in different tranches. . . .*  And that's why in a class action the class has to be in the same position, basically."  Ex. B at 7:10-8:21 (emphasis added).

- "THE COURT:  . . . And if, indeed, there are fewer than 100 people who bought what the plaintiff bought, there may not be a class action here . . . I am raising my own tentative view that fewer than 100 people bought each of these certificates in any particular tranche.  We really do not have a viable

3

1    class.  I do not know how many cases have addressed that particular issue."

2        Ex. B at 57:12-14, 58:8-11.

3        Finally, in response to the Court's questions regarding the existence of state law

4    claims in the state court litigation, the Countrywide Defendants respectfully notify the

5    Court that no state law claims were asserted in any complaints filed in either the

6    *Luther* or the *Washington State* action.[2]

7

8

9    Dated:  October 19, 2010                **GOODWIN PROCTER LLP**

10                                           /s/ Brian E. Pastuszenski

11                                           Brian E. Pastuszenski (*pro hac vice*)
                                             Lloyd Winawer (State Bar No. 157823)
12                                           Inez H. Friedman-Boyce (*pro hac vice*)
                                             Brian C. Devine (State Bar No. 222240)

13                                           *Counsel for the Countrywide Defendants*

14

15

16

17

18

19

20

21

22

23

24

25

26   _____

27   [2] The First Amended Complaint in *Luther*, filed on September 9, 2008 and submitted
     as Ex. 26 to the Countrywide Defendants' Request for Judicial Notice, had attached to
     it a complaint from another action that asserted state law claims.  But, the *Luther* and
28   *Washington State* plaintiffs themselves did not assert any state law claims.

4

**PROOF OF SERVICE**

I, Britani N. Selzler, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 601 S. Figueroa Street, suite 4100, Los Angeles, CA 90017.

On October 19, 2010, I served the following documents by placing a true copy thereof in a sealed envelope(s) on the persons listed on the service list below:

**COUNTRYWIDE DEFENDANTS' THIRD NOTICE OF RECENT AUTHORITY IN SUPPORT OF MOTION TO DISMISS**

☑      (CM/ECF Electronic Filing) I caused the above document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth above pursuant to Fed.R.Civ.P.5(d)(1). "A Notice of Electronic Filing (NEF) is generated automatically by the ECF system upon completion of an electronic filing. The NEF, when e-mailed to the e-mail address of record in the case, shall constitute the proof of service as required by Fed.R.Civ.P.5(d)(1). A copy of the NEF shall be attached to any document served in the traditional manner upon any party appearing pro se."

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction this service was made and that the foregoing is true and correct.

Executed on October 19, 2010, at Los Angeles, California.


_____              _____
    Britani N. Selzler                              (Signature)
   (Type or print name)

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

1

PROOF OF SERVICE

**SERVICE LIST**

**MAINE STATE RETIREMENT SYSTEM v.
COUNTRYWIDE FINANCIAL CORPORATION, et al.**

**CASE NO. CV-10-00302-MRP-(MAN)**

| | |
|---|---|
| Christopher Lometti<br>Daniel B. Rehns<br>Joel P. Laitman<br>**COHEN MILSTEIN SELLER & TOLL PLC**<br>88 Pine Street 14th Floor<br>New York, NY 10005 | *Attorneys for Lead Plaintiffs::*<br>**Iowa Public Employees' Retirement System** *Individually and On Behalf of All Other Similarly Situated*<br><br>Tel: 212-383-7797<br>Fax: 212-838-7745<br>clometti@cohenmilstein.com<br>drehns@cohenmilstein.com<br>jlaitman@cohenmilstein.com |
| Joshua S. Devore<br>Matthew B. Kaplan<br>S Douglas Bunch<br>Steven J. Toll<br>Julie G. Reiser<br>**COHEN MILSTEIN HAUSFELD & TOLL PLLC**<br>1100 New York Avenue NW West Tower Suite 500<br>Washington, DC 20005-3964 | Tel: 202-408-4600<br>Fax: 202-408-4699<br>jdevore@cohenmilstein.com<br>mkaplan@cohenmilstein.com<br>dbunch@cohenmilstein.com<br>stoll@cohenmilstein.com<br>jreiser@cohenmilstein.com |
| Michael M. Goldberg<br>**GLANCY BINKOW & GOLDBERG LLP**<br>1801 Avenue of the Stars Suite 311<br>Los Angeles, CA 90067 | Tel: 310-201-9150<br>Fax: 310-201-9160<br>mmgoldberg@glancylaw.com |
| Christina A. Royce<br>Daniel S. Drosman<br>Lauren G. Kerkhoff *<br>Scott H. Saham<br>Spencer Alan Burkholz<br>Thomas E. Egler<br>**ROBBINS GELLER RUDMAN & DOWD LLP**<br>655 West Broadway Suite 1900<br>San Diego, CA 92101 | *Attorneys for Plaintiff:*<br>**Maine State Retirement System** *Individually and On Behalf of All Others Similarly Situated*<br><br>Tel: 619-231-1058<br>Fax: 619-667-7056<br>croyce@rgrdlaw.com<br>ddrosman@rgrdlaw.com<br>lkerkhoff@rgrdlaw.com<br>scotts@rgrdlaw.com<br>spenceb@rgrdlaw.com<br>tome@rgrdlaw.com |
| Andrew L Zivitz<br>Jennifer L Joost<br>Sharan Nirmul<br>Sean M Handler<br>Lauren Wagner Pederson*<br>**BARROWAY TOPAZ KESSLER MELTZER & CHECK LLP**<br>280 King of Prussia Road<br>Radnor, PA 19087 | Tel: 610-667-7706<br>Fax: 610-667-7056<br>azivitz@btkmc.com<br>jjoost@btkmc.com<br>snirmul@btkmc.com<br>shandler@btkmc.com |

Goodwin Procter LLP<br>10250 Constellation Blvd., 21ˢᵗ Floor<br>Los Angeles, California 90067

PROOF OF SERVICE

*Goodwin Procter LLP*
*10250 Constellation Blvd., 21st Floor*
*Los Angeles, California 90067*

| | |
|---|---|
| Arthur L. Shingler , III<br>**SCOTT AND SCOTT LLP**<br>6424 Santa Monica Boulevard<br>Los Angeles, CA 90038 | *Attorney for Movant:*<br>**Putnam Bank**<br><br>Tel: 213-985-1274<br>Fax: 213-985-1278<br>ashingler@scott-scott.com |
| Avi N. Wagner<br>**THE WAGNER FIRM**<br>1801 Avenue of the Stars Suite 307<br>Los Angeles, CA 90067 | *Attorneys for Movant:*<br>**United Methodist Churches Benefit Board, Inc.**<br><br>Tel: 310-491-7949<br>Fax: 310-491-7949<br>avi@thewagnerfirm.com |
| Ira M. Press<br>Randall K. Berger<br>**KIRBY MCINERNEY LLP**<br>825 Third Avenue 16th Floor<br>New York, NY 10022 | Tel: 212-317-6600<br>Fax: 212-751-2540<br>ipress@kmllp.com<br>rberger@kmllp.com |
| Spencer Alan Burkholz<br>**ROBBINS GELLER RUDMAN & DOWD LLP**<br>655 West Broadway Suite 1900<br>San Diego, CA 92101 | *Attorneys for Movants:*<br>**Maine Public Employees Retirement System, Operating Engineers Annuity Plan, Pension Trust Fund for Operating Engineers, Vermont Pension Investment Committee, Washington State Plumbing & Pipefitting Pension Trust**<br><br>Tel: 619-231-1058<br>Fax: 619-667-7056<br>spenceb@rgrdlaw.com |
| Azra Z. Mehdi<br>**MILBERG LLP**<br>300 South Grand Avenue, Suite 3900<br>Los Angeles, CA 90071 | **Mashreqbank, P.S.C.**<br><br>Tel: 213-617-1200<br>Fax: 213-617-1975<br>amehdi@milberg.com |

3

PROOF OF SERVICE

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

| | |
|---|---|
| Alexander K. Mircheff<br>Dean J. Kitchens<br>**GIBSON DUNN & CRUTCHER LLP**<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197 | *Attorneys for Defendants:*<br>**J.P. Morgan Securities Inc., Deutsche Bank Securities Inc., Bear, Stearns & Co. Inc., Banc of America Securities LLC, UBS Securities, LLC, Morgan Stanley & Co. Incorporated, Edward D. Jones & Co., L.P., Citigroup Global Markets Inc., Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, Barclays Capital Inc., HSBC Securities (USA), BNP Paribas Securities Corp. Merrill Lynch, Pierce, Fenner & Smith, Incorporated**<br><br>Tel: 213-229-7000<br>Fax: 213-229-7520<br>amircheff@gibsondunn.com<br>dkitchens@gibsondunn.com |
| Christopher G. Caldwell<br>David C. Codell<br>Jeffrey M. Hammer<br>**CALDWELL LESLIE AND PROCTOR**<br>1000 Wilshire Blvd Suite 600<br>Los Angeles, CA 90017 | *Attorneys for Defendant:*<br>**Stanford L. Kurland**<br><br>Tel : 213-629-9040<br>Fax: 213-629-9022<br>caldwell@caldwell-leslie.com<br>codell@caldwell-leslie.com<br>hammer@caldwell-leslie.com |
| Jennifer M. Sepic<br>**BINGHAM MCCUTCHEN LLP**<br>355 South Grand Avenue Suite 4400<br>Los Angeles, CA 90071 | *Attorneys for Defendant:*<br>**David A. Spector**<br><br>Tel: 213-680-6400<br>Fax: 213-680-6499<br>jennifer.sepic@bingham.com |
| Leiv H. Blad , Jr<br>Boyd Cloern<br>**BINGHAM MCCUTCHEN LLP**<br>2020 K Street NW<br>Washington, DC 20006-1806 | Tel: 202-373-6564<br>Fax: 202-373-6001<br>leiv.blad@bingham.com<br>boyd.cloern@bingham.com |
| Joshua G. Hamilton<br>Peter Young Hoon Cho<br>William F. Sullivan<br>**PAUL HASTINGS JANOFSKY AND WALKER LLP**<br>515 South Flower Street 25th Fl<br>Los Angeles, CA 90071-2228 | *Attorneys for Defendants:*<br>**Ranjit Kripalani, Jennifer S. Sandefur,**<br><br>Tel: 213-683-6000<br>Fax: 213-627-0705<br>joshuahamilton@paulhastings.com<br>petercho@paulhastings.com<br>williamsullivan@paulhastings.com |

4

| | | |
|---|---|---|
| 1 | Michael D. Torpey<br>Penelope A. Graboys Blair<br>**ORRICK HERRINGTON AND**<br>**SUTCLIFFE LLP**<br>405 Howard Street<br>San Francisco, CA 94105-2669 | *Attorneys for Defendant:*<br>**David A. Sambol**<br><br>Tel: 415-773-5700<br>Fax: 415-773-5759<br>mtorpey@orrick.com<br>pgraboysblair@orrick.com |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | Michael C. Tu<br>**ORRICK HERRINGTON AND**<br>**SUTCLIFFE LLP**<br>777 South Figueroa Street Suite 3200<br>Los Angeles, CA 90017 | Tel: 213-629-2020<br>Fax: 213-612-2499<br>mtu@orrick.com |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | David A. Priebe<br>Jeffrey B. Coopersmith<br>**DLA PIPER LLP**<br>2000 University Avenue<br>East Palo Alto, CA 94303 | *Attorneys for Defendant:*<br>**Eric P. Sieracki**<br><br>Tel: 650-833-2000<br>Fax: 650-833-2001<br>david.priebe@dlapiper.com<br>jeff.coopersmith@dlapiper.com |
| 10 | | |
| 11 | | |
| 12 | Matthew D. Caplan<br>Nicolas Morgan<br>**DLA PIPER LLP**<br>1999 Avenue of the Stars, Suite 400<br>Los Angeles, CA 90067-6022 | Tel: 310-595-3000<br>Fax: 310-595-3300<br>david.priebe@dlapiper.com<br>nicolas.morgan@dlapiper.com |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | Shirli Fabbri Weiss<br>**DLA PIPER LLP**<br>401 B Street, Suite 1700<br>San Diego, CA 92101 | Tel: 619-699-2700<br>Fax: 619-699-2701<br>shirli.weiss@dlapiper.com |
| 17 | | |
| 18 | | |
| 19 | Matthew W. Close<br>**O'MELVENY AND MYERS**<br>400 S. Hope Street, 18th Floor<br>Los Angeles, CA 90071 | *Attorneys for Defendant:*<br>**Bank of America Corp.,**<br>**NB Holdings Corporation**<br><br>Tel: 213-430-6000<br>Fax: 213-430-6407<br>mclose@omm.com |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

**Goodwin Procter LLP**
**10250 Constellation Blvd., 21st Floor**
**Los Angeles, California 90067**

PROOF OF SERVICE

# EXHIBIT A

# EXHIBIT A

**E-Filed 10/19/2010**

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

|  |  |
|---|---|
| In Re WELLS FARGO MORTGAGE-BACKED CERTIFICATES LITIGATION | ) Case No.: 09-CV-01376-LHK ) ) ORDER GRANTING UNDERWRITER ) DEFENDANTS' MOTION TO DISMISS ) ) |

This Order supersedes the Court's Tentative Order of October 5, 2010, Dkt. No. 289.

On September 7, 2010, the Court heard oral argument on a Motion to Dismiss brought by the Underwriter Defendants[1] in the above-captioned case ("Consolidated Case"). The Underwriters moved to dismiss certain claims on statute of limitations grounds.

Complaints in other cases have relied upon the Consolidated Case to establish that their claims are timely. *See First Star Bank v. Wells Fargo Mortg. Backed Sec.* 2006-AR15 Trust ("*First Star*"), No. 10-cv-3508 LHK, Dkt. No. 1 (Compl.) at ¶95; *Charles Schwab Corp. v. Banc of America Sec. LLC* ("*Schwab I*"), No. 10-cv-03489 LHK, Dkt. No. 1, Ex. B (Am. Compl.) at ¶ 32; *Charles Schwab Corp. v. BNP Paribas Sec. Corp.* ("*Schwab II*"), No. 10-cv-04030 SI, Dkt. No. 1, Ex. A (Am. Compl.) ¶ 54; Reply ISO Mot. to Intervene filed by General Retirement System of the City of Detroit (Dkt. No. 279) at 7-10. As a result, some parties have already briefed the tolling

---

[1] Defendants Goldman, Sachs & Co., JP Morgan Securities, Inc., Bear, Stearns & Co., Inc., Deutsche Bank Securities, Inc., UBS Securities, LLC, Credit Suisse Securities (USA) LLC, RBS Securities, Inc., Banc of America Securities, LLC, Citigroup Global Markets, Inc., and Merrill Lynch, Pierce, Fenner & Smith, Inc.

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

EXHIBIT  A  -5-

**United States District Court**
For the Northern District of California

1    issue discussed here.[2]  In order to provide an opportunity for all parties to be heard, the Court

2    issued a Tentative Order on October 5, 2010, and invited the parties in these other actions to

3    address tolling at the hearing set for October 7, 2010.  First Star filed a brief opposing the Tentative

4    Order on October 6, 2010.  *See* First Star Resp. (Dkt. No. 291).  At the October 7, 2010 hearing,

5    the Court heard further oral argument from all parties on the issues.   Finally, with the Court's

6    permission, the Defendants in this case filed a response to First Star's October 6 filing on October

7    8, 2010.  *See* Defs.' Reply (Dkt. No. 292).

8           In addition to the Underwriter's Motion, a number of other motions have been filed in the

9    various cases listed above, as follows:

10          On August 13, 2010, the named Plaintiff in the first-filed action in the Consolidated Case

11   (General Retirement System of the City of Detroit, "General Retirement") moved to intervene in

12   the Consolidated Case in order to bring claims relating to the Wells Fargo Mortgage-Backed

13   Securities (WFMBS) 2006-AR15 Trust.  Dkt. No. 224.  General Retirement did not bring claims

14   relating to this trust in its initial complaint, nor did it otherwise attempt to raise these claims until

15   its Motion to Intervene.

16          On August 17, 2010, Wells Fargo[3] submitted an administrative motion asking the Court to

17   determine that the *Schwab I* case is related to the Consolidated Case under Local Rule 3-12.  Dkt.

18   No. 233.  No opposition was filed to this motion, and the Court found the cases related on

19   September 2, 2010.  Dkt. No. 252.  On September 9, 2010, Wells Fargo submitted notice to the

20   Court that it had inadvertently failed to serve the plaintiff in the *Schwab I* case (The Charles

21   Schwab Corporation, "Schwab") with the Motion to Relate; subsequently, Schwab moved for leave

22   to seek reconsideration of the Court's decision to relate the cases.  The Court granted Schwab leave

23   to seek reconsideration.  Dkt. No. 271.

24          On September 2, 2010, the Lead Plaintiffs in the Consolidated Case moved to consolidate

25   the *First Star* action with the Consolidated Case, and to enforce the Lead Plaintiffs determination

26

27   _____
     [2] Reply ISO Mot. to Intervene filed by General Retirement System of the City of Detroit (Dkt. No.
     279); Pls.' Mot. to Remand, Dkt. No. 18 filed in *Schwab I.*

28   [3] Wells Fargo Bank, N.A., Wells Fargo Asset Securities Corporation and the Individual Defendants

                                                    2
     Case No.: 09-CV-01376-LHK
     ORDER GRANTING MOTION TO DISMISS

                                                                              EXHIBIT  A  -6-

**United States District Court**
For the Northern District of California

1    so that after consolidation, counsel for Lead Plaintiffs would represent the putative class identified

2    in the *First Star* complaint.  Dkt. No. 255.  First Star opposed.  Dkt. No. 265.

3           On September 22, 2010, Wells Fargo submitted another administrative motion asking the

4    Court to determine that the *Schwab II* case is related to the Consolidated Case.  Dkt. No. 272.

5    Schwab opposed.  Dkt. No. 281.

6           Based on the arguments and the papers submitted, the Court GRANTS the Underwriters'

7    Motion to Dismiss; DENIES Wells Fargo's Motion to Relate the *Schwab II* action to the

8    Consolidated Case; GRANTS Schwab's Motion for Reconsideration of the Court's decision o

9    relate the *Schwab I* action to the Consolidated Case, and deems *Schwab I* unrelated; and deems

10   General Retirement's Motion to Intervene and the Plaintiffs' Motion to Consolidate the *First Star*

11   action moot because the claims asserted by both General Retirement and First Star are barred by

12   the statute of limitations.

## I.  BACKGROUND

14          This putative class action was initially filed on March 27, 2009, in a complaint styled

15   *General Retirement System of the City of Detroit v. The Wells Fargo Mortgage Backed Securities*

16   *2006-AR18 Trust, et al.*, No. 09-CV-1376 ("*Detroit*").  Another action bringing overlapping and

17   related claims, titled *New Orleans Employees' Retirement System v. Wells Fargo Asset Securities*

18   *Corp., et al.*, No. 09-CV-01620 ("*New Orleans*"), was filed April 13, 2009.  Judge Illston (to whom

19   this case was previously assigned) consolidated these two cases and granted lead plaintiff status to

20   the Louisiana Sheriffs' Pension and Relief Fund, Alameda County Employees' Retirement

21   Association, New Orleans Employees' Retirement System, and the Government of Guam

22   Retirement Fund, on July 16, 2009.  Plaintiffs filed a Consolidated Complaint on August 31, 2009.

23   Generally, the Consolidated Complaint alleged violations of Sections 11, 12(a)(2) and 15 of the

24   Securities Act of 1933 (15 U.S.C. §§ 77k, 77l(a)(2), and 77o) based on sales of mortgage pass-

25   through certificates ("Certificates") sold through fifty-four separate offerings ("Offerings").

26   Defendants moved to dismiss the Consolidated Complaint on a number of grounds.  On April 22,

27   2010, Judge Illston granted-in-part and denied-in-part Defendants' motions.  The April 22, 2010

28   Order provides factual background on the nature of the claims brought in the Consolidated

3

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

1    Complaint.  The Court will not re-state this background here.  *See* April 22, 2010 Order (Dkt. No.

2    198) at 1-3.

3         Judge Illston found that the Lead and named Plaintiffs had stated claims under Sections 11

4    and 15 of the Securities Act of 1933.  However, Judge Illston dismissed claims based on 37

5    Offerings, because the named Plaintiffs had not invested in them and therefore lacked standing to

6    bring claims regarding those Offerings.  *Id.* at 7.  Lead Plaintiffs were granted "leave to amend to

7    designate additional named plaintiffs who purchased securities through those offerings."  *Id.*  On

8    May, 28, 2010, Lead Plaintiffs filed an Amended Consolidated Complaint (ACC).  The ACC

9    identifies five new named Plaintiffs ("New Plaintiffs").  The New Plaintiffs allege that they

10   invested in ten of the 37 Offerings previously dismissed for lack of standing.  Dkt. No. 203.  The

11   Underwriter Defendants moved to dismiss the New Plaintiffs' claims on the ground that no named

12   plaintiffs had standing to bring these claims previously, and therefore the statute of limitations has

13   run on these claims.  *See* Mot. to Dismiss ACC (Dkt. No. 212) ("Underwriter Motion").  Lead

14   Plaintiffs opposed.  Mem. in Opp'n re Mot. to Dismiss ACC (Dkt. No. 218) ("Opposition").

15        One of the Offerings dismissed by Judge Illston's April 22, 2010 Order was the 2006-AR15

16   Trust, now the subject of General Retirement's Motion to Intervene and the *First Star* complaint.

17   Another dismissed Offering, the 2007-10 Trust, is the basis of several causes of action in the

18   *Schwab I* case.

19   **II. LEGAL STANDARD**

20        Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if

21   it fails to state a claim upon which relief can be granted. To survive a motion to dismiss, the

22   plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl*.

23   *Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the

24   plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted

25   unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  In deciding whether the plaintiff has

26   stated a claim, the Court must assume the plaintiff's allegations are true and draw all reasonable

27   inferences in the plaintiff's favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

28   However, the court is not required to accept as true "allegations that are merely conclusory,

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

United States District Court
For the Northern District of California

unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### III. DISCUSSION

#### a. Tolling of Additional Class Claims

At the September 7, 2010 hearing on these motions, Plaintiffs admitted that they must rely on tolling of the three-year statute of repose regarding seven of these revived Offerings. Regarding the other three, Plaintiffs argued at the hearing that it is a question of fact when the one-year statute of limitations began to run. The three-year statute of repose bars claims relating to any Offering first sold or offered for sale before May 28, 2007 (which is three years before the ACC was filed). Therefore, absent tolling, the statute would bar Plaintiffs from suing under seven of the revived Offerings.[4] *See* Section 13, 15 U.S.C. §77m. The one-year statute of limitations bars claims brought more than a year after discovery of the challenged statement was made or "should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The Underwriters argue that the original complaints in the pre-consolidation cases identify the same bases for Plaintiffs' claims, but were filed more than a year before the Consolidated Complaint. Therefore, the Underwriters urge that the New Plaintiffs knew or should have known about these claims at least as of the time the previous complaints were filed, and that this bars the remaining revived Offerings.[5]

Plaintiffs argue that the statutes of repose and of limitations should be tolled for the New Plaintiffs' claims based on the assertion of these claims by the plaintiffs in the original *Detroit* and *New Orleans* complaints. However, the *Detroit* and *New Orleans* plaintiffs did not allege facts to show they had standing to bring claims regarding these Offerings. In fact, the complaints themselves showed that no named plaintiff had made any investment in the securities now asserted by the New Plaintiffs. In arguing that the statute of limitations on these claims should be tolled, Plaintiffs principally rely on the Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), as well as a Southern District of New York case, *In re Flag Telecom Holdings*, *Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 455 (S.D.N.Y. 2005).

---

[4] These include the WFMBS 2006-7, 2006-10, 2006-AR16, 2006-AR19, 2006-18, 2006-20, and the Wells Fargo Alternative Loan 2007-PA1 Trusts.

[5] These include the WFMBS 2007-10, 2007-13, and 2007-AR4 Trusts.

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

EXHIBIT  A  -9-

In *American Pipe*, the Supreme Court held that when a class action is dismissed for failure to certify the class, the statute of limitations is tolled for class members who then intervene to assert the same claims individually. The holding was limited to situations "[W]here class action status has been denied solely because of failure to demonstrate that 'the class is so numerous that joinder of all members is impracticable. . . .'" *American Pipe*, 414 U.S. at 552 (internal citations omitted). In affirming the Ninth Circuit's decision to toll the claims of individual class members, the Supreme Court remarked that the Ninth Circuit was "careful to note" that "maintenance of the class action was denied *not* for . . . *lack of standing* of the representative . . . ." *American Pipe*, 414 U.S. at 553 (emphasis added). Thus, *American Pipe* did not address the precise situation presented here.[6] In this case, unlike in *American Pipe*, the *Detroit* and *New Orleans* plaintiffs lacked standing to bring claims regarding the ten revived Offerings.

Plaintiffs rely on *Flag Telecom* to argue that *American Pipe* provides for tolling securities claims dismissed for lack of standing when another named plaintiff subsequently appears to assert them. In *Flag Telecom*, the Southern District of New York tolled the statute of limitations to allow the addition of a new plaintiff with standing to assert Section 12(a)(2) claims regarding Flag securities. *Flag Telecom*, 352 F. Supp. 2d at 454-56. These claims were initially dismissed, because the original named plaintiff had not purchased the Flag securities at an Initial Public Offering (IPO), as required for Section 12(a)(2) claims. *Flag Telecom*, 352 F. Supp. 2d at 454. The original named plaintiff, Loftin, *had* purchased the Flag securities otherwise, however, and had standing to assert Section 11 claims on that basis. *Flag Telecom*, 352 F. Supp. 2d at 453. In this context, the court noted that the newly-added plaintiff "would probably have concluded that he had little chance of becoming lead plaintiff after Loftin, who appears to have invested a substantial amount of capital in Flag, filed his May 2002 Complaint." *Id.* at 456. The court concluded that failure to extend *American Pipe* tolling would undermine Rule 23's encouragement to investors to

---

[6] Some of the cases cited by Plaintiffs apply *American Pipe* where the issue of standing was not determined, and are therefore not on point. *See Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors*, 498 F.3d 920, 925 (9th Cir. 2007) (holding that *American Pipe* tolling applies to individual claims of putative class members when a putative class action complaint is voluntarily dismissed). *Anchor Capital* did not involve a determination that the original named plaintiffs lacked standing to bring the claims.

6

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

EXHIBIT A -10-

1    "refrain" from filing separate actions, or intervening, when those investors "feel their interests are

2    adequately protected in a proposed class action that has already been filed." *Id. See also In re*

3    *Enron Corp. Sec. Derivative & ERISA Litig.*, 529 F. Supp. 2d 644, 709 (S.D. Tex. 2006) (tolling

4    Section 12(a)(2) claims where named plaintiffs had standing only as to Section 11 claims).

5         Defendants counter that because the original named Plaintiffs had no standing as to *any*

6    claims relating to the dismissed Offerings, jurisdiction over these claims never attached. Thus, the

7    Court is simply without power to toll the statutes of limitations or repose over those claims. While

8    there is no Supreme Court or Ninth Circuit authority on this point, the Seventh Circuit has found

9    that if the named plaintiffs to a class action lack standing to bring a claim, no putative class

10   members can "step in to the [standing] breach." *Walters v. Edgar*, 163 F.3d 430, 432-33 (7th Cir.

11   1998). Following *Walters*, Judge Whyte (of this District) similarly found that the court could not

12   toll claims that the original named plaintiffs had no standing to bring. *Palmer v. Stassinos*, 236

13   F.R.D. 460, 465 (N.D. Cal. 2006). Judge Whyte noted that "it would be beyond the constitutional

14   power of a federal court to toll a period of limitations based on a claim that failed because the

15   claimant had no power to bring it." *Palmer*, 236 F.R.D. at 466. Other district courts have reached

16   the same conclusion. *Boilermakers Nat'l Annuity Trust Fund v. WAMU Mortg. Pass Through*

17   *Certificates*, No. 09-cv-00037, slip op. at 15-16 (W.D. Wash. Sept. 28, 2010).

18        In *American Pipe* itself, the Supreme Court expressed concern that a failure to toll claims

19   after certification has been denied would induce individuals to file duplicative suits (or risk giving

20   up their claims) in situations where class certification is difficult to predict. *American Pipe*, 414

21   U.S. at 553-54. Some courts have relied on this rationale to toll the statute of limitations on the

22   claims of  putative class members even when no original named plaintiff had standing to bring the

23   claims, but where special circumstances apply. For example, the Third Circuit determined that

24   tolling should permit substitution of a new plaintiff with standing where intervening law required

25   the district court to reverse its certification order because the named plaintiff had no standing as to

26   one claim. *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1097 (3d Cir. 1975). The Ninth Circuit

27   has also allowed putative class members to re-assert class claims after their initial claims were

28

**United States District Court**
For the Northern District of California

7

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

United States District Court
For the Northern District of California

1   dismissed based on an intervening change in the law. *Catholic Soc. Servs. v. INS*, 232 F.3d 1139,

2   1149 (9th Cir. 2000).

3        On the other hand, various district courts have expressed concerns that extending *American*

4   *Pipe* tolling to class action claims the original named plaintiffs had no standing to bring will

5   encourage filings made "merely to extend the period in which to find a class representative." *See*

6   *In re Crazy Eddie Sec. Litig.*, 747 F. Supp. 850, 856 (E.D.N.Y. 1990) (declining to toll class claims

7   originally asserted without standing); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, No. 00-4285

8   (GEB), 2002 U.S. Dist. LEXIS 27189 at *85-*86 (D.N.J. June 26, 2002) (noting that "the

9   possibility of abuse" is "acute" in the context of standing, where "the potential exists to circumvent

10  the statute of limitations by filing putative class actions on behalf of nominal plaintiffs without

11  standing solely to toll the limitations period until a suitable plaintiff can be found;"); *In re Elscint*,

12  *Ltd. Sec. Litig.*, 674 F. Supp. 374, 382 (D. Mass. 1987) ("I am not aware of any authority that

13  would support the application of the tolling rule to allow a timely filed claim of persons who are

14  not themselves members of an appropriate class to toll the statute of limitation for later filing and

15  certification of a class that could not properly include them.").

16       Consistent with the analysis in *American Pipe* and cases applying it, the Court finds that the

17  facts in this case counsel against tolling the statute for the revived claims of the New Plaintiffs.

18  Unlike the new plaintiffs in *Flag Telecom* or *Enron*, the New Plaintiffs here had no reason to rely

19  on the filing of the *Detroit* and *New Orleans* complaints to protect their claims. The original

20  complaints did not allege that the named plaintiffs had *any* ownership interest in the 37 dismissed

21  Offerings. Thus, review of these complaints would have revealed that the Plaintiffs in the *Detroit*

22  and *New Orleans* actions had no standing to bring claims as to the 37 dismissed Offerings. At the

23  October 7, 2010 hearing, Plaintiffs in the various cases argued that when the initial *Detroit* and

24  *New Orleans* complaints were filed, the law was unclear as to whether or not the named Plaintiffs

25  in those actions would have standing to assert claims for securities in which they did not invest.

26  *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1166 (C.D. Cal. 2008) (finding

27  Section 11 standing for all securities based on investment in only some when "(1) the securities are

28  traceable to the same initial shelf registration and (2) the registration statements share common

8

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

'parts' that (3) were false and misleading at each effective date.").  But the authority Plaintiffs cite on this point is distinguishable.  As the Southern District of New York recently held, finding standing based on purchases made under a common registration is appropriate only when "all of the relevant claims [are] premised on statements or alleged omissions in company reports that had been incorporated by reference in each of the registration statements at issue."  *In re Am. Int'l Group*, *Inc.*, No. 08 Civ. 4772(LTS), 2010 U.S. Dist. LEXIS 101263 at *65 (S.D.N.Y. Sept. 27, 2010).

Multiple courts have rejected an extension of this "common registration" theory to situations where, as here, Plaintiffs' claims rely on separate disclosures or omissions made for each Offering.  These courts have found that such an extension would be against the "overwhelming" weight of authority.  *See* April 22, 2010 Order at 5; *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303-304 (D. Mass. 2009); *In re Mortgage*, No. 09 Civ. 2137 (LTS)(MHD), 2010 U.S. Dist. LEXIS 84146 at *15-16 (S.D.N.Y. Aug. 17, 2010).  In the present case, as Judge Illston previously held, the Plaintiffs' claims depend on different statements in the separate Prospectus Supplements made for each Offering.  In short, the Court rejects Plaintiffs' contention that there was a reasonable basis to believe that the original *Detroit* and *New Orleans* named plaintiffs had standing to bring claims regarding the 37 Offerings in which they did not invest.  There are no unusual circumstances, such as an intervening change in the law affecting the standing analysis, or reversal of a previous class certification, that render this decision unfair.[7]

---

[7] In concluding that Plaintiffs had no standing to sue regarding securities in which they did not invest, Judge Illston relied on older, controlling authority, applying standing rules outside the Mortgage Backed Securities (MBS) context.  *See*, *e.g.*, *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999).  Counsel for both the Lead Plaintiffs and for Schwab argued at the October 7, 2010 hearing that until *Nomura*, which they identify as the first decision applying the traditional standing rule to MBS investments, they could not have been reasonably on notice that the original *Detroit* and *New Orleans* plaintiffs might not have standing to bring all of their asserted claims. *See Nomura*, 658 F. Supp. 2d at 303-304.  But neither Lead Plaintiffs nor Schwab explain why they continued to delay asserting their claims after this alleged sea-change.  *Nomura* was decided in September, 2009; the *First Star*, *Schwab I* and *Schwab II* actions were filed between June and August, 2010.

9

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

1    This conclusion is in accord with the Ninth Circuit's decision in *Lierboe v. State Farm Mut.*

2  *Auto. Ins.* Co., 350 F.3d 1018, 1023-24 (9th Cir. 2003).  Here, the Ninth Circuit ordered dismissal

3  of a putative class action brought by a named plaintiff without standing, expressly denying an

4  opportunity to substitute in a new named plaintiff.  The Ninth Circuit relied on a Seventh Circuit

5  decision in which a putative class action was dismissed because the named plaintiff lacked

6  standing.  The court noted that this outcome could easily have been avoided because "[i]t was

7  apparent from the face of her complaint that Foster [the named plaintiff] never had standing."

8  *Foster v. Ctr. Twp. of La Porte Cnty.*, 798 F.2d 237, 245 (7th Cir. 1986).

9    While the Court finds the *Walters* and *Palmer* decisions instructive, it is unnecessary to

10  decide today that it is beyond the power of the Court to toll the statute of limitations where the lead

11  plaintiff lacks standing.  Rather, the Court finds that *American Pipe* and the cases interpreting it

12  support the declination to extend tolling to claims over which the original named Plaintiffs asserted

13  no facts supporting standing.

14    As a result, the Court must dismiss the ten revived Offerings.  As to the seven Offerings that

15  were sold before May 28, 2007, Plaintiffs concede that they must rely on tolling of the three year

16  statute of repose to bring claims relating to these securities.  Thus, there is no dispute as to the

17  impact of the Court's decision on those Offerings, and they must be dismissed.

18    As to the remaining three Offerings, Plaintiffs contended at the September 7, 2010 hearing

19  that it is an issue of fact when the one-year statute of limitations regarding those claims began to

20  run, but raised no facts in briefing or at the hearing indicating that the previous complaints did not

21  actually put the New Plaintiffs on notice of their claims.  The statute begins running when an

22  investor actually discovers the misleading or omitted statement, or when a diligent investor should

23  have discovered it.  15 U.S.C. § 77m.  The March 27, 2009 *Detroit* complaint and the April 13,

24  2009 *New Orleans* complaint stated many of the same factual bases now alleged in the ACC

25  regarding these Offerings.  Specifically, these complaints cite to the same Registration Statements

26  and Prospectuses (Offering Documents), and many of the same alleged misrepresentations and

27  omissions within those Offering Documents, as cited in the May 28, 2010 ACC.  *Compare Detroit*

28  Complaint ¶¶ 54-70 and *New Orleans* Complaint ¶¶ 104-112 with ACC ¶¶ 57-67; 86-90; 100-103;

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

115-117.  Although the ACC expands upon the allegations, principally by adding statements by confidential witnesses, the Court finds that the information in the original *Detroit* and *New Orleans* Complaints was sufficient to make New Plaintiffs aware of the basis for their claims.  In addition, in opposing this motion, Plaintiffs argue that they were first "plausibly" on notice of their claims nearly a year before this, as of May 20, 2008.  *See* Dkt. No. 218 (Opposition) at 21.

In light of these facts, the Court finds that New Plaintiffs knew or should have known of the basis for the revived claims more than a year before the ACC was filed on May 28, 2010.[8]  *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935 (9th Cir. 1996) (finding that filing of a first complaint evidenced that plaintiffs had discovered the facts underlying their Securities Act of 1934 Section 10(b) claim, triggering the statute of limitations).[9]  If the *Detroit* and *New Orleans* plaintiffs were first "plausibly" on notice as of May 2008, and were able to file complaints alleging the basis for their claims as of March and April the following year, this indicates that a reasonably diligent investor should have been able to do the same.  The one-year statute of limitations for the 2007-10 Trust thus expired on March 27, 2010 (one year after the *Detroit* complaint was filed), at the very latest.  The one-year statute of limitations for the 2007-13 and 2007-AR4 Trusts likewise expired on April 13, 2010 (one year after the *New Orleans* complaint was filed) at the very latest.  The May 28, 2010 filing of the ACC was therefore past the one-year statute of limitations for all three remaining revived Offerings.  Accordingly, all ten revived Offerings brought by New Plaintiffs are hereby DISMISSED WITH PREJUDICE.

---

[8] At the hearing, Schwab argued that this determination is inconsistent with recent Supreme Court authority regarding inquiry notice.  *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1795-99 (2010).  The Court in *Merck* was applying the statute of limitations for fraud claims.  Such claims include an element of scienter not required for the claims asserted in this case; the Court noted that it is often difficult for plaintiffs to "discover" facts supporting the scienter element.  *Merck*, 130 S. Ct. at 1793-94.  This Court's determination that the New Plaintiffs were or should have been aware of the factual basis for their claims as of the filing of the *Detroit* and *New Orleans* actions is based on what the record shows the Plaintiffs actually knew, based on their own public filings and admissions.  While the Court's use of the term "inquiry notice" in the Tentative Order was perhaps unclear in light of *Merck*'s rejection of "inquiry notice" as the standard for triggering the statute of limitations for Section 10(b) claims, the substance of the Court's ruling is consistent with *Merck*.

[9] Although *In re Syntex* deals with inquiry notice of a Section 10(b) claim, a similar "knew or should have known" standard triggers the statute of limitations for Section 10(b) claims and Section 11 or 12 claims, and for purposes of this analysis, the Court finds the *In re Syntex* analysis applicable.

11

#### b.  Relation Back

At the October 7, 2010 hearing, General Retirement argued that its claims based on its investments in the 2006-AR15 Trust should relate back to the original claims based on this Trust asserted by the *New Orleans* plaintiffs.  General Retirement principally relies on a Ninth Circuit case setting forth the rule for relation back.  *Immigrant Assistance Project of the L.A. County Fed'n of Labor v. INS*, 306 F.3d 842, 857-58 (9th Cir. 2002).   In order to show that claims brought by a new plaintiff should relate back to an earlier filing, General Retirement must show that "1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly prejudice the defendant; and 3) there is an identity of interests between the original and newly proposed plaintiff."  *Id.*  Here, under Ninth Circuit authority cited in the *Immigrant Assistance* decision itself, General Retirement cannot show an identity of interests with the *New Orleans* plaintiffs regarding 2006-AR15 Trust, because no *New Orleans* plaintiff invested in that Trust.  In other words, no *New Orleans* plaintiff had any interest in the 2006-AR15 Trust at all.  The Ninth Circuit has held that there is no identity of interests between plaintiffs who "bought stock at different values and after different disclosures and statements were made by Defendants and analysts."  *In re Syntex*, 95 F.3d at 935.  General Retirement argued at the October 7, 2010 hearing that a recent Supreme Court decision supported its relate back argument.  *Krupski v. Costa Crociere S. p. A.*, 130 S. Ct. 2485, 2496 (2010).  However, the *Krupski* case did not address the "identity of interests" issue, as it involved a single plaintiff asserting her original claims against an additional defendant.  *Id.*  Nothing in the *Krupski* decision changes the fact that General Retirement has failed to show an identity of interests with the *New Orleans* plaintiffs regarding the 2006-AR15 Trust.

#### c.  Relation of *Schwab I* and *Schwab II* to the Consolidated Case

Local Rule 3-12 requires that cases be found related to one another if they concern "substantially the same parties, property, transaction or event" and "it appears likely that there will be an unduly burdensome duplication of labor or conflicting results if the cases are conducted before different Judges."  When the Court initially determined that the *Schwab I* case was related to the Consolidated Case, the 2007-10 Trust was asserted in both cases.  In light of today's Order,

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

however, it is being dismissed from the Consolidated Case.  Given the fact that each Offering has a separate Prospectus Supplement, and that both Schwab and Lead Plaintiffs' claims regarding each distinct Offering depend on these separate Supplements, the Court finds that there is no common Offering at issue in these cases.  Thus, there is no basis to find them related.  Therefore, in light of these changed circumstances, the Court finds that these matters are no longer related and GRANTS Schwab's Motion for Reconsideration.

Regarding *Schwab II*, the complaint alleges securities violations based on over 30 different offerings, only 3 of which have any relationship to Wells Fargo.  As to these three Wells Fargo-related trusts, they are no longer at issue in the Consolidated Case; they were dismissed for lack of standing, and Lead Plaintiffs did not attempt to re-assert them in the ACC.  Thus, the Court concludes that these cases do not concern "substantially the same" parties, property, transaction or event, as the differences between them far outweigh the similarities.  Accordingly, the Court declines to find these cases related and DENIES Wells Fargo's Motion to Relate.

### d.  General Retirement's Motion to Intervene

General Retirement has moved to intervene in this case in order to assert claims based on its investments in the WFMBS 2006-AR15 Trust.  Though it appears that General Retirement had standing to assert these claims all along, it did not raise them or state the factual basis for them in its initial complaint, or at any other time until its Motion to Intervene.  At the October 7, 2010 hearing, counsel for General Retirement could not explain the reason for this delay.  General Retirement alleges that it purchased this security January 1, 2007, so absent tolling, the three-year statute of repose bars claims filed after January 1, 2010.  *See* Dkt. No. 225 (Heffelfinger Decl.), Ex. A.  General Retirement did not file its motion to intervene until August 13, 2010.  In light of the Court's decision that, under the circumstances of this case, tolling will not apply to class claims that no named Plaintiff had standing to bring, the Court finds that General Retirement's claims are time-barred.  Therefore, General Retirement's Motion to Intervene is DENIED.

### e.  Lead Plaintiffs' Motion to Consolidate *First Star*

The Court's determination of the tolling issue is likewise dispositive of the *First Star* action.  In its complaint, First Star relied on tolling, based on the filing of the *New Orleans* complaint, to

13

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

United States District Court
For the Northern District of California

1     assert that its claims were timely.  Given that the 2006-AR15 Trust was sold more than three years

2     before the First Star complaint was filed, First Star is correct that without tolling, its claims are

3     barred.  As explained above, the Court finds that the initial complaints in the Consolidated Case did

4     not toll First Star's claims.

5          First Star argues that this decision is contrary to the lead-plaintiff provisions of the PSLRA.

6     First Star claims it was *prohibited* from bringing its claims in a class action (which First Star refers

7     to as "the only effective means of obtaining legal representation") so long as there was any

8     potential that the Lead Plaintiffs could successfully resurrect the 2006-AR15 Trust claim and

9     thereby control the litigation regarding that claim.  *See* First Star Response at 2.  However, the

10    authority First Star cites on this point shows that First Star was free to file an individual action, or

11    even another class action, at any time.  While those cases would very likely have been related to, or

12    consolidated with, the Consolidated Case, there was nothing preventing First Star from protecting

13    its interests by filing suit.  *In re Bank of Am*. *Corp*. *Sec. Derivative and ERISA Litig*., No. 09 MDL

14    2058 (DC), 2010 U.S. Dist. LEXIS 37799 at *6-*8  (S.D.N.Y. April 9, 2010).  First Star's

15    arguments are directed more toward determining lead plaintiff status.  Thus, they are not persuasive

16    regarding the tolling issues presented here.

17         In light of the Court's decision that, under the circumstances of this case, tolling will not

18    apply to class claims that no named Plaintiff had standing to bring, the Court finds that First Star's

19    claims are time-barred.  *See Levald*, *Inc*. *v. City of Palm Desert*, 998 F.2d 680, 687 (9th Cir. 1993)

20    (holding that the court may dismiss claims on statute-of-limitations grounds *sua sponte*, so long as

21    the defendant has not waived the defense, and the plaintiff has had an opportunity to argue the

22    question).  Therefore, the Lead Plaintiffs' Motion to Consolidate is DENIED as moot, and First

23    Star's complaint is hereby DISMISSED WITH PREJUDICE.

24         **f.   Tolling of Individual Claims**

25         Regarding Schwab's claims based on its investment in the 2007-10 Trust, asserted in

26    *Schwab I*, the parties' briefing to date has focused almost entirely on *American Pipe* tolling for

27    class action claims.  Before determining that Schwab's individual claims as to the 2007-10 Trust

28    are time-barred, the Court would appreciate briefing from Wells Fargo and Schwab specifically

14

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

regarding the tolling of individual claims. The Court understands Wells Fargo's position that it is without jurisdiction to toll such claims, but asks that the parties both address authority regarding *American Pipe* tolling of individual claims based on an original class claim asserted without standing. Therefore, Wells Fargo may submit a brief, not to exceed seven pages, by November 1, 2010, and Schwab may submit a responsive brief, not to exceed seven pages, by November 15, 2010. It would be helpful to the Court if Schwab could address when it became aware of the *New Orleans* and *Detroit* actions and its claims, and why it delayed in bringing its individual claims on the 2007-10 Trust.

In light of the fact that *Schwab I* is no longer related to the Consolidated Case, Schwab need not attend the Case Management Conference set for October 20, 2010. A case management conference will be held in *Schwab I* after the hearing on Schwab's Motion to Remand (Dkt. No. 19), set for December 9, 2010.

## IV. CONCLUSION

Accordingly, the ten revived Offerings brought by New Plaintiffs (WFMBS 2007-10, 2007-13, 2007-AR4, 2006-7, 2006-10, 2006-AR16, 2006-AR19, 2006-18, 2006-20 Trusts, and the Wells Fargo Alternative Loan 2007-PA1 Trust) are hereby DISMISSED with prejudice. Schwab's Motion for Reconsideration of the Court's previous order relating the Schwab I case to this one is GRANTED, and the cases are deemed unrelated. Wells Fargo's Motion to Relate *Schwab II* to this case is DENIED. General Retirement's Motion to Intervene is DENIED as moot. The Lead Plaintiffs' Motion to Consolidate the *First Star* action is DENIED as moot, and First Star's complaint is DISMISSED WITH PREJUDICE. The hearing on First Star's Motion to Appoint Lead Plaintiffs' Counsel, currently set for November 18, 2010, is hereby VACATED.

**IT IS SO ORDERED.**

Dated: October 19, 2010

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

United States District Court
For the Northern District of California

# EXHIBIT  B

# EXHIBIT  B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

NECA-IBEW HEALTH & WELFARE FUND, :   Civil Action No. 1:08-cv-10783-MGC
Individually and On Behalf of All Others   :
Similarly Situated,   :   "ECF Case"
   :
             Plaintiff,   :   <u>CLASS ACTION</u>
   :
     vs.   :   SUPPLEMENTAL MEMORANDUM OF
   :   LAW IN FURTHER SUPPORT OF
GOLDMAN, SACHS & CO., et al.,   :   PLAINTIFF'S OPPOSITION TO
   :   DEFENDANTS' MOTION TO DISMISS
             Defendants.   :   THE THIRD AMENDED COMPLAINT

———————————————————— x

580865_1

This memorandum is respectfully submitted on behalf of plaintiff NECA-IBEW Health & Welfare Fund ("plaintiff"), in response to matters raised at the Court's September 22, 2010 hearing on defendants' motion to dismiss.[1]  At that hearing, defendants asserted, for the first time, their position that a plaintiff who continues to hold its securities at the time of suit may only state a claim for damages under Section 11 of the Securities Act of 1933 if the securities at issue are traded in an efficient, or "actively traded," market.[2]  As set forth below, defendants are wrong.

For claims asserted under §11, it is well established that "[t]he plain language of section 11(e) prescribes the method of calculating damages, and the court must apply that method in every case." *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048 (2d Cir. 1995).  Specifically, this "plain language" states that, with regard to plaintiffs who continue to hold their securities at the time of suit, such as plaintiff here, the appropriate measure of damages is "the difference between the ***amount paid*** for the security . . . and . . . the ***value*** thereof as of the time such suit was brought." *Id.* at 1047-48 (quoting 15 U.S.C. §77k(e) (emphasis added)).  As set forth in plaintiff's previous submissions, plaintiff clearly alleges a decline in the ***value*** of its securities, and supports this allegation by setting forth detailed facts regarding: (i) the massive ratings downgrades experienced by all tranches of the Certificates; (ii) the skyrocketing delinquency rates associated with the underlying loans; and (iii) the dramatic price declines experienced by the Certificates in the

---

[1]     *See* Transcript for Sept. 22, 2010 Hearing, attached hereto as Exhibit A ("Ex. A") at 59:1-9 (granting plaintiff's counsel's request to "submit a memorandum" on issues raised at the hearing).

[2]     *See* Ex. A at 28:15-20 (summarizing defendants' position):

THE COURT:  OK.  So really you are arguing not that you have to suffer a loss in order to recover, a loss caused by reliance on the misrepresentation, but you are arguing simply that if something is not traded on a public market, you can't have a loss.  But if it's traded on a public market, you can, even if you don't sell.  That's a very, very slippery position.

- 1 -

secondary market.[3]  As such, plaintiff has adequately alleged a cognizable injury under the plain

terms of §11.  *See Wherehouse Entm't*, 65 F.3d at 1048 (holding that, under §11, a "decline in

market value permits plaintiffs to recover damages under the statutory scheme").

Despite plaintiff's straightforward allegations regarding the Certificates' decline in value,

defendants appear to contend that plaintiff cannot state a claim for damages because, according to

defendants, a plaintiff who continues to hold its securities at the time of suit can ***only*** demonstrate a

decline in the ***value*** of those securities by pointing to a ***price decline*** in an efficient or "actively

traded" market.  *See* Ex. A at 31:8-13, 36:14-20.  Defendants' argument, however, finds no support

in either the statutory language of §11 or any other relevant authority.  Indeed, despite the fact that

§11 has been on the books since 1933, plaintiff is not aware of ***any*** case that has ever held that a

plaintiff must plead or prove market efficiency in order to recover under §11.

Notably, the text of §11 makes ***no reference*** to the nature, or even existence, of the market in

which the relevant securities are traded.  *See* 15 U.S.C. §77k.  Indeed, focusing on the statute's

purposeful use of the term "value," as opposed to "price," the Second Circuit has recognized that the

market price, while relevant, is ***neither necessary to, nor determinative of,*** the damages calculation

set forth in §11(e).  *Wherehouse Entm't*, 65 F.3d at 1048-49 ("Congress' use [in §11(e)] of the term

'value,' as distinguished from the terms 'amount paid' and 'price' indicates that, under certain

circumstances, the market price may ***not*** adequately reflect the security's value.") (emphasis added).[4]

---

[3]     *See* Plaintiff's Opposition to Defendants' Motion to Dismiss the Third Amended Complaint
(Dkt. No.100) at 16-18; *see also* Third Amended Complaint for Violation of §§11, 12 and 15 of the
Securities Act of 1933 (Dkt. No. 88) at ¶¶6, 90-94, 105.

[4]     *See also Beecher v. Able*, 435 F. Supp. 397, 404-05 (S.D.N.Y. 1975) ("the conclusion that
'value' is not synonymous with 'market price' seems clearly dictated by the plain language of

580865_1

As such, contrary to defendants' assertion, the Second Circuit holds that a "reliable" or efficient market is *not* required in order to demonstrate a decrease in value under §11. *See Wherehouse Entm't*, 65 F.3d at 1049 (recognizing that value may still be determined under §11, "even where market price is *not* completely reliable") (emphasis added).[5]

Several other courts have followed the Second Circuit's reasoning and held that, because the statute explicitly focuses on "value," not "price," damages under §11 are *not* necessarily controlled or defined by the market in which the securities trade. *See, e.g., N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2010 U.S. Dist. LEXIS 47512, at *12-*16 (S.D.N.Y. Mar. 29, 2010) (upholding §11 "loss of market value" claims regarding similar mortgage-backed securities based, in part, on court's finding that "[m]any fixed-income debt securities, such as corporate bonds do *not* trade on national exchanges and yet institutional investors routinely purchase corporate bonds hoping to realize a profit through resale") (emphasis added); *Boilermakers Nat'l Annuity Trust Fund v. Wamu Mortg. Pass Through Certificates, Series AR1*, Order on Defendants Motions to Dismiss at 12 (W.D. Wash. Sept. 28, 2010) (attached hereto as Ex. B) (upholding §11 claims for similar mortgage-backed securities based, in part, on court's finding that, "[t]he mere fact

---

Section 11(e) in which both 'price' (sometimes 'amount paid') and 'value' are used, apparently deliberately, to connote different concepts").

[5]    Moreover, from a logical standpoint, defendants' position makes absolutely no sense. Because IPO markets, by their very nature, are neither developed nor "efficient," acceptance of defendants' contention would lead to the completely illogical conclusion that §11 liability could essentially *never* attach to *any* IPO offering. *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006) ("the market for IPO shares is not efficient"); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) ("[A] primary market for newly issued [securities] 'is not efficient or developed under any definition of these terms.'") (citation omitted); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 68 n.5 (S.D.N.Y. 2000) ("in an IPO there is no well-developed market in the offered securities"); *Degulis v. LXR Biotechnology*, 176 F.R.D. 123, 126 n.1 (S.D.N.Y. 1997) (collecting cases).

- 3 -

that Plaintiffs may have difficulty substantiating the exact nature of their loss in an illiquid market does **not** necessitate dismissal") (emphasis added); *In re WorldCom Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 3143, at *3-*13 (S.D.N.Y. Mar. 3, 2005) (allowing §11 plaintiff to present damages calculation to jury based on value of bonds at time of suit, despite defendants' argument that "'there [was] no way to determine with a reasonable degree of certainty the average disposition price for the bonds,'" because "[a]ctual trading data for the bonds [was] not publicly available," and "the daily volume of trading in an individual bond [was] not publicly reported") (citation omitted); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 347, 351 n.80 (S.D.N.Y. 2003) ("the determination of value is a fact-intensive inquiry . . . [that is] inappropriate to resolve . . . at the motion to dismiss stage").[6]

Furthermore, even if the Court were to accept defendants' completely unfounded theory and determine that an efficient market for the Certificates' sale is somehow necessary in order for plaintiff to establish damages under §11, such a finding would **not** warrant dismissal of plaintiff's claims, as it is well established that market efficiency is a fact question **not** suitable for determination at the motion to dismiss stage. *See, e.g., DeMarco v. Robertson Stephens Inc.,* 318 F. Supp. 2d 110,

---

[6]    Moreover, as numerous courts have recognized, because reliance and loss causation are **not** elements of plaintiff's §11 claims, there is no other reason why plaintiff would be required to plead or prove that the Certificates trade in an efficient market. *See, e.g., In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 782-84 (3d Cir. 2009) (rejecting defendants' argument that §11 plaintiffs must prove "market efficiency," and holding that, under §11, "the efficiency of a market . . . is **not at all relevant**") (emphasis added); *In re Scor Holding* (*Switz.*) *AG Litig.*, 537 F. Supp. 2d 556, 574-575 n.25 (S.D.N.Y. 2008) ("That a lead plaintiff may have difficulty showing that reliance may be presumed during [an 'inherently inefficient' 25-day 'quiet period' of an IPO] and therefore have difficulty obtaining certification of a class action for Exchange Act claims arising out of a registration statement does not leave a putative class without a remedy. 'If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case' for a claim under Section 11 of the Securities Act.").

- 4 -

EXHIBIT B -24-

121 (S.D.N.Y. 2004) ("It is not for the Court to decide, on a motion to dismiss . . . whether or to what extent the market functioned efficiently."); *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 297 (S.D.N.Y. 2008) ("Ultimately, whether the relevant markets were efficient is a question of fact to be resolved at trial."); *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 490 (S.D.N.Y. 1989) ("Whether in fact Laser Arms traded in an efficient market is a question of fact. Therefore, resolution of that issue must await presentation of further proof at trial.").

DATED: October 4, 2010      Respectfully submitted,

                        ROBBINS GELLER RUDMAN
                          & DOWD LLP
                        ROBBINS GELLER RUDMAN
                          & DOWD LLP
                        ARTHUR C. LEAHY
                        THOMAS E. EGLER
                        SCOTT H. SAHAM
                        SUSAN G. TAYLOR
                        NATHAN R. LINDELL
                        MATTHEW I. ALPERT

                                    s/ ARTHUR C. LEAHY
                                    ARTHUR C. LEAHY

                        655 West Broadway, Suite 1900
                        San Diego, CA 92101
                        Telephone: 619/231-1058
                        619/231-7423 (fax)
                        tome@rgrdlaw.com
                        scotts@rgrdlaw.com
                        susant@rgrdlaw.com
                        nlindell@rgrdlaw.com
                        malpert@rgrdlaw.com

- 5 -

SAMUEL H. RUDMAN
DAVID A. ROSENFELD
CAROLINA C. TORRES
JARRETT S. CHARO
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
ctorres@rgrdlaw.com
jcharo@rgrdlaw.com

Lead Counsel for Plaintiff

CAVANAGH & O'HARA
PATRICK J. O'HARA
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)

Additional Counsel for Plaintiff

580865_1

EXHIBIT B  -26-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 4, 2010, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 4, 2010.

s/ ARTHUR C. LEAHY
ARTHUR C. LEAHY

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: artl@rgrdlaw.com

# Mailing Information for a Case 1:08-cv-10783-MGC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Courtland W. Creekmore**
  ccreekmore@csgrr.com,karenc@csgrr.com,e_file_sd@csgrr.com

- **Thomas E. Egler**
  tome@rgrdlaw.com,malpert@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Evan Jay Kaufman**
  ekaufman@rgrdlaw.com

- **Richard Howard Klapper**
  klapperr@sullcrom.com

- **Lawrence Paul Kolker**
  kolker@whafh.com

- **Arthur C. Leahy**
  artl@rgrdlaw.com

- **Nathan R. Lindell**
  nlindell@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Patrice Alecia Rouse**
  rousep@sullcrom.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Scott H. Saham**
  scotts@csgrr.com

- **Denis Francis Sheils**
  dsheils@kohnswift.com

- **Gerald Harlan Silk**
  jerry@blbglaw.com

- **Susan G. Taylor**
  susant@rgrdlaw.com

- **Michael Thomas Tomaino , Jr**

tomainom@sullcrom.com,kirgisa@sullcrom.com

- **Harsh Nayan Trivedi**
  gilmorek@sullcrom.com,trivedih@sullcrom.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`

# EXHIBIT A

```
                                                              1
     09MVNECA                   Argument
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    NECA-IBEW HEALTH & WELFARE
3    FUND, et ano,
4
4                    Plaintiffs,
5
5          v.                            08 CV 10783 (MGC)
6
6    GOLDMAN SACHS & CO., ET AL,
7
7                    Defendants.
8
8    ------------------------------x
9                                        New York, N.Y.
9                                        September 22, 2010
10                                       10:40 a.m.
10
11   Before:
11
12                 HON. MIRIAM GOLDMAN CEDARBAUM,
12
13                                       District Judge
13
14                        APPEARANCES
14
15   ROBBINS GELLER RUDMAN & DOWD
15        Attorneys for Plaintiffs
16   BY:  ARTHUR C. LEAHY
16
17   SULLIVAN & CROMWELL
17        Attorneys for Defendants
18   BY:  RICHARD H. KLAPPER
18        HARSH N. TRIVEDI
19        MAYA KRUGMAN
19
20
21
22
23
24
25
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

```
        09MVNECA                        Argument
 1                   (In open court)
 2                   THE COURT:  All right.  Once again, we are focusing on
 3       whether the complaint in this putative class action states a
 4       claim.
 5                   The defendants have moved to dismiss, I guess, all of
 6       the claims.
 7                   And I would like to start with the first claim, which
 8       is for damages for injury, damages for loss for certificates --
 9       for a particular certificate that the plaintiff never sold and
10       received regular periodic payments, in accordance with the
11       provisions of the certificate.
12                   Before we turn to that, though, I also have no
13       conception of this case.  There are no numbers given in the
14       complaint.  So I have no conception of how much money the
15       plaintiff has already received from these distributions.
16       Because when we get to the second claim, which is under 12, not
17       11, which is a claim for restitution, in order to get
18       restitution, you have to proffer back what you received.
19       That's the way in which restitution works, as we all know.  I
20       have no conception as to what it is the plaintiff has received
21       so far.
22                   So I would like to hear about both of those things.
23                   I'd like to start with the Section 11 claim.
24                   MR. KLAPPER:  Your Honor, Richard Klapper --
25                   THE COURT:  I think I would like to hear the opponent
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

3

09MVNECA                    Argument
 1   first.
 2               MR. KLAPPER:  As you wish.
 3               THE COURT:  Because I would like to hear first what
 4   the plaintiff has received to date, since he has not sold
 5   anything.
 6               MR. LEAHY:  Good morning, your Honor.  Art Leahy on
 7   behalf of the plaintiff.
 8               THE COURT:  Good morning.
 9               MR. LEAHY:  I don't know the exact amount that the
10   plaintiff has received as of today.  We do know that
11   essentially these certificates were paying an interest rate
12   right around six percent.
13               THE COURT:  Which makes it roughly how much -- when
14   did he start receiving payments?
15               MR. LEAHY:  It depends on which certificate was
16   bought.  One certificate was bought in October of 2007; the
17   other certificate was bought, I believe, in April 2008.
18               THE COURT:  All right.  Well, let's start with 2007.
19   You are seeking damages, even though that certificate has not
20   been sold.
21               MR. LEAHY:  That is correct, your Honor.
22               THE COURT:  I would like to know how much the
23   plaintiff has received for that certificate since purchase.  I
24   am not holding you to a penny.  I would like to have some sense
25   of what the amount is.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
                                                              4
     09MVNECA                      Argument
 1            MR. LEAHY:  Your Honor, I don't know the answer to
 2   that.
 3            THE COURT:  Six percent of what?
 4            MR. LEAHY:  Six percent of the certificate amount
 5   purchased.
 6            THE COURT:  How much was the certificate amount
 7   purchased?
 8            MR. LEAHY:  Certificate for the 2010 --
 9            THE COURT:  How about certificate of 2007?  Is that
10   what you just told me about?
11            MR. LEAHY:  Right.  On October 15, 2007 --
12            THE COURT:  Your client bought --
13            MR. LEAHY:  -- the 2010 certificate.
14            THE COURT:  I see.  So it matures in 2010, is that --
15            MR. LEAHY:  No, it doesn't.
16            THE COURT:  Well, why is it called the 2010
17   certificate?
18            MR. LEAHY:  I'm sorry, it's the 2007-10 trust
19   certificate is what I meant --
20            THE COURT:  OK.
21            MR. LEAHY:  -- to say.  I apologize.
22            THE COURT:  That's all right.
23            MR. LEAHY:  And the face amount of that certificate is
24   $390,000.
25            THE COURT:  OK.  So if we take six percent of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
       09MVNECA                    Argument
 1    390,000 -- was it a monthly payment of six percent or --
 2            MR. LEAHY:  I believe they do receive either monthly
 3    or quarterly paydowns of interest and/or principal when loans
 4    are paid off early on things of that nature.
 5            THE COURT:  All right.  Well, it seems to me your
 6    client has to tell you what he's received or what it has
 7    received.
 8            MR. LEAHY:  Certainly, your Honor.  With our initial
 9    certification that we filed with the initial complaint, we had
10    listed the paydowns.  I don't have the initial complaint with
11    me or that certification, but they are listed there.
12            THE COURT:  Why are they not listed in the latest
13    complaint?
14            MR. LEAHY:  Well, because, your Honor, what we are
15    alleging in terms of damages is not a failure to make the
16    payments.
17            THE COURT:  I'm aware of that.  But you are seeking
18    restitution; so I have to know what you've received.  Isn't
19    that right?
20            MR. LEAHY:  Absolutely.  Your Honor, we can provide
21    you that information, if you like.  I can assure you it is much
22    less than they paid for the certificates.
23            THE COURT:  Well, that's what I want to be clear
24    about:  How much less?
25            MR. LEAHY:  Well, if we take the six percent --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

                                                                    6
09MVNECA                        Argument
1           THE COURT:  Because this is now 2010, and they
2    continue to receive payments.  Isn't that right?
3           MR. LEAHY:  That's correct.
4           THE COURT:  Payments have not stopped.
5           MR. LEAHY:  As of today, no, they have not.
6           THE COURT:  Yes.  They have received -- is this
7    quarterly or monthly?
8           MR. LEAHY:  I believe it's monthly, but I would have
9    to check.
10          THE COURT:  All right.  Monthly payments of?
11          MR. LEAHY:  Six percent per annum essentially.
12          THE COURT:  Six percent per annum.  And that's simple
13   interest, not compound interest.
14          MR. LEAHY:  It depends on how much the loan pool is
15   remaining at any particular time, how much has been prepaid,
16   how much has defaulted.  There is a lot of variables that go
17   into the calculation, as I understand it.
18          THE COURT:  OK.  But have these monthly payments
19   changed much over the years?
20          MR. LEAHY:  I believe the particular tranche that my
21   client bought is receiving the payment that was contracted for.
22          THE COURT:  Right.  And that was the first tranche.
23          MR. LEAHY:  That's correct.
24          THE COURT:  Yes.  This is the No. 1 level of whatever.
25          MR. LEAHY:  Our clients bought the top tranche in both
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

7

```
09MVNECA                      Argument
 1    trusts, that's correct.
 2             THE COURT:  Right.  All right.
 3             MR. LEAHY:  Or top of the second at the top.
 4             THE COURT:  All right.  And is there any expiration
 5    date?  No, they continue to receive monthly payments under this
 6    certificate, as long as they hold the certificate or until the
 7    certificate matures.
 8             MR. LEAHY:  Or until enough loans default where the
 9    payments cannot be made to that particular tranche.
10             THE COURT:  But those are all -- none of those has yet
11    happened.
12             MR. LEAHY:  Not to the particular tranche that my
13    client --
14             THE COURT:  That's what we are talking about; that's
15    all you can sue for, your own, not someone else's.
16             MR. LEAHY:  Actually, your Honor, we're suing on
17    behalf of all purchasers of the trust, all tranches at this
18    particular point.
19             THE COURT:  But I have ruled against you on that
20    already.  I have held that you must -- you may only represent
21    the same certificate, not other people's purchases.
22             MR. LEAHY:  That's not how we understand your Honor's
23    order.
24             THE COURT:  Well, that was my understanding of how I
25    ruled.
```

SOUTHERN DISTRICT REPORTERS, P.C.<br/>
(212) 805-0300

8

09MVNECA                     Argument

1          MR. LEAHY:  Your Honor --
2          THE COURT:  To be a class representative, you can only
3   represent the class of persons or entities that purchased the
4   particular -- the certificate from the particular tranche from
5   the particular trust that you purchased.
6          MR. LEAHY:  Your Honor, actually, your earlier ruling
7   was a little bit bigger than that.  You basically said you can
8   only sue on behalf of trusts that you purchased in.  So we're
9   only suing on behalf all purchasers in the two trusts that my
10  client bought in.
11         THE COURT:  Right.  But it must be the same tranche as
12  yours.
13         MR. LEAHY:  That's not what your Honor held.
14         THE COURT:  Well, how many are there in that tranche?
15         MR. LEAHY:  I believe there's probably 10 to 15
16  different tranches within the trust.
17         THE COURT:  No, no, I understand all of that.  But the
18  effects are very different in different tranches.
19         MR. LEAHY:  This is true, your Honor.
20         THE COURT:  And that's why in a class action the class
21  has to be in the same position, basically.
22         MR. LEAHY:  They are, your Honor.  They are all told
23  the same misrepresentations, we allege.  And what we are
24  getting into now is an issue of how much damages each
25  particular tranche has.  And damages are not a bar of the class
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

```
      09MVNECA                    Argument
 1    certification.  They are all suing on the same
 2    misrepresentations.  They didn't have a separate prospectus
 3    supplement for each tranche.
 4              THE COURT:  Now, wait just a moment.
 5              Damages are not a bar when we are just talking about
 6    how long you've held something.  Damages are not calculable in
 7    the same way for people who have never sold and people who have
 8    sold.  And they are not calculable in the same way for people
 9    in different tranches.  Isn't that right?
10              MR. LEAHY:  That's right.
11              THE COURT:  So let's stay for a moment with this
12    plaintiff's situation.  Because this plaintiff is claiming to
13    be essentially situated in the same way as those he wants to
14    represent.  Isn't that right?
15              MR. LEAHY:  That's correct, your Honor.
16              THE COURT:  OK.  And I'd like to focus just on that
17    group of putative plaintiff -- class action plaintiffs, the
18    ones who purchased in the first tranche from that particular
19    trust and have not sold.
20              Did anybody in this class buy before your client,
21    before the plaintiff?
22              MR. LEAHY:  We do not know that.
23              THE COURT:  You don't know.  OK.  OK.
24              MR. LEAHY:  I imagine so.
25              THE COURT:  But your plaintiff bought something fairly
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
        09MVNECA                    Argument
 1   early.
 2              MR. LEAHY:  If we're talking about the 2007-10, yes,
 3   they bought prior to the closing of offering; so essentially
 4   they bought right at the time of the offering.
 5              THE COURT:  On the initial offering?
 6              MR. LEAHY:  Correct.
 7              THE COURT:  OK.  And they have received payments on
 8   that initial purchase of six percent per annum monthly ever
 9   since?
10              MR. LEAHY:  Don't hold me exactly to six percent, but,
11   yes, approximately in that neighborhood.
12              THE COURT:  All right.  But you are going to give me
13   exact figures -- I just want to follow this a little bit --
14   which means that for roughly three years, they have been
15   receiving monthly payments.
16              Now, have the payments been consistently the same?
17   What is the relationship among the payments?
18              MR. LEAHY:  Your Honor, it's a certain percentage,
19   depending on what the loan pool is at any particular month.
20              THE COURT:  Right.  But I'm asking you, in fact, what
21   is the relationship among the sums that they have received?
22   Have they received roughly the same amount every month?  Have
23   the amounts varied greatly?
24              MR. LEAHY:  I think, given the amount purchased in
25   interest rate, yes, probably within a range.  I don't know that
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

```
      09MVNECA                      Argument
 1    for certain, your Honor.  As we allege, I mean in one of the
 2    trusts, 50 percent of the loans are delinquent, not paying,
 3    foreclosed, already owned by the bank.
 4              THE COURT:  But is that the trust your client bought?
 5              MR. LEAHY:  Yes, your Honor, it is.
 6              THE COURT:  All right.  But did that, in fact, affect
 7    what they received?  I need to know that.  That's important.
 8              MR. LEAHY:  I need to check.  I don't think it's
 9    affected it substantially because of the way the trust is
10    structured.
11              THE COURT:  I'm really trying to identify the amount
12    that would have to be proffered if there were recision.
13              MR. LEAHY:  I think if we want to do really rough
14    calculations math-wise, we take the $390,000.  Since they
15    bought in October of 2007, you have to prorate that six percent
16    annual for, you know, one quarter of that particular period of
17    time; six percent, 2008; six percent, 2009; and prorate six
18    percent for whatever this part of the year is.
19              THE COURT:  Now, is there some maturity provision?
20              MR. LEAHY:  Well, most of the loans in the trust are
21    30-year loans.  And I do recall vaguely --
22              THE COURT:  So they are ongoing?
23              MR. LEAHY:  Absolutely.
24              THE COURT:  That's all I want to be clear about.
25              MR. LEAHY:  Absolutely.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
       09MVNECA                    Argument
 1             THE COURT:  All right.
 2             MR. LEAHY:  Yes.
 3             THE COURT:  All right.  So for a period of three
 4     years, what would you say, a tenth of it has been paid off?
 5             MR. LEAHY:  Without doing the math off the top of my
 6     head, that sounds like it's --
 7             THE COURT:  Well, let me turn to the defendants.  You
 8     should know how much has been paid out, too.
 9             MR. KLAPPER:  We don't know exactly.  If you look at
10     the plaintiff's certification to the original complaint, which
11     only takes the payments through October of 2008, what they
12     allege is they have received repayments of principal, as well
13     as payments of interest.
14             THE COURT:  Yes, but the early years mortgage payments
15     of principal are minuscule or maybe not on these.
16             MR. KLAPPER:  Well, usually what comes about is the
17     loan is refinanced, repaid.  So if the loan is repaid, then
18     principal payments are made to the certificate holders.
19             THE COURT:  I see.  I see.
20             Well, what is your rough calculation as to how much
21     has been received to date by this plaintiff?
22             MR. KLAPPER:  Just looking at what they have put in
23     their certification, it would appear that they have received on
24     the 2007-10 certificate something in the neighborhood of 20 to
25     $30,000 in principal through October 2008, plus the interest
```

```
          09MVNECA                   Argument
 1   payments.
 2               THE COURT:  And so you would double that to get it up
 3   to 2010, roughly, again?
 4               MR. KLAPPER:  Perhaps.  Perhaps, as a rough estimate.
 5               THE COURT:  And how much did they pay for that?
 6               MR. LEAHY:  The face value was $390,000, your Honor,
 7   perhaps.  I'd have to double-check.
 8               THE COURT:  So what you're saying is roughly ten
 9   percent has been received of the face value.
10               MR. KLAPPER:  Very, very --
11               THE COURT:  Yes, the face value is what they paid?
12               MR. KLAPPER:  No.
13               MR. LEAHY:  They may have paid a slight discount or
14   they may have paid slightly more.  I can't remember if it was
15   high nineties they end up paying for that particular one.  I
16   believe it's 99 and some change they paid for that particular
17   investment.
18               MR. KLAPPER:  It's 99.44 is what they have in their
19   certificate --
20               THE COURT:  All right.
21               MR. KLAPPER:  -- for the first --
22               THE COURT:  Well, let's say $100,000.
23               MR. KLAPPER:  Right.
24               THE COURT:  And how many of those did they pay for?
25   They didn't buy those at the same time.  Yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

14

09MVNECA                    Argument

1              MR. LEAHY:  They bought a face amount of $390,000.
2    It's like buying a bond.  You buy a bond for --
3              THE COURT:  No, I understand.  That's one certificate.
4              MR. LEAHY:  Yes.
5              THE COURT:  Right.
6              MR. LEAHY:  I'm sorry.  The other certificate --
7              THE COURT:  I was interested in how much they've put
8    out.
9              MR. LEAHY:  Well, they essentially paid something --
10   399,000 times .9940, essentially.
11             THE COURT:  That is, they purchased more than -- I'm
12   interested in how many purchases they made.
13             MR. LEAHY:  They bought it all in one purchase is my
14   understanding.
15             THE COURT:  I see.  This was a single purchase.
16             MR. LEAHY:  Single purchase.
17             THE COURT:  The plaintiff here bought everything at
18   one time in the first -- in the initial offering three years
19   ago, roughly.
20             MR. LEAHY:  For the 2007-10 trust, yes, your Honor.
21             THE COURT:  OK.  And they have not bought anything
22   else since.  Is that right?
23             MR. LEAHY:  That's correct.
24             MR. KLAPPER:  In that trust.
25             MR. LEAHY:  In that trust, that's correct.  They did
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

15

```
     09MVNECA                 Argument
 1   buy in the 2007-5 trust, as well.
 2           THE COURT:  And when was that?
 3           MR. LEAHY:  That was in April of 2008.
 4           THE COURT:  April of 2008.
 5           MR. LEAHY:  Right.
 6           THE COURT:  So ostensibly they have not received as
 7   much in the second -- from the second purchase as from the
 8   first.
 9           MR. LEAHY:  Right.  Assuming the same interest rate
10   and what have you, yes.
11           THE COURT:  Is there the same interest rate?
12           MR. LEAHY:  They don't have the exact same interest
13   rates.  They are all in that five, six percent ballpark, if my
14   recollection serves me correctly.
15           THE COURT:  OK.  But close?
16           MR. LEAHY:  Yes.
17           THE COURT:  OK.  So they bought once in 2007 and once
18   in 2008.
19           MR. LEAHY:  Yes.
20           THE COURT:  And nothing since.
21           MR. LEAHY:  That's correct.  In the Goldman Sachs
22   trust, that's correct.
23           THE COURT:  Right.  And they have not sold anything.
24           MR. LEAHY:  That is correct.
25           THE COURT:  All right.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

16

09MVNECA                    Argument

1          Now, what I would like to hear is how they can have a
2    financial loss if they have held and have received everything
3    they were promised.
4          MR. LEAHY:  Well, your Honor, I think Judge Crotty
5    summed it up quite well in DLJ, this recent case dealing with
6    the exact same kind of case.
7          THE COURT:  I read it and I had difficulty following
8    the reasoning, frankly.  So I'd like you to articulate for me
9    how that is financial loss, if you have never sold.  The
10   fact -- or why it is not what I would call premature until you
11   actually sell.  At that point, if the price has gone down, you
12   realize a loss.  But you're talking about an unrealized loss.
13   Isn't that right?
14         MR. LEAHY:  No, your Honor, that's not --
15         THE COURT:  That's the tax description:  An unrealized
16   loss.  They have not yet actually lost anything.
17         MR. LEAHY:  They have actually lost something.  They
18   have lost value, the initial price that they paid for, the
19   value of it at the time we filed suit.
20         THE COURT:  At this moment.  But who knows what it
21   will be the next year or the year after.
22         MR. LEAHY:  That's the way Section 11 -- it's
23   statutorily calculated damages.  Section 11 says when you sue
24   under Section 11, if you state a claim, your damages are one of
25   the three of the following --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

17

09MVNECA                    Argument
1           THE COURT:  So it's your position that you never have
2    to prove actual loss under Section 11.
3           MR. LEAHY:  Your Honor, we're at a motion to dismiss.
4    All we have to do is allege.  Sure, we have to prove damages,
5    and we will.
6           THE COURT:  But the point is that until you sell, you
7    can never claim realized loss, that you have actually
8    experienced a loss, unless you're not getting the payments, the
9    monthly payments that you were promised.  Until you actually
10   sell, whatever you contend you are losing is unrealized.
11          MR. LEAHY:  No, I disagree with that, your Honor.
12   Because look at the investment banking houses here in New York
13   that had to revalue their mortgage-backed security portfolios.
14   They had to write them down, too, because they had a realized
15   loss, because the value of these things now are much less than
16   were paid for as a result of the fact that things were
17   misrepresented.
18          THE COURT:  You don't know that that will be true next
19   year or the year after, do you?
20          MR. LEAHY:  You know what?  It doesn't matter under
21   Section 11.
22          THE COURT:  That is, at any point, regardless of
23   whether you have realized a loss, it is your position that
24   under Section 11, you can sue for loss.
25          MR. LEAHY:  If you sue within the statute of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
        09MVNECA                    Argument
 1   limitations and you buy and you're holding at the time you file
 2   suit, and there's a difference in those two prices, yes, you
 3   can sue for that loss.  That's what the statute says.
 4              THE COURT:  Even if the next day the price goes way
 5   up?
 6              MR. LEAHY:  The defendants have opportunity to prove
 7   what's called negative causation; that whatever we are alleging
 8   didn't cause a loss and things like that.  But when we're at
 9   the pleading stage, certainty.
10              THE COURT:  OK.  So you are taking the position that
11   you do not have to, what I call, realize a loss.  You don't
12   have to actually prove that you could -- that the sales price
13   that you paid when you went to sell was less.  That's what we
14   normally call realized loss, when you sell for a lower price
15   than you paid.
16              MR. LEAHY:  If we're talking about loss requiring a
17   sale, sure, that's one way you calculate damages.  If you buy
18   and hold under Section 11, you take the difference between the
19   value at the time the suit is filed and the price you paid.
20              THE COURT:  All right.  But you agree that if you are
21   suing under the '34 Act, that would not be the measure of
22   damages.
23              MR. LEAHY:  Well, no, because under the '34 Act, it's
24   not the time --
25              THE COURT:  You have to prove realized loss.
```

```
     09MVNECA                    Argument
 1              MR. LEAHY:  No, your Honor.  It's not at the time the
 2   lawsuit is filed.  Section 11 has a very different calculation.
 3              Under the '34 Act, you have to prove at any particular
 4   point during the class period, if you will, when a plaintiff
 5   proves what the inflation in the price was which was caused by
 6   the fraud and how much of it that was taken out at the end is a
 7   result of the fraud as opposed to some other, what they call,
 8   compound information.
 9              THE COURT:  Right.  But you cannot prove that without
10   selling.
11              MR. LEAHY:  No.  Holders hold all the time during
12   class periods and have damages.  You don't have to sell on
13   either one of them.
14              THE COURT:  I don't know what you mean by "all the
15   time."  I have never had such a case.  Because the
16   representation has to cause the loss.
17              MR. LEAHY:  Correct.
18              THE COURT:  Under the '34 Act.
19              MR. LEAHY:  Right.
20              THE COURT:  And the representation has to cause the
21   loss here.  But you have to have a loss.  You can't have
22   something cause a loss if there was no loss.  That's the
23   problem that I deal with.  And you want me to take the position
24   that you don't need a loss.  All you have to do is calculate
25   some artificial value under the '33 Act.  I'm not going --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

20

```
        09MVNECA                    Argument
 1    we're not in the '34 Act, so I was just trying to make a
 2    comparison.
 3              MR. LEAHY:  Right.  Well, let me just do one more
 4    thing with the '34 Act, maybe put it in a little more
 5    perspective.
 6              Let's say you were a person that bought at the
 7    beginning of the class period when misrepresentations were in
 8    the market.  And as a result of the misrepresentations, you
 9    paid $10 more than you should for that stock.
10              THE COURT:  But the only way you can show that --
11              MR. LEAHY:  Well, wait.  No, your Honor.  You hold all
12    the way through the end of the class period.  At the end of the
13    class period, the truth comes out, the stock price dives, and
14    you're still holding the stock.  Of course you still have a
15    loss here; it's at the end.
16              THE COURT:  Well, I know of no '34 Act case where you
17    could recover without actually being out-of-pocket.
18              MR. LEAHY:  Your Honor, I respectfully disagree.  And
19    I would be happy to find you cases that show you otherwise.
20    But we're not talking about the '34 Act.
21              THE COURT:  But it's a controversial subject, let's
22    face it.
23              MR. LEAHY:  When we look at Section 11, it's very,
24    very different.  It's not out-of-pocket loss when you talk
25    about the damage part of the statute.  It's about value.  What
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21
09MVNECA                    Argument

```
 1  is the thing worth?  What is the value of the security at the
 2  time you file suit versus the value, i.e., the money you paid
 3  at the time you bought it?
 4            THE COURT:  Right.
 5            MR. LEAHY:  And we allege there was secondary
 6  market --
 7            THE COURT:  The question is what is the measure of
 8  value.  And you take one position, and the defendant takes
 9  another position.
10            One position is that you have calculated artificial
11  value on the theory that if you sold, you would have lost.  And
12  the other is that you can't, until you sell really, have a
13  measurable loss.
14            MR. LEAHY:  But Section 11 covers all -- both of those
15  scenarios, and even one more, it covers a scenario where you
16  buy --
17            THE COURT:  All right.  I understand your position.
18            Now let me hear from the other side on this.
19            MR. KLAPPER:  Thank you, your Honor.
20            There are two cases that we've been able to find that
21  are on point.  One is Judge Crotty's decision --
22            THE COURT:  Yes, it's a recent case.
23            MR. KLAPPER:  Very recent case.  And the other is the
24  Second Circuit in First Nationwide Bank v. Gelt Finance.  It's
25  a 1994 decision.
```

```
      09MVNECA                    Argument
 1            THE COURT:  I think there is a decision of Judge
 2    Kaplan's that comes pretty close, too, but --
 3            MR. KLAPPER:  And I'd like to focus on the decision of
 4    the Second Circuit in Gelt Funding, which is Chief Judge
 5    Walker.
 6            In that case, the bank made secured loans.  The
 7    allegations were that the borrower fraudulently represented the
 8    value of the collateral.
 9            There was a question though, as there is here, as to
10    whether on loans still held by the bank and not foreclosed on
11    there was any injury.  And the case was a RICO case.  So the
12    idea was there were multiple frauds building to a RICO
13    conspiracy.
14            What the Second Circuit said -- and this is at 27 F.3d
15    768 -- is according to First Nationwide Bank, it suffered
16    immediate quantifiable injury when the loans were made because
17    the loans were undersecured.  That's their theory here.
18            THE COURT:  Yes.
19            MR. KLAPPER:  Because loans were undersecured, FNB
20    assumed additional risk of loss was their allegation.  And for
21    all practical purposes, this is the Court quoting plaintiff,
22    the additional funds were lost the moment the loans were made.
23            So it's the same allegation.
24            These certificates are effectively secured debt, just
25    like a secured loan.  The idea alleged by the plaintiff there
```

23

```
        09MVNECA                    Argument
 1   was it didn't get as much collateral as it thought it was
 2   getting; and, therefore, the value of the loan was immediately
 3   less.  And the Second Circuit said we find this argument
 4   unpersuasive.
 5           And it goes on to say that First Nationwide Bank does
 6   not allege actual injury by simply claiming that it incurred
 7   additional risk of loss as a consequence of the fraud.
 8           Again, the same thing alleged here.
 9           Thus, we reject First National Bank's novel theory
10   that it was damaged simply by being undersecured, when, with
11   respect to those loans not yet foreclosed, the actual damages
12   it will suffer, if any, are yet to be determined.
13           THE COURT:  But here we have some loans that were
14   foreclosed, isn't that right?
15           MR. LEAHY:  That's correct.
16           MR. KLAPPER:  Well, but the issue is not whether the
17   collateral -- that those are -- the loans in our case are the
18   collateral for the certificates.  In that case, there were
19   secured loans, multiple secured loans, which the plaintiff, the
20   bank, had not yet foreclosed on.  And the security for those
21   loans, according to the Second Circuit, might or might not be
22   adequate to cover the loan.
23           And the Second Circuit said the mere fact that you
24   took on additional risk unknowingly because you had less
25   collateral than you thought you had was not enough to state
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

```
     09MVNECA                    Argument
1    injury.  That's the analogous situation here.
2            If you accept plaintiff's allegations, the collateral
3    underlying their certificates, the loans, was not as valuable
4    as they believed it was.  That's fundamentally what they are
5    alleging.  And, therefore, they have additional risk, just as
6    the bank in the Gelt Financing case, because they have less
7    security for their senior certificates.
8            The problem that they have is that they're still being
9    paid; collateral to date has been adequate to pay them.  Just
10   like the bank in Gelt Funding, which at the time of this
11   opinion, had not actually incurred loss; it just had increased
12   risk, if you believe their allegations.
13           THE COURT:  Right.  But a RICO claim requires
14   measurable injury.
15           MR. KLAPPER:  Well, any claim requires injury.
16           THE COURT:  That's the real problem.  Normally a
17   tort --
18           MR. KLAPPER:  Right.
19           THE COURT:  -- requires causation.
20           MR. KLAPPER:  Right.
21           THE COURT:  That is, injury caused by the misconduct.
22   And that's what we have -- that's what my problem is with the
23   Section 11 claim, that we do not actually have here.  And,
24   indeed, on the theory that's being put forward, there may never
25   be a loss.  It is a theoretical loss that the plaintiff seeks
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

```
            09MVNECA                    Argument
 1    recovery for.  And the argument of the plaintiff is that the
 2    statute provides them with a recovery based on theoretical
 3    loss, on a word called "value," which they say is a theory of
 4    loss, because it's not a loss.  It's only a prospective
 5    diminution in value.
 6              The question is, is there current diminution in value
 7    if the plaintiff has not done anything but hold the certificate
 8    and get paid what it was promised?
 9              Now, there are three different measures of value, as
10    the statute says.  But it's being argued that you can have
11    theoretical loss of value; that to recover in tort, which is
12    very unusual.  The tort does not have to cause actual loss; it
13    just has to cause the possibility of loss, because that's what
14    the plaintiff is asserting, a possibility of loss.
15              MR. KLAPPER:  They're asserting the same thing as in
16    Gelt Funding, which is an increased risk of loss.  And that's
17    what the Second Circuit said was not enough.
18              THE COURT:  Now, what do you do with the statute's
19    formulaic description of recovery based on loss of value?
20              MR. KLAPPER:  The distinction, and we've set this
21    out --
22              THE COURT:  And let's look at the statutory language,
23    because that's important, the value section.
24              MR. KLAPPER:  We should have Section 11.
25              THE COURT:  Without the statute, we can't decide
                     SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
       09MVNECA                    Argument
 1     anything about Section 11.
 2              MR. KLAPPER:  Right.
 3              There's no question that loss and value is one
 4     alternative way to determine damages.  And that is certainly
 5     applicable --
 6              THE COURT:  Right.  But the real issue here is what
 7     does value mean under Section 11.
 8              MR. KLAPPER:  Well, what does value mean --
 9              THE COURT:  That is, can a plaintiff, suing for what
10     is normally a tort, an intentional fraud which causes loss, say
11     that because the statute uses the word "value," you don't have
12     to prove loss.  It's enough to prove the possibility of loss,
13     what I call unrealized loss.
14              MR. KLAPPER:  Well, I draw a distinction between
15     unrealized loss and a provable, even allegable, loss.  What the
16     Second Circuit is saying and what Judge Crotty --
17              THE COURT:  Well, you can't prove an unrealized loss.
18     That's just another way of saying it.
19              MR. KLAPPER:  Well, to build on something that
20     Mr. Leahy said -- and I would, on this, agree with him -- if
21     there is an active marketplace in a particular security, as
22     there would be in, let's say, IBM stock, and if there is a
23     fraud lawsuit, certainly under the '34 Act, and if it can be
24     demonstrated that you bought at a price above where the value
25     would be, you can prove loss even if you don't sell your
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

27

09MVNECA                    Argument

1    securities.
2            THE COURT:  I don't think you can do that under the
3    '34 Act.
4            MR. KLAPPER:  In my experience, you can.  That is to
5    say, people --
6            THE COURT:  That's what we mean by loss causation.
7            MR. KLAPPER:  Yeah.  You have to show, and this is
8    Supreme Court recently --
9            THE COURT:  That you have been caused a loss by your
10   reliance on what was told to you.
11           MR. KLAPPER:  Correct.  And the Supreme Court in the
12   1934 Act context has recently said that the way you do that is
13   to show what happens to the market price when the disclosure
14   finally is made of whatever hadn't been disclosed properly.
15           THE COURT:  That's a measure when you sell.
16           MR. KLAPPER:  That's a measure of damages whether you
17   sold or not.
18           THE COURT:  Whether you sell or not.  You are agreeing
19   then that you can recover damages without selling?
20           MR. KLAPPER:  In the 1934 Act context.  The
21   distinction that we're making --
22           THE COURT:  Because normally for the tort of
23   intentional fraud, you can't do that; you have to, yourself,
24   realize a loss.  The fact that theoretically there is a loss is
25   not normally enough to provide damages in tort.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

28

09MVNECA                    Argument

1          MR. KLAPPER:  And the reason it is under the '34 Act
2    in those circumstances is only because there is an active
3    public market that sets the price, the market price.
4          THE COURT:  Yes, but the market price goes up and down
5    on any particular day if you do not sell.
6          MR. KLAPPER:  It does indeed.
7          THE COURT:  It's very hard to identify the price as a
8    loss.
9          MR. KLAPPER:  There's a very specific rule that the
10   Supreme Court set out that says you can, in that context, with
11   an actively-traded market, measure your loss by what happens to
12   the price when the announcement is made of whatever information
13   was either omitted or misstated.  But that's a specific rule
14   that is workable only because of the actively-traded market.
15         THE COURT:  OK.  So really you are arguing not that
16   you have to suffer a loss in order to recover, a loss caused by
17   reliance on the misrepresentation, but you are arguing simply
18   that if something is not traded on a public market, you can't
19   have a loss.  But if it's traded on a public market, you can,
20   even if you don't sell.  That's a very, very slippery position.
21         MR. KLAPPER:  You must demonstrate injury, that is
22   clear.  You must demonstrate a loss.
23         THE COURT:  And what is the injury, under the Supreme
24   Court rule, for securities fraud where you do not sell when
25   there is a reduction in the market price, but six years later

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
      09MVNECA                    Argument
 1    you sell, and the price has gone way up?
 2          MR. KLAPPER:  The injury that the Supreme Court has --
 3    or the damages calculation that the Supreme Court has mandated
 4    under its loss causation case recently is that when a public
 5    disclosure is made of the information that was misrepresented
 6    or omitted, the loss to people who bought the stock during the
 7    period when the misrepresentation was uncorrected is no more
 8    than the drop in the stock price on the day of disclosure or
 9    resulting from disclosure.
10          THE COURT:  And you can recover that, even if you --
11    when you sell --
12          MR. KLAPPER:  Even if I sold, let's say --
13          THE COURT:  The price has gone sky high.
14          MR. KLAPPER:  I didn't sell at all.  Just to
15    complicate things, under the '34 Act, there is a provision that
16    holds that if the price comes back up during the 90 days
17    following --
18          THE COURT:  Yes, I know.
19          MR. KLAPPER:  -- you can't recover.
20          But as a general proposition, if I hold the stock at
21    the time of the announcement of whatever information is
22    misrepresented, and I don't sell it, and I don't sell it until
23    today, and that company does marvelously, and my stock goes up
24    and up and up and up, I can still, under the 1934 Act, recover
25    for any part of that movement downward in price that occurred
```

30
09MVNECA                    Argument
1   after the disclosure that I can prove resulted from the fact
2   that the formerly-misrepresented information was correct.
3           THE COURT:  So you have a very tough road to hoe,
4   because you can't argue, as I initially thought you were
5   arguing, that you have to actually experience a loss.
6           MR. KLAPPER:  Well, I agree that we're --
7           THE COURT:  Because you can recover for a theoretical
8   loss.
9           MR. KLAPPER:  No.
10          THE COURT:  That's what it is.  If the price goes sky
11  high afterward, it is a theoretical loss.  You have not
12  realized a loss.
13          MR. KLAPPER:  The idea behind the theory is that you
14  overpaid when you bought.
15          THE COURT:  I understand.  And I understand that in
16  the context of restitution.
17          MR. KLAPPER:  Right.
18          THE COURT:  I do not understand that in the case of
19  the tort of fraud, intentional fraud, where you normally need
20  what we used to call proximate cause.
21          MR. KLAPPER:  Correct.  And that's why --
22          THE COURT:  And you're telling me that even under the
23  '34 Act, you no longer need proximate cause.
24          MR. KLAPPER:  Well, I'm saying that under the 1934
25  Act, the Supreme Court --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
        09MVNECA                    Argument
 1              THE COURT:  Has held you don't need proximate cause.
 2              MR. KLAPPER:  -- has held you can show proximate
 3      cause, and they did speak of --
 4              THE COURT:  Well, it's not proximate cause.  I mean
 5      let's -- it's an artificial definition of cause.
 6              MR. KLAPPER:  Correct, but one --
 7              THE COURT:  It's not actual cause.
 8              MR. KLAPPER:  It's one that depends very specifically
 9      on the existence of an active traded market in the security.
10              THE COURT:  So your whole position really depends on
11      the fact that there is no regularly established public market,
12      and that the plaintiff was told that there might never be.
13              MR. KLAPPER:  Correct.
14              THE COURT:  That's what your -- otherwise, the
15      plaintiff could succeed.
16              MR. KLAPPER:  If the plaintiff could demonstrate that
17      he was an active --
18              THE COURT:  Without selling.
19              MR. KLAPPER:  Correct.  If he was an active --
20              THE COURT:  That's a big change in the understanding
21      of causation.
22              MR. KLAPPER:  Well, your Honor, if you look at what
23      the --
24              THE COURT:  That is, causing the plaintiff loss or
25      injury, because injury is really what we are talking about.
```

```
     09MVNECA                    Argument
1              MR. KLAPPER:  We are talking about --
2              THE COURT:  And if you don't lose money, we used to
3    think you weren't injured.
4              MR. KLAPPER:  And that is still the general rule.
5              THE COURT:  But not, you tell me, in securities fraud.
6              MR. KLAPPER:  Not in the situation where you have an
7    actively-traded public market that you can point to to show
8    what people buy and sell.
9              THE COURT:  Well, that covers a lot of securities
10   fraud.
11             MR. KLAPPER:  It does, indeed, your Honor.  And if the
12   law were otherwise, I would certainly argue otherwise.  But I
13   have to concede that that's what the law is.
14             THE COURT:  Well, of course.  But it makes your
15   position much more difficult, let me put it that way.
16             MR. KLAPPER:  Yes.  If we could argue that they have
17   to sell in order to bring a claim, that would be an
18   open-and-shut case.  They haven't sold.
19             THE COURT:  That's right.
20             MR. KLAPPER:  But we can't say that.
21             THE COURT:  But you are not arguing that.  You are
22   arguing something much subtler; that because there is no
23   established secondary market, they do not get the same
24   remedy --
25             MR. KLAPPER:  Right, because they are --
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

09MVNECA                    Argument
1              THE COURT:  -- as someone who bought in an established
2     market.
3              MR. KLAPPER:  Right.  Their remedy is the same as --
4     and the standards are the same as the remedy and requirements
5     set out in Gelt Funding, because they hold an instrument that
6     is much more similar to a secured loan than it is to IBM stock.
7     And the reason is these mortgage-backed securities, each
8     tranche, there aren't all that many people who buy them.  They
9     are each unique because the collateral is different for each
10    transaction.
11             THE COURT:  How many people bought the tranche that's
12    being sued on here?
13             MR. KLAPPER:  I don't know.
14             THE COURT:  The first tranche, was it more than 100?
15             MR. KLAPPER:  I doubt it.
16             THE COURT:  Well, if it was less than 100, maybe they
17    are not a class.
18             MR. KLAPPER:  It could be.  We've always had a problem
19    with the notion that a plaintiff could sue not just in
20    different securitizations because the loans are different, but
21    for different tranches because the risks are very different.
22             THE COURT:  Yes.  But I have ruled that they can't.
23             MR. KLAPPER:  Right.  So what we are saying and what
24    Judge Crotty tried to counter is that these instruments don't
25    trade; there isn't an established public market and, therefore,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

34

```
    09MVNECA                    Argument
1   there isn't an established public price to refer to.  And
2   plaintiff knew that because we told them that that was the
3   case.
4            THE COURT:  I understand.  You said you couldn't be
5   sure, but --
6            MR. KLAPPER:  Judge Crotty addresses that issue by
7   saying, No, the plaintiff may have bought the security not to
8   hold it, as most fixed-income buyers do, but may have wanted to
9   resell it and profit in that fashion.
10           Now, we went back to the complaint to see whether that
11  plaintiff alleged anything of the sort, and that plaintiff
12  didn't.
13           THE COURT:  No, I understand all of that.  But I'm
14  going back to even more fundamental an issue.  Is it your
15  position that there is not a class of more than 100 people who
16  did what this plaintiff did?
17           MR. KLAPPER:  I would have to check.
18           THE COURT:  But you have not argued that.
19           MR. KLAPPER:  We haven't gotten to class.
20           THE COURT:  I haven't yet certified a class because
21  I'd like to be sure there is a viable claim before I certify a
22  class.
23           MR. KLAPPER:  There can be in these sorts of
24  securitizations, there can be tranches that are bought by one
25  buyer.  They can buy the entire tranche.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
       09MVNECA                    Argument
  1              THE COURT:  Then it shouldn't be a putative class
  2     action.  That's a sidetrack, I know.  I'm not getting to that
  3     at the moment, I'm just --
  4              MR. KLAPPER:  That's an issue that we, I hope, will
  5     never come to, but would, if it came to the issue of class
  6     certification.
  7              THE COURT:  All right.  Well, then let's move to the
  8     recision claim, which is 12.
  9              MR. KLAPPER:  Right.
 10              THE COURT:  And is there any question that they can
 11     get recision, which certainly doesn't depend on whether they
 12     sold?
 13              MR. KLAPPER:  Well, they have to allege injury in
 14     order to get recision.  And that gets us to the same question.
 15              THE COURT:  Yes.  But the recision, the injury is
 16     closer to being misled alone.
 17              MR. KLAPPER:  Well, we cite to the Dow Systems case
 18     from the Ninth Circuit which points out that 12(a)(2) does,
 19     indeed, have a requirement of injury.  And if you can't say you
 20     are injured, even if you were defrauded, you don't have a
 21     claim.
 22              THE COURT:  But, here again, you depend entirely on
 23     the fact that there was no established market to argue that
 24     there was no injury.
 25              MR. KLAPPER:  Correct.  We rely on the fact that --
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
      09MVNECA                    Argument
1            THE COURT:  Their injury they allege is that they
2     bought it all.
3            MR. KLAPPER:  Well, their injury, they allege, is the
4     same as Gelt Funding, and the risk that they won't be repaid is
5     higher than they thought it was.
6            THE COURT:  Right.
7            MR. KLAPPER:  That's their allegation.
8            THE COURT:  Yes.
9            MR. KLAPPER:  But if I can --
10           THE COURT:  And how can I dismiss that at this point?
11           MR. KLAPPER:  Well, you can dismiss it at this point
12    based upon Gelt Funding, because they don't have any realized
13    loss.  And in this circumstance, they have to have one.
14           THE COURT:  Well, but you told me they have to realize
15    a loss under the latest Supreme Court doctrine.
16           MR. KLAPPER:  If there was an established public
17    market, and there isn't.
18           THE COURT:  So you can't have a loss unless you have
19    an established public market, even for restitution?  I find
20    that a hard position.
21           MR. KLAPPER:  Well, you'd have to prove a loss.  And
22    the ways you prove a loss, the most obvious is you foreclose on
23    your loan or you sell your certificate and you are
24    out-of-pocket.
25           THE COURT:  You don't mean you have to prove a loss,
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

37

09MVNECA                    Argument
 1  you mean you have to prove an injury.
 2          MR. KLAPPER:  Correct.
 3          THE COURT:  And if you rely on a misrepresentation to
 4  make a purchase, and you seek to rescind on the ground that you
 5  were misled, I don't think you need exactly the same kind of
 6  realized loss as if you are suing for damages, under any
 7  theory, forgetting the securities law.  I don't think that
 8  recision for fraud is an identical claim to suit for damages
 9  for fraud.
10          MR. KLAPPER:  That's true.  That's true.  But you
11  still have to allege injury.
12          THE COURT:  So on your position on recision, I am
13  going to rule against you.  I'm going to deny the motion to
14  dismiss, because I think they have alleged enough theoretically
15  if they proffer back what they received to get recision.
16          MR. KLAPPER:  Your Honor, can I address the
17  substantive --
18          THE COURT:  The whole thing remains to be developed.
19  But I'm talking now strictly on the allegations of the
20  complaint.
21          MR. KLAPPER:  Well, let me turn to the allegations of
22  the complaint.  Because there are a number of different
23  categories of allegations, all but one --
24          THE COURT:  I'm aware, and I'm keenly aware the one
25  most important to you is the statement that there may not be a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
      09MVNECA                    Argument
 1    secondary market.
 2            MR. KLAPPER:  Correct.
 3            THE COURT:  I understand that.  But this is a document
 4    that is so thick and contains so much stuff that to believe
 5    that even a careful investor has parsed out every little piece
 6    of every little thing, unless it's a very clear statement and
 7    none -- and that is not a very clear statement, it's an iffy
 8    statement, is if this were a two-page statement of what they
 9    are getting, it would be one thing.
10            This is a volume which has so many little parts and so
11    many possibilities stated on both sides of every question that
12    I think it's very -- that makes it harder to take the position
13    that they were warned clearly that they could not even give it
14    back if there was no secondary market.
15            MR. KLAPPER:  Well, we would respectfully disagree.
16    But can I now address the actual substantive allegations of
17    alleged misrepresentations?
18            THE COURT:  That's tougher, I agree with you.  I agree
19    with you.
20            MR. KLAPPER:  Because if you take a look at -- there
21    are eight cases in the Southern District, one in the Eastern
22    District so far.  If you take a look at those cases, those
23    cases have dismissed the types of allegations that plaintiffs
24    make in this case in all but one -- for all but one type of
25    allegation.  So allegations of --
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
          09MVNECA                    Argument
 1                THE COURT:  I understand.  And I may want the
 2      plaintiff to replead to allege specifically which allegations
 3      they are really relying on.  Because there is so much iffy
 4      stuff on both sides here in this big volume.
 5                MR. KLAPPER:  Well, it's clear that allegations of
 6      appraisals overstating value have been dismissed.
 7                THE COURT:  Yes.  But that's not -- the only
 8      allegation here of any real substance, as I read both the
 9      complaint and this pound of paper, has to do with the standards
10      that were followed and would be followed in valuing the loans,
11      in valuing the mortgages.
12                MR. KLAPPER:  The one type of claim that has survived
13      is what could be called the wholesale departure from loan
14      originating standards.
15                THE COURT:  Correct.
16                MR. KLAPPER:  And that decision by, first, Judge
17      Kaplan, and then others following him, we would submit, is
18      distinguishable in this case.  But more than that, it's
19      misguided for at least two major reasons.
20                THE COURT:  I understand.  But on the face of the
21      complaint, until I see what it is exactly that we are talking
22      about and the evidence in the case, I cannot throw it out,
23      because there is enough here with respect to -- what's the
24      outfit that's now so controversial?  Countrywide --
25      Countrywide's standards and Countrywide's examination of the
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

EXHIBIT B -69-

```
     09MVNECA                    Argument
 1   ability of the mortgage borrower to pay back a loan, those are
 2   the ones that are the most iffy kind of -- on the one hand, on
 3   the other hand, statements in this pound of paper.
 4          As I said, if this were a two-page document which
 5   clearly asserted anything, you'd be in a much better position.
 6   But it's because the issuer didn't really want to commit to
 7   anything, everything in here is on the one hand and on the
 8   other hand.  And you have to be extraordinarily adept and an
 9   exceptionally careful reader to figure out exactly what risks
10   there are.
11          MR. KLAPPER:  Let me, though, if I may, address
12   directly the allegation of wholesale departure from
13   underwriting standards.  So however they claim the departure
14   occurred --
15          THE COURT:  Let's forget underwriting standards.
16   Let's focus, rather, on examination of the ability of the
17   borrower to repay the mortgage.
18          MR. KLAPPER:  Well, that's what I meant by
19   underwriting, loan underwriting standards.
20          THE COURT:  Well, I like to translate into English.
21          MR. KLAPPER:  It's the standards under which the
22   person who made the loan originally, the originator of the
23   loan --
24          THE COURT:  Right, right, paid attention to whom he
25   was lending to.
```

41

```
          09MVNECA                    Argument
1                 MR. KLAPPER:  -- decided to make the loan or not.
2                 THE COURT:  Right.
3                 MR. KLAPPER:  And with due respect to Judge Kaplan and
4         Judge Baer --
5                 THE COURT:  I'm not bound by anybody.  I'm bound by
6         the language of this volume and common sense about what people
7         can understand.
8                 MR. KLAPPER:  And one other thing:  By the regulations
9         of the Securities and Exchange Commission.
10                THE COURT:  Well, of course.
11                MR. KLAPPER:  To the extent that they are not, you
12        know, irrational or otherwise don't deserve deference.  And
13        that's what Judge Kaplan and Judge Baer have not done with
14        respect to Regulation 1111.  That's part of the SEC's
15        Regulation AB, asset-backed, which is their regulation for what
16        needs to be disclosed with respect to asset-backed securities.
17                THE COURT:  It's not just a matter of what needs to be
18        disclosed; it's a matter of what is said that when you make a
19        statement, if you don't need to make the statement in the first
20        place, that's fine, if you make no statement about it.  But
21        once you make a statement about something, you have to be
22        careful about what you say.
23                MR. KLAPPER:  Yes.  And, your Honor, the Securities
24        and Exchange Commission has addressed that.  And if I may just
25        hand up Regulation 1111 just so we know what we are talking
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

09MVNECA                    Argument

1     about.
2              THE COURT:  Right.  I understand.  I do not come to
3     you without having thought about all of this very carefully and
4     examined everybody's position and papers, or it would be a
5     waste of my time to hear oral argument.
6              MR. KLAPPER:  I understand, your Honor.  But I think
7     that this regulation is very clear.  We have highlighted what's
8     relevant for the purpose of the wholesale departure claim.  And
9     what you see is that in (a)(3) it both requires a description
10    of the underwriting or credit granting criteria used to
11    originate or purchase the pool of assets.  So you're required
12    to set forth what the standards are.  And including to the
13    extent known any changes in such criteria and the extent to
14    which such policies and criteria are or could be overwritten.
15             THE COURT:  Well, that's going to be an issue of fact,
16    isn't it?
17             MR. KLAPPER:  No.
18             THE COURT:  What these people knew when they said the
19    things they said in this pound of paper.
20             MR. KLAPPER:  Well, that, though, gets us to pleading,
21    because they don't plead that we knew about these departures.
22    They don't plead that we knew that Countrywide or anyone
23    else --
24             THE COURT:  But you argue that you said that not
25    everything is exactly the same as what we are saying.  So you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

09MVNECA                    Argument

```
 1    knew something.  You knew that the standards were not
 2    rigorously applied, let's put it that way.  But you put that in
 3    among hundreds of words.
 4              There are some things in this statement that might
 5    have exculpated you on the face -- I have no idea what the
 6    facts are -- from some of the other statements you made if you
 7    didn't make so many statements, wishy-washy statements about
 8    maybe this and maybe that, and it's possible that there will
 9    not be a secondary market, and this is this.
10              You didn't say it's unlikely that there will be a
11    secondary market.  You said, rather, that there may not -- it's
12    possible there may not be a secondary market.
13              Those two convey somewhat different notions to a
14    reader, even a careful reader.  But nobody could carefully read
15    all of the words in these pounds of paper.
16              MR. KLAPPER:  I understand, your Honor.
17              But with respect to the loan origination standards,
18    the underwriting standards for loans, there is no dispute on
19    the basis of the pleadings that there was a description of
20    underwriting standards.  The allegation is that there was a
21    wholesale departure from them.
22              THE COURT:  Why isn't that an issue of fact?
23              MR. KLAPPER:  It would be an issue of fact if they
24    alleged that we knew it.  It's not an issue of fact because
25    they don't allege it.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

44

09MVNECA                    Argument
1            THE COURT:  Well, there was a wholesale departure.
2            MR. KLAPPER:  Yes.
3            THE COURT:  I don't think in the first instance in a
4     complaint they have to allege that you knew it.  They are going
5     to have to ultimately show that, but if it was wholesale, it's
6     some circumstantial evidence that you may have known.
7            MR. KLAPPER:  Here is why they avoided it.  They have
8     avoided it because they don't want to satisfy the requirements
9     of Section 9(b) of the Rules of Civil Procedure.
10            THE COURT:  That remains to be seen, right?  That will
11     be their burden along the way.
12            The question is whether the complaint is subject to
13     dismissal.  And complaints are only subject to dismissal if the
14     claim is not plausible and, if proven, still do not meet the
15     legal requirements for an actionable claim.
16            And it's a close question here, I agree with you,
17     because they're as wishy-washy as this pound of paper that they
18     relied on.  But it doesn't help either one of you to be
19     wishy-washy.
20            MR. KLAPPER:  They may be wishy-washy about some
21     things, but one thing is clear, and that is they do not allege
22     that any of the defendants knew that there were wholesale
23     departures from the underwriters' standards.
24            THE COURT:  I think they are arguing essentially that
25     if there were wholesale departures, that itself is some
               SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

EXHIBIT B -74-

```
          09MVNECA                    Argument
 1    circumstantial evidence that somebody must have known.  Now,
 2    they may be wrong, maybe nobody knew, but you can't cover your
 3    ears and cover your eyes and say we didn't know.
 4              There is such a things as if something is done in many
 5    cases, it's arguable that that is some circumstantial evidence
 6    that whoever was theoretically making these loans and examining
 7    whatever they examined, they might have noticed it, right?
 8    That is, on the face of a complaint, I cannot assume in these
 9    circumstances and on these allegations that nobody who was
10    involved in issuing this stuff knew anything about the fact
11    that what they were dealing with were people who made -- that
12    the mortgage lenders were all totally unreliable.
13              MR. KLAPPER:  Your Honor, it's not a question of
14    assuming what ultimately can be proved.  It's a question of
15    whether they've alleged it.  And they have not alleged --
16              THE COURT:  You've made your point.  I've heard you.
17    And I've read you.
18              MR. KLAPPER:  OK.
19              THE COURT:  You don't have to keep repeating it.
20              MR. KLAPPER:  If I can advance just one point so that
21    I'm clear as to where your Honor is ruling.
22              Section 1111, because it specifies both that you have
23    to disclose the underwriting standards and, to the extent
24    known, departures from them, specifies what you need to --
25              THE COURT:  Let me stop you for a minute.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

46

09MVNECA                    Argument

1          An intentional misrepresentation always involves some
2    content of knowledge.  But there are some kinds of
3    representations that are so difficult to make without any
4    knowledge.  There is also some element in some representations
5    of being a representation that we know this is so.  Whether
6    this is a misrepresentation of what was known is itself a
7    question of fact here.
8          MR. KLAPPER:  If Goldman Sachs or the other defendants
9    knew --
10          THE COURT:  Or had -- I know that "should have known"
11    is not itself a sufficient standard, but there are some kinds
12    of should-have-knowns that are almost consciousness of --
13    consciously avoiding knowing.
14          MR. KLAPPER:  I agree with that.  There is a doctrine
15    of consciously avoiding the truth.
16          THE COURT:  Right.
17          MR. KLAPPER:  But that is deemed to be the equivalent
18    of knowledge.
19          THE COURT:  Yes.
20          MR. KLAPPER:  And knowledge is required here.  If you
21    look at the Blackmoss case by Judge Sweet which addresses a
22    similar SEC regulation involving known trends that need to be
23    disclosed, and he makes the point that even if you disclose
24    some things, but you don't disclose the known trend, that's not
25    good enough, because you have to actually know about the trend.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT B  -76-

47
09MVNECA                    Argument
1           And if you take a look at the --
2           THE COURT:  Well, trends are different from the kind
3    of knowledge we are talking about here.  Every one of these
4    cases depend, in part, on what kind of information we're
5    talking about.
6           To blithely say that the mortgage lenders here -- for
7    example, suppose it said the mortgage lenders here were
8    careful.  And you know they didn't, in fact, follow their
9    standards in many cases.  That is a misrepresentation of a
10   type.
11          MR. KLAPPER:  Well, and you knew it, under your
12   hypothetical.
13          THE COURT:  Well, all you're telling me is they have
14   to allege specifically that it was known.
15          MR. KLAPPER:  Correct.
16          THE COURT:  There are some kinds of representations
17   that on their face had to have had some ability to be observed
18   by the people who are making them, because certain
19   representations are also representations of knowledge.
20          You cannot represent that somebody followed certain
21   guidelines.  If you say that and you have no knowledge, that,
22   in itself, is a misrepresentation; because you are representing
23   that you know that or you couldn't say it.
24          MR. KLAPPER:  The representation, as required by 1111,
25   is what the underwriting standards are.  And the argument
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

48

09MVNECA                    Argument
1    plaintiff --
2              THE COURT:  All right.  Look, you're repeating and
3    repeating.  And I have heard you, and I've examined your
4    arguments.
5              On that, I rule against you on this complaint.
6              MR. KLAPPER:  Can I just cite to one last case?  And
7    that is the Second Circuit's opinion in the Morgan Stanley
8    Information Fund case, which dealt with yet another SEC
9    regulation, and whether or not there needed to be a disclosure
10   in that case of securities analysts having biased views in
11   order to support Morgan Stanley's offerings.
12             The Second Circuit, having obtained the views of the
13   SEC as to whether there was a requirement for the mutual funds
14   to disclose more than what was listed in regulation, said, no,
15   that's not required; you should list -- you're required to list
16   what the SEC tells you you must list and disclose, and not more
17   than that.
18             THE COURT:  I'm familiar with it.  Please.  You're
19   beating a dead horse at this point.
20             MR. KLAPPER:  All right.
21             Can I address the issue of statute of limitations --
22             THE COURT:  Yes, of course.
23             MR. KLAPPER:  -- which Judge Swain recently addressed
24   in a case, In Re: Morgan Stanley, that was decided after the
25   briefing of these motions, and so it isn't addressed in either
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
      09MVNECA                Argument
 1    our papers or the plaintiff's.
 2            THE COURT:  Right.  What is your position as to
 3    exactly when this information was released as distinguished
 4    from when the rating companies began to change the ratings?
 5            MR. KLAPPER:  The information that Judge Swain relied
 6    on, for example, increasing nonperforming loans, we have in
 7    this case, as well.  In fact, at the time that this plaintiff
 8    bought their second securities in the 2007-5 case, over 16
 9    percent of the loans by numbers, 17 and-a-half percent by
10    amount, were not performing.  We have the same pattern.
11            THE COURT:  Yes.  But how was that communicated?  It
12    seems to me when the rating agencies reduced the ratings, that
13    was information that no one could ignore.
14            MR. KLAPPER:  The trustees publish that information
15    every month.  It's available.
16            THE COURT:  Publish what?
17            MR. KLAPPER:  Nonperforming loans, how much has been
18    paid off, how much is --
19            THE COURT:  Publish it where?
20            MR. KLAPPER:  On their websites.
21            THE COURT:  And you think that all these people have
22    to read the website of the trustees every month?
23            MR. KLAPPER:  If they want to.  It's there.  It's
24    public.  And it's information about the collateral and the
25    trusts --
```

50

09MVNECA                    Argument

 1              THE COURT:  I don't know how public it is.  There are
 2      still a lot of people who don't rely on the Internet,
 3      especially -- I mean I'm sure that all of those who are 18 or
 4      under would look.
 5              MR. KLAPPER:  Well, if you take a look -- this
 6      complaint was first filed in December of 2008.  If you take a
 7      look at the complaint that Mr. Leahy's firm brought in Nomura
 8      v. Goldman Sachs and others, in that complaint, which was
 9      brought in, I think, December of 2007 or early 2008, it alleges
10      that the truth concerning these underwriters departing from
11      standards and appraisals and all that, the truth became known
12      in the summer of 2007.  So more than a year before this
13      plaintiff, represented by this law firm, brought the lawsuit.
14      And that's what the standard is.
15              So if you look at the information available on
16      nonperforming loans, if you look at the information available
17      about various loan originators departing from their standards
18      and problems with --
19              THE COURT:  Do you agree that what really triggered
20      public concern about all of this was when the -- and, indeed,
21      what would affect the price, if there were a market, were the
22      changes in the ratings?
23              When were those changed?  When did the rating agencies
24      reduce the ratings on all of this stuff?
25              MR. KLAPPER:  Well, if you want the correct --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
        09MVNECA                    Argument
1                 THE COURT:  What was the date?
2                 MR. KLAPPER:  Well, in July of 2007.
3                 THE COURT:  All right.
4                 MR. KLAPPER:  The rating agencies started reducing the
5       ratings on a large number of residential mortgage-backed
6       securities.
7                 THE COURT:  But we are talking about these.  We are
8       talking about these certificates.  When were the ratings
9       reduced on these certificates?
10                MR. KLAPPER:  It was within the one year before.  So
11      if there's a requirement that there be -- I think it might have
12      been in the summer of 2008, something like that.
13                THE COURT:  But if we are talking about the effect on
14      the sales price, if that has any significance, it is the change
15      in rating that had that effect.  Isn't that right?
16                MR. KLAPPER:  No.  To the extent that residential
17      mortgage-backed security prices, where they were traded,
18      declined, the big decline occurred in June and July and August
19      of 2007 initially, especially with the less creditworthy
20      securities to Bear Stearn's asset management funds collapsed in
21      June of 2007.  The rating agencies started reducing ratings on
22      all sorts of residential mortgage-backed securities.
23                THE COURT:  OK.  But wasn't this suit brought within
24      that period?
25                MR. KLAPPER:  No.  The suit was brought in December of
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

```
       09MVNECA                  Argument
1      2008.
2                THE COURT:  When were the ratings reduced?
3                MR. KLAPPER:  Just so I'm clear, I certainly don't
4      want to mislead the Court.  There were many, many
5      residential --
6                THE COURT:  Weren't there ratings in the initial
7      public offering?  Weren't ratings provided?
8                MR. KLAPPER:  Yes.
9                THE COURT:  Right.  And when were those ratings
10     reduced, publicly, for these certificates?
11               MR. KLAPPER:  These certificates, I don't believe
12     until the summer of -- let's see.  So December of 2008.
13               THE COURT:  Would have been within the statutory
14     period.
15               MR. KLAPPER:  Correct.
16               THE COURT:  Well, that, it seems to me, is what was
17     really significant here for investors.
18               MR. KLAPPER:  The claim, remember, is not that there
19     was something specific to this securitization trust or even the
20     originators who made the loans in these two securitization
21     trusts, but that there was a wholesale departure from
22     underwriting standards across the industry.
23               THE COURT:  Well, they can't do that.  They can only
24     claim with respect to their own certificates.
25               We've been through this many times now.  This is not a
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

                                                        53
        09MVNECA                    Argument
 1   universal case.  This is a case only about what happened to the
 2   plaintiffs in this case.
 3           MR. KLAPPER:  And if they have alleged that, we would
 4   have something that would be easier for us to assess and move
 5   against, but they are not.  They are alleging a
 6   wholesale-across-the-industry departure from loan standards.
 7           THE COURT:  Then what you are asking me now is an
 8   evidentiary problem.  You want me to preclude them from proving
 9   things that happened before the ratings were changed.  But what
10   really gave the public notice about how fishy these things
11   were, how really risky they were, were the reduction in
12   ratings.
13           Is there any question about that as a practical
14   matter?
15           MR. KLAPPER:  Absolutely.  Rating agencies were late
16   to the party.  Prices were down --
17           THE COURT:  Well, if rating agencies were late, why
18   shouldn't ordinary investors be equally late?  Why shouldn't
19   they look to the rating agencies?
20           MR. KLAPPER:  Because the rating agencies, although
21   late, were more than a year earlier than this plaintiff in
22   recognizing --
23           THE COURT:  But a year is what the law requires.  It's
24   not forever.  And it's a question of what it is that should
25   have given them warning.  And I think, in this case, it is the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

09MVNECA                    Argument
1   reduction in ratings.  And I think that probably was true -- I
2   don't rule on anything but this case.  I don't have to make a
3   universal ruling.  But I think the reduction in ratings was a
4   real jolt.
5           MR. KLAPPER:  The reduction in ratings, again, not
6   with respect to the particular certificates that they bought,
7   but in general, with respect to hundreds, if not thousands --
8           THE COURT:  Look, you want me to limit them to their
9   particular certificates, and I'm doing that.  So I'm limiting
10  their discoveries to their particular certificates, as well.
11          Let's move on.  Let's turn now -- once we get past the
12  11 and 12 claims, I don't think that the 15 claim raises
13  anything.  The 15 claim only depends on whether there's a claim
14  under either 11 or 12, isn't that right?
15          MR. KLAPPER:  Well, it's a supervision claim, control
16  claim, so they have to prove more.  But our basis for --
17          THE COURT:  No, but it's an absolute liability.  It's
18  a defense that I didn't have anything to do with it.
19          MR. KLAPPER:  Right.  There are some additional
20  issues.
21          THE COURT:  Yes.
22          MR. KLAPPER:  Goldman Sachs Mortgage Company, the
23  sponsor, is sued as an underwriter.  The law is clear, among
24  others, through Judge Rakoff --
25          THE COURT:  Didn't they sign this pound of paper?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
      09MVNECA                    Argument
 1              MR. KLAPPER:  No.
 2              THE COURT:  Their name doesn't appear on it?
 3              MR. KLAPPER:  No.  Their name may appear, but it's
 4     sponsor.
 5              And Judge Rakoff, addressing exactly this issue --
 6              THE COURT:  Well, I don't really understand the
 7     difference in the impact on the market of whether somebody is a
 8     sponsor or an underwriter.
 9              MR. KLAPPER:  Well, if you are not an underwriter, the
10     statute doesn't permit you to be sued.
11              THE COURT:  I know.  But I don't understand why a
12     sponsor is not an underwriter.
13              MR. KLAPPER:  Because a sponsor doesn't underwrite the
14     securities.  The sponsor buys the loans and contributes them --
15              THE COURT:  Yeah, but why isn't everybody whose name
16     is on that as an issuer not a seller?
17              MR. KLAPPER:  It's not an issuer.  The trust is the
18     issuer.
19              THE COURT:  I understand.  I'm not going to throw them
20     out yet.  Maybe at some point you'll show me that I should.
21              MR. KLAPPER:  Well, I would refer to Judge Rakoff's
22     decision in the Merrill Lynch case.
23              THE COURT:  I have enormous respect for my colleagues,
24     but I am not -- the authority that binds me is the Second
25     Circuit and the Supreme Court.  And I try very hard to follow
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

56

```
        09MVNECA                    Argument
 1   them to the letter.
 2               MR. KLAPPER:  Then there is the question of whether
 3   under 12(a)(2) plaintiff has adequately alleged that it
 4   purchased in the 2007-10 offering -- rather, sorry, that it
 5   purchased directly from Goldman Sachs.  And they say --
 6               THE COURT:  I thought that that was in the initial
 7   public offering.
 8               MR. LEAHY:  Yes, it was.  And we allege --
 9               THE COURT:  Whom else do you buy it from?
10               MR. KLAPPER:  Well, you could buy it from your broker,
11   who, in turn, bought it from -- in the offering.
12               MR. LEAHY:  Your Honor, it was a firm commitment
13   underwriting.  Goldman Sachs bought all the certificates and
14   then sold them to the public.  That's what the prospectus
15   supplement says.  Our client bought two weeks before the
16   closing date.  The trading records we have --
17               THE COURT:  In the initial public offering?
18               MR. LEAHY:  In the initial public offering.
19               Our trading records said from Goldman Sachs, we allege
20   that.
21               THE COURT:  It alleges that in the complaint.
22               MR. KLAPPER:  All we want is to be clear that they
23   didn't buy through a broker or other intermediary.
24               THE COURT:  Well, you'll find that out.  Why should
25   you assume that if it says in the complaint that they bought it
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
        09MVNECA                     Argument
 1    from Goldman Sachs?
 2              MR. KLAPPER:  If they can confirm that they didn't buy
 3    it through an intermediary, then that's the end of it.
 4              MR. LEAHY:  That's our allegation, your Honor.  We
 5    bought it directly from them in a public offering.
 6              THE COURT:  OK.
 7              I deny the motion to dismiss the allegation under 12
 8    and 15, which is just a subsidiary of 12.
 9              I am going to reserve decision on 11.
10              But there's no reason not to proceed with discovery.
11              And at this point, I need a case management plan,
12    because this case has to proceed.  And if, indeed, there are
13    fewer than 100 people who bought what the plaintiff bought,
14    there may not be a class action here.  But the complaint is all
15    I'm talking about, the plaintiff.  I have not certified a class
16    yet, and nobody has asked me to.
17              I do not think that the plaintiff can sue, as I've
18    told you before, except on the particular certificates that
19    he's talking about -- or that it's not "he," it is talking
20    about.
21              MR. LEAHY:  Your Honor, if I may.
22              We believe we can sue on all tranches of the trust.
23    May we file our motion for class certification?  Because that
24    is --
25              THE COURT:  I never prohibit anybody from making any
```

```
          09MVNECA                    Argument
 1   motion that the rules permit.
 2              MR. LEAHY:  Thank you.
 3              THE COURT:  But you should go forward with discovery
 4   on this plaintiff.
 5              MR. LEAHY:  Certainly.  Thank you.
 6              THE COURT:  You do not need my permission for that.
 7   But what the outcome will be, we will see.
 8              I am raising my own tentative view that fewer than 100
 9   people bought each of these certificates in any particular
10   tranche.  We really do not have a viable class.  I do not know
11   how many cases have addressed that particular issue.
12              MR. LEAHY:  I suspect none at this point, your Honor.
13              THE COURT:  Time will tell.  You will do as you are
14   advised, and the defendants will do as they are advised.  But
15   in the meantime, I want the case to move forward.
16              MR. LEAHY:  Yes, your Honor.
17              MR. KLAPPER:  Understood.
18              THE COURT:  Very well.  Good luck to everybody.
19              MR. KLAPPER:  Thank you, your Honor.
20              THE COURT:  And I will try to resolve the viability of
21   the complaint under Section 11 as soon as possible.
22              MR. LEAHY:  Your Honor, would you want --
23              THE COURT:  But, in the meantime, because it's viable
24   under 12, that shouldn't interfere with ongoing discovery.
25              MR. LEAHY:  Sure.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

59

09MVNECA                    Argument

1            Your Honor, defense counsel raised this issue about a
2    well-developed efficient market being prerequisite for damages
3    under Section 11.
4            If it would be helpful to the Court, we'd like to
5    submit a memorandum on that, because it is our understanding of
6    law that there is no need for an efficient market or a
7    well-developed market to sustain damages.
8            THE COURT:  I would be very interested in seeing
9    whatever you have on that subject.
10           MR. LEAHY:  Thank you.
11           THE COURT:  Very well.
12           MR. KLAPPER:  Thank you.
13                            *    *    *
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

# EXHIBIT B

The Honorable Marsha J. Pechman

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF WASHINGTON
9                              AT SEATTLE

10   BOILERMAKERS NATIONAL ANNUITY
     TRUST FUND, on behalf of itself and all others       Case No. C09-00037MJP
11   similarly situated,

12                              Plaintiff,                 **ORDER ON DEFENDANTS'**
                                                           **MOTIONS TO DISMISS**
13              v.

14   WAMU MORTGAGE PASS TRHOUGH
     CERTIFICATES, SERIES AR1, et al.,
15

16                              Defendants.

17

18          This matter is before the Court on Defendants' motions to dismiss Plaintiffs' second

19   amended consolidated complaint. (Dkt. Nos. 168, 170.) In addition filing responses to the

20   motions (Dkt. Nos. 177, 178), Plaintiffs have filed a motion to amend the complaint (Dkt. No.

21   179). Defendants have filed replies in support of their motions (Dkt. Nos. 184, 187), the Rating

22   Agency Defendants have filed a response to Plaintiffs' motion to amend (Dkt. No. 186), and

23   Plaintiffs have filed a reply in support of their motion to amend (Dkt. No. 190). For the reasons

24   set forth below, the Court GRANTS IN PART the WaMu Defendants' motion to dismiss,

25   GRANTS the Rating Agencies' motion to dismiss, and DENIES Plaintiffs' motion to amend.

26                                    **Background**

I.      Procedural History

        A total of six complaints have been filed in this matter.  On August 4, 2008, an action was filed in King County Superior Court.  (C09-0134; Dkt. No. 1 (Notice of Removal).)  On January 20, 2009, Plaintiff Boilermakers filed their complaint.  (C09-0037; Dkt. No. 1.)  The Doral Bank complaint was filed on October 2009.  (C09-1557: Dkt. No. 1.)  Plaintiffs filed their first consolidated complaint on November 23, 2009.  On December 31, 2009, Plaintiffs filed an amended consolidated complaint.  Finally, the Second Amended Complaint ("SAC") was filed on April 1, 2010.  (Dkt. No. 164.[1])  The proceedings were delayed by a statutorily-mandated stay for claims against Washington Mutual Bank, Plaintiffs' error in providing adequate PSLRA notices, and Plaintiffs' request for leave to amend their complaint in light of this Court's rulings in the In re Washington Mutual Securities, ERISA, and Derivative Litigation, 08-md-1919 MJP.

II.     Allegations in Second Amended Complaint[2]

        Lead Plaintiffs Doral Bank of Puerto Rico ("Doral Bank") and Policemen's Annuity and Benefit Fund of the City of Chicago ("Chicago PABF") and Plaintiff Boilermakers National Annuity Trust ("Boilermakers") bring this action on their own behalf and on behalf of a putative class of individuals and entities who purchased interests in certain Washington Mutual Mortgage Pass-Through Trusts ("Issuing Trusts").  (¶ 1.)  Plaintiffs purchased mortgage-backed securities created by Washington Mutual Bank subsidiaries from 75,608 "mainly sub-prime first-lien hybrid adjustable rate" mortgage loans.  (¶¶ 5-6.)  The securities entitled purchasers to the proceeds of payments made on the underlying mortgages: "[a]s the original borrowers on each of the underlying mortgage loans paid their mortgages, distributions were made to investors through the Issuing Trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates."  (¶ 7.)

---

[1] Unless otherwise noted, all references to the Complaint and all "¶" citations refer to the Second Amended Complaint

[2] The Court's summary of the Plaintiffs' allegations shall not be construed as an indication that any facts alleged have been established in fact.

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 2          CASE NO. C09-00037MJP

Washington Mutual Bank ("WMB"), which is no longer a named Defendant in this matter, either originated or acquired the mortgage loans underlying the Certificates. (¶ 23.) Defendant Washington Mutual Asset Acceptance Corporation ("WMAAC"), a wholly-owned subsidiary of Washington Mutual, Inc., purchased the mortgage loans from WMB and assigned the mortgage loans to the trustee. (¶ 24.) WMAAC filed two Registration Statements pertinent to the securities in this Complaint: (1) a December 2005 Form S-3, subsequently amended by a January 2006 Form S-3/A (together "the 2006 Registration Statement") and (2) a March 2007 Form S-3, as subsequently amended by an April 2007 Form S-3/A (together "the 2007 Registration Statement"). (¶ 25.) Defendant WaMu Capital Corporation ("WCC"), another wholly-owned subsidiary of Washington Mutual, Inc., underwrote the offerings and "assisted in drafting and disseminating the Offering Documents for the Offerings of Certificates" issued pursuant to the Registration Statements. (¶¶ 37-39.) Plaintiffs refer to WMB, WMAAC, and WCC collectively as "WaMu." (¶ 5.)

Defendants David Beck, Diane Novak, Thomas Green, Rolland Jurgens, Richard Careaga, Thoams, Lehmann, Stephen Fortunato, and Donald Wilhelm are officers of WMAAC who signed the Registration Statements. (¶¶ 4, 27-36.) Plaintiffs name Moody's Investors Services, Inc. ("Moody's") and McGraw Hill Companies, Inc. ("McGraw-Hill") (together "Rating Agencies") as Defendants for their role in providing credit ratings to the certificates which were published in the Prospectus Supplements. (¶¶ 4, 11, 42-43.)

Unlike dividends issued to holders of common stock, the cash flow from mortgage-backed securities ("MBS") is distributed "in order of priority, based on the specific tranche held by the MBS investor." (¶ 45.) Thus, "[t]he highest tranche . . . is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages." (Id.) Plaintiffs allege Defendants made a number of misrepresentations with respect to certificates issued in 36 public offerings between January 26, 2006 and June 26, 2007. (¶ 2.) Defendants amended the Registration Statements with

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 3                CASE NO. C09-00037MJP

1    Certificate-specific Prospectus Supplements, which describe the mortgage pool underlying each

2    trust.  (¶¶ 61-62.)

**Discussion**

3

4    I.    Legal Standards

5           On a Rule 12(b)(6) motion to dismiss, the Court must assess the viability of the

6    Complaint.  Dismissal is appropriate where a complaint fails to allege "enough facts to state a

7    claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

8    (2007).  The Supreme Court has recently clarified that "[a] claim has facial plausibility when the

9    plaintiff plead factual content that allows the court to draw the reasonable inference that the

10    defendant is liable for the conduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); see

11    also Moss v. United States Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) ("In sum, for a

12    complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable

13    inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to

14    relief.") (citing Iqbal, 129 S. Ct. at 1949).  The Court must accept Plaintiffs' factual allegations

15    as true, but need not accord the same deference to legal conclusions. Id. at 1949-150 (citing

16    Twombly, 550 U.S. at 555).  To the extent documents referenced in a complaint contradict a

17    plaintiff's conclusory allegations, the Court is not required to accept those allegations as true.

18    Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir. 1998).

19       Under a facial challenge to jurisdiction under Rule 12(b)(1), the Court's analysis mirrors its

20    Rule 12(b)(6) inquiry. See James Wm. Moore, et al., Moore's Federal Practice § 12.30[4]; see

21    also Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2204) (distinguishing

22    between facial and factual challenges).

23    II.    Request for Judicial Notice

24           When deciding a motion to dismiss, the court "may generally consider only allegations

25    contained in the pleadings, exhibits attached to the complaint, and matters properly subject to

26    judicial notice." Swartz v. KPMG LLP, 476 U.S. 756, 763 (9th Cir. 2007).  A court may

consider "a writing referenced in the complaint but not explicitly incorporated therein" if a claim necessarily relies on the document and there is no dispute as to authenticity. Id. A court may take judicial notice of public documents filed with the SEC. Dreiling v. American Express Co., 458 F.2d 942, 946 n.2 (9th Cir. 2006).

The WaMu Defendants seek judicial notice of (1) certain SEC filings (Dkt. No. 171 ("RJN"), Exs. 1-6, 21-22, 25), (2) the Mortgage Loan Purchase and Sale Agreement (id., Ex. 23), (3) summaries and supporting data related to the delinquency rates of the loans (id., Exs. 7, 8), and (4) a number of press releases, newspaper articles, and reports (id., Exs. 9-19). Plaintiffs do not distinguish among the exhibits and object the Court taking judicial notice of any document. (Dkt. No. 177 at 14 n.5.) The Court GRANTS the request as to the SEC filings, which are referenced in the complaint, but DENIES the request as to the remainder of the documents, which do not bear on the Court's analysis.

III.    Sections 11 and 12(a)(2)

     a.    Standing under Section 11

The WaMu Defendants challenge Plaintiffs' standing to bring § 11 and § 12(a)(2) claims with respect to a number of the certificates. Because the standard for standing differs under each statute, the Court analyzes standing as to these claims separately. To establish standing under § 11, a plaintiff must allege "they purchased shares either (1) directly in the public offering for which the misleading registration statement was filed or (2) traceable to that public offering." Guenther v. Cooper Life Sciences, Inc., 759 F. Supp. 1437, 1439 (N.D. Cal. 1990); see also 15 U.S.C. § 77k(a). This Court has previously observed that named plaintiffs who purchased certain types of notes lacked standing to pursue § 11 claims for other related notes which they did not purchase. See In re Washington Mutual Securities Litig., 694 F. Supp. 2d 1192, 1220 (W.D. Wash. 2009); In re Wells Fargo Mortgage-Backed Certificates Litig., ___ F. Supp. 2d. ___, 2010 WL 1661534, at *4 (N.D. Cal. April 22, 2010) (same); accord, Casey v. Lewis, 4 F.3d 1516, 1519 (9th Cir. 1993) ("At least one named plaintiff must satisfy the actual injury

component of standing in order to seek relief on behalf of himself or the class.") (emphasis in original).

Doral Bank alleges it purchased WaMu Mortgage-Pass Through Certificates, Series 2006-AR17, 2006-AR18, 2007-OA4, and 2007-OA5 and WMALT Series 2007-OA5. (¶ 20.) Chicago PABF purchased WaMu Mortgage-Pass Through Certificates, Series 2006-AR5, 2006-AR12, 2006-AR16, 2007-HY1, and 2006-HY1. (¶ 21.) Boilermakers purchased WaMu Mortgage-Pass Through Certificates, Series 2006-AR7. (¶ 22.) Plaintiffs do not allege they purchased any of the following certificates identified in the complaint: 2006-AR1, 2006-AR2, 2006-AR3, 2006-AR4, 2006-AR6, 2006-AR8, 2006-AR9, 2006-AR10, 2006-AR11, 2006-AR13, 2006-AR14, 2006-AR15, 2006-AR19, 2006-HY2, 2006-HY3, 2006-HY4, 2006-HY5, 2006-HY6, 2006-HY7, 2006-OA6, WMALT 2007-OC1, WMALT 2007-OC2, WMALT 2007-1, WMALT 2007-2, and WMALT 2007-3. (See ¶¶ 38-39; Dkt. No. 170, Appx. B.)

Plaintiffs, relying primarily on In re Countrywide Financial Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1166 (C.D. Cal. 2008), argue they have standing to sue on behalf of the class because all the certificates were issued pursuant to either the 2006 or 2007 Registration Statements. (Dkt. No. 177 at 17; see also Dkt. No. 191 (notice of supplemental authority).) The Court is not persuaded to adopt Plaintiffs' expansive view of standing. Unlike the scenario in Countrywide, Plaintiffs here allege that certain statements in the supplemental prospectuses are materially misleading. (See ¶ 61.) In instances where the misstatements extend beyond the shelf registration materials, it is difficult to adopt the rationale that the common misstatements suffice for standing. Plaintiffs lack standing to sue for losses related to the 25 certificates for which they have failed to identify a purchaser.

Plaintiffs also urge the Court to defer ruling on the issue of standing because the issue is "premature to raise on a motion to dismiss." (Dkt. No. 177 at 15.) Plaintiffs' argument and selective quotation of authority invites this Court to commit error. The courts in Global Crossing Ltd. Sec. Litig., 313 F. Supp. 2d 189, 204-05 (S.D.N.Y 2003), and Hevesi v. Citigroup, Inc., 366

1   F.3d 70, 82 (2d Cir. 2004), were contrasting the standing of the lead plaintiffs with that of the

2   named plaintiffs.  Thus, those courts contemplated revisiting the issue of standing in the context

3   of a Rule 23 typicality and adequacy of representation analysis.  See Global Crossing, 313 F.

4   Supp. 2d at 205 ("Lead Plaintiffs have a responsibility to identify and include named plaintiffs

5   who have standing to represent the various potential subclasses of plaintiff who may be

6   determined, at the class certification stage, to have distinct interests or claims.")  In this case,

7   Plaintiffs have not identified any named plaintiff who purchased 25 of the Certificates cited in

8   the Complaint.  Without any purchaser who suffered a loss, plaintiffs cannot identify an injury in

9   fact traceable to the offering as required for Article III standing.  See In re Lehman Brothers Sec.

10  and ERISA Litig., 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010).   Because Plaintiffs have not

11  alleged an injury in fact for the purposes of those certificates, the issue is properly addressed on a

12  motion to dismiss.

13          b.      Standing under Section 12(a)(2)

14          Standing under Section 12(a)(2) is more restrictive than under Section 11.  Section 12

15  "permits suit against a seller of a security by prospectus only by 'the person purchasing such

16  security from him,' thus specifying that a plaintiff must have purchased the security directly

17  from the issuer of the prospectus."  Hertzberg v. Dignity Partners, Inc., 191 F.3d 1076, 1081 (9th

18  Cir. 1999).  This Court has previously held that simply alleging a purchase was "traceable to" a

19  particular offering is insufficient to confer standing under Section 12.  WaMu II, 694 F. Supp. 2d

20  at 1226; see also In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 399 (S.D.N.Y. 2007)

21  (Plaintiffs' allegations that (1) underwriters sold securities as part of an offering and (2)

22  "plaintiffs acquired securities in the Offerings" were sufficient).

23          Plaintiffs allege they purchased certificates "pursuant to" the offending Registration

24  Statements and subsequent Prospectus Supplements.  (¶¶ 20-22.)  In their response brief,

25  Plaintiffs submit: "[t]he Complaint alleges that WCC sold the Certificates as part of the

26  Offerings, and that Plaintiffs acquired the Certificates sold as part of those Offerings."  (Dkt. No.

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 7             CASE NO. C09-00037MJP

177 at 19.)  However, an allegation that a plaintiff acquired certificates that had been—at some point in time—sold in an Offering is different from an allegation a plaintiff purchased certificates as part of an Offering.  As the Court in <u>Nomura</u> recognized, "[i]f plaintiffs did in fact purchase the Certificates directly from the defendants, they should have said so." <u>Plumbers' Union Local No. 12 Pension v. Nomura Asset Acceptance Corp.</u>, 658 F. Supp. 2d 299, 305 (D. Mass. 2009). Plaintiffs' § 12 claims are dismissed for lack of standing.

       c.     <u>Misrepresentation</u>

      Section 11 creates a private right of action for purchasers of a security when an issuer's coordinate registration statement includes "an untrue statement of a material fact or omit[s] to state a material fact required to be stated . . . to make the statements therein not misleading."  15 U.S.C. § 77k(a).  To prevail on a § 11 claim, "a plaintiff must prove '(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have mislead a reasonable investor about the nature of his or her investment.'"  <u>Rubke v. Capitol Bancorp, Ltd.</u>, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting <u>In re Daou Sys., Inc.</u>, 411 F.3d 1006, 1027 (9th Cir. 2005)).  Similarly, § 12(a)(2) imposes liability "on parties who sell securities with a false or misleading prospectus."  <u>In re Worlds of Wonder Sec. Litig.</u>, 35 F.3d 1407, 1423 (9th Cir. 1994).  The standard for § 12 materiality is the same as under § 11.  <u>Id.</u> at 1424.

      "[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact."  <u>Fecht v. Price Co.</u>, 70 F.3d 1078, 1081 (9th Cir. 1995).  Thus, the court may only determine the issue of materiality as a matter of law where "the statement is so obvious that reasonable minds could not differ."  <u>Id.</u> (internal quotations omitted).

      Following a familiar refrain, Plaintiffs allege the offering documents were materially misleading because (1) they misinformed investors about the nature of the mortgage loans' underwriting guidelines (¶¶136-149); (2) they failed to disclose the risks associated with the

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 8         CASE NO. C09-00037MJP

mortgage loan appraisals and misstated the loan-to-value ratios of the mortgages (¶¶ 150-159; 165-167), and (3) the prospectus supplements misstated the certificates' true credit ratings (¶¶168-171). The Court analyzes each in turn.

>1. Underwriting Guidelines

In Wells Fargo, the court denied dismissal of a complaint alleging improper deviations from underwriting guidelines where "plaintiffs allege[d] that the Offering Documents were misleading as to the extent to which Wells Fargo and the third-party originators deviated from their guidelines." 2010 WL 1661534, at *11; see also Tsereteli, 692 F. Supp. 2d at 392-93 (declining to dismiss complaint where plaintiffs alleged (1) abandonment of underwriting guidelines and (2) a dramatic rise in defaulting loans). In contrast, the court in Nomura dismissed a complaint based on deviations from underwriting standards in the issuance of MBS certificates when a "fusillade of cautionary statements" muted plaintiffs' claim they were not on notice of soft underwriting standards. 658 F. Supp. 2d at 307.

The Registration Statements provide:

> The mortgage loan seller's underwriting standards are intended to evaluate a prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgage property as collateral. In the loan application process, prospective mortgagors generally will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items….

(¶ 138.) Plaintiffs allege such statements are misleading because WaMu pressured appraisers into overstating the value of the properties, made no attempt to confirm underwriting standards for third party issuers, and did not investigate the validity of appraisal values of a sufficient number of loans prior to securitization. (¶ 139.) The Prospectus Supplements stated:

> The sponsor's underwriting guidelines [and Washington Mutual Bank's underwriting guidelines] generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 9          CASE NO. C09-00037MJP

(¶ 143.)  Plaintiffs allege these statements are misleading because WaMu failed to verify the
information contained in borrowers' mortgage loan applications, and ignored adverse
information about the borrowers.  (¶144.)  Defendants urge dismissal because the Prospectus
Supplements included warnings about a number of other documentation programs used to
evaluate mortgage loan applications.  (Dkt. No. 170 at 16; RJN, Ex. 3 at S-28.)  Even under these
alternative documentation programs, the Supplements indicated "exceptions to the sponsor's
loan program parameters may be made on a case-by-case basis if competing factors are present."
(RJN, Ex. 3 at S-30.)  The Prospectus Supplements identify the number of "full documentation"
and "reduced documentation" loans in each Certificate pool.  (RJN, Ex. 4 at S-111.)

Plaintiffs' underwriting allegations survive dismissal because the statements may be
misleading if they mask the extent to which the sponsor's underwriting guidelines were
disregarded.   In essence, Plaintiffs allege the underwriting guidelines ceased to exist.  If proven
true, the absence of underwriting standards could make the identified statements misleading.
The Court denies Defendants' motion to dismiss the underwriting guidelines.

### 2.    Appraisal/LTV ratio Allegations

In Tsereteli, the court dismissed allegations based on faulty appraisal practices reasoning
that "neither an appraisal nor a judgment that a property's value supports a particular loan
amount is a statement of fact."  692 F. Supp. 2d at 393 (Plaintiffs failed to allege the speaker did
not have the opinion at the time he made the statement appraisals were conducted "in accordance
with the Uniform Standards of Practice.").  In contrast, the Wells Fargo court denied dismissal of
appraisal and LTV allegations where Plaintiffs supported their claims with numerous statements
from confidential witnesses that included estimates about the degree to which LTV ratios were
inaccurate for the Wells Fargo.  2010 WL 1661534, at *11-12.

Plaintiffs have not alleged actionable misrepresentations based on appraisals or loan-to-
value ratios.  Plaintiffs allege the statement that appraisals were completed in accordance with
the Uniform Standards of Professional Appraisal Practice was misleading because LTV ratios

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 10             CASE NO. C09-00037MJP

were manipulated to meet certain targets. (¶¶ 60-61.) Plaintiffs' allegations on this issue are simply too conclusory. For instance, the near wholesale reliance on the New York Attorney General's complaint against eAppraiseIT offers no nexus to the Certificates at issue here. (¶¶ 61-84.) The Court is left to assume there is an identity between these loans and the ones at issue in the eAppraiseIT complaint, even though the NYAG complaint focuses on events that post-date the vast majority of these offerings. (Dkt. No. 170 at 23.) Though Plaintiffs offer some appraisal values from reviews completed, they do not allege that the differences in valuation have any connection with any loan underlying the securities here. Thus, unlike the complaint in Wells Fargo, Plaintiffs have not substantiated their conclusory allegations with facts suggesting a viable claim. The appraisal and coordinate LTV ratio allegations must be dismissed.

### 3.    Credit Ratings

Plaintiffs' credit ratings allegations are similarly insufficient. Plaintiffs allege the offering documents were misleading because the ratings were based on outdated models. (¶¶ 15-16, 105-113.) However, Plaintiffs fail to allege facts that would make this a material omission. Other courts have held that there is no duty to disclose the methods used by agencies in developing a rating. Tsereteli, 2010 WL 816623, at *5. The mere fact that the ratings would have been different under a different methodology is insufficient to state a claim.

Further, Plaintiffs allege that WaMu failed to disclose the Ratings Agencies' conflicts of interests. (¶¶ 91-97.) However, "the risk that the rating agencies operated under a conflict of interest because they were paid by the issuers had been known publicly for years." In re Lehman Bros. Sec. and ERISA Litig., 684 F. Supp. 2d 485, 492 (S.D.N.Y. 2010). Thus, because reasonable investors knew that the rating agencies were paid by the issuers, the alleged misstatement is immaterial. Id.

The Court dismisses the credit ratings allegations.

### 4.    Purchase and Sale Agreements

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 11            CASE NO. C09-00037MJP

Defendants claim the Purchase and Sale agreements shield them from liability because it provided that purchasers' sole remedy is the obligation to repurchase the certificates or substitute the mortgage loans in the trust.  (Dkt. No. 170 at 33; RJN, Ex. 25.)  In <u>Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC</u>, the Fifth Circuit held plaintiffs could not advance misrepresentation claims based on statement "that there were no delinquent loans in the BR2 and BR3 trusts" when the prospectuses provided the defendant would substitute performing mortgages in the trusts.  594 F.3d 383, 388-90 (5th Cir. 2010).  The <u>Lone Star</u> Court reasoned the "repurchase or substitute clauses change[d] the nature of [defendant's] representation."  <u>Id.</u> at 390.

Unlike the scenario in <u>Lone Star</u>, Plaintiffs allegations are not simply based on a representation about the absence of delinquent loans.  As set forth above, Plaintiffs allege misstatements and omissions regarding underwriting guidelines.  The purchase and sale agreements thus cannot shield Defendants from liability at the pleadings stage.

5.   <u>Economic Loss</u>

Defendants urge dismissal because Plaintiffs do not allege they have failed to receive an income stream from the Certificates and, as such, have failed to allege an economic loss.  (Dkt. No. 170 at 35.)  The Court declines to dismiss the Complaint on this basis.

Plaintiffs allege the "delinquency, foreclosure, repossession, and bankruptcy rates for all the collateral underlying the Certificates—arising from defective collateral and faulty origination practices—triggered unprecedented downgrades of the Certificates' credit ratings by the Rating Agencies and attendant declines in the value of the Certificates."  (¶¶ 191, 211.)  Section 11 allows damages for "the difference between the amount paid for the security . . . and  . . .  the value thereof as of the time such suit was brought."  Here, Plaintiffs allegations of loss give rise to the inference that the value of the security is much less than the purchase price.  The mere fact that Plaintiffs may have difficulty substantiating the exact nature of their loss in an illiquid market does not necessitate dismissal.

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 12           CASE NO. C09-00037MJP

6.   Risk Disclosures

Defendants argue all claims must be dismissed because the prospectus documents contained numerous risk disclosures.  The two cases on which Defendants rely, In re Convergent Techs. Sec. Litig., 948 F.2d 507 (9thCir. 1991), and Worlds of Wonder, 35 F.3d at 1420-21, affirmed rulings granting summary judgment based on the sufficiency of risk disclosures.  The Court declines to analyze the sufficiency of the disclosures at the pleadings stage.   As the Ninth Circuit cautioned in Fecht: "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact."  70 F.3d at 1081.

d.   Control Persons—Section 15 Claims

The Court grants Defendants' motion to dismiss the Section 15 claims as to the Individual Defendants.  Section 15 of the Securities Act provides that "[e]very person who … controls any person liable under [Sections 11 or 12 of the Securities Act] shall also be liable jointly and severally with and to the same extent as such controlled person."  15 U.S.C. § 77o. To state a claim for control person liability, a plaintiff must allege: (1) a primary violation of securities law; and (2) that the defendant exercised control over the primary violator.  See In re Washington Mutual Sec. Litig., 259 F.R.D. 490, 508-09 (W.D. Wash. 2009) (citing Howard v. Everex, Sys., 228 F.3d 1057, 1065 (9th Cir. 2000)).  Control means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405; see also Howard, 228 F.3d at 1065 n.9.

Plaintiffs simply allege the Individual Defendants were either officers or directors of WMAAC and that they signed the Registration Statements. (¶¶ 27-34.)  Based on nothing more, Plaintiffs claim each of the Individual Defendants are control persons "by virtue of his or her control, ownership, offices, [or] directorship."  (¶ 205.)  Such allegations, alone, are insufficient to state a claim.  First, making blanket allegations about the Individual Defendants makes no

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 13          CASE NO. C09-00037MJP

1   sense when the Defendants apparently held different positions.  In other words, Plaintiffs should

2   have substantiated their allegations about the Individual Defendants with individualized facts.

3   Second, the allegations are entirely circular and couched as conclusions of law.  Plaintiffs allege

4   the Individual Defendants are control persons "by virtue of his or her control."  This offers no

5   factual content that would establish a plausible claim.

6          The Court also dismisses the Section 15 claims as to WCC.  In opposition to Defendants'

7   motion on the issue, Plaintiffs cite paragraphs 55-60 and 82-84 from the Complaint.  (Dkt. No.

8   177 at 35.)  Tellingly, none of those paragraphs reference WCC.  Instead, they refer to WMB or

9   WaMu (as a way of referencing WMB, WMAAC, and WCC).  (See ¶ 5.)  But Plaintiffs cannot

10  plead control person liability simply through the use of shorthand.  Plaintiffs have not alleged

11  facts giving rise to WCC's status as a control person.  The Section 15 claims must be dismissed.

12         e.   Inquiry Notice—Doral Bank Claims

13         Defendants claim Doral Bank's claims are barred by the statute of limitations because

14  Plaintiffs were on notice as of the August 20, 2008 complaint in In re WaMu.  (Dkt. No. 170 at

15  40.)   Under 15 U.S.C. § 77m, the statute of limitations for Securities Act claims is "one year

16  after the discovery of the untrue statement or the omissions, or after such discovery should have

17  been by the exercise of reasonable diligence."  An amendment adding a plaintiff "relates back to

18  the date of the original pleading only when: 1) the original complaint gave defendant adequate

19  notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly

20  prejudice the defendant; and 3) there is an identity of interests between the original and newly

21  proposed plaintiff."  In re Syntex Corp. Sec. Litig., 95 F.3d 922, 935 (9th Cir. 1996) (no relation

22  back where new plaintiffs bought securities at different values and after different disclosures);

23  see also In re Morgan Stanley Mortgage Pass-Through Certificates Litig., No. 09-civ-2137, 2010

24  U.S. Dist. LEXIS 84146, at *22 (S.D.N.Y Aug. 17, 2010) ("Inquiry notice exists where

25  sufficient facts would suggest to a plaintiff of normal intelligence that wrongdoing is

26  probable, not merely possible.").

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 14          CASE NO. C09-00037MJP

1    The original complaint in this action was filed on August 1, 2008. Doral Bank filed its

2    complaint on October 30, 2009. (C09-1557; Dkt. No. 1.) Plaintiffs argue that the two cases

3    involved different securities and, thus, Doral could not have been on inquiry notice. (Dkt. No.

4    177 at 38.) Plaintiffs cannot, however, ignore their own allegations. Plaintiffs' allegations are

5    based on substantially identical statements in the Offering Documents and focus almost

6    exclusively on the shelf Registration documents. If these allegations are sufficient to state a

7    claim as to the earlier Certificates, they must also be sufficient to put other holders of WaMu

8    certificates on notice of underwriting and appraisal issues. (See Dkt. No. 187 at 22.) The Court

9    therefore dismisses claims to the extent they include the following Certificates: WaMu 2007-

10   OA4, WaMu 2007-OA5, and WMALT-OA5.

11        f.    Time Barred Appraisal Claims

12   The Court dismisses Plaintiffs appraisal allegations as to a number of the Certificates

13   because they are time barred. Plaintiffs' appraisal allegations are predicated upon the NY

14   Attorney General's complaint against First American and eAppraiseIT, which was filed on

15   November 1, 2007. (See ¶¶ 64-84.) A number of plaintiffs filed their appraisal allegations more

16   than a year after the NYAG's complaint. (See Dkt. No. 170 at 42 (Chicago PABF on March 16,

17   2009, Doral Bank on October 30, 2009, and Boilermakers on January 12, 2009).)

18   These claims were not equitably tolled by the filing of the New Orleans Action. In

19   American Pipe & Const. Co. v. Utah, the Supreme Court held that "the commencement of a class

20   action suspends the applicable statute of limitations as to all asserted members of the class who

21   would have been parties had the suit been permitted to continue as a class action." 414 U.S. 538,

22   554 (1974). Courts since American Pipe have found that the statute of limitations does not toll

23   for putative class actions whose named plaintiff lacks standing to advance claims in the first

24   place. See Walters v. Edgar, 163 F.3d 430, 432 (7th Cir. 1998); Palmer v. Stassinos, 236 F.R.D.

25   46, 465-66 and n.6 (N.D. Cal. 2006) ("It is one thing to toll a period of limitations because of the

26   discretionary act of one judge seeking to manage his or her docket in an efficient manner, but it

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 15        CASE NO. C09-00037MJP

1   would be beyond the constitutional power of a federal court to toll a period of limitations based

2   on a claim that failed because the claimant had no power to bring it.")  Because there are no

3   allegations the New Orleans plaintiffs had standing to assert the appraisal claims on behalf of

4   Chicago PABF, Doral Bank, or Boilermakers, the only surviving certificates with coordinate

5   appraisal allegations are 2006-AR2, AR14, AR 16, AR18, 2007-HY2, HY4.  (See New Orleans

6   Complaint  ¶¶ 16, 17.)

7   IV.     Rating Agencies' Motion

8          The Rating Agencies move for dismissal of the § 15 claims against them because (1)

9   Plaintiffs' failed to identify a primary violation by the Issuing Trusts, (2) Plaintiffs failed to set

10  forth sufficient allegations of "control" against the Agencies, and (3) Plaintiffs' claims are time-

11  barred.  (Dkt. No. 168.)  In response, Plaintiffs concede that WMAAC—and not the Issuing

12  Trusts—should have been identified as the entity allegedly under the Rating Agencies' control.

13  (Dkt. No. 178 at 7.) Plaintiffs seek leave to amend their complaint "for the sole purpose of

14  correcting their misidentification of the 'issuer' that was the controlled entity" and maintain

15  amendment is appropriate because "the core supporting factual allegations" about the Rating

16  Agencies' control remain unchanged. (Dkt. No. 190 at 2.)   Because amendment would be futile,

17  the Court DENIES the motion to amend and GRANTS the Rating Agency's motion to dismiss.

18         As set forth above, to sustain a Section 15 claim, a plaintiff must allege: (1) a primary

19  violation of securities law; and (2) that the defendant exercised control over the primary violator.

20  Whether an individual is a "control person" is "an intensely factual question, involving scrutiny

21  of the defendant's participation in the day-to-day affairs the corporation and the defendant's

22  power to control corporate actions."  Kaplan v. Rose, 49 F.3d 1363, 1382 (9th Cir. 1994); see

23  also Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1162 (9th Cir. 1996)

24  ("As the definition suggests, our inquiry must revolve around the "management and policies" of

25  the corporation, not around discrete transactions.").  The Lehman Bros. court dismissed § 15

26  claims against rating agencies where plaintiffs alleged they "largely determined which loans

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 16          CASE NO. C09-00037MJP

1   were to be included in the securitization, the amount and form of credit enhancement for each

2   Certificate and the Certificate structure before they were actually engaged by Lehman. . . ."   In

3   re Lehman Bros. Sec. and ERISA Litig., 681 F. Supp. 2d 495, 500 (S.D.N.Y. 2010).  That court

4   reasoned plaintiffs allegations fell "considerably short of anything that could justify a reasonable

5   trier of fact in concluding that the decision making power lay entirely with the Rating Agencies."

6   Id. at 501.

7           Plaintiffs allege the Rating Agencies "determined the structure and credit support for

8   each of the Issuing Trusts [or WMAAC] which purportedly justified the ratings." (¶¶ 11, 42,

9   43.)  Plaintiffs further cite to a 2009 report from a Congressional oversight panel that suggests

10  certain agencies enabled and validated the decision-making behind the flawed mortgage-backed

11  securities market. (¶ 97.)  Plaintiffs describe the methods the Rating Agencies used to rate the

12  Certificates. (¶¶ 124-129.)  Even if the Court were to allow Plaintiffs to substitute WMAAC for

13  the Issuing Trusts, Plaintiffs' allegations are insufficient for the purposes of control person

14  liability.  Plaintiffs' allegations simply do not implicate WMAAC's management or policies, nor

15  do they suggest the ability to be involved in any day-to-day activities.

16          Indeed, Plaintiffs' allegations regarding the Rating Agencies' "ratings shopping" plainly

17  contradict any claim that the Rating Agencies controlled WMAAC.   The complaint suggests it

18  was the arrangers who "pressured" the Rating Agencies to reduce credit enhancement levels.

19  (¶ 94.)  WaMu purportedly "leveraged" the Rating Agencies of one another in order "to obtain

20  the most profitable structure—to WaMu—on the Offerings." (¶¶ 114- 120.)  Read as a whole,

21  Plaintiffs' allegations regarding the Rating Agencies' control person liability simply fail to state

22  a claim.  Because Plaintiffs have failed to present a viable alternative Third Amended Complaint,

23  the Court's dismissal as to the Rating Agencies should be with prejudice.  In light of the

24  insufficiency of the allegations, the Court need not reach the question of whether the claims are

25  time-barred.

26  \\

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 17              CASE NO. C09-00037MJP

1                              **Conclusion**

2        First, Plaintiffs lack standing to sue for losses related to the 25 certificates for which they

3 have failed to identify a purchaser. The Court GRANTS the motions to dismiss these claims.

4 Second, the Court GRANTS the motions to dismiss Plaintiffs' § 12 claims for lack of standing.

5 Third, the Court rules on Plaintiffs' § 11 claims as follows: (1) Plaintiffs' underwriting

6 allegations survive dismissal and the Court DENIES the motions on this issue; (2) the Court

7 GRANTS the motions to dismiss Plaintiffs' § 11 misrepresentations claims based on appraisals

8 or loan-to-value ratios; and (3) the Court GRANTS the motions to dismiss Plaintiffs' § 11 credit

9 ratings allegations. Fourth, the Court DENIES the motions to dismiss as to the arguments that

10 the purchase and sale agreements shield Defendants from liability, that economic loss is not

11 sufficiently alleged, and that the prospectuses contained numerous risk disclosures. Fifth, the

12 Court GRANTS Defendants' motion to dismiss the Section 15 claims against the Individual

13 Defendants and WCC. Sixth, the Court GRANTS Defendants' motions to dismiss Doral Banks'

14 claims to the extent they include the following Certificates: WaMu 2007-OA4, WaMu 2007-

15 OA5, and WMALT-OA5. Seventh, the Court GRANTS the motions to dismiss on statute of

16 limitation grounds as to Plaintiffs' appraisal allegations, except as to certain certificates. Eighth,

17 because amendment would be futile, the Court DENIES Plaintiffs' motion to amend, and

18 GRANTS the Rating Agencies' motion to dismiss the Section 15 claims against them.

19        The Clerk is directed to send copies of this order to all counsel of record.

20        Dated this 28th day of September, 2010.

21

22

23                                  Marsha J. Pechman

24                                  United States District Judge

25

26

ORDER ON DEFENDANTS' MOTIONS TO DISMISS - 18          CASE NO. C09-00037MJP