Lloyd Winawer (State Bar No. 157823)
*lwinawer@goodwinprocter.com*
**GOODWIN PROCTER LLP**
10250 Constellation Boulevard, 21st Floor
Los Angeles, CA 90067
Telephone: 310-788-5177
Facsimile: 310-286-0992

Brian E. Pastuszenski (*pro hac vice*)
*bpastuszenski@goodwinprocter.com*
Inez H. Friedman-Boyce (*pro hac vice*)
*ifriedmanboyce@goodwinprocter.com*
Brian C. Devine (State Bar No. 222240)
*bdevine@goodwinprocter.com*
**GOODWIN PROCTER LLP**
53 State Street
Boston, MA 02109-2802
Telephone: 617-570-1000
Facsimile: 617-523-1231

*Attorneys for Defendants*
Countrywide Financial Corp.,
Countrywide Home Loans, Inc., CWALT,
Inc., CWMBS, Inc., CWABS, Inc.,
CWHEQ, Inc., Countrywide Capital
Markets, Countrywide Securities Corp.,
and N. Joshua Adler

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAINE STATE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, et al.,<br><br>Defendants. | Case No. 2:10-CV-00302-MRP (MANx)<br><br>**NOTICE OF ERRATA RE: COUNTRYWIDE DEFENDANTS' THIRD NOTICE OF RECENT AUTHORITY IN SUPPORT OF MOTION TO DISMISS**<br><br>Date: October 18, 2010<br>Time: 1:00 p.m.<br>Courtroom: 12<br>Judge: Hon. Mariana R. Pfaelzer |

TO THE CLERK OF COURT, ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Exhibit B to Countrywide Defendants' Third Notice of Recent Authority, filed in this matter on October 19, 2010 (Dkt. No. 215), inadvertently included additional pages.  Countrywide Defendants' Third Notice of Recent Authority with *corrected* exhibits is attached hereto as Exhibit 1.


Dated:  October 20, 2010                **GOODWIN PROCTER LLP**

/s/ Brian E. Pastuszenski
Brian E. Pastuszenski (*pro hac vice*)
Lloyd Winawer (State Bar No. 157823)
Inez H. Friedman-Boyce (*pro hac vice*)
Brian C. Devine (State Bar No. 222240)

*Counsel for the Countrywide Defendants*

*EXHIBIT 1*

Lloyd Winawer (State Bar No. 157823)
*lwinawer@goodwinprocter.com*
**GOODWIN PROCTER LLP**
10250 Constellation Boulevard, 21st Floor
Los Angeles, CA 90067
Telephone: 310-788-5177
Facsimile: 310-286-0992

Brian E. Pastuszenski (*pro hac vice*)
*bpastuszenski@goodwinprocter.com*
Inez H. Friedman-Boyce (*pro hac vice*)
*ifriedmanboyce@goodwinprocter.com*
Brian C. Devine (State Bar No. 222240)
*bdevine@goodwinprocter.com*
**GOODWIN PROCTER LLP**
53 State Street
Boston, MA 02109-2802
Telephone: 617-570-1000
Facsimile: 617-523-1231

*Attorneys for Defendants*
Countrywide Financial Corp.,
Countrywide Home Loans, Inc., CWALT,
Inc., CWMBS, Inc., CWABS, Inc.,
CWHEQ, Inc., Countrywide Capital
Markets, Countrywide Securities Corp.,
and N. Joshua Adler

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAINE STATE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTRYWIDE FINANCIAL CORPORATION, et al., <br><br> Defendants. | Case No. 2:10-CV-00302-MRP (MANx) <br><br> **COUNTRYWIDE DEFENDANTS' THIRD NOTICE OF RECENT AUTHORITY IN SUPPORT OF MOTION TO DISMISS** <br><br> Date: October 18, 2010 <br> Time: 1:00 p.m. <br> Courtroom: 12 <br> Judge: Hon. Mariana R. Pfaelzer |

1   Following up on the arguments made at yesterday's hearing on the pending

2   motion to dismiss, the Countrywide Defendants respectfully notify the Court of

3   today's final opinion in *In re Wells Fargo Mortgage-Backed Certificates Litig.*, No.

4   09-CV-01376-LHK (N.D. Cal. Oct. 19, 2010) ("*Wells Fargo*") (attached hereto as

5   Exhibit A),[1] and submit the transcript of proceedings held and rulings made on

6   September 22, 2010 in *NECA-IBEW Health and Welfare Fund v. Goldman, Sachs &*

7   *Co.*, No. 08-CV-10783-MGC (S.D.N.Y. Sept. 22, 2010) ("*NECA-IBEW*") (attached

8   hereto as Exhibit B).

9   In *Wells Fargo*, Judge Koh of the United States District Court for the Northern

10  District of California dismissed with prejudice claims under the Securities Act of 1933

11  on behalf of a putative class of investors in 10 offerings of mortgage-backed securities

12  ("MBS") issued by Wells Fargo.  The Countrywide Defendants respectfully draw the

13  Court's attention to the following passages in *Wells Fargo*:

14  • "In *American Pipe* . . . the Supreme Court remarked that the Ninth Circuit

15      was 'careful to note' that 'maintenance of the class action was denied *not* for

16      . . . lack *of standing* of the representative. . . .'  Thus, *American Pipe* did not

17      address the precise situation presented here.  In this case, unlike in *American*

18      *Pipe*, the *Detroit* and *New Orleans* plaintiffs lacked standing to bring claims

19      regarding the ten revived Offerings."  Ex. A at 6 (emphasis in original).

20  • "Consistent with the analysis in *American Pipe* and cases applying it, the

21      Court finds that the facts in this case counsel against tolling the statute for

22      the revived claims of the New Plaintiffs.  Unlike the new plaintiffs in *Flag*

23      *Telecom* or *Enron*, the New Plaintiffs here had no reason to rely on the filing

24      of the *Detroit* and *New Orleans* complaints to protect their claims.  The

25      original complaints *did not allege that the named plaintiffs had any*

26

27  _____

    [1] At yesterday's hearing, counsel referenced a tentative order that had been issued in
28  *Wells Fargo* on October 5, 2010.  The attached final order (which superseded the
    tentative order of October 5) was issued today, on October 19, 2010.

*ownership interest in the 37 dismissed Offerings.*  Thus, review of these complaints would have revealed that the Plaintiffs in the *Detroit* and *New Orleans* actions had *no standing* to bring claims as to the 37 dismissed Offerings."  Ex. A at 8 (emphasis added).

- "While the Court finds the *Walters* and *Palmer* decisions instructive, it is unnecessary to decide today that it is beyond the power of the Court to toll the statute of limitations where the lead plaintiff lacks standing.  Rather, the Court finds that *American Pipe* and the cases interpreting it support the declination to extend tolling to claims *over which the original named Plaintiffs asserted no facts supporting standing*.  As a result, the Court must dismiss the ten revived Offerings."  Ex. A at 10 (emphasis added).

- "The March 27, 2009 *Detroit* complaint and the April 13, 2009 *New Orleans* complaint stated many of the same factual bases now alleged in the ACC regarding these Offerings.  Specifically, these complaints cite to the same Registration Statements and Prospectuses (Offering Documents), and many of the same alleged misrepresentations and omissions within those Offering Documents. . . .  Although the ACC expands upon the allegations . . . the Court finds that the information in the original *Detroit* and *New Orleans* Complaints was sufficient to make New Plaintiffs aware of the basis for their claims. . . .  [T]he Court finds that New Plaintiffs knew or should have known of the basis for the revived claims more than a year before the ACC was filed on May 28, 2010. . . .  If the *Detroit* and *New Orleans* plaintiffs were first 'plausibly' on notice as of May 2008, and were able to file complaints alleging the basis for their claims as of March and April the following year, this indicates that a reasonably diligent investor should have been able to do the same."  Ex. A at 10-11.

In *NECA-IBEW*, Judge Cedarbaum clarified her earlier ruling on standing dated January 28, 2010 (which is attached to the Countrywide Defendants' motion to

1  dismiss as Exhibit 35).  The Countrywide Defendants respectfully draw the Court's

2  attention to the following excerpts from the September 22, 2010 hearing transcript:

3    • "THE COURT:  But those are all—none of those has yet happened.

4    MR. LEAHY:  Not to the particular tranche that my client—

5    THE COURT:  That's what we are talking about; *that's all you can sue*

6    *for, your own, not someone else's.*

7    MR. LEAHY:  Actually, your Honor, we're suing on behalf of all

8    purchasers of the trust, all tranches at this particular point.

9    THE COURT:  But I have ruled against you on that already.  I have held

10    that you must—*you may only represent the same certificate, not other*

11    *people's purchases.*

12    MR. LEAHY:  That's not how we understand your Honor's order.

13    THE COURT:  Well, *that was my understanding of how I ruled*. . . .  To be

14    a class representative, *you can only represent the class of persons or*

15    *entities that purchased the particular—the certificate from the particular*

16    *tranche from the particular trust that you purchased.*

17    MR. LEAHY:  Your Honor, actually, your earlier ruling was a little bit

18    bigger than that.  You basically said you can only sue on behalf of trusts

19    that you purchased in.  So we're only suing on behalf all purchasers in the

20    two trusts that my client bought in.

21    THE COURT:  Right.  *But it must be the same tranche as yours*. . . .  *[T]he*

22    *effects are very different in different tranches*. . . .  And that's why in a

23    class action the class has to be in the same position, basically."  Ex. B at

24    7:10-8:21 (emphasis added).

25    • "THE COURT:  . . . And if, indeed, there are fewer than 100 people who

26    bought what the plaintiff bought, there may not be a class action here . . . I

27    am raising my own tentative view that fewer than 100 people bought each of

28    these certificates in any particular tranche.  We really do not have a viable

1    class.  I do not know how many cases have addressed that particular issue."

2    Ex. B at 57:12-14, 58:8-11.

3    Finally, in response to the Court's questions regarding the existence of state law

4    claims in the state court litigation, the Countrywide Defendants respectfully notify the

5    Court that no state law claims were asserted in any complaints filed in either the

6    *Luther* or the *Washington State* action.[2]

7

8

9    Dated:  October 19, 2010                    **GOODWIN PROCTER LLP**

10                                               /s/ Brian E. Pastuszenski
                                                 Brian E. Pastuszenski (*pro hac vice*)
11                                               Lloyd Winawer (State Bar No. 157823)
                                                 Inez H. Friedman-Boyce (*pro hac vice*)
12                                               Brian C. Devine (State Bar No. 222240)

13                                               *Counsel for the Countrywide Defendants*

14

15

16

17

18

19

20

21

22

23

24

25

26   _____
     [2] The First Amended Complaint in *Luther*, filed on September 9, 2008 and submitted
27   as Ex. 26 to the Countrywide Defendants' Request for Judicial Notice, had attached to
     it a complaint from another action that asserted state law claims.  But, the *Luther* and
28   *Washington State* plaintiffs themselves did not assert any state law claims.

4

# EXHIBIT  A

# EXHIBIT  A

EXHIBIT 1 TO ERRATA  -7-

**E-Filed 10/19/2010**

United States District Court
For the Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |  |
|---|---|---|
| | ) | Case No.: 09-CV-01376-LHK |
| | ) | |
| In Re WELLS FARGO MORTGAGE-BACKED | ) | ORDER GRANTING UNDERWRITER |
| CERTIFICATES LITIGATION | ) | DEFENDANTS' MOTION TO DISMISS |
| | ) | |
| | ) | |

This Order supersedes the Court's Tentative Order of October 5, 2010, Dkt. No. 289.

On September 7, 2010, the Court heard oral argument on a Motion to Dismiss brought by the Underwriter Defendants[1] in the above-captioned case ("Consolidated Case"). The Underwriters moved to dismiss certain claims on statute of limitations grounds.

Complaints in other cases have relied upon the Consolidated Case to establish that their claims are timely. *See First Star Bank v. Wells Fargo Mortg. Backed Sec.* 2006-AR15 Trust ("*First Star*"), No. 10-cv-3508 LHK, Dkt. No. 1 (Compl.) at ¶95; *Charles Schwab Corp. v. Banc of America Sec. LLC* ("*Schwab I*"), No. 10-cv-03489 LHK, Dkt. No. 1, Ex. B (Am. Compl.) at ¶ 32; *Charles Schwab Corp. v. BNP Paribas Sec. Corp.* ("*Schwab II*"), No. 10-cv-04030 SI, Dkt. No. 1, Ex. A (Am. Compl.) ¶ 54; Reply ISO Mot. to Intervene filed by General Retirement System of the City of Detroit (Dkt. No. 279) at 7-10. As a result, some parties have already briefed the tolling

---

[1] Defendants Goldman, Sachs & Co., JP Morgan Securities, Inc., Bear, Stearns & Co., Inc., Deutsche Bank Securities, Inc., UBS Securities, LLC, Credit Suisse Securities (USA) LLC, RBS Securities, Inc., Banc of America Securities, LLC, Citigroup Global Markets, Inc., and Merrill Lynch, Pierce, Fenner & Smith, Inc.

1

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

EXHIBIT 1 TO ERRATA  -8-
EXHIBIT  A  -5-

issue discussed here.[2]  In order to provide an opportunity for all parties to be heard, the Court
issued a Tentative Order on October 5, 2010, and invited the parties in these other actions to
address tolling at the hearing set for October 7, 2010.  First Star filed a brief opposing the Tentative
Order on October 6, 2010.  *See* First Star Resp. (Dkt. No. 291).  At the October 7, 2010 hearing,
the Court heard further oral argument from all parties on the issues.   Finally, with the Court's
permission, the Defendants in this case filed a response to First Star's October 6 filing on October
8, 2010.  *See* Defs.' Reply (Dkt. No. 292).

In addition to the Underwriter's Motion, a number of other motions have been filed in the
various cases listed above, as follows:

On August 13, 2010, the named Plaintiff in the first-filed action in the Consolidated Case
(General Retirement System of the City of Detroit, "General Retirement") moved to intervene in
the Consolidated Case in order to bring claims relating to the Wells Fargo Mortgage-Backed
Securities (WFMBS) 2006-AR15 Trust.  Dkt. No. 224.  General Retirement did not bring claims
relating to this trust in its initial complaint, nor did it otherwise attempt to raise these claims until
its Motion to Intervene.

On August 17, 2010, Wells Fargo[3] submitted an administrative motion asking the Court to
determine that the *Schwab I* case is related to the Consolidated Case under Local Rule 3-12.  Dkt.
No. 233.  No opposition was filed to this motion, and the Court found the cases related on
September 2, 2010.  Dkt. No. 252.  On September 9, 2010, Wells Fargo submitted notice to the
Court that it had inadvertently failed to serve the plaintiff in the *Schwab I* case (The Charles
Schwab Corporation, "Schwab") with the Motion to Relate; subsequently, Schwab moved for leave
to seek reconsideration of the Court's decision to relate the cases.  The Court granted Schwab leave
to seek reconsideration.  Dkt. No. 271.

On September 2, 2010, the Lead Plaintiffs in the Consolidated Case moved to consolidate
the *First Star* action with the Consolidated Case, and to enforce the Lead Plaintiffs determination

---

[2] Reply ISO Mot. to Intervene filed by General Retirement System of the City of Detroit (Dkt. No.
279); Pls.' Mot. to Remand, Dkt. No. 18 filed in *Schwab I*.
[3] Wells Fargo Bank, N.A., Wells Fargo Asset Securities Corporation and the Individual Defendants

2

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

EXHIBIT 1 TO ERRATA  -9-
EXHIBIT  A  -6-

so that after consolidation, counsel for Lead Plaintiffs would represent the putative class identified in the *First Star* complaint.  Dkt. No. 255.  First Star opposed.  Dkt. No. 265.

On September 22, 2010, Wells Fargo submitted another administrative motion asking the Court to determine that the *Schwab II* case is related to the Consolidated Case.  Dkt. No. 272.  Schwab opposed.  Dkt. No. 281.

Based on the arguments and the papers submitted, the Court GRANTS the Underwriters' Motion to Dismiss; DENIES Wells Fargo's Motion to Relate the *Schwab II* action to the Consolidated Case; GRANTS Schwab's Motion for Reconsideration of the Court's decision o relate the *Schwab I* action to the Consolidated Case, and deems *Schwab I* unrelated; and deems General Retirement's Motion to Intervene and the Plaintiffs' Motion to Consolidate the *First Star* action moot because the claims asserted by both General Retirement and First Star are barred by the statute of limitations.

## I.  BACKGROUND

This putative class action was initially filed on March 27, 2009, in a complaint styled *General Retirement System of the City of Detroit v. The Wells Fargo Mortgage Backed Securities 2006-AR18 Trust*, *et al.*, No. 09-CV-1376 ("*Detroit*").  Another action bringing overlapping and related claims, titled *New Orleans Employees' Retirement System v. Wells Fargo Asset Securities Corp.*, *et al.*, No. 09-CV-01620 ("*New Orleans*"), was filed April 13, 2009.  Judge Illston (to whom this case was previously assigned) consolidated these two cases and granted lead plaintiff status to the Louisiana Sheriffs' Pension and Relief Fund, Alameda County Employees' Retirement Association, New Orleans Employees' Retirement System, and the Government of Guam Retirement Fund, on July 16, 2009.  Plaintiffs filed a Consolidated Complaint on August 31, 2009.  Generally, the Consolidated Complaint alleged violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77l(a)(2), and 77o) based on sales of mortgage pass-through certificates ("Certificates") sold through fifty-four separate offerings ("Offerings").  Defendants moved to dismiss the Consolidated Complaint on a number of grounds.  On April 22, 2010, Judge Illston granted-in-part and denied-in-part Defendants' motions.  The April 22, 2010 Order provides factual background on the nature of the claims brought in the Consolidated

3

1    Complaint.  The Court will not re-state this background here.  *See* April 22, 2010 Order (Dkt. No.

2    198) at 1-3.

3         Judge Illston found that the Lead and named Plaintiffs had stated claims under Sections 11

4    and 15 of the Securities Act of 1933.  However, Judge Illston dismissed claims based on 37

5    Offerings, because the named Plaintiffs had not invested in them and therefore lacked standing to

6    bring claims regarding those Offerings.  *Id*. at 7.  Lead Plaintiffs were granted "leave to amend to

7    designate additional named plaintiffs who purchased securities through those offerings."  *Id*.  On

8    May, 28, 2010, Lead Plaintiffs filed an Amended Consolidated Complaint (ACC).  The ACC

9    identifies five new named Plaintiffs ("New Plaintiffs").  The New Plaintiffs allege that they

10   invested in ten of the 37 Offerings previously dismissed for lack of standing.  Dkt. No. 203.  The

11   Underwriter Defendants moved to dismiss the New Plaintiffs' claims on the ground that no named

12   plaintiffs had standing to bring these claims previously, and therefore the statute of limitations has

13   run on these claims.  *See* Mot. to Dismiss ACC (Dkt. No. 212) ("Underwriter Motion").  Lead

14   Plaintiffs opposed.  Mem. in Opp'n re Mot. to Dismiss ACC (Dkt. No. 218) ("Opposition").

15        One of the Offerings dismissed by Judge Illston's April 22, 2010 Order was the 2006-AR15

16   Trust, now the subject of General Retirement's Motion to Intervene and the *First Star* complaint.

17   Another dismissed Offering, the 2007-10 Trust, is the basis of several causes of action in the

18   *Schwab I* case.

19   **II. LEGAL STANDARD**

20        Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if

21   it fails to state a claim upon which relief can be granted. To survive a motion to dismiss, the

22   plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl*.

23   *Corp*. *v*. *Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the

24   plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted

25   unlawfully." *Ashcroft v*. *Iqbal*, 129 S.Ct. 1937, 1949 (2009).  In deciding whether the plaintiff has

26   stated a claim, the Court must assume the plaintiff's allegations are true and draw all reasonable

27   inferences in the plaintiff's favor.  *Usher v*. *City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

28   However, the court is not required to accept as true "allegations that are merely conclusory,

4

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

EXHIBIT 1 TO ERRATA  -11-
EXHIBIT  A  -8-

unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig*., 536

F.3d 1049, 1055 (9th Cir. 2008).

### III. DISCUSSION

#### a. Tolling of Additional Class Claims

At the September 7, 2010 hearing on these motions, Plaintiffs admitted that they must rely

on tolling of the three-year statute of repose regarding seven of these revived Offerings.  Regarding

the other three, Plaintiffs argued at the hearing that it is a question of fact when the one-year statute

of limitations began to run.  The three-year statute of repose bars claims relating to any Offering

first sold or offered for sale before May 28, 2007 (which is three years before the ACC was filed).

Therefore, absent tolling, the statute would bar Plaintiffs from suing under seven of the revived

Offerings.[4]  *See* Section 13, 15 U.S.C. §77m.  The one-year statute of limitations bars claims

brought more than a year after discovery of the challenged statement was made or "should have

been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  The Underwriters argue

that the original complaints in the pre-consolidation cases identify the same bases for Plaintiffs'

claims, but were filed more than a year before the Consolidated Complaint.  Therefore, the

Underwriters urge that the New Plaintiffs knew or should have known about these claims at least as

of the time the previous complaints were filed, and that this bars the remaining revived Offerings.[5]

Plaintiffs argue that the statutes of repose and of limitations should be tolled for the New

Plaintiffs' claims based on the assertion of these claims by the plaintiffs in the original *Detroit* and

*New Orleans* complaints.  However, the *Detroit* and *New Orleans* plaintiffs did not allege facts to

show they had standing to bring claims regarding these Offerings.  In fact, the complaints

themselves showed that no named plaintiff had made any investment in the securities now asserted

by the New Plaintiffs.  In arguing that the statute of limitations on these claims should be tolled,

Plaintiffs principally rely on the Supreme Court's decision in *American Pipe & Construction Co. v.

Utah*, 414 U.S. 538, 554 (1974), as well as a Southern District of New York case, *In re Flag

Telecom Holdings*, *Ltd. Sec. Litig*., 352 F. Supp. 2d 429, 455 (S.D.N.Y. 2005).

---

[4] These include the WFMBS 2006-7, 2006-10, 2006-AR16, 2006-AR19, 2006-18, 2006-20, and the
Wells Fargo Alternative Loan 2007-PA1 Trusts.
[5] These include the WFMBS 2007-10, 2007-13, and 2007-AR4 Trusts.

5

In *American Pipe*, the Supreme Court held that when a class action is dismissed for failure to certify the class, the statute of limitations is tolled for class members who then intervene to assert the same claims individually.  The holding was limited to situations "[W]here class action status has been denied solely because of failure to demonstrate that 'the class is so numerous that joinder of all members is impracticable. . . .'" *American Pipe*, 414 U.S. at 552 (internal citations omitted).  In affirming the Ninth Circuit's decision to toll the claims of individual class members, the Supreme Court remarked that the Ninth Circuit was "careful to note" that "maintenance of the class action was denied *not* for . . . *lack of standing* of the representative . . . ." *American Pipe*, 414 U.S. at 553 (emphasis added).  Thus, *American Pipe* did not address the precise situation presented here.[6]  In this case, unlike in *American Pipe*, the *Detroit* and *New Orleans* plaintiffs lacked standing to bring claims regarding the ten revived Offerings.

Plaintiffs rely on *Flag Telecom* to argue that *American Pipe* provides for tolling securities claims dismissed for lack of standing when another named plaintiff subsequently appears to assert them.   In *Flag Telecom*, the Southern District of New York tolled the statute of limitations to allow the addition of a new plaintiff with standing to assert Section 12(a)(2) claims regarding Flag securities.  *Flag Telecom*, 352 F. Supp. 2d at 454-56.  These claims were initially dismissed, because the original named plaintiff had not purchased the Flag securities at an Initial Public Offering (IPO), as required for Section 12(a)(2) claims.  *Flag Telecom*, 352 F. Supp. 2d at 454.  The original named plaintiff, Loftin, *had* purchased the Flag securities otherwise, however, and had standing to assert Section 11 claims on that basis.  *Flag Telecom*, 352 F. Supp. 2d at 453.  In this context, the court noted that the newly-added plaintiff "would probably have concluded that he had little chance of becoming lead plaintiff after Loftin, who appears to have invested a substantial amount of capital in Flag, filed his May 2002 Complaint." *Id*. at 456.  The court concluded that failure to extend *American Pipe* tolling would undermine Rule 23's encouragement to investors to

---

[6] Some of the cases cited by Plaintiffs apply *American Pipe* where the issue of standing was not determined, and are therefore not on point.  *See Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors*, 498 F.3d 920, 925 (9th Cir. 2007) (holding that *American Pipe* tolling applies to individual claims of putative class members when a putative class action complaint is voluntarily dismissed).   *Anchor Capital* did not involve a determination that the original named plaintiffs lacked standing to bring the claims.

6

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

EXHIBIT 1 TO ERRATA  -13-
EXHIBIT  A  -10-

United States District Court
For the Northern District of California

1    "refrain" from filing separate actions, or intervening, when those investors "feel their interests are

2    adequately protected in a proposed class action that has already been filed." *Id.  See also In re*

3    *Enron Corp. Sec. Derivative & ERISA Litig.*, 529 F. Supp. 2d 644, 709 (S.D. Tex. 2006) (tolling

4    Section 12(a)(2) claims where named plaintiffs had standing only as to Section 11 claims).

5            Defendants counter that because the original named Plaintiffs had no standing as to *any*

6    claims relating to the dismissed Offerings, jurisdiction over these claims never attached.  Thus, the

7    Court is simply without power to toll the statutes of limitations or repose over those claims.  While

8    there is no Supreme Court or Ninth Circuit authority on this point, the Seventh Circuit has found

9    that if the named plaintiffs to a class action lack standing to bring a claim, no putative class

10   members can "step in to the [standing] breach." *Walters v. Edgar*, 163 F.3d 430, 432-33 (7th Cir.

11   1998).  Following *Walters*, Judge Whyte (of this District) similarly found that the court could not

12   toll claims that the original named plaintiffs had no standing to bring. *Palmer v. Stassinos*, 236

13   F.R.D. 460, 465 (N.D. Cal. 2006).  Judge Whyte noted that "it would be beyond the constitutional

14   power of a federal court to toll a period of limitations based on a claim that failed because the

15   claimant had no power to bring it." *Palmer*, 236 F.R.D. at 466.  Other district courts have reached

16   the same conclusion. *Boilermakers Nat'l Annuity Trust Fund v. WAMU Mortg. Pass Through*

17   *Certificates*, No. 09-cv-00037, slip op. at 15-16 (W.D. Wash. Sept. 28, 2010).

18           In *American Pipe* itself, the Supreme Court expressed concern that a failure to toll claims

19   after certification has been denied would induce individuals to file duplicative suits (or risk giving

20   up their claims) in situations where class certification is difficult to predict. *American Pipe*, 414

21   U.S. at 553-54.  Some courts have relied on this rationale to toll the statute of limitations on the

22   claims of  putative class members even when no original named plaintiff had standing to bring the

23   claims, but where special circumstances apply.  For example, the Third Circuit determined that

24   tolling should permit substitution of a new plaintiff with standing where intervening law required

25   the district court to reverse its certification order because the named plaintiff had no standing as to

26   one claim. *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1097 (3d Cir. 1975).  The Ninth Circuit

27   has also allowed putative class members to re-assert class claims after their initial claims were

28

7

**United States District Court**
For the Northern District of California

dismissed based on an intervening change in the law.  *Catholic Soc. Servs. v. INS*, 232 F.3d 1139, 1149 (9th Cir. 2000).

On the other hand, various district courts have expressed concerns that extending *American Pipe* tolling to class action claims the original named plaintiffs had no standing to bring will encourage filings made "merely to extend the period in which to find a class representative."  *See In re Crazy Eddie Sec. Litig.*, 747 F. Supp. 850, 856 (E.D.N.Y. 1990) (declining to toll class claims originally asserted without standing); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, No. 00-4285 (GEB), 2002 U.S. Dist. LEXIS 27189 at *85-*86 (D.N.J. June 26, 2002) (noting that "the possibility of abuse" is "acute" in the context of standing, where "the potential exists to circumvent the statute of limitations by filing putative class actions on behalf of nominal plaintiffs without standing solely to toll the limitations period until a suitable plaintiff can be found;"); *In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 382 (D. Mass. 1987) ("I am not aware of any authority that would support the application of the tolling rule to allow a timely filed claim of persons who are not themselves members of an appropriate class to toll the statute of limitation for later filing and certification of a class that could not properly include them.").

Consistent with the analysis in *American Pipe* and cases applying it, the Court finds that the facts in this case counsel against tolling the statute for the revived claims of the New Plaintiffs. Unlike the new plaintiffs in *Flag Telecom* or *Enron*, the New Plaintiffs here had no reason to rely on the filing of the *Detroit* and *New Orleans* complaints to protect their claims.  The original complaints did not allege that the named plaintiffs had *any* ownership interest in the 37 dismissed Offerings.  Thus, review of these complaints would have revealed that the Plaintiffs in the *Detroit* and *New Orleans* actions had no standing to bring claims as to the 37 dismissed Offerings.  At the October 7, 2010 hearing, Plaintiffs in the various cases argued that when the initial *Detroit* and *New Orleans* complaints were filed, the law was unclear as to whether or not the named Plaintiffs in those actions would have standing to assert claims for securities in which they did not invest. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1166 (C.D. Cal. 2008) (finding Section 11 standing for all securities based on investment in only some when "(1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common

8

'parts' that (3) were false and misleading at each effective date."). But the authority Plaintiffs cite on this point is distinguishable. As the Southern District of New York recently held, finding standing based on purchases made under a common registration is appropriate only when "all of the relevant claims [are] premised on statements or alleged omissions in company reports that had been incorporated by reference in each of the registration statements at issue." *In re Am. Int'l Group, Inc.*, No. 08 Civ. 4772(LTS), 2010 U.S. Dist. LEXIS 101263 at *65 (S.D.N.Y. Sept. 27, 2010).

Multiple courts have rejected an extension of this "common registration" theory to situations where, as here, Plaintiffs' claims rely on separate disclosures or omissions made for each Offering. These courts have found that such an extension would be against the "overwhelming" weight of authority. *See* April 22, 2010 Order at 5; *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303-304 (D. Mass. 2009); *In re Mortgage*, No. 09 Civ. 2137 (LTS)(MHD), 2010 U.S. Dist. LEXIS 84146 at *15-16 (S.D.N.Y. Aug. 17, 2010). In the present case, as Judge Illston previously held, the Plaintiffs' claims depend on different statements in the separate Prospectus Supplements made for each Offering. In short, the Court rejects Plaintiffs' contention that there was a reasonable basis to believe that the original *Detroit* and *New Orleans* named plaintiffs had standing to bring claims regarding the 37 Offerings in which they did not invest. There are no unusual circumstances, such as an intervening change in the law affecting the standing analysis, or reversal of a previous class certification, that render this decision unfair.[7]

---

[7] In concluding that Plaintiffs had no standing to sue regarding securities in which they did not invest, Judge Illston relied on older, controlling authority, applying standing rules outside the Mortgage Backed Securities (MBS) context. *See*, *e.g.*, *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999). Counsel for both the Lead Plaintiffs and for Schwab argued at the October 7, 2010 hearing that until *Nomura*, which they identify as the first decision applying the traditional standing rule to MBS investments, they could not have been reasonably on notice that the original *Detroit* and *New Orleans* plaintiffs might not have standing to bring all of their asserted claims. *See Nomura*, 658 F. Supp. 2d at 303-304. But neither Lead Plaintiffs nor Schwab explain why they continued to delay asserting their claims after this alleged sea-change. *Nomura* was decided in September, 2009; the *First Star*, *Schwab I* and *Schwab II* actions were filed between June and August, 2010.

9

United States District Court
For the Northern District of California

1        This conclusion is in accord with the Ninth Circuit's decision in *Lierboe v. State Farm Mut.*

2  *Auto. Ins.* Co., 350 F.3d 1018, 1023-24 (9th Cir. 2003).  Here, the Ninth Circuit ordered dismissal

3  of a putative class action brought by a named plaintiff without standing, expressly denying an

4  opportunity to substitute in a new named plaintiff.  The Ninth Circuit relied on a Seventh Circuit

5  decision in which a putative class action was dismissed because the named plaintiff lacked

6  standing.  The court noted that this outcome could easily have been avoided because "[i]t was

7  apparent from the face of her complaint that Foster [the named plaintiff] never had standing."

8  *Foster v. Ctr. Twp. of La Porte Cnty.*, 798 F.2d 237, 245 (7th Cir. 1986).

9        While the Court finds the *Walters* and *Palmer* decisions instructive, it is unnecessary to

10 decide today that it is beyond the power of the Court to toll the statute of limitations where the lead

11 plaintiff lacks standing.  Rather, the Court finds that *American Pipe* and the cases interpreting it

12 support the declination to extend tolling to claims over which the original named Plaintiffs asserted

13 no facts supporting standing.

14       As a result, the Court must dismiss the ten revived Offerings.  As to the seven Offerings that

15 were sold before May 28, 2007, Plaintiffs concede that they must rely on tolling of the three year

16 statute of repose to bring claims relating to these securities.  Thus, there is no dispute as to the

17 impact of the Court's decision on those Offerings, and they must be dismissed.

18       As to the remaining three Offerings, Plaintiffs contended at the September 7, 2010 hearing

19 that it is an issue of fact when the one-year statute of limitations regarding those claims began to

20 run, but raised no facts in briefing or at the hearing indicating that the previous complaints did not

21 actually put the New Plaintiffs on notice of their claims.  The statute begins running when an

22 investor actually discovers the misleading or omitted statement, or when a diligent investor should

23 have discovered it.  15 U.S.C. § 77m.  The March 27, 2009 *Detroit* complaint and the April 13,

24 2009 *New Orleans* complaint stated many of the same factual bases now alleged in the ACC

25 regarding these Offerings.  Specifically, these complaints cite to the same Registration Statements

26 and Prospectuses (Offering Documents), and many of the same alleged misrepresentations and

27 omissions within those Offering Documents, as cited in the May 28, 2010 ACC.  *Compare Detroit*

28 Complaint ¶¶ 54-70 and *New Orleans* Complaint ¶¶ 104-112 with ACC ¶¶ 57-67; 86-90; 100-103;

10

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

EXHIBIT 1 TO ERRATA  -17-
EXHIBIT  A  -14-

United States District Court
For the Northern District of California

115-117.  Although the ACC expands upon the allegations, principally by adding statements by confidential witnesses, the Court finds that the information in the original *Detroit* and *New Orleans* Complaints was sufficient to make New Plaintiffs aware of the basis for their claims.  In addition, in opposing this motion, Plaintiffs argue that they were first "plausibly" on notice of their claims nearly a year before this, as of May 20, 2008.  *See* Dkt. No. 218 (Opposition) at 21.

In light of these facts, the Court finds that New Plaintiffs knew or should have known of the basis for the revived claims more than a year before the ACC was filed on May 28, 2010.[8]  *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935 (9th Cir. 1996) (finding that filing of a first complaint evidenced that plaintiffs had discovered the facts underlying their Securities Act of 1934 Section 10(b) claim, triggering the statute of limitations).[9]  If the *Detroit* and *New Orleans* plaintiffs were first "plausibly" on notice as of May 2008, and were able to file complaints alleging the basis for their claims as of March and April the following year, this indicates that a reasonably diligent investor should have been able to do the same.  The one-year statute of limitations for the 2007-10 Trust thus expired on March 27, 2010 (one year after the *Detroit* complaint was filed), at the very latest.  The one-year statute of limitations for the 2007-13 and 2007-AR4 Trusts likewise expired on April 13, 2010 (one year after the *New Orleans* complaint was filed) at the very latest.  The May 28, 2010 filing of the ACC was therefore past the one-year statute of limitations for all three remaining revived Offerings.  Accordingly, all ten revived Offerings brought by New Plaintiffs are hereby DISMISSED WITH PREJUDICE.

---

[8] At the hearing, Schwab argued that this determination is inconsistent with recent Supreme Court authority regarding inquiry notice.  *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1795-99 (2010).  The Court in *Merck* was applying the statute of limitations for fraud claims.  Such claims include an element of scienter not required for the claims asserted in this case; the Court noted that it is often difficult for plaintiffs to "discover" facts supporting the scienter element.  *Merck*, 130 S. Ct. at 1793-94.  This Court's determination that the New Plaintiffs were or should have been aware of the factual basis for their claims as of the filing of the *Detroit* and *New Orleans* actions is based on what the record shows the Plaintiffs actually knew, based on their own public filings and admissions.  While the Court's use of the term "inquiry notice" in the Tentative Order was perhaps unclear in light of *Merck*'s rejection of "inquiry notice" as the standard for triggering the statute of limitations for Section 10(b) claims, the substance of the Court's ruling is consistent with *Merck*.
[9] Although *In re Syntex* deals with inquiry notice of a Section 10(b) claim, a similar "knew or should have known" standard triggers the statute of limitations for Section 10(b) claims and Section 11 or 12 claims, and for purposes of this analysis, the Court finds the *In re Syntex* analysis applicable.

11

Case No.: 09-CV-01376-LHK
ORDER GRANTING MOTION TO DISMISS

EXHIBIT 1 TO ERRATA  -18-
EXHIBIT  A  -15-

**United States District Court**
For the Northern District of California

### b.  Relation Back

At the October 7, 2010 hearing, General Retirement argued that its claims based on its investments in the 2006-AR15 Trust should relate back to the original claims based on this Trust asserted by the *New Orleans* plaintiffs.  General Retirement principally relies on a Ninth Circuit case setting forth the rule for relation back.  *Immigrant Assistance Project of the L.A. County Fed'n of Labor v. INS*, 306 F.3d 842, 857-58 (9th Cir. 2002).   In order to show that claims brought by a new plaintiff should relate back to an earlier filing, General Retirement must show that "1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly prejudice the defendant; and 3) there is an identity of interests between the original and newly proposed plaintiff."  *Id*.  Here, under Ninth Circuit authority cited in the *Immigrant Assistance* decision itself, General Retirement cannot show an identity of interests with the *New Orleans* plaintiffs regarding 2006-AR15 Trust, because no *New Orleans* plaintiff invested in that Trust.  In other words, no *New Orleans* plaintiff had any interest in the 2006-AR15 Trust at all.  The Ninth Circuit has held that there is no identity of interests between plaintiffs who "bought stock at different values and after different disclosures and statements were made by Defendants and analysts."  *In re Syntex*, 95 F.3d at 935.  General Retirement argued at the October 7, 2010 hearing that a recent Supreme Court decision supported its relate back argument.  *Krupski v. Costa Crociere S. p. A.*, 130 S. Ct. 2485, 2496 (2010).  However, the *Krupski* case did not address the "identity of interests" issue, as it involved a single plaintiff asserting her original claims against an additional defendant.  *Id*.  Nothing in the *Krupski* decision changes the fact that General Retirement has failed to show an identity of interests with the *New Orleans* plaintiffs regarding the 2006-AR15 Trust.

### c.  Relation of *Schwab I* and *Schwab II* to the Consolidated Case

Local Rule 3-12 requires that cases be found related to one another if they concern "substantially the same parties, property, transaction or event" and "it appears likely that there will be an unduly burdensome duplication of labor or conflicting results if the cases are conducted before different Judges."  When the Court initially determined that the *Schwab I* case was related to the Consolidated Case, the 2007-10 Trust was asserted in both cases.  In light of today's Order,

12

EXHIBIT 1 TO ERRATA  -19-
EXHIBIT  A  -16-

however, it is being dismissed from the Consolidated Case.  Given the fact that each Offering has a separate Prospectus Supplement, and that both Schwab and Lead Plaintiffs' claims regarding each distinct Offering depend on these separate Supplements, the Court finds that there is no common Offering at issue in these cases.  Thus, there is no basis to find them related.  Therefore, in light of these changed circumstances, the Court finds that these matters are no longer related and GRANTS Schwab's Motion for Reconsideration.

Regarding *Schwab II*, the complaint alleges securities violations based on over 30 different offerings, only 3 of which have any relationship to Wells Fargo.  As to these three Wells Fargo-related trusts, they are no longer at issue in the Consolidated Case; they were dismissed for lack of standing, and Lead Plaintiffs did not attempt to re-assert them in the ACC.  Thus, the Court concludes that these cases do not concern "substantially the same" parties, property, transaction or event, as the differences between them far outweigh the similarities.  Accordingly, the Court declines to find these cases related and DENIES Wells Fargo's Motion to Relate.

### d.  General Retirement's Motion to Intervene

General Retirement has moved to intervene in this case in order to assert claims based on its investments in the WFMBS 2006-AR15 Trust.  Though it appears that General Retirement had standing to assert these claims all along, it did not raise them or state the factual basis for them in its initial complaint, or at any other time until its Motion to Intervene.  At the October 7, 2010 hearing, counsel for General Retirement could not explain the reason for this delay.  General Retirement alleges that it purchased this security January 1, 2007, so absent tolling, the three-year statute of repose bars claims filed after January 1, 2010.  *See* Dkt. No. 225 (Heffelfinger Decl.), Ex. A.  General Retirement did not file its motion to intervene until August 13, 2010.  In light of the Court's decision that, under the circumstances of this case, tolling will not apply to class claims that no named Plaintiff had standing to bring, the Court finds that General Retirement's claims are time-barred.  Therefore, General Retirement's Motion to Intervene is DENIED.

### e.  Lead Plaintiffs' Motion to Consolidate *First Star*

The Court's determination of the tolling issue is likewise dispositive of the *First Star* action. In its complaint, First Star relied on tolling, based on the filing of the *New Orleans* complaint, to

13

United States District Court
For the Northern District of California

1    assert that its claims were timely. Given that the 2006-AR15 Trust was sold more than three years

2    before the First Star complaint was filed, First Star is correct that without tolling, its claims are

3    barred. As explained above, the Court finds that the initial complaints in the Consolidated Case did

4    not toll First Star's claims.

5    First Star argues that this decision is contrary to the lead-plaintiff provisions of the PSLRA.

6    First Star claims it was *prohibited* from bringing its claims in a class action (which First Star refers

7    to as "the only effective means of obtaining legal representation") so long as there was any

8    potential that the Lead Plaintiffs could successfully resurrect the 2006-AR15 Trust claim and

9    thereby control the litigation regarding that claim. *See* First Star Response at 2. However, the

10   authority First Star cites on this point shows that First Star was free to file an individual action, or

11   even another class action, at any time. While those cases would very likely have been related to, or

12   consolidated with, the Consolidated Case, there was nothing preventing First Star from protecting

13   its interests by filing suit. *In re Bank of Am. Corp. Sec. Derivative and ERISA Litig.*, No. 09 MDL

14   2058 (DC), 2010 U.S. Dist. LEXIS 37799 at *6-*8  (S.D.N.Y. April 9, 2010). First Star's

15   arguments are directed more toward determining lead plaintiff status. Thus, they are not persuasive

16   regarding the tolling issues presented here.

17   In light of the Court's decision that, under the circumstances of this case, tolling will not

18   apply to class claims that no named Plaintiff had standing to bring, the Court finds that First Star's

19   claims are time-barred. *See Levald*, *Inc. v. City of Palm Desert*, 998 F.2d 680, 687 (9th Cir. 1993)

20   (holding that the court may dismiss claims on statute-of-limitations grounds *sua sponte*, so long as

21   the defendant has not waived the defense, and the plaintiff has had an opportunity to argue the

22   question). Therefore, the Lead Plaintiffs' Motion to Consolidate is DENIED as moot, and First

23   Star's complaint is hereby DISMISSED WITH PREJUDICE.

24   **f.   Tolling of Individual Claims**

25   Regarding Schwab's claims based on its investment in the 2007-10 Trust, asserted in

26   *Schwab I*, the parties' briefing to date has focused almost entirely on *American Pipe* tolling for

27   class action claims. Before determining that Schwab's individual claims as to the 2007-10 Trust

28   are time-barred, the Court would appreciate briefing from Wells Fargo and Schwab specifically

14

regarding the tolling of individual claims. The Court understands Wells Fargo's position that it is without jurisdiction to toll such claims, but asks that the parties both address authority regarding *American Pipe* tolling of individual claims based on an original class claim asserted without standing. Therefore, Wells Fargo may submit a brief, not to exceed seven pages, by November 1, 2010, and Schwab may submit a responsive brief, not to exceed seven pages, by November 15, 2010. It would be helpful to the Court if Schwab could address when it became aware of the *New Orleans* and *Detroit* actions and its claims, and why it delayed in bringing its individual claims on the 2007-10 Trust.

In light of the fact that *Schwab I* is no longer related to the Consolidated Case, Schwab need not attend the Case Management Conference set for October 20, 2010. A case management conference will be held in *Schwab I* after the hearing on Schwab's Motion to Remand (Dkt. No. 19), set for December 9, 2010.

## IV. CONCLUSION

Accordingly, the ten revived Offerings brought by New Plaintiffs (WFMBS 2007-10, 2007-13, 2007-AR4, 2006-7, 2006-10, 2006-AR16, 2006-AR19, 2006-18, 2006-20 Trusts, and the Wells Fargo Alternative Loan 2007-PA1 Trust) are hereby DISMISSED with prejudice. Schwab's Motion for Reconsideration of the Court's previous order relating the Schwab I case to this one is GRANTED, and the cases are deemed unrelated. Wells Fargo's Motion to Relate *Schwab II* to this case is DENIED. General Retirement's Motion to Intervene is DENIED as moot. The Lead Plaintiffs' Motion to Consolidate the *First Star* action is DENIED as moot, and First Star's complaint is DISMISSED WITH PREJUDICE. The hearing on First Star's Motion to Appoint Lead Plaintiffs' Counsel, currently set for November 18, 2010, is hereby VACATED.

**IT IS SO ORDERED.**

Dated: October 19, 2010

_____
LUCY H. KOH
United States District Judge

**United States District Court**
For the Northern District of California

15

# EXHIBIT B

# EXHIBIT B

EXHIBIT 1 TO ERRATA  -23-

1

```
     09MVNECA                    Argument
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   NECA-IBEW HEALTH & WELFARE
 3   FUND, et ano,
 4
 4                 Plaintiffs,
 5
 5        v.                              08 CV 10783 (MGC)
 6
 6   GOLDMAN SACHS & CO., ET AL,
 7
 7                 Defendants.
 8
 8   ------------------------------x
 9                                       New York, N.Y.
 9                                       September 22, 2010
10                                       10:40 a.m.
10
11   Before:
11
12            HON. MIRIAM GOLDMAN CEDARBAUM,
12
13                                       District Judge
13
14                        APPEARANCES
14
15   ROBBINS GELLER RUDMAN & DOWD
15        Attorneys for Plaintiffs
16   BY:  ARTHUR C. LEAHY
16
17   SULLIVAN & CROMWELL
17        Attorneys for Defendants
18   BY:  RICHARD H. KLAPPER
18        HARSH N. TRIVEDI
19        MAYA KRUGMAN
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>
(212) 805-0300

EXHIBIT 1 TO ERRATA -24-
EXHIBIT B -20-

2

09MVNECA                    Argument

1              (In open court)
2              THE COURT:  All right.  Once again, we are focusing on
3    whether the complaint in this putative class action states a
4    claim.
5              The defendants have moved to dismiss, I guess, all of
6    the claims.
7              And I would like to start with the first claim, which
8    is for damages for injury, damages for loss for certificates --
9    for a particular certificate that the plaintiff never sold and
10   received regular periodic payments, in accordance with the
11   provisions of the certificate.
12             Before we turn to that, though, I also have no
13   conception of this case.  There are no numbers given in the
14   complaint.  So I have no conception of how much money the
15   plaintiff has already received from these distributions.
16   Because when we get to the second claim, which is under 12, not
17   11, which is a claim for restitution, in order to get
18   restitution, you have to proffer back what you received.
19   That's the way in which restitution works, as we all know.  I
20   have no conception as to what it is the plaintiff has received
21   so far.
22             So I would like to hear about both of those things.
23             I'd like to start with the Section 11 claim.
24             MR. KLAPPER:  Your Honor, Richard Klapper --
25             THE COURT:  I think I would like to hear the opponent
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

EXHIBIT 1 TO ERRATA  -25-
EXHIBIT B  -21-

```
    09MVNECA              Argument
1   first.
2              MR. KLAPPER:  As you wish.
3              THE COURT:  Because I would like to hear first what
4   the plaintiff has received to date, since he has not sold
5   anything.
6              MR. LEAHY:  Good morning, your Honor.  Art Leahy on
7   behalf of the plaintiff.
8              THE COURT:  Good morning.
9              MR. LEAHY:  I don't know the exact amount that the
10  plaintiff has received as of today.  We do know that
11  essentially these certificates were paying an interest rate
12  right around six percent.
13             THE COURT:  Which makes it roughly how much -- when
14  did he start receiving payments?
15             MR. LEAHY:  It depends on which certificate was
16  bought.  One certificate was bought in October of 2007; the
17  other certificate was bought, I believe, in April 2008.
18             THE COURT:  All right.  Well, let's start with 2007.
19  You are seeking damages, even though that certificate has not
20  been sold.
21             MR. LEAHY:  That is correct, your Honor.
22             THE COURT:  I would like to know how much the
23  plaintiff has received for that certificate since purchase.  I
24  am not holding you to a penny.  I would like to have some sense
25  of what the amount is.
```

EXHIBIT 1 TO ERRATA  -26-
EXHIBIT B  -22-

```
                                                              4
     09MVNECA                    Argument
1              MR. LEAHY:  Your Honor, I don't know the answer to
2    that.
3              THE COURT:  Six percent of what?
4              MR. LEAHY:  Six percent of the certificate amount
5    purchased.
6              THE COURT:  How much was the certificate amount
7    purchased?
8              MR. LEAHY:  Certificate for the 2010 --
9              THE COURT:  How about certificate of 2007?  Is that
10   what you just told me about?
11             MR. LEAHY:  Right.  On October 15, 2007 --
12             THE COURT:  Your client bought --
13             MR. LEAHY:  -- the 2010 certificate.
14             THE COURT:  I see.  So it matures in 2010, is that --
15             MR. LEAHY:  No, it doesn't.
16             THE COURT:  Well, why is it called the 2010
17   certificate?
18             MR. LEAHY:  I'm sorry, it's the 2007-10 trust
19   certificate is what I meant --
20             THE COURT:  OK.
21             MR. LEAHY:  -- to say.  I apologize.
22             THE COURT:  That's all right.
23             MR. LEAHY:  And the face amount of that certificate is
24   $390,000.
25             THE COURT:  OK.  So if we take six percent of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

EXHIBIT 1 TO ERRATA -27-
EXHIBIT B -23-

5

```
      09MVNECA                    Argument
 1    390,000 -- was it a monthly payment of six percent or --
 2              MR. LEAHY:  I believe they do receive either monthly
 3    or quarterly paydowns of interest and/or principal when loans
 4    are paid off early on things of that nature.
 5              THE COURT:  All right.  Well, it seems to me your
 6    client has to tell you what he's received or what it has
 7    received.
 8              MR. LEAHY:  Certainly, your Honor.  With our initial
 9    certification that we filed with the initial complaint, we had
10    listed the paydowns.  I don't have the initial complaint with
11    me or that certification, but they are listed there.
12              THE COURT:  Why are they not listed in the latest
13    complaint?
14              MR. LEAHY:  Well, because, your Honor, what we are
15    alleging in terms of damages is not a failure to make the
16    payments.
17              THE COURT:  I'm aware of that.  But you are seeking
18    restitution; so I have to know what you've received.  Isn't
19    that right?
20              MR. LEAHY:  Absolutely.  Your Honor, we can provide
21    you that information, if you like.  I can assure you it is much
22    less than they paid for the certificates.
23              THE COURT:  Well, that's what I want to be clear
24    about:  How much less?
25              MR. LEAHY:  Well, if we take the six percent --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -28-
EXHIBIT B  -24-

```
                                                              6
        09MVNECA                    Argument
1               THE COURT:  Because this is now 2010, and they
2       continue to receive payments.  Isn't that right?
3               MR. LEAHY:  That's correct.
4               THE COURT:  Payments have not stopped.
5               MR. LEAHY:  As of today, no, they have not.
6               THE COURT:  Yes.  They have received -- is this
7       quarterly or monthly?
8               MR. LEAHY:  I believe it's monthly, but I would have
9       to check.
10              THE COURT:  All right.  Monthly payments of?
11              MR. LEAHY:  Six percent per annum essentially.
12              THE COURT:  Six percent per annum.  And that's simple
13      interest, not compound interest.
14              MR. LEAHY:  It depends on how much the loan pool is
15      remaining at any particular time, how much has been prepaid,
16      how much has defaulted.  There is a lot of variables that go
17      into the calculation, as I understand it.
18              THE COURT:  OK.  But have these monthly payments
19      changed much over the years?
20              MR. LEAHY:  I believe the particular tranche that my
21      client bought is receiving the payment that was contracted for.
22              THE COURT:  Right.  And that was the first tranche.
23              MR. LEAHY:  That's correct.
24              THE COURT:  Yes.  This is the No. 1 level of whatever.
25              MR. LEAHY:  Our clients bought the top tranche in both
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

EXHIBIT 1 TO ERRATA -29-
EXHIBIT B -25-

```
                                                         7
        09MVNECA                    Argument
 1   trusts, that's correct.
 2             THE COURT:  Right.  All right.
 3             MR. LEAHY:  Or top of the second at the top.
 4             THE COURT:  All right.  And is there any expiration
 5   date?  No, they continue to receive monthly payments under this
 6   certificate, as long as they hold the certificate or until the
 7   certificate matures.
 8             MR. LEAHY:  Or until enough loans default where the
 9   payments cannot be made to that particular tranche.
10             THE COURT:  But those are all -- none of those has yet
11   happened.
12             MR. LEAHY:  Not to the particular tranche that my
13   client --
14             THE COURT:  That's what we are talking about; that's
15   all you can sue for, your own, not someone else's.
16             MR. LEAHY:  Actually, your Honor, we're suing on
17   behalf of all purchasers of the trust, all tranches at this
18   particular point.
19             THE COURT:  But I have ruled against you on that
20   already.  I have held that you must -- you may only represent
21   the same certificate, not other people's purchases.
22             MR. LEAHY:  That's not how we understand your Honor's
23   order.
24             THE COURT:  Well, that was my understanding of how I
25   ruled.
```

EXHIBIT 1 TO ERRATA  -30-
EXHIBIT B  -26-

```
       09MVNECA                  Argument
  1              MR. LEAHY:  Your Honor --
  2              THE COURT:  To be a class representative, you can only
  3     represent the class of persons or entities that purchased the
  4     particular -- the certificate from the particular tranche from
  5     the particular trust that you purchased.
  6              MR. LEAHY:  Your Honor, actually, your earlier ruling
  7     was a little bit bigger than that.  You basically said you can
  8     only sue on behalf of trusts that you purchased in.  So we're
  9     only suing on behalf all purchasers in the two trusts that my
 10     client bought in.
 11              THE COURT:  Right.  But it must be the same tranche as
 12     yours.
 13              MR. LEAHY:  That's not what your Honor held.
 14              THE COURT:  Well, how many are there in that tranche?
 15              MR. LEAHY:  I believe there's probably 10 to 15
 16     different tranches within the trust.
 17              THE COURT:  No, no, I understand all of that.  But the
 18     effects are very different in different tranches.
 19              MR. LEAHY:  This is true, your Honor.
 20              THE COURT:  And that's why in a class action the class
 21     has to be in the same position, basically.
 22              MR. LEAHY:  They are, your Honor.  They are all told
 23     the same misrepresentations, we allege.  And what we are
 24     getting into now is an issue of how much damages each
 25     particular tranche has.  And damages are not a bar of the class
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

EXHIBIT 1 TO ERRATA  -31-<br>EXHIBIT B  -27-

```
     09MVNECA                 Argument
 1   certification.  They are all suing on the same
 2   misrepresentations.  They didn't have a separate prospectus
 3   supplement for each tranche.
 4              THE COURT:  Now, wait just a moment.
 5              Damages are not a bar when we are just talking about
 6   how long you've held something.  Damages are not calculable in
 7   the same way for people who have never sold and people who have
 8   sold.  And they are not calculable in the same way for people
 9   in different tranches.  Isn't that right?
10              MR. LEAHY:  That's right.
11              THE COURT:  So let's stay for a moment with this
12   plaintiff's situation.  Because this plaintiff is claiming to
13   be essentially situated in the same way as those he wants to
14   represent.  Isn't that right?
15              MR. LEAHY:  That's correct, your Honor.
16              THE COURT:  OK.  And I'd like to focus just on that
17   group of putative plaintiff -- class action plaintiffs, the
18   ones who purchased in the first tranche from that particular
19   trust and have not sold.
20              Did anybody in this class buy before your client,
21   before the plaintiff?
22              MR. LEAHY:  We do not know that.
23              THE COURT:  You don't know.  OK.  OK.
24              MR. LEAHY:  I imagine so.
25              THE COURT:  But your plaintiff bought something fairly
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

EXHIBIT 1 TO ERRATA  -32-
EXHIBIT B  -28-

```
     09MVNECA                    Argument
 1   early.
 2           MR. LEAHY:  If we're talking about the 2007-10, yes,
 3   they bought prior to the closing of offering; so essentially
 4   they bought right at the time of the offering.
 5           THE COURT:  On the initial offering?
 6           MR. LEAHY:  Correct.
 7           THE COURT:  OK.  And they have received payments on
 8   that initial purchase of six percent per annum monthly ever
 9   since?
10           MR. LEAHY:  Don't hold me exactly to six percent, but,
11   yes, approximately in that neighborhood.
12           THE COURT:  All right.  But you are going to give me
13   exact figures -- I just want to follow this a little bit --
14   which means that for roughly three years, they have been
15   receiving monthly payments.
16           Now, have the payments been consistently the same?
17   What is the relationship among the payments?
18           MR. LEAHY:  Your Honor, it's a certain percentage,
19   depending on what the loan pool is at any particular month.
20           THE COURT:  Right.  But I'm asking you, in fact, what
21   is the relationship among the sums that they have received?
22   Have they received roughly the same amount every month?  Have
23   the amounts varied greatly?
24           MR. LEAHY:  I think, given the amount purchased in
25   interest rate, yes, probably within a range.  I don't know that
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT 1 TO ERRATA  -33-
EXHIBIT B  -29-

```
       09MVNECA                   Argument
  1   for certain, your Honor.  As we allege, I mean in one of the
  2   trusts, 50 percent of the loans are delinquent, not paying,
  3   foreclosed, already owned by the bank.
  4             THE COURT:  But is that the trust your client bought?
  5             MR. LEAHY:  Yes, your Honor, it is.
  6             THE COURT:  All right.  But did that, in fact, affect
  7   what they received?  I need to know that.  That's important.
  8             MR. LEAHY:  I need to check.  I don't think it's
  9   affected it substantially because of the way the trust is
 10   structured.
 11             THE COURT:  I'm really trying to identify the amount
 12   that would have to be proffered if there were recision.
 13             MR. LEAHY:  I think if we want to do really rough
 14   calculations math-wise, we take the $390,000.  Since they
 15   bought in October of 2007, you have to prorate that six percent
 16   annual for, you know, one quarter of that particular period of
 17   time; six percent, 2008; six percent, 2009; and prorate six
 18   percent for whatever this part of the year is.
 19             THE COURT:  Now, is there some maturity provision?
 20             MR. LEAHY:  Well, most of the loans in the trust are
 21   30-year loans.  And I do recall vaguely --
 22             THE COURT:  So they are ongoing?
 23             MR. LEAHY:  Absolutely.
 24             THE COURT:  That's all I want to be clear about.
 25             MR. LEAHY:  Absolutely.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -34-
EXHIBIT B  -30-

```
      09MVNECA                   Argument
 1              THE COURT:  All right.
 2              MR. LEAHY:  Yes.
 3              THE COURT:  All right.  So for a period of three
 4     years, what would you say, a tenth of it has been paid off?
 5              MR. LEAHY:  Without doing the math off the top of my
 6     head, that sounds like it's --
 7              THE COURT:  Well, let me turn to the defendants.  You
 8     should know how much has been paid out, too.
 9              MR. KLAPPER:  We don't know exactly.  If you look at
10     the plaintiff's certification to the original complaint, which
11     only takes the payments through October of 2008, what they
12     allege is they have received repayments of principal, as well
13     as payments of interest.
14              THE COURT:  Yes, but the early years mortgage payments
15     of principal are minuscule or maybe not on these.
16              MR. KLAPPER:  Well, usually what comes about is the
17     loan is refinanced, repaid.  So if the loan is repaid, then
18     principal payments are made to the certificate holders.
19              THE COURT:  I see.  I see.
20              Well, what is your rough calculation as to how much
21     has been received to date by this plaintiff?
22              MR. KLAPPER:  Just looking at what they have put in
23     their certification, it would appear that they have received on
24     the 2007-10 certificate something in the neighborhood of 20 to
25     $30,000 in principal through October 2008, plus the interest
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -35-
EXHIBIT B  -31-

```
     09MVNECA                Argument
 1  payments.
 2           THE COURT:  And so you would double that to get it up
 3  to 2010, roughly, again?
 4           MR. KLAPPER:  Perhaps.  Perhaps, as a rough estimate.
 5           THE COURT:  And how much did they pay for that?
 6           MR. LEAHY:  The face value was $390,000, your Honor,
 7  perhaps.  I'd have to double-check.
 8           THE COURT:  So what you're saying is roughly ten
 9  percent has been received of the face value.
10           MR. KLAPPER:  Very, very --
11           THE COURT:  Yes, the face value is what they paid?
12           MR. KLAPPER:  No.
13           MR. LEAHY:  They may have paid a slight discount or
14  they may have paid slightly more.  I can't remember if it was
15  high nineties they end up paying for that particular one.  I
16  believe it's 99 and some change they paid for that particular
17  investment.
18           MR. KLAPPER:  It's 99.44 is what they have in their
19  certificate --
20           THE COURT:  All right.
21           MR. KLAPPER:  -- for the first --
22           THE COURT:  Well, let's say $100,000.
23           MR. KLAPPER:  Right.
24           THE COURT:  And how many of those did they pay for?
25  They didn't buy those at the same time.  Yes.
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>
(212) 805-0300

EXHIBIT 1 TO ERRATA  -36-
EXHIBIT B  -32-

14

```
        09MVNECA                 Argument
 1              MR. LEAHY:  They bought a face amount of $390,000.
 2  It's like buying a bond.  You buy a bond for --
 3              THE COURT:  No, I understand.  That's one certificate.
 4              MR. LEAHY:  Yes.
 5              THE COURT:  Right.
 6              MR. LEAHY:  I'm sorry.  The other certificate --
 7              THE COURT:  I was interested in how much they've put
 8  out.
 9              MR. LEAHY:  Well, they essentially paid something --
10  399,000 times .9940, essentially.
11              THE COURT:  That is, they purchased more than -- I'm
12  interested in how many purchases they made.
13              MR. LEAHY:  They bought it all in one purchase is my
14  understanding.
15              THE COURT:  I see.  This was a single purchase.
16              MR. LEAHY:  Single purchase.
17              THE COURT:  The plaintiff here bought everything at
18  one time in the first -- in the initial offering three years
19  ago, roughly.
20              MR. LEAHY:  For the 2007-10 trust, yes, your Honor.
21              THE COURT:  OK.  And they have not bought anything
22  else since.  Is that right?
23              MR. LEAHY:  That's correct.
24              MR. KLAPPER:  In that trust.
25              MR. LEAHY:  In that trust, that's correct.  They did
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

EXHIBIT 1 TO ERRATA -37-
EXHIBIT B -33-

15

```
        09MVNECA                    Argument
 1   buy in the 2007-5 trust, as well.
 2               THE COURT:  And when was that?
 3               MR. LEAHY:  That was in April of 2008.
 4               THE COURT:  April of 2008.
 5               MR. LEAHY:  Right.
 6               THE COURT:  So ostensibly they have not received as
 7   much in the second -- from the second purchase as from the
 8   first.
 9               MR. LEAHY:  Right.  Assuming the same interest rate
10   and what have you, yes.
11               THE COURT:  Is there the same interest rate?
12               MR. LEAHY:  They don't have the exact same interest
13   rates.  They are all in that five, six percent ballpark, if my
14   recollection serves me correctly.
15               THE COURT:  OK.  But close?
16               MR. LEAHY:  Yes.
17               THE COURT:  OK.  So they bought once in 2007 and once
18   in 2008.
19               MR. LEAHY:  Yes.
20               THE COURT:  And nothing since.
21               MR. LEAHY:  That's correct.  In the Goldman Sachs
22   trust, that's correct.
23               THE COURT:  Right.  And they have not sold anything.
24               MR. LEAHY:  That is correct.
25               THE COURT:  All right.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -38-
EXHIBIT B  -34-

09MVNECA                          Argument

 1           Now, what I would like to hear is how they can have a
 2    financial loss if they have held and have received everything
 3    they were promised.
 4           MR. LEAHY:  Well, your Honor, I think Judge Crotty
 5    summed it up quite well in DLJ, this recent case dealing with
 6    the exact same kind of case.
 7           THE COURT:  I read it and I had difficulty following
 8    the reasoning, frankly.  So I'd like you to articulate for me
 9    how that is financial loss, if you have never sold.  The
10    fact -- or why it is not what I would call premature until you
11    actually sell.  At that point, if the price has gone down, you
12    realize a loss.  But you're talking about an unrealized loss.
13    Isn't that right?
14           MR. LEAHY:  No, your Honor, that's not --
15           THE COURT:  That's the tax description:  An unrealized
16    loss.  They have not yet actually lost anything.
17           MR. LEAHY:  They have actually lost something.  They
18    have lost value, the initial price that they paid for, the
19    value of it at the time we filed suit.
20           THE COURT:  At this moment.  But who knows what it
21    will be the next year or the year after.
22           MR. LEAHY:  That's the way Section 11 -- it's
23    statutorily calculated damages.  Section 11 says when you sue
24    under Section 11, if you state a claim, your damages are one of
25    the three of the following --
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

EXHIBIT 1 TO ERRATA  -39-
EXHIBIT B  -35-

17

09MVNECA                    Argument
1          THE COURT:  So it's your position that you never have
2     to prove actual loss under Section 11.
3          MR. LEAHY:  Your Honor, we're at a motion to dismiss.
4     All we have to do is allege.  Sure, we have to prove damages,
5     and we will.
6          THE COURT:  But the point is that until you sell, you
7     can never claim realized loss, that you have actually
8     experienced a loss, unless you're not getting the payments, the
9     monthly payments that you were promised.  Until you actually
10    sell, whatever you contend you are losing is unrealized.
11         MR. LEAHY:  No, I disagree with that, your Honor.
12    Because look at the investment banking houses here in New York
13    that had to revalue their mortgage-backed security portfolios.
14    They had to write them down, too, because they had a realized
15    loss, because the value of these things now are much less than
16    were paid for as a result of the fact that things were
17    misrepresented.
18         THE COURT:  You don't know that that will be true next
19    year or the year after, do you?
20         MR. LEAHY:  You know what?  It doesn't matter under
21    Section 11.
22         THE COURT:  That is, at any point, regardless of
23    whether you have realized a loss, it is your position that
24    under Section 11, you can sue for loss.
25         MR. LEAHY:  If you sue within the statute of
                 SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

EXHIBIT 1 TO ERRATA  -40-
EXHIBIT B  -36-

18

09MVNECA                        Argument
1  limitations and you buy and you're holding at the time you file
2  suit, and there's a difference in those two prices, yes, you
3  can sue for that loss.  That's what the statute says.
4          THE COURT:  Even if the next day the price goes way
5  up?
6          MR. LEAHY:  The defendants have opportunity to prove
7  what's called negative causation; that whatever we are alleging
8  didn't cause a loss and things like that.  But when we're at
9  the pleading stage, certainty.
10         THE COURT:  OK.  So you are taking the position that
11 you do not have to, what I call, realize a loss.  You don't
12 have to actually prove that you could -- that the sales price
13 that you paid when you went to sell was less.  That's what we
14 normally call realized loss, when you sell for a lower price
15 than you paid.
16         MR. LEAHY:  If we're talking about loss requiring a
17 sale, sure, that's one way you calculate damages.  If you buy
18 and hold under Section 11, you take the difference between the
19 value at the time the suit is filed and the price you paid.
20         THE COURT:  All right.  But you agree that if you are
21 suing under the '34 Act, that would not be the measure of
22 damages.
23         MR. LEAHY:  Well, no, because under the '34 Act, it's
24 not the time --
25         THE COURT:  You have to prove realized loss.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

EXHIBIT 1 TO ERRATA  -41-
EXHIBIT B  -37-

```
       09MVNECA                    Argument
 1              MR. LEAHY:  No, your Honor.  It's not at the time the
 2     lawsuit is filed.  Section 11 has a very different calculation.
 3              Under the '34 Act, you have to prove at any particular
 4     point during the class period, if you will, when a plaintiff
 5     proves what the inflation in the price was which was caused by
 6     the fraud and how much of it that was taken out at the end is a
 7     result of the fraud as opposed to some other, what they call,
 8     compound information.
 9              THE COURT:  Right.  But you cannot prove that without
10     selling.
11              MR. LEAHY:  No.  Holders hold all the time during
12     class periods and have damages.  You don't have to sell on
13     either one of them.
14              THE COURT:  I don't know what you mean by "all the
15     time."  I have never had such a case.  Because the
16     representation has to cause the loss.
17              MR. LEAHY:  Correct.
18              THE COURT:  Under the '34 Act.
19              MR. LEAHY:  Right.
20              THE COURT:  And the representation has to cause the
21     loss here.  But you have to have a loss.  You can't have
22     something cause a loss if there was no loss.  That's the
23     problem that I deal with.  And you want me to take the position
24     that you don't need a loss.  All you have to do is calculate
25     some artificial value under the '33 Act.  I'm not going --
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -42-
EXHIBIT B  -38-

```
    09MVNECA                    Argument
1   we're not in the '34 Act, so I was just trying to make a
2   comparison.
3            MR. LEAHY:  Right.  Well, let me just do one more
4   thing with the '34 Act, maybe put it in a little more
5   perspective.
6            Let's say you were a person that bought at the
7   beginning of the class period when misrepresentations were in
8   the market.  And as a result of the misrepresentations, you
9   paid $10 more than you should for that stock.
10           THE COURT:  But the only way you can show that --
11           MR. LEAHY:  Well, wait.  No, your Honor.  You hold all
12  the way through the end of the class period.  At the end of the
13  class period, the truth comes out, the stock price dives, and
14  you're still holding the stock.  Of course you still have a
15  loss here; it's at the end.
16           THE COURT:  Well, I know of no '34 Act case where you
17  could recover without actually being out-of-pocket.
18           MR. LEAHY:  Your Honor, I respectfully disagree.  And
19  I would be happy to find you cases that show you otherwise.
20  But we're not talking about the '34 Act.
21           THE COURT:  But it's a controversial subject, let's
22  face it.
23           MR. LEAHY:  When we look at Section 11, it's very,
24  very different.  It's not out-of-pocket loss when you talk
25  about the damage part of the statute.  It's about value.  What
                 SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -43-
EXHIBIT B  -39-

```
      09MVNECA                    Argument
 1    is the thing worth?  What is the value of the security at the
 2    time you file suit versus the value, i.e., the money you paid
 3    at the time you bought it?
 4              THE COURT:  Right.
 5              MR. LEAHY:  And we allege there was secondary
 6    market --
 7              THE COURT:  The question is what is the measure of
 8    value.  And you take one position, and the defendant takes
 9    another position.
10              One position is that you have calculated artificial
11    value on the theory that if you sold, you would have lost.  And
12    the other is that you can't, until you sell really, have a
13    measurable loss.
14              MR. LEAHY:  But Section 11 covers all -- both of those
15    scenarios, and even one more, it covers a scenario where you
16    buy --
17              THE COURT:  All right.  I understand your position.
18              Now let me hear from the other side on this.
19              MR. KLAPPER:  Thank you, your Honor.
20              There are two cases that we've been able to find that
21    are on point.  One is Judge Crotty's decision --
22              THE COURT:  Yes, it's a recent case.
23              MR. KLAPPER:  Very recent case.  And the other is the
24    Second Circuit in First Nationwide Bank v. Gelt Finance.  It's
25    a 1994 decision.
```

EXHIBIT 1 TO ERRATA  -44-
EXHIBIT B  -40-

09MVNECA                         Argument
1           THE COURT:  I think there is a decision of Judge
2      Kaplan's that comes pretty close, too, but --
3           MR. KLAPPER:  And I'd like to focus on the decision of
4      the Second Circuit in Gelt Funding, which is Chief Judge
5      Walker.
6           In that case, the bank made secured loans.  The
7      allegations were that the borrower fraudulently represented the
8      value of the collateral.
9           There was a question though, as there is here, as to
10     whether on loans still held by the bank and not foreclosed on
11     there was any injury.  And the case was a RICO case.  So the
12     idea was there were multiple frauds building to a RICO
13     conspiracy.
14          What the Second Circuit said -- and this is at 27 F.3d
15     768 -- is according to First Nationwide Bank, it suffered
16     immediate quantifiable injury when the loans were made because
17     the loans were undersecured.  That's their theory here.
18          THE COURT:  Yes.
19          MR. KLAPPER:  Because loans were undersecured, FNB
20     assumed additional risk of loss was their allegation.  And for
21     all practical purposes, this is the Court quoting plaintiff,
22     the additional funds were lost the moment the loans were made.
23          So it's the same allegation.
24          These certificates are effectively secured debt, just
25     like a secured loan.  The idea alleged by the plaintiff there
                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

EXHIBIT 1 TO ERRATA  -45-
EXHIBIT B  -41-

23

09MVNECA                    Argument

1  was it didn't get as much collateral as it thought it was
2  getting; and, therefore, the value of the loan was immediately
3  less.  And the Second Circuit said we find this argument
4  unpersuasive.
5          And it goes on to say that First Nationwide Bank does
6  not allege actual injury by simply claiming that it incurred
7  additional risk of loss as a consequence of the fraud.
8          Again, the same thing alleged here.
9          Thus, we reject First National Bank's novel theory
10  that it was damaged simply by being undersecured, when, with
11  respect to those loans not yet foreclosed, the actual damages
12  it will suffer, if any, are yet to be determined.
13          THE COURT:  But here we have some loans that were
14  foreclosed, isn't that right?
15          MR. LEAHY:  That's correct.
16          MR. KLAPPER:  Well, but the issue is not whether the
17  collateral -- that those are -- the loans in our case are the
18  collateral for the certificates.  In that case, there were
19  secured loans, multiple secured loans, which the plaintiff, the
20  bank, had not yet foreclosed on.  And the security for those
21  loans, according to the Second Circuit, might or might not be
22  adequate to cover the loan.
23          And the Second Circuit said the mere fact that you
24  took on additional risk unknowingly because you had less
25  collateral than you thought you had was not enough to state

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

EXHIBIT 1 TO ERRATA  -46-
EXHIBIT B  -42-

24

09MVNECA                    Argument
1   injury.  That's the analogous situation here.
2           If you accept plaintiff's allegations, the collateral
3   underlying their certificates, the loans, was not as valuable
4   as they believed it was.  That's fundamentally what they are
5   alleging.  And, therefore, they have additional risk, just as
6   the bank in the Gelt Financing case, because they have less
7   security for their senior certificates.
8           The problem that they have is that they're still being
9   paid; collateral to date has been adequate to pay them.  Just
10  like the bank in Gelt Funding, which at the time of this
11  opinion, had not actually incurred loss; it just had increased
12  risk, if you believe their allegations.
13          THE COURT:  Right.  But a RICO claim requires
14  measurable injury.
15          MR. KLAPPER:  Well, any claim requires injury.
16          THE COURT:  That's the real problem.  Normally a
17  tort --
18          MR. KLAPPER:  Right.
19          THE COURT:  -- requires causation.
20          MR. KLAPPER:  Right.
21          THE COURT:  That is, injury caused by the misconduct.
22  And that's what we have -- that's what my problem is with the
23  Section 11 claim, that we do not actually have here.  And,
24  indeed, on the theory that's being put forward, there may never
25  be a loss.  It is a theoretical loss that the plaintiff seeks
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

EXHIBIT 1 TO ERRATA  -47-
EXHIBIT B  -43-

25

09MVNECA                    Argument

1   recovery for.  And the argument of the plaintiff is that the
2   statute provides them with a recovery based on theoretical
3   loss, on a word called "value," which they say is a theory of
4   loss, because it's not a loss.  It's only a prospective
5   diminution in value.
6            The question is, is there current diminution in value
7   if the plaintiff has not done anything but hold the certificate
8   and get paid what it was promised?
9            Now, there are three different measures of value, as
10  the statute says.  But it's being argued that you can have
11  theoretical loss of value; that to recover in tort, which is
12  very unusual.  The tort does not have to cause actual loss; it
13  just has to cause the possibility of loss, because that's what
14  the plaintiff is asserting, a possibility of loss.
15           MR. KLAPPER:  They're asserting the same thing as in
16  Gelt Funding, which is an increased risk of loss.  And that's
17  what the Second Circuit said was not enough.
18           THE COURT:  Now, what do you do with the statute's
19  formulaic description of recovery based on loss of value?
20           MR. KLAPPER:  The distinction, and we've set this
21  out --
22           THE COURT:  And let's look at the statutory language,
23  because that's important, the value section.
24           MR. KLAPPER:  We should have Section 11.
25           THE COURT:  Without the statute, we can't decide
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

EXHIBIT 1 TO ERRATA  -48-
EXHIBIT B  -44-

```
        09MVNECA                    Argument
 1   anything about Section 11.
 2           MR. KLAPPER:  Right.
 3           There's no question that loss and value is one
 4   alternative way to determine damages.  And that is certainly
 5   applicable --
 6           THE COURT:  Right.  But the real issue here is what
 7   does value mean under Section 11.
 8           MR. KLAPPER:  Well, what does value mean --
 9           THE COURT:  That is, can a plaintiff, suing for what
10   is normally a tort, an intentional fraud which causes loss, say
11   that because the statute uses the word "value," you don't have
12   to prove loss.  It's enough to prove the possibility of loss,
13   what I call unrealized loss.
14           MR. KLAPPER:  Well, I draw a distinction between
15   unrealized loss and a provable, even allegable, loss.  What the
16   Second Circuit is saying and what Judge Crotty --
17           THE COURT:  Well, you can't prove an unrealized loss.
18   That's just another way of saying it.
19           MR. KLAPPER:  Well, to build on something that
20   Mr. Leahy said -- and I would, on this, agree with him -- if
21   there is an active marketplace in a particular security, as
22   there would be in, let's say, IBM stock, and if there is a
23   fraud lawsuit, certainly under the '34 Act, and if it can be
24   demonstrated that you bought at a price above where the value
25   would be, you can prove loss even if you don't sell your
```

EXHIBIT 1 TO ERRATA  -49-
EXHIBIT B  -45-

27

```
      09MVNECA                  Argument
 1  securities.
 2            THE COURT:  I don't think you can do that under the
 3  '34 Act.
 4            MR. KLAPPER:  In my experience, you can.  That is to
 5  say, people --
 6            THE COURT:  That's what we mean by loss causation.
 7            MR. KLAPPER:  Yeah.  You have to show, and this is
 8  Supreme Court recently --
 9            THE COURT:  That you have been caused a loss by your
10  reliance on what was told to you.
11            MR. KLAPPER:  Correct.  And the Supreme Court in the
12  1934 Act context has recently said that the way you do that is
13  to show what happens to the market price when the disclosure
14  finally is made of whatever hadn't been disclosed properly.
15            THE COURT:  That's a measure when you sell.
16            MR. KLAPPER:  That's a measure of damages whether you
17  sold or not.
18            THE COURT:  Whether you sell or not.  You are agreeing
19  then that you can recover damages without selling?
20            MR. KLAPPER:  In the 1934 Act context.  The
21  distinction that we're making --
22            THE COURT:  Because normally for the tort of
23  intentional fraud, you can't do that; you have to, yourself,
24  realize a loss.  The fact that theoretically there is a loss is
25  not normally enough to provide damages in tort.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT 1 TO ERRATA  -50-
EXHIBIT B  -46-

09MVNECA                    Argument

1          MR. KLAPPER:  And the reason it is under the '34 Act
2    in those circumstances is only because there is an active
3    public market that sets the price, the market price.
4          THE COURT:  Yes, but the market price goes up and down
5    on any particular day if you do not sell.
6          MR. KLAPPER:  It does indeed.
7          THE COURT:  It's very hard to identify the price as a
8    loss.
9          MR. KLAPPER:  There's a very specific rule that the
10   Supreme Court set out that says you can, in that context, with
11   an actively-traded market, measure your loss by what happens to
12   the price when the announcement is made of whatever information
13   was either omitted or misstated.  But that's a specific rule
14   that is workable only because of the actively-traded market.
15         THE COURT:  OK.  So really you are arguing not that
16   you have to suffer a loss in order to recover, a loss caused by
17   reliance on the misrepresentation, but you are arguing simply
18   that if something is not traded on a public market, you can't
19   have a loss.  But if it's traded on a public market, you can,
20   even if you don't sell.  That's a very, very slippery position.
21         MR. KLAPPER:  You must demonstrate injury, that is
22   clear.  You must demonstrate a loss.
23         THE COURT:  And what is the injury, under the Supreme
24   Court rule, for securities fraud where you do not sell when
25   there is a reduction in the market price, but six years later
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

EXHIBIT 1 TO ERRATA  -51-
EXHIBIT B  -47-

```
          09MVNECA                    Argument
 1    you sell, and the price has gone way up?
 2              MR. KLAPPER:  The injury that the Supreme Court has --
 3    or the damages calculation that the Supreme Court has mandated
 4    under its loss causation case recently is that when a public
 5    disclosure is made of the information that was misrepresented
 6    or omitted, the loss to people who bought the stock during the
 7    period when the misrepresentation was uncorrected is no more
 8    than the drop in the stock price on the day of disclosure or
 9    resulting from disclosure.
10              THE COURT:  And you can recover that, even if you --
11    when you sell --
12              MR. KLAPPER:  Even if I sold, let's say --
13              THE COURT:  The price has gone sky high.
14              MR. KLAPPER:  I didn't sell at all.  Just to
15    complicate things, under the '34 Act, there is a provision that
16    holds that if the price comes back up during the 90 days
17    following --
18              THE COURT:  Yes, I know.
19              MR. KLAPPER:  -- you can't recover.
20              But as a general proposition, if I hold the stock at
21    the time of the announcement of whatever information is
22    misrepresented, and I don't sell it, and I don't sell it until
23    today, and that company does marvelously, and my stock goes up
24    and up and up and up, I can still, under the 1934 Act, recover
25    for any part of that movement downward in price that occurred
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

EXHIBIT 1 TO ERRATA -52-
EXHIBIT B -48-

30

09MVNECA                    Argument

1  after the disclosure that I can prove resulted from the fact
2  that the formerly-misrepresented information was correct.
3          THE COURT:  So you have a very tough road to hoe,
4  because you can't argue, as I initially thought you were
5  arguing, that you have to actually experience a loss.
6          MR. KLAPPER:  Well, I agree that we're --
7          THE COURT:  Because you can recover for a theoretical
8  loss.
9          MR. KLAPPER:  No.
10          THE COURT:  That's what it is.  If the price goes sky
11  high afterward, it is a theoretical loss.  You have not
12  realized a loss.
13          MR. KLAPPER:  The idea behind the theory is that you
14  overpaid when you bought.
15          THE COURT:  I understand.  And I understand that in
16  the context of restitution.
17          MR. KLAPPER:  Right.
18          THE COURT:  I do not understand that in the case of
19  the tort of fraud, intentional fraud, where you normally need
20  what we used to call proximate cause.
21          MR. KLAPPER:  Correct.  And that's why --
22          THE COURT:  And you're telling me that even under the
23  '34 Act, you no longer need proximate cause.
24          MR. KLAPPER:  Well, I'm saying that under the 1934
25  Act, the Supreme Court --
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

EXHIBIT 1 TO ERRATA  -53-
EXHIBIT B  -49-

```
     09MVNECA                Argument
 1           THE COURT:  Has held you don't need proximate cause.
 2           MR. KLAPPER:  -- has held you can show proximate
 3   cause, and they did speak of --
 4           THE COURT:  Well, it's not proximate cause.  I mean
 5   let's -- it's an artificial definition of cause.
 6           MR. KLAPPER:  Correct, but one --
 7           THE COURT:  It's not actual cause.
 8           MR. KLAPPER:  It's one that depends very specifically
 9   on the existence of an active traded market in the security.
10           THE COURT:  So your whole position really depends on
11   the fact that there is no regularly established public market,
12   and that the plaintiff was told that there might never be.
13           MR. KLAPPER:  Correct.
14           THE COURT:  That's what your -- otherwise, the
15   plaintiff could succeed.
16           MR. KLAPPER:  If the plaintiff could demonstrate that
17   he was an active --
18           THE COURT:  Without selling.
19           MR. KLAPPER:  Correct.  If he was an active --
20           THE COURT:  That's a big change in the understanding
21   of causation.
22           MR. KLAPPER:  Well, your Honor, if you look at what
23   the --
24           THE COURT:  That is, causing the plaintiff loss or
25   injury, because injury is really what we are talking about.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT 1 TO ERRATA  -54-
EXHIBIT B  -50-

```
        09MVNECA                    Argument
1                MR. KLAPPER:  We are talking about --
2                THE COURT:  And if you don't lose money, we used to
3       think you weren't injured.
4                MR. KLAPPER:  And that is still the general rule.
5                THE COURT:  But not, you tell me, in securities fraud.
6                MR. KLAPPER:  Not in the situation where you have an
7       actively-traded public market that you can point to to show
8       what people buy and sell.
9                THE COURT:  Well, that covers a lot of securities
10      fraud.
11               MR. KLAPPER:  It does, indeed, your Honor.  And if the
12      law were otherwise, I would certainly argue otherwise.  But I
13      have to concede that that's what the law is.
14               THE COURT:  Well, of course.  But it makes your
15      position much more difficult, let me put it that way.
16               MR. KLAPPER:  Yes.  If we could argue that they have
17      to sell in order to bring a claim, that would be an
18      open-and-shut case.  They haven't sold.
19               THE COURT:  That's right.
20               MR. KLAPPER:  But we can't say that.
21               THE COURT:  But you are not arguing that.  You are
22      arguing something much subtler; that because there is no
23      established secondary market, they do not get the same
24      remedy --
25               MR. KLAPPER:  Right, because they are --
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -55-
EXHIBIT B  -51-

33

09MVNECA                      Argument
1          THE COURT:  -- as someone who bought in an established
2    market.
3          MR. KLAPPER:  Right.  Their remedy is the same as --
4    and the standards are the same as the remedy and requirements
5    set out in Gelt Funding, because they hold an instrument that
6    is much more similar to a secured loan than it is to IBM stock.
7    And the reason is these mortgage-backed securities, each
8    tranche, there aren't all that many people who buy them.  They
9    are each unique because the collateral is different for each
10   transaction.
11         THE COURT:  How many people bought the tranche that's
12   being sued on here?
13         MR. KLAPPER:  I don't know.
14         THE COURT:  The first tranche, was it more than 100?
15         MR. KLAPPER:  I doubt it.
16         THE COURT:  Well, if it was less than 100, maybe they
17   are not a class.
18         MR. KLAPPER:  It could be.  We've always had a problem
19   with the notion that a plaintiff could sue not just in
20   different securitizations because the loans are different, but
21   for different tranches because the risks are very different.
22         THE COURT:  Yes.  But I have ruled that they can't.
23         MR. KLAPPER:  Right.  So what we are saying and what
24   Judge Crotty tried to counter is that these instruments don't
25   trade; there isn't an established public market and, therefore,
                   SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

EXHIBIT 1 TO ERRATA  -56-
EXHIBIT B  -52-

34

09MVNECA                        Argument
1   there isn't an established public price to refer to.  And
2   plaintiff knew that because we told them that that was the
3   case.
4            THE COURT:  I understand.  You said you couldn't be
5   sure, but --
6            MR. KLAPPER:  Judge Crotty addresses that issue by
7   saying, No, the plaintiff may have bought the security not to
8   hold it, as most fixed-income buyers do, but may have wanted to
9   resell it and profit in that fashion.
10           Now, we went back to the complaint to see whether that
11  plaintiff alleged anything of the sort, and that plaintiff
12  didn't.
13           THE COURT:  No, I understand all of that.  But I'm
14  going back to even more fundamental an issue.  Is it your
15  position that there is not a class of more than 100 people who
16  did what this plaintiff did?
17           MR. KLAPPER:  I would have to check.
18           THE COURT:  But you have not argued that.
19           MR. KLAPPER:  We haven't gotten to class.
20           THE COURT:  I haven't yet certified a class because
21  I'd like to be sure there is a viable claim before I certify a
22  class.
23           MR. KLAPPER:  There can be in these sorts of
24  securitizations, there can be tranches that are bought by one
25  buyer.  They can buy the entire tranche.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

EXHIBIT 1 TO ERRATA  -57-
EXHIBIT B  -53-

09MVNECA                          Argument
1              THE COURT:  Then it shouldn't be a putative class
2      action.  That's a sidetrack, I know.  I'm not getting to that
3      at the moment, I'm just --
4              MR. KLAPPER:  That's an issue that we, I hope, will
5      never come to, but would, if it came to the issue of class
6      certification.
7              THE COURT:  All right.  Well, then let's move to the
8      recision claim, which is 12.
9              MR. KLAPPER:  Right.
10             THE COURT:  And is there any question that they can
11     get recision, which certainly doesn't depend on whether they
12     sold?
13             MR. KLAPPER:  Well, they have to allege injury in
14     order to get recision.  And that gets us to the same question.
15             THE COURT:  Yes.  But the recision, the injury is
16     closer to being misled alone.
17             MR. KLAPPER:  Well, we cite to the Dow Systems case
18     from the Ninth Circuit which points out that 12(a)(2) does,
19     indeed, have a requirement of injury.  And if you can't say you
20     are injured, even if you were defrauded, you don't have a
21     claim.
22             THE COURT:  But, here again, you depend entirely on
23     the fact that there was no established market to argue that
24     there was no injury.
25             MR. KLAPPER:  Correct.  We rely on the fact that --
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

EXHIBIT 1 TO ERRATA -58-
EXHIBIT B -54-

```
      09MVNECA                    Argument
 1             THE COURT:  Their injury they allege is that they
 2    bought it all.
 3             MR. KLAPPER:  Well, their injury, they allege, is the
 4    same as Gelt Funding, and the risk that they won't be repaid is
 5    higher than they thought it was.
 6             THE COURT:  Right.
 7             MR. KLAPPER:  That's their allegation.
 8             THE COURT:  Yes.
 9             MR. KLAPPER:  But if I can --
10             THE COURT:  And how can I dismiss that at this point?
11             MR. KLAPPER:  Well, you can dismiss it at this point
12    based upon Gelt Funding, because they don't have any realized
13    loss.  And in this circumstance, they have to have one.
14             THE COURT:  Well, but you told me they have to realize
15    a loss under the latest Supreme Court doctrine.
16             MR. KLAPPER:  If there was an established public
17    market, and there isn't.
18             THE COURT:  So you can't have a loss unless you have
19    an established public market, even for restitution?  I find
20    that a hard position.
21             MR. KLAPPER:  Well, you'd have to prove a loss.  And
22    the ways you prove a loss, the most obvious is you foreclose on
23    your loan or you sell your certificate and you are
24    out-of-pocket.
25             THE COURT:  You don't mean you have to prove a loss,
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -59-
EXHIBIT B  -55-

37

```
        09MVNECA                    Argument
1    you mean you have to prove an injury.
2             MR. KLAPPER:  Correct.
3             THE COURT:  And if you rely on a misrepresentation to
4    make a purchase, and you seek to rescind on the ground that you
5    were misled, I don't think you need exactly the same kind of
6    realized loss as if you are suing for damages, under any
7    theory, forgetting the securities law.  I don't think that
8    recision for fraud is an identical claim to suit for damages
9    for fraud.
10            MR. KLAPPER:  That's true.  That's true.  But you
11   still have to allege injury.
12            THE COURT:  So on your position on recision, I am
13   going to rule against you.  I'm going to deny the motion to
14   dismiss, because I think they have alleged enough theoretically
15   if they proffer back what they received to get recision.
16            MR. KLAPPER:  Your Honor, can I address the
17   substantive --
18            THE COURT:  The whole thing remains to be developed.
19   But I'm talking now strictly on the allegations of the
20   complaint.
21            MR. KLAPPER:  Well, let me turn to the allegations of
22   the complaint.  Because there are a number of different
23   categories of allegations, all but one --
24            THE COURT:  I'm aware, and I'm keenly aware the one
25   most important to you is the statement that there may not be a
                  SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -60-

EXHIBIT B  -56-

```
        09MVNECA                    Argument
 1  secondary market.
 2           MR. KLAPPER:  Correct.
 3           THE COURT:  I understand that.  But this is a document
 4  that is so thick and contains so much stuff that to believe
 5  that even a careful investor has parsed out every little piece
 6  of every little thing, unless it's a very clear statement and
 7  none -- and that is not a very clear statement, it's an iffy
 8  statement, is if this were a two-page statement of what they
 9  are getting, it would be one thing.
10           This is a volume which has so many little parts and so
11  many possibilities stated on both sides of every question that
12  I think it's very -- that makes it harder to take the position
13  that they were warned clearly that they could not even give it
14  back if there was no secondary market.
15           MR. KLAPPER:  Well, we would respectfully disagree.
16  But can I now address the actual substantive allegations of
17  alleged misrepresentations?
18           THE COURT:  That's tougher, I agree with you.  I agree
19  with you.
20           MR. KLAPPER:  Because if you take a look at -- there
21  are eight cases in the Southern District, one in the Eastern
22  District so far.  If you take a look at those cases, those
23  cases have dismissed the types of allegations that plaintiffs
24  make in this case in all but one -- for all but one type of
25  allegation.  So allegations of --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -61-
EXHIBIT B  -57-

09MVNECA                     Argument
1            THE COURT:  I understand.  And I may want the
2    plaintiff to replead to allege specifically which allegations
3    they are really relying on.  Because there is so much iffy
4    stuff on both sides here in this big volume.
5            MR. KLAPPER:  Well, it's clear that allegations of
6    appraisals overstating value have been dismissed.
7            THE COURT:  Yes.  But that's not -- the only
8    allegation here of any real substance, as I read both the
9    complaint and this pound of paper, has to do with the standards
10   that were followed and would be followed in valuing the loans,
11   in valuing the mortgages.
12           MR. KLAPPER:  The one type of claim that has survived
13   is what could be called the wholesale departure from loan
14   originating standards.
15           THE COURT:  Correct.
16           MR. KLAPPER:  And that decision by, first, Judge
17   Kaplan, and then others following him, we would submit, is
18   distinguishable in this case.  But more than that, it's
19   misguided for at least two major reasons.
20           THE COURT:  I understand.  But on the face of the
21   complaint, until I see what it is exactly that we are talking
22   about and the evidence in the case, I cannot throw it out,
23   because there is enough here with respect to -- what's the
24   outfit that's now so controversial?  Countrywide --
25   Countrywide's standards and Countrywide's examination of the
                   SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

EXHIBIT 1 TO ERRATA  -62-
EXHIBIT B  -58-

40

```
        09MVNECA                    Argument
 1   ability of the mortgage borrower to pay back a loan, those are
 2   the ones that are the most iffy kind of -- on the one hand, on
 3   the other hand, statements in this pound of paper.
 4          As I said, if this were a two-page document which
 5   clearly asserted anything, you'd be in a much better position.
 6   But it's because the issuer didn't really want to commit to
 7   anything, everything in here is on the one hand and on the
 8   other hand.  And you have to be extraordinarily adept and an
 9   exceptionally careful reader to figure out exactly what risks
10   there are.
11          MR. KLAPPER:  Let me, though, if I may, address
12   directly the allegation of wholesale departure from
13   underwriting standards.  So however they claim the departure
14   occurred --
15          THE COURT:  Let's forget underwriting standards.
16   Let's focus, rather, on examination of the ability of the
17   borrower to repay the mortgage.
18          MR. KLAPPER:  Well, that's what I meant by
19   underwriting, loan underwriting standards.
20          THE COURT:  Well, I like to translate into English.
21          MR. KLAPPER:  It's the standards under which the
22   person who made the loan originally, the originator of the
23   loan --
24          THE COURT:  Right, right, paid attention to whom he
25   was lending to.
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

EXHIBIT 1 TO ERRATA  -63-
EXHIBIT B  -59-

41

09MVNECA                    Argument
1              MR. KLAPPER:  -- decided to make the loan or not.
2              THE COURT:  Right.
3              MR. KLAPPER:  And with due respect to Judge Kaplan and
4      Judge Baer --
5              THE COURT:  I'm not bound by anybody.  I'm bound by
6      the language of this volume and common sense about what people
7      can understand.
8              MR. KLAPPER:  And one other thing:  By the regulations
9      of the Securities and Exchange Commission.
10             THE COURT:  Well, of course.
11             MR. KLAPPER:  To the extent that they are not, you
12     know, irrational or otherwise don't deserve deference.  And
13     that's what Judge Kaplan and Judge Baer have not done with
14     respect to Regulation 1111.  That's part of the SEC's
15     Regulation AB, asset-backed, which is their regulation for what
16     needs to be disclosed with respect to asset-backed securities.
17             THE COURT:  It's not just a matter of what needs to be
18     disclosed; it's a matter of what is said that when you make a
19     statement, if you don't need to make the statement in the first
20     place, that's fine, if you make no statement about it.  But
21     once you make a statement about something, you have to be
22     careful about what you say.
23             MR. KLAPPER:  Yes.  And, your Honor, the Securities
24     and Exchange Commission has addressed that.  And if I may just
25     hand up Regulation 1111 just so we know what we are talking
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

EXHIBIT 1 TO ERRATA  -64-
EXHIBIT B  -60-

```
     09MVNECA                    Argument
1    about.
2              THE COURT:  Right.  I understand.  I do not come to
3    you without having thought about all of this very carefully and
4    examined everybody's position and papers, or it would be a
5    waste of my time to hear oral argument.
6              MR. KLAPPER:  I understand, your Honor.  But I think
7    that this regulation is very clear.  We have highlighted what's
8    relevant for the purpose of the wholesale departure claim.  And
9    what you see is that in (a)(3) it both requires a description
10   of the underwriting or credit granting criteria used to
11   originate or purchase the pool of assets.  So you're required
12   to set forth what the standards are.  And including to the
13   extent known any changes in such criteria and the extent to
14   which such policies and criteria are or could be overwritten.
15             THE COURT:  Well, that's going to be an issue of fact,
16   isn't it?
17             MR. KLAPPER:  No.
18             THE COURT:  What these people knew when they said the
19   things they said in this pound of paper.
20             MR. KLAPPER:  Well, that, though, gets us to pleading,
21   because they don't plead that we knew about these departures.
22   They don't plead that we knew that Countrywide or anyone
23   else --
24             THE COURT:  But you argue that you said that not
25   everything is exactly the same as what we are saying.  So you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -65-

EXHIBIT B  -61-

43

09MVNECA                    Argument

1  knew something.  You knew that the standards were not
2  rigorously applied, let's put it that way.  But you put that in
3  among hundreds of words.
4           There are some things in this statement that might
5  have exculpated you on the face -- I have no idea what the
6  facts are -- from some of the other statements you made if you
7  didn't make so many statements, wishy-washy statements about
8  maybe this and maybe that, and it's possible that there will
9  not be a secondary market, and this is this.
10          You didn't say it's unlikely that there will be a
11  secondary market.  You said, rather, that there may not -- it's
12  possible there may not be a secondary market.
13          Those two convey somewhat different notions to a
14  reader, even a careful reader.  But nobody could carefully read
15  all of the words in these pounds of paper.
16          MR. KLAPPER:  I understand, your Honor.
17          But with respect to the loan origination standards,
18  the underwriting standards for loans, there is no dispute on
19  the basis of the pleadings that there was a description of
20  underwriting standards.  The allegation is that there was a
21  wholesale departure from them.
22          THE COURT:  Why isn't that an issue of fact?
23          MR. KLAPPER:  It would be an issue of fact if they
24  alleged that we knew it.  It's not an issue of fact because
25  they don't allege it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT 1 TO ERRATA  -66-
EXHIBIT B  -62-

44

09MVNECA                    Argument
1           THE COURT:  Well, there was a wholesale departure.
2           MR. KLAPPER:  Yes.
3           THE COURT:  I don't think in the first instance in a
4   complaint they have to allege that you knew it.  They are going
5   to have to ultimately show that, but if it was wholesale, it's
6   some circumstantial evidence that you may have known.
7           MR. KLAPPER:  Here is why they avoided it.  They have
8   avoided it because they don't want to satisfy the requirements
9   of Section 9(b) of the Rules of Civil Procedure.
10          THE COURT:  That remains to be seen, right?  That will
11  be their burden along the way.
12          The question is whether the complaint is subject to
13  dismissal.  And complaints are only subject to dismissal if the
14  claim is not plausible and, if proven, still do not meet the
15  legal requirements for an actionable claim.
16          And it's a close question here, I agree with you,
17  because they're as wishy-washy as this pound of paper that they
18  relied on.  But it doesn't help either one of you to be
19  wishy-washy.
20          MR. KLAPPER:  They may be wishy-washy about some
21  things, but one thing is clear, and that is they do not allege
22  that any of the defendants knew that there were wholesale
23  departures from the underwriters' standards.
24          THE COURT:  I think they are arguing essentially that
25  if there were wholesale departures, that itself is some
                SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

EXHIBIT 1 TO ERRATA  -67-
EXHIBIT B  -63-

45

09MVNECA                    Argument
1   circumstantial evidence that somebody must have known.  Now,
2   they may be wrong, maybe nobody knew, but you can't cover your
3   ears and cover your eyes and say we didn't know.
4           There is such a things as if something is done in many
5   cases, it's arguable that that is some circumstantial evidence
6   that whoever was theoretically making these loans and examining
7   whatever they examined, they might have noticed it, right?
8   That is, on the face of a complaint, I cannot assume in these
9   circumstances and on these allegations that nobody who was
10  involved in issuing this stuff knew anything about the fact
11  that what they were dealing with were people who made -- that
12  the mortgage lenders were all totally unreliable.
13          MR. KLAPPER:  Your Honor, it's not a question of
14  assuming what ultimately can be proved.  It's a question of
15  whether they've alleged it.  And they have not alleged --
16          THE COURT:  You've made your point.  I've heard you.
17  And I've read you.
18          MR. KLAPPER:  OK.
19          THE COURT:  You don't have to keep repeating it.
20          MR. KLAPPER:  If I can advance just one point so that
21  I'm clear as to where your Honor is ruling.
22          Section 1111, because it specifies both that you have
23  to disclose the underwriting standards and, to the extent
24  known, departures from them, specifies what you need to --
25          THE COURT:  Let me stop you for a minute.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

EXHIBIT 1 TO ERRATA -68-
EXHIBIT B -64-

```
       09MVNECA                    Argument
 1              An intentional misrepresentation always involves some
 2     content of knowledge.  But there are some kinds of
 3     representations that are so difficult to make without any
 4     knowledge.  There is also some element in some representations
 5     of being a representation that we know this is so.  Whether
 6     this is a misrepresentation of what was known is itself a
 7     question of fact here.
 8              MR. KLAPPER:  If Goldman Sachs or the other defendants
 9     knew --
10              THE COURT:  Or had -- I know that "should have known"
11     is not itself a sufficient standard, but there are some kinds
12     of should-have-knowns that are almost consciousness of --
13     consciously avoiding knowing.
14              MR. KLAPPER:  I agree with that.  There is a doctrine
15     of consciously avoiding the truth.
16              THE COURT:  Right.
17              MR. KLAPPER:  But that is deemed to be the equivalent
18     of knowledge.
19              THE COURT:  Yes.
20              MR. KLAPPER:  And knowledge is required here.  If you
21     look at the Blackmoss case by Judge Sweet which addresses a
22     similar SEC regulation involving known trends that need to be
23     disclosed, and he makes the point that even if you disclose
24     some things, but you don't disclose the known trend, that's not
25     good enough, because you have to actually know about the trend.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT 1 TO ERRATA -69-
EXHIBIT B -65-

47
09MVNECA                          Argument
 1              And if you take a look at the --
 2              THE COURT:  Well, trends are different from the kind
 3    of knowledge we are talking about here.  Every one of these
 4    cases depend, in part, on what kind of information we're
 5    talking about.
 6              To blithely say that the mortgage lenders here -- for
 7    example, suppose it said the mortgage lenders here were
 8    careful.  And you know they didn't, in fact, follow their
 9    standards in many cases.  That is a misrepresentation of a
10    type.
11              MR. KLAPPER:  Well, and you knew it, under your
12    hypothetical.
13              THE COURT:  Well, all you're telling me is they have
14    to allege specifically that it was known.
15              MR. KLAPPER:  Correct.
16              THE COURT:  There are some kinds of representations
17    that on their face had to have had some ability to be observed
18    by the people who are making them, because certain
19    representations are also representations of knowledge.
20              You cannot represent that somebody followed certain
21    guidelines.  If you say that and you have no knowledge, that,
22    in itself, is a misrepresentation; because you are representing
23    that you know that or you couldn't say it.
24              MR. KLAPPER:  The representation, as required by 1111,
25    is what the underwriting standards are.  And the argument
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

EXHIBIT 1 TO ERRATA  -70-
EXHIBIT B  -66-

```
     09MVNECA                    Argument
 1   plaintiff --
 2              THE COURT:  All right.  Look, you're repeating and
 3   repeating.  And I have heard you, and I've examined your
 4   arguments.
 5              On that, I rule against you on this complaint.
 6              MR. KLAPPER:  Can I just cite to one last case?  And
 7   that is the Second Circuit's opinion in the Morgan Stanley
 8   Information Fund case, which dealt with yet another SEC
 9   regulation, and whether or not there needed to be a disclosure
10   in that case of securities analysts having biased views in
11   order to support Morgan Stanley's offerings.
12              The Second Circuit, having obtained the views of the
13   SEC as to whether there was a requirement for the mutual funds
14   to disclose more than what was listed in regulation, said, no,
15   that's not required; you should list -- you're required to list
16   what the SEC tells you you must list and disclose, and not more
17   than that.
18              THE COURT:  I'm familiar with it.  Please.  You're
19   beating a dead horse at this point.
20              MR. KLAPPER:  All right.
21              Can I address the issue of statute of limitations --
22              THE COURT:  Yes, of course.
23              MR. KLAPPER:  -- which Judge Swain recently addressed
24   in a case, In Re: Morgan Stanley, that was decided after the
25   briefing of these motions, and so it isn't addressed in either
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>
(212) 805-0300

EXHIBIT 1 TO ERRATA  -71-

EXHIBIT B  -67-

09MVNECA                    Argument

```
 1   our papers or the plaintiff's.
 2           THE COURT:  Right.  What is your position as to
 3   exactly when this information was released as distinguished
 4   from when the rating companies began to change the ratings?
 5           MR. KLAPPER:  The information that Judge Swain relied
 6   on, for example, increasing nonperforming loans, we have in
 7   this case, as well.  In fact, at the time that this plaintiff
 8   bought their second securities in the 2007-5 case, over 16
 9   percent of the loans by numbers, 17 and-a-half percent by
10   amount, were not performing.  We have the same pattern.
11           THE COURT:  Yes.  But how was that communicated?  It
12   seems to me when the rating agencies reduced the ratings, that
13   was information that no one could ignore.
14           MR. KLAPPER:  The trustees publish that information
15   every month.  It's available.
16           THE COURT:  Publish what?
17           MR. KLAPPER:  Nonperforming loans, how much has been
18   paid off, how much is --
19           THE COURT:  Publish it where?
20           MR. KLAPPER:  On their websites.
21           THE COURT:  And you think that all these people have
22   to read the website of the trustees every month?
23           MR. KLAPPER:  If they want to.  It's there.  It's
24   public.  And it's information about the collateral and the
25   trusts --
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT 1 TO ERRATA  -72-
EXHIBIT B  -68-

50

09MVNECA                    Argument

1           THE COURT:  I don't know how public it is.  There are
2   still a lot of people who don't rely on the Internet,
3   especially -- I mean I'm sure that all of those who are 18 or
4   under would look.
5           MR. KLAPPER:  Well, if you take a look -- this
6   complaint was first filed in December of 2008.  If you take a
7   look at the complaint that Mr. Leahy's firm brought in Nomura
8   v. Goldman Sachs and others, in that complaint, which was
9   brought in, I think, December of 2007 or early 2008, it alleges
10  that the truth concerning these underwriters departing from
11  standards and appraisals and all that, the truth became known
12  in the summer of 2007.  So more than a year before this
13  plaintiff, represented by this law firm, brought the lawsuit.
14  And that's what the standard is.
15          So if you look at the information available on
16  nonperforming loans, if you look at the information available
17  about various loan originators departing from their standards
18  and problems with --
19          THE COURT:  Do you agree that what really triggered
20  public concern about all of this was when the -- and, indeed,
21  what would affect the price, if there were a market, were the
22  changes in the ratings?
23          When were those changed?  When did the rating agencies
24  reduce the ratings on all of this stuff?
25          MR. KLAPPER:  Well, if you want the correct --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

EXHIBIT 1 TO ERRATA  -73-
EXHIBIT B  -69-

51

09MVNECA                    Argument

1           THE COURT:  What was the date?
2           MR. KLAPPER:  Well, in July of 2007.
3           THE COURT:  All right.
4           MR. KLAPPER:  The rating agencies started reducing the
5    ratings on a large number of residential mortgage-backed
6    securities.
7           THE COURT:  But we are talking about these.  We are
8    talking about these certificates.  When were the ratings
9    reduced on these certificates?
10          MR. KLAPPER:  It was within the one year before.  So
11   if there's a requirement that there be -- I think it might have
12   been in the summer of 2008, something like that.
13          THE COURT:  But if we are talking about the effect on
14   the sales price, if that has any significance, it is the change
15   in rating that had that effect.  Isn't that right?
16          MR. KLAPPER:  No.  To the extent that residential
17   mortgage-backed security prices, where they were traded,
18   declined, the big decline occurred in June and July and August
19   of 2007 initially, especially with the less creditworthy
20   securities to Bear Stearn's asset management funds collapsed in
21   June of 2007.  The rating agencies started reducing ratings on
22   all sorts of residential mortgage-backed securities.
23          THE COURT:  OK.  But wasn't this suit brought within
24   that period?
25          MR. KLAPPER:  No.  The suit was brought in December of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

EXHIBIT 1 TO ERRATA  -74-
EXHIBIT B  -70-

```
        09MVNECA                    Argument
 1   2008.
 2              THE COURT:  When were the ratings reduced?
 3              MR. KLAPPER:  Just so I'm clear, I certainly don't
 4   want to mislead the Court.  There were many, many
 5   residential --
 6              THE COURT:  Weren't there ratings in the initial
 7   public offering?  Weren't ratings provided?
 8              MR. KLAPPER:  Yes.
 9              THE COURT:  Right.  And when were those ratings
10   reduced, publicly, for these certificates?
11              MR. KLAPPER:  These certificates, I don't believe
12   until the summer of -- let's see.  So December of 2008.
13              THE COURT:  Would have been within the statutory
14   period.
15              MR. KLAPPER:  Correct.
16              THE COURT:  Well, that, it seems to me, is what was
17   really significant here for investors.
18              MR. KLAPPER:  The claim, remember, is not that there
19   was something specific to this securitization trust or even the
20   originators who made the loans in these two securitization
21   trusts, but that there was a wholesale departure from
22   underwriting standards across the industry.
23              THE COURT:  Well, they can't do that.  They can only
24   claim with respect to their own certificates.
25              We've been through this many times now.  This is not a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

EXHIBIT 1 TO ERRATA -75-
EXHIBIT B -71-

09MVNECA                         Argument

1    universal case.  This is a case only about what happened to the
2    plaintiffs in this case.
3            MR. KLAPPER:  And if they have alleged that, we would
4    have something that would be easier for us to assess and move
5    against, but they are not.  They are alleging a
6    wholesale-across-the-industry departure from loan standards.
7            THE COURT:  Then what you are asking me now is an
8    evidentiary problem.  You want me to preclude them from proving
9    things that happened before the ratings were changed.  But what
10   really gave the public notice about how fishy these things
11   were, how really risky they were, were the reduction in
12   ratings.
13           Is there any question about that as a practical
14   matter?
15           MR. KLAPPER:  Absolutely.  Rating agencies were late
16   to the party.  Prices were down --
17           THE COURT:  Well, if rating agencies were late, why
18   shouldn't ordinary investors be equally late?  Why shouldn't
19   they look to the rating agencies?
20           MR. KLAPPER:  Because the rating agencies, although
21   late, were more than a year earlier than this plaintiff in
22   recognizing --
23           THE COURT:  But a year is what the law requires.  It's
24   not forever.  And it's a question of what it is that should
25   have given them warning.  And I think, in this case, it is the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT 1 TO ERRATA  -76-
EXHIBIT B  -72-

54

09MVNECA                     Argument

1   reduction in ratings.  And I think that probably was true -- I
2   don't rule on anything but this case.  I don't have to make a
3   universal ruling.  But I think the reduction in ratings was a
4   real jolt.
5             MR. KLAPPER:  The reduction in ratings, again, not
6   with respect to the particular certificates that they bought,
7   but in general, with respect to hundreds, if not thousands --
8             THE COURT:  Look, you want me to limit them to their
9   particular certificates, and I'm doing that.  So I'm limiting
10  their discoveries to their particular certificates, as well.
11            Let's move on.  Let's turn now -- once we get past the
12  11 and 12 claims, I don't think that the 15 claim raises
13  anything.  The 15 as claim depends on whether there's a claim
14  under either 11 or 12, isn't that right?
15            MR. KLAPPER:  Well, it's a supervision claim, control
16  claim, so they have to prove more.  But our basis for --
17            THE COURT:  No, but it's an absolute liability.  It's
18  a defense that I didn't have anything to do with it.
19            MR. KLAPPER:  Right.  There are some additional
20  issues.
21            THE COURT:  Yes.
22            MR. KLAPPER:  Goldman Sachs Mortgage Company, the
23  sponsor, is sued as an underwriter.  The law is clear, among
24  others, through Judge Rakoff --
25            THE COURT:  Didn't they sign this pound of paper?
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

EXHIBIT 1 TO ERRATA  -77-
EXHIBIT B  -73-

55

09MVNECA                    Argument

1              MR. KLAPPER:  No.
2              THE COURT:  Their name doesn't appear on it?
3              MR. KLAPPER:  No.  Their name may appear, but it's
4      sponsor.
5              And Judge Rakoff, addressing exactly this issue --
6              THE COURT:  Well, I don't really understand the
7      difference in the impact on the market of whether somebody is a
8      sponsor or an underwriter.
9              MR. KLAPPER:  Well, if you are not an underwriter, the
10     statute doesn't permit you to be sued.
11             THE COURT:  I know.  But I don't understand why a
12     sponsor is not an underwriter.
13             MR. KLAPPER:  Because a sponsor doesn't underwrite the
14     securities.  The sponsor buys the loans and contributes them --
15             THE COURT:  Yeah, but why isn't everybody whose name
16     is on that as an issuer not a seller?
17             MR. KLAPPER:  It's not an issuer.  The trust is the
18     issuer.
19             THE COURT:  I understand.  I'm not going to throw them
20     out yet.  Maybe at some point you'll show me that I should.
21             MR. KLAPPER:  Well, I would refer to Judge Rakoff's
22     decision in the Merrill Lynch case.
23             THE COURT:  I have enormous respect for my colleagues,
24     but I am not -- the authority that binds me is the Second
25     Circuit and the Supreme Court.  And I try very hard to follow
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

EXHIBIT 1 TO ERRATA  -78-
EXHIBIT B  -74-

```
         09MVNECA                    Argument
 1   them to the letter.
 2           MR. KLAPPER:  Then there is the question of whether
 3   under 12(a)(2) plaintiff has adequately alleged that it
 4   purchased in the 2007-10 offering -- rather, sorry, that it
 5   purchased directly from Goldman Sachs.  And they say --
 6           THE COURT:  I thought that that was in the initial
 7   public offering.
 8           MR. LEAHY:  Yes, it was.  And we allege --
 9           THE COURT:  Whom else do you buy it from?
10           MR. KLAPPER:  Well, you could buy it from your broker,
11   who, in turn, bought it from -- in the offering.
12           MR. LEAHY:  Your Honor, it was a firm commitment
13   underwriting.  Goldman Sachs bought all the certificates and
14   then sold them to the public.  That's what the prospectus
15   supplement says.  Our client bought two weeks before the
16   closing date.  The trading records we have --
17           THE COURT:  In the initial public offering?
18           MR. LEAHY:  In the initial public offering.
19           Our trading records said from Goldman Sachs, we allege
20   that.
21           THE COURT:  It alleges that in the complaint.
22           MR. KLAPPER:  All we want is to be clear that they
23   didn't buy through a broker or other intermediary.
24           THE COURT:  Well, you'll find that out.  Why should
25   you assume that if it says in the complaint that they bought it
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -79-
EXHIBIT B  -75-

```
     09MVNECA                    Argument
 1   from Goldman Sachs?
 2              MR. KLAPPER:  If they can confirm that they didn't buy
 3   it through an intermediary, then that's the end of it.
 4              MR. LEAHY:  That's our allegation, your Honor.  We
 5   bought it directly from them in a public offering.
 6              THE COURT:  OK.
 7              I deny the motion to dismiss the allegation under 12
 8   and 15, which is just a subsidiary of 12.
 9              I am going to reserve decision on 11.
10              But there's no reason not to proceed with discovery.
11              And at this point, I need a case management plan,
12   because this case has to proceed.  And if, indeed, there are
13   fewer than 100 people who bought what the plaintiff bought,
14   there may not be a class action here.  But the complaint is all
15   I'm talking about, the plaintiff.  I have not certified a class
16   yet, and nobody has asked me to.
17              I do not think that the plaintiff can sue, as I've
18   told you before, except on the particular certificates that
19   he's talking about -- or that it's not "he," it is talking
20   about.
21              MR. LEAHY:  Your Honor, if I may.
22              We believe we can sue on all tranches of the trust.
23   May we file our motion for class certification?  Because that
24   is --
25              THE COURT:  I never prohibit anybody from making any
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

EXHIBIT 1 TO ERRATA  -80-
EXHIBIT B  -76-

```
        09MVNECA                    Argument
 1   motion that the rules permit.
 2             MR. LEAHY:  Thank you.
 3             THE COURT:  But you should go forward with discovery
 4   on this plaintiff.
 5             MR. LEAHY:  Certainly.  Thank you.
 6             THE COURT:  You do not need my permission for that.
 7   But what the outcome will be, we will see.
 8             I am raising my own tentative view that fewer than 100
 9   people bought each of these certificates in any particular
10   tranche.  We really do not have a viable class.  I do not know
11   how many cases have addressed that particular issue.
12             MR. LEAHY:  I suspect none at this point, your Honor.
13             THE COURT:  Time will tell.  You will do as you are
14   advised, and the defendants will do as they are advised.  But
15   in the meantime, I want the case to move forward.
16             MR. LEAHY:  Yes, your Honor.
17             MR. KLAPPER:  Understood.
18             THE COURT:  Very well.  Good luck to everybody.
19             MR. KLAPPER:  Thank you, your Honor.
20             THE COURT:  And I will try to resolve the viability of
21   the complaint under Section 11 as soon as possible.
22             MR. LEAHY:  Your Honor, would you want --
23             THE COURT:  But, in the meantime, because it's viable
24   under 12, that shouldn't interfere with ongoing discovery.
25             MR. LEAHY:  Sure.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

EXHIBIT 1 TO ERRATA -81-
EXHIBIT B -77-

59
```
09MVNECA                    Argument
```
1          Your Honor, defense counsel raised this issue about a
2    well-developed efficient market being prerequisite for damages
3    under Section 11.
4          If it would be helpful to the Court, we'd like to
5    submit a memorandum on that, because it is our understanding of
6    law that there is no need for an efficient market or a
7    well-developed market to sustain damages.
8          THE COURT:  I would be very interested in seeing
9    whatever you have on that subject.
10          MR. LEAHY:  Thank you.
11          THE COURT:  Very well.
12          MR. KLAPPER:  Thank you.
13                          *    *    *
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT 1 TO ERRATA  -82-
EXHIBIT B  -78-

**PROOF OF SERVICE**

I, Britani N. Selzler, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 601 S. Figueroa Street, Los Angeles, CA 90017.

On October 20, 2010, I served the following documents by placing a true copy thereof in a sealed envelope(s) on the persons listed on the service list below:

**NOTICE OF ERRATA RE: COUNTRYWIDE DEFENDANTS' THIRD NOTICE OF RECENT AUTHORITY IN SUPPORT OF MOTION TO DISMISS**

☑ (CM/ECF Electronic Filing) I caused the above document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth above pursuant to Fed.R.Civ.P.5(d)(1). "A Notice of Electronic Filing (NEF) is generated automatically by the ECF system upon completion of an electronic filing. The NEF, when e-mailed to the e-mail address of record in the case, shall constitute the proof of service as required by Fed.R.Civ.P.5(d)(1). A copy of the NEF shall be attached to any document served in the traditional manner upon any party appearing pro se."

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction this service was made and that the foregoing is true and correct.

Executed on October 20, 2010, at Los Angeles, California.

Britani N. Selzler
(Type or print name)                              (Signature)

PROOF OF SERVICE

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

**SERVICE LIST**

**MAINE STATE RETIREMENT SYSTEM v.
COUNTRYWIDE FINANCIAL CORPORATION, et al.**

**CASE NO. CV-10-00302-MRP-(MAN)**

Goodwin Procter LLP
10250 Constellation Blvd., 21ˢᵗ Floor
Los Angeles, California  90067

| | |
|---|---|
| Christopher Lometti<br>Daniel B. Rehns<br>Joel P. Laitman<br>**COHEN MILSTEIN SELLER &<br>TOLL PLC**<br>88 Pine Street 14th Floor<br>New York, NY 10005 | *Attorneys for Lead Plaintiffs::*<br>**Iowa Public Employees' Retirement<br>System** *Individually and On Behalf of<br>All Other Similarly Situated*<br><br>Tel: 212-383-7797<br>Fax: 212-838-7745<br>clometti@cohenmilstein.com<br>drehns@cohenmilstein.com<br>jlaitman@cohenmilstein.com |
| Joshua S. Devore<br>Matthew B. Kaplan<br>S Douglas Bunch<br>Steven J. Toll<br>Julie G. Reiser<br>**COHEN MILSTEIN HAUSFELD &<br>TOLL PLLC**<br>1100 New York Avenue NW West<br>Tower Suite 500<br>Washington, DC 20005-3964 | Tel: 202-408-4600<br>Fax: 202-408-4699<br>jdevore@cohenmilstein.com<br>mkaplan@cohenmilstein.com<br>dbunch@cohenmilstein.com<br>stoll@cohenmilstein.com<br>jreiser@cohenmilstein.com |
| Michael M. Goldberg<br>**GLANCY BINKOW & GOLDBERG<br>LLP**<br>1801 Avenue of the Stars Suite 311<br>Los Angeles, CA 90067 | Tel: 310-201-9150<br>Fax: 310-201-9160<br>mmgoldberg@glancylaw.com |
| Christina A. Royce<br>Daniel S. Drosman<br>Lauren G. Kerkhoff *<br>Scott H. Saham<br>Spencer Alan Burkholz<br>Thomas E. Egler<br>**ROBBINS GELLER RUDMAN &<br>DOWD LLP**<br>655 West Broadway Suite 1900<br>San Diego, CA 92101 | *Attorneys for Plaintiff:*<br>**Maine State Retirement System**<br>*Individually and On Behalf of All<br>Others Similarly Situated*<br><br>Tel: 619-231-1058<br>Fax: 619-667-7056<br>croyce@rgrdlaw.com<br>ddrosman@rgrdlaw.com<br>lkerkhoff@rgrdlaw.com<br>scotts@rgrdlaw.com<br>spenceb@rgrdlaw.com<br>tome@rgrdlaw.com |
| Andrew L Zivitz<br>Jennifer L Joost<br>Sharan Nirmul<br>Sean M Handler<br>Lauren Wagner Pederson*<br>**BARROWAY TOPAZ KESSLER<br>MELTZER & CHECK LLP**<br>280 King of Prussia Road<br>Radnor, PA 19087 | Tel: 610-667-7706<br>Fax: 610-667-7056<br>azivitz@btkmc.com<br>jjoost@btkmc.com<br>snirmul@btkmc.com<br>shandler@btkmc.com |

PROOF OF SERVICE

*Goodwin Procter LLP*
*10250 Constellation Blvd., 21ˢᵗ Floor*
*Los Angeles, California 90067*

| | |
|---|---|
| Arthur L. Shingler , III<br>**SCOTT AND SCOTT LLP**<br>6424 Santa Monica Boulevard<br>Los Angeles, CA 90038 | *Attorney for Movant:*<br>**Putnam Bank**<br><br>Tel: 213-985-1274<br>Fax: 213-985-1278<br>ashingler@scott-scott.com |
| Avi N. Wagner<br>**THE WAGNER FIRM**<br>1801 Avenue of the Stars Suite 307<br>Los Angeles, CA 90067 | *Attorneys for Movant:*<br>**United Methodist Churches Benefit Board, Inc.**<br><br>Tel: 310-491-7949<br>Fax: 310-491-7949<br>avi@thewagnerfirm.com |
| Ira M. Press<br>Randall K. Berger<br>**KIRBY MCINERNEY LLP**<br>825 Third Avenue 16th Floor<br>New York, NY 10022 | Tel: 212-317-6600<br>Fax: 212-751-2540<br>ipress@kmllp.com<br>rberger@kmllp.com |
| Spencer Alan Burkholz<br>**ROBBINS GELLER RUDMAN & DOWD LLP**<br>655 West Broadway Suite 1900<br>San Diego, CA 92101 | *Attorneys for Movants:*<br>**Maine Public Employees Retirement System, Operating Engineers Annuity Plan, Pension Trust Fund for Operating Engineers, Vermont Pension Investment Committee, Washington State Plumbing & Pipefitting Pension Trust**<br><br>Tel: 619-231-1058<br>Fax: 619-667-7056<br>spenceb@rgrdlaw.com |
| Azra Z. Mehdi<br>**MILBERG LLP**<br>300 South Grand Avenue, Suite 3900<br>Los Angeles, CA 90071 | **Mashreqbank, P.S.C.**<br><br>Tel: 213-617-1200<br>Fax: 213-617-1975<br>amehdi@milberg.com |

3

PROOF OF SERVICE

Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067

| | |
|---|---|
| Alexander K. Mircheff<br>Dean J. Kitchens<br>**GIBSON DUNN & CRUTCHER LLP**<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197 | *Attorneys for Defendants:*<br>**J.P. Morgan Securities Inc., Deutsche Bank Securities Inc., Bear, Stearns & Co. Inc., Banc of America Securities LLC, UBS Securities, LLC, Morgan Stanley & Co. Incorporated, Edward D. Jones & Co., L.P., Citigroup Global Markets Inc., Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, Barclays Capital Inc., HSBC Securities (USA), BNP Paribas Securities Corp. Merrill Lynch, Pierce, Fenner & Smith, Incorporated** |
| | Tel: 213-229-7000<br>Fax: 213-229-7520<br>amircheff@gibsondunn.com<br>dkitchens@gibsondunn.com |
| Christopher G. Caldwell<br>David C. Codell<br>Jeffrey M. Hammer<br>**CALDWELL LESLIE AND PROCTOR**<br>1000 Wilshire Blvd Suite 600<br>Los Angeles, CA 90017 | *Attorneys for Defendant:*<br>**Stanford L. Kurland**<br><br>Tel : 213-629-9040<br>Fax: 213-629-9022<br>caldwell@caldwell-leslie.com<br>codell@caldwell-leslie.com<br>hammer@caldwell-leslie.com |
| Jennifer M. Sepic<br>**BINGHAM MCCUTCHEN LLP**<br>355 South Grand Avenue Suite 4400<br>Los Angeles, CA 90071 | *Attorneys for Defendant:*<br>**David A. Spector**<br><br>Tel: 213-680-6400<br>Fax: 213-680-6499<br>jennifer.sepic@bingham.com |
| Leiv H. Blad , Jr<br>Boyd Cloern<br>**BINGHAM MCCUTCHEN LLP**<br>2020 K Street NW<br>Washington, DC 20006-1806 | Tel: 202-373-6564<br>Fax: 202-373-6001<br>leiv.blad@bingham.com<br>boyd.cloern@bingham.com |
| Joshua G. Hamilton<br>Peter Young Hoon Cho<br>William F. Sullivan<br>**PAUL HASTINGS JANOFSKY AND WALKER LLP**<br>515 South Flower Street 25th Fl<br>Los Angeles, CA 90071-2228 | *Attorneys for Defendants:*<br>**Ranjit Kripalani,**<br>**Jennifer S. Sandefur,**<br><br>Tel: 213-683-6000<br>Fax: 213-627-0705<br>joshuahamilton@paulhastings.com<br>petercho@paulhastings.com<br>williamsullivan@paulhastings.com |

4

| | |
|---|---|
| 1 Michael D. Torpey<br>Penelope A. Graboys Blair | *Attorneys for Defendant:*<br>**David A. Sambol** |
| 2 **ORRICK HERRINGTON AND<br>SUTCLIFFE LLP** | |
| 3 405 Howard Street<br>San Francisco, CA 94105-2669 | Tel: 415-773-5700<br>Fax: 415-773-5759<br>mtorpey@orrick.com |
| 4 | pgraboysblair@orrick.com |
| 5 | |
| 6 Michael C. Tu<br>**ORRICK HERRINGTON AND** | Tel: 213-629-2020<br>Fax: 213-612-2499<br>mtu@orrick.com |
| 7 **SUTCLIFFE LLP**<br>777 South Figueroa Street Suite 3200<br>Los Angeles, CA 90017 | |
| 8 | |
| 9 David A. Priebe<br>Jeffrey B. Coopersmith | *Attorneys for Defendant:*<br>**Eric P. Sieracki** |
| 10 **DLA PIPER LLP**<br>2000 University Avenue<br>East Palo Alto, CA 94303 | Tel: 650-833-2000<br>Fax: 650-833-2001 |
| 11 | david.priebe@dlapiper.com<br>jeff.coopersmith@dlapiper.com |
| 12 Matthew D. Caplan<br>Nicolas Morgan | |
| 13 **DLA PIPER LLP**<br>1999 Avenue of the Stars, Suite 400 | Tel: 310-595-3000<br>Fax: 310-595-3300 |
| 14 Los Angeles, CA 90067-6022 | david.priebe@dlapiper.com<br>nicolas.morgan@dlapiper.com |
| 15 | |
| 16 Shirli Fabbri Weiss<br>**DLA PIPER LLP** | Tel: 619-699-2700 |
| 17 401 B Street, Suite 1700<br>San Diego, CA 92101 | Fax: 619-699-2701<br>shirli.weiss@dlapiper.com |
| 18 | |
| 19 Matthew W. Close<br>**O'MELVENY AND MYERS** | *Attorneys for Defendant:*<br>**Bank of America Corp.,** |
| 20 400 S. Hope Street, 18th Floor<br>Los Angeles, CA 90071 | **NB Holdings Corporation** |
| 21 | |
| 22 | Tel: 213-430-6000<br>Fax: 213-430-6407 |
| 23 | mclose@omm.com |

24

25

26

27

28

5

PROOF OF SERVICE

*(left margin)* Goodwin Procter LLP
10250 Constellation Blvd., 21st Floor
Los Angeles, California 90067