1   GLANCY BINKOW & GOLDBERG LLP
    LIONEL Z. GLANCY (#134180)
2   MICHAEL GOLDBERG (#188669)
    1801 Avenue of the Stars, Suite 311
3   Los Angeles, California  90067
4   Telephone:   (310) 201-9150
    Facsimile:    (310) 201-9160
5   E-mail: info@glancylaw.com

6   *Liaison Counsel for Lead Plaintiff Iowa Public*
    *Employees' Retirement System*
7   *[Additional Counsel on Signature Page]*

8             UNITED STATES DISTRICT COURT
9             CENTRAL DISTRICT OF CALIFORNIA

10  MAINE STATE RETIREMENT SYSTEM,          No.  2:10-CV-00302 MRP
    Individually and On Behalf of All Others    (MAN)
11  Similarly Situated,

12              Plaintiff,

13        v.                                  CLASS ACTION

14  COUNTRYWIDE FINANCIAL
    CORPORATION;  COUNTRYWIDE          SECOND AMENDED CLASS
15  SECURITIES CORPORATION;            ACTION COMPLAINT
    COUNTRYWIDE HOME LOANS, INC.;
16  COUNTRYWIDE CAPITAL MARKETS;
    BANK OF AMERICA CORP.; NB
17  HOLDINGS CORPORATION; CWALT,
    INC.; CWMBS, INC.; CWABS, INC.;
18  CWHEQ, INC.; J.P. MORGAN
    SECURITIES, INC.; DEUTSCHE BANK
19  SECURITIES INC.; BEAR, STEARNS &
    CO., INC.; JPMORGAN CHASE, INC.;
20  BANC OF AMERICA SECURITIES LLC;
    UBS SECURITIES LLC; MORGAN
21  STANLEY & CO., INC.; EDWARD D.
    JONES & CO., L.P.; CITIGROUP GLOBAL
22  MARKETS, INC.; GOLDMAN, SACHS &
    CO.; CREDIT SUISSE SECURITIES (USA)
23  LLC; RBS SECURITIES INC.; BARCLAY'S
    CAPITAL, INC.; HSBC SECURITIES (USA)
24  INC.; BNP PARIBAS SECURITIES CORP.;
    MERRILL LYNCH, PIERCE, FENNER &
25  SMITH, INC.; STANFORD L. KURLAND;
    DAVID A. SPECTOR; ERIC P. SIERACKI;
26  N. JOSHUA ADLER; RANJIT KRIPALANI;
    JENNIFER S. SANDEFUR; THOMAS
27  KEITH MCLAUGHLIN; THOMAS H.
    BOONE; JEFFREY P. GROGIN; DAVID A.
28  SAMBOL,
                Defendants.

FILED
CLERK, U.S. DISTRICT COURT

DEC – 6 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF THE ACTION ................................................................. 2

II.     JURISDICTION AND VENUE ............................................................... 7

III.    PROCEDURAL HISTORY ..................................................................... 8

IV.     PARTIES ................................................................................................ 11

     A.    Plaintiffs ...................................................................................... 11

     B.    Defendants ................................................................................... 13

          1.    Countrywide Defendants ................................................. 13

          2.    The Issuer Defendants ..................................................... 17

          3.    The Underwriter Defendants ........................................... 21

          4.    The Individual Defendants .............................................. 25

          5.    David A. Sambol .............................................................. 26

     C.    The Issuing Trust Non-Parties ................................................... 26

V.      TOLLING OF THE STATUTE OF LIMITATIONS ............................. 27

     A.    Defendant CWALT Offerings .................................................... 27

     B.    Defendant CWHEQ Offerings ................................................... 29

     C.    Defendant CWABS Offerings ..................................................... 32

     D.    Defendant CWMBS Offerings .................................................... 40

VI.     BACKGROUND .................................................................................... 41

     A.    Countrywide Was a Leading Issuer and Underwriter of
          Mortgage-Backed Securities ....................................................... 41

     B.    Countrywide's Origination and Securitization Operations .............. 44

VII.    EVIDENCE OF SYSTEMIC DISREGARD OF STATED LOAN
       ORIGINATION GUIDELINES CONTAINED IN OFFERING
       DOCUMENTS ....................................................................................... 48

     A.    Exponential Increase in Certificate Default Rates in Months
          After Issuance No Matter When Offering Occurred Evidences
          Disregard of Origination Guidelines ......................................... 48

     B.    Rating Agencies Collapsed Certificate Ratings to "Junk Bond"
          Levels Due to Undisclosed "Aggressive Underwriting"
          Practices ...................................................................................... 50

C.   Numerous Government Investigations Reveal the Falsity of the Offering Documents ........................................................ 52

D.   Allegations in Numerous Other Civil Lawsuits Show the Falsity of the Offering Documents ...................................................... 61

E.   Underwriter Defendants "Contracted Out" and Failed to Conduct Required Due Diligence of Loan Underwriting Guidelines Contained in Offering Documents ...................... 69

F.   Additional Government Investigations Further Confirm Systemic Disregard for Mortgage Loan Underwriting Guidelines ....................................................................... 75

G.   Underwriter Defendants Employed Rating Shopping Practices to Ensure Inflated Investment Grade Rating for All the Certificates .................................................................. 76

VIII.   THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING AND APPRAISAL STANDARDS ...................... 78

IX.   CLASS ACTION ALLEGATIONS ........................................... 98

X.   STANDING ......................................................................... 100

XI.   CLAIMS............................................................................ 100

COUNT I............................................................................ 100

Violation of Section 11 of the Securities Act Against the Individual Defendants, the Issuer Defendants, and the Underwriter Defendants

COUNT II ......................................................................... 104

Violation of Section 12(a)(2) of the Securities Act Against the Issuer Defendants and the Underwriter Defendants

COUNT III ........................................................................ 106

Violation of Section 15 of the Securities Act Against the Countrywide Defendants

XII.   RELIEF REQUESTED......................................................... 107

XIII.   JURY DEMAND ................................................................. 107

1    In accordance with the Court's Opinion and Order dated November 4, 2010

2 ("Countrywide Tolling Decision"), Lead Plaintiff Iowa Public Employees'

3 Retirement System and additional named plaintiffs the General Board of Pension

4 and Health Benefits of the United Methodist Church, Orange County Employees'

5 Retirement System, and Oregon Public Employees' Retirement System

6 (collectively, "Plaintiffs"), allege the following upon personal knowledge as to

7 themselves and their own acts and upon information and belief as to all other

8 matters.  Plaintiffs' information and belief is based on the investigation of their

9 counsel.  The investigation included, for example: (i) review and analysis of the

10 offering materials for the Certificates as defined below, and the Certificates' rating

11 histories; (ii) examination of the monthly service or remittance reports issued in

12 connection with the Certificates; (iii) examination of the SEC filings, press releases

13 and other public statements of Countrywide Financial Corporation ("CFC"); (iv)

14 review and analysis of court filings cited herein; (v) review and analysis of media

15 reports, congressional testimony and additional material; and (vi) analysis of the

16 Securities and Exchange Commission's ("SEC") Summary Report of Issues

17 Identified in the Commission Staff's Examinations of Select Credit Rating

18 Agencies ("SEC Report") and additional documents cited herein.  Many of the

19 facts related to Plaintiffs' allegations are known only by the Defendants named

20 herein, or are exclusively within their custody or control.  Plaintiffs believe that

21 substantial additional evidentiary support for the allegations set forth below will be

22 developed after a reasonable opportunity for discovery.

23    Plaintiffs undertake this amendment to comply with the Countrywide

24 Tolling Decision.  In so doing, Plaintiffs do not waive and hereby preserve all

25 previously asserted claims regarding all securities included in the Consolidated

26 Amended Class Action Complaint ("First Amended Complaint," or "FAC") in this

27 action as if fully set forth herein.

28

## I.    SUMMARY OF THE ACTION

1.     This Complaint is brought by Plaintiffs pursuant to the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* (the "Securities Act"), on behalf of all persons or entities who purchased or otherwise acquired $17.83 billion of mortgage-backed securities ("MBS" or "Certificates") issued pursuant or traceable to Registration Statements, Original Basic Prospectuses, and Prospectus Supplements (collectively, the "Offering Documents") filed with the SEC: (1) Alternative Loan Trust Certificates issued by Defendant CWALT, Inc. ("CWALT"); (2) CWABS Asset-Backed Trust Certificates issued by Defendant CWABS, Inc. ("CWABS"); (3) CHL Mortgage Pass-Through Trust Certificates issued by Defendant CWMBS, Inc. ("CWMBS"); and (4) CWHEQ Revolving Home Equity Loan Trusts and Home Equity Loan Trusts issued by Defendant CWHEQ, Inc. ("CWHEQ") (CWALT, CWABS, CWMBS, and CWHEQ are collectively referred to herein as the "Depositors" or "Issuers").   All of the Certificates were collateralized by residential mortgage loans that Countrywide Home Loans, Inc. ("Countrywide") or its affiliates originated.   The Certificates were sold in 14 separate public offerings (the "Offerings") over thirty-four months between October 2005 and December 2006.   A complete list of each Offering that is the subject of this Second Amended Class Action Complaint ("SAC") is set forth in **Exhibit A** of the accompanying Appendix ("SAC Appendix").

2.     The Offerings were underwritten by Defendants Countrywide Securities Corporation ("CSC"), Deutsche Bank Securities Inc. ("Deutsche Bank"), UBS Securities LLC ("UBS"), Morgan Stanley & Co., Inc. ("Morgan Stanley"), Goldman, Sachs & Co. ("Goldman Sachs"), RBS Securities Inc. f/k/a RBS Greenwich Capital d/b/a Greenwich Capital Markets, Inc. ("RBS"), Barclay's Capital, Inc. ("Barclay's) and HSBC Securities (USA) Inc. ("HSBC") (collectively the "Underwriters" or "Underwriter Defendants").

3.     Plaintiffs assert claims for violations of Sections 11, 12(a)(2) and 15

1  of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, arising from material

2  misstatements and omissions in the Registration Statements, Prospectuses and

3  subsequently-filed Prospectus Supplements (collectively referred to herein as the

4  "Offering Documents").  Accordingly, this action involves claims of negligence

5  and strict liability under the Securities Act.  The Complaint asserts no allegations

6  of fraud on the part of any Defendant.

7       4.      From 2005 through 2007, Countrywide was the nation's largest

8  residential mortgage lender.  Countrywide originated in excess of $850 billion in

9  home loans throughout the United States in 2005 and 2006 alone.  Countrywide's

10  ability to originate residential mortgages on such a massive scale was facilitated, in

11  large part, by its ability to rapidly package or securitize those loans and then,

12  through the activities of the Underwriter Defendants, sell them to investors as

13  purportedly investment grade mortgage-backed securities.

14       5.      Each Offering operated in the same manner.  A special-purpose trust

15  (the "Issuing Trust") was created by the Depositor to hold the underlying mortgage

16  loan collateral.  Certificates entitled investors to receive monthly distributions of

17  interest and principal from the Issuing Trusts derived from cash flows from

18  borrower repayment of the mortgage loans.  The cash flows from the principal and

19  interest payments from those mortgage loans were then divided into multiple

20  classes, or "tranches," of senior and subordinated Certificates.  If borrowers failed

21  to pay back their mortgages, these losses would flow to Plaintiffs based on the

22  seniority of their Certificates.  However, since all of the Certificates issued by an

23  individual Issuing Trust were backed by the pool of mortgages associated with that

24  Issuing Trust, a decline in the value of the mortgages in the pool arising from

25  delinquencies, defaults, or other problems with the particular loans would cause a

26  decline in the value of each and every class or tranche of Certificates in the Issuing

27  Trust, regardless of the subordination of certain Certificates to more senior ones.

28       6.      The assembly line created by Countrywide and the Underwriter

Defendants for the mass production and sale of the Certificates began with Countrywide and its affiliates originating the mortgage loans. These loans were all purportedly underwritten pursuant to specific loan origination guidelines set forth in the Offering Documents. The guidelines provided, *inter alia*, that Countrywide and its affiliates would assess borrower creditworthiness and appraise the value of the mortgaged property pursuant to standard appraisal methodologies. As set forth below, these descriptions of the loan origination guidelines in the Offering Documents contained material misstatements and omissions since, in fact, the guidelines were systematically disregarded to include borrowers who did not meet the aforementioned criteria.

7.     Once the loans were originated they were ultimately sold to the Depositors who were all limited purpose entities created by CFC. The Depositors would deposit the loans into Issuing Trusts and, along with the Underwriter Defendants and the Rating Agencies, including Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's ("S&P") and Fitch Ratings, Inc. ("Fitch") (collectively referred to herein as the "Rating Agencies"), design the structure of each Offering. The Offering structures determined how the cash flows from the mortgage loans would be distributed to different senior and subordinate classes of Certificate investors. Each Offering purported to provide various forms of investor protections and purported to justify the investment grade ratings assigned to the Certificates.

8.     It was critically important to the Underwriter Defendants not only that all of the Certificates be assigned investment grade ratings by the Rating Agencies at the time of issuance, but that they be assigned the highest investment grade ratings. The highest investment rating used by the Rating Agencies is AAA (Aaa for Moody's), which signifies the highest investment grade and suggests that there is almost no risk of investment loss associated with the security – the safest investment next to U.S. Treasury bonds. Ratings of "AA," "A" and "BBB"

represent very high credit quality, high credit quality, and good credit quality, respectively.   There are various intermediate ratings between BBB and AAA. Anything rated lower than BBB is considered speculative or "junk," *i.e.,* not investment grade.

9. In fact, all of the Countrywide-issued Certificates were assigned investment grade ratings and over 90% received the highest investment grade ratings. These ratings assured the rapid sale of the Certificates to conservative investors such as public and private pension funds and insurance companies whose investment guidelines typically require them to purchase only investment grade securities. The Underwriter Defendants exercised their substantial economic power by soliciting the Rating Agencies to bid for the ratings engagements via the Rating Agencies' proposed ratings of the Certificates. The Underwriters' competitive selection process for securing ratings, known as "ratings shopping," ensured that the highest investment grade ratings were assigned to substantially all of the Certificates.

10. After the Certificates were issued, facts began to emerge reflecting that the mortgage collateral supporting the purported investment grade securities was fundamentally impaired and that the guidelines described in the Offering Documents had been systematically disregarded.[1]

11. No matter when the Offering occurred, the default and delinquency rates of the Certificates at issue herein skyrocketed exponentially in the first year after the loans were originated, reflecting en mass early payment defaults. Such early defaults are a strong indicator that origination guidelines have not been applied, *infra* ¶¶102-09, 113.

---

[1] For purposes of the Securities Act, the Depositor is considered the "Issuer" under Section 2(a)(4), 15 U.S.C. § 77b(a)(4). The "issuing entity" in each Offering was the specifically denominated Issuing Trust, *e.g.,* for the CWALT Series 2005-62 $1,559,819,100 Offering on October 28, 2005, the Issuer was CWALT, Inc. and the issuing entity was the Issuing Trust denominated "Alternative Loan Trust 2005-62."

12.   As a result of such poor loan performance the Rating Agencies were forced not merely to downgrade isolated Certificates, but rather to revise the entire methodology used to assign investment grade ratings to the Certificates.  Further, in making these fundamental revisions, the Rating Agencies explained that the impetus for the change was previously undisclosed and systematic "aggressive underwriting" practices used to originate the mortgage loan collateral.  When these revised methodologies were applied to the Certificates in 2008 and 2009, the result was an unprecedented collapse of the investment grade ratings.  Indeed, the Certificates bearing the highest investment grade ratings collapsed largely in one fell swoop – not merely one or two rating levels, but *as much as 22 rating levels* to below investment grade or junk bond rating.  Indeed, 91% of the Certificates have been downgraded to junk bond levels – including over 90% of the Certificates initially awarded AAA/maximum-safety ratings, *infra* ¶¶107-114.

13.   Investigations into Countrywide's loan origination practices during the period from 2005 through 2007 and presented in actions filed by the SEC against Countrywide and its senior management, including Angelo Mozilo ("Mozilo"), David Sambol ("Sambol") and Eric Sieracki ("Sieracki"), as well as by the Illinois and California attorneys general have confirmed, as a result of those agencies' subpoena power, that Countrywide's underwriting guidelines were systematically disregarded.  In addition, MBIA Insurance Corp. ("MBIA"), one of the largest providers of bond insurance, brought its own lawsuit against Countrywide alleging that Countrywide fraudulently induced it to insure certain Certificates at issue in this action based on its improper loan origination practices.  Moreover, allegations set forth in complaints against Countrywide alleging derivative and securities claims have further detailed Countrywide's rampant disregard for its own loan origination guidelines.

14.   Fourth, more general government investigations into the issuance of mortgage-backed securities during the period when the Certificates were issued

1   have also confirmed a systemic disregard for loan origination guidelines.  Thus, for

2   example, according to the March 2008 policy statement of the President's Working

3   Group on Financial Markets (the "President's Working Group"), the underlying

4   causes of the mortgage crisis include, *inter alia*:  (i) "a breakdown in underwriting

5   standards for subprime mortgages"; and (ii) "a significant erosion of market

6   discipline by those involved in the securitization processes, including originators

7   [and] underwriters … related in part to failures to provide or obtain adequate risk

8   disclosures."

9          15.   Finally, commensurate with the exponential increases in delinquency

10   and default rates in the underlying mortgages and the Certificates' ratings collapse,

11   the value of the Certificates has plummeted.

12          16.   As a result of Countrywide's systemic disregard for its underwriting

13   guidelines, numerous statements set forth in the Offering Documents contained

14   material misstatements and omissions, including regarding: (i) the high quality of

15   the mortgage pools underlying the Issuing Trusts, resulting from the underwriting

16   standards employed to originate the mortgages, the value of the collateral securing

17   the mortgages, and the soundness of the appraisals used to arrive at this value; (ii)

18   the mortgages' loan-to-value ("LTV") ratios; and (iii) other criteria that were used

19   to qualify borrowers for mortgages.

20          17.   The widespread collapse of Countrywide mortgages not only resulted

21   in damage to Certificate investors but also drove Countrywide toward the brink of

22   bankruptcy.  To survive, Countrywide merged with Bank of America in a $4.1

23   billion stock exchange in January 2008.

24   **II.    JURISDICTION AND VENUE**

25          18.   The claims asserted herein arise under and pursuant to Sections 11,

26   12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. This

27   Court has jurisdiction over the subject matter of this action pursuant to Section 22

28   of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

19.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c). Many of the acts and conduct complained of herein occurred in substantial part in this District, including the dissemination of the Offering Documents, which contained material misstatements and omissions, complained of herein.  In addition, Defendants conduct business in this District.

20.     In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

**III.    PROCEDURAL HISTORY**

21.     The instant litigation was originally commenced on November 14, 2007 with the filing of *Luther v. Countrywide Home Loans Servicing LP, et al.,* Case No. BC380698 (Cal. Superior Court, Los Angeles County) ("Initial Luther Complaint").    The Initial Luther Complaint asserted claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act on behalf of a class of all purchasers of 188 Offerings of Countrywide MBS issued by Defendant CWALT between January 2005 and June 2007 pursuant to five separate Shelf Registration Statements.  ***See* SAC Appendix Exhibit C**.  All 188 Offerings included in the Initial Luther Complaint are included in the FAC.  The Offerings included in the Initial Luther Complaint are set forth in **SAC Appendix Exhibit D**, annexed hereto. ***There were no PSLRA Certifications identifying the securities purchased by the named Plaintiffs accompanying the filing of the Initial Luther Complaint, nor did the Initial Luther Complaint include allegations of specific securities purchased by the named plaintiff.***

22.     Thereafter, on June 14, 2008, a second action was filed in California State Superior Court captioned *Washington State Plumbing & Pipefitting Pension Trust v. Countrywide Financial Corporation, et al.,* Case No. BC392571 (Cal. Superior Court, Los Angeles County) ("Washington State Action" or "Washington

State Complaint"). The named Plaintiff, Washington State Plumbing & Pipefitting Pension Trust ("Washington State") asserted claims on behalf of a class of all purchasers of 398 Offerings of Countrywide MBS issued between June 13, 2005 and December 27, 2007 pursuant to 19 separate Shelf Registration Statements. *See* **SAC Appendix Exhibit C**. Three hundred and ninety-six Offerings included in the Washington State Complaint were included in the FAC. The Offerings included in the Washington State Complaint are set forth in **SAC Appendix Exhibit D**, annexed hereto. *There were no PSLRA Certifications identifying the securities purchased by the named Plaintiffs accompanying the filing of the Washington State Complaint, nor did the Washington State Complaint include allegations identifying the specific securities purchased by the named plaintiffs.*

23.     Thereafter, on September 9, 2008, an amended complaint was filed in *Luther* ("Amended Luther Complaint"), adding four additional plaintiffs to the action – Vermont Pension Investment Committee ("Vermont"), Mashreqbank, P.S.C. ("MASH"), Pension Trust Fund for Operating Engineers ("PTOE") and Operating Engineers Annuity Plan ("OEAP"). The named plaintiffs asserted claims on behalf of a class of all purchasers of 428 Offerings of Countrywide MBS issued between January 2005 and December 2007 pursuant to 20 separate Shelf Registration Statements. *See* **SAC Appendix Exhibit C**. All 427 Countrywide Offerings in the FAC were included in the Amended Luther Complaint. The Offerings included in the Amended Luther Complaint are set forth in **SAC Appendix Exhibit D**, annexed hereto. *There were no PSLRA Certifications identifying the securities purchased by the named Plaintiffs accompanying the filing of the Amended Luther Complaint, nor did the Amended Luther Complaint include allegations identifying the specific securities purchased by the named plaintiffs.*

24.     After consolidation of the *Luther* and *Washington State* actions, a consolidated complaint was filed on October 16, 2008 (the "Luther Consolidated

1   Complaint"), naming Luther, Vermont, MASH, PTOE, OEAP and Washington

2   State as plaintiffs.  In addition, the Luther Consolidated Complaint added Maine

3   State Retirement System ("Maine") as an additional named plaintiff.  Vermont,

4   MASH, PTOE, OEAP, Maine and Washington State are collectively referred to

5   herein at times as the "Luther Plaintiffs."  These plaintiffs asserted claims on

6   behalf of a class of all purchasers of 428 Offerings of Countrywide MBS issued

7   between January 2005 and December 2007 pursuant to 20 separate Shelf

8   Registration Statements.  *See* **SAC Appendix Exhibit C**.   Again, all 427

9   Countrywide MBS Offerings in the FAC were included in the Luther Consolidated

10   Complaint.  The Offerings included in the Luther Consolidated Complaint are set

11   forth in **SAC Appendix Exhibit D**, annexed hereto.  *There were no PSLRA*

12   *Certifications identifying the securities purchased by the named Plaintiffs*

13   *accompanying the filing of the Luther Consolidated Complaint, nor did the*

14   *Luther Consolidated Complaint include allegations identifying the specific*

15   *securities purchased by the named plaintiffs.*

16        25.    On January 14, 2010, after being dismissed due to lack of subject

17   matter jurisdiction in state court, counsel for the Luther Plaintiffs filed *Maine State*

18   *Retirement System v. Countrywide Financial Corporation, et al.,* Civ. No. 10-

19   00302-MRP-MAN (C.D. Cal. Jan. 14, 2010) (the "Federal Action" or "Federal

20   Complaint").  Maine State Retirement System was the sole named plaintiff in the

21   Federal Complaint, which set forth identical allegations regarding the same 428

22   Countrywide Offerings as the Luther Consolidated Complaint.  *See* **SAC**

23   **Appendix Exhibit C**.  All 427 Offerings in the FAC were included in the Federal

24   Complaint.  The Offerings included in the Federal Complaint are set forth in **SAC**

25   **Appendix Exhibit D**, annexed hereto.  *Annexed to the Federal Complaint was*

26   *the Certification of Maine State Retirement System which set forth the specific*

27   *Countrywide MBS which Maine had purchased.*

28        26.    The Luther Plaintiffs also appealed their dismissal by the Superior

1    Court to the California Court of Appeals (Second Appellate District). That appeal

2    remains pending.

3        27.    There were no PSLRA Certifications or allegations setting forth

4    precisely which Offerings the remaining five Luther Plaintiffs (*i.e.,* MASH, PTOE,

5    OEAP, Washington State and Vermont) purchased until the filing of the motions

6    for lead plaintiff in this action on April 2, 2010. *See* Dkt. Nos. 86-89. Moreover,

7    the specific Countrywide Certificates purchased by the named plaintiff in the

8    Luther Action, David Luther, have never been publicly disclosed or set forth in any

9    previous complaints in this action. In fact, this information was only obtained

10   from Mr. Luther's counsel in response to a request from Plaintiffs' Counsel.

11   Ultimately, on May 17, 2010, IPERS was appointed as Lead Plaintiff in the action.

12       28.    On July 13, 2010, IPERS, along with additional named Plaintiffs

13   OCERS, OPERS and GBPHB, filed the FAC in the Federal Action. The FAC

14   asserted claims on behalf of a class of all purchasers of 427 Offerings of

15   Countrywide MBS issued between January 2005 and December 2007 pursuant to

16   19 separate Shelf Registration Statements. *See* **SAC Appendix Exhibit C**. The

17   Offerings included in the FAC are set forth in **SAC Appendix Exhibit D**, annexed

18   hereto. Thereafter, Defendants moved to dismiss the FAC. By Opinion and Order

19   dated November 4, 2010, the Court granted Defendants' motions to dismiss with

20   leave to replead in accordance with the Countrywide Tolling Decision. This SAC

21   is filed in compliance therewith.

22   **IV.    PARTIES**

23       **A.    Plaintiffs**

24       29.    **Iowa Public Employees' Retirement System** ("IPERS") is a public

25   pension fund for employees of the State of Iowa. IPERS acquired its Certificates

26   pursuant and traceable to one or more Shelf Registration Statements, Original

27   Basic Prospectuses and later-filed Prospectus Supplements. The Offering

28   Documents were rendered materially misleading as a consequence of the same

course of conduct with respect to each Offering by Defendants. A Certification documenting IPERS' transactions in the Certificates was filed with IPERS' motion for appointment as lead plaintiff on April 2, 2010. *See* Dkt. No. 80. As set forth in ¶¶60-83, directly below, IPERS purchased the Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

30. **General Board of Pension and Health Benefits of the United Methodist Church** ("GBPHB") is the pension fund for the active and retired clergy and lay employees of the United Methodist Church. GBPHB acquired its Certificates pursuant and traceable to one or more Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements. The Offering Documents were rendered materially misleading as a consequence of the same course of conduct with respect to each Offering by Defendants. A Certification documenting GBPHB's transactions in the Certificates was filed with GBPHB's motion for appointment as lead plaintiff on April 2, 2010. *See* Dkt. No. 85. As set forth in ¶¶60-83, directly below, GBPHB purchased its Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

31. **Orange County Employees' Retirement System** ("OCERS") is a public pension fund for the employees of Orange County, California. OCERS acquired its Certificates pursuant and traceable to one or more Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements. The Offering Documents were rendered materially misleading as a consequence of the same course of conduct with respect to each Offering by Defendants. A Certification documenting OCERS' transactions in the Certificates and willingness to serve as a representative party in this litigation was annexed to and filed with the FAC on July 13, 2010. *See* Dkt. No. 122. As set forth in ¶¶60-83, directly below, OCERS purchased its Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

32.     **State of Oregon, by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board on behalf of the Oregon Public Employee Retirement Fund** ("OPERS") is a public pension fund for employees of the State of Oregon.  OPERS acquired its Certificates pursuant and traceable to one or more Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements.  The Offering Documents were rendered materially misleading as a consequence of the same course of conduct with respect to each Offering by Defendants.  A Certification documenting OPERS' transactions in Countrywide MBS and willingness to serve as a representative party in this litigation was annexed to and filed with the FAC on July 13, 2010.  *See* Dkt. No. 122.  As set forth in ¶¶60-83, directly below, OPERS purchased its Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

**B.     Defendants**

33.     Plaintiffs allege that each and every Defendant is, to the maximum extent permitted by law, jointly and severally liable for the misconduct alleged in this Complaint.

**1.     Countrywide Defendants**

34.     Defendant **Countrywide Financial Corporation** ("CFC") was, at times relevant to this Complaint, a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California.  CFC was a holding company which, through its subsidiaries, was engaged in mortgage lending and other real estate finance related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting.  The Company operated through five business segments:  Mortgage Banking, which originated, purchased, sold and serviced non-commercial mortgage loans nationwide;  Banking, which took deposits and invested in mortgage loans and home equity lines of credit;  Capital Markets, which operated

an institutional broker-dealer that primarily specialized in trading and underwriting MBS; Insurance, which offered property, casualty, life and disability insurance as an underwriter and as an insurance agency; and Global Operations, which licensed and supported technology for mortgage lenders in the United Kingdom.   As discussed below, CFC merged with and became Bank of America in 2008. The Issuer Defendants, as set forth below, were controlled directly by the Individual Defendants and CFC, including by the appointment of CFC executives as directors and officers of these entities.   Revenues flowing from the issuance and sale of MBS issued by CWALT, CWMBS, CWABS and CWHEQ and the Issuing Trusts were passed through to CFC and consolidated into CFC's financial statements. Defendant CFC, therefore, exercised actual day-to-day control over Defendants CWALT, CWMBS, CWABS, and CWHEQ.   Defendant CFC was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC.   These complaints alleged that CFC's role relating to the creation and sale of MBS violated the Securities Act.   The claims asserted in this SAC as they relate to CFC were tolled under the Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix Exhibits E & F.**

35.   Defendant **Countrywide Securities Corporation** ("CSC") is a broker-dealer within CFC.   According to CFC's Form 10-K for the year ended December 31, 2007, filed with the SEC on February 29, 2008 ("2007 Form 10-K"), CSC "primarily specializes in trading and underwriting MBS."   The financial results of CSC are set forth in the Capital Markets section of CFC's financial statements.   CFC further stated in its 2007 Form 10-K that it was "ranked fourth among Non-Agency MBS Underwriters" for 2007.   Defendant CSC was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC.   These complaints alleged that CSC's conduct relating to

the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to CFC were tolled under the Countrywide Tolling Decision for the Offerings set forth in SAC Appendix Exhibits E & F. Defendant

36.   **Countrywide Home Loans, Inc.** ("CHL") was, at times relevant to this Complaint, a direct wholly-owned subsidiary of CFC. CHL was engaged in the mortgage banking business, and originated, purchased, sold and serviced mortgage loans. CHL's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. CHL served as the "Sponsor" or "Seller" of the Certificates, meaning that it played a central role in providing the pools of mortgage loans to the Issuing Trusts upon which the Certificates were based. Defendant CHL was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC. These complaints alleged that CHL's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to CHL were tolled under the Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix Exhibits E & F.**

37.   Defendant **Countrywide Capital Markets** ("CCM") was, at times relevant to this Complaint, a direct wholly-owned subsidiary of CFC. CCM's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. CCM operated through its two main wholly-owned subsidiaries, CSC and Countrywide Servicing Exchange. According to CFC's 2007 Form 10-K, "Capital Markets participates in both competitive bid and negotiated underwritings and performs underwriting services for CHL, Countrywide Bank and third parties." The financial results of CCM were set forth in the Capital Markets section of CFC's financial statements. Defendant CCM was a named defendant in the Consolidated Luther Complaint, the Federal Complaint and the FAC. These complaints alleged that CCM's conduct relating to the

1   creation and sale of MBS violated the Securities Act.  The claims asserted in this

2   SAC as they relate to CCM were tolled under the Countrywide Tolling Decision

3   for the Offerings set forth in **SAC Appendix Exhibits E & F.**

4       38.   Defendant **Bank of America Corp.** ("Bank of America") is a

5   successor to Defendant CFC, having *de facto* merged with CFC.  On July 1, 2008,

6   Defendant CFC completed a merger with Red Oak Merger Corporation ("Red

7   Oak"), a wholly-owned subsidiary of Bank of America, pursuant to the terms of an

8   Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank

9   of America, Red Oak, and CFC.   The acquisition was through an all-stock

10  transaction involving a Bank of America subsidiary that was created for the sole

11  purpose of facilitating the acquisition of CFC.  The Countrywide brand was retired

12  shortly after the merger and currently CFC's former website redirects to the Bank

13  of America website.  Moreover, Bank of America has assumed CFC's liabilities,

14  having paid to resolve other litigation arising from misconduct such as predatory

15  lending allegedly committed by CFC.  *See, e.g.,* Shayndi Raice and Marshall

16  Eckblad, Countrywide's Mess Billed to Bank of America, *Wall St. J.* (June 7,

17  2010).   Substantially all of Countrywide's assets were transferred to Bank of

18  America on November 7, 2008, in connection with Countrywide's integration with

19  Bank of America's other businesses and operations, along with certain of

20  Countrywide's debt securities and related guarantees.  CFC ceased filing its own

21  financial statements in November 2008, and instead its assets and liabilities have

22  been included in Bank of America's financial statements.  Further, many of the

23  same locations, employees, assets and business operations that were formerly CFC

24  continue under the Bank of America Home Loans brand.  CSC, CHL and CCM

25  likewise are now part of Bank of America.  As noted above, Defendant CFC, of

26  which Bank of America is a successor in interest, was a named defendant in the

27  Washington State Complaint, the Amended Luther Complaint, the Consolidated

28  Luther Complaint, the Federal Complaint and the FAC.  These complaints alleged

1   that CFC's conduct relating to the creation and sale of MBS violated the Securities

2   Act.  The claims asserted in this SAC as they relate to CFC were tolled under the

3   Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix**

4   **Exhibits E & F.**

5       39.    Defendant **NB Holdings Corporation** is one of the shell entities used

6   to effectuate the Bank of America-CFC merger, and is a successor to Defendant

7   CHL.  On July 3, 2008, Defendant CHL completed the sale of substantially all of

8   its assets to NB Holdings Corporation, a wholly-owned subsidiary of Bank of

9   America.  As noted above, Defendant CHL, of which Defendant NB Holdings is a

10  successor in interest, was a named defendant in the Initial Luther Complaint, the

11  Washington State Complaint, the Amended Luther Complaint, the Consolidated

12  Luther Complaint, the Federal Complaint and the FAC.  These complaints alleged

13  that CHL's conduct relating to the creation and sale of MBS violated the Securities

14  Act.  The claims asserted in this SAC as they relate to CHL were tolled under the

15  Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix**

16  **Exhibits E & F.**  CFC, CSC, CCM, CHL, Bank of America and NB Holdings

17  Corp. are collectively referred to as the "Countrywide Defendants."

18       **2.    The Issuer Defendants**

19       40.    Defendant CFC structured Defendants CWALT, CWMBS, CWABS,

20  and CWHEQ as limited purpose, wholly-owned, finance subsidiaries to facilitate

21  its issuance and sale of the MBS.  CWALT, CWMBS, CWABS, and CWHEQ

22  were controlled directly by CFC, including by the appointment of CFC executives

23  as directors and officers of these entities.  Revenues flowing from the issuance and

24  sale of MBS issued by CWALT, CWMBS, CWABS and CWHEQ and the Issuing

25  Trusts were passed through to CFC and consolidated into CFC's financial

26  statements.  Defendant CFC, therefore, exercised actual day-to-day control over

27  Defendants CWALT, CWMBS, CWABS, and CWHEQ.

28       41.    Defendant **CWALT, Inc.** was, at times relevant to this Complaint, a

No. 2:10-cv-00302: SECOND AMENDED CLASS ACTION COMPLAINT          17

Delaware corporation and a limited purpose financing subsidiary of CFC. CWALT's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC.  Defendant CWALT served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in **SAC Appendix Exhibit A** and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Issuer | Date | No. of Offerings in SAC |
|---|---|---|---|---|
| 333-110343 | $19,000,000,000 | CWALT, Inc. | January 13, 2004 | 0 |
| 333-117949 | $24,126,942,035 | CWALT, Inc. | September 23, 2004 | 0 |
| 333-123167 | $22,731,808,071 | CWALT, Inc. | April 21, 2005 | 2 |
| 333-125902 | $45,335,287,290 | CWALT, Inc. | July 25, 2005 | 0 |
| 333-131630 | $100,271,785,327 | CWALT, Inc. | March 6, 2006 | 0 |
| 333-140962 | $103,095,483,061 | CWALT, Inc. | April 24, 2007 | 0 |

Defendant CWALT was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC.  These complaints alleged that CWALT's conduct relating to the creation and sale of MBS violated the Securities Act.  The claims asserted in this SAC as they relate to CWALT were tolled under the Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix Exhibits E & F.**

42.     Defendant **CWHEQ, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWHEQ's principal executive offices were located at 4500 Park Granada,

Calabasas, California, the same location as CFC. Defendant CWHEQ served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in **SAC Appendix Exhibit A** and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Issuer | Date | No. of Offerings in SAC |
|---|---|---|---|---|
| 333-121378[2] | $20,000,000,000 | CWHEQ, Inc. | December 17, 2004 | 0 |
| 333-126790 | $30,685,000,000 | CWHEQ, Inc. | August 4, 2005 | 1 |
| 333-132375 | $26,572,949,813 | CWHEQ, Inc. | April 12, 2006 | 2 |
| 333-139891 | $31,717,192,508 | CWHEQ, Inc. | May 22, 2007 | 0 |

Defendant CWHEQ was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC. These complaints alleged that CWHEQ's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to CWHEQ were tolled under the Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix Exhibits E & F**.

43. Defendant **CWABS, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWABS' principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. Defendant CWABS served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in **SAC Appendix Exhibit A** and was an "Issuer" of the Certificates within the

---

[2]   There were no Offerings included in the FAC issued pursuant to this Shelf Registration Statement.

meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Issuer | Date | No. of Offerings in SAC |
|---|---|---|---|---|
| 333-118926 | $60,598,485,932 | CWABS, Inc. | October 18, 2004 | 0 |
| 333-125164 | $46,598,657,434 | CWABS, Inc. | June 10, 2005 | 2 |
| 333-131591 | $34,327,892,523 | CWABS, Inc. | February 21, 2006 | 4 |
| 333-135846 | $40,000,000,000 | CWABS, Inc. | August 8, 2006 | 2 |
| 333-140960 | $113,336,555,700 | CWABS, Inc. | April 24, 2007 | 0 |

Defendant CWABS was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC. These complaints alleged that CWABS' conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to CWABS were tolled under the Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix Exhibits E & F.**

44.     Defendant **CWMBS, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWMBS' principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. Defendant CWMBS served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in **SAC Appendix Exhibit A** and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Issuer | Date | No. of Offerings in SAC |
|---|---|---|---|---|
| 333-100418 | $14,978,548,884 | CWMBS, Inc. | October 28, 2002 | 0 |
| 333-121249 | $20,863,464,518 | CWMBS, Inc. | February 8, 2005 | 0 |
| 333-125963 | $40,742,304,251 | CWMBS, Inc. | July 25, 2005 | 0 |
| 333-131662 | $60,846,662,430 | CWMBS, Inc. | March 6, 2006 | 1 |
| 333-140958 | $144,647,113,029 | CWMBS, Inc. | April 24, 2007 | 0 |

Defendant CWMBS was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC. These complaints alleged that CWMBS' conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to CWMBS were tolled under the Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix Exhibits E & F.**

45. CWALT, CWMBS, CWABS and CWHEQ are collectively referred to herein as the "Issuer Defendants."

### 3. **The Underwriter Defendants**

46. As set forth above, Defendant CSC is an affiliate of CFC, and acted as an underwriter for the Certificates identified in **SAC Appendix Exhibit B** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. As set forth above, Defendant CSC now operates as Bank of America. Defendant CSC, was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC. These complaints alleged that CSC's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to CSC were tolled under the

1    Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix**
2    **Exhibits E & F.**

3         47.    Defendant **Deutsche Bank Securities Inc.** ("Deutsche Bank") acted
4    as an underwriter for the Certificates identified in **SAC Appendix Exhibit B**
5    within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and
6    disseminated the Prospectus Supplements pursuant to which the MBS were sold to
7    Plaintiffs. Defendant Deutsche Bank was a named defendant in the Initial Luther
8    Complaint, the Washington State Complaint, the Amended Luther Complaint, the
9    Consolidated Luther Complaint, the Federal Complaint and the FAC.    These
10   complaints alleged that Deutsche Bank's conduct relating to the creation and sale
11   of MBS violated the Securities Act.  The claims asserted in this SAC as they relate
12   to Deutsche Bank were tolled under the Countrywide Tolling Decision for the
13   Offerings set forth in **SAC Appendix Exhibits E & F.**

14        48.    Defendant **UBS Securities LLC** ("UBS") acted as an underwriter for
15   the MBS identified in **SAC Appendix Exhibit B** within the meaning of the
16   Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the
17   Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.
18   Defendant UBS was a named defendant in the Initial Luther Complaint, the
19   Washington State Complaint, the Amended Luther Complaint, the Consolidated
20   Luther Complaint, the Federal Complaint and the FAC.  These complaints alleged
21   that UBS' conduct relating to the creation and sale of MBS violated the Securities
22   Act.  The claims asserted in this SAC as they relate to UBS were tolled under the
23   Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix**
24   **Exhibits E & F.**

25        49.    Defendant **Morgan Stanley & Co., Inc.** ("Morgan Stanley") acted as
26   an underwriter for the Certificates identified in **SAC Appendix Exhibit B** within
27   the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and
28   disseminated the Prospectus Supplements pursuant to which the MBS were sold to

1    Plaintiffs.  Defendant Morgan Stanley was a named defendant in the Initial Luther

2    Complaint, the Washington State Complaint, the Amended Luther Complaint, the

3    Consolidated Luther Complaint, the Federal Complaint and the FAC.    These

4    complaints alleged that Morgan Stanley's conduct relating to the creation and sale

5    of MBS violated the Securities Act.  The claims asserted in this SAC as they relate

6    to Morgan Stanley were tolled under the Countrywide Tolling Decision for the

7    Offerings set forth in **SAC Appendix Exhibits E & F.**

8         50.    Defendant **Goldman, Sachs & Co.** ("Goldman Sachs") acted as an

9    underwriter for the Certificates identified in **SAC Appendix Ex. B** within the

10   meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and

11   disseminated the Prospectus Supplements pursuant to which the MBS were sold to

12   Plaintiffs.  Defendant Goldman Sachs was a named defendant in the Initial Luther

13   Complaint, the Washington State Complaint, the Amended Luther Complaint, the

14   Consolidated Luther Complaint, the Federal Complaint and the FAC.    These

15   complaints alleged that Goldman Sachs' conduct relating to the creation and sale

16   of MBS violated the Securities Act.  The claims asserted in this SAC as they relate

17   to Goldman Sachs were tolled under the Countrywide Tolling Decision for the

18   Offerings set forth in **SAC Appendix Exhibits E & F.**

19        51.    Defendant **RBS Securities Inc. f/k/a RBS Greenwich Capital d/b/a**

20   **Greenwich Capital Markets, Inc.** ("RBS") acted as an underwriter for the

21   Certificates identified in **SAC Appendix Exhibit B** within the meaning of the

22   Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the

23   Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

24   Defendant RBS was a named defendant in the Initial Luther Complaint, the

25   Washington State Complaint, the Amended Luther Complaint, the Consolidated

26   Luther Complaint, the Federal Complaint and the FAC.  These complaints alleged

27   that RBS' conduct relating to the creation and sale of MBS violated the Securities

28   Act.  The claims asserted in this SAC as they relate to RBS were tolled under the

Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix Exhibits E & F.**

52.    Defendant **Barclays Capital, Inc.** ("Barclays") acted as an underwriter for the Certificates identified in **SAC Appendix Exhibit B** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.    Defendant Barclays was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC.    These complaints alleged that Barclays' conduct relating to the creation and sale of MBS violated the Securities Act.    The claims asserted in this SAC as they relate to Barclays were tolled under the Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix Exhibits E & F.**

53.    Defendant **HSBC Securities (USA) Inc.** ("HSBC") acted as an underwriter for the Certificates identified in **SAC Appendix Exhibit B** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.    Defendant HSBC was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC.    These complaints alleged that HSBC's conduct relating to the creation and sale of MBS violated the Securities Act.    The claims asserted in this SAC as they relate to HSBC were tolled under the Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix Exhibits E & F.**

54.    Defendants CSC, Deutsche Bank, UBS, Morgan Stanley, Goldman Sachs, RBS, Barclays and HSBC are referred to herein as the "Underwriter Defendants." "Underwriter Defendants" also includes Defendant Bank of America as successor in interest as set forth above. Furthermore, Defendants CSC and UBS

1   are referred to herein at times as the **"Section 12 Underwriter Defendants."**

2           **4.**    **The Individual Defendants**

3       55.    Defendant **Stanford L. Kurland** ("Kurland") was, at relevant times,

4   the Chief Executive Officer ("CEO"), President and Chairman of the Board of

5   Directors for CWALT, CWMBS, CWABS and CWHEQ.   Defendant Kurland

6   signed all seven (7) Shelf Registration Statements at issue herein.   Defendant

7   Kurland was concurrently the Executive Vice President and Chief Operating

8   Officer ("COO") of Defendant CFC.   Defendant Kurland was a named defendant

9   in the Initial Luther Complaint, the Washington State Complaint, the Amended

10   Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and

11   the FAC.  These complaints alleged that Kurland's conduct relating to the creation

12   and sale of MBS violated the Securities Act.  The claims asserted in this SAC as

13   they relate to Kurland were tolled under the Countrywide Tolling Decision for the

14   Offerings set forth in **SAC Appendix Exhibits E & F.**

15       56.    Defendant **David A. Spector** ("Spector") was, at relevant times, Vice

16   President and a member of the Board of Directors for CWALT, CWMBS,

17   CWABS and CWHEQ. Defendant Spector signed all seven (7) Shelf Registration

18   Statements at issue herein.    Defendant Spector was concurrently the Senior

19   Managing Director of Secondary Marketing of Defendant CFC.    Defendant

20   Spector was a named defendant in the Initial Luther Complaint, the Washington

21   State Complaint, the Amended Luther Complaint, the Consolidated Luther

22   Complaint, the Federal Complaint and the FAC.  These complaints alleged that

23   Spector's conduct relating to the creation and sale of MBS violated the Securities

24   Act.  The claims asserted in this SAC as they relate to Spector were tolled under

25   the Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix**

26   **Exhibits E & F.**

27       57.    Defendant **Eric P. Sieracki** ("Sieracki") was, at relevant times, the

28   Executive Vice President, CFO, Treasurer and member of the Board of Directors

1    for CWALT, CWMBS, CWABS and CWHEQ.  Defendant Sieracki signed all

2    seven (7) Shelf Registration Statements at issue herein.  Defendant Sieracki was

3    concurrently the Executive Vice President and CFO of Defendant CFC.  Defendant

4    Sieracki was a named defendant in the Initial Luther Complaint, the Washington

5    State Complaint, the Amended Luther Complaint, the Consolidated Luther

6    Complaint, the Federal Complaint and the FAC.  These complaints alleged that

7    Sieracki's conduct relating to the creation and sale of MBS violated the Securities

8    Act.  The claims asserted in this SAC as they relate to Sieracki were tolled under

9    the Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix**

10   **Exhibits E & F.**

11          58.    Defendants Kurland, Spector and Sieracki, are collectively referred to

12   hereinafter as the "Individual Defendants."

13                 **5.    David A. Sambol**

14          59.    Defendant David A. Sambol ("Sambol") was, at relevant times, the

15   President and COO of Defendant CFC.  Defendant Sambol was a control person of

16   the Countrywide Defendants and the Issuing Defendants. .  Defendant Sambol was

17   a named defendant in the Washington State Complaint, the Amended Luther

18   Complaint, the Consolidated Luther Complaint, the Federal Complaint and the

19   FAC.  These complaints alleged that Sambol's role relating to the creation and sale

20   of MBS violated the Securities Act.  The claims asserted in this SAC as they relate

21   to Sambol were tolled under the Countrywide Tolling Decision for the Offerings

22   set forth in **SAC Appendix Exhibits E & F.**

23          **C.    The Issuing Trust Non-Parties**

24          The Issuing Trusts were set up by Defendants CWALT, CWMBS, CWABS

25   and CWHEQ to issue hundreds of billions of dollars worth of Certificates pursuant

26   to the Offering Documents.  **Exhibits A and B** of the SAC Appendix, annexed

27   hereto, identify (1) each Issuing Trust, (2) the stated value of the Certificates it

28   issued, (3) the Registration Statements and Prospectus Supplements pursuant to

which the Certificates were issued and sold, and (4) the identities of the Underwriters, Sponsor/Seller, and Depositor/Issuer for each issuance.

## V.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Defendant CWALT Offerings

60.   Defendant CWALT issued $163,499,734,519.00 of Countrywide MBS in 226 separate Offerings between January 2005 and December 2007 pursuant to six Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements as set forth above in ¶41 and in the FAC at ¶34. The Luther Consolidated Complaint, the Federal Complaint and the FAC all included claims on behalf of 226 CWALT Offerings issued between January 2005 and December 2007. *See* SAC Appendix Exhibit D.

61.   Pursuant to the Court's November 4, 2010 Countrywide Tolling Decision, the allegations set forth herein are limited to those Offerings which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintain standing to pursue Securities Act claims on two (2) Countrywide MBS Offerings issued pursuant to one (1) CWALT Registration Statement, as set forth in detail below.

62.   As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWALT 2005-62 ("2005-62") Certificates, Class 2A1**, pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWALT 2005-62, Class 2A1 | 8,446,540.84 | $1.0003 | August 4, 2006 | Deutsche Bank |

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. OPERS' Section 11 and 15 claims on behalf of all purchasers of the 2005-62 Certificates were tolled in accordance with the Countrywide Tolling Decision since at least June 12, 2008

No. 2:10-cv-00302: SECOND AMENDED CLASS ACTION COMPLAINT          27

when Washington State was named as a plaintiff in the Washington State Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Washington State purchased the 2005-62 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Washington State Complaint, including the Amended Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint and the FAC, included a named plaintiff that had standing to assert the 2005-62 claims. **See SAC Appendix Exhibit E.** As such, Plaintiff OPERS derives tolling from Washington State's standing to pursue those claims.[3] **See SAC Appendix Exhibit F.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to OPERS' custodial statements, was priced at $0.5718, causing OPERS to suffer injury as a result.

63.   As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWALT 2005-72 ("2005-72") Certificates, Class A1,** on the Offering and directly from the underwriter, Defendant UBS, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWALT 2005-72, Class A1 | 16,930,000.00 | $1.0000 | November 21, 2005 | UBS |
| CWALT 2005-72, Class A1 | 13,024,000.00 | $1.0000 | December 15, 2005 | UBS |

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. OPERS' Sections 12(a)(2) and 15 claims on behalf of all purchasers of the 2005-72 Certificates were tolled in

---

[3]   In addition to Washington State's standing to pursue the 2005-62 claims, OPERS relies on the standing of MASH as of the filing of the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, MASH purchased the 2005-62 Certificates and had standing to assert Securities Act claims in connection therewith.

accordance with the Countrywide Tolling Decision since at least September 9,
2008 when PTOE was added as a named plaintiff to the Amended Luther
Complaint.  According to the Certification filed with its motion for lead plaintiff
on April 2, 2010, PTOE purchased the 2005-72 Certificates and had standing to
assert Securities Act claims in connection therewith.  Each complaint filed
subsequent to the Amended Luther Complaint, including the Luther Consolidated
Complaint, the Federal Complaint and the FAC, included a named plaintiff that
had standing to assert the 2005-72 claims.  *See* **SAC Appendix Exhibit E.**  As
such, Plaintiff OPERS derives tolling from PTOE's standing to pursue those
claims.  *See* **SAC Appendix Exhibit F.** As of the date of the filing of the Federal
Action in January 2010, the value of the Certificates had diminished considerably,
and according to OPERS' custodial statements, was priced at $0.6001, causing
OPERS to suffer injury as a result.

### B.  Defendant CWHEQ Offerings

64.  Defendant CWHEQ issued $50,303,553,300.00 of Countrywide MBS
in 39 separate Offerings between August 26, 2005 and August 14, 2007 pursuant to
four Shelf Registration Statements, Original Basic Prospectuses and later-filed
Prospectus Supplements as set forth above in ¶42 and in the FAC at ¶35.   All 39
Offerings were included for the first time in the Washington State Complaint.  *See*
**SAC Appendix Exhibit D.**

65.  Pursuant to the Court's Countrywide Tolling Decision, the allegations
set forth herein are limited to those CWHEQ Offerings which the Luther Plaintiffs
had standing to pursue while the case was pending in California state court.  As a
result, Plaintiffs maintain standing to pursue Securities Act claims on three (3)
Countrywide MBS Offerings issued pursuant to two (2) CWHEQ Registration
Statements, as set forth in detail below.

66.  As set forth below, and also in the Certification annexed hereto,
OPERS purchased the **CWL 2005-H ("2005-H") Certificates, Class 2A,** on the

Offering and directly from the underwriter, Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2005-H, Class 2A | 1,200,000 | $1.0000 | September 27, 2005 | CSC |

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. OPERS' Sections 12(a)(2) and 15 claims on behalf of all purchasers of the 2005-H Certificates were tolled in accordance with the Countrywide Tolling Decision since at least September 9, 2008 when PTOE was added as a named plaintiff to the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, PTOE purchased the 2005-H Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint and the FAC, included a named plaintiff that had standing to assert the 2005-H Claims. *See* **SAC Appendix Exhibit E.** As such, Plaintiff OPERS derives tolling from PTOE's standing to pursue those claims. *See* **SAC Appendix Exhibit F.** OPERS disposed of the 2005-H Certificates in the open market on October 19, 2007 at a price of $0.9700, and suffered injury as a result.

67. As set forth below, and also in the Certification annexed hereto, IPERS purchased the **CWL 2006-S3 ("2006-S3") Certificates, Class A2**, on the Offering and directly from the Underwriter, Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-S3, Class A2 | 1,999,956.46 | $1.0000 | June 16, 2006 | CSC |

Lead Plaintiff IPERS was named as a representative Plaintiff in the Federal Action

for the first time on July 13, 2010, when the FAC was filed. IPERS' Sections 11, 12(a)(2) and 15 claims on behalf of all purchasers of the 2006-S3 Certificates were tolled in accordance with the Countrywide Tolling Decision since at least June 12, 2008 – the date the Washington State Complaint was filed. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Washington State purchased the 2006-S3 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Washington State Complaint, including the Amended Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint and the FAC, included a named plaintiff that had standing to assert the 2006-S3 claims. *See* **SAC Appendix Exhibit E.** As such, IPERS derives tolling from Washington State's standing to pursue those claims.[4] *See* **SAC Appendix Exhibit F.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to IPERS' custodial statements, was priced at $0.6300, causing IPERS to suffer injury as a result.

68. As set forth below, and also in the Certification annexed hereto, IPERS purchased the **CWL 2006-S9 ("2006-S9") Certificates, Class A2,** on the Offering and directly from the Underwriter, Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-S9, Class A2 | 1,845,000.00 | $1.0000 | December 14, 2006 | CSC |

Lead Plaintiff IPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. IPERS' Sections 11,

---

[4]    In addition to Washington State's standing to pursue the 2006-S3 claims, IPERS relies on the standing of Vermont as of the filing of the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Vermont purchased the 2006-S3 Certificates and had standing to assert Securities Act claims in connection therewith.

No. 2:10-cv-00302: SECOND AMENDED CLASS ACTION COMPLAINT          31

1   12(a)(2) and 15 claims on behalf of all purchasers of the 2006-S9 Certificates were

2   tolled in accordance with the Countrywide Tolling Decision since at least June 12,

3   2008 – the date the Washington State Complaint was filed.   According to the

4   Certification filed with its motion for lead plaintiff on April 2, 2010, Washington

5   State purchased the 2006-S9 Certificates and had standing to assert Securities Act

6   claims in connection therewith.     Each complaint filed subsequent to the

7   Washington State Complaint, including the Amended Luther Complaint, the

8   Luther Consolidated Complaint, the Federal Complaint and the FAC, included a

9   named plaintiff that had standing to assert the 2006-S9 claims.   *See* **SAC**

10  **Appendix Exhibit E.**   As such, IPERS derives tolling from Washington State's

11  standing to pursue those claims.[5]  *See* **SAC Appendix Exhibit F.**   As of the date

12  of the filing of the Federal Action in January 2010, the value of the Certificates had

13  diminished considerably, and according to IPERS' custodial statements, was priced

14  at $0.6318, causing IPERS to suffer injury as a result.

15      **C.**     **Defendant CWABS Offerings**

16      69.     Defendant CWABS issued $82,129,061,400.00 of Countrywide MBS

17  in 76 separate Offerings between June 2005 and October 2007 pursuant to four

18  Shelf Registration Statements, Original Basic Prospectuses and later-filed

19  Prospectus Supplements as set forth above in ¶43 and in the FAC at ¶36.   All 76

20  Offerings were included, for the first time, in the Washington State Complaint and

21  thereafter included in the Luther Amended Complaint, Consolidated Luther

22  Complaint, Federal Complaint and FAC.   *See* **SAC Appendix Exhibit D.**

23      70.     Pursuant to the Court's Countrywide Tolling Decision, the allegations

24  set forth herein are limited to those CWABS Offerings which the Luther Plaintiffs

25  had standing to pursue while the case was pending in California state court.   As a

---

[5]     In addition to Washington State's standing to pursue the 2006-S9 claims, IPERS relies on the standing of Vermont as of the filing of the Amended Luther Complaint.   According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Vermont purchased the 2006-S9 Certificates and had standing to assert Securities Act claims in connection therewith.

result, Plaintiffs maintain standing to pursue Securities Act claims on eight (8) Countrywide MBS Offerings issued pursuant to three (3) CWABS Registration Statements, as set forth in detail below.

71.     As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2005-11 ("2005-11") Certificates, Class AF3**, on the Offering and directly from the Underwriter, Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2005-11, Class AF3 | 1,000,000.00 | $1.0000 | September 12, 2005 | CSC |

Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed.  GBPHB's Sections 12(a)(2) and 15 claims on behalf of all purchasers of the 2005-11 Certificates were tolled in accordance with the Countrywide Tolling Decision since at least September 9, 2008 when PTOE was added as a named plaintiff to the Amended Luther Complaint.  According to the Certification filed with its motion for lead plaintiff on April 2, 2010, PTOE purchased the 2005-11 Certificates and had standing to assert Securities Act claims in connection therewith.  Each complaint filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint and the FAC, included a named plaintiff that had standing to assert the 2005-11 claims.  ***See* SAC Appendix Exhibit E.**  As such, Plaintiff GBPHB derives tolling from PTOE's standing to pursue those claims.  ***See* SAC Appendix Exhibit F.**  GBPHB disposed of the 2005-11 Certificates in the open market on September 28, 2009 at a price of $0.7500, and suffered injury as a result.

72.     As set forth below, and also in the Certification annexed hereto, OCERS purchased the **CWHL 2005-HYB9 ("2005-HYB9") Certificates, Class 3A2A**, on the Offering and directly from the Underwriter, Defendant CSC,

pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWHL 2005-HYB9, Class 3A2A | 400,000.00 | $0.9972 | November 28, 2005 | CSC |

73.     Plaintiff OCERS was named as the Lead Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. OCERS' Section 12(a)(2) and Section 15 claims on behalf of all purchasers of the 2005-HYB9 Certificates were tolled in accordance with the Countrywide Tolling Decision since at least October 16, 2008 when Maine was added as a named plaintiff to the Luther Consolidated Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Maine purchased the 2005-HYB9 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Luther Consolidated Complaint, including the Federal Complaint and the FAC, included a named plaintiff that had standing to assert the 2005-HYB9 claims. *See* **SAC Appendix Exhibit E.** As such, Plaintiff OCERS derives tolling from Maine's standing to pursue those claims. *See* **SAC Appendix Exhibit F.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to OCERS' custodial statements, was priced at $0.6772, causing OCERS to suffer injury as a result.

74.     As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2006-3 ("2006-3") Certificates, Class 2A2** pursuant and traceable to the misleading Offering Documents, and **Class M2** on the Offering and directly from the Underwriter, Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-3, Class 2A2 | 1,030,000.00 | $0.9938 | July 23, 2007 | CSC |
| CWL 2006-3, Class M2 | 2,500,000.00 | $1.0000 | February 16, 2006 | CSC |

Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed.  GBPHB's Sections 11, 12(a)(2) and 15 claims on behalf of all purchasers of the 2006-3 Certificates were tolled in accordance with the Countrywide Tolling Decision since at least October 16, 2008 when Maine was added as a named plaintiff to the Luther Consolidated Complaint.  According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Maine purchased the 2006-3 Certificates and had standing to assert Securities Act claims in connection therewith.   Each complaint filed subsequent to the Luther Consolidated Complaint, including the Federal Complaint and the FAC, included a named plaintiff that had standing to assert the 2006-3 claims. *See* **SAC Appendix Exhibit E.**   As such, Plaintiff GBPHB derives tolling from Maine's standing to pursue those claims. *See* **SAC Appendix Exhibit F.** As of the date of the filing of the Federal Action in January 2010, the values of the Class 2A2 and Class M2 Certificates had diminished considerably, and according to GBPHB's custodial statements, were priced at $0.8216 and $0.0383, respectively, causing GBPHB to suffer injury as a result.

75.    As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2006-6 ("2006-6") Certificates, Class 2A2** pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-6, Class 2A2 | 1,290,000.00 | $0.9938 | July 23, 2007 | CSC |

Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed.  GBPHB's Sections 11 and

15 claims on behalf of all purchasers of the 2006-6 Certificates were tolled in accordance with the Countrywide Tolling Decision since at least October 16, 2008 when Maine was added as a named plaintiff to the Luther Consolidated Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Maine purchased the 2006-6 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Luther Consolidated Complaint, including the Federal Complaint and the FAC, included a named plaintiff that had standing to assert the 2006-6 claims. **_See_ SAC Appendix Exhibit E.** As such, Plaintiff GBPHB derives tolling from Maine's standing to pursue those claims. **_See_ SAC Appendix Exhibit F.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to GBPHB's custodial statements, was priced at $0.7697, causing GBPHB to suffer injury as a result.

76. As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2006-9 ("2006-9") Certificates, Class 1AF3 and Class 1AF6** pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-9, Class 1AF3 | 1.000,000.00 | $1.0048 | April 27, 2007 | BOAS |
| CWL 2006-9, Class 1AF6 | 500,000.00 | $1.0150 | April 5, 2007 | JPMSI |

Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. GBPHB's Sections 11 and 15 claims on behalf of all purchasers of the 2006-9 Certificates were tolled in accordance with the Countrywide Tolling Decision since at least September 9, 2008 when Vermont was added as an additional named plaintiff to the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Vermont purchased the 2006-9 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint

filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint and the FAC, included a named plaintiff that had standing to assert the 2006-9 claims. ***See* SAC Appendix Exhibit E.** As such, Plaintiff GBPHB derives tolling from Vermont's standing to pursue those claims. ***See* SAC Appendix Exhibit F.** GBPHB disposed of the 2006-9 Class 1AF3 Certificates in the open market on April 15, 2009 at a price of $0.3075, and suffered injury as a result. Furthermore, GBPHB disposed of the 2006-9 Class 1AF6 Certificates in the open market on March 27, 2009 at a price of $0.3300, and suffered injury as a result.

77.    As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2006-11 ("2006-11") Certificates, Class 1AF3 and Class 1AF4** pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-11, Class 1AF3 | 595,000.00 | $0.9900 | September 14, 2007 | BOAS |
| CWL 2006-11, Class 1AF4 | 1,000,000.00 | $1.0264 | September 28, 2006 | Stifel Nicolaus |

Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. GBPHB's Sections 11 and 15 claims on behalf of all purchasers of the 2006-11 Certificates were tolled in accordance with the Countrywide Tolling Decision since at least June 12, 2008 when Washington State was named as a plaintiff in the Washington State Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Washington State purchased the 2006-11 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Washington State Complaint, including the Amended Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint and the FAC, included a named plaintiff that had standing to assert the 2006-11 claims.

*See* **SAC Appendix Exhibit E.**  As such, Plaintiff GBPHB derives tolling from Washington State's standing to pursue those claims.[6]  *See* **SAC Appendix Exhibit F.**  GBPHB disposed of the 2006-11 Class 1AF3 and 1AF4 Certificates in the open market on April 23, 2009 at prices of $0.3200 and $0.2244, respectively, and suffered injury as a result.

78.    As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2006-15 ("2006-15") Certificates, Class A1** on the Offering and directly from the Underwriter, Defendant CSC, pursuant to the misleading Offering Documents, and **Class A6** pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-15, Class A1 | 1,400,000.00 | $1.0000 | August 23, 2006 | CSC |
| CWL 2006-15, Class A1 | 224,912.98 | $0.9964 | October 4, 2007 | JPMSI |
| CWL 2006-15, Class A6 | 350,000.00 | $1.0086 | January 3, 2007 | BOAS |

Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed.  GBPHB's Sections 11, 12(a)(2) and 15 claims on behalf of all purchasers of the 2006-15 Certificates were tolled in accordance with the Countrywide Tolling Decision since at least June 12, 2008 when Washington State was named as a plaintiff in the Washington State Complaint.  According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Washington State purchased the 2006-15 Certificates and had standing to assert Securities Act claims in connection therewith.  Each complaint filed subsequent to the Washington State Complaint, including the Amended

---

[6]    In addition to Washington State's standing to pursue the 2006-11 claims, GBPHB relies on the standing of Vermont as of the filing of the Amended Luther Complaint.  According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Vermont purchased the 2006-11 Certificates and had standing to assert Securities Act claims in connection therewith.

1    Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint and

2    the FAC, included a named plaintiff that had standing to assert the 2006-15 claims.

3    *See* **SAC Appendix Exhibit E.**  As such, Plaintiff GBPHB derives tolling from

4    Washington State's standing to pursue those claims.[7]  *See* **SAC Appendix Exhibit**

5    **F.**  As of the date of the filing of the Federal Action in January 2010, the value of

6    the Class A1 Certificates had diminished considerably, and according to GBPHB's

7    custodial statements, was priced at $0.9698, causing GBPHB to suffer injury as a

8    result.  GBPHB disposed of the 2006-15 Class A6 Certificates in the open market

9    on April 8, 2009 at a price of $0.4113, and suffered injury as a result.

10         79.    As set forth below, and also in the Certification annexed hereto,

11   GBPHB purchased the **CWL 2006-24 ("2006-24") Certificates, Class 2A1**

12   pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-24, Class 2A1 | 385,809.66 | $0.9927 | October 12, 2007 | Morgan Stanley |

16         80.    Plaintiff GBPHB was named as a representative Plaintiff in the

17   Federal Action for the first time on July 13, 2010 when the FAC was filed.

18   GBPHB's Sections 11 and 15 claims on behalf of all purchasers of the 2006-24

19   Certificates were tolled in accordance with the Countrywide Tolling Decision since

20   at least September 9, 2008 when Vermont was added as an additional named

21   plaintiff to the Amended Luther Complaint.  According to the Certification filed

22   with its motion for lead plaintiff on April 2, 2010, Vermont purchased the 2006-24

23   Certificates and had standing to assert Securities Act claims in connection

24   therewith.  Each complaint filed subsequent to the Amended Luther Complaint,

25   including the Luther Consolidated Complaint, the Federal Complaint and the FAC,

---

[7]    In addition to Washington State's standing to pursue the 2006-15 claims,
GBPHB relies on the standing of Vermont as of the filing of the Amended Luther
Complaint.  According to the Certification filed with its motion for lead plaintiff
on April 2, 2010, Vermont purchased the 2006-15 Certificates and had standing to
assert Securities Act claims in connection therewith.

No. 2:10-cv-00302: SECOND AMENDED CLASS ACTION COMPLAINT          39

included a named plaintiff that had standing to assert the 2006-24 claims. *See* **SAC Appendix Exhibit E.**   As such, Plaintiff GBPHB derives tolling from Vermont's standing to pursue those claims. *See* **SAC Appendix Exhibit F.**  As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to GBPHB's custodial statements, was priced at $0.9428, causing GBPHB to suffer injury as a result.

### D.   Defendant CWMBS Offerings

81.   Defendant CWMBS issued $56,178,680,394 of Countrywide MBS in 87 separate Offerings between June 2005 and October 2007 pursuant to five Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements as set forth above in ¶44 herein and in the FAC at ¶37.   All 87 Offerings were included, for the first time, in the Washington State Complaint and thereafter included in the Luther Amended Complaint, Consolidated Luther Complaint, Federal Complaint and FAC. *See* **SAC Appendix Exhibit D.**

82.   Pursuant to the Court's Countrywide Tolling Decision, the allegations set forth herein are limited to those CWMBS Offerings which the Luther Plaintiffs had standing to pursue while the case was pending in California state court.  As a result, Plaintiffs maintain standing to pursue Securities Act claims on one (1) Countrywide MBS Offering issued pursuant to one (1) CWMBS Registration Statement, as set forth in detail below.

83.   As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWHL 2006-HYB3 ("2006-HYB3") Certificates, Class 2A1A**, pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWHL 2006-HYB3, Class 2A1A | 1,076,000.00 | $1.0002 | April 27, 2006 | CSS |
| CWHL 2006-HYB3, Class 2A1A | 154,493.47 | $0.9919 | August 21, 2007 | CSC |

1   Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for

2   the first time on July 13, 2010 when the FAC was filed.  OPERS' Sections 11 and

3   15 claims on behalf of all purchasers of the 2006-HYB3 Certificates were tolled in

4   accordance with the Countrywide Tolling Decision since at least June 12, 2008

5   when Washington State was named as a plaintiff in the Washington State

6   Complaint.  According to the Certification filed with its motion for lead plaintiff

7   on April 2, 2010, Washington State purchased the 2006-HYB3 Certificates and had

8   standing to assert Securities Act claims in connection therewith.  Each complaint

9   filed subsequent to the Washington State Complaint, including the Amended

10  Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint and

11  the FAC, included a named plaintiff that had standing to assert the 2006-HYB3

12  Claims.  *See* **SAC Appendix Exhibit E.**  As such, Plaintiff OPERS derives tolling

13  from Washington State's standing to pursue those claims.[8]  *See* **SAC Appendix**

14  **Exhibit F.**  As of the date of the filing of the Federal Action in January 2010, the

15  value of the Certificates had diminished considerably, and according to OPERS'

16  custodial statements, was priced at $0.6877, causing OPERS to suffer injury as a

17  result.

18  **VI.   BACKGROUND**

19

20  **A.      Countrywide Was a Leading Issuer and Underwriter of**
           **Mortgage-Backed Securities**

21

22       84.    As illustrated below, a mortgage securitization is where mortgage

23  loans are acquired, pooled together, and then sold to investors, who acquire rights

24  in the income flowing from the mortgage pools.

25

26  _____

    [8]      In addition to Washington State's standing to pursue the 2006-HYB3 claims,
27  OPERS relies on the standing of MASH as of the filing of the Amended Luther
    Complaint.  According to the Certification filed with its motion for lead plaintiff
28  on April 2, 2010, MASH purchased the 2006-HYB3 Certificates and had standing
    to assert Securities Act claims in connection therewith.

**Follow the Mortgage** What happens to your mortgage after you sign on the dotted line

85.     When mortgage borrowers make interest and principal payments, the cash flow is distributed to the holders of MBS certificates in order of priority, based on the specific tranche held.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.  Because the lower tranches are designed to provide a cushion, diminished cash flows to the lower tranches results in impaired value of the higher tranches, as, among other reasons, there is less certainty of the continued cash flows to the higher tranches.

86.     The securitization of loans fundamentally shifts the risk of loss from mortgage loan originators to investors who purchase an interest in the securitized pool of loans.  When the originator holds a mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan.   As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  In securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing

borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

87.   In the 1980s and 1990s, securitizations were generally within the domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators. Investors in these early GSE securitizations were provided protections since the underlying loans were originated pursuant to strict underwriting guidelines.

88.   Between 2001 and 2006, however, there was dramatic growth in non-GSE loan originations and securitizations such that non-GSE securitizations grew 330%, becoming a $1.48 trillion industry.

89.   The market for adjustable rate mortgages ("ARMs"), including interest-only and negative amortization loans, grew concurrently with the boom in subprime and Alt-A loan originations and securitizations.  ARMs increased from $355 billion in 2001 to $1.3 trillion in 2006.  Mortgage Market Statistical Annual, Vol. 1 (2007), at 4.  Such growth coincided with the increase in popularity of so-called "exotic" or non-traditional ARMs which had fixed interest rates for a limited period before "resetting" during the life of the loan to significantly higher adjustable rates.   These non-traditional ARMs included "2/28 or 3/27 ARMs" (many with below-market teaser rates for two or three years before conversion to the fully-indexed rate); interest-only ARMs (permitting interest-only payments for a set period of time during which the rate may fluctuate, resulting in negative amortization and rising principal); option payment ARMs (offering up to four payment options, including minimum and interest-only payments, which, if chosen, result in negative amortization and rising principal); and 40-year ARMs (in which payments are calculated based on a 40-year payment term but where the loan terminates in 30 years, resulting in a final balloon payment).  Origination of non-traditional ARMs increased 278% between 2004 and 2006 – from $205 billion

to $775 billion.  Mortgage Market Statistical Annual, Vol. 1 (2007), at 6.

90.    Here, the Certificate collateral was composed of a substantial number of non-traditional adjustable mortgages, interest-only and negative amortization loans.  These types of loans presented the greatest potential for "payment shock" to the borrower since they provided for initially small monthly payments based on low fixed rates which then reset thereafter to significantly higher monthly payment amounts based on adjustable interest rates.   Although these loans were not traditional, the underwriting guidelines still required the loans to be originated responsibly and in accordance with those guidelines.   Yet, Countrywide would routinely provide loans to borrowers who could only afford the short-term "teaser" rates (or, even to those that could not even afford the teaser rates) – not the full payments that would be required after the short-term rates reset.  Although these types of loans were designed for high net worth investors who were capable of earning higher returns through investment than in making interest and principal payments upfront, Countrywide routinely sold these loans to unsophisticated borrowers who were unable to make the required payments after the loans reset – and frequently, to those who could not even make the "teaser" payments, leading to early defaults on the loans.

**B.    Countrywide's Origination and Securitization Operations**

91.    CFC set up Defendants CWALT, CWMBS, CWABS, and CWHEQ, the Depositors in this case, as "limited purpose finance entities" solely for the purpose of facilitating the issuance of the Certificates.  CHL acted as the servicer of the mortgages and CSC, Countrywide's underwriting division, along with the other Underwriter Defendants, marketed and sold the securities.   Although Defendants CWALT, CWMBS, CWABS, and CWHEQ served as the Depositors for the Issuing Trusts and issued the Registration Statements, this process was directed and controlled by the Countrywide Defendants, the Individual Defendants, and Sambol.

92.     With respect to the Certificates at issue here, the Registration Statements and each of the Prospectus Supplements contained material misstatements concerning, *inter alia*, the quality of the loans supporting the MBS associated with each trust, including, specifically, statements about (1) the underwriting process and standards by which mortgages held by the Issuing Trusts were originated, and (2) the values of the real estate securing the mortgages pooled in the Issuing Trusts, expressed in part as the average LTV ratios of the underlying mortgages and the appraisal standards by which such real estate values were obtained.

93.     Each MBS sold to Plaintiffs was sold pursuant to a Registration Statement.  The Prospectus Supplements, which were filed at the time that the Certificates were sold to Plaintiffs, incorporated by reference each of the Registration Statements they were issued pursuant to.   The Prospectus Supplements contained specific disclosures concerning each Issuing Trust. Nonetheless, in each Prospectus Supplement, as set forth herein, the Issuer Defendants and the Underwriter Defendants made the same representations concerning CHL's standards in originating the mortgages and valuing the properties underlying the Issuing Trusts.

94.     CWALT filed six Registration Statements with the SEC, *see* **SAC Appendix Exhibit C**, registering mortgage-backed securities backed primarily by:

  a)    first lien mortgage loans secured by one- to four-family residential properties;

  b)    mortgage loans secured by first liens on small multi-family residential properties, such as residential apartment buildings or projects containing five to fifty residential units;

  c)    collections arising from one or more types of the loans described above which are not used to make payments on securities issued by a trust fund, including excess servicing fees and prepayment charges;

d)   mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or

e)   mortgage-backed securities evidencing an interest in, or secured by, loans of the type that would otherwise be eligible to be loans included in a trust fund and issued by entities other than Ginnie Mae, Fannie Mae, or Freddie Mac.

95.   CWHEQ filed four Registration Statements with the SEC, *see* **SAC Appendix Exhibit C**, registering mortgage-backed securities backed primarily by:

a)   first lien mortgage loans secured by first and/or subordinate liens on one- to four-family residential properties;

b)   closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties; or

c)   home improvement loans, secured by first or subordinate liens on one- to four-family residential properties or by personal property security interests, and home improvement sales contracts, secured by personal property security interests.

96.   CWABS filed five Registration Statements with the SEC *see* **SAC Appendix Exhibit C**, registering mortgage-backed securities backed primarily by:

a)   first lien mortgage loans secured by one- to four-family residential properties;

b)   mortgage loans secured by first liens on small multi-family residential properties, such as residential apartment buildings or projects containing five to fifty residential units;

c)   closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties; or

d) home improvement loans, secured by first or subordinate liens on one- to four-family residential properties or by personal property security interests, and home improvement sales contracts, secured by personal property security interests.

97. CWMBS filed five Registration Statements with the SEC, *see* **SAC Appendix Exhibit C**, registering mortgage-backed securities backed primarily by:

a) first lien mortgage loans secured by one- to four-family residential properties or participations in that type of loan;

b) mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or

c) private mortgage-backed securities backed by first lien mortgage loans secured by one- to four-family residential properties or participations in that type of loan.

98. Prior to securitization, Countrywide sent the "Loan Level File" to the Rating Agencies to enable them to rate the Certificates. Upon receipt of the "Loan Level File," S&P would run the loan tape through both its "LEVELS" and "SPIRE" Models. Moody's would run the loan tape through its M-3 Model. These models analyzed 50-80 loan characteristics (*e.g.,* FICO score, LTV ratio, property location, etc.), in order to estimate the number of loans that were likely to default and the corresponding amount of the dollar loss resulting from such default.

99. As a condition to the issuance of the Certificates, the Rating Agencies had to assign pre-determined ratings to the Certificates. Yet, as detailed herein, the ratings at the time of issuance were vastly higher than they should have been and failed to represent the true value of the Certificates due to incorrect information provided by Countrywide and widespread misrepresentations in the origination process. Accordingly, despite the fact that the Rating Agencies assigned investment-grade ratings, the Certificates were far riskier than other investments with the same ratings.

100.   The models purported to calculate the amount of "credit enhancement" required to assign a specific set of Certificates "AAA" ratings.  As a result of relatively low levels of credit enhancement being required, as reflected in **SAC Appendix Exhibit G**, 90% of the Certificates were assigned AAA/maximum safety ratings.

101.   These ratings, although based on inaccurate assumptions, were critical to institutional investors – public pension funds, banks, insurance companies and mutual funds – whose investment guidelines restrict investments based on a security's rating.

VII.   Evidence of SYstemic Disregard of Stated Loan Origination Guidelines Contained IN Offering documents

A.   **Exponential Increase in Certificate Default Rates in Months After Issuance No Matter When Offering Occurred Evidences Disregard of Origination Guidelines**

102.   The defective nature of the mortgage collateral underlying the Certificates is reflected by the recurring pattern of exponential increases in borrower delinquencies in the months after each of the Offerings was commenced.

103.   Four months after each of the Offerings was commenced, borrower delinquency and default rates on the underlying mortgage collateral had increased by a staggering 1,816% – from an average of 0.14% to over 2.7% of the mortgage loan balance.  By the sixth month after issuance of the Certificates, delinquency and default rates had increased 3,064% to an average of 4.5% of the mortgage loan balance.  And shockingly, by 12 months after the Offering date, delinquency and default rates had increased 8,508% from issuance to 12.1% of the mortgage loan balance.   Borrower default and delinquency rates in the underlying mortgage collateral have continued to increase.

104.   These early payment defaults and delinquency rates are reflective of a systematic disregard for underwriting guidelines.  As reported by the Federal

Bureau of Investigation ("FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications. The study cited by the FBI and conducted by Base Point Analytics found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not. The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more and fictitious employers and falsified tax returns. The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., in concluding that the top states for mortgage fraud – including the states where the MBS collateral was principally originated – were also the top states with the highest percentage of early payment defaults.

105.   As set forth above, it is now apparent that Countrywide mortgage originators routinely encouraged such misstatements in loan applications. Unsurprisingly, this has resulted in dismal performance of the loans. As of the filing of the Amended Luther Complaint in October 2008, borrower delinquency and default rates had risen to an average of approximately 42% of the mortgage loan collateral underlying the Certificates, forcing the Rating Agencies to downgrade substantially all of the Certificates to at or near junk bond status. As of the date of the filing of the complaint in the above-captioned action in January 2010, *over 59%* of mortgage collateral was considered to be in some form of delinquency or default, with *over 85%* of the mortgage loans underlying the Offerings issued by Defendant CWALT at issue herein being delinquent or in default.

106.   Despite assurances by the Defendants in the Offering Documents that the mortgage loans collateralizing the Certificates were originated pursuant to Countrywide's stated guidelines, nothing could have been further from the truth.

**B.   Rating Agencies Collapsed Certificate Ratings to "Junk Bond" Levels Due to Undisclosed "Aggressive Underwriting" Practices**

107.   The Rating Agencies rated the Certificates pursuant to the following twenty-three (23) level rating system:

| | | Definition | Moodys | S & P. | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P. | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

108.   As noted above, the Rating Agencies initially assigned the highest ratings of AAA/maximum safety to 90%, or $16.03 billion, of the Certificates at issue herein.

109.   As of the filing of this Complaint, as set forth directly above, the underlying collateral has largely failed, with *over 60%* of the total mortgage loan balance now severely delinquent, in default, repossessed, in bankruptcy or in foreclosure. This performance was an indication to the Rating Agencies, including

S&P and Moody's, of pervasive underwriting failures in the origination of the collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes.

110.   On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous Certificates because the performance of the underlying collateral "called into question" the accuracy of the loan data.  This announcement triggered several government investigations which only began reporting their findings in 2008.  Specifically, S&P announced that it was revising its methodology assumption to require increased "credit protection" for rated transactions.  S&P reiterated that it would also seek in the future to review and minimize the incidence of potential underwriting abuse given "the level of *loosened underwriting* at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

111.   One day later, on July 11, 2007, Moody's announced it was also revising its methodology used to rate the Certificates, and anticipated Certificate downgrades in the future.  Moody's did in fact significantly downgrade most of the Certificate classes, noting "aggressive underwriting" used in the origination of the collateral.

112.   As a result, the Certificates were downgraded as many as 22 levels with, for example, 90%, or $14.5 billion, of the total $16.03 billion of Certificates initially rated AAA/maximum safety now having been downgraded from AAA to "Ba1" or below, meaning these Certificates were not only designated "junk bonds," but were assessed to be in danger of "imminent default."  Over 93%, or $16.6 billion, of the Certificate tranches have now been downgraded, with 91%, or $16.2 billion, of the total Certificates at issue having now been downgraded to speculative "junk" status.

113.   Countrywide's systematic disregard for its underwriting guidelines led to dramatic downgrades of the Certificates as set forth directly above.  Currently,

91% ($14.5 billion) of the $17.83 billion of Certificates initially rated AAA/maximum safety have been downgraded to speculative "junk" status or below. Delinquency and default rates on the Countrywide loans in the Certificates have risen exponentially by over 41,000% since issuance of the Certificates – from 0.14% as of the respective Offering dates to *over 60%* as of May 2010.

114. Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to the loan originators which further evidenced that they had engaged in underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statements and Prospectus Supplements.

C.     Numerous Government Investigations Reveal the Falsity of the Offering Documents

115. Although the poor performance of the MBS alone strongly suggests that Countrywide's lending practices were far from was disclosed in the Prospectus Supplements, there is substantial additional evidence that also indicates that the statements in the Prospectus Supplements about loan quality and loan underwriting practices were materially inaccurate.  Among this evidence are statements by former Countrywide employees, facts which have emerged in ongoing litigation involving the SEC (including a recent judicial opinion dealing with disclosures by Countrywide), facts set out in complaints filed by state attorneys general, facts set out in filings by private litigants and information from press reports and other sources.

116. Taken together, these facts indicate that, while the Offering Documents represented that Countrywide's underwriting of mortgages was designed to ensure the borrower's ability to repay the mortgage and the adequacy of the collateral supporting the mortgage, in reality Countrywide's underwriting practices were actually designed to originate as many mortgage loans as possible without regard to the ability of borrowers to afford such mortgages.  Indeed,

contrary to the representations in the Registration Statements and Prospectus Supplements, it has now been revealed that Countrywide's loan originators systemically disregarded and/or manipulated the income, assets and employment status of borrowers seeking mortgage loans in order to qualify these borrowers for mortgages that were then pooled and used as collateral for the MBS sold to Plaintiffs. In many instances, this was done by inflating borrowers' stated income, or facilitating income inflation by encouraging ineligible borrowers to resort to "no documentation loans" and "stated income loans." In other cases, Countrywide customers were steered to more expensive, higher interest loans, such as subprime and "alternative" mortgages, which they would not likely be able to repay, because making such loans allowed Countrywide to increase the number of attractive mortgages it could sell to the secondary mortgage markets. As set forth below, Countrywide's notorious origination practices were pervasive throughout the United States and throughout the time period during which the Offerings were issued.

117.   On or about March 10, 2008, the FBI disclosed that it had initiated a probe into Countrywide's mortgage lending practices, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and Countrywide's specific instructions to underwriters not to scrutinize certain types of loans it issued. The next day, *The Wall Street Journal* published an article detailing the FBI investigation of Countrywide's lending practices. According to the sources interviewed by *The Wall Street Journal*, federal investigators were finding that "Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients, according to people involved in the matter. The company packaged many of those mortgages into securities and sold them to investors, raising the additional question of whether Countrywide understated the risks such investments carried." Subsequently, on April 2, 2008, a federal

1    bankruptcy judge overseeing the proceedings of more than 300 Countrywide-

2    related bankruptcies ordered a further inquiry into the misconduct, and specifically,

3    the illegal inflation of fees throughout the loan process that had been occurring at

4    Countrywide.

5        118. On June 4, 2009, the SEC filed a complaint against Mozilo,

6    Countrywide's former Chief Executive Officer, and against two Defendants in this

7    case, Sambol and Sieracki (the "SEC Complaint"). The SEC Complaint alleges

8    that the defendants in that case made material false statements in Countrywide's

9    SEC filings and in other forums about the quality of Countrywide's residential

10    mortgage loans and about the underwriting process for those loans. According to

11    the SEC, the underwriting process for Countrywide loans was far less rigorous than

12    what the defendants in that case had stated and, consequently, the quality of

13    Countrywide's loans was much poorer than was indicated by those public

14    statements.

15        119. The basis for the allegations in the SEC Complaint – that

16    Countrywide and its officers substantially overstated the quality of the company's

17    residential mortgage loan underwriting and, as a result, issued mortgage loans of a

18    far worse quality than Countrywide publicly disclosed – are materially similar to

19    the allegations made by Plaintiffs in this case. Although the statements targeted by

20    the SEC were made to Countrywide's shareholders in SEC filings, statements

21    made in Offering Documents for securities that securitized the mortgage collateral

22    were similarly false and misleading to MBS investors.

23        120. The SEC Complaint alleges, among other things:

24

25          • Countrywide embarked on a strategy of underwriting a
       higher number of exception loans. The SEC alleges that

26            "[t]he elevated number of exceptions resulted largely
       from Countrywide's use of exceptions as part of its

27            matching strategy to introduce new guidelines and
       product changes." SEC Complaint, ¶ 29. By February

28

2007, internal risk management "noted that the production divisions continued to advocate for, and operated pursuant to, an approach based upon the matching strategy alone. ... Additionally, [a senior risk management employee warned [Sambol] that, 'I doubt this approach would play well with regulators, investors, rating agencies etc. *To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines.*'" SEC Complaint, ¶ 44 (emphasis added).

- Countrywide's risk management reported to the credit risk committee on June 28, 2005, that there was "evidence of borrowers misrepresenting their income and occupation on reduced documentation loan applications." SEC Complaint, ¶ 37.

- By June 2006 "both Mozilo and Sambol were aware ... that a significant percentage of borrowers who were taking out stated income loans were engaged in mortgage fraud." SEC Complaint, ¶ 40. For example, "[o]n June 2, 2006, Sambol received an email reporting on the results of a quality control audit at Countrywide Bank that showed that 50% of the stated income loans audited by the bank showed a variance in income from the borrowers' IRS filings of greater than 10%. Of those, 69% had an income variance of greater than 50%." *Id.*

- Angelo Mozilo, Countrywide's CEO, noted in an April 13, 2006 email "that he had 'personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan [*sic*].'" SEC Complaint, ¶ 49.

- A December 13, 2007 internal Countrywide memorandum reveals, "'Countrywide had reviewed limited samples of first- and second-trust-deed mortgages originated by Countrywide Bank during the fourth quarter of 2006 and the first quarter of 2007 in order to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures. The review resulted in

... the finding that borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans. More specifically, debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or any increase in interest.'" SEC Complaint, ¶ 56.

- A senior risk management employee warned defendant Sambol on May 22, 2005 "of the likelihood of significantly higher default rates in loans made on an exception basis: '[t]he main issue is to make sure everyone's aware that we will see higher default rates.'" SEC Complaint, ¶ 54. According to the SEC Complaint, the senior risk management employee explained to Sambol "that exceptions are generally done at terms more aggressive than our guidelines,' and continued that '[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions.' [The senior risk management employee further] warned [Sambol] that increased defaults would cause repurchase and indemnification requests to rise and the performance of Countrywide-issued MBS to deteriorate." *Id.*

121.    On November 3, 2009 U.S. District Judge John Walter denied in their entirety defendants' motions to dismiss the SEC Complaint, holding, among other things, that the SEC had adequately alleged that defendants in that case had made statements that materially exaggerated the quality of Countrywide's residential mortgage-backed loans.

122.    There was apparently no dispute in the SEC litigation that defendants in that case, like Defendants here, had repeatedly made statements asserting that Countrywide's residential mortgage loans were of high quality. The defendants did not dispute that they had made the statements that the SEC said they had made – many of these statements were in SEC filings that the defendants had indisputably filed or caused to be filed. Defendants did, however, ask the court to take judicial notice of numerous other SEC filings containing additional

information relating to Countrywide's loans, a request that was granted. Notably, defendants used the judicially noticed documents they had brought to the court's attention to "argue that the majority of the misstatements and omissions were not material or misleading as a matter of law in light of Countrywide's extensive disclosures and the context of the alleged misstatements or omissions." *SEC v. Mozilo*, CV 09-3994-JFW (MANx), 2009 U.S. Dist. LEXIS 104689, at *25-26 (C.D. Cal. Nov. 3, 2009).

123. Judge Walter flatly rejected this argument, explaining that "neither Countrywide's disclosures nor a careful review of the context of the statements convince this Court that the alleged omissions or misstatements were immaterial or not misleading as a matter of law. Accordingly, the Court concludes that the SEC on the whole has adequately alleged that Defendants have made false or misleading statements or omissions of material fact." *Id.* at *26.

124. In addition, numerous attorneys general have initiated investigations into Countrywide's lending practices and also have alleged that Countrywide systematically departed from the underwriting standards it professed to use to originate residential loans.

125. The Illinois Attorney General initiated a lawsuit against Countrywide and Mozilo, contending that the company and its executives sold borrowers costly and defective loans that quickly went into foreclosure. *See People of the State of Illinois v. Countrywide Fin. Corp.*, No. 08CH22994 (Cook County Ch. Ct.) (the "First Illinois AG Complaint").

126. Additionally, the First Illinois AG Complaint alleges, based on evidence from Countrywide employees whom the Illinois Attorney General interviewed, that Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrower was able to repay the loan. Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of Countrywide's stated income

loans were based on inflated estimates of borrowers' income.  For example, according to the First Illinois AG Complaint: (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.  Furthermore, to supplement an employee's judgment as to whether a potential borrower's income was "reasonable," Countrywide required its employees to utilize a website, www.salary.com.  Even if the stated salary was outside of the range provided by the website, Countrywide employees could still approve the loan.  The Illinois Attorney General alleged that the "reasonableness" test contravened proper underwriting practices.

127.   As the Illinois Attorney General explained, "[t]his mounting disaster has had an impact on individual homeowners statewide and is having an impact on the global economy."  *The New York Times* reported that the complaint, derived from 111,000 pages of Countrywide documents and interviews with former employees, "paints a picture of a lending machine that was more concerned with volume of loans than quality."  *See* Gretchen Morgenson, "Illinois to Sue Countrywide," *N.Y. Times* (June 25, 2008).

128.   In a second complaint filed on June 29, 2010, the Illinois Attorney General further enumerated the problems with Countrywide's origination practices, including that Countrywide engaged in discriminatory and predatory lending.  *See People of the State of Illinois v. Countrywide Fin. Corp.*, No. 10CH27929 (Cook County Ch. Ct.) (the "Second Illinois AG Complaint").   There, the Illinois Attorney General sets forth how CFC incentivized its employees to sell riskier subprime loans with higher spreads, paying its brokers more for those riskier loans than for originating prime loans.

129.   California's Attorney General also commenced an investigation into

Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, entitled *People of the State of California v. Countrywide Fin. Corp.*, No. LC081846 (Los Angeles Super. Ct.) (the "California AG Complaint"). The California AG Complaint also alleged that Countrywide routinely departed from its stated underwriting standards.

130. For example, the California AG Complaint alleged that employees were incentivized to make exceptions to underwriting standards and failed to verify borrower documentation and information. According to the California AG Complaint, Countrywide used a system called CLUES (Countrywide Loan Underwriting Expert System), to provide a loan analysis report that indicated whether the loan was within Countrywide's underwriting guidelines. CLUES reports indicating a loan was not originated within the purview of Countrywide's underwriting guidelines often were ignored in order to effectuate the loan.

131. Further, consistent with the allegations of the Illinois Attorney General, California Countrywide employees cited in the California AG Complaint also claimed to have utilized the website www.salary.com to purportedly confirm a borrower's stated income. However, according to the California AG Complaint, California employees would know ahead of time the range of salaries that www.salary.com would provide for a particular job and, therefore, know by how much they could overstate a borrower's income. A former California loan officer for Countrywide further explained that its loan officers typically told potential borrowers that "with your credit score of X, for this house, and to make X payment, X is the income that you need to make"; after which the borrower would state that he or she made X amount of income.

132. Likewise, the Connecticut Attorney General filed a complaint in Superior Court, Judicial District of Hartford, entitled *State of Connecticut v. Countrywide Fin. Corp.*, No. CV08-40390945 (Hartford Super. Ct.), alleging that Countrywide's employees inflated borrowers' incomes in order to qualify them for

1    loans they otherwise would not have received.

2        133.  Investigations in other states such as Washington, West Virginia,

3    Indiana and Florida have confirmed many of the allegations in the Illinois,

4    California, and Connecticut complaints.

5        134.  Further, the Massachusetts Attorney General set forth details of

6    Underwriter Defendant Morgan Stanley's subprime conduct in a settlement

7    agreement entered on June 24, 2010 in which Morgan Stanley agreed to pay $102

8    million in compensation to homeowners and the Commonwealth of Massachusetts.

9    Although Morgan Stanley denied all wrongdoing, the Massachusetts Attorney

10    General set out that Morgan Stanley routinely ignored warning reports from

11    Clayton Holdings, Inc. ("Clayton"), a due diligence firm, showing that mortgages

12    originated by another defunct subprime originator, New Century Financial ("New

13    Century"), did not meet their underwriting guidelines.  Despite being advised by

14    Clayton of underwriting guideline violations, Morgan Stanley repeatedly

15    purchased and securitized New Century loans that did not have sufficient

16    compensating factors to offset their failure to meet the underwriting guidelines.

17    Widespread government investigations suggest that Morgan Stanley was typical of

18    banks such as the Underwriter Defendants in ignoring warnings from due diligence

19    firms like Clayton.

20        135.  On July 24, 2008, *The Los Angeles Times* reported that "three big

21    Southland lenders (are) under federal investigation; Sources say IndyMac,

22    Countrywide and New Century [have been] subpoenaed." *The Los Angeles Times*

23    further reported that officials have begun to investigate the value of mortgage-

24    backed securities:

25

26               A federal grand jury in Los Angeles has begun probing
               three of the nation's largest subprime mortgage lenders

27               in the clearest sign yet that prosecutors are investigating
               whether fraud and other crimes contributed to the

28               mortgage debacle.

> *Grand jury subpoenas have been issued in recent weeks and months to Countrywide Financial Corp.,* New Century Financial Corp. and IndyMac Federal Bank seeking a wide range of information, according to sources with direct knowledge of the subpoenas.
>
> Officials have said they are beginning to investigate whether securities investors were defrauded about the value of subprime mortgages they purchased, as well as other possible crimes such as insider trading by corporate officials who sold stock knowing their holdings were about to deflate in value.

(emphasis added).

136.  On October 6, 2008, certain of the Countrywide Defendants settled lawsuits brought by eleven attorneys general.   The settlement, valued at *$8.4 billion,* detailed a program whereby existing loans would be modified:

> [B]orrowers were placed in the riskiest loans, including adjustable-rate mortgages whose interest rates reset significantly several years after the loans were made. Pay-option mortgages, under which a borrower must pay only a small fraction of the interest and principal, thereby allowing the loan balance to increase, also are included in the modification.

### D.   Allegations in Numerous Other Civil Lawsuits Show the Falsity of the Offering Documents

137.  On February 15, 2008, Countrywide shareholders filed a consolidated complaint in the U.S. District Court for the Central District of California alleging derivative claims against the officers and directors of Countrywide, in an action styled *In re Countrywide Fin. Corp. Derivative Litig.*, No. 07-CV-06923-MRP-(MANx) (C.D. Cal.) (the "Derivative Complaint").   The derivative litigation was subsequently dismissed because of the plaintiffs' lack of standing

138.  The Derivative Complaint cited information obtained from several confidential sources who were former Countrywide employees who stated that the vast majority of Countrywide's loans were underwritten in contravention of the

company's stated underwriting standards. According to one of the confidential sources in that complaint, a former "Underwriter II" (a Countrywide employment classification) based in a Jacksonville, Florida processing center between June 2006 and April 2007, because of a campaign by Countrywide to increase the volume of loan originations, as much as 80% of the loans originated by Countrywide in that office involved significant variations from Countrywide's normal underwriting standards.

139. According to another confidential witness cited in the Derivative Complaint, a Senior Underwriter in Roseville, California, from September 2002 to September 2006, Countrywide would regularly label loans as "prime" even if made to unqualified borrowers (including those who had recently gone through a bankruptcy and were still having credit problems). According to that confidential witness, Countrywide's lending practices became riskier in 2006 and Countrywide more lax in enforcing its underwriting policies.

140. Another confidential witness cited in the Derivative Complaint, an Executive Vice President of Production Operations and later an Executive Vice President of Process Improvement who worked at Countrywide for 17 years before leaving in October 2005, disclosed that Countrywide created a computer system (or "rules engine") that routed highly risky loans out of the normal loan approval process to a central underwriting group for evaluation. The system was called the Exception Processing System. According to that source, the Exception Processing System identified loans that violated Countrywide's underwriting requirements. However, according to the same source, loans identified by the Exception Processing System as violating underwriting standards were *not* rejected. Rather, Countrywide executives wanted the company's Central Underwriting group to review such loans to evaluate whether these loans should require a higher price (upfront points) or a higher interest rate in light of the violation at issue. Central Underwriting entered information into the Exception Processing System about its

1    decisions to approve such loans and charge additional fees to the borrower.

2         141.   Yet another confidential source in the Derivative Complaint, an

3    underwriter from Long Island, New York at Countrywide between March 2000

4    and January 2007, stated that Countrywide extended loans to individuals with

5    increasing debt-to-income ratios.   Initially, Countrywide limited debt-to-income

6    ratios to 38%, but this rose to 50%.   According to this source, Countrywide branch

7    managers' compensation was tied to loan origination volume and not the quality of

8    the loans.   Thus, according to this source, branch managers pushed originators to

9    sell more loans despite the riskiness of these loans.   Additional confidential sources

10   in the Derivative Complaint confirmed this.

11        142.   Indeed, according to yet another confidential source in the Derivative

12   Complaint, Countrywide simply "didn't turn down loans."   Rather, Countrywide

13   "'did whatever they had to do to close loans' including making exceptions to

14   underwriting guidelines – everyone was motivated to increase loan volume and

15   'approv[e] things that should not have been approved.'"

16        143.   On January 6, 2009, purchasers of Countrywide common shares filed

17   a second amended complaint in the U.S. District Court for the Central District of

18   California, captioned *In re Countrywide Fin. Corp. Sec. Litig.*, No. 07-CV-05295-

19   MRP-(MANx) (C.D. Cal.) (the "Securities Complaint").   Facts set forth in the

20   Securities Complaint confirm major, systematic irregularities in Countrywide's

21   loan origination practices.   The Securities Complaint cited information obtained

22   from several confidential sources who were former Countrywide employees who

23   stated that the vast majority of Countrywide's loans were underwritten in

24   contravention of the company's stated underwriting standards.   The securities

25   litigation recently settled for $624 million.

26        144.   Among numerous internal Countrywide sources cited in the Securities

27   Complaint, one, a supervising underwriter at Countrywide until mid-2005 who

28   oversaw the company's underwriting operations in several states (the "Supervising

Underwriter"), stated that the underwriting guidelines were repeatedly lowered, and "very loose and lax" and designed to help Countrywide make more loans (as opposed to protecting the entity that ended up taking on the credit risk that the borrower would default on the mortgage).

145. The Supervising Underwriter further stated that from late 2004, Countrywide's Structured Loan Desks employed the Exception Processing System in order to obtain approval for loans that were exceptions to and should have been rejected by Countrywide's underwriting standards. As many as 15% to 20% of the loans generated each day at the Company's Structured Loan Desks were run through the Exception Processing System and very few were ever rejected.

146. The Supervising Underwriter further stated that if a potential borrower applying for a stated income, stated asset ("SISA") loan provided a bank name, address and account number for asset verification, it was the practice at Countrywide not to verify the bank balance.

147. According to another confidential source identified in the Securities Complaint, and confirmed by an April 6, 2008 article in *The New York Times*, even though Countrywide had the right to verify stated income on an application through the Internal Revenue Service ("IRS") (and this check took less than one day to complete), income was verified with the IRS on only 3%-5% of all loans funded by Countrywide in 2006.

148. The Securities Complaint also details that the appraisals obtained by Countrywide underwriters were not independent or accurate. For example, since at least 2005, loan officers from all of Countrywide's origination divisions were permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that did not support loan transactions, and (iii) substitute more favorable appraisals by replacement appraisers when necessary to obtain a more favorable LTV ratio so as to qualify the loan for approval. Countrywide loan officers were allowed to lobby appraisers to assign particular values to a property in order to support the closing

1  of a loan.

2      149.  Further, according to allegations made by Capitol West Appraisals

3  LLC ("Capitol West") a real estate appraisal company cited in the Securities

4  Complaint, "Countrywide engaged in a pattern and practice of pressuring real

5  estate appraisers to artificially increase appraisal values for properties underlying

6  mortgages Countrywide originated and/or underwrote.  Capitol West stated that

7  Countrywide loan officers sought to pressure Capitol West to increase appraisal

8  values for three separate loan transactions.  When Capitol West refused to vary the

9  appraisal values from what it independently determined was appropriate,

10  Countrywide retaliated...."

11      150.  According to Capitol West's allegations in the Securities Complaint,

12  "Countrywide maintained a database titled the 'Field Review List' containing the

13  names of appraisers whose reports Countrywide would not accept unless the

14  mortgage broker also submitted a report from a second appraiser.  Capitol West

15  was placed on the Field Review List after refusing to buckle under pressure to

16  inflate real estate values.  The practical effect of being placed on the Field Review

17  List was to be blacklisted as no mortgage broker would hire an appraiser appearing

18  on the Field Review List to appraise real estate for which Countrywide would be

19  the lender because neither the broker nor the borrower would pay to have two

20  appraisals done.  Instead, the broker would simply retain another appraiser who

21  was not on the Field Review List."  The Securities Complaint further sets forth

22  Capitol West's descriptions of the additional steps Countrywide took to enforce its

23  blacklisting of appraisers that refused to artificially inflate their appraisals.

24      151.  On September 30, 2008, MBIA Insurance Corp. ("MBIA"), one of the

25  largest providers of bond insurance, filed a complaint against Countrywide in New

26  York state court, entitled *MBIA Ins. Corp. v. Countrywide*, No. 08/602825 (N.Y.

27  Sup. Ct.) (the "MBIA Complaint").  The MBIA Complaint alleges that

28  Countrywide fraudulently induced MBIA to provide insurance for certain

1   investment certificates, including those contained in the following trusts: CWHEQ

2   2005-E; CWHEQ 2005-I; CWHEQ 2005-M; CWHEQ 2006-E; CWHEQ 2006-G;

3   CWHEQ 2006-S8; CWHEQ 2007-E; CWHEQ 2007-S1; CWHEQ 2007-S2; and

4   CWHEQ 2007-S3.

5        152.   MBIA was able to obtain approximately 19,000 loan files for the

6   Certificates it insured as a result of its contractual agreements with Countrywide.

7   After reviewing the portfolios and re-underwriting each loan provided by

8   Countrywide, MBIA discovered that there was "*an extraordinarily high incidence*

9   *of material deviations from the underwriting guidelines Countrywide represented*

10  *it would follow*." MBIA Complaint, ¶ 78 (emphasis added). MBIA discovered

11  that many of the loan applications "lack[ed] key documentation, such as a

12  verification of borrower assets or income; include[d] an invalid or incomplete

13  appraisal; demonstrate[d] fraud by the borrower on the face of the application; or

14  reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-

15  income] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any

16  permissible exception)." MBIA Complaint, ¶ 79. Significantly, "MBIA's re-

17  underwriting review ... revealed that almost 90% of defaulted or delinquent loans

18  in the Countrywide Securitizations show material discrepancies." On April 27,

19  2010, the Supreme Court of the State of New York, although determining that

20  MBIA did not have a legal claim for negligent misrepresentation, denied a motion

21  to dismiss MBIA's claims of fraud against several Countrywide entities and Bank

22  of America.

23       153.   On April 11, 2008, an amended complaint for violations of the federal

24  securities laws was filed against Countrywide in the U.S. District Court for the

25  Central District of California. *See Argent Classic Convertible Arbitrage Fund LP*

26  *v. Countrywide Fin. Corp.*, No. 07-CV-7097-MRP-(MANx) (C.D. Cal.). The

27  complaint identified specific deviations from Countrywide's stated underwriting

28  guidelines.   For example, in connection with the "No Income/No Asset

Documentation Program," Countrywide represented that "[t]his program is limited to borrowers with excellent credit histories." However, Countrywide routinely extended these loans to borrowers with weak credit and knew that such "low doc" or "no doc" loans, particularly when coupled with nontraditional products like ARMs, likely contained misinformation from the borrower, such as overstated incomes, that increased the likelihood of defaults. Because borrowers were advised that their representations on loan applications would not be verified, Countrywide employees referred to these products as "liar loans."

154. Furthermore, in an action commenced against Countrywide for wrongful termination, styled *Zachary v. Countrywide Fin. Corp.*, No. 4:08-cv-00214, currently pending in the U.S. District Court for the Southern District of Texas, the plaintiff, Mark Zachary ("Zachary"), a Regional Vice President of Countrywide KB Home Loans, Inc. ("CWKB"), alleged that CWKB, a 50-50 joint venture between Countrywide and KB Home Loans ("KB Home"), engaged in a host of mortgage origination and underwriting activities that did not comport with stated and standard practices. Zachary described how loan officers would go so far as to help the loan applicant submit a loan application with false income amounts, so that the applicant would get the loan under false pretenses.

155. According to Zachary, one of these practices involved CWKB's practice of "flipping" a loan application from a "full documentation" loan program to a "stated income" or "no income, no asset" loan program. He learned that loans were being canceled at the prime regional operations center as full documentation loans and transferred to the subprime operations center in Plano, Texas, as stated asset, stated income ("SISA") loans, a "low-doc" loan, or no income, no assets ("NINA") loans, a "no-doc" loan. Otherwise known as "liar loans," NINA loans allowed a borrower to simply state their income without providing any documentation or proof of this income. Thus, rather than denying an applicant based on the information revealed in the original mortgage application,

Countrywide pretended that it did not see the disqualifying information, such as insufficient income or assets, and instead, allowed applicants to apply for a no documentation loan, implicitly encouraging them to lie on these renewed applications.

156. Furthermore, Zachary explained that while a material number of Countrywide's loan applicants were not eligible for any loan program requiring documentation based on the applicant's verified income level and/or job status, CWKB loan officers would (1) cancel the application for the loan program that required documentation, (2) re-do the application as a SISA or a NINA loan through the company's subprime originators in Plano, Texas, and (3) coach the loan applicant as to what income level he or she would need to have in order to qualify for the low-doc or no-doc loan.

157. Moreover, according to Zachary, Countrywide blatantly ignored its underwriting policies and procedures. Zachary stated that there was a problem with appraisals performed on homes being purchased with Countrywide loans. According to Zachary, the appraiser was being strongly encouraged to inflate appraisal values by as much as 6% to allow the homeowner to "roll up" all closing costs. According to Zachary, this inflated value put the buyer "upside down" on the home immediately after purchasing it, *i.e.*, the borrower owed more than the home's worth. Thus, the borrower was more susceptible to default. It also put the lender and secondary market investor at risk because they were unaware of the true value of their asset. According to Zachary, Countrywide performed an audit into these matters in January 2007 which corroborates his story.

158. Another civil complaint, *Zaldana v. KB Home*, No. CV 08-3399 (EDL), currently pending in the U.S. District Court for the Northern District of California (the "Zaldana Complaint"), further details Countrywide's failure to follow standard appraisal practices. The Zaldana Complaint described a process whereby KB Home paid Countrywide to make loans with subsidized initial

payments to KB borrowers, thereby allowing KB to prop up the ostensible sales prices of KB homes and sell to buyers who would not otherwise be able to afford or qualify for the monthly mortgage payments. In turn, Countrywide would have its appraisers ignore the subsidies in order to appraise the home at the full stated sales price, thereby inflating the actual value of the home (*i.e.*, the price that a buyer was truly willing to pay for it).

### E.    Underwriter Defendants "Contracted Out" and Failed to Conduct Required Due Diligence of Loan Underwriting Guidelines Contained in Offering Documents

159. Prior to securitization, a process of cursory "due diligence" on the mortgage loans was conducted. The review's ostensible purpose was to determine whether the loans contained the requisite legal documentation, were based on an independent appraisal and were originated in accordance with Countrywide's loan underwriting guidelines, which were detailed in the Offering Documents. The due diligence review that was conducted on the mortgage collateral was not specific to any securitized pool of mortgage loans. Rather, the due diligence was periodically performed on a small sample of Countrywide's entire "warehouse" of mortgage loans.

160. The Underwriter Defendants contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to outside firms – Clayton and The Bohan Group ("Bohan") – and then conducted limited oversight of these subcontractors' activities.

161. As disclosed as part of an ongoing investigation of investment banking misconduct in underwriting MBS being conducted by, among others, the New York Attorney General (the "NYAG") and the Massachusetts Attorney General, Clayton and Bohan routinely provided investment banks with detailed reports of loans non-compliant with underwriting guidelines, but the investment banks just as routinely disregarded the non-compliant loans and included them in

securitization pools anyway.  Further, the President of Bohan stated that, by the time the Offerings of the Certificates took place, investment banks were requiring a review of only 5% to 7% of the entire loan pools.

162.  The Underwriter Defendants contracted their due diligence work to Clayton and Bohan.  The outside firms were supposed to examine the loans for conformity with Countrywide's guidelines, as detailed in the Offering Documents. Each loan reviewed was rated as category "1," "2" or "3."  Category "3" loans were defective and recommended for exclusion from securitization, however such loans were routinely included in securitizations despite being defective.  Because the risk of default was passed on to investors in the Certificates rather than held by the Underwriter Defendants or Countrywide, there was no incentive to remove such category "3" loans from the Offerings, because if the Underwriter Defendants rejected any significant portion of the loans, the size of the securitization, and thus the size of the fees derived from the securitization, would decrease significantly.

163.  In June 2007, the NYAG subpoenaed documents from Clayton and Bohan related to their due diligence efforts on behalf of the investment banks, such as Bear Stearns, that underwrote mortgage-backed securities.  The NYAG, along with Massachusetts and Connecticut attorneys general and the SEC (all of which also subpoenaed documents), are investigating whether investment banks held back information they should have provided in the disclosure documents related to the sale of mortgage-backed securities to investors.

164.  In a December 6, 2007 article published in *The New York Times*, it was reported that:

> Andrew Cuomo, the New York attorney-general, has subpoenaed RBS and about 15 of Wall Street's biggest sub-prime mortgage bond underwriters, such as Bear Stearns and Merrill Lynch, requesting information that will help to determine how much due diligence was conducted on the home loan-backed securities that they issued.

*       *       *

Mr. Cuomo is also examining the relationship between mortgage lenders, third party-due diligence firms, the credit rating agencies and the underwriting banks to see if they colluded to ignore risks.

Wall Street firms made hefty fees from buying high-risk sub-prime mortgages and packaging them into bonds backed by the home loans' interest payments. Investors, including Wall Street giants such as Citigroup, as well as hedge funds and pension funds, have collectively lost more than $50 billion this year on sub-prime-backed bonds after a surge in defaults on high-risk home loans forced down their valuations.

Many of Wall Street's underwriters relied heavily on third-party vendors to examine the home loans that were used to back the mortgage bonds. This helped them to determine how reliable an income stream the underlying mortgages would produce and, in turn, how likely it was that the bonds' interest payments would be met.

Since bond underwriters have an obligation to make sure that the statements made in the securities' Offering Documents are accurate, Mr. Cuomo is investigating how much, if any, due diligence they conducted themselves. He is also seeking to determine whether they should have done more.

165.   In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on Loans," *The New York Times* further reported:

An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.

Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms. But the

banks did not disclose the details of these reports to credit-rating agencies or investors.

The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter. Charges could be filed in coming weeks.

\*       \*       \*

The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures. The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.

As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans. In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.

It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans. Some industry officials say such loans made up a quarter to a half of the portfolios they saw. In some cases, the loans accounted for as much as 80 percent. While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.

Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

\*       \*       \*

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco. Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

\*　　\*　　\*

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said *lenders and investment banks routinely ignored concerns raised by these consultants.*

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said. "We stopped checking."

(emphasis added).

166.  On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients. Both *The New York Times* (J. Anderson and V. Bajaj, "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," *N.Y. Times*, (Jan. 27, 2008)) and *The Wall Street Journal* (A. Efrati and R. Simon, "Due Diligence Firm to Aid New York Subprime Probe," *Wall St. J.* (Jan. 29, 2008)) ran articles describing the nature of the NYAG's investigation and Clayton's testimony. *The*

*Wall Street Journal* reported that the NYAG's investigation was focused on "the broad language written in prospectuses about the risky nature of these securities," which "changed little in recent years, even as due diligence reports noted that the number of exception loans backing the securities was rising." According to the *New York Times* article, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

167.   A March 23, 2008 *Los Angeles Times* article reported that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports" as follows:

> The reviewers' role was just one of several safeguards – including home appraisals, lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system.

> But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start. Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.

> "The investors were paying us big money to filter this business," said loan checker Cesar Valenz. "It's like with water. If you don't filter it, it's dangerous. And it didn't get filtered."

> As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.

> The FBI is conducting more than a dozen investigations into whether companies along the financing chain

concealed problems with mortgages.  And a presidential
working group has blamed the subprime debacle in part
on a lack of due diligence by investment banks, rating
outfits and mortgage-bond buyers.

E. Scott Reckard, "Subprime Watchdogs Ignored," *L.A. Times* (Mar. 23, 2008).

**F.     Additional Government Investigations Further Confirm Systemic
        Disregard for Mortgage Loan Underwriting Guidelines**

168.   In August 2007, following reports of defaults in mortgage loans
underlying various MBS, downgrades of such MBS and potential downgrades of
additional MBS in the future, and the resulting illiquidity in the credit markets, the
President of the United States commissioned the Secretary of the Treasury, the
SEC and the Commodities Futures Trading Commission ("CFTC") (hereinafter
referred to as the "President's Working Group" or the "PWG") to investigate the
causes of the market turmoil.  After a seven-month investigation, the PWG issued
its report on March 13, 2008.  The PWG found as follows:

- A significant erosion of market discipline by those
  involved in the securitization process, including
  *originators, underwriters, credit rating agencies, and
  global investors,* related in part to failures to provide or
  obtain adequate risk disclosures;

- The turmoil in financial markets clearly was triggered by
  a *dramatic weakening of underwriting standards for
  U.S. subprime mortgages*…

(emphasis added).

169.   In December 2007, the Massachusetts Attorney General launched an
investigation into Wall Street's securitization of subprime loans.  The investigation
focused on the industry practices involved in the issuance and securitization of
subprime loans to Massachusetts consumers.  According to a press release issued
by the Massachusetts Attorney General's Office,

The Office is investigating whether securitizers may have:

- facilitated the origination of "unfair" loans under Massachusetts law;
- failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;
- failed to take sufficient steps to avoid placing problem loans in securitization pools;
- been aware of allegedly unfair or problem loans;
- failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan diligence and the pre-securitization process, as well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

170.   On January 30, 2008, the FBI and SEC launched a joint investigation into 14 investment banks, loan providers and developers as part of a crackdown focusing on the subprime mortgage crisis.  According to the *Los Angeles Times*:

We're looking at the whole range of those involved – including the investment banks and other entities that bundled the loans up for sale and the institutions that held them and reported [to investors] on their value...

### G.   Underwriter Defendants Employed Rating Shopping Practices to Ensure Inflated Investment Grade Ratings for All the Certificates

171.   The Underwriter Defendants derived their profits from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans.   For the Certificates to sell profitably, approximately 80% of the securitization had to be assigned the highest AAA rating by the Rating Agencies.

172.   As set forth above, the Underwriter Defendants ultimately engaged the Rating Agencies through a "ratings shopping" process.  Initially, a collateral analyst would send the preliminarily structured deal to the Rating Agencies for feedback.  The Underwriter Defendants' in-house rating agency personnel would

1   oversee the communications with the Rating Agencies.  Then S&P, for example,

2   would run the loan tape through both its LEVELS and SPIRE Models again and

3   provide the Underwriter Defendants with the results in an effort to obtain the

4   ratings engagement.    Through the LEVELS Model, S&P would advise the

5   Underwriter Defendants responsible for each deal, for example, that 94.25% of the

6   Certificates would be rated AAA as long as 5.75% of the total collateral balance

7   supporting those Certificates was subordinate.  This 5.75% was the amount of loss

8   coverage required.  The Underwriter Defendants would then again "negotiate" with

9   the Rating Agencies before they were hired, in order to get them to agree to the

10  least amount of loss coverage and credit enhancement, and the highest percentage

11  of AAA-designated Certificates.

12      173.   The Underwriter Defendants used this "ratings shopping" process to

13  obtain the most profitable structure on the Offerings.  Ratings shopping resulted in

14  **over 90%** of the Certificates being initially awarded the AAA/maximum-security

15  rating.

16      174.   Finally however, in 2008, the practice was effectively ended by way

17  of an agreement entered into between the Rating Agencies and the NYAG.  In June

18  2008, the NYAG announced that after an investigation of the Rating Agencies, it

19  had reached an agreement with S&P, Moody's and Fitch which contemplated a

20  complete overhaul of the then-current ratings procedures and guidelines and put an

21  end to what had been termed "ratings shopping."   Instead of investment banks

22  looking to issue mortgage-backed bonds going to all three agencies for a review,

23  but only using, and paying for, the most optimistic rating, the Rating Agencies

24  would now be paid upfront regardless of whether they were hired to assign a

25  rating, a move expected to remove any potential for conflicts of interest.

26

27

28

## VIII.  THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING AND APPRAISAL STANDARDS

175.  Countrywide was a principal originator for all 14 of the Offerings complained of herein.  The total value of the 14 Offerings for which Countrywide was the principal originator was $17.83 billion, of which the Rating Agencies assigned initial ratings of AAA/maximum safety to over 90%.

176.  Each Registration Statement at issue herein for the Issuing Trusts contained an illustrative form of a Prospectus Supplement for use in the offering of the Certificates.  Each Registration Statement was prepared by the Issuer Defendants and signed by the Individual Defendants.  At the effective date of the offering of the Certificates, a final Prospectus Supplement was filed with the SEC containing a description of the mortgage pool underlying the Certificates and the underwriting standards by which the mortgages were originated.  The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements.

177.  Countrywide made clear in the Offering Documents that exceptions were made to the underwriting guidelines but only where "compensating factors were demonstrated by the borrowers.  Each Registration Statement filed by CWALT and CWMBS at issue herein, as well as the Prospectus Supplements issued pursuant to those Registration Statements, contained the following language concerning the underwriting standards by which the mortgages pooled into CWALT and CWMBS Offerings were originated:

> All of the Mortgage Loans have been originated or acquired by Countrywide Home Loans, Inc., in accordance with its credit, appraisal and underwriting standards.... Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.
>
> Countrywide Home Loans' underwriting standards are applied, by or on behalf of Countrywide Home Loans to

evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis, varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. ***Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.***

*See* **SAC Appendix Exhibit H;** *see also* **Exhibit I.**

178. The above statements concerning Countrywide's adherence to its underwriting standards and to federal and state underwriting standards, with respect to mortgages pooled into CWALT and CWMBS Issuing Trusts, contained material misstatements when made because:

a. Defendants failed to disclose that Countrywide systematically ignored underwriting standards imposed by state and federal law in issuing the mortgages pooled into the Issuing Trusts;

b. Countrywide did not, contrary to its statement above, properly "evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." Rather, as alleged herein, Countrywide systematically ignored borrowers'