LINKS: 145, 146, 149, 156, 158, 159

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

MAINE STATE RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,

               Plaintiff,

     v.

COUNTRYWIDE FINANCIAL CORPORATION, et al.,

               Defendants.

Case No. 2:10-CV-0302 MRP (MANx)

**ORDER RESOLVING PENDING MOTIONS TO DISMISS**

## I.    INTRODUCTION & BACKGROUND

Plaintiffs filed this putative class action individually and "on behalf of a class of all persons or entities who purchased or otherwise acquired beneficial interests in" certain mortgage backed securities ("MBS") in the form of Certificates[1] issued in 427 separate offerings between January 25, 2005 and

---

[1] A Certificate is a document that shows ownership of a mortgage backed security issued pursuant to a registration statement and prospectus supplement in a public offering. "Certificates entitled investors to receive monthly distributions of interest and principal from the Issuing Trusts derived from cash flows from borrower repayment of the mortgage loans." SAC ¶ 5. Each Certificate represents a different tranche within an offering. *See infra* n.8. The term "tranche" comes from the French word for slice. It is used to refer to the different types of mortgage backed securities and collateralized debt

-1-

November 29, 2007 "pursuant and/or traceable to the Offering Documents" and were damaged thereby.  Consolidated Amended Complaint ¶¶ 1, 186.  The claims are brought against the Countrywide Defendants pursuant to Sections 11, 12 and 15 of the Securities Act of 1933.  The operative complaint, which is now the Second Amended Complaint ("SAC"), refers to Countrywide Financial Corporation ("CFC"), Countrywide Securities Corporation ("CSC"), Countrywide Home Loans ("CHL"), and Countrywide Capital Markets ("CCM") as the "Countrywide Defendants."  Plaintiffs also purported to include Bank of America and NB Holdings Corporation in this category, but the Court dismissed both of those parties with prejudice.  April 20, 2011 Order (Docket No. 255).  Plaintiffs originally contended the Countrywide Defendants made materially untrue or misleading statements or omissions regarding Countrywide's loan origination practices in public offering documents associated with 427 separate offerings.  In addition to the Countrywide Defendants, Plaintiffs sued Countrywide special-purpose issuing trusts ("Issuer Defendants"),[2] several current or former Countrywide officers and directors ("Individual Defendants"[3] and David A. Sambol), and a number of banks that served as underwriters on one or more of the offerings at issue ("Underwriter Defendants").[4]

_____

obligation ("CDO") bonds that provide specified priorities and amounts of returns: "senior" tranches have the highest priority of return and therefore the lowest risk and interest rate; mezzanine tranches have mid-levels of return and risk; and "equity" (also known as "residual" or "first loss") tranches typically receive any remaining cash flows. *The Financial Crisis Inquiry Report*, Financial Crisis Inquiry Commission (January 2011).  Because each Certificate is a document evidencing ownership of a specific tranche, the Court uses the terms "tranche" and "Certificate" somewhat interchangeably.

[2] The Issuer Defendants are CWALT, CWMBS, CWABS, and CWHEQ.  SAC ¶ 45.

[3] The Individual Defendants are Stanford Kurland, David Spector and Eric Sieracki.  SAC ¶ 58.

[4] The Underwriter Defendants include: CSC; Deutsche Bank Securities Inc.; UBS Securities LLC ("UBS"); Morgan Stanley & Co., Inc.; Goldman, Sachs & Co.; RBS Securities Inc. f/k/a RBS Greenwich Capital d/b/a Greenwich Capital Markets, Inc.; Barclays Capital, Inc.; and HSBC Securities (USA) Inc.  SAC ¶ 54.

All of the defendants (collectively, "Defendants") filed motions to dismiss the Consolidated Amended Complaint.  After the motions were fully briefed, the Court heard extensive oral argument on October 18, 2010.  The Court dismissed the action without prejudice on the basis of standing and the statute of limitations on November 4, 2010.  *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1163-64 (C.D. Cal. 2010).  The Court ruled that Plaintiffs have standing to sue only with respect to the offerings in which they purchased.  *Id.* Plaintiffs alleged the statute of limitations on their causes of action was tolled under the doctrine of *American Pipe*[5] during the pendency in state court of two putative class actions that were later consolidated into one action.[6]  The Court held that the doctrine of *American Pipe* tolled the statute of limitations only for those offerings as to which the named plaintiffs in the prior putative class actions had standing to sue, *i.e.*, those offerings which the named plaintiffs purchased.  *Id.* at 1166-67.  The Court then instructed Plaintiffs to "replead their causes of action with respect to securities actually purchased by Plaintiffs. . . . [and] specify in which tranches they invested."  *Id.* at 1164.  The Court reserved judgment on the remaining issues until after Plaintiffs had cured the chief pleading deficiencies the Court identified in that Order.  *Id.* at 1161.

On December 6, 2010, Plaintiffs filed the SAC, which reduced the offerings in the case to 14 separate public offerings between October 2005 and December 2006 and set forth the alleged bases for tolling.  Docket No. 227.  The Court requested supplemental briefing on the issue of tolling.  Docket No. 229.  The Countrywide Defendants responded with argument that the statute of limitations was tolled only with respect to the specific tranches that the *Luther* and

---

[5] *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).

[6] *Luther v. Countrywide Home Loans Servicing LP*, No. BC 380698 (Cal. Super. Ct. Nov. 14, 2007); *Washington State Plumbing and Pipefitting Pension Fund Trust v. Countrywide Fin. Corp., et al.*, No. BC 392571 (Cal. Super. Ct. June 12, 2008).  The actions were later consolidated into one action, *Luther*.

*Washington State* plaintiffs purchased.  Docket No. 231.  The Court held an additional hearing on March 23, 2011 to discuss the issue of a tranche-based standing requirement.  Docket No. 251.  The Court resolves that issue in this Order, as well as the issues that remain pending from the motions to dismiss filed last Fall.

After careful consideration, the Court has concluded that Plaintiffs must establish they have tranche-based standing as to the securities involved here.  The Court **DISMISSES** the SAC as to all Certificates that at least one named plaintiff did not purchase.  Likewise, the Court holds the statute of limitations was tolled during the pendency of the *Luther* cases only with respect to the Certificates that the named plaintiffs purchased in those cases.

The Court **DISMISSES** Count Two against the Issuer Defendants because they are not statutory sellers.  With respect to the Section 12 Underwriter Defendants,[7] the Court finds Plaintiffs have sufficiently stated a claim for Section 12(a)(2) liability and **DENIES** the motion to dismiss with respect to them. However, the Court allows Plaintiffs to bring a Section 12(a)(2) claim only as to those securities that Plaintiffs purchased pursuant to the prospectus supplement in the initial public offering.  To the extent Plaintiffs seek to include other securities, the claims as to those particular securities are **DISMISSED** from Count Two.

With respect to Count Three, the Section 15 claim, the Court finds the SAC adequately pleads control person liability and thus the Court **DENIES** the motions to dismiss Count III.  Moreover, the statute of limitations was tolled with respect to the Section 15 claim against Sambol.  His motion to dismiss is **DENIED**.  The Court **GRANTS** Defendant Sieracki's motion to strike because Plaintiffs have not reasonably investigated the allegations they copied from complaints in other cases.

---

[7] The Section 12 Underwriter Defendants, as defined in the SAC, are CSC and UBS. SAC ¶ 54.  In the SAC, Plaintiffs bring Count Two against the Issuer Defendants and the Section 12 Underwriter Defendants only.

Finally, the Court **DENIES** the Countrywide Defendants' motion to dismiss the SAC on the grounds that Plaintiffs have not adequately pleaded material misrepresentations, reliance, or injury.  The allegations are sufficient.

## II.    MOTION TO DISMISS STANDARD

A Rule 12(b)(6) motion to dismiss should be granted when, assuming the truth of the plaintiff's allegations, the complaint fails to state a claim for which relief can be granted.  *See Epstein v. Washington Energy. Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).  In the past, a complaint could not be dismissed for failure to state a claim "unless it appear[ed] beyond doubt that the plaintiff [could] prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court expressly retired *Conley*'s "no set of facts" language and required judges to engage in a "context-specific" review of the complaint. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).  Pleading labels or conclusions is no longer sufficient.  *Twombly*, 550 U.S. at 555.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

The Countrywide Defendants contend that Plaintiffs' claims "sound in fraud" and must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  The Court rejects that contention.  Plaintiffs bring suit under Sections 11, 12(a)(2) and 15 of the Securities Act.  These statutes do not require allegations of scienter.  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("Section 12(a)(2) is a virtually absolute liability provision that does not require an allegation that defendants possessed scienter." (internal quotation marks and citation omitted)); *In re Morgan Stanley Info. Secs. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("Issuers are subject to 'virtually absolute' liability under section 11,

while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence."). These claims are subject to the ordinary notice pleading requirements of Federal Rule of Civil Procedure 8(a), unless the allegations "sound in fraud." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005). The SAC explicitly disclaims fraud and alleges strict liability and negligence. *See, e.g.*, SAC ¶¶ 3, 209, 211. The SAC does not include any allegations that Defendants knowingly or intentionally made misstatements or omissions in the offering documents. The Court therefore applies standard Rule 8 pleading requirements as set forth above.

## III.   STANDING

Standing is a threshold question in every federal case because it determines the power of a court to entertain the suit. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). This Court confronts the question of whether the Plaintiffs have standing to sue on behalf of investors who purchased different Certificates in the same public offerings—*i.e.*, different tranches offered pursuant to the same prospectus supplement—in which Plaintiffs purchased.[8]

"A plaintiff may not avoid the standing inquiry merely by styling his suit as a class action." *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 119 (D. Mass. 2006). Thus, "[a] lead plaintiff cannot prosecute a class action based on claims he could not advance individually." *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 965 (N.D. Cal. 2010). Yet, Plaintiffs purport to bring

---

[8] Each Certificate represents a tranche, a slice of a larger offering. *See supra* n.1. The MBS tranche structure enables the issuer to direct the principal and interest cashflow generated by the collateral, here the underlying mortgage loan groups, to the different tranches in a prescribed manner in order to meet different investment objectives. *See* Securities Industry & Financial Markets Association, *The Building Blocks of Mortgage-Backed Securities*, http://www.investinginbonds.com/learnmore.asp?catid=11&subcatid=56&id=132 (last visited May 2, 2011). An investor in an MBS can assess the risk and the promised interest rate and choose the security that best meets its needs.

suit on behalf of "a class consisting of all persons or entities who purchased or otherwise acquired *beneficial interests* in the Certificates identified [in the SAC] pursuant and/or traceable to the Offering Documents defined [in the SAC] and were damaged thereby." SAC ¶ 201 (emphasis added). Although Plaintiffs claimed otherwise at the March 23, 2011 Hearing, Plaintiffs' proposed class definition appears to include the purchasers of the riskier lower tranches, many of which were repackaged into collateralized debt obligations ("CDOs") and resold.[9] Plaintiffs may also have meant to include investors in CDOs which hold these lower tranches. The Court is puzzled by Plaintiffs' use of the phrase "beneficial interests in the Certificates" and because Plaintiffs' counsel cannot explain the meaning, the Court will not allow this expansive and unclear class definition and **ORDERS** Plaintiffs to amend their class action allegations accordingly.

　　　　Plaintiffs insist they have standing to sue as to every tranche of MBS that was issued pursuant to the same prospectus supplements as Plaintiffs purchased, regardless of which tranche(s) Plaintiffs purchased. Defendants contend Plaintiffs' standing to represent other investors is limited to the Certificates they purchased, not Certificates from any other tranches created by an offering, because each

---

[9] CDOs are an entirely different type of investment purchased by very large financially sophisticated investors. They are often designed to meet specific investor needs in terms of maturity and credit-risk, resulting in more highly-tailored but less liquid securities than might otherwise be available. CDOs are not publicly tradable on registered exchanges or markets because of this design. Many CDOs are actively managed and resemble hedge funds. Ferrel, Allen, Bethel, Jennifer E. and Hu, Gang, *Legal and Economic Issues in Litigation Arising From the 2007-2008 Credit Crisis*, pp. 10-11 (November 17, 2008). Harvard Law and Economics Discussion Paper No. 612; PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN, Chapter 5, pp. 163-235 (Yasuyuki Fuchita et al. eds., Brookings Institution Press, 2009), available at http://ssrn.com/abstract=1096582.

Certificate is a unique security and reflects a different calculus in terms of investor expectations.[10]

The parties disagree on the scope of statutory standing set forth by Sections 11(a) and 12(a)(2) of the Securities Act, 15 U.S.C. §§ 77k(a), 77*l*(a)(2), and constitutional standing under Article III of the United States Constitution. Defendants argue that the Securities Act explicitly limits standing to a person who acquired or purchased a specific security, and each tranche is a separate security. Plaintiffs argue that the Securities Act bestows standing on any person who purchased pursuant to the same allegedly misleading offering documents, in this case the same prospectus supplement. With respect to constitutional standing, Defendants insist Plaintiffs cannot allege to be injured by a misrepresentation about the quality of an investment that Plaintiffs did not make. Plaintiffs counter that Defendants' systematic disregard of underwriting guidelines pervaded all pools of loans and injured all proposed class members in the same manner, irrespective of which tranche they purchased.

The importance of the Court's resolution of the standing question in this case is two-fold. First, Plaintiffs' standing determines the essential scope of this litigation, and which securities are properly the subject of it. Second, Plaintiffs are relying on two prior cases, which were later consolidated, to toll the statute of

---

[10] Plaintiffs contend that fifteen decisions addressing motions to dismiss Securities Act class actions have ruled a plaintiff's standing is not limited to the tranches they purchased in the offering. Plaintiffs' Supplemental Memorandum at 7 (Docket No. 241). This is not correct. None of the decisions Plaintiffs cite address this particular question of tranche-based standing. *But see New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 165-66 (S.D.N.Y. 2011) (finding that the purchase of different tranches need not defeat typicality at the class certification stage because the question whether the offering documents were materially misleading will be answered the same way regardless of which tranche was purchased). In *New Jersey Carpenters Health Fund*, the plaintiffs filed suit over only two offerings, comprised of a total of four loan groups originated under identical loan underwriting guidelines and by the same four principal loan originators.

limitations for Plaintiffs' causes of action in this case.[11]  As the Court explained in
its prior Order, the consolidated case *Luther* tolls the statute of limitations only
with respect to those securities as to which the named plaintiffs in *Luther* and
*Washington State* had standing to sue.  *Maine State Ret. Sys.*, 722 F. Supp. 2d at
1166-67.  Thus, the Court's decision about whether to impose a tranche standing
requirement affects not only the litigants in this case, but potentially any other
plaintiffs who seek the benefits of tolling based on *Luther*.  *But see In re Wachovia
Equity Secs. Litig.*, Nos. 08-6171(RJS), 09-4473(RJS), 09-5466(RJS), 09-
6351(RJS), --- F. Supp. 2d ----, 2011 WL 1344027, at *29 (S.D.N.Y. Mar. 31,
2011) (tolling the statute of limitations under *American Pipe* where class action
claims were dismissed for lack of standing).

## A.  PLAINTIFFS MUST HAVE PURCHASED THE SECURITY.

The Securities Act provides a private right of action for only a narrow group
of persons.  Section 11(a) provides that where a material fact is misstated or
omitted from a registration statement filed with the Securities and Exchange
Commission, "any person acquiring such security" may bring an action for losses
caused by the misstatement or omission.  15 U.S.C. § 77k(a).  A Section 12(a)(2)
claim can be asserted only by "the person purchasing such security."[12]  15 U.S.C. §
77l(a)(2).  Federal courts have construed these phrases to mean that a plaintiff must
actually have purchased the security upon which it seeks to sue.  *E.g., In re
Lehman Bros. Secs. and ERISA Litig.*, 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010);
*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
658 F. Supp. 2d 299, 303 & n.3 (D. Mass. 2009), *aff'd in part*, 632 F.3d 762 (1st
Cir. 2011);  *In re Salomon Smith Barney Mutual Fund Fees Litig.*, 441 F. Supp. 2d
579, 607 (S.D.N.Y. 2006).

---

[11] *See supra* n.6.

[12] In addition, under Section 12, the plaintiff must show that the defendant is a statutory
seller.  *See Pinter v. Dahl*, 486 U.S. 622, 645 (1988).  *See infra* Part IV.A.

Defendants contend, and Plaintiffs concede, that each tranche is a separate and unique security.  Defendants point out that even when issued pursuant to the same prospectus supplement, each tranche was issued its own Certificate, with a unique CUSIP[13] number, an individual credit rating, a different interest rate, different rights to distribution of principal and interest payments, distinct credit enhancement rights,[14] and was often backed by different loans than other tranches in the same MBS offering.  *See* Defendants' Request for Judicial Notice ("RJN"), Exs. 11, 12, 14, 15, 17, 20, 21 (Docket No. 231).[15]  Moreover, each tranche is traded separately; some were not traded at all.  The Court agrees that each tranche, or Certificate, is indisputably a separate security.

Defendants interpret the plain language of Sections 11 and 12(a) of the Securities Act to mean that a person can assert a claim only if that person has purchased or acquired that particular tranche, or Certificate.  According to Defendants, Plaintiffs do not have statutory standing to assert claims as to Certificates they did not purchase.

Plaintiffs vigorously disagree that the Securities Act limits standing to the particular tranche or Certificate purchased.  Plaintiffs rely on *Hertzberg v. Dignity*

---

[13] CUSIP is an acronym for the Committee on Uniform Securities Identification Procedures, which in 1968 began issuing unique nine-digit numbers to publicly-traded securities.  These numbers are permanently assigned to each issue and are generally printed on the face of the security if they are issued in physical form.

[14] Credit enhancement is designed to absorb all or a portion of credit losses, thereby increasing the likelihood that investors receive their contractual cash flows and raising the securities' credit ratings.  Credit enhancement can be internal, such as over-collateralizing pool assets and structuring transactions to include subordinated classes of securities that absorb cash-flow shortfalls, or external, such as third party letters of credit or bond insurance.  *See* Ferrel, Bethel, & Hu, *supra* n.9, pp.12-13.

[15] Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of these excerpts from prospectus supplements for offerings at issue in this lawsuit.  The prospectus supplements were publicly filed with the Securities and Exchange Commission ("SEC") and a court may take judicial notice of SEC filings on a motion to dismiss.  *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006).

*Partners, Inc.*, 191 F.3d 1076 (9th Cir. 1999), in which the Ninth Circuit interpreted the phrase "acquired such security" in Section 11(a).  The Ninth Circuit concluded that Section 11(a) allows a claim by any person who purchased stock issued under the allegedly misleading registration statement, regardless of whether they purchased in the initial offering or sometime thereafter.  *Id*. at 1080.  Plaintiffs contend that the *Hertzberg* opinion holds that a plaintiff has standing to sue as to all securities issued by an allegedly misleading offering document, as long as it purchased at least one of them.[16]  The Court has heard this argument before.  In opposition to Defendants' motions to dismiss, Plaintiffs contended they had standing to sue with respect to all securities issued pursuant to a common registration statement, so long as one of the lead plaintiffs had purchased a security pursuant to that same registration statement.  Opposition to Motions to Dismiss (Docket No. 182) at 60-67.  This Court, like many other federal courts, rejected that interpretation because Plaintiffs' claims rely on separate disclosures or omissions made with respect to different loan pools for each offering.  *See In re Wachovia Equity Secs. Litig.*, 2011 WL 1344027, at *27; *Maine State Ret. Sys.*,

---

[16] The Court finds *Hertzberg* unhelpful in the context of MBS.  The Ninth Circuit did not address the question of whether Section 11(a) confers standing on a person who purchased any Certificate pursuant to an allegedly misleading registration statement to claim securities law violations for every other Certificate linked to that registration statement.  In *Hertzberg*, the Ninth Circuit was faced with an initial public offering of common stock issued in 1996, an offering far simpler than the MBS that would be offered a decade later.  The Ninth Circuit's opinion does not contemplate the types of securities this Court and numerous other courts across the country now find themselves addressing.  In MBS cases, one shelf registration statement can be linked to a dozen prospectus supplements, which each offer a dozen different Certificates backed by pools of different mortgages.  Indeed, Plaintiffs calculate there are 208 Certificates within the 14 offerings still at issue in this case.  Plaintiffs' Supplemental Memorandum at 8 (Docket No. 241).  That is an average of almost 15 Certificates—or 15 different securities—per offering.

722 F. Supp. 2d at 1163-64 & n.7 (collecting cases).[17]  This Court recently ruled that Plaintiffs have standing to sue only with respect to the offerings in which they purchased.  *Id*.  The Court then instructed Plaintiffs to "replead their causes of action with respect to securities actually purchased by Plaintiffs. . . . [and] specify in which tranches they invested."  *Id*. at 1364.  In light of the Court's recent ruling, Plaintiffs now contend they have standing to represent investors who have purchased any Certificate offered pursuant to the same prospectus supplement under which Plaintiffs have purchased.

The Court concludes that the plain text of the Securities Act dictates that Plaintiffs must have acquired or purchased the security on which they sue.  It is undisputed that each Certificate is a separate security.  Thus, Plaintiffs have standing to assert their claims with respect only to those Certificates a named Plaintiff has purchased.  Moreover, to the extent that the *Luther* state court plaintiffs did not themselves buy particular Certificates included in the SAC, the relevant limitations periods continued to run with respect to those tranches.  There can be no tolling with respect to securities the *Luther* plaintiffs did not purchase.

---

[17] In *In re Wachovia*, the Court rejected the shelf registration argument as misreading the relevant statute.  2011 WL 1344027, at *27.  The Court explained:

> Although Section 11 contemplates liability where "any part of the registration statement" contains a material misstatement or omission, the resulting cause of action is still limited to "any person acquiring such security" under the registration statement.  15 U.S.C. § 77k(a).  Thus, the "any part" provision allows the relevant purchaser to sue for misstatements that appear in the shelf registration statement, the supplemental prospectus, or any other filings incorporated therein.  *But defining the field of possible misstatements does not thereby enlarge the field of possible plaintiffs beyond the ranks of those who purchased or acquired the securities at issue*.

*Id*. (emphasis added).

1    **B.    PLAINTIFFS MUST BE PERSONALLY INJURED.**

2           The Court's conclusion is supported by Article III of the United States

3    Constitution.  To establish constitutional standing under Article III, a plaintiff must

4    demonstrate that it has personally suffered an injury in fact that is fairly traceable

5    to a defendant's alleged misconduct and is likely to be redressed by a decision in

6    the plaintiff's favor.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

7    In a class action, the lead plaintiffs must show that they *personally* have been

8    injured, "not that injury has been suffered by other, unidentified members of the

9    class to which they belong and which they purport to represent."  *Warth*, 422 U.S.

10   at 502.  Under Article III, Plaintiffs lack standing to sue on Certificates they did

11   not purchase because they have suffered no injury from those investments they did

12   not make.

13                    **a.  Systematic Disregard of Underwriting Guidelines**

14          Plaintiffs' alleged injury is a drop in the value of their investments.  SAC ¶

15   228 ("The value of the Certificates has declined substantially, subsequent to, and

16   due to, the violations of the Defendants named in this Count [One].").  Plaintiffs

17   allege Countrywide misrepresented that it was issuing loans in conformance with

18   its underwriting guidelines, but systematically disregarded those guidelines.  This

19   wrongful act allegedly pervaded all pools of loans and injured all proposed class

20   members in the same manner, irrespective of which tranche they purchased.  This

21   is the same theory Plaintiffs advanced when they argued they were entitled to sue

22   with respect to every security issued pursuant to a common registration statement.

23   The Court rejected that argument because each prospectus supplement identified

24   and contained disclosures about the specific loans being offered.  It is the loan-

25   level information that is relevant.  And in this case, individual tranches were

26   supported by different groups of loans.

27          The key to the standing issue is the significant differences between the

28   underlying pools of mortgages.  *See Maine State Ret. Sys.*, 722 F. Supp. 2d at

-13-

1164. "Each MBS is backed by a pool of unique loans, and the representations made in the prospectus supplements accompanying the issuance of those securities are themselves unique, focused on the specific loans underlying each offering and the specific underwriting standards and origination practices in effect at the time those specific loans were originated." *Id*. The loans are unique within an MBS offering from loan group to loan group in the same way they are unique from offering to offering. In most of the offerings, the senior tranches were backed by different groups of mortgage loans within the overall offering pool. In other words, the potential cash flow to be distributed to one tranche would come from a specific subgroup of loans different from the subgroups that would fund distributions to other tranches.

In some instances, these loans were originated by different companies, by different underwriting officers, and valued by different appraisers. Moreover, the loan groups could be comprised of different types of loan products, *e.g.*, first lien loans, second lien loans, fixed rate loans, and adjustable rate loans. The term length of the loans could also differ. The variety in terms of type of loan products, length of the term, credit rating and interest rate, existed at the tranche level to allow each investor to choose the characteristics of the security that best matched its needs.[18] Some investors forwent the opportunity for a higher return and chose safer investments, such as the most senior tranches. Other investors decided the riskiest tranches met their needs. In all cases, each tranche provided a different investment opportunity with unique characteristics.

Because the loan groups backing the Certificates differed from tranche to tranche, the statements regarding underwriting and credit characteristics found in

---

[18] *See* Robert G. Gucwa, *The 2007 Collapse in Securitization: A Case for Regulatory Reform*, 14 N.Y.U. J. LEGIS. & PUB. POL'Y 245, 249 & n.27 (2011); Peter H. Hamner, *The Credit Crisis and Subprime Litigation: How Fraud Without Motive 'Makes Little Economic Sense'*, 1 No. 1 U. PUERTO RICO BUS. L.J. 103, 109 (2010).

the prospectus supplements for those MBS deals were essentially different statements for each tranche, given that the point of reference for those statements—the loan groups—differed at the tranche level.  In other words, an alleged misstatement as to the origination practices with respect to one loan group backing a particular tranche would not necessarily constitute a misstatement as to a different loan group backing a different tranche.  In this case, the Court must view standing at the loan group level.  The injury arises when the specific loans do not conform to the representations in the prospectus supplement.  Accordingly, for standing purposes, any alleged injury flowing from an alleged misstatement as to one tranche would not necessarily constitute injury to purchasers of different tranches backed by different loan groups.

The Court's decision makes good practical sense.  The logical extension of Plaintiffs' theory is that their allegations of systematic disregard of underwriting guidelines confers standing upon them to challenge every single person or entity that purchased from any offering which was originated or underwritten by the Defendants.  The Securities Act and Article III do not support that result.

### b.  Interconnectedness is Irrelevant.

Plaintiffs argue an investor in one tranche is injured-in-fact by misrepresentations as to the quality of loans that back other tranches, even those they have not purchased, because the tranches within an offering are interconnected.  They argue, for instance, that tranches may share a common pool of mortgages or may have credit enhancement mechanisms that divert payments from one pool of loans to another.  As a result of this interconnection, Plaintiffs argue that an investment in one tranche is affected by the quality of loans that back another tranche.[19]

---

[19] Plaintiffs demonstrate this interconnection in part by relying on high default rates among the various tranches and by arguing there was a fairly uniform downgrade of ratings among the different tranches.

1     The Court recognizes that the tranches are interconnected.  That fact is

2  indisputable.  However, the interconnectedness is largely irrelevant.  Plaintiffs

3  cannot plausibly allege to be injured by another group of loans merely because one

4  tranche they purchased had a credit enhancement that entitled them to cash flows

5  from another group if their own pool performed poorly.  Such an enhancement

6  would never be triggered if the loans underlying their own tranche paid out

7  sufficiently.  It is therefore speculative to conclude that any injury to one tranche

8  will necessarily result in injury to a different tranche.

9     The Court **DISMISSES** the SAC as to all Certificates that at least one

10 named plaintiff did not purchase.

11         **IV.    THE SECTION 12(a)(2) CLAIMS**

12        Count Two is brought pursuant to Section 12(a)(2) against the Issuer

13 Defendants and "the Section 12 Underwriter Defendants."  SAC ¶ 231.  To plead a

14 claim under Section 12(a)(2), the plaintiff must allege that (1) the defendant is a

15 statutory seller; (2) the sale was effected by means of a prospectus or oral

16 communication; and (3) the prospectus or oral communication contained a material

17 misstatement or omission.  *See* 15 U.S.C. 77*l* (a)(2).  Count Two alleges that the

18 Issuer Defendants and Section 12 Underwriter Defendants (collectively, the

19 "Count Two Defendants") "promoted and sold the Certificates pursuant to the

20 defective Offering Documents."  SAC ¶ 232.  The Issuer Defendants were the

21 depositors and issued the registration statements.  SAC ¶¶ 41-44.  The Section 12

22 Underwriter Defendants drafted and disseminated the Prospectus Supplements

23 pursuant to which the MBS were sold to Plaintiffs.  SAC ¶¶ 46, 48.  Plaintiffs and

24 members of the Class purchased Certificates directly from the Section 12

25 Underwriter Defendants in the MBS offerings.  SAC ¶ 232.

26        The SAC distinguishes between Certificates which Plaintiffs bought

27 "pursuant or traceable" to the offering documents and those bought "on the

28 Offering and directly from the Underwriter."  *See*, *e.g.*, SAC ¶ 78.  With respect to

the Certificates bought "directly from the Section 12 Underwriter Defendants," the SAC sets forth which named plaintiff purchased which Certificates of which Issuing Trust on which date and which underwriter sold the Certificates.  SAC ¶ 235.  The SAC also sets forth the date on which the relevant prospectus supplement was issued.  *Id.*  Appendix Exhibit B to the SAC lists all fourteen MBS offerings at issue in the SAC and shows the prospectus date, the depositor, and the underwriter for each offering.

The Count Two Defendants move to dismiss the Section 12(a)(2) claims on two bases.  *See* Docket Nos. 158, 159.  First, they move to dismiss the claim against the Issuer Defendants because the Issuer Defendants do not qualify as sellers as set forth in Section 12(a)(2).  Next, they argue Plaintiffs have not adequately alleged they purchased the securities in an initial public offering, within forty days of the issuance of the relevant prospectus supplement, as opposed to in the secondary market.  The Court agrees that the Issuer Defendants are not statutory sellers and **DISMISSES** Count Two against them.  With respect to the Section 12 Underwriter Defendants, the Court finds Plaintiffs have sufficiently stated a claim and **DENIES** the motion to dismiss with respect to those defendants.  However, the Court will not allow Plaintiffs to bring a Section 12(a)(2) claim regarding purchase of securities that Plaintiffs did not purchase pursuant to the prospectus supplement in the initial public offering.  To the extent Plaintiffs seek to include such securities, allegations as to those particular securities are **DISMISSED** from Count Two.

## A.   THE ISSUER DEFENDANTS ARE NOT STATUTORY SELLERS.

As set forth in the SAC, the Issuer Defendants—CWALT, CWMBS, CWABS, CWHEQ—did not pass title directly to the Plaintiffs.  *See* SAC ¶ 45. Instead, the underwriters purchased the securities from the Issuer Defendants and then sold the securities to the Plaintiffs.  *See, e.g.*, Countrywide Defendants' RJN

Ex. 5 [CWALT 2005-24 Prospectus Supplement at S-128], Ex. 9 [CWHEQ 2007-E Prospectus Supplement at S-89] (Docket No. 160).

Section 12(a)(2) of the Securities Act imposes liability upon any person who "offers or sells a security." 15 U.S.C. § 77*l*(a)(2). "The 'offers or sells' clause limits § 12(a)(2) liability to two narrow classes of defendants: (1) immediate sellers ('remote purchasers are precluded from bringing actions against remote sellers'); and (2) those who solicit purchases to serve their 'own financial interests or those of the securities owner.'" *In re Countrywide Fin. Corp. Secs. Litig.*, 588 F. Supp. 2d 1132, 1183 (C.D. Cal. 2008) (quoting *Pinter*, 486 U.S. at 644 n.21); *In re Daou Sys., Inc.*, 411 F.3d at 1029.[20] Because the securities at issue were sold through a firm commitment underwriting, in which title passed from the Issuer Defendants to the underwriters before passing to the ultimate purchasers, the Issuer Defendants are not immediate sellers. *See*, *e.g.*, *Lone Star Ladies Inv. Club v. Schlotsky's, Inc.*, 238 F.3d 363, 370 (5th Cir. 2001).

To sustain a Section 12(a)(2) claim against the Issuer Defendants under the second prong of the *Pinter* test, seller by solicitation, Plaintiffs would have to plead active participation in the solicitation of the immediate sale, a direct relationship between the purchaser and the defendant. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998); *In re Westinghouse Secs. Litig.*, 90 F.3d 696, 717 & n.19 (3d Cir. 1996). Plaintiffs allege the Issuer Defendants issued the registration statements, but the Section 12 Underwriters drafted and disseminated the prospectus supplements pursuant to which the MBS were sold to Plaintiffs. SAC ¶¶ 41-44, 46, 48. Even if Plaintiffs had alleged the Issuer Defendants prepared the prospectus supplements, many courts have found mere preparation of

---

[20] *Pinter v. Dahl* addressed Section 12(a)(1). Section 12(a)(2) uses the identical language "any person who offers or sells a security" and thus the Pinter approach applies to Section 12(a)(2) as well. *See Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 635 (3d Cir. 1989).

prospectus supplements insufficient to plead solicitation. *E.g.*, *Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989); *Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 99 (D. P.R. 2010) ("Plaintiffs must demonstrate that there was some sort of relationship between the plaintiffs and defendants and that defendants actively solicited plaintiffs' purchases." (internal quotation marks and citation omitted)); *In re Sonus Networks, Inc. Secs. Litig.*, No. 04-10294-DPW, 2006 WL 1308165, * 10 (D. Mass. May 10, 2006). Even participation in road shows to promote the sale of stock does not constitute active solicitation under *Pinter*. *Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397, *7 (W.D. Wa. Dec. 29, 2008); *see also Lone Star Ladies Inv. Club*, 238 F.3d at 370 ("Virtually all issuers routinely promote a new issue, if only in the form of preparing a prospectus and conducting a road show.").

Plaintiffs clearly allege the Section 12 Underwriter Defendants are direct sellers, but do not explain how the Issuer Defendants have solicited their sale. The allegation that the Issuer Defendants "promoted" the sale of securities is not sufficient. SAC ¶ 232; *Lone Star Ladies Inv. Club*¸ 238 F.3d at 370. Plaintiffs must include very specific allegations of solicitation, including direct communication with Plaintiffs. *See, e.g.*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *In re Westinghouse Secs. Litig.*, 90 F.3d at 717; *In re Thornburg Mortg., Inc. Secs. Litig.*, 695 F. Supp. 2d 1165, 1220-21 (D. N.M. 2010). As the Supreme Court stated in *Pinter*, "[b]eing merely a 'substantial factor' in causing the sale of unregistered securities is not sufficient in itself to render a defendant liable." *Pinter*, 486 U.S. at 654. Under *Pinter*, Count Two must be dismissed against the Issuer Defendants.

Plaintiffs rely on SEC Rule 159A, which provides that an issuer is a statutory seller for the purposes of Section 12(a)(2) regardless of the form of underwriting. *See* 17 C.F.R. § 230.159A. Rule 159A became effective on December 1, 2005. almost two decades after the Supreme Court's decision in

*Pinter*.  The SEC explained that an issuer "can be viewed as soliciting purchases of the issuer's registered securities" and can therefore be statutory sellers.  *Securities Offering Reform*, Securities Act Release No. 52056 (July 19, 2005), 2005 WL 1692642, at *78.  Yet, although numerous courts have been presented with the question of whether an issuer is a statutory seller if there was a firm commitment underwriting, only one court has applied SEC Rule 159A .  *Citiline Holdings, Inc. v. iStar Financial Inc*., 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010).  No other decision even mentions Rule 159A.  All other courts have applied *Pinter* and almost all have found that unless there are specific allegations that the issuer falls within the solicitation prong of *Pinter*'s definition, the issuer is not a statutory seller.  *See, e.g.*, *In re Thornburg Mortg., Inc. Secs. Litig.*, 695 F. Supp. 2d at 1220-21; *Hoff*, 727 F. Supp. 2d at 99.

*Pinter* states that Congress did not intend to impose liability under Section 12 for "mere participation" in an unlawful sales transaction.  486 U.S. at 650.  The Court therefore concludes that, regardless of what the SEC's position may be, Plaintiffs must allege direct solicitation.  As a policy matter, the Court notes that because Section 12(a)(2) claims do not require allegations of scienter, reliance or loss causation, liability is more easily established.  *See In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d at 359-60.  This aspect of the statute supports a more narrowly drawn interpretation of a statutory seller.  The Court **DISMISSES** Count Two against the Issuer Defendants.

**B.    PLAINTIFFS MUST ALLEGE THEY PURCHASED THE SECURITIES IN AN INITIAL PUBLIC OFFERING.**

Section 12(a)(2) provides that any person who "offers or sells" a security by means of a prospectus containing a materially false statement or material omission shall be liable to any "person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2).  To maintain a claim under Section 12(a)(2), Plaintiffs must allege they purchased a security directly from the issuer of the prospectus supplement, here the

1   Section 12 Underwriter Defendants, as part of the initial public offering rather than

2   in the secondary market. *See Hertzberg*, 191 F.3d at 1081 ("Section 12 . . . permits

3   suit against a seller of a security by prospectus only by 'the person purchasing such

4   security *from him*,' thus specifying that a plaintiff must have purchased the security

5   directly from the issuer of the prospectus." (quoting 15 U.S.C. § 77*l*(a)(2))

6   (emphasis added in *Hertzberg*)); *In re Levi Strauss & Co. Secs. Litig.*, 527 F. Supp.

7   2d 965, 983 (N.D. Cal. 2007) (holding Section 12(a) does not apply to aftermarket

8   purchases). Accordingly, Plaintiffs must allege they purchased the securities

9   "pursuant to" the allegedly misleading offering documents instead of "pursuant

10  and/or traceable to" those documents. *In re Century Aluminum Co. Secs. Litig.*,

11  749 F. Supp. 2d 964, 976-77 (N.D. Cal. 2010); *Boilermakers Nat'l Annuity Trust*

12  *Fund v. WaMu Mortg. Pass Through Certificates, Series AR1, et al.*, 748 F. Supp.

13  2d 1246, 1253-54 (W.D. Wash. 2010); *In re Wells Fargo Mortgage-Backed*

14  *Certificates Litig.*, 712 F. Supp. 2d at 966; *Plumbers' Union Local No. 12 Pension*

15  *Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d at 305.

16      The Section 12 Underwriter Defendants argue that Plaintiffs have not

17  adequately alleged they bought their securities in the challenged initial public

18  offering as opposed to in the aftermarket. Plaintiffs have alleged that they

19  purchased some Certificates "directly from the Section 12 Underwriter Defendants

20  in the Offerings" and have set forth which are those offerings. SAC ¶¶ 232, 235.

21  In the remaining offerings, Plaintiffs have alleged they purchased Certificates

22  "pursuant to the Offering Documents." SAC ¶ 234. The Court concludes these

23  allegations are sufficient to state a claim against the Section 12 Underwriter

24  Defendants.[21]

25

26  _____

27  [21] The Court notes that certain paragraphs in the SAC use the language "pursuant or
    traceable to." *See*, *e.g.*, SAC ¶ 1. This language is sufficient for Section 11 claims,

28  which require only an allegation that the plaintiff purchased pursuant to or traceable to a
    false registration statement. Under Section 12(a)(2), however, an allegation that

-21-

1    Defendants argue that many of Plaintiffs' purchases occurred after the
2    expiration of the forty-day prospectus delivery period set forth in the Securities
3    Act, 15 U.S.C. §§ 77d(3), 77e(b), and thus cannot be considered to be made
4    pursuant to the initial offering.  Brief In Support Of Motion to Dismiss (Docket
5    No. 158) at 74-75 & n.75.  Plaintiffs counter that Defendants have raised this issue
6    prematurely.  The Court concludes that the issue is not premature as it relates
7    directly to standing.  Plaintiffs have standing to bring a Section 12(a)(2) claim only
8    related to offerings in which they purchased Certificates in the initial public
9    offering under the prospectus.  It is not clear to the Court at this stage which
10   securities were not purchased in the initial public offering; however, the Court
11   holds that those securities cannot be the basis of Plaintiffs' Section 12(a)(2) claim
12   and Plaintiffs shall amend their complaint accordingly.

## V.    COUNT III: CONTROL PERSON LIABILITY

14   The SAC alleges Sambol and the Countrywide Defendants are controlling
15   persons of the Issuer Defendants within the meaning of Section 15 of the Securities
16   Act, 15 U.S.C. § 77*o*, and brings a claim against them for control person liability.
17   SAC ¶¶ 239-43.  Sambol and the Countrywide Defendants move to dismiss the
18   claim under Federal Rule of Civil Procedure 12(b)(6).  The Court finds the claim
19   adequately pleaded and **DENIES** the motions to dismiss Count III.

20   Sambol moves to dismiss Count III for the additional reason that the statute
21   of limitations has run with respect to the claim against him.  The Court finds the
22   statute of limitations was tolled with respect to Sambol and **DENIES** Sambol's
23   motion to dismiss on this basis as well.

### A.    SUFFICIENCY OF ALLEGATIONS

25   "To establish controlling person liability, the plaintiff must show that a
26   primary violation was committed and that the defendant directly or indirectly

---

28   Plaintiffs purchased "pursuant or traceable to" the offering documents would be insufficient.

controlled the violator.  In general, the determination of who is a controlling person is an intensely factual question."  *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) (internal quotation marks and citations omitted).  However, "[a]t the motion to dismiss stage, allegations concerning an individual defendant's title and responsibilities are usually sufficient to establish control."  *In re Int'l Rectifier Corp. Secs. Litig.*, No. CV 07-02544-JFW (VBKx), 2008 WL 4555794, at *22 (C.D. Cal. May 23, 2008) (citing *In re Metawave Communications Corp. Secs. Litig.*, 298 F. Supp. 2d 1056, 1091 (W.D. Wash. 2003); *In re Adaptive Broadband Secs. Litig.*, No. C 01-1092 SC, 2002 WL 989478, at *19 (N.D. Cal. Apr. 2, 2002)).  Control means the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  *See* 17 C.F.R. § 230.405; *Safeway Portland Emp. Fed. Credit Union v. C.H. Wagner & Co., Inc.*, 501 F.2d 1120, 1124 n.17 (9th Cir. 1974).

### a.  Countrywide Defendants

The SAC identifies the Countrywide Defendants—CFC, CSC, CCM and CHL—as controlling persons of the Issuer Defendants within the meaning of Section 15 of the Securities Act.  SAC ¶ 241.  The SAC explains, "[a]lthough Defendants CWALT, CWMBS, CWABS, and CWHEQ served as the Depositors for the Issuing Trusts and issued the Registration Statements, this process was directed and controlled by the Countrywide Defendants, the Individual Defendants, and Sambol."  SAC ¶ 91.  "The Countrywide Defendants [] had the power and influence and exercised the same to cause the Issuer Defendant to engage in the acts described herein."  SAC ¶ 241.  And, "[t]he Countrywide Defendants' [] control, ownership and position made them privy to and provided them with knowledge of the material facts concealed from Plaintiffs and the Class."  SAC ¶ 242.

With respect to CFC, the SAC alleges that CFC structured the Issuer Defendants to facilitate the issuance and sale of the MBS and controlled them directly.  SAC ¶ 40.  It alleges also:

> The Issuer Defendants, as set forth below, were controlled directly by the Individual Defendants and CFC, including by the appointment of CFC executives as directors and officers of these entities. . . . Defendant CFC, therefore, exercised actual day-to-day control over Defendants CWALT, CWMBS, CWABS, and CWHEQ.

SAC ¶ 34.  "CFC set up Defendants CWALT, CWMBS, CWABS, and CWHEQ, the Depositors in this case, as 'limited purpose finance entities' solely for the purpose of facilitating the issuance of the Certificates."  SAC ¶ 91.  The Court finds these allegations sufficient to state a claim that CFC had the power to direct or cause the direction of the management of the Issuer Defendants.

With respect to the remaining Countrywide Defendants, CSC is alleged to be a Countrywide Defendant and an Underwriter Defendant.  The SAC alleges CSC is a broker-dealer within CFC that specializes in trading and underwriting MBS.  SAC ¶ 35.  CSC allegedly acted as an underwriter for the Certificates at issue, and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.  SAC ¶¶ 46, 213.  Later, the SAC alleges that CSC itself marketed and sold the securities. SAC ¶ 91.  CHL was engaged in the mortgage banking business, and originated, purchased, sold and serviced mortgage loans.  SAC ¶¶ 36, 91. CHL also valued the properties underlying the Issuing Trusts.  SAC ¶ 93. "CHL served as the 'Sponsor' or 'Seller' of the Certificates, meaning that it played a central role in providing the pools of mortgage loans to the Issuing Trusts upon which the Certificates were based."  *Id.*  The SAC alleges CCM participates in competitive bid and negotiated underwritings and performs

underwriting services for CHL, Countrywide Bank and third parties.  SAC ¶ 37.

By virtue of these entities' "ownership and position," Plaintiffs allege they were privy to knowledge of material facts concealed from Plaintiffs and had the power and influence to cause the Issuer Defendants to violate the Securities Act.  SAC ¶¶ 241, 242.  Although Plaintiffs certainly have not proven any of these entities actually exercised control over the Issuer Defendants, by virtue of the alleged interconnection and involvement in the process of issuing the MBS, the Court concludes Plaintiffs have sufficiently pleaded Section 15 claims against the Countrywide Defendants.

**b. David Sambol**

The SAC identifies David Sambol as the President and Chief Operating Officer ("COO") of CFC.  SAC ¶ 59.  As such, Plaintiffs allege Sambol was a control person of the Countrywide Defendants and the Issuing Defendants and they bring Count III against him.  SAC ¶¶ 239-43.  Sambol contends Plaintiffs have failed to meet their pleading burden with respect to him because they have omitted any factual allegations regarding the control relationship.  According to Sambol, Plantiffs improperly rely on his title, when the law dictates that a control person claim cannot be based solely on the assertion that the defendant held a high-ranking position.  *In re Digital Island Secs. Litig.*, 223 F. Supp. 2d 546, 561 & n.9 (D. Del. 2002) (plaintiff must allege defendant exercised direct or indirect control); *Wanetick v. Mel's of Modesto, Inc.*, 811 F. Supp. 1402, 1407 (N.D. Cal. 1992).

The SAC does not rely only upon Sambol's title as President and COO of CFC.  The SAC contains sufficient allegations to explain Sambol's control relationship over the Issuer Defendants.  The SAC states:

The Issuer Defendants, as set forth below, were controlled directly by the Individual Defendants and CFC, including by the appointment of CFC executives as directors and officers of these entities. . . .

Defendant CFC, therefore, exercised actual day-to-day control over Defendants CWALT, CWMBS, CWABS, and CWHEQ.  SAC ¶ 34. Sambol is identified as the President and COO of CFC.  SAC ¶ 59.  CFC allegedly structured the Issuer Defendants to facilitate the issuance and sale of the MBS. SAC ¶ 40.  The SAC alleges that the process of issuing the Certificates and the Registration Statements that the Issuer Defendants were engaged in, was directed and controlled by Sambol.  SAC ¶ 91.  Later, the SAC explains, "Sambol had the power and influence and exercised the same to cause the Issuer Defendant to engage in the acts described herein."  SAC ¶ 241.  Finally, "Sambol's control, ownership and position made [him] privy to and provided [him] with knowledge of the material facts concealed from Plaintiffs and the Class."  SAC ¶ 242.

Based on these allegations, the Court concludes that the SAC sufficiently pleads a *prima facie* case of controlling person liability under Section 15 against Sambol.  It is "reasonable to presume that th[is] officer ha[d] the power to control or influence the particular transactions giving rise to the [alleged] securities violation."  *Wool v. Tandem Computers*, 818 F.2d 1433, 1441 (9th Cir. 1987), *impliedly overruled in part on other grounds by Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577-78 (9th Cir. 1990).

**B.   STATUTE OF LIMITATIONS**

Claims brought under Section 15 are subject to the one-year statute of limitations set out under Section 13 of the Securities Act.  *See* 15 U.S.C. § 77m. Plaintiffs allege the control person liability claim against Sambol was tolled during the pendency of the two consolidated putative class actions that came before this suit, *Washington State* and *Luther*.[22]  Sambol claims that the statute of limitations ceased to toll when the two cases were consolidated and the consolidated complaint dropped the Section 15 claim against him.

---

[22] *See supra* n.6.

### a. *Washington State*

Sambol was first named as a defendant in the *Washington State* complaint filed on June 12, 2008.  Defendants' RJN, Ex. 27 (Docket No. 160-17).  Paragraph 47 on page 36 of the *Washington State* complaint states:

> Defendant David Sambol ("Sambol") was, at relevant times, CWHEQ's CEO, President, and Chairman of the Board of Directors. Defendant Sambol signed CWHEQ's January 10, 2007, March 2, 2007 and April 17, 2007 Registration Statements.

*Id.* at 36, ¶ 47.  The complaint also alleged that Countrywide executives disregarded warnings from the company's risk-control managers as early as late 2003 and quotes a Wall Street Journal article that said "Sambol (Countrywide's President and Chief Operating Officer) brushed aside warnings from risk-control managers at Countrywide that the company's lending standards were too lax."  *Id.* at 55, ¶ 69.  "Being too cautious would turn Countrywide into a 'nice little boutique,' a former colleague recalls him saying."  *Id.*  The plaintiffs in *Washington State* brought a Section 11 claim against Sambol for making false and materially misleading statements in CWHEQ's Registration Statements, and a Section 12(a)(2) claim against the Issuing Defendants, including CWHEQ—of which Sambol was the CEO, President and Chairman of the Board of Directors. They brought Section 15 claims against CFC, CSC and CHL by virtue of their control, ownership, offices, directorships, power and influence to cause the Issuing Defendants to engage in the acts described herein.  Sambol was not named in any claim but the Section 11 claim.

### b. *Luther*

Sambol was named as a defendant in the *Luther* complaint for the first time when the *Luther* plaintiffs amended their complaint on September 9, 2008 and added him as a defendant to all of their claims, comprising of Section 11, 12(a)(2)

and a Section 15 claim.  Countrywide Defendants' RJN Exhibit 26 (Docket No. 160-15).

       When the *Washington State* and *Luther* cases were consolidated and the consolidated complaint was filed on October 16, 2008, Sambol was accused only of violating Section 11, based on his position as CWHEQ's CEO, President and Chairman of the Board of Directors and his signing of the CWHEQ Registration Statements.  Countrywide Defendants' RJN Exhibit 28 (Docket No. 160-18) ¶ 68. The consolidated complaint also stated that Sambol was concurrently the President and COO of Defendant CFC.  *Id.*  Although the Section 12(a)(2) and Section 15 claims were dropped against Sambol, the complaint alleged that Defendant CFC structured the Defendants CWALT, CWMBS, CWABS, and CWHEQ as limited purpose, wholly-owned, finance subsidiaries to facilitate CFC's issuance and sale of the Certificates.  *Id.* ¶ 31.  It alleged that the Issuing Defendants "are controlled directly by CFC, through its appointment of CFC executives as directors and officers of these entities" and that CFC "exercised actual day to day control over Defendants CWALT, CWMBS, CWABS and CWHEQ."  *Id.*  The Section 15 claim was asserted against CFC, CSC, CCM and CHL as controlling persons of the Issuing Defendants.  Sambol claims that at this time, the statute of limitations ceased tolling and began running anew on the Section 12(a)(2) and 15 claims against him.

       **c.  The Present Action**

       Fifteen months later, on January 14, 2010, this action was filed and Plaintiffs brought a Section 15 claim against Sambol.  Sambol asks the Court to dismiss the Section 15 claim against him as barred by the one-year statute of limitations that ran between the filing of the consolidated complaint in *Luther* and the initial complaint in this action.  Sambol relies on *In re Stac Electronics Litigation*, a case in which the court dismissed securities claims brought against *new* defendants for the first time in an amended complaint, where the one-year statute of limitations

expired after the original complaint was filed but before the amended complaint was filed.  89 F.3d 1399, 1411 (9th Cir. 1996).  This case is inapposite because Sambol is not a new defendant.  He has been a defendant continuously since June 12, 2008—only the claims against him have changed.

> The United States Supreme Court explained in *American Pipe*,
>
> statutory limitation periods are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.  The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.

*American Pipe*, 414 U.S. at 554 (internal citations and quotation omitted).  Tolling is permissible when commencement of the class suit notifies the defendant of the claims being brought against him.  *Id*. at 555.  In *Johnson v. Railway Express Agency, Inc.*, the Supreme Court explained the importance that the prior filings involve the same cause of action subsequently asserted.  421 U.S. 454, 467 (1975).  Here, Sambol was first on notice of the Section 15 claim in June 2008.  A few months later, he saw the claim dropped against him, but continued to be sued under Section 11 and was identified in the consolidated complaint as a leader of CFC.

The Court recognizes that it must ensure "*American Pipe* is not abused by the assertion of claims that differ from those raised in the original class suit" and that only claims as to which the defendant was fairly placed on notice by the class suit are protected under *American Pipe*.  *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 355 (1983) (quoting *American Pipe,* 414 U.S. at 562) (Powell, concurring).  However, the cause of action in a subsequent complaint need not be identical to that in a previous complaint for *American Pipe* tolling to apply, as long as the claims "concern the same evidence, memories, and witnesses as the subject

matter of the original class suit" so that "the defendant will not be prejudiced."  *Id.* In *Cullen v. Margiotta*, the Second Circuit held that the statute of limitations could be tolled under *American Pipe* by a putative class action concerning the same wrongful acts even if the legal theory was different.  811 F.2d 698, 720 (2d Cir. 1987), *overruled on other grounds by Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987).  Likewise, in *In re Enron Corporation Securities, Derivative, & "ERISA" Litigation*, the district court found that subsequent claims "need not be identical to the original class action's claims for tolling to apply as long as they share a common factual basis and legal nexus so that the defendant would rely on the same evidence and witnesses in his defense." 465 F. Supp. 2d 687, 718 (S.D. Tex. 2006); *Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985) ("We find no persuasive authority for the rule which would require that the individual suit must be identical in every respect to the class suit for the statute to be tolled.").  In this case, applying *American Pipe* would not subject Sambol to any unfair surprise—the charges against him in the Complaint arise from the same transactions and wrongful acts as those indentified in the earlier complaints in which he was named.  At all times, Sambol has been accused of violating the Securities Act of 1933.

As a separate argument, Sambol claims that by the time he was named as a defendant in June 2008, the statute of limitations had already run because "[a]n abundance of publicly-available information put [P]laintiffs on inquiry notice of the facts underlying their claim against him well before June 2007."  Sambol's Motion to Dismiss (Docket No. 157) at 11.  This argument is best reserved for a motion for summary judgment.  Accordingly, the Court **DENIES** Sambol's motion to dismiss the Section 15 claim on the basis of the statute of limitations.

Finally, Sambol argues that the Section 15 claim against him cannot stand because the underlying violations of Sections 11 and 12(a)(2) are not properly pleaded.  Sambol joins in the Countrywide Defendants' motion to dismiss with

1  respect to inadequate allegations, which is addressed in Section VI, *infra*, and he

2  emphasizes the argument that Plaintiffs failed to allege legally cognizable injury.

3  The Court rejects these arguments for the reasons set forth in Section VI.  Sambol

4  also argues that the statute of repose bars the claims against him; the Court rejected

5  that argument in its prior Order.  *See Maine State Ret. Sys.*, 722 F. Supp. 2d at

6  1166.

## VI.   OTHER GROUNDS RAISED BY THE COUNTRYWIDE DEFENDANTS[23]

9  The Countrywide Defendants make several other arguments about the

10  insufficiency of the SAC allegations.  With respect to these remaining arguments,

11  the Court **DENIES** the motion to dismiss.

### A.   THE ALLEGATIONS OF MATERIAL MISSTATEMENTS ARE SUFFICIENT.

13  The Countrywide Defendants move to dismiss the Securities Act claims for

14  failure to allege material misstatements or omissions.  They argue Plaintiffs must

15  plead that a specific loan that Plaintiffs purchased was misrepresented, that

16  Plaintiffs requested cure or replacement, and that Countrywide failed to repurchase

17  or substitute delinquent mortgages in accordance with the provisions of the

18  securitization documents.

19  As explained above, the Court applies the Rule 8(a) pleading standard to

20  Plaintiffs' Securities Act claims.  When viewed in its totality, the SAC alleges

21  enough facts to state a claim to relief that is plausible on its face.  *Twombly*, 550

22  U.S. at 570.  A claim is plausible when a plaintiff has pleaded enough factual

23  content to allow a court to draw a reasonable inference that the defendant is liable

24  for the alleged misconduct.  *Iqbal*, 129 S. Ct. at 1949.

---

[23] Defendants Sieracki (Docket No. 145), Spector (Docket No. 146), Kurland (Docket No. 149), Sambol (Docket No. 163), and the Underwriter Defendants (Docket No. 159) joined in the motion to dismiss filed by the Countrywide Defendants.

1    The Court disagrees that Plaintiffs must identify specific loans that were
2  issued by deviating from the underwriting guidelines.  The SAC alleges that
3  Defendants are liable for material misrepresentations and omissions in the offering
4  documents, which failed to disclose that Countrywide was originating loans in
5  systematic disregard of its underwriting guidelines, including using inflated
6  appraisals.  *See*, *e.g.*, SAC ¶¶ 6, 10, 92, 177-200.  In effect, Plaintiffs allege that the
7  misstatements and omissions were made with respect to all of the loans, and all of
8  the loans were issued by deviating from the underwriting guidelines.  *See In re*
9  *Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d at 971-72.
10  2010); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d
11  387, 392-93 (S.D.N.Y. 2010).  The SAC pleads facts regarding high default and
12  delinquency rates and a widespread downgrade of the Certificates from investment
13  grade to junk bond levels, both of which fairly give rise to an inference that
14  Countrywide had systematically disregarded its underwriting guidelines and that
15  such information was withheld from the offering documents.  *See*, *e.g.*, SAC ¶¶ 6,
16  11, 12, 102-104, 106, 109-114.  At the present time, Plaintiffs' allegations are
17  sufficient.

18    Defendants also argue that any alleged misrepresentations or omissions were
19  not material because the offering documents contained numerous disclosures
20  which told investors all the material information needed to assess the risk
21  associated with the pool loans.  This argument is best raised at summary judgment.

22  **B.   RELIANCE**

23    To state a claim under Section 11, a plaintiff "must demonstrate (1) that the
24  registration statement contained an omission or misrepresentation, and (2) that the
25  omission or misrepresentation was material, that is, it would have misled a
26  reasonable investor about the nature of his or her investment."  *In re Stac Elecs.*
27  *Sec. Litig.*, 89 F.3d at 1403-04 (quotations and citation omitted).  Although reliance
28  ordinarily is not an element, an exception applies where the issuer released an

earnings statement that covers a twelve-month (or greater) period that began after the effective date.  *In re Countrywide Fin. Corp. Secs. Litig.*, 588 F. Supp. 2d at 1162 n.34.  In that case, aftermarket purchasers who acquired the security after the earnings statement must also prove reliance on the registration statement. 15 U.S.C. § 77k(a); *Id.*

In response to the Consolidated Amended Complaint—before the Court ordered Plaintiffs to reduce the offerings in this case and before Plaintiffs filed the SAC bringing suit on only 14 offerings—the Countrywide Defendants argued that numerous of the Certificates at issue here were purchased after twelve months of Distribution Reports had been issued.  According to the Countrywide Defendants, Disclosure Reports for MBS issuers are analogous to earning statements for a public operating company.  Thus, they argued, the earning statement exception should apply in those instances.  Defendants contend Plaintiffs must plead specifically that they relied on the allegedly misleading offering documents rather than the more recently issued Disclosure Reports.

It is unclear to the Court whether this argument applies any longer, now that the Court has reduced the case to those securities—at a tranche level—that Plaintiffs have purchased and on which the consolidated *Luther* plaintiffs had standing to sue.  The Court therefore reserves judgment on this issue.

## C.   ALLEGATIONS OF INJURY ARE SUFFICIENT.

Section 11 requires that a plaintiff plead facts demonstrating that he suffered the particular type of injury contemplated by the statute.  The type of injury contemplated is a decline in investment value due to materially false or misleading information in the registration statement.  *In re Countrywide Fin. Corp. Secs. Litig.*, 588 F. Supp. 2d at 1167-68.  The Countrywide Defendants argue that Plaintiffs have not alleged a legally cognizable injury.  Plaintiffs purchased the right to receive monthly distributions of interest and principal from the Issuing Trusts derived from cash flows from borrower repayment of the mortgage loans

1  that underlie the securities.  SAC ¶ 5.  Because the vast majority of MBS

2  Certificates at issue have made every payment they were required to make during

3  the time Plaintiffs held them, Defendants argue Plaintiffs have not been injured.

4       Plaintiffs counter that MBS are not mere contractual vehicles providing

5  payment streams; they are also securities that some investors purchase to realize a

6  profit through resale.  Plaintiffs' alleged injury is a diminution in the market value

7  of the securities themselves.  Plaintiffs allege:

8       Plaintiffs and the Class have sustained damages.  The value of the

9       Certificates has declined substantially, subsequent to, and due to, the

10       violations of the Defendants named in this Count.  SAC ¶ 228.

11  Defendants insist that the offering documents unequivocally stated the market was

12  illiquid for these securities, that no secondary market might ever develop, and that

13  investors might not be able to sell their Certificates readily, at a favorable price, or

14  at all.  Reply Br. at 42 (citing Countrywide Defendants' RJN Ex. 5 [CWALT 2005-

15  24 Prospectus Supplement] at S-19 (Docket No. 160-4)).[24]  Therefore, Defendants

16

17

---

18  [24] The one Prospectus Supplement the Countrywide Defendants cite, contains multiple

19  disclosures about "Risk Factors."  Defendants' RJN Ex. 5 at S-10-19.  The final factor
identified is "You May Have Difficulty Reselling Certificates."  The documents

20  discloses:

21       No market for any of the certificates will exist before they are issued.  The

22       underwriter intends to make a secondary market in the classes of
     certificates purchased by it, but has no obligation to do so.  We cannot

23       assure you that a secondary market will develop or, if it develops, that it
     will continue.  Consequently, you may not be able to sell your certificates

24       readily or at prices that will enable you to realize your desired yield.  The
     market values of the certificates are likely to fluctuate; these fluctuations

25       may be significant and could result in significant losses to you.

26

27       The secondary markets for mortgage backed securities have experienced
     period of illiquidity and can be expected to do so in the future.  Illiquidity

28       can have a severe adverse effect on the prices of securities that are
     especially sensitive to prepayment, credit, or interest rate risk, or that have

contend, Plaintiffs' allegation regarding loss in market value is unreasonable and implausible. *Id.*

The Court finds this issue incapable of resolution at the motion to dismiss stage. Whether there is a secondary market for these Certificates, whether such market is liquid, whether Plaintiffs were sufficiently warned in each and every prospectus supplement that they would not be able to resell the Certificates in a secondary market, and whether Plaintiffs have suffered a loss in market value are all questions which are better resolved at the summary judgment stage. As this Court recognized in a prior case, "so long as the other allegations in the complaint (and matters of which a court may take judicial notice) do not conclusively demonstrate that plaintiffs cannot prove a loss, the complaint survives a motion to dismiss." *In re Countrywide Fin. Corp. Secs. Litig.*, 588 F. Supp. 2d at 1170 (addressing Section 11 claims in the context of Countrywide corporate bonds); *see also New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, No. 08 Civ. 5653(PAC), 2010 WL 1473288, *4-5 (S.D.N.Y. Mar. 29, 2010) (finding plaintiff's allegations of market value loss sufficient at the motion to dismiss stage). *But see NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, 743 F. Supp. 2d 288, 291-92 (S.D.N.Y. 2010) (holding plaintiffs could not claim injury based on an alleged decline in secondary market trading prices where the offering documents explicitly warned that the certificates "might not be resalable" and markets "might not be liquid."). It is plausible that Plaintiffs have suffered a loss. This Court finds Plaintiffs have adequately alleged injury.

### VII.   MOTION TO STRIKE

Defendant Sieracki filed a motion to strike. Docket No. 145. Sieracki complains that the SAC quotes and cites to unproven, untested allegations in

---

been structured to meet the investment requirements of limited categories of investors.

*Id.* at S-19. Other prospectus supplements at issue in this case make different disclosures.

1    complaints filed in separate lawsuits, as if they were facts.  Sieracki argues the

2    SAC provides no indication that Plaintiffs' counsel personally investigated these

3    allegations or the basis thereof before asserting them in this lawsuit.  Instead, he

4    observes the allegations appear to have been cut and pasted into the SAC.  Sieracki

5    objects to this practice under Federal Rule of Civil Procedure 11 and asks the

6    Court to strike the offending allegations.

7            Attorneys have a non-delegable duty to make a reasonable inquiry into

8    whether the factual contentions made in a complaint have evidentiary support.

9    Fed. R. Civ. P. 11(b);  *In re Connectics Corp. Secs. Litig.*, 542 F. Supp. 2d 996,

10   1005-06 (N.D. Cal. 2008).  This duty means Plaintiffs cannot rely on allegations

11   from complaints in other cases if the Plaintiffs themselves have not investigated

12   the allegations.  *See Geinko v. Padda*, No. 00 C 5070, 2002 WL 276236, at *6

13   (N.D. Ill. Feb. 27, 2002) ("Plaintiffs' attorneys cannot shirk their Rule 11

14   obligation to conduct an appropriate investigation into the facts that is reasonable

15   under the circumstances by merely stating that 'the SEC alleges' certain additional

16   facts.").  "Investigation" would include speaking directly to the sources upon

17   which the other complaints rely, or examining the purported internal Countrywide

18   documents which the other complaints describe, or contacting the attorneys whose

19   allegations they copied to discuss the basis for the claims.  *See, e.g., Johns v. Bayer

20   Corp.*, No. 09-cv-1935 DMS (JMA), 2010 WL 2573493 (S.D. Cal. June 24, 2010)

21   (allowing the "lifting" of allegations from other complaints where Plaintiffs'

22   counsel contacted the attorneys in the other cases to discuss their basis); *In re

23   Connectics Corp. Sec. Litig.*, No. Civ.A. 07-02940 SI, 2008 WL 3842938, at *4

24   (N.D. Cal. Aug. 14, 2008).  In *In re Connetics Corp. Sec. Litig.*, plaintiffs' counsel

25   contacted the witnesses quoted in an SEC complaint, from which counsel copied

26   their allegations, and cited other anonymous sources on their own.  2008 WL

27   3842938, at *4.  Plaintiffs here do not claim to have taken either step.

28

In *Johns v. Bayer Corp.*, plaintiffs' counsel contacted the attorney in the other case, from which she copied allegations, to discuss the basis for the claims. 2010 WL 2573493, at *2.  When defense counsel made a motion to strike, the attorney from the other case made an appearance to vouch for plaintiffs' counsel's investigation.  *Id.*  Plaintiffs' counsel in *Johns v. Bayer* also personally reviewed the medical studies that referred to the defendant company and drug at issue, and formed the basis of her complaint.  *Id.*

 Here, in this case, Plaintiffs' counsel does not claim to have taken these or any other measures to investigate the bases for allegations in other complaints they cite.  They did not speak to the "sources" or examine the purported internal Countrywide documents.  They did not contact attorneys in the other cases from which they copied allegations to discuss the basis for the claims.  The Court agrees with Sieracki that Plaintiffs cannot rely on allegations from other complaints that the Plaintiffs themselves have not investigated.  Lifting allegations from other complaints does not constitute reasonable investigation as required by Fed. R. Civ. P. 11(b).  If Plaintiffs wish to use the allegations of other complaints, they must at least contact the attorneys in the other cases from which they copied the allegations to discuss the basis for the allegations.

Because Plaintiffs have not reasonably investigated the allegations they copied from complaints in other cases, the Court **GRANTS** Defendant Sieracki's motion to strike.[25]  The following paragraphs of the SAC are therefore stricken: paragraphs 13, 14, 105, 115-158.

## VIII.  INDIVIDUAL DEFENDANTS

---

[25] *Cf. In re Countrywide Fin. Corp. Sec. Litig.*, No. 07-5295 (C.D. Cal.), Consolidated Amended Class Complaint (Docket No. 186), in which the attorneys conducted an impressive independent investigation which included interviews of numerous former Countrywide executives and employees and review and analysis of certain nonpublic documents concerning Countrywide's business.

1    In addition to joining in the motion to dismiss submitted by the Countrywide

2    Defendants, the Individual Defendants filed their own motions to dismiss.

3    **A.  STANFORD L. KURLAND**

4    Stanford Kurland is the former President and COO of CFC.  Kurland

5    Motion to Dismiss (Docket No. 149) at 1.  He is alleged also to be the CEO,

6    President and Chairman of the Board of Directors for the Issuer Defendants and the

7    Executive Vice President of CFC.  SAC ¶ 55.  The Consolidated Amended

8    Complaint alleged he violated Sections 11 and 15, but the SAC drops the Section

9    15 claim against him.

10    With respect to Section 11, Kurland moved to dismiss the claim against him

11    as barred by the statute of repose, which he contends cannot be tolled.  The Court

12    ruled in its November 4, 2010 Order that the statute of repose was tolled by the

13    pendency of the consolidated *Luther* action.  *See Maine State Ret. Sys. v.*

14    *Countrywide Fin. Corp.*, 722 F. Supp. 2d at 1166.  Kurland also argues the Section

15    11 claim is inadequately pleaded because it does not allege reliance.  The Court

16    reserved that issue above and **DENIES** Kurland's motion for that reason.

17    **B.  ERIC P. SIERACKI**

18    Eric P. Sieracki was the CFO of CFC from April 2005 until it was acquired

19    by Bank of America in July 2008.  Sieracki Motion to Dismiss (Docket No. 145) at

20    1.  He was also an officer of the four Countrywide subsidiaries referred to as the

21    Issuer Defendants.  *Id*.  The SAC alleges Sieracki violated Section 11.  SAC ¶ 209.

22    Sieracki joins in the Countrywide Defendants' motion and filed an individual

23    motion to strike.  The Court resolved both motions above.

24    **C.  DAVID A. SPECTOR**

25    David A. Spector is alleged to be the Vice President and a member of the

26    Board of Directors for the Issuer Defendants.  SAC ¶ 56.  Spector was concurrently

27    the Senior Managing Director of Secondary Marketing of CFC.  *Id*.  The

28    Consolidated Amended Complaint alleged he violated Sections 11 and 15, but the

1  SAC drops the Section 15 claim against him.  Spector moves separately to dismiss

2  the Section 11 claims against him on the basis that the statute of repose bars

3  Plaintiffs' claims.  The Court ruled in its November 4, 2010 Order that the statute

4  of repose was tolled by the pendency of the consolidated *Luther* action.  *See Maine*

5  *State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d at 1166.  The Court

6  **DENIES** Spector's motion to dismiss.

## IX.    CONCLUSION

8      Because Plaintiffs must establish they have tranche-based standing as to the

9  securities involved here, the Court **DISMISSES** the SAC as to all Certificates that

10  at least one named plaintiff did not purchase.  The Court **DISMISSES** Count Two

11  against CWALT, CWMBS, CWABS and CWHEQ because the Issuer Defendants

12  are not statutory sellers.  In addition, the Court will not allow Plaintiffs to bring a

13  Section 12(a)(2) claim regarding purchase of securities that Plaintiffs did not

14  purchase pursuant to the prospectus supplement in the initial public offering.  To

15  the extent Plaintiffs seek to include such securities, those particular securities are

16  **DISMISSED** from Count Two.  The Court **GRANTS** Defendant Sieracki's

17  motion to strike because Plaintiffs have not reasonably investigated the allegations

18  they copied from complaints in other cases.  The Court **DENIES** the Defendants'

19  motions to dismiss on all other grounds.

20      The Court **GRANTS** Plaintiffs leave to file a Third Amended Complaint no

21  later than 30 days from the date of this Order.  Plaintiffs must file their motion for

22  certification that the action is maintainable as a class action by the same date, *i.e.*,

23  no later than 30 days from the date of this Order.

24      **IT IS SO ORDERED**.

25  DATED:  May 5, 2011

26  Hon. Mariana R. Pfaelzer
   United States District Judge

-39-