FILED

1   LIONEL Z. GLANCY (#134180)
    MICHAEL GOLDBERG (#188669)
2   GLANCY BINKOW & GOLDBERG LLP
    1801 Avenue of the Stars, Suite 311
3   Los Angeles, California 90067
    Telephone: (310) 201-9150
4   Facsimile: (310) 201-9160
    E-mail: info@glancylaw.com
5

2011 JUN -6 PM 12: 53

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

6   *Liaison Counsel for Lead Plaintiff Iowa Public*
7   *Employees' Retirement System*
    *[Additional Counsel on Signature Page]*
8

9            UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
10

11  MAINE STATE RETIREMENT SYSTEM,       No. 2:10-CV-00302 MRP
    Individually and On Behalf of All Others   (MAN)
    Similarly Situated,
12

13              Plaintiff,

                                         CLASS ACTION
14          v.

15  COUNTRYWIDE FINANCIAL
    CORPORATION; COUNTRYWIDE          **THIRD AMENDED CLASS**
16  SECURITIES CORPORATION;           **ACTION COMPLAINT**
    COUNTRYWIDE HOME LOANS, INC.;
17  COUNTRYWIDE CAPITAL MARKETS;
    CWALT, INC.; CWMBS, INC.; CWABS,
18  INC.; CWHEQ, INC.; DEUTSCHE BANK
    SECURITIES INC.; UBS SECURITIES
19  LLC; MORGAN STANLEY & CO., INC.;
    GOLDMAN, SACHS & CO.; RBS
20  SECURITIES INC.; HSBC SECURITIES
    (USA) INC.; STANFORD L. KURLAND;
21  DAVID A. SPECTOR; ERIC P. SIERACKI;
    DAVID A. SAMBOL,
22
                Defendants.
23

24

25

26

27

28

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF THE ACTION .................................................................2

II.    JURISDICTION AND VENUE ..............................................................7

III.   PROCEDURAL HISTORY ......................................................................8

IV.    PARTIES ...............................................................................................12

    A.     Plaintiffs ....................................................................................12

    B.     Defendants ..................................................................................13

        1.     Countrywide Defendants ..................................................13

        2.     The Issuer Defendants .....................................................16

        3.     The Underwriter Defendants.............................................20

        4.     The Individual Defendants ................................................23

        5.     David A. Sambol ...............................................................25

    C.     The Issuing Trust Non-Parties...................................................25

V.     TOLLING OF THE STATUTE OF LIMITATIONS .............................25

    A.     Defendant CWALT Offerings ....................................................25

    B.     Defendant CWHEQ Offerings ...................................................28

    C.     Defendant CWABS Offerings ....................................................30

    D.     Defendant CWMBS Offerings ...................................................34

VI.    BACKGROUND ...................................................................................36

    A.     Countrywide Was a Leading Issuer and Underwriter of Mortgage-Backed Securities ....................................................36

    B.     Countrywide's Origination and Securitization Operations.................39

VII.   EVIDENCE OF SYSTEMIC DISREGARD OF STATED LOAN ORIGINATION GUIDELINES CONTAINED IN OFFERING DOCUMENTS ........................................................................43

    A.     Exponential Increase in Certificate Default Rates in Months After Issuance No Matter When Offering Occurred Evidences Disregard of Origination Guidelines ....................................43

    B.     Rating Agencies Collapsed Certificate Ratings to "Junk Bond" Levels Due to Undisclosed "Aggressive Underwriting" Practices .................................................................................44

C.     Government Investigations Reveal the Falsity of the Offering Documents...................................................................47

D.     Allegations in Numerous Civil Lawsuits Involving Countrywide Show the Falsity of the Offering Documents...............57

E.     Underwriter Defendants "Contracted Out" and Failed to Conduct Required Due Diligence of Loan Underwriting Guidelines Contained in Offering Documents.....................................62

F.     Additional Government Investigations Further Confirm Systemic Disregard for Mortgage Loan Underwriting Guidelines.....................................................................................68

G.     Underwriter Defendants Employed Rating Shopping Practices to Ensure Inflated Investment Grade Rating for All the Certificates................................................................................69

VIII.   THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING AND APPRAISAL STANDARDS .............................71

IX.     CLASS ACTION ALLEGATIONS ..................................................91

X.      STANDING ....................................................................................92

XI.     CLAIMS .........................................................................................93

        COUNT I ........................................................................................93

        Violation of Section 11 of the Securities Act Against the Individual Defendants, the Issuer Defendants and the Underwriter Defendants

        COUNT II ........................................................................................96

        Violation of Section 12(a)(2) of the Securities Act Against the Section 12 Underwriter Defendants

        COUNT III........................................................................................98

        Violation of Section 15 of the Securities Act Against Sambol and the Countrywide Defendants

XII.    RELIEF REQUESTED ....................................................................99

XIII.   JURY DEMAND..........................................................................100

1    In accordance with the Court's Opinion and Order dated November 4, 2010
2  ("Countrywide Tolling Decision") and Opinion and Order dated May 5, 2011
3  ("Countrywide MTD Decision"), Lead Plaintiff Iowa Public Employees'
4  Retirement System and additional named plaintiffs the General Board of Pension
5  and Health Benefits of the United Methodist Church, Orange County Employees'
6  Retirement System, and Oregon Public Employees' Retirement System
7  (collectively, "Plaintiffs"), submit this Third Amended Class Action Complaint
8  ("TAC") and allege the following upon personal knowledge as to themselves and
9  their own acts and upon information and belief as to all other matters.  Plaintiffs'
10  information and belief is based on the investigation of their counsel.   The
11  investigation included, for example: (i) review and analysis of the offering
12  materials for the Certificates as defined below, and the Certificates' rating
13  histories; (ii) examination of the monthly service or remittance reports issued in
14  connection with the Certificates; (iii) examination of the SEC filings, press releases
15  and other public statements of Countrywide Financial Corporation ("CFC"); (iv)
16  review and analysis of court filings cited herein; (v) review and analysis of media
17  reports, congressional testimony and additional material; (vi) analysis of the
18  Securities and Exchange Commission's ("SEC") Summary Report of Issues
19  Identified in the Commission Staff's Examinations of Select Credit Rating
20  Agencies ("SEC Report") and additional documents cited herein; and (vii)
21  discussions with federal and state agencies as well as attorneys for private litigants
22  who have investigated and pursued civil actions against one or more Countrywide
23  entities alleging wrongdoing during the period at issue herein.  Many of the facts
24  related to Plaintiffs' allegations are known only by the Defendants named herein,
25  or are exclusively within their custody or control.  Plaintiffs believe that substantial
26  additional evidentiary support for the allegations set forth below will be developed
27  after a reasonable opportunity for discovery.
28

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          1

Plaintiffs undertake this amendment to comply with the Countrywide Tolling Decision and Countrywide MTD Decision.  In so doing, Plaintiffs do not waive and hereby preserve all previously asserted claims regarding all securities included in the Consolidated Amended Class Action Complaint ("First Amended Complaint" or "FAC") and Consolidated Second Amended Class Action Complaint ("Second Amended Complaint" or "SAC") in this action as if fully set forth herein.  True and correct copies of the FAC and SAC are annexed hereto as **Exhibit A and Exhibit B**, respectively, of the accompanying Appendix ("TAC Appendix").  Furthermore, annexed hereto as **TAC Appendix Exhibit C** is a redline of the TAC to the SAC.

## I.   SUMMARY OF THE ACTION

1.   This Complaint is brought by Plaintiffs pursuant to the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* (the "Securities Act"), on behalf of All persons or entities who purchased mortgage-backed securities one or more of the nine tranches in the offerings set forth below and in **TAC Appendix Exhibits D-F** (collectively the "MBS" or "Certificates") pursuant and traceable to Registration Statements, Original Basic Prospectuses, and Prospectus Supplements (collectively, the "Offering Documents") filed with the Securities and Exchange Commission ("SEC") by Defendants (1) Alternative Loan Trust Certificates issued by Defendant CWALT, Inc. ("CWALT"); (2) CWABS Asset-Backed Trust Certificates issued by Defendant CWABS, Inc. ("CWABS"); (3) CHL Mortgage Pass-Through Trust Certificates issued by Defendant CWMBS, Inc. ("CWMBS"); and (4) CWHEQ Revolving Home Equity Loan Trusts and Home Equity Loan Trusts issued by Defendant CWHEQ, Inc. ("CWHEQ") (CWALT, CWABS, CWMBS, and CWHEQ are collectively referred to herein as the "Depositors" or "Issuers").  All of the Certificates were collateralized by residential mortgage loans that Countrywide Home Loans, Inc. ("Countrywide") or its affiliates originated.  The Certificates were sold in nine separate public offerings (the "Offerings") over

fifteen months between October 2005 and December 2006.  A complete list of each Certificate that is the subject of this TAC is set forth in **TAC Appendix Exhibit D.**  The $2.63 billion in Countrywide Certificates which are the subject of this Complaint is comprised of nine separate tranches of Certificates issued in nine separate Countrywide MBS Offerings, as set forth herein at ¶¶58-78 and **TAC Appendix Exhibits D & E.**

2.      Excluded from the Class are Defendants, their officers and directors at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest

3.      The Certificates were underwritten by Defendants Countrywide Securities Corporation ("CSC"), Deutsche Bank Securities Inc. ("Deutsche Bank"), UBS Securities LLC ("UBS"), Morgan Stanley & Co., Inc. ("Morgan Stanley"), Goldman, Sachs & Co. ("Goldman Sachs"), RBS Securities Inc. f/k/a RBS Greenwich Capital d/b/a Greenwich Capital Markets, Inc. ("RBS") and HSBC Securities (USA) Inc. ("HSBC") (collectively the "Underwriters" or "Underwriter Defendants").

4.      Plaintiffs assert claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, arising from material misstatements and omissions in the Registration Statements, Prospectuses and subsequently-filed Prospectus Supplements (collectively referred to herein as the "Offering Documents").  Accordingly, this action involves claims of negligence and strict liability under the Securities Act.  The Complaint asserts no allegations of fraud on the part of any Defendant.

5.      From 2005 through 2007, Countrywide was the nation's largest residential mortgage lender.  Countrywide originated in excess of $850 billion in home loans throughout the United States in 2005 and 2006 alone.  Countrywide's ability to originate residential mortgages on such a massive scale was facilitated, in

large part, by its ability to rapidly package or securitize those loans and then, through the activities of the Underwriter Defendants, sell them to investors as purportedly investment grade mortgage-backed securities.

6.     Each Offering operated in the same manner.  A special-purpose trust (the "Issuing Trust") was created by the Depositor to hold the underlying mortgage loan collateral.  Certificates entitled investors to receive monthly distributions of interest and principal from the Issuing Trusts derived from cash flows from borrower repayment of the mortgage loans.  The cash flows from the principal and interest payments from those mortgage loans were then divided into multiple classes, or "tranches," of senior and subordinated Certificates.  If borrowers failed to pay back their mortgages, these losses would flow to Plaintiffs based on the seniority of their Certificates.  However, since all of the Certificates issued by an individual Issuing Trust were backed by the pool of mortgages associated with that Issuing Trust, a decline in the value of the mortgages in the pool arising from delinquencies, defaults, or other problems with the particular loans would cause a decline in the value of each and every class or tranche of Certificates in the Issuing Trust, regardless of the subordination of certain Certificates to more senior ones.

7.     The assembly line created by Countrywide and the Underwriter Defendants for the mass production and sale of the Certificates began with Countrywide and its affiliates originating the mortgage loans.  These loans were all purportedly underwritten pursuant to specific loan origination guidelines set forth in the Offering Documents.  The guidelines provided, *inter alia*, that Countrywide and its affiliates would assess borrower creditworthiness and appraise the value of the mortgaged property pursuant to standard appraisal methodologies.  As set forth below, these descriptions of the loan origination guidelines in the Offering Documents contained material misstatements and omissions since, in fact, the guidelines were systematically disregarded to include borrowers who did not meet the aforementioned criteria.

8.     Once the loans were originated they were ultimately sold to the Depositors who were all limited purpose entities created by CFC.  The Depositors would deposit the loans into Issuing Trusts and, along with the Underwriter Defendants and the Rating Agencies, including Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's ("S&P") and Fitch Ratings, Inc. ("Fitch") (collectively referred to herein as the "Rating Agencies"), design the structure of each Offering.  The Offering structures determined how the cash flows from the mortgage loans would be distributed to senior and subordinate classes of Certificates.  Each Offering purported to provide various forms of investor protections and purported to justify the investment grade ratings assigned to the Certificates.

9.     It was critically important to the Underwriter Defendants not only that all of the Certificates be assigned investment grade ratings by the Rating Agencies at the time of issuance, but that they be assigned the highest investment grade ratings.  The highest investment rating used by the Rating Agencies is AAA (Aaa for Moody's), which signifies the highest investment grade and suggests that there is almost no risk of investment loss associated with the security – the safest investment next to U.S. Treasury bonds.  Ratings of "AA," "A" and "BBB" represent very high credit quality, high credit quality, and good credit quality, respectively.  There are various intermediate ratings between BBB and AAA.  Anything rated lower than BBB is considered speculative or "junk," *i.e.,* not investment grade.

10.     In fact, all of the Countrywide-issued Certificates at issue herein were assigned investment grade ratings and 100% received the highest investment grade ratings.  These ratings assured the rapid sale of the Certificates to conservative investors such as public and private pension funds and insurance companies whose investment guidelines typically require them to purchase only investment grade securities.  The Underwriter Defendants exercised their substantial economic

power by soliciting the Rating Agencies to bid for the ratings engagements via the Rating Agencies' proposed ratings of the Certificates. The Underwriters' competitive selection process for securing ratings, known as "ratings shopping," ensured that the highest investment grade ratings were assigned to substantially all of the Certificates.

11.    After the Certificates were issued, facts began to emerge reflecting that the mortgage collateral supporting the purported investment grade securities was fundamentally impaired and that the guidelines described in the Offering Documents had been systematically disregarded.[1]

12.    No matter when the Offering occurred, the default and delinquency rates of the Certificates at issue herein skyrocketed exponentially in the first year after the loans were originated, reflecting en mass early payment defaults. Such early defaults are a strong indicator that origination guidelines have not been applied, *infra* ¶¶97-105, 108.

13.    As a result of such poor loan performance the Rating Agencies were forced not merely to downgrade isolated Certificates, but rather to revise the entire methodology used to assign investment grade ratings to the Certificates. Further, in making these fundamental revisions, the Rating Agencies explained that the impetus for the change was previously undisclosed and systematic "aggressive underwriting" practices used to originate the mortgage loan collateral. When these revised methodologies were applied to the Certificates in 2008 and 2009, the result was an unprecedented collapse of the investment grade ratings. Indeed, the Certificates bearing the highest investment grade ratings collapsed largely in one fell swoop – not merely one or two rating levels, but *as much as 22 rating levels* to

---

[1]    For purposes of the Securities Act, the Depositor is considered the "Issuer" under Section 2(a)(4), 15 U.S.C. § 77b(a)(4). The "issuing entity" in each Offering was the specifically denominated Issuing Trust, *e.g.*, for the CWALT Series 2005-62 $1,559,819,100 Offering on October 28, 2005, the Issuer was CWALT, Inc. and the issuing entity was the Issuing Trust denominated "Alternative Loan Trust 2005-62."

1  below investment grade or junk bond rating.  Indeed, 89% of the Certificates, all of
2  which were initially awarded AAA/maximum-safety ratings, have now been
3  downgraded to junk bond levels, *infra* ¶¶102-109.

4       14.    Finally, commensurate with the exponential increases in delinquency
5  and default rates in the underlying mortgages and the Certificates' ratings collapse,
6  the value of the Certificates has plummeted.

7       15.    As a result of Countrywide's systemic disregard for its underwriting
8  guidelines, numerous statements set forth in the Offering Documents contained
9  material misstatements and omissions, including regarding: (i) the high quality of
10 the mortgage pools underlying the Issuing Trusts, resulting from the underwriting
11 standards employed to originate the mortgages, the value of the collateral securing
12 the mortgages, and the soundness of the appraisals used to arrive at this value; (ii)
13 the mortgages' loan-to-value ("LTV") ratios; and (iii) other criteria that were used
14 to qualify borrowers for mortgages.

15      16.    The widespread collapse of Countrywide mortgages not only resulted
16 in damage to Certificate investors but also drove Countrywide toward the brink of
17 bankruptcy.  To survive, Countrywide merged with Bank of America in a $4.1
18 billion stock exchange in January 2008.

19 **II.    JURISDICTION AND VENUE**

20      17.    The claims asserted herein arise under and pursuant to Sections 11,
21 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 771(a)(2) and 77o. This
22 Court has jurisdiction over the subject matter of this action pursuant to Section 22
23 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

24      18.    Venue is proper in this District pursuant to Section 22 of the
25 Securities Act and 28 U.S.C. § 1391(b) and (c). Many of the acts and conduct
26 complained of herein occurred in substantial part in this District, including the
27 dissemination of the Offering Documents, which contained material misstatements
28 and omissions, complained of herein.  In addition, Defendants conduct business in

1   this District.

2       19.   In connection with the acts and conduct alleged herein, Defendants,

3   directly or indirectly, used the means and instrumentalities of interstate commerce,

4   including the mails and telephonic communications.

5   **III   PROCEDURAL HISTORY**

6       20.   The instant litigation was originally commenced on November 14,

7   2007 with the filing of *Luther v. Countrywide Home Loans Servicing LP, et al.,*

8   Case No. BC380698 (Cal. Superior Court, Los Angeles County) ("Initial Luther

9   Complaint").  The Initial Luther Complaint asserted claims for violations of

10   Sections 11, 12(a)(2) and 15 of the Securities Act on behalf of a class of all

11   purchasers of 188 Offerings of Countrywide MBS issued by Defendant CWALT

12   between January 2005 and June 2007 pursuant to five separate Shelf Registration

13   Statements. ***See* TAC Appendix Exhibit F**.  All 188 Offerings included in the

14   Initial Luther Complaint are included in the FAC.  The Offerings included in the

15   Initial Luther Complaint are set forth in **TAC Appendix Exhibit G**, annexed

16   hereto. ***There were no PSLRA Certifications identifying the securities purchased***

17   ***by the named Plaintiffs accompanying the filing of the Initial Luther Complaint,***

18   ***nor did the Initial Luther Complaint include allegations of specific securities***

19   ***purchased by the named plaintiff.***

20       21.   Thereafter, on June 14, 2008, a second action was filed in California

21   State Superior Court captioned *Washington State Plumbing & Pipefitting Pension*

22   *Trust v. Countrywide Financial Corporation, et al.,* Case No. BC392571 (Cal.

23   Superior Court, Los Angeles County) ("Washington State Action" or "Washington

24   State Complaint").  The named Plaintiff, Washington State Plumbing & Pipefitting

25   Pension Trust ("Washington State") asserted claims on behalf of a class of all

26   purchasers of 398 Offerings of Countrywide MBS issued between June 13, 2005

27   and December 27, 2007 pursuant to 19 separate Shelf Registration Statements. ***See***

28   **TAC Appendix Exhibit F**.  Three hundred and ninety-six Offerings included in

the Washington State Complaint were included in the FAC.   The Offerings included in the Washington State Complaint are set forth in **TAC Appendix Exhibit G**, annexed hereto.  *There were no PSLRA Certifications identifying the securities purchased by the named Plaintiffs accompanying the filing of the Washington State Complaint, nor did the Washington State Complaint include allegations identifying the specific securities purchased by the named plaintiffs.*

22.     Thereafter, on September 9, 2008, an amended complaint was filed in *Luther* ("Amended Luther Complaint"), adding four additional plaintiffs to the action – Vermont Pension Investment Committee ("Vermont"), Mashreqbank, P.S.C. ("MASH"), Pension Trust Fund for Operating Engineers ("PTOE") and Operating Engineers Annuity Plan ("OEAP").   The named plaintiffs asserted claims on behalf of a class of all purchasers of 428 Offerings of Countrywide MBS issued between January 2005 and December 2007 pursuant to 20 separate Shelf Registration Statements.  *See* **TAC Appendix Exhibit F**.  All 427 Countrywide Offerings in the FAC were included in the Amended Luther Complaint.   The Offerings included in the Amended Luther Complaint are set forth in **TAC Appendix Exhibit G**, annexed hereto.  *There were no PSLRA Certifications identifying the securities purchased by the named Plaintiffs accompanying the filing of the Amended Luther Complaint, nor did the Amended Luther Complaint include allegations identifying the specific securities purchased by the named plaintiffs.*

23.     After consolidation of the *Luther* and *Washington State* actions, a consolidated complaint was filed on October 16, 2008 (the "Luther Consolidated Complaint"), naming Luther, Vermont, MASH, PTOE, OEAP and Washington State as plaintiffs.  In addition, the Luther Consolidated Complaint added Maine State Retirement System ("Maine") as an additional named plaintiff.  Vermont, MASH, PTOE, OEAP, Maine and Washington State are collectively referred to herein at times as the "Luther Plaintiffs."  These plaintiffs asserted claims on

behalf of a class of all purchasers of 428 Offerings of Countrywide MBS issued between January 2005 and December 2007 pursuant to 20 separate Shelf Registration Statements. *See* **TAC Appendix Exhibit F**. Again, all 427 Countrywide MBS Offerings in the FAC were included in the Luther Consolidated Complaint. The Offerings included in the Luther Consolidated Complaint are set forth in **TAC Appendix Exhibit G**, annexed hereto. ***There were no PSLRA Certifications identifying the securities purchased by the named Plaintiffs accompanying the filing of the Luther Consolidated Complaint, nor did the Luther Consolidated Complaint include allegations identifying the specific securities purchased by the named plaintiffs.***

24.   On January 14, 2010, after being dismissed due to lack of subject matter jurisdiction in state court, counsel for the Luther Plaintiffs filed *Maine State Retirement System v. Countrywide Financial Corporation, et al.,* Civ. No. 10-00302-MRP-MAN (C.D. Cal. Jan. 14, 2010) (the "Federal Action" or "Federal Complaint"). Maine State Retirement System was the sole named plaintiff in the Federal Complaint, which set forth identical allegations regarding the same 428 Countrywide Offerings as the Luther Consolidated Complaint. ***See* TAC Appendix Exhibit F**. All 427 Offerings in the FAC were included in the Federal Complaint. The Offerings included in the Federal Complaint are set forth in **TAC Appendix Exhibit G**, annexed hereto. ***Annexed to the Federal Complaint was the Certification of Maine State Retirement System which set forth the specific Countrywide MBS which Maine had purchased.***

25.   The Luther Plaintiffs also appealed their dismissal by the Superior Court to the California Court of Appeals (Second Appellate District). On May 19, 2011, the California Court of Appeals reversed the Superior Court in full and remanded the case back to the trial court for further proceedings. *Luther v. Countrywide Financial Corp., et al.,* Case No. B222889, 2011 Cal. App. LEXIS 596 (Cal. Ct. App. May 18, 2011).

26.    There were no PSLRA Certifications or allegations setting forth precisely which Offerings or tranches thereof the remaining five Luther Plaintiffs (*i.e.,* MASH, PTOE, OEAP, Washington State and Vermont) purchased until the filing of the motions for lead plaintiff in this action on April 2, 2010.  *See* Dkt. Nos. 86-89.  Moreover, the specific Countrywide Certificates purchased by the named plaintiff in the Luther Action, David Luther, have never been publicly disclosed or set forth in any previous complaints in this action.  In fact, this information was only obtained from Mr. Luther's counsel in response to a request from Plaintiffs' Counsel.  Ultimately, on May 17, 2010, IPERS was appointed as Lead Plaintiff in the action.

27.    On July 13, 2010, IPERS, along with additional named Plaintiffs OCERS, OPERS and GBPHB, filed the FAC in the Federal Action.  The FAC asserted claims on behalf of a class of all purchasers of 427 Offerings of Countrywide MBS issued between January 2005 and December 2007 pursuant to 19 separate Shelf Registration Statements.  **See TAC Appendix Exhibit F**.  The Offerings included in the FAC are set forth in **TAC Appendix Exhibit G**, annexed hereto.  Thereafter, Defendants moved to dismiss the FAC.  By Opinion and Order dated November 4, 2010, the Court granted Defendants' motions to dismiss with leave to replead in accordance with the Countrywide Tolling Decision.

28.    On December 12, 2010, Plaintiffs filed the SAC in the Federal Action.  While expressly preserving all claims against all parties contained in the FAC, the SAC asserted claims on behalf of a class of all purchasers of 20 Offerings of Countrywide MBS issued between September 2005 and December 2006 pursuant to seven separate Shelf Registration Statements.  **See TAC Appendix Exhibit F.** The Offerings included in the SAC are set forth in **TAC Appendix Exhibits G,** annexed hereto.  Thereafter, Defendants moved to dismiss the SAC.  By Opinion and Order dated May 5, 2011, the Court granted in part and denied in part Defendants' motions to dismiss and granted a motion to strike certain allegations

in the SAC, and directed Plaintiffs to replead within 30 days in accordance with the Countrywide MTD Decision.  This TAC is filed in compliance therewith.

## IV.   PARTIES

### A.   Plaintiffs

29.   **Iowa Public Employees' Retirement System** ("IPERS") is a public pension fund for employees of the State of Iowa.  IPERS acquired its Certificates pursuant and traceable to one or more Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements.  The Offering Documents were rendered materially misleading as a consequence of the same course of conduct with respect to each Offering by Defendants.  A Certification documenting IPERS' transactions in the Certificates was filed with IPERS' motion for appointment as lead plaintiff on April 2, 2010.  *See* Dkt. No. 80.  As set forth in ¶¶58-78, directly below, IPERS purchased the Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

30.   **General Board of Pension and Health Benefits of the United Methodist Church** ("GBPHB") is the pension fund for the active and retired clergy and lay employees of the United Methodist Church.  GBPHB acquired its Certificates pursuant and traceable to one or more Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements.  The Offering Documents were rendered materially misleading as a consequence of the same course of conduct with respect to each Offering by Defendants.  A Certification documenting GBPHB's transactions in the Certificates was filed with GBPHB's motion for appointment as lead plaintiff on April 2, 2010.  *See* Dkt. No. 85.  As set forth in ¶¶58-78, directly below, GBPHB purchased its Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

31.   **Orange County Employees' Retirement System** ("OCERS") is a public pension fund for the employees of Orange County, California.  OCERS acquired its Certificates pursuant and traceable to one or more Shelf Registration

Statements, Original Basic Prospectuses and later-filed Prospectus Supplements. The Offering Documents were rendered materially misleading as a consequence of the same course of conduct with respect to each Offering by Defendants.   A Certification documenting OCERS' transactions in the Certificates and willingness to serve as a representative party in this litigation was annexed to and filed with the FAC on July 13, 2010.  *See* Dkt. No. 122.  As set forth in ¶¶58-78, directly below, OCERS purchased its Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

32.   **State of Oregon, by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board on behalf of the Oregon Public Employee Retirement Fund** ("OPERS") is a public pension fund for employees of the State of Oregon.  OPERS acquired its Certificates pursuant and traceable to one or more Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements.  The Offering Documents were rendered materially misleading as a consequence of the same course of conduct with respect to each Offering by Defendants.  A Certification documenting OPERS' transactions in Countrywide MBS and willingness to serve as a representative party in this litigation was annexed to and filed with the FAC on July 13, 2010.  *See* Dkt. No. 122.  As set forth in ¶¶58-78, directly below, OPERS purchased its Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

## B.   Defendants

33.   Plaintiffs allege that each and every Defendant is, to the maximum extent permitted by law, jointly and severally liable for the misconduct alleged in this Complaint.

### 1.   Countrywide Defendants

34.   Defendant **Countrywide Financial Corporation** ("CFC") was, at times relevant to this Complaint, a Delaware corporation with its principal

executive offices located at 4500 Park Granada, Calabasas, California.  CFC was a holding company which, through its subsidiaries, was engaged in mortgage lending and other real estate finance related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting.  The Company operated through five business segments:  Mortgage Banking, which originated, purchased, sold and serviced non-commercial mortgage loans nationwide; Banking, which took deposits and invested in mortgage loans and home equity lines of credit; Capital Markets, which operated an institutional broker-dealer that primarily specialized in trading and underwriting MBS; Insurance, which offered property, casualty, life and disability insurance as an underwriter and as an insurance agency; and Global Operations, which licensed and supported technology for mortgage lenders in the United Kingdom.   As discussed below, CFC merged with and became Bank of America in 2008. The Issuer Defendants, as set forth below, were controlled directly by the Individual Defendants and CFC, including by the appointment of CFC executives as directors and officers of these entities.   Revenues flowing from the issuance and sale of MBS issued by CWALT, CWMBS, CWABS and CWHEQ and the Issuing Trusts were passed through to CFC and consolidated into CFC's financial statements. Defendant CFC, therefore, exercised actual day-to-day control over Defendants CWALT, CWMBS, CWABS, and CWHEQ.   Defendant CFC was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CFC's role relating to the creation and sale of MBS violated the Securities Act.  The claims asserted in this SAC as they relate to CFC were tolled under the Countrywide Tolling Decision and Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I**.

35.    Defendant **Countrywide Securities Corporation** ("CSC") is a broker-dealer within CFC.  According to CFC's Form 10-K for the year ended

1  December 31, 2007, filed with the SEC on February 29, 2008 ("2007 Form 10-K"),
2  CSC "primarily specializes in trading and underwriting MBS."   The financial
3  results of CSC are set forth in the Capital Markets section of CFC's financial
4  statements.   CFC further stated in its 2007 Form 10-K that it was "ranked fourth
5  among Non-Agency MBS Underwriters" for 2007.   Defendant CSC was a named
6  defendant in the Initial Luther Complaint, the Washington State Complaint, the
7  Amended Luther Complaint, the Consolidated Luther Complaint, the Federal
8  Complaint, the FAC and the SAC.   These complaints alleged that CSC's conduct
9  relating to the creation and sale of MBS violated the Securities Act.   The claims
10 asserted in this SAC as they relate to CFC were tolled under the Countrywide
11 Tolling Decision and Countrywide MTD Decision for the Certificates set forth in
12 **TAC Appendix Exhibits H & I**.

13     36.     **Countrywide Home Loans, Inc.** ("CHL") was, at times relevant to
14 this Complaint, a direct wholly-owned subsidiary of CFC.   CHL was engaged in
15 the mortgage banking business, and originated, purchased, sold and serviced
16 mortgage loans.   CHL's principal executive offices were located at 4500 Park
17 Granada, Calabasas, California, the same location as CFC.   CHL served as the
18 "Sponsor" or "Seller" of the Certificates, meaning that it played a central role in
19 providing the pools of mortgage loans to the Issuing Trusts upon which the
20 Certificates were based.   Defendant CHL was a named defendant in the Initial
21 Luther Complaint, the Washington State Complaint, the Amended Luther
22 Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC
23 and the SAC.   These complaints alleged that CHL's conduct relating to the
24 creation and sale of MBS violated the Securities Act.   The claims asserted in this
25 SAC as they relate to CHL were tolled under the Countrywide Tolling Decision
26 and Countrywide MTD Decision for the Certificates set forth in **TAC Appendix
27 Exhibits H & I**.

28     37.     Defendant **Countrywide Capital Markets** ("CCM") was, at times

relevant to this Complaint, a direct wholly-owned subsidiary of CFC.  CCM's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC.  CCM operated through its two main wholly-owned subsidiaries, CSC and Countrywide Servicing Exchange.  According to CFC's 2007 Form 10-K, "Capital Markets participates in both competitive bid and negotiated underwritings and performs underwriting services for CHL, Countrywide Bank and third parties."  The financial results of CCM were set forth in the Capital Markets section of CFC's financial statements.  Defendant CCM was a named defendant in the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC.  These complaints alleged that CCM's conduct relating to the creation and sale of MBS violated the Securities Act.  The claims asserted in this SAC as they relate to CCM were tolled under the Countrywide Tolling Decision and Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I**.

### 2.    The Issuer Defendants

38.    Defendant CFC structured Defendants CWALT, CWMBS, CWABS, and CWHEQ as limited purpose, wholly-owned, finance subsidiaries to facilitate its issuance and sale of the MBS.  CWALT, CWMBS, CWABS, and CWHEQ were controlled directly by CFC, including by the appointment of CFC executives as directors and officers of these entities.  Revenues flowing from the issuance and sale of MBS issued by CWALT, CWMBS, CWABS and CWHEQ and the Issuing Trusts were passed through to CFC and consolidated into CFC's financial statements.  Defendant CFC, therefore, exercised actual day-to-day control over Defendants CWALT, CWMBS, CWABS, and CWHEQ.

39.    Defendant **CWALT, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC.  CWALT's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC.  Defendant CWALT served in the

role of the "Depositor" in the securitization of the Issuing Trusts as identified in **TAC Appendix Exhibit D** and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Issuer | Date | No. of Offerings in TAC |
|---|---|---|---|---|
| 333-110343 | $19,000,000,000 | CWALT, Inc. | January 13, 2004 | 0 |
| 333-117949 | $24,126,942,035 | CWALT, Inc. | September 23, 2004 | 0 |
| 333-123167 | $22,731,808,071 | CWALT, Inc. | April 21, 2005 | 0 |
| 333-125902 | $45,335,287,290 | CWALT, Inc. | July 25, 2005 | 2 |
| 333-131630 | $100,271,785,327 | CWALT, Inc. | March 6, 2006 | 0 |
| 333-140962 | $103,095,483,061 | CWALT, Inc. | April 24, 2007 | 0 |

Defendant CWALT was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC.  These complaints alleged that CWALT's conduct relating to the creation and sale of MBS violated the Securities Act.  The claims asserted in this TAC as they relate to CWALT were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

40.     Defendant **CWHEQ, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC.  CWHEQ's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC.  Defendant CWHEQ served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in **TAC Appendix Exhibit D** and was an "Issuer" of the Certificates within the

meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Issuer | Date | No. of Offerings in TAC |
|---|---|---|---|---|
| 333-121378[2] | $20,000,000,000 | CWHEQ, Inc. | December 17, 2004 | 0 |
| 333-126790 | $30,685,000,000 | CWHEQ, Inc. | August 4, 2005 | 1 |
| 333-132375 | $26,572,949,813 | CWHEQ, Inc. | April 12, 2006 | 1 |
| 333-139891 | $31,717,192,508 | CWHEQ, Inc. | May 22, 2007 | 0 |

Defendant CWHEQ was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CWHEQ's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to CWHEQ were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

41. Defendant **CWABS, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWABS' principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. Defendant CWABS served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in **TAC Appendix Exhibit D** and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

---

[2] There were no Offerings included in the FAC issued pursuant to this Shelf Registration Statement.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          18

| File No. | Amount Registered | Issuer | Date | No. of Offerings in SAC |
|---|---|---|---|---|
| 333-118926 | $60,598,485,932 | CWABS, Inc. | October 18, 2004 | 0 |
| 333-125164 | $46,598,657,434 | CWABS, Inc. | June 10, 2005 | 2 |
| 333-131591 | $34,327,892,523 | CWABS, Inc. | February 21, 2006 | 1 |
| 333-135846 | $40,000,000,000 | CWABS, Inc. | August 8, 2006 | 1 |
| 333-140960 | $113,336,555,700 | CWABS, Inc. | April 24, 2007 | 0 |

Defendant CWABS was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CWABS' conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to CWABS were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

42.    Defendant **CWMBS, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWMBS' principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. Defendant CWMBS served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in **SAC Appendix Exhibit D** and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Issuer | Date | No. of Offerings in SAC |
|----------|-------------------|--------|------|-------------------------|
| 333-100418 | $14,978,548,884 | CWMBS, Inc. | October 28, 2002 | 0 |
| 333-121249 | $20,863,464,518 | CWMBS, Inc. | February 8, 2005 | 0 |
| 333-125963 | $40,742,304,251 | CWMBS, Inc. | July 25, 2005 | 0 |
| 333-131662 | $60,846,662,430 | CWMBS, Inc. | March 6, 2006 | 1 |
| 333-140958 | $144,647,113,029 | CWMBS, Inc. | April 24, 2007 | 0 |

Defendant CWMBS was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC.  These complaints alleged that CWMBS' conduct relating to the creation and sale of MBS violated the Securities Act.  The claims asserted in this TAC as they relate to CWMBS were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

43.    CWALT, CWMBS, CWABS and CWHEQ are collectively referred to herein as the "Issuer Defendants."

### 3.    The Underwriter Defendants

44.    As set forth above, Defendant CSC is an affiliate of CFC, and acted as an underwriter for the Certificates identified in **TAC Appendix Exhibit E** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.  As set forth above, Defendant CSC now operates as Bank of America. Defendant CSC, was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC.  These complaints alleged that CSC's conduct relating to the creation and sale of MBS

1  violated the Securities Act.  The claims asserted in this TAC as they relate to CSC

2  were tolled under the Countrywide Tolling Decision and Countrywide MTD

3  Decision for the Certificates set forth in **TAC Appendix Exhibits H & I**.

4      45.    Defendant **Deutsche Bank Securities Inc.** ("Deutsche Bank") acted

5  as an underwriter for the Certificates identified in **SAC Appendix Exhibit E**

6  within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and

7  disseminated the Prospectus Supplements pursuant to which the MBS were sold to

8  Plaintiffs.  Defendant Deutsche Bank was a named defendant in the Initial Luther

9  Complaint, the Washington State Complaint, the Amended Luther Complaint, the

10  Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC.

11  These complaints alleged that Deutsche Bank's conduct relating to the creation and

12  sale of MBS violated the Securities Act.  The claims asserted in this TAC as they

13  relate to Deutsche Bank were tolled under the Countrywide Tolling Decision and

14  the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix**

15  **Exhibits H & I.**

16      46.    Defendant **UBS Securities LLC** ("UBS") acted as an underwriter for

17  the MBS identified in **SAC Appendix Exhibit E** within the meaning of the

18  Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the

19  Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs.

20  Defendant UBS was a named defendant in the Initial Luther Complaint, the

21  Washington State Complaint, the Amended Luther Complaint, the Consolidated

22  Luther Complaint, the Federal Complaint, the FAC and the SAC.   These

23  complaints alleged that UBS' conduct relating to the creation and sale of MBS

24  violated the Securities Act.  The claims asserted in this TAC as they relate to UBS

25  were tolled under the Countrywide Tolling Decision and the Countrywide MTD

26  Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

27      47.    Defendant **Morgan Stanley & Co., Inc.** ("Morgan Stanley") acted as

28  an underwriter for the Certificates identified in **SAC Appendix Exhibit E** within

the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Defendant Morgan Stanley was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that Morgan Stanley's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to Morgan Stanley were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

48.   Defendant **Goldman, Sachs & Co.** ("Goldman Sachs") acted as an underwriter for the Certificates identified in **SAC Appendix Ex. E** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Defendant Goldman Sachs was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that Goldman Sachs' conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to Goldman Sachs were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

49.   Defendant **RBS Securities Inc. f/k/a RBS Greenwich Capital d/b/a Greenwich Capital Markets, Inc.** ("RBS") acted as an underwriter for the Certificates identified in **SAC Appendix Exhibit E** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Defendant RBS was a named defendant in the Initial Luther Complaint, the

Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that RBS' conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to RBS were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

50.   Defendant **HSBC Securities (USA) Inc.** ("HSBC") acted as an underwriter for the Certificates identified in **SAC Appendix Exhibit E** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Defendant HSBC was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that HSBC's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to HSBC were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

51.   Defendants CSC, Deutsche Bank, UBS, Morgan Stanley, Goldman Sachs, RBS, Barclays and HSBC are referred to herein as the "Underwriter Defendants." "Underwriter Defendants" also includes Defendant Bank of America as successor in interest as set forth above. Furthermore, Defendants CSC and UBS are referred to herein at times as the **"Section 12 Underwriter Defendants."**

### 4.   The Individual Defendants

52.   Defendant **Stanford L. Kurland** ("Kurland") was, at relevant times, the Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ. Defendant Kurland signed all seven (7) Shelf Registration Statements at issue herein. Defendant Kurland was concurrently the Executive Vice President and Chief Operating

Officer ("COO") of Defendant CFC.  Defendant Kurland was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC.  These complaints alleged that Kurland's conduct relating to the creation and sale of MBS violated the Securities Act.  The claims asserted in this TAC as they relate to Kurland were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

53.  Defendant **David A. Spector** ("Spector") was, at relevant times, Vice President and a member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ.  Defendant Spector signed all seven (7) Shelf Registration Statements at issue herein.  Defendant Spector was concurrently the Senior Managing Director of Secondary Marketing of Defendant CFC.  Defendant Spector was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC.  These complaints alleged that Spector's conduct relating to the creation and sale of MBS violated the Securities Act.  The claims asserted in this TAC as they relate to Spector were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

54.  Defendant **Eric P. Sieracki** ("Sieracki") was, at relevant times, the Executive Vice President, CFO, Treasurer and member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ.  Defendant Sieracki signed all seven (7) Shelf Registration Statements at issue herein.  Defendant Sieracki was concurrently the Executive Vice President and CFO of Defendant CFC.  Defendant Sieracki was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC.  These complaints

alleged that Sieracki's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to Sieracki were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

55. Defendants Kurland, Spector and Sieracki, are collectively referred to hereinafter as the "Individual Defendants."

### 5. David A. Sambol

56. Defendant David A. Sambol ("Sambol") was, at relevant times, the President and COO of Defendant CFC. Defendant Sambol was a control person of the Countrywide Defendants and the Issuing Defendants. Defendant Sambol was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that Sambol's role relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to Sambol were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

### C. The Issuing Trust Non-Parties

57. The Issuing Trusts were set up by Defendants CWALT, CWMBS, CWABS and CWHEQ to issue hundreds of billions of dollars worth of Certificates pursuant to the Offering Documents. **Exhibits D and E** of the TAC Appendix, annexed hereto, identify (1) each Issuing Trust, (2) the stated value of the Certificates it issued, (3) the Registration Statements and Prospectus Supplements pursuant to which the Certificates were issued and sold, and (4) the identities of the Underwriters, Sponsor/Seller, and Depositor/Issuer for each issuance.

## V. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Defendant CWALT Offerings

58. Defendant CWALT issued $163,499,734,519.00 of Countrywide

MBS in 226 separate Offerings between January 2005 and December 2007 pursuant to six Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements as set forth above in ¶39, in the SAC at ¶41 and in the FAC at ¶34.   The Luther Consolidated Complaint, the Federal Complaint and the FAC all included claims on behalf of 226 CWALT Offerings issued between January 2005 and December 2007.  ***See* TAC Appendix Exhibit G.**

59.   Pursuant to the Court's November 4, 2010 Countrywide Tolling Decision, the allegations set forth in the FAC were limited to those Offerings which the Luther Plaintiffs had standing to pursue while the case was pending in California state court.  As a result, Plaintiffs maintained standing in the SAC to pursue Securities Act claims on two (2) Countrywide MBS Offerings issued pursuant to one (1) CWALT Registration Statement.

60.   Pursuant to the Court's May 5, 2011 Countrywide MTD Decision, the allegations set forth  herein are limited to those "tranches" of Certificates which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintain standing to pursue Securities Act claims on one (1) tranche of Certificates in each of two (2) Countrywide MBS Offerings issued pursuant to one (1) CWALT Registration Statement, as set forth in detail below.

61.   As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWALT 2005-62 ("2005-62"), Class 2A1 Certificates,** pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWALT 2005-62, Class 2A1 | 8,446,540.84 | $1.0003 | August 4, 2006 | Deutsche Bank |

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed.  OPERS' Section 11 and 15 claims on behalf of all purchasers of the 2005-62, Class 2A1 Certificates were

tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least June 12, 2008 when Washington State was named as a plaintiff in the Washington State Complaint.  According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Washington State purchased the 2005-62, Class 2A1 Certificates and had standing to assert Securities Act claims in connection therewith.  Each complaint filed subsequent to the Washington State Complaint, including the Amended Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2005-62, Class 2A1 Claims.  *See* **TAC Appendix Exhibit H.**  As such, Plaintiff OPERS derives tolling from Washington State's standing to pursue those claims.  *See* **TAC Appendix Exhibit I.**  As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to OPERS' custodial statements, was priced at $0.5718, causing OPERS to suffer injury as a result.

62.   As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWALT 2005-72 ("2005-72"), Class A1 Certificates,** *on the Offering and directly from the underwriter*, Defendant UBS, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWALT 2005-72, Class A1 | 16,930,000.00 | $1.0000 | November 21, 2005 | UBS |
| CWALT 2005-72, Class A1 | 13,024,000.00 | $1.0000 | December 15, 2005 | UBS |

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed.  OPERS' Sections 12(a)(2) and 15 claims on behalf of all purchasers of the 2005-72, Class A1 Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least September 9, 2008 when PTOE was added as a

named plaintiff to the Amended Luther Complaint.  According to the Certification filed with its motion for lead plaintiff on April 2, 2010, PTOE purchased the 2005-72, Class A1 Certificates and had standing to assert Securities Act claims in connection therewith.  Each complaint filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2005-72, Class A1 Claims.  ***See* TAC Appendix Exhibit H.**  As such, Plaintiff OPERS derives tolling from PTOE's standing to pursue those claims.  ***See* TAC Appendix Exhibit I.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to OPERS' custodial statements, was priced at $0.6001, causing OPERS to suffer injury as a result.

## B.  Defendant CWHEQ Offerings

63.  Defendant CWHEQ issued $50,303,553,300.00 of Countrywide MBS in 39 separate Offerings between August 26, 2005 and August 14, 2007 pursuant to four Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements as set forth above in ¶40, in the SAC at ¶42 and in the FAC at ¶35.   All 39 Offerings were included for the first time in the Washington State Complaint.  ***See* TAC Appendix Exhibit G.**

64.  Pursuant to the Court's Countrywide Tolling Decision, the allegations set forth in the SAC were limited to those CWHEQ Offerings which the Luther Plaintiffs had standing to pursue while the case was pending in California state court.  As a result, Plaintiffs maintained standing in the SAC to pursue Securities Act claims on three (3) Countrywide MBS Offerings issued pursuant to two (2) CWHEQ Registration Statements.

65.  Pursuant to the Court's May 5, 2011 Countrywide MTD Decision, the allegations set forth  herein are limited to those "tranches" of Certificates which the Luther Plaintiffs had standing to pursue while the case was pending in California

state court. As a result, Plaintiffs maintain standing to pursue Securities Act claims on one (1) tranche of Certificates in each of two (2) Countrywide MBS Offerings issued pursuant to two (2) CWHEQ Registration Statements, as set forth in detail below.

66.    As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWL 2005-H ("2005-H"), Class 2A Certificates** *on the Offering and directly from the Underwriter,* Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWL 2005-H, Class 2A | 1,200,000 | $1.0000 | September 27, 2005 | CSC |

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed.  OPERS' Sections 12(a)(2) and 15 claims on behalf of all purchasers of the 2005-H Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least September 9, 2008 when PTOE was added as a named plaintiff to the Amended Luther Complaint.  According to the Certification filed with its motion for lead plaintiff on April 2, 2010, PTOE purchased the 2005-H, Class 2A Certificates and had standing to assert Securities Act claims in connection therewith.  Each complaint filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2005-H, Class 2A Claims.  *See* **TAC Appendix Exhibit H.**  As such, Plaintiff OPERS derives tolling from PTOE's standing to pursue those claims.  *See* **TAC Appendix Exhibit I.**   OPERS disposed of the 2005-H, Class 2A Certificates in the open market on October 19, 2007 at a price of $0.9700, and suffered injury as a result.

67.    As set forth below, and also in the Certification annexed hereto,

IPERS purchased the **CWL 2006-S3 ("2006-S3"), Class A2 Certificates**, *on the Offering and directly from the Underwriter*, Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWL 2006-S3, Class A2 | 1,999,956.46 | $1.0000 | June 16, 2006 | CSC |

Lead Plaintiff IPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010, when the FAC was filed. IPERS' Sections 11, 12(a)(2) and 15 claims on behalf of all purchasers of the 2006-S3, Class A2 Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least September 9, 2008 when Vermont was added as a named plaintiff to the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Vermont purchased the 2006-S3, Class A2 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Amended Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2006-S3, Class A2 Claims. ***See* TAC Appendix Exhibit H.** As such, IPERS derives tolling from Vermont's standing to pursue those claims. ***See* TAC Appendix Exhibit I.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to IPERS' custodial statements, was priced at $0.6300, causing IPERS to suffer injury as a result.

### C.    Defendant CWABS Offerings

68.    Defendant CWABS issued $82,129,061,400.00 of Countrywide MBS in 76 separate Offerings between June 2005 and October 2007 pursuant to four Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements as set forth above in ¶41, in the SAC at ¶43 and in the

FAC at ¶36.   All 76 Offerings were included, for the first time, in the Washington State Complaint and thereafter included in the Luther Amended Complaint, Consolidated Luther Complaint, Federal Complaint, the FAC and SAC.  **See TAC Appendix Exhibit G.**

69.   Pursuant to the Court's Countrywide Tolling Decision, the allegations set forth in the SAC were limited to those CWABS Offerings which the Luther Plaintiffs had standing to pursue while the case was pending in California state court.  As a result, Plaintiffs maintained standing in the SAC to pursue Securities Act claims on eight (8) Countrywide MBS Offerings issued pursuant to three (3) CWABS Registration Statements.

70.   Pursuant to the Court's May 5, 2011 Countrywide MTD Decision, the allegations set forth  herein are limited to those "tranches" of Certificates which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintain standing to pursue Securities Act claims on one (1) tranche of Certificates in each of four (4) Countrywide MBS Offerings issued pursuant to three (3) CWABS Registration Statements, as set forth in detail below.

71.   As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2005-11 ("2005-11"), Class AF3 Certificates**, *on the Offering and directly from the Underwriter,* Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWL 2005-11, Class AF3 | 1,000,000.00 | $1.0000 | September 12, 2005 | CSC |

Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed.  GBPHB's Sections 12(a)(2) and 15 claims on behalf of all purchasers of the 2005-11, Class AF3 Certificates were tolled in accordance with the Countrywide Tolling Decision and

Countrywide MTD Decision since at least September 9, 2008 when PTOE was added as a named plaintiff to the Amended Luther Complaint.  According to the Certification filed with its motion for lead plaintiff on April 2, 2010, PTOE purchased the 2005-11, Class AF3 Certificates and had standing to assert Securities Act claims in connection therewith.  Each complaint filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2005-11, Class AF3 Claims.  ***See* TAC Appendix Exhibit H.**  As such, Plaintiff GBPHB derives tolling from PTOE's standing to pursue those claims.  ***See* TAC Appendix Exhibit I.**  GBPHB disposed of the 2005-11 Certificates in the open market on September 28, 2009 at a price of $0.7500, and suffered injury as a result.

72.    As set forth below, and also in the Certification annexed hereto, OCERS purchased the **CWHL 2005-HYB9 ("2005-HYB9"), Class 3A2A Certificates**, *on the Offering and directly from the Underwriter*, Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWHL 2005-HYB9, Class 3A2A | 400,000.00 | $0.9972 | November 28, 2005 | CSC |

Plaintiff OCERS was named as the Lead Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed.  OCERS' Section 12(a)(2) and Section 15 claims on behalf of all purchasers of the 2005-HYB9, Class 3A2A Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least October 16, 2008 when Maine was added as a named plaintiff to the Luther Consolidated Complaint.  According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Maine purchased the 2005-HYB9, Class 3A2A Certificates and had standing to assert Securities Act claims in connection therewith.  Each complaint filed subsequent to

1   the Luther Consolidated Complaint, including the Federal Complaint, the FAC and

2   the SAC, included a named plaintiff that had standing to assert the 2005-HYB9,

3   Class 3A2A Claims. *See* **TAC Appendix Exhibit H.**   As such, Plaintiff OCERS

4   derives tolling from Maine's standing to pursue those claims. ***See* TAC Appendix**

5   **Exhibit I.**   As of the date of the filing of the Federal Action in January 2010, the

6   value of the Certificates had diminished considerably, and according to OCERS'

7   custodial statements, was priced at $0.6772, causing OCERS to suffer injury as a

8   result.

9          73.    As set forth below, and also in the Certification annexed hereto,

10  GBPHB purchased the **CWL 2006-9 ("2006-9"), Class 1AF3 Certificates,**

11  pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-9, Class 1AF3 | 1.000.000.00 | $1.0048 | April 27, 2007 | BOAS |

15  Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for

16  the first time on July 13, 2010 when the FAC was filed.  GBPHB's Sections 11 and

17  15 claims on behalf of all purchasers of the 2006-9, Class 1AF3 Certificates were

18  tolled in accordance with the Countrywide Tolling Decision and Countrywide

19  MTD Decision since at least September 9, 2008 when Vermont was added as an

20  additional named plaintiff to the Amended Luther Complaint.  According to the

21  Certification filed with its motion for lead plaintiff on April 2, 2010, Vermont

22  purchased the 2006-9, Class 1AF3 Certificates and had standing to assert

23  Securities Act claims in connection therewith.  Each complaint filed subsequent to

24  the Amended Luther Complaint, including the Luther Consolidated Complaint, the

25  Federal Complaint, the FAC and the SAC, included a named plaintiff that had

26  standing to assert the 2006-9, Class 1AF3 Claims. *See* **TAC Appendix Exhibit**

27  **H.**  As such, Plaintiff GBPHB derives tolling from Vermont's standing to pursue

28  those claims. *See* **TAC Appendix Exhibit I.**  GBPHB disposed of the 2006-9

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          33

Class 1AF3 Certificates in the open market on April 15, 2009 at a price of $0.3075, and suffered injury as a result.

74.    As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2006-24 ("2006-24"), Class 2A1 Certificates,** pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-24, Class 2A1 | 385,809.66 | $0.9927 | October 12, 2007 | Morgan Stanley |

Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed.  GBPHB's Sections 11 and 15 claims on behalf of all purchasers of the 2006-24, Class 2A1 Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least September 9, 2008 when Vermont was added as an additional named plaintiff to the Amended Luther Complaint.  According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Vermont purchased the 2006-24, Class 2A1 Certificates and had standing to assert Securities Act claims in connection therewith.  Each complaint filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2006-24, Class 2A1 Claims.  *See* **TAC Appendix Exhibit H.** As such, Plaintiff GBPHB derives tolling from Vermont's standing to pursue those claims.  *See* **TAC Appendix Exhibit I.**  As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to GBPHB's custodial statements, was priced at $0.9428, causing GBPHB to suffer injury as a result.

**D.    Defendant CWMBS Offerings**

75.    Defendant CWMBS issued $56,178,680,394 of Countrywide MBS in 87 separate Offerings between June 2005 and October 2007 pursuant to five Shelf

Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements as set forth above in ¶42, in the SAC at ¶44 herein and in the FAC at ¶37.   All 87 Offerings were included, for the first time, in the Washington State Complaint and thereafter included in the Luther Amended Complaint, Consolidated Luther Complaint, Federal Complaint and FAC.   ***See* TAC Appendix Exhibit G.**

76.    Pursuant to the Court's Countrywide Tolling Decision, the allegations set forth in the SAC were limited to those CWMBS Offerings which the Luther Plaintiffs had standing to pursue while the case was pending in California state court.  As a result, Plaintiffs maintained standing in the SAC to pursue Securities Act claims on one (1) Countrywide MBS Offering issued pursuant to one (1) CWMBS Registration Statement, as set forth in detail below.

77.    Pursuant to the Court's May 5, 2011 Countrywide MTD Decision, the allegations set forth  herein are limited to those "tranches" of Certificates which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintain standing to pursue Securities Act claims on one (1) tranche of Certificates in one (1) Countrywide MBS Offerings issued pursuant to one (1) CWABS Registration Statement, as set forth in detail below.

78.    As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWHL 2006-HYB3 ("2006-HYB3"), Class 2A1A Certificates**, pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWHL 2006-HYB3, Class 2A1A | 1,076,000.00 | $1.0002 | April 27, 2006 | Credit Suisse Securities, LLC |
| CWHL 2006-HYB3, Class 2A1A | 154,493.47 | $0.9919 | August 21, 2007 | CSC |

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed.  OPERS' Sections 11 and

15 claims on behalf of all purchasers of the 2006-HYB3, Class 2A1A Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least June 12, 2008 when Washington State was named as a plaintiff in the Washington State Complaint.  According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Washington State purchased the 2006-HYB3, Class 2A1A Certificates and had standing to assert Securities Act claims in connection therewith.   Each complaint filed subsequent to the Washington State Complaint, including the Amended Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2006-HYB3, Class 2A1A Claims.  *See* **TAC Appendix Exhibit H.**  As such, Plaintiff OPERS derives tolling from Washington State's standing to pursue those claims.  *See* **TAC Appendix Exhibit I.**  As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to OPERS' custodial statements, was priced at $0.6877, causing OPERS to suffer injury as a result.

## VI.   BACKGROUND

### A.   Countrywide Was a Leading Issuer and Underwriter of Mortgage-Backed Securities

79.   As illustrated below, a mortgage securitization is where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT            36



80.    When mortgage borrowers make interest and principal payments, the cash flow is distributed to the holders of MBS certificates in order of priority, based on the specific tranche held.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.  Because the lower tranches are designed to provide a cushion, diminished cash flows to the lower tranches results in impaired value of the higher tranches, as, among other reasons, there is less certainty of the continued cash flows to the higher tranches.

81.    The securitization of loans fundamentally shifts the risk of loss from mortgage loan originators to investors who purchase an interest in the securitized pool of loans.  When the originator holds a mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan.  As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  In securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing

borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

82.    In the 1980s and 1990s, securitizations were generally within the domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators. Investors in these early GSE securitizations were provided protections since the underlying loans were originated pursuant to strict underwriting guidelines.

83.    Between 2001 and 2006, however, there was dramatic growth in non-GSE loan originations and securitizations such that non-GSE securitizations grew 330%, becoming a $1.48 trillion industry.

84.    The market for adjustable rate mortgages ("ARMs"), including interest-only and negative amortization loans, grew concurrently with the boom in subprime and Alt-A loan originations and securitizations.  ARMs increased from $355 billion in 2001 to $1.3 trillion in 2006.  Mortgage Market Statistical Annual, Vol. 1 (2007), at 4.  Such growth coincided with the increase in popularity of so-called "exotic" or non-traditional ARMs which had fixed interest rates for a limited period before "resetting" during the life of the loan to significantly higher adjustable rates.   These non-traditional ARMs included "2/28 or 3/27 ARMs" (many with below-market teaser rates for two or three years before conversion to the fully-indexed rate); interest-only ARMs (permitting interest-only payments for a set period of time during which the rate may fluctuate, resulting in negative amortization and rising principal); option payment ARMs (offering up to four payment options, including minimum and interest-only payments, which, if chosen, result in negative amortization and rising principal); and 40-year ARMs (in which payments are calculated based on a 40-year payment term but where the loan terminates in 30 years, resulting in a final balloon payment).  Origination of non-traditional ARMs increased 278% between 2004 and 2006 – from $205 billion

to $775 billion. Mortgage Market Statistical Annual, Vol. 1 (2007), at 6.

85. Here, the Certificate collateral was composed of a substantial number of non-traditional adjustable mortgages, interest-only and negative amortization loans. These types of loans presented the greatest potential for "payment shock" to the borrower since they provided for initially small monthly payments based on low fixed rates which then reset thereafter to significantly higher monthly payment amounts based on adjustable interest rates. Although these loans were not traditional, the underwriting guidelines still required the loans to be originated responsibly and in accordance with those guidelines. Yet, Countrywide would routinely provide loans to borrowers who could only afford the short-term "teaser" rates (or, even to those that could not even afford the teaser rates) – not the full payments that would be required after the short-term rates reset. Although these types of loans were designed for high net worth investors who were capable of earning higher returns through investment than in making interest and principal payments upfront, Countrywide routinely sold these loans to unsophisticated borrowers who were unable to make the required payments after the loans reset – and frequently, to those who could not even make the "teaser" payments, leading to early defaults on the loans.

## B.    Countrywide's Origination and Securitization Operations

86. CFC set up Defendants CWALT, CWMBS, CWABS, and CWHEQ, the Depositors in this case, as "limited purpose finance entities" solely for the purpose of facilitating the issuance of the Certificates. CHL acted as the servicer of the mortgages and CSC, Countrywide's underwriting division, along with the other Underwriter Defendants, marketed and sold the securities. Although Defendants CWALT, CWMBS, CWABS, and CWHEQ served as the Depositors for the Issuing Trusts and issued the Registration Statements, this process was directed and controlled by the Countrywide Defendants, the Individual Defendants, and Sambol.

87. With respect to the Certificates at issue here, the Registration Statements and each of the Prospectus Supplements contained material misstatements concerning, *inter alia*, the quality of the loans supporting the MBS associated with each trust, including, specifically, statements about (1) the underwriting process and standards by which mortgages held by the Issuing Trusts were originated, and (2) the values of the real estate securing the mortgages pooled in the Issuing Trusts, expressed in part as the average LTV ratios of the underlying mortgages and the appraisal standards by which such real estate values were obtained.

88. Each MBS sold to Plaintiffs was sold pursuant to a Registration Statement. The Prospectus Supplements, which were filed at the time that the Certificates were sold to Plaintiffs, incorporated by reference each of the Registration Statements they were issued pursuant to. The Prospectus Supplements contained specific disclosures concerning each Issuing Trust. Nonetheless, in each Prospectus Supplement, as set forth herein, the Issuer Defendants and the Underwriter Defendants made the same representations concerning CHL's standards in originating the mortgages and valuing the properties underlying the Issuing Trusts.

89. CWALT filed six Registration Statements with the SEC, *see* **TAC Appendix Exhibit F**, registering mortgage-backed securities backed primarily by:

    a)    first lien mortgage loans secured by one- to four-family residential properties;

    b)    mortgage loans secured by first liens on small multi-family residential properties, such as residential apartment buildings or projects containing five to fifty residential units;

    c)    collections arising from one or more types of the loans described above which are not used to make payments on securities issued by a trust fund, including excess servicing fees and prepayment charges;

d)      mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or

e)      mortgage-backed securities evidencing an interest in, or secured by, loans of the type that would otherwise be eligible to be loans included in a trust fund and issued by entities other than Ginnie Mae, Fannie Mae, or Freddie Mac.

90.     CWHEQ filed four Registration Statements with the SEC, *see* **TAC Appendix Exhibit F**, registering mortgage-backed securities backed primarily by:

a)      first lien mortgage loans secured by first and/or subordinate liens on one- to four-family residential properties;

b)      closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties; or

c)      home improvement loans, secured by first or subordinate liens on one- to four-family residential properties or by personal property security interests, and home improvement sales contracts, secured by personal property security interests.

91.     CWABS filed five Registration Statements with the SEC *see* **TAC Appendix Exhibit F**, registering mortgage-backed securities backed primarily by:

a)      first lien mortgage loans secured by one- to four-family residential properties;

b)      mortgage loans secured by first liens on small multi-family residential properties, such as residential apartment buildings or projects containing five to fifty residential units;

c)      closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties; or

d)     home improvement loans, secured by first or subordinate liens on one-
       to four-family residential properties or by personal property security
       interests, and home improvement sales contracts, secured by personal
       property security interests.

92.    CWMBS filed five Registration Statements with the SEC, *see* **TAC Appendix Exhibit F**, registering mortgage-backed securities backed primarily by:

a)     first lien mortgage loans secured by one- to four-family residential
       properties or participations in that type of loan;

b)     mortgage pass-through securities issued or guaranteed by Ginnie Mae,
       Fannie Mae, or Freddie Mac; or

c)     private mortgage-backed securities backed by first lien mortgage
       loans secured by one- to four-family residential properties or
       participations in that type of loan.

93.    Prior to securitization, Countrywide sent the "Loan Level File" to the Rating Agencies to enable them to rate the Certificates. Upon receipt of the "Loan Level File," S&P would run the loan tape through both its "LEVELS" and "SPIRE" Models. Moody's would run the loan tape through its M-3 Model. These models analyzed 50-80 loan characteristics (*e.g.,* FICO score, LTV ratio, property location, etc.), in order to estimate the number of loans that were likely to default and the corresponding amount of the dollar loss resulting from such default.

94.    As a condition to the issuance of the Certificates, the Rating Agencies had to assign pre-determined ratings to the Certificates. Yet, as detailed herein, the ratings at the time of issuance were vastly higher than they should have been and failed to represent the true value of the Certificates due to incorrect information provided by Countrywide and widespread misrepresentations in the origination process. Accordingly, despite the fact that the Rating Agencies assigned investment-grade ratings, the Certificates were far riskier than other investments with the same ratings.

95.     The models purported to calculate the amount of "credit enhancement" required to assign a specific set of Certificates "AAA" ratings.  As a result of relatively low levels of credit enhancement being required, as reflected in **TAC Appendix Exhibit I**, on average, 92% of the Certificates in each Offering were assigned AAA/maximum safety ratings.

96.     These ratings, although based on inaccurate assumptions, were critical to institutional investors – public pension funds, banks, insurance companies and mutual funds – whose investment guidelines restrict investments based on a security's rating.

VII.   Evidence of SYstemic Disregard of Stated Loan Origination Guidelines Contained IN Offering documents

      A.     **Exponential Increase in Certificate Default Rates in Months After Issuance No Matter When Offering Occurred Evidences Disregard of Origination Guidelines**

97.     The defective nature of the mortgage collateral underlying the Certificates is reflected by the recurring pattern of exponential increases in borrower delinquencies in the months after each of the Offerings was commenced.

98.     Four months after each of the Offerings was commenced, borrower delinquency and default rates on the underlying mortgage collateral had increased by a staggering 1,673% – from an average of 0.17% to over 3.06% of the mortgage loan balance.  By the sixth month after issuance of the Certificates, delinquency and default rates had increased 2,601% to an average of 4.66% of the mortgage loan balance.  And shockingly, by 12 months after the Offering date, delinquency and default rates had increased by almost 6,000% from issuance to 10.5% of the mortgage loan balance.  Borrower default and delinquency rates in the underlying mortgage collateral have continued to increase.

99.     These early payment defaults and delinquency rates are reflective of a systematic disregard for underwriting guidelines.  As reported by the Federal

Bureau of Investigation ("FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  The study cited by the FBI and conducted by Base Point Analytics found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not.  The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more and fictitious employers and falsified tax returns.  The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., in concluding that the top states for mortgage fraud – including the states where the MBS collateral was principally originated – were also the top states with the highest percentage of early payment defaults.

100.   As of the filing of the Amended Luther Complaint in October 2008, borrower delinquency and default rates had risen to an average of approximately 42% of the mortgage loan collateral underlying the Certificates, forcing the Rating Agencies to downgrade substantially all of the Certificates to at or near junk bond status.  As of the date of the filing of the complaint in the above-captioned action in January 2010, *over 59%* of mortgage collateral was considered to be in some form of delinquency or default, with *over 85%* of the mortgage loans underlying the Offerings issued by Defendant CWALT at issue herein being delinquent or in default.

101.   Despite assurances by the Defendants in the Offering Documents that the mortgage loans collateralizing the Certificates were originated pursuant to Countrywide's stated guidelines, nothing could have been further from the truth.

**B.     Rating Agencies Collapsed Certificate Ratings to "Junk Bond" Levels Due to Undisclosed "Aggressive Underwriting" Practices**

102.   The Rating Agencies rated the Certificates pursuant to the following twenty-three (23) level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

103.   As noted above, the Rating Agencies initially assigned the highest ratings of AAA/maximum safety to 100%, or $2.63 billion, of the Certificates at issue herein. *See* **SAC Appendix Exhibit J**.

104.   As of the filing of the FAC, as set forth directly above, the underlying collateral has largely failed, with ***over 59%*** of the total mortgage loan balance now severely delinquent, in default, repossessed, in bankruptcy or in foreclosure.  This performance was an indication to the Rating Agencies, including S&P and Moody's, of pervasive underwriting failures in the origination of the collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes.

105.   On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous Certificates because the performance of the underlying collateral "called into question" the accuracy of the loan data.  This announcement triggered several government investigations which only began reporting their findings in 2008.  Specifically, S&P announced that it was revising its methodology assumption to require increased "credit protection" for rated transactions.  S&P reiterated that it would also seek in the future to review and minimize the incidence of potential underwriting abuse given "the level of *loosened underwriting* at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

106.   One day later, on July 11, 2007, Moody's announced it was also revising its methodology used to rate the Certificates, and anticipated Certificate downgrades in the future.  Moody's did in fact significantly downgrade most of the Certificate classes, noting "aggressive underwriting" used in the origination of the collateral.

107.   As a result, the Certificates were downgraded as many as 20 levels with, for example, 89%, or $2.3 billion, of the total $2.6 billion of Certificates initially rated AAA/maximum safety now having been downgraded from AAA to "B2 ('highly speculative')" or below, meaning these Certificates were not only designated "junk bonds," but were assessed to be in danger of "imminent default." 100%, or $2.6 billion, of the Certificate tranches have now been downgraded, with 89%, or $2.3 billion, of the total Certificates at issue having now been downgraded to speculative "junk" status.

108.   Countrywide's systematic disregard for its underwriting guidelines led to dramatic downgrades of the Certificates as set forth directly above.  Currently, 89% ($2.3 billion) of the $2.6 billion of Certificates initially rated AAA/maximum safety have been downgraded to speculative "junk" status or below.  Delinquency and default rates on the Countrywide loans in the Certificates have risen

1    exponentially by over 33,000% since issuance of the Certificates – from 0.17% as

2    of the respective Offering dates to **over 59%** as of May 2010.

3       109.   Further, as set forth more fully below, disclosures emerged well after

4    the issuance of the Certificates with respect to the loan originators which further

5    evidenced that they had engaged in underwriting practices which were wholly

6    inconsistent with the guidelines set forth in the Registration Statements and

7    Prospectus Supplements.

8

9       **C.   Government Investigations Reveal the
            Falsity of the Offering Documents[3]**

10      110.   Although the poor performance of the MBS alone strongly suggests

11   that Countrywide's lending practices were far from was disclosed in the Prospectus

12   Supplements, there is substantial additional evidence that also indicates that the

13   statements in the Prospectus Supplements about loan quality and loan underwriting

14   practices were materially inaccurate.   Among this evidence are statements by

15   former Countrywide employees, facts which have emerged in ongoing litigation

16   involving the SEC (including a recent judicial opinion dealing with disclosures by

17   Countrywide), facts set out in complaints filed by state attorneys general, facts set

18   out in filings by private litigants and information from press reports and other

19   sources.

20      111.   Taken   together,   these   facts   indicate   that,   while   the   Offering

21

22   ───────────────

23   [3]      The allegations set forth in Sections VII(C) and (D) of this Complaint are
     derived from investigations and lawsuits involving one or more of the Countrywide

24   Defendants or entities referred to herein by or on behalf of the Securities and
     Exchange Commission (¶¶112-118), various Attorneys General Offices (¶¶119-

25   133) and private litigants (¶¶134-148).  Counsel for Plaintiffs personally contacted
     those responsible for the investigation and development of the allegations set forth

26   in these sections and confirmed their validity.   Furthermore, each of these
     allegations was made in a signed complaint filed consistent with Rule 11 of the

27   Federal Rules of Civil Procedure or corresponding State rule.  As such, Plaintiffs
     maintain that there exists a good faith belief that such allegations are true and

28   accurate to the extent they describe the fraudulent lending practices being engaged
     in at Countrywide during the time the mortgages in question were originated and
     securitizations took place.