Documents represented that Countrywide's underwriting of mortgages was designed to ensure the borrower's ability to repay the mortgage and the adequacy of the collateral supporting the mortgage, in reality Countrywide's underwriting practices were actually designed to originate as many mortgage loans as possible without regard to the ability of borrowers to afford such mortgages.  Indeed, contrary to the representations in the Registration Statements and Prospectus Supplements, it has now been revealed that Countrywide's loan originators systemically disregarded and/or manipulated the income, assets and employment status of borrowers seeking mortgage loans in order to qualify these borrowers for mortgages that were then pooled and used as collateral for the MBS sold to Plaintiffs.  In many instances, this was done by inflating borrowers' stated income, or facilitating income inflation by encouraging ineligible borrowers to resort to "no documentation loans" and "stated income loans."   In other cases, Countrywide customers were steered to more expensive, higher interest loans, such as subprime and "alternative" mortgages, which they would not likely be able to repay, because making such loans allowed Countrywide to increase the number of attractive mortgages it could sell to the secondary mortgage markets.  As set forth below, Countrywide's notorious origination practices were pervasive throughout the United States and throughout the time period during which the Offerings were issued.

112.  On June 4, 2009, the SEC filed a complaint against Mozilo, Countrywide's former Chief Executive Officer, and against two Defendants in this case, Sambol and Sieracki (the "SEC Complaint").  The SEC Complaint alleges that the defendants in that case made material false statements in Countrywide's SEC filings and in other forums about the quality of Countrywide's residential mortgage loans and about the underwriting process for those loans.  According to the SEC, the underwriting process for Countrywide loans was far less rigorous than what the defendants in that case had stated and, consequently, the quality of

1   Countrywide's loans was much poorer than was indicated by those public
2   statements.

3         113.   The allegations in the SEC Complaint that Countrywide and its
4   officers substantially overstated the quality of the company's residential mortgage
5   loan underwriting and, as a result, issued mortgage loans of a far worse quality
6   than Countrywide publicly disclosed are materially similar to the allegations made
7   by Plaintiffs in this case.  Although the statements targeted by the SEC were made
8   to Countrywide's shareholders in SEC filings, statements made in Offering
9   Documents for securities that securitized the mortgage collateral were similarly
10  false and misleading to MBS investors.

11        114.   Based on discussions with one of the attorneys of record involved in
12  the filing of the SEC Complaint, the basis for the allegations in the SEC Complaint
13  was an extensive investigation done by the SEC and its investigators into
14  Countrywide's fraudulent lending practices, namely during the period of 2005-
15  2007, prior to drafting the complaint and commencing the lawsuit. The SEC's
16  investigation spanned several months and testimony was taken from various
17  confidential sources, many of which were former Countrywide employees.
18  Counsel for the SEC stated that the SEC had a good faith belief that each and every
19  allegation set forth in the Complaint was true and corroborated, and does not
20  believe that there is any chance of a Rule 11 violation by the SEC with respect to
21  the allegations in the complaint.

22        115.   The SEC Complaint alleges, among other things:

24        • Countrywide embarked on a strategy of underwriting a
25           higher number of exception loans. The SEC alleges that
             "[t]he elevated number of exceptions resulted largely
26           from Countrywide's use of exceptions as part of its
             matching strategy to introduce new guidelines and
27           product changes." SEC Complaint, ¶29.  By February
             2007,  internal  risk  management  "noted  that  the
28           production  divisions  continued  to  advocate  for,  and

operated pursuant to, an approach based upon the
matching strategy alone. ...  Additionally, [a senior risk
management employee warned [Sambol] that, 'I doubt
this approach would play well with regulators, investors,
rating agencies etc. ***To some, this approach might seem
like we've simply ceded our risk standards and balance
sheet to whoever has the most liberal guidelines*.'"  SEC
Complaint, ¶44 (emphasis added).

- Countrywide's risk management reported to the credit
risk committee on June 28, 2005, that there was
"evidence of borrowers misrepresenting their income and
occupation on reduced documentation loan applications."
SEC Complaint, ¶37.

- By June 2006 "both Mozilo and Sambol were aware ...
that a significant percentage of borrowers who were
taking out stated income loans were engaged in mortgage
fraud." SEC Complaint, ¶40.  For example, "[o]n June 2,
2006, Sambol received an email reporting on the results
of a quality control audit at Countrywide Bank that
showed that 50% of the stated income loans audited by
the bank showed a variance in income from the
borrowers' IRS filings of greater than 10%.  Of those,
69% had an income variance of greater than 50%." *Id.*

- Angelo Mozilo, Countrywide's CEO, noted in an April
13, 2006 email "that he had 'personally observed a
serious lack of compliance within our origination system
as it relates to documentation and generally a
deterioration in the quality of loans originated versus the
pricing of those loan [*sic*].'" SEC Complaint, ¶49.

- A December 13, 2007 internal Countrywide
memorandum reveals, "'Countrywide had reviewed
limited samples of first- and second-trust-deed mortgages
originated by Countrywide Bank during the fourth
quarter of 2006 and the first quarter of 2007 in order to
get a sense of the quality of file documentation and
underwriting practices, and to assess compliance with
internal policies and procedures.  The review resulted in
... the finding that borrower repayment capacity was not
adequately assessed by the bank during the underwriting

process for home equity loans.  More specifically, debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or any increase in interest.'"  SEC Complaint, ¶56.

- A senior risk management employee warned defendant Sambol on May 22, 2005 "of the likelihood of significantly higher default rates in loans made on an exception basis: '[t]he main issue is to make sure everyone's aware that we will see higher default rates.'"  SEC Complaint, ¶54.  According to the SEC Complaint, the senior risk management employee explained to Sambol "that exceptions are generally done at terms more aggressive than our guidelines,' and continued that '[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions.'  [The senior risk management employee further] warned [Sambol] that increased defaults would cause repurchase and indemnification requests to rise and the performance of Countrywide-issued MBS to deteriorate."  *Id.*

116.   On November 3, 2009 U.S. District Judge John Walter denied in their entirety defendants' motions to dismiss the SEC Complaint, holding, among other things, that the SEC had adequately alleged that defendants in that case had made statements that materially exaggerated the quality of Countrywide's residential mortgage-backed loans.

117.   There was apparently no dispute in the SEC litigation that defendants in that case, like Defendants here, had repeatedly made statements asserting that Countrywide's residential mortgage loans were of high quality.  The defendants did not dispute that they had made the statements that the SEC said they had made – many of these statements were in SEC filings that the defendants had indisputably filed or caused to be filed.  Defendants did, however, ask the court to take judicial notice of numerous other SEC filings containing additional information relating to Countrywide's loans, a request that was granted.  Notably,

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          51

1    defendants used the judicially noticed documents they had brought to the court's

2    attention to "argue that the majority of the misstatements and omissions were not

3    material or misleading as a matter of law in light of Countrywide's extensive

4    disclosures and the context of the alleged misstatements or omissions."  *SEC v.*

5    *Mozilo*, CV 09-3994-JFW (MANx), 2009 U.S. Dist. LEXIS 104689, at *25-26

6    (C.D. Cal. Nov. 3, 2009).

7        118.   Judge Walter flatly rejected this argument, explaining that "neither

8    Countrywide's disclosures nor a careful review of the context of the statements

9    convince this Court that the alleged omissions or misstatements were immaterial or

10   not misleading as a matter of law.  Accordingly, the Court concludes that the SEC

11   on the whole has adequately alleged that Defendants have made false or

12   misleading statements or omissions of material fact."  *Id.* at *26.

13       119.   In addition, numerous attorneys general have initiated investigations

14   into Countrywide's lending practices and also have alleged that Countrywide

15   systematically departed from the underwriting standards it professed to use to

16   originate residential loans.

17       120.   The Illinois Attorney General initiated a lawsuit against Countrywide

18   and Mozilo, contending that the company and its executives sold borrowers costly

19   and defective loans that quickly went into foreclosure.  *See People of the State of*

20   *Illinois v. Countrywide Fin. Corp.*, No. 08CH22994 (Cook County Ch. Ct.) (the

21   "First Illinois AG Complaint").

22       121.   Based on discussions with one of the attorneys of record involved in

23   the filing of the First Illinois AG Complaint, the basis for the allegations in the

24   First Illinois AG Complaint was an extensive investigation done by the Illinois

25   AG's Office and its investigators into Countrywide's fraudulent lending practices,

26   namely during the period of 2005-2007, prior to drafting the complaint and

27   commencing the lawsuit. The Illinois AG Office's investigation spanned several

28   months and testimony was taken from various confidential sources, many of which

1  were former Countrywide employees.  Counsel in the Illinois AG Office stated that

2  they had a good faith belief that each and every allegation set forth in their

3  complaint was true and corroborated, and does not believe that there is any chance

4  of a Rule 11 violation by the Illinois AG with respect to the allegations in the

5  complaint.

6    122.  The First Illinois AG Complaint alleges, based on evidence from

7  Countrywide employees whom the Illinois Attorney General interviewed, that

8  Countrywide employees were incentivized to increase the number of loan

9  originations without concern for whether the borrower was able to repay the loan.

10  Countrywide employees did not properly ascertain whether a potential borrower

11  could afford the offered loan, and many of Countrywide's stated income loans

12  were based on inflated estimates of borrowers' income.  For example, according to

13  the First Illinois AG Complaint: (1) a Countrywide employee estimated that

14  approximately 90% of all reduced documentation loans sold out of a Chicago

15  office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One

16  Source Mortgage Inc., routinely doubled the amount of the potential borrower's

17  income on stated income mortgage applications.  Furthermore, to supplement an

18  employee's judgment as to whether a potential borrower's income was

19  "reasonable," Countrywide required its employees to utilize a website,

20  www.salary.com.  Even if the stated salary was outside of the range provided by

21  the website, Countrywide employees could still approve the loan.  The Illinois

22  Attorney General alleged that the "reasonableness" test contravened proper

23  underwriting practices.

24    123.  As the Illinois Attorney General explained, "[t]his mounting disaster

25  has had an impact on individual homeowners statewide and is having an impact on

26  the global economy."  *The New York Times* reported that the complaint, derived

27  from 111,000 pages of Countrywide documents and interviews with former

28  employees, "paints a picture of a lending machine that was more concerned with

1   volume of loans than quality." *See* Gretchen Morgenson, "Illinois to Sue
2   Countrywide," *N.Y. Times* (June 25, 2008).

3   124.  In a second complaint filed on June 29, 2010, the Illinois Attorney
4   General further enumerated the problems with Countrywide's origination practices,
5   including that Countrywide engaged in discriminatory and predatory lending. *See*
6   *People of the State of Illinois v. Countrywide Fin. Corp.,* No. 10CH27929 (Cook
7   County Ch. Ct.) (the "Second Illinois AG Complaint").   There, the Illinois
8   Attorney General sets forth how CFC incentivized its employees to sell riskier
9   subprime loans with higher spreads, paying its brokers more for those riskier loans
10  than for originating prime loans.

11  125.  Based on discussions with one of the attorneys of record involved in
12  the filing of the Second Illinois AG Complaint, the basis for the allegations in the
13  Second Illinois AG Complaint was an extensive investigation done by the Illinois
14  AG's Office and its investigators into Countrywide's fraudulent lending practices,
15  namely during the period of 2005-2007, prior to drafting the complaint and
16  commencing the lawsuit. The Illinois AG Office's investigation spanned several
17  months and testimony was taken from various confidential sources, many of which
18  were former Countrywide employees.  Counsel in the Illinois AG Office stated that
19  they had a good faith belief that each and every allegation set forth in their
20  complaint was true and corroborated, and does not believe that there is any chance
21  of a Rule 11 violation by the Illinois AG with respect to the allegations in the
22  complaint.

23  126.  California's Attorney General also commenced an investigation into
24  Countrywide's lending activities and filed a complaint in the Northwest District of
25  the Superior Court for Los Angeles County, entitled *People of the State of*
26  *California v. Countrywide Fin. Corp.*, No. LC081846 (Los Angeles Super. Ct.)
27  (the "California AG Complaint").  The California AG Complaint also alleged that
28  Countrywide routinely departed from its stated underwriting standards.

127.   Based on discussions with one of the attorneys of record involved in the filing of the California AG Complaint, the basis for the allegations in the California AG Complaint was an extensive investigation done by the California AG's Office and its investigators into Countrywide's fraudulent lending practices, namely during the period of 2005-2007, prior to drafting the complaint and commencing the lawsuit. The California AG Office's investigation spanned several months and testimony was taken from various confidential sources, many of which were former Countrywide employees.  Counsel in the California AG Office stated that they had a good faith belief that each and every allegation set forth in their complaint was true and corroborated, and does not believe that there is any chance of a Rule 11 violation by the California AG with respect to the allegations in the complaint.

128.   For example, the California AG Complaint alleged that employees were incentivized to make exceptions to underwriting standards and failed to verify borrower documentation and information.   According to the California AG Complaint, Countrywide used a system called CLUES (Countrywide Loan Underwriting Expert System), to provide a loan analysis report that indicated whether the loan was within Countrywide's underwriting guidelines.   CLUES reports indicating a loan was not originated within the purview of Countrywide's underwriting guidelines often were ignored in order to effectuate the loan.

129.   Further, consistent with the allegations of the Illinois Attorney General, California Countrywide employees cited in the California AG Complaint also claimed to have utilized the website www.salary.com to purportedly confirm a borrower's stated income.  However, according to the California AG Complaint, California employees would know ahead of time the range of salaries that www.salary.com would provide for a particular job and, therefore, know by how much they could overstate a borrower's income.  A former California loan officer for Countrywide further explained that its loan officers typically told potential

1    borrowers that "with your credit score of X, for this house, and to make X

2    payment, X is the income that you need to make"; after which the borrower would

3    state that he or she made X amount of income.

4        130.   Likewise, the Connecticut Attorney General filed a complaint in

5    Superior Court, Judicial District of Hartford, entitled *State of Connecticut v.*

6    *Countrywide Fin. Corp.*, No. CV08-40390945 (Hartford Super. Ct.) ("Connecticut

7    AG Complaint"), alleging that Countrywide's employees inflated borrowers'

8    incomes in order to qualify them for loans they otherwise would not have received.

9        131.   Based on discussions with one of the attorneys of record involved in

10   the filing of the Connecticut AG Complaint, the basis for the allegations in the

11   Connecticut AG Complaint was an extensive investigation done by the

12   Connecticut AG's Office and its investigators into Countrywide's origination and

13   lending practices, namely during the period of 2005-2007, prior to drafting the

14   complaint and commencing the lawsuit.  The Connecticut AG Office's

15   investigation spanned several months and interviews were conducted with various

16   sources, including borrowers who obtained loans from Countrywide.  Counsel in

17   the Connecticut AG Office stated that they had a good faith belief that each and

18   every allegation set forth in their complaint was true and correct, and does not

19   believe that there is any chance of a Rule 11 violation by the Connecticut AG with

20   respect to the allegations in the complaint.  Soon after the complaint was filed

21   Countrywide settled the claims with the Connecticut AG.

22       132.   Investigations in other states such as Washington, West Virginia,

23   Indiana and Florida contain many of the same types of allegations in the Illinois,

24   California and Connecticut complaints.

25       133.   On October 6, 2008, certain of the Countrywide Defendants settled

26   lawsuits brought by eleven attorneys general for approximately ***$8.4 billion.***

27

28

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          56

**D.    Allegations in Numerous Civil Lawsuits Involving Countrywide Show the Falsity of the Offering Documents**

134.   On February 15, 2008, Countrywide shareholders filed a consolidated complaint in the U.S. District Court for the Central District of California alleging derivative claims against the officers and directors of Countrywide, in an action styled *In re Countrywide Fin. Corp. Derivative Litig.*, No. 07-CV-06923-MRP-(MANx) (C.D. Cal.) (the "Derivative Complaint").  The derivative litigation was subsequently dismissed because of the plaintiffs' lack of standing

135.   Based on discussions with one of the attorneys of record involved in the filing of the Derivative Complaint, the basis for the allegations in the Derivative Complaint was an extensive investigation done by Plaintiffs' Counsel in the Derivative Action its investigators into Countrywide's fraudulent lending practices, namely during the period of 2005-2007.  The investigation spanned several months and interviews were conducted with various confidential sources, many of which were former Countrywide employees.  Counsel for the Derivative Plaintiffs stated that they had a good faith belief that each and every allegation set forth in their complaint was true and corroborated, and does not believe that there is any chance of a Rule 11 violation with respect to the allegations in the complaint.

136.   The Derivative Complaint cited information obtained from several confidential sources who were former Countrywide employees who stated that the vast majority of Countrywide's loans were underwritten in contravention of the company's stated underwriting standards.  According to one of the confidential sources in that complaint, a former "Underwriter II" (a Countrywide employment classification) based in a Jacksonville, Florida processing center between June 2006 and April 2007, because of a campaign by Countrywide to increase the volume of loan originations, as much as 80% of the loans originated by Countrywide in that office involved significant variations from Countrywide's normal underwriting standards.

137.   According to another confidential witness cited in the Derivative Complaint, a Senior Underwriter in Roseville, California, from September 2002 to September 2006, Countrywide would regularly label loans as "prime" even if made to unqualified borrowers (including those who had recently gone through a bankruptcy and were still having credit problems).  According to that confidential witness, Countrywide's lending practices became riskier in 2006 and Countrywide more lax in enforcing its underwriting policies.

138.   Another confidential witness cited in the Derivative Complaint, an Executive Vice President of Production Operations and later an Executive Vice President of Process Improvement who worked at Countrywide for 17 years before leaving in October 2005, disclosed that Countrywide created a computer system (or "rules engine") that routed highly risky loans out of the normal loan approval process to a central underwriting group for evaluation.  The system was called the Exception Processing System.  According to that source, the Exception Processing System identified loans that violated Countrywide's underwriting requirements.  However, according to the same source, loans identified by the Exception Processing System as violating underwriting standards were *not* rejected.  Rather, Countrywide executives wanted the company's Central Underwriting group to review such loans to evaluate whether these loans should require a higher price (upfront points) or a higher interest rate in light of the violation at issue.  Central Underwriting entered information into the Exception Processing System about its decisions to approve such loans and charge additional fees to the borrower.

139.   Yet another confidential source in the Derivative Complaint, an underwriter from Long Island, New York at Countrywide between March 2000 and January 2007, stated that Countrywide extended loans to individuals with increasing debt-to-income ratios.  Initially, Countrywide limited debt-to-income ratios to 38%, but this rose to 50%.  According to this source, Countrywide branch managers' compensation was tied to loan origination volume and not the quality of

1    the loans.  Thus, according to this source, branch managers pushed originators to

2    sell more loans despite the riskiness of these loans.  Additional confidential sources

3    in the Derivative Complaint confirmed this.

4         140.   Indeed, according to yet another confidential source in the Derivative

5    Complaint, Countrywide simply "didn't turn down loans."  Rather, Countrywide

6    "'did whatever they had to do to close loans' including making exceptions to

7    underwriting guidelines – everyone was motivated to increase loan volume and

8    'approv[e] things that should not have been approved.'"

9         141.   On September 30, 2008, MBIA Insurance Corp. ("MBIA"), one of the

10   largest providers of bond insurance, filed a complaint against Countrywide in New

11   York state court, entitled *MBIA Ins. Corp. v. Countrywide*, No. 08/602825 (N.Y.

12   Sup. Ct.) (the "MBIA Complaint").   The MBIA Complaint alleges that

13   Countrywide fraudulently induced MBIA to provide insurance for certain

14   investment certificates, including those contained in the following trusts: CWHEQ

15   2005-E; CWHEQ 2005-I; CWHEQ 2005-M; CWHEQ 2006-E; CWHEQ 2006-G;

16   CWHEQ 2006-S8; CWHEQ 2007-E; CWHEQ 2007-S1; CWHEQ 2007-S2; and

17   CWHEQ 2007-S3.

18        142.   Based on discussions with one of the attorneys of record involved in

19   the filing of the MBIA Complaint, the basis for the allegations in the MBIA

20   Complaint was an extensive investigation done by Plaintiffs' Counsel in the MBIA

21   Action into Countrywide's fraudulent lending practices, namely during the period

22   of 2005-2007.  The investigation spanned several months and an intensive analysis

23   was performed on files obtained by MBIA which served as the basis for the

24   allegations in the complaint.  Counsel for the MBIA Plaintiff stated that they had a

25   good faith belief that each and every allegation set forth in their complaint was true

26   and corroborated, and does not believe that there is any chance of a Rule 11

27   violation with respect to the allegations in the complaint.

28        143.   MBIA was able to obtain approximately 19,000 loan files for the

Certificates it insured as a result of its contractual agreements with Countrywide. After reviewing the portfolios and re-underwriting each loan provided by Countrywide, MBIA discovered that there was "***an extraordinarily high incidence of material deviations from the underwriting guidelines Countrywide represented it would follow***." MBIA Complaint, ¶78 (emphasis added).  MBIA discovered that many of the loan applications "lack[ed] key documentation, such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-income] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible exception)."  MBIA Complaint, ¶79.  Significantly, "MBIA's re-underwriting review ... revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies."  On April 27, 2010, the Supreme Court of the State of New York, although determining that MBIA did not have a legal claim for negligent misrepresentation, denied a motion to dismiss MBIA's claims of fraud against several Countrywide entities and Bank of America.

144.  Furthermore, in an action commenced against Countrywide for wrongful termination, styled *Zachary v. Countrywide Fin. Corp.*, No. 4:08-cv-00214, currently pending in the U.S. District Court for the Southern District of Texas, the plaintiff, Mark Zachary ("Zachary"), a Regional Vice President of Countrywide KB Home Loans, Inc. ("CWKB"), alleged that CWKB, a 50-50 joint venture between Countrywide and KB Home Loans ("KB Home"), engaged in a host of mortgage origination and underwriting activities that did not comport with stated and standard practices.  Zachary described how loan officers would go so far as to help the loan applicant submit a loan application with false income amounts, so that the applicant would get the loan under false pretenses.

145.  Based on discussions with one of the attorneys of record involved in

1    the filing of the Zachary Complaint, the basis for the allegations in the Zachary

2    Complaint was an extensive investigation done by Plaintiff's Counsel in the

3    Zachary Action and Plaintiff's first-hand account of wrongdoing by Countrywide

4    in or around 2005-2007.  Counsel for the Zachary Plaintiff stated that they had a

5    good faith belief that each and every allegation set forth in their complaint was true

6    and corroborated, and does not believe that there is any chance of a Rule 11

7    violation with respect to the allegations in the complaint.

8         146.  According to Zachary, one of these practices involved CWKB's

9    practice of "flipping" a loan application from a "full documentation" loan program

10   to a "stated income" or "no income, no asset" loan program.  He learned that loans

11   were being canceled at the prime regional operations center as full documentation

12   loans and transferred to the subprime operations center in Plano, Texas, as stated

13   asset, stated income ("SISA") loans, a "low-doc" loan, or no income, no assets

14   ("NINA") loans, a "no-doc" loan.  Otherwise known as "liar loans," NINA loans

15   allowed a borrower to simply state their income without providing any

16   documentation or proof of this income.  Thus, rather than denying an applicant

17   based on the information revealed in the original mortgage application,

18   Countrywide pretended that it did not see the disqualifying information, such as

19   insufficient income or assets, and instead, allowed applicants to apply for a no

20   documentation loan, implicitly encouraging them to lie on these renewed

21   applications.

22        147.  Furthermore, Zachary explained that while a material number of

23   Countrywide's loan applicants were not eligible for any loan program requiring

24   documentation based on the applicant's verified income level and/or job status,

25   CWKB loan officers would (1) cancel the application for the loan program that

26   required documentation, (2) re-do the application as a SISA or a NINA loan

27   through the company's subprime originators in Plano, Texas, and (3) coach the

28   loan applicant as to what income level he or she would need to have in order to

1  qualify for the low-doc or no-doc loan.

2  148.   Moreover, according to Zachary, Countrywide blatantly ignored its

3  underwriting policies and procedures.   Zachary stated that there was a problem

4  with appraisals performed on homes being purchased with Countrywide loans.

5  According to Zachary, the appraiser was being strongly encouraged to inflate

6  appraisal values by as much as 6% to allow the homeowner to "roll up" all closing

7  costs.   According to Zachary, this inflated value put the buyer "upside down" on

8  the home immediately after purchasing it, *i.e.*, the borrower owed more than the

9  home's worth.   Thus, the borrower was more susceptible to default.   It also put the

10 lender and secondary market investor at risk because they were unaware of the true

11 value of their asset.   According to Zachary, Countrywide performed an audit into

12 these matters in January 2007 which corroborates his story.

13

14 **E.   Underwriter Defendants "Contracted Out" and Failed to Conduct
        Required Due Diligence of Loan Underwriting Guidelines
15      Contained in Offering Documents**

16

17 149.   Prior to securitization, a process of cursory "due diligence" on the

18 mortgage loans was conducted.   The review's ostensible purpose was to determine

19 whether the loans contained the requisite legal documentation, were based on an

20 independent appraisal and were originated in accordance with Countrywide's loan

21 underwriting guidelines, which were detailed in the Offering Documents.   The due

22 diligence review that was conducted on the mortgage collateral was not specific to

23 any securitized pool of mortgage loans.   Rather, the due diligence was periodically

24 performed on a small sample of Countrywide's entire "warehouse" of mortgage

25 loans.

26 150.   The Underwriter Defendants contracted out the inspection of loans for

27 compliance with the Originator's underwriting guidelines to outside firms –

28 Clayton and The Bohan Group ("Bohan") – and then conducted limited oversight
   of these subcontractors' activities.

151.   As disclosed as part of an ongoing investigation of investment banking misconduct in underwriting MBS being conducted by, among others, the New York Attorney General (the "NYAG") and the Massachusetts Attorney General, Clayton and Bohan routinely provided investment banks with detailed reports of loans non-compliant with underwriting guidelines, but the investment banks just as routinely disregarded the non-compliant loans and included them in securitization pools anyway.  Further, the President of Bohan stated that, by the time the Offerings of the Certificates took place, investment banks were requiring a review of only 5% to 7% of the entire loan pools.

152.   The Underwriter Defendants contracted their due diligence work to Clayton and Bohan.  The outside firms were supposed to examine the loans for conformity with Countrywide's guidelines, as detailed in the Offering Documents. Each loan reviewed was rated as category "1," "2" or "3."  Category "3" loans were defective and recommended for exclusion from securitization, however such loans were routinely included in securitizations despite being defective.  Because the risk of default was passed on to investors in the Certificates rather than held by the Underwriter Defendants or Countrywide, there was no incentive to remove such category "3" loans from the Offerings, because if the Underwriter Defendants rejected any significant portion of the loans, the size of the securitization, and thus the size of the fees derived from the securitization, would decrease significantly.

153.   In June 2007, the NYAG subpoenaed documents from Clayton and Bohan related to their due diligence efforts on behalf of the investment banks, such as Bear Stearns, that underwrote mortgage-backed securities.  The NYAG, along with Massachusetts and Connecticut attorneys general and the SEC (all of which also subpoenaed documents), are investigating whether investment banks held back information they should have provided in the disclosure documents related to the sale of mortgage-backed securities to investors.

154.   In a December 6, 2007 article published in *The New York Times*, it

was reported that:

> Andrew Cuomo, the New York attorney-general, has
> subpoenaed RBS and about 15 of Wall Street's biggest
> sub-prime mortgage bond underwriters, such as Bear
> Stearns and Merrill Lynch, requesting information that
> will help to determine how much due diligence was
> conducted on the home loan-backed securities that they
> issued.
>
> *       *       *
>
> Mr. Cuomo is also examining the relationship between
> mortgage lenders, third party-due diligence firms, the
> credit rating agencies and the underwriting banks to see if
> they colluded to ignore risks.
>
> Wall Street firms made hefty fees from buying high-risk
> sub-prime mortgages and packaging them into bonds
> backed by the home loans' interest payments.  Investors,
> including Wall Street giants such as Citigroup, as well as
> hedge funds and pension funds, have collectively lost
> more than $50 billion this year on sub-prime-backed
> bonds after a surge in defaults on high-risk home loans
> forced down their valuations.
>
> Many of Wall Street's underwriters relied heavily on
> third-party vendors to examine the home loans that were
> used to back the mortgage bonds.  This helped them to
> determine how reliable an income stream the underlying
> mortgages would produce and, in turn, how likely it was
> that the bonds' interest payments would be met.
>
> Since bond underwriters have an obligation to make sure
> that the statements made in the securities' Offering
> Documents are accurate, Mr. Cuomo is investigating how
> much, if any, due diligence they conducted themselves.
> He is also seeking to determine whether they should have
> done more.

155.   In a January 12, 2008 article titled "Inquiry Focuses on Withholding
of Data on Loans," *The New York Times* further reported:

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          64

An investigation into the mortgage crisis by New York
State prosecutors is now focusing on whether Wall Street
banks withheld crucial information about the risks posed
by investments linked to subprime loans.

Reports commissioned by the banks raised red flags
about high-risk loans known as exceptions, which failed
to meet even the lax credit standards of subprime
mortgage companies and the Wall Street firms. But the
banks did not disclose the details of these reports to
credit-rating agencies or investors.

The inquiry, which was opened last summer by New
York's attorney general, Andrew M. Cuomo, centers on
how the banks bundled billions of dollars of exception
loans and other subprime debt into complex mortgage
investments, according to people with knowledge of the
matter. Charges could be filed in coming weeks.

*      *      *

The inquiries highlight Wall Street's leading role in
igniting the mortgage boom that has imploded with a
burst of defaults and foreclosures. The crisis is sending
shock waves through the financial world, and several big
banks are expected to disclose additional losses on
mortgage-related investments when they report earnings
next week.

As plunging home prices prompt talk of a recession, state
prosecutors have zeroed in on the way investment banks
handled exception loans. In recent years, lenders, with
Wall Street's blessing, routinely waived their own credit
guidelines, and the exceptions often became the rule.

It is unclear how much of the $1 trillion subprime
mortgage market is composed of exception loans. Some
industry officials say such loans made up a quarter to a
half of the portfolios they saw. In some cases, the loans
accounted for as much as 80 percent. While exception
loans are more likely to default than ordinary subprime
loans, it is difficult to know how many of these loans
have soured because banks disclose little information
about them, officials say.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          65

Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

*     *     *

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco.  Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

*     *     *

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws.  But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said **lenders and investment banks routinely ignored concerns raised by these consultants.**

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said.  "We stopped checking."

(emphasis added).

156.  On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports

1    provided to its clients.  Both *The New York Times* (J. Anderson and V. Bajaj,

2    "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," *N.Y. Times*, (Jan.

3    27, 2008)) and *The Wall Street Journal* (A. Efrati and R. Simon, "Due Diligence

4    Firm to Aid New York Subprime Probe," *Wall St. J.* (Jan. 29, 2008)) ran articles

5    describing the nature of the NYAG's investigation and Clayton's testimony.  *The*

6    *Wall Street Journal* reported that the NYAG's investigation was focused on "the

7    broad language written in prospectuses about the risky nature of these securities,"

8    which "changed little in recent years, even as due diligence reports noted that the

9    number of exception loans backing the securities was rising."  According to the

10   *New York Times* article, Clayton told the NYAG "that starting in 2005, it saw a

11   significant deterioration of lending standards and a parallel jump in lending

12   expectations" and "some investment banks directed Clayton to halve the sample of

13   loans it evaluated in each portfolio."

14       157.   A March 23, 2008 *Los Angeles Times* article reported that Clayton and

15   Bohan employees "raised plenty of red flags about flaws [in subprime home loans]

16   so serious that mortgages should have been rejected outright – such as borrowers'

17   incomes that seemed inflated or documents that looked fake – but the problems

18   were glossed over, ignored or stricken from reports" as follows:

19           The reviewers' role was just one of several safeguards –
20           including home appraisals, lending standards and ratings
21           on mortgage-backed bonds – that were built into the
             country's mortgage-financing system.
22
             But in the chain of brokers, lenders and investment banks
23           that  transformed  mortgages  into  securities  sold
24           worldwide, no one seemed to care about loans that
             looked bad from the start.  Yet profit abounded until
25           defaults spawned hundreds of billions of dollars in losses
26           on mortgage-backed securities.

27           "The investors were paying us big money to filter this
28           business," said loan checker Cesar Valenz.  "It's like

with water.  If you don't filter it, it's dangerous.  And it didn't get filtered."

As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.

The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages.  And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

E. Scott Reckard, "Subprime Watchdogs Ignored," *L.A. Times* (Mar. 23, 2008).

### F.   Additional Government Investigations Further Confirm Systemic Disregard for Mortgage Loan Underwriting Guidelines

158.   In August 2007, following reports of defaults in mortgage loans underlying various MBS, downgrades of such MBS and potential downgrades of additional MBS in the future, and the resulting illiquidity in the credit markets, the President of the United States commissioned the Secretary of the Treasury, the SEC and the Commodities Futures Trading Commission ("CFTC") (hereinafter referred to as the "President's Working Group" or the "PWG") to investigate the causes of the market turmoil.  After a seven-month investigation, the PWG issued its report on March 13, 2008.  The PWG found as follows:

- A significant erosion of market discipline by those involved in the securitization process, including *originators, underwriters, credit rating agencies, and global investors,* related in part to failures to provide or obtain adequate risk disclosures;

- The turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages*…

(emphasis added).

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT                68

159.   In December 2007, the Massachusetts Attorney General launched an investigation into Wall Street's securitization of subprime loans.  The investigation focused on the industry practices involved in the issuance and securitization of subprime loans to Massachusetts consumers.  According to a press release issued by the Massachusetts Attorney General's Office,

> The Office is investigating whether securitizers may have:
>
> - facilitated the origination of "unfair" loans under Massachusetts law;
> - failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;
> - failed to take sufficient steps to avoid placing problem loans in securitization pools;
> - been aware of allegedly unfair or problem loans;
> - failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan diligence and the pre-securitization process, as well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

160.   On January 30, 2008, the FBI and SEC launched a joint investigation into 14 investment banks, loan providers and developers as part of a crackdown focusing on the subprime mortgage crisis.  According to the *Los Angeles Times*:

> We're looking at the whole range of those involved – including the investment banks and other entities that bundled the loans up for sale and the institutions that held them and reported [to investors] on their value…

### G.   Underwriter Defendants Employed Rating Shopping Practices to Ensure Inflated Investment Grade Ratings for All the Certificates

161.   The Underwriter Defendants derived their profits from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage

1   loans.   For the Certificates to sell profitably, approximately 80% of the

2   securitization had to be assigned the highest AAA rating by the Rating Agencies.

3        162.   As set forth above, the Underwriter Defendants ultimately engaged

4   the Rating Agencies through a "ratings shopping" process.   Initially, a collateral

5   analyst would send the preliminarily structured deal to the Rating Agencies for

6   feedback.   The Underwriter Defendants' in-house rating agency personnel would

7   oversee the communications with the Rating Agencies.   Then S&P, for example,

8   would run the loan tape through both its LEVELS and SPIRE Models again and

9   provide the Underwriter Defendants with the results in an effort to obtain the

10  ratings engagement.   Through the LEVELS Model, S&P would advise the

11  Underwriter Defendants responsible for each deal, for example, that 94.25% of the

12  Certificates would be rated AAA as long as 5.75% of the total collateral balance

13  supporting those Certificates was subordinate.   This 5.75% was the amount of loss

14  coverage required.   The Underwriter Defendants would then again "negotiate" with

15  the Rating Agencies before they were hired, in order to get them to agree to the

16  least amount of loss coverage and credit enhancement, and the highest percentage

17  of AAA-designated Certificates.

18       163.   The Underwriter Defendants used this "ratings shopping" process to

19  obtain the most profitable structure on the Offerings.   Ratings shopping resulted in

20  **100%** of the Certificates at issue being initially awarded the AAA/maximum-

21  security rating.

22       164.   Finally however, in 2008, the practice was effectively ended by way

23  of an agreement entered into between the Rating Agencies and the NYAG.   In June

24  2008, the NYAG announced that after an investigation of the Rating Agencies, it

25  had reached an agreement with S&P, Moody's and Fitch which contemplated a

26  complete overhaul of the then-current ratings procedures and guidelines and put an

27  end to what had been termed "ratings shopping."   Instead of investment banks

28  looking to issue mortgage-backed bonds going to all three agencies for a review,

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          70

but only using, and paying for, the most optimistic rating, the Rating Agencies would now be paid upfront regardless of whether they were hired to assign a rating, a move expected to remove any potential for conflicts of interest.

## VIII. THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING AND APPRAISAL STANDARDS

165.   Countrywide was a principal originator for all nine of the SAC Offerings for which the Certificates complained of herein were issued in connection with.  The total value of the nine tranches in the SAC Offerings for which Countrywide was the principal originator was $2.6 billion, of which the Rating Agencies assigned initial ratings of AAA/maximum safety to 100%.

166.   Each Registration Statement at issue herein for the Issuing Trusts contained an illustrative form of a Prospectus Supplement for use in the offering of the Certificates. Each Registration Statement was prepared by the Issuer Defendants and signed by the Individual Defendants.  At the effective date of the offering of the Certificates, a final Prospectus Supplement was filed with the SEC containing a description of the mortgage pool underlying the Certificates and the underwriting standards by which the mortgages were originated.  The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements.

167.   Countrywide made clear in the Offering Documents that exceptions were made to the underwriting guidelines but only where "compensating factors were demonstrated by the borrowers.  Each Registration Statement filed by CWALT and CWMBS at issue herein, as well as the Prospectus Supplements issued pursuant to those Registration Statements, contained the following language concerning the underwriting standards by which the mortgages pooled into CWALT and CWMBS Offerings were originated:

1

2

3

4

All of the Mortgage Loans have been originated or acquired by Countrywide Home Loans, Inc., in accordance with its credit, appraisal and underwriting standards.... Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Countrywide Home Loans' underwriting standards are applied, by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis, varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. ***Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.***

22

*See* **TAC Appendix Exhibit K;** *see also* **Exhibit L.**

23

24

25

26

168.  The above statements concerning Countrywide's adherence to its underwriting standards and to federal and state underwriting standards, with respect to mortgages pooled into CWALT and CWMBS Issuing Trusts, contained material misstatements when made because:

27

28

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT                    72

a.   Defendants failed to disclose that Countrywide systematically ignored underwriting standards imposed by state and federal law in issuing the mortgages pooled into the Issuing Trusts;

b.   Countrywide did not, contrary to its statement above, properly "evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." Rather, as alleged herein, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans; and

c.   Countrywide's underwriting standards did not require that a borrower "generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." Instead, Countrywide's underwriting included the following practices, described *supra* at ¶¶97-164, that disregarded a borrowers' ability to pay by:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed-rate" when the adjustable rate adjusted;

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies; and

- Systematically overriding flags identified by the CLUES system that was meant to weed out non-qualifying loans and nonetheless approving such loans.

169. Each Registration Statement and Prospectus Supplement issued by CWABS and CWHEQ at issue herein contained the following language concerning the underwriting standards by which the mortgages pooled into the Issuing Trusts were originated:

> Credit Blemished Mortgage Loans. The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit blemished mortgage loans.... Countrywide Home Loans produces its credit blemished mortgage loans through its Consumer Markets, Full Spectrum Lending, Correspondent Lending and Wholesale Lending Divisions. Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans. In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit blemished mortgage loan that it has not itself underwritten.

Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. ***Compensating factors may include low loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors. It is expected that a significant number of the Mortgage Loans will have been originated based on such underwriting exceptions.***

Each prospective borrower completes an application which includes information with respect to the applicant's assets, liabilities income and employment history, as well as certain other personal information. Countrywide Home Loans requires an independent credit bureau report on the credit history of each applicant in order to evaluate the applicant's prior willingness and/or ability to repay. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments, among other matters.  After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations.  The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income. The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 50%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT                    75

> While more flexible, Countrywide Home Loans'
> underwriting guidelines still place primary reliance on a
> borrower's ability to repay; however, Countrywide Home
> Loans may require lower loan-to-value ratios than for
> loans underwritten to more traditional standards.
> Borrowers who qualify generally have payment histories
> and debt-to-income ratios which would not satisfy more
> traditional underwriting guidelines and may have a
> record of major derogatory credit items such as
> outstanding judgments or prior bankruptcies.
> Countrywide Home Loans' credit blemished mortgage
> loan underwriting guidelines establish the maximum
> permitted loan-to-value ratio for each loan type based
> upon these and other risk factors with more risk factors
> resulting in lower loan-to-value ratios.

*See* **TAC Appendix Exhibit M**; *see also* **Exhibit N.**

170. In addition, the Prospectus Supplements issued pursuant to the CWHEQ Registration Statements at issue herein also contained additional language describing the standards by which CWHEQ's home equity loans and second lien mortgage loans were originated:

> The underwriting process is intended to assess the
> applicant's credit standing and repayment ability, and the
> value and adequacy of the real property security as
> collateral for the proposed loan. Exceptions to the
> applicable originator's underwriting guidelines will be
> made when compensating actors are present. These
> factors include the borrower's employment stability,
> favorable credit history, equity in the related property,
> and the nature of the underlying first mortgage loan.

*See* **TAC Appendix Exhibit O**.

171. The Prospectus Supplements for the Offerings issued pursuant to the CWHEQ Registration Statements at issue herein also stated:

> After obtaining all applicable income, liability, asset,
> employment, credit, and property information, the

applicable originator generally uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments (including any escrows for property taxes and hazard insurance premiums) and other monthly credit obligations. The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations (assuming the mortgage loan interest rate is based on the applicable fully indexed interest rate) to the borrower's gross monthly income. Based on this, the maximum monthly debt-to-income ratio is 45%. Variations in the monthly debt-to-income ratios limits are permitted based on compensating factors. The originators currently offer home equity loan products that allow maximum combined loan-to-value ratios up to 100%.

*See* **TAC Appendix Exhibit P**.

172. The above statements contained material misstatements of fact when made because:

    a.    Contrary to the statements that Countrywide's underwriting standards were "primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan" and to evaluate "the borrower's credit standing and repayment ability," Countrywide subordinated its underwriting standards to originating and securitizing as many mortgage loans as it could so that it could garner fees in the secondary mortgage market. As alleged herein, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans. Rather, Countrywide designed its underwriting standards to ensure that it received the highest possible fees for originating loans without regard to the actual ability of its borrowers to repay the loan, or whether the mortgaged property had sufficient value to collateralize the loan.

b.     Contrary to the representation above that "After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations," Countrywide's underwriting included the following practices, described *supra* at ¶¶97-164, that disregarded a borrowers' ability to pay by:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted;

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies; and

- Systematically overriding flags identified by the CLUES system that were meant to weed out non-qualifying loans and, despite the flags, approving such loans.

c.      Contrary to the statement that "Exceptions to the applicable originator's underwriting guidelines will be made when compensating factors are present" and that those factors included "the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan," Countrywide adopted procedures to incentivize its employees to approve exceptions to loans regardless of whether any compensating factors were present.

173.    Each Registration Statement issued by CWALT, CWABS, CWMBS and CWHEQ at issue herein contained the following statement regarding Countrywide's assessment of a prospective borrower:

> Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance). ***The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist***.

*See* **TAC Appendix Exhibit Q**.

174.    Each Registration Statement issued by CWALT, CWABS, CWMBS and CWHEQ at issue herein contained the following statement regarding

Countrywide's review of information provided by a prospective borrower:

> Under the Stated Income/Stated Asset Documentation
> Program, the mortgage loan application is ***reviewed to
> determine that the stated income is reasonable for the
> borrower's employment and that the stated assets are
> consistent with the borrower's income.***

*See* **TAC Appendix Exhibit R**.

175.   According to the Registration Statement and Prospectus Supplements issued by CWALT at issue herein, Countrywide originated loans pursuant to a Preferred Processing Program, pursuant to which documentation requirements were waived for those applicants with favorable credit histories and higher FICO scores.

> Under   Countrywide   Home   Loans'   underwriting
> guidelines, borrowers possessing higher FICO Credit
> Scores, ***which indicate a more favorable credit history***,
> and who give Countrywide Home Loans the right to
> obtain the tax returns they filed for the preceding two
> years may be eligible for Countrywide Home Loans'
> processing   program   (the   "Preferred   Processing
> Program"). ….Countrywide Home Loans may waive
> some documentation requirements for mortgage loans
> originated under the Preferred Processing Program.

*See* **TAC Appendix Exhibit S;** *see also* **Exhibit T**.

176.   Furthermore, under the CWALT Registration Statement at issue herein, Countrywide also offered four programs where less than full borrower documentation of income, assets and employment were required, however, in all instances credit scores had to be obtained and any deficiencies or derogations fully explained to the loan officers and, except for the Streamlined Documentation Program which had limited application, independent appraisals of the mortgage properties obtained – with all appraisals conforming to Fannie Mae and Freddie Mac standards:

A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both. Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "Alternative Documentation Program"), a Reduced Documentation Loan Program (the "Reduced Documentation Program"), a CLUES Plus Documentation Loan Program (the "CLUES Plus Documentation Program"), a No Income/No Asset Documentation Loan Program (the "No Income/No Asset Documentation Program"), a Stated Income/Stated Asset Documentation Loan Program (the "Stated Income/Stated Asset Documentation Program") and a Streamlined Documentation Loan Program (the "Streamlined Documentation Program").

***For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loan obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.***

***Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost***

> *analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.*

*See* **TAC Appendix Exhibit U;** *see also* **Exhibit V**.

177.   In addition, the Offering Documents for the CWALT Offerings at issue herein stated that the Alternative Documentation Program required, in addition to FICO scores and standard appraisals, W-2 forms instead of tax returns for two years and bank statements instead of deposits and employment verification:

> The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

*See* **SAC Appendix Exhibit W;** *see also* **Exhibit X**.

178.   The Reduced Documentation Program, according to the CWALT Offering Documents at issue herein, was only applied where maximum LTV was equal to or less than 75% including secondary financing as follows:

> Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 75%.

*See* **TAC Appendix Exhibit Y;** *see also* **Exhibit Z**.

179.   Furthermore, the CLUES Plus program also had a 75% LTV limit but

required borrower bank statements and excluded cash out refinancing:

> The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

*See* **TAC Appendix Exhibit AA;** *see also* **Exhibit BB**.

180. Finally, pursuant to the CWALT Offering Documents at issue herein, the Streamlined Documentation Program offered refinancing for non-delinquent borrowers who had originated their loans with Countrywide, but this program was limited:

> The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required,

and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

*See* **TAC Appendix Exhibit CC;** *see also* **Exhibit DD.**

181.   These statements contained material misstatements and omissions of fact when made because, contrary to its published statement that "a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan," Countrywide implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage, described *supra* at ¶¶97-164, such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed-rate" when the adjustable rate adjusted;

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies;

- Systematically overriding flags identified by the CLUES system that were meant to weed out non-qualifying loans and, despite the flags, approving such loans; and

- Failing to determine whether stated income or stated assets were reasonable, failing to inform investors that Countrywide employees used www.salary.com in order to verify income and, often times, failing to check the veracity of information that was provided and easily verified (such as bank account balances).

182.   Each Registration Statement and Prospectus Supplement issued by CWALT and CWMBS at issue herein contained the following language concerning the collateral supporting each mortgage pooled in the Issuing Trusts and the appraisals by which the collateral was valued:

> Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

*See* **SAC Appendix Exhibit EE**; *see also* **Exhibit FF**.

183.   Each Registration Statement and Prospectus Supplement issued by CWABS and CWHEQ at issue herein contained the following language concerning the collateral supporting each mortgage pooled in the Issuing Trusts

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          85

and the appraisals by which the collateral was valued:

> Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type.  Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan.

*See* **TAC Appendix Exhibit GG;** *see also* **Exhibit HH**.

184.   In general, the Prospectus Supplements issued by CWHEQ at issue herein contained representations concerning the appraisals done with respect to home equity and second mortgage liens.  They stated with respect to home equity loans:

> Full appraisals are generally performed on all home equity loans.  These appraisals are determined on the basis of an applicable originator-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac.  For certain home equity loans that had at origination a credit limit between $100,000 and $250,000, determined by the FICO score of the borrower, a drive-by evaluation is generally completed by a state-licensed, independent third party, professional appraiser on forms approved by either Fannie Mae or Freddie Mac.   The drive-by evaluation is an exterior examination of the premises by the appraiser to determine that the property is in good condition. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements, and generally must

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT            86

have been made not earlier than 180 days before the date of origination of the mortgage loan.  For certain home equity loans with credit limits between $100,000 and $250,000, determined by the FICO score of the borrower, the applicable originator may have the related mortgaged property appraised electronically.  The minimum and maximum loan amounts for home equity loans are generally $7,500 (or, if smaller, the state-allowed maximum) and $1,000,000, respectively.

*See* **TAC Appendix Exhibit II**.

185.  Finally, with respect to its CWALT Offerings at issue herein, Countrywide also offered expanded underwriting allowing for higher LTV and loan amounts though loans would still be subject to certain standards:

> Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

> Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% on 1 unit properties with principal balances up to $333,700 ($500,550 in Alaska and Hawaii) and 2 unit properties with principal balances up to $427,150 ($640,725 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $516,300 ($774,450 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $641,650 ($962,475 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $333,700 ($500,550 in

Alaska and Hawaii). Countrywide Home Loans'
Expanded Underwriting Guidelines for conforming
balance mortgage loans generally allow Loan-to-Value
Ratios at origination on investment properties of up to
90% unit properties with principal balances up to
$333,700 ($500,550 in Alaska and Hawaii) and 2 unit
properties with principal balances up to $427,150
($640,725 in Alaska and Hawaii) and up to 85% on 3
unit properties with principal balances of up to $516,300
($774,450 in Alaska and Hawaii) and 4 unit properties
with principal balances of up to $641,650 ($962,475 in
Alaska and Hawaii).  Under its Expanded Underwriting
Guidelines, Countrywide Home Loans generally permits
a debt-to income ratio based on the borrower's monthly
housing expenses of up to 36% and a debt-to-income
ratio based on the borrower's total monthly debt of up to
40%; provided, however, that if the Loan-to-Value Ratio
exceeds 80%, the maximum permitted debt-to-income
ratios are 33% and 38%, respectively.

In connection with the Expanded Underwriting
Guidelines, Countrywide Home Loans originates or
acquires mortgage loans under the Full Documentation
Program, the Alternative Documentation Program, the
Reduced Documentation Loan Program, the No
Income/No Asset Documentation Program and the Stated
Income/Stated Asset Documentation Program. Neither
the No Income/No Asset Documentation Program nor the
Stated Income/Stated Asset Documentation Program is
available under the Standard Underwriting Guidelines.
The same documentation and verification requirements
apply to mortgage loans documented under the
Alternative Documentation Program regardless of
whether the loan has been underwritten under the
Expanded Underwriting Guidelines or the Standard
Underwriting Guidelines. However, under the Alternative
Documentation Program, mortgage loans that have been
underwritten pursuant to the Expanded Underwriting
Guidelines may have higher loan balances and Loan-to-
Value Ratios than those permitted under the Standard
Underwriting Guidelines

*See* **TAC Appendix Exhibit JJ**.

186.   These statements contained material misstatements and omitted necessary facts when made because they failed to disclose that the value and adequacy of the mortgaged property was not appraised, on a consistent basis, using "market data analysis based on recent sales of comparable homes in the area, where deemed appropriate, replacement cost analysis based on the current costs of constructing a similar home" or "on the basis of an applicable originator-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac."   Instead, as alleged herein, Countrywide systematically inflated appraisals for properties used as collateral for mortgage loans underlying the Issuing Trusts. These inflated appraisals did not conform to the USPAP and were not market data analyses of comparable homes in the area or analyses of the cost of construction of a comparable home.

187.   Each Prospectus Supplement at issue herein referenced and incorporated into each Registration Statement described the LTV ratio of the mortgages pooled into the Issuing Trusts. The LTV ratio of mortgages in the Issuing Trusts was described as equal to: (1) the principal balance of the mortgage loan at the date of origination, divided by (2) the collateral value of the related mortgaged property, where the "collateral value" was the lesser of either the appraised value based on an appraisal made for Countrywide by an independent fee appraiser at the time of the origination of the related mortgage loan, or the sales price of the mortgaged property at the time of origination. Each Prospectus Supplement then provided an average LTV ratio of the mortgage loans included in the Issuing Trusts and a disclosure concerning the maximum LTV ratio of mortgage loans included in the Issuing Trusts.   *See* **TAC Appendix Exhibit KK**.

188.   The statements concerning the average LTV ratio of mortgages included in the Issuing Trusts and the maximum LTV ratio of mortgages included in the Issuing Trusts were materially misstated when made because these ratios were based on incorrect and/or inflated appraisal values assigned to the collateral

1    supporting the mortgage loans pooled into each Issuing Trust. For example, as

2    explained above, the appraisals of the properties underlying the mortgage loans

3    were inaccurate and inflated. Furthermore, stated sales prices of properties

4    underlying the mortgage loans did not accurately reflect the true values of the

5    properties. These inflated appraisals and misleading sales prices were used to

6    calculate the LTV ratios listed in the Prospectus Supplements. Incorporating an

7    inflated appraisal into the LTV ratio calculation will result in a lower LTV ratio for

8    a given loan. For instance, as described above, if a borrower seeks to borrow

9    $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000

10    or 90%. If, however, the appraised value of the house is artificially increased to

11    $120,000, the LTV ratio drops to just 75% ($90,000/$120,000). Due to the

12    inflated appraisals, the LTV ratios listed in the Prospectus Supplements were

13    artificially low, making it appear that the loans underlying the trusts had greater

14    collateral and thus were less risky than they actually were.

15        189. The Offering Documents also stated that exceptions to underwriting

16    standards could be granted if the borrower's loan application reflected

17    "compensating factors" including "loan-to-value ratio." As detailed above,

18    however, the LTV ratios were deflated and inaccurate; therefore the use of this

19    metric as a "compensating factor" further violated the stated underwriting

20    standards. These statements in the Offering Documents related to Countrywide's

21    underwriting standards contained material misstatements and omissions because,

22    as described herein, Countrywide: (1) systematically disregarded its stated

23    underwriting standards and regularly made exceptions to its underwriting

24    guidelines in the absence of sufficient compensating factors. Despite assurances

25    that certain loans were limited to borrowers with excellent credit histories,

26    Countrywide routinely extended these loans to borrowers with weak credit

27    histories; and (2) largely disregarded appraisal standards and did not prepare

28    appraisals in conformity with Fannie Mae or Freddie Mac appraisal standards.

## IX.   CLASS ACTION ALLEGATIONS

190.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a) and (b)(3), individually, and on behalf of a class consisting of all persons or entities who purchased the Certificates identified herein issued pursuant and traceable to the Offering Documents defined above (the "Class") and were damaged thereby.  *See* ¶1.

191.   This action is properly maintainable as a class action for the following reasons:

192.   The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members of the proposed Class, who may be identified from records maintained by the Issuer Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

193.   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class.  The tranches for each Certificate Offering were issued pursuant to a single Prospectus Supplement issued by Defendants pursuant to a common Shelf Registration Statement.  The individual tranches which made up the Offerings were interconnected by virtue of the credit enhancement provisions specified in each of the Prospectus Supplements. Plaintiffs have standing to bring their claims on behalf of all purchasers of each class of Certificates purchased because the Class of purchasers of the Countrywide Certificates suffered damages from the impairment of the entire mortgage pools and the value of the tranches in each series of Certificates depended on the performance of the same pools of mortgages.  As such, the impairment of the collateral underlying a particular Certificate Offering affected all investors in any

1  single tranche in that Offering, in addition to investors of all tranches in any

2  particular Offering.   Accordingly, Plaintiffs are adequate representatives of the

3  Class and will fairly and adequately protect the interests of the Class.

4        194.   The prosecution of separate actions by individual members of the

5  Class would create the risk of inconsistent or varying adjudications with respect to

6  individual members of the Class, which would establish incompatible standards of

7  conduct for Defendants, or adjudications with respect to individual members of the

8  Class which would, as a practical matter, be dispositive of the interests of the other

9  members not parties to the adjudications or substantially impair or impede their

10 ability to protect their interests.

11       195.   A class action is superior to all other methods for a fair and efficient

12 adjudication of this controversy.   There will be no difficulty in the management of

13 this action as a class action.   Furthermore, the expense and burden of individual

14 litigation make it impossible for members of the Class to individually redress the

15 wrongs done to them.

16       196.   There are questions of law and fact which are common to the Class

17 and which predominate over questions affecting any individual Class member.

18 The common questions include, *inter alia*, the following:

19       (a)     whether Defendants violated the Securities Act;

20       (b)     whether statements made by Defendants to the investing public in the

21 Registration Statements, Prospectuses and Prospectus Supplements both omitted

22 and misrepresented material facts about the underlying mortgages; and

23       (c)     the extent and proper measure of the damages sustained by the

24 members of the Class.

## X.   STANDING

27       197.   Plaintiffs have constitutional standing to advance the claims alleged

28 herein.   As set forth herein at ¶¶58-78 as well as in Plaintiffs' certifications (*see*

¶¶29-32), Plaintiffs purchased the Countrywide Certificates and are alleged to have been damaged by Defendants, and can assert a claim directly against each Defendant.   Accordingly, Plaintiffs have alleged concrete and particularized invasions of legally protected interests for all of the claims alleged under the Securities Act.

## XI.   CLAIMS

### COUNT I

**Violation of Section 11 of the Securities Act Against the Individual
Defendants, the Issuer Defendants and the Underwriter Defendants**

198.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the Defendants to defraud Plaintiffs or members of the Class.  This Count is predicated upon Defendants' strict liability for material misstatements and omissions in the Offering Documents.  This Count is brought pursuant to Section 11 of the Securities Act, on behalf of the Class, against the Individual Defendants, the Issuer Defendants, and the Underwriter Defendants.

199.   The Offering Documents for the Offerings were materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

200.   The Defendants named in this Count are strictly liable to Plaintiffs and the Class under Section 11 of the Securities Act for the misstatements and omissions contained in the Offering Documents issued in connection with the following Certificates:

| Issuing Trust | Plaintiff | TAC ¶ |
|---|---|---|
| CWALT 2005-62 | OPERS | 61 |
| CWALT 2005-72 | OPERS | 62 |
| CWHEL 2005-H | OPERS | 66 |
| CWL 2006-S3 | IPERS | 67 |
| CWL 2005-11 | GBPHB | 71 |
| CWHL 2005-HYB9 | OCERS | 72 |
| CWL 2006-9 | GBPHB | 73 |
| CWL 2006-24 | GBPHB | 74 |
| CWHL 2006-HYB3 | OPERS | 78 |

201.  The Individual Defendants signed the Registration Statements for the Offerings, which were incorporated by reference into the Prospectuses and Prospectus Supplements, on behalf of the Issuer Defendants.

202.  Defendant CSC, an affiliate of CFC, acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates.  Defendant CSC was an underwriter for the Issuing Trusts as shown in **TAC Appendix Exhibit E**.  Defendant Bank of America is successor in interest to CSC.

203.  Defendant Deutsche Bank acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates.  Defendant Deutsche Bank was an underwriter for the Issuing Trusts as shown in **TAC Appendix Exhibit E**.

204.  Defendant UBS acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates.  Defendant UBS was an underwriter for the Issuing Trusts as shown in **TAC Appendix Exhibit E**.

205.  Defendant Morgan Stanley acted as an underwriter in the sale of the Issuing Trusts' Certificates, and helped to draft and disseminate the Offering Documents for the Certificates.  Defendant Morgan Stanley was an underwriter for the Issuing Trusts as shown in **TAC Appendix Exhibit E**.

1    206.   Defendant Goldman Sachs acted as an underwriter in the sale of the

2    Issuing Trusts' Certificates, and helped to draft and disseminate the Offering

3    Documents for the Certificates.  Defendant Goldman Sachs was an underwriter for

4    the Issuing Trusts as shown in **TAC Appendix Exhibit E**.

5    207.   Defendant RBS acted as an underwriter in the sale of the Issuing

6    Trusts' Certificates, and helped to draft and disseminate the Offering Documents

7    for the Certificates.  Defendant RBS was an underwriter for the Issuing Trusts as

8    shown in **TAC Appendix Exhibit E**.

9    208.   Defendant HSBC acted as an underwriter in the sale of the Issuing

10   Trusts' Certificates, and helped to draft and disseminate the Offering Documents

11   for the Certificates. Defendant HSBC was an underwriter for the Issuing Trusts as

12   shown in **TAC Appendix Exhibit E**.

13   209.   The Defendants named in this Count owed to Plaintiffs the duty to

14   make a reasonable and diligent investigation of the statements contained in the

15   Registration Statements at the time they became effective to ensure that such

16   statements were true and correct and that there was no omission of material facts

17   required to be stated in order to make the statements contained therein not

18   misleading.  The Defendants knew, or in the exercise of reasonable care should

19   have known, of the material misstatements and omissions contained in or omitted

20   from the Offering Documents as set forth herein.  As such, the Defendants are

21   liable to the Class.

22   210.   None of the Defendants named in this Count made a reasonable

23   investigation or possessed reasonable grounds for the belief that the statements

24   contained in the Offering Documents were true or that there was no omission of

25   material facts necessary to make the statements made therein not misleading.

26   211.   The Defendants named in this Count issued and disseminated, caused

27   to be issued and disseminated, and participated in the issuance and dissemination

28   of material misstatements to the investing public which were contained in the

1  Offering Documents, which misrepresented or failed to disclose, *inter alia*, the
2  facts set forth above.

3      212.  By reason of the conduct herein alleged, each of the Defendants
4  named in this Count violated Section 11 of the Securities Act.

5      213.  Plaintiffs acquired the Certificates pursuant and traceable to the
6  Offering Documents.

7      214.  At the time they obtained their Certificates, Plaintiffs and members of
8  the Class did so without knowledge of the facts concerning the misstatements or
9  omissions alleged herein.

10      215.  This claim is brought within one year after discovery of the untrue
11  statements and omissions in and from the Offering Documents which should have
12  been made through the exercise of reasonable diligence, and within three years of
13  the effective date of the Offering Documents, and are otherwise being brought in
14  accordance with the Countrywide Tolling Decision and Countrywide MTD
15  Decision.

16      216.  Plaintiffs and the Class have sustained damages.  The value of the
17  Certificates has declined substantially, subsequent to, and due to, the violations of
18  the Defendants named in this Count.

19      217.  By virtue of the foregoing, Plaintiffs and the other members of the
20  Class are entitled to damages under Section 11, as measured by the provisions of
21  Section 11(e), jointly and severally from each of the Defendants named in this
22  Count.

23  **COUNT II**

24  **Violation of Section 12(a)(2) of the Securities Act Against the**
25  **Section 12 Underwriter Defendants**

26      218.  Plaintiffs repeat and reallege each and every allegation contained
27  above as if fully set forth herein.

28      219.  This Count is brought pursuant to Section 12(a)(2) of the Securities

1    Act on behalf of the Class, against the Section 12 Underwriter Defendants.

2        220.   The Section 12 Underwriter Defendants promoted and sold the

3    Certificates pursuant to the defective Offering Documents.  Plaintiffs and members

4    of the Class purchased Certificates directly from the Section 12 Underwriter

5    Defendants in the Offerings.

6        221.   The Offering Documents contained untrue statements of material

7    facts, omitted to state other facts necessary to make the statements made not

8    misleading, and concealed and failed to disclose material facts.

9        222.   The Section 12 Underwriter Defendants owed to Plaintiffs, who

10   purchased the Certificates pursuant to the Offering Documents, the duty to make a

11   reasonable and diligent investigation of the statements contained in the Offering

12   Documents, to ensure that such statements were true and that there was no

13   omission to state a material fact required to be stated in order to make the

14   statements contained therein not misleading.   The Section 12 Underwriter

15   Defendants knew of, or in the exercise of reasonable care should have known of,

16   the misstatements and omissions contained in the Offering Documents as set forth

17   above.

18       223.   Plaintiffs purchased the following Certificates in the Offerings and

19   directly from the Section 12 Underwriter Defendants as follows:

| Issuing Trust | Pro. Supp. Date | Plaintiff | Purchase Date | Purchased From | TAC ¶ |
|---|---|---|---|---|---|
| CWALT 2005-72 | 11/29/2005 | OPERS | 11/21/2005 12/15/2005 | UBS | 62 |
| CWL 2005-H | 9/28/2005 | OPERS | 9/27/2005 | CSC | 66 |
| CWL 2006-S3 | 6/26/2006 | IPERS | 6/16/2006 | CSC | 67 |
| CWL 2005-11 | 9/23/2005 | GBPHB | 9/12/2005 | CSC | 71 |
| CWHL 2005-HYB9 | 11/29/2005 | OCERS | 11/28/2005 | CSC | 72 |

    224.   Plaintiffs did not know, and in the exercise of reasonable diligence
could not have known, of the misrepresentations and omissions contained in the
Offering Documents.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          97