included a named plaintiff that had standing to assert the 2006-24 claims. *See* **SAC Appendix Exhibit E.** As such, Plaintiff GBPHB derives tolling from Vermont's standing to pursue those claims. *See* **SAC Appendix Exhibit F.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to GBPHB's custodial statements, was priced at $0.9428, causing GBPHB to suffer injury as a result.

### D. Defendant CWMBS Offerings

81. Defendant CWMBS issued $56,178,680,394 of Countrywide MBS in 87 separate Offerings between June 2005 and October 2007 pursuant to five Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements as set forth above in ¶44 herein and in the FAC at ¶37. All 87 Offerings were included, for the first time, in the Washington State Complaint and thereafter included in the Luther Amended Complaint, Consolidated Luther Complaint, Federal Complaint and FAC. *See* **SAC Appendix Exhibit D.**

82. Pursuant to the Court's Countrywide Tolling Decision, the allegations set forth herein are limited to those CWMBS Offerings which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintain standing to pursue Securities Act claims on one (1) Countrywide MBS Offering issued pursuant to one (1) CWMBS Registration Statement, as set forth in detail below.

83. As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWHL 2006-HYB3 ("2006-HYB3") Certificates, Class 2A1A**, pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWHL 2006-HYB3, Class 2A1A | 1,076,000.00 | $1.0002 | April 27, 2006 | CSS |
| CWHL 2006-HYB3, Class 2A1A | 154,493.47 | $0.9919 | August 21, 2007 | CSC |

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. OPERS' Sections 11 and 15 claims on behalf of all purchasers of the 2006-HYB3 Certificates were tolled in accordance with the Countrywide Tolling Decision since at least June 12, 2008 when Washington State was named as a plaintiff in the Washington State Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Washington State purchased the 2006-HYB3 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Washington State Complaint, including the Amended Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint and the FAC, included a named plaintiff that had standing to assert the 2006-HYB3 Claims. *See* **SAC Appendix Exhibit E.** As such, Plaintiff OPERS derives tolling from Washington State's standing to pursue those claims.[8] *See* **SAC Appendix Exhibit F.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to OPERS' custodial statements, was priced at $0.6877, causing OPERS to suffer injury as a result.

## VI.    BACKGROUND

### A.    Countrywide Was a Leading Issuer and Underwriter of Mortgage-Backed Securities

84.    As illustrated below, a mortgage securitization is where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.

---

[8]    In addition to Washington State's standing to pursue the 2006-HYB3 claims, OPERS relies on the standing of MASH as of the filing of the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, MASH purchased the 2006-HYB3 Certificates and had standing to assert Securities Act claims in connection therewith.

Follow the Mortgage What happens to your mortgage after you sign on the dotted line

Source: WSJ Reporting

85.     When mortgage borrowers make interest and principal payments, the cash flow is distributed to the holders of MBS certificates in order of priority, based on the specific tranche held.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.  Because the lower tranches are designed to provide a cushion, diminished cash flows to the lower tranches results in impaired value of the higher tranches, as, among other reasons, there is less certainty of the continued cash flows to the higher tranches.

86.     The securitization of loans fundamentally shifts the risk of loss from mortgage loan originators to investors who purchase an interest in the securitized pool of loans.  When the originator holds a mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan.   As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  In securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing

1    borrower creditworthiness or a fair appraisal value of the property in the loan
2    origination process.

3        87.    In the 1980s and 1990s, securitizations were generally within the
4    domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National
5    Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage
6    Corporation ("Freddie Mac"), which would purchase loans from originators.
7    Investors in these early GSE securitizations were provided protections since the
8    underlying loans were originated pursuant to strict underwriting guidelines.

9        88.    Between 2001 and 2006, however, there was dramatic growth in non-
10   GSE loan originations and securitizations such that non-GSE securitizations grew
11   330%, becoming a $1.48 trillion industry.

12       89.    The market for adjustable rate mortgages ("ARMs"), including
13   interest-only and negative amortization loans, grew concurrently with the boom in
14   subprime and Alt-A loan originations and securitizations.  ARMs increased from
15   $355 billion in 2001 to $1.3 trillion in 2006.  Mortgage Market Statistical Annual,
16   Vol. 1 (2007), at 4.  Such growth coincided with the increase in popularity of so-
17   called "exotic" or non-traditional ARMs which had fixed interest rates for a limited
18   period before "resetting" during the life of the loan to significantly higher
19   adjustable rates.   These non-traditional ARMs included "2/28 or 3/27 ARMs"
20   (many with below-market teaser rates for two or three years before conversion to
21   the fully-indexed rate); interest-only ARMs (permitting interest-only payments for
22   a set period of time during which the rate may fluctuate, resulting in negative
23   amortization and rising principal); option payment ARMs (offering up to four
24   payment options, including minimum and interest-only payments, which, if
25   chosen, result in negative amortization and rising principal); and 40-year ARMs (in
26   which payments are calculated based on a 40-year payment term but where the
27   loan terminates in 30 years, resulting in a final balloon payment).  Origination of
28   non-traditional ARMs increased 278% between 2004 and 2006 – from $205 billion

1    to $775 billion.  Mortgage Market Statistical Annual, Vol. 1 (2007), at 6.

2         90.    Here, the Certificate collateral was composed of a substantial number

3    of non-traditional adjustable mortgages, interest-only and negative amortization

4    loans.  These types of loans presented the greatest potential for "payment shock" to

5    the borrower since they provided for initially small monthly payments based on

6    low fixed rates which then reset thereafter to significantly higher monthly payment

7    amounts based on adjustable interest rates.   Although these loans were not

8    traditional, the underwriting guidelines still required the loans to be originated

9    responsibly and in accordance with those guidelines.   Yet, Countrywide would

10   routinely provide loans to borrowers who could only afford the short-term "teaser"

11   rates (or, even to those that could not even afford the teaser rates) – not the full

12   payments that would be required after the short-term rates reset.  Although these

13   types of loans were designed for high net worth investors who were capable of

14   earning higher returns through investment than in making interest and principal

15   payments upfront, Countrywide routinely sold these loans to unsophisticated

16   borrowers who were unable to make the required payments after the loans reset –

17   and frequently, to those who could not even make the "teaser" payments, leading

18   to early defaults on the loans.

19        **B.    Countrywide's Origination and Securitization Operations**

20        91.    CFC set up Defendants CWALT, CWMBS, CWABS, and CWHEQ,

21   the Depositors in this case, as "limited purpose finance entities" solely for the

22   purpose of facilitating the issuance of the Certificates.  CHL acted as the servicer

23   of the mortgages and CSC, Countrywide's underwriting division, along with the

24   other Underwriter Defendants, marketed and sold the securities.   Although

25   Defendants CWALT, CWMBS, CWABS, and CWHEQ served as the Depositors

26   for the Issuing Trusts and issued the Registration Statements, this process was

27   directed and controlled by the Countrywide Defendants, the Individual Defendants,

28   and Sambol.

92.    With respect to the Certificates at issue here, the Registration Statements and each of the Prospectus Supplements contained material misstatements concerning, *inter alia*, the quality of the loans supporting the MBS associated with each trust, including, specifically, statements about (1) the underwriting process and standards by which mortgages held by the Issuing Trusts were originated, and (2) the values of the real estate securing the mortgages pooled in the Issuing Trusts, expressed in part as the average LTV ratios of the underlying mortgages and the appraisal standards by which such real estate values were obtained.

93.    Each MBS sold to Plaintiffs was sold pursuant to a Registration Statement.  The Prospectus Supplements, which were filed at the time that the Certificates were sold to Plaintiffs, incorporated by reference each of the Registration Statements they were issued pursuant to.    The Prospectus Supplements contained specific disclosures concerning each Issuing Trust. Nonetheless, in each Prospectus Supplement, as set forth herein, the Issuer Defendants and the Underwriter Defendants made the same representations concerning CHL's standards in originating the mortgages and valuing the properties underlying the Issuing Trusts.

94.    CWALT filed six Registration Statements with the SEC, *see* **SAC Appendix Exhibit C**, registering mortgage-backed securities backed primarily by:

    a)    first lien mortgage loans secured by one- to four-family residential properties;

    b)    mortgage loans secured by first liens on small multi-family residential properties, such as residential apartment buildings or projects containing five to fifty residential units;

    c)    collections arising from one or more types of the loans described above which are not used to make payments on securities issued by a trust fund, including excess servicing fees and prepayment charges;

d)      mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or

e)      mortgage-backed securities evidencing an interest in, or secured by, loans of the type that would otherwise be eligible to be loans included in a trust fund and issued by entities other than Ginnie Mae, Fannie Mae, or Freddie Mac.

95.    CWHEQ filed four Registration Statements with the SEC, *see* **SAC Appendix Exhibit C**, registering mortgage-backed securities backed primarily by:

a)      first lien mortgage loans secured by first and/or subordinate liens on one- to four-family residential properties;

b)      closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties; or

c)      home improvement loans, secured by first or subordinate liens on one- to four-family residential properties or by personal property security interests, and home improvement sales contracts, secured by personal property security interests.

96.    CWABS filed five Registration Statements with the SEC *see* **SAC Appendix Exhibit C**, registering mortgage-backed securities backed primarily by:

a)      first lien mortgage loans secured by one- to four-family residential properties;

b)      mortgage loans secured by first liens on small multi-family residential properties, such as residential apartment buildings or projects containing five to fifty residential units;

c)      closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties; or

d)   home improvement loans, secured by first or subordinate liens on one- to four-family residential properties or by personal property security interests, and home improvement sales contracts, secured by personal property security interests.

97.   CWMBS filed five Registration Statements with the SEC, *see* **SAC Appendix Exhibit C**, registering mortgage-backed securities backed primarily by:

a)   first lien mortgage loans secured by one- to four-family residential properties or participations in that type of loan;

b)   mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or

c)   private mortgage-backed securities backed by first lien mortgage loans secured by one- to four-family residential properties or participations in that type of loan.

98.   Prior to securitization, Countrywide sent the "Loan Level File" to the Rating Agencies to enable them to rate the Certificates. Upon receipt of the "Loan Level File," S&P would run the loan tape through both its "LEVELS" and "SPIRE" Models. Moody's would run the loan tape through its M-3 Model. These models analyzed 50-80 loan characteristics (*e.g.,* FICO score, LTV ratio, property location, etc.), in order to estimate the number of loans that were likely to default and the corresponding amount of the dollar loss resulting from such default.

99.   As a condition to the issuance of the Certificates, the Rating Agencies had to assign pre-determined ratings to the Certificates. Yet, as detailed herein, the ratings at the time of issuance were vastly higher than they should have been and failed to represent the true value of the Certificates due to incorrect information provided by Countrywide and widespread misrepresentations in the origination process. Accordingly, despite the fact that the Rating Agencies assigned investment-grade ratings, the Certificates were far riskier than other investments with the same ratings.

100.   The models purported to calculate the amount of "credit enhancement" required to assign a specific set of Certificates "AAA" ratings.  As a result of relatively low levels of credit enhancement being required, as reflected in **SAC Appendix Exhibit G**, 90% of the Certificates were assigned AAA/maximum safety ratings.

101.   These ratings, although based on inaccurate assumptions, were critical to institutional investors – public pension funds, banks, insurance companies and mutual funds – whose investment guidelines restrict investments based on a security's rating.

VII.   Evidence of SYstemic Disregard of Stated Loan Origination Guidelines Contained IN Offering documents

**A.   Exponential Increase in Certificate Default Rates in Months After Issuance No Matter When Offering Occurred Evidences Disregard of Origination Guidelines**

102.   The defective nature of the mortgage collateral underlying the Certificates is reflected by the recurring pattern of exponential increases in borrower delinquencies in the months after each of the Offerings was commenced.

103.   Four months after each of the Offerings was commenced, borrower delinquency and default rates on the underlying mortgage collateral had increased by a staggering 1,816% – from an average of 0.14% to over 2.7% of the mortgage loan balance.  By the sixth month after issuance of the Certificates, delinquency and default rates had increased 3,064% to an average of 4.5% of the mortgage loan balance.  And shockingly, by 12 months after the Offering date, delinquency and default rates had increased 8,508% from issuance to 12.1% of the mortgage loan balance.   Borrower default and delinquency rates in the underlying mortgage collateral have continued to increase.

104.   These early payment defaults and delinquency rates are reflective of a systematic disregard for underwriting guidelines.  As reported by the Federal

Bureau of Investigation ("FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  The study cited by the FBI and conducted by Base Point Analytics found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not.  The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more and fictitious employers and falsified tax returns.  The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., in concluding that the top states for mortgage fraud – including the states where the MBS collateral was principally originated – were also the top states with the highest percentage of early payment defaults.

105.  As set forth above, it is now apparent that Countrywide mortgage originators routinely encouraged such misstatements in loan applications. Unsurprisingly, this has resulted in dismal performance of the loans.  As of the filing of the Amended Luther Complaint in October 2008, borrower delinquency and default rates had risen to an average of approximately 42% of the mortgage loan collateral underlying the Certificates, forcing the Rating Agencies to downgrade substantially all of the Certificates to at or near junk bond status.  As of the date of the filing of the complaint in the above-captioned action in January 2010, *over 59%* of mortgage collateral was considered to be in some form of delinquency or default, with *over 85%* of the mortgage loans underlying the Offerings issued by Defendant CWALT at issue herein being delinquent or in default.

106.  Despite assurances by the Defendants in the Offering Documents that the mortgage loans collateralizing the Certificates were originated pursuant to Countrywide's stated guidelines, nothing could have been further from the truth.

## B. Rating Agencies Collapsed Certificate Ratings to "Junk Bond" Levels Due to Undisclosed "Aggressive Underwriting" Practices

107. The Rating Agencies rated the Certificates pursuant to the following twenty-three (23) level rating system:

| Color code | Number | Definition | Moodys | S & P. | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P. | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

108. As noted above, the Rating Agencies initially assigned the highest ratings of AAA/maximum safety to 90%, or $16.03 billion, of the Certificates at issue herein.

109. As of the filing of this Complaint, as set forth directly above, the underlying collateral has largely failed, with *over 60%* of the total mortgage loan balance now severely delinquent, in default, repossessed, in bankruptcy or in foreclosure. This performance was an indication to the Rating Agencies, including

1   S&P and Moody's, of pervasive underwriting failures in the origination of the

2   collateral which ultimately led to widespread and deep downgrades of most of the

3   Certificate classes.

4       110.   On or about July 10, 2007, S&P publicly announced it was revising

5   the methodologies used to rate numerous Certificates because the performance of

6   the underlying collateral "called into question" the accuracy of the loan data.  This

7   announcement triggered several government investigations which only began

8   reporting their findings in 2008.  Specifically, S&P announced that it was revising

9   its methodology assumption to require increased "credit protection" for rated

10  transactions.  S&P reiterated that it would also seek in the future to review and

11  minimize the incidence of potential underwriting abuse given "the level of

12  *loosened underwriting* at the time of loan origination, misrepresentation and

13  speculative borrower behavior reported for the 2006 ratings."

14      111.   One day later, on July 11, 2007, Moody's announced it was also

15  revising its methodology used to rate the Certificates, and anticipated Certificate

16  downgrades in the future.  Moody's did in fact significantly downgrade most of the

17  Certificate classes, noting "aggressive underwriting" used in the origination of the

18  collateral.

19      112.   As a result, the Certificates were downgraded as many as 22 levels

20  with, for example, 90%, or $14.5 billion, of the total $16.03 billion of Certificates

21  initially rated AAA/maximum safety now having been downgraded from AAA to

22  "Ba1" or below, meaning these Certificates were not only designated "junk

23  bonds," but were assessed to be in danger of "imminent default."  Over 93%, or

24  $16.6 billion, of the Certificate tranches have now been downgraded, with 91%, or

25  $16.2 billion, of the total Certificates at issue having now been downgraded to

26  speculative "junk" status.

27      113.   Countrywide's systematic disregard for its underwriting guidelines led

28  to dramatic downgrades of the Certificates as set forth directly above.  Currently,

91% ($14.5 billion) of the $17.83 billion of Certificates initially rated AAA/maximum safety have been downgraded to speculative "junk" status or below. Delinquency and default rates on the Countrywide loans in the Certificates have risen exponentially by over 41,000% since issuance of the Certificates – from 0.14% as of the respective Offering dates to *over 60%* as of May 2010.

114. Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to the loan originators which further evidenced that they had engaged in underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statements and Prospectus Supplements.

## C.   Numerous Government Investigations Reveal the Falsity of the Offering Documents

115. Although the poor performance of the MBS alone strongly suggests that Countrywide's lending practices were far from was disclosed in the Prospectus Supplements, there is substantial additional evidence that also indicates that the statements in the Prospectus Supplements about loan quality and loan underwriting practices were materially inaccurate. Among this evidence are statements by former Countrywide employees, facts which have emerged in ongoing litigation involving the SEC (including a recent judicial opinion dealing with disclosures by Countrywide), facts set out in complaints filed by state attorneys general, facts set out in filings by private litigants and information from press reports and other sources.

116. Taken together, these facts indicate that, while the Offering Documents represented that Countrywide's underwriting of mortgages was designed to ensure the borrower's ability to repay the mortgage and the adequacy of the collateral supporting the mortgage, in reality Countrywide's underwriting practices were actually designed to originate as many mortgage loans as possible without regard to the ability of borrowers to afford such mortgages. Indeed,

contrary to the representations in the Registration Statements and Prospectus Supplements, it has now been revealed that Countrywide's loan originators systemically disregarded and/or manipulated the income, assets and employment status of borrowers seeking mortgage loans in order to qualify these borrowers for mortgages that were then pooled and used as collateral for the MBS sold to Plaintiffs. In many instances, this was done by inflating borrowers' stated income, or facilitating income inflation by encouraging ineligible borrowers to resort to "no documentation loans" and "stated income loans." In other cases, Countrywide customers were steered to more expensive, higher interest loans, such as subprime and "alternative" mortgages, which they would not likely be able to repay, because making such loans allowed Countrywide to increase the number of attractive mortgages it could sell to the secondary mortgage markets. As set forth below, Countrywide's notorious origination practices were pervasive throughout the United States and throughout the time period during which the Offerings were issued.

117.   On or about March 10, 2008, the FBI disclosed that it had initiated a probe into Countrywide's mortgage lending practices, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and Countrywide's specific instructions to underwriters not to scrutinize certain types of loans it issued. The next day, *The Wall Street Journal* published an article detailing the FBI investigation of Countrywide's lending practices. According to the sources interviewed by *The Wall Street Journal*, federal investigators were finding that "Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients, according to people involved in the matter. The company packaged many of those mortgages into securities and sold them to investors, raising the additional question of whether Countrywide understated the risks such investments carried." Subsequently, on April 2, 2008, a federal

1   bankruptcy judge overseeing the proceedings of more than 300 Countrywide-
2   related bankruptcies ordered a further inquiry into the misconduct, and specifically,
3   the illegal inflation of fees throughout the loan process that had been occurring at
4   Countrywide.

5        118.   On June 4, 2009, the SEC filed a complaint against Mozilo,
6   Countrywide's former Chief Executive Officer, and against two Defendants in this
7   case, Sambol and Sieracki (the "SEC Complaint").   The SEC Complaint alleges
8   that the defendants in that case made material false statements in Countrywide's
9   SEC filings and in other forums about the quality of Countrywide's residential
10   mortgage loans and about the underwriting process for those loans.  According to
11   the SEC, the underwriting process for Countrywide loans was far less rigorous than
12   what the defendants in that case had stated and, consequently, the quality of
13   Countrywide's loans was much poorer than was indicated by those public
14   statements.

15        119.   The basis for the allegations in the SEC Complaint – that
16   Countrywide and its officers substantially overstated the quality of the company's
17   residential mortgage loan underwriting and, as a result, issued mortgage loans of a
18   far worse quality than Countrywide publicly disclosed – are materially similar to
19   the allegations made by Plaintiffs in this case.  Although the statements targeted by
20   the SEC were made to Countrywide's shareholders in SEC filings, statements
21   made in Offering Documents for securities that securitized the mortgage collateral
22   were similarly false and misleading to MBS investors.

23        120.   The SEC Complaint alleges, among other things:

25       •  Countrywide embarked on a strategy of underwriting a
26   higher number of exception loans. The SEC alleges that
"[t]he elevated number of exceptions resulted largely
27   from Countrywide's use of exceptions as part of its
matching strategy to introduce new guidelines and
28   product changes." SEC Complaint, ¶ 29.  By February

2007, internal risk management "noted that the production divisions continued to advocate for, and operated pursuant to, an approach based upon the matching strategy alone. ... Additionally, [a senior risk management employee warned [Sambol] that, 'I doubt this approach would play well with regulators, investors, rating agencies etc. *To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines.*'" SEC Complaint, ¶ 44 (emphasis added).

- Countrywide's risk management reported to the credit risk committee on June 28, 2005, that there was "evidence of borrowers misrepresenting their income and occupation on reduced documentation loan applications." SEC Complaint, ¶ 37.

- By June 2006 "both Mozilo and Sambol were aware ... that a significant percentage of borrowers who were taking out stated income loans were engaged in mortgage fraud." SEC Complaint, ¶ 40. For example, "[o]n June 2, 2006, Sambol received an email reporting on the results of a quality control audit at Countrywide Bank that showed that 50% of the stated income loans audited by the bank showed a variance in income from the borrowers' IRS filings of greater than 10%. Of those, 69% had an income variance of greater than 50%." *Id.*

- Angelo Mozilo, Countrywide's CEO, noted in an April 13, 2006 email "that he had 'personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan [*sic*].'" SEC Complaint, ¶ 49.

- A December 13, 2007 internal Countrywide memorandum reveals, "'Countrywide had reviewed limited samples of first- and second-trust-deed mortgages originated by Countrywide Bank during the fourth quarter of 2006 and the first quarter of 2007 in order to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures. The review resulted in

... the finding that borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans. More specifically, debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or any increase in interest.'" SEC Complaint, ¶ 56.

- A senior risk management employee warned defendant Sambol on May 22, 2005 "of the likelihood of significantly higher default rates in loans made on an exception basis: '[t]he main issue is to make sure everyone's aware that we will see higher default rates.'" SEC Complaint, ¶ 54. According to the SEC Complaint, the senior risk management employee explained to Sambol "that exceptions are generally done at terms more aggressive than our guidelines,' and continued that '[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions.' [The senior risk management employee further] warned [Sambol] that increased defaults would cause repurchase and indemnification requests to rise and the performance of Countrywide-issued MBS to deteriorate." *Id.*

121. On November 3, 2009 U.S. District Judge John Walter denied in their entirety defendants' motions to dismiss the SEC Complaint, holding, among other things, that the SEC had adequately alleged that defendants in that case had made statements that materially exaggerated the quality of Countrywide's residential mortgage-backed loans.

122. There was apparently no dispute in the SEC litigation that defendants in that case, like Defendants here, had repeatedly made statements asserting that Countrywide's residential mortgage loans were of high quality. The defendants did not dispute that they had made the statements that the SEC said they had made – many of these statements were in SEC filings that the defendants had indisputably filed or caused to be filed. Defendants did, however, ask the court to take judicial notice of numerous other SEC filings containing additional

1    information relating to Countrywide's loans, a request that was granted. Notably,

2    defendants used the judicially noticed documents they had brought to the court's

3    attention to "argue that the majority of the misstatements and omissions were not

4    material or misleading as a matter of law in light of Countrywide's extensive

5    disclosures and the context of the alleged misstatements or omissions." *SEC v.*

6    *Mozilo*, CV 09-3994-JFW (MANx), 2009 U.S. Dist. LEXIS 104689, at *25-26

7    (C.D. Cal. Nov. 3, 2009).

8       123.   Judge Walter flatly rejected this argument, explaining that "neither

9    Countrywide's disclosures nor a careful review of the context of the statements

10   convince this Court that the alleged omissions or misstatements were immaterial or

11   not misleading as a matter of law.  Accordingly, the Court concludes that the SEC

12   on the whole has adequately alleged that Defendants have made false or

13   misleading statements or omissions of material fact." *Id.* at *26.

14      124.   In addition, numerous attorneys general have initiated investigations

15   into Countrywide's lending practices and also have alleged that Countrywide

16   systematically departed from the underwriting standards it professed to use to

17   originate residential loans.

18      125.   The Illinois Attorney General initiated a lawsuit against Countrywide

19   and Mozilo, contending that the company and its executives sold borrowers costly

20   and defective loans that quickly went into foreclosure. *See People of the State of*

21   *Illinois v. Countrywide Fin. Corp.*, No. 08CH22994 (Cook County Ch. Ct.) (the

22   "First Illinois AG Complaint").

23      126.   Additionally, the First Illinois AG Complaint alleges, based on

24   evidence from Countrywide employees whom the Illinois Attorney General

25   interviewed, that Countrywide employees were incentivized to increase the number

26   of loan originations without concern for whether the borrower was able to repay

27   the loan.  Countrywide employees did not properly ascertain whether a potential

28   borrower could afford the offered loan, and many of Countrywide's stated income

loans were based on inflated estimates of borrowers' income. For example, according to the First Illinois AG Complaint: (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications. Furthermore, to supplement an employee's judgment as to whether a potential borrower's income was "reasonable," Countrywide required its employees to utilize a website, www.salary.com. Even if the stated salary was outside of the range provided by the website, Countrywide employees could still approve the loan. The Illinois Attorney General alleged that the "reasonableness" test contravened proper underwriting practices.

127. As the Illinois Attorney General explained, "[t]his mounting disaster has had an impact on individual homeowners statewide and is having an impact on the global economy." *The New York Times* reported that the complaint, derived from 111,000 pages of Countrywide documents and interviews with former employees, "paints a picture of a lending machine that was more concerned with volume of loans than quality." *See* Gretchen Morgenson, "Illinois to Sue Countrywide," *N.Y. Times* (June 25, 2008).

128. In a second complaint filed on June 29, 2010, the Illinois Attorney General further enumerated the problems with Countrywide's origination practices, including that Countrywide engaged in discriminatory and predatory lending. *See People of the State of Illinois v. Countrywide Fin. Corp.*, No. 10CH27929 (Cook County Ch. Ct.) (the "Second Illinois AG Complaint"). There, the Illinois Attorney General sets forth how CFC incentivized its employees to sell riskier subprime loans with higher spreads, paying its brokers more for those riskier loans than for originating prime loans.

129. California's Attorney General also commenced an investigation into

Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, entitled *People of the State of California v. Countrywide Fin. Corp.*, No. LC081846 (Los Angeles Super. Ct.) (the "California AG Complaint"). The California AG Complaint also alleged that Countrywide routinely departed from its stated underwriting standards.

130.   For example, the California AG Complaint alleged that employees were incentivized to make exceptions to underwriting standards and failed to verify borrower documentation and information.   According to the California AG Complaint, Countrywide used a system called CLUES (Countrywide Loan Underwriting Expert System), to provide a loan analysis report that indicated whether the loan was within Countrywide's underwriting guidelines.   CLUES reports indicating a loan was not originated within the purview of Countrywide's underwriting guidelines often were ignored in order to effectuate the loan.

131.   Further, consistent with the allegations of the Illinois Attorney General, California Countrywide employees cited in the California AG Complaint also claimed to have utilized the website www.salary.com to purportedly confirm a borrower's stated income.   However, according to the California AG Complaint, California employees would know ahead of time the range of salaries that www.salary.com would provide for a particular job and, therefore, know by how much they could overstate a borrower's income.   A former California loan officer for Countrywide further explained that its loan officers typically told potential borrowers that "with your credit score of X, for this house, and to make X payment, X is the income that you need to make"; after which the borrower would state that he or she made X amount of income.

132.   Likewise, the Connecticut Attorney General filed a complaint in Superior Court, Judicial District of Hartford, entitled *State of Connecticut v. Countrywide Fin. Corp.*, No. CV08-40390945 (Hartford Super. Ct.), alleging that Countrywide's employees inflated borrowers' incomes in order to qualify them for

1    loans they otherwise would not have received.

2         133.  Investigations in other states such as Washington, West Virginia,

3    Indiana and Florida have confirmed many of the allegations in the Illinois,

4    California, and Connecticut complaints.

5         134.  Further, the Massachusetts Attorney General set forth details of

6    Underwriter Defendant Morgan Stanley's subprime conduct in a settlement

7    agreement entered on June 24, 2010 in which Morgan Stanley agreed to pay $102

8    million in compensation to homeowners and the Commonwealth of Massachusetts.

9    Although Morgan Stanley denied all wrongdoing, the Massachusetts Attorney

10   General set out that Morgan Stanley routinely ignored warning reports from

11   Clayton Holdings, Inc. ("Clayton"), a due diligence firm, showing that mortgages

12   originated by another defunct subprime originator, New Century Financial ("New

13   Century"), did not meet their underwriting guidelines.  Despite being advised by

14   Clayton of underwriting guideline violations, Morgan Stanley repeatedly

15   purchased and securitized New Century loans that did not have sufficient

16   compensating factors to offset their failure to meet the underwriting guidelines.

17   Widespread government investigations suggest that Morgan Stanley was typical of

18   banks such as the Underwriter Defendants in ignoring warnings from due diligence

19   firms like Clayton.

20        135.  On July 24, 2008, *The Los Angeles Times* reported that "three big

21   Southland lenders (are) under federal investigation; Sources say IndyMac,

22   Countrywide and New Century [have been] subpoenaed."  *The Los Angeles Times*

23   further reported that officials have begun to investigate the value of mortgage-

24   backed securities:

25

26        A federal grand jury in Los Angeles has begun probing
          three of the nation's largest subprime mortgage lenders
27        in the clearest sign yet that prosecutors are investigating
          whether fraud and other crimes contributed to the
28        mortgage debacle.

*Grand jury subpoenas have been issued in recent weeks and months to Countrywide Financial Corp.,* New Century Financial Corp. and IndyMac Federal Bank seeking a wide range of information, according to sources with direct knowledge of the subpoenas.

Officials have said they are beginning to investigate whether securities investors were defrauded about the value of subprime mortgages they purchased, as well as other possible crimes such as insider trading by corporate officials who sold stock knowing their holdings were about to deflate in value.

(emphasis added).

136.   On October 6, 2008, certain of the Countrywide Defendants settled lawsuits brought by eleven attorneys general.   The settlement, valued at *$8.4 billion,* detailed a program whereby existing loans would be modified:

[B]orrowers were placed in the riskiest loans, including adjustable-rate mortgages whose interest rates reset significantly several years after the loans were made. Pay-option mortgages, under which a borrower must pay only a small fraction of the interest and principal, thereby allowing the loan balance to increase, also are included in the modification.

### D.   Allegations in Numerous Other Civil Lawsuits Show the Falsity of the Offering Documents

137.   On February 15, 2008, Countrywide shareholders filed a consolidated complaint in the U.S. District Court for the Central District of California alleging derivative claims against the officers and directors of Countrywide, in an action styled *In re Countrywide Fin. Corp. Derivative Litig.*, No. 07-CV-06923-MRP-(MANx) (C.D. Cal.) (the "Derivative Complaint").   The derivative litigation was subsequently dismissed because of the plaintiffs' lack of standing

138.   The Derivative Complaint cited information obtained from several confidential sources who were former Countrywide employees who stated that the vast majority of Countrywide's loans were underwritten in contravention of the

1   company's stated underwriting standards.  According to one of the confidential

2   sources in that complaint, a former "Underwriter II" (a Countrywide employment

3   classification) based in a Jacksonville, Florida processing center between June

4   2006 and April 2007, because of a campaign by Countrywide to increase the

5   volume of loan originations, as much as 80% of the loans originated by

6   Countrywide in that office involved significant variations from Countrywide's

7   normal underwriting standards.

8       139.  According to another confidential witness cited in the Derivative

9   Complaint, a Senior Underwriter in Roseville, California, from September 2002 to

10  September 2006, Countrywide would regularly label loans as "prime" even if made

11  to unqualified borrowers (including those who had recently gone through a

12  bankruptcy and were still having credit problems).  According to that confidential

13  witness, Countrywide's lending practices became riskier in 2006 and Countrywide

14  more lax in enforcing its underwriting policies.

15      140.  Another confidential witness cited in the Derivative Complaint, an

16  Executive Vice President of Production Operations and later an Executive Vice

17  President of Process Improvement who worked at Countrywide for 17 years before

18  leaving in October 2005, disclosed that Countrywide created a computer system

19  (or "rules engine") that routed highly risky loans out of the normal loan approval

20  process to a central underwriting group for evaluation.  The system was called the

21  Exception Processing System.  According to that source, the Exception Processing

22  System identified loans that violated Countrywide's underwriting requirements.

23  However, according to the same source, loans identified by the Exception

24  Processing System as violating underwriting standards were *not* rejected.  Rather,

25  Countrywide executives wanted the company's Central Underwriting group to

26  review such loans to evaluate whether these loans should require a higher price

27  (upfront points) or a higher interest rate in light of the violation at issue.  Central

28  Underwriting entered information into the Exception Processing System about its

1   decisions to approve such loans and charge additional fees to the borrower.

2       141.   Yet another confidential source in the Derivative Complaint, an

3   underwriter from Long Island, New York at Countrywide between March 2000

4   and January 2007, stated that Countrywide extended loans to individuals with

5   increasing debt-to-income ratios.   Initially, Countrywide limited debt-to-income

6   ratios to 38%, but this rose to 50%.  According to this source, Countrywide branch

7   managers' compensation was tied to loan origination volume and not the quality of

8   the loans.  Thus, according to this source, branch managers pushed originators to

9   sell more loans despite the riskiness of these loans.  Additional confidential sources

10  in the Derivative Complaint confirmed this.

11      142.   Indeed, according to yet another confidential source in the Derivative

12  Complaint, Countrywide simply "didn't turn down loans."  Rather, Countrywide

13  "'did whatever they had to do to close loans' including making exceptions to

14  underwriting guidelines – everyone was motivated to increase loan volume and

15  'approv[e] things that should not have been approved.'"

16      143.   On January 6, 2009, purchasers of Countrywide common shares filed

17  a second amended complaint in the U.S. District Court for the Central District of

18  California, captioned *In re Countrywide Fin. Corp. Sec. Litig.*, No. 07-CV-05295-

19  MRP-(MANx) (C.D. Cal.) (the "Securities Complaint").  Facts set forth in the

20  Securities Complaint confirm major, systematic irregularities in Countrywide's

21  loan origination practices.  The Securities Complaint cited information obtained

22  from several confidential sources who were former Countrywide employees who

23  stated that the vast majority of Countrywide's loans were underwritten in

24  contravention of the company's stated underwriting standards.   The securities

25  litigation recently settled for $624 million.

26      144.   Among numerous internal Countrywide sources cited in the Securities

27  Complaint, one, a supervising underwriter at Countrywide until mid-2005 who

28  oversaw the company's underwriting operations in several states (the "Supervising

1   Underwriter"), stated that the underwriting guidelines were repeatedly lowered,
2   and "very loose and lax" and designed to help Countrywide make more loans (as
3   opposed to protecting the entity that ended up taking on the credit risk that the
4   borrower would default on the mortgage).

5       145.  The Supervising Underwriter further stated that from late 2004,
6   Countrywide's Structured Loan Desks employed the Exception Processing System
7   in order to obtain approval for loans that were exceptions to and should have been
8   rejected by Countrywide's underwriting standards.  As many as 15% to 20% of the
9   loans generated each day at the Company's Structured Loan Desks were run
10  through the Exception Processing System and very few were ever rejected.

11      146.  The Supervising Underwriter further stated that if a potential borrower
12  applying for a stated income, stated asset ("SISA") loan provided a bank name,
13  address and account number for asset verification, it was the practice at
14  Countrywide not to verify the bank balance.

15      147.  According to another confidential source identified in the Securities
16  Complaint, and confirmed by an April 6, 2008 article in *The New York Times*, even
17  though Countrywide had the right to verify stated income on an application
18  through the Internal Revenue Service ("IRS") (and this check took less than one
19  day to complete), income was verified with the IRS on only 3%-5% of all loans
20  funded by Countrywide in 2006.

21      148.  The Securities Complaint also details that the appraisals obtained by
22  Countrywide underwriters were not independent or accurate.  For example, since at
23  least 2005, loan officers from all of Countrywide's origination divisions were
24  permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that
25  did not support loan transactions, and (iii) substitute more favorable appraisals by
26  replacement appraisers when necessary to obtain a more favorable LTV ratio so as
27  to qualify the loan for approval.  Countrywide loan officers were allowed to lobby
28  appraisers to assign particular values to a property in order to support the closing

No. 2:10-cv-00302: SECOND AMENDED CLASS ACTION COMPLAINT          64

1   of a loan.

2        149.  Further, according to allegations made by Capitol West Appraisals

3   LLC ("Capitol West") a real estate appraisal company cited in the Securities

4   Complaint, "Countrywide engaged in a pattern and practice of pressuring real

5   estate appraisers to artificially increase appraisal values for properties underlying

6   mortgages Countrywide originated and/or underwrote.  Capitol West stated that

7   Countrywide loan officers sought to pressure Capitol West to increase appraisal

8   values for three separate loan transactions.  When Capitol West refused to vary the

9   appraisal  values  from  what  it  independently  determined  was  appropriate,

10  Countrywide retaliated...."

11       150.  According to Capitol West's allegations in the Securities Complaint,

12  "Countrywide maintained a database titled the 'Field Review List' containing the

13  names  of  appraisers  whose  reports  Countrywide  would  not  accept  unless  the

14  mortgage broker also submitted a report from a second appraiser.  Capitol West

15  was placed on the Field Review List after refusing to buckle under pressure to

16  inflate real estate values.  The practical effect of being placed on the Field Review

17  List was to be blacklisted as no mortgage broker would hire an appraiser appearing

18  on the Field Review List to appraise real estate for which Countrywide would be

19  the lender because neither the broker nor the borrower would pay to have two

20  appraisals done.  Instead, the broker would simply retain another appraiser who

21  was not on the Field Review List."  The Securities Complaint further sets forth

22  Capitol West's descriptions of the additional steps Countrywide took to enforce its

23  blacklisting of appraisers that refused to artificially inflate their appraisals.

24       151.  On September 30, 2008, MBIA Insurance Corp. ("MBIA"), one of the

25  largest providers of bond insurance, filed a complaint against Countrywide in New

26  York state court, entitled *MBIA Ins. Corp. v. Countrywide*, No. 08/602825 (N.Y.

27  Sup. Ct.) (the "MBIA Complaint").    The MBIA Complaint alleges that

28  Countrywide  fraudulently  induced  MBIA  to  provide  insurance  for  certain

1   investment certificates, including those contained in the following trusts: CWHEQ

2   2005-E; CWHEQ 2005-I; CWHEQ 2005-M; CWHEQ 2006-E; CWHEQ 2006-G;

3   CWHEQ 2006-S8; CWHEQ 2007-E; CWHEQ 2007-S1; CWHEQ 2007-S2; and

4   CWHEQ 2007-S3.

5       152.   MBIA was able to obtain approximately 19,000 loan files for the

6   Certificates it insured as a result of its contractual agreements with Countrywide.

7   After reviewing the portfolios and re-underwriting each loan provided by

8   Countrywide, MBIA discovered that there was "*an extraordinarily high incidence*

9   *of material deviations from the underwriting guidelines Countrywide represented*

10  *it would follow*." MBIA Complaint, ¶ 78 (emphasis added).  MBIA discovered

11  that many of the loan applications "lack[ed] key documentation, such as a

12  verification of borrower assets or income; include[d] an invalid or incomplete

13  appraisal; demonstrate[d] fraud by the borrower on the face of the application; or

14  reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-

15  income] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any

16  permissible exception)." MBIA Complaint, ¶ 79.  Significantly, "MBIA's re-

17  underwriting review ... revealed that almost 90% of defaulted or delinquent loans

18  in the Countrywide Securitizations show material discrepancies." On April 27,

19  2010, the Supreme Court of the State of New York, although determining that

20  MBIA did not have a legal claim for negligent misrepresentation, denied a motion

21  to dismiss MBIA's claims of fraud against several Countrywide entities and Bank

22  of America.

23      153.   On April 11, 2008, an amended complaint for violations of the federal

24  securities laws was filed against Countrywide in the U.S. District Court for the

25  Central District of California.  *See Argent Classic Convertible Arbitrage Fund LP*

26  *v. Countrywide Fin. Corp.*, No. 07-CV-7097-MRP-(MANx) (C.D. Cal.).   The

27  complaint identified specific deviations from Countrywide's stated underwriting

28  guidelines.    For example, in connection with the "No Income/No Asset

Documentation Program," Countrywide represented that "[t]his program is limited to borrowers with excellent credit histories." However, Countrywide routinely extended these loans to borrowers with weak credit and knew that such "low doc" or "no doc" loans, particularly when coupled with nontraditional products like ARMs, likely contained misinformation from the borrower, such as overstated incomes, that increased the likelihood of defaults. Because borrowers were advised that their representations on loan applications would not be verified, Countrywide employees referred to these products as "liar loans."

154. Furthermore, in an action commenced against Countrywide for wrongful termination, styled *Zachary v. Countrywide Fin. Corp.*, No. 4:08-cv-00214, currently pending in the U.S. District Court for the Southern District of Texas, the plaintiff, Mark Zachary ("Zachary"), a Regional Vice President of Countrywide KB Home Loans, Inc. ("CWKB"), alleged that CWKB, a 50-50 joint venture between Countrywide and KB Home Loans ("KB Home"), engaged in a host of mortgage origination and underwriting activities that did not comport with stated and standard practices. Zachary described how loan officers would go so far as to help the loan applicant submit a loan application with false income amounts, so that the applicant would get the loan under false pretenses.

155. According to Zachary, one of these practices involved CWKB's practice of "flipping" a loan application from a "full documentation" loan program to a "stated income" or "no income, no asset" loan program. He learned that loans were being canceled at the prime regional operations center as full documentation loans and transferred to the subprime operations center in Plano, Texas, as stated asset, stated income ("SISA") loans, a "low-doc" loan, or no income, no assets ("NINA") loans, a "no-doc" loan. Otherwise known as "liar loans," NINA loans allowed a borrower to simply state their income without providing any documentation or proof of this income. Thus, rather than denying an applicant based on the information revealed in the original mortgage application,

1    Countrywide pretended that it did not see the disqualifying information, such as
2    insufficient income or assets, and instead, allowed applicants to apply for a no
3    documentation loan, implicitly encouraging them to lie on these renewed
4    applications.

5        156. Furthermore, Zachary explained that while a material number of
6    Countrywide's loan applicants were not eligible for any loan program requiring
7    documentation based on the applicant's verified income level and/or job status,
8    CWKB loan officers would (1) cancel the application for the loan program that
9    required documentation, (2) re-do the application as a SISA or a NINA loan
10   through the company's subprime originators in Plano, Texas, and (3) coach the
11   loan applicant as to what income level he or she would need to have in order to
12   qualify for the low-doc or no-doc loan.

13       157. Moreover, according to Zachary, Countrywide blatantly ignored its
14   underwriting policies and procedures.  Zachary stated that there was a problem
15   with appraisals performed on homes being purchased with Countrywide loans.
16   According to Zachary, the appraiser was being strongly encouraged to inflate
17   appraisal values by as much as 6% to allow the homeowner to "roll up" all closing
18   costs.  According to Zachary, this inflated value put the buyer "upside down" on
19   the home immediately after purchasing it, *i.e.*, the borrower owed more than the
20   home's worth.  Thus, the borrower was more susceptible to default.  It also put the
21   lender and secondary market investor at risk because they were unaware of the true
22   value of their asset.  According to Zachary, Countrywide performed an audit into
23   these matters in January 2007 which corroborates his story.

24       158. Another civil complaint, *Zaldana v. KB Home*, No. CV 08-3399
25   (EDL), currently pending in the U.S. District Court for the Northern District of
26   California (the "Zaldana Complaint"), further details Countrywide's failure to
27   follow standard appraisal practices.  The Zaldana Complaint described a process
28   whereby KB Home paid Countrywide to make loans with subsidized initial

payments to KB borrowers, thereby allowing KB to prop up the ostensible sales prices of KB homes and sell to buyers who would not otherwise be able to afford or qualify for the monthly mortgage payments. In turn, Countrywide would have its appraisers ignore the subsidies in order to appraise the home at the full stated sales price, thereby inflating the actual value of the home (*i.e.*, the price that a buyer was truly willing to pay for it).

> **E.    Underwriter Defendants "Contracted Out" and Failed to Conduct Required Due Diligence of Loan Underwriting Guidelines Contained in Offering Documents**

159. Prior to securitization, a process of cursory "due diligence" on the mortgage loans was conducted. The review's ostensible purpose was to determine whether the loans contained the requisite legal documentation, were based on an independent appraisal and were originated in accordance with Countrywide's loan underwriting guidelines, which were detailed in the Offering Documents. The due diligence review that was conducted on the mortgage collateral was not specific to any securitized pool of mortgage loans. Rather, the due diligence was periodically performed on a small sample of Countrywide's entire "warehouse" of mortgage loans.

160. The Underwriter Defendants contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to outside firms – Clayton and The Bohan Group ("Bohan") – and then conducted limited oversight of these subcontractors' activities.

161. As disclosed as part of an ongoing investigation of investment banking misconduct in underwriting MBS being conducted by, among others, the New York Attorney General (the "NYAG") and the Massachusetts Attorney General, Clayton and Bohan routinely provided investment banks with detailed reports of loans non-compliant with underwriting guidelines, but the investment banks just as routinely disregarded the non-compliant loans and included them in

1    securitization pools anyway.  Further, the President of Bohan stated that, by the

2    time the Offerings of the Certificates took place, investment banks were requiring a

3    review of only 5% to 7% of the entire loan pools.

4         162.  The Underwriter Defendants contracted their due diligence work to

5    Clayton and Bohan.  The outside firms were supposed to examine the loans for

6    conformity with Countrywide's guidelines, as detailed in the Offering Documents.

7    Each loan reviewed was rated as category "1," "2" or "3."  Category "3" loans

8    were defective and recommended for exclusion from securitization, however such

9    loans were routinely included in securitizations despite being defective.  Because

10   the risk of default was passed on to investors in the Certificates rather than held by

11   the Underwriter Defendants or Countrywide, there was no incentive to remove

12   such category "3" loans from the Offerings, because if the Underwriter Defendants

13   rejected any significant portion of the loans, the size of the securitization, and thus

14   the size of the fees derived from the securitization, would decrease significantly.

15        163.  In June 2007, the NYAG subpoenaed documents from Clayton and

16   Bohan related to their due diligence efforts on behalf of the investment banks, such

17   as Bear Stearns, that underwrote mortgage-backed securities.  The NYAG, along

18   with Massachusetts and Connecticut attorneys general and the SEC (all of which

19   also subpoenaed documents), are investigating whether investment banks held

20   back information they should have provided in the disclosure documents related to

21   the sale of mortgage-backed securities to investors.

22        164.  In a December 6, 2007 article published in *The New York Times*, it

23   was reported that:

24              Andrew Cuomo, the New York attorney-general, has
25              subpoenaed RBS and about 15 of Wall Street's biggest
26              sub-prime mortgage bond underwriters, such as Bear
                Stearns and Merrill Lynch, requesting information that
27              will help to determine how much due diligence was
                conducted on the home loan-backed securities that they
28              issued.

*       *       *

Mr. Cuomo is also examining the relationship between mortgage lenders, third party-due diligence firms, the credit rating agencies and the underwriting banks to see if they colluded to ignore risks.

Wall Street firms made hefty fees from buying high-risk sub-prime mortgages and packaging them into bonds backed by the home loans' interest payments. Investors, including Wall Street giants such as Citigroup, as well as hedge funds and pension funds, have collectively lost more than $50 billion this year on sub-prime-backed bonds after a surge in defaults on high-risk home loans forced down their valuations.

Many of Wall Street's underwriters relied heavily on third-party vendors to examine the home loans that were used to back the mortgage bonds. This helped them to determine how reliable an income stream the underlying mortgages would produce and, in turn, how likely it was that the bonds' interest payments would be met.

Since bond underwriters have an obligation to make sure that the statements made in the securities' Offering Documents are accurate, Mr. Cuomo is investigating how much, if any, due diligence they conducted themselves. He is also seeking to determine whether they should have done more.

165.   In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on Loans," *The New York Times* further reported:

An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.

Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms. But the

banks did not disclose the details of these reports to credit-rating agencies or investors.

The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter. Charges could be filed in coming weeks.

\* \* \*

The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures. The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.

As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans. In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.

It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans. Some industry officials say such loans made up a quarter to a half of the portfolios they saw. In some cases, the loans accounted for as much as 80 percent. While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.

Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

\* \* \*

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco. Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

\*       \*       \*

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said **lenders and investment banks routinely ignored concerns raised by these consultants.**

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said. "We stopped checking."

(emphasis added).

166.  On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients. Both *The New York Times* (J. Anderson and V. Bajaj, "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," *N.Y. Times*, (Jan. 27, 2008)) and *The Wall Street Journal* (A. Efrati and R. Simon, "Due Diligence Firm to Aid New York Subprime Probe," *Wall St. J.* (Jan. 29, 2008)) ran articles describing the nature of the NYAG's investigation and Clayton's testimony. *The*

1   *Wall Street Journal* reported that the NYAG's investigation was focused on "the

2   broad language written in prospectuses about the risky nature of these securities,"

3   which "changed little in recent years, even as due diligence reports noted that the

4   number of exception loans backing the securities was rising."  According to the

5   *New York Times* article, Clayton told the NYAG "that starting in 2005, it saw a

6   significant deterioration of lending standards and a parallel jump in lending

7   expectations" and "some investment banks directed Clayton to halve the sample of

8   loans it evaluated in each portfolio."

9       167.   A March 23, 2008 *Los Angeles Times* article reported that Clayton and

10   Bohan employees "raised plenty of red flags about flaws [in subprime home loans]

11   so serious that mortgages should have been rejected outright – such as borrowers'

12   incomes that seemed inflated or documents that looked fake – but the problems

13   were glossed over, ignored or stricken from reports" as follows:

> The reviewers' role was just one of several safeguards – including home appraisals, lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system.
>
> But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start.  Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.
>
> "The investors were paying us big money to filter this business," said loan checker Cesar Valenz.  "It's like with water.  If you don't filter it, it's dangerous.  And it didn't get filtered."
>
> As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.
>
> The FBI is conducting more than a dozen investigations into whether companies along the financing chain

concealed problems with mortgages. And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

E. Scott Reckard, "Subprime Watchdogs Ignored," *L.A. Times* (Mar. 23, 2008).

**F.     Additional Government Investigations Further Confirm Systemic Disregard for Mortgage Loan Underwriting Guidelines**

168.   In August 2007, following reports of defaults in mortgage loans underlying various MBS, downgrades of such MBS and potential downgrades of additional MBS in the future, and the resulting illiquidity in the credit markets, the President of the United States commissioned the Secretary of the Treasury, the SEC and the Commodities Futures Trading Commission ("CFTC") (hereinafter referred to as the "President's Working Group" or the "PWG") to investigate the causes of the market turmoil. After a seven-month investigation, the PWG issued its report on March 13, 2008. The PWG found as follows:

- A significant erosion of market discipline by those involved in the securitization process, including *originators, underwriters, credit rating agencies, and global investors,* related in part to failures to provide or obtain adequate risk disclosures;

- The turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages...*

(emphasis added).

169.   In December 2007, the Massachusetts Attorney General launched an investigation into Wall Street's securitization of subprime loans. The investigation focused on the industry practices involved in the issuance and securitization of subprime loans to Massachusetts consumers. According to a press release issued by the Massachusetts Attorney General's Office,

The Office is investigating whether securitizers may have:

- facilitated the origination of "unfair" loans under Massachusetts law;
- failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;
- failed to take sufficient steps to avoid placing problem loans in securitization pools;
- been aware of allegedly unfair or problem loans;
- failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan diligence and the pre-securitization process, as well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

170.   On January 30, 2008, the FBI and SEC launched a joint investigation into 14 investment banks, loan providers and developers as part of a crackdown focusing on the subprime mortgage crisis.  According to the *Los Angeles Times*:

We're looking at the whole range of those involved – including the investment banks and other entities that bundled the loans up for sale and the institutions that held them and reported [to investors] on their value...

## G.   Underwriter Defendants Employed Rating Shopping Practices to Ensure Inflated Investment Grade Ratings for All the Certificates

171.   The Underwriter Defendants derived their profits from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans.   For the Certificates to sell profitably, approximately 80% of the securitization had to be assigned the highest AAA rating by the Rating Agencies.

172.   As set forth above, the Underwriter Defendants ultimately engaged the Rating Agencies through a "ratings shopping" process.  Initially, a collateral analyst would send the preliminarily structured deal to the Rating Agencies for feedback.  The Underwriter Defendants' in-house rating agency personnel would

No. 2:10-cv-00302: SECOND AMENDED CLASS ACTION COMPLAINT          76

1   oversee the communications with the Rating Agencies.  Then S&P, for example,

2   would run the loan tape through both its LEVELS and SPIRE Models again and

3   provide the Underwriter Defendants with the results in an effort to obtain the

4   ratings engagement.   Through the LEVELS Model, S&P would advise the

5   Underwriter Defendants responsible for each deal, for example, that 94.25% of the

6   Certificates would be rated AAA as long as 5.75% of the total collateral balance

7   supporting those Certificates was subordinate.  This 5.75% was the amount of loss

8   coverage required.  The Underwriter Defendants would then again "negotiate" with

9   the Rating Agencies before they were hired, in order to get them to agree to the

10  least amount of loss coverage and credit enhancement, and the highest percentage

11  of AAA-designated Certificates.

12      173.   The Underwriter Defendants used this "ratings shopping" process to

13  obtain the most profitable structure on the Offerings.  Ratings shopping resulted in

14  *over 90%* of the Certificates being initially awarded the AAA/maximum-security

15  rating.

16      174.   Finally however, in 2008, the practice was effectively ended by way

17  of an agreement entered into between the Rating Agencies and the NYAG.  In June

18  2008, the NYAG announced that after an investigation of the Rating Agencies, it

19  had reached an agreement with S&P, Moody's and Fitch which contemplated a

20  complete overhaul of the then-current ratings procedures and guidelines and put an

21  end to what had been termed "ratings shopping."   Instead of investment banks

22  looking to issue mortgage-backed bonds going to all three agencies for a review,

23  but only using, and paying for, the most optimistic rating, the Rating Agencies

24  would now be paid upfront regardless of whether they were hired to assign a

25  rating, a move expected to remove any potential for conflicts of interest.

26

27

28

## VIII. THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING AND APPRAISAL STANDARDS

175.   Countrywide was a principal originator for all 14 of the Offerings complained of herein.   The total value of the 14 Offerings for which Countrywide was the principal originator was $17.83 billion, of which the Rating Agencies assigned initial ratings of AAA/maximum safety to over 90%.

176.   Each Registration Statement at issue herein for the Issuing Trusts contained an illustrative form of a Prospectus Supplement for use in the offering of the Certificates.   Each Registration Statement was prepared by the Issuer Defendants and signed by the Individual Defendants.   At the effective date of the offering of the Certificates, a final Prospectus Supplement was filed with the SEC containing a description of the mortgage pool underlying the Certificates and the underwriting standards by which the mortgages were originated.   The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements.

177.   Countrywide made clear in the Offering Documents that exceptions were made to the underwriting guidelines but only where "compensating factors were demonstrated by the borrowers.   Each Registration Statement filed by CWALT and CWMBS at issue herein, as well as the Prospectus Supplements issued pursuant to those Registration Statements, contained the following language concerning the underwriting standards by which the mortgages pooled into CWALT and CWMBS Offerings were originated:

> All of the Mortgage Loans have been originated or acquired by Countrywide Home Loans, Inc., in accordance with its credit, appraisal and underwriting standards.... Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.

> Countrywide Home Loans' underwriting standards are applied, by or on behalf of Countrywide Home Loans to

evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis, varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. ***Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.***

See **SAC Appendix Exhibit H;** *see also* **Exhibit I.**

178. The above statements concerning Countrywide's adherence to its underwriting standards and to federal and state underwriting standards, with respect to mortgages pooled into CWALT and CWMBS Issuing Trusts, contained material misstatements when made because:

      a.    Defendants failed to disclose that Countrywide systematically ignored underwriting standards imposed by state and federal law in issuing the mortgages pooled into the Issuing Trusts;

      b.    Countrywide did not, contrary to its statement above, properly "evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." Rather, as alleged herein, Countrywide systematically ignored borrowers'

repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans; and

      c.    Countrywide's underwriting standards did not require that a borrower "generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." Instead, Countrywide's underwriting included the following practices, described *supra* at ¶¶91-101, 151-75, that disregarded a borrowers' ability to pay by:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed-rate" when the adjustable rate adjusted;

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under
  exceptions to Countrywide's underwriting policies; and

- Systematically overriding flags identified by the CLUES
  system that was meant to weed out non-qualifying loans
  and nonetheless approving such loans.

179. Each Registration Statement and Prospectus Supplement issued by CWABS and CWHEQ at issue herein contained the following language concerning the underwriting standards by which the mortgages pooled into the Issuing Trusts were originated:

> Credit Blemished Mortgage Loans. The following is a description of the underwriting procedures customarily employed by Countrywide Home Loans with respect to credit blemished mortgage loans.... Countrywide Home Loans produces its credit blemished mortgage loans through its Consumer Markets, Full Spectrum Lending, Correspondent Lending and Wholesale Lending Divisions. Prior to the funding of any credit blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans. In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit blemished mortgage loan that it has not itself underwritten.

> Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. ***Compensating factors may include low loan-***

*to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors. It is expected that a significant number of the Mortgage Loans will have been originated based on such underwriting exceptions.*

Each prospective borrower completes an application which includes information with respect to the applicant's assets, liabilities income and employment history, as well as certain other personal information. Countrywide Home Loans requires an independent credit bureau report on the credit history of each applicant in order to evaluate the applicant's prior willingness and/or ability to repay. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments, among other matters.   After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations.   The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income. The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 50%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

While more flexible, Countrywide Home Loans' underwriting guidelines still place primary reliance on a borrower's ability to repay; however, Countrywide Home Loans may require lower loan-to-value ratios than for loans underwritten to more traditional standards. Borrowers who qualify generally have payment histories and debt-to-income ratios which would not satisfy more traditional underwriting guidelines and may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies.

> Countrywide Home Loans' credit blemished mortgage loan underwriting guidelines establish the maximum permitted loan-to-value ratio for each loan type based upon these and other risk factors with more risk factors resulting in lower loan-to-value ratios.

*See* **SAC Appendix Exhibit J**; *see also* **Exhibit K.**

180. In addition, the Prospectus Supplements issued pursuant to the CWHEQ Registration Statements at issue herein also contained additional language describing the standards by which CWHEQ's home equity loans and second lien mortgage loans were originated:

> The underwriting process is intended to assess the applicant's credit standing and repayment ability, and the value and adequacy of the real property security as collateral for the proposed loan. Exceptions to the applicable originator's underwriting guidelines will be made when compensating actors are present. These factors include the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan.

*See* **SAC Appendix Exhibit L.**

181. The Prospectus Supplements for the Offerings issued pursuant to the CWHEQ Registration Statements at issue herein also stated:

> After obtaining all applicable income, liability, asset, employment, credit, and property information, the applicable originator generally uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments (including any escrows for property taxes and hazard insurance premiums) and other monthly credit obligations. The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations (assuming the mortgage loan interest rate is based on the applicable fully indexed

interest rate) to the borrower's gross monthly income. Based on this, the maximum monthly debt-to-income ratio is 45%. Variations in the monthly debt-to-income ratios limits are permitted based on compensating factors. The originators currently offer home equity loan products that allow maximum combined loan-to-value ratios up to 100%.

*See* **SAC Appendix Exhibit M.**

182.   The above statements contained material misstatements of fact when made because:

a.   Contrary to the statements that Countrywide's underwriting standards were "primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan" and to evaluate "the borrower's credit standing and repayment ability," Countrywide subordinated its underwriting standards to originating and securitizing as many mortgage loans as it could so that it could garner fees in the secondary mortgage market. As alleged herein, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans. Rather, Countrywide designed its underwriting standards to ensure that it received the highest possible fees for originating loans without regard to the actual ability of its borrowers to repay the loan, or whether the mortgaged property had sufficient value to collateralize the loan.

b.   Contrary to the representation above that "After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations," Countrywide's underwriting included the

following practices, described *supra* at ¶¶91-101, 151-75, that disregarded a borrowers' ability to pay by:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted;

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies; and

- Systematically overriding flags identified by the CLUES system that were meant to weed out non-qualifying loans and, despite the flags, approving such loans.

    c.    Contrary to the statement that "Exceptions to the applicable originator's underwriting guidelines will be made when compensating factors are present" and that those factors included "the borrower's employment stability, favorable credit history, equity in the related property,

and the nature of the underlying first mortgage loan," Countrywide adopted procedures to incentivize its employees to approve exceptions to loans regardless of whether any compensating factors were present.

183.    Each Registration Statement issued by CWALT, CWABS, CWMBS and CWHEQ at issue herein contained the following statement regarding Countrywide's assessment of a prospective borrower:

> Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance). *The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist.*

See **SAC Appendix Exhibit N.**

184.    Each Registration Statement issued by CWALT, CWABS, CWMBS and CWHEQ at issue herein contained the following statement regarding Countrywide's review of information provided by a prospective borrower:

> Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is *reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.*

See **SAC Appendix Exhibit O.**

185.   According to the Registration Statement and Prospectus Supplements issued by CWALT at issue herein, Countrywide originated loans pursuant to a Preferred Processing Program, pursuant to which documentation requirements were waived for those applicants with favorable credit histories and higher FICO scores.

> Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, *which indicate a more favorable credit history*, and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years may be eligible for Countrywide Home Loans' processing program (the "Preferred Processing Program"). ....Countrywide Home Loans may waive some documentation requirements for mortgage loans originated under the Preferred Processing Program.

*See* **SAC Appendix Exhibit P**; *see also* **Exhibit Q**.

186.   Furthermore, under the CWALT Registration Statement at issue herein, Countrywide also offered four programs where less than full borrower documentation of income, assets and employment were required, however, in all instances credit scores had to be obtained and any deficiencies or derogations fully explained to the loan officers and, except for the Streamlined Documentation Program which had limited application, independent appraisals of the mortgage properties obtained – with all appraisals conforming to Fannie Mae and Freddie Mac standards:

> A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both. Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "Alternative Documentation Program"), a Reduced Documentation

Loan Program (the "Reduced Documentation Program"), a CLUES Plus Documentation Loan Program (the "CLUES Plus Documentation Program"), a No Income/No Asset Documentation Loan Program (the "No Income/No Asset Documentation Program"), a Stated Income/Stated Asset Documentation Loan Program (the "Stated Income/Stated Asset Documentation Program") and a Streamlined Documentation Loan Program (the "Streamlined Documentation Program").

*For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loan obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.*

*Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.*

*See* **SAC Appendix Exhibit R**; *see also* **Exhibit S.**

187.   In addition, the Offering Documents for the CWALT Offerings at issue herein stated that the Alternative Documentation Program required, in addition to FICO scores and standard appraisals, W-2 forms instead of tax returns

No. 2:10-cv-00302: SECOND AMENDED CLASS ACTION COMPLAINT          88

for two years and bank statements instead of deposits and employment verification:

> The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

*See* **SAC Appendix Exhibit T**; *see also* **Exhibit U.**

188.   The Reduced Documentation Program, according to the CWALT Offering Documents at issue herein, was only applied where maximum LTV was equal to or less than 75% including secondary financing as follows:

> Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 75%.

*See* **SAC Appendix Exhibit V**; *see also* **Exhibit W.**

189.   Furthermore, the CLUES Plus program also had a 75% LTV limit but required borrower bank statements and excluded cash out refinancing:

> The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing,