- **Dean J Kitchens**
  dkitchens@gibsondunn.com,MOstrye@gibsondunn.com

- **Joel P Laitman**
  jlaitman@cohenmilstein.com

- **Christopher Lometti**
  clometti@cohenmilstein.com

- **Jennifer B Luz**
  jluz@goodwinprocter.com

- **Azra Z Mehdi**
  amehdi@milberg.com

- **Alexander K Mircheff**
  amircheff@gibsondunn.com,dlanning@gibsondunn.com,inewman@gibsondunn.com

- **Nicolas Morgan**
  nicolas.morgan@dlapiper.com

- **Sharan Nirmul**
  snirmul@btkmc.com,azivitz@btkmc.com

- **Brian E Pastuszenski**
  bpastuszenski@goodwinprocter.com,ktayman@goodwinprocter.com

- **Lauren Wagner Pederson**
  lpederson@btkmc.com,neena.verma@btkmc.com,dpotts@btkmc.com

- **Ira M Press**
  ipress@kmllp.com,lmorris@kmllp.com

- **David A Priebe**
  david.priebe@dlapiper.com,stacy.murray@dlapiper.com

- **Daniel B Rehns**
  drehns@cohenmilstein.com,efilings@cohenmilstein.com

- **Julie G Reiser**
  jreiser@cohenmilstein.com

- **Jonathan Rosenberg**
  jrosenberg@omm.com

- **Christina A Royce**
  croyce@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Scott H Saham**
  scotts@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer M Sepic**
  jennifer.sepic@bingham.com

- **Arthur L Shingler , III**
  ashingler@scott-scott.com,efile@scott-scott.com

- **Richard A Speirs**
  rspeirs@cohenmilstein.com

- **William F Sullivan**
  williamsullivan@paulhastings.com,lisavermeulen@paulhastings.com

- **Steven J Toll**
  stoll@cohenmilstein.com

- **Michael D Torpey**
  mtorpey@orrick.com

- **Michael C Tu**
  mtu@orrick.com,fphan@orrick.com

- **Avi N Wagner**
  avi@thewagnerfirm.com,anwagneresq@hotmail.com

- **Shirli Fabbri Weiss**
  shirli.weiss@dlapiper.com,emiko.gonzales@dlapiper.com

- **Lloyd Winawer**
  lwinawer@goodwinprocter.com,ahsia@goodwinprocter.com,sasmith@goodwinprocter.com,monyeagbako@goodwinprocter.com,cburgos@goodwinprocter.com

- **Andrew L Zivitz**
  azivitz@btkmc.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Lauren G Kerkhoff**
Robbins Geller Rudman & Dowd LLP
655 West Broadway Suite 1900
San Diego, CA 92101-8498

Name & Address:
Lionel Z. Glancy
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAINE STATE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, PLAINTIFF(S) | CASE NUMBER 2:10-cv-00302-MRP-MAN |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE SECURITIES CORPORATION; [See Attachment for Additional Defendants] DEFENDANT(S). | **SUMMONS** ON SECOND AMENDED CLASS ACTION COMPLAINT |

TO: DEFENDANT(S): ALL NAMED DEFENDANTS

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☑ Second amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Lionel Z. Glancy, whose address is Glancy Binkow & Goldberg LLP, 1801 Ave. of the Stars, Ste 311, Los Angels, CA 90067. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: DEC - 6 2010

By: JULIE PRADO
Deputy Clerk

SEAL

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

Name & Address:
Lionel Z. Glancy
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAINE STATE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, PLAINTIFF(S) | CASE NUMBER 2:10-cv-00302-MRP-MAN |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE SECURITIES CORPORATION; [See Attachment for Additional Defendants] DEFENDANT(S). | **SUMMONS** ON SECOND AMENDED CLASS ACTION COMPLAINT |

TO: DEFENDANT(S): ALL NAMED DEFENDANTS

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☑ Second amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Lionel Z. Glancy, whose address is Glancy Binkow & Goldberg LLP, 1801 Ave. of the Stars, Ste 311, Los Angels, CA 90067. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: DEC - 6 2010

By: Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

SUMMONS ON SECOND AMENDED CLASS ACTION COMPLAINT
2:10-CV-00302-MRP-MAN

[Attachment of Additional Defendants]

COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE CAPITAL MARKETS; BANK OF AMERICA CORP.; NB HOLDINGS CORPORATION; CWALT, INC.; CWMBS, INC.; CWABS, INC.; CWHEQ, INC.; J.P. MORGAN SECURITIES, INC.; DEUTSCHE BANK SECURITIES INC.; BEAR, STEARNS & CO., INC.; JPMORGAN CHASE, INC.; BANC OF AMERICA SECURITIES LLC; UBS SECURITIES LLC; MORGAN STANLEY & CO., INC.; EDWARD D. JONES & CO., L.P.; CITIGROUP GLOBAL MARKETS, INC.; GOLDMAN, SACHS & CO.; CREDIT SUISSE SECURITIES (USA) LLC; RBS SECURITIES INC.; BARCLAY'S CAPITAL, INC.; HSBC SECURITIES (USA) INC.; BNP PARIBAS SECURITIES CORP.; MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; STANFORD L. KURLAND; DAVID A. SPECTOR; ERIC P. SIERACKI; N. JOSHUA ADLER; RANJIT KRIPALANI; JENNIFER S. SANDEFUR; THOMAS KEITH MCLAUGHLIN; THOMAS H. BOONE; JEFFREY P. GROGIN; and DAVID A. SAMBOL.

# TAC APPENDIX EXHIBIT C

# Plaintiffs' Redlined Third Amended Class Action Complaint to Second Amended Class Action Complaint

LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com

*Liaison Counsel for Lead Plaintiff Iowa Public Employees' Retirement System*
*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAINE STATE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE SECURITIES CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE CAPITAL MARKETS; BANK OF AMERICA CORP.; NB HOLDINGS CORPORATION; CWALT, INC.; CWMBS, INC.; CWABS, INC.; CWHEQ, INC.; J.P. MORGAN SECURITIES, INC.; DEUTSCHE BANK SECURITIES INC.; BEAR, STEARNS & CO., INC.; JPMORGAN CHASE, INC.; BANC OF AMERICA SECURITIES LLC; UBS SECURITIES LLC; MORGAN STANLEY & CO., INC.; EDWARD D. JONES & CO., L.P.; CITIGROUP GLOBAL MARKETS, INC.; GOLDMAN, SACHS & CO.; CREDIT SUISSE SECURITIES (USA) LLC; RBS SECURITIES INC.; BARCLAY'S CAPITAL, INC.; HSBC SECURITIES (USA) INC.; BNP PARIBAS SECURITIES CORP.; MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; STANFORD L. KURLAND; DAVID A. SPECTOR; ERIC P. SIERACKI; N. JOSHUA ADLER; RANJIT KRIPALANI; JENNIFER S. SANDEFUR; THOMAS KEITH MCLAUGHLIN; THOMAS H. BOONE; JEFFREY P. GROGIN; DAVID A. SAMBOL,<br><br>Defendants. | No. 2:10-CV-00302 MRP (MAN)<br><br>CLASS ACTION<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT** |

Deleted: SECOND

Deleted: SECOND

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF THE ACTION ........ 2
II. JURISDICTION AND VENUE ........ 7
III. PROCEDURAL HISTORY ........ 8
IV. PARTIES ........ 12
  A. Plaintiffs ........ 12
  B. Defendants ........ 13
    1. Countrywide Defendants ........ 13
    2. The Issuer Defendants ........ 16
    3. The Underwriter Defendants ........ 20
    4. The Individual Defendants ........ 23
    5. David A. Sambol ........ 25
  C. The Issuing Trust Non-Parties ........ 25
V. TOLLING OF THE STATUTE OF LIMITATIONS ........ 25
  A. Defendant CWALT Offerings ........ 25
  B. Defendant CWHEQ Offerings ........ 28
  C. Defendant CWABS Offerings ........ 30
  D. Defendant CWMBS Offerings ........ 34
VI. BACKGROUND ........ 36
  A. Countrywide Was a Leading Issuer and Underwriter of Mortgage-Backed Securities ........ 36
  B. Countrywide's Origination and Securitization Operations ........ 39
VII. EVIDENCE OF SYSTEMIC DISREGARD OF STATED LOAN ORIGINATION GUIDELINES CONTAINED IN OFFERING DOCUMENTS ........ 43
  A. Exponential Increase in Certificate Default Rates in Months After Issuance No Matter When Offering Occurred Evidences Disregard of Origination Guidelines ........ 43
  B. Rating Agencies Collapsed Certificate Ratings to "Junk Bond" Levels Due to Undisclosed "Aggressive Underwriting" Practices ........ 44

Deleted: 1
Deleted: 8¶
Deleted: 8
Deleted: 15¶
Deleted: 18¶
Deleted: 21
Deleted: 24
Deleted: IV
Deleted: 24¶
Deleted: 24¶
Deleted: 27¶
Deleted: 31¶
Deleted: 31¶
Deleted: SECOND

C. Government Investigations Reveal the Falsity of the Offering Documents ........ 47

D. Allegations in Numerous Civil Lawsuits Involving Countrywide Show the Falsity of the Offering Documents ........ 57

E. Underwriter Defendants "Contracted Out" and Failed to Conduct Required Due Diligence of Loan Underwriting Guidelines Contained in Offering Documents ........ 62

F. Additional Government Investigations Further Confirm Systemic Disregard for Mortgage Loan Underwriting Guidelines ........ 68

G. Underwriter Defendants Employed Rating Shopping Practices to Ensure Inflated Investment Grade Rating for All the Certificates ........ 69

VIII. THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING AND APPRAISAL STANDARDS ........ 71

IX. CLASS ACTION ALLEGATIONS ........ 91

X. STANDING ........ 92

XI. CLAIMS ........ 93

COUNT I ........ 93

Violation of Section 11 of the Securities Act Against the Individual Defendants, the Issuer Defendants and the Underwriter Defendants

COUNT II ........ 96

Violation of Section 12(a)(2) of the Securities Act Against the Section 12 Underwriter Defendants

COUNT III ........ 98

Violation of Section 15 of the Securities Act Against Sambol and the Countrywide Defendants

XII. RELIEF REQUESTED ........ 99

XIII. JURY DEMAND ........ 100

Deleted: 33¶
Deleted: Numerous
Deleted: 35¶
Deleted: Other
Deleted: 44¶
Deleted: 52¶
Deleted: 58¶
Deleted: 59¶
Deleted: 60
Deleted: VII
Deleted: 81
Deleted: VIII
Deleted: 82
Deleted: IX
Deleted: 83¶
Deleted: 83¶
Deleted: ,
Deleted: 87¶
Deleted: Issuer Defendants and the
Deleted: 89¶
Deleted:
Deleted: 89¶
Deleted: 90¶
Deleted: SECOND

In accordance with the Court's Opinion and Order dated November 4, 2010 ("Countrywide Tolling Decision") and Opinion and Order dated May 5, 2011 ("Countrywide MTD Decision"), Lead Plaintiff Iowa Public Employees' Retirement System and additional named plaintiffs the General Board of Pension and Health Benefits of the United Methodist Church, Orange County Employees' Retirement System, and Oregon Public Employees' Retirement System (collectively, "Plaintiffs"), submit this Third Amended Class Action Complaint ("TAC") and allege the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their counsel. The investigation included, for example: (i) review and analysis of the offering materials for the Certificates as defined below, and the Certificates' rating histories; (ii) examination of the monthly service or remittance reports issued in connection with the Certificates; (iii) examination of the SEC filings, press releases and other public statements of Countrywide Financial Corporation ("CFC"); (iv) review and analysis of court filings cited herein; (v) review and analysis of media reports, congressional testimony and additional material; (vi) analysis of the Securities and Exchange Commission's ("SEC") Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies ("SEC Report") and additional documents cited herein; and (vii) discussions with federal and state agencies as well as attorneys for private litigants who have investigated and pursued civil actions against one or more Countrywide entities alleging wrongdoing during the period at issue herein. Many of the facts related to Plaintiffs' allegations are known only by the Defendants named herein, or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

Deleted: and

Deleted: SECOND

Plaintiffs undertake this amendment to comply with the Countrywide Tolling Decision and Countrywide MTD Decision. In so doing, Plaintiffs do not waive and hereby preserve all previously asserted claims regarding all securities included in the Consolidated Amended Class Action Complaint ("First Amended Complaint" or "FAC") and Consolidated Second Amended Class Action Complaint ("Second Amended Complaint" or "SAC") in this action as if fully set forth herein. True and correct copies of the FAC and SAC are annexed hereto as **Exhibit A and Exhibit B**, respectively, of the accompanying Appendix ("TAC Appendix"). Furthermore, annexed hereto as **TAC Appendix Exhibit C** is a redline of the TAC to the SAC.

## I. SUMMARY OF THE ACTION

1. This Complaint is brought by Plaintiffs pursuant to the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* (the "Securities Act"), on behalf of All persons or entities who purchased mortgage-backed securities one or more of the nine tranches in the offerings set forth below and in **TAC Appendix Exhibits D-F** (collectively the "MBS" or "Certificates") pursuant and traceable to Registration Statements, Original Basic Prospectuses, and Prospectus Supplements (collectively, the "Offering Documents") filed with the Securities and Exchange Commission ("SEC") by Defendants (1) Alternative Loan Trust Certificates issued by Defendant CWALT, Inc. ("CWALT"); (2) CWABS Asset-Backed Trust Certificates issued by Defendant CWABS, Inc. ("CWABS"); (3) CHL Mortgage Pass-Through Trust Certificates issued by Defendant CWMBS, Inc. ("CWMBS"); and (4) CWHEQ Revolving Home Equity Loan Trusts and Home Equity Loan Trusts issued by Defendant CWHEQ, Inc. ("CWHEQ") (CWALT, CWABS, CWMBS, and CWHEQ are collectively referred to herein as the "Depositors" or "Issuers"). All of the Certificates were collateralized by residential mortgage loans that Countrywide Home Loans, Inc. ("Countrywide") or its affiliates originated. The Certificates were sold in nine separate public offerings (the "Offerings") over

Deleted: ,

Deleted: ¶

Deleted: all

Deleted: or otherwise acquired $17.83 billion of

Deleted: ("

Deleted: "

Deleted: "

Deleted: ") issued

Deleted: or

Deleted: "

Deleted: ")

Deleted: :

Deleted: 14

Deleted: SECOND

fifteen months between October 2005 and December 2006. A complete list of each Certificate that is the subject of this TAC is set forth in **TAC Appendix Exhibit D.** The $2.63 billion in Countrywide Certificates which are the subject of this Complaint is comprised of nine separate tranches of Certificates issued in nine separate Countrywide MBS Offerings, as set forth herein at ¶¶58-78 and **TAC Appendix Exhibits D & E.**

2. Excluded from the Class are Defendants, their officers and directors at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest

3. The Certificates were underwritten by Defendants Countrywide Securities Corporation ("CSC"), Deutsche Bank Securities Inc. ("Deutsche Bank"), UBS Securities LLC ("UBS"), Morgan Stanley & Co., Inc. ("Morgan Stanley"), Goldman, Sachs & Co. ("Goldman Sachs"), RBS Securities Inc. f/k/a RBS Greenwich Capital d/b/a Greenwich Capital Markets, Inc. ("RBS") and HSBC Securities (USA) Inc. ("HSBC") (collectively the "Underwriters" or "Underwriter Defendants").

4. Plaintiffs assert claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, arising from material misstatements and omissions in the Registration Statements, Prospectuses and subsequently-filed Prospectus Supplements (collectively referred to herein as the "Offering Documents"). Accordingly, this action involves claims of negligence and strict liability under the Securities Act. The Complaint asserts no allegations of fraud on the part of any Defendant.

5. From 2005 through 2007, Countrywide was the nation's largest residential mortgage lender. Countrywide originated in excess of $850 billion in home loans throughout the United States in 2005 and 2006 alone. Countrywide's ability to originate residential mortgages on such a massive scale was facilitated, in

Deleted: thirty-four

Deleted: Offering

Deleted: Second Amended Class Action Complaint ("SAC")

Deleted: **Exhibit A** of the accompanying Appendix ("SAC

Formatted: Font: Bold

Deleted: "). ¶

Formatted: Bullets and Numbering

Deleted: "), Barclay's Capital, Inc. ("Barclay's

Deleted: SECOND

large part, by its ability to rapidly package or securitize those loans and then, through the activities of the Underwriter Defendants, sell them to investors as purportedly investment grade mortgage-backed securities.

6. Each Offering operated in the same manner. A special-purpose trust (the "Issuing Trust") was created by the Depositor to hold the underlying mortgage loan collateral. Certificates entitled investors to receive monthly distributions of interest and principal from the Issuing Trusts derived from cash flows from borrower repayment of the mortgage loans. The cash flows from the principal and interest payments from those mortgage loans were then divided into multiple classes, or "tranches," of senior and subordinated Certificates. If borrowers failed to pay back their mortgages, these losses would flow to Plaintiffs based on the seniority of their Certificates. However, since all of the Certificates issued by an individual Issuing Trust were backed by the pool of mortgages associated with that Issuing Trust, a decline in the value of the mortgages in the pool arising from delinquencies, defaults, or other problems with the particular loans would cause a decline in the value of each and every class or tranche of Certificates in the Issuing Trust, regardless of the subordination of certain Certificates to more senior ones.

7. The assembly line created by Countrywide and the Underwriter Defendants for the mass production and sale of the Certificates began with Countrywide and its affiliates originating the mortgage loans. These loans were all purportedly underwritten pursuant to specific loan origination guidelines set forth in the Offering Documents. The guidelines provided, *inter alia*, that Countrywide and its affiliates would assess borrower creditworthiness and appraise the value of the mortgaged property pursuant to standard appraisal methodologies. As set forth below, these descriptions of the loan origination guidelines in the Offering Documents contained material misstatements and omissions since, in fact, the guidelines were systematically disregarded to include borrowers who did not meet the aforementioned criteria.

**Deleted:** SECOND

8. Once the loans were originated they were ultimately sold to the Depositors who were all limited purpose entities created by CFC. The Depositors would deposit the loans into Issuing Trusts and, along with the Underwriter Defendants and the Rating Agencies, including Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's ("S&P") and Fitch Ratings, Inc. ("Fitch") (collectively referred to herein as the "Rating Agencies"), design the structure of each Offering. The Offering structures determined how the cash flows from the mortgage loans would be distributed to senior and subordinate classes of Certificates. Each Offering purported to provide various forms of investor protections and purported to justify the investment grade ratings assigned to the Certificates.

9. It was critically important to the Underwriter Defendants not only that all of the Certificates be assigned investment grade ratings by the Rating Agencies at the time of issuance, but that they be assigned the highest investment grade ratings. The highest investment rating used by the Rating Agencies is AAA (Aaa for Moody's), which signifies the highest investment grade and suggests that there is almost no risk of investment loss associated with the security – the safest investment next to U.S. Treasury bonds. Ratings of "AA," "A" and "BBB" represent very high credit quality, high credit quality, and good credit quality, respectively. There are various intermediate ratings between BBB and AAA. Anything rated lower than BBB is considered speculative or "junk," *i.e.*, not investment grade.

10. In fact, all of the Countrywide-issued Certificates at issue herein were assigned investment grade ratings and 100% received the highest investment grade ratings. These ratings assured the rapid sale of the Certificates to conservative investors such as public and private pension funds and insurance companies whose investment guidelines typically require them to purchase only investment grade securities. The Underwriter Defendants exercised their substantial economic

**Deleted:** different

**Deleted:** Certificate investors

**Deleted:**

**Deleted:** over 90

**Deleted:** SECOND

power by soliciting the Rating Agencies to bid for the ratings engagements via the Rating Agencies' proposed ratings of the Certificates. The Underwriters' competitive selection process for securing ratings, known as "ratings shopping," ensured that the highest investment grade ratings were assigned to substantially all of the Certificates.

11. After the Certificates were issued, facts began to emerge reflecting that the mortgage collateral supporting the purported investment grade securities was fundamentally impaired and that the guidelines described in the Offering Documents had been systematically disregarded.[1]

12. No matter when the Offering occurred, the default and delinquency rates of the Certificates at issue herein skyrocketed exponentially in the first year after the loans were originated, reflecting en mass early payment defaults. Such early defaults are a strong indicator that origination guidelines have not been applied, *infra* ¶¶97-105, 108.

13. As a result of such poor loan performance the Rating Agencies were forced not merely to downgrade isolated Certificates, but rather to revise the entire methodology used to assign investment grade ratings to the Certificates. Further, in making these fundamental revisions, the Rating Agencies explained that the impetus for the change was previously undisclosed and systematic "aggressive underwriting" practices used to originate the mortgage loan collateral. When these revised methodologies were applied to the Certificates in 2008 and 2009, the result was an unprecedented collapse of the investment grade ratings. Indeed, the Certificates bearing the highest investment grade ratings collapsed largely in one fell swoop – not merely one or two rating levels, but *as much as 22 rating levels* to

[1] For purposes of the Securities Act, the Depositor is considered the "Issuer" under Section 2(a)(4), 15 U.S.C. § 77b(a)(4). The "issuing entity" in each Offering was the specifically denominated Issuing Trust, *e.g.*, for the CWALT Series 2005-62 $1,559,819,100 Offering on October 28, 2005, the Issuer was CWALT, Inc. and the issuing entity was the Issuing Trust denominated "Alternative Loan Trust 2005-62."

Deleted:

Deleted: 102-09, 113

Deleted:

Deleted: SECOND

below investment grade or junk bond rating. Indeed, 89% of the Certificates, all of which were initially awarded AAA/maximum-safety ratings, have now been downgraded to junk bond levels, *infra* ¶¶102-109.

14. Finally, commensurate with the exponential increases in delinquency and default rates in the underlying mortgages and the Certificates' ratings collapse, the value of the Certificates has plummeted.

15. As a result of Countrywide's systemic disregard for its underwriting guidelines, numerous statements set forth in the Offering Documents contained material misstatements and omissions, including regarding: (i) the high quality of the mortgage pools underlying the Issuing Trusts, resulting from the underwriting standards employed to originate the mortgages, the value of the collateral securing the mortgages, and the soundness of the appraisals used to arrive at this value; (ii) the mortgages' loan-to-value ("LTV") ratios; and (iii) other criteria that were used to qualify borrowers for mortgages.

16. The widespread collapse of Countrywide mortgages not only resulted in damage to Certificate investors but also drove Countrywide toward the brink of bankruptcy. To survive, Countrywide merged with Bank of America in a $4.1 billion stock exchange in January 2008.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 771(a)(2) and 77o. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

18. Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c). Many of the acts and conduct complained of herein occurred in substantial part in this District, including the dissemination of the Offering Documents, which contained material misstatements and omissions, complained of herein. In addition, Defendants conduct business in

**Deleted:** 91

**Deleted:** have been downgraded to junk bond levels – including over 90% of the Certificates

**Deleted:** 107-114

**Deleted:** <#> Investigations into Countrywide's loan origination practices during the period from 2005 through 2007 and presented in actions filed by the SEC against Countrywide and its senior management, including Angelo Mozilo ("Mozilo"), David Sambol ("Sambol") and Eric Sieracki ("Sieracki"), as well as by the Illinois and California attorneys general have confirmed, as a result of those agencies' subpoena power, that Countrywide's underwriting guidelines were systematically disregarded. In addition, MBIA Insurance Corp. ("MBIA"), one of the largest providers of bond insurance, brought its own lawsuit against Countrywide alleging that Countrywide fraudulently induced it to insure certain Certificates at issue in this action based on its improper loan origination practices. Moreover, allegations set forth in complaints against Countrywide alleging derivative and securities claims have further detailed Countrywide's rampant disregard for its own loan origination guidelines.¶
<#> Fourth, more general government investigations into the issuance of mortgage-backed securities during the period when the Certificates were issued have also confirmed a systemic disregard for loan origination guidelines. Thus, for example, according to the March 2008 policy statement of the President's Working Group on Financial Markets (the "President's Working Group"), the underlying causes of the mortgage crisis include, *inter alia*: (i) "a breakdown in underwriting standards for subprime mortgages"; and (ii) "a significant erosion of market discipline by those involved in the securitization processes, including originators [and] underwriters … related in part to failures to provide or obtain adequate risk disclosures."¶

**Formatted:** Bullets and Numbering

**Deleted:** SECOND

this District.

19. In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

## III PROCEDURAL HISTORY

20. The instant litigation was originally commenced on November 14, 2007 with the filing of *Luther v. Countrywide Home Loans Servicing LP, et al.*, Case No. BC380698 (Cal. Superior Court, Los Angeles County) ("Initial Luther Complaint"). The Initial Luther Complaint asserted claims for violations of Sections 11, 12(a)(2) and 15 of the Securities Act on behalf of a class of all purchasers of 188 Offerings of Countrywide MBS issued by Defendant CWALT between January 2005 and June 2007 pursuant to five separate Shelf Registration Statements. ***See* TAC Appendix Exhibit F**. All 188 Offerings included in the Initial Luther Complaint are included in the FAC. The Offerings included in the Initial Luther Complaint are set forth in **TAC Appendix Exhibit G**, annexed hereto. ***There were no PSLRA Certifications identifying the securities purchased by the named Plaintiffs accompanying the filing of the Initial Luther Complaint, nor did the Initial Luther Complaint include allegations of specific securities purchased by the named plaintiff.***

21. Thereafter, on June 14, 2008, a second action was filed in California State Superior Court captioned *Washington State Plumbing & Pipefitting Pension Trust v. Countrywide Financial Corporation, et al.*, Case No. BC392571 (Cal. Superior Court, Los Angeles County) ("Washington State Action" or "Washington State Complaint"). The named Plaintiff, Washington State Plumbing & Pipefitting Pension Trust ("Washington State") asserted claims on behalf of a class of all purchasers of 398 Offerings of Countrywide MBS issued between June 13, 2005 and December 27, 2007 pursuant to 19 separate Shelf Registration Statements. ***See* TAC Appendix Exhibit F.** Three hundred and ninety-six Offerings included in

Deleted: SAC
Deleted: C
Deleted: SAC
Deleted: D
Deleted: SAC
Deleted: C.
Deleted: SECOND

the Washington State Complaint were included in the FAC. The Offerings included in the Washington State Complaint are set forth in **TAC Appendix Exhibit G**, annexed hereto. ***There were no PSLRA Certifications identifying the securities purchased by the named Plaintiffs accompanying the filing of the Washington State Complaint, nor did the Washington State Complaint include allegations identifying the specific securities purchased by the named plaintiffs.***

22. Thereafter, on September 9, 2008, an amended complaint was filed in *Luther* ("Amended Luther Complaint"), adding four additional plaintiffs to the action – Vermont Pension Investment Committee ("Vermont"), Mashreqbank, P.S.C. ("MASH"), Pension Trust Fund for Operating Engineers ("PTOE") and Operating Engineers Annuity Plan ("OEAP"). The named plaintiffs asserted claims on behalf of a class of all purchasers of 428 Offerings of Countrywide MBS issued between January 2005 and December 2007 pursuant to 20 separate Shelf Registration Statements. ***See* TAC Appendix Exhibit F**. All 427 Countrywide Offerings in the FAC were included in the Amended Luther Complaint. The Offerings included in the Amended Luther Complaint are set forth in **TAC Appendix Exhibit G**, annexed hereto. ***There were no PSLRA Certifications identifying the securities purchased by the named Plaintiffs accompanying the filing of the Amended Luther Complaint, nor did the Amended Luther Complaint include allegations identifying the specific securities purchased by the named plaintiffs.***

23. After consolidation of the *Luther* and *Washington State* actions, a consolidated complaint was filed on October 16, 2008 (the "Luther Consolidated Complaint"), naming Luther, Vermont, MASH, PTOE, OEAP and Washington State as plaintiffs. In addition, the Luther Consolidated Complaint added Maine State Retirement System ("Maine") as an additional named plaintiff. Vermont, MASH, PTOE, OEAP, Maine and Washington State are collectively referred to herein at times as the "Luther Plaintiffs." These plaintiffs asserted claims on

Deleted: SAC
Deleted: D
Deleted: SAC
Deleted: C
Deleted: SAC
Deleted: D
Deleted: SECOND

behalf of a class of all purchasers of 428 Offerings of Countrywide MBS issued between January 2005 and December 2007 pursuant to 20 separate Shelf Registration Statements. ***See*** **TAC Appendix Exhibit F**. Again, all 427 Countrywide MBS Offerings in the FAC were included in the Luther Consolidated Complaint. The Offerings included in the Luther Consolidated Complaint are set forth in **TAC Appendix Exhibit G**, annexed hereto. ***There were no PSLRA Certifications identifying the securities purchased by the named Plaintiffs accompanying the filing of the Luther Consolidated Complaint, nor did the Luther Consolidated Complaint include allegations identifying the specific securities purchased by the named plaintiffs.***

Deleted: SAC
Deleted: C
Deleted: SAC
Deleted: D

24. On January 14, 2010, after being dismissed due to lack of subject matter jurisdiction in state court, counsel for the Luther Plaintiffs filed *Maine State Retirement System v. Countrywide Financial Corporation*, *et al.*, Civ. No. 10-00302-MRP-MAN (C.D. Cal. Jan. 14, 2010) (the "Federal Action" or "Federal Complaint"). Maine State Retirement System was the sole named plaintiff in the Federal Complaint, which set forth identical allegations regarding the same 428 Countrywide Offerings as the Luther Consolidated Complaint. ***See*** **TAC Appendix Exhibit F**. All 427 Offerings in the FAC were included in the Federal Complaint. The Offerings included in the Federal Complaint are set forth in **TAC Appendix Exhibit G**, annexed hereto. ***Annexed to the Federal Complaint was the Certification of Maine State Retirement System which set forth the specific Countrywide MBS which Maine had purchased.***

Deleted: SAC
Deleted: C
Deleted: SAC
Deleted: D

25. The Luther Plaintiffs also appealed their dismissal by the Superior Court to the California Court of Appeals (Second Appellate District). On May 19, 2011, the California Court of Appeals reversed the Superior Court in full and remanded the case back to the trial court for further proceedings. *Luther v. Countrywide Financial Corp., et al.*, Case No. B222889, 2011 Cal. App. LEXIS 596 (Cal. Ct. App. May 18, 2011).

Deleted: That appeal remains pending

Deleted: SECOND

26. There were no PSLRA Certifications or allegations setting forth precisely which Offerings or tranches thereof the remaining five Luther Plaintiffs (*i.e.*, MASH, PTOE, OEAP, Washington State and Vermont) purchased until the filing of the motions for lead plaintiff in this action on April 2, 2010. *See* Dkt. Nos. 86-89. Moreover, the specific Countrywide Certificates purchased by the named plaintiff in the Luther Action, David Luther, have never been publicly disclosed or set forth in any previous complaints in this action. In fact, this information was only obtained from Mr. Luther's counsel in response to a request from Plaintiffs' Counsel. Ultimately, on May 17, 2010, IPERS was appointed as Lead Plaintiff in the action.

27. On July 13, 2010, IPERS, along with additional named Plaintiffs OCERS, OPERS and GBPHB, filed the FAC in the Federal Action. The FAC asserted claims on behalf of a class of all purchasers of 427 Offerings of Countrywide MBS issued between January 2005 and December 2007 pursuant to 19 separate Shelf Registration Statements. ***See* TAC Appendix Exhibit F**. The Offerings included in the FAC are set forth in **TAC Appendix Exhibit G**, annexed hereto. Thereafter, Defendants moved to dismiss the FAC. By Opinion and Order dated November 4, 2010, the Court granted Defendants' motions to dismiss with leave to replead in accordance with the Countrywide Tolling Decision.

28. On December 12, 2010, Plaintiffs filed the SAC in the Federal Action. While expressly preserving all claims against all parties contained in the FAC, the SAC asserted claims on behalf of a class of all purchasers of 20 Offerings of Countrywide MBS issued between September 2005 and December 2006 pursuant to seven separate Shelf Registration Statements. ***See* TAC Appendix Exhibit F.** The Offerings included in the SAC are set forth in **TAC Appendix Exhibits G,** annexed hereto. Thereafter, Defendants moved to dismiss the SAC. By Opinion and Order dated May 5, 2011, the Court granted in part and denied in part Defendants' motions to dismiss and granted a motion to strike certain allegations

Deleted: SAC
Deleted: C
Deleted: SAC
Deleted: D

Deleted: SECOND

in the SAC, and directed Plaintiffs to replead within 30 days in accordance with the Countrywide MTD Decision. This TAC is filed in compliance therewith.

Deleted: SAC

## IV. PARTIES

Deleted: III

### A. Plaintiffs

29. **Iowa Public Employees' Retirement System** ("IPERS") is a public pension fund for employees of the State of Iowa. IPERS acquired its Certificates pursuant and traceable to one or more Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements. The Offering Documents were rendered materially misleading as a consequence of the same course of conduct with respect to each Offering by Defendants. A Certification documenting IPERS' transactions in the Certificates was filed with IPERS' motion for appointment as lead plaintiff on April 2, 2010. *See* Dkt. No. 80. As set forth in ¶¶58-78, directly below, IPERS purchased the Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

Deleted: 60-83

30. **General Board of Pension and Health Benefits of the United Methodist Church** ("GBPHB") is the pension fund for the active and retired clergy and lay employees of the United Methodist Church. GBPHB acquired its Certificates pursuant and traceable to one or more Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements. The Offering Documents were rendered materially misleading as a consequence of the same course of conduct with respect to each Offering by Defendants. A Certification documenting GBPHB's transactions in the Certificates was filed with GBPHB's motion for appointment as lead plaintiff on April 2, 2010. *See* Dkt. No. 85. As set forth in ¶¶58-78, directly below, GBPHB purchased its Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

Deleted: 60-83

31. **Orange County Employees' Retirement System** ("OCERS") is a public pension fund for the employees of Orange County, California. OCERS acquired its Certificates pursuant and traceable to one or more Shelf Registration

Deleted: SECOND

Statements, Original Basic Prospectuses and later-filed Prospectus Supplements. The Offering Documents were rendered materially misleading as a consequence of the same course of conduct with respect to each Offering by Defendants. A Certification documenting OCERS' transactions in the Certificates and willingness to serve as a representative party in this litigation was annexed to and filed with the FAC on July 13, 2010. *See* Dkt. No. 122. As set forth in ¶¶58-78, directly below, OCERS purchased its Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

32. **State of Oregon, by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board on behalf of the Oregon Public Employee Retirement Fund** ("OPERS") is a public pension fund for employees of the State of Oregon. OPERS acquired its Certificates pursuant and traceable to one or more Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements. The Offering Documents were rendered materially misleading as a consequence of the same course of conduct with respect to each Offering by Defendants. A Certification documenting OPERS' transactions in Countrywide MBS and willingness to serve as a representative party in this litigation was annexed to and filed with the FAC on July 13, 2010. *See* Dkt. No. 122. As set forth in ¶¶58-78, directly below, OPERS purchased its Certificates pursuant and traceable to the Offering Documents and has been damaged thereby.

**B. Defendants**

33. Plaintiffs allege that each and every Defendant is, to the maximum extent permitted by law, jointly and severally liable for the misconduct alleged in this Complaint.

**1. Countrywide Defendants**

34. Defendant **Countrywide Financial Corporation** ("CFC") was, at times relevant to this Complaint, a Delaware corporation with its principal

Deleted: 60-83

Deleted: 60-83

Formatted: Indent: Left: 0.5", First line: 0.5"

Formatted: No underline

Deleted: SECOND

executive offices located at 4500 Park Granada, Calabasas, California. CFC was a holding company which, through its subsidiaries, was engaged in mortgage lending and other real estate finance related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting. The Company operated through five business segments: Mortgage Banking, which originated, purchased, sold and serviced non-commercial mortgage loans nationwide; Banking, which took deposits and invested in mortgage loans and home equity lines of credit; Capital Markets, which operated an institutional broker-dealer that primarily specialized in trading and underwriting MBS; Insurance, which offered property, casualty, life and disability insurance as an underwriter and as an insurance agency; and Global Operations, which licensed and supported technology for mortgage lenders in the United Kingdom. As discussed below, CFC merged with and became Bank of America in 2008. The Issuer Defendants, as set forth below, were controlled directly by the Individual Defendants and CFC, including by the appointment of CFC executives as directors and officers of these entities. Revenues flowing from the issuance and sale of MBS issued by CWALT, CWMBS, CWABS and CWHEQ and the Issuing Trusts were passed through to CFC and consolidated into CFC's financial statements. Defendant CFC, therefore, exercised actual day-to-day control over Defendants CWALT, CWMBS, CWABS, and CWHEQ. Defendant CFC was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CFC's role relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to CFC were tolled under the Countrywide Tolling Decision and Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I**.

35. Defendant **Countrywide Securities Corporation** ("CSC") is a broker-dealer within CFC. According to CFC's Form 10-K for the year ended

Deleted: FAC

Deleted: Offerings

Deleted: SAC

Deleted: E & F

Formatted: Font: Not Bold

Deleted: SECOND

December 31, 2007, filed with the SEC on February 29, 2008 ("2007 Form 10-K"), CSC "primarily specializes in trading and underwriting MBS." The financial results of CSC are set forth in the Capital Markets section of CFC's financial statements. CFC further stated in its 2007 Form 10-K that it was "ranked fourth among Non-Agency MBS Underwriters" for 2007. Defendant CSC was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CSC's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to CFC were tolled under the Countrywide Tolling Decision and Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

Deleted: and
Deleted: Offerings
Deleted: SAC
Formatted: Font: Bold
Deleted: E & F. Defendant

36. **Countrywide Home Loans, Inc.** ("CHL") was, at times relevant to this Complaint, a direct wholly-owned subsidiary of CFC. CHL was engaged in the mortgage banking business, and originated, purchased, sold and serviced mortgage loans. CHL's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. CHL served as the "Sponsor" or "Seller" of the Certificates, meaning that it played a central role in providing the pools of mortgage loans to the Issuing Trusts upon which the Certificates were based. Defendant CHL was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CHL's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to CHL were tolled under the Countrywide Tolling Decision and Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I**.

Deleted: and
Deleted: Offerings
Deleted: SAC
Deleted: E & F
Formatted: Font: Not Bold

37. Defendant **Countrywide Capital Markets** ("CCM") was, at times

Deleted: SECOND

relevant to this Complaint, a direct wholly-owned subsidiary of CFC. CCM's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. CCM operated through its two main wholly-owned subsidiaries, CSC and Countrywide Servicing Exchange. According to CFC's 2007 Form 10-K, "Capital Markets participates in both competitive bid and negotiated underwritings and performs underwriting services for CHL, Countrywide Bank and third parties." The financial results of CCM were set forth in the Capital Markets section of CFC's financial statements. Defendant CCM was a named defendant in the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CCM's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to CCM were tolled under the Countrywide Tolling Decision and Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I**.

**2. The Issuer Defendants**

38. Defendant CFC structured Defendants CWALT, CWMBS, CWABS, and CWHEQ as limited purpose, wholly-owned, finance subsidiaries to facilitate its issuance and sale of the MBS. CWALT, CWMBS, CWABS, and CWHEQ were controlled directly by CFC, including by the appointment of CFC executives as directors and officers of these entities. Revenues flowing from the issuance and sale of MBS issued by CWALT, CWMBS, CWABS and CWHEQ and the Issuing Trusts were passed through to CFC and consolidated into CFC's financial statements. Defendant CFC, therefore, exercised actual day-to-day control over Defendants CWALT, CWMBS, CWABS, and CWHEQ.

39. Defendant **CWALT, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWALT's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. Defendant CWALT served in the

Deleted: and
Deleted: Offerings
Deleted: SAC
Deleted: E & F
Formatted: Font: Not Bold
Deleted: <#>Defendant **Bank of America Corp.** ("Bank of America") is a successor to Defendant CFC, having *de facto* merged with CFC. On July 1, 2008, Defendant CFC completed a merger with Red Oak Merger Corporation ("Red Oak"), a wholly-owned subsidiary of Bank of America, pursuant to the terms of an Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank of America, Red Oak, and CFC. The acquisition was through an all-stock transaction involving a Bank of America subsidiary that was created for the sole purpose of facilitating the acquisition of CFC. The Countrywide brand was retired shortly after the merger and currently CFC's former website redirects to the Bank of America website. Moreover, Bank of America has assumed CFC's liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending allegedly committed by CFC. *See, e.g.*, Shayndi Raice and Marshall Eckblad, Countrywide's Mess Billed to Bank of America, *Wall St. J.* (June 7, 2010). Substantially all of Countrywide's assets were transferred to Bank of America on November 7, 2008, in connection with Countrywide's integration with Bank of America's other businesses and operations, along with certain of Countrywide's debt securities and related guarantees. CFC ceased filing its own financial statements in November 2008, and instead its assets and liabilities have been included in Bank of America's financial statements. Further, many of the same locations, employees, assets and business operations that were formerly CFC continue under the Bank of America Home Loans brand. CSC, CHL and CCM likewise are now part of Bank of America. As noted above, Defendant CFC, of which Bank of America is a successor in interest, was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC. These complaints alleged that CFC's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to CFC were tolled und ... [1]
Formatted: Indent: Left: 0.5", First line: 0.5"
Formatted: Font: Bold
Formatted: No underline
Formatted: Font: Bold
Deleted: SECOND

role of the "Depositor" in the securitization of the Issuing Trusts as identified in **TAC Appendix Exhibit D** and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Issuer | Date | No. of Offerings in TAC |
|---|---|---|---|---|
| 333-110343 | $19,000,000,000 | CWALT, Inc. | January 13, 2004 | 0 |
| 333-117949 | $24,126,942,035 | CWALT, Inc. | September 23, 2004 | 0 |
| 333-123167 | $22,731,808,071 | CWALT, Inc. | April 21, 2005 | 0 |
| 333-125902 | $45,335,287,290 | CWALT, Inc. | July 25, 2005 | 2 |
| 333-131630 | $100,271,785,327 | CWALT, Inc. | March 6, 2006 | 0 |
| 333-140962 | $103,095,483,061 | CWALT, Inc. | April 24, 2007 | 0 |

Defendant CWALT was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CWALT's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to CWALT were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

40. Defendant **CWHEQ, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWHEQ's principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. Defendant CWHEQ served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in **TAC Appendix Exhibit D** and was an "Issuer" of the Certificates within the

Deleted: SAC
Deleted: A
Formatted: Keep with next, Keep lines together
Deleted: SAC
Deleted: 2
Deleted: 0
Deleted: FAC
Deleted: SAC
Deleted: Offerings
Deleted: SAC
Deleted: E & F
Deleted: SAC
Deleted: A
Deleted: SECOND

meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

| File No. | Amount Registered | Issuer | Date | No. of Offerings in TAC |
|---|---|---|---|---|
| 333-121378[2] | $20,000,000,000 | CWHEQ, Inc. | December 17, 2004 | 0 |
| 333-126790 | $30,685,000,000 | CWHEQ, Inc. | August 4, 2005 | 1 |
| 333-132375 | $26,572,949,813 | CWHEQ, Inc. | April 12, 2006 | 1 |
| 333-139891 | $31,717,192,508 | CWHEQ, Inc. | May 22, 2007 | 0 |

Defendant CWHEQ was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CWHEQ's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to CWHEQ were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I**.

41. Defendant **CWABS, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWABS' principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. Defendant CWABS served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in **TAC Appendix Exhibit D** and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

[2] There were no Offerings included in the FAC issued pursuant to this Shelf Registration Statement.

Formatted: Keep with next, Keep lines together
Deleted: SAC
Deleted: 2
Deleted: FAC
Deleted: SAC
Deleted: Offerings
Deleted: SAC
Deleted: E & F
Formatted: Font: Bold
Deleted: SAC
Deleted: A
Deleted: SECOND

| File No. | Amount Registered | Issuer | Date | No. of Offerings in SAC |
|---|---|---|---|---|
| 333-118926 | $60,598,485,932 | CWABS, Inc. | October 18, 2004 | 0 |
| 333-125164 | $46,598,657,434 | CWABS, Inc. | June 10, 2005 | 2 |
| 333-131591 | $34,327,892,523 | CWABS, Inc. | February 21, 2006 | 1 |
| 333-135846 | $40,000,000,000 | CWABS, Inc. | August 8, 2006 | 1 |
| 333-140960 | $113,336,555,700 | CWABS, Inc. | April 24, 2007 | 0 |

Defendant CWABS was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CWABS' conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to CWABS were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

42. Defendant **CWMBS, Inc.** was, at times relevant to this Complaint, a Delaware corporation and a limited purpose financing subsidiary of CFC. CWMBS' principal executive offices were located at 4500 Park Granada, Calabasas, California, the same location as CFC. Defendant CWMBS served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified in **SAC Appendix Exhibit D** and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4), traceable to the following amended Registration Statements it filed with the SEC:

Formatted: Keep with next, Keep lines together

Formatted: Keep with next, Keep lines together

Deleted: 4

Deleted: 2

Deleted: FAC

Deleted: SAC

Deleted: Offerings

Deleted: SAC

Deleted: E & F

Formatted: Font: Bold

Deleted: A

Formatted: Font: Bold

Deleted: SECOND

| File No. | Amount Registered | Issuer | Date | No. of Offerings in SAC |
|---|---|---|---|---|
| 333-100418 | $14,978,548,884 | CWMBS, Inc. | October 28, 2002 | 0 |
| 333-121249 | $20,863,464,518 | CWMBS, Inc. | February 8, 2005 | 0 |
| 333-125963 | $40,742,304,251 | CWMBS, Inc. | July 25, 2005 | 0 |
| 333-131662 | $60,846,662,430 | CWMBS, Inc. | March 6, 2006 | 1 |
| 333-140958 | $144,647,113,029 | CWMBS, Inc. | April 24, 2007 | 0 |

Defendant CWMBS was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CWMBS' conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to CWMBS were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in TAC **Appendix Exhibits H & I.**

43. CWALT, CWMBS, CWABS and CWHEQ are collectively referred to herein as the "Issuer Defendants."

**3. The Underwriter Defendants**

44. As set forth above, Defendant CSC is an affiliate of CFC, and acted as an underwriter for the Certificates identified in **TAC Appendix Exhibit E** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. As set forth above, Defendant CSC now operates as Bank of America. Defendant CSC, was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that CSC's conduct relating to the creation and sale of MBS

Deleted: FAC

Deleted: SAC

Deleted: Offerings

Deleted: SAC

Deleted: E & F

Formatted: Font: Bold

Formatted: Font: Bold

Formatted: No underline

Deleted: SAC

Deleted: B

Deleted: FAC

Deleted: SECOND

violated the Securities Act. The claims asserted in this TAC as they relate to CSC were tolled under the Countrywide Tolling Decision and Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I**.

45. Defendant **Deutsche Bank Securities Inc.** ("Deutsche Bank") acted as an underwriter for the Certificates identified in **SAC Appendix Exhibit E** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Defendant Deutsche Bank was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that Deutsche Bank's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to Deutsche Bank were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

46. Defendant **UBS Securities LLC** ("UBS") acted as an underwriter for the MBS identified in **SAC Appendix Exhibit E** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Defendant UBS was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that UBS' conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to UBS were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

47. Defendant **Morgan Stanley & Co., Inc.** ("Morgan Stanley") acted as an underwriter for the Certificates identified in **SAC Appendix Exhibit E** within

Deleted: SAC
Deleted: Offerings
Deleted: SAC
Deleted: E & F
Formatted: Font: Not Bold
Deleted: B
Deleted: and
Deleted: SAC
Deleted: Offerings
Deleted: SAC
Deleted: E & F
Formatted: Font: Bold
Deleted: B
Deleted: and
Deleted: SAC
Deleted: Offerings
Deleted: SAC
Deleted: E & F
Formatted: Font: Bold
Deleted: B
Deleted: SECOND

the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Defendant Morgan Stanley was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that Morgan Stanley's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to Morgan Stanley were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I**.

Deleted: and

Deleted: SAC

Deleted: Offerings

Deleted: SAC

Deleted: E & F

Formatted: Font: Bold

48. Defendant **Goldman, Sachs & Co.** ("Goldman Sachs") acted as an underwriter for the Certificates identified in **SAC Appendix Ex. E** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Defendant Goldman Sachs was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that Goldman Sachs' conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to Goldman Sachs were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I**.

Deleted: B

Deleted: and

Deleted: SAC

Deleted: Offerings

Deleted: SAC

Deleted: E & F

49. Defendant **RBS Securities Inc. f/k/a RBS Greenwich Capital d/b/a Greenwich Capital Markets, Inc.** ("RBS") acted as an underwriter for the Certificates identified in **SAC Appendix Exhibit E** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Defendant RBS was a named defendant in the Initial Luther Complaint, the

Deleted: B

Deleted: SECOND

Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that RBS' conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to RBS were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

50. Defendant **HSBC Securities (USA) Inc.** ("HSBC") acted as an underwriter for the Certificates identified in **SAC Appendix Exhibit E** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Defendant HSBC was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that HSBC's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to HSBC were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

51. Defendants CSC, Deutsche Bank, UBS, Morgan Stanley, Goldman Sachs, RBS, Barclays and HSBC are referred to herein as the "Underwriter Defendants." "Underwriter Defendants" also includes Defendant Bank of America as successor in interest as set forth above. Furthermore, Defendants CSC and UBS are referred to herein at times as the **"Section 12 Underwriter Defendants."**

### 4. The Individual Defendants

52. Defendant **Stanford L. Kurland** ("Kurland") was, at relevant times, the Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ. Defendant Kurland signed all seven (7) Shelf Registration Statements at issue herein. Defendant Kurland was concurrently the Executive Vice President and Chief Operating

Deleted: and

Deleted: SAC

Deleted: Offerings

Deleted: SAC

Deleted: E & F. ¶
Defendant **Barclays Capital, Inc.** ("Barclays") acted as an underwriter for the Certificates identified in **SAC Appendix Exhibit B** within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus Supplements pursuant to which the MBS were sold to Plaintiffs. Defendant Barclays was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint and the FAC. These complaints alleged that Barclays' conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this SAC as they relate to Barclays were tolled under the Countrywide Tolling Decision for the Offerings set forth in **SAC Appendix Exhibits E & F**

Formatted: Font: Bold

Deleted: B

Deleted: FAC

Deleted: SAC

Deleted: Offerings

Deleted: SAC

Deleted: E & F

Formatted: Font: Bold

Formatted: No underline

Formatted: Indent: Left: 0.5", First line: 0.5"

Deleted: SECOND

Officer ("COO") of Defendant CFC. Defendant Kurland was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that Kurland's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to Kurland were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

53. Defendant **David A. Spector** ("Spector") was, at relevant times, Vice President and a member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ. Defendant Spector signed all seven (7) Shelf Registration Statements at issue herein. Defendant Spector was concurrently the Senior Managing Director of Secondary Marketing of Defendant CFC. Defendant Spector was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that Spector's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to Spector were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

54. Defendant **Eric P. Sieracki** ("Sieracki") was, at relevant times, the Executive Vice President, CFO, Treasurer and member of the Board of Directors for CWALT, CWMBS, CWABS and CWHEQ. Defendant Sieracki signed all seven (7) Shelf Registration Statements at issue herein. Defendant Sieracki was concurrently the Executive Vice President and CFO of Defendant CFC. Defendant Sieracki was a named defendant in the Initial Luther Complaint, the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints

Deleted: FAC
Deleted: SAC
Deleted: Offerings
Deleted: **SAC**
Deleted: **E & F**
Formatted: Font: Bold
Deleted: and
Deleted: SAC
Deleted: Offerings
Deleted: **SAC**
Deleted: **E & F**
Deleted: and
Deleted: SECOND

alleged that Sieracki's conduct relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to Sieracki were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

55. Defendants Kurland, Spector and Sieracki, are collectively referred to hereinafter as the "Individual Defendants."

**5. David A. Sambol**

56. Defendant David A. Sambol ("Sambol") was, at relevant times, the President and COO of Defendant CFC. Defendant Sambol was a control person of the Countrywide Defendants and the Issuing Defendants. Defendant Sambol was a named defendant in the Washington State Complaint, the Amended Luther Complaint, the Consolidated Luther Complaint, the Federal Complaint, the FAC and the SAC. These complaints alleged that Sambol's role relating to the creation and sale of MBS violated the Securities Act. The claims asserted in this TAC as they relate to Sambol were tolled under the Countrywide Tolling Decision and the Countrywide MTD Decision for the Certificates set forth in **TAC Appendix Exhibits H & I.**

**C. The Issuing Trust Non-Parties**

57. The Issuing Trusts were set up by Defendants CWALT, CWMBS, CWABS and CWHEQ to issue hundreds of billions of dollars worth of Certificates pursuant to the Offering Documents. **Exhibits D and E** of the TAC Appendix, annexed hereto, identify (1) each Issuing Trust, (2) the stated value of the Certificates it issued, (3) the Registration Statements and Prospectus Supplements pursuant to which the Certificates were issued and sold, and (4) the identities of the Underwriters, Sponsor/Seller, and Depositor/Issuer for each issuance.

## V. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Defendant CWALT Offerings

58. Defendant CWALT issued $163,499,734,519.00 of Countrywide

**Deleted:** SAC
**Deleted:** Offerings
**Deleted:** SAC
**Deleted:** E & F
**Formatted:** Font: Bold
**Formatted:** Font: Not Bold
**Formatted:** No underline
**Formatted:** Font: Not Bold
**Formatted:** Indent: Left: 0.5", First line: 0.5"
**Deleted:** .
**Deleted:** FAC
**Deleted:** SAC
**Deleted:** Offerings
**Deleted:** SAC
**Deleted:** E & F
**Formatted:** Font: Bold
**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, ... + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Tab after: 0.5" + Indent at: 0"
**Deleted:** A
**Deleted:** B
**Deleted:** SAC
**Deleted:** SECOND

MBS in 226 separate Offerings between January 2005 and December 2007 pursuant to six Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements as set forth above in ¶39, in the SAC at ¶41 and in the FAC at ¶34. The Luther Consolidated Complaint, the Federal Complaint and the FAC all included claims on behalf of 226 CWALT Offerings issued between January 2005 and December 2007. ***See* TAC Appendix Exhibit G.**

Deleted: SAC

Deleted: D

59. Pursuant to the Court's November 4, 2010 Countrywide Tolling Decision, the allegations set forth in the FAC were limited to those Offerings which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintained standing in the SAC to pursue Securities Act claims on two (2) Countrywide MBS Offerings issued pursuant to one (1) CWALT Registration Statement.

Deleted: herein are

60. Pursuant to the Court's May 5, 2011 Countrywide MTD Decision, the allegations set forth herein are limited to those "tranches" of Certificates which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintain standing to pursue Securities Act claims on one (1) tranche of Certificates in each of two (2) Countrywide MBS Offerings issued pursuant to one (1) CWALT Registration Statement, as set forth in detail below.

Deleted:

61. As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWALT 2005-62 ("2005-62"), Class 2A1 Certificates,** pursuant and traceable to the misleading Offering Documents:

Deleted: ") Certificates

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWALT 2005-62, Class 2A1 | 8,446,540.84 | $1.0003 | August 4, 2006 | Deutsche Bank |

Deleted: ¶

Formatted Table

Deleted: (s)

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. OPERS' Section 11 and 15 claims on behalf of all purchasers of the 2005-62, Class 2A1 Certificates were

Deleted: SECOND

tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least June 12, 2008 when Washington State was named as a plaintiff in the Washington State Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Washington State purchased the 2005-62, Class 2A1 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Washington State Complaint, including the Amended Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2005-62, Class 2A1 Claims. ***See* TAC Appendix Exhibit H.** As such, Plaintiff OPERS derives tolling from Washington State's standing to pursue those claims. ***See* TAC Appendix Exhibit I.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to OPERS' custodial statements, was priced at $0.5718, causing OPERS to suffer injury as a result.

62. As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWALT 2005-72 ("2005-72") Certificates**, ***on the Offering and directly from the underwriter***, Defendant UBS, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWALT 2005-72, | 16,930,000.00 | $1.0000 | November 21, 2005 | UBS |

Deleted: and
Deleted: claims
Deleted: SAC
Deleted: E
Deleted: .[3]
Deleted: SAC
Deleted: F
Deleted: , Class A1
Formatted: Font: Not Bold
Deleted: Class A1,
Formatted: Font: Bold, Italic
Deleted: (s)
Deleted: SECOND

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| Class A1 | | | | |
| CWALT 2005-72, Class A1 | 13,024,000.00 | $1.0000 | December 15, 2005 | UBS |

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. OPERS' Sections 12(a)(2) and 15 claims on behalf of all purchasers of the 2005-72, Class A1 Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least September 9, 2008 when PTOE was added as a named plaintiff to the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, PTOE purchased the 2005-72, Class A1 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2005-72, Class A1 Claims. ***See* TAC Appendix Exhibit H.** As such, Plaintiff OPERS derives tolling from PTOE's standing to pursue those claims. ***See* TAC Appendix Exhibit I.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to OPERS' custodial statements, was priced at $0.6001, causing OPERS to suffer injury as a result.

**B. Defendant CWHEQ Offerings**

63. Defendant CWHEQ issued $50,303,553,300.00 of Countrywide MBS in 39 separate Offerings between August 26, 2005 and August 14, 2007 pursuant to four Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements as set forth above in ¶40, in the SAC at ¶42 and in the FAC at ¶35. All 39 Offerings were included for the first time in the Washington

Deleted: (s)

Deleted: and

Deleted: claims

Deleted: SAC

Deleted: E

Deleted: SAC

Deleted: F

Deleted: SECOND

State Complaint. ***See* TAC Appendix Exhibit G.**

64. Pursuant to the Court's Countrywide Tolling Decision, the allegations set forth in the SAC were limited to those CWHEQ Offerings which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintained standing in the SAC to pursue Securities Act claims on three (3) Countrywide MBS Offerings issued pursuant to two (2) CWHEQ Registration Statements.

65. Pursuant to the Court's May 5, 2011 Countrywide MTD Decision, the allegations set forth herein are limited to those "tranches" of Certificates which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintain standing to pursue Securities Act claims on one (1) tranche of Certificates in each of two (2) Countrywide MBS Offerings issued pursuant to two (2) CWHEQ Registration Statements, as set forth in detail below.

66. As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWL 2005-H ("2005-H"), Class 2A Certificates *on the Offering and directly from the Underwriter*,** Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWL 2005-H, Class 2A | 1,200,000 | $1.0000 | September 27, 2005 | CSC |

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. OPERS' Sections 12(a)(2) and 15 claims on behalf of all purchasers of the 2005-H Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least September 9, 2008 when PTOE was added as a named plaintiff to the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, PTOE purchased the 2005-H,

Deleted: SAC
Deleted: D
Deleted: herein are
Deleted:
Deleted: ") Certificates
Deleted: ,
Formatted: Font: Bold, Italic
Deleted: underwriter
Formatted: Font: Bold, Italic
Deleted: (s)
Deleted: SECOND

Class 2A Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2005-H, Class 2A Claims. ***See* TAC Appendix Exhibit H.** As such, Plaintiff OPERS derives tolling from PTOE's standing to pursue those claims. ***See* TAC Appendix Exhibit I.** OPERS disposed of the 2005-H, Class 2A Certificates in the open market on October 19, 2007 at a price of $0.9700, and suffered injury as a result.

67. As set forth below, and also in the Certification annexed hereto, IPERS purchased the **CWL 2006-S3 ("2006-S3") Certificates**, ***on the Offering and directly from the Underwriter***, Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWL 2006-S3, Class A2 | 1,999,956.46 | $1.0000 | June 16, 2006 | CSC |

Lead Plaintiff IPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010, when the FAC was filed. IPERS' Sections 11, 12(a)(2) and 15 claims on behalf of all purchasers of the 2006-S3, Class A2 Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least September 9, 2008 when Vermont was added as a named plaintiff to the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Vermont purchased the 2006-S3, Class A2 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Amended Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2006-S3, Class A2 Claims. ***See* TAC Appendix Exhibit H.** As such,

Deleted: and
Deleted: SAC
Deleted: E
Deleted: SAC
Deleted: F
Deleted: , Class A2
Formatted: Font: Not Bold
Deleted: Class A2,
Formatted: Font: Bold, Italic
Formatted Table
Deleted: (s)
Deleted: June 12
Deleted: – the date the Washington State
Deleted: was filed
Deleted: Washington State
Deleted: Washington State Complaint, including the
Deleted: and
Deleted: claims
Deleted: SAC
Deleted: E
Deleted: SECOND

IPERS derives tolling from Vermont's standing to pursue those claims. ***See* TAC Appendix Exhibit I.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to IPERS' custodial statements, was priced at $0.6300, causing IPERS to suffer injury as a result.

Deleted: Washington State's

Deleted: .[4]

Deleted: SAC

Deleted: F

**C. Defendant CWABS Offerings**

Deleted: <#>As set forth below, and also in the Certification annexed hereto, IPERS purchased the **CWL 2006-S9 ("2006-S9") Certificates, Class A2**, on the Offering and directly from the Underwriter, Defendant CSC, pursuant to the misleading Offering Documents:¶
¶
**Certificates Purchased** ... [2]

68. Defendant CWABS issued $82,129,061,400.00 of Countrywide MBS in 76 separate Offerings between June 2005 and October 2007 pursuant to four Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements as set forth above in ¶41, in the SAC at ¶43 and in the FAC at ¶36. All 76 Offerings were included, for the first time, in the Washington State Complaint and thereafter included in the Luther Amended Complaint, Consolidated Luther Complaint, Federal Complaint, the FAC and SAC. ***See* TAC Appendix Exhibit G.**

Deleted: FAC

Deleted: SAC

Deleted: D

Deleted: SECOND

69. Pursuant to the Court's Countrywide Tolling Decision, the allegations set forth in the SAC were limited to those CWABS Offerings which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintained standing in the SAC to pursue Securities Act claims on eight (8) Countrywide MBS Offerings issued pursuant to three (3) CWABS Registration Statements.

70. Pursuant to the Court's May 5, 2011 Countrywide MTD Decision, the allegations set forth herein are limited to those "tranches" of Certificates which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintain standing to pursue Securities Act claims on one (1) tranche of Certificates in each of four (4) Countrywide MBS Offerings issued pursuant to three (3) CWABS Registration Statements, as set forth in detail below.

71. As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2005-11 ("2005-11"), Class AF3 Certificates**, ***on the Offering and directly from the Underwriter,*** Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWL 2005-11, Class AF3 | 1,000,000.00 | $1.0000 | September 12, 2005 | CSC |

Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. GBPHB's Sections 12(a)(2) and 15 claims on behalf of all purchasers of the 2005-11, Class AF3 Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least September 9, 2008 when PTOE was added as a named plaintiff to the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, PTOE purchased the 2005-11, Class AF3 Certificates and had standing to assert

Deleted: herein are

Deleted:

Deleted: ") Certificates

Formatted: Font: Bold, Italic

Deleted: (s)

Deleted: SECOND

Securities Act claims in connection therewith. Each complaint filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2005-11, Class AF3 Claims. ***See* TAC Appendix Exhibit H**. As such, Plaintiff GBPHB derives tolling from PTOE's standing to pursue those claims. ***See* TAC Appendix Exhibit I**. GBPHB disposed of the 2005-11 Certificates in the open market on September 28, 2009 at a price of $0.7500, and suffered injury as a result.

72. As set forth below, and also in the Certification annexed hereto, OCERS purchased the **CWHL 2005-HYB9 ("2005-HYB9") Certificates**, ***on the Offering and directly from the Underwriter***, Defendant CSC, pursuant to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase | Purchased From |
|---|---|---|---|---|
| CWHL 2005-HYB9, Class 3A2A | 400,000.00 | $0.9972 | November 28, 2005 | CSC |

Plaintiff OCERS was named as the Lead Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. OCERS' Section 12(a)(2) and Section 15 claims on behalf of all purchasers of the 2005-HYB9, Class 3A2A Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least October 16, 2008 when Maine was added as a named plaintiff to the Luther Consolidated Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Maine purchased the 2005-HYB9, Class 3A2A Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Luther Consolidated Complaint, including the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2005-HYB9, Class 3A2A Claims. ***See* TAC Appendix Exhibit H**. As such, Plaintiff OCERS derives tolling from Maine's standing to pursue those claims. ***See* TAC Appendix**

Deleted: and
Deleted: claims
Deleted: SAC
Deleted: E
Deleted: SAC
Deleted: F
Deleted: , Class 3A2A
Formatted: Font: Not Bold
Deleted: Class 3A2A,
Formatted: Font: Bold, Italic
Deleted: (s)
Formatted: No bullets or numbering
Deleted: and
Deleted: claims
Deleted: SAC
Deleted: E
Deleted: SAC
Deleted: SECOND

**Exhibit I.** As of the date of the filing of the Federal Action in January 2010, the value of the Certificates had diminished considerably, and according to OCERS' custodial statements, was priced at $0.6772, causing OCERS to suffer injury as a result.

73. As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2006-3 ("2006-9"), Class 1AF3 Certificates,**

73. pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-9, Class 1AF3 | 1.000,000.00 | $1.0048 | April 27, 2007 | BOAS |

Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. GBPHB's Sections 11 and 15 claims on behalf of all purchasers of the 2006-9, Class 1AF3 Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least September 9, 2008 when Vermont was added as an additional named plaintiff to the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Vermont purchased the 2006-9, Class 1AF3 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2006-9, Class 1AF3 Claims. ***See* TAC Appendix Exhibit H.** As such, Plaintiff GBPHB derives tolling from Vermont's standing to pursue those claims. ***See* TAC Appendix Exhibit I.** GBPHB disposed of the 2006-9 Class 1AF3 Certificates in the open market on April 15, 2009 at a price of $0.3075, and suffered injury as a result.

Deleted: F

Deleted: 9

Deleted: 3")

Deleted: **Class 2A2** pursuant and traceable to the misleading Offering Documents, and **Class M2** on the Offering and directly from the Underwriter, Defendant CSC, pursuant to the misleading Offering Documents:¶
¶
¶
**Certificates Purchased** ... [3]

Formatted Table

Deleted: CWL 2006-9, Class 1A ... [4]

Deleted: and

Deleted: claims

Deleted: SAC

Deleted: E

Deleted: SAC

Deleted: F

Deleted: Furthermore, GBPHB disposed of the 2006-9 Class 1AF6 Certificates in the open market on March 27, 2009 at a price of $0.3300, and suffered injury as a result.¶
<#>As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2006-11 ("2006-11") Certificates, Class 1AF3 and Class 1AF4** pursuant and traceable to the misleading Offering Documents:¶
**Certificates Purchased** ... [5]

Deleted: SECOND

74. As set forth below, and also in the Certification annexed hereto, GBPHB purchased the **CWL 2006-24 ("2006-24"), Class 2A1 Certificates,** pursuant and traceable to the misleading Offering Documents:

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWL 2006-24, Class 2A1 | 385,809.66 | $0.9927 | October 12, 2007 | Morgan Stanley |

Plaintiff GBPHB was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. GBPHB's Sections 11 and 15 claims on behalf of all purchasers of the 2006-24, Class 2A1 Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least September 9, 2008 when Vermont was added as an additional named plaintiff to the Amended Luther Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Vermont purchased the 2006-24, Class 2A1 Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Amended Luther Complaint, including the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2006-24, Class 2A1 Claims. ***See* TAC Appendix Exhibit H.** As such, Plaintiff GBPHB derives tolling from Vermont's standing to pursue those claims. ***See* TAC Appendix Exhibit I.** As of the date of the filing of the Federal

Deleted: ") Certificates

Formatted: No bullets or numbering

Deleted: and

Deleted: claims

Deleted: SAC

Deleted: E

Deleted: SAC

Deleted: F

Deleted: SECOND

Action in January 2010, the value of the Certificates had diminished considerably, and according to GBPHB's custodial statements, was priced at $0.9428, causing GBPHB to suffer injury as a result.

**D. Defendant CWMBS Offerings**

75. Defendant CWMBS issued $56,178,680,394 of Countrywide MBS in 87 separate Offerings between June 2005 and October 2007 pursuant to five Shelf Registration Statements, Original Basic Prospectuses and later-filed Prospectus Supplements as set forth above in ¶42, in the SAC at ¶44 herein and in the FAC at ¶37. All 87 Offerings were included, for the first time, in the Washington State Complaint and thereafter included in the Luther Amended Complaint, Consolidated Luther Complaint, Federal Complaint and FAC. ***See* TAC Appendix Exhibit G.**

Deleted: SAC

Deleted: D

76. Pursuant to the Court's Countrywide Tolling Decision, the allegations set forth in the SAC were limited to those CWMBS Offerings which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintained standing in the SAC to pursue Securities Act claims on one (1) Countrywide MBS Offering issued pursuant to one (1) CWMBS Registration Statement, as set forth in detail below.

Deleted: herein are

77. Pursuant to the Court's May 5, 2011 Countrywide MTD Decision, the allegations set forth herein are limited to those "tranches" of Certificates which the Luther Plaintiffs had standing to pursue while the case was pending in California state court. As a result, Plaintiffs maintain standing to pursue Securities Act claims on one (1) tranche of Certificates in one (1) Countrywide MBS Offerings issued pursuant to one (1) CWABS Registration Statement, as set forth in detail below.

78. As set forth below, and also in the Certification annexed hereto, OPERS purchased the **CWHL 2006-HYB3 ("2006-HYB3"), Class 2A1A Certificates**, pursuant and traceable to the misleading Offering Documents:

Deleted: ") Certificates

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|

Deleted: SECOND

| Certificates Purchased | Units Purchased | Price Per Unit | Date of Purchase(s) | Purchased From |
|---|---|---|---|---|
| CWHL 2006-HYB3, Class 2A1A | 1,076,000.00 | $1.0002 | April 27, 2006 | Credit Suisse Securities, LLC |
| CWHL 2006-HYB3, Class 2A1A | 154,493.47 | $0.9919 | August 21, 2007 | CSC |

Deleted: CSS

Plaintiff OPERS was named as a representative Plaintiff in the Federal Action for the first time on July 13, 2010 when the FAC was filed. OPERS' Sections 11 and 15 claims on behalf of all purchasers of the 2006-HYB3, Class 2A1A Certificates were tolled in accordance with the Countrywide Tolling Decision and Countrywide MTD Decision since at least June 12, 2008 when Washington State was named as a plaintiff in the Washington State Complaint. According to the Certification filed with its motion for lead plaintiff on April 2, 2010, Washington State purchased the 2006-HYB3, Class 2A1A Certificates and had standing to assert Securities Act claims in connection therewith. Each complaint filed subsequent to the Washington State Complaint, including the Amended Luther Complaint, the Luther Consolidated Complaint, the Federal Complaint, the FAC and the SAC, included a named plaintiff that had standing to assert the 2006-HYB3, Class 2A1A Claims. ***See*** **TAC Appendix Exhibit H.** As such, Plaintiff OPERS derives tolling from Washington State's standing to pursue those claims. ***See*** **TAC Appendix Exhibit I.** As of the date of the filing of the Federal Action in January 2010, the

Deleted: and

Deleted: SAC

Deleted: E

Deleted: .[8]

Deleted: SAC

Deleted: F

Deleted: SECOND

value of the Certificates had diminished considerably, and according to OPERS' custodial statements, was priced at $0.6877, causing OPERS to suffer injury as a result.

## VI. BACKGROUND

Formatted: Line spacing: single

### A. Countrywide Was a Leading Issuer and Underwriter of Mortgage-Backed Securities

79. As illustrated below, a mortgage securitization is where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.

**Follow the Mortgage** What happens to your mortgage after you sign on the dotted line

MORTGAGE-BACKED SECURITY

| | Borrower | Broker | Lender | Investment Bank | Investors |
|---|---|---|---|---|---|
| | Works with a broker or directly with a lender to get a home-purchase loan or a refinancing | Finds a lender who can close the loan. They usually have a working arrangement with multiple lenders. | Often funds loan via 'warehouse' line of credit from investment bank. Then sells loan to investment bank | Packages the loans into a mortgage-backed bond deal,often known as a securitization. Sells the securitization sorted by risk to investors. Lower-rated slices take the first defaults when mortgages go bad, but offer higher returns. | Choose what to buy based on their appetites for risk and reward. HIGH RISK LOW RISK |
| What they get | Financing needed to purchase a home or cash from refinancing | Takes fees for doing the preliminary sales and paperwork | Takes up-front fees for making the loan | Collects fees for packaging the loans into bond deal | Earn interest on the bonds and absorb any gain or loss in price of the bond. |
| If the loan goes bad | House can be repossessed | May get cut from lender's approved broker list | Can be forced to take back loan if there's an early default or documentation is questionable | May push back loan to lender, or be forced to eat any loss | May have legal recourse against bank if they can show the quality of the loan or loan documentation was misrepresented. |

Source: WSJ Reporting

80. When mortgage borrowers make interest and principal payments, the cash flow is distributed to the holders of MBS certificates in order of priority, based on the specific tranche held. The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages. Because the lower tranches are designed to provide a cushion, diminished cash flows to the lower tranches results in impaired value of the higher tranches, as, among other reasons, there is less certainty of the continued cash flows to the higher tranches.

81. The securitization of loans fundamentally shifts the risk of loss from

Deleted: SECOND

mortgage loan originators to investors who purchase an interest in the securitized pool of loans. When the originator holds a mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan. As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans. In securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

82. In the 1980s and 1990s, securitizations were generally within the domain of Government Sponsored Enterprises ("GSE"), *i.e.*, the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators. Investors in these early GSE securitizations were provided protections since the underlying loans were originated pursuant to strict underwriting guidelines.

83. Between 2001 and 2006, however, there was dramatic growth in non-GSE loan originations and securitizations such that non-GSE securitizations grew 330%, becoming a $1.48 trillion industry.

84. The market for adjustable rate mortgages ("ARMs"), including interest-only and negative amortization loans, grew concurrently with the boom in subprime and Alt-A loan originations and securitizations. ARMs increased from $355 billion in 2001 to $1.3 trillion in 2006. Mortgage Market Statistical Annual, Vol. 1 (2007), at 4. Such growth coincided with the increase in popularity of so-called "exotic" or non-traditional ARMs which had fixed interest rates for a limited period before "resetting" during the life of the loan to significantly higher adjustable rates. These non-traditional ARMs included "2/28 or 3/27 ARMs"

Deleted: SECOND

(many with below-market teaser rates for two or three years before conversion to the fully-indexed rate); interest-only ARMs (permitting interest-only payments for a set period of time during which the rate may fluctuate, resulting in negative amortization and rising principal); option payment ARMs (offering up to four payment options, including minimum and interest-only payments, which, if chosen, result in negative amortization and rising principal); and 40-year ARMs (in which payments are calculated based on a 40-year payment term but where the loan terminates in 30 years, resulting in a final balloon payment). Origination of non-traditional ARMs increased 278% between 2004 and 2006 – from $205 billion to $775 billion. Mortgage Market Statistical Annual, Vol. 1 (2007), at 6.

85. Here, the Certificate collateral was composed of a substantial number of non-traditional adjustable mortgages, interest-only and negative amortization loans. These types of loans presented the greatest potential for "payment shock" to the borrower since they provided for initially small monthly payments based on low fixed rates which then reset thereafter to significantly higher monthly payment amounts based on adjustable interest rates. Although these loans were not traditional, the underwriting guidelines still required the loans to be originated responsibly and in accordance with those guidelines. Yet, Countrywide would routinely provide loans to borrowers who could only afford the short-term "teaser" rates (or, even to those that could not even afford the teaser rates) – not the full payments that would be required after the short-term rates reset. Although these types of loans were designed for high net worth investors who were capable of earning higher returns through investment than in making interest and principal payments upfront, Countrywide routinely sold these loans to unsophisticated borrowers who were unable to make the required payments after the loans reset – and frequently, to those who could not even make the "teaser" payments, leading to early defaults on the loans.

Deleted: SECOND

**B. Countrywide's Origination and Securitization Operations**

86. CFC set up Defendants CWALT, CWMBS, CWABS, and CWHEQ, the Depositors in this case, as "limited purpose finance entities" solely for the purpose of facilitating the issuance of the Certificates. CHL acted as the servicer of the mortgages and CSC, Countrywide's underwriting division, along with the other Underwriter Defendants, marketed and sold the securities. Although Defendants CWALT, CWMBS, CWABS, and CWHEQ served as the Depositors for the Issuing Trusts and issued the Registration Statements, this process was directed and controlled by the Countrywide Defendants, the Individual Defendants, and Sambol.

87. With respect to the Certificates at issue here, the Registration Statements and each of the Prospectus Supplements contained material misstatements concerning, *inter alia*, the quality of the loans supporting the MBS associated with each trust, including, specifically, statements about (1) the underwriting process and standards by which mortgages held by the Issuing Trusts were originated, and (2) the values of the real estate securing the mortgages pooled in the Issuing Trusts, expressed in part as the average LTV ratios of the underlying mortgages and the appraisal standards by which such real estate values were obtained.

88. Each MBS sold to Plaintiffs was sold pursuant to a Registration Statement. The Prospectus Supplements, which were filed at the time that the Certificates were sold to Plaintiffs, incorporated by reference each of the Registration Statements they were issued pursuant to. The Prospectus Supplements contained specific disclosures concerning each Issuing Trust. Nonetheless, in each Prospectus Supplement, as set forth herein, the Issuer Defendants and the Underwriter Defendants made the same representations concerning CHL's standards in originating the mortgages and valuing the properties underlying the Issuing Trusts.

Deleted: SECOND