89.   CWALT filed six Registration Statements with the SEC, *see* **TAC Appendix Exhibit F**, registering mortgage-backed securities backed primarily by:

a)   first lien mortgage loans secured by one- to four-family residential properties;

b)   mortgage loans secured by first liens on small multi-family residential properties, such as residential apartment buildings or projects containing five to fifty residential units;

c)   collections arising from one or more types of the loans described above which are not used to make payments on securities issued by a trust fund, including excess servicing fees and prepayment charges;

d)   mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or

e)   mortgage-backed securities evidencing an interest in, or secured by, loans of the type that would otherwise be eligible to be loans included in a trust fund and issued by entities other than Ginnie Mae, Fannie Mae, or Freddie Mac.

90.   CWHEQ filed four Registration Statements with the SEC, *see* **TAC Appendix Exhibit F**, registering mortgage-backed securities backed primarily by:

a)   first lien mortgage loans secured by first and/or subordinate liens on one- to four-family residential properties;

b)   closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties; or

c)   home improvement loans, secured by first or subordinate liens on one- to four-family residential properties or by personal property security interests, and home improvement sales contracts, secured by personal property security interests.

Deleted: SAC

Deleted: C

Deleted: SAC

Deleted: C

Deleted: SECOND

91.   CWABS filed five Registration Statements with the SEC *see* **TAC Appendix Exhibit F**, registering mortgage-backed securities backed primarily by:

a)   first lien mortgage loans secured by one- to four-family residential properties;

b)   mortgage loans secured by first liens on small multi-family residential properties, such as residential apartment buildings or projects containing five to fifty residential units;

c)   closed-end and/or revolving home equity loans, secured in whole or in part by first and/or subordinate liens on one- to four-family residential properties; or

d)   home improvement loans, secured by first or subordinate liens on one- to four-family residential properties or by personal property security interests, and home improvement sales contracts, secured by personal property security interests.

92.   CWMBS filed five Registration Statements with the SEC, *see* **TAC Appendix Exhibit F**, registering mortgage-backed securities backed primarily by:

a)   first lien mortgage loans secured by one- to four-family residential properties or participations in that type of loan;

b)   mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or

c)   private mortgage-backed securities backed by first lien mortgage loans secured by one- to four-family residential properties or participations in that type of loan.

93.   Prior to securitization, Countrywide sent the "Loan Level File" to the Rating Agencies to enable them to rate the Certificates.  Upon receipt of the "Loan Level File," S&P would run the loan tape through both its "LEVELS" and "SPIRE" Models.  Moody's would run the loan tape through its M-3 Model. These models analyzed 50-80 loan characteristics (*e.g.,* FICO score, LTV ratio,

Deleted: SAC

Deleted: C

Deleted: SAC

Deleted: C

Deleted: SECOND

property location, etc.), in order to estimate the number of loans that were likely to default and the corresponding amount of the dollar loss resulting from such default.

94.   As a condition to the issuance of the Certificates, the Rating Agencies had to assign pre-determined ratings to the Certificates.  Yet, as detailed herein, the ratings at the time of issuance were vastly higher than they should have been and failed to represent the true value of the Certificates due to incorrect information provided by Countrywide and widespread misrepresentations in the origination process.   Accordingly, despite the fact that the Rating Agencies assigned investment-grade ratings, the Certificates were far riskier than other investments with the same ratings.

95.   The models purported to calculate the amount of "credit enhancement" required to assign a specific set of Certificates "AAA" ratings.  As a result of relatively low levels of credit enhancement being required, as reflected in **TAC** **Appendix Exhibit** **I**, on average, 92% of the Certificates in each Offering were assigned AAA/maximum safety ratings.

96.   These ratings, although based on inaccurate assumptions, were critical to institutional investors – public pension funds, banks, insurance companies and mutual funds – whose investment guidelines restrict investments based on a security's rating.

## VII. EVIDENCE OF SYSTEMIC DISREGARD OF STATED LOAN ORIGINATION GUIDELINES CONTAINED IN OFFERING DOCUMENTS

### A.   Exponential Increase in Certificate Default Rates in Months After Issuance No Matter When Offering Occurred Evidences Disregard of Origination Guidelines

97.   The defective nature of the mortgage collateral underlying the Certificates is reflected by the recurring pattern of exponential increases in borrower delinquencies in the months after each of the Offerings was commenced.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          44

Deleted: SAC

Deleted: G, 90

Deleted:

Formatted: Indent: First line: 0"

Deleted: SECOND

98.   Four months after each of the Offerings was commenced, borrower delinquency and default rates on the underlying mortgage collateral had increased by a staggering 1,673% – from an average of 0.17% to over 3.06% of the mortgage loan balance.  By the sixth month after issuance of the Certificates, delinquency and default rates had increased 2,601% to an average of 4.66% of the mortgage loan balance.  And shockingly, by 12 months after the Offering date, delinquency and default rates had increased by almost 6,000% from issuance to 10.5% of the mortgage loan balance.  Borrower default and delinquency rates in the underlying mortgage collateral have continued to increase.

99.   These early payment defaults and delinquency rates are reflective of a systematic disregard for underwriting guidelines.  As reported by the Federal Bureau of Investigation ("FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  The study cited by the FBI and conducted by Base Point Analytics found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not.  The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more and fictitious employers and falsified tax returns.  The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., in concluding that the top states for mortgage fraud – including the states where the MBS collateral was principally originated – were also the top states with the highest percentage of early payment defaults.

100.   As of the filing of the Amended Luther Complaint in October 2008, borrower delinquency and default rates had risen to an average of approximately 42% of the mortgage loan collateral underlying the Certificates, forcing the Rating Agencies to downgrade substantially all of the Certificates to at or near junk bond status.  As of the date of the filing of the complaint in the above-captioned action

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT        45

---

Deleted: 816
Deleted: 14
Deleted: 2.7
Deleted: 3,064
Deleted: 5
Deleted: 8,508
Deleted: 12.1
Deleted: set forth above, it is now apparent that Countrywide mortgage originators routinely encouraged such misstatements in loan applications. Unsurprisingly, this has resulted in dismal performance
Deleted: loans.  As of the
Deleted: SECOND

in January 2010, *over 59%* of mortgage collateral was considered to be in some form of delinquency or default, with *over 85%* of the mortgage loans underlying the Offerings issued by Defendant CWALT at issue herein being delinquent or in default.

101.   Despite assurances by the Defendants in the Offering Documents that the mortgage loans collateralizing the Certificates were originated pursuant to Countrywide's stated guidelines, nothing could have been further from the truth.

**B.  Rating Agencies Collapsed Certificate Ratings to "Junk Bond" Levels Due to Undisclosed "Aggressive Underwriting" Practices**

102.   The Rating Agencies rated the Certificates pursuant to the following twenty-three (23) level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

Deleted: SECOND

103.   As noted above, the Rating Agencies initially assigned the highest ratings of AAA/maximum safety to 100%, or $2.63 billion, of the Certificates at issue herein.  *See* **SAC Appendix Exhibit J**.

104.   As of the filing of the FAC, as set forth directly above, the underlying collateral has largely failed, with ***over 59%*** of the total mortgage loan balance now severely delinquent, in default, repossessed, in bankruptcy or in foreclosure.  This performance was an indication to the Rating Agencies, including S&P and Moody's, of pervasive underwriting failures in the origination of the collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes.

105.   On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous Certificates because the performance of the underlying collateral "called into question" the accuracy of the loan data.  This announcement triggered several government investigations which only began reporting their findings in 2008.  Specifically, S&P announced that it was revising its methodology assumption to require increased "credit protection" for rated transactions.  S&P reiterated that it would also seek in the future to review and minimize the incidence of potential underwriting abuse given "the level of *loosened underwriting* at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

106.   One day later, on July 11, 2007, Moody's announced it was also revising its methodology used to rate the Certificates, and anticipated Certificate downgrades in the future.  Moody's did in fact significantly downgrade most of the Certificate classes, noting "aggressive underwriting" used in the origination of the collateral.

107.   As a result, the Certificates were downgraded as many as 20 levels with, for example, 89%, or $2.3 billion, of the total $2.6 billion of Certificates

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT        47

Deleted: 90
Deleted: 16.03
Deleted: this Complaint
Deleted: 60
Deleted: 22
Deleted: 90
Deleted: 14.5
Deleted: 16.03
Deleted: SECOND

initially rated AAA/maximum safety now having been downgraded from AAA to "B2 ('highly speculative')" or below, meaning these Certificates were not only designated "junk bonds," but were assessed to be in danger of "imminent default." 100%, or $2.6 billion, of the Certificate tranches have now been downgraded, with 89%, or $2.3 billion, of the total Certificates at issue having now been downgraded to speculative "junk" status.

108.   Countrywide's systematic disregard for its underwriting guidelines led to dramatic downgrades of the Certificates as set forth directly above. Currently, 89% ($2.3 billion) of the $2.6 billion of Certificates initially rated AAA/maximum safety have been downgraded to speculative "junk" status or below. Delinquency and default rates on the Countrywide loans in the Certificates have risen exponentially by over 33,000% since issuance of the Certificates – from 0.17% as of the respective Offering dates to *over 59%* as of May 2010.

109.   Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to the loan originators which further evidenced that they had engaged in underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statements and Prospectus Supplements.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT                    48

### C.   Government Investigations Reveal the Falsity of the Offering Documents[9]

110.  Although the poor performance of the MBS alone strongly suggests that Countrywide's lending practices were far from was disclosed in the Prospectus Supplements, there is substantial additional evidence that also indicates that the statements in the Prospectus Supplements about loan quality and loan underwriting practices were materially inaccurate.   Among this evidence are statements by former Countrywide employees, facts which have emerged in ongoing litigation involving the SEC (including a recent judicial opinion dealing with disclosures by Countrywide), facts set out in complaints filed by state attorneys general, facts set out in filings by private litigants and information from press reports and other sources.

111.  Taken together, these facts indicate that, while the Offering Documents represented that Countrywide's underwriting of mortgages was designed to ensure the borrower's ability to repay the mortgage and the adequacy of the collateral supporting the mortgage, in reality Countrywide's underwriting practices were actually designed to originate as many mortgage loans as possible without regard to the ability of borrowers to afford such mortgages.   Indeed, contrary to the representations in the Registration Statements and Prospectus Supplements, it has now been revealed that Countrywide's loan originators systemically disregarded and/or manipulated the income, assets and employment

---

[9]   The allegations set forth in Sections VII(C) and (D) of this Complaint are derived from investigations and lawsuits involving one or more of the Countrywide Defendants or entities referred to herein by or on behalf of the Securities and Exchange Commission (¶¶112-118), various Attorneys General Offices (¶¶119-133) and private litigants (¶¶134-148).  Counsel for Plaintiffs personally contacted those responsible for the investigation and development of the allegations set forth in these sections and confirmed their validity.  Furthermore, each of these allegations was made in a signed complaint filed consistent with Rule 11 of the Federal Rules of Civil Procedure or corresponding State rule.  As such, Plaintiffs maintain that there exists a good faith belief that such allegations are true and accurate to the extent they describe the fraudulent lending practices being engaged in at Countrywide during the time the mortgages in question were originated and securitizations took place.

1    status of borrowers seeking mortgage loans in order to qualify these borrowers for

2    mortgages that were then pooled and used as collateral for the MBS sold to

3    Plaintiffs.  In many instances, this was done by inflating borrowers' stated income,

4    or facilitating income inflation by encouraging ineligible borrowers to resort to "no

5    documentation loans" and "stated income loans."   In other cases, Countrywide

6    customers were steered to more expensive, higher interest loans, such as subprime

7    and "alternative" mortgages, which they would not likely be able to repay, because

8    making such loans allowed Countrywide to increase the number of attractive

9    mortgages it could sell to the secondary mortgage markets.  As set forth below,

10   Countrywide's notorious origination practices were pervasive throughout the

11   United States and throughout the time period during which the Offerings were

12   issued.

13        112.  On June 4, 2009, the SEC filed a complaint against Mozilo,

14   Countrywide's former Chief Executive Officer, and against two Defendants in this

15   case, Sambol and Sieracki (the "SEC Complaint").  The SEC Complaint alleges

16   that the defendants in that case made material false statements in Countrywide's

17   SEC filings and in other forums about the quality of Countrywide's residential

18   mortgage loans and about the underwriting process for those loans.  According to

19   the SEC, the underwriting process for Countrywide loans was far less rigorous than

20   what the defendants in that case had stated and, consequently, the quality of

21   Countrywide's loans was much poorer than was indicated by those public

22   statements.

23        113.  The allegations in the SEC Complaint that Countrywide and its

24   officers substantially overstated the quality of the company's residential mortgage

25   loan underwriting and, as a result, issued mortgage loans of a far worse quality

26   than Countrywide publicly disclosed are materially similar to the allegations made

27   by Plaintiffs in this case.  Although the statements targeted by the SEC were made

28   to Countrywide's shareholders in SEC filings, statements made in Offering

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT        50

Deleted: <#>On or about March 10, 2008, the FBI disclosed that it had initiated a probe into Countrywide's mortgage lending practices, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and Countrywide's specific instructions to underwriters not to scrutinize certain types of loans it issued.  The next day, *The Wall Street Journal* published an article detailing the FBI investigation of Countrywide's lending practices.  According to the sources interviewed by *The Wall Street Journal*, federal investigators were finding that "Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients, according to people involved in the matter.  The company packaged many of those mortgages into securities and sold them to investors, raising the additional question of whether Countrywide understated the risks such investments carried."  Subsequently, on April 2, 2008, a federal bankruptcy judge overseeing the proceedings of more than 300 Countrywide-related bankruptcies ordered a further inquiry into the misconduct, and specifically, the illegal inflation of fees throughout the loan process that had been occurring at Countrywide.  ¶

Deleted: basis for the

Deleted: Complaint –

Deleted: –

Deleted: SECOND

Documents for securities that securitized the mortgage collateral were similarly false and misleading to MBS investors.

114.   Based on discussions with one of the attorneys of record involved in the filing of the SEC Complaint, the basis for the allegations in the SEC Complaint was an extensive investigation done by the SEC and its investigators into Countrywide's fraudulent lending practices, namely during the period of 2005-2007, prior to drafting the complaint and commencing the lawsuit. The SEC's investigation spanned several months and testimony was taken from various confidential sources, many of which were former Countrywide employees. Counsel for the SEC stated that the SEC had a good faith belief that each and every allegation set forth in the Complaint was true and corroborated, and does not believe that there is any chance of a Rule 11 violation by the SEC with respect to the allegations in the complaint.

115.   The SEC Complaint alleges, among other things:

- Countrywide embarked on a strategy of underwriting a higher number of exception loans. The SEC alleges that "[t]he elevated number of exceptions resulted largely from Countrywide's use of exceptions as part of its matching strategy to introduce new guidelines and product changes." SEC Complaint, ¶29.  By February 2007, internal risk management "noted that the production divisions continued to advocate for, and operated pursuant to, an approach based upon the matching strategy alone. ...  Additionally, [a senior risk management employee warned [Sambol] that, 'I doubt this approach would play well with regulators, investors, rating agencies etc. *To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines*.'" SEC Complaint, ¶44 (emphasis added).

- Countrywide's risk management reported to the credit risk committee on June 28, 2005, that there was "evidence of borrowers misrepresenting their income and

Deleted:

Deleted:

Deleted: SECOND

occupation on reduced documentation loan applications." SEC Complaint, ¶37.

- By June 2006 "both Mozilo and Sambol were aware ... that a significant percentage of borrowers who were taking out stated income loans were engaged in mortgage fraud." SEC Complaint, ¶40. For example, "[o]n June 2, 2006, Sambol received an email reporting on the results of a quality control audit at Countrywide Bank that showed that 50% of the stated income loans audited by the bank showed a variance in income from the borrowers' IRS filings of greater than 10%. Of those, 69% had an income variance of greater than 50%." *Id.*

- Angelo Mozilo, Countrywide's CEO, noted in an April 13, 2006 email "that he had 'personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan [*sic*].'" SEC Complaint, ¶49.

- A December 13, 2007 internal Countrywide memorandum reveals, "'Countrywide had reviewed limited samples of first- and second-trust-deed mortgages originated by Countrywide Bank during the fourth quarter of 2006 and the first quarter of 2007 in order to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures. The review resulted in ... the finding that borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans. More specifically, debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or any increase in interest.'" SEC Complaint, ¶56.

- A senior risk management employee warned defendant Sambol on May 22, 2005 "of the likelihood of significantly higher default rates in loans made on an exception basis: '[t]he main issue is to make sure everyone's aware that we will see higher default rates.'" SEC Complaint, ¶54. According to the SEC Complaint, the senior risk management employee explained to

Sambol "that exceptions are generally done at terms more aggressive than our guidelines,' and continued that '[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions.' [The senior risk management employee further] warned [Sambol] that increased defaults would cause repurchase and indemnification requests to rise and the performance of Countrywide-issued MBS to deteriorate." *Id.*

116.   On November 3, 2009 U.S. District Judge John Walter denied in their entirety defendants' motions to dismiss the SEC Complaint, holding, among other things, that the SEC had adequately alleged that defendants in that case had made statements that materially exaggerated the quality of Countrywide's residential mortgage-backed loans.

117.   There was apparently no dispute in the SEC litigation that defendants in that case, like Defendants here, had repeatedly made statements asserting that Countrywide's residential mortgage loans were of high quality.  The defendants did not dispute that they had made the statements that the SEC said they had made – many of these statements were in SEC filings that the defendants had indisputably filed or caused to be filed.  Defendants did, however, ask the court to take judicial notice of numerous other SEC filings containing additional information relating to Countrywide's loans, a request that was granted.  Notably, defendants used the judicially noticed documents they had brought to the court's attention to "argue that the majority of the misstatements and omissions were not material or misleading as a matter of law in light of Countrywide's extensive disclosures and the context of the alleged misstatements or omissions."  *SEC v. Mozilo*, CV 09-3994-JFW (MANx), 2009 U.S. Dist. LEXIS 104689, at *25-26 (C.D. Cal. Nov. 3, 2009).

118.   Judge Walter flatly rejected this argument, explaining that "neither Countrywide's disclosures nor a careful review of the context of the statements

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          53

**Deleted:** SECOND

convince this Court that the alleged omissions or misstatements were immaterial or not misleading as a matter of law.  Accordingly, the Court concludes that the SEC on the whole has adequately alleged that Defendants have made false or misleading statements or omissions of material fact." *Id.* at *26.

119.   In addition, numerous attorneys general have initiated investigations into Countrywide's lending practices and also have alleged that Countrywide systematically departed from the underwriting standards it professed to use to originate residential loans.

120.   The Illinois Attorney General initiated a lawsuit against Countrywide and Mozilo, contending that the company and its executives sold borrowers costly and defective loans that quickly went into foreclosure. *See People of the State of Illinois v. Countrywide Fin. Corp.*, No. 08CH22994 (Cook County Ch. Ct.) (the "First Illinois AG Complaint").

121.   Based on discussions with one of the attorneys of record involved in the filing of the First Illinois AG Complaint, the basis for the allegations in the First Illinois AG Complaint was an extensive investigation done by the Illinois AG's Office and its investigators into Countrywide's fraudulent lending practices, namely during the period of 2005-2007, prior to drafting the complaint and commencing the lawsuit. The Illinois AG Office's investigation spanned several months and testimony was taken from various confidential sources, many of which were former Countrywide employees.  Counsel in the Illinois AG Office stated that they had a good faith belief that each and every allegation set forth in their complaint was true and corroborated, and does not believe that there is any chance of a Rule 11 violation by the Illinois AG with respect to the allegations in the complaint.

122.   The First Illinois AG Complaint alleges, based on evidence from Countrywide employees whom the Illinois Attorney General interviewed, that Countrywide employees were incentivized to increase the number of loan

**Deleted:** Additionally,

**Deleted:** SECOND

originations without concern for whether the borrower was able to repay the loan. Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of Countrywide's stated income loans were based on inflated estimates of borrowers' income.  For example, according to the First Illinois AG Complaint: (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.  Furthermore, to supplement an employee's judgment as to whether a potential borrower's income was "reasonable," Countrywide required its employees to utilize a website, www.salary.com.  Even if the stated salary was outside of the range provided by the website, Countrywide employees could still approve the loan.  The Illinois Attorney General alleged that the "reasonableness" test contravened proper underwriting practices.

123.  As the Illinois Attorney General explained, "[t]his mounting disaster has had an impact on individual homeowners statewide and is having an impact on the global economy."  *The New York Times* reported that the complaint, derived from 111,000 pages of Countrywide documents and interviews with former employees, "paints a picture of a lending machine that was more concerned with volume of loans than quality."  *See* Gretchen Morgenson, "Illinois to Sue Countrywide," *N.Y. Times* (June 25, 2008).

124.  In a second complaint filed on June 29, 2010, the Illinois Attorney General further enumerated the problems with Countrywide's origination practices, including that Countrywide engaged in discriminatory and predatory lending.  *See People of the State of Illinois v. Countrywide Fin. Corp.,* No. 10CH27929 (Cook County Ch. Ct.) (the "Second Illinois AG Complaint").  There, the Illinois Attorney General sets forth how CFC incentivized its employees to sell riskier

subprime loans with higher spreads, paying its brokers more for those riskier loans than for originating prime loans.

125.    Based on discussions with one of the attorneys of record involved in the filing of the Second Illinois AG Complaint, the basis for the allegations in the Second Illinois AG Complaint was an extensive investigation done by the Illinois AG's Office and its investigators into Countrywide's fraudulent lending practices, namely during the period of 2005-2007, prior to drafting the complaint and commencing the lawsuit. The Illinois AG Office's investigation spanned several months and testimony was taken from various confidential sources, many of which were former Countrywide employees.  Counsel in the Illinois AG Office stated that they had a good faith belief that each and every allegation set forth in their complaint was true and corroborated, and does not believe that there is any chance of a Rule 11 violation by the Illinois AG with respect to the allegations in the complaint.

126.    California's Attorney General also commenced an investigation into Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, entitled *People of the State of California v. Countrywide Fin. Corp.*, No. LC081846 (Los Angeles Super. Ct.) (the "California AG Complaint").  The California AG Complaint also alleged that Countrywide routinely departed from its stated underwriting standards.

127.    Based on discussions with one of the attorneys of record involved in the filing of the California AG Complaint, the basis for the allegations in the California AG Complaint was an extensive investigation done by the California AG's Office and its investigators into Countrywide's fraudulent lending practices, namely during the period of 2005-2007, prior to drafting the complaint and commencing the lawsuit. The California AG Office's investigation spanned several months and testimony was taken from various confidential sources, many of which were former Countrywide employees.  Counsel in the California AG Office stated

Deleted: SECOND

that they had a good faith belief that each and every allegation set forth in their complaint was true and corroborated, and does not believe that there is any chance of a Rule 11 violation by the California AG with respect to the allegations in the complaint.

128. For example, the California AG Complaint alleged that employees were incentivized to make exceptions to underwriting standards and failed to verify borrower documentation and information.  According to the California AG Complaint, Countrywide used a system called CLUES (Countrywide Loan Underwriting Expert System), to provide a loan analysis report that indicated whether the loan was within Countrywide's underwriting guidelines.  CLUES reports indicating a loan was not originated within the purview of Countrywide's underwriting guidelines often were ignored in order to effectuate the loan.

129. Further, consistent with the allegations of the Illinois Attorney General, California Countrywide employees cited in the California AG Complaint also claimed to have utilized the website www.salary.com to purportedly confirm a borrower's stated income.  However, according to the California AG Complaint, California employees would know ahead of time the range of salaries that www.salary.com would provide for a particular job and, therefore, know by how much they could overstate a borrower's income.  A former California loan officer for Countrywide further explained that its loan officers typically told potential borrowers that "with your credit score of X, for this house, and to make X payment, X is the income that you need to make"; after which the borrower would state that he or she made X amount of income.

130. Likewise, the Connecticut Attorney General filed a complaint in Superior Court, Judicial District of Hartford, entitled *State of Connecticut v. Countrywide Fin. Corp.*, No. CV08-40390945 (Hartford Super. Ct.) ("Connecticut AG Complaint"), alleging that Countrywide's employees inflated borrowers' incomes in order to qualify them for loans they otherwise would not have received.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          57

**Deleted:** .).

**Deleted:** SECOND

131. Based on discussions with one of the attorneys of record involved in the filing of the Connecticut AG Complaint, the basis for the allegations in the Connecticut AG Complaint was an extensive investigation done by the Connecticut AG's Office and its investigators into Countrywide's origination and lending practices, namely during the period of 2005-2007, prior to drafting the complaint and commencing the lawsuit. The Connecticut AG Office's investigation spanned several months and interviews were conducted with various sources, including borrowers who obtained loans from Countrywide.  Counsel in the Connecticut AG Office stated that they had a good faith belief that each and every allegation set forth in their complaint was true and correct, and does not believe that there is any chance of a Rule 11 violation by the Connecticut AG with respect to the allegations in the complaint.  Soon after the complaint was filed Countrywide settled the claims with the Connecticut AG.

132. Investigations in other states such as Washington, West Virginia, Indiana and Florida contain many of the same types of allegations in the Illinois, California and Connecticut complaints.

133. On October 6, 2008, certain of the Countrywide Defendants settled lawsuits brought by eleven attorneys general for approximately $8.4 billion.

**D. Allegations in Numerous Civil Lawsuits Involving Countrywide Show the Falsity of the Offering Documents**

134. On February 15, 2008, Countrywide shareholders filed a consolidated complaint in the U.S. District Court for the Central District of California alleging derivative claims against the officers and directors of Countrywide, in an action styled *In re Countrywide Fin. Corp. Derivative Litig.*, No. 07-CV-06923-MRP-(MANx) (C.D. Cal.) (the "Derivative Complaint").  The derivative litigation was subsequently dismissed because of the plaintiffs' lack of standing

135. Based on discussions with one of the attorneys of record involved in the filing of the Derivative Complaint, the basis for the allegations in the

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          58

Deleted: have confirmed

Deleted: .

Deleted: <#>Further, the Massachusetts Attorney General set forth details of Underwriter Defendant Morgan Stanley's subprime conduct in a settlement agreement entered on June 24, 2010 in which Morgan Stanley agreed to pay $102 million in compensation to homeowners and the Commonwealth of Massachusetts.  Although Morgan Stanley denied all wrongdoing, the Massachusetts Attorney General set out that Morgan Stanley routinely ignored warning reports from Clayton Holdings, Inc. ("Clayton"), a due diligence firm, showing that mortgages originated by another defunct subprime originator, New Century Financial ("New Century"), did not meet their underwriting guidelines. Despite being advised by Clayton of underwriting guideline violations, Morgan Stanley repeatedly purchased and securitized New Century loans that did not have sufficient compensating factors to offset their failure to meet the underwriting guidelines.  Widespread government investigations suggest that Morgan Stanley was typical of banks such as the Underwriter Defendants in ignoring warnings from due diligence firms like Clayton.¶
<#>On July 24, 2008, *The Los Angeles Times* reported that "three big Southland lenders (are) under federal investigation; Sources say IndyMac, Countrywide and New Century [have been] subpoenaed." *The Los Angeles Times* further reported that officials have begun to investigate the value of mortgage-backed securities;¶
¶
A federal grand jury in Los Angeles has begun probing three of the nation's largest subprime mortgage lenders in the clearest sign yet that prosecutors are investigating whether fraud and other crimes contributed to the mortgage debacle.¶
*Grand jury subpoenas have been issued in recent weeks and months to Countrywide Financial Corp., Ne* ... [6]

Deleted: .  The settlement, valued at

Deleted: <#>, detailed a program whereby existing loans would be modified: ¶
¶
[B]orrowers were placed in the riskiest loans, including adjustable-rate ... [7]

Formatted: Style Legal Paras + 14 pt Char, Font: 12 pt, Font color: Red, Strikethrough

Formatted: Legal Paras, Indent: Left:  0", Right:  0", Space After:  0 pt, Line spacing:  Exactly 12 pt, Tabs: Not at  5.45"

Deleted: Other

Formatted: Indent: First line:  0"

Deleted: SECOND

Derivative Complaint was an extensive investigation done by Plaintiffs' Counsel in the Derivative Action its investigators into Countrywide's fraudulent lending practices, namely during the period of 2005-2007.  The investigation spanned several months and interviews were conducted with various confidential sources, many of which were former Countrywide employees.  Counsel for the Derivative Plaintiffs stated that they had a good faith belief that each and every allegation set forth in their complaint was true and corroborated, and does not believe that there is any chance of a Rule 11 violation with respect to the allegations in the complaint.

136.   The Derivative Complaint cited information obtained from several confidential sources who were former Countrywide employees who stated that the vast majority of Countrywide's loans were underwritten in contravention of the company's stated underwriting standards.  According to one of the confidential sources in that complaint, a former "Underwriter II" (a Countrywide employment classification) based in a Jacksonville, Florida processing center between June 2006 and April 2007, because of a campaign by Countrywide to increase the volume of loan originations, as much as 80% of the loans originated by Countrywide in that office involved significant variations from Countrywide's normal underwriting standards.

137.   According to another confidential witness cited in the Derivative Complaint, a Senior Underwriter in Roseville, California, from September 2002 to September 2006, Countrywide would regularly label loans as "prime" even if made to unqualified borrowers (including those who had recently gone through a bankruptcy and were still having credit problems).  According to that confidential witness, Countrywide's lending practices became riskier in 2006 and Countrywide more lax in enforcing its underwriting policies.

138.   Another confidential witness cited in the Derivative Complaint, an Executive Vice President of Production Operations and later an Executive Vice

**Deleted:** SECOND

President of Process Improvement who worked at Countrywide for 17 years before leaving in October 2005, disclosed that Countrywide created a computer system (or "rules engine") that routed highly risky loans out of the normal loan approval process to a central underwriting group for evaluation.  The system was called the Exception Processing System.  According to that source, the Exception Processing System identified loans that violated Countrywide's underwriting requirements.  However, according to the same source, loans identified by the Exception Processing System as violating underwriting standards were *not* rejected.  Rather, Countrywide executives wanted the company's Central Underwriting group to review such loans to evaluate whether these loans should require a higher price (upfront points) or a higher interest rate in light of the violation at issue.  Central Underwriting entered information into the Exception Processing System about its decisions to approve such loans and charge additional fees to the borrower.

139.  Yet another confidential source in the Derivative Complaint, an underwriter from Long Island, New York at Countrywide between March 2000 and January 2007, stated that Countrywide extended loans to individuals with increasing debt-to-income ratios.  Initially, Countrywide limited debt-to-income ratios to 38%, but this rose to 50%.  According to this source, Countrywide branch managers' compensation was tied to loan origination volume and not the quality of the loans.  Thus, according to this source, branch managers pushed originators to sell more loans despite the riskiness of these loans.  Additional confidential sources in the Derivative Complaint confirmed this.

140.  Indeed, according to yet another confidential source in the Derivative Complaint, Countrywide simply "didn't turn down loans."  Rather, Countrywide "'did whatever they had to do to close loans' including making exceptions to underwriting guidelines – everyone was motivated to increase loan volume and 'approv[e] things that should not have been approved.'"

141.  On September 30, 2008, MBIA Insurance Corp. ("MBIA"), one of the

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          60

Deleted: <#>On January 6, 2009, purchasers of Countrywide common shares filed a second amended complaint in the U.S. District Court for the Central District of California, captioned *In re Countrywide Fin. Corp. Sec. Litig.*, No. 07-CV-05295-MRP-(MANx) (C.D. Cal.) (the "Securities Complaint").  Facts set forth in the Securities Complaint confirm major, systematic irregularities in Countrywide's loan origination practices.  The Securities Complaint cited information obtained from several confidential sources who were former Countrywide employees who stated that the vast majority of Countrywide's loans were underwritten in contravention of the company's stated underwriting standards.  The securities litigation recently settled for $624 million. ¶
<#>Among numerous internal Countrywide sources cited in the Securities Complaint, one, a supervising underwriter at Countrywide until mid-2005 who oversaw the company's underwriting operations in several states (the "Supervising Underwriter"), stated that the underwriting guidelines were repeatedly lowered, and "very loose and lax" and designed to help Countrywide make more loans (as opposed to protecting the entity that ended up taking on the credit risk that the borrower would default on the mortgage). ¶
<#>The Supervising Underwriter further stated that from late 2004, Countrywide's Structured Loan Desks employed the Exception Processing System in order to obtain approval for loans that were exceptions to and should have been rejected by Countrywide's underwriting standards.  As many as 15% to 20% of the loans generated each day at the Company's Structured Loan Desks were run through the Exception Processing System and very few were ever rejected. ¶
<#>The Supervising Underwriter further stated that if a potential borrower applying for a stated income, stated asset ("SISA") loan provided a bank name, address and account number for asset verification, it was the practice at Countrywide not to verify the bank balance. ¶
<#>According to another confidential source identified in the Securities Complaint, and confirmed by an April 6, 2008 article in *The New York Times*, even though Countrywide had the right to verify stated income on an application through the Internal Revenue Service ("IRS") (and this check took less than one day to complete), income was verified with the IRS on only 3%-5% of all loans funded by Countrywide in 2006.¶
<#>The Securities Complaint also details that the appraisals obtained by Countrywide underwriters were not independent or accurate.  For example, since at least 2005, loan officers from all of Countrywide's origination divisions were permitted to (i) hire appraiser ... [8]

Deleted: SECOND

largest providers of bond insurance, filed a complaint against Countrywide in New York state court, entitled *MBIA Ins. Corp. v. Countrywide*, No. 08/602825 (N.Y. Sup. Ct.) (the "MBIA Complaint").   The MBIA Complaint alleges that Countrywide fraudulently induced MBIA to provide insurance for certain investment certificates, including those contained in the following trusts: CWHEQ 2005-E; CWHEQ 2005-I; CWHEQ 2005-M; CWHEQ 2006-E; CWHEQ 2006-G; CWHEQ 2006-S8; CWHEQ 2007-E; CWHEQ 2007-S1; CWHEQ 2007-S2; and CWHEQ 2007-S3.

142.   Based on discussions with one of the attorneys of record involved in the filing of the MBIA Complaint, the basis for the allegations in the MBIA Complaint was an extensive investigation done by Plaintiffs' Counsel in the MBIA Action into Countrywide's fraudulent lending practices, namely during the period of 2005-2007.  The investigation spanned several months and an intensive analysis was performed on files obtained by MBIA which served as the basis for the allegations in the complaint.  Counsel for the MBIA Plaintiff stated that they had a good faith belief that each and every allegation set forth in their complaint was true and corroborated, and does not believe that there is any chance of a Rule 11 violation with respect to the allegations in the complaint.

143.   MBIA was able to obtain approximately 19,000 loan files for the Certificates it insured as a result of its contractual agreements with Countrywide. After reviewing the portfolios and re-underwriting each loan provided by Countrywide, MBIA discovered that there was "***an extraordinarily high incidence of material deviations from the underwriting guidelines Countrywide represented it would follow***." MBIA Complaint, ¶78 (emphasis added).  MBIA discovered that many of the loan applications "lack[ed] key documentation, such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-income] or

Deleted:

Deleted: SECOND

CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible exception)." MBIA Complaint, ¶79. Significantly, "MBIA's re-underwriting review ... revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies." On April 27, 2010, the Supreme Court of the State of New York, although determining that MBIA did not have a legal claim for negligent misrepresentation, denied a motion to dismiss MBIA's claims of fraud against several Countrywide entities and Bank of America.

144. Furthermore, in an action commenced against Countrywide for wrongful termination, styled *Zachary v. Countrywide Fin. Corp.*, No. 4:08-cv-00214, currently pending in the U.S. District Court for the Southern District of Texas, the plaintiff, Mark Zachary ("Zachary"), a Regional Vice President of Countrywide KB Home Loans, Inc. ("CWKB"), alleged that CWKB, a 50-50 joint venture between Countrywide and KB Home Loans ("KB Home"), engaged in a host of mortgage origination and underwriting activities that did not comport with stated and standard practices. Zachary described how loan officers would go so far as to help the loan applicant submit a loan application with false income amounts, so that the applicant would get the loan under false pretenses.

145. Based on discussions with one of the attorneys of record involved in the filing of the Zachary Complaint, the basis for the allegations in the Zachary Complaint was an extensive investigation done by Plaintiff's Counsel in the Zachary Action and Plaintiff's first-hand account of wrongdoing by Countrywide in or around 2005-2007. Counsel for the Zachary Plaintiff stated that they had a good faith belief that each and every allegation set forth in their complaint was true and corroborated, and does not believe that there is any chance of a Rule 11 violation with respect to the allegations in the complaint.

146. According to Zachary, one of these practices involved CWKB's practice of "flipping" a loan application from a "full documentation" loan program

---

Deleted:

Deleted: <#>On April 11, 2008, an amended complaint for violations of the federal securities laws was filed against Countrywide in the U.S. District Court for the Central District of California. *See Argent Classic Convertible Arbitrage Fund LP v. Countrywide Fin. Corp.*, No. 07-CV-7097-MRP-(MANx) (C.D. Cal.). The complaint identified specific deviations from Countrywide's stated underwriting guidelines. For example, in connection with the "No Income/No Asset Documentation Program," Countrywide represented that "[t]his program is limited to borrowers with excellent credit histories." However, Countrywide routinely extended these loans to borrowers with weak credit and knew that such "low doc" or "no doc" loans, particularly when coupled with nontraditional products like ARMs, likely contained misinformation from the borrower, such as overstated incomes, that increased the likelihood of defaults. Because borrowers were advised that their representations on loan applications would not be verified, Countrywide employees referred to these products as "liar loans." ¶

Deleted: SECOND

to a "stated income" or "no income, no asset" loan program.  He learned that loans were being canceled at the prime regional operations center as full documentation loans and transferred to the subprime operations center in Plano, Texas, as stated asset, stated income ("SISA") loans, a "low-doc" loan, or no income, no assets ("NINA") loans, a "no-doc" loan.  Otherwise known as "liar loans," NINA loans allowed a borrower to simply state their income without providing any documentation or proof of this income.  Thus, rather than denying an applicant based on the information revealed in the original mortgage application, Countrywide pretended that it did not see the disqualifying information, such as insufficient income or assets, and instead, allowed applicants to apply for a no documentation loan, implicitly encouraging them to lie on these renewed applications.

147.  Furthermore, Zachary explained that while a material number of Countrywide's loan applicants were not eligible for any loan program requiring documentation based on the applicant's verified income level and/or job status, CWKB loan officers would (1) cancel the application for the loan program that required documentation, (2) re-do the application as a SISA or a NINA loan through the company's subprime originators in Plano, Texas, and (3) coach the loan applicant as to what income level he or she would need to have in order to qualify for the low-doc or no-doc loan.

148.  Moreover, according to Zachary, Countrywide blatantly ignored its underwriting policies and procedures.  Zachary stated that there was a problem with appraisals performed on homes being purchased with Countrywide loans.  According to Zachary, the appraiser was being strongly encouraged to inflate appraisal values by as much as 6% to allow the homeowner to "roll up" all closing costs.  According to Zachary, this inflated value put the buyer "upside down" on the home immediately after purchasing it, *i.e.*, the borrower owed more than the home's worth.  Thus, the borrower was more susceptible to default.  It also put the

Deleted: SECOND

lender and secondary market investor at risk because they were unaware of the true value of their asset.  According to Zachary, Countrywide performed an audit into these matters in January 2007 which corroborates his story.

**E.    Underwriter Defendants "Contracted Out" and Failed to Conduct Required Due Diligence of Loan Underwriting Guidelines Contained in Offering Documents**

149.    Prior to securitization, a process of cursory "due diligence" on the mortgage loans was conducted.  The review's ostensible purpose was to determine whether the loans contained the requisite legal documentation, were based on an independent appraisal and were originated in accordance with Countrywide's loan underwriting guidelines, which were detailed in the Offering Documents.  The due diligence review that was conducted on the mortgage collateral was not specific to any securitized pool of mortgage loans.  Rather, the due diligence was periodically performed on a small sample of Countrywide's entire "warehouse" of mortgage loans.

150.    The Underwriter Defendants contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to outside firms – Clayton and The Bohan Group ("Bohan") – and then conducted limited oversight of these subcontractors' activities.

151.    As disclosed as part of an ongoing investigation of investment banking misconduct in underwriting MBS being conducted by, among others, the New York Attorney General (the "NYAG") and the Massachusetts Attorney General, Clayton and Bohan routinely provided investment banks with detailed reports of loans non-compliant with underwriting guidelines, but the investment banks just as routinely disregarded the non-compliant loans and included them in securitization pools anyway.  Further, the President of Bohan stated that, by the time the Offerings of the Certificates took place, investment banks were requiring a review of only 5% to 7% of the entire loan pools.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          64

Deleted: <#>Another civil complaint, *Zaldana v. KB Home*, No. CV 08-3399 (EDL), currently pending in the U.S. District Court for the Northern District of California (the "Zaldana Complaint"), further details Countrywide's failure to follow standard appraisal practices.  The Zaldana Complaint described a process whereby KB Home paid Countrywide to make loans with subsidized initial payments to KB borrowers, thereby allowing KB to prop up the ostensible sales prices of KB homes and sell to buyers who would not otherwise be able to afford or qualify for the monthly mortgage payments.  In turn, Countrywide would have its appraisers ignore the subsidies in order to appraise the home at the full stated sales price, thereby inflating the actual value of the home (*i.e.*, the price that a buyer was truly willing to pay for it).¶

Deleted: SECOND

152.   The Underwriter Defendants contracted their due diligence work to Clayton and Bohan.  The outside firms were supposed to examine the loans for conformity with Countrywide's guidelines, as detailed in the Offering Documents. Each loan reviewed was rated as category "1," "2" or "3."  Category "3" loans were defective and recommended for exclusion from securitization, however such loans were routinely included in securitizations despite being defective.  Because the risk of default was passed on to investors in the Certificates rather than held by the Underwriter Defendants or Countrywide, there was no incentive to remove such category "3" loans from the Offerings, because if the Underwriter Defendants rejected any significant portion of the loans, the size of the securitization, and thus the size of the fees derived from the securitization, would decrease significantly.

153.   In June 2007, the NYAG subpoenaed documents from Clayton and Bohan related to their due diligence efforts on behalf of the investment banks, such as Bear Stearns, that underwrote mortgage-backed securities.  The NYAG, along with Massachusetts and Connecticut attorneys general and the SEC (all of which also subpoenaed documents), are investigating whether investment banks held back information they should have provided in the disclosure documents related to the sale of mortgage-backed securities to investors.

154.   In a December 6, 2007 article published in *The New York Times*, it was reported that:

> Andrew Cuomo, the New York attorney-general, has subpoenaed RBS and about 15 of Wall Street's biggest sub-prime mortgage bond underwriters, such as Bear Stearns and Merrill Lynch, requesting information that will help to determine how much due diligence was conducted on the home loan-backed securities that they issued.
>
> *      *      *
>
> Mr. Cuomo is also examining the relationship between mortgage lenders, third party-due diligence firms, the

Deleted: SECOND

credit rating agencies and the underwriting banks to see if they colluded to ignore risks.

Wall Street firms made hefty fees from buying high-risk sub-prime mortgages and packaging them into bonds backed by the home loans' interest payments.  Investors, including Wall Street giants such as Citigroup, as well as hedge funds and pension funds, have collectively lost more than $50 billion this year on sub-prime-backed bonds after a surge in defaults on high-risk home loans forced down their valuations.

Many of Wall Street's underwriters relied heavily on third-party vendors to examine the home loans that were used to back the mortgage bonds.  This helped them to determine how reliable an income stream the underlying mortgages would produce and, in turn, how likely it was that the bonds' interest payments would be met.

Since bond underwriters have an obligation to make sure that the statements made in the securities' Offering Documents are accurate, Mr. Cuomo is investigating how much, if any, due diligence they conducted themselves. He is also seeking to determine whether they should have done more.

155.    In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on Loans," *The New York Times* further reported:

An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.

Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms. But the banks did not disclose the details of these reports to credit-rating agencies or investors.

The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT                66

**Deleted:** SECOND

how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter. Charges could be filed in coming weeks.

\*       \*       \*

The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures. The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.

As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans. In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.

It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans. Some industry officials say such loans made up a quarter to a half of the portfolios they saw. In some cases, the loans accounted for as much as 80 percent. While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.

Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

\*       \*       \*

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a

Deleted: SECOND

1

2

number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco.  Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

* * *

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws.  But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said **lenders and investment banks routinely ignored concerns raised by these consultants.**

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said. "We stopped checking."

(emphasis added).

156.   On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  Both *The New York Times* (J. Anderson and V. Bajaj, "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," *N.Y. Times*, (Jan. 27, 2008)) and *The Wall Street Journal* (A. Efrati and R. Simon, "Due Diligence Firm to Aid New York Subprime Probe," *Wall St. J.* (Jan. 29, 2008)) ran articles describing the nature of the NYAG's investigation and Clayton's testimony.  *The Wall Street Journal* reported that the NYAG's investigation was focused on "the broad language written in prospectuses about the risky nature of these securities," which "changed little in recent years, even as due diligence reports noted that the number of exception loans backing the securities was rising."  According to the

**Deleted:** SECOND

*New York Times* article, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

157.   A March 23, 2008 *Los Angeles Times* article reported that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports" as follows:

> The reviewers' role was just one of several safeguards – including home appraisals, lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system.

> But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start.   Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.

> "The investors were paying us big money to filter this business," said loan checker Cesar Valenz.   "It's like with water.   If you don't filter it, it's dangerous.   And it didn't get filtered."

> As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.

> The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages.   And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

E. Scott Reckard, "Subprime Watchdogs Ignored," *L.A. Times* (Mar. 23, 2008).

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          69

**Deleted:** SECOND

**F.      Additional Government Investigations Further Confirm Systemic Disregard for Mortgage Loan Underwriting Guidelines**

158.   In August 2007, following reports of defaults in mortgage loans underlying various MBS, downgrades of such MBS and potential downgrades of additional MBS in the future, and the resulting illiquidity in the credit markets, the President of the United States commissioned the Secretary of the Treasury, the SEC and the Commodities Futures Trading Commission ("CFTC") (hereinafter referred to as the "President's Working Group" or the "PWG") to investigate the causes of the market turmoil.  After a seven-month investigation, the PWG issued its report on March 13, 2008.  The PWG found as follows:

- A significant erosion of market discipline by those involved in the securitization process, including *originators, underwriters, credit rating agencies, and global investors,* related in part to failures to provide or obtain adequate risk disclosures;

- The turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages*…

(emphasis added).

159.   In December 2007, the Massachusetts Attorney General launched an investigation into Wall Street's securitization of subprime loans.  The investigation focused on the industry practices involved in the issuance and securitization of subprime loans to Massachusetts consumers.  According to a press release issued by the Massachusetts Attorney General's Office,

The Office is investigating whether securitizers may have:

- facilitated the origination of "unfair" loans under Massachusetts law;
- failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;

Formatted: Line spacing: single

Deleted: SECOND

- failed to take sufficient steps to avoid placing problem loans in securitization pools;
- been aware of allegedly unfair or problem loans;
- failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan diligence and the pre-securitization process, as well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

160.   On January 30, 2008, the FBI and SEC launched a joint investigation into 14 investment banks, loan providers and developers as part of a crackdown focusing on the subprime mortgage crisis.  According to the *Los Angeles Times*:

> We're looking at the whole range of those involved – including the investment banks and other entities that bundled the loans up for sale and the institutions that held them and reported [to investors] on their value…

### G.   Underwriter Defendants Employed Rating Shopping Practices to Ensure Inflated Investment Grade Ratings for All the Certificates

161.   The Underwriter Defendants derived their profits from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans.   For the Certificates to sell profitably, approximately 80% of the securitization had to be assigned the highest AAA rating by the Rating Agencies.

162.   As set forth above, the Underwriter Defendants ultimately engaged the Rating Agencies through a "ratings shopping" process.  Initially, a collateral analyst would send the preliminarily structured deal to the Rating Agencies for feedback.  The Underwriter Defendants' in-house rating agency personnel would oversee the communications with the Rating Agencies.  Then S&P, for example, would run the loan tape through both its LEVELS and SPIRE Models again and provide the Underwriter Defendants with the results in an effort to obtain the ratings engagement.   Through the LEVELS Model, S&P would advise the

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          71

**Deleted:** SECOND

Underwriter Defendants responsible for each deal, for example, that 94.25% of the Certificates would be rated AAA as long as 5.75% of the total collateral balance supporting those Certificates was subordinate.  This 5.75% was the amount of loss coverage required.  The Underwriter Defendants would then again "negotiate" with the Rating Agencies before they were hired, in order to get them to agree to the least amount of loss coverage and credit enhancement, and the highest percentage of AAA-designated Certificates.

163.   The Underwriter Defendants used this "ratings shopping" process to obtain the most profitable structure on the Offerings.  Ratings shopping resulted in **_100_**% of the Certificates at issue being initially awarded the AAA/maximum-security rating.

*Deleted: over 90*

164.   Finally however, in 2008, the practice was effectively ended by way of an agreement entered into between the Rating Agencies and the NYAG.  In June 2008, the NYAG announced that after an investigation of the Rating Agencies, it had reached an agreement with S&P, Moody's and Fitch which contemplated a complete overhaul of the then-current ratings procedures and guidelines and put an end to what had been termed "ratings shopping."   Instead of investment banks looking to issue mortgage-backed bonds going to all three agencies for a review, but only using, and paying for, the most optimistic rating, the Rating Agencies would now be paid upfront regardless of whether they were hired to assign a rating, a move expected to remove any potential for conflicts of interest.

*Formatted: Font: Not Bold, No underline*

## VIII. THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING STATED UNDERWRITING AND APPRAISAL STANDARDS

165.   Countrywide was a principal originator for all nine of the SAC Offerings for which the Certificates complained of herein were issued in connection with.  The total value of the nine tranches in the SAC Offerings for

*Deleted: 14*

*Deleted: 14*

*Deleted: SECOND*

which Countrywide was the principal originator was $2.6 billion, of which the Rating Agencies assigned initial ratings of AAA/maximum safety to 100%.

166.  Each Registration Statement at issue herein for the Issuing Trusts contained an illustrative form of a Prospectus Supplement for use in the offering of the Certificates.  Each Registration Statement was prepared by the Issuer Defendants and signed by the Individual Defendants.  At the effective date of the offering of the Certificates, a final Prospectus Supplement was filed with the SEC containing a description of the mortgage pool underlying the Certificates and the underwriting standards by which the mortgages were originated.  The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements.

167.  Countrywide made clear in the Offering Documents that exceptions were made to the underwriting guidelines but only where "compensating factors were demonstrated by the borrowers.  Each Registration Statement filed by CWALT and CWMBS at issue herein, as well as the Prospectus Supplements issued pursuant to those Registration Statements, contained the following language concerning the underwriting standards by which the mortgages pooled into CWALT and CWMBS Offerings were originated:

> All of the Mortgage Loans have been originated or acquired by Countrywide Home Loans, Inc., in accordance with its credit, appraisal and underwriting standards.... Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.
>
> Countrywide Home Loans' underwriting standards are applied, by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          73

portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis, varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. ***Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.***

***See* TAC Appendix Exhibit K;** *see also* **Exhibit L.**

168.  The above statements concerning Countrywide's adherence to its underwriting standards and to federal and state underwriting standards, with respect to mortgages pooled into CWALT and CWMBS Issuing Trusts, contained material misstatements when made because:

a.  Defendants failed to disclose that Countrywide systematically ignored underwriting standards imposed by state and federal law in issuing the mortgages pooled into the Issuing Trusts;

b.  Countrywide did not, contrary to its statement above, properly "evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." Rather, as alleged herein, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans; and

c.  Countrywide's underwriting standards did not require that a borrower "generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard

Deleted: SAC

Formatted: Font: Bold

Formatted: Default Paragraph Font

Deleted: H

Formatted: Font: Bold

Deleted: I

Formatted: Font: Bold

Deleted: SECOND

insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." Instead, Countrywide's underwriting included the following practices, described *supra* at ¶¶97-164, that disregarded a borrowers' ability to pay by:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed-rate" when the adjustable rate adjusted;

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies; and

- Systematically overriding flags identified by the CLUES system that was meant to weed out non-qualifying loans and nonetheless approving such loans.

169. Each Registration Statement and Prospectus Supplement issued by CWABS and CWHEQ at issue herein contained the following language

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          75

concerning the underwriting standards by which the mortgages pooled into the
Issuing Trusts were originated:

> Credit Blemished Mortgage Loans. The following is a
> description of the underwriting procedures customarily
> employed by Countrywide Home Loans with respect to
> credit blemished mortgage loans.... Countrywide Home
> Loans produces its credit blemished mortgage loans
> through its Consumer Markets, Full Spectrum Lending,
> Correspondent Lending and Wholesale Lending
> Divisions. Prior to the funding of any credit blemished
> mortgage loan, Countrywide Home Loans underwrites
> the related mortgage loan in accordance with the
> underwriting standards established by Countrywide
> Home Loans. In general, the mortgage loans are
> underwritten centrally by a specialized group of
> underwriters who are familiar with the unique
> characteristics of credit blemished mortgage loans. In
> general, Countrywide Home Loans does not purchase
> any credit blemished mortgage loan that it has not itself
> underwritten.

> Countrywide Home Loans' underwriting standards are
> primarily intended to evaluate the value and adequacy of
> the mortgaged property as collateral for the proposed
> mortgage loan and the borrower's credit standing and
> repayment ability. On a case by case basis, Countrywide
> Home Loans may determine that, based upon
> compensating factors, a prospective borrower not strictly
> qualifying under the underwriting risk category
> guidelines described below warrants an underwriting
> exception. *Compensating factors may include low loan-
> to-value ratio, low debt-to-income ratio, stable
> employment, time in the same residence or other
> factors. It is expected that a significant number of the
> Mortgage Loans will have been originated based on
> such underwriting exceptions.*

> Each prospective borrower completes an application
> which includes information with respect to the
> applicant's assets, liabilities income and employment

No. 2:10-cv-00302: <u>THIRD</u> AMENDED CLASS ACTION COMPLAINT          76

**Deleted:** SECOND

history, as well as certain other personal information. Countrywide Home Loans requires an independent credit bureau report on the credit history of each applicant in order to evaluate the applicant's prior willingness and/or ability to repay. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments, among other matters.  After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations.  The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income. The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 50%. Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.

While more flexible, Countrywide Home Loans' underwriting guidelines still place primary reliance on a borrower's ability to repay; however, Countrywide Home Loans may require lower loan-to-value ratios than for loans underwritten to more traditional standards. Borrowers who qualify generally have payment histories and debt-to-income ratios which would not satisfy more traditional underwriting guidelines and may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies. Countrywide Home Loans' credit blemished mortgage loan underwriting guidelines establish the maximum permitted loan-to-value ratio for each loan type based upon these and other risk factors with more risk factors resulting in lower loan-to-value ratios.

*See* **TAC** **Appendix Exhibit** **M**; *see also* **Exhibit** **N**.

170.  In addition, the Prospectus Supplements issued pursuant to the

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          77

CWHEQ Registration Statements at issue herein also contained additional language describing the standards by which CWHEQ's home equity loans and second lien mortgage loans were originated:

> The underwriting process is intended to assess the applicant's credit standing and repayment ability, and the value and adequacy of the real property security as collateral for the proposed loan. Exceptions to the applicable originator's underwriting guidelines will be made when compensating actors are present. These factors include the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan.

*See* **TAC Appendix Exhibit O**.

171. The Prospectus Supplements for the Offerings issued pursuant to the CWHEQ Registration Statements at issue herein also stated:

> After obtaining all applicable income, liability, asset, employment, credit, and property information, the applicable originator generally uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments on the home equity loan in addition to any senior mortgage loan payments (including any escrows for property taxes and hazard insurance premiums) and other monthly credit obligations. The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations (assuming the mortgage loan interest rate is based on the applicable fully indexed interest rate) to the borrower's gross monthly income. Based on this, the maximum monthly debt-to-income ratio is 45%. Variations in the monthly debt-to-income ratios limits are permitted based on compensating factors. The originators currently offer home equity loan products that allow maximum combined loan-to-value ratios up to 100%.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          78

---

Deleted: SAC

Formatted: Font: Bold

Deleted: L

Deleted: SECOND

*See* **TAC** Appendix Exhibit **P**.

172. The above statements contained material misstatements of fact when made because:

a. Contrary to the statements that Countrywide's underwriting standards were "primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan" and to evaluate "the borrower's credit standing and repayment ability," Countrywide subordinated its underwriting standards to originating and securitizing as many mortgage loans as it could so that it could garner fees in the secondary mortgage market. As alleged herein, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans. Rather, Countrywide designed its underwriting standards to ensure that it received the highest possible fees for originating loans without regard to the actual ability of its borrowers to repay the loan, or whether the mortgaged property had sufficient value to collateralize the loan.

b. Contrary to the representation above that "After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations," Countrywide's underwriting included the following practices, described *supra* at ¶¶97-164, that disregarded a borrowers' ability to pay by:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT                    79

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted;

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies; and

- Systematically overriding flags identified by the CLUES system that were meant to weed out non-qualifying loans and, despite the flags, approving such loans.

c.     Contrary to the statement that "Exceptions to the applicable originator's underwriting guidelines will be made when compensating factors are present" and that those factors included "the borrower's employment stability, favorable credit history, equity in the related property, and the nature of the underlying first mortgage loan," Countrywide adopted procedures to incentivize its employees to approve exceptions to loans regardless of whether any compensating factors were present.

173.  Each Registration Statement issued by CWALT, CWABS, CWMBS and CWHEQ at issue herein contained the following statement regarding Countrywide's assessment of a prospective borrower:

**Deleted:** SECOND

Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgaged property such as property taxes and hazard insurance). ***The underwriting standards applied by sellers, particularly with respect to the level of loan documentation and the mortgagor's income and credit history, may be varied in appropriate cases where factors as low Loan-to-Value Ratios or other favorable credit factors exist***.

*See* **TAC Appendix Exhibit Q**.

174.  Each Registration Statement issued by CWALT, CWABS, CWMBS and CWHEQ at issue herein contained the following statement regarding Countrywide's review of information provided by a prospective borrower:

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is ***reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.***

*See* **TAC Appendix Exhibit R**.

175.  According to the Registration Statement and Prospectus Supplements issued by CWALT at issue herein, Countrywide originated loans pursuant to a Preferred Processing Program, pursuant to which documentation requirements were waived for those applicants with favorable credit histories and higher FICO scores.

Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          81

Scores, *which indicate a more favorable credit history*, and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years may be eligible for Countrywide Home Loans' processing program (the "Preferred Processing Program"). ....Countrywide Home Loans may waive some documentation requirements for mortgage loans originated under the Preferred Processing Program.

*See* **TAC** **Appendix Exhibit S;** *see also* **Exhibit T.**

176. Furthermore, under the CWALT Registration Statement at issue herein, Countrywide also offered four programs where less than full borrower documentation of income, assets and employment were required, however, in all instances credit scores had to be obtained and any deficiencies or derogations fully explained to the loan officers and, except for the Streamlined Documentation Program which had limited application, independent appraisals of the mortgage properties obtained – with all appraisals conforming to Fannie Mae and Freddie Mac standards:

A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both. Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "Alternative Documentation Program"), a Reduced Documentation Loan Program (the "Reduced Documentation Program"), a CLUES Plus Documentation Loan Program (the "CLUES Plus Documentation Program"), a No Income/No Asset Documentation Loan Program (the "No Income/No Asset Documentation Program"), a Stated Income/Stated Asset Documentation Loan Program (the "Stated Income/Stated Asset Documentation Program") and a Streamlined Documentation Loan Program (the "Streamlined Documentation Program").

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          82

*For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loan obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.*

*Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.*

*See* **TAC** Appendix Exhibit **U**; *see also* **Exhibit V**.

177. In addition, the Offering Documents for the CWALT Offerings at issue herein stated that the Alternative Documentation Program required, in addition to FICO scores and standard appraisals, W-2 forms instead of tax returns for two years and bank statements instead of deposits and employment verification:

The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

*See* **SAC** Appendix Exhibit **W**; *see also* **Exhibit X**.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT                     83

Deleted: SAC
Deleted: R
Formatted: Font: Bold
Formatted: Font: Bold
Deleted: S

Deleted: T
Formatted: Font: Bold
Deleted: U
Formatted: Font: Bold
Deleted: SECOND

178.   The Reduced Documentation Program, according to the CWALT Offering Documents at issue herein, was only applied where maximum LTV was equal to or less than 75% including secondary financing as follows:

> Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 75%.

*See* **TAC** **Appendix Exhibit Y**; *see also* **Exhibit Z.**

179.   Furthermore, the CLUES Plus program also had a 75% LTV limit but required borrower bank statements and excluded cash out refinancing:

> The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT                84

---

Deleted: SAC

Formatted: Font: Bold

Deleted: V

Formatted: Font: Bold

Deleted: W

Deleted: SECOND

*See* **TAC** Appendix Exhibit **AA**; *see also* Exhibit **BB**.

180.   Finally, pursuant to the CWALT Offering Documents at issue herein, the Streamlined Documentation Program offered refinancing for non-delinquent borrowers who had originated their loans with Countrywide, but this program was limited:

> The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

*See* **TAC** Appendix Exhibit **CC**; *see also* Exhibit **DD**.

181.   These statements contained material misstatements and omissions of fact when made because, contrary to its published statement that "a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan," Countrywide implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage, described *supra* at ¶¶97-164, such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to more expensive loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed-rate" when the adjustable rate adjusted;

- Allowing non-qualifying borrowers to be approved for loans under exceptions to Countrywide's underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors;

- Incentivizing its employees to approve borrowers under exceptions to Countrywide's underwriting policies;

- Systematically overriding flags identified by the CLUES system that were meant to weed out non-qualifying loans and, despite the flags, approving such loans; and

- Failing to determine whether stated income or stated assets were reasonable, failing to inform investors that Countrywide employees used www.salary.com in order to verify income and, often times, failing to check the veracity of information that was provided and easily verified (such as bank account balances).

182. Each Registration Statement and Prospectus Supplement issued by CWALT and CWMBS at issue herein contained the following language

Deleted: SECOND

concerning the collateral supporting each mortgage pooled in the Issuing Trusts
and the appraisals by which the collateral was valued:

> Except with respect to mortgage loans originated
> pursuant to its Streamlined Documentation Program,
> Countrywide Home Loans obtains appraisals from
> independent appraisers or appraisal services for
> properties that are to secure mortgage loans. The
> appraisers inspect and appraise the proposed mortgaged
> property and verify that the property is in acceptable
> condition. Following each appraisal, the appraiser
> prepares a report which includes a market data analysis
> based on recent sales of comparable homes in the area
> and, when deemed appropriate, a replacement cost
> analysis based on the current cost of constructing a
> similar home. All appraisals are required to conform to
> Fannie Mae or Freddie Mac appraisal standards then in
> effect.

*See* **SAC Appendix Exhibit EE**; *see also* **Exhibit FF**.

183. Each Registration Statement and Prospectus Supplement issued by
CWABS and CWHEQ at issue herein contained the following language
concerning the collateral supporting each mortgage pooled in the Issuing Trusts
and the appraisals by which the collateral was valued:

> Countrywide Home Loans' underwriting standards are
> applied in accordance with applicable federal and state
> laws and regulations and require an independent
> appraisal of the mortgaged property prepared on a
> Uniform Residential Appraisal Report (Form 1004) or
> other appraisal form as applicable to the specific
> mortgaged property type.  Each appraisal includes a
> market data analysis based on recent sales of comparable
> homes in the area and, where deemed appropriate,
> replacement cost analysis based on the current cost of
> constructing a similar home and generally is required to
> have been made not earlier than 180 days prior to the
> date of origination of the mortgage loan.

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT            87

*See* **TAC** Appendix Exhibit **GG**; *see also* **Exhibit HH**.

184. In general, the Prospectus Supplements issued by CWHEQ at issue herein contained representations concerning the appraisals done with respect to home equity and second mortgage liens. They stated with respect to home equity loans:

> Full appraisals are generally performed on all home equity loans. These appraisals are determined on the basis of an applicable originator-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac. For certain home equity loans that had at origination a credit limit between $100,000 and $250,000, determined by the FICO score of the borrower, a drive-by evaluation is generally completed by a state-licensed, independent third party, professional appraiser on forms approved by either Fannie Mae or Freddie Mac. The drive-by evaluation is an exterior examination of the premises by the appraiser to determine that the property is in good condition. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements, and generally must have been made not earlier than 180 days before the date of origination of the mortgage loan. For certain home equity loans with credit limits between $100,000 and $250,000, determined by the FICO score of the borrower, the applicable originator may have the related mortgaged property appraised electronically. The minimum and maximum loan amounts for home equity loans are generally $7,500 (or, if smaller, the state-allowed maximum) and $1,000,000, respectively.

*See* **TAC** Appendix Exhibit **II**.

185. Finally, with respect to its CWALT Offerings at issue herein, Countrywide also offered expanded underwriting allowing for higher LTV and loan amounts though loans would still be subject to certain standards:

No. 2:10-cv-00302: THIRD AMENDED CLASS ACTION COMPLAINT          88

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% on 1 unit properties with principal balances up to $333,700 ($500,550 in Alaska and Hawaii) and 2 unit properties with principal balances up to $427,150 ($640,725 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $516,300 ($774,450 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $641,650 ($962,475 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $333,700 ($500,550 in Alaska and Hawaii). Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% unit properties with principal balances up to $333,700 ($500,550 in Alaska and Hawaii) and 2 unit properties with principal balances up to $427,150 ($640,725 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $516,300 ($774,450 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $641,650 ($962,475 in Alaska and Hawaii).  Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio

**Deleted:** SECOND

exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines. The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines

*See* **TAC** **Appendix Exhibit JJ**.

186. These statements contained material misstatements and omitted necessary facts when made because they failed to disclose that the value and adequacy of the mortgaged property was not appraised, on a consistent basis, using "market data analysis based on recent sales of comparable homes in the area, where deemed appropriate, replacement cost analysis based on the current costs of constructing a similar home" or "on the basis of an applicable originator-approved, independent third-party, fee-based appraisal completed on forms approved by Fannie Mae or Freddie Mac." Instead, as alleged herein, Countrywide systematically inflated appraisals for properties used as collateral for mortgage loans underlying the Issuing Trusts. These inflated appraisals did not conform to the USPAP and were not market data analyses of comparable homes in the area or

Deleted: SAC

Formatted: Font: Bold

Deleted: HH

Deleted: SECOND

1   analyses of the cost of construction of a comparable home.

2       187. Each Prospectus Supplement at issue herein referenced and

3   incorporated into each Registration Statement described the LTV ratio of the

4   mortgages pooled into the Issuing Trusts. The LTV ratio of mortgages in the

5   Issuing Trusts was described as equal to: (1) the principal balance of the mortgage

6   loan at the date of origination, divided by (2) the collateral value of the related

7   mortgaged property, where the "collateral value" was the lesser of either the

8   appraised value based on an appraisal made for Countrywide by an independent

9   fee appraiser at the time of the origination of the related mortgage loan, or the sales

10  price of the mortgaged property at the time of origination. Each Prospectus

11  Supplement then provided an average LTV ratio of the mortgage loans included in

12  the Issuing Trusts and a disclosure concerning the maximum LTV ratio of

13  mortgage loans included in the Issuing Trusts. *See* **TAC** **Appendix Exhibit KK**.

14      188. The statements concerning the average LTV ratio of mortgages

15  included in the Issuing Trusts and the maximum LTV ratio of mortgages included

16  in the Issuing Trusts were materially misstated when made because these ratios

17  were based on incorrect and/or inflated appraisal values assigned to the collateral

18  supporting the mortgage loans pooled into each Issuing Trust.  For example, as

19  explained above, the appraisals of the properties underlying the mortgage loans

20  were inaccurate and inflated.   Furthermore, stated sales prices of properties

21  underlying the mortgage loans did not accurately reflect the true values of the

22  properties.   These inflated appraisals and misleading sales prices were used to

23  calculate the LTV ratios listed in the Prospectus Supplements.  Incorporating an

24  inflated appraisal into the LTV ratio calculation will result in a lower LTV ratio for

25  a given loan.  For instance, as described above, if a borrower seeks to borrow

26  $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000

27  or 90%.  If, however, the appraised value of the house is artificially increased to

28  $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).  Due to the

Deleted: SAC

Deleted: II

Deleted: SECOND