1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   SPENCER A. BURKHOLZ (147029)
    THOMAS E. EGLER (189871)
3   SCOTT H. SAHAM (188355)
    NATHAN R. LINDELL (248668)
4   ASHLEY M. ROBINSON (281597)
    655 West Broadway, Suite 1900
5   San Diego, CA  92101
    Telephone:  619/231-1058
6   619/231-7423 (fax)
    spenceb@rgrdlaw.com
7   tome@rgrdlaw.com
    scotts@rgrdlaw.com
8   nlindell@rgrdlaw.com
    arobinson@rgrdlaw.com
9
    KESSLER TOPAZ MELTZER
10     & CHECK, LLP
    ANDREW L. ZIVITZ
11  SHARAN NIRMUL
    KIMBERLY JUSTICE
12  JENNIFER L. JOOST
    280 King of Prussia Road
13  Radnor, PA  19087
    Telephone:  610/667-7706
14  610/667-7056 (fax)
    azivitz@ktmc.com
15  snirmul@ktmc.com
    kjustice@ktmc.com
16  jjoost@ktmc.com

17  Co-Lead Counsel in the *Luther*
    and *Western Conference* actions

COHEN MILSTEIN SELLERS
   & TOLL PLLC
STEVEN J. TOLL (*pro hac vice*)
JULIE GOLDSMITH REISER (*pro hac vice*)
JOSHUA S. DEVORE (*pro hac vice*)
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005-3964
Telephone:  202/408-4600
202/408-4699 (fax)
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
jdevore@cohenmilstein.com

Lead Counsel in the *Maine State* action only

18

19          UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA

20  MAINE STATE RETIREMENT            )   No. 2:10-cv-00302-MRP(MANx)
    SYSTEM, Individually and On Behalf )
21  of All Others Similarly Situated,  )   CLASS ACTION
                                       )
22                      Plaintiff,     )   JOINT DECLARATION OF
                                       )   SPENCER A. BURKHOLZ AND
23          vs.                        )   ANDREW L. ZIVITZ IN SUPPORT
                                       )   OF (1) PLAINTIFFS' MOTION FOR
24  COUNTRYWIDE FINANCIAL             )   FINAL APPROVAL OF CLASS
    CORPORATION, et al.,              )   ACTION SETTLEMENT AND PLAN
25                                     )   OF ALLOCATION OF SETTLEMENT
                        Defendants.    )   PROCEEDS; AND (2) PLAINTIFFS'
26  _____ )   COUNSEL'S MOTION FOR
                                       )   ATTORNEYS' FEES AND
27  [Caption continued on following page.]   EXPENSES

28

866280_2

| | | |
|---|---|---|
| 1 | WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST FUND, Individually and On Behalf of All Others Similarly Situated, | ) No. 2:12-cv-05122-MRP(MANx) |
| 2 | | ) CLASS ACTION |
| 3 | Plaintiff, | ) |
| 4 | vs. | ) |
| 5 | COUNTRYWIDE FINANCIAL CORPORATION, et al., | ) |
| 6 | | ) |
| 7 | Defendants. | ) |
| 8 | DAVID H. LUTHER, et al., Individually and On Behalf of All Others Similarly Situated, | No. 2:12-cv-05125-MRP(MANx) |
| 9 | | CLASS ACTION |
| 10 | Plaintiffs, | ) |
| 11 | vs. | ) |
| 12 | COUNTRYWIDE FINANCIAL CORPORATION, et al., | ) |
| 13 | Defendants. | ) |
| 14 | | ) |

866280_2

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................. 5

II.  FACTUAL SUMMARY OF PLAINTIFFS' CLAIMS AGAINST DEFENDANTS .............................................................................................. 9

III. RELEVANT PROCEDURAL HISTORY ............................................... 11

    A.   Commencement of the Litigation ............................................. 11

    B.   Removal of the Initial *Luther* Action Based on CAFA .................... 13

    C.   The Ninth Circuit Appeal.......................................................... 13

    D.   The *Washington State* Complaint Is Filed ........................................ 15

    E.   The Amended *Luther* Complaint Is Filed in State Court.................... 16

    F.   Consolidation of the *Luther* and *Washington State* Actions and Filing of the Operative Complaint ........................................ 18

    G.   Defendants Move to Stay Discovery in the Consolidated State Action........................................................................................ 21

    H.   Defendants' Initial Demurrer Based on SLUSA and Standing .......... 23

    I.   Plaintiffs File a Complaint for Declaratory Relief in Federal Court....................................................................................... 25

    J.   Dismissal of the *Luther* State Court Action Under SLUSA .............. 26

    K.   Plaintiffs File a Separate Securities Class Action in Federal Court....................................................................................... 27

    L.   Plaintiffs Appeal the State Court Dismissal ....................................... 28

    M.   The *Western Conference* Action Is Filed in State Court .................... 29

    N.   Plaintiffs' State Court Action Is Revived ........................................... 30

    O.   Defendants File Renewed Demurrers on Standing and Timeliness ................................................................................. 31

    P.   Plaintiffs Request the Commencement of Document Discovery ....... 32

    Q.   Defendants Move to Stay the *Luther* and *Western Conference* Actions in Light of the Pendency of the *Maine State* Action in Federal Court.......................................................................... 34

    R.   *Luther* and *Western Conference* Are Removed Under Federal Bankruptcy Law....................................................................... 35

**Page**

S.     Defendants' Motions to Dismiss the Actions ....................................... 36

IV.     PLAINTIFFS' INVESTIGATION AND ANALYSIS .................................. 38

V.     FACT DISCOVERY AND DISCOVERY DISPUTES ............................... 39

     A.     Plaintiff Luther's Initial Discovery Requests ...................................... 39

     B.     Plaintiff Luther Moves to Compel Discovery from Defendants ........ 41

     C.     Defendants' Motion to Stay Discovery Under the PSLRA ............... 43

     D.     Plaintiffs File an Additional Motion to Compel Discovery ............... 44

     E.     Plaintiffs' Request to Coordinate Discovery with Federal Actions ................................................................................................ 45

     F.     Plaintiffs' Additional Discovery Requests ......................................... 45

     G.     Plaintiffs File a Motion to Commence Discovery .............................. 47

     H.     Plaintiffs' Review and Analysis of Documents .................................. 49

VI.     THE MEDIATION ...................................................................................... 52

VII.     THE STRENGTHS AND WEAKNESSES OF THE CASE AND THE RISKS FACED BY PLAINTIFFS IN THE LITIGATION ................ 55

     A.     Standing ............................................................................................... 56

     B.     Statutes of Repose and Limitations .................................................... 58

     C.     Class Certification ............................................................................... 59

     D.     Loss Causation and Damages ............................................................. 60

     E.     Establishing Liability .......................................................................... 61

     F.     Appeals ................................................................................................ 63

     G.     Insolvency ........................................................................................... 63

VIII.     SETTLEMENT NEGOTIATIONS AND THE TERMS OF THE SETTLEMENT .......................................................................................... 64

IX.     THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS APPROVAL ...................................................... 65

X.     THE PLAN OF ALLOCATION .................................................................. 66

866280_2

1

2                                                                                          **Page**

3
XI.      PLAINTIFFS' COUNSEL'S APPLICATION FOR ATTORNEYS'
4        FEES IS REASONABLE.................................................................................. 69

5        A.      The Requested Fee of 17% of the Gross Settlement Fund Is Fair
                 and Reasonable, Is Consistent with Percentages Routinely
6                Awarded by Courts in this Circuit, and Is Amply Justified by
                 the Facts and Nature of the Actions...................................................... 69
7
                 1.      Nature and Extent of Litigation................................................. 69
8
         B.      The Requested Fee Is Reasonable.......................................................... 70
9
                 1.      The Time Expended.................................................................... 71
10
                 2.      The Settlement Achieved............................................................ 73
11
                 3.      The Risk, Magnitude and Complexity of the Litigation .......... 73
12
                 4.      Quality of the Representation ..................................................... 75
13
XII.     PAYMENT OF PLAINTIFFS' COUNSEL'S EXPENSES......................... 76
14
XIII.    CONCLUSION .............................................................................................. 78
15

16

17

18

19

20

21

22

23

24

25

26

27

28

866280_2

1    We, SPENCER A. BURKHOLZ and ANDREW L. ZIVITZ, declare as follows:

2    1.    We are partners of the law firms of Robbins Geller Rudman & Dowd

3    LLP ("Robbins Geller") and Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz"),

4    respectively, counsel for the plaintiffs in the above-captioned *Luther* and *Western*

5    *Conference* Actions.[1]  We have personal knowledge of the matters set forth herein

6    based on our active supervision of and participation in the investigation, prosecution

7    and resolution of the claims asserted on behalf of the class in the *Luther* and *Western*

8    *Conference* Actions.  We could and would testify competently to the matters set forth

9    herein if called upon to do so.

10    2.    We submit this joint declaration in support of Plaintiffs'[2] motion,

11    pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (a) the

12    proposed Settlement of the Actions as set forth in the Stipulation dated July 9, 2013

13    for a cash recovery of $500 million on behalf of the Class; (b) the proposed plan for

14    allocating the settlement proceeds to eligible members of the Class; and (c) Plaintiffs'

15    Counsel's application for an award of attorneys' fees and expenses.  For the reasons

16    set forth below and in the accompanying declarations and memoranda,[3] plaintiffs and

17    counsel in the *Luther* and *Western Conference* Actions respectfully submit that (i) the

18    terms of the Settlement are fair, reasonable and adequate in all respects and should be

19    approved by the Court; (ii) the proposed Plan of Allocation is fair and reasonable and

20    should be approved by the Court; and (iii) Plaintiffs' Counsel's request for attorneys'

21    

22    [1]    Plaintiffs in the *Luther* and *Western Conference* Actions may herein be referred to collectively as "plaintiffs" or the "*Luther* Plaintiffs," unless otherwise noted.

23    [2]    Unless otherwise defined herein, capitalized terms shall have the same meanings as
24    set forth in the Stipulation and Agreement of Settlement (the "Stipulation"), which was previously filed with the Court on July 9, 2013.  *Luther* Dkt. No. 151, *Western*
25    *Conference* Dkt. No. 132 and *Maine State* Dkt. No. 408.

26    [3]    In addition, plaintiffs and counsel in the *Maine State* Action are submitting the
27    Declaration of Julie Goldsmith Reiser in Support of Maine State Plaintiff's Motion for
   Final Approval of Proposed Class Action Settlement and Plan of Allocation, and
   Petition for Award of Attorneys' Fees and Reimbursement of Expenses (the "Reiser
28    Declaration"), which addresses the specific details of that action.

- 4 -

1  fees and expenses is supported by the facts and the law and should be granted in all

2  respects.

3  **I.      PRELIMINARY STATEMENT**

4          3.      The *Luther* and *Western Conference* Actions have been vigorously

5  litigated from the commencement of the first action on November 14, 2007 until the

6  Court entered the Order Granting Preliminary Approval to Settlement and Directing

7  Dissemination of Notice to the Class on August 7, 2013.

8          4.      With document review actively underway and defendants' motions to

9  dismiss fully briefed and *sub judice*, the parties were able to reach an agreement-in-

10  principle to settle the *Luther* and *Western Conference* Actions, along with the related

11  *Maine State* Action, on April 16, 2013.  The agreement-in-principle was achieved

12  only after nearly six months of ongoing settlement discussions and formal mediation,

13  comprehensive mediation briefings and thorough presentations of the perceived

14  strengths and weaknesses of each side's case, as well as comprehensive damages

15  analyses performed by industry experts.

16          5.      We believe the result achieved in this litigation is exceptional given, *inter*

17  *alia*, the Court's prior rulings on standing and statutes of limitation, Countrywide's

18  public representation that it was considering filing for bankruptcy if it was unable to

19  resolve its legacy litigation matters on suitable terms, and defendants' defenses to both

20  liability and damages.  The Settlement provides an excellent recovery for Certificate

21  purchasers who faced a substantial risk of receiving no recovery at all had the

22  litigation continued.  Additionally, this landmark Settlement, if approved, would

23  represent the largest mortgage-backed security ("MBS") class action recovery to date

24  and would rank among the largest 25 class action securities settlements of all time.[4]

25  At every stage of the litigation, counsel for defendants asserted (and would continue to

26  _____

27  [4]   *See* Securities Class Action Services, *The SCAS TOP 100 Settlements Semi-Annual Report* (Institutional Shareholder Services Inc. July 1, 2013), *available at* http://issgovernance.com/files/private/SCATop100Settlements_2H2012Rev01312013.pdf.

28

1    assert had the actions continued) aggressive defenses and expressed the belief that

2    plaintiffs could not prevail on the claims asserted and, in any event, that any

3    subsequently certified class would be pared-down dramatically from the class

4    plaintiffs initially sought to represent.

5          6.    Plaintiffs and counsel in the *Luther* and *Western Conference* Actions

6    clearly understood the strengths and weaknesses of plaintiffs' claims as a result of

7    their prosecution of the actions over the course of nearly six years.  Indeed, the

8    Settlement was not achieved until plaintiffs and their counsel had, *inter alia*: (a)

9    conducted an extensive factual investigation; (b) filed both an amended and a

10   consolidated complaint; (c) twice opposed demurrers to plaintiffs' state court

11   complaint; (d) successfully and vigorously fought to remand the Initial *Luther* Action

12   back to state court following defendants' removal to the Court based on the Class

13   Action Fairness Act of 2005 ("CAFA") (*see Luther v. Countrywide Home Loans

14   Servicing*, No. 2:07-cv-08165 MRP (MANx), 2008 U.S. Dist. LEXIS 26534 (C.D.

15   Cal. Feb. 28, 2008)), and successfully opposed defendants' appeal to the Court of

16   Appeals for the Ninth Circuit for same (*see Luther v. Countrywide Home Loans

17   Servicing, LP*, 533 F.3d 1031 (9th Cir. 2008)); (e) sought declaratory relief on SLUSA

18   (i.e., the Securities Litigation Uniform Standards Act) jurisdiction divestiture in the

19   Court; (f) successfully appealed the subsequent state court dismissal of the *Luther*

20   Action based on SLUSA to the California Court of Appeal and opposed defendants'

21   appeal to the California Supreme Court (*see Luther v. Countrywide Fin. Corp.*, 195

22   Cal. App. 4th 789, 125 Cal. Rptr. 3d 716 (2d Dist. May 18, 2011)) (petition for review

23   denied at *Luther (David H.) v. Countrywide Fin. Corp.*, No. S194319, 2011 Cal.

24   LEXIS 9830 (Cal. Sept. 14, 2011)); (g) sought remand a second time following

25   defendants' removal under federal bankruptcy law; (h) lodged oppositions to

26   defendants' motions to dismiss the complaints; (i) reviewed over 5.5 million pages of

27   documents produced by defendants and third parties; and (j) engaged in protracted

28   settlement negotiations.

7.     The Settlement was accomplished through arm's-length settlement negotiations facilitated by Professor Eric Green, a respected mediator with over 30 years of mediation experience and co-founder and principal of Resolutions, LLC, an alternative dispute resolution provider in Boston, Massachusetts.  Professor Green conducted two full-day, in-person mediation sessions on November 5, 2012 and December 11, 2012 in Boston, Massachusetts.  In advance of the mediation sessions, Plaintiffs and Defendants prepared and submitted comprehensive mediation statements for Professor Green's review.  Additionally, plaintiffs expended substantial efforts in preparation for mediation, including preparing presentations and working with damages consultants who performed detailed and comprehensive damages analyses.  Representatives of Pension Trust Fund for Operating Engineers/Operating Engineers Annuity Plan, and Vermont Pension Investment Committee each attended one mediation session and representatives for all other plaintiffs were fully briefed on the mediation sessions and were kept apprised of the developments and subsequent discussions.   Although neither of the in-person mediation sessions resulted in resolution, after thoughtful evaluation of the strengths and weaknesses of the claims and defenses over the course of six months, Professor Green made a Mediator's Proposal to settle the Actions for $500 million.   The parties each accepted the proposal and thereafter initiated exhaustive negotiations of a settlement term sheet and related settlement documents.

8.     After the parties reached an agreement-in-principle, Plaintiffs' Counsel continued to work on developing a plan for allocating the Settlement Amount.  To this end, and at the suggestion of Professor Green, on June 19, 2013, Plaintiffs' Counsel met with the Honorable Nancy Gertner (Ret.), a former United States District Court Judge for the District of Massachusetts and Professor of Practice at Harvard Law School.   Robbins Geller and Kessler Topaz on the one hand, and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), plaintiffs' counsel in the *Maine State Action*, on  the other, each prepared comprehensive submissions setting forth their

1   positions regarding allocation.  The purpose of the meeting with Judge Gertner was to

2   determine a fair and reasonable plan for allocating the Settlement Amount among

3   purchasers of the Certificates at issue in the Actions based on the strength of the

4   purchasers' claims and respective appellate rights.  In connection with the session,

5   Plaintiffs' Counsel expended substantial efforts, including working with damages

6   consultants who performed detailed and comprehensive damages analyses,

7   researching relevant case law and applying the Court's prior holdings to support

8   allocation.  On June 19, 2013, with the assistance of Judge Gertner, Plaintiffs and

9   Plaintiffs' Counsel finalized the proposed Plan of Allocation set forth in the Notice.

10          9.     As set forth in greater detail below, we believe this Settlement represents

11   an excellent result for the Class.  While we believe these actions are meritorious, we

12   carefully evaluated the risks the *Luther* and *Western Conference* plaintiffs faced had

13   the Settlement not been reached.  This evaluation included plotting the course for

14   continued litigation and determining which course (i.e., whether to settle and on what

15   terms, or to continue to litigate through the pending motions to dismiss, additional

16   merits, class and expert discovery, plaintiffs' motions for class certification, and

17   potentially summary judgment and trial) was in the best interest of the class.  Despite

18   the fact that plaintiffs believe their allegations and claims were supported by legal

19   authority and evidence, the specific circumstances involved here presented many

20   uncertainties with respect to plaintiffs' ability to ultimately prevail in the actions.

21   Indeed, plaintiffs recognized the very real risk, given the novel issues implicated in

22   litigating MBS class actions and the recent authority in this and other Circuits, that the

23   Court might not sustain plaintiffs' allegations, or might sustain only a portion of

24   plaintiffs' claims.  Additionally, there was a distinct possibility that the Court would

25   further reduce the scope of the class following plaintiffs' eventual motion for class

26   certification.  Were plaintiffs to overcome the obstacles presented by defendants'

27   motions to dismiss and obtain class certification, they would still need to expend

28   significant time and incur the expense of continued discovery in order to litigate the

- 8 -

866280_2

1  actions through the challenges of summary judgment and trial, which would have

2  taken years.  The $500 million Settlement enables damaged Class Members, who have

3  already endured nearly six years of litigation, to receive a recovery in the near future.

## II.   FACTUAL SUMMARY OF PLAINTIFFS' CLAIMS AGAINST DEFENDANTS

10.   The claims set forth in the Operative Complaint[5] in these actions were

brought under §§11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act")

on behalf of a class of all persons or entities who acquired Certificates issued pursuant

to 429 Offerings between January 2005 and December 2007 pursuant and/or traceable

to false and misleading Registration Statements filed with the United States Securities

and Exchange Commission ("SEC").  ¶¶55, 185.

11.   The Operative Complaint alleges that the Registration Statements and

Prospectus Supplements (or "Offering Documents") contained false and misleading

statements about the processes used to originate, and the quality of, the mortgages that

were packaged, securitized and sold to investors.  ¶11.  Specifically, the Operative

Complaint alleges that defendants did not follow the underwriting and appraisal

standards disclosed in the Offering Documents.  ¶¶11, 81.  The Operative Complaint

further alleges that the mortgage loans were deposited into a trust for securitization

and limited purpose finance entities created by Countrywide Financial Corporation

subsequently issued Certificates which the underwriter defendants then sold to

investors.  ¶¶77-79.  The entire securitization process allegedly was conducted at

Countrywide Financial Corporation's direction.  ¶80.

---

[5]   All references to "¶" or "¶¶" are to the Consolidated Complaint for Violation of §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Operative Complaint") filed in the *Luther* Action on October 16, 2008, unless otherwise noted.  The allegations in the Complaint for Violation of §§11, 12(a)(2) and 15 of the Securities Act of 1933 filed by *Western Conference* on November 17, 2010 are substantially similar to those alleged in the Operative Complaint in *Luther*.  The *Western Conference* complaint additionally includes successor-in-interest liability claims against the Bank of America Defendants.

- 9 -

12.     Plaintiffs allege that the underwriting practices actually employed in the origination process diverged substantially from the underwriting guidelines stated in the Offering Documents.  Contrary to the representations in the Offering Documents, plaintiffs allege that defendants did not properly evaluate a prospective borrower's creditworthiness and repayment ability and the value and adequacy of the mortgage property to serve as collateral.   ¶¶89, 103.   Instead, the underwriting standards employed allegedly were designed to originate as many mortgage loans as possible without regard to the ability of prospective borrowers to repay the mortgages.  ¶103. Plaintiffs allege that material deviations from the stated underwriting standards resulted in elevated delinquency rates and foreclosures of mortgaged properties that were appraised in excess of their true value.  ¶¶101-103.  Defendants' origination mantra "quantity over quality," allegedly resulted in a lack of income verification ("low doc" or "no doc" loans), or falsified income data, and inflated appraisal values, which led to higher-than-disclosed loan-to-value ("LTV") ratios and also incentivized employees to approve exceptions to the stated guidelines in an effort to pump out more loans.  ¶¶104, 158.

13.     The Operative Complaint further alleges that the Offering Documents misrepresented or omitted material facts about the appraisals conducted by or for the loan originators and describes the alleged underwriting transgressions.  ¶145.  It also alleges how, as a result of oft-inflated appraisals, the true LTV ratios – an important metric used to evaluate the price and risk of MBS – deviated substantially from those disclosed to investors.  ¶95.  Additionally, the Operative Complaint describes how rating agencies rated all of the Certificates as "investment grade" based on the allegedly false information provided by defendants regarding the quality of the mortgages underlying each mortgage pool and MBS.  ¶¶8-9.  As a result of the alleged material misrepresentations in, and omissions from, the Offering Documents, investors purchased securities that were far riskier than represented, believing them to

- 10 -

1  be investment grade, and the values of the Certificates collapsed as the truth about the

2  quality of mortgages underlying the MBS emerged.  ¶12.

3         14.    The Operative Complaint identifies each of the alleged misstatements in,

4  and omissions from, the Offering Documents.  ¶¶3-19, 70-194.  It also alleges that the

5  Certificates purchased by plaintiffs and the Class declined in value as a result of the

6  misrepresentations and omissions in the Offering Documents, and thus caused

7  damages to plaintiffs and the Class.  ¶¶18, 101, 222-223.

8  **III.   RELEVANT PROCEDURAL HISTORY**

9         **A.    Commencement of the Litigation**

10        15.    On November 14, 2007, plaintiff David H. Luther, through his counsel

11 Coughlin Stoia Geller Rudman & Robbins LLP (n/k/a Robbins Geller) filed an initial

12 complaint in the Superior Court of the State of California, County of Los Angeles (the

13 "Initial *Luther* Complaint").[6]  Luther brought strict liability and negligence claims

14 under §§11, 12(a)(2) and 15 of the Securities Act and named the following

15 defendants: CWALT, Inc., the issuing trusts; Countrywide Home Loans Servicing LP;

16 Countrywide Home Loans, Inc.; Countrywide Securities Corporation ("CSC");

17 numerous underwriter banks[7]; and individual defendants Stanford L. Kurland, Eric. P.

18 Sieracki, David A. Spector, N. Joshua Adler, Ranjit Kripalani and Jennifer S.

19 Sandefur.

20        16.    Luther brought the action pursuant to California Code of Civil Procedure

21 §382 on behalf of a class of all persons or entities who acquired CWALT Certificates

22 pursuant and/or traceable to CWALT's false and misleading registration statements

---

23

24  [6]   This action was styled *Luther v. Countrywide Home Loans Servicing LP*, No. BC380698 (Cal. Super. Ct.) (the "Initial *Luther* Action").

25  [7]   The underwriter banks named as defendants in the Initial *Luther* Action were:
26  Morgan Stanley & Co. Incorporated, UBS Securities LLC, Deutsche Bank Securities Inc., Citigroup Global Markets Inc., Lehman Brothers, Inc., Greenwich Capital
27  Markets, Inc., Edward D. Jones & Co., L.P., J.P. Morgan Securities Inc., Credit Suisse First Boston; Goldman, Sachs & Co., Banc of America Securities LLC, Barclays
28  Capital Inc., and Bear Stearns & Co. Inc.

866280_2

1  issued between January 2005 and June 2007.  All told, Luther sought to recover on

2  behalf of a class of investors in 188 MBS offerings issued pursuant to five false and

3  misleading registration statements.  The Initial *Luther* Complaint was the first of its

4  kind and contained extensive allegations concerning defendants' complete disregard

5  for stated underwriting standards and appraisal guidelines.

6      17.    In preparation for filing the Initial *Luther* Complaint, Robbins Geller: (i)

7  retained industry experts and conducted an extensive investigation into the matters in

8  dispute; (ii) reviewed analyses of Countrywide MBS by the nation's top rating

9  agencies, including Fitch Investor Service, Standard & Poor's Corporation, and

10 Moody's Investor Service, and evaluated early reports of ratings downgrades; (iii)

11 thoroughly reviewed media and investigative reports relating to the originators and

12 MBS at issue, and the eventual downfall of Countrywide Financial Corporation; (iv)

13 reviewed and analyzed publicly-available information filed with the SEC, including

14 reviewing the registration statements and prospectus supplements for all 188

15 offerings; and (v) researched the applicable law related to Luther's claims and

16 defendants' potential defenses.

17     18.    On December 5, 2007, Robbins Geller served detailed Interrogatories and

18 Requests for Production of Documents on behalf of the class on 14 underwriter

19 defendants named in the Initial *Luther* Complaint seeking information related to the

20 due diligence process for several of the registration statements at issue.  On the same

21 day, Robbins Geller also served detailed Interrogatories and Requests for Production

22 of Documents on the Countrywide defendants relating to Countrywide's policies and

23 practices with respect to the mortgages which ultimately backed the investment

24 certificates sold pursuant to the Registration Statements at issue.  On December 11,

25 2007, Robbins Geller also served Notices of Depositions of CSC, CWALT, Inc.,

26 Countrywide Home Loans, Inc. and Countrywide Home Loans Servicing LP pursuant

27 to California Code of Civil Procedure §2025.230.

28

- 12 -

## B.   Removal of the Initial *Luther* Action Based on CAFA

19.   On December 14, 2007, one month after Luther filed his initial state court complaint, defendants removed the Initial *Luther* Action to this Court based on 28 U.S.C. §§1332 and 1441 as amended in relevant part by CAFA, arguing that under CAFA, federal courts had exclusive jurisdiction over a class action seeking more than $5 million in damages. *Luther et al v. Countrywide Home Loans Servicing LP et al.*, No. 2:07-cv-8165, Dkt. No. 1 (C.D. Cal.). Thereafter, on January 10, 2008, Luther filed an extensive remand motion, arguing that CAFA, by its plain language, did not alter the express non-removability of a plaintiff's Securities Act claims, and that state and federal courts enjoyed concurrent jurisdiction over such claims. As an additional argument against removal, Luther asserted that his claims fell squarely within the securities-related exceptions to CAFA removal, namely, that the action related to the rights, duties and obligations relating to the MBS issued by defendants. Luther's remand motion was an issue of first impression because at the time of Luther's motion, no other CAFA removal decision had involved an express non-removability provision like that of the Securities Act. Defendants opposed the remand motion and Luther filed a 20-page reply memorandum, reiterating that the strict non-removability of Securities Act claims prevented removal of the case to federal court.

20.   On February 28, 2008, the Court, based on the "novel" removal issues presented by Luther, agreed with Luther that CAFA and §22(a) of the Securities Act cannot mutually coexist. The Court granted the remand motion, holding "the Court continues to harbor significant doubt that CAFA provides removal jurisdiction in the face of the 1933 Act's absolute prohibition on removal." *Luther*, 2008 U.S. Dist. LEXIS 26534, at *10.

## C.   The Ninth Circuit Appeal

21.   On March 11, 2008, following the Court's remand of the action, the Countrywide and underwriter defendants named in the Initial *Luther* Complaint filed separate petitions for permission to appeal the remand to the United States Circuit

- 13 -

1    Court of Appeals for the Ninth Circuit.  Luther opposed defendants' petition via an

2    18-page submission on the grounds that the Court correctly ruled that CAFA's general

3    removal provision did not trump the Securities Act's specific anti-removal mandate.

4    Defendants' petitions for permission to appeal were granted on May 28, 2008 and the

5    Ninth Circuit ordered the parties to file simultaneous briefs stating their positions on

6    appeal.  *See Luther, et al. v. Countrywide Home Loans Servicing, et al.*, Nos. 08-

7    80032, 08-80033, Dkt. No. 6 (9th Cir. May 28, 2008); *Luther v. Countrywide Home*

8    *Loans Servicing, et al.*, No. 08-55865, Dkt. No. 1 (9th Cir. May 28, 2008).

9        22.    On June 9, 2008, Luther filed his 28-page answering brief against

10   removal of the action to federal court, based on the Court's ruling that removal of

11   Securities Act claims were flatly prohibited.  Luther further argued that his absolute

12   choice of forum should not be disturbed due to defendants' misinterpretation of the

13   statutory text and congressional intent in enacting CAFA.  CAFA, Luther argued, was

14   enacted primarily to overcome the threat of plaintiffs deliberately defeating diversity

15   jurisdiction, not to provide a means of overcoming statutes that strictly prohibit

16   removal and allow for concurrent jurisdiction.  Again, Luther presented unique

17   arguments in an area of statutory interpretation of first impression in the federal

18   courts.

19       23.    On July 14, 2008, the Ninth Circuit held oral argument on defendants'

20   petitions for appeal.  In a published opinion issued on July 16, 2008, a three-judge

21   panel concluded that CAFA does not permit removal of Securities Act claims from

22   state court and affirmed the court's order remanding the case to Superior Court.  *See*

23   *Luther*, 533 F.3d 1031.  The Ninth Circuit held that CAFA "does not supersede

24   §22(a)'s **specific** bar against removal of cases arising under the '33 Act."  *Id*. at 1032

25   (emphasis in original).  The Ninth Circuit found that Luther met his burden of proving

26   that an express exception to CAFA removal existed, noting "by virtue of §22(a) of the

27   Securities Act of 1933, Luther's state court class action alleging only violations of the

28   Securities Act of 1933 was not removable.  The motion to remand was properly

- 14 -

1  granted." *Id*. at 1034.  Due to Luther's appeal and the resulting Ninth Circuit opinion,

2  actions of this type arising under the Securities Act can now proceed in state court

3  without threat of removal under CAFA.  Accordingly, the Initial *Luther* Action was

4  then remanded to the California Superior Court on September 3, 2008.

D.     **The *Washington State* Complaint Is Filed**

6      24.     On June 12, 2008, while the Initial *Luther* Action was pending on appeal

7  in the Ninth Circuit, Washington State Plumbing & Pipefitting Pension Trust through

8  its counsel, Schiffrin Barroway Topaz & Kessler, LLP (n/k/a Kessler Topaz) filed an

9  action in the Superior Court of the State of California, County of Los Angeles (the

10 "*Washington State* Complaint").[8]  The *Washington State* Complaint expanded upon

11 the scope of the Initial *Luther* Action, naming as defendants: Countrywide Financial

12 Corp.; Countrywide Home Loans, Inc.; CSC; CWALT, Inc.; CWMBS, Inc.; CWABS,

13 Inc.; CWHEQ, Inc.; underwriter banks[9]; and individual defendants Stanford L.

14 Kurland, David A. Spector, Eric P. Sieracki, N. Joshua Adler, Ranjit Kripalani,

15 Jennifer S. Sandefur and David Sambol.  The *Washington State* Complaint was

16 properly brought as a putative class action pursuant to California Code of Civil

17 Procedure §382, on behalf of all persons or entities who acquired certificates issued

18 pursuant to 398 offerings between June 13, 2005 and December 27, 2007.  The

19 *Washington State* Complaint involved solely strict liability and negligence claims

20 brought pursuant to the Securities Act, based on numerous material misrepresentations

21 and omissions contained in the Offering Documents.   The *Washington State*

---

[8]   The action was styled *Washington State Plumbing & Pipefitting Pension Trust v. Countrywide Financial Corporation, et al*., No. BC392571 (Cal. Super. Ct.) (the "*Washington State* Action").

[9]   The underwriter banks named as defendants in the *Washington State* Action were: J.P. Morgan Securities Inc.; Deutsche Bank Securities Inc.; Bear, Stearns & Co. Inc.; Bank of America Securities LLC; UBS Securities LLC; Morgan Stanly & Co. Incorporated; Edward D. Jones & Co.; L.P.; Citigroup Global Markets Inc.; Goldman, Sachs & Co.; Credit Suisse Securities (USA) LLC; Greenwich Capital Markets, Inc.; Lehman Brothers Inc.; Barclays Capital Inc.; HSBC Securities (USA); BNP Paribas Securities Corp.; and Merrill Lynch Pierce, Fenner & Smith Inc.

866280_2

Complaint alleged that the mortgages that were packaged, securitized and offered by the trusts were not originated in accordance with applicable standards and regulations. Furthermore, the complaint alleged that disclosures relating to the mortgages' LTV ratios and debt-to-income ratios were manipulated by defendants through the systematic over-appraisal of property values, lax or nonexistent income verification, and generally unsound underwriting practices.

25.     In preparation for filing the *Washington State* Complaint, Kessler Topaz: (i) undertook extensive background research on asset-backed securities; (ii) reviewed and analyzed publicly-available SEC filings, including the registration statements and prospectus supplements for the 398 offerings; (iii) researched Countrywide and its business; (iv) reviewed news articles, blogs and other current events discussing Countrywide and MBS; (v) had preliminary damages analyses and loss valuations performed; (vi) reviewed reports and analyses from Standard & Poor's Corporation and other rating agencies including ratings downgrades; and (vii) researched case law and statutory law applicable to plaintiffs' claims and defendants' potential defenses and removal/remand issues.

26.     Following the filing of the *Washington State* Complaint, Kessler Topaz continued to investigate the falsity of the alleged misstatements and omissions, communicated with Countrywide's counsel concerning voluntary dismissal of certain parties and scheduling, and met with other clients concerning involvement in the matter.

**E.     The Amended *Luther* Complaint Is Filed in State Court**

27.     On September 9, 2008, following remand of the Initial *Luther* Action from federal court, Luther filed a detailed, 55-page amended complaint (the "Amended *Luther* Complaint" or "Amended *Luther* Action"). The Amended *Luther* Complaint included four additional named plaintiffs (Vermont Pension Investment Committee, Mashreqbank, P.S.C., Pension Trust for Operating Engineers, and Operating Engineers Annuity Plan), who purchased certificates issued pursuant to 12

- 16 -

866280_2

of the 16 registration statements at issue, and brought claims against additional defendants named in the *Washington State* Complaint.   The Amended *Luther* Complaint likewise was brought as a putative class action pursuant to California Code of Civil Procedure §382, and alleged that defendants violated §§11, 12(a)(2) and 15 of the Securities Act.   The Amended *Luther* Complaint asserted claims on behalf of purchasers of certificates from offerings issued between 2004 and 2007.

28.     In preparation for filing the Amended *Luther* Complaint, Robbins Geller: (i) conferred with industry experts and conducted an in-depth investigation into the matters at issue in the case; (ii) continued to research and analyze the underwriting standards disclosed in the Offering Documents for all offerings; (iii) reviewed information pertaining to the due diligence investigations conducted by the New York Attorney General relating to the deterioration of lending standards and the extent of lending exceptions; (iv) reviewed and analyzed the complaint filed by the California Attorney General related to the poor quality of loans that defendants were selling to investors, as well as similar complaints filed by the Attorneys General for Indiana, Florida, West Virginia, Connecticut and Illinois; (v) researched and analyzed reports from the nation's top ratings agencies, including Fitch Investor Service, Standard & Poor's Corporation, and Moody's Investor Service, regarding the valuation and ratings of the MBS at issue; (vi) reviewed publicly-available information contained in filings with the SEC; (vii) reviewed media reports relating to Countrywide Financial Corporation and other defendants; (viii) conducted an investigation into, and performed an in-depth analysis of delinquency rates in the mortgage pools backing the MBS; and (ix) continued to research the applicable law related to plaintiffs' claims and defendants' potential defenses.

29.     The Amended *Luther* Complaint alleged that the registration statements omitted or misrepresented that the sellers of the mortgages underlying the defendant trusts were issuing mortgages to borrowers that did not comply with the stated underwriting guidelines, and as a result investors were damaged by the rapid decline

- 17 -

in value of the MBS as the market began to crumble.  Specifically, the Amended *Luther* Complaint alleged that the Offering Documents misrepresented the underwriting standards purportedly used in connection with the origination of the underlying mortgage loans and included numerous misrepresentations about the LTV ratios used to qualify borrowers, the appraisals of properties underlying the mortgages and the debt-to-income ratios permitted on the underlying loans.  The Amended *Luther* Complaint further alleged that as a result of defendants' failure to comply with the stated underlying guidelines, the certificates sold to plaintiffs and the class were much riskier than represented in the Offering Documents.

**F.  Consolidation of the *Luther* and *Washington State* Actions and Filing of the Operative Complaint**

30.    On September 9, 2008, plaintiffs in the Amended *Luther* Action filed a motion to consolidate the Amended *Luther* Action with the *Washington State* Action, and for Robbins Geller to be appointed lead counsel, together with a detailed memorandum of points and authorities in support thereof.  The plaintiffs in the Amended *Luther* Action argued that consolidation was warranted under the California Code of Civil Procedure and would enhance judicial efficiency while protecting against the threat of inconsistent adjudications in similar actions.  Plaintiffs in the Amended *Luther* Action further detailed the lengths to which Robbins Geller had gone to diligently prosecute the action, including its thorough investigation into the legal bases supporting plaintiffs' claims and review of the available factual information relating to the alleged misrepresentations in the Offering Documents, and its crafting of the detailed discovery requests and notices of depositions already served on defendants.  Together with the motion, plaintiffs filed an *ex parte* application to shorten the time for the court to consider the motion for consolidation and appointment of Robbins Geller as lead counsel.  Plaintiffs in the *Washington State* Action filed an opposition to the *ex parte* application, asserting that the proposed shortened timeframe failed to provide Washington State and other interested parties

866280_2

1   with sufficient time to: (1) respond to the motions to consolidate and for lead plaintiff

2   appointment; and (2) file their own motions for lead plaintiff and lead counsel

3   appointment.

4        31.    On September 12, 2008, the court heard oral argument regarding the

5   plaintiffs' *ex parte* application.  The court, pursuant to California Rule of Court 3.300,

6   related the Amended *Luther* Action and the *Washington State* Action under the

7   caption *Luther v. Countrywide Home Loans Servicing, LP*, No. BC380698 (Cal.

8   Super. Ct.) and designated the Amended *Luther* Action as the lead case.  Thereafter,

9   Robbins Geller and Kessler Topaz met and conferred and concluded that cooperation

10  between counsel and plaintiffs in the Amended *Luther* Action and the *Washington*

11  *State* Action was in the best interest of the putative class.

12       32.    On October 6, 2008, the court appointed plaintiffs in the Amended *Luther*

13  Action and the *Washington State* Action, including newly joined Maine State Public

14  Employees Retirement System as co-lead plaintiffs in the consolidated action (the

15  "*Luther* Plaintiffs").  Additionally, the court appointed Robbins Geller and Kessler

16  Topaz as co-lead counsel on behalf of the class ("*Luther* Plaintiffs' Counsel") and

17  ordered the *Luther* Plaintiffs to file a consolidated complaint.

18       33.    On October 16, 2008, the *Luther* Plaintiffs filed the 95-page Operative

19  Complaint (or the *Luther* Action).  The Operative Complaint was brought on behalf of

20  all persons or entities who acquired Certificates pursuant to 20 false and misleading

21  Registration Statements filed with the SEC between January 2005 and December

22  2007.  The *Luther* Action was brought as a class action pursuant to California Code

23  of Civil Procedure §382 and asserted strict liability and negligence claims brought

24  pursuant to §§11, 12(a)(2) and 15 of the Securities Act.  All told, the Operative

25  Complaint addressed 429 Offerings.

26       34.    In preparation for filing the Operative Complaint, Robbins Geller and

27  Kessler Topaz: (i) conferred with experts and investigated the matters underlying the

28  action; (ii) reviewed and analyzed publicly-available information regarding the

866280_2

defendants, including reviewing the Prospectus Supplements for each of the 429 Offerings and the 20 Registration Statements at issue that were filed with the SEC; (iii) reviewed media and investigative reports relating to the defendants and conducted an extensive nationwide review of court dockets and filings pertaining to private civil and criminal litigation and government actions related to defendants' loan origination practices, including keeping apprised of developments in (a) the federal Countrywide securities action and state representation and warranties actions; (b) settlements in other litigation; and (c) investigations launched by Attorneys General of several states; (iv) sifted through and reviewed myriad news articles devoted to uncovering defendants' alleged lax origination and underwriting practices; (v) reviewed statements made by former Countrywide employees, and (vi) researched the applicable law related to the *Luther* Plaintiffs' claims and defendants' potential defenses.

35.     As alleged in the Operative Complaint, the Registration Statements represented that the underlying mortgages were originated pursuant to underwriting guidelines purportedly designed to evaluate: (1) the borrower's ability to repay; and (2) the value of the mortgaged property to serve as collateral.  Based on counsels' exhaustive research and investigation, the Operative Complaint alleges that the representations were false and misleading because defendants failed to disclose that the underwriting standards were in fact not designed to accurately evaluate a borrower's ability to repay or the true value of a mortgaged property.  Additionally, the Operative Complaint alleges that while each Prospectus Supplement included detailed disclosures regarding appraisals performed on the mortgaged property, the Prospectus Supplements failed to disclose that the appraisals of many of the underlying properties were inflated so that the loan would be approved, and that appraisers were rewarded for inflating appraisal values.  As a result of the inflated appraisals, the LTV ratios of the collateral underlying the pooled mortgages, as disclosed to investors through the Offering Documents, were inaccurate, false and

866280_2

misleading.   Because of defendants' alleged misrepresentations and omissions regarding the underwriting defects and appraisal manipulations, they were able to secure "AAA" ratings for many of the Certificates.  The Operative Complaint alleges, however, that the Certificates should not have received AAA ratings and as the truth regarding defendants' alleged systemic failure to comply with stated underwriting standards and appraisal guidelines emerged, the value of the Certificates plummeted, thereby damaging the *Luther* Plaintiffs and the class.[10]

### G.   Defendants Move to Stay Discovery in the Consolidated State Action

36.   On October 1, 2008, defendants filed a motion to stay discovery in the *Luther* Action pending resolution of defendants' yet-to-be-filed demurrers to the Operative Complaint.  Alternatively, defendants argued discovery should be stayed pending coordination of discovery between the *Luther* Action and certain federal securities class actions proceeding in federal court, including *In re Countrywide Financial Corporation Securities Litigation*, No. 07-CV-05295-MRP (MANx) (C.D. Cal.) ("*New York Funds*").  On October 14, 2008, the *Luther* Plaintiffs filed an opposition to defendants' motion, based on the premise that defendants could not create an analog to the Private Securities Litigation Reform Act of 1995's ("PSLRA") discovery stay in state court simply by analogizing their demurrers, which were not yet filed, to motions to dismiss under the Federal Rules of Civil Procedure.  The *Luther* Plaintiffs crafted their argument around federal statutory text and congressional intent, together with California's Code of Civil Procedure, which allows for reasonable discovery notwithstanding a pending demurrer.  The *Luther* Plaintiffs also argued that a stay of discovery would be prejudicial because Luther's original discovery requests were nearly a year old, and there was a very real threat of loss of witnesses, memories and evidence.  Citing differences in claims, classes of plaintiffs,

---

[10]   On October 20, 2008, plaintiffs requested to dismiss without prejudice the defendant trusts.

1  types of securities and different representations made by certain different defendants,

2  the *Luther* Plaintiffs steadfastly argued that there was no basis for state court

3  discovery to fall behind the factually distinct federal securities fraud class actions.

4  Defendants filed their reply brief in support of their motion to stay discovery on

5  October 20, 2008.

6       37.    On November 21, 2008, the parties filed a 20-page Joint Initial Status

7  Conference Report, highlighting outstanding items and the parties' positions with

8  regard to the core factual and legal issues, how discovery should be conducted and

9  proposed scheduling. On November 25, 2008, the parties appeared at a status

10  conference and motion hearing before Judge Elias of the Superior Court regarding

11  defendants' motion to stay discovery. At the hearing, *Luther* Plaintiffs' Counsel gave

12  an in-depth recitation of the factual differences between the state court MBS action

13  and the pending federal stock action (*New York Funds*) and discussed the potential

14  overlap of other Countrywide cases. The *Luther* Plaintiffs' Counsel further addressed

15  the potential problem of receiving a larger amount of discovery than would be

16  specifically relevant and admissible into evidence in the *Luther* Action, were

17  discovery to be coordinated with the federal actions. At the hearing, Judge Elias said

18  she was not inclined to stay discovery pending resolution of defendants' demurrers,

19  but was inclined to coordinate discovery with the federal actions to avoid duplicative

20  document production and depositions.

21       38.    Following the November 25, 2008 hearing, the court ordered the parties

22  to develop a general plan for coordinating discovery with the federal actions. The

23  court further allowed the *Luther* Plaintiffs to begin serving subpoenas on third parties

24  for the purpose of preserving documents, and the *Luther* Plaintiffs began serving such

25  subpoenas shortly thereafter. *See* §V.E, *infra*.

26

27

28

866280_2

### H.   Defendants' Initial Demurrer Based on SLUSA and Standing

39.    On March 6, 2009, defendants filed their first round of demurrer briefing. The demurrers raised several arguments with regard to the justiciability of the action. Namely, defendants argued that: (i) the claims alleged in the Operative Complaint were subject to exclusive federal jurisdiction as a "covered class action" under SLUSA; (ii) separate and apart from the supposed lack of subject matter jurisdiction, neither the *Luther* Plaintiffs nor class members sustained any judicially cognizable harm as a result of any MBS purchase; (iii) the named *Luther* Plaintiffs lacked standing to pursue claims, as they failed to allege specific Offerings from which the *Luther* Plaintiffs purchased MBS; (iv) the *Luther* Plaintiffs failed to state a claim under the Securities Act because they did not allege to have incurred any recoverable losses; (v) the Operative Complaint failed because it "sounded in fraud" and therefore was subject to heightened pleading requirements which were not met; and (vi) plaintiffs did not state a claim under §12(a)(2) of the Securities Act because they did not adequately allege that any of the Countrywide defendants actually sold securities to the plaintiffs.[11]   Additionally, the *Luther* Plaintiffs were presented with separate demurrers filed by individual defendants Sambol, Grogin, Boone, and McLaughlin, who demurred to the complaint based on additional arguments related to timeliness and whether the Registration Statements were signed by certain of the individual defendants.[12]

40.    On April 3, 2009, the *Luther* Plaintiffs filed an Omnibus Memorandum of Law in Support of Opposition to Defendants' Demurrers and Joinders Thereto. Despite the fact that plaintiffs believed the demurrers raised improper issues of fact not ripe for adjudication on a demurrer, the 55-page opposition addressed each of

---

[11]   Other defendants joined in the Countrywide defendants' demurrer.

[12]   Individual defendants Grogin, Boone and McLaughlin were dismissed from the action with prejudice prior to the date for filing the oppositions to their demurrers.

866280_2

defendants' arguments in turn, responding in-depth to the unique issues presented. Plaintiffs' opposition provided a roadmap for the action to proceed under California law, succinctly reiterated the allegations in the Operative Complaint, detailed the falsity of defendants' misrepresentations and provided a basis for relief under the Securities Act.  Plaintiffs rebuffed defendants' SLUSA arguments, citing to the Court's and the Ninth Circuit's prior remand based on defendants' failed removal under CAFA.  Namely, plaintiffs argued that federal Securities Act class actions had a place to proceed in state court and were tasked with demonstrating that the MBS at issue were not "covered class actions" that would deprive the state court of jurisdiction under SLUSA.  Further, plaintiffs addressed defendants' assertions that the Operative Complaint did not allege cognizable harm, by carefully citing the plain language of the Securities Act, which requires only a demonstration of decline in value of securities, and asserted that such a demonstration was presented in the detailed Operative Complaint.  Plaintiffs further argued that in any event, under California law, any issue of damage is a factual question not suited for resolution on demurrer.  Finally, the *Luther* Plaintiffs fully addressed the issue of standing under both the Securities Act and California class action procedure raised by defendants' demurrers.  In the opposition to demurrers and throughout the litigation, plaintiffs repeatedly demonstrated a keen understanding of both California class action and federal securities laws.  Briefing on defendants' demurrers was completed on April 24, 2009.

41.    On May 14, 2009, the court held oral argument to resolve defendants' demurrers.  The court was primarily concerned with whether SLUSA abrogated state court subject matter jurisdiction over the action.  In an extensive argument, *Luther* Plaintiffs' Counsel discussed the concurrent jurisdiction of state and federal courts over alleged violations of the Securities Act.  *Luther* Plaintiffs' counsel also provided an in-depth analysis, retracing the Court's and the Ninth Circuit's previous holdings with regard to defendants' initial attempt at CAFA removal.  *Luther* Plaintiffs'

- 24 -

Counsel presented novel arguments that the MBS at issue were not "covered securities" that would allow for removal under SLUSA. The court declined to issue a ruling disposing of the jurisdictional question presented at the hearing and instead urged counsel to stipulate to remove the case to federal court. The court also refrained from ruling on defendants' demurrers at that time.

42. After the May 14, 2009 hearing, counsel for the parties continued to engage in meet-and-confer discussions but were unable to reach an agreement regarding a mechanism for litigating the *Luther* Plaintiffs' claims in federal court. On June 15, 2009, the state court issued an order requiring that the *Luther* Plaintiffs file an action in federal court, based on the unresolved issue of whether SLUSA stripped the state court of jurisdiction. The June 15, 2009 order also stayed the California action pending the filing of a federal action.

**I.     Plaintiffs File a Complaint for Declaratory Relief in Federal Court**

43. On August 24, 2009, at the state court's direction, the *Luther* Plaintiffs filed a Complaint for Declaratory Relief in this Court. *See Luther v. Countrywide Fin. Corp.*, No. 2:09-cv-06162-MRP-MAN, Dkt. No. 2 (C.D. Cal.). A declaration from the Court that SLUSA did not impede the state court's jurisdiction was vital to the continued litigation of the action in state court. The complaint synopsized plaintiffs' state court allegations and included a detailed procedural history of the action. In a thorough analysis, plaintiffs fully scrutinized the relevant statutory text, again presenting the issue of whether the MBS are "covered securities" under SLUSA. The *Luther* Plaintiffs additionally provided an in-depth analysis of the congressional intent behind the enactment of SLUSA. On September 29, 2009, the Court ordered the parties attend a status conference to "discuss this case's unusual procedural background (including its proprietary and jurisdictional implications) and the related proceedings in the state court." *Luther*, No. 2:09-cv-06162-MRP-MAN, Dkt. No. 49 (C.D. Cal. Sept. 29, 2009). The status conference was held on October 8, 2009,

- 25 -

1  during which counsel for the *Luther* Plaintiffs and defendants argued their respective

2  positions concerning whether SLUSA precludes state court jurisdiction under the

3  Securities Act.

4      44.    On October 9, 2009, the Court dismissed plaintiffs' Complaint for

5  Declaratory Relief, concluding that the state court was "equally competent" to

6  determine the question of whether the state court had continuing subject matter

7  jurisdiction under SLUSA to hear class action cases filed exclusively under the 1933

8  Act. *Luther*, No. 2:09-cv-06162-MRP-MAN, Order Dismissing the Complaint, Dkt.

9  No. 59 (C.D. Cal. Oct. 9, 2009).

10     **J.    Dismissal of the *Luther* State Court Action Under SLUSA**

11     45.    On October 23, 2009, the *Luther* Plaintiffs filed a motion in state court

12 both to vacate the stay put in place prior to the filing of the declaratory action and

13 deny defendants' demurrers.  The *Luther* Plaintiffs asserted that since the declaratory

14 action was resolved by the Court, the state court action should no longer be stayed.

15 Relying on newly issued Ninth Circuit case law and a straightforward application of

16 statutory text, plaintiffs argued that because their claims were not brought under state

17 securities laws, which would implicate SLUSA, the action was ripe for adjudication in

18 state court.  On December 3, 2009, defendants filed a supplemental memorandum in

19 support of their demurrer to the Operative Complaint.   In the supplemental

20 memorandum, defendants opposed plaintiffs' motion to vacate the stay, or in the

21 alternative, if the court determined that the action should proceed, defendants asked

22 the court to first decide the question of subject matter jurisdiction.

23     46.    On December 10, 2009, plaintiffs filed a reply brief in support of their

24 motion to vacate the stay and deny defendants' demurrers.  The reply brief again

25 asserted that SLUSA was not an impediment to plaintiffs' state action, and addressed

26 the issues of standing, economic loss and misrepresentations.  On January 6, 2010,

27 Superior Court Judge Elias issued an order granting plaintiffs' motion to vacate the

28 stay, while at the same time ruling on defendants' pending demurrers.  Order re: (1)

866280_2

1    Motion to Vacate Stay; and (2) Demurrers, No. BC380698 (Cal. Sup. Ct. Jan. 6,

2    2010).  The court concluded that SLUSA divested the state court of subject matter

3    jurisdiction over plaintiffs' Securities Act class action claims.  The judgment of

4    dismissal of the action was filed on March 3, 2010.

**K.    Plaintiffs File a Separate Securities Class Action in Federal Court**

47.    On January 14, 2010, Maine State, a lead plaintiff in the *Luther* Action,

filed a separate action in federal court in order to preserve the interests of the Class

against defendants' timeliness arguments should the California Court of Appeal affirm

the dismissal of the state court action.  *See Maine State Ret. Sys. v. Countrywide Fin.

Corp., et al.*, No. 2:10-cv-00302-MRP-MAN (C.D. Cal.) (the "*Maine State* Action").

48.    On April 2, 2010, after plaintiffs filed their notice of appeal of the state

court dismissal, plaintiffs Vermont Pension Investment Committee, Mashreqbank,

p.s.c., Pension Trust Fund for Operating Engineers, Operating Engineers Annuity

Plan, Washington State Plumbing & Pipefitting Pension Trust and Maine State (the

"Investor Group Plaintiffs") collectively filed a motion for appointment as lead

plaintiffs pursuant to the PSLRA and approval of Robbins Geller and Kessler Topaz

as co-lead counsel for the class. Pursuant to the PSLRA, the Investor Group Plaintiffs

certified that they purchased the securities at issue and identified such transactions.

On April 12, 2010, the Investor Group Plaintiffs filed an opposition to competing

motions for appointment as lead plaintiff, and on April 19, 2010, filed a reply

memorandum in further support of their motion for appointment as lead plaintiff.  The

court held oral argument on the lead plaintiff appointment on May 3, 2010.  On May

14, 2010, the Court, after a rigorous analysis, appointed an unrelated plaintiff, Iowa

Public Employees' Retirement System as lead plaintiff, and appointed its counsel,

1 Cohen Milstein as lead counsel.[13]  Thereafter, the Investor Group Plaintiffs, along

2 with plaintiff Luther, continued to pursue their appeal in state court.

3 **L.      Plaintiffs Appeal the State Court Dismissal**

4          49.     On March 5, 2010, plaintiffs filed a notice of appeal from the Superior

5 Court's dismissal of the action in the California Court of Appeal, Second Appellate

6 District.  On July 14, 2010, pointing to the *Maine State* Action pending before the

7 Court, defendants filed a motion to stay the state action proceedings in the California

8 Court of Appeal on the grounds that the same litigation was proceeding

9 simultaneously in different forums.  While plaintiffs were in the midst of researching

10 and drafting a response to defendants' motion, the California Court of Appeal denied

11 defendants' motion to stay the state court proceedings on July 15, 2010.

12         50.     On July 22, 2010, plaintiffs filed their opening appellate brief in support

13 of reversal of the state court's dismissal based on SLUSA.  Plaintiffs' comprehensive

14 34-page submission again addressed complex jurisdictional issues and included

15 substantive statutory interpretation supporting plaintiffs' position.  On October 22,

16 2010, defendants responded to plaintiffs' opening brief.  Plaintiffs filed a reply brief

17 on November 24, 2010, refuting defendants' challenges and reiterating that the MBS

18 at issue were not "covered securities" that would strip the state court of jurisdiction

19 under SLUSA.

20         51.     Following oral argument on April 4, 2011, the California Court of Appeal

21 unanimously vindicated plaintiffs' right to continue to assert their Securities Act

22 claims in state court on May 18, 2011.  *Luther*, 195 Cal. App. 4th 789.  At that time,

23 the opinion of the California Court of Appeal was the only appellate decision in the

24 country to touch on the unique issues presented by concurrent jurisdiction over

25

26 ─────────────────
   [13]  Iowa Public Employees' Retirement System and its counsel, Cohen Milstein, continued litigating the *Maine State* Action in federal court.  Plaintiff Maine State was not a lead plaintiff in the *Maine State* Action as the action moved forward after the lead plaintiff appointment.  The *Maine State* Action is part of this Settlement together with the *Luther* and *Western Conference* Actions.

27

28

866280_2

1  Securities Act class action claims in light of SLUSA.  On June 2, 2011, defendants

2  filed a petition for rehearing with the Court of Appeal, which was denied on June 17,

3  2011.

4       52.    On June 27, 2011, defendants filed a petition for review of the Court of

5  Appeal's reversal of the state court dismissal with the California Supreme Court (No.

6  S194319 (Cal. Sup. Ct.)).  On July 18, 2011, plaintiffs filed an answer to defendants'

7  petition, asserting that the Court of Appeal thoroughly deliberated on complex issues

8  of first impression and properly decided the appeal.  Plaintiffs argued that review by

9  the California Supreme Court was not warranted in the first place as there existed no

10  split of California authority on the issue.  Plaintiffs further argued that statutory

11  interpretation and case law supported the finding of the Court of Appeal.  Plaintiffs

12  distinguished the case law relied on by defendants throughout the appeals process, and

13  again reiterated that the MBS at issue were not "covered securities" under SLUSA

14  that would justify stripping the state court of jurisdiction.

15       53.    On September 14, 2011, the Supreme Court of California denied

16  defendants' petition for review.  Shortly thereafter, defendants moved the Court of

17  Appeal for a stay of remittitur pending the disposition of a petition for writ of

18  *certiorari* to the United States Supreme Court.  Both the motion to stay the remittitur

19  and defendants' petition for writ of *certiorari* to the United States Supreme Court

20  were subsequently denied.  On September 27, 2011, plaintiffs' action was remitted

21  back to the Superior Court.

22      **M.**    **The *Western Conference* Action Is Filed in State Court**

23       54.    On November 17, 2010, while the *Luther* Action was on appeal in

24  California, a separate plaintiff, through its counsel Robbins Geller, filed an action in

25  the Superior Court of the State of California, County of Los Angeles.[14]  The *Western*

26  _____

27  [14]  The action was styled *Western Conference of Teamsters Pension Trust Fund v. Countrywide Financial Corp., et al.*, No. BC449726 (Cal. Super. Ct.) (the "*Western*

28  *Conference* Action").

*Conference* Action alleged claims under §§11, 12(a)(2) and 15 of the Securities Act and was brought as a putative class action pursuant to California Code of Civil Procedure §382 on behalf of all persons or entities who acquired certificates pursuant and/or traceable to 20 Registration Statements for the Trusts' Offerings, and had been damaged thereby.  In addition to the defendants named in the *Luther* Action, the *Western Conference* Action included successor liability allegations against Bank of America Corporation and NB Holdings.

55.    On January 4, 2011, the parties jointly requested that the *Western Conference* Action be stayed pending a decision on plaintiffs' appeal of the Superior Court's dismissal of the *Luther* Action for lack of subject matter jurisdiction under SLUSA.  Plaintiffs succeeded in their appeal and thereafter, the *Luther* Action was remitted to the state court.  *See* §III.N.

**N.    Plaintiffs' State Court Action Is Revived**

56.    On November 10, 2011, following remittitur of the action from the California Court of Appeal, plaintiffs filed a statement in advance of a scheduled November 17, 2011 status conference.  In the statement, plaintiffs provided an in-depth review of the unique and complex procedural history of the case over the previous four years of litigation.  Additionally, plaintiffs urged the court to consolidate the *Western Conference* Action with the *Luther* Action, now that it was clear that both actions would properly proceed in state court.  Plaintiffs also described issues with regard to standing and analyzed the current state of federal law in that regard.  The crux of plaintiffs' argument, however, was that standing was a uniquely procedural matter, governed by the laws of the state of California.  Comparing the law on standing at the state level to that at the federal level in the MBS context, plaintiffs argued that California's "community of interest" standard broadly defined the scope of the class that plaintiffs could represent in state court, thereby providing plaintiffs with registration statement based standing in California state court.  Plaintiffs represented that in the event the court took a more narrow view, plaintiffs were

willing to amend their pleadings, should the court allow, in order to include additional named plaintiffs.

57.     On November 16, 2011, defendants filed a motion to stay the state court proceedings pending resolution of their petition to the United States Supreme Court for a writ of *certiorari* on the SLUSA jurisdiction issue.  On November 17, 2011, the parties appeared before the court for a status conference to discuss the briefing schedule for defendants' renewed demurrers and the possibility of continuing defendants' motion to stay, so as to allow plaintiffs time to oppose the motion. Defendants withdrew their motion to stay the action on January 13, 2012, after the United States Supreme Court denied their petition for writ of *certiorari*.

### O.     Defendants File Renewed Demurrers on Standing and Timeliness

58.     On December 19, 2011, defendants filed renewed demurrers to plaintiffs' Operative Complaint based on standing and timeliness arguments.  Defendants Sieracki, Sambol and Kurland each also filed separate demurrers.  Defendants relied on federal case law to argue that plaintiffs only had standing to sue on behalf of tranches they actually purchased.  Additionally, defendants argued that the three-year statute of repose or one-year statute of limitations barred certain of plaintiffs' claims.

59.     On January 19, 2012, plaintiffs filed oppositions to the renewed demurrers.  Plaintiffs raised unique issues of California procedural law, including the community of interest standard governing standing in California class actions. Importantly, plaintiffs distinguished California class actions from federal class actions, noting that Article III standing did not apply in California state court to bar plaintiffs from pursuing class claims.  As an added measure, plaintiffs also analogized the facts of their case to other MBS cases in federal courts – the majority of which, plaintiffs argued, recognized that at the very least offering-based standing applied to MBS cases asserting claims under federal law.  Additionally, plaintiffs argued that California law is liberally construed to allow plaintiffs to amend their complaint to

866280_2

include plaintiff-purchasers of other MBS at issue.   Plaintiffs also rebuffed defendants' arguments that the claims were untimely, citing to the pre-Securities Offering Reform liability scheme ("pre-SOR"),[15] as well as California's "relation back" doctrine.   Plaintiffs separately opposed the Sieracki, Sambol and Kurland demurrers, arguing that the statute of limitations did not bar claims for which plaintiffs could not have discovered facts supporting their cause of action until after June 2007, well within the statute of limitations imposed by §13 of the Securities Act.   Briefing on the renewed demurrers was completed on February 9, 2012 and a hearing was scheduled for March 2, 2012.   The court thereafter rescheduled the hearing for July 18, 2012.   On June 26, 2012, the court took the hearing off-schedule due to defendants' removal of the actions based upon the bankruptcy filings of certain mortgage loan originators whose loans were pooled into a limited number of the MBS at issue in the actions.  *See* §III.R, *infra*.

## P.   Plaintiffs Request the Commencement of Document Discovery

60.   On December 29, 2011, after defendants filed their demurrers, plaintiffs met and conferred with defendants' counsel, and requested that defendants produce in the *Luther* Action the same documents produced in the federal *Maine State* Action, including due diligence reports for some of the MBS at issue.

61.   On January 4, 2012, after defendants refused plaintiffs' request for documents, and in the midst of briefing on the renewed demurrers, plaintiffs filed a request to commence discovery.   Defendants filed an opposition to plaintiffs' request on January 5, 2012.   The same day, the court held a status conference to discuss the implications of document production proceeding in the federal case and asked the

---

[15]   In connection with this argument, plaintiffs conducted extensive research on the history and enactment of the Securities Offering Reform as plaintiffs' arguments regarding when the statute of repose began to run for certain parties under the pre-SOR liability scheme was both novel and unique.

866280_2

1   parties to submit further briefing on the issue surrounding commencement of

2   discovery in the state action.

3        62.    On January 10, 2012, plaintiffs filed a detailed memorandum in support

4   of their motion to lift the discovery stay.  Importantly, plaintiffs argued that California

5   procedural law governed discovery and that California law allowed plaintiffs to

6   commence discovery during the pendency of a demurrer.  Additionally, plaintiffs

7   argued that defendants should not be permitted to use the PSLRA as a shield to avoid

8   producing to plaintiffs the million pages of documents that had already been produced

9   in the federal *Maine State* Action.  Plaintiffs argued that the documents produced in

10  the *Maine State* Action starting in late December 2011 would be relevant and similar

11  to the documents that would eventually be produced in plaintiffs' state action.

12  Namely, the documents would tend to show Countrywide's failure to follow

13  underwriting guidelines, as well as defendants' failure to disclose to investors that

14  defective mortgages were being bundled and used to securitize the MBS at issue.

15  Additionally, plaintiffs argued that defendants would face no additional burden

16  because defendants had begun the process of producing to the *Maine State* plaintiffs

17  those documents previously produced in the *New York Funds* action.  Plaintiffs'

18  arguments were based on the fact that in order to avoid duplicative depositions,

19  plaintiffs were entitled to the production of the relevant documents so that they could

20  review them in a timely manner prior to the contemplated depositions.  Plaintiffs

21  further argued that, in the alternative, even if the PSLRA did apply to the state court

22  action, the PSLRA discovery stay is not absolute, and the state court, using its

23  discretion, could properly lift the stay.  In support of this alternative argument,

24  plaintiffs proffered that they would be unfairly prejudiced should the stay not be lifted,

25  and that because the request was particularized, only a minimal burden, if any, would

26  be placed on defendants.

27        63.    On January 24, 2012, defendants filed their opposition to plaintiffs'

28  motion to lift the discovery stay.  Plaintiffs filed their reply on January 31, 2012,

866280_2

1    further arguing that, as defendants acknowledged, even if the PSLRA discovery stay

2    applied in state court, it only applied to claims that were reasonably in dispute and

3    potentially subject to dismissal.   Plaintiffs argued that following the recently

4    completed demurrer briefing, it was clear that plaintiffs' claims would proceed at least

5    as to those securities which the named plaintiffs purchased.

6        64.    On February 15, 2012, the state court held a hearing on the *Luther*

7    Plaintiffs' motion to lift the discovery stay.  At that time, the state court ordered

8    defendants to produce to plaintiffs those documents that were previously produced in

9    the *New York Funds* action.  Thereafter, defendants began producing the documents,

10   and plaintiffs immediately commenced document review of the newly-produced

11   documents.

12       **Q.    Defendants Move to Stay the *Luther* and *Western Conference***
         **Actions in Light of the Pendency of the *Maine State* Action in**
13       **Federal Court**

14       65.    On February 3, 2012, after briefing on plaintiffs' motion to lift the

15   discovery stay was completed, defendants moved to stay the state court actions,

16   arguing that proceeding with the *Luther* and *Maine State* Actions would be needless

17   and wasteful.  On February 17, 2012, the *Luther* Plaintiffs opposed defendants'

18   motion.  Plaintiffs argued that the state court actions, which had been actively litigated

19   for over four years, should not be stayed for several reasons.  First, the *Luther*

20   Plaintiffs noted that defendants simply rehashed the very same arguments that they

21   had already made to the California Court of Appeal, which previously denied

22   defendants' request to stay the action.  Plaintiffs further argued that their state actions

23   were separate and different from the pending federal action (because the Court had

24   adopted defendants' standing arguments), and that the damages in the state court

25   actions were larger than those claimed in the federal *Maine State* Action.  The state

26   court scheduled a hearing to address defendants' motion to stay, along with

27   defendants' demurrers, for March 2, 2012 and then rescheduled the hearing for July

28   18, 2012.  The court, however, took the hearing off-schedule because defendants

866280_2

removed the actions again, this time under the "related to" federal bankruptcy provision of the removal statute.  *See* §III.R, *infra*.

### R.   *Luther* and *Western Conference* Are Removed Under Federal Bankruptcy Law

66.   On June 12, 2012, prior to the scheduled state court hearing on defendants' demurrers and motions to stay the state court proceedings in light of the *Maine State* Action, defendants again removed the actions to federal court. Defendants based their removal on 28 U.S.C. §1452(a), asserting that the consolidated *Luther* and *Western Conference* Actions were "related to" federal bankruptcy proceedings filed by third-party lenders, which originated certain of the loans backing the MBS at issue in the *Luther* and *Western Conference* complaints.

67.   On July 12, 2012, plaintiffs filed a motion to remand the *Luther* and *Western Conference* Actions.  Plaintiffs provided the Court with several arguments in support of their motion to remand.  First, plaintiffs asserted that it is a basic canon of statutory construction that the Securities Act, which contains a specific and precise bar on removal, could not be subsumed by the later enacted bankruptcy statute allowing for general "related to" bankruptcy removal.  Second, plaintiffs argued that defendants waived removal of the *Luther* Action as a result of related bankruptcy proceedings when they failed to raise this alternative basis for removal in their initial CAFA removal motion.  Third, and in any event, plaintiffs argued the volume of loans originated by the now-bankrupt originators was too *de minimus* to warrant removal and there was not a "sufficient link" between the *Luther* and *Western Conference* Actions and the bankruptcy proceedings.  Not only did the loans originated by the bankrupt entities represent a negligible portion of the collateral underlying the offerings at issue, plaintiffs, upon diligent investigation, determined that only a small portion of the total offerings at issue in the *Luther* and *Western Conference* Actions contained any loans originated by the bankrupt originators.  Fourth, plaintiffs additionally argued that in the interests of equity, the Court should remand the actions.

- 35 -

1   Plaintiffs also provided a thorough analysis of the fourteen equitable factors that

2   weighed in favor of remand.  Defendants opposed the motion on August 3, 2012, and

3   briefing concluded with plaintiffs' reply brief filed on August 10, 2012.  Plaintiffs

4   again reiterated that defendants had continuously sought to disturb plaintiffs' choice

5   of forum and also presented argument based on statutory construction and strict versus

6   general removability provisions.  The Court held oral argument on August 24, 2012,

7   and on August 31, 2012, denied plaintiffs' motion to remand.

8   **S.   Defendants' Motions to Dismiss the Actions**

9        68.   On November 1, 2012, the parties filed a Joint Status Report with the

10   Court.  In the submission, defendants requested that the Court rule on defendants'

11   statute of limitations, statute of repose and standing arguments made in their state

12   court demurrers, rather than require that defendants file motions to dismiss the actions.

13   Plaintiffs argued against this course of action, asserting that it would be procedurally

14   improper for the Court to consider defendants' state court demurrers as being

15   equivalent to federal motions to dismiss the actions.  The Court agreed with plaintiffs

16   and, on November 2, 2012, set the briefing schedule for defendants' motions to

17   dismiss based on standing, timeliness and the merits.

18        69.   On November 30, 2012, defendants moved to dismiss the *Luther* and

19   *Western Conference* Actions based on a lack of statutory and constitutional standing,

20   the failure to file the actions within the applicable statutes of repose and limitations,

21   and on the merits.[16]  On January 21, 2013, plaintiffs filed a 40-page opposition to

22   defendants' motion to dismiss.  Plaintiffs argued that, as a result of defendants'

23   misleading statements in the Registration Statements and Prospectus Supplements,

24   plaintiffs had standing to pursue claims for all tranches offered pursuant to those

25   Registration Statements or, at the very least, all tranches within the same offerings

26   from which plaintiffs purchased, since plaintiffs shared the same set of concerns as

27   

28   ────────────────────

[16]   Defendants Sandefur, Adler and Kripalani joined in the Countrywide defendants' motion to dismiss.

1    purchasers of other tranches.  Plaintiffs argued, *inter alia*, that both Article III of the

2    Constitution and the Securities Act conferred on plaintiffs the right to bring Securities

3    Act claims on behalf of the putative class.  After exhaustively researching the ever-

4    changing landscape of MBS standing decisions, plaintiffs argued that a determination

5    as to the **scope** of the class that plaintiffs were permitted to represent was

6    appropriately reserved for class certification and was not a matter of individual

7    standing, but rather was a question of "class standing."  Plaintiffs also argued that they

8    should be permitted to amend the pleadings to add additional plaintiffs to cure any

9    standing deficiencies that the Court identified.   Plaintiffs also addressed the

10   sufficiency of the allegations in the complaints under the notice pleading requirements

11   of Fed. R. Civ. P. 8(a).  Finally, plaintiffs argued that the vast majority of their claims

12   were timely under both the statute of repose and statute of limitations imposed by the

13   Securities Act, providing a detailed analysis of the applicable statute of repose trigger

14   dates under the pre-SOR liability scheme.   This analysis involved novel and

15   complicated issues of statutory interpretation the resolution of which stood to

16   dramatically decrease the size of plaintiffs' putative class.[17]

17       70.    In the opposition to defendants' motions to dismiss, plaintiffs also

18   addressed defendants' arguments regarding the timeliness of the *Western Conference*

19   Action.   Plaintiffs demonstrated that the question of whether the Initial *Luther*

20   Complaint tolled the statute of limitations for the later-filed *Western Conference*

21   Action was uniquely a matter of California law, i.e., that California tolling principles

22   applied.  Thus, although defendants attempted to assert that the *Western Conference*

23   Action was barred by the Court's prior holdings on the issue of cross-jurisdictional

24   tolling, plaintiffs argued that these holdings were not implicated because the *Western*

---

25   [17]  Plaintiffs also filed separate oppositions to the motions to dismiss filed by
26   defendants Sambol, Kurland and Sieracki.  Though these defendants joined in the
     Countrywide defendants' motion to dismiss, each also advanced unique arguments,
27   namely with regard to the statute of limitations and control person liability.  In their
     opposition to defendant Sambol's motion to dismiss, plaintiffs also requested leave to
28   amend to add a §15 claim.

1  *Conference* Action was filed in state court.  Rather, as plaintiffs argued, because the

2  Initial *Luther* Action and the *Western Conference* Action shared a "well-defined

3  'community of interest' in the questions of law and fact involved," the Initial *Luther*

4  Action tolled the statute of limitations for the *Western Conference* Action.  *Daniels v.*

5  *Centennial Grp., Inc.*, 16 Cal. App. 4th 467, 473, 21 Cal. Rptr. 2d 1 (1993).

6       71.    In a stand-alone brief also filed on January 21, 2013, the *Western*

7  *Conference* plaintiff addressed the Bank of America Defendants' motion to dismiss

8  the successor-in-interest claims.  Plaintiff Western Conference tailored its argument

9  based on conflict of law principles.  Plaintiffs argued that under both California and

10  Delaware law, plaintiff's successor liability claims should be upheld on the grounds

11  that a *de facto* merger occurred between Bank of America and Countrywide Financial

12  Corporation.  In support of its position, plaintiff argued that Bank of America assumed

13  Countrywide's liabilities, had paid to resolve Countrywide's litigation, and had

14  included Countrywide's assets and liabilities on its financial statements.  Defendants

15  filed their reply brief in support of the motions to dismiss on February 14, 2013.

16       72.    On March 12, 2013, at the Court's instruction, the *Luther* Plaintiffs

17  submitted a detailed history of the proceedings in advance of the hearing on

18  defendants' motions to dismiss.[18]  The Court held oral argument on March 13, 2013.

19  The Court took the parties' positions into consideration and the matter was *sub judice*

20  at the time the parties reached a settlement-in-principle on April 16, 2013.

21  **IV.    PLAINTIFFS' INVESTIGATION AND ANALYSIS**

22       73.    The parties negotiated the Settlement on an informed basis and with a

23  thorough understanding of the merits and value of the plaintiffs' claims and

24  defendants' defenses obtained, in part, from the *Luther* Plaintiffs' investigatory efforts

25  and discovery.

---

26  [18]   Immediately prior to the motion to dismiss hearing, plaintiffs reached an agreement

27  with defendant Sambol to voluntarily dismiss him from the action. Pursuant to Fed. R. Civ. P. 41(a)(1), plaintiffs subsequently voluntarily dismissed Sambol from the *Luther*

28  and *Western Conference* Actions, with prejudice, on March 25, 2013.

866280_2

74.     As noted above, the *Luther* Plaintiffs, through their counsel, conducted an extensive investigation of the claims asserted in the litigation.  This investigation began prior to the filing of the initial complaints with a review of all relevant public information, including public statements, filings with the SEC, regulatory filings and reports, the Prospectus Supplements for each of the 429 Offerings and 20 Registration Statements at issue, as well as securities analysts' reports, advisories and media reports about the defendants, each of the underwriters identified in the Offering Documents, the mortgage and securitization markets in general, and the rating agencies.  Counsel also conferred with and retained industry experts, reviewed the litigation files relating to actions filed by numerous states' Attorneys General regarding, *inter alia*, the deterioration of lending standards and lending exceptions, and the poor quality of loans being sold to investors.

75.     Counsel's investigatory and confirmatory efforts continued throughout the course of the litigation as events continued to unfold.

76.     Throughout the course of the Actions and as discussed below, the *Luther* Plaintiffs also conducted extensive, novel, and sometimes first impression legal research on the areas of, *inter alia*:  (1) removal and remand;  (2) equitable and cross-jurisdictional tolling; (3) SLUSA and CAFA; (4) privilege, including the bank examiner's privilege; (5) Article III, Securities Act and California's "community of interest" class standing; (6) intervention; (7) default judgment; (8) motions to stay; (9) the Anti-Injunction Act; (10) scope of a settlement release; (11) damages; (12) joint and several liability; (13) litigation consolidation; and (14) plans of allocation.

## V.     FACT DISCOVERY AND DISCOVERY DISPUTES

### A.     Plaintiff Luther's Initial Discovery Requests

77.     Plaintiffs' decision to settle was also informed by extensive discovery taken in the litigation by the parties.  Plaintiffs worked tirelessly to obtain and review millions of pages of documents relevant to their claims.  The discovery process was

866280_2

1   riddled with complexities, magnified by defendants' repeated removals, demurrers

2   and requests for stays.

3       78.   Specifically, on December 5, 2007, plaintiff Luther served

4   comprehensive Interrogatories and Requests for Production of Documents on behalf

5   of the class on 14 underwriter defendants seeking information related to the due

6   diligence process for several of the registration statements at issue.  That same day,

7   plaintiff Luther also served detailed Requests for Production of Documents on the

8   Countrywide defendants pertaining to Countrywide's policies and practices relating to

9   the mortgages which ultimately backed the investment certificates sold pursuant to the

10   registration statements at issue.  Plaintiff Luther's requests were directly tailored to

11   the allegations in the Initial *Luther* Complaint.

12       79.   On December 11, 2007, plaintiff Luther also served Notices of

13   Depositions of CSC, CWALT, Inc., Countrywide Home Loans, Inc. and Countrywide

14   Home Loans Servicing LP pursuant to California Code of Civil Procedure §2025.230.

15   Over the subsequent months, plaintiffs aggressively pursued discovery.

16       80.   On September 22, 2008, nearly a year after service of the initial requests,

17   and following the Court's and the Ninth Circuit's remand of the action after

18   defendants' removal under CAFA, the Countrywide defendants lodged objections to

19   plaintiff Luther's first set of requests for production of documents.  The Countrywide

20   defendants refused to provide any documents or information in response to plaintiff's

21   requests.  On the same day, the Countrywide defendants served objections to plaintiff

22   Luther's first set of interrogatories and requests for production of documents directed

23   to the underwriter defendants.  Again, defendants provided no responsive information.

24   The Countrywide defendants based their objections to plaintiff Luther's requests

25   primarily on vagueness, ambiguity, lack of relevance and privilege.  The Countrywide

26   defendants further asserted that their objections were based on the PSLRA, which they

27   claimed stayed discovery in the state action pending the resolution of motions to

28

- 40 -

1    dismiss in two securities class action lawsuits proceeding in federal court, and during

2    the pendency of the impending state court demurrers.

3        81.    Also on September 22, 2008, the non-Countrywide underwriter

4    defendants responded and objected to plaintiff Luther's interrogatories and requests

5    for production of documents.  Much like the Countrywide defendants, the underwriter

6    defendants also asserted generalized, conclusory objections without providing

7    substantive responses to plaintiff Luther's requests.

8        82.    Following service of the Countrywide defendants' objections to plaintiff

9    Luther's interrogatories and document requests, counsel for plaintiffs and the

10   Countrywide defendants met and conferred to discuss defendants' objection to

11   discovery based on the PSLRA discovery stay.  The parties strongly disagreed on the

12   propriety of the objection.  On October 1, 2008, plaintiffs and defendants both filed

13   motions seeking to protect their interests.  *See* §§V.B, C, *infra*.

14   **B.    Plaintiff Luther Moves to Compel Discovery from Defendants**

15   

16       83.    On October 1, 2008, the same day defendants moved to stay the action,

17   plaintiffs filed a Motion to Compel the Countrywide Defendants' Response to

18   Plaintiff's First Set of Requests for Production of Documents in state court.  Plaintiffs

19   asked the court to compel the Countrywide defendants to produce documents that they

20   had already produced in other, similar litigations and investigations that were at the

21   time being conducted by various government agencies.  Specifically, plaintiffs were

22   informed that the Federal Bureau of Investigation, the SEC, and Attorney Generals of

23   California, Indiana, Florida, West Virginia, Connecticut and Illinois, among others,

24   were conducting investigations into and litigating allegations and issues arising from

25   Countrywide's loan origination and underwriting practices that were similar to the

26   allegations in the Initial *Luther* Complaint.  Plaintiffs argued that the documents

27   produced to the government entities were relevant to the Initial *Luther* Action and,

28   accordingly, they should be allowed access to the same documents and information

866280_2

already produced to other entities.  Plaintiffs argued that under California discovery law, they were entitled to production because the information sought was directly related to the issues framed in the pleadings; that the disclosure was of practical benefit to plaintiffs and, that the burden on defendants was relatively minor, since the documents had already been produced in related investigations.  Additionally, in light of defendants' objection to production based on the PSLRA, plaintiffs further argued that the PSLRA mandatory discovery stay has no application to California state court discovery procedures.  Plaintiff Luther argued that the California Code of Civil Procedure governs procedural matters, such as discovery, even if the litigation is premised on purely federal claims.  Plaintiffs asserted that defendants should begin production of the requested documents because under California procedure, discovery commences before the resolution of any demurrer, unlike during the pendency of a motion to dismiss in federal court in a PSLRA action.  In the alternative, plaintiffs requested that even if the PSLRA discovery stay applied, at the very least, the court should provide relief by compelling defendants to produce documents to the extent that they were already produced to any governmental entity.

84.   Also on October 1, 2008, plaintiffs filed a Separate Statement of Discovery in Dispute Regarding Request No. 1 of Plaintiff's First Set of Requests for Production of Documents.  This request was narrowly tailored in an effort to obtain documents that had already been produced to the SEC, Department of Justice, or any other governmental entity that was related to the trusts identified in the Initial *Luther* Complaint, and therefore relevant to the allegations in the Initial *Luther* Complaint.  In the separate statement, plaintiffs repeated that California law, which governed discovery in the state court action, did not permit a stay of discovery.  Plaintiffs further argued that the class would be unduly prejudiced unless the class members were permitted to review the documents produced by the Countrywide defendants in governmental actions and investigations.  Additionally, as the Countrywide defendants had already located, reviewed and organized the documents that were

- 42 -

1   produced to the other entities, plaintiffs argued that any such production in the Initial

2   *Luther* Action would not place any burden on defendants, much less an undue one.

3       85.    On October 14, 2008, the Countrywide defendants filed an opposition to

4   plaintiffs' motion to compel, arguing that the PSLRA discovery stay provisions

5   applied and asserting an absence of unusual circumstances that would warrant lifting

6   the stay.  Plaintiffs filed their reply brief in support of the motion to compel on

7   October 20, 2008.  Reiterating that the PSLRA applied only to actions filed in federal

8   court, plaintiffs cited to California procedural rules, which allow discovery to start

9   even while a demurrer is pending.  Plaintiffs further argued that the equities weighed

10  in favor of production, given the nine-month delay between plaintiffs' request and

11  defendants' objections, coupled with the relatively minor burden production of the

12  documents would place on defendants.  Additionally, plaintiffs argued that the class

13  would be prejudiced if defendants were permitted to continue to withhold discovery.

14  **C.    Defendants' Motion to Stay Discovery Under the PSLRA**

15      86.    Also on October 1, 2008, defendants filed a motion to stay discovery in

16  the consolidated action pending resolution of defendants' then yet-to-be-filed

17  demurrers to the complaint, or in the alternative, pending coordination of discovery

18  between the state action and certain federal securities class actions pending in federal

19  court, including *New York Funds*.  On October 14, 2008, plaintiffs filed an opposition,

20  based on the premise that defendants could not enforce the PSLRA's mandatory

21  discovery stay in state court by analogizing their impending demurrers to motions to

22  dismiss in federal court.  Plaintiffs crafted their argument around federal statutory text

23  and congressional intent, together with California's Code of Civil Procedure, which

24  allows for reasonable discovery notwithstanding a pending demurrer.  Plaintiffs also

25  argued that a stay of discovery would be prejudicial, as plaintiffs' original discovery

26  requests were nearly a year old, and there was a very real threat of lost memories,

27  unavailable witnesses and loss of evidence.  Citing differences in claims, classes of

28  plaintiffs, types of securities and different representations made by certain different

- 43 -

1    defendants, plaintiffs steadfastly argued that there was no basis for state court

2    discovery to fall behind the factually distinct federal securities fraud class actions.

3    Defendants filed their reply brief in support of their motion to stay discovery on

4    October 20, 2008.

5        **D.     Plaintiffs File an Additional Motion to Compel Discovery**

6        87.    On October 7, 2008, while plaintiffs' first motion to compel was pending,

7    the Countrywide defendants indicated that they refused to meet and confer regarding

8    the scope of any of their other objections to plaintiffs' discovery requests.  The

9    Countrywide defendants further indicated that they believed discovery was stayed and

10   unilaterally terminated the discovery process.

11       88.    Due to the Countrywide defendants' refusal to meet and confer on the

12   issue, on October 20, 2008, plaintiffs filed a second motion to compel the

13   Countrywide Defendants' Reponses to Plaintiff's First Set of Interrogatories and

14   Plaintiff's First Sets of Requests for Production of Documents.  Plaintiffs argued that

15   defendants' motion to stay discovery did not relieve defendants of their obligation to

16   continue to participate in the discovery process.  Moreover, plaintiffs argued,

17   defendants' objections were inoperative and void under California law, which

18   governed the state court action.  Further, plaintiffs urged the court to compel

19   discovery because good cause existed that warranted compelling further responses.

20   Specifically, plaintiffs argued that the information sought by the discovery requests

21   was specifically tailored to the issues framed in the pleadings and was of practical

22   benefit to the class, and would not create a burden for defendants.  Additionally,

23   because plaintiffs filed an initial motion to compel on October 1, 2008, plaintiffs

24   argued that the burden was on the Countrywide defendants to justify any objection or

25   failure to fully respond to interrogatories.  Citing to California law, plaintiffs argued

26   that defendants' boilerplate objections failed to comply with the statutory

27   requirements.

28

- 44 -

866280_2

89.     With the second motion to compel, on October 20, 2008, plaintiffs also filed a Separate Statement of Discovery in Dispute.  Plaintiffs again argued that even if discovery were stayed in the action, defendants should be compelled to respond to Request No. 1, which sought documents already produced in governmental actions and investigations that were relevant to the allegations in the Operative Complaint. Withholding such documents, plaintiffs argued, would only result in undue prejudice to the class and would cause a severe disadvantage as the litigation proceeded. Additionally, plaintiffs again reiterated that the Countrywide defendants would face minimal burden in producing documents that they already located, reviewed and organized.  On November 5, 2008, plaintiffs filed a motion to withdraw the second motion to compel.

**E.     Plaintiffs' Request to Coordinate Discovery with Federal Actions**

90.     On November 21, 2008, the parties filed a 20-page Joint Initial Status Conference Report.  *See supra* §III.G.  At the hearing, Judge Elias said she was not inclined to stay discovery pending resolution of defendants' demurrers, but was inclined to coordinate discovery with the federal actions to avoid duplicative document production and depositions.

91.     Following the November 25, 2008 hearing, the court ordered the parties to develop a general plan for coordinating discovery with the federal actions, including *New York Funds*.  The court further allowed plaintiffs to begin serving subpoenas on third parties for the purpose of preserving documents.  Plaintiffs began serving these subpoenas shortly thereafter.

**F.     Plaintiffs' Additional Discovery Requests**

92.     On December 10, 2008, plaintiff Luther, on behalf of all named plaintiffs, served a Second Set of Requests for Production of Documents to the Countrywide defendants.   These requests, like the first set of requests, were tailored to the allegations in the Operative Complaint and sought documents previously produced to

- 45 -

government agencies related to the trusts at issue and the alleged lax underwriting and appraisal practices.  Additionally, plaintiffs requested documents previously produced in actions brought by the Attorneys General of several states that were related to the allegations in the Operative Complaint.

93.    On January 12, 2009, the Countrywide defendants served their objections to plaintiffs' second set of discovery requests.  Again, defendants objected to the requests on the premise that the PSLRA stayed discovery of the state action pending resolution of motions to dismiss in two securities class action lawsuits proceeding in federal court.  Defendants also asserted objections based on vagueness, ambiguity, overbreadth, burden, and privilege.

94.    In an effort to preserve documents for the continued litigation of the action, on January 23, 2009, plaintiffs also served subpoenas *duces tecum* on the following third parties:

KB Home;

KPMG L.L.P.;

MBIA Insurance Corporation;

Moody's Investors Service, Inc.;

The Bank of New York;

Fitch, Inc.;

Standard & Poor's Financial Services LLC;

First American eAppraiseIT;

LandSafe Inc.;

Lender's Service, Inc.; and

The Bohan Group.

95.    Over the subsequent months, plaintiffs actively sought discovery from defendants and third parties, engaging in numerous meet and confers and exchanging frequent correspondence regarding the scope of defendants' and the third parties'

- 46 -

1  efforts to delay production in light of discovery in the federal actions proceeding

2  apace.

3       96.    As a consequence of these efforts, on August 20, 2009, the Countrywide

4  defendants produced nearly 10 million pages of documents that were previously

5  produced to the SEC in the SEC enforcement action, *In re Countrywide Financial*

6  *Corporation*, File No. LA-3370, against former Countrywide executives who were

7  also named as defendants in the *Luther* Action.   Plaintiffs immediately began

8  reviewing and analyzing the documents for the purpose of better understanding the

9  facts at issue and facilitating future settlement negotiations.   This review process

10 continued as the action proceeded.

11       **G.    Plaintiffs File a Motion to Commence Discovery**

12       97.    As detailed above in §III.J., in March 2010, the state Superior Court

13 dismissed the *Luther* Action.  Subsequently, the *Maine State* Action was filed, and the

14 *Luther* Action was successfully appealed and reinstated in September 2011. *See supra*

15 §III.K.-L.

16       98.    On December 29, 2011, the *Luther* Plaintiffs conducted a meet and

17 confer with defendants, at which point plaintiffs requested that defendants turn over

18 the same documents produced in the federal *Maine State* Action, including due

19 diligence reports for the MBS at issue.

20       99.    On January 4, 2012, after defendants refused the *Luther* Plaintiffs'

21 request for documents, and in the midst of briefing on the renewed demurrers, the

22 *Luther* Plaintiffs filed a request to commence discovery.   Defendants filed an

23 opposition on January 5, 2012.  The same day, the court held a status conference to

24 discuss the implications of document production proceeding in the federal case and

25 asked the parties to submit further briefing on the commencement of discovery in the

26 state action.

27       100.   On January 10, 2012, the *Luther* Plaintiffs filed a detailed memorandum

28 in support of their motion to lift the discovery stay.  The *Luther* Plaintiffs argued that

- 47 -

1    the PSLRA could not be used to stay discovery during the pendency of a state court

2    demurrer.  Importantly, plaintiffs argued that California procedural law governed

3    discovery, which allowed plaintiffs to commence discovery during the pendency of a

4    demurrer.  Additionally, the *Luther* Plaintiffs argued that defendants should not be

5    shielded by the PSLRA to avoid producing the approximately 25 million pages of

6    documents that had already been produced in the federal *Maine State* Action.  The

7    *Luther* Plaintiffs argued that the documents produced in the *Maine State* Action

8    starting in late December 2011 would be relevant and similar to the documents that

9    would need to be produced in the state action.  Namely, the documents would tend to

10   show Countrywide's alleged failure to follow underwriting guidelines, as well as

11   defendants' alleged failure to disclose to investors that defective mortgages were

12   being bundled and used to securitized the MBS at issue.  Plaintiffs' arguments were

13   based on the fact that in order to avoid depositions that were duplicative of those

14   taking place in the federal action, plaintiffs were entitled to review the relevant

15   documents in advance of the depositions so that they could meaningfully participate in

16   these depositions.  Plaintiffs further argued that, in the alternative, even if the PSLRA

17   did apply, the PSLRA discovery stay is not absolute, and the state court, using its

18   discretion can properly lift the stay.  In support of this alternative argument, the *Luther*

19   Plaintiffs proffered that they would be unfairly prejudiced should the stay not be

20   lifted, and that the request was particularized and thusly created only a minimal

21   burden on defendants, as the documents were already produced in another action.

22        101.   On January 24, 2012, defendants filed their opposition to the motion to

23   lift the discovery stay.  The *Luther* Plaintiffs filed their reply on January 31, 2012,

24   further arguing that, as defendants acknowledged, even if the PSLRA discovery stay

25   applied in state court, it only applied to claims that were reasonably in dispute and

26   potentially subject to dismissal.  Plaintiffs argued that following the demurrer briefing,

27   which had just concluded, it was clear that plaintiffs' claims would proceed as to at

28   least those securities which they themselves purchased.

- 48 -

1       102.   On February 15, 2012, the state court held a hearing on the motion to lift

2   the discovery stay.  At that time, the state court ordered defendants to produce to

3   plaintiffs those documents that were already produced in *New York Funds*.  Beginning

4   in February 2012, defendants began producing millions of pages of documents that

5   were previously produced in the *New York Funds* action.

6       **H.      Plaintiffs' Review and Analysis of Documents**

7       103.   The *Luther* Plaintiffs reviewed and analyzed over 5.5 million pages of

8   documents produced by defendants and third parties between August 2009 and May

9   2012.  In August 2009, defendants produced nearly 10 million pages of documents

10  previously produced to the SEC in its enforcement action against former Countrywide

11  executives who were also named as defendants in the *Luther* Action.   *Luther*

12  Plaintiffs' Counsel immediately thereafter began to review and analyze the

13  documents.  In early 2012, as the *Luther* and *Western Conference* Actions proceeded

14  in state court, defendants further produced the documents which were previously

15  produced in the *New York Funds* action.

16      104.   In order to process the vast amount of documents produced, *Luther*

17  Plaintiffs' Counsel deployed substantial resources and technology.   All of the

18  documents were placed in e-discovery platforms maintained and developed by third-

19  party software providers, which specialize in the development of software for e-

20  discovery; specifically, the processing, review, analysis and production of electronic

21  documents during litigation.  Robbins Geller hosted the databases on its internal

22  servers.

23      105.   The databases, called Concordance and Relativity, allowed counsel to

24  search for documents through Boolean-type searches, as well as by multiple other

25  categories, such as by document type (i.e., emails, spreadsheets, memoranda, due

26  diligence reports), date, custodian, or author and/or recipient, and through "batching."

27  The technologies available through Concordance and Relativity allowed *Luther*

28  Plaintiffs' Counsel to conduct targeted searches for relevant information and to

- 49 -

efficiently prepare and effectively collect the best evidence to be used in depositions and at trial.

106.   In order to meaningfully prepare for mediation and future depositions, Plaintiffs' Counsel needed to thoroughly analyze the produced documents.  *Luther* Plaintiffs' Counsel's ultimate goal was to complete a thorough review and analysis of all produced documents prior to the commencement of depositions and to formulate a comprehensive list of potential deponents.

107.   All aspects of the document review process were carefully designed to ensure that the process was as thorough and efficient as possible.  This required in-person training sessions and an in-depth introduction to the facts, relevant law, theories of the case, and detailed overview of the securitization process as a whole, as well as the securitization process within Countrywide and coordination of the document review process.  *Luther* Plaintiffs' Counsel met on a regular basis to discuss the status of the document review process, important findings, and to refine the review strategy as the process progressed.  Additionally, as new facts came to light through the document review process, additional search parameters and strategies were employed to further streamline the review.

108.   To increase the effectiveness and efficiency of the review, the documents were sorted into various "batches" based on the presence of targeted search terms (i.e., underwriting standards, due diligence, valuation, appraisals, reduced and no documentation loan programs, waivers and exceptions, quality control and credit risk findings, and identification of certain key individuals or defendants).  The document review process also included targeted searches and analyses of documents specifically related to the 429 Offerings at issue, as well as Countrywide's internal organization.  Attorneys were tasked with reviewing specifically assigned batches to determine which types of documents supported plaintiffs' claims or defendants' potential defenses.   As the review process continued, documents were pared down into

- 50 -

1  deposition witness files for use in future depositions.  The document review also

2  helped *Luther* Plaintiffs' Counsel identify potential deponents.

3      109.  The review process yielded a collection of thousands of useful

4  documents.  In order to communicate their findings, the reviewing attorneys regularly

5  prepared memoranda and/or engaged in face-to-face meetings with other attorneys on

6  the matter detailing the types of documents reviewed, whether the documents

7  supported plaintiffs' claims, and whether modifications to the search parameters

8  would be required to unearth additional useful documents.  Additionally, the attorneys

9  conducting the document review separately maintained files of "hot" documents –

10  documents that tended to support plaintiffs' allegations – for eventual use in opposing

11  defendants' motion for summary judgment.

12      110.  *Luther* Plaintiffs' Counsel diligently worked to effectively parse through

13  the millions of pages of documents in order to construct a clear picture of

14  Countrywide's underwriting practices, use of underwriting exceptions, due diligence,

15  internal controls and risk management, and each defendant's role in the securitization

16  process.

17      111.  *Luther* Plaintiffs' Counsel also reviewed hundreds of SEC filings related

18  to the litigation, including thousands of pages of Offering Documents.  Throughout

19  the litigation, *Luther* Plaintiffs' Counsel kept themselves apprised of developments in

20  other actions, including reviewing the allegations in the complaints filed by Attorneys

21  General of several states in addition to reviewing each complaint filed in individual

22  MBS actions against Countrywide.

23      112.  The hours *Luther* Plaintiffs' Counsel devoted to the document review

24  process were necessarily expended in order to prepare for future depositions, oppose

25  and support future motion practice, and prepare for trial.  A significant portion of

26  discovery-related work was completed prior to the state court's dismissal of the *Luther*

27  Action under SLUSA in March of 2010, as plaintiffs prepared for the original

28  settlement discussions.  At that time, *Luther* Plaintiffs' Counsel had expended over

- 51 -

866280_2

1   16,500 hours and a lodestar value of over $7.7 million litigating this action for more

2   than two years.

3       113.   The document review process started anew in September 2011, when the

4   state action was resurrected and plaintiffs' case again moved forward.  The document

5   review process was complex and included, *inter alia*: analyzing how loans packaged

6   into the MBS were valued; reviewing due diligence reports; documenting instances of

7   abandonment of underwriting guidelines; examining LTV ratios and related appraisal

8   values; researching Countrywide's internal organization; reviewing quality control

9   audits and reports and credit risk committee findings; and analyzing Countrywide's

10  external structure and movement of loans from origination to securitization, for

11  example.  Throughout the review process, Plaintiffs' Counsel regularly exchanged

12  information and documented work product in detailed memoranda analyzing their

13  findings.

14      114.   *Luther* Plaintiffs' Counsel's discovery efforts, including the

15  comprehensive review and analysis of over 5.5 million pages of documents between

16  August 2009 and June 2012, allowed plaintiffs to enter settlement discussions with a

17  deep conviction that their claims were strong and enabled the *Luther* Plaintiffs to

18  negotiate a favorable resolution for the Class.

19  **VI.   THE MEDIATION**

20      115.   Informal settlement negotiations first began in 2009, when the parties to

21  the *Luther* Action met with Professor Eric Green.  Following the initial session,

22  negotiations were stalled due to the state court's dismissal of the *Luther* Action and

23  the subsequent procedural issues.

24      116.   After the reinstatement of the *Luther* Action and defendants' removal of

25  the *Luther* and *Western Conference* Actions to federal court in 2012, all Plaintiffs

26  agreed to engage in a joint mediation with Defendants.  On November 5, 2012,

27  Plaintiffs and Defendants met in Boston, Massachusetts, for the first of two full-day

28  mediation sessions with Professor Green.  On November 2, 2012, in preparation for

- 52 -

the first mediation session, Plaintiffs and Defendants submitted comprehensive mediation statements to Professor Green.  These mediation statements addressed, *inter alia*, the relative strengths and weaknesses of the parties' respective claims and defenses, including issues of timeliness and standing, loss causation and the parties' damages analyses and estimates.  Plaintiffs expended significant time and effort drafting their mediation statement and preparing for the in-person mediation session, including consulting with a damages expert who provided a comprehensive damages analysis.

117.   During the November 5, 2012 mediation session, the parties made oral presentations on the issues presented in their mediation statements and engaged in negotiations facilitated by Professor Green.  A representative of Pension Trust Fund for Operating Engineers/Operating Engineers Annuity Plan attended and actively participated in the mediation.  After a full day of presentations and discussions, the parties better understood each side's position, but left the mediation session at an *impasse*.

118.   Following the first mediation session, counsel for the *Luther* Plaintiffs began to prepare for the second scheduled mediation session by conducting additional research, refining their damages analysis, and preparing a fulsome visual presentation of plaintiffs' arguments.   Plaintiffs also participated in numerous telephonic conferences to discuss their strategy and approach going into the second mediation session.   During this period, Plaintiffs also had telephonic conversations with Professor Green to discuss their mediation position.

119.   On December 11, 2012, Plaintiffs and Defendants convened for a second full-day, in-person mediation session with Professor Green in Boston, Massachusetts. A representative for Vermont Pension Investment Committee attended and was actively engaged in the mediation.  Again, however, after additional presentations and settlement discussions, the parties were unable to bridge the gap that existed between their respective positions to reach a suitable resolution.

120.   Throughout late 2012 and early 2013, Professor Green continued to facilitate settlement negotiations between the parties.  Plaintiffs thereafter participated in numerous telephonic conversations with Professor Green from December 2012 to April 2013, and engaged in numerous telephonic conferences with Defendants. Representatives for all other plaintiffs were fully briefed on the mediation sessions and were kept apprised of the developments and subsequent discussions.

121.   On April 3, 2013, after evaluating the strengths and weaknesses of the parties' respective claims and defenses, Professor Green issued a Mediator's Proposal to settle the three pending Actions for $500 million.

122.   On April 4, 2013, the parties agreed to accept the Mediator's Proposal. Following the parties' acceptance of the Mediator's Proposal, the parties negotiated the form of a term sheet, with the assistance of Professor Green, which was executed on April 16, 2013, and the parties publicly announced the settlement the following day.[19]

123.   Over the next twelve weeks, the parties worked diligently to draft a mutually acceptable settlement agreement setting forth the terms of the Settlement and the related settlement documents.  Due to the various legal arguments affecting the different categories of tranches, Plaintiffs enlisted the aid of the Honorable Nancy Gertner (Ret.) in developing a fair and equitable plan for allocating the settlement proceeds among eligible Class Members.

124.   Throughout the extensive mediation process in these matters, Plaintiffs' Counsel tirelessly advocated for the interests of the Class Members, including those Class Members who purchased in the tranches in Category Three of the proposed

---

[19]   After the term sheet was finalized, Plaintiffs' Counsel issued a request for proposals from various claims administrators in order to ensure that the most effective and reasonably priced claims administrator was selected to administer the Settlement. Plaintiffs' Counsel ultimately chose The Garden City Group, Inc., as a result of, among other factors, its previous experience administering other MBS cases, its selection as the claims administrator in the $8.5 billion settlement with Bank of America and the proposed pricing for its services.

866280_2

settlement Plan of Allocation – i.e., purchasers for which no buyer of the same securities has ever come forward and expressed an interest in prosecuting a class action.  More specifically, during both the parties' formal mediation sessions and in many numerous telephone conferences, outside of those formal sessions, Plaintiffs' Counsel vigorously advocated for all Class Members.  During the final stages of mediation, when Plaintiffs' Counsel discussed among themselves what a fair and reasonable allocation of the $500 million settlement fund would be, Plaintiffs' Counsel recognized that these Category Three Class Members had appeal rights.  For that reason, $50 million was ultimately allocated to these Category Three Class Members, reflecting in part the relative strength of those appellate rights.

125.    On June 11, 2013, the parties filed a Joint Stipulation Extending the Time in Which to File Papers for Preliminary Approval of Settlement (Dkt. No. 137), which the Court granted on June 12, 2013 (Dkt. No. 138).  On June 25, 2013, Plaintiffs filed the following documents: (i) Notice of Motion and Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement (Dkt. No. 140); (ii) Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement (Dkt. No. 141); and (iii) the Stipulation and Agreement of Settlement (Dkt. No. 142).  On July 9, 2013, Plaintiffs filed an Amended Stipulation and Agreement of Settlement (Dkt. No. 151).  The purpose of the amendment was to address the Second Circuit's recent decision in *Police & Fire Retirement System v. Indymac MBS, Inc.*, 721 F.3d 95 (2d Cir. June 27, 2013), and to include a provision carving-out one matter, i.e., *Retirement Board of the Policeman's Annuity & Benefit Fund of the City of Chicago v. The Bank of New York Mellon*, No. 1:11-cv-05459 (S.D.N.Y.) from the definition of "Settled Claims."

## VII.   THE STRENGTHS AND WEAKNESSES OF THE CASE AND THE RISKS FACED BY PLAINTIFFS IN THE LITIGATION

126.    Based on the review of publicly-available documents, information and internal documents obtained through plaintiffs' investigation, discussions with experts

866280_2

1   and consultants and preliminary fact discovery conducted in the litigation, counsel

2   believe that the *Luther* Plaintiffs' claims have merit and are supported by substantial

3   evidence.  However, counsel also recognize that the *Luther* Plaintiffs would have

4   faced significant risks and hurdles (as described below) if the actions continued.  The

5   *Luther* Plaintiffs and their counsel carefully weighed these risks during the pendency

6   of the litigation and during the course of the settlement discussions with defendants.

7       **A.**    **Standing**

8      127.   Throughout the litigation, the *Luther* Plaintiffs faced a series of risks

9   relating to standing and their ability to represent purchasers of Certificates not

10   purchased by the named plaintiffs.  The *Luther* Plaintiffs would have continued to face

11   such risks if they continued to litigate the *Luther* Action before the Court.

12      128.   The *Luther* Plaintiffs initially filed their actions in California state court

13   where the "community of interest" standard governs any inquiry into a plaintiff's

14   standing to represent a class of other purchasers of securities.  Under this standard,

15   plaintiffs have standing to represent other investors who did not buy the same exact

16   security as long as a "sufficient community of interest to define the class" exists, such

17   as when the different investments were "prepared by the same defendants, and

18   contain[ed] the same alleged omissions and misrepresentations."  *Daniels*, 16 Cal.

19   App. 4th at 473 (internal citations and quotation marks omitted).  Thus, while the

20   *Luther* Action was pending in California state court, the *Luther* Plaintiffs believed that

21   they had standing under the applicable case law to validly represent purchasers of

22   Certificates within all 429 Offerings named in the Operative Complaint.

23      129.   Upon defendants' successful removal of the *Luther* Action to this Court,

24   the *Luther* Plaintiffs likely could no longer benefit from the broader standing

25   principles followed in the California state courts.  While the *Luther* Plaintiffs asserted

26   that they should be entitled to amend their complaint to cure any standing deficiencies

27   by naming purchasers of the unrepresented securities as named plaintiffs, the Court

28

866280_2

1    had yet to rule on this request at the time the Settlement was reached and its prior

2    rulings suggested that the *Luther* Plaintiffs would not be granted leave to amend.

3         130.   The successful removal of the *Luther* Action to this Court also increased

4    the risk that this Court's prior standing and tolling decisions in the related *Maine State*

5    Action would be applied to the *Luther* Plaintiffs' claims upon defendants' motions to

6    dismiss thereby further reducing the number of securities at issue and the scope of the

7    class.   Indeed, in their oppositions to defendants' motions to dismiss, the *Luther*

8    Plaintiffs recognized that an application of the Court's prior standing decisions would

9    dramatically reduce the scope of the putative class that plaintiffs could represent.  On

10   May 5, 2011, in ruling on the *Maine State* defendants' motions to dismiss, the Court

11   held that because "each [c]ertificate is a separate security . . . [p]laintiffs have standing

12   to assert their claims with respect only to those [c]ertificates [that] a named [p]laintiff

13   has purchased." *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302

14   MRP (MANx), 2011 U.S. Dist. LEXIS 125203, at *25-*26 (C.D. Cal. May 5, 2011).

15   Because it was likely that the Court would apply these same standing principles to the

16   *Luther* Action, the *Luther* Plaintiffs faced a substantial risk that claims based on any

17   Certificates not purchased by the *Luther* Plaintiffs would be dismissed for lack of

18   standing.

19        131.   While the *Luther* Plaintiffs would have retained their right to appeal the

20   Court's certificate-based standing ruling to the Ninth Circuit, the chances of prevailing

21   on appeal are uncertain at best.

22        132.   Moreover, even if the Ninth Circuit had overturned the Court's standing

23   decision, the Court nonetheless could have determined at the class certification stage

24   that the lead plaintiffs could validly represent only a class consisting of purchasers of

25   the same certificates purchased by the lead plaintiffs thereby rendering moot any

26   successful appeal.[20]

27   _____

28   [20]   This issue was left un-litigated in *Maine State* as the parties stipulated to a defined class in that case.

- 57 -

866280_2

### B.     Statutes of Repose and Limitations

133.   In their papers filed in opposition to defendants' motion to dismiss, the *Luther* Plaintiffs also acknowledge that an application of the Court's prior holdings with respect to tolling the statutes of repose and limitations would further limit the number of Certificates for which the lead plaintiffs could validly assert claims.  In the *Maine State* Action, the Court held that the tolling doctrine articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974), only tolls the statute of repose and statute of limitations for "claims where the named plaintiffs had standing." *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1166-67 (C.D. Cal. 2010).  Specifically, the Court later stated:

> Plaintiffs have standing to assert their claims with respect only to those [c]ertificates a named Plaintiff has purchased.  Moreover, to the extent that the *Luther* state court plaintiffs did not themselves buy particular [c]ertificates included in the [complaint], the relevant limitations periods continued to run with respect to those tranches.  There can be no tolling with respect to securities the *Luther* plaintiffs did not purchase.

*Maine State*, 2011 U.S. Dist. LEXIS 125203, at *25-*26.  An application of this holding to the *Luther* Action would further reduce the number of certificates at issue because plaintiffs who purchased certain certificates were not included in an iteration of the complaint until after the statute of repose had expired for those certificates and the *Luther* Plaintiffs would be unable to benefit from tolling based on purchases of other Certificates within these Offerings.

134.   The *Luther* Plaintiffs would have appealed any tolling decision that flowed from the Court's certificate-based standing holding.  As discussed above, however, the outcome of any appeal would be extremely uncertain.

135.   Thus, under the Court's prior rulings, the claims as to all Certificates except the Live Represented Tranches would have been dismissed from the *Luther* Action.  Such a dismissal, barring a successful appeal that likely would not have been

- 58 -

1  available until after final judgment, would have precluded the holders of the

2  Certificates within the Dismissed Represented Tranche and Dismissed Unrepresented

3  Tranche categories from having any chance of recovery.

4        136.   In summary, based on the Court's prior standing and tolling decisions,

5  the *Luther* Plaintiffs would have faced significant hurdles in seeking to represent the

6  purchasers within all 429 Offerings included in the Operative Complaint beyond the

7  pleading stage and, thus, the Settlement, which provides a recovery to all Certificate

8  holders, is a commendable result.

9  **C.    Class Certification**

10       137.   As noted above, had the actions continued, the *Luther* Plaintiffs would

11  have faced risks in obtaining class certification pursuant to Fed. R. Civ. P. 23(b).  The

12  *Luther* Plaintiffs anticipated challenges from defendants with respect to the adequacy,

13  typicality, numerosity and predominance requirements for class certification.  The

14  *Luther* Plaintiffs would have opposed these challenges based on the developing body

15  of case law addressing class certification in the MBS context.

16       138.   In certifying a class, however, the Court could have further narrowed the

17  number of securities at issue by accepting defendants' typicality arguments,

18  determining that plaintiffs were inadequate class representatives, finding that

19  individual issues predominated over class-wide issues due to, *inter alia*, the relative

20  knowledge levels of the individual Class Members, or determining that because of the

21  large proportion of institutional investors who purchased the Certificates at issue, the

22  numerosity requirement was not met.

23       139.   While the *Luther* Plaintiffs believe that the putative class would have

24  been certified by the Court had the actions proceeded, there was a real risk that class

25  certification would be denied and that the actions would have to proceed on an

26  individual basis.  As noted above, the Court did not rule on any class certification

27  motion in the *Maine State* Action.  Instead the parties stipulated to a class of eight

28  certificates in that action.  The proposed class in the *Luther* Action would have been at

1   least seven times as large, and because it is unclear whether defendants would have

2   stipulated to class certification in the *Luther* Action, the risk of failing to attain class

3   certification was real.  The prosecution of plaintiffs' claims on an individual basis

4   would likely have been cost-prohibitive, thus forcing plaintiffs to forego continued

5   litigation or accept any settlement offered by defendants, regardless of the size.

6        **D.**    **Loss Causation and Damages**

7       140.   The *Luther* Plaintiffs also would have faced significant challenges in

8   establishing both loss causation and damages at summary judgment and at trial.

9   Section 11 of the Securities Act provides for a "negative causation" defense whereby

10   any losses that resulted from external factors unrelated to the alleged

11   misrepresentations and omissions are not recoverable.  Defendants surely would have

12   asserted such a defense.

13       141.   Beginning in 2007, and continuing throughout the remainder of the class

14   period, the steep decline in real estate prices both nationally and globally led to the

15   largest national decline in home prices in recent history.  According to defendants,

16   during this same time period, the credit and capital markets in the United States seized

17   and demand for MBS all but disappeared as investors sought out what they perceived

18   to be less risky investments.

19       142.   Defendants vigorously asserted throughout the litigation that the market

20   for MBS froze and values declined as investors panicked in the wake of the housing

21   and credit markets crises.  Defendants argued that this freezing and the resultant

22   decline in value, not defendants' alleged misstatements, caused all or most of the

23   losses suffered by the *Luther* Plaintiffs and the class.  Because of the availability of

24   this negative causation affirmative defense, the *Luther* Plaintiffs would have had an

25   uphill battle proving that their losses were caused by defendants' false and misleading

26   statements as alleged in the Operative Compliant rather than intervening external

27   market forces.

28

866280_2

143.   The *Luther* Plaintiffs would have argued that defendants' misstatements and omissions played a significant role in the housing and market crises and therefore the impact of the external market forces on the value of the Certificates cannot and should not be disaggregated.  While the *Luther* Plaintiffs believe these arguments are strong, they nevertheless faced the risk that the Court or a jury would accept defendants' negative causation and disaggregation arguments, which would have significantly reduced, or eliminated altogether, the class' alleged damages.

144.   Based upon experience from other MBS actions, the *Luther* Plaintiffs also expected that defendants, going forward, would have provided testimony on the difficulties inherent in the valuation of MBS, especially during the time period at issue, due to the lack of an active secondary market for the securities.  Defendants would  further argue that these difficulties precluded the *Luther* Plaintiffs from establishing their damages with any sort of certainty.  In addition, defendants surely would have asserted that any damages suffered by the *Luther* Plaintiffs must be reduced by the portion of the $8.5 billion BNYM Settlement allocated to each of the Certificates at issue in the *Luther* Action upon final approval of that settlement.

145.   The *Luther* Plaintiffs would have responded to these arguments by calling their own experts to testify to the various methodologies used to value MBS and would have asserted that any set-off resulting from the BNYM Settlement was minimal due to the number of offerings across which the proceeds from the BNYM Settlement would be distributed.  However, it is uncertain whether Plaintiffs would have prevailed on these issues.

**E.     Establishing Liability**

146.   Establishing defendants' liability also would come with risks.  But for the Settlement, defendants would have continued to assert that the *Luther* Plaintiffs could not establish that the Offering Documents contained material misstatements or omitted to disclose material information.  In support of this assertion, defendants likely would have argued that the *Luther* Plaintiffs would be unable to show that the deviations in

underwriting standards alleged in the Operative Complaint applied to the specific loans underlying the specific MBS that they purchased. Defendants likely would have also asserted that the Offering Documents fully disclosed the relevant characteristics of the mortgage loans collateralizing the MBS and contained extensive risk disclosures, thereby rendering any alleged misstatements and omissions immaterial. These risk disclosures, defendants would argue, informed sophisticated investors, such as the *Luther* Plaintiffs, that the securities carried a high risk of default. Finally, defendants asserted in their motions to dismiss, and would likely assert at summary judgment and at trial, that purchasers of certain of the Certificates were on notice of the alleged false and misleading statements at the time of their purchases due to the filing of the Initial *Luther* Complaint and thus could not recover under §§11 or 12(a)(2) of the Securities Act.

147. The *Luther* Plaintiffs would have responded to these arguments by pointing to the numerous publicly-available documents confirming that Countrywide systematically disregarded the applicable underwriting standards at the time the mortgage loans underlying the Certificates were originated. The *Luther* Plaintiffs also believe that had full-blown discovery commenced in this action, they would have unearthed additional evidence supporting the falsity of the statements in the Offering Documents regarding, *inter alia*, the underwriting standards to which defendants actually adhered. In addition, the *Luther* Plaintiffs likely would have engaged an expert to perform a statistical sampling analysis of the mortgage loans collateralizing the Certificates in order to demonstrate with reasonable certainty that a statistically significant percentage of these loans failed to comply with the stated guidelines and standards.

148. The *Luther* Plaintiffs would have further argued that any risk disclosures included in the Offering Documents were inadequate to inform investors of the true risk associated with the Certificates because these disclosures did not address the misstatements that are the subject of the *Luther* Plaintiffs' claims, i.e., that defendants

- 62 -

complied with the stated underwriting guidelines and that these guidelines were designed to evaluate a borrower's creditworthiness and ability to repay and the value and adequacy of the underlying mortgage property serving as collateral.  Finally, with respect to defendants' notice arguments, the *Luther* Plaintiffs asserted in their opposition papers and would have asserted at summary judgment and at trial that defendants failed to prove that the post-Initial *Luther* Complaint purchasers had actual knowledge of the misstatements and omissions in the Offering Documents at the time of their purchases.  While the *Luther* Plaintiffs maintain that defendants' arguments with respect to liability are misplaced, there was always a risk that the Court or a jury would nonetheless accept these arguments and find in defendants' favor.

### F.    Appeals

149.   Assuming that the *Luther* Plaintiffs were able to overcome the risks discussed above and prevail both on summary judgment and at trial, defendants would certainly appeal the Court's denial of summary judgment and/or final judgment on the jury verdict.  Such an appeal likely would prolong the litigation for an extended period of time and would result in additional fees and expenses.  Defendants' appeal would also create a risk that the Court's decision and the favorable verdict could be overturned by the Ninth Circuit.  By agreeing to the Settlement, the *Luther* Plaintiffs avoided the possibility of a lengthy and risky appeals process.

### G.    Insolvency

150.   The *Luther* Plaintiffs faced the additional risk that had they prevailed at trial and obtained a favorable verdict and prevailed on defendants' inevitable appeal, defendants, in particular Countrywide, would be insolvent or would declare bankruptcy when the *Luther* Plaintiffs attempted to enforce the verdict such that the class would receive no recovery.  In other proceedings, defendants' representatives have testified that Countrywide would declare bankruptcy if it faced substantial judgments.  The *Luther* Plaintiffs, in reaching the Settlement, circumvented the risk

- 63 -

created by defendants' potential insolvency and ensured that the class would receive a meaningful recovery.

## VIII. SETTLEMENT NEGOTIATIONS AND THE TERMS OF THE SETTLEMENT

151.   As detailed above, the settlement negotiations spanned a period of six months from November 2012 through April 2013.   During that time, and in the months that followed, the parties met in person for two full-day mediation sessions and engaged in numerous conference calls, including a multitude of conference calls between counsel for Plaintiffs in the Actions.

152.   Spencer Burkholz and Andrew Zivitz led the settlement negotiations for plaintiffs in the *Luther* and *Western Conference* Actions, and Steven Toll of Cohen Milstein led the negotiations for plaintiffs in the *Maine State* Action.   Each of these counselors has years of experience in the prosecution and resolution of complex class actions.   Brian Pastuszenski for Goodwin Proctor LLP led the defense team, and similarly shares unquestionable credentials.

153.   Plaintiffs' Counsel are actively engaged in complex civil litigation, particularly the litigation of securities class actions.   We believe that counsel's experience and reputation as attorneys who will indefatigably litigate a meritorious case through trial and the subsequent appeals process put Plaintiffs in as strong a position as possible during the settlement negotiations with defendants.   Indeed, Counsel's fervent advocacy has resulted in the largest class-wide settlement in a MBS case to date.

154.   The Settlement is the result of extensive arm's-length negotiations. Counsel believe that the compromise embodied by the Stipulation represents a successful resolution of a complex and risky class action in an area of law riddled with challenges and uncertainties.

155.   As set forth in the Stipulation, the Gross Settlement Fund (which includes interest) will be used to pay for certain administrative expenses, including the cost of

- 64 -

providing notice to the class, via mail delivery and newspaper publishing; the payment of taxes assessed against the income earned by the Gross Settlement Fund, if any, and tax expenses; escrow fees; the costs of processing claims; and Plaintiffs' Counsel's fees and expenses awarded by the Court. The balance of the Gross Settlement Fund after the foregoing deductions (the "Net Settlement Fund") will be distributed according to the proposed Plan of Allocation set forth in the Notice to eligible Class Members who submit valid, timely Proof of Claim and Release forms.

## IX.   THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS APPROVAL

156.   While plaintiffs believe that they would have prevailed on the merits had the actions proceeded to summary judgment and trial, defendants in contrast, believed that plaintiffs' claims would have failed. As discussed in more detail above, there was a very real risk that plaintiffs' claims would be significantly pared-down through the Court's ruling on defendants' motions to dismiss or at the class certification stage. Plaintiffs were also faced with additional risks in proving liability and damages. At summary judgment and at trial, plaintiffs would face significant hurdles in successfully demonstrating that defendants made material misstatements and omissions in the Offering Documents. Additionally, any judgment in plaintiffs' favor would present the very real risk of an appeal by defendants which would add years of litigation and pose a threat of reversal. The actions presented unique risks, not present in traditional securities class actions, including the numerous novel legal and factual issues facing plaintiffs in MBS actions generally, and specifically the Court's prior rulings on standing.

157.   Having considered the foregoing, and evaluating the likelihood that all of plaintiffs' claims would prevail through the motions to dismiss, at class certification, summary judgment and eventually at trial, it is with the utmost informed judgment that plaintiffs and their counsel have determined that this Settlement represents an excellent recovery for the class. Additionally, based on all proceedings to date,

counsel's perseverance through numerous adverse rulings at the California state and federal court levels, and the Court's precedent in MBS actions, coupled with *Luther* Plaintiffs' Counsel's paramount experience in litigating securities class actions, Plaintiffs and Plaintiffs' Counsel have concluded that the proposed Settlement is fair, reasonable and adequate, and in the best interests of the Class.

## X. THE PLAN OF ALLOCATION

158.   Plaintiffs engaged in extensive negotiations and debate concerning the allocation structure and sought the assistance of the Hon. Nancy Gertner (Ret.), a former United States District Court Judge for the District of Massachusetts in developing a fair and equitable plan.   After meeting with Judge Gertner, Plaintiffs' Counsel determined to allocate the Net Settlement Fund to purchasers of Certificates based on the strength of their claims and appellate rights.   Accordingly, as provided in the Plan of Allocation, 65% of the Net Settlement Fund will be allocated to Authorized Claimants who purchased Certificates within the 58 tranches that are still "live" or likely to remain live in the Actions based on the Court's prior standing and tolling rulings (the "Live Represented Tranches").   These are the tranches purchased by the *Luther* Plaintiffs (eight of which were previously certified as a class in the *Maine State* Action).   Separately, 25% of the Net Settlement Fund will be allocated to Authorized Claimants who purchased Certificates within the "Dismissed Represented Tranches" category which is comprised of the Certificates that were purchased by named plaintiffs in the *Luther*, *Western Conference* and *Maine State* Actions and the plaintiff in *Putnam Bank v. Countrywide Fin. Corp., et al.*, No. 2:11-cv-04698-MRP (MANx) (C.D. Cal.), but were dismissed by, or subject to dismissal, based on the Court's prior standing and tolling rulings.   Finally, 10% of the Net Settlement Fund will be allocated to Authorized Claimants who purchased Certificates that were issued pursuant to the 429 Offerings that the *Luther* Action sought to represent but were not purchased by any of the named plaintiffs in the Actions (the "Dismissed Unrepresented Tranches").

866280_2

159.   If approved, the proposed Plan of Allocation set forth in the Notice will govern how the Net Settlement Fund will be distributed among Authorized Claimants. The proposed Plan of Allocation – which is based on the statutory measure of damages set forth in §11 of the Securities Act – is designed to achieve an equitable and rational distribution of the Net Settlement Fund to the Class.  Additionally, the Plan of Allocation takes into consideration the strengths of the claims and appellate rights of the purchasers of the Certificates.[21]

160.   In developing the Plan of Allocation, Plaintiffs' Counsel conferred with their valuation expert, Steven P. Feinstein, who has extensive experience in MBS. The Plan of Allocation is based generally on each Authorized Claimant's out-of-pocket loss resulting from their investment in the Certificates.  It considers: (i) when the Certificate was purchased or acquired; (ii) whether the Certificate was sold, and if so, when it was sold (i.e., before or after suit) and for how much; (iii) the Value of the Certificate on its applicable date of first suit (i.e., the date on which a plaintiff with standing to pursue the claims for that Certificate brought suit, or in the case of Dismissed Represented Tranches and Dismissed Unrepresented Tranches, October 16, 2008); and (iv) the outstanding principal balance for the Certificate at the time of sale, or if not sold, the principal amount outstanding as of the applicable date of first suit.

161.   In order to assist the Claims Administrator in determining an Authorized Claimant's Recognized Losses (or Gains), Plaintiffs' valuation consultant, Steven P. Feinstein, calculated the Value of each Certificate as of the applicable date of first suit, along with the portion of original face value that remained outstanding for each Certificate as of the applicable date of first suit, which is referred to in the Plan of Allocation as the "Factor."

---

[21]   As set forth in the Plan of Allocation, only those purchases made from March 12, 2004 to October 16, 2008 are eligible to potentially recover from the Net Settlement Fund.

162.   Based on purchase and sale information, the Factors, the Value as of the applicable date of first suit, and an Authorized Claimant's transactional data for the Certificate, the Claims Administrator will calculate each Authorized Claimant's Recognized Losses (or Gains) based on the formulas set forth in the Plan of Allocation.

163.   In sum, each Authorized Claimant's Recognized Losses (or Gains) will be determined by: (i) the original principal amount purchased; (ii) principal payments received; (ii) the amount received upon sale of the Certificate; and (iv) for Certificates not sold or sold after the applicable date of first suit, the Value as of the applicable date of first suit.

164.   To the extent there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's claim.  If, however, as is the more likely scenario, the amount in the Net Settlement Fund is not sufficient to permit payment of the total claim of each Authorized Claimant, then each Authorized Claimant shall be paid a *pro rata* share of the Net Settlement Fund that was allocated to the category in which the Authorized Claimant's claim belongs, i.e., Live Represented Tranches, Dismissed Represented Tranches, or Dismissed Unrepresented Tranches.

165.   A Total Recognized Loss by CUSIP will be calculated for each Authorized Claimant on a CUSIP by CUSIP basis.  Accordingly, multiple transactions by an Authorized Claimant in a single CUSIP will be netted; i.e., the total Recognized Loss or Gain Amounts for that CUSIP shall be calculated by (1) totaling the Recognized Loss Amounts for that CUSIP; and (2) subtracting from that total Recognized Loss Amount the total of all Recognized Gain Amounts for that CUSIP. However, a Total Recognized Loss by CUSIP cannot be less than zero.

166.   The Claims Administrator will calculate each Authorized Claimant's claim.  However, the Factors and Values for each Eligible Certificate as of the applicable date of first suit are available to the Authorized Claimants on the website

866280_2

created for the Settlement, www.countrywidembssettlement.com, or by calling the Claims Administrator. Plaintiffs believe that the proposed Plan of Allocation provides a fair and equitable allocation of the Net Settlement Fund.

## XI.   PLAINTIFFS' COUNSEL'S APPLICATION FOR ATTORNEYS' FEES IS REASONABLE

### A.   The Requested Fee of 17% of the Gross Settlement Fund Is Fair and Reasonable, Is Consistent with Percentages Routinely Awarded by Courts in this Circuit, and Is Amply Justified by the Facts and Nature of the Actions

#### 1.   Nature and Extent of Litigation

167.   The nearly six-year prosecution and resolution of the Actions required Plaintiffs' Counsel and their professional support staff to perform in excess of 87,000 hours of work and to incur $2,977,145 in expenses for which they have not been paid.

168.   As detailed above, these cases were vigorously litigated and settled only after Robbins Geller and Kessler Topaz had, *inter alia*: (a) conducted an extensive factual investigation; (b) filed three state action complaints and subsequent Operative Complaint for violations of the Securities Act; (c) opposed two rounds of defendants' demurrers in state court; (d) vigorously fought to remand the action back to state court following defendants' removal to this Court based on CAFA, and opposed defendants' appeal to the Ninth Circuit on the issue; (e) sought declaratory relief on SLUSA jurisdiction divestiture before this Court; (f) appealed the subsequent state court dismissal of the action on SLUSA grounds to the California Court of Appeal and subsequently opposed defendants' appeal to the California Supreme Court; (g) sought remand a second time based on defendants' removal under federal bankruptcy law;(h) opposed defendants' motions to dismiss the complaints; (i) reviewed over 5.5 million pages of documents produced by defendants and third parties; and (j) prepared for and attended two full-day formal mediation sessions, followed by extensive post-mediation settlement discussions.

169.   Likewise, Robbins Geller and Kessler Topaz encountered a variety of complex litigation issues and issues of first impression that required extensive

1    research and investigation in the areas of, *inter alia*:  (1) removal and remand;  (2)
2    equitable and cross-jurisdictional tolling; (3) SLUSA and CAFA; (4) privilege,
3    including  the  bank  examiner's  privilege;  (5)  Article  III,  Securities  Act  and
4    California's "community of interest" class standing; (6) intervention; (7) default
5    judgment; (8) motions to stay; (9)  the Anti-Injunction Act; (10) settlement release
6    enforceability;  (11)  damages;  (12)  joint  and  several  liability;  (13)  litigation
7    consolidation; and (14) plans of allocation.

8         170.   These efforts and others on the part of Plaintiffs' Counsel in the *Luther*
9    and *Washington State* Actions are described in detail throughout this joint declaration.
10   The efforts taken on behalf of Cohen Milstein, counsel in the *Maine State* Action, are
11   detailed in the Reiser Declaration submitted herewith.

12        171.   In  consideration  of  their  extensive  efforts  on  behalf  of  the  Class,
13   Plaintiffs' Counsel are applying for compensation from the Gross Settlement Fund in
14   the amount of 17% – a fee of $85,000,000.00, plus interest.  Plaintiffs' Counsel
15   respectfully submit that the requested fee is reasonable under the percentage-of-
16   recovery method, which has been implicitly endorsed in this Circuit.  Additionally, the
17   percentage sought (17%) is well within the range of acceptable percentages in this
18   Circuit, and is also fair and reasonable when compared to Plaintiffs' Counsel's
19   collective lodestar.

20        **B.    The Requested Fee Is Reasonable**

21        172.   The 17% fee is sought with Plaintiffs' express consent and approval
22   pursuant to certain agreements between Plaintiffs' Counsel and Plaintiffs.[22]  Each
23   plaintiff considered the risks assumed by Counsel, and the litigation challenges

24   ─────────────────────
     [22]   *See* Declarations of named plaintiffs Maine Public Employees Retirement System;
25   David H. Luther; MashreqBank, psc; Iowa Public Employees' Retirement System;
     Orange County Employees Retirement System; Western Conference of Teamsters
26   Pension Trust Fund; Oregon Public Employees' Retirement System; Vermont Pension
     investment Committee; Washington State Plumbing and Pipefitting Pension Trust;
27   Pension Trust Fund for Operating Engineers and the Operating Engineer's Annuity
     Plans; and General Board of Pension and Health Benefits of the United Methodist
28   Church, filed herewith.

through which Counsel persevered, including numerous adverse rulings in both the California state and federal court systems, and litigation of issues of first impression in this Circuit and in state court.

173.   Plaintiffs' Counsel have at all times assumed the responsibility of litigating these Actions on a contingent-fee basis, such that any attorneys' fees would be paid only upon Plaintiffs' Counsel securing a recovery for the benefit of the Class by settlement or judgment.   In our experience, defendants' counsel are paid on an ongoing basis as opposed to on a contingent basis.

174.   Since reaching agreements with Plaintiffs regarding the requested fee, Counsel have continued to incur substantial additional expenses in the form of time spent finalizing the papers, documenting the Settlement, including the Plan of Allocation and a supplemental submission in support thereof, and preparing motion papers in support of preliminary approval and final approval of the Settlement. Additionally, Plaintiffs' Counsel will incur additional time in connection with Plaintiffs' reply papers in further support of final approval, which will address any objections thereto, and in administering and distributing the Net Settlement Fund.  As set forth in the accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses ("Fee Memorandum"), numerous courts have applied the percentage-of-recovery method in awarding fees in "common fund" cases.  In light of the effort required over the past five-plus years of litigation, and the excellent recovery for the Class, the 17% fee sought is merited.  The fee is also fair based on the lodestar cross-check.

### 1.    The Time Expended

175.   Plaintiffs' Counsel, as well as each of the following firms: Glancy Binkow & Goldberg LLP (local counsel in the *Maine State* Action), Kirby McInerney LLP (counsel for United Methodist Churches Benefit Board), The Mehdi Firm (counsel for Mashreqbank, p.s.c.), Deutsch & Lipner (counsel for David H. Luther), and Scott & Scott LLP (counsel for plaintiff in *Putnam Bank v. Countrywide Fin.*

- 71 -

1   *Corp., et al.*, No. 2:11-cv-4698-MRP (MANx) (C.D. Cal.)) (collectively, "Additional

2   Plaintiffs' Counsel") have at all times assumed the risks of litigating the Actions on a

3   contingent-fee basis.

4   176.   Prior to the state court's dismissal of the *Luther* Action in March 2010,

5   the *Luther* Plaintiffs' Counsel, after having litigated the case for over two years, had

6   already necessarily expended over 16,500 hours with a lodestar value of over $7.7

7   million to vigorously pursue plaintiffs' claims.  Thereafter, over the next 1.5 years,

8   *Luther* Plaintiffs' Counsel aggressively pursued an appeal of the dismissal and took

9   measures to protect plaintiffs' interests, including filing a federal action.  By the time

10   plaintiffs' state action was reinstated in September 2011, over 50% of the *Luther*

11   Plaintiffs' Counsel's total lodestar had reasonably been expended.  As of August 31,

12   2013, Plaintiffs' Counsel in the *Luther* and *Western Conference* Actions along with

13   additional counsel for the *Luther* Plaintiffs have expended a cumulative total of

14   44,788 hours in attorney and professional support staff time in litigating the Actions

15   and obtaining this Settlement.  Together with Counsel in the *Maine State* Action and

16   all other additional Plaintiffs' Counsel, the resulting cumulative lodestar is

17   $40,209,519.05.  Thus, the requested fee represents a lodestar multiplier of 2.11.

18   177.   *Luther* Plaintiffs' Counsel have each prepared a detailed, firm-specific

19   declaration setting forth the time spent, total lodestar, and work performed in the

20   Actions.[23]

21

22   [23]   *See* Declaration of Spencer A. Burkholz Filed on Behalf of Robbins Geller
     Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and
23   Expenses ("Robbins Geller Decl."); Declaration of Andrew L. Zivitz in Support of
     Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Expenses Filed on
24   Behalf of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz Decl."); Reiser
     Decl.; Declaration of Seth E. Lipner Filed on Behalf of Deutsch & Lipner in Support
25   of Application for Award of Attorneys' Fees ("Deutsch & Lipner Decl."); Declaration
     of Randall K. Berger in Support of Maine State Plaintiffs' Motion for Final Approval
26   of Proposed Class Action Settlement and Plan of Allocation, and Petition for Award
     of Attorneys' Fees and Reimbursement of Expenses ("Berger Decl."); Declaration of
27   Lionel Z. Glancy on Behalf of Glancy Binkow & Goldberg LLP in Support of Motion
     for Attorneys' Fees and Expenses ("Glancy Decl."); Declaration of Azra Z. Mehdi on
28   Behalf of the Mehdi Firm, PC in Support of Application for Award of Attorneys' Fees
     and Expenses ("Mehdi Decl."); Declaration of Geoffrey M. Johnson on Behalf of

- 72 -

178.   Each of the Additional Plaintiffs' Counsel has also prepared a detailed, firm-specific declaration that sets forth the time spent, total lodestar, and work performed in the Actions.  *See* Deutsch & Lipner Decl.; Berger Decl.; Glancy Decl.; Mehdi Decl.; Scott Decl.

## 2.   The Settlement Achieved

179.   As discussed above, the $500 million cash Settlement was achieved as a result of extensive and innovative prosecutorial efforts, in-depth investigations, extensive document review, and contentious and complicated motion practice on numerous issues of first impression, followed by months of settlement negotiations culminating with the agreement-in-principle reached after nearly six years of litigation.  As a result of this Settlement, the eligible Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement and in light of the current state of the law in the context of MBS actions.

## 3.   The Risk, Magnitude and Complexity of the Litigation

180.   Courts have continually recognized that the risk, novelty and complexity of the issues presented, as well as the result achieved are important factors in determining a fee award.  As demonstrated in detail above, the Actions involved difficult issues of fact and law regarding defendants' alleged misstatements or omissions of material fact in the Offering Documents, required an intimate understanding of the mortgage underwriting and securitization process, and implicated difficult and novel issues regarding state court jurisdiction over Securities Act claims in light of CAFA and SLUSA, as well as challenges regarding unique standing issues in MBS cases and the scope of the putative class.  Additionally, these Actions further required an understanding of the complex structure of the Certificates, an analysis of

Scott + Scott, Attorneys at Law, LLP in Support of Motion for Attorneys' Fees and Expenses ("Scott Decl."), filed herewith.

866280_2

difficult and risky issues regarding proof of damages, and defenses on loss causation and statutes of limitations and repose. This joint declaration and the motions in support of the proposed Settlement and Plaintiffs' Counsel's fee application describe the substantial risks of the Actions. And, given the contingent fee nature of the Actions, those same risks also magnified the risk that *Luther* Plaintiffs' Counsel would not receive any fee award for their efforts.

181. There are numerous cases where class counsel in contingent fee cases such as this, after expending thousands of hours and incurring significant expenses litigating a case in good faith, have received no compensation whatsoever. *Luther* Plaintiffs' Counsel know from personal experience that despite the most vigorous and competent of efforts, including trials to a jury verdict, attorneys' success in contingent litigation such as this is never assured. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

182. As discussed in greater detail above, this litigation was fraught with significant risks from the outset. Defendants repeatedly sought to avoid prosecution in the state court, twice arguing that the state court was divested of jurisdiction over plaintiffs' Securities Act claims. Additionally defendants disputed whether plaintiffs could pursue claims on behalf of the class, establish material misstatements or omissions, and prove damages. If this Settlement were not achieved, and even if plaintiffs prevailed through trial, there was a potential that plaintiffs would face years of costly and risky appeals, such that ultimate success was far from certain. Equally plausible is the possibility that a jury would have found no liability or no damages. We respectfully submit that Plaintiffs' Counsel are entitled to 17% of the Gross Settlement Fund because of the risk factors involved in this case, coupled with the tireless prosecution of the Actions over the past nearly six years.

- 74 -

866280_2

#### 4.     Quality of the Representation

183.   A 17% fee is also warranted in light of the extensive efforts on the part of *Luther* Plaintiffs' Counsel, as outlined above and in the accompanying documents being submitted herewith, that were required to produce this Settlement.  *Luther* Plaintiffs' Counsel and their in-house professionals spent tens of thousands of hours litigating the claims asserted against the defendants including, *inter alia*, conducting a thorough investigation, reviewing publicly-available documents, conferring with valuation consultants, drafting three state court complaints and a consolidated Operative Complaint, drafting comprehensive memoranda concerning novel jurisdictional and standing issues, twice briefing oppositions to defendants' demurrers, opposing defendants' motions to dismiss, negotiating document production with defendants and third parties, moving to compel production of documents, reviewing, searching, and analyzing millions of pages of documents, engaging in extensive settlement discussions and strategically guiding the Actions through months of settlement negotiations, including formal mediation, culminating in an excellent recovery and resolution for the class.

184.   Counsel in the *Luther* and *Washington State* Actions are two of the preeminent class action, securities litigation boutiques in the country.  Robbins Geller is a preeminent law firm specializing in securities class action and has served as lead or co-lead counsel on behalf of major institutional investors.  Robbins Geller is responsible for achieving some of the largest recoveries in class action history – for example, it represented Regents of the University of California in *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.), securing a $7.3 billion recovery for the investor class, and recovered $600 million for investors in *In re Cardinal Health, Inc. Sec. Litig.*, No. C2-04-575 (S.D. Ohio).  Likewise, in *In re UnitedHealth Group Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.), Robbins Geller secured over $925 million for the class in the largest stock option backdating recovery ever – a recovery that is more than four times larger than the next largest options backdating recovery, and in

- 75 -

1   2011 achieved a record-breaking settlement in *In re Wachovia Preferred Sec. and*
2   *Bond/Notes Litig.*, No. 09-cv-06351-RJS (S.D.N.Y.) ($627 million recovery).
3   Undeterred by the defense bar, Robbins Geller is also not afraid to see a case through
4   trial, and as sole lead counsel has obtained the largest securities class action jury
5   verdict in history in *Lawrence E. Jaffe Pension Plan v. Household International, Inc.,*
6   *et al.*, No. 02-C-05893 (N.D. Ill.), resulting in $2.25 billion in investor claims.
7   Additionally, Robbins Geller has been entrusted to represent more institutional
8   investors in securities litigation than any other law firm in the United States.

9       185.   Kessler Topaz also specializes in prosecuting complex class action
10  litigation and is one of the leading law firms in its field.   Kessler Topaz has
11  successfully prosecuted numerous securities class actions on behalf of and obtained
12  billions of dollars for injured investors, including the following matters:   *In re Tyco*
13  *Int'l, Ltd. Sec. Litig.*, No. 02-md-01335-PB (D.N.H., filed Aug. 23, 2002) ($3.2 billion
14  recovery); *In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Security*
15  *Act (ERISA) Litig.*, No. 09-md-02058-PKC (S.D.N.Y., filed June 11, 2009) ($2.425
16  billion recovery); *In re Citigroup Inc. Bond Litig.*, Master File No. 08 Civ. 9522
17  (SHS) (S.D.N.Y.) ($730 million recovery); *In re Wachovia Preferred Sec. and*
18  *Bond/Notes Litig.*, No. 09-cv-06351-RJS (S.D.N.Y., filed July 15, 2009) ($627 million
19  recovery); *In re Lehman Bros. Equity/Debt Sec. Litig.*, No. 08-cv-05523-LAK-GWG
20  (S.D.N.Y., filed June 18, 2008) ($517 million partial recovery); and *In re Tenet*
21  *Healthcare Corp. Sec. Litig.*, No. 02-cv- 08462-RSWL-RZ (C.D. Cal., filed Nov. 4,
22  2002) ($215 million recovery).   Additionally, in *In re Southern Peru Copper Corp.*
23  *Derivative Litig.*, Consol. CA No. 961-CS (Del. Ch.), Kessler Topaz secured the
24  largest damage award in Delaware Chancery Court history, a $1.3 billion derivative
25  judgment that was affirmed on appeal by the Delaware Supreme Court.

26  **XII.   PAYMENT OF PLAINTIFFS' COUNSEL'S EXPENSES**

27      186.   Plaintiffs' Counsel also request payment of expenses incurred in
28  connection with the prosecution and resolution of the Actions, in the total amount of

- 76 -

$2,977,145.57. Each law firm requesting expenses has submitted a declaration, which states that the expenses are: (i) reflected in the books and records maintained by the firm; and (ii) accurately recorded in their declaration. *See* Robbins Geller Decl.; Reiser Decl.; Kessler Topaz Decl.; Deutsche & Lipner Decl.; Berger Decl.; Glancy Decl.; Mehdi Decl.; Scott Decl.

187.   *Luther* Plaintiffs' Counsel submit that the expenses are reasonable and were necessary for the successful prosecution of these Actions.  Counsel were aware that they may not recover any of these expenses unless and until the actions were successfully resolved against defendants.   Accordingly, Counsel took steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of plaintiffs' claims.

188.   A substantial portion $482,921.55, or 47.6% of *Luther* Plaintiffs' Counsels' expenses, relate to the cost of database management hosting charges.  These expenses were critical to allowing document reviewers to search, download, code, and analyze documents produced in this litigation.  The expense award sought for database management reflects charges for the management of e-discovery platforms which held more than 19 million pages of documents produced by defendants and non-parties in the actions.  Given the nature and breadth of document production and the number of components that are part of a database management system (such as hardware, software, license/access fees, etc.), as well as the expense of using third-party database vendors, Robbins Geller has undertaken to store, analyze, and review electronic discovery in-house.  Accordingly, in-house database management hosting allowed *Luther* Plaintiffs' Counsel to more efficiently and more cost-effectively navigate through the document review process.

189.   Approximately $239,209.75 or 23.6% of *Luther* Plaintiffs' Counsels' expenses, relate to the cost of experts, consultants and investigators.  These expenses were critical to pleading and proving plaintiffs' claims and calculating the class' damages.  Given the complexity of the Securities Act claims at issue, it was essential

- 77 -

1  for Plaintiffs' Counsel to engage the services of experts and consultants in order to

2  ensure success in prosecuting the Actions and achieving the proposed Settlement.

3      190.   *Luther* Plaintiffs' Counsel's expenses also reflect routine and typical

4  expenditures incurred in the course of litigation, such as the costs of legal research

5  (*i.e.*, Westlaw and Lexis fees), travel, document duplication, telephone expenses, and

6  overnight mail delivery, for example.   These expenses are reasonable and were

7  necessary for the successful prosecution of the Actions.

8  **XIII.  CONCLUSION**

9      191.   In view of the significant recovery to the class and the very substantial

10  risks of this litigation, as described above and in the accompanying Memorandum of

11  Points and Authorities in Support of Plaintiffs' Motion for Final Approval of Class

12  Action Settlement and Plan of Allocation of Settlement Proceeds, Plaintiffs' Counsel

13  respectfully submit that the Settlement should be approved as fair, reasonable and

14  adequate and that the proposed Plan of Allocation should be approved as fair and

15  reasonable.  In addition to the significant recovery in the face of substantial risks; due

16  to the efforts of Plaintiffs' Counsel, the novel issues faced, the quality of work

17  performed, the contingent nature of the fee, the complexity of the case and the

18  standing and experience of Plaintiffs' Counsel, as described above and in the

19  accompanying Fee Memorandum, Plaintiffs' Counsel respectfully submit that the

20  Court should award a fee in the amount of 17% of the Settlement Amount plus

21  $2,977,145.57 in expenses, plus the interest earned thereon at the same rate and for the

22  same period as that earned on the Settlement Amount until paid.

23      I declare under penalty of perjury under the laws of the United States of

24  America that the foregoing is true and correct.  Executed this 23rd day of September

25  2013, at San Diego, California.

26                                           s/ Spencer A. Burkholz

27                                      SPENCER A. BURKHOLZ

28

1

2          I declare under penalty of perjury under the laws of the United States of

3  America that the foregoing is true and correct.  Executed this 23rd day of September

4  2013, at Radnor, Pennsylvania.

5                                                        s/ Andrew L. Zivitz
                                                ANDREW L. ZIVITZ
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

866280_2

1

## CERTIFICATE OF SERVICE

2  I hereby certify that on September 23, 2013, I authorized the electronic filing of

3 the foregoing with the Clerk of the Court using the CM/ECF system which will send

4 notification of such filing to the e-mail addresses denoted on the attached Electronic

5 Mail Notice List, and I hereby certify that I caused to be mailed the foregoing

6 document or paper via the United States Postal Service to the non-CM/ECF

7 participants indicated on the attached Manual Notice List.

8  I certify under penalty of perjury under the laws of the United States of America

9 that the foregoing is true and correct.  Executed on September 23, 2013.

10

11          s/ Spencer A. Burkholz
           SPENCER A. BURKHOLZ

12
           ROBBINS GELLER RUDMAN
13             & DOWD LLP
           655 West Broadway, Suite 1900
14           San Diego, CA  92101-3301
           Telephone:  619/231-1058
15           619/231-7423 (fax)

16           E-mail:  spenceb@rgrdlaw.com

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 2:10-cv-00302-MRP-MAN

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Seth A Aronson**
  saronson@omm.com,LitigationCalendar@omm.com,skemp@omm.com

- **Randall K Berger**
  rberger@kmllp.com

- **Leiv H Blad , Jr**
  leiv.blad@bingham.com

- **Stephen Douglas Bunch**
  dbunch@cohenmilstein.com,efilings@cohenmilstein.com

- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,jillk@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christopher G Caldwell**
  caldwell@caldwell-leslie.com,hammer@caldwell-leslie.com, ,hong@caldwell-leslie.com,perigoe@caldwell-leslie.com,pettit@caldwell-leslie.com,records@caldwell-leslie.com,hayes@caldwell-leslie.com,popescu@caldwell-leslie.com,strother@caldwell-leslie.com

- **Matthew D Caplan**
  matthew.caplan@dlapiper.com,susan.byrd@dlapiper.com

- **Matthew W Close**
  mclose@omm.com

- **Jeffrey B Coopersmith**
  jeffcoopersmith@dwt.com,evelyndacuag@dwt.com

- **John B Daukas**
  jdaukas@goodwinprocter.com

- **Brian Charles Devine**
  bdevine@goodwinprocter.com,ABoivin@goodwinprocter.com

- **Joshua S Devore**
  jdevore@cohenmilstein.com,efilings@cohenmilstein.com

- **Rajiv S Dharnidharka**
  rajiv.dharnidharka@dlapiper.com

- **Daniel S Drosman**
  ddrosman@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Thomas E Egler**
  tome@rgrdlaw.com

- **Andrew A Esbenshade**
  esbenshade@caldwell-leslie.com,records@caldwell-leslie.com,harper@caldwell-leslie.com

- **John O Farley**
  jfarley@goodwinprocter.com

- **James O Fleckner**
  jfleckner@goodwinprocter.com

- **Inez H Friedman-Boyce**
  ifriedmanboyce@goodwinprocter.com,MConnolly@goodwinprocter.com

- **Jeanne A Fugate**
  fugate@caldwell-leslie.com,records@caldwell-leslie.com,harper@caldwell-leslie.com

- **Michael M Goldberg**
  mmgoldberg@glancylaw.com,dmacdiarmid@glancylaw.com,info@glancylaw.com

- **Penelope A Graboys Blair**
  pgraboysblair@orrick.com

- **Joshua G Hamilton**
  joshuahamilton@paulhastings.com,melmanahan@paulhastings.com,lindayoung@paulhastings.com

- **Jeffrey M Hammer**
  hammer@caldwell-leslie.com

- **Sean M Handler**
  shandler@btkmc.com

- **Jennifer L Joost**
  jjoost@ktmc.com,mswift@ktmc.com

- **Matthew B Kaplan**
  mbkaplan@thekaplanlawfirm.com

- **Don M Kennedy**
  dkennedy@goodwinprocter.com

- **Dean J Kitchens**
  dkitchens@gibsondunn.com,MOstrye@gibsondunn.com

- **Joel P Laitman**
  jlaitman@cohenmilstein.com

- **Christopher Lometti**
  clometti@cohenmilstein.com

- **Jennifer B Luz**
  jluz@goodwinprocter.com

- **Azra Z Mehdi**
  azram@themehdifirm.com,ghamilton@themehdifirm.com

- **Alexander K Mircheff**
  amircheff@gibsondunn.com,mostrye@gibsondunn.com,inewman@gibsondunn.com,cnowlin@gibsondunn.com,mpulley@gibsondunn.com

- **Nicolas Morgan**
  nicolas.morgan@dlapiper.com,docketingpaloalto@dlapiper.com,sonji.leblanc@dlapiper.com,paul.puzon@dlapiper.com

- **Sharan Nirmul**
  snirmul@ktmc.com,azivitz@ktmc.com

- **Brian E Pastuszenski**
  bpastuszenski@goodwinprocter.com,dkantrowitz@goodwinprocter.com,aboivin@goodwinprocter.com,ashapiro@goodwinprocter.com

- **Kelly L Perigoe**
  perigoe@caldwell-leslie.com,records@caldwell-leslie.com

- **Ira M Press**
  ipress@kmllp.com,lmorris@kmllp.com

- **David A Priebe**
  david.priebe@dlapiper.com,carmen.manzano@dlapiper.com

- **Daniel B Rehns**
  drehns@cohenmilstein.com,efilings@cohenmilstein.com

- **Julie G Reiser**
  jreiser@cohenmilstein.com

- **Daniel P Roeser**
  droeser@goodwinprocter.com

- **Jonathan Rosenberg**
  jrosenberg@omm.com

- **Scott H Saham**
  scotts@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer M Sepic**
  jennifer.sepic@bingham.com

- **Richard A Speirs**
  rspeirs@cohenmilstein.com

- **William F Sullivan**
  williamsullivan@paulhastings.com,lisavermeulen@paulhastings.com,lindayoung@paulhastings.com

- **Steven J Toll**
  stoll@cohenmilstein.com

- **Michael D Torpey**
  mtorpey@orrick.com

- **Michael C Tu**
  mtu@orrick.com,cchiang@orrick.com

- **Avi N Wagner**
  avi@thewagnerfirm.com,anwagneresq@hotmail.com

- **Shirli Fabbri Weiss**
  shirli.weiss@dlapiper.com,emiko.gonzales@dlapiper.com

- **Lloyd Winawer**
  lwinawer@goodwinprocter.com,ahsia@goodwinprocter.com,cburgos@goodwinprocter.com

- **Andrew L Zivitz**
  azivitz@ktmc.com,dpotts@ktmc.com,jenck@ktmc.com,cchiappinelli@ktmc.com,acashwell@ktmc.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Peter              Young Hoon Cho
,

Dennis             N D'Angelo
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109

Lauren             G Kerkhoff
Robbins Geller Rudman & Dowd LLP
655 West Broadway  Suite 1900
San Diego, CA 92101-8498

Lauren             Wagner Pederson
Kessler Topaz Meltzer & Check LLP
280 King of Prussia Road
Radnor, PA 19087

Christina          A Royce
Robbins Geller Rudman & Dowd LLP
655 West Broadway   Suite 1900
San Diego, CA 92101

Arthur             L Shingler                         , III
Scott and Scott LLP
6424 Santa Monica Boulevard
Los Angeles, CA 90038
```