# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| MAINE STATE RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, *et al.*,<br><br>Defendants. | Case No.  2:10-CV-00302 MRP (MANx)*<br><br>**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS, AND REQUEST FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES** |
| DAVID H. LUTHER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, *et al.*,<br><br>Defendants. | Case No. 2:12-CV-05125 MRP (MANx) |
| WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, *et al.*,<br><br>Defendants. | Case No. 2:12-CV-05122 MRP (MANx) |

## I.   INTRODUCTION

The parties in *Luther v. Countrywide Financial Corp.*, No. 12-CV-5125-MRP (MANx) (C.D. Cal.) ("*Luther*"), *Western Conf. of Teamsters Pension Trust Fund v. Countrywide Financial Corp.*, No. 12-CV-5122-MRP (MANx) (C.D. Cal.) ("*Western Teamsters*"), and *Maine State Retirement Systems v. Countrywide Financial Corp.*, No. 10-CV-00302-MRP (MANx) (C.D. Cal.) ("*Maine State*") (collectively, the "Settlement Actions") propose a settlement on behalf of all purchasers or acquirers, during the period of March 12, 2004 through August 7, 2013, of any Certificates purchased in connection with 429 mortgage-backed securities ("MBS") offerings at issue in the Settlement Actions.  All of these cases involve MBS issued by affiliates of Countrywide Financial Corporation ("Countrywide").   Plaintiffs allege that the registration statements, prospectuses, and prospectus supplements related to the 429 MBS offerings contain materially false and misleading statements and omitted material information in violation of Section 11, 12(a)(2), and 15 of the Securities Act of 1933.  Plaintiffs propose, and Defendants do not oppose, a settlement of all claims asserted in these actions in exchange for a payment of $500 million in cash, plus interest.  Having reviewed the proposed class action settlement and plan of allocation, the Court finds that both are fair, reasonable, and adequate and hereby approves the settlement and plan of allocation pursuant to Federal Rule of Civil Procedure 23.  For the reasons set forth below, the Court also grants the request of Plaintiffs' Counsel for an award of attorneys' fees in the amount of 17 percent of the gross settlement fund.

## II.   BACKGROUND

**A. Summary of Allegations**

The allegations in these cases stem from Countrywide's home loan origination practices between 2004 and 2007.  Many of the loans Countrywide made to borrowers were pooled together and deposited into special-purpose entities, referred to as the "issuing trusts," which were created by Defendants CWALT, CWABS, CWMBS, and CWHEQ, wholly-owned subsidiaries of Countrywide.  These pools of mortgages were

then securitized into MBS and sold by the trusts and various investment banks that underwrote offerings of Countrywide securities (the "Underwriter Defendants")[1] in the form of certificates (the "Certificates"). The Certificates entitled the holder to a portion of the cash flow from the pool of underlying mortgages. The trusts issued Certificates via registration statements, prospectuses, and prospectus supplements (the "Offering Documents") that included representations concerning the quality of the mortgage pools underlying the issuing trusts, the mortgages' loan-to-value ("LTV") ratios, and other criteria used to qualify borrowers for the mortgages. Plaintiffs sue Countrywide for making material misstatements or omissions in the Offering Documents in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Plaintiffs sue the Underwriter Defendants under Sections 11 and 12(a)(2) for marketing and selling the Certificates to Plaintiffs while knowing of misstatements and omissions contained in the Offering Documents. Finally, Plaintiffs sue the Individual Defendants[2] under Section 11 because they allegedly signed the registration statements for the offerings, which were incorporated by reference into the Offering Documents.

**B. Pre-Settlement Procedural History**

The proposed settlement before the Court follows a lengthy and complex procedural history. Indeed, the complaint in *Luther* was filed over six years ago, representing the first MBS case following the financial crisis. The procedural history of *Luther, Western Teamsters*, and *Maine State* merits detailed recitation, for it provides necessary context in assessing the essential fairness of the final settlement

---

[1] The Underwriter Defendants consist of Banc of America Securities LLC; Barclays Capital Inc.; Bear Stearns & Co. Inc.; BNP Paribas Securities Corp.; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; Edward D. Jones & Co. L.P. d/b/a Edward Jones; Goldman, Sachs & Co.; Greenwich Capital Markets, Inc., now known as RBS Securities Inc., HSBC Securities (USA) Inc.; J.P. Morgan Securities Inc.; Merrill, Lynch, Pierce, Fenner & Smith Incorporated; Morgan Stanley & Co. Incorporated; and UBS Securities LLC.

[2] The Individual Defendants consist of former Countrywide officers and directors, including Stanford L. Kurland, David A. Spector, Eric P. Sieracki, David A. Sambol, Ranjit Kripalani, N. Joshua Adler, Jennifer S. Sandefur, Jeffrey P. Grogin, Thomas Boone, and Thomas K. McLaughlin.

1   amount, the terms of the settlement, the plan of allocation, and the requested

2   attorneys' fees.

3       **1.  The *Luther* Action**

4           On November 14, 2007, David Luther filed *Luther v. Countrywide Home Loans*

5   *Servicing LP* in the Superior Court of the State of California, County of Los Angeles.

6   Luther, the sole Plaintiff, brought this lawsuit as a class action pursuant to California

7   Code of Civil Procedure 382, on behalf of those who acquired certificates traceable to

8   five registration statements for offerings made between January 2005 through June

9   2007.   The *Luther* Complaint, which was later consolidated with subsequent

10  complaints, alleged violations of the federal Securities Act of 1933 with respect to 429

11  separate Countrywide offerings and more than 9,500 separate tranches of MBS.

12          On December 17, 2007, Defendants removed *Luther* to the United States

13  District Court for the Central District of California under the Class Action Fairness

14  Act of 2005 ("CAFA").  Plaintiffs subsequently moved to remand, arguing that the

15  claims could be brought in either state or federal court and there was no basis for

16  removal under CAFA.  This Court granted Plaintiffs' motion to remand, a decision

17  which was affirmed on appeal to the Ninth Circuit.  *Luther v. Countrywide  Home*

18  *Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008).

19          On June 12, 2008, while the Ninth Circuit appeal was pending, Washington

20  State Plumbing and Pipefitting Pension Fund Trust ("Washington Trust Fund") filed

21  *Washington State Plumbing & Pipefitting Pension Fund Trust v. Countrywide*

22  *Financial Corp.* in the Superior Court of the State of California, County of Los

23  Angeles.  The Complaint, brought by the same counsel that represents the named

24  plaintiffs in *Luther*, was virtually identical to that in *Luther*.  Washington Trust Fund,

25  the sole plaintiff, purported to allege a class action pursuant to California Code of

26  Civil Procedure 382, on behalf of those who acquired 397 offerings issued between

27  June 13, 2005 and December 27, 2007.  This Complaint, like the one in *Luther*,

28  contained causes of action under the Securities Act.

After Plaintiffs amended their Complaint in *Luther* to include additional named plaintiffs (Vermont Pension Investment Committee; Mashreqbank, P.S.C.; Pension Trust for Operating Engineers; and Operating Engineers Annuity Plan), *Luther* and *Washington State Plumbing* were consolidated on September 12, 2008, with *Luther* designated as the lead action.  The Superior Court of California appointed the Named Plaintiffs, including the newly-added Maine State Retirement System ("Maine State"), as Co-Lead Plaintiffs and appointed the Named Plaintiffs' counsel, Robbins Geller Rudman & Dowd LLP and Kessler, Topaz, Meltzer & Check, LLP, as Co-Lead Counsel to the class.

On October 16, 2008, the Co-Lead Plaintiffs filed a Consolidated Complaint for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, which remains the operative complaint in the coordinated *Luther* cases today.  Collectively, the Named Plaintiffs allege that they purchased more than $200 million in securities from Defendants.  Plaintiffs, like the cases prior to consolidation, purported to bring the lawsuit as a class action pursuant to California Code of Civil Procedure 382, on behalf of all who acquired certificates pursuant or traceable to registration statements for the issuing trusts' offerings.  The Consolidated Complaint alleged three causes of action, all under the Securities Act.

On March 6, 2009, Defendants filed demurrers to the Consolidated Complaint, arguing that Plaintiffs' causes of action were subject to exclusive federal subject matter jurisdiction because the Federal Securities Litigation Uniform Standards Act of 1998 ("SLUSA") abrogated state court jurisdiction over "covered class actions" as defined in SLUSA.  The Superior Court directed the Named Plaintiffs to file a declaratory action in this Court to determine whether SLUSA barred state jurisdiction. This Court declined to render a declaratory judgment, "confident that [the Superior Court], and the rest of the state judiciary, can reach an appropriate conclusion, regardless whether this Court (or another lower federal court) might come to the same conclusion."  *Luther v. Countrywide Fin. Corp.*, No. CV-09-06162-MRP (JWJx),

1   2009 WL 3271368, at *2 (C.D. Cal. Oct. 9, 2009).  The Superior Court dismissed

2   *Luther* as barred by SLUSA on January 6, 2010.  Named Plaintiffs thereafter appealed

3   the Superior Court's decision and, on January 14, 2010, the Maine State Plaintiff in

4   *Luther* filed a separate, but virtually identical action, discussed in greater detail below,

5   in the Central District of California.

6       On May 18, 2011, the California Court of Appeals reversed the Superior

7   Court's ruling, unanimously concluding that concurrent jurisdiction of the state court

8   had survived the amendments to the Securities Act.  *Luther v. Countrywide Fin.*

9   *Corp.*, 195 Cal. App. 4th 789 (2011).  The Court of Appeals denied rehearing, *Luther*

10  *v. Countrywide Fin. Corp.*, No. B228449, 2011 Cal. App. LEXIS 828 (June 17, 2011),

11  the California Supreme Court denied review, *Luther v. Countrywide Fin. Corp.*, No.

12  S194319, 2011 Cal. LEXIS 9830 (Sept. 14, 2011), and the United States Supreme

13  Court denied a petition for certiorari.  *Countrywide Fin. Corp. v Luther*, 132 S. Ct.

14  832 (Dec. 5, 2011).

15      On May 14, 2012, two of the mortgage originators that issued loans securitized

16  into the MBS purchased by Plaintiffs initiated bankruptcy proceedings.  The

17  Countrywide Defendants again filed a notice of removal, together with a notice of

18  removal of *Western Teamsters*, under "related to" bankruptcy jurisdiction, 28 U.S.C. §

19  1452(a).  On September 4, 2012, this Court denied Plaintiffs' motion to remand

20  because the *Luther* and *Western Teamsters* actions were "related to" federal

21  bankruptcy proceedings filed by now-bankrupt third-party lenders that had originated

22  loans backing the securities embraced by the *Luther* and *Western Teamsters*

23  Complaints, thus conferring original jurisdiction over the action pursuant to 28 U.S.C.

24  § 1334(b).

25      Defendants moved to dismiss the Consolidated Complaint on November 30,

26  2012.  The motion to dismiss was fully briefed and this Court heard oral arguments on

27  March 13, 2013.  The Court, however, deferred any ruling on the motion to dismiss in

28  light of the parties' settlement negotiations.  Although the Court reviewed the

memoranda and exhibits submitted in connection with the motion to dismiss, the parties reached a settlement prior to the resolution of that motion.

### 2.  The *Western Teamsters* Action

On November 17, 2010, while the *Luther* action was on appeal in California state court, a separate plaintiff, Western Conference of Teamsters Pension Fund ("Western Teamsters"), filed a new action in the California Superior Court. *Western Conference of Teamsters Pension Trust Fund v. Countrywide Fin. Corp., et al.*, No. BC449726 (Cal. Super. Ct., L.A. Cnty). The underlying allegations in the Complaint were essentially identical to the operative Consolidated Complaint in the *Luther* action. Western Teamsters alleged damages in connection with its purchase of more than $170 million worth of Countrywide MBS pursuant to 25 tranches in 22 offerings. Unlike the *Luther* Complaint, Western Teamsters alleged that Bank of America and N.B. Holdings are liable for Countrywide's wrongdoing as its successors in interest.

On June 12, 2012, Countrywide filed a Notice of Removal in the *Western Teamsters* action at the same time as the *Luther* action and on the same basis of "related to" bankruptcy jurisdiction. *Western Teamsters* was assigned to this Court and coordinated with *Luther* for briefing and hearings on the motions to remand and to dismiss. The Court denied Plaintiffs' motion to remand on September 4, 2012 and deferred any ruling on the motion to dismiss due to the parties' settlement negotiations. The parties reached a settlement prior to the resolution of the motion to dismiss.

### 3.  The *Maine State* Action

Shortly after the California Superior Court dismissed the *Luther* action, one of the named plaintiffs in *Luther*, Maine State, filed a nearly identical action in the Central District of California that asserted the same 1933 Act claims with respect to 428 of the same MBS offerings on behalf of the same putative class of investors. Maine State also brought successor-liability claims against Bank of America and N.B. Holdings. According to Plaintiffs, *Maine State* was filed as a separate action in

federal court to preserve the interests of the class against timeliness arguments in the event that the California Court of Appeal affirmed the lower court's dismissal of *Luther*.

On April 2, 2010, five of the six Plaintiffs in the *Luther* action, including Maine State, moved to be appointed as lead plaintiff and requested that their counsel be appointed as lead counsel in the *Maine State* action. Putative class member Iowa Public Employees' Retirement System ("IPERS") and Putnam Bank submitted competing applications for appointment as lead plaintiff and lead counsel. The Court denied the *Luther* plaintiffs' motion and appointed IPERS as Lead Plaintiff (and its counsel as Lead Counsel) after finding that it had "the greatest financial interest" in the *Maine State* action based on the face amount of securities IPERS purchased. (*Maine State*, Dkt. No. 122.)

Following the appointment of Lead Plaintiff and class counsel, the Court rendered two decisions which dramatically reduced the number of securities at issue. On November 14, 2010, the Court held that the plaintiffs in *Maine State* had standing to sue "only with respect to the 81 Offering in which the named plaintiffs [in *Luther*] purchased." *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1164 (C.D. Cal. 2010). Further, the Court held that because the *Luther* plaintiffs lacked standing with respect to any MBS offerings in which they did not purchase, *American Pipe* did not toll the statute of limitations for investors who purchased in MBS offerings other than those in which the named *Luther* Plaintiffs had purchased. *Id.* at 166–67. Later, on May 5, 2011, the Court held that plaintiffs must establish tranche-based standing in addition to offering-based standing for each security at issue. *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-cv-0302, 2011 WL 4389689, at *2 (C.D. Cal. May 5, 2011). These rulings effectively narrowed *Maine State* to involve only eight specific MBS tranches that had been purchased by both the *Maine State* named plaintiffs and the *Luther* named plaintiffs, out of the more than 9,000 tranches comprising nearly 430 offerings upon which the *Maine State* Plaintiffs

originally sued.[3]  Plaintiffs opine that the Court's tranche-based rulings, if applied to *Luther* and *Western Teamsters*, would effectively reduce the collective size of the Settlement Actions to 58 "live" tranches.

Pursuant to a stipulation of the parties, the Court certified a class on October 12, 2011 consisting of eight sub-classes (one for each remaining tranche) of investors who purchased in the eight specific tranches.

### 4.  *Strategic Capital Bank*

The Court's November 21, 2012 ruling in *Strategic Capital Bank*, although not directly related to the procedural history of this settlement, risked dismissal of all remaining tranches in *Maine State* and *Western Teamsters.  Federal Deposit Ins. Corp. as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) ("*Strategic Capital*").   In *Strategic Capital*, the Court reevaluated the extent to which the state court filing of *Luther* had triggered *American Pipe* tolling. *Id.* at *12–13.  The Court concluded that Federal Rule of Civil Procedure 23, the Private Securities Litigation Reform Act, and principles of fairness dictate that "*American Pipe* tolling cannot apply to a class action filed in state court." *Id.* at *13.  Plaintiffs believe that the Court's ruling in *Strategic Capital* would, if applied, likely result in dismissal of *Maine State* and *Western Teamsters* in their entirety.

## C. Settlement History and Significant Terms of the Settlement

### 1.  Settlement Negotiations

The parties in *Luther* first discussed settlement prospects in June 2009 during a meeting with experienced mediator Professor Eric D. Green.  Those negotiations, however, were stalled due in part to the dismissal of *Luther* in California state court. After the California Court of Appeals reinstated *Luther* and Defendants removed the

---

[3] In addition, on April 20, 2011, the Court dismissed with prejudice the successor-liability claims against Bank of America and N.B. Holdings.  *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 1765509, at *9 (C.D. Cal. Apr. 20, 2011).

*Luther* and *Western Conference* actions to this Court in 2012, all parties agreed to participate in joint mediation facilitated by Professor Green.  The parties submitted comprehensive mediation statements regarding the relative strengths and weaknesses of each side and subsequently engaged in two full-day mediation sessions with Professor Green in Boston, Massachusetts.  During the sessions, both sides delivered detailed presentations analyzing the relative strengths and weaknesses of their claims and defenses. A representative of Named Plaintiff Pension Trust Fund for Operating Engineers/Operating Engineers Annuity Plan attended and participated in the first full-day mediation session and a representative for Named Plaintiff Vermont Pension Investment Committee attended and participated in the second full-day session. Because of divergent views on several significant issues, including standing and damages, the parties were not able to reach a settlement.  From December 2012 to April 2013, Professor Green facilitated numerous telephonic settlement discussions between the parties.  In April 2013, Professor Green issued, and the parties accepted, a mediator's proposal to settle the three actions for $500 million.  With the assistance of Professor Green, the parties negotiated and finalized the terms of the settlement on April 16, 2013.

### 2.  Proposed Plan of Allocation

Retired U.S. District Court Judge Nancy Gertner assisted Plaintiffs in developing a plan for allocating the settlement proceeds among the class members. With the recommendation of Judge Gertner, Plaintiffs propose a plan of allocation designed to distribute a certain percentage of the settlement proceeds to class members based on the relative strengths and weaknesses of their claims.  Under the proposed plan of allocation, a major part of the total settlement proceeds (65 percent or $325 million) will be distributed to those members of the proposed class who purchased Certificates within the 85 tranches purchased by the *Luther* Plaintiffs (collectively, "Category One").  Plaintiffs and Judge Gertner believe that the class members in Category One should receive this portion of the settlement proceeds because their

claims were likely to be upheld based on the Court's prior standing and tolling decisions.   Moreover, the Court has already upheld eight of the 58 tranches in Category One at the pleading stage in *Maine State*.

The proposed plan of allocation distributes $125 million (or 25 percent) of the total settlement proceeds to those members of the class who purchased Certificates within the 111 tranches that were purchased by Named Plaintiffs in the Settlement Actions and in *Putnam Bank v. Countrywide Fin. Corp. et al.*, No. 2:11-cv-04698-MRP (MANx) (C.D. Cal.) ("*Putnam Bank*")[4] (collectively, "Category Two"). Category Two consists of 83 tranches purchased by the Named Plaintiffs in *Maine State* that were dismissed on standing and tolling grounds, 11 tranches purchased by several *Luther* named plaintiffs that were subject to dismissal based on the Court's prior rulings concerning application of the statute of repose under the Securities Act, nine tranches purchased by the named plaintiff in *Western Conference* and subject to dismissal based on the Court's prior standing and tolling decisions in *Maine State*, and eight tranches purchased by the named plaintiff in the *Putnam Bank* putative class action that were dismissed on standing and tolling grounds.   Plaintiffs and Judge Gertner believe that class members who invested in the 111 tranches in Category Two should receive a smaller portion of the settlement proceeds than those in Category One because the Category Two claims were dismissed by the Court, thereby diminishing their settlement value.   Plaintiffs and Judge Gertner believe, however, that the appellate rights of Category Two are stronger than those of Category Three, discussed below, because the Category Two tranches, unlike the Category Three tranches, were represented by a Named Plaintiff.

Finally, the proposed plan of allocation distributes $50 million (or 10 percent) of the total settlement proceeds to class members who purchased Certificates between

---

[4] Plaintiffs have included tranches from the *Putnam Bank* action in Category Two because Putnam Bank sought to represent a class of investors in the eight tranches it purchased.  Plaintiffs believe that Putnam Bank has appellate rights like those of the named Plaintiffs and should be treated similarly.

March 12, 2004 and October 16, 2008, within the remaining 9,214 tranches that were not purchased by any of the Named Plaintiffs (collectively, "Category Three"). All claims arising from the Category Three certificates were dismissed or, as Plaintiffs believe, subject to dismissal based on this Court's prior rulings on standing and tolling in *Maine State*. Nearly all of the mezzanine tranches involved in the proposed Settlement are included in Category Three, and no class member ever sought to act as class representative for investors in this category. Judge Gertner and Plaintiffs believe that the Category Three class members are the least likely to recover because their claims have been, or would be, dismissed by the Court on standing and tolling grounds, and the Certificates in this category were not purchased by any of the Named Plaintiffs. Class Counsel also believes that certification would present an additional challenge to recovery for investors in Category Three due to their lack of tranche-based representation.

### 3.  Preliminary Approval of the Settlement

On June 25, 2013, Plaintiffs filed an unopposed motion seeking, *inter alia*, preliminary approval of the proposed settlement and certification of a class for settlement purposes only. On July 8, 2013, and by order of the Court, Plaintiffs submitted a memorandum in support of their request for 17 percent of the total settlement fund (or $85 million) in attorneys' fees. On July 10, 2013, the Court held a hearing on Plaintiffs' unopposed motion for preliminary approval of the settlement. Pursuant to the Court's instructions during the hearing, Plaintiffs submitted for the Court's approval a proposed letter to be sent to counsel of record who have filed individual actions on behalf of members in the settlement class. The proposed letter informs counsel for individual class members that their clients' claims may be released by the proposed settlement if they fail to opt out in a timely fashion. Plaintiffs also submitted for the Court's review a detailed explanation of the proposed plan of allocation and formula for calculating recognized losses as set forth in the notice.

The Court issued an order granting preliminary approval of the settlement on August 7, 2013, which, in relevant part, (1) certified a class under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure for settlement purposes only, (2) appointed the settlement class representatives and class counsel, (3) preliminarily approved the settlement, (4) approved the form and manner of notice to the settlement class, including the letter to be sent to counsel representing individual class members, and (5) entered a scheduling order for final settlement approval and a fairness hearing.

### 4. Objections and Final Settlement Hearing

Following the Court's preliminary approval order, the claims administrator mailed 52,883 copies of the settlement notice to potential class members. Plaintiffs' counsel received 117 requests for exclusion, of which 48 had previously filed "opt-out" actions. Two groups of class members, comprised of 37 entities, objected to the settlement. One group consists of the Federal Deposit Insurance Corporation ("FDIC") as receiver for 19 failed banks along with 16 Collateralized Debt Obligation entities and other institutional investors ("FDIC and CDO Objectors") which appear to have purchased a substantial portion of mezzanine certificates in Category Three. This group, represented by counsel from the law firm Grais & Ellsworth LLP, objected on the grounds that named Plaintiffs and their counsel cannot adequately represent the settlement class and the overall settlement amount of $500 million is neither fair nor adequate.

The second group of objectors consists of First National Bank & Trust Company of Rochelle and LL Funds LLC ("First National and LL Funds Objectors") represented by counsel from the Talcott Franklin firm. They object to the settlement on the grounds that (1) non-parties cannot be released for the claims asserted in the Settlement Actions, (2) the release is overly broad because it includes certain class members who will not receive consideration, and (3) class counsel fails to satisfy the typicality and adequacy requirements under Rule 23.

1    After reviewing the written objections, the Court held a fairness hearing as
2    scheduled in the settlement notice on October 28, 2013.  At the hearing, counsel for
3    Plaintiffs delivered a presentation regarding the fairness and adequacy of the
4    settlement and the reasonableness of the requested attorneys' fees.  Counsel for each
5    of the two groups of objectors also proffered arguments in opposition to the proposed
6    settlement.

7    ## III.   MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
8

9    Against this background, the Court turns to Plaintiffs' motion for certification
10   of a class for settlement purposes only and final approval of the proposed class action
11   settlement.   Although the Court previously certified a settlement class in the Order
12   Granting Preliminary Approval, two objectors now challenge certification.   In the
13   sections that follow, the Court details the reasons for certifying the settlement class
14   under Rule 23 and determines whether the proposed settlement is sufficiently "fair,
15   reasonable, and adequate" to warrant final approval.

16   **A. Legal Standard**

17   Rule 23 of the Federal Rules of Civil Procedure contemplates a two-step
18   process for settling class actions, requiring courts to "ratify both the propriety of the
19   certification and the fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938,
20   952 (9th Cir. 2003).  The proposed settlement class must first satisfy the traditional
21   numerosity, commonality, typicality, and adequacy requirements under Rule 23(a) of
22   the Federal Rules of Civil Procedure. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,
23   619-22 (1997).   Where, as here, the parties enter into a settlement agreement before
24   the Court has certified the class, the Court "must pay undiluted, even heightened,
25   attention to class certification requirements . . . ." *Hanlon v. Chrysler Corp.*, 150 F.3d
26   1011, 1019 (9th Cir. 1998); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848–49
27   (1999).   Assuming the proposed settlement class satisfies the class certification
28

1 requirements of Rule 23, courts then consider whether the proposed settlement is "fair,

2 reasonable, and adequate" so as to warrant final approval.  Fed. R. Civ. P. 23(e)(2).

3 **B. The Rule 23(a) Class Certification Requirements Are Satisfied**

4         Parties seeking certification of a class must satisfy two requirements under the

5 Federal Rules of Civil Procedure.  First, Rule 23(a) requires that (1) the proposed class

6 be sufficiently numerous; (2) there be at least one common question of fact or law; (3)

7 the named plaintiff's claims be typical of the class as a whole; and (4) the named

8 plaintiff adequately represent the class.  Second, a class action may be maintained

9 only if it meets one of the three criteria set forth in Rule 23(b).  Here, Plaintiffs seek

10 certification pursuant to Rule 23(b)(3), which allows for certification of a class where

11 "questions of law or fact common to the members of the class predominate over any

12 questions affecting only individual members, and that a class action is superior to

13 other available methods for the fair and efficient adjudication of the controversy."

14 Fed. R. Civ. P. 23(b)(3).  These general standards for class certification apply equally

15 to class action settlements, with one exception: courts in the context of a settlement

16 class "need not inquire whether the case, if tried, would present intractable

17 management problems[.]"  *Amchem*, 521 U.S. at 620.

18         **1. Numerosity**

19         Rule 23(a)(1) requires that the class be "so numerous that  joinder of all

20 members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "'Impracticability' does not

21 mean 'impossibility', but only the difficulty or inconvenience of joining all members

22 of the class." *Harris v. Palm Springs Alpine Estates, Inc*., 329 F.2d 909, 913–14 (9th

23 Cir. 1964).   Because the Settlement Actions cover more than 9,000 MBS tranches

24 comprising nearly 430 offerings, the proposed settlement class likely consists of

25 thousands of investors who purchased or otherwise acquired the securitizations at

26 issue here.  Indeed, the claims administrator sent over 52,000 copies of the settlement

27 notice to potential class members.  The numerosity standard is therefore satisfied

28 because it would not be practical to join all the class members in a single action.

## 2.  Commonality

Rule 23(a)(2) requires that the case involve "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  It is not necessary that members of the proposed class "share every fact in common or completely identical legal issues." *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010).  Rather, the "existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998).  The commonality requirement is satisfied only by a common question "of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011).

The Settlement Actions involve several common questions as to which their "determination of truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 131 S.Ct. at 2551.  Such common questions include whether Defendants violated the federal securities law and whether the registration statements and prospectus supplements misrepresented material facts about the mortgages underlying the securitizations at issue.  Because these questions can be addressed on a classwide basis, the commonality requirement is satisfied.

## 3.  Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Here, the Named Plaintiffs, like the other class members, purchased or otherwise acquired certificates issued in connection with the same offering documents.  The Named Plaintiffs and the class members share a common argument that these offering documents contain misrepresentations regarding Countrywide's underwriting practices.   The First National and LL Funds objectors contend that the claims of the named Plaintiffs are not typical of the claims in Category Three because the latter are

- 15 -

1  weaker from a legal standpoint than the claims in Category One and Category Two.

2  This, however, misapprehends the "permissive" typicality standard, which requires

3  "only that the representative's claims are reasonably co-extensive with those of absent

4  class members; they need not be substantially identical." *Rodriguez*, F.3d at 1124.

5  Moreover, although the claims in Category Three are deemed weaker than those in the

6  other categories, all class members, including the Named Plaintiffs, "have been

7  injured by the same course of conduct" in satisfaction of the typicality requirement

8  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  The Court is

9  therefore persuaded that the Named Plaintiffs' claims are typical of the claims in the

10  settlement class.

11       **4. Adequacy**

12       Adequacy of representation under Rule 23(a)(4) turns on whether "the named

13  plaintiffs and their counsel have any conflicts of interest with other class members"

14  and whether "the named plaintiffs and their counsel [will] prosecute the action

15  vigorously on behalf of the class[.]"   *Hanlon*, 150 F.3d at 1020.   As the

16  aforementioned procedural history amply shows, it is beyond serious dispute that

17  Class Counsel has vigorously prosecuted the Settlement Actions on both the state and

18  federal level over the last six years.  The FDIC and CDO Objectors, however, contend

19  that this Court's prior rulings on standing "disarmed the named plaintiffs" such that

20  they "ceased to be able to fairly and adequately protect the interests" of the class.

21  (*Maine State*, Dkt. No. 482.)  They further allege that class counsel had a material

22  conflict of interest with the majority of the class in accepting a settlement and not

23  appealing this Court's ruling on standing and tolling in *Maine State*.  These arguments

24  are unavailing.  Class counsel, on behalf of the entire class, consistently and zealously

25  argued that the *Maine State* decision was erroneous.  The *Luther* plaintiffs recently

26  argued in opposition to Defendants' motion to dismiss that they possess standing to

27  represent all 429 offerings at issue.  Nor is there any indication that the decision in

28  *Maine State* disincentivized class counsel from further prosecuting the claims of the

entire class in a zealous fashion. According to Class Counsel, certain Named Plaintiffs purchased certificates in Category Three, presumably incentivizing the largest possible recovery for certificates in that category.[5] Finally, the objectors' arguments attempt to capitalize on hindsight. At the time of the *Maine State* decision and thereafter, no class member, including the objectors, sought to prosecute the claims of Category Three. By all appearances, the advocacy of Class Counsel was the best possible chance of obtaining any recovery for the Category Three class members.

The objectors' allegation of a conflict of interest also fails to appreciate the structural assurances of fairness present in this settlement. *See Amchem*, 521 U.S. at 627 (requiring that there be "structural assurance of fair and adequate representation for the diverse groups and individuals affected" in a settlement). Judge Gertner assisted Plaintiffs in developing a plan of allocation that was fair to all class members, including those with claims based on Category Three certificates. Judge Gertner and Professor Eric Green each evaluated the plan of allocation and both independently concluded that it was fair to all class members. These cases, moreover, have been the subject of significant media attention over the last six years and have generated several notable state and federal court decisions. The putative class members, a majority of which are highly sophisticated investors, had ample opportunity to learn of this litigation, evaluate whether Named Plaintiffs adequately protected their rights, and pursue their own claims if desired. The Court therefore concludes that the Named

---

[5] Whether Named Plaintiffs actually purchased certificates in Category Three remains unsettled. In a supplemental explanation regarding the plan of allocation filed on July 23, 2013, Class Counsel represented that none of the Named Plaintiffs purchased certificates or tranches in Category Three. (*See Maine State*, Dkt. No. 414 at 5.) Judge Gertner, in supporting the plan of allocation, also appeared to be operating under the assumption that "none of these tranches were purchased by any of the named Plaintiffs in the Actions." (*Maine State*, Dkt. No. 460 at 5–6.) In a submission on October 21, 2013, however, Class Counsel defended objections to the plan of allocation on the ground that two Named Plaintiffs purchased certificates in Category Three. (*Maine State*, Dkt. No. 543 at 21.) This factual question is unsuitable for resolution here and, in any event, does not alter the fundamental fairness of the plan of allocation or adequacy of representation.

1  Plaintiffs and their counsel are adequate class representatives, thereby satisfying all

2  four requirements of Rule 23(a).

3  **C. The Rule 23(b)(3) Requirements are Satisfied**

4      Because Plaintiffs have satisfied the four prongs of Rule 23(a), the Court now

5  turns to the requirements of Rule 23(b)(3) that "questions of law or fact common to

6  class members predominate over any questions affecting only individual members,"

7  and "a class action is superior to other available methods for fairly and efficiently

8  adjudicating the controversy."  Plaintiffs have satisfied both of these requirements.

9  A number of common questions of law predominate.  The core inquiry in these

10 actions, as discussed under the commonality section above, is whether the prospectus

11 and registration statements contained material misstatements in violation of the

12 Securities Act.

13     With respect to the second element, superiority "requires determination of

14 whether the objectives of the particular class action procedure will be achieved in the

15 particular case," which "necessarily involves a comparative evaluation of alternative

16 mechanisms of dispute resolution."  *Hanlon*, 150 F.3d at 1023.  Among the pertinent

17 factors in assessing superiority are "the class members' interests in individually

18 controlling the prosecution or defense of separate actions" and "the likely difficulties

19 in managing a class action."  Fed. R. Civ. P. 23(b)(3).  The Court finds that a class

20 action is superior to other methods for adjudicating these claims.  But in doing so, the

21 Court notes that the inherent nature of MBS would likely pose significant case

22 management issues at trial.  As this Court has previously observed in requiring the

23 *Maine State* Plaintiffs to establish tranche-based standing:

24         The loans are unique within an MBS offering from loan group to loan
           group in the same way they are unique from offering to offering. In most
25         of the offerings, the senior tranches were backed by different groups of
           mortgage loans within the overall offering pool. In other words, the
26         potential cash flow to be distributed to one tranche would come from a
           specific subgroup of loans different from the subgroups that would fund
27         distributions to other tranches . . . . The variety in terms of type of loan
28

1
2
3
4
5

> products, length of the term, credit rating and interest rate, existed at the
> tranche level to allow each investor to choose the characteristics of the
> security that best matched its needs.   Some investors forwent the
> opportunity for a higher return and chose safer investments, such as the
> most senior tranches. Other investors decided the riskiest tranches met
> their needs.  In all cases, each tranche provided a different investment
> opportunity with unique characteristics.

6
7
8
9
10
11
12
13
14

*Me. State Ret. Sys.*, No. 2:10-cv-0302, 2011 WL 4389689, at *2 (C.D. Cal. May 5, 2011).  Even if a trial resolved common questions regarding misstatements in the offering documents, the unique qualities of each class members' security raises the prospect of significantly complex and individualized damage determinations.  The Supreme Court, however, has held that in the context of settlement-only class certification, "a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620 (internal citation omitted).  The Court is therefore satisfied that the proposed class settlement meets the superiority requirement under Rule 23(b)(3).

15
16
17
18

For the reasons set forth above, the proposed settlement class satisfies the class certification requirements of Rules 23(a) and 23(b)(3).  The Court therefore finds that certification of the proposed class should be granted for settlement purposes only under Rule 23.

19
**D. The Proposed Settlement is Fair, Reasonable, and Adequate**

20
21
22
23
24
25
26
27
28

Having determined that certification is appropriate, the Court next considers whether the proposed settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Settlements are afforded a presumption of fairness if (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.  4 William B. Rubenstein, Alba Conte, & Herbert B. Newberg, Newberg on Class Actions § 11.41 (4th ed. West 2013).  Here, the parties reached a settlement through the efforts of experienced counsel following two full-day

1    mediation sessions and various telephonic negotiations facilitated by Professor Eric
2    Green, a mediator with experience in resolving MBS class action disputes and other
3    complex litigation.  Further, Class Counsel obtained significant discovery at both the
4    state and federal level from Defendants prior to reaching this settlement, and there
5    were few objections and exclusions relative to the total size of the class.  The
6    proposed settlement is thus entitled to a presumption of fairness.

7          In determining whether a proposed settlement is "fair, reasonable, and
8    adequate" courts may consider the following factors where relevant:  (1) the strength
9    of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further
10   litigation; (3) the risk of maintaining class action status throughout trial; (4) the
11   amount offered in settlement; (5) the extent of discovery completed; (6) the
12   experience and views of counsel; (7) the presence of a governmental participant; (8)
13   the reaction of the class members to the proposed settlement; and (9) the absence of
14   collusion in the settlement procedure.  *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d
15   566, 575 (9th Cir. 2004).  Here, the relevant *Churchill* factors weigh in favor of final
16   approval.

17          **1.  The Strength of Plaintiffs' Case**

18          The first of the *Churchill* factors considers Plaintiffs' likelihood of success on
19   the merits compared to the proposed settlement amount.  *See Rodriguez v. West Publ'g*
20   *Corp.*, 563 F.3d 948, 964–65 (9th Cir.2009); *see also* 5 *Moore Federal Practice,* §
21   23.85[2][b] (Matthew Bender 3d. ed.) ("An important consideration in judging the
22   reasonableness of a settlement is the strength of the plaintiffs' case on the merits
23   balanced against the amount offered in the settlement.").  In assessing the strength of
24   the Settlement Actions, the Court need not "reach any ultimate conclusions on the
25   contested issues of fact and law which underlie the merits of the dispute, for it is the
26   very uncertainty of the outcome in litigation and avoidance of wasteful and expensive
27   litigation that induce consensual settlements."  *Officers for Justice v. Civil Service*
28   *Comm'n of the City and County of San Francisco,* 688 F.2d 615, 625 (9th Cir. 1982).

1    Plaintiffs readily acknowledge several legal difficulties in continued

2    prosecution of the Settlement Actions.  This Court's decision in *Maine State*, if

3    applied, would in Plaintiffs' estimation reduce the number of certificates at issue to 58

4    "live" tranches from over 9,000 tranches upon which Plaintiffs originally sued.

5    Further affecting the strength of these cases is this Court's ruling in *Strategic Capital*.

6    There, the Court held that state-filed class actions cannot toll the statute of limitations

7    in federal court.  Plaintiffs believe that *Strategic Capital*, if applied, would effectively

8    cause dismissal of all remaining tranches in *Maine State* and *Western Teamsters*.

9    Plaintiffs would also encounter challenges with respect to damages and loss

10   causation.   Defendants would likely contend that any declines in the value of the

11   certificates at issue are the result of broad, macroeconomic forces and not any

12   actionable misstatements or omissions in the Offering Documents.  According to

13   Defendants, real estate prices fell significantly across the United States beginning in

14   2007, causing the largest national decline in home prices since the Great Depression.

15   During this period, the credit and capital markets in the United States (including the

16   secondary market on which MBS are traded) seized up, and demand for MBS all but

17   disappeared.  Defendants would likely argue that frozen markets were not unique to

18   the United States but occurred in markets both domestically and abroad in which

19   Countrywide did not operate or sell securities.  The parties acknowledge that the

20   claims upon which Plaintiffs sue allow Defendants to argue that the market for MBS

21   froze and values declined because investors panicked in the wake of the broader crisis

22   in the housing and credit markets and not because of alleged misstatements or

23   omissions in the MBS offering materials at issue.

24   Yet, despite significant problems affecting the value of the Settlement Actions,

25   the FDIC and CDO Objectors contend that $500 million is not enough.  They assert

26   that the settlement amount is low compared to other MBS class actions in terms of the

27   original face value of the MBS certificates involved in those class actions. As an

28   initial matter, the Court questions whether such a comparison is useful in assessing the

1   fairness of MBS settlements.   Loss in terms of original face value overlooks

2   certificates that still yield (and likely will yield for quite some time) payments to their

3   investors.   Moreover, any comparison in settlement values is meaningless without

4   considering the relative strengths, weaknesses, and risks involved in the instant cases

5   with those present in other MBS class actions.   In view of the significant legal

6   obstacles affecting the strength of the Settlement Actions, the Court finds that this

7   factor weighs in favor of approval.

8       **2. The Risk, Expense, Complexity, and Likely Duration of Further**

9          **Litigation**

10      The second *Churchill* factor balances the "risk, expense, complexity, and likely

11  duration of further litigation" against the immediate recovery available through

12  settlement.   *Churchill,* 361 F.3d at 575.   "In most situations, unless the settlement is

13  clearly inadequate, its acceptance and approval are preferable to lengthy and

14  expensive litigation with uncertain results."   4 A. Conte & H. Newberg, *Newberg on*

15  *Class Actions*, Section 11:50 at 155 (4th ed. 2002).   The Settlement Actions have been

16  litigated for more than six years at the state and federal level by sophisticated and

17  experienced counsel on both sides.   Without a settlement, these cases would continue

18  indefinitely, resulting in significant risks to recovery and continued litigation costs.

19      It is difficult to understate the risks to recovery if litigation had continued.   The

20  Chief Risk Officer for Bank of America Corporation, Countrywide's parent entity, has

21  recently testified in the $8.5 billion *Bank of New York Mellon* settlement proceedings

22  that putting Countrywide into bankruptcy remains a possibility.   (*See* Burkholz Decl.,

23  Ex. B at 717:10–18, 719:8–17 (citing June 10, 2013 testimony of Terry Laughlin,

24  Chief Risk Officer for Bank of America) (Dkt. No. 281-2.) ("One of the options that

25  was available to us, and continues to be available to us, is to put Countrywide into

26  bankruptcy.").)   Further compounding the uncertainty associated with bankruptcy, in

27  several different orders the Court has dismissed with prejudice Plaintiffs' successor-

28  in-interest claims against Bank of America for the acts or omissions of Countrywide

- 22 -

1    prior to Bank of America's acquisition of Countrywide.  As a result, only the assets of

2    Countrywide, and not Bank of America, could satisfy a judgment in these cases,

3    leaving Plaintiffs to fight with Countrywide's other creditors for an uncertain portion

4    of the bankrupt estate.   Even without bankruptcy it remains unclear whether

5    Countrywide's assets are sufficient to cover its accumulated liabilities.

6          Beyond mounting financial risks that may jeopardize a future recovery,

7    settlement avoids major uncertainties on appeal.  Prior to obtaining any recovery on

8    claims in *Maine State* and *Western Conference*, the parties have acknowledged that

9    the Ninth Circuit must resolve three discrete questions in Plaintiffs' favor.  First, the

10   Ninth Circuit must decide that Plaintiffs have standing under both Article III of the

11   U.S. Constitution and the Securities Act of 1933 to assert claims relating to

12   certificates that Plaintiffs did not actually purchase.  The Court of Appeals for the

13   Second Circuit has granted "class standing" as to any certificates backed by loans

14   from the same originator that backed the named plaintiff's certificates.  *NECA-IBEW*

15   *Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012).  This

16   Court, however, has thoroughly considered and reluctantly rejected the Second

17   Circuit's reasoning.  *See Strategic Capital.*, 2012 WL 5900973, at *9–12 (Nov. 21,

18   2012).  Second, the Ninth Circuit must decide that the filing of *Luther* in state court

19   triggers *American Pipe* tolling for actions filed in federal court.  Finally, assuming that

20   *Luther* can toll federal suits, the Ninth Circuit must conclude that tolling applies to

21   other tranches unrelated to the ones the *Luther* plaintiffs purchased.  In sum, an

22   immediate cash payout that avoids the risks and expenses associated with bankruptcy,

23   protracted litigation, appellate review, and several legal challenges militates in favor

24   of final approval.

25          **3.  The Risk of Maintaining Class Action Status Throughout Trial**

26          The parties in *Maine State* stipulated to a class shortly before settling, but the

27   suitability of class action status has never been fully litigated by the parties.  As

28   discussed above, however, the individualized nature of MBS poses significant case

1    management issues at trial, potentially jeopardizing Plaintiffs' ability to maintain class

2    action status throughout trial.  This factor, therefore, supports final approval of the

3    settlement.

4         **4.  The Amount Offered in Settlement**

5         A "settlement should stand or fall on the adequacy of its terms."  *In re*

6    *Corrugated Container Antitrust Litig*., 643 F.2d 195, 211 (5th Cir. 1981).  The Court

7    examines "the complete package taken as a whole, rather than the individual

8    component parts," to determine whether the proposal is fair.  *Officers for Justice* 688

9    F.2d at 628.  "The fact that a proposed settlement may only amount to a fraction of the

10   potential recovery does not, in and of itself, mean that the proposed settlement is

11   grossly inadequate and should be disapproved."  *Linney v. Cellular Alaska P'ship*, 151

12   F.3d 1234, 1242 (9th Cir.1998).   Here, the proposed $500 million settlement

13   represents one of the 25 largest securities class action settlements and largest MBS

14   class action settlements to date.[6]  Indeed, this settlement easily surpasses the next

15   largest $315 million MBS settlement reached in *Public Employees' Retirement System*

16   *of Mississippi v. Merrill Lynch & Co., Inc.*, No. 1:08-cv-10841-JSR-JLC (S.D.N.Y.)

17   Given the risk and uncertainty of continued litigation in the hopes of obtaining a larger

18   recovery, the proposed settlement amount weighs in favor of final approval.

19        **5.  The Extent of Discovery Completed and the Stage of the Proceedings**

20        The amount of discovery completed indicates whether the parties had an

21   "adequate opportunity to assess the pros and cons of settlement and further litigation."

22   *In re Cylink Sec. Litig.*, 274 F. Supp. 2d 1109, 1112 (N.D. Cal. 2003).  Here, the

23   parties have benefited from sufficient discovery over the last six years to adequately

24   assess the relative strengths and weaknesses of their respective positions.

25   Specifically, on February 22, 2012 and April 4, 2012, Defendants in *Luther* produced

26

27   [6] *See* Securities Class Action Services, *The SCAS TOP 100 Settlements Semi-Annual
     Report* (Institutional Shareholder Services, Inc., July 1, 2013), *available at*
28   http://www.issgovernance.com/scas100_1H2013.

1    to Plaintiffs all documents they had previously produced in the *In re Countrywide*

2    *Financial Corp. Securities Litigation*, No. 07-cv-05295-MRP (MANx) (C.D. Cal.)

3    action, which was overseen by this Court.  Moreover, throughout July and August

4    2011, the parties in *Maine State* engaged in discovery related to class certification.

5    Pursuant to the parties' discovery plan in *Maine State*, the parties conducted merits-

6    based discovery throughout 2012, which included third-party document discovery and

7    several depositions.  Addition discovery occurred in connection with the mediation

8    sessions leading to settlement.  With the assistance of Professor Green, the parties

9    reached an agreement which allowed for the production of nearly 10 million pages of

10   documents that had been previously produced to the Securities and Exchange

11   Commission.  This production better enabled the *Luther* Plaintiffs to assess in detail

12   the strengths and risks associated with continued litigation.  Accordingly, this factor

13   weighs in favor of granting final approval.

14        **6.  The Experience and Views of Counsel**

15        In reviewing a settlement for final approval, courts accord "great weight" to the

16   recommendation of counsel.  *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104,

17   125 (S.D.N.Y. 1997).  Counsel "are most closely acquainted with the facts of the

18   underlying litigation" and are therefore in an ideal position to assess the fairness of the

19   settlement offer.  *Id.*; *see also Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir.

20   1995) ("Parties represented by competent counsel are better positioned than courts to

21   produce a settlement that fairly reflects each party's expected outcome in the

22   litigation.").  The expertise and capabilities of counsel on both sides are beyond

23   reasonable dispute.  In their stipulation and settlement agreement, counsel on both

24   sides explain in detail their efforts in litigating and ultimately settling these actions,

25   their reasons for reaching a settlement, and the legal and practical obstacles associated

26   with continued litigation.  Further, Plaintiffs' Counsel—as well as the Named

27   Plaintiffs, a majority of which are sophisticated institutional investors—fully support

28   the proposed Settlement.  It is their opinion that, in light of the risks associated with

1    pursuing these cases through trial, as well as the risks, uncertainties, and delays

2    presented by further litigation, the proposed Settlement is fair, reasonable, and

3    adequate.  The Court therefore finds that this factor supports final approval.

4        **7.  The Reaction of the Class Members to the Proposed Settlement**

5        The Court next turns to the class members' reaction to the proposed Settlement.

6    In assessing the reaction of the class, courts have considered (1) the views of the class

7    representatives, *see, e.g.*, *Nat'l Rural Telecom. Coop.*, 221 F.R.D. at 528; (2) the

8    number of requests for exclusion or opt-outs compared with the total number of

9    members in the class, *see, e.g.*, *White v. Experian Info. Solutions, Inc.*, 803 F. Supp.

10   2d 1086, 1099–1100 (C.D. Cal. 2011); and (3) the "number and vociferousness of the

11   objectors," *see, e.g.*, *True v. American Honda Motor Co.*, 749 F. Supp. 1052, 1078

12   (C.D. Cal. 2010) (quotation omitted).  The Court finds that all three of these

13   considerations support final approval.

14       Courts afford special weight to the opinions of class representatives because

15   their "views may be important in shaping the agreement" and they "may have a better

16   understanding of the case than most members of the class."  *Nat'l Rural Telecom.

17   Coop.*, 221 F.R.D. at 528.  Here, two class representatives—Pension Trust Fund for

18   Operating Engineers/Operating Engineers Annuity Plan and Vermont Pension

19   Investment Committee—attended and participated in the mediation sessions leading to

20   the proposed Settlement.  These two class representatives, as well as the other class

21   representatives, have attested to understanding and supporting the terms of the

22   proposed Settlement.

23       In addition to the reaction of the class representatives, courts consider the

24   number of opt-outs or exclusions compared to the size of the class as a whole.  Here,

25   the claims administrator mailed 52,883 copies of the notice to potential class members

26   and received only 117 requests for exclusion on behalf of 439 persons or entities.  Of

27   the 117 total requests for exclusion, 48 are previously filed individual opt-out actions,

28   leaving only 69 requests for exclusion in response to the settlement notice.

- 26 -

1  Proportionally, the number of exclusions represents only a small fraction of the class

2  members.

3         Finally, "courts look to the number and vociferousness of the objectors." *Am.*

4  *Honda Motor Co.*, 749 F. Supp. at 1078 (quoting *In re Gen. Motors Corp. Pick–Up*

5  *Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 812 (3rd Cir. 1995)). "However,

6  a combination of observations about the practical realities of class actions has led a

7  number of courts to be considerably more cautious about inferring support from a

8  small number of objectors to a sophisticated settlement." *In re GMC Pick–Up Litig.*,

9  55 F.3d at 812 (citation omitted). Here, only two groups of investors, comprising a

10 total of 37 entities, filed objections. Again, of the 52,883 potential members in this

11 class, 37 objectors constitute only a minor fraction of the class. Indeed, the number of

12 objectors in this case appears even less significant in light of the fact that 35 of the 37

13 objectors are represented by a single law firm. Courts, moreover, have approved

14 settlements involving classes of similar size when more individuals objected or opted

15 out. *See, e.g.*, *Churchill*, 361 F.3d at 577 (approving a settlement where "only 45 of

16 the approximately 90,000 [.005 percent] notified class members objected to the

17 settlement" and 500 [0.6 percent] members opted out). The Court therefore finds that

18 this factor supports approval of the proposed Settlement.

19     **8. Remaining Objections**

20        Perhaps more important than the quantity of the objectors is the substance of

21 their objections. The Court has carefully considered and rejected each of the

22 objectors' arguments—presented in written submissions and at the fairness hearing—

23 as ultimately lacking a basis in fact and law. Where relevant, this Order has addressed

24 several of those objections already. But before concluding, the Court addresses two

25 additional objections that merit brief consideration.

26        First, the objectors criticize the plan of allocation for distributing settlement

27 proceeds to different subgroups based on the strength of their claims. In particular,

28 they contend that the allocation of only $50 million (or 10 percent of the gross

settlement fund) to the Category Three class members, which encompasses the vast majority of the settlement class, is inadequate.  Like the other components of the proposed Settlement, the plan of allocation must be fair, reasonable, and adequate to warrant final approval.  *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284–85 (9th Cir.1992).  That a plan of allocation distributes proceeds based on the relative strength and weaknesses of a claim does not, in itself, render a proposed settlement unfair.  *See, e.g.*, *In re Omnivision Tech., Inc.*, 599 F. Supp. 2d 1036, 1045 (C.D. Cal. 2008) ("It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits."); *In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 WL 1594403, at *11 (C.D. Cal. June 10, 2005) ("A plan of allocation . . . fairly treats class members by awarding a pro rata share to every Authorized Clamant, [even as it] sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue.") (quotation omitted).

Fatal to the objectors' argument, however, is the fact that they never adequately explain why the Category Three class members should receiver a larger share of the settlement proceeds based on the strengths of their claims.  The stars must align for this category to obtain any recovery beyond what the proposed Settlement immediately offers: they must prevail—without exception—on at least three discrete issues before the Ninth Circuit, they must withstand challenges from Defendants regarding loss causation and damages, and they must hope that Countrywide avoids bankruptcy or insolvency during the pendency of the litigation.  This, of course, is preliminary to trial, which presents another set of obstacles towards recovery.  Indeed, in light of these challenges, it is remarkable that the Category Three class members will obtain any recovery at all.

Citing the Supreme Court's decision in *Amchem*, the objectors next contend that, because the class representatives have a conflict of interest with other members of the class, Class Counsel cannot simultaneously represent  the interests of Category

One, Category Two, and Category Three.  Rather, each category should be designated as a subclass with its own appointed subclass counsel.  The Court finds no support for such an argument.  It is true that distinct subgroups in a settlement class require individual named representatives.  *Amchem*, 521 U.S. at 627–28.  But not every distinction among class members requires the creation of a subclass.  *Shaffer v. Continental Cas. Co*., 362 Fed. Appx. 627, 630–31 (9th Cir. 2010) (explaining that "the fact that it is possible to draw a line between categories of class members" does not necessarily mean that subclasses are required under *Amchem*); *see also Staton v. Boeing Co.*, 327 F.3d 938, 958 (9th Cir. 2003) (finding adequate class representation even though the class contained both supervisors and rank-and-file employees).  Indeed, if every difference among class members "required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair."  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers v. GMC*, 497 F.3d 615, 629 (6th Cir. 2007).  Instead, subclasses are necessary where "differences between class members would [] affect the adequacy of representation."  *Shaffer*, 362 Fed. Appx. at 627.  As discussed above, nothing in the settlement history or the terms of the proposed Settlement calls into question the adequacy of Plaintiffs' Counsel in representing the class.

In sum, after considering the terms of the proposed Settlement, the Court finds that it is fair, reasonable, and adequate.  Further litigation would involve significant risk and expense.  The amount offered in the proposed Settlement appears reasonable, and the parties settled these actions after sufficient discovery to evaluate the merits of the class members' claims.

## IV.   MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

Plaintiffs' Counsel has requested that the Court approve a fee of 17 percent of the gross settlement fund—*i.e.*, $85,000,000—plus reimbursement for litigation expenses in the amount of $2,977,145.  Plaintiffs' Counsel argue that the fee is

- 29 -

1  appropriate based on the complexity of litigation, the favorable result achieved, the

2  normal fees for similar complex cases, and the risks involved.  While the objectors

3  and Defendants do not appear to oppose the request for attorneys' fee, "the district

4  court [has] the authority and duty to pass upon the fairness of the attorneys' fees

5  settlement independently of whether there [is] objection."  *Zucker v. Occidental*

6  *Petroleum Corp.*, 192 F.3d 1323, 1329 (9th Cir. 1999).  For the reasons discussed

7  below, the Court finds that the requested award of attorneys' fees merits approval.

8  **A. Legal Standard**

9       In assessing the reasonableness of attorneys' fees, "the district court has

10  discretion in common fund cases to choose either the percentage-of-the-fund or the

11  lodestar method."  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002)

12  (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295–96 (9th

13  Cir. 1994)).  Under the percentage-of-recovery method, the prevailing attorneys are

14  awarded a percentage of the common fund recovered for the class.  *Id*.  In applying

15  this method, courts typically set a benchmark of 25 percent of the fund as a reasonable

16  fee award, and justify any increase or decrease from this amount based on

17  circumstances in the record.  *Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d

18  1301, 1311 (9th Cir. 1990).  This calculation should apply where, as here, Plaintiffs'

19  Counsel will be paid from the compensation made available to class members.  *See*

20  *Williams v. MGM–Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997).

21  **B.  The Requested Fee is Reasonable Under the Percentage-of-Recovery Method**

22       Because the proposed Settlement involves compensation from a gross

23  settlement fund, the Court finds that the percentage-of-recovery method, as opposed to

24  the lodestar method, for determining attorneys' fees is appropriate.  The Ninth Circuit

25  has approved a number of factors which may be relevant to the district court's

26  determination of reasonable attorneys' fees, including: (1) the results achieved; (2) the

27  risk of litigation; (3) the skill required and the quality of work; (4) the contingent

28  nature of the fee and the financial burden carried by the plaintiffs; and (5) awards

- 30 -

1   made in similar cases. *Vizcaino*, 290 F.3d at 1048–50. Unsurprisingly, many of these

2   factors parallel the same considerations when evaluating the adequacy of a proposed

3   settlement. Because the first three factors have already been analyzed at length in

4   other sections of this Order, the Court briefly addresses the last two factors, both of

5   which support the requested award for attorneys' fees.

6          First, as the procedural history in the Settlement Actions readily demonstrates,

7   Plaintiffs' Counsel have over the last six years persisted through numerous adverse

8   rulings at both the state and federal levels and litigated issues of first impression in the

9   Ninth Circuit and in California state court to maintain the viability of their claims.

10  During this time, Plaintiffs' Counsel expended considerable resources on discovery

11  requests and motion practice. Because the fees in the Settlement Actions were

12  entirely contingent, Plaintiffs' Counsel faced the continual possibility of obtaining no

13  payout even after incurring significant expense. Thus, in light of the contingent nature

14  of any reward from these cases, coupled with the financial burdens attendant to

15  litigating these cases, a 17 percent fee is reasonable.

16         An award of 17 percent of the gross settlement fund also accords with other

17  MBS settlements. In the *Merrill Lynch* MBS settlement, the court awarded counsel a

18  fee of 17 percent of the $325 million settlement fund after less than three years of

19  litigation. *Public Employees' Retirement System of Mississippi v. Merrill Lynch &*

20  *Co. Inc.*, No. 1:08-cv-10841-JSR-JLC, slip op. (S.D.N.Y. May 8, 2012). Similarly, in

21  *Wells Fargo*, the court awarded a fee of 19.75 percent after approximately two years

22  of litigation. *In re Wells Fargo Mortg.-Backed Certificates Litig.*, No. 09-cv-1376-

23  LHK, slip op. (N.D. Cal. Nov. 14, 2011). Here, Plaintiffs' Counsel obtained a

24  substantially larger settlement in more protracted proceedings. The requested fee is

25  therefore comparable with fee awards in similar MBS class action suits.

26         After careful consideration of the aforementioned factors, the Court finds that

27  17 percent of the gross settlement fund (or $85 million) for attorneys' fees is

28

1  reasonable and therefore grants the requested fee award.  The Court also awards

2  Plaintiffs' Counsel $2,977,145 as reimbursement for litigation expenses.

3  <center>**V.   CONCLUSION**</center>

4   For the reasons set forth above, the Court hereby:[7]

5      1. **GRANTS** certification of the settlement class;

6      2. **GRANTS** final settlement approval;

7      3. **APPROVES** the plan of allocation of settlement proceeds;

8      4. **GRANTS** the request for attorneys' fees and expenses; and

9      5. **OVERRULES** all objections to the settlement.

10

11      **IT IS SO ORDERED.**

12

13  DATED:  December 5, 2013      _____

14                               THE HONORABLE MARIANA R. PFAELZER
                                 UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27  _____

[7] The parties may file additional motions with the Court if further orders are needed to

28  effectuate this Settlement.

<center>- 32 -</center>